UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANICE C. AMARA, individually | : | CIVIL ACTION NO. |
| and on behalf of others similarly | : | 3:01-CV-2361 (DJS) |
| situated, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CIGNA CORP. AND CIGNA | : | |
| PENSION PLAN, | : | |
| | : | |
| Defendants. | : | JULY 9, 2004 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>MOTION TO DECERTIFY CLASS</u>**

**Introduction**

As part of a staff reduction within CIGNA's Retirement & Investment Services division, Janice Amara's employment was terminated on October 17, 2003. Her acceptance of severance benefits at that time does not make her an inadequate class representative. The standard release which she, and presumably hundreds or thousands of other class members, signed is no defense to this action because it contains an express exception for "<u>any claims for benefits under any retirement ... programs</u>." While a unique defense of release can, under certain circumstances, make a named representative atypical, the Court has broad discretion to determine that a frivolous and at best colorable claim, which a Defendant is using to manufacture a ground for decertification, is an insufficient basis for replacing a class representative.

If the named representative was no longer typical, moreover, the alternative would not be to "decertify" the class but to invite the intervention of another class member. See, e.g., <u>Manual for Complex Litigation, Fourth</u>, §21.26[1]; <u>Robinson v. Metro-North Commuter R.R.</u>, 267 F.3d 147, 171 (2d Cir. 2001); <u>Birmingham Steel Corp. v. TVA</u>, 353 F.3d 1331, 1339-40 (11th Cir. 2003). Numerous class members have been identified as a result of discovery and news articles who could step forward to serve as a named representative. But there is no need for this because the named Plaintiff is a more than capable representative of the class, whose qualifications and pension records have already been thoroughly reviewed. CIGNA's effort to displace her lacks merit.

**1.    CIGNA's Release Expressly Excepts Any Claims for Retirement Benefits.**

On October 17, 2003, Amara's employment at CIGNA was "voluntarily" terminated as part of a staff reduction plan. The staff reduction plan offered severance pay, but in exchange for the severance pay, CIGNA requested that Amara sign a standard "Agreement and Release" which contains the following language (Exhibit A):

5.    **Your Release of Claims**
   a.    You agree that you will not file (or ask or let anyone file for you) any charge, complaint, claim or lawsuit of any kind in connection with any claim released by this Agreement against any Released Person. ...
         * * *
   d.    "Released Persons" are the Company, its predecessors, successors, parents, subsidiaries and affiliates, and all of their directors, officers, agents and employees.
   e.    "Claims" are any and all claims, demands and causes of action of whatever kind, including any claims for attorney's fees, that you now have, or at any time had, against any Released Persons, **but only to the extent they arise out of or relate in any way to your employment or termination of employment with the Company and its affiliates**. "Claims" includes things you may not even know about or suspect as well as any claims you may have under ADEA.
   f.    "**Claims does not include (and you are not releasing):**
         * * *

_____

[1]    Section 30.16 in the Third Edition of the <u>Manual for Complex Litigation</u>.

(2)    **any claims for benefits under any retirement, savings or other employee benefit programs** (but your Release does not cover any claims you may make for severance benefits beyond those described and referred to in this Agreement).

The foremost reason this Agreement, which CIGNA unilaterally drafted, does not release the claims that are the subject of this class action is because it explicitly provides that **"'Claims' does not include (and you are not releasing):  … any claims for benefits under any retirement, savings, or other employee benefit programs…."** Id. Supporting that provision, the list of "Released Persons" does not include the Defendant CIGNA Pension Plan. The omission of the CIGNA Pension Plan doubtless reflects that the Agreement is concerned with employment actions, not claims for retirement or other benefits (other than additional "severance benefits"). Reinforcing that point, the definition of "Claims" includes any and all claims "**but only to the extent they arise out of or relate in any way to your employment or termination of employment with the Company and its affiliates**." If needed, there are still more reasons for concluding that the release that Amara signed for severance pay does not release her claims here. For example, the release covers future actions ("you will not file"), whereas Amara filed her suit nearly two years before.[2]  In addition, Amara's waiver can, by no stretch of the imagination, be considered "knowing" as is required for a release of ERISA rights to be effective. Laniok v. Brainerd Mfg., Pension Plan, 935 F.2d 1360, 1367-68 (2d Cir. 1991). Amara read the language of the severance pay agreement, as did class counsel, and saw that it plainly excepts "any claims for benefits under any retirement ... programs."  The Second Circuit has held that a release of

---

[2]    In Section 13, the employee agrees to return the severance benefits "within thirty (30) days of the start of [any] legal action" that is covered by the release. This provision is obviously not drafted to cover a legal action filed close to two years before the Agreement was signed. If it covered such actions, the severance benefits would simply not be paid.

