# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - -

Plf's EXHIBIT 88
FOR IDENTIFICATION
7-24-03
D.M. LONDO[N]

Janice C. Amara, individually and on behalf of )
others similarly situated,                     )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )   Civil Action
                                               )   No. 3:01-CV-2361(DJS)
                                               )
CIGNA Corp. and CIGNA Pension Plan,            )
                                               )
                                               )
          Defendants.                          )

## DECLARATION OF CLAUDE POULIN, F.S.A., M.A.A.A., E.A.

I, Claude Poulin, am over 21 years of age and based on personal knowledge, state as follows:

1. I am an Enrolled Actuary under ERISA, a Fellow in the Society of Actuaries, and a member of the American Academy of Actuaries. I have over 30 years of experience in designing, administering, and reviewing defined benefit pension plans, including providing advice to employers, unions, governments, employees and their representatives. My Curriculum Vitae is attached as Exhibit A.

2. For the last twenty years, I have been serving as the Actuarial Trustee of the Connecticut State Employees Retirement Commission. I also have been an actuarial consultant to the AARP, the EEOC, the Internal Revenue Service as well

1

as the CWA, the IBEW and the UAW.

3. At the time ERISA (The Employee Retirement Income Security Act) was enacted in 1974, I was the Senior Actuary for the United Automobile Workers ("UAW") and in that capacity I was responsible for the review and compliance under ERISA of approximately 3,000 pension plans the UAW had negotiated. I testified several times before Congressional Committees of both the U.S. House and Senate on matters related to ERISA.

4. I have attached as Exhibit B a list of the cases in which I have testified as an expert at trial or at deposition within the last four years.

5. I have been retained in this matter to offer expert actuarial analysis on the facts related to the claims in the First Amended Class Action Complaint about benefit accrual rates under the Cash Balance Plan and the payment of previously earned benefits. I am compensated at the rate of $350 per hour.

6. I have reviewed copies of the documents listed on Exhibit C.

7. Before 1998, CIGNA sponsored a traditional defined benefit plan. With respect to employees hired before January 1, 1989, the plan's benefit formula provided a pension benefit equal to 2% times Final Average Earnings times years of credited service ( with a maximum of thirty years) less 50% of the participant's Social Security benefit prorated for years less than thirty. CIGNA called this the "Tier 1" formula. For employees hired on or after January 1, 1989, the plan's benefit formula provided a pension benefit equal to 1.67% times Final Average Earnings times years of credited service (with a maximum of thirty five years) less 50% of

the participant's Social Security benefit prorated for years less than thirty five. CIGNA called this the "Tier 2" formula.

8. On January 1, 1998, CIGNA converted its traditional defined benefit pension plan into a "cash balance" plan. CIGNA called this new arrangement "Part B" and redubbed the old plan as "Part A."

9. The Part B CIGNA Pension Plan provides for benefit accruals based on hypothetical or bookkeeping accounts which increase with the allocation of pay credits (called benefit credits under the Plan) and interest credits.

10. The normal retirement benefit provided by the CIGNA Pension Plan Part B is equal to the employee's account at age 65, with interest projected to that date, converted into an annuity by applying annuity factors derived from actuarial assumptions stated in the Plan.

11. Janice Amara worked for CIGNA from 1972 to 1995. During that time, she earned a pension benefit of $1,833.65 a month payable at age 55 for life. Since her return to CIGNA in September 1998, Janice Amara has participated in CIGNA Pension Plan Part B.

12. In performing my analysis, I reviewed Mrs. Amara's benefit computations. I have also examined the benefits of other employees, including employees matching the three employee "profiles" that CIGNA itself used in studying the changes in the plan, i.e., a Tier 1 employee age 30 with 9 years of service and $40,000 in compensation, a Tier 2 employee age 40 with 5 years of service and $45,000 in compensation, and a Tier 2 employee age 50 with 10 years of service and $60,000

in compensation.

## The Rate of Benefit Accrual under Part B Decreases with Age and is Lower than the Prior Plan's Rate of Benefit Accrual

13. To determine an employee's benefit accruing under Part B, the Plan administrator must take the following steps as of any date of determination (DOD). In contrast to the prior plan where age was not a factor, the age of the employee is an integral part of the rate of benefit accrual under Part B.

