Exhibit 10

# Expert Report on CIGNA Cash Balance Pension Plan Summary Documents and Precursor Documents in <u>Amara et. al. v. CIGNA Corporation and CIGNA Pension Plan</u>, C.A. 01-2361

<u>Prepared by</u>:

James F. Stratman, Associate Professor

University of Colorado at Denver
Technical Communication Program
Plaza Building, Suite 102-F
Denver, Colorado 80217-3364
<u>Phone</u>: 303-556-2884
<u>FAX</u>: 303-556-6018
<u>Email</u>: jstratma@carbon.cudenver.edu

April 25, 2003

## I. Introduction

I have been asked by Stephen R. Bruce Law Offices to address the following question in connection with *Amara et al. v. CIGNA Corporation and CIGNA Pension Plan, C.A. 01-2361*:

**In my expert opinion, do CIGNA's 1998 and 1999 Summary Plan Documents (SPDs) and their precursor documents disclose to the average plan participant the potential reductions of benefits associated with the change?**

**A. Summary of My Opinion.** Upon inspecting these documents carefully, my conclusion is that the SPDs and precursor documents fail to disclose to the average plan participant the potential reductions in benefits from the new cash balance plan relative to the old plan. On the contrary, the language in these documents suggests that the benefits plan participants had earned prior to January 1, 1998 would not be reduced by the change to the new plan and that benefits would grow steadily. Further, the documents suggest that plan participants would continue to earn benefits under the new plan that are equal to or better than those obtainable in future years under the old plan. There is simply no language in these documents making explicit the circumstances under which the move to the new plan could result in significant benefit reductions relative to the old plan or indicating that benefit reductions would be reduced based on age.

**B. Professional Qualifications.** I am a tenured Associate Professor of Communication at the University of Colorado at Denver, where for the last seven years I have been the Director of the Communication Department's graduate and undergraduate programs in Technical Communication. I received a Ph.D. in Rhetoric from Carnegie Mellon University (Pittsburgh, PA) in 1988, with a focus on scientific methods for testing the usability and understandability of written communication in legal, business, and technical fields. I am currently an active, funded researcher publishing empirical studies of both legally trained and ordinary readers' comprehension of legal documents and legal argumentation (see attached Vita). With respect to ERISA related research, in 1988 I published an empirical study of readers' understanding of contract disclaimer language contained in a Summary Plan Document, in connection with Bower v. Bunker Hill, 725 F.2d 1221 (9th Cir. 1984).[1]  However, I have not testified as an expert witness previously. I have from time to time privately consulted for attorneys on issues of language clarity and reader understanding in various types of insurance contract litigation. In the present case I am working as a paid consultant and receive $170 per

---

[1] Stratman, J. (1988). Contract Disclaimers In ERISA Summary Plans: A Deceptive Practice ?" *Industrial Relations Law Journal 10*, No. 3, 350 - 380.

hour plus travel and related expenses.

      **C. Preparation and Scope of My Review.**  As part of my preparation for this investigation, I reviewed potentially applicable ERISA provisions concerning clear disclosure in SPDs. I was already quite familiar with these provisions in connection with the previous published research noted above. These provisions provide that SPDs must "be written in a manner calculated to be understood by the average plan participant" and must "clearly [identify] circumstances which may result in . . . denial, loss, forfeiture or suspension of benefits that a participant or beneficiary might . . . reasonably expect the plan to provide . . . ;" these provisions also provide that "the advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations."[2]

      For my review I also carefully read two recent GAO reports investigating communication and disclosure problems associated with conversions of traditional defined pension benefit plans to cash balance plans.[3]  Both of these reports stress that many cash balance pension plan providers are inadequately communicating with employees about the effects of changing to such plans. One of these reports (Private Pensions) concluded that

> About half of the cash balance SPDs we analyzed did not make any reference to the hypothetical nature of the cash balance plan accounts . Not stating that the accounts are hypothetical . . . can prevent plan participants from understanding how cash balance plans work and the benefits they are entitled to receive.  For example, without making reference to the hypothetical nature of cash balance accounts, one firm described its cash balance plan as a "personal retirement account" that grows on the basis of compensation credits and interest credits . . . without explicitly explaining that participants did not "own" the cash balance accounts and did not control how the assets are invested.[4]

