Exhibit 12

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF CONNECTICUT
 3                      - - -
 4   JANICE C. AMARA, Individually and on:
 5   behalf of others similarly situated :
 6                 -vs-                  :
 7   CIGNA CORP. and CIGNA PENSION PLAN  :
 8                      - - -
 9            No. 3:01-CV-2361 (DIS)
10      Oral Deposition of JOHN ARKO, was taken
11   pursuant to notice, held at ZANARAS REPORTING AND
12   VIDEO, 1616 Walnut Street, Philadelphia,
13   Pennsylvania, at 10:05 a.m., on July 3, 2003, before
14   Kristen Augello, Court Reporter and Notary Public,
15   there being present:
16
17
18                      - - -
19           ZANARAS REPORTING AND VIDEO
20                1616 Walnut Street
21         Philadelphia, Pennsylvania 19103
22     2112 Bay Avenue, Ocean City, New Jersey 08226
23           1-215-790-7857   1-877-GO-DEPOS
24
```

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   BY: STEPHEN R. BRUCE, ESQUIRE
 4   805 15th Street, NW, Suite 210
 5   Washington, DC 20005
 6   202-371-8013
 7   Attorney for the Plaintiff
 8
 9
10   MORGAN, LEWIS & BOCKIUS
11   BY: JEREMY P. BLUMENFELD ESQUIRE
12   1701 Market Street
13   Philadelphia, Pennsylvania 19103
14   215-963-5258
15   Attorney for the Defendants
16
17
18
19
20   Also Present: Thomas G. Moukawsher, Esquire
21
22
23
24
```

Page 3

```
 1   I N D E X
 2   NAME OF WITNESS:      EXAMINATION     PAGE NO.
 3   John Arko
 4              Mr. Bruce              5
 5
 6
 7
 8         E X H I B I T   I N D E X
 9   NO.                             PAGE
10   Exhibit-52 through 59            5
11   Exhibit-60                      13
12   Exhibit-61                      43
13   Exhibit-62                      71
14   Exhibit-63                      76
15   Exhibit-64                     179
16   Exhibit-65                     184
17   Exhibit-66                     235
18   Exhibit-67                     250
19   Exhibit-68                     252
20   Exhibit-69                     273
21   Exhibit-70                     278
22
23
24
```

Page 4

```
 1            LITIGATION SUPPORT INDEX
 2
 3       DIRECTION TO WITNESS NOT TO ANSWER
 4
 5   PAGE LINE       PAGE LINE        PAGE LINE
 6    16   4         29    1          37   15
 7    61   9        171    5         194   12
 8   203  11        298   19         311    9
 9   314  22        316    1
10      REQUEST FOR PRODUCTION OF DOCUMENTS
11
12   PAGE LINE       PAGE LINE        PAGE LINE
13
14                      (NONE)
15
16                   STIPULATION
17
18   PAGE                         LINE
19     5                            1
20
21                 QUESTIONS MARKED
22   PAGE                         LINE
23
24
```

Page 5

1.      - - -
2.      (It is agreed by and between
3.  counsel that the reading, signing,
4.  sealing, filing and certification are
5.  hereby waived; and all objections,
6.  except as to form of the question, are
7.  reserved until the time of trial.)
8.      - - -
9.      JOHN ARKO, after having been
10. first duly sworn, was examined and
11. testified as follows:
12.     - - -
13.
14.     (Whereupon, the court reporter
15. marked Exhibits-52 through 59 for
16. purposes of identification.)
17.     - - -
18. BY MR. BRUCE:
19.     Q.    Would you please state your name?
20.     A.    John Arko.
21.     Q.    And what's your address?
22.     A.    401 Dudley Avenue, Narberth,
23. Pennsylvania.
24.     Q.    How do you spell Narberth?

Page 6

1.      A.    N-a-r-b-e-r-t-h.
2.      Q.    And Mr. Arko, I have met you before,
3.  because I deposed you in Mr. Depenbrock's case.
4.      A.    Yes.
5.      Q.    What's your job title now?
6.      A.    Director of retirement benefits.
7.      Q.    And you're here in response to a Rule
8.  30(b)(6) notice of deposition. Do you understand
9.  what that is?
10.     A.    Yes. I have been informed.
11.     Q.    Can you explain what your
12. understanding of that is?
13.     A.    That in general this is a -- you have
14. some questions to pose of either Cigna Corporation or
15. the Cigna pension plan, and you needed somebody who
16. could speak on their behalf, since they are unable
17. to.
18.     Q.    So this is a corporation?
19.     A.    Yes.
20.     Q.    And what are the subjects on which
21. you're to speak?
22.         MR. BLUMENFELD: Objection.
23. BY MR. BRUCE:
24.     Q.    What's your understanding of what the

Page 7

1.  subjects are on which you're to speak for the
2.  corporation?
3.         MR. BLUMENFELD: Same objection.
4.  He is here pursuant to your notice of
5.  deposition under 30(b)(6) to speak to
6.  the subjects you will identify.
7.         MR. BRUCE: I can ask him what
8.  his understanding is of the subjects.
9.  BY MR. BRUCE:
10.     Q.    Go ahead.
11.     A.    I believe in general you wanted to
12. cover a couple of points. You see, I had to recall
13. now just from memory. One was something a little bit
14. about 204(h) notices around the plan, and we see the
15. accruals of the benefit. The second was how we look
16. at how the plan was designed, or around age
17. discrimination issues, and there was a third. It's
18. escaping me at the moment.
19.         MR. BLUMENFELD: Are you finished
20. with your answer?
21.         THE WITNESS: Yes, I am.
22.         MR. BLUMENFELD: I'd just like to
23. note for the record, he is here
24. pursuant to the 30(b)(6) notice of

Page 8

1.  deposition to answer questions on
2.  subjects identified in that notice and
3.  for purposes of the 30(b)(6) with
4.  regard to him speaking on behalf of
5.  Cigna Corporation and Cigna pension
6.  plan. He is authorized to speak on
7.  regarding subjects that you identified
8.  in the notice.
9.         MR. BRUCE: Okay.
10. BY MR. BRUCE:
11.     Q.    And what did you do to prior to
12. speaking on Cigna's behalf on these subjects?
13.     A.    Had a few meetings with Jeremy
14. Blumenfeld and with Paul Gontarek.
15.     Q.    Anyone else?
16.     A.    No.
17.     Q.    How about Mr. Meyn?
18.     A.    No.
19.     Q.    Did you speak with Mr. Meyn about what
20. you were going to do?
21.     A.    I let him know that I was scheduled to
22. be at this deposition today.
23.     Q.    And what was your conversation with
24. him?

