Exhibit 15



September 23, 1997

# Pension War Is Breaking Out As Deloitte Workers Study Plan

By ELIZABETH MACDONALD
Staff Reporter of THE WALL STREET JOURNAL
September 23, 1997

**DOW JONES REPRINTS**

<R> This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

You'd think Deloitte & Touche would be one firm that knows how to come up with a new retirement plan for its workers. After all, it's one of the world's top pension-consulting firms, serving blue-chip clients like Microsoft Corp., General Motors Corp. and Chrysler Corp.

But its workers also know better than most employees how to judge a pension plan's impact, and now they're furious about the new plan Deloitte has adopted for them.

In January, the Big Six accounting and consulting firm enrolled most of its 14,000 workers in its new pension program, telling them it would be a big improvement over their old plan. But when employees crunched the numbers, they concluded that the new plan won't improve most workers' benefits and it will cut some pension payouts by nearly 70%, with employees aged 40 to 50 being socked the hardest.

Some employees in Deloitte's tax division are so angry they are threatening to decamp to other Big Six firms. Meanwhile, employees say Deloitte has threatened to fire anyone who talks to the media about the matter.

The firm declines to comment on the alleged threat, but it does appear to be trying to calm the waters. Partners in its New York, New Jersey and Connecticut offices, where the firm's tax experts are based, are informally telling Deloitte employees that the whole affair is a terrible mistake that will be corrected, according to several Deloitte employees. "We didn't want to disadvantage anybody," says James H. Wall, Deloitte's national director of human resources. "But certain individuals were disadvantaged."

In response to a reporter's query, Deloitte provided a statement saying that late last May, "we learned of unintended consequences for some employees. We are in the process of examining the extent of this and plan to make modifications to fully resolve the issue." At Deloitte, the partners' committee that makes recommendations on employee-retirement benefits is scheduled to meet next Monday at the firm's headquarters in Wilton, Conn., to discuss the brouhaha.

Deloitte spokeswoman Ellen Ringel says the plan wasn't an effort to save Deloitte any money. A statement she provided Monday from Deloitte's management says that it "modified its pension plan to better meet the retirement needs of our people by helping them achieve financial security at retirement and to provide an incentive for younger people to stay with the firm for a longer period of

time."

The pension-payout reductions surprised outside experts. "Cuts on the order of 70%? I haven't seen anything like that -- that's pretty deep," says Thomas Murphy, who has studied a summary of Deloitte's plan and is a consulting actuary and a principal at Kwasha Lipton Group, a benefits-consulting unit of Deloitte rival Coopers & Lybrand.

In the past, Deloitte's employee benefits have received high marks. Working Mother magazine recently named J. Michael Cook, Deloitte's chairman and chief executive, its Family Champion of the year for his firm's "promotion of family-friendly practices in the workplace," among other things. Mr. Wall also notes that Deloitte has beefed up its other employee-benefits programs over the last five years.

The pension flap started late last year, when Deloitte's board asked the firm's retirement-plan experts to draw up a new "cash balance" pension plan for all employees who weren't partners at the firm, including directors, who are a step below partners.

Partners would get to stay in their old plan, and employees aged 50 and over with 15 years or more of service would get to keep the benefits they had under the old plan.

The experts then told the board that this new plan "would not harm" any of the firm's employees, according to several directors who talked with board members. The board subsequently yanked the old pension plan, effective Jan. 1, 1997.

Retirement benefits accumulate differently in different pension plans. In traditional pension plans, the value of the benefit grows progressively faster as an employee approaches retirement. But in cash-balance plans, benefits grow at an even rate from year to year. Though the design of such plans varies, they tend to pay out less to older workers over the long term than traditional plans, and they are easier and cheaper for employers to administer.

Deloitte's new plan packed a double whammy for certain workers. The formula Deloitte used to credit future contributions to the new plan resulted in lower benefits than the old plan would have provided, says Kwasha. It analyzed the summary distributed to Deloitte employees at the request of The Wall Street Journal.

In addition, when Deloitte pulled its employees out of the old pension plan, older employees lost the rapid growth in their benefit that they would have gotten under the old plan in the years just before retirement. As a result, many veterans won't receive nearly as much as they would have under the old plan.

On March 24, Deloitte's benefits administration division sent a memo to workers promising that each would get a new "personalized pension statement" on or about June 1. "The Firm is committed to helping you build long-term financial security," the plan's brochure promised.

