# Exhibit 3



Page 1

1       UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF CONNECTICUT
3                    - - -
4   JANICE C. AMARA, Individually and on:
5   behalf of others similarly situated :
6            -vs-              :
7   CIGNA CORP. and CIGNA PENSION PLAN  :
8                    - - -
9            No. 3:01-CV-2361 (DIS)
10          Oral Deposition of JOHN ARKO, was taken
11   pursuant to notice, held at ZANARAS REPORTING AND
12   VIDEO, 1616 Walnut Street, Philadelphia,
13   Pennsylvania, at 10:05 a.m., on July 3, 2003, before
14   Kristen Augello, Court Reporter and Notary Public,
15   there being present:
16
17
18                    - - -
19          ZANARAS REPORTING AND VIDEO
20              1616 Walnut Street
21          Philadelphia, Pennsylvania 19103  .
22       2112 Bay Avenue, Ocean City, New Jersey 08226
23          1-215-790-7857  1-877-GO-DEPOS
24

Page 2

1   A P P E A R A N C E S:
2
3   BY: STEPHEN R. BRUCE, ESQUIRE
4   805 15th Street, NW, Suite 210
5   Washington, DC 20005
6   202-371-8013
7   Attorney for the Plaintiff
8
9
10   MORGAN, LEWIS & BOCKIUS
11   BY: JEREMY P. BLUMENFELD ESQUIRE
12   1701 Market Street
13   Philadelphia, Pennsylvania 19103
14   215-963-5258
15   Attorney for the Defendants
16
17
18
19
20   Also Present: Thomas G. Moukawsher, Esquire
21
22
23
24

Page 3

1   I N D E X
2   NAME OF WITNESS:    EXAMINATION    PAGE NO.
3   John Arko
4                       Mr. Bruce         5
5
6
7
8                E X H I B I T    I N D E X
9   NO.                           PAGE
10   Exhibit-52 through 59          5
11   Exhibit-60                    13
12   Exhibit-61                    43
13   Exhibit-62                    71
14   Exhibit-63                    76
15   Exhibit-64                   179
16   Exhibit-65                   184
17   Exhibit-66                   235
18   Exhibit-67                   250
19   Exhibit-68                   252
20   Exhibit-69                   273
21   Exhibit-70                   278
22
23
24

Page 4

1               LITIGATION SUPPORT INDEX
2
3         DIRECTION TO WITNESS NOT TO ANSWER
4
5   PAGE LINE        PAGE LINE           PAGE LINE
6   16    4.         29   1            37   15
7   61    9          171  5            194  12
8   203   11         298  19           311  9
9   314   22         316  1
10        REQUEST FOR PRODUCTION OF DOCUMENTS
11
12   PAGE LINE        PAGE LINE           PAGE LINE
13
14                    (NONE)
15
16                 STIPULATION
17
18   PAGE                      LINE
19    5                         1
20
21              QUESTIONS MARKED
22   PAGE                   LINE
23
24

Page 5

1.                   - - -
2                   (It is agreed by and between
3          counsel that the reading, signing,
4          sealing, filing and certification are
5          hereby waived; and all objections,
6          except as to form of the question, are
7          reserved until the time of trial.)
8                   - - -
9                   JOHN ARKO, after having been
10         first duly sworn, was examined and
11         testified as follows:
12                  - - -
13                  - - -
14                  (Whereupon, the court reporter
15         marked Exhibits-52 through 59 for
16         purposes of identification.)
17                  - - -
18    BY MR. BRUCE:
19         Q.    Would you please state your name?
20         A.    John Arko.
21         Q.    And what's your address?
22         A.    401 Dudley Avenue, Narberth,
23    Pennsylvania.
24         Q.    How do you spell Narberth?

