UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANICE C. AMARA, individually and on behalf of others similarly situated, | : : : | |
| | : | |
| Plaintiff, | : | 3:01 CV 2361 (MJK) |
| v. | : : | |
| CIGNA CORP. AND CIGNA PENSION PLAN, | : : | |
| Defendants. | : | |

MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S
MOTION IN LIMINE ON DIRECT TESTIMONY RELEVANT
TO THE "LIKELY PREJUDICE" STANDARD IN BURKE V. KODAK

## I.     INTRODUCTION

Defendants CIGNA Corp. and CIGNA Pension Plan (collectively "Defendants") submit

this Memorandum of Law in response to Plaintiff's Motion in Limine on Direct Testimony

Relevant To The "Likely Prejudice" Standard in Burke v. Kodak Retirement Income Plan, 336

F.3d 103 (2d Cir. 2003).

## II.     DISCUSSION

**A.     Plaintiff Alleges In Count II That Certain Provisions Of The Plan Cannot Be
Enforced Against Her Because They Were Not Described In The Summary Plan
Description For The CIGNA Pension Plan.**

Count II of Plaintiff's Complaint alleges that the summary plan description ("SPD") for

Part B of the Plan does not satisfy the requirements for SPDs set forth in 29 U.S.C. § 1022(b)

and 29 C.F.R. § 2520-102.  (First Amended Complaint, ¶¶ 39-41).  In Count II, Plaintiff seeks

benefits purportedly based on the terms of the SPD, instead of the actual terms of the Plan.

**B.      To Prevail On A Claim Based On An SPD, A Plaintiff Must Prove That He Was "Likely Prejudiced" By The SPD's Failure To Disclose Certain Information Required By ERISA.**

      **1.      The Likely Prejudice Test Requires The Plaintiff To Prove That He Likely Was Harmed By The Failure To Disclose Certain Information In The SPD.**

The Second Circuit ruled in <u>Burke</u> that a plaintiff claiming an entitlement to benefits based on an SPD must prove both (1) that the SPD failed to comply with ERISA[1] and (2) that he was "likely to have been harmed as a result of a deficient SPD." <u>Burke</u>, 336 F.3d at 110, 113 (emphasis omitted).  The Second Circuit explained:

> At the outset, we agree that a prejudice standard is more consistent with ERISA's objective to protect the employee against inadequate SPDs. . . .  Cognizant of ERISA's distribution of benefits, we require, for a showing of prejudice, that a plan participant or beneficiary *was likely to have been harmed as a result of a deficient SPD.*  Where a participant makes this initial showing, however, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error.

<u>Id.</u> (emphasis added, except as to the word "likely").  In other words, a participant bears an initial burden of proof that he "was likely . . . harmed" because the SPD did not contain certain information required by ERISA's SPD disclosure requirements.  Where a participant satisfies that burden of proof, he is entitled to a presumption of harm which the employer can rebut with evidence that the plaintiff was not actually harmed by the inadequate disclosure.[2]  <u>See id.</u>

Critically, the "likely prejudice" standard articulated by the Second Circuit in

---

[1]    Defendants submit that the SPD at issue in this case does satisfy ERISA's disclosure requirements.  As that is not the subject of Plaintiff's motion, Defendants are not addressing this issue in detail herein.

[2]    This brief only addresses the likely prejudice standard because that is the subject of Plaintiff's motion.

Burke refers to harm or prejudice "as a result of," i.e., *caused by*, the inadequate disclosure.

Burke, 336 F.3d at 113.  One district court explained this causation requirement in Burke as

follows:

> The rule to be derived from Burke and Manginaro is that in an ERISA action,
> likely prejudice to a plaintiff will be presumed if, as the result of an SPD
> deficiency, he was not aware of the need to take an action within his control
> (submitting an affidavit, filing a law suit) which would have avoided the
> restriction on eligibility for benefits, and consequently failed to take that action.

Sheehan v. Metropolitan Life Ins. Co., No. 01-9182, 2005 WL 627636, *31 (S.D.N.Y. Mar. 17,

2005).  Thus, the mere fact that an SPD describes a better benefit than exists in the plan – or a

benefit without certain conditions required by the plan – is not sufficient to state a claim based

on an SPD; otherwise, the "likely prejudice" test would be superfluous because a participant

could state a claim based on an SPD every time the SPD did not satisfy the requirements of

ERISA.

For example, in Burke, the plan provided supplemental income benefits to the domestic

partner of a participant, but only if the participant submitted a domestic partnership affidavit.

Although the SPD disclosed the affidavit requirement for other benefits,[3] the supplemental

income benefit section of the SPD did not disclose that an affidavit was required to obtain those

benefits.  When the plaintiff requested supplemental income benefits, the plan administrator

denied the request specifically because the participant never submitted the domestic partnership

affidavit.  See id. at 109-110.  Under these circumstances, the Second Circuit found likely

prejudice because (1) the plaintiff likely did not know that an affidavit was required in order to

---

[3]     Kodak used a single SPD to summarize many of their benefit plans.

3

obtain the benefits, (2) the plaintiff could have qualified for the supplemental income benefits had she submitted the affidavit, and (3) there was evidence in the record that the participant probably would have submitted the affidavit had he known it was required. See id. at 114. The court found:

- The plan administrator denied benefits to the plaintiff "for her failure to comply with the domestic partnership affidavit requirement;"

- "The conspicuous absence of the domestic partnership affidavit requirement in the self-contained [] section likely led the Burkes to believe that an affidavit was unnecessary for [those] benefits;" and

- "Mr. Burke designated Mrs. Burke as the primary beneficiary of his Kodak-provided life insurance, his Savings and Investment Plan Account, and his Employee Stock Ownership Plan Account. Therefore, his forfeiture of substantial lifetime benefits for his disabled partner, and later spouse, is belied by his prudence in other Kodak benefit decisions."

Id. at 110, 114. Importantly, in finding likely prejudice, the Burke court relied on the plaintiff's own individual life circumstances, not just the terms of the plan and the SPD. See id.

