# EXHIBIT 9

```
                UNITED STATES DISTRICT COURT

                   DISTRICT OF CONNECTICUT



JANICE C. AMARA, ET AL,        CV No. 3:01-2361 (DJS)

           PLAINTIFFS,
    VS.

CIGNA CORPORATION,
CIGNA PENSION PLAN,

           DEFENDANTS.


------------------------------------------------------
       DEPOSITION OF:  JAMES F. STRATMAN, PH.D.
------------------------------------------------------




       Taken before Kathleen S. Norton,
Registered Professional Reporter, Lic./Reg.
No. 00105, and Notary Public in and for the State of
Connecticut, pursuant to Notice, at the offices of
Robinson & Cole, 280 Trumbull Street, Hartford,
Connecticut, on June 19, 2003, commencing at 10:03
a.m.




          BRANDON SMITH REPORTING SERVICE, LLC
                   44 Capitol Avenue
                   Hartford, CT  06106
                   Tel:  (860) 549-1850
                   Fax:  (860) 549-1537
```

### Page 2

```
 1          APPEARANCES
 2   Representing the Plaintiff:
 3      LAW OFFICE OF STEPHEN R. BRUCE
        805 15th Street, NW
 4      Suite 210
        Washington, D.C. 20005
 5         By: STEPHEN R. BRUCE, ESQUIRE
 6   Representing the Defendants:
 7      MORGAN LEWIS & BOCKIUS, LLP
        101 Park Avenue
 8      New York, NY 10178-0060
           By: CHRISTOPHER A. PARLO, ESQUIRE
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1          STIPULATIONS
 2
 3      IT IS STIPULATED by the attorneys for the
 4   Plaintiffs and the Defendants that each party
 5   reserves the right to make specific objections in
 6   open court to each and every question asked and the
 7   answers given thereto by the witness, reserving the
 8   right to move to strike out where applicable, except
 9   as to such objections as are directed to the form of
10   the question.
11
12      IT IS STIPULATED and agreed between
13   counsel for the parties that the proof of the
14   authority of the Notary Public before whom this
15   deposition is taken is waived.
16
17      IT IS FURTHER STIPULATED and agreed that
18   the reading and signing of this deposition are not
19   waived and any defects in the notice are waived.
20
21
22
23
24
25
```

### Page 4

```
 1
 2         JAMES F. STRATMAN, PH.D.,
 3      having first been duly sworn, was examined
 4      and testified as follows:
 5
 6         DIRECT EXAMINATION
 7   BY MR. PARLO:
 8   Q  Good morning, Mr. Stratman. My name is Chris
 9      Parlo. I'm counsel for the defendant in a
10      matter brought by Ms. Amara. We're here today
11      to take your deposition. I want to go through
12      a couple of ground rules to, hopefully, make it
13      go more smoothly for you and I, but also for
14      the court reporter.
15   A  Okay.
16   Q  First, it's very hard for a court reporter to
17      take down two people speaking at once, so I'm
18      going to try very hard to wait for you to
19      finish your answer before I ask another
20      question.
21   A  Understood.
22   Q  And I would ask that you wait for me to finish
23      a question before you provide an answer.
24         It's also difficult for a court
25      reporter to write down or interpret what an
```

### Page 5

```
 1      uh-hum means or huh-uh. I'm not even sure how
 2      she wrote that down now, so we need verbal
 3      answers. And usually the problem comes up with
 4      a yes or no, so keep that in mind.
 5   A  Right.
 6   Q  If at any point in time you want to break, let
 7      me know. I will be happy to accommodate you
 8      for a bathroom break, or anything you need. I
 9      would only ask that before we do take a break
10      that if a question is pending, that you answer
11      the question.
12   A  Right. I understand; exactly.
13   Q  The only exception to that is if there is a
14      question of privilege, attorney-client
15      privilege or some other privilege that I can't
16      imagine that would apply here, you can decline
17      to answer a question if you need to talk to
18      counsel about that.
19         If you answer a question that I pose
20      to you, I will assume that you understood it.
21      So if at any point in time you don't understand
22      a question for any reason, it's compound,
23      you're not understanding a word I'm using, for
24      any other reason, let me know and I will
25      attempt to rephrase it or repeat it so when you
```

