UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

JANICE C. AMARA, individually and
on behalf of all others similarly
situated,

                    Plaintiff,

          vs.                          Civil No. 3:01-CV-2361 (MRK)

CIGNA CORP. and CIGNA PENSION
PLAN,

                    Defendants.

## PLAINTIFFS' TRIAL BRIEF

Stephen R. Bruce Ct23534
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

Thomas Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Plaintiff Class

## Table of Contents

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   In a Defined Benefit Plan, the "Accrued Benefit" Is the Annual Benefit
      Commencing at Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      A.    Cash Balance Plans Are Defined Benefit Plans Which Must
            Comply With the Rules Applicable to Such Plans . . . . . . . . . . . . . 4
      B.    CIGNA's Cash Balance Plan Is a Defined Benefit Plan . . . . . . . . . 6

III.  CIGNA's Cash Balance Conversion Produced Periods of Years with No
      Additional Benefits in Violation of ERISA's Anti-Backloading and
      Vesting Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      A.    CIGNA Converted Statutorily-Protected Retirement Benefits to
            Opening Account Balances and Then Restricted Future Accruals
            to this Lower and Less Stable Floor . . . . . . . . . . . . . . . . . . . . . . . 7
      B.    CIGNA's Conditioning of Future Accruals on Foregoing
            Statutory Rights to Previously-Earned Annuities Violates ERISA's
            Vesting Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      C.    A Period of Years with "No Further Accruals" Violates ERISA's
            133⅓% Accrual Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.   The Rate of an Employee's Benefit Accrual under CIGNA's Cash
      Balance Plan Decreases Based on Age. . . . . . . . . . . . . . . . . . . . . . . . . 17
      A.    The Annual Retirement Benefits Produced by CIGNA's Cash
            Balance Formula Decrease with Age. . . . . . . . . . . . . . . . . . . . . . 19
      B.    ERISA Prohibits Reductions in Accrual Rates Based on Age. . . . 19
      C.    ERISA Does Not Support the Proposition that Although "the
            Rate of an Employee's Benefit Accrual" Generally Means the
            Change in the "Accrued Benefit," It Can Also Have a Secondary
            Meaning Based on Credits to a Hypothetical Account . . . . . . . . . 23

V.    CIGNA Violated Its Duty to Disclose Significant Benefit Reductions. . . 31
      A.    It Is Well-Established that Cash Balance Conversions "Mask"
            Benefit Reductions In the Absence of Full Disclosure . . . . . . . . . 34
      B.    ERISA Section 204(h) Requires Notice of a "Significant
            Reduction" in Future Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
      C.    Summaries of Material Modification or Updated Summary Plan

        Descriptions Must "Fully Explain" Benefit Reductions. . . . . . . 39

D.    CIGNA's Cash Balance Conversion Substantially Reduced
       Future Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E.    CIGNA Did Not Disclose Reductions But Instead Represented
       that "the New Plan Is Designed to Work Well for *Both* Longer-
       and Shorter-Service Employees" and Offer "Larger" or
       "Comparable" Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

       1.    The Purported Section 204(h) Notice Told Participants that
           the Changes Were "Enhancements" to the Retirement
           Program and Never Mentioned Reductions . . . . . . . . . . . . 45

       2.    CIGNA's Summary of Material Modification and SPD Told
           Participants that the Benefits Were "Larger" or "Comparable"
           and Never Mentioned Reductions . . . . . . . . . . . . . . . . . . . 47

F.    CIGNA Avoided "Any Negative Reaction from Employees" by
       Withholding Disclosure of the Reductions; This Deprived
       Employees of Information Needed to Make "Well-Informed
       Employment and Retirement Decisions" and Constitutes "Likely
       Prejudice" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

G.    The Amendment to CIGNA's "Rehire Rule" Was Not Disclosed
       in a Summary of Material Modification or in the Purported
       Section 204(h) Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

VI.   CIGNA Has Not Protected "Minimum Benefits" or Notified Participants
    When an Optional Form of Benefit Had a Greater "Relative Value" . . . . 60

A.    Minimum Benefits Were Not Protected and the Necessary Data
       for Over 9,400 Class Members Was Not Even Loaded into
       CIGNA's DBRK System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

B.    Participants and Spouses Have Not Been Provided Information
       About the "Relative Value" of Actuarially Unequal Benefit
       Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

VII.  CIGNA Continues to Neglect Implementation of the Third
    Circuit's 2004 <u>Depenbrock v. CIGNA</u> Decision for More Than 180
    Members of the <u>Amara</u> Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Amato v. Western Union International*, 773 F.2d 1402 (2d Cir. 1985) ........ 1

*Antolik v. Saks*, 2005 WL 233320 (S.D. Iowa 2005) ........................ 53, 56-57

*Arizona Committee for Deferred Compensation Plans v. Norris*,
463 U.S. 1073 (1983) .............................................................. 30

*Arnett v. CalPERS*, 179 F.3d 690 (9th Cir. 1999), *vacated and remanded
on other grounds*, 528 U.S. 1111 (2000) ................................................ 30

*Becker v. Kodak*, 120 F.3d 5 (2d Cir. 1997) ................................................ 34

*Berger v. Xerox*, 338 F.3d 755 (7th Cir. 2003) ...................... 2, 5-6, 8, 12, 65

*Burke v. Kodak Retirement Income Plan*, 336 F.3d 103 (2d Cir. 2003),
*cert. denied*, 540 U.S. 1105 (2004) ............................................. 41, 51-52

*Burstein v. Allegheny Fdn. Retirement Acct. Plan*, 2004 WL 2612162
(E.D. Pa. 2004), *on remand from* 334 F.3d 365 (3d Cir. 2003) ............. 41

*Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004) ............ 1, 10

*Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032
(2d Cir. 1985) ....................................................................... 40

*Cooper v. IBM*, 274 F. Supp. 2d 1010 (S.D. Ill. 2003) ............................ 2, 20

*Copeland v. Geddes Federal Sav.*, 62 F.S.2d 673 (N.D.N.Y. 1999) ........... 39

*Costantino v. TRW*, 13 F.3d 969 (6th Cir. 1994) ........................................ 64

*Crosby v. Bowater*, 212 F.R.D. 350 (W.D. Mich. 2002), *vacated and
remanded on other grounds*, 382 F.3d 587 (6th Cir. 2004) ..................... 8

iii

*Deal v. United States*, 508 U.S. 129 (1993) ................................................. 27

*Depenbrock v. CIGNA*, 389 F.3d 78 (3d Cir. 2004) ...................................... 9

*Desert Palace v. Costa*, 539 U.S. 90 (2003) ................................................. 56

*Eaton v. Onan*, 117 F. Supp. 2d 812 (S.D.Ind. 2000) ...................... 24-25, 35

*Eddy v. Colonial Life Insurance Co.*, 919 F.2d 747 (D.C. Cir. 1990) ........ 32

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000) ... 4-5, 7, 11-12, 14, 20

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006) .......................... *passim*

*Gediman v. Anheuser-Busch*, 299 F.2d 537 (2d Cir. 1962) ........................ 65

*Greenblatt v. Delta Plumbing & Heating*, 68 F.3d 561 (2d Cir. 1995) ...... 27

*Hamilton v. Air Jamaica*, 945 F.2d 74 (3d Cir. 1991) ................................. 32

*Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238
   (2000) ...................................................................................................... 27

*Harte v. Bethelehem Steel, supra*, 214 F.3d at 446 (3d Cir.), *cert. denied*,
   531 U.S. 1037 (2003) .............................................................................. 32

*Heidgerd v. Olin Corp.*, 906 F.2d 903 (2d Cir. 1990) ................................. 39

*Holloway v. United States*, 526 U.S. 1 (1999) ............................................. 26

*Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2004) ....................................... 55

*Layaou v. Xerox Corp.*, 238 F.3d 205 (2d Cir. 2001) ................................. 40

*Layaou v. Xerox*, 330 F. Supp. 2d 297 (W.D.N.Y. 2004) ...................... 41, 53

*Meinhardt v. Unisys*, 74 F.3d 420 (3d Cir. 1996) ........................................ 51

*Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987) ................. 27

*Miller v. Xerox*, __ F.3d __, 2006 WL 1215764 (9th Cir. 2006) ............ 6, 30

*Mullins v. Pfizer, Inc.*, 23 F.3d 663 (2d Cir. 1994) ...................................... 34

*Ream v. Frey*, 107 F.3d 147 (3d Cir. 1997) ................................................. 53

*Register v. PNC Financial*, 2005 WL 3120268 (E.D. Pa. 2005) ................. 25

*Richards v. FleetBoston*, __ F. Supp. 2d __, 2006 WL 980565
    (D. Conn. 2006) ............................................................................... passim

*Richards v. FleetBoston*, __ F. Supp. 2d __, 2006 WL 860674
    (D. Conn. 2006) ...................................................................................... 53

*Romero v. Allstate*, 404 F.3d 212 (3d Cir. 2005) ........................................ 38

*Rothwell v. Chenango County*, 2005 WL 2276023 (N.D.N.Y. 2005) ......... 63

*Smith v. City of Jackson*, 544 U.S. 228 (2005) ........................................... 27

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ................................................. 27

*Weinreb v. Hospital for Joint Diseases*, 404 F.3d 167 (2d Cir. 2005) ........ 56

*West v. AK Steel*, 2005 WL 3465637 (S.D. Oh. 2005) .................................. 8

*Whitman v. America Trucking Association*, 531 U.S. 457 (2001) .............. 26

*Wilkins Mason Tenders District Council Pension Fund*, 445 F.3d 572
    (2d Cir. 2006) ........................................................................................ 56

**FEDERAL STATUTES, REGULATIONS, AND LEGISLATIVE HISTORY**

ADEA §4(i), 29 U.S.C. §623(i) ................................................................. 18

ERISA §2(a), 29 U.S.C. §1001(a) ................................................................ 1

ERISA §3(16)(A), 29 U.S.C. §1002(16)(A) ................................................ 34

ERISA §3(19), 29 U.S.C. §1002(19) .......................................................... 10

ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) ................................................ 34

ERISA §102(a), 29 U.S.C. §1022(a) ..................................................... 32, 55

ERISA §203(e), 29 U.S.C. §1053(e) .......................................................... 60

ERISA §204(b)(1)(A), 29 U.S.C. §1054(b)(1)(A) ........................................ 7

ERISA §204(b)(1)(B), 29 U.S.C. §1054(b)(1)(B) ................................ *passim*

ERISA §204(b)(1)(C), 29 U.S.C. §1054(b)(1)(C) ................................... 7, 29

ERISA §204(b)(1)(H), 29 U.S.C. §1054(b)(1)(H) ...................... 4, 17-18, 27

ERISA §204(b)(2), 29 U.S.C. §1054(b)(2) ....................................... 4, 18, 31

ERISA §204(g), 29 U.S.C. §1054(g) ................................................. 3, 60, 63

ERISA §204(h), 29 U.S.C. §1054(h) ................................................... *passim*

ERISA §205(g), 29 U.S.C. §1055(g) ................................................... 60, 64

IRC §411(b)(1)(H), 26 U.S.C. §411(b)(1)(H) ............................................ 18

IRC §411(b)(2), 26 U.S.C. §411(b)(2) ...................................................... 18

26 C.F.R. 1.401(a)-20 ................................................................................ 65

26 C.F.R. 1.411(a)-4 .................................................................................. 11

26 C.F.R. 1.411(a)-11(c)(2)(i) ................................................................... 65

26 C.F.R. 1.411(b)-1(a) ............................................................ 17-18

26 C.F.R. 1.411(b)-1(b)(2)(iii) ...................................................... 28

26 C.F.R. 1.411(b)-2(i) ................................................................. 7

26 C.F.R. 1.411(d)-4 ................................................................... 66

26 C.F.R. 1.411(d)-6 ............................................. 32- 33, 37-38, 59

26 C.F.R. 1.417(e)-1(b)(2)(I) ........................................................ 65

26 C.F.R. 54.4980F-1 ................................................................. 38

29 C.F.R. 2520.102-2 .................................................... 32-33, 40-41

29 C.F.R. 2520.102-3(l) ............................................................... 41

29 C.F.R. 2520.104b-3 ..................................................... 32-33, 41

29 C.F.R. 2520.104b-4(c) ............................................................ 59

Treas. Reg. 1.401(a)-20 .............................................................. 64

Treas. Reg. 1.411(b)-1(b)(3)(iii) .................................................. 16

53 F.R. 11876 (April 11, 1988) ..................................................... 18

60 F.R. 64320 (Dec. 15, 1995) ........................................... 17, 37-38

63 F.R. 68678 (Dec. 14, 1998) ........................................... 17, 28, 37

65 F.R. 70227 (Nov. 21, 2000) ..................................................... 42

67 F.R. 76123 (Dec. 11, 2002) ............................................... 18, 21

68 F.R. 17277 (April 9, 2003) ............................................... 17, 38

H.R. Conf. Rep. 93-1280, 1974 U.S.C.C.A.N. 5038 ................................... 28

H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868 ................................... 29

IRS Notice 96-8, 1996-1 C.B. 359 .......................................................... 11-12

## MISCELLANEOUS

2A Scott & Fratcher, *Law of Trusts* ............................................................. 62

*Restatement of Contracts 2d* ........................................................................ 14

Langbein, *Questioning the Trust Law Duty of Loyalty,* 114 Yale L.J.
929 (March 2005) ............................................................................. 34, 64

Shea, Francese and Newman, *Age Discrimination in Cash Balance Plans:
Another View,* 19 Va. Tax. Rev. 763 (2000) .......................................... 23

Zelinsky, *The Cash Balance Controversy,* 19 Va. Tax. Rev. 683 (2000) .... 2

**Introduction**

"There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them." Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 743 (2004). "ERISA was enacted for the purpose of assuring employees that they would not be deprived of their reasonably-anticipated pension benefits." Amato v. Western Union Int'l, 773 F.2d 1402, 1409 (2d Cir. 1985) (citing ERISA §2(a), 29 U.S.C. §1001(a)). Congress recognized that "ERISA's vesting provisions could be thwarted if employers were permitted too much latitude in defining accrued benefits." Id.

