UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

JANICE C. AMARA, GISELA R.
BRODERICK, and ANNETTE S.
GLANZ, individually and on behalf of
all others similarly situated,

Plaintiffs,

vs.                                      Civil No. 3:01-CV-2361 (MRK)

CIGNA CORP. and CIGNA PENSION
PLAN,

Defendants.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

Stephen R. Bruce
Suite 210
805 15th St., NW
Washington, DC 20005
(202) 371-8013

Thomas Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Plaintiff Class

## <u>Table of Contents</u>

I.    Characteristics of Defined Benefit, Defined Contribution and Cash
      Balance Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   CIGNA's Cash Balance Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  CIGNA's Cash Balance Conversion Produced Years
      with No Further Benefit Accruals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      A.    The Plan Years With No Additional Benefits Are Followed by
            Later Plan Years in Which the Rate of Accrual Is Over 33%
            Higher  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      B.    CIGNA Concedes that There Are Periods in Which "Employees
            Accrue No Additional Benefits."  . . . . . . . . . . . . . . . . . . . . . . . . . 20
      C.    The Cash Balance Accruals Were Conditioned on Participants
            Giving Up Statutory Rights to Previously-Earned Annuities;
            CIGNA Does Not Allow Employees to Receive Both Their
            Previously-Earned Accrued Benefits and the Future Cash
            Balance Accruals.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
      D.    CIGNA Admits that It Does Not Provide the "Minimum Benefit
            under Part B Plus [the Plaintiffs'] Benefit and Interest Credits on
            Top of That". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV.   CIGNA's Cash Balance Formula Produces Rates of Benefit Accrual
      that Decrease With Age. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
      A.    CIGNA Recognized Internally that "Older" Employees Lose
            Benefits with Cash Balance and that the Rates of Accrual
            Decline with Age. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      B.    CIGNA Was Advised of its "Vulnerability" to the Age
            Discrimination Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V.    Cash Balance Conversions "Mask" Benefit Reductions Because
      Participants Cannot Compare the Cash Balance Accounts to Annuities
      Without Converting the Accounts to Annuity Form . . . . . . . . . . . . . . . 37
      A.    CIGNA's Cash Balance Conversion Substantially Reduced
            Future Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      B.    CIGNA Recognized Internally that the Cash Balance Conversion
            Reduced Future Benefits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

i

C.    CIGNA's SPD, SMM and Purported Section 204(h) Notice Do
      Not Disclose the Reductions in Future Benefits. . . . . . . . . . . . . 49
      1.    Professor Stratman found no disclosures of reductions or
            other disadvantages in CIGNA's communications with its
            employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      2.    CIGNA offered no expert report to rebut Professor
            Stratman's analysis.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
D.    CIGNA's 30(b)(6) Witness Agrees that the SPD, SMM and
      Purported Section 204(h) Notice Do Not Disclose Benefit
      Reductions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
E.    Although It Has Made Disclosures of Other Potential Reductions,
      CIGNA Did Not Disclose these Reductions And Contends That It
      Did Not Have to . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
F.    CIGNA's Inadequate Disclosures Affected the Ability of Its
      Employees to Make Well-Informed Employment and Retirement
      Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      1.    CIGNA repeatedly recognized that employees have to plan
            for retirement with the information that CIGNA provides.. 68
      2.    Employees requested additional information in managers
            meetings, focus groups and individual communications. . . 69
      3.    CIGNA had a policy of "NOT" providing benefit
            comparisons or information about "negative impacts"
            from the cash balance changes. . . . . . . . . . . . . . . . . . . . . . 73
      4.    CIGNA's objective was to "quickly dispel any perceptions
            of take-aways" and avoid "significant negative reaction
            from employees" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
      5.    The individual testimony offers additional circumstantial
            evidence that employees were "likely to have been harmed
            as a result" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
G.    The Amendment to CIGNA's "Rehire Rule" Was Not Disclosed
      in the Purported Section 204(h) Notice or a Summary of Material
      Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

VI.  CIGNA Did Not Protect "Minimum Benefits" or Notify Participants
     of Those Benefits as the SPD Promised; Participants Were Also Not
     Notified When Optional Benefit Forms Had Greater "Relative Values"  95
     A.    CIGNA Did Not Notify Participants of Minimum Benefit
           Entitlements and Did Not "Populate" the Fields for Minimum

Benefits for Over 9,400 Members of the Class . . . . . . . . . . . . . . 95

B.   CIGNA Has Not Notified Participants When the Annuity Form
of Benefit Has a Higher "Relative Value" . . . . . . . . . . . . . . . . . 101

C.   CIGNA Also Failed to Protect the "Free 30%" Survivor's
Benefits as the Plan Document and ERISA Require. . . . . . . . . 105

D.   CIGNA's Actuarial Expert Admits that the Plan Document
Requires Minimum Benefits to Be Protected and that
CIGNA's Benefit Notices Do Not Explain the "Relative Value"
of Benefit Options. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

VII.   CIGNA Has Still Not Conformed with the Third Circuit's *Depenbrock v.
CIGNA* Decision, Which Requires It to Place the Members of the *Amara*
Class Who Were Rehired Before December 21, 1998 Back Under the
Part A Benefit Formula. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

## I.    Characteristics of Defined Benefit, Defined Contribution and Cash Balance Plans.

1.    Defined benefit plans typically offer to pay employees an annuity based on a percentage of the employee's highest salary multiplied by years of service. Edward Zelinsky, *The Cash Balance Controversy*, 19 VA. TAX REV. 683, 687 (2000). As an employee draws closer to retirement age and enjoys a higher salary, the plan's benefits increase. Id. at 688.

2.    Defined contribution plans do not offer fixed assurances about the benefits that employees will receive at retirement. Employees bear the risk of what happens to the money after the funds are contributed. Id. at 691-2. But employees have an unconditional right to the money allocated to their separate individual accounts, plus the upside risk of favorable investment returns.

3.    The employer's contributions to a defined contribution plan are typically level (e.g., 10% of each year's salary). Zelinsky, supra, at 692.

4.    Cash balance plans "mimic" defined contribution plans by referring to individual accounts and allocations, but the accounts and allocations are "hypothetical" rather than actual: "the employee has no actual account, the employer makes no contributions to an employee account, and ... there is no account to which interest might be added." Berger v. Xerox, 338 F.3d 755, 758 (7th Cir. 2003).

1

5.     In a cash balance conversion, a hypothetical opening account is established. Many companies have established the opening account by calculating the present value of the participant's normal retirement benefit, without including any subsidized early retirement benefits to which the participant may be eligible. A variety of other methods have been used, including assigning a value to all of the employee's previously-earned benefits or setting the opening account at zero with the previous benefits treated as a dual benefit. Ex. 12 at P 2094; Ex. 13 at MER 01798; Ex. 14 at 20.

6.     The employee's hypothetical account typically receives a benefit credit (also called a pay credit) equal to a percentage of an employee's salary. Hypothetical interest credits are also assigned to the account at a specified rate, e.g., 4.5%, or a variable rate under a specified standard, e.g., the interest crediting rate tracks rates for short- or mid-term Treasury bills. Zelinsky, supra, at 693-4. The hypothetical interest credits are not related to the employer's return on investments, as required for defined contribution plans.

7.     In what was dubbed the "first generation," cash balance formulas offered all participants a flat percentage pay credit, such as 5%, along with interest credits, which resulted in "accrual patterns that strongly favored short-service employees." Ex. 15 at 3.

2

8.    The "second generation" of cash balance designs offered graded pay credits, usually based on age or a combination of age and service. Ex. 16 (*Benefits Canada*, Aug. 1996, referring to this as a "life cycle" plan). According to a 2004 survey by Mellon, 74% of cash balance formulas have graded pay credits. Ex. 17 at 12; see also Ex. 18 (U.S. Bureau of Labor Statistics Compensation Survey for 2002-2003).

9.    The employee's cash balance "account" is the cumulative total of any opening account balance and the hypothetical pay and interest credits. The account may or may not be fully-funded. See, e.g., Burstein v. Allegheny Fdn. Ret. Account Plan, 334 F.3d 365 (3d Cir. 2003) (cash balance plan terminated without funds to pay the amounts credited to the accounts).

10.    The hypothetical cash balance accounts do not "inherently" replicate the traditional defined benefit promise of a definite year-by-year increment to a retirement annuity. In July 1996, the William Mercer consulting company ("Mercer"), which advised CIGNA about its cash balance conversion, prepared a discussion of legal issues for cash balance plans for its clients. Mercer's discussion recognized that ERISA's vesting, accrual and benefit option rules "all key off" the deferred annuity at normal retirement age. But Mercer observed that cash balance designs do not "inherently" offer a deferred annuity commencing at

3

normal retirement age:

> "The plan design operates quite well merely defining the account balance
> and the method for determining an immediate annuity at any point in
> time." "Many employers continue to simply treat the plan like a lump-sum
> account plan without regard to making a deferred annuity calculation. It's
> not clear whether the IRS will approve this."

Ex. 19 at EPTO 4166-67.

11.   In a March 2006 "Issue Brief," the Employee Benefit Research

Institute ("EBRI") analyzed the 401k contributions that would have to be made

to make up for lost benefit accruals if final-average pay plans or cash balance

plans were frozen. EBRI found that the median contribution rate for a final-

average pay plan is from 8 to 13.5% of pay, compared with about 3 to 4.6% of

pay for a cash balance plan. Ex. 20 at 9.

12.   In November 2005, the GAO issued a report finding that older

workers have borne the brunt of reductions in benefits from cash balance

conversions. The report found that the median benefit decrease for an older

worker was $238 per month compared with $59 per month for a younger worker

(a difference of 300%).  *Private Pensions: Information on Cash Balance Pension

Plans* (GAO-06-42), available at http://www.gao.gov/new.items/d0642.pdf.

13.   In a November 1999 Employment Law Seminar, the Morgan Lewis

& Bockius law firm which represents CIGNA recognized that plan sponsors

4

have not "advertised" cash balance plans to participants as "lesser

replacements":

> "Certainly one reason that cash balance plans are receiving so much
> negative attention is that plan sponsors have not advertised them to
> participants as lesser replacements for previously generous pensions.
> Yet, for some participants, the cash balance accrual formula inevitably
> generates smaller accruals in future years than would have accrued under
> their original plan."

"Cash Balance Plans," written for Morgan Lewis & Bockius Labor and

Employment Law Seminar, November 16, 1999, attached as Ex. 22 at 5-2.

## II.    CIGNA's Cash Balance Conversion.

14.    Before 1998, CIGNA plan participants enjoyed a traditional defined

benefit formula consisting of an annuity calculated at 1.67% or 2% of an average

of highest pay times years of credited service. The two-tiered benefit structure

(1.67% or 2%) depended on the employee's date of hire: Individuals hired after

December 31, 1988 were called "New Formula Participants" and placed under

the lower 1.67% formula. Ex. 2 at 11 and 34.

15.    CIGNA's traditional defined benefit plan "provide[d] a fixed

monthly pension benefit for the employee's lifetime based on ... years of service

with a participating CIGNA company and earnings closest to the date an

employee leaves CIGNA.... So, since current wages generally reflect the retiree's

current standard of living, retirement income levels can more closely reflect

current economic needs." Ex. 23 (Signature Benefits Newsletter for EQUICOR Employees).

16.     The Tier 1 (2%) formula offered "subsidized" early retirement benefits under which benefits for employees eligible for early retirement were only reduced to 76 or 79% for retirement at age 55. The early retirement benefits included a valuable Social Security supplement payable between ages 55 and 65. Ex. 2 at 36-37. A "Free 30%" survivor's benefit, also called a Preserved Spouse's Benefit, was also provided. Id. at 56-57, 67-73.

17.     CIGNA's Tier 2 (1.67%) formula offered early retirement benefits with longer service requirements and larger reductions for early retirement, with a Social Security supplement payable between ages 55 and 62. Ex. 2 at 36-39. It did not offer a Free 30% survivor's benefit.

18.     In 1998, CIGNA converted its traditional defined benefit pension plan (sometimes called "Part A") to a cash balance pension plan (sometimes called "Part B"). See, e.g., Ex. 8 (Stratman Rpt. Ex. 2) at AMARA-00441.

19.     Participants under the Tier 1 (2%) formula with 45 or more age and service points were grand-fathered and therefore remained under CIGNA's traditional defined benefit formula. The other participants were moved to the cash balance formula. Ex. 1 at 6 and Ex. 24 at 6-8.

20.    Section 1.55 of the Plan document specifically provides that the cash balance account of a participant "is a bookkeeping account ...; it is not an actual account, and no Plan assets are allocated to it." Ex. 1 at 14. The Plan also provides that CIGNA does not guarantee "that the assets of this Plan will be sufficient to provide any or all of the benefits payable under this Plan." Id. at 74.

21.    CIGNA's Annual Report for 2005 shows that its Pension Plan is less than 75% funded. Ex. 25 at 65.

22.    In August 1997, the Mercer company advised CIGNA that "There are no legal requirements whatsoever in terms of how you determine an employee's opening account balance":

> "As you know, the typical method is to set it equal to the present value of the accrued benefit. However, in theory, a company could take other plausible approaches such as a retroactive application of the cash balance formula or a special contribution applied to past service or really anything else. It could even be zero if you wanted."

Ex. 13 at MER 01798.

23.    CIGNA decided to establish opening accounts, which it called "initial retirement accounts," by calculating the participant's current annual benefits at normal retirement age, computing an actuarial value for that benefit based on a 6.05% interest rate and using the "GATT" mortality table. See Ex. 1 at 9-10; Ex. 26 at DO3925. A lower 5.05% interest rate was applied to the

accrued benefit at age 62 for participants who were active employees on January 1, 1998 and whose age and service were 55 points or greater. Id.

24.     The value of early retirement benefits and other favorable features under the prior plan were not included in the opening balances. Ex. 3 (Poulin Rpt) ¶25.

25.     The GATT mortality table was applied in a manner that took a discount for "pre-retirement mortality," i.e., the likelihood that a participant would die between his or her current age and age 65. Ex. 3 (Poulin Rpt) ¶32 and Ex. 4 (Poulin Suppl  Rpt) ¶15; see also Ex. 10 (Sher Rpt) at 8 (mortality was "assumed at all ages"); Ex. 27 (Answer to Int. No. 4 in the First Set of Interrogatories).

26.     CIGNA's hypothetical pay credits followed a "second generation" design by using a graded schedule based on age and service. Specifically, CIGNA's cash balance formula used the following schedule to calculate benefit credits (also called "pay credits"):

| POINTS | BENEFIT CREDITS | |
|---|---|---|
| Age + Service | On Earnings Below Integration Level | On Earnings Above Integration Level[1] |
| Under 35 | 3% | 4.5% |

[1] CIGNA defined the "Integration Level" as one-half of the Social Security taxable wage limit in each year. Ex. 1 at 10-11.

|            |     |      |
|------------|-----|------|
| 35 to 44   | 4%  | 5.5% |
| 45 to 54   | 5%  | 6.5% |
| 55 to 64   | 6%  | 7.5% |
| 65 or more | 7%  | 8.5% |

Ex. 1 at 22.

27.     Interest credits would be added to the benefit credits by using the yield on 5-year Treasury bills plus 25 basis points as an index, with a Floor Interest Rate of 4.5%. Ex. 1 at 24.

28.     CIGNA expected to earn more on the plan's actual investments than the interest crediting rates: "A cash balance approach allows us to ... reduce overall cost by earning more on our investments than we pay in the declared rate." Ex. 28 at D12287 (G.T. Meyn to D.M. Levinson, 1/6/1997).

29.     Like the cash balance plans to which Mercer's July 1996 discussion refers, CIGNA's cash balance formula offers to pay the accumulated benefit credits and interest credits, but it does not project a definite level of benefits at retirement. With one exception, Section 1.1 of CIGNA's Plan document defines the "accrued benefit" as the balance of a participant's Retirement Account on the date of determination. Ex. 1 at 1. The indefinite level of future benefits makes the plan's promise of future benefits comparable to that of a variable annuity. The risk of lower future interest rates is effectively placed on the participant. Ex.

9

3 (Poulin Rpt) at ¶35.

30.    When a participant separates from service before age 55, CIGNA only offers the participant a lump sum distribution or an "immediate" annuity based on the participant's current age, even if the participant is young, e.g., age 30. Ex. 29 (Answer to Int. No. 4 is Second Set). CIGNA assumes that 100% of participants select the lump sum. ¶328 below. As a result, "the benefit is effectively a lump sum delivered at termination." Ex. 30.

31.    By converting to the cash balance formula, CIGNA expected to reduce both the ultimate benefits paid and its pension liability. Gerald Meyn, CIGNA's Vice President for Employee Benefits, observed in January 1997 that "A cash balance approach allows us to provide the competitive benefit level of a defined contribution plan but reduce overall cost by earning more on our investments than we pay in the declared rate." Ex. 28 at D12287. In June of that same year, David Durham, CIGNA's Assistant Vice President of Global Benefits, estimated "pension expense reductions of 12 to 15% over the next 20 years," even though most of the Tier 1 (2%) formula employees were being grand-fathered under the prior plan. Ex. 77. In 2002, Mr. Meyn again observed "A conversion to a cash balance plan clearly reduces the ultimate benefits paid, and, of course, lowers the net pension liability." Ex. 31 at 29113 (Gerry Meyn to Jim

10

Stewart).

## III. CIGNA's Cash Balance Conversion Produced Years with No Further Benefit Accruals.

32.     In certifying the class, Judge Squatrito found that the Plaintiff contends "that the conversion of the pension plan necessarily conditioned receipt of further benefits under the provisions of Part B upon [Ms. Amara's] acceptance of CIGNA's valuation of her accrued benefit under the prior plan.... [Under this methodology] plaintiff's annuity benefit would remain constant for a certain period of time even though she is technically accruing additional benefits under Part B." Slip Op. filed Dec. 20, 2002, at 2-3.

