UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

JANICE C. AMARA, GISELA R.
BRODERICK, and ANNETTE S.
GLANZ, individually and on behalf of
all others similarly situated,

Plaintiffs,

vs.

Civil No. 3:01-CV-2361 (MRK)

CIGNA CORP. and CIGNA PENSION
PLAN,

Defendants.

## **PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

Stephen R. Bruce
Suite 210
805 15th St., NW
Washington, DC 20005
(202) 371-8013

Thomas Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Plaintiff Class

# Table of Contents

I.     Purpose of ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    The Definition of the "Accrued Benefit". . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   The Legal Consequences of Cash Balance Plans Being Defined Benefit
Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   Benefit Accruals Must Be Unconditional. . . . . . . . . . . . . . . . . . . . . . . . . . 5

V.     Benefit Accruals May Not Be Backloaded. . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.   Rates of Benefit Accrual May Not Decrease With Advancing Age . . . . . 10

VII.   ERISA Disclosure Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.     The Duty to Disclose Complete and Accurate Information,
            Including the "Full Import of the Interaction" Between an
            Amendment and Prior Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . 17

      B.     "Likely Prejudice" from Inadequate Disclosures . . . . . . . . . . . . . . 23

      C.     Notice to Vested Separated Participants About Amendments
            Affecting Their Future Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VIII.   ERISA'S Anti-Cutback Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IX.   The Consent Requirement for a Benefit Option With Unequal Relative
Value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

X.     Enforcing Declaratory Rulings of Other Courts . . . . . . . . . . . . . . . . . . . . 31

## I.    PURPOSE OF ERISA.

1.    "There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them." Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 743 (2004).  "ERISA was enacted for the purpose of assuring employees that they would not be deprived of their reasonably-anticipated pension benefits." Amato v. Western Union Int'l, 773 F.2d 1402, 1409 (2d Cir. 1985) (citing ERISA §2(a), 29 U.S.C. §1001(a)). Congress recognized that "ERISA's vesting provisions could be thwarted if employers were permitted too much latitude in defining accrued benefits." Id.

## II.    THE DEFINITION OF THE "ACCRUED BENEFIT".

1.    Federal law defines two types of pension plans: (a) defined benefit plans which promise annuities at retirement, and (b) defined contribution plans, such as 401k plans, which have separate individual accounts. ERISA's standards for the latter focus on ensuring that employers actually make promised contributions to the accounts and protecting the investment returns on those accounts. Berger v. Xerox, 338 F.3d 755, 757 (7th Cir. 2003); Cooper v. IBM, 274 F.Supp. 2d 1010, 1020-21 (S.D. Ill. 2003); Zelinsky, "The Cash Balance Controversy," 19 Va.Tax Rev. 683, 687-93 (2000).

2.     Under ERISA, a "defined contribution" plan, also called an

"individual account plan," is defined as:

> "a pension plan which provides for an individual account for each
> participant and for benefits based solely upon the amount
> contributed to the participant's account, and any income, expenses,
> gains, and losses and any forfeitures of accounts of other
> participants which may be allocated to such participant's account."

ERISA §3(34).

3.     A defined benefit plan is defined more simply as: "a pension plan

other than an individual account plan." ERISA §3(35).

4.     Critical to the distinction between these two types of plans is

ERISA's definition of the "accrued benefit" for each:

> "The term "accrued benefit" means–
>
> (A) in the case of a defined benefit plan, the individual's accrued
> benefit determined under the plan and except as provided in
> §204(c)(3), expressed in the form of an annual benefit commencing
> at normal retirement age.
>
> (B) in the case of a plan which is an individual account plan, the
> balance of the individual's account."

ERISA §3(23).

5.     To protect participants in these plans, Congress has enacted a series

of minimum standards which build on the "accrued benefit" as defined for each

of these two categories of plans. Some of these rules cover both types of plans,

but the application depends on the definition of the "accrued benefit." For example, ERISA establishes vesting requirements for "accrued benefits." ERISA §§3(19) and 203. But the "accrued benefit" that has vested is different in each type of plan. ERISA also provides that a plan cannot be amended to reduce a participant's "accrued benefit." ERISA §204(g). The rule is the same for both types of plans, but the application again depends on the definition of the "accrued benefit."

6.     ERISA also contains three provisions specifically directed at problems with defined benefit plans: <u>First</u>, ERISA establishes "anti-backloading" rules that regulate the rates at which benefits must accrue under a defined benefit plan. ERISA §§204(a)(1) and 204(b)(1). There are no parallel rules for defined contribution plans. <u>Second</u>, ERISA has since 1986 prohibited age discrimination in the rate of an employee's benefit accrual under a defined benefit plan. ERISA §204(b)(1)(H). A different test based on the rate at which amounts are allocated to an employee's account applies to defined contribution plans. ERISA §204(b)(2). <u>Third</u>, ERISA §204(h) establishes an advance notice requirement when an employer amends a defined benefit plan to reduce the rate of future benefit accrual. Only a limited subset of defined contribution plans are subject to

this requirement.[1]

## III.    THE LEGAL CONSEQUENCES OF CASH BALANCE PLANS BEING DEFINED BENEFIT PLANS.

1.    Cash balance pension plans are defined benefit plans. In <u>Esden v. Bank of Boston</u>, 229 F.3d 154 (2000), this Circuit ruled:

> "... notwithstanding that cash balance plans are designed to imitate some features of defined contribution plans, they are nonetheless defined benefit plans under ERISA. n 6.
>
> n 6. . . . However "hybrid" in design a cash balance plan may be, it remains subject to a regulatory framework that is in many regards rigidly binary. Because the individual accounts, and the employer contributions and the interest credits to those accounts, are all hypothetical under a cash balance plan, it is classified as a defined benefit plan. The Plan does not (and cannot) dispute this definition. Rather it resists–and has tried to draft around–its consequences."

