# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JANICE C. AMARA, ET AL,          CV No. 3:01-2361 (DJS)

PLAINTIFFS,
VS.
CIGNA CORPORATION,
CIGNA PENSION PLAN,

DEFENDANTS.

------------------------------------------------
        DEPOSITION OF:   JAMES F. STRATMAN, PH.D.
------------------------------------------------


     Taken before Kathleen S. Norton, Registered Professional Reporter, Lic./Reg. No. 00105, and Notary Public in and for the State of Connecticut, pursuant to Notice, at the offices of Robinson & Cole, 280 Trumbull Street, Hartford, Connecticut, on June 19, 2003, commencing at 10:03 a.m.


BRANDON SMITH REPORTING SERVICE, LLC
44 Capitol Avenue
Hartford, CT  06106
Tel:  (860) 549-1850
Fax:  (860) 549-1537

Amara, et al vs Cigna Corp.

6/19/2003                                           James F. Stratman, Ph. D.

Page 2

```
 1         APPEARANCES
 2  Representing the Plaintiff:
 3  LAW OFFICE OF STEPHEN R. BRUCE
    805 15th Street, NW
 4  Suite 210
    Washington, D.C. 20005
 5     By: STEPHEN R. BRUCE, ESQUIRE
 6  Representing the Defendants:
 7  MORGAN LEWIS & BOCKIUS, LLP
    101 Park Avenue
 8  New York, NY 10178-0060
       By: CHRISTOPHER A. PARLO, ESQUIRE
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              STIPULATIONS
 2
 3       IT IS STIPULATED by the attorneys for the
 4  Plaintiffs and the Defendants that each party
 5  reserves the right to make specific objections in
 6  open court to each and every question asked and the
 7  answers given thereto by the witness, reserving the
 8  right to move to strike out where applicable, except
 9  as to such objections as are directed to the form of
10  the question.
11
12       IT IS STIPULATED and agreed between
13  counsel for the parties that the proof of the
14  authority of the Notary Public before whom this
15  deposition is taken is waived.
16
17       IT IS FURTHER STIPULATED and agreed that
18  the reading and signing of this deposition are not
19  waived and any defects in the notice are waived.
20
21
22
23
24
25
```

Page 4

```
 1
 2         JAMES F. STRATMAN, PH.D.,
 3    having first been duly sworn, was examined
 4    and testified as follows:
 5
 6         DIRECT EXAMINATION
 7  BY MR. PARLO:
 8  Q  Good morning, Mr. Stratman. My name is Chris
 9     Parlo. I'm counsel for the defendant in a
10     matter brought by Ms. Amara. We're here today
11     to take your deposition. I want to go through
12     a couple of ground rules to, hopefully, make it
13     go more smoothly for you and I, but also for
14     the court reporter.
15  A  Okay.
16  Q  First, it's very hard for a court reporter to
17     take down two people speaking at once, so I'm
18     going to try very hard to wait for you to
19     finish your answer before I ask another
20     question.
21  A  Understood.
22  Q  And I would ask that you wait for me to finish
23     a question before you provide an answer.
24        It's also difficult for a court
25     reporter to write down or interpret what an
```

Page 5

```
 1     uh-hum means or huh-uh. I'm not even sure how
 2     she wrote that down now, so we need verbal
 3     answers. And usually the problem comes up with
 4     a yes or no, so keep that in mind.
 5  A  Right.
 6  Q  If at any point in time you want to break, let
 7     me know. I will be happy to accommodate you
 8     for a bathroom break, or anything you need. I
 9     would only ask that before we do take a break
10     that if a question is pending, that you answer
11     the question.
12  A  Right. I understand; exactly.
13  Q  The only exception to that is if there is a
14     question of privilege, attorney-client
15     privilege or some other privilege that I can't
16     imagine that would apply here, you can decline
17     to answer a question if you need to talk to
18     counsel about that.
19        If you answer a question that I pose
20     to you, I will assume that you understood it.
21     So if at any point in time you don't understand
22     a question for any reason, it's compound,
23     you're not understanding a word I'm using, for
24     any other reason, let me know and I will
25     attempt to rephrase it or repeat it so when you
```

2 (Pages 2 to 5)

3e4e1835-6fc6-4489-893b-6a964e3d0e8

Amara, et al vs Cigna Corp.
6/19/2003                                                                                                James F. Stratman, Ph. D.

