Case 3:01-cv-02361-MRK   Document 178-1   Filed 06/27/2006   Page 3 of 9

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------X
:
JANICE C. AMARA, GISELA : 3:01 CV 2361 (MRK)
R. BRODERICK, ANNETTE S. GLANZ :
individually, and on behalf of others : Trial Date: 09/11/06
similarly situated, :
:
Plaintiffs, :
v. :
:
CIGNA CORP. AND CIGNA :
PENSION PLAN, :
:
Defendants. :
:
------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION <u>IN LIMINE</u> TO EXCLUDE
THE EXPERT TESTIMONY OF PROFESSOR STRATMAN**

I. **INTRODUCTION**

The case pending before this Court is a class action challenging the design of the CIGNA cash balance pension plan, known as the CIGNA Pension Plan "Part B." A five day bench trial is scheduled to begin on September 11, 2006.

In Count 2 of the Third Amended Complaint, Plaintiffs allege that the summary plan description ("SPD") for Part B did not satisfy ERISA's SPD disclosure requirements. See 29 U.S.C. § 1022 and 29 C.F.R. § 2520.102-1 through 102-5.[1] In Count 4, Plaintiffs allege that the Section 204(h) Notice issued by the Plan Administrator did not satisfy ERISA's Section 204(h) Notice requirements. See 29 U.S.C. § 1054(h). In support of these claims, Plaintiffs seek to

---

[1] In their Trial Brief, Plaintiffs also attack the adequacy of the Plan's summary of material modifications. Because this claim is not alleged anywhere in Plaintiffs' Third Amended Complaint, however, it is not properly before the Court.

introduce the Expert Report and testimony of Professor James Stratman[2] that the Plan Administrator's SPD, Section 204(h) Notice and other communications to the Plan participants do not "adequately disclose" information required by ERISA and otherwise do not satisfy ERISA's SPD and Section 204(h) Notice requirements, respectively.

Whether or not an SPD or a Section 204(h) Notice satisfies ERISA's statutory disclosure requirements, however, is a conclusion of law that depends exclusively on the terms of the written disclosure at issue, i.e., the SPD or Section 204(h) Notice. As such, Professor Stratman's opinions about the SPD and Section 204(h) Notice address purely legal issues for which expert testimony is not permitted under Second Circuit law. Moreover, Professor Stratman offers no opinions or analyses in his report other than those addressing the adequacy of the Plan Administrator's communications to Plan participants. Accordingly, Defendants CIGNA Corporation and the CIGNA Pension Plan ("Defendants") respectfully request that Professor Stratman be precluded from testifying at trial and that his Expert Report be excluded.

## II. ARGUMENT

### A. Expert Testimony Addressing An Issue Of Law Or Stating A Legal Conclusion Is Inadmissible.

Federal Rule of Evidence 702 allows expert testimony when it will assist a trier of fact "to determine <u>a fact in issue</u>." Fed. R. Evid. 702 (emphasis added). Testimony that addresses an issue of law however, or that tries to state a legal conclusion, is not admissible regardless of the qualifications of the expert. See, e.g., United States v. Articles of Banned Hazardous Substances, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in

---

[2] Professor Stratman is a tenured Professor at the University of Colorado at Denver and Director of its Technical Communications Program.

requiring exclusion of expert testimony that expresses a legal conclusion."); Breezy Point Co. v. CIGNA Prop. & Cas. Co., 868 F. Supp. 33, 36 (E.D.N.Y. 1994) ("Thus, an expert is prohibited from offering his opinion as to the legal obligations of parties under a contract, drawing legal conclusions concerning whether a defendant's behavior violates statutory provisions, and offering conclusions as to the legal significance of various facts adduced at trial.") (citing Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 508 (2d Cir. 1977) and Hygh, 961 F.2d at 364).[3]

### B. Whether The SPD Section 204(h) Notice Regarding Part B Satisfied ERISA's Statutory Disclosure Requirements Is A Conclusion of Law.

