# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-----------------------------------------------------X
                                :

JANICE C. AMARA, GISELA         :      3:01 CV 2361 (MRK)
R. BRODERICK, ANNETTE S. GLANZ  :
individually, and on behalf of others   :      Trial Date: 09/11/06
similarly situated,                :
                                :
                   Plaintiffs,  :
             v.            :
                                :
CIGNA CORP. AND CIGNA        :
PENSION PLAN,                :
                                :
                 Defendants.  :
                                :
-----------------------------------------------------X

## DEFENDANTS' PROPOSED FINDINGS OF FACT

Dated:  June 27, 2006          **MORGAN, LEWIS & BOCKIUS LLP**
                                  By:  /s/ Joseph J. Costello
                                  Joseph J. Costello
                                  Jeremy P. Blumenfeld
                                  Jamie M. Kohen
                                  *Admitted pro hac vice*
                                  1701 Market Street
                                  Philadelphia, Pennsylvania  19103-2921
                                  (215) 963-5295/5258/5472
                                  (215) 963-5001 (fax)

                                **ROBINSON & COLE**
                                  James A. Wade (CT # 00086)
                                  280 Trumbull Street
                                  Hartford, Connecticut  06103
                                  (860) 275-8270
                                  (860) 275-8299 (fax)

                                  *Attorneys for Defendants*
                                  *CIGNA Corporation and CIGNA Pension Plan*

## TABLE OF CONTENTS

**Page**

I.  BACKGROUND ON CASH BALANCE PLANS AND TRADITIONAL PLANS ........ 1

  A.  Traditional Defined Benefit Plans .......................................................... 1

  B.  Cash Balance Plans ................................................................................. 2

II.  THE CIGNA PENSION PLAN .......................................................................... 6

  A.  CIGNA's Part A Traditional Pension Plan And The Creation Of The Part
      B Cash Balance Plan ............................................................................... 6

    1.  All Plan Participants Earned Benefits Under Part A Through
        December 31, 1997. ....................................................................... 6

    2.  On November 4, 1997, CIGNA Amended The Plan To Freeze
        Accruals In Part A For Certain Plan Participants As Of December
        31, 1997. ........................................................................................ 8

    3.  On December 21, 1998, The Amendment Creating Part B Was
        Signed,  Retroactive To January 1, 1998. ..................................... 9

  B.  The Terms Of Part B .............................................................................. 11

    1.  Benefit And Interest Credits ........................................................ 11

    2.  Opening Account Balances, Protected Minimum Benefits, And
        Retirement .................................................................................... 13

    3.  Plan Administration ..................................................................... 17

III.  B TREATS OLDER EMPLOYEES AT LEAST AS WELL AS IT TREATS
      YOUNGER EMPLOYEES (COUNT 3) .......................................................... 22

  A.  Defendants' Expert's Analysis Of Age Discrimination Is Grounded In
      Sound Actuarial Science. ....................................................................... 22

    1.  Mr. Sher's Credentials ................................................................. 22

    2.  Mr. Sher's Methodology And Conclusions .................................. 23

  B.  Plaintiffs' Expert's Analysis Of Age Discrimination Is Fatally Flawed ............ 28

IV.  PART B DID NOT RESULT IN FORFEITURES, BACKLOADING OR
     CUTBACKS (COUNTS 1 AND 5). ................................................................. 40

V.   PLAINTIFFS AND THE TESTIFYING CLASS MEMBERS HAVE BEEN
     PROVIDED ABUNDANT INFORMATION REGARDING THEIR
     RETIREMENT BENEFITS AND HAVE SUFFERED NO LIKELY, OR
     ACTUAL HARM RESULTING FROM ANY OMISSIONS FROM THE SPD
     OR SECTION 204(H) NOTICE (COUNTS 2 AND 4) ................................... 47

# TABLE OF CONTENTS
(continued)

**Page**

A. The Plan Administrator Provided Participants A Number Of Communications Regarding The Freezing Of Accruals Under The Old Plan, The Creation Of Part B, And The Precise Amounts In Participants' Part B Accounts. ........................................................................................... 47

    1. A Memorandum Was Sent To Managers, A Letter Was Sent To Grandfathered Participants Notifying Them Of Their Status, And A Memorandum Was Sent To Human Resources Representatives And Key Benefits Contacts. ...................................................................... 47

    2. The Signature Benefits Newsletter Sent To Employees In Early November Provided Notice That Part A Accruals Would Be Frozen As Of December 31, 1997, And Explained The Cash Balance Plan. ........................................................................................... 48

    3. In December 1997, All Participants Received A Signature Benefits Retirement Kit, Which Reinforced To Participants That CIGNA Would Freeze Accruals Under Part A For All Non-Grandfathered Participants As Of December 31, 1997, And Further Explained The Cash Balance Plan. .......................................................................... 52

    4. In June 1998, Part B Participants Received A Statement Advising Them Of Their Opening Account Balance, And CIGNA Published Part B SPDs In October 1998 And September 1999, Which Accurately Describe Part B's Benefit Structure. .................................... 60

    5. The Plan Administrator Provided Participants Precise Information Regarding Their Part B Pension Accounts Through Annual Account Statements, Total Compensation Reports, A Retirement Planner, A Benefits Hotline, And Websites. ........................................... 64

B. None Of The Plaintiffs Or Testifying Class Members Suffered Likely Or Actual Harm Resulting From Any Omission In The SPD Or Section 204(h) Notice. ...................................................................................... 68

VI. PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES WHICH BAR THEIR CLAIMS (ALL COUNTS). ................................... 78

In addition to Defendants' Objections and Responses to Plaintiffs' Proposed Findings of Fact in which Defendants stipulated to many of Plaintiffs' proposed findings, Defendants CIGNA Corporation ("CIGNA") and CIGNA Pension Plan (collectively, "Defendants") hereby propose the additional findings of fact set forth below.

## I.     BACKGROUND ON CASH BALANCE PLANS AND TRADITIONAL PLANS

### A.     Traditional Defined Benefit Plans

1.     The formula for earning benefits in a traditional defined benefit pension plan typically is an annual benefit payable for the life of the employee ("annuity"), where the annual benefit is a percentage of the employee's "salary" multiplied by the employee's years of service. Salary may be defined as final salary, the average of salary in the last five years, or some other similar definition. For example, an employee might accrue a pension benefit commencing at age 65 of 1.5% of salary for every year of service. After 30 years of service he would have an annual pension benefit of 45% of salary. Testimony of Lawrence Sher (hereinafter "Sher Testimony").

2.     The annuity has an actuarially equivalent present value based on interest rates and the participant's age and life expectancy. In other words, using certain actuarial assumptions, the value of the annuity can be expressed as a lump sum value today. Sher Testimony.

3.     By design, participants under traditional pension plans earn most of their benefits in their last years of service. Traditional plans provide most of their benefits only after an employee stays with the same employer for many years. Sher Testimony.

4.     Traditional plans also frequently provide subsidized early retirement benefits that encourage employees to stay with the employer until such benefits become available and then to leave. An unsubsidized early retirement benefit is a benefit payable before normal retirement age (typically age 65) that has the same value (discounting to present value and with actuarial adjustments) as the age-65 benefit. A subsidized early retirement benefit is a benefit payable

before normal retirement age that has an overall value <u>greater than</u> the value of the normal retirement benefit.  If the employee does not retire early, the value of the subsidized benefit is worn away and lost.  Sher Testimony.

### B.    Cash Balance Plans

5.    "Cash balance" retirement plans were designed to reflect changes in the workforce of employees and to allow employees to earn their retirement benefits more evenly over their careers.  Sher Testimony.

6.    Since the mid-1980s, hundreds of U.S. employers have adopted "cash balance" retirement plans.  Most of these plans resulted from the "conversion" of their traditional defined benefit plans to cash balance plans.  Sher Testimony.

7.    Recent estimates indicate that between one-quarter and one-third of large U.S. employers sponsor a cash balance plan.  According to the Pension Benefit Guaranty Corporation, over 1,500 cash balance plans and other similar "hybrid" plans were in existence as of 2003, providing pension benefits to over 8 million participants, one quarter of the total population covered by defined benefit plans.  Defs' Ex. 531, Pension Benefit Guaranty Corp., Pension Insurance Data Book 2004, at 59 (2005), at http://www.pbgc.gov/docs/2004databook.pdf (last visited June 22, 2006); Sher Testimony.

8.    Usually, the amount of the cash balance benefit earned in any period is equal to a percentage of the participant's pay during that period and, therefore, is often referred to as a "pay credit."  Pay credits are defined in a number of ways.  For example, they may be a fixed percentage of pay (e.g., 5%), they may be integrated with Social Security (e.g., 3% of pay up to the Social Security wage base and 5% over the wage base), or they may vary by the employee's age or service (e.g., 4% of pay each year up to age 40 and 5% each year thereafter).  The pay credits are periodically credited to a participant's account (e.g., each pay period).  Sher

Testimony.

9.     In order to reflect economic changes associated with the passage of time, i.e., the time value of money, cash balance plans also provide for "interest credits," determined by applying a plan-specified interest rate to the participant's account balance.  In most cases, the interest credit rate is a "floating" rate that changes annually (or more frequently) and is tied to a market rate such as the yield on a selected U.S. Treasury security.  Sometimes, a floating interest credit rate is subject to a minimum fixed rate (e.g., 4%), to a maximum fixed rate (e.g., 8%), or both.  Sher Testimony.

10.     Thus, for example, if a cash balance plan provides pay credits of 5% salary, and one assumes that interest rates are approximately the same as increases in wages (e.g., 4%), then in year 1, an employee with a salary of $60,000 would earn a pay credit of 5% x $60,000 = $3,000.  The next year, the employee would earn interest on his first year's pay credit of 4% x 3,000 = $120.  As of year 2, therefore, his first year's pay credit has a value of $3,120 (first year's pay credit plus interest).  That employee also would earn a pay credit on his year 2 salary, which salary is 4% higher than his year 1 salary, 1.04 x $60,000 = $62,400.  The pay credit on the $62,400 year 2 salary is 5% x $62,400 = $3,120.  In this example, the first year's benefit and second year's benefit have the same value ($3,120) as of year 2.  In year 3, both of these benefits will continue to earn interest at the same rate and will continue to have the same value.  This process can be followed through each additional year that the employee works and earns pay credits.  Sher Testimony.

11.     Because of its different plan design, the benefit formula under a cash balance plan is expressed in a different way than under a traditional defined benefit plan.  In a traditional plan, the benefit formula is typically expressed as a life annuity beginning at the normal retirement age

defined by the plan (often age 65).  Conversely, the benefit in a cash balance plan is expressed as a current lump sum value that is equal to the employee's "cash balance account."  Sher Testimony.

12.    One of the main attributes of cash balance plans that has spurred this trend is that their benefit values, as in 401(k) plans, are much easier to understand than those under a traditional defined benefit plan, because the benefit value is expressed in terms of an account. Sher Testimony.

13.    Another important attribute of cash balance plans is that meaningful benefit values accrue more quickly and evenly over an employee's career as compared to traditional defined benefit plans.  Sher Testimony.

14.    Since most employees do not stay with the same employer for most of their careers, employees will often receive more generous benefits under cash balance plans than under traditional defined benefit plans with similar costs.  Cash balance plans are not inherently more or less costly than traditional defined benefit plans.  Sher Testimony.

15.    Many cash balance plans are the result of "conversions" from traditional defined benefit plans that are accomplished through plan amendments.  There are two major approaches used in practice:  the "sum-of" approach and the "opening balance" approach.  Sher Testimony.

16.    Under the "sum-of" approach, benefit accruals as of the conversion date under the prior traditional benefit formula are frozen.  At the same time, participants begin to receive pay credits (and interest credits) going forward.  The prior plan accrued benefits typically would continue to be paid under the forms previously allowed (which often do not include a lump sum option), and the cash balance portion usually is payable in a lump sum equal to the participant's account balance, or as an annuity.  Essentially, the participant in these cases has two separate

pension benefits, with different rules, formulas, and procedures governing each form.  Sher
Testimony.

17.    Under the "opening balance" approach, participants are granted initial cash
balance accounts as of the conversion date to reflect their years of service under the prior benefit
formula.  Often, opening balances are determined based on the lump sum value of the accrued
normal retirement benefits (typically the age-65 benefit) under the prior formula as of the
conversion date, by discounting the benefit to present value using certain interest rates and
actuarial factors prevalent at the time.  Sher Testimony.

18.    Sometimes, opening balances are increased to an extent to reflect subsidies
inherent in early retirement benefits under the prior formula.  Many employers have been
reluctant, however, to build early retirement subsidies into opening balances because that could
result in a much more favorable treatment as compared to the prior benefit formula.  That is
because in a traditional plan, the value of early retirement subsidies dissipates, i.e., wears away
and is lost, as the employee continues to work.  Once the subsidized value of the early retirement
benefit is factored into the opening balance, however, it does not wear away.  Sher Testimony.

19.    There is no provision of law that sets forth minimum requirements for
determining opening balances.  In fact, the United States General Accounting Office has
specifically stated that "current federal law does not govern how plan sponsors set opening
hypothetical account balances for cash balance plans, provided that a plan ensures that
participants do not receive less than the present value of prior accrued benefits if they separate
from the employer."  Defs' Ex. 533, United States General Accounting Office, Report to
Congressional Requesters, Private Pensions, Implications of Conversions to Cash Balance Plans,
September, 2000 at 30 (P02283); Sher Testimony.

20.    However, in order to assure that participants always receive at least as much as they were entitled to under the prior formula, cash balance plan conversions with opening balances generally provide that in no event will the employee's total benefit (or the value of such benefit) be less than the benefit accrued on the conversion date (or the value of such benefit) under the pre-conversion benefit formula. Sher Testimony.

21.    The opening balance approach has been the more popular approach primarily because employers perceived that employees would prefer to have all of the plan benefits expressed under the new paradigm – that is, in terms of a current lump sum value. From the employee's perspective, neither approach is inherently superior. It depends on the design details and on future events that are unknown at the time of the conversion (e.g., changes in interest rates, pay increase rates, etc.). Sher Testimony.

## II.    THE CIGNA PENSION PLAN

### A.    CIGNA's Part A Traditional Pension Plan And The Creation Of The Part B Cash Balance Plan

#### 1.    All Plan Participants Earned Benefits Under Part A Through December 31, 1997.

22.    Prior to January 1, 1998, CIGNA had a traditional pension plan for its employees. Stip. Ex. 2, Prior CIGNA Pension Plan in effect before January 1, 1998 ("Part A"). When CIGNA created a cash balance plan for certain participants in the CIGNA Pension Plan (sometimes referred to as the "Plan"), known as "Part B," the original traditional defined benefit plan formula that continued for certain grandfathered participants was labeled "Part A." Stip. Ex. 2, Part A. For ease of reference, CIGNA's traditional defined benefit will be hereafter referred to as "Part A."

23.    Depending on an employee's employment history, the employee would either be entitled to benefits under the Tier 1 or Tier 2 formula under the Plan. The "Tier 1" formula

- 6 -

provides an age-65 annuity benefit equal to 2% of final three-year average pay for each year of service up to 30 years, less a "social security offset." The participant can retire early at age 55 with 10 or more years of service and receive an immediate annuity benefit equal to the accrued age 65 benefit (not reflecting the social security offset), reduced for early commencement by factors in the Plan (e.g., to 79% of the unreduced benefit for most participants). Upon reaching age 65, the benefit is reduced by the participant's social security offset. Stip. Ex. 2, Part A at 4.2, 4.3 (D00040-46).

24.     The Tier 2 formula provides an age-65 annuity benefit equal to 1-2/3% of final five year average pay for each year of service up to 35 years, less the social security offset. A Tier 2 participant could retire early after age 55 with 15 more years of service and receive an immediate annuity benefit equal to the accrued age-65 benefit (not reflecting the social security offset), reduced by 5% per year if benefits begin before age 65 (e.g., 50% for commencement at age 55). Upon reaching age 62, the benefit payable is reduced by the social security offset (adjusted to age 62). Stip. Ex. 2, Part A at 4.3(b) (D00046).

25.     The early retirement benefits, i.e. pre-age 65 benefits, available under Tier 1 and Tier 2 were subsidized benefits. Stip. Ex. 2, Part A at 4.3 (D00043).

26.     The Plan also included a provision that benefited certain married participants – the so-called "preserved spouse's benefit" – whereby a portion of the participant's pension (generally 30%) would be payable after his or her death for the remaining lifetime of the surviving spouse. When this kind of protection is provided to retired participants, many pension plans reduce the participant's lifetime pension in order to compensate for the added value of the survivor payments. However, participants eligible for this coverage received it free of charge. A participant eligible for this coverage who elects to have a larger portion (e.g., greater than 30%)

of the pension to continue to his or her spouse after the participant's death, would get credit for the free preserved spouse's benefit – i.e., only the difference between the amount elected and the amount of preserved spouse's benefit would serve to reduce the participant's lifetime pension. For example, a participant who elects a 50% spouse's benefit would only have his or her lifetime pension reduced to pay for the cost of providing the additional 20% spouse's benefit. Stip. Ex. 2, Part A at Section 6.4 (D00063).

27.     The Tier 1 and Tier 2 formulas did not have a lump sum option. That is, participants could elect their benefits in one of several different annuity options, but could not elect to receive their benefits as a lump sum. Stip. Ex. 2, Part A at Article VI (D00260 - 71).

28.     Under Part A, once employees were separated from employment with CIGNA, their prior plan benefit was static and did not continue to accrue, because it was based on earnings with CIGNA. Stip. Ex. 2, Part A at 4.2 (D00040 - 43).

