# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------------------------------X
                                :

JANICE C. AMARA, GISELA         :         3:01 CV 2361 (MRK)
R. BRODERICK, ANNETTE S. GLANZ  :
individually, and on behalf of others   :       Trial Date: 09/11/06
similarly situated,                :
                                :

                  Plaintiffs,   :

         v.                    :
                                :

CIGNA CORP. AND CIGNA       :
PENSION PLAN,               :
                                :

                  Defendants.   :
                                :
------------------------------------------------------X

## DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

Dated: June 27, 2006                **MORGAN, LEWIS & BOCKIUS LLP**
                             By: /s/ Joseph J. Costello_____
                             Joseph J. Costello
                             Jeremy P. Blumenfeld
                             Jamie M. Kohen
                             *Admitted pro hac vice*
                             1701 Market Street
                             Philadelphia, Pennsylvania  19103-2921
                             (215) 963-5295/5258/5472
                             (215) 963-5001 (fax)

                             **ROBINSON & COLE**
                             James A. Wade (CT # 00086)
                             280 Trumbull Street
                             Hartford, Connecticut  06103
                             (860) 275-8270
                             (860) 275-8299 (fax)

                             *Attorneys for Defendants*
                             *CIGNA Corporation and CIGNA Pension Plan*

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ............................................................................. 1

II.   PLAINTIFFS' CLAIM THAT THE PLAN VIOLATES ERISA'S AGE
      DISCRIMINATION PROVISION (COUNT 3) FAILS. .................................... 3

      A.    The Phrase "Rate Of An Employee's Benefit Accrual" Does Not
            Refer To The "Accrued Benefit." ............................................... 3

      B.    The Term "Accrued Benefit" Does Not Require That It Be
            Expressed In The Form Of An Age-65 Annuity........................................ 8

      C.    Any Differences In The Age-65 Annuity Benefits Are Attributable
            To The Time Value Of Money And Differences In The Number Of
            Years To Payout Of The Benefit, Not "Because Of The Attainment
            Of Any Age." ............................................................................. 9

III.  PLAINTIFFS' CLAIM THAT THE PLAN VIOLATES ERISA'S
      NONFORFEITABILITY RULE AND ERISA'S 133⅓% ANTI-
      BACKLOADING RULE (COUNT 1) FAILS. ................................................ 10

      A.    The Plan Does Not Cause Any Impermissible Forfeitures..................... 10

      B.    The Plan Does Not Violate ERISA's 133⅓% Rule ............................... 11

IV.   PLAINTIFFS' CLAIM THAT THE PLAN VIOLATES ERISA'S ANTI-
      CUTBACK OR OTHER PROVISIONS (COUNT 5) FAILS BECAUSE
      THE PLAN PROTECTS EMPLOYEES' PREVIOUSLY ACCRUED
      BENEFITS. ................................................................................. 14

V.    PLAINTIFFS' CLAIM THAT THE SUMMARY PLAN DESCRIPTION
      IS DEFICIENT (COUNT 2) FAILS BECAUSE THE SPD SATISFIES
      ERISA'S DISCLOSURE REQUIREMENTS, AND THERE IS NO
      EVIDENCE THAT PLAINTIFFS OR THE TESTIFYING CLASS
      MEMBERS WERE LIKELY, OR ACTUALLY, HARMED........................... 17

      A.    The Part B SPD Met The Disclosure Requirements Of ERISA
            Section 102............................................................................. 17

      B.    Even If The SPD Was Technically Deficient, Each Plaintiff And
            Class Member Must Prove He Or She Was "Likely Harmed" By A
            Failure To Inform Participants Of Material Plan Information
            Required By ERISA.................................................................... 21

      C.    Plaintiffs And The Testifying Class Members Cannot Prove Likely
            Harm. ................................................................................. 24

      D.    Any Alleged Deficiencies In the SPD Constituted Harmless Error ........ 25

      E.    Plaintiffs' SPD Claim Fails Because The Plan Administrator Is Not
            A Party To This Lawsuit.............................................................. 26

# TABLE OF CONTENTS
## (continued)

Page

F.    Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be Governed Exclusively By The Terms Of The CIGNA Pension Plan, Not The SPD. .................................................................................... 27

VI.    PLAINTIFFS' CLAIM FOR FAILURE TO PROVIDE A SECTION 204(H) NOTICE (COUNT 4) FAILS BECAUSE THE PLAN ADMINISTRATOR PROVIDED ALL PARTICIPANTS ADEQUATE NOTICE OF THE PLAN'S BENEFIT FREEZE AND THE PLAN ADMINISTRATOR WAS NOT REQUIRED TO INFORM FORMER EMPLOYEES OF THE AMENDED REHIRE RULE. .................................... 28

A.    The Plan Administrator Provided Proper Notice Regarding The Amendment Freezing Part A Benefits. .................................... 28

B.    Even If The Plan Administrator Was Required To Issue A Section 204(h) Notice For The Part B Amendment, Plaintiffs' Section 204(h) Claim Still Fails. ................................................................ 29

C.    The Plan Administrator Was Not Required Under ERISA Section 204(h) To Notify Terminated Part A Participants About The Amended Rehire Rule. ........................................................................ 31

D.    Plaintiffs' Section 204(h) Claim Fails Because The Plan Administrator Is Not A Party To This Lawsuit. ...................................... 33

E.    Plaintiffs' Section 204(h) Claim Is Time-Barred. .................................... 33

VII.    EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEY ARE NOT ENTITLED TO ANY REMEDY. .............................................................. 35

VIII.    PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES WHICH BAR THEIR CLAIMS. .................................................... 36

IX.    PLAINTIFFS' REQUEST TO ENFORCE THE DEPENBROCK DECISION IS FRIVOLOUS. .......................................................................... 37

Defendants propose the following conclusions of law:

**I.**    **BACKGROUND**

1.    When a person retires, a traditional defined benefit pension plan typically pays a participating retiree a fixed amount of money each year for life, payable in monthly installments. Typically, the annual pension benefit that an individual receives under a traditional defined benefit plan is a percentage of the employee's final salary multiplied by the employee's years of service.  As the Second Circuit explained in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000):

> A conventional defined benefit plan, adopting a final-pay formula would credit the employee with a specific percentage of salary for each year of employment. For instance, an employee might accrue a pension of 1.5% of "salary" for every year of service. After 30 years of service he would have a pension equivalent to 45% of "salary." Salary may be defined as final salary, or the average of salary in the last five years.

Id. at 158 n.4 (citation omitted).

2.    By design, participants under traditional pension plans earn most of their benefits in their last years of service.  The annual pension benefit for life that the participant is entitled to receive is generally referred to as an annuity, and has an actuarially equivalent present value based on interest rates and the participant's age and life expectancy.  In other words, using certain actuarial assumptions, the value of the annuity can be expressed as a lump-sum value today.  The Employee Retirement and Income Security Act ("ERISA") governs the interest rate to be used in determining the actuarially equivalent value of pension benefits.  Id. at 159.

3.    Under a traditional plan, an employee who elects to take his benefit before age 65 generally would have his benefit amount actuarially reduced to account for the earlier time for payout.  For example, if an employee is entitled to a benefit of $1,000 per month commencing at age 65, he might be entitled to receive a benefit of approximately $500 per month if he

commences his benefit 10 years earlier, at age 55.  The present value of these two benefits is the same, taking into account mortality (e.g., that payments will be made for an extra 10 years) and discounting to present value at the statutory discount rate.

4.    Traditional plans, however, sometimes have subsidized early retirement benefits available as benefit options.  A subsidized early retirement benefit is one that has a monthly payment that is greater than the present value of the normal retirement benefit.  For example, if the employee in the above example was entitled to an early retirement benefit of $700 per month (instead of $500 per month), then the value of that early retirement benefit would be subsidized (enhanced) by $200 per month.

5.    Although cash balance plans differ from the traditional plans described above, they are a type of defined benefit plan.  Id. at 158.  Cash balance plans use a different formula for calculating the amount of pension benefits that an individual is to receive.  Specifically,

> [u]nder a cash balance pension plan, a hypothetical account is established in each participant's name.  Benefits are credited to that "account" over time, driven by two variables:  (1) the employer's hypothetical "contributions," and (2) hypothetical earnings expressed as interest credits.  Employer "contributions" are usually expressed as a percentage of salary, the rate of which may vary with employee tenure.  Interest credits may be at a fixed interest rate, but more often they are tied to an extrinsic index - for example, U.S. Government securities of a specified maturity - and they vary accordingly.  Each year an employee receives a statement of her "account" balance, and can therefore see the value of her pension benefit.

Id.

## II.   PLAINTIFFS' CLAIM THAT THE PLAN VIOLATES ERISA'S AGE DISCRIMINATION PROVISION (COUNT 3) FAILS.

6.   ERISA Section 204(b)(1)(H)(i) provides in relevant part that

> a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i).

