## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-----------------------------------------------------X
                      :

JANICE C. AMARA, GISELA         :    3:01 CV 2361 (MRK)
R. BRODERICK, ANNETTE S. GLANZ  :
individually, and on behalf of others   :    Trial Date: 09/11/06
similarly situated,               :
                      :
             Plaintiffs,   :
       v.               :
                      :
CIGNA CORP. AND CIGNA      :
PENSION PLAN,             :
                      :
            Defendants.  :
                      :
-----------------------------------------------------X

## DEFENDANTS' TRIAL BRIEF

Dated:  June 27, 2006         **MORGAN, LEWIS & BOCKIUS LLP**
                            By:  /s/ Joseph J. Costello_____
                            Joseph J. Costello
                            Jeremy P. Blumenfeld
                            Jamie M. Kohen
                            *Admitted pro hac vice*
                            1701 Market Street
                            Philadelphia, Pennsylvania  19103-2921
                            (215) 963-5295/5258/5472
                            (215) 963-5001 (fax)

                            **ROBINSON & COLE**
                            James A. Wade (CT # 00086)
                            280 Trumbull Street
                            Hartford, Connecticut  06103
                            (860) 275-8270
                            (860) 275-8299 (fax)

                            *Attorneys for Defendants*
                            *CIGNA Corporation and CIGNA Pension Plan*

INTRODUCTION ............................................................................................................ 1

I.   NATURE OF THE CASE ........................................................................................ 1

II.  BACKGROUND ON CASH BALANCE PLANS AND TRADITIONAL PLANS ........ 5

     A.   Traditional Defined Benefit Plans ............................................................. 5

     B.   Cash Balance Plans .................................................................................... 7

III. THE CIGNA PENSION PLAN .............................................................................. 8

     A.   CIGNA's Part A Traditional Plan And The Creation Of The Part B Cash
          Balance Plan .............................................................................................. 8

     B.   The Terms Of Part B .................................................................................. 9

          1.   Benefit Credits And Interest Credits .............................................. 9

          2.   Opening Account Balances, Protected Minimum Benefits, And
               Retirement ..................................................................................... 10

IV.  COMMUNICATIONS REGARDING FREEZING ACCRUALS UNDER
     PART A, THE CREATION OF PART B, AND THE PRECISE AMOUNTS IN
     PARTICIPANTS' PART B ACCOUNTS ................................................................ 11

ARGUMENT ................................................................................................................ 12

I.   JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON
     COUNT 3 BECAUSE PART B IS NOT AGE DISCRIMINATORY ......................... 12

     A.   Part B Treats Older Employees At Least As Well As It Treats Younger
          Employees ................................................................................................ 12

     B.   Plaintiffs' Argument That ERISA Section 204(b)(1)(H)(i) Requires
          Comparisons Of Age-65 Annuity Benefits Is Wrong ............................. 16

          1.   The Phrase "Rate Of An Employee's Benefit Accrual" Does Not
               Refer To The "Accrued Benefit." ................................................. 17

          2.   The Term "Accrued Benefit" Does Not Require That It Be
               Expressed In The Form Of An Age-65 Annuity ............................ 22

          3.   Any Differences In The Age-65 Annuity Benefits Are Attributable
               To The Time Value Of Money And Differences In The Number Of
               Years To Payout Of The Benefit, Not "Because Of The Attainment
               Of Any Age." ................................................................................. 23

     C.   The Treasury Department Has Consistently Endorsed Cash Balance Plans
          As Not Being Age Discriminatory ........................................................... 24

     D.   Richards v. FleetBoston Was Wrongly Decided ...................................... 27

II.  JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON
     COUNT 1 BECAUSE PART B DOES NOT VIOLATE ERISA'S
     NONFORFEITABILITY RULE OR ERISA'S 133⅓% ANTI-BACKLOADING
     RULE ................................................................................................................. 31

A.      The Plan Does Not Cause Any Impermissible Forfeitures ................................. 32

B.      The Plan Does Not Violate ERISA's 133⅓% Rule ............................................. 37

III.    JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON
        COUNT 5 BECAUSE PART B DOES NOT VIOLATE ERISA'S ANTI-
        CUTBACK RULE AND PROTECTS EMPLOYEES' PREVIOUSLY
        ACCRUED BENEFITS ................................................................................................. 40

IV.     JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON
        COUNT 2 BECAUSE PLAINTIFFS LACK EVIDENCE THAT THEY WERE
        LIKELY OR ACTUALLY HARMED BY ANY DEFICIENCY IN THE
        SUMMARY PLAN DESCRIPTION. ............................................................................ 48

A.      The Part B SPD Met The Disclosure Requirements of ERISA Section 102 ....... 49

B.      Even If The SPD Was Technically Deficient, Each Plaintiff And Class
        Member Must Prove He Or She Was "Likely Harmed" By A Failure To
        Inform Participants of Material Plan Information Required By ERISA ............. 56

C.      Plaintiffs And The Testifying Class Members Cannot Prove Likely Harm ........ 60

D.      Any Alleged Deficiencies In The SPD Constituted Harmless Error .................. 62

E.      Plaintiffs' SPD Claim Fails Because The Plan Administrator Is Not A
        Party To This Lawsuit ......................................................................................... 65

F.      Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be Governed
        Exclusively By The Terms Of The CIGNA Pension Plan, Not The SPD. .......... 67

V.      JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON
        COUNT 4 BECAUSE THE PLAN ADMINISTRATOR PROVIDED
        ADEQUATE NOTICE UNDER ERISA SECTION 204(H). ....................................... 68

A.      The Plan Administrator Provided Proper Notice Regarding The
        Amendment Freezing Accruals Under Part A. .................................................... 69

B.      Even If The Plan Administrator Was Required To Issue A Section 204(h)
        Notice For The Amendment That Created Part B, Plaintiffs' Section
        204(h) Claim Still Fails ....................................................................................... 70

C.      The Plan Administrator Was Not Required Under ERISA Section 204(h)
        To Notify Terminated Part A Participants About The Amended Rehire
        Rule. .................................................................................................................... 72

D.      Plaintiffs' Section 204(h) Claim Fails Because The Plan Administrator Is
        Not A Party To This Lawsuit ............................................................................... 75

E.      Plaintiffs' Section 204(h) Claim Is Time-Barred .............................................. 76

VI.     EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEY ARE NOT
        ENTITLED TO ANY REMEDY. .................................................................................. 78

VII.    PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED
        RELEASES WHICH BAR THEIR CLAIMS. .............................................................. 79

VIII.   PLAINTIFFS' REQUEST TO ENFORCE THE DEPENBROCK DECISION IS
          FRIVOLOUS. ........................................................................................... 81

CONCLUSION.......................................................................................................... 83

EXHIBIT A .............................................................. SEE NEXT DOCKET ENTRY

TABLE OF AUTHORITIES ....................................... SEE NEXT DOCKET ENTRY

**INTRODUCTION**

I.    **NATURE OF THE CASE**

Plaintiffs Janice C. Amara, Gisela R. Broderick, and Annette S. Glanz ("Plaintiffs") have brought this action against Defendants CIGNA Corporation ("CIGNA") and the CIGNA Pension Plan (the "Plan") (together "Defendants") alleging violations of the Employee Retirement Income Security Act ("ERISA").  Plaintiffs' Third Amended Complaint (the "Complaint") challenges certain aspects of, and communications about, CIGNA's cash balance pension plan, known as "Part B," which was effective January 1, 1998.  The Third Amended Complaint contains five claims:[1]

- Count 1 alleges that the formula used to calculate "opening account balances" for the cash balance plan violated the non-forfeitability and accrual rule of ERISA Sections 203(a) and 204(b)(1)(B), 29 U.S.C. §§ 1053(a) and 1054(b)(1)(B).

- Count 2 alleges that the summary plan description ("SPD") for Part B did not satisfy applicable statutory disclosure requirements under ERISA Section 102, 29 U.S.C. § 1022.

- Count 3 alleges that Part B (and by definition all cash balance plans) is inherently age discriminatory and therefore violates ERISA Section 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i).

---

[1]    This Court, per Judge Squatrito, certified a plaintiff class by Order of December 20, 2002.  Plaintiffs added Counts 4 and 5 of their Complaint after the class was certified.  See Motion to File Second Amended Complaint (dkt #112-1); Third Amended Complaint (dkt # 165).  Accordingly, the appropriateness of these claims for class treatment has not been considered in this case.

- • Count 4 challenges whether Defendants satisfied any disclosure obligations under ERISA Section 204(h), 29 U.S.C. § 1054(h), as that provision existed in 1997-1998.

- • Count 5 alleges that Part B violated the anti-cutback rule under ERISA Section 204(g), 29 U.S.C. § 1054(g). See Third Amended Complaint (dkt # 165).

Counts 1, 3, and 5 depend exclusively on the written terms of Part B and the interpretation of applicable law. In that regard, every court to have considered the question presented in Count 1 has rejected Plaintiffs' argument that similar formulas for setting opening account balances for cash balance plans violate ERISA. Campbell v. BankBoston, 327 F.3d 1 (1st Cir. 2003) (cash balance formula for setting opening account balances does not violate ERISA); Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150 (D. Conn. 2006) (same); Register v. PNC Fin. Servs., Group, No. 04-6097, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005) (same). These courts all reached the right result and, for the reasons explained in detail herein, Defendants respectfully submit that this Court too should reject Plaintiffs' claim in Count 1.

As for Count 3, there is a split of legal authority as to whether cash balance plans are inherently age discriminatory. Several courts have found that the relevant statutory provision, ERISA Section 204(b)(1)(H)(i), is ambiguous, i.e., capable of more than one reasonable interpretation. Based on the legislative history, the Treasury Department's view that cash balance plans are legal, and fundamental economic principles, these courts have rejected challenges to the design of cash balance plans. Tootle v. ARINC, Inc., 222 F.R.D. 88 (D. Md. 2004) (rejecting claim that cash balance plan design is age discriminatory); Eaton v. Onan, Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000) (same); Register, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005) (same); Engers v. AT&T Corp., No. 98-3660, 2001 U.S. Dist. LEXIS 25889 (D.N.J.

June 6, 2001) (same);  Hurlic v. S. Cal. Gas Co., No. 05-5027 (C.D. Cal. Mar. 24, 2006) (same)

(attached hereto as Exhibit A).  Two other courts have found that the relevant statutory provision

is unambiguous and have essentially held that all cash balance plans are per se age

discriminatory and illegal.  See Cooper v. IBM Pers. Pension Plan, 274 F. Supp. 2d 1010 (S.D.

Ill. 2003) (cash balance plan is age discriminatory based on the unambiguous language in the

statute);[2] FleetBoston, 427 F. Supp. 2d at 150 (same).  Respectfully, the IBM and FleetBoston

courts reached their conclusion based on meaningless mathematical comparisons (e.g.,

comparing the benefit payable to a 60 year-old in 2011 against the benefit payable to a 30-year

old in 2041 without reducing the benefits to present value), notwithstanding that from an

economic or financial standpoint, it is undisputed that older participants in a cash balance plan

are treated the same as, or better than, similarly situated younger participants.  For the reasons

explained in detail herein, and consistent with Eaton, Tootle, Engers, Register, and Hurlic,

Defendants respectfully submit that this Court should find that Part B is not age discriminatory

and reject Plaintiffs' claim in Count 3.[3]

Plaintiffs' claim in Count 5 alleges a violation of the anti-cutback rule under ERISA

Section 204(g), which prohibits a plan amendment that reduces a participant's previously

accrued benefit.  At a fundamental level, this claim fails because the written terms of Part B

unequivocally provide that all benefits previously accrued under the prior plan formula ("Part

A") are protected, which protection is all that ERISA's anti-cutback rule requires.  See, e.g.,

---

[2]     Cooper is on appeal to the United States Court of Appeals for the Seventh Circuit, Case No. 05-3588.  The
American Benefits Council, the ERISA Industry Committee, and several large employers submitted an amicus
brief to the Seventh Circuit in Cooper urging reversal of the district court decision because of its implications
for the pension plan community as a whole.  Oral argument in the case was held on February 16, 2006.

[3]     Congress presently is considering legislation to clarify that cash balance plans are legal and do not discriminate
against older employees.  See, e.g., H.R. 2830 (2005).

King v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Industry, No. 01-CV-2604, 2003 WL 22071612, at *10 (E.D.N.Y. Sept. 5, 2003) ("[T]he proper inquiry under ERISA § 204(g)(1) is whether plaintiff's monthly benefit was in fact reduced by a plan amendment.") (internal citations and quotations omitted); Langman v. Laub, No. 97 Civ. 6063(MGC), 2002 WL 472033, at *2 (S.D.N.Y. Mar. 28, 2002) (same), aff'd, 328 F.3d 68 (2d Cir. 2003).

Counts 2 and 4 challenge particular communications about the Plan, i.e., the SPDs and Section 204(h) notice, and therefore turn on the content of those communications and the precise statutory provisions at issue. See 29 U.S.C. § 1022; 29 U.S.C. § 1054(h). See also Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 102 (2d Cir. 2005) ("[A fiduciary] has no duty to disclose to plan participants information additional to that required by ERISA.").  Even if these communications were deficient – which they were not – these claims would fail because Plaintiffs were not likely, or actually, harmed by any such deficiencies.  See Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 113 (2d Cir. 2003) (To prevail based on a deficient SPD, a plaintiff must prove that he or she "was likely to have been harmed as a result of a deficient SPD.  Where a participant makes this initial showing, however, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error."); Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst., 404 F.3d 167, 170-72 (2d Cir. 2005) (same).  The evidence at trial will demonstrate that neither Plaintiffs nor the testifying class members were denied information that, if disclosed, would have made a difference in the benefits they received.  Indeed, each was provided details regarding how the cash balance plans operated and annual statements reflecting their account balance and how much it had increased from the prior year —more than enough information to permit them to make informed employment, retirement and financial decisions.

Moreover, Plaintiffs' claims in Counts 2 and 4 lie only against the Plan Administrator, whom Plaintiffs did not name as a defendant.  Plaintiffs' Section 204(h) notice claim also is time-barred.

Finally, there are serious questions about the remedies available to Plaintiffs in the unlikely event that they prevail on one or more of their claims.  Given Plaintiffs' failure to address this issue with any specificity in their submissions to the Court, Defendants respectfully request that they be given the opportunity to brief this issue if and when it becomes necessary to do so.  However, to the extent Plaintiffs seek benefits that exceed those available under the written terms of the Plan, their claims and those of thousands of other class members are barred by the releases they signed in exchange for severance pay at the time they left CIGNA.

For the reasons set forth below, and as further supported by Defendants' Proposed Findings of Fact and Defendants' Proposed Conclusions of Law, each filed simultaneously herewith, there simply is no factual or legal basis for Plaintiffs' claims.  At the conclusion of trial, judgment should therefore be entered in favor of Defendants on all counts of the Complaint.

## II.    BACKGROUND ON CASH BALANCE PLANS AND TRADITIONAL PLANS

### A.    Traditional Defined Benefit Plans

When a person retires, a traditional defined benefit pension plan pays a participating retiree a fixed amount of money each year for life, payable in monthly installments. Typically, the annual pension benefit that an individual receives under a traditional defined benefit plan is a percentage of an employee's final salary multiplied by the employee's years of service.  As the Second Circuit explained in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000):

> A conventional defined benefit plan, adopting a final-pay formula
> would credit the employee with a specific percentage of salary for

> each year of employment. For instance, an employee might accrue a pension of 1.5% of "salary" for every year of service.  After 30 years of service he would have a pension equivalent to 45% of "salary."  Salary may be defined as final salary, or the average of salary in the last five years.

229 F.3d at 158 n.4 (citation omitted).

By design, participants in traditional pension plans earn most of their benefits in their last years of service.  Defendants' Proposed Findings of Fact ("DFF") ¶ 3.  The annual pension benefit for life that the participant is entitled to receive is generally referred to as an annuity, and has an actuarially equivalent present value based on interest rates and the participant's age and life expectancy.  DFF ¶ 2.  In other words, using certain actuarial assumptions, the value of the annuity can be expressed as a lump sum value today.  As explained in more detail below, ERISA governs the interest rate to be used in determining the actuarially equivalent present value of pension benefits.  Esden, 229 F.3d at 159.

Under a traditional plan, an employee who elects to take his benefit before normal retirement age (typically age 65) generally would have his benefit amount actuarially reduced to account for the earlier payout date.  For example, if an employee is entitled to a benefit of $1,000 per month commencing at age 65, he or she might be entitled to receive a benefit of approximately $500 per month if he or she commences his benefit 10 years earlier, at age 55.  The present value of these two benefits is the same, taking into account mortality and discounting to present value at the statutory discount rate.  DFF ¶ 4.

Some plans, however, include subsidized early retirement benefits available as a benefit option.  A subsidized early retirement benefit is one that commences before normal retirement age and has a present value that is greater than the present value of the normal retirement benefit.  For example, if under the plan the employee in the above example was entitled to an early

retirement benefit of $700 per month (instead of $500 per month), then the value of that early

retirement benefit would be subsidized (enhanced) by $200 per month.  DFF ¶ 4.

B.     **Cash Balance Plans**

Although cash balance plans differ from traditional plans like those described above, they

are a type of defined benefit plan.  Esden, 229 F.3d at 158.  Cash balance plans use a different

formula for calculating the amount of pension benefits that an individual will receive.

Specifically,

> Under a cash balance pension plan, a hypothetical account is
> established in each participant's name.  Benefits are credited to
> that "account" over time, driven by two variables:  (1) the
> employer's hypothetical "contributions," and (2) hypothetical
> earnings expressed as interest credits.  Employer "contributions"
> are usually expressed as a percentage of salary, the rate of which
> may vary with employee tenure.  Interest credits may be at a fixed
> interest rate, but more often they are tied to an extrinsic index – for
> example, U.S. Government securities of a specified maturity – and
> they vary accordingly.    Each year an employee receives a
> statement of her "account" balance, and can therefore see the value
> of her pension benefit.

Id.  These plans operate more like defined contribution arrangements (such as 401(k) plans), but

they are subject to the legal constraints and rules applicable to defined benefit plans.

According to the Pension Benefit Guaranty Corporation, over 1,500 cash balance plans

and other similar "hybrid" plans were in existence as of 2003, which provided pension benefits

to over 8 million participants, one quarter of the total population covered by defined benefit

plans.  See Pension Benefit Guaranty Corp., Pension Insurance Data Book 2004, at 59 (2005), at

http://www.pbgc.gov/docs/2004databook.pdf (last visited June 22, 2006).  This case challenges

the fundamental design of all of these plans.

III.    **THE CIGNA PENSION PLAN**

    A.    **CIGNA's Part A Traditional Plan And The Creation Of The Part B Cash Balance Plan.**

Prior to 1998, CIGNA was the plan sponsor of a traditional defined benefit pension plan, now known as "Part A." Depending on an employee's hire date and employment history, the employee would either be entitled to benefits under the Tier 1 or Tier 2 formula in the Plan. The Tier 1 formula provides an age 65 annuity benefit equal to 2% of final three-year average pay for each year of service up to 30 years, less a "social security offset." The Tier 2 formula provides an age-65 annuity benefit equal to 1⅔% of final five-year average pay for each year of service up to 35 years, less the social security offset. Both the Tier 1 and Tier 2 formulas offered subsidized early retirement benefits commencing at age 55. DFF ¶ 25.

