# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

Janice C. Amara, Gisela R. Broderick,　　:
Annette S. Glanz, individually and　　　 :
on behalf of all others similarly situated,　:
　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　Plaintiffs,　　　:
　　　　　　　　　　　　　　　　　　　 :
　　　　vs.　　　　　　　　　　　　　:　Civil. No. 3:01-CV-2361 (MRK)
　　　　　　　　　　　　　　　　　　　 :
CIGNA Corp. and　　　　　　　　　　 :　July 25, 2006
CIGNA Pension Plan,　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　Defendants.　 :

# PLAINTIFFS' REPLY TRIAL BRIEF

Stephen R. Bruce Ct 23534
Suite 210
805 15th St., NW
Washington, DC 20005
(202) 371-8013

Thomas Moukawsher Ct 08940
Moukawsher & Walsh, LLC
21 Oak Street
Hartford, CT 06106
(860) 287-7000

Attorneys for the Plaintiff Class

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   Section 7.3 of CIGNA's Plan Provides that Participants Will Lose Their
     Cash Balance Accruals If They "Elect" to Preserve Their Previously-Earned
     Annuity Benefits; This Violates ERISA's Nonforfeiture Rule. . . . . . . . . . . . . . . 2

II.  The Periods of "Wear-away" with No Additional Benefits Violate ERISA's
     133⅓% Accrual Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. The "Benefit" that Section 204(b)(1)(H) Regulates Is the Same "Benefit"
     that Every Other Part of ERISA Section 204 Regulates. . . . . . . . . . . . . . . . . . . . 6

     A.   CIGNA's Argument that the Rate of "Benefit Accrual" Does Not
          Refer to the Increase in the "Accrued Benefit" Is Contrary to
          Congress' and the Federal Agencies' Consistent Use of that Term . . . . . . 9

     B.   If an "Accrued Benefit" Is Determined in a Form "Other Than an
          Annual Benefit Commencing at Normal Retirement Age," ERISA
          §204(c)(3) Requires that It Be the Actuarial Equivalent of
          "Such Benefit" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     C.   Reductions in the Rate of an Employee's Benefit Accrual Based on
          Age Cannot Be Erased by Rephrasing the Discrimination as Based
          on the Number of Years to Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     D.   The Treasury Department Has Never Adopted the "Consistent View"
          that CIGNA Suggests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     E.   CIGNA's Criticisms of Richards as "Wrongly Decided" Do Not
          Withstand Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     F.   The Periods of "Wear-Away" With No Additional Benefits Violate
          the Age Discrimination Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

     G.   CIGNA's Suggestion that It Would Be "Enormously Expensive"
          to Comply with the Age Discrimination Law Is Unsupported and
          Contrary to the Available Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

IV.   ERISA Section 204(h) Requires Understandable, Advance Notice of a
      Significant Reduction in Benefits. ...................................... 31

      A.   Section 204(h) Required CIGNA to Tell Its Employees that Their
           Future Benefits Were Being Reduced. ........................... 32

      B.   ERISA Section 204(h) Also Required Advance Notice of the Repeal
           of the Favorable "Rehire Rule" When that Action Had Disastrous
           Consequences for the Benefits of Rehired Employees. ............... 35

V.    CIGNA's Summary of Material Modification and SPD Omit Any Disclosure
      of the Reductions and Falsely Assured Participants that the Cash Balance
      Benefits Were "Larger" or "Comparable" and that "Each Dollar's Worth of
      Credits Is a Dollar of Retirement Benefits Payable to You" ................ 37

      A.   CIGNA Falsely Assured the Employees that the New Cash Balance
           Plan Was Comparable to or Better than the Old Plan in Order to
           "Avoid Any Significant Negative Reaction from Employees" ......... 38

      B.   CIGNA's Disclosures Resulted in "Likely Prejudice" to the
           Participants' Ability to Make Well-Informed Employment and
           Retirement Decisions. ......................................... 41

VI.   CIGNA's Other Defenses to the Disclosure Violations Lack Merit. .......... 50

      A.   CIGNA Had Notice of the SMM Claim under Rule 8. ............... 50

      B.   CIGNA Is the "Plan Administrator" for Disclosure Purposes
           Because It Controlled the Disclosures. ........................... 51

      C.   There Is No Statute of Limitations Barrier to the Section 204(h)
           Claim, or the SMM and SPD Claim. ........................... 60

      D.   Burke v. Kodak and Frommert Show that the Supreme Court's
           Schoonejongen Decision Does Not Preclude Relief for Disclosure
           Violations. .................................................. 66

VII.  CIGNA Does Not Contest that "Minimum Benefits" Earned under the Old
      Plan Have Not Been Protected and that Participants Were Never Notified
      of their Minimum Benefits, as the SPD Promised. ....................... 67

       A.      CIGNA Does Not Contest that the "Free 30%" Survivor's Benefit
Is a Minimum Benefit that Was Not Protected. . . . . . . . . . . . . . . . . . . . . . 70

       B.      CIGNA Does Not Contest that the "Relative Value" of Optional
Forms of Benefit With Unequal Values Has Not Been Disclosed . . . . . . 71

       C.      Exhaustion Is Not "Jurisdictional" and It Is Not Required for
Statutory Claims; Moreover, Named Plaintiffs Amara and Broderick
Exhausted CIGNA's Internal Claims Procedure. . . . . . . . . . . . . . . . . . . 74

VIII.  Frommert Shows that the Supreme Court's Great-West Decision Does Not
Preclude Relief for ERISA Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

IX.    The Releases that CIGNA Has Solicited from Over 2,000 Class Members,
Mostly After the Certification of this Case as a Class Action, Contain an
Express Exception for "Any Claims for Benefits Under Any Retirement . . .
Programs." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

X.     This Court Has Authority to Compel CIGNA to Comply with the Declaratory
Order in the Depenbrock Litigation in Favor of Members of This Class. . . . . . 86

XI.    The 2002 Class Certification Order May Be Altered or Amended to Define
the Claims and Defenses Before Final Judgment Is Entered. . . . . . . . . . . . . . . 88

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arnett v. CalPERS*, 179 F.3d 690 (9th Cir. 1999), *vacated and remanded on other grounds*, 528 U.S. 1111 (2000) ........................................................ 19

*Auer v. Robbins*, 519 U.S. 452 (1997) .................................................. 22

*Augustin v. Jablonsky*, 2001 WL 770839 (E.D.N.Y. 2001) ................................. 87

*Berger v. Xerox*, 338 F.3d 755 (7th Cir. 2003) ................................................ 12, 16

*Bonovich v. Knights of Columbus,* 146 F.3d 57 (2d Cir. 1998); *aff'g* 963 F.Supp. 143 (D.Conn. 1997) .............................................................. 3

*Brody v. Enhance Reins. Co. Pension Plan*, 2003 WL 1213084 (S.D.N.Y. 2003) ................................................................. 33

*Burke v. Kodak Retirement Income Plan*, 336 F.3d 103 (2d Cir. 2003), *cert. denied*, 540 U.S. 1105 (2004) ................................................. 45, 48-49, 54

*Campanella v. Mason Tenders' District Council Pension Plan*, 299 F. Supp. 2d 274 (S.D.N.Y. 2004); *aff'd*, 132 Fed. Appx. 855, 2005 WL 414844 (2d Cir. 2005) ...................................................... 61, 75

*Campbell v. BankBoston*, 327 F.3d 1 (2003) ......................................... 3

*In re Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002 (S.D.Ohio 2006) ....................................................................... 59

*Carey v. IBEW Local 363 Pension Plan*, 201 F.3d 44 (2d Cir. 1999) ................. 61

*Carlson v. Principal Financial Group*, 320 F.3d 301 (2d Cir. 2003) ................. 52

*Carrabba v. Randalls Food Markets*, 145 F. Supp. 2d 763 (N.D. Tex. 2000); *aff'd*, 252 F.3d 721 (5th Cir. 2001), *cert. denied*, 534 U.S. 995 (2001) .......... 84

*Carter v. AT&T*, 870 F. Supp. 1438 (S.D. Ohio 1994) ........................................ 83

*Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032 (2d
    Cir. 1985) ................................................... 38

*Chao v. Malkani*, __ F.3d __, 2006 WL 1703368 (4th Cir. June 22, 2006) ........ 67

*Chapman v. Choicecare Long Island Term Disability Plan*, 288 F.3d 506
    (2d Cir. 2002) ................................................... 53

*Chisolm v. Plan Administrator of Joint Industry Board*, 2004 WL 3267292
    (E.D.N.Y. Oct. 19, 2004) ................................................... 47

*City of Los Angeles v. Manhart*, 435 U.S. 702 (1978) ......................... 78

*Cole v. Travelers Insurance Co.*, 208 F. Supp. 2d 248 (D.Conn. 2002) ............. 61

*Cooper v. IBM*, 274 F. Supp. 2d 1010 (S.D. Ill. 2003) ................................... 11, 25

*Connecticut v. Teal*, 447 U.S. 440 (1982) ........................... 29

*Costantino v. TRW*, 13 F.3d 969 (6th Cir. 1994) ................................... 72

*Crocco v. Xerox Corp.*, 137 F.3d 105 (2d Cir. 1998) ................................ 52-53, 59

*In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237
    (S.D.N.Y. 2005) ................................................... 79

*Curtiss-Wright v. Schoonejongen*, 514 U.S. 73 (1995) ......................... 66

*DePace v. Matsushita Electric Corp. of America*, 257 F. Supp. 2d 543
    (E.D.N.Y. 2003) ................................................... 75

*Depenbrock v. CIGNA*, 389 F.3d 78 (3d Cir. 2004); *rev'g*
    278 F. Supp. 2d 461 (E.D. Pa. 2003) .......................... 22, 32-33, 54-55, 86-88

*Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76 (2d. Cir. 2001) ........ 60

*Dist. Council 37, AFSME v. NY City Dep't of Parks*, 113 F.3d 347, 354
    (2d Cir.1997) ................................................... 29

*Donaldson v. Pharmacia Pension Plan*, __F.Supp.2d __, 2006 WL 1669789
    (S.D.Ill. June 14, 2006) ................................................... 78

v

*Eastman Kodak v. STWB*, __ F.3d __, 2006 WL 1835245 (2d Cir.
    June 26, 2006) ........................................................................... 22

*Engers v. AT&T*, 2001 U.S. Dist. LEXIS 25889 (D.N.J. 2001) .......................... 28

*Engler v. Cendant Corp.*, 2006 WL 1408583 (E.D.N.Y. 2006) .......................... 75

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000) ......... 2, 5, 10, 16, 25-26, 31

*Exarhakis v. Visiting Nurse Svc.*, 2006 WL 335420 (E.D.N.Y. Feb 13, 2006) .... 49

*Felker v. Pepsi-Cola Co.*, 863 F. Supp. 71 (D.Conn. 1994) ................................ 65

*Flanigan v. GE*, 242 F.3d 78 (2d Cir. 2001) .................................................. 41, 45

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006) .................................. *passim*

*Great-West v. Knudson*, 534 U.S. 204 (2002) .......................................... 52, 77-78

*Hamilton v. Carell*, 243 F.3d 992 (6th Cir. 2001) ................................................ 58

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 530 (2000) . 52

*Heidgerd v. Olin Corp.*, 906 F.2d 903 (2d Cir. 1990) .......................................... 54

*Hein v. FDIC*, 88 F.3d 210 (3d Cir. 1996) .......................................................... 67

*Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union*,
    980 F.2d 465 (7th Cir. 1992) ........................................................................ 10

*Hirt v. Equitable*, __ F. Supp. 2d __, 2006 WL 2023545 (S.D.N.Y. July 20,
    2006) .................................................................................. 28, 32, 39, 53

*In re Household International Tax Reduction Plan*, 441 F.3d 500 (7th Cir.
    March 20, 2006) .......................................................................................... 76

*Hudson v. General Dynamics Corp.*, 118 F. Supp. 2d 226 (D.Conn. 2000) ........ 41

*Hurlic v. S. California Gas Co.*, No. 05-5027 (C.D. Cal. Mar. 24, 2006) ........... 28

*Jensen v. Times Mirror Co.*, 634 F. Supp. 304 (D.Conn. 1986) ......................... 65

*Katt v. City of New York*, 151 F. Supp. 313 (S.D.N.Y. 2001) ............................. 6

*Kling v. Fidelity Management Trust Co.*, 323 F. Supp. 2d 132 (D. Mass. 2004) . 59

*Langman v. Loeb*, 328 F.3d 68 (2d Cir. 2003) ........................................................ 4

*Layaou v. Xerox Corp.*, 238 F.3d 205 (2d Cir. 2001) ........................................... 38

*Layaou v. Xerox Corp.*, 330 F. Supp. 2d 297 (W.D.N.Y. 2004); *on remand from*, 238 F.3d 2005 (2001) ............................................................... 43-44, 54

*Lee v. Burkhart*, 991 F.2d 1001 (2d Cir. 1993) .................................................... 55

*Manginaro v. Welfare Fund of Local 71*, 21 F. Supp. 2d 284 (S.D.N.Y. 1998) .............................................................. 47, 49, 61

*Martsolf v. JBC Legal Group, P.C.*, 2005 WL 331544 (M.D. Pa. 2005) ............. 89

*McCarthy v. Associated Clearing Bureau*, 1999 WL 1995185 (D.Conn. 1999) ................................................................. 64-65

*McCoy v. Laborers Local 222 Pension Plan*, 188 F. Supp. 2d 461 (D.N.J. 2002), *aff'd*, 2003 WL 1512167 (3d Cir. 2003) ............................................... 76

*McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund*, 2001 WL 1154630 (S.D.N.Y. 2001); *aff'd in part, rev'd in part*, 320 F.3d 151 (2d Cir. 2003) ............................................................... 86-87

*Medoy v. Warnaco Employees Long Term Disability*, 2005 WL 3775953 (E.D.N.Y. Dec. 24, 2005) .......................................................... 47

*Miles v. New York State Teamsters Conference Pension & Retirement Employee Pension Benefit Plan*, 698 F.2d 593 (2d Cir. 1983) .................. 60-61

*Minadeo v. ICI Paints*, 398 F.3d 751 (6th Cir. 2005) ...................................... 59-60

*Mirabel v. General Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976) ..... 69

*Mullins v. Pfizer*, 23 F.3d 663 (2d Cir. 1994) ................................................. 41, 45

*National Football Scouting, Inc. v. Cont'l Assur. Co.*, 931 F.2d 646 (10th Cir.1991) ...................................................................................... 58

*Nechis v. Oxford Health Plans*, 421 F.3d 96 (2d Cir. 2005) ..................... 55, 74-75

*Paese v. Hartford Life and Accident InsuranceCo.*, 449 F.3d 435 (2d Cir. May 24, 2006) ...................................................................................... 74

*Parry v. SBC Corp.*, 363 F. Supp. 2d 275 (D.Conn. 2005) .................................. 76

*Richards v. FleetBoston Fin. Corp.*, 427 F. Supp. 2d 150 (D.Conn. 2006) .. *passim*

*Estate of Ritzer v. National Organization of Industrial Trade Unions Insurance Trust Fund*, 822 F. Supp. 951 (E.D.N.Y. 1993) ............................ 47

*Rousey v. Jacoway*, 544 U.S. 320 (2005) ............................................................. 19

*Sereboff v. Mid Atlantic Medical Svcs., Inc.*, __ U.S. __, 126 S. Ct. 1869 (2006) ................................................................................................ 78

*Shane v. Connecticut*, 821 F. Supp. 829 (D.Conn. 1993) ..................................... 65

*Sheehan v. Metropolitan Life Insurance Co.*, 368 F. Supp. 2d 228 (S.D.N.Y. 2005) ................................................................................................ 44

*Siegel v. Converters Transportation, Inc.*, 714 F.2d 213 (2d Cir. 1983) ............. 66

*Smith v. City of Jackson*, 544 U.S. 228 (2004) .................................................... 29

*Stahl v. Tony's Building Materials*, 875 F.3d 1404 (9th Cir. 1989) ..................... 38

*State Teachers Retirement Board v. Fluor*, 654 F.2d 843 (2d Cir. 1981) ............ 64

*Stolarz v. Rosen*, 2005 WL 2124545 (S.D.N.Y. 2005) ........................................ 75

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ..................................................... 51

*Thomforde v. IBM*, 406 F.3d 500 (8th Cir. 2005) ................................................. 84

*Tootle v. ARINC*, 222 F.R.D. 88 (D.Md. 2004) .................................................... 27

*Travelers Insurance Co. v. 633 Third Assocs.*, 14 F.3d 114 (2d Cir. 1994) ......... 64

*United States v. Kelly*, 6 F. Supp. 2d 1168 (D.Kan. 1998) ..................................... 7

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) .......................................................... 60

*Venturini v. Metropolitan Life Ins. Co.*, 55 F. Supp. 2d 119 (D.Conn.1999) ....... 61

*Vogel v. America Kiosk Management*, 371 F. Supp. 2d 122 (D.Conn. 2005) ...... 70

*Wachtel v. Guardian Life Insurance*, __ F.3d __, 2006 WL 1790555 (3d
    Cir.  June 30, 2006) ..................................................................................... 88

*Weiss v. Regal Collections*, 385 F.3d 337 (3d Cir. 2004) ................................... 70

*Wells v. Gannett Retirement Plan*, 385 F. Supp. 2d 1101 (D.Colo. 2005) .......... 28

*Wells v. Harris*, 185 F.R.D. 128 (D.Conn. 1999) ......................................... 64, 66

*Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir.), *cert. denied*,
    421 U.S. 1011 (1975) ................................................................................... 87

*White v. Sundstrand*, 256 F.3d 580 (7th Cir. 2001) ............................................. 3

*White v. White Rose Rood*, 128 F.3d 110 (2d Cir.1997) ..................................... 64

*Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572 (2d Cir.
    2006) ............................................................................................................ 38

*Williams v. Caterpillar*, 994 F.2d 658 (9th Cir. 1991) .......................................... 3

*Wolf v. National Shopmen Pension Fund*, 728 F.2d 182 (3d Cir. 1984) .............. 76

## FEDERAL STATUTES, REGULATIONS, RULES,
## AND LEGISLATIVE HISTORY

ERISA §204(b)(1)(B), 29 U.S.C. §1054(b)(1)(B) ......................................... 4, 14

ERISA §204(b)(1)(H), 29 U.S.C. §1054(b)(1)(H) ....................................... *passim*

ERISA §204(b)(2), 29 U.S.C. §1054(b)(2) ...................................................... 11-12

ERISA §204(g), 29 U.S.C. §1054(g) ......................................................... 3, 74, 81

ERISA §204(h), 29 U.S.C. §1054(h) ............................................................ *passim*

ERISA §205(g), 29 U.S.C. §1055(g) ........................................................... 71, 74

IRC §401(a)(9), 26 U.S.C. §401(a)(9) ............................................................ 15

29 C.F.R. 2520.102-2(b) ...................................................................... 40

29 C.F.R. 2530.203-3(b)(4) ................................................................... 15

29 C.F.R. 2530.204-1(a) ...................................................................... 13

Treas. Reg. 1.401(a)-4 .............................................................. 12, 13, 23

Treas. Reg. 1.401(a)-9 ......................................................................... 15

Treas. Reg. 1.411(a)-11(c)(2)(i) .............................................................. 71

Treas. Reg. 1.401(a)-20 ....................................................................... 71

Treas. Reg. 1.411(b)-1(a) ....................................................................... 5

Treas. Reg. 1.411(b)-1(b)(2) ............................................................... 4, 14

Treas. Reg. 1.411(d)(6) ........................................................................ 36

Treas. Reg. 1.417(e)-1(b)(2)(i) ................................................................ 71

52 F.R. 45360 (Nov. 27, 1987) ................................................................ 18

53 F.R. 11876 (April 11, 1988) ............................................................... 18

53 F.R. 31837 (Aug. 22, 1988) ................................................................ 71

63 F.R. 68678 (Dec. 14, 1998) ................................................................ 14

67 F.R. 76123 (Dec. 11, 2002) .................................................................. 18, 22-23

H. Conf. Rep. 93-1280, 1974 U.S.C.C.A.N. 5038 .................................................. 4

H. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868 ........................................... 9, 15

H. Rep. 99-453 ....................................................................................... 34

S. Rep. 98-575, 1984 U.S.C.C.A.N. 2547 ........................................... 15

3 ERISA Leg. Hist. 4750 .......................................................... 37

IRS Notice 96-8, 1996-1 C.B. 359 ............................................... 10, 23

Rev. Rul. 76-259, 1976-2 C.B. 111 ............................................. 3

F.R.C.P. 11(b)(3) ............................................................ 49

F.R.C.P. 15(c) ................................................................ 64

F.R.C.P. 19 .................................................................... 52

## STATE STATUTES

Conn. Gen. Stat. Ann. §52-576 (2006) .................................................. 61

## MISCELLANEOUS

Albert Feuer, "When Are Releases of Claims for ERISA Plan Benefits
    Effective?" 38 J. MARSHALL L. REV. 773, 865-66 (Spring 2005) .................. 85

*EEOC Compliance Manual* .................................................. 19

*Manual for Complex Litig.* (Fourth) .................................................. 79

*Restatement (2d) of Trusts* .................................................. 50

**Introduction**

CIGNA's trial brief shows that practically all of its defenses are based on legal, not factual, arguments. CIGNA's brief would be over 110 pages if 12 and 9 point fonts had not been used, but in all of that briefing, there is no contest to the basic facts that Plaintiffs are presenting. CIGNA does not contest that:

(1) A pre-retirement mortality discount of up to 10% was applied in computing opening account balances which participants never regain;

(2) For years after the cash balance conversion, many participants did not earn any additional benefits at all;

(3) There were substantial benefit reductions from 30% to close to 50% in future benefit accruals;

(4) If the rate of benefit accruals is measured by the accrual of retirement benefits, the accrual rate is reduced with advancing age;

(5) There was no disclosure of any of these features in CIGNA's Section 204(h) notice, its Summary of Material Modifications or its SPDs;

(6) There was no disclosure to vested separated employees of the modified rehire rule until after they returned to work;

(7) There was no notice to employees, as the SPDs expressly promised, when their cash balance benefits were less than their old plan "minimum benefits," and for thousands of class members the minimum benefits were not protected at all;

(8) There was no disclosure of the "relative value" of optional forms of benefit, and in particular, no notice that participants who elected a lump sum were "forfeiting" the value of early retirement benefits; and

(9) The declaratory relief in the November 2004 <u>Depenbrock</u> decision and January 2005 district court order is still not implemented for over 175 members of this class whose retirement benefits would be improved and, in many cases, nearly doubled.

