Amara v. CIGNA, Case No. 01-2361 (MRK)

# EXHIBIT 206

Westlaw.

53 FR 31837-03                                                                    Page 1
53 FR 31837-03, 1988 WL 1017169 (F.R.)
**(Cite as: 53 FR 31837)**

RULES and REGULATIONS

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Parts 1 and 602

[T.D. 8219]

Income Tax: Taxable Years Beginning After December 31, 1953; OMB Control
Number Under The Paperwork Reduction Act; Survivor Benefits, Distribution
Restriction and Various Other Issues Under the Retirement Equity Act of 1984

Monday, August 22, 1988

**\*31837** AGENCY: Internal Revenue Service, Treasury.

ACTION: Final regulations.

SUMMARY: This document provides final regulations relating to qualified joint and survivor annuities required to be provided under certain retirement plans under section 401(a)(11) prior to its amendment by the Retirement Equity Act of 1984 (REA 1984). The pre-REA 1984 regulations are changed to conform them to BBS Associates, Inc. v. Commissioner of Internal Revenue.

This document also provides final regulations relating to the qualified joint and survivor and qualified preretirement survivor annuity requirements and the notice, election and consent rules enacted by REA 1984 and relating to the effective dates, transitional rules, restrictions on distributions from employee plans, and other issues arising under REA 1984. The final regulations also reflect certain provisions in the Tax Reform Act of 1986 (1986 Act) that affect the REA 1984 provisions. The regulations will generally affect sponsors of, and participants in, pension, profit-sharing and stock bonus plans, and provide plan sponsors with guidance to comply with the law.

DATES: The regulations are effective August 22, 1988. The pre-REA 1984 regulations are applicable for plan years beginning after December 31, 1974. The REA 1984 regulations are generally applicable for plan years beginning after December 31, 1984 except as otherwise specified in REA 1984, or in the 1986 Act.

FOR FURTHER INFORMATION CONTACT:William D. Gibbs of the Employee **\*31838** Benefits and Exempt Organizations Division, Office of the Chief Counsel, Internal Revenue Service, 1111 Constitution Avenue NW., Washington, DC 20224 (Attention CC:LR:T) (202-377-9372) not a toll-free number).

Background--Pre-REA 1984 Regulations

On October 27, 1982, the Federal Register published proposed amendments to the Income Tax Regulations (26 CFR Part 1) under section 401(a)(11) of the Internal Revenue Code of 1954. The amendments were proposed to conform the regulations to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 FR 31837-03                                                            Page 2
53 FR 31837-03, 1988 WL 1017169 (F.R.)
**(Cite as: 53 FR 31837)**

BBS Associates, Inc. v. Commissioner of Internal Revenue, 74 T.C. 1118 (1980), aff'd mem., 661 F.2d 913 (1981).

No hearing was requested on these pre-REA regulations and none was held.

Explanation of Provisions

Section 401(a)(11), prior to REA 1984, provided that if a trust provides for the payment of benefits in the form of an annuity, such trust must provide for the payment of annuity benefits in a form having the effect of qualified joint and survivor annuity in order for the trust to be qualified under section 401.

Regulations under section 401(a)(11) published prior to REA 1984 interpret this provision to mean that a plan offering a life annuity as a benefit option must provide that the automatic form of benefit payment is a qualified joint and survivor annuity.

The Tax Court and the Court of Appeals for the Third Circuit rejected the interpretation of section 401(a)(11) expressed in the regulations in BBS Associates, Inc. v. Commissioner of Internal Revenue, 74 T.C. 1118 (1980), aff'd mem., 661 F.2d 913 (1981). The Court held that sections 401(a)(11)(A) and 401(a)(11)(E) (prior to REA 1984) do not require that the automatic form of benefit distribution be a qualified joint and survivor annuity merely because a plan offers a life annuity as an optional form of benefit. The Court held that Example (1) of § 1.401(a)-11(a)(3), was invalid.

In Notice 82-4, 1982-1 C.B. 356, the Internal Revenue Service stated that it would not file a petition for a writ of certiorari in the BBS case and that the invalidated regulations would be amended.

The pre-REA 1984 regulations, § 1.401(a)-11, are amended to conform to the BBS decision. The regulations provide that in order for a plan offering benefits payable as a life annuity to qualify under section 401(a), such life annuity benefits must be paid in the form of a qualified joint and survivor annuity unless the participant elects otherwise.

