**<u>Amara v. CIGNA</u>, Case No. 01-2361 (MRK)**

# EXHIBIT 215

12BD, SCHEDO

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
## CIVIL DOCKET FOR CASE #: 2:98-cv-03660-SRC-CCC

PHILLIP C. ENGERS, et al v. AT&T AND AT&T
MANAGE, et al
Assigned to: Judge Stanley R. Chesler
Referred to: Magistrate Judge Claire C. Cecchi
Demand: $0
Cause: 29:1149 Recover Pension & Profit Sharing

Date Filed: 08/05/1998
Jury Demand: Plaintiff
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

**Plaintiff**

**MANAGEMENT EMPLOYEES OF
AT&T**
*TERMINATED: 06/08/1999*

represented by **GERALD SMIT**
14 SARAH COURT
BRIDGEWATER, NJ 08807
*TERMINATED: 06/08/1999*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**NEIL H. DEUTSCH**
DEUTSCH ATKINS, PC
COURT PLAZA NORTH
25 MAIN STREET
HACKENSACK, NJ 07601
(201) 498-0900
Email:
ndeutsch@njemployeerights.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JONATHAN I. NIRENBERG**
RESNICK NIRENBERG & SIEGLER
101 EISENHOWER PARKWAY
SUITE 300
ROSELAND, NJ 07068
973-795-1240
Email:
jnirenberg@njemploymentlawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GERALD SMIT**

represented by **JONATHAN I. NIRENBERG**
(See above for address)
*ATTORNEY TO BE NOTICED*

7/21/2006 5:42 PM

| 12/01/1999 | 48 | CERTIFICATE OF SERVICE by AT&T, AT&T MANAGEMENT PEN re: reply brief (femp) (Entered: 12/02/1999) |
|---|---|---|
| 12/13/1999 | 49 | Minute entry: Proceedings recorded by Ct-Reporter: Stan Rizman; Minutes of: 12/13/99; The following actions were taken, [46-1] motion for leave to file amended complaint taken under advisement, decision reserved. By Judge Nicholas H. Politan (bl) (Entered: 12/15/1999) |
| 12/13/1999 | 50 | Minute entry: Proceedings recorded by Ct-Reporter: Stan Rizman; Minutes of: 12/13/99; The following actions were taken, [35-1] motion for partial dismissal taken under advisement, decision Reserved. By Judge Nicholas H. Politan (bl) (Entered: 12/15/1999) |
| 12/13/1999 | 51 | Minute entry: Proceedings recorded by Ct-Reporter: Stan Rizman; Minutes of: 12/13/99; The following actions were taken, [40-1] motion to dismiss Pltf's First, Second & Ninth Claims taken under advisement, per rule 78. By Judge Nicholas H. Politan (bl) (Entered: 12/15/1999) |
| 04/14/2000 | 52 | Notice of MOTION for preliminary injunction by PHILLIP C. ENGERS, WARREN J. MCFALL, DONALD G. NOERR, Motion set for 5/8/00 on [52-1] motion proof of service (Brief/PO Subm) (femp) (Entered: 04/17/2000) |
| 04/14/2000 | 53 | CERTIFICATION of Gerald J. Smit, Esq. on behalf of PHILLIP C. ENGERS, WARREN J. MCFALL, DONALD G. NOERR Re: [52-1] motion for preliminary injunction (femp) (Entered: 04/17/2000) |
| 04/24/2000 | 54 | CERTIFICATION in opposition of Sharon A. Byrne on behalf of AT&T Re: [52-1] motion for preliminary injunction (femp) (Entered: 04/25/2000) |
| 04/24/2000 | 55 | CERTIFICATE OF SERVICE by AT&T (femp) (Entered: 04/25/2000) |
| 05/09/2000 | 56 | Minute entry: Proceedings recorded by Ct-Reporter: Rizman; Minutes of: 5.9.00; The following actions were taken, granting [52-1] motion for preliminary injunction By Judge Nicholas H. Politan (femp) (Entered: 05/10/2000) |
| 05/11/2000 | 58 | CERTIFICATION of Carol Rosa on behalf of MANAGEMENT EMPLOYEES, PHILLIP C. ENGERS, WARREN J. MCFALL, DONALD G. NOERR (femp) (Entered: 05/15/2000) |
| 05/12/2000 | 57 | TRANSCRIPT of Proceedings taken on 05/09/00 (sr) (Entered: 05/12/2000) |
| 05/15/2000 | 59 | APPLICATION/motion for Edgar Pauk to appear pro hac vice by PHILLIP C. ENGERS, WARREN J. MCFALL, DONALD G. NOERR (copy to chambers) (femp) (Entered: 05/16/2000) |
| 06/07/2000 | 60 | ORDER for Edgar Pauk, Esq. to appear pro hac vice ( signed by Mag. Judge Ronald J. Hedges ) n/m (femp) (Entered: 06/08/2000) |

