# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-----------------------------------------------------X
:
JANICE C. AMARA, GISELA          :       3:01 CV 2361 (MRK)
R. BRODERICK, ANNETTE S. GLANZ   :
individually, and on behalf of others      :       Trial Date: 09/11/06
similarly situated,                 :
:
                  Plaintiffs,   :
        v.                :
:
CIGNA CORP. AND CIGNA         :
PENSION PLAN,               :
:
                 Defendants.  :
:
-----------------------------------------------------X

## DEFENDANTS' SUPPLEMENTAL TRIAL BRIEF

Dated:  August 30, 2006

**MORGAN, LEWIS & BOCKIUS LLP**
By:  /s/ Joseph J. Costello
Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
*Admitted pro hac vice*
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
(215) 963-5295/5258/5472
(215) 963-5001 (fax)
jcostello@morganlewis.com
jkohen@morganlewis.com

**ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)
jwade@rc.com

*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 1

I.  NEW LAW CONFIRMS THAT CASH BALANCE PLANS ARE NOT  AGE-DISCRIMINATORY. ............................................................................... 1

    A.  In Cooper v. IBM, The First Appellate Court To Rule On The Issue Confirmed That Cash Balance Plans Are Not Age-Discriminatory. ..................... 1

    B.  The Southern District of New York Rejected An Age Discrimination Challenge to A Cash Balance Plan In Hirt v. Equitable. ....................................... 3

    C.  New Federal Legislation Confirms That Cash Balance Are Not Age-Discriminatory Or Illegal. .................................................................................. 4

II.  HIRT'S REASONING ON THE REQUIREMENTS OF A SECTION 204(H) NOTICE IS MISGUIDED AND SHOULD BE REJECTED. ......................... 7

III.  PLAINTIFFS' ALLEGATIONS IN COUNT 5 REGARDING PRUDENTIAL'S ISOLATED RECORD-KEEPING ERRORS DO NOT RAISE CLASS CLAIMS APPROPRIATE FOR DETERMINATION IN THIS CASE. ........................................ 10

    A.  Plaintiffs' Allegation That Prudential Did Not Preserve The Minimum Benefit For Thousands Of Class Members Is Inaccurate and Misleading. .......... 12

    B.  No Class Claim Exists For Failure to Provide The Plan's Free 30% Or The Relative Value Of Benefit Options. .................................................................... 14

    C.  No Class Representatives or Class Members Have Standing To Pursue Plaintiffs' Minimum Benefit, Free 30% or Relative Value Claims. .................... 16

        1.  None of the Named Plaintiffs Have Standing To Assert A Claim Regarding the Minimum Benefit, Free 30 or Relative Value Disclosures. ............................................................................................. 16

        2.  The Group Of Participants Who May In the Future Have Standing To Pursue Minimum Benefit, Relative Value or Free 30% Claims Is Undefineable And Therefore Class Consideration Is Inappropriate. ......................................................................................... 17

        3.  Participants Who Have Initiated A Pension Payment Lack Standing To Pursue Minimum Benefit, Relative Value or Free 30% Claims ................................................................................................... 19

**TABLE OF CONTENTS**
**(continued)**

IV.    CIGNA'S SOLICITATION OF RELEASES FROM THOUSANDS OF CLASS
       MEMBERS DID NOT VIOLATE ANY ETHICAL RULES OR RULE 23. ................. 21

V.     PLAINTIFF'S <u>DEPENBROCK</u> ALLEGATIONS ARE IRRELEVANT
       BECAUSE THE CLASS REPRESENTATIVES LACK STANDING AND
       CIGNA IS VOLUNTARILY RECALCULATING ALL PARTICIPANTS
       SIMILARLY-SITUATED TO JOHN DEPENBROCK................................................. 23

VI.    CONCLUSION............................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

Abbott Laboratories v. Gardiner, 387 U.S. 136 (1967) ..................................................18

Abels v. Titan Int'l, Inc., 85 F. Supp. 2d 924 (S.D. Iowa. 2000)...................................10

Adams v. Bowater Inc., 313 F.3d 611 (1st Cir. 2002) ...................................................20

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) ..........................................8, 9

Brimstone R. Co. v. United States, 276 U.S. 104 (1928) ...............................................8

Carlos v. Reed Rolled Thread Die Co., 49 F.3d 790 (1st Cir. 1995)............................11

Charles v. Pepco Holdings, Inc., No. 05-702, 2006 WL 1892672
    (D. Del. July 11, 2006).........................................................................................10

Christensen v. Qwest Pension Plan, 376 F. Supp. 2d 934 (D. Neb. 2005) ...................11

City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283 (1982).................................20

Cooper v. IBM Personal Pension Plan and IBM Corp., No. 05-3588, 2006 WL 2243300
    (7th Cir. August 7, 2006) ..............................................................................1, 2, 3

Copeland v. Geddes Fed. Savings & Loan Ass'n Ret. Income Plan, 62 F. Supp. 2d 673
    (N.D.N.Y. 1999) ...................................................................................................9

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83 (2d Cir. 2002) .........18

Easa v. Florists' Transworld Delivery Ass'n, 5 F. Supp. 2d 522 (E.D. Mich. 1998)...................12

Eaton v. Onan Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000) ..........................................2

Engers v. AT&T Corp., No. 98-3660, 2001 U.S. Dist. LEXIS 25889
    (D.N.J. June 6, 2001) ...........................................................................................2

Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000)..................................................4

Fitch v. Chase Manhattan Bank, 64 F. Supp. 2d 212 (W.D.N.Y. 1999) .......................12

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167 (2000) .............20

Gramm v. Bell Atlantic Mgmt., 983 F. Supp. 585, 593 (D.N.J. 1997) .........................13

Hebert v. Aetna Life Ins. Co., 96 F. Supp. 2d 540 (E.D. L.A. 1998) ...........................................12

Hirt v. Equitable Ret. Plan for Employees, Managers and Agents, No. 01 Civ. 7920, 2006
    WL. 2023545 (S.D.N.Y. July 20, 2006) ...........................................................1, 3, 4, 7, 8, 10

Hurlic v. S. Cal. Gas Co., No. 05-5027 (C.D. Cal. Mar. 24, 2006) ...........................................2

Landgraf v. USI Film Prods., 511 U.S. 244 (1994) ...........................................................9

Lugo v. Employees Ret. Fund of Illumination Prod's Indus., 529 F.2d 251
    (2d Cir. 1976)...........................................................................................................18-19

Makar v. Health Care Corp., 872 F.2d 80, 83 (4th Cir.1989) ...........................................12

Normann v. Amphenol Corp., 956 F. Supp. 158 (N.D.N.Y. 1997)...........................................9

O'Shea v. Littleton, 414 U.S. 488 (1974) ...........................................................16

Peterson v. Cont'l Cas. Co., 282 F.3d 112 (2d Cir. 2002)...........................................19

Ravencraft v. UNUM Life Ins. Co. of Am., 212 F.3d 341 (6th Cir. 2000) ...................................12

Register v. PNC Fin. Servs. Group, Inc., No. 04-6097, 2005 WL. 3120268 (E.D. Pa.
    Nov. 21, 2005) ...........................................................................................................2

Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150 (D. Conn. 2006)...............................2, 4

Thomas v. City of New York, 143 F.3d 31 (2d Cir. 1998)...........................................18

Tootle v. ARINC, Inc., 222 F.R.D. 88 (D. Md. 2004)...........................................2

United States v. Quinones, 313 F.3d 49 (2d Cir. 2002)...........................................18

## STATUTES AND REGULATIONS

29 U.S.C. § 1054(b)(i)(H)(i) ...........................................................1

29 U.S.C. § 1054(g)(1) ...........................................................11

Fed. R. Civ. P. 23 advisory committee's notes...........................................22, 23

Fed. R. Civ. P. 23(c)(1)(B) ...........................................................16

Fed. R. Civ. P. 23(e)(1)(a) ...........................................................22

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................22

26 C.F.R. § 1.417(a)(3)-1(f).........................................................................15

Notice of Significant Reduction in the Rate of Future Benefit Accrual, 63 Fed. Reg.
    68,678, 68,682 (Dec. 14, 1998) .............................................................10

Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 ..............5

## MISCELLANEOUS

152 Cong. Rec. S8747, 8751 (August 3, 2006) .............................................6

Erwin Chemerinsky, Federal Jurisdiction, Section 2.4 (3d ed. 1999) ...........18

Fawn Johnson, *New Pension Law Plus Cooper Ruling Dooms Age-Related Suits,*
    *Practitioners Say*, D.L.R., No. 166............................................................3

**INTRODUCTION**

Defendants CIGNA Corporation ("CIGNA") and the CIGNA Pension Plan (the "Plan") (together "Defendants") hereby supplement their Trial Brief to describe a number of recent legal developments related to cash balance plans, to address the impact of discovery completed since the date of Defendants' initial pre-trial submission, and to respond to a new argument and exhibits presented by Plaintiffs for the first time in their Reply to Defendants' Trial Brief ("Pls' Reply").

