**Amara v. CIGNA, Case No. 01-2361 (MRK)**

# EXHIBIT 217

**Gerald T. Meyn**
Vice President
Employee Benefits & Health Management




December 4, 1998

Routing TL17A
Two Liberty Place
Philadelphia PA 19192
Telephone 215.761.2729
Facsimile 215.761.5524
GERALD.MEYN@CIGNA.COM

Dear CIGNA Employee:

You may have seen the article from the Wall Street Journal (Friday, December 4) about "cash balance" pension plans. The writer states that these plans are saving large companies millions of dollars at the expense of older workers' benefits.

As you know, CIGNA introduced a new account balance plan, which is a type of "cash balance" plan, on January 1, 1998. Let me restate our objectives for introducing the new CIGNA Pension Plan, which are to:

- deliver adequate retirement income to CIGNA employees,
- improve the competitiveness of our benefits program and thus our ability to attract and retain top talent,
- meet the changing needs of a more mobile employee workforce, and
- provide retirement benefits in a form that people can understand.

CIGNA has not reduced the overall amount it contributes for retirement benefits by introducing the new Plan, and the Plan is not designed to save money. Further, those employees entering the career stage in which the old Pension Plan would provide the highest growth in benefits remained in the old Plan. And others nearing that stage were given a special conversion formula that boosted their opening account balances. CIGNA wants to ensure that older, longer-service employees receive fair and adequate benefits at retirement.

CIGNA's Retirement Program, which includes both the Pension Plan and the 401(k) Plan, is an important part of the company's commitment to helping you build a significant source of income for your retirement years.

I have attached a Fact Sheet and Questions and Answers. For more information, you may also:

- Access the intranet, CIGNA Central, at: http://home.cigna.com/cigandu/benefits/pensQA.html.
- Refer to Section H of your Signature Benefits binder. A summary plan description insert of the new Pension Plan was recently distributed to all eligible employees.
- Call Signature Benefits Services at Network 761.3539. Benefits Counselors are available Monday through Friday, 8:00am to 5:00pm Eastern time.

Sincerely,

Gerald T. Meyn
Vice President, Employee Benefits & Health Management

# Pension Plan Q&As

**Q. What is a "cash balance" Pension Plan?**
A. "Cash balance" is a generic term for a relatively new type of pension plan. We more accurately refer to our "cash balance" pension plan as an "account balance" plan. With this type of plan, a specific amount is credited to a pension account for you periodically – similar to a savings plan. The best part is CIGNA does the saving for you. You make no contributions of your own to the Plan. As you age, company service and pay increase, the dollar amounts credited to your account increase as well.

You receive quarterly statements of your Pension Plan account balance so you can see that amount continue to grow every year you are with CIGNA. Once you have five years of service, you'll be eligible to receive pension benefits when you leave – that is, you'll be vested in your plan account.

**Q. Why did CIGNA change the retirement program?**
A. There are several reasons for the change:
*We wanted to improve the competitiveness of our benefits program and thus our ability to attract and retain top talent.* The enhancements to the plans make our retirement program more competitive with those offered by other companies in our industry. Many companies already have moved to account balance retirement plans, and a large number of others are headed in that direction. The changes help us attract and retain employees in a marketplace that is getting more and more competitive.

*We wanted to meet the changing needs of a more mobile employee workforce.* The new Pension Plan provides more portable retirement benefits. If you leave the company before retirement you can take your benefits with you (as long as you are vested after five years). In addition, benefits will grow faster during the early part of your career. This helps you earn a fair benefit from the plan, whether you work here five years or 20.

*We wanted to provide retirement benefits in a form that people can understand.* The new Pension Plan is far easier to understand than the old Pension Plan. Just as important, it coordinates well with the 401(k) Plan, so that you can easily understand your total retirement package, monitor its growth and plan for your future financial security.

**Q. How much money is CIGNA saving with these changes?**
A. None. CIGNA has *not* reduced the overall amount it contributes for retirement benefits, nor has the new program been designed to save money. The company had a different set of objectives, including competitiveness, flexibility and simplicity.

**Q. Will my benefit be better under the new Pension Plan?**
A. The new Pension Plan is different from the old Pension Plan, so exact comparisons of benefits that cover all possible outcomes are difficult. Generally, the new Pension Plan, compared with the old Pension Plan, tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees.

Of course, other features of the new Plan also add to your benefit value. The lump sum distribution option can be very valuable, since it allows you to move your benefits into other tax-deferred investments after you retire or leave CIGNA. Also, because the new Pension Plan works like a savings plan, with contributions credited to an account, you should find it easier to understand. You now have two plans that are account-based, enabling you to track your retirement benefits by looking at your statements. As a result, you will see the growth in your total retirement benefits from CIGNA every year and will be able to update your financial plans accordingly.

