**EXHIBIT 3**

John Arko

1 (Pages 1 to 4)

### Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - -

JANICE C. AMARA, GISELA R.       : 3:01 CV 2361 (MRK)
BRODERICK, ANNETTE S.            :
GLANZ, individually and on       : April 28, 2006
behalf of others similarly       :
situated                         :
   -vs-                          :
CIGNA CORP. And CIGNA
Pension Plan

- - -
Oral deposition of JOHN ARKO, was taken pursuant to notice, held at ZANARAS REPORTING AND VIDEO, 1616 Walnut Street, Suite 300, Philadelphia, Pennsylvania, commencing at 10:00 a.m. on April 28, 2006, before Lynn McCloskey, Shorthand Reporter and Notary Public, there being present:
- - -

ZANARAS REPORTING AND VIDEO
REGISTERED PROFESSIONAL REPORTERS
1616 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19103
2112 Bay Avenue
Ocean City, New Jersey 08226
(215) 790-7857   1-877-GO-DEPOS

### Page 2

APPEARANCES:

LAW OFFICES OF STEPHEN R. BRUCE
BY: STEPHEN R. BRUCE, ESQUIRE 805
15th Street, NW, Suite 210
Washington, DC 20005
(202) 371-8013
Counsel for Plaintiff

MORGAN LEWIS & BOCKIUS, LLP
BY: JEREMY P. BLUMENFELD, ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5258
Counsel for Defendant

ALSO PRESENT:

PAUL GONTAREK

### Page 3

I N D E X

WITNESS:                                    PAGE
John ARKO
BY MR. BRUCE                                  5

- - -

E X H I B I T S

NUMBER       DESCRIPTION                    PAGE
Arko-1       Notice of Deposition             5
Arko-2       Comparison of Benefits Under
             The Current and the New
             Retirement Plan                 95
Arko-3       Interoffice Memo                97
Arko-4       Graph                          158
Arko-5       Pension Express Vested
             Term Benefit Data              170
Arko-6       Document with Bates Number
             EPTO0004164                    213
Arko-7       Document with Bates
             Number D029352                 287

### Page 4

LITIGATION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

PAGE   LINE      PAGE   LINE      PAGE   LINE
(NONE)

REQUEST FOR PRODUCTION OF DOCUMENTS

PAGE   LINE      PAGE   LINE      PAGE   LINE
(NONE)

STIPULATION

         PAGE         LINE
          5            1

Page 257

1   should note that we objected to this
2   request.
3       MR. BRUCE: Well, that's -- you
4   objected.
5   BY MR. BRUCE:
6       Q.  Could you find anything, any
7   documents that indicated the basis for Jerry
8   Meyn stating that in the memo to the managers or
9   it was in the CIGNA benefits newsletter assuring
10  participants that the company is not going to
11  get cost savings from this, did you find any
12  sport for that showing that the company was not
13  achieving any cost savings?
14      MR. BLUMENFELD: Objection.
15      THE WITNESS: Given that it was
16  objected to, I didn't specifically search
17  documents looking for that information
18  but --
19  BY MR. BRUCE:
20      Q.  That's not a basis for not
21  searching.
22      I am assuming your counsel told you
23  that?
24      MR. BLUMENFELD: Excuse me,

Page 258

1   Stephen.
2       MR. BRUCE: It isn't, Jeremy. You
3   didn't assert privilege here that we are
4   asking for documents.
5       MR. BLUMENFELD: We can --
6   BY MR. BRUCE:
7       Q.  We are asking for documents and so
8   you are saying that you didn't search for
9   documents on this?
10      A.  No, I didn't say that.
11      Q.  What are you saying that you did
12  search?
13      A.  Specifically that we would have
14  provided to our counsel all documents and files
15  that Jerry Meyn would have had and provided them
16  to our counsel.
17      Q.  Did Jerry Meyn write the -- excuse
18  me. Did Jerry Meyn write the November 1997
19  newsletter?
20      A.  He would have had input into that
21  newsletter, working with the communications team
22  at that time.
23      MR. BLUMENFELD: Now I want to
24  respond to your suggestion, Stephen, that

Page 259

1   objecting on the grounds of privilege is
2   the only reason upon which somebody cannot
3   produce documents. It's one thing -- I am
4   not telling the witness that he is not
5   supposed to answer your questions.
6       What I am saying is that in
7   response to that request, we asserted an
8   objection that the information you were
9   seeking was not relevant.
10      MR. BRUCE: Was he instructed not
11  to prepare on that for the 30(b)(6) notice
12  because of your objection?
13      MR. BLUMENFELD: No, I think he is
14  answering your questions.
15      MR. BRUCE: So he is saying that he
16  didn't really search very hard for that
17  because he understood that you posed an
18  objection; is that correct?
19      MR. BLUMENFELD: Objection to your
20  characterization.
21  BY MR. BRUCE:
22      Q.  Is that correct is that what
23  happened?
24      A.  I did not spend time attempting to

