# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------x
                               :
JANICE C. AMARA, GISELA R.     :
BRODERICK, ANNETTE S. GLANZ,   :
Individually and on Behalf of  :
Others Similarly Situated,     :
                               :
        Plaintiffs,            :   Civil Action No.
                               :   3:01CV2361(MRK)
     -vs-                      :
                               :
CIGNA CORPORATION AND CIGNA    :
PENSION PLAN,                  :
                               :
        Defendants.            :
                               :
-------------------------------x

VOLUME I - PAGES 1-162

DEPOSITION OF: LORRAINE MORRIS
DATE: APRIL 19, 2006
HELD AT: MOUKAWSHER & WALSH, LLC
21 OAK STREET, SUITE 209
HARTFORD, CONNECTICUT

Reporter: JILL I. HUDON, RPR, LSR #00082
    Brandon Smith Reporting Service, LLC

44 Capitol Avenue          Six Landmark Square, 4th Floor
Hartford, CT 06106              Stamford, CT 06901
   (860) 549-1850                  (203) 316-8591
   (800) 852-4589                  (800) 852-4589

Page 6

1       PROCEEDINGS
2
3       (Plaintiffs' Exhibit No. 1 was
4       marked for identification.)
5
6       (The deposition of Lorraine Morris commenced
7   at 10:02 a.m. on this 19th day of April, 2006, with
8   counsel and the deponent present.)
9
10      THE REPORTER: The usual stipulations?
11      MR. BRUCE: No, no.
12      THE REPORTER: Do you want to make all
13  objections now, or just objections as to form?
14      MR. BRUCE: Well, I don't do the usual
15  stipulations, so --
16      THE REPORTER: Okay.
17      MR. BRUCE: I mean, the witness, she'll
18  get to review the transcript and make changes, and so
19  forth.
20      THE REPORTER: What do you want to do
21  with the objections?
22      MR. BRUCE: They can make objections,
23  yeah.
24      THE REPORTER: Any objections, or --
25      MR. BRUCE: Well, we'll see what kind

Page 7

1   of objections they make.
2       THE REPORTER: Okay.
3       MS. RAVITZ: Stephen, generally we
4   would agree to some stipulations, specifically that we
5   would waive any issues with regard to notice of the
6   deposition; that the notary is competent, waiving any
7   issues with regard to the stenographer's ability to be
8   a notary in this instance.
9       And as to objections, typically we would
10  waive any objections, except as to form. If you want
11  all objections to be made at this time for the
12  purposes of preserving them for trial, I think that
13  would be a bit onerous, but that's, I suppose,
14  something we could discuss.
15      And then reading and signing, I think that's
16  our prerogative, you know, to make that determination,
17  so --
18      MR. BRUCE: Yeah. But "the usual
19  stipulations" is something that's so vague and varies
20  from jurisdiction to jurisdiction of what you mean by
21  that, so --
22      MS. RAVITZ: Okay. Did you want some
23  of the stipulations to apply?
24      MR. BRUCE: I don't know what "the
25  usual stipulations" are.

Page 8

1       THE REPORTER: I have those, if you
2   want to take a look at what I would call "the usual
3   stipulations." And then the witness signature is
4   whether or not you decide to read and sign.
5       MS. RAVITZ: I think we would want to
6   read and sign; but, otherwise, we would be agreeable
7   to --
8       MR. BRUCE: You do want to read and
9   sign?
10      MS. RAVITZ: Yeah, I think we do.
11      MR. BRUCE: Yeah. Okay.
12      MS. RAVITZ: But, otherwise, we would
13  agree to the other stipulations.
14      MR. BRUCE: Okay.
15      MS. RAVITZ: Jamie, is that agreeable
16  to you?
17      MS. KOHEN: Can I -- oh, yeah, sure.

