<u>**Amara v. CIGNA**</u>, Case No. 01-2361 (MRK)

# EXHIBIT 239

**Amara v. CIGNA, C.A. 01-2361 (MRK)**

## DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS

### Deposition of John Arko dated July 3, 2003

**(1) Plaintiffs' Designations (marked in blue)**

    p.  6, lines 2 - 19
    p. 17, line 12 - p. 30, line 21
    p. 33, line  6 - p. 36, line 15
    p. 41, line 17  - p. 59, line 18
    p. 81, line  5 - p. 85, line 8
    p. 90, line 20 - p. 92, line 14
    p. 95, line  3 - p. 96, line 5
    p. 106, line  9 - p. 128, line 18
    p. 133, line  6 - p. 156, line 7 (See attached Depo. Ex. 52)
    p. 190, line  4 - p. 191, line 23
    p. 200, line 14 - p. 201, line 13
    p. 212, lines 1 - 21
    p. 238, line  9 - p. 239, line 4 (See Pls. Ex. 120)
    p. 253, line  5 - p. 270, line 16
    p. 285, line  7 - p. 298, line 9
    p. 307, lines 1 - 24
    p. 317, line 14  - p. 321, line 21

**(2) Defendants' Counter-Designations (marked in red)**

    p. 128, line 24 - p. 129, line 4
    p. 234, line 23 - p. 235, line 10

## JOHN ARKO

Page 1

1     UNITED STATES DISTRICT COURT
2     FOR THE DISTRICT OF CONNECTICUT
3              - - -
4   JANICE C. AMARA, Individually and on:
5   behalf of others similarly situated :
6                -vs-            :
7   CIGNA CORP. and CIGNA PENSION PLAN  :
8              - - -
9          No. 3:01-CV-2361 (DIS)
10       Oral Deposition of JOHN ARKO, was taken
11   pursuant to notice, held at ZANARAS REPORTING AND
12   VIDEO, 1616 Walnut Street, Philadelphia,
13   Pennsylvania, at 10:05 a.m., on July 3, 2003, before
14   Kristen Augello, Court Reporter and Notary Public,
15   there being present:
16
17
18              - - -
19       ZANARAS REPORTING AND VIDEO
20          1616 Walnut Street
21        Philadelphia, Pennsylvania 19103
22    2112 Bay Avenue, Ocean City, New Jersey 08226
23        1-215-790-7857  1-877-GO-DEPOS
24

Page 2

1   A P P E A R A N C E S :
2
3   BY: STEPHEN R. BRUCE, ESQUIRE
4   805 15th Street, NW, Suite 210
5   Washington, DC 20005
6   202-371-8013
7   Attorney for the Plaintiff
8
9
10  MORGAN, LEWIS & BOCKIUS
11  BY: JEREMY P. BLUMENFELD ESQUIRE
12  1701 Market Street
13  Philadelphia, Pennsylvania 19103
14  215-963-5258
15  Attorney for the Defendants
16
17
18
19
20  Also Present: Thomas G. Moukawsher, Esquire
21
22
23
24

Page 3

1   I N D E X
2   NAME OF WITNESS:    EXAMINATION    PAGE NO.
3   John Arko
4              Mr. Bruce        5
5
6
7
8        E X H I B I T    I N D E X
9   NO.                    PAGE
10  Exhibit-52 through 59       5
11  Exhibit-60                 13
12  Exhibit-61                 43
13  Exhibit-62                 71
14  Exhibit-63                 76
15  Exhibit-64                179
16  Exhibit-65                184
17  Exhibit-66                235
18  Exhibit-67                250
19  Exhibit-68                252
20  Exhibit-69                273
21  Exhibit-70                278
22
23
24

Page 4

1           LITIGATION SUPPORT INDEX
2
3       DIRECTION TO WITNESS NOT TO ANSWER
4
5   PAGE LINE        PAGE LINE        PAGE LINE
6   16   4           29   1           37   15
7   61   9           171  5           194  12
8   203  11          298  19          311  9
9   314  22          316  1
10      REQUEST FOR PRODUCTION OF DOCUMENTS
11
12  PAGE LINE        PAGE LINE        PAGE LINE
13
14              (NONE)
15
16              STIPULATION
17
18  PAGE                 LINE
19   5                    1
20
21           QUESTIONS MARKED
22  PAGE                 LINE
23
24

## JOHN ARKO

**Page 5**

1              - - -
2              (It is agreed by and between
3       counsel that the reading, signing,
4       sealing, filing and certification are
5       hereby waived; and all objections,
6       except as to form of the question, are
7       reserved until the time of trial.)
8              - - -
9              JOHN ARKO, after having been
10      first duly sworn, was examined and
11      testified as follows:
12             - - -
13             - - -
14             (Whereupon, the court reporter
15      marked Exhibits-52 through 59 for
16      purposes of identification.)
17             - - -
18   BY MR. BRUCE:
19      Q.      Would you please state your name?
20      A.      John Arko.
21      Q.      And what's your address?
22      A.      401 Dudley Avenue, Narberth,
23   Pennsylvania.
24      Q.      How do you spell Narberth?

**Page 6**

1       A.      N-a-r-b-e-r-t-h.
2       Q.      And Mr. Arko, I have met you before,
3    because I deposed you in Mr. Depenbrock's case.
4       A.      Yes.
5       Q.      What's your job title now?
6       A.      Director of retirement benefits.
7       Q.      And you're here in response to a Rule
8    30 (b)(6) notice of deposition.  Do you understand
9    what that is?
10      A.      Yes.  I have been informed.
11      Q.      Can you explain what your
12   understanding of that is?
13      A.      That in general this is a -- you have
14   some questions to pose of either Cigna Corporation or
15   the Cigna pension plan, and you needed somebody who
16   could speak on their behalf, since they are unable
17   to.
18      Q.      So this is a corporation?
19      A.      Yes.
20      Q.      And what are the subjects on which
21   you're to speak?
22              MR. BLUMENFELD:  Objection.
23   BY MR. BRUCE:
24      Q.      What's your understanding of what the

**Page 7**

1    subjects are on which you're to speak for the
2    corporation?
3              MR. BLUMENFELD:  Same objection.
4       He is here pursuant to your notice of
5       deposition under 30 (b)(6) to speak to
6       the subjects you will identify.
7              MR. BRUCE:  I can ask him what
8       his understanding is of the subjects.
9    BY MR. BRUCE:
10      Q.      Go ahead.
11      A.      I believe in general you wanted to
12   cover a couple of points.  You see, I had to recall
13   now just from memory.  One was something a little bit
14   about 204(h) notices around the plan, and we see the
15   accruals of the benefit.  The second was how we look
16   at how the plan was designed, or around age
17   discrimination issues, and there was a third.  It's
18   escaping me at the moment.
19              MR. BLUMENFELD:  Are you finished
20      with your answer?
21              THE WITNESS:  Yes, I am.
22              MR. BLUMENFELD:  I'd just like to
23      note for the record, he is here
24      pursuant to the 30 (b)(6) notice of

**Page 8**

1       deposition to answer questions on
2       subjects identified in that notice and
3       for purposes of the 30 (b)(6) with
4       regard to him speaking on behalf of
5       Cigna Corporation and Cigna pension
6       plan.  He is authorized to speak on
7       regarding subjects that you identified
8       in the notice.
9              MR. BRUCE:  Okay.
10   BY MR. BRUCE:
11      Q.      And what did you do to prior to
12   speaking on Cigna's behalf on these subjects?
13      A.      Had a few meetings with Jeremy
14   Blumenfeld and with Paul Gontarek.
15      Q.      Anyone else?
16      A.      No.
17      Q.      How about Mr. Meyn?
18      A.      No.
19      Q.      Did you speak with Mr. Meyn about what
20   you were going to do?
21      A.      I let him know that I was scheduled to
22   be at this deposition today.
23      Q.      And what was your conversation with
24   him?

## JOHN ARKO

**Page 17**

1  think that that's entirely improper
2  for a 30 (b)(6) deposition. If you
3  intend to ask him facts related to
4  that, ask your questions.
5        MR. BRUCE: I asked him a
6  question, Jeremy, and you're making
7  speeches. Can you ask him the last
8  question again?
9        (The previous question is read
10        back.)
11  BY MR. BRUCE:
12        Q.    Have you been asked to testify about
13  that today on behalf of Cigna and the pension plan?
14        A.    I have been asked to respond to your
15  questions, yes.
16        Q.    And one of the subjects of those
17  questions is concerning the 133 and a third percent
18  rule.
19        A.    That's what I understand, yes.
20        Q.    And what did you do to prepare
21  yourself to testify about that subject?
22        A.    Nothing more than what I have already
23  described to you.
24        Q.    Did you review any documents

**Page 18**

1  concerning the 133 and a third percent rule?
2        A.    In preparation of this, beyond what I
3  described, no.
4        Q.    What documents did you review that
5  related to the 133 and a third percent rule? The
6  only one would be Exhibit-60?
7        A.    Yes.
8        Q.    No other documents?
9        A.    No.
10        Q.    Are you familiar with who -- go
11  ahead.
12        A.    I can correct that. I did review
13  quickly some information that the Mercer Consulting
14  firm put together.
15        Q.    And what information was that?
16        A.    It was material around the design of
17  the pension plan.
18        Q.    What material was that, Mr. Arko? Can
19  you describe it? What was it, spreadsheets?
20        A.    Specifically, it is a binder that
21  contained information around a variety of design
22  formulas.
23        Q.    And can you not produce that this
24  morning?

**Page 19**

1        MR. BLUMENFELD: That's already
2  been produced to you.
3        MR. BRUCE: But the binder that
4  he reviewed was not produced.
5        MR. BLUMENFELD: You have a copy
6  of the same document.
7        MR. BRUCE: Is it the one that we
8  marked as an exhibit?
9        MR. BLUMENFELD: I believe so.
10  BY MR. BRUCE:
11        Q.    What did you learn from that binder,
12  Mr. Arko?
13        MR. BLUMENFELD: Objection.
14  BY MR. BRUCE:
15        Q.    What did you learn from that binder?
16        A.    Just that there was a sentence
17  describing the fact that under a variety of benefit
18  crediting formulas that we created, that the fact of
19  putting in an interest credit floor would help pass,
20  and if I recall from memory, the accrual rules --
21        MR. BLUMENFELD: Stephen, your
22  notice of deposition is limited in
23  temporal scope to matters after
24  December 31, 1997. I think it might

**Page 20**

1  be helpful if you would ask the
2  questions of the witness that were
3  based on the 30 (b)(6) notice of
4  deposition, which is limited in
5  temporal scope.
6        MR. BRUCE: But the basis for
7  believing the plan is in compliance
8  could be a document that was prepared
9  before the end of 1997, Mr.
10  Blumenfeld. You're not going to try
11  those kinds of distinctions, are you?
12        MR. BLUMENFELD: I am certainly
13  going to make a distinction with
14  regard to the 30 (b)(6) nature of that
15  deposition in that it relates to the
16  plan's compliance after December 31,
17  1997 in its revisions.
18        MR. BRUCE: The plan's compliance
19  after December 31, 1997 can be based
20  on a document that was prepared before
21  that time, and he has testified that
22  he reviewed a binder from William
23  Mercer about that compliance, right?
24        MR. BLUMENFELD: Just to be

**JOHN ARKO**

Page 21

1  clear, Stephen, I wasn't instructing
2  him not to answer your question on the
3  basis that it wasn't limited in
4  temporal scope, I just think it would
5  be helpful --
6      MR. BRUCE:  I didn't understand
7  what you were instructing, then.  What
8  were you instructing, then?
9      MR. BLUMENFELD:  I was suggesting
10  that it would be helpful to you to
11  limit your questions or to define the
12  time frame for your questions, since
13  that is what you did in your notice of
14  deposition, and he is only permitted
15  to speak on behalf of the corporation
16  with regards to the items in your
17  notice of deposition, and I think that
18  that should be clear on the record.
19      MR. BRUCE:  Are you instructing
20  him, or are you making another
21  speech?
22      MR. BLUMENFELD:  I was advising
23  you of our position with regards to
24  the 30(b)(6) deposition.

Page 22

1      MR. BRUCE:  I have heard your
2  position.  Fine.
3  BY MR. BRUCE:
4      Q.    Did you see any other spreadsheets
5  concerning compliance with the 133 and a third
6  percent rule?
7      A.    In preparation for this meeting, no.
8      Q.    Have you ever seen any?
9      A.    Have I seen any spreadsheets?
10      MR. BLUMENFELD:  Objection.
11  BY MR. BRUCE:
12      Q.    About the Cigna pension plan's
13  compliance with the 133 and a third percent rule.
14      MR. BLUMENFELD:  Objection, and
15  to the extent that your question is
16  not limited in scope, I object on the
17  grounds that it exceeds the scope of
18  the 30(b)(6) deposition.
19      MR. BRUCE:  You have objected.
20  Just make your objection.
21      MR. BLUMENFELD:  I did.
22      MR. BRUCE:  You don't have to do
23  speaking objects.  You have done a
24  number -- you have spoken almost more

Page 23

1  than I have this morning, so you need
2  to stop that, okay?
3      MR. BLUMENFELD:  I am trying to
4  make the record clear, because you're
5  not doing so.
6      MR. BRUCE:  Is that okay?  No
7  speaking objections, or are you going
8  to insist on making speaking
9  objections?
10      MR. BLUMENFELD:  Because it's a
11  30(b)(6) deposition.
12      MR. BRUCE:  Are you going to
13  insist on making speaking objections,
14  or are you going --
15      MR. BLUMENFELD:  I am going to
16  make objections that I deem are
17  appropriate.
18      MR. BRUCE:  You are going to have
19  to stop the speaking objections,
20  because you're taking up too much
21  time, okay?
22  BY MR. BRUCE:
23      Q.    Are you familiar with an actuary named
24  Arthur Assantes?

Page 24

1      A.    Yes.
2      Q.    Do you know whether Mr. Assantes ever
3  did any work on the plan's compliance with the
4  nondiscrimination rules?
5      MR. BLUMENFELD:  Objection.
6      THE WITNESS:  In general, he did
7  nondiscrimination testing for the
8  pension plan, but there's a number of
9  ways I understand that we need to be
10  -- the plan needs to be tested for
11  nondiscrimination.  I can't speak to
12  what he did specifically.
13  BY MR. BRUCE:
14      Q.    Do you know of any other individuals
15  who -- any other actuaries who worked on the
16  nondiscrimination testing aside from Mr. Assantes?
17      MR. BLUMENFELD:  Objection.
18      THE WITNESS:  Any other
19  actuaries?  Can you be more specific
20  in what nondiscrimination topics
21  you're talking about?
22  BY MR. BRUCE:
23      Q.    No, I can't.  You testified that you
24  reviewed this Exhibit-60 about nondiscrimination

6 (Pages 21 to 24)

## JOHN ARKO

Page 25

1  testing, right, so you know what nondiscrimination
2  testing is, right?
3                    MR. BLUMENFELD:  Objection.
4  BY MR. BRUCE:
5        Q.      Or not do you know?
6        A.      I understand the concept, and I know
7  that I rely on others to help me to do the right
8  thing for our pension plan.
9        Q.      And the question is, do you know of
10 any other actuaries besides Mr. Assantes who worked
11 on the nondiscrimination testing?
12                   MR. BLUMENFELD:  Objection.
13                   THE WITNESS:  Art Assantes is no
14                   longer with Cigna.  He is no longer
15                   our actuary.  We use somebody else
16                   now.
17 BY MR. BRUCE:
18       Q.      Can you answer the question?
19       A.      So, yes, I do.
20       Q.      And who is that?
21       A.      Actuaries at Cigna Retirement
22 Investment Services, including Lisa Carskadden.
23       Q.      Anyone else?
24       A.      You would have to ask Lisa who else

Page 26

1  was involved.
2        Q.      I am asking you.  If you don't know
3  anyone else, just say so.
4        A.      I don't know anybody else for certain.
5        Q.      Do you know anyone who helped Arthur
6  Assantes in testing the plan for nondiscrimination?
7                    MR. BLUMENFELD:  Objection.
8                    THE WITNESS:  It would be from
9                    memory.
10 BY MR. BRUCE:
11       Q.      That's what most questions are, Mr.
12 Arko.
13                   MR. BLUMENFELD:  Objection.
14                   THE WITNESS:  I don't know who
15                   else, who he would have turned to for
16                   help.
17 BY MR. BRUCE:
18       Q.      So you don't know?
19       A.      I don't know that answer.
20       Q.      And are you familiar with whether
21 there are any documents concerning the plan's
22 compliance with the 133 and a third percent rule?
23       A.      Besides what I am looking at right
24 here and the previously mentioned Mercer binder, I

Page 27

1  can't recall any others.
2        Q.      So to your knowledge, there are no
3  other documents concerning the plan's compliance with
4  the 133 and a third percent rule?
5        A.      Right correct.
6        Q.      And did you do any type of search or
7  inquiries concerning that in preparation for your
8  deposition here today?
9        A.      No, I didn't.
10       Q.      Why wouldn't you?  If one of the
11 subjects of the deposition was the 133 and a third
12 percent rule, and you're here to testify on behalf of
13 Cigna and the Cigna pension plan, so did you feel
14 like you knew everything there was to know about it?
15       A.      No, I certainly don't feel that.
16       Q.      Well, did you not feel any need to
17 make any inquiries of others concerning the plan's
18 compliance with the subject so that you could testify
19 knowledgeably?
20       A.      No, I didn't.
21       Q.      How about the plan's compliance with
22 the age discrimination rules, do you know of any
23 documents concerning the plan's compliance with the
24 age discrimination rules?

Page 28

1        A.      I am not familiar with any documents.
2        Q.      Your belief is that the pension plan
3  is in compliance with the age discrimination rules,
4  right?
5        A.      Yes, it is.
6        Q.      Okay.  And what is this belief based
7  on?
8        A.      The input of experts that we have
9  retained to review our plan, the Cigna pension plan.
10       Q.      And what experts are those?
11       A.      The actuaries, including Art Assantes
12 at that time, and others.
13       Q.      And what others are we talking about?
14       A.      In the past we have retained outside
15 legal counsel; Drinker, Biddle and Reath, and we
16 utilized Mercer Consulting in the design of the -- in
17 particular the Part B of the pension plan.
18       Q.      And is it your understanding that
19 .Mr. Assantes opined that the plan was in compliance
20 with age discrimination rules?
21       A.      No, it is not.
22       Q.      And how about outside legal counsel,
23 did outside legal counsel opine that the plan was in
24 compliance with the age discrimination rules?

# JOHN ARKO

Page 29

1           MR. BLUMENFELD:  I am going to
2     object.  To the extent that what he is
3     asking you calls for the disclosure of
4     attorney/client communications, I am
5     going to instruct you not to answer
6     that question.
7  BY MR. BRUCE:
8      Q.     So you are refusing to answer whether
9  outside legal counsel opined on the subject?
10     A.     (Indicating.)
11     Q.     You have to say yes.
12     A.     Yes.
13     Q.     And how about William Mercer?  Did
14 William Mercer opine on whether the plan complied
15 with age discrimination rules?
16     A.     And by opined, did they --
17     Q.     Did they express a view?
18     A.     Did they express a view, certainly
19 they helped in the design, and our understanding was
20 that they, as the consulting expert, the expert in
21 the design of such plans, designed the program to be
22 in compliance with all rules and regulations,
23 especially in particular the ones you're describing.
24     Q.     And what was that understanding based

Page 30

1  on?
2           MR. BLUMENFELD:  Objection.
3  BY MR. BRUCE:
4      Q.     Was there a conversation where William
5  Mercer indicated that the plan that they were
6  offering, the plan design that they were offering was
7  in compliance with age discrimination rules?
8           MR. BLUMENFELD:  Objection.
9           THE WITNESS:  I don't recall.
10 BY MR. BRUCE:
11     Q.     Is there any document that you recall
12 seeing where William Mercer expressed a view on
13 whether the plan that had been designed would be in
14 compliance with age discrimination rules?
15     A.     No, I don't recall one.
16     Q.     And have you seen any documents
17 related to the plan's compliance with age
18 discrimination rules?
19           MR. BLUMENFELD:  Objection.
20           THE WITNESS:  No, I don't recall
21     any.
22 BY MR. BRUCE:
23     Q.     Have you seen any documents testing
24 the plan's rates of accruals to see whether they

Page 31

1  comply with age discrimination rules?
2      A.     Again, the binder that I referred to
3  earlier that Mercer produced.
4      Q.     I will show you what's been marked as
5  Exhibit-27.  Is that the binder that you reviewed?
6      A.     I can't be certain.  There was a
7  number of binders that had the same look.
8      Q.     Did you look at a number of different
9  binders, or you looked at one?
10     A.     In preparation for this meeting, just
11 one.
12     Q.     And do you recall looking at other
13 binders?  Do you recall looking at other binders from
14 William Mercer?
15     A.     Over any career at Cigna, during this
16 design, yes.
17     Q.     Well, looking at Exhibit-27, is there
18 anything in this binder that refers to age
19 discrimination or that relates to age discrimination?
20           MR. BLUMENFELD:  Objection.
21 BY MR. BRUCE:
22     Q.     You're here to testify on these
23 subjects, Mr. Arko.
24     A.     I don't know.  I could look through

Page 32

1  the entire binder.
2      Q.     Well, try and be helpful.  You're here
3  to testify to these subjects.
4           MR. BLUMENFELD:  I am going to
5     object on two bases.  This is a
6     document.  Obviously it speaks for
7     itself.  The document is not after
8     December 31, 1997, and your assertion
9     that he is here to speak on behalf of
10     the corporation with regard to this
11     document in particular is not proper.
12          MR. BRUCE:  He said that he
13     reviewed it.  You vouched that this is
14     the document he reviewed.
15          MR. BLUMENFELD:  No, I did not.
16     I advised you that I believed that
17     that was the case.
18          MR. BRUCE:  That's close enough,
19     I think.
20 BY MR. BRUCE:
21     Q.     Do you believe that this is the
22 document that you reviewed in preparation for your
23 deposition?
24          MR. BLUMENFELD:  Objection, asked

## JOHN ARKO

Page 33

1    and answered.
2        THE WITNESS:  I can't be
3    certain.  So many of them look exactly
4    the same.
5  BY MR. BRUCE:
6        Q.    You can take your time.  What in this
7  document relates to age discrimination?
8        MR. BLUMENFELD:  Objection.
9        THE WITNESS:  Here's one point.
10   I have not gone through the whole
11   document, but on that page the
12   sentence that describes, passes the
13   benefit accrual test using a
14   guaranteed interest crediting rate of
15   3 percent.
16 BY MR. BRUCE:
17       Q.    That was what you referred to earlier
18 when you said you gleaned from William Mercer's
19 exhibit that certain interest rates were required as
20 a floor in order to pass the accrual test, right?
21       A.    Correct.
22       Q.    I am asking you what in here -- I
23 thought you testified that the binder that you
24 referred to earlier from William Mercer contained

Page 34

1  some information related to the plan's compliance
2  with age discrimination rules.  So is there something
3  in here that you believe relates to the plan's
4  compliance with age discrimination rules?
5        A.    Beyond what I just described here, I
6  don't believe there is anything else.  I don't
7  believe there's anything else.
8        Q.    Okay.  Is there any other document
9  that you can think of that relates to the Cigna
10 pension plan's compliance with age discrimination
11 tests?
12       A.    No other documents that I can recall.
13       MR. BLUMENFELD:  Objection.
14 BY MR. BRUCE:
15       Q.    And so other than outside legal
16 counsel where you're refusing to answer the question
17 of whether they provided advice, is there anyone else
18 that you believe has advised Cigna or the Cigna
19 pension plan that it is in compliance with the rules
20 on age discrimination and rates of accrual?
21       MR. BLUMENFELD:  Objection.
22       THE WITNESS:  We utilized Mercer
23       Consulting.  That was who we relied
24       on.