"any claim to benefits under the pension plan" includes "any ERISA-based cause of action" for benefits. Finz v. Schlesinger, 957 F.2d 78, 83 (2d Cir. 1992), cert. denied, 506 U.S. 822 (1992). Perforce, an express exception that saves "any claims for benefits under any retirement ... programs" must preserve "any ERISA-based cause of action for benefits under any retirement ... programs."

CIGNA's only discussion of the clear exception for benefit claims appears in an almost casual footnote at the beginning of the brief in which CIGNA asserts that Amara's "claims in this lawsuit are not "claims for benefits under" the Plan," but are for "monies in addition to the benefits provided under the Plan." CIGNA Br. at 2 n.1 (emph. in orig.). The distinction CIGNA draws is expressed nowhere in the Agreement and it is legally unsupportable. As CIGNA and its counsel well know, ERISA does not allow participants to recover "monies in addition to" benefits under the Plan. See, e.g., Great-West Life & Annuity Ins. v. Knudson, 534 U.S. 204, 210-12 (2002).[3]  Accordingly, Amara has sought  "appropriate equitable relief" including an equitable order directing that her benefits be paid under the plan in conformity with ERISA. See, e.g., Great-West, supra, 534 U.S. at 212 (distinguishing "an injunction to correct the method of calculating payments" from monetary relief). CIGNA tries to lend credence to an unsupportable distinction, moreover, by a misleading and unacceptable device: omitting a key word from a quotation. Twice CIGNA refers to the exception in the release as covering "claims for benefits" dropping the word "any" in both places. Br. at 2 n.1. CIGNA's effort to withdraw some claims from the scope of "any claims for benefits" by omitting part of the quote falls flat for two

---

[3]     CIGNA was aware of this before the class was certified. In arguing against certification, CIGNA wrote: "In this case, by statute, Plaintiff (and putative class members) could only recover "appropriate equitable relief"–not damages–on any of the claims asserted in the Complaint." Opp. Br. filed June 7, 2002, at 8-10 (citing Great-West). CIGNA then argued that the certification was unnecessary because it had a fiduciary duty to afford appropriate

reasons. First, it intentionally disregards the plain language. Second, it ignores that a reading of the exception that is inconsistent with the plain language can hardly form the basis for a "knowing" release.

The Second Circuit's decision in <u>Finz v. Schlesinger</u> that any claim for benefits includes "any ERISA-based cause of action" is consistent with other decisions. In <u>May Department Stores v. Federal Insurance</u>, 305 F.3d 597, 600-601 (7th Cir. 2002), the Seventh Circuit addressed an insurance policy covering breaches of fiduciary duty which excluded, as many such policies do, "benefits due or to become due under the terms of a Benefit Program." May Department Stores argued that the insurer should have to pay for classwide ERISA claims for statutory violations (which resulted in a $25 million settlement) and that the exclusion should <u>not</u> apply. The Seventh Circuit rejected May's argument, finding that "the benefits sought were plan benefits; the question was how to compute them. The answer was given by ERISA, but that is just to say that, like many other contracts, pension plans governed by ERISA contain provisions implied by law."

In <u>Sokolowski v. Aetna Life & Casualty</u>, 1986 U.S. Dist. LEXIS 21721 at *12 (S.D.N.Y. Aug. 11, 1986), a class action and a related individual action were brought against the Masters Mates & Pilots Pension Plan for breaches of fiduciary duty in adopting certain plan amendments and giving inadequate notice of the new rules. The cases resulted in additional benefits. As with the insurance policy in the May Department Stores case, the Plan had a fiduciary liability policy that excluded "benefits due or to become due under the terms of the Trust or Plan." The Southern District of New York held that the insurer was not required to reimburse the Plan for the Court-

---

equitable relief to all participants, should it be held to be in violation of any law. The Court discussed this argument on page 5 of the December 20, 2002 Slip Opinion certifying the class.

ordered benefits because "as later construed by the courts, the Trustees of the Plan were required to grant benefits."

CIGNA's initial footnote portends a later effort to explain how CIGNA can avoid this clear exception. See Br. at 2 n.1 ("As explained herein..."). But none is offered  – other than CIGNA's indirect characterization of its own argument as a "arguable" or "colorable" one. CIGNA Br. at 5. As a result, CIGNA's affirmative defense is never actually supported in the motion and should not be considered. See e.g.  Berger v. Xerox, 2001 U.S. Dist. LEXIS 10222 *6 (S.D. Ill. 2001) ("Because the Court finds that the release Berger signed does not bar his claim, it is clear that 'a major focus of the litigation will not be on this defense'").

## 2.     Amara Remains a Typical and Adequate Class Representative Even if the Court Accepted that CIGNA Has a "Colorable" Claim.