> Step 1: determine the amount of the employee's hypothetical account balance at the DOD;
>
> Step 2: determine the interest credit rate to be used between the DOD and the employee's normal retirement age of 65; this interest credit rate is defined as the Floor Interest Rate in Section 1.56 of Part B;
>
> Step 3: determine the employee's age at the DOD;
>
> Step 4: calculate the number of years from the DOD until the employee will attain the normal retirement age of 65;
>
> Step 5: increase the account balance at the DOD with interest at the interest credit rate (determined in Step 2) for the number of years until the employee will attain age 65;
>
> Step 6: divide the account balance as "projected to age 65" by the applicable age 65 annuity factor (as specified in the Plan) to determine the annuity payable commencing at age 65.

The above computation can also be stated in terms of the following mathematical formula:

$$\text{normal retirement benefit} = AB \times (1+i)^{65-n} \div a$$

where,

$AB$ = the employee's hypothetical account balance at the DOD;
$i$ = the interest credit rate at the DOD;
$(1+i)^{65-n}$ = the mathematical expression for the accumulation of interest from the date of determination to age 65;
$n$ = the employee's age at the DOD; and

        *a*     = the cost of purchasing an annuity commencing at age 65 based on the mortality table and the interest credit rate as provided under the terms of the plan.

As this mathematical formula demonstrates, the benefit provided under the CIGNA Pension Plan Part B cannot be calculated without reference to the employee's age.

14. Each year's benefit accrual is obtained by substituting in the above formula the annual Benefit Credit (pay credit) payable under Part B for the account balance (*AB*). The rate of benefit accrual is determined by dividing the year's benefit accrual by the employee's compensation for the year.

15. Section 204(b)(1)(H)(i) of ERISA stipulates that an employee's rate of benefit accrual may not be reduced on account of age. However, the above formula shows that under Part B, the rate of benefit accrual decreases as a direct result of increases in the employee's age. As the employee gets one year older, the interest credit, which is strictly a function of the number of years between the date of determination and age 65, is correspondingly reduced. Similarly, a younger employee, identical to an older employee in all respects except for age, accrues a larger normal retirement benefit than the older employee.

16. Under a number of cash balance plans, pay credits increase with age and/or service. By offering gradually increasing pay credits, CIGNA's Part B partially compensates for the age-related reduction in the interest accrual. However, this process stops at the point where the employee attains 65 combined age and service points, e.g. age 45 and 20 years of service. After that point, the pay

credit remains a fixed and flat percentage of pay.

17. Under the terms of Part B, Ms. Amara is supposed to receive annual pay and interest credits into her cash balance account. Upon her participation in Part B, Ms. Amara was entitled to annual pay credits of 7% of her salary up to one-half of the Social Security Wage Base plus 8.5% of her salary above that level. The interest credit on these pay credits must be at least equal to the Floor Interest Rate of 4.5%.

18. The attached Exhibit D shows the benefit accrual (Column 3) for Ms. Amara from age 48 to age 65 calculated according to the formula described in Paragraph 13. Column (4) shows the rate of benefit accrual, i.e., the benefit accrual divided by the assumed annual compensation of $100,000 that, for simplicity purposes, remains at that level at all ages. The accrual rate goes from 1.59% at age 48 to 0.75% at age 65.

19. The attached Exhibit E illustrates graphically the gradual reduction in the rate of benefit accrual from age 48 to age 65. This decrease in the rate of benefit accrual is strictly a function of increasing age.

20. The future rates of benefit accrual under Part B not only decrease because of age, they are also significantly lower compared to the accrual rates under Part A. During the last years when Ms. Amara was a participant under Part A, her rate of benefit accrual was approximately 2% of compensation, while it will decrease to under 1% of compensation within the next ten years under Part B, finally to as low as 0.75% before she reaches age 65. Section 204(h) of ERISA

requires that a pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides a notice to applicable participants providing sufficient information to allow them to understand the effect of the plan amendment.

21. In the attached Exhibit F series, I have computed comparative rates of benefit accrual for the three different profiles of employees that CIGNA itself used to illustrate the plan changes. In all three cases, the exhibits show decreasing rates of benefit accrual on the basis of age. Exhibits F-1, F-2, and F-3 also show that while rates of benefit accrual in Column (5) sometimes begin at close to a comparable level (see F-2), they always become significantly lower than the rates in Column (6) found under the Part A formulas.