---

    [2] 29 U.S.C. § 1022(a)(1) & (2); 29 C.F.R. §§ 2520.102-3(j)(1) and 2520.102-2(b).  ERISA Section 204(h) also requires advance notice to employees if there is to be a "significant reduction in the rate of future benefit accrual." Notice of the amendment may be offered to employees in the form of a summary, but as with summary plan descriptions, the summary must be "written in a manner calculated to be understood by the average plan participant." 26 C.F.R. 1.411(d)-6, Q&A 10.

    [3] Private Pensions: Implications of Conversions to Cash Balance Plans. GAO/HEHS-00-185 (September 2000); Cash Balance Plans: Implications for Retirement Income. GAO/HEHS-00-207 (September 2000).

    [4] See *supra*, Private Pensions, at 37 - 38.

The other report (Cash Balance Plans) specifically concluded that

> we found significant variation in the quality of information explaining the cash balance formula that was provided to plan participants . . . no SPD explained that there was a difference between the hypothetical account balance [in the newer cash balance plans] and the accrued benefit. In fact, some SPDs specifically stated that the account balance was equivalent to the accrued benefit. As a result, workers do not have sufficient or accurate information to assess the effect that changing jobs or the implications of choosing a lump sum payment rather than an annuity payable at normal retirement will have on the amount of money available to them at retirement.[5]

As will become apparent, both of these findings provide an important focus for the analysis of CIGNA documents presented below.

My investigation is framed by the fact that I am a written communication expert. I am not a pension actuary or a legal expert on benefits. Therefore, in performing my review of CIGNA's SPDs, I assumed that the class can establish some facts to be true. My review was to determine whether, assuming those facts, CIGNA's SPDs have, or have not, adequately described the new cash balance benefit program. The facts that I assumed to be true are as follows:

1. CIGNA's opening account balances under the cash balance plan did not include the entire value of the benefits that many employees had previously earned. For example, the cash balance conversion did not include the early retirement features that the prior plan offered, nor did it include the "Free 30%" survivor annuity.

2. Employees' previously earned benefits did not have to be "converted" to an opening account balances at all. CIGNA could have protected the employees' previously earned benefits by starting employees' benefits anew under the cash balance plan.

3. The pay credits that CIGNA offers under the cash balance formula only go with the converted account balances. Thus, the pay credits are not necessarily an addition to the full value of the annuities the employees earned before 1998. As a result, some employees will experience periods of months or years when their total benefits do not grow at all.

---

[5] See *supra*, Cash Balance Plans, at 37 - 38.

4.  For some classes of employees, the on-going rates of benefit accruals offered by the new plan are less than the rates offered under their prior benefit formulas.

5.  The rates of accruals that CIGNA offers under the cash balance plan decrease with age after employees accumulate 65 age and service points.

**D.  Preview of Supporting Discussion.** In Sections II through IV below I provide a detailed discussion of two SPDs that the company distributed to employees in October 1998 and September 1999. Importantly, however, I also initially focus upon a series of precursor documents that CIGNA distributed to employees starting in November 1997. These precursor documents include a "Signature Benefits Newsletter Special Edition" (discussed in Section II) and an "Information Kit" (Section III). (The SPDs and precursor documents are attached in Exhibits 1 through 4, in their chronological sequence.) I present my discussion following the chronological order in which all of these documents were originally distributed to CIGNA employees. I do so in part because there is robust experimental research showing that the sheer repetition of statements has a powerful persuasive effect on listeners and readers alike.[6] The more often readers read something, the more they believe it. That CIGNA employees may have read some or all of the CIGNA precursor documents *before* receiving and reading the SPDs that the company later distributed must be appreciated. These precursor documents potentially shape the employee's expectations when they later read the SPDs and thus the way they interpret information presented in them. Many experimental studies in the decision science and communication literatures attest to the ways that prior context can shape the perception and interpretation of subsequent information and new data. A consistently positive message in the earlier documents would condition readers to expect a positive message in later documents and reduce their diligence in seeking contrary information.[7]