Page 133

1  A.  The letter doesn't say, and I
2  certainly don't recall. I am sorry, the letter does
3  say up top, DWD, comments.
4  Q.  That's David W. Durham?
5  A.  Yes.
6  Q.  And then item number four of this
7  says, how your balance was created, and Mr. Durham
8  says, for the new employee it is easy, since it's
9  zero; however, we need to provide a quick summary of
10 how an opening balance was created for employees
11 actively employed on 1/1/98 versus a rehired
12 employee, slash, transfer from nonparticipating
13 company employee. Just explain that we take the age
14 65 or, parens, age 62, benefit they accrued at
15 termination of employment transfer and use the
16 actuarial equivalency under standard group unisex
17 actuarial tables using an interest rate of 6.05,
18 parens, or 5.05, percent on 1/1/98 or rate in effect
19 in the year of rehire or retransfer. Do you know
20 whether the summary plan description in Exhibit-3
21 indicates that the -- the opening account balance is
22 based on the age 65 or age 62 benefit?
23    MR. BLUMENFELD: Objection.
24    THE WITNESS: I can look really

Page 134

1  quick. I am not certain.
2     MR. BRUCE: Okay.
3     THE WITNESS: There's a paragraph
4  that seems to describe.
5  BY MR. BRUCE:
6  Q.  This is on the page that is number 64?
7  A.  Correct.
8  Q.  Under, how your account grows?
9  A.  Yes, that's the one I am looking at.
10 Q.  And does that -- it says, if you were
11 an employee on December 31, 1997 or rehired after
12 1997, any benefit you earned under the pension plan
13 through December 31, 1997 was converted to an opening
14 account balance in this pension plan. The opening
15 balance was equal to the lump sum value of the
16 pension benefit you earned through December 31, 1998;
17 is that right?
18 A.  Yes.
19 Q.  Does that disclose the points that Mr.
20 Durham made in his comments about that it's taking
21 the age 62 or age 65 benefit?
22    MR. BLUMENFELD: Objection.
23    THE WITNESS: I suppose you could
24 ask Dave Durham.

Page 135

1  BY MR. BRUCE:
2  Q.  Does the SPD appear to disclose that
3  the evaluation is based on the age 62 or 65 benefit?
4     MR. BLUMENFELD: Objection.
5     THE WITNESS: It discloses that
6  it's based on the benefit you earned
7  through 12/31/97.
8  BY MR. BRUCE:
9  Q.  The benefit people earned through
10 12/31/97 could be considered to be the age 55
11 benefit?
12    MR. BLUMENFELD: Objection.
13    THE WITNESS: I don't know what
14 people would consider. The terms of
15 the plan are what they are.
16 BY MR. BRUCE:
17 Q.  And the terms of the plan included
18 benefits at age 55 which had subsidized value, right?
19    MR. BLUMENFELD: Objection.
20    THE WITNESS: Depending on the
21 specific person's situation and career
22 information at the time they commence
23 payments, it would have gone to the
24 terms of the plan, again from Part B

Page 136

1  of the plan document, and if need be
2  it would have gone into Part A of the
3  plan document, and calculated specific
4  benefits.
5  BY MR. BRUCE:
6  Q.  Is that a yes, the terms of the plan
7  included early retirement benefits at age 55?
8     MR. BLUMENFELD: Objection.
9     THE WITNESS: Yes, under certain
10 circumstances, yes.
11 BY MR. BRUCE:
12 Q.  And under certain circumstances those
13 benefits at age 55 included what's called subsidized
14 value, right?
15 A.  I don't think there's anything in the
16 plan that talks to the term, subsidized value, so you
17 would have to ask the participants if they feel it's
18 subsidized, but clearly the terms of the plan are
19 followed very precisely to each individual
20 participant at the time they commence their benefits.
21 Q.  So the summary plan description on
22 Exhibit-3 does not appear to disclose whether the
23 opening balance is based on the age 55 or the age 65
24 benefit, right?

Page 137

1     MR. BLUMENFELD: Objection.
2          THE WITNESS: No, it describes in
3       general terms how that opening account
4       balance is created, what the terms of
5       the plan are, what they are.
6  BY MR. BRUCE:
7     Q.   Are you familiar with the standard in
8  the Department of Labor regulations on clearly
9  identifying circumstances which may result in the
10 loss or denial of benefits that a participant might
11 reasonably expect to be provided to them? Are you
12 familiar with the idea that the summary plan
13 descriptions are supposed to clearly identify
14 circumstances in which people may not get the
15 benefits that they may reasonably expect?
16         MR. BLUMENFELD: Objection.
17         THE WITNESS: I understand the
18       concept personally, yes.
19 BY MR. BRUCE:
20    Q.   And so is there someplace in the
21 summary plan description which discloses to employees
22 that their opening account balance may not include
23 the value of those age 55 benefits?
24         MR. BLUMENFELD: Objection.

Page 138

1          THE WITNESS: The summary plan
2       description describes what benefits
3       somebody might get that has a career,
4       and specific career histories that
5       would fall under the terms that this
6       summary plan description describes;
7       what benefits and what available
8       options would be available to them.
9  BY MR. BRUCE:
10    Q.   Try and answer any question. Does the
11 summary plan description disclose that the opening
12 account balance may not include the value of the
13 early retirement benefits that the person has?
14         MR. BLUMENFELD: Objection.
15         THE WITNESS: The summary plan
16       description describes the terms of the
17       plan, provides information on where to
18       get precise calculations, what would
19       show given a specific commencement
20       date what your options are, and the
21       specific dollars in each option.
22       That's in this summary plan
23       description.
24         MR. BRUCE: Try and answer my

Page 139

1       question.
2          MR. BLUMENFELD: Objection. He
3       has already done so.
4          MR. BRUCE: Can you ask the
5       question again?
6  BY MR. BRUCE:
7     Q.   You need to listen to my question.
8  Try and answer it. You can add qualifications or
9  whatever, but try and answer my question, please?
10         MR. BRUCE: Can you read him back
11       the question?
12         (The previous question is read
13       back.)
14         MR. BLUMENFELD: Objection.
15         THE WITNESS: I don't see the
16       specific words that you're mentioning,
17       but this summary plan description
18       defines the benefits that participants
19       that fit the criteria to receive
20       benefits under this plan would
21       receive, provides them information on
22       where to go to get a specific
23       calculation given the scenario and the
24       specific benefit commencement date, of

Page 140

1       where to get it.
2  BY MR. BRUCE:
3     Q.   There are some words in there, if you
4  don't see the specific words that disclose that,
5  there are some words in the summary plan description
6  which you think reasonably suggest to the participant
7  that their opening account balance is based on the
8  age 65 value, not the early retirement value? Is
9  there something in there --
10         MR. BLUMENFELD: Objection.
11 BY MR. BRUCE:
12    Q.   -- from which you think a reasonable
13 participant should have gleaned that the opening
14 account balance does not include the early retirement
15 benefit?
16    A.   I don't see specific words that define
17 that detail; however, there was other information
18 that was provided to people that did provide specific
19 information about how their opening account balances
20 are created.
21    Q.   And what other information are you
22 thinking about?
23    A.   Provided the retirement kits -- prior
24 to conversion, we provided each participant with at