On April 25, 10 tax directors e-mailed William Parrett, managing partner of Deloitte's Connecticut, New Jersey and New York region, to express their distress. "We're certainly concerned with [the plan's] financial implications for us and our families," the e-mail writers wrote. "It would probably also benefit all involved if some of those who designed the new policy would make themselves available to answer technical questions."

Several directors say Mr. Parrett was outraged when he found out about the problem and later assured them that it would be solved immediately. Mr. Parrett referred a reporter's calls seeking comment to Deloitte's public relations department, which declined comment.

But so far, employees say, the firm hasn't conducted any employee meetings or sent out any voice mail, e-mail or interoffice memos about the new program. In addition, Deloitte employees got their "personalized pension statements" in August, almost two months late. Deloitte has yet to provide the actual plan documents, which give more specific details.

Deloitte isn't the only Big Six firm that has gotten into trouble over employee pensions. Last May, the U.S. Supreme Court refused to review a November 1996 decision handed down in Cincinnati's sixth Circuit Court of Appeals against Ernst & Young.

Former partner Peyton Larue Simpson claimed that Ernst & Young had fired him because he was approaching the age when his retirement benefits would be vested. The court found that Mr. Simpson was one of 120 partners over age 40 who were laid off during an 18-month period after the 1989 merger of Arthur Young & Co. and Ernst & Whinney.

The court ruled that the firm, which also hired 162 new partners under age 40, fired the older partners to reduce its unfunded pension liability, then projected at $290 million. Mr. Simpson got more than $5 million in a judgment that included attorney fees, court costs and interest.

**Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contactDow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.



September 20, 1999

# Pension-Plan Controversy Escalates As IBM Gives In to Employee Anger

By ELLEN E. SCHULTZ, JON G. AUERBACH and GLENN BURKINS
Staff Reporters of THE WALL STREET JOURNAL
September 20, 1999

DOW JONES REPRINTS

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Chalk it up as a victory for aging baby boomers.

On Friday, International Business Machines Corp. gave in to the protests of middle-aged employees and significantly revised its plan to switch to cash-balance pensions, a controversial new type of pension system that has been criticized for benefiting young workers at the expense of older ones. IBM said anyone 40 or older with at least 10 years of service could remain in the old plan, more than doubling the number of employees who have a choice.

IBM said its retreat was driven entirely by employees, who barraged the company with e-mails and other correspondence, and used the Internet to stoke their collective anger. "We heard from enough of them to make the changes," says a company spokesman, John Bukovinsky.

But the controversy stirred by the cash-balance phenomenon, which stayed under the radar for several years, goes well beyond IBM. One reason is that the computer company's disgruntled employees reinforced their message by getting Congress into the act. Republican Sen. James M. Jeffords of Vermont, one of several legislators who got involved, eventually wrote to IBM's chairman, Louis V. Gerstner Jr., asking him to reconsider. The Senate Health, Education, Labor and Pensions Committee, which Mr. Jeffords heads, is holding a hearing Tuesday to look into cash-balance pension plans.

- IRS Tells Field Offices to Hold Off on Clearing 'Cash Balance' Plans (Sept. 17)
- Cash-Balance Pension Plans Studied by Equal Employment Commission (Sept. 15)
- IBM Settles Pension Dispute; Deal May Have Wide Impact (Sept. 14)
- Riled IBM Computer Workers Consider Organizing a Union (July 26)
- IBM Will Adopt 'Cash-Balance' Plan for U.S. Employees' Pension Program (May 4)

The Internal Revenue Service is trying to figure out whether the plans qualify for favorable tax treatment. Although it has approved favorable tax treatment for several hundred plans in the past, the IRS last week put a moratorium on the approval of any more of them until it sorts out the complex issues.

Perhaps most important is the issue of possible age discrimination. Some IBM employees were preparing to sue the computer company alleging age bias because of the way the new plan treated older workers. The Equal Employment Opportunity Commission had begun an investigation into IBM's pension change.

IBM's backtracking is certain to give pause to other companies that are considering cash-balance pension plans. Indeed, a few other companies, such as New York utility Niagara Mohawk Power, have already revamped plans in the face of employee resistance, and the move by high-profile IBM is likely to send chills through many others of the 300 or so companies that have adopted such plans.

The computer giant says it is confident its proposed changes were legal, even without the Friday revision. But its retreat will only reinforce the arguments of those who say the plans violate pension and age-discrimination laws. It could strengthen the hand, for instance, of the employees who have brought a class-action suit against AT&T Corp. following its cash-balance conversion last year. AT&T says its plan isn't discriminatory.