Page 6

1         A.    N-a-r-b-e-r-t-h.
2         Q.    And Mr. Arko, I have met you before,
3    because I deposed you in Mr. Depenbrock's case.
4         A.    Yes.
5         Q.    What's your job title now?
6         A.    Director of retirement benefits.
7         Q.    And you're here in response to a Rule
8    30 (b)(6) notice of deposition.  Do you understand
9    what that is?
10        A.    Yes.  I have been informed.
11        Q.    Can you explain what your
12   understanding of that is?
13        A.    That in general this is a -- you have
14   some questions to pose of either Cigna Corporation or
15   the Cigna pension plan, and you needed somebody who
16   could speak on their behalf, since they are unable
17   to.
18        Q.    So this is a corporation?
19        A.    Yes.
20        Q.    And what are the subjects on which
21   you're to speak?
22                  MR. BLUMENFELD:  Objection.
23   BY MR. BRUCE:
24        Q.    What's your understanding of what the

Page 7

1    subjects are on which you're to speak for the
2    corporation?
3                   MR. BLUMENFELD:  Same objection.
4                   He is here pursuant to your notice of
5                   deposition under 30 (b)(6) to speak to
6                   the subjects you will identify.
7                   MR. BRUCE:  I can ask him what
8                   his understanding is of the subjects.
9    BY MR. BRUCE:
10        Q.    Go ahead.
11        A.    I believe in general you wanted to
12   cover a couple of points.  You see, I had to recall
13   now just from memory.  One was something a little bit
14   about 204(h) notices around the plan, and we see the
15   accruals of the benefit.  The second was how we look
16   at how the plan was designed, or around age
17   discrimination issues, and there was a third.  It's
18   escaping me at the moment.
19                  MR. BLUMENFELD:  Are you finished
20                  with your answer?
21                  THE WITNESS:  Yes, I am.
22                  MR. BLUMENFELD:  I'd just like to
23                  note for the record, he is here
24                  pursuant to the 30 (b)(6) notice of

Page 8

1                   deposition to answer questions on
2                   subjects identified in that notice and
3                   for purposes of the 30 (b)(6) with
4                   regard to him speaking on behalf of
5                   Cigna Corporation and Cigna pension
6                   plan.  He is authorized to speak on
7                   regarding subjects that you identified
8                   in the notice.
9                   MR. BRUCE:  Okay.
10   BY MR. BRUCE:
11        Q.    And what did you do to prior to
12   speaking on Cigna's behalf on these subjects?
13        A.    Had a few meetings with Jeremy
14   Blumenfeld and with Paul Gontarek.
15        Q.    Anyone else?
16        A.    No.
17        Q.    How about Mr. Meyn?
18        A.    No.
19        Q.    Did you speak with Mr. Meyn about what
20   you were going to do?
21        A.    I let him know that I was scheduled to
22   be at this deposition today.
23        Q.    And what was your conversation with
24   him?

Page 41

1            immediately into the cash balance
2            plan.
3   BY MR. BRUCE:
4        Q.    Were the accruals under the cash
5   balance plan significantly reduced compared to the
6   accruals under the prior plan?
7                  MR. BLUMENFELD:  Objection.
8                  THE WITNESS:  You need to be more
9            specific.  Can you ask a more specific
10           question?
11  BY MR. BRUCE:
12       Q.    Can you answer the question?
13       A.    I don't think I understand the
14  question in that context.
15                 MR. BLUMENFELD:  Objection.
16  BY MR. BRUCE:
17       Q.    Let's skip over that.  Did Cigna give
18  notice to employees of a reduction in the rate of
19  accruals?
20                 MR. BLUMENFELD:  Objection.
21                 THE WITNESS:  Yes, I believe we
22           did.
23  BY MR. BRUCE:
24       Q.    And what document was that in?

Page 42

1        A.    It was in a newsletter that was
2   delivered to participants.
3        Q.    Was it in what's called the SPD?
4        A.    No.
5        Q.    Was it in what's been called the
6   information kit?
7                  MR. BLUMENFELD:  Objection.
8                  THE WITNESS:  No, I don't believe
9            so.
10  BY MR. BRUCE:
11       Q.    And you know what I am referring to
12  about information kit?
13       A.    Yes, I do.
14       Q.    That was that maroon binder with a
15  number of different documents?
16       A.    Yes, there was a few versions.
17                 MR. BLUMENFELD:  Objection.
18       Q.    That was different versions for people
19  who were grandfathered and people who were converted
20  to the cash balance plan?
21       A.    Correct.
22       Q.    So your understanding is that notice
23  of a reduction was contained in the newsletter that
24  was distributed to employees in November of 1997?