To give further guidance to district courts in applying the likely prejudice test, the Burke court cited approvingly from the district court decision in Manginaro v. Welfare Fund of Local 771, I.A.T.S.E., 21 F. Supp. 2d 284 (S.D.N.Y. 1998). The Burke court stated:

The facts of Manginaro v. Welfare Fund of Local 771, I.A.T.S.E., 21 F.Supp.2d 284 (S.D.N.Y. 1998), provide a useful illustration. In that case, the plan itself imposed a two-year statute of limitations on legal actions against an employee welfare fund. The SPD, however, omitted any mention of the statute of limitations. The normal statute of limitations under New York law would have been six years. The district court ruled, in accordance with Second Circuit precedent, that because the plan and the SPD were in conflict, the SPD controlled. Noting a division in the circuits over whether reliance or prejudice was required for recovery, the court adopted a "possible prejudice" approach. Applying that standard revealed that "plaintiffs were likely prejudiced by the SPD's failure to disclose the limitation on actions contained in the Plan" because New York's statute of limitations allowed an additional four years to sue.

Burke, 336 F.3d at 113.  Thus, in Manginaro, the plaintiff did not know about the time limit for

filing a claim because it was not described in the SPD.  As in Burke, the inadequate disclosure

"likely" harmed the plaintiff because he could have qualified for the benefits (by filing a timely

claim) had the SPD provided sufficient disclosures.[4]

The Second Circuit recently addressed the likely prejudice standard again in Weinreb v.

Hospital For Joint Diseases Orthopaedic Institute, 404 F.3d 167 (2d Cir. 2005).  In Weinreb, the

plaintiff sought to prevent enforcement of a plan requirement that a participant submit an

enrollment form to be eligible for life insurance because the participant was not notified of the

requirement in an SPD.[5]  See id. at 170.  The participant, however, had been notified of the

enrollment form requirement through other informal communications and telephone calls.  See

id. at 172.  Accordingly, the Second Circuit held that the plaintiff "failed to raise any material

issue of fact demonstrating likely prejudice from the absence of an SPD" and affirmed summary

judgment against the plaintiff.  Id. at 172.  Importantly, the Second Circuit held that these

individualized oral and written disclosures made to the participant were relevant to (and

precluded the participant from proving) "likely prejudice," and never reached the issue of actual

---

[4]    Because the plaintiff was likely harmed by the nondisclosure of the limitations period in
the plan, the remedy was to preclude application of the plan's two year limitations period
to the plaintiff's claims.  See Manginaro, 21 F.Supp.2d at 294 ("Accordingly, I will apply
the six-year statute of limitations of N.Y. C.P.L.R. § 213 to plaintiffs' benefits claims.").
Thus, the remedy specifically corrected for the harm likely caused by the inadequate
disclosure, nothing more.

[5]    The employer in Weinreb did not provide any SPD at all.  Nonetheless, the Second
Circuit held that the same "likely prejudice" standard applied.  See Weinreb, 404 F.3d at
171.

prejudice. See Weinreb, 404 F.3d at 172.[6]

### 2. Plaintiff Is Not Automatically Entitled To A Presumption Of Likely Prejudice.

Plaintiff argues, in reliance on securities caselaw, that she is automatically entitled to a presumption of likely harm in this case. (Ptf's Brf. at 19-20). Plaintiff is wrong. First, both Burke and Weinreb involved allegations of non-disclosure. Yet the Second Circuit held in Burke and again in Weinreb that a plaintiff must *prove* that he was likely prejudiced by the non-disclosure. See Burke, 336 F.3d at 113 ("Where a participant *makes this initial showing. . .*") (emphasis added); Weinreb, 404 F.3d at 171 ("[A]n ERISA claim premised on the complete absence of an SPD also requires *a showing* of likely prejudice.") (emphasis added). Indeed, in Weinreb the Second Circuit affirmed summary judgment specifically because the plaintiff failed to meet her burden of proving likely prejudice. See Weinreb, 404 F.3d at 172. Moreover, courts have universally rejected application of any presumption of prejudice (or reliance) under ERISA. See, e.g., In re Unisys Retiree Medical Benefit ERISA Litigation, MDL No. 969, 2003 WL 252106, *5 and n.13 (E.D. Pa. Feb. 4, 2003) (rejecting presumption of reliance under ERISA and instead requiring individualized proof of reliance); Thomas v. Aris Corp. of America, 219 F.R.D.

---

[6]      Parry v. SBC Communications, Inc., 363 F. Supp. 2d 275 (D. Conn. 2005), cited by Plaintiff, is inapposite. In Parry, the district court was faced with three documents: a plan, an SPD, and a collectively bargained memorandum of understanding ("MOU"). According to the district court, there was no difference between the plan and the SPD (and no discussion of whether the SPD complied with ERISA) because both entitled the plaintiffs to a certain benefit. See id. at 300-04. The defendant, however, refused to pay that benefit based on the terms of the MOU. See id. Thus, although the district court discussed whether the plaintiffs were prejudiced by the difference between their benefits under the plan and the MOU, such discussion was irrelevant; a participant is entitled to benefits based on the terms of an ERISA plan (as opposed to an SPD) without showing any prejudice. See 29 U.S.C. § 1132(a)(1)(B).

338, 342 (M.D. Pa. 2003) ("The Court of Appeals for the Third Circuit has held that, in the

context of an ERISA claim, a plan participant's detrimental reliance upon the representation or

omission of a fiduciary may not be presumed."); Hudson v. Delta Air Lines, Inc., 90 F.3d 451,

457 (11th Cir. 1996) (affirming denial of class certification because "even if the plaintiffs are

able to prove that Delta disseminated a false and uniform message to all potential retirees . . . ,

they would have to show that all members of the class would have [relied to their detriment].").

Plaintiff's suggestion that she is entitled to a presumption of likely prejudice is inconsistent with

Second Circuit law and should be rejected.[2]

     In sum, Burke and Weinreb require that a participant prove that a deficient disclosure in

an SPD likely caused him harm that he would not have suffered had the SPD complied with

ERISA. This proof must be based on the participant's own facts and circumstances.

---

[2]    Even the premise of Plaintiff's argument is misplaced. Specifically, Plaintiff argues that
she should be entitled to a presumption of reliance because the SPD did not compare her
benefits under the old plan versus the new plan. (Ptf's Brf. at 20). Plaintiff ignores,
however, that an SPD is a summary of the *existing*, operative plan. ERISA does not
require that an SPD describe a plan that no longer applies or compare benefits under a
current plan versus benefits under a prior plan that no longer applies. See 29 C.F.R. §
2520.102-3 (listing items required to be in SPDs); 29 C.F.R. § 2520.102-4 (SPD "may
omit information which is not applicable to the class of participants or beneficiaries to
which it is furnished"). Indeed, where, as here, a pension plan is amended as to only
some participants (i.e., those being moved into Part B), the regulations provide that the
SPD for those participants need only include information applicable to them. See 29
C.F.R. § 2520.102-4. Neither Burke nor Weinreb permit a participant to state a claim
based on an SPD for failure to disclose information that is not required to be in the SPD.