Page 6

1  give an answer the record is clear that you
2  understood it.
3       I don't mean to be offensive by these
4  questions, but they are standard in a
5  deposition. Have you taken any type of drugs
6  or any other medication this morning before the
7  deposition?
8       MR. BRUCE: I object. They are not
9    entirely standard and I don't ask them, but
10   you may ask them.
11 A  No, I have not.
12 BY MR. PARLO:
13 Q  Have you had any alcohol or any other type of
14  drinks or anything this morning that might
15  interfere with your ability to testify?
16 A  No, I have not.
17 Q  Have you suffered any type of illness or injury
18  in the last five years that might interfere
19  with, number one, your ability to recollect
20  facts accurately or, number two, to testify
21  truthfully here today?
22 A  No, I have not.
23 Q  Are you currently suffering from any other
24  illness or injury that might in any way affect
25  your ability to testify truthfully today?

Page 7

1  A  No, I am not.
2  Q  Are you aware of any other reason that might
3     interfere with your ability to testify
4     truthfully and honestly here today?
5  A  No, I'm not.
6  Q  When is it that you were first contacted to
7     provide an expert report for this case?
8  A  It was sometime last fall. I don't remember
9     the exact date.
10 Q  Fall of 2002?
11 A  Yes.
12 Q  And who contacted you?
13 A  Mr. Bruce did.
14 Q  Is that the first time you had ever spoken with
15    Mr. Bruce?
16 A  Yes, I believe it is the first time I had ever
17    spoken with him.
18 Q  Was that the first type of contact of any kind
19    that you had with Mr. Bruce?
20 A  Well, I was familiar with him many years ago,
21    certainly in 1988 in my one previous experience
22    dealing with ERISA. I had consulted a book
23    that Mr. Bruce had written in connection with a
24    Law Review article that I wrote.
25 Q  Did you ever have an exchange by correspondence

Page 8

1     or letter?
2  A  No.
3  Q  When he contacted you, was that by letter or
4     phone?
5  A  By phone.
6  Q  When was the next contact that you had with
7     him?
8  A  Gosh, I don't remember dates very well from
9     last fall.
10 Q  Was there a subsequent contact with him?
11 A  Yes. I mean, at some point I did send him my
12    terms for working as a witness in this case, so
13    I think that was probably the next exchange.
14 Q  Do you have a copy of that term sheet with you?
15 A  Yes, I believe so.
16 Q  May I see a copy of that?
17 A  Sure. (Handing.)
18 Q  Is this your only copy?
19 A  I have it on the computer. I think Stephen
20    also has a copy.
21       MR. BRUCE: It's not an original, is
22    it?
23       MR. PARLO: No, but I'm going to mark
24    it as an exhibit and we'll make a copy
25    today during lunch and give it back to you,

Page 9

1     so if you can mark that.
2         (Defendant's Exhibit No. 1,
3          Letter dated 10-18-2002, marked
4          for identification.)
5  BY MR. PARLO:
6  Q  Mr. Stratman, you indicated that the first
7     contact from Mr. Bruce was a phone call?
8  A  Yes.
9  Q  And the second contact you believe was sending
10    him this letter?
11 A  I believe so.
12 Q  This indicates in the first sentence, "Dear
13    Stephen: It was a pleasure meeting you this
14    week."
15       Does that refresh your recollection?
16 A  We didn't have a physical meeting. He was in
17    Washington. Yes, let me follow up on that. We
18    met at a Downtown Denver hotel after I had sent
19    him the terms, those terms obviously because
20    I'm referencing the meeting. We met in
21    Downtown Denver, somewhere around the mall;
22    that's right.
23 Q  I'm confused. This is the letter about the
24    terms marked as Defendant's Exhibit 1 and it
25    says, "It was a pleasure meeting you this

Page 142

1    about, you know, "I'm going to need to
2    understand where this is coming from in order
3    to search for it." And that was eventually
4    forthcoming.
5  Q What were you told were the early retirement
6    benefits in Plan A?
7  A I cannot remember all of the things that
8    Stephen may have told me about the nature of
9    those benefits, but I understand that there was
10   a larger monetary benefit involved at that age
11   available under the plan that you -- when you
12   go to Plan B, if you retired early you could no
13   longer get that amount of money, or there would
14   be a change in the amount of money available to
15   you. The mathematics there may be something
16   that I don't know about, exactly how that's
17   computed, but I'm, again, taking that as a
18   starting point for what I'm doing. My job was
19   not to investigate the veracity of these claims
20   as to the differences between Plan A and Plan
21   B, so I'm not going to be able to answer your
22   questions about exactly how the new plan is
23   evaluated relative to the old and what its
24   differences are.
25 Q Is that not what you were doing, what you were