The violations this class action addresses all relate to the protections that Congress enacted for "accrued benefits" under defined benefit plans. As demonstrated below, CIGNA has failed, and continues to fail, to comply with ERISA's vesting, anti-backloading, age discrimination, minimum benefit, and disclosure standards.

**I.     In a Defined Benefit Plan, the "Accrued Benefit" Is the Annual Benefit Commencing at Retirement.**

Federal law defines two types of pension plans: (1) defined benefit plans and (2) defined contribution plans. Defined benefit plans offer annuities at retirement. ERISA's standards for defined benefit plans focus on protecting

1

justified expectations of retirement income in annuity form.  Defined

contribution plans, such as 401k plans, are plans with separate individual

accounts. ERISA's standards for them focus on making sure that employers

actually make the promised contributions to the accounts and protecting the

returns on those accounts. Berger v. Xerox, 338 F.3d 755, 757 (7th Cir. 2003);

Cooper v. IBM, 274 F.Supp. 2d 1010, 1020-21 (S.D. Ill. 2003); Zelinsky, "The

Cash Balance Controversy," 19 Va.Tax Rev. 683, 687-93 (2000).

The distinctions between defined benefit and defined contribution plans

are found in ERISA's definitions of the two types of plans and the definition of

the "accrued benefit." Under ERISA, an "individual account plan" or "defined

contribution" plan is defined as:

> "a pension plan which provides for an individual account for each
> participant and for benefits based solely upon the amount
> contributed to the participant's account, and any income, expenses,
> gains, and losses and any forfeitures of accounts of other
> participants which may be allocated to such participant's account."

ERISA §3(34). A defined benefit plan is defined more simply as: "a pension plan

other than an individual account plan." ERISA §3(35). Critical to the distinction

between these two types of plans is ERISA's definition of the "accrued benefit"

for each plan type:

> "The term "accrued benefit" means–

> (A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and except as provided in §204(c)(3), expressed in the form of an annual benefit commencing at normal retirement age.
>
> (B) in the case of a plan which is an individual account plan, the balance of the individual's account."

ERISA §3(23).

To protect plan participants, Congress has enacted minimum standards which build on the "accrued benefit" as defined for each of these two categories of plans. Some of these rules cover both types of plans, but the application depends on the definition of the "accrued benefit." For example, ERISA establishes minimum vesting requirements for "accrued benefits." ERISA §§3(19) and 203. But the "accrued benefit" that has to vest is different in each type of plan. ERISA also provides that a plan cannot be amended to reduce a participant's "accrued benefit." ERISA §204(g). Again, the rule is the same for both types of plans, but the application depends on the definition of the "accrued benefit."

ERISA also contains three important provisions specifically directed at problems with defined benefit plans: First, to keep plan sponsors from avoiding the vesting rules through the mathematical formulas under which employees earn "accrued benefits," ERISA establishes "anti-backloading" rules that regulate the

rates at which benefits must accrue under a defined benefit plan. ERISA

§§204(a)(1) and 204(b)(1). There are no parallel rules for defined contribution

plans. Second, since 1986, ERISA has prohibited age discrimination in the rate

of an employee's benefit accrual under a defined benefit plan. ERISA

§204(b)(1)(H). A different test based on the rate at which amounts are allocated

to an employee's account applies to defined contribution plans. See ERISA

§204(b)(2). Third, ERISA §204(h) establishes an advance notice requirement

when an employer amends a defined benefit plan to reduce the rate of future

benefit accrual. Only a limited subset of defined contribution plans are subject to

this requirement.[1]

    **A.    Cash Balance Plans Are Defined Benefit Plans Which Must Comply With the Rules Applicable to Such Plans.**

In Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000) the Second

Circuit held that, as much as a plan sponsor or benefit consultant might want to

create a "hybrid" legal status, cash balance plans are "defined benefit" plans,

with consequences which cannot be ignored:

> "... notwithstanding that cash balance plans are designed to imitate some
> features of defined contribution plans, they are nonetheless defined benefit

---

[1] The Section 204(h) notice requirement applies to defined contribution plans known as "money purchase" pension plans, but does not apply to profit-sharing or stock bonus plans. "401k" plans are qualified as profit sharing or stock bonus plans and are thus not subject to the rule.

plans under ERISA. n 6. The regulatory consequences of this classification are wide-reaching. First, ERISA § 3(23) provides different definitions of "accrued benefit" for defined benefit and defined contribution plans. Only for a defined contribution plan is "accrued benefit" defined as simply "the balance of the individual's account." ERISA §3(23)(B); I.R.C. §411(a)(7)(A). Second, defined benefit plans are subject to a series of parallel statutory constraints ... from which defined contribution plans are exempted. Those relevant to this case include: limitations on "backloading" of accruals, see ERISA §204(b)(1); I.R.C. §411(b)(1); the valuation rules of I.R.C. §417(e) as made applicable by I.R.C. §411(a)(11)(B), see also ERISA §§203(e), 205(g); and the definitely determinable benefits requirement of I.R.C. §401(a)(25).

n 6. . . . However "hybrid" in design a cash balance plan may be, it remains subject to a regulatory framework that is in many regards rigidly binary. Because the individual accounts, and the employer contributions and the interest credits to those accounts, are all hypothetical under a cash balance plan, it is classified as a defined benefit plan. The Plan does not (and cannot) dispute this definition. Rather it resists–and has tried to draft around–its consequences."

Id at 158.

In Richards v. FleetBoston, __ F.Supp.2d __, 2006 WL 980565 (D. Conn. 2006), a case nearly identical to this one, Judge Hall followed Esden in ruling that "defined benefit plans face significantly different requirements from those applicable to defined contribution plans" and therefore the classification of a cash balance plan as a defined benefit plan has "wide-reaching" "regulatory consequences." Id. at *9. Likewise, in Berger v. Xerox, supra, Judge Posner observed that when a "hybrid" cash balance plan does not comply with the rules for defined benefit plans, the meaning of "hybrid" is clear: "for 'hybrid' read

5

'unlawful.'" 338 F.3d at 763. Accord <u>Miller v. Xerox</u>, __ F.3d __, 2006 WL 1215764, *4 (9th Cir. 2006) (cash balance plan cannot take a "revisionist approach" and treat "accrued benefits" as though the plan is a defined contribution plan).

**B.    CIGNA's Cash Balance Plan Is a Defined Benefit Plan.**

In certifying the lawsuit as a class action, Judge Squatrito recognized that CIGNA's conversion of its traditional defined benefit pension plan to a "cash balance" formula "changed the method of calculating and accounting for annuity benefits by basing the amount of the annuity upon a hypothetical individual account balance. This hypothetical balance is derived from "credits" reflecting a predetermined percentage of the employee's salary ("benefit credit") and interest at a predetermined rate ("interest credit"). Thus, the cash balance plan resembles a defined contribution plan, <u>but remains a defined benefit plan</u>." Slip Op. filed Dec. 20, 2002, at 2 (emph. added). See also Ex. 37 (CIGNA's Application for Determination to Internal Revenue Service) at DO1954.

**III.    CIGNA's Cash Balance Conversion Produced Periods of Years with No Further Benefit Accruals in Violation of ERISA's Anti-Backloading and Vesting Rules.**

For a plan like CIGNA's, ERISA's accrual rules require that "the value of the benefit accrued in any year...not exceed the value of a benefit accrued in any

previous year by more than 33%." Esden v. Bank of Boston, 229 F.3d 154, 169

(2d Cir. 2000); ERISA §204(b)(1)(B); 26 C.F.R. 1.411(b)-2(i)(B). This is called

the "133⅓ percent" accrual rule. The two other accrual rules in ERISA are

designed for formulas that base benefits on an average of highest pay. See

ERISA §§204(b)(1)(A) and (C).[2]

The 133⅓% test is the only standard that a cash balance plan which bases

benefits on each year's pay can satisfy. It requires that the plan offer an "annual

rate" of benefit accrual in each "particular plan year" which is not less than 75%

of the accrual rate in any later plan year. Id. at 167.

### A. CIGNA Converted Statutorily-Protected Retirement Benefits to Opening Account Balances and Then Restricted Future Accruals to this Lower and Less Stable Floor.

In its cash balance conversion, CIGNA restricted the annual accrual of

future benefits under its cash balance formula by converting statutorily-protected

retirement benefits to opening account balances. The opening balances did not

include the full value of participants' previous benefits. The report of the class'

actuarial expert, Claude Poulin, explains that the shortfall between the

participant's retirement benefits and the opening account initially stemmed from:

(1) CIGNA's exclusion of participants' rights to subsidized early retirement

---

[2] Under those rules, an increase in a participant's highest pay automatically increases benefits for all years of service.

benefits, including a valuable Social Security supplement, and (2) CIGNA's application of a "pre-retirement mortality" discount. [3] Ex. 3 ( Poulin Rpt) ¶¶ 25 and 32. In addition, the opening balances had a less stable value in terms providing retirement income than the participants' previous retirement benefits. As Mr. Poulin explained, converting annuity benefits to opening accounts essentially transforms the benefits into variable annuities. Ex. 3 (Poulin Rpt) ¶33-35. If interest rates move above the interest rate used at the conversion, benefits can increase. But if interest rates go down, as they have since 1997, the retirement benefits that can be "re-purchased" with the accounts decrease. Id.

After establishing the accounts, CIGNA provided that future benefit accruals could "grow" only on top of this new base. Because the opening accounts did not include the full value of the previously-earned benefits and because interest rates fell after 1997, this caused the benefits of many members of the Plaintiff class not to grow at all for a period of years.

In certifying the class, Judge Squatrito described this claim:

---

[3] Pre-retirement mortality discounts have been examined and generally found to violate ERISA when the retirement plan does not actually forfeit benefits in the event of death prior to retirement. See Berger v. Xerox Corp., supra, 338 F.3d at 764 (use of pre-retirement mortality discount was "unfathomable"); West v. AK Steel, 2005 WL 3465637, *3-6 (S.D. Oh. 2005); Crosby v. Bowater, 212 F.R.D. 350, 361-62 (W.D. Mich. 2002), vacated and remanded on other grounds, 382 F.3d 587 (6th Cir. 2004).

"In layman's terms, as a result of these calculations plaintiff experienced a period where benefits "constructively" accrued in her cash balance account. This is so because the minimum benefit payable to plaintiff was greater than her hypothetical account balance, which means that plaintiff would not begin to realize the accrual of benefits under Plan B until her hypothetical account balance exceeded the amount of the minimum benefit". Slip Op. at 3 - 4.

In the case of the named Plaintiff Janice Amara, CIGNA's "wear-away" made her participation in the CIGNA cash balance accruals illusory for more than 7 years. Ex. 32 at 28174 and 28629. Under the old plan formula, Ms. Amara earned early retirement benefits of $1,833.65 a month starting at age 55. Ex. 3 (Poulin Rpt) ¶¶ 24-26. But Amara's opening cash balance account was $91,124.88, which converts to an age 55 annuity of just $900 per month. Id. If not for the Third Circuit's 2004 decision in Depenbrock v. CIGNA, 389 F.3d 78, Ms. Amara would have spent the rest of her career with CIGNA 'catching up' with the benefits she had already earned. The same type of wear-away applied to named Plaintiff Gisela Broderick. ¶¶39-47. Because named Plaintiff Annette Glanz did not have substantial early retirement benefits, her benefits caught up with her previous level of benefits after three years, but the accruals in those 'catch up' years were never regained. ¶¶51-52.