33.     Judge Squatrito detailed the related facts:

"Upon conversion, plaintiff's annuity benefit was no longer based upon the formula set forth in Part A, but rather was transformed into a hypothetical individual account, with a particular "balance." This "initial retirement account" was based upon the present actuarial value of the annuity benefit due plaintiff at her normal retirement age, which is sixty-five years of age, under Part A. Part B provides that when plaintiff elects to receive her benefit, she would receive the greater of the account balance, or the "minimum benefit" as that term is defined under Part B.

"[A]s a result of these calculations plaintiff experienced a period where benefits "constructively" accrued in her cash balance account. This is so because the minimum benefit payable to plaintiff was greater than her hypothetical account balance, which means that plaintiff would not begin to realize the accrual of benefits under Plan B until her hypothetical account balance exceeded the amount of the minimum benefit." Slip Op. at 3 - 4.

11

34.     The Class' actuarial expert, Claude Poulin, prepared a report showing how CIGNA's opening accounts were established below actual value, beginning with CIGNA's exclusion of valuable rights to subsidized early retirement benefits in establishing the opening balances. Ex. 3 (Poulin Rpt) ¶¶ 24-29.

35.     Mr. Poulin found that CIGNA had also taken a "pre-retirement mortality" discount when it converted their Part A benefits to cash balance, which caused participants to lose another part of the value of their previous benefits. Ex. 3 (Poulin Rpt) ¶32 and Ex. 4 (Poulin Suppl Rpt) ¶15.

36.     A discount for pre-retirement mortality is as much as 10% at age 30. Ex. 4 (Poulin Suppl. Rpt. ¶15). CIGNA offered no mechanism under which participants could recoup this mortality discount as they grew older and the risk of pre-retirement mortality shrank. Ex. 3 (Poulin Rpt) ¶32) and Ex. 4 (Poulin Suppl Rpt) ¶15.

37.     Mr. Poulin's report explains how participants lost still another part of their previous benefit accruals when interest rates fell below the 6.05% interest rate generally used to establish the opening account balance, and stayed below that level for all but one of the years from 1999 to date. Under these conditions, participants are unable to "re-purchase" the annuities that they

12

already possessed with the opening balances that CIGNA had established. Ex. 3 (Poulin Rpt) ¶34 and Ex. 4 (Poulin Suppl Rpt) ¶12-14.

38.     To illustrate, if an employee age 40 had earned a $1,000 per month annuity before 1998 and the annuity was converted to an opening account balance of approximately $27,900 with a 6% interest rate, the opening account balance converts back to an annuity of only $640 per month based on current interest rates of around 4.5%. Ex. 3 (Poulin Rpt) ¶¶33-34; Ex. 4 (Poulin Suppl Rpt) ¶¶12-14.

39.     In Ms. Amara's case, CIGNA's exclusion of the value of her early retirement benefits, its pre-retirement mortality discount and its use of a 6+% interest rate to establish the opening account balances created a "wear-away" period that made her participation in the cash balance plan's accruals illusory for more than 7 years. Ex. 32 at 28174 and 28629.

40.     Under the "Part A"/Tier 1 formula, Ms. Amara earned benefits of $1,833.65 a month starting at age 55 before the 1998 cash balance conversion. Ex. 3 (Poulin Rpt) ¶¶ 24-26.

41.     However, Amara's opening account balance under the "Part B" cash balance provisions was just $91,124.88, which converts to an age 55 annuity of only $900 per month. This is less than 50% of her Part A benefit of $1,833 per

month. Id.

42.    Under CIGNA's formula, Ms. Amara accrued no actual cash balance benefits until the $900 Part B annuity combined with years of benefit credits and interest progresses to the point where it exceeds the $1,833.65 age 55 benefit to which she was entitled before Part B was established. Id. at ¶ 30.

43.    At the approximately $7,000-8,500 per year rate at which she was earning pay credits under the cash balance formula, the difference of $93,000 would not be made up for over ten years. Ex. 4 (Poulin Suppl Rpt) ¶¶21-22.

44.    Ms. Amara testified that she only learned about the "wear-away" when she attended a going-away party for two of her colleagues in September 2000. CIGNA's chief actuary, Mark Lynch, told her at that event that "you would be sick if you knew the wear-away you are under." Ex. 181 (Amara Decl.).

45.    When Ms. Broderick separated from service in 2004 after 3½ years of participation under the cash balance formula, her retirement benefits, like Ms. Amara's, were still based on the benefits that she had earned before 1998. The cash balance formula had added nothing to those benefits. Ex. 4 (Poulin Suppl Rpt) ¶23.

46.    CIGNA's system printouts show the wear-away for Gisela

14

Broderick. They show $218,944 as the value of her minimum benefit from her service under the old plan prior to 1998 compared with $208,764 in her cash balance account when her benefits commenced. Ex. 33 at SuppD1936 and SuppD1940.

47.     Like Ms. Amara, Ms. Broderick was unaware that her benefits had not grown at all based on her employment from 2000 to 2004 until after she became a named Plaintiff in this litigation. Ex. 182 (Broderick witness statement) at 3-4.

48.     The same applied to Patricia Flannery. After nearly six years of service under the cash balance formula from October 2000 to the present, Patricia Flannery has zero net accruals because of CIGNA's wear-away. Her cash balance account at the end of 2005 only converts to an annuity benefit of $756 per month, Ex. 7 (Poulin Indiv Calcs), compared with the annuity of $813 per month ($9,762 annually) that she had already earned with her service before 1998. Ex. 156 at P 1588.

49.     For any employee whose "minimum benefit," i.e., the benefit they had earned before 1998, is greater than their cash balance account at separation, the additional accruals from the cash balance formula were zero. Ex. 4 (Poulin Suppl Rpt) ¶31.

15

50.    The Plaintiff class requested electronic data in discovery that would show how many participants should have been covered by the minimum benefits rule in each year. Ex. 34 (Request No. 4). CIGNA has not produced the requested data, despite the Plaintiffs' Motion to Compel and two Rule 30(b)(6) depositions.

51.    Even if a participant's cash balance account ultimately exceeds the value of the previously-earned benefits by the time the participant separates from service, the value of the cash balance accruals in the first few years after the conversion may still be zero. Mr. Poulin prepared a spreadsheet showing how Annette Glanz's benefits did not increase for 3 years after the cash balance conversion. Ex. 4 (Poulin Suppl Rpt) ¶25 and Ex. 6 (Poulin 1/2006 Dep. Ex. 104). Her cash balance accruals in the first three years after January 1, 1998 of over $254 per month went to "catch up" with the value of the benefits that she had already had earned for her service before 1998. Id. The lost accruals in those years are never recouped.

52.    Ms. Glanz's understanding prior to March 2006 was that her "benefits were growing under the cash balance formula." Ex. 183 (Glanz witness statement) at 3.

53.    The only group of class members who did not experience significant

16

wear-aways were those under the Tier 2 (1.67%) formula like Barbara Hogan and Stephen Curlee who had more than 55 age and service points. CIGNA used a lower 5.05% interest rate to convert their benefits to account balances which generally meant that their benefits were not subject to a significant wear-away. Mr. Poulin prepared a table illustrating how the benefits of Barbara Hogan grow. The table shows that Ms. Hogan did not experience a wear-away, but her future benefits were still substantially reduced compared with the benefits she would have earned under the Tier 2 (1.67%) formula. Ex. 4 (Poulin Suppl Rpt) ¶28 and Ex. 7 (Poulin Indiv Calcs).

54.     CIGNA could have avoided any wear-aways by using what is called a "sum of" or "A+B" approach, "where A is the protected benefit earned before the cash balance conversion and B is the benefit under the cash balance formula." Ex. 35 at 74 (Jt. Comm. on Taxation report dated 3/1/2006). Many companies with cash balance formulas use this approach. Ex. 17 at 5 (2004 Mellon Survey of Cash Balance Plans).

55.     A July 2000 survey by PriceWaterhouseCoopers stated that "We may see more employers adopting the no-opening-balance approach due to the negative media and Congressional attention recently directed at the so called "wear-away" effect that can occur under the opening balance approach–i.e.,

17

when employees' pensions do not grow for a period of time after the conversion." Ex. 12 at P 2095.

56.    CIGNA adopted an A+B formula for Tier 1 (2%) formula participants who were rehired after 2000 so that they "keep their already-earned old plan benefits." Ex. 132 at D05532 and 5534.

57.    CIGNA never disclosed the wear-aways to its employees. In fact, it made the opposite representation: Both its Summary of Material Modifications and its Summary Plan Description promised that "Each dollar's worth of credits is a dollar of retirement benefits payable to you after you are vested." Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-00463 and Stratman Rpt. Ex. 3 at D00828).

58.    As described in ¶75 below, CIGNA advised its Board of Directors in September 1999 that no periods of wear-away existed.

### A.    The Plan Years With No Additional Benefits Are Followed by Later Plan Years in Which the Rate of Accrual Is Over 33% Higher.

59.    CIGNA maintains that pay and interest credits that it assigns to participants' accounts provide benefit accruals in each plan year that comply with ERISA's 133⅓% accrual rule. See Ex. 37 at DO1955.

60.    But CIGNA conditioned payment of those accruals in the years following the cash balance conversion. For example, CIGNA maintains that it

18

credited Ms. Broderick with annual benefit credits totaling over $29,500 for her employment from June 2000 to March 2004. Ex. 36 (fourth page). But Ms. Broderick's retirement benefits did not actually increase at all as a result of the hypothetical credits. The lump sum distribution that CIGNA offered Ms. Broderick in November 2004 was based on the $218,944 value of the benefits that she had earned before 1998. Ex. 33 at SuppD1940 and Ex. 38. The final amount of her cash balance account, which was to include accruals from 2000 to 2004, was only $208,764 – over $10,000 less. Ex. 33 at SuppD1931.

61.     The same imbalance applies to Patricia Flannery. Her cash balance account after six years under the cash balance formula remains less than the value of the benefits she earned before 1998. See ¶48 above.

62.     Similarly, Annette Glanz did not receive any increase to her retirement benefits for her employment from 1998 through 2000. Mr. Poulin prepared a spreadsheet showing that her cash balance account at the end of 2000 translated to an annuity benefit of $566.88 per month which was only $2.88 more than the $564 benefit that she had at the end of 1997. Ex. 6 (revised Poulin Suppl Rpt Ex-3). The benefit "credits" of $11,586 that CIGNA assigned to Ms. Glanz's "account" for the period from 1998 to 2000 did not add to her retirement benefits and therefore were not unconditionally payable to her. Id.

19

63.    The wear-away periods for Broderick and Flannery appear when the cash balance benefits are compared with both their previously earned early retirement benefits and their previously earned  normal retirement benefits. Ms. Glanz's wear-away was based on her normal retirement benefits (she was not eligible for early retirement under the prior plan).  For periods of 3+ years (and close to 6 years in Ms. Flannery's case), there were no additional accruals for them.

64.    The rate of benefit accrual after the wear-away concludes is "infinitely" greater than the zero accrual rate in effect during the wear-away period. Ex. 3 (Poulin Rpt) ¶ 30.

65.    The Treasury Department's Alert Guidelines on the vesting and accrual rules offer an example where a participant has a minimum benefit under one formula and a benefit computed under a different formula. In these instances, the Treasury Department examines the additional accrual in each year after the two formulas are aggregated to determine whether the Plan complies with the accrual rules. Ex. 39 at 12.

**B.    CIGNA Concedes that There Are Periods in Which "Employees Accrue No Additional Benefits."**

66.    CIGNA's Answer to Interrogatory No. 8 admits that there were wear-away periods after CIGNA's cash balance conversion:

20

> "certain participants can have a 'wear-away period' .... During the wear-away period, a participant continues to accrue additional benefits under the cash balance formula, but because the benefits under the cash balance formula are less than the participant's 'Minimum Benefit' (a defined term under Part B), the participant is entitled to the (greater) Minimum Benefit. Whether a participant has a wear-away period, and the length of that period, depends on a number of factors, including work history and interest rates, both at the time of retirement and the time an Initial Retirement Account is established."

Ex. 17. See also id. (Answer to Interrogatory No. 10) ("the length of a participant's 'wear-away period' ... depends on a participant's individual facts and circumstances and cannot be computed in advance, because it can depend on future changes in interest rates and changes in an employee's salary").

67.    An internal memorandum by CIGNA's Vice-President for Employee Benefits acknowledges: "Using the present value of normal retirement age benefits results in a significant "wear-away" period during which time employees accrue no additional benefits with future service." Ex. 40 at 28635 (Jerry Meyn and David Cordani to Don Levinson and Jim Stewart 1/7/2002).

68.    Another memo prepared by CIGNA's Assistant Vice President of Global Benefits in November 2001 explains how under "the concept of "wear-away" ... long service employees earn little or no benefit in the first years after a pension change while early retirement benefits are "worn-away" by the passage of time." Ex. 41 at 28655.

21

69.    CIGNA recorded notes of conversations in December 2000 with Michele Bergman, another rehired participant like Ms. Amara. The notes show that CIGNA advised Ms. Bergman that the "wearaway" ends "at age 62"–ten years after she was rehired–and that "if you fly by age 55-56, you'll actually wind up with more." CIGNA concluded, "hope you didn't come back just for pension." Ex. 42 at 20518-21.

70.    An October 2002 letter from CIGNA to another participant states: "Mr. Lamb's pension has not decreased each year from 1998 to 2002; however, it has not increased" over those five years. Ex. 43 at 4.

71.    Papers related to Peter Andruszkiewicz refer to a "wearaway until ? [sic]" Ex. 44 at 20527.

72.    In January 2002, about a month after Janice Amara filed this lawsuit, John Arko, CIGNA's Director of Retirement Benefits, prepared an example of "wear-away" for CIGNA officials, using Ms. Amara's age, service, benefit amounts, and initial termination and rehire dates. Compare Ex. 32 with Ex. 45 and Ex. 46.

73.    The spreadsheet shows that Ms. Amara earns no additional benefits for more than 7 years after 1998. At age 55, the annuity value of her account balance is only projected to reach $1,340 per month, compared with the $1,830

22

per month that she already had before the cash balance conversion. Ex. 32 at 28174 and 28629. Thus, Ms. Amara "accrue[s] no additional benefits" for her service from 1998 to retirement. Ex. 40 at 28635.

74.     However, in a January 1, 1999 memo to CIGNA's head of Human Resources responding to criticisms in the *Wall Street Journal* that some employers were "deliberately establishing opening balances below the real value of each employee's pension," Gerry Meyn denied that this occurred in CIGNA's conversion: "we didn't do that and would have disclosed it if we had. So there's no exposure for us on that point." Ex. 48 at D10837.

75.     In a September 1999 communication with CIGNA's Board of Directors, Mr. Meyn also recognized that wear-aways occur after some cash balance conversions, but denied that any took place after CIGNA's conversion: Some companies' "opening cash balances are established below actual value, resulting in multiple years without additions to an individual's pension accrual ... No [CIGNA] employee will experience any period without standard additions to his pension account." Ex. 47 (third page of exhibit). In an earlier July 15, 1997 memo to the People Resources Committee of CIGNA's Board, the Committee was also assured that there would be "no reduction in benefit value" for Tier 1 employees who were transferred. Ex. 49 at D00606.

23

76.     CIGNA's Rule 30(b)(6) witness, who was designated to offer the corporation's testimony about compliance with the rules in ERISA section 204(b)(1)(B), see Ex. 21, testified that he was unaware of any analysis about whether the plan's wear-away complies with the 133⅓% accrual rule – other than some material in a "binder" that Mercer prepared. Ex. 194 (Arko Depo) at 17-19, 190-91.

77.     In response to a subpoena duces tecum, Mercer produced the "binder" material. The binder and a November 1997 memorandum discuss the benefit accrual tests, but do not analyze any compliance issues related to wear-aways. See Ex. 50 at MER 90-94 and Ex. 51.

78.     An April 27, 1997 Mercer memo indicates that Mercer believed that the actual rate at which benefits accrue did not matter and that CIGNA simply had to ensure that the final benefit was "no less than" the frozen minimum:

> "The important legal requirement is to ensure that when a final benefit is determined for an employee, it is no less than the present value of the accrued benefit payable at normal retirement age that the participant had earned up through the effective date of the change to cash balance, in other words a preservation of the minimum benefit under Section 411(d)(6) of the Code."

Ex. 13 at MER 1798.

79.     CIGNA's expert witness, Mr. Sher, did not discuss the requirements of the 133⅓% rule, except in the last paragraph of his report. Ex. 10 (Sher Rpt)

at 35. Mr. Sher asserted that the 133⅓% test could be performed without regard to any offset of benefits earned under a prior formula. Id.

80.    Three months after his deposition, Mr. Sher attended a November 2003 meeting of the Conference of Consulting Actuaries which was recorded on tape (copies of the tapes are available from the Conference of Consulting Actuaries). At the Conference, Mr. Sher asked a panel of IRS officials whether the Treasury regulation providing that benefit accruals under different formulas "must be aggregated" (see 26 C.F.R. 1.411(b)-1(a)) applies to a frozen minimum benefit formula that has the effect of eliminating or reducing net accruals in future plan years. He was told that the aggregation rule applies: "You look at the net benefit and when you have...a period of zero years and the other kicks in, it's an issue on a 133 and 1/3." See Ex. 52 at 12.

81.    Because younger, shorter-service employees will not have substantial early retirement benefits from their service before the cash balance conversion, they experience shorter wear-away periods than employees who have such benefits. See Ex. 3 (Poulin Rpt) ¶27.

**C.    The Future Cash Balance Accruals Were Conditioned on Participants Giving Up Statutory Rights to Previously-Earned Annuities; CIGNA Does Not Permit Employees to Receive Both.**

82.    CIGNA employees whose Tier 1 or Tier 2 retirement benefits were

higher than the values established under the Part B cash balance formula can receive either their "old plan benefits," also known as "minimum benefits," or their cash balance accruals under Part B, but not both. Section 7.3 of the Plan provides that if a participant's old plan benefit has been converted to a cash balance account, the participant can receive the frozen benefit amount as an annuity, but without any cash balance pay or interest credits. Ex. 1 at 40, and Ex. 3 (Poulin Rpt) ¶¶25-28.