229 F.3d at 158.

2.    The classification of a cash balance plan as a defined benefit plan has "wide-reaching" "regulatory consequences." <u>Id</u>. at 158; <u>Richards v. FleetBoston</u>, __ F.Supp.2d __, 2006 WL 980565, *9 (D. Conn. 2006) ("defined benefit plans face significantly different requirements from those applicable to defined contribution plans"); <u>Berger v. Xerox</u>, 338 F.3d at 763 (when a "hybrid"

---

[1] The Section 204(h) notice requirement applies to defined contribution plans known as "money purchase" pension plans. But it does not apply to profit-sharing or stock bonus plans. "401k" plans are qualified as profit sharing or stock bonus plans and are thus not subject to the rule.

plan does not comply with the defined benefit plan rules, "for 'hybrid' read

'unlawful.'"); <u>Miller v. Xerox</u>, __ F.3d __, 2006 WL 1215764, *4 (9th Cir. 2006)

(a cash balance plan cannot take a "revisionist approach" and treat "accrued

benefits" as though the plan is a defined contribution plan).

## IV.    BENEFIT ACCRUALS MUST BE UNCONDITIONAL.

1.    For a defined benefit plan like CIGNA's that does not use a highest

average of salary to compute benefits, ERISA's accrual rules require that "the

value of the benefit accrued in any year...not exceed the value of a benefit

accrued in any previous year by more than 33%." <u>Esden</u>, 229 F.3d at 169 (2d

Cir. 2000); ERISA §204(b)(1)(B); 26 C.F.R. 1.411(b)-2(i)(B). This is called the

"133⅓ percent" accrual rule.

2.    The two other accrual rules in ERISA do not apply to cash balance

plans. <u>Esden</u>, 229 F.3d at 167.

3.    To keep promises of accrued benefits from proving illusory, ERISA

§203(a) provides that benefit accruals must be "nonforfeitable" once a

participant has the number of years of service required to be vested (generally

five years). ERISA §3(19) defines a nonforfeitable right as a right that is

"unconditional." Under ERISA, indirect conditions are no more lawful than

direct reductions in the benefit amount. In <u>Central Laborers' Pension Trust v.</u>

Heinz, 541 U.S. 739, 744 (2004), the Supreme Court held that "placing

materially greater restrictions on the receipt of the benefit 'reduces' the benefit

just as surely as a decrease in the size of the monthly payment." See also

Frommert v. Conkright, 433 F.3d 254, 268 (2d Cir. 2006)("[A]lthough the

application of the phantom account does not directly deplete an employee's

pension account, by altering the comparative process, it imposes a condition on

the payment of benefits that leads just as surely to a decrease.").

4.    Since 1988, Treasury regulations have provided that "A right which,

at a particular time, is conditioned under the plan upon a subsequent event,

subsequent performance, or subsequent forbearance which will cause loss of

such right is a forfeitable right at that time." 26 C.F.R. 1.411(a)-4. IRS Notice

96-8, 1996-1 C.B. 359, explains:

> "If benefits . . . have accrued [but] those benefits are disregarded
> when benefits commence before normal retirement age, the plan has
> effectively conditioned entitlement to the benefits . . . on the
> employee not taking a distribution prior to retirement age."

5.    ERISA prohibits plans from saying participants can take their

benefits in a particular form only if they agree to a partial forfeiture of benefits.

Esden at 167-78 (citing Treasury regulation at 1.411(a)-4(a) and IRS Notice 96-

8, 1996-1 C.B. 359); see also Berger 338 F.3d at 761-3 (the "law forbids" that a

"plan conditions the employee's right to future interest credits on the form of the

distribution that he elects to take (pension at age 65 rather than lump sum now)").

6.    A condition may exist even if there is no viable choice because a "condition" is any event that "limits or qualifies" an obligation to distribute money or other property. Res. of Contracts 2d, §224 and Comment a.

## V.    BENEFIT ACCRUALS MAY NOT BE BACKLOADED.

1.    The 133⅓% accrual test requires that the "annual rate" of benefit accrual "payable at the normal retirement age" can escalate by no more than 133⅓% in any later plan year. ERISA §204(b)(1)(B).

2.    IRS Notice 96-8, 1996-1 C.B. 359, states that in a "backloaded interest credit plan, benefits attributable to interest credits do not accrue until the interest credits are credited to the employee's account." "[B]ackloaded interest credit plans typically will not satisfy any of the accrual rules." In Esden, the Second Circuit adopted this analysis and held that "As accrued benefits ... the interest credits must ... be taken into account in determining whether a cash balance plan complies with the benefit accrual requirements." 229 F.3d at 167 n.18.

3.    CIGNA's cash balance plan is a "backloaded interest credit plan" because it defines the "accrued benefit" as the "balance" of the "Retirement

7

Account," Pls. Ex. 1 at 1, and does not credit future interest credits in order to compute the benefit commencing at normal retirement age.