Page 98

1   inaccurate. And they -- generally what people
2   do is they read things and, Oh, yeah, that's
3   either what I think I would hear, or that's
4   what I have heard before, or if it's expense
5   thing, most people are adverse to doing more
6   work than they have to. So if information
7   comes to them and it's very different from
8   something they were accustomed to hearing, it
9   might -- it might trigger them. It also has to
10  do with who's communicating.
11      If it's what they'd expect from that
12  source, and it seems congruent with what they
13  think that source would tell them, they're also
14  now going to be impacted by that in a
15  particular way. So their what we call in
16  reading their depth of processing issues,
17  people don't want to have to process more
18  information than they want to reach some kind
19  of conclusion. And they may set a very, very
20  low threshold. They may not need to read more
21  than a sentence or two from a document and say,
22  "Oh, yeah, I'm chilling with this. This is
23  good. This is what I expected. This is what I
24  like. I don't have to deal with this. This is
25  not a problem for me." People read documents

Page 99

1   like that.
2   Q  Going back to your 1988 study, you came to
3      the -- it may not have been a conclusion, but
4      you contained -- you put language in your
5      report that SPDs often don't contain adequate
6      information, correct?
7   A  If my report stated that, I can't remember
8      exactly without looking at it.
9   Q  Did you form a conclusion that the SPDs
10     disclaimer language in that case was a problem?
11  A  Yes. It seemed to be a problem in that case.
12     There were one or two examples that I think I
13     remember looking at in that paper that seemed
14     to be better examples. So there could be a
15     range of performances in the sense of done
16     well, done not so well. I did question the
17     validity of using them at all, because I think
18     they're burdensome for readers and difficult
19     for them to work with.
20  Q  That's your perception?
21  A  Based on the study.
22  Q  Based on the 1988 study?
23  A  Yes.
24  Q  So you had that perception going into your
25     discussions with Mr. Bruce, right?

Page 100

1   A  Yes.
2   Q  And then Mr. Bruce told you there were a whole
3      bunch of problems with the SPD, right?
4   A  He asked me to investigate whether these
5      particular things were disclosed in here.
6      Obviously, he was communicating he was
7      concerned about these problems, what did I
8      think.
9   Q  He told you there were problems in the SPD,
10     right?
11  A  Yes.
12  Q  He told you he thought there was age
13     discrimination, didn't he?
14  A  He may have said something to that effect, yes.
15  Q  And he told you older people weren't getting
16     the proper rate of accrual, right?
17  A  He stated that was his concern, right.
18  Q  And he told you he didn't think that the SPD
19     adequately described these issues, correct?
20  A  That's the question that he put to me.
21  Q  And he expressed his view to you on that,
22     didn't he?
23  A  Well, I would have that understanding since he
24     came to me, sure.
25  Q  And you understood that he believed the SPD did

Page 101

1      not properly disclose things, right?
2   A  That was his question, yes.
3   Q  But my question was: Did you believe that that
4      was his opinion on it?
5   A  Yes.
6   Q  Okay. And you read some JAO articles; is that
7      right?
8   A  Yes.
9   Q  Two of them, right?
10  A  Yes.
11  Q  And in both of those articles did they raise
12     questions about the general issue of the amount
13     of disclosure in SPDs?
14  A  They raised questions, yes. They had questions
15     of their concerns about it.
16  Q  Stating that some SPDs did not properly
17     disclose, right?
18  A  That was a concern that they expressed, right.
19  Q  And you read an article in the New York Times
20     about cash balance plans?
21  A  That was long before this case.
22         MR. BRUCE: I object. He said Wall
23     Street Journal.
24  A  I don't remember the source, but it was a
25     magazine or newspaper article, very short kind

26 (Pages 98 to 101)