The requirements for SPDs are set forth in ERISA Section 102 and its accompanying regulations. See 29 U.S.C. § 1022; 29 C.F.R. § 2520.102-1 through 102-5. ERISA requires that an SPD be "written in a manner calculated to be understood by the average plan participant" and "be sufficiently accurate and comprehensive to apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). Similarly, the requirements for Section 204(h) Notices are set forth (as its name implies) in ERISA Section 204(h), 29 U.S.C. § 1054(h). Under that statute, and the regulations in effect in 1997 and 1998, a Section 204(h) Notice was required to summarize plan amendments that were likely to result in a significant reduction in future benefits. See 26 C.F.R. § 1.411(d)-6T (1998), Q&A-10.

Whether a particular communication satisfies the applicable legal requirements therefore depends exclusively on an application of the governing law to the written communication at issue, i.e., the SPD or Section 204(h) Notice. The Second Circuit held in Wilkins v. Mason

---

[3] See also Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Plan & Trust Agreement, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992) (excluding expert testimony as to the requirements or scope of ERISA as an impermissible delegation of the trial court's duty to determine questions of law); Allen v. West Point-Pepperell, Inc., No. 90 Civ. 3841, 1995 LEXIS 11025, at *37 (S.D.N.Y. Aug. 4, 1995) (three actuaries' testimony, on whether IRS Revenue Ruling 79-90 showed that the defendant could not change a pension plan's discount rate without a formal amendment from its Board of Directors, was inadmissible because whether "revenue ruling 79-90 limited the [defendant's] authority to change the discount rate [was] a legal question on which such testimony [was] inadmissible").

Tenders Dist. Council Pension Fund, 445 F.3d 527, 581 (2d Cir. 2006), for example, that whether an SPD satisfies ERISA's disclosure requirements is an issue of statutory interpretation:

> But [plaintiff's] SPD claim does not ask us to review either the [defendant's] exercise of discretion or its interpretation of the plan. Rather, we are called on to judge the [defendant's] compliance with the applicable [ERISA] statute and regulations [regarding the content of SPDs]. To do this, we must construe ERISA's requirement that 'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits' be published in the SPD. 29 U.S.C. § 1022(b). <u>In other words, the question before us is simply one of statutory interpretation.</u>

Wilkins, 445 F.3d at 581 (emphasis added). See also Layaou v. Xerox Corp., 238 F.3d 205, 210 (2d Cir. 2001) ("We disagree and find, <u>as a matter of law</u>, that the SPD failed to provide notice to [plaintiff] and other similarly situated employees that their future benefits would be offset by an appreciated value of their prior lump-sum benefits distributions.") (emphasis added).[4]

In Counts 2 and 4, the Court must determine whether the SPD and Section 204(h) Notice for Part B met the requirements of 29 U.S.C. §§ 1022 and 1054(h). These are conclusions of law, i.e., issues of "statutory interpretation." Professor Stratman attempts to usurp the Court's authority to make these conclusions by opining himself about what the SPD and the Section 204(h) Notice do, and do not, disclose. Professor Stratman testified in his deposition that "the question that [Plaintiffs' counsel] put to [him]" was "whether the SPD <u>adequately described</u>" certain plan provisions.[5] Deposition of James Stratman ("Stratman Dep.") at 100-101, excerpt

---

[4] See also Rhorer v. Raytheon Engineers and Constructors, Inc., 181 F.3d 634, 639 (5th Cir. 1999) (SPD claim "turns on whether the summary plan description complies with ERISA's disclosure requirements. That claim is thus premised on a legal question which we review de novo."); Register v. PNC Fin. Servs. Group, No. 04-CV-6097, 2005 WL 3120268, at *9 (E.D. Pa. Nov. 21, 2005) (granting motion to dismiss challenge to cash balance plan SPD based on the written terms of the SPD).

[5] Professor Stratman testified:

> Q: And then Mr. Bruce told you there were a whole bunch of problems with the SPD, right?
> A: **He asked me to investigate whether these particular things were disclosed in here.** Obviously, he was communicating he was concerned about these problems, what did I think.

attached hereto at Exhibit A. Whether the SPD (and the other communications Professor Stratman reviewed) "adequately described" provisions of Part B, however, is a legal conclusion based on the relevant statutes and for which expert testimony is inadmissible. See Wilkins, 445 F.3d at 581 (whether SPD satisfies ERISA's disclosure requirements is an issue of statutory interpretation); Hygh, 961 F.2d at 363 (experts may not testify as to legal conclusions); Articles of Banned Hazardous Substances, 34 F.3d at 96 (same); Breezy Point Co., 868 F. Supp. at 36 (same).