> **2.     On November 4, 1997, CIGNA Amended The Plan To Freeze Accruals In Part A For Certain Plan Participants As Of December 31, 1997.**

29.     In November 1997, CIGNA's Chief Executive Officer ("CEO"), Wilson Taylor, signed an amendment to the CIGNA Pension Plan freezing benefit accruals for all Tier 2 participants (also known as "new formula participants") and all participants with a combined age and years of credited service less than 45. Depenbrock v. CIGNA Corp., 278 F. Supp. 2d 461, 469 (E.D. Pa. 2003), reversed on other grounds, 389 F.3d 78 (3d Cir. 2004) ("Taylor's execution of Amendment Number 4 . . . froze the pension benefit accruals of the participants that would be converted to cash balance plan effective December 31, 1997").

30.     The amendment provided in part:

> Notwithstanding any other provision of the Plan, no Employee who, as of December 31, 1997, is a New Formula Participant or has a combined total Years of Credited Service and age less than

forty-five (45) shall accrue any additional benefits under the Plan after December 31, 1997.

The foregoing cessation and/or suspension in benefit accruals and exclusion from eligibility to participate in the Plan after December 31, 1997, shall remain in effect until the adoption of a subsequent amendment to the Plan, and such subsequent amendment may provide for benefit accruals under terms and conditions different from the Plan provision in effect before 1998. No such subsequent amendment shall result in the accrued benefits of any Participant being less than such Participant's accrued benefit under the plan as of December 31, 1997.

Stip. Ex. 2, Amendment No. 4 (D00132 - 133).

31.     Thus, according to the express words of Amendment No. 4, until a "subsequent amendment" was adopted, the affected participants had their benefits frozen (i.e, reduced their accruals to zero), and they would accrue no new pension benefits after December 31, 1997. Stip. Ex. 2, Amendment No. 4 (D00132).

32.     The only Plan amendment causing a reduction in benefits, and which therefore required a Section 204(h) notice, was this freezing of benefit accruals under Part A for certain participants, effective December 31, 1997. Stip. Ex. 2, Amendment No. 4 (D00132).

33.     Those older, longer service employees whose age plus service totaled at least 45 and who were not "new formula participants" were grandfathered, and continued to accrue benefits under Part A. Stip. Ex. 2, Amendment No. 4 (D00132).

**3.      On December 21, 1998, The Amendment Creating Part B Was Signed, Retroactive To January 1, 1998.**

34.     On December 21, 1998, the CEO signed the Plan document for the cash balance plan, Part B, as well as an updated traditional Plan document, Stip. Ex. 2, Part A at D10336 - 443); Stip. Ex. 1, Part B at D10444 - 10530; Depenbrock, 389 F.3d 78 (holding that "December 21, 1998, is the effective date of the amendment" implementing the cash balance plan).

35.     Although the Plan document was not signed until December 1998, it was

retroactive to January 1, 1998.  Depenbrock, 389 F.3d at 83.  Thus, Part B participants received

pension and interest credits in 1998 for the entire year, not just ten days.  See, e.g., Defs' 519,

Pension Plan Statement for the Period Ending June 30, 1998 (reflecting benefit and interest

credits earned from January 1, 1998 to June 30, 1998).

 36. The adoption of Part B resulted in an increase in benefit accruals for non-

grandfathered participants who moved to the cash balance plan because the previously adopted

Amendment No. 4 had frozen all of their benefit accruals.  That is, non-grandfathered

participants went from having no benefit accruals (under Amendment No. 4) to accruing benefits

under Part B.

 37. The non-grandfathered participants who were employed as of December 31, 1997

became participants in Part B, and their Part A accrued benefits were converted to an opening

account balance in Part B at that time.  Stip. Ex. 1, Part B at Section 1.28 (D00278-79).

 38. Additionally, any employees hired for the first time after January 1, 1998

automatically became participants in Part B upon their hire.  Stip. Ex. 1, Part B at Section 2.1

(D00285). These individuals are not part of the class in this case, which only includes Part B

participants who previously were participants in Part A.

 39. Plan participants who were no longer employed by CIGNA on December 31,

1997, did not become participants in Part B on January 1, 1998.  So long as they did not return to

work for CIGNA, as further described below, they remained forever as participants in Part A.

Accordingly, these individuals are not part of the class in this case because they never were

participants in Part B.  Stip. Ex. 1, Part B at 2.4(a) (D00285).

 40. Part B provides that grandfathered participants in Part A who left CIGNA and

then were rehired by CIGNA after the adoption of the Part B would become participants in Part

B upon their rehire.  Stip. Ex. 1, Part B at Section 2.4 (00285).

41.    These "rehires" are people who were grandfathered under Part A, left CIGNA to take a job with another company, and then returned to CIGNA months or years later.  Testimony of John Arko (hereinafter "Arko Testimony"), identified as Stip. Ex. 194.

42.    Originally, the Plan Administrator placed rehires who rejoined CIGNA between January 1, 1998 and December 21, 1998 (when Part B was signed) into Part B.  Depenbrock, 389 F.3d at 80.  However, in a lawsuit filed by a rehire, John Depenbrock, the United States Court of Appeals for the Third Circuit determined that those rehires should have remained in Part A because the amendment creating Part B and establishing its rule applicable to rehires was not valid until signed by the CEO on December 21, 1998.  Depenbrock, 389 F.3d at 82-83.

43.    As a result of the Depenbrock decision, the Plan Administrator decided to notify other grandfathered Part A participants who were rehired between January 1, 1998 and December 21, 1998 that their benefits would be recalculated under Part A.  Defs' Ex. 539, Letters from Plan Administrator Regarding Depenbrock dated February 4, 2005.  There are approximately 194 employees who fall into this group.  Stip. Ex. 176, Depenbrock Letters at SuppD0484.

## B.    The Terms Of Part B

### 1.    Benefit And Interest Credits

44.    Under Part B, participants earn pay credits (referred to as "benefit credits") based on a percentage of their "Eligible Earnings" each year, plus interest on their account balance. Stip. Ex. 1, Part B at Article VI (D00291 - 93).

45.    The pay credit rate is age-# and service-favored – i.e., Part B provides a higher credit rate to older or longer service employees than similarly situated younger or shorter service

employees.[1]  The following table shows the Plan's benefit credit rates:

**Table A:  Benefit Credit Rates Under Part B of CIGNA Pension Plan**

| Age Plus Service | Rate Applied to Pay Up to Integration Level | Rate Applied to Pay Over Integration Level |
|---|---|---|
| Under 35 | 3% | 4.5% |
| 35 – 44 | 4% | 5.5% |
| 45 – 54 | 5% | 6.5% |
| 55 – 64 | 6% | 7.5% |
| 65 or over | 7% | 8.5% |

Arko Testimony.

46.    For example, an employee who is age 40 with 10 years of service in 2003 (i.e, age plus service is 50) and earns $60,000 receives a benefit credit in 2003 of $3,247.50 (5% of $43,500 plus 6.5% of $16,500).  Had the same employee been age 60 rather than 40, the pay credit would be $1,200 higher, or $4,447.50 (7% of $43,500 plus 8.5% of $16,500).  For any two participants who have the same service and pay history, the older one will receive a benefit credit in a given year that is either the same or higher than the younger employee.  Similarly, as an employee continues in service, his or her benefit credit rates will either remain the same or increase from one year to the next.  Arko Testimony; Sher Testimony.

47.    Participants also receive interest credits quarterly on their account balances at a floating rate that is subject to change at the beginning of each calendar year.  The annualized Plan rate is the rate on five-year U.S. Treasury securities (constant maturity) in the preceding November plus 0.25% (subject to a minimum of 4.5% and a maximum of 9.0%).  Stip. Ex. 1, Part B at Section 4.2(b) (D00293).  Interest credits continue to be added to a participant's

---

[1]    The pay credit rate also is integrated with Social Security to some extent – i.e., provides a higher credit rate on pay over the "Social Security integration level."  Part B provides that the integration level is one-half of the Social Security taxable wage limit in each year (e.g., $34,200 in 1998 and $43,500 in 2003). Defs' Ex. 503, Amendment 1.2 to Part B (D00323).

account until the account is paid out as a lump sum or until annuity payments start.  Stip. Ex. 1,

Part B at Section 4.2 (D00292 - 293).  The interest rate is the same for all employees, regardless

of age.  The actual historical interest credit rates under Part B of the Plan are as follows:

### Table B:  Interest Credit Rates
### Under Part B of CIGNA Pension Plan

| Year | Plan Interest Credit Rates |
|------|---------------------------|
| 1998 | 6.05% |
| 1999 | 4.79% |
| 2000 | 6.22% |
| 2001 | 5.95% |
| 2002 | 4.50% |
| 2003 | 4.50% |
| 2004 | 4.50% |
| 2005 | 4.50% |
| 2006 | 4.50% |

Arko Testimony.

48.    Thus, in any given year, the older employee's benefit will equal or exceed the

benefit payable to a similarly situated (i.e., same salary history and years of service) younger

employee.

**2.    Opening Account Balances, Protected Minimum Benefits, And Retirement**

49.    Former Part A participants who began coverage under Part B under the terms of

the Plan received opening balances based on the present value of their accrued benefits under the

applicable Part A benefit formula as of December 31, 1997.[2]  Stip. Ex. 1, Part B at Section 1.28

---

[2]    New hires after December 31, 1997 were placed into Part B with an opening account balance of zero because they had no previously earned benefit.  Employees rehired between December 21, 1998 and December 31, 2000 became participants in Part B and had their Part A benefits converted into an opening account balance.

(D00278 - 279).

50.     For purposes of calculating the present value of each participant's accrued benefit under Part A, different present value factors (and the benefits to which they apply) were used depending upon individual circumstances.  Stip. Ex. 1, Part B at Section 1.28 (D00278 - 79).

51.     The most favorable treatment was provided to participants who were eligible for Part B on January 1, 1998 and whose age plus service totaled 55 or more on such date.  For such a participant, the opening balance was equal to the present value of the accrued Part A normal retirement benefit, adjusted by the Plan's early retirement reduction factors to an amount payable at age 62, using an interest rate equal to the five-year Treasury rate in effect in November 1997, minus 0.75% — i.e., 5.05%.  Mortality was assumed at all ages based on the 1983 (unisex) Group Annuity Mortality Table ("1983 GAM Table").  Stip. Ex. 1, Part B at 1.28 (D00278 - 79); Sher Testimony.

52.     Thus, for these older employees, the benefit was converted into an opening account balance using a lower (and hence more favorable) interest rate.  Sher Testimony.

53.     In other words, these participants received a portion (or all) of the early retirement subsidies under the prior benefit formulas included in their account balances and present values were determined using a discount rate that was more than 1% below prevailing rates on 30-year Treasury bonds at the time.  Using a lower discount rate produced higher opening balances since the value of future annuity payments is discounted to a lesser degree when using a lower discount rate.  For example, a dollar payable a year from now is worth about 95 cents if discounted at 5% and about 94 cents if discounted at 6%.  Arko Testimony; Sher Testimony.

54.     For all other Part B participants, the opening balances were determined based on

---

Employees rehired after December 31, 2000 became entitled to two different benefits based on two different formulas:  one based on the benefits earned under Part A before they left CIGNA and a separate benefit based on their service in Part B once they were rehired.  Defs' Ex. 504, Amendment No. 2 to Part B.

the accrued Part A normal retirement benefit (payable at age 65), using an interest rate equal to the five-year Treasury rate in effect in November 1997, plus 0.25% — i.e., 6.05% (except using the 30-year Treasury bond rate in effect in the November preceding the year that the opening balance is established in the case of Part B participants who were not active participants on January 1, 1998). Again, mortality was assumed at all ages based on the 1983 GAM Table. The setting of these opening account balances was within the mainstream of practice in cash balance conversions. In fact, the most common approach is not to include any early retirement subsidies in opening balances. This is because an early retirement subsidized benefit is lost if not taken at early retirement. If the early retirement subsidized benefit is included in the opening account balance, the employee who retires at normal retirement age will have an increased account balance based on a subsidized benefit that he or she did not actually elect to receive. This defeats the purpose of the subsidized early retirement benefit (to permit employees to retire early if they so choose). Sher Testimony.

55.     Under Part B, any participant (including any of the Plaintiffs) is absolutely entitled at retirement to receive a benefit equivalent to his or her account balance, including all benefit and interest credits. Stip. Ex. 1, Part B at Section 7.1 (D00305 - 07); Stip. Ex. 1, Part B at Section 1.1 (D00270).

56.     At retirement, or upon termination of employment, a participant is entitled to his or her account balance if he or she elects to receive benefits in the form of a lump sum. Alternatively, a participant can elect to receive benefits in one of several other forms available, including a single life annuity (stream of monthly payments payable for life) or a joint and survivor annuity (stream of monthly payments for life, with additional payments payable to a spouse for the life of the spouse). Stip. Ex. 1, Part B at Section 7.2 (D00307 - 09).

57.     If the amount of that account is less than a certain minimum benefit[3] set forth in Part B (the "Minimum Benefit"), the participant receives the equivalent of the account balance (including all benefit and interest credits) plus additional pension benefits sufficient to raise the participant's overall retirement benefit up to the minimum.  Stip. Ex. 1, Part B at Sections 1.1(c) (D00270), 1.32 (D00280), 7.3(b) (D00309).[4]  In other words, a participant is entitled to the greater of a retirement benefit based on his account balance or the Minimum Benefit set forth in Part B.  Stip. Ex. 1, Part B at Sections 1.1(c) (D00270), 1.32 (D00280), 7.3(b) (D00309).

58.     Specifically, Section 1.1(c) of the Plan provides that:

> Minimum Benefit.  In the case of a Participant who has a Part A Accrued Benefit which is converted into an Initial Retirement Account, such Participant's Accrued Benefit, expressed in the form of an immediate lump sum distribution, shall in no event be less than the present Equivalent Actuarial Value (determined using the Applicable Interest Rate and the Applicable Mortality Table) of the Participant's Minimum Benefit.

Stip. Ex. 1, Part B at Section 1.1(c) (D10451).

59.     The Minimum Benefit is defined as a participant's age-65 annuity benefit under Part A, enhanced by the value of the "Preserved Spouse's Benefit," if applicable.  Stip. Ex. 1, Part B at Section 1.32 (D00280).

60.     Normal retirement age under the Plan is defined as age 65.  Stip. Ex. 1, Part B at Section 1.34 (D00281).

61.     In addition, Section 7.3 of the Plan protects other benefits, in other benefit forms

---

[3]     The Minimum Benefit is based on the participant's ERISA-protected benefits under Part A, including early retirement benefits, plus certain non-protected benefits, such as Social Security supplements.  Part B, Sections 1.32, 7.3(b).

[4]     Specifically, section 7.3 of Part B provides in relevant part that:

> The payments under this Part B to a Participant described in paragraph 7.3(a) in the annuity form he has elected shall in no event be less than the Equivalent Actuarial Value of his Minimum Benefit . . . .

Part B, Section 7.3(b).

(e.g., early retirement subsidized benefits), to which an employee was entitled under the prior formula.  Stip. Ex. 1, Part B at Section 1.34 (D00281); Stip. Ex. 1, Part B at Section 7.3(c) (D00309).

62.     The most common reason that a participant's Minimum Benefit might exceed the value of his or her account balance is if the participant was entitled to a subsidized early retirement benefit under the prior Plan, which would be preserved as part of the Minimum Benefit but was not included (for most employees) as part of the employee's opening account balance.  A participant who retired before age 65 might have a Minimum Benefit that was subsidized which exceeded the value of the account balance, which was based on the age-65 (and hence unsubsidized) benefit.  Because the initial account balance was calculated by converting each participant's annuity benefit into a lump sum using a particular interest rate, a subsequent decrease in interest rates could cause an employee's Minimum Benefit to exceed the value of the employee's account balance.  Under these circumstances, the participant is entitled to his or her protected Minimum Benefit.  Sher Testimony.  Stip. Ex. 1, Part B at Sections 1.1(c) (D00270), 1.32 (D00280), 7.3 (D00309).

63.     Because the prior Plan formula also had several subsidies that applied only to particular benefit forms (e.g., joint and survivor annuity benefits), an employee also might have a protected Minimum Benefit that only applies if the employee elects that particular form of benefit.  Stip. Ex. 1, Part B at Section 7.3 (D00309).

### 3.     Plan Administration

64.     Both the Part A and Part B Plan documents provided that a Plan Administrator would be designated by "The Committee," which was defined as "the CIGNA Corporation Corporate Benefit Plan Committee, or a successor entity or group of persons, that is the Named Fiduciary for the Plan as described in Article XII."  Stip. Ex. 1, Part B at Section 1.17 (D00272);

Stip. Ex. 2, Part A at Section 1.18 (D00010); Stip. Ex. 1, Part B at Section 1.46 (D00282) (The

Plan Administrator shall be "the person, entity, or committee responsible for the administration

of the Plan as specified in Article XIII."); Stip. Ex. 2, Part A at Section 15.1 (D00098); Stip. Ex.

1, Part B at Section 13.1 (D00329) ("The Committee shall delegate to a Plan Administrator the

duties, authority and functions set forth in this Article XIII."); Stip. Ex. 2, Part A at Section 15.1

(D00098).

65.     Thus, the Plan document vested authority in the Benefits Committee to appoint a

Plan Administrator.  Stip. Ex. 1, Part B at 13.1 (D00329); Stip. Ex. 2, Part A at 15.1 (D00098).