7.   This Court acknowledges that two courts have held that this provision unambiguously requires a comparison of the age-65 annuity benefits payable to participants at different times.  See Cooper v. IBM Personal Pension Plan, 274 F. Supp. 2d 1010 (S.D. Ill. 2003); Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150 (D. Conn. 2006).  Respectfully, this Court disagrees with the holdings of Cooper and Richards.  Instead, for the reasons explained herein, the Court agrees with those courts that have rejected claims that cash balance plans are inherently age discriminatory.  See Eaton v. Onan, Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000) (rejecting claim that cash balance plan design is age discriminatory); Tootle v. ARINC, Inc., 222 F.R.D. 88 (D. Md. 2004) (same); Register v. PNC Fin. Servs. Group, No. 04-6097, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005) (same); Engers v. AT&T Corp., No. 98-3660, 2001 U.S. Dist. LEXIS 25889 (D.N.J. June 6, 2001) (same);  Hurlic v. S. Cal. Gas Co., No. 05-5027 (C.D. Cal. Mar. 24, 2006).

### A.   The Phrase "Rate Of An Employee's Benefit Accrual" Does Not Refer To The "Accrued Benefit."

8.   This Court holds that the phrase "rate of an employee's benefit accrual" in ERISA Section 204(b)(1)(H)(i) does not mean the same thing as the defined term "accrued benefit" under ERISA Section 3(23), 29 U.S.C. § 1002(23).

9.   When Congress intended to refer to the accrued benefit in ERISA, it used the

3

words "accrued benefit" in the statute.  See, e.g., 29 U.S.C. §§ 1053, 1054, 1055.  Similarly,

when Congress intended to refer to the annual rate of change in an age-65 annuity benefit, it

explicitly said so.  See, e.g., 29 U.S.C. § 1054(b)(1)(B).

10.     The fact that Congress did not use the phrase "accrued benefit" or benefits

"payable at normal retirement age" in ERISA Section 204(b)(1)(H)(i), but instead chose to use a

different term – "benefit accrual" – reflects that Congress intended a different meaning.  See

Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002) ("[I]t is a general principle of

statutory construction that when Congress includes particular language in one section of a statute

but omits it in another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations

omitted); United States v. Gaggi, 811 F.2d 47, 56 (2d Cir. 1987) ("We presume that the use of

different terminology within a body of legislation evidences a Congressional purpose to

differentiate.").

11.     Unlike the term "accrued benefit," the phrase "rate of an employee's benefit

accrual" has no specific definition under ERISA.  See Register, 2005 WL 3120268, at *6

("ERISA does not define the 'rate of an employee's benefit accrual' for purposes of applying the

ERISA age discrimination provisions."); Eaton, 117 F. Supp. 2d at 829-30 ("[T]hese provisions

[Section 204(b)(1)(H)(i)] do not require a measure of a participant's rate of benefit accrual that is

based solely on the value of the participant's annuity payable at normal retirement age."); Tootle,

222 F.R.D. at 93-94 (same).

12.     There are many different ways to measure the rate at which benefits are accrued

under a plan, depending on the purpose for which the measurement is taken and the type of plan

at issue.  See Eaton, 117 F. Supp. 2d at 830 ("The concept of the 'benefit accrual rate' does not

have a single, self-evident meaning, especially in the world of pension plan regulation.  The term

is used and defined in different ways and for different purposes under ERISA and the Internal

Revenue Code."); <u>Register</u>, 2005 WL 3120268, at *7 (same).

13.     Because of the nature of cash balance plans, this Court holds that age

discrimination claims involving a cash balance plan must be examined by looking at changes to

the account balance from year to year.  <u>See Id.</u> ("Cash balance plans are not defined in terms of

an age 65 annuity, rather they are defined in terms of an account balance that grows with pay

credits and interest.  Therefore, it follows logically that the rate of benefit accrual is determined

by the change in the account balance."); <u>Eaton</u>, 117 F. Supp. 2d at 832-33 ("[T]he rate of benefit

accrual [in a cash balance plan] should be defined as the change in the employee's cash balance

account from one year to the next."); <u>Tootle</u>, 222 F.R.D. at 94 (same).

14.     Such a comparison reflects the actual economic benefit provided to older and

younger participants and demonstrates whether an older participant is better or worse off than a

similarly situated younger participant.  By contrast, the interpretation of the rate of an

employee's benefit accrual advocated by Plaintiffs would appear to find age discrimination even

under a plan (such as a cash balance plan) where an older employee is economically better off

than similarly situated younger employees.  This makes no sense.

15.     The effects of Plaintiffs' interpretation of ERISA Section 204(b)(1)(H)(i) and the

legislative history of the statute further demonstrate that Congress did not intend for the rate of

benefit accrual to necessarily refer to the change in the normal retirement age annuity benefit.

16.     The legislative history behind ERISA Section 204(b)(1)(H)(i) reflects that

Congress's principal, if not, exclusive, purpose in enacting the statute was to protect employees

who continued to work <u>after</u> normal retirement age.  <u>See Eaton</u>, 117 F. Supp. 2d at 826-29

("[The legislative history] provides considerable support for defendant's argument that Congress did not intend for the pension age discrimination provisions to apply to the rate of benefit accrual for participants under the age of 65."); Tootle, 222 F.R.D. at 93 ("[L]egislative history and statutory language provide strong evidence that [ERISA's age discrimination provisions are] not intended to protect workers until after they have attained normal retirement age."); Engers, 2001 U.S. Dist. LEXIS 25889, at *10 ("[I]t is clear to this court that . . . Congress intended both the ADEA and ERISA provisions [  ] to apply only to those employees who continue to work after the normal retirement age of sixty-five.").

17.    When Congress enacted ERISA Section 204(b)(1)(H)(i), it provided an example in the Conference Report of how the statute should work to ensure that plans were not discriminatory.  See Eaton, 117 F. Supp. 2d at 830, citing H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868, 4026.

18.    The Conference Report is "the most authoritative source[] on the meaning of legislation."  Chen v. U.S. Dep't of Justice, 434 F.3d 144, 153 (2d Cir. 2006).[1]

19.    Yet, if the "rate of employee's benefit accrual" in ERISA Section 204(b)(1)(H) necessarily referred exclusively to an employee's normal retirement age annuity benefit, the example in the Conference Report would itself be illegal.

20.    Similarly, many common and traditional defined benefit plans would be age discriminatory with respect to benefits earned by employees who work after normal retirement age.  Indeed, even traditional career pay plans and final average pay plans (the most common plan designs for non-union employees in the United States) would be age discriminatory after

---

[1]    See also Thornburg v. Gingles, 478 U.S. 30, 43 n.7 (1986) ("We have repeatedly recognized that the authoritative source for legislative intent lies in the Committee Reports on the bill."); United States v. Awadallah, 349 F.3d 42, 54 (2d Cir. 2003) ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.") (internal quotation marks omitted).

normal retirement age if benefit accruals were exclusively measured in terms of the normal retirement age annuity.

21.      These fundamentally unreasonable results demonstrate that Congress did not intend for the term "benefit accrual" as used in ERISA Section 204(b)(1)(H)(i) to refer to the normal retirement age annuity benefit.  See United States v. Am. Trucking Ass'ns, 310 U.S. 534, 542-44 (1940) ("When [a literal interpretation of a statute] has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act.  Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has followed that purpose, rather than the literal words.").

22.      This Court's interpretation of ERISA Section 204(b)(1)(H)(i) also accords with the Treasury Department's consistent view that cash balance plans are not age discriminatory.  See Treas. Reg. § 1.401(a)(4)-8(c)(3)(iii)(B); 56 Fed. Reg. 47,524 (Sept. 19, 1991)(codified at 26 C.F.R. pt. 1); IRS Notice 96-8, Part III.A; Testimony before the Senate Committee on Health, Education, Labor and Pensions, 1999 TNT 183-11 (Sept. 21, 1999); 67 Fed. Reg. 76,123-01 (Dec. 11, 2002); Department of Treasury, General Explanation of the Administration's Fiscal Year 2005 Revenue Proposals 104 (2004); Department of Treasury, General Explanation of the Administration's Fiscal Year 2006 Revenue Proposals 82 (2005); Department of Treasury, General Explanation of the Administration's Fiscal Year 2007 Revenue Proposals 66 (2006).