    In November 1997, CIGNA's Chief Executive Officer ("CEO") signed Amendment No. 4 to the Plan, freezing benefit accruals under Part A for many employees. DFF ¶ 24. On December 21, 1998, CIGNA's CEO signed a second plan amendment adopting the Part B cash balance plan design for these employees, and all rehired employees, to be effective retroactively as of January 1, 1998.[4]

    Certain older, longer service employees, however, were grandfathered into the prior plan formula. Specifically, active participants on January 1, 1998 whose age plus service totaled at least 45 and who were not "new formula participants" automatically continued to participate

---

[4]    The Plan Administrator had originally determined that employees rehired after January 1, 1998 would be placed into Part B. In Depenbrock v. CIGNA Corp., 389 F.3d 78 (3d Cir. 2004), however, the Third Circuit ruled that an employee (John Depenbrock) should have continued in Part A upon rehire because the amendment creating Part B and modifying the rule applicable to rehires was not valid until signed by the CEO on December 21, 1998. Id. at 83. The Plan Administrator has notified 194 other rehires that it is recalculating their benefits in accordance with the terms of Part A. Plaintiff Amara is one of those rehires and currently is receiving her benefits under Part A. DFF ¶ 223.

under Part A.  (New formula participants generally were those who became plan participants on or after January 1, 1989.)  That is, these employees were not subject to the freeze (Amendment No. 4) and were not subject to the part B cash balance formula.  DFF ¶ 33.  Instead, these older, longer service employees continued to earn benefits under the same Part A formula that had applied to them previously.

### B.    The Terms Of Part B

#### 1.    Benefit Credits And Interest Credits

Under Part B, participants earn "benefit credits" based on a percentage of the pay they receive during their employment with CIGNA.  These benefit credits are added to the participant's account each year.  The percentage is age- and service-favored, i.e., an older employee will receive the same or a higher percentage of pay than a similarly situated younger employee and a longer service employee will receive the same or a higher percentage than a similarly situated shorter service employee.  DFF ¶ 45.  The table below reflects the benefit credit rate under the Plan.

| Age Plus Service | Rate Applied to Pay Up to Integration Level[5] | Rate Applied to Pay Over Integration Level |
|---|---|---|
| Under 35 | 3% | 4.5% |
| 35 – 44 | 4% | 5.5% |
| 45 – 54 | 5% | 6.5% |
| 55 – 64 | 6% | 7.5% |
| 65 or over | 7% | 8.5% |

DFF ¶ 45.

For example, an employee earning $60,000 who is age 40 with 10 years of service in 2003 (i.e., age plus service is 50) receives a benefit credit in 2003 of $3,247.50 (5% of $43,500

---

[5]    The CIGNA Pension Plan provides that the "Integration Level" is one-half of the Social Security taxable wage limit in each year (e.g., $34,200 in 1998 and $43,500 in 2003).

plus 6.5% of $16,500).  Had the same employee been age 60 rather than 40, the pay credit would

be $1,200 <u>higher</u>, or $4,447.50 (7% of $43,500 plus 8.5% of $16,500).  For any two participants

who have the same service and pay history, the older one will receive a benefit credit in any

given year that is the same or higher than the younger employee.  Similarly, as an employee

continues in service, his or her benefit credit rate will either remain the same or increase from

one year to the next.  DFF ¶ 46.

The interest rate is the same for all participants:  the interest on five-year Treasury

Constant Maturities plus ¼ percent, subject to a 4.5% minimum and a 9% maximum.  In

addition, all participants in Part B earn interest on their account balances.  DFF ¶ 47.

## 2.    Opening Account Balances, Protected Minimum Benefits, And Retirement.

Part B contains certain special protections for participants who were converted to Part B

effective January 1, 1998, and some rehired employees.  First, these participants were given

opening account balances based on the lump sum value of their benefits under the prior plan as

of December 31, 1997.  For most employees, the opening account balance was based on the

lump sum value of their age-65 benefit; for certain older employees (those who were employed

on January 1, 1998 and whose age plus service as of that date totaled at least 55), the opening

balance was increased to the lump sum value of their <u>more-valuable</u> age 62 subsidized early

retirement benefit.  DFF ¶ 51.  In addition, for these older employees, the benefit was converted

into an opening account balance using a lower (and hence more favorable) interest rate.  DFF ¶

52.

Part B also provides that if a participant has earned a particular benefit in a particular

form under the old plan, e.g., a subsidized early retirement annuity benefit, that benefit will be

protected.  Specifically, Section 1.1(c) of Part B provides:

> In the case of a participant who has a Part A Accrued Benefit which is converted into an Initial Retirement Account, such Participant's Accrued Benefit, expressed in the form of an immediate lump sum distribution, shall in no event be less than the present Actuarial Value (determined using the Applicable Interest Rate and the Applicable Mortality Table), of the Participant's Minimum Benefit.

DFF ¶ 58. The Minimum Benefit is defined in Part B as a participant's age-65 annuity benefit under Part A, enhanced by the value of the "Preserved Spouse's Benefit," if applicable.

DFF ¶ 59. In addition, Section 7.3 of the Plan protects other benefits, in other benefit forms (e.g., early retirement subsidized benefits), to which an employee was entitled under the prior formula. Accordingly, for any participant – regardless of age – the participant's previously accrued benefit is protected. DFF ¶¶ 61-62.

At retirement, or upon termination of employment, a participant is entitled to his or her account balance if he or she elects to receive benefits in the form of a lump sum. Alternatively, a participant can elect to receive benefits in one of several other forms available, including a single life annuity (stream of monthly payments payable for life) or a joint and survivor annuity (stream of monthly payments for life, with additional payments payable to a spouse for the life of the spouse). DFF ¶ 63.

## IV. COMMUNICATIONS REGARDING FREEZING ACCRUALS UNDER PART A, THE CREATION OF PART B, AND THE PRECISE AMOUNTS IN PARTICIPANTS' PART B ACCOUNTS.

In November 1997, before the cash balance plan was implemented, CIGNA published a newsletter advising participants that benefit accruals under Part A would be frozen for certain participants effective January 1, 1998 pending the adoption of the cash balance plan. DFF ¶¶ 16-69. CIGNA also distributed Retirement Information Kits describing in detail how the cash balance plan would work and how opening account balances would be calculated. DFF ¶¶ 170-

90.  The Plan Administrator for the Plan published an SPD that was provided to employees and put into new hire benefits binders (binders that also contained descriptions of CIGNA's other benefit plans).  DFF ¶ 205.  On an annual basis, CIGNA also sent (and continues to send) personalized statements to each participant indicating the amount of his or her account balance at the end of the year and how much that account balance changed from the prior year (as well as certain other information).  DFF ¶¶ 206-10.  Separately, CIGNA provided employees with an annual Total Compensation Report indicating their account balance, the approximate annuity benefit to which the employee was entitled, and other details to assist in retirement planning. DFF ¶¶ 211-18.  In more recent years, CIGNA has published its SPD on its intranet and has developed a web-based system for participants to view their account balance and obtain benefit estimates on-line. DFF ¶¶ 220-21.

## ARGUMENT

**I.    JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 3 BECAUSE PART B IS NOT AGE DISCRIMINATORY.**

### A.    Part B Treats Older Employees At Least As Well As It Treats Younger Employees.

The Court should enter judgment in favor of Defendants on Count 3 because Part B is not age discriminatory.  To the contrary, benefits under Part B, and the accrual of those benefits, increase with age.  While the interest credit rate under Part B is the same for all participants, regardless of age, the benefit credit rate is the same or higher for older employees than similarly situated younger employees.  DFF ¶ 45.  As a result, the account balance of an older employee will be the same as or higher than the account balance of a younger employee with the same service and salary at every point in time.  In other words, in any given year, the older employee's benefit will equal or exceed the benefit payable to a similarly situated (i.e., same salary history

and years of service) younger employee.  DFF ¶ 48.  This result, of course, cannot be described as age discriminatory.

Notwithstanding that Part B on its face does not discriminate against older employees, Plaintiffs engage in twisted math and contorted statutory construction to construe this age-favored plan design as if it discriminates against older employees.  Specifically, Plaintiffs' entire argument that Part B is age discriminatory is based on the meaningless comparison of the annuity values at normal retirement age (age 65) of an older and younger participant.  For example, Plaintiffs argue that Part B is age discriminatory by comparing the annuity payment that a 50-year-old will get in 2021 (when he or she turns 65) against the annuity payment that a 35-year-old will get in 2036 (when he or she turns 65).  See Pls' Trial Brief at 19-22.  Such a comparison makes no sense because the 50 year-old's benefit is paid out 15 years earlier than the 35-year old's benefit, and therefore has 15 years fewer to accumulate interest.  This is not age discrimination; it merely reflects the time value of money.[6]  The fact that the younger and older participants can elect to receive their benefits at the same time and, if they do so, the older employee will receive the same, or more, money than the younger employee, drives home this point.  DFF ¶ 100.

An example also illustrates the point.  Consider two employees who started work at CIGNA at the beginning of 1998 when the cash balance conversion occurred – Employee Y,

---

[6]     See, e.g., Metz v. United Techs. Corp., 754 F.2d 63, 66 (2d Cir. 1985) ("[I]n computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.")(citations omitted); Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 536-37 (1983) ("In all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.") (internal quotations omitted).

who was age 45 at the time, and Employee O who was age 50.  Assume that both employees

receive the same salary until the end of 2002 (assumed to be $30,000 in 1998 and growing 4.5%

each year) and then leave for other jobs.  During the five-year period, both employees will

receive the same pay credits (based on 5% of pay since all of their pays will be under the social

security integration level), the same interest credits (based on the actual rates in effect those

years) and the same account balance.  The table below, which applies equally to both employees,

shows the development of their pay credits, interest credits and account balances as of the end of

each year. [7]

| Year | Pay | Pay Credits | Interest Credits | Account at End of Yr. |
|------|--------|-------------|------------------|------------------------|
| 1998 | 30,000 | 1,500 | 0 | 1,500 |
| 1999 | 31,350 | 1,568 | 72 | 3,140 |
| 2000 | 32,761 | 1,638 | 195 | 4,973 |
| 2001 | 34,235 | 1,712 | 296 | 6,981 |
| 2002 | 35,776 | 1,789 | 314 | 9,084 |
|      |        |       |     |       |
| 2012 | -- | -- | 5,023 | 14,107 |
| 2017 | -- | -- | 3,473 | 17,580 |

DFF ¶ 101.

At the end of 2002, both employees have the same account balance of $9,084.  Employee

Y is then age 50 and Employee O is age 55.  Assume that the account balances, if left untouched,

will grow at a 4.5% interest-crediting rate (the minimum under Part B) as follows:

Year                                    Account Balance (rounded)

2002 (both depart)                 $ 9,100

2012 (Employee O turns 65)      $14,100

---

[7]     For simplicity of illustration, the table adds interest credits at the end of the year.

2017 (Employee Y turns 65)        $17,600

DFF ¶ 101.

Plaintiffs' methodology compares the $14,100 "age 65 benefit" that the older employee

will have in 2012 with the $17,600 "age 65 benefit" that the younger employee will have in

2017.  Pls' Trial Brief at 29-31.  Because $17,600 is nominally larger than $14,100 (although not

more valuable given the time value of money), Plaintiffs suggest that age discrimination results

and that the younger employee had a higher rate of benefit accrual than the older employee from

1998 through 2002.[8]  This analysis is nonsensical and not consistent with, let alone compelled

by, the terms of the statute upon which Plaintiffs rely.

Specifically, the statute that Plaintiffs claim Part B violates is ERISA Section

204(b)(1)(H)(i), which provides in relevant part that:

> a defined benefit plan shall be treated as not satisfying the
> requirements of this paragraph if, under the plan, an employee's
> benefit accrual is ceased, or the rate of an employee's benefit
> accrual is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i).

Plaintiffs root their entire analysis in the premise that this provision unambiguously

requires that age discrimination be tested based exclusively on a comparison of age-65 annuity

benefits.  Admittedly, two courts have agreed with this premise and have found that cash balance

plans are per se age discriminatory and illegal.  See Cooper v. IBM Pers. Pension Plan, 274 F.

---

[8]    For ease of illustration, the example speaks of a 45-year-old and a 50-year old who are two different people.
While ERISA Section 204(b)(1)(H)(i) does not seem to require a comparison of an employee's rates of benefit
accrual to those of any other employee, the same principles apply if one analyzes a single individual at
different ages.  Unless one discounts the benefits accrued by an individual at various ages to present value in
the year the benefit is earned, comparisons are distorted by the time value of money.  Indeed, one might see a
declining accrual pattern simply because a dollar invested in 2000 is worth more than a dollar invested in 2010.
DFF ¶ 102.

Supp. 2d 1010 (S.D. Ill. 2003); <u>FleetBoston</u>, F. Supp. 2d at 150.  Several other courts, however, have disagreed, and have correctly rejected claims that cash balance plans are age discriminatory.  <u>See</u> <u>Eaton v. Onan, Corp.</u>, 117 F. Supp. 2d 812 (S.D. Ind. 2000) (rejecting claim that cash balance plan design is age discriminatory); <u>Tootle v. ARINC, Inc.</u>, 222 F.R.D. 88 (D. Md. 2004) (same); <u>Register v. PNC Fin. Servs., Group</u>, No. 04-6097, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005) (same); <u>Engers v. AT&T Corp.</u>, No. 98-3660, 2001 U.S. Dist. LEXIS 25889 (D.N.J. June 6, 2001) (same);  <u>Hurlic v. S. Cal. Gas Co.</u>, No. 05-5027 (C.D. Cal. Mar. 24, 2006) (attached as Exhibit A).  With due respect to the <u>Cooper</u> and <u>FleetBoston</u> judges, and as explained below, ERISA Section 204 does not compel the analysis and absurd results that Plaintiffs advocate.

## B.     Plaintiffs' Argument That ERISA Section 204(b)(1)(H)(i) Requires Comparisons Of Age-65 Annuity Benefits Is Wrong.

Plaintiffs' interpretation of ERISA Section 204(b)(1)(H)(i) requires stringing together three leaps of faith and strained statutory construction.  More specifically, Plaintiffs' argument requires:

> • that the phrase "rate of an employee's benefit accrual" in ERISA Section 204(b)(1)(H)(i) <u>must</u> mean the exact same thing as the term "accrued benefit," a specifically defined term under ERISA Section 3(23), 29 U.S.C. § 1002(23);

> • that the term "accrued benefit" be limited to a benefit expressed as an age-65 annuity; and

> • that age-65 annuity benefit differences are attributable to age discrimination, as opposed to the number of years until the benefit will be paid and the time value of money.

Plaintiffs argue that if the Court agrees with these premises, then it must find that Part B (and effectively all other cash balance plans) are illegal.  <u>See</u> Pls' Trial Brief at 17-31.  Each of these premises, however, is wrong as a matter of law.

1.     **The Phrase "Rate Of An Employee's Benefit Accrual" Does Not Refer To The "Accrued Benefit."**

First, the phrase "rate of an employee's benefit accrual" in ERISA Section

204(b)(1)(H)(i) is not the same thing as the defined term "accrued benefit" under ERISA Section

3(23), 29 U.S.C. 1002(23).  To the contrary, when Congress intended to refer to the accrued

benefit in ERISA, it used the words "accrued benefit" in the statute.  See, e.g., 29 U.S.C. §§

1053, 1054, 1055.  Similarly, when Congress intended to refer to the annual rate of change in an

age-65 annuity benefit, it explicitly said so.  For example, ERISA Section 204(b)(1)(B) – another

part of the same statutory provision at issue here – explicitly refers to the "accrued benefit

payable at the normal retirement age" and requires testing of "the annual rate at which any

individual . . . can accrue the retirement benefits payable at normal retirement age . . . ."

29 U.S.C. § 1054(b)(1)(B) (emphasis added).  The fact that Congress did not use the phrase

"accrued benefit" or benefits "payable at normal retirement age" in Section 204(b)(1)(H)(i), but

instead chose to use different words – "benefit accrual" – reflects that Congress intended a

different meaning.[9]  See Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002) ("[I]t is a

general principle of statutory construction that when Congress includes particular language in

one section of a statute but omits it in another section of the same Act, it is generally presumed

that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal

quotations omitted); United States v. Gaggi, 811 F.2d 47, 56 (2d Cir. 1987) ("We presume that

---

[9]     The above-quoted statute is instructive specifically because it differs so markedly from the language in Section 204(b)(1)(H)(i), the provision at issue in this case.  Had Congress intended Section 204(b)(1)(H)(i), to be tested the same way the backloading rules are tested, Congress could have used the same language, or could at least have added the phrase "payable at normal retirement age" to Section 204(b)(1)(H)(i), as it did with the backloading rules.  That different language was used – "rate of benefit accrual" and without any reference to when the benefit was payable – confirms that a different meaning was intended.

- 17 -

the use of different terminology within a body of legislation evidences a Congressional purpose

to differentiate.").

   Unlike the term "accrued benefit," the phrase "rate of an employee's benefit accrual" has

no specific definition under ERISA.  Thus, the Register, Eaton and Tootle courts relied on the

consequences of different interpretations, economic principles and applicable legislative history,

and rejected the argument that "accrued benefit" under ERISA unambiguously and necessarily

means the same thing as "benefit accrual."  See Register, 2005 WL 3120268, at *6 ("ERISA

does not define the 'rate of an employee's benefit accrual' for purposes of applying the ERISA

age discrimination provisions."); Eaton, 117 F. Supp. 2d at 829-30 ("[T]hese provisions [Section

204(b)(1)(H)(i)] do not require a measure of a participant's rate of benefit accrual that is based

solely on the value of the participant's annuity payable at normal retirement age."); Tootle, 222

F.R.D. at 93-94 (same).

   As will be explained at trial, there are many different ways to measure the rate at which

benefits are accrued under a plan, depending on the purpose for which the measurement is taken

and the type of plan at issue.  The Eaton court held:

> The concept of the "benefit accrual rate" does not have a single,
> self-evident meaning, especially in the world of pension plan
> regulation.  The term is used and defined in different ways and for
> different purposes under ERISA and the Internal Revenue Code.

117 F. Supp. 2d at 830 (also collecting examples); see also Register, 2005 WL 3120268, at *7

(same).[10]

----

[10]   The Eaton court further held:

> The argument distinguishing between "accrued benefit" and "rate of benefit
> accrual" may seem like pretty fine hair splitting.  Nevertheless, pension law is a
> highly technical field where hairs are split with ever finer razors.

continued . . .

Because of the nature of cash balance plans, the <u>Register</u>, <u>Eaton</u>, and <u>Tootle</u> courts held that age discrimination claims involving a cash balance plan must be examined by looking at changes to the account balance from year to year.  <u>See, e.g.</u>, <u>Register</u>, 2005 WL 3120268, at *7 ("Cash balance plans are not defined in terms of an age-65 annuity, rather they are defined in terms of an account balance that grows with pay credits and interest.  Therefore, it follows logically that the rate of benefit accrual is determined by the change in the account balance."); <u>Eaton</u>, 117 F. Supp. 2d at 832-33 ("[T]he rate of benefit accrual [in a cash balance plan] should be defined as the change in the employee's cash balance account from one year to the next."); <u>Tootle</u>, 222 F.R.D. at 94 (same).  Such a comparison reflects the actual economic benefit provided to older and younger participants and demonstrates whether an older participant is better or worse off than a similarly situated younger participant.  Applying this test to Part B confirms that there is no age discrimination.  <u>See</u> <u>supra</u> at 12-16.

The legislative history behind Section 204(b)(1)(H)(i) demonstrates that Congress's principal, if not, exclusive, purpose in enacting the statute was to protect employees who continued to work <u>after</u> normal retirement age.  <u>See</u> <u>Eaton</u>, 117 F. Supp. 2d at 826-29 ("[The legislative history] provides considerable support for defendants' argument that Congress did not intend for the pension age discrimination provisions to apply to the rate of benefit accrual for participants under the age of 65.").[11]  If Congress was concerned about protecting employees who work after normal retirement age, it would make no sense to interpret the provision to

---

117 F. Supp. 2d at 830 n.8 (internal parenthetical omitted).

[11]    <u>See also</u> <u>Tootle</u>, 222 F.R.D. at 93 ("[L]egislative history and statutory language provide strong evidence that [ERISA's age discrimination provisions are] not intended to protect workers until after they have attained normal retirement age."); <u>Engers</u>, 2001 U.S. Dist. LEXIS 25889, at *10 ("[I]t is clear to this court that . . . Congress intended both the ADEA and ERISA provisions [  ] to apply only to those employees who continue to work after the normal retirement age of sixty-five.").

require testing based exclusively on benefits payable <u>at</u> normal retirement age, as Plaintiffs

suggest.