1

In a "Memorandum Regarding Defendants' Responses to Plaintiffs Proposed Trial Exhibits," CIGNA objects to some of Plaintiffs' supporting exhibits as hearsay. Plaintiffs respond to those objections in a memorandum filed concurrently with this Reply. To the extent those objections are overruled, CIGNA offers no evidence in rebuttal.

## I.    Section 7.3 of CIGNA's Plan Provides that Participants Will Lose Their Cash Balance Accruals If They "Elect" to Preserve Their Previously-Earned Annuity Benefits; This Violates ERISA's Nonforfeiture Rule.

Section 7.3 of CIGNA's Plan document expressly requires participants to "elect" to preserve their prior benefits "in annuity form." Pls. Ex. 1 at D00309.  A participant who "elects" under Section 7.3 to receive benefits earned in plan years before January 1, 1998 as an annuity loses any right to payment of the cash balance accruals earned in all plan years after that date. Pls. Prop. Findings ¶82.[1]  Plaintiffs maintain that the elective forfeiture of cash balance accruals after January 1, 1998 violates ERISA §203(a).

In Esden v. Bank of Boston, 229 F.3d 154, 173 (2000), the Second Circuit found that part of a participant's accrued benefit had been made conditional on the distribution option chosen in violation of the anti-forfeiture rule. Esden held that a company cannot "offer an employee the voluntary choice of a partial forfeiture in exchange for a particular form of payment." The court relied on Treasury Regulation 1.411(a)-4, which provides that a right which is conditioned on "subsequent forbearance which will cause a loss of

---

[1] References to Plaintiffs' Proposed Findings of Fact are hereafter referred to as "¶___." Defendants' Proposed Findings are identified as "Dfs. Prop. Findings ¶___."

2

such right" is a forfeitable right.

CIGNA's brief does not address <u>Esden</u>'s holding or the Treasury regulation (other than an effort to distinguish <u>Esden</u> factually, Dfs. Br. at 36). Instead, CIGNA recharacterizes Plaintiffs' claim as something else: See Dfs. Br. at 31 (Count 1 "essentially challenges the Plan's formula for calculating an opening account balance"); id., at 1-2 ("Count 1 alleges that the formula used to calculate opening account balances for the cash balance plan" violated ERISA); and Dfs. Mem. Re Pls. Prop. Trial Exs., at 1.

The cases which CIGNA cites do not provide a basis for ignoring <u>Esden</u> or the regulations. <u>Bonovich v. Knights of Columbus</u>, a case in which your Honor participated, specifically stated that the renewal commissions that were being offset "cannot be construed as previously-earned and deferred wages." 146 F.3d 57, 62 (2d Cir. 1998), aff'g, 963 F.Supp. 143, 147 (D.Conn. 1997). As CIGNA acknowledges, the First Circuit decision in <u>Campbell v. BankBoston</u>, 327 F.3d 1 (2003), concerns ERISA §204(g), not the forfeiture of benefits accrued under the cash balance formula. Dfs. Br. at 34 n.20.[2]

## II.   The Periods of "Wear-away" with No Additional Benefits Violate ERISA's 133⅓% Accrual Rule.

CIGNA internally recognized that its cash balance conversion resulted in periods

---

[2] <u>White v. Sundrand</u>, 256 F.3d 580 (7th Cir. 2001), and <u>Williams v. Caterpillar</u>, 994 F.2d 658 (9th Cir. 1991), are not precedential in this circuit and are, moreover, not inconsistent with <u>Esden</u>. <u>Sundrand</u> concerned a "floor offset" arrangement, which allows benefits "concurrently" accruing under a profit-sharing plan to be offset. See Rev. Rul. 76-259, 1976-2 C.B. 111.

3

of "wear-away" in which participants "accrue no additional benefits," earn little or no benefits" and "see no benefit improvement." See ¶¶67-68, 283. CIGNA asserts that the 133⅓% accrual test can be satisfied, despite the periods in which participants "accrue no additional benefits," if it is allowed to make a counter-factual assumption: "If Part B is assumed to have existed for all prior years, then no employees would have opening account balances or minimum benefits and there would be no wearaway." Dfs. Br. at 39; see also id. at 38.

As CIGNA accurately states (Dfs. Br. at 38), the statute provides that "any amendment which is in effect for the current year shall be treated as in effect for all other plan years." ERISA §204(b)(1)(B)(i) and Treas. Reg. 1.411(b)-1(b)(2)(ii)(A). But CIGNA misunderstands what this clause does. In Langman v. Loeb, 328 F.3d 68, 71 (2d Cir. 2003), the Second Circuit explained that this clause permits "across-the-board increases in benefit rates made at some future time on behalf of all current employees regardless of past service." The ERISA Conference Report explains the clause in a similar manner: "For example, if a plan provides a one percent rate of accrual for all participants in 1976, and is amended to provide a 2 percent rate of accrual for all participants in 1977, the plan will meet this test, even though 2 is more than 1-1/3 times 1." H.Conf. Rep. 93-1280, at 274, 1974 U.S.C.C.A.N. 5038, 5055.

If an amendment does not increase benefit rates "for all participants" or "across-the-board," but instead provides for a period with no accruals for some participants

4

because of an interaction with their prior benefits, the "ultimate effect" of the amendment must be examined. <u>Frommert v. Conkright</u>, 433 F.3d 254, 268 (2d Cir. 2006). If the ultimate effect could be ignored, as CIGNA urges, a plan could offer a one percent of pay rate of accrual for all years before the current one, and a 1.33 percent of pay accrual thereafter but with "no additional accruals" for a period of years if an employee's previous accruals exceeded 10 percent of pay. The interaction with the past accruals would mean that longer-service workers received nothing more for a period of years followed by accruals in later years that are infinitely greater.

As <u>Esden</u> makes clear, neither CIGNA nor other companies are allowed "to have it both ways." 229 F.3d at 167 n.8. If the amendment "in effect for the current year" provides that the benefits under a prior formula are taken into account, the accrual rule must actually be satisfied on that basis. The opening section of the Treasury regulations makes this clear by specifying that if benefits are "determined under more than one plan formula," the benefits "must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfy one of the alternative methods". Treas. Reg. 1.411(b)-1(a); see also IRS Alert Guidelines on Minimum Vesting Standards (12/98) (Pls. Ex. 39) at 12.  There is no authority under which a plan can satisfy the 133⅓% accrual rule based on a counter-factual assumption about an amendment, even though a participant is actually accruing "no additional benefits."

The statutory language and purpose are designed to ensure that participants

actually earn an additional retirement benefit in each plan year that is payable at

retirement. As the Plaintiffs' actuarial expert found, there was a zero rate of accruals for

plan years immediately after CIGNA's cash balance conversion (the "wear-away"

period). Pls. Ex. 3 (Poulin Rpt) ¶ 30. If a zero rate of accruals is followed by positive

rates of accruals in later plan years, the Plan violates this anti-backloading rule because

the rates of accrual in later years are "infinitely" greater than the zero rates of accrual in

the earlier plan years. Id.

If CIGNA's position were correct, a participant who actually accrues no additional

benefits could be assumed counter-factually to have an accrued benefit that is "payable at

the normal retirement age" for a plan year. This would turn the statute into a pro forma

mathematical exercise which bears no relationship to whether any additional benefit is

actually payable for that plan year.

### III. The "Benefit" that Section 204(b)(1)(H) Regulates Is the Same "Benefit" that Every Other Part of ERISA Section 204 Regulates.

CIGNA's argument on the age discrimination provision in ERISA §204(b)(1)(H)

displays no respect for the statutory language. CIGNA instead relies on anticipated

testimony from an actuarial expert, Lawrence Sher, who has a strong interest in the

legality of cash balance plans because he has been advising companies to adopt them for

over 15 years.[3]

---

[3] Expert testimony from a qualified expert with a partisan interest in the outcome is generally not excluded per se, but weighed appropriately. See, e.g., Katt v. City of New

CIGNA's Proposed Findings describe how Mr. Sher believes that the statutory language should be interpreted: Mr. Sher proposes that if a provision such as §204(b)(1)(H) provides "no specificity at all about how the employee's benefit accrual rate is to be determined," "an actuary ... should choose a method that is consistent with sound actuarial and economic principles and with the purpose for which the determination is being made. Of course, the actuary should reflect applicable regulations or other binding authority." Dfs. Prop. Findings ¶90. There is no indication that the "purpose for which the determination is being made" is Congress' purpose; rather it appears to be the purpose the employer, or an actuary, deems fit.

In other words, through Mr. Sher, CIGNA proposes that an actuary can adopt an actuarially or economically defensible interpretation of the statute if a term is not defined within the subparagraph in which appears or in applicable regulations. Since Congress rarely defines each term in each statutory subparagraph and no final regulations have been issued because of the controversy over cash balance plans, this approach would leave the plan sponsor or actuary free to establish the basic effect of a statute.

To justify this, CIGNA asserts that Congress could not have intended to enact a law that compares the rate at which retirement benefits are earned because this is, in its view, a "meaningless mathematical comparison," "nonsensical," and inconsistent with

_____

York, 151 F.Supp. 313, 363 (S.D.N.Y. 2001); United States v. Kelly, 6 F.Supp.2d 1168, 1179-84 (D.Kan. 1998) (determining areas where partisan expert's "testimony extend[ed] beyond his demonstrated areas of specialized knowledge").

"fundamental economic principles." Dfs. Br. at 3, 13-15 and 30.[4] CIGNA argues that if an

employee hired at age 45 earns a $17,600 per year annuity at age 65 and an employee

hired at age 50 earns a $14,100 per year annuity at age 65, based on the same period of

service and salaries, comparing those two retirement benefits is "nonsensical." Id. at 15.[5]

At bottom, CIGNA contends that because it costs more (from an individual, non-group

perspective) to provide the annuity of $17,600 to the employee hired at age 50, it is

irrational for Congress to enact a law that requires both older and younger workers to earn

the same benefit for the same period of service and the same salary. See Dfs. Br. at 13-15;

Dfs. Prop. Findings at ¶¶101-103; 127-130.

It is undeniable, however, that retirement benefits are the foundation for the

statutory regulation of defined benefit plans. As Judge Hall stated:

> "Congress' intent was to assure a <u>benefit</u> measured as of normal retirement age.
> The value of that benefit does not change, regardless of whether the employee is
> younger or older than normal retirement age. What it costs to provide the benefit
> may change depending on an employee's age. However, that was not Congress'
> concern when it prohibited the diminution of the rate of accrual of the benefit

---

[4] CIGNA also maintains that comparisons of "the benefits accrued by an individual
at various ages" are "distorted by the time value of money." Dfs. Br. at 15 n.8.

[5] Mr. Sher's position is inconsistent with a prior statement. In 1991, he advised the
Internal Revenue Service, in a letter published in <u>Tax Notes</u>, that cash balance plans could
satisfy all of ERISA's requirements, including the age discrimination standard, based on
<u>benefits</u>. New Ex. 200. Now he asserts that it is "absurd" to do this. Dfs. Prop. Findings
¶130.

The Exhibits numbered 200-216 which are referenced in the Reply brief are new
Trial Exhibits, submitted in response to the positions taken in Defendants' Trial Brief,
Proposed Findings and Conclusions.

expressed as an annual benefit commencing at normal retirement age."

Richards v. FleetBoston, 427 F.Supp.2d 150, 166 (D.Conn. 2006). As Richards suggests, Congress is well aware that, from a non-group perspective, offering defined benefits to older workers "costs" more.[6] But pension benefits are, however, not funded on that basis. Pension benefits are funded as group insurance. CIGNA's point that a $17,600 annuity "costs" more for the age 50 employee is only valid if the costs of retirement benefits are conceptualized from a non-group perspective, and without taking into account that (1) the cost of annuities is actually amortized and (2) no one stays young forever.

### A. CIGNA's Argument that the Rate of "Benefit Accrual" Does Not Refer to the Increase in the "Accrued Benefit" Is Contrary to Congress' and the Federal Agencies' Consistent Use of that Term.

At bottom, CIGNA's difficulty turns out to be not with the words "rate" or "accrual," but with the "benefit" that must be earned.[7] CIGNA argues that the "benefit" under Section 204(b)(1)(H) should be the employee's "account balance" because this is how CIGNA decided to define the new plan's "basic promise" effective January 1, 1998. Dfs. Prop. Findings ¶¶93, 96-97. Esden is explicit, however, in its holding that the sponsor of a cash balance plan cannot "contract around" or "draft around" the

---

[6] See H.R. Conf. Rep. 99-1012, 379, 1986 U.S.C.C.A.N. 3868, 4024 (ending the exclusion of older workers from participation in benefit accruals "may have the effect of increasing an employer's minimum funding requirements significantly for employees hired within five years of normal retirement age").

[7] Defendants do not dispute that the "rate" means the annual change and that "accrual" means the growth in the benefit. See Dfs. Prop. Findings ¶¶93-96 and Dfs. Prop. Conclusions ¶13.

9

"consequences" of the classification of a cash balance plan as a defined benefit plan. 229

F.3d at 159 n. 6 and 173; accord Richards v. FleetBoston, 427 F.Supp.2d at 163, 164 and

167 (following Esden); Hickey v. Chicago Truck Drivers, Helpers and Warehouse

Workers Union, 980 F.2d 465, 468 (7th Cir. 1992) (the "labeling" placed on a benefit

cannot change the statutory definitions); IRS Notice 96-8, 1996-1 C.B. 359 (the accrual

and other requirements in this notice "apply even in the case of a cash balance plan that

defines an employee's accrued benefit as an amount equal to the employee's hypothetical

account balance).

Essentially, CIGNA would transform Section 204(b)(1)(H) into a regulation of

lump sum termination pay based on the premise that this is now its plan's "basic

promise." Congress' purpose, however, was to ensure continued accruals of retirement

benefits at the same rate for older workers as younger workers. Under CIGNA's view, if a

younger and older worker earn different retirement benefits, but receive the same $2,000

current "credit" for a year of service, the plan should be considered non-discriminatory,

even though the retirement benefits that such credits provide are unequal.

CIGNA makes two efforts to support its argument that the term "benefit accrual"

refers to the credit or change to a hypothetical account balance, rather than the "accrued

benefit" defined in ERISA §3(23)(A). Dfs. Br. at 17-22. First, CIGNA contends that

Congress would not have used the word "benefit accrual" if it intended to refer to the

"change in the age-65 annual benefit" in §204(b)(1)(H). Dfs. Br. at 17. This is not

10

persuasive because Congress repeatedly used the term "benefit accrual" to refer to the <u>change</u> in the "accrued benefit." Section 204(b)(1), which the drafters of the legislation referred to as a "subsection" or a "paragraph," establishes "benefit accrual" rules which regulate the rates at which participants must earn the "accrued benefit." Section 204(b)(1)(H) then provides that "a defined benefit plan shall be treated as not satisfying the requirements <u>of that paragraph</u> if ... the rate of an employee's benefit accrual is reduced because of the attainment of any age." From a legislative drafter's standpoint, it was unnecessary to repeat the term "accrued benefit" because "the requirements of that paragraph" make clear that "benefit accrual" refers to the change in the "accrued benefit." Without grammatical revisions, the latter phrase could not be substituted into the statutory text.[8]

The revision that CIGNA proposes is not to substitute this longer phrase, but to do exactly what <u>Richards</u> warns against. CIGNA essentially proposes to lift the words from the defined contribution standard in ERISA §204(b)(2) (the "rate of allocations to the

_____

[8] If the longer phrase that CIGNA suggests is used, the statute would read:

"Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's [change in the age-65 annuity benefit] is ceased, or the rate of an employee's [change in the age-65 annuity benefit] is reduced, because of the attainment of any age."

As Judge Murphy held in <u>Cooper</u>, Congress used the term "benefit accrual" because it is "grammatically correct." 274 F.Supp.2d at 1016.

employee's account") and substitute them in §204(b)(1)(H). Dfs. Prop. Findings ¶¶93-96

and Dfs. Prop. Conclusions ¶13. Judge Hall concluded that it was not credible that

Congress intended the "completely different" test in ERISA §204(b)(2) to be substituted.

427 F.Supp.2d at 164. CIGNA's construction would, moreover, deny participants even

the protections afforded under §204(b)(2) because the "account balance" and

"allocations" under a cash balance plan are entirely "hypothetical." There are no actual

accounts, individual contributions or allocation of investment returns as in a defined

contribution plan. See Berger v. Xerox, 338 F.3d 755, 758 (7th Cir. 2003). The

"hypothetical" nature of the accounts allows a plan designer to place "wear-aways" and

other contractual strictures on the credits that would not be permissible under a defined

contribution plan.