Actions Taken

Proposed Treas. Reg. § 1.401(a)-11(c)(2)(i)(C)(3) allowed defined benefit plans to satisfy the requirement for the early survivor annuity election by providing a survivor benefit at least equal in value to the present value of the vested portion of the participant's accrued benefit (determined immediately prior to death). Under the proposed regulations, present value must be "determined in accordance with actuarial assumptions or factors specified in the plan".

As suggested by commentators, the requirement with respect to specification of actuarial factors or assumptions for determining present value is conformed to the requirements of Rev. Rul. 79-90, 1979-1 C.B. 155. Thus, certain defined benefit plans must state either assumptions or factors or a variable standard independent of employer discretion determining the present value of a participant's accrued benefit.

The pre-REA 1984 regulations are also amended to reflect the amendment to section 401(a)(11) by REA 1984. However, the rules in the pre-REA regulations, to the extent not inconsistent with the statute and the new regulations, continue to apply to plan years governed by the REA 1984 amendment to section 401(a)(11).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
53 FR 31837-03                                                           Page 3
53 FR 31837-03, 1988 WL 1017169 (F.R.)
```
**(Cite as: 53 FR 31837)**

Background--REA 1984 Regulations

On July 19, 1985, the Federal Register published proposed and temporary amendments to the Income Tax Regulations (26 CFR Part 1) under sections 401(a)(11) and (13), 402(f), 410(a)(5), 411(a)(6), (7) and (11), 411(d)(3), 414(p), and 417. The text of the temporary regulations served as the text for the proposed regulations. The amendments were proposed to conform the regulations to the Internal Revenue Code provisions of Titles II and III of REA 1984. Amendments under the Paperwork Reduction Act were also proposed. (26 CFR Part 602). A public hearing was held on these REA 1984 proposed regulations on December 9, 1985.

On October 22, 1986, the Tax Reform Act of 1986 (1986 Act) (Pub. L. 99-514, 100 Stat. 2085) was enacted. Sections 1139, 1145 and 1898 of the 1986 Act amended certain Internal Revenue Code provisions affected by REA 1984. The final regulations which are the subject matter of this Treasury decision reflect those provisions. Further, certain provisions of REA 1984 that were not reflected in the proposed regulations are reflected in the final regulations.

After consideration of all written comments and the comments made at the REA 1984 hearing regarding the proposed amendments, the proposed regulations under the applicable Code sections are adopted as revised by this Treasury decision.

Explanation of Provisions

For an explanation of the proposed regulations, see the following preambles to the proposed and temporary REA 1984 regulations in the July 19, 1985 Federal Register: (1) EE-3-85 (see the cross-referenced temporary regulations, T.D. 8037) 50 FR 29436; (2) EE-35-85 (see the cross-referenced temporary regulations, T.D. 8038), 50 FR 29436; (3) T.D. 8037 (OMB Control Numbers under the Paperwork Reduction Act; Notice, Election, and Consent Rules under REA 1984), 50 FR 29376; and (4) T.D. 8038 (Effective Dates, Transitional Rules, Restrictions on Plan Distributions, and Other Issues Arising Under REA 1984), 50 FR 29371.

Matters Relating to Reporting (T.D. 8037)

The principal reporting change in the final regulations, § 1.402(f)-1, relates to the safe harbor notice that may be given recipients of certain plan distributions to satisfy the reporting requirement of section 402(f). The safe harbor notice provided by § 1.402(f)-1T(b) (the temporary regulations superseded by this Treasury decision) is obsolete because of the changes to the distribution rules since its publication.

The final regulations provide the Commissioner with authority to provide new safe harbor notices. The Service intends to publish a notice that reflects the various changes to the taxation of distributions under sections 402 and 403 made by sections 1122 and 1124 of the 1986 Act. Any such notice would cease to be effective upon any change in the applicable law effect by a statute, regulation, revenue ruling or other general guidance that is inconsistent with such notice.

Title I of ERISA

Under section 101 of Reorganization Plan No. 4 of 1978 (43 FR 47713), the Secretary of the Treasury has jurisdiction over the subject matter addressed in the REA 1984 regulations. Therefore, under section 104 of the Reorganization Plan, these regulations apply when the Secretary of Labor exercises authority under Title

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 FR 31837-03                                                                 Page 4
53 FR 31837-03, 1988 WL 1017169 (F.R.)
**(Cite as: 53 FR 31837)**

I of the Employee Retirement Income Security Act of 1974 (as amended, including the amendments made by Title I of REA and *31839 the subsequent amendments by the 1986 Act) ("ERISA").  Thus, the requirements also apply to employee plans subject to Title I of ERISA.