1

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
2                        CIVIL NO. 98-3660

3   PHILLIP C. ENGERS, WARREN J.        :
    MC FALL and DONALD G. NOERR,        :
4   individually and on behalf of all   :
    others similary situated,           :
5                                       :
              Plaintiffs,               :
6                                       :
       -vs-                             : TRANSCRIPT OF PROCEEDINGS
7                                       :
    AT&T and AT&T MANAGEMENT PENSION     :
8   PLAN,                               :
                                        :
9             Defendants.               :
    - - - - - - - - - - - - - - - - - - -

10
                                   Newark, New Jersey
11                                 May 9, 2000

12  B E F O R E:

13        THE HONORABLE NICHOLAS H. POLITAN, U.S.D.J.

14
    A p p e a r a n c e s:
15
    STEPHEN R. BRUCE, ESQ.,
16          and
    EDGAR PAUK, ESQ.,
17          and
    GERALD J. SMIT, ESQ.,
18  For the Plaintiffs

19

20

21      Pursuant to Section 753 Title 28 United States Code, the
    following transcript is certified to be an accurate record as
22  taken stenographically in the above-entitled proceedings.

23

24  _____
                    Stanley B. Rizman, C.S.R.
25                  Official Court Reporter

1    A p p e a r a n c e s (Continued):

2    COLLIER, JACOB & MILLS, P.C.,
     BY:  CHRISTOPHER H. MILLS, ESQ.,
3          TERRANCE J. NOLAN, ESQ.,
                and
4    LAWRENCE JOSEPH, ESQ.,
     For the Defendants

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Engers, et al. versus AT&T.

2          Please come forward and note your appearances for the

3   record.

4          MR. SMIT:  Gerald Smit for the plaintiff Engers.

5   Petitioners here today.

6          MR. BRUCE:  Stephen Bruce for the plaintiff.

7          MR. PAUK:  Edgar Pauk, P-a-u-k.

8          MR. MILLS:  Good morning, your Honor.  Chris Mills from

9   Collier, Jacobs & Mills.

10          With me is Terrance Nolan of the firm and also Larry

11   Joseph from AT&T.

12          THE COURT:  I think, Mr. Bruce, you're the speaker,

13   aren't you?

14          MR. BRUCE:  Yes, sir.

15          THE COURT:  Let me ask you a question.

16          I'm reversing the role.  No.  I'm not really.  You're

17   the movant here, Mr. Bruce.

18          My question is:  The new notice -- revised notice that

19   AT&T is giving these people whom they seek to -- I'll use the

20   term "buy out" for want of a better expression.  What is wrong

21   with that notice?  Prospectively.  Not retrospectively.

22   Prospectively.

23          MR. BRUCE:  Prospectively what is wrong with the

24   notice.  It still carves out ERISA claims.

25          THE COURT:  Do we have a copy of that?  Which exhibit

4

1   is that?

2        MR. BRUCE:  It is attached.  Exhibit B to defendants'

3   letter brief.

4        THE COURT:  This is the new one?

5        What would you want in there that would satisfy you

6   prospectively that the people who are being presented with this

7   are fully advised as to their rights, vis-a-vis this lawsuit?

8        MR. BRUCE:  On page 1 and 2 there are carve-outs for

9   the claims under the ADA.