**ARGUMENT**

**I.    NEW LAW CONFIRMS THAT CASH BALANCE PLANS ARE NOT AGE-DISCRIMINATORY.**

On August 7, 2006, the Seventh Circuit issued its much-anticipated decision in Cooper v. IBM Personal Pension Plan and IBM Corp., No. 05-3588, 2006 WL 2243300 (7th Cir. August 7, 2006), and rejected age discrimination challenges related to IBM's cash balance plan. This is the first appellate court to address this issue. Also since the time of Defendants' Trial Brief, a district court in the Southern District of New York joined the majority of other courts that have rejected challenges to the design of cash balance plans. Hirt v. Equitable Ret. Plan for Employees, Managers and Agents, No. 01 Civ. 7920, 2006 WL 2023545 (S.D.N.Y. July 20, 2006). Finally, on August 17, 2006, President Bush signed into law the Pension Protection Act of 2006, which included among its provisions certain language related to cash balance plans.

**A.    In Cooper v. IBM, The First Appellate Court To Rule On The Issue Confirmed That Cash Balance Plans Are Not Age-Discriminatory.**

In a case of first impression, the Seventh Circuit this month agreed with the majority of district courts that cash balance plans are not age-discriminatory under ERISA Section 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(i)(H)(i). Cooper v. IBM Personal Pension Plan and IBM

- 1 -

Corp., No. 05-3588, 2006 WL 2243300 (7th Cir. August 7, 2006).  See Tootle v. ARINC, Inc.,

222 F.R.D. 88 (D. Md. 2004) (rejecting claim that cash balance plan design is age-

discriminatory); Eaton v. Onan Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000) (same); Register v.

PNC Fin. Servs. Group, Inc., No. 04-6097, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005) (same);

Engers v. AT&T Corp., No. 98-3660, 2001 U.S. Dist. LEXIS 25889 (D.N.J. June 6, 2001)

(same);  Hurlic v. S. Cal. Gas Co., No. 05-5027 (C.D. Cal. Mar. 24, 2006) (same).  Thus, the

district court in Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150 (D. Conn. 2006), now

stands alone in finding that cash balance plans are inherently age-discriminatory.

In Cooper, the district court had concluded that IBM's cash balance plan was age-

discriminatory because "younger employees receive interest credits for more years."  Cooper,

2006 WL 2243300, at *1.  The district court's decision had turned on its interpretation of the

phrase "benefit accrual" under ERISA Section 204(b)(1)(H)(i), which equated to the definition

of "accrued benefit," i.e., an amount  "expressed in the form of an annual benefit commencing at

normal retirement age."  Id. at *2.  Thus, under the district court's view, the IBM plan

discriminated against older employees because younger workers would receive a greater payout

as a result of "the power of compound interest."  Id.  The Seventh Circuit concluded that this

approach was improper and rejected the premise that the time value of money properly forms the

basis for an age discrimination claim:

> Nothing in the language or background of §204(b)(1)(H)(i)
> suggests that Congress set out to legislate against the fact that
> younger workers have (statistically) more time left before
> retirement, and thus a greater opportunity to earn interest on each
> year's retirement savings. **Treating the time value of money as a
> form of discrimination is not sensible.**

Id. at *3 (emphasis added).

Thus, the Seventh Circuit adopted the same approach to the issue of age discrimination that has been embraced by the vast majority of courts that have addressed the issue, and that served as the theoretical underpinning for the conclusion of Defendants' expert that the CIGNA Plan is not age-discriminatory.  In doing so, the Seventh Circuit expressly rejected the position espoused by Plaintiffs and their expert in this case.  (See Defs' Trial Brief at 12-30; Pls' Trial Brief at 1-6, 17-31; Pls' Reply at 6-29).

Like IBM's cash balance plan, CIGNA's cash balance plan ("Part B") is age-neutral: "Under IBM's plan any differences in pension benefits are a function of differing years of service, salary history, or the years the balance has been allowed to compound; age is not a factor."  Id. at *6.  Accordingly, this Court should follow the reasoning of the Seventh Circuit, as well as every district court but one to rule on the issue, in rejecting Plaintiffs' claim that CIGNA's cash balance plan is age-discriminatory.  "[T]he Cooper decision virtually inoculates employers against age discrimination lawsuits attacking hybrid plans."  Fawn Johnson, *New Pension Law Plus Cooper Ruling Dooms Age-Related Suits, Practitioners Say*, D.L.R., No. 166, Aug. 28, 2006, at C-1.

**B.    The Southern District of New York Rejected An Age Discrimination Challenge to A Cash Balance Plan In Hirt v. Equitable.**

Since the time of filing of Defendants' Trial Brief, a district court in the Southern District of New York also has held that cash balance plans are not inherently age-discriminatory.  In Hirt v. Equitable Ret. Plan for Employees, Managers and Agents, No. 01 Civ. 7920, 2006 WL 2023545 (S.D.N.Y. July 20, 2006), Equitable's cash balance plan participants earned benefit credits as a percentage of annual compensation and compounded interest credits on the accumulation, like Part B at issue in this suit.  Id. at *27.  The plaintiffs alleged that Equitable's cash balance plan was age-discriminatory because "the longer an employee works before

reaching normal retirement age, the more interest accumulates in the employee's Cash Account, and the larger the employee's annuity will be following retirement or earlier termination." Id. Like CIGNA, Equitable argued in response "that its plan does not discriminate, that the differences in accumulations reflect the time value of money, between the time that retirement benefits are earned to the time they may be distributed." Id.

The Hirt court followed the reasoning of most other district courts in holding that the Equitable cash balance plan did not discriminate because of attainment of any age. The court rejected Judge Hall's interpretation of the phrase "the rate of an employee's benefit accrual" in Richards, 427 F. Supp. 2d 150, and held that "it follows logically that the rate of benefit accrual [for cash balance plans] is determined by the change in the account balance." Id. at *32-33 (citing Register, 2005 WL 3120268) (alteration in original).

Plaintiffs' Reply attempted to diminish the importance of Hirt, contending that it ignored the Second Circuit's admonitions in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000). Although Esden involved a cash balance plan, the only issue was the calculation of lump sum benefits pursuant to IRS Notice 96-8 and a process known as "whipsaw." Esden did not rule as to whether the cash balance plan was age-discriminatory under Section 204(b)(1)(H)(i). (See Defs' Trial Brief at 36). Plaintiffs cannot avoid the clear import of Hirt—that another court joined the majority (now 7 in all), and rejected Richard's position (the only one of its kind), in finding that cash balance plans are not age-discriminatory.

C.    **New Federal Legislation Confirms That Cash Balance Are Not Age-Discriminatory Or Illegal.**

On August 17, 2006, President Bush signed into law the Pension Protection Act of 2006 ("PPA"), a 900-page comprehensive bill that makes significant changes in the federal laws, including ERISA, governing traditional single employer defined benefit pension plans,

multiemployer pension plans, "cash balance" and pension equity plans, 401(k) and other defined

contribution plans, and individual retirement accounts.  See Pension Protection Act of 2006, Pub.