**Q. Did all CIGNA employees change to the cash balance plan?**
No. Employees who were hired prior to 1989, who do not work for a healthplan company in the CIGNA HealthCare Division, and whose age and service total at least 45 years, remained in the old CIGNA Pension Plan rather than transferring to the cash balance plan. These long-service employees are about to enter the period of their careers when the old CIGNA Pension Plan provides most of its benefits. Moving these employees from the old Plan to the new Plan could have significantly reduced the future value of their benefits. To prevent this from happening, they remained in the Old Pension Plan. There are no changes to the old Plan for employees who stayed in it. The benefit formula, retirement provisions and payment options all remain the same.

**Q. Are longer-service employees being treated fairly in the new Plan?**
A. Those longer-service employees whose age and credited service with CIGNA totaled 55 or more on January 1, 1998, were allowed two special procedures in calculating an opening balance: 1) the opening balance was based on a present value of an age 62 early retirement benefit, rather than an age 65 normal retirement benefit, and 2) a lower interest rate was used in making the present value calculation (one percentage point less than the standard rate – for instance, 5.5%, if the standard rate is 6.5%). The lower interest rate increases the size of the opening balance.

These special procedures were adopted because most employees in this age and service category will have fewer years to accumulate benefits under the new Pension Plan. CIGNA wants to ensure that these older, longer-service employees receive fair and adequate benefits at retirement.

**Q. Do I have to contribute to the Pension Plan?**
A. No. CIGNA makes all contributions to the new Plan, as it did with the old Plan. If you want to save for retirement, while earning additional company matching contributions, however, the 401(k) Plan allows you to contribute up to 16 percent of your pay through payroll deductions (subject to certain limits if you are a highly compensated employee).

**Q. How do I earn benefits under the new Pension Plan?**
A. Each year, you earn *benefit credits* under the new Plan based on your age, eligible earnings and service with the company. These benefit credits are allocated to your plan account and range from 3 percent to 8.5 percent of your eligible earnings. The company also credits your account with interest credits. The annual interest rate varies from 4.5 percent to 9 percent, depending on the recent five-year Treasury Bond yields.

**Q. The new Pension Plan looks a lot like the 401(k) Plan. Why didn't CIGNA just put the money into the 401(k) Plan?**

A. There are some similarities between the Pension Plan and the 401(k) Plan, but there also are some important differences. A key difference between the Plans is that the benefits you earn under the new Pension Plan are more secure. Unlike your 401(k) Plan, you cannot have and investment loss in your Pension Plan account. Also, Pension Plan benefits are insured (up to certain amounts) by the government-sponsored Pension Benefit Guaranty Corporation. Providing you with a secure retirement benefit at company expense is an essential part of the total compensation package we offer in return for your work contributions. A plan like the 401(k) Plan provides many benefits as well, including the opportunity for larger investment gains. But your 401(k) account balance also is exposed to investment risk and is not guaranteed by either the company or the government.

**Q. In the 401(k) Plan, I can choose how to invest my funds. Why can't I do the same in the new Pension Plan?**

A. Your Pension Plan account is a bookkeeping account only. The benefit and interest credits added to it measure the amount owed to you by the plan but do not represent actual assets set aside to fund your benefit. Instead, all Plan benefits are paid out of a single pension fund, which is managed and invested by the pension trustee. Funding your benefit in this way is more secure for two reasons. First, CIGNA bears all the investment responsibility and investment risk. You cannot have and investment loss as you might in a plan like your 401(k), where assets are added to an account that you manage and invest yourself. Second, this funding method allows Pension Plan benefits to be insured (up to certain amounts) by the Pension Benefit Guaranty Corporation. This creates additional security for your benefits, which could not be realized in a 401(k) plan.

n fund-
iry.
.ccess to
subject.
id a pre-
ing that
iry. The
.esignate
.tee must
.ings will
.te is now
ge A20)
the full
e more
ie GOP
ion to a
ators.