Page 260

1   interpret the information that was already -- we
2   provided the information that was in Jerry's
3   files and looked for information in
4   communications files that was relevant to this
5   case.
6       Q.  Well, did you look for anything
7   with regard to cost savings to show that the
8   company didn't have any cost savings from this?
9       A.  We provided all of the files and
10  documents that were -- that we related to the
11  pension plan to our counsel.
12      Q.  Was it in anyway related to cost
13  savings?
14      A.  To the extent that cost savings
15  would have been related to the pension plan, I
16  assume that would have been inside of the files
17  that are related to the pension plan. And those
18  we searched for and found and provided them to
19  counsel.
20      Q.  Do you recall producing documents
21  related to cost savings or the lack thereof?
22      A.  Not specifically, no.
23      Q.  Then let's go to request number 27.
24  All documents related to accounting losses or

Page 261

1  gains that CIGNA recognized as a result of the
2  1998 conversion to the pension plan.
3       Q.   Did you search for those documents?
4       A.   We instructed Paul Gontarek -- or
5  Paul Gontarek did so and made a request of the
6  proper people that would maintain such
7  documents.
8       Q.   What was the response to that
9  request?
10      A.   I believe he obtained some
11 information and is providing that to our
12 counsel.
13      Q.   He is?
14      A.   He did do so, I believe just in the
15 past few days.
16      Q.   And is that something that's
17 forthcoming?
18           MR. BLUMENFELD:  I have not looked
19      at what those documents are.  So I don't
20      know.
21 BY MR. BRUCE:
22      Q.   Isn't this also the type of
23 information that you would expect to have been
24 communicated to Lamay, Bell or Schwartz; aren't

Page 262

1  they the financial decision makers?
2           MR. BLUMENFELD:  Objection.
3           THE WITNESS:  Information that goes
4      into our financials that's reflective of
5      the pension plan would run through those
6      people that you just mentioned, yes.
7  BY MR. BRUCE:
8       Q.   And so Paul obtained information
9  related to those things, but not from Lamay,
10 Schwartz or Bell; is that your understanding?
11      A.   Correct.
12      Q.   So where did he get that
13 information from?
14      A.   He went to our accounting team that
15 is responsible for actually creating the
16 financial information that's created and
17 publically disclosed, specifically that
18 information around the pension plan.
19      Q.   Okay.  And you would expect for
20 them to also have information about whether the
21 company achieved any cost savings from changing
22 to the cash balance plan?
23      A.   Paul asked -- those would be the
24 people that would have the information as far as

Page 263

1  the accounting losses and gains and what goes
2  into our financial statements.  That information
3  they would have provided.
4       Q.   So they would have provided cost
5  information in addition to the accounting losses
6  or gains, correct?
7       A.   To the extent that information was
8  necessary to flow into our financials, yes.
9       Q.   And when -- for example, when there
10 were changes made in 2004, was it, to the Part A
11 plan?
12      A.   Yes.
13      Q.   Did you ever see accounting items
14 to indicate what the impact of that was?
15      A.   Did I see such numbers?
16      Q.   Yes.
17      A.   Yes, I did.
18      Q.   And who produced those numbers?
19      A.   Or accounting department.  Also our
20 actuarial team at Prudential would have done
21 some initial calculation numbers, but that
22 information would go to our accounting team to
23 determine how it is to be disclosed in our
24 financials.

Page 264

1       Q.   Okay.  But before they merge them
2  in with other items, they do a separate impact
3  of the specific changes to the pension plan?
4           MR. BLUMENFELD:  Objection.
5           Is that a question.
6  BY MR. BRUCE:
7       Q.   Because I don't think what appears
8  in the financials breaks it down plan by plan in
9  terms of changes.
10          MR. BLUMENFELD:  Is there a
11     question?
12 BY MR. BRUCE:
13      Q.   Is that right?
14      A.   I'm sorry, I don't -- I mean the
15 financial statements in particular, our annual
16 report of financial information has footnotes
17 that are very particular to the pension plan.
18 It's not just the CIGNA Pension Plan.  It does
19 role in the non-qualified plan and to small
20 extents, some other plans that we have in place.
21      Q.   You don't think it shows accounting
22 gains or losses from a particular change, but at
23 some point in the process, those would be broken
24 out and then they would be combined with other