Page 9

1       LORRAINE MORRIS,
2   having been first duly sworn to tell the truth, the
3   whole truth, and nothing but the truth, deposeth and
4   sayeth as follows:
5
6       DIRECT EXAMINATION
7
8   BY MR. BRUCE:
9       Q   And would you state your name?
10      A   Lorraine Morris.
11      MS. RAVITZ: Oh, can I -- I'm sorry to
12  interrupt.
13      But just for the record, some general
14  understanding of this deposition, I just want to make
15  a couple statements.
16      MR. BRUCE: Okay.
17      MS. RAVITZ: One is, I know we have no
18  formal agreement with regard to confidentiality or
19  privilege or proprietary information, but it is a
20  concern that if some information comes out that has to
21  do with participants that are not a part of your class
22  that you'll agree that those are to be maintained
23  confidentially, that if there's any documents that
24  come up that are privileged between CIGNA and its own
25  internal people -- there's some attorney documents --

Page 58

1  that, of how --
2       MS. RAVITZ: Do you want to go back in
3  the record, Stephen, and --
4       MR. BRUCE: No, no. She can answer it.
5       MS. RAVITZ: No. You're not entitled
6  to ask the same question over and over, Stephen.
7  Q  (By Mr. Bruce) Now, tell me, how was that
8  brought to your attention?
9  A  My --
10      MS. RAVITZ: I'm sorry. I --
11      MR. BRUCE: Go ahead.
12      MS. KOHEN: How was what brought to her
13 attention?
14      MR. BRUCE: That they were missing
15 fields.
16      THE WITNESS: My staff brought it to my
17 attention.
18 Q  (By Mr. Bruce) And how did they bring it to
19 your attention?
20 A  When they were --
21      MS. KOHEN: Objection.
22      THE WITNESS: -- doing cal- -- when
23 they were doing calculations.
24 Q  (By Mr. Bruce) And were there particular
25 groups of people for whom this was a problem?

Page 59

1  A  No. I'm not aware of it being for a
2  specific group. I don't think it's -- we haven't seen
3  a trend where it's any particular group.
4  Q  Wasn't that identified as being a problem
5  associated with rehires?
6       MS. RAVITZ: Objection.
7       MS. KOHEN: Objection.
8       THE WITNESS: I can't say that's true
9  or not true. I don't know that to be a fact.
10 Q  (By Mr. Bruce) Wasn't there a project item
11 about checking the opening account balances for
12 rehires?
13      MS. RAVITZ: Objection.
14      THE WITNESS: Yeah. That's part of the
15 process.
16 Q  (By Mr. Bruce) Isn't there an outstanding
17 project that the pension group has to recheck the
18 opening account balances for rehires?
19 A  Yes.
20      MS. RAVITZ: Objection.
21      THE WITNESS: That is one of the steps.
22 Q  (By Mr. Bruce) And that hasn't been, like,
23 a special project, because that was a --
24 A  Yes. It is a project that we're doing.
25 We're tackling it as a project. And we're also

Page 60

1  tackling it as individual people come up.
2  Q  And do you know when that project started?
3  A  I don't know. It was a full-fledged project
4  in 2004, maybe.
5  Q  And do you know how much progress has been
6  made?
7  A  I couldn't give you the numbers off the top
8  of my head. I'd have to pull that information.
9  Q  Well, 50-percent done?
10      MS. RAVITZ: Objection.
11      THE WITNESS: I can't feel that I can
12 honestly answer that question.
13 Q  (By Mr. Bruce) So what's the state of
14 your -- where you said you were gathering the
15 information to provide to your attorneys at
16 Prudential, what is the state of your work on that?
17      MS. RAVITZ: Objection. Anything
18 regarding information being provided to attorneys is
19 privileged.
20      If you want to reword that question in
21 another way, please do that.
22 Q  (By Mr. Bruce) What is the status of your
23 investigation into these missing fields for opening
24 account balances and annuities?
25 A  There was missing information, as I