Page 35

1  BY MR. BRUCE:
2        Q.    And did you have any concern about
3  whether the plan complied with the rules on age
4  discrimination and rates of accrual?
5        MR. BLUMENFELD:  Objection.
6        THE WITNESS:  Did I personally,
7        or did Cigna Corporation?
8  BY MR. BRUCE:
9        Q.    Cigna.
10       A.    Certainly Cigna always wants to make
11 sure that the plan is designed in accordance with all
12 applicable guidelines, rules, regulations.
13       Q.    And so given that, what did Cigna do
14 to make sure that it was in compliance with those
15 rules related to age discrimination and rates of
16 accrual?
17       MR. BLUMENFELD:  Objection.  Are
18       you talking about after December 31st,
19       1997?
20       MR. BRUCE:  He can answer the
21       question at any time.
22       THE WITNESS:  At any time?  For
23       this specific amendment that we are
24       talking about in 1998, we utilized

Page 36

1        Mercer Consulting.
2  BY MR. BRUCE:
3        Q.    So you believe that Mercer Consulting
4  expressed a view on whether the plan was in
5  compliance with the age discrimination rules?
6        A.    We relied on Mercer Consulting to
7  design a plan that was in compliance with all the
8  rules, yes.
9        Q.    And is there any communication with
10 Mercer that indicates that you were relying on Mercer
11 to design a plan that was in compliance with age
12 discrimination rules?
13       MR. BLUMENFELD:  Objection.
14       THE WITNESS:  Not that I am aware
15       of.  This was done before 1998.
16 BY MR. BRUCE:
17       Q.    You were there before 1998, right?
18       A.    But only from April of '97.
19       Q.    And did you make any inquiries about
20 what the plan or Cigna did to ensure that it was in
21 compliance with the age discrimination rules?
22       MR. BLUMENFELD:  Objection, time
23       frame.
24 BY MR. BRUCE:

JOHN ARKO

**Page 41**

1          immediately into the cash balance
2          plan.
3  BY MR. BRUCE:
4          Q.     Were the accruals under the cash
5  balance plan significantly reduced compared to the
6  accruals under the prior plan?
7                 MR. BLUMENFELD:  Objection.
8                 THE WITNESS:  You need to be more
9          specific.  Can you ask a more specific
10         question?
11 BY MR. BRUCE:
12         Q.     Can you answer the question?
13         A.     I don't think I understand the
14 question in that context.
15                MR. BLUMENFELD:  Objection.
16 BY MR. BRUCE:
17         Q.     Let's skip over that.  Did Cigna give
18 notice to employees of a reduction in the rate of
19 accruals?
20                MR. BLUMENFELD:  Objection.
21                THE WITNESS:  Yes, I believe we
22         did.
23 BY MR. BRUCE:
24         Q.     And what document was that in?

**Page 42**

1          A.     It was in a newsletter that was
2  delivered to participants.
3          Q.     Was it in what's called the SPD?
4          A.     No.
5          Q.     Was it in what's been called the
6  information kit?
7                 MR. BLUMENFELD:  Objection.
8                 THE WITNESS:  No, I don't believe
9          so.
10 BY MR. BRUCE:
11         Q.     And you know what I am referring to
12 about information kit?
13         A.     Yes, I do.
14         Q.     That was that maroon binder with a
15 number of different documents?
16         A.     Yes, there was a few versions.
17                MR. BLUMENFELD:  Objection.
18         Q.     That was different versions for people
19 who were grandfathered and people who were converted
20 to the cash balance plan?
21         A.     Correct.
22         Q.     So your understanding is that notice
23 of a reduction was contained in the newsletter that
24 was distributed to employees in November of 1997?

**Page 43**

1                 MR. BLUMENFELD:  Objection.
2                 THE WITNESS:  I can't recall
3          specifically the date it was
4          delivered, but it sounds like that was
5          the newsletter.
6                 MR. BRUCE:  Let's mark this as
7          61.
8                        - - -
9                 (Whereupon, the court reporter
10         marked Exhibit-61 for purposes of
11         identification.)
12                        - - -
13 BY MR. BRUCE:
14         Q.     I am showing you what's been marked as
15 Exhibit-61.  Is that the newsletter to which you're
16 referring?
17         A.     Yes.
18         Q.     And you're testifying on behalf of
19 Cigna Corporation and Cigna pension plan that this
20 newsletter is the notice of reduction that's required
21 under ERISA and --
22                MR. BLUMENFELD:  Objection.
23 BY MR. BRUCE:
24         Q.     That it contains the notice of

**Page 44**

1  reduction that was required by ERISA, right?
2                 MR. BLUMENFELD:  Objection on two
3          grounds; first of all, as has already
4          been established, this document is
5          before December 31, 1997, and
6          therefore is not subject to the 30
7          (b)(6) notice.  That's grounds number
8          one.  Second of all, it
9          mischaracterizes his testimony.
10                MR. BRUCE:  Go ahead and answer.
11                THE WITNESS:  Repeat that
12         question.
13                MR. BRUCE:  Could you repeat the
14         question?
15                (The previous question is read
16         back.)
17                MR. BLUMENFELD:  Objection.
18                THE WITNESS:  I don't know that
19         it was required to be produced, but we
20         feel it would satisfy a 204(h) type of
21         notification.
22 BY MR. BRUCE:
23         Q.     And you say we feel, who is the we?
24         A.     Cigna Corporation.

**JOHN ARKO**

Page 45

1      Q.      But who did you talk to about whether
2   this newsletter constituted the 204(h) notice?
3      A.      In direct preparation of this meeting,
4   are you asking?
5      Q.      Okay.
6      A.      Nobody in particular.
7      Q.      And prior to this meeting, where did
8   you get your understanding that this newsletter,
9   Exhibit-61, contains 204(h) notice?
10     A.      From any recollection of what was
11  going on at the time that this newsletter was created
12  back in 1997.
13     Q.      And what do you recall happening where
14  you thought that this was the 204(h) notice?
15     A.      During 1997 we were creating the
16  communication, entire program and plan to tell
17  employees about all these changes in the retirement
18  program.  During those discussions it was that -- one
19  of the issues discussed, as I recall, was can we put
20  a 204(h) notice somewhere.
21     Q.      And who do you recall discussing that
22  with?
23     A.      Paul Gontarek, our legal, and the
24  person we all relied on.

Page 46

1      Q.      And anyone else?
2      A.      I can't recall specifically.  A lot of
3   people were involved with the creating the
4   communications.
5      Q.      How about David Durham?
6      A.      He would have been involved in
7   creating this material.
8      Q.      How about Andy Hodges?
9              MR. BLUMENFELD:  Objection.
10             THE WITNESS:  I can't recall if
11             he would have been tangentially
12             involved, but I don't think at all
13             directly, would not have had any
14             responsibilities to review any of this
15             type of material.
16  BY MR. BRUCE:
17     Q.      How about the age discrimination
18  analysis and rates of accruals, did Andy Hodges take
19  any part in that?
20             MR. BLUMENFELD:  Objection.
21             THE WITNESS:  At the time during
22             1997, during the design phases?
23             MR. BRUCE:  Yes.
24             THE WITNESS:  Not that I recall.

Page 47

1   BY MR. BRUCE:
2      Q.      Anytime after that?
3      A.      Not that I recall.
4      Q.      Did he take any part in analyzing
5   whether the plan complied with the 133 and a third
6   percent rule?
7              MR. BLUMENFELD:  Objection.  Go
8              ahead.
9              THE WITNESS:  During the design
10             phases of this plan design, 1997?
11             MR. BRUCE:  Yes.
12             THE WITNESS:  You would have to
13             ask him, but not that I am aware of at
14             Cigna Corporation.
15  BY MR. BRUCE:
16     Q.      And looking at Exhibit-61, the
17  newsletter, what in the newsletter constitutes notice
18  to employees of reductions in rates of accrual?
19             MR. BLUMENFELD:  Objection, calls
20             for a legal conclusion.
21             THE WITNESS:  Are you asking me
22             what I thought was a 204(h) notice in
23             here?
24             MR. BRUCE:  Yes.

Page 48

1              THE WITNESS:  It was on Page 5 of
2              this newsletter.  It would be the
3              story labeled, opening balances to be
4              calculated next spring.
5   BY MR. BRUCE:
6      Q.      What in there notified employees of a
7   reduction in accruals?
8              MR. BLUMENFELD:  Objection.
9              THE WITNESS:  I can read you what
10             is here.
11  BY MR. BRUCE:
12     Q.      What language do you think relates to
13  that issue?
14     A.      I think the entire story, but I am
15  happy to read it.
16     Q.      The entire story relates to reductions
17  in rates of accrual?
18             MR. BLUMENFELD:  Objection.
19             THE WITNESS:  I think that this
20             story satisfies to the extent we were
21             trying to put a 204(h) notice out,
22             that this was -- this notice and that
23             story was intended to do that.
24  BY MR. BRUCE:

## JOHN ARKO

Page 49

1      Q.      So this story was intended to satisfy
2  the 204(h) requirement, the one entitled, opening
3  balances to be calculated next spring?
4      A.      I don't know that it was a
5  requirement, but it was intended to satisfy and to
6  serve as 204(h) notice.
7      Q.      And how do you recall that?
8              MR. BLUMENFELD:  Objection.
9  BY MR. BRUCE:
10     Q.      What do you recall being discussed, or
11 how did you come --
12     A.      Just as I answered before during the
13 creation and design of the communications plan back
14 in 1997, I believe it was Paul Gontarek who suggested
15 that we -- or at least put into discussion
16 potentially doing a 204(h) notice.
17     Q.      And you recall some discussion of this
18 article relating to the 204(h) notice?
19     A.      Out of that discussion and design, any
20 understanding is this was served to satisfy a 204(h)
21 notice.
22     Q.      Was there anything else in the
23 newsletter that you thought satisfied the 204(h)
24 notice?

Page 50

1              MR. BLUMENFELD:  Objection.
2              THE WITNESS:  I am not certain.
3              We would have relied on Paul Gontarek
4              and our outside counsel to confirm
5              that it did satisfy a 204(h) notice.
6  BY MR. BRUCE:
7      Q.      And are you aware that the 204(h)
8  notice is the responsibility of the plan
9  administrator under ERISA?
10     A.      That sounds familiar, yes.
11     Q.      And the plan administrator under ERISA
12 has fiduciary duties, right?
13             MR. BLUMENFELD:  Objection.
14             THE WITNESS:  Yes, a variety of
15             them, yes.
16 BY MR. BRUCE:
17     Q.      And in terms of real-life individuals,
18 the people who function as the plan administrator for
19 Cigna Corporation are yourself; is that right?
20     A.      You would have to be more specific.
21 Are you talking about in 1997, or now?
22     Q.      Back in 1997.
23     A.      During the design of this plan?
24     Q.      Yes.

Page 51

1      A.      I don't know that I would have put
2  myself in that role at that time.
3      Q.      Who would you have put in that role?
4      A.      The main plan administrator at that
5  time was Stuart Beltz.
6      Q.      And how about Jerry Meyn?
7      A.      He was responsible -- vice-president
8  of employee benefits and health management.  You
9  would have to ask him what he thought his role was in
10 particular.
11     Q.      And in preparation for your deposition
12 here today, did you contact Mr. Beltz about the
13 204(h) notice?
14     A.      No, I did not.
15     Q.      Did you try to determine whether or
16 not he had any documents related to the 204(h)
17 notice?
18     A.      No, I did not.
19     Q.      Did you ask anyone whether there were
20 any documents related to the 204(h) notice?
21     A.      No, I did not.
22     Q.      So have you ever seen anything in
23 writing relating to 204(h) notice?
24     A.      Again, you're talking during 1997 or

Page 52

1  now?
2      Q.      Anytime.
3              MR. BLUMENFELD:  Objection.
4              THE WITNESS:  During 1997, no
5              doubt, whether the documents or the
6              conversation, I can't recall
7              specifically.
8  BY MR. BRUCE:
9      Q.      In going back to this article that's
10 entitled, opening balances to be calculated next
11 spring, in Exhibit-61, what notice does it give to
12 employees relating to reductions in accruals?
13             MR. BLUMENFELD:  Objection.
14             THE WITNESS:  I can read you
15             again what it says.
16 BY MR. BRUCE:
17     Q.      No, I'm asking you the question of
18 what is your understanding of what does this article
19 communicate to employees related to reductions in the
20 rate of accruals?
21             MR. BLUMENFELD:  Objection.
22 BY MR. BRUCE:
23     Q.      Does it tell them anything about that
24 subject?

## JOHN ARKO

Page 53

1          MR. BLUMENFELD:  Objection.
2          THE WITNESS:  I can just say that
3     Paul Gontarek and outside legal
4     counsel reviewed this and surmised
5     that it satisfied requirements to be a
6     204(h) notice, if we were to need one.
7  BY MR. BRUCE:
8     Q.     And so the idea as you recall it was
9  that without determining whether Cigna needed a
10 204(h) notice, that Cigna would give one anyway; is
11 that right?
12    A.     I think what's a fair conclusion, yes.
13    Q.     And you don't recall any discussions
14 with Mr. Durham that 204(h) notice was needed, that
15 there were reductions in rates of accrual?
16         MR. BLUMENFELD:  Objection.
17         THE WITNESS:  I don't recall
18         specific conversations back in 1997.
19 BY MR. BRUCE:
20    Q.     Do know whether there were any
21 reductions in rates of accrual comparing the new plan
22 with the old plan?
23    A.     I don't know how to answer that
24 question.  In particular, individual?

Page 54

1     Q.     In particular individuals.
2          MR. BLUMENFELD:  Objection.
3          THE WITNESS:  You would have to
4          provide a specific point in history
5          and do calculations.
6  BY MR. BRUCE:
7     Q.     Do you remember in terms of particular
8  individuals, whether there were any reductions?
9          MR. BLUMENFELD:  Objection.
10         THE WITNESS:  I don't know how to
11         answer that question.
12 BY MR. BRUCE:
13    Q.     Do you remember Bob Upton?
14    A.     Robert Upton?
15    Q.     Yes.
16    A.     I believe I do from recollection, pure
17 memory, yes.
18    Q.     Do you remember that there were
19 reductions in his rates of accrual under the new
20 plan, compared to the old?
21    A.     No, I don't recall.
22    Q.     Do you recall an individual employees
23 where there were reductions in their rates of
24 accruals?

Page 55

1          MR. BLUMENFELD:  Objection.
2          THE WITNESS:  I am not -- could
3          you clarify what you mean by rates of
4          accrual; ultimate retirement
5          benefits?
6  BY MR. BRUCE:
7     Q.     Do you know what rates of accrual
8  means?
9          MR. BLUMENFELD:  Objection.
10         THE WITNESS:  I mean, they mean
11         different things in different
12         contexts.
13 BY MR. BRUCE:
14    Q.     Tell me what you believe they mean in
15 the context of 204(h).
16    A.     What I personally believe?
17    Q.     Yes.
18    A.     That the value of benefits that are
19 under the plan would be less under one design,
20 presumably a new design, than an older design
21 formula.
22    Q.     And do you know, given your
23 understanding of what that means, do you know whether
24 there were any individuals whose rates of accrual

Page 56

1  were less under the new plan compared to the old
2  plan?
3     A.     And by that, do you mean the benefits
4  they ultimately received in the plan?
5     Q.     No, I mean the definition that you
6  just gave.
7     A.     I don't know.  I would need to review
8  that, and ascertain whether there were -- how
9  specific individuals were calculated, but any
10 understanding is no, there wouldn't be anybody.
11    Q.     So your understanding -- tell us about
12 that.  Tell me about your understanding that no,
13 there wouldn't be anyone in general?  What was that
14 understanding based on?
15    A.     Again, similar to the answer before
16 about the discussion we had in 1997 as we were
17 creating these communications pieces, and I think it
18 was under the discussion of the 204(h) notice,
19 whether we wanted to do one or not.  I can't recall
20 the specifics of how those discussions went, but I
21 think they during those discussions probably realized
22 that in general, no accruals were going to be
23 reduced.
24    Q.     And who were those discussions with?

## JOHN ARKO

Page 57

1    A.    The names you were naming before;
2  David Durham and Paul Gontarek would be the crux of
3  it, our communications people, probably others.
4    Q.    Were your communications people
5  performing comparisons of the old rates of accrual
6  with the new rates of accrual?
7    A.    No, not to any understanding.
8    Q.    So who would have had a knowledgeable
9  assessment of whether the old rates of accrual were
10  higher in some cases than the new rates of accrual,
11  David Durham.
12    A.    Who would have.
13    Q.    Who would be knowledgeable about this?
14    A.    Certainly we would have looked to Paul
15  Gontarek and our outside legal counsel, Drinker,
16  Biddle.
17    Q.    Did they make numerical comparisons
18  like that?
19    A.    No, but they would have been
20  knowledgeable.
21    Q.    Who would be knowledgeable about the
22  numerical comparisons besides David Durham?
23    A.    Mercer Consulting was part of the
24  design.

Page 58

1    Q.    Anyone else?
2    A.    And I presume some of our actuaries at
3  Cigna Retirement Investment Services.
4    Q.    Who, Andy Hodges?
5    A.    Perhaps Andy Hodges.
6    Q.    Do you recall that Andy Hodges had a
7  spreadsheet where he would do comparisons of benefits
8  under the old plan with benefits under the new plan?
9    MR. BLUMENFELD:  Objection.
10    THE WITNESS:  During 1997?
11    MR. BRUCE:  After 1997.
12    THE WITNESS:  After 1997?  Yes, I
13    do recall that he had created some --
14    for some purposes.
15  BY MR. BRUCE:
16    Q.    Did you ever see any of the results
17  that he created?
18    A.    After 1997, yes, I am sure that I saw
19  some results that he created.
20    Q.    And when you're talking about that
21  there would not, in general, be any reductions, are
22  you including the enhancement in people's SIP
23  benefits in your analysis?
24    MR. BLUMENFELD:  Objection.

Page 59

1    THE WITNESS:  No, not to my
2    knowledge.
3  BY MR. BRUCE:
4    Q.    So you are comparing pension benefits
5  to pension benefits; you're comparing the old Cigna
6  pension plan with the new Cigna pension plan?
7    A.    Benefits under the Cigna pension plan
8  as it was amended.
9    Q.    And your understanding was that in
10  general there would not be any lower rates of
11  accruals for employees who were moved to the new
12  Cigna pension plan?
13    MR. BLUMENFELD:  Objection.
14  BY MR. BRUCE:
15    Q.    Is that right?
16    A.    In particular -- in general?  In
17  general as you asked, I am not clear on the question
18  precisely, but in general I guess I would say no.
19    Q.    Have you talked with anyone about that
20  recently?
21    A.    No.
22    Q.    Did you make any inquiries concerning
23  how the rates of accrual under the old plan compared
24  with the rates of accrual under the new plan in

Page 60

1  preparation for testifying here today?
2    MR. BLUMENFELD:  Objection.  You
3    are asking him about matters that are
4    outside the scope of the 30 (b)(6)
5    deposition.
6  BY MR. BRUCE:
7    Q.    Did you?
8    A.    Beyond discussion, no.
9    Q.    Did you make any inquiries concerning
10  whether there were any computations or analyses of
11  rates of accrual for purposes of the 204(h) notice
12  and tests?
13    A.    During 1997, or in preparation for
14  here?
15    Q.    Yes.
16    A.    No.
17    Q.    So you are testifying here today on
18  behalf of Cigna and Cigna pension plan about the
19  plan's compliance with 204(h), including but not
20  limited to any computation or analyses of rates of
21  benefit accrual, but you didn't ask anyone whether
22  there were any computations or analyses of rates of
23  accrual; is that your testimony?
24    MR. BLUMENFELD:  Objection.