Even if the Court were to accept CIGNA's release defense as a "colorable" one, Amara continues to possess a typical claim and be an adequate class representative. In Wagner v. Nutrasweet Co., 95 F.3d 527 (7th Cir. 1996), the Seventh Circuit considered the issue of class certification in a discrimination case where the class representatives had signed general releases, and the District Court refused to certify the class on that basis. Id. at 530-31.  The Court of Appeals instructed the District Court not to allow the releases to pose insurmountable obstacles to class certification:

> The court on remand may well conclude that Wagner satisfies the four criteria of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *We note only that the court's concern with NutraSweet's defense based on the releases went too far. Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members*.

Id.  at 534 (emphasis added). The Seventh Circuit decided Wagner approximately four months after the Northern District of Illinois decided Mathews v. Sears, 1996 U.S. Dist. LEXIS 5357

(N.D. Ill. April 23, 1996), one of the cases on which CIGNA principally relies. See CIGNA Br. at 8.  <u>Wagner</u> plainly means that <u>Mathews'</u> "concern with [the] defense based on the release... went too far," and that the release part of <u>Mathews'</u> analysis was superseded by the Appeals Court's views.[4]

In <u>Bittinger v. Tecumseh Products Co.</u>, 123 F.3d 877, 884-85 (6th Cir. 1997) the Sixth Circuit considered a release defense in an ERISA class action where some class members signed releases and others didn't. <u>Id</u>. at 884. The company argued that the releases signed by the class representatives created "atypical" or "varied" defenses. The Appeals Court declared that while the District Court had the option to create subclasses for those who signed releases and those who did not, the subclasses were not required in order to certify the class. And, most important, citing the "broad discretion" in certifying the class, the Court held that the difference between signers and non-signers was "not enough to justify rejection of class certification." <u>Id</u>.; <u>see also</u>, <u>Wells v. Allstate Ins. Co.</u>, 210 F.R.D. 1, 8 (D.D.C. 2002) ("Although Wells executed a unique release to specifically preserve her class claims, the existence of general releases does not disqualify a class under Rule 23 (a)(3)").

The adequacy and typicality of a class representative's claims are matters committed to the "sound discretion" of the district court. <u>Rossini v. Ogilvy & Mather, Inc.</u>, 798 F.2d 590, 594 (2d Cir. 1986); <u>Malchman v. Davis</u>, 761 F.2d 893, 899 (2d Cir. 1985). As these precedents show,

---

[4]      Following <u>Wagner</u> several decisions in the Seventh Circuit have ruled that a release defense unique to a class representative need not overwhelm class action litigation or make an otherwise appropriate class action certification inappropriate.  <u>Ramirez v. Nutrasweet</u>, 1996 U.S. Dist. LEXIS 13462 *7-*8 (N.D. Ill. 1996) ("Because the 'release' defense is neither unique nor dominant over the Plaintiffs' claims, Defendant's objection is overruled"); <u>Gaspar v. Linvatec</u>, 167 F.R.D. 51, 57-58 (E.D. Ill. 1996) ("The court finds that the defenses of release, tender, and laches...do not threaten to become primary issues in the case such that Gaspare's representation of the class would suffer."); <u>Berger v. Xerox</u>, supra, 2001 U.S. Dist. LEXIS 10222 at *6.

the district court is not compelled to find that a colorable claim of release (if this one even rises to that level) makes a named representative atypical.

**3.    To Defeat Typicality It Must Be Predictable that a Unique Defense Is a "Major Focus" of the Litigation and Even Then the Objective Is to Protect the Class from an Actual Conflict, Not to Shield a Defendant from a Meritorious Class Action.**

Notwithstanding that a "colorable" release does not automatically destroy typicality or adequacy, CIGNA points to this Court's observation that: "…the presence of any arguable defense peculiar to the named plaintiff …may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." Br. at 5 quoting Amara v. CIGNA 2002 U.S. Dist. LEXIS 25947 * 8 (December 20, 2002). Contrary to CIGNA's implication, however, the Court's opinion uses the word "may," not "shall." The Court was not inviting CIGNA to contrive an at best colorable defense against Amara with the promise that CIGNA would escape class action certification if it did.[5] "'Minor conflicts ... do not make a plaintiff's claims atypical; it is when the conflict goes to the very subject matter of the litigation that the conflict will defeat the claim of representative status." Scott v. Aetna Servs., 210 F.R.D. 261, 267 (D. Conn. 2002) (quoting Walsh v. Northrup Grumman Corp., 162 F.R.D. 440, 445 (E.D.N.Y. 1995)). See also McAdams v. Odom, 2002 U.S. Dist. LEXIS 9944 *18 (D. Mass. 2002) ("It is only when a unique defense will consume the merits of the case that a class should not be certified").