22. It should be noted that the rates under Part A are based on the assumption that salary increases by 4% per year, which is an assumption that CIGNA itself uses. Omitting this assumption would underestimate the rate of benefit accrual under Part A. The pension benefits provided under Tier 1 and Tier 2 of Part A were based on participants' final average salaries. By contrast, Part B only offers an annual year-by-year pay formula. Under Part A, any increase in salary not only increased the pension benefit for that year but also raised the benefits earned for all prior years. On the other hand, under a cash balance plan like Part B, an increase in salary in any given year only affects the pay credit in that year with no impact whatsoever in pension benefits accrued to date. Cash balance plans like Part B are career average pay plans as opposed to the two tiers of

Part A, which are final average pay plans. Treasury Regulation 1.411(d)-6 Q&A-6, which spells out the circumstances under which an ERISA Section 204(h) notice must be given to plan participants, stipulates that "All plan provisions that may affect the rate of future benefit accrual of participants or alternate payees must be taken into account in determining whether an amendment provides for a significant reduction in the rate of future benefit accrual. Such provisions include, for example, …the method of determining average compensation for calculating benefit accruals…" Therefore, the change in the compensation average must be taken into account to show the disparity between the rates of benefit accrual under Part A and Part B.

23. My findings that the new rates of benefit accrual are significantly lower under Part B than they were under Part A are corroborated by calculations that the consulting firm of William Mercer performed for CIGNA: they show employees earning less than 80% of the prior rates. William Mercer used even higher salary increase assumptions in its estimates.

### The New Part B Benefit Accruals Are Conditional

24. In addition to providing decreasing rates of accrual, CIGNA Pension Plan Part B, in Article VII, restricts participants' actual receipt of the accruals to their account balances. In Ms. Amara's case, the plan stipulates that she can receive the benefit she was supposed to earn under Part B since 1998 only if she forfeits the early retirement benefits, payable from age 55, of $1,833.65 a month she had previously earned under the Part A plan. This pre-1998 plan

document did not condition future benefit accruals on giving up part of the value of already earned early retirement benefits.

25. As set out in Sections 7.2 and 7.3 of the Part B document, Ms. Amara must accept CIGNA's method of valuing her Part A benefits as described in Section 1.28 of the Plan in order to receive her annual accruals since 1998. Specifically, by converting Ms. Amara's accrued benefit "expressed as a single life annuity commencing at age 65", Section 1.28(b) excludes the value of her early retirement benefits of $1,833.65 a month starting at age 55. If she selects a lump-sum distribution under Section 7.2(a)(1), she loses or forfeits the value of the early retirement subsidy to which she was entitled under Part A and if she selects the early retirement annuity under Section 7.3(b), she loses the Benefit Credits to which she is entitled under Part B. Therefore, depending on her selection, there is a period during which Ms. Amara either (a) accrues new benefits at the expense of losing a portion of her prior benefits, or else (b) accrues no additional retirement benefits.

26. Ms. Amara's opening account balance under Part B was $91,124.77. This opening account balance would only provide a pension benefit of approximately $900 a month to Ms. Amara at age 55, i.e., less than 50% of the early retirement benefit to which she was entitled under Part A. For several years, she will be in a position of playing "catch-up" under the Part B formula.

27. The same unfavorable treatment applies to other participants. While the catch-up period may not be as significant in all cases, it will nevertheless exist in

9

varying degrees in each case. For example, CIGNA has excluded the value of early retirement benefits and has applied a pre-retirement mortality discount (described further below) in every case. These exclusions or discounts cause the new cash balance accruals to be conditional on giving up part of the participant's previous benefits in each instance.

28. CIGNA offers a "minimum benefit" based on the previously earned benefits, including subsidized early retirement benefits and the value of a "free" surviving spouse benefit, but these benefits are payable only if the participant gives up their cash balance accruals.

29. By restricting actual receipt of annual benefit accruals, Sections 1.28 and 7.3 of Part B have made receipt of Ms. Amara's annual pension accruals conditional upon foregoing part of her previously earned benefit or waiting until normal retirement age to receive her distribution. IRS Notice 96-8 states that if accrued benefits "are disregarded when benefits commence before normal retirement age, the plan has effectively conditioned entitlement to the benefits ... on the employee not taking a distribution prior to normal retirement age." Notice 96-8 further says that "[p]ursuant to Section 1.411(a)-4T, a right that is conditioned under the plan on a subsequent forbearance is a forfeitable right. Accordingly, conditioning entitlement to benefits on the employee not taking a distribution violates the nonforfeitability requirements of section 411(a)."