---

[6] Hasher, L. & Chromiak, W. (1977). The processing of frequency information: an automatic mechanism? *Journal of Verbal Learning & Verbal Behavior 16*, 173-184. Hasher, L. Goldstein, D. & Toppino, T. (1977). Frequency and the conference of referential validity. *Journal of Verbal Learning & Verbal Behavior 16*, 107-112. Petty, R. & Caccioppo, J. (1979). Issue involvement can increase or decrease persuasion by enhancing message relevant cognitive responses. *Journal of Personality and Social Psychology 37*, 1915-1926.

[7] Green, D. & Blair, I. (1995). Framing and the price elasticity of private and public goods. *Journal of Consumer Psychology 4*, 1-32; Haugtvedt, C. & Wegener, D. (1994). Message order effects in persuasion: An attitude strength perspective. *Journal of Consumer Researc, 21*, 205-218; Kahneman, D. & Tversky, A. (1984). Choices, values and frames. *American Psychologist 39*, 341-350; Shah, D., Domke, D., & Wackman, D. (1996). "To thine own self be true": Values, framing, and voter decision-making strategies. *Communication Research 23*, 509-560; Wang, X. (1996). Framing effects: Dynamics and task domains. *Organizational Behavior and Human Decision Processes 68*, 145-157.

I searched all of these CIGNA documents for any statement bearing upon differences in benefits obtainable under the old versus the new plan, including any warnings or assurances about such differences that could be found. For ease of comparison and reference, all document excerpts that are discussed below are displayed chronologically in tables at the end of this report.

## II. CIGNA'S Pre SPD Documents: "Signature Benefits Newsletter"[8] (November 1997)

As an initial step in its transition from a defined benefit plan to a cash balance plan, in November 1997 CIGNA distributed a "Signature Benefits Newsletter" to its employees. This precursor document contains no language suggesting that certain classes of participants may see reductions as a result of the change to the new retirement plan. Instead, it begins with a letter (inset on the first page) to employees from CEO Bill Taylor, who states, without qualification, that the new retirement plan will "significantly enhance" CIGNA's retirement program. This statement is important because it may set participant's expectations about all other information that follows in the subsequent stream of CIGNA communications concerning the change of plans. This inset letter, like the main text of the "Newsletter," contains no language suggesting that certain classes of employees will not see an enhancement to their retirement benefits and will instead see reductions. The "Newsletter" also does not suggest that accruals will decrease with age. Indeed, the main portion of the "Newsletter" offers several other unqualified reassurances to plan participants. It states that:

-- new plan participants "will see an overall improvement in their retirement benefits" (inset box, p. 2, col. b);

-- "the new plan is designed to work well for *both* longer- and shorter-service employees" (p. 4, col. a);

-- the new plan provides "steadier benefit growth throughout [the employee's] career" (p. 4, col. a).

All of these statements are inaccurate for some employees. For example, not all employees will see "overall improvement." The plan does not work as well for older employees, who will not see steadier benefit growth as they near retirement but on the contrary will see reduced benefit rates during this crucial period. The last statement is

---

[8] Hereafter referred to as the "Newsletter" document.

inaccurate because the pay credits that CIGNA offers *only go with converted accounts*; these credits are not added to annuities earned before 1998. As a result, some employees will not see "steadier benefit growth throughout [the employee's] career" because CIGNA makes no actual contributions for some employees during the initial years following conversion.

## III. CIGNA'S Pre SPD Documents: "Information Kit on Your Retirement Program" (December 1997)[9]

In December 1997 CIGNA circulated a second set of communications to employees in a "kit" containing several separate brochures. These brochures (in sequence) are titled as follows:

A) Transition to the New CIGNA Retirement Plan

B) Questions and Answers on the Retirement Program

C) Your CIGNA Retirement Program

As noted above, because these documents were distributed to employees in advance of the two SPDs, they may have conditioned employees' expectations and understanding of statements made in the subsequent SPDs. For this reason, it is relevant and important to evaluate the statements in these documents first.