Page 141

1   the time of the conversion, 1/1/98, with the specific
2   calculation of their opening account balance, the
3   accrued benefits. That was how it was calculated,
4   12/31/97, and how it was converted into opening
5   account balance.
6       Q.   We talked earlier about the A plus B
7   concept, that people would get, A, their previously
8   earned benefit, and B, the new accruals, under the
9   cash balance formula. Is there somewhere in the
10  summary plan description that tells people that
11  that's not the method that Cigna is using, that they
12  are not using A plus B?
13              MR. BLUMENFELD: Objection.
14              THE WITNESS: No, not to my
15          knowledge. I don't tell them what's
16          not available to them.
17  BY MR. BRUCE:
18      Q.   Is there something in here that
19  suggests to them that they are not getting A plus B?
20              MR. BLUMENFELD: Objection.
21              THE WITNESS: I don't know. I
22          guess you'd have to ask the
23          participants what is suggested to
24          them, but there's nothing in here

Page 142

1   about benefits that are -- benefits
2   that are not available to them.
3   BY MR. BRUCE:
4       Q.   If you look on the same page, Page
5   624, under how your account grows, you see in the
6   first paragraph where it says, each dollar's worth of
7   credit is a dollar of retirement benefits payable to
8   you after you're vested?
9       A.   Yes.
10      Q.   It says: Under the plan, your benefit
11  will grow steadily throughout your career as credits
12  are added to your account?
13      A.   Yes.
14      Q.   Doesn't that suggest to people that
15  they are getting A plus B?
16              MR. BLUMENFELD: Objection.
17              THE WITNESS: I can't interpret
18          what this might -- how people might
19          interpret that statement, but to me it
20          just says what it says.
21  BY MR. BRUCE:
22      Q.   It says each dollar's worth of credit
23  is a dollar of retirement benefits payable to you
24  after you're vested. Doesn't that suggest to people

Page 143

1   that they are getting additional benefits?
2               MR. BLUMENFELD: Objection,
3           already asked and answered.
4               THE WITNESS: It doesn't suggest
5           anything, I don't think. It tells
6           these people what their benefits are
7           per the terms of the pension plan.
8   BY MR. BRUCE:
9       Q.   Is it suggesting to people that they
10  are not getting A plus B, they are not getting
11  additional benefits on top of the benefits that they
12  have already earned?
13              MR. BLUMENFELD: Objection.
14              THE WITNESS: To my knowledge,
15          the SPD does not talk about benefits
16          that people do not get. It only talks
17          about benefits that are due them if
18          they meet the criteria of the terms of
19          Part B of the pension plan.
20  BY MR. BRUCE:
21      Q.   Mr. Arko, if you have -- you know what
22  a defined contribution plan is, right?
23      A.   Yes.
24      Q.   If you have a defined contribution

Page 144

1   plan with a $20,000 balance in it and Cigna tells you
2   that next year they are going to contribute a
3   thousand dollars to your defined contribution plan,
4   don't you assume that they mean a thousand dollars on
5   top of the $20,000 that you already have?
6               MR. BLUMENFELD: Objection.
7               THE WITNESS: Just asking me that
8           question, I would say yes, that makes
9           sense.
10  BY MR. BRUCE:
11      Q.   And so wouldn't participants in the
12  Cigna pension plan assume that if they have earned
13  benefits up until the end of 1997, and Cigna is
14  promising them a new cash balance plan, that the new
15  cash balance benefits will be on top of the benefits
16  they have already earned?
17              MR. BLUMENFELD: Objection.
18              THE WITNESS: The pension plan is
19          what it is. It is not a defined
20          contribution plan, it is a defined
21          benefit plan, and the benefit is
22          determined at the time people commence
23          their benefits, given their specific
24          situation, and the terms of the plan

Page 145

1  that have been in place throughout
2  their career.
3  BY MR. BRUCE:
4  Q. Is there anyplace in the summary plan
5  description which is clearly identifying for the
6  participants that the benefits offered under this
7  cash balance plan are not in addition to the benefits
8  that they have already earned?
9        MR. BLUMENFELD: Objection.
10       MR. BRUCE: Jeremy, don't close
11       an exhibit for the witness. Leave it
12       the way he has it.
13       MR. BLUMENFELD: Fine.
14       THE WITNESS: I am sorry, you're
15       going to have to repeat the question.
16       Too many nots in there.
17       (The previous question is read
18       back.)
19       THE WITNESS: Again, there is
20       nothing in here that I am aware of
21       that talks about benefits that are not
22       available to our participants.
23 BY MR. BRUCE:
24  Q. But are you familiar with the legal

Page 146

1  standard for summary plan descriptions, that they are
2  supposed to clearly identify the circumstances which
3  may result in a loss or denial of benefits that a
4  participant might reasonably expect to receive from
5  the plan?
6        MR. BLUMENFELD: Objection.
7  BY MR. BRUCE:
8  Q. Do you think it would be unreasonable
9  for a participant to expect to receive the cash
10 balance benefits on top of the benefits that they
11 have already earned?
12 A. I can't speak to what our participants
13 might feel about this. I know there's a number of
14 requirements in the summary plan description, and
15 that's why we rely on legal counsel to review and
16 sign off on the summary plan descriptions.
17 Q. So independent of legal counsel, do
18 you have an opinion on whether this summary plan
19 description clearly identifies the circumstances in
20 which participants may lose or be denied benefits
21 that they reasonably expect to receive?
22       MR. BLUMENFELD: Objection.
23       THE WITNESS: I can't speak to
24       what participants might glean from the

Page 147

1  summary plan description, but I can
2  say that the summary plan description
3  was designed to explain to
4  participants what their benefits will
5  be at the time they commence them.
6  BY MR. BRUCE:
7  Q. Was it designed to explain to
8  participants the circumstances in which they might
9  not receive all of the benefits that they expected to
10 receive?
11       MR. BLUMENFELD: Objection.
12       THE WITNESS: Again, the plan,
13       the summary plan description, to my
14       knowledge, does not talk about
15       benefits that are not available to
16       participants. It describes what
17       benefits are available to them given
18       their work history and --
19 BY MR. BRUCE:
20 Q. Do you understand that if it is a
21 reasonable expectation for a participant to think
22 that they are going to receive A plus B, their old
23 benefit plus the new benefits, that the summary plan
24 description regulations require Cigna to disclose