Cash-balance pension plans, which were devised in the late 1980s and began really catching on in the mid-1990s, are promoted as a way to "modernize" a company's pension plan for today's highly mobile work force. Traditional "defined benefit" pension plans are structured so employees earn as much as half their ultimate benefits in their last five to 10 years on the job. But under cash-balance plans, employees accrue benefits at a steady rate throughout their years of employment. The company sets aside a hypothetical sum -- say, 3% to 7% of salary -- each year for each employee. This theoretical "cash balance" grows at a specific rate, perhaps 5%. If the employee leaves, he or she can usually take the accumulated benefits along. This may be a better system for younger workers who switch jobs before reaching peak pension-earning years.

But many older workers have discovered that when their employer switches to a cash-balance plan, they can lose anywhere from 20% to 50% -- in extreme cases -- of the value of their pensions. Not only do they miss out on the chance to fatten the pension in the late years, but also, in many cases, older workers have found that the opening balance in their cash-balance accounts was significantly lower than the value of their old benefits.

The reason for this is that companies have flexibility in deciding what assumptions they use to calculate the opening balance. The overall result: Some older employees find they would have to work for five or more years just to earn their way back to their old level of benefits -- a phenomenon variously known as "pension plateau" or "wearaway."

Employers sometimes sweeten the cash-balance option for some of their oldest employees, and give some of them the option of staying in the old plan. But typically, many workers who just miss the cutoff are left worse off.

For companies, on the other hand, the switch to cash balance has financial rewards. Because they reduce future pension liabilities, companies don't need to put as much into their pension plans.

And even when a company has a huge pension surplus, and thus doesn't need to contribute to the pension plan at all, it can benefit by converting to a cash-balance plan. That is because companies can take a credit on their income statements when pension income exceeds current liabilities. Cutting benefit obligations through conversion to a cash-balance plan reduces liabilities, fattens the surplus and thus can boost the earnings still more.

### IBM Figures

IBM has an overfunded pension plan, and hasn't had to make new contributions in recent years. In 1998, its plan's surpluses provided IBM with about a $450 million credit to earnings. By converting most employees to a cash-balance plan, it was hoping to add to those surpluses and be able to report

about a $650 million credit. IBM's Mr. Bukovinsky says that the company, anticipating a boost to its income statement from the pension change, has spent about $200 million to increase compensation and expand a stock-option program. He says there is a possibility that Friday's pension revision could affect the company's bottom line, but says it's too early to say by how much. The cost to IBM "won't be insignificant," Mr. Bukovinsky says.

Whether these plans run afoul of age-discrimination law is a matter yet to be decided. The primary relevant statute is the Age Discrimination in Employment Act of 1967, which protects workers age 40 and older. To win under it, a complainant must prove an employer used age considerations when determining any term, condition or privilege of employment, including hiring, firing, promotion, layoff, compensation, benefits, job assignment and training.

Age-discrimination law and related tax and pension laws were amended in 1986 to, among other things, bar employers from using age as a basis for ending or reducing a worker's pension accruals under defined-benefit plans. The change was aimed at companies that, for instance, stopped pension accruals for workers once they reached age 65. Pension law says the rate of accrual can't go down on the basis of age. Now, some are arguing that cash-balance plans run afoul of this provision because the rate of accrual declines with age, something that doesn't happen under traditional pension plans.

**IRS Moves**

Earlier this month, the office of Rep. Bernard Sanders, Independent of Vermont, leaked to the press a confidential memo in which the IRS district office in Cincinnati said it thought cash-balance plans discriminated against older workers. The IRS Washington office had publicly remained silent on the issue until last week, when it instructed its field offices to stop approving cash-balance plans until further notice.

The issue hasn't yet gotten a clear airing in the courts. The first case against a cash-balance plan was Aull v. Cavalcade Pension Plan, brought against Furr's/Bishop's Cafeterias Inc., one of the first companies to convert to a cash-balance plan, back in 1987. The IRS began an audit of that plan and essentially forced the employer to settle the case in March of this year.

A broader case making its way to trial is a suit by employees of Onan Corp., a subsidiary of Cummins Engine Co. The court has certified the case as a class action under the age-discrimination and pension laws. Set for trial next April, the suit has created shock waves among those who follow benefit issues. The IRS has sided with employees and asked the court to disqualify Onan's pension plan.