Page 43

1                  MR. BLUMENFELD:  Objection.
2                  THE WITNESS:  I can't recall
3            specifically the date it was
4            delivered, but it sounds like that was
5            the newsletter.
6                  MR. BRUCE:  Let's mark this as
7            61.
8                  - - -
9                  (Whereupon, the court reporter
10           marked Exhibit-61 for purposes of
11           identification.)
12                 - - -
13  BY MR. BRUCE:
14       Q.    I am showing you what's been marked as
15  Exhibit-61.  Is that the newsletter to which you're
16  referring?
17       A.    Yes.
18       Q.    And you're testifying on behalf of
19  Cigna Corporation and Cigna pension plan that this
20  newsletter is the notice of reduction that's required
21  under ERISA and --
22                 MR. BLUMENFELD:  Objection.
23  BY MR. BRUCE:
24       Q.    That it contains the notice of

Page 44

1   reduction that was required by ERISA, right?
2                  MR. BLUMENFELD:  Objection on two
3            grounds; first of all, as has already
4            been established, this document is
5            before December 31, 1997, and
6            therefore is not subject to the 30
7            (b)(6) notice.  That's grounds number
8            one.  Second of all, it
9            mischaracterizes his testimony.
10                 MR. BRUCE:  Go ahead and answer.
11                 THE WITNESS:  Repeat that
12           question.
13                 MR. BRUCE:  Could you repeat the
14           question?
15                 (The previous question is read
16           back.)
17                 MR. BLUMENFELD:  Objection.
18                 THE WITNESS:  I don't know that
19           it was required to be produced, but we
20           feel it would satisfy a 204(h) type of
21           notification.
22  BY MR. BRUCE:
23       Q.    And you say we feel, who is the we?
24       A.    Cigna Corporation.

Page 45

1    Q.    But who did you talk to about whether
2  this newsletter constituted the 204(h) notice?
3    A.    In direct preparation of this meeting,
4  are you asking?
5    Q.    Okay.
6    A.    Nobody in particular.
7    Q.    And prior to this meeting, where did
8  you get your understanding that this newsletter,
9  Exhibit-61, contains 204(h) notice?
10    A.    From any recollection of what was
11  going on at the time that this newsletter was created
12  back in 1997.
13    Q.    And what do you recall happening where
14  you thought that this was the 204(h) notice?
15    A.    During 1997 we were creating the
16  communication, entire program and plan to tell
17  employees about all these changes in the retirement
18  program.  During those discussions it was that -- one
19  of the issues discussed, as I recall, was can we put
20  a 204(h) notice somewhere.
21    Q.    And who do you recall discussing that
22  with?
23    A.    Paul Gontarek, our legal, and the
24  person we all relied on.

Page 46

1    Q.    And anyone else?
2    A.    I can't recall specifically.  A lot of
3  people were involved with the creating the
4  communications.
5    Q.    How about David Durham?
6    A.    He would have been involved in
7  creating this material.
8    Q.    How about Andy Hodges?
9         MR. BLUMENFELD:  Objection.
10        THE WITNESS:  I can't recall if
11        he would have been tangentially
12        involved, but I don't think at all
13        directly, would not have had any
14        responsibilities to review any of this
15        type of material.
16  BY MR. BRUCE:
17    Q.    How about the age discrimination
18  analysis and rates of accruals, did Andy Hodges take
19  any part in that?
20        MR. BLUMENFELD:  Objection.
21        THE WITNESS:  At the time during
22        1997, during the design phases?
23        MR. BRUCE:  Yes.
24        THE WITNESS:  Not that I recall.