**C.**    **Plaintiff Has Not Proffered Any Evidence That Plaintiff Or Any Other Plan Participant Likely Was Harmed By The Alleged Omission Of Any Information From The SPD.**

Plaintiff has identified several categories of evidence she intends to introduce to prove likely prejudice, each of which is addressed in turn.[8] Before addressing this evidence, however, it is important to note that this is not a case like Burke, Weinreb, or Manginaro, where a participant *could have* obtained a higher benefit had he known about a particular plan provision that was not disclosed in the SPD. To the contrary, there is nothing here that Plaintiff or any other participant could do to get a higher benefit, regardless of whether the SPD complied with ERISA. In other words, this is not a situation where, "as the result of an SPD deficiency, [a plaintiff] was not aware of the need to take an action within his control (submitting an affidavit, filing a law suit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action." Sheehan, 2005 WL 627636, *31. Accordingly, there is no possible harm, let alone "likely" harm, caused by any inadequate disclosure in the SPD, as the

---

[8]    For most of these categories of evidence, Plaintiff does not identify what specific evidence she seeks to introduce to prove likely prejudice. This, of course, makes it difficult for Defendants to respond because whether any particular evidence is admissible will, of course, depend on the specific evidence at issue.

Second Circuit articulated the standard in <u>Burke</u> and <u>Weinreb</u>.[2]

### 1.    **Expert Testimony**

Federal Rule of Civil Procedure 26(a)(2)(B) requires that any expert that Plaintiff intends

to call to testify in the trial of this matter prepare a report, which "shall contain a <u>complete</u>

<u>statement</u> of all opinions to be expressed and the basis and reasons therefor." Here, Plaintiff has

identified two experts in this litigation and has attached to her brief an expert report from each

witness. (Ptf's Brf. at Exs. 1, 10). Pursuant to Rule 26(a)(2)(B), therefore, any expert opinions

that Plaintiff might seek to introduce to prove likely prejudice must be contained within these

reports.

Unfortunately, Plaintiff does not identify any particular aspect of either of her experts'

reports that she claims is relevant to whether Plaintiff, or any other person, was likely prejudiced

by the omission of any information from the SPD. A review of both reports, however, reveals no

opinion relevant to likely prejudice. Professor Stratman's expert report describes selected

---

[2]    Moreover, even a comparison of a participant's benefit under the Plan versus what it
would be under Plaintiff's characterization of the SPD is highly individualized. For
example, Plaintiff argues that the principal difference between the Plan and the SPD is
that the Plan requires calculation of a participant's opening account balance for his cash
balance benefit based on the participant's previously earned age-65 benefit (for most
participants), but that the SPD suggests that it will be based on the participant's early
retirement benefit.[2] (Ptf's Brf. Ex. 10, p. 11) ("But CIGNA does not tell employees [in
the SPD] that the value of their opening account balance does not include early retirement
benefits . . ."). The difference between the terms of the Plan and the SPD (according to
Plaintiff's reading of the SPD) – and hence the significance of that difference –
necessarily depends on the participant's salary, years of service, and age. For some
participants, this may be a significant sum of money; for others, it will not be. The
significance of any such difference to the participant also will turn on that participant's
own financial circumstances, <u>i.e.</u>, whether the difference in monthly pension is significant
relevant to the participant's other assets and income sources.

portions of the SPD and several other documents, and opines as to what they do or do not say.[10]

Professor Stratman summarizes his conclusions as follows:

> Upon inspecting these documents carefully, my conclusion is that the SPDs and precursor documents fail to disclose to the average plan participant the potential reductions in benefits from the new cash balance plan relative to the old plan. On the contrary, the language in these documents suggests that the benefits plan participants had earned prior to January 1, 1998 would not be reduced by the change to the new plan and that benefits would grow steadily. Further, the documents suggest that plan participants would continue to earn benefits under the new plan that are equal to or better than those obtainable in future years under the old plan. There is simply no language in these documents making explicit the circumstances under which the move to the new plan could result in significant benefit reductions relative to the old plan or indicating that benefit reductions would be reduced based on age.

(Ptf's Brf. at Ex. 10, p. 1). Regardless of whether Professor Stratman's report is admissible to

prove whether the SPD satisfies the requirements of ERISA,[11] nothing in Professor Stratman's

---

[10]    Professor Stratman also opines in his report on communications beyond the SPD. The likely prejudice standard articulated by the Second Circuit in Burke and Weinreb, however, is limited to claims based on an SPD because the SPD has a special importance in ERISA's statutory framework. See Burke, Weinreb, supra. See also Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988) ("[A]bsent a showing tantamount to proof of fraud, an ERISA welfare plan is not subject to amendment as a result of informal communications between an employer and plan beneficiaries."). In addition, these other communications were not sent to all plan participants. For example, Plaintiff Amara did not receive any of the communications (except for the SPD) that Professor Stratman discusses in his report because she was not employed by CIGNA at the time those communications were published. (First Amended Complaint, ¶ 17 (Amara was re-hired in September, 1998); Ptf's Brf. Ex. 10, p. 4 (describing documents distributed to employees in November 1997).

[11]    Defendants intend to move to preclude Professor Stratman from testifying, because Professor Stratman's report merely opines as to whether the SPD satisfies the requirements of ERISA. This is a question of law which depends exclusively on the written terms of the Plan and the SPD. See, e.g., Doyle v. Local 25, No. 97-6814, 1999 WL 1044206, *6 (N. D. Ill. Nov. 9, 1999) ("[T]he question whether the SPD satisfies ERISA's disclosure requirements is a question of law that must be examined by the court de novo."); Arnold v. Arrow Transp. Co. of Delaware, 926 F.2d 782, 785 (9th Cir. 1991)

report even purports to explain how Plaintiff or any other participant likely was harmed because of any inadequate disclosures in the SPD. For example, there is no suggestion that Plaintiff could have done anything to obtain a higher pension benefit had she known the information that Professor Stratman claims was missing from the SPD.