Page 143

1    supposed to be doing?
2  A No. I have not done that at all.
3         MR. BRUCE: Objection. This is
4    getting argumentative. Ask him a question.
5  BY MR. PARLO:
6  Q Is that not what you were supposedly doing?
7  A No, it's not. I've stated repeatedly what I'm
8    doing. What I'm doing is taking statements --
9    someone is asking me: Do they talk about
10   change from X to Y? Do they talk about the
11   change from P to Q? Do they mention that these
12   things may change? In fact, looking at this as
13   a communication researcher, my expertise, in a
14   normal communication context -- let me give you
15   an example.
16 Q You know what, I don't need the theories or
17   more of this mumbo-jumbo.
18         MR. BRUCE: Objection. That's really
19   insulting, Chris.
20         MR. PARLO: Okay. I want him to
21   answer the questions instead of going off
22   on these tangents that have nothing to do
23   with the question, so --
24         MR. BRUCE: No, no. Let him answer
25   the questions and don't refer to something

Page 144

1    as mumbo-jumbo. That is highly insulting,
2    Chris, and you're above that, I'm sure.
3         MR. PARLO: Well, I would like answers
4    to questions as opposed to all these
5    tangential long-winded answers which is
6    going to keep us from finishing the
7    deposition today. And I'm telling you
8    right now --
9         MR. BRUCE: Okay, but the mumbo-jumbo
10   stuff is a bad term. I think you'll agree.
11        MR. PARLO: I will attempt to avoid
12   using it in the future.
13 A I would like to finish my answer that I
14   started.
15 BY MR. PARLO:
16 Q Go ahead.
17 A Two points, one of the points is an example.
18   First of all, if you pull up to a stop sign in
19   Hartford, Connecticut, and you ask a person on
20   the corner -- because you don't know the city
21   -- "I need directions to the State Capitol."
22   Your common assumption as a communicator in
23   that situation is that the person who is
24   talking to you on the street corner would not
25   deliberately suppress information that assisted

Page 145

1    you in getting to the State Capitol. You would
2    expect that person -- or if there were
3    difficulties en route, if they knew about them,
4    your normal expectation is that they would tell
5    you about those.
6         In this context when I review these
7    documents, I looked for any information in here
8    apart from these four points that would say
9    anything -- anything negative about any kind of
10   loss, any kind of subtraction of benefits, any
11   kind of additional risk that people would incur
12   as a result of this transition. And my
13   conclusion there was that there was barely even
14   a hint of any negative consequences to this
15   plan, let alone a statement that breaches these
16   four points or something like these four
17   points. So that's my answer to that with very
18   little mumbo-jumbo.
19 Q So there was some mumbo-jumbo?
20 A No.
21 Q I didn't understand then your use of the term
22   very little.
23        MR. BRUCE: Okay, come on. This is
24   getting school-yard-type stuff.
25        THE WITNESS: Whatever.

Page 146

1    MR. PARLO: My common language
2    interpretation is "very little" means there
3    was some.
4    MR. BRUCE: Let's take a break now.
5    Okay?
6    THE WITNESS: Very little.
7    MR. BRUCE: We can stop? Do we need
8    to take a break?
9    MR. PARLO: We're fine.
10   MR. BRUCE: Are you fine,
11   Mr. Stratman?
12   THE WITNESS: I'm fine.
13   MR. BRUCE: Are you okay? You can
14   stop this back and forth?
15   MR. PARLO: Are you okay? I'm okay.
16   Are you okay?
17   MR. BRUCE: I wasn't doing it this
18   time.
19   MR. PARLO: I'm okay, you're okay.
20   MR. BRUCE: Usually I'm -- I wasn't
21   doing it this time.
22   MR. PARLO: Meaning sometimes you do
23   that, using my common English.
24   BY MR. PARLO:
25   Q  If you didn't really read part A, ever, how do