CIGNA was aware of this "wear-away" effect. For example, an internal CIGNA memorandum acknowledges: "Using the present value of normal

9

retirement age benefits results in a significant "wear-away" period during which time employees accrue no additional benefits with future service." Ex. 40 at 28635 (David Cordani and Gerry Meyn to Don Levinson and Jim Stewart 1/7/2002) (emph. added); see also ¶¶66-73.

CIGNA's "wear-away" design has two critical legal ramifications. First, it conditions the participant's right to actually collect the additional benefit accruals that are technically offered under the cash balance formula, thereby causing a loss of those benefits. Second, the period with no additional benefits followed by additional benefits in later plan years violates the prohibition in ERISA's 133⅓% accrual rule against "backloading" benefit accruals to later years.

**B.      CIGNA's Conditioning of Future Accruals on Foregoing Statutory Rights to Previously-Earned Annuities Violates ERISA's Vesting Requirement.**

To keep promises of accrued benefits from becoming illusory, ERISA §203(a) provides that benefit accruals must be "nonforfeitable" once a participant has the number of years of service required to be vested (which is generally five years). ERISA §3(19) defines a non-forfeitable right as a right that is "unconditional." Under ERISA, indirect conditions are no more lawful than direct reductions in the amount of benefits. In <u>Central Laborers' Pension Trust v.</u>

Heinz, 541 U.S. 739, 744 (2004), the Supreme Court held that "placing materially greater restrictions on the receipt of the benefit 'reduces' the benefit just as surely as a decrease in the size of the monthly payment."

Since 1988, Treasury regulations have provided that "A right which, at a particular time, is conditioned under the plan upon a subsequent event, subsequent performance, or subsequent forbearance which will cause loss of such right is a forfeitable right at that time." 26 C.F.R. 1.411(a)-4. IRS Notice 96-8, 1996-1 C.B. 359, explains:

> "If benefits . . . have accrued [but] those benefits are disregarded when benefits commence before normal retirement age, the plan has effectively conditioned entitlement to the benefits . . . on the employee not taking a distribution prior to retirement age."

In Esden v. Bank of Boston, supra, Bank of Boston converted to a cash balance plan in 1989. The Bank protected the benefits that Lynn Esden earned with her 16 years of service before the change and offered her additional accruals for her service after the change on top of those benefits (unlike CIGNA). However, the Bank offered Ms. Esden an option under which it actually would pay only part of the value of the benefit accruals she accrued after the change if she commenced benefits before the plan's normal retirement age.

The Second Circuit held that the "only test that [a cash balance pension plan like the Bank of Boston's] might satisfy is the so-called 133⅓ percent test

11

under ERISA section 204(b)(l)(B)." 229 F.3d at 167. According to <u>Esden</u>, a plan sponsor "tries to have it both ways" if it claims compliance with ERISA's benefit accrual rules, but conditions the actual right to payment of the accruals earned in a plan year on whether the participant commences benefits before normal retirement age. <u>Id.</u> at 167 n.8 and 168. The Second Circuit concluded that "part of [Lynn Esden's] pension benefit was made conditional on the distribution option chosen, in violation of the anti-forfeiture provisions of ERISA §203(a)." <u>Id.</u> at 158 and 168. In so holding, the Second Circuit relied on the Treasury Department's nonforfeitability regulation and IRS Notice 96-8, 1996-1 C.B. 359. 229 F.3d at 167-78 and 173.

In <u>Berger v. Xerox</u>, the Seventh Circuit relied on <u>Esden</u> and held that the "law forbids" that a "plan conditions the employee's right to future interest credits on the form of the distribution that he elects to take (pension at age 65 rather than lump sum now)." 338 F.3d at 763. When a "plan concedes that the employee has an absolute, vested, indefeasible entitlement . . . to a pension at age 65," it cannot condition those benefits. 338 F.3d at 761.

In <u>Frommert v. Conkright</u>, 433 F.3d 254, 260-61 (2d Cir. 2006), the Second Circuit described plan provisions which offer the "greater of" benefits under two or more formulas as using a "comparison" methodology. In

12

Frommert, Xerox amended its plan to create a "hypothetical" or "phantom" offset under one of those formulas. The Second Circuit held that "although the application of the phantom account does not directly deplete an employee's pension account, by altering the comparative process, it imposes a condition on the payment of benefits that leads just as surely to a decrease." 433 F.3d at 268. The district court was reversed because it "overlook[ed] the ultimate effect of that comparison." Id.

Here the "ultimate effect" of CIGNA's payment of cash balance accruals only in conjunction with the opening account balance conditioned payment of the cash balance accruals on the value of the opening account compared with the value of the previously-earned benefits. This can produce a period of years with little or no additional benefits beyond those that were previously accrued. The annual rates of future benefit accrual, which previously were unconditional once an employee vested, are now conditional on the difference between the opening account balance and the previously-earned benefits. When there is a difference between the value of the account and the previously-earned benefits, the new accruals go to make up that deficit.

This conditioning has little or no effect on new hires or younger, shorter-service participants who did not have significant benefits under the prior plan.

Instead, it applies to older or longer-service employees whose opening balances were "established below actual value." Ex. 47 (third page). A new hire or a shorter-service employee will accrue benefits at the plan's stated accrual rates, while older, longer-service employees find their cash balance benefit accruals subject to a period years with no additional accruals. ¶81.

In <u>Richards</u>, Judge Hall did not find a forfeiture in similar circumstances because she saw no "choice" that the participant has to make. 2006 WL 980565 at *13-14. There are two problems with this conclusion. First, a "condition" is an event that "limits or qualifies" an obligation to distribute money or other property. <u>Res. of Contracts 2d</u>, §224 and Comment a. A condition may exist even if there is no viable choice. Second, there is an election here. Under Section 7.3 of CIGNA's Plan document, the participant "elects" whether to take his or her benefits from before 1998 "in an annuity form," or whether to take the cash balance accruals combined with the opening account balance. Ex. 1 at 40. <u>Esden</u> holds that a "voluntary choice" cannot result in a "partial forfeiture" of benefits. 229 F.3d at 172. Here, the election of the protected annuity benefits results in a forfeiture of the cash balance accruals earned in the years after 1997.

### C.    A Period of Years with "No Further Accruals" Violates ERISA's 133⅓% Accrual Rule.

The 133⅓% rule offers a second ground for holding that CIGNA's

condition on new accruals is illegal. Internally, CIGNA admitted that there could be a period of years after the conversion where participants "accrue no additional benefits." The 133⅓% accrual test requires that the "annual rate" of benefit accrual "payable at the normal retirement age" can escalate by no more than 133⅓% in any later plan year. ERISA §204(b)(1)(B). If there are "no further accruals" for a period of years, the plan obviously does not comply with the statutory rule against backloading benefit accruals to later plan years when accruals eventually resume. In such cases, the rate of benefit accrual after the wear-away expires is "infinitely" greater than the rate in effect during the years with no additional benefit accruals. Ex. 3 (Poulin Rpt) ¶ 30.

CIGNA's compliance with the ERISA's 133⅓% rule cannot be salvaged by drawing down higher rates of benefit accrual under previous plan provisions as if they were a cookie jar of accounting credits. Treasury regulations make clear that higher accruals from previous years cannot be averaged with, or treated as credits against, lower or non-existent rates in intermediate years in order to avoid a violation. The Treasury regulations issued in 1977 offer an example in which a plan offers a 2% accrual rate in the first 5 years of participation, followed by a 1% rate in years 6-10, and then 1.5% in all years thereafter. The regulations provide that the accrual rates in the intermediate years must comply with the

statutory requirements without taking into account the higher accrual rates in the earlier years. As a result, the lower accrual rate in plan years 6-10 violates the law, notwithstanding that the average accrual rate for years 1-10 never falls below 1.5%. Treas. Reg. 1.411(b)-1(b)(3)(iii) (Example 3) (when the annual rate in a period of years is too low, the 133⅓% test is not satisfied even if the "average rate of accrual" is "not less rapidly than ratably").

Previously-earned early retirement benefits also cannot be used as if they were the employer's rainy day fund. ERISA §204(b)(1)(B)(i) provides that the current plan provisions must be treated as in effect for all years in determining whether a plan satisfies the requirements of the 133⅓% rule. ERISA §204(b)(1)(B)(iii) further provides that any early retirement benefits to which "certain employees" may be eligible must be disregarded in satisfying the requirements.

In brief, the 133⅓% rule requires that an "annual rate" of accruals be provided for each plan year that is actually "payable at the normal retirement age." If those benefits are commenced earlier, ERISA §§3(23)(A) and 204(c)(3) require that at least the actuarial equivalent of those accrued benefits must be provided. The accrual rate cannot be subject to any offset or other restrictive interaction with previously earned benefits, including early retirement benefits. In

16

regulations issued under ERISA §204(h), the Treasury Department recognizes that a "minimum benefit" provision can affect the "rate of future benefit accrual." 60 F.R. 64320, 64322 (Dec. 15, 1995); 63 F.R. 68678, 68681 (Dec. 14, 1998).

CIGNA's actuarial expert, Mr. Sher, did not analyze the requirements of the 133⅓% rule, except in the last paragraph to his report. Ex. 10 (Sher Rpt) at 35. In it, he asserted that the 133⅓% test could be performed without taking into account the effect of the minimum benefits under the protected but frozen formula. Id. This position is inconsistent with a Treasury regulation in effect since 1977 which provides that the benefits under all formulas "must be aggregated" to determine whether or not the net accruals under the plan satisfy one of the benefit accrual methods. 26 C.F.R. 1.411(b)-1(a). At a November 2003 meeting of the Conference of Consulting Actuaries, only three months after his deposition, Mr. Sher is recorded on tape asking a panel of two IRS officials whether the above-cited regulation applies to a minimum benefit that has the effect of eliminating or reducing net accruals in future plan years. The IRS told him that "You look at the net benefit and when you have ... a period of zero accruals and the other kicks in, it's an issue on a 133 and 1/3." Ex. 52 at 12.

**IV.  The Rate of an Employee's Benefit Accrual under CIGNA's Cash Balance Plan Decreases Based on Age**.

ERISA §204(b)(1)(H) and (b)(2) prohibit age discrimination in rates of

17

benefit accrual for defined benefit plans and in monetary allocations to

individual accounts for defined contribution plans.

ERISA §204(b)(1)(H) provides that a defined benefit plan:

"shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or *the rate of an employee's benefit accrual is reduced, because of the attainment of any age.*"

Id. (emphasis added). In regulations proposed in 1988, the Treasury Department

stated: "any differences in the rate of benefit accrual . . . may not be based,

directly or indirectly, on the attainment of any age." 53 Fed. Reg. 11876, 11880

(April 11, 1988).[4]

ERISA establishes a different age discrimination requirement for defined

contribution plans. A defined contribution plan is required to ensure that "the

rate at which amounts are allocated to the employee's account is not reduced

because of the attainment of any age." ERISA §204(b)(2).[5] Invoking the

"hybrid" nature of its plan, CIGNA essentially asks this Court to apply an

---

[4] Although these regulations were never finalized, taxpayers are authorized to "rely on these regulations for guidance." Id. at 11878. See also 67 Fed. Reg. 76123, 76129 (Dec. 11, 2002) ("the reliance provided on the 1988 proposed regulations continues to be available").

[5] Congress adopted parallel rules in the Internal Revenue Code and the Age Discrimination in Employment Act. See IRC §411(b)(1)(H) and (b)(2), 26 U.S.C. §§411(b)(1)(H) and (b)(2), and ADEA §4(i), 29 U.S.C. §623(i).

amalgam of the two tests, which draws on the defined contribution test but conforms with neither.

### A.   The Annual Retirement Benefits Produced by CIGNA's Cash Balance Formula Decrease with Age.

Before 1998, CIGNA plan participants enjoyed a traditional defined benefit formula consisting of an annuity calculated at 2% or 1.67% of a final average of salary times years of service. The rates of benefit accrual did not decrease on account of age. Ex. 2 at 34-35 and Ex. 3 (Poulin Rpt) ¶13.