83.     The effect of this Section is to require participants to give up their protected Tier 1 or Tier 2 retirement benefits in annuity form as a condition of collecting any cash balance accruals. Ex. 3 (Poulin Rpt) ¶29.

## D.     CIGNA Admits that It Does Not Provide the "Minimum Benefit under Part B Plus [the Plaintiffs'] Benefit and Interest Credits on Top of That."

84.     CIGNA is aware of the Class's claim. Its 2005 Annual Report states that "The plaintiffs allege ... that the Plan violated ERISA by impermissibly conditioning certain post-1997 benefit accruals on the amount of pre-1998 benefit accruals." Ex. 25 at 84. In a February 15, 2002 motion to dismiss, CIGNA recognized that Plaintiff "wants the Minimum Benefit under Part B plus her benefit and interest credits on top of that." Defs. Mem. at 16 (dkt #12).

85.     CIGNA's expert witness, Mr. Sher, recognized that CIGNA's cash

26

balance design places conditions on the payment of the cash balance accruals. He

contends that these conditions should not be considered a forfeiture, without

offering supporting authority. Ex. 10 (Sher Rpt) at 30-33 and Ex. 192 (Sher

Depo) at 231-36, 251-61.

## IV.   CIGNA's Cash Balance Formula Produces Rates of Benefit Accrual that Decrease With Age.

86.     Mr. Poulin found that "age was not a factor" in determining benefit

accruals under CIGNA's "prior plan." Ex. 3 (Poulin Rpt) ¶13. Under CIGNA's

prior 2% and 1.67% of final average pay formulas, retirement benefits were

computed based on years of credited service and salary. The calculation of

benefits did not depend on age.

87.     Mr. Poulin found, however, that "the age of the employee is an

integral part of the rate of benefit accrual under Part B." Id. Mr. Poulin's report

shows how age, or the proxy of how near the participant is to retirement, is a key

element in computing benefit accrual under CIGNA's formula. Mr. Poulin shows

that the benefit accrual under CIGNA's cash balance formula is computed by

taking the annual pay credit and hypothetically compounding it using a factor

equal to $(1 + i)^{65 - n}$ and dividing the result by an annuitization factor. In this

formula, "n" equals the employee's current age. Other factors being equal, the

benefit accrual rate will be lower for older employees than for younger

27

employees because "65 - n" represents potential years to retirement.

88.    Mr. Poulin explains:

"[U]nder Part B, the rate of benefit accrual decreases as a direct result of increases in the employee's age. As the employee gets one year older, the interest credit, which is strictly a function of the number of years between the date of determination and age 65, is correspondingly reduced."

Id. at ¶15.

89.    Professor Edward Zelinsky also explains:

"Consider, for example, a participant who, at ages thirty-five, forty-five, and fifty-five receives in each year a theoretical contribution of $1000 to her hypothetical cash balance account. As of age sixty-five, the earliest contribution will, in annuity terms, represent an annual income of $1094 per year; the $1000 contributed ten years later at age forty-five will constitute at retirement an annuity of $507 per year; and the last $1000 contributed at age fifty-five will, at retirement, represent an annuity of $235 per year. Thus, even though the employee, in defined contribution terms, has been accruing contributions at a steady pace (i.e., $1000 per year), the employee has been earning benefits at a decreasing rate in defined benefit terms."

Zelinsky, supra at 721-23.

90.    For the named Plaintiff Janice Amara, Mr. Poulin calculated benefit accrual rates (without regard to the wear-away) that decrease from 1.59% at age 48, to 1.27% at age 53, and down to 0.75% at age 65. Id. at ¶18 and Ex.D.

91.    Mr. Poulin's analysis shows that CIGNA's age-graded benefit credit schedule counteracts the age bias in the underlying formula to a limited degree

but, as in Ms. Amara's case, does not eliminate it. Ex. 3 (Poulin Rpt) ¶¶ 16-19.

92.     In Exhibits F-1 through F-3 to his report, Mr. Poulin computed the decreasing accrual rates for three employee "profiles" that correspond with the ones CIGNA used internally to benchmark the changes: a Tier 1 (2%) employee age 30 with 9 years of service and $40,000 in compensation, a Tier 2 (1.67%) employee age 40 with 5 years of service and $45,000 in compensation and a Tier 2 employee age 50 with 10 years of service and $60,000 in compensation. Ex. 53 at 12983. Mr. Poulin again found rates of accruals that decrease from 1.79% at early ages to 1.2% at age 50, and down to .66% at age 65. Ex. 3 (Poulin Rpt) ¶21 and Exs. F-1 to F-3.

93.     CIGNA's periods of wear-away are also a function of age because the wear-away is based on early retirement eligibility. Employees such as Janice Amara, Gisela Broderick and Patricia Flannery, who are eligible for early retirement benefits, have wear-aways based on the value of those benefits.  See Ex. 3 (Poulin Rpt) ¶¶25-28. Early retirement eligibility is a function of age. Ex. 2 at 36-37 and 40.

**A.     CIGNA Recognized Internally that "Older" Employees Lose Benefits with Cash Balance and that the Rates of Accrual Decline with Age.**

94.     Internally, CIGNA recognized as early as January of 1997 that

"older" employees, also described as those "nearer" or "closer to retirement,"

would lose benefits with cash balance:

> • A "disadvantage" of cash balance plans is that "Employees closer to retirement can't accumulate sufficient assets to replicate the DB benefit at the same age." Ex. 54 at D00467 (attachment to 1/2/1997 memo from Gerry Meyn to Don Levinson).

> • Cash balance plans offer "lower final pension values for older, longer service ee's." Ex. 55 at MER 1384 (GTM to DML memo dated 1/6/1997).

> • "Older employees will not attain as large a retirement fund value under the cash balance plan." Ex. 28 at 12288 (GT Meyn memo to DM Levinson dated 1/6/1997).

> • "For older employees with longer service the benefit may be viewed as a takeaway." Ex. 56 at SuppD1870 (3/12/1997 "Cigna Discussion Outline: Cash Balance Plan Implementation Issues").

> • "The current Plan provides its highest growth in benefits nearer retirement age - a benefit they can't match under the new Plan." Ex. 57 at 14468) (draft "Managers' Q&As").

> • "Factually, we know that the benefit earned from age 60 to 65 is going to be lower;" from "Commentary on Deloitte and Touche Article" in "Retirement Plan Changes, Possible Media Questions" packet dated 9/23/1997. Ex. 58 at SuppD1579-80.

> • "[T]he nearer employees get to retirement age, the less time they have to earn compounded interest on their benefit credits. The higher points help compensate for this." Ex. 59 at 27438 ("Cash Balance Phone Scripts").

95.    CIGNA also specifically knew that the benefit "accrual rates" under

its cash balance formula decline with increases in age and service. A CIGNA

actuary, who is now the President of the Hooker & Holcomb actuarial consulting

firm in Hartford, see Ex. 60, wrote:

> "As [one] would expect in a plan designed to mimic a defined contribution plan, ***accrual rates decline with increases in age and service*** for employees in the cash balance plan."

Ex. 61 at 10044 (6/26/1997 memo from Arthur Assantes to David Durham) (emphasis added).

96.    A spreadsheet dated October 22, 1997 prepared by another CIGNA actuary also shows "accrual rates" declining from 1.73% at age 43 down to .66% by age 65. Ex. 62.[2]

97.    The electronic version of this Lotus spreadsheet shows that CIGNA computed the "accrual rates" in the same manner as Mr. Poulin, i.e., by projecting the account balance to retirement age, converting to an annuity, subtracting the annuity at the end of the previous year, and computing the "accrual rate" as a percentage of compensation. Ex. 9 (Declaration of Allison Caalim) ¶8.

98.    In CIGNA's capacity as a provider of retirement services to other companies, CIGNA posted material on its corporate website recognizing that:

> Under cash balance plans, "employees who are age 50 or older" may "experience a material reduction in the future rate at which they accrue benefits, resulting in a measurably lower benefit at retirement."

---

[2] The date of this document is shown in the electronic file. Ex. 9 (Caalim Decl.) ¶8.

Ex. 63 (third page).

**B.    CIGNA Was Advised of its "Vulnerability" to the Age Discrimination Claim.**

99.    CIGNA's Board of Directors was aware of CIGNA's "vulnerability" to the legal argument that its accrual rates discriminate as early as September 1999. In a memorandum to CIGNA's Board of Directors, the Vice-President for Employee Benefits warned:

> "Cash Balance Plans are alleged to violate ADEA: This is a new challenge, related in part to opening balances established below actual value, but also is a challenge to a flatter schedule of accruals. . . . CIGNA's age-progressive accrual schedule reduces, but does not eliminate, vulnerability to this argument."

Ex. 47 (third page) (attachment to 9/21/1999 e-mail from Gerry Meyn entitled "Cash Balance Pension Plans: Background for September 1999 Board meeting").

100.    The same memorandum advises the Board about problems when "Opening cash balances are established below actual value, resulting in multiple years without additions to an individual's pension accrual," i.e., periods of wear-away, but the Board was told that CIGNA had not done this and therefore "No employee will experience any period without standard additions to his pension account." Ex. 47 (third page).

101.    Although CIGNA and its Board were aware of the company's "vulnerability" to an age discrimination claim, CIGNA did not obtain a legal

32

opinion on whether its cash balance formula is lawful. The class requested any legal advice related to this claim in two different requests. Ex. 34 (Request No. 2) and Ex. 64 (Request No. 14). No legal opinion on age discrimination was produced in discovery or identified in a privilege log.

102.   Andrew Hodges, CIGNA's chief actuary for projects, testified that he was not aware that there was an age discrimination issue related to the cash balance formula and does not recall ever discussing age discrimination issues. Ex. 196 (Hodges Depo) at 91-93.

103.   CIGNA's Rule 30(b)(6) witness, John Arko, testified he believed that CIGNA obtained some assurance from Mercer about age discrimination. Ex. 194 (Arko Depo) at 29-30, 33-34, 36. However, neither CIGNA nor Mercer (which was served with a subpoena duces tecum) produced any such document.[3]

104.   In its July 8, 1996 discussion of legal issues, Mercer recognized that "If the rate of accrual is interpreted as the rate of increase in accrued benefit, and the accrued benefit is defined as an annuity at normal retirement age, then there's an issue" about whether "cash balance plans violate the rule" on the rate of benefit accrual decreasing because of age. Ex. 19 at EPTO 4170. In this

---

[3] Because the Mercer company is not authorized to practice law, attorney-client privilege would not be a basis to withhold any opinion that it distributed to CIGNA.

discussion, Mercer gives an example where the accrual drops from $459 per month at age 35 to $143 per month at age 55. Id.

105.   In November 1997, Mercer prepared a spreadsheet specifically for CIGNA showing accrual rates at older ages decreasing to 35.5% of the rate in the earlier years. Ex. 51 at MER 769-70. The accompanying memo explains that "an employee's accrual rate declines as he ages through a particular contribution rate – that is, a 3% contribution this year produces a higher accrual rate than a 3% contribution next year ... if the formula wasn't graded accrual rates would decline steadily" as the participant ages. Ex. 51 at MER 767.

106.   In this litigation, CIGNA defends against the age discrimination claim through legal arguments advanced by Lawrence Sher, the actuary who CIGNA engaged as an expert witness.

107.   Mr. Sher is a well-known defender of cash balance designs who served as the chief actuary for Kwasha Lipton and successor companies for 24 years. Ex. 10 (Sher Rpt) at A-1, B-1 (work history and list of cash balance publications). Kwasha Lipton is recognized as responsible for the original cash balance conversions in the mid-1980's. See Eaton v. Onan, 117 F.Supp.2d 812, 819 (S.D. Ind. 2000). [4] Mr. Sher has testified for the defense in many cash

_____

[4] PriceWaterhouse Coopers acquired Kwasha Lipton in 1997. A 2001 sales brochure prepared by Pricewaterhouse Coopers touts: "Hands down, we're the

34

balance cases, including Esden v. Bank of Boston, Cooper v. IBM, Berger v.

Xerox, Lyons v. Georgia Pacific, and Engers v. AT&T.

108.   Mr. Sher admits that neither he nor his consulting firm is authorized

to give legal advice. He also testified that neither he nor his firm ever warned

clients of any concerns with the legality of cash balance formulas.  Ex. 192 (Sher

Depo) at 148-51 and 173-77. A slide entitled "Age Discrimination" that he

prepared for a 1999 Glasser LegalWorks seminar states that age discrimination is

"Not an Issue in Practice." Ex. 66 at P 2344.

109.   Mr. Sher admits that CIGNA's Plan does not conform with ERISA's

definition of the term "accrued benefit" as the "annual benefit commencing at

normal retirement age." Ex. 192 (Sher Depo) at 78-79 and 269-72.

110.   Mr. Sher also admits that Plaintiffs' expert computes the plan's

accrual rate consistent with the methodology used under the 133⅓% accrual rule

and the related Treasury regulations. Ex. 10 (Sher Rpt) at 27-28 and Ex. 192

(Sher Depo) at 159-63.

111.   But Mr. Sher does not believe this should be the only way to comply

with the age discrimination rule. Instead, he suggests that the rate of benefit

accrual might be measured by "the rate of growth in an employee's account

––––––––––––––––––––

experts. No other company has more experience assisting companies in
introducing Cash Balance plans." Ex. 65 at 29100.

balance." Ex. 10 (Sher Rpt) at 11 and 13.

112.   Alternatively, Mr. Sher contends that the differences in annuity benefits that younger and older workers receive as a result of the annual hypothetical allocations under CIGNA's formula reflect the "time value of money." Ex. 10 (Sher Rpt) at 15-18.

113.   It is undisputed that CIGNA's annual pay and interest credits are hypothetical credits and not monetary allocations. The end-products of CIGNA's hypothetical pay and interest credits are economically indistinguishable from a schedule under which the rate of accrual decreases progressively from 1.73% of pay down to .66% of pay because of age.

114.   CIGNA recognized internally that the hypothetical pay and interest credits would reduce the benefits of "older employees" more in relation to the prior formula than younger employees. CIGNA also recognized that the Plan's traditional 1.67% and 2% of average pay formulas provided their "highest growth in benefits nearer retirement age." Ex. 57 at 14468 and ¶94 above.

115.   After the cash balance changes, CIGNA's Plan offers the lowest rate of growth in retirement benefits "nearer to retirement age." CIGNA's internal spreadsheets show that the Plan's "accrual rates" decrease from 1.95% at age 20 to 0.66% at age 65. Ex. 62.

116.   The actual cost that CIGNA incurs as a result of the hypothetical

pay and interest credits for employees like Janice Amara, Gisela Broderick,

Annette Glanz and Patricia Flannery who "accrue no additional benefits with

future service," Ex. 40 at 28635, is less than for younger employees who have

little or no previously-earned benefits to "wear-away."

## V. Cash Balance Conversions "Mask" Benefit Reductions Because Participants Cannot Compare the Cash Balance Accounts to Annuities Without Converting the Accounts to Annuity Form.

117.   The May 5, 1999 issue of the *Wall Street Journal* published a story on

professional conferences in which consulting actuaries discussed how

"[c]onverting to a cash-balance plan does have an advantage as it masks a lot of

the changes....There is very little comparison that can be done between the two

plans." Ex. 67. The article quotes actuaries, including from Mercer firm which

prepared CIGNA's disclosures, discussing the confusion among employees in a

recorded October 1998 meeting of the Society of Actuaries in New York:

> "Amy Viener, an actuary at William M. Mercer Inc., noted: 'You switch to a cash-balance plan where the people are probably getting smaller benefits, at least the older-longer-service people; but they are really happy, and they think you are great for doing it.'"

> "An actuary with Watson Wyatt Worldwide who spoke on a panel called 'Introduction to Cash Balance/Pension Equity Plans' alongside Ms. Viener, is heard saying on a tape: 'It is not until they are ready to retire that they understand how little they are actually getting.' 'Right, but they're happy while they're employed,' responded Ms. Viener of Mercer during the panel discussion."

118.   In a September/October 1999 article, CIGNA's actuarial expert, Mr.

37

Sher, writes: "For the same reason that it's hard to compare apples with oranges, employees will find it difficult to compare benefits under a cash balance plan with those under the prior traditional plan–no matter what information is provided." Ex. 68 ("A Workable Alternative to Defined Benefit Plans") at 20. In a First Quarter 2001 article, Mr. Sher reported on a survey conducted by his consulting firm which found that among the 59% of cash balance conversions with 20% or more "benefit reductions" "at certain ages," there was little or no disclosure of the reductions to employees. Ex. 14 at 22; see also Ex. 12 at 59-60 (concerning same survey).

119.   In September 2000, the United States General Accounting Office concluded that "In many instances of conversions to cash balance plans, sponsors did not ensure that participants received sufficient information about plan changes that can reduce future benefit accruals." Ex. 69 at 35.

**A.     CIGNA's Cash Balance Conversion Substantially Reduced Future Benefits.**

120.   In March 13, 2000 internal memorandum about class member John Depenbrock's benefits, Gerald Meyn stated: "John's projected pension value (present value at age 55) if he had continued in Part A earning 2% per year would have been $1.8 million. The projected pension value at age 55 under present circumstances [in the case balance plan] is $1.0 million." Ex. 70. This was a 45%

reduction.

121.   After the Third Circuit's 2004 <u>Depenbrock v. CIGNA </u>decision

required CIGNA to place Mr. Depenbrock back under the Part A formula, his

retirement benefits nearly doubled. Mr. Depenbrock's benefits increased from

$2,769 per month at age 55 to $5,266 per month between the ages of 55 and 65

and $4,737 per month after age 65. Ex. 71 and Ex. 72.

122.   After the <u>Depenbrock</u> decision, CIGNA also moved named Plaintiff

Janice Amara back into the Part A Plan. Ms. Amara was at that time the sole

named Plaintiff in this case. She was the first person after Mr. Depenbrock

whose benefits were recalculated and one of only 14 individuals whose benefits

have been recalculated in the nearly two years between the date of the

<u>Depenbrock</u> decision and the date of this filing.  Ex. 73.  Ms. Amara's benefits

increased from $1,831 per month to $4,096 per month between ages 55 and 65

and $3,386 per month after age 65. Ex. 46.