4.    A cash balance conversion also does not comply with the 133⅓% rule if it produces a period with no additional accruals followed by renewed benefit accruals in later plan years. ERISA does not permit higher accruals from previous years to be averaged with, or treated as credits against, lower or non-existent rates in intermediate years in order to buffer a violation.  The Treasury regulations issued in 1977 offer an example in which a plan offers a 2% accrual rate in the first 5 years of participation, followed by a 1% rate in years 6-10, and then 1.5% in all years thereafter. The regulations provide that the accrual rates in the intermediate years must comply with the statutory requirements without taking into account the higher accrual rates in the earlier years. As a result, the 1% accrual rate in plan years 6-10 violates the law, notwithstanding that the average accrual rate for years 1-10 never falls below 1.5%. Treas. Reg. 1.411(b)-1(b)(3)(iii) (Example 3) (the 133⅓% test is not satisfied even if the "average rate of accrual" is "not less rapidly than ratably").

5.    After a plan amendment, previously-earned retirement benefits cannot be used in satisfying the 133⅓% rule. ERISA §204(b)(1)(B)(i) provides that "any amendment to the plan which is in effect for the current year shall be

treated as in effect for all other plan years." This means that benefits earned under previous plan provisions must be disregarded in satisfying the 133⅓% rule's accrual standard.

6.    ERISA §204(b)(1)(B)(iii) and the related regulations at 1.411(b)-1(b)(2)(C) also provide that the 133⅓% rule's accrual standards must be satisfied disregarding any "early retirement benefit" to which "certain employees" may be entitled. This means that an early retirement benefit entitlement, including one earned under previous plan provisions, cannot be taken into account to satisfy the accrual requirements.

7.    If benefits are computed under more than one formula, including one that is frozen, the Treasury regulations provide that the accrued benefits "must be aggregated" to determine the participant's accrued benefit. 26 C.F.R. 1.411(b)-1(a). For purposes of the 133⅓% requirement that the annual rate of accrual satisfy certain standards, this means that the net benefit increase from the two formulas must be determined.[2]

8.    A "minimum benefit" or "benefit offset" provision based on previous accruals can affect the "rate of future benefit accrual." 60 F.R. 64320, 64322 (Dec. 15, 1995); 63 F.R. 68678, 68681 (Dec. 14, 1998); and 68 F.R. 17277,

---

[2] See IRS Alert Guidelines on Minimum Vesting Standards for Defined Benefit Plans, Pls. Ex. 39, at 12.

17282 (April 9, 2003); accord <u>Frommert</u>, 433 F.3d at 257, 262-63.

9.      The 133⅓% rule requires that an "annual rate" of accruals be provided for each plan year that is actually "payable at the normal retirement age." If the benefits are commenced earlier, ERISA §§3(23)(A) and 204(c)(3) require that at least the "actuarial equivalent" of those benefit accruals must be provided. Offsets or other restrictions not expressed in the statute are not permitted.

## VI.    RATES OF BENEFIT ACCRUAL MAY NOT DECREASE WITH ADVANCING AGE.

1.      ERISA §204(b)(1)(H) and (b)(2) prohibit age discrimination in rates of benefit accrual under defined benefit plans and age discrimination in the monetary allocations to the individual accounts of defined contribution plans.

2.      ERISA §204(b)(1)(H) provides that:

"a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or *the rate of an employee's benefit accrual is reduced, because of the attainment of any age.*"

<u>Id</u>. (emphasis added).

3.      In regulations proposed in 1988, the Treasury Department stated that for a defined benefit plan this means that "any differences in the rate of benefit accrual . . . may not be based, <u>directly or indirectly</u>, on the attainment of any

10

age." 53 Fed. Reg. 11876, 11880 (April 11, 1988) (emph. added).[3]

4.    ERISA establishes a different age discrimination requirement for

defined contribution plans. A defined contribution plan is required to ensure that

"the rate at which amounts are allocated to the employee's account is not

reduced because of the attainment of any age." ERISA §204(b)(2).[4]

5.    Defined benefit plan accrual rates must be determined by

reference to the normal retirement age annuity because "the rules governing

distributions from defined benefit plans are framed in terms of the normal

retirement benefit – typically a single life annuity payable at normal retirement

age." Esden 229 F.3d at 159.

6.    Cash balance plan sponsors cannot alter this measurement based on

their "hybrid" design; they cannot "contract around the statute." Id. at 173.

7.    Cash balance plans produce a "larger accrual for younger employees

when measured as the increase in the benefit payable at normal retirement age."

See 67 Fed. Reg. 76123, 76126 (Dec. 11, 2002). See also Richards, 2006 WL

---

[3] Although these regulations were not finalized, taxpayers are authorized to "rely on these regulations for guidance." Id. at 11878. See also 67 Fed. Reg. 76123, 76129 (Dec. 11, 2002) ("the reliance provided on the 1988 proposed regulations continues to be available").

[4] Congress adopted parallel rules in the Internal Revenue Code and the Age Discrimination in Employment Act. See IRC §411(b)(1)(H) and (b)(2), 26 U.S.C. §§411(b)(1)(H) and (b)(2), and ADEA §4(i), 29 U.S.C. §623(i).

11

980565, *8.