Moreover, Professor Stratman reaches his conclusions by merely reading the communications at issue – written documents whose terms speak for themselves. Professor Stratman explained his opinions, and the bases thereof, in his Expert Report as follows:

> In my expert opinion, Do CIGNA's 1998 and 1999 Summary Plan Documents (SPDs) and their precursor documents disclose to the average plan participant the potential reductions of benefits associated with the change?
>
> A.   Summary of My Opinion. <u>Upon inspecting these documents carefully</u>, my conclusion is that the SPD and precursor documents fail to disclose to the average plan participant the potential reductions in benefits from the new cash balance plan relative to the old plan. On the contrary, the <u>language in these documents suggests . . . . Further, the documents suggest . . . . There simply is no language in these documents</u>. . . .

Stratman Expert Report, at 1, excerpt attached hereto at Exhibit B (emphasis added).

---

> Q: He told you there was age discrimination, didn't he?
> A: He may have said something to that effect, yes.
>
> Q: And he told you older people weren't getting the proper rate of accrual, right?
> A: He stated that was his concern, right.
>
> Q: And he told you he didn't think that the SPD adequately described these issues, correct?
> A: That's the question that he put to me.
>
> Q: And he expressed his view to you on that, didn't he?
> A: Well, I would have that understanding since he came to me, sure.

Stratman Dep. at 100-101, excerpt attached hereto at Exhibit A (emphasis added).

In short, Professor Stratman seeks to testify about legal issues of "statutory interpretation." His testimony will not aid the Court in resolving any "fact in issue." Fed. R. Evid. 702. His testimony therefore is inadmissible.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court exclude any testimony or other evidence from Professor James Stratman.

Dated:  June 27, 2006                     Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: /s/ Joseph J. Costello
Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
*Admitted pro hac vice*
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
(215) 963-5295/5258/5472
(215) 963-5001 (fax)

**ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)

*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*

# Exhibit A

6/19/2003
Amara, et al vs Cigna Corp.
James F. Stratman, Ph. D.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JANICE C. AMARA, ET AL,        CV No. 3:01-2361 (DJS)

PLAINTIFFS,
VS.
CIGNA CORPORATION,
CIGNA PENSION PLAN,

DEFENDANTS.

-----------------------------------------------
       DEPOSITION OF:   JAMES F. STRATMAN, PH.D.
-----------------------------------------------

Taken before Kathleen S. Norton, Registered Professional Reporter, Lic./Reg. No. 00105, and Notary Public in and for the State of Connecticut, pursuant to Notice, at the offices of Robinson & Cole, 280 Trumbull Street, Hartford, Connecticut, on June 19, 2003, commencing at 10:03 a.m.

BRANDON SMITH REPORTING SERVICE, LLC
44 Capitol Avenue
Hartford, CT 06106
Tel:  (860) 549-1850
Fax:  (860) 549-1537

Brandon Smith Reporting Service

3e4e1835-6fc6-4489-893b-6a964e3d0e82

Amara, et al vs Cigna Corp.

6/19/2003                                                              James F. Stratman, Ph. D.

### Page 2

```
 1        APPEARANCES
 2  Representing the Plaintiff:
 3  LAW OFFICE OF STEPHEN R. BRUCE
    805 15th Street, NW
 4  Suite 210
    Washington, D.C. 20005
 5     By: STEPHEN R. BRUCE, ESQUIRE
 6  Representing the Defendants:
 7  MORGAN LEWIS & BOCKIUS, LLP
    101 Park Avenue
 8  New York, NY 10178-0060
       By: CHRISTOPHER A. PARLO, ESQUIRE
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1           STIPULATIONS
 2
 3      IT IS STIPULATED by the attorneys for the
 4  Plaintiffs and the Defendants that each party
 5  reserves the right to make specific objections in
 6  open court to each and every question asked and the
 7  answers given thereto by the witness, reserving the
 8  right to move to strike out where applicable, except
 9  as to such objections as are directed to the form of
10  the question.
11
12      IT IS STIPULATED and agreed between
13  counsel for the parties that the proof of the
14  authority of the Notary Public before whom this
15  deposition is taken is waived.
16
17      IT IS FURTHER STIPULATED and agreed that
18  the reading and signing of this deposition are not
19  waived and any defects in the notice are waived.
20
21
22
23
24
25
```