66.     In accordance with these Plan provisions, the Committee formally designated

Stewart M. Beltz, Assistant Vice President Benefits, as the Plan Administrator for the traditional

defined benefit plan on March 29, 1996.  Defs' Ex. 507, Plan Administrator Appointments at

SuppD1098.

67.     The Committee designated Mr. Beltz's replacement as Plan Administrator, Gerald

T. Meyn, Vice President, on May 14, 2003.  Defs' Ex. 507, Plan Administrator Appointments at

SuppD1099.

68.     Effective August 20, 2004, the Committee replaced Mr. Meyn with John Arko as

Plan Administrator.   Defs' Ex. 507, Plan Administrator Appointments at SuppD1092.

69.     The 1998 Part B summary plan description ("SPD") and 1999 Part B SPD

explicitly list the Plan Sponsor and the Plan Administrator for Part B:

> Plan Sponsor          CIGNA Corporation
>                 . . .
> Plan Administrator    Stewart M. Beltz
>                       CIGNA Corporation
>                       1601 Market Street
>                       Philadelphia, PA 19192

Defs' Ex. 505, 1998 Part B SPD at 17 (D00842); Defs' Ex. 506, 1999 Part B SPD at J-10
(D00652).

70.    CIGNA is the Plan Sponsor for the CIGNA Pension Plan.  Stip. Ex. 1, Part B at Section 14.1 (D00333).

71.    CIGNA is not the Plan Administrator for the CIGNA Pension Plan.  Stip. Ex. 1, Part B at Section 13.1 (D00329 - D00330).

72.    John Arko is the current Plan Administrator for the CIGNA Pension Plan.   Stip. Ex. 1, Part B at Section 13.1 (D00329 - D00330).

73.    The Plan Administrator has the power to "interpret and construe the provisions of the Plan" and to "determine all questions relating to a Participant's participation and benefits under the Plan."  Stip. Ex. 1, Part B at Sections 13.2(a), 13.2(d) (D00329); Stip. Ex. 2, Part A at 15.2(a), 15.2(d) (D00098).

74.    The Plan Administrator has the responsibility:  "(e) To advise or assist Participants regarding any rights, benefits or elections available under the Plan; (f) To provide the Participant an appropriate, written explanation in non-technical terms, within a reasonable period prior to the Benefit Commencement Date."  Stip. Ex. 1, Part B at Section 13.2(e)-13.2(f) (D00329).

75.    The Plan contains a detailed claims and appeals procedure for employees who have questions or concerns about their benefits.  Stip. Ex. 1, Part B at Article XIII.  As detailed in the Plan, the Claims Procedure states:

13.5 Claims Procedure

(a)    Filing a Claim for Benefits.  A Participant or Beneficiary shall notify the Plan Administrator or its delegate of a claim for benefits under the Plan. Such request may be in any form adequate to give reasonable notice to the Plan Administrator or its delegate and shall set forth the basis of such claim and shall authorize the Plan Administrator or its delegate to conduct such examinations as may be necessary to determine the validity of the claim and to take such steps as may be necessary to facilitate the payment of any benefits to which the Participant or Beneficiary may be entitled

under the Plan.  The Plan Administrator shall make all determinations as to the right of any person to a benefit under the Plan.

(b)  Denial of Claim.  If the Plan Administrator denies in whole or in part any claim for benefits under the Plan by any Participant or Beneficiary, the Plan Administrator shall furnish the claimant with written notice of the decision not later than ninety (90) days after receipt of the claim, unless special circumstances require an extension of time for processing the claim.  If such an extension of time for processing is required, written notice of the extension shall be furnished to the claimant before the end of the initial ninety- (90-) day period.  In no event shall such extension exceed the period of ninety (90) days from the end of the initial period.  The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan Administrator expects to render the final decision.

The written notice of the denial of a claim shall set forth in a manner calculated to be understood by the claimant:

(1)  The specific reason or reasons for the denial;

(2)  Specific reference to the pertinent Plan provisions on which the denial is based;

(3)  A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4)  Appropriate information as to the steps to be taken if the claimant wishes to submit his claim for review.

(c)  Appeals Procedure.  A claimant or his authorized representative may request a review of the denied claim by the Plan Administrator.  Such request shall be made in writing and shall be presented to the Plan Administrator not more than sixty (60) days after receipt by the claimant of written notice of the denial of the claim.  The claimant shall have the right to review the pertinent documents and to submit issues and comments in writing.  The Plan Administrator shall make its decision on review not later than sixty (60) days after receipt of the claimant's request for review, unless special circumstances require an

- 20 -

> extension of time, in which case a decision shall be
> rendered as soon as possible, but not later than 120 days
> after receipt of the request for review.  The decision on
> review shall be in writing and shall include the specific
> reasons for the decision, written in a manner calculated to
> be understood by the claimant, and specific references to
> pertinent Plan provisions on which the decision is based.
>
> The Plan claims procedure shall be administered in
> accordance with the applicable regulations of the
> Department of Labor.

Stip. Ex. 1, Part B at Section 13.5 (D00330 - 331).

76.    The Plan Administrator has considered numerous claims on a range of issues.

Even where a participant does not follow the claim procedure in the Plan, the Plan Administrator

will consider a claim and decide the claim on its merits.  The claim and appeal process is a fair

and effective method for participants to have their claims heard and to have the terms of the Plan

interpreted and applied.  Arko Testimony.

77.    The Plan also accounts for the fact that occasionally errors may occur by

specifically providing that the Plan Administrator will correct any mistakes:

> 13.6 Clerical Error
>
> If any fact pertaining to eligibility for an amount of benefits
> payable under the Plan to a Participant or other payee has
> been misstated, or in the event of clerical error, the benefits
> will be adjusted by the Plan Administrator or its delegate
> on the basis of the correct facts in a manner precluding
> individual selection.

Stip. Ex. 1, Part B at Section 13.6 (D00331 - 332).

78.    Prudential Retirement ("Prudential") is the record keeper for the CIGNA Pension

Plan, since the Stock Purchase and Asset Transfer of CRIS of CIGNA to Prudential in November

2003.

79.    Since the sale, Prudential completes the benefits estimates and calculations for

Plan participants, including the Class Members herein.  When Prudential is missing information

required to complete such estimates and calculations, Prudential contacts CIGNA, which

provides the information.

80.    Prudential has various controls, checks and systems in place to ensure that the

accuracy of all estimates and calculations for Plan participants is confirmed.

III.   **B TREATS OLDER EMPLOYEES AT LEAST AS WELL AS IT TREATS YOUNGER EMPLOYEES (COUNT 3)**

   A.   **Defendants' Expert's Analysis Of Age Discrimination Is Grounded In Sound Actuarial Science.**

81.    Defendants' expert, Lawrence Sher, has proposed a methodology for determining

the rate of an employee's benefit accruals with respect to cash balance benefits under Part B of

the CIGNA Pension Plan.  The Court finds that Mr. Sher's methodology and conclusions are

sound and grounded in well-accepted principles of actuarial science.

   1.   **Mr. Sher's Credentials**

82.    Lawrence Sher is a Principal and the Director of Retirement Policy at Buck

Consultants, Inc., an actuarial and employee benefits consulting firm owned by Affiliated

Computer Services.   He is a Fellow of the Society of Actuaries and has practiced as an actuary

since 1973.  He practices primarily in the area of pension benefits.  Sher Testimony.

83.    Mr. Sher has extensive experience designing and consulting with respect to

defined benefit pension plans, including cash balance plans.  In the past sixteen years, he has

devoted a significant portion of his time to issues relating to cash balance plans, including

providing technical assistance and advice to his firm's consultants and clients and to government

officials, initiating and supervising research activities, speaking at professional conferences,

publishing articles, and responding to questions from the media.  Sher Testimony.

84.    Pursuant to Fed. R. Evid. 702, the Court finds that Mr. Sher is qualified as an

expert by his knowledge, skill, experience, training and education on the design of cash balance

and traditional defined benefit plans generally, and the operation of Parts A and B of the CIGNA

Pension Plan specifically.  The Court further finds that Mr. Sher's testimony is based on

sufficient facts and data drawn from the record, and is the product of reliable actuarial principles

and methods, and that Mr. Sher has applied these principles and methods reliably to the facts of

this case.

### 2.    Mr. Sher's Methodology And Conclusions

85.    The Part B benefit credits for any older employee are at least as great as for any

younger employee with the same years of service and pay.  Stip. Ex. 1, Part B, at Section 4.1

(D00291).

86.    In addition, all Part B participants, regardless of age, receive interest credits at an

interest rate equal to the rate on five-year Treasury securities for the year plus 0.25% (subject to

the 4.5% minimum and 9% maximum rates).  Stip. Ex. 1, Part B, at Section 4.2 (D00292 - 293).

87.    Section 204(b)(1)(H)(i) of ERISA uses the undefined phrase "the rate of an

employee's benefit accrual."  This phrase is not a term of art that has a specific meaning in the

actuarial profession.  Actuaries calculate benefit accrual rates in a variety of contexts.

Sometimes actuaries project benefits and then attribute those benefits to particular years of

service or periods of time, in which case the actuary has calculated a benefit accrual "rate."  In

this general sense, actuaries commonly calculate benefit accrual rates.  However, there is no

universal method that actuaries invariably or ordinarily use for these purposes.  Benefit accrual

rates can be determined in a variety of ways, and the method that should be used in any given

instance depends on the purpose of the calculation and the guidance, if any, given in the

applicable rules and regulations.  Sher Testimony.

88.    In some instances, ERISA and the Internal Revenue Code spell out precisely how

benefit accrual rates should be determined.  For example, ERISA and the Code provide

significant details as to how benefit accrual rates must be determined in testing a defined benefit

plan under the anti-backloading rules in ERISA sections 204(b)(1)(A), (B) and (C) and the

parallel provisions of the Code.  In this instance, IRS regulations provide even more details as to

how to comply with those provisions.  Under these circumstances, actuaries follow the

requirements of the statute and regulations.  Sher Testimony.

89.     Other provisions in ERISA and the Code allow a choice among various methods

of calculating benefit accrual rates.  For instance, section 1.401(a)(4)-3 of the nondiscrimination

regulations introduces the term "accrual rate" and proceeds to define two types of rates, the

"normal accrual rate" and the "most valuable accrual rate," and then provides three general

approaches for calculating either of those rates.  These regulations permit additional variations in

how the rates can be calculated, for example, by allowing Social Security benefits to be

"imputed" into the rates and by allowing the rates to be stated as dollar amounts or as a

percentage of pay, where pay may be determined in alternative ways.  Sher Testimony.

90.     Still other provisions, such as ERISA section 204(b)(1)(H)(i), provide no

specificity at all about how the employee's benefit accrual rate is to be determined.  In these

instances, an actuary called upon to calculate a rate of benefit accrual should choose a method

that is consistent with sound actuarial and economic principles and with the purpose for which

the determination is being made.  Of course, the actuary should reflect applicable regulations or

other binding authority.  Sher Testimony.

91.     A preliminary question is whether it is even necessary to engage in actuarial

calculations of the rate of benefit accrual under the Part B cash balance formula.  Section

204(b)(1)(H)(i) asks whether the "rate of an employee's benefit accrual" is frozen or reduced

"because of the attainment of any age." If it is clear from the terms of a benefit formula that benefits continue to accrue in the same manner before and after the attainment of any given age or in a manner that becomes more favorable as age progresses, then there is no reason why mathematical calculations would be required. Sher Testimony.

92.    Under the CIGNA Part B cash balance formula, <u>as age progresses</u>, benefit credit rates continue to apply at the <u>same</u> or at a <u>higher</u> level. And, interest is credited to all participants at a rate indexed to five-year Treasury securities (subject to the minimum and maximum fixed rates). <u>Neither interest credits nor pay credits are reduced or frozen because of the attainment of any age</u>. Thus, actuarial calculations are not required in order to see that the cash balance formula does not reduce the rate of an employee's benefit accrual because of age. Sher Testimony.

93.    To the extent that actuarial calculations are required, an appropriate means of determining the rate of benefit accrual under the Part B cash balance formula is to measure the rate of growth in an employee's account balance. Table C-1 illustrates this approach for an employee hired at age 30 with a starting salary of $60,000 per year and 4.5% annual pay increases. The interest-crediting rate is also assumed to be 4.5% in all years. Sher Testimony.

**Table C-1: Rate of Increase in Account Balance[5]**
(4.5% Annual Pay Increases; 4.5% Annual Interest Credit Rate)

| | | | | | | Rate of Employee's Benefit Accrual Based on Incr. in Acct. Balance | | | |
| | | | | | | Not Time Value Adj. Including Interest | | IRS Prop. Approach Excluding Interest | |
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| Age | Service | Pay | Benefit Credits | Interest Credits | End of Yr. Acct. Bal. | As Dollar Amount | As a % of Pay | As Dollar Amount | As a % of Pay |
|---|---|---|---|---|---|---|---|---|---|
| 31 | 1 | 60,000 | 2,048 | – | 2,048 | 2,048 | 3.41% | 2,048 | 3.41% |
| 32 | 2 | 62,700 | 2,140 | 92 | 4,280 | 2,232 | 3.56% | 2,140 | 3.41% |

---

[5]    For simplicity of illustration, Table C-1 adds interest credits at the end of the year.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 33 | 3 | 65,522 | 2,891 | 193 | 7,364 | 3,084 | 4.71% | 2,891 | 4.41% |
| 34 | 4 | 68,470 | 3,021 | 331 | 10,716 | 3,352 | 4.90% | 3,021 | 4.41% |
| 35 | 5 | 71,551 | 3,157 | 482 | 14,355 | 3,639 | 5.09% | 3,157 | 4.41% |
| | | | | | | | | | |
| 40 | 10 | 89,166 | 4,826 | 1,525 | 40,236 | 6,351 | 7.12% | 4,826 | 5.41% |
| 45 | 15 | 111,117 | 7,125 | 3,291 | 83,545 | 10,416 | 9.37% | 7,125 | 6.41% |
| 50 | 20 | 138,471 | 10,264 | 6,132 | 152,663 | 16,396 | 11.84% | 10,264 | 7.41% |
| 55 | 25 | 172,561 | 12,791 | 10,396 | 254,201 | 23,187 | 13.44% | 12,791 | 7.41% |
| 60 | 30 | 215,042 | 15,940 | 16,387 | 396,482 | 32,327 | 15.03% | 15,940 | 7.41% |
| 65 | 35 | 267,981 | 19,864 | 24,698 | 593,409 | 44,562 | 16.63% | 19,864 | 7.41% |

Sher Testimony.

94.    The resulting rates are determined in dollar amounts (columns 6 and 8) and as a percentage of pay (columns 7 and 9). Columns 6 and 7 take the total increase in account balance during each year. Looking at these results, it is not surprising that annual changes in account balances increase more and more quickly over time as interest credits begin to accumulate on growing account balances. If one considers the time value of money, however, the rates of increase would track the benefit credit amounts (Column 8) and the benefit credit rates (Column 9) because the time value of money would offset the interest credits paid under the formula. In fact, the IRS proposed regulations mentioned earlier do precisely that. Column 8 presents the time value adjusted rates determined in accordance with the IRS proposed regulations using dollar amounts and Column 9 does so as percentages of pay. Again, the rates either remain level or increase in each passing year. Sher Testimony.

95.    The following Table C-2 repeats the calculations in Table C-1 except that, rather than assuming 4.5% annual pay increases, no annual pay increases are assumed (i.e., the employee's pay is assumed to remain at $60,000 in all years).

**Table C-2:  Rate of Increase in Account Balance[6]**
(No Annual Pay Increases; 4.5% Annual Interest Credit Rate)

| | | | | | | Rate of Employee's Benefit Accrual Based on Incr. in Acct. Balance | | | |
| | | | | | | Not Time Value Adj. Including Interest | | IRS Prop. Approach Excluding Interest | |
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| Age | Service | Pay | Benefit Credits | Interest Credits | End of Yr. Acct. Bal. | As Dollar Amount | As a % of Pay | As Dollar Amount | As a % of Pay |
|---|---|---|---|---|---|---|---|---|---|
| 31 | 1 | 60,000 | 2,048 | – | 2,048 | 2,048 | 3.41% | 2,048 | 3.41% |
| 32 | 2 | 60,000 | 2,048 | 92 | 4,188 | 2,140 | 3.57% | 2,048 | 3.41% |
| 33 | 3 | 60,000 | 2,648 | 188 | 7,025 | 2,836 | 4.73% | 2,648 | 4.41% |
| 34 | 4 | 60,000 | 2,648 | 316 | 9,989 | 2,964 | 4.95% | 2,648 | 4.41% |
| 35 | 5 | 60,000 | 2,648 | 449 | 13,086 | 3,097 | 5.16% | 2,648 | 4.41% |
| | | | | | | | | | |
| 40 | 10 | 60,000 | 3,248 | 1,267 | 32,676 | 4,515 | 7.53% | 3,248 | 5.41% |
| 45 | 15 | 60,000 | 3,848 | 2,434 | 60,372 | 6,282 | 10.47% | 3,848 | 6.41% |
| 50 | 20 | 60,000 | 4,448 | 4,036 | 98,168 | 8,484 | 14.14% | 4,448 | 7.41% |
| 55 | 25 | 60,000 | 4,448 | 6,124 | 146,669 | 10,572 | 17.62% | 4,448 | 7.41% |
| 60 | 30 | 60,000 | 4,448 | 8,727 | 207,110 | 13,175 | 21.96% | 4,448 | 7.41% |
| 65 | 35 | 60,000 | 4,448 | 11,971 | 282,430 | 16,419 | 27.36% | 4,448 | 7.41% |

Sher Testimony.