23.      The Treasury Department's interpretation is entitled to deference.  Esden, 229 F.3d at 169 (A "consistent and reasonable interpretation by the responsible agency is entitled to deference, regardless of its form of publication."); Auer v. Robbins, 519 U.S. 452, 462 (1997) (agency's interpretation set forth in amicus brief was entitled to deference where "[t]here is

simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question"); Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 48 (2d Cir. 2002) ("Even though not formally promulgated as regulations, these opinion letters, as the views of the agency charged with implementing ERISA, are at least a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and we have often relied on them for guidance.") (internal quotations and citations omitted); Register, 2005 WL 3120268, at *7 ("The Department of Treasury has consistently stated that cash balance plans are not age discriminatory.").

**B.  The Term "Accrued Benefit" Does Not Require That It Be Expressed In The Form Of An Age-65 Annuity.**

24.     Even if the term "benefit accrual" was the same as the term "accrued benefit," ERISA does not require that such a benefit be expressed in the form of an age-65 annuity. ERISA Section 3(23) defines "accrued benefit" as "the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A) (emphasis added).

25.     29 U.S.C. § 1054(c)(3), in turn, provides:

> For purposes of this Section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit.

29 U.S.C. § 1054(c)(3) (emphasis added).  Thus, ERISA specifically permits an accrued benefit "to be determined as an amount other than an annual benefit commencing at" age 65.  Id.

26.     In fact, if the "rate of an employee's benefit accrual" in ERISA Section 204(b)(1)(H)(i) unambiguously referred to the normal (age-65) annuity benefit, ERISA Section

8

204(b)(1)(H)(v) – which references "the <u>subsidized</u> portion of any <u>early retirement benefit</u>" – would be superfluous.  Such an interpretation of the statute cannot be correct.  <u>See</u> <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotations omitted); <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001) (same).

C.    **Any Differences In The Age-65 Annuity Benefits Are Attributable To The Time Value Of Money And Differences In The Number Of Years To Payout Of The Benefit, Not "Because Of The Attainment Of Any Age."**

27.    ERISA Section 204(b)(1)(H)(i) only prohibits discrimination "because of the attainment of any age."  29 U.S.C. § 1054(b)(1)(H)(i).

28.    The interest crediting rate under Part B of the CIGNA Pension Plan (the "Plan" and "Part B") is the same for all participants, regardless of age.  In addition, the benefit credit rate is the same or higher for older employees than similarly situated younger employees.  As a result, the account balance of an older employee will be the same as or higher than the account balance of a younger employee with the same service and salary at every point in time.  In other words, in any given year, the value of the older employee's benefit will equal or exceed the value of the benefit payable to a similarly situated (i.e., same salary history and years of service) younger employee.  Such a result is inconsistent with any legal definition of age discrimination.

29.    The Court concludes as a matter of law that the differences between the age-65 annuity benefit of an older participant compared to a younger participant are due exclusively to differences in the number of years to payout of the benefit and the time value of money.  Such differences are not "because of the attainment of any age."

### III.    PLAINTIFFS' CLAIM THAT THE PLAN VIOLATES ERISA'S NONFORFEITABILITY RULE AND ERISA'S 133⅓% ANTI-BACKLOADING RULE (COUNT 1) FAILS.

30.    Plaintiffs' challenge, in Count 1, that the formula for calculating opening account balances violates ERISA's nonforfeitability provisions, ERISA Section 203(a), 29 U.S.C. § 1053(a), fails.

### A.    The Plan Does Not Cause Any Impermissible Forfeitures.

31.    Under ERISA § 203(a), every pension plan must "provide that an employee's right to his <u>normal retirement benefit</u> is non-forfeitable upon the attainment of <u>normal retirement age</u>" and satisfaction of the Plan's vesting rules.  29 U.S.C. § 1053 (emphasis added).

32.    In <u>Alessi v. Raybestos-Manhattan, Inc.</u>, 451 U.S. 504 (1981), the Supreme Court held that

> the statutory definition of "nonforfeitable" assures that an employee's claim to the protected benefit is legally enforceable, <u>but it does not guarantee a particular amount or a method for calculating the benefits.</u>

<u>Id.</u> at 512 (emphasis added and citation omitted).

33.    Consistent with <u>Alessi</u>, courts repeatedly have held that ERISA's nonforfeitability provision does not prohibit a plan from providing participants with the greater of two benefit formulas.  Rather, ERISA's nonforfeitability provision simply requires that whatever benefits the plan provides – and whatever formula or combination of formulas are used – those benefits actually are paid to participants.  <u>See Francia v. Wonderoast, Inc. Profit Sharing Plan</u>, No. 92-CV-790S, 1995 WL 625705, at *13 (W.D.N.Y. Oct. 19, 1995) ("Applying this rule in the present case, this Court finds that while ERISA protects an employee's right to his accrued pension benefits it exerts little control over the content/amount of the benefits themselves.  The parties to the pension plan are responsible for deciding the actual benefits available under the plan.");

White v. Sundstrand Corp., 256 F.3d 580, 582-83 (7th Cir. 2001); Campbell v. BankBoston, 327

F.3d 1, 8-9 (1st Cir. 2003); Williams v. Caterpillar, Inc., 944 F.2d 658, 662-63 (9th Cir. 1991)

34.     Part B of the Plan provides that Plaintiffs' years of service are taken into account

under the cash balance formula.  If the cash balance formula yields a lower benefit than the prior

plan's benefit formula (because of the way opening account balances are calculated), however,

the higher benefit is paid.  Pursuant to Section 1.1(c) of Part B, a greater-of formula is used

under the Plan; therefore, participants can never receive less than the value of their accrued

benefit.  This formula can work only to the advantage of employees because it ensures that

employees always receive the higher benefit.  It is impossible under Part B for any employee to

receive a lower benefit amount than that to which the employee was entitled previous to the plan

amendment.  There is no forfeiture.

## B.     The Plan Does Not Violate ERISA's 133⅓% Rule.

35.     ERISA's backloading rules limit a plan's ability to "backload" certain retirement

benefits in later years of service.  In order to satisfy ERISA's accrual rules, a defined benefit plan

need only meet one of three separate tests: (1) the "3 % method"; (2) the "133⅓% rule"; and (3)

the "fractional rule."  See 29 U.S.C. § 1054(b)(1)(A)-(C); 29 C.F.R. § 1.411(b)-1(a); 29 C.F.R. §

1.411(b)-1(b)(1), (2), and (3) (describing the "3 % method," the "133⅓% rule," and the

"fractional rule," respectively).

36.     Here, Plaintiffs challenge the cash balance plan's compliance with the 133⅓%

rule, which generally requires that

> the annual rate at which any individual who is or could be a
> participant can accrue the retirement benefits payable at
> normal retirement age under the plan for any later plan year is not
> more than 133⅓% of the annual rate at which he can accrue
> benefits for any plan year beginning on or after such particular
> plan year and before such later plan year.

11

29 U.S.C. § 1054(b)(1)(B) (emphasis added).  See also 29 C.F.R. § 1.411(b)1(b)(2) (providing examples).

37.    The 133⅓% rule is tested only with respect to benefits payable at "normal retirement age."  29 U.S.C. § 1054(b)(1)(B).  The statute specifically provides that "the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded."  29 U.S.C. § 1054(b)(1)(B)(iii).

38.    Regulations further explain that "the requirements of subdivision (i) of this subparagraph [regarding the 133⅓ % rule] must be satisfied without regard to any benefit payable prior to the normal retirement benefit (such as an early retirement benefit which is not the normal retirement benefit)."  26 C.F.R. § 1.411(b)-1(b)(2)(ii)(C).

39.    In addition, the 133⅓% rule must be examined without consideration of any prior benefit formulas or prior plans.  29 U.S.C. § 1054(b)(1)(B)(i) specifically provides that when testing compliance with the 133⅓% rule, "any amendment which is in effect for the current year shall be treated as in effect for all other plan years."  29 U.S.C. § 1054(b)(1)(B)(i).  This means that in testing compliance with the 133⅓% rule, the current operative plan is assumed to have existed for all time; it is impermissible to compare benefits under the current formula with benefits under a prior formula.