Moreover, when Congress enacted Section 204(b)(1)(H)(i), it provided an example in the

Conference Report of how the statute should work to ensure that plans were not discriminating.

<u>See</u> <u>Eaton</u>, 117 F. Supp. 2d at 830, citing H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868,

4026.  The Conference Report is "the most authoritative source[] on the meaning of legislation."

<u>Chen v. U.S. Dep't of Justice</u>, 434 F.3d 144, 153 (2d Cir. 2006).[12]  Yet if Plaintiffs'

interpretation of Section 204(b)(1)(H)(i) were correct, the example in the Conference Report

would itself be illegal because the accrual formula described – when measured in terms of an

age-65 annuity – actually decreases with age and would be illegal.  Specifically, the first accrual

described in the example is $10 per month at age 65.  <u>See</u> H.R. Conf. Rep. 99-1012, 1986

U.S.C.C.A.N. 3868, 4026.  The second accrual also is $10 per month, but to an age-66 annuity.

<u>See</u> <u>id.</u>  When this latter amount is converted to an age-65 annuity (as Plaintiffs' interpretation of

Section 204(b)(1)(H)(i) would require), the amount is less than $10 per month, because $10 per

month starting at age 66 is worth less than $10 per month starting at age 65.  This is due to the

additional year of payout of the benefit from age 65 to age 66.  <u>See</u> <u>Eaton</u>, 117 F. Supp. 2d at

830.  The same is true with the third accrual of $10 per month at age 67, because that is less than

$10 per month at age 66 (and even less per month at age 65).  <u>See</u> <u>id.</u>  As the <u>Eaton</u> court

explained:

---

[12]    <u>See also</u> <u>Thornburg v. Gingles</u>, 478 U.S. 30, 43 n.7 (1986) ("We have repeatedly recognized that the authoritative source for legislative intent lies in the Committee Reports on the bill."); <u>United States v. Awadallah</u>, 349 F.3d 42, 54 (2d Cir. 2003) ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.") (citations and internal quotation marks omitted).

> Under plaintiffs' interpretation of the statutes, however, if benefit accruals after normal retirement age must be measured in terms of annuities payable at normal retirement age, i.e., in a year before the benefit accruals are earned, then the example in the Conference Report itself would become illegal! . . .  <u>Yet the OBRA 1986 Conference Report included this example to describe the intended effect of compliance with the new law.  Plaintiffs' interpretation would transform that example of compliance into an example of a violation.  That is a strong sign that there is a problem with plaintiffs' interpretation</u>.

<u>Id.</u> (emphasis added, internal citation omitted).

These same mathematical principles, under Plaintiffs' interpretation of ERISA Section 2004(b)(1)(H)(i), would cause the accrual pattern for many common and traditional defined benefit plans to be age discriminatory with respect to benefits earned by employees who work after normal retirement age.  Indeed, even traditional career pay plans and final average pay plans (the most common plan designs for non-union employees in the United States) would be age discriminatory under Plaintiffs' approach for accruals after age 65.  Likewise, Plaintiffs' construction of Section 204(b)(1)(H)(i) would render certain types of contributory defined benefit plans (plans that are specifically authorized in ERISA Section 204(c)(2), 29 U.S.C. § 1054(c)(2)) illegal because the age-65 annuity benefit in such plans is affected by the number of years to payout of the benefit.  DFF ¶ 125.  These absurd results demonstrate that Plaintiffs' interpretation of Section 204(b)(1)(H)(i) cannot stand.[13]

---

[13]    <u>See</u> <u>United States v. Am.Trucking Ass'ns</u>, 310 U.S. 534, 542-44 (1940) ("When [a literal interpretation of a statute] has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act.  Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has followed that purpose, rather than the literal words.").

**2.     The Term "Accrued Benefit" Does Not Require That It Be Expressed In The Form Of An Age-65 Annuity.**

Second, contrary to the premise of Plaintiffs' argument, even if the term "benefit accrual" was the same as the term "accrued benefit," there is no reason that such a benefit must be expressed in the form of an age-65 annuity.  ERISA Section 3(23) defines "accrued benefit" as "the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A) (emphasis added).  29 U.S.C. § 1054(c)(3), in turn, provides:

> For purposes of this Section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age. . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit.

29 U.S.C. § 1054(c)(3) (emphasis added).  Thus, ERISA specifically permits an accrued benefit "to be determined as an amount other than an annual benefit commencing at" age 65.  Id.

Moreover, "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (internal quotations omitted); Duncan v. Walker, 533 U.S. 167, 174 (2001) (same).  Yet, Plaintiffs' assertion that the "rate of an employee's benefit accrual" in ERISA Section 204(b)(1)(H)(i) unambiguously refers to the normal (age-65) annuity benefit would render superfluous another provision of the same statute, ERISA Section 204(b)(1)(H)(v).  That section provides that "the subsidized portion of any early retirement benefit [should be] disregarded in determining benefit accruals."  29 U.S.C. § 1054(b)(1)(H)(v) (emphasis added).  If, however, the only way to measure benefit accruals is with reference to benefits payable at normal retirement age, as

- 22 -

Plaintiffs claim, then any reference to <u>early</u> retirement benefits is nonsensical and ERISA Section 204(b)(1)(H)(v) would be meaningless.  In other words, there is no subsidized early retirement benefit to "disregard" if "benefit accruals" must, as Plaintiffs argue, be measured exclusively with respect to the annuity payable at normal retirement age.  Such a contorted interpretation of the statute cannot stand.

Indeed, when Congress intended to require parties to compare benefits payable at normal retirement age, <u>it specifically said so in the statute</u>.  For example, ERISA's 133⅓% "backloading" rules provide in relevant part that "[a] defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit <u>payable at the normal retirement age</u> is equal to the normal retirement benefit."  29 U.S.C. § 1054(b)(1)(B) (emphasis added).  If the term "accrued benefit" itself automatically requires that the benefit only be measured at normal retirement age, as Plaintiffs allege, the emphasized language in the statute – "payable at normal retirement age" – would be superfluous.  Such a tortured interpretation is contrary to the canons of statutory construction.  <u>See</u> <u>TRW Inc.</u>, 534 U.S. at 31; <u>Duncan</u>, 533 U.S. at 174 (same).

> **3.    Any Differences In The Age-65 Annuity Benefits Are Attributable To The Time Value Of Money And Differences In The Number Of Years To Payout Of The Benefit, Not "Because Of The Attainment Of Any Age."**

Lastly, as explained previously, any unfavorable differential in the age-65 annuity benefit of an older participant compared to a younger participant is due exclusively to differences in the number of years to payout of the benefit and the time value of money.  <u>See</u> <u>supra</u> at 13-16.  Such differences are not "because of age."  <u>See</u> <u>Eaton</u>, 117 F. Supp. 2d at 831 ("[T]he effects of the time value of money [are what] plaintiffs attack [in their 204(b)(1)(H) claim]."  Indeed, as an economics matter, the interest earned in cash balance plans over time is no different than the

effects of interest on defined contribution plans, or of cost of living increases under the Social

Security system.  See id.  Such economic realities are perfectly lawful in these contexts.  The

Eaton court explained that "[i]t is difficult to fathom why Congress might have wanted to outlaw

similar effects under defined benefit plans."  Id.  Even the Cooper court – the court that found

that cash balance plans were *per se* discriminatory – acknowledged that from an economic

standpoint, its analysis made no sense:

> According to Defendants, it is economically nonsensical to
> compare a 25 year old employee's rate of benefit accrual with a 64
> year old employee's rate of benefit accrual by reference to the age
> 65 benefit that each has accumulated, because the 64 year old
> employee is set to receive his benefit much sooner. Accordingly, §
> 204(b)(1)(H)'s phrase "rate of benefit accrual" should be
> interpreted to refer to benefits payable immediately upon
> termination of employment.
>
> From an economist's perspective, Defendants have a good
> argument.  A dollar today is worth more than the promise of a
> dollar a year from now.

274 F. Supp. 2d at 1016.

In short, regardless of how the rate of accrual is measured, Part B is not age

discriminatory.  Plaintiffs' claim in Count 3 therefore fails as a matter of law.

### C.    The Treasury Department Has Consistently Endorsed Cash Balance Plans As Not Being Age Discriminatory.

Plaintiffs' interpretation of ERISA Section 204 (b)(1)(H)(i) also ignores the Treasury

Department's repeated and consistent determination that cash balance plans are not inherently

age discriminatory.  The Second Circuit in Esden explained that a "consistent and reasonable

interpretation by the responsible agency is entitled to deference, regardless of its form of

publication."  229 F.3d at 169.  See also Auer v. Robbins, 519 U.S. 452, 462 (1997) (agency's

interpretation set forth in amicus brief was entitled to deference where "[t]here is simply no

reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question"); <u>Marcella v. Capital Dist. Physicians' Health Plan, Inc.</u>, 293 F.3d 42, 48 (2d Cir. 2002) ("Even though not formally promulgated as regulations, these opinion letters, as the views of the agency charged with implementing ERISA, are at least a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and we have often relied on them for guidance.") (internal quotations and citations omitted).  Here, the Treasury Department's endorsement of cash balance plans is clear:

- In 1991, the Treasury Department published safe harbor regulations for cash balance plans.[14]  <u>See</u> Treas. Reg. § 1.401(a)(4)-8(c)(3)(iii)(B).  In the preamble to the regulations, the Treasury Department stated that "[t]he fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation [i.e., the pay credit] will not cause a cash balance plan to fail to satisfy the requirements of section 411(b)(1)(H), relating to age-based reductions in the rate at which benefits accrue under a plan." 56 Fed. Reg. 47,524 (Sept. 19, 1991)(codified at 26.C.F.R. pt. 1).  This is an explicit rejection of Plaintiffs' theory that cash balance plans are inherently age discriminatory because of the increased time that younger participants have to earn interest.

- In 1996, the Treasury Department published IRS Notice 96-8, approving cash balance plan designs with interest credits that accrue up-front (like Part B) and describing how lump sum benefits in a cash balance plan should be determined.  <u>See</u> IRS Notice 96-8, Part III.A.  The Treasury Department would not have issued rules describing how to calculate lump

---

[14]    The Second Circuit in <u>Esden</u> cited approvingly to these safe harbor regulations.  229 F.3d at 169-70.

sums in a cash balance plan if its interpretation of ERISA would render all cash balance plans inherently illegal.

- In 1999, IRS Chief Counsel Stuart Brown testified that interest credits under cash balance plans do not cause these plans to violate Code Section 411(b)(1)(H), the Code's counterpart to ERISA Section 204(b)(1)(H).  <u>See</u> Testimony before the Senate Committee on Health, Education, Labor and Pensions, 1999 TNT 183-11 (Sept. 21, 1999).

- In 2002, the Treasury Department proposed regulations that squarely rejected the notion that cash balance plans are inherently age discriminatory.  <u>See</u> 67 Fed. Reg. 76,123-01 (Dec. 11, 2002)(codified at 26 C.F.R. pt. 1).[15]

- In its revenue proposals for 2005, 2006, and 2007, the Treasury Department confirmed that "cash balance plans and cash balance plan conversions are not inherently age discriminatory."[16]

In short, as the <u>Register</u> court held, "[t]he Department of Treasury has consistently stated that cash balance plans are not age discriminatory."  2005 WL 3120268, at *7.  That determination, which is consistent with the legislative history and the economic reality of the cash balance plan design, is entitled to deference.[17]

---

[15]   These proposed regulations have since been withdrawn and were replaced by the Treasury Department's legislative proposals, which also endorse cash balance plans, and which are noted in the following footnote.

[16]   <u>See</u> Department of Treasury, General Explanation of the Administration's Fiscal Year 2005 Revenue Proposals 104 (2004); Department of Treasury, General Explanation of the Administration's Fiscal Year 2006 Revenue Proposals 82 (2005); Department of Treasury, General Explanation of the Administration's Fiscal Year 2007 Revenue Proposals 66 (2006).

[17]   Plaintiffs mistakenly rely on the Treasury Department's interpretation of ERISA Section 204(h) (regarding certain disclosure requirements) to support their interpretation of the age discrimination prohibition in ERISA Section 204(b)(1)(H).  <u>See</u> Pls' Trial Brief at 17-18.  As explained previously, however, there are numerous ways to determine a rate of benefit accrual, <u>depending on the purpose for which the rate is being measured</u>.  Obviously, ERISA's age discrimination provision has a different purpose than ERISA's Section 204(h) notice provision, so it is reasonable for the Treasury Department to interpret these two provisions differently,

continued . . .

### D. Richards v. FleetBoston Was Wrongly Decided.

Plaintiffs rely heavily on Judge Hall's recent decision in FleetBoston, in which she agreed with the holding of the district court in Cooper v. IBM that all cash balance plans are inherently age discriminatory.  See FleetBoston, F. Supp. 2d at 163-64 (citing Cooper, 274 F. Supp. 2d 1010).  Judge Hall explained the basis of her decision as follows:

> In light of the great similarity that this phrase [rate of benefit accrual] bears to the statutorily defined term "accrued benefit," and the fact that ERISA requires accrued benefit to be measured as an annual benefit commencing at normal retirement age for defined benefit plans, but requires accrued benefit to be measured as the balance of an individual's account for defined contribution plans, the term "rate of benefit accrual," as used in section 204(b)(1)(H)(i), refers to rate measured as a change in the annual benefit commencing at normal retirement age.  The statute is unambiguous in this respect, and the court need not inquire further into its meaning.

FleetBoston, F. Supp. 2d at 164.  Defendants submit that Judge Hall's decision in FleetBoston was wrong for at least five reasons.

First, Judge Hall offers no legal basis for her conclusion that "rate of benefit accrual" must mean the same thing as the specifically defined term "accrued benefit."  As explained previously, Congress could have used the term "accrued benefit" in Section 204(b)(1)(H)(i) but did not do so.  See supra at 17.  Congress also could have required that ERISA's age

---

consistent with their respective (and different) purposes.  Thus, although the Treasury Department may have determined that it was appropriate to measure rates of benefit accrual one way for purposes of ERISA Section 204(h) notice requirements, the Treasury Department has determined that a different interpretation is appropriate for purposes of ERISA's age discrimination provision.  As the Eaton court held:

> The concept of the "benefit accrual rate" does not have a single, self-evident meaning, especially in the world of pension plan regulation.  The term is used and defined in different ways and for different purposes under ERISA and the Internal Revenue Code.

Eaton, 117 F. Supp. 2d at 830 (also collecting examples).

discrimination provision be tested in the same manner as ERISA's anti-backloading rules by using the same language as in those rules, 29 U.S.C. § 1054(b)(1)(B).  See supra at 17.  It did not, and as discussed above, the agency charged with interpreting these different statutory phrases has declined to adopt the reading that was adopted in FleetBoston.  See supra at 24-26.

Second, Judge Hall's conclusion that, for purposes of testing compliance with ERISA, an "accrued benefit" must be "measured as an annual benefit commencing at normal retirement age," FleetBoston, F. Supp. 2d at 164 is wrong.  As explained previously, 29 U.S.C. § 1002(23)(A) and 29 U.S.C. § 1054(c)(3) specifically authorize plans to measure an accrued benefit as something other than an accrued benefit payable in annuity form at normal retirement age.[18]  See supra at 22-23.  Indeed, the Second Circuit in Esden described exactly how to calculate accrued benefits expressed as a lump sum, relying on 29 U.S.C. § 1054(c)(3).  See Esden, 229 F.3d at 159.

Third, Judge Hall also appears to have misunderstood the mathematics relevant to the example in the Conference Report, discussed supra.  Judge Hall suggested that the example in the Conference Report (the employee receiving a benefit of $10 per month per year of service at ages 65, 66, and 67) was consistent with her interpretation of Section 204(b)(1)(H)(i) because "[t]he value of that benefit does not change, regardless of whether the employee is younger or older than normal retirement age."  FleetBoston, F. Supp. 2d at 164.  This is simply wrong.  A plan that provides a participant a benefit of $10 per month for each year of service at ages 65, 66,

---

[18]    Generally, participants in a plan must be offered the right to receive their benefit in the form of an annuity payable at normal retirement age if they so choose, but an annuity is not the exclusive method of paying a benefit, nor is it the only measure to be used for testing compliance with ERISA.  Eaton, 117 F. Supp. 2d at 830 (same term may be used and defined in different ways and for different purposes under ERISA).  How benefits are paid is a different issue from how plans must be tested for purposes of compliance with ERISA.

and 67 reduces the rate of benefit accrual if measured the way Plaintiffs suggests, because $10 per month at age 66 (or 67) has a lower value than $10 per month when expressed in terms of an age-65 annuity.  It is ironic that Judge Hall references the "value" of a benefit in her analysis of Section 204(b)(1)(H)(i).  As explained before, when one compares the economic value of the benefit payable to an older and younger participant under a cash balance plan, there is no age discrimination.  See supra at 13-16.

Fourth, although Judge Hall held that the IRS's interpretation (expressed in a proposed regulation) of one aspect of Section 204(b)(1)(H)(i) was entitled to some deference or "respect," FleetBoston, F. Supp. 2d at 161, she ignored the same agency's repeated and considered determination that cash balance plans are not age discriminatory.  See supra at 24-26.  Indeed, Judge Hall disregarded (without mention) the IRS's interpretation of the phrase "rate of benefit accrual" expressed in the same proposed regulation that she relied upon for other aspects of her decision.  See, e.g., Register, 2005 WL 3120268, at *7 ("The proposed 2002 Treasury Department regulations stated that cash balance plans are not inherently age discriminatory.").  Defendants respectfully submit that it was error for Judge Hall to reject a longstanding and considered Treasury Department interpretation that cash balance pension plans are lawful without even addressing why that interpretation is wrong.

Lastly, Judge Hall suggests that if defined benefit plans were supposed to be tested for age discrimination based on the allocation to the employee's account – the way defined contribution plans are tested – Congress would have used the same language for prohibiting age discrimination in a defined benefit plan that it used to prohibit age discrimination in a defined contribution plan.  Compare 29 U.S.C. § 1054(b)(1)(H) with 29 U.S.C. § 1054(b)(2).  This argument reflects an apparent misunderstanding of the definition of a defined benefit plan.

Specifically, a defined benefit plan is defined as any plan other than an individual account plan, i.e., a defined contribution plan.  Compare 29 U.S.C. § 1002(34) with 29 U.S.C. § 1002(35). There are many different types of defined benefit plans, which accrue benefits in different ways. Congress could not test age discrimination for all defined benefit plans in terms of an account balance (like it did for defined contribution plans) because most defined benefit plans do not even have "accounts."[19]  For a defined benefit plan that mirrors an individual account plan (e.g., a cash balance plan), however, the rate of benefit accrual should be measured in terms of the way benefits actually are accrued, i.e., earned, in the plan – based on allocations to the employee's account.  See Eaton, 117 F. Supp. 2d at 830-34 (testing age discrimination in a cash balance plan is based on changes to the employee's account); Tootle, 222 F.R.D. at 93-94 (same); Register, 2005 WL 3120268, at *7 (same).

In sum, this Court can either join Judge Hall and the district court in Cooper in condemning all cash balance plans, or adopt the approach endorsed by the five district courts that have concluded that such an outcome would be inconsistent with the statutory text, legislative history, Treasury Department pronouncements, common sense and fundamental economic principles.  Under Part B of CIGNA's Pension Plan, the interest rate used in the Plan is the same for all participants and the benefit credit rate increases with age.  An older participant is provided a benefit that is at least as valuable as – and generally more valuable than – the benefit provided to a similarly situated younger employee.  There is no age discrimination and judgment should therefore be entered in favor of Defendants on Count 3.

---

[19]    By contrast, all defined contribution plans are individual account plans.  See 29 U.S.C. § 1002(34).  Thus, it made sense for Congress to define the accrued benefit in a defined contribution plan as the account balance.

## II.    JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 1 BECAUSE PART B DOES NOT VIOLATE ERISA'S NONFORFEITABILITY RULE OR ERISA'S 133⅓% ANTI-BACKLOADING RULE.