To support its position, CIGNA contends that, to an actuary, the term "benefit

accrual" can mean "many different" things "depending on the purpose for which the

measurement is taken." Dfs. Br. at 18; Df. Prop. Findings ¶¶87-89. But the only example

that CIGNA offers in the Proposed Findings is a red herring. Treas. Reg. 1.401(a)(4)-3

establishes a general test for non-discrimination in favor of highly-compensated

employees based on a determination of the "normal accrual rate" and the "most valuable

accrual rate."[9] In both instances, the "accrual rate" is the increase in the "accrued

---

[9] The "non-discrimination" test is an Internal Revenue Code requirement for tax-qualification that is not replicated in ERISA.

12

benefit." The "normal accrual rate" is defined as "the increase in the employee's <u>accrued benefit</u> ... during the measurement period." And the "most valuable accrual rate" is defined as "the increase in the employee's most valuable optional form of payment <u>of the accrued benefit</u> during the measurement period." Treas. Reg. 1.401(a)(4)-3(d)(1)(i) and (ii). CIGNA has cited no instance in which either Congress or the Federal agencies used the term "benefit accrual," in the context of a defined benefit plan, to refer to anything other than retirement benefits.

As Judge Hall found, there is no serious debate that the "benefit" that §204(b)(1)(H) regulates is the benefit at normal retirement age, and not a hypothetical credit payable on separation from service. Congress and the federal agencies have since 1974 consistently used the term "benefit accrual" in the context of defined benefit plans to refer to the accrual of retirement benefits. ERISA's 1974 Conference Report consistently uses the term benefit accrual to refer to the change in the accrued benefit. See Pls. Opening Br. at 28.

Two years later, the Department of Labor finalized regulations on years of participation for benefit accrual purposes. Those regulations state that "Section 204(b)(1) of the Act ... contain[s] certain requirements relating to <u>benefit accrual</u> under a defined benefit pension plan" and then prescribes rules "relate[d] to service which must be taken into account in determining an employee's period of service <u>for purposes of benefit accrual</u>."  29 C.F.R. 2530.204-1(a) and (b) (emph. added).

13

In August 1977, the Treasury Department finalized its regulations implementing §204(b)(1)(B). Those regulations, too, use the term "benefit accrual" or "accrual rate" to refer to the change in the "annual benefit, commencing at age 65." See Treas. Reg. 1.411(b)-1(b)(2)(iii) (Example (1)) (if a "plan provides for an annual benefit (commencing at age 65) of a percentage of an participant's average compensation" of "2 percent for each of the first 20 years of participation and 1 percent per year thereafter" the "plan satisfies the requirements of this subparagraph because the 133 percent rule does not restrict subsequent <u>accrual rate</u> decreases"); 1.411(b)-1(g) (Example (iii) (if a "plan provides an annual benefit, commencing at age 65, equal to $96 per year of service for the first 25 years of service, and $48 per year of service" thereafter, "<u>the rate of benefit accrual</u> is equal in each of the first 25 years and the rate decreases thereafter").

In April 1986, only six months before §204(b)(1)(H) was enacted, Congress enacted §204(h) in order to require advance notice of a reduction in the "future rate of benefit accrual." There is no dispute that Congress again used the term "benefit accrual" to refer to changes in the accrued benefits payable at the normal retirement age. See 63 Fed. Reg. 68678, 68680 (December 14, 1998) ("[t]he statutory phrase "rate of future benefit accrual" implies, on its face, that section 204(h) is limited to changes in the accrued benefits").[10]

---

[10] Two years before, Congress enacted the Retirement Equity Act of 1984 ("REA"), which provides a lower minimum entry age for participating in a plan's benefit accruals and reforms the break-in-service rules applicable to both accruals and vesting.

14

CIGNA advances a cloudy argument about how an extension of Plaintiffs' "approach" would require a Plan that offers a $10 per month per year of service annuity to provide an approximately $11 per month annuity to a participant who worked to age 66. Dfs. Br. at 20-21; Dfs. Prop. Findings ¶¶118-24. Put simply, neither the Plaintiffs nor their actuarial expert espouse this. The 1986 Conference Report plainly states that if a plan provides an "additional benefit of $10 per month," it satisfies the age discrimination requirement if the plan provides the "same" benefit to an employee who works to age 66. H.R. Conf. Rep. No. 99-1012, at 381, 1986 U.S.C.C.A.N. 3868, 4026. An actuarial adjustment to the annuity to reflect the later retirement age is <u>not</u> required to satisfy the age discrimination requirement.[11] While CIGNA cites this example, it actually <u>supports</u> Plaintiffs' position because it further shows that Congress sought to ensure that an older worker accrues the same additional retirement benefit (in this example, a $10 per month retirement benefit) as a younger worker.

---

REA's legislative history also states that "present law requires that a participant in a defined benefit pension plan accrue (earn) the normal retirement benefit provided by the plan at certain minimum rates.  The accrual rules are designed to limit backloading of <u>benefit accruals</u>...." S. Rep. 98-575 at 8, 1984 U.S.C.C.A.N. 2547, 2554.

[11] Internal Revenue Code §401(a)(9) separately requires an actuarial adjustment when an employee works past age 70-1/2.  See Treas. Reg. 1.401(a)(9)-6, Q&A 7, 8, and 9.  Actuarial adjustments are also required if an employee works past age 65 and is not given a notice of suspension of benefits.  ERISA §203(a)(3)(B); 29 C.F.R. §2530.203-3(b)(4).

**B.     If an "Accrued Benefit" Is Determined in a Form "Other Than an Annual Benefit Commencing at Normal Retirement Age," ERISA §204(c)(3) Requires that It Be the Actuarial Equivalent of "Such Benefit."**

CIGNA maintains that <u>even if</u> the term "benefit accrual" refers to the change in the "accrued benefit," the definition of the accrued benefit in ERISA §§3(23)(A) and 204(c)(3) allows the benefit to be determined in a form "other than an annual benefit commencing at normal retirement age." Dfs. Br. at 22-24. As far as it goes, this is true. But CIGNA neglects the latter part of §204(c)(3), which provides that in such cases, "the employee's accrued benefit ... shall be the actuarial equivalent of <u>such benefit</u>," referring to the "annual benefit commencing at normal retirement age." Thus, expression in a different form does not allow the plan sponsor to circumvent the referent, which is the "annual benefit commencing at normal retirement age." See <u>Esden</u>, 229 F.3d at 163 ("regardless of any option as to timing or form of distribution, a vested participant in a defined benefit plan must receive a benefit that is the actuarial equivalent of her normal retirement benefit (that is, the accrued benefit expressed as an annuity beginning at normal retirement age"); <u>Berger v. Xerox</u>, 338 F.3d at 759 ("ERISA requires that any lump-sum substitute for an accrued pension benefit be the actuarial equivalent of that benefit").

CIGNA next contends that if Congress intended for "benefit accrual" to refer to the annual benefit commencing at normal retirement age, ERISA §204(b)(1)(H)(v) would be rendered "superfluous." Dfs. Br. at 22-23. This clause provides that the "subsidized

16

portion of any early retirement benefit is disregarded in determining benefit accruals."

CIGNA's argument is not persuasive because ERISA §204(b)(1)(B), which CIGNA

concedes regulates the annual benefit commencing at normal retirement age, see Dfs. Br.

at 17, contains a nearly identical special rule to ensure that rule's proper application:

ERISA §204(b)(1)(B)(iii) provides that the "fact that benefits payable under the plan may

be payable to certain employees before normal retirement age shall be disregarded."

Under CIGNA's reasoning, that special rule, too, would be "superfluous."

Far from subtracting from Plaintiffs' position, the special rule in §204(b)(1)(H)(v)

reinforces that Congress sought to ensure that the accrual of benefits payable at normal

retirement age does not discriminate because of age. It is logically fallacious to reason

that a special rule that excludes "the subsidized portion of any early retirement benefit"

indicates that the term "benefit accrual" does not refer to the "retirement benefit" in the

first place. Instead, the special rule reinforces the point that "benefit accrual" refers to the

rate at which an employee earns retirement benefits.

### C.    Reductions in the Rate of an Employee's Benefit Accrual Based on Age Cannot Be Erased by Rephrasing the Discrimination as Based on the Number of Years to Retirement.

CIGNA next asserts that any reductions in the rate of benefit accruals under its

Plan are not "because of" age, but due to the "time value of money." Dfs. Br. at 23-24.

CIGNA elsewhere suggests that it decided to convert its traditional plan to cash balance

not for age-related reasons, but to "reflect changes in the workforce of employees," "to

17

allow employees to earn their retirement benefits more evenly over their careers" and for other reasons consistent with "fundamental economic principles." Dfs.Br. at 2, 13, 23-24, 30; Dfs. Prop. Findings at ¶¶5, 9, 12-13, 21; Dfs. Prop. Conclusions at 9.

CIGNA's internal documents show that these are post hoc explanations. CIGNA was well aware that the benefits of older workers would be reduced and it intended that result. ¶¶94-105, 114-115. CIGNA took limited steps to lessen its vulnerability to age discrimination claims, such as adopting a graded schedule of pay credits and providing higher opening accounts for certain employees, but it did not seek to eliminate the age-based impact of the change. CIGNA objects to the admission of evidence concerning its intent, but Plaintiffs are entitled to rebut pretextual reasons and show that age discrimination was the expected and realized result.

CIGNA's reframing of the discrimination as a product of the "time value of money" can also be addressed as Richards does: Older workers naturally have fewer years to retirement than younger workers. Hence, practically any age discrimination in retirement benefits can be reframed as based on time to retirement, rather than age per se. But the Court must ask: Is CIGNA's time-based distinction independent of age, or is it "perfectly correlated" with it? 427 F.Supp.2d at 168. If age is the limiting criterion, there is age discrimination. See 67 Fed. Reg. 76123, 76124 and 76133 (2002 proposed Treasury regulations, now withdrawn); 52 Fed. Reg. 45360, 45362, and 53 Fed. Reg. 11876, 11880 (1987 and 1998 proposed regulations by the EEOC and Treasury Department stating that

age discrimination exists if age is a limiting factor); Arnett v. CalPERS, 179 F.3d 690,

695 (9th Cir. 1999), vacated and remanded on other grounds, 528 U.S. 1111 (2000);

EEOC Compliance Manual, Section 3, Employee Benefits (issued October 27, 2000)

(formula that bases benefits on "potential years" to retirement is a proxy for age because

it gives younger workers more "constructive years" than older workers).[12]

**D.  The Treasury Department Has Never Adopted the "Consistent View" that CIGNA Suggests.**

CIGNA finally relies on an assemblage of a withdrawn proposed regulation, a

conclusory statement in revenue proposals, and a sentence in a 1991 preamble to

regulations about a safe harbor to the Code's "non-discrimination" rule to form a

"consistent view" of the Treasury Department that cash balance plans are not age

discriminatory. Dfs. Br. at 24-26. All but one of the sources on which CIGNA relies

ignores the fundamental point that Congress directed that the interpretation of ERISA

§204(b)(1)(H) be coordinated with the Department of Labor and the EEOC. P.L. 99-509,

Section 9204(d) ("The Secretary of Labor, Secretary of the Treasury, and the Equal

Employment Opportunity Commission are to issue rulings and regulations that are

consistent and are to consult and coordinate with one another in issuing such rulings and

regulations").

---

[12] Accord Rousey v. Jacoway, 544 U.S. 320, 329 (2005) (Bankruptcy Code's references to pension and like plans where rights to payment are "because of age" or "on account of age" do not require that the payment be "solely on account of this factor").

19

One of the items in Defendants' collection is the testimony of the IRS's Chief

Counsel, Stuart Brown, before the Senate Health Education Labor & Pension Committee

on September 22, 1999. See Dfs. Br. at 26. Defendants' Exhibit shows that the IRS's

Chief Counsel testified to something different than what CIGNA represents. Mr. Brown

testified that:

> "The Service has not to date asserted that cash balance plan benefit formulas result in per se violations of the age discrimination requirements of section 411(b)(1)(H)."

He then testified that:

> "The application of the age discrimination requirements of section 411(b)(1)(H) involves a difficult analysis that may differ depending on the factual context of the plan being considered.... [W]e are now reviewing the issue of age discrimination in the context of these conversions in active coordination with the Equal Employment Opportunity Commission (EEOC) and Department of Labor (DOL). In this analysis, we are considering the whole range of factors that might indicate a cash balance plan conversion has resulted in age discrimination. For example, we will consider the impact of the wearaway period, as it affects employees of different ages."

Dfs. Ex. 532 at 4-5. This is not the endorsement that CIGNA's trial brief represents. The

on-going "review" and "analysis" suggest, furthermore, that CIGNA is drawing more

from the statements that the IRS made in 1991 and 1996 than was actually intended.

The only Treasury views after Mr. Brown's testimony were in 2002 proposed

Treasury regulations and a sentence included in the Treasury Department's 2004-2006

revenue proposals. The proposed regulations, which were coordinated with the EEOC and

DOL, were withdrawn in 2004. See IRS Announcement 2004-57. The sentence in the

revenue proposals states that "cash balance plans and cash balance conversions are not inherently age discriminatory." Emph. added. This sentence was not coordinated with the EEOC and the DOL. But, even if accepted, it is consistent with both Mr. Brown's testimony and Plaintiffs' position. Neither Plaintiffs nor the Class' actuarial expert have taken the position that "all" cash balance transition rules or benefit formulas are "per se" or "inherently" age discriminatory. See Pls. Opening Brief at 20 and Pls. Ex. 3 (Poulin Rpt.) at ¶16 and Ex. 4 ¶¶18-19. Plaintiffs contend that a cash balance plan is discriminatory if it is designed to provide: (1) a rate of benefit accrual that decreases because of age when the annual pay credits and future interest credits are converted to accrued benefits, or (2) an age-based "wear-away" of previously earned benefits rather than cumulative benefit accruals in which the cash balance accruals are an addition to the previously-earned benefits, without regard to age.

As Mr. Poulin's analysis shows, CIGNA's cash balance conversion and formula discriminate based on age. Pls. Ex. 3 and 4. The extent to which other cash balance conversions discriminate will depend on similar analysis of the factual context. As described below, those results are not preordained. Many cash balance plans have graded pay credit schedules sufficient to ensure non-decreasing rates of benefit accrual and many, perhaps most, cash balance plans do not have "wear-aways."

Plaintiffs do not contest that the approach that the Federal agencies should take in applying §204(b)(1)(H) has been the subject of controversy and that the IRS has not "to

date" asserted "per se" violations. But only one of the statements on which CIGNA relies favors its position. This was the 2002 proposed regulations, which would have set up a "special definition" for cash balance plans. 67 F.R. at 76128. But the Treasury Department withdrew those regulations because of Congressional criticism and the comments of interested parties. IRS Announcement 2004-57. It is well-established that proposed regulations are not entitled to Chevron deference. See Depenbrock v. CIGNA, 389 F.3d at 85 (a "proposed regulation does not represent an agency's considered opinion"). A fortiori, a withdrawn regulatory proposal has even less credence.

CIGNA relies on Auer v. Robbins, 519 U.S. 452 (1997), for the proposition that agency views, even in an amicus brief, are entitled to Chevron deference, indirectly suggesting that this might extend to a withdrawn proposed regulation. Dfs. Br. at 24-25. But this is certainly not the law. See Eastman Kodak v. STWB, __ F.3d __, 2006 WL 1835245 *6 n.8 (2d Cir. June 26, 2006) (Christensen v. Harris "seemingly undercut" Auer and "held that many forms of agency interpretations that lack the force of law do not merit Chevron deference" but are instead accepted based on their persuasiveness under Skidmore v. Swift & Co.). Even in the withdrawn regulatory proposal, the Treasury Department offered no explanation of how the statutory language could be construed to justify the discriminatory results, but bypassed the statutory interpretation issue with a

22

"special definition."[13] The statute did not delegate substantive rule-making authority to the Treasury Department, as is necessary to promulgate a "special definition" at odds with the general statutory language.

Examining the other views which CIGNA cites, all of them are, like Mr. Brown's actual testimony, more limited than CIGNA represents. For example, CIGNA has never complied with the "safe harbor" described in the 1991 preamble to the non-discrimination regulations because CIGNA does not accrue interest adjustments through normal retirement in the year of the related hypothetical allocation. Compare 1.401(a)(4)-8(c)(3)(iv) and (vi) and Dfs. Prop. Findings ¶¶55-56 and 96-97. Nor has CIGNA complied with other rules necessary to qualify for that safe harbor. See generally Treas. Reg. 1.401(a)(4)-8(c)(3). Accordingly, the sentence in the preamble is not referring to CIGNA's Plan.

CIGNA also tries to draw a negative inference from IRS Notice 96-8, 1996-1 C.B. 359, that "[t]he Treasury Department would not have issued rules describing how to calculate lump sums in a cash balance plan if its interpretation of ERISA would render all

---

[13] Even the "special definition" in the 2002 proposed regulations was subject to a restriction that CIGNA neglects to mention: An employer could not satisfy §204(b)(1)(H) on the basis of pay credits if it used retirement benefits to satisfy the non-discrimination tests. 67 F.R. at 76128. CIGNA's Application for Determination shows that it satisfied the non-discrimination tests based on "normal" and "most valuable" "accrual rates," which are both based on benefits. See Pls. Ex. 37 at AMARA-00730-44. Therefore, CIGNA would not have been able to qualify for the special definition offered under the proposed regulations.

cash balance plans inherently illegal." Dfs. Br. at 25-26. Again, the IRS's Chief Counsel testified that the IRS was still reviewing and analyzing these issues in coordination with the EEOC and DOL and had not "to date" made a determination, so CIGNA's inference must be misplaced.

To the extent Notice 96-8 addresses "accrual" issues, the Notice finds that cash balance plans of the "type" that CIGNA adopted "typically" violate the accrual requirements in ERISA §204(b)(1)(A), (B) and (C). The Notice finds that "benefits attributable to interest credits are in the nature of accrued benefits within the meaning of 1.411(a)-7(a)." The Notice then describes two types of cash balance plans. According to the IRS, the first type, a "front-loaded interest credit plan," is a cash balance plan in which "the benefits attributable to future interest credits with respect to a hypothetical allocation accrue at the same time that the benefits attributable to the hypothetical allocation accrue." By contrast, the Notice states that under a "back-loaded interest credit plan," the "benefits attributable to interest credits do not accrue until the interest credits are credited to the employee's account." The Notice concludes that this second type of cash balance plans "typically will not satisfy any of the accrual rules in section 411(b)(1)(A), (B) or (C)" and does not address such plans further because of that violation. Section III.C of the Notice makes the same point:

> "if the benefits attributable to future interest credits have not accrued and will accrue only as of the later dates when the interest credits are included in the hypothetical account balance, the timing of those later accruals must be taken into account in applying the accrual rules of section 411(b)(1). As a result such a plan

24

typically will not satisfy those accrual rules."[14]

CIGNA's cash balance plan is a "back-loaded interest credit plan" because <u>future interest</u> <u>credits</u> are not accrued in the year that the pay credits are assigned to the employee's cash balance account.  Pls. Ex. 1 at 1; and see Dfs. Prop. Findings ¶96. Accordingly, Notice 96-8 not only does not offer any assurance to CIGNA but does the opposite, concluding that a cash balance plan of the "type" that CIGNA adopted "typically will not satisfy those accrual rules."

### E.    CIGNA's Criticisms of <u>Richards</u> as "Wrongly Decided"Do Not Withstand Review.

CIGNA says there are "five reasons" for concluding that Judge Hall's March 2006 decision in <u>Richards</u> is "wrongly decided." Dfs. Br. at 27-30. The reasons CIGNA offers largely repeat its earlier arguments, but we discuss them briefly:

<u>First</u>, contrary to CIGNA's assertion, Judge Hall did not conclude that "rate of benefit accrual must mean the same thing as the specifically defined term 'accrued benefit.'" Dfs. Br. at 27. Instead, she, like Judge Murphy in the <u>Cooper v. IBM</u> case, found that Congress used the term "benefit accrual" to refer to "a change in the annual benefit commencing at normal retirement age." 427 F.Supp.2d at 164-65. Having used the

---

[14] See also <u>Esden</u>, 229 F.3d at 164 (under Notice 96-8, "a cash balance plan must project the balance of the hypothetical account forward to normal retirement age and then pay out the present value of that projected balance"). See also <u>Esden</u>, 229 F.3d at 164 (under Notice 96-8, "a cash balance plan must project the balance of the hypothetical account forward to normal retirement age and then pay out the present value of that projected balance").

term "benefit accrual" in this manner consistently since 1974, and having never used it in any other manner, Congress was not compelled to repeat the definition.