No Spousal Consent Needed for Commencement of Qualified Joint and Survivor Annuity

 The proposed and temporary regulations required that the spouse of a participant consent to the distribution of a qualified joint and survivor annuity (QJSA) before the participant attains the later of age 62 or normal retirement age.  Section 1.417(e)-1(b) of the final regulations removes this requirement and permits plans subject to section 417 to provide that a married participant who retires may elect, without the consent of the participant's spouse, to begin receiving a QJSA before attaining the later of age 62 or normal retirement age.  The Service announced this position on October 2, 1985 (see News Release 85-99, also published in 1985-43 I.R.B. 29 (October 28, 1985)).

 Section 417(b) defines a QJSA. In general, a QJSA is an immediate annuity for the life of the participant, with a survivor annuity for the life of the participant's spouse.  A plan may have more than one joint and survivor annuity satisfying the QJSA requirements.  If so, the plan must designate which one is the QJSA and therefore the automatic form of payment.  The QJSA for a married participant must be at least equal to the most valuable optional form of benefit payable to the participant at the time of the election.  The amount of the survivor annuity may not be less than 50 percent, and not more than 100 percent, of the amount of the annuity payable during the time when the participant and spouse are both alive. (See also pre-REA 1984 section 401(a)(11) and §  1.401(a)-11(b)(2) for the pre-REA 1984 definition of a QJSA which is still generally applicable.)

Plan Amendments

 Under the proposed and temporary regulations, plan amendments reequired by REA 1984 were generally required to be adopted not later than the end of the first plan year to which the statutory provisions apply (generally the first plan year beginning in 1985).

 Since the publication of the regulations, technical corrections to REA 1984 (technical corrections) were enacted in Title XVIII of the 1986 Act. In Notice 87-28, published in 1987--14 I.R.B. 46 (April 6, 1987), the Service generally extended the date by which plans must be amended to satisfy the proposed and temporary REA regulations and the technical corrections. Under the Notice, plan amendments generally are not required until the time section 1140 of the 1986 Act would require other plan amendments, generally the 1989 plan year, as long as there is compliance in operation with the proposed and temporary regulations and the technical corrections.

 The time for making plan amendments to comply with REA would also be extended to the time permitted by section 401(b) for plans to be amended to comply with the 1986 Act. In general, plans can continue to follow Notice 87-28 until that time, except that the plan must satisfy the retroactive compliance requirements of section 401(b).  Thus, in general, most plans must satisfy these final regulations as of the first day of the first plan year beginning after December 31, 1988.

Use of PBGC Interest Rate

 The proposed and temporary regulations required that plans subject to the survivor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 FR 31837-03                                                                    Page 5
53 FR 31837-03, 1988 WL 1017169 (F.R.)
**(Cite as: 53 FR 31837)**

annuity requirements of sections 411(a)(11) and 417(e) satisfy two basic rules. First, for purposes of determining whether a distribution may be made without obtaining the applicable consents (the "threshold rule"), a participant's benefit must be valued by using an interest rate no greater than the Pension Benefit Guaranty Corporation's (PBGC) immediate interest rate for trusteed single-employer plans. Second, the actual single sum that the participant (or beneficiary) receives under the plan must be calculated using an interest rate no greater than the immediate PBGC rate (the "amount rule") for trusteed single-employer plans. The same interest rate must be used for both the threshold and amount rules. Many commentators objected to the amount rule.

Section 1139 of the 1986 Act ratified the threshold and amount rules set forth in the proposed and temporary regulations and sections 411(a)(11) and 417 with certain changes. The final regulations adopt these rules to reflect section 1139 of the 1986 Act. The Service issued guidance on these rules in Notice 87-20, 1987-6 I.R.B. 17 (February 9, 1987). The rules in Notice 87-20 are adopted in these final REA 1984 regulations, except as otherwise indicated. For plans that did not satisfy the interest rate restrictions of the proposed and temporary regulations, Notice 87-20 requires retroactive adjustments using the interest rates set forth in the Notice. Increased distributions resulting from these adjustments were required to be made by August 9, 1987. The time to distribute required increases due to recalculation of benefits using the appropriate interest rate is extended until the end of the first plan year beginning after December 31, 1988.