10        If you look down to the bottom of page 1, it says, "I

11   signed this release except for claims under the ADEA."

12        Then at the top of the next page, it says, "Except for

13   claims under the ADEA."  And those references to carve out the

14   claims in our lawsuit, they should refer to the Age

15   Discrimination in Employment Act and ERISA.  And if it was

16   necessary, they should also refer to the New Jersey Law Against

17   Discrimination.

18        I believe that would be encompassed with --

19        THE COURT:  How would you change it?

20        MR. BRUCE:  It would say "except for claims under the

21   ADEA and ERISA."

22        THE COURT:  And ERISA.  Where would that be?  On page 1

23   or page 2?

24        MR. BRUCE:  Page 1 and page 2.

25        THE COURT:  ADEA and ERISA.

1          MR. BRUCE:  And to make it perfectly clear, and the New

2    Jersey Law Against Discrimination.

3          THE COURT:  What is the difference between the ADEA and

4    the claim against the Law Against Discrimination?

5          MR. BRUCE:  There are some procedural differences, your

6    Honor.

7          THE COURT:  The government passed too many laws.

8          There are too many laws that are passed which overlap

9    one another.  That would, for your purposes, adequately notify

10   an individual who is faced with this kind of a decision?

11         MR. BRUCE:  For our purposes that would solve the

12   problem by saying that AT&T is no longer soliciting releases of

13   these claims.

14         So then they don't have to fully -- our position is if

15   they're going to solicit releases, they have to fully inform the

16   employees of the causes of action that they're losing.  So one

17   way to deal with that is not to seek the releases any more.

18         THE COURT:  Well, there are two things involved.

19         Number one, the company, if you would, I think is

20   larger than this lawsuit as a practical matter or as a realistic

21   matter.

22         While there may be people who may be included in this

23   class case that you are bringing here, there may be people who

24   are not included and there may be people who, for whatever

25   reason, be it personal or otherwise, after being duly notified,

1    want to sign and get off the payroll.

2            I just don't know.  I don't think I can internally

3    control AT&T from doing business as they see fit pending this

4    case as long as I'm satisfied that the people are getting

5    adequate notice of what is happening -- do you know what I'm

6    saying -- and having the right to assert their rights in this

7    class action.

8            MR. BRUCE:  I think that's right, your Honor.

9            I think that is what happened in the Coca-Cola case and

10   in the Jennifer case.  That if the company is presented with --

11   it recognizes that the law requires them to fully inform

12   participants of the causes of action they're giving up.  Then

13   they're faced with:  Are they going to write a release -- a

14   package that talks about the Engers case and the causes of

15   action that people are foregoing?

16           I think most companies respond to that by saying:

17   Okay, if you're going to make us do that, we're not going to ask

18   for those releases any more.

19           THE COURT:  That depends upon what the company's plans

20   are in the high echelons of management and how they want to run

21   their business, which is the balance I have to strike.

22           What is wrong with this, Mr. Mills?  What is wrong with

23   my suggestion so far as the prospective aspects of this matter?

24           MR. MILLS:  I'm not sure -- I'm not sure I understand

25   what your suggestion is.  If I could --

1          THE COURT:  Whatever he said.  Now it is very clear.

2          MR. MILLS:  If I could just start the discussion back

3   up one because I think there is somewhat of a misconception as

4   to what the release says and what it does and doesn't do.

5          The release on page 1, at the bottom -- I'm now

6   referring to the April 12 version.  That paragraph solely refers

7   to a release signer's right to participate as a litigant in a

8   class claim under ADEA.  It does not carve out their right to

9   take any relief or money under ADEA.  In other words, they're

10  waiving their right to recover under ADEA.

11         Please turn to page 3 of the release.  Paragraph 5.

12  The last sentence.  "However, by signing this ... Release, I

13  understand I waive and release any right I may have to recover

14  money ... in any lawsuit or proceeding brought by me or my

15  agency ..."

16         THE COURT:  I'm sorry.  I'm losing you.

17         MR. MILLS:  Page 3.

18         THE COURT:  Paragraph 5.

19         MR. MILLS:  Paragraph 5.  The second paragraph starts

20  "I understand that I will not ..."