L. No. 109-280, 120 Stat. 780.  Most importantly for this litigation, the PPA established that cash

balance plans that meet certain requirements are a viable option for plan sponsors, do not

inherently violate the age discrimination prohibitions of ERISA, the Internal Revenue Code or

the Age Discrimination in Employment Act, and indeed are legal.[1]

The cash balance plan provisions of the PPA apply generally prospectively from June 29,

2005, and the statute specifically provides that no inference may drawn from these provisions

regarding the legality of cash balance plans created prior to June 29, 2005.  Nevertheless, the

Senate debate on the issue (excerpts of which are attached as Exhibit A) makes clear that

Congress was focused squarely on precluding age discrimination claims from rendering cash

balance plans illegal:

> Hybrid plans have been criticized on the theory that the design was
> per se discriminatory. The theory suggests that the hypothetical
> individual account plan design unlawfully favors younger workers
> over older ones because younger workers could accrue interest on
> their account over a longer period of time than older workers. This
> theory amounts to a declaration that the "time-value of money'' is
> age-discriminatory.
>
> Not surprisingly, given the confused logic of stating that
> compound interest in a pension plan is age-discriminatory, most

---

[1]     The PPA provides that for conversions of traditional plans to cash balance plans that occur after June 29, 2005,
certain conditions must be met in order to comply with the PPA.  Significantly, however, because CIGNA's
plan conversion occurred before 2005, these provisions are not applicable to this case.  See Pension Protection
Act of 2006, Pub. L. No. 109-280, 120 Stat. 780.  Additionally, the PPA amended ERISA to permit cash
balance plans to treat the account balance as the participant's accrued benefit (rather than requiring conversion
to an annuity at normal retirement and then discounting to present value), as long as the plan credits interest on
account balances at a "market" rate.  Thus, lump sum distributions may be based on the participant's
hypothetical account balance, and sponsors are no longer required to pay larger distributions because of the so-
called "whipsaw" effect, also not at issue in this litigation.  This amendment, unlike the others, is effective for
distributions made after enactment of the PPA.  Id.

courts that have reviewed the age appropriateness of hybrid plan designs have found them to be legitimate. Indeed, the first federal court to review the question stated "Plaintiffs' proposed interpretation would produce strange results totally at odds with the intended goal of the OBRA 1986 pension age discrimination provisions (Eaton v. Onan (S.D. N.Y. 2000))." The case law validating the hybrid design includes three federal court decisions issued since a 2003 rogue decision in the Southern District of Illinois [*Cooper v. IBM*]. These decisions explicitly reject that court's reasoning and conclusion (Tootle v. ARINC (D. Md. 2004), Register v. PNC (E.D. Pa. 2005) and Hirt v. Equitable (S.D. N. Y. 2006) and hold the hybrid pension design to be legal. Consistent with these numerous federal court decisions, the Internal Revenue Service (IRS) for 15 years issued approvals for individual cash balance plans and the Treasury Department and IRS repeatedly issued guidance as to the validity of the cash balance design.

* * *

[¶]  This bill sets forth a test for age discrimination in defined benefit pension plans that compares an employee's accrued benefit with that of any similarly situated younger employee.  For this purpose, an employee's accrued benefit may be expressed as the current balance in a hypothetical account for any plan that determines the employee's accrued benefit (or any portion thereof) by reference to a hypothetical account, such as a cash balance plan.

152 Cong. Rec. S8747, 8751 (August 3, 2006) (emphasis added).

Because Part B complies with the PPA as of July 29, 2005,[2] any claim that Part B is illegal after that date is directly refuted by the statute.  Thus, even if this Court were to find that cash balance plans are age-discriminatory – contrary to the only appellate court to rule on the issue, contrary to the PPA's view of plans post-July 2005, and contrary to all but one district court – any relief for Plaintiffs must be cut off as of July 29, 2005.

---

[2]    In order to comply with the PPA as of 2008, Part B will need to be amended to provide for three-year vesting, a change which CIGNA is prepared to undertake.

- 6 -

In sum, these new legal developments – <u>Cooper</u>, <u>Hirt</u>, and The Pension Protection Act of 2006 – further support Defendants' position that CIGNA's cash balance plan is not inherently age-discriminatory or illegal.

## II.    HIRT'S REASONING ON THE REQUIREMENTS OF A SECTION 204(H) NOTICE IS MISGUIDED AND SHOULD BE REJECTED.

In Part IV of their Reply, discussing Plaintiffs' Section 204(h) notice claims, Plaintiffs point to the recent district court decision in <u>Hirt</u>, 2006 WL 2023545, discussed above.  (<u>See</u> Pls' Reply at 70-77).  While it logically analyzed the age discrimination claims, the <u>Hirt</u> court's analysis of Equitable's 204(h) notice of its cash balance conversion drew conclusions that are both puzzling and unfortunate.  This Court should reject <u>Hirt's</u> skewed reasoning and apply the statute and regulations in effect at the time of CIGNA's Plan Administrator's 204(h) Notice, in finding that he complied with all legal requirements in effect at the time.

The <u>Hirt</u> court examined several amendment notices prepared and distributed by the plan administrator to plan participants, including one issued on December 4, 1990 related to the conversion to a cash balance plan ("1990 Notice").  <u>Hirt</u>, 2006 WL 2023545, at *20-23.[3]  In holding that the 1990 Notice was inadequate, the <u>Hirt</u> court appears to have applied the notice requirements set forth in Section 204(h) as amended in 2001—eleven years after the issuance of

---

[3]    The 1990 Notice was a one-page document addressed to "Participants in the Equitable Retirement Plan for Employees and Managers," which stated that "after December 31, 1990, only those participants who either had attained age fifty or had completed twenty years of service by December 31, 1990 could receive benefits under the grandfathering provision [as set forth in the December 1988 notice ("1988 Notice")]."  <u>Hirt</u>, 2006 WL 2023545, at *6.  The 1990 Notice did not explain the new amendment, but rather referred participants to an attached one-and-a-half page Benefits Update which, in turn, further referred participants to the 1988 Notice "for a description of the change."  <u>Id.</u>

the 1990 Notice.  Id. at *22.[4]  In so doing, the court held that "[t]he 2001 statutory amendment made explicit that which was implicit in the requirement of a notice."  Id.

    This Court should reject Hirt's reliance on a subsequent statutory amendment for several reasons.  First, the application of the 2001 amended statutory requirements to the 1990 Notice may be disregarded as mere dicta.  The court stated that the statute, as it read in 1990, itself implied that that a notice must include "the material terms of the plan amendment."  Because the 1990 Notice did not even include the material terms, it violated the statute in effect in 1990.  Id. at *22.  Indeed, the court stated that "[t]he insufficiency of Equitable's 1990 Notice – under the terms of the statute in effect at the time it was given, December 4, 1990, and the courts' interpretation of the statutory requirements – vitiates the amendment itself."  Id. at *23 (emphasis added).

    Next, Hirt's interpretation of a subsequent amendment as merely clarifying that which was implicit in an earlier statute, without any written legislative intent for the statute or regulation to do so, makes no sense.  The fact that Congress changed the statute to require administrators to explain an amendment's resultant reductions in benefits, if anything, supports the view that prior to such amendment that requirement did not exist.[5]  Hirt's application of a subsequent statute/regulation to a Section 204(h) notice issued prior to the effective date of such

---

[4]    Notably, Hirt's analysis of the plan's 1998 notice appears to apply the correct version of Section 204(h), since the court determined the notice was adequate despite the fact that it did not make benefit comparisons required under the current statutory and regulatory scheme, because the notice explained the applicable amendments and provided the effective date, all that was required at the time.  See Hirt, 2006 WL 2023545, at *19.

[5]    It is well-established that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) (citing Brimstone R. Co. v. United States, 276 U.S. 104, 122 (1928) ("[t]he power to require readjustments for the past is drastic.  It … ought not to be extended so as to permit unreasonably harsh action without very plain words.")).

- 8 -

statute/regulation was improper because it constitutes an unauthorized retroactive application of

the subsequent changes.  Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988)

("Retroactivity is not favored in the law.  Thus, congressional enactments and administrative

rules will not be construed to have retroactive effect unless their language requires this result.")

(citations omitted).  This canon of statutory and regulatory interpretation is even more

compelling where, as here, retroactive application would unjustly impose liability for past

conduct where that conduct was legitimate at the time it was taken.  Landgraf v. USI Film

Prods., 511 U.S. 244, 272 (1994) (holding that prospective statutory application remains the

appropriate default rule unless Congress has made clear its intent to disrupt the parties' settled

expectations).

      Significantly, Hirt's application of the current standard to a Section 204(h) notice issued

prior to the standard's enactment also is inconsistent with the approach of every other court

which has evaluated a 204(h) claim after a subsequent change in the legal standard.  As one

district court in this district noted:

> In reaching this conclusion the Court notes that the IRS has
> recently promulgated regulations that state that "future benefit
> accrual is determined without regard to optional forms of benefit
> …, early retirement benefits, or retirement type subsidies." 26
> C.F.R. Part 1, § 1.411(d)-6T, A-5(b). However, the Court need not
> address here whether the IRS regulations comport with the plain
> language of ERISA because the regulations state: "This section
> applies to amendments adopted on or after Dec. 15, 1995 and
> amendments effective by their terms on or after Jan. 2, 1996." 26
> C.F.R. Part 1, § 1.411(d)-6T, A-15(b).

Normann v. Amphenol Corp., 956 F. Supp. 158, 165 n.4 (N.D.N.Y. 1997); see also e.g.