) change
s, saying
.rks. The
ked to the
nge could
) jets can
B2)

.tary elec-
ng opposi-
ms.
.esi-
.ident pro-
.bible step
ge A17)

deal may
y-General
th Libya's
the issue.
since 1992
. sought in
etliner.

eight eth-
cross into
deadliest
cease-fire
four other
the restive
o days.
protested
S. soldiers
t act," and
ration with
slav Krstic,
rial for his
renica.

e killed 28
others are
vestigators

INSIDE

# WEEKEND JOURNAL.

—Digital Hell—
*Walk into any home electronics store and you won't recognize a thing: TVs, VCRs, camcorders have been transformed. What you need—and what to ignore.*

—Up in Smoke—
*Forget home gyms; now status seekers want smoking rooms.*

—Beaujolais Nouveau—
*It isn't just Kool-Aid for grownups.*

## *Millennium Bugged: The Big Y2K Problem Is the Silly Questions*

* * *

### Dan Lee of Mirage Resorts Inc. Is Sick of All the Queries About Whether He's Ready

By CHRISTINA BINKLEY
*Staff Reporter of* THE WALL STREET JOURNAL

Dan Lee, a soft-spoken former Wall Street analyst and weekend pilot, isn't generally given to flights of fancy.

But he's had it with the so-called millennium bug.

Last month, Mr. Lee, the chief financial officer of Mirage Resorts Inc. in Las Vegas, got a two-page query from Harrah's Entertainment Inc., in Memphis, Tenn., asking whether Mirage's computers are ready for the new millennium. "Who is leading your Y2K efforts?" Harrah's asked Mr. Lee, requesting titles, names and phone numbers.


*Dan Lee*

Such letters are common now as companies rush to ensure that their computers will be able to cope when the date rolls from 1999 to 2000. Hoping to avoid breakdowns and legal liability for year 2000 problems, they are seeking blanket assurances from people they do business with that they, too, are millen-

# Washington Wire

A Special Weekly Report From The Wall Street Journal's Capital Bureau

**ISRAEL WORRIES Clinton's Mideast trip will boost Palestinian statehood hopes.**

Clinton plans a televised speech on Mideast peace to students in Israel next week and a talk to a Palestinian council in Gaza. Israelis lobby against Air Force One landing at the new airport at Gaza and fret over details of a possible Clinton stopover in the West Bank town of Bethlehem. "We won't cross any lines" in terms of sovereignty, says a White House spokesman.

The trip also aims to boost support at home for Clinton's plan to give the Palestinians an extra $400 million in aid. House International Relations Committee Chairman Gilman warns of "significant problems" with the request. To build support, Clinton plans also to propose an added $1.2 billion for Israel and $200 million for Jordan.

*The White House invites lawmakers to join Clinton on the trip, with one requirement: They must go to both Israel and Gaza, not just Israel.*

**NO GIFT from the Federal Reserve is likely this holiday season.**

After cutting interest rates by three-quarters of a percentage point since the end of September, the Fed is likely to sit on the sidelines at its Dec. 22 meeting. The stock-market recovery and the persistent strength of consumer spending ease worries about recession. But bond-market conditions, which prompted the Fed's rate-cutting spree, still aren't back to normal, officials say.

With surprisingly little notice from the White House, the U.S. economic expansion this week moved into its 93rd month, beating the 92-month Reagan-Bush record for the longest peacetime growth. The next milestone: the 106-month record set during the Vietnam War.

**FOREIGN POLICY gets renewed attention as presidential hopefuls gear up.**

GOP strategists say an underfunded Pentagon, plummeting military morale and Clinton's wavering on force against Iraq provide openings. "Foreign policy will once again be central to the presidential campaign," predicts conservative publisher William Kristol. Arizona Sen. McCain considers a series of foreign-policy speeches as he weighs a GOP presidential bid.

But Clinton will soon unveil a big Pentagon budget boost. And, referring to Texas's GOP governor, Democratic strategist Robert Shrum says "someone named George Bush" can hardly attack Clinton and Gore for not removing Saddam Hussein. Former New Jersey Sen. Bradley today will announce an ex-

*Retirement Wrinkle*

# Employers Win Big With a Pension Shift; Employees Often Lose

## 'Cash Balance' Plans Save Firms Millions but Hide Pitfalls for Their Workers

### A Staffer Who Did the Math

By ELLEN E. SCHULTZ
And ELIZABETH MACDONALD
*Staff Reporters of* THE WALL STREET JOURNAL

Largely out of sight, an ingenious change in the way big companies structure their pension plans is saving them millions of dollars, with barely a peep of resistance. Unless they happen to have a Jim Bruggeman on their staff.

Sifting through his bills and junk mail one day last year, Mr. Bruggeman found the sort of notice most people look at but don't spend a lot of time on: His company was making some pension-plan changes.

The company, Central & South West Corp., was replacing its traditional plan with a new variety it said was easier to understand and better for today's more-mobile work force. A brochure sent to workers stressed that "the changes being made are good for both you and the company."