Page 61

1  understand it, for the terminated people that were
2  paid out. Your office had asked for benefit amounts
3  and forms of benefits paid, and that's the information
4  that we're gathering.
5  Q  Okay. So you're gathering that off of what
6  system?
7  A  ABC, BAS. Those are the payment systems.
8  Q  And what is the status of that project?
9  A  We were provided some data late yesterday.
10 I've not had the opportunity to look at it yet.
11 Q  And who are you being provided that data by?
12 A  Our technology people.
13 Q  And one of the -- well, do you have any idea
14 why that information wasn't included on the class list
15 that you prepared earlier this year?
16 A  Well, initially because it pertained to
17 terminated people who had been paid out, so we first
18 needed to identify who those folks were, and then we
19 were in the midst of transferring information from one
20 system to the other, so now we're gathering it from
21 both places.
22 Q  Okay. And so when would you expect for that
23 to be completed?
24 A  I would assume that we can probably get it
25 next week, unless we find that there's an issue with

Page 62

1  the data that's been extracted. You know, we need to
2  confirm that they've pulled the right data elements.
3      Q   Okay. Then one of the other requests was
4  for the account balance at the commencement date, and
5  that field was in the DBRK system.
6          Do you know --
7      A   Say that again.
8          MS. RAVITZ: Just let him finish.
9      Q   (By Mr. Bruce) Were you aware that one of
10 the other --
11         MR. BRUCE: Well, let's go ahead and
12 mark this. Let's mark this as Exhibit 2.
13
14             (Plaintiffs' Exhibit No. 2 was
15             marked for identification.)
16
17     Q   (By Mr. Bruce) Let me show you what's been
18 marked as Exhibit 2 for your deposition, and ask you
19 if you can identify that.
20     A   Yes. It's the original diskette that we had
21 provided of participant information, and we had
22 initially provided it to Morgan, Lewis.
23     Q   In --
24     A   I would say -- I think it was January of
25 '06.

Page 63

1      Q   Right. Okay. And in producing that, one of
2  the fields that we requested was the account balance
3  at the commencement date.
4          Do you know why it wasn't possible to
5  include that field?
6      A   Because DBRK doesn't house the actual
7  payment amount.
8      Q   But I thought there was a field in DBRK for
9  account balance at commencement date.
10         MS. KOHEN: Objection.
11         MS. RAVITZ: Objection.
12         MS. KOHEN: Is there a question?
13     Q   (By Mr. Bruce) Is that right?
14     A   I'm sorry. What's the question?
15         MS. RAVITZ: You want her to answer
16 whether what you thought was what you thought?
17     Q   (By Mr. Bruce) Isn't there a field in DBRK
18 for the account balance at commencement date?
19     A   I don't know.
20     Q   Do you recall --
21     A   There's a benefit calculation.
22     Q   Isn't there a field that cumulates the
23 account balance at the date of commencement?
24     A   There is a field that cumulates the benefit
25 at the point in time that we do the calculation on the

Page 64

1  system, which may or may not be the commencement date.
2      Q   So did you check for whether there was a
3  field for the account balance at the commencement
4  date?
5      A   No.
6          MS. RAVITZ: Objection.
7          THE WITNESS: We're pulling the account
8  balance at commencement date from the payment system.
9  That's what we've asked our technology people to do.
10     Q   (By Mr. Bruce) Okay. So they're going to
11 provide --
12     A   If they elected a lump sum, that's what we
13 would be pulling.
14     Q   Well, how about if they didn't elect a lump
15 sum?
16     A   No. We didn't pull that. It's my
17 understanding you wanted to know what their benefit
18 was at commencement.
19     Q   Well, there's two separate items there.
20 There's the benefit amount elected, and then the
21 account balance at the commencement date, so the
22 benefit amount elected might be an annuity --
23     A   Correct.
24     Q   -- or --
25         MS. KOHEN: Stephen, are you referring

Page 65

1  to a document?
2          MS. RAVITZ: Yeah. Could you please --
3          MR. BRUCE: Yeah. She's looking, under
4  tab 3 in the notice of deposition, at the listing of
5  the items that we wanted to follow up on after the
6  systems inspection in January.
7          MS. RAVITZ: Well, it's my
8  understanding that this is not part of what we've
9  agreed is the scope of this deposition. I'll allow
10 you to ask questions, and if my witness can answer,
11 she, obviously, will answer, but this is not what we
12 agreed to. But continue.
13         MR. BRUCE: Yes, it is. It's item
14 number 2.
15         MS. KOHEN: Well --
16         THE WITNESS: Item number 2 --
17         MS. KOHEN: -- number 12 --
18         THE WITNESS: -- on the notice?
19         MR. BRUCE: Yeah.
20         MS. KOHEN: Even number 12 of the
21 notice specifically incorporates the list from which
22 you're now asking her, so --
23         MR. BRUCE: We're asking her about the
24 fields that she's working on, so --
25         THE WITNESS: The additional fields