### JOHN ARKO

Page 81

1    Q.      Just try and answer the question.  If
2  the answer is you don't know, just say that.
3    A.      I don't know if I have an answer to
4  that.  I don't know.
5    Q.      Let's go back to Exhibit-61.  The
6  article that you identified on Page 5 is, providing
7  the 204(h) notice.  I believe you described earlier
8  that the 204(h) notice is to tell participants that
9  there has been a reduction in this future benefit,
10  right?
11                  MR. BLUMENFELD:  Objection.
12                  THE WITNESS:  A 204(h) notice in
13                  general, yes, that's what it is for.
14  BY MR. BRUCE:
15    Q.      Going through this article, let's take
16  the first sentence.  It states:  Employees
17  participating in the new Cigna retirement plan will
18  stop earning benefits under the current pension plan
19  on December 31, 1997.  Is that providing people with
20  notice that their benefits are being reduced?
21                  MR. BLUMENFELD:  Objection.  The
22                  document speaks for itself.
23  BY MR. BRUCE:
24    Q.      Is that sentence providing people with

Page 82

1  notice that their benefits are being reduced?
2    A.      It's telling people that they'll stop
3  earning benefits under the current plan.
4    Q.      Is it telling people what their
5  benefits will be under the new plan?
6    A.      It goes on to talk about the fact that
7  effective 1/1/98, there will be -- I can read
8  again -- there will be a new plan in place.
9    Q.      That's the last sentence, the
10  effective date of the new plan, which will
11  technically be an amendment to the existing plan,
12  will be January 1, 1998?
13    A.      Yes.
14    Q.      Does that sentence tell participants
15  that their benefits will be reduced under that new
16  plan?
17                  MR. BLUMENFELD:  Objection.  The
18                  document speaks for itself.
19                  THE WITNESS:  I don't know, no.
20  BY MR. BRUCE:
21    Q.      How about the next paragraph that
22  says:  Cigna will begin the process of calculating
23  final pension benefits and retirement plan opening
24  balances early in 1998, after all 1997 payroll data

Page 83

1  are finalized.  Does that sentence tell participants
2  that their benefits under the new plan will be
3  reduced?
4                  MR. BLUMENFELD:  Same objection.
5                  The document speaks for itself.
6                  MR. BRUCE:  You can just say,
7                  same objection.
8                  THE WITNESS:  No.
9  BY MR. BRUCE:
10    Q.      The next sentence:  Benefit
11  calculations are expected to be completed in the
12  spring.  Does that tell employees that their benefits
13  will be reduced under the new plan?
14    A.      No.
15    Q.      And the next sentence after that, once
16  balances are calculated, they will be credited to
17  retirement plan accounts retroactively to January 1,
18  1998, so you won't lose any interest credits for the
19  first part of 1998.  Does that sentence tell
20  employees that their benefits will be reduced under
21  the new plan?
22                  MR. BLUMENFELD:  Same objection.
23                  THE WITNESS:  No.
24  BY MR. BRUCE:

Page 84

1    Q.      And the final sentence:  You will be
2  informed of your final pension plan benefit and
3  retirement plan opening balance in your total
4  compensation report scheduled to be mailed in May
5  1998.  Does that sentence tell employees that their
6  benefits will be reduced under the new plan?
7                  MR. BLUMENFELD:  Same objection.
8                  THE WITNESS:  No.
9  BY MR. BRUCE:
10    Q.      So when you considered this article to
11  provide notice to employees that their benefits will
12  be reduced under the new plan --
13                  MR. BLUMENFELD:  Objection.
14  BY MR. BRUCE:
15    Q.      -- you were relying solely on the
16  advice of counsel?
17    A.      We didn't feel we needed to do a
18  204(h) notice, but to the extent this article
19  satisfies any requirements of a 204(h) notice, we
20  relied on counsel.
21    Q.      But is there something in this article
22  that tells employees that their benefits will be
23  reduced under the new plan?
24                  MR. BLUMENFELD:  Objection.  The

## JOHN ARKO

Page 85

1  document speaks for itself, and you
2  have already gone through the entire
3  thing with him.
4  BY MR. BRUCE:
5      Q.     Is there something in this article
6  that tells employees that their benefits will be
7  reduced under the new plan?
8      A.     No.
9      Q.     Let's go over some of the documents
10 that you have brought, starting with Exhibit-52.  Mr.
11 Arko, have you seen the expert report that Mr. Poulan
12 prepared in this case?
13     A.     The name doesn't sound familiar to me.
14     Q.     He is the expert for the plaintiffs.
15     A.     Yes, I did.
16     Q.     You have reviewed that?
17     A.     I have a copy of that testimony, and I
18 have skimmed it.
19     Q.     When did you skim it?
20     A.     It's been over a month now ago.
21     Q.     And how about the expert report
22 prepared by Harry Scherr, did you review that?  He is
23 your expert for Cigna.
24     A.     No, I did not.

Page 86

1      Q.     You have never seen his expert report?
2      A.     No, I have not.
3      Q.     You're familiar with the term
4  wearaway, right?
5      A.     In the context of pension plans?
6      Q.     Yes.
7      A.     That of a plan amendment, yes.
8      Q.     Do you know whether the Cigna pension
9  plan had a wearaway after January 1, 1998?
10     A.     Can you be more specific, provide a
11 scenario?  I think there's no -- to my knowledge, the
12 plan document doesn't define any terms like wearaway.
13     Q.     Did the employees -- were any of the
14 employees under a wearaway after January 1, 1998?
15     MR. BLUMENFELD:  Objection.
16     THE WITNESS:  By -- I am not
17         quite sure what you mean by wearaway
18         beyond what I have defined before.
19 BY MR. BRUCE:
20     Q.     Why don't you tell me what you mean by
21 wearaway?
22     A.     When a plan amendment is created that
23 provides for a benefit formula different from a
24 previous formula plan document had in effect, and

Page 87

1  that for a period of time that the previous formula
2  continues on as part and comes into play in the
3  benefit calculation, and if that benefit calculation
4  under the old plan is, provides for a benefit that is
5  higher at the time of commencement of a benefit
6  formula than the new amendment formula provides for,
7  then that might be termed a wearaway period.
8      Q.     Why do people call it a wearaway,
9  because there is a period in which the participant
10 doesn't earn any additional benefits?
11     MR. BLUMENFELD:  Objection.
12     THE WITNESS:  Because -- I don't
13         know why people term it a wearaway
14         period.  I can tell you that I think
15         that's, generally speaking, why they
16         would term it a wearaway period, yes.
17 BY MR. BRUCE:
18     Q.     Because there's a period of time
19 during which people don't earn any additional
20 benefits?
21     MR. BLUMENFELD:  Objection.
22     THE WITNESS:  They get their
23         benefits at the time that they meet
24         all the requirements to start to

Page 88

1  receive a payment from the plan.
2  BY MR. BRUCE:
3      Q.     Do you know whether Cigna conducted
4  any focus groups in connection with its
5  communications to employees about the cash balance
6  plan?
7      MR. BLUMENFELD:  Objection.
8      THE WITNESS:  So this would be
9         back in the 1997 time frame?
10     MR. BRUCE:  Yes.
11     THE WITNESS:  I can't recall.
12 BY MR. BRUCE:
13     Q.     Again, when did you start with Cigna?
14     A.     April of '97.
15     Q.     You don't remember focus groups in the
16 summer after you started?
17     A.     I didn't participate in any.
18     Q.     Who would have been responsible for
19 focus groups?
20     MR. BLUMENFELD:  Objection.
21     THE WITNESS:  I don't know that
22         there was any, but if there were it
23         would have been the communications
24         people, perhaps David Durham.

## JOHN ARKO

Page 89

1    BY MR. BRUCE:
2         Q.    Are you familiar with the requirements
3    for summary plan description?
4         A.    In general I am familiar with them,
5    yes.
6         Q.    Do you know whether there was a
7    wearaway under the Cigna cash balance plan based on
8    early retirement benefits that were provided under
9    the prior plan?
10                MR. BLUMENFELD:  Objection.
11                THE WITNESS:  Nothing to do with
12                the summary plan description now,
13                you're just asking me the formulas?
14   BY MR. BRUCE:
15        Q.    Yes.
16        A.    Just in the way that we described them
17   before, that I previously answered your question.  It
18   depends on a specific participant's career.
19        Q.    Were there any wear-aways under the
20   Cigna cash balance plan?
21        A.    By wearaway, do you mean did people
22   start a benefit at their commencement date that might
23   have experienced the wearaway provision that we
24   discussed before?  I am not -- I am not aware of

Page 90

1    anyone in particular.
2         Q.    How about the employees who were
3    rehired, did they have wear-aways?
4                 MR. BLUMENFELD:  Objection.
5                 THE WITNESS:  I am not aware of
6                 any rehires that -- directly aware of
7                 any rehires that terminated and
8                 started a benefit that somehow now are
9                 receiving a benefit that met the
10                criteria of the wear-aways we were
11                discussing before.
12   BY MR. BRUCE:
13        Q.    Do you know, in valuing the employees'
14   accrued benefits for purposes of establishing opening
15   account balances, do you know how that was done?
16        A.    By any memory, yes, I do recall pieces
17   of it, but I would need to refer to the terms of the
18   plan, because there was a number of different ways to
19   convert an opening account balance.
20        Q.    Do you no whether what's called
21   pre-retirement mortality discounts were taken in
22   establishing open account balances?
23        A.    I know that a mortality table needed
24   to be utilized in establishing opening account

Page 91

1    balances, and could be found under the terms of the
2    plan defined in the terms of the plan.
3         Q.    Do you know if a pre-retirement
4    mortality discount was included in establishing
5    opening account balances?
6                 MR. BLUMENFELD:  Objection.
7                 THE WITNESS:  And I am not clear
8                 on that question.  Can you define what
9                 a pre-retirement mortality discount
10                is?
11   BY MR. BRUCE:
12        Q.    You don't know?
13        A.    I don't know that I could -- no, I
14   don't know exactly what you mean by that.
15        Q.    And you studied for the actuarial
16   exams, right?
17        A.    The first one, quite awhile ago, yes.
18        Q.    But you have never heard that Cigna
19   used pre-retirement mortality discounts in
20   establishing the opening account balances under the
21   cash balance plan?
22                MR. BLUMENFELD:  Objection.
23                THE WITNESS:  Again, I am not
24                quite clear on what you are asking.

Page 92

1                 We definitely used mortality tables in
2                 calculating an account balance.
3    BY MR. BRUCE:
4         Q.    Do you know a pre-retirement mortality
5    discount is a discount based on the probability that
6    someone may die between their current age and the
7    normal retirement age under the plan?
8         A.    Okay, yes.
9         Q.    Do you know whether Cigna applied a
10   discount based on that probability of mortality in
11   establishing opening account balances?
12                MR. BLUMENFELD:  Objection.
13                THE WITNESS:  Yes, exactly, per
14                the terms of the plan.
15   BY MR. BRUCE:
16        Q.    You think that was provided under the
17   terms of the plan, to do that?
18        A.    Yes.
19        Q.    And do you understand that if a
20   pre-retirement mortality discount is applied in
21   establishing an opening account balance and an
22   employee continues to work for Cigna thereafter, that
23   if they took that account balance with interest, that
24   they would not be able to repurchase the same annuity

# JOHN ARKO

1   that they started out with?
2                   MR. BLUMENFELD:  Objection.
3                   THE WITNESS:  I don't understand
4                   that question.
5   BY MR. BRUCE:
6       Q.      You don't understand that concept or
7   you don't understand the question?
8       A.      I don't understand the specific
9   question.
10      Q.      Do you understand that if a
11  pre-retirement mortality discount is applied in
12  establishing an opening account balance and you took
13  that money from the opening account balance and you
14  let it accrue interest at the same rate that was
15  established in -- that was used in establishing the
16  opening account balance, that the person could never
17  repurchase the same annuity that they started out
18  with?
19      A.      I don't know that they could never
20  purchase the same annuity.
21                  MR. BLUMENFELD:  Objection.
22                  THE WITNESS:  There's no -- the
23                  plan doesn't offer any purchase of
24                  annuities.

1               date.
2   BY MR. BRUCE:
3       Q.      You were aware that there were early
4   retirement -- so-called early retirement subsidies
5   under the Part A pension plan, were you not?
6       A.      Yes, I am.
7       Q.      And there were not early retirement
8   subsidies under the Part B plan, right?
9                   MR. BLUMENFELD:  Objection.
10                  THE WITNESS:  There wasn't a
11                  concept of early retirement subsidies
12                  in the new plan.  You could receive
13                  your benefits prior to the normal
14                  retirement date under the new plan.
15  BY MR. BRUCE:
16      Q.      And how about, you were aware that
17  there was what was called a free 30 percent survivor
18  annuity under the Part A plan, were you not?
19                  MR. BLUMENFELD:  Objection.
20                  THE WITNESS:  I would need to --
21                  it is a complicated plan, the prior
22                  plan, but I do know concepts about
23                  some of the pre -- quote pre 30
24                  percent survive benefits, yes.

1   BY MR. BRUCE:
2       Q.      How do they recoup the mortality
3   discount that was taken?
4                   MR. BLUMENFELD:  Objection.
5   BY MR. BRUCE:
6       Q.      How does the employee recoup the
7   mortality discount that was taken in establishing the
8   opening account balance?
9                   MR. BLUMENFELD:  Objection.
10                  THE WITNESS:  Our employees
11                  simply receive the benefits under the
12                  terms of the plan at the time that
13                  they commence receipt of those
14                  benefits.
15  BY MR. BRUCE:
16      Q.      And so is there any way that they can
17  ever recoup the mortality discount that was taken in
18  establishing their opening account balance?
19                  MR. BLUMENFELD:  Objection.
20                  THE WITNESS:  The terms of the
21                  plan don't define such a concept, to
22                  my knowledge.  The terms of the plan
23                  are followed when a participant
24                  receives a benefit at the commencement

1   BY MR. BRUCE:
2       Q.      And that was not offered under the new
3   cash balance plan, right?
4       A.      No, not that specific type of pre 30
5   benefit, no.
6       Q.      And you're aware that interest rates
7   have dropped below the level that was used in
8   establishing opening account balances under the cash
9   balance plan, are you not?
10                  MR. BLUMENFELD:  Objection.
11                  THE WITNESS:  What kind of
12                  interest rates are you asking me
13                  about?
14  BY MR. BRUCE:
15      Q.      Are you aware of what interest rates
16  were used in establishing opening account balances
17  under the Cigna cash balance plan?
18      A.      The plan defines what interest rates
19  were used, yes.
20      Q.      And it was approximately 6.05 percent
21  for most people whose benefits were converted, and it
22  was 5.05 percent for another group; is that right?
23      A.      That sounds right.
24                  MR. BLUMENFELD:  Objection.

## JOHN ARKO

Page 105

1    the reporter read it back.
2         (The previous question is read
3    back.)
4         MR. BLUMENFELD:  Can we step
5    outside for a second?
6         MR. BRUCE:  No, it's in the
7    middle of a question.
8         MR. BLUMENFELD:  It's related to
9    a privileged answer.
10        THE WITNESS:  No --
11        MR. BLUMENFELD:  You should
12   answer.
13        THE WITNESS:  The answer has to
14   be, I don't know.
15   BY MR. BRUCE:
16        Q.    Is there someone else who would know
17   the answer?
18        MR. BLUMENFELD:  Objection.
19        THE WITNESS:  If you could
20   describe the question again, perhaps
21   in different terms or more
22   specifically, I would probably answer.
23        MR. BRUCE:  She read it back.  It
24   was obviously a pretty specific

Page 106

1    question, Mr. Arko.
2         MR. BLUMENFELD:  Objection.
3         MR. BRUCE:  If you want me to
4    make it even more specific, it's going
5    to be even longer.  Can you try and
6    answer it?
7         MR. BLUMENFELD:  Objection.
8    BY MR. BRUCE:
9         Q.    In terms of the A plus B concept, I am
10   saying, isn't what the plan is providing the greater
11   of A, which is the benefit that was accrued as of
12   December 31st of 1997, or, and the second item would
13   be or, the opening account balance plus the benefits
14   accrued after January 1, 1998?  Isn't that the plan,
15   what the plan is offering?
16        A.    That is one portion of the benefit.
17   That is one option that is available to people at the
18   time they commence benefits, again depending on even
19   specific circumstances.
20        Q.    And you think that is a less
21   complicated formula than A plus B?
22        A.    In any opinion?
23        Q.    Yes.
24        A.    Yes, I do.

Page 107

1         Q.    And how is that less complicated?
2         A.    In terms of our plan, again it depends
3    on each person's circumstances and information and
4    what terms of the plan apply to them, but for many
5    people that are converted, that ends up being their
6    opening account balance at the end of 1998, growing
7    into the future with benefit credits and interest
8    credits, and that total account balance is one of the
9    options available to them as a very simply stated
10   number at the time they are ready to commence
11   benefits.
12        Q.    They still have to be offered the A
13   portion, the greater of the two; don't they still
14   have to be offered the benefits that they had accrued
15   up to December 31, 1997?
16        MR. BLUMENFELD:  Objection.
17        THE WITNESS:  My understanding is
18        yes, they do.
19   BY MR. BRUCE:
20        Q.    And don't they have to be told whether
21   that is the more valuable option than the opening
22   account balance plus additional accruals?
23        MR. BLUMENFELD:  Objection.
24        THE WITNESS:  At the point they

Page 108

1         commence benefits, we tell people
2         precisely what options they have
3         available, and how -- exactly what
4         those dollar amounts are.
5    BY MR. BRUCE:
6         Q.    And if someone commences benefits,
7    say, before age 55, do you tell them what the age 55
8    benefit for them is under the prior plan?
9         A.    If they are under 55?
10        Q.    Yes.
11        A.    I can't think of any situations in the
12   plan except under the cash balance portion where they
13   would be able to receive a benefit, and that benefit
14   would be the account balance that they have at the
15   time they commence benefits.  That's what they are
16   given.
17        Q.    And isn't it possible that they can
18   have a benefit commencing at age 55 which is, in
19   fact, a more valuable option?
20        MR. BLUMENFELD:  Objection.
21        THE WITNESS:  They are not 55,
22        you just described somebody that is
23        commencing their benefits prior to age
24        55.

27 (Pages 105 to 108)

# JOHN ARKO

Page 109

1  BY MR. BRUCE:
2       Q.     So if someone commences their benefits
3  at age 54 and they would, in fact, have a more
4  valuable benefit if they waited one year to age 55,
5  Cigna does not tell them that -- does not give them
6  any indication that they might consider waiting one
7  year to retire?
8                      MR. BLUMENFELD:  Objection.
9                      THE WITNESS:  The information
10                     that is provided to people through our
11                     standard distribution package wouldn't
12                     describe such a benefit if it isn't
13                     available, no.
14  BY MR. BRUCE:
15       Q.     You're familiar that there are
16  regulations put out by the Treasury Department about
17  disclosing the relative value of benefit options?
18                     MR. BLUMENFELD:  Objection.
19                     THE WITNESS:  There are
20                     regulations available?
21                     MR. BRUCE:  Yes.
22                     THE WITNESS:  I would have to say
23                     I don't know.
24  BY MR. BRUCE:

Page 110

1       Q.     That was one of the items in the
2  notice of deposition.  It was -- the third item was
3  plan administrator's compliance with the rules on
4  disclosing the relative value of the optional forms
5  of benefit available under the plan; e.g. the extent
6  to which optional forms are subsidized relative to
7  the normal form of benefit.  Do you recall reviewing
8  that in the notice of deposition?
9       A.     Yes, I do.
10       Q.     And did you familiarize yourself with
11  the plan administrator's compliance with that
12  regulation in order to testify here today?
13       A.     Only in terms of the preparation that
14  I described earlier.
15       Q.     So you are familiar with that
16  regulation?
17                     MR. BLUMENFELD:  Objection.
18  BY MR. BRUCE:
19       Q.     Are you familiar with that regulation?
20       A.     Only to the -- yes.
21       Q.     Are you prepared to testify about the
22  plan administrator's compliance with it?
23       A.     I am prepared to testify about what
24  the plan and the administrative team of retirement

Page 111

1  investment services provides to our participants,
2  yes.
3       Q.     So what testimony do you want to offer
4  on the plan administrator's compliance with the rule
5  about disclosing the relative value of optional forms
6  of benefit, including any subsidized options?
7                      MR. BLUMENFELD:  Objection,
8                      that's not a question.
9                      MR. BRUCE:  Go ahead.
10                     THE WITNESS:  Could you ask me a
11                     specific question?
12  BY MR. BRUCE:
13       Q.     Go ahead, what's your testimony about
14  the plan administrator's compliance?  Are they
15  complying?
16                     MR. BLUMENFELD:  Objection.
17  BY MR. BRUCE:
18       Q.     Is the plan administrator complying
19  with that rule?
20       A.     So that's your question?
21       Q.     Yes.
22       A.     I'm not quite clear on exactly what
23  rules you're talking about, but I think we comply
24  with all the appropriate rules that exist.