Moreover, the principle that a unique defense that will be a "major focus" may cause the court to reconsider adequacy or typicality is "intended to protect the class." It is not a concept to

_____

[5]    Kline v. Wolf, 88 F.R.D. 696, 700 (S.D.N.Y. 1981), the case cited by this Court for the proposition that unique defenses may destroy typicality and adequacy, is a good example of a case where the merits of the action had the potential to become overwhelmed by unique defenses. In that case, questions of the named plaintiff's credibility and reliance directly related to the transactions that were the subject of the complaint. Id. See also Baffa v. Donaldson, 222

be manipulated to "shield defendants from a potentially meritorious suit." In Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 200-201 (S.D.N.Y. 1992), Judge Edelstein wrote:

> The Court recognizes that a party should not be allowed to represent a class "if a major focus of the litigation will be on an arguable defense unique to the named plaintiff. . . . A representative plaintiff should not be permitted to impose such a disadvantage on the class." Koos v. First Nat'l Bank, 496 F.2d 1162, 1164-65 (7th Cir. 1974). This rule has not been rigidly applied in this Circuit, however, and it is intended to protect plaintiff class -- not to shield defendants from a potentially meritorious suit. ***Indeed, it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members***.

Emph. added. Thus, a defendant cannot shield itself from class certification simply by raising a unique defense with "colorable" merit:

> A review of cases in which class certification is denied for fear that a defense unique to the named plaintiff might unfairly prejudice the claims of the absent class members reveals that most such defenses similarly attack ***the heart of the plaintiff's case***.

Langner v. Brown, 1996 U.S. Dist. LEXIS 18256, 8-9 (S.D.N.Y. 1996) (emphasis added).

As the Second Circuit has explained, the conflict must be real and not based upon a defendant's self-serving hypothesis or speculation:

> Even if a level of conflict may exist among the three groups, that potential for conflict need not defeat certification. While Rule 23(a)(4) is designed to ferret out potential conflicts between representatives and other class members, see Amchem, 521 U.S. at 625-26, "not every potential disagreement between a representative and the class members will stand in the way of a class suit." 1 Newberg & Conte, supra, § 3.26, at 3-143. "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental," id. § 3.26, at 3-143 to -144, and "***speculative conflict should be disregarded at the class certification stage.***" Id. § 3.25, at 3-136.

In re Visa Check/MasterMoney Antitrust Litig. v. Visa, USA Inc., 280 F.3d 124, 145 (2d Cir. 2001) (emphasis added).  Indeed, conflicts of interest that *might* arise are better addressed when and if they *do* arise, rather than at the class certification stage:

---

F.3d 52, 59 (2d Cir. 2000)(defenses related to the unique timing, circumstances, and investment strategy of proposed class representative in a securities fraud case).

> Metro-North's contention that the Class Plaintiffs may thereafter fail to "vigorously" pursue the individual relief stages is both speculative and premature, and, we believe, is an insufficient basis for rejecting class certification at this juncture. Rather, the preferable course is for the district court to revisit the question of the Class Plaintiffs' "fitness" to represent the class if and when the individual-relief stages of the claims occur. Then, if the district court deems it appropriate, it can direct that class members who are entitled to seek individual relief be named as additional class representatives.

Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 171 (2d Cir. 2001).

While counsel are obviously leery of encouraging any dispute to be filed, we would be remiss to omit that CIGNA has not instituted an arbitration to declare Amara or anyone else in violation of this severance benefits agreement by virtue of having started an action for benefits or being a member of a class seeking benefits.[6] Instead, CIGNA simply speculates that it could and depicts this like a cloud hovering over "every step" in the litigation. CIGNA then speculates that during "summary judgment, trial, and in any settlement discussions the parties might have" whatever individual decisions Amara makes might be "colored" by her unique interest in keeping CIGNA from pursuing an unfiled release claim. Br. at 7-8. This is speculation with an undertow of duress. If CIGNA was interested in an opinion on the scope of the exception for "any claims for benefits," and did not already suspect the obvious answer, it could already have submitted the scope of the release's exception to an arbitrator, according to CIGNA's own legal theory. There is no reason for the cloud that CIGNA conjures, other than CIGNA's renewed interest in shielding itself from this class action.

Moreover, if CIGNA was correct about arbitration being the "exclusive" forum for interpreting the release, including its exceptions, the release could never become the focus of this

---

[6]    There presumably are hundreds and potentially thousands of other class members who signed this form agreement. So if CIGNA was intent on testing its ability to escape the all-too-clear exception for "any claims for benefits," there would be no reason to single Janice Amara out. Indeed, ERISA §510, 29 U.S.C. §1140, makes it unlawful to discriminate against a participant for exercising any right to which he or she is entitled under ERISA.