30. Under the anti-backloading rules of ERISA Section 204(b)(1)(B), the rate of benefit accrual in any year also may not exceed the rate of benefit accrual in

any previous year by more than 33 1/3%. For several years, Ms. Amara will accrue no additional benefit under Part B – as long as the value of her account balance is less than the value of the pension benefit she had already accrued under Part A. This will ultimately be followed by a period of benefit accrual. The rate of benefit accrual at that time will be infinitely greater than the zero accrual rate in the period immediately preceding. The same analysis applies to the other employees who have been converted to Part B.

**Previously Earned Pension Benefits Have Been Further Eroded by a Pre-Retirement Mortality Discount and Falling Interest Rates; the Part B Benefit Accruals Are Conditional on Accepting those Losses**

31. Except as a frozen "minimum benefit," CIGNA is not really protecting benefit accruals earned before the cash balance conversion. Even after adding interest to their opening account balances, participants would not be able to go back and repurchase the annuities that they possessed before.

32. There are two principal reasons for this: First, in converting previously earned benefits to cash balance, CIGNA applied a pre-retirement mortality discount. However, as participants grow older, their decreased risk of mortality is never credited back. As a result, the annuities participants are able to repurchase with their original cash balance accounts are, even with interest, less than the annuities that they originally had.

33. Second, when interest rates fall below the conversion interest rate, as they have over the past five years, this situation becomes even worse. Participants can

repurchase even less of the annuity that they had previously earned.

34. To illustrate both of these factors, Exhibit G provides an example of an individual with an annuity of $1,000 per month payable at age 65 that is converted to an opening account balance using 6.155% interest and GATT mortality. These are the rates that CIGNA generally used in conversions. The opening account balance then credits interest to the account balances at the following rates:

    1998: 6.06%

    1999: 4.79%

    2000: 6.22%

    2001: 5.95%

    2002: 4.50%

    2003: 4.50%

To reconvert to an annuity benefit, the account balance is projected for the remainder of the period to age 65 at 4.50%. The projected account balance at age 65 is reconverted to an annuity form using 5% interest and GATT mortality. These are the interest rate and mortality assumptions used by ERISA (for simplicity, the interest rate has been rounded). I found that such participants end up with an annuity between $500 and $600 compared to the original $1,000. Therefore, the values of initial account balances, which were already set artificially low by stripping out the values of protected early retirement and surviving spouse benefits, have been further decreased as a

result of a pre-retirement mortality discount and lower interest rates.

35. Effectively, CIGNA's cash balance conversion has transformed the defined annuity benefits before the conversion into stripped down variable annuities that are discounted for pre-retirement mortality, with no possibility of recapturing that discount, and that fall further below the previously earned level when interest rates decline. Additional benefit accruals under Part B have been conditioned on accepting these losses or discounts.

### CIGNA Does Not Explain the Relative Values of Benefit Options

36. Before a participant and spouse consent to a lump sum distribution, Treasury regulations require CIGNA to give participants and their spouses "sufficient" information "to explain the relative value of the optional forms of benefit available under the plan (e.g., the extent to which optional forms are subsidized relative to the normal form of benefit. . .)." Treas. Reg. 1.401(a)-20, Q&A 36.

37. Because the protected "minimum" benefit includes an early retirement subsidy and a Free 30% joint and survivor's benefit (for Tier 1 participants), had no pre-retirement mortality discount attached to it, and is protected against interest rate declines, CIGNA needs to explain that its "relative value" may be higher than the account balance under Part B. For example, if Mrs. Amara elects a lump sum distribution at age 55, she would receive less than the actuarial value of the annuity benefits she earned under the Part A formula.

38. The benefit commencement package that I have examined, attached as Exhibit

H, does not disclose either the amount of the protected annuity or its relative value. Instead, participants and their spouses are asked to elect lump sums and give up lifetime annuity benefits with no disclosure that the annuities may have higher values.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge.

Signed: _____

Claude Poulin

Date: April 25, 2003

H, does not disclose either the amount of the protected annuity or its relative value. Instead, participants and their spouses are asked to elect lump sums and give up lifetime annuity benefits with no disclosure that the annuities may have higher values.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge.

Signed: *[signature]*

Claude Poulin

Date: April 25, 2003

14