### A. "Transition to the New CIGNA Retirement Plan"[10]

This first document in the "Information Kit" begins with language that reassures participants moving out the old plan that they will not, as a result of the change in plans, suffer any reductions in pension benefits. Specifically, on page 2 (column a) the company tells the participants that "the benefits you have earned under the Pension Plan will be *converted* to an opening account balance in the new plan." It immediately adds that employee benefits "are fully protected" and "their value will be *reflected* in the new plan balance" (italics added). Precisely what the terms "converted" and "reflected" are meant to convey is not explained. These terms would not likely be noticed by the average plan participant as signals of potential trouble given that participants are concurrently told their old benefits are "fully protected." Even if a few participant readers felt

---

[9] Hereafter referred to as the "Information Kit" document.

[10] Hereafter referred to as the "Transition" document.

6

suspicions about the meaning of these terms, their impact in context is diluted by other statements that are reassuring, for example, "your retirement benefit will continue to grow" (p. 3, column a). In fact, employees' previously earned benefits did not have to be "converted" at all. CIGNA could have "fully protected" the employees' previously earned benefits by starting employees benefits anew under the cash balance plan. CIGNA's account conversions do not "fully protect" the value of benefits that some employees previously earned.  The cash balance plan does not offer the early retirement features that the prior plan offered, nor does it offer a "Free 30%" survivor annuity.

Following this introduction, this document then shows two formulas participants are invited to use to project their pension benefits. The first formula (p. 2) purports to enable them to determine how much their final pension benefits would be if they retired as of 12/31/97. However, using these formulas will not enable participants to accurately project their benefits due to missing actuarial information. At the same time, the sample calculation does not show or suggest the ways in which benefit reductions relative to the old plan are possible. The "Step 2" section of this document further directs participants' attention away from a comparison of the old plan with the new. This section focuses upon unspecified differences between the participant's possible benefits and benefits shown in the examples: "Your actual benefit will depend upon your age, future service, and salary history, and *may differ from the benefits shown in the examples*" (p. 5, italics added).

### B. "Questions and Answers on the Retirement Program"[11]

This second document in the "Information Kit" leaves participants with the false impression that the lump sum value of their pension as of 12/31/97 is simply "transferred" *unchanged* (p. 11) to another account.

Specifically, on page 4 (column a) of the "Q & A" document, immediately after telling participant readers that their opening balance in the new plan "*will equal* the lump sum value of their pension [under the old plan]," the very next section mentions that CIGNA will use "conversion factors" to determine opening account balances (italics added). Here the text hypothetically asks, "How do I know that the lump sum *conversion* is fair and accurate?" The company, however, does not answer this question.  Instead, the company states that "The conversion factors we are using to determine your opening account balance are based on guidelines established by the government to *ensure a fair transition* for employees." In fact, the "guidelines" to which CIGNA apparently refers here concern lump sum distributions that occur with the written consent of participants

---

[11] Hereafter referred to as the "Q & A" document.

and their spouses. These guidelines are not applicable to cash balance conversions that occur without consent and with no actual distribution of money to the employee. The phrase "ensure a fair transition" and the mention of "federal guidelines," together with the preceding strong assurance that the new plan balance "will equal" the lump sum value of benefits under the old plan, screens from view the fact that the "conversion factors" can substantially reduce the benefits available in the new plan relative to the old. At the same time, the language in this document conflates the difference between "transferring" (i.e., preserving) the value of the old plan's benefits and "converting" (i.e., changing its value) by concurrently using the phrase, "fair transition." The phrase "fair transition" suggests to the average reader that *conversion* of the pension value is no more than a mere *transfer* of the pension value, i.e., a value that does not change.

Further reinforcing this confusion about the nature and effect of the change to the new plan, the "Q & A" document later says, "If you are eligible for the new CIGNA Plan, *all of your benefits* earned under the current pension plan through December 31,1997 *will remain yours*. As of January 1, 1998, those benefits will be *transferred* to the new plan" (p. 4, italics added). The explicit use of the term "transferred" in this context leads employees to believe that their benefits under the old plan would not be reduced through some "conversion" process at all, but simply and literally moved unchanged from one account to another.