Page 148

1  that that isn't going to happen?
2        MR. BLUMENFELD: Objection.
3  BY MR. BRUCE:
4  Q. Do you understand that?
5        MR. BLUMENFELD: The law is what
6        it is, Steven. You can't get him to
7        change that fact.
8  BY MR. BRUCE:
9  Q. Do you understand that?
10 A. I can follow your words to what you
11 have described, yes.
12 Q. And so do you think that it's an
13 unreasonable expectation for a participant to think
14 that they are going to get their old benefits plus
15 new benefits?
16       MR. BLUMENFELD: Objection.
17       THE WITNESS: I can't speak to
18       what participants might feel, or --
19       out of this plain document, but I do
20       know -- out of this summary plan
21       description, but it does define what
22       benefits will be available to them at
23       the time.
24 BY MR. BRUCE:

Page 149

1  Q.  Doesn't the regulation require Cigna
2  to assess whether a reasonable participant might
3  expect to receive A plus B, that a reasonable
4  participant might expect to receive the old benefits
5  plus the new benefits?
6      MR. BLUMENFELD:  Objection as to
7      what the law requires.
8  BY MR. BRUCE:
9  Q.  Doesn't the regulation require Cigna
10 to make an assessment about what participants may
11 reasonably expect to receive?
12 A.  I don't know.  There's a lot of laws
13 that we try to -- we intend to follow each and every
14 law and regulation that applies to pension plans,
15 that's why we work with our outside counsel and
16 others to make sure we follow them.
17     MR. BLUMENFELD:  Steven, I think
18     John should step out for a minute,
19     because I need to say something on the
20     record, if that's all right.
21     MR. BRUCE:  You need to say
22     something on the record without him
23     present?
24     MR. BLUMENFELD:  Yes, I want to

Page 150

1  say it without him present because I
2  don't want to cloud his testimony, and
3  I'd like to say it because it needs to
4  be said on the record.  Can you step
5  out for just one minute?
6  (Witness leaves room.)
7      MR. BLUMENFELD:  I think it's
8      entirely improper for you to be asking
9      him questions based on your
10     representation of what the law
11     requires, and trying to get him to
12     admit that that's the case.  I also
13     think it's entirely improper for you
14     to be asking him questions when you
15     know there's a specific provision in
16     the SPD known as minimum benefit that
17     discloses the very thing that you're
18     trying to talk to the witness about
19     without pointing it out to him, and
20     just sort of expecting that he might
21     get it or might not get it, and you
22     know that provision is in there, so
23     you should ask him with regard to that
24     specific provision and deal with it

Page 151

1  that way.
2      MR. BRUCE:  Well, you have made
3      your statement.  I don't agree with
4      you.
5      MR. BLUMENFELD:  That's fine.
6      MR. BRUCE:  I don't know why
7      you're making these speeches.
8  (Witness reenters room.)
9  BY MR. BRUCE:
10 Q.  Mr. Arko, is it your understanding
11 that the summary plan description disclosed to
12 participants, that the actual payment of benefits
13 would be under a greater-of provision, where they
14 would receive the greater of A, the old benefits, or
15 B, the opening account balance plus additional cash
16 balance contributions?
17     MR. BLUMENFELD:  Objection.
18     THE WITNESS:  Again, the plan,
19     the summary plan description, defined
20     what benefits are available to people
21     upon their commencement.
22 BY MR. BRUCE:
23 Q.  And did it disclose what we talked
24 about earlier, the greater-of rule?

Page 152

1      MR. BLUMENFELD:  Objection.  The
2      document speaks for itself.
3      MR. BRUCE:  He is here as the
4      designated witness on the summary plan
5      description, Jeremy.
6      MR. BLUMENFELD:  And so you want
7      to ask him what the document says when
8      it speaks for itself?
9      MR. BRUCE:  You're tiresome at
10     this point, so let him answer the
11     questions.
12     MR. BLUMENFELD:  I was letting
13     him do that, and noting an objection,
14     and you felt it necessary to comment,
15     so I was responding.
16     THE WITNESS:  Is there a question
17     on the table?
18     MR. BRUCE:  There was until your
19     counsel interrupted.  Can you go back
20     to the question?
21     (The previous question is read
22     back.)
23     THE WITNESS:  The summary plan
24     description describes the optional

Page 153

```
 1        payment method available to
 2        participants at the time they commence
 3        the benefit.
 4  BY MR. BRUCE:
 5     Q.   We talked earlier about the relative
 6  value of benefit options, and I think you agreed that
 7  Exhibit-26 did not specifically disclose that some
 8  benefit options might have greater benefit values
 9  than others. Is that the right exhibit number, 26?
10             MR. BLUMENFELD: Objection.
11             THE WITNESS: And I am sorry, now
12        you are going to have to repeat that
13        question.
14  BY MR. BRUCE:
15     Q.   Is that a fair description of the
16  previous testimony on Exhibit-26?
17             MR. BLUMENFELD: Objection, asked
18        and answered.
19  BY MR. BRUCE:
20     Q.   Do you recall that?
21     A.   I am not recollecting the question
22  that's on the table now. What do you want to know
23  about Exhibit-26?
24     Q.   That we talked earlier about the
```

Page 154

```
 1  benefits options under Exhibit-26, that the
 2  description of those options does not indicate
 3  whether one option or another might have subsidized
 4  values, correct?
 5             MR. BLUMENFELD: Objection. The
 6        document speaks for itself, and
 7        already asked and answered.
 8  BY MR. BRUCE:
 9     Q.   We discussed this before lunch?
10     A.   Yes, we discussed it.
11     Q.   You remember that?
12     A.   Yes, I do.
13     Q.   Okay. Does the summary plan
14  description disclose to participants that when they
15  go to retire, there may be some options that have a
16  greater relative value than other options?
17             MR. BLUMENFELD: Objection.
18             THE WITNESS: The summary plan
19        description describes the benefits
20        that are available to people at the
21        time they commence retirement.
22  BY MR. BRUCE:
23     Q.   In Exhibit-3 on Page 625 it has a
24  heading entitled, optional payment method. Does that
```

Page 155

```
 1  description indicate to participants that some of
 2  those benefit payment options may contain subsidized
 3  values, whereas other ones may not contain subsidized
 4  values?
 5             MR. BLUMENFELD: Objection.
 6             THE WITNESS: The optional
 7        payment methods described here are
 8        those that are available under the
 9        Part B plan, provided the participant
10        otherwise meets the criteria of this
11        plan. These are the options available
12        to them at the time they decide to
13        commence retirement.
14  BY MR. BRUCE:
15     Q.   You need to try and answer my
16  question, and then qualify it how you want, but to
17  try and answer my question, as I have asked you this
18  one twice, again, so can you read him back the
19  question? Try and answer the question first, and
20  then you're free to digress and add stuff.
21             MR. BLUMENFELD: Objection.
22             (The previous question is read
23        back.)
24             THE WITNESS: I see no specific
```