At the EEOC, Ida L. Castro, the chairwoman, says, "There is a reason I've taken a very measured approach" on whether cash-balance plans involve age bias. "It's very complicated. It's really difficult to come up with a broad-stroke decision."

Age-discrimination complaints have been on a downtrend, perhaps because of the low-unemployment economy. The EEOC investigated 26,350 such complaints last year, down from 32,000 in 1992. About half of the complaints blame age for a dismissal, and most of the rest allege unfair treatment or failure to be hired because of age. Only about 1.5% of 1998 complaints involved pensions or other benefits.

**Case by Case**

But with the conversion to cash-balance plans, it is clear that pension-related complaints are on the rise. David Certner, who coordinates economic issues for the AARP, says pension issues may be emerging as the next battleground in the age-discrimination war.

Government officials expect the matter to be dealt with on a case-by-case basis. By allowing long-employed workers 40 and over -- the key age in age-bias law -- to stay in existing plans, companies such as IBM may skirt a lot of liability.

Companies can do things that soften or eliminate the impact on older workers. Eastman Kodak Co. will give all its U.S. workers a choice of remaining in the old pension plan or joining the new one. They have until the end of November to decide. And Boeing Co. has eliminated the "wearaway" problem by keeping the old benefit in one pot and starting the new benefit from zero, so even older workers begin to build a benefit from the start.

One of several bills in Congress addressing cash-balance issues deals with the wearaway problem, and several others require employers to make clearer to workers how a pension conversion would affect them. Employees' confusion about how they were affected was one of the first issues to arise with cash-balance plans.

**IBM Pension Switch**

At IBM, rumors began to circulate about a switch to cash balance late in 1998. In April, after news leaked that IBM was considering such a move, employees discovered that a "pension calculator" had been removed from the company's internal computer system, making it harder for them to figure the value of their pensions.

On May 3, IBM announced its plan to convert. Two weeks later, IBM employees launched a Web site on Yahoo! (clubs.yahoo.com/clubs/ibmpension ) to compare notes and air gripes about the plan. The Yahoo board says it has recorded about 1.7 million page views since May 18. And as people began getting their personal profiles from IBM on the new pension plan in June, many long-service employees realized their pensions would fall.

About this time, IBM's human-resources chief, J. Thomas Bouchard, laid out the cash-balance setup to board members. Although the possibility of a backlash was raised, the company clearly underestimated that reaction.

Workers began to organize in July, forming the IBM Employee Benefits Action Coalition, and joined forces with a group of activist retirees at General Electric Co., which doesn't have a cash-balance plan but has a much-overfunded traditional plan. IBM employees reached out to the EEOC, the IRS and Congress. IBM employees showed up at August town-hall meetings held by numerous members of Congress, making their biggest stand in Vermont, where 800 people jammed into the art center at St. Michael's College in Winooski for a meeting held by Rep. Sanders.

Mr. Gerstner and other top managers were astonished by the reaction, company insiders say, and before long began planning a retreat. On Friday, Mr. Gerstner called Sen. Jeffords to tell him of the change. The senator praised IBM for "understanding what's the right thing to do."

**Union Drive at IBM**

The reversal hasn't ended the problem for IBM, however. The Communications Workers of America

has used the controversy to launch organizing drives at IBM facilities. In Poughkeepsie, N.Y., where IBM has about 10,000 employees, organizers have been collecting signatures and passing out flyers. "The whole union movement is gaining steam," says Bruce Cunningham, a 36-year-old employee.

Some IBMers say the past three months make them feel differently about IBM. Beth Harrington, a programmer in Rochester, N.Y., says she joined the company 10 years ago because of the pension plan and impressive benefits.

Although 45 years old, she missed by just a few weeks the 10-year service cutoff set under Friday's revised IBM plan. Ms. Harrington, who has two children and whose husband is self-employed, says she has $41,000 in her cash-balance retirement account and expects to get 7% of her about $80,000 salary each year, plus interest, under the new plan. "I cannot retire on that," she says, adding that she is considering leaving the company.

The pension-plan flap at a high-profile employer like IBM has sent a distinct message to employers, a reminder to beware of the sentiments of aging workers. It is as if the generation that once rallied around the slogan "Don't trust anyone over 30" now has a new one: Don't mess with anyone over 40.

Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.



December 4, 1998

# 'Cash Balance' Saves Millions, Hides Pitfalls From Workers

By ELLEN E. SCHULTZ and ELIZABETH MACDONALD
Staff Reporters of THE WALL STREET JOURNAL
December 4, 1998

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Largely out of sight, an ingenious change in the way big companies structure their pension plans is saving them millions of dollars, with barely a peep of resistance. Unless they happen to have a Jim Bruggeman on their staff.