Page 47

1  BY MR. BRUCE:
2    Q.    Anytime after that?
3    A.    Not that I recall.
4    Q.    Did he take any part in analyzing
5  whether the plan complied with the 133 and a third
6  percent rule?
7         MR. BLUMENFELD:  Objection.  Go
8         ahead.
9         THE WITNESS:  During the design
10        phases of this plan design, 1997?
11        MR. BRUCE:  Yes.
12        THE WITNESS:  You would have to
13        ask him, but not that I am aware of at
14        Cigna Corporation.
15  BY MR. BRUCE:
16    Q.    And looking at Exhibit-61, the
17  newsletter, what in the newsletter constitutes notice
18  to employees of reductions in rates of accrual?
19        MR. BLUMENFELD:  Objection, calls
20        for a legal conclusion.
21        THE WITNESS:  Are you asking me
22        what I thought was a 204(h) notice in
23        here?
24        MR. BRUCE:  Yes.

Page 48

1         THE WITNESS:  It was on Page 5 of
2         this newsletter.  It would be the
3         story labeled, opening balances to be
4         calculated next spring.
5  BY MR. BRUCE:
6    Q.    What in there notified employees of a
7  reduction in accruals?
8         MR. BLUMENFELD:  Objection.
9         THE WITNESS:  I can read you what
10        is here.
11  BY MR. BRUCE:
12    Q.    What language do you think relates to
13  that issue?
14    A.    I think the entire story, but I am
15  happy to read it.
16    Q.    The entire story relates to reductions
17  in rates of accrual?
18        MR. BLUMENFELD:  Objection.
19        THE WITNESS:  I think that this
20        story satisfies to the extent we were
21        trying to put a 204(h) notice out,
22        that this was -- this notice and that
23        story was intended to do that.
24  BY MR. BRUCE:

Page 49

1    Q.    So this story was intended to satisfy
2    the 204(h) requirement, the one entitled, opening
3    balances to be calculated next spring?
4          A.    I don't know that it was a
5    requirement, but it was intended to satisfy and to
6    serve as 204(h) notice.
7          Q.    And how do you recall that?
8                MR. BLUMENFELD:  Objection.
9    BY MR. BRUCE:
10         Q.    What do you recall being discussed, or
11   how did you come --
12         A.    Just as I answered before during the
13   creation and design of the communications plan back
14   in 1997, I believe it was Paul Gontarek who suggested
15   that we -- or at least put into discussion
16   potentially doing a 204(h) notice.
17         Q.    And you recall some discussion of this
18   article relating to the 204(h) notice?
19         A.    Out of that discussion and design, any
20   understanding is this was served to satisfy a 204(h)
21   notice.
22         Q.    Was there anything else in the
23   newsletter that you thought satisfied the 204(h)
24   notice?

Page 50

1                MR. BLUMENFELD:  Objection.
2                THE WITNESS:  I am not certain.
3                We would have relied on Paul Gontarek
4                and our outside counsel to confirm
5                that it did satisfy a 204(h) notice.
6    BY MR. BRUCE:
7          Q.    And are you aware that the 204(h)
8    notice is the responsibility of the plan
9    administrator under ERISA?
10         A.    That sounds familiar, yes.
11         Q.    And the plan administrator under ERISA
12   has fiduciary duties, right?
13               MR. BLUMENFELD:  Objection.
14               THE WITNESS:  Yes, a variety of
15               them, yes.
16   BY MR. BRUCE:
17         Q.    And in terms of real-life individuals,
18   the people who function as the plan administrator for
19   Cigna Corporation are yourself; is that right?
20         A.    You would have to be more specific.
21   Are you talking about in 1997, or now?
22         Q.    Back in 1997.
23         A.    During the design of this plan?
24         Q.    Yes.

Page 51

1          A.    I don't know that I would have put
2    myself in that role at that time.
3          Q.    Who would you have put in that role?
4          A.    The main plan administrator at that
5    time was Stuart Beltz.
6          Q.    And how about Jerry Meyn?
7          A.    He was responsible -- vice-president
8    of employee benefits and health management.  You
9    would have to ask him what he thought his role was in
10   particular.
11         Q.    And in preparation for your deposition
12   here today, did you contact Mr. Beltz about the
13   204(h) notice?
14         A.    No, I did not.
15         Q.    Did you try to determine whether or
16   not he had any documents related to the 204(h)
17   notice?
18         A.    No, I did not.
19         Q.    Did you ask anyone whether there were
20   any documents related to the 204(h) notice?
21         A.    No, I did not.
22         Q.    So have you ever seen anything in
23   writing relating to 204(h) notice?
24         A.    Again, you're talking during 1997 or