Similarly, Mr. Poulin opines in his report that the Plan is age discriminatory (based on his method of measuring age discrimination),[12] and that the Plan allegedly violates other provisions of ERISA. As Plaintiff characterizes it, "Mr. Poulin has prepared an expert report for the Plaintiff Class which identifies the features of CIGNA's cash balance conversion that cause losses of benefits that participants might reasonably expect to receive." (Ptf's Brf. at 12). Once again, regardless of whether Mr. Poulin's opinions are correct (which, Defendants submit, they are not), they are irrelevant to likely prejudice because they do not identify any likely harm that

_____

(same). Defendants do not intend to address herein whether either of Plaintiff's expert reports are admissible and the standards that should govern that admissibility generally. Instead, the instant memorandum addresses the relevance of Plaintiff's expert reports vis-à-vis the likely prejudice standard because that is the subject of Plaintiff's motion.

[12]  Mr. Poulin argues that the Plan is age discriminatory because, for example, a 64 year old planning to retire next year will receive a lower monthly pension benefit than a 20 year old scheduled to retire in 45 years. Mr. Poulin's analysis does not consider that the 64 year old will receive his pension 44 years *earlier* than the 20 year old. In other words, his opinion does not take into account the time value of money (i.e., inflation protection), or that the real difference between the 64 year old's benefit and the 20 year old's benefit is the number of years to payout of the benefit, not age. For example, if the 20 year old and 64 year elected to receive their benefits at the same time, or if the 20 year old elected to receive his benefit before the 64 year old (both of which are possible under Part B), the 64 year old's benefit would be greater than the 20 year old's. Compare Eaton v. Onan Corp., 117 F. Supp. 2d 812, 825-29 (S.D. Ind. 2000) (cash balance plans are not age discriminatory), Tootle v. ARINC, Inc., 222 F.R.D. 88, 92-94 (D. Md. 2004) (same); Engers v. AT&T Corp., No. 98-3660, at page 6-11 (June 11, 2001) (attached as Ex. A) (rejecting challenge to cash balance plan as being age discriminatory), with Cooper v.

Plaintiff (or any other person) suffered because of any alleged deficiencies in the SPD. (Ptf's Brf. at Ex. 1).

2.  **Surveys**

Defendants acknowledge that surveys sometimes can constitute admissible evidence, depending on who and what they purport to survey, the purpose for which they are being introduced, and the methodology used to prepare the survey, among other factors. See, e.g., Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 225-239 (2d Cir. 1999) (discussing factors to be considered to determine whether a survey is admissible). Here, Plaintiff has not identified any particular survey that he intends to introduce into evidence. Under such circumstances, it is impossible to determine whether any such surveys might be admissible into evidence and for what purposes. Accordingly, Defendants respectfully submit that it would be inappropriate for this Court to determine whether or not surveys generally – or any survey in particular – are admissible evidence (and for what purposes) at this juncture.

3.  **Testimony From Participants**

Plaintiff suggests in her brief that the likely prejudice standard is an objective, reasonable person test, similar to materiality, which does not require proof about any particular participant's circumstances. (Ptf's Brf. at 20). Plaintiff also argues that the likely prejudice standard "contemplates that if one written communication is at issue, there will be one determination." (Ptf's Brf. at 21). This is wrong. Materiality is relevant to whether the SPD satisfies ERISA's disclosure requirements – an objective test based exclusively on the terms of the documents. The

---

IBM Personal Pension Plan, 274 F. Supp. 2d 1010, 1021-22 (S.D. Ill. 2003) (cash balance plans are age discriminatory).

likely prejudice standard, by contrast, does not turn on whether a reasonable participant likely was prejudiced by the inadequate disclosures in the SPD. Indeed, the Second Circuit could have articulated a reasonable person standard for determining prejudice, but it did not do so. To the contrary, Burke and Weinreb require each participant to prove that he personally likely was harmed as a result of the deficient SPD. For example, in Burke, the plaintiff demonstrated that her husband made other financial decisions regarding plan benefits to protect the plaintiff financially, which evidenced that the plaintiff's husband likely would have filled out the required affidavit (to obtain the additional benefits) had he known it was required. See Burke, 336 F.3d at 113-14. Conversely, in Weinreb, the Second Circuit found no likely prejudice because the participant had been told through individualized oral and written communications about the particular requirement at issue, even though it was not described in the SPD.[13] Weinreb, 404 F.3d at 171. Here, similar testimony as to every participant is relevant to whether that participant has met his or her burden of proving likely prejudice.

Plaintiff provides selected examples of testimony from individual participants that might be relevant to the likely prejudice standard. For example, Plaintiff suggests that individual participants may testify about their understanding of the terms of the SPD. (Ptf's Brf. at 21). This may be relevant to a participant's ability to prove likely prejudice if the participant can

---

[13]    Likewise here, Plaintiff admits that she was orally told about the relevant provisions of the Plan in September, 2000. (Amara Dep. at 74-79 (attached as Ex. B). At the time, Plaintiff had been working for CIGNA (during her second period of employment) for only two years and kept working for an additional three years thereafter. Plaintiff did not request her retirement benefits until 2005. Accordingly, under these circumstances, Plaintiff could not have suffered any prejudice and, as to her, the Plan's terms should control.

demonstrate that because of his understanding about benefits (based on the SPD), he likely failed to take action that he otherwise would have taken to obtain the benefits. The mere fact that a participant may have misunderstood the way his benefits were calculated, however, is, without more, insufficient to prove likely prejudice under the test articulated by the Second Circuit in Burke and Weinreb.

Plaintiff also suggests that participants might testify that they were not able based on the SPD to compare their benefits under the Plan with the benefits available under CIGNA's prior pension plan. Plaintiff offers no explanation as to how such testimony might be relevant under the likely prejudice standard, particularly where, as here, a participant could not choose to be in the prior plan even if he wanted to. Moreover, ERISA's SPD requirements do not require that an SPD provide information about a prior plan, or comparing a current plan versus a prior plan, in which the participants no longer participate (and cannot participate). See 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-3 (describing required contents of SPDs); 29 C.F.R. § 2520.102-4 (SPD may omit information that does not apply to the participants receiving the SPD).