Page 147

1    you know whether there were any changes?
2    A  Well, I could determine from reading that they
3    were talking about changes that were made, else
4    why would I have this comparison. If there
5    were no changes at all, we wouldn't be having
6    this large document to try to go through and
7    technically talk about how various features in
8    this new plan were created.
9    Q  Did you understand only from Mr. Bruce that
10   there were changes, or from reading the SPD
11   that there were changes?
12   A  I gathered from Mr. Bruce and the document
13   there were changes.
14   Q  So the average reader looking at the SPDs would
15   recognize there were changes?
16   A  Well, they would assume that, yeah, there were
17   some changes taking place here and they would
18   probably want to know about the nature of that
19   change and one of the first things they ask is
20   how does it affect me?
21   Q  But the specific changes that you were looking
22   for to see if anything was described, you
23   didn't identify those yourself?
24   A  No, but I always did, at each reading with the
25   umpteen readings I did of these documents, I

Page 148

1    was also looking for -- and I'm accustomed to
2    doing this by examining, for example, health
3    risk documents. You take a prescription, there
4    are contraindications and there are risks.
5    Many kinds of safety issues in OSHA
6    communications, there are risks, dangers,
7    warnings, negatives. Things people need to be
8    told about before they do X or get involved
9    with Y.
10   So I looked in here very carefully for
11   statements that pointed to or suggested,
12   implied, risks or possible loss of money or
13   worth of benefit to them and, you know, could
14   not find any, so I did go beyond those four
15   points because I want to see if anywhere in
16   here -- see if anything has gone away, is left,
17   that is potentially negative. And as I
18   conclude here, I could not find statements to
19   that effect.
20   Q  Mr. Bruce said to you, can you find whether
21   this change is reported, essentially, right?
22   A  Yes, on these issues.
23   Q  Okay. And if you took a nine-year-old and
24   said, "Read this document and see if there's
25   language about this in it," a nine-year-old

Page 149

1    could do that, couldn't they?
2    A  No.
3    Q  Why?
4    A  They don't have the comprehension skills to
5    understand a tenth of this.
6    Q  If I say to my nine-year-old, "Look in this
7    document for me for the words 'early retirement
8    benefit,'" you don't think a nine-year-old
9    could find that?
10   A  Does that mean they understand it? No. How
11   could they search for things if they don't
12   understand what they're reading. Anyone can
13   match symbols, but matching a symbol is not the
14   at same as understanding a word.
15   Q  But you specifically referenced a 30 percent
16   survivor benefit, right?
17   A  Right.
18   Q  Is there anything linguistically I should know
19   about the three words "30 percent survivor
20   benefit"?
21   A  Well, but that's not the point. The point is,
22   what you have to understand is, if people had
23   this in a prior plan under A, what we're
24   looking to see if this is truly taken away, is
25   that taking away, is that specific change

Page 150

1  discussed or reported to them as a, By the way,
2  you won't have this anymore, is that conveyed
3  in these documents. And my understanding and
4  my reading is that, no, it's not.
5  Q  You said, yeah, there is. What should I know
6     linguistically about the 30 percent survivor
7     benefit? Just that three-word combo I'm
8     talking about.
9  A  You can search for those words. Anyone can sit
10    down at the computer if they knew how to use
11    the search function and find those three words
12    in serial and they can find them individually.
13    Obviously this is no guarantee about what those
14    words mean, why they're important, who cares.
15 Q  But you could take literally a child or
16    teenager who can read and say, "Look for these
17    three words," right?
18 A  Assuming certain things about their lexical
19    skills, but we have to -- I mean, there's huge
20    variances in this country, people in tenth
21    grade who read on a second grade level. There
22    are far fewer people on a second or third grade
23    level who read at a tenth grade level. They
24    probably could do word recognition, although
25    some people's visual decoding skills are

Page 151

1  challenged, people that are marginally
2  literate. That's all off the point. The point
3  here is, again, the change. We're talking
4  about a larger unit than 30 percent survivor
5  benefit, and I did a lot more than just look
6  for 30 percent survivor benefit when I reviewed
7  these documents. Sure I looked for that, but
8  that was the beginning of what I was looking
9  for with respect to that item.
10 Q  Let me get a little more pointed. You go to a
11    nine-year-old and you say, "These words,
12    "30 percent survivor benefit," this concept is
13    not in this document. I want you to read this
14    and confirm that." Someone could do that,
15    right?
16        MR. BRUCE: Objection. You have asked
17    this same question three different times
18    and it's obviously calculated to be an
19    insulting line of questioning.
20        MR. PARLO: No.
21        MR. BRUCE: Yes, it is.
22        MR. PARLO: That's your opinion.
23        MR. BRUCE: Well, it is and I think
24    that you need to move off it and move to
25    something more substantive. You already