Effective January 1, 1998, CIGNA converted this traditional defined benefit formula to the cash balance formula. Mr. Poulin's expert report shows how age, or the proxy of the number of years to retirement, became the key factor in computing benefit accruals under CIGNA's new benefit formula. Mr. Poulin's report demonstrates that this means that the "accrued benefit" that ERISA requires must now be computed by taking the annual pay credit and compounding it using a factor equal to $(1 + i)^{65 - n}$ and then dividing the result by an annuitization factor. In this formula, "n" equals the employee's age. Because "65 - n" represents potential years to retirement, the accrual rate will be lower for older employees than for younger employees, all other factors being equal.

### B.   ERISA Prohibits Reductions in Accrual Rates Based on Age.

In <u>Esden</u>, <u>supra</u>, the Second Circuit recognized that "the rules governing

19

distributions from defined benefit plans are framed in terms of the normal

retirement benefit – typically a single life annuity payable at normal retirement

age." 229 F.3d at 159. The Second Circuit held that the Plan is not free to

"contract around the statute":

> "The Plan is correct that a pension benefit is defined according to the
> terms of the plan; but ERISA is quite explicit that those terms are
> circumscribed by statutory requirements and restrictions. The Plan cannot
> contract around the statute."

Esden, 229 F.3d at 173.

Because cash balance plans are defined benefit plans under ERISA, the

rate of benefit accrual under a cash balance plan must be determined by

converting the contents of the Plan's hypothetical cash balance "account" into an

"accrued benefit" which for a defined benefit plan means an annuity at normal

retirement. "[T]he benefits attributable to interest credits are accrued benefits"

and as such "must be valued in terms of the annuity that [they] will yield at

normal retirement age." Id. at 163 and 166.

Designed as they unfortunately often have been, cash balance plans accrue

benefits at rates that decrease with advancing age. In finding age discrimination

in IBM's cash balance plan, the District Court in Cooper, supra, 274 F.Supp.2d

at 1021, declared: "At this point in the analysis, the result is inevitable. In terms

of an age 65 annuity, the interest credits will always be more valuable for a

20

younger employee as opposed to an older employee." The Treasury Department has also recognized that cash balance plans produce a "larger accrual for younger employees when measured as the increase in the benefit payable at normal retirement age." See also 67 Fed. Reg. 76123, 76126 (Dec. 11, 2002). The William Mercer company ("Mercer") which CIGNA used as its advisor in the cash balance conversion also recognized this in a July 1996 discussion of legal issues with cash balance conversions:

> "If the rate of accrual is interpreted as the rate of increase in accrued benefit, and the accrued benefit is defined as an annuity at normal retirement age, then there's an issue [about whether] cash balance plans violate the rule."

Ex. 19 at EPTO 4170.

In <u>Richards</u>, 2006 WL 980565 at *8, Judge Hall found:

> "Under the Amended Plan's cash balance terms, an older employee receiving the same dollar amount of contribution to her cash balance account as that received by a younger employee buys a smaller age-65 pension annuity with that money. This phenomenom occurs because the older worker is closer to retirement, so the money contributed to her hypothetical account has less time to earn annual interest credits under the plan than does the money contributed to the younger worker's account.... [E]mployees experience an increasingly lower rate of benefit accrual as they age, if that rate is defined as the change in the value of their accrued benefit measured as an annual benefit commencing at normal retirement age."

For the named Plaintiff Janice Amara, Mr. Poulin calculated decreasing benefit accrual rates from 1.59% of each year's at age 48 (the age when she was

rehired) down to 0.75% at age 65. Ex. 3 ¶18 (setting aside the wear-away which actually caused her to earn no additional benefits). For three "profiles" of employees, that CIGNA itself used, he computed rates ranging from 1.79% at age 30 down to 0.63% at age 65. Ex. 3 at Ex. F-1. In a 10/22/1997 internal analysis, CIGNA found the same accrual rates as Mr. Poulin. ¶96 and Ex. 62.

The record shows, moreover, that CIGNA was specifically told that the benefit "accrual rates" under the cash balance formula decreased with age. A senior CIGNA actuary recognized:

> "As [one] would expect in a plan designed to mimic a defined contribution plan, ***accrual rates decline with increases in age and service*** for employees in the cash balance plan."

Ex. 61 at 10044 (emphasis added).  Other internal documents show the same awareness. CIGNA repeatedly recognized that "older employees" (which it variously described as employees "closer to retirement" or "nearer to retirement age") earn lower benefits under the cash balance formula. ¶94.

In a September 1999 memorandum to its Board, CIGNA recognized its "vulnerability" to the argument that its cash balance accrual rates decrease with age. In the memorandum, a company official warned:

> "Cash Balance Plans are alleged to violate ADEA: This is a new challenge, related in part to opening balances established below actual value, but also is a challenge to a flatter schedule of accruals. . . . CIGNA's age-progressive accrual schedule reduces, but <u>does not</u>

22

<u>eliminate, vulnerability to this argument</u>."

Ex. 47 (third pages) (emph. added) (attachment to 9/21/1999 e-mail from Gerry Meyn entitled "Cash Balance Pension Plans: Background for September 1999 Board meeting").

CIGNA also recognized that "wear-aways" with "no further benefit accruals" for a period of years could occur for those employees with "early retirement subsidies" from the previous plan, ¶¶67-68, but CIGNA never assessed whether this resulted in age discrimination because of the inherent relationship between early retirement eligibility and age.

**C.     ERISA Does Not Support the Proposition that Although "the Rate of an Employee's Benefit Accrual" Generally Means the Change in the "Accrued Benefit," It Can Also Have a Secondary Meaning Based on Credits to a Hypothetical Account.**

CIGNA defends against the discrimination charge with arguments advanced by cash balance promoters, primarily the argument that the "rate of an employee's benefit accruals" does not have to be computed on the basis of the definition of "accrued benefit" because Congress did not specifically define the term "benefit accruals" within the text in ERISA §204(b)(1)(H). <u>See, e.g.</u> Shea, Francese and Newman, "Age Discrimination in Cash Balance Plans: Another View", 19 <u>Va. Tax Rev.</u> 763 (2000). CIGNA's arguments in this regard have been advanced through the report of Mr. Sher, the actuary CIGNA engaged as an

23

expert witness in this lawsuit,[6] as well as CIGNA's reliance in a February 2002

motion to dismiss on the decision in Eaton v. Onan, 117 F.Supp.2d 812 (S.D.Ind.

2000).

Although Mr. Sher concedes that legal opinions are outside of his area of

expertise,[7] he argues that the words "rate of benefit accrual" in ERISA

§204(b)(1)(H) do not always have to be interpreted consistently with the rest of

ERISA §204 or with ERISA's definition of the term "accrued benefit" where a

cash balance plan is concerned. Ex. 10 (Sher Rpt) at 9-10. According to Mr.

Sher, Congress' failure to define the term "benefit accrual" within ERISA

§204(b)(1)(H) itself has given plan sponsors and the Federal courts the latitude

to interpret that term as something other than the change in the accrued benefit.

As CIGNA's actuarial expert, Mr. Sher suggests that the rate of benefit

---

[6] Mr. Sher is a well-known defender of cash balance plan designs who served as the chief actuary for Kwasha Lipton and successor companies for 24 years. Ex. 10 (Sher Rpt) at A-1, B-1(work history and list of cash balance publications). Kwasha Lipton developed the first cash balance plans in the mid-1980's. See Eaton, supra, 117 F.Supp.2d at 819. Today, after a series of sales, Kwasha operates under the name of Buck Consultants. Ex. 11 (Sher Suppl Rpt) at Appendix A. Mr. Sher has testified for the defense in many cash balance cases, including Esden v. Bank of Boston, Cooper v. IBM, Berger v. Xerox, Lyons v. Georgia Pacific, and Engers v. AT&T.

[7] Mr. Sher admitted at his deposition that he is not qualified to practice law and testified that he never gave clients advice on whether cash balance plans comply with the age discrimination requirement. ¶108.

accrual for a cash balance plan could be measured by the hypothetical dollar amount assigned to the participant's account. Id. at 11, 13. Mr. Sher does not suggest that the term "benefit accrual" generally means something other than the change in the "accrued benefit." Instead, he suggests that an alternative or secondary meaning could be attached to the term "benefit accrual" in certain cases, especially those involving cash balance plans.

The district court in Eaton v. Onan, 117 F.Supp.2d 812, 830 and 832-34 (S.D. Ind. 2000), similarly concluded that the statutory phrase does not have a "single, self-evident meaning," as did the district court in Register v. PNC Financial, 2005 WL 3120268 *6-7 (E.D. Pa. 2005) (appeal pending under C.A. 05-5445), which followed Eaton. Eaton and Register allowed plans to then use the hypothetical allocations to the cash balance accounts to satisfy the age discrimination standard, rather than looking at "accrued benefits."

In Richards, however, Judge Hall held that this analysis does not take into account that Congress enacted a "completely different" test for age discrimination under a defined contribution plan. This manifests that "Congress did not intend" that the rate at which amounts are "allocated to the employee's account" be applied to a defined benefit plan. The "great similarity" between "benefit accrual" and the statutorily-defined term "accrued benefit" mandates

25

that age discrimination under a defined benefit plan be measured by the "change in the annual benefit commencing at normal retirement age." Richards, 2006 WL 980565 at *9-10.

> "Congress' intent was to assure a benefit measured as of normal retirement age. The value of that benefit does not change, regardless of whether the employee is younger or older than normal retirement age. What it costs to provide the benefit may change depending on an employee's age. However, that was not Congress' concern when it prohibited the diminution of the rate of accrual of the benefit expressed as an annual benefit commencing at normal retirement age."

Id. at *10.

Judge Hall's analysis is also grounded on other statutory construction principles: It is commonplace for Congress not to define statutory terms in each place that it uses them. Thus, although Congress did not specifically define the term "benefit accrual" within the text of ERISA §204(b)(1)(H), this does not mean that the term is ambiguous. If a statutory term is susceptible in isolation to different interpretations, courts examine the "placement and purpose" of the term in the statutory scheme, and other indicia of Congressional intent, including the use of the term in other sections of the statute. Holloway v. United States, 526 U.S. 1, 6-7 (1999); Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 465-68 (2001) (rejecting "secondary meaning" that would insert economic cost factor into air quality standard);  Deal v. United States, 508 U.S. 129, 131-32 (1993) (when word

has two meanings "all but one . . . is ordinarily eliminated by context") .

There is, moreover, a "presumption that similar language in two labor law statutes has a similar meaning."  Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 61 (1987). In Smith v. City of Jackson, 544 U.S. 228, 233 (2005), the Supreme Court emphasized:

> "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended the text to have the same meaning in both statutes."

Emph. added. Accord Harris Trust & Sav. Bank v. Salomon Smith Barney, 530 U.S. 238, 244-46 (2000) (interpreting ERISA §502(a)(3) similarly to §502(a)(5)); Varity Corp. v. Howe, 516 U.S. 489, 510 (1996); Greenblatt v. Delta Plumbing & Heating, 68 F.3d 561, 576 (2d Cir. 1995) (argument that company was an "employer" for purposes of one section of ERISA but not another discarded because the "statute makes no such distinction").

Here, only six months prior to the enactment of §204(b)(1)(H), Congress enacted §204(h). This section requires a plan administrator to notify employees of a significant reduction in "the rate of future benefit accrual."  In 1998 regulations, the Treasury Department concluded that "[t]he statutory phrase "rate of future benefit accrual" implies, on its face, that section 204(h) is limited to changes in the accrued benefits."  63 Fed. Reg. 68678, 68680 (December 14,

27

1998) (emph. added).

The use of the phrases "accrual rate" or "annual rate" of accrual in the anti-backloading tests also shows that Congress intended the "rate of benefit of accrual" to mean the growth in the "accrued benefit": (a) The so-called 133% rule in ERISA §204(b)(1)(B), 29 U.S.C. §1054(b)(1)(B), uses the term "accrual rate" or the "annual rate at which any individual ... can accrue the retirement benefits" to describe the rate at which an individual "can accrue benefits"; (b) Treasury regulations issued to implement §204(b)(1)(B) also compare the "rate of benefit accrual" or the "rate of accrual" in earlier and later years by looking at the benefits "accrued" in those years.  26 C.F.R. §1.411(b)-1(b)(2)(iii), Examples (2) and (3) and §1.411(b)-1(g); (c) The ERISA Conference Report describes how the "accrued benefit" is "subject to" the requirements in the "benefit accrual" or "accrued benefit tests (which limit the extent of "backloading" permitted under the plan" and how the 133⅓% method tests the "rate of accrual" or "accrual rate" under the plan. H. CONF. REP. 93-1280, 273-74, 1974 U.S.C.C.A.N. 5038, 5055-56.