123.   Another class member, Jack Lamb, saw his benefits nearly double

when he was placed back in the Part A formula in February 2006 as the result of

the <u>Depenbrock</u> decision and he and his wife's repeated complaints that CIGNA

was not implementing the Court's decision. Ex. 73 at SuppD14400 and Ex. 74.

124.   Other examples of the increases are included in Ex. 73 (e.g.,

Michael Ferris). CIGNA has still not recalculated the benefits for the rest of the

class members that the <u>Depenbrock</u> decision affects. This prevents the class from offering over 150 potential additional examples of the "much higher" benefits that the old formula provided.

125.   Mr. Poulin's calculations for the other named Plaintiffs and witnesses who were under the Tier 1 (2%) formula show similar reductions: Ms. Broderick's benefits were reduced by 46% compared to if she continued under the Tier 1 formula. Ms. Glanz's benefits were reduced by 48%. Mr. Law's were reduced by 49%, Ms. Flannery's by 48%, and Mr. Charette's by 40%. Ex. 7 (Poulin Indiv. Calcs). The reductions for the Tier 2 (1.67%) witnesses were only slightly less, ranging from 34% to 49%. <u>Id</u>.

126.   Mr. Poulin's Supplemental Report shows how a change from a final or highest average pay formula to a career average pay formula alone nearly always causes a substantial reduction in future benefits. Ex. 4 (Poulin Suppl Rpt) ¶¶8-10. As Mr. Poulin's Supplemental Report shows, cash balance conversions effect the same change. <u>Id</u>.

127.   CIGNA's expert, Mr. Sher, agrees with Mr. Poulin's conclusion that CIGNA's new formula substantially reduced the future rate of benefit accruals. In his report, Mr. Sher estimated that the prior Tier 1 plan's net accrual rate was approximately 1.5% of highest pay (net of a Social Security offset) compared with an accrual rate of approximately 0.75% of highest pay under the cash

balance formula, assuming 4.5% annual salary increases. Ex. 10 (Sher Rpt) at 19 and 20 n.12 and Ex. 192 (Sher Depo) at 186-91. Mr. Sher was instructed not to prepare or include any benefit comparisons in his supplemental report. Ex. 193 (Sher 11/2005 Depo) at 31-33 and 166.

128.    Mr. Poulin's actuarial report identifies and summarizes three other features of CIGNA's cash balance conversion that have caused future benefits to be lower than under the prior formula and less than participants might reasonably expect. He describes how:

(1)    The value of the prior plan's subsidized early retirement benefits, including a Social Security supplement payable between age 55 and ages 62 or 65, and the Free 30% survivor's benefit, were excluded from the computation of opening account balances;

(2)    A pre-retirement mortality discount was applied in computing the opening accounts, further discounting their value; and

(3)    Because interest rates declined after 1997, the opening account balances established with a 6.05% interest rate do not, even with interest, allow participants to "re-purchase" their previous normal retirement age benefits.

Poulin Rpt. at ¶25-35 and Suppl. Poulin Rpt. at ¶12-17 and 37-39.

129.    Defendants' expert, Mr. Sher, agreed that early retirement benefits were excluded from the opening accounts, that mortality was "assumed at all ages," including before retirement, and that falling interest rates have reduced the value of the opening accounts in terms of retirement benefits. He also agreed that

the plan's method of comparing benefits under two formulas means that a participant's "actual benefit might be rising more slowly or not at all." Ex. 10 (Sher Rpt) at 8 and 29-35. Mr. Sher only disagreed with the legal conclusions that can be drawn from these facts.

### B.  CIGNA Recognized Internally that the Cash Balance Conversion Reduced Future Benefits.

130.   As early as February 1994, the Towers Perrin consulting company advised CIGNA that "Mid-career hires" and Long-service retirees" are "losers with cash balance." Ex. 76 at D10656.

131.   CIGNA was originally not going to transfer any Tier 1 (2%) formula participants to the cash balance formula because it recognized that the Tier 1 formula was "much higher." A January 6, 1997 memorandum from the Vice President for Employee Benefits to the head of Human Resources stated:

> "We do not suggest offering this program to Tier 1 (2%) pension plan participants whose plan provides much higher pension benefits."

Ex. 28 at 12288 (GT Meyn memo to DM Levinson).

132.   Sometime before July 1997, the cash balance proposal was modified to move Tier 1 participants with less than 45 age and service points to the lower cash balance formula. Ex. 49 at D00603.

133.   CIGNA's Information Kit was never revised to cover the inclusion of Tier 1 (2%) formula participants. Instead, it only described the Tier 2 (1.67%)

42

formula. Ex. 8 (Stratman Rpt Ex. 2 at AMARA-00441-442).

134.   CIGNA recognized that one of the "Negatives" of the cash balance change was that it is "Not [a] final pay based benefit." Ex. 54 at D00464. A 7/15/1997 Memo to the People Resources Committee of CIGNA's Board recognizes that the current formula is based on "highest" pay and states that the cash balance plan's "career average accrual of benefits" will "result in an expense reduction." Ex. 49 at D00599-600. An article by Ian Glew, CIGNA's Senior Vice President for Plan Sponsor Solutions, also states that "in many traditional defined benefit plans, benefits are based on final earnings.  This can be more costly to employers than cash balance plans, where benefits are based on career average earnings." Ex. 75 at 3.

135.   In a February 26, 1998 memorandum, Actuary Art Assantes wrote to David Durham and John Arko that the cash balance amendment "substantially affected [the] future accrual pattern of approximately 24,000 participants in the plan." Ex. 78.

136.   A November 2001 computation by CIGNA "compares the level of pension benefits we provide to employees" under the old Tier 1 plan and shows the old pension plan providing 53% of Final Pay at age 65 compared with 31% under CIGNA's Cash Balance Plan. The reductions were even more pronounced at early retirement ages, e.g., 35% of Final Pay under the old plan compared with

43

17% of Final Pay under Cash Balance. Ex. 41 at 28654 and 28660; see also Ex. 40 at 28634 and 28638 (1/7/2002 memo from Gerry Meyn and Dave Cordani to Don Levinson and Jim Stewart using same data).

137.  A November 2002 memo by actuary Andy Hodges states that if the grand-fathered Part A employees were moved to cash balance, their benefits would be reduced to 61% to 78% of their former levels after only 5 years under the cash balance plan. Ex. 79 at 29424 (examining options for grand-fathered employees).

138.  The reductions for the Tier 2 employees were slightly less than for Tier 1 employees. In April 1997, CIGNA asked Mercer to prepare a "comparability analysis to gauge the amount of additional or reduced benefit value relative to the current benefit formulas." Ex. 80 at MER 1320 (emph. added). Mercer prepared spreadsheets for CIGNA showing that the new plan's benefits were often between 70 and 80% of the prior plan's Tier 2 (1.67%) formula. Ex. 81 at MER 792.

139.  Another memo indicates that the cash balance formula was designed to provide older Tier 2 employees with "benefits at age 60 of about 85% of what they would have received from their former plan." Ex. 41 at 28656.

140.  The Tier 2 employees who testified, Messrs. Haber, Upton, and Curlee and Ms. Hogan, incurred reductions of 49%, 40%, 36% and 34%,

respectively, over periods of employment with CIGNA after the cash balance conversion ranging from 4 to 7 years. Ex. 7 (Poulin Indiv Calcs).

141.   Bar graphs entitled "Proposed Program vs. Current Program" show the impact of the changes on Tier 2 employees." Ex. 82 at SuppD1644 (7/24/1997 email to Denise Hill from David Durham re: "Pension and SIP Communications"). These bar graphs were also included in a 7/25/1997 packet of "Revised discussion points with division presidents." Ex. 83 at SuppD1617-1628.

142.   The bar graphs show that the Proposed Program was only comparable to the Current Program if CIGNA made additional contributions to the 401k Plan (aka "SIP") of 2% of pay every year and the 401k accounts always earned a 9% rate of interest.  See Ex. 83 at SuppD1623-26 and Ex. 195 (Arko 4/2006 Depo) at 158-66.

143.   CIGNA's additional SIP contributions have averaged less than 1% over the period from 1998-2005. Ex. 84. That level of additional SIP contributions assumes the participant contributes the maximum of 6% of his or her own pay; if the participant does not do this, the additional SIP contributions are proportionately lower. See id.

144.   Total Compensation Reports ("TCR"s) distributed to participants in 1998 and later years offered participants income replacement percentages based

45

on the cash balance formula using a 6.8% interest crediting rate and a 7 or 8%

annuity conversion interest assumption. Ex. 85 (1994-2002 TCRs for Stephen

Curlee) and Ex. 86 (2003-2005 TCRs for Bruce Charette).  The 1998 Total

Compensation Report states: "The estimates shown in this report represent our

best efforts at this time to calculate figures based on what we consider to be

realistic assumptions." Ex. 85 at P 1803.

145.   In a 3/19/1998 communication to Denise Hill with a "cc" to DML

(Donald M. Levinson, the head of HR), Barry Wiksten wrote in regard to the

1998 Total Compensation package: "Did suggest some changes to reassure those

with concerns about having "sufficient retirement income." The compound

interest examples ought to do it …" Ex. 87 at SuppD1641.

146.   The compound interest assumptions used in the Total Compensation

Reports were unrealistic. CIGNA's interest crediting rates for 1998-2005

averaged less than 5% and the applicable interest rates used to convert cash

balance accounts to annuities averaged less than 5.5%. Ex. 3 (Poulin Rpt) ¶34

and Ex. 88 (IRS table of 30-year Treasury securities rates).[5]

147.   Mr. Poulin's Supplemental Report shows how a 1.5% differential in

the projected interest rate for an employee who is age 40 can make a 60%

---

[5]   CIGNA uses the rate from November of the preceding year. Ex. 1 at 2.

difference in the projected benefit. Ex. 4 at ¶12.

148.   CIGNA "Production Outline" shows that Mercer was assigned to perform additional "old/new plan comparisons" in October 1997, with a target distribution date of Dec. 5, 1997. Ex. 89 at SuppD1724.

149.   An October 6, 1997 memo from Mercer to Denise Hill, CIGNA's Director of Human Resources Communications, attaches drafts of the Newsletter and Information Kit and talks about Mercer's actuaries "adjusting the assumptions" in a "comparison graph" "so that both plans provide equal benefits at 30 years of service. We'll fax this graph separately." Ex. 90 at SuppD 1850.

150.   No faxed comparison graph was included in Mercer's or CIGNA's discovery production. The final versions of CIGNA's Newsletter and its Information Kit did not contain a comparison graph. See Ex. 8 (Stratman Rpt. Ex. 1 and 2).

151.   In addition to recognizing that the cash balance formula offers a benefit based on "career average" salary instead of "highest" pay, CIGNA has recognized the three points in Mr. Poulin's analysis, either in internal communications or in admissions in this litigation: First, CIGNA recognized that it was eliminating the old Plan's early retirement benefits for the future: "Employees in the old Tier 1 (2%) Plan lose the potential ultimate value of that Qualified and Supplemental plans' early retirement subsidy." Ex. 140 at 4649;

47

see also Ex. 49 at D00600 (7/15/1997 memo to People Resources Committee: The Tier 1 formula "offers significant early retirement and surviving spouse subsidies.... The pension change will result in an expense reduction due to the ... elimination of early retirement subsidies"); Ex. 91 at D030950 (letter by Gerald Meyn stating that "our early retirement provisions effectively doubled the value of the plan for those who took advantage of early retirement"); Ex. 75 at 3 (article by CIGNA's Senior Vice President for Plan Sponsor Solutions observing cash balance "savings from the elimination of the large early retirement subsidies generally offered in traditional defined benefit plans").

152.   CIGNA has also recognized that its opening accounts excluded the value of early retirement benefits and Social Security supplements from the opening account balances. A chart prepared for a meeting at Eagle Lodge in Bucks County, Pennsylvania in May 1997 shows an employee with a beginning of the year account balance less than the lump sum value of minimum benefit because the early retirement subsidy is not included. Ex. 93 at 29935; see also Ex. 92 (handwritten note to class member Susanne Thistle: the "early retirement subsidy is what you lose"). An 8/29/1997 draft indicates that CIGNA considered adjusting the cash balance accounts when an employee reached age 55 to include early retirement subsidies, but this was not part of the final plan design. Ex. 94 at D11911. A 2001 memo again considers including early retirement subsidies in

48

the accounts for a limited group of former Tier 1 employees because it "Offers some protection should regulatory review of cash balance conversions become severe." Ex. 140 at 4650.

153.   Second, CIGNA's Answer to Interrogatory No. 4 in the First Set of Interrogatories admits that a discount for pre-retirement mortality was applied in establishing the opening accounts. Ex. 27.

154.   Third, the effects that a "declining interest rate" would have on the value of benefits was observed as early as CIGNA's May 1997 meeting with Mercer at Eagle Lodge in Pennsylvania. Ex. 93 at 29937-38; see also Ex. 48 (1/1/1999 memo to head of HR discussing "effect of falling interest rates"); and Ex. 27 (Answer to Interrogatory No. 8, recognizing that wear-away is a function of "interest rates").

**C.    CIGNA's SPD, SMM and Purported Section 204(h) Notice Do Not Disclose the Reductions in Future Benefits.**

155.   CIGNA offered its employees an overview of how the cash balance plan operates in a series of communications.  In a 10/30/1997 letter to employees, CIGNA began by representing that "we expect the new plan...to be a plus for most employees." Ex. 95 at SuppD1275.

156.   In November 1997 CIGNA distributed a "Special Edition" of its Benefits Newsletter entitled: "Introducing Your New Retirement Program." Ex.

8 (Stratman Rpt. Ex. 1).

157.   CIGNA contends that this Newsletter constitutes an ERISA Section 204(h) Notice of a significant reduction in the rate of accruals, although it is not identified as such. Ex. 194 (Arko Depo) at 41-46.

158.   In an inset box on the Newsletter's cover, a "Message from CEO Bill Taylor" declares: "I am pleased to announce that on January 1, 1998, CIGNA will significantly enhance its retirement program." "These enhancements will make our retirement program highly competitive...." Ex. 8 (Stratman Rpt. Ex. 1).

159.   The Newsletter tells employees that "The new plan is designed to work well for *both* longer- and shorter-service employees," it provides "steadier benefit growth throughout [the employee's] career," and it "build[s] benefits faster" than the old plan. Id. at 4 (emph. in orig.).

160.   The same page of the November 1997 Newsletter tells employees that "One advantage the company will not get from the retirement program changes is cost savings." Id.

161.   CIGNA contends that a December 1997 Information Kit is a summary of material modification ("SMM") under ERISA, although it is not identified as such.  Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

162.   The Information Kit represents that CIGNA is not saving any money

50

with these changes, "nor has the new program been designed to save money." Ex. 8 (Stratman Rpt Ex. 2 at AMARA-00448). The Information Kit states that the changes are being made to "improve the competitiveness of our benefits program and thus our ability to attract and retain top talent." The Kit represents that the changes are "enhancements to the plans." Id. at AMARA 00447.

163.    A brochure in the Information Kit entitled "Transition to the New Retirement Plan" includes a discussion, with a numerical example, about how the "benefits that you have earned under the Pension Plan through December 31, 1997 are fully protected, and their value will be reflected in your new plan balance." Emph. added. The brochure includes an example showing how the opening balance can be reconverted to the same benefits. Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-00441 to 443).

164.    Mr. Poulin's supplemental report examined this example and explains how it is "mathematically impossible" for the opening balance used in this example to repurchase the same benefit:

> "In the example, a hypothetical plan participant entitled to a normal retirement age benefit of $2,123 a year at age 40 has an opening account balance of $4,076 based on the conversion factor of 1.920 at that age.  This factor is the actuarial present value at age 40 of an annuity of $1.00 a year starting at age 65 and payable for life, based on an interest rate of 6.5% and the GATT Mortality Table.  This section of the Information Kit ends with the following statement: 'After 25 years of investment at 6.5% annual interest, $4,076 would grow to about $19,700, which is enough money to pay the employee

> the $2,123 annual benefit beginning at age 65, assuming the
> employee has an average life expectancy and the unpaid portion of
> the benefit continues to grow at a rate of 6.5% per year.' The
> second portion of this statement is inaccurate and misleading.
> While it is true that the accumulation of $4,076 at 6.5% for 25 years
> will yield $19,700, this amount can only purchase an annuity of
> $1,920 at age 65, ie., 90.4% of the amount on which the opening
> account balance was based.  It is in fact mathematically impossible
> to repurchase the normal retirement age annuity of $2,123 to which
> this participant was entitled on December 31, 1997 at a rate of 6.5%
> since the initial mortality discount is lost forever."

Ex. 4 (Poulin Suppl Rpt) ¶16.

165.   Under the heading "How Your Benefit Grows," the Information Kit

represents that "Each dollar's worth of credits is dollar of retirement benefits

payable to you." Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-00463). No indication

was given of a potential for wear-away periods during which participants will

not earn additional retirement benefits. See id.

166.    The Information Kit poses the question "Will my benefit be better

under the new Retirement Plan?" In response, CIGNA told employees that while

comparisons are "difficult,"  "Generally speaking, the new Retirement Plan, in

comparison with the current Pension Plan, tends to provide larger benefits for

shorter-service employees and comparable benefits for longer-service

employees." Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-00452). Employees were

separately told that the "benefits will grow faster during the early part of your

career." Id. at AMARA-00447.

52

167.   In response to the question "Why wasn't I allowed to stay in the Pension Plan?," the Information Kit told participants who were being moved to cash balance that "Our analysis showed that, in comparison to people with a higher age and service combination, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan." Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-00448). Neither CIGNA nor Mercer produced any such analysis in discovery.

168.   Similar representations that the cash balance benefits were comparable or larger appear in other written communications: A 7/25/1997 list of "Revised discussion points with division presidents" represents that there will be "NO negative impact on most employees with long service or near retirement." Ex. 83 at SuppD1618. The memo further states that the "Short term impact is very positive – higher average benefits for all" and the "Long term impact – potentially the same or more but dependent on profitability measures, personal savings/investment." Id.