8.    Although Congress did not specifically define the term "benefit accrual" within the text of ERISA §204(b)(1)(H), this does not mean that the term is ambiguous. If a statutory term is susceptible in isolation to different interpretations, courts examine the "placement and purpose" of the term in the statutory scheme, and other indicia of Congressional intent, including the use of the term in other sections of the statute. Holloway v. United States, 526 U.S. 1, 6-7 (1999); Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 465-68 (2001) (rejecting "secondary meaning" that would insert economic cost factor into air quality standard);  Deal v. United States, 508 U.S. 129, 131-32 (1993) (when word has two meanings "all but one . . . is ordinarily eliminated by context") .

9.    When several provisions are contained within one statutory section (or in this case in one statutory subsection), this presumption is particularly strong. See Harris Trust & Sav. Bank v. Salomon Smith Barney, 530 U.S. 238, 244-46 (2000) (interpreting ERISA §502(a)(3) similarly to §502(a)(5)); Varity Corp. v. Howe, 516 U.S. 489, 510 (1996); Greenblatt v. Delta Plumbing & Heating, 68 F.3d 561, 576 (2d Cir. 1995) (argument that company was an "employer" for purposes of one section of ERISA but not another discarded because the "statute makes no such distinction").

12

10.    There is a "presumption that similar language in two labor law statutes has a similar meaning." <u>Metropolitan Life Ins. Co. v. Taylor</u>, 481 U.S. 58, 61 (1987). In <u>Smith v. City of Jackson</u>, 544 U.S. 228, 233 (2005), the Supreme Court emphasized:

> "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended the text to have the same meaning in both statutes."

11.    Reading the statutory language to give plan sponsors "latitude" to draft around the general meaning of "benefit accrual" and elect a less protective, "secondary meaning" could thwart the statutory purpose. See <u>Amato v. Western Union Int'l</u>, 773 F.2d 1402, 1409 (2d Cir. 1985) ("ERISA's vesting provisions could be thwarted if employers were permitted too much latitude in defining accrued benefits").

12.    Congress' enactment of a "completely different" test for age discrimination under a defined contribution plan manifests that "Congress did not intend" that the rate at which amounts are "allocated to the employee's account" be applied to a defined benefit plan. The "great similarity" between "benefit accrual" and the statutorily-defined term "accrued benefit" mandates age discrimination under a defined benefit plan be measured by the "change in the annual benefit commencing at normal retirement age." <u>Richards</u>, 2006 WL

13

980565 at *9-10.

> "Congress' intent was to assure a benefit measured as of normal retirement age. The value of that benefit does not change, regardless of whether the employee is younger or older than normal retirement age. What it costs to provide the benefit may change depending on an employee's age. However, that was not Congress' concern when it prohibited the diminution of the rate of accrual of the benefit expressed as an annual benefit commencing at normal retirement age."

Id. at *10.

13.     Only six months prior to the enactment of §204(b)(1)(H), Congress enacted §204(h). This section requires a plan administrator to notify employees of a significant reduction in "the rate of future benefit accrual."  In 1998 regulations, the Treasury Department concluded that "[t]he statutory phrase "rate of future benefit accrual" implies, on its face, that section 204(h) is limited to changes in the accrued benefits."  63 Fed. Reg. 68678, 68680 (December 14, 1998) (emph. added).

14.     The use of the phrases "accrual rate" or "annual rate" of accrual in the anti-backloading tests further shows that Congress intended the "rate of benefit of accrual" to mean the growth in the "accrued benefit": (a) The so-called 133% rule in ERISA §204(b)(1)(B), 29 U.S.C. §1054(b)(1)(B), uses the term "accrual rate" or the "annual rate at which any individual ... can accrue the retirement benefits" to describe the rate at which an individual "can accrue benefits"; (b) Treasury

14

regulations issued to implement §204(b)(1)(B) also compare the "rate of benefit

accrual" or the "rate of accrual" in earlier and later years by looking at the benefits

"accrued" in those years.  26 C.F.R. §1.411(b)-1(b)(2)(iii), Examples (2) and (3)

and §1.411(b)-1(g); (c) The ERISA Conference Report describes how the

"accrued benefit" is "subject to" the requirements in the "benefit accrual" or

"accrued benefit tests (which limit the extent of "backloading" permitted under

the plan" and how the 133⅓% method tests the "rate of accrual" or "accrual

rate" under the plan. H. CONF. REP. at 273-74, 1974 U.S.C.C.A.N. at 5055-56.

15.    If legislative history needs to be resorted to (see <u>Richards</u>, 2006 WL

980565, *6), the 1986 Conference Committee Report on OBRA provides further

support that Congress intended for "benefit accrual" to refer to the change in the

"accrued benefit." The Conference Report describes how: "Present law specifies

certain requirements with respect to the rate at which benefits are accrued (i.e.,

earned) under a pension plan.  These benefit accrual requirements generally

prevent the backloading of benefit accruals by specifying a minimum rate of

benefit accrual for each year of participation." 1986 U.S.C.C.A.N. at 4020.