### Page 4

```
 1
 2      JAMES F. STRATMAN, PH.D.,
 3      having first been duly sworn, was examined
 4      and testified as follows:
 5
 6          DIRECT EXAMINATION
 7  BY MR. PARLO:
 8  Q  Good morning, Mr. Stratman. My name is Chris
 9     Parlo. I'm counsel for the defendant in a
10     matter brought by Ms. Amara. We're here today
11     to take your deposition. I want to go through
12     a couple of ground rules to, hopefully, make it
13     go more smoothly for you and I, but also for
14     the court reporter.
15  A  Okay.
16  Q  First, it's very hard for a court reporter to
17     take down two people speaking at once, so I'm
18     going to try very hard to wait for you to
19     finish your answer before I ask another
20     question.
21  A  Understood.
22  Q  And I would ask that you wait for me to finish
23     a question before you provide an answer.
24         It's also difficult for a court
25     reporter to write down or interpret what an
```

### Page 5

```
 1     uh-hum means or huh-uh. I'm not even sure how
 2     she wrote that down now, so we need verbal
 3     answers. And usually the problem comes up with
 4     a yes or no, so keep that in mind.
 5  A  Right.
 6  Q  If at any point in time you want to break, let
 7     me know. I will be happy to accommodate you
 8     for a bathroom break, or anything you need. I
 9     would only ask that before we do take a break
10     that if a question is pending, that you answer
11     the question.
12  A  Right. I understand; exactly.
13  Q  The only exception to that is if there is a
14     question of privilege, attorney-client
15     privilege or some other privilege that I can't
16     imagine that would apply here, you can decline
17     to answer a question if you need to talk to
18     counsel about that.
19         If you answer a question that I pose
20     to you, I will assume that you understood it.
21     So if at any point in time you don't understand
22     a question for any reason, it's compound,
23     you're not understanding a word I'm using, for
24     any other reason, let me know and I will
25     attempt to rephrase it or repeat it so when you
```

2 (Pages 2 to 5)

6/19/2003 — Amara, et al vs Cigna Corp. — James F. Stratman, Ph. D.

Page 98

1. inaccurate. And they -- generally what people
2. do is they read things and, Oh, yeah, that's
3. either what I think I would hear, or that's
4. what I have heard before, or if it's expense
5. thing, most people are adverse to doing more
6. work than they have to. So if information
7. comes to them and it's very different from
8. something they were accustomed to hearing, it
9. might -- it might trigger them. It also has to
10. do with who's communicating.
11. If it's what they'd expect from that
12. source, and it seems congruent with what they
13. think that source would tell them, they're also
14. now going to be impacted by that in a
15. particular way. So their what we call in
16. reading their depth of processing issues,
17. people don't want to have to process more
18. information than they want to reach some kind
19. of conclusion. And they may set a very, very
20. low threshold. They may not need to read more
21. than a sentence or two from a document and say,
22. "Oh, yeah, I'm chilling with this. This is
23. good. This is what I expected. This is what I
24. like. I don't have to deal with this. This is
25. not a problem for me." People read documents

Page 99

1. like that.
2. Q Going back to your 1988 study, you came to
3. the -- it may not have been a conclusion, but
4. you contained -- you put language in your
5. report that SPDs often don't contain adequate
6. information, correct?
7. A If my report stated that, I can't remember
8. exactly without looking at it.
9. Q Did you form a conclusion that the SPDs
10. disclaimer language in that case was a problem?
11. A Yes. It seemed to be a problem in that case.
12. There were one or two examples that I think I
13. remember looking at in that paper that seemed
14. to be better examples. So there could be a
15. range of performances in the sense of done
16. well, done not so well. I did question the
17. validity of using them at all, because I think
18. they're burdensome for readers and difficult
19. for them to work with.
20. Q That's your perception?
21. A Based on the study.
22. Q Based on the 1988 study?
23. A Yes.
24. Q So you had that perception going into your
25. discussions with Mr. Bruce, right?