96.     Using the growth in an employee's account balance to measure an employee's rate of benefit accrual (whether time value adjusted or not) is consistent with the fact that the basic promise in the cash balance formula is the employee's account balance.  Part B generally provides (Section 1.1) that on any date of determination the "Accrued Benefit, expressed in the form of an immediate lump sum distribution" is equal to the participant's cash balance account. Stip. Ex. 1, Part B, at Section 1.19(a) (D00270).

97.     Consistent with Section 1.1, every form of benefit that an employee may elect to receive with respect to the cash balance benefit is derived from the employee's account balance.

---

[6]     For simplicity of illustration, Table C-2 adds interest credits at the end of the year.

B.    **Plaintiffs' Expert's Analysis Of Age Discrimination Is Fatally Flawed**.

98.    Plaintiffs' expert, Claude Poulin, has proposed a methodology for determining the rate of an employee's benefit accrual with respect to cash balance benefits under Part B of the CIGNA Pension Plan.  The Court finds that Mr. Poulin's methodology and conclusions are flawed and unreasonable as a matter of actuarial science.

99.    The Poulin methodology measures rates of benefit accrual by considering the size of the benefit that an employee would have if the employee (i) left the balance in his or her cash balance account to accumulate until age 65, and then (ii) converted the age 65 account balance into a life annuity.  The second of these steps – conversion of the account balance into a life annuity – has no impact on the analysis.  Sher Testimony.

100.    On the other hand, the first step — measuring the size of the benefit that the employee would have if he left his account balance untouched until age 65 – is critical.  By definition, a younger employee will have to wait longer than an older employee to turn age 65. The Poulin methodology, however, measures the rate of accrual of an employee's "age 65 benefit" without making any allowance for the fact that younger employees will have to wait longer than older employees before they will actually be able to receive the benefit being measured.  Thus, when Mr. Poulin compares rates of benefit accrual of employees of different ages, he inherently compares employees who wait unequal lengths of time to receive their benefits.  This approach ignores the time value of money and misstates the value of the benefit delivered by a plan over time.  Sher Testimony.

101.    An example will illustrate the point.  Consider two employees who started work at CIGNA at the beginning of 1998, when the cash balance conversion occurred, at ages 45 (Employee Y) and 50 (Employee O).  Assume that both employees work at the same salary until the end of 2002 (assumed to be $30,000 in 1998 and growing 4.5% each year) and then leave for

other jobs.  During the 5-year period, both employees receive the same pay credits (based on 5%

of pay since all of their pays will be under the Social Security integration level), the same interest

credits (based on the actual rates in effect those years) and the same account balance.  Table D,

which applies to both employees, shows the development of their pay credits, interest credits and

account balances as of the end of each year.[7]    Sher Testimony.

**Table D: Development of Cash Balance Accounts for
Two Hypothetical Employees**

| Year | Pay | Pay Credits | Interest Credits | Account at End of Yr. |
|---|---|---|---|---|
| 1998 | 30,000 | 1,500 | 0 | 1,500 |
| 1999 | 31,350 | 1,568 | 72 | 3,140 |
| 2000 | 32,761 | 1,638 | 195 | 4,973 |
| 2001 | 34,235 | 1,712 | 296 | 6,981 |
| 2002 | 35,776 | 1,789 | 314 | 9,084 |
|  |  |  |  |  |
| 2012 | -- | -- | 5,023 | 14,107 |
| 2017 | -- | -- | 3,473 | 17,580 |

Sher Testimony.

Both employees have the same account balance of $9,084 at the end of 2002; Employee Y is

then age 50 and Employee O is age 55.  Assume that the account balances, if left untouched, will

grow at a 4.5% interest-crediting rate as follows:

| Year | Account Balance (rounded) |
|---|---|
| 2002 (both depart) | $  9,100 |
| 2012 (Employee O turns 65) | $14,100 |
| 2017 (Employee Y turns 65) | $17,600 |

Sher Testimony.

     102.    The Poulin methodology would compare the $14,100 "age 65 benefit" that the

---

[7]    For simplicity of illustration, Table D adds interest credits at the end of the year.

older employee will have in 2012 with the $17,600 "age 65 benefit" that the younger employee will have in 2017. Because $17,600 is larger than $14,100, the Poulin methodology implies that the younger employee had a higher rate of benefit accrual than the older employee from 1998 through 2002.[8]  Sher Testimony.

103.    This approach compares economic apples and oranges. The younger employee in the example will receive a larger age 65 benefit than the older employee, but will have to wait five years longer to receive it. At any given point in time, the two employees will have the same account balances. Only by waiting longer to receive his or her benefits can the younger employee receive more interest credits than the older employee, and hence, a superficially larger benefit. Sher Testimony.

104.    The Poulin methodology distorts the value of the benefits delivered by a benefit formula unless it is adjusted to reflect the economic significance of <u>waiting</u> to receive payment of a benefit, i.e., unless it is corrected to reflect the time value of money. The time value of money is an economic principle which holds that the longer one must wait to receive a payment, the less the payment is worth. If the Poulin methodology were adjusted to reflect the time value of money, it would correctly indicate that the rate of benefit accrual under the CIGNA Part B cash balance formula stays constant or increases with age. Sher Testimony.

105.    Actuaries routinely account for the time value of money by "discounting" a sum payable in the future to its "present value" using an appropriate "discount rate." The interest-crediting rate paid by the CIGNA Part B cash balance formula is a reasonable measure of the rate

---

[8]    For ease of illustration, the example speaks of a 45-year-old and a 50-year-old who are two different people. While ERISA section 204(b)(1)(H) does not seem to require a comparison of an employee's rates of benefit accrual to those of any other employee, the same principles apply if one analyzes a single individual at different ages. Unless one discounts the benefits accrued by an individual at various ages to present value in the year the benefit is earned, comparisons are distorted by the time value of money. One might see a declining accrual pattern simply because a dollar invested in 2000 is worth more than a dollar invested in the 2010. Sher Testimony.

of return that the market would pay for an investment similar to a CIGNA cash balance account, and is therefore an appropriate discount rate for purposes of discounting future benefits under the cash balance formula to present value.  Sher Testimony.

106.    The interest-crediting rate and the time value of money offset each other during the period that employees wait to receive their benefits, leaving the plan benefit credit rates as the real rates of benefit accrual under the cash balance formula in economic terms.  The interest-crediting rate does not discriminate in favor of younger employees; it prevents the value of a pay credit from being eroded by the passage of time.  Sher Testimony.

107.    Mr. Poulin's approach also violates another actuarial principle — that assumptions regarding the future should be applied consistently throughout the same set of calculations.  In his Ex. D, Mr. Poulin assumes that there will be a positive interest-crediting rate under the Plan in the future (4.5%), but that employees will not receive any future pay increases.  Given historical relationships among general inflation, general wage and salary increases and market interest rates, assuming zero pay increases in this instance is actuarially unreasonable.  Such an assumption also is inconsistent with Mr. Poulin's assumption of 4% salary increases elsewhere in his report (Exs. F-1, F-2 and F-3).  Sher Testimony.

108.    Even if one were to use the Poulin methodology, it should be employed in a manner that makes reasonable and actuarially consistent assumptions about the future.  Such an approach would no longer appear to show a declining rate of benefit accrual with age under the cash balance formula.  Table E modifies Poulin's Ex. D by assuming 4.5% annual pay increases.  The projected accounts at age 65 attributable to each year's pay credit with interest (Column 4) turn out to be the same for all ages (except for rounding).  Columns 5 and 6 calculate rates of benefit accrual both in dollar amounts (Column 5) and as percentages of pay at age 65 (Column

6). The rates determined as dollar amounts are level by age as are the rates as a percentage of

age 65 pay. Age 65 pay is used rather than the pay in each year because the annuity benefits all

begin at age 65. It would be actuarially unsound to compare annuities beginning at age 65 with

pay at any other point in time. Sher Testimony.

**Table E:  Accrual Rates Under CIGNA Part B Applying Poulin Approach
Revised to Reflect 4.5% Pay Increase Assumption**

| | | | | Age 65 Annuity Benefit Accrual Rates | |
|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] |
| Age | Pay | Pay Credits | Value of Pay Credits at Age 65 | Dollar Amounts | % of Pay at Age 65 |
| 48 | 100,000 | 7,987 | 16,880 | 1,586 | 0.75% |
| 49 | 104,500 | 8,346 | 16,879 | 1,585 | 0.75% |
| 50 | 109,203 | 8,722 | 16,880 | 1,586 | 0.75% |
| 51 | 114,117 | 9,115 | 16,880 | 1,586 | 0.75% |
| 52 | 119,252 | 9,525 | 16,880 | 1,586 | 0.75% |
| 53 | 124,618 | 9,953 | 16,879 | 1,585 | 0.75% |
| 54 | 130,226 | 10,401 | 16,879 | 1,585 | 0.75% |
| 55 | 136,086 | 10,869 | 16,879 | 1,585 | 0.75% |
| 56 | 142,210 | 11,358 | 16,879 | 1,585 | 0.75% |
| 57 | 148,609 | 11,869 | 16,879 | 1,585 | 0.75% |
| 58 | 155,296 | 12,403 | 16,879 | 1,585 | 0.75% |
| 59 | 162,284 | 12,962 | 16,880 | 1,586 | 0.75% |
| 60 | 169,587 | 13,545 | 16,880 | 1,586 | 0.75% |
| 61 | 177,218 | 14,154 | 16,879 | 1,585 | 0.75% |
| 62 | 185,193 | 14,791 | 16,879 | 1,585 | 0.75% |
| 63 | 193,527 | 15,457 | 16,879 | 1,585 | 0.75% |
| 64 | 202,236 | 16,153 | 16,880 | 1,586 | 0.75% |
| 65 | 211,337 | 16,879 | 16,879 | 1,585 | 0.75% |

Sher Testimony.

109.    Although Mr. Poulin assumes no pay increases in his Ex. D, he used a 4% pay

increase assumption in his Exs. F-1, F-2 and F-3 when calculating benefit accrual rates for both

Parts A and B of the CIGNA Pension Plan. Even assuming a 4% annual salary increase, the

resulting dollar amounts of age-65 annuities under Part B (column 4 of Poulin Exs. F) are

virtually level by age within each benefit credit range (and show a generally increasing pattern taking the benefit credit increases into account). With a slightly higher pay increase rate, the dollar amounts would remain level or increase at each successive age. Sher Testimony.

110.     In paragraph 22 of his declaration, Mr. Poulin asserts that his Exs. F require the use of a pay increase assumption to fairly analyze Part A benefits (which are based on final average pay). He characterizes cash balance benefits as being "career average pay" benefits because pay increases do not affect benefits already earned. However, unlike a true career average pay plan, cash balance plan benefits do respond to the same inflationary and related economic forces as final average pay plans. Final average pay benefits are "indexed" by each individual's pay increase rates whereas cash balance benefits are indexed equally for all employees by interest credits. Sher Testimony.

111.     The fact that indexing in the final average pay plan is individually determined and is only granted while the employee is working – as compared to a broad index that applies as long as the cash balance account remains in the plan – does not change the fundamental economics. Just because an employee does not have continued inflation protection in a final average pay plan if he leaves before retirement should not, in and of itself, cause the accrual rates to change in a way that makes them appear to be age discriminatory. Sher Testimony.

112.     Mr. Poulin concludes that age is the cause of the decline in rates of benefit accrual observed under his proposed methodology. Even if that methodology is accepted as a correct means of measuring rates of benefit accrual, it does not establish that age is the cause of the observed decline. In fact, it is time and not age that explains the results produced by Mr. Poulin's methodology. Any apparent link between age and rate of benefit accrual would disappear if the methodology compared employees who waited equal lengths of time to take their

benefits. Sher Testimony.

113. The same correlation between age and rate of benefit accrual would appear to exist if the Poulin methodology were applied to a savings account or to Social Security benefits. Savings accounts earn interest over time, and Social Security benefits increase over time because they are indexed to the growth in national average wages. As a result, all other things being equal, a younger person will have a larger savings account or a larger Social Security benefit at age 65 than an older person. These differences, however, are not caused by age; they are caused by the passage of time. Sher Testimony.

114. This point is illustrated in Table D above. Two employees of different ages who have the same cash balance account at the time they terminate employment will continue to have the same account at any future date regardless of their ages. Sher Testimony.

115. In addition, the Part B cash balance formula would not appear to produce a declining rate of benefit accrual under the Poulin methodology if the formula did not guarantee interest credits to employees irrespective of whether they continue to work for CIGNA. The Poulin methodology assumes that all of the interest credits that ultimately accrue on a given pay credit accrue in the year that the underlying pay credit was earned. That assumption could not be made if the formula conditioned the receipt of interest credits on continued employment at CIGNA. In that case, interest credits would have to be treated as accruing in the year that the credits are actually added to an employee's cash balance account, since the credits would not accrue at all if not for the year of service in which they were added to the account. Under the Poulin methodology, the latter treatment of interest credits would result in rates of benefit accrual that appear to increase rather than decrease as the employee approaches age 65. Sher Testimony.

116.    The fact that the Part B cash balance formula guarantees interest credits whether or not an employee continues working for CIGNA is thus an essential cause of the declining rate of benefit accrual that appears to exist under the Poulin methodology.  It makes little sense, however, to say that guaranteeing interest credits "causes" a reduction in the rate of employee benefit accruals because of age.  The guarantee of interest credits has nothing to do with age.  It simply ensures that former as well as current CIGNA employees are protected from having their benefits eroded by the passage of time.  Sher Testimony.

117.    If an actuarial approach to testing rates of benefit accrual implies that common and traditional defined benefit formulas that are age-neutral or age-favored on their face results in a rate of benefit accrual that decreases with age, that is a strong indication that the approach is unreasonable.  Mr. Poulin's approach implies that many well-accepted types of plan designs are age discriminatory.  Sher Testimony.

118.    Consider a plan that gives employees an age-65 annuity equal to $10 dollars per month multiplied by the employee's number of years of service.  An employee who participates in the plan for 5 years will receive an age-65 annuity of $50 per month; one who participates for 10 years will receive an age-65 annuity of $100 per month; and so on.  If the employee continues to work beyond age 65, he or she continues to accrue an additional $10 per month for each additional year of service, but his or her annuity will not start until he or she retires.  The plan described above is cited in the Conference Report on ERISA section 204(b)(1)(H) as an example of a plan that complies with the age discrimination rules.  H.R. Conf. Rep. 1012, 99th Cong., 2d Sess. 381 (1986).  If the mathematical approach advocated by Mr. Poulin were applied to this plan, the plan would violate ERISA Section 204(b)(1)(H)(i) for all employees over age 65.  In the example, an employee who works through age 66 earns an extra $10 per month during the

year he or she turns 66, but the extra annuity does not begin until age 66 when he or she retires. Thus, in his or her 66th year, the employee earns an annuity of $10 per month <u>beginning at age 66</u>. Sher Testimony.

119.    Mr. Poulin's report did not illustrate rates of accrual after age 65 for the Part B cash balance formula even though it seems that the primary, if not the only, focus in adopting ERISA section 204(b)(1)(H)(i) was on accruals after normal retirement age.  Stip. Exs. 3, 4, and 7.

120.    Nevertheless, under Mr. Poulin's approach – and his mathematical formula – all benefits must be expressed in the form of an age-65 annuity for purposes of determining the rate of benefit accrual.  If $10 per month beginning at age 66 is expressed as an actuarially equivalent age-65 annuity, it will be <u>less</u> than $10 per month.  This is both because an age-66 annuity would begin one year later than an age-65 annuity and because a 66-year-old is not expected to live as long as a 65-year-old and is therefore expected to receive fewer annuity payments.  Applying Mr. Poulin's approach to the plan cited in the Conference Report will therefore make it appear that the plan's rate of benefit accrual steadily decreases with age after age 65.  The rate of benefit accrual under the plan declines from $10 per year of service at age 65 to about $9 per year of service at age 66, and continues to decrease with each additional year of service thereafter.  The age-65 annuities that are actuarially equivalent to $10 annuities at ages 66 through 70 would be $9.09, $8.24, $7.45, $6.72 and $6.04, respectively.[9]  Sher Testimony.

121.    Many pension plans in the United States covering union employees follow the flat dollar per year of service model of the $10 per month example cited in the Conference Report.  If the plan in the Conference Report fails the age discrimination rules, then so would many union

---

[9]    For this purpose, a 6% interest rate and the 1983 GAM Table were used.

pension plans.  Sher Testimony.

122.    For the same reasons, a traditional career pay plan or final average pay plan would fail under Mr. Poulin's approach for all employees who work past age 65.  Consider a career pay plan that provides an annuity at age 65 equal to the sum of 1% of each year's pay.  An employee who participates in the plan for 10 years will receive an annuity at age 65 equal to 1% of the sum of his or her pay during those 10 years (which is equivalent to 10% of his or her average pay over that period).  Typically, such a plan would provide that individuals who work past age 65 continue to accumulate 1% of pay as an annuity, and begin receiving their annuity upon retirement.  Sher Testimony.

123.    This is a traditional and widely used type of benefit formula.  Under Mr. Poulin's approach, however, such plans would violate ERISA section 204(b)(1)(H)(i) for all employees over age 65.  The mathematics of this formula is the same as for the $10 per month plan discussed above.  At all ages over 65, the rate of employee benefit accrual under such a plan, expressed in terms of an age-65 annuity (as required by Mr. Poulin's methodology), steadily declines with increasing age.  The same results would occur with a traditional final average pay plan as well.  Sher Testimony.