40.    Plaintiffs' argument that the Plan violates the 133⅓% rule, however, depends on just such a prohibited comparison.  Specifically, Plaintiffs allege that because of the wear-away created by the protected "minimum benefit," the Plan violates the 133⅓% rule.  Because the minimum benefit is based solely on the prior plan's benefit formula, however, it must be disregarded for testing compliance with the 133⅓% rule.  In other words, if the current plan is assumed to have been in existence for all time, no participants would have opening account

12

balances or minimum benefits, so there would be no wear-away period.  As the <u>Register</u> court

held in dismissing an identical claim:

> When a company changes its pension plan, ERISA protects benefits previously earned under the prior plan provisions. 29 U.S.C. § 1054(g)(1). At no point can the participant receive less than his accrued benefit at the time the plan was changed.  <u>Id.</u>  In order to comply with this provision of ERISA, the new [employer] plan provides that a participant receives the greater of his cash balance benefit and his frozen accrued benefit, including any applicable early retirement subsidies, under the prior plan.  For some participants, the frozen prior plan benefit may be greater than the benefit under the new plan for a few years.  When this occurs, the participant's benefit will not accrue any additional value.
>
> Plaintiffs claim that since some employees' benefits will not increase for a few years after the plan change, it is inevitable that the plan will fail the 133⅓% test, as no accrual followed by the resumption of accruals will inevitably be more than a third higher.  While it is certainly true that the resumption of accruals after a time of no accrual will result in a change in accrual rate that is higher than one third, the 133⅓% test has provisions that address a situation such as this one, where the period of no accrual results from a plan amendment.  <u>See</u> 29 U.S.C. § 1054(b)(1)(B)(I). The test states that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years."  <u>Id.</u>  Once a plan amendment occurs, only the new plan is taken into consideration when performing the test.  Since the protected prior benefits under the old plan are disregarded, no wearaway of the benefit occurs.  Plaintiffs do not allege that the cash balance plan, when viewed by itself, violates the 133-1/3% test. Therefore, Plaintiffs have failed to state a claim for relief.

2005 WL 3120268, at *3 (internal citation omitted).  <u>See also</u> <u>FleetBoston</u>, 427 F. Supp. 2d at

170-72 (same).

    41.    When the Part B formula is treated as if it always had been in effect, as required

by the 133⅓% rule, Part B satisfies the rule.  There is no impermissible backloading and no

violation.

IV.    **PLAINTIFFS' CLAIM THAT THE PLAN VIOLATES ERISA'S ANTI-CUTBACK OR OTHER PROVISIONS (COUNT 5) FAILS BECAUSE THE PLAN PROTECTS EMPLOYEES' PREVIOUSLY ACCRUED BENEFITS.**

42.    Count 5 of the Complaint alleges a violation of ERISA's anti-cutback rule, 29 U.S.C. § 1054(g).

43.    This statute provides in relevant part that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title."  29 U.S.C. § 1054(g).

44.    This provision does not limit an employer's ability to reduce future pension accruals or even to cease them altogether.  See, e.g., Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 747 (2004) ("[E]mployers are perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, future employment."); 26 C.F.R. § 1.411(d)-3(b)(3)(ii) ("Section 411(d)(6) only protects benefits that accrue before the applicable amendment date.").

45.    As one court has explained, "the proper inquiry under ERISA § 204(g)(1) [29 U.S.C. § 1054(g)(1)] is whether plaintiff's monthly benefit was in fact reduced by a plan amendment."  King v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus., No. 01-CV-2604, 2003 WL 22071612, at *10 (E.D.N.Y. Sept. 5, 2003) (emphasis added); Langman v. Laub, No. 97 Civ. 6063 (MGC), 2002 WL 472033, at *2 (S.D.N.Y. Mar. 28, 2002) (same), aff'd, 328 F.3d 68 (2d Cir. 2003).

46.    Pursuant to applicable Treasury Regulations, an amendment or series of amendments "will only violate section 411(d)(6) if, for any participant, the net effect is to decrease participants' accrued benefit as of that applicable amendment date."  26 C.F.R. § 1.411(d)-3(a)(2)(ii).

47.    The regulations further provide an example of a plan design that complies with

the anti-cutback rule:

> Example 2. (i) Facts. The facts are the same as Example 1, except that Plan A includes a provision under which Participant N's accrued benefit cannot be less than what it was immediately before the applicable amendment date (so that Participant N's accrued benefit could not be less than $6,000 per year at normal retirement age).
>
> (ii) Conclusion. The amendment does not violate the requirements of section 411(d)(6)(A) with respect to Participant M (whose accrued benefit has been increased) or with respect to Participant N (although Participant N would not accrue any benefits until the point in time at which the new formula amount would exceed the amount payable under the minimum provision, approximately 3 years after the amendment becomes effective).

26 C.F.R. § 1.411(d)-3(a)(4).

48.     In this case, Part B does exactly what the Treasury Department's regulation requires. The written terms of Part B unequivocally provide that all benefits previously accrued under the prior plan formula are protected.

49.     Section 1.1(c) provides that a participant's Accrued Benefit under Part B "shall in no event be less than the . . . Participant's Minimum Benefit," which in turn is defined as "the Participant's Part A Accrued Benefit." Part B, Section 1.32.

50.     For employees who were entitled to a "Preserved Spouse's Benefit" under Part A (also known as the free 30%), the employee's Minimum Benefit also includes the value of that benefit. Part B, Section 1.32.

51.     Lastly, Section 7.3(b) protects employees' rights to any early retirement annuity benefits that they earned under Part A. Part B, Section 7.3(b).

52.     ERISA's anti-cutback rule only prohibits an accrued benefit from being "decreased by an amendment of the plan." 29 U.S.C. § 1054(g)(1) (emphasis added). Here, Part B complies with both the letter and the spirit of the rule, so there is no violation of ERISA's anti-

cutback rule.

53.    Moreover the failure to maintain electronic records of Minimum Benefits does not constitute a violation of the anti-cutback rule.  Part B requires that minimum benefits be protected, and the terms of the Plan are being followed.

54.    Plaintiffs also maintain that participants allegedly were not notified of the relative value of benefit options or that their minimum benefits applied.

55.    As explained previously, however, ERISA Section 204(g) prohibits <u>plan amendments</u> from reducing previously accrued benefits; nothing in ERISA Section 204(g) addresses, let alone mandates, <u>disclosures</u> about employee benefit matters.  Accordingly, this claim fails as a matter of law.

56.    Moreover, any disclosure obligations are those of the Plan Administrator, who is not a defendant in this case.

57.    Even the Plan Administrator, however, does not have a statutory obligation under any section of ERISA – let alone under Section 204(g) – to disclose to any participant on their benefit election form when the minimum benefit rule applies.  The Plan Administrator notified participants about each benefit form available to them, the amount of the benefit, and when and how that benefit is payable.  Although not specifically designated on the form as a minimum benefit under Section 1.1(c) or 7.3 of Part B, the minimum benefits were included among those benefit options.  These disclosures complied with applicable requirements at the time.

58.    Plaintiffs have identified only two participants – Lillian Jones and Douglas Robinson – who apparently believe they received inadequate disclosures of the relative value of their benefit options, neither of whom is a named Plaintiff in this lawsuit.  If these participants want to, and believe that they should be allowed to, submit a new benefit election and commence

16

their benefits in a different form, they must file a claim with the Plan Administrator.  Absent

such a claim and appeal to the Plan Administrator, this Court lacks jurisdiction to consider these

two class members' personal circumstances and individual claims.  See Chapman v. ChoiceCare

Long Island Term Disability Plan, 288 F.3d 506, 511 (2d Cir. 2002); Peterson Cont'l Cas. Co.,

282 F.3d 112, 118 (2d Cir. 2002).

59.     Plaintiffs have not proven any harm suffered as a result of the Plan

Administrator's allegedly inadequate disclosures.

60.     There is no violation of ERISA's anti-cutback rule.

**V.     PLAINTIFFS' CLAIM THAT THE SUMMARY PLAN DESCRIPTION IS
DEFICIENT (COUNT 2) FAILS BECAUSE THE SPD SATISFIES ERISA'S
DISCLOSURE REQUIREMENTS, AND THERE IS NO EVIDENCE THAT
PLAINTIFFS OR THE TESTIFYING CLASS MEMBERS WERE LIKELY, OR
ACTUALLY, HARMED.**

61.     Plaintiffs' SPD claim fails because (1) the information that Plaintiffs' claim is

missing is not required by ERISA, (2) even if the SPD was deficient, Plaintiffs and the testifying

class members cannot each prove that he or she was likely harmed by any such deficiency, (3)

any such deficiency constituted harmless error given their individual circumstances and the

specific information provided by the Plan Administrator on the status of their Part B accounts,

and (4) Plaintiffs' claim lies only against the Plan Administrator, whom they failed to sue.

**A.     The Part B SPD Met The Disclosure Requirements Of ERISA Section 102.**

62.     An SPD cannot contain or describe in detail all of the plan's provisions.  Mers v.

Marriott Int'l Group Accidental Death, Dismemberment Plan, 137 F.3d 510, 517 (7th Cir. 1998)

(rejecting argument "that beneficiaries should be able to use only the SPD and never consider

whether additional terms exist.  This position is counter to the purpose of an SPD."); Lorenzen v.

Employees Ret. Plan of Sperry & Hutchinson Co., 896 F.2d 228, 236 (7th Cir. 1990) ("[A] plan

summary is not required to anticipate every possible idiosyncratic contingency that might affect

17

a particular participant's or beneficiary's status . . . .  If it were, the summaries would be choked with detail and hopelessly confusing.").