Count 1 of the Complaint essentially challenges the Plan's formula for calculating an opening account balance as (1) causing an impermissible forfeiture of benefits, and (2) violating ERISA's 133⅓% anti-backloading rule.  At a fundamental level, Plaintiffs' challenges to the formula for calculating opening account balances fail because:

> [C]urrent federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, provided that a plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate from the employer.

Defs' Ex. 533, United States General Accounting Office, Report to Congressional Requesters, Private Pensions, Implications of Conversions to Cash Balance Plans, September, 2000, at 30.

Here, the terms of the Plan unambiguously do exactly what is required.  Specifically, Section 1.1(c) of Part B provides that:

> In the case of a Participant who has a Part A Accrued Benefit which is converted into an Initial Retirement Account, such Participant's Accrued Benefit, expressed in the form of an immediate lump sum distribution, shall in no event be less than the present Equivalent Actuarial Value (determined using the Applicable Interest Rate and the Applicable Mortality Table) of the Participant's Minimum Benefit.

DFF ¶ 58.  The Minimum Benefit is defined as a participant's age-65 annuity benefit under Part A, enhanced by the value of the "Preserved Spouse's Benefit," if applicable.  DFF ¶ 59.  In addition, Section 7.3 of the Plan protects other benefits, in other benefit forms (e.g., early retirement subsidized benefits), to which an employee was entitled under the prior formula. Accordingly, for any participant – regardless of age – the participant's previously accrued benefit

is protected.  DFF ¶ 55.  ERISA requires nothing more.  There is no impermissible forfeiture and no violation of ERISA's backloading rules.

Nevertheless, Plaintiffs have relied on ERISA Sections 203(a) and 204(b)(1)(B) in attacking the calculation of opening account balances under Part B.  As set forth below, however, there is no statutory basis for Plaintiffs' claims and the courts that have addressed similar claims have uniformly rejected them.

### A.    The Plan Does Not Cause Any Impermissible Forfeitures.

Under ERISA Section 203(a), every pension plan must "provide that an employee's right to his <u>normal retirement benefit</u> is non-forfeitable upon the attainment of <u>normal retirement age</u> . . ." and satisfaction of the Plan's vesting rules.  29 U.S.C. § 1053(a) (emphasis added).  Plaintiffs claim that Part B somehow violates this provision of ERISA even though it protects employees' minimum benefits by providing employees with the greater of (1) their Minimum Benefit ("A"), or (2) their cash balance account balance ("B").  In fact, what Plaintiffs seek is "A + B."  Pls' Proposed Findings of Fact ¶¶ 54-56.  There is no legal basis, however, for such a claim.

In <u>Alessi v. Raybestos-Manhattan, Inc.</u>, 451 U.S. 504 (1981), the Supreme Court held that:

> the statutory definition of "nonforfeitable" assures that an employee's claim to the protected benefit is legally enforceable, <u>but it does not guarantee a particular amount or a method for calculating the benefits.</u>

451 U.S. at 512 (emphasis added and citation omitted).  Consistent with <u>Alessi</u>, courts repeatedly have held that ERISA's nonforfeitability provision does not prohibit a plan from providing participants with the greater of two benefit formulas.  Rather, ERISA's nonforfeitability provision simply requires that whatever benefits the plan provides – and whatever formula or

combination of formulas is used – those benefits are actually paid to participants.  As one district

court explained:

> Applying this rule in the present case, this Court finds that while ERISA protects an employee's right to his accrued pension benefits it exerts little control over the content/amount of the benefits themselves.  The parties to the pension plan are responsible for deciding the actual benefits available under the plan.

Francia v. Wonderoast, Inc. Profit Sharing Plan, No. 92-CV-790S, 1995 WL 625705, at *13

(W.D.N.Y. Oct. 19, 1995) (internal quotations and citations omitted).

With respect to plans that provide the greater of two benefits (and not "A + B"), the

Seventh Circuit explained in White v. Sundstrand Corp., 256 F.3d 580 (7th Cir. 2001), that:

> Any pension plan giving retirees the greater of two amounts, as opposed to the sum of these amounts, can be described as confiscating the difference. . . . But under ERISA that is neither here nor there.  The Employee Retirement Income Security Act does not require employers to establish plans that are particularly favorable to employees.

256 F.3d at 582-83.

Recognizing this totally acceptable, and lawful, form of pension plan design, courts have

rejected challenges virtually identical to those asserted here.  For example, the First Circuit

affirmed the dismissal of an identical claim in Campbell, 327 F.3d 1, when addressing the

employer's conversion from a traditional plan to a cash balance plan:

> [Plaintiff] argues that this reduction amounts to a forfeiture of an accrued benefit in violation of 29 U.S.C. § 1054(g).  There was no forfeiture, because no accrued benefits were reduced; only expected benefits were reduced, which [defendant] could, under the law, modify or eliminate.
>
> The ERISA anti-cutback provision protects against the erosion of "accrued benefits". . . .  The reduction of pension benefits of which [plaintiff] complains was merely the elimination of future expected accruals of benefit.  The December 31, 1996 amendment to the

> plan protected all of the pension benefit based on [plaintiff's] work
> for the company up to that point; it merely ceased accruals under
> the old plan based on employment from that point forward.  This
> was an elimination of an expected, not accrued, benefit.  There was
> no ERISA violation.

327 F.3d at 8-9 (internal citations and quotations omitted).[20]  See also Register, 2005 WL

3120268, at *2-3 (same).

Similarly, in Williams v. Caterpillar, Inc., 944 F.2d 658 (9th Cir. 1991), Caterpillar

maintained union and management pension plans that were part of an "integrated system."  Id. at

662.  Under the integrated plan, employees who retired would receive the greater of either their

management pension or their union pension, but would not receive both.  Id. at 663.  A number

of former employees who had been demoted from management into the union one to five years

before their retirements filed suit.  Like Plaintiffs in the instant case, they alleged that the

benefits they accrued under the union plan were forfeitable because they would not receive those

benefits if they received their management plan benefits.  Id. at 662.  Specifically, these former

employees claimed – as Plaintiffs contend here – that:

> Although receiving the higher of these two figures [the
> management or union pensions] would appear to be the result that
> appellants would want, appellants contend that even the
> Management Plan figure is impermissibly low.  Because that
> [management] plan did not give credit for any years of service
> after their demotions, it does not literally compensate appellants
> for those years.  Technically, appellants fell under the coverage of
> the Union Plan for their final years, but because that plan produced
> a lower figure [of retirement benefits] and was "offset" by the
> Management Plan amount, appellants actually received no
> additional incremental benefit allocable to those final years.  In

---

[20]    Although the plaintiff in Campbell brought his challenge under ERISA Section 204(g), the First Circuit
specifically held that the cash balance conversion did not cause a "forfeiture" of benefits, because the
plaintiff's previously earned benefits – like Plaintiffs' previously earned benefits in this case – were protected.
329 F. 3d at 8-9.

> short, under Caterpillar's calculations, appellants would have
> received the very same pensions that they are now receiving if they
> had been eligible to retire and had retired on the dates on which
> they received their demotions, rather than one to five years later.

Id. at 663 (italics in original).  Therefore, the plaintiffs argued, the plans "worked an

impermissible forfeiture of nonforfeitable vested benefits" and violated ERISA.  Id. at 662

(internal quotations omitted).  The Ninth Circuit rejected the plaintiffs' claim, holding that:

> [T]he Caterpillar plans do take all of appellants' years of service
> into account.  It only appears otherwise because of the offset
> provision:  the Union Plan, which credits appellants for 100% of
> the time they have devoted to the company, would yield a lower
> pension benefit than the Management Plan, which does not, and so
> pursuant to the offset, Caterpillar has given appellants the greater
> Management Plan amount.

Id. at 663 (emphasis in original).  See also Bonovich v. Knights of Columbus, 963 F. Supp. 143,

146-48 (D. Conn. 1997) (dismissing forfeiture claim because "plaintiffs overlook the fact that

deduction of their benefit-like renewal commissions is itself part of the formula for determining

the amount of their pension benefits, and because ERISA does not control the content and

calculation method of plan benefits, [defendant] may integrate participants' pension plan benefits

with their renewal commissions"), aff'd, 146 F.3d 57 (2d Cir. 1998).

     The same is true here.  Plaintiffs' years of service are taken into account under the Part B

cash balance formula.  If the Part B formula yields a lower benefit than the Part A formula

(because of the way opening account balances were calculated), however, the higher benefit is

paid.  DFF ¶ 57.  This can only work to the advantage of employees because it ensures that

employees always receive higher benefits.  It is impossible under Part B for any employee to

receive a lower normal retirement benefit amount than that to which the employee was entitled previously.  DFF ¶ 57.  Consistent with <u>White</u> and <u>Williams</u>, <u>supra</u>, there is no forfeiture.[21]

Plaintiffs' reliance on the Second Circuit's decision in <u>Esden</u> and the Seventh Circuit's decision in <u>Berger v. Xerox Corp. Retirement Income Guarantee Plan</u>, 338 F.3d 755 (7th Cir. 2003), is grossly misplaced.  <u>See</u> Pls' Trial Brief at 12.  Although they involved cash balance plans, the only issue in these cases was the calculation of lump sum benefits pursuant to IRS Notice 96-8 and a process known as "whipsaw."  Because of the lump sum calculations used in the plans in <u>Esden</u> and <u>Berger</u>, employees received less than the present value of their normal retirement benefit.  Esden, 229 F.3d at 167; <u>Berger</u>, 338 F. 3d at 763.  By contrast, Part B fully complies with the requirements of Notice 96-8, <u>Esden</u> and <u>Berger</u>, and Plaintiffs do not even challenge the calculation of lump sum benefits under Part B.  Moreover, pursuant to Section 1.1(c), Part B uses a greater-of formula – participants can never receive less than the value of their accrued benefit.  DFF ¶ 57.  Lastly, it bears note that neither <u>Berger</u> nor <u>Esden</u> even mentioned how to calculate the "rate of an employee's benefit accrual" under ERISA Section 204(b)(1)(H)(i).

Plaintiffs' reliance on the Second Circuit's decision in <u>Frommert v. Conkright</u>, 433 F.3d 254 (2d Cir. 2006), is similarly misplaced.  <u>See</u> Pls' Trial Brief at 12-13.  In <u>Frommert</u>, the plaintiffs were not told about a "phantom" offset that reduced their pension benefits below what the employees thought they would receive.  <u>Id.</u> at 262-66.  Here, by contrast, there was no

---

[21]    <u>See also</u> Rev. Rul. 81-12, 1981-1 C.B. 228 (approving "greater of" feature to protect accrued benefits following amendment of a plan's actuarial factors); <u>Lunn v. Montgomery Ward & Co., Inc. Ret. Sec. Plan</u>, No. 97 C 3026, 1998 WL 102751, at *6 (N.D. Ill. Feb. 26, 1998) (granting a motion to dismiss and holding that "[b]enefits provided by one plan may be offset by benefits received under other plans provided by the same employer").

undisclosed offset that reduced participants' account balances.  Participants were told how their account balances were calculated and how the account balance grew each year.  DFF ¶¶ 164, 178-79.  Pursuant to the Minimum Benefit provisions of Part B, participants could never receive less than the value of their account balance.  DFF ¶ 57.

### B.    The Plan Does Not Violate ERISA's 133⅓% Rule.

Plaintiffs also suggest that the Plan violates ERISA's 133⅓% anti-backloading rule because of the "wear-away" period that exists for some employees related to the minimum benefit "greater-of" protection in Part B.[22]  This claim likewise fails.

ERISA's anti-backloading rules in Section 204(b)(1) limit a defined benefit plan's ability to "backload" certain retirement benefits in later years of service.  This means that there is a limitation on the extent to which benefit accruals can be delayed until the end of an employee's career.  In order to satisfy ERISA's accrual rules, a defined benefit plan need only meet one of three separate tests: (1) the "3% method;" (2) the "133⅓% rule;" or (3) the "fractional rule."  See

---

[22]    "Wear-away" is a period of time during which a participant accrues new benefits under one benefit formula, but because those benefits are less than benefits earned under a different formula, the overall amount of benefits does not change for a period of time.  See FleetBoston, 235 F.R.D. at 168 ("The idea that an employee covered by these terms does not actually accrue any new benefits under the Amended Plan until the value of the hypothetical cash balance account exceeds that of the frozen Traditional Plan benefit is known as the "wear-away" effect."); Brody v. Enhance Reinsurance Co. Pension Plan, No. 00 Civ. 9660 (LAP), 2003 WL 1213084, at *3 (S.D.N.Y. Mar. 17, 2003) ("In calculating the Accrued Benefits as of November 1, 1989 for each of the Plan participants, PDI used a 'greater of (also known as a 'wear-away') method.").  In other words, although benefits are accrued under the new formula, the overall benefit does not increase until the employee "catches up" to the old formula benefit.  Wear-away is a lawful feature incorporated into many plan designs.  Indeed, the Treasury Department has issued regulations that specifically acknowledge and endorse wear-away periods, including with respect to cash balance conversions.  For example, the regulations provide safe harbors (i.e., exemptions) from certain ERISA requirements for plans that have particular types of wear-away periods.  See 26 C.F.R. § 1.401(a)(4)-13 (describing safe harbor "formula with wear-away" and "formula with extended wear-away"); 26 C.F.R. § 1.410(b)-3(a)(2)(iii)(C) (permitting plans where "the plan is applying the wear-away formula . . . and the employee's frozen accrued benefit exceeds the benefit determined under the current formula").  Current regulations under ERISA Section 204(h), 29 U.S.C. § 1054(h), further provide that a Section 204(h) notice is required for a plan amendment after September 2, 2003 "that results in a wear-away period" and describes in detail how notice should be provided when a wear-away results from the conversion of a traditional plan to a cash balance plan.  See 26 C.F.R. § 54.4980F-1 Q&A11(a)(4)(ii).  Thus, the existence of a wear-away period is not unlawful.

29 U.S.C. § 1054(b)(1)(A)-(C); 29 C.F.R. § 1.411(b)-1(a); 29 C.F.R. § 1.411(b)-1(b)(1), (2) and (3) (describing the "3% method," the "133⅓% rule," and the "fractional rule").  The challenges to cash balance plans in other cases, and in this case, involve application of the 133 ⅓% rule.

> The 133⅓% rule generally requires that:

>> the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133⅓ percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

29 U.S.C. § 1054(b)(1)(B); see also 29 C.F.R. § 1.411(b)-1(b)(2) (providing examples).

Critically, the 133⅓% rule must be examined without consideration of any prior benefit formulas or prior plans.  ERISA Section 204(b)(1)(B)(i) specifically provides that when testing compliance with the 133⅓% rule, "any amendment which is in effect for the current year shall be treated as in effect for all other plan years."  29 U.S.C. § 1054(b)(1)(B)(i).  This means that the current operative plan is assumed to have existed for all time; it is impermissible to compare benefits under the current formula with benefits under a prior formula in testing compliance under the rule.[23]  See Register, 2005 WL 3120268, at *3.

Plaintiffs' argument that Part B violates the 133⅓% rule depends on just such a prohibited comparison.  Specifically, Plaintiffs argue:

> A.  Because of the minimum benefit protection – which is based on benefits earned under the prior plan formula – there is a period of time (the "wear-away" period) during which an employee's account balance might increase but would still be below the employee's minimum benefit, such that, according to Plaintiffs, there is no new net benefit accrual;

---

[23]    As noted previously, in contrast to ERISA Section 204(b)(1)(H)(i), the 133⅓% rule also is tested only with respect to benefits payable at "normal retirement age."  29 U.S.C. § 1054(b)(1)(B).  The statute specifically provides that "the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded."  29 U.S.C. § 1054(b)(1)(B)(iii).  Regulations further explain that "the requirements of subdivision (i) of this subparagraph [regarding the 133⅓% rule] must be satisfied without regard to any benefit payable prior to the normal retirement benefit (such as an early retirement benefit which is not the normal retirement benefit)."  26 C.F.R. § 1.411(b)-1(b)(2)(ii)(C).

B.  When the account balance later surpasses the minimum benefit amount, benefit accruals resume according to Plaintiffs; and

C.  Because any benefit accrual ("B" above) would be more than 133⅓ percent of a "zero" benefit accrual ("A" above), Part B violates the 133⅓ rule, according to Plaintiffs.

Pls' Trial Brief at 15-16.

As explained previously, however, the minimum benefit protection under Part B is based exclusively on the prior plan's benefit formula.  Under ERISA Section 204(b)(1)(B)(i), it must be disregarded for testing compliance with the 133⅓% rule.  When the 133⅓% rule is properly applied to Part B without regard to the prior formula, no violation can be established.  If Part B is assumed to have existed for all prior years, then no employees would have opening account balances or minimum benefits and there would be no wear-away.  Indeed, Plaintiffs do not even allege a violation of the 133⅓% rule within the Part B formula itself.  Accordingly, there is no violation of the 133⅓% rule here.  As the Register court held in dismissing an identical claim:

> When a company changes its pension plan, ERISA protects benefits previously earned under the prior plan provisions. 29 U.S.C. § 1054(g)(1). At no point can the participant receive less than his accrued benefit at the time the plan was changed. Id. In order to comply with this provision of ERISA, the new [employer] plan provides that a participant receives the greater of his cash balance benefit and his frozen accrued benefit, including any applicable early retirement subsidies, under the prior plan. For some participants, the frozen prior plan benefit may be greater than the benefit under the new plan for a few years. When this occurs, the participant's benefit will not accrue any additional value.

> Plaintiffs claim that since some employees' benefits will not increase for a few years after the plan change, it is inevitable that the plan will fail the 133-1/3% test, as no accrual followed by the resumption of accruals will inevitably be more than a third higher. While it is certainly true that the resumption of accruals after a time of no accrual will result in a change in accrual rate that is higher than one third, the 133-1/3% test has provisions that address a situation such as this one, where the period of no accrual results from a plan amendment. See 29 U.S.C. § 1054(b)(1)(B)(I). The

- 39 -

test states that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." Id.  Once a plan amendment occurs, only the new plan is taken into consideration when performing the test.  Since the protected prior benefits under the old plan are disregarded, no wearaway of the benefit occurs.  Plaintiffs do not allege that the cash balance plan, when viewed by itself, violates the 133-1/3% test. Therefore, Plaintiffs have failed to state a claim for relief.

2005 WL 3120268, at *3 (internal citation omitted).  Notably, Judge Hall in the FleetBoston case agreed with this analysis.  See FleetBoston, F. Supp. 2d at 170-71 (rejecting claim that cash balance conversion violated 133⅓% rule).

Like their forfeiture claim under ERISA Section 203(a), Plaintiffs' backloading claim under ERISA Section 204(b)(1)(B)(i) falls well short of the mark.  Judgment should therefore be entered in favor of Defendants on Count 1.

## III.    JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 5 BECAUSE PART B DOES NOT VIOLATE ERISA'S ANTI-CUTBACK RULE AND PROTECTS EMPLOYEES' PREVIOUSLY ACCRUED BENEFITS.

Count 5 of the Complaint alleges a violation of the anti-cutback rule under ERISA Section 204(g), which provides in relevant part that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title." 29 U.S.C. § 1054(g). Critically, this provision does not prohibit, or even limit, an employer's ability to reduce future pension accruals or even to cease them altogether.  See, e.g., Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 747 (2004) ("[E]mployers are perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, future employment."); 26 C.F.R. §

- 40 -

1.411(d)-3(b)(3)(ii) ("Section 411(d)(6)[24] only protects benefits that accrue before the applicable amendment date.").

Rather, "the proper inquiry under ERISA § 204(g)(1) is whether plaintiff's monthly benefit was in fact reduced by a plan amendment." King, 2003 WL 22071612, at *10 (emphasis added); Langman, 2002 WL 472033, at *2. Treasury regulations further explain that an amendment or series of amendments "will only violate section 411(d)(6) if, for any participant, the net effect is to decrease participants' accrued benefit as of that applicable amendment date." 26 C.F.R. § 1.411(d)-3(a)(2)(ii) (emphasis added). The regulations further explain how a plan might fail to satisfy Section 204(g), and how a plan can ensure that it meets the requirements of the provision. Specifically, the regulations provide:

---

[24] This is the parallel provision to 29 U.S.C. § 1054(g)(1) in the Internal Revenue Code. Regulations issued pursuant to Section 411(d)(6) of the Internal Revenue Code are equally applicable to Section 204(g) of ERISA, 29 U.S.C. § 1054(g). See Heinz, 541 U.S. at 747 ("Although the pertinent regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to ERISA § 204(g).").