Second, while ERISA §§3(23)(A) and 204(c)(3) allow the accrued benefit "to be determined as an amount other than an annual benefit commencing at normal retirement age," this does not allow the employer to ignore the statutory referent (contrary to the CIGNA's suggestion). When the "accrued benefit" is "determined as an amount other than an annual benefit commencing at retirement age," it must still be the actuarial equivalent of "such benefit," i.e., the annual benefit commencing at normal retirement age. Esden, 229 F.3d at 163.

Third, Judge Hall's decision does not "misunderstand the mathematics relevant to the example in the Conference Report" about how an older worker must earn the same $10 per month annuity as a younger worker. It is CIGNA that does not appear to appreciate how that example undercuts its position. As Judge Hall stated, "Congress' intent was to assure a benefit measured as of normal retirement age." 427 F.Supp.2d at 166. The example in the Conference Report about how an older worker must receive the same additional $10 per month annuity confirms that intention.

Fourth, Judge Hall properly relied on the Treasury Department's explanation in the preamble to the 2002 proposed regulations as "support" for concluding that the statute applies "regardless of whether the participant is older than, younger than, or at normal retirement age." This "explanatory statement" was not limited to the proposed regulations

26

and it offers a persuasive analysis of the statute. See 427 F.Supp.2d at 161. It was not

inconsistent for Judge Hall to ignore the "special definition" contained in the proposed

regulations because that special definition was withdrawn and the Treasury Department

never explained how the statute could be construed in that manner.

Fifth, Judge Hall did not "misunderstand" the definition of a defined benefit plan.

She followed Esden in holding that cash balance plans are defined benefit plans and, as

such, they must conform with the laws applicable to those plans. See 427 F.Supp.2d at

163, 165 and 167.

In its trial brief, CIGNA invites the Court to either "join Judge Hall and the district

court in Cooper in condemning all cash balance plans" (which Judge Hall did not do) or

else "adopt the approach endorsed by ... five district courts." Dfs. Br. at 30 and id. at 2-3

(citing five cases). Plaintiffs have already discussed two of those cases (Eaton and

Register). See Pls. Br. at 25, 35 n.11. Tootle v. ARINC, 222 FRD 88 (D.Md. 2004), is

another "policy" decision like Register, that is inconsistent with Esden's determination

that cash balance plans are defined benefit plans which must comply with the rules

applicable to such plans. See 222 FRD at 93-94 ("employers should not be forced to

calculate accrued benefits under a cash balance plan in terms of an age-65 annuity"; a

"more sensible approach" is to test the benefit accruals under the "ERISA provisions for

27

defined contribution plans").[15]

The two other cases which CIGNA cites do not speak to this issue. In an interlocutory ruling, Engers held, sua sponte, that §204(b)(1)(H) does not apply at all to employees who are below the age of 65. See 2001 U.S. Dist. LEXIS 25889 *9 (D.N.J.) (not for publication). The Treasury Department has expressly disavowed this position and no subsequent decision has accepted it. See, e.g., Wells v. Gannett Ret. Plan, 385 F.Supp.2d 1101, 1102 (D.Colo. 2005), Richards, supra, 427 F.Supp.2d at 159 and 161. Hurlic v. S. California Gas Co., No. 05-5027 (C.D. Cal. Mar. 24, 2006), is an unpublished order by Judge Real that denies all of the Plaintiffs' claims with no explanation of the grounds. See Dfs. Ex. A.

### F.     The Periods of "Wear-Away" With No Additional Benefits Violate the Age Discrimination Rule

CIGNA's Trial Brief does not discuss the point that there was also an age-based cessation in the rate of benefit accruals, whether measured by additional retirement

---

[15] Hirt v. Equitable, __ F.Supp.2d __, 2006 WL 2023545 (S.D.N.Y. July 20, 2006), which came out after Defendants' Brief was prepared, is another decision along the lines as Register and Tootle. The opinion states that because Congress used the term "rate of benefit accrual" and "left that term undefined," there is an "ambiguity" that "allows for multiple interpretations." *34. Rather than determine Congress' intent based on the use of the term "benefit accrual" in adjacent subsections and the absence of any different usage, the opinion decides that "the measure used to determine discrimination for traditional defined benefit plans may be fashioned to fit the structure of those ... plans and the measure used for cash balance plans may be fashioned to fit those plans." Id. Essentially, despite Esden's admonition, the Hirt decision allows an employer to "contract around" one of ERISA's benefit accrual requirements by adopting a cash balance plan.

benefits <u>or</u> by the payment of cash balance benefit credits,  for employees who were subject to "wear-aways." See Pls. Opening Br. at 31. CIGNA's Response to Plaintiffs' Proposed Findings admits that the Plan's periods of "wear-away" with no additional benefits were "more likely" for participants who were eligible for early retirement benefits under the prior plan and it admits that "early retirement eligibility is a function of age." Dfs. Resp. to Pls. Prop. Findings, ¶¶81 and 93. The word "likely" cannot mean a probabilistic effect because CIGNA simultaneously admits that this resulted from designing the opening account balance to exclude the value of early retirement benefits for which an employee may be eligible. Id. at ¶81.

In response to the Plaintiffs' Proposed Findings, CIGNA nevertheless asserts that "the wearaway period for employees who are over age 65 will be less than the wear-away period for employees who are younger than age 65." Id. at ¶93. In addition to the fact that only 171 of 29,570 participants in the cash balance plan are over age 65, New Ex. 201, this defense is inconsistent with the law. If employees in a protected group are discriminated against, it is "of little comfort" that "other members" are not. <u>Connecticut v. Teal</u>, 447 U.S. 440, 455 (1982) (Title VII); <u>Dist. Council 37, AFSME v. NY City Dep't of Parks</u>, 113 F.3d 347, 354 (2d Cir. 1997) (ADEA). Because the discrimination in paying the "benefit credits" based on early retirement eligibility is undisputed, whether it is termed disparate impact or disparate treatment is inconsequential. The law prohibits both. <u>Smith v. City of Jackson</u>, 544 U.S. 228, 235-38 (2004).

G.    **CIGNA's Suggestion that It Would Be "Enormously Expensive" to Comply with the Age Discrimination Law Is Unsupported and Contrary to the Available Evidence.**

In its Proposed Findings, CIGNA asserts that any ruling against it will be "enormously expensive and disruptive." Dfs. Prop. Findings ¶127. The legality of CIGNA's actions does not, of course, turn on the expense to remedy the violation. Moreover, CIGNA does not quantify or support this assertion with any evidence. In discovery and in its responses to Plaintiffs' Trial Exhibits, CIGNA has maintained its cost savings from the cash balance conversion have "no bearing" on this litigation. See, e.g., Dfs. Mem. Regarding Pls. Prop. Trial Exs, at 9. Internally, CIGNA recognizes that its graded schedule of pay credits lessens its "vulnerability" to this claim. Pls. Ex. 47 (third page). CIGNA's liability for this violation is also attenuated because only a small percentage of its employees are older. CIGNA's Form 5500 reveals that only 8% of the Part B Plan's participants are age 55 and over and only 3% are 60 and over. New Ex. 201.

Wrapping itself in the cloak of other employers' interests, CIGNA alternatively maintains that any ruling against it would make "all" cash balance plans illegal. Dfs. Br. at 7 ("This case challenges the fundamental design of all of these plans"); id. at 1, 16 and 30. We have already pointed out that this is not Plaintiffs' position. Close to 75% of the companies with cash balance formulas have adopted graded pay credit schedules which lessen their exposure to an age discrimination claim. ¶8. In many cases, those schedules are graded substantially more than CIGNA's. In Tootle v. ARINC, 222 F.R.D. 88 (D.Md.

30

2004), for example, the defendant provided a graded schedule of pay credits ranging from 3.0 % at age 24 to 16.0 % at age 60.  222 F.R.D. at 90 n.1.  In Esden, the schedule of pay credits ranged from 3.25 % to 11.0 %.  229 F.3d at 160. Furthermore, most cash balance plans avoid any "wear-away" of previously-earned benefits based on age by providing "A+B" or similar transition formulas.

## IV.    ERISA Section 204(h) Requires Understandable, Advance Notice of a Significant Reduction in Benefits.

It is uncontested that CIGNA's cash balance conversion caused very substantial reductions in future retirement benefits: Mr. Poulin's Supplemental Report shows how a change from a final average pay formula to a career average formula causes a substantial reduction in benefits by itself, up to a 42% difference.  Pls. Ex. 4 and ¶126.  After three to eight years of additional employment, the benefits of the ten named Plaintiffs and testifying witnesses were from 30 to 50% lower than if the prior formulas had continued. ¶¶125 and 140. CIGNA's consultant, Mercer, also computed significant reductions, as did CIGNA's in-house actuaries. ¶¶136-139.

CIGNA's actuarial expert, Mr. Sher, does not contest these calculations. And he offers no support for CIGNA's assurances to its employees that their benefits would be "comparable" or "larger" under the cash balance formula. Indeed, Mr. Sher was specifically instructed by counsel not to do any comparative calculations.¶ 127. And CIGNA has produced no other documents to support its representations.

A.    **Section 204(h) Required CIGNA to Tell Its Employees that Their Future Benefits Were Being Reduced.**

In Hirt v. Equitable Ret. Plan, supra, 2006 WL 2023545, Judge Hellerstein observed that "Companies are free to change from traditional defined benefit plans to cash balance plans, notwithstanding that a significant reduction in future benefit accruals will result.  But they must give adequate notice that their plans are being amended." *21. Equitable's "notice did not offer a comparison of benefits under the Cash Balance Plan to those under the former plan" and "did not give adequate notice ... about the reduction in retirement benefits produced by the amendment." *21-22. "A notice is intended to give fair warning, and fails to do so if it is cryptic, or requires research beyond the document itself."  Id.

CIGNA's only defense is to propound a "one second freeze" theory of Section 204(h) notice: CIGNA maintains that it notified employees of a freeze in their benefit accruals between December 31, 1997 and January 1, 1998. Following this logic, CIGNA did not have to notify its employees of future reductions because any future benefits were an "increase" compared to the absence of benefits during the one second freeze. See Dfs. Br. at 68-71 ("freezing the Part A benefits" between December 31, 1997 and January 1, 1998 "was the only reduction of benefit accruals that participants experienced"; "the subsequent adoption of Part B did not effect any 'reduction'").[16]

---

[16] CIGNA attempts to use the Third Circuit's Depenbrock decision to its advantage. Dfs. Br. at 69 and Prop. Conclusions ¶110. Depenbrock held that CIGNA's

There are two problems with CIGNA's theory: First, it makes a mockery of the statutory notice requirement. If it were accepted, an employer could satisfy the statute by notifying its employees of a "one second freeze" and thereafter reduce benefits by any amount with no disclosure. Defendants' argument is remarkably similar to the one made in Brody v. Enhance Reinsurance Co. Pension Plan, 2003 WL 1213084 *11 (S.D.N.Y. 2003). There, Defendants relied "on the conclusory statement that [s]ection 204(h) notice was not required as to the 1995 Amendment because, once Enhance validly froze benefit accruals in September 1994, the rate of future accruals for all Participants was zero....Thus, when Enhance adopted the 1995 Amendment, the new Plan provisions effected an increase, not a decrease in the rate of future accruals." In Brody, Judge Preska denied the Defendants' motion for summary judgment on this ground, ruling that "It is not so obvious to this Court that when there is a freeze in benefits, along with the promise of retroactive benefit accruals once the new Plan is adopted ... any additional benefit accruals at all constitute an overall increase because the baseline is zero. It is possible, for example, that pre-freeze benefits accrued a X rate, and post-freeze benefits made retroactive accrued at a rate less than X and that such a change falls within §204(h)."

The other problem with CIGNA's theory is that CIGNA actually provided no notice of a "freeze." Neither the word nor the concept was communicated. Instead,

---

"rehire rule" could not be retroactively modified from a favorable rule to an unfavorable rule. It did not, as CIGNA characterizes it, hold that "the effective date" of the amendment implementing the cash balance plan was December 21, 1998.

CIGNA's alleged notice told employees it was "introduc[ing]" a new retirement program on January 1, 1998 under which the current formula would be "replaced" with a new benefit formula that would "significantly enhance" the retirement program. Pls. Ex. 8 (Stratman Rpt) at Ex. 1, pages 1 and 5; see also id., Ex.2, AMARA -00447 ("Effective January 1, 1998, CIGNA will replace the current Pension Plan with a new retirement plan for most employees") and AMARA-00462 (plan will be "replace[d] with a new plan). There is no mention of a freeze.

Alternatively, CIGNA argues that Section 204(h) does not require it to notify employees of reductions, but merely requires it to notify them that the plan is being amended. Frommert holds that §204(h) requires that notice of an amendment creating a significant reduction in the rate of future benefit accrual must explain that "benefits [will] be reduced" so employees can "make a meaningful decision regarding whether they [will] accept the terms." 433 F.3d at 262. CIGNA's distinction of Frommert as holding that notice is required where benefit accruals are reduced "indirectly" is unpersuasive (and actually supports Plaintiffs' position). See Dfs. Br. at 72. Congress enacted §204(h) because the existing rules for understandable disclosures of material modifications to benefit formulas only required disclosure within 210 days after the plan year in which the amendments went into effect. Section 204(h) was enacted to require a specific notice of benefit reductions 15 days in advance of the effectiveness of the amendment. H. Rep. 99-453 at 568-69 (New Ex. 202). There is no indication that Congress intended for an

34

advance notice to be less understandable than the disclosures required by current law. The purpose of the notice requirement would not be served by such a construction.

Moreover, far from staying silent, CIGNA's alleged notice went out of its way to assure employees that there were no reductions, telling them that their retirement program was being "enhanced" and that there would be an "overall improvement in their retirement benefits." ¶182.

CIGNA also neglects to address the Plaintiffs' other point that it provided <u>no</u> notice of the years with no future benefit accruals at all (the "wear-away" periods). See Pls. Br. at 47-49. Those periods did not last for only 'one second,' but for years after December 31, 1997. Again, CIGNA was not just silent on this point, but assured its employees that they would enjoy "steadier benefit growth" in their benefits compared with the old plan (which never had any "wear-aways"). ¶182.

**B.    ERISA Section 204(h) Also Required Advance Notice of the Repeal of the Favorable "Rehire Rule" When that Action Had Disastrous Consequences for the Benefits of Rehired Employees.**

Until December 21, 1998, CIGNA's Plan documents contained a favorable "rehire rule" under which rehired employees were returned to the Part A formula that they previously enjoyed. CIGNA argues that this favorable rule could be repealed, with no notice, because it was not "likely" that "droves" of former employees would return to CIGNA and be affected. See Dfs. Br. at 74 and Dfs. Prop. Conclusions at ¶121. The evidence shows, however, that no determination was made "at that time," as the

regulations require, see Treas. Reg. 1.411(d)-6, Q&A-9, and that it was reasonably expected that a significant number of such employees would return and be affected by this change: CIGNA rehired over 2,600 former employees in 1998-2000, close to 500 of whom would have been grand-fathered under the Part A Plan if the rehire rule had not been amended. ¶292. Placing the rehires under the cash balance plan with no prior notice had disastrous consequences for their benefits. Rehired employees like Gisela Broderick and Patricia Flannery have not earned $1 more in benefits for the rest of their careers. ¶¶47-48; see also ¶283 ("Rehires see no benefit improvement for several years"). CIGNA's position that it did not expect to rehire a significant number of employees is belied by the fact that it specifically amended the rehire rule in Part A of the Plan to repeal it. Moreover, according to CIGNA, notice of the modification of the rehire rule was given to active employees who were less "likely" to both leave CIGNA and be rehired.¶285; Dfs. Prop. Findings ¶189.[17]

If notice was required, CIGNA does not contest that there was "likely prejudice" to the rehired employees. See Dfs. Br. at 72-75. "Likely prejudice" is clear because CIGNA

---

[17] CIGNA cites an example in the Treasury regulations where benefits for employees in Division M are reduced, but notice is not required for employees in Division N because "it is reasonable to expect that only a small percentage of employees in Division N will be transferred" to Division M. Treas. Reg. 1.411(d)-6, Q&A-9 (Example (4)) and Dfs. Br. at 74-75. However, if the amendment was to specifically reduce the future accruals for employees transferred from Division N to Division M, notice would certainly be required. This is the situation that both Frommert and this case address.

modified the rehire rule a second time (effective January 1, 2001) precisely because

rehired employees were upset when they accepted job offers, returned to CIGNA and

learned that they were under a cash balance plan and were losing early retirement

subsidies. This was starting to affect CIGNA's ability to rehire employees.¶¶296-97.

Frommert required Section 204(h) notice of a change in a rehire rule with similar

consequences on benefits and found likely prejudice from being deprived of the

opportunity to seek injunctive relief, alter retirement investment strategies, or consider

other employment.  See 433 F.3d at 266-67.

**V.    CIGNA's Summary of Material Modification and SPD Omit Any Disclosure
        of the Reductions and Falsely Assured Participants that the Cash Balance
        Benefits Were "Larger" or "Comparable" and that "Each Dollar's Worth of
        Credits Is a Dollar of Retirement Benefits Payable to You."**

In the floor debates on ERISA, the late Senator Jacob Javits, the chief co-sponsor

of ERISA, voiced Congress' concern with the assurances that "nicely phrased" booklets

provided that workers were "covered by a good pension plan" when the cold legal

phrasing in plan documents provided otherwise:

> "Many workers are led to believe they are covered by a good pension plan because
> of nicely phrased booklets and other assurances handed them by their employers.
> When the time comes for the payoff, they learn that the cold legal phrasing in
> pension contracts says otherwise."

3 ERISA Leg. Hist. 4750.

CIGNA does not contest that, in light of the statutory purpose and language, the

Second Circuit requires adverse changes to a plan to be "fully explained," including the

full import of the interaction with any prior plan provisions. <u>Layaou v. Xerox Corp.</u>, 238

F.3d 205, 210-11 (2d Cir. 2001); <u>Chambless v. Masters, Mates & Pilots Pension Plan</u>, 772

F.2d 1032, 1040 (2d Cir. 1985). Accord <u>Wilkins v. Mason Tenders Dist. Council Pension</u>

<u>Fund</u>, 445 F.3d 572, 584 (2d Cir. 2006) ("SPD must be specific enough to enable the

ordinary employee to sense when there is a danger that benefits could be lost or

diminished," quoting <u>Stahl v. Tony's Bldg. Materials</u>, 875 F.3d 1404, 1408 (9th Cir.

1989)).

### A.    CIGNA Falsely Assured the Employees that the New Cash Balance Plan Was Comparable to or Better than the Old Plan in Order to "Avoid Any Significant Negative Reaction from Employees."

The evidence shows that the "nicely phrased" statements in CIGNA's Section

204(h) notice, SMMs and SPDs were calculated to assure the employees that they were

still covered by a good pension plan and thereby "avoid any significant negative reaction

from employees." ¶264. The Exhibits reveal specific instructions to Mercer "not to

compare the old to the new plans" in preparing the Newsletter (Section 204(h) notice) or

the Retirement Information Kit (the SMM). ¶237. CIGNA also recognized that "exact

comparisons of benefits" would be "difficult" for employees to make on their own, ¶240,

but instructed its own benefits personnel not to offer comparisons in response to

individual requests:

> "We continue to focus on NOT providing employees before and after samples of
> the Pension Plan changes."