Some of the principal changes in the final regulations resulting from the 1986 Act are discussed below. First, plan provisions must use the PBGC applicable interest rate rather than the PBGC immediate interest rate for both the threshold rule and the amount rule. The PBGC immediate interest rate is a single interest rate used to value an immediate annuity that is determined at the date of plan termination of an insufficient trusteed single-employer plan. The PBGC applicable interest rate (referred to in the final REA 1984 regulations as the "section 417 interest rate") is the immediate interest rate where an immediate annuity is being valued and is a set of interest rates computed for varying time periods where a deferred annuity is being valued. See also, final PBGC regulations under section 29 CFR Part 2619 (Appendix B) which are discussed in more detail in Notice 87-20.

Second, the final regulations reflect the amendments to the threshold and amount rule in sections 411(a)(11)(B) and 417(e)(3) made by section 1139 of the 1986 Act. There is a two-tier test for valuing single sum distributions using $25,000 (unindexed) as the breakpoint. The section 417(e) interest rate for vested accrued benefits equal to or less than $25,000 is the PBGC applicable interest rate and for vested accrued benefits greater than $25,000 is 120 percent of such PBGC rate. If a participant or beneficiary would receive a single sum distribution of less than $25,000 if the interest rate used to calculate the distribution were 120 percent of the PBGC applicable interest rate then 100 percent of such PBGC rate must be used to calculate the amount of the benefit. This two-tier test is set forth in §§ 1.411(a)-11(d) and 1.417(e)-1(d)(2).

Finally, in order to retain its qualification under section 401(a) or 403(a), a plan must contain provisions reflecting the section 417(e) interest rate limitations used in the threshold and amount rules, even if the provisions that are currently in the plan currently result in greater single sum distributions than the distributions that would result from use of the section 417(e) interest rate. This provision is required because, in the future, use of the section 417(e) rate rather than the plan rate may result in larger distributions due to the variable nature of PBGC rates. These rules are discussed in more detail in Notice 87-20.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 FR 31837-03                                                          Page 6
53 FR 31837-03, 1988 WL 1017169 (F.R.)
**(Cite as: 53 FR 31837)**

The proposed and temporary regulations were unclear as to how the *31840 interest rate limitations applied to benefits under plans in situations in which plan benefits in the form of single sum distributions include subsidies. The final regulations apply the interest rate limitations to value all benefits, including subsidies such as early retirement and survivor subsidies, effective for distributions commencing on or after the first day of the first plan year beginning after December 31, 1988. Prior to such date, a plan will be considered to satisfy the interest rate limitation rules with respect to subsidies if under the plan a reasonable interpretation of the temporary regulations was applied on a consistent basis.

Loan Rules

The proposed and temporary REA 1984 regulations provided rules governing the reduction of an accrued benefit to satisfy a participant's loan obligation to the plan. Because such a reduction is treated as a distribution from the plan, it is generally subject to the applicable consent requirements of sections 411(a)(11) and 417(e). Nevertheless, the proposed and temporary regulations provided that a plan may obtain the consent of the participant and the participant's spouse within the 90-day period before a loan is secured by the accrued benefit.

The loan rules of sections 401(a)(11)(B)(iii) and 417 (a)(4) and (c)(3) were revised by the 1986 Act. Section 1.401(a)-20, Q&A 24, reflects these amendments, which closely approximate the rules in the proposed and temporary regulations.

The Department of Labor has interpretive authority over the prohibited transaction rules of section 4975. It has indicated that a loan secured by an accrued benefit subject to REA 1984 may not be adequately secured under section 4975(d)(1) if consent to a reduction in the accrued benefit is not obtained before a loan is so secured, and, therefore, may be a prohibited transaction.

DEC Benefits and Employee Contributions

The final regulations, § 1.401(a)-20, Q&As 14(b) and 39(c), contain rules applying the consent requirements to plans holding Qualified Voluntary Employee Contributions (Accumulated DECs). Accumulated DECs are plan benefits attributable to employee contributions deductible under section 219. Because the consent requirements were not applied to Accumulated DECs under the proposed and temporary regulations, these rules will not apply to distributions made before the first day of the first plan year beginning after December 31, 1988.