21         THE COURT:  "... I will not be in breach of this

22  termination ..."

23         MR. MILLS:  Go to the next sentence.  "However" --

24         THE COURT:  What do you say?

25         MR. MILLS:  What I'm saying is what AT&T has carved

STANLEY B. RIZMAN, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

8

1    out.  This is something that is very narrowly drafted to address

2    concerns by the EEOC.  Starting with a case called EEOC v.

3    Cosmair some years ago out of the Fifth Circuit, the EEOC has

4    taken the position that you may not require a release signer to

5    waive his rights to file a charge with the Commission, to

6    participate in an EEOC investigation and, subsequently, in a set

7    of approved regulations.  Last April, under the OWPPA, they've

8    taken the position that you may not have a covenant not to sue.

9    So you may not require a person signing a release to agree not

10   to sue you or to agree to not.

11            THE COURT:  That is the EEOC?

12            MR. MILLS:  The EEOC enforcing the ADEA.  What they did

13   is address the issue that the EEOC will say they will litigate

14   and they issued proposed regulations saying doing A is unlawful,

15   we believe.

16            AT&T has carved out --

17            THE COURT:  You're suggesting this agreement would

18   constitute a release of their rights in this lawsuit?

19            MR. MILLS:  It would.  We believe that.

20            It will not -- what is carved out?  If you look at page

21   1 --

22            THE COURT:  They're under a misconception and you're

23   under a misconception.

24            MR. MILLS:  I don't think I'm under a misconception.

25   We say what we have carved out is what the EEOC says we should

1    carve out.

2          THE COURT:  The impression I get from your brief is

3    that you have carved out of the relief in this case.  That is,

4    the genesis or the premises upon which I had the whole

5    conversation with Mr. Bruce because in your brief you say -- you

6    say words to the effect that:  We think we've rendered it moot

7    because we've gone back to the January form of release.

8          MR. MILLS:  We say we rendered it moot because so far

9    as we understood, Mr. Bruce accepted the October form of

10   release.

11         Mr. Bruce came in with his letter first to us and to

12   your Honor which said:  You're improperly changing the October 1

13   form of release.  You've gone to a January release.

14         THE COURT:  Yes.

15         MR. MILLS:  We say in our point as to the mootness

16   we've gone back to the October form of release.  If you liked

17   it, then you don't have any gripe with the new version.

18         So I was very careful when I drafted --

19         THE COURT:  Let me ask you a question.

20         What if, for whatever reason, in this case I certify

21   the plaintiffs as a class?

22         MR. MILLS:  Then different rules apply.

23         THE COURT:  Forget about -- put aside for the moment

24   the problem I have with releases which were executed prior to

25   the institution of the lawsuit.  Okay?

1          And put aside for the moment any problems I may have

2   with reference to any releases which were executed up until May

3   the 9th, 2000.  Between the period of January to May or whenever

4   that is or whenever that period is.  Some period of time up to

5   today's date.  Okay?

6          If you signed somebody up tomorrow on that release,

7   they're releasing out of -- in essence, opting out of the class

8   action?

9          MR. MILLS:  They're releasing any right to recover

10  money or other relief.

11         THE COURT:  In this case?

12         MR. MILLS:  In this case.

13         They are not releasing the ability to litigate, which

14  is what the EEOC says.

15         THE COURT:  Is -- as to the EEOC.  I won't permit it.

16  That is the end of the story.  No more release.

17         You can't go after them until it is satisfactory to me.

18         Under my Rule 23 supervisory power under a class

19  action, with all due respect to all the great draftsmanship that

20  is done, I have in my court a pending proposed class action.

21         I have not decided the motions as yet as to whether it

22  be or be not dismissed.  Obviously, if it is dismissed, then my

23  order precluding your getting releases from people will dissolve

24  with that dismissal.

25         However, until such time as I dismiss this case, there

 1    are no more releases going to be obtained except with the

 2    specific permission of this Court and language sufficient so

 3    this Court feels that everyone is understanding what is going

 4    on.