Copeland v. Geddes Fed. Savings & Loan Ass'n Ret. Income Plan, 62 F. Supp. 2d 673, 678

(N.D.N.Y. 1999) (analyzing Section 204(h) notice under text of the 1986 version of the statute

only, with no reference to either the 1995 temporary or the 1998 permanent regulations, and requiring only that the plan administrator set forth "the plan amendment and its effective date.").[6]

In sum, the legality of the Section 204(h) notice issued by CIGNA's Plan Administrator in 1997 must be governed solely by the statutory and regulatory scheme in place as of that date, and no legal justification exists to scrutinize it under statutes and/or regulations that did not exist at the time. Nothing in Section 204(h) at the time required the notice to describe how benefits are reduced or to compare what a participant's benefits would be had the participant remained in a prior plan, as Plaintiffs suggest. (See Pls' Trial Brief at 35-39; Pls' Reply at 31-37). Rather, the legislative and regulatory scheme required only that plan administrators make a "good faith effort to" ensure that Section 204(h) notices provided a "summary of the amendment . . .written in a manner calculated to be understood by the average plan participant." Notice of Significant Reduction in the Rate of Future Benefit Accrual, 63 Fed.Reg. 68,678, 68,682 (Dec. 14, 1998); Hirt, 2006 WL 2023545, at *18. As a result, Hirt notwithstanding, this is the appropriate standard by which the Court must evaluate the Section 204(h) notice at issue in the upcoming trial.

## III.    PLAINTIFFS' ALLEGATIONS IN COUNT 5 REGARDING PRUDENTIAL'S ISOLATED RECORD-KEEPING ERRORS DO NOT RAISE CLASS CLAIMS APPROPRIATE FOR DETERMINATION IN THIS CASE.

In Count 5, Plaintiffs allege a violation of the anti-cutback rule under ERISA Section 204(g), which only prohibits an accrued benefit from being "decreased by an amendment of the

---

[6]    Charles v. Pepco Holdings, Inc., No. 05-702, 2006 WL 1892672, at *3 (D. Del. July 11, 2006) (regarding Section 204(h) notice in 1998, court noted that "the law only requires the notice to include an understandable summary of the amendment and not a description of its potentially adverse effects."); Abels v. Titan Int'l, Inc., 85 F. Supp. 2d 924, 936-37 (S.D. Iowa 2000) (applying only the 1986 version of Section 204(h) to a plan's notice issued in 1993, with no reference to the existing but subsequently issued regulations).

plan." 29 U.S.C. § 1054(g)(1).  Unable to avoid the fact that the Part B plan document indeed

protects all accrued benefits from being decreased, Plaintiffs point to a handful of isolated

record-keeping errors by Prudential Retirement ("Prudential"), which have been corrected, and

broadly assert that benefits are being cut.  (See Pls' Reply at 67-69).  Specifically, Plaintiffs

appear to allege three purported violations of the anti-cutback rule:

- Prudential, the recordkeeper for the Plan, did not maintain electronic records of the minimum benefit applicable for thousands of participants and therefore the minimum benefit was not protected;

- Prudential improperly did not provide participants the Preserved Spouse's Benefit, also known as the Free 30%, which is to be protected under the terms of Part B;

- Participants were not sufficiently notified of the relative value of benefit options or the minimum benefit's applicability.

(See id. at 1; Pls' Trial Brief at 64).  These claims are completely baseless, and Plaintiffs'

characterizations are at best mistaken, and at worst a manipulation of the facts in this matter.

Even if Plaintiffs' claims had any merit, the Court should disregard them because no Class

Representative has standing to present these claims on behalf of the class certified in this action.

As an initial matter, Plaintiffs' suggestion that random and isolated record-keeping errors

on the part of the Plan's record-keeper, Prudential, forms a basis for liability at all is incorrect.

"Several courts have held that the communication of inaccurate information regarding the

amount of benefits to which an employee is entitled is not a breach of fiduciary duty under

ERISA."  Christensen v. Qwest Pension Plan, 376 F. Supp. 2d 934, 943 (D. Neb. 2005)

(collecting cases).[7]  Moreover, the Court lacks jurisdiction to review claims regarding errors in

---

[7]     (See also Defs' Trial Brief at 50).  Carlos v. Reed Rolled Thread Die Co., 49 F.3d 790, 795, n.5 (1st Cir. 1995) (finding no breach of duty where employer initially provided incorrect early retirement benefit figures, but later informed the employee of its mistake and permitted the employee to make a new election as to whether to
continued . . .

the benefits offered or paid to participants, until those participants have exhausted administrative remedies and provided the administrator the opportunity to correct any mistakes.  See Ravencraft v. UNUM Life Ins. Co. of Am., 212 F.3d 341, 343 (6th Cir. 2000) (holding, in dismissing plaintiff's claim of futility in failing to exhaust his administrative remedies, that review or exhaustion "enables plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions.") (quoting Makar v. Health Care Corp., 872 F.2d 80, 83 (4th Cir.1989) (emphasis added)); Hebert v. Aetna Life Ins. Co., 96 F. Supp. 2d 540, 542 (E.D. L.A. 1998) (same).

**A.      Plaintiffs' Allegation That Prudential Did Not Preserve The Minimum Benefit For Thousands Of Class Members Is Inaccurate and Misleading.**

Plaintiffs expend much energy arguing that Prudential failed to protect the minimum benefit for thousands of class members.  They point to a spreadsheet created by Prudential for this litigation, with information derived from its record-keeping system, which reflects a zero entry in the opening account balance ("OAB") field for 9,400 class members.  Plaintiffs' wild conspiracy theories should not lead this Court astray.  Plaintiffs' accusation – that because the OAB was "missing" for thousands of individuals their minimum benefit was not be protected – derives only from a lack of understanding of the plan's operation and the record-keeping functionalities Prudential employs.

---

retire); Fitch v. Chase Manhattan Bank, 64 F. Supp. 2d 212 , 230-31 (W.D.N.Y. 1999) (finding that the employer was not liable for an incorrect calculation of benefits where it was shown that the error was not based on any motive to actively mislead the plaintiffs); Easa v. Florists' Transworld Delivery Ass'n, 5 F. Supp. 2d 522, 529-30 (E.D. Mich. 1998) (clerical error in calculating anticipated retirement benefits by actuary for pension plan was not breach of fiduciary duty).

Prudential has various procedures and checks in place to ensure the accuracy of benefit estimates and distributions and to ensure that the minimum benefit is fully protected. Pursuant to Prudential's verification procedures, before a benefit distribution is effectuated, the benefits administration staff verifies the accuracy of the benefit payment, including checking for the application of the minimum benefit. (See Defendants' Proposed Findings of Fact "DFF" No. 244; Defs' Proposed Trial Exs. 728-29). Accordingly, no concerns exists that participants who have received benefits were improperly not given the advantage of their minimum benefit, where it applied.[8]

Nevertheless, upon Plaintiffs' accusation that the OAB field was inappropriately "missing" data for certain class members, Prudential undertook an extensive investigation of the propriety of the zero entries. Prudential hired Andrew Hodges, who was familiar with Part B as a result of his work on the conversion, to complete this review, on which he spent a month and a half.[9]

Numerous explanations exist for why zero in the OAB field in the record-keeping system is both accurate and proper.[10] To date, out of approximately 10,000 entries reviewed,

---

[8]    Again, if in isolated instances Prudential committed a record-keeping error and failed to provide a participant the minimum benefit, no class-wide liability results. That individual participant would be required to exhaust his administrative remedies and "a mistake in calculating pension benefits does not constitute willful misconduct or bad faith sufficient" for liability." Gramm v. Bell Atlantic Mgmt., 983 F. Supp. 585, 593 (D.N.J. 1997).

[9]    Mr. Hodges also evaluated any class members who had a zero entry in the field representing the annuity at the time of conversion, or the social security offset, figures that also may be used to determine a participant's minimum benefit, and three other record-keeping data fields. (See DFF No. 248).

[10]   As explained in the Prudential 30(b)(6) deposition of Mr. Hodges this month, these include that, inter alia: (1) the participant did not have sufficient credited service under the old pension plan to accrue an OAB; (2) the participant took a payment from the plan and his OAB was "zeroed out" in the record-keeping system; (3) the participant took a cash payout of his entire Part A benefit; (4) the participant was hired after January 1, 2001 and therefore did not have his Part A benefit converted to an OAB; and (5) the participants left CIGNA in a nonvested status. (See DFF No. 250).

Mr. Hodges has confirmed that for approximately 9,700, the "zero OAB" entries were proper because the participant did not have, and should not have had, an opening account balance. For a number of participants, Mr. Hodges' analysis did not reveal a rationale for the zero OAB field, and in those instances Prudential collected any required information from CIGNA and calculated the OABs.[11] Most importantly, because the participants whose OAB was corrected have not (yet) requested a benefits distribution, no harm resulted from Prudential's correction of the OAB data from its record-keeping for any individuals.