*Jim Bruggeman*

Alone among Central & South West's 7,000 employees, Mr. Bruggeman, a 49-year-old engineer in the Dallas utility's Tulsa, Okla., office, set out to discover exactly how the new system, known as a cash-balance plan, worked. During a year-long quest to master the assumptions, formulas and calculations behind it, Mr. Bruggeman found himself at odds with his superiors, and labeled a troublemaker. In the end, though, he figured out something about the new pension system that few other employees have noticed: For many of them, it is far from a good deal.

But it clearly was, as the brochure noted, good for the company. A peek at a CSW regulatory filing in March 1998, after the new plan took effect, shows that the company saved $20 million in pension costs last year alone. Other government filings

ctions rose ning every Centers for The agency his decade access to opulation.

... effect ode Island, help states e rules, ap- fight para- which was ree in 1993.

it the inves- of an arch- a report on ilitary. The t and his dog the case.

e counted in he tally may ier James P. om Leedham mbers turned fficials said.

greed to early n after admit- contracts to a ing an affair. n 30 days of Wednesday.

n presidential opulist former ... coup, is C... ez victory s, backs Henri- Page A17)

players were ng and betting Northwestern a similar bas- charges is an owa in 1994.

Asked for the names of his suppliers, he listed God and gave "Heaven" as the address. Then, in the margins, he scribbled further remarks to Colin Reed, Harrah's chief financial officer: "This is the best proof I've seen yet that the Y2K situation is a . . . scheme initiated by Bill Gates, et al., to sell software."

The questionnaire he mocked specifically pertained to the computer readiness of an Atlantic City parking lot that Harrah's rents from Mirage Resorts. The lot is very low-tech. "I'm not even sure that it's paved," says the 42-year-old Mr. Lee.

So, asked by Harrah's to describe how he has tested the parking lot's systems, he responded: "We took an old Ford pickup truck and removed the clock. We then drove the Ford to the site and parked it, being careful to avoid the rodents mentioned above. It drove fine. It parked fine. We are seeking an expensive consultant who will verify, based on this data, that our parking lot is Y2K compliant."

Mr. Lee's year 2000 problem is overkill: He has been deluged all year with letters and questionnaires overreacting, in his opinion, to predictions of computer havoc. "This year 2000 stuff is waayyyy overdone," he says. "It's complete, complete lunacy."

Not all of his colleagues have reacted quite so strongly, though many say they are searching for solutions to the paperwork glut. Glenn Schaeffer, president and chief financial officer of Circus Circus Enterprises Inc., another Las Vegas gambling company, says his staff has been swamped with form letters for the past six months or so. "The anxiety level as we get closer to the date is getting higher," he says. Mr. Schaeffer sends a form-letter response to the form-letter requests.

The madness started in earnest last spring, Mr. Lee says, when federal banking regulators asked financial institutions to make sure their borrowers are prepared. The banks in return requested details of Mirage Resorts' computer progress. "I

*Please Turn to Page A15, Column 1*

*... among potential GOP contenders.*

SUPPLY SIDERS Jack Kemp and Jude Wanniski push Bear Stearns international economist David Malpass for the top job at the Congressional Budget Office as a potential ally for "growth-oriented tax cuts." But Dan Crippen, a onetime aide to former Sen. Howard Baker, still looks like the strongest contender.

EX-SENATORS CLUB: Former Sen. Dole recruits retiring Indiana GOP Sen. Coats to join him and former Democratic Sens. Mitchell and Bentsen at Washington law firm Verner, Lipfert, Bernhard, McPherson & Hand. Dole jokes that now he "won't be outvoted" on "which office to meet in."

NO BIG ANTITRUST-LAW changes are likely to be recommended after a months-long White House study of merger trends. Economic advisers, wrapping up their review amid the proposed Exxon-Mobil megamerger, mostly will just call for more funds to help federal antitrust regulators track economic impact.

DEMOCRATS CANCEL a trip to Disney World because of a labor dispute at Disney-owned ABC. Lawmakers and major donors had planned to leave today for a "family weekend," says a Democratic National Committee spokeswoman, but "pulled the plug" because a network technicians' strike isn't settled.

**RIGHT-TO-SUE LAWS for HMO patients gain momentum at the state level.**

A recent federal court ruling upholding parts of Texas' law "will fuel a prairie fire across the nation" for such laws, says Jamie Court, a California consumer activist. States that may act include New York, Pennsylvania and California, where incoming Gov. Davis has voiced support. Advocates think the GOP's recent election setback also will boost prospects in Congress.

But employer groups and the managed-care industry step up opposition. In a letter to incoming members of Congress, the Health Benefits Coalition says a liability law "would put health plans, and the employers who sponsor them, at risk of costly new lawsuits." GOP Rep. Norwood, who backs the right to sue, wants to meet soon with incoming Speaker Livingston on the issue.