Page 82

1  other places in the company where we have information
2  that might --
3      MR. BRUCE: Right.
4      MS. RAVITZ: -- be more current on a
5  particular person's responsibilities. It's not put in
6  this manual.
7      Q  (By Mr. Bruce) Okay. So part of this
8  Exhibit 3 are phone scripts.
9          So do you have phone scripts that you use
10 currently?
11     A  The phone scripts here would have been
12 primarily for our call center, and those would be
13 different now, too, because we're under the Prudential
14 interactive voice response system now.
15     Q  So do you have phone scripts for --
16     A  I don't personally have them, but I'm sure
17 Prudential does.
18         MS. RAVITZ: Let him finish the
19 question.
20     Q  (By Mr. Bruce) So who handles the phone
21 scripts?
22         MS. RAVITZ: Objection.
23         THE WITNESS: Management in the call
24 center.
25     Q  (By Mr. Bruce) And how about inquiries from

Page 83

1  participants? Is that the call center?
2      A  It starts through the call center, and if
3  they can answer the question, they will. If not, then
4  they create a task that gets routed electronically to
5  my group, for them to call the participant back and
6  answer their questions.
7      Q  And how are those routed? Electronically
8  through e-mails?
9      A  No. It's a work-tracking system.
10     Q  And what does that work-tracking system
11 produce? Does it produce a log?
12     A  It's all on-line. It creates a task with a
13 task type on it, so like a telephone call, and it
14 would instruct us who we need to speak to, where we
15 can reach them, and what the general question is or
16 what the participant is asking for.
17        MR. BRUCE: Let me ask to have this
18 marked as Exhibit 4.
19
20         (Plaintiffs' Exhibit No. 4 was
21          marked for identification.)
22
23     Q  (By Mr. Bruce) Let me show you what's been
24 marked as Exhibit 4.
25        Now, are you familiar with these types of

Page 84

1  documents? I think the cover e-mail is on the back,
2  the very last page.
3      A  Uh-huh.
4      Q  And this is entitled "CIGNA Pension Plan
5  Initiatives"?
6      A  Uh-huh.
7      Q  You said "yes"?
8      A  Yes. I'm sorry.
9      Q  Okay. And the cover e-mail indicates it
10 comes from an Ellen Meseroll?
11     A  It did this one period. She was covering
12 for someone else in March.
13     Q  Okay. She's in Philadelphia, or no?
14     A  Ellen Meseroll, no. She works for me.
15     Q  Oh, okay. And these are -- there's -- what,
16 is this a regular meeting?
17     A  It's a monthly meeting that recaps some
18 various initiatives for the pension plan that we're
19 working with CIGNA on.
20     Q  Okay. And you keep records of these
21 activity reports?
22     A  Right. We produce them once a month. We
23 provide them to CIGNA prior to our meeting with them.
24     Q  Okay. And you keep copies of the ones from
25 the past?

Page 85

1      A  Yes.
2      Q  And where do you keep those copies?
3      A  They're in a shared drive, on a shared
4  drive.
5      Q  Okay. So everybody can access them,
6  and --
7      A  Whoever has access to that drive. It's not
8  the whole company.
9      Q  Okay. And what do they access? A scanned
10 document? Or they access e-mails with these as
11 scanned documents, or what?
12     A  This?
13     Q  Yes.
14     A  This is just an Excel spreadsheet or Word
15 document that we have.
16     Q  Okay. But what's on the shared drive would
17 be the e-mail with the --
18     A  No. It would just be the document itself.
19     Q  Okay. And how far back do these go? When
20 did you start this?
21     A  I don't know how far back we'd have them,
22 but several years, I would guess.
23     Q  Is this something that you started, or that
24 started after you --
25     A  No. It was in place before I came to the