Page 112

1       Q.     And do you comply with the rule about
2  disclosing the relative value of benefit options?
3                      MR. BLUMENFELD:  Objection.
4                      THE WITNESS:  I think the
5                      distributions package that we provide
6                      to our employees, the information we
7                      give them in all of the materials,
8                      satisfies all requirements under the
9                      provisions you stated, and others.
10  BY MR. BRUCE:
11       Q.     Does it have a space on those forms
12  for disclosing the annuity available from the prior
13  plan?
14                     MR. BLUMENFELD:  Objection.
15                     THE WITNESS:  It has a --
16                     MR. BRUCE:  You have objected.
17  Let him answer.
18                     THE WITNESS:  It has a space for
19                     every option available to that person
20                     at the time they commence, and lists a
21                     number that is available to them to
22                     receive as a benefit.
23  BY MR. BRUCE:
24       Q.     And did you answer any question?  Does

## JOHN ARKO

Page 113

1  it have a place where the participant's annuity under
2  the prior plan is disclosed?
3              MR. BLUMENFELD: Objection. What
4        document are you talking about?
5              MR. BRUCE: He knows what
6        document I am talking about. He has
7        just testified about it. Go ahead.
8        You're talking about the benefit
9        commencement package.
10             THE WITNESS: Yes, I am.
11 BY MR. BRUCE:
12     Q.    Does it have a space for disclosing to
13 the participants the annuity that they had earned
14 under the prior plan?
15             MR. BLUMENFELD: Objection. The
16       document speaks for itself.
17             THE WITNESS: Again, the document
18       provides the exact number of every
19       option available to the participant at
20       the commencement date, and each of
21       those numbers is created per the terms
22       of the plan document.
23 BY MR. BRUCE:
24     Q.    Can you answer my question?

Page 114

1              MR. BLUMENFELD: Objection.
2              THE WITNESS: And to the extent
3        that that calculation requires moving
4        from the Part B of the document into
5        Part A of the document, it would look
6        to Part A of the document.
7  BY MR. BRUCE:
8      Q.    And if one of the options was taken
9  from Part A of the document, would it disclose that
10 that option might have a greater value than other
11 options?
12             MR. BLUMENFELD: Objection. The
13       document speaks for itself.
14             THE WITNESS: The distributions
15       package simply states what it states.
16       It gives numbers, and I don't know
17       who -- now you are asking me the
18       value. I presume you are coming now
19       from the participant's viewpoint, if
20       they see the precise numbers and then
21       we make available to them a call
22       center or they have any other
23       questions they are certainly able to
24       ask, and they're provided the summary

Page 115

1        plan description or any other
2        information we make available.
3              MR. BLUMENFELD: Can we take
4        another quick break, Steve?
5              MR. BRUCE: Sure.
6        (Recess taken.)
7  BY MR. BRUCE:
8      Q.    I am just going to show you what's
9  been marked as Exhibit-26 at Bob Steele's deposition,
10 and this is what -- you can verify, but this looks
11 like a benefits commencement package for an Audrey
12 McCash who separated from service at the end of
13 2002. Does that seem right?
14     A.    Yes, it does.
15     Q.    And there's a page, even though the
16 pages aren't really numbered, but there's a page, the
17 sixth page in is entitled, Cigna pension plan
18 distribution form, page one of two, and it has a
19 number of different options for Ms. McCash; there's a
20 lump sum, a single life annuity, a single life
21 annuity with a lump sum refund, a 50 percent joint
22 survivor annuity, a 100 percent joint survivor
23 annuity and a deferred benefit; is that right?
24     A.    Yes.

Page 116

1      Q.    Does that seem familiar in terms of
2  the options that people are given?
3              MR. BLUMENFELD: Objection.
4              THE WITNESS: Under the terms of
5        the Cigna pension plan and
6        participants from the Cigna plan, this
7        looks pretty typical.
8  BY MR. BRUCE:
9      Q.    And down at the bottom it has a space
10 for deferred benefit, but it doesn't provide an
11 amount. Do you see that?
12     A.    Yes.
13     Q.    Does that seem typical?
14     A.    Typical for people that have an option
15 to defer their benefits from our plan, yes.
16     Q.    If you look down two pages further
17 there's what is called a participant benefits summary
18 sheet for Ms. McCash. Do you see that?
19     A.    Yes.
20     Q.    Are you familiar with those sheets?
21     A.    Yes, they look familiar.
22     Q.    And this indicates that at the time
23 when she is terminating, that she is about age 53.
24 In fact, it has the age years and months computed up

# JOHN ARKO

1  there, of age 53 and three months, correct?

2      A.      Correct.

3      Q.      And does this information show her the

4  annuity that would be available to her at age 55?

5      A.      No, it shows her benefits at --

6  receiving them at 1/1/02, which looks to be her age,

7  53.

8      Q.      And so if she was entitled to a

9  benefit under the prior plan, which I assume she was,

10  because she was under -- she started work in 1990,

11  that she would not be available -- she would not be

12  able to draw those benefits from the prior plan until

13  age 55, right?

14          MR. BLUMENFELD:  Objection.

15          THE WITNESS:  Here are the

16              benefits that are available to her at

17              1/1/02 given the terms of the plan

18              that is in effect at the time, at the

19              time she terminated employment.

20  BY MR. BRUCE:

21      Q.      The benefits that she earned under the

22  prior plan up until the end of 1997 would not be

23  available to her until she reached age 55, right?

24          MR. BLUMENFELD:  Objection.

1  BY MR. BRUCE:

2      Q.      Is that right?

3      A.      The benefits that were offered to

4  Ms. McCash per this sheet here that I am looking at,

5  at her age, 53, would incorporate the benefits that

6  are for her for entire time she was a participant in

7  the Cigna pension plan.

8      Q.      They would incorporate -- the benefits

9  derived from the opening account balance that Cigna

10  established for her benefits before 1998, right, they

11  would incorporate --

12          MR. BLUMENFELD:  Objection.

13  BY MR. BRUCE:

14      Q.      -- the annuity benefit that she earned

15  before 1998, wouldn't it?

16      A.      The benefits that are available to Ms.

17  McCash are those that she earned over the course of

18  her entire career with Cigna under the terms of the

19  plan, and followed whatever the plan document was in

20  effect back in 2002 when she terminated, I believe it

21  was, and to the extent those are the terms of the

22  plan, the formulas used started under Part B and

23  referred back to Part A.  Those would be incorporated

24  in these numbers.

1      Q.      Under the Part A plan, were

2  participants able to draw annuities before age 55?

3      A.      Under the Part A plan, it depends on

4  the circumstances.  In general I would say no, they

5  couldn't.

6      Q.      Can you think of some circumstance

7  where an individual could draw an annuity before age

8  55 under the Part A plan?

9      A.      I can't think of any where they would

10  have been able to draw an annuity.  They would have

11  -- the plan has a provision for small benefit

12  cash-out.

13      Q.      But what's not as an annuity, is it?

14      A.      Correct.

15      Q.      So your answer is no, as far as you

16  can recall there was no provision for drawing an

17  annuity before age 55?

18          MR. BLUMENFELD:  Objection.

19          THE WITNESS:  Not typically that

20              I can recall.  There was a lot of

21              formulas that make up the pension plan

22              prior to 1998, but I think you're

23              correct in general, yes.

24  BY MR. BRUCE:

1      Q.      And so would these sheets show

2  Ms. McCash the annuity benefit that she could draw at

3  age 55 if she waited until age 55 to draw her

4  benefits?

5          MR. BLUMENFELD:  Objection.

6          THE WITNESS:  She chose her

7              benefits that are available to her at

8              12/1/02, which from reading here is

9              the time she was 53 and three months.

10  BY MR. BRUCE:

11      Q.      So is the answer no, that the sheets

12  do not show the annuity benefit available to her at

13  age 55?

14          MR. BLUMENFELD:  Objection.  The

15              documents speak for themselves.

16          THE WITNESS:  No, I don't see

17              that anywhere in this document.

18  BY MR. BRUCE:

19      Q.      And the same thing with respect to the

20  sheet two pages forward that is entitled Cigna

21  pension plan distributions form, that does not tell

22  Ms. McCash the annuity benefit that she can draw

23  beginning at age 55, right?

24          MR. BLUMENFELD:  Objection.

## JOHN ARKO

Page 121

1              THE WITNESS:  It tells her the
2         benefits available at 12/1/02.
3    BY MR. BRUCE:
4         Q.    And does it tell her if any of these
5    options contain subsidized values?
6              MR. BLUMENFELD:  Objection.
7              THE WITNESS:  I would have to
8         read through the document.
9    BY MR. BRUCE:
10        Q.    Okay.  Go ahead.
11        A.    Can I do that?
12        Q.    Yes.
13        A.    I am going to ask that you read the
14   question one more time.
15             MR. BRUCE:  Can you read him the
16        question again?
17             (The previous question is read
18        back.)
19             MR. BLUMENFELD:  Objection.
20             THE WITNESS:  I am not quite
21        clear what you mean by subsidized
22        values, but I don't see any language
23        stating subsidies.
24   BY MR. BRUCE:

Page 122

1         Q.    And is it possible that one or more of
2    these options does contain some subsidized value from
3    the prior pension plan?
4              MR. BLUMENFELD:  Objection.
5              THE WITNESS:  You would have to
6         provide for me all of the inputs into
7         these calculations; you know, looking
8         at her age and her employment history
9         and given the terms of the plan, but
10        to the best of my knowledge, if she
11        is, as this states, under 55, I don't
12        know.  I would say it doesn't.
13   BY MR. BRUCE:
14        Q.    You would say then in her particular
15   situation there would not be any subsidized values in
16   any of the options, except perhaps the deferred
17   benefit option down at the bottom?
18             MR. BLUMENFELD:  Objection.
19             THE WITNESS:  Again, the numbers
20        are specific to the benefit that is
21        available to Audrey McCash given her
22        employment history at 12/1/02 under
23        the terms of the plan.
24   BY MR. BRUCE:

Page 123

1         Q.    Can you try and answer my question?
2    Can you read him back the question?  Listen to my
3    questions and try and answer them, and then you can
4    go on to add something else, but I don't think you
5    tried to answer it.
6              (The previous question is read
7         back.)
8              MR. BLUMENFELD:  Objection.
9              THE WITNESS:  To the extent Ms.
10        McCash interprets these numbers, that
11        some of them might be subsidized, I
12        can't speak to that.  I don't know
13        what her -- how she feels about these
14        numbers, so I guess I don't know.
15   BY MR. BRUCE:
16        Q.    There were some subsidized options
17   under the prior pension plan, right?  The early
18   retirement benefit was subsidized; is that correct?
19             MR. BLUMENFELD:  Objection.
20             THE WITNESS:  I can try to
21        clarify your question and answer it
22        then.  To the extent there were
23        certain options available under the
24        Part A plan, and by subsidy, is this

Page 124

1         what you mean, that that provided for
2         a benefit at commencement, and on a
3         certain form, that that could be
4         construed to be worth more than some
5         sort of equivalent comparator
6         benefits.
7    BY MR. BRUCE:
8         Q.    Um-hum, okay, using that definition,
9    were there some options under the Part A plan that
10   were subsidized, such as the early retirement option
11   and the pre 30 percent survivors annuity?
12        A.    I would say yes.
13        Q.    So when those benefits are protected
14   and offered as the greater of A, the prior benefits
15   or the opening account balance plus future accruals,
16   when those subsidized options are protected, and they
17   appear on one of these sheets as an option for the
18   participant to select, does the participant have any
19   way of identifying which of those options are
20   subsidized?
21             MR. BLUMENFELD:  Objection.
22   BY MR. BRUCE:
23        Q.    Other than hiring an actuary?
24        A.    The benefits that are listed here that

## JOHN ARKO

Page 125

1  a participant sees are those per the terms of the
2  pension plan, and to the extent that the person, and
3  I am not looking at Ms. McCash here anymore, but in
4  general, you asked, that those benefits are such that
5  the person's employment history leads the calculation
6  to flow from Part B of the plan back into Part A of
7  the plan, those numbers are calculated very
8  precisely, and the actual dollar amount is labeled
9  there, and that's what is available to them.  To the
10  extent the participant has more information available
11  to them, they have summary plan description and
12  access to an 800 number, and I'm sure they are even
13  invited to call with questions.
14      Q.      Isn't there a possibility that, for
15  example, taking the first two options, that the lump
16  sum option would be based entirely on the cash
17  balance benefit, but the single life annuity could be
18  based on the Part A benefit the person had?
19          MR. BLUMENFELD:  Objection.
20  BY MR. BRUCE:
21      Q.      In general, not taking Ms. McCash.
22      A.      In general the terms of the plan are
23  such that an opening account balance growing with
24  benefit credit and interest credit is what's

Page 126

1  available as a lump sum, given you're a person that
2  fits into that criteria, and if you meet the other
3  criteria that placed you at your benefit commencement
4  date at a point in time where you might have been
5  eligible for some other of these subsidized benefits
6  that you described in Part A of the plan, those would
7  be taken into account, and that calculation would be
8  placed under whatever optional form is being --
9  you're looking at here, yes.
10      Q.      But in terms of the individual making
11  a decision, is there any disclosure to the individual
12  that there's a possibility that the single life
13  annuity might be more valuable because of a
14  carry-over of some subsidies than the lump sum
15  option?
16          MR. BLUMENFELD:  Objection.
17  BY MR. BRUCE:
18      Q.      Or is that left to the individual to
19  ascertain?
20      A.      It's left to the individual to
21  determine what is valuable to them.
22      Q.      And so how do you say that the plan
23  administrator complies with this regulation about
24  disclosing the relative value of optional forms of

Page 127

1  benefit, including the extent to which any optional
2  forms are subsidized?
3          MR. BLUMENFELD:  Objection.
4          Whether the Cigna pension plan and the
5          plan administrator comply with a
6          particular Treasury regulation, part
7          of which is quoted in your notice of
8          deposition, which you haven't marked
9          as an exhibit or put in front of the
10          witness, is a conclusion of law.
11  BY MR. BRUCE:
12      Q.      You can answer the question, your
13  understanding of how, if this is left up to the
14  individuals to ascertain which is more valuable, then
15  how does Cigna comply with this regulation which
16  seems to be placing a duty on Cigna to tell people
17  something about the relative values of the options?
18          MR. BLUMENFELD:  Objection.
19          THE WITNESS:  The information in
20          the distribution package is calculated
21          specific to that individual, provides
22          them precisely the dollar amount and a
23          description of those options available
24          at their commencement date, provides

Page 128

1          them summary plan description,
2          provides them access to an 800 number,
3          and this package is similar to
4          packages that we rely on our records
5          keeper, Cigna Retirement Investment
6          Services, to produce for all
7          participants.
8  BY MR. BRUCE:
9      Q.      But at least in terms of this package,
10  can you identify any disclosures which would indicate
11  that there's a possibility that some of the annuity
12  options may contain subsidized values, whereas some
13  of the other options may not contain those subsidies?
14          MR. BLUMENFELD:  Objection.
15          THE WITNESS:  I see nothing in
16          this specific package besides the
17          actual specific number of the benefit
18          that is available to this person.
19          MR. BRUCE:  Maybe that's a good
20          point for us to take a break for
21          lunch.
22      (Recess taken.)
23  BY MR. BRUCE:
24      Q.      Let's look at Exhibit-52.  This is one

32 (Pages 125 to 128)

## JOHN ARKO

Page 129

1  of the documents that you brought to your deposition
2  today, right?
3      A.    Yes, I believe so.  I didn't bring
4  them, Jeremy did.
5      Q.    So are these documents that you
6  reviewed, or not?
7              MR. BLUMENFELD:  Objection.
8              THE WITNESS:  Just as part of the
9              previous meetings that I described.
10 BY MR. BRUCE:
11     Q.    So you have looked through these
12 documents, or not?
13     A.    In preparation for this meeting?
14     Q.    Yes.
15     A.    Only in the context, again, of the
16 meetings I described before with Jeremy and Paul
17 Gontarek.
18     Q.    Well, Exhibit-52 indicates that this
19 document was distributed to you; you're one of the
20 people, right?
21     A.    Yes.
22     Q.    And if we look on the third page,
23 there's a message to you, to John Arko:  You should
24 add some helpful text on this point in your comments

Page 130

1  to Todd.  Do you see that?
2      A.    Yes, I do.
3      Q.    And that was in reference to the
4  message that the previous plan contained special
5  subsidized annuity benefits for early retirement and
6  survivor benefits.  The annuity benefits available
7  under the new schedule are guaranteed to provide at
8  least those level of benefits available to
9  participants under the prior schedule based on their
10 service through 1997.  Do you see that?
11     A.    Yes, I do.
12     Q.    And it says:  To John Arko, you should
13 add some helpful text on this point in your comments
14 to Todd.  Do you know whether you did that?
15     A.    I cannot recall.
16     Q.    What is this suggesting that you
17 should add some helpful text about?
18             MR. BLUMENFELD:  Objection.
19             THE WITNESS:  I can't recall what
20             this was asking for back in 1998.  I
21             can read the words now.
22 BY MR. BRUCE:
23     Q.    Can you find in this document the
24 description of minimum benefits?

Page 131

1              MR. BLUMENFELD:  Objection.
2              Which document are you looking at
3              now?
4              MR. BRUCE:  Exhibit-52.
5  BY MR. BRUCE:
6      Q.    It appears to be on the page that is
7  marked 27280.
8      A.    Minimum benefits, yes, I see it.
9      Q.    Let's take a look at what was marked
10 as Exhibit-3.  It's a summary plan description, and I
11 believe that if you look on the page that is numbered
12 as 629, there is a minimum benefits provision.
13     A.    Yes, I see it.
14     Q.    Does that appear to indicate anything
15 concerning subsidized annuity benefits for early
16 retirement and survivors?
17             MR. BLUMENFELD:  Objection.
18             THE WITNESS:  I was just reading
19             it, and from reading it, I don't see
20             any words to that effect.
21 BY MR. BRUCE:
22     Q.    So it appears that if you ever
23 suggested any helpful text on that point, it was not
24 included, correct?

Page 132

1              MR. BLUMENFELD:  Objection.
2              THE WITNESS:  I can't recall what
3              was provided or what was included.
4  BY MR. BRUCE:
5      Q.    Who is Todd Blaine?
6      A.    He was in the benefits communications
7  area back in 1998.
8      Q.    Is he still at Cigna?
9      A.    No, he is not.
10     Q.    Where is he?
11     A.    I could only speculate.
12     Q.    When do you remember him leaving?
13     A.    He left a couple of years ago.
14     Q.    And what would you speculate?
15     A.    Where is he at now?
16     Q.    Yes.
17     A.    He went to a consulting firm, and it
18 escapes me, the name of the firm.
19     Q.    A benefits consulting firm?
20     A.    I believe so, yes.
21     Q.    So the letter that is the second and
22 third pages of Exhibit-52, it says, dear Todd, and it
23 says:  I have included any comments on the draft.
24 Who is this letter coming from?

**JOHN ARKO**

Page 133

1    A.    The letter doesn't say, and I
2  certainly don't recall.  I am sorry, the letter does
3  say up top, DWD, comments.
4    Q.    That's David W. Durham?
5    A.    Yes.
6    Q.    And then item number four of this
7  says, how your balance was created, and Mr. Durham
8  says, for the new employee it is easy, since it's
9  zero; however, we need to provide a quick summary of
10 how an opening balance was created for employees
11 actively employed on 1/1/98 versus a rehired
12 employee, slash, transfer from nonparticipating
13 company employee.  Just explain that we take the age
14 65 or, parens, age 62, benefit they accrued at
15 termination of employment transfer and use the
16 actuarial equivalency under standard group unisex
17 actuarial tables using an interest rate of 6.05,
18 parens, or 5.05, percent on 1/1/98 or rate in effect
19 in the year of rehire or retransfer.  Do you know
20 whether the summary plan description in Exhibit-3
21 indicates that the -- the opening account balance is
22 based on the age 65 or age 62 benefit?
23            MR. BLUMENFELD:  Objection.
24            THE WITNESS:  I can look really

Page 134

1            quick.  I am not certain.
2            MR. BRUCE:  Okay.
3            THE WITNESS:  There's a paragraph
4            that seems to describe.
5  BY MR. BRUCE:
6    Q.    This is on the page that is number 64?
7    A.    Correct.
8    Q.    Under, how your account grows?
9    A.    Yes, that's the one I am looking at.
10   Q.    And does that -- it says, if you were
11 an employee on December 31, 1997 or rehired after
12 1997, any benefit you earned under the pension plan
13 through December 31, 1997 was converted to an opening
14 account balance in this pension plan.  The opening
15 balance was equal to the lump sum value of the
16 pension benefit you earned through December 31, 1998;
17 is that right?
18   A.    Yes.
19   Q.    Does that disclose the points that Mr.
20 Durham made in his comments about that it's taking
21 the age 62 or age 65 benefit?
22            MR. BLUMENFELD:  Objection.
23            THE WITNESS:  I suppose you could
24            ask Dave Durham.