litigation. Because while suggesting that "every step" in this litigation will be colored by the release issue, Br. at 8, CIGNA simultaneously claims that everything about the release is exclusively the subject of arbitration: "Plaintiff executed a Release, and obligated herself to arbitrate any disputes related to the validity or interpretation of her release…." CIGNA Br. at 2; see also id. at 7 ("A trier of fact – here an arbitrator – will have to analyze each and every one of the "knowing and voluntary" factors…") and at 9-10 (referring to "Plaintiff's obligation to arbitrate any dispute related to the Release"). We would suggest that CIGNA's defense is finished as soon as anyone looks at the threshold issue of whether the release, which CIGNA drafted, expressly excepts "any claims for benefits under any retirement … programs." It is only necessary to reach the other "knowing and voluntary" factors if it is first established that the release's exception does <u>not</u> mean what it plainly says.[7]

An issue that, according to the party raising it, cannot be considered during the litigation can hardly overwhelm it. Thus, this is a far cry from a situation where named representatives claim that they were threatened into signing facially-encompassing releases. <u>See</u> <u>e.g.</u> <u>Walker v. Asea Brown Boveri, Inc.</u>, 214 F.R.D. 58, 65 (D. Conn. 2003) (certification denied where proposed class representatives signed releases not signed by putative class members but asserted they were threatened into signing them). A facially-inapplicable release that the defendant claims is <u>not</u> subject to judicial interpretation is unlikely to consume the time and attention of a courtside trial on claims that releases were essentially coerced.

---

[7]     Unless the Court requests, Amara will take no formal position on CIGNA's view that its interpretation of an exception which on its face preserves ERISA claims is an issue for arbitration. <u>Laniok v. Brainerd</u>, supra, 935 F.2d at 1367, suggests that the Federal courts "strictly scrutinize" whether an ERISA right has been waived.  It is not logical that waiver of a statutory right would be an exclusive issue for arbitration simply because an employer takes an exception, which on its face preserves any ERISA-related claims, and attaches a contrary interpretation to it.

Moreover, even if the Court harbored any lingering concern, it is clear that the Court is well advised to see if a conflict materializes. If there are actual problems with adequate representation, other representatives can be invited to appear. Robinson v. Metro-North Commuter R.R., supra, 267 F.3d at 171; Manual for Complex Litigation, Fourth, supra, §21.26.

**Conclusion**

Janice Amara has not done anything that should jeopardize her typicality and adequacy as a class representative. Indeed, she is the epitome of a conscientious class representative: As an individual with experience in the benefits field, she is informed about the issues in the case and she consults with counsel about developments in the litigation. In essence, the Court has before it a baseless and contrived defense that, according to CIGNA, cannot even be considered during the litigation, and which, if an arbitration were ever instituted, would raise no significant possibility of a future conflict because of the express language of the release's exception.  These circumstances present no occasion to reconsider the Court's previous determination on class action certification. Accordingly, CIGNA's motion does not merit a different determination on typicality or the adequacy of representation.

THE PLAINTIFF

By__/s/ Thomas G. Moukawsher___
     Thomas G. Moukawsher
     Fed. Bar. No.: ct08940
     Moukawsher & Walsh, LLC
     21 Oak Street, Suite 209
     Hartford, CT 06106
     (860) 278-7003

     Stephen R. Bruce (Proc Hac Vice)
     805 15th St., NW, Suite 210
     Washington, DC 20005
     (202) 371-8013

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing has been mailed on this date to the defendant

at:

        Christopher A. Parlo
        Morgan, Lewis & Bockius
        101 Park Avenue
        New York, NY 10178

        Joseph J. Costello
        Jeremy P. Blumenfeld
        Morgan, Lewis & Bockius
        1701 Market Street
        Philadelphia, PA 19103-2921

Dated this 9th day of July, 2004.

                /s/ Thomas G. Moukawsher
             Thomas G. Moukawsher



**James Eckels**
Mgr, Relationship Mgmt



**CIGNA** Retirement &
Investment Services

September 19, 2003

Routing H20A
280 Trumbull Street
Hartford, CT 06010
Telephone 860.534.2508

Janice Amara
39 Town Beach Road
Old Saybrook, CT 06475

Dear Janice:

The purpose of this letter is to notify you that it has been determined that a staff reduction
is necessary. As you volunteered for job elimination, I want to inform you that your job will
be eliminated on October 17, 2003.

Because your job will be eliminated, you may be eligible for outplacement assistance and
may be eligible for benefits under the company's Severance Pay Plan if you continue your
employment through October 17, 2003 and sign the enclosed Agreement and Release which
you do not revoke. You have forty-five (45) calendar days from tomorrow to review,
consider and return the signed Agreement and Release and, thereafter, seven (7) days to
revoke it.

By signing the Agreement and Release, you are waiving your rights to pursue any issues or
claims related to your employment or termination of employment in any form, including
the Employment Dispute Resolution Program (i.e., Speak Easy or Mediation/Arbitration
Processes). You may wish to review your rights and the Agreement and Release with an
attorney.