Finally, on pages 3 and 7 the "Q & A" document continues to direct employees' attention away from potential reductions in new plan benefits resulting from "conversion" by making statements concerning participants' future benefits. On page 3, participants read this question: "I was hired in 1989. Why wasn't I allowed to stay in the [old] Pension Plan?" In answer, the company states that "Our analysis showed that, *in comparison to people with higher age and service combination*, you have plenty of time to take full advantage of the *many attractive features* of the Retirement Plan . . ." The company does not offer any direct or explicit comparison of new with old plan benefits. Instead, the reassuring phrase "plenty of time to take full advantage of the many attractive features" could easily be construed by participant readers as saying that the new plan is better for participants in this situation when, in fact, some participants could realize a reduction in benefits.

The remarks on p. 3 are reinforced on page 7. Here the document asks, "Will my benefits be better under the new retirement plan?" The company answers that "Generally speaking, the new retirement plan, in comparison with the current pension plan, tends to provide larger benefits for shorter-term employees and *comparable benefits* for longer service employees" (p.7, italics added). There are two ways this answer is problematic and obscure. First, when a speaker uses the qualifying phrase "Generally speaking" in

beginning to answer such a seemingly clear and direct question, the phrase implies that the speaker recognizes and intends to cite *some clear exceptions or situations* in which benefits will *not* be "better" or "comparable," if these exist. Here, no such exceptions are stated when, in fact, some employees will not receive "comparable benefits" and instead realize significant reductions. Under the cash balance plan, benefit accrual rates decrease with age so that, for an employee who is age 60, the rate of accruals may be significantly less than under the prior plan, and thus not a "comparable" benefit. Second, the use of the term "comparable," when added to the terms and phrases already discussed (e.g., "equal," "fair transition"), contributes to employees' possible misunderstanding that the new plan only involves a simple balance "transfer" process when in reality it involves a potentially harmful "conversion" process. In many cases, CIGNA's cash balance benefits are not "better," "significantly enhanced" (as characterized by Mr. Taylor in the precursor "Newsletter" document), nor even "comparable" to the prior plan.

## C. "Your CIGNA Retirement Program"

This third document in the "Information Kit" continues to equate the potentially harmful "conversion" of "opening account balances" with a simple and harmless "transfer" of employees' account balances from the old pension plan, as discussed above. For example, on p. 3 (column b) this document again tells employees that "Any benefits that you have earned under the CIGNA Pension Plan will be converted to an opening account balance in the new plan." But on page 3 (column a) employees are (again) told the following (p. 4, col a): "*The opening account balance will equal* the lump sum value of the pension benefit you earned through December 31, 1997" (italics added). At the same time this document reassures all participants that they will continue to earn benefits in future years. On page 4 (column a) under the heading, "How Your Benefit Grows," this document states:

> "Each dollar's worth of credit is a dollar of retirement after you are vested. Under the plan, your benefit will *grow steadily throughout your career* as credits are added to your account"(italics added).

This statement fails to reveal that benefits may not grow at all for several years and that the ultimate rate may be lower than the prior rate. It does not reveal that after employees have reached 65 service and age points, e.g., age 48 with 17 years of service, their benefit rate will *drop* with each additional year of age.

9

## IV. CIGNA Summary Plan Documents (SPDs)

In October 1998 CIGNA distributed to its employees an SPD concerning the change in plans. A little less than a year later, in September 1999, CIGNA distributed a second, slightly revised SPD, also concerning the change in plans. That CIGNA employees may have read some or all of the precursor documents discussed above *before* receiving and reading the SPDs that the company later distributed must be appreciated. These precursor documents potentially shape the employee's expectations when they read the SPDs, and thus the degree to which they question statements presented in them. As noted earlier, many experimental studies in the decision science and communication literatures attest to the ways that prior context can shape the perception and interpretation of subsequent information and new data. A consistently positive message that is repeated in the earlier documents would condition readers to expect a positive message in later documents and reduce their diligence in seeking contrary information.[12] As it happens, the earlier, unqualified assurances about the change from the old pension plan to the new cash balance plan continue in the two SPDs that CIGNA distributed to employees in 1998 and 1999. No statements are offered in these documents that indicate circumstances or ways in which a reduction in benefits can occur under the new plan relative to the old.