Page 156

```
 1        words that mirror those that you just
 2        asked about, but it does clearly
 3        describe the specific payment method
 4        and forms of payment available to a
 5        participant that meets the terms of
 6        the Part B plan at the time they
 7        decide to commence benefits.
 8  BY MR. BRUCE:
 9     Q.   And you mentioned earlier that besides
10  the information in Exhibit-26, the benefit
11  commencement package that would be given to
12  participants, and besides the information in the
13  summary plan description, that a participant could
14  call an 800 number and ask questions at the 800
15  number.
16     A.   Yes.
17     Q.   And that 800 number connects
18  participants up with where, a unit in Hartford?
19     A.   I don't know that it's in Hartford.
20  They might be connected elsewhere, but it's with
21  Cigna Retirement Investment Services.
22     Q.   And is there a question-and-answer
23  script that the operators use there to answer
24  questions?
```

Page 253

1    marked Exhibit-68 for purposes of
2    identification.)
3         - - -
4  BY MR. BRUCE:
5    Q.   Exhibit-68 is an e-mail from David
6  Durham to Denise Hill and Jerry Meyn with a copy to
7  you, and he is attaching some notes from his
8  discussions with groups of managers grades 52 to 55
9  about pension changes. How high up are managers with
10 grades 52 to 55?
11   A.   That's above a mid-level manager, but
12 not --
13   Q.   But not senior?
14   A.   But not senior managers.
15   Q.   And on the page that is stamped as
16 11936 there is a heading entitled, bad news.
17   A.   Um-hum.
18   Q.   It says, published case studies
19 positive and negative, and expect to be able to
20 support employees who will be negatively impacted
21 ASAP. Do you see that?
22   A.   Yes.
23   Q.   Do you recall any case studies that
24 were negative, publishing any negative case studies?

Page 254

1    A.   I don't recall, no.
2    Q.   Doesn't this indicate that the
3  managers were picking up that there might be some
4  cases where these changes would not be positive?
5         MR. BLUMENFELD: Objection.
6  BY MR. BRUCE:
7    Q.   And the case studies should be
8  published on both sides of the equation?
9    A.   I can only read these notes which look
10 to be, I guess David Durham's notes of these meetings
11 with managers. I can't read into them any more than
12 that.
13   Q.   They have a number of notes from
14 yourself where you have marked up -- you have marked
15 this up?
16   A.   Yes, it looks like I did back in 1997,
17 but I still do not remember it at all.
18   Q.   And do you know of any negative case
19 studies that are in the summary plan description?
20        MR. BLUMENFELD: Objection.
21        THE WITNESS: I don't know of any
22   negative case studies. If you mean by
23   case studies, examples or something, I
24   believe there are examples in there,

Page 255

1    but they are just that examples of the
2    benefits that are provided under the
3    terms of the pension plan.
4  BY MR. BRUCE:
5    Q.   So going back to the summary plan
6  description to Exhibit-3, is there anything in there
7  that you would consider to be disclosure of any
8  negative features about the cash balance plan?
9         MR. BLUMENFELD: Objection. The
10   document speaks for itself.
11        THE WITNESS: I don't know what
12   you mean by negative features. Whose
13   perception --
14 BY MR. BRUCE:
15   Q.   In your understanding, did you think
16 there was any negative features about the cash
17 balance plan?
18   A.   I guess I don't understand --
19        MR. BLUMENFELD: Objection.
20        THE WITNESS: -- the context of
21   the question, to whom would there be
22   negative features? Participants?
23 BY MR. BRUCE:
24   Q.   Were there any disadvantages of the

Page 256

1  cash balance plan compared to the prior pension plan?
2    A.   The features are different.
3         MR. BLUMENFELD: Objection.
4         THE WITNESS: However they are
5    interpreted by participants, I can't
6    speak to their views.
7  BY MR. BRUCE:
8    Q.   Well, you are in this field. Were
9  there any provisions under the cash balance plan that
10 you felt or thought might be disadvantageous compared
11 to what people had under the prior plan?
12   A.   In any --
13   Q.   You testified before there were early
14 retirement subsidies under the retirement plan that
15 weren't under the cash balance plan.
16   A.   Under certain conditions and
17 situations, yes, there were, under the old plan.
18   Q.   And there was a free 30 percent
19 survivor annuity that was under the old plan that
20 wasn't offered under the new plan, right?
21        MR. BLUMENFELD: Objection.
22        THE WITNESS: If you met the
23   criteria under the terms of that,
24   quote, 33 percent benefit, yes, you

Page 257

```
 1        could get that.
 2   BY MR. BRUCE:
 3        Q.   And that wasn't -- the loss of that
 4   feature is not described in the summary plan
 5   description, right?
 6             MR. BLUMENFELD:  Objection.
 7             THE WITNESS:  Again, the summary
 8        plan description for the 1/1/98 Part B
 9        the plan doesn't talk about the
10        benefits that people can't get, if
11        that's what you mean.
12   BY MR. BRUCE:
13        Q.   And we looked at Mr. Upton's
14   calculations where his benefits would be reduced by 5
15   percent or more.  Would you consider that to be a
16   disadvantage, comparing the old plan with the new
17   plan?
18             MR. BLUMENFELD:  Objection.
19             THE WITNESS:  Again, I didn't
20        look closely at what those
21        calculations were done or how they
22        were completed, but --
23   BY MR. BRUCE:
24        Q.   You did them?
```

Page 258

```
 1        A.   A long time ago.  I don't again recall
 2   what assumptions were used and how future benefits
 3   that you could or could not get under the plan were
 4   completed specifically.
 5        Q.   So is the possibility of reductions
 6   like the ones that Mr. Upton was shown by you, is
 7   that possibility disclosed in the summary plan
 8   description?
 9             MR. BLUMENFELD:  Objection.  The
10        document speaks for itself.
11             THE WITNESS:  The document, we
12        don't show -- summary plan description
13        does not show benefits that people
14        could not get.  It only describes the
15        terms of the plan and what is
16        available to somebody upon their
17        commencement of benefits.
18   BY MR. BRUCE:
19        Q.   Do you recall indications to
20   participants that benefits under the cash balance
21   plan would be comparable to the benefits under the
22   old plan?
23        A.   Calculations?
24             MR. BLUMENFELD:  Objection.
```

Page 259

```
 1   BY MR. BRUCE:
 2        Q.   Comparable.
 3        A.   I don't recall specifically, no.
 4        Q.   Take a look at Exhibit-16.  That was
 5   described as the information kit, and I will
 6   represent to you that this is the kit that was given
 7   to employees who were being transferred to the cash
 8   balance plan.
 9        A.   Okay.
10        Q.   Look on the page that is numbered
11   Amara 452.
12        A.   Yes.
13        Q.   It says, question, will my benefits be
14   better under the new retirement plan?  Do you see
15   that?
16        A.   Yes.
17        Q.   And it says, generally speaking, the
18   new retirement plan in comparison with the current
19   pension plan tends to provide larger benefits for
20   shorter service employees, and comparable benefits
21   for longer service employees.  Do you see that?
22        A.   Yes.
23        Q.   And do you believe that to be an
24   accurate statement?
```