Sifting through his bills and junk mail one day last year, Mr. Bruggeman found the sort of notice most people look at but don't spend a lot of time on: His company was making some pension-plan changes.

The Ins and Outs of Cash-Balance Plans

The company, Central & South West Corp., was replacing its traditional plan with a new variety it said was easier to understand and better for today's more-mobile work force. A brochure sent to workers stressed that "the changes being made are good for both you and the company."

Alone among Central & South West's 7,000 employees, Mr. Bruggeman, a 49-year-old engineer in the Dallas utility's Tulsa, Okla., office, set out to discover exactly how the new system, known as a cash-balance plan, worked. During a year-long quest to master the assumptions, formulas and calculations behind it, Mr. Bruggeman found himself at odds with his superiors, and labeled a troublemaker. In the end, though, he figured out something about the new pension system that few other employees have noticed: For many of them, it is far from a good deal.

But it clearly was, as the brochure noted, good for the company. A peek at a CSW regulatory filing in March 1998, after the new plan took effect, shows that the company saved $20 million in pension costs last year alone. Other government filings revealed that whereas the year before, CSW had to set aside $30 million to fund its pension obligations, after it made the mid-1997 switch it didn't have to pay a dime to fund the pension plan.

**Pension Light**

The switch to cash-balance pension plans -- details later -- is the biggest development in the pension world in years, so big that some consultants call it revolutionary. Certainly, many call it lucrative; one says such a pension plan ought to be thought of as a profit center. Not since companies dipped into pension funds in the 1980s to finance leveraged buyouts have corporate treasurers been so abuzz over a pension technique.

But its little-noticed dark side -- one that many companies don't make very clear to employees, to say the least -- is that a lot of older workers will find their pensions cut, in some cases deeply.

So far, only the most financially sophisticated employees have figured this out, because the formulas are so complex. Even the Labor Department and the Internal Revenue Service have trouble with them. So thousands of employees, while acutely aware of how the stock market affects their retirement nest eggs, are oblivious to the effect of this change.

One might get the impression, from the rise of 401(k) retirement plans funded jointly by employer and employee, that pensions are a dead species. In fact, nearly all large employers still have pension plans, because pulling the plug would be too costly; the company would have to pay out all accrued benefits at once. Meanwhile, companies face growing obligations as the millions of baby boomers move into their peak pension-earning years.

Now, however, employers have discovered a substitute for terminating the pension plan: a restructuring that often makes it unnecessary ever to feed the plan again.

**Pitfalls for Employers**

But this financially appealing move has its risks. The IRS has never given its blessing to some of the maneuvers involved. If employers don't win a lobbying battle currently being waged for exemptions from certain pension rules, some of these plans could be in for a costly fix.

In addition, the way employers are handling the transition could result in employee-relations backlashes as more and more older workers eventually figure out they are paying the price for the transformation of traditional pension plans.

In those traditional plans, most of the benefits build up in an employee's later years. Typical formulas multiply years of service by the average salary in the final years, when pay usually is highest. As a result, as much as half of a person's pension is earned in the last five years on the job.

With the new plans, everyone gets the same steady annual credit toward an eventual pension, adding to his or her pension-account "cash balance." Employers contribute a percentage of an employee's pay, typically 4%. The balance earns an interest credit, usually around 5%. And it is portable when the employee leaves.

For the young, 4% of pay each year is more than what they were accruing under the old plan. But for those nearing retirement, the amount is far less. So an older employee who is switched into a cash-balance system can find his or her eventual pension reduced by 20% to 50% or, in rare cases, even more.

This is one way companies save money with the switch. The other is a bit more complicated. Companies can also benefit from the way they invest the assets in the cash-balance accounts.

If the employer promised to credit 5% interest to employees' account balances, it can keep whatever it earns above that amount. The company can use these earnings to finance other benefits, to pay for a work-force reduction, or -- crucially -- to cover future years' contributions. This is why the switch makes pension plans self-funding for many companies.

Although employers can do this with regular pensions, the savings are greater and easier to measure

in cash-balance plans. The savings often transform an underfunded pension plan into one that is fully funded. "Cash-balance plans have a positive effect on a company's profitability," says Joseph Davi, a benefits consultant at Towers Perrin in Stamford, Conn. They "could be considered a profit center."