Page 52

1    now?
2          Q.    Anytime.
3                MR. BLUMENFELD:  Objection.
4                THE WITNESS:  During 1997, no
5                doubt, whether the documents or the
6                conversation, I can't recall
7                specifically.
8    BY MR. BRUCE:
9          Q.    In going back to this article that's
10   entitled, opening balances to be calculated next
11   spring, in Exhibit 61, what notice did it give to
12   employees relating to reductions in accruals?
13               MR. BLUMENFELD:  Objection.
14               THE WITNESS:  I can read you
15               again what it says.
16   BY MR. BRUCE:
17         Q.    No, I'm asking you the question of
18   what is your understanding of what does this article
19   communicate to employees related to reductions in the
20   rate of accruals?
21               MR. BLUMENFELD:  Objection.
22   BY MR. BRUCE:
23         Q.    Does it tell them anything about that
24   subject?

Page 53

1             MR. BLUMENFELD:  Objection.
2             THE WITNESS:  I can just say that
3       Paul Gontarek and outside legal
4       counsel reviewed this and surmised
5       that it satisfied requirements to be a
6       204(h) notice, if we were to need one.
7   BY MR. BRUCE:
8        Q.     And so the idea as you recall it was
9   that without determining whether Cigna needed a
10  204(h) notice, that Cigna would give one anyway; is
11  that right?
12       A.     I think what's a fair conclusion, yes.
13       Q.     And you don't recall any discussions
14  with Mr. Durham that 204(h) notice was needed, that
15  there were reductions in rates of accrual?
16             MR. BLUMENFELD:  Objection.
17             THE WITNESS:  I don't recall
18       specific conversations back in 1997.
19  BY MR. BRUCE:
20       Q.     Do know whether there were any
21  reductions in rates of accrual comparing the new plan
22  with the old plan?
23       A.     I don't know how to answer that
24  question.  In particular, individual?

Page 54

1        Q.     In particular individuals.
2             MR. BLUMENFELD:  Objection.
3             THE WITNESS:  You would have to
4       provide a specific point in history
5       and do calculations.
6   BY MR. BRUCE:
7        Q.     Do you remember in terms of particular
8   individuals, whether there were any reductions?
9             MR. BLUMENFELD:  Objection.
10            THE WITNESS:  I don't know how to
11      answer that question.
12  BY MR. BRUCE:
13       Q.     Do you remember Bob Upton?
14       A.     Robert Upton?
15       Q.     Yes.
16       A.     I believe I do from recollection, pure
17  memory, yes.
18       Q.     Do you remember that there were
19  reductions in his rates of accrual under the new
20  plan, compared to the old?
21       A.     No, I don't recall.
22       Q.     Do you recall an individual employees
23  where there were reductions in their rates of
24  accruals?

Page 55

1             MR. BLUMENFELD:  Objection.
2             THE WITNESS:  I am not -- could
3       you clarify what you mean by rates of
4       accrual; ultimate retirement
5       benefits?
6   BY MR. BRUCE:
7        Q.     Do you know what rates of accrual
8   means?
9             MR. BLUMENFELD:  Objection.
10            THE WITNESS:  I mean, they mean
11      different things in different
12      contexts.
13  BY MR. BRUCE:
14       Q.     Tell me what you believe they mean in
15  the context of 204(h).
16       A.     What I personally believe?
17       Q.     Yes.
18       A.     That the value of benefits that are
19  under the plan would be less under one design,
20  presumably a new design, than an older design
21  formula.
22       Q.     And do you know, given your
23  understanding of what that means, do you know whether
24  there were any individuals whose rates of accrual

Page 56

1   were less under the new plan compared to the old
2   plan?
3        A.     And by that, do you mean the benefits
4   they ultimately received in the plan?
5        Q.     No, I mean the definition that you
6   just gave.
7        A.     I don't know.  I would need to review
8   that, and ascertain whether there were -- how
9   specific individuals were calculated, but any
10  understanding is no, there wouldn't be anybody.
11       Q.     So your understanding -- tell us about
12  that.  Tell me about your understanding that no,
13  there wouldn't be anyone in general?  What was that
14  understanding based on?
15       A.     Again, similar to the answer before
16  about the discussion we had in 1997 as we were
17  creating these communications pieces, and I think it
18  was under the discussion of the 204(h) notice,
19  whether we wanted to do one or not.  I can't recall
20  the specifics of how those discussions went, but I
21  think they during those discussions probably realized
22  that in general, no accruals were going to be
23  reduced.
24       Q.     And who were those discussions with?