Plaintiff's suggestion that participants might testify that they would not have returned to work at CIGNA[14] (or would have left CIGNA) had the SPD accurately reflected the terms of the Plan is irrelevant under the likely prejudice standard. The purpose of the likely prejudice standard is to enable a participant to obtain benefits they *could have obtained* had they known

---

[14]    Moreover, there is no requirement under ERISA to provide an SPD to a person who is not yet a participant in Part B. Thus, not providing an SPD to a potential employee (or a potential rehire) does not state a claim under the likely prejudice standard because there was no violation of ERISA's SPD disclosure rules, which is a prerequisite to such a claim.

about the information in the SPD.  If a participant would have left CIGNA (or never joined

CIGNA), then they would not have been entitled to any benefits under the Plan in any event.

Thus, such testimony is irrelevant under the likely prejudice standard.

### 4.     Newspaper Articles

Last, but not least, Plaintiff seeks to introduce various newspaper articles to demonstrate

likely prejudice.  (Ptf's Brf. Ex. 15).  These articles plainly have no bearing on the likely

prejudice standard articulated by the Second Circuit in Burke and Weinreb.  In fact, these

newspaper articles do not deal with the CIGNA Plan or its participants at all.  In short, these

articles have no relevance to Plaintiff's likely prejudice claim and, on that basis alone, should not

be admitted into evidence.[15]

---

[15]     Of course, the mere fact that newspaper articles generally are self-authenticating does not
render them admissible evidence.  Whether the articles (or the contents of those articles)
constitute hearsay would depend on the purpose for which the article was being
introduced and the specific portion of the article in question.  In this case, the Court need
not reach these issues, because the subject matter of the articles is irrelevant to any claim
of likely prejudice.

## III.     CONCLUSION

For each and all of the foregoing reasons, Defendants respectfully submit that Plaintiff's

Motion in Limine on Direct Testimony Relevant To The "Likely Prejudice" Standard in <u>Burke v.</u>

<u>Kodak</u> should be denied.

Dated:  June 14, 2005                    Respectfully submitted,

                                                **MORGAN, LEWIS & BOCKIUS LLP**

                                                        Christopher A. Parlo (CT-04700)
                                                        101 Park Avenue
                                                        New York, New York  10178
                                                        (212) 309-6062
                                                        (212) 309-6273 (fax)

                                                        Joseph J. Costello
                                                        Jeremy P. Blumenfeld
                                                        1701 Market Street
                                                        Philadelphia, Pennsylvania  19103-2921
                                                        (215) 963-5295/5258

                                                **ROBINSON & COLE LLP**

                                                By: _____

                                                        James A. Wade (CT # 00086)
                                                        Elizabeth  A. Fowler (CT # 23584)
                                                        280 Trumbull Street
                                                        Hartford, Connecticut  06103
                                                        (860) 275-8270
                                                        (860) 275-8299

                                                        Attorneys for Defendants
                                                        CIGNA Corporation and CIGNA Pension Plan

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 14th day of

June, 2005, via telecopy and first-class mail upon the following:

Thomas G. Moukawsher
Moukawsher & Walsh, LLC
328 Mitchell Street
Groton, CT 06340

and upon:

Stephen R. Bruce
805 15th Street, NW
Suite 210
Washington, DC 20005

Elizabeth A. Fowler

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

CHAMBERS
NICHOLAS H. POLITAN
DISTRICT JUDGE

MARTIN LUTHER KING JR.
FEDERAL BUILDING & U.S. COURTHOUSE
50 WALNUT ST, ROOM 5076
P.O. BOX 999
NEWARK, N.J. 07101-0999

<u>NOT FOR PUBLICATION</u>

June 6, 2001

<u>THE ORIGINAL OF THIS LETTER OPINION
IS ON FILE WITH THE CLERK OF THE COURT</u>

Stephen R. Bruce, Esq.
805 15th St., NW
Suite 210
Washington, DC 20005

Edgar Pauk, Esq.
144 E. 44th St.
Suite 600
New York, NY 10017

Gerald J. Smit, Esq.
14 Sarah Court
Bridgewater, NJ 08807
 Attorneys for Plaintiffs

Christopher H. Mills, Esq.
Terrence J. Nolan, Esq.
David J. Treibman, Esq.
COLLIER, JACOB & MILLS
580 Howard Ave.
Somerset, NJ 08873
 Attorneys for Defendants
 AT&T Corp. and
 AT&T Management Pension Plan

        Re:  Phillip C. Engers, et al.
             v. AT&T Corp., et al.
             <u>Civil Action No. 98-3660 (NHP)</u>

1

Dear Counsel:

This matter comes before the Court on the motion of plaintiffs Phillip C. Engers, Warren J. McFall, Donald Noerr, and Gerald Smit (hereinafter "plaintiffs") for the certification of this case as a class action. The Court heard oral argument on January 23, 2001, during which it was brought to the Court's attention that the Court possibly may not have subject matter jurisdiction over the Third and Ninth Claims for Relief in the Second Amended Class Action Complaint. Upon review of the submissions of the parties, and for the reasons expressed herein, it is ordered that plaintiffs shall proffer evidence which would tend to counter the defendants' contention that none of the named plaintiffs will suffer a reduction in annual benefits commencing at age sixty-five by virtue of the Plan Amendment. The Court will also dismiss the Ninth Claim for Relief. Lastly, the Court will grant plaintiffs' motion to certify the class as to the remaining claims in the Second Amended Class Action Complaint.

### DISCUSSION

The circumstances surrounding this case are set forth in this Court's previous Letter Opinion dated June 29, 2000. Suffice it to say that defendants AT&T and AT&T Management Pension Plan (hereinafter "AT&T") have raised the issue of whether the Court possesses subject matter jurisdiction over the Third and Ninth Claims for Relief in the Second Amended Class

2

Action Complaint.  The Court's findings are as follows.

### I.  "Case or Controversy" and the Standing Requirement

Specifically, AT&T has argued that subject matter jurisdiction is lacking in this Court because the named plaintiffs in this action do not have standing to bring the causes of action asserted in the Third and Ninth Claims for Relief.  At the outset, it must be explained that pursuant to Federal Rule of Civil Procedure 12(h)(3), a court may dismiss a case for lack of subject matter jurisdiction by motion of a party or sua sponte.  Indeed, the Court is permitted, if not obliged, to inquire at any point in a case as to whether it has subject matter jurisdiction.  See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 704 (1982); Quern v. Mandley, 436 U.S. 725, 730 n.3 (1978); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977); Medlin v. Boeing Vertol Co., 620 F.2d 957, 960 (3d Cir. 1980).