Page 152

1  asked the question. He already responded.
2  And it's just becoming kind of this
3  back-and-forth like we had earlier, so --
4        MR. PARLO: I disagree. The prior
5     question is what I think you did originally
6     is say to him, look for this concept. And
7     then the second thing your question did,
8     what you also did with him, I think, is
9     say, This isn't in here. Go ahead and look
10    and confirm for me that it's not in here.
11    That's my latest question that hasn't been
12    asked before.
13        THE WITNESS: He never said to me at
14    any point that any of these things were or
15    were not there.
16 BY MR. PARLO:
17 Q  Okay.
18 A  The question was: Are negative things
19    generally discussed in here with respect to the
20    plan, and I looked for anything. I even
21    widened my lens, okay, as to what is here. I
22    mean, in a two-sided analysis, right, I'm used
23    to analyzing all kinds of discourse for
24    two-sided argumentation. Do we have the pros
25    and the cons given here in this change of

Page 153

1  plans. And so --
2  Q  Mr. Stratman --
3  A  And so we don't have the negatives presented
4     here.
5  Q  You testified earlier today that Mr. Bruce told
6     you -- it's the only place you got the
7     information from about the reduction in these
8     certain benefits, right?
9  A  Yes.
10 Q  And now, within the last 30 seconds, you said,
11    "He didn't tell me one way or the other."
12    Which is it?
13 A  You didn't hear. No, no. He didn't tell me --
14    he told me what to look for. He didn't comment
15    upon whether he believed the items were in the
16    document or not, to my recollection. All
17    right?
18        Now, he had said earlier he thinks
19    there are losses in this plan, yeah. But did
20    he say to me specifically, "I want you to -- I
21    believe that these things are not there"?
22    Which wouldn't make, you know, a whole lot of
23    beans of difference to me because I understand
24    he's an advocate and I'm a witness, so I will
25    do my job to investigate this independently on

Page 154

1  my own and come to my own conclusions. I don't
2  recall him saying to me, point by point, "These
3  things are not there, go check for me." No, he
4  didn't do that. He said, "These are things
5  that have disappeared between -- we believe
6  have disappeared between Plan A and B, and I
7  want you to read and see if you can find
8  language that indicates that those subtractions
9  have occurred." So, that's what we're talking
10 about.
11        So, in a general sense, yeah, he's
12 telling me these things aren't there. That's
13 his belief, that's his claim. But I'm reading
14 this as an independent source because that's
15 what I do. And I went and I looked and I tried
16 to cast my lens very wide, anything that
17 smacked remotely is the hint I would look at
18 very closely and that's how I read the
19 documents.
20 Q  Let's make sure I'm not mischaracterizing what
21    you're saying. You said, "He told me what to
22    look for"?
23        MR. BRUCE: Objection.
24 BY MR. PARLO:
25 Q  Right?

Page 155

1        MR. BRUCE: Can we read back the
2     answer then, because I don't think you were
3     taking down every word there, Chris.
4  BY MR. PARLO:
5  Q  Did he, in words or substance, say, tell you
6     what to look for?
7  A  He told me questions that he had about the
8     documents. He told me, and to the effect that
9     someone -- if someone asks you a question and
10    the question is: Do you find them discussing
11    this? Well, sure he's telling me what I'm
12    looking for because he's asking me the question
13    about it. If someone asks you a question, Is
14    there a bottle in the room next door? They are
15    telling you what to look for, correct? Of
16    course. So, to that extent, that's exactly
17    what happened, yeah.
18        When I read this, I also read it, as I
19    mentioned before, I even thought more widely
20    about what can I find in here that tells me as
21    a consumer, as an employee, what negative
22    things might happen, okay, as a result of this
23    transition, just as I may search a patient
24    package insert, I might search a warning on a
25    home-use product. There's all kinds of

Page 156

1  scenarios where all of us are aware that
2  choices entail risks and change entails risk.
3  I want to know what might happen.
4        SEC, right, has lots of rules you have
5  to inform investors about. I'm looking through
6  the documents generically to find something
7  bad, where is the bad news, where is even a
8  hint of things that might not be the same or
9  that might have changed relative to what I was
10 getting before. Okay. I couldn't find that.
11 Q  Are you the only person who could find the bad
12    or find the negative?
13        MR. BRUCE: Objection. I don't
14     believe he testified to that.
15 A  Other people are free to look.
16 BY MR. PARLO:
17 Q  But are you the only one in the whole United
18    States who could find the bad?
19 A  Heaven's no.
20 Q  Are you the only one that could find the
21    negative?
22 A  Heaven's no.
23 Q  Let's not use my nine-year-old. Let's, with
24    all due respect, use the court reporter. If I
25    asked her to look at this document and tell me