If legislative history needs to be resorted to (see Richards, 2006 WL 980565 at *6), the 1986 Conference Committee Report on OBRA provides further support that Congress intended for "benefit accrual" to refer to the change in the

"accrued benefit." The Conference Report describes how: "Present law specifies certain requirements with respect to the rate at which benefits are accrued (i.e., earned) under a pension plan. These benefit accrual requirements generally prevent the backloading of benefit accruals by specifying a minimum rate of benefit accrual for each year of participation." 1986 U.S.C.C.A.N. at 4020.

The Conference Report offers two examples about the age discrimination standard. In the first, "a plan provides a benefit of $10 monthly per year of service." The Conferees stated that an older worker must be provided the same "additional benefit of $10 per month." H.R. Conf. Rep. No. 99-1012, at 381, 1986 U.S.C.C.A.N. 3868, 4026. In the second, the Conferees explain how under ERISA's fractional rule (ERISA §204(b)(1)(C), participants can "have different accrued benefits because of the different rate of accruals for each year of service." H.R. Conf. Rep. 99-1012, at 379, 1986 U.S.C.C.A.N. 3868, 4024. In both examples, the rate of "benefit accrual" refers to "additional benefit" or the change in the "accrued benefit." See Richards, 2006 WL 980565 at *6-7.

Mr. Sher alternatively suggests that the decreasing rates of accrual are just the product of the "time value of money." Ex. 10 (Sher Rpt) at 15-18. But employers cannot avoid anti-discrimination standards by articulating discriminatory effects in economic terms like the time value of money which

29

bear a necessary correlation with race, sex or age. Richards, 2006 WL 980565 at

*11-13 (the effect of FleetBoston's formula is "perfectly correlated" with age);

Arizona Comm. for Deferred Compensation Plans v. Norris, 463 U.S. 1073,

1081 (1983) ("one cannot say that an actuarial distinction based entirely on sex

is based on any other factor than sex."); Arnett v. CalPERS, 179 F.3d 690, 695

(9th Cir. 1999), vacated and remanded on other grounds, 528 U.S. 1111

(2000)("practical application" of formula "leaves no doubt that age at hire . . . is

the sole basis for lower benefits.").[8] Cf. Miller v. Xerox, __ F.3d __, 2006 WL

1215764 * 5 (9th Cir. 2006) ("the Cash Balance Retirement Account interest

credits are defined benefit entitlements specified by the plan terms, and are not

analogous to the investment growth in a defined contribution plan").

Here, CIGNA's internal documents and spreadsheets clearly demonstrate

that CIGNA knew that the cash balance plan's accrual rates progressively

declined with advancing age from 1.73% of pay at age 43 down to .66% of pay

at 65. ¶96. The explanation that Mr. Sher offers on CIGNA's behalf about the

"time value" of money is an afterthought because: (1) CIGNA acted on a

different basis, and (2) there are actually no individual accounts or allocations of

---

[8] Because the Supreme Court ruled in another case that public employees cannot sue State governments,  Arnett was vacated.  However, the EEOC subsequently refiled the suit under its authority.

money. The effects of CIGNA's hypothetical credits are economically indistinguishable from a prescribed schedule or table of accrual rates under which the rate drops progressively from 1.73% of pay down to .66% of pay because of age.

Finally, it is important to recognize that, despite the efforts to analogize CIGNA's cash balance plan to a defined contribution plan, CIGNA could not satisfy the age discrimination test for a defined contribution plan. The ERISA §204(b)(2) test for defined contribution plans requires that <u>actual</u> monetary contributions be allocated to a participant's separate individual account. The Plan's actual investment returns must be credited to the participant's account, not artificial interest credits. No "wear-aways" of the monetary "allocations" are permitted based on previously-earned benefits. As a result, even if this Court possessed the latitude to substitute the defined contribution test, CIGNA's cash balance formula would fail. The actual costs that CIGNA has incurred for older employees like Janice Amara and Gisela Broderick, who "accrue no additional benefits," are non-existent, and therefore reduced in comparison to both the costs for younger workers and to its costs under the prior plan.

**V.    CIGNA Violated Its Duty to Disclose Significant Benefit Reductions.**

The "duty to disclose material information" is at "the core" of an ERISA

"fiduciary's responsibility." <u>Eddy v. Colonial Life Ins. Co.</u>, 919 F.2d 747, 750

(D.C. Cir. 1990). In addition to requiring plans to satisfy ERISA's vesting and

benefit accrual standards, Congress intended to ensure that companies inform

employees in understandable language about benefit reductions and other

disadvantages from plan amendments. Armed with that information,

"dissatisfied" employees can "bargain further" with their employer, <u>Hamilton v.</u>

<u>Air Jamaica</u>, 945 F.2d 74, 78 (3d Cir. 1991), and if that proves unsuccessful, at

least make "well-informed employment and retirement decisions" based on that

information. <u>Harte v. Bethelehem Steel</u>, supra, 214 F.3d at 446, 451 (3d Cir.),

cert. denied, 531 U.S. 1037 (2003).

ERISA requires understandable disclosures of benefit reductions in two

forms of written communication: (1) in ERISA §204(h) notices of significant

reductions in the future rate of benefit accruals, which are required to be

distributed at least 15 days before the effective dates of the changes, (2) in a

summary of material modification ("SMM") or updated summary plan

description ("SPD"), as required by ERISA §102(a). These notices and

summaries must be written "in a manner calculated to be understood by the

average plan participant." See 29 C.F.R. 2520.102-2(a) (SPD), 2520.104b-3(a)

(SMM) and 26 C.F.R. 1.411(d)-6, Q&A 10 (Section 204(h) notice).

This requires that notice of "significant reductions" be given in advance to satisfy Section 204(h). It also requires that the SPD contain a statement:

"clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, offset [or] reduction of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide based on the description of benefits required by paragraphs (j) and (k) of this section [which provide that the plan's requirements "respecting eligibility and for benefits," including survivor's benefits must be described].

It further requires that:

"Any description of exception, limitations, reductions, and other restrictions on plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.... The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations."

29 C.F.R. 2520.102-2(b).

ERISA places the responsibility for all these disclosures on the "plan administrator."[9] Here, the "plan administrator" is CIGNA because the Plan document does specifically not designate anyone other than the corporation.

---

[9] See 29 C.F.R. 2520.102-2(a) ("In fulfilling these requirements, the plan administrator shall exercise considered judgment and discretion by taking into account such factors as ... the complexity of the terms of the plan"); 29 C.F.R. 2520.104b-3(a) ("The administrator ... shall furnish a summary of any material modification to the plan"; "the administrator shall furnish this summary, written in a manner calculated to be understood by the average plan participant...."), and 26 C.F.R. 1.411(d)-6, Q&A-1 ("The plan administrator must provide the notice ... not less than 15 days before the effective date of the plan amendment"). See also id. at Q&A 9, 11, 13-14.

ERISA §3(16)(A) and Ex. 1 at 13 and 60.[10]

Because the plan administrator is a fiduciary, see ERISA §3(21)(A), the

assignment of the disclosure responsibilities to the plan administrator reinforces

the responsibility to "speak truthfully" to employees about benefit reductions and

other disadvantages. Cf. Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994);

Becker v. Kodak, 120 F.3d 5, 10 (2d Cir. 1997) (duty to disclose "complete and

accurate information"). Professor Langbein at Yale writes that "The court-

created disclosure duties of ERISA fiduciaries respond to (and to some extent

compensate for) the widespread use of conflicted fiduciaries in ERISA plan

administration." "Questioning the Trust Law Duty of Loyalty," 114 Yale L.J.

929, 950-51 (March 2005).

### A.    It Is Well-Established that Cash Balance Conversions "Mask" Benefit Reductions In the Absence of Full Disclosure.

It is well-established that it is very difficult for average, or above-average,

employees to compare their prior pension benefit formulas to cash balance

formulas that do not express benefits in the form of an annuity. As early as 1999,

the *Wall Street Journal* reported on a professional conference in which actuarial

consultants, including from the Mercer firm which advised CIGNA, joked about

---

[10] Internally, CIGNA gives the title of Plan administrator to an employee (currently, John Arko, and previously Stewart Beltz and Gerald Meyn), but the legal responsibility to fulfill the statutory functions remains CIGNA's.

how cash balance conversions "mask" benefit reductions until employees retire:

> "Amy Viener, an actuary at William M. Mercer Inc., noted: "You switch to a cash-balance plan where the people are probably getting smaller benefits, at least the older-longer-service people; but they are really happy, and they think you are great for doing it."

> An actuary with Watson Wyatt Worldwide who spoke on a panel called "Introduction to Cash Balance/Pension Equity Plans" alongside Ms. Viener, is heard saying on a tape: "It is not until they are ready to retire that they understand how little they are actually getting." "Right, but they're happy while they're employed," responded Ms. Viener of Mercer."

Ex. 67. This was not a chance comment. Mercer prepared client presentation materials in 1996 touting how cash balance conversions "mask" benefit reductions and identifying this as a reason why cash balance conversions are "popular" with employers. Ex. 115. Mr. Sher has also recognized that "For the same reasons it's difficult to compare apples with oranges, employees will find it difficult to compare benefits under a cash balance plan with those under the prior traditional plan." Ex. 68.[11]

### B. ERISA Section 204(h) Requires Notice of a "Significant Reduction" in Future Benefits.

ERISA §204(h) provides:

_____

[11] In Eaton, supra, 117 F.Supp.2d 812, the district court found that Kwasha Lipton, the firm which employed CIGNA's expert, told the Onan Corporation that one feature of a cash balance plan that "might come in handy is that it is difficult for employees to compare prior pension benefit formulas to the account balance approach." Id. at 837 n. 13.

"that a plan ...may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date to ...each participant in the plan."

Id. In Frommert, supra, 433 F.3d at 263, the Second Circuit held that "under ERISA §204, plan sponsors are prohibited from amending a plan in a way that reduces future benefit accrual without proper notice to plan participants."

Notice to employees is required not only for direct reductions in percentage rates or dollar amounts of future accruals, but also for indirect changes that reduce future benefits. In Frommert, a plan amendment created a "hypothetical" or "phantom" offset based on prior distributions. The Second Circuit held that "although the application of the phantom account does not directly deplete an employee's pension account, by altering the comparative process, it imposes a condition on the payment of benefits that leads just as surely to a decrease." 433 F.3d at 268.  The "ultimate effect of that comparison" was that "once the phantom account was added, the value of an employee's accrued benefits were reduced significantly." Id.[12]

---

[12] In temporary regulations issued in 1995 and finalized in 1998, the Treasury Department has also recognized that a new "benefit offset" or "minimum benefit" provision can reduce the "rate of future benefit accrual," just as much as a direct reduction in a percentage rate. 26 C.F.R. 1.411(d)-6, Q&A-6, promulgated at 60 F.R. 64320, 64322 (Dec. 15, 1995), and finalized at 63 F.R.

Some actuarial consultants, including the Mercer consulting firm which advised CIGNA, have floated the idea that a §204(h) notice does not necessarily have to disclose the benefit reductions so long as it provides a general overview of the amendment. As quoted in the *Wall Street Journal* on May 5, 1999, Paul Strella, a Mercer consultant who was involved in advising CIGNA about this conversion, see Ex. 13, stated: "The law 'doesn't require you to say, We're significantly lowering your benefit.' All it says is, 'Describe the amendment.' So you describe the amendment." Ex. 67.

Since its enactment in April 1986, ERISA §204(h) has, however, provided under the title "Notice of significant reduction in benefit accruals" that "a plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless . . . the plan administrator provides a written notice setting forth the plan amendment and its effective date to each participant in the plan." P.L. 99-272, Sec. 11006.

The Treasury regulations, which were first promulgated in temporary form, are entitled "Notice of Significant Reduction in the Rate of Future Benefit Accrual." The regulations provide a summary "need not explain how the individual benefit of each participant ... will be affected by the amendment," but

---

68678, 68681 (Dec. 14, 1998).

it must be "written in a manner calculated to be understood by the average plan participant." 26 C.F.R. 1.411(d)-6, Q&A 10; see also 60 F.R. 64320, 64323 (Dec. 15, 1995) (the temporary regulations in effect when CIGNA did its conversion). This notice requirement would be hollow if the summary was not required to give notice of the reductions, especially when the reductions are not otherwise understandable to the average plan participant.[13]

In Frommert, the Second Circuit found that Xerox did not "fully explain[]" how an amendment reduced future benefits for several years after it was first implemented: "Allowing tardy notice several years after the effective date of an amendment to stand in for the advance notice that is actually required under §204(h) upends the purpose of the provision by turning 'future benefit accrual' into past accrual." "Such belated disclosure of so significant a change cannot be squared with ERISA's mandate." "[W]ithout such proper notice to Plan participants, the amendment was ineffective as to them." 433 F.3d at 262, 266, and 268.