169.   The same representation that the new Retirement Plan "tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees" appears in a set of questions and answers prepared for managers in December 1997.  Ex. 57 at D00596 ("Questions and Answers: The New Retirement Program, Special Manager's Edition").

53

170.    An Interoffice Memo dated 11/3/1997 entitled "Introducing the New Retirement Plan" from Gerald Meyn to CIGNA Managers again represents that CIGNA is "*not* changing the plan to cut costs." Ex. 96 at D00584 (emph. in orig.).

171.    A February 1998 Signature Benefits Newsletter states that employees hired before 1989 with age and service less than 45 points "were moved…because they have enough time to take advantage of the new plan provision. They do not face the problem that those nearer to retirement would face if they were suddenly moved out of the pre-1989 plan."  Ex. 97 at SuppD 1330.

172.    Subsequent communications did not qualify or correct any of these statements. A May 1998 Signature Benefits Newsletter responds to a sample of survey responses from the Retirement Plan Communications Survey but only addresses questions re: the "Social Security offset," "1,000 hours needed to accrue a year of service," and the five year vesting requirement. Ex. 180 at SuppD1292. Numerous survey responses quoted below at ¶¶230-31 asked for information about how the old plan compares with the new, but those questions went unanswered.

173.    Phone scripts were used to field calls to a 1-800 telephone number provided to participants. The phone scripts did not provide information about

benefit reductions from the cash balance conversion or any other disadvantages of the changes. See Ex. 59.

174.   CIGNA's 1998 Total Compensation Report ("TCR") contains an almost identical representation to the statement in the Information Kit about how the opening account balance will, with interest credits, result in the same lifetime annuity benefits, with no mention of a pre-retirement mortality discount or the effect on benefits if interest rates fall:

> "This [initial] balance represents the full value of the benefit you earned for service before 1998 payable to you at age 65. ... It was converted to a lump sum based on an assumed interest rate of 6.05%. **This means that the lump sum growing at this rate of interest to retirement is equivalent to the value of the lifetime annuity payments you have earned**."

Ex. 98 at P 1527 (emph. in original).

175.   The Total Compensation Reports also represented that "CIGNA pays" specific dollar amounts for their pensions. CIGNA does not actually make contributions to any accounts and the amounts given do not correspond with what CIGNA actually pays. For example, Gisela Broderick is told that "CIGNA pays" $7,617 and $16,757 for her pension in 2001 and 2002. Ex. 99. There was no qualification that she was actually under a "wear-away" where she was not earning any additional benefits. Id.

176.   In October 1998, the company issued the ERISA-required summary plan description ("SPD") about the amendments. The SPD repeated the

55

representation that "Each dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested." Ex. 8 (Stratman Rpt. Ex. 3 at 3 and Stratman Rpt Ex. 4 at J-2). The SPD did not contain any disclosure about the wear-away periods in which participants would earn no accruals for several years of participation. See id.

177.   The SPD contained no descriptions of reductions in future rates of accruals. It also does not describe any other disadvantages of the cash balance formula, such as the elimination of a formula based on highest pay closest the retirement, the exclusion of valuable early retirement benefits from the opening accounts, or the application of a pre-retirement mortality discount in computing the opening accounts. See Ex. 8 (Stratman Rpt. Ex. 3).

178.   In November 1999, CIGNA reissued the same SPD, with no noticeable changes other than in the format. See Ex. 8 (Stratman Rpt Ex. 4). CIGNA again made no disclosures about the benefit reductions or other disadvantages of cash balance. Id.

### 1.    *Professor Stratman found no disclosures of reductions or other disadvantages in CIGNA's communications with its employees.*

179.   The Plaintiff class engaged Professor James Stratman, Associate Professor at the University of Colorado at Denver and Director of its Technical Communications Program, to examine CIGNA's purported Section 204(h)

Notice, its SMM and its SPD. Ex. 8 (Stratman Rpt) at 4.

180.    Professor Stratman has written a law review article based on his research on ERISA SPD's which the Third and the Tenth Circuit Courts of Appeal have relied upon.[6] He is an expert in the understandability of written communications in the legal, business and technical fields.

181.    Professor Stratman analyzed the statement in the November 1997 Newsletter–which CIGNA contends is a Section 204(h) Notice, see Ex. 194 (Arko Depo) at 41-46–stating that the retirement program changes will "significantly enhance" CIGNA's program. Professor Stratman found: "This statement is important because it may set participants' expectations about all other information that follows in the subsequent stream of CIGNA communications concerning the change of plans." Ex. 8 (Stratman Rpt) at 5.

182.    According to Professor Stratman, the Newsletter reinforced the impression that the changes "enhanced" benefits with three other representations:

- "new plan participants 'will see an overall improvement in their retirement benefits' (inset box, p.2, col.b)

- 'the new plan is designed to work well for *both* longer-and shorter service employees' (p. 4, col. a);

---

[6] James F. Stratman, "Contract Disclaimers in ERISA Summary Plans: A Deceptive Practice?" *Industrial Relations Law Journal*, Vol. 10, No. 3, 350 - 380 (1988). Cited in Alexander v. Primerica Holdings, 967 F.2d 90, 93 (3d Cir. 1992), and Chiles v. Ceridian, 95 F.3d 1505, 1518-19 (10th Cir. 1996).

- the new plan provides 'steadier benefit growth throughout [the employee's] career" (p.4, col. a).

183.   Professor Stratman also analyzed the disclosures in the December 1997 Information Kit (which CIGNA contends is a Summary of Material Modifications ("SMM")). Professor Stratman found the Kit assured participants that their benefits were "fully protected" after they were converted to a value "in the new plan balance." Ex. 8 (Stratman Rpt) at 7. Professor Stratman found that the Kit reinforces that assurance by telling participants that the conversion factors were "based on guidelines established by the government to ensure a fair transition for employees." Id. Professor Stratman found that CIGNA compares the conversion to a mere "transfer" of benefits from one place to another, assuring employees that:

> "all of your benefits earned under the current pension plan through December 31,1997 will remain yours. As of January 1, 1998, those benefits will be transferred to the new plan."

Id. at 8.

184.   Professor Stratman found that CIGNA's communications repeatedly "direct employees' attention away from potential reductions," for example, by representing that they were moved because "Our analysis showed, that in comparison to people with a higher age and service combination, you have plenty of time to take full advantage of the many attractive features of the

Retirement Plan." <u>Id</u>. at 8.

185.  Professor Stratman found that the direction away from potential reductions was "reinforced" by the answer to the question, "Will my benefits be better under the new retirement plan?" where CIGNA tells its employees that "Generally speaking, the new retirement plan, in comparison with the current pension plan, tends to provide larger benefits for shorter-term employees and comparable benefits for longer service employees." <u>Id</u>. at 8.

186.  Professor Stratman observed how the Information Kit assures participants moved to the new plan that their "retirement benefit will continue to grow," <u>id</u>. at 7, and in another part of the Kit reassured them of that growth by stating that:

> "Each dollar's worth of credits is a dollar of retirement benefits payable to you after you are vested. Under the plan, your benefit will grow steadily throughout your career as credits are added to your account."

<u>Id</u>. at 9.

187.  Professor Stratman concludes that the Information Kit nowhere suggests any "ways in which benefit reductions relative to the old plan are possible" and does not disclose that "benefits may not grow at all for several years and that the ultimate rate may be lower than the prior rate."Ex. 8 (Stratman Rpt) at 7 and 9.

188.  Professor Stratman next examined the nearly-identical SPDs

distributed in 1998 and 1999. Observing the SPD's repetition of the promise in the Information Kit that "Each dollar's worth of credits is a dollar of retirement benefits payable to you," Professor Stratman found that the SPDs reinforce "[t]he notion that the change to the new plan involves no loss of benefits...." Id. at 11. The SPDs fail to disclose that:

> - "employees might not immediately begin earning benefits after conversion but will instead have new benefits delayed for a number of years.
>
> - the early (age 55) retirement benefits disappear entirely.
>
> - the employee's total pension value may not be comparable to what it was under the old plan and may even be significantly reduced.
>
> - the cash balance payment option may be relatively less valuable than the annuity options under the old plan."

Id. at 12.

189.    Professor Stratman points to only a "hint" of possible reductions in the SPD's statement that "your final Plan benefits cannot be less than your old plan benefits on December 31, 1997" with the promise that "if this minimum benefits rule applies to you, you'll be notified by the Retirement Benefit Center." Id. at 12. He concludes that it is doubtful an average reader would understand the import of this clause given all the other reassuring language in CIGNA's documents. Id. As described in ¶¶301-10 below, CIGNA did not, in fact, ever notify employees when this "minimum benefits rule" applied to them.

60

190.   Professor Stratman concludes:

"In my expert opinion CIGNA's 1998 and 1999 Summary Plan
Documents (SPDs), as well as the precursor documents distributed to
employees before the SPDs, fail to disclose to the average plan participant
the potential reductions of benefits associated with the new cash balance
plans. Instead of disclosing the potential reductions, the SPDs and
precursor documents offer assurance of steadier benefit growth with no
disclosure that the rates decrease with age, that they drop in comparison
with the old plan, or that they are conditional upon giving up part of the
value of accrued benefits under the old plan."

Id. at 12-13.

### 2.     *CIGNA offered no expert report to rebut Professor Stratman's analysis.*

191.   CIGNA produced no expert testimony to counter Professor

Stratman's report on the Newsletter, Information Kit or SPDs.

192.   CIGNA's actuarial expert, Mr. Sher, has both written that

"employees will find it difficult to compare benefits under a cash balance plan

with those under the prior traditional plan," Ex. 68 at 20, and found in a survey

on this topic that "[i]n most cases, employees do not receive details about

significant potential benefit reductions." Ex. 14 ("Survey of Cash Balance

Plans") at 24.

193.   Mr. Sher has also urged companies to be honest about reductions

from cash balance conversions: "Explain to people who will see reductions what

will happen and why you are doing it so they will understand." Ex. 100 ("Cash

Balancing Act," <u>Plan Sponsor</u> (February, 1999), quoting Lawrence Sher).

194.    Mr. Sher testified that he asked Defendants' counsel whether he should address the disclosure issues in Mr. Poulin's report and was told that counsel "didn't want me to address them." Ex. 192 (Sher Depo) at 106-7.

**D.    CIGNA's Rule 30(b)(6) Witness Agrees that the SPD, SMM and Purported Section 204(h) Notice Do Not Disclose Benefit Reductions.**

195.    In response to a Rule 30(b)(6) notice about compliance with the disclosure rules, Ex. 21, CIGNA produced John Arko, whose title was Director of Retirement Benefits at that time and is now Benefits Strategy Director and Plan Administrator. Ex. 194 (Arko Depo) at 6 and Ex. 195 (Arko 4/2006 Depo) at 5.

196.    According to Mr. Arko, the November 1997 Newsletter contained a §204(h) notice that gave employees notice "of a reduction in the rate of accruals." Ex. 194 (Arko Depo) at 41-46.

197.    Mr. Arko specified the part of the Newsletter that he believes gave the §204(h) notice: "It was on Page 5 of this newsletter. It would be the story labeled, Opening Balances to be Calculated Next Spring." <u>Id</u>. at 47-8 (describing Pls. Dep Ex. 61, which is the same as Ex. 1 to the Stratman Report [Pls. Ex. 8]). "I think that this story satisfies to the extent we were trying to put a 204(h) notice out, that this was – this notice and that story was intended to do that." <u>Id</u>. at 48.

198. Asked where in the story the disclosure was made, Arko declared: "I think the entire story...." Id.

199. Confronted with each section of the story and asked "Does that ...tell participants that their benefits will be reduced under that new plan?" Mr. Arko testified for each section that "No," the language did not tell participants that their benefits will be reduced under the new plan. Id. 81-85; see also 49-58.

200. Having reviewed the article paragraph-by-paragraph, Mr. Arko finally agreed:

> "Q. Is there something in this article that tells employees that their benefits will be reduced under the plan?
>
> A. No."

Id. at 85.

201. Mr. Arko was also asked whether CIGNA's Information Kit contained notice of reductions in the rate of accruals. He stated "No, I don't believe so." Ex. 194 (Arko Depo) at 41-42. When asked about the statement in the Kit that "Generally speaking, the new retirement plan in comparison with the current pension plan tends to provide larger benefits for shorter service employees, and comparable benefits for longer service employees," Mr. Arko stated that this was an accurate statement "given this was created in 1997." Id. at 260. He would not describe what he considered "comparable benefits" to mean,

id. at 265-270 or respond to the question of whether a shorter- service employee who was older would receive a "larger" benefit under the cash balance plan. Id. at 260-64.

202.   In his Rule 30(b)(6) deposition, Mr. Arko also agreed that CIGNA's SPDs do not identify the features described in ¶¶90-93 and 120-29 above. When asked whether the SPD discloses that the opening account balance is not based on the early retirement value, Mr. Arko responded "I don't see specific words that define that detail."  Ex. 194 (Arko Depo) at 140.

203.   Mr. Arko was non-responsive to a series of questions about whether the SPD suggested that participants would not receive their old plan benefits plus the new plan benefits. See Ex. 194 (Arko Depo) at 141-53 and 285-92.

204.   In response to whether the SPD discloses that accrual rates decrease with age, Mr. Arko stated "I don't believe it directly does." Ex. 194 (Arko Depo) at 321.

### E.    Although It Has Made Disclosures of Other Potential Reductions, CIGNA Did Not Disclose these Reductions And Contends That It Did Not Have to.

205.   As described above, CIGNA's summaries of the amendments do not mention any periods of wear-way with no additional benefits or any other reductions in the rate of future benefit accrual.

206.   CIGNA's disclosures also did not provide sufficient information

about the changes for participants to compute such reductions for themselves. Participants were not given formulas to help them calculate the retirement benefits that they would receive under the cash balance plan and compare them with the old plan's benefits. See Ex. 8 (Stratman Rpt. Exs. 1-4).

207.    CIGNA separately offered a software program named "Retirement Planner" to "help employees with their financial planning." Ex. 101 at SuppD 1279. This software did not, however, allow participants who were moved to the new cash balance plan to project their annual retirement benefits. Ex. 102 at SuppD 1254.

208.    In contrast to the absence of any disclosure of reductions in the Newsletter, CIGNA provided notice of "reductions" in a 2004 disclosure directed to the employees who were previously grand-fathered. There, CIGNA disclosed that certain early retirement and death benefits would be "frozen" and "eliminated" prospectively. See Ex. 103 at 5, 10 and 24.

209.    CIGNA also talked about "potential reductions" in benefits in another context immediately prior to the cash balance conversion: The 1997 Total Compensation Report talks about "the potential reduction in retirement income" that "mobility creates" i.e., "[i]f you move among employers over the years." Ex. 85 at P 1774.

210.    David Durham testified that he believes there was a discussion that

65

the 204(h) notice "language" should be included in the Information Kit because the benefits for former Tier 1 employees were less. Ex. 197 (Durham Depo) at 167-69. But the language was not included.

211.   Mr. Sher opines that he believes that "there was no requirement to disclose in an ERISA 204(h) notice the effect of a plan amendment, either in general or at the participant level." Ex. 11 (Sher Suppl Rpt) at 4.

212.   Paul Strella, one of the Mercer consultants who advised CIGNA, see Ex. 13, has been quoted in a May 5, 1999 *Wall Street Journal* article as stating: "The [advance notice] law 'doesn't require you to say, We're significantly lowering your benefit.' All it says is, 'Describe the amendment.' So you describe the amendment." Ex. 67. As described in ¶¶237-40 below, Mercer prepared both CIGNA's Newsletter and the Information Kit.

213.   The Newsletter article which CIGNA's 30(b)(6) witness identified as the 204(h) notice does not describe the amendment. See Ex. 8 (Stratman Rpt. Ex. 1 at 5).

214.   The Newsletter contains statements about how the cash balance changes "enhance" the retirement program, are "designed to work well for *both* longer-and shorter-service employees" and provide "steadier benefit growth throughout [the employee's] career." Ex. 8 (Stratman Rpt. Ex. 1 at 1 and 4) (emph. in orig.).

66

215.    A description and graph about "How your benefit could grow" appears alongside the article with the purported "204h notice" in the Newsletter. The graph indicates that the benefits under cash balance may grow to over $1 million at age 65. Id.

216.    CIGNA's Answers to Interrogatory Nos. 6-7 alternatively maintain that a 204(h) notice was given that benefits were "frozen." Ex. 27. But the Newsletter does not provide notice of a freeze. It tells employees their benefits under the old formula will stop "after" December 31, 1997 and on January 1, 1998 that their benefits will start under the cash balance formula. Ex. 8 (Stratman Rpt. Ex. 1 at 1 and 5).

**F.    CIGNA's Inadequate Disclosures Affected the Ability of Its Employees to Make Well-Informed Employment and Retirement Decisions.**

217.    It is a basic principle of neoclassical economics that labor markets function efficiently when both employees and employers both have reasonably "complete information." See, e.g., "Comparable Worth: A Brief Review of History Practices & Theory, 69 Minn. L. Rev. 1199, 1213 (May 1985).

218.    CIGNA's purported Section 204(h) notice and its SMM and SPDs do not tell employees about reductions in future rates of accruals or any periods with no additional benefit accruals. See ¶¶155-204.

219.    The only employees who knew about the extent of the reductions

appear to have been the executives and actuaries, such as Gerry Meyn, David Durham, John Arko and Denise Hill, who knew about the reductions from the internal communications that they either received or wrote.

220.   CIGNA admits that the cash balance amendments were "material modifications" because, *inter alia*, it prepared a summary of material modifications in the form of the Information Kit about the changes. Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

### 1. *CIGNA repeatedly recognized that employees have to plan for retirement with the information that CIGNA provides.*

221.   CIGNA recognized that "employees have based their financial and retirement planning on the assumption that they will continue to earn benefits under the CIGNA Pension Plan." Ex. 104 at D12398.