16.    The Conference Report offers two examples about the age

discrimination standard. In the first, "a plan provides a benefit of $10 monthly per

year of service." The Conferees stated that an older worker must be provided the

same "additional benefit of $10 per month." H.R. Conf. Rep. No. 99-1012, at 381, 1986 U.S.C.C.A.N. 3868, 4026. In the second, the Conferees explain how under ERISA's fractional rule (ERISA §204(b)(1)(C), participants can "have different accrued benefits because of the different rate of benefit accrual for each year of service." The Conferees state that they do not intend the age discrimination standard to be violated "merely because a younger employee has a lower accrued benefit than an older employee with the same years of service." H.R. Conf. Rep. 99-1012, at 379, 1986 U.S.C.C.A.N. 3868, 4024. In both examples, the rate of "benefit accrual" refers to "additional benefit" or the change in the "accrued benefit." See Richards, 2006 WL 980565 at *6-7.

17.    Employers cannot avoid anti-discrimination standards by articulating discriminatory effects in economic terms like the "time value of money" which bear a necessary correlation with race, sex or age. Richards, 2006 WL 980565, *11-13 (the effect of FleetBoston's formula is "perfectly correlated" with age); Arizona Comm. for Deferred Compensation Plans v. Norris, 463 U.S. 1073, 1081 (1983)("one cannot say that an actuarial distinction based entirely on sex is based on any other factor than sex."); Arnett v. CalPERS, 179 F.3d 690, 695 (9th Cir. 1999), vacated and remanded on other grounds, 528 U.S. 1111 (2000)("practical application" of formula "leaves no

doubt that age at hire . . . is the sole basis for lower benefits.").[5]

18.     An employee benefit plan that decreases benefits, directly or indirectly, because of a participant's age is discriminatory. O'Brien v. Board of Educ., 92 F.Supp.2d 110, 115-16 (E.D.N.Y. 2000) (age, not years of service, was the "trigger" for the reduction of sick leave benefits); accord McGinty v. New York, 193 F.3d 64, 66-67 (2d Cir. 1999) (death and disability benefits were reduced after age 60).

## VII.   ERISA DISCLOSURE DUTIES.

### A.     The Plan Administrator's Duty to Disclose Complete and Accurate Information, Including the "Full Import of the Interaction" Between an Amendment and Prior Plan Provisions.

1.     The "duty to disclose material information" is at "the core" of an ERISA "fiduciary's responsibility." Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750 (D.C. Cir. 1990).

2.     ERISA requires disclosures of reductions in benefits in two forms of written communication: (1) in ERISA §204(h) notices of significant reductions in the future rate of benefit accruals, which are required to be distributed at least 15 days before the effective dates of the changes, (2) in a summary of material

---

[5] Because the Supreme Court ruled in another case that public employees cannot sue State governments, Arnett was vacated.  However, the EEOC subsequently refiled the suit under its authority.

modification ("SMM") or updated summary plan description ("SPD"), as required by ERISA §102(a).

3.    These notices and summaries must be written "in a manner calculated to be understood by the average plan participant." See 29 C.F.R. 2520.102-2(a) (SPD), 2520.104b-3(a) (SMM) and 26 C.F.R. 1.411(d)-6, Q&A 10 (Section 204(h) notice).

4.    By its very terms, the Section 204(h) notice must give notice of a "significant reduction."

5.    The regulations on SPDs also require that the SPD contain a statement:

>  "clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, offset [or] <u>reduction</u> of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide based on the description of benefits required by paragraphs (j) and (k) of this section [which provide that the plan's requirements "respecting eligibility and for benefits," including survivor's benefits, must be described].

29 C.F.R. 2520.102-3(l) (emph. added).

6.    The SPD regulations further specify that:

>  "Any description of exception, limitations, <u>reductions</u>, and other restrictions on plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.... The advantages <u>and</u> <u>disadvantages</u> of the plan shall be presented without either exaggerating the benefits or <u>minimizing the limitations</u>."

29 C.F.R. 2520.102-2(b).

7.    ERISA places the responsibility for the 204(h) notice, the Summary

of Material Modification, and the Summary Plan Description on the "plan

administrator." [6]

8.    Because the plan administrator is a fiduciary, see ERISA §3(21)(A),

the assignment of the disclosure responsibilities to the plan administrator

reinforces the responsibility to "speak truthfully" to employees about benefit

reductions and other disadvantages. See Mullins v. Pfizer, Inc., 23 F.3d 663, 669

(2d Cir. 1994); Becker v. Kodak, 120 F.3d 5, 10 (2d Cir. 1997) (duty to disclose

"complete and accurate information").

9.    "The court-created disclosure duties of ERISA fiduciaries respond

to (and to some extent compensate for) the widespread use of conflicted

fiduciaries in ERISA plan administration." "Questioning the Trust Law Duty of

Loyalty," 114 Yale L.J. 929, 950-51 (March 2005).

---

[6] See 29 C.F.R. 2520.102-2(a) ("In fulfilling these requirements, the plan administrator shall exercise considered judgment and discretion by taking into account such factors as ... the complexity of the terms of the plan") (emph. added); 29 C.F.R. 2520.104b-3(a) ("The administrator ... shall furnish a summary of any material modification to the plan"; "the administrator shall furnish this summary, written in a manner calculated to be understood by the average plan participant....")(emph. added), and 26 C.F.R. 1.411(d)-6, Q&A-1 ("The plan administrator must provide the notice ... not less than 15 days before the effective date of the plan amendment")(emph. added). See also id. at Q&A 9, 11, 13-14.

10.    ERISA §204(h) provides:

"that a plan ...may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date to ...each participant in the plan."