Page 100

1. A Yes.
2. Q And then Mr. Bruce told you there were a whole
3. bunch of problems with the SPD, right?
4. A He asked me to investigate whether these
5. particular things were disclosed in here.
6. Obviously, he was communicating he was
7. concerned about these problems, what did I
8. think.
9. Q He told you there were problems in the SPD,
10. right?
11. A Yes.
12. Q He told you he thought there was age
13. discrimination, didn't he?
14. A He may have said something to that effect, yes.
15. Q And he told you older people weren't getting
16. the proper rate of accrual, right?
17. A He stated that was his concern, right.
18. Q And he told you he didn't think that the SPD
19. adequately described these issues, correct?
20. A That's the question that he put to me.
21. Q And he expressed his view to you on that,
22. didn't he?
23. A Well, I would have that understanding since he
24. came to me, sure.
25. Q And you understood that he believed the SPD did

Page 101

1. not properly disclose things, right?
2. A That was his question, yes.
3. Q But my question was: Did you believe that that
4. was his opinion on it?
5. A Yes.
6. Q Okay. And you read some JAO articles; is that
7. right?
8. A Yes.
9. Q Two of them, right?
10. A Yes.
11. Q And in both of those articles did they raise
12. questions about the general issue of the amount
13. of disclosure in SPDs?
14. A They raised questions, yes. They had questions
15. of their concerns about it.
16. Q Stating that some SPDs did not properly
17. disclose, right?
18. A That was a concern that they expressed, right.
19. Q And you read an article in the New York Times
20. about cash balance plans?
21. A That was long before this case.
22.     MR. BRUCE: I object. He said Wall
23. Street Journal.
24. A I don't remember the source, but it was a
25. magazine or newspaper article, very short kind

26 (Pages 98 to 101)

# Exhibit B

# Expert Report on CIGNA Cash Balance Pension Plan Summary Documents and Precursor Documents in <u>Amara et. al. v. CIGNA Corporation and CIGNA Pension Plan</u>, C.A. 01-2361

Prepared by:

James F. Stratman, Associate Professor

University of Colorado at Denver
Technical Communication Program
Plaza Building, Suite 102-F
Denver, Colorado 80217-3364
Phone: 303-556-2884
FAX: 303-556-6018
Email: jstratma@carbon.cudenver.edu

April 25, 2003

I. Introduction

I have been asked by Stephen R. Bruce Law Offices to address the following question in connection with *Amara et al. v. CIGNA Corporation and CIGNA Pension Plan, C.A. 01-2361*:

**In my expert opinion, do CIGNA's 1998 and 1999 Summary Plan Documents (SPDs) and their precursor documents disclose to the average plan participant the potential reductions of benefits associated with the change?**

A. **Summary of My Opinion.** Upon inspecting these documents carefully, my conclusion is that the SPDs and precursor documents fail to disclose to the average plan participant the potential reductions in benefits from the new cash balance plan relative to the old plan. On the contrary, the language in these documents suggests that the benefits plan participants had earned prior to January 1, 1998 would not be reduced by the change to the new plan and that benefits would grow steadily. Further, the documents suggest that plan participants would continue to earn benefits under the new plan that are equal to or better than those obtainable in future years under the old plan. There is simply no language in these documents making explicit the circumstances under which the move to the new plan could result in significant benefit reductions relative to the old plan or indicating that benefit reductions would be reduced based on age.

B. **Professional Qualifications.** I am a tenured Associate Professor of Communication at the University of Colorado at Denver, where for the last seven years I have been the Director of the Communication Department's graduate and undergraduate programs in Technical Communication. I received a Ph.D. in Rhetoric from Carnegie Mellon University (Pittsburgh, PA) in 1988, with a focus on scientific methods for testing the usability and understandability of written communication in legal, business, and technical fields. I am currently an active, funded researcher publishing empirical studies of both legally trained and ordinary readers' comprehension of legal documents and legal argumentation (see attached Vita). With respect to ERISA related research, in 1988 I published an empirical study of readers' understanding of contract disclaimer language contained in a Summary Plan Document, in connection with Bower v. Bunker Hill, 725 F.2d 1221 (9th Cir. 1984).[1] However, I have not testified as an expert witness previously. I have from time to time privately consulted for attorneys on issues of language clarity and reader understanding in various types of insurance contract litigation. In the present case I am working as a paid consultant and receive $170 per

---

[1] Stratman, J. (1988). Contract Disclaimers In ERISA Summary Plans: A Deceptive Practice?" *Industrial Relations Law Journal 10*, No. 3, 350 - 380.

1