124.    This conclusion is disturbing because most of the traditional pension plans covering non-union employees in the United States are based on a career or final average pay formula and would fail Mr. Poulin's test for age discrimination.  Sher Testimony.

125.    Mr. Poulin's approach would also cause contributory defined benefit plans to fail the age discrimination rules.  In a typical contributory defined benefit plan, an employee earns a benefit equal to the greater of either (a) a benefit defined by the plan, or (b) the benefit derived from employee contributions to the plan, plus statutory interest credits on those contributions

until normal retirement age.  Employee contributions to a contributory defined benefit plan and the statutory interest credits that accrue on those contributions are directly analogous to the pay and interest credits in a cash balance plan, and accrue in the same pattern as do benefits under a cash balance plan.  Sher Testimony.

126.     If the rate of benefit accrual under a contributory defined benefit plan is calculated under the Poulin approach and employee contributions plus interest are producing the larger benefit (as can often occur), such a plan will display a declining rate of benefit accrual at every age before normal retirement age in exactly the same pattern that Mr. Poulin attributes to cash balance plans.  In other words, under Mr. Poulin's approach, providing the interest credits that ERISA mandates for contributory defined benefit plans can cause those plans to fail the age discrimination rules.  Sher Testimony.

127.     Mr. Poulin's basic objection to cash balance plans is that younger employees will have more time than older employees to accumulate compound interest credits before turning age 65.  Under this logic, any means of remedying the alleged discrimination will be radical because the remedy will have to neutralize the effects of compound interest and the time value of money.  A plan would have to provide a 64-year-old with just as much of an increase in his or her benefit from the effects of compound interest credits as a 21-year-old by the time both turn 65.  In other words, the 64-year-old would have to get the advantage of 44 years of compound interest even though he or she would only have to wait a single year to receive his or her benefit.  Alternatively, the 64-year-old would have to be given an offsetting benefit large enough to offset the advantage of compound interest to the 21-year old.  As Mr. Poulin observes, the CIGNA Part B cash balance benefit credits do increase with age (actually by a combination of age plus service), but not by enough to satisfy his requirements.  Therefore, no matter how one tries to do

this, it would be enormously expensive and disruptive, unless one cuts the benefits of younger employees almost to zero.  Sher Testimony.

128.    Table F illustrates the pay credits that would be necessary at each age – beginning with the lowest rates in the current plan formula at age 21 – to produce acceptable results under Mr. Poulin's methodology.  For this purpose, it is assumed that interest credits each year would be equal to the maximum plan rate of 9% because to assume any lower interest credit rate would not guarantee that benefit credit rates would never decrease by age. The required benefit credit rates are stated in terms of single rates at each age (i.e., not integrated with Social Security as in the current Part B) to simplify the analysis.  Sher Testimony.

**Table F: Required Part B Benefit Credit Rates to Satisfy Poulin Theory**

| Age | Current Benefit Credit Rates (under / over integration level) | Required Composite Rates |
|:---:|:---:|:---:|
| 21 | 3.0% / 4.5% | 4.2% |
| 25 | 3.0% / 4.5% | 5.9% |
| 30 | 4.0% / 5.5% | 9.1% |
| 35 | 5.0% / 6.5% | 13.9% |
| 40 | 6.0% / 7.5% | 21.5% |
| 45 | 7.0% / 8.5% | 33.0% |
| 50 | 7.0% / 8.5% | 50.8% |
| 55 | 7.0% / 8.5% | 78.2% |
| 60 | 7.0% / 8.5% | 120.3% |
| 64 | 7.0% / 8.5% | 169.7% |

Sher Testimony.

129.    As Table F demonstrates, in order to equalize the highly skewed "rates of benefit accrual" produced by Mr. Poulin's proposed methodology, an employee aged 64 would have to

- 39 -

receive a pay credit about 40 times the size of the pay credit of a 21-year-old!  Thus, if the 21-year-old received an annual pay credit equal to 4.2% of pay, the 64-year-old would have to receive an annual pay credit of almost 170% of pay!  If the 21-year-old worked his or her entire career under such a plan, he or she would accrue a life annuity at age 65 that would pay him or her well in excess of his or her salary while working – as much as five to seven times his or her salary – depending upon actual pay increases and interest credits.  Sher Testimony.

130.    These figures are absurd.  Pension plans are designed to replace a <u>portion</u> of an employee's pay while working.  The Court is not aware of any plan that was designed to pay a retirement annuity greater than an employee's salary while working, much less five to seven times that salary, and Mr. Poulin failed to identify any such plan.  Moreover, any actuarial approach that implies that older workers would have to receive pay credits 40 times higher than younger employees in order to avoid age discrimination is in the Court's view unsound.  Cash balance plans like Part B are economically age-neutral or age-biased in <u>favor</u> of older workers as they are.  Requiring them to change in the way that Mr. Poulin's approach requires would make them radically <u>reverse</u> age discriminatory.  Sher Testimony.

## IV.    PART B DID NOT RESULT IN FORFEITURES, BACKLOADING OR CUTBACKS (COUNTS 1 AND 5).

131.    The written terms of Part B unequivocally provide that all benefits previously accrued under the prior Plan formula are protected.  First, Section 1.1(c) provides that a participant's Accrued Benefit under Part B "shall in no event be less than the . . . Participant's Minimum Benefit," which in turn is defined as "the Participant's Part A Accrued Benefit."  Stip. Ex. 1, Part B, at Section 1.1 (D00270).

132.    Second, for employees who were entitled to a "Preserved Spouse's Benefit" under Part A (also known as the "free 30%"), the employee's Minimum Benefit also includes the value

of that benefit.  Stip. Ex. 2, Part A, at Section 7.2, 7.3 (D00074 - 78).

133.    Third, Section 7.3(b) of the Plan protects employees' rights to any early retirement annuity benefits that they earned under Part A.

134.    Lastly, Amendment No. 4, which provided for the freezing of accruals under Part A, expressly provided that "[n]o such subsequent amendment shall result in the accrued benefits of any Participant being less than such Participant's accrued benefit under the plan as of December 31, 1997."  Stip. Ex. 2; Amendment No. 4 (D00132).

135.    Although Prudential may not maintain computerized records of the minimum benefit applicable for some participants, that does not mean that the actual benefit is not being protected.  To the contrary, Prudential has a number of procedures in place to ensure that minimum benefits are calculated and that those benefits are protected.  There also is a process in placed for CIGNA to provide any information (e.g., payroll information) that Prudential needs to calculate a participant's minimum benefit, or for any other purpose.  Arko Testimony.

136.    For many participants, the minimum benefit is irrelevant because the participant's account balance exceeds the minimum benefit value at the time of benefit commencement. Admittedly in a few isolated instances, benefits were not calculated in accordance with the terms of the Plan.  When those issues were brought to the attention of Prudential or the Plan Administrator (pursuant to the Plan's claim and appeal procedures), the mistake was corrected, the terms of Part B were followed, and the correct minimum benefit was paid.  Sher Testimony; Arko Testimony.

137.    For example, although Prudential initially miscalculated Plaintiff Broderick's benefit without the Free 30%, that mistake was corrected once the issue was brought to its attention and Ms. Broderick has since received all of the benefits she is due.  Stip. Ex. 172,

March 31, 2006 letter from Prudential to Gisela Broderick (hereinafter "Gisela/Prudential letter"), (P2050); Arko Testimony.

138.    Plaintiffs have no evidence that Prudential or the Plan Administrator (neither of whom is a party to this case) routinely ignores the terms of Part B and fails to protect the minimum benefit that Part B unambiguously requires be protected.

139.    Because the Part A benefit formulas include "early retirement subsidies" (i.e., the favorable reduction factors for benefit commencement before age 65), such favorable treatment, including the value of a Social Security supplement, was preserved under section 7.3. Stip. Ex. 1, Part B, Section 7.3 (D00309).

140.    The CIGNA Pension Plan did not have a lump sum option before the January 1, 1998 amendment (and still does not offer Part A benefits in a lump sum). Moreover, basing lump sums on the present value of normal retirement benefits in traditional defined benefit plans that provide early retirement subsidies on annuity benefits is a common practice. Sher Testimony.

141.    Whenever employees in a defined benefit plan are entitled to the greater of the amounts under two benefit formulas, the employee might be accruing benefits under one formula, yet their actual benefit might be rising more slowly or not at all. Sher Testimony.

142.    For example, take a simple case of a traditional defined benefit plan that provides a normal retirement annuity benefit equal to 2% of final average pay times years of service, subject to a minimum of $5,000 per year. The following table shows the year-by-year accruals under the 2% formula both before and after reflecting the $5,000 minimum benefit. For simplicity, it is assumed that the employee earns $30,000 each year. Sher Testimony.

**Illustration of How Benefits Accrue With Multiple Benefit Formulas**

| [1]<br><br><br><br>Service | [2]<br><br>Accrued Ben.<br>Under 2%<br>Formula | [3]<br><br>Annual Incr. in<br>Accrued Benefit<br>2% Formula | [4]<br><br>Accrued Benefit<br>Reflecting $5,000<br>Minimum | [5]<br><br>Annual Incr. in<br>Accrued Benefit<br>Actual |
|---|---|---|---|---|
| 1 | 600 | 600 | 5,000 | 5,000 |
| 2 | 1,200 | 600 | 5,000 | 0 |
| 3 | 1,800 | 600 | 5,000 | 0 |
| 4 | 2,400 | 600 | 5,000 | 0 |
| 5 | 3,000 | 600 | 5,000 | 0 |
| 6 | 3,600 | 600 | 5,000 | 0 |
| 7 | 4,200 | 600 | 5,000 | 0 |
| 8 | 4,800 | 600 | 5,000 | 0 |
| 9 | 5,400 | 600 | 5,400 | 400 |
| 10 | 6,000 | 600 | 6,000 | 600 |

Sher Testimony.

143.    If one focuses only on the 2% formula it will appear that $600 accrues each year. But, in reality, $5,000 accrues in the first year, the employee will not earn any net additional benefits in years 2 through 8, $400 accrues in year 9 and $600 accrues in all subsequent years. The Plaintiff and Mr. Poulin apparently would say that by electing the $5,000 minimum benefit formula, the employee is forfeiting his accruals in years 2-8 under the 2% formula. Of course, this is not true since the employee is always entitled to the greater of what the two formulas produce. Sher Testimony.

144.    This effect is relatively common both in ongoing plans and in conjunction with a plan amendment that changes the plan's basic benefit formula or the method for determining early retirement benefits. In a plan amendment, the result, often called the "wearaway" effect, can mean that the employee will not receive additional benefits for a period of time after the

- 43 -

amendment.  Sher Testimony.

145.    The above example can be changed slightly to illustrate the wearaway effect. Assume that the pre-amendment plan provided a flat benefit of $5,000 to all employees, regardless of pay or service.  That plan is amended after the employee in the example has five year of service to substitute the 2% benefit formula for all years of service, both past and future. The employee will receive a past service benefit under the new formula equal to $3,000 ($600 times five years) and will be credited with $600 in each year thereafter.  The plan provides that all existing participants will receive no less than the $5,000 accrued benefit on the date of amendment under the prior formula.  That provides an immediate $2,000 boost in what otherwise would have been provided under the new formula (i.e., $5,000 less $3,000).  Sher Testimony.

146.    This protection is a real benefit to the existing employee.  A new employee who earns $30,000 each year will have a benefit of only $3,000 after he or she renders 5 years of service.  Thus, although the employee in the example will not receive any additional benefits until he renders another four years of service, he or she will be better off vis-à-vis the new employee.  Sher Testimony.

147.    The fact that an employee who elects an annuity under Part B of the CIGNA Pension Plan might receive no more than the protected annuity as of December 31, 1997 (with the early retirement subsidies) is caused by a wearaway effect.  The accrued benefit under the Part A formula as of December 31, 1997 payable as an early retirement annuity has subsidized early commencement factors included in it.  The fact that the value of the Social Security supplement increased the protected benefit accentuates the wearaway effect, even though such add-on can only benefit, not harm, affected employees.  Sher Testimony.

148.    Mr. Poulin also testified that Ms. Amara would be entitled to a monthly annuity of

- 44 -

$900 beginning at age 55 attributable to her opening balance of $91,124.77 and that such annuity is less than 50% of the $1,833.65 annuity she was entitled to under Part A.  Several points are worth noting regarding this claim:

- No matter what the annuity attributable to the opening balance turns out to be, Ms. Amara's age 55 annuity cannot fall below $1,833.65.

- CIGNA voluntarily included the value of the social security supplement in employees' minimum annuity benefits.  The legally required minimum annuity benefit to Ms. Amara at age 55 was $1,565.48 monthly.  The difference is an added benefit to Ms. Amara's annuity amount.

- The remaining difference between the guaranteed age 55 annuity and the $900 estimated age 55 annuity is attributed to the fact that opening balances do not include early retirement subsidies inherent in the $1,565.48 amount.  The 79% factor at age 55 under the Plan would drop to about 42% had true actuarial equivalent early retirement reductions been applied.  As discussed earlier, it is perfectly acceptable and common practice not to include early retirement subsidies in opening balances or in lump sum distributions.

- It is also common practice to include a discount for mortality both before and after age 65 both in determining opening balances and lump sum distributions.

- At the time of the conversion, it was not possible to know what Ms. Amara's annuity benefit at any future date would actually be with respect to her opening balance since that depends on future interest rates.

- Mr. Poulin engages in "Monday morning quarterbacking" by implying that CIGNA intentionally understated opening balances.  Mr. Poulin apparently believes that CIGNA should be punished for not having predicted the decline in interest rates subsequent to the January 1, 1998 conversion date.

- Given that the 30-year US Treasury bond rate was 6.11% in November 1997, the discount rates used to determine opening balances were generous for those with age plus service 55 or higher (5.05%) and quite reasonable for all others (6.05% or the 30 year Treasury rate for those who become participants in Part B after January 1, 1998).

- Mr. Poulin did not analyze what the impact would have been if interest rates had risen rather than fallen and what the effect would be if interest rates were to rise from this point forward.

Sher Testimony.

149.    Additionally, the Plan Administrator's disclosures complied with applicable requirements at the time regarding the requirement to provide notice of the relative value of benefit options for certain participants who subsequently elected to receive a lump sum benefit that had a lower actuarial present value than an early retirement annuity benefit to which the employee was entitled.  Participants were notified about each benefit form available to them, the amount of the benefit, and when and how that benefit is payable.  Sher Testimony.

150.    The Treasury regulations in effect at the time did not require that a plan automatically provide a participant with every benefit option that might be available to him at any point in time in the future.  Rather, the regulations only require that when a participant elects his benefit, he be informed of the different options available to him at that time.  Stip. Ex. 11, Supplemental Expert Report of Lawrence Sher, at 9-10.

151.    The Plan Administrator presently is in the process of updating its disclosures to comply with new regulations.  Arko Testimony.

152.    Plaintiffs have identified only two participants who apparently believe they received inadequate disclosures, neither of whom is a named Plaintiff in this lawsuit.  These two class members underlined elected to receive their benefits in a particular form, e.g., single lump sum payment versus monthly annuity.  They have not filed a claim with the Plan Administrator.  Defs' Ex. 536, Distribution Election Forms.  Plaintiffs have not alleged or proven that these two individuals would have elected a different benefit form had they received the information Plaintiffs claim was required.

153.    Part B does not cause an accrued benefit to be "decreased <u>by an amendment of the</u>

<u>plan</u>." 29 U.S.C. § 1054(g)(1) (emphasis added).

**V.    PLAINTIFFS AND THE TESTIFYING CLASS MEMBERS HAVE BEEN PROVIDED ABUNDANT INFORMATION REGARDING THEIR RETIREMENT BENEFITS AND HAVE SUFFERED NO LIKELY, OR ACTUAL HARM RESULTING FROM ANY OMISSIONS FROM THE SPD OR SECTION 204(H) NOTICE (COUNTS 2 AND 4).**

**A.    The Plan Administrator Provided Participants A Number Of Communications Regarding The Freezing Of Accruals Under The Old Plan, The Creation Of Part B, And The Precise Amounts In Participants' Part B Accounts.**

154.    The decision to freeze accruals in the Plan for non-grandfathered participants and

to create Part B triggered the distribution of a series of communications that provided notice of

the changes that would begin January 1, 1998, as next described.

155.    Denise Hill, at the time the Assistant Vice President, Human Resources &

Services ("HRS") Communications, was personally responsible for managing the

communications process to employees.  Testimony of Denise Hill (hereinafter "Hill

Testimony").

156.    In August of 1997, after learning that there would be a conversion to the cash

balance plan, Hill requested proposals from consultants for preparation of communications to

employees, and ultimately hired William H. Mercer ("Mercer").  Hill Testimony.

**1.    A Memorandum Was Sent To Managers, A Letter Was Sent To Grandfathered Participants Notifying Them Of Their Status, And A Memorandum Was Sent To Human Resources Representatives And Key Benefits Contacts.**

157.    On November 3, 1997, a memorandum was sent to all managers above grade 50,

along with an advance copy of the Signature Benefits Newsletter described below.  This

memorandum was individually addressed to each manager with a mailing label and the

manager's office address.  Defs' Ex. 514, November 3, 1997 Memorandum attaching November

1997 Signature Page (D00583-591); Hill Testimony.

158.    In early October of 1997, a letter was sent to all grandfathered Part A participants notifying them that they would continue to accrue benefits under the old defined benefit formula, and also alerting them that more information on the changes would be distributed in a Signature Benefits Newsletter and Retirement Program Information Kit.  Defs' Ex. 513, October, 1997 Letter (D00582).  Participants received this letter at their home addresses.  Hill Testimony.