63.    While an SPD is the principal way through which a Plan Administrator summarizes the key terms of a plan, Congress did not intend or provide that an SPD would replace the governing plan document, with all of its detail.  Compare 29 U.S.C. § 1022 (describing SPD disclosure requirements) with 29 U.S.C. § 1102 ("Every employee benefit plan shall be established and maintained pursuant to a written instrument" that must contain certain information).

64.    ERISA sets forth specific parameters concerning information that must be included in an SPD.  Thus, the SPD must contain a statement

> clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by [the regulations].

29 C.F.R. § 2520.102-3(l).

65.    The Part B SPD meets these disclosure requirements.

66.    Information not required by the statue or regulations, including, for example, the detailed formulas used to calculate benefits under different circumstances and in different forms, is left to the plan document.  See e.g., Borowski v. Dun & Bradstreet, No. 3:03CV431, 2004 WL 2743569, at *4 (D. Ct. Nov. 30, 2004) (SPD need not include method of calculating benefit).

67.    An SPD is not required to compare benefits under an old plan versus a new plan because an SPD is a summary of the existing, operative plan.  ERISA does not require that an SPD describe a plan that no longer applies or compare benefits under a current plan versus benefits under the plan it replaced.  See 29 C.F.R. § 2520.102-3 (listing items required to be in

18

SPDs); 29 C.F.R. § 2520.102-4 (SPD "may omit information which is not applicable to the class of participants or beneficiaries to which it is furnished").

68.    Because the cash balance plan did not result in rates that decrease with age or benefits that are conditional upon giving up part of the value of the accrued benefits under the old plan, the Plan Administrator was not required to disclose such alleged failings in Part B.

69.    The Plan Administrator was not required to reveal in the SPD the "pre-retirement mortality discount" and the interest rates that were applied in computing opening account balances.  "[Courts] recognize that an SPD need not 'anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status.'"  Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 9 (2d Cir. 1997) (quoting Lorenzen, 896 F.2d at 236 (holding that an SPD "need not discuss every imaginable situation in which such events or actions might occur, but it must be specific enough to enable the ordinary employee to sense when there is a danger that benefits could be lost or diminished").  Indeed, "[t]here is nothing in the language of the relevant ERISA statute indicating that an SPD must disclose how a benefit reduction is calculated."  Borowski, 2004 WL 2743569, at *4.

70.    Layaou v. Xerox Corp., 330 F. Supp. 2d 297 (W.D.N.Y. 2004), is not instructive in this case.  In Layaou, the plan set forth a "phantom account" system, by which if an employee had received a prior distribution, the employee's current distribution would be reduced by an amount equal to the sum distributed as it would have increased until the time of the employee's retirement.  Id. at 302-03.  The SPD omitted any reference to the phantom account system, however, and noted only that "the amount you receive may also be reduced if you had previously left the Company and received a distribution at that time."  Id. at 303.  The court found that from the SPD, a participant "would not know how or to what extent the benefit would be reduced,

although he or she might reasonably assume that the administrator would simply subtract out the value of the prior distribution." Id.

71.    In ruling that the SPD was therefore misleading, the Layaou court relied squarely on the fact the information missing from the SPD "resulted in a significant reduction in plaintiff's benefits, compared to what he or she would have received without the offset, or with what he or she would reasonably have expected his benefit to be, based on the information provided to him in the SPD." Id.  Thus, the court was concerned that the company misled the plaintiff into believing that he or she was going to receive more than he or she did in pension benefits.  As it explained:

> [T]he conspicuous absence of any reference to or explanation of the "phantom account" offset, coupled with the annual benefit statements that had been provided to Layaou, would clearly have misled him into believing that his monthly benefit would be considerably higher than it turned out to be.

Id. at 304.

72.    Here, in contrast, the SPD told Plaintiffs exactly how they would obtain benefits under the cash balance plan; there was no hidden offset or other circumstance that might lead Plaintiffs to mistakenly believe they would obtain higher benefits than the Plan provided.

73.    Because Plaintiffs' Third Amended Complaint did not raise a claim for a missing or deficient summary of material modifications ("SMM"), or articulate factual allegations relevant to such a claim, it is barred.

74.    The requirement to publish an SMM is excused where an SPD describing the change is timely filed:

> The summary of material modifications to the plan or changes in information required to be included in the summary plan description need not be furnished separately if the changes or modifications are described in a timely summary plan description.

29 C.F.R. § 2520.104b-3(b).

75.    CIGNA's Plan Administrator published a sufficient SPD within the required time, obviating the need for an SMM.

76.    Even if CIGNA's SPD was legally deficient, CIGNA's Plan Administrator met its requirements to publish an SMM by providing each converted plan participant a Retirement Information Kit in December 1997.

77.    Plaintiffs' SMM claim is time-barred.

78.    Plaintiffs' SMM claim fails because the Plan Administrator is not a defendant.

**B.    Even If The SPD Was Technically Deficient, Each Plaintiff And Class Member Must Prove He Or She Was "Likely Harmed" By A Failure To Inform Participants Of Material Plan Information Required By ERISA.**

79.    Under Second Circuit law, a legally deficient SPD itself does not give rise to liability.  Rather, the Second Circuit in <u>Burke v. Kodak Retirement Income Plan</u>, 336 F.3d 103, 113 (2d Cir. 2003), held that to recover damages, a plaintiff must also prove that he or she was "likely to have been harmed as a result of a deficient SPD."  <u>Id.</u> at 113 (emphasis omitted).

80.    The Second Circuit explained:

> At the outset, we agree that a prejudice standard is more consistent with ERISA's objective to protect the employee against inadequate SPDs. . . . Cognizant of ERISA's distribution of benefits, we <u>require, for a showing of prejudice, that a plan participant or beneficiary was likely to be have been harmed as a result of a deficient SPD.</u>  Where a participant makes this initial showing, however, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error.

<u>Id.</u> (emphasis in original).

81.    The Second Circuit addressed the "likely harm" standard again in <u>Weinreb v. Hosp. for Joint Diseases Orthopaedic Institute</u>, 404 F.3d 167 (2d Cir. 2005).  In <u>Weinreb</u>, the plaintiff sought to prevent enforcement of a plan requirement that a participant submit an

21

enrollment form to be eligible for life insurance because the participant was not notified of the requirement in an SPD.  See id. at 170.  The participant, however, had been notified of the enrollment form requirement through other informal communications and telephone calls.  See id. at 172.  Accordingly, the Second Circuit held that the plaintiff "failed to raise any material issue of fact demonstrating likely prejudice from the absence of an SPD" and affirmed summary judgment against the plaintiff, and never reached the harmless error standard.  Id.

82.     Plaintiffs are not entitled to a presumption of likely harm upon a finding that an SPD was deficient, or because of other communications by CIGNA.  Presuming likely harm from a deficiency in an SPD itself would render obsolete the Second Circuit's likely harm requirement articulated in Burke.

83.     The likely harm analysis requires the court to examine not just the language of the SPD, but also the plaintiff's own individual life circumstances.  See Burke, 336 F.3d at 113.

84.     For example, in Weinreb, the court found that individualized oral and written disclosures made to the participant were relevant to (and precluded the participant from proving) "likely prejudice," and never reached the issue of actual prejudice or harmless error.  Weinreb, 404 F.3d at 172 (finding that likely prejudice was not shown based on SPD's failure to notify plaintiff of plan requirement that a participant submit an enrollment form to be eligible for life insurance, since plaintiff had all the information needed to understand the enrollment form requirement).

85.     More recently, the Second Circuit addressed the likely harm standard in Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 585 (2d Cir. 2006), and again reiterated that such harm may not be presumed, and requires an inquiry individualized to the particular participant.  In Wilkins, the court found that a pension plan SPD was deficient in

22

failing to alert participants of the need to provide proof of covered employment upon an

employer underreporting of earnings, and then remanded the likely prejudice question for

"further development of the factual record."  Id.  The court's illustration of the evidence plaintiff

must show to demonstrate likely harm is instructive:

> To show likely prejudice, he must proffer sufficient evidence that,
> had the SPD given him adequate notice of his burden of proof, he
> would have taken effective measures either to safeguard these
> records against such perils, or to obtain and safeguard other
> competent evidence of covered employment.  [fn]  Such evidence
> might include, for example, affidavits from other workers or
> supervisors who could attest to his employment on certain jobs
> covered by the Mason Tenders CBA.  He must also show that the
> records or evidence that would have been preserved would be
> adequate to prove his entitlement to additional benefits.

Id. at 585 (emphasis added).