Example 1. (i) Facts. Plan A provides an annual benefit of 2% of career average pay times years of service commencing at normal retirement age (age 65). Plan A is amended on November 1, 2006, effective as of January 1, 2007, to provide for an annual benefit of 1.3% of final pay times years of service, with final pay computed as the average of a participant's highest 3 consecutive years of compensation. As of January 1, 2007, Participant M has 16 years of service, M's career average pay is $37,500, and the average of M's highest 3 consecutive years of compensation is $67,308. Thus, Participant M's accrued benefit as of the applicable amendment date is increased from $12,000 per year at normal retirement age (2% times $37,500 times 16 years of service) to $14,000 per year at normal retirement age (1.3% times $67,308 times 16 years of service). As of January 1, 2007, Participant N has 6 years of service, N's career average pay is $50,000, and the average of N's highest 3 consecutive years of compensation is $51,282. Participant N's accrued benefit as of the applicable amendment date is decreased from $6,000 per year at normal retirement age (2% times $50,000 times 6 years of service) to $4,000 per year at normal retirement age (1.3% times $51,282 times 6 years of service).

(ii) Conclusion. While the plan amendment increases the accrued benefit of Participant M, the plan amendment fails to satisfy the requirements of section 411(d)(6)(A) because the amendment decreases the accrued benefit of Participant N below the level of the accrued benefit of Participant N immediately before the applicable amendment date.

Example 2. (i) Facts. The facts are the same as Example 1, except that Plan A includes a provision under which Participant N's accrued benefit cannot be less than what it was immediately before the applicable amendment date (so that Participant N's accrued benefit could not be less than $6,000 per year at normal retirement age).

(ii) Conclusion. The amendment does not violate the requirements of section 411(d)(6)(A) with respect to Participant M (whose accrued benefit has been increased) or with respect to Participant N (although Participant N would not accrue any benefits until the point in time at which the new formula amount would exceed the amount payable under the minimum provision, approximately 3 years after the amendment becomes effective).

26 C.F.R. § 1.411(d)-3(a)(4) (emphasis added).[25]

In this case, Part B of the CIGNA Pension Plan does exactly what the Treasury Department's regulation requires. The written terms of Part B unequivocally provide that all benefits previously accrued under the prior plan formula are protected. First, Section 1.1(c) provides that a participant's Accrued Benefit under Part B "shall in no event be less than the . . . Participant's Minimum Benefit," which in turn is defined as "the Participant's Part A Accrued Benefit." DFF ¶ 131. Second, for employees who were entitled to a "Preserved Spouse's Benefit" under Part A (also known as the "Free 30%"), the employee's Minimum Benefit also includes the value of that benefit. DFF ¶ 132. Third, Section 7.3(b) protects employees' rights to any early retirement annuity benefits that they earned under Part A.[26] DFF ¶ 133. Lastly, Amendment No. 4, which provided for the freezing of accruals under Part A, expressly provided that "[n]o such subsequent amendment shall result in the accrued benefits of any Participant being less than such Participant's accrued benefit under the plan as of December 31, 1997." DFF ¶ 134. Thus, as with example 2 in the Treasury regulations, Part B ensures that all previously accrued benefits are protected. ERISA requires nothing more.

Nevertheless, in their Trial Brief, Plaintiffs allege three purported violations of the anti-cutback rule:

- Prudential Retirement ("Prudential"), the recordkeeper for the Plan, did not maintain electronic records of the minimum benefit applicable for some participants;

---

[25]    Of note, this example describes a plan formula with a three-year wear-away period for Participant N, during which Participant N's minimum benefit would exceed his benefit under the plan's new formula. This further demonstrates that such a wear-away feature is lawful; the Treasury Department would not use as an example in its own regulations a plan feature that was unlawful.

[26]    Part A did not offer employees a lump sum benefit option. DFF ¶ 27. Thus, all of the early retirement benefits were available under Part A only in annuity form, and they are protected by Part B in that same form.

- Part B allegedly does not protect the Preserved Spouse's Benefit, also known as Free 30%, for participants who were eligible for the benefit;

- Participants allegedly were not notified of the relative value of benefit options or the minimum benefits applicable.  See Pls' Trial Brief at 64.  As will be demonstrated at trial, however, there was no violation of the anti-cutback rule.

Plaintiffs' suggestion that Part B does not protect previously accrued benefits because Prudential does not maintain certain electronic records of those benefits is a non sequitur and is grossly misleading.  Although Prudential may not maintain computerized records of the minimum benefit applicable for some participants, that does not mean that the actual benefit is not being protected.  To the contrary, Part B requires that those benefits be protected.  DFF ¶ 135.  Moreover, Prudential has a number of procedures in place to ensure that minimum benefits are calculated and that those benefits are protected.  There also is a process in place for CIGNA to provide any information (e.g., payroll information) that Prudential needs to calculate a participant's minimum benefit.  DFF ¶ 135.  Nothing in ERISA requires that Prudential maintain any electronic records, let alone subjects CIGNA (as Plan sponsor) or Part B (as an ERISA plan) to liability if the Plan's recordkeeper does not maintain certain electronic records.  Plaintiffs have no evidence that Prudential or the Plan Administrator (neither of whom are parties to this case) routinely ignore the terms of Part B or intentionally do not protect the minimum benefit that Part B unambiguously requires be protected.[27]  ERISA's anti-cutback rule only prohibits an accrued

---

[27]  For many participants, the minimum benefit is irrelevant because the participants' account balances exceed the minimum benefit value at the time of benefit commencement.  Admittedly, in a few isolated instances, benefits were not calculated in accordance with the terms of the Plan.  When those issues were brought to the attention of Prudential or the Plan Administrator (pursuant to the Plan's claim and appeal procedures), the mistakes were corrected, the terms of Part B were followed, and the correct minimum benefit was paid.  DFF ¶ 136.  Any other participant who believes that a mistake was made in calculating his or her benefit is required to file a

continued . . .

benefit from being "decreased <u>by an amendment of the plan</u>." 29 U.S.C. § 1054(g)(1) (emphasis

added). Here, Part B complies with both the letter and the spirit of the rule, so there is no

violation. <u>See, e.g.</u>, <u>Fitch v. Chase Manhattan Bank, N.A.</u>, 64 F. Supp. 2d 212, 224-25

(W.D.N.Y. 1999) (finding that incorrect benefit estimates upon which participants relied were

insufficient to prove liability under any theory "absent a showing of proof tantamount to fraud");

<u>Kietlinski v. Gen. Elec. Co.</u>, 886 F. Supp. 994, 999 (N.D.N.Y. 1995) (find that an erroneous

comparison of the employee's expected pension benefits upon resignation versus upon

retirement did not yield liability where there was no evidence of "bad faith or intent to deceive").

As for the Free 30 %, Plaintiffs cannot meaningfully dispute that Part B unequivocally

provides that the benefit is protected.[28] DFF ¶¶ 132, 137. Although Prudential initially

miscalculated Plaintiff Broderick's benefit without the Free 30%, that mistake was corrected

once the issue was brought to its attention and Ms. Broderick has since received all of the

benefits she is due. DFF ¶ 137. Far from violating ERISA, that this mistake was corrected as

part of the Plan's internal claim and appeal procedure demonstrates exactly how the

---

claim with the Plan Administrator so that the mistake can be corrected by the Plan Administrator in the first instance. Indeed, the purpose of the ERISA-mandated claim and appeal process is to ensure the efficient and inexpensive resolution of exactly these types of issues. <u>See</u> <u>Park v. Trs. of the 1199 SEIU Health Care Employees Pension Fund</u>, 418 F. Supp. 2d 343, 354 (S.D.N.Y. 2005) ("The exhaustion requirement is intended to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned."); <u>Suozzo v. Bergreen</u>, No. 00 Civ. 9649, 2003 WL 22387083, at *8 (S.D.N.Y. Oct. 20, 2003) ("Requiring plaintiffs to raise such challenges during the administrative process serves several of the main purposes behind ERISA's exhaustion requirement: reducing the number of frivolous claims, enabling plan fiduciaries to manage their funds expertly and efficiently, allowing fiduciaries to correct their own errors, and encouraging fiduciaries to build a factual record to assist courts in reviewing plan decisions.").

[28]    It bears note that most Part B participants were never eligible for the Free 30% even under the prior Plan, so they are not entitled to it under Part B. DFF ¶ 132. Moreover, the Free 30% is irrelevant for all participants except those who elect a benefit in annuity form where the annuity with the Free 30% exceeds the value of the participant's account balance.

administration of a plan is supposed to work.[29]  <u>See, e.g.</u>, <u>Coomer v. Bethesda Hosp., Inc.</u>, 370
F.3d 499, 504 (6th Cir. 2004) ("The exhaustion requirement enables plan fiduciaries to
efficiently manage their funds; <u>correct their errors</u>; interpret plan provisions; and assemble a
factual record which will assist a court in reviewing the fiduciaries' actions.") (internal
quotations and citations omitted, emphasis added); <u>Gramm v. Bell Atlantic Mgmt.</u>, 983 F. Supp.
585, 593 (D.N.J. 1997) ("[A] mistake in calculating pension benefits does not constitute willful
misconduct or bad faith sufficient to support a breach of fiduciary duty claim.").

Moreover, Plaintiffs' suggestion that the Plan or CIGNA violated the anti-cutback rule by
failing to make certain disclosures regarding relative value and minimum benefits is nonsensical.
ERISA Section 204(g) prohibits <u>plan amendments</u> from reducing previously accrued benefits;
nothing in ERISA Section 204(g) addresses, let alone mandates, <u>disclosures</u> about employee
benefit matters.

In any event, these claims would fail.  First, any disclosure obligations are those of the
Plan Administrator, who is not a defendant in this case.  <u>See</u> <u>infra</u> at Section IV. E.  Even the

---

[29]    The Second Circuit recently reaffirmed that "[w]e require exhaustion of benefit claims brought under ERISA."
<u>Chapman v. ChoiceCare Long Island Term Disability Plan</u>, 288 F.3d 506, 511 (2d Cir. 2002).  As the court
explained, "claimants must pursue all administrative remedies provided by their plan pursuant to statute."  <u>Id.</u>
Moreover, the Second Circuit recently held that this requirement is jurisdictional, as it goes to the ripeness of
the claims asserted:

> ERISA empowers federal courts to review the decisions of plan administrators,
> and provides no authority for a court to render a <u>de novo</u> determination of an
> employee's eligibility for benefits.   Therefore, <u>absent a determination by the</u>
> <u>plan administrator, federal courts are without jurisdiction to adjudicate whether</u>
> <u>an employee is eligible for benefits under an ERISA plan</u>.

<u>Peterson v. Cont'l Cas. Co.</u>, 282 F.3d 112, 118 (2d Cir. 2002) (emphasis added) (also holding that "[b]y
issuing a decision on permanent benefits [before the plaintiff filed a claim for benefits with the plan
administrator], the District Court determined a question over which it had no jurisdiction").  <u>See also</u> <u>Pulvers</u>
<u>v. First Unum Life Ins. Co.</u>, 210 F.3d 89, 94 and n.2 (2d Cir. 2000) (noting that, if issue had not been
determined by plan administrator in the first instance, a remand to the administrator for further proceedings
would be required); <u>Rodriguez v. McGraw-Hill Cos., Inc.</u>, 297 F. Supp. 2d 676, 677 n.2 (S.D.N.Y. 2004)
(holding that claims not previously ruled on by plan administrator were not properly before the court).

Plan Administrator, however, does not have a statutory obligation under any section of ERISA – let alone Section 204(g) – to disclose to any participant on their benefit election form when the minimum benefit rule applied.  Not surprisingly, Plaintiffs fail to cite any authority for this proposition.  The Plan Administrator notified participants about each benefit form available to them, the amount of the benefit, and when and how that benefit is payable.  Although not specifically designated on the form as a minimum benefit under Section 1.1(c) or 7.3 of Part B, the minimum benefits were included among those benefit options.  The Plan Administrator's disclosures complied with applicable requirements at the time.[30]

Second, Plaintiffs have identified only two participants – Lillian Jones and Douglas Robinson – who apparently believe they received inadequate disclosures of the relative value of their benefit options, neither of whom is a named Plaintiff in this lawsuit.[31]  See Pls' Trial Brief at 65-66.  If these participants want to, and believe that they should be allowed to, submit a new benefit election and commence their benefits in a different form, they must file a claim with the

---

[30]    Contrary to Plaintiffs' suggestion, the Treasury regulations that Plaintiffs cite, see Pls' Trial Brief at 64, do not require that a plan automatically provide a participant with every benefit option that might be available to him at any point in time in the future.  Indeed, there are infinite combinations of benefit commencement dates (e.g., age 54 and 10 months, age 54 and 11 months, age 55, and 55 and 1 month) and benefit forms (e.g., lump sum, single life annuity, joint and survivor annuity, joint and survivor annuity with lump sum) available under Part B, and, indeed, available under most plans.  But the regulations only require that when a participant elects his benefit, he be informed of the different options available to him at that time.  See Treas. Reg. § 1.401(a)-20; DFF ¶ 150.  Plaintiffs have not cited a single case in which any court has ever invalidated a participant's consent to a particular benefit distribution based on the regulations Plaintiffs cite.  Here, moreover, the Plan Administrator made available benefit estimates to any participant upon request, either through telephone requests or its web-based benefit system.  Participants could select any benefit commencement date they wanted, and obtain an estimate of their pension benefits as of that time.  The system also allowed participants to compare different benefits using financial planning tools.  DFF ¶¶ 217, 221-22.

[31]    Plaintiffs have no standing to assert this claim on their own behalves, let alone on behalf of these two other participants.  The Court never considered whether Plaintiffs were appropriate class representatives for, or whether their claims were typical of, the claims of absent class members vis-à-vis Count 5, because Plaintiffs filed their Third Amended Complaint adding Count 5 over two years after the Class was certified.  See Fed. R. Civ. P. 23(c)(1)(B) ("An order certifying a class action must define and the class and the class claims, issues , or defenses").

Plan Administrator.  Absent such a claim and appeal to the Plan Administrator, this Court lacks

jurisdiction to consider these two class members' personal circumstances and individual claims.

See Chapman, 288 F.3d at 511; Peterson, 282 F.3d at 118.  More fundamentally, Plaintiffs

cannot prove any harm suffered as a result of the Plan Administrator's allegedly inadequate

disclosures.[32]

    Plaintiffs' tortured arguments notwithstanding, there was no violation of ERISA Section

204(g) here.  Judgment should therefore be entered in favor of Defendants on Count 5.

## IV.    JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 2 BECAUSE PLAINTIFFS LACK EVIDENCE THAT THEY WERE LIKELY OR ACTUALLY HARMED BY ANY DEFICIENCY IN THE SUMMARY PLAN DESCRIPTION.

    Plaintiffs' attack on the adequacy of the Part B SPDs[33] in Count 2 is grounded in a

strained reading of the governing statute and regulations, and is belied by their own experience

and that of the absent class members who will testify at trial.  Specifically, Plaintiffs' SPD claim

fails because (1) the information that Plaintiffs claim is missing in not required by ERISA;

(2) even if the SPD was deficient, Plaintiffs and the absent class member cannot each prove that

he or she were likely harmed by any such deficiency; (3) any such deficiency constituted

harmless error given Plaintiffs' individual circumstances and the specific information provided

by the Plan Administrator on the status of their Part B accounts; and (4) Plaintiffs' claim lies

---

[32]    Plaintiffs have not yet made Lillian Jones available for deposition, although they have promised to do so before trial.  Moreover, Plaintiffs have not even identified Douglas Robinson as a witness in this case and have not offered any admissible evidence regarding their request (apparently on his behalf) for Mr. Robinson to re-elect his benefits.

[33]    The October 1998 and September 1999 SPDs are identical in substance.  Accordingly, this Brief refers jointly to the two SPDs in the singular.

only against the Plan Administrator, whom they failed to sue.[34]  For these reasons, judgment should be entered in favor of Defendants on Count 2.[35]

### A.  The Part B SPD Met The Disclosure Requirements of ERISA Section 102.

The Plan documents for CIGNA's original defined benefit pension plan and for Part B set forth the terms of each plan in detail.  The Part B Plan document, for example, contains some 80 pages of single-spaced information that attempts to address every aspect of the Plan's design, and every contingency that might occur with any participant or beneficiary:  current, former, deceased, disabled, rehire, part-time, full-time, temporary, permanent, single, married, separated, divorced, widowed.  DFF ¶ 196.  In fact, the Plan document by necessity reads much like a statute:  it contains 63 specifically defined terms and 16 different "Articles," each with numerous sections and subsections, as well as internal cross-references between provisions.  DFF ¶ 197. This detail is required to ensure that those responsible for administering the Plan can correctly calculate benefits and bring the Plan into compliance with the specific requirements of ERISA and the Internal Revenue Code.  See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83-84 (1995) (explaining importance of "written plan documents").

---

[34]  Plaintiffs' SPD claim also is barred for the same reason as Plaintiffs' Section 204(h) claim in Count 4 in that it is time-barred.  See infra Section V. E.

[35]  In their Trial Brief, Plaintiffs assert that the Plan Administrator provided participants an inadequate summary of material modification ("SMM") regarding the cash balance conversion, a claim which this Court should not entertain since it was not raised in Plaintiffs' Third Amended Complaint.  See (dkt # 165).  In any event, it is undisputed that CIGNA distributed an SMM, in the form of a Retirement Information Kit, in December 1997. DFF ¶170.  The Retirement Information Kits provided each participant with information regarding how his or her own specific opening account balance was calculated.  DFF ¶¶ 183-84.  Consequently, even if Plaintiffs' SMM claim was properly before the Court, it would fail for the same reasons as those set forth below relating to their SPD claim in Count 2.  An SMM claim would also be barred for two of the same reasons as Plaintiffs' Section 204(h) claim in Count 4 — it was not asserted against the Plan Administrator and it would be time-barred.  See Sections V. D. and E.

Of course, this detailed Plan document would be difficult to comprehend and digest for the average participant.  For this reason, ERISA requires plan administrators to provide participants with an SPD – a summary plan description – which summarizes the plan.  As a summary, the SPD is, by definition, shorter and simpler than the plan.  As a result, and by necessity, the SPD cannot contain or describe in detail all of the plan's provisions.  Mers v. Marriott Int'l Group Accidental Death, Dismemberment Plan, 137 F.3d 510, 517 (7th Cir. 1998) (rejecting argument "that beneficiaries should be able to use only the SPD and never consider whether additional terms exist.  This position is counter to the purpose of an SPD."); Lorenzen v. Employees Ret. Plan of Sperry & Hutchinson Co., 896 F.2d 228, 236 (7th Cir.1990) ("[A] plan summary is not required to anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status . . . .  If it were, the summaries would be choked with detail and hopelessly confusing.").  While Defendants acknowledge that an SPD is a plan administrator's principal method of communicating the key terms of a plan, Congress plainly did not intend that an SPD would replace the governing plan document, with all of its detail. Compare 29 U.S.C. § 1022 (describing SPD disclosure requirements) with 29 U.S.C. § 1102 ("Every employee benefit plan shall be established and maintained pursuant to a written instrument" that must contain certain information.).

Section 102 of ERISA and the applicable regulations set forth specific parameters concerning information that must be included in a SPD.  29 U.S.C. § 1022; 29 C.F.R. §§ 2520.102-1 through 102-5.  Thus, the SPD must contain a statement:

> clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of [the regulations].

29 C.F.R. § 2520.102-3(l) (in effect 1997 through Nov. 21, 2000).

Information not required by the statute or regulations, including, for example, the detailed formulas used to calculate benefits under different circumstances and in different forms, is left to the plan document.  See e.g., Borowski v. Dun & Bradstreet, No. 3:03CV431, 2004 WL 2743569, at *4 (D. Conn. Nov. 30, 2004) (SPD need not include method of calculating benefit).