¶¶241-51.

38

CIGNA was not satisfied, however, with leaving its communications bare of comparative information. Instead, CIGNA's disclosures affirmatively assured the employees that their benefits were being be "enhanced" and would be "larger" or "comparable" under the new cash balance plan. ¶¶158-59, 162, 166, 169. CIGNA also specifically assured employees that "each dollar's worth of credits is a dollar of retirement benefits payable to you" with no reference to "wear-away" periods in which they would not earn any benefits at all. ¶¶165, 176. CIGNA further represented that prior benefits were "fully protected" in the opening balances, when they were not, and offered a "mathematically impossible" example to reinforce that representation, omitting the effect of its pre-retirement mortality discount. ¶¶163-64.[18] CIGNA also assured its employees that there were no "cost savings" from the changes, when the evidence shows that this was not true. Compare ¶¶28 and 31 with ¶¶160, 162, 170.[19]

The above representations stand in stark contrast to the true adverse impact of the changes and to the internal documents in which CIGNA recognized that the benefits under the prior formula were "much higher" and that wear-away periods could occur during which participants "accrue no additional benefits." See ¶¶67-68, 131, 283. In

---

[18] CIGNA represented that the opening balances were determined by following "guidelines established by the government" which it now admits do not exist. Compare ¶183 with Dfs. Prop. Findings ¶19.

[19] In Hirt v. Equitable, supra, 2006 WL 2023545 *20, Judge Hellerstein found that "The savings that Equitable's management estimated to result from the change in pension plan is also indicative of the reduced rate of benefit accrual to participants."

39

short, CIGNA deliberately led its employees to believe that benefit reductions and wear-aways were "not components of the plan." Richards, 427 F.Supp.2d at 173 (following Frommert, 433 F.3d at 267).

In its trial brief, CIGNA asserts that (1) these "details" were omitted because there was so much information from the 80-page Plan document to convey, (2) benefit comparisons and disclosure of reductions are "not required" by ERISA at all, and (3) it would have been "confusing" to the employees to offer them comparative information. Dfs. Br. at 51 and Dfs. Prop. Findings, ¶187. CIGNA goes so far as to characterize the pre-retirement mortality discount, which took away close to 10% of the value of participants' benefits, as a "plan administration detail" or an "idiosyncratic contingency," that need not be disclosed. Dfs. Br. at 52-53.

Conspicuously, CIGNA avoids any discussion of the fact that it offered its employees, not silence, but misleading assurances and information. CIGNA instead suggests that it would have been "confusing" to employees to know the truth. Clearly, "confusing" is not the right word: Instead, truthful disclosures undoubtedly would have caused the "significant negative reaction from employees" that CIGNA sought to avoid. Under ERISA, this is something that an employer must be able withstand, or bend to, when it decides to reduce benefits. See 29 C.F.R. 2520.102-2(b) ("Any description of exception, limitations, reductions, and other restrictions on plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant").

40

In Mullins v. Pfizer, 23 F.3d 663, 668 (2d Cir. 1994), the Second Circuit recognized the fiduciary duty "not to affirmatively mislead participants." Pfizer maintained a policy of denying any rumors about the new plan, going so far as to announce "that it was not considering offering an increased lump sum severance plan in the foreseeable future." The Second Circuit held that "[w]e adopt the view that a plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan." Id. Although a fiduciary is not required "to be perfectly prescient as to all future changes in employee benefits," "when a plan administrator speaks, it must speak truthfully." Id. at 669. Similarly, in Hudson v. General Dynamics Corp., 118 F.Supp.2d 226, 249 (D.Conn. 2000), Judge Arterton held that "A fiduciary cannot leave its front-line benefits counselors in the dark, or instruct them to give noncommittal and nonfactual responses to inquiries regarding potential benefit changes, if the information that is withheld is material to beneficiaries." Compare Flanigan v. GE, 242 F.3d 78, 84-85 (2d Cir. 2001) (recognizing that "[c]ommunicating information about future plan benefits is indeed a fiduciary obligation" but finding no breach where there was no evidence that GE "withheld material information" or "purposefully misled the plaintiffs in any way").

### B. CIGNA's Disclosures Resulted in "Likely Prejudice" to the Participants' Ability to Make Well-Informed Employment and Retirement Decisions.

In the middle of the briefing on likely prejudice from inadequate and misleading

disclosures, CIGNA, which is itself a major provider of employee benefit plans,  launched

an advertising campaign whose theme is the impact that would result if a company placed

"Help Wanted" ads disclosing that it was "squeez[ing]" benefits or providing "minimal"

ones:

> "WANTED: Hard working, educated employees who will not mind that their
> benefits are squeezed because the company's profit margins are squeezed."

> "SEARCHING: Dedicated employees who will contribute to the company's
> success, even though their health care benefits are minimal because of
> unmanageable costs. Must be willing to work long hours and try not to get sick."

New Ex. 203. CIGNA's advertisements again demonstrate CIGNA's awareness of the

negative human relations consequences of notifying employees of "minimal" benefits.

But in its own case, CIGNA sought to avoid that "negative reaction" by failing to disclose

benefit reductions and offering repeated representations to its employees that their cash

balance benefits would be "comparable" or "larger," and an "enhancement."

There is no serious contest that Congress' statutory policy is to require companies

to tell their employees when benefits are being reduced, and not to offer them false

assurances that reductions are "not components of the plan." Frommert, 433 F.3d at 267.

As Plaintiffs have shown, CIGNA flouted these rules. Now it argues that there should be

no relief for the employees by pretending that its inaccurate and incomplete disclosures

had no consequences. CIGNA repeatedly contends that if the benefit reductions were

disclosed to participants, it would not have "made a difference in the benefits they

received." Dfs. Br. at 4; id. at 60 ("Because Plaintiffs and the testifying class members

42

cannot show that they would have received any greater benefit had the alleged SPD deficiencies not existed, their claim fails"); and id. at 63 n. 40 ("here, there is no information Plaintiffs have alleged was missing from the SPD which, if included, would have permitted any class member to reap a larger Part B benefit").

As CIGNA's ad campaign shows, this is an incomplete test for likely prejudice. When an employer discloses that benefits are being substantially reduced, there are negative human relations consequences. An employer can always tell the employees that the decision is made and the new plan terms are set in stone. But the point is that employees must be informed about the reductions so they can express dissatisfaction, press for changes, e.g., benefit improvements or increased compensation, make informed employment, savings and retirement decisions, and, if necessary, file a lawsuit if the benefit reductions involve statutory violations.

In Layaou, Xerox made the same argument as CIGNA, contending that:

 "Layaou cannot show any prejudice because, even if the SPD had adequately explained the 'phantom account' offset, there is nothing that he could have done differently that would have resulted in his receiving a higher retirement benefit. Since the Plan itself provided for the application of the offset, according to defendants, plaintiff got exactly the benefit to which he was entitled."

330 F.Supp.2d at 302. The district court responded that:

 "To adopt defendants' analysis, though, would effectively be to require plaintiff to show 'detrimental reliance' on the faulty SPD, a standard that the Burke court rejected.... To hold that plaintiff cannot recover because the Plan provides for the offset would run counter to the Burke court's admonition that 'the consequences of an inaccurate SPD must be placed on the employer' ... and instead would effectively penalize plaintiff for Xerox's issuance of a faulty SPD."

43

Id. (emph. in orig.) As <u>Layaou</u> and <u>Frommert</u> both show, likely prejudice from inadequate or misleading disclosures does not just involve the inability of participants "to reap a larger ... benefit" under a Plan's terms, but involves the "depriv[ation] of the opportunity to take timely action" with respect to retirement, employment, and even litigation decisions. <u>Frommert</u>, supra, 433 F.3d at 266; <u>Layaou</u>, supra, 330 F.Supp.2d at 304. CIGNA's brief quotes the language in <u>Sheehan v. Metropolitan Life Ins. Co.</u>, 368 F.Supp.2d 228, 262 (S.D.N.Y. 2005) about how "filing a lawsuit" is one of the options that a participant could take if changes were fully explained. But CIGNA then skips over that factor as if the language was meaningless. See Dfs. Br. at 60-61.

CIGNA attempts to distinguish <u>Frommert</u> on the ground that "[t]here was no hidden offset, or other circumstances that led Plaintiffs to mistakenly believe they would obtain higher benefits than the plan provided." Dfs. Br. at 54.[20] But there were: CIGNA represented that the opening accounts "fully protected" their previously earned benefits, ¶163, when early retirement benefits were not included and a pre-retirement mortality discount was applied which would never be regained. CIGNA then represented that there would be "steadier benefit growth" under its cash balance plan and that "Each dollar's worth of credits is a dollar of retirement benefits payable to you," ¶¶165, 176, when there were actually wear-away periods during which participants received "credits" but no

---

[20] CIGNA also describes <u>Frommert</u> as "inapposite because it is so markedly different from this case." Dfs. Br. at 62.

additional benefits payable at retirement. And CIGNA represented that the cash balance

formula offered "comparable" or "larger" benefits and an "overall improvement," ¶¶166,

169, when the pay credits actually translated to much lower retirement benefits.

The case law in this circuit recognizes the importance of disclosures on

employees' ability to make informed decisions.  In <u>Mullins v. Pfizer</u>, supra, 23 F.3d at

669, the Second Circuit held that if Pfizer was found to make a misrepresentation,

whether it is "material" depends on "whether there is a substantial likelihood that it would

mislead a reasonable employee in making an adequately informed decision about if and

when to retire."  In <u>Flanigan v. GE</u>, supra,  242 F.3d at 84, the Second Circuit stated that

"This Court has also held fiduciaries liable for non-disclosure of information about a

current plan when the omitted information was necessary to an employee's intelligent

decision about retirement."

CIGNA mischaracterizes Plaintiffs' position when it acts as though Plaintiffs are

seeking a "presumption" of likely prejudice based on the language of the disclosures

alone. Dfs. Br. at 57 and 60. The presumption that Plaintiffs seek is based on <u>Burke</u>,

which holds that there "is a presumption of prejudice in favor of the plan participant after

an initial showing that he was likely to have been harmed." 336 F.3d at 113-14. Plaintiffs

have made the initial showing of likely harm by demonstrating the materiality of the

information to bargaining and employment, savings and retirement decisions, including

CIGNA's recognition in internal documents and disclosures that information is critical

45

those very important decisions. See Pls. Opening Br. at 53-55. Instead of dealing with a "significant negative reaction" and letting employees make decisions with complete and accurate information, CIGNA sought to avoid any negative reaction by concealing comparative information and offering inaccurate assurances. The results of that strategy were "better than expected." ¶¶264-65. As a result, employees lost the opportunity to "timely" register their dissatisfaction with the changes and make appropriate decisions with the knowledge that their benefits were being substantially reduced. CIGNA cannot disclaim that its efforts produced the intended results.

CIGNA does not challenge the direct testimony of any the named Plaintiffs and other witnesses about how they could have complained, asked for more compensation or benefits, and changed their employment, savings and retirement plans if they had known the extent of the benefit reductions. CIGNA merely recharacterizes different parts of the witnesses' testimony. Dfs. Br. at 64-65.

CIGNA congratulates itself on its "annual statements" of cash balance accounts stating that they offer employees a "more straightforward picture of a plan participant's retirement benefits" (Dfs. Br. at 64), a "much better basis for making informed financial decisions" (id. at 62), and "more than enough information to make informed employment, retirement and financial decisions." Id. at 4. But the "annual statements" have never told employees about 30 to 50% reductions in their future retirement benefits or years after the conversion with no additional benefits. Indeed, they do not even tell employees how

46

much their "retirement benefits" are. See Dfs. Ex. 520.

CIGNA indirectly suggests that each class member could now be required to prove that he or she read the Newsletter (204(h) notice), the Information Kit (which CIGNA says is an SMM), and the SPD to obtain any relief. Dfs. Br. at 64-65. However, the point is that the information about reductions and other disadvantages was not disclosed, no matter how carefully an employee read the communications. If CIGNA's SPD or SMM had disclosed 30-50% reductions and periods of years with no further benefit accruals, we can rest assured that employees would have read them carefully and that word would have spread to other employees.

Three cases in this circuit recognize that if the information is disclosed, the employee can learn about it from co-workers "even if he never read the SPD himself." Manginaro v. Welfare Fund of Local 71, 21 F.Supp.2d 284, 296-97 (S.D.N.Y. 1998); Medoy v. Warnaco Employees Long Term Disability, 2005 WL 3775953, *5 (E.D.N.Y. Dec. 24, 2005); Chisolm v. Plan Adm'r of Joint Industry Bd., 2004 WL 3267292, *5-6 (E.D.N.Y. Oct. 19, 2004). These cases follow from the principle that if the disclosures had been adequate, all participants would be "charged with constructive notice" of the contents. Manginaro, supra, 21 F.S.2d at 299.  Manginaro relies on Estate of Ritzer v. Nat'l Org. of Indus. Trade Unions Ins. Trust Fund, 822 F.Supp. 951, 955 (E.D.N.Y. 1993), which held that:

> "Given the in terrorem nature of the "selective participation" rule, the court could reasonably expect that had the Fund adequately explained the rule in its summary

47

plan description Ritzer would have learned about the retroactive aspect of the rule from co-workers, even if he had not read the plan. While many employees may never in fact study summary plan descriptions, they are likely to learn of the provision as explained in the description through conversations with fellow employees and their employer.

"Where a disclosed provision threatens to deprive every worker in a workplace of health benefits, the court may infer that a plan participant learned of the provision from others. Conversely, where a plan fails to disclose such a provision to participants in a workplace (either through the summary plan description or by other means), the court may infer that the employee did not know of its existence."

In Burke the Second Circuit cited Manginaro as a "useful illustration" of how "likely prejudice" is established and specifically quoted the district court's conclusion that Manginaro could have learned about the limitation, if it had been disclosed, from his co-workers or the union "even if he never read the SPD himself." 336 F.3d at 113.

CIGNA argues that even if there is "likely prejudice," CIGNA has rebutted it by showing "harmless error." Dfs. Br. at 62-65 and 72. But the grounds for CIGNA's rebuttal are spurious: CIGNA circularly argues that "given the abundance of information" that was provided to participants, "any claim that participants were harmed by the deficiencies in the SPD is illusory." Id. at 63. Securities cases involving voluminous prospectuses prove time and again that an "abundance of information" can hide information as well as disclose it. CIGNA then offers three single-spaced bullet points, the first two of which are unresponsive to any of the deficiencies and misleading statements in its disclosures. Id. at 63-64. The last bullet point falsely asserts that "CIGNA provided numerous opportunities for participants to obtain such information,"

48

i.e., "comparisons of their Part B cash balance benefit with what they would have earned had they continued to be eligible for Part A." Id. at 64. As the record demonstrates, this is simply wrong. CIGNA had an express policy against providing any such information both in its written disclosures or in response to individual requests. See ¶¶237, 241-51, 294. It is bad faith for CIGNA to make factual contentions that lack evidentiary support. See F.R.C.P. 11(b)(3).[21]

CIGNA's argument about "harmless error" also raises an important issue concerning fiduciary duties and selective defenses. CIGNA is effectively waiving the established way to prove "harmless error," i.e., showing that participants otherwise knew about the reductions even if the disclosures are inadequate. See Weinreb and Exarhakis v. Visiting Nurse Service, 2006 WL 335420, *13 (E.D.N.Y. Feb 13, 2006); and cf. Burke, 336 F.3d at 113-14 and Manginaro, 21 F.Sup.2d at 297 n.7. Here, any such defense would implicate the key people involved in developing the cash balance plan, e.g., Gerald Meyn, John Arko, and the actuaries, who knew about the reductions and other disadvantages of cash balance from the internal communications produced in discovery. CIGNA's decision not to pursue this line of proof raises a fiduciary issue because CIGNA is foregoing a viable defense against individuals for whom the disclosures actually may have been "harmless error," while continuing to press for any defense whatsoever that would deny

_____

[21] As support, CIGNA cites to ¶¶217 and 220 of its Proposed Findings. But those findings do not support the statement.

relief to the people who were affected its disclosures. See Res. (2d) of Trusts, §183

(fiduciaries have duty to deal impartially with beneficiaries).[22]

## VI.     CIGNA's Other Defenses to the Disclosure Violations Lack Merit.

### A.     CIGNA Had Notice of the SMM Claim under Rule 8.

In passing, CIGNA questions whether the Complaint provided CIGNA with notice

of an allegation that CIGNA did not comply with the rules for summaries of material

modification (SMM's). Dfs. Br. at 49 n.35; see also Dfs. Prop. Conclusions ¶73 (asserting

that the Complaint does "not articulate factual allegations relevant to" an SMM claim).

However, the quoted language in ¶40 of the original Complaint, and ¶49 of the amended

Complaint, is in both CIGNA's Retirement Information Kit (which CIGNA presently

contends is an SMM) and its SPD. Moreover, the regulations on which the Complaint

relies apply to both an SMM or an updated SPD. As CIGNA otherwise recognizes,

ERISA requires that participants receive either an understandable SMM or an "updated

SPD" when a Plan is materially modified. See Dfs. Prop. Conclusions at 20-21. In his

April 25, 2003 report, Professor Stratman carefully analyzed the disclosure requirements

in the Information Kit (Pls. Ex. 8 at 6-9), and John Arko was deposed on those

disclosures in a July 3, 2003 Rule 30(b)(6) deposition (Pls. Ex. 194). CIGNA only

confirmed that its Retirement Information Kit was intended to be an SMM in an answer

_____

[22] In a footnote, CIGNA again tries to preserve the option of grinding these
proceedings to a halt with individual proofs of likely prejudice. See Dfs. Br. at 65 n.42
and Pls. Opening Br. at 55.

to Plaintiffs' Interrogatories dated February 27, 2006.  See Pls. Ex. 29 (Answer No. 2). It

is farfetched for CIGNA to now maintain that it lacked notice from the Complaint and

discovery that its compliance with the disclosure requirements for an SMM was at issue.

See Swierkiewicz v. Sorema, 534 U.S. 506, 513-14 (2002) (Rule 8(a)'s "simplified notice

pleading standard relies on liberal discovery rules and summary judgment motions to

define disputed facts and issues"; exceptions requiring "greater particularity" are not to be

extended).

**B.     CIGNA Is the "Plan Administrator" for Disclosure Purposes Because
It Controlled the Disclosures.**

The centerpiece of CIGNA's defense to the disclosure claims now appears to be

that Plaintiffs have not sued the "Plan administrator" and that this prevents the Court

from providing any relief for the disclosure violations. See Dfs. Br. at 5, 44, 46, 48-49,

65-67, 75-76. However, the Complaint sues both the CIGNA and the Plan. Cplt.¶¶8-9

(dkt. #165). CIGNA is sued as both the Plan sponsor and the Plan administrator, as well

as the named fiduciary for the Plan, id., ¶10, and ERISA §502(d) expressly makes the

Plan an entity for purposes of suit. Although CIGNA disclaimed in its answer to the

Complaint that it was the Plan administrator, CIGNA did not produce a designation of

anyone else. CIGNA only produced an internal memorandum purportedly appointing a

former CIGNA employee named Stewart Beltz as a Plan administrator on September 15,

2005. New Ex. 204. Now, CIGNA asserts that the Plan administrator who should be sued

is Mr. Beltz. Dfs. Br. at 66-67. Mr. Beltz was laid off by CIGNA in mid-2003.