Further, a transitional rule is provided for plans that paid benefits attributable to employee contributions to employees who were not vested in employer contributions. Under this transitional rule, distribution of these employee contributions prior to October 22, 1986, will generally not be treated as violating sections 401(a)(11) and 417.

Annuity Starting Date

The final regulations clarify the meaning of annuity starting date. In the case of payment of a benefit as an annuity, the annuity starting date is the first day of the first period for which an annuity is paid. For example, if an annuity is paid retroactive to January 1, the annuity stating date is January 1 even though the actual payment is not made until a later date. Similarly, in the case of a payment not in an annuity form, the annuity starting date is the first day of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 FR 31837-03                                                                  Page 7
53 FR 31837-03, 1988 WL 1017169 (F.R.)
**(Cite as: 53 FR 31837)**

first period for which the benefit form is paid.

The annuity starting date is important for purposes of determining when QPSA coverage ends and, therefore, when a QJSA must be provided and when participant and spousal consent must be provided. Further, the annuity starting date is the distribution date under sections 411(a)(11) and 417(e) for purposes of determining the applicable PBGC interest rate.

Participant and spousal consent must be obtained within 90 days prior to the annuity starting date. For example, if the plan offers a deferred annuity option starting five years hence, in order for the plan to pay the deferred annuity option, participant and spousal consent to waive the QJSA and take the annuity must be obtained 90 days before the start of the period five years hence. Thus, the plan may only receive consent with respect to benefits that commence within 90 days (i.e., annuity starting date is within 90 days). Any delayed payment form alternative to the QJSA requires consents at the time of commencement of the delayed payments.

Accrued Benefit, Cash-Out Rules

A plan may have more than one optional form of benefit under which benefits may be paid. There is no requirement that each form of benefit be the actuarial equivalent of all other benefit forms. Thus, a plan could have a QJSA benefit form that has a larger actuarial value than a benefit payable as a single life annuity and the amount of a single sum optional form could be determined based on the single life annuity. Similarly, a plan may provide for a retirement subsidy or an early retirement benefit that applies to the payment of a specific optional form. Whether these subsidies must be valued when calculating the amount of the single sum distribution depends on the plan provisions. The present value required by sections 411(a)(11) and 417(e) and § 1.417(e)-1(a) applies to the particular optional form of benefit as determined under the plan. The definitely determinable requirement and the requirements of section 411(c)(3) also apply in determining the amount of any optional form of benefit. Thus, a plan may satisfy such requirements even though it has a subsidized joint and survivor annuity and determines a single sum distribution based on an unsubsidized single life annuity.

The final regulations, § 1.411(a)-7(d)(2)(ii) (C) and (D) and (d)(4) (i) and (iv), change the existing cash-out rules under section 411(a)(7) to reflect REA 1984. Generally, a plan must permit a participant to repay any plan distribution that is less than the present value of the participant's accrued benefit. The determination of the present value of the accrued benefit is based on the form of benefit distributed to the participant. A plan distributing a participant's entire accrued benefit is not required to take into account benefit subsidies described in section 411(d)(6)(B)(i) to which the participant is not currently entitled but to which the participant could subsequently be entitled. For example, if a participant receives a distribution of his entire accrued benefit at a time when he has not yet satisfied the conditions for a subsidized benefit, the plan is not required to permit the participant to repay the distribution of his benefit. If the plan does not distribute the entire accrued benefit, however, and the participant both repays the distribution and later satisfies the conditions for the subsidy, the participant must be entitled to the subsidy in order for the plan to satisfy section 411.

Executive Order 12291 and Regulatory Flexibility Act

The Treasury Department has determined that this final rule is not a major rule as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 FR 31837-03 Page 8
53 FR 31837-03, 1988 WL 1017169 (F.R.)
**(Cite as: 53 FR 31837)**

defined in Executive Order 12291 and that, therefore, a regulatory impact analysis is not required.

Although a notice of proposed rulemaking that solicited public comment was issued, the Internal Revenue Service concluded that the regulations are interpretative and that the notice and public procedure requirements of 5 U.S.C. 553 did not apply. Accordingly, the final regulations do not constitute regulations subject to **\*31841** the Regulatory Flexibility Act (5 U.S.C. Chapter 6).