 5           MR. MILLS:  Your Honor, the two results that usually

 6    pertain in these cases -- I think the one that you see out of

 7    the Abdallah case in which the actual order by the judge in

 8    Atlanta issued was that a company is free in the normal course

 9    to solicit releases.

10           THE COURT:  Not until I see them.

11           MR. MILLS:  With a notice of --

12           THE COURT:  If you want to notify them about this

13    lawsuit, then I have no problem.  If you want to put in there

14    there is a pending lawsuit, a pending proposed class action

15    which seeks blah, blah, blah blah, blah, blah, blah, blah --

16           MR. MILLS:  And you're waiving your rights.

17           THE COURT:  You can participate.  If you sign this, you

18    waive your rights to participate in this in plain, ordinary

19    clear English language.  Then I will consider that subject to

20    whatever comments the plaintiffs may make to them making

21    comments to me and me deciding it.

22           MR. MILLS:  On that wording?

23           THE COURT:  What I'm saying to you is I have no

24    objection to you running your business as you want to run it.

25    However, unfortunately for me, maybe unfortunately for you,

1   there is a class action pending in front of me, the validity of

2   which I have not adjudicated as yet.

3        I don't think it is fair for AT&T, in the course of

4   doing their normal course of business -- I'm giving you the best

5   of both sides here, of doing -- meltdowns.  Whatever you want to

6   call them.  RIFs.  Whatever you want to call them.

7        I don't think it is fair that those people who may

8   or -- who may be parties to this class action, if the class

9   action survives, should be -- should be -- should wash away

10  those rights.

11       I already have a problem if I certify a class here

12  about what to do with the people who signed it prior to.  That

13  is a legal issue I am going to have to decide, if I get to that

14  point.

15       I have a second problem on the new one which was signed

16  between the time the case was started and today's date.  But I'm

17  not going to have a problem in the future.  If people want to

18  waive their right to be in this lawsuit, they have every right

19  to do that.  That is what America is all about.

20       In order for them to do that, I want them to know in

21  plain and simple English language that they're waiving it.  That

22  is all.  Simple.

23       MR. MILLS:  From a pragmatic standpoint.  At any given

24  time I asked AT&T how many cases are pending against them,

25  employment related, throughout the country, average in 1999.

STANLEY B. RIZMAN, CSR, OFFICIAL COURT REPORTER, NEWARK, N.J.

1    284.  Does that mean that we should be giving them the

2    proverbial --

3              THE COURT:  No, no.  I'm only concerned about my little

4    case here.  Enger versus AT&T.  Docket No. 98-3660.  Whatever

5    the implications of what AT&T does as it relates to 283 other

6    cases, I don't care unless it is my case.

7              I'm only concerned about my case.  I'm only concerned

8    about people who will be affected by my case.  I'm not concerned

9    about people who would not be affected by my case.

10             That's all.  I just want the people who are potentially

11   affected by this case to have a clear notice as to this case and

12   a clear right to either say no, I don't want to do it because I

13   want to participate or say I'm waiving that right.

14             MR. MILLS:  As your Honor pointed out earlier in

15   conversations with Mr. Bruce, not everyone who is affected by

16   reduction in force is a potential class member here.

17             THE COURT:  That's right.  It may very well be.

18             You can do what you want with those people.  You can

19   hang them.  You can give them money.  Don't give them money.

20   That is not my business.  I'm not running AT&T.  I don't intend

21   to run AT&T.  I tend to just focus in on that case.  That is all

22   I want.

23             I'm making it -- I think it is pretty clear, isn't it?

24   I'm saying, very clearly, for those individuals who this case

25   may touch there must be language in there which is very specific

1   that they're waiving it.

2           MR. MILLS:  It is quite complex in terms of identifying

3   the class, here.

4           THE COURT:  Then the answer is do -- exercise the good

5   rule of a good lawyer and include those even if you don't think

6   they should be included.  That is the way I would do it.

7           All I'm doing is preserving the status right now so we

8   have no more hassles about these matters while I decide the

9   case.