B. **No Class Claim Exists For Failure to Provide The Plan's Free 30% Or The Relative Value Of Benefit Options.**

As explained more fully in Defendants' Trial Brief, Plaintiffs' suggestion that Defendants violated the anti-cutback rule by failing to make certain disclosures regarding relative value and minimum benefits is nonsensical, since Section 204(g) refers to plan amendments not disclosures about employee benefit matters. (See Defs' Trial Brief at 40-42). The Plan Administrator notified participants about each benefit form available to them, the amount of the benefit, and when and how that benefit is payable. Although not specifically designated on the form as a minimum benefit under Section 1.1(c) or 7.3 of Part B, the minimum benefits were included among those benefit options. The Plan Administrator's disclosures complied with applicable requirements at the time.[12]

---

[11]  Of the approximately 300 class members for whom further review was required, 111 required additional information from CIGNA to validate the social security offset or employment history. For the remaining 188, Prudential collected and/or calculated missing information, and all record-keeping errors have been resolved before the participant elected a benefit. (See DFF No. 251; Defs' Proposed Trial Ex. 724).

[12]  Contrary to Plaintiffs' suggestion, the Treasury regulations that Plaintiffs cite, (see Pls' Trial Brief at 64), do not require that a plan automatically provide a participant with every benefit option that might be available to him at any point in time in the future. Indeed, there are infinite combinations of benefit commencement dates (e.g., age 54 and 10 months, age 54 and 11 months, age 55, and 55 and 1 month) and benefit forms (e.g., lump sum, single life annuity, joint and survivor annuity, joint and survivor annuity with lump sum) available under

continued . . .

As to Plaintiffs' allegations that the Free 30% was not preserved, Defendants admit that Broderick improperly did not receive the Free 30% until she exhausted her claim with the plan administrator and the problem was corrected.  In response to Broderick's complaint, Prudential also reviewed its data to ensure that all class members who had initiated a pension payment and were entitled to the Free 30% (i.e., former Tier 1 participants who had a spouse at the time of the benefit commencement), were properly provided the Free 30%.

Of the more than 16,500 participants who were vested terminated and had initiated payments, Prudential determined that only twelve (12) of those participants, Ms. Broderick, improperly did not receive the benefit of the Free 30%, although they were entitled to such benefit upon their payout.[13]  (See DFF No. 256).  Prudential accordingly is in the process of contacting these participants and issuing a payment reflecting the difference between the lump sum payment they received and that which they were owed by virtue of the Free 30% benefit.  (See id. at No. 258).  Moreover, Prudential has put into place detailed processes for its benefits specialists to follow to assure that the Free 30% is appropriately applied in the future.  (See id. at

_____

Part B, and, indeed, available under most plans.  In accordance with Treas. Reg. § 1.401(a)-20, the participant was informed of the options available to him at that time, and could receive other explanations upon request or through the financial planning tools made available.  The Treasury Regulations which now require further disclosures, such as "a meaningful comparison of the relative economic values of the two forms of benefit without the participant having to make calculations using interest or mortality assumptions" only became applicable as of February 1, 2006, and Prudential has taken steps to comply with the new requirements on disclosures.  See 26 C.F.R. § 1.417(a)(3)-1(f) ("Except as otherwise provided in this paragraph (f), this section applies to a QJSA explanation with respect to any distribution with an annuity starting date that is on or after February 1, 2006.").  (See Defs' Proposed Trial Ex. 727).

[13]    Prudential conducted a detailed analysis to determine the scope of the issue, evaluating whether there was a basis for non-application of the Free 30% for each participant who was terminated vested and received a payment since 1998.  (See DFF No. 254; Defs' Proposed Trial Exhibit 722).  The proper reasons for not being eligible for Free 30% included, inter alia, that the participant:  was a prior Tier 2 participant; was a prior employee of Healthsource/Provident (did not begin participating in Plan until 1999), Teledrug/Trilog (did not begin participating in Plan until 2001, no prior DB pension plan), Intracorp (had no prior CIGNA benefit), or Unum- (no prior DB pension plan), or was less than age 55 upon termination.  Id.

No. 259). Thus, no concern exists that any class members but these ten (10) individuals were, or will be, deprived of the Free 30%, and Plaintiffs' claim for relief should be rejected.

      **C.**    **No Class Representatives or Class Members Have Standing To Pursue Plaintiffs' Minimum Benefit, Free 30% or Relative Value Claims.**

Even if Plaintiffs' claims regarding the minimum benefit, Free 30% or relative value disclosures had any merit, they still cannot be litigated in the upcoming trial since there is not a Class Representative who has standing to pursue these claims.

      **1.**    **None of the Named Plaintiffs Have Standing To Assert A Claim Regarding the Minimum Benefit, Free 30 or Relative Value Disclosures.**

The Court never considered whether the named plaintiffs were appropriate class representatives for, or whether their claims were typical of, the claims of absent class members vis-à-vis Count 5, because Plaintiffs filed their Third Amended Complaint adding Count 5 over two years after the Class was certified. See Fed. R. Civ. P. 23(c)(1)(B). Indeed, none of the named plaintiffs have standing to assert an issue regarding the minimum benefit, Free 30% or relative value disclosures and accordingly none may serve as a Class Representative for purposes of these claims. See O'Shea v. Littleton, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendant, none may seek relief on behalf of himself or any other member of the class.") (emphasis added).

Specifically, as to Plaintiff Amara, while Plaintiffs allege she was not told about her minimum benefit on two occasions, because Ms. Amara was rehired before December 21, 1998, CIGNA voluntarily recalculated her benefits to her satisfaction in accordance with the Depenbrock decision. (See Pls' Trial Brief at 58 n.19, 61; Pls' Proposed Findings of Fact No. 122). Ms. Amara is receiving benefits as if she was in Part A, and therefore any written

- 16 -

estimates or distribution forms related to Part B had no bearing on the benefits to which she is entitled. Ms. Amara, like all other participants whose benefits have been recalculated as a result of the <u>Depenbrock</u> decision, accordingly lacks standing on these claims.

Plaintiff Broderick, a Tier 1 rehire who was eligible for the Free 30%, was erroneously not offered the Free 30% when she initiated benefit payments in 2003. As noted above, CIGNA recalculated Ms. Broderick's benefits to provide the Free 30%. She is now receiving all benefits to which she is due, and therefore lacks standing on these claims. Similarly, Plaintiffs have never asserted that Plaintiff Glanz, a Tier 1 employee who was continuously employed from 1988 until June 2004, suffered any harm as a result of any disclosures associated with benefit option forms.

Because even if Plaintiffs' claims in Count 5 are appropriate for class-wide consideration the named plaintiffs lack standing to pursue these claims, the Court must dismiss these claims.

> **2.     The Group Of Participants Who May In the Future Have Standing To Pursue Minimum Benefit, Relative Value or Free 30% Claims Is Undefineable And Therefore Class Consideration Is Inappropriate.**

Plaintiffs may argue that the Court nevertheless should permit them to pursue these claims in Count 5 on behalf of those class members who have not yet initiated a pension payment and accordingly may face such issues in the future. Such groups of participants–undefined and undefineable at the present time–similarly lack standing.

Plaintiffs would not dispute that the minimum benefit and Free 30% do not apply to the entire class. Indeed, for many participants, the minimum benefit is irrelevant because the participants' account balances exceed the minimum benefit value at the time of benefit commencement. Likewise, the applicability of the Free 30% or relative value disclosures to individual class members is necessarily unknown at the present. For example, as to the Free

30%, most Part B participants were never eligible even under the prior Plan, so they are not entitled to it under Part B. (DFF No. 132). Moreover, the Free 30% is irrelevant for all participants except those who elect a benefit in annuity form where the annuity with the Free 30% exceeds the value of the participant's account balance. Additionally, because the Free 30% only is applicable where the participant has a surviving spouse at benefit commencement, its application only may be evaluated at the time of benefit commencement.

Because the participants who might be affected by these claims cannot be identified at the present time, their claims are not ripe for this Court's determination. "[T]he ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and never may occur, from those cases that are appropriate for federal court action." Erwin Chemerinsky, Federal Jurisdiction, Section 2.4 (3d ed. 1999); see Abbott Laboratories v. Gardiner, 387 U.S. 136, 148 (1967). "The purpose of the ripeness requirement is to ensure that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution" by "prevent[ing] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur. . ." Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002). The lack of ripeness is a jurisdictional defect that bars this Court from adjudicating these claims. Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998) (holding "[b]ecause the ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction, the court can

raise it sua sponte, and, indeed, can do so for the first time on appeal.") (internal citations omitted)).[14]

Not surprisingly given the lack of ripe claims, no subclass of the narrow band of class members affected by these claims by has been identified, let alone certified. The individualized nature of the application of the minimum benefit and Free 30% further highlights that these claims are inappropriate for class review.