*One possible compromise: allowing injured patients to sue for economic damages such as lost wages, but not for punitive damages or pain and suffering.*

MINOR MEMOS: Over inspirer? Sen. Glenn frets about an elderly man who came up to him at an airport to say the 77-year-old astronaut has inspired him to carry out a childhood dream: "I'm going to climb Mount Kilimanjaro." . . . A list of 311 acronyms and abbreviations prepared for the European Union-U.S. summit here includes RUE (regional use of energy) and SAD (single administrative document). . . . At this week's impeachment hearing on perjury, the House Judiciary Committee didn't swear in convicted perjurers who testified.

— RONALD G. SHAFER

**Pension Fight**

The switch to cash-balance pension plans—details later—is the biggest development in the pension world in years, so big that some consultants call it revolutionary. Certainly, many call it lucrative; one says such a pension plan ought to be thought of as a profit center. Not since companies dipped into pension funds in the 1980s to finance leveraged buyouts have corporate treasurers been so abuzz over a pension technique.

But its little-noticed dark side—one that many companies don't make very clear to employees, to say the least—is that a lot of older workers will find their pensions cut, in some cases deeply.

So far, only the most financially sophisticated employees have figured this out, because the formulas are so complex. Even the Labor Department and the Internal Revenue Service have trouble with them. So thousands of employees, while acutely aware of how the stock market affects their retirement nest eggs, are oblivious to the effect of this change. (See related article on page C1.)

One might get the impression, from the rise of 401(k) retirement plans funded jointly by employer and employee, that pensions are a dead species. In fact, nearly all large employers still have pension plans, because pulling the plug would be too costly; the company would have to pay out all accrued benefits at once. Meanwhile, companies face growing obligations as the millions of baby boomers move into their peak pension-earning years.

Now, however, employers have discovered a substitute for terminating the pension plan: a restructuring that often makes it unnecessary ever to feed the plan again.

### Pitfalls for Employers

But this financially appealing move has its risks. The IRS has never given its blessing to some of the maneuvers involved. If employers don't win a lobbying battle currently being waged for exemptions from certain pension rules, some of these plans could be in for a costly fix.

In addition, the way employers are handling the transition could result in employee-relations backlashes as more and more older workers eventually figure out they are paying the price for the transformation of traditional pension plans.

In those traditional plans, most of the benefits build up in an employee's later years. Typical formulas multiply years of service by the average salary in the final years, when pay usually is highest. As a result, as much as half of a person's pension is earned in the last five years on the job.

With the new plans, everyone gets the same steady annual credit toward an eventual pension, adding to his or her pension-account "cash balance." Employers contribute a percentage of an employee's pay, typically 4%. The balance earns an interest credit, usually around 5%. And it is portable when the employee leaves.

For the young, 4% of pay each year is more than what they were accruing under

*Please Turn to Page A6, Column 1*

## TENTS


EARS ON PAGE B2

FROM PAST: ...nployers have ...ied traditional setups for ...lance' plans. ...ny more could Page C1.

...: Lernout & ...arkens, C2.

...cts Internet ...6.

...tudents cross ...mees, B1.

... to land a ...e, B1.

POLITICS & POLICY: Social Security deal may be a tale of two Bills, A20.

INTERNATIONAL: German economic growth is expected to slow, A17.

REVIEW & OUTLOOK: Assessing the verdict on Mike Espy, A18.

OPINION: Ambulance chasers demean Holocaust victims, A18.

OPINION: Will Venezuela elect a Castro acolyte? A19.




# Pension Switch Helps Employers, but Not Al

*Continued From First Page*

the old plan. But for those nearing retirement, the amount is far less. So an older employee who is switched into a cash-balance system can find his or her eventual pension reduced by 20% to 50% or, in rare cases, even more.

This is one way companies save money with the switch. The other is a bit more complicated. Companies can also benefit from the way they invest the assets in the cash-balance accounts.

If the employer promised to credit 5% interest to employees' account balances, it can keep whatever it earns above that amount. The company can use these earnings to finance other benefits, to pay for a work-force reduction, or—crucially—to cover future years' contributions. This is why the switch makes pension plans self-funding for many companies.

Although employers can do this with regular pensions, the savings are greater and easier to measure in cash-balance plans. The savings often transform an underfunded pension plan into one that is fully funded. "Cash-balance plans have a positive effect on a company's profitability," says Joseph Davi, a benefits consultant at Towers Perrin in Stamford, Conn. They "could be considered a profit center."