Page 86

1  team.
2  Q  And what else is on the shared drive that --
3  with these documents?
4        MS. RAVITZ: Objection.
5        THE WITNESS: It could be anything that
6  we work with CIGNA on. There's a similar one for
7  their defined contribution plans. There could be
8  testing data or data results for the ADCAP testing.
9  It's generally not e-mail, no. It's not an imaging
10 system.
11 Q  (By Mr. Bruce) But what other documents
12 does it have related to the DB plan?
13 A  I couldn't rattle them all off the top of my
14 head. I mean --
15 Q  Well, rattle off the ones that you can.
16 A  The fulfillment material would be there,
17 copies that we use for the benefit packages that we do
18 manually.
19       There might be different queries that we've
20 provided CIGNA with for a variety of things, not just
21 related to the defined benefit plan, but to some of
22 their other plans, their other retirement plans, not
23 specific to this plan, but it could be anything that
24 we recordkeep for them.
25       It could be any project plans that we might

Page 87

1  be doing. If they were implementing some kind of
2  initiative or communication that we would be involved
3  in.
4        Sometimes there's materials that we put
5  together for our call center routes on a particular
6  topic.
7  Q  And how about the phone scripts?
8  A  No. I don't have those.
9  Q  Those wouldn't be on the shared drive?
10 A  Not my shared drive. There could be other
11 drives within Prudential, but they're not part of my
12 organization.
13 Q  Okay. And how about the procedures that we
14 were talking about earlier with respect to checking
15 final calculations?
16       MS. RAVITZ: Objection.
17       THE WITNESS: As I said before, we
18 don't have a specific manual, per se.
19 Q  (By Mr. Bruce) But, I mean, would those be
20 on the shared drive somewhere?
21 A  We don't have procedures in that manual --
22 you mean, like, e-mails or memos?
23 Q  (Mr. Bruce nods.)
24 A  No. E-mails and memos probably wouldn't be
25 on the shared drive. It's not an imaging system. So

Page 88

1  if it was produced in a Word document, it might be
2  saved to a shared drive.
3  Q  So is there any recordkeeping system with
4  regard to memos related to the DB plan?
5        MS. KOHEN: Objection.
6  Q  (By Mr. Bruce) Does anybody follow those?
7        MS. RAVITZ: Objection.
8        THE WITNESS: Yeah. We would have some
9  memos.
10 Q  (By Mr. Bruce) And how are they filed?
11 Chronologically, or --
12 A  No. It's more individual people maintaining
13 their own notes on specific things. Generally kept
14 with our SPD copy or planned document copy, if there's
15 something that's clarified, or --
16 Q  Okay. So in terms of keeping memos related
17 to defined benefit calculations, the person who would
18 be most likely to keep those would be Denise Belanger?
19 A  Oh, okay. I'm sorry. If you're talking
20 about a participant individual that we're providing
21 calculations for, then that information would be
22 imaged if it can be imaged, and if it's not imaged,
23 then it's kept in a hard copy file, or, you know,
24 presumably would be in that person's file.
25 Q  I'm talking about memos or e-mails, or

Page 89

1  whatever, that are related to the defined benefit plan
2  administration and calculations.
3        Who would be most likely to keep copies of
4  those? Denise Belanger?
5  A  Yeah. Denise would probably be one of our
6  sources.
7  Q  Okay.
8  A  I have some with the SPD, but I don't -- I
9  mean, I'd have them all.
10 Q  So have you asked Denise to put together
11 what she would consider to be her procedure- and
12 calculation-related memos and e-mails and sources?
13 A  No, I did not.
14 Q  Okay. Would it be possible for her to put
15 together her -- the things that she considers -- you
16 know, that she considers to be her files on what her
17 procedures and calculation --
18       MS. RAVITZ: Objection.
19       MR. BRUCE: -- steps are?
20       MS. RAVITZ: If you know what Denise is
21 capable of, you can answer.
22       THE WITNESS: Well, I mean, if she has
23 documents relating to that, there's no reason why we
24 can't produce them. They're just not in a formal
25 procedures manual.