Page 135

1  BY MR. BRUCE:
2    Q.    Does the SPD appear to disclose that
3  the evaluation is based on the age 62 or 65 benefit?
4            MR. BLUMENFELD:  Objection.
5            THE WITNESS:  It discloses that
6            it's based on the benefit you earned
7            through 12/31/97.
8  BY MR. BRUCE:
9    Q.    The benefit people earned through
10 12/31/97 could be considered to be the age 55
11 benefit?
12            MR. BLUMENFELD:  Objection.
13            THE WITNESS:  I don't know what
14            people would consider.  The terms of
15            the plan are what they are.
16 BY MR. BRUCE:
17   Q.    And the terms of the plan included
18 benefits at age 55 which had subsidized value, right?
19            MR. BLUMENFELD:  Objection.
20            THE WITNESS:  Depending on the
21            specific person's situation and career
22            information at the time they commence
23            payments, it would have gone to the
24            terms of the plan, again from Part B

Page 136

1            of the plan document, and if need be
2            it would have gone into Part A of the
3            plan document, and calculated specific
4            benefits.
5  BY MR. BRUCE:
6    Q.    Is that a yes, the terms of the plan
7  included early retirement benefits at age 55?
8            MR. BLUMENFELD:  Objection.
9            THE WITNESS:  Yes, under certain
10           circumstances, yes.
11 BY MR. BRUCE:
12   Q.    And under certain circumstances those
13 benefits at age 55 included what's called subsidized
14 value, right?
15   A.    I don't think there's anything in the
16 plan that talks to the term, subsidized value, so you
17 would have to ask the participants if they feel it's
18 subsidized, but clearly the terms of the plan are
19 followed very precisely to each individual
20 participant at the time they commence their benefits.
21   Q.    So the summary plan description on
22 Exhibit-3 does not appear to disclose whether the
23 opening balance is based on the age 55 or the age 65
24 benefit, right?

## JOHN ARKO

Page 137

1      MR. BLUMENFELD:  Objection.
2          THE WITNESS:  No, it describes in
3    general terms how that opening account
4    balance is created, what the terms of
5    the plan are, what they are.
6  BY MR. BRUCE:
7      Q.    Are you familiar with the standard in
8  the Department of Labor regulations on clearly
9  identifying circumstances which may result in the
10  loss or denial of benefits that a participant might
11  reasonably expect to be provided to them?  Are you
12  familiar with the idea that the summary plan
13  descriptions are supposed to clearly identify
14  circumstances in which people may not get the
15  benefits that they may reasonably expect?
16          MR. BLUMENFELD:  Objection.
17          THE WITNESS:  I understand the
18    concept personally, yes.
19  BY MR. BRUCE:
20      Q.    And so is there someplace in the
21  summary plan description which discloses to employees
22  that their opening account balance may not include
23  the value of those age 55 benefits?
24          MR. BLUMENFELD:  Objection.

Page 138

1          THE WITNESS:  The summary plan
2    description describes what benefits
3    somebody might get that has a career,
4    and specific career histories that
5    would fall under the terms that this
6    summary plan description describes;
7    what benefits and what available
8    options would be available to them.
9  BY MR. BRUCE:
10      Q.    Try and answer any question.  Does the
11  summary plan description disclose that the opening
12  account balance may not include the value of the
13  early retirement benefits that the person has?
14          MR. BLUMENFELD:  Objection.
15          THE WITNESS:  The summary plan
16    description describes the terms of the
17    plan, provides information on where to
18    get precise calculations, what would
19    show given a specific commencement
20    date what your options are, and the
21    specific dollars in each option.
22    That's in this summary plan
23    description.
24          MR. BRUCE:  Try and answer my

Page 139

1    question.
2          MR. BLUMENFELD:  Objection.  He
3    has already done so.
4          MR. BRUCE:  Can you ask the
5    question again?
6  BY MR. BRUCE:
7      Q.    You need to listen to my question.
8  Try and answer it.  You can add qualifications or
9  whatever, but try and answer my question, please?
10          MR. BRUCE:  Can you read him back
11    the question?
12          (The previous question is read
13    back.)
14          MR. BLUMENFELD:  Objection.
15          THE WITNESS:  I don't see the
16    specific words that you're mentioning,
17    but this summary plan description
18    defines the benefits that participants
19    that fit the criteria to receive
20    benefits under this plan would
21    receive, provides them information on
22    where to go to get a specific
23    calculation given the scenario and the
24    specific benefit commencement date, of

Page 140

1    where to get it.
2  BY MR. BRUCE:
3      Q.    There are some words in there, if you
4  don't see the specific words that disclose that,
5  there are some words in the summary plan description
6  which you think reasonably suggest to the participant
7  that their opening account balance is based on the
8  age 65 value, not the early retirement value?  Is
9  there something in there --
10          MR. BLUMENFELD:  Objection.
11  BY MR. BRUCE:
12      Q.    -- from which you think a reasonable
13  participant should have gleaned that the opening
14  account balance does not include the early retirement
15  benefit?
16      A.    I don't see specific words that define
17  that detail; however, there was other information
18  that was provided to people that did provide specific
19  information about how their opening account balances
20  are created.
21      Q.    And what other information are you
22  thinking about?
23      A.    Provided the retirement kits -- prior
24  to conversion, we provided each participant with at

# JOHN ARKO

Page 141

1  the time of the conversion, 1/1/98, with the specific
2  calculation of their opening account balance, the
3  accrued benefits. That was how it was calculated,
4  12/31/97, and how it was converted into opening
5  account balance.
6        Q.    We talked earlier about the A plus B
7  concept, that people would get, A, their previously
8  earned benefit, and B, the new accruals, under the
9  cash balance formula. Is there somewhere in the
10 summary plan description that tells people that
11 that's not the method that Cigna is using, that they
12 are not using A plus B?
13                MR. BLUMENFELD: Objection.
14                THE WITNESS: No, not to my
15                knowledge. I don't tell them what's
16                not available to them.
17 BY MR. BRUCE:
18        Q.    Is there something in here that
19 suggests to them that they are not getting A plus B?
20                MR. BLUMENFELD: Objection.
21                THE WITNESS: I don't know. I
22                guess you'd have to ask the
23                participants what is suggested to
24                them, but there's nothing in here

Page 142

1                about benefits that are -- benefits
2                that are not available to them.
3  BY MR. BRUCE:
4        Q.    If you look on the same page, Page
5  624, under how your account grows, you see in the
6  first paragraph where it says, each dollar's worth of
7  credit is a dollar of retirement benefits payable to
8  you after you're vested?
9        A.    Yes.
10       Q.    It says: Under the plan, your benefit
11 will grow steadily throughout your career as credits
12 are added to your account?
13       A.    Yes.
14       Q.    Doesn't that suggest to people that
15 they are getting A plus B?
16                MR. BLUMENFELD: Objection.
17                THE WITNESS: I can't interpret
18                what this might -- how people might
19                interpret that statement, but to me it
20                just says what it says.
21 BY MR. BRUCE:
22       Q.    It says each dollar's worth of credit
23 is a dollar of retirement benefits payable to you
24 after you're vested. Doesn't that suggest to people

Page 143

1  that they are getting additional benefits?
2                MR. BLUMENFELD: Objection,
3                already asked and answered.
4                THE WITNESS: It doesn't suggest
5                anything, I don't think. It tells
6                these people what their benefits are
7                per the terms of the pension plan.
8  BY MR. BRUCE:
9        Q.    Is it suggesting to people that they
10 are not getting A plus B, they are not getting
11 additional benefits on top of the benefits that they
12 have already earned?
13                MR. BLUMENFELD: Objection.
14                THE WITNESS: To my knowledge,
15                the SPD does not talk about benefits
16                that people do not get. It only talks
17                about benefits that are due them if
18                they meet the criteria of the terms of
19                Part B of the pension plan.
20 BY MR. BRUCE:
21       Q.    Mr. Arko, if you have -- you know what
22 a defined contribution plan is, right?
23       A.    Yes.
24       Q.    If you have a defined contribution

Page 144

1  plan with a $20,000 balance in it and Cigna tells you
2  that next year they are going to contribute a
3  thousand dollars to your defined contribution plan,
4  don't you assume that they mean a thousand dollars on
5  top of the $20,000 that you already have?
6                MR. BLUMENFELD: Objection.
7                THE WITNESS: Just asking me that
8                question, I would say yes, that makes
9                sense.
10 BY MR. BRUCE:
11       Q.    And so wouldn't participants in the
12 Cigna pension plan assume that if they have earned
13 benefits up until the end of 1997, and Cigna is
14 promising them a new cash balance plan, that the new
15 cash balance benefits will be on top of the benefits
16 they have already earned?
17                MR. BLUMENFELD: Objection.
18                THE WITNESS: The pension plan is
19                what it is. It is not a defined
20                contribution plan, it is a defined
21                benefit plan, and the benefit is
22                determined at the time people commence
23                their benefits, given their specific
24                situation, and the terms of the plan

## JOHN ARKO

Page 145

1              that have been in place throughout
2              their career.
3    BY MR. BRUCE:
4         Q.       Is there anyplace in the summary plan
5    description which is clearly identifying for the
6    participants that the benefits offered under this
7    cash balance plan are not in addition to the benefits
8    that they have already earned?
9                   MR. BLUMENFELD:  Objection.
10                   MR. BRUCE:  Jeremy, don't close
11              an exhibit for the witness.  Leave it
12              the way he has it.
13                   MR. BLUMENFELD:  Fine.
14                   THE WITNESS:  I am sorry, you're
15              going to have to repeat the question.
16              Too many nots in there.
17                   (The previous question is read
18              back.)
19                   THE WITNESS:  Again, there is
20              nothing in here that I am aware of
21              that talks about benefits that are not
22              available to our participants.
23    BY MR. BRUCE:
24         Q.       But are you familiar with the legal

Page 146

1    standard for summary plan descriptions, that they are
2    supposed to clearly identify the circumstances which
3    may result in a loss or denial of benefits that a
4    participant might reasonably expect to receive from
5    the plan?
6                   MR. BLUMENFELD:  Objection.
7    BY MR. BRUCE:
8         Q.       Do you think it would be unreasonable
9    for a participant to expect to receive the cash
10    balance benefits on top of the benefits that they
11    have already earned?
12         A.       I can't speak to what our participants
13    might feel about this.  I know there's a number of
14    requirements in the summary plan description, and
15    that's why we rely on legal counsel to review and
16    sign off on the summary plan descriptions.
17         Q.       So independent of legal counsel, do
18    you have an opinion on whether this summary plan
19    description clearly identifies the circumstances in
20    which participants may lose or be denied benefits
21    that they reasonably expect to receive?
22                   MR. BLUMENFELD:  Objection.
23                   THE WITNESS:  I can't speak to
24              what participants might glean from the

Page 147

1              summary plan description, but I can
2              say that the summary plan description
3              was designed to explain to
4              participants what their benefits will
5              be at the time they commence them.
6    BY MR. BRUCE:
7         Q.       Was it designed to explain to
8    participants the circumstances in which they might
9    not receive all of the benefits that they expected to
10    receive?
11                   MR. BLUMENFELD:  Objection.
12                   THE WITNESS:  Again, the plan,
13              the summary plan description, to my
14              knowledge, does not talk about
15              benefits that are not available to
16              participants.  It describes what
17              benefits are available to them given
18              their work history and --
19    BY MR. BRUCE:
20         Q.       Do you understand that if it is a
21    reasonable expectation for a participant to think
22    that they are going to receive A plus B, their old
23    benefit plus the new benefits, that the summary plan
24    description regulations require Cigna to disclose

Page 148

1    that that isn't going to happen?
2                   MR. BLUMENFELD:  Objection.
3    BY MR. BRUCE:
4         Q.       Do you understand that?
5                   MR. BLUMENFELD:  The law is what
6              it is, Steven.  You can't get him to
7              change that fact.
8    BY MR. BRUCE:
9         Q.       Do you understand that?
10         A.       I can follow your words to what you
11    have described, yes.
12         Q.       And so do you think that it's an
13    unreasonable expectation for a participant to think
14    that they are going to get their old benefits plus
15    new benefits?
16                   MR. BLUMENFELD:  Objection.
17                   THE WITNESS:  I can't speak to
18              what participants might feel, or --
19              out of this plain document, but I do
20              know -- out of this summary plan
21              description, but it does define what
22              benefits will be available to them at
23              the time.
24    BY MR. BRUCE:

37 (Pages 145 to 148)

## JOHN ARKO

Page 149

1      Q.      Doesn't the regulation require Cigna
2   to assess whether a reasonable participant might
3   expect to receive A plus B, that a reasonable
4   participant might expect to receive the old benefits
5   plus the new benefits?
6              MR. BLUMENFELD:  Objection as to
7              what the law requires.
8   BY MR. BRUCE:
9      Q.      Doesn't the regulation require Cigna
10  to make an assessment about what participants may
11  reasonably expect to receive?
12     A.      I don't know.  There's a lot of laws
13  that we try to -- we intend to follow each and every
14  law and regulation that applies to pension plans,
15  that's why we work with our outside counsel and
16  others to make sure we follow them.
17             MR. BLUMENFELD:  Steven, I think
18             John should step out for a minute,
19             because I need to say something on the
20             record, if that's all right.
21             MR. BRUCE:  You need to say
22             something on the record without him
23             present?
24             MR. BLUMENFELD:  Yes, I want to

Page 150

1              say it without him present because I
2              don't want to cloud his testimony, and
3              I'd like to say it because it needs to
4              be said on the record.  Can you step
5              out for just one minute?
6              (Witness leaves room.)
7              MR. BLUMENFELD:  I think it's
8              entirely improper for you to be asking
9              him questions based on your
10             representation of what the law
11             requires, and trying to get him to
12             admit that that's the case.  I also
13             think it's entirely improper for you
14             to be asking him questions when you
15             know there's a specific provision in
16             the SPD known as minimum benefit that
17             discloses the very thing that you're
18             trying to talk to the witness about
19             without pointing it out to him, and
20             just sort of expecting that he might
21             get it or might not get it, and you
22             know that provision is in there, so
23             you should ask him with regard to that
24             specific provision and deal with it

Page 151

1              that way.
2              MR. BRUCE:  Well, you have made
3              your statement.  I don't agree with
4              you.
5              MR. BLUMENFELD:  That's fine.
6              MR. BRUCE:  I don't know why
7              you're making these speeches.
8              (Witness reenters room.)
9   BY MR. BRUCE:
10     Q.      Mr. Arko, is it your understanding
11  that the summary plan description disclosed to
12  participants, that the actual payment of benefits
13  would be under a greater-of provision, where they
14  would receive the greater of A, the old benefits, or
15  B, the opening account balance plus additional cash
16  balance contributions?
17             MR. BLUMENFELD:  Objection.
18             THE WITNESS:  Again, the plan,
19             the summary plan description, defined
20             what benefits are available to people
21             upon their commencement.
22  BY MR. BRUCE:
23     Q.      And did it disclose what we talked
24  about earlier, the greater-of rule?

Page 152

1              MR. BLUMENFELD:  Objection.  The
2              document speaks for itself.
3              MR. BRUCE:  He is here as the
4              designated witness on the summary plan
5              description, Jeremy.
6              MR. BLUMENFELD:  And so you want
7              to ask him what the document says when
8              it speaks for itself?
9              MR. BRUCE:  You're tiresome at
10             this point, so let him answer the
11             questions.
12             MR. BLUMENFELD:  I was letting
13             him do that, and noting an objection,
14             and you felt it necessary to comment,
15             so I was responding.
16             THE WITNESS:  Is there a question
17             on the table?
18             MR. BRUCE:  There was until your
19             counsel interrupted.  Can you go back
20             to the question?
21             (The previous question is read
22             back.)
23             THE WITNESS:  The summary plan
24             description describes the optional

38 (Pages 149 to 152)

## JOHN ARKO

Page 153

1              payment method available to
2              participants at the time they commence
3              the benefit.
4      BY MR. BRUCE:
5          Q.      We talked earlier about the relative
6      value of benefit options, and I think you agreed that
7      Exhibit-26 did not specifically disclose that some
8      benefit options might have greater benefit values
9      than others.  Is that the right exhibit number, 26?
10                 MR. BLUMENFELD:  Objection.
11                 THE WITNESS:  And I am sorry, now
12             you are going to have to repeat that
13             question.
14     BY MR. BRUCE:
15         Q.      Is that a fair description of the
16     previous testimony on Exhibit-26?
17                 MR. BLUMENFELD:  Objection, asked
18             and answered.
19     BY MR. BRUCE:
20         Q.      Do you recall that?
21         A.      I am not recollecting the question
22     that's on the table now.  What do you want to know
23     about Exhibit-26?
24         Q.      That we talked earlier about the

Page 154

1      benefits options under Exhibit-26, that the
2      description of those options does not indicate
3      whether one option or another might have subsidized
4      values, correct?
5                  MR. BLUMENFELD:  Objection.  The
6              document speaks for itself, and
7              already asked and answered.
8      BY MR. BRUCE:
9          Q.      We discussed this before lunch?
10         A.      Yes, we discussed it.
11         Q.      You remember that?
12         A.      Yes, I do.
13         Q.      Okay.  Does the summary plan
14     description disclose to participants that when they
15     go to retire, there may be some options that have a
16     greater relative value than other options?
17                 MR. BLUMENFELD:  Objection.
18                 THE WITNESS:  The summary plan
19             description describes the benefits
20             that are available to people at the
21             time they commence retirement.
22     BY MR. BRUCE:
23         Q.      In Exhibit-3 on Page 625 it has a
24     heading entitled, optional payment method.  Does that

Page 155

1      description indicate to participants that some of
2      those benefit payment options may contain subsidized
3      values, whereas other ones may not contain subsidized
4      values?
5                  MR. BLUMENFELD:  Objection.
6                  THE WITNESS:  The optional
7              payment methods described here are
8              those that are available under the
9              Part B plan, provided the participant
10             otherwise meets the criteria of this
11             plan.  These are the options available
12             to them at the time they decide to
13             commence retirement.
14     BY MR. BRUCE:
15         Q.      You need to try and answer my
16     question, and then qualify it how you want, but to
17     try and answer my question, as I have asked you this
18     one twice, again, so can you read him back the
19     question?  Try and answer the question first, and
20     then you're free to digress and add stuff.
21                 MR. BLUMENFELD:  Objection.
22                 (The previous question is read
23             back.)
24                 THE WITNESS:  I see no specific

Page 156

1              words that mirror those that you just
2              asked about, but it does clearly
3              describe the specific payment method
4              and forms of payment available to a
5              participant that meets the terms of
6              the Part B plan at the time they
7              decide to commence benefits.
8      BY MR. BRUCE:
9          Q.      And you mentioned earlier that besides
10     the information in Exhibit-26, the benefit
11     commencement package that would be given to
12     participants, and besides the information in the
13     summary plan description, that a participant could
14     call an 800 number and ask questions at the 800
15     number.
16         A.      Yes.
17         Q.      And that 800 number connects
18     participants up with where, a unit in Hartford?
19         A.      I don't know that it's in Hartford.
20     They might be connected elsewhere, but it's with
21     Cigna Retirement Investment Services.
22         Q.      And is there a question-and-answer
23     script that the operators use there to answer
24     questions?