Benefits at termination information can be found in your Health, Life & Disability Summary
Plan Description (SPD) under (Events Affecting Benefits). The SPD can be found on the
CIGNA Central Intranet site.

Enclosed is the Agreement and Release. If you have any questions after reading this
document, please do not hesitate to ask either Kate Sanderson – 860.534.9660 or me
860.534.2508.

I want you to know that all of us appreciate the contribution you have made to this
organization and wish you well in future endeavors.

Sincerely,

*James M Eckels*

James Eckels
Mgr, Relationship Mgmt

Attachment

P 1137

CIGNA Retirement & Investment Services' products and services are provided exclusively by various operating subsidiaries of CIGNA Corporation, including Connecticut General Life Insurance Company.  "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

## AGREEMENT AND RELEASE

This Agreement and Release ("Agreement") is dated September 19, 2003 ("Today"). It is between Janice Amara, 39 Town Beach Road, Old Saybrook, CT 06475, ("you") and Connecticut General Life Insurance Company, a Connecticut corporation ("the Company").

You and the Company intend to be legally bound by the Agreement, and are entering into it in reliance on the promises made to each other in the Agreement. Under the Agreement, your employment will end, and you and the Company agree to settle all issues concerning your employment and termination of employment. The Company is eliminating your job and will pay you certain benefits under the CIGNA Severance Pay Plan ("the Plan"). The Plan is described in the Severance Pay Summary Plan Description and can be found on the CIGNA Central Intranet site.

Under this Agreement, your employment will end and you and the Company agree to settle all issues concerning your employment and termination of employment. You intend to be legally bound by this Agreement and acknowledge that your release of claims against the Company is entered into voluntarily and without coercion.

1.      **Your Termination Date.**     The Company gave you written notice that your job is being eliminated, and your employment will end on October 17, 2003 ("Termination Date"), unless you find or otherwise receive another job with a CIGNA[1] company before your Termination Date. If you file a claim for unemployment compensation benefits because you do not yet have another job as of your Termination Date, the Company agrees that your unemployment will be because the Company did not have any work for you.

2.      **Pay and Benefits until Termination Date.**

        a.      From Today until your Termination Date, the Company will pay you your current regular salary and you may continue to participate in the Company's employee benefits programs.

        b.      Within 30 days after your Termination Date, the Company will pay you (less applicable withholding) for all the regular vacation days and personal holidays you earned, but have not used. That amount will be reduced by the value of any vacation days and personal holidays you take after Today. If you have taken more vacation and personal holidays than you have earned, you agree that these days can be deducted from your severance pay described in paragraph 3a. You agree that you have no right to any more vacation days or personal holidays.

---

[1] The terms "CIGNA", "CIGNA Company" and "CIGNA Companies" as used throughout this Agreement and Release means CIGNA Corporation and/or its subsidiaries. CIGNA Corporation owns the subsidiaries for which most employees work. The term "the Company" means the particular CIGNA Company that employs you.

1

c.  If you bought or sold vacation days under the Signature Benefits Program, the regular provisions of that program will determine whether you receive an additional payment, or have an amount deducted from your pay, to make up any difference between the days you bought or sold and the days you actually used.

d.  If you die before the Termination Date in paragraph 1, the date you die will automatically become your new Termination Date, and no salary payments will be made beyond your new Termination Date. However, if you die before receiving all other payments due to you under the Agreement, the remaining amounts will be paid in a lump sum within ninety (90) days after your death to your surviving spouse. If you have no surviving spouse, the payment will be made to your estate.

3.  **Your Severance Benefits.**   In exchange for (i) voluntarily signing and returning this Agreement to the Company within the required timeframe after you receive it and (ii) satisfying all of the eligibility criteria listed in the Plan, the Company will provide you with severance benefits and other benefits as described in this Agreement, subject to all applicable withholding and other deductions. Severance benefits will be paid by the Company or an affiliate.

a.  You are eligible for severance benefits under Schedule I of the Plan. Your Basic Severance Pay will total $100,400.00 (less applicable withholding). Unless you make the lump sum election below:

- Basic Severance Pay will be paid to you in bi-weekly installments over a total period of fifty-two (52) weeks beginning with the first regular payday after your Termination Date. (The period you receive these bi-weekly payment is your "Severance Period".)
- Your Signature Benefits Basic Life Insurance coverage will continue at the Company's expense during the Severance Period.
- Under the provisions of federal law (COBRA), you may elect to continue your Company group health care coverage after your Termination Date. If you elect COBRA coverage, the Company will subsidize the COBRA rates you pay during the Severance Period (that is, you will pay the same rates as if you continued to be employed) and will not subsidize the rates after the Severance Period. You will be billed monthly.