### A. 1998 and 1999 Summary Plan Documents

In the first of these two SPDs (October, 1998), on page 2 (column a, top left) the company states: "If you were in the CIGNA Pension Plan before 1998, you've received credit for your prior years of **vesting service** and **credited service**." This statement may suggest that the change to the new plan involves no loss of benefits. But because of the way credits are accrued, some employees may enter the new plan and receive no new benefit payments in future years. The text here does not disclose this possible consequence to participants, nor does it do so anywhere else. Indeed, repeating a statement made in the company's earlier document titled "Your CIGNA Retirement Program" (see above), the October 1998 SPD again reassures all participants that they will continue to earn benefits in future years. Specifically, on page 2 the SPD prominently states (center, across the top of the page):

> "Each dollar's worth of credit is a dollar of retirement after you are vested. Under the plan, your benefit will *grow steadily throughout your career* as credits are added to your account" (italics added).

This statement fails to reveal that benefits may not grow at all for several years and that

---

[12] See works cited *supra* note 7.

the ultimate rate may be lower than the prior rate. It does not reveal that after employees have reached 65 service and age points, e.g., age 48 with 17 years of service, their benefit rate will drop with each additional year. Moreover, given the repetition of this reassurance from the earlier document, employees are less likely to question it.

The notion that the change to the new plan involves no loss of benefits is again implied on page 3 (column a), again in language almost identical to the language that appears in the precursor texts analyzed above (e.g., see "Your CIGNA Retirement Plan," p. 4, column a). Here the SPD states:

> "If you were an employee on December 31, 1997, or rehired after 1997, any benefit you earned under the Pension Plan through December 31, 1997 was converted to an opening account balance in this Pension Plan. The opening balance was equal to the lump sum value of the pension benefit you earned through December 31, 1997."

Moreover, in two other statements the October 1998 SPD reassure employees who left the company and returned that, relative to the benefits obtainable under the old plan, the new plan would be the same or better. The first of these statements occurs on page 8 (column b), the second on page 13 (column a):

> *"If you were in the **old Plan** when you left,* the pension benefits you earned will be converted to an opening account balance in this plan when you return. The conversion formula used is based on guidelines established by the federal government for valuing pension benefits. If you have questions about the conversion formula, you may call the CIGNA Retirement Service Center at 1-800-224-4624."

> "If you participated in the Pension Plan before 1998, your **old plan** benefits were converted to an opening account balance in the Plan. Your final Plan benefits cannot be less than your **old plan** benefits on December 31, 1997. If this minimum benefits rule applies to you, you'll be notified by the Retirement Benefit Center when you request a distribution."

The first segment above, by alluding to federal regulations, may suggest to some plan participants that they cannot lose benefits. As noted in the analysis above, CIGNA had already linked the federal guidelines with the notion of a "fair transition," suggesting that participants would not lose benefits in the plan shift. But CIGNA does not tell employees that the value of their opening account balance does not include early retirement benefits and other features such as the free 30% survivor annuity. While this

11

first statement invites employees to call an 800 number if they "have questions about the conversion formula," all references to the conversion formula are conflated with language suggesting that the shift to the new plan involves a simple "transfer" of funds.

The second segment above contradictorily implies that participants both could and could not lose benefits already earned up to 1998. The contradictory implication arises from the second and third sentence. The second sentence appears to make a categorical assertion: you cannot lose any benefits earned up to 1998. But the third sentence hints that under some undisclosed set of circumstances the participant may lose benefits earned through 1997: "*If* this minimum benefits rule applies to you . . ." (italics added). No explanation is offered here as to why the rule is needed to keep participants from losing benefits. This clause is the only hint in either the 1998 or 1999 SPD that a participant could lose benefits already earned through 1997. Yet it is doubtful average readers would understand the import of this clause (if indeed they notice it at all) given all of the other reassuring and repetitious language appearing in CIGNA documents up to this point.