Page 260

```
 1        A.   Given this was created in 1997, yes, I
 2   do.
 3        Q.   Given that it was in 1997, do you know
 4   now that that is not always accurate?
 5        A.   No, I know in '97 this was created and
 6   reviewed by some experts that understood these plans,
 7   including Mercer Consulting.
 8        Q.   And who else reviewed it?
 9        A.   The benefits communications team would
10   know better exactly who reviewed it, but certainly
11   their lawyer and our legal counsel as well, Paul
12   Gontarek.
13        Q.   Doesn't the reference to larger
14   benefits for shorter service employees really mean
15   larger benefits for younger employees --
16             MR. BLUMENFELD:  Objection.
17   BY MR. BRUCE:
18        Q.   -- and comparable benefits for older
19   employees?
20             MR. BLUMENFELD:  Objection.
21             THE WITNESS:  It doesn't say
22        that.
23   BY MR. BRUCE:
24        Q.   You don't know how this plan works,
```

Page 285

1  BY MR. BRUCE:
2      Q.   Do you exercise any mental processes
3  there, or you just leave it to Paul?
4      A.   I make sure that Paul reviews summary
5  plan descriptions. That takes a lot of mental
6  exercise.
7      Q.   And was it your understanding that
8  this summary plan description disclosed all of the
9  conditions on the payment of these benefit credits
10 that exist under the Cigna pension plan?
11     A.   This summary plan description was
12 meant to describe the terms of Part B of the pension
13 plan, and in conjunction with calculations that are
14 provided to people at the time they commence benefits
15 where we specifically list exactly that options are
16 available and what those dollar amounts are, together
17 those provide exactly the payments that are available
18 to participants under the plan.
19     Q.   And does this summary plan description
20 tell participants that they can't have both their
21 previously earned benefits and the cash balance
22 accruals?
23          MR. BLUMENFELD: Objection.
24          THE WITNESS: This plan tells

Page 286

1          them what benefits are available to
2          them, and again in conjunction with
3          the materials that they receive at the
4          time they are ready to commence
5          benefits, they have all of that
6          information available.
7  BY MR. BRUCE:
8      Q.   Okay. Assuming that if Janice Amara
9  terminated from Cigna today and she commenced
10 benefits, that the best benefit for her would be the
11 benefit that she had already earned before 1998?
12     A.   Assuming that?
13     Q.   Yes.
14     A.   To Ms. Amara, that would be the case.
15     Q.   Yes. Does this tell her that she
16 cannot get any part of the cash balance pay credits
17 that have been allocated to her account since 1998?
18          MR. BLUMENFELD: Objection.
19 BY MR. BRUCE:
20     Q.   Does this tell her that she can't have
21 those pay credits?
22     A.   It tells her what her benefits are
23 going to be, and her benefits, no matter what she
24 assumes, are going to be exactly those provided under

Page 287

1  the terms of the pension plan when she terminates, if
2  that's today, and then starts to receive her benefits
3  given her employment career with Cigna. It would go
4  through every calculation needed to show her all
5  options of benefits. Those would be calculated under
6  Part B of the plan. As I recall, she's under Part B
7  of the plan now, and where appropriate they would
8  extend back to Part A of the plan, and those numbers
9  would be displayed for her in her sheet to select the
10 appropriate option.
11     Q.   Let's say that the benefits that she
12 has under the Part B plan is $1833 per month
13 beginning at age 55, and let's suppose to generalize
14 that Cigna has contributed to her cash balance
15 account $10,000 in each of the years from 1999
16 through 2003, so that she's got five years of pay
17 credits. Does this summary plan description tell her
18 that she can't get that $5,000 plus interest in
19 addition to the $1,833 that she had already earned?
20          MR. BLUMENFELD: Objection.
21          THE WITNESS: The summary plan
22          description tells her exactly what
23          benefits would be available to her,
24          and in conjunction with the actual

Page 288

1          benefit calculation sheet, to show her
2          each of her options that would
3          specifically show what dollar amount
4          under a variety of options she would
5          be able to receive as pension.
6  BY MR. BRUCE:
7      Q.   So you think that as an average --
8  that an average participant reading the summary plan
9  description would understand that the $10,000 per
10 year contributed between 1999 and 2003 was only
11 payable if she does not ask for the $1,833 that she
12 had already earned?
13          MR. BLUMENFELD: Objection.
14          THE WITNESS: I think the average
15          participant would read the benefit
16          calculation sheet that shows them
17          precisely how much they could take
18          under each available option, whether
19          it be the account balance, lump sum or
20          any of the other annuity options. No
21          matter how they were calculated, they
22          were calculated per the terms of the
23          plan, those dollar amounts is what
24          they would use to select whichever

Page 289

```
 1          option they wanted to, or payment they
 2          wanted.
 3   BY MR. BRUCE:
 4        Q.   But your understanding is that this
 5   summary plan description tells the average
 6   participant, including Janice Amara, that she cannot
 7   get A plus B?
 8              MR. BLUMENFELD: Objection.
 9   BY MR. BRUCE:
10        Q.   She cannot get the $50,000 that was
11   contributed between '99 and 2003 plus the benefits
12   that she had before 1998?
13              MR. BLUMENFELD: Objection.
14              THE WITNESS: I think this
15          document, and in conjunction with the
16          calculations and the actual plan
17          document, provide that she sees
18          precisely the dollar amount of
19          benefits available to her based on her
20          entire career at Cigna, including the
21          time prior to 1998, and those facts
22          would be applied to the terms of the
23          Cigna pension plan, and she would be
24          shown specific numbers of every
```

Page 290

```
 1          option.
 2   BY MR. BRUCE:
 3        Q.   You are not answering the question.
 4        A.   I think I did.
 5              MR. BLUMENFELD: Objection.
 6              MR. BRUCE: Read back the
 7          question.
 8              MR. BLUMENFELD: He answered it
 9          to the best of his ability.
10              MR. BRUCE: He is answering other
11          questions than the one I asked. Let's
12          read it back, the question, once
13          more. Try and listen to it and answer
14          the question, and then you can
15          digress. I promise I will listen.
16              (The previous question is read
17          back.)
18              THE WITNESS: I am going to stand
19          by my previous answer. I already
20          answered that question.
21   BY MR. BRUCE:
22        Q.   Let me ask you the question, and try
23   and listen and answer it.
24              MR. BLUMENFELD: Objection.
```