**Motive for the Move**

Employers, however, are almost universally reticent about how they benefit. "Cost savings were not the reason the company switched to a cash-balance plan," says Paul Douty, the compensation director at Mr. Bruggeman's employer, CSW. Sure, the move resulted in substantial cost savings, he says, but the company's goal was to become more competitive and adapt to changing times. Besides, he notes, the $20 million in pension-plan savings last year were partly offset by a $3 million rise in costs in the 401(k); the company let employees contribute more and increased its matching contributions.

There is another reason some employers like cash-balance plans: By redistributing pension assets from older to younger workers, they turn pension rights -- which many young employees ignore, since their pension is so far in the future -- into appealing benefits today. At the same time, older workers lose a financial incentive to stay on the job, since their later years no longer can balloon the pension.

Some pension professionals think companies should be more candid. "If what you want to do is get rid of older workers, don't mask it as an improvement to the pension plan," says Michael Pikelny, an employee-benefits specialist at Hartmarx Corp., an apparel maker in Chicago that decided not to install a cash-balance plan.

**Under a Microscope**

Most employees aren't equipped to question what employers tell them. But Mr. Bruggeman was. He had a background in finance, his hobby was actuarial science, he had taken graduate-level courses in statistics and probability, and he knew CSW's old pension plan inside and out. So when the company announced it was converting to a cash-balance plan last year, he began asking it for the documents and assumptions he needed to compare the old pension to the new one.

With each new bit of data, he gained another insight. First, he figured out that future pension accruals had been reduced by at least 30% for most employees. CSW got rid of early-retirement and other subsidies and reduced the rates at which employees would accrue pensions in the future.

Employees wouldn't necessarily conclude this from the brochures the human-resources department handed out. Like most employers that switch to cash-balance plans, CSW assured employees that the overall level of retirement benefits would remain unchanged. But a close reading of the brochure revealed that this result depended on employees' putting more into their 401(k) plans, gradually making up for the reduction in pensions.

At a question-and-answer session on the new plan before it was adopted, Mr. Bruggeman spoke up and told co-workers how their pensions were being reduced. The next day, he says, his supervisor in Tulsa came to his office and told him that CSW management in Dallas was concerned that his remarks would "cause a class-action suit" or "uprising," and said he shouldn't talk to any other employees. He says the supervisor, Peter Kissman, informed him that if he continued to challenge the new pension plan, CSW officials would think he wasn't a team player, and his job could be in

jeopardy.

Asked about this, Mr. Kissman says: "In my department I would not tolerate employee harassment. I believe the company feels the same way. Past that, I really can't speak to this issue. It's being investigated by the company."

**A Few Sweeteners**

Employers, aware that switching to cash-balance plans can slam older workers, often offer features to soften the blow. They may agree to contribute somewhat more than the standard 4% of pay for older employees, or they may provide a "grandfather clause." CSW offered both options, saying employees 50 or older with 10 years of service could stay in the old plan if they wished. Mr. Bruggeman, a 25-year veteran, was just shy of 49. He calculated that people in his situation would see their pensions fall 50% under the new plan, depending on when they retired.

Mr. Bruggeman told company officials that the plan wasn't fair to some long-term employees. Subsequently, he says, in his November 1997 performance evaluation, his supervisor's only criticism was that he "spends too much time thinking about the pension plan." A CSW official says the company can't discuss personnel matters.

What bothered Mr. Bruggeman even more was his discovery of one of the least-known features of cash-balance plans: Once enrolled in them, some employees don't earn any more toward their pension for several years.

The reasons are convoluted, but in a nutshell: Most employees believe the opening balance in their new pension account equals the credits they've earned so far under the old plan. But in fact, the balance often is lower.

When employers convert to a cash-balance plan, they calculate a present-day, lump-sum value for the benefit each employee has already earned. In Mr. Bruggeman's case, this was $352,000 -- something he discovered only after obtaining information from the company and making the calculations himself. Yet Mr. Bruggeman's opening account in the cash-balance plan was just $296,000, because the company figured it using different actuarial and other assumptions.

This is generally legal, despite a federal law that bars companies from cutting already-earned pensions. If Mr. Bruggeman quit, he would get the full $352,000, so the law isn't violated. But if he stays, it will take several years of pay credits and interest before his balance gets back up to $352,000.

**'Wearaway'**

Mr. Douty says this happened to fewer than 2% of workers at CSW. But at some companies that switch to cash-balance plans, far more are affected. At AT&T Corp., which adopted a cash-balance plan this year, many older workers will have to work three to eight years before their balance catches up and they start building up their pension pot again. "Wearaway," this is called. Only if an employee knows what figures to ask for can he or she make a precise comparison of old and new benefits.