Page 81

```
1       Q.    Just try and answer the question. If
2   the answer is you don't know, just say that.
3       A.    I don't know if I have an answer to
4   that. I don't know.
5       Q.    Let's go back to Exhibit-61. The
6   article that you identified on Page 5 is, providing
7   the 204(h) notice. I believe you described earlier
8   that the 204(h) notice is to tell participants that
9   there has been a reduction in this future benefit,
10  right?
11                  MR. BLUMENFELD:  Objection.
12                  THE WITNESS:  A 204(h) notice in
13          general, yes, that's what it is for.
14  BY MR. BRUCE:
15      Q.    Going through this article, let's take
16  the first sentence. It states: Employees
17  participating in the new Cigna retirement plan will
18  stop earning benefits under the current pension plan
19  on December 31, 1997. Is that providing people with
20  notice that their benefits are being reduced?
21                  MR. BLUMENFELD:  Objection.  The
22          document speaks for itself.
23  BY MR. BRUCE:
24      Q.    Is that sentence providing people with
```

Page 82

```
1   notice that their benefits are being reduced?
2       A.    It's telling people that they'll stop
3   earning benefits under the current plan.
4       Q.    Is it telling people what their
5   benefits will be under the new plan?
6       A.    It goes on to talk about the fact that
7   effective 1/1/98, there will be -- I can read
8   again -- there will be a new plan in place.
9       Q.    That's the last sentence, the
10  effective date of the new plan, which will
11  technically be an amendment to the existing plan,
12  will be January 1, 1998?
13      A.    Yes.
14      Q.    Does that sentence tell participants
15  that their benefits will be reduced under that new
16  plan?
17                  MR. BLUMENFELD:  Objection.  The
18          document speaks for itself.
19                  THE WITNESS:  I don't know, no.
20  BY MR. BRUCE:
21      Q.    How about the next paragraph that
22  says: Cigna will begin the process of calculating
23  final pension benefits and retirement plan opening
24  balances early in 1998, after all 1997 payroll data
```

Page 83

```
1   are finalized. Does that sentence tell participants
2   that their benefits under the new plan will be
3   reduced?
4                   MR. BLUMENFELD:  Same objection.
5           The document speaks for itself.
6                   MR. BRUCE:  You can just say,
7           same objection.
8                   THE WITNESS:  No.
9   BY MR. BRUCE:
10      Q.    The next sentence:  Benefit
11  calculations are expected to be completed in the
12  spring. Does that tell employees that their benefits
13  will be reduced under the new plan?
14      A.    No.
15      Q.    And the next sentence after that, once
16  balances are calculated, they will be credited to
17  retirement plan accounts retroactively to January 1,
18  1998, so you won't lose any interest credits for the
19  first part of 1998. Does that sentence tell
20  employees that their benefits will be reduced under
21  the new plan?
22                  MR. BLUMENFELD:  Same objection.
23                  THE WITNESS:  No.
24  BY MR. BRUCE:
```

Page 84

```
1       Q.    And the final sentence:  You will be
2   informed of your final pension plan benefit and
3   retirement plan opening balance in your total
4   compensation report scheduled to be mailed in May
5   1998. Does that sentence tell employees that their
6   benefits will be reduced under the new plan?
7                   MR. BLUMENFELD:  Same objection.
8                   THE WITNESS:  No.
9   BY MR. BRUCE:
10      Q.    So when you considered this article to
11  provide notice to employees that their benefits will
12  be reduced under the new plan --
13                  MR. BLUMENFELD:  Objection.
14  BY MR. BRUCE:
15      Q.    -- you were relying solely on the
16  advice of counsel?
17      A.    We didn't feel we needed to do a
18  204(h) notice, but to the extent this article
19  satisfies any requirements of a 204(h) notice, we
20  relied on counsel.
21      Q.    But is there something in this article
22  that tells employees that their benefits will be
23  reduced under the new plan?
24                  MR. BLUMENFELD:  Objection.  The
```