Article III, § 2 of the Constitution confers subject matter jurisdiction upon federal district courts only where a "case or controversy" exists.  The doctrine of standing implicates the "case or controversy" requirement and hence, where a plaintiff has no standing, it follows that a court does not possess subject matter jurisdiction.

The standing requirement includes three elements: (1) injury in fact to the plaintiff; (2) a causal connection between the

3

injury and the conduct of the defendant complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The plaintiff bears the burden of establishing the elements of standing.  See id. at 561.

To establish an injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest which is . . . concrete and particularized . . . ."  Lujan, 504 U.S. at 560 n. 1.  A legally protected interest may be created where Congress confers substantive rights by statute upon the citizenry.  See Linda R. S. v. Richard D., 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.").  It is axiomatic that one must be protected by such a statute or, stated another way, possess rights under the statute, in order to have those rights violated in the first instance.

### A.  Third Claim for Relief

In the Third Claim for Relief, plaintiffs allege that AT&T violated ERISA by implementing significant reductions in the rate of future accruals before adoption of the Plan amendments and without providing participants with notice of the Plan amendments as required by § 204(h) of ERISA.  AT&T contends that § 204(h) confers no rights on the plaintiffs, and therefore the plaintiffs

4

do not have standing to assert the Third Claim for Relief.

Section 204(h) of ERISA provides as follows:

(h) Notice of significant reduction in benefit accruals

(1) A plan described in paragraph (2) may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to--
(A) each participant in the plan . . . .

29 U.S.C. § 1054(h).

Pursuant to 29 U.S.C. § 1135, the Secretary of the Treasury has the authority to issue regulations concerning § 204(h) of ERISA. The Secretary has defined a "significant reduction in the rate of future benefit accrual" to include only an amendment that "is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." See 60 Fed. Reg. at 64322, Q&A 5. The Secretary has also provided that the plan administrator "need not provide § 204(h) notice to any participant whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment." See 60 Fed. Reg. at 64323, Q&A 9. Hence, a Plan participant is only entitled to § 204(h) notice if the Plan Amendment is reasonably expected to reduce the participant's annual benefit commencing at retirement age.

AT&T has submitted evidence which demonstrates that none of

5

the named plaintiffs will suffer a reduction in annual benefits commencing at age sixty-five by virtue of the Plan Amendment. See Certification of Kevin R. Armant, ¶ 18. This evidence also tends to show that at any point in time plaintiffs' "Accrued Benefit at Age 65" under the Cash Balance formula will always be greater than the "Accrued Benefit at Age 65" would have been under either the Special Update or the prior Plan formula. See Certification of Kevin R. Armant, Exhs. E-H.

Indeed, if this is the case, then the named plaintiffs would not fall under the scope of § 204(h) and thus would not be entitled to notification. As such, the named plaintiffs would not have standing to pursue a claim under § 204(h). Consequently, this Court directs plaintiffs to proffer evidence which would tend to counter the defendants' contention that none of the named plaintiffs will suffer a reduction in annual benefits commencing at age sixty-five by virtue of the Plan Amendment. Such a proffer would satisfy plaintiffs' burden of establishing that this Court possesses subject matter jurisdiction over the Third Claim for Relief.

### B.  Ninth Claim for Relief

In the Ninth Claim for Relief, plaintiffs allege that AT&T violated § 4(i)(1)(A) of ADEA, 29 U.S.C. § 623(i)(1)(A), and § 204(b)(1)(H)(i) of ERISA, 29 U.S.C. § 1054(b)(1)(H)(i), because the Plan Amendment reduces the rate of accrual based on age.

6

AT&T argues that the named plaintiffs have no standing because § 4(i)(1)(A) of ADEA and § 204(b)(1)(H)(i) of ERISA only apply to employees who continue to work past the age of sixty-five.

Section 4(i)(1)(A) of ADEA prohibits an employer from establishing or maintaining "an employee pension benefit plan which requires or permits . . . the reduction of the rate of an employee's benefit accrual, because of age . . . ." 29 U.S.C. 623(i)(1)(A). Similarly, § 204(b)(1)(H)(i) of ERISA states that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(i). The Internal Revenue Code at 26 U.S.C. § 411(b)(1)(H) contains the same language as the ERISA provision. These three provisions were passed as part of the Omnibus Budget Reconciliation Act of 1986 ("OBRA"), P.L. 99-509, 100 Stat. 1874, 1973-78. The House Senate Conference Committee report on these three provisions indicates that the conferees intended that the three provisions be interpreted in a consistent manner. See H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. 378-79 (1986), reprinted in 1986 U.S.C.C.A.N. 3868, 4023-24.

Defendants direct the Court's attention to the recent case of Eaton v. Onan Corp., 117 F.Supp.2d 812 (S.D.Ind. 2000). In Eaton, the district court held that both § 4(i)(1)(A) of ADEA and

7

§ 204(b)(1)(H)(i) of ERISA apply only to employees who work beyond the normal retirement age of sixty-five.  See 117 F.Supp.2d 812, 826 (S.D.Ind. 2000).  Finding the language of the pertinent ADEA and ERISA provisions ambiguous, the Eaton court concluded that OBRA's legislative history convincingly proves that Congress intended the provisions at issue to apply only to those employees who work beyond the normal retirement age of sixty-five.  See id. at 826-29.

This Court is inclined to agree with Judge Hamilton's well-reasoned opinion in Eaton.  The language of the ADEA and ERISA provisions at issue is indeed ambiguous, as neither statute defines the pivotal statutory phrase: "rate of an employee's benefit accrual."  It is generally understood that in the face of unclear statutory language, a court is to look to the legislative history of the statute.  See Toibb v. Radloff, 501 U.S. 157, 161 (1991); United States v. Gregg, 226 F.3d 253, 257 (3d Cir. 2000). A court may also consider the headings of a statute as a guide in determining the meaning of the provision.[1]  See Helen L. v. DiDario, 46 F.3d 325, 333 n.15 (3d Cir. 1995) (looking to heading of regulation in addition to legislative history to find intent

---

[1] The heading found in the Internal Revenue Code provision enacted by OBRA, 26 U.S.C. § 411(b)(1)(H), states "Continued accrual beyond normal retirement age." (emphasis added).  This heading offers some guidance since Congress intended the ADEA, ERISA and Internal Revenue Code provisions in OBRA to be interpreted consistently.