Page 157

1  whether you see anything negative in here, you
2  don't think she could do that?
3  A  It depends on how much conversation and
4     information she was provided prior to doing
5     that, what is the nature of these, does she
6     know about benefits plans. There has to be
7     some basis for knowledge. It's possible
8     someone else could do that, sure.
9  Q  So it depends on how much prior conversation
10    she had? So we would need Mr. Bruce to tell
11    her what to do?
12 A  Prior knowledge; she needs prior knowledge.
13 Q  She would need Mr. Bruce to tell her there is a
14    negative?
15 A  Not necessarily Mr. Bruce. She could have any
16    number of sources of information about benefit
17    plans to help her to make some interpretation.
18    That is clearly the case in any conversation
19    all we have to do is interpret what somebody
20    else says and work with that to the best of
21    your understanding, and augment that
22    understanding with other sources of
23    information. Which is just what, is clearly
24    what I did. I'm used to reading text, as I
25    said, and looking for two-sided information.

Page 158

1   Having spent the time I have looking at legal
2   argument, I'm familiar with two-sided case
3   analyses. I'm looking for a generic form of
4   presentation here, of structuring. There are
5   insurance policies where we have exclusions,
6   right? Okay. What works as an exclusion? Do
7   we have any kind of information like that here?
8       Warning labels. There's all kinds of
9   things. Where are we getting any kinds of
10  downside information? Can someone else do it?
11  I'm quite confident many other people can do
12  this. Some people can do it more carefully and
13  thoroughly than other people can based on
14  training. I'm not talking about training in
15  ERISA; I'm talking about discourse, language
16  and communication training. And people would
17  have a general familiarity with the class of
18  documents of the kinds I have described:
19  Warnings, health-risk communications, all that
20  kind of stuff.
21      If you're familiar with how disclosure
22  generally works in these other documents, how
23  warnings work, there are structures in
24  discourse that are canonical in some forms of
25  writing, like in contracts where you have

Page 159

1   exclusions, where that information is put
2   forward. That's what I was looking for here.
3   And then, you get down to the specific points,
4   yeah, sure, Stephen asked me, do they warn or
5   talk about or say anything about these issues,
6   these changes in the plan. Assuming them to be
7   factually so, yeah, I'm taking things on fact
8   that I have not investigated, but I have said
9   that now about 12 times today.
10  Q   I didn't ask you to say it again. You just
11      volunteered that.
12  A   I understand.
13  Q   You have worked with lawyers before?
14  A   Yes.
15  Q   You have been on an ABA committee, right?
16  A   I served on the board of the Legal Writing
17      Institute.
18  Q   Which was part of the association of the bar
19      committee?
20  A   No, it's a separate organization. I served --
21      it was just -- I was doing research on a
22      different project and I don't remember how it
23      came about, but a lawyer at the University of
24      Pittsburgh Law School got me to join the ABA at
25      that point.

Page 160

1   Q   That's my question. You were on a committee in
2       the ABA?
3   A   Sure. I was not -- I was not on the committee.
4       I was a member of the organization. They have
5       a section like you can become a member. You're
6       not doing committee work. I never met with
7       anybody to do anything. Just based on the
8       research you may be doing, people say it would
9       be good for you.
10  Q   You wrote, "Former member American Bar
11      Association"?
12  A   Right.
13          MR. BRUCE: Committee on Legal
14      Writing.
15          MR. PARLO: Fine.
16  BY MR. PARLO:
17  Q   You wrote also, "Former Member American Bar
18      Foundation"?
19  A   Right.
20  Q   So do you know what a jury is?
21  A   Sure, I do.
22  Q   And normally people like me and the court
23      reporter sit on the jury, right?
24          MR. BRUCE: Objection. Lawyers don't
25      always sit on juries.