---

[13] In June 2001, Congress amended ERISA §204(h) to require still more specific information "to allow applicable individuals to understand the effect of the plan amendment." Id., as amended by P.L. 107-16, Sec. 659. The subsequent regulations require the "approximate magnitude" of reductions to be illustrated or described. 26 C.F.R. 54.4980F-1, Q&A 11; 68 F.R. 17277, 17284 and 17287 (April 9, 2003). Romero v. Allstate, 404 F.3d 212, 219 (3d Cir. 2005), recognizes that Congress "did not alter the basic notice requirement, but rather set forth requirements for the notice itself."

In <u>Richards</u>, Judge Hall relied on <u>Frommert</u> in holding that the "Complaint could support a finding that the defects in notice 'likely, and quite reasonably led participants to believe' that the wear-away effect and decreasing rate of benefit accrual were not components of the plan." 2006 WL 980565 at *17. See also <u>Copeland v. Geddes Federal Sav.</u>, 62 F.S.2d 673, 678 (N.D.N.Y. 1999) (purported 204(h) notice was inadequate because it was not timely and did not adequately explain the amendment).

### C. Summaries of Material Modification or Updated Summary Plan Descriptions Must "Fully Explain" Benefit Reductions.

The Second Circuit has carefully examined the role of the SPD in ERISA's statutory scheme:

> ERISA "contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." <u>Heidgerd v. Olin Corp.</u>, 906 F.2d 903, 907-08 (2d Cir. 1990).

> ... Regulations promulgated under ERISA prescribe the format of a SPD. The format of the summary plan description must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, [or] restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant . . . [and] shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. 29 C.F.R. § 2520.102-2(b).

<u>Layaou v. Xerox Corp.</u>, 238 F.3d 205, 209-10 (2d Cir. 2001).

39

Since 1985, the Second Circuit has ruled that the "full import of the interaction" between existing plan provisions and an amendment altering the computation of benefits must be explained, or else the disclosure does not comply with ERISA. Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1040 (2d Cir. 1985). In Layaou, 238 F.3d at 210-11, the Second Circuit determined that even general language that benefits "may also be reduced" is inadequate under this standard. Instead, Xerox had to fully disclose the interaction between "prior distributions" and current benefits. For the disclosure to be adequate, it had to explain how benefits are reduced and be definite, e.g., "will be reduced." Because "the explanations provided in the SPD . . . did not provide the critical information needed by employees in [plaintiff's] circumstances . . . the SPD lacked the clarity and completeness required by § 1022." On remand, the district court in Layaou found that based on the SPD, a participant "would not know how or to what extent the benefit would be reduced" even though the plan provision "resulted in a significant reduction in plaintiff's benefits, compared to what he would have received without the offset." 330 F.Supp.2d 297, 303 (W.D.N.Y. 2004).

ERISA specifically requires that material modifications, including amendments that reduce benefits, be understandably disclosed to participants,

using the same standards that apply to SPDs. See 29 C.F.R. 2520.102-2(b) and

2520.102-3(l) (the SPD regulation) and 29 C.F.R. 2520.104b-3 (the SMM

regulation). ERISA thus prohibits an SPD (or an SMM) that "obscures" or tends

to "minimize" benefit limitations. Burke v. Kodak Retirement Income Plan, 336

F.3d 103, 110 (2d Cir. 2003), cert. denied, 540 U.S. 1105 (2004).

These rules are no different for cash balance conversions. In Richards,

Judge Hall applied the disclosure requirements to "defects in notice" in a cash

balance conversion. 2006 WL 980565 at *17. Accord Burstein v. Allegheny Fdn.

Ret. Acct. Plan, 2004 WL 2612162 *1 (E.D. Pa. 2004), on remand from 334

F.3d 365 (3d Cir. 2003) (after the Third Circuit ruled that an SPD's disclosures

about cash balance conversion must be sufficiently comprehensive to apprise

employees of changes affecting their benefits, the district court found that the

term "earned" in the SPD in essence "created a contractual right to the

hypothetical bookkeeping entries").[14]

### D. CIGNA's Cash Balance Conversion Substantially Reduced Future Benefits.

Whatever arguments CIGNA wishes to advance about compliance with the

---

[14] The Department of Labor has also specifically recognized that the SPD/SMM regulations "require a reasonably comprehensive and clear description of the provisions of a cash balance plan and how a prior conversion may have affected benefits that classes of participants may have reasonably expected the plan to provide." 65 Fed. Reg. 70227 (Nov. 21, 2000).

statutory rules against conditioning vested benefits, back-loading benefit accruals, or age discrimination in the rate of accruals, there is no getting around that CIGNA's 1998 cash balance amendments substantially reduced benefits compared with the benefits offered under the prior 1.67% and 2% of highest average pay formulas.

The Class' expert, Mr. Poulin, found significant reductions for both Tier 1 and Tier 2 employees based on the "profiles" of employees that CIGNA itself used in its analyses. Ex. 3 at ¶¶20-21. Benefit calculations for the ten witnesses with data provided by CIGNA show benefit reductions ranging from 34% to 49% after periods of only four to eight years under the cash balance formula. Ex. 7 (Poulin Indiv Calcs) and ¶122 (Amara calculations). Mr. Poulin's supplemental report shows how a change from a highest or final average pay formula to a formula which bases benefits on each year's pay (a "career average" formula) will, by itself, produce substantial reductions. Ex. 4 at ¶10.[15]

Internally, CIGNA recognized that the Tier 1 (2%) formula "provides much higher pension benefits." Ex. 28 at 12288. Other memos shows that the cash balance plan's benefits may be less than 50% of the benefits under the old

---

[15] Mr. Sher's expert report agrees with Mr. Poulin's conclusion that the new formula substantially reduces the future rate of benefit accruals. Mr. Sher found that the new plan offers a level accrual rate of .75% of highest pay compared with the old plan's rate of at least 1.5%. Ex. 10 at 19 and 20 n. 12.

plan's Tier 1 formula. ¶136. For Tier 2 (1.67%) formula participants, Mercer prepared comparisons generally showing 20% or more reductions. ¶138. The reductions for Tier 2 employees were actually considerably higher: Mr. Poulin's calculations, using CIGNA's data, show that the benefits of the four witnesses from Tier 2 were reduced by an average of 40% after only four to seven years under the cash balance formula. Ex. 7 ¶6.

Mr. Poulin's actuarial report identifies the other features of Cigna's cash balance conversion that CIGNA should have disclosed because they may cause losses of benefits that participants might expect: He describes: (1) the exclusion of the value of early retirement benefits from the opening accounts; (2) CIGNA's application of a pre-retirement mortality discount in computing the opening accounts, (3) CIGNA's use of higher interest rates to establish opening accounts than those available to "repurchase" annuities with those accounts; and (4) the conditioning/wear-away approach that caused participants to lose several years of future accruals under any formula. Ex. 3 (Poulin Rpt) ¶¶ 18-35.

The Defendants' expert, Mr. Sher, did not disagree with any part of Mr. Poulin's analysis. Mr. Sher agreed that early retirement benefits were excluded from the opening accounts, that mortality was "assumed at all ages," including before retirement, that falling interest rates have reduced the value of the opening

accounts in terms of retirement benefits, and that the plan's methodology of comparing benefits under two formulas means that a participant's "actual benefit might be rising more slowly or not at all." Ex. 10 (Sher Rpt) at 8 and 29-35. Mr. Sher only disagreed with the legal conclusions that can be drawn from these facts.

E.    **CIGNA Did Not Disclose Reductions But Instead Represented that "the New Plan Is Designed to Work Well for *Both* Longer- and Shorter-Service Employees" and Offer "Larger" or "Comparable" Benefits.**

Faced with the statutory and fiduciary duty to tell its employees that it was substantially reducing their retirement benefits, CIGNA offered an overview of how the cash balance plan operates, and, when it said more, it represented that the changes were actually an "enhancement" or a "plus" for employees. The three documents that CIGNA contends constituted its Section 204(h) Notice, Summary of Material Modifications, and Summary Plan Description are, respectively: (1) the November 1997 Newsletter, (2) the December 1997 Information Kit, and (3) the October 1998 and September 1999 SPDs. None of these documents satisfies the disclosure requirements.

Professor James F. Stratman, Associate Professor at the University of Colorado at Denver and Director of its Technical Communications Program, was retained by the Plaintiff class to examine the November 1997 Newsletter, the

December 1997 Information Kit and the 1998/1999 SPD. Ex. 8 (Stratman Rpt) at

4. Professor Stratman is an expert in the understandability of written

communications in the legal, business and technical fields.

> ### 1.    The Purported Section 204(h) Notice Told Participants that the Changes Were "Enhancements" to the Retirement Program and Never Mentioned Reductions.

Professor Stratman analyzed the November 1997 Newsletter which

CIGNA contends was its ERISA §204(h) notice. The Newsletter began with an

inset from CIGNA's CEO telling employees that the cash balance changes will

"significantly enhance" CIGNA's retirement program. Stratman finds: "This

statement is important because it may set participants' expectations about all

other information that follows in the subsequent stream of CIGNA

communications concerning the change of plans." Id. at 5. According to

Stratman, the Newsletter not only leads participants to anticipate an

"enhance[ment]" and fails to disclose benefit reductions, but it also contains

three misleading representations:

> - new plan participants 'will see an overall improvement in their retirement benefits' (inset box, p.2, col.b)
>
> - 'the new plan is designed to work well for *both* longer- and shorter-service employees' (p. 4, col. a);
>
> - the new plan provides 'steadier benefit growth throughout [the employee's] career" (p.4, col. a).

In response to a Rule 30(b)(6) notice related to compliance with the disclosure rules, CIGNA produced John Arko, its Director of Retirement Benefits (who CIGNA has since designated as the Plan administrator). According to Mr. Arko, the §204(h) Notice "of a reduction in the rate of accruals" was contained in a specific article within the November 1997 Newsletter. Ex. 194 (Arko Depo) at 41. Pressed on the subject, Arko specified the part of the newsletter that he believed gave the notice: "It was on Page 5 of this newsletter. It would be the story labeled, Opening Balances to be Calculated Next Spring." Id. at 47-8 (describing Pltf. Ex. 61). "I think that this story satisfies to the extent we were trying to put a 204(h) notice out, that this was – this notice and that story was intended to do that." Id. at 48. Asked where in the story the disclosure was made, Arko declared: "I think the entire story...." Confronted with each section of the story and asked "Does that ...tell participants that their benefits will be reduced under that new plan?" Mr. Arko testified for each section that "No" the language cited did not tell participants that their benefits will, in fact, be reduced under the new plan. Id. 82-84. Having reviewed the article section by section, Arko finally agreed:

> "Q. Is there something in this article that tells employees that their benefits will be reduced under the plan?
>
> A. No."

Id. at 85.

As Professor Stratman's analysis indicates, this may be an "easier" case than Frommert or Richards because CIGNA's purported ERISA §204(h) notice did not simply omit any explanation of the reductions. Instead, CIGNA affirmatively represented to its employees that the changes would result in an "enhanced" retirement program that "works well for both longer- and shorter-service employees, and offers "steadier benefit growth." ¶¶158-59. The November 1997 Newsletter was, in short, the opposite of a "complete and accurate" notice, which might have stated, "I regret to announce that on January 1, 1998, CIGNA will significantly reduce its retirement program."

> ### 2.   CIGNA's Summary of Material Modification and SPD Told Participants that the Benefits Were "Larger" or "Comparable" and Never Mentioned Reductions.

CIGNA's SMM and SPD gave participants no more indication of the "reductions" or "wear-aways" than the purported ERISA §204(h) notice, but suggested instead that the cash balance plan would offer benefits "larger" or "comparable" to those that they previously enjoyed.

Professor Stratman analyzed the disclosures in the Information Kit. He found that participants were then assured that their previous benefits were "fully protected" with the opening accounts, as if this were a mere transfer of

obligations.[16] He then found that in answer to the question "Why wasn't I allowed to stay in the [old] Pension Plan?" participants were assured that "in comparison to people with higher age and service combinations, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan." Ex. 8 (Stratman Rpt) at 8. In response to the question, "Will my benefits be better under the new retirement plan?" CIGNA assured participants that "the new retirement plan, in comparison with the current pension plan, tends to provide larger benefits for shorter-term employees and comparable benefits for longer service employees." Id.