222.   In annual Total Compensation Reports ("TCRs"), CIGNA recognized that employees have to make "difficult decisions" based on the information that CIGNA provides. Ex. 86 at P 1956. The 1997 Total Compensation Report began by asking"Are you prepared for the future?" Ex. 85 at P 1766. The Report focuses on financial plans, the decisions that employees have to make about whether to spend or save, and the need to replace 75% of pre-retirement income. Id. at P 1766 and 1776.

223.   The December 1997 Information Kit/SMM also recognizes that

68

employees needed to update their financial plans for the cash balance changes. It states that under cash balance, "you will see the growth in your total retirement benefits from CIGNA every year and will be able to update your financial plans accordingly." Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-00452).

224.   The Information Kit stresses the importance of planning for the future: "It's never too early or too late to start planning...the sooner you start planning and saving, the better off you'll be financially when you decide to retire." Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-00461).

225.   A June 1998 Signature Benefits Newsletter states that "The Total Compensation Report has extensive information to help everyone with retirement planning–particularly how much you should consider saving in SIP...or if you need to increase your savings for retirement in other ways." Ex. 101 at SuppD1279.

226.   The June 1998 Newsletter states that the 1998 Total Compensation Report "devotes considerable space to retirement planning" and informs participants that the "average retirement period is longer with longer average lifetimes." Ex. 101 at SuppD1278.

227.   The 1998 Total Compensation Report states that "With this information, you can begin to measure whether you need to save more, or change your investment strategy to satisfy your personal income goals."  Ex. 85

at P 1788-89.

> ### 2. *Employees requested additional information in managers meetings, focus groups and individual communications.*

228.  Focus group sessions in April 1997 found that "Over 70% [of employees in focus group sessions conducted in April 1997] saw a Pension Plan as an important company guarantee. A guaranteed benefit (disregarding the actual size of the benefit) was seen as an important benefit component." Ex. 105 at SuppD1854.

229.  In August 1997, CIGNA managers were asked to review the cash balance proposal. They urged CIGNA to "publish case studies (positive and negative)" and be ready "to support the employees who will be negatively impacted ASAP" and "avoid perception that we are not telling the entire story." They also urged CIGNA to "show illustrations that 'prove' small lump sums will yield equivalent benefits in the future."  Ex. 106 at 11936.

230.  A survey questionnaire attached to CIGNA's December 1997 Information Kit asked "What additional information would you like CIGNA to provide?" The survey elicited numerous questions from employees about whether and to what extent, if any, the cash balance conversion reduced their benefits:

> "I don't understand why CIGNA is not providing the details instead of saying trust me." Ex. 107 at SuppD1601.

"More specific detail re: calculation of lump sum" and "project the retirement under the old and new plan." Ex. 107 at SuppD1604.

"Show me the math on the old vs. new. Did I win or lose?" "How much additional personal savings will be required to cover potential shortfalls." Ex. 107 at SuppD1605.

"Comparison to old pension plan ie. dollar amount ie. would lump sum distribution buy an annuity comparable to the old plan?" Ex. 107 at SuppD1606.

"Specifics on my benefit and how to plan for annuity amounts at early retirement." Ex. 107 at SuppD1606.

"I have read the information and studied the examples, however I am not sure how/what impact this will have on me. I trust CIGNA will be distributing individual specifics in the future." Ex. 107 at SuppD1606.

"would lump sum distribution buy an annuity comparable to old pension plan?" Ex. 107 at SuppD1606.

"A comparison for me personally of my benefit at retirement, given identical assumptions, under each plan." Ex. 107 at SuppD1607.

"How much I accrued under the old program that will be transferred to the new and the real reason CIGNA made this change." Ex. 107 at SuppD1607.

Provide "a comparison for me...under each plan...unless the interest rate under the new plan exceeds 7% consistently, my benefit will turn out to be less than what I would have received under the old plan." Ex. 107 at SuppD1607.

"I would like specific information regarding what I can look forward to as a retirement income. Am I better off before or after the changes in 1998? I certainly could not tell by this information." Ex. 107 at SuppD1609.

231.   In individual communications with CIGNA, employees also asked

71

for comparisons:

> "I would like to understand how the new Plan results in my particular case would compare to what I would have received in the future under the current Plan, whether I spent 30, 20, 15, or less years at CIGNA.... what I am interest in is what financial enhancement this new plan provides for someone in my situation.... The SB Newsletter does not provide this." Ex. 108 (11/6/1997 email from Janice Weidenborner), at SuppD1668.

> "In my case, it appears that CIGNA is planning to cut its annual contribution to my pension plan by 39%. I hope I have misunderstood or miscalculated. In any case, I would appreciate any clarification that you can provide. One of the claimed advantages of the new plan is that it is easier to understand. This ceases to be much of an advantage if I understand that the new plan will dramatically reduce my pension." Ex. 109 (11/6/1997 email from Steve Bailey) at SuppD1673.

> "what would the value of my retirement package be under the old plan, and under the new plan? ...So I can get an apples to apples comparison"; "my sense" is that "my lifetime benefit has been reduced." Ex. 110 (11/5/1997 email from Mike Walsh) at SuppD1671.

> "I just received the information kit on the retirement plan conversion. Inside, it details how to roughly calculate my "balance" that will be deposited into the new account balance plan in the spring. If I go back to my 1997, 1996, 1995 Signature Benefits Total Compensation reports (page 2 of the report where it details what CIGNA pays on my behalf for the CIGNA Pension Plan) and add these CIGNA contributions for those years together, and also add estimated amounts for the prior years before the total compensation report was prepared, I can't seem to get the two numbers close. My question is are these two supposed to be comparable?" Ex. 111 (12/11/1997 email from Mike Walsh) at D030811.

> "trying to understand why I am...in the new pension plan. I was hired prior to 89 and my age and service exceed 45. How will the highest growth in benefits, for me, be met under the new plan?" Ex. 112 (12/16/1997 email from Barry Pitek) at SuppD1686.

> "What is the percent difference (plus or minus) between what I will

72

receive at retirement under the new program compared to what I would
have received under the old plan?" Ex. 113 (1/6/1998 email from John
Schwoerer) at D030795.

"I would not expect CIGNA to have many employees that were hired prior
to 1989 and have under 45 years of combined age and service. Being in
the minority I am suspicious to how good the new plan is for me! I would
suspect that the plan is optimized to the majority of employees with little
consideration for the few that share my circumstances. Therefore, I would
like to formally request a meeting so that somebody from human resources
of benefits can explain to me why: ... The new plan is better for me in the
long run." Ex. 114 (12/19/1997 email from Brian Mitchell) at D030797.

232.   As described below, the responses to these requests which were

produced in discovery generally told the employees that CIGNA was not doing

"side-by-side comparisons." ¶¶246-48.

### 3. CIGNA had a policy of "NOT" providing benefit comparisons or information about "negative impacts" from the cash balance changes.

233.   As indicated in the *Wall Street Journal* article, CIGNA's consultant

Mercer was aware that cash balance conversions can "mask" pension benefit

reductions. Ex. 67. In presentation materials for clients prepared in July 1996,

Mercer identified "Masking a cut in pension plan benefits" as a reason why

"Cash balance plans are popular with employers." Ex. 115 at P 2159.

234.   At the same time, a 3/17/1997 Mercer presentation to CIGNA stated

that the client should "Deal with 'bad news' up front" in its communications. Ex.

116 at 1521 (Mercer's 3/17/1997 "Communication Issues in Transitioning to a

Cash Balance Plan"). The same presentation includes a point about offering a "Comparison of new to old." Id. at 1516.

235.   In May 1997, Mercer prepared a second presentation for a meeting with CIGNA at Eagle Lodge in Pennsylvania. Mercer identified "Major Problem Areas in Cash Balance Administration" including "New benefits compared to "expectation" from the current plan." Ex. 93 at 29930-31.

236.   In a third presentation in August 1997, Mercer stated: "What helps in this situation is to acknowledge the reality, to be forthright about any negative news...." Ex. 117 at SuppD1549 (in presentation entitled "Meeting the Communication Challenge: A Communications Plan for Benefits Change").

237.   However, in the same presentation, Mercer states that CIGNA has decided not to offer comparisons. The August 1997 presentation expressly states that "CIGNA has decided, for a number of reasons, not to compare the old to the new plans." Ex. 117 at SuppD1548 (emph. added).

238.   The Plaintiff class asked CIGNA to explain this instruction in Interrogatory No. 1 to the Second Set of Interrogatories. CIGNA answered that "employees could be confused if they were provided with a comparison of the old plan to the new plan, particularly because employees could not choose to select benefits under the old plan.  In addition, a comparison would be highly dependent on individualized circumstances, costly and time-consuming to

prepare." Ex. 29.

239.   In September 1997, CIGNA entered into an over $200,000 contract

with Mercer to offer professional communications services to prepare CIGNA's

disclosures, including the Newsletter and Information Kit. Ex. 118 at

SuppD1775-76.

240.   The Newsletter and Information Kit that Mercer prepared for

CIGNA did not compare the old and the new plans, except to tell participants

that "exact comparisons of benefits ... are difficult" and then offer the assurances

detailed above, such as that "Generally speaking" the new plan provides

"comparable" or "larger" benefits. Ex. 8 (Stratman Rpt. Ex. 2 at AMARA-

00452).

241.   Although employees requested more comparative information in

focus groups, in response to surveys, and in individual communications, CIGNA

had a policy against providing comparisons, which was expressed in its

instruction to Mercer and in other internal communications. A September 13,

1997 email from CIGNA's Assistant Vice President of Global Benefits on the

subject of "Retirement Communications" states:

> "We continue to focus on NOT providing employees before and after
> samples of the Pension Plan changes. We will focus on their need to project
> retirement income needs (with our help), anticipate SS benefits (with our
> help) and ultimately in the Total Compensation Report we can offer advice
> on a reasonable level of savings they need to consider in addition to the

Pension benefits CIGNA will provide (as shown in detail in the TCR)."

Ex. 119 at 11708. See also Ex. 120 at 20529 ("we don't do" comparisons); Ex.

121 at 21235 (don't do any "non-standard" pension calculations of "what if"

employee stayed in the old plan).

242.   Robert Upton, a lawyer in the group insurance law department who

was under the Tier 2 (1.67%) formula in the prior plan, is the only non-executive

level employee known to have obtained a comparison from CIGNA. The

comparison that he received showed a 29% reduction compared to the Tier 2

formula.  Ex. 122 at D020832.

243.   Even that comparison was adjusted form an originally higher

estimate of the reduction: David Durham initially computed Mr. Upton's

reduction at 42%. But a 12/7/1999 email from John Arko to Mr. Durham about

that computation states: "Using a 6 or 6.8% rate tells much better, accurate story.

Using 6.8% the annuity would be about 61K for a replacement ratio to the old

plan of 75% (instead of 58% using your numbers)." Ex. 122 at D020852.

244.   Mr. Upton testified that he met with Gerald Meyn and asked him

whether other employees could obtain comparisons. Mr. Meyn said that they

could. Mr. Upton then told Naomi Biggs, a senior attorney in the Group

Insurance Law department, that she could ask for a comparison. Ex. 187 (Upton

witness statement) at 6. When Ms. Biggs asked for a "comparison/projection of

old/new benefits," she was told it "would NOT be provided." Ex. 120 at 20529 and 20531.

245.   Discovery uncovered a number of examples of employees who sought comparisons and were denied them. Barry Pitek asked "How will the highest growth in benefits, for me, be met under the new plan?" He was told that "Moving to the new plan does not negatively impact you." Ex. 123 at D0292744 and Ex. 112 at SuppD1686.

246.   Mike Walsh asked "what would the value of my retirement package be under the old plan, and under the new plan?" He was told "We are not doing side-by-side comparisons of old versus new benefits since any comparison we make requires estimates" of various factors "which are different for each employee's situation."  He was also told that the "goal of the program is to provide comparable benefits for a long career with CIGNA." Ex. 123 (next to last page in the Exhibit) and Ex. 110 at 1671.

247.   Janice R. Weidenborner who was age 32 with 10 years of service at the conversion was told  "[w]e are not doing side-by-side comparisons of old versus new benefits" but "you have plenty of time to take advantage of the many attractive features of the Retirement Plan." Ex. 123 at 29766.

248.   In another communication, Steve J. Bailey noted the CEO's statement about how cash balance would be an "enhancement" but by his "quick

calculation" it was a 39% reduction for him. Ex. 109 at 1673. CIGNA told him that "We are not providing comparisons of benefits at this time." Id.

249.   The Plan administrator, Stewart Beltz, wrote to named Plaintiff Gisela Broderick on July 31, 2001 in response to her request that CIGNA "identify the impact of the pension benefit conversion to your pension benefit at the time of your retirement."  He told her that "It is difficult to quantify the impact; however, I can assure you that in no event will your benefit be less than the benefit you had accrued through December 31, 1997."  Ex. 125 at P 1236.

250.   John Arko's notes of a discussion with class member John Nystrom state: "When pushed for rationale, I explained people employed 12/31/97 were examined to be sure projected benefits were fair." Ex. 126.

251.   A memo from Mr. Arko to Jerry Meyn concerning questions raised by class member Dave Carlson indicates that Mr. Arko was to tell him that "At your age (less than early retirement eligibility) accruals over the next few years look to be greater than they would have been under the old plan." Ex. 127 at D020652.

> ### 4.   CIGNA's objective was to "quickly dispel any perceptions of take-aways" and avoid "any significant negative reaction from employees."

252.   As described below, CIGNA's communications strategy was to "quickly dispel any perceptions of take-aways" and avoid "any significant

negative reaction from employees."

253.   In three internal documents, CIGNA stated that it wanted to "Quickly dispel any perceptions of 'takeaways'" in communicating with the employees and "focus on the potential additional benefits." Ex. 128 at D14872 (7/25/1997 Discussion Points for Division Presidents); Ex. 117 at 1544 (8/1997 Meeting with Mercer: "dispel perception of a takeaway and focus on the 'new deal'"); Ex. 129 at 1897 (9/12/1997 Project Planning Meeting with Mercer: "Objectives" include: "Dispel perception of a takeaway and focus on the 'new deal'").

254.   In September 1997, newspaper articles began appearing on cash balance conversions covering instances involving Deloitte & Touche, IBM, Chase-Manhattan Bank, and Verizon, in which complaints from employees caused benefit reductions to be wholly or partially rescinded. Ex. 130. An article also appeared in July 1999 about changes that Prudential, one of CIGNA's main competitors, made in response to complaints from managerial-level employees about a 40% reduction in pension benefits. Ex. 131.

255.   The first article was the *Wall Street Journal*'s September 23, 1997 news article on Deloitte & Touche's cash balance conversion entitled "Pension War Breaks Out at Accounting Giant." Id.

256.   The same day, CIGNA's Gerry Meyn compared CIGNA's changes

with Deloitte's changes in a "Commentary on Deloitte and Touche Article." Ex. 58 at 1578.

257.    Mr. Meyn attached his "commentary on the WSJ Article, explaining where D&T went wrong, and how we are and will be different" to a 9/23/1997 email for Donald Levinson, the head of Human Resources. Ex. 58 at SuppD1581.

258.    Mr. Meyn told Mr. Levinson that Deloitte had "stupidly promised 'no harm' and 'big improvement.'" Ex. 58 at SuppD1579. Mr. Meyn then listed what CIGNA's communications should "tout" or "stress" and what to not to say. The list states that "CIGNA's communications will not make unequivocal statements about 'will not harm' or 'big improvement.'" Id. at SuppD1581.

259.    A handwritten note by Gerry Meyn to Mr. Levinson on another copy of the *Wall Street Journal* article states that: "Our goal is to take all necessary steps to stay out of the papers." Ex. 58 at SuppD1582.

260.    CIGNA prepared materials "to be used only in the event of media inquiries." Those materials contain the same statements as in the Information Kit that "Generally speaking" shorter-service employees will receive "larger" benefits and longer-service employees will receive "comparable" benefits. The materials also repeat the statements that "CIGNA employees and new hires will be able to earn comparable benefits as career employees under the cash balance

80

plan" and that "CIGNA is not saving money by making these changes." Ex. 58 at SuppD 1584-86.

261.   A survey included in the December 1997 Information Kit found that employees believed that CIGNA was committed to providing comprehensive information about their retirement benefits: 90% agreed with the statement that "[t]he company seems committed to giving me comprehensive information about retirement benefits." Ex. 107 at SuppD1592.

262.   The survey also asked employees whether they agreed with the statement "I believe my retirement benefits will be the same or better after the changes." Ex. 107 at SuppD1588. Of those in the New Plan, 18% strongly agreed, 38% agreed, 30% neither agreed nor disagreed or did not know, and only 14% disagreed. Id. at SuppD1592.

263.   The strategy of not disclosing the reductions produced the desired result. In September 1999 Gerry Meyn reported to the Board that "CIGNA's Cash Balance plan has been very well received by CIGNA employees (employee survey ratings up 15 percentage points) and has not generated notable controversy." Ex. 47.

264.   CIGNA concluded "we've been able to avoid bad press," Ex. 48, and "we have avoided any significant negative reaction from employees." Ex. 133 at SuppD1566 (3/9/1998 Memo from Gerald Meyn to HR Officers re:

81

survey results).

265.   The statement that "we have avoided any significant negative reaction from employees" has handwritten comments from the head of CIGNA's Human Resources Department, Donald M. Levinson: "Neat!" and "Agree!" and "Better than expected outcome." Ex. 133 at SuppD1566.

266.   A March 13, 2000 e-mail from Gerald Meyn states that "Our Jan 1998 introduction of the plan did not set off any significant rumblings at CIGNA and things remain quiet." Nevertheless, he attached "materials which would be sent to employees soon after any negative press for CIGNA on this topic." Ex. 124 at D14160. The attached "Fact Sheet" for employees would reiterate the statement that "our new account balance pension plan generally tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees." Id. at D14162 and D14165. CIGNA planned to continue to maintain that "the Plan is not designed to save money," id. at D14161, and did not identify any reductions or other disadvantages of cash balance in the materials. See id. at D14161-65.