Id. "[U]nder ERISA §204, plan sponsors are prohibited from amending a plan in a way that reduces future benefit accrual without proper notice to plan participants." Frommert v. Conkright, supra, 433 F.3d at 266.

11.    Notice to employees is required not only for direct reductions in percentage rates or dollar amounts of future accruals, but for indirect changes that reduce future benefits, such as the introduction of a minimum benefit provision or a new offset. Id.[7]

12.    The notice "need not explain how the individual benefit of each participant ... will be affected by the amendment," but it must be "written in a manner calculated to be understood by the average plan participant." 26 C.F.R. 1.411(d)-6, Q&A 10; see also 60 F.R. 64320, 64323 (Dec. 15, 1995) (the temporary regulations in effect when CIGNA did its conversion).

---

[7] See also 26 C.F.R. 1.411(d)-6, Q&A-6, promulgated in 60 F.R. 64320, 64322 (Dec. 15, 1995), as temporary regulations and finalized at 63 F.R. 68678, 68681 (Dec. 14, 1998) (recognizing that a new "benefit offset" or "minimum benefit" provision can reduce the "rate of future benefit accrual," as much as a direct reduction in a percentage rate).

20

13.    To satisfy the notice requirement, the employer must "fully explain[]" how an amendment reduces future benefits or the amendment is ineffective.  <u>Frommert</u>, 433 F.3d at 262, 266, and 268. See also <u>Richards</u>, 2006 WL 980565, *17 (Complaint "could support a finding that the defects in notice 'likely, and quite reasonably led participants to believe' that the wear-away effect and decreasing rate of benefit accrual were not components of the plan"); <u>Copeland v. Geddes Federal Sav.</u>, 62 F.S.2d 673, 678 (N.D.N.Y. 1999) (purported 204(h) notice did not adequately explain the amendment and was untimely).

14.    SPDs play a central role in ERISA's statutory scheme:

"ERISA 'contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary.' <u>Heidgerd v. Olin Corp.</u>, 906 F.2d 903, 907-08 (2d Cir. 1990).

... Regulations promulgated under ERISA prescribe the format of a SPD. The format of the summary plan description must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, [or] restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant . . . [and] shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. 29 C.F.R. § 2520.102-2(b)."

<u>Layaou v. Xerox Corp.</u>, 238 F.3d 205, 209-10 (2d Cir. 2001).

15.     The "full import of the interaction" between existing plan provisions and an amendment altering the computation of benefits must be explained, or the disclosure does not comply with ERISA. <u>Chambless v. Masters, Mates & Pilots Pension Plan</u>, 772 F.2d 1032, 1040 (2d Cir. 1985). See also <u>Layaou</u>, 238 F.3d at 210-11(general language that benefits "may also be reduced" is inadequate); <u>Layaou</u>, 330 F.Supp.2d 297, 303 (W.D.N.Y. 2004)(on remand, holding that based on the SPD, a participant "would not know how or to what extent the benefit would be reduced" even though the plan provision "resulted in a significant reduction in plaintiff's benefits, compared to what he would have received without the offset").

16.     ERISA specifically requires that material modifications, including ones that reduce benefits, be understandably disclosed to participants, using the same standards that apply to SPDs. See 29 C.F.R. 2520.102-2(b) and 2520.102-3(l) (the SPD regulation) and 29 C.F.R. 2520.104b-3 (the SMM regulation). ERISA thus prohibits an SMM or an SPD that "obscures" or tends to "minimize" benefit limitations. <u>Burke v. Kodak Retirement Income Plan</u>, 336 F.3d 103, 110 (2d Cir. 2003), cert. denied, 540 U.S. 1105 (2004); see also <u>Richards</u>, 2006 WL 980565 at *17-18; <u>Burstein v. Allegheny Fdn. Ret. Acct. Plan</u>, 2004 WL 2612162 *1 (E.D. Pa. 2004), on remand from 334 F.3d 365 (3d Cir. 2003) (after

the Third Circuit ruled that an SPD's disclosures about cash balance conversion must be sufficiently comprehensive to apprise employees of changes affecting their benefits, district court found that the term "earned" in the SPD in essence "created a contractual right to the hypothetical bookkeeping entries"); 65 Fed. Reg. 70227 (Nov. 21, 2000)(the SPD/SMM regulations "require a reasonably comprehensive and clear description of the provisions of a cash balance plan <u>and how a prior conversion may have affected benefits that classes of participants may have reasonably expected the plan to provide</u>").

17. Even when there is no duty to speak initially, when a fiduciary has "elected ... to communicate" on a subject, there is a duty to convey "complete and accurate information" "material" to participants' circumstances. <u>Meinhardt v. Unisys</u>, 74 F.3d 420, 442-43 (3d Cir. 1996).

### B. "Likely Prejudice" from Inadequate Disclosures.

1. Complete and accurate disclosures allow "dissatisfied" employees to "bargain further" with their employer, <u>Hamilton v. Air Jamaica</u>, 945 F.2d 74, 78 (3d Cir. 1991). If that bargaining is unsuccessful, complete and accurate disclosures help employees make "well-informed employment and retirement decisions." <u>Harte v. Bethelehem Steel</u>, supra, 214 F.3d at 446, 451 (3d Cir.), cert. denied, 531 U.S. 1037 (2003).