159.    In late November of 1997, a memorandum entitled "New Benefit Processes or Rules Effective January 1, 1998" was sent to all human resources and benefits managers describing the key eligibility attributes of the new plan.  Defs' Ex. 518, November 28, 1997 Memorandum**;** Hill Testimony.  This memorandum was intended to provide additional information about upcoming Plan changes to those individuals who would be responsible for administering the changes and explaining them to employees.  Hill Testimony.

### 2.    The Signature Benefits Newsletter Sent To Employees In Early November Provided Notice That Part A Accruals Would Be Frozen As Of December 31, 1997, And Explained The Cash Balance Plan.

160.    In early November of 1997, a special edition "Signature Benefits Newsletter" (hereinafter the "Newsletter") was issued to all employees at their desktops, describing changes to the Plan.  Defs' Ex. 516, November, 1997 Signature Benefits Newsletter; Hill Testimony.

161.    For the sake of simplicity, it was determined that the old plan (Part A) would be referred to as the "Pension Plan," while the new cash balance plan (Part B) would be referred to as the "Retirement Plan."  This distinction has since been erased.  Hill Testimony.

162.    The Newsletter informed employees that a new retirement program was going to be introduced effective January 1, 1998, which was more than four weeks away.  As it stated:

> On January 1, 1998, CIGNA will introduce a new retirement program.  The program includes the new CIGNA *Retirement Plan*, which replaces the current CIGNA Pension Plan for most

> employees, plus an enhanced version of Savings and Investment
> Plus (SIP), our 401(k) plan.  Most CIGNA employees will
> participate in the new CIGNA Retirement Plan, although some
> long-service employees will remain in the current Pension Plan. . .
>
> If you are moving to the new Retirement Plan, you will continue to
> earn benefits under the Pension Plan through December 31, 1997,
> and then transfer to the CIGNA Retirement Plan beginning in
> 1998.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 1 (D00607).  Notably, the

Newsletter described not only the change from Part A to Part B for the defined benefit pension

plan, but also enhancements to CIGNA's Savings and Investment Plus ("SIP"), the 401(k)

defined contribution plan.

163.    The Newsletter informed non-grandfathered employees that benefits accrued

under Part A would be frozen on December 31, 1998.  As it stated:

> Employees participating in the new CIGNA Retirement Plan will
> stop earning benefits under the current Pension Plan on December
> 31, 1997.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 5 (D00611).  Thus, the

Newsletter provided notice of the impending freeze more than 15 days before the effective date

of December 31, 1997.

164.    The Newsletter introduced employees to the concept of a cash balance plan, and

explained to employees how their account would grow by increasing benefit and interest credits.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 2 (D00608).  As it stated:

> The new CIGNA Retirement Plan is an *account balance plan*—a
> type of retirement plan that is becoming increasingly popular as a
> simpler alternative to traditional pension plans.  Here's how the
> new plan will work:
>
> If you are transferring from the current Pension Plan to the new
> plan, an account will be set up for you in January.

If you earned a benefit from the current Pension Plan, the lump sum value of that benefit as of December 31, 1997, will be transferred to your account as your opening balance.

Beginning in January, your Retirement Plan account will grow through two types of credits:

- **Benefit credits.**  CIGNA will make a benefit credit to your account for each year in which you work at least 1,000 hours for the company. These credits will range from 3% to 8.5% of your eligible annual earnings, depending on your age, service and earnings.

- **Interest Credits.**  CIGNA will also credit your account with interest each quarter until you receive your benefit from the plan. The annual interest rate will vary from 4.5% to 9%, depending on recent yields of 5-year Treasury Bonds.  This interest rate is consistent with guidelines set by the IRS for account balance retirement plans.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 2 (D00608) (emphasis in original).

165.    The Newsletter also informed employees that information concerning their account balances was forthcoming:

CIGNA will begin the process of calculating final pension benefits and Retirement Plan opening balances early in 1998, after all 1997 payroll data are finalized.  Benefit calculations are expected to be completed in the spring.  Once balances are calculated, they will be credited to Retirement Plan accounts retroactively to January 1, 1998, so you won't lose any interest credits for the first part of 1998.  You will be informed of your final Pension Plan benefits and Retirement Plan opening balance in your *Total Compensation Report*, scheduled to be mailed in May 1998.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 5 (D00622) (emphasis in original).

166.    Although the employees who were to remain in Part A were notified by letter, as noted above, the Newsletter reiterated which employees would remain in the old plan:

> Employees who were hired prior to 1989, who do not work for a healthplan company in the CIGNA HealthCare Division, and whose age and service total at least 45 years, will stay in the current Pension Plan rather than transfer to the new CIGNA Retirement Plan.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 2 (D00608).

167.    The Newsletter also explained to employees their options upon leaving CIGNA, including that:

> When you retire or leave CIGNA, you will have the option to receive your vested account balance in one of two ways. You may choose an annuity (monthly payments for life), or you may take your account balance as a single lump sum payment. The lump sum option is new and resembles the SIP payment option. If you prefer, you may roll over your lump sum payment into an individual retirement account (IRA) or your new employer's qualified retirement plan. This provision allows you to assume investment control over your benefit—and defer income taxes on it—until you are ready to use it. You will also have the option to leaver your account balance in the Retirement Plan, where it will continue to earn interest credits until you elect to receive your benefit.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 2 (D00608).

168.    The Newsletter provided employees information concerning the opportunity to seek additional information concerning their benefits:

> If you have questions, please e-mail your questions to Signature Benefits Services (e-mail address:  Signature Benefits, Svcs) or you may call Signature Benefits Services at Network 761.3539 or 1.800.551.3539.

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 6 (D00612).

169.    The Newsletter informed employees that additional information concerning the new pension plan would be forthcoming in December 1997, when they received a comprehensive Retirement Program Information Kit (hereinafter the "Retirement Kit").  Defs'

Defs' Ex. 516, November, 1997 Signature Benefits Newsletter at 1 (D00607).

- 51 -

**3.    In December 1997, All Participants Received A Signature Benefits Retirement Kit, Which Reinforced To Participants That CIGNA Would Freeze Accruals Under Part A For All Non-Grandfathered Participants As Of December 31, 1997, And Further Explained The Cash Balance Plan.**

170.    In early December 1997, CIGNA sent each participant a Retirement Kit, comprising Signature Benefits brochures, utilizing an individual mailing label on a sealed envelope at the participant's office.  Hill Testimony.

171.    There were four versions of the Retirement Kit, depending upon whether the participant was being converted to Part B or grandfathered into Part A, and whether the participant also participated in the supplemental pension plan.  Accordingly, employees were separated into four different categories with a particular code on their mailing label:

| Color of Brochure | Conversion to Part B? | Subject to Supplemental Plan? | Mailing Label Code |
| --- | --- | --- | --- |
| Burgundy | N | N | 298 PEN |
| Burgundy | N | Y | 299 PENSUP |
| Blue | Y | N | 300 RET |
| Blue | Y | Y | 301 RETSUP |

Hill Testimony.

172.    Hill kept records of which participants were covered by each category.  Defs' Ex. 517, E-mail dated November 17, 1997 (D00578-00579).  The reason for using these codes on the mailing labels was to ensure that the correct brochure went to the correct employee.  Mercer handled the mailing process itself.  Hill Testimony.

173.    The Signature Benefits brochures were effectively distributed.  Hill would have heard if there were complaints about non-receipt of the brochure.  Indeed, in her file, she has only two e-mails from employees stating that they had not received a brochure due to a wrong address.  Hill Testimony.

174.    The employees overwhelmingly felt that the Signature Benefits Retirement Kits

were easily understandable.  In a survey of recipients of the brochure, 92% of respondents said

that they thoroughly read the brochure, and 89% said that the brochure was clearly written.

These results demonstrate that employees paid attention to the Signature Benefits brochure.

Stip. Ex. 107, March 3, 1998 Memorandum from D. Hill attaching Surveys (SuppD001587-

1609); Hill Testimony.

175.    The Retirement Kit described not only the change from Part A to Part B for the

defined benefit pension plan, but also enhancements to CIGNA's SIP, the 401(k) defined

contribution plan.  Defs' Ex. 508, Retirement Information Kit.

176.    The Retirement Kit's question and answer section notified each participant that

the benefits in his or her Part A pension plan would be frozen as of December 31, 1997.  As it

stated:

> Q.  What will happen to the benefits I have earned under the
> Pension Plan?
>
> A.  Benefits that you have earned under the current Pension Plan
> will be converted to an opening account balance in the new
> CIGNA Retirement Plan.  Your opening balance will equal the
> lump sum value of your pension benefits as of December 31, 1997.
> This amount will be calculated during the spring of 1998, once we
> have all the year-end payroll data for 1997.  It will then be added
> to your new plan account retroactive to January 1, 1998.  **You will
> earn no further benefits under the Pension Plan after
> December 31, 1997**.  Starting in 1998, you will earn benefits under
> the new plan.

Defs' Ex. 508, December, 1997 Part B Retirement Information Kit Q&A at 4 (D00726)

(emphasis added).

177.    The Retirement Kit notified employees of the impending freeze of benefits more

than 15 days before the effective date of December 31, 1997.  Defs' Ex. 508, Retirement

Information Kit; Hill Testimony.

178.    The Retirement Kit essentially repeated the information contained in the

- 53 -

Newsletter regarding the cash balance plan's growth through benefit and interest credits, that CIGNA would credit previously earned benefits into an opening account balance equivalent to the pension earned through December 31, 1997, and that employees once vested could choose to receive benefits as either a lump sum or an annuity.  Defs' Ex. 508, Retirement Information Kit.

179.    The Retirement Kit, however, offered more detail concerning the way in which benefit and interest credits were earned:

**Benefit Credits**

For each year in which you earn a year of credited service, CIGNA will add a benefit credit to your account equal to a percentage of your annual eligible earnings. the percentage will depend on your benefit points, which are the sum of your age and credited service as of January 1 of the year.  Benefits credits are made according to the chart below.

The Retirement Plan is designed to work together with Social Security.  As the chart shows, the plan provides a higher benefit credit for the portion of your eligible earnings above the Social Security "integration level."  The integration level will be $34,000 in 1998 and 50% of the Social Security taxable wage base thereafter.

The additional credit for income above the integration level reflects the fact that there are no Social Security retirement benefits for income above the taxable wage base.  Neither you nor CIGNA pays Social Security retirement taxes on your income above the Social Security taxable wage base, so CIGNA shares some of these tax savings with you through this extra credit.

Once you terminate or take a distribution from the plan, benefit credits will no longer be made to your account.

**Interest Credits**

Your account balance will also grow through interest credits.  The annual interest rate will equal the yield on 5-year Treasury Bonds as of November of the previous year, plus 0.25 percentage points. In no case, however, will the annual interest rate be less than 4.5% or greater than 9%.  These interest rates are consistent with guidelines established by the IRS for account balance plans.

Interest credits will be made to your account until you take a distribution of your plan benefit.

**Quarterly Posting of Credits**

While you are working at CIGNA, benefit and interest credits will be added to your account quarterly. Interest credits will be calculated using your account balance at the end of the quarter, but before benefit credits have been made. The quarterly posting of benefit credits is merely a projection until you meet the 1,000 hour service requirement to earn benefit credits during the year. You continue to earn quarterly interest credits until you receive your benefit from the plan, regardless of whether you are eligible for benefit credits.

Defs' Ex. 508, Retirement Information Kit at 4-5 (D00740-D00741) (emphasis in original).

180. The Retirement Kit defined "eligible earnings" and "credited service" under the plan. Defs' Ex. 508, Retirement Information Kit at 5-6 (D00741-D00742).

181. The Retirement Kit also offered examples to help participants understand how their accounts would grow. One such example explained:

In each example, we will assume that the plan's integration level for the year is $34,000 and the rate used in determining the interest credit is 6.5%.

*Example 2*: Assume that Joan is 50 years old, earning $70,000 a year, and has 6 years of service with CIGNA. Let's also assume that her starting account balance is $24,625. Because Joan's age and service total 56 points, she qualifies for a benefit credit of 65 of eligible earnings up to the integration level and 7.5% above the integration level.

| | |
|---|---|
| Opening account balance | $24,625 |
| Interest credit (assuming 6.5%) | $1,750 |
| Benefit credit (6% x $34,000) + | |
| (7.5% x $36,000) | $4,740 |
| Joan's account balance at end of year | $31,115 |
| Joan's account balance at age 55 | $63,910 |

- 55 -

>              Joan's account balance at age 65              $228,876
>
>              *Note:* The projections for benefits at age 55 and 65 assume no
>              increase in eligible earnings and a consistent annual interest credit
>              of 6.5%.

Defs' Ex. 508, Retirement Information Kit at 6 (D00742).

182.    The Retirement Kit made participants aware of the account statements they would

receive to be able to monitor the balance of their cash balance accounts:

>              To help you keep track of your account growth, you will receive
>              periodic account statements. Each statement will show CIGNA's
>              benefits credits and interest credits to your account and the value
>              of your account at the end of each period. Benefits credits for the
>              period covered by the statement will be based on the assumption
>              that you will earn at least 1,000 hours of credited service for that
>              year. If you don't complete the required service for a period, your
>              account will be adjusted accordingly.

Defs' Ex. 508, Retirement Information Kit at 9 (D00745).

183.    With respect to opening account balances, the Retirement Kits also specifically

advised employees (1) that for most employees, opening account balances would be based on the

value of the employee's age-65 annuity as of December 31, 1997; (2) that CIGNA would be

using an interest rate of approximately 6.5% for calculating the present values; (3) that age was a

factor in determining opening account balances, with an older employee receiving a higher

opening account balance than a younger employee with the same earnings history; (4) of the

factors used to calculate opening account balances; and (5) that for employees with a

combination of age and service of 55 or higher (i.e., certain older employees), their opening

account balances would include part (or all) of the value of their subsidized early retirement

benefits and would be converted using a lower, and hence more favorable, interest rate. Defs'

Defs' Ex. 508, Retirement Information Kit at 9 (D00745).

184.    The Retirement Kits provided:

**(Step 2) Converting Your Final Pension Benefit to an Opening Balance**

Your normal pension benefit is an annual payment made to you for life, beginning when you turn 65.  To convert that annual pension benefit into an opening balance for the new plan, a calculation has to be made to determine how much that future stream of payments is worth today.  This type of calculation is called a present value calculation.

The method used to calculate the present value of a pension benefit is established by law.  Basically, the present value of your pension benefit equals the amount of money that someone would need to invest now to have enough money in the future to pay your annual pension benefit.  This calculation is made assuming that the "invested" money would earn a moderate rate of interest (about 6.5% per year).  Because of the relatively low interest rate, the amount available to you today is relatively large.  In fact, to increase your opening balance, CIGNA has selected a much lower interest rate than the 7% or 8% rate adopted by most companies making similar pension plan changes.

Your current age affects the present value of your pension benefit, because the closer you are to retirement age, the less time there is for the lump sum balance to grow, and therefore the more money you need to invest now.  Because of this, two people who have earned the same pension benefit at age 65 will have different opening account balances if their ages are different.  The older person will have the larger opening balance because there is less time for that person's account balance to grow.

Table 1 shows the factors that will be used to convert final annual pension benefits to opening balances.  If the employee in the example in the previous section were 40 years old, the opening balance would be calculated by multiplying his or her $2,123 annual pension benefit by the factor for a 40-year-old in the table.  In this case, the opening balance would be:

$2,123   x   1.920 = $4,076

After 25 years of investment at 6.5% annual interest, $4,076 would grow to about $19,700 which is enough money to pay the employee the $2,123 annual benefit beginning at age 65, assuming the employee has an average life expectancy and the unpaid portion of the benefit continues to grow at a rate of 6.5% per year.

**Special Conversion Formula for Older, Longer-service Employees**

If your age and credited service with CIGNA total 55 or more on January 1, 1998, two special procedures will be used in calculating your opening account balance:

- First, your opening balance will be based on the present value of your age 62 early retirement benefit, rather than on the present value of your age 65 normal retirement benefit. The age 62 benefit has a higher present value than the age 65 benefit.

- Second, a lower interest rate will be used in making the present value calculation (one percentage point less than the standard rule – for instance, 5.5% if the standard rate is 6.5%). The lower interest rate increases the size of your opening balance.

    These special procedures have been adopted because most employees in this age and service category will have fewer years to accumulate benefits under the new Retirement Plan. CIGNA wants to ensure that these older, longer-service employees receive fair and adequate benefits at retirement.

Defs' Ex. 508, Retirement Information Kit at 3-5 (D00719-00721).

185. The Retirement Kit also provided detailed information regarding the payment options, including the lump sum option, single life annuity (with no cash refund), single life annuity (with cash refund), 50% joint and survivor annuity and 100% joint and survivor annuity. Defs' Ex. 508, Retirement Information Kit at 8 (D00744).

186. The Retirement Kit's question and answer section also addressed the relative value of the participants' benefits under Part A and Part B:

Q. Will my benefit be better under the new Retirement Plan?

A. The new Retirement Plan is different from the current Pension Plan, so exact comparisons of benefits that cover all possible outcomes are difficult. Generally speaking, the new Retirement Plan, in comparison with the current Pension Plan, tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees. . . .