86.     District courts in the wake of Burke and Weinreb similarly have rejected claims

of likely harm where the plaintiff's individual circumstances fail to demonstrate that absent the

SPD deficiency, he or she could have obtained greater benefits.  For example, in Park v. Trustees

of the 1199 SEIU Health Care Employees Pension Fund, 418 F. Supp. 2d 343 (S.D.N.Y. 2005),

the court noted in dicta that plaintiffs could not show that Mrs. Park, the plan participant, was

"likely prejudiced" by the failure of the SPD to include information regarding the plan's lost

spouse waiver, because plaintiffs admitted that Mrs. Park herself was sufficiently aware of the

requirement that was missing from the SPD.  Id. at 354.  Again, as in Weinreb, the court made

this determination of "likely prejudice" without reaching the question of harmless error.

87.     Similarly, in Exarhakis v. Visiting Nurse Service of New York, No. 02-CV-5562

(ILG), 2006 WL 335420, at *13 (E.D.N.Y. Feb. 13, 2006 ), the court held that the plaintiff could

not demonstrate likely prejudice based on the failure to provide a SPD for the employer's long-

term disability ("LTD") benefits policy, by examining the specific circumstances concerning that

23

participant.  Because the plaintiff's testimony suggested that even if she had been given an SPD she would have returned to work as soon as possible rather than taking LTD under the plan, no likely prejudice could be shown.

88.    The court's decision in Sheehan v. Metropolitan Life Insurance Co., 368 F. Supp. 2d 228, 262 (S.D.N.Y. 2005), is instructive.  In Sheehan, to make the likely harm determination, the court made detailed explicit factual findings concerning whether the individual participant's disability "result[ed] from, or [was] caused or contributed to by a mental or nervous disorder," by closely examining the medical testimony.  Id. at 235-36, 263-65.

### C.    Plaintiffs And The Testifying Class Members Cannot Prove Likely Harm.

89.    Because Plaintiffs and the testifying class members cannot show that they would have received any greater benefit had the alleged SPD deficiencies not existed, their claim fails.

90.    None of the Plaintiffs or testifying class members provided any evidence that had the SPD better reflected the terms of Part B, they would have obtained any greater benefits.  In other words, this is not a situation where, "as a result of an SPD deficiency, [a plaintiff] was not aware of the need to take an action within his control (submitting an affidavit, filing a law suit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action."  Sheehan, 368 F. Supp. 2d at 262.

91.    Plaintiffs contend that they can show likely harm without proving that they would have received greater plan benefits had the SPD disclosed more information because, as in Frommert, they lost the opportunity to register complaints and make employment and retirement decisions with the knowledge that their benefits were being substantially reduced.  This is wrong.

92.    In Frommert, contrary to its earlier decisions in Burke and Weinreb and its later decision in Wilkins, the Second Circuit indeed suggested that likely prejudice may be shown where a faulty SPD deprived plaintiffs of the opportunity to make employment and retirement

24

decisions because they were led to believe they would obtain greater benefits than they were eventually provided. See Frommert, 433 F.3d at 265. However, in Frommert, the Second Circuit relied upon the fact that the plaintiffs had their benefits reduced by a "phantom account" that was never disclosed to them and was not even properly part of the plan until after many had already retired. Id. at 265-67. As the court stated:

> The prolonged absence of any mention of the phantom account from Plan documents, most notably SPDs, likely, and quite reasonably, led Plan participants to believe that it was not a component of the Plan. Rather, rehired employees likely believed that their past distributions would only be factored into their benefits calculations by taking into account the amounts they had actually received.

Id. at 266-67.

93.     Thus, Frommert is inapposite because there the plaintiffs had no way of knowing the actual benefits they were to receive. Here, in contrast, Plaintiffs and all Part B participants were provided annual account statements and Total Compensation Reports telling them the precise amount in their cash balance accounts each year.

### D.     Any Alleged Deficiencies In the SPD Constituted Harmless Error.

94.     Even if Plaintiffs had met their burden of proving that the SPD was deficient and that those deficiencies resulted in likely harm, Defendants successfully rebutted that showing through evidence that the deficiencies constituted harmless error, i.e., that the employees independently knew the information that was wrongfully omitted from the SPD or would not have conducted themselves any differently had they known it. See Burke, 336 F.3d at 113-14; Pastore v. Witco Corp., 388 F. Supp. 2d 212 (S.D.N.Y. 2005) (finding harmless error where the plaintiff received the information missing from the SPD through another channel).[2]

---

[2]     In Pastore, the court granted summary judgment in favor of the plan administrator, despite finding that the severance plan's SPD unlawfully omitted information that a participant was only entitled to severance if he

95.     Given the abundance of information the Plan Administrator provided to participants concerning the operation of the cash balance plan and the value of their accounts, any claim that Plaintiffs were harmed by the omission of data from the SPD is illusory.

### E.     Plaintiffs' SPD Claim Fails Because The Plan Administrator Is Not A Party To This Lawsuit.

96.     Plaintiffs' SPD disclosure claim lies against the Plan Administrator for the CIGNA Pension Plan. See 29 U.S.C. § 1024(b)(1) ("The administrator shall furnish. . . a copy of the summary plan description"); see also Nechis v. Oxford Health Plans, Inc., 329 F. Supp. 2d 469, 476 (S.D.N.Y.) (disclosure obligations are imposed only on the "plan administrator").

97.     Here, in accordance with the terms of Part A and Part B, CIGNA's Benefits Committee appointed a Plan Administrator for the Plan, which was disclosed to Plaintiffs in the SPD.

98.     The Second Circuit has explained in this vein that ERISA's disclosure "obligation is placed on the person designated under ERISA as the 'administrator' of the plan, not on every fiduciary," let alone the Plan sponsor. Lee v. Burkhart, 991 F.2d 1004 (2d Cir. 1993) (emphasis added); see also Malia v. General Elec. Co., 23 F.3d 828, 833 (3d Cir. 1994) (rejecting disclosure claims against employer under 29 U.S.C. §§ 1021-25 because "[o]nly plan administrators are required to disclose benefits information to beneficiaries").

99.     Because Plaintiffs chose not to sue CIGNA's Plan Administrator for Part B, judgment is entered in Defendants' favor on Plaintiffs' disclosure claims against CIGNA

---

resigned because the company was requiring him to relocate. Id. at 219-220. Pastore had been offered the option of moving to another office or working part-time at home, and accordingly was refused severance upon his resignation on the ground that he was not required to relocate, a condition to benefits about which he pled ignorance. Id. In finding that Witco proved harmless error, the court noted that "it is undisputed that Plaintiff learned of the 'required to relocate' requirement of the CIC Program when he was provided and admittedly read a copy of the 'Change in Control Severance Program Description' before he announced his resignation." Id. at 221.

Corporation and the Plan itself.

**F.     Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be Governed Exclusively By The Terms Of The CIGNA Pension Plan, Not The SPD.**

100.     The Second Circuit has held that publishing an SPD can effectively modify the terms of an underlying plan document in some circumstances, see, e.g., Burke, 336 F.3d at 110; Weinreb, 404 F.3d at 171, and this Court is bound by the Second Circuit's decisions in those cases.

101.     Nevertheless, the Second Circuit's suggestion that an SPD can effectively modify the terms of an ERISA plan is inconsistent with the Supreme Court's decision in Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73 (1995). In Curtiss-Wright, a company tried to amend its medical plan by publishing a new SPD describing the new plan terms. The Supreme Court held that publishing the SPD could only modify the terms of the Plan if the act of publishing the SPD satisfied the formal amendment procedures in the plan. See id. at 83-85. The Supreme Court further explained in Curtiss-Wright that where a plan reserves to one particular corporate body the right to modify a plan, "one must look only to [that corporate body] and not to any other person" to determine whether an amendment is valid. Id. at 79 (emphasis in original).

102.     Here, the Plan Administrator – the person with exclusive responsibility for publishing the SPD – did not have the power to modify the terms of Part B, and, moreover, the publication of the SPD did not satisfy the Plan's formal amendment procedures. See Part B, Section 14.1.

103.     Accordingly, to permit the SPD to effectively modify the terms of Part B would run afoul of Curtiss-Wright. Plaintiffs' benefits must be governed exclusively by the terms of the Part B Plan document.

VI.  **PLAINTIFFS' CLAIM FOR FAILURE TO PROVIDE A SECTION 204(H) NOTICE (COUNT 4) FAILS BECAUSE THE PLAN ADMINISTRATOR PROVIDED ALL PARTICIPANTS ADEQUATE NOTICE OF THE PLAN'S BENEFIT FREEZE AND THE PLAN ADMINISTRATOR WAS NOT REQUIRED TO INFORM FORMER EMPLOYEES OF THE AMENDED REHIRE RULE.**

104.    Plaintiffs' claim that CIGNA violated ERISA Section 204(h),

29 U.S.C. § 1054(h), by reducing their plan benefits without proper advance notice to

participants is without merit because (1) the Plan Administrator provided timely notice of the

Plan amendment freezing Part A benefits, which was the only reduction of benefit accruals class

members experienced, (2) even if the Part B amendment required a Section 204(h) notice, the

Plan Administrator's written communications to all covered participants fulfilled that

requirement, (3) the Plan Administrator was not required to provide notice of the rehire

amendment to employees who were not employed by CIGNA at the time, (4) Plaintiffs' claim

lies only against the Plan Administrator, whom they failed to sue, and (5) Plaintiffs' claim is

time-barred.