The Part B SPD met these disclosure requirements.  Specifically, the SPD contained information concerning the following topic areas:  eligibility; how breaks in service affected eligibility; how the cash balance account grows, including how benefit and interest credits accrued; when benefits are paid; how benefits are paid; how the benefit is affected by certain "life events;" administrative details concerning the operation of the plan; Minimum Benefits; change of control protections; spouse's rights; the appeal process;  circumstances under which the plan can be amended or terminated; and statement of ERISA rights.  DFF ¶ 199.

Nonetheless, Plaintiffs argue that the SPD was deficient because it did not provide a comparison of each participant's benefits in the form of an annuity under Part A and Part B.  See Pls' Trial Brief at 34-35, 50.[36]  This argument relies on the flawed premise that an SPD is required to compare benefits under the old plan versus the new plan.  Such a comparison is not required by ERISA because an SPD is a summary of the existing, operative plan.[37]  ERISA does not require that an SPD describe a plan that no longer applies or compare benefits under a

---

[36]   Plaintiffs repeatedly cite to their "expert in the understandability of written communications," Professor James F. Stratman, to support the legal positions they advocate.  See, e.g., Pls' Trial Brief at 44-50.  As set forth in Defendants' Motion In Limine, however, Plaintiffs' reliance on Professor Stratman is nothing more than an impermissible attempt to have an expert assume the Court's role in interpreting the law.  His opinion should therefore be excluded.

[37]   Moreover, it would likely have been confusing for the Plan Administrator to provide to participants a comparison of their Part B annuity benefit estimate versus a Part A annuity benefit to which they would never be entitled because the Part A plan was frozen and inapplicable as to these converted participants.  DFF ¶ 187.

current plan versus benefits under the plan it replaced.  See 29 C.F.R. § 2520.102-3 ("The summary plan description must accurately reflect the contents of the plans as of a date no earlier than 120 days prior to the date such summary plan description is disclosed."); 29 C.F.R. § 2520.102-4 (SPD "may omit information which is not applicable to the class of participants or beneficiaries to which it is furnished.").  Indeed, where, as here, a pension plan is amended as to only some participants (i.e., those being moved into Part B), the regulations provide that the SPD for those participants need only include information applicable to them.  See 29 C.F.R. § 2520.102-4.  In other words, the SPD for Part B need not include information as to Part A going forward, as such information would be inapplicable to the converted participants starting January 1, 1998.

Plaintiffs also allege that the SPD failed to disclose to converted class members the circumstances under Part B that would result in a "reduction," unlawful wear-away or conditioning of their benefits.  See Pls' Trial Brief at 47-51.  As an initial matter, and as more fully explained above, Defendants dispute that Part B required participants to give up the value of their accrued benefits under Part A or was in any way unlawful.  As such, the Plan Administrator was not required to disclose such information.  Moreover, the requirement that an SPD include references to circumstances which may result in a "reduction" in benefits refers to provisions setting forth conditions which, if applicable, reduce the amount of a benefit that a participant may recover.  See 29 C.F.R. § 2520.102-3(l).  As noted previously, the Part B SPD fully disclosed such circumstances to Plan participants. See supra at 49-55.

Plaintiffs also complain that the "pre-retirement mortality discount" and the interest rates that CIGNA applied in computing opening account balances were not described in the SPD. However, CIGNA was not required to reveal such plan administration details in the SPD.

"[Courts] recognize that an SPD need not 'anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status." Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 9 (2d Cir. 1997) (quoting Lorenzen, 896 F.2d at 236 (holding that an SPD "need not discuss every imaginable situation in which such events or actions might occur, but it must be specific enough to enable the ordinary employee to sense when there is a danger that benefits could be lost or diminished"). Indeed, "[t]here is nothing in the language of the relevant ERISA statute indicating that an SPD must disclose how a benefit reduction is calculated." Borowski, 2004 WL 2743569, at *4. "No case has ever held that a mere failure to include the specific methodology used to calculate a benefit is an ERISA violation." Id. at *5. Moreover, the use of mortality factors in determining pension benefits is routine and uncontroversial. See, e.g., Esden, 229 F.3d at 161, 165 and n.14 (noting that mortality was assumed in cash balance calculation); Allen v. WestPoint-Pepperell, Inc., 11 F. Supp. 2d 277, 285 (S.D.N.Y. 1997) (noting use of mortality tables in retirement plan calculations).

Plaintiffs cite Layaou v. Xerox Corp., 330 F. Supp. 2d 297 (W.D.N.Y. 2004), for the proposition that an SPD must not only state that benefits may be reduced, but also describe how benefits are reduced. See Pls' Trial Brief at 40. In Layaou, the plan set forth a "phantom account" system, by which if an employee had a prior distribution, the employee's distribution would be reduced by an amount equal to the sum distributed as it would have increased until the time of the employee's retirement. Id. at 302-03. The SPD omitted any reference to the phantom account system, however, and noted only that "the amount you receive may also be reduced if you had previously left the Company and received a distribution at that time." Id. at 303. The court found that from the SPD, a participant "would not know how or to what extent

the benefit would be reduced, although he or she might reasonably assume that the administrator would simply subtract out the value of the prior distribution." Id.

In ruling that the SPD was therefore misleading, the Layaou court relied squarely on the fact that the information missing from the SPD "resulted in a significant reduction in plaintiff's benefits, compared to what he or she would have received without the offset, or with what he or she would reasonably have expected his benefit to be, based on the information provided to him in the SPD." Id. Thus, the court was concerned that the company misled the plaintiff into believing that he or she was going to receive more than he or she did in pension benefits. As it explained:

> [T]he conspicuous absence of any reference to or explanation of the "phantom account" offset, coupled with the annual benefit statements that had been provided to Layaou, would clearly have misled him into believing that his monthly benefit would be considerably higher than it turned out to be.

Id. at 304.

Layaou is not instructive in this case, since here the SPD told Plaintiffs exactly how they would obtain benefits under the cash balance plan. There was no hidden offset, or other circumstances that led Plaintiffs to mistakenly believe they would obtain higher benefits than the plan provided. DFF ¶ 202. The disclosure to Plaintiffs that their opening account balance would be based on their Part A benefits was entirely accurate and complete. DFF ¶¶ 49-53, 176. Unlike in Layaou, the critical information regarding how benefits accrued under the cash balance plan was in fact laid out in the SPD.

Finally, tacitly recognizing that they cannot demonstrate a deficient SPD, Plaintiffs criticize other documents provided to participants to explain Part B, and cite to the duty of a plan administrator to speak truthfully to participants about plan amendments. See Pls' Trial Brief at

34, 51.  They also cite to a number of cases discussing the separate issue of a fiduciary's duty of disclosure.  See id. at 32, 34.  However, Plaintiffs have not asserted a breach of fiduciary duty claim in this case, which is not surprising, since Plaintiffs cannot show that they relied to their detriment on any alleged misleading communications.  See, e.g., Adams v. Tetley USA, Inc., 363 F. Supp. 2d 94, 108 (D. Conn. 2005) ("To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an employee benefit plan, a plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to their [sic] detriment.") (internal citations and quotations omitted, "[sic]" in original) (Arterton, J.); Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo, 148 F.3d 194, 196-97 (2d Cir. 1998) (rejecting ERISA misrepresentation claim where plaintiffs did not personally rely on alleged misrepresentations to their detriment). Plaintiffs' resort to condemning other documents or to general principles of fiduciary duty does not in any way support their position that the SPD provided to participants was deficient under ERISA.[38]

---

[38]  Of course, these other communications are relevant to the question of whether Plaintiffs were likely or actually harmed by any information omitted from the SPD.  In that regard, Plaintiffs' criticism of the language in the November 1997 Newsletter and the Retirement Information Kit misses the mark.  The newsletter and Retirement Information Kit were describing not only the change from Part A to Part B for the defined benefit pension plan, but also enhancements to CIGNA's Savings and Investment Plus ("SIP"), the 401(k) defined contribution plan.  The newsletter accurately anticipates "enhancements" to participants' retirement programs because it refers to both the cash balance plan and the 401(k) plan.  DFF ¶ 162.  Plaintiffs also cannot deny, and indeed they do not, that the cash balance plan did offer some distinct advantages over the prior defined benefit plan, for example, by offering a plan that is understandable and easy to use, and that offered a lump sum payment option.  DFF ¶¶ 167, 227.

**B.     Even If The SPD Was Technically Deficient, Each Plaintiff And Class Member Must Prove He Or She Was "Likely Harmed" By A Failure To Inform Participants of Material Plan Information Required By ERISA.**

Under Second Circuit law, a legally deficient SPD itself does not give rise to liability. Rather, the Second Circuit in <u>Burke v. Kodak Retirement Income Plan</u>, 336 F.3d 103, 113 (2d Cir. 2003), held that to recover, a plaintiff must also prove that he or she was "likely to have been harmed as a result of a deficient SPD." <u>Id.</u> (emphasis omitted).  The Second Circuit explained:

> At the outset, we agree that a prejudice standard is more consistent with ERISA's objective to protect the employee against inadequate SPDs. . . .  Cognizant of ERISA's distribution of benefits, we <u>require, for a showing of prejudice, that a plan participant or beneficiary was likely to be have been harmed as a result of a deficient SPD.</u>  Where a participant makes this initial showing, however, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error.

<u>Id.</u> (emphasis in original).

In other words, a participant bears an initial burden of proof that he or she "was likely . . . harmed" because the SPD did not contain certain information required by ERISA's SPD disclosure requirements.  Even where a participant satisfies this burden of proof, he or she is not entitled to relief if the defendant demonstrates that the plaintiff was not actually harmed by the inadequate disclosure.  <u>See id.</u>[39]

---

[39]    In <u>Burke</u>, the plan provided supplemental income benefits to the domestic partner of a participant, but only if the participant submitted a domestic partnership affidavit.  Although the SPD described the affidavit requirement for other benefits, the supplemental income benefit section of the SPD did not disclose that an affidavit was required to obtain these benefits.  When the plaintiff requested supplemental income benefits, the plan administrator denied the request specifically because the participant never submitted the required affidavit.  <u>See Burke</u>, 336 F.3d at 109-10.  Under these circumstances, the Second Circuit found likely prejudice because (1) the plaintiff likely did not know that an affidavit was required in order to obtain the benefits, (2) the plaintiff could have qualified for the supplemental income benefits had she submitted the affidavit, and (3) there was evidence in the record that the participant probably would have submitted the affidavit had she known it was required.  <u>See id.</u> at 114.

The Second Circuit addressed the "likely harm" standard again in <u>Weinreb</u>, 404 F.3d 167. In <u>Weinreb</u>, the plaintiff sought to prevent enforcement of a plan requirement that a participant submit an enrollment form to be eligible for life insurance because the participant was not notified of the requirement in an SPD.  <u>See id.</u> at 170.  The participant, however, had been notified of the enrollment form requirement through other informal communications and telephone calls.  <u>See id.</u> at 172.  Accordingly, the Second Circuit held that the plaintiff "failed to raise any material issue of fact demonstrating <u>likely prejudice</u> from the absence of an SPD" and affirmed summary judgment against the plaintiff, and never reached the harmless error standard. <u>Id.</u> at 172 (emphasis added).

Contrary to their assertion, Plaintiffs are not entitled to a presumption of harm upon a finding that an SPD was deficient, or because of other communications by CIGNA.  <u>See</u> Pls' Trial Brief at 54.  While Plaintiffs are correct that the <u>Burke</u> court rejected a detrimental reliance standard in favor of a "likely harm" standard, their contention that likely harm can be "presumed" merely from the SPD's alleged deficiencies is dead wrong.  Presuming likely harm from a deficiency in an SPD itself would render obsolete the Second Circuit's likely harm requirement articulated in <u>Burke</u>.  In fact, although <u>Burke</u> and <u>Weinreb</u> involved allegations of non-disclosure, the Second Circuit held in both cases that the plaintiff was required to <u>prove</u> that she was likely harmed by the non-disclosure.  <u>See Burke</u>, 336 F.3d at 113 ("Where a participant makes this initial showing. . ."); <u>Weinreb</u>, 404 F.3d at 171 ("[A]n ERISA claim premised on the complete absence of an SPD also requires a showing of likely prejudice.").  Indeed, in <u>Weinreb</u> the Second Circuit affirmed summary judgment specifically because the plaintiff failed to meet her burden of proving likely harm.  <u>See Weinreb</u>, 404 F.3d at 172.

Thus, the likely harm analysis requires the court to examine not just the language of the SPD, but also the plaintiff's own individual life circumstances.  See Burke, 336 F.3d at 113.  For example, in Weinreb, the court found that individualized oral and written disclosures made to the participant were relevant to (and precluded the participant from proving) "likely prejudice," and never reached the issue of actual prejudice or harmless error.  404 F.3d at 172 (finding that likely prejudice was not shown based on SPD's failure to notify plaintiff of plan requirement that a participant submit an enrollment form to be eligible for life insurance, since plaintiff had all information needed to understand the enrollment form requirement).  More recently, the Second Circuit addressed the likely harm standard in Wilkins v. Mason Tenders District Council Pension Fund, 445 F.3d 572, 585 (2d Cir. 2006), and again reiterated that such harm may not be presumed, and requires an inquiry individualized to the particular participant.  In Wilkins, the court found that a pension plan SPD was deficient in failing to alert participants of the need to provide proof of covered employment upon an employer underreporting of earnings, and then remanded the likely prejudice question for "further development of the factual record."  Id.  The court's illustration of the evidence plaintiff must show to demonstrate likely harm is instructive:

> To show likely prejudice, he must proffer sufficient evidence that, had the SPD given him adequate notice of his burden of proof, he would have taken effective measures either to safeguard these records against such perils, or to obtain and safeguard other competent evidence of covered employment.  Such evidence might include, for example, affidavits from other workers or supervisors who could attest to his employment on certain jobs covered by the Mason Tenders CBA.  He must also show that the records or evidence that would have been preserved would be adequate to prove his entitlement to additional benefits.

Id. (emphasis added and footnote omitted).

District courts in the wake of Burke and Weinreb have similarly rejected claims of likely harm where the plaintiff's individual circumstances fail to demonstrate that absent the SPD

deficiency, he or she could have obtained greater benefits.  For example, in Park, 418 F. Supp. 2d 343, the court noted in dicta that plaintiffs could not show that Mrs. Park, the plan participant, was "likely prejudiced" by the failure of the SPD to include information regarding the plan's lost spouse waiver, because plaintiffs admitted that Mrs. Park herself was sufficiently aware of the requirement that was missing from the SPD.  Id. at 354.  Again, as in Weinreb, the court made this determination of the "likely prejudice" without reaching the question of harmless error. Similarly, in Exarhakis v. Visiting Nurse Service of New York, No. 02-CV-5562 (ILG), 2006 WL 335420, at *13 (E.D.N.Y. Feb. 13, 2006 ), the court held that the plaintiff could not demonstrate likely harm based on the failure to provide an SPD for the employer's long-term disability ("LTD") benefits policy, by examining the specific circumstances concerning that participant.  Because the plaintiff's testimony suggested that even if she had been given an SPD she would have returned to work as soon as possible rather than taking LTD under the plan, no likely harm could be shown.  Id.

The court's decision in Sheehan v. Metropolitan Life Insurance Co., 368 F. Supp. 2d 228, 262 (S.D.N.Y. 2005), is particularly noteworthy.  In Sheehan, the plaintiff alleged likely harm based on a restriction in the employer's disability benefits certificate that was absent from the SPD, which provided that benefits will not be paid if the participant's disability "results from, or is caused or contributed to by a mental or nervous disorder."  Id. at 235-36, 262.  The court found the plaintiff could not prove likely harm because even if he or she had been apprised of the terms missing from the SPD, he or she could not "have acted in a way as to avoid the effect of the restrictions" in the plan.  Id. at 262.  To make this determination, the court made detailed explicit factual findings concerning whether the individual participant's disability "result[ed]

from, or [was] caused or contributed to by a mental or nervous disorder," by closely examining the medical testimony.  Id. at 235-36, 263-65.

Indeed, Plaintiffs' reference to a "presumption" may result from a confused reading of the case law.  The only relevant presumption in the likely harm analysis is that where a plaintiff can prove that without the SPD's deficiency, he or she would have taken some action to obtain a greater benefit, a presumption of likely harm arises.  However, the Second Circuit has made clear that only after the plaintiff has offered evidence to demonstrate the SPD's deficiency does this presumption arise.  As the court in Sheehan recently explained:

> [I]n an ERISA action, likely prejudice to a plaintiff will be presumed if, as the result of an SPD deficiency, he was not aware of the need to take an action within his control (submitting an affidavit, filing a lawsuit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action.

Sheehan, 368 F. Supp. 2d at 262.

In sum, Burke, Weinreb and Wilkins require that a participant prove that a deficient disclosure in an SPD likely caused harm vis-à-vis his or her benefits that would not have occurred had the SPD complied with ERISA.  Moreover, this proof must be based on the participant's own facts and circumstances.

## C.    Plaintiffs And The Testifying Class Members Cannot Prove Likely Harm.

As described above, the "likely harm" standard articulated by the Second Circuit in Burke refers to harm or prejudice "as a result of," i.e., caused by, the inadequate disclosure. Burke, 336 F.3d at 113.  Because Plaintiffs and the testifying class members cannot show that they would have received any greater benefit had the alleged SPD deficiencies not existed, their claim fails.

None of the Plaintiffs and testifying class members selected by Plaintiffs can provide any evidence that had the SPD better reflected the terms of Part B, they would have obtained any greater benefits.  Accordingly, Plaintiffs are not entitled to a presumption of harm based on the SPD.  In other words, this is not a situation where, "as a result of an SPD deficiency, [a plaintiff] was not aware of the need to take an action within his control (submitting an affidavit, filing a law suit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action."  Sheehan, 368 F. Supp. 2d at 262.

Plaintiffs incorrectly claim that they can show likely harm without proving that they would have received greater plan benefits had the SPD disclosed more information because, as in Frommert, they lost the opportunity to register complaints and make employment and retirement decisions with the knowledge that their benefits were being substantially reduced.  See Pls' Trial Brief at 56.  Defendants acknowledge that, contrary to its earlier decisions in Burke and Weinreb and its later decision in Wilkins, the Second Circuit in Frommert suggested that likely harm may be shown where a faulty SPD deprived plaintiffs of the opportunity to make employment and retirement decisions because they were led to believe they would obtain greater benefits than they were eventually provided.  See Frommert, 433 F. 3d at 265.  However, in Frommert, the Second Circuit relied upon the fact that the plaintiffs had their benefits reduced by a "phantom account" that was never disclosed to them and was not even properly part of the plan until after many had already retired.  Id. at 265-67.  As the court stated:

> The prolonged absence of any mention of the phantom account from Plan documents, most notably SPDs, likely, and quite reasonably, led Plan participants to believe that it was not a component of the Plan.  Rather, rehired employees likely believed that their past distributions would only be factored into their benefits calculations by taking into account the amounts they had actually received.

Id. at 266-67.

Thus, Frommert is inapposite because it is so markedly different from this case. In Frommert, the plaintiffs had no way of knowing the actual benefits they were to receive. Here, in addition to the November 1997 Newsletter, the Retirement Information Kit and the SPD, Plaintiffs and all Part B participants were provided annual account statements and Total Compensation Reports which advised them of the precise amount in their cash balance accounts each year. DFF ¶ 215. No one will testify that he or she did not know how much was in his or her cash balance account. Indeed, as discussed further in detail below, some will testify that the Part B information they received gave them a much better basis for making informed financial decisions. DFF ¶¶ 216-22. In sum, Plaintiffs and the testifying class members cannot demonstrate likely harm from the alleged SPD deficiencies.