51

Starting from that premise, CIGNA reaches an "inescapable conclusion that only the Plan administrator–and not CIGNA or the Plan itself–may be liable for a disclosure violation." Dfs. Br. at 67. This is simply wrong. First, the Supreme Court made clear in Harris Trust & Savings Bank v. Salomon Smith Barney, Inc., 530 U.S. 530 U.S. 238, 246 (2000), that ERISA "§502(a)(3) admits of no limit (aside from the appropriate equitable relief" caveat)... on the universe of possible defendants.... [T]he focus, instead, is on redressing the "act or practice which violates any provision of [ERISA Title I]." Because ERISA §502(a)(3) only allows for equitable relief, and not individual personal liability, see, e.g., Great-West v. Knudson, 534 U.S. 204, 210 (2002), it is unclear what equitable relief an ex-CIGNA employee like Mr. Beltz could possibly offer. See F.R.C.P. 19 (providing for joinder if "in the person's absence complete relief cannot be accorded among those already parties").

With regard to CIGNA's own status, even if it was not the Plan administrator the Second Circuit has held in Carlson v. Principal Financial Group, 320 F.3d 301 (2d Cir. 2003), that because "Section 502(a)(3) admits of no limit on the universe of possible defendants, [a party's] non-fiduciary status does not end the analysis." 320 F.3d at 307-8. "[A] non-fiduciary may be a proper defendant under Section 502(a)(3) if it would be a proper defendant under the common law of trusts." Principal was a proper defendant if it had "actual or constructive knowledge that rendered its transaction with Nationar unlawful." See also Crocco v. Xerox Corp., 137 F.3d 105, 107 n.2 (2d Cir. 1998)

52

(recognizing that plaintiff may sue an employer if her claim "request[s] injunctive or other equitable relief under ERISA §502(a)(3)); Richards v. FleetBoston, supra, 427 F.Supp.2d at 181 ("Crocco left open the possibilities that a plan participant might sue a corporate employer who was not a named plan administrator as a fiduciary, where the participant is bringing a breach of fiduciary duty claim, and that a participant might be able to sue the corporate employer for equitable relief under section 502(a)(3)").[23]

Second, CIGNA's position ignores the established principles of relief for disclosure violations. ERISA §204(h) specifically provides that the "pension plan may not be amended" unless the plan administrator provides the required notice of a significant reduction. If the notice is not provided, the result is not personal liability for a plan administrator, but invalidation of the amendment for which the required notice was not provided. In Frommert, the Second Circuit held that "the requirements of §204(h)" were violated and "[w]ithout such proper notice to Plan participants, the amendment was ineffective as to them." 433 F.3d at 268; accord, Hirt, supra, 2006 WL 2023545 *23.

---

[23] Claims under ERISA §502(a)(1)(B) are also not limited to plan administrators. See Bernstein v. Citigroup Inc., C.A. 06-00209 (N.D. Tex. July 5, 2006) (Slip. Op.) ("Section 1132(a)(1)(B) does not expressly limit claims to plan administrators. In determining whether or not an entity is a proper defendant for the purposes of Section 1132(a)(1)(B), courts do not look to the legal status of an entity under Section 1002(16)(A); rather, they consider whether an entity actually controls administration of the plan"); accord, Chapman v. Choicecare Long Island Term Disability Plan, 288 F.3d 506, 509 (2d Cir. 2002) (Sections 1132(a)(1)(B) and 1132(d) "make plain that a plan can be held liable in its own name for a money judgment"); Crocco, supra, 137 F.3d at 107 (in 1132(a)(1)(B) claim, "the plan and the administrators and trustees of the plan in their capacity as such may be held liable").

The cases on SPDs and SMM's also hold the Plan or the employer responsible for an inaccurate SPD. In <u>Burke v. Kodak Ret. Income Plan</u>, 336 F.3d 103, 113, the Second Circuit held that "[t]he statute and the DOL regulations place the burden on employers to draft an SPD that is accurate, comprehensible, and clear regarding restrictions on eligibility for benefits....The consequences of an inaccurate SPD must be placed on the employer." See also <u>Layaou v. Xerox Corp.</u>, 330 F.Supp.2d 297, 305 (W.D.N.Y. 2004), on remand from, 238 F.3d 2005 (2001) (directing "Plan" to "recalculate plaintiff's retirement benefit" and pay plaintiff the difference; Xerox itself was dismissed from action; Plan administrator was not sued); <u>Heidgerd v. Olin Corp.</u>, 906 F.2d 903, 909 (2d Cir. 1990) (SPD controlled and Olin was responsible for the benefits).

Third, CIGNA's position is inconsistent with its memorandum in opposition to class certification in this case and with the <u>Depenbrock v. CIGNA</u> decision. In opposing class certification, CIGNA represented that "If the Court orders that a provision of the Plan must be changed or removed, the Plan, acting through its trustees and fiduciaries, must then implement that relief as to all of the Plan's participants." Dfs. Opp. Br. filed June 7, 2002, at 8 (dkt. #30).

In <u>Depenbrock v. CIGNA</u>, Depenbrock also sued the Plan and CIGNA for statutory violations, including of ERISA's disclosure requirements. As here, CIGNA disclaimed in its answer to the Complaint that it was the Plan administrator, but did not raise this as a defense in opposition to Plaintiff's motion for summary judgment or in its

54

own cross-motion. The district court found that "CIGNA distributed" the required

information to active employees in a timely fashion. 278 F.Supp.2d 461, 470 (E.D. Pa.

2003), rev'd on other grounds, 389 F.3d 78 (3d Cir. 2004).  After the Third Circuit

reversed, CIGNA attempted to revive its denial, arguing that the district court lacked the

authority to order CIGNA to place Mr. Depenbrock back in the Part A Plan because

"CIGNA is merely the Plan sponsor; it has no control over the determination of who is

entitled to benefits under the terms of the Plan." New Ex. 205 at 8. The district court

rejected this argument and ordered the Defendants to place him back under Part A. See

Pls. Ex. 175.

Fourth, CIGNA's position that Mr. Beltz is the Plan administrator with respect to

the required ERISA disclosures is legally and factually defective for several reasons.

ERISA provides that the Plan sponsor is the Plan administrator unless the Plan document

specifically designates another person or entity as the Plan administrator. Lee v. Burkhart,

991 F.2d 1001, 1010 (2d Cir. 1993) ("Thus, unless the plan sponsor, in this case P&W,

designates another party to provide the disclosure mandated by ERISA, the duty to make

such disclosure is on the plan sponsor"); Nechis v. Oxford Health Plans, 421 F.3d 96, 104

(2d Cir. 2005) (the employer was the default plan administrator because Oxford Health

was not designated as such in the plan documents).

Mr. Beltz's appointment is not as CIGNA represents. CIGNA maintains that the

Plan document allows the CIGNA Corporation Corporate Benefit Plan Committee to

name the Plan administrator and that "the Committee formally designated" named Mr.

Beltz. Dfs. Br. at 66. Even if that was accurate, it would not satisfy the statutory

requirement because Mr. Beltz was not named in the Plan document as the Plan

administrator. Moreover, the factual representation is incorrect. The Exhibit on which

CIGNA relies is an internal memorandum from the head of HR, Donald Levinson, in

which he states that he has been authorized by the Committee to make an appointment

and that he appoints Mr. Beltz. Dfs. Ex. 507 at SuppD1098. No formal Committee

records were produced reflecting either Mr. Levinson's authorization or this appointment.

Finally, the Committee's authority did not extend to ERISA disclosures. The Plan

document provides that the Committee has "the duties, authority and functions set forth in

this Article XIII" and that it has the authority to delegate those duties. See Pls. Ex. 1 at

D00098. But the Committee's duties never included the responsibility to prepare a

Section 204(h) notice, SMM, or SPD.

This point is reinforced by the fact that Mr. Beltz actually had <u>no</u> responsibilities

for the preparation of the Section 204(h) notice, the SMM or the SPD. The Newsletter,

Information Kit and SPDs were prepared and distributed by CIGNA. CIGNA, not Mr.

Beltz, entered into a contract with the William Mercer company to assist in preparing the

204(h) and SMM. Mercer's own presentation materials state that:

   "<u>CIGNA</u> has decided, for a number of reasons, not to compare the old to the new
   plans."

Pls. Ex. 237 (emph. added). In a September 1997 memorandum from Gerald Meyn, the

Vice-President for Employee Benefits, to Don Levinson further states that:

> "CIGNA's communications will not make unequivocal statements about 'will not harm' or 'big improvement.'"

¶258. The Newsletter is expressly designated as the product of "CIGNA Benefits Communications" department.  See Pls. Ex. 8 at Ex. 1 at 1. The first page of the Newsletter contains a personal message from CIGNA's CEO to the employees about how the changes will "enhance" their benefits and thereafter the Newsletter communicates with the employees using the pronouns "we" and "you" to show that it is a communication between CIGNA and the employee. The SMM bears CIGNA's registered trademark.  Pls. Ex. 8 at Ex. 2 at AMARA-00445, 457, and 449.  The SPDs bear the logo of CIGNA's Signature Benefits department. See Ex. 8 at Ex. 3 and 4.

The key CIGNA employee on all of these communications was not Mr. Beltz, but Denise Hill, a former employee who CIGNA has designated as a witness. CIGNA's Proposed Findings expressly acknowledge that Hill was "personally responsible for managing the communications process to employees." See id. at ¶154-56. Ms. Hill was an Assistant Vice President in Human Resources & Services Communications. Id at ¶155. She did not report to Mr. Beltz. And CIGNA does not even list Mr. Beltz as a witness.

CIGNA argues nevertheless that Mr. Beltz has to be the Plan administrator because he is named as such in the SPD and the SPD is a Plan document (contradicting its position in the next section of the brief that an SPD cannot modify the Plan document, see Dfs. Br. at 67-68). CIGNA quotes but then ignores the fact that the SPD actually names

"<u>Stewart M. Beltz</u>[,] CIGNA Corporation" as the Plan administrator. Dfs. Br. at 67. The import of this designation is that the responsibilities that Mr. Beltz possessed were within the scope of his employment with CIGNA. There is no indication that CIGNA Corporation was consigning its legal responsibility to participants for ERISA disclosures to Mr. Beltz as if he were a separate legal entity. The SPD, furthermore, tells employees to direct their questions about the plan either to CIGNA's Retirement & Investment Services division, "Signature Benefits," or the Plan administrator. See Pls. Ex. 8 (Stratman Rpt) at Ex. 3, pages D00826, 833, 835-36, and 841. The only functions that the SPD assigns exclusively to the "Plan administrator" are processing claims and making Plan documents available for examination.

Fifth, the courts have not indulged an employer's artificial designations of an individual employee or committee as the plan administrator. The doctrine of respondeat superior shows that CIGNA's premise that it can designate an individual employee as the Plan administrator and thereby relieve itself of statutory responsibilities is mistaken when any functions that he performed were within the scope of his employment with CIGNA. See <u>Wasley Products, Inc. v. Bulkalites</u>, (03 cv 383) (MRK/WIG), Slip Op. dated May 31, 2006, at 14-16; <u>Hamilton v. Carell</u>, 243 F.3d 992, 1002-3 (6th Cir. 2001) (doctrine of respondeat superior applicable in ERISA cases where employee "breached his or her fiduciary duties while acting in the course and scope of employment"); <u>Nat'l Football Scouting, Inc. v. Cont'l Assur. Co.</u>, 931 F.2d 646, 648-49 (10th Cir.1991) ("in ERISA

cases, the doctrine of respondeat superior could impose liability on a principal for the

misdeeds of his agent"); In re Cardinal Health, Inc. ERISA Litigation, 424 F.Supp.2d

1002, 1048-1049 (S.D.Ohio Mar. 31, 2006) (allegations that company could be held liable

under respondeat superior were sufficient to withstand motions to dismiss); Kling v.

Fidelity Management Trust Co., 323 F.Supp.2d 132, 146 (D. Mass. 2004) ("Defendants

have failed to cite a single authority that evinces an intent within ERISA to eliminate the

vicarious liability of a corporation for the acts of its employees or agents").[24]

Even under ERISA §502(c) which, unlike §502(a)(3), limits the universe of

defendants who may be liable for statutory penalties to the "administrator," courts have

looked beyond transparent designations. In Minadeo v. ICI Paints, 398 F.3d 751 (6th Cir.

2005), Glidden argued that a plaintiff's claim for statutory penalties should be dismissed

because she did not sue the plan administrator, which was designated as the "Pension

Committee of ICI Paints."  The Sixth Circuit remanded the case for determination of

relationship between Glidden and the Committee because "the available related

information suggests both that Glidden participated in the administration of benefits

under the pension plan and that the Pension Committee may be so closely related to

Glidden that a request to Glidden should have been construed as one to the Pension

---

[24] In Crocco the Second Circuit reversed a district court's holding that an employer
with indirect control over plan administration was legally the plan administrator, but
noted that a participant may sue an employer if her claim "request[s] injunctive or other
equitable relief under ERISA §502(a)(3)." 137 F.3d at 107 n.2; accord, Richards, supra,
427 F.Supp.2d at 181.

Committee." 398 F.3d at 759.

In light of this record, it is outlandish for CIGNA to pretend that it delegated discretionary control over the ERISA disclosures to an individual who lacked responsibilities for them. If CIGNA was responsible for the disclosures, it has the fiduciary duties appurtenant thereto. See Devlin v. Empire Blue Cross and Blue Shield, 274 F.3d 76, 88 (2d. Cir. 2001) (employer may have acted as fiduciary when it communicated with employees and retirees concerning contents of plan); Varity Corp. v. Howe, 516 U.S. 489, 498 (1996) (Varity was acting as both the employer and as the Plan administrator when it communicated with employees about benefits).

### C. There Is No Statute of Limitations Barrier to the Section 204(h) Claim, or the SMM and SPD Claim.

Although CIGNA represented in its response to the May 2005 motion for leave to amend that it was not opposing the Section 204(h) claim on "futility" grounds, Mem. in Opp. at 9 n.8 (dkt #117), CIGNA now argues that the Section 204(h) claim is barred by the "most analogous" limitations period in Connecticut. Dfs. Br. at 76-78. In two footnotes, CIGNA also contends that the SPD/SMM claim is time-barred. Dfs. Br. at 49 ns. 34 and 35.

When "ERISA does not prescribe a limitations period for actions under § 1132, the controlling limitations period is that specified in the most nearly analogous state limitations statute." Miles v. New York State Teamsters Conference Pension & Retirement Employee Pension Benefit Plan, 698 F.2d 593, 598 (2d Cir. 1983). Since

ERISA does not provide a statute of limitations specifically for Section 204(h), CIGNA

contends that the most analogous state statute of limitations is one for a "civil action to

collect wage claim or fringe benefit claim," which is two years. Alternatively,

Defendants argue that a three-year statute of limitations under Connecticut's statute of

limitations for tort claims. Dfs. Br. at 76-78.

CIGNA neglects to mention that the limitations period under Connecticut state law

is a 6-year period for written contracts. See Conn. Gen. Stat. Ann. §52-576 (2006).The

Second Circuit and district courts within it have consistently held that the state statute of

limitations for contract actions is the "most analogous" statute to ERISA §502(a)(1)(B)

claims. See, e.g., Campanella v. Mason Tenders' Dist. Council, 132 Fed. Appx. 855, 856,

2005 WL 414844 *1 (2d Cir. 2005) (applying 6-year New York statute for written

contracts to statutory and non-statutory claims for benefits under ERISA); Carey v. IBEW

Local 363 Pension Plan, 201 F.3d 44, 49 (2d Cir. 1999); Miles, 698 F.2d at 598; Cole v.

Travelers Ins. Co., 208 F. Supp. 2d 248, 252 (D.Conn. 2002) (applying Connecticut's 6-

year statute of limitations for written contracts); Venturini v. Metropolitan Life Ins. Co.,

55 F. Supp. 2d 119, 121 (D.Conn. 1999) (same); Manginaro, supra, 21 F.Supp.2d at 294

(applying New York's 6-year limitations period for written contracts).

In Frommert, 433 F.3d at 269-70, the plaintiffs sought relief for violations of

ERISA §204(h). The Second Circuit found that because the Section 204(h) notice had

ultimately been provided, "sweeping" injunctive relief was no longer needed and "the

61

necessary remedies can be fully provided under §502(a)(1)(B)" which allows plan participants to recover benefits due him "under the terms of the plan." The Second Circuit concluded that the "gravamen" of the plaintiffs' claims for benefits as a result of the 204(h) violations is "a claim for monetary compensation" for which adequate relief is available under Section 502(a)(1)(B). Accordingly, the most analogous state limitations period for a claim for back benefits under §502(a)(1)(B) from a 204(h) violation is the 6-year Connecticut state period for written contracts. Future injunctive relief cannot be barred because the need for it demonstrates that this is a continuing violation.

The second element to applying a statute of limitations is to determine when the cause of action accrued. CIGNA's effort to bar the disclosure claims falls short because a "plaintiff's ERISA cause of action accrues "when there has been a repudiation by the fiduciary which is *clear* and made known to the beneficiaries." Miles v. New York State Teamsters Conference Pension & Retirement Employee Pension Benefit Plan, 698 F.2d 593, 598 (2d Cir. 1983) (emph. in orig.; citations omitted). "[A]n unfair duty of clairvoyance" would otherwise be imposed on employees and "participants likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA" would be required "to become watchdogs over potential plan errors and abuses." Romero v. Allstate, 404 F.3d 212, 223-24 (3d Cir. 2005).

In Romero, a case in which the Morgan Lewis law firm represented the plaintiffs, the defendants argued that a cause of action under ERISA §204(h) accrued 15 days before

the effective date of the "Phase-Out Amendment."  However, the <u>Romero</u> court rejected a "rule that unwaveringly ties the date of accrual to the date of amendment" and held that the "discovery rule" is applicable in determining the date of accrual for the purposes of Section 204(h).  "It would make no sense, and indeed do a remarkable disservice to the underlying purposes of ERISA and its disclosure requirements, to deem a notice claim to have accrued before a plaintiff knows or should have known that an amendment has the effect which triggers the notice requirement."  Id. at 225.

As <u>Romero</u> recognizes, Plaintiffs' ERISA §204(h) claim could not have accrued when CIGNA distributed its purported Section 204(h) notice in November 1997 because participants did not know the notice was deficient (and most do not know that it is deficient today). In <u>Frommert v. Conkright</u>, supra, 433 F.3d at 272, the Second Circuit reversed the district court's finding that plaintiffs' cause of action accrued when employees received a Benefits Update that disclosed the nature of the phantom account. "[W]hile the Benefits Update may have heightened the plaintiffs' concerns regarding their expected benefits, it is not enough that plaintiffs had notice that something was awry; plaintiffs must have had specific knowledge of the actual breach of duty upon which they sued."  Id. (citing <u>Caputo v. Pfizer</u>, 267 F.3d 181, 193 (2d Cir. 2001)).

Plaintiffs' Section 204(h) claim is also not time-barred even if the six-year Connecticut statute claims were applied from the November 1997 date of the first notice. The Complaint here was filed on December 19, 2001, well within the six-year period.

Defendants nevertheless contend that the Section 204(h) claim could be untimely because it was not added until Plaintiffs' filed their Second Amended Complaint in May 2005. Under Federal Rule 15(c), however, an amended complaint "filed after the statute of limitations has otherwise expired" can "relate back to the initial filing and will survive a time bar." McCarthy v. Associated Clearing Bureau, 1999 WL 1995185, *4 (D.Conn. 1999). The amendment of a pleading relates back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." F.R.C.P. 15(c).