Paperwork Reduction Act

The collections of information contained in this final regulation have been reviewed and approved by the Office of Management and Budget in accordance with the requirements of the Paperwork Reduction Act (44 U.S.C. 3504(h)) under control number 1545-0928. The estimated average burden associated with the collection of information in this final rule is 35 minutes per respondent or recordkeeper. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to the Internal Revenue Service, Washington, DC 20224, Attention: IRS Reports Clearance Office, TR:FP and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503, Attention Desk Officer for Internal Revenue Service.

Temporary Regulations Superseded

The following table indicates sections in the temporary regulations that are superceded, the sections of the corresponding final regulation that replaces the temporary regulation and the subject matter for the regulation section:

Drafting Information

The principal authors of these final regulations are William D. Gibbs and Richard J. Wickersham, of the Employee Benefit and Exempt Organizations Division of the Office of the Chief Counsel, Internal Revenue Service. Personnel from other offices of the Internal Revenue Service and Treasury Department also participated in developing the regulations, on matters of both substance and style.

List of Subjects

*26 CFR 1.401-0--1.425-1*

Income taxes, Employee benefit plans, Pensions.

*26 CFR Part 602*

Reporting and recordkeeping requirements.

Adoption of Amendments to the Regulations

Accordingly, 26 CFR Parts 1 and 602 are amended as follows:

Income Tax Regulation

PART 1--[AMENDED]

Paragraph 1. The authority citation for Part 1 continues to read in part:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

before the separation from service and ending one year after such separation. If such a participant returns to service, the plan must also comply with pragraph (a).

(c) Reasonable period. For purposes of applying paragraph (a), a reasonable period ending after the enumerated events described in paragraphs (a) (2), (3) and (4) is the end of the one-year period beginning with the date the applicable event occurs. The applicable period for such events begins one year prior to the occurrence of the enumerated events.

(d) Transition rule. In the case of an individual who was a participant in the plan on August 23, 1984, and, as of that date had attained age 34, the plan will satisfy the requriement of section 417(a)(3)(B) if it provided the explanation not later than December 31, 1985.

Q-36: How do plans satisfy the requirements of providing participants explanations of QPSAs and QJSAs

A-36: Section 417(a)(3) sets forth the requirements for providing plan participants written explanations of QPSAs and QJSAs. The requirement that the terms and conditions of the QJSA or QPSA, as the case may be, be furnished to participants is not satisfied unless the written explanation complies with the requirements set forth in § 1.401(a)-11(c)(3). Also, for plan years beginning after December 31, 1988, participants must be furnished a general description of the eligibility conditions and other material features of the optional forms of benefit and sufficient additional information to explain the relative values of the optional forms of benefit available under the plan (e.g., the extent to which optional forms are subsidized relative to the normal form of benefit or the interest rates used to calculate the optional forms).

Q-37: What are the consequences of fully subsidizing the cost of either a QJSA or a QPSA in accordance with section 417(a)(5)

A-37: If a plan fully subsidizes a QJSA or QPSA in accordance with section 417(a)(5) and does not allow a participant to waive such QJSA or QPSA or to select a nonspouse beneficiary, the plan is not required to provide the written explanation required by section 417(a)(3). However, if the plan offers an election to waive the benefit or designate a beneficiary, it must satisfy the election, consent, and notice requirements of section 417(a) (1), (2), and (3), with respect to such subsidized QJSA or QPSA, in accordance with section 417(a)(5).

Q-38: What is a fully subsidized benefit

A-38: (a) QJSA--(1) General rule. A fully subsidized QJSA is one under which no increase in cost to, or decrease in actual amounts received by, the participant may result from the participant's failure to elect another form of benefit.

(2) Examples.

Example (1). If a plan provides a joint and survivor annuity and a single sum option, the plan does not fully subsidize the joint and survivor annuity, regardless of the actuarial value of the joint and survivor annuity because, in the event of the participant's early death, the participant would have received less under the annuity than he would have received under the single sum option.

Example (2). If a plan provides for a life annuity of $100 per month and a joint and 100% survivor benefit of $99 per month, the plan does not fully subsidize the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.