10          Hopefully, I'll have the decision shortly as to the

11  motion to dismiss.  But until that time and until whenever, I

12  don't want to create further problems for myself in this case.

13          That is the answer.

14          MR. MILLS:  Then, your Honor, what would you suggest?

15  That we draft that notice and submit it to you?

16          THE COURT:  I suggest you draft whatever notice there

17  is.  Show it to Mr. Bruce and/or his whole contingent there for

18  their comments.  If they have no objection to it or if they have

19  an objection to it, sit down and see if we can resolve it.

20          Failing -- I don't mean sit in the same room,

21  necessarily.  If you can't resolve it, then bring the two sides

22  to me and I'll decide it.  I have no problem deciding it.  I'll

23  decide it as soon as you give it to me.

24          But you got to have -- it has to be clear in plain

25  English what they're waiving.  Waivers have to be clear and

1    unambiguous, in my judgment.  Okay?

2              MR. MILLS:  Yes, sir.

3              THE COURT:  Thank you, gentlemen.

4              MR. MILLS:  Your Honor, I guess one thing.

5              As I said, there were two ways to go.  One is to do

6    what Mr. Bruce seemed to be advocating, which is to carve out

7    this lawsuit completely.

8              The other is to tell them if you sign this release,

9    you're waiving your claims under this lawsuit.  You don't care

10   which way we go.

11             THE COURT:  I don't care.  If it is satisfactory to

12   them and you and you are both satisfied that the field is

13   covered, assuming I have no objection to the way it is set up by

14   you, I'll sign off on it.  But if you have a dispute, I'll

15   decide it.  If the dispute goes to the very essence of how it

16   should be phrased, I'll decide that.

17             Do the best you can.

18             Thank you, gentlemen.

19                          -    -    -

20

21

22

23

24

25



## COLLIER
## JACOB & MILLS

A PROFESSIONAL CORPORATION
COUNSELLORS AT LAW
℀
580 Howard Avenue
Somerset NJ 08873-1167
732.560.7100
Fax 732.560.0788

Richard F. Collier, Jr.          John P. Barry
Cynthia M. Jacob                 Sandra N. Fears
Christopher H. Mills             Michele C. Meyer-Shipp
Alan G. Lesnewich                Terrence J. Nolan
Patricia S. Robinson             Lori Ann Schiraldi
Rosemary S. Gousman              Catherine J. Smith
Kathleen McLeod Caminiti         David E. Strand
David H. Ganz                    David J. Treibman
Donna duBeth Gardiner            Christopher Walsh

Christopher H. Mills
Also admitted in NY, FL, DC

WRITER'S DIRECT ACCESS
732.537.2102
Fax 732.537.7041
cmills@collierjacobmills.com

May 11, 2000

Hon. Nicholas H. Politan, U.S.D.J.
United States District Court
M.L. King Jr. Federal Bldg. & Courthouse
50 Walnut Street - Room 5076
P.O. Box 999
Newark, New Jersey  07102

  Re: **Engers et al. v. AT&T & AT&T Management Pension Plan**
     **98-CV-3660**

Dear Judge Politan:

  Following Your Honor's ruling on May 9 on the motion filed by plaintiffs relating to AT&T's severance plan release, AT&T considered the options you specified and determined to carve out all claims arising under the *Engers* case from the scope of the release that will be tendered to participants in the Management Pension Plan who are affected by a work force reduction. Henceforth, the release will contain the following language immediately following the key sentence of the provision explaining what is being waived by executing the release:

  EXCEPTION: Nothing in this Release limits my right to participate and recover damages or other relief in a case known as "Engers v. AT&T and AT&T Management Pension Plan," Civil Action No. 98-CV-3660 (NHP), which alleges ADEA and ERISA violations in AT&T's cash balance pension program for management employees and is currently pending before the United States District Court for the District of New Jersey.

  I enclose a revised version of the release which will be used. We would draw your attention to the bottom third of page 3, where the new language has been added to the second paragraph of section 5.