### 3. Participants Who Have Initiated A Pension Payment Lack Standing To Pursue Minimum Benefit, Relative Value or Free 30% Claims.

Plaintiffs' Reply suggests that other participants who initiated a benefit distribution believe they received inadequate disclosures of the relative value of their benefit options (see Pls' Reply at 73), but none of those individuals is a Class representative, named plaintiff, or even testifying class member in this suit. (See Pls' Reply at 73). The Court should preclude Plaintiffs from inundating the upcoming bench trial with evidence concerning random class members' complaints regarding plan administration.

Moreover, these other class members lack standing to pursue these claims in this suit. If any believe they should be permitted to re-elect their benefits in a different form, he must file a claim with the Plan Administrator. Absent such a claim and appeal to the Plan Administrator, this Court lacks jurisdiction to consider these class members' personal circumstances and individual claims. Peterson v. Cont'l Cas. Co., 282 F.3d 112, 118 (2d Cir. 2002) (holding that

---

[14] C.f. Lugo v. Employees Ret. Fund of Illumination Prod's Indus., 529 F.2d 251, 258 (2d Cir. 1976) (holding 53-year-old plaintiff's claim for retirement benefits, under plan which required that participants reach age 60 and work at least 90 months in prior ten years, "not ripe for adjudication" because the plaintiff's claim is "at best a claim that when, seven years from now, plaintiff is old enough to be entitled to apply for such benefits, the trustees will deny his application on the basis of the 90/10 rule, which he claims is illegal."). Moreover, there is no "hardship to the parties of withholding court consideration," given that the administrative review process is in place to evaluate any claims by participants that they were improperly denied the full benefits to which they were due. See United States v. Quinones, 313 F.3d 49, 58 (2d Cir. 2002).

"[b]y issuing a decision on permanent benefits [before the plaintiff filed a claim for benefits with the plan administrator], the District Court determined a question over which it had no jurisdiction").  (See also Defs' Trial Brief at 46, n. 29).  Of course, the fact that each participant must exhaust his concern to the plan administrator highlights more fundamentally the problem that an analysis of the alleged harm from inadequate disclosures requires an individualized inquiry inappropriate for class-wide consideration.

Moreover, Prudential has corrected any mistakes in which the Free 30% was omitted or minimum benefit not applied in error.  Because these participants already received a payment correcting this error, the claims are moot and cannot be disposed of in the upcoming trial.  Where Prudential has shored up its procedures to prevent any errors in the future, and where no intention that these problems will recur can be inferred from past practices or comments, the dispute is deemed moot.  City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283 (1982); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 190 (2000) (holding that the threshold of mootness is not that allegedly wrongful behavior is absolutely shown to never possibly recur, but that it is absolutely clear that the behavior is not reasonably expected to recur).[15]

---

[15]     For example, in Adams v. Bowater Inc., 313 F.3d 611 (1st Cir. 2002), the court found that a claim regarding a plan amendment that was subsequently deleted was not moot, relying specifically on the fact that the plan administrator "has been persistently unwilling either to admit that its amendment was unlawful or to say that it will not be reintroduced."  Id. at 614.  The court explained:

> [The administrator] could easily have said on the record that it would not in the future reintroduce for [certain] workers the substance of the challenged amendment.  If this had been done without hesitation in the district court, this almost certainly would have persuaded us that the quarrel was moot.  Yet, even at oral argument on this appeal, [the plan administrator]'s counsel said he could not give such a commitment to the plaintiffs.

Id.  Here, in contrast, Prudential and CIGNA have admitted that the failure to provide the Free 30% to twelve (12) participants was error, and also have evidenced a clear intent to provide a recalculation of all participants

continued . . .

- 20 -

Finally, even if the claims of participants who made an election years ago and already received a payment were not moot, the statute of limitations would defeat their claims. Whether the statute of limitations barred a given participant's claim, however, would of course depend upon *when* the participant collected benefits, another analysis which highlights the highly individualized nature of the issue, inappropriate for class consideration in this trial.

## IV.    CIGNA'S SOLICITATION OF RELEASES FROM THOUSANDS OF CLASS MEMBERS DID NOT VIOLATE ANY ETHICAL RULES OR RULE 23.

As noted in Defendants' Trial Brief, the claims of all three named plaintiffs, a testifying class member (Curlee), and thousands of other class members in this suit are barred entirely by an Agreement and Release ("Release") each signed in exchange for the payment of severance. (See Defs' Trial Brief at 79-81; DFF No. 235-42, 270). In their Reply, Plaintiffs suggest that CIGNA and its counsel violated Rule 23 by soliciting releases from class members, and therefore the Court should not enforce the releases. This argument is factually and legally incorrect.

Plaintiffs' maintain that "Defendants' attorneys 'may only communicate through class counsel with members on matters regarding the litigation." (Pls' Reply at 79). While indeed state attorney ethics rules might prevent CIGNA's in-house attorneys or outside counsel from speaking directly with class members about this suit, no evidence even remotely suggests that any lawyer engaged in such conduct. Rather, CIGNA provided severance payments to thousands of class members who were laid off in exchange for a release that was presented by CIGNA's human resources professionals in the ordinary course of business. (See DFF No. 271). The depositions of the Named plaintiffs and the testifying class member confirm that none of them

---

allegedly "affected" by the Depenbrock litigation. Accordingly, Adams is clearly distinguishable from these claims, which are moot.

had discussions regarding the releases with attorneys representing CIGNA in which they were not represented by counsel.[16] (See id. No. 272). No ethical issues exist concerning CIGNA's solicitation of releases that waived the claims pursued in this litigation.

Moreover, Rule 23's prerequisites to class action settlements are not at stake here, because CIGNA has not sought a class-wide settlement. Rather, as noted above, in the ordinary course of reductions in force, CIGNA solicited releases from various individuals who are class members in this suit. The 2003 changes to Rule 23 requiring that a court must review and approve a settlement in a class action apply only to class-wide settlements of a certified class. Fed.R.Civ. P. 23(e)(1)(a) ("The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class."). As the Advisory Committee Notes to the 2003 changes to Rule 23(e) explained:

> Rule 23(e)(1)(A) resolves the ambiguity in former Rule 23(e)'s reference to dismissal or compromise of "a class action." That language could be--and at times was--read to require court approval of settlements with putative class representatives that resolved only individual claims. See Manual for Complex Litigation Third, § 30.41. The new rule requires approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise.

Fed. R. Civ. P. 23 advisory committee's notes.

Moreover, the fact that Rule 23's provisions regarding class notice of a settlement specifically do not apply to the settlement of individual class representatives' claims further supports the notion that individual putative or certified class members may release their claims. Fed. R. Civ. P. 23(e)(1)(B) ("The court must direct notice in a reasonable manner to all class

---

[16]     Defendants also understand that the remainder of the class members who signed releases did not engage in any discussion with counsel for CIGNA regarding the release, without their own counsel present.

members who would be bound by a proposed settlement, voluntary dismissal, or compromise.").

As the Advisory Committee Notes state:

> Subdivision (e)(1)(B) carries forward the notice requirement of present Rule 23(e) when the settlement binds the class through claim or issue preclusion; <u>notice is not required when the settlement binds only the individual class representatives</u>. Notice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed simultaneously.

Fed. R. Civ. P. 23 advisory committee's notes (emphasis added).  Accordingly, Rule 23 does not bar the release of claims by individual members of the class.[17]

## V.     PLAINTIFF'S <u>DEPENBROCK</u> ALLEGATIONS ARE IRRELEVANT BECAUSE THE CLASS REPRESENTATIVES LACK STANDING AND CIGNA IS VOLUNTARILY RECALCULATING ALL PARTICIPANTS SIMILARLY-SITUATED TO JOHN DEPENBROCK.

Relying on loose logic, Plaintiffs maintain that in the upcoming trial, this Court should enforce the judgment entered by the United States District Court for the Eastern District of Pennsylvania in <u>Depenbrock</u>.  (<u>See</u> Pls' Reply at 86-88).  Even apart from the fact that the <u>Depenbrock</u> court itself did not even require the relief Plaintiffs ask this Court to impose, (<u>see</u> Defs' Trial Brief at 81-82), the Court should not waste another minute on this issue which is now moot.