## Motive for the Move

Employers, however, are almost universally reticent about how they benefit. "Cost savings were not the reason the company switched to a cash-balance plan," says Paul Douty, the compensation director at Mr. Bruggeman's employer, CSW. Sure, the move resulted in substantial cost savings, he says, but the company's goal was to become more competitive and adapt to changing times. Besides, he notes, the $20 million in pension-plan savings last year were partly offset by a $3 million rise in costs in the 401(k); the company let employees contribute more and increased its matching contributions.

There is another reason some employers like cash-balance plans: By redistributing pension assets from older to younger workers, they turn pension rights—which many young employees ignore, since their pension is so far in the future—into appealing benefits today. At the same time, older workers lose a financial incentive to stay on the job, since their later years no longer can balloon the pension.

Some pension professionals think companies should be more candid. "If what you want to do is get rid of older workers, don't mask it as an improvement to the pension plan," says Michael Pikelny, an employee-benefits specialist at Hartmarx Corp., an apparel maker in Chicago that decided not to install a cash-balance plan.

## Under a Microscope

Most employees aren't equipped to question what employers tell them. But Mr. Bruggeman was. He had a background in finance, his hobby was actuarial science, he had taken graduate-level courses in statistics and probability, and he knew when the company announced it was converting to a cash-balance plan last year, he began asking it for the documents and assumptions he needed to compare the old pension to the new one.

With each new bit of data, he gained another insight. First, he figured out that future pension accruals had been reduced by at least 30% for most employees. CSW got rid of early-retirement and other subsidies and reduced the rates at which employees would accrue pensions in the future.

Employees wouldn't necessarily conclude this from the brochures the human-resources department handed out. Like most employers that switch to cash-balance plans, CSW assured employees that the overall level of retirement benefits would remain unchanged. But a close reading of the brochure revealed that this result depended on employees' putting more into their 401(k) plans, gradually making up for the reduction in pensions.

At a question-and-answer session on the new plan before it was adopted, Mr. Bruggeman spoke up and told co-workers how their pensions were being reduced. The next day, he says, his supervisor in Tulsa came to his office and told him that CSW management in Dallas was concerned that his remarks would "cause a class-action suit" or "uprising," and said he shouldn't talk to any other employees. He says the supervisor, Peter Kissman, informed him that if he continued to challenge the new pension plan, CSW officials would think he wasn't a team player, and his job could be in jeopardy.

Asked about this, Mr. Kissman says: "In my department I would not tolerate employee harassment. I believe the company feels the same way. Past that, I really can't speak to this issue. It's being investigated by the company."

## A Few Sweeteners

Employers, aware that switching to cash-balance plans can slam older workers, often offer features to soften the blow. They may agree to contribute somewhat more than the standard 4% of pay for older employees, or they may provide a "grandfather clause." CSW offered both options, saying employees 50 or older with 10 years of service could stay in the old plan if they wished. Mr. Bruggeman, a 25-year veteran, was just shy of 49. He calculated that people in his situation would see their pensions fall 50% under the new plan, depending on when they retired.

Mr. Bruggeman told company officials that the plan wasn't fair to some long-term employees. Subsequently, he says, in his November 1997 performance evaluation, his supervisor's only criticism was that he "spends too much time thinking about the pension plan." A CSW official says the company can't discuss personnel matters.

What bothered Mr. Bruggeman even more was his discovery of one of the least-known features of cash-balance plans: Once enrolled in them, some employees don't earn any more toward their pension for several years.

The reasons are convoluted, but in a nutshell: Most employees believe the opening balance in their new pension account equals the credits they've earned so far under the old plan. But in fact, the balance often is lower.

When employers convert to a cash-balance plan, they calculate a present-day, lump-sum value for the benefit each employee has already earned. In Mr. Bruggeman's case, this was $352,000—something he discovered only after obtaining information from the company and making the calculations himself. Yet Mr. Bruggeman's opening account in the cash-balance plan was just $296,000, because the company figured it using different actuarial and other assumptions.

This is generally legal, despite a federal law that bars companies from cutting already-earned pensions. If Mr. Bruggeman quit, he would get the full $352,000, so the law isn't violated. But if he stays, it will take several years of pay credits and interest before his balance gets back up to $352,000.

## 'Wearaway'

Mr. Douty says this happened to fewer than 2% of workers at CSW. But at some companies that switch to cash-balance plans, far more are affected. At AT&T Corp., which adopted a cash-balance plan this year, many older workers will have to work three to eight years before their balance catches up and they start building up their pension pot again. "Wearaway," this is called. Only if an employee knows what figures to ask for can he or she make a precise comparison of old and new benefits.

Indeed, the difficulty of making comparisons has sometimes been portrayed as an advantage of switching to cash-balance plans. A partner at the consulting firm that invented the plans in the 1980s told a client in a 1989 letter: "One feature which might come in handy is that it is difficult for employees to compare prior pension benefit formulas to the account balance approach."