23 (Pages 86 to 89)

### Page 90

1   Q   (By Mr. Bruce) Okay. And you don't believe
2   she's been asked to do that today?
3   A   I haven't asked her.
4   Q   Okay. And you have been -- in terms of this
5   discovery, you have been the point person; right?
6   A   For Jamie.
7       MS. RAVITZ: Objection.
8   Q   (By Mr. Bruce) And for Jeremy?
9   A   I guess for Jeremy as well, although I
10  haven't spoken with him as much.
11      MS. RAVITZ: Could you identify who
12  Jeremy is?
13      MR. BRUCE: Jeremy Blumenfeld from
14  Morgan, Lewis.
15      THE WITNESS: Uh-huh.
16  Q   (By Mr. Bruce) And so do you know whether
17  Jeremy was relating directly to anyone on your team
18  other than yourself?
19  A   No. I don't --
20      MS. KOHEN: Objection.
21      You can answer.
22      THE WITNESS: No. I don't believe they
23  were.
24      MR. BRUCE: Okay.
25      MS. RAVITZ: Are you asking at a time

### Page 91

1   frame when Lorraine worked for Prudential?
2       MR. BRUCE: Yeah.
3       MS. RAVITZ: Okay. I just don't know
4   if there's a privilege issue, and I just didn't want
5   you to -- I don't want to waive anything with regard
6   to that.
7   Q   (By Mr. Bruce) Okay. And the same with
8   respect to Jamie, that Jamie has not been contacting
9   people on your team other than yourself; correct?
10  A   Right.
11  Q   Okay. So in your understanding, when we
12  were asking for updates of your administrative
13  manuals, was that only if it was something --
14  A   Yeah. I was thinking it was more --
15      MS. RAVITZ: Let him finish the
16  question.
17      THE WITNESS: Sorry.
18  Q   (By Mr. Bruce) Only if it was something
19  that was put into this binder, that those were the
20  only things that we were interested in?
21  A   Yeah. I assumed it was a more formal
22  documentation process.
23  Q   Okay. So now -- I mean, if you don't have a
24  more formal documentation process, then -- correct?
25  A   Right.

### Page 92

1   Q   So --
2       MS. RAVITZ: Objection. Is there --
3       Let him finish the question.
4   Q   (By Mr. Bruce) So you understand now that
5   we do want -- if there isn't a formal document, that
6   we want the informal documents to try to put together
7   what the procedures are on things like the minimum
8   benefits and opening account balances?
9       MS. RAVITZ: Okay. I'm just going to
10  object at this point.
11      And if you want to provide to us a written
12  request under Rule 34 --
13      MR. BRUCE: Well, we already
14  requested -- we already requested this, and I --
15      MS. RAVITZ: Let me --
16      MR. BRUCE: -- clarified it with Nick
17  Merritt, you know, and we talked about this in
18  January.
19      We talked about that sometimes people don't
20  continue updating manuals like this; that they start
21  off on the memo trail, and they don't continue to
22  update their more formal document. And we talked
23  about that in January. I've talked about it with Nick
24  Merritt on the phone.
25      MS. RAVITZ: If you have a specific

### Page 93

1   request of Prudential --
2       MR. BRUCE: We've made --
3       MS. RAVITZ: -- you can provide it to
4   us in writing in accordance with Rule 34.
5       MR. BRUCE: We've made this request,
6   and I think there was a real misunderstanding here.
7       Let's take a break here.
8       MS. KOHEN: Yeah. Thanks.
9       MS. RAVITZ: Okay.
10
11      (A brief recess was taken from
12      11:42 to 11:51 a.m.)
13
14  Q   (By Mr. Bruce) Now, in one of the
15  conversations I had with Nick Merritt, he indicated
16  that something -- with respect to the missing opening
17  account balances and annuity amounts, that something
18  might have happened in a system turnaround.
19      Do you recall that?
20      MS. RAVITZ: Objection.
21      If you recall his conversation with Nick
22  Merritt, you can address that.
23  Q   (By Mr. Bruce) Do you recall anything about
24  a system turnaround?
25  A   No, I don't. I'm not sure what that would