# JOHN ARKO

Page 189

1          as it relates specifically to the
2          Cigna pension plan.
3     BY MR. BRUCE:
4          Q.     But you're referring here to
5     wearaway.  You testified earlier that you know
6     something about what wearaway is, right?
7          A.     I testified that I, in general, yes.
8          Q.     Yes.  And so is it your understanding
9     that wearaways are generally permissible?  Is there
10    any limits on wearaways?
11                MR. BLUMENFELD:  Objection, calls
12          for a conclusion of law.
13                THE WITNESS:  Just asking any
14          opinion, I am familiar with the
15          concept of wearaways, but when it
16          comes to the term of the Cigna pension
17          plan or probably anything specific, I
18          would have to turn to the experts,
19          such as Gene Renshaw or Paul
20          Gontarek.
21    BY MR. BRUCE:
22          Q.     But again any question is, is it your
23    understanding that wearaways are generally
24    permissible, or is there any limitation that you

Page 190

1     understand on the pension plan's use of a wearaway?
2          A.     I can't speak to the specifics of it,
3     but I think in general they are permitted to be done.
4          Q.     Have you ever heard the 133 and a
5     third percent rule does not always permit wearaways?
6                MR. BLUMENFELD:  Objection.
7                THE WITNESS:  I can't recall.  I
8          can't recall.
9     BY MR. BRUCE:
10         Q.     You have never heard that there's a
11    regulation under the 133 and a third percent rule
12    which indicates that wearaways are not always
13    permissible?
14         A.     I don't know.  I would have to rely
15    and turn to experts.  I can't recall reading that
16    myself, no.
17         Q.     And you're not aware of whether Cigna
18    or the Cigna pension plan has ever analyzed whether
19    the plan's formula complies with the 133 and a third
20    percent rule when it contains a wearaway?
21                MR. BLUMENFELD:  Objection.
22                THE WITNESS:  I am aware that we
23          relied on experts such as Mercer
24          Consulting during the design of the

Page 191

1          plan.
2     BY MR. BRUCE:
3          Q.     You need to answer my question first.
4                MR. BLUMENFELD:  Let him finish.
5                THE WITNESS:  We relied on
6          experts such as Mercer and Paul
7          Gontarek and legal counsel, and that
8          would have probably been -- in any
9          opinion that was sufficient to ensure
10         the plan complies with all the
11         applicable rules and regulations
12         required of it.
13    BY MR. BRUCE:
14         Q.     You don't specifically remember
15    anything about whether the Cigna pension plan could
16    comply with the 133 and a third percent rule when it
17    has a wearaway?
18                MR. BLUMENFELD:  Objection.
19                THE WITNESS:  Do I recall any
20         discussions?
21                MR. BRUCE:  Yes.
22                THE WITNESS:  I don't know.  I
23         don't recall.
24    BY MR. BRUCE:

Page 192

1          Q.     But in your letter you say that this
2     method of preserving protected benefits does not
3     result in forfeiture.
4                MR. BLUMENFELD:  Objection.
5                THE WITNESS:  The letter says
6          that, but as I mentioned before, I
7          relied on Gene Renshaw to draft much
8          of this note.
9     BY MR. BRUCE:
10         Q.     And in the conclusion paragraph you
11    say that neither notice 96-8 nor Esden addresses the
12    establishment of an opening account balance or
13    preserving ERISA Section 204(G), protected benefits
14    with respect to benefits accrued prior to the cash
15    balance conversion.  Do you see that?
16         A.     I see that.
17                MR. BLUMENFELD:  Objection.
18    BY MR. BRUCE:
19         Q.     Is it your understanding that Cigna
20    could have used any method that it wanted to
21    establish the opening account balances under the cash
22    balance plan?
23                MR. BLUMENFELD:  Objection.
24                THE WITNESS:  I don't know.  We

# JOHN ARKO

1  asking me to remember what information John Arko, in
2  his career, has gleaned about cash balance plans.
3  That's a very broad question that I don't think I can
4  answer specifically.
5      Q.     Can you identify any documents that
6  you have read about cash balance plans?  You can say
7  no, that you don't remember any right now, but just
8  answer the question.
9      A.     No, I don't remember any specifically.
10          MR. BLUMENFELD:  Objection.
11 BY MR. BRUCE:
12     Q.     Do you remember any specific seminars
13 that you attended about cash balance plans?
14     A.     It would be vague recollections, and I
15 very well could not answer correctly, so I am going
16 to have to say I don't remember.
17     Q.     Did you have any understanding about
18 whether the establishment of an opening account
19 balance was governed by any ERISA rules?
20     A.     I have an understanding that ERISA
21 rules govern much about pension plans.
22     Q.     So what do ERISA rules have to say
23 about how an opening account balance is established?
24          MR. BLUMENFELD:  Objection, calls

1          for a legal conclusion.
2  BY MR. BRUCE:
3      Q.     What's your understanding of that?
4      A.     When it comes to the Cigna pension
5  plan, I would have relied on our own expert legal
6  advice.  In general, any personal understandings are
7  simply that you need to be careful when you have a
8  pension plan, especially when you're converting to a
9  cash balance plan, that you follow all the
10 appropriate rules and regulations and seek advice
11 when you're not certain.
12     Q.     The letter that you signed here,
13 Exhibit-65, indicates that notice 96-8 does not
14 address the establishment of an opening account
15 balance.  Do you know what notice 96-8 is?
16     A.     I do recall 96-8 generally, yes.
17     Q.     And so this letter that you signed is
18 saying that notice 96-8 does not address the
19 establishment of an opening account balance?
20          MR. BLUMENFELD:  Objection.
21          THE WITNESS:  I am sorry, you are
22          going to have to reread it again
23          because of the nots.  I don't know if
24          I heard it correctly.

1          MR. BLUMENFELD:  Objection.  The
2          document speaks for itself.
3          THE WITNESS:  I don't know that I
4          read that here in this document.  I
5          can read what the document does say
6          about 96-8.  Would you like me to do
7          that?
8  BY MR. BRUCE:
9      Q.     It says:  Neither notice 96-8 nor
10 Esden addresses the establishment of an opening
11 account balance.  Doesn't that mean that notice 96-8
12 does not address the establishment of an opening
13 account balance?
14     A.     Neither notice 96-8 nor Esden
15 addresses the establishment of an opening account
16 balance.  That's what the letter says, and I would
17 have relied on -- Gene Renshaw, I am sure, drafted
18 that section of the letter.
19     Q.     You don't have any understanding about
20 whether or not notice 96-8 addresses opening account
21 balances; you're relying on Gene Renshaw?
22     A.     I am relying on Gene Renshaw when it
23 comes to drafting the specific letter, yes.
24     Q.     As far as you know, are there any

1  constraints on establishing an opening account
2  balance?  Could it be 50 percent of the value of the
3  person's benefits or --
4          MR. BLUMENFELD:  Objection.
5          THE WITNESS:  There are rules and
6          regulations when you're describing or
7          creating a pension plan and you create
8          a formula that delivers a pension
9          under a defined benefit plan, and I am
10          not sure -- I am sure there are rules
11          around how you do that.  The limits
12          are there.
13 BY MR. BRUCE:
14     Q.     I will show you what was marked as
15 Exhibit-39 at Mr. Hodges' deposition, and there's a
16 spreadsheet which appears to test compliance with the
17 133 and a third percent rule.  Did you ever see this
18 spreadsheet, or anything like it?
19     A.     No, I don't recall seeing anything
20 like this.  I don't recall.
21     Q.     So you didn't familiarize yourself
22 with this spreadsheet or any others like it in
23 preparing for your testimony today on the plan's
24 compliance with the 133 and a third percent rule?

## JOHN ARKO

Page 201

1    A.    No, I don't think, no, in preparation
2  I didn't see this spreadsheet.
3    Q.    Did you see any other spreadsheets
4  testing compliance with the 133 and a third percent
5  rule?
6    A.    No, in preparation for this.
7    Q.    Who would you ask to find out whether
8  there were any such spreadsheets?
9    A.    As I testified before, the experts
10 that we relied on, Mercer Consulting as to the
11 design, and depending what time frame you're in,
12 perhaps Cigna Retirement Investment Services
13 actuaries, perhaps Art Assantes or Ms. Carskadden.
14   Q.    Recently Lisa Carskadden?
15   A.    Right.
16   Q.    You didn't ask Lisa Carskadden in
17 preparation for your deposition today about what she
18 had on compliance with the 133 and a third percent
19 rule?
20   A.    No.
21   Q.    So you just didn't think it was
22 relevant to ask other people who knew about the 133
23 and a third percent rule about what they knew about
24 it before coming here to testify?

Page 202

1             MR. BLUMENFELD:  Objection.
2             THE WITNESS:  I didn't know what
3             you were going to ask.
4  BY MR. BRUCE:
5    Q.    You didn't know the subjects of the
6  testimony from the notice of deposition?
7             MR. BLUMENFELD:  Objection.
8             THE WITNESS:  And again, only to
9             the extent I reviewed with Jeremy
10            Blumenfeld and Paul Gontarek.
11 BY MR. BRUCE:
12   Q.    When did you review those things with
13 Jeremy and Paul Gontarek?
14   A.    Over the course of the past couple
15 days.
16   Q.    And if you look at Exhibit-39, if you
17 look at the accrual rates beginning with age 43, do
18 you see that the accrual rates decline with age,
19 going between age 43, where it is 1.73 percent, and
20 then down to .66 percent at age 65?
21   A.    I can just read the numbers that are
22 on this piece of paper and agree that that's what the
23 numbers do, yes.
24   Q.    And so did you ever see any such

Page 203

1  analysis in conjunction with whether the plan
2  complied with ERISA's rules on age discrimination and
3  rates of accrual?
4    A.    I don't recall seeing anything
5  specific.  I would have just relied, again, on the
6  experts.
7    Q.    And do you recall the experts telling
8  you that the plan complied with age discrimination
9  rules, even though the rates seem to decline with
10 age?
11            MR. BLUMENFELD:  I am going to
12            object and instruct you that to the
13            extent the experts he is referring to
14            are Cigna attorneys, you're instructed
15            not to answer that question.  Other
16            than that, you can answer.
17            THE WITNESS:  I relied on any
18            attorneys for that information.
19 BY MR. BRUCE:
20   Q.    But did the plan administrator make
21 the final decision on whether the rates of accrual
22 declined based on age?
23            MR. BLUMENFELD:  Objection.
24            THE WITNESS:  The plan

Page 204

1  administrator relied on our attorneys
2  as far as the entire design of the
3  plan, to be sure that it complied with
4  any and all regulations.
5            MR. BLUMENFELD:  You know,
6            Stephen, that whether the plan
7            complies with the age discrimination
8            rules or the 133 and a third rule or
9            any of the other rules is a question
10           of law.  The plan administrator
11           doesn't get to make that decision and
12           the plan sponsor doesn't get to make
13           that decision, and you don't get to
14           make that decision, and neither do I.
15           MR. BRUCE:  Is that your
16           objection?
17           MR. BLUMENFELD:  Yes, that's my
18           objection.
19           MR. BRUCE:  Good.
20 BY MR. BRUCE:
21   Q.    Did you ever see any other numbers
22 where the rates of accrual did not decline with age?
23 This document appears to show rates of accrual that
24 decline beginning at age 43 and going to age 65.  Did

# JOHN ARKO

Page 209

1    A.    Right, then we would have relied on
2  our legal counsel.
3    Q.    Then his exhibits, if you look at
4  Exhibit D, he computes the cash balance normal
5  accrual rate.. With just a little bit of zigzagging,
6  it's uniformly declining based on age and service
7  points, right?
8                    MR. BLUMENFELD:  Objection.
9                    THE WITNESS:  It is from what I
10                   can see in the words here and on the
11                   paper documents I am looking at.
12 BY MR. BRUCE:
13   Q.    In fact, it declines uniformly, when
14 you look at the highly compensated employees, it's
15 going from 2.79 percent down to 1.12 percent.  If you
16 look at the non-highly compensated employees, it's
17 going from 2.8 percent down to 1.09 percent, right?
18   A.    I can see that here, yes.
19   Q.    Do you recall that the accrual rates
20 under the cash balance plan were decreasing with age?
21                   MR. BLUMENFELD:  Objection.
22                   THE WITNESS:  I just recall that
23                   we would have relied on the experts to
24                   make sure that our plan was doing what

Page 210

1                    it was supposed to do.
2  BY MR. BRUCE:
3    Q.    If we go back to Exhibit-60, the
4  application for determination to the IRS, that it has
5  a demonstration related to accrual rates that begins
6  on the page that is stamped as Amara 730.
7                    MR. BLUMENFELD:  Objection.
8  BY MR. BRUCE:
9    Q.    Were you familiar with this
10 demonstration of nondiscrimination on the basis of
11 accrual rates?
12   A.    I recall that we --
13                   MR. BLUMENFELD:  Objection.
14                   THE WITNESS:  I recall that we
15                   had the work done, and would have
16                   looked to Gene Renshaw and others at
17                   Drinker, Biddle and Reath to make sure
18                   that it was appropriate.
19 BY MR. BRUCE:
20   Q.    But the demonstration here would
21 actually have been prepared by the actuaries, right?
22   A.    Correct.
23   Q.    Jean Renshaw didn't actually compute
24 accrual rates, did she?

Page 211

1    A.    No, not that I would believe so, no.
2    Q.    And this demonstration has some sample
3  accrual rates for employees, too, beginning on Pages
4  738 and 739.  Do you see those, employee one and
5  employee two?
6    A.    Yes.
7    Q.    So when you were testifying earlier
8  about reviewing the application for determination,
9  and some of the nondiscrimination demonstration, that
10 you were testifying that you reviewed some of this
11 material in which accrual rates were computed?
12   A.    I don't recall specifically the
13 testimony you're describing, but as far as these
14 exhibits and calculations, we would have looked to
15 our actuary to complete them, and Drinker, Biddle and
16 Reath to ensure that they were appropriately
17 representing the plan.
18   Q.    That what was appropriately
19 representing the plan?
20   A.    That the testing that was required to
21 fulfill the requirements here of 5300, that our
22 actuary was producing appropriate material, and that
23 material sufficed to show the plan was working
24 appropriately under all the rules and regulations.

Page 212

1    Q.    Is it your testimony that Cigna
2  obtained any type of an opinion letter from Drinker,
3  Biddle and Reath concerning the plan's compliance
4  with the 133 and a third percent rule?
5                    MR. BLUMENFELD:  Objection.
6                    MR. BRUCE:  He can answer whether
7                    they obtained an opinion letter.
8                    MR. BLUMENFELD:  Concerning a
9                    particular subject matter?
10                   MR. BRUCE:  Yes.
11                   THE WITNESS:  I don't recall.
12 BY MR. BRUCE:
13   Q.    How about concerning the age
14 discrimination requirements?
15   A.    I don't know, I don't recall.
16   Q.    How about concerning 204(h) notice?
17 Your testimony earlier seemed to indicate that that
18 was done more in-house.
19   A.    I don't recall what specific
20 documentation Drinker, Biddle would have provided, if
21 any.
22   Q.    You don't recall any opinion letters
23 or advice from Drinker, Biddle on any of these
24 subjects?

# JOHN ARKO

Page 233

1    THE WITNESS:  It doesn't change
2    the previous answer that I gave to
3    you.  We don't provide estimates or
4    projections of benefits that we don't
5    expect people to receive from the
6    Cigna pension plan.
7  BY MR. BRUCE:
8        Q.      But you do provide them in some
9  cases.  You did do a computation for Robert Upton,
10  right?
11        A.      Um-hum.
12        Q.      And you're aware that Mr. Hodges had
13  an Excel spreadsheet where he would do computations
14  comparing benefits under the old plan and benefits
15  under the new plan, right?
16        A.      On individual cases?
17        Q.      Yes.
18        A.      Because that's not my definition of a
19  policy, but under individual cases people are --
20  participants are permitted to call the 800 number,
21  inquire about their benefits, and we strive to answer
22  their questions as much as we can, and are
23  appropriate.
24        Q.      I believe Mr. Hodges testified he

Page 234

1  didn't just provide -- he provided those when there
2  was a direction from Philadelphia for him to provide
3  them.  Does that seem familiar?
4        A.      You have to give me the specific
5  situations, but we might instruct Andy to provide any
6  number of calculations for any number of reasons.
7        Q.      But you don't have a recollection that
8  if somebody called the 800 number, that they could
9  get a comparison of their old and new benefits, do
10  you?
11        A.      As a matter of policy?
12        Q.      Yes.
13        A.      There was no mechanism like that.
14        Q.      Isn't the mechanism, in fact, against
15  providing such comparisons unless there was specific
16  individuals --
17        A.      Specific issues, yes.
18            MR. BLUMENFELD:  Objection.
19  BY MR. BRUCE:
20        Q.      That was --
21        A.      I believe so, yes.  David Durham's
22  note here, yes.
23            MR. BRUCE:  Mark 66.
24            - - -

Page 235

1            (Whereupon, the court reporter
2            marked Exhibit-66 for purposes of
3            identification.)
4            - - -
5  BY MR. BRUCE:
6        Q.      Exhibit 66 is an appeal/complaint
7  tracking form for an employee named Naomi Biggs with
8  a related e-mail from her to you.  Do you recall
9  Naomi Biggs?
10        A.      I don't recall her.
11        Q.      I believe she is also an attorney --
12        A.      Okay.
13        Q.      -- for Cigna.
14        A.      I don't recall.  I can just see her
15  name here with Esquire next to it.
16        Q.      On the first page it has a summary,
17  and I believe this is in your handwriting, right?
18        A.      Yes, that looks like my handwriting,
19  the summary does.
20        Q.      It says, wants comparison/projection
21  of old/new benefits.  I told her we don't do.  She
22  can call CRIS for new plan projection, right?
23        A.      Yes.
24        Q.      So you are saying that she can call

Page 236

1  CRIS and get a projection of her cash balance
2  benefits, but you don't do comparisons, projections
3  with the old benefits, right?
4            MR. BLUMENFELD:  Objection.  It's
5            outside the scope of the 30(b)(6)
6            deposition.
7  BY MR. BRUCE:
8        Q.      Is that right?
9        A.      That's what it says here, yes.
10        Q.      And in her e-mail to you she also says
11  in the first paragraph that she was told that
12  employees would not, and capitalizing all the letters
13  in not, be provided with such a comparison?
14            MR. BLUMENFELD:  Objection.
15            THE WITNESS:  I can read that,
16            yes.
17  BY MR. BRUCE:
18        Q.      This all does seem familiar to you,
19  that comparisons were not provided to employees?
20        A.      Our records keeper, or as I have
21  testified before, communications plan around the
22  1/1/98 change never created a mechanism to provide
23  comparisons or to provide calculations for
24  hypothetical benefits or benefits that they could not

# JOHN ARKO

Page 237

1 receive under the pension plan.
2        Q.        But Andy Hodges prepared an Excel
3 spreadsheet which did that, right?
4        A.        On particular --
5                  MR. BLUMENFELD:  Objection.
6                  THE WITNESS:  -- particular
7        occasions, that's what I think, he did
8        it on his own.
9 BY MR. BRUCE:
10        Q.        He did that on his own, or he did that
11 as part of his job?
12        A.        You'd have to ask Andy.  I know he did
13 them, and I saw some of the calculations over time.
14        Q.        I think you testified that he was
15 asked to do those calculations.  Are you suggesting
16 that he was doing that on an unauthorized basis?
17                  MR. BLUMENFELD:  Objection.
18                  THE WITNESS:  I can't speak to
19        what Andy was doing, I can't recall.
20 BY MR. BRUCE:
21        Q.        But are you suggesting that, are you
22 suggesting that he was making unauthorized
23 computations?
24                  MR. BLUMENFELD:  Objection.

Page 238

1 BY MR. BRUCE:
2        Q.        He was asked to do a computation of
3 Mr. Depenbrock's benefits under the old plan or new
4 plan.
5        A.        Who was it that asked him that?
6        Q.        I think Jerry Meyn.
7        A.        You need to ask Jerry Meyn his
8 instructions to Andy.
9        Q.        So in certain circumstances individual
10 comparisons were made, but as a general rule the
11 policy was that employees would not be provided with
12 comparisons between their benefits under the old plan
13 and the new plan.
14        A.        Fair statement.
15        Q.        This has a handwritten note that I
16 believe is also in your handwriting, or all of the
17 notes at the bottom of 20531 are in your handwriting,
18 right?
19        A.        Yes, they look to be, yes.
20        Q.        And it has a note dated 2/4, which I
21 guess is February 4th of 2000.  It says, spoke with
22 Naomi, general concepts on why she has not, quote,
23 lost benefits, unquote, and then it has parens, cause
24 no wearaway, and then later on it says, no, we don't

Page 239

1 do comparisons.  What do you mean by, why she's not
2 lost benefits cause no wearaway?
3        A.        I don't remember this discussion back
4 in early 2000.
5        Q.        And down below it says, why don't we
6 have issues like IBM with wearaway?
7                  MR. BLUMENFELD:  Objection.
8 BY MR. BRUCE:
9        Q.        Was it your understanding that you had
10 no wearaway under the Cigna cash balance plan?
11        A.        I can't recall how this conversation
12 went.
13        Q.        You can't recall what you mean by, why
14 she's not, quote, lost benefits, unquote, cause no
15 wearaway?
16        A.        I can just speculate by looking at it
17 now, but I don't recall from early 2000 what my
18 thinking was.
19        Q.        What is your thinking now about
20 whether the Cigna pension plan had any wearaway?
21                  MR. BLUMENFELD:  Objection.
22                  That's already been discussed at
23                  length.
24                  THE WITNESS:  That's not what you

Page 240

1        asked before.  You were asking about,
2        quote, lost benefits.  It is a plan,
3        as I would always say, that given a
4        participant's work history and the
5        time they leave Cigna and the plan
6        that's in effect at the time, and when
7        they ultimately decide to take their
8        benefits, pension plan always provides
9        exactly what it is designed to
10        provide.
11 BY MR. BRUCE:
12        Q.        Did Cigna have any cost reductions
13 from the change to cash balance?
14                  MR. BLUMENFELD:  Objection, again
15                  well outside the scope of the
16                  30(b)(6).
17                  MR. BRUCE:  It's in the
18                  newsletter that we identified earlier.
19                  MR. BLUMENFELD:  Objection.
20                  THE WITNESS:  What are you asking
21                  me?  I am not sure.
22                  MR. BLUMENFELD:  Are you
23                  directing the witness to the
24                  newsletter?

## JOHN ARKO

Page 253

1          marked Exhibit-68 for purposes of
2          identification.)
3                 - - -
4    BY MR. BRUCE:
5          Q.     Exhibit-68 is an e-mail from David
6    Durham to Denise Hill and Jerry Meyn with a copy to
7    you, and he is attaching some notes from his
8    discussions with groups of managers grades 52 to 55
9    about pension changes.  How high up are managers with
10   grades 52 to 55?
11         A.     That's above a mid-level manager, but
12   not --
13         Q.     But not senior?
14         A.     But not senior managers.
15         Q.     And on the page that is stamped as
16   11936 there is a heading entitled, bad news.
17         A.     Um-hum.
18         Q.     It says, published case studies
19   positive and negative, and expect to be able to
20   support employees who will be negatively impacted
21   ASAP.  Do you see that?
22         A.     Yes.
23         Q.     Do you recall any case studies that
24   were negative, publishing any negative case studies?