**Lump Sum Election:**

Initial for lump sum

If you want your Basic Severance Pay paid in a lump sum within 30 days after your Termination Date, you must sign your initials on the line to the left. If you elect a lump sum payment:

- Your Signature Benefits Basic Life Insurance coverage will expire at the end of the month in which your Termination Date occurs.

2

- If you elect COBRA coverage, the Company will not subsidize the COBRA rates you pay. You will be billed monthly.

b.    You may convert certain group benefits coverages to individual coverages under the terms of the Signature Benefits program. You will not be eligible for any Signature Benefits credits after your Termination Date.

c.    The Company agrees to pay you, within 30 calendar days after your Termination Date, a lump sum of $13,566.35 (less applicable withholding) which represents a Bonus Severance Payment as described in the Plan.

d.    Within 30 calendar days after your Termination Date, the Company will make a lump sum Stock Plan Severance Payment to you. This payment, before applicable withholding, will be equal to the number of restricted shares of CIGNA Corporation stock which you now hold, but forfeit on your Termination Date, multiplied by the Fair Market Value (as defined under the applicable CIGNA Corporation stock plan) of a share of CIGNA Corporation stock as of your Termination Date.

e.    Your stock options are subject to the terms of the applicable CIGNA Corporation stock plan and your option grant letter and Attachment.

f.    If you desire, outplacement assistance will be provided. Further details will be provided by your Human Resources Representative, upon your request. Your eligibility for benefits under the Severance Pay Plan will not be affected if you decline outplacement assistance.

g.    Should you be offered and refuse a Suitable Position (as defined in the Plan), or refuse to interview for one, your eligibility under the Plan will cease immediately.

h.    Any benefits you may have earned under the CIGNA Pension and 401(k) Plans will be payable to you under the provisions of those Plans.

i.    If you find or otherwise receive another job with a CIGNA Company before your Termination Date, or if the Plan Administrator determines that you are not eligible to receive any severance pay under the terms of the Plan, then this Agreement shall no longer be in effect.

j.    If you find or otherwise receive another job with a CIGNA Company after your Termination Date, then the amount of severance pay which you are entitled to receive or keep will be determined by the terms of the Plan.

k.    The Company will pay you no other money except as described in this Agreement.

3

4.    **Your Promises to the Company**

    a.    Before your Termination Date, you will return to the Company all CIGNA Company property that you now have (for example: identification card, access card, keys, company car, computer, company manuals, office equipment, records and files).

    b.    You will hold all of the trade secrets, confidential information and proprietary materials belonging to the CIGNA Companies in the strictest confidence. You will not use, disclose or reveal them to anyone.

    c.    For the 12-month period starting on your Termination Date, you will not solicit, try to hire, hire, refer for hire, or assist in hiring any CIGNA Company employee who is employed Today, if you have had any contact or involvement with that person during the 12-month period ending Today.

    d.    For the 12-month period starting on your Termination Date, you will not do business with any existing CIGNA Company customer in any way that would compete with the Company, if you have had any business contact or involvement with that customer during the 12-month period ending Today.

5.    **Your Release of Claims**

    a.    You agree that you will not file (or ask or let anyone file for you) any charge, complaint, claim or lawsuit of any kind in connection with any claim released by this Agreement against any Released Person. However, the preceding sentence does not apply to any claim you might file alleging that your waiver of claims under the Age Discrimination in Employment Act of 1967 ("ADEA") was not knowing and voluntary.

    b.    You acknowledge full and complete satisfaction of, and release and discharge all Released Persons from, any Claims.

    c.    You are giving this release for yourself as well as for your executors, administrators, heirs and assigns.

    d.    "Released Persons" are the Company, its predecessors, successors, parents, subsidiaries and affiliates, and all of their directors, officers, agents and employees.

    e.    "Claims" are any and all claims, demands and causes of action of whatever kind, including any claims for attorney's fees, that you now have, or at any time had, against any Released Persons, but only to the extent they arise out of or relate in any way to your employment or termination of employment with the Company and its affiliates. "Claims" includes things you may not even know about or suspect as well as any claims you may have under ADEA.

4

6.    **Confidentiality.**    The terms of this agreement are confidential. You agree not

if any legal action covered by paragraph 5 or 9 (except claims related to the validity of this Agreement or how it is interpreted or implemented, or claims related to whether your release of ADEA claims was knowing and voluntary) is started by you (or by someone else on your behalf) against any Released Person, you agree to pay back to the Company within thirty (30) days of the start of that legal action all the money you receive under paragraphs 2 and 3 above, as well as any other thing of value you receive under this Agreement. You also agree to pay the Company any costs and attorneys' fees it incurs in that action at the conclusion of the action. However, if you claim that your release of ADEA claims was not knowing and voluntary, the Company reserves its right to recover from you its attorneys' fees and/or costs in defending that claim, at the conclusion of that action.