In the revised September 1999 SPD distributed by CIGNA , all of the statements in the 1998 SPD discussed above *recur with no changes* (see Table 3 below). In fact, across both SPDs, while there is but one contradictory hint that pre-1998 benefits might be lost (and that hint is left unexplained), there are many statements in both SPDs consistently suggesting that plan participants will not lose benefits obtainable under the old plan. There is no mention in either SPD that:

– employees might not immediately begin earning benefits after conversion but instead have new benefits delayed for a number of years;

– early (age 55) retirement benefits disappear entirely;

– the employee's total pension value may not be comparable to what it was under the old plan and that it may even be significantly reduced;

– the cash balance payment option may be relatively less valuable than the annuity options under the old plan.

## B. Conclusion

In my expert opinion CIGNA's 1998 and 1999 Summary Plan Documents (SPDs), as well as the precursor documents distributed to employees before the SPDs, fail to disclose to the average plan participant the potential reductions of benefits associated

with the change to a new cash balance plan. Instead of disclosing the potential reductions, the SPDs and precursor documents offer assurances of steadier benefit growth with no disclosure that the rates decrease with age, that they drop in comparison with the old plan, or that they are conditional upon giving up part of the value of accrued benefits under the old plan.


Signature: _____    Date: _____

with the change to a new cash balance plan. Instead of disclosing the potential reductions, the SPDs and precursor documents offer assurances of steadier benefit growth with no disclosure that the rates decrease with age, that they drop in comparison with the old plan, or that they are conditional upon giving up part of the value of accrued benefits under the old plan.

Signature: _James J. Stichwan_        Date: _April 25, 2003_

13

## Table 1

| CIGNA Precursor Documents Distributed to Employees in November & December 1997 | |
| --- | --- |
| **"Signature Benefits Newsletter Special Edition"** **November 1997** | **"Transition to the New CIGNA Retirement Plan" December 1999** |
| – new plan participants "will see an overall improvement in their retirement benefits" (inset box, p. 2, col. b);<br><br>– "the new plan is designed to work well for *both* longer- and shorter-service employees" (p. 4, col. a);<br><br>– "the new plan provides steadier benefit growth throughout [the employee's] career" (p. 4, col. a). | "...the benefits you have earned under the Pension Plan will be converted to an opening account balance in the new plan" (p. 2, column a).<br><br>Benefits "are fully protected" and "their value will be reflected in the new plan balance" . . . "your retirement benefit will continue to grow" (p. 3).<br><br>"Keep in mind that this benefit comparison is intended to provide you with general information about opening balances and benefit growth . . . Your actual benefit will depend upon your age, future service, and salary history, and may differ from the benefits shown in the examples" (p. 5). |

14

**Table 2**

| CIGNA Precursor Documents Distributed to Employees in December 1997 | |
| --- | --- |
| **"Questions & Answers"** | **"Your CIGNA Retirement Program"** |
| "I was hired in 1989.  Why wasn't I allowed to stay in the [old] Pension Plan? . . .Our analysis showed that in comparison to people with higher age and service combination, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan . . ." (p. 3).<br><br>"Your opening balance will equal the lump sum value of your pension benefits as of December 31st, 1997" (p. 4)<br><br>"How do I know that the lump sum conversion is fair and accurate?  The conversion factors we are using to determine your opening account balance are based on guidelines established by the government to ensure a fair transition for employees" (p. 4).<br><br>"If you are eligible for the new CIGNA Plan, all of your benefits earned under the current pension plan through 12/31/97 will remain your's. As of 1/1/98, those benefits will be transferred to the new plan. . . ." (p. 4).<br><br>"Will my benefit be better under the new retirement plan? Generally speaking, the new retirement plan, in comparison with the current pension plan, tends to provide larger benefits for shorter-term employees and comparable benefits for longer service employees" (p.7). | "Any benefits that you have earned under the CIGNA Pension Plan will be converted to an opening account balance in the new plan." (p. 3, column b).<br><br>"If you were an employee before 1998, any benefit you earned under the CIGNA Pension Plan through December 31, 1997 will be converted to an opening account balance in the Retirement Plan.  The opening balance will equal the lump sum value of the pension benefit you earned through December 31, 1997" (p. 4).<br><br>"Each dollar's worth of credit is a dollar of retirement after you are vested.  Under the plan, your benefit will grow steadily throughout your career as credits are added to your account." |