Page 291

```
 1   BY MR. BRUCE:
 2        Q.   Does the summary plan description,
 3   Exhibit-3, disclose to a participant like Janice
 4   Amara that the $10,000 per year that was postulated
 5   as pay credits between 1999 and 2003 are only payable
 6   to her if she does not ask for the $1,833 that she
 7   had previously earned under the plan?
 8              MR. BLUMENFELD: Objection. The
 9          document speaks for itself.
10              THE WITNESS: I am trying to
11          think of a way to respond differently
12          than I did previously, and I am
13          struggling to do that.
14   BY MR. BRUCE:
15        Q.   I am asking you, does the SPD tell a
16   participant like her that she cannot get the $10,000
17   per year that was postulated between 1999 and 2003
18   unless she gives up the $1,833 that she earned before
19   1998?
20              MR. BLUMENFELD: Stephen, the
21          document speaks for itself. You have
22          asked the witness several times, and
23          he has given you his answer. If you
24          don't like it, look to the document.
```

Page 292

```
 1              MR. BRUCE: You have made your
 2          objection.
 3   BY MR. BRUCE:
 4        Q.   Answer the question.
 5        A.   The document provides information
 6   about Part B of the pension plan, and in conjunction
 7   with calculations that she would receive. She would
 8   get credit for her entire career at Cigna. When it
 9   comes time for her to select a benefit, even under
10   your scenario that that were today that she
11   terminated, she would receive credit for her entire
12   time with Cigna, both before and after the 1/1/98
13   change, and she could -- she would receive a
14   distribution package from Cigna Retirement Investment
15   Services that would specifically show what those
16   amounts are under a variety of options, and she could
17   choose one. All of them, every one of them, would
18   have taken into account her entire career at Cigna
19   under the terms of the pension plan.
20        Q.   We talked about earlier that rather
21   than having an A plus B formula, that the Cigna
22   pension plan has a formula that can be expressed
23   under those same kinds of concepts as the greater of
24   A or the opening account balance, plus B.
```

Page 293

1    A.    You described such things, yes.
2    Q.    And you agreed that that was a
3  reasonably accurate description of what the Cigna
4  pension plan Part B does?
5            MR. BLUMENFELD: Objection.
6  BY MR. BRUCE:
7    Q.    So does the summary plan description
8  tell her that what she will actually be paid is the
9  greater of, A, her previously earned benefits, or B,
10 the opening account balance plus accruals under the
11 cash balance plan?
12           MR. BLUMENFELD: Objection, the
13           document speaks for itself, and I
14           would like to note the same objection
15           that I made before when the witness
16           left the room.
17           MR. BRUCE: Let him answer,
18           Jeremy.
19           MR. BLUMENFELD: Stop asking the
20           same questions again and again about
21           what a document says that you had in
22           front of you.
23           MR. BRUCE: He can answer the
24           question, and stop this kind of

Page 294

1            filibustering.
2            THE WITNESS: This summary plan?
3  BY MR. BRUCE:
4    Q.    Yes.
5    A.    I would still say she gets credit for
6  all of her time as a Cigna employee, both before and
7  after 1998, under the terms of the plan as it stands
8  when she terminates, whenever that may be, and we
9  provide her those specific calculations. In the SPD
10 there's a section here that talks about minimum
11 benefits. Perhaps that's more responsive to what
12 you're trying to ask. I can read that. If you
13 participated in the pension plan before 1998, your
14 old plan benefits were converted to an opening
15 account balance in this plan. Your final plan
16 benefits cannot be less than your old plan benefits
17 on December 31, 1997. If this minimum benefits rule
18 applies to you, you will be notified by the
19 retirement service center when you request a
20 distribution.
21   Q.    Is that your understanding, that
22 participants are automatically notified by the
23 retirement service center when they request a
24 distribution, if the minimum benefits rule applies to

Page 295

1  them?
2    A.    They receive very specifically the
3  exact dollar amounts of every benefit option
4  available to them.
5    Q.    How is that any different than what
6  they would receive if the minimum benefit rule did
7  not apply to them?
8            MR. BLUMENFELD: Objection.
9            THE WITNESS: The numbers would
10           be different.
11 BY MR. BRUCE:
12   Q.    The numbers would be different, but is
13 there some different disclosure that tells them what
14 they are being offered is the minimum benefit?
15   A.    Not that I am aware of, but we make
16 available to them the 800 number if they want to call
17 to ask specific questions about the calculation of
18 benefits.
19   Q.    And is it your understanding that this
20 tells participants that if this minimum benefit rule
21 applies to them, they don't get the pay credits that
22 are described on Page 624?
23   A.    Again, I point out to you the fact
24 that we definitely, as the summary plan description

Page 296

1  describes, your final plan benefits cannot be less
2  than your old plan benefits on December 31, 1997.
3    Q.    Does that tell them that they won't
4  get any of the pay credits that are described on Page
5  624 of the SPD if the minimum benefit applies?
6            MR. BLUMENFELD: Objection.
7            THE WITNESS: They get a
8            distributions package that shows them
9            they can take the account balance as a
10           lump sum, and if they have any other
11           benefits available to them, and
12           annuity options, it gives them those
13           specific dollars.
14 BY MR. BRUCE:
15   Q.    Did you answer the question? I asked
16 you, does that description of the minimum benefits
17 rule, does it tell participants that if this minimum
18 benefit rule applies to them, that that means that
19 they don't get the pay credits that are described on
20 Page 624 of the SPD?
21           MR. BLUMENFELD: Objection.
22           THE WITNESS: 624 describes pay
23           credits, and 629 describes how we
24           protect their old plan benefits at

Page 297

1    12/31/97.
2    BY MR. BRUCE:
3        Q.    Do you want to try and answer the
4    question?
5                MR. BLUMENFELD:  Objection.
6                THE WITNESS:  I think that's an
7            answer.
8                MR. BLUMENFELD:  He is answering
9            to the best of his ability.  You are
10           asking him about what a document says.
11   BY MR. BRUCE:
12       Q.    Is it your understanding that the
13   description of the minimum benefit rule in this SPD
14   communicates to participants that if the minimum
15   benefit rule applies to them, that that means that
16   they don't receive the pay credits that are described
17   on Page 624 of the SPD?  Yes, no, I don't know, how
18   about that?
19               THE WITNESS:  It describes
20           optional payment methods.  If you
21           don't want to receive your benefits by
22           the normal payment method, which
23           previously is described as a single
24           life annuity starting at age 65, you

Page 298

1            may choose one of the following
2            payment methods, and it goes on to
3            describe a variety of payment
4            methods.  They can choose amongst any
5            of these, but they can only choose
6            one, and each one of those are again
7            described in the materials that are
8            provided people at the time they
9            commence the benefits.
10   BY MR. BRUCE:
11       Q.    Mr. Arko, again, you're not even
12   trying to answer the question.
13               MR. BLUMENFELD:  Objection.  An
14           objection to all of your questions in
15           this regard.
16   BY MR. BRUCE:
17       Q.    Did your attorney not instruct you
18   about trying to answer the questions?
19               MR. BLUMENFELD:  Objection.  I
20           will instruct you that you shouldn't
21           disclose attorney/client
22           communications, so I instruct you not
23           to answer that question.
24               MR. BRUCE:  Read him back the