Indeed, the difficulty of making comparisons has sometimes been portrayed as an advantage of switching to cash-balance plans. A partner at the consulting firm that invented the plans in the 1980s

told a client in a 1989 letter: "One feature which might come in handy is that it is difficult for employees to compare prior pension benefit formulas to the account balance approach."

Asked to comment, the author of that line, Robert S. Byrne of Kwasha Lipton (now a unit of PricewaterhouseCoopers), says, "Dwelling on old vs. new benefits is probably not something that's a good way to go forward."

At one company, employees did know how to make comparisons. When Deloitte & Touche started putting a cash-balance plan in place last year, some older actuaries rebelled. The firm eventually allowed all who had already been on the staff when the cash-balance plan was adopted to stick with the old benefit if they wished.

**Struggle at Chase**

At Chase Manhattan Corp., two executives in the private-banking division hired an actuary and calculated that their future pensions had fallen 45% as a result of a conversion to a cash-balance plan by Chase predecessor Chemical Bank. "I would have had to work about 10 more years before I broke even and got a payout equal to my old pension," says one of the executives, John Healy, now 61.

He and colleague Nathan Davi say that after seven years of their complaints, Chase agreed to give each a pension lump sum of about $487,000, which was roughly $72,000 more than what they would have received under the new cash-balance plan. Although a Chase official initially said the bank had "never given any settlement to any employee over the bank's pension plans," when told about correspondence about the Healy-Davi case, Chase said that a review had determined that about 1,000 employees could be eligible for additional benefits. "We amended the plan so that it would cover all similarly situated employees," a spokesman said.

How many quiet arrangements have been reached is unknown. But employees are currently pressing class-action suits against Georgia-Pacific Corp. and Cummins Engine Co.'s Onan Corp. subsidiary, alleging that cash-balance plans illegally reduce pensions. (Both defendants are fighting the suits.) Judges have recently dismissed similar suits against Bell Atlantic Corp. and BankBoston N.A.

**Concern at the IRS**

Not aware of any of this ferment, Mr. Bruggeman in August 1998 filed his multiple-spreadsheet analysis of the CSW cash-balance plan with the IRS and the Labor Department, asking them for a review. Soon after, he says, a manager in CSW's benefits department called him in and "wanted to know what it would take for me to drop all this." The answer wasn't to be "grandfathered" and exempted from the new plan. "I told him all I want is for the company to ... be fair to employees," he says. "It's the principle of the thing."

The manager couldn't be reached for comment, but a CSW official says the company takes complaints "very seriously and they're thoroughly investigated. In every part of this type of investigation an employee is interviewed by a company representative, and in every initial interview the employee is asked for suggestions on what might be a preferred solution."

Even without Mr. Bruggeman's input, the IRS has a lot of cash-balance data on its plate. The agency is swamped with paperwork from hundreds of new plans seeking its approval, and applications are piling up. The delay is due in part to concern at the IRS that such plans may violate various pension

laws, according to a person familiar with the situation. Meanwhile, the consulting firms that create the plans for companies are lobbying for exemptions from certain pension rules.

They say they aren't worried. That's because "companies who now have these plans are sufficiently powerful, sufficiently big and have enough clout that they could get Congress to bend the law ... to protect their plans," says Judith Mazo, a Washington-based senior vice president for consulting firm Segal Co. Regulators, meanwhile, are playing catch-up. Bottom line, Ms. Mazo says: "The plans are too big to fail."

**Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

7 of 11 DOCUMENTS

Copyright 2000 The New York Times Company
The New York Times

March 8, 2000, Wednesday, Late Edition - Final

**SECTION:** Section G; Page 1; Column 1; Workplace

**LENGTH:** 996 words

**HEADLINE:** The Electronic Rank and File

**BYLINE:** By VIRGINIA MUNGER KAHN

**BODY:**

Last October, as an uproar over the move by I.B.M. from a traditional pension plan to a cash balance plan was peaking, a group of employees at Bell Atlantic set up a Web site intended to address questions about their own pension plan.

In the weeks that followed, executives at Bell Atlantic were deluged with e-mail messages and letters expressing outrage at a similar move by the company, even though the switch had taken place two years earlier. "I've been here 26 years, and I have never seen such an outpouring," said Janice Winston, co-founder of the Bell Atlantic Employee Coalition for Retirement Security, which set up the Web site, bapensions.org.