Page 85

```
1                    document speaks for itself, and you
2          have already gone through the entire
3                    thing with him.
4    BY MR. BRUCE:
5         Q.     Is there something in this article
6    that tells employees that their benefits will be
7    reduced under the new plan?
8         A.     No.
9         Q.     Let's go over some of the documents
10   that you have brought, starting with Exhibit-52.  Mr.
11   Arko, have you seen the expert report that Mr. Poulan
12   prepared in this case?
13        A.     The name doesn't sound familiar to me.
14        Q.     He is the expert for the plaintiffs.
15        A.     Yes, I did.
16        Q.     You have reviewed that?
17        A.     I have a copy of that testimony, and I
18   have skimmed it.
19        Q.     When did you skim it?
20        A.     It's been over a month now ago.
21        Q.     And how about the expert report
22   prepared by Harry Scherr, did you review that?  He is
23   your expert for Cigna.
24        A.     No, I did not.
```

Page 86

```
1         Q.     You have never seen his expert report?
2         A.     No, I have not.
3         Q.     You're familiar with the term
4    wearaway, right?
5         A.     In the context of pension plans?
6         Q.     Yes.
7         A.     That of a plan amendment, yes.
8         Q.     Do you know whether the Cigna pension
9    plan had a wearaway after January 1, 1998?
10        A.     Can you be more specific, provide a
11   scenario?  I think there's no -- to my knowledge, the
12   plan document doesn't define any terms like wearaway.
13        Q.     Did the employees -- were any of the
14   employees under a wearaway after January 1, 1998?
15                    MR. BLUMENFELD:  Objection.
16                    THE WITNESS:  By -- I am not
17             quite sure what you mean by wearaway
18             beyond what I have defined before.
19   BY MR. BRUCE:
20        Q.     Why don't you tell me what you mean by
21   wearaway?
22        A.     When a plan amendment is created that
23   provides for a benefit formula different from a
24   previous formula plan document had in effect, and
```

Page 87

```
1    that for a period of time that the previous formula
2    continues on as part and comes into play in the
3    benefit calculation, and if that benefit calculation
4    under the old plan is, provides for a benefit that is
5    higher at the time of commencement of a benefit
6    formula than the new amendment formula provides for,
7    then that might be termed a wearaway period.
8         Q.     Why do people call it a wearaway,
9    because there is a period in which the participant
10   doesn't earn any additional benefits?
11                    MR. BLUMENFELD:  Objection.
12                    THE WITNESS:  Because -- I don't
13             know why people term it a wearaway
14             period.  I can tell you that I think
15             that's, generally speaking, why they
16             would term it a wearaway period, yes.
17   BY MR. BRUCE:
18        Q.     Because there's a period of time
19   during which people don't earn any additional
20   benefits?
21                    MR. BLUMENFELD:  Objection.
22                    THE WITNESS:  They get their
23             benefits at the time that they meet
24             all the requirements to start to
```

Page 88

```
1              receive a payment from the plan.
2    BY MR. BRUCE:
3         Q.     Do you know whether Cigna conducted
4    any focus groups in connection with its
5    communications to employees about the cash balance
6    plan?
7                    MR. BLUMENFELD:  Objection.
8                    THE WITNESS:  So this would be
9             back in the 1997 time frame?
10                    MR. BRUCE:  Yes.
11                    THE WITNESS:  I can't recall.
12   BY MR. BRUCE:
13        Q.     Again, when did you start with Cigna?
14        A.     April of '97.
15        Q.     You don't remember focus groups in the
16   summer after you started?
17        A.     I didn't participate in any.
18        Q.     Who would have been responsible for
19   focus groups?
20                    MR. BLUMENFELD:  Objection.
21                    THE WITNESS:  I don't know that
22             there was any, but if there were it
23             would have been the communications
24             people, perhaps David Durham.
```