8

of Congress).

In particular, it is clear to this Court that the legislative history of OBRA provides compelling evidence that Congress intended both ADEA and ERISA provisions at issue to apply only to those employees who continue to work after the normal retirement age of sixty-five. In other words, the ADEA and ERISA provisions at issue here were enacted to ensure that employees who choose to work past the age of normal retirement continue to accrue pension benefits.

The Conference Report demonstrates that Congress intended to protect the pension benefits of those employees who choose to continue to work after the age of sixty-five. See OBRA 1986 Conference Report at 378, *reprinted in* 1986 U.S.C.C.A.N. at 4023. For example, the Conference Report stated the following:

> Under the conference agreement, the rules preventing the reduction or cessation of benefit accruals on account of the attainment of age are <u>not</u> intended to apply in cases in which a plan satisfies the normal benefit accrual requirements for employees who <u>have not attained normal retirement age</u>.

OBRA 1986 Conference Report at 379, *reprinted in* 1986 U.S.C.C.A.N. at 4024 (emphasis added).

The statements of the bill's sponsors indicates the same intent. Senator Grassley explained the legislation as follows: "I am introducing legislation today that would amend the Age Discrimination in Employment Act (ADEA) and the Employee Retirement Income Security Act (ERISA) to require continued

9

pension benefit accruals for workers <u>who work past the normal</u>
<u>retirement age of 65</u>."     131 Cong. Rec. 18868 (July 11, 1985)
(emphasis added).   Representative Jeffords (now Senator) made the
following comments:

> The bill before us is also a pension bill which extends
> valuable pension accrual protections to older Americans
> <u>who work beyond normal retirement age</u>.   It is important
> for this body to understand what this "Older Americans
> Pension Benefits" provision does and does not do.   What
> it does is prevent a covered employee pension benefit
> plan from eliminating or reducing an employee's pension
> benefit accruals, because of the attainment of any age,
> <u>for the period of employment after the employee attains</u>
> <u>the normal retirement age under his or her plan</u>.

132 Cong. Rec. 32963 (Oct. 17, 1986) (emphasis added).

Representative Roukema offered the following remarks:

> The legislation amends current law to preclude the
> "attainment of any age" as a reason for eliminating or
> reducing pension benefits accruals <u>after normal</u>
> <u>retirement age</u>.   Therefore, employees who want or need to
> continue working <u>beyond normal retirement age</u> will no
> longer be able to be treated adversely under their
> pension plans because of their age.

132 Cong. Rec. 32975 (Oct. 17, 1986) (emphasis added).   And
lastly, Representative Clay stated the bill would "make it clear
that employee benefit plans may not reduce pension accruals or
allocations on the basis of an employee's age.   In short, these
changes will assure that older Americans who work <u>beyond normal</u>
<u>retirement age</u> continue to earn pension credits."   132 Cong. Rec.
32975 (Oct. 17, 1986) (emphasis added).

     Consequently, since none of the named plaintiffs fall into
this category - namely, employees who have reached the normal

10

retirement age of sixty-five - they are not protected by §

4(i)(1)(A) of ADEA or § 204(b)(1)(H)(i) of ERISA and thus do not

have standing to pursue those claims.  Indeed, it must be

remembered that "[i]f none of the named plaintiffs purporting to

represent a class meets the case or controversy requirement, none

may seek relief on behalf of himself or any member of the class."

O'Shea v. Littleton, 414 U.S. 488, 494 (1974).  See also 3B J.

Moore, FEDERAL PRACTICE, 23.10-1, n.8 (2d ed. 1971).  The Court

does not have subject matter jurisdiction over the Ninth Claim

for Relief.  Accordingly, the Court will dismiss the Ninth Claim

for Relief contained in the Second Amended Class Action

Complaint.

## II.  Certification of the Class

The named plaintiffs have moved for certification of the

class.  Because the Ninth Claim for Relief has been dismissed, no

ADEA claims remain in this case, and therefore no ADEA

representative action must be considered.  Only certification of

the class as to the ERISA claims under Fed.R.Civ.P. 23 is

necessary.

Upon review of the Second Amended Class Action Complaint and

the submissions of the parties, it is the opinion of this Court

that the named plaintiffs have satisfied the requisites of

Fed.R.Civ.P. 23 for class certification with regards to the

remaining claims in the Second Amended Class Action Complaint.

Therefore, the Court will certify the Second Amended Class Action
Complaint pursuant to Fed.R.Civ.P. 23(c).  At this juncture, the
remaining claims include the Third, Fourth, Fifth, Sixth, and
Seventh Claims for relief in the Second Amended Class Action
Complaint.  The Third Claim for Relief may be subject to
decertification and dismissal depending upon whether plaintiffs
proffer evidence which would tend to counter the defendants'
contention that none of the named plaintiffs will suffer a
reduction in annual benefits commencing at age sixty-five by
virtue of the Plan Amendment.

## CONCLUSION

For the foregoing reasons, the Court rules as follows:

1.  Regarding the Third Claim for Relief, the named plaintiffs are ordered to proffer evidence which would tend to counter the defendants' contention that none of the named plaintiffs will suffer a reduction in annual benefits commencing at age sixty-five by virtue of the Plan Amendment. The Third Claim for Relief may be subject to decertification and dismissal depending upon the named plaintiffs' submissions;

2.  The Ninth Claim for Relief is **DISMISSED**;

3.  Plaintiffs' motion to certify the class is **GRANTED** as to the remaining claims. The remaining Claims contained in the Second Amended Class Action Complaint, to wit, the Third, Fourth, Fifth, Sixth, and Seventh Claims for Relief, are hereby certified as a class action pursuant to Fed.R.Civ.P. 23.

NICHOLAS H. POLITAN
U.S.D.J.

13

**11/22/02 Janice Amara deposition**

1    Q    Okay.  Tell me, as best as you recall, the

2           entire conversation you had with Mark Lynch on

3           September 14th, 2000.

4    A    I need to understand.  The entire

5           conversation?  Are you asking for the

6           conversation as it relates to this issue?