Page 161

1           MR. PARLO: Okay.
2   BY MR. PARLO:
3   Q   Do you know that a jury is made up of people
4       who are not all linguistic experts?
5   A   Sure.
6   Q   And if I went to a jury, 12 normal people and
7       said, "Take this document and tell me what you
8       see in there that is negative," you're telling
9       me they couldn't do that?
10  A   I would never assert that.
11  Q   Because they could?
12  A   They might or might not; depends on who is on
13      the jury.
14  Q   Well, particularly if they were given a
15      background, given some guidance what to look
16      for, given some information about what might
17      have been negative, they could look for that,
18      right?
19  A   Depends on the amount of information. They can
20      look for anything, right.
21  Q   But the chances are, if told these things,
22      "It's our opinion these things were left out,"
23      a jury could look for that, right?
24  A   Sure; they could look for it.
25  Q   And they don't need your opinion to tell them

Page 162

1  that that is what occurred, right?
2       MR. BRUCE: Objection. That's
3    argumentative and I believe he already
4    testified about the prevalence of expert
5    testimony in this field.
6  A  I think that there are occasions, many
7    occasions where, you know, your question said,
8    Can jurors look for this? They can look. They
9    might do a better job or a bad job, somewhere
10   in there, depending on the kind of guidance
11   that they receive. I think some of the
12   guidance I provide is probably, relative to the
13   average juror selected at random, probably
14   fairly unique and likely to be of consequence
15   to their understanding of what they are asked
16   to do. So I think there are juries and there
17   are juries and there are juries. And there are
18   lawyers and there are lawyers and there are
19   lawyers; okay? Not all lawyers understand
20   language as well as they'd like. Anybody
21   doesn't understand language as well as they'd
22   like. I think I have some expertise that would
23   enable people to address these questions far
24   more adroitly than the average person might and
25   with more focus.

Page 163

1      Now, I'm not saying I'm the only
2    person that could do this. I know lots of
3    experts in my field who could do this job also
4    like I'm doing. And they would go about it in
5    the same manner.
6  BY MR. PARLO:
7  Q  What are you saying? You would be there to
8    teach a jury how to look for these things more
9    adeptly?
10 A  I might. In a hypothetical scenario, I might
11   have a variety of -- let's say we're talking
12   about patient package inserts. Let's say we're
13   talking about the same pharmaceutical compound
14   manufactured by six companies. All of these
15   companies have warning information that they
16   put in their patient package insert, but we
17   notice that some of them are describing, let's
18   say, one of the risks more fully than another.
19   I would be able to talk about, and maybe it's a
20   subtle thing, "Here are some differences
21   between these tasks," all right, that are not
22   necessarily things that people are going to see
23   who are average readers, average jurors, if you
24   will. So there are features of language that I
25   can point out to people that generally people

Page 164

1    would not have a name for a handle on or
2    understand how it might work. And there are
3    differences between texts that I can analyze
4    pretty well, okay, that I don't think an
5    average juror would.
6       So, do I think I could contribute to a
7    jury's understanding on these points? Yes, I
8    do. I think I can give them things that they
9    might not necessarily be able to think about on
10   their own reconnaissance. Obviously, I can't
11   say guaranteed. Jurors walk in the door at
12   8:00 a.m. in the morning and get polled. I've
13   noticed a distinct preference in the courts to
14   not have professors serve as jurors. I have
15   colleagues that tell me this, too. But the
16   average person might do this and they might
17   not.
18 Q  But an average person reading an SPD doesn't go
19   through a course with you or a series of
20   instructions with you prior to reading the SPD?
21 A  My point exactly.
22 Q  These aren't your exact words, but you said
23   along these lines, "These are things that have
24   disappeared and I want you to look for language
25   that confirms it isn't there."

Page 165

1      If you went to a juror and said,
2    "These are things that have disappeared from
3    the first plan to the second plan, and I want
4    you to look and confirm that that is not
5    there," you're telling me without you a juror
6    couldn't do that?
7       MR. BRUCE: Objection. He answered
8    this before, this precise question, and
9    you're asking him again. I mean, he
10   answered it that a juror could do this.
11   And you're asking him the same question
12   again, Chris. He's already given you the
13   answer.
14      MR. PARLO: It's not the same
15   question.
16      MR. BRUCE: Well, it is the exact
17   same.
18      MR. PARLO: Your objection is
19   preserved.
20      THE WITNESS: You're going to need to
21   repeat it, Chris.
22
23 BY MR. PARLO:
24 Q  If I went to a juror and said: "These things,
25   these three things have disappeared from this

42 (Pages 162 to 165)