Professor Stratman concluded that the Information Kit nowhere discloses that: (1) the opening balances did not "fully protect" the benefits that participants had already earned, (2) that "benefits may not grow at all for several years," and (3) even after such periods of wear-away, the future rates of benefit accrual were significantly reduced. Instead, the Kit offered contrary assurances and did not even "suggest ways in which benefit reductions relative to the old plan are possible." Ex. 8 (Stratman Rpt) at 7 and 9.

---

[16] Mr. Poulin examined a numerical example in the Information Kit and found that it was "mathematically impossible." The example describes how the opening balances will, with interest, allow a participant to obtain the same annuity as before the change. Mr. Poulin found that the example is mathematically impossible because it fails to account for the "pre-retirement mortality" discount that CIGNA took. Ex. 4 at ¶16.

Professor Stratman's analysis of the adequacy of the disclosures in the SPD is no more favorable. Observing the SPD's promise that "Each dollar's worth of credit is a dollar of retirement", Stratman found that the SPD continually reinforces "[t]he notion that the change to the new plan involves no loss of benefits...." Id. The SPD fails to disclose that:

> - employees might not immediately begin earning benefits after conversion but will instead have new benefits delayed for a number of years.
>
> - the early (age 55) retirement benefits disappear entirely.
>
> - the employee's total pension value may not be comparable to what it was under the old plan and may even be significantly reduced.

Id. at 12.

Professor Stratman concluded:

> "In my expert opinion CIGNA's 1998 and 1999 Summary Plan Documents (SPDs), as well as the precursor documents distributed to employees before the SPDs, fail to disclose to the average plan participant the potential reductions of benefits associated with the new cash balance plans. Instead of disclosing the potential reductions, the SPDs and precursor documents offer assurance of steadier benefit growth with no disclosure that the rates decrease with age, that they drop in comparison with the old plan, or that they are conditional upon giving up part of the value of accrued benefits under the old plan."

Id. at 12-13.

Confirming Professor Stratman's findings, CIGNA's Rule 30(b)(6) witness on disclosures agreed that CIGNA's SMM and SPD do not identify the

reductions and other disadvantages described above. Asked whether the SPD

discloses that the opening accounts do not include early retirement benefits, he

testified "I don't see specific words that define that detail." Asked whether the

SPD discloses the potential for wear-aways, Mr. Arko was repeatedly non-

responsive. In response to whether the SPD discloses that accrual rates decrease

with age, he stated "I don't believe it directly does." Ex. 192 (Arko Depo) at

140-53, 285-92, and 321.

CIGNA's refusal to offer complete and accurate comparisons of benefits

before and after the conversion was anything but inadvertent: CIGNA

specifically instructed Mercer "not to compare the old to the new plans" in

preparing the Newsletter and Information Kit.  ¶¶237-40. In responding to

individual requests for information, CIGNA followed the same policy: "We

continue to focus on NOT providing employees before and after samples of the

Pension Plan changes." Ex. 117 at 11708. The only reservation that CIGNA ever

expressed was that it would not make "unequivocal statements about 'will not

harm' or 'big improvement.'" Ex. 58 at SuppD1581. As a result, CIGNA crafted

a few of its representations with qualifiers such as that "Generally speaking" the

benefits under cash balance would be "larger" or "comparable."

Even if there was no disclosure duty to disclose the reductions before,

once CIGNA engaged on the subject of the impact of the changes, it had a

fiduciary duty to speak truthfully. Meinhardt v. Unisys, 74 F.3d 420, 442-43 (3d

Cir. 1996) ("when a fiduciary speaks, it must speak truthfully...and when it

communicates with plan participants and beneficiaries it must convey complete

and accurate information that is material to their circumstance"). But instead of

fulfilling this duty, CIGNA offered its employees a long series of assurances,

such as that their previous benefits were "fully protected" and that "Each dollar's

worth of credits is a dollar of retirement benefits payable to you." ¶¶155-78.

F.    **CIGNA Avoided "Any Negative Reaction from Employees" by Withholding Disclosure of the Reductions; This Deprived Employees of Information Needed to Make "Well-Informed Employment and Retirement Decisions" and Constitutes "Likely Prejudice."**

Settling a longstanding question about the proof required to obtain relief

for an inadequate SMM or SPD, Burke v. Kodak, supra, ruled that plan

participants can prevail in cases challenging flawed SPDs without proving

individual detrimental reliance. 336 F.3d at 112-14. Instead the Second Circuit

requires a showing of "likely prejudice," meaning that the participant "was likely

to have been harmed as a result of the deficient SPD:"

> "This "likely prejudice" standard avoids the use of harsh common law
> principles to defeat employees' claims based on a federal law designed for
> their protection. The result is a presumption of prejudice in favor of the
> plan participant after an initial showing that he was likely to have been

harmed."

336 F.3d at 113-14.

In Frommert, supra, the Second Circuit held that the "likely prejudice" standard was satisfied where "[t]he prolonged absence of any mention of the phantom account from Plan documents, most notably SPDs, likely, and quite reasonably, led plan participants to believe that it was not a component of the Plan. Rather, rehired employees likely believed that their past distributions would only be factored into their benefit calculations by taking into account the amounts that they had actually received." 433 F.3d at 267. As a result, "they were deprived of the opportunity to take timely action in response to the purported 'amendment'" such as by "seeking injunctive relief, altering retirement investment strategies, or perhaps considering other employment." Id. at 266.

After the remand in Layaou, the district court found that the "conspicuous absence" of any "explanation" led Layaou to believe that "his monthly benefit would be considerably higher then it turned out to be. That mistaken belief would likely have affected plaintiff's financial planning for his upcoming retirement."330 F.Supp.2d 297, 304 (W.D.N.Y. 2004).

In Richards, Judge Hall relied on Frommert in holding that likely prejudice

may be established when the disclosures lead participant to believe that

reductions such as decreased rates of benefit accrual and wear-away periods with

no additional benefits "were not components" of the amendments. 2006 WL

980565 at *17; see also 2006 WL 860674, *4 (ruling on class certification) (the

"defects in disclosure themselves are significant enough to establish a

presumption of likely prejudice, common to all members of the class").[17]

Here, the record clearly shows that CIGNA deliberately withheld truthful

comparative information with the objectives to "dispel any perception of a take-

away" and to "avoid[] any significant negative reaction from employees." ¶¶253

and 264-65. CIGNA was concerned with the possibility of newspaper articles

about the reductions such as the *Wall Street Journal*'s September 1997 article on

the benefit reductions in Deloitte & Touche's cash balance conversion, which

resulted in Deloitte & Touche having to roll back the changes. ¶¶254-60. To

"avoid any significant negative reaction from employees," CIGNA did not

---

[17] See also <u>Antolik v. Saks</u>, 2005 WL 233320, *11 (S.D. Iowa 2005) (SPD "induced the Plaintiffs not to act" and a letter "told them not to worry" and "the plaintiffs responded accordingly"; presenting evidence of specific jobs passed up "would create an almost insurmountable burden since the SPD called for Plaintiffs to stay loyal"). Accord <u>Ream v. Frey</u>, 107 F.3d 147, 156 (3d Cir. 1997) (while "it is impossible to know exactly what steps the beneficiaries could or would have taken on the basis of that information, at a minimum they would have been able to negotiate with Frey for installation of a procedure to secure the funds. Failing that, we believe they could have sought injunctive relief under ERISA §502(a)(3)(B) on behalf of the plan to the same end").

simply omit honest comparisons; instead, it made repeated affirmative representations about "enhancements" and "larger" benefits.

"Likely prejudice" can be presumed from CIGNA's misleading disclosures, its instructions to Mercer and its own staff to withhold comparative information, and from its objective of avoiding any significant employee reaction. The likely prejudice is unmistakable here because CIGNA was far from silent: Its disclosures offered participants repeated assurances that the changes were not negative. ¶¶163, 165-66 and 176. As in Frommert, this led participants to believe that wear-aways and reductions in future benefits were "not a component of the plan."

The "likely prejudice" was that employees lost the opportunity to register their dissatisfaction and bargain with CIGNA on a timely basis, formally and informally, to roll back the changes or else increase their direct or indirect compensation. The employees instead had to make "employment and retirement decisions" without realizing that the annual cash balance benefit credits were not even actually payable and that CIGNA was very substantially reducing their benefits.

The testimony of the individual witnesses illustrates how with full disclosures, employees could have asked for additional compensation, sought

other employment, adjusted 401k contributions and made different retirement plans. ¶¶270-78.

CIGNA has indicated that it may seek to "grind" these proceedings "to a halt" by requiring each member of the class to individually prove "likely prejudice" and taking 25,000 depositions to test that proof. See 6/10/02 Opp. Br. at 12. The statutory standard is, however, what the "average plan participant" would understand, not what each individual class member understood and speculates that he or she "would have" done with adequate disclosures. ERISA §102(a). "Likely prejudice" should therefore be capable of demonstration on a classwide basis based on objective and circumstantial evidence. In Frommert, the Second Circuit assessed what "over 100 participants" could "likely" have done without examining individual-by-individual testimony. In Klay v. Humana, 382 F.3d 1241, 1260 (11th Cir. 2004), a plaintiff class in a RICO case was comprised of over 600,000 doctors. They alleged that "explanation of benefit" forms concealed that they were being underpaid by HMO's and induced them to accept reduced payments. The Eleventh Circuit ruled that circumstantial evidence can be used to prove reliance on the explanations common to the class because "it is ridiculous to expect 600,000 doctors across the nation to repeatedly prove these

complicated and overwhelming facts."[18]

Even when disclosure violations and "likely prejudice" are uncontested, Burke v. Kodak permits an employer to rebut by establishing "harmless error." This is usually done by showing that a participant "independently knew" about the matter. See Wilkins Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 585  (2d Cir. 2006);  Weinreb v. Hospital for Joint Diseases, 404 F.3d 167, 172 (2d Cir. 2005) (defendant can rebut "by showing that plaintiff was aware of the requirement"); Antolik v. Saks, supra, 2005 WL 2333320 *12 (Saks "failed to show evidence that the Class Plaintiffs did have knowledge of the specialized definition of "change of control" or that the misinformation was harmless error").

In this case, CIGNA has made no effort to show "harmless error." Because there has still been no general notice of the reductions, the only groups of employees who otherwise know about the extent of the reductions are the executives, actuaries and other key employees who were parties to the internal communications. CIGNA was given permission to ask 8 absent class members and 26 "key" employees for any documents that would show "harmless error"

---

[18] Accord  Desert Palace v. Costa, 539 U.S. 90, 100 (2003) ("absent some affirmative directive in a statute," a plaintiff cannot be "restricted" in the presentation of evidence to non-circumstantial evidence).

but CIGNA declined to do so. ¶279.

Even if the reductions were disclosed to employees generally as of a certain date (for example, as of September 2006), a defense of "harmless error" would not arise because CIGNA already achieved its objective: Avoiding the "negative employee reaction" that "timely" disclosure of the reductions would have caused. See <u>Frommert</u>, 433 F.3d at 268; <u>Antolik</u>, supra, 2005 WL 233320, *11 (Saks avoided the "roar" that disclosures would have caused).

### G. The Amendment to CIGNA's "Rehire Rule" Was Not Disclosed in a Summary of Material Modification or in the Purported Section 204(h) Notice.

In <u>Depenbrock v. CIGNA</u>, the Third Circuit held that CIGNA did not adopt an amendment to its "rehire rule" until December 21, 1998. Prior to December 21, 1998, CIGNA's "rehire rule" required it to place rehired employees back under the benefit formula applicable to other employees with the same hire date. A December 21, 1998 amendment changed this rule from one that provided for a "resumption of participation upon re-employment" to one that provided for "no resumption of participation." ¶¶280-81. The effect of the amendment was to provide that all rehired employees would be placed under the cash balance plan where they "see no benefit improvement for several years." ¶283 and Ex. 140 at 4649.

57

The Third Circuit's 2004 decision on the adoption date of CIGNA's amendment to that rule required CIGNA to place Mr. Depenbrock back under the old formula, but it did not affect the employees, such as Gisela Broderick, Patricia Flannery and Steven Law, who were rehired by CIGNA after December 21, 1998.[19] These employees accepted job offers unaware that they were being moved to the cash balance plan and unaware that this meant not only much lower pension benefits but that they would "see no benefit improvement for a period of years." ¶¶283 and 287-89.