267.   As late as January 2003, CIGNA continued to be concerned that it not "raise awareness" of the cash balance changes. In considering a proposal to transfer the grand-fathered employees who were still under the Tier 1 formula to the cash balance plan, Kenneth Bottoms in CIGNA's Compensation department

82

wrote to Gerald Meyn, with a copy to Don Levinson, the head of HR:

> "the media will be all over it no matter how it is handled ... the 10% of employees who have this special benefit ... will complain to the 90% who are in the cash balance plan and renew this as an issue for employees in the 90% group who have been reading in the newspapers about the evils of cash balance plan. The point is that this is an issue that will raise awareness for many employees even beyond those in the Tier 1 plan."

Ex. 134. CIGNA ultimately decided to leave the grand-fathered employees under the Tier 1 formula, but to make prospective reductions to their early retirement and death benefits. See ¶208.

### 5. *The individual testimony offers additional circumstantial evidence that employees "were likely to have been harmed as a result."*

268.    The three named Plaintiffs and seven other class members prepared witness statements related to the likely prejudice from CIGNA's misleading and inadequate disclosures.

269.    Janice Amara, a Tier 1 (2%) formula employee who was rehired in September 1998, testified that she looked through the SPD online and "Nothing suggested I would not receive the[] benefits" from the cash balance benefit credits. She testified that:

> "I did not learn that I was not actually receiving any additional benefits until I talked with a Cigna actuary named Mark Lynch at a farewell party for two other Cigna employees on September 14, 2000. Mark Lynch said, 'Jan, you would be sick if you knew the wearaway factors they are using.'

> "Frankly, I was sick when I heard this. I don't think I said much to Mark,

83

> but I began asking for a statement of my benefits and I went to Andy
> Hodges, another Cigna actuary, about what I thought were errors in my
> benefit statement. I also contacted my attorney in March of 2001."

Ex. 181 (Amara Decl.).

270.   Gigi Broderick, a Tier 1 formula employee who was rehired in June

2000, testified that she was never informed about the change in the rehire rule

which required rehired employees to be converted to the cash balance plan.  She

testified that CIGNA's communications described the cash balance plan as

"similar" to the old plan and an "enhancement."  Nothing informed her that she

would earn no additional benefits for the rest of her career after she returned to

CIGNA.  Ms. Broderick further testified that had she known about the reductions

in her pension benefit, she could have remained at her higher-paying job at

Aetna, bargained for additional compensation upon her rehire, complained up the

chain of command, put more money in savings, and made greater 401k

contributions.  Ex. 182 (Broderick witness statement).

271.   Patricia Flannery, a Tier 1 rehire, testified that upon her return to

CIGNA in October 2000, she was never told that she would be converted to the

cash balance plan, nor was she informed that the new plan would reduce her

pension.  Ms. Flannery stated that she would not have come back to work for

CIGNA had she known her benefits were being reduced.  Alternatively, she

would have bargained for a higher salary, complained to her managers about the

reductions and the policy of switching rehires to cash balance, and increased her

401k contributions to make up for the difference in benefits. Ms. Flannery

further testified that she "will have to work longer to be able to make up for the

reductions, even though I had prior plans to retire at age 62." Ex. 184 (Flannery

witness statement).

272.   Steven Law, a Tier 1 employee who was rehired in September 1999,

testified that "I was never told that my pension would change if I returned to

work for CIGNA." When he discovered he was converted to the cash balance

plan, he "could not do comparisons with the old plan" and "did not have the

formulas" to calculate his account balance. According to Mr. Law, if he had

known before his rehire that he would be switched to the cash balance plan and

his benefits were being reduced, he would have "reconsidered [his] rehire offer

and may not have returned to CIGNA." Mr. Law also testified that he could

have asked to be placed in a higher job grade, complained to his department

managers and farther up the ladder, and looked for another position that offered

better benefits and compensation. Ex. 185 (Law witness statement).

273.   Annette Glanz, a Tier 1 employee who was continuously employed

from 1988 until June 2004, testified that, based on CIGNA's communications

and the managers' assurances at staff meetings, she believed that "the opening

account balance represented the "lump sum value" of our benefits under the Part A

85

Plan and that the cash balance credits were building benefits on top of the benefits I had from the old plan." She could not verify her opening account balance because CIGNA did not disclose how they were calculated and "I did not know how to calculate the amount on my own." Ms. Glanz testified that had she been told that her pension benefits were being reduced under the cash balance plan, she could have complained to her managers and asked for higher raises or an increase in salary to make up the difference, and she could have also contributed more to her 401k account or opened an IRA. Ex. 183 (Glanz witness statement).

274.   Bruce Charette, a Tier 1 employee who has been continuously employed by CIGNA from January 1987 to date, testified that, based on CIGNA's communications, "My understanding was that my benefits were growing under the cash balance formula with the annual benefit and interest credits comparable to the way they grew before." When he inquired about his opening account balance, a Benefit Services representative told him the amount was "definitely comparable" to what he had under the old plan. Mr. Charette testified that "I still do not have the information to do an apples-to-apples comparison of where my benefits under the 2% formula would be today compared with my retirement benefits under the cash balance plan." If he had known earlier how much his benefits were reduced, Mr. Charette testified he would have complained to his managers, asked for a raise or higher salary,

looked for other job opportunities, increased his 401k contributions, or opened

an IRA account sooner. Ex. 186 (Charette witness statement).

275.   Robert Upton, a Tier 2 employee who was continuously employed

from 1990 to April 2005, testified "When CIGNA first informed us that it was

switching to a new pension plan, I was under the impression that the old defined

benefit plan and the new cash balance plan resulted in comparable payments on

retirement." He stated that the November 1997 Newsletter "did not inform me

that:

> (a) my benefit under the new plan would be significantly lower than my benefit under the old plan,
>
> (b) I would need to significantly increase my personal retirement savings outside the 401(k) plan in order to have a similar level of income on retirement, or
>
> (c) investment risk under the pension plan was being transferred from the company to me."

Mr. Upton further testified that if he had known earlier how much his benefits

were being reduced under the new plan, he would have "worked with other

similarly situated employees to jointly object to this action prior to its

implementation." Once he learned in late 2001 that he had a 30-40% reduction,

Mr. Upton asked Gerald Meyn who he could complain to about the scale of the

reductions. Mr. Meyn told him that he could take it up with Donald Levinson,

the head of Human Resources. But after their meeting, Mr. Meyn called Mr.

Upton's supervisor, Mike James, and told him to advise Mr. Upton not to go to Mr. Levinson. Mr. Upton testified that he "found it very threatening that I would be warned not to take this any further." After that, Mr. Upton adjusted his financial plans and his assessment of whether he should stay at CIGNA for the rest of his career or accept another job offer.  Ex. 187 (Upton witness statement).

276.   Mitchell Haber, a Tier 2 employee who was employed from 1989 to December 2001, testified that the cash balance conversion was portrayed as a "positive change": "My understanding was that I was going to receive a lump sum amount and would earn benefits each year on top of what I already had." He "did not find out about the reductions until late in 2004", three years after he had already left CIGNA.  Mr. Haber testified that if he had known that the new plan was going to reduce his retirement benefits, he would have complained about the change to his managers, tried to find out more information about the reductions from his colleagues, looked for other job opportunities sooner, or increased his savings.  Ex. 188 (Haber witness statement).

277.   Barbara Hogan, a Tier 2 employee who was employed from 1990 to May 2001 and had more than 55 age and service points at the conversion, testified that "CIGNA made it sound like the employees were going to get a better deal under the cash balance plan" and "Neither the Newsletter nor the 1998 or 1999 Summary Plan Descriptions stated that my benefits were going to

be reduced under the cash balance plan." She testified that had she known about the reductions, she could have complained to her managers or the executives at the head office, asked for a higher salary to compensate for the loss in benefits, looked for another job with better benefits or compensation, or increased her savings and 401k contributions. Ex. 189 (Hogan witness statement).

278. Stephen Curlee, a Tier 2 employee who was employed by CIGNA from 1990 to March 2004 and had more than 55 age and service points at the conversion, testified that the new plan was portrayed as "similar" to the prior plan and that it "provides the same benefit security." He stated that "When people see that type of language about the new plan, they are led to believe that everything is okay." According to Mr. Curlee, if CIGNA had disclosed how much his benefits were going to be reduced under the cash balance plan, he would have talked to his manager about ways to make up the difference in benefits, increased his 401k and IRA contributions, set more money aside for savings, or moved to a different company with better benefits or compensation. Ex. 190 (Curlee witness statement).

279. The parties' March 10, 2006 Stipulation gave CIGNA gave the right to take discovery from 8 absent class members, to be selected by CIGNA, about "likely prejudice" for CIGNA's disclosures. Ex. 135 at 1-2 (see also dkt. #167). CIGNA did not exercise this right. The Stipulation also gave CIGNA permission

89

to ask 26 "key employees," including Gerald Meyn and John Arko, for any documents that would tend to show an absence of likely prejudice. Id. at 3. CIGNA did not exercise this right either.

### G.    The Amendment to CIGNA's "Rehire Rule" Was Not Disclosed in the Purported Section 204(h) Notice or a Summary of Material Modification.

280.    Section 2.4 of CIGNA's prior Pension Plan contained a rule entitled "Resumption of Participation Upon Re-Employment" under which rehired participants were returned to the benefit formula that previously applied to them. Ex. 2 at 18-19.

281.    In 1998, CIGNA amended the prior Pension Plan, which was now called Part A, to change the heading of this Section to "No Resumption of Participation Upon Re-employment" and to provide that a participant who had the age and service to be remain under the old formula would instead be moved to the cash balance formula upon any rehire. Ex. 24 at 16-17; see also Ex. 1 at 16-17.

282.    The Third Circuit's Depenbrock v. CIGNA decision determined that CIGNA did not adopt this amendment until December 21, 1998. 389 F.3d 78, 86 (2004).

283.    The modification to the rehire rule affected vested separated participants because it changed their retirement benefits if they were re-

employed by CIGNA in comparison with the rule in effect when they left.
CIGNA recognized that under the amended rule the "Rehires see no benefit
improvement for several years." Ex. 140 at 4649.

284.   CIGNA did not give any notice of this amendment to the
participants who would be subject to it: CIGNA's purported Section 204(h)
Notice (the November 1997 Newsletter) does not mention any amendment to the
rehire rule. Ex. 8 (Stratman Rpt. Ex. 1).

285.   In Depenbrock, CIGNA maintained that the Information Kit was a
summary of material modification of the change. Ex. 136 (CIGNA's Appellate
Br. at 47-49, CIGNA SJ Brief at 36-37); see also 278 F.Supp.2d 461, 470 (E.D.
Pa. 2003). CIGNA contended that the version of the Information Kit distributed
to Tier 1 participants who were grand-fathered under the Part A Plan, including
John Depenbrock, disclosed the modification. CIGNA pointed to a sentence in
this version of the Information Kit which states: "If you leave CIGNA
companies and are reemployed after December 31, 1997, you will not participate
in the Pension Plan when you return.  Instead, you will be eligible to participate
in the new CIGNA Retirement Plan." Id. and see Ex. 137 at D00642. No
explanation was given of the impact of that change. Id.

286.   No such statement was contained in the version of the Information
Kit distributed to employees who were moved to the cash balance formula, nor

91

was any explanation given of the impact. See Ex. 8 (Stratman Rpt. Ex. 2).

287.   No version of the Information Kit or other summary of material modification about the amended rehire rule was prepared or distributed to former employees who might be returning to work. CIGNA admits that neither version of the Information Kit nor any other notice was distributed to separated vested participants like Janice Amara, Patricia Flannery or Steven Law. Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

288.   CIGNA maintains that "Vested separated participants were not affected by the amendment to the CIGNA Pension Plan, and were therefore not provided with a revised summary plan description, until and unless they were rehired by CIGNA."  Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

289.   CIGNA further admits that the Information Kit was not distributed to some current CIGNA employees, including Gisela Broderick, who were transferred by CIGNA to Lincoln National after 12/31/1997.  Ex. 27 (Answer to Interrogatory No. 14).

290.   The October 1998 SPD stated that "If you were an employee on December 31, 1997, or rehired after 1997, any benefit you earned under the Pension Plan through December 31, 1997 was converted to an opening account balance in this Pension Plan." Ex. 8 (Stratman Rpt. Ex. 3).

291.   But the October 1998 SPD was not given to rehired employees until

after they were rehired. Ex. 29 (Answer to Interrogatory No. 2) (notice was not given "until and unless they were rehired by CIGNA").

292.    The only way in which a change to the rehire rule would not affect vested separated participants is if former employees had no reasonable expectation of being rehired. But "CIGNA rehired 2,600 former employees in 1998 and 1999." "480 employees (17%) were formerly from Tier 1 ..." Ex. 140 at 4649; see also Ex. 138 at DO4355 ("Recent patterns in rehires have shown that on average we are now rehiring more employees who are closer to early retirement age than ever before").

293.    When rehired employees found that they were being converted to the cash balance formula after being rehired, they were upset. See, e.g., Ex. 139 (Gisela Broderick's complaint letters); Ex. 44 at 20525 ("another rehire" [Peter Andruszkiewicz]; "Guess what? He's upset.").

294.    CIGNA's policy was to refuse to provide benefit comparisons to such employees. A 3/20/2001 email from Stewart Beltz, the Plan administrator, titled "Non-standard Pension Calculation Requests" states:

> "In the event of ... the re-hire of a former employee with a vested or unvested benefit, only conduct a pension calculation for the specific plan they would be eligible for. Please do not perform any "hypothetical" or "what if" calculations for any pension benefit accruals for which the employee is not currently or could not in the future be an eligible plan participant. If a participant has a frozen pension benefit, please do not conduct any pension calculation that projects future growth in any frozen

benefit."

"Any attempt to request a "hypothetical", "what if" or any other non-standard pension calculation must be directed to John Arko or myself for prior approval, consistent with the process currently in place for all executive requests."

Ex. 121.

295.   When Ms. Broderick asked for a comparison, Stewart Beltz, who at that time had the title of Plan administrator, told her that it is "difficult to quantify the impact" of the cash balance changes. Ex. 125 at P 1236.

296.   When news of the effect of the change leaked out there were "Problems with rehiring those who would lose substantial amounts of early retirement subsidy." Ex. 70.

297.   In the year 2000, CIGNA decided to modify the rehire rule, effective for individuals rehired on or after January 1, 2001, to an "A+B" formula under which rehires would "keep their already-earned old plan benefits," including early retirement subsidies, as a separate benefit and earn cash balance accruals with no wear-away. Ex. 132 at D05532 and 5534 and Ex. 140 at DO4646 and 4649-50. CIGNA described this "as a recruiting incentive." Id. at 4650; see also Ex. 141 at SuppD0186 (amendment "Facilitates re-hire of late career staff by grandfathering their favorable early retirement factors from the tier 1 plan").

298.   CIGNA remained concerned with the effect that disclosure of this

94

change would have on the individuals who had already been rehired. "I strongly suggest that any discussion [of changes to the pension benefits of rehired employees] be oral and not written for perpetuity (and xerox machines) since we have another 300+ employees rehired over the last two years who may not like their exclusion from the new rule." Ex. 142.

299.   Gisela Broderick, Patricia Flannery, and Steven Law testified that they might not have accepted CIGNA's job offer or could have bargained for increased compensation had they known what they were losing. See ¶¶270-72 above.

## VI.   CIGNA Did Not Protect "Minimum Benefits" or Notify Participants of Those Benefits as the SPD Promised; Participants Were Also Not Notified When Optional Benefit Forms Had Higher "Relative Values."

### A.   CIGNA Did Not Notify Participants of Minimum Benefit Entitlements and Did Not "Populate" the Fields for Minimum Benefits for Over 9,400 Members of the Class.

300.   Under the heading "Minimum Benefits," the 1998 and 1999 SPD promised that participants would be notified of minimum benefits: "Your final Plan benefits cannot be less than your **old plan** benefits on December 31, 1997. If this minimum benefits rule applies to you, you'll be notified by the Retirement Services Center when you request a distribution." Ex. 8 (Stratman Rpt Ex. 3 at 13 and Stratman Rpt Ex. 4 at J-7) (emph. in orig.).

301.   CIGNA was asked in discovery to produce any benefit notices that

95

disclosed minimum benefits. CIGNA responded that it would produce

"exemplars of responsive documents sent to particular participants." Ex. 34

(Request No. 13). But CIGNA did not do this.

302.   Asked again, one of CIGNA's counsel transmitted an email

identifying two documents by Bates numbers as "exemplars" of such notices.

Ex. 143. Inspection of those documents shows that they contain no notice related

to "minimum benefits." Id.

303.   Discovery showed that there were no disclosures of minimum

benefits when participants separate from service before age 55.  In addition to

Ms. Amara (who separated from service at age 53), Douglas Robinson left

CIGNA at age 54 and 3 months. CIGNA's benefit notice told him he had the

option of: (1) a lump sum of $131,940.65, (2) an immediate annuity of $741.87

per month, or $725.99 per month with a lump sum refund feature, or (3) a

"Deferred Benefit" under which he would "keep his Retirement Account with

the Plan" and earn interest credits. Ex. 144 at SuppD2406.

304.   If Mr. Robinson deferred his benefits for just 9 months, he was

entitled to a minimum benefit from the old plan of $1,625 per month ($19,506

annually), which is more than twice the $741 immediate annuity option. Ex. 144

at SuppD2405.

305.   As occurred with Ms. Amara and Mr. Robinson, CIGNA

"automatically" mails a benefit notice to participants within 60 days after they separate from employment with a lump sum amount and "immediate" annuity options. Ex. 29 (Answer to Interrogatory No. 4 in the Second Set).

306.   The notice contains a box about an option to defer benefits. But the description of that option indicates that the only thing to be gained by deferral is interest at the Plan's interest crediting rate: "I elect to keep my Retirement Account with the Plan until I notify you otherwise, but, not later than my age 65. I will receive interest in accordance with the Plan's provisions." Ex. 3 (Poulin Rpt. Ex. H) and Ex. 4 (Poulin Suppl. Rpt. Ex. 10). There is no notice that a higher minimum benefit may be available if the participant defers benefits to age 55.