2.    The materiality of misleading or incomplete information is defined by the "likelihood" that the information will affect a participant's ability to make "well-informed employment and retirement decisions." Harte v. Bethelehem Steel, supra, 214 F.3d at 451.

3.    Plan participants can prevail in cases challenging flawed SPDs without proving individual detrimental reliance. Burke v. Kodak, 336 F.3d at 112-14. A participant need only show "likely prejudice," meaning that the participant "was likely to have been harmed as a result of the deficient SPD:"

> "This "likely prejudice" standard avoids the use of harsh common law principles to defeat employees' claims based on a federal law designed for their protection. The result is a presumption of prejudice in favor of the plan participant after an initial showing that he was likely to have been harmed."

336 F.3d at 113-14.

4.    In Frommert, the "likely prejudice" standard was satisfied where "[t]he prolonged absence of any mention of the phantom account from Plan documents, most notably SPDs, likely, and quite reasonably, led plan participants to believe that it was not a component of the Plan. Rather, rehired employees likely believed that their past distributions would only be factored into their benefit calculations by taking into account the amounts that they had actually received." 433 F.3d at 267. As a result, "they were deprived of the

24

opportunity to take timely action in response to the purported 'amendment'"

such as by "seeking injunctive relief, altering retirement investment strategies, or

perhaps considering other employment." <u>Id</u>. at 266.

5.    The "likely prejudice" standard is also satisfied where the

"conspicuous absence" of any "explanation" led a participant to believe that "his

monthly benefit would be considerably higher then it turned out to be. That

mistaken belief would likely have affected plaintiff's financial planning for his

upcoming retirement." <u>Layaou</u>, 330 F.Supp.2d 297, 304 (W.D.N.Y. 2004).

6.    Likely prejudice may be established when the disclosures lead

participants to believe that reductions, such as decreased rates of benefit accrual

and wear-away periods with no additional benefits, "were not components" of

the amendments. <u>Richards</u>, 2006 WL 980565 at *17; see also 2006 WL 860674,

*4 (ruling on class certification) (the "defects in disclosure themselves are

significant enough to establish a presumption of likely prejudice, common to all

members of the class").[8]

---

[8] See also <u>Antolik v. Saks</u>, 2005 WL 233320, *11 (S.D. Iowa 2005) (SPD
"induced the Plaintiffs not to act" and a letter "told them not to worry" and "the
plaintiffs responded accordingly"; presenting evidence of specific jobs passed up
"would create an almost insurmountable burden since the SPD called for
Plaintiffs to stay loyal"). Accord <u>Ream v. Frey</u>, 107 F.3d 147, 156 (3d Cir. 1997)
(while "it is impossible to know exactly what steps the beneficiaries could or
would have taken on the basis of that information, at a minimum they would
have been able to negotiate with Frey for installation of a procedure to secure the

7.    Likely harm need not be shown by individual testimony from each class member. <u>Frommert</u>, 433 F.3d at 268 (Second Circuit assessed what "over 100 participants" could "likely" have done without examining individual testimony). It can be shown by circumstantial evidence on a class wide basis. <u>Klay v. Humana</u>, 382 F.3d 1241, 1260 (11th Cir. 2004)(in determining reliance on "explanation of benefits" forms distributed by HMO's, "it is ridiculous to expect 600,000 doctors across the nation to repeatedly prove these complicated and overwhelming facts"). [9]

8.    An employer can rebut a showing of likely harm by establishing "harmless error." <u>Burke</u>, 336 F.3d at 113.  This is usually done by showing that a participant "independently knew" about the matter. See <u>Wilkins Mason Tenders Dist. Council Pension Fund</u>, 445 F.3d 572, 585 (2d Cir. 2006);  <u>Weinreb v. Hospital for Joint Diseases</u>, 404 F.3d 167, 172 (2d Cir. 2005) (defendant can rebut "by showing that plaintiff was aware of the requirement"); <u>Antolik v. Saks</u>, supra, 2005 WL 2333320 *12 (Saks "failed to show evidence that the Class Plaintiffs did have knowledge of the specialized definition of "change of control"

---

funds. Failing that, we believe they could have sought injunctive relief under ERISA §502(a)(3)(B) on behalf of the plan to the same end").

[9] Accord  <u>Desert Palace v. Costa</u>, 539 U.S. 90, 100 (2003) ("absent some affirmative directive in a statute," a plaintiff cannot be "restricted" in the presentation of evidence to non-circumstantial evidence).

or that the misinformation was harmless error").

### C. Notice to Vested Separated Participants About Amendments Affecting Their Future Rights.

1.    The Treasury regulations on ERISA §204(h) provide that notice need not be provided to "any participant whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment." Whether a participant is encompassed within that language "is determined based on all relevant facts and circumstances at the time the amendment is adopted." 26 C.F.R. 1.411(d)-6, Q&A-9.

2.    The Labor Department's regulations on summaries of material modification provide that SMMs need not be distributed if the amendment "in no way affects ... [a] vested separated participant's rights under the plan." "[A] modification in benefits under the plan to which such ... vested separated participant ... had not at any time been entitled (and would not in the future be entitled) would not affect his or her rights and hence need not be furnished." 29 C.F.R. 2520.104b-4(c).

3.    In <u>Frommert</u>, the Second Circuit held that Section 204(h) required an amendment under which a phantom offset would be applied to the future benefits of "rehired" employees to be disclosed in advance of the amendment's effective date. 433 F.3d at 257 and 262-63.