Of course, other features of the new plan add to your benefit value as well. The lump sum distribution option can be very valuable, since it will allow you to move your benefits into other tax-deferred investments after you retire or leave CIGNA. Also, because the Retirement Plan works like a savings plan, with

> contributions credited to an account, you should find it easier to understand. You now have two plans that are account-based, enabling you to track your retirement benefits by looking at your statements. As a result, you will see the growth in your total retirement benefits from CIGNA every year and will be able to update your financial plans accordingly.

Defs' Ex. 508, Retirement Information Kit at 7 (D00729) (omitting information re 401(k) plan).

187. It would likely have been confusing for the Plan Administrator to provide to participants a comparison of their Part B annuity benefit estimate versus a Part A annuity benefit to which they would never be entitled because the Part A plan was frozen and inapplicable as to these converted participants. Stip. Ex. 11, Supplemental Expert Report of Lawrence Sher, dated October 28, 2005 at 5.

188. The employees also were told how to obtain information concerning their current pension benefits:

> Q. I don't know what my current pension benefit is. How do I find out?
>
> A. You recently received a Signature Benefits *Total Compensation Report,* which shows your Pension Plan benefit as of March 31, 1997. You will receive a similar statement in the spring of 1998, showing your final benefit under the Pension Plan, plus your CIGNA Retirement Plan opening account balance. Your opening account balance will be the lump sum value of your final Pension Plan benefit, which will be transferred to the new CIGNA Retirement Plan. Remember, final pension benefits and opening balances will not be calculated until the spring of 1998, after all 1997 payroll data have been finalized.

Defs' Ex. 508, Retirement Information Kit (D00733).

189. The Retirement Kit addressed the fact that employees rehired after January 1, 1998, would be placed in Part B, as it stated:

> If you are hired or rehired after January 1, 1998, you will become a participant in the Retirement Plan on your date of hire.

Defs' Ex. 508, Retirement Information Kit (D00739).

190.    The Retirement Kit's question and answer section also provided information to participants on how they could obtain additional information on their pension benefits:

> These pages provide answers to questions that you may have about the retirement program changes. If you have additional questions about the Retirement Plan, you may e-mail your questions to Signature Benefits Services (e-mail address: Signature Benefits at network 761.3539 or 1.800.551.3539.

Defs' Ex. 508, Retirement Information Kit (D00733).

191.    The following February, participants received the February 1998 Signature Benefits Newsletter, which provided answers to frequently asked questions regarding Part B, including explaining why certain people were moved into the cash balance plan while others were grandfathered into Part A. Stip. Ex. 97, February 1998 Signature Benefits Newsletter.

**4.    In June 1998, Part B Participants Received A Statement Advising Them Of Their Opening Account Balance, And CIGNA Published Part B SPDs In October 1998 And September 1999, Which Accurately Describe Part B's Benefit Structure.**

192.    In May 1998, all participants received a Signature Benefits Newsletter further answering frequently asked questions regarding Part B. Stip. Ex. 180, May 1998 Signature Benefits Newsletter.

193.    Again in June 1998, participants received another Signature Benefits Newsletter, which explained the Plan Administrator's forthcoming Total Compensation Reports to the participants, and how to use them. Stip. Ex. 101, June 1998 Signature Benefits Newsletter.

194.    That same month, all Part B participants received a statement advising them of the exact amount in their opening account balance in the cash balance plan, via a mailing to their home address.  Defs' Ex. 519, June 1998 Pension Plan Statement; Arko Testimony.

195.    Because the Plan document would be difficult for the average participant to comprehend, CIGNA prepared an SPD for Part B.  Arko Testimony.

196.    The Part B Plan document contains some 80 pages of single-spaced information that attempts to address every aspect of the Plan's design, and every contingency that might occur with any participant or beneficiary:  current, former, deceased, disabled, rehire, part-time, full-time, temporary, permanent, single, married, separated, divorced, widowed.  Stip. Ex. 1, Part B.

197.    The Plan document by necessity reads much like a statute:  it contains 63 specifically defined terms and 16 different "Articles," each with numerous sections and subsections, as well as internal cross-references between provisions.  Stip. Ex. 1, Part B.

198.    In October of 1998, CIGNA issued the SPD for Part B, an identical version of which was reissued in September of 1999.  Defs' Ex. 505, 1998 SPD for Part B; Defs' Ex. 506, 1999 SPD for Part B.[10]

199.    The SPD contained information concerning the following topic areas:  eligibility; how breaks in service affected eligibility; how the cash balance account grows, including how benefit and interest credits accrued; when benefits are paid; how benefits are paid; how the benefit is affected by certain "life events;" administrative details concerning the operation of the plan; Minimum Benefits; change of control protections; spouse's rights; the appeal process; circumstances under which the plan can be amended or terminated; and statement of ERISA rights.  Defs' Ex. 505, 1998 Part B SPD at Table of Contents (D00825); Defs' Ex. 506, 1999 Part B SPD at Table of Contents (D00622).

200.    The SPD states:

If you participated in the Pension Plan before 1998, your old plan benefits were converted into an opening account balance in this Plan.

---

[10]    Because the 1998 and 1999 SPDs are virtually identical, they will be referenced together as "the SPD."

Defs' Ex. 505, 1998 Part B SPD at 13 (D00838) (emphasis omitted); Defs' Ex. 506, 1999 Part B SPD at J-7 (D00629).

> The conversion formula used [to obtain the opening account balance] is based on guidelines established by the federal government for valuing pension benefits.  If you have questions about the conversion formula, you may call CIGNA retirement Services Center at 1.800.224.4624.

Defs' Ex. 505, 1998 Part B SPD at 8 (D00833).

> Your account balance grows in two ways – annual benefit credits and quarterly interest credits. . . .  For each year in which you earn a year of credited service, CIGNA will add benefit credits to your account equal to a percentage of your eligible earnings. . . .  Your account also will grow through interest credits.

Defs' Ex. 505, 1998 SPD at 3-4 (D00828-00829); Defs' Ex. 506, 1999 Part B SPD at J-2 (D00624).

> Your final Plan benefits cannot be less than your old plan benefits on December 31, 1997.  If this minimum benefit rule applies to you, you'll be notified by the Retirement Service Center when you request a distribution.

Defs' Ex. 505, 1998 SPD at 13 (D00838); Defs' Ex. 506, 1999 Part B SPD at J-7 (D00629) (emphasis omitted).

201.    The SPD also indicated that the final benefit would be subject to a minimum:

> Minimum Benefits
>
> If you participated in the Pension Plan before 1998, your **old plan** benefits were converted to an opening account balance in this Plan. Your final Plan benefits cannot be less than your **old plan** benefits on December 31, 1997.  If this minimum benefit rule applies to you, you'll be notified by the Retirement Services Center when you request a distribution.

Defs' Ex. 505, 1998 SPD at 13 (D00838) (emphasis in original); Defs' Ex. 506, 1999 Part B SPD at J-7 (D00629).

202.    Nowhere does the SPD represent that an employee will receive the Minimum

Benefit plus his or her benefit and interest credits ("A +B"), as Plaintiffs now seek.  To the

contrary, the SPD explains that benefit and interest credits are added to an employee's account

and that if a participant's account balance (including those benefit and interest credits) is less than the Minimum Benefit (the "old plan benefits on December 31, 1997"), the employee will receive the Minimum Benefit.  Defs' Ex. 505, 1998 SPD at 13 (D00838).

203.    The SPD made clear that while it sought to concisely and accurately reflect the key Plan provisions, it served only as a summary and that additional terms and conditions dictated the methodology of the Plan:

> This summary plan includes certain key features of the CIGNA Pension Plan.  It does not, however, cover every detail included in the plan document, trust agreement or other contracts that govern the plan. Every attempt has been made to ensure the accuracy of the information within.  If there is any discrepancy between the contents of this material and the official plan documents and contracts, the plan documents and contracts will govern.

Defs' Ex. 505, 1998 SPD at 19 (D00844).

204.    The SPD informs participants that they may obtain a copy of the Plan:

> ERISA provides that all plan participants are entitled to:

> Obtain copies of the plan documents and trust agreements and other plan information upon written request to the plan administrator.

Defs' Ex. 505, 1998 SPD at 15(D00840).

205.    The SPD was thereafter included (and is still included) in the new hire benefits binder provided to new employees, and rehired employees, upon the inception of their employment.  Defs' Exs. 509-512, Signature Benefits Binders for 1998-2001.  It also later was added to the CIGNA Intranet cite.  Arko Testimony; Defs' Ex. 524, CIGNA Laptop with Intranet Electronic File; Defs' Ex. 523, "CIGNA & You" & "Your CIGNA Life" Intranet Printouts.

     **5.**       **The Plan Administrator Provided Participants Precise Information Regarding Their Part B Pension Accounts Through Annual Account Statements, Total Compensation Reports, A Retirement Planner, A Benefits Hotline, And Websites.**

206.     The Plan Administrator has provided every participant in Part B with an annual cash balance account statement since June 1998. Defs' Ex. 520, Pension Plan Statements.

207.     The first Pension Plan Statement provided, in June 1998, also included information concerning the calculation of participants' opening account balances

> Your opening balance was based on the lump sum equivalent value of the Age 65 benefit you earned under the prior Pension Plan as of December 31, 1997. The detailed calculation of your benefit was produced in your 1998 Total Compensation Report which you received in May.

Defs' Ex. 519, Pension Plan Statement, for Period Ending June 30, 1998.

208.     The annual statements list the opening balance at the start of the subject year, the new benefit credits earned and interest credits earned, and the closing balance as of June 30 of that year. Defs' Ex. 520, Pension Plan Statements.

209.     The annual statements note the annualized interest rate which was applied in determining the benefit and interest credits. Defs' Ex. 519, Pension Plan Statement, for Period Ending June 30, 1998; Defs' Ex. 520, Pension Plan Statements.

210.     The annual account statements list the participant's starting balance, pay and interest credits earned during the year, and ending balance. The account statement also reminded participants of the pay credit rates and interest credit rates under Part B. At the bottom of the statement, a toll-free 800 number was provided so that participants could raise any questions about their statements. Defs' Ex. 520, Pension Plan Statements.

211.     Additionally, each participant received yearly a document called the Total

Compensation Report. The 1998 Total Compensation Report provided information regarding the

opening account balance in Part B:

> The new CIGNA Pension Plan features the security of a traditional pension plan, but adds more flexibility since you can decide how much of your retirement funds you want to use and when. You are not tied to a fixed schedule of benefit payments. What's more, it is portable so you can take your vested benefit when you leave the company and invest it as you wish.

> Your initial account balance on January 1, 1998 was $[number]

> The balance represents the full value of the benefit you earned for service before 1989 and payments to you at age 62. It was calculated just as if you had left CIGNA on December 31, 1997 and deferred your pension to age 62. It was converted to a lump sum based on an assumed interest rate of 5.05%. This means that the lump sum growing at this rate of interest to retirement is equivalent or the value of the lifetime annuity payments you have earned.

Stip. Ex. 85, 1998 Total Compensation Report at 2 (P1788) (emphasis omitted).

     212.    The 1998 Total Compensation Report showed each participant exactly how his or

her particular opening account balance was calculated, including the following example:

| | | |
|---|---|---|
| Your Highest Eligible Average Earnings | | $ 143,478.96 |
| Your Benefit Service Factor | x | 01670 |
| Years of Credited Service | x | 7.00 |
| Your Age 62 Benefit Before Offset | = | $ 16,772.69 |
| Your Social Security Offset (see note) plus Early Retirement Reduction | - | $ 3,859.89 |
| Your Actual Age 62 Annual Benefit | = | $ 12,912.80 |
| Based on average life expectancy at your age and an interest rate of 5.05% the lump sum actuarial factor is | x | 6.0813 |
| Your lump sum benefit – Opening Account Balance | | $ 78,526.55 |

Stip. Ex. 85, 1998 Total Compensation Report at 15 (P1801).

213.    Thus, the 1998 Total Compensation Report disclosed the specific benefit upon which the account balance was based (age 62, in the above example – age 65, for most younger employees), the interest rate that was used to calculate the present value opening account balance (5.05% in this example, slightly higher (and less favorable) for most younger employees), and that the calculations factor in the "average life expectancy," which is a layman's way of referring to mortality tables.  Stip. Ex. 85, 1998 Total Compensation Report at 15 (P1801)

214.    The 1998 Total Compensation Report provided information regarding the interest rate used to calculate the opening account balances and that life expectancy was a factor in those calculations and demonstrated exactly how the opening account balance was calculated.  Stip. Ex. 85 1998 Total Compensation Report at 15 (P1801).

215.    Since 1998, Total Compensation Reports have been provided to employees on an annual basis.  Although the reports after 1998 no longer explained how the opening account balance in Part B was established, they continue to provide information on participants' account balances and estimated annual benefit payable at age 62.  Stip. Ex. 85, 1999 Total Compensation Report (P1815).

216.    The Total Compensation Reports also provide information to employees suggesting how much they would need in assets to reach their target retirement income, and how inflation might affect that analysis.  Stip. Ex. 85, 1998 Total Compensation Report (P1790).

217.    The Total Compensation Reports also notify employees of the Retirement Planner available to them:

> CIGNA Retirement Planner is a Windows-based financial planning program that comes on a disk.  Just pop it into your personal computer and explore how changes in your future savings and your investments results can affect your potential retirement income.

> CIGNA Retirement Planner allows you to include all your personal savings and company pension benefits as well as those of your spouse to get a more complete picture of your financial situation. Just call CIGNA's AnswerLine® at 1.800.253.2287 for your copy of CIGNA Retirement Planner.

Stip. Ex. 85, 1998 Total Compensation Report at 8 (P1794) (emphasis omitted).

218.    The Total Compensation Reports alert employees that more information is available:

> This personalized Total Compensation Report highlights your CIGNA cash compensation and benefit plans.   More detailed information can be found in the official plan documents.   This report is only a summary of your benefits and does not constitute a legal document or contract, nor is it an express or implied contract or guarantee of employment.

> The estimates shown in this report represent our best efforts at this time to calculate figures based on what we consider to be realistic assumptions.   CIGNA reserves the right to correct any errors.   In the event that any information set forth in this report is incorrect, the actual amount of your benefit as determined in accordance with the terms of the plan will govern the benefit to which you will be entitled under that plan.

> If you have any questions concerning your Total Compensation Report, contact Signature Benefits Services at 1.800.551.3539.

Stip. Ex. 85, 1998 Total Compensation Report at 17 (P1803).

219.    As noted in the Signature Benefits documentation provided to participants, and as listed on participants' annual account statements, CIGNA operated a telephone hotline, called AdviceLine®, for participants who wanted more information about the new plan or their benefits thereunder.  The "Signature Benefits Services" operating out of CIGNA's Philadelphia office fielded questions about the new plan through the end of 1997 and into 1998.  In the Fall of 1998, this task was transferred to CIGNA Retirement and Investment Services (hereinafter "CRIS") in Connecticut.  Arko Testimony.

220.    Additionally, CIGNA's Intranet site also permitted current employees to request a

benefits estimate or ask questions of a benefits specialist.  This site was called "Cigna and You" until 2005, when the name was changed to "Your Cigna Life."  The Intranet also posted the SPDs for Plan A and Plan B.  Arko Testimony; Defs' Ex. 524, CIGNA Laptop with Intranet Electronic file; Defs' Ex. 523, "CIGNA & You" & "Your CIGNA Life" Intranet Printouts.

221.    Finally, CIGNA's Internet website permitted participants to log on to obtain account information, including calculations of their benefits at a given retirement age.  Defs' Ex. 521, CIGNA Internet Website Printout.

222.    Today, Prudential maintains a similar website that is called the Prudential Website.  Arko Testimony; Defs' Ex. 522, Prudential Internet Website Printout.

**B.    None Of The Plaintiffs Or Testifying Class Members Suffered Likely Or Actual Harm Resulting From Any Omission In The SPD Or Section 204(h) Notice.**

223.    Based on the testimony of Plaintiff Janice Amara, the Court finds the following facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Ms. Amara was born on April 13, 1950, making her 47 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- She has been a member of the Connecticut Bar since 1986.

- She is a chartered employee benefits specialist.

- She worked for CIGNA from 1972 until 1995, and was rehired in 1998.

- At the time she left CIGNA in 1995, the Plan Administrator provided her with an estimate of the pension benefits she would receive under Part A at retirement.

- She knew before being rehired by CIGNA that she would be placed in Part B when she returned.

- She took a pay cut to return to CIGNA in 1998.

- Her expected pension benefits at CIGNA had nothing to do with her decision to return to the company, and she did not read the Part B SPD before she returned.

- She first reviewed the Part B SPD on CIGNA's Intranet in 1999.

- She did not read the SPD carefully, but simply skimmed through it.

- She was advised by a co-worker, Mark Lynch, in September 2000 that her opening account balance in Part B was affected by a "wearaway."

- She understood what a "wearaway" was at the time Mr. Lynch spoke with her.

- She spoke to the U.S. Department of Labor ("DOL") about the "wearaway," and the DOL confirmed that it was legal.

- Beginning in 1999, she received annual account statements and Total Compensation Reports that described the exact amount of her Part B benefits.

- She understood that she could have asked to see the Part B Plan document or could have spoken to benefit counselors at CIGNA about the Part B conversion formula and how her opening account balance was established, but she never did.

- She made no effort to seek other employment outside of CIGNA at any point before she left the company in 2005.  She received $100,400 in severance pay in exchange for signing a release.

- As of 2002, she had no plans to retire at any particular age.