    A.  **The Plan Administrator Provided Proper Notice Regarding The Amendment Freezing Part A Benefits.**

105.    ERISA Section 204(h) requires a plan administrator to notify participants of a

plan amendment that is likely to cause a "significant reduction" in the rate of future benefit

accrual at least 15 days in advance of the implementation of the amendment.  See 29 U.S.C.

§ 1054(h).

106.    ERISA Section 204(h), as it was stated at the time of the alleged violation, read:

> (h) Notice of significant reduction in benefit accruals
>
> (1) A [pension] plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to

28

(A) each participant in the plan.

29 U.S.C. § 1054(h) (emphasis added).

107.    The only plan amendment causing a reduction in benefits, and which therefore required a Section 204(h) notice, was the freezing of benefit accruals under Part A for certain participants, effective December 31, 1997.  See Amendment No. 4 to Part A.

108.    The November 1997 Newsletter, issued to all employees at his or her desktop, and/or the December 1997 Retirement Information Kit, sent using an individual mailing label on a sealed envelope at each participant's office, timely notified each participant of the freeze and constituted a lawful ERISA Section 204(h) notice.  See 29 U.S.C. § 1054(h) (requiring notice to "each participant in the plan").

109.    Nothing in ERISA requires that a Section 204(h) notice be explicitly entitled as such.  Either of these documents suffices to fulfill the Plan Administrator's obligations under Section 204(h) regarding the freeze amendment.

**B.    Even If The Plan Administrator Was Required To Issue A Section 204(h) Notice For The Part B Amendment, Plaintiffs' Section 204(h) Claim Still Fails.**

110.    The adoption of the Part B amendment, signed on December 21, 1998, retroactive to January 1, 1998, did not effect any "reduction"; rather, it resumed benefit accruals that previously were frozen and therefore not increasing.  Depenbrock, 389 F.3d at 83 (holding that "December 21, 1998, is the effective date of the amendment" implementing the cash balance plan).

111.    Because the converted participants' benefit accruals were increased rather than reduced by the implementation of Part B, no additional Section 204(h) notice was required.

112.    Plaintiffs' suggestion that the freeze and the cash balance plan implementation were a singular plan amendment is faulty.  While the freeze amendment was signed in October

29

1997, and became effective on December 31, 1997, the cash balance amendment was signed on December 21, 1998 and became effective only on that date.  See Depenbrock, 278 F. Supp. 2d at 466, 469 (noting that Amendment No. 4, "which froze the pension benefit accruals of the participants that would be converted to the cash balance plan effective December 31, 1997," was executed on October 31, 1997); Depenbrock, 389 F.3d at 83 (holding that "December 21, 1998, is the effective date of the amendment" implementing the cash balance plan).

113.    Even if, however, the Part B amendment signed December 21, 1998 was an event requiring a Section 204(h) notice, the Plan Administrator fulfilled this requirement by providing to all converted participants the 1997 Newsletter, the December 1997 Retirement Information Kit and/or the 1998 SPD, each of which timely "[set] forth the plan amendment and its effective date."  29 U.S.C. § 1054(h).

114.    Nothing in Section 204(h) requires the notice to describe how benefits are reduced or to compare what a participant's benefits would be if the participant remained in the prior plan.

115.    Plaintiffs incorrectly contend that where a notice does not "fully explain" how an amendment reduces participants' benefits, the notice is insufficient under Section 204(h), citing Frommert.  The Second Circuit in Frommert did not hold that a Section 204(h) notice must disclose the amount of the reductions in benefit accruals.  433 F.3d at 266.  Instead, the Second Circuit simply held that a Section 204(h) notice is required even where benefit accruals are reduced indirectly, e.g., via the introduction of a new offset.

116.    Nonetheless, even if Plaintiffs could prove that the Plan Administrator failed to provide an adequate Section 204(h) notice, their claim would still fail.

117.    To recover on a Section 204(h) claim, Plaintiffs also must demonstrate that they suffered "likely harm," which they cannot do.  See FleetBoston, 427 F.Supp.2d at 171-72 (noting

30

that the Section 204(h) test would be subject to the "likely prejudice" test); <u>Frommert</u>, 433 F.3d

at 266-67 (applying likely prejudice test to a 204(h) claim).

**C.     The Plan Administrator Was Not Required Under ERISA Section 204(h) To Notify Terminated Part A Participants About The Amended Rehire Rule.**

118.     No Section 204(h) notice was required for former class members who were

rehired after December 21, 1998 because (1) these employees were not likely to be affected by

the amendment, and (2) the Plan amendment did not cause a reduction in their future benefits

since these former employees were not accruing any benefits at the time of the amendment.

119.     ERISA Section 204(h) requires that written notice of any amendments be

provided <u>only</u> to those participants who are likely to experience a significant reduction in

benefits.  The regulations in effect during the relevant time state that a participant who, at the

time of the amendment, is not expected to have a "significant reduction" is not required to be

provided notice:

> Q-9:   If section 204(h) notice is required with respect to an amendment, must such notice be provided to participants or alternate payees whose rate of future benefit accrual is not reduced by the amendment?
>
>  A-9:  (a) In general A plan administrator need not provide section 204(h) notice to any participant whose rate of future benefit accrual is <u>reasonably expected not to be reduced by the amendment</u>, nor to any alternate payee under an applicable qualified domestic relations order whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment.  A plan administrator need not provide section 204(h) notice to an employee organization unless the employee organization represents a participant to whom section 204(h) notice is required to be provided.

26 C.F.R. § 1.411(d)-6T (emphasis added).

120.     Whether a particular participant is expected to have a significant reduction in

future benefits is "determined based on all relevant facts and circumstances at the time the

31

amendment is adopted." Id.

121.    At the time of the implementation of the plan amendment for rehires, the benefits of class members like Ms. Broderick were not likely to be affected by the amendment, let alone to suffer a significant reduction.  This is because, generally, Part A participants who were not employed on December 31, 1997 did not become participants in the cash balance plan.  Indeed, nothing in the testimony of Plaintiffs or the testifying class members explains "facts and circumstances" that would demonstrate a likelihood or appreciable expectation in 1997 or 1998 that droves of former employees would return to CIGNA.

122.    Nor does the fact that class members like Ms. Broderick might be affected by the amendment in the future if they happened to be rehired by CIGNA require that a Section 204(h) notice be provided:

> Example 3.    Plan B covers hourly employees and salaried employees.  Plan B provides the same rate of benefit accrual for both groups.  The employer amends Plan B to reduce significantly the rate of future benefit accrual of the salaried employees only. <u>At that time, it is reasonable to expect that only a small percentage of hourly employees will become salaried in the future. Accordingly, the plan administrator is not required to provide section 204(h) notice to the participants who are currently hourly employees.</u>

26 C.F.R. § 1.411(d)-6T (emphasis added).

123.    Importantly, if a plan administrator is not required to provide a Section 204(h) notice to a particular participant at the time of the amendment, there is no obligation to provide that participant a Section 204(h) notice at any later date.  Section 204(h) notice obligations are triggered based on the facts and circumstances "at the time the amendment is adopted."  26 C.F.R. § 1.411(d)-6T (Q-9).

124.    The Plan Administrator also was not required to provide a Section 204(h) notice to these former employees because they were not accruing benefits, and accordingly, it cannot be

said that the rehire amendment reduced their benefit accrual.

**D.    Plaintiffs' Section 204(h) Claim Fails Because The Plan Administrator Is Not A Party To This Lawsuit.**

125.    Plaintiffs' Section 204(h) claim lies against the Plan Administrator for the CIGNA Pension Plan, who was never named as a Defendant in this suit.  See 29 U.S.C. 1054(h) ("the plan administrator provides a written notice, setting forth the plan amendment").

126.    Because the Plan Administrator has not been named as a Defendant in this suit, this claim fails as a matter of law.

**E.    Plaintiffs' Section 204(h) Claim Is Time-Barred.**

127.    Plaintiffs' claims that the Plan Administrator failed to provide an adequate Section 204(h) notice under 29 U.S.C. § 1054(H) fails as a matter of law because it was not filed within the controlling statute of limitations.

128.    These same principles compel the conclusion that Plaintiffs' claims under 29 C.F.R. § 2520.104b-3(a) (SMM) and 29 U.S.C. § 1024 (SPD) are also time-barred.