### D.      Any Alleged Deficiencies In The SPD Constituted Harmless Error.

Even if the Court finds that Plaintiffs and the testifying class members met their burden of proving that the SPD was deficient and that those deficiencies resulted in likely harm, Defendants may rebut this showing through evidence that the deficiencies constituted harmless error — e.g., that the employees either independently knew the information that they claim was omitted from the SPD or would not have conducted themselves any differently had they known it. See Burke, 336 F.3d at 113-14. Thus, Plaintiffs bear the burden of demonstrating likely harm with regard to each participant, and upon a finding of likely harm, and Defendants bear the burden of demonstrating that any deficiency resulted only from harmless error. In a sense, the likely harm and harmless error analyses are two sides of the same coin, and courts in the Second Circuit often seem to conflate the two. Compare Weinreb, 404 F.3d at 172 (finding no likely harm where the plaintiff received the information missing from an SPD through other channels)

with Pastore v. Witco Corp., 388 F. Supp. 2d 212, 221 (S.D.N.Y. 2005) (finding harmless error where the plaintiff received the information missing from the SPD through another channel).[40] Regardless of who bears the burden on this score, however, the evidence at trial will show that Plaintiffs were not likely, or actually, harmed by any alleged deficiencies in the SPD.

Specifically, given the abundance of information the Plan Administrator provided to participants concerning the operation of the cash balance plan and the value of their Part B accounts, any claim that participants were harmed by the deficiencies in the SPD is illusory. Specifically, all Part B participants were provided with the following materials in addition to the SPD:[41]

- The Plan Administrator provided each participant an annual account statement, which reflected the opening and closing balances in the account, as well as a Total Compensation Report, which provided additional account balance information and a detailed description of how their opening balances were calculated. Plaintiffs were also advised that they could receive their cash balance as a lump sum or an annuity, and how the benefit and interest credit would accrue. DFF ¶¶ 206-218.

---

[40]  In Pastore, the court granted summary judgment in favor of the plan administrator, despite finding that the severance plan's SPD unlawfully omitted information that a participant was only entitled to severance if he resigned because the company was requiring him to relocate. 388 F. Supp. 2d at 221. Pastore had been offered the choice of moving to another office or working part-time at home, and accordingly was refused severance upon his resignation on the ground that he was not required to relocate, a condition to benefits about which he pled ignorance. Id. In finding that Witco proved harmless error, the court noted that "it is undisputed that Plaintiff learned of the 'required to relocate' requirement of the CIC Program when he was provided and admittedly read a copy of the 'Change in Control Severance Program Description' before he announced his resignation." Id. at 221. In contrast, where courts have held that the employer could not demonstrate harmless error, the employee had been given no information concerning the information missing from the SPD in violation of ERISA. For example, in Rothwell v. Chenango County N.Y.S.A.R.C. Pension Plan, No. 3:03-CV-00637 (GLS), 2005 WL 2276023, at *7 (N.D.N.Y. Sept. 19, 2005), the plaintiff did not receive information critical to her ability to minimize market losses on her benefits. Again, here there is no information Plaintiffs have alleged was missing from the SPD which, if included, would have permitted any class member to reap a larger Part B benefit.

[41]  Both the Part A and the Part B SPDs further informed Plaintiffs that they could obtain a copy of the written Plan document, which provided additional information regarding the operation of the respective plans, if they so desired. DFF ¶ 204.

- Plaintiffs were provided with information concerning the cash balance conversion, such as the November 1997 Newsletter and the Retirement Information Kit. DFF ¶¶ 160-91.

- While Plaintiffs now complain that they were not provided comparisons of their Part B cash balance benefit with what they would have earned had they continued to be eligible for Part A, CIGNA provided numerous opportunities for participants to obtain such information.  For example, CIGNA made available a 1-800 hotline called Signature Benefits Services and later AnswerLine®, which was designed for the express purpose of answering participants' questions, and had an Intranet site through which participants could request a benefits estimate.  DFF ¶¶ 217, 220.

Based on this information, Defendants anticipate that a number of Plaintiffs and class members will testify that they did not find the SPD misleading, were not wanting for any additional pension information, and incorporated the cash balance information they received into their financial and retirement planning.  DFF ¶ 227-29.  Contrary to Plaintiffs' suggestion that the cash balance plan masked pension information, some Plaintiffs and class members will testify that the cash balance plan was actually easier to understand than CIGNA's traditional defined benefit plan.  DFF ¶ 227.  This is not surprising, as it is well established that one of the most attractive features of a cash balance plan is that a yearly account balance provides a much more straightforward picture of a plan participant's retirement benefits.  United States General Accounting Office, Report to Congressional Requestors, Private Pensions, Implications of Conversions to Cash Balance Plan, September 2000, at 14-15.  Indeed, some Plaintiffs and testifying class members will admit that the Plan Administrator provided them so much information about their cash balance benefits that they did not even read the SPD or failed to

read it carefully. DFF ¶¶ 223, 225, 226, 228, 230. In short, Plaintiffs and the testifying class

members suffered no harm from the alleged deficiencies in the SPD.[42]

     **E.**    **Plaintiffs' SPD Claim Fails Because The Plan Administrator Is Not A Party
To This Lawsuit.**

Plaintiffs admit that their SPD disclosure claim lies against the Plan Administrator for the

CIGNA Pension Plan. As they themselves state: "ERISA places the responsibility for the

204(h) notice, the Summary of Material Modification, and the Summary Plan Description on the

plan administrator." Plaintiffs' Proposed Conclusions of Law at 19 ¶ 7; see 29 U.S.C. §

1024(b)(1) ("The administrator shall furnish . . . a copy of the summary plan description . . .");

see also Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 104 (S.D.N.Y. 2005) (disclosure

obligations are imposed only on the "plan administrator"). Despite this, Plaintiffs have chosen

not to sue CIGNA's Plan Administrator for Part B, who is not and has never been a party to this

lawsuit. Accordingly, the Court should enter judgment in Defendants' favor on Plaintiffs'

disclosure claims against CIGNA and the Plan itself.

Plaintiffs allege that this Court may deem CIGNA the Plan Administrator because the

Part B Plan document did not reference anyone else as the plan administrator. See Pls' Trial

Brief at 33. This is incorrect. Where a plan and its sponsor fail to designate a plan administrator,

it is true that the sponsor itself may be deemed the plan administrator for purposes of ERISA's

disclosure duties. 29 U.S.C. § 1002(16)(A)(ii) ("The term 'administrator' means . . . if an

---

[42]    Given the varying testimony expected from Plaintiffs and the testifying class members on these issues, it is
clear that while the adequacy of the SPD can be addressed on a class-wide basis, the issues of likely harm and
harmless only error can be resolved on an individualized basis. Of course, if the Court finds no deficiencies in
the SPD, the issues of likely harm and harmless error need not be addressed. But if the Court finds that the
SPD or the Section 204(h) notice is deficient, the trial can only ultimately resolve the SPD and Section 204(h)
claims for the ten Plaintiffs and testifying class members. See, e.g., In re Unisys Corp. Ret. Med. Ben. ERISA
Litig., MDL No. 969, 2003 WL 252106, at *5 (E.D. Pa. Feb. 4, 2003) (decertifying class because
individualized questions of reliance could not be resolved on a class-wide basis under ERISA).

administrator is not so designated, the plan sponsor.").  Where, as here, a plan administrator has

been designated by the sponsor, however, that plan administrator alone – and not the sponsor – is

responsible.  The Second Circuit has explained in this vein that ERISA's disclosure "obligation

is placed on the person designated under ERISA as the 'administrator' of the plan, not on every

fiduciary," let alone the plan sponsor.  Lee v. Burkhart, 991 F.2d 1004 (2d Cir. 1993) (emphasis

added); see also Malia v. Gen. Elec. Co., 23 F. 3d 828, 833 (3d Cir. 1994) (rejecting disclosure

claims against employer under 29 U.S.C. §§ 1021-25 because "[o]nly plan administrators are

required to disclose benefits information to beneficiaries").

Both the Part A and Part B Plan documents provide that the Plan Administrator will be

designated by "The Committee," which is defined as "the CIGNA Corporation Corporate Benefit

Plan Committee, or a successor entity or group of persons, that is the Named Fiduciary for the

Plan as described in Article XII."  DFF ¶ 64; see also DFF ¶ 64 (The Plan Administrator shall be

"the person, entity, or committee responsible for the administration of the Plan as specified in

Article XIII."), DFF ¶ 64 (Part A) (same); DFF ¶ 64 (Part B) ("The Committee shall delegate to

a Plan Administrator the duties, authority and functions set forth in this Article XIII."); DFF ¶

64 (Part A) (same).  Thus, the Plan document vest authority in the Benefits Committee to appoint

a Plan Administrator for Part B.

In accordance with these Plan provisions, the Committee formally designated Stewart M.

Beltz, Assistant Vice President Benefits, as the Plan Administrator for the traditional defined

benefit plan on March 29, 1996.  DFF ¶ 66.[43]  Moreover, the 1998 Part B SPD and 1999 Part B

SPD explicitly list the Plan Sponsor and the Plan Administrator for Part B:

---

[43]    The Committee designated Mr. Beltz's replacement as Plan Administrator, Gerald T. Meyn, Vice President, on
continued . . .

|                    |                          |
|--------------------|--------------------------|
| Plan Sponsor       | CIGNA Corporation        |
|         . . .      |                          |
| Plan Administrator | Stewart M. Beltz         |
|                    | CIGNA Corporation        |
|                    | 1601 Market Street       |
|                    | Philadelphia, PA 19192   |

DPPF ¶ 69.  Because the Committee in fact designated a Plan Administrator, Plaintiffs'

suggestion that CIGNA be held to be the Plan Administrator should be rejected.  Rather, the

existence of this designation leads to the inescapable conclusion that only the Plan Administrator

– and not CIGNA or the Plan itself – may be liable for a disclosure violation.  Since the Plan

Administrator was not named as a defendant, Plaintiffs' disclosure claim fails as a matter of law.

### F.    Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be Governed Exclusively By The Terms Of The CIGNA Pension Plan, Not The SPD.

As explained previously, the Part B SPD satisfied ERISA's disclosure requirements and

Plaintiffs have not been harmed by any alleged inadequate disclosures in the SPD.  Nevertheless,

even assuming arguendo that Plaintiffs could otherwise satisfy the elements of their SPD claim,

they still cannot be entitled to pension benefits based on any document aside from the actual

governing Part B plan document.

Defendants recognize that the Second Circuit has held that publishing an SPD can

effectively modify the terms of an underlying plan document in some circumstances, see, e.g.,

Burke, 336 F. 3d 110; Weinreb, 404 F.3d at 171, and that this Court is bound by the Second

Circuit's decisions in those cases.  Nevertheless, Defendants respectfully submit (and raise this

issue to preserve it for appeal) that the Second Circuit's suggestion that an SPD can effectively

modify the terms of an ERISA plan is inconsistent with the Supreme Court's decision in Curtiss-

---

May 14, 2003.  DFF ¶ 67.  Effective August 20, 2004, the Committee replaced Mr. Meyn with John Arko as Plan Administrator.   DFF ¶ 68.

Wright, 514 U.S. 73.  In Curtiss-Wright, a company tried to amend its medical plan by

publishing a new SPD describing the new plan terms.  The Supreme Court held that publishing

the SPD could only modify the terms of the Plan if the act of publishing the SPD satisfied the

formal amendment procedures in the plan.  See id. at 83-85.  The Supreme Court further

explained in Curtiss-Wright that where a plan reserves to one particular corporate body the right

to modify a plan, "one must look only to [that corporate body] and not to any other person" to

determine whether an amendment is valid.  Id., at 79 (emphasis in original).[44]  Here, the Plan

Administrator – the person with exclusive responsibility for publishing the SPD – did not have

the power to modify the terms of Part B, and, moreover, the publication of the SPD did not

satisfy the Plan's formal amendment procedures.  DFF ¶¶ 65-66, 74.  Accordingly, to permit the

SPD to effectively modify the terms of Part B would run afoul of Curtiss-Wright.  Plaintiffs'

benefits must be governed exclusively by the terms of the Part B plan document.

## V.    JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 4 BECAUSE THE PLAN ADMINISTRATOR PROVIDED ADEQUATE NOTICE UNDER ERISA SECTION 204(h).

In Count 4, Plaintiffs contend that CIGNA violated ERISA Section 204(h),

29 U.S.C. § 1054(h), by reducing their plan benefits without proper advance notice to

participants.  This argument is without merit because (1) the Plan Administrator provided timely

notice of the Plan amendment freezing the Part A benefits, which was the only reduction of

benefit accruals class members experienced; (2) even if the Part B amendment required a Section

---

[44]    In addition, and as earlier noted, see supra Section IV. E., publishing an SPD is the exclusive responsibility of the plan administrator.  By contrast, the act of amending or modifying the terms of an ERISA plan is a settlor function that does not implicate any of ERISA's fiduciary duties.  See, e.g., Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444-45 (1999) ("[A]n employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets. . . .  A settlor's powers include the ability to add a new benefit structure to an existing plan.").

204(h) notice, the Plan Administrator's written communications to all covered participants fulfilled that requirement; (3) CIGNA was not required to provide notice of the rehire amendment to employees who were not employed by CIGNA at the time; (4) Plaintiffs' claim lies only against the Plan Administrator, whom they failed to sue; and (5) Plaintiffs' claim is time-barred.  For these reasons, judgment should be entered in favor of Defendants on Count 4.

### A.     The Plan Administrator Provided Proper Notice Regarding The Amendment Freezing Accruals Under Part A.

ERISA Section 204(h) requires a plan administrator to notify participants of a plan amendment that is likely to cause a "significant reduction" in the rate of future benefit accrual, at least 15 days in advance of the implementation of the amendment.  See 29 U.S.C. § 1054(h).[45]

Here, the only plan amendment causing a reduction in "future benefit accruals," and which therefore required a Section 204(h) notice, was the freezing of benefit accruals under Part A for certain participants, effective December 31, 1997.  DPP ¶ 32 (Amendment No. 4). See Depenbrock v. CIGNA Corp., 278 F. Supp. 2d 461, 469 (E.D. Pa. 2003), reversed on other grounds, 389 F.3d 78 (3d Cir. 2004) ("Taylor's execution of Amendment Number 4 . . . froze the pension benefit accruals of the participants that would be converted to cash balance plan effective December 31, 1997").  For this amendment, the Plan Administrator adequately and

---

[45]     Section 204(h), as it was stated at the time of the alleged violation, stated:

> (h) Notice of significant reduction in benefit accruals
>
> (1) A [pension] plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to-
>
> (A) each participant in the plan.

29 U.S.C. § 1054(h) (emphasis added).

timely provided a Section 204(h) notice to each participant through the November 1997

Newsletter and/or the Retirement Information Kit distributed in early December 1997.[46]  See the

November 1997 Newsletter ("Employees participating in the new CIGNA Retirement Plan will

stop earning benefits under the current Pension Plan on December 31, 1997."); DFF ¶ 163;

Retirement Information Kit (Q.  What will happen to the benefits I have earned under the

Pension Plan? . . .  You will earn no further benefits under the Pension Plan after December 31,

1997.) (emphasis added); DFF ¶ 176.  Thus, the newsletter, issued to each employee at his or her

desktop, and/or the Retirement Information Kit, sent using an individual mailing label on a

sealed envelope to each participant's office, timely notified each participant of the freeze and

constituted a lawful Section 204(h) notice.  See 29 U.S.C. § 1054(h) (requiring notice to "each

participant in the plan").

> **B.      Even If The Plan Administrator Was Required To Issue A Section 204(h) Notice For The Amendment That Created Part B, Plaintiffs' Section 204(h) Claim Still Fails.**

Nonetheless, Plaintiffs suggest that the Plan Administrator violated ERISA Section

204(h) by failing to provide an adequate Section 204(h) notice for the Part B amendment.  This

theory likewise fails.

First, while the freeze amendment caused a "reduction" in the rate of future benefit

accruals, the subsequent adoption of Part B did not effect any "reduction."  Rather, the Part B

amendment, which was signed on December 21, 1998, retroactive to January 1, 1998, resulted in

benefits accruing for participants whose accruals, at that point, were frozen.  In other words,

---

[46]    Either of these documents suffices to fulfill the Plan Administrator's obligations under Section 204(h) regarding the freeze amendment, although the Plan Administrator intended the Newsletter to satisfy its notice obligation.  Plaintiffs complain that the Newsletter did not state explicitly that it constituted a Section 204(h) notice; however, nothing in ERISA requires that a Section 204(h) be explicitly entitled as such.

there were <u>two</u> amendments: (1) Amendment No. 4, which froze accruals under Part A and therefore triggered the notice requirement of Section 204(h), and (2) the December 21, 1998 amendment that created Part B and therefore actually <u>increased</u> accruals.[47]  Because the converted participants' benefit accruals were <u>increased</u> rather than <u>reduced</u> by the implementation of Part B, no additional Section 204(h) notice was required.

Even if, however, this Court somehow finds that the Part B amendment signed December 21, 1998 was an event requiring a Section 204(h) notice, the Plan Administrator fulfilled this requirement by providing to all converted participants the November 1997 Newsletter, the Retirement Information Kits and/or the 1998 SPD, each of which "[set] forth the plan amendment and its effective date."  29 U.S.C. § 1054(h); DFF ¶117.  Plaintiffs acknowledge that the Plan Administrator provided participants "a general overview" of the cash balance plan, but contend that the notice should have compared participants' benefits under Part A and Part B. <u>See</u> Pls' Trial Brief at 37.  Nothing in Section 204(h), however, requires the notice to describe how benefits are reduced or to compare what a participant's benefits would be had the participant remained in a prior plan, and indeed, Plaintiffs cite no authority to justify their strained reading of Section 204(h)'s requirements.[48]

---

[47]  Plaintiffs variously argue that the amendments implementing the freeze and Part B were a single event, a proposition entirely belied by both the Plaintiffs in <u>Depenbrock</u> (which were a subset of the Class in this case, represented by the same counsel and that court's findings.  While the freeze amendment was signed in October 1997, and became effective December 31, 1997, the cash balance amendment was signed on December 21, 1998 and became effective only on that date.  <u>See Depenbrock</u>, 278 F. Supp. 2d at 466, 469 (noting that Amendment No. 4, "which froze the pension benefit accruals of the participants that would be converted to the cash balance plan effective December 31, 1997," was executed on October 31, 1997); <u>Depenbrock</u>, 389 F.3d at 83 (holding that "December 21, 1998, is the effective date of the amendment" implementing the cash balance plan).  Thus, Plaintiffs' suggestion that the freeze and the cash balance plan implementation were a single plan amendment is both faulty and disingenuous.

[48]  While Section 204(h) as it was in effect at the time is applicable to Plaintiffs' claim, Plaintiffs nevertheless point to Section 204(h) as it was amended in 2001 to specifically require that the "approximate magnitude" of reductions be illustrated or described.  <u>See</u> Pls' Trial Brief at 38 n.13.  Plaintiffs' reliance on a subsequent

continued . . .

Plaintiffs contend that where a notice does not "fully explain" how an amendment reduces participants' benefits, the notice is insufficient under Section 204(h), citing the Second Circuit's recent decision in <u>Frommert</u>.  <u>See</u> Pls' Trial Brief at 38.  Plaintiffs' misleading reliance on <u>Frommert</u> should not lead this Court astray.  The Second Circuit in <u>Frommert</u> <u>did not</u> hold that a Section 204(h) notice must disclose the amount of the reductions in benefit accruals.  433 F. 3d at 266.  Instead, the Second Circuit simply held that a Section 204(h) notice is required even where benefit accruals are reduced <u>indirectly</u>, e.g., via the introduction of a new offset.

Moreover, to recover on a Section 204(h) claim, Plaintiffs also must demonstrate that they suffered "likely harm," which they cannot do, as explained above in Section IV. C, concerning Plaintiffs' lack of harm due to the alleged SPD deficiencies.  <u>See</u> <u>FleetBoston</u>, F. Supp. 2d at 171-72 (noting that the Section 204(h) test would be subject to the likely prejudice test); <u>Frommert</u>, 433 F.3d at 266-67 (applying likely prejudice test to a Section 204(h) claim).  Likewise, for the same reasons as described above, even if Plaintiffs could prove likely harm, CIGNA can demonstrate that any deficiency resulted only in harmless error, thus precluding recovery.