"The Second Circuit has repeatedly made clear that where a revised pleading contains alternative theories based on the same core facts as presented in a prior pleading, the alternative pleadings relate back to the original." Wells v. Harris, 185 F.R.D. 128, 131 (D.Conn. 1999) (the amended pleading "will relate back to the original pleading, even where the revised pleading contains legal theories not included in the original," citing White v. White Rose Rood, 128 F.3d 110, 116 (2d Cir.1997)); Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 125 (2d Cir. 1994)). The Wells court found that a "side - by-side review" of Plaintiffs' amended complaint and the proposed complaint "clearly shows that the claims" "were present in the original amended complaint and are amplified in the proposed amended complaint." 185 F.R.D. at 132. See also State Teachers Ret. Bd. v. Fluor, 654 F.2d 843, 856 (2d Cir. 1981) (granting leave to amend because "the

64

amended claim was obviously one of the objects of discovery and related closely to the original claim").[25]

Relation back will not be permitted if the amendment "alleges a new set of operational facts."  See McCarthy, 1999 WL 1995185, *5 (concluding that claim did not relate back where it was "dependent upon entirely different facts and evidence"); Felker v. Pepsi-Cola Co., 863 F.Supp. 71, 76 (D.Conn. 1994) (plaintiffs' new claim of retaliation was "a separate occurrence from the facts relating to plaintiff's transfer and discharge").

Plaintiff's §204(h) claim clearly "relates back" to Plaintiffs' original complaint filed in December 2001.  Plaintiffs' original Complaint alleges that CIGNA's SPD failed to disclose the reductions and other conditions on future accruals associated with the cash balance conversion. Cplt. ¶40 (dkt #1). Because ERISA's SPD and Section 204(h) requirements operate under the same legal standard (i.e., understandable disclosures of "reductions" to the "average participant"), a failure to disclose benefit reductions violates both the SPD and Section 204(h) notice rules. As Plaintiffs explained in their motion for leave to amend, the Section 204(h) claim is an alternative legal theory arising out of the

---

[25] Accord, McCarthy, 1999 WL 1995185 at * 5 (noting that courts have permitted relation back where "the later pleading merely clarified or expanded upon the basic factual allegations of the original or simply altered a legal theory"); Shane v. Connecticut, 821 F.Supp. 829, 834 (D.Conn. 1993) (additional claims "arise out of the same core of operative facts as the other causes of action in the complaint"); Jensen v. Times Mirror Co., 634 F. Supp. 304, 315 (D.Conn. 1986) ("Defendants clearly had notice of the conduct on which plaintiff relied in the original complaint. The amendment merely changed her theory").

same core of facts as plaintiffs' original complaint. See <u>Siegel v. Converters</u>

<u>Transportation</u>, Inc., 714 F.2d 213, 216 (2d Cir. 1983) (relation back provision should be

liberally construed to ensure that claims are decided "on the merits rather than on

procedural technicalities"); <u>Wells v. Harris</u>, 185 F.R.D. 128, 131 (D.Conn. 1999) (Rule

15(c) is "to be liberally construed").

    **D.**    **<u>Burke v. Kodak</u> and <u>Frommert</u> Show that the Supreme Court's <u>Schoonejongen</u> Decision Does Not Preclude Relief for Disclosure Violations.**

CIGNA further argues that the Supreme Court's decision in <u>Curtiss-Wright v.</u>

<u>Schoonejongen</u>, 514 U.S. 73 (1995), precludes this Court from ordering that the terms of

a Plan are effectively modified by an inadequate and misleading SPD. See Dfs. Br. at 67-

68 and Dfs. Prop. Conclusions at 27. Simply put, <u>Schoonejongen</u> addressed an employer's

ability to modify a Plan without conforming with the amendment procedures. It nowhere

addressed the scope of "appropriate equitable relief" for disclosure violations. See 514

U.S. at 83-85. If CIGNA's position was correct, an employer's inadequate or misleading

SPD would never result in relief, a result that would defeat the purposes of the disclosure

requirements, reward employers who violate the law, and effectively penalize employers

who comply. The Second Circuit's 2003 and 2006 decisions in <u>Burke v. Kodak</u> and

<u>Frommert</u> both show that CIGNA is misreading <u>Schoonejongen</u>'s holding.[26]

---

[26] Offering no relief for violations of ERISA's protective disclosure requirements would exceed even the "insurmountable hardship" that <u>Burke</u> found in a "detrimental reliance" requirement.

**VII.  CIGNA Does Not Contest that "Minimum Benefits" Earned under the Old Plan Have Not Been Protected and that Participants Were Never Notified of their Minimum Benefits, as the SPD Promised.**

Plaintiffs are offering compelling evidence that minimum benefits, i.e., the benefits that participants earned under the old plan before 1998, were not protected. ¶¶300-321. CIGNA's SPDs promised that notice would be given if the old benefits exceeded the new benefits, but such notice was never provided and benefits were not actually protected. ¶303.

In response, CIGNA offers up the remarkable contention that if the Plan document "unequivocally provides" that accrued benefits will be protected, it does not matter what CIGNA actually does. Dfs. Br. at 3; see also id. at 11 and 43 ("The written terms of Part B unequivocally provide that all benefits previously accrued under the prior plan formula are protected"). It is almost painful to point out that ERISA's anti-cutback rule cannot be evaded by adopting a pro forma plan provision that benefits are protected and then not actually administering the plan that way. See Hein v. FDIC, 88 F.3d 210, 216 (3d Cir. 1996) ("An erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an "amendment" for the purposes of ERISA §204(g)"); Chao v. Malkani, __ F.3d __, 2006 WL 1703368 (4th Cir. June 22, 2006) (defendants' "bizarre" misreading of plan's vesting provision "contradicted the Plan's plain language" and "violated ERISA").

CIGNA next attempts to downplay the magnitude of its violations. It states in a

footnote that "Admittedly, in a few isolated instances, benefits were not calculated in accordance with the terms of the Plan." Dfs. Br. at 44 n.27. But CIGNA offers no evidence that the violations were either "isolated" or "few." Plaintiffs have shown, and CIGNA does not contest, that the class list that CIGNA produced in discovery in January 2006 showed that the minimum benefits data was omitted for over 9,400 participants. Pls. Ex. 9 at ¶¶3-4. Internal memoranda dating back to August 1999 and deposition testimony repeatedly recognize the problems with these records. ¶¶311-321.

CIGNA seeks to diminish the proof by asserting that the deficiencies in the records are limited to "electronic records," the responsibility for which it foists on Prudential (which acquired the CIGNA division that administered the Plan in April 2004). Dfs. Br. at 43-44. However, no paper records of the missing minimum benefits were produced for any time period (either before April 2004 or after). ERISA §209 requires that records "sufficient to determine the benefits due or which may become due" must be maintained. This responsibility cannot be delegated or transferred to a contractor or other third-party. See, e.g., DOL Advisory Opinion 84-19A.

CIGNA now also asserts that "Prudential has a number of procedures" under which records of minimum benefits are recreated if the electronic records are missing. Dfs. Br. at 44. But there is no evidence of such procedures and neither CIGNA nor Prudential produced any records of recreated minimum benefits under any such procedures. The testimony that such procedures exist is attributed to CIGNA's John Arko.

But Mr. Arko testified at his Rule 30(b)(6) deposition that while he "understands" Prudential has such "processes," he has no personal knowledge of them. Pls. Ex. 195 (Arko Depo at 35-43, 132-141, 298-300, 324-26). If such processes existed, either CIGNA or Prudential, or both, should have produced procedures and records in response to the discovery requests, Rule 30(b)(6) notices, and the subpoena directed to Prudential. See Mirabel v. General Motors Acceptance Corp., 537 F.2d 871, 878 n.13 (7th Cir. 1976) (under TILA, "when no procedures are set up to provide correct disclosure calculations errors made do not even rise to the level of bona fide errors").

CIGNA alternatively maintains that any "mistakes" in protecting minimum benefits will now be corrected if they are "brought to the attention of Prudential or the Plan administrator." Dfs. Br. at 44 n.27. At the same time, CIGNA admits that when the minimum benefits were included in calculations they are "not specifically designated on the form as a minimum benefit." Dfs. Br. at 47. Thus, participants cannot tell whether their minimum benefits are included or "mistakenly" omitted.

Other than this apparently disingenuous offer, CIGNA indicates no plans to remedy these violations. This is why ERISA contains an express provision for "appropriate equitable relief." It is unfortunate but not entirely unusual that even when violations are established, some defendants will still try to walk away or otherwise place the burden back on the participants.

### A.    CIGNA Does Not Contest that the "Free 30%" Survivor's Benefit Is a Minimum Benefit that Was Not Protected.

CIGNA acts as though its failure to pay the Free 30% survivor's benefit is yet another "isolated" mistake in protecting minimum benefits, in this case, isolated to named Plaintiff Gisela Broderick. But CIGNA repeatedly stated that it was not paying the Free 30% survivor's benefit to participants who were moved to Part B, including in its answer to the amended Complaint, in an SPD and a sworn Rule 30(b)(6) deposition. ¶¶341-342.[27] CIGNA did not even import the data required to provide this benefit into its DBRK calculation system.¶¶314-18.

CIGNA's effort to eliminate the Free 30% claim by only paying Ms. Broderick is a classic "pick off" maneuver. See <u>Weiss v. Regal Collections</u>, 385 F.3d 337 (3d Cir. 2004) (allowing defendants to "pick off" representative plaintiffs "undercut[s] the viability of the class action procedure and frustrate[s] the objectives of this procedural mechanism for aggregating small claims"); <u>Vogel v. Am. Kiosk Mgmt.</u>, 371 F. Supp. 2d 122, 126-27 (D.Conn. 2005) (expressing concern for "picking off" of representatives). CIGNA falsely asserts that "Although Prudential initially miscalculated Plaintiff Broderick's benefit without the Free 30%, that mistake was corrected once the issue was brought to its attention." Dfs. Br. at 45. Actually, it took 13 months between the date Plaintiffs sought leave to amend the Complaint before the Defendants paid Ms. Broderick. See Pls. Ex. 172

---

[27] CIGNA denied the allegations about the Free 30% survivor's benefit in the Answer and Affirmative Defenses filed Oct. 3, 2005.  Dkt. # 145, at ¶¶27-28, 36, and 56.

and Mot. for Leave to Amend filed May 6, 2005 (dkt.#112).

Alternatively, CIGNA seeks to diminish the violation by stating that "most" of the Part B participants are not eligible for the Free 30% survivor's benefit. Dfs. Br. at 45 n.28. Plaintiffs have provided a summary declaration based on the class list that CIGNA produced in discovery, showing that over 200 participants have separated from service to date who appear to have been eligible for the Free 30% survivor's benefit. Pls. Ex. 9 at ¶7. In addition, the violations are ongoing. Defendants' Proposed Findings confirm that the Free 30% survivor's benefit should have been paid even when participants elected lump sum distributions instead of annuities. ¶¶59, 132. However, neither CIGNA nor Prudential has done this. CIGNA's resistance to remedying violations is again why it is necessary to obtain "appropriate equitable relief" to remedy violations.

**B.     CIGNA Does Not Contest that the "Relative Value" of Optional Forms of Benefit With Unequal Values Has Not Been Disclosed.**

To implement ERISA 203(e) and 205(g), Treas. Reg. 1.401(a)-20, Q&A 36, which was adopted in 1988, provides that a participant who is making a benefit election must be provided an explanation about the "relative value" of his or her optional forms of benefit, including "the extent to which optional forms are subsidized relative to the normal form of benefit."[28] "No consent is valid" unless this explanation is provided.  26

_____

[28] This regulation is no longer published in the Code of Federal Regulations because it was replaced by a new set of regulations. The cited regulation can still be found at 53 Fed. Reg. 31837, 31849 (Aug. 22, 1988) (attached for convenience as New Ex. 206).

C.F.R.1.411(a)-11(c)(2)(i) and 1.417(e)-1(b)(2)(i). The regulations are part of Congress'
strategy of protecting "retirement subsidies." <u>Costantino v. TRW</u>, 13 F.3d 969, 979-80
(6th Cir. 1994). A participant and his or her spouse must be made aware if the company is
offering them an optional form of benefit, such as a lump sum distribution, that does not
include such subsidies.

There is no contest that CIGNA was aware of this regulation because it adopted
nearly identical language in its Plan document. Section 7.1(b) specifically requires
"sufficient additional information to explain the relative values of the optional forms of
benefit available under the Plan." Pls. Ex. 1 at D00305.

As early as September 1997, Mercer advised CIGNA that under its proposed
design, a participant who elects a lump sum distribution of his or her cash balance
account would "forfeit" the value of any early retirement subsidy that he or she had under
the prior plan. ¶323.  But CIGNA never told its employees this. Instead, the Retirement
Information Kit told them that the  "lump sum distribution option can be very valuable,"
Pls. Ex. 8 at Ex.4 page AMARA-00452, with no reservations about losing benefits. The
benefit option materials that are distributed to participants automatically after a separation
from service did not tell employees about this either. ¶¶326-27.

Over 9,900 out of 10,337 class members who have separated from service to date
have elected lump sum distributions. This includes Lillian Jones and Douglas Robinson
who lost nearly one-half of the value of their benefits (over $80,000 in Ms. Jones' case).

72

CIGNA's response is to act as if Lillian Jones and Douglas Robinson are the "only" examples that Class counsel can find. Dfs. Br. at 47. But of the 17 records of separated class members that were reviewed in the on-site inspection on January 17, 2006, 6 showed participants who had, without disclosure of relative values, selected lump sum distributions instead of more valuable annuity options, including Mr. Robinson, Ms. Jones, Dolores Feeney-Gallagher, Peter Andruszkiewicz, Robert Scanlan, and Michael McCormack. See Exs. 144 and 191 and New Ex. 207.[29] As with Mr. Robinson, CIGNA did not notify Messrs. Andruszkiewicz and Scanlan that if they commenced their benefits at age 55 (instead of at ages 47 and 50, respectively), they would be entitled to much more under the Plan's "minimum benefits" provision. Instead, CIGNA's benefit election materials only told them that if they selected a deferred benefit, they would "receive interest in accordance with the Plan's provisions."

As much as CIGNA might like to have the Plaintiff Class identify each person who CIGNA has harmed as a predicate to finding liability, the issue is CIGNA's common practice of not disclosing the relative value of optional forms of benefit. CIGNA has failed to provide a single example where this information was disclosed. ¶327. In addition, the violations are ongoing. The April 2006 30(b)(6) depositions establish that CIGNA has finally recognized that it has been offering benefit options with "unequal"

---

[29] The printouts that CIGNA furnished for Mr. McCormack do not include his actual benefit election form.

values without disclosures. ¶334. CIGNA is now "drafting" benefit election forms that will make the required disclosures of relative values, but it has not implemented this to date and has no plans to correct past violations. ¶¶332-335. This is again why appropriate equitable relief is necessary to redress violations.

> **C.    Exhaustion Is Not "Jurisdictional" and It Is Not Required for Statutory Claims; Moreover, Named Plaintiffs Amara and Broderick Exhausted CIGNA's Internal Claims Procedure.**

CIGNA alternatively argues that this Court "lacks jurisdiction" to even consider Plaintiffs' alleged violations of the relative value disclosure requirements and the minimum benefit protections because the Second Circuit "recently" held that exhaustion is a "jurisdictional" requirement. Dfs. Br. at 46 n.29; and see Dfs. Prop. Conclusions ¶58 and Dfs. Mem. Regarding Pls. Prop. Trial Exs., at 9.

CIGNA's assertion is wrong for four reasons. <u>First</u>, in a May 24, 2006 decision, the Second Circuit distinguished the passage on which CIGNA is relying and held that failure to exhaust remedies in a claim for benefits is <u>not</u> jurisdictional, but is an affirmative defense subject to waiver, estoppel, futility, and similar equitable considerations. <u>Paese v. Hartford Life and Accident Ins.Co.</u>, 449 F.3d 435 (2d Cir. May 24, 2006).

<u>Second</u>, Defendants' exhaustion argument lacks merit because the claims in Claim 5 are statutory claims based on ERISA Section 204(g) and 205(g) and the applicable regulations. Exhaustion is not required for statutory claims. See, e.g., <u>Nechis v. Oxford</u>

Health Plans, 421 F.3d 96, 102 (2d Cir. 2005) (applying the distinction without formally

adopting it; "This circuit has not addressed the specific question whether exhaustion is

required for statutory claims, but has consistently recognized" "the primary purposes of

the exhaustion requirement"). "District courts in the Second Circuit have routinely

dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA

violation." Id. (citing DePace v. Matsushita Elec. Corp. of Am., 257 F.Supp.2d 543, 557-

558 (E.D.N.Y. 2003) (collecting other cases). Accord Richards v. FleetBoston, supra, 427

F.Supp.2d at 179-80 (defendants alleged plaintiffs failed to exhaust 204(h) and SPD

claims; "Because all of Richards' surviving claims will require review of whether the

Amended Plan conforms with the substantive guarantees of ERISA, rather than review of

the denial of benefits under the terms of the plan, the court finds that the plaintiff need not

have exhausted her claim in order to bring the present suit"). [30]

    Third, exhaustion of this claim has also already taken place. Janice Amara filed a

claim for benefits concerning CIGNA's omission of her minimum benefits on September

---

[30] See also Engler v. Cendant Corp., 2006 WL 1408583, *5 (E.D.N.Y. 2006) (exhaustion unnecessary where plaintiff alleges statutory violation because "unlike a claim for benefits under a plan, the administrators have no expertise in deciding a claim that asserts a statutory right"); Stolarz v. Rosen, 2005 WL 2124545 *4 (S.D.N.Y. 2005) ("while plan fiduciaries have expertise in interpreting plan documents, the Court has expertise in interpreting the statute"; "no administrative record is required to determine whether the defendants have complied with the statute"); Campanella v. Mason Tenders' District Council Pension Plan, 299 F.Supp. 2d 274, 281 (S.D.N.Y. 2004) ("although plan fiduciaries may have expertise in interpreting the terms of a particular plan, it is primarily the role of the judiciary to engage in statutory interpretation").

17, 2001. The letter in response contained a nearly two-page denial that any reduction in Ms. Amara's accrued benefit has occurred. New Ex. 208. Likewise, Ms. Broderick exhausted CIGNA's claim procedures three times in trying to obtain her benefits. Each time, CIGNA told her that she was receiving everything she was due. New Ex. 209. As Judge Arterton and other courts have held, ERISA only requires claim exhaustion; it does not require plaintiffs "to raise every legal theory on which they base their claim for benefits in order to exhaust."  Parry v. SBC Corp., 363 F.Supp. 2d 275, 304 (D.Conn. 2005); see also Wolf v. Nat'l Shopmen Pension Fund, 728 F.2d 182, 186 (3d Cir. 1984) ("ERISA does not require either issue or theory exhaustion, it requires only claim exhaustion"); McCoy v. Laborers Local 222 Pension Plan, 188 F.Supp.2d 461, 467 (D.N.J. 2002), aff'd, 2003 WL 1512167 (3d Cir. 2003). "[G]iven the similarity of the plaintiff's claim to the claims of the unnamed class members," absent class members should not be required to further exhaust administrative remedies. In re Household International Tax Reduction Plan, 441 F.3d 500, 502 (7th Cir. March 20, 2006).

Fourth, the futility of further "exhaustion" is shown by the fact that CIGNA is transparently trying to utilize it as a tactic for avoiding classwide relief and making class members come forward one individual after another, without any notice to them and with no judicial controls. See Dfs. Br. at 45 n.27, 46-48. Again, because the hundreds or perhaps thousands of participants who have been adversely affected by CIGNA's failure to disclose the relative value of benefit options have no way of knowing that they should

76

even come forward, this is, at its core, a hollow and disingenuous offer.[31]

## VIII.  **Frommert** Shows that the Supreme Court's **Great-West** Decision Does Not Preclude Relief for ERISA Violations.

CIGNA also contends that the Supreme Court's decision in Great-West v.