We have communicated with Mr. Bruce, counsel for plaintiffs, on the issue of the modification to AT&T's release. He is in agreement that the above language addresses plaintiffs' concerns. Furthermore, AT&T will not seek to bar any former employee from participating as a class member or benefitting from any relief that might be awarded in this case on the basis that they signed a release under the AT&T Separation Plan since the date this lawsuit was filed.

We trust that this addresses your concerns and conforms with your ruling.

Respectfully submitted,

CHRISTOPHER H. MILLS

CHM/hs
Enclosure

cc:Stephen R. Bruce, Esq. (W/encls.)

**AT&T FORCE MANAGEMENT PROGRAM**
**AT&T SEPARATION PLAN (ASP)**

## VOLUNTARY TERMINATION AGREEMENT AND RELEASE

In consideration of the fact that I have voluntarily and of my own free will elected to terminate my employment and accept a Post-Employment Payment, Post-Employment Payment Supplement, if applicable, ("Payment(s)"), and a Voluntary Termination Supplement, and that the AT&T Corp. and its subsidiaries and affiliates (collectively, the "Company") has agreed to pay me the Payments and the Voluntary Termination Supplement, subject to the terms of the AT&T Separation Plan ("ASP"), I acknowledge and agree to the following:

1.  **I have been told by the Company, and I understand, that I may elect, at my option, to terminate my employment and receive Payments and the Voluntary Termination Supplement, but that my election to receive the Payments and the Voluntary Termination Supplement is expressly conditioned upon my signing a Voluntary Termination Agreement and Release on the date of my termination from the Company, and returning it to my Force Management Coordinator within a reasonable period of time.**

2.  I realize that there are various state and federal laws that govern my employment relationship with the Company and/or prohibit employment discrimination on the basis of, among other things, age, color, race, creed, gender, sexual preference/orientation, marital status, national origin, mental or physical disability, religious affiliation or veteran status, and that these laws are enforced through the courts and agencies such as the Equal Employment Opportunity Commission, Department of Labor and State Human Rights Agencies. Such laws include, but are not limited to, Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act of 1993 ("FMLA"), the Employee Retirement Income Security Act of 1974 ("ERISA"), the Americans with Disabilities Act of 1990 ("ADA") the Age Discrimination in Employment Act of 1967 ("ADEA"), 42 U.S.C. Section 1981, the New Jersey Law Against Discrimination, the New Jersey Conscientious Employee Protection Act, the New Jersey Family Leave Act, etc., as each may have been amended. In consideration of all the benefits provided to me under the ASP, I agree to give up any rights I may have under these or any other laws with respect to my employment and termination of employment at the Company. I also agree to give up any claims I may have that any Releasee, as defined below, has (a) breached any express or implied contract with me, (b) committed any tort (civil wrong) against me, or (c) otherwise acted unlawfully toward me.

    I also waive any right to become, and promise not to consent to become, a member of any class in which claims are asserted against any Releasee (as defined below) that are related in any way to my employment or the termination of my employment with the Company, and that involve events which have occurred as of the date I signed this Voluntary Termination Agreement and Release, except for claims under the ADEA, including claims to challenge this Voluntary Termination Agreement and Release as invalid under the ADEA.

**Voluntary Release**                                           **1**                                           **May 1, 2000**

## VOLUNTARY TERMINATION AGREEMENT AND RELEASE

this Voluntary Termination Agreement and Release is intended to include not only claims that are known, anticipated or disclosed, but also claims that are unknown, unanticipated and undisclosed.

4.    Subject to Paragraph 5 herein, I covenant and agree not to bring any action, suit or administrative proceeding contesting the validity of this Voluntary Termination Agreement and Release or attempting to negate, modify or reform it, nor to sue the Company or any other Releasee for any reason, except that I may bring a claim under the ADEA, including a claim to challenge this Voluntary Termination Agreement and Release as invalid under the ADEA. If I breach either Paragraph 3 or 4 hereof, other than by filing a claim under the ADEA, including a claim to challenge this Voluntary Termination Agreement and Release as invalid under the ADEA, I shall: (i) promptly return to the Participating Company all consideration received hereunder, and (ii) pay any Releasee all of their actual attorneys' fees and costs incurred in each such action, suit or other proceeding including any and all appeals or petitions therefrom, regardless of the outcome. I agree to pay such expenses within thirty (30) days of written demand. This Paragraph 4 is not intended to limit me from instituting legal action for the sole purpose of enforcing this Voluntary Termination Agreement and Release.