---

[17]   Plaintiffs also suggest that this Court should invalidate the releases based on Rule 23, citing the <u>Engers v. AT&T</u> district court's injunction requiring that releases carve out the cash balance litigation, in which the same plaintiffs' counsel represented the plaintiff class.  (<u>See</u> Pls' Reply at 85).  Here, however, since at least March of 2004, Plaintiffs' counsel has been aware of CIGNA's solicitation of releases of laid-off employees, including class members, and yet unlike in <u>Engers</u>, Plaintiffs' counsel has never moved the Court for an injunction concerning CIGNA's solicitation of releases in the ordinary course of business.  (<u>Id.</u> at 80).  Moreover, the Named plaintiffs, the testifying class member, and the thousands of other class members who signed releases received the benefit of their bargain — valuable severance pay in exchange for a broad release.  If the Court was inclined to invalidate the releases signed, these class members would be required to tender back the consideration received in exchange for the release.

Plaintiffs request that CIGNA be ordered immediately to complete the recalculations for all class members who, like John Depenbrock, were hired between January 1, 1998 and December 21, 1998. They maintain that only 14 recalculations have been implemented, an assertion that is factually inaccurate. Despite that neither the terms of the Plan, nor the Court's order in <u>Depenbrock</u> **required** CIGNA to recalculate the benefits of the 206 participants similarly-situated to John Depenbrock, CIGNA has voluntarily undertaken to complete those recalculations. (<u>See</u> DFF No. 276). To that end, CIGNA and Prudential formed an agreement for Prudential to complete the recalculations, and sent notification to the participants of such recalculations, a process which is now nearly complete.[18] (<u>See</u> DFF No. 277; Defs' Proposed Trial Ex. 718). Prudential is in the process of recalculating the benefits for all of those participants similarly-situated to the plaintiff John Depenbrock, namely those participants rehired between January 1, 1998 and December 21, 1998, and notifying those participants. (<u>See</u> DFF No. 278; Defs' Proposed Trial Ex. 719-21). In other words, Plaintiffs already have obtained the relief they are asking this Court to impose in the upcoming trial.

Thus, because CIGNA voluntarily is recalculating the so-called "affected" participants' benefits and these recalculations have been sent to the participants (or will be sent in the next week), there is no likelihood that the alleged harm could recur and Plaintiffs' claim requesting recalculations is moot. <u>See</u> supra at 20. Even if some recalculations were not completed, or if upon receipt of the recalculation, a class member is not satisfied, this Court still lacks jurisdiction to review those issues. First, no Class Representative exists who has standing to pursue claims

---

[18]   As explained in the Prudential 30(b)(6) deposition of Mark Lynch, the process of recalculation for each participant was complicated and required various assumptions to be drawn. (<u>See also</u> DFF No. 277; Defs' Proposed Trial Ex. 718) (letter agreement between Prudential and CIGNA for the recalculation of participants <u>not</u> pursuant to the terms of the plan).

for <u>Depenbrock</u> recalculations on behalf of class members.  Each of the Named plaintiffs either was not impacted by the <u>Depenbrock</u> decision at all (Broderick and Glanz), or already has been recalculated to her satisfaction (Amara).  Without a class representative, the claims must be dismissed.  <u>See</u> <u>supra</u> at 16.  Moreover, if a class member wishes to dispute the recalculation, she may complain to the Plan Administrator, John Arko, regarding the benefits provided.  As noted above, a participant not satisfied with a benefits determination must exhaust her remedies with the plan administrator.  <u>See supra</u> at 12.

In short, Defendants are in full compliance with the <u>Depenbrock</u> decision and Plaintiffs have no standing to pursue this issue.  Plaintiffs' invitation for the Court to become involved in the protracted but completed <u>Depenbrock</u> litigation is unnecessary, inappropriate and should be denied.[19]

---

[19]    The only possible relation of the <u>Depenbrock</u> recalculations on this suit is that recalculated participants may not be proper class members, as defined by this Court.

VI.     **CONCLUSION**

For the reasons set forth above, and those set forth in Defendants' Trial Brief, there exists no factual or legal basis for Plaintiffs' claims.  At the conclusion of trial, judgment should therefore be entered in favor of Defendants on all counts of the Complaint.


Dated:  August 30, 2006                    **MORGAN, LEWIS & BOCKIUS LLP**

                                           By:  /s/ Joseph J. Costello_____
                                           Joseph J. Costello
                                           Jeremy P. Blumenfeld
                                           Jamie M. Kohen
                                           *Admitted pro hac vice*
                                           1701 Market Street
                                           Philadelphia, Pennsylvania  19103-2921
                                           (215) 963-5295/5258/5472
                                           (215) 963-5001 (fax)
                                           jcostello@morganlewis.com
                                           jkohen@morganlewis.com

                                           **ROBINSON & COLE**
                                           James A. Wade (CT # 00086)
                                           280 Trumbull Street
                                           Hartford, Connecticut  06103
                                           (860) 275-8270
                                           (860) 275-8299 (fax)
                                           jwade@rc.com


                                           *Attorneys for Defendants*
                                           *CIGNA Corporation and CIGNA Pension Plan*

# Exhibit A

**Excerpts from Statements Regarding Hybrid Plans During**
**August 3, 2006 Senate Debate on H. R. 4, The Pension Protection Act of 2006**

**KENNEDY**:

Our legislation also addresses new types of pensions, like "hybrid" pensions, which play a growing role in our retirement system. These pensions provide a guaranteed pension, and the benefits are attractive to younger workers and to others, such as parents caring for children, who move in and out of the workforce. Older workers, however, can lose out when their companies switch to these plans because they lose a large portion of the benefits they were promised. Some companies have been taking advantage of the conversion process to eliminate early retirement benefits that workers have already earned.

This legislation gives companies clear guidance about the future legal status of these plans, but allows workers who have been harmed in the past to continue to pursue their rights. And it contains clear  protections against such "wearaway" or erosion of older workers' benefits. The bill also makes these pensions more portable, so that they better serve a mobile workforce.

**ENZI:**

The legality of cash balance and other hybrid pension plan designs is clarified on a prospective basis under ERISA, the Internal Revenue Code, and the Age Discrimination in Employment Act, thus ending legal challenges that have driven hundreds of quality employers out of the defined benefit system. We have always felt that these plans are valid under the Code, ERISA and the ADEA.

******

One of my highest priorities for pension reform is clarification of the legal status of hybrid pension plans. Since late in 1998 when sensational stories about these plans first hit the newspapers, the Congress has been struggling over how to respond. I have never doubted the legality of hybrid plans. While some conversion practices may have been questioned, the plans are entirely valid.  Hybrid plans have been criticized on the theory that the design was per se discriminatory. The theory suggests that the hypothetical individual account plan design unlawfully favors younger workers over older ones because younger workers could accrue interest on their account over a longer period of time than older workers. This theory amounts to a declaration that the "time-value of money" is age discriminatory.

Not surprisingly, given the confused logic of stating that compound interest in a pension plan is age discriminatory, most courts that have reviewed the age appropriateness of hybrid plan designs have found them to be legitimate. Indeed, the first federal court to review the question stated "Plaintiffs' proposed interpretation would produce strange results totally at odds with the

1

intended goal of the OBRA 1986 pension age discrimination provisions (Eaton v. Onan (S.D. N.Y. 2000))." The case law validating the hybrid design includes three federal court decisions issued since a 2003 rogue decision in the Southern District of Illinois. These decisions explicitly reject that court's reasoning and conclusion (Tootle v. ARINC (D. Md. 2004), Register v. PNC (E.D. Pa. 2005) and Hirt v. Equitable (S.D. N. Y. 2006) and hold the hybrid pension design to be legal. Consistent with these numerous federal court decisions, the Internal Revenue Service (IRS) for 15 years issued approvals for individual cash balance plans and the Treasury Department and IRS repeatedly issued guidance as to the validity of the cash balance design. It is not time for the IRS' self-imposed moratorium on determination letters for sponsors of these plans to end.

For purposes of applying the age discrimination test, the bill permits a plan to express an employee's accrued benefit "under the terms of the plan" as an account balance or current value of the accumulated percentage of the employee's final average compensation.This rule was intended to limit, for purposes of age discrimination testing, the use of an account balance to cash balance plans and the use of a current value to pension equity plans. However, the phrase "under the terms of the plan" could create the impression that the rule applies only to cash balance and pension equity plans that define in the plan document the term "accrued benefit" in this way.