Asked to comment, the author of that line, Robert S. Byrne of Kwasha Lipton (now a unit of PricewaterhouseCoopers), says, "Dwelling on old vs. new benefits is probably not something that's a good way to go forward."

At one company, employees did know how to make comparisons. When Deloitte & Touche started putting a cash-balance plan in place last year, some older actuaries rebelled. The firm eventually allowed all who had already been on the staff when the cash-balance plan was adopted to stick with the old benefit if they wished.

## Struggle at Chase

At Chase Manhattan Corp., two executives in the private-banking division hired an actuary and calculated that their future pensions had fallen 45% as a result of a conversion to a cash-balance plan by Chase predecessor Chemical Bank. "I would have had to work about 10 more years before I broke even and got a payout equal to my old pension," says one of the executives, John Healy, now 61.

He and colleague Nathan Davi say that after seven years of their complaints, Chase agreed to give each a pension lump sum of

# witch Helps Employers, but Not All Employees

Page
aring retire-
Se en older
h-bal-
ner eventual
on, in rare

s save money
s a bit more
also benefit
assets in the

to credit 5%
it balances. It
s above that
se these earn-
s, to pay for a
—crucially—to
tions. This is
ion plans self-
s.
t do this with
gs are greater
cash-balance
nsform an un-
to one that is
e plans have a
ny's profitabil-
benefits consul-
tamford, Conn.
a profit center."

e almost univer-
efit. "Cost
company
plan," says Paul
director at Mr.
CSW. Sure, the
ial cost savings.
s goal was to be-
d adapt to chang-
s, the $20 million
last year were
n rise in costs in
et employees con-
sed its matching

on some employ-
s: By redistribut-
older to younger
ion rights—which
gnore, since their
ture—into appeal-
same time, older
ncentive to stay on
r years no longer

sionals think com-
ndid. "If what you
der workers, don't
ent to the pension
elny, an employee-
artmarx Corp., an
go that decided not
e plan.

ren't equipped to
ers tell them. But
e had a background
was actuarial sci-
duate-level courses
bility, and he knew
n inside and out. So

when the company announced it was converting to a cash-balance plan last year, he began asking it for the documents and assumptions he needed to compare the old pension to the new one.

With each new bit of data, he gained another insight. First, he figured out that future pension accruals had been reduced by at least 30% for most employees. CSW got rid of early-retirement and other subsidies and reduced the rates at which employees would accrue pensions in the future.

Employees wouldn't necessarily conclude this from the brochures the human-resources department handed out. Like most employers that switch to cash-balance plans, CSW assured employees that the overall level of retirement benefits would remain unchanged. But a close reading of the brochure revealed that this result depended on employees' putting more into their 401(k) plans, gradually making up for the reduction in pensions.

At a question-and-answer session on the new plan before it was adopted, Mr. Bruggeman spoke up and told co-workers how their pensions were being reduced. The next day, he says, his supervisor in Tulsa came to his office and told him that CSW management in Dallas was concerned that his remarks would "cause a class-action suit" or "uprising," and said he shouldn't talk to any other employees. He says the supervisor, Peter Kissman, informed him that if he continued to challenge the new pension plan, CSW officials would think he wasn't a team player, and his job could be in jeopardy.

Asked about this, Mr. Kissman says: "In my department I would not tolerate employee harassment. I believe the company feels the same way. Past that, I really can't speak to this issue. It's being investigated by the company."

## A Few Sweeteners

Employers, aware that switching to cash-balance plans can slam older workers, often offer features to soften the blow. They may agree to contribute somewhat more than the standard 4% of pay for older employees, or they may provide a "grandfather clause." CSW offered both options, saying employees 50 or older with 10 years of service could stay in the old plan if they wished. Mr. Bruggeman, a 25-year veteran, was just shy of 49. He calculated that people in his situation would see their pensions fall 50% under the new plan, depending on when they retired.

Mr. Bruggeman told company officials that the plan wasn't fair to some long-term employees. Subsequently, he says, in his November 1997 performance evaluation, his supervisor's only criticism was that he "spends too much time thinking about the pension plan." A CSW official says the company can't discuss personnel matters.

What bothered Mr. Bruggeman even more was his discovery of one of the least-known features of cash-balance plans: Once enrolled in them, some employees don't earn any more toward their pension for several years.

The reasons are convoluted, but in a nutshell: Most employees believe the opening balance in their new pension account equals the credits they've earned so far under the old plan. But in fact, the balance often is lower.