Page 102

1  Q  And was that at your initiative?
2  A  Yes.
3  Q  And why did you initiate that project?
4  A  That goes back to the same issue we
5  discussed earlier, back in 2002, where there were
6  participants who didn't have complete records, didn't
7  have an OAB --
8  Q  But this indicates --
9  A  -- or had an OAB when they shouldn't have,
10 because they had been paid out.
11 Q  But this indicates that it's related to
12 rehires; correct?
13 A  Yes. It was part of that. But that was a
14 subset, if you will.
15 Q  What was a subset? The rehires?
16 A  The entire issue was that the OABs were
17 either missing or still there when someone had been
18 paid out, and the rehires were a part of that.
19 Q  But this indicates that your project is
20 limited to the rehires; is that correct?
21     MS. KOHEN: Objection. This was asked
22 and answered. Objection.
23     THE WITNESS: Yes. This particular
24 project is addressing the rehires.
25 Q  (By Mr. Bruce) So if the problem is broader

Page 103

1  than that, why wouldn't the project be broader than
2  that?
3      MS. KOHEN: Objection.
4      THE WITNESS: It's just not captured
5  here, because we don't have an actual initiative where
6  we're taking the group of them. We're doing them as
7  one-offs.
8  Q  (By Mr. Bruce) And who is doing the
9  research? This indicates it's yourself and Donna
10 Cherry; is that correct?
11 A  We were overseeing the project. Donna
12 Cherry is not doing that, and at this time we're not
13 currently. We haven't had the capacity to complete
14 that at this time, so we're trying to chip away at
15 them as they come up.
16 Q  And when you chip away at them, what is the
17 work product?
18 A  We update the participant record on DBRK to
19 reflect what it should be reflecting.
20 Q  And is there any kind of history track to
21 show that it was updated or to show why it was
22 updated?
23 A  Yes. We usually make notes in our imaging
24 system.
25 Q  And are there any kind of procedures with

Page 104

1  regard to reviewing the rehires to determine if the
2  opening account balance is correct?
3  A  Yeah. We probably -- we have some steps
4  that we had put together as to what steps should be
5  gone through in analyzing each record.
6  Q  And in what form do those steps take? What
7  type of a document is that in?
8  A  Word document.
9  Q  And where would that be?
10 A  That is probably in one of the shared
11 drives.
12 Q  And do you know who prepared that?
13 A  I believe Janet Van Duesen did.
14 Q  And what is the work product when you review
15 the rehire opening account balances?
16     MS. RAVITZ: Objection.
17 Q  (By Mr. Bruce) Is there something that's
18 filled out, a work sheet or any kind of a record of
19 that, other than the notes that you say may be entered
20 in the imaging system?
21 A  Yes. There would be documentation.
22 Q  And where would that documentation be kept?
23 A  And it would be tied to the individual
24 person's record in imaging.
25 Q  So documentation would be put into the

Page 105

1  imaging system?
2  A  Yeah, for that individual person.
3  Q  And what if the review indicated no change
4  was needed?
5  A  Then it would note that.
6  Q  And when this review is going on, to
7  determine if the account balance is correct, that
8  involves getting data that is not in the DBRK system;
9  correct?
10 A  Well, it depends. If these were people who
11 had an opening account balance, but then were
12 subsequently paid out, it probably would mean they had
13 an account balance when we shouldn't have had them
14 there. We need to show that the benefit has been
15 paid.
16     Because, again, remember, I said that we
17 were taking it out in the early years. When someone
18 was paid out, we were moving that amount, so it
19 wouldn't appear that they had a benefit still due.
20     If it's missing information, then, yes, then
21 we have to try to obtain it or calculate it.
22 Q  Okay. Well, let's take that one step at a
23 time.
24     The first point was that if it looked like
25 the opening account balance might have been stripped