Page 254

1          A.     I don't recall, no.
2          Q.     Doesn't this indicate that the
3    managers were picking up that there might be some
4    cases where these changes would not be positive?
5                 MR. BLUMENFELD:  Objection.
6    BY MR. BRUCE:
7          Q.     And the case studies should be
8    published on both sides of the equation?
9          A.     I can only read these notes which look
10   to be, I guess David Durham's notes of these meetings
11   with managers.  I can't read into them any more than
12   that.
13         Q.     They have a number of notes from
14   yourself where you have marked up -- you have marked
15   this up?
16         A.     Yes, it looks like I did back in 1997,
17   but I still do not remember it at all.
18         Q.     And do you know of any negative case
19   studies that are in the summary plan description?
20                MR. BLUMENFELD:  Objection.
21                THE WITNESS:  I don't know of any
22                negative case studies.  If you mean by
23                case studies, examples or something, I
24                believe there are examples in there,

Page 255

1          but they are just that examples of the
2          benefits that are provided under the
3          terms of the pension plan.
4    BY MR. BRUCE:
5          Q.     So going back to the summary plan
6    description to Exhibit-3, is there anything in there
7    that you would consider to be disclosure of any
8    negative features about the cash balance plan?
9                 MR. BLUMENFELD:  Objection.  The
10                document speaks for itself.
11                THE WITNESS:  I don't know what
12                you mean by negative features.  Whose
13                perception --
14   BY MR. BRUCE:
15         Q.     In your understanding, did you think
16   there was any negative features about the cash
17   balance plan?
18         A.     I guess I don't understand --
19                MR. BLUMENFELD:  Objection.
20                THE WITNESS:  -- the context of
21                the question, to whom would there be
22                negative features?  Participants?
23   BY MR. BRUCE:
24         Q.     Were there any disadvantages of the

Page 256

1    cash balance plan compared to the prior pension plan?
2          A.     The features are different.
3                 MR. BLUMENFELD:  Objection.
4                 THE WITNESS:  However they are
5                 interpreted by participants, I can't
6                 speak to their views.
7    BY MR. BRUCE:
8          Q.     Well, you are in this field.  Were
9    there any provisions under the cash balance plan that
10   you felt or thought might be disadvantageous compared
11   to what people had under the prior plan?
12         A.     In any --
13         Q.     You testified before there were early
14   retirement subsidies under the retirement plan that
15   weren't under the cash balance plan.
16         A.     Under certain conditions and
17   situations, yes, there were, under the old plan.
18         Q.     And there was a free 30 percent
19   survivor annuity that was under the old plan that
20   wasn't offered under the new plan, right?
21                MR. BLUMENFELD:  Objection.
22                THE WITNESS:  If you met the
23                criteria under the terms of that,
24                quote, 33 percent benefit, yes, you

## JOHN ARKO

Page 257

1    could get that.
2 BY MR. BRUCE:
3    Q.    And that wasn't -- the loss of that
4 feature is not described in the summary plan
5 description, right?
6              MR. BLUMENFELD:  Objection.
7              THE WITNESS:  Again, the summary
8              plan description for the 1/1/98 Part B
9              the plan doesn't talk about the
10             benefits that people can't get, if
11             that's what you mean.
12 BY MR. BRUCE:
13    Q.    And we looked at Mr. Upton's
14 calculations where his benefits would be reduced by 5
15 percent or more.  Would you consider that to be a
16 disadvantage, comparing the old plan with the new
17 plan?
18             MR. BLUMENFELD:  Objection.
19             THE WITNESS:  Again, I didn't
20             look closely at what those
21             calculations were done or how they
22             were completed, but --
23 BY MR. BRUCE:
24    Q.    You did them?

Page 258

1    A.    A long time ago.  I don't again recall
2 what assumptions were used and how future benefits
3 that you could or could not get under the plan were
4 completed specifically.
5    Q.    So is the possibility of reductions
6 like the ones that Mr. Upton was shown by you, is
7 that possibility disclosed in the summary plan
8 description?
9              MR. BLUMENFELD:  Objection.  The
10             document speaks for itself.
11             THE WITNESS:  The document, we
12             don't show -- summary plan description
13             does not show benefits that people
14             could not get.  It only describes the
15             terms of the plan and what is
16             available to somebody upon their
17             commencement of benefits.
18 BY MR. BRUCE:
19    Q.    Do you recall indications to
20 participants that benefits under the cash balance
21 plan would be comparable to the benefits under the
22 old plan?
23    A.    Calculations?
24             MR. BLUMENFELD:  Objection.

Page 259

1 BY MR. BRUCE:
2    Q.    Comparable.
3    A.    I don't recall specifically, no.
4    Q.    Take a look at Exhibit-16.  That was
5 described as the information kit, and I will
6 represent to you that this is the kit that was given
7 to employees who were being transferred to the cash
8 balance plan.
9    A.    Okay.
10    Q.    Look on the page that is numbered
11 Amara 452.
12    A.    Yes.
13    Q.    It says, question, will my benefits be
14 better under the new retirement plan?  Do you see
15 that?
16    A.    Yes.
17    Q.    And it says, generally speaking, the
18 new retirement plan in comparison with the current
19 pension plan tends to provide larger benefits for
20 shorter service employees, and comparable benefits
21 for longer service employees.  Do you see that?
22    A.    Yes.
23    Q.    And do you believe that to be an
24 accurate statement?

Page 260

1    A.    Given this was created in 1997, yes, I
2 do.
3    Q.    Given that it was in 1997, do you know
4 now that that is not always accurate?
5    A.    No, I know in '97 this was created and
6 reviewed by some experts that understood these plans,
7 including Mercer Consulting.
8    Q.    And who else reviewed it?
9    A.    The benefits communications team would
10 know better exactly who reviewed it, but certainly
11 their lawyer and our legal counsel as well, Paul
12 Gontarek.
13    Q.    Doesn't the reference to larger
14 benefits for shorter service employees really mean
15 larger benefits for younger employees --
16             MR. BLUMENFELD:  Objection.
17 BY MR. BRUCE:
18    Q.    -- and comparable benefits for older
19 employees?
20             MR. BLUMENFELD:  Objection.
21             THE WITNESS:  It doesn't say
22             that.
23 BY MR. BRUCE:
24    Q.    You don't know how this plan works,

## JOHN ARKO

Page 261

1  right? Do you know that an older shorter service
2  employee would have less benefits under this plan
3  than under the prior plan?
4              MR. BLUMENFELD: Objection.
5              THE WITNESS: We have one pension
6              plan in place, and it provides you
7              benefits based on your employment
8              service.
9  BY MR. BRUCE:
10      Q.      Try and answer the question. Were you
11 aware that a shorter service employee who is older
12 would not receive larger benefits under the cash
13 balance plan?
14              MR. BLUMENFELD: Objection,
15              foundation, outside the scope of the
16              notice, among other things.
17              THE WITNESS: Say it one more
18              time, please.
19              MR. BRUCE: Can you read it
20              back?
21              (The previous question is read
22              back.)
23              THE WITNESS: I was aware that
24              all participants would receive

Page 262

1              benefits under the terms of a plan as
2              it was amended 1/1/98, and that plan
3              design was again reviewed by Mercer.
4  BY MR. BRUCE:
5      Q.      Try and answer the question again.
6  This is just taking time. Try and answer the
7  question. I asked it to you twice. You're here to
8  make responsive answers, not just to digress, okay?
9              MR. BLUMENFELD: Objection.
10 BY MR. BRUCE:
11      Q.      I asked you twice, do you understand
12 that an older, shorter service employee would receive
13 a smaller benefit under cash balance compared to the
14 prior plan?
15      A.      And you're talking about the terms of
16 our Cigna pension plan when they ultimately leave
17 benefits, leave Cigna, terminate, start to receive a
18 benefit, of course if they had somebody with shorter
19 service, and again it depends on where that service
20 happened at Cigna and what terms are in place, they
21 would get a benefit that might be less than somebody
22 with longer service regardless of age. Depends on
23 what the plan formula specifically calculates as a
24 benefit for that person at the time they commence to

Page 263

1  receive payments.
2      Q.      So is the answer that you don't know
3  the answer to my question?
4      A.      The answer is you need to give me some
5  specific employment history and times, and I would be
6  happy to answer.
7      Q.      This booklet seems to be able to make
8  generalizations here without providing specific
9  employment histories, and you said you generally
10 agreed with these statements, right? It says,
11 generally speaking, the new retirement plan in
12 comparison with the current plan tends to provide
13 larger benefits for shorter service employees and
14 comparable benefits for longer service employees.
15 You were able to agree with that statement, but then
16 when I asked you a question you said that you need
17 more specifics?
18      A.      I was able to agree that the people
19 that created this, again, was Mercer Consulting
20 and --
21      Q.      So you don't have any independent
22 understanding of whether this statement is true or
23 not?
24              MR. BLUMENFELD: Perhaps you

Page 264

1              should read the rest of the paragraph,
2              too.
3  BY MR. BRUCE:
4      Q.      You don't have any independent
5  understanding of whether this statement is true or
6  not?
7      A.      I would have reviewed this as well.
8      Q.      You're just relying on Mercer?
9              MR. BLUMENFELD: Objection.
10 BY MR. BRUCE:
11      Q.      Is that right?
12              MR. BLUMENFELD: Mischaracterizes
13              his prior testimony.
14              THE WITNESS: I am saying that
15              this answer certainly was an
16              appropriate answer to this question
17              given the review that was completed at
18              the time this was done, and the entire
19              context of the answer here.
20 BY MR. BRUCE:
21      Q.      But are you familiar with any part of
22 that review which supports that answer?
23              MR. BLUMENFELD: Objection.
24              THE WITNESS: I can't recall

## JOHN ARKO

Page 265

```
 1              specifically, but again there was much
 2              work done around the potential design
 3              of the plan amendment that was in
 4              place of 1/1/98.
 5   BY MR. BRUCE:
 6       Q.      What do you consider comparable
 7   benefits to be?  Would that be like 80 percent of the
 8   prior benefits, or does comparable mean close to 100
 9   percent, or can that mean 80 percent, 60 percent?
10              MR. BLUMENFELD:  Objection.
11              THE WITNESS:  I didn't
12              specifically write these words,
13              comparable, so I couldn't assign a
14              definition.
15   BY MR. BRUCE:
16       Q.      What's your understanding of that when
17   you read it?
18              MR. BLUMENFELD:  Objection.
19              THE WITNESS:  I don't think I'd
20              give it a specific numerical value.
21   BY MR. BRUCE:
22       Q.      So comparable to you can mean less
23   than 100 percent, right?
24       A.      Comparable to me doesn't even have to
```

Page 266

```
 1   be simply benefits from -- available to from the
 2   Cigna pension plan.  It could mean their ability to
 3   have appropriate retirement and provide income into
 4   their retirement utilizing during their career at
 5   Cigna the benefit plans that we make available to
 6   them.
 7       Q.      It just says, the new retirement plan
 8   in comparison with the current retirement plan.  So
 9   isn't that comparing the current retirement plan with
10   the new retirement plan?
11              MR. BLUMENFELD:  Objection.
12              THE WITNESS:  It says what it
13              says, yes.
14   BY MR. BRUCE:
15       Q.      So you don't have any idea what
16   comparable means?
17       A.      No.
18              MR. BLUMENFELD:  Objection.
19   BY MR. BRUCE:
20       Q.      Right?
21       A.      Not to -- not beyond the explanation I
22   have just given, no.
23       Q.      So this statement could be -- it could
24   be true if benefits for longer service employees are
```

Page 267

```
 1   75 percent of what they were under the prior plan,
 2   that that could be enough to make this sentence true;
 3   is that right?
 4       A.      It's not how I responded.  I don't
 5   know that I would give numerical comparisons in my
 6   interpretation of that.
 7       Q.      Would this sentence be untrue for
 8   Robert Upton, if his benefits under the new plan were
 9   5 percent less than under the old plan?
10              MR. BLUMENFELD:  Objection.
11   BY MR. BRUCE:
12       Q.      Would this be an accurate description
13   of Robert Upton's benefits, that they were
14   comparable?
15              MR. BLUMENFELD:  Objection.
16              THE WITNESS:  You have to ask
17              Robert Upton, when he ultimately
18              receives his benefits, how he feels,
19              what his interpretation of comparable
20              is.
21   BY MR. BRUCE:
22       Q.      I am asking for your interpretation.
23       A.      You are asking for any interpretation
24   about Robert Upton's benefits?
```

Page 268

```
 1       Q.      No.  I'm asking you for something
 2   you're perfectly capable of answering.  Would this
 3   statement be accurate for a person like Robert Upton
 4   if his ultimate benefits are 75 percent of what his
 5   benefits were under the current plan -- under the
 6   prior plan?
 7              MR. BLUMENFELD:  Objection.  Just
 8              so we are clear, what statement are
 9              you talking about?
10              MR. BRUCE:  That generally
11              speaking, the new retirement plan in
12              comparison with the current plan tends
13              to provide comparable benefits for
14              longer service employees.
15              MR. BLUMENFELD:  Objection.
16              MR. BRUCE:  You have objected.
17              THE WITNESS:  I think this answer
18              covers quite a lot of ground.
19   BY MR. BRUCE:
20       Q.      Try and answer the question, Mr.
21   Arko.
22       A.      I think it is a very broad question
23   that I don't know how to answer.  I certainly agree
24   with the statements here, generally speaking, that
```

67 (Pages 265 to 268)

## JOHN ARKO

Page 269

1  the retirement plan, in comparison with the current
2  plan, tends to provide larger benefits for shorter
3  service employees, comparable benefits for longer
4  service, and then it goes on to talk about the
5  retirement plan also brought into play the changes to
6  the SIP program, including the addition of the
7  variable match.
8       Q.      Would you still agree with that
9  statement if it could be shown that longer service
10  employees often had 25 percent reductions in their
11  benefits?
12              MR. BLUMENFELD:  Objection.
13              THE WITNESS:  Speaking
14              hypothetically, if you would show me
15              these sort of calculations?
16  BY MR. BRUCE:
17      Q.      Sure.
18      A.      And if somehow you could extrapolate
19  that to this generally speaking comment that is
20  clearly placed here because this was a communication
21  that was meant to go to more than 30,000 people, I
22  don't know.  I would have to see that itself and see
23  how I interpret that material when you handed it to
24  me.  I don't know what I would do.

Page 270

1       Q.      I have postulated that we can show you
2  that there's a 25 percent reduction for a lot of
3  longer service employees.  Would that change your
4  agreement with the statement, or would you still say
5  that's a fair statement?
6               MR. BLUMENFELD:  Objection.
7               THE WITNESS:  It's hard for me to
8               answer under the limited information
9               you have given me.  A lot of people --
10              I just can't answer that question
11              without more information, even
12              postulated information.
13  BY MR. BRUCE:
14      Q.      So you couldn't say one way or
15  another?
16      A.      Correct.
17      Q.      Let's look at the summary plan
18  descriptions of Exhibit-3, the page that is marked
19  630.
20      A.      630?
21      Q.      Yes.  And this comes under, if you
22  look at the preceding page, this comes under a
23  heading of, other important information.  That's the
24  general heading, and then there's a subheading for

Page 271

1  paying for your pension.  The second paragraph says:
2  Your account contains credits in the form of
3  hypothetical dollars.  It does not contain actual
4  dollars.  What does Cigna intend to communicate by
5  that?  Is that a qualification or a restriction on
6  the plan's benefits, or what is the significance of
7  that statement?
8               MR. BLUMENFELD:  Objection.
9               THE WITNESS:  My understanding is
10              just simply that it says it's
11              describing the account, the account
12              balance, as just a notional account,
13              and it's not -- individually allocated
14              dollars don't exist.
15  BY MR. BRUCE:
16      Q.      Does it have any significance beyond
17  that?
18              MR. BLUMENFELD:  Objection.
19              THE WITNESS:  I don't know.
20  BY MR. BRUCE:
21      Q.      It is a common description for defined
22  benefit plans that you don't have -- you don't
23  actually have an individual account in this plan when
24  we tell you that you have a thousand dollar a month

Page 272

1  annuity, right?
2       A.      Correct.
3       Q.      So is this just providing the same
4  information for this plan, it's just telling people
5  that we are saying you have $1,000 in this account;
6  there really isn't an individual account?
7       A.      Yes.
8       Q.      But is this supposed to qualify the
9  promise that's being made to pay people the thousand
10  dollars that is in their account?
11              MR. BLUMENFELD:  Objection.
12  BY MR. BRUCE:
13      Q.      Is this supposed to indicate that this
14  is, like, funny money?
15              MR. BLUMENFELD:  Objection.
16              THE WITNESS:  No, not that I know
17              of.
18  BY MR. BRUCE:
19      Q.      The fact that it refers to
20  hypothetical dollars, what is a hypothetical dollar?
21      A.      Again, my understanding of that
22  provision in that sentence there is that it is simply
23  describing a notional account balance, and that it's
24  not truly reflective of individual dollars allocated

## JOHN ARKO

Page 285

BY MR. BRUCE:

2    Q.    Do you exercise any mental processes
3 there, or you just leave it to Paul?

4    A.    I make sure that Paul reviews summary
5 plan descriptions.  That takes a lot of mental
6 exercise.

7    Q.    And was it your understanding that
8 this summary plan description disclosed all of the
9 conditions on the payment of these benefit credits
10 that exist under the Cigna pension plan?

11    A.    This summary plan description was
12 meant to describe the terms of Part B of the pension
13 plan, and in conjunction with calculations that are
14 provided to people at the time they commence benefits
15 where we specifically list exactly that options are
16 available and what those dollar amounts are, together
17 those provide exactly the payments that are available
18 to participants under the plan.

19    Q.    And does this summary plan description
20 tell participants that they can't have both their
21 previously earned benefits and the cash balance
22 accruals?

23         MR. BLUMENFELD:  Objection.

24         THE WITNESS:  This plan tells

Page 286

1              them what benefits are available to
2              them, and again in conjunction with
3              the materials that they receive at the
4              time they are ready to commence
5              benefits, they have all of that
6              information available.

7 BY MR. BRUCE:

8    Q.    Okay.  Assuming that if Janice Amara
9 terminated from Cigna today and she commenced
10 benefits, that the best benefit for her would be the
11 benefit that she had already earned before 1998?

12    A.    Assuming that?

13    Q.    Yes.

14    A.    To Ms. Amara, that would be the case.

15    Q.    Yes.  Does this tell her that she
16 cannot get any part of the cash balance pay credits
17 that have been allocated to her account since 1998?

18         MR. BLUMENFELD:  Objection.

19 BY MR. BRUCE:

20    Q.    Does this tell her that she can't have
21 those pay credits?

22    A.    It tells her what her benefits are
23 going to be, and her benefits, no matter what she
24 assumes, are going to be exactly those provided under

Page 287

1 the terms of the pension plan when she terminates, if
2 that's today, and then starts to receive her benefits
3 given her employment career with Cigna.  It would go
4 through every calculation needed to show her all
5 options of benefits.  Those would be calculated under
6 Part B of the plan.  As I recall, she's under Part B
7 of the plan now, and where appropriate they would
8 extend back to Part A of the plan, and those numbers
9 would be displayed for her in her sheet to select the
10 appropriate option.

11    Q.    Let's say that the benefits that she
12 has under the Part B plan is $1833 per month
13 beginning at age 55, and let's suppose to generalize
14 that Cigna has contributed to her cash balance
15 account $10,000 in each of the years from 1999
16 through 2003, so that she's got five years of pay
17 credits.  Does this summary plan description tell her
18 that she can't get that $5,000 plus interest in
19 addition to the $1,833 that she had already earned?

20         MR. BLUMENFELD:  Objection.

21         THE WITNESS:  The summary plan
22              description tells her exactly what
23              benefits would be available to her,
24              and in conjunction with the actual

Page 288

1              benefit calculation sheet, to show her
2              each of her options that would
3              specifically show what dollar amount
4              under a variety of options she would
5              be able to receive as pension.

6 BY MR. BRUCE:

7    Q.    So you think that as an average --
8 that an average participant reading the summary plan
9 description would understand that the $10,000 per
10 year contributed between 1999 and 2003 was only
11 payable if she does not ask for the $1,833 that she
12 had already earned?

13         MR. BLUMENFELD:  Objection.

14         THE WITNESS:  I think the average
15              participant would read the benefit
16              calculation sheet that shows them
17              precisely how much they could take
18              under each available option, whether
19              it be the account balance, lump sum or
20              any of the other annuity options.  No
21              matter how they were calculated, they
22              were calculated per the terms of the
23              plan, those dollar amounts is what
24              they would use to select whichever

## JOHN ARKO

Page 289

1      option they wanted to, or payment they

2      wanted.

3  BY MR. BRUCE:

4      Q.    But your understanding is that this

5  summary plan description tells the average

6  participant, including Janice Amara, that she cannot

7  get A plus B?

8          MR. BLUMENFELD:  Objection.

9  BY MR. BRUCE:

10     Q.    She cannot get the $50,000 that was

11  contributed between '99 and 2003 plus the benefits

12  that she had before 1998?

13         MR. BLUMENFELD:  Objection.

14         THE WITNESS:  I think this

15      document, and in conjunction with the

16      calculations and the actual plan

17      document, provide that she sees

18      precisely the dollar amount of

19      benefits available to her based on her

20      entire career at Cigna, including the

21      time prior to 1998, and those facts

22      would be applied to the terms of the

23      Cigna pension plan, and she would be

24      shown specific numbers of every

Page 290

1      option.