If, in any legal action or arbitration, the release in paragraph 5 is found to be unenforceable for any reason, then this Agreement (except for paragraph 9) shall be null and void from Today on, and any money paid by the Company to you after Today under paragraphs 2 and 3 and not yet returned to the Company (including the value of any Company-subsidy for group health care and life insurance coverages provided under paragraphs 2 and 3), will be treated as an overpayment by the Company, and you will have to repay it to the Company with interest, compounded annually at the rate of 6%. However, the repayment provision in this paragraph does not apply to legal actions in which you claim that your release of ADEA claims was not knowing and voluntary.

This paragraph does not apply to any thing of value given to you for which you actually performed services and which by law you are entitled to receive.

This Agreement will not be effective or binding on either you or the Company until both have signed it. This Agreement was signed on the dates indicated:

9-22-2003
Date

*Janice Amara*

Janice Amara

9-24-63
Date

*Helen K. Frye*

Helen K. Frye

On Behalf of Connecticut General Life
Insurance Company

7

f.    "Claims" does not include (and you are not releasing):

    (1)    any claims against the Company for promises it is making to you in this Agreement;

    (2)    any claims for benefits under any retirement, savings, or other employee benefit programs (but your Release does cover any claims you may make for severance benefits beyond those described or referred to in this Agreement);

    (3)    any claims covered by workers compensation laws; and

    (4)    any claims that you did not knowingly and voluntarily waive your Claims under ADEA.

**6.    Confidentiality.**    The terms of this agreement are confidential. You agree not to disclose in any way this Agreement or any of its terms to any person other than your spouse, lawyer or accountant.

**7.    No Admission of Wrongdoing.**    Just because the Company is entering into this Agreement and paying you money, the Company is not admitting that it (or any other Released Person) has done anything wrong or violated any law, rule, order, policy, procedure, or contract, express or implied, or otherwise incurred any other liability.

**8.    Applicable Law.**    This Agreement is being made in the state in which you work. It will be interpreted, enforced and governed under the laws of that state.

**9.    Arbitration.**    Without in any way affecting the release in paragraph 5, any and all disagreements, disputes or claims listed below will be resolved exclusively by arbitration in the city where you work Today, or if there is no American Arbitration Association ("AAA") office in the city where you work, in the nearest city with an AAA office. Arbitration will be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association, as modified by the Company. Copies of the Arbitration Policy and Rules and Procedures can be obtained from your Human Resources Representative. A legal judgment based upon the Arbitrator's award may be entered in any court having jurisdiction over the matter. You and the Company agree to arbitrate anything:

    a.    related in any way to the validity of this Agreement or how it is interpreted or implemented (including the validity of your ADEA Waiver); and

    b.    that involves any dispute about your candidacy for employment, employment or termination of employment, including any disputes arising under local, state or federal statutory or common law (if for any reason your release and waiver under paragraph 5 is found to be unenforceable or inapplicable).

**10.    Final and Entire Agreement.**    This Agreement is intended to be the complete, final and entire Agreement between you and the Company. It fully replaces all earlier agreements or understandings. However, it does not replace the terms of any:

  a.    CIGNA stock or option grant you might have received or the terms of any employee benefit plan; or

  b.    other agreement you might have entered into with the Company that requires you to pay back money to the Company, or that authorizes the Company to deduct money from your pay, when your employment terminates or at any other time.

Neither you nor the Company has relied upon any other statement, agreement or contract, written or oral, in deciding to enter into this Agreement. Any amendment to this Agreement must be in writing and signed by both you and the Company.

**11.    Your Understanding.**    By signing this Agreement, you admit and agree that:

  a.    you have read the Agreement;

  b.    you understand it is legally binding, and you were advised to review it with a lawyer of your choice;

  c.    you have had (or have had the opportunity to take) forty-five (45) calendar days to discuss it with a lawyer of your choice before signing it and, if you sign before the end of that period, you do so of your own free will and with the full knowledge that you could have taken the full period;

  d.    you realize and understand that the release covers all claims, demands, and causes of action against the Company and any Released Persons (but does not apply to claims described in paragraph 5f), including claims under the Age Discrimination in Employment Act of 1967, whether or not you know or suspect them to exist at the present time; and

  e.    you understand the terms of the Agreement, you are signing voluntarily and with the full understanding of its consequences, and you have not been forced or coerced in any way.

**12.    Revoking the Agreement.**    You have seven days from the date you sign the Agreement to revoke and cancel it. To do that, a clear, written cancellation letter, signed by you must be received by Kate Sanderson, 280 Trumbull Street, H19A, Hartford, CT 06103, before the close of business on the seventh (7th) calendar day following the date you sign this Agreement. The company will make no payments other than those required by law until the end of the seventh day.

**13.    If Legal Action Is Started.**    You understand and agree that the Company's main reason for entering into this Agreement is to avoid lawsuits and other litigation. Therefore,

6