15

## Table 3

| Summary Plan Documents Distributed to Employees | |
|---|---|
| **Summary Plan Document<br>December 1998** | **Summary Plan Document<br>September 1999** |
| 1) "Each dollar's worth of credit is a dollar of retirement after you are vested. Under the plan, your benefit will grow steadily throughout your career as credits are added to your account" (p. 3, top center). | 1) "Each dollar's worth of credit is a dollar of retirement after you are vested. Under the plan, your benefit will grow steadily throughout your career as credits are added to your account" (p. J2, column a). |
| 2) "If you were an employee on December 31, 1997, or rehired after 1997, any benefit you earned under the Pension Plan through December 31st, 1997 was converted to an opening account balance in this Pension Plan. The opening balance was equal to the lump sum value of the pension benefit you earned through December 31, 1997" (p. 3). | 2) "If you were an employee on December 31, 1997, or rehired after 1997, any benefit you earned under the Pension Plan was converted to an opening account balance in this Pension Plan. The opening balance was equal to the lump sum value of the pension benefit you earned through December 31, 1997" (p. J2). |
| 3) "*If you were in the **old Plan** when you left*, the pension benefits you earned will be converted to an opening account balance in the (sic) this plan when you return. The conversion formula used is based on guidelines established by the federal government for valuing pension benefits. If you have questions about the conversion formula, you may call . . ." (p. 8). | 3) "*If you were in the **old plan** when you left*, the pension benefits you earned will be converted to an opening account balance in this plan when you return. The conversion formula used is based on guidelines established by the federal government for valuing pension benefits. If you have questions about the conversion formula, you may call . . ." (p. J5). |
| 4) "Your final plan benefits cannot be less than your **old plan** benefits on December 31st, 1997. If this minimum benefits rule applies to you, you'll be notified by the Retirement Service Center when you request a distribution." | 4) "Your final plan benefits cannot be less than your **old plan** benefits on December 31st, 1997. If this minimum benefits rule applies to you, you'll be notified by the Retirement Service Center when you request a distribution." |

16

# VITA

## JAMES FALLON STRATMAN

**Office Address:**

Technical Communication Program
Campus Box 176
University of Colorado at Denver
Denver, CO 80217-3364 U.S.A.
Office: (303) 556 - 2884

**Home Address:**

1150 Inca Street # 37
Denver, CO 80204
Home: (303) 571-9004
SS#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
FAX (303) 556 - 6018

## EDUCATION

1988    **CARNEGIE MELLON UNIVERSITY, Ph.D.**
Rhetoric

1979    **UNIVERSITY OF DETROIT**
Rhetorical Theory

1976    **UNIVERSITY OF CINCINNATI, M.A.**
English Literature and
Literary Criticism

1973    **OHIO UNIVERSITY, B.A.**
Literature and Philosophy
(cum laude)

## DISSERTATION

"The Rhetorical Dynamics of Appellate Court Persuasion: An Exploratory Comparison of Advocates' Brief Composing Process With Court Clerks' Brief Reading And Review Process." Research funded by the American Bar Foundation, 1984 _ 85. Professor Linda Flower, Doctoral Committee, Chairperson.

## TEACHING INTERESTS

Legal writing, rhetoric and argumentation; technical writing and editing; health risk communication; empirical research methods (behavioral and cognitive) in document design; usability testing; functional text analysis.

## RESEARCH INTERESTS

Comprehension processes in technical, legal, and health-risk communication; cognitive, rhetorical, and forensic linguistic methodologies for understanding, designing, and improving scientific, health risk, technical, and legal documentation.