Page 299

1    question once more, and if he refuses
2    to answer, we are go to get someone in
3    here who is capable of responding to
4    the notice of deposition on these
5    subjects.
6                MR. BLUMENFELD:  I think we have
7            answered all of the questions that you
8            have relative to the notice of
9            deposition on this subject.
10               MR. BRUCE:  He said that he knew
11           virtually nothing about anything
12           related to any of the subjects.  He
13           just said that he relies on legal
14           counsel, and he has no idea of how
15           they analyze anything or what
16           conclusions they reach.  He has never
17           seen any documents about the accrual
18           rates and the 133 and a third percent
19           rule.  He hasn't even seen the
20           documents that you produced in
21           discovery on that subject.
22               MR. BLUMENFELD:  Excuse me, as I
23           recall, the document that you produced
24           here is not with regards to the actual

Page 300

1    plan, it was with regard to a further
2    proposal with regard to the plan, and
3    you haven't asked the distinction
4    between things post 1998 and pre 1998
5    per your notice of deposition, and you
6    haven't asked any of the proper
7    questions to find out that information
8    this witness might have and what
9    information might exist regarding the
10   subject matters that you have been
11   trying to ask questions about all day.
12               MR. BRUCE:  I haven't asked him
13           the proper questions about what
14           materials might exist, about the
15           subjects, okay, let me go over, let's
16           start and we will go over those,
17           Jeremy.  Let's identify some questions
18           that I haven't asked about those
19           subjects, if you're suggesting that
20           there is additional materials that he
21           could provide us that he hasn't
22           provided.
23               MR. BLUMENFELD:  I told you that
24           we have provided you with all material

Page 317

1   MR. BLUMENFELD: Stephen, you
2   understand that the design of the plan
3   is one thing, and that the
4   administration of that plan is a
5   separate thing, and that a company is
6   allowed to seek legal advice in
7   connection with the design of its
8   pension plan to ensure that that
9   design complies with ERISA, and that
10  there is no fiduciary exception to the
11  attorney/client privilege under those
12  circumstances.
13  BY MR. BRUCE:
14      Q.   What is the plan administrator relying
15  on, is what I am asking. What is the plan
16  administrator relying on? You are relying on the
17  advice that you presume was given to the corporation
18  in this design phase, right?
19      A.   That would be accurate.
20          MR. BLUMENFELD: You didn't even
21      ask him if the plan administrator
22      undertook any independent steps after
23      the plan was designed to ensure that
24      the plan complied with these

Page 318

1       positions.
2   BY MR. BRUCE:
3       Q.   Did the plan administrator undertake
4   any independent steps after the plan was implemented
5   to determine whether the provisions complied with the
6   age discrimination rule?
7       A.   Not that I recall, no.
8       Q.   Did the plan administrator undertake
9   any independent steps to determine that the plan
10  complied with the 133 and a third percent rule after
11  1/1/98?
12      A.   Not that I recall.
13      Q.   Did the plan administrator undertake
14  any steps to determine whether the plan complied with
15  the 204(h) notice after 1/1/98?
16          MR. BLUMENFELD: Objection.
17      204(h) doesn't even apply after
18      1/1/98.
19  BY MR. BRUCE:
20      Q.   So if the notice should have been
21  given for 1/1/98, the plan administrator wouldn't
22  have any responsibility for determining whether that
23  requirement had been met? Was it the plan
24  administrator's responsibility in the first place to

Page 319

1   give the 204(h) notice?
2       A.   Uh-huh.
3       Q.   So did the plan administrator
4   undertake any independent steps to determine whether
5   or not the 204(h) notice was given that you know of?
6       A.   Not after 1/1/98, that I am aware of.
7       Q.   Did the plan administrator undertake
8   any steps before 1/1/98 to determine whether 204(h)
9   notice was given?
10          MR. BLUMENFELD: Objection, asked
11      and answered at length.
12          THE WITNESS: I --
13  BY MR. BRUCE:
14      Q.   Your answer is that the plan
15  administrator relied on the advice of Paul Gontarek?
16      A.   Correct.
17      Q.   And can you tell me what Paul
18  Gontarek's advice was?
19      A.   I can't recall specifically, but as
20  regards to other completed 204(h) notice, it was
21  discussed amongst the review group during the time we
22  were creating communications that Paul raised the
23  issue.
24      Q.   Who is the review group?

Page 320

1       A.   People that were in place to create
2   and determine the communications to participants
3   regarding the change in plan of 1/1/98.
4       Q.   Were you a member of the review group?
5       A.   It was just a term that I used now. I
6   don't know. It's not truly a defined term, I would
7   think, at Cigna. It was just a term now that I used
8   to try and answer your question.
9       Q.   Were you a member of what you
10  considered to be the review group?
11      A.   I was asked to review certain aspects
12  of the whole communication plan and be a part of the
13  decisions that were made or what kind of materials
14  were delivered.
15      Q.   And independent of whether or not it
16  is legal, did the summary plan description disclose
17  to participants that the accrual rates decrease with
18  age?
19          MR. BLUMENFELD: Objection in
20      terms of the documents speak for
21      themselves.
22          THE WITNESS: The plan documents
23      provide information specifically about
24      what benefits are available to people

Page 321

1    under the pension plan.
2    BY MR. BRUCE:
3        Q.    And does it disclose that the accrual
4    rates in terms of annuities decrease with age under
5    the cash balance plan?
6              MR. BLUMENFELD: Same objection.
7              THE WITNESS: Again, the SPD
8              simply describes the terms of the
9              pension plan available to participants
10             at the time that they elect to receive
11             their benefit.
12   BY MR. BRUCE:
13       Q.    Can you try and answer the question?
14   Does the summary plan description -- you can just
15   say, no, it doesn't or you can say, I don't know,
16   just try and answer the question. Does the summary
17   plan description disclose to participants that
18   accrual rates in terms of annuities decrease with age
19   under the cash balance plan?
20       A.    I don't know. I don't believe it
21   directly does.
22             MR. BRUCE: Well, that's all I
23             have for him, but we are going to
24             request that Judge Squatrito have you

Page 322

1    produce a witness who can answer the
2    questions in the notice of deposition.
3              MR. BLUMENFELD: I think we can
4    do this off the record.
5                     - - -
6              (At 5:55 p.m., the witness was
7    excused and the deposition was
8    concluded.)
9                     - - -

Page 323

1    C E R T I F I C A T I O N
2
3
4              I hereby certify that the proceedings
5    and evidence are contained fully and accurately in
6    the stenographic notes taken by me upon the foregoing
7    matter on July 3, 2003, and that this is a correct
8    transcript of the same.
9
10
11
12             Kristen Augello
13             Court Reporter-Notary Public

Page 324

1    CASE: Amara vs. Cigna
2    DEPOSITION OF: John Arko
3    TAKEN: July 3, 2003
4    PAGE   LINE    ERROR        CORRECTION       REASON

19                                          Witness