On Jan. 19, Bell Atlantic blinked. It told 20,000 employees with 15 or more years of tenure that they would be given their benefits under a modified traditional plan if the company's analysis found that they would be better off than under the new pension plan. Generally, younger employees can do better under cash balance plans, but workers of middle-age and older often do worse, with some seeing the value of their retirement benefits drop as much as 50 percent.

Bell Atlantic denied that it had been influenced by the employee group. "We would have come to this decision had there been no Web site," said a spokesman, Steven Marcus. "We have a long tradition of staying in touch with our employees."

That is not how Ms. Winston sees it. "They knew they couldn't go forward with employee morale the way it was," she said. "I believe our Web site was key."

At a time of declining membership in traditional blue-collar unions, the Internet is spawning a new form of collective organization that is enabling once-compliant white-collar workers to put pressure on management. Though some coalitions that are formed around Web sites and fueled by e-mail and Internet chat rooms may be fleeting, and though such groups do not enjoy the legal protections that old-style unions do, they have proven to be a potent weapon that many companies must come to grips with.

The model for this new worker activism was established by I.B.M. employees after the computer giant announced its pension conversion plan last May. Originally, I.B.M. said it would allow about 30,000 employees who were near retirement to stay with the traditional plan. In September, however, it more than doubled that number to 65,000. What happened? I.B.M. employees used their computers to band together, to create programs that compared the old plan with the new and to lobby legislators in Washington against the change. The company's decision came within days of a Congressional hearing on cash balance plans.

"I just don't see how we could have done it without the Web," said Lynda French, who created www.cashpensions.com, one of the best-known sites associated with the I.B.M. employee effort. With more than 97,000 site visits and with links to government agencies, Congressional offices and other employee-sponsored Web sites, cashpensions.com has become a fount of information for organizers at other companies.

Indeed, since the I.B.M. backpedaling, employees at several large corporations besides Bell Atlantic have established Web sites and chat rooms dedicated to pension issues, including att.nac.net for AT&T employees and dukeemployees.8m.com for Duke Power employees. In addition, employees at SmithKline Beecham and the Williams Companies have set up sites at clubs.yahoo.com.

The Coalition for Retirement Security (www.pensions-r-us.org), a nonprofit umbrella organization for employee groups that is based in Springfield, Mass., has been active in getting several of these sites off the ground. "We have so many new groups coming on, it's amazing," said Paul R. Edwards, the founder of the organization.

The results have often been impressive. More than 20,000 hits have been recorded at att.nac.net since that site was set up in December with the aim of rolling back AT&T's switch in 1997 to a cash balance plan. "We have copies of hundreds of letters written to our executives," said one AT&T organizer, who insisted on anonymity. "They would never have been written without the Web site." (So far, however, AT&T is not bending to the pressure, saying it has "no plans" to change its pension plan.)

Even the Labor Department has got into the online act, setting up a special section on cash balance plans at www.dol.gov and an e-mail address to take comments and answer questions. "We've found the Internet to be one of the best ways to get information out to the public," Labor Secretary Alexis Herman said when asked about the Web site. "As the old saying goes: 'knowledge is power,' and this type of information empowers workers to make the right choices."

None of this new activism could have happened without the Internet, in the view of Ms. French, who recently retired from I.B.M. She noted that the conversions had been going on for years with not a peep of protest. "Employees didn't understand," she said. "Now, it's very difficult not to."

Some employers play down the importance of Web protests on their policy making. "We didn't need to look at the Web sites to know what our employees were thinking," said Jana Weatherbee, an I.B.M. spokeswoman. "We heard their concerns and we made adjustments."

Still, some people think the Web's role as a conduit for employee grievances will only grow. "Once this tool is understood, employees will seek to improve all their benefits programs," said David Wray, president of the Profitsharing/401k Council of America, an association in Chicago of employers with defined-contribution pension plans. "This will have a powerful impact on the workplace over the next 10 years."

Ms. Winston is already looking beyond pension issues. "Now that we understand how our retirements can be affected by decisions in Congress and by our employers, we feel we have to make active decisions to protect our rights," she said. "We hope to branch out into health benefits."

http://www.nytimes.com

**GRAPHIC:** Photo: Janice Winston thinks a Web site she helped set up on pensions at Bell Atlantic was crucial to a change in policy. (Tim Shaffer for The New York Times)

**LOAD-DATE:** March 8, 2000