7    Q    That's a good point.  Did you have

8           conversations with him on that day about other

9           issues besides the pension plan?

10    A    Yes.

11    Q    Let's just talk about the conversation that

12          you had with him regarding the pension plan.

13    A    In our conversation, Mark raised the issue of

14          the pension plan and he said, "You would be

15          sick if you knew the wearaway factors that

16          they're using," and I believe that he made a

17          statement to the effect that it was not Plan A

18          plus Plan B.

19    Q    You're not sure whether or not he made that

20          last statement; is that correct?

21    A    I'm not sure.  I'm not sure.

22    Q    And the last statement that I was referring to

23          was, "It's not Plan A plus Plan B"?

24    A    Let me clarify.  What he said, as I recall,

25          had the same meaning; I don't recall how he

**11/22/02 Janice Amara deposition**

1         stated it.

2   Q   Okay.  Are you now certain that he said

3         something to the effect that it's not Plan A

4         plus Plan B?

5   A   Uh-huh.

6   Q   Is that a yes?

7   A   Yes.

8   Q   Okay.  So when you said before you weren't

9         sure, is what you weren't sure about whether

10        he said those exact words or just something

11        like that?

12   A   I was not sure that he had said those exact

13        words, and then I realized that it was the

14        result or the intent or the -- regardless of

15        the phrase, that was the meaning that I

16        interpreted from his answer.

17   Q   This is different than what you had been told

18        orally by Kim Gabler and Sherry Lombardi; is

19        that correct?

20   A   That is correct.

21   Q   Was that the extent of your conversation with

22        Mark Lynch about pension benefits?

23   A   As I recall, it was.

24   Q   What was the context in which he all of a

25        sudden brought up the fact that you would be

**11/22/02  Janice Amara deposition**

1           sick if you knew about the wearaway factors?

2    A      Joe O'Rourke and Steve Hanson were laid off

3           from CIGNA Retirement and Investment Services,

4           and I believe that we were talking about

5           issues that Joe went to healthcare and at that

6           time Steve didn't have a job, so we were

7           talking about that Joe had a young family,

8           that he was very concerned about his pension

9           benefits, and so he wanted to stay with CIGNA

10          if he could.  So he looked around within CIGNA

11          and had secured a job I believe in the

12          healthcare area.  So I believe that was the

13          context in which we were talking about pension

14          benefits.

15   Q      What made him bring up the wearaway?

16   A      I do not know.

17   Q      Were you expecting him to say something about

18          the interaction between Part A and Part B?

19   A      I wasn't expecting him to say that.

20   Q      No.  Were you expecting him to say anything

21          about the interaction between Part A and

22          Part B?

23   A      No.  I was not expecting him to say anything.

24          He just --

25   Q      Volunteered?

**11/22/02 Janice Amara deposition**

1    A    -- volunteered that.

2    Q    Did you understand what he was talking about

3           when he referred to wearaway factors?

4    A    I had a basic understanding; very basic.

5    Q    Where did you get that understanding?

6    A    I don't recall.

7    Q    What's your understanding?  What was your

8           understanding at the time?  Just to be clear,

9           when you had this conversation with Mark Lynch

10          in September of 2000, what was your

11          understanding of what a wearaway was?

12    A    That the old benefit would -- that the old

13          benefit and the new cash balance weren't quite

14          the same and that it would take some time

15          before the cash balance would be -- would

16          provide the same benefit as the Part A.

17    Q    Okay.  So that your opening account balance

18          was something less than the value of all of

19          your prior accrued benefits, correct?

20    A    That it would not support an annuity of what I

21          had been given and had been told in 1995.

22          That's how I understood it.

23    Q    Sure.  Sticking with your understanding, when

24          you had this conversation with Mark Lynch,

25          your understanding of what the wearaway was

**11/22/02 Janice Amara deposition**

| | | |
|---|---|---|
| 1 | | and what he was referring to was that the |
| 2 | | value of the prior annuity that you had under |
| 3 | | Part A was greater than the value of your |
| 4 | | initial account balance? |
| 5 | A | I didn't think of it, actually, that way.  The |
| 6 | | way I thought of it was that the contributions |
| 7 | | to Part B were not actually additions to my |
| 8 | | pension benefit.  I thought of it in that way. |
| 9 | Q | The additions to the Part B, the pay credits |
| 10 | | and the interest credits, those were being |
| 11 | | added to your account balance, correct? |
| 12 | A | Yes, as I -- yes.  Pay credits and interest |
| 13 | | credits were being added to the account |
| 14 | | balance that was maintained in Part B |
| 15 | | according to the statements that I received. |
| 16 | | What I meant was that those credits were not |
| 17 | | available to me; they were not actually adding |
| 18 | | any additional retirement benefit. |
| 19 | Q | Do you understand the reason for that? |
| 20 | A | Do you mean the reason why CIGNA chose that |
| 21 | | plan design? |
| 22 | Q | No.  I'm sorry.  Do you understand that the |
| 23 | | reason that the pay credits and interest |
| 24 | | credits may not affect your pension is because |
| 25 | | the account balance that you were given to |

**11/22/02 Janice Amara deposition**

| | | |
|---|---|---|
| 1 | | start with was less than the value of some of |
| 2 | | your prior early retirement benefits? |
| 3 | A | The way I thought of it was that the actuarial |
| 4 | | formulas, interest rates, that the way that |
| 5 | | they were calculated was such that it would |
| 6 | | be -- it was such that the contributions going |
| 7 | | in weren't adding to my benefit. |
| 8 | Q | And that's because your old benefit was |
| 9 | | greater than your benefit under the cash |
| 10 | | balance? |
| 11 | A | Yes. |
| 12 | Q | After this conversation with Mark Lynch, did |
| 13 | | you do anything to investigate what he was |
| 14 | | telling you? |
| 15 | A | I certainly would have gone -- I certainly |
| 16 | | went online to see what the written words |
| 17 | | were, and I talked to Bob Steele and asked |
| 18 | | him.  Now, I can't say this was in 2000 or |
| 19 | | 2001, but I contacted the Department of Labor. |
| 20 | Q | Anything else? |
| 21 | A | I don't recall.  As I said earlier, I asked |
| 22 | | for a benefit estimate. |
| 23 | Q | From the AnswerNet? |
| 24 | A | Yeah, which I believe was not available at |
| 25 | | that time.  As a matter of fact, I believe |