There is no dispute that the December 21, 1998 amendment to CIGNA's "Rehire Rule" was not disclosed in the November 1997 Newsletter (the purported ERISA §204(h) Notice) or in the December 1997 Information Kit (CIGNA's Summary of Material Modification), which were  distributed to participants who were moved to the cash balance plan.

It is also undisputed that neither of these communications was distributed to vested separated employees. ¶¶284-89. CIGNA maintains that it was not required to give vested separated employees any notice of the change in the rehire rule. ¶287. However, the Treasury regulations on ERISA §204(h) provide that whether notice is required "is determined based on all relevant facts and

---

[19] Ms. Amara was rehired before December 21, 1998, and was thus affected by the <u>Depenbrock</u> decision.

circumstances at the time the amendment is adopted." 26 C.F.R. 1.411(d)-6,

Q&A-9. The regulations on summaries of material modification are even more

specific: They provide that SMMs need not be distributed if the amendment "in

no way affects ... vested separated participant's rights under the plan." "[A]

modification in benefits under the plan to which such ... vested separated

participant ... had not at any time been entitled (and would not in the future be

entitled) would not affect his or her rights and hence need not be furnished." 29

C.F.R. 2520.104b-4(c).

Here, it was neither unusual nor unexpected for former CIGNA employees

to be rehired. "CIGNA rehired 2,600 former employees in 1998 and 1999" alone.

CIGNA also stated that "Recent patterns in rehires have shown that on average

we are now rehiring more employees who are closer to early retirement age than

ever before." ¶292. The incidence of rehires was thus significant enough to

warrant the adoption of a specific amendment changing their status upon a

rehire. The effect of that amendment was clearly very negative because it caused

employees like Gisela Broderick to "see no benefit improvement" for the rest of

their careers.

In <u>Frommert</u>, the Second Circuit addressed the application of the Section

204(h) notice requirements to another "rehire" rule under which a phantom offset

based on prior distributions was applied to the future benefits of rehired employees. 433 F.3d at 257 and 262-63. The Second Circuit held that the amendment "imposes a condition on the payment of benefits that leads just as surely to a decrease." Id. at 268 (citing Central Laborers, 541 U.S. at 744-45).

The "likely prejudice" to rehired CIGNA employees from the failure to disclose the change in advance is confirmed by the testimony of Gisela Broderick, Patricia Flannery and Steven Law that they might not have returned to CIGNA, or could have asked for additional compensation, if they had known their retirement benefits were not going to increase. ¶¶270-72. Likely prejudice from the non-disclosure is also shown by CIGNA's admission that when rehires began to learn that they would be moved to cash balance there were "Problems with rehiring those who would lose substantial amounts." ¶¶296-97.

## VI.    CIGNA Has Not Protected "Minimum Benefits" or Notified Participants When an Optional Form of Benefit Has a Greater "Relative Value."

ERISA §204(g) provides that accrued benefits cannot be reduced by a plan amendment. This is known as a "minimum benefits" or "anti-cutback" rule. ERISA §§203(e) and 205(g) and the related Treasury regulations also provide that any distribution of benefits other than in annuity form must be based on the "consent" of both the participant and his or her spouse, provided after they have

received an explanation of their options.

A.     **Minimum Benefits Were Not Protected and the Necessary Data for Over 9,400 Class Members Was Not Even Loaded into CIGNA's DBRK System.**

At the back of its October 1998 and September 1999 SPDs, CIGNA promised under the heading "Minimum Benefits Rule" that employees would be notified when they request a distribution if their "final" cash balance benefits were "less" than their **"old plan** benefits on December 31, 1997." ¶300 (quoting the SPDs, emph. in orig.).

In practice, CIGNA <u>never</u> notified any participants when the minimum benefits rule applied to them, much less explained how their cash balance benefits could be "less" than their old plan benefits on December 31, 1997. ¶¶301-6, 309. CIGNA neglected to tell named Plaintiff Janice Amara about her minimum benefit on two occasions: in February 2001 when she asked for a benefit estimate and in December 2003 when she went to commence benefits. ¶310.

Mr. Poulin, the Class' actuarial expert, examined the written material that CIGNA distributes when participants choose among benefit options and found no disclosures. Observing that the protected minimum benefit under the old plan included a valuable early retirement subsidy, a free 30% survivor's benefit, and

no "pre-retirement mortality" discount, Poulin found that CIGNA failed to notify participants of minimum benefits. Ex. 3 (Poulin Rpt) ¶37-38. Professor Stratman likewise found that the SPD failed to disclose that the cash payment options could be less valuable than the minimum annuity options. Ex. 8 (Stratman Rpt) at 12.

Discovery revealed still another flaw. The "minimum benefits" data was not even loaded into CIGNA's recordkeeping system for over 9,400 members of the class. ¶312-17. After class counsel discovered that the data was missing, CIGNA and Prudential looked into the matter and could find no explanation for its absence. No audit or system checks were used to ensure that calculations were performed with this data. ¶318.[20]

CIGNA's promise in the SPDs to notify participants of "minimum benefits" and its failure to even maintain the minimum benefits data in its administrative system resulted in "likely prejudice" for the class members whose minimum benefits were more valuable than their other options. In Rothwell v. Chenango County, 2005 WL 2276023, *6-7 (N.D.N.Y. 2005), the district court found that "Rothwell was prejudiced by ARC's failure to educate her in plain

---

[20] See 2A Scott & Fratcher, Law of Trusts, §172 at 452 and 454 (4th ed. 1987) ("if the trustee fails to keep proper accounts, all doubts will be resolved against him").

English concerning her retirement and lump sum pension distribution options":

"Rothwell received no ... information that conveyed critical and precise

information concerning valuation, cut-off and distribution dates. Had she

understood those concepts, she could have orchestrated her termination to

minimize 2001 market losses."

Here, CIGNA failed to notify participants when cash balance benefits were

less than their statutorily-protected "minimum benefits."  This deprived

participants of the opportunity to take steps to protect themselves, namely, by

electing the more valuable benefit option or deferring commencement of benefits

until the minimum benefits became available to them at age 55.

In addition, CIGNA failed to <u>ever</u> protect the "Free 30%" survivor's

benefit that had been offered under the prior plan to participants who were

employed before 1989. In April 2006, CIGNA finally admitted that this valuable

benefit had simply been eliminated, even though the Plan document for the cash

balance plan expressly provides that it is protected.  ¶¶336-47.

ERISA §204(g)'s anti-cutback rule was clearly violated by (1) CIGNA's

failure to notify participants of their minimum benefits, (2) its failure to even

maintain the data necessary to protect minimum benefits, and (3) its failure to

protect the "Free30%" survivor's benefits.

**B.     Participants and Spouses Have Not Been Provided Information About the "Relative Value" of Actuarially Unequal Benefit Options.**

To implement ERISA §§203(e) and 205(g) and protect retirement subsidies, Treas. Reg. 1.401(a)-20, Q&A 36, specifically requires CIGNA to give participants and their spouses "sufficient" information "to explain the relative value of the optional forms of benefit available under the plan." These regulations are "integral part" of Congress' "strategy" as expressed in the 1984 Retirement Equity Act of protecting "retirement subsidies." Costantino v. TRW, 13 F.3d 969, 979-80 (6th Cir. 1994). The basic premise is explained by Professor Langbein: "Beneficiary consent is ineffective, if, when consenting, the beneficiary 'did not know of his rights and of the material facts which the trustee knew or should have known and which the trustee did not reasonably believe that the beneficiary knew.'" "Questioning the Trust Law Duty of Loyalty," 114 Yale L.J. 929, 964 (quoting Res. (2d) of Trusts §216(2)(b)). When participants or beneficiaries elect a benefit option with a lower value, they are, "in short, being invited to sell their pension entitlement back to the company cheap." Berger v. Xerox, supra, 338 F.3d at 762.[21]

---

[21] The Second Circuit's concern with inadequate disclosures concerning benefit options antedates ERISA. See Gediman v. Anheuser-Busch, 299 F.2d 537, 545 (2d Cir. 1962) (Friendly) (finding breach of duty where explanation that a benefit "'Would not be as much as' [was] not an apt description of the

The Treasury regulations adopted to implement the informed consent requirement provide that participants must be "furnished . . . sufficient additional information to explain the relative value of the optional forms of benefit available under the plan (e.g., the extent to which optional forms are subsidized relative to the normal form of benefit)." 26 C.F.R. 1.401(a)-20, Q&A 36 (emph. added). "No consent is valid" unless the participant has received an "explanation of the relative values" of the optional benefit forms. 26 C.F.R. 1.411(a)-11(c)(2)(i) and 1.417(e)-1(b)(2)(i).

In a September 1997 memorandum, Mercer advised CIGNA that "any Tier 1 employee electing a lump sum would forfeit the value of the early retirement subsidy." ¶323 . This is precisely what happened with class member Lillian Jones. With no disclosure from CIGNA about the relative value of her retirement options, Ms. Jones elected a lump sum and thereby forfeited an early retirement subsidy which was worth approximately $80,000 more than the lump sum. Ex. 191 and Ex. 7 (Poulin Indiv Calcs) ¶7. As its Rule 30(b)(6) witness ultimately admitted in April 2006, CIGNA has not given participants or their spouses the information on relative values required to make informed choices. ¶¶334-35.

The Treasury regulations also require disclosure of relative values when a

---

relationship of $ 32,780.44 to $ 79,690"; it does "not convey to the ordinary unlearned pensioner that on this account it would be only 42% as much").

benefit with a higher value is available if a participant defers the commencement of benefits after separating from service. For example, class member Douglas Robinson elected a lump sum benefit at age 54 and 3 months when an annuity benefit worth <u>twice</u> as much was available to him beginning at age 55. ¶303-4. The Treasury regulations provide that optional forms of benefit include an annuity option with a different commencement date. 26 C.F.R. 1.411(d)-4, Q&A-1(b)(1); see also 1.411(d)-3(g)(6)(ii)(A), and 1.401(a)(4)-4(e)(1). Thus, Mr. Robinson should have both been notified about his minimum benefits and should have had an explanation of the relative value of that option.

CIGNA offers no defense for its failure to inform participants about the "relative value" of their benefit options, i.e. the differences in value between taking the minimum annuity benefits or accepting cash payouts. The actuarial expert's only attempt at a defense was to maintain that (1) CIGNA was not alone in ignoring the "relative value" regulation pending more specific guidance, and (2) that he believes disclosure can, in some instances, be "misleading" to participants who have health conditions like cancer that make a lump sum more valuable to them than under a standard financial valuation. ¶350.[22]

---

[22] He did not explain why the plan could not disclose the relative value and then offer a caveat that individual circumstances may differ.

**VII.  CIGNA Continues to Neglect Implementation of the Third Circuit's
2004 <u>Depenbrock v. CIGNA</u> Decision for More Than 180 Members of
the <u>Amara</u> Class.**

The retirement benefits of those class members whose benefits have been

recalculated under the <u>Depenbrock v. CIGNA</u> decision have nearly doubled

when they were placed back into the "much higher" traditional defined benefit

formula. ¶121-24. However, almost two years after the Third Circuit issued its

mandate, CIGNA has still not implemented the <u>Depenbrock</u> decision for the 194

members of this class whom that decision affects. To date, less than 15

recalculations have been produced.

Even in the instances where the recalculations have been performed,

CIGNA has presented participants with the "option" to stay under the cash

balance formula, without disclosing the "relative value" of the option, and asked

participants to make an affirmative and irrevocable election. ¶359.

In May 2005 (dkt # 110), this Court requested memoranda on the impact

of the <u>Depenbrock</u> decision. CIGNA responded that it was "continuing to wrestle

with the impact" of the decision. Br. at 4 (dkt. #111).  Class counsel said then

that they reserved the right to enforce the <u>Depenbrock</u> decision if the decision

was not completely implemented. Because CIGNA has continued not to

implement the <u>Depenbrock</u> decision for the class members who it affects,

counsel request that the Court issue an order specifically enforcing the decision.

**Conclusion**

If CIGNA were to be given "latitude in defining accrued benefits" for purposes of ERISA's statutory tests, ERISA's anti-backloading rules, its prohibition on age discrimination in the rate of benefit accruals, and its anti-cutback protection will not serve their intended purposes. If CIGNA is allowed to affirmatively mislead participants that their benefits were either "larger" or "comparable" under cash balance and avoid disclosures of the substantial reductions, participants will never possess the information needed to make "well-informed employment and retirement decisions" and ERISA's disclosure rules will amount to a hollow formality.

Dated: June 6, 2006

Respectfully submitted,

Stephen R. Bruce Ct23534
Allison Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

s/ Thomas G. Moukawsher
Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106

68

(860) 278-7000

Attorneys for Plaintiff Class