307.   The Class' actuarial expert, Mr. Poulin, examined the written material that CIGNA distributes when participants and their spouses choose among benefit options and found no notice of minimum benefits. Ex. 3 (Poulin Rpt) ¶38 and Ex. 4 (Poulin Suppl Rpt) ¶¶39-40.

308.   Mr. Poulin observed that the protected "minimum" benefits may include a valuable early retirement benefit and a "Free 30%" survivor's benefit. Ex. 3 (Poulin Rpt) ¶37. The minimum benefits can also be more valuable if interest rates fall below the level used to compute the opening account balance, as occurred in 1999 and 2001-2006. In these instances, the value of the annuity

97

benefit can be greater than the value of the account balance. Ex. 4 (Poulin Suppl Rpt) ¶31.

309.   In his Rule 30(b)(6) deposition, Mr. Arko stated there was no disclosure that "I'm aware of" telling participants they are receiving the minimum benefit; "but we make available to them the 800 number if they want to call to ask specific questions." Ex. 194 (Arko Depo) at 295. See also id. at 107-28 (admitting that the benefit notices do not show an annuity benefit available at age 55).

310.   CIGNA failed to tell named Plaintiff Janice Amara about her "minimum benefits" on two occasions: in February 2001 when she asked for a benefit estimate, and in December 2003 when she was automatically mailed a notice of her benefits after she separated from service. Ex. 145 at P 1011 and Ex. 146 at P 1147.

311.   CIGNA attributed the first omission to a "flaw" in "populating" the records in the system. Ex. 147. As described above, the second omission was because the system was not designed to disclose minimum benefits if a participant separates from service before age 55.

312.   Internal documents show that the "flaw" in "populating" records was not isolated to Ms. Amara. Mercer warned CIGNA of pitfalls if CIGNA's Retirement and Investment Services division had not designed a cash balance

recordkeeping system before. Ex. 148 at D13473. Subsequent documents dating from August 1999 refer to problems with "statements for the rehires" and that "rehires were not being calculated correctly," Ex. 149 at D13647, the need "to examine why records aren't getting opening account balances (for example, rehires)," Ex. 150 at D14589, and a "serious issue" of about "400 1998-99 Rehires that do not have an OAB that probably should have," observing that the "bad news" is that no "process" has been established for doing this. Ex. 151 (email about "MISSING OABs for REHIRES").

313.   A 2002 PowerPoint presentation shows that CIGNA continued to recognize that there were data problems, particularly with the records for rehires. Ex. 152 at SuppD19510. According to "Pension Activity" logs, CIGNA established a project in 2003 to "Review 1637 Rehires between 1/1/98 and 4/1/2002 to determine if account balance / OAB are correct." Ex. 153 at 15357 (11/25/2003 log). CIGNA never completed that project and put it "on hold due to other priorities" in October of 2005. Ex. 154 at SuppD15453 (10/24/2005 log).

314.   Production of the class list with certain requested fields in January 2006 revealed that the "flaw" in "populating" records with minimum benefits data applied to over one-third of the class. The class list that CIGNA produced shows that CIGNA's "DBRK" system (DBRK is an acronym for Defined Benefit Record Keeping) does not have the minimum benefits data for 9,400

members of the 27,000 person class. Ex. 9 (Caalim Decl.) ¶¶3-4.

315.   Final benefit calculations and notices, as well as benefit estimates, are based on the data in CIGNA's DBRK system. Unless the fields for the minimum benefit are populated, the DBRK system does not protect the minimum benefit. Ex. 198 (Morris Depo) at 115 and 117-121.

316.   At a Rule 30(b)(6) deposition, Lorraine Morris of the Retirement & Investment Services division of Prudential (which was a part of CIGNA until a sale to Prudential the end of March 2004), testified that she became aware of instances where the minimum benefits data was missing "about a year" after she was assigned in August 2001 to the CIGNA Plan account team. Ex. 198 (Morris Depo) at 30-31 and 118.

317.   Ms. Morris testified that as a result, a batch of minimum benefits data was loaded in 2002. Morris Depo at 118-21. She could not recall whether the data that was loaded was applied to participants whose benefits had already been processed.  Id. at 32-3.

318.   In the 30(b)(6) deposition, Ms. Morris offered no explanation for the absence of minimum benefit data in the DBRK system. Ex. 198 (Morris Depo) at 97, 111-15 and 151-57. She testified that the system has no audit flags or other systems checks to keep calculations from being performed when this field is empty. Id. at 115-18. She also testified that no steps are being taken "at this

time" if the minimum benefits data is not in the system, other than on a "one off" basis.  Id. at 120-21, 147 and 157. CIGNA's 30(b)(6) representative confirmed that there are no ongoing activities to address this issue. Ex. 195 (Arko 4/2006 Depo) at 143-48 and 322-24.

319.   If minimum benefits were in CIGNA's "DBRK" system, the distributions for practically everyone who separated from service in 1999 should have been based on the minimum benefits because interest rates had dropped, which made the previously-earned benefits more valuable than the account balances established using higher interest rates. Ex. 4 (Poulin Suppl Rpt) ¶31. The class list produced in January 2006 shows that over 2,400 participants separated from service in 1999 who do not have an entry for minimum benefits in the DBRK system. Ex. 9 (Caalim Decl.) ¶5.

320.   Even when the minimum benefits data was in the system, it was sometimes populated with an "understated" amount. Patricia Flannery's minimum benefits were entered as less than one-third of what they should have been. Compare Ex. 155 and Ex. 156. She wrote a series of letters and had to retain an attorney before this was corrected in January 2006. Ex. 157.

321.   In discovery, CIGNA's Rule 30(b)(6) representative stated he is aware of the understatement of Ms. Flannery's minimum benefit but it is up to Prudential to decide whether "further steps" need to be taken beyond the

"specific series of events that lead to this person's misstatement." Ex. 195 (Arko 4/2006 Depo) at 203-4.

**B.    CIGNA Has Not Notified Participants When the Annuity Form of Benefit Has a Higher "Relative Value."**

322.    In addition to not notifying participants of "minimum benefits," CIGNA has not provided participants, or their spouses, with information about the "relative values" of benefit options.

323.    In September 1997, Mercer had advised CIGNA that "any Tier 1 employee electing a lump sum would forfeit the value of the early retirement subsidy."  Ex. 158 at MER 00660.

324.    In his first Rule 30(b)(6) deposition, John Arko testified that there were "no specific words" in the SPD disclosing that some benefit options may have a higher relative value than others. Ex. 194 (Arko Depo) at 154-56.

325.    Professor Stratman also found that the SPD fails to disclose that the cash payment options can be less valuable than the minimum annuity options. Ex. 8 (Stratman Rpt) at 12.

326.    After examining the benefit commencement package, Mr. Poulin observed that CIGNA does not explain that benefit options based on the protected minimum benefit can have a higher relative value than the account balance under Part B. Ex. 3 (Poulin Rpt) ¶38.

327.   In discovery, CIGNA was asked to produce any benefit notices that disclosed the "relative values" of benefit options.  Ex. 34 (Request No. 18) and Ex. 27 (Interrogatory No. 12). CIGNA did not produce any such notices. Asked again, CIGNA's counsel transmitted an email identifying two documents by Bates numbers as "exemplars" of such notices. Ex. 143. Inspection of those documents reveals that they contain no disclosures related to the relative values of benefit options. Id.

328.   CIGNA's failure to disclose relative value of optional forms of benefit caused participants to elect lump sum distributions when annuity options are much more valuable. For example, Lillian Jones worked for CIGNA continuously, except for two short layoffs, for 36 years before her job was abolished in 2001. She was sent a benefit election form that listed a $1,251 per month Life Annuity beginning at age 59 or a $122,965 lump sum. Ex. 191 (Jones Decl.) at ¶3.

329.   Ms. Jones elected the lump sum not knowing that her annuity benefit was worth much more. Id. at ¶¶4-6 (the annuity is worth approximately $200,600, see Ex. 7 (Poulin Indiv Calcs). CIGNA's election form and related materials contain no disclosures concerning the "relative value" of her benefit options. There was also no notice to her, as the SPD promised, that her "old plan" benefits were greater than the cash balance option. Ms. Jones testified that

she would probably have chosen the annuity option had the relative values been disclosed. Id.

330.   Without disclosures that immediate or future annuity options can have a higher value, participants nearly always select the lump sum distributions: The class list shows nearly 10,000 participants commenced benefits since the cash balance conversion, 96% of whom elected lump sum options. Ex. 9 (Caalim Decl.) ¶6. Since April of 1997, CIGNA's actuaries have "assume[d] 100% utilization of the cash option, i.e., all CFP/Tier II participants elect cash at termination." Ex. 159 at D12949. Other documents refer to the "rare instances we have had to date with Cash Balance participants electing an annuity." Ex. 160 at D12683.

331.   As early as January 1998, CIGNA documents mention "relative value" disclosures. Ex. 161 at 28834 and Ex. 162 at 28819. A "Calc Rel Val" computation routine is contained in the DBRK system to perform calculations of relative values. See Ex. 163.[7] But CIGNA has produced no examples where this routine was applied to a participant in the cash balance plan.

332.   An undated document that CIGNA produced on March 13, 2006, contains draft language about relative financial values "in order to help you

---

[7] CIGNA is not the only user of the DBRK system. It is used for a "book of business." Ex. 199 (Loboda Depo) at 84.

understand the effect of selecting one form of payment over another." Ex. 164 at SuppD14907. But neither a final version of this notice nor any accompanying memo about this draft were produced.

333.   A Pension Activity log shows that CIGNA took the position that the "forms of annuity" under its cash balance plan were all of equal value" and therefore the only disclosure needed was to "advise participants that the forms of annuity are all of equal value." Ex. 165 at SuppD 15444 and 15446.

334.   At two Rule 30(b)(6) depositions in April 2006, CIGNA and Prudential admitted that benefit options under the cash balance plan sometimes have "unequal" values and that disclosures should have been provided. Ex. 198 (Morris Depo) at 135-37 ("It was our understanding that all benefits were equal [or] relatively equal" but Prudential is now aware of situations "of not being relatively equal") and Ex. 195 (Arko 4/2006 Depo) at 117-24 ("there are certain times and certain circumstances when, in fact, they are not equal auctorial [sic] equivalent value and need to provide different documentation to people").

335.   A May 6, 2006 "draft" analysis from one of Prudential's actuaries to John Arko also acknowledges that there are situations where the cash balance plan offers benefit options with "unequal" values. Ex. 166.

**C.   CIGNA Also Failed to Protect the "Free 30%" Survivor's Benefits as the Plan Document and ERISA Require.**

336. Section 6.4 of the prior Plan document offered a "Preserved Spouse's Benefit" which CIGNA also called a "Free 30%" survivor's benefit to participants who were hired before 1989 and separated from service after age 55 or died before separating from service. Ex. 2 at 56-57, 67-73.

337. The Free 30% survivor's benefit supplied 30% of the participant's annuity to a surviving spouse without reduction in the primary annuity. The Free 30% survivor's benefit was also based on a different, and more favorable computation of the ultimate annuity. Id. and see Ex. 167 at H-24 to H-25.

338. Section 1.32(b) of the Plan document for the cash balance plan provides that the "Preserved  Spouse's Benefit" (also known as the "Free 30% survivor's benefit) will be protected. Ex. 1 at 11.

339. The 1998 and 1999 SPDs also promised that participants would be notified of minimum benefits, see  ¶300, which under Section 1.32(b) of the Plan document includes the Free 30% survivor's benefit.

340. CIGNA's Operations Manual and the handwritten notes of CIGNA's outside counsel, Jean Renshaw of Drinker Biddle & Reath, also state that the Free 30% benefits were to be protected. Ex. 168 at DO4161-62 and Ex. 169.

341. But CIGNA failed to offer these benefits to any participants to whom this Section should apply. At his July 3, 2003 deposition, John Arko

testified that the SPD did not describe the Free 30% survivor's benefit because the SPD "doesn't talk about the benefits that people can't get." Ex. 194 (Arko Depo) at 257.

342.   CIGNA prepared an SPD in November 2000 that mentions the elimination of the Free 30% survivor's benefits for participants who were rehired in 1998, 1999 and 2000. Ex. 171 at 18. But this SPD was only distributed to the "grand-fathered" Part A participants.

343.   Two hundred participants who have separated from service after age 55 after being moved to the cash balance plan appear to have met the eligibility requirements for Free 30% survivor's benefits. Ex. 9 (Caalim Decl.) ¶7.

344.   Named Plaintiff Gisela Broderick illustrates the elimination of this benefit. Ms. Broderick was entitled to a "Free 30%" survivor's benefit because she was hired before 1989 and separated from service after age 55. However, CIGNA did not offer her the Free 30% survivor's benefit when she retired. See Ex. 38.

345.   CIGNA never adopted any amendment authorizing the elimination of this benefit. In a 11/23/2005 letter, CIGNA's counsel stated: "We write to confirm that there was not a Plan Amendment that mandated that the 1998-2000 rehires did not get free 30%. This change was made pursuant to the cash balance conversion ...." Ex. 170 (letter from CIGNA's counsel Morgan Lewis & Bockius).

107

346.   On March 31, 2006, Prudential mailed a letter to Gisela Broderick on CIGNA's behalf changing her monthly benefits retroactively to the December 1, 2004 effective date of her retirement and stating that "Unfortunately, this monthly benefit amount was understated because it did not include the value of the 'CIGNA Free 30% Survivor Annuity'." Ex. 172.

347.   In April 2006 Rule 30(b)(6) depositions, CIGNA and Prudential admitted that the Free 30% survivor's benefits should have been protected and paid as part of the minimum benefits. Ex. 198 (Morris Depo) at 146-47; Ex. 195 (Arko 4/2006 Depo) at 109-112.

### D.    CIGNA's Actuarial Expert Admits that the Plan Document Requires Minimum Benefits to Be Protected and that CIGNA's Benefit Notices Do Not Explain the "Relative Value" of Benefit Options.

348.   Defendants' actuarial expert admits that the Plan document requires minimum benefits, including the Free 30% survivor's benefits (also called the "preserved spouse's benefits"), to be protected. Ex. 11 (Sher Suppl Rpt) at 6-7, and Ex. 193 (Sher 11/2005 Depo) at 103-7.

349.   Mr. Sher also admitted that the Plan does not comply with the "relative value" regulations. Going through the notices and comparing them with the regulations, he could find no explanation of relative values of benefit options, no disclosure of the extent to which optional forms are subsidized, and no

explanation of the interest rates used to calculate optional forms. Ex. 193 (Sher 11/2005 Depo) at 76-81.

350.   Mr. Sher excuses CIGNA's non-compliance on the ground that many other companies that he and his firm advised failed to comply, too, and that he believes that disclosures of relative values can potentially be "misleading" because telling a participant that the actuarial present value of an option is greater than another could discourage him from choosing the second option even when there are special circumstances, such as cancer or another health condition, that make the actuarially less valuable option better for them. Ex. 11 (Sher Suppl Rpt) at 9-11 and Ex. 193 (Sher 11/2005 Depo) at 55-76 and 82-87.

351.   CIGNA has produced no other expert testimony or evidence to defend its non-compliance with the Treasury regulations requiring disclosure of the relative value of optional forms of benefit.

**VII.   CIGNA Has Still Not Conformed with the Third Circuit's *Depenbrock v. CIGNA* Decision, Which Requires It to Place the Members of the *Amara* Class Who Were Rehired Before December 21, 1998 Back Under the Part A Formula.**

352.   CIGNA rehired 194 members of the class before December 21, 1998, who were previously under the Tier 1 (2%) formula and had 45 or more age and service points. Ex. 173 at SuppD15466 and Ex. 174 (listing Depenbrock

rehires). Under the <u>Depenbrock v. CIGNA</u> decision, "the effective date of the amendment of Section 2.4 (the Rehire rule) of the CIGNA Pension Plan [was] DECLARED to be December 21, 1998." Ex. 175 (Order of Hon. Robert  F. Kelly, Jr., U.S.D.J.).

353.   As a result, these 194 members of the <u>Amara v. CIGNA</u> class were to be restored to the Tier 1 formula because the amendment to the rehire rule that placed them into the cash balance plan was not adopted until after they were rehired.

354.   CIGNA mailed a letter on February 4, 2005, stating that "As a result of a recent federal court decision, the pension benefits of certain CIGNA Pension Plan participants rehired by CIGNA between January 1, 1998 and December 21, 1998 will be recalculated under Part A of the CIGNA Pension Plan." Ex. 176.

355.   But one and one-half years later, CIGNA has only produced recalculations for 14 of these participants. See Ex. 73. As described in ¶¶121-24, the benefits of the class members who have received recalculations have nearly doubled.

356.   Other class members have asked for the recalculations, but have not received them. Ex. 177 at SuppD15670-15688, SuppD22395-22408, and SuppD22428-22437 and Ex. 74. The Plan administrator has "directed [Prudential] to handle these as one offs," meaning  batch calculations are not in

process. Ex. 173 at SuppD 15451.

357. CIGNA has indicated that there were "questions" concerning these calculations in an email to class member Jack Lamb dated 11/30/2005. Ex. 178 and Ex. 173 (Pension Activity reports related to Depenbrock recalculations: "Lorraine sent John Arko write up 4/23/05" and "Follow up sent to John Arko by Lorraine," at SuppD 15466; "Pending additional information from John Arko," at SuppD 15446; "Still in attny hands, J Arko expects to do status communication to ppts by yr end," at SuppD15458).

358. But despite discovery requests and two Rule 30(b)(6) depositions related to those requests, CIGNA has not produced documents related to questions, problems or issues with the recalculations. Ex. 34 (Request No. 12) and Ex. 179 (Request No. 12 in the Fourth Set).

359. In the instances where it has performed the recalculations, CIGNA has been offering participants an irrevocable "election" of remaining in the cash balance formula or going to the Part A formula, without disclosing the "relative value" of those options. See, e.g., Ex. 73 at SuppD21495.

Dated: June 6, 2006

Respectfully submitted,

Stephen R. Bruce Ct23534

Allison Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013


s/ Thomas G. Moukawsher
Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Plaintiff Class