27

## VIII. ERISA'S ANTI-CUTBACK PROTECTION.

1.      ERISA §204(g) provides that accrued benefits cannot be reduced by a plan amendment. This is known as a "minimum benefits" or "anti-cutback" rule.

2.      Congress amended ERISA §204(g) in 1984 to specifically include early retirement benefits and other optional forms of benefit. The amendment added §204(g)(2) which expressly protects an early retirement benefit, a retirement-type subsidy or an optional form of benefit. See also 26 C.F.R. 1.411(d)-4.

3.      There is a fiduciary and statutory duty to keep the records necessary to confirm compliance with the law's requirements. ERISA §§404(a)(1)(D)and 107. See also 2A Scott & Fratcher, Law of Trusts, 172 at 452 and 454 (4th ed.) ("if the trustee fails to keep proper records, all doubts will be resolved against him").

4.      If the SPD promises notification, it is breach of duty and breach of contract when the notice is not provided. Ballone v. Eastman Kodak Co., 109 F.3d 117 (2d Cir. 1997) (breach of fiduciary duty where employer informed employees that it would not enhance retirement benefits, but then did so subsequent to their retirements).

5.     A plan cannot avoid the anti-cutback requirement of ERISA §204(g) by eliminating a benefit without a plan amendment because ERISA requires that any changes to the plan's terms be made according to the plan's amendment procedures.  <u>Depenbrock v. CIGNA</u>, 389 F.3d 78, 81-82 (3d Cir. 2004).

## IX.    THE CONSENT REQUIREMENT FOR A BENEFIT OPTION WITH UNEQUAL RELATIVE VALUE.

1.     ERISA §§203(e) and 205(g) and the related Treasury regulations provide that any distribution of benefits other than in the form of an annuity at retirement age must be based on the informed "consent" of the participant and his or her spouse.

2.     The Treasury regulations adopted to implement the consent requirement provide that participants and beneficiaries must be "furnished . . . sufficient additional information to explain the relative value of the optional forms of benefit available under the plan (<u>e.g., the extent to which optional forms are subsidized relative to the normal form of benefit</u>)." 26 C.F.R. 1.401(a)-20, Q&A 36 (emph. added).

3.     The required explanation includes deferred options. The Treasury Department defines an optional form of benefits to include an option with a different date of commencement. 26 C.F.R. 1.411(d)-4, Q&A-1(b)(1); see also 1.411(d)-3(g)(6)(ii)(A) and 1.401(a)(4)-4(e)(1).

29

4.    When participants or beneficiaries select a benefit option with a lower value, they are, in effect, selling the "pension entitlement back to the company cheap." Berger v. Xerox, supra, 338 F.3d at 762.

5.    "No consent is valid" unless the participant and any beneficiary has received an "explanation of the relative values" of the optional benefit forms. 26 C.F.R. 1.411(a)-11(c)(2)(i) and 1.417(e)-1(b)(2)(i). Accord Rothwell v. v. Chenango County, 2005 WL 2276023, *6-7 (N.D.N.Y. 2005).

6.    The Treasury regulations are an "integral part" of Congress' "strategy" as expressed in the 1984 Retirement Equity Act of protecting "retirement subsidies." Costantino v. TRW, 13 F.3d 969, 979-80 (6th Cir. 1994).

7.    The Restatement of Trusts contains essentially the same standard about the ineffectiveness of uninformed consent: "Beneficiary consent is ineffective, if, when consenting, the beneficiary 'did not know of his rights and of the material facts which the trustee knew or should have known and which the trustee did not reasonably believe that the beneficiary knew.'" "Questioning the Trust Law Duty of Loyalty," 114 Yale L.J. 929, 964 (quoting Res. (2d) of Trusts §216(2)(b)).

8.    In a decision that precedes ERISA, the Second Circuit ruled that an inadequate disclosure of benefit options can also be a violation of tort law. In

Gediman v. Anheuser-Busch, 299 F.2d 537, 545 (2d Cir. 1962) (Friendly), the

Second Circuit found a breach of duty where an explanation that a benefit

"'Would not be as much as' [was] not an apt description of the relationship of

$32,780.44 to $79,690." It does "not convey to the ordinary unlearned pensioner

that on this account it would be only 42% as much."

## X.    ENFORCING THE DECLARATORY RULINGS OF OTHER COURTS

1.    A federal court has the authority to enforce the declaratory order of

another federal court without relitigating the same issues where the principles of

res judicata or collateral estoppel apply. See Allen v. McCurry, 449 U.S. 90, 94

(1980) ("Under res judicata, a final judgment on the merits of an action

precludes the parties from relitigating issues that were or could have been raised

in that action...Under collateral estoppel, once a court has decided an issue of

fact or law necessary to its judgment, that decision may preclude relitigation of

the issue..."); accord Kirke v. Howe, 1999 U.S. App. LEXIS 5697 (2d Cir. 1999)

(plaintiffs awarded sanctions against defendant for breaches of settlement

agreement; on appeal, court held defendants barred by res judicata from

attacking jurisdiction of order entering the settlement).

Dated: June 6, 2006

Respectfully submitted,

Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

 s/ Thomas G. Moukawsher
Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak Street
Hartford, CT 061060
(860) 278-7000

Attorneys for Plaintiff Class