- She currently receives a pension benefit under Part A.  The Plan Administrator switched her from Part B to Part A following the Third Court's decision in the Depenbrock case.

224.    Based on the testimony of Plaintiff Gisela Broderick, the Court finds the

following facts regarding the issues of likely harm and harmless error in connection with Counts

2 and 4:

- Ms. Broderick was born on March 12, 1944, making her 53 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- She has a college degree in mathematics.

- She began working for CIGNA in 1980, but left the company as of December 31, 1997 when her business unit was sold to Lincoln National.

- Prior to leaving CIGNA, she received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan.

- At the time she left CIGNA, the Plan Administrator provided her with an estimate of the pension benefits she would receive under Part A at retirement.

- Although she was entitled to a defined benefit pension while at Lincoln National, she never asked to see the SPD or plan document that described those benefits.

- Later in 1998, she left Lincoln National to work for Hartford Life. Prior to accepting employment with Hartford Life, she did not request any information about Hartford's pension plan. Although she was entitled to a defined benefit pension while at Hartford, she never read the pension plan SPD in detail.

- In 1999, she left Hartford Life to work for Aetna. Prior to accepting employment with Aetna, she did not request or review the SPD describing her pension benefits.

- She received an SPD for the Aetna pension plan and the 401(k) plan after she started her employment, but did not read it cover-to-cover. She focused on what she considered to be the salient points — the company matching contribution under the 401(k) plan and the vesting schedules.

- Although Ms. Broderick testified that she was interested in returning to CIGNA so she could be eligible for retiree medical benefits and earn additional pension benefits, she never initiated contact with CIGNA to explore re-employment. However, representatives of CIGNA did initiate contact with her to ask her to consider returning in 2000.

- Prior to returning to CIGNA, Ms. Broderick did not ask to see the SPDs or Plan documents for Part A or Part B of the CIGNA Pension Plan. She did, however, contact the CIGNA Benefits Hotline and was advised that she would recover her service years and be reinstated in the Plan. The Benefits Hotline representative did not indicate whether she would be placed in Part A or Part B.

- Ms. Broderick returned to CIGNA in June 2000 and was placed in Part B.

- Upon returning to CIGNA, she received annual account statements and Total Compensation Reports that described the exact amount of her Part B benefits. She read these statements carefully and never raised any questions about them.

- Ms. Broderick did not review the Part B SPD until 2002, although she was aware that the SPD was available through the CIGNA Intranet website.

- Ms. Broderick left CIGNA in 2004 because she was unhappy with her work assignments. Her pension benefits had nothing to do with her decision to leave. She received $81,528.45 in severance pay in exchange for signing a release.

- Her husband retired at age 50 in 1993 and receives a pension.

- She never read the SPD for her husband's pension plan.

- She and her husband have never engaged in financial or retirement planning because her husband is not inclined to discuss financial issues and plans.

225. Based on the testimony of Plaintiff Annette Glanz, the Court finds the following

facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Ms. Glanz was born on October 6, 1964, making her 33 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- She has a college degree in accounting.

- She began working for CIGNA in 1988.

- In 1997, she received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan.

- In 1998, she received the Part B SPD, but did not read that document carefully.

- In 1999, she received the revised Part B SPD, but did not read that document carefully.

- Beginning in 1998, she received annual account statements and Total Compensation Reports that described the exact amount of her Part B benefits. She read the first annual account statement carefully, understood what her benefits under Part B were, and thereafter did not read these statements carefully because she already understood what they portrayed.

- As a result of information communicated on the annual account statements, she was aware that there was a toll-free number she could call to raise questions about her Part B opening account balance and benefits, but she never did so.

- She never asked for a pension estimate while at CIGNA because, given how long she still intended to work before retiring, the variables would change so much that the estimate would be meaningless.

- While employed by CIGNA, she never applied for employment at any other company.

- Ms. Glanz volunteered for layoff from CIGNA in 2004 because she wanted to move closer to her parents, who had relocated to Charlotte, North Carolina. Her parents had been responsible for watching her children while she and her husband worked.

- As she requested, she was laid off from CIGNA in June 2004, and relocated to Charlotte. She lives in the same town as her parents, who continue to watch her children.

- Her decision to volunteer for layoff had nothing to do with the pension benefits she was receiving from CIGNA.

- At the time she left CIGNA, she signed a release in exchange for $46,009.62 in severance pay.

- Upon relocating to Charlotte, she did not begin a formal job search until September 2004. She ultimately accepted a job with a company that has no defined benefit pension plan. She is entitled to participate in a 401(k) plan. She did not ask to review the SPD for the 401(k) plan before accepting employment because retirement benefits were not a factor in her decision to accept the job.

- Prior to leaving CIGNA, she and her husband did not have a financial plan or engage in retirement planning. After arriving in Charlotte, she and her husband retained a financial adviser. The financial adviser proposed a financial plan that included assumptions about retirement based on her husband's retirement date.

226. Based on the testimony of class member Bruce Charette, the Court finds the following facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Mr. Charette was born on December 13, 1967, making him 29 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- He began working for CIGNA in 1987.

- In 1995, the Plan Administrator provided him with an estimate of the pension benefits he would receive under Part A at retirement.

- In 1997, he received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan, but did not read the entire document.

- In 1998, he received the Part B SPD, but did not read it carefully. He found nothing misleading in the SPD.

- In 1999, he accessed the revised Part B SPD on CIGNA's Intranet website, but did not read it carefully. There is nothing he found misleading in the SPD.

- He never asked any questions of anyone at CIGNA about his benefits after reviewing the Part B SPDs.

- Beginning in 1998, he received annual account statements and Total Compensation Reports that described the exact amount of his Part B benefits. Upon receiving the first annual report, which described his Part B opening account balance, he contacted the CIGNA benefit counselors because he thought his opening balance was too low. The benefit counselors explained why he had been placed into Part B and how his opening account balance had been determined. He then consulted with his financial adviser.

- Mr. Charette did not alter his retirement plans based on the information he received regarding the amount of his Part B opening account balance.

- He thereafter received account statements and Total Compensation Reports on an annual basis. Although he understood that he had access to a toll-free number to ask questions about these subsequent statements, he never did so.

- In 2000, the Plan Administrator provided him with a benefit summary sheet describing his Part B benefits.

- In 2005, Mr. Charette asked for and received from Prudential, the Plan's new recordkeeper, a written explanation of how his Part B opening account balance was determined.

- None of the information he received from CIGNA or Prudential regarding his Part B account has had any impact on Mr. Charette's expectations regarding when he would retire, the amount he contributes to his 401(k) account, or his decision to remain employed with CIGNA, where he still works today.

227. Based on the testimony of class member Mitchell Haber, the Court finds the following facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Mr. Haber was born on August 20, 1958, making him 39 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- He began working for CIGNA in 1989.

- In 1997, he received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan.

- He cannot recall whether he received the 1998 Part B SPD, but would have just glanced at it if he did.

- He did not try to access the 1999 SPD through CIGNA's Intranet website because he did not think he had a need for it.

- Beginning in 1998, he received annual account statements and Total Compensation Reports that described the exact amount of his Part B benefits.

- He feels that the cash balance plan design is much easier to understand than the traditional defined benefit plan design, and the understandability of the Part B account information has made it much easier for him to incorporate this information into his financial and retirement planning.

- Beginning in 2000, the Plan Administrator provided him with a series of benefit summary sheets describing his Part B benefits.

- Although he understood that he had access to a toll-free number to ask questions about his pension benefits, he never did so.

- Mr. Haber has not identified a particular age by which he plans to retire.

- He left CIGNA voluntarily in 2001 to work for Mass Mutual. His CIGNA retirement benefits had nothing to do with his decision to leave the company. In fact, Mass Mutual also has a cash balance plan.

228.    Based on the testimony of class member Barbara Hogan, the Court finds the following facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Ms. Hogan was born on November 5, 1945, making her 52 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- She began working for CIGNA in 1990.

- In March 1997, the Plan Administrator provided her with an estimate of the pension benefits she would receive under Part A at retirement.

- Later in 1997, she received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan. Upon reading these materials, she understood that she would not be accruing any additional benefits under Part A.

- She received the 1998 Part B SPD, but did not read it carefully.

- Beginning in 1998, she received annual account statements and Total Compensation Reports that described the exact amount of her Part B benefits. Upon seeing the amount in her opening account balance in 1998, she increased her contributions to her 401(k) account. She thereafter incorporated the information regarding her pension benefits set forth in those reports in her retirement and financial planning.

- She also received a summary of her Part B benefits in June 1999, which she incorporated into her financial planning.

- Ms. Hogan retired from CIGNA in 2001 and received a lump sum distribution of her Part B account balance.

- She has made no effort to obtain employment since retiring from CIGNA.

229.    Based on the testimony of class member Robert Upton, the Court finds the following facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Mr. Upton was born on March 28, 1952, making him 45 years old at the time of the November 1997 newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- Among the positions he held prior to joining CIGNA was a five-year stint with the Social Security Administration, where he received extensive training on, among other things, calculating benefits.

- He has been a member of the Pennsylvania Bar since 1985.

- He worked for CIGNA from 1990 until April 2005.

- In 1997, he received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan.

- He received the 1988 and 1999 Part B cash balance plan SPDs, but does not recall reading either document.

- Beginning in 1998, he received annual account statements and Total Compensation Reports that described the exact amount of his Part B benefits.  He received the first account statement, which set forth his Part B opening account balance, in the summer of 1998.  He thought the amount in his opening balance was "shockingly" below what he had expected to receive, and raised this issue with the Plan Administrator.  He later advised the Plan Administrator that his expected Social Security benefit had been overestimated in setting his Part B opening account balance by $47.43.  The Plan Administrator recalculated his opening account balance to account for this error.

- Mr. Upton continued to receive annual account statements and Total Compensation Reports describing the exact amount of his Part B benefit until he left CIGNA in 2005.  He has incorporated the information set forth in these reports in his financial and retirement planning.  However, this information had

no impact on the amount he was contributing to his 401(k) account, as he had already reached the maximum contribution limits.

- Beginning in November 1998, the Plan Administrator provided Mr. Upton with a series of benefit summary sheets describing his Part B benefits.

- Mr. Upton also raised a number of questions about his Part B benefits with the Plan Administrator in 1999 and 2000, to which the Plan Administrator truthfully responded.

- Mr. Upton made no effort to actively search for a job outside of CIGNA until he interviewed with AAA Mid-Atlantic in 2005.

- He left CIGNA voluntarily in April 2005 to work for AAA Mid-Atlantic.  His decision to leave CIGNA had nothing to do with his pension benefits.  In fact, AAA Mid-Atlantic also has a cash balance plan.  He did not ask any questions about the AAA Mid-Atlantic cash balance plan or review the AAA Mid-Atlantic cash balance plan SPD before accepting employment with AAA Mid-Atlantic.

- He is a beneficiary under his partner's pension plan, but has never reviewed the SPD for that plan.

230.    Based on the testimony of Steven Law, the Court finds the following facts

regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Mr. Law was born on September 3, 1949, making him 48, years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- He has a Ph.D. in philosophy.

- He is a chartered financial analyst.

- He began his employment with CIGNA in 1985, left in 1991, and returned to the company in 1999.

- Prior to returning to CIGNA, he had no discussions with anyone at the company regarding his pension benefits and he raised no questions about the subject.

- He does not recall if he received the Part B SPD upon returning to CIGNA, but acknowledges that he did not try to view it on CIGNA's Intranet website because he had no choices to make to be eligible to participate in the Plan.  He does recall receiving the CIGNA benefits binder in which the Part B SPD was located, but he did not review it carefully.

- Beginning in 2000, he received annual account statements and Total Compensation Reports that described the exact amount of his Part B benefits. Based on the information he received in these reports, he increased his savings beginning in 2000. However, the information had no impact on how much he contributed to his 401(k) account, as he was already contributing the maximum.

- In 2001 and 2004, the Plan Administrator provided him with benefits summaries describing his Part B benefits.

- Mr. Law left CIGNA in March 2006 because his position was eliminated. He received approximately $40,000 in severance pay in exchange for signing a release.

231.    Based on the testimony of Steven Curlee, the Court finds the following facts

regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:

- Mr. Curlee was born on March 18, 1949, making him 48 years old at the time of the November 1997 newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

- He has a college degree in business administration.

- He began working for CIGNA in 1990, when the company for which he worked was purchased by CIGNA.

- In 1997, he received the November 1997 newsletter and the Retirement Kit describing the Part B cash balance plan.

- In 1998, he received the Part B SPD, but did not read it thoroughly.

- He understood that he could request a copy of the Part B Plan document, but never did so.

- Beginning in 1998, he received annual account statements and Total Compensation Reports that described the exact amount of his Part B benefits.

- As a result of information communicated on the annual account statements, he was aware that there was a toll-free number he could call to raise questions about his Part B opening account balance and benefits, but he never did so.

- He cannot think of any information that he would have liked to have seen added to the annual account statements or Total Compensation Reports.

- He never provided the annual account statements or Total Compensation Reports to his financial adviser, and his financial adviser has not done any retirement calculations for him.

- Prior to leaving CIGNA, Mr. Curlee periodically increased and decreased his contributions to his 401(k) account based on his immediate income needs.

- Mr. Curlee left CIGNA in 2003, when his job was eliminated. CIGNA agreed to push back his separation date so that he could be eligible for retiree medical benefits. He received $142,840.03 in severance pay in exchange for signing a release.

232.  Based on the testimony of class member Patricia Flannery, the Court finds the following facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4:[11]

- Ms. Flannery was born on March 30, 1946, making her 51 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

233.  Based on the testimony of class member Lillian Jones, the Court finds the following facts regarding the issues of likely harm and harmless error in connection with Counts 2 and 4: [12]

- Ms. Jones was born on March 13, 1962 making her 37 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.

234.  None of the Plaintiffs or testifying class members suffered any likely or actual harm as a result of any alleged disclosure violations in connection with Counts 2 or 4.[13]

## VI.   PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES WHICH BAR THEIR CLAIMS (ALL COUNTS).

235.  On September 22, 2003, almost two years after first filing her original complaint, Plaintiff Amara volunteered to be laid of by CIGNA and signed an Agreement and Release ("Release") in which she agreed "that [she] will not file (or ask or let anyone file for [her]) any

---

[11]  Defendants will supplement their Proposed Findings of Fact with respect to Ms. Flannery upon completion of her deposition, which has not yet been conducted.

[12]  Defendants will supplement their Proposed Findings of Fact with respect to Ms. Jones upon completion of her deposition, which has not yet been conducted.

[13]  Defendants will supplement their Proposed Findings of Fact with respect to Ms. Jones upon completion of her deposition, which has not yet been conducted.

charge, complaint, claim or lawsuit of any kind in connection with any claim released by this

Agreement. . . ."  Defs' Ex. 525, Amara Release at ¶ 5(a).

236.    Ms. Amara further agreed to "release and discharge" any "Claims," defined in the

Release as "any and all claims, demands and causes of action of whatever kind, including any

claims for attorney's fees, that you now have, or at any time had, against any Released Persons,

but only to the extent they arise out of or relate in any way to your employment or termination of

employment with the Company and its affiliates."  Defs' Ex. 525, Amara Release at ¶ 5(e).

237.    The Release Ms. Amara signed waived all claims relating to her employment, but

provided a narrow exception for claims for benefits under a pension plan.  Specifically, the

Release contains an exception for, among other things, "claims for benefits under any retirement,

savings or other employee benefit programs."  Defs' Ex. 525, Amara Release at ¶ 5(f).

238.    As explained herein, Ms. Amara and the other Plaintiffs' claims in this lawsuit are

not "claims for benefits under" the Plan.  Rather, Plaintiffs assert that the Plan is unlawful and

that they are entitled to monies in addition to the benefits provided under the Plan.

239.    This Court has already recognized the potential problems in this litigation posed

by Ms. Amara's execution of the Release.  Amara v. CIGNA Corp., No. 3:01CV2361 (DJS),

2004 WL 2381733, at *1-2 (D. Conn. Oct. 13, 2004).

240.    Ms. Amara did not tender back the release upon receipt of the consideration she

received.

241.    Thousand of other class members signed a release virtually identical to the one

signed by Ms. Amara, and received severance pay in exchange for doing so.  Arko Testimony;

Defs' Ex. 559, Agreements and Releases of Class Members.  Among those who also signed a

release were Plaintiffs Broderick and Glanz, and testifying class members Law, Curlee and

Jones.  Defs' Ex. 26, 27, 28, Agreements and Releases of Broderick, Glanz, and Law.

242.    Like Ms. Amara, none of the Plaintiffs or class members who signed a release has

tendered back the consideration they received in exchange for doing so.  Arko Testimony.


Dated:  June 27, 2006                          Respectfully submitted,

                                               **MORGAN, LEWIS & BOCKIUS LLP**


                                               By:  /s/ Joseph J. Costello_____
                                               Joseph J. Costello
                                               Jeremy P. Blumenfeld
                                               Jamie M. Kohen
                                               *Admitted pro hac vice*
                                               1701 Market Street
                                               Philadelphia, Pennsylvania  19103-2921
                                               (215) 963-5295/5258/5472
                                               (215) 963-5001 (fax)

                                               **ROBINSON & COLE**
                                               James A. Wade (CT # 00086)
                                               280 Trumbull Street
                                               Hartford, Connecticut  06103
                                               (860) 275-8270
                                               (860) 275-8299 (fax)

                                               *Attorneys for Defendants*
                                               *CIGNA Corporation and CIGNA Pension Plan*