129.    29 U.S.C. § 1054(H) (Section 204(h) notice), 29 C.F.R. § 2520.104b-3(a) (SMM) and 29 U.S.C. § 1024 (SPD) do not have their own statute of limitations.  Where an ERISA provision does not contain its own statute of limitations, the most analogous state statute of limitations governs.  See Sandberg v. KPMG Peat Marwick, LLP, 111 F.3d 331, 333 (2d Cir. 1997) ("Congress has neglected, however, to establish a statute of limitations for this enforcement section [29 U.S.C. §1132(a)(3)] of ERISA.  When Congress fails to provide a statute of limitations for claims arising under federal statutes, a court must apply the limitations period of the state-law cause of action most analogous to the federal claim.").

130.    Here, Plaintiffs' Section 204(h) claim is most analogous to a "[c]ivil action to collect wage claim [or] fringe benefit claim" under Connecticut law.  Conn. Gen. Stat. Ann. §

31-72; see Syed v. Hercules Inc., 214 F.3d 155, 160-61 (3d Cir. 2000) (holding that Delaware's one-year statute of limitations for claims to recover wages and benefits applied to plaintiff's ERISA claims), cert. denied, 531 U.S. 1148 (2001).

131.    In Connecticut, the statute of limitations on such claims is two years. See, e.g., Conn. Gen. Stat. Ann. § 52-596 ("No action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues.").

132.    Even if the two-year statute of limitations does not apply, however, Plaintiffs' claims would be subject to Connecticut's three-year residual statute of limitations for tort claims. See Conn. Gen. Stat. Ann. § 52-577 (describing three-year statute of limitations for all tort claims not specifically addressed elsewhere).

133.    This limitations period has been held to apply to claims alleging statutory violations, including certain ERISA claims. See, e.g., Jaskilka v. Carpenter Tech. Corp., 757 F. Supp. 175, 177 (D. Conn. 1991) (holding the three-year tort statute of limitations applies to claims under ERISA Section 510); Visconti v. Pepper Partners Ltd. P'ship, No. X06CV990170072S, 2002 WL 1293224, at *8 (Conn. Super. Ct. May 14, 2002) (three-year statute of limitations under Conn. Gen. Stat. Ann. § 52-577 applies to claims under the Connecticut Environmental Protection Act); Henderson v. Henderson Auto, No. CV980086823, 2002 WL 725503, at *2 (Conn. Super. Ct. Apr. 1, 2002) (three-year statute of limitations under Conn. Gen. Stat. Ann. § 52-577 applies to claims pursuant to Conn. Gen. Stat. Ann. § 14-150(g) seeking a statutory lien).

134.    Plaintiffs allege that the Plan Administrator's 204(h) notice distributed mid-December 1997 was deficient. Yet Plaintiffs filed their Second Amended Complaint, which raised a 204(h) notice claim for the first time, more than seven years later - on May 6, 2005.

34

135. This claim does not relate back to the filing of the original Complaint because it does not arise out of the same conduct upon which the claims in the original Complaint were based. See Fed. R. Civ. P. 15(c)(2). See, e.g., Gomes v. Avco Corp., 964 F.2d 1330, 1334 (2d Cir. 1992) (finding that a § 1981 claim based on discriminatory refusal to process a grievance did not relate back to the plaintiff's original claim which only mentioned one of the grievances because the second grievance was considered a separate transaction not contained in the original complaint); Jackson v. Suffolk County Homicide Bureau, 135 F.3d 254 (2d Cir. 1998) (holding that the claims arising from the photography of a plaintiff's nude body after his arrest did not relate back to his original complaint because it had only alleged that the police applied excessive force); American Express Co. Sec. Lit., 02 Civ. 5533 (WHP), 2004 U.S. Dist LEXIS, at *23 (S.D.N.Y. Mar. 31, 2004) (stating that "an amended pleading does not relate back if it introduces a different set of operative facts").

136. Even if this claim were to relate back to the filing of the original Complaint, it still would be time-barred. The original Complaint was filed on December 18, 2001, more than four years after Plaintiffs allege a Section 204(h) notice was required.

137. Plaintiffs' claim in Count 4 is time-barred.

## VII. EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEY ARE NOT ENTITLED TO ANY REMEDY.

138. Plaintiffs seek monetary damages which are unavailable under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3). See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 215 (2002) (holding that under Section 502(a)(3), the only remedy is equitable relief limited to "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)").

139. Moreover, Supreme Court precedent dictates that under these circumstances,

Plaintiffs would not be entitled to any retroactive relief.  City of Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 721 (1978); Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris, 463 U.S. 1073, 1106-07 (U.S. 1983); Florida v. Long, 487 U.S. 223, 229-40 (1988); see also, Walsche v. First Investors Corp., 793 F. Supp. 395, 400 (D. Conn. 1992).

## VIII. PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES WHICH BAR THEIR CLAIMS.

140.    The claims of thousands of the class members in this suit are barred entirely because they each signed an Agreement and Release ("Release") in exchange for a payment of severance.

141.    These class members cannot avoid the release based on its exclusion for "any claims for benefits under any retirement, savings, or other employee benefit programs."  By its terms, this exclusion only applies to claims for benefits under the Plan, not claims alleging statutory ERISA violations.  In this suit, Plaintiffs allege that the terms of the Plan violate ERISA and that the summary plan description was misleading, both statutory claims that the Second Circuit consistently distinguishes from claims for benefits under the terms of a plan.

142.    In Campanella v. Mason Tenders District Council Pension Plan, 299 F. Supp. 2d 274 (S.D.N.Y. 2004), the plaintiffs alleged "that the Plan itself violates ERISA" – specifically, ERISA's accrual rules.  Id. at 280, 281.  The court ruled these were statutory claims, not claims for benefits under the plan, and that therefore the plaintiffs were not required to exhaust their administrative remedies.  The court held:

> The Second Circuit requires that a plaintiff bringing an ERISA claim for denial of specific benefits under an employee benefits plan exhaust his or her administrative remedies before pursuing the claim in court.  But the Second Circuit has not yet addressed whether it requires exhaustion of claims generally alleging statutory ERISA violations. . . .  [T]he Third, Fourth, Fifth, Sixth,

36

> Ninth, and Tenth Circuits have expressly stated that exhaustion is
> not a prerequisite to actions asserting statute-based ERISA claims.
> Furthermore, several district courts in the Second Circuit have
> declined to require exhaustion of statute-based ERISA claims.

Id. at 281 (internal citations omitted).  See also De Pace v. Matsushita Elec. Corp. of Am., 257 F.

Supp. 2d 543, 558 (E.D.N.Y. 2003) ("District courts in the Second Circuit have routinely

dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation.");

Gray v. Briggs, No. 97-6252, 1998 WL 386177, at *7 (S.D.N.Y. July 7, 1998) ("This Court is

persuaded by Judge Leisure's decision . . . finding that there is no exhaustion requirement in

ERISA suits alleging statutory violations rather than a denial of benefits.") (internal citations

omitted).

     143.    Ms. Amara ratified the Release by not tendering back the consideration she

received.  See, e.g., Harless v. Research Inst. of Am., 1 F. Supp. 2d 235, 242-243 (S.D.N.Y.

1998) (rejecting challenge to the validity of a release because the "plaintiff has failed to tender

back and has ratified the Release"); Bittinger v. Tecumseh Prods. Co., 83 F. Supp. 2d 851, 871-

72 (E.D. Mich. 1998) (plaintiff cannot challenge the validity of a release as to ERISA claims

because he did not tender back the consideration received for executing the release), aff'd, 201

F.3d 440 (6th Cir. 1999).

## IX.    PLAINTIFFS' REQUEST TO ENFORCE THE <u>DEPENBROCK</u> DECISION IS FRIVOLOUS.

     144.    Plaintiffs' request to enforce the Judgment entered by the United States District

Court for the Eastern District of Pennsylvania in Depenbrock v. CIGNA Corp., 389 F.3d 78 (3d

Cir. 2004), is denied as frivolous.

     145.    The district court's Judgment in Depenbrock required John Depenbrock's benefit

– and only his benefit – to be recalculated as if he had remained in Part A.  See Stip. Ex. 175,

Order dated December 23, 2004 (ordering that "The amendment of Section 2.4 shall not be

applied retroactively to Plaintiff.").

146.    Moreover, Plaintiffs lack standing to pursue this action on behalf of absent class members.

147.    Defendants are in full compliance with the Court's Order in Depenbrock.


Dated:  June 27, 2006                          Respectfully submitted,


**MORGAN, LEWIS & BOCKIUS LLP**


By: /s/ Joseph J. Costello
Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
*Admitted pro hac vice*
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
(215) 963-5295/5258/5472
(215) 963-5001 (fax)

**ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)

*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*