### C.      The Plan Administrator Was Not Required Under ERISA Section 204(h) To <u>Notify Terminated Part A Participants About The Amended Rehire Rule.</u>

Finally, Plaintiffs allege that CIGNA violated Section 204(h) by implementing the modified "rehire rule" on December 21, 1998, without providing notice of the resulting significant reduction in benefit accruals to participants <u>not</u> employed at that time.  Specifically, Plaintiffs complain that class members who were rehired after December 21, 1998, and then

---

statutory amendment is nonsensical.  The fact that Congress subsequently amended the statute to require administrators to explain an amendment's resultant reductions in benefits, if anything, supports the view that prior to such amendment that requirement did not exist.

became participants in Part B, like Plaintiff Broderick, were not notified of the amended rehire rule.  See Pls' Trial Brief at 57-58.[49]  This claim fails because no Section 204(h) notice was required for these former employees because (1) these employees were not likely to be affected by the amendment, and (2) the Plan amendment did not cause a reduction in their future benefit accruals since these former employees were not accruing any benefits at the time of the amendment.

First, Section 204(h) requires that written notice be provided only to those participants who are likely to experience a significant reduction in benefits.  The regulations in effect during the relevant time state that a participant who, at the time of the amendment, is not expected to have a "significant reduction" is not required to be provided the notice:

> Q-9:   If section 204(h) notice is required with respect to an amendment, must such notice be provided to participants or alternate payees whose rate of future benefit accrual is not reduced by the amendment?
>
> A-9:   (a) In general.   A plan administrator need not provide section 204(h) notice to any participant whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment nor to any alternate payee under an applicable qualified domestic relations order whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment.   A plan administrator need not provide section 204(h) notice to an employee organization unless the employee organization represents a participant to whom section 204(h) notice is required to be provided.

26 C.F.R. § 1.411(d)-6T (emphasis added).

---

[49]   Plaintiffs mistakenly allege that the Section 204(h) notice did not reference the amended rehire rule.  Id. at 58. In fact, the Retirement Kit addressed the fact that employees rehired after January 1, 1998, would be placed in Part B, as it stated, "If you are hired or rehired after January 1, 1998, you will become a participant in the Retirement Plan on your date of hire."  DFF ¶ 189.  See Pls' Trial Brief at 58.

The regulations also make clear that whether a particular participant is expected to have a significant reduction in future benefits is "determined based on all relevant facts and circumstances at the time the amendment is adopted." Id.  Thus, this Court must analyze all of the "facts and circumstances" applicable to each participant to determine whether that participant is someone who, <u>at the time of the amendment</u>, was likely to have a "significant" reduction.[50]

Tellingly, during the period from January 1, 1998 until December 21, 1998, when the modified "rehire rule" was adopted, only 194 participants were rehired, a fact revealed as a result of the <u>Depenbrock</u> suit, also litigated by Plaintiffs' counsel herein.[51]  Nothing in the expected testimony of Plaintiffs or testifying class members will explain "facts and circumstances" that would demonstrate a likelihood or appreciable expectation in 1997 or 1998 that droves of former employees would return to CIGNA.

Thus, at the time of the adoption of the plan amendment that modified the "rehire rule" on December 21, 1998, the benefits of class members like Ms. Broderick, who no longer worked for CIGNA, were not likely to be affected by the amendment, let alone to suffer a "significant reduction." See 26 C.F.R. § 1.411(d)-6T.  The regulations specifically address these circumstances and provide that no Section 204(h) notice is required:

> (c) Examples.  The following examples illustrate the rules in this Q&A-9:
>
> Example 1.  Plan A is amended to reduce significantly the rate of future benefit accrual of all current employees who are participants in the plan.  <u>It is reasonable to expect based on the facts and circumstances that the amendment will not reduce the rate of future benefit accrual of former employees who are currently receiving</u>

---

[50]   As noted earlier, this Court has not examined the propriety of class certification for Plaintiffs' disclosure claims, including this claim regarding the rehire's Section 204(h) notification.

[51]   <u>Depenbrock.</u>, 278 F. Supp. 2d at 469, <u>rev'd on other grounds</u>, 389 F.3d 78.

> <u>benefits or that of former employees who are entitled to vested</u>
> <u>benefits.   Accordingly, the plan administrator is not required to</u>
> <u>provide section 204(h) notice to such former employees.</u>

26 C.F.R. § 1.411(d)-6T (emphasis added).[52]

Second, at the time that Plaintiffs allege a Section 204(h) notice should have been issued to these former employees, they were not earning service or benefit credits at all.  Rather, once these employees were separated from employment with CIGNA, their prior plan benefit was static and did not continue to accrue.  DFF ¶ 28.  Accordingly, the Plan Administrator was not required to provide a Section 204(h) notice to these former employees because they were not accruing benefits, and accordingly, no logical argument can be made that the rehire amendment reduced their "benefit accruals."

In sum, the Plan Administrator was not required to issue a Section 204(h) notice to former employees.  Plaintiffs' claim in Count 4 based on the rehired participants is therefore without merit.

### D.     Plaintiffs' Section 204(h) Claim Fails Because The Plan Administrator Is Not A Party To This Lawsuit.

Plaintiffs admit that their Section 204(h) claim lies against the Plan Administrator for the CIGNA Pension Plan, who was never named as a Defendant in this suit.  As they state:  "ERISA places the responsibility for the 204(h) notice, the Summary of Material Modification, and the Summary Plan Description on the plan administrator."  Pls' Proposed Conclusions of Law at

---

[52]   Importantly, if a plan administrator is not required to provide a Section 204(h) notice to a particular participant at the time of the amendment, there is no obligation to provide that participant a Section 204(h) notice at any later date.  Section 204(h) notice obligations are triggered based on the facts and circumstances "at the time the amendment is adopted."  26 C.F.R. § 1.411(d)-6T (Q-9).

19 ¶ 7; <u>see</u> 29 U.S.C. 1054(h) ("the plan administrator provides a written notice, setting forth the plan amendment").

As argued earlier, <u>see</u> <u>supra</u> Section IV. E., neither CIGNA nor the Plan itself, the only named Defendants in this suit, was the Plan Administrator for either Part A or Part B.  Because the Plan Administrator has not been named as a Defendant in this suit, this claim fails as a matter of law.

### E.     **Plaintiffs' Section 204(h) Claim Is Time-Barred.**

Plaintiffs' claim that the Plan Administrator failed to provide an adequate Section 204(h) notice also fails because it was not filed within the controlling statute of limitations.  Specifically, the claim is barred by Connecticut's two- or three-year statute of limitations, which should be borrowed by the Court here given the absence of a statute of limitations for Section 204(h) claims in ERISA.

Where an ERISA provision does not contain its own statute of limitations for a particular claim, the most analogous state statute of limitations governs.  <u>See</u> <u>Sandberg v. KPMG Peat Marwick, LLP</u>, 111 F.3d 331, 333 (2d Cir. 1997) ("Congress has neglected, however, to establish a statute of limitations for this enforcement section [29 U.S.C. §1132(a)(3)] of ERISA.  When Congress fails to provide a statute of limitations for claims arising under federal statutes, a court must apply the limitations period of the state-law cause of action most analogous to the federal claim.").[53]  Here, Plaintiffs' Section 204(h) claim is most analogous to a "[c]ivil action to collect wage claim [or] fringe benefit claim" under Connecticut law.  Conn. Gen. Stat. Ann. § 31-72; <u>see</u> <u>Syed v. Hercules Inc.</u>, 214 F.3d 155, 160-61 (3d Cir. 2000) (holding that Delaware's

---

[53]     ERISA does contain its own limitations period for claims for breach of fiduciary duty.  29 U.S.C. § 1113. Plaintiffs have not alleged such a claim.

one–year statute of limitations for claims to recover wages and benefits applied to plaintiff's ERISA claims), <u>cert. denied</u>, 531 U.S. 1148 (2001). In Connecticut, the statute of limitations on such claims is two years. <u>See, e.g.</u>, Conn. Gen. Stat. Ann. § 52-596 ("No action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues.").

If the Court concludes that the two-year statute of limitations does not apply, the only realistic alternative is Connecticut's three-year residual statute of limitations for tort claims. <u>See</u> Conn. Gen. Stat. Ann. § 52-577 (describing three-year statute of limitations for all tort claims not specifically addressed elsewhere). This limitations period has been held to apply to claims alleging statutory violations, including certain ERISA claims. <u>See, e.g.</u>, <u>Jaskilka v. Carpenter Tech. Corp.</u>, 757 F. Supp. 175, 177 (D. Conn. 1991) (holding the three-year tort statute of limitations applies to claims under ERISA Section 510); <u>Visconti v. Pepper Partners Ltd. Partnership</u>, No. X06CV990170072S, 2002 WL 1293224, at *8 (Conn. Super. Ct. May 14, 2002) (three-year statute of limitations under Conn. Gen. Stat. Ann. § 52-577 applies to claims under the Connecticut Environmental Protection Act); <u>Henderson v. Henderson Auto</u>, No. CV980086823, 2002 WL 725503, at *2 (Conn. Super. Ct. Apr. 1, 2002) (three-year statute of limitations under Conn. Gen. Stat. Ann. § 52-577 applies to claims pursuant to Conn. Gen. Stat. Ann. § 14-150(g) seeking a statutory lien).

Plaintiffs appear to be claiming that the Plan Administrator should have issued a Section 204(h) notice for the amendment that created Part B in either December 1997 or December 1998. Plaintiffs filed their Second Amended Complaint, which for the first time alleged that the Plan Administrator was required to, and did not, issue a Section 204(h) notice, more than 7 years later—on May 6, 2005. This claim does not relate back to the filing of the original Complaint

because it does arise out of the same conduct upon which the claims in the original Complaint were based.  See Fed. R. Civ. P. 15(c)(2).[54]  Accordingly, Plaintiffs' claim in Count 4 is time-barred.[55]

## VI.    EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEY ARE NOT ENTITLED TO ANY REMEDY.

Notably, nowhere in their Trial Brief do Plaintiffs describe the specific remedy they are asking this Court to impose if they prevail on any of their claims.  Likewise, Plaintiffs' Trial Memorandum states only that Plaintiffs seek injunctions finding Part B illegal, and that:

> Plaintiffs request that this Court order appropriate equitable and remedial relief to enjoin and provide redress for Defendants' violations of ERISA's vesting, benefit accrual and anti-cutback standards and its disclosure requirements.

Pls' Trial Memo at 3-4.

While Defendants are confident that this Court will enter judgment in their favor on all of Plaintiffs' claims, should the Court for some reason find for Plaintiffs, a host of legal principles may preclude any remedy to Plaintiffs.  For example, to the extent Plaintiffs seek monetary damages, they are unavailable under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).  See Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 215 (2002) (holding that

---

[54]    See, e.g., Goss v. Revlon, Inc., 548 F.2d 405, 407 (2d Cir.1976); Gomes v. Avco Corp., 964 F.2d 1330, 1334 (2d Cir. 1992) (finding that a § 1981 claim based on discriminatory refusal to process a grievance did not relate back to the plaintiff's original claim, which only mentioned one of the grievances because the second grievance was considered a separate transaction not contained in the original complaint);  Jackson v. Suffolk County Homicide Bureau, 135 F.3d 254 (2d Cir. 1998) (holding that the claims arising from the photography of a plaintiff's nude body after his arrest did not relate back to his original complaint because it had only alleged that the police applied excessive force);  Korody-Colyer Corp. v. Gen. Motors Corp., 828 F.2d 1572, 1575 (Fed. Cir. 1987) ("Because [plaintiff's] amendment asserts an entirely new claim for relief based upon different facts, it does not relate back.");  Am. Express Co. Sec. Litig., 02 Civ. 5533 (WHP), 2004 U.S. Dist. LEXIS, at *23 (S.D.N.Y. March 31, 2004) (stating that "an amended pleading does not relate back if it introduces a different set of operative facts").

[55]    Even if this claim were to relate back to the filing of the original complaint, it still would be time-barred since the original complaint was filed on December 18, 2001.

under Section 502(a)(3), the only remedy is equitable relief limited to "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)").  Also, Supreme Court precedent dictates that under the circumstances related to their cash balance plan claims in Counts 1, 3 and 5, Plaintiffs would not be entitled to any retroactive relief.  City of Los Angeles, Dep't of Water & Power v. Manhart, 435 U.S. 702, 721 (1978); Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris, 463 U.S. 1073, 1106-07 (U.S. 1983); Fla. v. Long, 487 U.S. 223, 229-40 (1988); Walsche v. First Investors Corp., 793 F. Supp. 395, 400 (D. Conn. 1992).

If Plaintiffs further describe the remedies they seek in this suit, or in the unlikely event that liability is found, Defendants respectfully request the right to provide the Court with a more thorough analysis concerning what, if any, remedies might be appropriate.

## VII.  PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES WHICH BAR THEIR CLAIMS.

The claims of all three Plaintiffs, two testifying class members, and thousands of other class members in this suit are barred entirely by an Agreement and Release ("Release") each signed in exchange for the payment of severance.  DPP ¶¶ 235-42, 270.  A review of the actual terms of the Releases signed – and the law governing such releases – confirms that the releases are binding as to the claims asserted in this case because they are statutory ERISA claims, not claims for benefits under the Plan, which is a critical distinction under Second Circuit law.

Plaintiffs cannot avoid the Release based on the exclusion for "any claims for benefits under any retirement, savings, or other employee benefit programs."  Release ¶ 5(f).  By its terms, this exclusion only applies to claims for benefits under the Plan, not claims alleging statutory ERISA violations.  In this suit, Plaintiffs allege that the terms of the Plan violate ERISA and that the summary plan description was misleading, in violation of ERISA's disclosure

- 79 -

obligations.  These are statutory claims that courts in the Second Circuit consistently distinguish from claims for benefits under the terms of a plan.  For example, in <u>Campanella v. Mason Tenders District Council Pension Plan</u>, 299 F. Supp. 2d 274 (S.D.N.Y. 2004), the plaintiffs, like Plaintiffs here, alleged "that the Plan itself violates ERISA" – specifically, ERISA's accrual rules.  299 F. Supp. 2d at 280, 281.  The court ruled these were statutory claims, <u>not</u> claims for benefits under the plan, and that therefore the plaintiffs were not required to exhaust their administrative remedies.  The court held:

> The Second Circuit requires that a plaintiff bringing an ERISA claim for denial of specific benefits under an employee benefits plan exhaust his or her administrative remedies before pursuing the claim in court.  But the Second Circuit has not yet addressed whether it requires exhaustion of claims generally alleging statutory ERISA violations. . . .  [T]he Third, Fourth, Fifth, Sixth, Ninth, and Tenth Circuits have expressly stated that exhaustion is not a prerequisite to actions asserting statute-based ERISA claims. Furthermore, several district courts in the Second Circuit have declined to require exhaustion of statute-based ERISA claims.

<u>Id.</u> at 281 (internal citations omitted).  <u>See also</u> <u>De Pace v. Matsushita Elec. Corp. of Am.</u>, 257 F. Supp. 2d 543, 558 (E.D.N.Y. 2003) ("District courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation."); <u>Gray v. Briggs</u>, No. 97-6252, 1998 WL 386177, at *7 (S.D.N.Y. July 7, 1998) ("This Court is persuaded by Judge Leisure's decision . . . finding that there is no exhaustion requirement in ERISA suits alleging statutory violations rather than a denial of benefits.") (internal citations omitted).

Plaintiffs, the two testifying class members, and the thousands of other class members who signed releases received the benefit of their bargain — valuable severance pay in exchange for a broad release.  Given the nature of Plaintiffs' claims in this case – none of which constitutes a claim for benefits under CIGNA's existing benefit plans – these claims are plainly barred by

the release.  That affirmative defense was preserved by Defendants in their Answer, and it is fatal

to all of Plaintiffs' claims.  See Defendants' Answer and Affirmative Defenses to the Third

Amended Complaint, at 14 (dkt # 166).[56]

## VIII.   PLAINTIFFS' REQUEST TO ENFORCE THE <u>DEPENBROCK</u> DECISION IS FRIVOLOUS.

In their Trial Brief, Plaintiffs also ask this Court to enforce the judgment entered by the

United States District Court for the Eastern District of Pennsylvania in <u>Depenbrock</u>, 389 F.3d

78.[57]  This request is frivolous for numerous reasons.  First, the district court's judgment in

<u>Depenbrock</u> required John Depenbrock's benefit – and only his benefit – to be recalculated as if

he or she had remained in Part A.  Although Plaintiffs' counsel in this case, Mr. Bruce (who also

represented Mr. Depenbrock), requested that the <u>Depenbrock</u> court enter a broader order

applicable to other participants, Defendants objected to such proposal.  <u>Compare</u> Defs' Ex. 529,

Proposed Order dated December 17, 2004 (proposing order that "Defendants must apply Section

2.4 as in effect before December 21, 1998 to employees who were rehired before that date") <u>with</u>

Defs' Ex. 530, Defendants' Memorandum In Opposition to Proposed Order (noting that the

proposed order incorrectly requested class-wide relief).  The district court's Order applied only

to Depenbrock.  <u>See</u> Stip. Ex. 175, Order dated December 23, 2004 (ordering that "The

amendment of Section 2.4 shall not be applied retroactively to Plaintiff.").

Thus, Defendants are in full compliance with the Court's Order in <u>Depenbrock</u>.

---

[56]   Given that Plaintiffs Amara, Broderick and Glanz signed a Release while thousands of other class members did not, they are plainly not adequate class representatives for the class as a whole.  See <u>Walker v. Asea Brown Boveri, Inc.,</u> 214 F.R.D. 58 (D. Conn. 2003); <u>see also</u> <u>Amara v. CIGNA Corp.,</u> No. 3:01CV2361 (DJS), 2004 WL 2381733, at *1-2 (D. Conn. Oct. 13, 2004) (acknowledging potential class certification issues raised by release).

[57]   This claim is not even in Plaintiffs' Third Amended Complaint.

Second, Plaintiffs lack standing to pursue this action on behalf of absent class members. Plaintiffs Broderick and Glanz were not impacted by the <u>Depenbrock</u> decision at all and any "Depenbrock" relief would not inure to their benefit.  Although Plaintiff Amara was situated similarly to Mr. Depenbrock, her benefits already have been recalculated under Part A and she is receiving benefits as if she were in Part A.  DFF ¶ 223.  That is, Plaintiff Amara is no longer in Part B and is not receiving benefits under Part B.  Indeed, for this reason, Plaintiff Amara lacks standing to pursue any of the claims challenging the design of Part B or communications about Part B, and she is not an appropriate class representative on any of the claims alleged in the Third Amended Complaint.  <u>See, e.g.,</u> <u>Dickerson v. Feldman</u>, 04 Civ. 7935, 2006 U.S. Dist. LEXIS 14230, at *3 (S.D.N.Y. Mar. 30, 2006)**.**

Third, Defendants have already notified all of the individuals potentially affected by the <u>Depenbrock</u> decision (i.e., approximately 189 employees rehired by CIGNA between January 1, 1998 and December 21, 1998) of the decision and that their benefits will be recalculated under Part A if that recalculation affords them a greater benefit.  DFF ¶ 43.  Defendants have recalculated those benefits for participants as they retire or request a benefits estimate, and are presently in the process of recalculating those benefits for those participants who have not yet elected to retire or requested an estimate.  DFF ¶ 43.

In short, Defendants are in full compliance with the <u>Depenbrock</u> decision and Plaintiffs have no standing to pursue this issue in any event.  Accordingly, Plaintiffs' request to enforce the <u>Depenbrock</u> decision is unnecessary, inappropriate and should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' presentation at the upcoming trial will demonstrate that this Court should enter judgment in Defendants' favor on all of Plaintiffs' claims in this case.


Dated:  June 27, 2006                    Respectfully submitted,


**MORGAN, LEWIS & BOCKIUS LLP**


By:  /s/ Joseph J. Costello_____
Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
*Admitted pro hac vice*
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
(215) 963-5295/5258/5472
(215) 963-5001 (fax)

**ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)


*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*