Knudson, 534 U.S. 204 (2002), precludes relief for any of its ERISA violations, although

it concedes Second Circuit precedent is to the contrary. See Dfs. Br. at 78-79. Great-West

actually states, however, that whether a remedy is "legal or equitable in a particular case

(and hence whether it is authorized by Section 502(a)(3)) remains dependent on the nature

of the relief sought." 534 U.S. at 215. In Great-West, the Supreme Court distinguished its

earlier decision in Bowen v. Massachusetts, as a suit that "was not merely for past due

sums, but for an injunction to correct the method of calculating payments going forward.

534 U.S. at 212. Consistent with Great-West, Frommert also holds that to the extent

---

[31] In a footnote, CIGNA argues alternatively that the named Plaintiffs lack standing to raise the issues about the notification and protection of minimum benefits and the disclosures of the relative value of benefit options. Dfs. Br. at 47 n.31. Standing was not raised as a defense when the Complaint was amended. As the Court will remember, CIGNA contested Janice Amara and Gisela Broderick's standing to raise the Section 204(h) claim and in response an additional named Plaintiff (Annette Glanz) was added.

In any event, the named Plaintiffs have standing to raise the issues about the notification and protection of minimum benefits and the disclosure of the relative value of benefit options. As stated in the Proposed Findings, Janice Amara's minimum benefits were omitted on two occasions, one of which occurred after the Complaint was filed. ¶310. Gisela Broderick was also directly affected by the minimum benefit and relative value claims. She was not told that her benefit options were entirely based on the benefits she had earned before 1998 (her cash balance accruals had literally added nothing) and she was denied her Free 30% survivor's benefits. ¶¶344, 346 and New Ex. 209.

77

plaintiffs are only entitled to past due benefits under the plan, the "gravamen" of the

action is "a claim for monetary compensation" which "falls comfortably within the scope

of Section 502(a)(1)(B)." 433 F.3d at 270. To the extent the Plaintiffs seek "an injunction

to correct the method of calculating payments going forward," Great-West approves of

that relief under Section 502(a)(3).[32]  See also Donaldson v. Pharmacia Pension Plan,

__F.Supp.2d __, 2006 WL 1669789, *13 (S.D.Ill. June 14, 2006) (applying Great-West

and the Supreme Court's decision in Sereboff v. Mid Atlantic Medical Svcs., Inc., __

U.S. __, 126 S.Ct. 1869 (2006), to a proposed class action to redress statutory violations

in a cash balance conversion).[33]

## IX.   The Releases that CIGNA Has Solicited from Over 2,000 Class Members, Mostly After the Certification of this Case as a Class Action, Contain an Express Exception for "Any Claims for Benefits Under Any Retirement ... Programs."

Judge Squatrito certified this case as a class action on December 20, 2002.

Although no discovery request was made, CIGNA has in the past six months produced

copies of approximately 2,000 individual releases (from a class of over 27,000

participants). Review of the releases shows that CIGNA solicited the vast majority after

the December 19, 2001 and December 20, 2002 dates on which this case was filed and

---

[32] Great West also indicates that past due benefits can be awarded under Section 502(a)(3), if it is an "integral part of an equitable remedy" going forward. See 534 U.S. at 218.

[33] Defendants' citation of City of Los Angeles v. Manhart, 435 U.S. 702 (1978), as precluding relief for violations of ERISA's minimum standards is beyond belief.

then certified as a class action. The releases, moreover, have an express exception for:

> "any claims for benefits under any retirement, savings, or other employee benefit programs (but your Release does cover any claims you may make for severance benefits beyond those described or referred to in this Agreement)."

The releases furthermore do not contain any notice of the existence of this lawsuit.

CIGNA nonetheless contends that the exception should be interpreted to only cover "claims for benefits" based on "statutory ERISA violations" and that the release should be applied to bar relief in this lawsuit. See Dfs. Br. at 79-81 and at 5.

CIGNA's defense based on the releases is wrong for so many different reasons that it should be sanctioned. For example, CIGNA appears to reargue the denial of its 2004 motion to decertify in which it contended that the scope of the release is exclusively the "subject of arbitration." 2004 WL 2381733 *2 (D.Conn. Oct. 13, 2004).[34]

Moreover, if CIGNA's position about the scope of the releases were to be accepted, its solicitation of the releases <u>after</u> the filing of this action would violate the rules on communicating with members of a class during the pendency of a class action. See <u>Manual for Complex Litig</u>. (Fourth) §21.33 ("Once a class has been certified, the rules governing communications apply as though each class member is a client of the class counsel." Defendants' attorneys "may only communicate through class counsel with members on matters regarding the litigation."); <u>In re Currency Conversion Fee Antitrust</u>

---

[34] See also Dfs. Reply filed July 27, 2004 at 3-4 (dkt. #88) (attached for convenience as New Ex. 210) ("Thus, the merits of Defendants' defense based on the release is not for the Court to decide, but instead should be considered by an arbitrator").

Litig., 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (district court's authority over communications with class members "is not limited to communications that actually mislead or otherwise threaten to create confusion, but extends to communications that interfere with the proper administration of a class action or those that abuse the rights of members of the class").

Perhaps the most remarkable point, however, is that CIGNA continues to press this defense despite the fact that its release contains the express exception for "any claims for benefits under any retirement ... programs." In its brief, CIGNA argues that this exception for "any claims" should only cover non-statutory claims and "not claims alleging statutory ERISA violations." Dfs. Br. at 79.[35] But CIGNA has produced <u>no evidence</u> indicating that this was CIGNA's intention, much less that any such intention was ever communicated to employees.

As the Court knows, in June 2004, CIGNA challenged whether this case could continue to be maintained as a class action because Janice Amara, who was originally the sole named Plaintiff, had signed such a release. With the advice of her counsel, Ms. Amara signed that release in exchange for severance pay on September 23, 2003, so she could retire and stay with her husband (who has Parkinson's disease). Class counsel produced a copy of the release on March 12, 2004 along with other documents from Ms.

---

[35] In its Proposed Findings, CIGNA excises the word "any" from the exception and describes it as "narrow." Dfs. Prop. Findings ¶237.

Amara. New Ex. 211. On April 6, 2004, CIGNA's counsel moved to amend CIGNA's

answer to the Complaint to raise the release as an affirmative defense. Then, on June 7,

2004, CIGNA filed a motion to decertify on the basis of Janice Amara's release. CIGNA

contended that the Court could not rule on the scope of the release, or the exception

contained therein, because the Agreement provides that such matters must be arbitrated.

See New Ex. 210.

     In an October 13, 2004 ruling, Judge Squatrito denied CIGNA's motion to

decertify the class:

> "Amara contends that, by its own terms, the release does not apply to the claims set
> forth in the complaint. Defendants disagree and claim that the scope of the release
> is a subject for arbitration.... [T]he possibility that defendants' defense against
> Amara could subsume this litigation is remote because, if the parties maintain their
> current positions, the merits of the parties' contention would be decided in an
> arbitration proceeding unrelated to this litigation." 2004 WL 2381733 *2.

Subsequent to this ruling, CIGNA's counsel mailed Class counsel a "Demand for

Arbitration" dated December 23, 2004, but CIGNA never filed anything with the

American Arbitration Association. Not only did CIGNA not file with AAA, but in March

2005, it placed Ms. Amara back under the Part A formula as a result of the Depenbrock

decision applying ERISA §§402 and 204(g). As a result, Ms. Amara's retirement benefits

nearly doubled. CIGNA did not invoke Amara's release as a basis for precluding her from

the fruits of the Depenbrock decision.

     The two other named Plaintiffs, Gisela Broderick and Annette Glanz, signed

identical releases to Ms. Amara's on February 19, 2004 and June 8, 2004. Dfs. Exs. 526

and 527.  Both have testified that they understood the release to only cover employment

claims and not their rights to retirement benefits. Dfs. Ex. 551 (Broderick Depo) at 36-37,

165-70 and Dfs. Ex. 554 (Glanz Depo) at 21-23. The cover letter to the named Plaintiffs

is consistent with that understanding. It states: "By signing the Agreement and Release,

you are waiving your rights to pursue any issues or claims <u>related to your employment or</u>

<u>termination of employment</u> ....." See New Ex. 212 (emph. added). Ms. Glanz also

produced a summary plan description for the Severance Pay Plan. It states that:

> "You will release *CIGNA companies*, and their officers, directors, employees and agents, from any liabilities arising out of, or related to, your employment and termination of employment (<u>of course, your rights arising under other benefit plans</u> <u>on or after your *termination of employment date* will be preserved</u>)."

New Ex. 213 at P-2307 (emph. added; italics in orig.). The SPD does not disclose any

qualification or restriction on the preservation of rights, as ERISA's disclosure rules

clearly require if one exists. CIGNA has, moreover, not produced any evidence that

CIGNA ever had any different intention, much less that one that was communicated in an

understandable manner to employees who signed the releases.[36]

---

[36] CIGNA's litigation position is also undercut by a revision of the exception that occurred sometime in August of 2004. The revised exception covers "any claims for benefit payments to which the Plan administrator determines you are entitled under the terms of any retirement, savings, or other employee benefit programs in which the Company participates." New Ex. 214. CIGNA has produced no documents concerning the reason for this revision. Review of the releases indicates that the new language was added in the middle part of 2004 and became the standard by the end of 2004; both actions were after Plaintiffs' opposition to Defendants' motion to decertify was filed, emphasizing the exception contained in the release.

In addition to the exception for "any claims for benefits," CIGNA's position fails to account for the fact that the employee agrees in the release that he or she "will not file" a lawsuit. The only participant who filed this lawsuit was Janice Amara and, as mentioned, CIGNA nearly doubled her retirement benefits in March 2005 as a result of the <u>Depenbrock</u> ruling, without invoking the release as a barrier. This lawsuit was filed and certified as a class action before the vast majority of these releases were signed. As a result, the restriction that the person who signs "will not file" a lawsuit cannot plausibly apply.

Currently, CIGNA is foreswearing its position before Judge Squatrito that "the scope of the release is a subject for arbitration" and asking this Court to rule that the claims of any class member who signed a release are barred. Dfs. Br. at 80 ("these claims are plainly barred by the release") and Dfs. Prop. Conclusions ¶¶140-43. Your Honor already informed CIGNA in a telephone conference call on discovery of absent class members that the Court did not intend to revisit Judge Squatrito's decision.

If the Court were to allow CIGNA to shift its position despite its admonition and the "law of the case" doctrine, the Court should rule that the exception for "any claims for benefits" must be given its ordinary and common meaning. In <u>Carter v. AT&T</u>, 870 F.Supp. 1438, 1442 (S.D. Ohio 1994), AT&T claimed that a plaintiff released her rights to bring a lawsuit for a violation of the Pregnancy Discrimination Act when she signed a general release that reserved her rights for benefit claims under the pension plan. The

court held "this is exactly the exception that was provided for in the release."

Even if CIGNA's outside counsel are capable of drawing fine legal distinctions between claims for benefits under the Plan and claims for ERISA statutory violations, this does not mean that either CIGNA, the named Plaintiffs, or any other members of the class had that understanding. In addressing the validity of a waiver under the ADEA, the Eighth Circuit in Thomforde v. IBM, 406 F.3d 500, 505 n.1 (8th Cir. 2005), stated, "It seems axiomatic that if an agreement needs clarification" from a "corporate attorney," "it is not written in a manner calculated to be understood." In Carrabba v. Randalls Food Markets, 145 F.Supp.2d 763, 771-72 (N.D. Tex. 2000), aff'd, 252 F.3d 721 (5th Cir. 2001), cert. denied, 534 U.S. 995 (2001), the district court held that "there is no evidence that any of the plaintiffs understood that they were releasing claims relating to the MSP [Management Security Plan]"; "The indication from the evidence is that neither party to the waiver/release documents gave any thought to the MSP or any claims arising under the MSP when the documents were drawn, signed, and delivered. There is certainly no basis in the evidence for any finding that any signatory on such a release/waiver document intended by execution and delivery of the document to release defendant of any claim that is being asserted in this action."[37]

---

[37] Although it professes to rely on "the law governing releases" (Dfs. Br. at 79), CIGNA has not cited any cases on releases. The cases that CIGNA cites are ones that draw a distinction between exhausting statutory claims for benefits, as opposed to claims for benefits under a plan's terms which do not involve statutory issues. See Dfs. Br. at 80. While those cases are valid in that context, they are untenable outside of it, particularly in

Furthermore, even if the language of the release had contained no exception and was understandably communicated, there are substantial legal questions about whether nonforfeitable pension benefits may be released in exchange for severance pay. See generally, Albert Feuer, "When Are Releases of Claims for ERISA Plan Benefits Effective?" 38 J. Marshall L. Rev. 773, 865-66 (Spring 2005) (other than in the context of settling a claim for pension benefits, a release of accrued benefits is ineffective due to ERISA's anti-alienation and non-exculpation rules in ERISA §§ 206 and 410(a)).

Finally, even if CIGNA's releases were interpreted to cover the claims in this lawsuit, CIGNA's solicitation of the releases after this action was filed would, as mentioned, violate the rules against communicating with absent class members during the pendency of a lawsuit. In the Engers v. AT&T cash balance action (CV-98-3660 D.N.J.), AT&T was found to be soliciting releases from class members as part of Force Management Programs. AT&T's releases covered all ERISA claims and did not contain an  exception parallel to CIGNA's. The district court issued a preliminary injunction against that practice (and AT&T agreed to nullify any releases signed after the date the lawsuit was filed) on the grounds that AT&T needed to inform members of the class that they were giving up rights in the proposed class action and could not communicate with them about their rights under the class action except through counsel. New Ex. 215

---

light of the Second Circuit's 2006 holding in Frommert that the terms of the plan are the ones that are statutorily valid or enforceable. 433 F.3d at 266-67.

(minute entry and May 9, 2000 transcript).

**X.    This Court Has Authority to Compel CIGNA to Comply with the Declaratory Order in the _Depenbrock_ Litigation in Favor of Members of This Class**.

CIGNA argues that Plaintiffs' request that this Court order it to comply with the _Depenbrock_ decision is "frivolous" because the District Court's judgment "required John Depenbrock's benefit–and only his benefit–to be recalculated as if he had remained in Part A." See Dfs. Br. at 81-82.

CIGNA overlooks that the Third Circuit's decision and the District Court's declaratory order were not limited to Mr. Depenbrock. Plaintiff's counsel went over this issue with Judge Kelly in the Eastern District of Pennsylvania and Judge Kelly revised and reissued his original Order to take this into account and include a general declaratory judgment as well as a specific order that Mr. Depenbrock be reinstated in the Part A Plan. CIGNA is aware of this because it was a party to those proceedings, represented by the same law firm, and it argued against Judge Kelly taking this action. New Ex. 205, at 8.

It is relatively common, especially in cases involving fiduciary duties and governmental entities, that declaratory orders have a broader effect on defendants than application to the plaintiff alone. In _McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund_, 2001 WL 1154630, *3 n.1 (S.D.N.Y. 2001), the district court recognized that a declaratory judgment and order "may have other consequences for the defendants given their fiduciary duties to other plan beneficiaries." On appeal, the Second Circuit vacated the district court's order for consideration of a different issue, while affirming that

86

Section 502(a)(3) "affords the district court the discretion to fashion appropriate equitable

relief–relief that may or may not benefit non-party beneficiaries." 320 F.3d 151, 161

(2003). Accord, Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 256 (3d Cir.), cert. denied,

421 U.S. 1011 (1975) (even without Rule 23 certification, a "suit brought by an

individual plaintiff" may be binding through "collateral estoppel or the stare decisis

effect" of the suit); Augustin v. Jablonsky, 2001 WL 770839, *7 (E.D.N.Y. 2001).

It has been over 14 months since this Court ordered the parties to submit respective

memoranda on the impact of the Depenbrock decision. Dkt. #110. In May 2005, CIGNA

represented that it was "wrestling" with unspecified issues and stated that "the Plan

Administrator is still in the process of determining the actual impact of the Depenbrock

decision on each of these 178 individuals." Dfs. Br. filed May 6, 2005 (dkt. #111-1) at 4-

5. But to date, CIGNA has still not conformed with the declaratory order, except for a

handful of participants, and it continues to refuse to produce documents about the

problems or issues it is "wrestling" with in implementation.

Absent another Court order, there is no indication that CIGNA will fully

implement the declaratory order. Even the limited steps that have occurred to date has

been flawed because class members have been advised that they must make "irrevocable"

elections between Part A and Part B with no information about the "relative value" of

those options in compliance with the rules described above.

There is no question that: (1) all of the persons affected by the declaratory order in

87

Depenbrock are members of this class, and (2) CIGNA and its Plan are bound by the

Depenbrock decision and order. CIGNA and the Plan are precluded by the doctrine of

collateral estoppel (or issue preclusion) from asserting a defense against these class

members inconsistent with the declaratory order in the Depenbrock case. Moreover, the

doctrine of claim preclusion requires CIGNA to adhere to that decision in this litigation.

Therefore, under issue and claim preclusion, as well as the authority to manage this action

conferred by Rule 23(d), this Court has the power to order the Defendants to conform

with the declaratory order in Depenbrock. There is no reason for this Court to reach the

issues of additional relief for these class members for CIGNA's violation of the Section

204(h) notice requirements, or the other claims in this lawsuit, when adequate or

potentially better relief is already available under the Depenbrock order.

## XI.    The 2002 Class Certification Order May Be Altered or Amended to Define the Claims and Defenses Before Final Judgment Is Entered.

CIGNA has raised the concern that the class certification order currently defines

membership in the class, but does not define the class claims and defenses as Rule

23(c)(1)(B) presently requires. Dfs. Br. at 1 n.1, 47 n.31, and 74 n.50. Rule 23 was

amended in December 2003 after Judge Squatrito's December 2002 order certifying the

class. As amended, Rule 23(c)(1)(B) provides that "[a]n order certifying a class action

must define the class and the class claims, issues, or defenses...." No case has addressed

whether or how the amendment applies to an already-certified class action. However,

Wachtel v. Guardian Life Insurance, __ F.3d. __, 2006 WL 1790555, *6 n.8, (3d Cir.

June 30, 2006), which involved a 2004 class certification, shows that this Court can

address any uncertainty by exercising its authority under Rule 23(c)(1)(C) to "alter or

amend" the order before final judgment is entered. See also Martsolf v. JBC Legal Group,

P.C., 2005 WL 331544, *2 (M.D. Pa. 2005) (satisfying the requirement by reference to

the pleadings).

**Conclusion**

For the foregoing reasons, the Plaintiff Class requests that this Court enter

judgment in its favor.

Dated: July 25, 2006

<div style="margin-left:40%">

Respectfully submitted,

 /s/ Stephen R. Bruce
Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

 /s/ Thomas G. Moukawsher
Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Plaintiff Class

</div>

<u>**CERTIFICATE OF SERVICE**</u>

I certify that the foregoing Plaintiff Class' Reply Trial Brief, with Plaintiffs' Trial

Exhibits 200 to 216, and this Certificate of Service were filed electronically through the

CM/ECF system on July 25, 2006. Notice of the filing will be sent by e-mail to all parties

listed below by operation of the Court's electronic filing system. The parties may access

the filing through the Court's CM/ECF system.

> Joseph J. Costello
> Jeremy P. Blumenfeld
> Jamie M. Kohen
> Morgan, Lewis & Bockius
> 1701 Market St.
> Philadelphia, PA 19103-2921
>
> James A. Wade
> Brett J. Boskiewicz
> Robinson & Cole, LLP
> 280 Trumbull Street
> Hartford, CT 06103-3597
>
> Christopher A. Parlo
> Morgan Lewis & Bockius
> 101 Park Avenue
> New York, NY 10178-0600

> /s/ Thomas G. Moukawsher
> Thomas G. Moukawsher  ct08940
> 21 Oak Street
> Hartford, CT 06106
> (860) 278-7000
> (860) 446-8161 (fax)
> tmoukawsher@mwlawgroup.com
>
> Attorney for the Plaintiffs