5.    I understand that this Voluntary Termination Agreement and Release has neither the purpose nor intent of interfering with my protected right to file a charge with or participate in an investigation or proceeding pursuant to the statutes administered and enforced by the EEOC, specifically: the ADEA, the Equal Pay Act, Title VII of the Civil Rights Act of 1964, and the ADA.

I understand that I will not be in breach of this Voluntary Termination Agreement and Release if I file a charge with or participate in an investigation or proceeding pursuant to the statutes administered and enforced by the EEOC. However, by signing this Voluntary Termination Agreement and Release, I understand that I waive and release any right I may have to recover money or other relief in any lawsuit or proceeding brought by me or by an agency or third party, including the EEOC, on my behalf. EXCEPTION: Nothing in this Release limits my right to participate and recover damages or other relief in a case known as "Engers v. AT&T and AT&T Management Pension Plan," Civil Action No. 98-CV-3660 (NHP), which alleges ADEA and ERISA violations in AT&T's cash balance pension program for management employees and is currently pending before the United States District Court for the District of New Jersey.

6.    I hereby acknowledge and agree that if I am re-employed by the Company, any entity within AT&T's controlled group of corporations (as defined in Section 1563 of the Internal Revenue Code), or any other company that participates in AT&T's pension plans, I will repay to the Participating Company the difference between the total number of weeks for which payments were made and the number of weeks from my termination date to the effective date of my re-employment. I will be entitled to retain my Voluntary

**Voluntary Release**                        **3**                        **May 1, 2000**

## VOLUNTARY TERMINATION AGREEMENT AND RELEASE

Termination Supplement. To the maximum extent permitted by law, I further expressly authorize, and give permission to, my new employer to deduct and withhold from my wages monies sufficient to satisfy my re-payment obligation hereunder. In no event, however, shall any deductions or withholdings operate to reduce my salary below federally mandated minimum wages.

7.   I have no knowledge of any wrongdoing involving improper or false claims against a federal or state governmental agency, or other wrongdoing that involves me or other present or former Company Employees other than what I have disclosed in writing to the Company's Law Division.

8.   The construction, interpretation and performance of this Voluntary Termination Agreement and Release shall be governed, unless preempted by applicable federal laws, by the laws of the state in which I am working on the date of my termination from the Company's payroll, except that state's conflict of laws rule.

9.   In the event that any one or more of the provisions contained in this Voluntary Termination Agreement and Release shall for any reason be held to be unenforceable in any respect under the law of any state or of the United States of America, such unenforceability shall not affect any other provisions of this Voluntary Termination Agreement and Release, but, with respect only to that jurisdiction holding the provision to be unenforceable, this Voluntary Termination Agreement and Release shall then be construed as if such unenforceable provision or provisions had never been contained herein.

10.   I acknowledge and understand that the Company has advised me to consult with an attorney about the terms of this Voluntary Termination Agreement and Release before signing it, I have forty-five (45) days to consider this Voluntary Termination Agreement and Release before signing it, and I may revoke this Voluntary Termination Agreement and Release within seven (7) calendar days (15 in Minnesota) after signing it. I understand that revocation can be made by delivering the written notice of revocation to my Force Management Coordinator.

11.   I agree that I will submit all vouchers for reasonable business expenses prior to my off-payroll date or as soon thereafter as is practicable. I further understand and agree that after my off-payroll date I will no longer be authorized to incur any expenses, obligations or liabilities on behalf of the Company.

12.   In accordance with my existing and continuing obligations to the Company, I agree to return to the Company, on or before my off-payroll date, all Company property or copies thereof, including, but not limited to, files, records, computer access codes, computer programs, keys, card key passes, instruction manuals, documents, business plans and other property which I received or prepared or helped to prepare in connection with my employment with the Company, and to assign to the Company all right, title and interest