Many cash balance and pension equity plans define "accrued benefit" as an age-65 annuity, even though that annuity is determined by reference to an account balance or current value. In many cases, this definition has been required by the Internal Revenue Service. It is important to clarify that Congress does not intend to require a plan document to include a specific definition of the term "accrued benefit" to apply the standard set forth in this legislation.

This bill sets forth a test for age discrimination in defined benefit pension plans that compares an employee's accrued benefit with that of any similarly situated younger employee. For this purpose, an employee's accrued benefit may be expressed as the current balance in a hypothetical account for any plan that determines the employee's accrued benefit (or any portion thereof) by reference to a hypothetical account, such as a cash balance plan. Similarly, for this purpose, an employee's accrued benefit may be expressed as a current value equal to an accumulated percentage of the employee's final average pay for any plan that determines an employee's accrued benefit (or any portion thereof) by reference to such current value, such as a pension equity plan.

But the bill does not elevate form over substance. How a plan expresses the accrued benefit for purposes of the age discrimination rules is not contingent upon how the plan document defines the term "accrued benefit." For example, a cash balance plan may, for purposes of the age discrimination rules, express the accrued benefit as the current balance of the hypothetical account determined under the terms of the plan, even if the plan defines the term "accrued benefit" in a different form, such as an annuity commencing at normal retirement age that is based on the hypothetical account.

Similarly, a pension equity plan may express the accrued benefit as a current value equal to an accumulated percentage of the employee's final average pay as determined under the terms of the

2

plan, even if the plan defines the term "accrued benefit" in a different form, such as an annuity commencing at normal retirement age that is based on that current value. This flexibility is important because pension plans will often define the "accrued benefit" in different fashions. For example, the IRS has frequently insisted that plans define the term "accrued benefit" as "an annuity commencing at normal retirement age", even though the annuity is determined by reference to a hypothetical account or a current value equal to an accumulated percentage of an employee's final average pay.

Any hybrid plan including a cash balance or pension equity plan may also apply the age discrimination test by expressing the employee's accrued benefit as an annuity beginning at normal retirement age (or at the employee's current age, if later), as determined under the terms of the plan. If a cash balance or pension equity plan were to do so, it likely would rely on the indexing rules elsewhere in section 701 to satisfy the age discrimination test.

The pension reform bill also provides new specifications for hybrid plan conversions. These are entirely new requirements and they have been worked out among the parties to these discussions. The rule specifies that for conversions, plans should follow an "A + B" formula. This means that the benefit accrued to date under the old formula, that was in effect prior to the conversion, must be added to the benefit under the new formula beginning on the date the conversion takes effect.

Under this A + B formula, any early retirement subsidy that was accrued up to the date of the conversion would be preserved in the benefit of the participant. This early retirement benefit would be payable only if the participant earned the requisite number of years of service to entitle him or her to the benefit subsidy. The participant would not be entitled to any additional amount of subsidy, but only the amount earned to-date could be paid out and only assuming he or she worked the number of years required under the plan to earn it. The new rule does not require a plan to pay an early retirement subsidy in lump sum unless the plan provides that it will do so. This is consistent with current law and practice.

The hybrid language also corrects the so-called pension whipsaw for distributions after the date of enactment. The parties to the pension discussions took the view that the position taken by the IRS in Notice 96-8 was an incorrect interpretation of present law. Many of us who were engaged in the pension reform discussions noted that Notice 96-8 was never finalized by the IRS in their regulations and we observed that the Treasury Department had been reviewing the position in Notice 96-8 for some time, but without result.

The approach taken in Notice 96-8 can actually harm many participants. Many employers have reduced the rate of interest crediting under their hybrid plans due to concerns that over the requirements of the notice. In addition to its other flaws, the approach taken in the notice provides a larger benefit to be paid to a participant who takes a distribution before normal retirement age than for a participant who waits to take his or her benefit distribution. Thus Notice 96-8 would penalize an employee who waits to take a distribution. This is a perverse result for a rule governing retirement plans.

As we developed these new rules for hybrid plans, we were cognizant that the system is voluntary and as such, it must accommodate the needs and concerns of employers and

3

employees. A viable pension system must grant plan sponsors the ability to change their plan designs on a prospective basis without undue restrictions or mandates on benefit levels.

This legislation is a clarification of the law; the action in producing this clarification should not cast any negative inference on the legality of the hybrid plans.

**BURR/ENZI COLLOQUY:**

section 701

Mr. BURR. Mr. President, I would like to ask the chairman of the Committee on Health, Education, Labor, and Pensions a question regarding how section 701 of the new bill relates to capital preservation and loss protection. Would you please explain what types of plans are subject to each of the two rules and how the rules operate?

Mr. ENZI. The capital preservation rule applies to applicable defined benefit plans, such as cash balance and pension equity plans. To illustrate how the rule operates in the case of a cash balance plan, the rule requires that the cumulative effect of all the interest credits to an employee's hypothetical account may not reduce the account balance below the sum of all the pay credits made to the account.

Mr. BURR. The bill refers to "contributions credited to the account" rather than pay credits?

Mr. ENZI. Yes. The two terms are synonymous. Since the account in a cash balance plan is hypothetical, the contributions credited to it are hypothetical also. Hypothetical contributions is merely another name for pay credits.

The second rule, the loss protection rule, applies to all defined benefit plans that use any form of benefit indexing. Thus, the second rule applies not only to cash balance and pension equity plans but also to other defined benefit plans that index benefits.

The loss prevention rule would apply in the same way as the capital preservation rule in the above example of a cash balance plan. However, because the loss prevention rule applies to a broader group of plans than just applicable defined benefit plans, the rule is written in more general terms than the capital preservation rule, which applies to a narrower universe of plans.

To illustrate how the loss protection rule operates in the case of a defined benefit plan that indexes benefits by reference to changes in the Consumer Price Index, the rule requires that the cumulative effect of such indexing may not cause a decrease in an employee's benefit below what it would have been in the absence of such indexing. Although it is very unlikely, this would occur if there were a sustained period of deflation in which the overall change in the CPI were negative rather than positive. In that extremely unlikely case, the plan could not reflect the cumulative negative change in the CPI.

4

Mr. BURR. At what point are the rules applied?

Mr. ENZI. The capital preservation and loss protection rules are intended to provide long-term protection to employees, so the determination of whether the rules are satisfied is made at the time benefits commence but not beforehand. In the case of plans that index benefits after benefits begin, the determination is made by reference to the benefit in effect at the time benefits begin.

**GREGG/ENZI COLLOQUY:**

lump sums from hybrid pension plans

Mr. GREGG. Mr. President, I would like to ask the chairman of the Committee on Health, Education, Labor, and Pensions, to clarify provisions of H.R. 4 that address the payment of lump sums from hybrid pension plans.

My first question relates to a clarification of the effective date of those provisions. As you are aware, under the so-called whipsaw method of calculating lump sums, younger workers would receive much larger lump sums than identically situated older workers.

This result is one that Congress never intended. Furthermore, the practical effect of the whipsaw calculation would be to reduce benefits for all participants, young and old, in cash balance plans. Therefore, the intent of the whipsaw provisions is to put this issue to rest. Accordingly, the provisions are effective for distributions made after the date of enactment, regardless of why they are made.

Mr. ENZI. Yes. The provisions do apply to all distributions made after the date of enactment.

Mr. GREGG. My second question relates to the definition of "market rate of return" in the whipsaw provisions. My understanding is that the term "market rate of return" is intended to allow plans to adjust benefits in ways that benefit participants. For example, a plan could provide a variable market rate of return and, in addition, protect participants by preventing the rate of return in their accounts from falling below a reasonable, minimum level without having to reduce the variable market rate of return. My further understanding is that the term "market rate of return" is intended to include a fixed rate of interest that is no greater than the yield on long-term, investment-grade corporate bonds at any time during a reasonable period before the rate is first applied under the plan; is this correct?

Mr. ENZI. Yes, it is.

**BAUCUS:**

5

Second, let me address cash balance plans. We have been struggling with the difficult problems of a new form of defined benefit plan called a "cash balance plan" for many years. Most pension experts recognize the cash balance design and other hybrid plan designs as the future of the defined benefit system. And that future is in limbo until we provide certainty as to the governing rules. Yet there is a real concern about age discrimination and what happens to workers who get caught up in the switch from a traditional plan to a cash balance plan.

This bill once again strikes a balance. It is a balance that is not likely to make anyone completely happy. We have dealt with the law going forward. We intend no inference to what the rules were prior to enactment. We will leave the past to the courts.

But in the future, employers and workers will know the guiding principles. I expect that as a result, we will see new life in the cash balance world. And we also make sure that workers are protected.

6