When employers convert to a cash-balance plan, they calculate a present-day, lump-sum value for the benefit each employee has already earned. In Mr. Bruggeman's case, this was $352,000—something he discovered only after obtaining information from the company and making the calculations himself. Yet Mr. Bruggeman's opening account in the cash-balance plan was just $296,000, because the company figured it using different actuarial and other assumptions.

This is generally legal, despite a federal law that bars companies from cutting already-earned pensions. If Mr. Bruggeman quit, he would get the full $352,000, so the law isn't violated. But if he stays, it will take several years of pay credits and interest before his balance gets back up to $352,000.

## 'Wearaway'

Mr. Douty says this happened to fewer than 2% of workers at CSW. But at some companies that switch to cash-balance plans, far more are affected. At AT&T Corp., which adopted a cash-balance plan this year, many older workers will have to work three to eight years before their balance catches up and they start building up their pension pot again. "Wearaway," this is called. Only if an employee knows what figures to ask for can he or she make a precise comparison of old and new benefits.

Indeed, the difficulty of making comparisons has sometimes been portrayed as an advantage of switching to cash-balance plans. A partner at the consulting firm that invented the plans in the 1980s told a client in a 1989 letter: "One feature which might come in handy is that it is difficult for employees to compare prior pension benefit formulas to the account balance approach."

Asked to comment, the author of that line, Robert S. Byrne of Kwasha Lipton (now a unit of PricewaterhouseCoopers), says, "Dwelling on old vs. new benefits is probably not something that's a good way to go forward."

At one company, employees did know how to make comparisons. When Deloitte & Touche started putting a cash-balance plan in place last year, some older actuaries rebelled. The firm eventually allowed all who had already been on the staff when the cash-balance plan was adopted to stick with the old benefit if they wished.

## Struggle at Chase

At Chase Manhattan Corp., two executives in the private-banking division hired an actuary and calculated that their future pensions had fallen 45% as a result of a conversion to a cash-balance plan by Chase predecessor Chemical Bank. "I would have had to work about 10 more years before I broke even and got a payout equal to my old pension," says one of the executives, John Healy, now 61.

He and colleague Nathan Davi say that after seven years of their complaints, Chase agreed to give each a pension lump sum of about $487,000, which was roughly $72,000 more than what they would have received under the new cash-balance plan. Although a Chase official initially said the bank had "never given any settlement to any employee over the bank's pension plans," when told about correspondence about the Healy-Davi case, Chase said that a review had determined that about 1,000 employees could be eligible for additional benefits. "We amended the plan so that it would cover all similarly situated employees," a spokesman said.

How many quiet arrangements have been reached is unknown. But employees are currently pressing class-action suits against Georgia-Pacific Corp. and Cummins Engine Co.'s Onan Corp. subsidiary, alleging that cash-balance plans illegally reduce pensions. (Both defendants are fighting the suits.) Judges have recently dismissed similar suits against Bell Atlantic Corp. and BankBoston N.A.

## Concern at the IRS

Not aware of any of this ferment, Mr. Bruggeman in August 1998 filed his multiple-spreadsheet analysis of the CSW cash-balance plan with the IRS and the Labor Department, asking them for a review. Soon after, he says, a manager in CSW's benefits department called him in and "wanted to know what it would take for me to drop all this." The answer wasn't to be "grandfathered" and exempted from the new plan. "I told him all I want is for the company to ... be fair to employees," he says. "It's the principle of the thing."

The manager couldn't be reached for comment, but a CSW official says the company takes complaints "very seriously and they're thoroughly investigated. In every part of this type of investigation an employee is interviewed by a company representative, and in every initial interview the employee is asked fo[r] suggestions on what might be a preferre[d] solution."

Even without Mr. Bruggeman's input the IRS has a lot of cash-balance data on it[s] plate. The agency is swamped with pape[r]work from hundreds of new plans seekin[g] its approval, and applications are pilin[g] up. The delay is due in part to concern [at] the IRS that such plans may violate vario[us] pension laws, according to a person fam[il]iar with the situation. Meanwhile, the co[n]sulting firms that create the plans for co[m]panies are lobbying for exemptions fro[m] certain pension rules.

They say they aren't worried. That's b[e]cause "companies who now have the[se] plans are sufficiently powerful, sufficien[tly] big and have enough clout that they co[uld] get Congress to bend the law ... to prot[ect] their plans," says Judith Mazo, a Washi[ng]ton-based senior vice president for cons[ult]ing firm Segal Co. Regulators, meanwh[ile] are playing catch-up. Bottom line, [Ms.] Mazo says: "The plans are too big to fa[il]."




**Journal Link:** For more on '... balance' pension plans, see To... Business at 7 a.m. EST on CNBC