2  BY MR. BRUCE:

3     Q.    You are not answering the question.

4     A.    I think I did.

5         MR. BLUMENFELD:  Objection.

6         MR. BRUCE:  Read back the

7      question.

8         MR. BLUMENFELD:  He answered it

9      to the best of his ability.

10        MR. BRUCE:  He is answering other

11      questions than the one I asked.  Let's

12      read it back, the question, once

13      more.  Try and listen to it and answer

14      the question, and then you can

15      digress.  I promise I will listen.

16      (The previous question is read

17      back.)

18        THE WITNESS:  I am going to stand

19      by my previous answer.  I already

20      answered that question.

21  BY MR. BRUCE:

22     Q.    Let me ask you the question, and try

23  and listen and answer it.

24         MR. BLUMENFELD:  Objection.

Page 291

1  BY MR. BRUCE:

2     Q.    Does the summary plan description,

3  Exhibit-3, disclose to a participant like Janice

4  Amara that the $10,000 per year that was postulated

5  as pay credits between 1999 and 2003 are only payable

6  to her if she does not ask for the $1,833 that she

7  had previously earned under the plan?

8         MR. BLUMENFELD:  Objection.  The

9      document speaks for itself.

10        THE WITNESS:  I am trying to

11      think of a way to respond differently

12      than I did previously, and I am

13      struggling to do that.

14  BY MR. BRUCE:

15     Q.    I am asking you, does the SPD tell a

16  participant like her that she cannot get the $10,000

17  per year that was postulated between 1999 and 2003

18  unless she gives up the $1,833 that she earned before

19  1998?

20        MR. BLUMENFELD:  Stephen, the

21      document speaks for itself.  You have

22      asked the witness several times, and

23      he has given you his answer.  If you

24      don't like it, look to the document.

Page 292

1        MR. BRUCE:  You have made your

2      objection.

3  BY MR. BRUCE:

4     Q.    Answer the question.

5     A.    The document provides information

6  about Part B of the pension plan, and in conjunction

7  with calculations that she would receive.  She would

8  get credit for her entire career at Cigna.  When it

9  comes time for her to select a benefit, even under

10  your scenario that that were today that she

11  terminated, she would receive credit for her entire

12  time with Cigna, both before and after the 1/1/98

13  change, and she could -- she would receive a

14  distribution package from Cigna Retirement Investment

15  Services that would specifically show what those

16  amounts are under a variety of options, and she could

17  choose one.  All of them, every one of them, would

18  have taken into account her entire career at Cigna

19  under the terms of the pension plan.

20     Q.    We talked about earlier that rather

21  than having an A plus B formula, that the Cigna

22  pension plan has a formula that can be expressed

23  under those same kinds of concepts as the greater of

24  A or the opening account balance, plus B.

# JOHN ARKO

Page 293

1      A.      You described such things, yes.
2      Q.      And you agreed that that was a
3  reasonably accurate description of what the Cigna
4  pension plan Part B does?
5              MR. BLUMENFELD: Objection.
6  BY MR. BRUCE:
7      Q.      So does the summary plan description
8  tell her that what she will actually be paid is the
9  greater of, A, her previously earned benefits, or B,
10 the opening account balance plus accruals under the
11 cash balance plan?
12             MR. BLUMENFELD:  Objection, the
13             document speaks for itself, and I
14             would like to note the same objection
15             that I made before when the witness
16             left the room.
17             MR. BRUCE:  Let him answer,
18             Jeremy.
19             MR. BLUMENFELD:  Stop asking the
20             same questions again and again about
21             what a document says that you had in
22             front of you.
23             MR. BRUCE:  He can answer the
24             question, and stop this kind of

Page 294

1             filibustering.
2             THE WITNESS:  This summary plan?
3  BY MR. BRUCE:
4      Q.      Yes.
5      A.      I would still say she gets credit for
6  all of her time as a Cigna employee, both before and
7  after 1998, under the terms of the plan as it stands
8  when she terminates, whenever that may be, and we
9  provide her those specific calculations.  In the SPD
10 there's a section here that talks about minimum
11 benefits.  Perhaps that's more responsive to what
12 you're trying to ask.  I can read that.  If you
13 participated in the pension plan before 1998, your
14 old plan benefits were converted to an opening
15 account balance in this plan.  Your final plan
16 benefits cannot be less than your old plan benefits
17 on December 31, 1997.  If this minimum benefits rule
18 applies to you, you will be notified by the
19 retirement service center when you request a
20 distribution.
21     Q.      Is that your understanding, that
22 participants are automatically notified by the
23 retirement service center when they request a
24 distribution, if the minimum benefits rule applies to

Page 295

1  them?
2      A.      They receive very specifically the
3  exact dollar amounts of every benefit option
4  available to them.
5      Q.      How is that any different than what
6  they would receive if the minimum benefit rule did
7  not apply to them?
8              MR. BLUMENFELD:  Objection.
9              THE WITNESS:  The numbers would
10             be different.
11 BY MR. BRUCE:
12     Q.      The numbers would be different, but is
13 there some different disclosure that tells them what
14 they are being offered is the minimum benefit?
15     A.      Not that I am aware of, but we make
16 available to them the 800 number if they want to call
17 to ask specific questions about the calculation of
18 benefits.
19     Q.      And is it your understanding that this
20 tells participants that if this minimum benefit rule
21 applies to them, they don't get the pay credits that
22 are described on Page 624?
23     A.      Again, I point out to you the fact
24 that we definitely, as the summary plan description

Page 296

1  describes, your final plan benefits cannot be less
2  than your old plan benefits on December 31, 1997.
3      Q.      Does that tell them that they won't
4  get any of the pay credits that are described on Page
5  624 of the SPD if the minimum benefit applies?
6              MR. BLUMENFELD:  Objection.
7              THE WITNESS:  They get a
8              distributions package that shows them
9              they can take the account balance as a
10             lump sum, and if they have any other
11             benefits available to them, and
12             annuity options, it gives them those
13             specific dollars.
14 BY MR. BRUCE:
15     Q.      Did you answer the question?  I asked
16 you, does that description of the minimum benefits
17 rule, does it tell participants that if this minimum
18 benefit rule applies to them, that that means that
19 they don't get the pay credits that are described on
20 Page 624 of the SPD?
21             MR. BLUMENFELD:  Objection.
22             THE WITNESS:  624 describes pay
23             credits, and 629 describes how we
24             protect their old plan benefits at

## JOHN ARKO

Page 297

1           12/31/97.
2    BY MR. BRUCE:
3        Q.    Do you want to try and answer the
4    question?
5                   MR. BLUMENFELD:  Objection.
6                   THE WITNESS:  I think that's an
7    answer.
8                   MR. BLUMENFELD:  He is answering
9               to the best of his ability.  You are
10              asking him about what a document says.
11   BY MR. BRUCE:
12       Q.    Is it your understanding that the
13   description of the minimum benefit rule in this SPD
14   communicates to participants that if the minimum
15   benefit rule applies to them, that that means that
16   they don't receive the pay credits that are described
17   on Page 624 of the SPD?  Yes, no, I don't know, how
18   about that?
19                  THE WITNESS:  It describes
20              optional payment methods.  If you
21              don't want to receive your benefits by
22              the normal payment method, which
23              previously is described as a single
24              life annuity starting at age 65, you

Page 298

1               may choose one of the following
2               payment methods, and it goes on to
3               describe a variety of payment
4               methods.  They can choose amongst any
5               of these, but they can only choose
6               one, and each one of those are again
7               described in the materials that are
8               provided people at the time they
9               commence the benefits.
10   BY MR. BRUCE:
11       Q.    Mr. Arko, again, you're not even
12   trying to answer the question.
13                  MR. BLUMENFELD:  Objection.  An
14              objection to all of your questions in
15              this regard.
16   BY MR. BRUCE:
17       Q.    Did your attorney not instruct you
18   about trying to answer the questions?
19                  MR. BLUMENFELD:  Objection.  I
20              will instruct you that you shouldn't
21              disclose attorney/client
22              communications, so I instruct you not
23              to answer that question.
24                  MR. BRUCE:  Read him back the

Page 299

1    question once more, and if he refuses
2    to answer, we are go to get someone in
3    here who is capable of responding to
4    the notice of deposition on these
5    subjects.
6                   MR. BLUMENFELD:  I think we have
7    answered all of the questions that you
8    have relative to the notice of
9    deposition on this subject.
10                  MR. BRUCE:  He said that he knew
11   virtually nothing about anything
12   related to any of the subjects.  He
13   just said that he relies on legal
14   counsel, and he has no idea of how
15   they analyze anything or what
16   conclusions they reach.  He has never
17   seen any documents about the accrual
18   rates and the 133 and a third percent
19   rule.  He hasn't even seen the
20   documents that you produced in
21   discovery on that subject.
22                  MR. BLUMENFELD:  Excuse me, as I
23   recall, the document that you produced
24   here is not with regards to the actual

Page 300

1    plan, it was with regard to a further
2    proposal with regard to the plan, and
3    you haven't asked the distinction
4    between things post 1998 and pre 1998
5    per your notice of deposition, and you
6    haven't asked any of the proper
7    questions to find out that information
8    this witness might have and what
9    information might exist regarding the
10   subject matters that you have been
11   trying to ask questions about all day.
12                  MR. BRUCE:  I haven't asked him
13   the proper questions about what
14   materials might exist, about the
15   subjects, okay, let me go over, let's
16   start and we will go over those,
17   Jeremy.  Let's identify some questions
18   that I haven't asked about those
19   subjects, if you're suggesting that
20   there is additional materials that he
21   could provide us that he hasn't
22   provided.
23                  MR. BLUMENFELD:  I told you that
24   we have provided you with all material

JOHN ARKO

Page 305

1      determine --
2                MR. BRUCE: From this witness.
3                MR. BLUMENFELD: -- to determine
4         whether the items in your notice of
5         deposition are covered. Now, if you
6         have questions for the witness --
7                MR. BRUCE: You are saying from
8         this witness -- let's go over the
9         areas again, Jeremy, if you're not
10        willing to say that we've listed all
11        of the information that this witness
12        has to offer us.
13   BY MR. BRUCE:
14        Q.    Let's look at Exhibit-1 of item one.
15               MR. BLUMENFELD: Exhibit-1 of
16        item one?
17   BY MR. BRUCE:
18        Q.    Exhibit-64, item number one of the
19   notice of deposition. Mr. Arko, do you have any
20   other testimony to offer concerning the plan's
21   compliance with the 133 and a third percent rule?
22               MR. BLUMENFELD: Objection.
23        That's not a question.
24               MR. BRUCE: Yes, it is.

Page 306

1                MR. BLUMENFELD: No, it isn't.
2    BY MR. BRUCE:
3         Q.    Do you have any other information to
4    offer that you have not offered concerning the 133
5    and a third percent rule?
6                MR. BLUMENFELD: That's overbroad
7         and ambiguous, and not a proper
8         question.
9                MR. BRUCE: Yes, it is a proper
10        question.
11               MR. BLUMENFELD: You just asked
12        him to tell you everything he knows
13        about a subject that you haven't asked
14        him about.
15               MR. BRUCE: I have asked him
16        about a subject.
17               MR. BLUMENFELD: You are asking
18        him to fill in all of the gaps of
19        information that you have not already
20        asked him. That's not a proper
21        question.
22               MR. BRUCE: Jeremy, it is a
23        proper question.
24   BY MR. BRUCE:

Page 307

1         Q.    Do you have any more testimony to
2    offer concerning the plaintiff's compliance with the
3    133 and a third percent rule?
4                THE WITNESS: I cannot recall
5         anything further than what we have
6         discussed today.
7    BY MR. BRUCE:
8         Q.    Do you have any more testimony to
9    offer concerning the plan's compliance with age
10   discrimination rules?
11               MR. BLUMENFELD: Objection.
12               THE WITNESS: I tried to answer
13        all of your questions today.
14   BY MR. BRUCE:
15        Q.    Do you have any more testimony to
16   offer concerning the plan's compliance with the age
17   discrimination rules?
18               MR. BLUMENFELD: He wants to know
19        if there is anything else that he
20        hasn't asked that you'd like to tell
21        him now.
22               THE WITNESS: I cannot think of
23        any other information that you would
24        want to hear.

Page 308

1    BY MR. BRUCE:
2         Q.    How about the ERISA section 204(h), do
3    you have any more testimony to offer concerning ERISA
4    section 204(h)?
5                MR. BLUMENFELD: Are you
6         representing that these are the items
7         in the notice of deposition? Because
8         the notice of deposition is limited to
9         compliance after December 31, 1997
10        with the rules and these various
11        provisions.
12               MR. BRUCE: I am asking him the
13        questions, Jeremy, I am not making
14        representations.
15               THE WITNESS: I can't think of
16        anything else besides what we have
17        talked about today.
18   BY MR. BRUCE:
19        Q.    Have you seen any other documents that
20   we haven't gone over today concerning the plan's
21   compliance with any of those subjects?
22        A.    You mean in preparation for this?
23        Q.    At any time?
24        A.    At any time, I can't recall. We have

77 (Pages 305 to 308)

Page 317

```
 1                MR. BLUMENFELD:  Stephen, you
 2        understand that the design of the plan
 3        is one thing, and that the
 4        administration of that plan is a
 5        separate thing, and that a company is
 6        allowed to seek legal advice in
 7        connection with the design of its
 8        pension plan to ensure that that
 9        design complies with ERISA, and that
10        there is no fiduciary exception to the
11        attorney/client privilege under those
12        circumstances.
13   BY MR. BRUCE:
14        Q.    What is the plan administrator relying
15   on, is what I am asking.  What is the plan
16   administrator relying on?  You are relying on the
17   advice that you presume was given to the corporation
18   in this design phase, right?
19        A.    That would be accurate.
20                MR. BLUMENFELD:  You didn't even
21        ask him if the plan administrator
22        undertook any independent steps after
23        the plan was designed to ensure that
24        the plan complied with these
```

Page 318

```
 1        positions.
 2   BY MR. BRUCE:
 3        Q.    Did the plan administrator undertake
 4   any independent steps after the plan was implemented
 5   to determine whether the provisions complied with the
 6   age discrimination rule?
 7        A.    Not that I recall, no.
 8        Q.    Did the plan administrator undertake
 9   any independent steps to determine that the plan
10   complied with the 133 and a third percent rule after
11   1/1/98?
12        A.    Not that I recall.
13        Q.    Did the plan administrator undertake
14   any steps to determine whether the plan complied with
15   the 204(h) notice after 1/1/98?
16                MR. BLUMENFELD:  Objection.
17        204(h) doesn't even apply after
18            1/1/98.
19   BY MR. BRUCE:
20        Q.    So if the notice should have been
21   given for 1/1/98, the plan administrator wouldn't
22   have any responsibility for determining whether that
23   requirement had been met?  Was it the plan
24   administrator's responsibility in the first place to
```

Page 319

```
 1   give the 204(h) notice?
 2        A.    Uh-huh
 3        Q.    So did the plan administrator
 4   undertake any independent steps to determine whether
 5   or not the 204(h) notice was given that you know of?
 6        A.    Not after 1/1/98, that I am aware of.
 7        Q.    Did the plan administrator undertake
 8   any steps before 1/1/98 to determine whether 204(h)
 9   notice was given?
10                MR. BLUMENFELD:  Objection, asked
11        and answered at length.
12                THE WITNESS:  I --
13   BY MR. BRUCE:
14        Q.    Your answer is that the plan
15   administrator relied on the advice of Paul Gontarek?
16        A.    Correct.
17        Q.    And can you tell me what Paul
18   Gontarek's advice was?
19        A.    I can't recall specifically, but as
20   regards to other completed 204(h) notice, it was
21   discussed amongst the review group during the time we
22   were creating communications that Paul raised the
23   issue.
24        Q.    Who is the review group?
```

Page 320

```
 1        A.    People that were in place to create
 2   and determine the communications to participants
 3   regarding the change in plan of 1/1/98.
 4        Q.    Were you a member of the review group?
 5        A.    It was just a term that I used now.  I
 6   don't know.  It's not truly a defined term, I would
 7   think, at Cigna.  It was just a term now that I used
 8   to try and answer your question.
 9        Q.    Were you a member of what you
10   considered to be the review group?
11        A.    I was asked to review certain aspects
12   of the whole communication plan and be a part of the
13   decisions that were made or what kind of materials
14   were delivered.
15        Q.    And independent of whether or not it
16   is legal, did the summary plan description disclose
17   to participants that the accrual rates decrease with
18   age?
19                MR. BLUMENFELD:  Objection in
20        terms of the documents speak for
21        themselves.
22                THE WITNESS:  The plan documents
23        provide information specifically about
24        what benefits are available to people
```

Page 321

1              under the pension plan.
2   BY MR. BRUCE:
3        Q.     And does it disclose that the accrual
4   rates in terms of annuities decrease with age under
5   the cash balance plan?
6              MR. BLUMENFELD:  Same objection.
7              THE WITNESS:  Again, the SPD
8              simply describes the terms of the
9              pension plan available to participants
10             at the time that they elect to receive
11             their benefit.
12  BY MR. BRUCE:
13       Q.     Can you try and answer the question?
14  Does the summary plan description -- you can just
15  say, no, it doesn't or you can say, I don't know,
16  just try and answer the question.  Does the summary
17  plan description disclose to participants that
18  accrual rates in terms of annuities decrease with age
19  under the cash balance plan?
20       A.     I don't know.  I don't believe it
21  directly does.
22             MR. BRUCE:  Well, that's all I
23             have for him, but we are going to
24             request that Judge Squatrito have you

Page 322

1   produce a witness who can answer the
2   questions in the notice of deposition.
3              MR. BLUMENFELD:  I think we can
4   do this off the record.
5                    - - -
6              (At 5:55 p.m., the witness was
7   excused and the deposition was
8   concluded.)
9                    - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 323

1   C E R T I F I C A T I O N
2
3
4              I hereby certify that the proceedings
5   and evidence are contained fully and accurately in
6   the stenographic notes taken by me upon the foregoing
7   matter on July 3, 2003, and that this is a correct
8   transcript of the same.
9
10
11
12             Kristen Augello
13             Court Reporter-Notary Public
14
15
16
17
18
19
20
21
22
23
24

Page 324

1   CASE: Amara vs. Cigna
2   DEPOSITION OF: John Arko
3   TAKEN: July 3, 2003
4   PAGE  LINE  ERROR       CORRECTION        REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19                    Witness
20
21
22
23
24

# *Interoffice Memo*

**Date:**       March 13, 1998

**To:**         Those listed below

**From:**       Todd Lane, Benefits Communications, TL17A

**Telephone:**  215.761.2308
**Facsimile:**  215.761.5524

**Subject:**    SPD for the New Pension Plan


Here's draft 3 of the SPD for the new cash balance pension plan for you review.  Please have your comments back to me by **April 27**.

/tl

attachment

Distribution:
Arko, John
Beltz, Stew
Czaklosz, Ania
Durham, Dave
Gontarek, Paul
Lepp, Kathy
Pepper, Hildy

cc:    Denise Hill
       Jerry Meyn



D027263

April 14, 1998
Draft 3
Account Balance SPD
DWD Comments

Dear Todd:

I have included my comments on the draft but will highlight some of the major items in this message:

1. Supplemental Pension Plan:   We do intend to include a SPD for that Plan as an addendum to this document since in future the two pieces are integrally tied.... employees will get a consolidate Pension and Supplemental Pension statement.  We can't and shouldn't forget it.  You have enough information from the Mercer work to write a complete SPD which we can edit as needed to make sure we cover all of the differences in the Supplemental Plan from the qualified Plan.

2. Definitions:   There are still some definitions that need more work including:

> o participating company versus non-participating company, U.S. service versus covered foreign service
> o vesting service ( including U.S. service, U.S. expatriate service, etc.
> o credited service ( ditto)
> o elements of eligible compensation paid after termination of employment (there are some that apply to almost every terminating employee)
> o eligible earnings: this really needs more work (are you sure you can't put in a "definitions" section?
> o eligible deferred compensation
> o re-characterization of some benefits between qualified and supplemental plans

3.  Change of Control Provisions: I believe these must be in the SPD for them to be effective in the event it occurs.  You have the material in the Design Document I distributed.

4.  How your Balance was Created: For the new employee, it's easy since it is zero.  However, we need to provide a quick summary of how an Opening Balance was created for employees actively employed on 1/1/98 versus a re-hired employee/transfer from non-participating company employee.  Just explain that we take the age 65(age 62) benefit they accrued at termination of employment/transfer and use the actuarial equivalency under standard Group (Unisex) Actuarial Tables using an interest rate of 6.05 (5.05%) on 1/1/98 or rate in effect in the year of re-hire or re-transfer.

5.  Minimum Benefits:  Just note that the previous plan contained special subsidized annuity benefits for early retirement and survivor benefits.  The annuity benefits available under the new schedule are guaranteed to provide at least those level of benefits available to participants under

D027264

the prior schedule based on their service through 1997.
**(To John Arko:  You should add some helpful text on this point in your comments to Todd)**

6.  Top Heavy Provisions:   To Paul Gontarek : Can we drop this section?  If not, then we need to provide the detail.  CRIS is not going to provide any further explanation so we can't leave the reader with a "to be provided if necessary" note because the answer will always be NO.

7.  PBGC Coverage: It does not apply to all benefits.  I leave to Paul Gontarek to deal with that issue.

Thanks.

D027265