Amara v. CIGNA, Case No. 01-2361 (MRK)

# EXHIBIT 240

<u>Amara v. CIGNA</u>, C.A. 01-2361 (MRK)

## DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS

### <u>Deposition of John Arko dated April 28, 2006</u>

**(1) Plaintiffs' Designations (marked in blue)**

    p.   5, lines 15 - 21
    p. 10, lines 7 - 21
    p. 37, line 14  - p. 44, line 17
    p. 109, line 21 - p. 112, line 24
    p. 117, line  9 - p. 125, line 4
    p. 129, line 15 - p. 140, line 11
    p. 141, line 14 - p. 148, line 14
    p. 158, line  9 - p. 166, line 23
    p. 203, line   1 - p. 204, line 23
    p. 297, line 16 - p. 304, line 9
    p. 322, line 10 - p. 324, line 24
    p. 325, line 11 - p. 326, line 19

**(2) Defendants' Counter-Designations (marked in red)**

    p. 140, line 12 - p. 141, line 13
    p. 304, lines 10 - 22
    p. 325, lines 1-10

John Arko

1 (Pages 1 to 4)

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - -

JANICE C. AMARA, GISELA R.    : 3:01 CV 2361 (MRK)
BRODERICK, ANNETTE S.        :
GLANZ, individually and on   : April 28, 2006
behalf of others similarly   :
situated                     :
         -vs-
CIGNA CORP. And CIGNA
Pension Plan

- - -

Oral deposition of JOHN ARKO, was taken pursuant
to notice, held at ZANARAS REPORTING AND VIDEO,
1616 Walnut Street, Suite 300, Philadelphia,
Pennsylvania, commencing at 10:00 a.m. on April
28, 2006, before Lynn McCloskey, Shorthand
Reporter and Notary Public, there being present:
- - -

ZANARAS REPORTING AND VIDEO
REGISTERED PROFESSIONAL REPORTERS
1616 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19103
2112 Bay Avenue
Ocean City, New Jersey  08226
(215) 790-7857   1-877-GO-DEPOS

Page 2

1
2   A P P E A R A N C E S:
3
4   LAW OFFICES OF STEPHEN R. BRUCE
    BY: STEPHEN R. BRUCE, ESQUIRE 805
5   15th Street, NW, Suite 210
    Washington, DC 20005
6   (202) 371-8013
    Counsel for Plaintiff
7   MORGAN LEWIS & BOCKIUS, LLP
    BY: JEREMY P. BLUMENFELD, ESQUIRE
8   1701 Market Street
    Philadelphia, Pennsylvania 19103-2921
9   (215) 963-5258
    Counsel for Defendant
10
11
12
    ALSO PRESENT:
13
    PAUL GONTAREK
14
15
16
17
18
19
20      - - -
21
22
23
24

Page 3

1              I N D E X
2
3   WITNESS:                      PAGE
4   John ARKO
5   BY MR. BRUCE                    5
6
7
8              - - -
9
10             E X H I B I T S
11
12  NUMBER      DESCRIPTION          PAGE
13  Arko-1    Notice of Deposition     5
14  Arko-2    Comparison of Benefits Under
15            The Current and the New
16            Retirement Plan        95
17  Arko-3     Interoffice Memo       97
18  Arko-4     Graph                 158
19  Arko-5     Pension Express Vested
20            Term Benefit Data      170
21  Arko-6     Document with Bates Number
22            EPTO0004164           213
23  Arko-7     Document with Bates
24            Number D029352         287

Page 4

1        LITIGATION SUPPORT INDEX
2
3
4     DIRECTION TO WITNESS NOT TO ANSWER
5
6
7   PAGE  LINE     PAGE  LINE     PAGE  LINE
8   (NONE)
9
10
11    REQUEST FOR PRODUCTION OF DOCUMENTS
12
13  PAGE  LINE     PAGE  LINE     PAGE  LINE
14  (NONE)
15
16
17
18            STIPULATION
19
20        PAGE     LINE
21         5        1
22
23
24

cbd182c6-b34b-49bf-9a2e-efa105ffc6c8

John Arko

2 (Pages 5 to 8)

Page 5

1       (It is hereby stipulated and agreed
2   by and between counsel that reading,
3   signing, sealing, filing and certification
4   are waived; and that all objections,
5   except as to the form of the questions, be
6   reserved until the time of trial.)
7       (Arko-1 was marked for
8   identification by the court reporter.)
9       JOHN ARKO, after having been first
10  duly sworn, was examined and testified as
11  follows:
12  BY MR. BRUCE:
13      Q.    Would you state your name?
14      A.    John Arko, A-R-K-O.
15      Q.    And Mr. Arko, what is your position
16  at CIGNA?
17      A.    Director of benefits strategy.
18      Q.    And do you have any other titles?
19      A.    I hold the role of plan
20  administrator for the CIGNA Pension Plan and a
21  number of other qualified benefit plans.
22      Q.    For a number of other ones as well;
23  is that what you said?
24      A.    Yes.

Page 6

1       Q.    Okay.  What are those other plans?
2       A.    The retiree health care -- no, I
3   take that back.  For a number of non-qualified
4   deferred compensation programs that are not
5   currently active and that would be it.
6       Q.    Okay.  So you are not the plant
7   administrator for the CIGNA health plan?
8       A.    Correct.
9       Q.    Okay.  And who is that person?
10      A.    That person was Kathy Hawks and
11  recently her role has changed.
12      MR. BLUMENFELD:  Stephen, before we
13      go forward, do you want to agree to the
14      same stipulations that have been agreed to
15      in other depositions in this case?
16      MR. BRUCE:  That you will just
17      object to form?
18      MR. BLUMENFELD:  Yes.
19      MR. BRUCE:  Yes.
20      MR. BLUMENFELD:  And the witness
21      will read and sign.
22      MR. BRUCE:  Yes.
23      Anything else.
24      MR. BLUMENFELD:  I don't believe

Page 7

1   so.
2       MR. BRUCE:  Okay.
3   BY MR. BRUCE:
4       Q.    And who do you report to?
5       A.    Currently I report to Jim Wolf.
6       Q.    And what is his position?
7       A.    He is a director of benefit
8   strategy.  That's all.
9       Q.    And who does he report to?
10      A.    Charlene Parsons.
11      Q.    And who reports to you?
12      A.    Tomika Stricklin, administrative
13  assistant.  That's all.
14      Q.    How about Terry Kaine?
15      A.    No, she does not report to me.
16      Q.    Who does she report to?
17      A.    She reports to John Kissel.
18      Q.    Who is he?
19      MR. BLUMENFELD:  Objection.
20      THE WITNESS:  Yes.  He's -- he
21      manages the HR operations organization
22      within CIGNA companies.
23  BY MR. BRUCE:
24      Q.    Okay.  So but Terry Kaine performs

Page 8

1   some functions for you?
2       A.    To the extent the operations team
3   is responsible for payroll systems, feeds for
4   benefit programs, including the ones that I am
5   responsible for, yes, Terry Kaine is responsible
6   for many of those interfaces that supply
7   information.
8       Q.    What is her title?
9       A.    I'm not sure.  I believe she is a
10  specialist in the HR operations organization.
11      Q.    Okay.  And who reports to you from
12  Prudential?
13      A.    No one reports to me at Prudential.
14  It's completely a separate organization.
15      MR. BLUMENFELD:  Objection.
16  BY MR. BRUCE:
17      Q.    Who do you communicate with at
18  Prudential concerning the CIGNA Pension Plan?
19      A.    There's quite a number of people
20  that I communicate with on a variety of reasons
21  at Prudential.  Generally there is an account
22  representative that is responsible for our
23  account at Prudential overall and that person is
24  Pam Hughes.

1f22a21a-aff5-4635-b04b-a5bed631e288

John Arko

Page 9

1    Q.    And how about Lorraine Morris, is
2  she your principal operational contact there?
3    A.    To the extent that --
4        MR. BLUMENFELD: Objection.
5        THE WITNESS: -- operational being
6    responsible for the CIGNA Pension Plan,
7    that actual calculation of benefits,
8    record keeping on the administrative side,
9    yes, Lorraine is responsible for the
10   accounts team that processes all of those.
11  BY MR. BRUCE:
12   Q.    Okay. And you understand that you
13  are here today pursuant to a Notice of a
14  30(b)(6) deposition?
15   A.    Yes.
16   Q.    And do you understand what that
17  means?
18   A.    Yes.
19   Q.    Okay. What is your understanding
20  of that?
21   A.    That I am here representing CIGNA
22  Corporation and to be responsive to questions
23  that you are going to pose.
24   Q.    And how about the CIGNA Pension

Page 10

1  Plan?
2    A.    My understanding --
3        MR. BLUMENFELD: Objection.
4        THE WITNESS: My understanding is
5    that that's not what I am here to
6    represent today.
7  BY MR. BRUCE:
8    Q.    That you are just representing the
9  CIGNA Corporation?
10   A.    Right.
11   Q.    All right. And the CIGNA
12  Corporation is the plan sponsor, right?
13   A.    Yes.
14   Q.    And --
15       MR. BLUMENFELD: Objection.
16  BY MR. BRUCE:
17   Q.    And the CIGNA Corporation is plan
18  administrator or you are?
19   A.    I have been named the plan
20  administrator for the pension plan document and
21  appropriate authorities, yes.
22   Q.    Can you describe what you did in
23  preparation for your deposition?
24   A.    Reviewed the information that was

Page 11

1  provided as part of the -- I'm sorry if this is
2  a subpoena, I am not sure. Read through that
3  material, had a chance to discuss it and make
4  sure that I understood it with counsel, Morgan
5  Lewis, represented by Jeremy Blumenfeld and our
6  internal risk counsel.
7    Q.    And that's Mr. Gontarek?
8    A.    Yes.
9    Q.    Let me show you what was marked as
10  Arko-1.
11        Can you identify that?
12   A.    Yes. This is the document that I
13  labeled as perhaps the subpoena, but this is the
14  notice.
15       MR. BLUMENFELD: Do you have a copy
16   of the exhibits that you are going to use
17   for me?
18       MR. BRUCE: Not all of them, but
19   you have a copy of that, right?
20       MR. BLUMENFELD: Yes.
21       MR. BRUCE: Okay.
22  BY MR. BRUCE:
23   Q.    And do you recall approximately
24  when you first saw this document?

Page 12

1    A.    I don't recall specifically.
2  Within a number of weeks ago.
3    Q.    And what did you do after you
4  received this?
5        MR. BLUMENFELD: Objection.
6  BY MR. BRUCE:
7    Q.    You said you talked with Mr.
8  Blumenfeld and Mr. Gontarek. So what did you do
9  in preparation to -- concerning the subjects of
10  the Notice of Deposition?
11   A.    Talked with them about a number of
12  the items on here to the extent that we had, in
13  fact, you know, what already we had already done
14  and accomplished to meet --
15       MR. BLUMENFELD: I'm going to
16   object to the extent that he is asking you
17   about things that you did. Other than
18   having discussions with counsel, you can
19   answer that question. You are not
20   supposed to answer his question and
21   disclose communications with counsel.
22       THE WITNESS: Right.
23  BY MR. BRUCE:
24   Q.    I'm asking what you did?

Page 37

1 administrator?
2 BY MR. BRUCE:
3    Q.    Yes.
4    A.    If I am asked questions, yes, I
5 either generally would funnel that request
6 through Prudential, as they are the folks that
7 are the experts in explaining benefits and how
8 they are calculated per the terms of the plan
9 document and giving people specific demographic
10 and an employment history with CIGNA.
11          And I also then would at times
12 utilizing much of the same information provide
13 an explanation to individuals.
14    Q.    Okay.    Item number five in the
15 Notice of Deposition was concerning any
16 exceptions of what CIGNA is aware to the
17 protection of minimum benefits earned for
18 participants who were converted to Part B.
19          So what did you learn about that in
20 preparation for your deposition?
21    A.    There are no exceptions made beyond
22 simply what the terms of the pension plan
23 allowed for.    Those are not exceptions, those
24 are terms of the plan and we followed them.

Page 38

1    Q.    How is the minimum benefit
2 protected if the field is empty?
3    A.    Because --
4          MR. BLUMENFELD:    Objection.
5          THE WITNESS:    Because --
6          MR. BLUMENFELD:    Stephen, I want to
7 say --
8          MR. BRUCE:    You have made your
9 objection and now you are going to try to
10 coach him.    Let him answer the question.
11          MR. BLUMENFELD:    If you want the
12 witness to step outside --
13          MR. BRUCE:    No.    It's in the middle
14 of a question, Jeremy.    You made your
15 objection.    Now he can answer the
16 question.
17          Do you need it read back to you?
18          THE WITNESS:    Yes, please.
19          (Whereupon, the court reporter read
20 back the pertinent testimony.)
21          THE WITNESS:    The minimum benefit
22 or any benefit that is calculated per the
23 terms of the pension plan is the
24 responsibility to administer of Prudential

Page 39

1 Retirement and they have a process in
2 place to insure that the specific
3 calculations to a specific individual
4 follow all of the terms of the CIGNA
5 Pension Plan, including those that would
6 relate to what we are describing here as
7 minimum benefit, creating open account
8 balance and protecting any benefits earned
9 in previous or other provisions of the
10 plan prior to specifically the Part B of
11 the pattern.
12 BY MR. BRUCE:
13    Q.    And do you have any idea of how
14 that is done when the field with that
15 information is empty?
16    A.    Yes.    Lorraine Morris has, as we
17 talked about before, is responsible for a
18 specific accounts team that actually produces
19 and provides to individuals calculations of
20 their benefits.    And those folks are, when they
21 complete those calculations, simply this -- the
22 tools that they have in hand, each one of them
23 is not sufficient to actually complete the
24 calculation.    They rely on, overall, all of

Page 40

1 their full understanding of the pension plan to
2 get those calculations.
3          MR. BLUMENFELD:    Before the ask the
4 next question, I want to make clear on the
5 record what I was trying to make clear
6 before, which is Mr. Arko is here as a
7 30(b)(6) witness regarding for CIGNA on
8 behalf of the topics that you have
9 identified.    I think on a number of
10 occasions you have gone beyond the scope
11 of the topics that you've identified.
12          I am not objecting to your asking
13 the questions right now, but I do want to
14 make clear that Mr. Arko is not testifying
15 as a 30(b)(6) witness on behalf of CIGNA
16 Corporation regarding matters that are
17 outside the scope of the topics that you
18 have identified in your 30(b)(6).
19          MR. BRUCE:    You've made your
20 statement.
21 BY MR. BRUCE:
22    Q.    If the field for minimum benefits
23 is empty, what is your understanding of where
24 Lorraine Morris or her team would find the

Page 41

1  **dollar amount of the minimum benefit?**
2      MR. BLUMENFELD: Objection.
3      THE WITNESS: I have very limited
4  understanding of exactly where and how
5  they obtain that information.
6  BY MR. BRUCE:
7      **Q.   What is your limited understanding?**
8      A.   That they have in their data bases,
9  and accessible to each team member, information
10  about each participant that has been fed to them
11  over the course of time from CIGNA Corporation
12  or that they have calculated and maintained
13  themselves. And that material is, of course,
14  always available to every person on the team to
15  have access.
16      To the extent information is
17  required to do a calculation under the CIGNA
18  Pension Plan because for whatever reason the
19  participant in question may have service prior
20  to the time that Prudential Retirement took on
21  record keeping responsibilities for certain
22  aspects of the plan, then they have a conduit to
23  obtain that information from CIGNA corporate, to
24  the extent it's previous periods of employment

Page 42

1  or old payroll information.
2      **Q.   If they have that information, why**
3  **wouldn't it have been included in the class**
4  **list?**
5      MR. BLUMENFELD: Objection.
6  BY MR. BRUCE:
7      **Q.   If they have the minimum benefit**
8  **information for the nine thousand people where**
9  **that field is empty in the DBRK system, why**
10  **wouldn't it have been included in the class**
11  **list?**
12      MR. BLUMENFELD: Objection.
13      THE WITNESS: As we pointed out or
14  I think your question mentioned earlier
15  that this is -- the information is
16  calculated as it is needed and as it is
17  completed for a participant.
18      The person on Lorraine Morris's
19  account team that is completing this
20  specific calculation would only move to
21  create it if it's not available to them
22  directly on the system. They would move
23  to create additional components of the
24  benefit before they calculate the entire

Page 43

1  benefit as it is needed for a specific
2  benefit commencement date or a specific
3  request.
4  BY MR. BRUCE:
5      **Q.   But you don't know how they do**
6  **that; is that correct?**
7      MR. BLUMENFELD: Objection.
8      THE WITNESS: I am not familiar
9  with the exact precise process that they
10  follow to go about doing that, no.
11  BY MR. BRUCE:
12      **Q.   And you are not familiar with the**
13  **source or sources that they would look to to**
14  **find the person's minimum benefits?**
15      MR. BLUMENFELD: Objection.
16      THE WITNESS: Exactly the
17  mechanisms and the sources that Prudential
18  Retirement uses to calculate benefits; no,
19  I am not familiar.
20  BY MR. BRUCE:
21      **Q.   And you didn't become familiar with**
22  **that in the course of preparing for this**
23  **deposition, correct?**
24      A.   Correct.

Page 44

1      **Q.   Can you go back in terms of the**
2  **history of going from pension express to the**
3  **DBRK system? You were at CIGNA when that**
4  **occurred, correct?**
5      A.   It was -- yes, happening during my
6  employment with CIGNA, yes.
7      **Q.   When did you start with CIGNA**
8  **again?**
9      A.   It was April of '97.
10      **Q.   Okay. And the pension express**
11  **system had been developed by the Watson Wyatt**
12  **Corporation?**
13      A.   That's my understanding, yes.
14      **Q.   And that was the system that was**
15  **used to calculate benefits prior to the cash**
16  **balance conversion, correct?**
17      A.   Correct.
18      **Q.   Okay. And so the people who were**
19  **moved from pension express to the DBRK system**
20  **under the cash balance formula, there was never**
21  **a period where they were under the DBRK system,**
22  **with the traditional plan formula, correct?**
23      A.   The pension express system had no
24  mechanism that we had access to to do any sort

John Arko

## Page 109

1    Prudential has put together overtime for Janice
2    Amara, that has been either provided to our
3    counsel many times through me, yes.
4        Q.    Okay.  And you are aware that her
5    records in the Part B system were expunged when
6    she was put back into the Part A system,
7    correct?
8            MR. BLUMENFELD:  Objection.
9            THE WITNESS:  To the extent that
10    that was -- I suppose so.  I can't speak
11    to that responsively without looking at
12    that and understanding what you are
13    asking, but I simply obtained that
14    information from Prudential and provided
15    it to you through Jeremy.
16   BY MR. BRUCE:
17       Q.    I am assuming that we have gotten
18   it.
19            MR. BLUMENFELD:  Objection.
20   BY MR. BRUCE:
21       Q.    And were you aware that there was a
22   decision, perhaps you made the decision,
23   concerning providing the so call free 30 percent
24   survivors benefit to Mrs. Broderick; were you

## Page 110

1    aware of that?
2        A.    To the extent that the CIGNA
3    Pension Plan provides in certain circumstances
4    if you meet all of those requirements that a
5    "free 30 percent benefit" needs to be included
6    in the benefit, then yes, I am aware of that.
7        Q.    You were aware that that was
8    previously not provided to her, correct?
9        A.    Yes, Prudential looked into that
10   matter and had determined that she was provided
11   -- her calculation was completed inaccurately
12   not per the terms of the plan, yes.
13       Q.    Was there any communication with
14   you concerning that?
15       A.    There was discussions with
16   Prudential Retirement and myself.
17       Q.    When did those occur?
18       A.    Over the past approximately two
19   months.  I am not sure.
20       Q.    And have you provided your counsel
21   with any documents concerning those discussions?
22       A.    I don't believe any documents -- I
23   believe the only document that's regarding the
24   free 30 and Broderick has been the draft or

## Page 111

1    actually a letter that Prudential had provided
2    that I believe went directly to Mrs. Broderick
3    for that matter.  But there is very little
4    information at this time because they are still
5    in the process of reviewing not just Broderick,
6    but to the extent that this issue may be
7    something that they need to understand and make
8    sure that they provide continually accurate
9    calculations, which include, when applicable,
10    this free 30 to everybody.
11       Q.    You are reviewing the past
12    retirements to see whether it was included?
13       A.    I have instructed Prudential to do
14    an analysis on this matter and they are in the
15    process of doing so.
16       Q.    And how did you instruct them to do
17    an analysis?
18            MR. BLUMENFELD:  Objection.
19            THE WITNESS:  Mainly through -- I
20    had reason to be in their physical offices
21    and we had a meeting.  And one of the
22    topics we discussed was this Broderick
23    matter, in particular, and the fact that,
24    you know, clearly, if there is some need

## Page 112

1    or excuse me, if there was an inaccurate
2    calculation here, they need to and will
3    look at that specific calculation.
4            And again, redo the calculation
5    accurately, bring in the auctorial team as
6    appropriate, if it needs to be looked at
7    beyond Lorraine Morris' organization and
8    then following that, determine and review
9    the process going forward.  And also to
10    look back in some fashion and determine
11    who else may have been -- had a
12    calculation provided to them that did not
13    reflect the free 30.
14   BY MR. BRUCE:
15       Q.    So you instructed Prudential to
16    provide those people with the free 30 percent or
17    do an analysis of it?
18       A.    Instructed them to do an analysis
19    of it.
20       Q.    Of how many people --
21            MR. BLUMENFELD:  Objection.
22    BY MR. BRUCE:
23       Q.    Such people there might be?
24       A.    Right.

Page 117

1  because you were refusing to do it?
2         MR. BLUMENFELD: Objection.
3  BY MR. BRUCE:
4      Q.   Mrs. Broderick was raising this
5  issue for two years.
6      A.   We have a process in place to
7  review and make sure that every calculation is
8  accurate.
9      Q.   How about the so-called relative
10 value disclosures. Were you aware of Lorraine
11 Morris's testimony concerning that?
12     A.   I'm just only -- I don't know that
13 I am aware specifically of any of her testimony
14 in the relative value calculations.
15     Q.   There was a decision made recently
16 concerning the relative value disclosures for
17 people in the cash balance plan, correct?
18        MR. BLUMENFELD: Objection.
19        THE WITNESS: There's been -- from
20 my point of view, there has not been -- we
21 have -- we are still in the process of
22 reviewing our distribution packages and
23 the materials that we provided to
24 participants as to those relative values.

Page 118

1  And we continue to await more information
2  from Prudential so that we can ensure that
3  they are providing, you know, accurate and
4  -- accurate and complete information that
5  is -- you know, addresses every correct
6  regulation that's in place.
7  BY MR. BRUCE:
8      Q.   My understanding is that she
9  credited you with pointing out that they were
10 assuming that all of the forms of annuity under
11 the cash balance plan had equal value and that
12 you pointed out that they don't; is that
13 correct?
14        MR. BLUMENFELD: Objection.
15        THE WITNESS: I had a meeting with
16 them when we were still part of this
17 process of reviewing the documentation
18 that should be in place as far as the
19 recent regulations on relative value and I
20 did raise a number of questions that's on
21 how they were perhaps determining what is
22 a relative value for specific people under
23 certain circumstances under the pension
24 plan. And yes, it was my understanding

Page 119

1  that they were -- I did convince them
2  that, perhaps, there are certain times and
3  certain circumstances when, in fact, they
4  are not equal auctorial equivalent value
5  and need to provide different
6  documentation to people.
7         And that's why they are now in the
8  process of doing a review of that overall
9  program and are making changes to
10 materials that are provided to our
11 participants under the pension plan.
12 BY MR. BRUCE:
13     Q.   Again, are there any written or
14 electronic materials concerning these
15 discussions or what they are looking into now
16 that you can produce?
17     A.   We are simply reviewing work
18 products that they are putting together and that
19 material -- there is draft materials that have
20 been produced for you of all of our distribution
21 packages and information.
22     Q.   My understanding was that the
23 actuary or an actuary at Prudential had advised
24 that all of the options under the cash balance

Page 120

1  plan had equal value and therefore these
2  disclosures didn't need to be made, correct?
3         MR. BLUMENFELD: Objection to the
4  form of the question.
5         THE WITNESS: That was one of their
6  -- as they were initially describing to me
7  the process that they were putting in
8  place. Yes, that was information that
9  they had provided at first and
10 immediately, you know, as we were
11 discussing this package, provided my
12 feedback that perhaps I think that's not
13 accurate. And they went back and upon
14 reflection, upon what I pointed out to
15 them, did come back and say there are
16 certain circumstances where, in fact, they
17 are not equal and you are correct.
18 BY MR. BRUCE:
19     Q.   What are those circumstances under
20 the cash balance plan?
21        MR. BLUMENFELD: Objection.
22        THE WITNESS: When are there
23 circumstances that a variety of forms of
24 payments in those annuity options may or

Page 121

1       not be equivalent in the value?
2  BY MR. BRUCE:
3       **Q.    Not equal value, right.**
4       A.    It could be found in the planned
5  document because there can be many circumstances
6  that drive that to happen.  But, for instance,
7  could be that whenever the person -- well,
8  whenever the account balance is the annuity
9  value of the account balance would be lower than
10 the annuity, that would have -- that would be
11 provided to the participant and that annuity was
12 calculated as either from their opening account
13 balance initially or from additional minimum
14 benefits that you referred to here which can be
15 any number of previously protected benefits that
16 we ensure are paid out as per the terms of the
17 plan.
18      **Q.    Are you saying that there are two**
19 **instances that you can think of.  One is that**
20 **the minimum benefit in annuity form may be**
21 **greater than the cash balance annuity and that**
22 **would be an instance where the options may not**
23 **have equal value, correct?**
24      A.    Correct.

Page 122

1       **Q.    But then you said -- also you said**
2  **if the opening account balance converted to an**
3  **annuity might be greater than the cash balance,**
4  **the current cash balance?**
5       A.    The account balance.
6       **Q.    Explain to me how that could**
7  **happen?**
8       A.    This is in the planned document and
9  described exactly how this calculation is
10 completed, so I would be --
11      **Q.    How is it -- I guess what I am**
12 **trying to figure out is how is that distinct**
13 **from the minimum benefit?  Is that really just**
14 **one instance or is it two separate things?**
15      A.    There be can two --
16      MR. BLUMENFELD:  Objection.
17      THE WITNESS:  There can be two
18 separate things.  There could be an
19 opening account balance or a previously
20 accrued benefit that when compared to an
21 opening account balance, might be higher
22 or there might be other --
23 BY MR. BRUCE:
24      **Q.    Explain to me the opening -- how**

Page 123

1       **the opening account balance could be higher as**
2  **distinct from the previously accrued benefit.**
3  **Give me an example.**
4       A.    The amount that if a participant
5  chooses a form of annuity, that would include
6  the need to reach back and pay the amount that
7  was accrued through the date that their opening
8  account balance was created.  If that, in fact,
9  produced a benefit that was larger than what
10 their account balance had grown to, at the point
11 in time when a distribution was made.
12      **Q.    I am trying to figure out how that**
13 **could happen.**
14      **I can understand the previously**
15 **earned benefit may be more than the cash balance**
16 **converted to an annuity, but then you are also**
17 **saying that there is a second category, an**
18 **opening account balance converted to an annuity**
19 **may be more than the current account balance?  I**
20 **don't see how that --**
21      A.    I'm sorry, I'm sorry.  I was just
22 speaking in general terms.
23      I meant we compare annuity forms,
24 previously accrued annuities and when the time

Page 124

1  comes that somebody may select to have an
2  account balance paid as a lump sum, if that
3  annuity that was frozen at the time of an open
4  account balance for whatever reason produces a
5  lump sum value that's greater than the account
6  balance, we would pay the greater of the two
7  benefits.
8       **Q.    Okay.  And Ms. Morris also**
9  **indicated that that was -- that that decision**
10 **might have ramifications for people who have**
11 **commenced benefits already, correct?**
12      MR. BLUMENFELD:  Objection.
13 BY MR. BRUCE:
14      **Q.    The disclosures may not have been**
15 **given to people who made choices, that they may**
16 **have chosen a lump sum as opposed to an annuity,**
17 **even though the annuity had greater value; is**
18 **that correct?**
19      A.    That she was going to and
20 Prudential was going to go and make sure that
21 the rules as now they -- and the process they
22 had in place and any calculations that they had
23 done previously, make sure that that information
24 was provided to people and included in the

Page 125

1  calculation, the numbers that they had available
2  to them at the time of their distribution, yes,
3  she thought that there may be times they need to
4  go back and redo those calculations.
5      Q.   How would they redo the
6  calculation, if someone chose the lump sum
7  distribution, even though the annuity was worth
8  more.  So when are they going to do in those
9  cases?
10     A.    At this point in time, I don't know
11 what they are going to do.  They are right now
12 determining if, in fact, there even are people
13 in that situation and --
14     Q.   We know that there are, don't we,
15 John, from this lawsuit?  Don't we know that yet
16 from this lawsuit that there are people such as
17 that who chose lump sums, even though the
18 annuities were worth more?
19     A.    I don't know that I follow your
20 question.  I know that there are people who have
21 made choices of their benefit form based on the
22 actual numbers that we have provided them and
23 the materials at the time they took that
24 distribution and Lorraine and her team at

Page 126

1  Prudential are now looking back to be sure that
2  those specific numbers were, in fact, calculated
3  accurately in terms of the plan and the
4  information for those people and, in fact, turns
5  out to provide -- you know, provides or that
6  they provide for the fact that that happened,
7  there were miscalculations, we will take a look
8  at those and correct that as best that we can.
9      Q.   You will correct the situation by
10 providing people with an additional annuity?
11     A.    I don't know how at this point we
12 would seek to put these people, you know, and
13 provide them with the right information.
14         Once we receive more information
15 from Prudential, if, in fact, there are people
16 in this situation, then we will take steps to
17 seek counsel as appropriate and take steps to
18 make the corrections.
19     Q.   Are you looking at this in terms of
20 correcting collections that were made after
21 October of 2004 or correcting collections that
22 were made including those that were made before
23 October of 2004?
24     You know there were new regulations

Page 127

1  that's went into effect in 2004, correct?
2      A.    Correct.
3      Q.   So is Prudential looking at
4  correcting this problem going back to October of
5  2004 or correcting it going back before October
6  of 2004?
7          MR. BLUMENFELD:  Objection.
8          THE WITNESS:  I'm not sure all that
9  Prudential is doing as far as being
10 responsive to this request that I made of
11 them, once again as you have pointed out,
12 I helped them understand that there were
13 times when these were not -- well, there's
14 two things.  They are looking at the
15 current distribution packages and making
16 sure that they comply with the recent
17 regulations, as you have just described.
18         And that's where we have the
19 discussion with the actuary and I pointed
20 out that you do need to take another look
21 at this and they are going to go back and
22 they are in the process of doing that.
23         A separate issue identified that
24 wait, given that understanding, we feel

Page 128

1      that there are, in fact, people such as
2      Mrs. Broderick that have been provided
3      calculations and distribution packages
4      that did not reflect certain components of
5      the benefits as provided for under the
6      planned document.  So that they will seek
7      to determine are there anybody in that
8      situation.  If there are, how can we
9      identify them.  What, if anything, might
10     they suggest needs to be done and that
11     would be brought to my attention and
12     others at CIGNA.
13 BY MR. BRUCE:
14     Q.    There are no electronic or written
15 communications concerning this, correct?
16         MR. BLUMENFELD:  Objection.
17         Concerning -- what are you talking
18     about?
19         MR. BRUCE:  What you just talked
20     about.
21         THE WITNESS:  The fact that
22     there's --
23 BY MR. BRUCE:
24     Q.    What Prudential is looking into,

Page 129

1  your discussions with Prudential, there is no
2  electronic or written communications concerning
3  that?
4      A.    It was very limited and mostly it
5  was done, as I pointed out, at a meeting held at
6  Prudential.
7      Q.    When did that meeting occur?
8      A.    This was the one I referred to
9  earlier, approximately two months ago.
10     Q.    That was the same meeting as you
11 talked about the free 30 percent?
12          MR. BLUMENFELD: Stephen, we had
13     produced some documents to you yesterday.
14          MR. BRUCE: It wasn't related to
15     this decision. The presumption, as I
16     understand it, for the cash balance plan,
17     you know, based on this actuary's
18     recommendation is that they didn't have to
19     bother with those relative value
20     disclosures and that they were developing
21     relative value disclosures for people in
22     the Part A plan; is that correct?
23          And so the relative value materials
24     that they were preparing had to do with

Page 130

1      the Part A plan and now they realize that
2      they may have to prepare them for the
3      people in the cash balance plan; is that
4      correct?
5          MR. BLUMENFELD: Objection.
6          THE WITNESS: They may realize
7      that, yes. I would -- the words you used
8      I think you are accurate.
9          I await them to make sure that they
10     let us know what they uncover so that --
11     so that we can determine the correct
12     course of action.
13          MR. BRUCE: Let's take a lunch
14     here.
15          (Whereupon, a brief recess was
16     taken.)
17 BY MR. BRUCE:
18     Q.    Let's go back for a minute to the
19 missing minimum benefit amounts. My
20 understanding from Ms. Morris' testimony was
21 that the current instructions were to correct
22 for those problems on what is called a one off
23 basis. And that no decision had been made yet
24 about what else to do.

Page 131

1          Is that in accordance with your
2  understanding?
3          MR. BLUMENFELD: Objection.
4  BY MR. BRUCE:
5      Q.    The missing minimum benefit amounts
6  in the DBRK system, that the current -- that her
7  current understanding was that she's to deal
8  with those on a one off basis and that no
9  decision had been made yet about what else to do
10 on a batch basis?
11     A.    Are you referring to the process
12 that Lorraine and Prudential have in place to
13 calculate benefits for everybody or in
14 particular --
15     Q.    The issues that there are missing
16 minimum benefits amounts for a large portion of
17 the people in the cash balance plan, that my
18 understanding from her testimony was that she is
19 to address that on a one off basis and that no
20 decision had been made yet about what else to
21 do.
22          MR. BLUMENFELD: Objection.
23          THE WITNESS: And I am still not
24     clear about what you are asking about.

Page 132

1          If you are asking about -- we had
2      talked previously about the issue about
3      the joint and survivor of the free 30
4      benefit, as we called it, is that the
5      context in which you are asking your
6      question?
7  BY MR. BRUCE:
8      Q.    No. I am asking about the -- when
9  people's records in the DBRK system don't have
10 their minimum benefit there, then when the
11 system calculates their benefits, when they
12 commence benefits or when they separate from
13 employment, it doesn't have any data to work
14 with to provide the greater of the minimum
15 benefit or the cash balance account.
16          And my understanding was that she
17 recognizes the problem and that the current
18 instructions are to deal with it on a one off
19 basis and that a decision will be made at some
20 point about what to do about what may have
21 happened in the past and about the complete data
22 base?
23          MR. BLUMENFELD: Objection.
24          THE WITNESS: You are putting a lot

John Arko

Page 133

1   on the table and I am trying to discern
2   what you are asking so that I can be
3   responsive to your question.
4       To the extent that her team as a
5   process in place to make sure that each
6   person's benefit is calculated properly at
7   the time of disbursement or commencement
8   or whatever other reason might be that a
9   person asks for a calculation, their team
10  -- I cannot speak precisely to the overall
11  process that they use to do that
12  calculation, to make sure that it does, in
13  fact, follow the terms of the plan, wether
14  that information is available to them
15  through a systemic calculation or whether
16  they need to look at that systemic
17  calculation to determine there's other
18  calculations that need to be done off
19  line. If that's what we mean by one off
20  in this situation, that I feel that or I
21  understand that Prudential Retirement
22  continuously reviews how they do that work
23  and continuously look for opportunities
24  to, you know, make changes to the system

Page 134

1   that would do that more efficiently and
2   more effectively and more easily for them.
3   BY MR. BRUCE:
4       Q.   So in your understanding, has any
5   problem been recognized with the data base, that
6   there are missing minimum benefit amounts for a
7   large portion of the people in the cash balance
8   plan?
9       MR. BLUMENFELD: Objection.
10  BY MR. BRUCE:
11      Q.   Your understanding is that there is
12  no problem; is that correct?
13      MR. BLUMENFELD: Objection.
14      THE WITNESS: My understanding is
15  that Prudential has a process in place
16  that insures that people receive accurate
17  information at the time that they have
18  calculations completed.
19  BY MR. BRUCE:
20      Q.   Apparently they didn't have any
21  what are called system checks or edit checks to
22  make sure that there was a minimum benefit
23  amount for the software to work with. And so
24  there wasn't a system in place. And there was

Page 135

1   missing data in those fields.
2       So your understanding is that there
3   is no problem; there has always been a procedure
4   for dealing with that; is that correct?
5       MR. BLUMENFELD: Objection.
6   BY MR. BRUCE:
7       Q.   Is that correct?
8       A.   My understanding is that, and as we
9   have reviewed over the years, that they have a
10  solid process in place. They understand what
11  the plan document is and what the provisions of
12  the plan are and take steps to provide accurate
13  calculations.
14      Q.   If the DBRK system doesn't have an
15  entry for the minimum benefit amount, how can it
16  insure that people receive the minimum benefit
17  amount if that's greater than their cash balance
18  account?
19      MR. BLUMENFELD: Objection.
20      THE WITNESS: This is -- Prudential
21  Retirement has their processes in place
22  and you are asking me to speak on their
23  behalf?
24  BY MR. BRUCE:

Page 136

1       Q.   I suppose she didn't explain any
2   process. So you are saying there is a process
3   and I would like to know what that is?
4       MR. BLUMENFELD: Objection.
5       THE WITNESS: I am not quite sure
6   how to answer your question specifically
7   except to say there is -- we retain
8   Prudential Retirement to complete these
9   calculations and they utilize data bases
10  and systems and individual people and any
11  number of other, you know, means and
12  opportunities available to them to do
13  those calculations.
14  BY MR. BRUCE:
15      Q.   But you are the plan administrator?
16      A.   Right.
17      Q.   This problem, at least through this
18  litigation, has been brought to your attention,
19  that there are over nine thousand people in the
20  cash balance plan who didn't have an amount
21  entered for their minimum benefit. And the
22  system cannot calculate -- cannot insure that
23  their minimum benefit is protected if the data
24  is missing.

Page 137

1    **So you don't think that there's any**
2    **problem there; is that correct?**
3         MR. BLUMENFELD: Objection.
4         THE WITNESS: So now you are asking
5    me do I think that there may be a problem
6    with calculations that are completed and
7    provided to the participants of the CIGNA
8    Pension Plan?
9    BY MR. BRUCE:
10   **Q.    Yes.**
11   A.    I think that we look to retire --
12   or Prudential Retirement to provide accurate
13   statements. To the extent I have in the past
14   looked at certain calculations, they have been
15   accurate.
16        There are times when I receive,
17   through my role as plan administrator,
18   information from people that asks us to look at
19   their benefits. To the extent that there needs
20   to be an understanding of how these calculations
21   were done, provide for me information, I reach
22   out or provide that directly or seek the
23   information from Prudential Retirement and they
24   provide it.

Page 138

1    **Q.    It's been brought to your attention**
2    **as the plan administrator that there are over**
3    **nine thousand people in the CIGNA cash balance**
4    **plan who do not have any data on what their**
5    **minimum benefits were from the prior plan. And**
6    **you don't think that that's a problem or that**
7    **that's exclusively Prudential's problem?**
8         MR. BLUMENFELD: Objection.
9    BY MR. BRUCE:
10   **Q.    You recognized -- earlier we talked**
11   **about how you recognized that the minimum**
12   **benefits may be worth more in some cases than**
13   **the cash balance account, right?**
14   A.    Right.
15   **Q.    So if the data is there and**
16   **accurate, in some cases it may be more than the**
17   **cash balance account, correct?**
18   A.    Correct.
19   **Q.    So if the data is missing, isn't**
20   **there a possibility that the person isn't**
21   **receiving the correct benefit, if their**
22   **distribution is then based on the cash balance**
23   **amount?**
24   A.    The data is not missing. The data

Page 139

1    is in different places.
2         That system that you described that
3    was, as I understand it, used to provide you
4    with information relevant to your request about
5    whatever data fields they had available for the
6    class participants, whether that was there or
7    not, that's not what and how benefits are
8    calculated under the plan.
9         It is our account team that, again,
10   utilizes many different mechanisms to make sure
11   that a calculation is done accurately, including
12   when necessary, seek any other information that
13   would provide them information for previously
14   accrued benefits that might be a minimum
15   benefit.
16   **Q.    Okay. So you understand that the**
17   **primary system for calculating benefits is the**
18   **DBRK system, correct?**
19   A.    Yes, I would say that's the primary
20   system that Prudential relies upon what its team
21   goes to produce an individual calculation, yes.
22   **Q.    That's the only automative system**
23   **that you have, correct?**
24   A.    That Prudential Retirement uses to

Page 140

1    do so?
2    **Q.    Yes.**
3    A.    I don't know that I could speak to
4    that for sure.
5    **Q.    That's the only software system**
6    **that they have for calculating benefits,**
7    **correct?**
8         MR. BLUMENFELD: Objection.
9         THE WITNESS: I don't know all of
10   the systems that Prudential has to
11   calculate benefits.
12   BY MR. BRUCE:
13   **Q.    Well, do you think that there's**
14   **another one? Have you heard that there may be**
15   **an alternative system to the DBRK system?**
16   A.    In some of your previous questions
17   to me, you, I thought, had tried to ask me about
18   certain Excel spread sheets that perhaps may
19   have or may not have been considered to be a
20   system. And in that definition, as you tried to
21   use that with me in prior times, do they have
22   graph spread sheets that they use to help,
23   again, calculate an accurate benefit? They may
24   have.

John Arko

Page 141

1    **Q.    So you think they may be correcting**
2    **for problems in the DBRK system on an individual**
3    **basis through an Excel spread sheet?**
4            MR. BLUMENFELD: Objection.
5    BY MR. BRUCE:
6    **Q.    Is that what you are saying?**
7    A.    I am saying that there may be,
8    depending on what you mean by system, other
9    means, electronic means that they use to
10   calculate ultimately an accurate benefit CIGNA
11   Pension Plan. And I don't know and I can't
12   speak to what Prudential utilizes entirely to do
13   so.
14   **Q.    And it would be a simple matter,**
15   **wouldn't it, to audit the DBRK system to see**
16   **whether the data fields for minimum benefits are**
17   **present or absent, right?**
18           MR. BLUMENFELD: Objection.
19           THE WITNESS: Would it be a simple
20   matter to do so?
21   BY MR. BRUCE:
22   **Q.    Yes.**
23   A.    Perhaps if that needed to be done,
24   I can't speak to how simple it would be. You

Page 142

1    would need to speak to Prudential Retirement
2    about that.
3    **Q.    Is that the type of thing that you**
4    **are authorized as the plan administrator to**
5    **direct Prudential Retirement to do, to say it**
6    **looks like there may be a problem here, at least**
7    **do an audit of whether this data is present or**
8    **absent?**
9    A.    It's within my authority and
10   responsibility to make sure that they are doing
11   calculations that are accurate per the terms of
12   the plan.
13           Was it within my authority to tell
14   them exactly whether some of the components that
15   they are using to do that are working as in some
16   way that you described as being a problem? I
17   don't know that that's within my realm of
18   authority or ability to ask them to do that.
19           I can ask them to do anything.
20   **Q.    Apparently you told them that they**
21   **were doing the relative value analysis wrong**
22   **because they were not taking into account that**
23   **the minimum benefit may be worth more.**
24           MR. BLUMENFELD: Objection.

Page 143

1            THE WITNESS: When it was presented
2    to them as noted earlier, an individual
3    calculation that came to our attention
4    that was -- appeared that it did not, in
5    fact, bring that into account, the
6    previous minimum benefit, then again, I
7    asked them in my authority to be sure that
8    that is correct and accurate information.
9    And they did so and determined that it was
10   not and took steps to make corrections and
11   let the participant know.
12   BY MR. BRUCE:
13   **Q.    So insofar as you know, there is**
14   **nothing under consideration, including by**
15   **yourself, to address the issue of the missing**
16   **data for minimum benefits in the DBRK system,**
17   **correct?**
18   A.    Do I think --
19           MR. BLUMENFELD: Objection.
20           THE WITNESS: Am I aware of
21   something in effect or a project in place
22   to begin to fill some of the opening
23   account balance information in the DBRK
24   system? Yes, they are projects moving in

Page 144

1    that direction that Prudential Retirement
2    has let me know of and lets people at
3    CIGNA aware of because to the extent to
4    help them -- whatever information -- for
5    them to complete such a project, it seems
6    like it would be worthwhile and to the
7    extent they need any additional
8    information that we are able to supply, we
9    would, of course, do so.
10   BY MR. BRUCE:
11   **Q.    Okay. And you said there are**
12   **projects to fill the opening account balance**
13   **information. Is that distinct from to fill the**
14   **minimum benefit information?**
15   A.    Yes, because a minimum benefit, as
16   we described earlier, is not necessarily -- only
17   protecting the amount of the accrued benefit
18   that went into the opening account balance.
19   **Q.    Is there any projects going on to**
20   **fill the minimum benefit information when it's**
21   **not in the system?**
22   A.    Prudential -- this is part of -- I
23   would say there's a, as I described earlier,
24   Prudential is looking into the free 30 issue

Page 145

1  that was raised earlier and that is something,
2  that as I mentioned before, they are looking at
3  the individual and they are also looking at
4  anybody else that may have been affected
5  previously to this time and they are looking at
6  their mechanisms and their process to calculate
7  benefits to make sure that it is, in fact,
8  accurate and that's an -- I would call that a
9  project that I am awaiting any information from
10  them to understand what, if anything, is --
11  needs to be changed and I am awaiting that
12  information now.
13    Q.    You are talking about the free 30
14  percent or you are talking about the minimum
15  benefits more generally? Are you awaiting
16  information on what they might do about the
17  missing minimum benefit data?
18    MR. BLUMENFELD: Objection.
19    THE WITNESS: I think you are
20  asking about two or three different
21  things, but when you started your question
22  on the free 30 --
23    MR. BRUCE: Let's go off the record
24  for a second.

Page 146

1    (Whereupon, a brief off-the-record
2  discussion was held.)
3    MR. BRUCE: Can you please read
4  back the question?
5    (Whereupon, the court reporter read
6  back the pertinent testimony.)
7  BY MR. BRUCE:
8    Q.    Are you awaiting on what they might
9  do about the missing minimum benefit data?
10    MR. BLUMENFELD: Objection.
11    THE WITNESS: No. As far as I
12  understand the question and how it was
13  put, there is nothing -- I am -- they are
14  reviewing information, as I described,
15  that I am aware of because of a number of
16  matters going on. The free 30 percent has
17  lead to what I have described earlier.
18  They will do a thorough review or I rely
19  upon them to do a thorough review. And to
20  the extent that the free 30 winds up being
21  an additional amount that may, in effect,
22  have to get converted into a lump sum and
23  paid, I read that as a minimum benefit.
24    So, yes, in that regards, I am

Page 147

1  awaiting information from them regarding
2  that manner.
3  BY MR. BRUCE:
4    Q.    But you are not awaiting
5  information concerning the issue of minimum
6  benefits more generally of that there isn't any
7  data for minimum benefits for a large portion of
8  the people in the cash balance plan?
9    MR. BLUMENFELD: Objection.
10    THE WITNESS: I don't understand
11  what you are asking.
12    They are and continue to look at
13  the way that they do calculations and the
14  information available to them through
15  their DBRK system, for the most part, as
16  you point out, to the extent they at any
17  time are able to come to CIGNA or even
18  amongst themselves and figure out a way to
19  make changes to that data base that would
20  allow them to be more efficient in their
21  calculations of benefits, that's always a
22  possibility.
23  BY MR. BRUCE:
24    Q.    Lorraine Morris seemed to

Page 148

1  understand that this was a problem, but as far
2  as your understanding goes, there is no problem
3  with missing minimum benefit data, correct?
4    MR. BLUMENFELD: Objection.
5    THE WITNESS: Prudential Retirement
6  has an obligation to calculate benefits
7  accurately, per the terms of the plan, and
8  to the extent that Lorraine Morris feels
9  somehow about the mechanisms they have in
10  place now they could be refined or to
11  use your word, are a problem for her, I
12  presume that's just something to do with
13  her ability to get that work effort
14  completed.
15  BY MR. BRUCE:
16    Q.    Hasn't there been, going back to
17  five or more years, indications that there were
18  problems with the data for people who were
19  rehired, that the opening account balances and
20  the minimum benefits were often missing? You
21  weren't aware of that?
22    MR. BLUMENFELD: Objection.
23    THE WITNESS: Where was this
24  information?

Page 157

1  **balances may have been computed incorrectly or**
2  **the process may have simply been skipped over**
3  **because there wasn't -- because it was a manual**
4  **non-systemic process; is that correct?**
5  　　　MR. BLUMENFELD: Objection.
6  　　　THE WITNESS: I think that, for the
7  　　most part, yes, that would be correct. As
8  　　far as getting information into this one
9  　　system, that's a part of the overall
10 　　mechanism, again, to ultimately calculate
11 　　benefits for our participants, yes.
12 BY MR. BRUCE:
13 　　**Q.    Do you know whether this project**
14 **has ever been completed?**
15 　　A.    I believe it still is currently on
16 our activity log because as it is pointing out
17 here, I believe it was being done in pieces.
18 They were pulling a certain number of records as
19 their resources allowed and were reviewing those
20 over time.
21 　　**Q.    So do you think it's ongoing?**
22 　　A.    Is it ongoing today?  Yes, I do
23 believe it is.
24 　　**Q.    I thought the activity reports in**

Page 158

1  **the latter part of 2005 said that it had been**
2  **shelved as a low priority?**
3  　　A.    The priority wouldn't mean that it
4  was shelved.
5  　　**Q.    So it may be that nothing is going**
6  **on right now, but it's still on the agenda?**
7  　　A.    Correct.
8  　　**Q.    Okay.**
9  　　　MR. BRUCE:  Let's mark this as
10 　　Arko-4.
11 　　　(Arko-4 was marked for
12 　　identification by the court reporter.)
13 BY MR. BRUCE:
14 　　**Q.    Do you recognize these charts, Mr.**
15 **Arko?**
16 　　A.    I don't know if I recognize these
17 specific charts, but overall I recognize them.
18 　　**Q.    And these were prepared by Mercer?**
19 　　A.    That's what it appears to be, as
20 far as I can tell, yes.
21 　　**Q.    And can you interpret these charts**
22 **without the color coding of what they are**
23 **showing?**
24 　　A.    As you point, out generally they

Page 159

1  are supposed to be color-coded, but I believe it
2  should go in order whereas the SIP nine percent
3  interest component, I believe, was the top most
4  bracket on the bar chart moving right down
5  through DB and cash balance being the dark black
6  at the bottom.
7  　　**Q.    And what was the current SIP?  The**
8  **SIP at four percent is with a one percent**
9  **increment?  Wasn't the basic SIP three percent?**
10 　　　MR. BLUMENFELD: Objection.
11 BY MR. BRUCE:
12 　　**Q.    The basic -- before the cash**
13 **balance plan went into affect, the basic**
14 **employer or match under the SIP plan was three**
15 **percent, right?**
16 　　A.    It was 50 cents on every dollar up
17 to six percent of pay; so, it could be as much
18 as three percent of pay rate.
19 　　**Q.    A SIP with a four percent would be**
20 **better than the current plan in place before**
21 **1998, correct?**
22 　　A.    Yes, I would presume so; yes.
23 　　**Q.    And there is no -- the employer**
24 **match, in fact, is still three percent under the**

Page 160

1  **SIP plan, correct?**
2  　　A.    And there is also an additional
3  component, a variable match of an additional
4  percentage.
5  　　**Q.    That's in the employer's**
6  **discretion, correct?**
7  　　A.    Yes.
8  　　**Q.    When is the last time that that**
9  **occurred?**
10 　　A.    For the 2005 plan year, deposited
11 in February of this year.
12 　　**Q.    And before that, when did it occur?**
13 　　A.    I believe in 2004 plan year,
14 deposited in February of '05.  It's been --
15 　　**Q.    You think it occurred in when --**
16 **did it occur in 1998?**
17 　　A.    Yes.
18 　　**Q.    Okay.  And then between 1999 and**
19 **2003 there were none?**
20 　　A.    No.  I believe from -- the variable
21 match went into affect in 1998 and it is still
22 currently in effect and I believe there was only
23 two years where no variable match was paid.
24 　　**Q.    And what years were those?**

Page 161

1    A.    2003 and I'm not sure. I don't
2  recollect the other year.
3    Q.    And all of the other years it was
4  one percent or some years it was a half of a
5  percent?
6    A.    It varied between a half percent
7  and I believe the largest one was one point two
8  five percent. And those percentages are percent
9  of pay. The actual match itself is, you know,
10  an additional match on eligible contributions
11  that people make.
12    Q.    The variable match is still
13  depending on the employee making contributions
14  above six percent, correct or no?
15    A.    No. The variable match is anywhere
16  from zero to 33 percent of the employee's
17  contribution during the plan year in question up
18  to six percent of pay.
19    Q.    Okay. So in effect, if there was a
20  one percent variable match, you would really
21  have -- it would really be a 66 and two thirds
22  percent employer match; is that so?
23    A.    If you were to combine it with the
24  regular fixed match, yes, that would be an

Page 162

1  accurate statement.
2    Q.    So is it your interpretation of
3  this graph, the line that's showing current is
4  reflecting the current defined benefit plan and
5  the current SIP plan or it's just reflecting the
6  current refined benefit plan?
7    A.    Just by looking at this and from my
8  memory, I think it's both the defined benefit
9  and the SIP plan, the 401(k) plan.
10    Q.    Okay. And so for this Tier 2,
11  under this hypothetical, if someone is in Tier
12  2, this is showing that the only way the
13  proposed program matches up with the current
14  plan is if there is, in fact, a four percent
15  SIP; is that correct?
16        MR. BLUMENFELD: Objection.
17        THE WITNESS: If by matching up you
18    mean given this specific scenario,
19    projected out overtime and ultimately what
20    this certain values of benefits, then yes,
21    I would agree with that.
22  BY MR. BRUCE:
23    Q.    And if you look on the second page,
24  the second page is -- these are varying -- the

Page 163

1  second page is also Tier 2, but it is showing
2  someone whose current age is 40, as opposed to
3  age 30. And their service is seven years as
4  opposed to five and their compensation is 60
5  thousand as opposed to 35 thousand, correct?
6    A.    Correct.
7    Q.    And it's showing -- this one is
8  showing that in some of -- at some of these
9  ages, the proposed program would only match the
10  current program, if there was a five percent
11  SIP, correct?
12    A.    Again, with the comments that I
13  made before, that simply showing values of
14  benefits projected out to a variety of points in
15  time in the future, then yes, I would agree.
16    Q.    And then the next page is showing
17  someone whose current age is 50 with 10 years of
18  service and starting compensation of 80 thousand
19  dollars. And that's showing that at some of the
20  ages that the proposed program would only match
21  the current program with the -- if the SIP not
22  only had five percent company match, but also
23  earned nine percent interest; is that correct?
24    A.    Given the same comments that I made

Page 164

1  before, yes, it appears to be true.
2    Q.    And then the last page is Tier 1
3  participants, who, I guess, is comparable to the
4  very first page or almost comparable to the very
5  first page we looked at where the person is age
6  30 with 10 years of service and 35 thousand
7  dollars in starting compensation.
8        And that one is showing that the
9  current plan would be matched by the proposed
10  plan with the five percent SIP plus nine percent
11  interest at some ages and at some ages it would
12  be require -- or at age 62 it would require at
13  least a five percent SIP and at age 65 it would
14  require a least a four percent SIP, correct?
15    A.    And at certain ages, it would, in
16  fact, be -- provide greater benefits than what I
17  see the current line shows, yes.
18    Q.    Which ages are those?
19    A.    I'm sorry, I am misreading this.
20        You are correct, yep.
21    Q.    And these would be assuming, if
22  it's talking about a four percent SIP or a five
23  percent SIP, it's assuming that that is provided
24  every year, correct? It's not assuming that one

Page 165

1  year it's zero and the next year -- correct?
2      A.    Yes, I believe that's the accurate
3  statement of how these were created; yes.
4      Q.    And did you see comparable spread
5  sheets where these numbers were presented as a
6  spread sheet as opposed to a bar graph?
7      A.    The materials that -- where I think
8  these came from, from the Mercer binder, also
9  displayed this information. I believe that's
10  what you are speaking to and I believe one page
11  -- chart, basically, with many numbers, had all
12  kinds of variety of ages and services and plant
13  designs, yes.
14      Q.    And these, I'll represent to you,
15  were attached to a memo that was from July of
16  '97.
17          Do you know whether Mercer did any
18  comparisons as you drew closer to the cash
19  balance conversion, kind of like doing a final
20  comparison?
21      A.    They definitely did quite a number
22  of these comparisons and a variety of programs
23  and I would say as an general rule, they refined
24  those and made additional charts available as

Page 166

1  they would have -- you know, as they would learn
2  more about or discuss more or share their
3  knowledge with CIGNA and determine what might be
4  the types of programs that they would like to
5  see displayed in these charts. So, I guess the
6  answer is yes.
7      Q.    And did you ever see charts that
8  were -- that were comparing defined benefit to
9  defined benefit without including SIP?
10      A.    These charts are from a long time
11  ago. I believe yes, they did do a variety of
12  comparisons to defined benefit and defined
13  benefit and inclusive or exclusive of additional
14  components of the SIP program. I believe that's
15  the case, but I am not one hundred percent
16  certain.
17      Q.    And wasn't that one of Mr. Upton's
18  complaints about the initial comparisons, that
19  he was offered that they included the SIP and
20  didn't compare defined benefit to defined
21  benefit?
22          Do you recall that?
23      A.    I don't recall that.
24      Q.    Okay.

Page 167

1      A.    If you can help me.
2      Q.    Do you recall telling Mr. Upton
3  that your understanding was that the difference
4  between the Tier 2 formula and the cash balance
5  formula at most should be about 10 percent,
6  about a 10 percent reduction?
7      A.    I don't recall --
8      Q.    Was that --
9      A.    -- specifically stating that.
10      Q.    Was that one of your bench marks in
11  terms of what you thought the Tier 2 formula,
12  how you thought it compared to the cash balance
13  formula?
14      A.    No, I don't recall having a
15  specific overall bench mark without some
16  specific bit of knowledge. For instance, if it
17  was a specific person, like Mr. Upton, and I had
18  a little bit better understanding of his
19  specific situation, I think I might be -- then
20  have had some reason to come up with a number,
21  if I was asked to, for some reason.
22      Q.    In his specific situation you came
23  up with a reduction of 30 percent, right?
24          MR. BLUMENFELD: Objection.

Page 168

1          THE WITNESS: I don't recall.
2  BY MR. BRUCE:
3      Q.    Well, didn't we do that as an
4  exhibit?
5      A.    Can we look?
6      Q.    Yes. I will give you a pocket
7  calculator.
8      A.    Your question again was about the
9  information I provided to Robert Upton?
10      Q.    You are finding a 29 or 30 percent
11  reduction in those calculations, aren't you?
12      A.    In where I had projected a
13  hypothetical benefit under the "old plan" and
14  converted it into an annual benefit of 76
15  thousand dollars. And the next stop point does
16  a projection, a hypothetical projection, on the
17  current pension plan account and grows that out
18  to the same age and converts it into an annuity
19  of about 54 thousand dollars. So if I divide 54
20  by 76, that's about a 29 or 30 percent amount
21  under this second projection than the first,
22  yes.
23      Q.    So did that surprise you? Does
24  that surprise you that it would be that much per

John Arko

Page 201

1    I was referring to as far as being printed out
2    was, again, focused, as I said, on the 401(k)
3    plan.
4        Q.    So you don't think that you get any
5    other written materials about the CIGNA Pension
6    Plan other than the pension activity reports?
7        A.    As regards to individual calls or
8    number of transactions, no. But I do get, of
9    course, other materials and information from
10   Prudential.
11       Q.    How about like on systems requests,
12   would you be copied if there was, for instance,
13   you were talking about the procedure that
14   Prudential apparently had for removing opening
15   account balances in some cases when people would
16   commence benefits and then there was a system
17   modification to allow them to handle that in a
18   different way without removing data.  Would you
19   be copied on the system request?
20       A.    No. I don't recall ever seeing
21   such a document and, in fact, we don't get that
22   information.
23       Q.    Okay. And so the system request,
24   if it was recorded at all, would be for

Page 202

1    communications to you would be in the pension
2    plan activity report or in a separate e-mail or
3    what?
4        A.    Simply being made aware that this
5    was an "systems request". It's unlimited. We
6    don't even know or I know I don't even know
7    exactly what that means to Prudential.
8            If it was ever made note of or
9    referenced, it could be inside the activity log
10   or perhaps in a work e-mail.
11       Q.    Okay. And would you be aware if
12   CIGNA had done a batch load of minimum benefit
13   data earlier in this year?
14           MR. BLUMENFELD: Objection.
15           If CIGNA had done it?
16           MR. BRUCE: If Prudential, I'm
17   sorry.
18           THE WITNESS: We may have been
19   aware. I am not sure exactly what data
20   was loaded on a batch mechanism.
21   BY MR. BRUCE:
22       Q.    You may have been aware?
23       A.    Depends on if you could let me know
24   what and when type of information is --

Page 203

1        Q.    I understand there was some minimum
2    benefit data that was loaded to the system in
3    December of 2005 or January of 2006.
4            You weren't aware of that or you
5    were aware of it?
6        A.    I am not aware of it.
7        Q.    Okay. And you were aware of
8    Patricia Flannery's communications about her
9    minimum benefit being understated, correct?
10       A.    Yes. I am aware of that, yes.
11       Q.    And was it your understanding that
12   that was simply an individual problem or did
13   that reflect something that might have brought
14   significance in Ms. Flannery's individual
15   benefits?
16       A.    Prudential handling that inquiry, I
17   don't think it came up as a discussion as
18   something that may need to be looked at in a
19   broader basis. I don't remember having that --
20   connecting those two if or if there were two
21   discussions, no.
22       Q.    Do you recall that it was a
23   significant understatement?
24           MR. BLUMENFELD: Objection.

Page 204

1            THE WITNESS: I don't recall
2    specifically.
3    BY MR. BRUCE:
4        Q.    You don't recall that her opening
5    account balance and minimum benefit were about a
6    third of what they were supposed to be?
7        A.    No, I don't recall.
8        Q.    And would that raise any kind of
9    red flags with you?
10       A.    I would expect -- well, if
11   Prudential didn't simply, you know, handle that
12   situation and discover why there may have been
13   an inaccurate calculation, then I would expect
14   them to make us aware of that so that -- and I
15   would expect them to take further steps to
16   decide if there is something beyond a simple
17   specific series of events that led to this
18   person's misstatement, as you put it.
19       Q.    You didn't ask any questions to
20   determine whether it was an individual problem
21   or a more systemic one?
22       A.    No, I don't recall doing so on this
23   one, no.
24       Q.    Do you recall doing it on some

Page 297

1    related to one of the formulas that traces
2    it's way back to Part A of the plan or to
3    the old plan benefit, that precise number
4    was put in place and provided to
5    participants.
6    BY MR. BRUCE:
7       Q.    Unless it was zero in the data
8    base?
9          MR. BLUMENFELD: Objection.
10   BY MR. BRUCE:
11      Q.    Unless the data base didn't have
12   the entry, correct?
13      A.    You mean the data base being,
14   again, just one component of how these
15   calculations were completed, no.
16          Prudential before they complete
17   that calculation would utilize any and all tools
18   at their disposal to make sure that every number
19   that was placed in that distribution package was
20   accurate and was reflected in the plan document.
21      Q.    So DBRK is only one component of
22   the system; is that correct?
23      A.    It's one tool or one part of the
24   process that Lorraine's accounts team might use

Page 298

1    to do a calculation of benefits for individual
2    participants under the terms of the plan.
3       Q.    And the other parts are what, an
4    Excel spread sheet; is that right?
5       A.    I am not certain --
6          MR. BLUMENFELD: Objection.
7          THE WITNESS: -- of the others.
8    Prudential --
9          MR. BLUMENFELD: This has been
10      asked and answered a number of times.
11         THE WITNESS: Prudential is the one
12      that has that information.
13   BY MR. BRUCE:
14      Q.    You don't know what the components
15   are of their system; is that right?
16         MR. BLUMENFELD: Objection; asked
17      and answered.
18         THE WITNESS: I am not familiar
19      with exactly all of the components and the
20      processes that they use to calculate our
21      benefits under the pension plan.
22   BY MR. BRUCE:
23      Q.    Is it -- let me try and see whether
24   this is a reasonable summary of your testimony

Page 299

1    on the minimum benefits data.  Is that if the
2    minimum benefits data is not in the DBRK system
3    for over a third of the class, that you trust
4    that somehow it does work it's way into the
5    calculations, but you are not sure how it does
6    that; is that correct?
7          MR. BLUMENFELD: Objection.
8          THE WITNESS: For the most part, I
9       am not familiar with the precise
10      mechanisms that Prudential Retirement uses
11      to calculate our benefits, but I have --
12      but, yes, I do allow them whatever the
13      freedom to utilize whatever means is
14      appropriate that they can display and
15      demonstrate to us that provides for an
16      accurate calculation of our benefits or
17      the benefits that we provide participants
18      under the pension plan.
19   BY MR. BRUCE:
20      Q.    Don't you have to exercise some
21   supervision over that process to make sure that
22   it's operating as you trust that it does?
23      A.    Yes.
24      Q.    And what have you done to assure

Page 300

1    that they are actually calculating minimum
2    benefits when people commence their benefits?
3       A.    What steps might I have taken or do
4    I take to ensure they are calculating accurate
5    benefits under the CIGNA Pension Plan, I can
6    answer.  Would that be satisfactory?
7       Q.    I want to focus in on the minimum
8    benefits because that's what we identified as
9    bing missing data and the class list, that it
10   was only provided for about two thirds of the
11   class.  And I am trying to get an understanding
12   of what you do as the plan administrator and
13   director of benefits strategy to make sure that
14   that process does work properly, even though the
15   data doesn't seem to be present.
16         MR. BLUMENFELD: Objection to your
17      characterization.
18         THE WITNESS: Some of the steps
19      that I take to insure accurate calculation
20      and that Prudential does accurate
21      calculations of the benefits under the
22      CIGNA Pension Plan to participants
23      encompasses a number of areas, probably
24      one of the most sources that I rely upon

Page 301

1      is the fact that the organization,
2      Prudential, provides for an audited review
3      of their mechanisms to do calculations in
4      a SAS 70 report.
5  BY MR. BRUCE:
6      Q.    And who conducts that audit?
7      A.    I believe that Prudential retains
8  an auditor to do so.  And I believe that's Price
9  Waterhouse.
10     Q.    Do you get a report from that
11 auditor?
12     A.    We actually obtain a copy of the
13 SAS 70.
14     Q.    And have you produced those
15 reports?
16     A.    I do not believe that we have.
17     Q.    And those are done annually?
18     A.    They have been done annually, yes.
19     Q.    And what -- how do they come into
20 you; as what, a paper copy or electronic file or
21 what?
22     A.    I believe it comes electronically
23 via a large PDF file that would be printed out
24 and retained in that format.

Page 302

1      Q.    And where do you maintain those?
2      A.    To the extent I keep copies of
3  these, I have printed copies of recent reports.
4      Q.    And what is your understanding of
5  what Price Waterhouse does in that audit?
6      A.    That they ensure a number of
7  mechanisms that Prudential Retirement are
8  working as they are supposed to work, that
9  accurate calculations and their information
10 produced is, in fact, reliable.
11     Q.    And so did you go back to ask any
12 questions about how this could be audited if
13 there is missing minimum benefit data for a
14 third of the class --
15     A.    No.
16     Q.    Or how the auditors could have
17 missed that?
18     MR. BLUMENFELD:  Objection.
19 BY MR. BRUCE:
20     Q.    No?
21     MR. BLUMENFELD:  To your
22 characterization.
23     THE WITNESS:  I did not ask that.
24 BY MR. BRUCE:

Page 303

1      Q.    So wouldn't you want to know how
2  they would miss that?
3      MR. BLUMENFELD:  Objection to the
4  form of the question.  It assumes facts.
5      THE WITNESS:  No, I want to know
6  that Prudential Retirement is doing
7  accurate and complete calculations per the
8  terms of the plan.
9  BY MR. BRUCE:
10     Q.    And one of the terms of the plan is
11 that they are there to protect minimum benefits,
12 correct?
13     A.    There are certain formulas and
14 rules in the plan document that need to be
15 calculated before ultimately a specific number
16 for a form of annuity is actually completed and
17 provided to the participants, yes.
18     Q.    And that's as important -- you have
19 made that an important point in terms of the
20 relative value disclosures that you told the
21 Prudential people that they needed to take into
22 account that the minimum benefits may be worth
23 more than the cash balance account, correct?
24     MR. BLUMENFELD:  Objection.  Asked

Page 304

1  and answered and to the form of the
2  question.
3      THE WITNESS:  As I noted before, in
4  the recent discussions we have had, as
5  Prudential is beginning to -- has put
6  together materials responsive to the
7  recent regulations around relative value
8  disclosure, we had that discussion and
9  pointed that out, yes.
10     MR. BLUMENFELD:  Stephen, can I
11 interrupt with a question about the SAS 70
12 report from Price Waterhouse?
13     MR. BRUCE:  Yes.
14     MR. BLUMENFELD:  Are those specific
15 to the work that Prudential does for CIGNA
16 or is it more abroad?
17     THE WITNESS:  It's more abroad.
18     MR. BLUMENFELD:  Okay.
19 BY MR. BRUCE:
20     Q.    They are checking Prudential in
21 general; is that what you are saying?
22     A.    Yes.
23     MR. BLUMENFELD:  Do you want them,
24 Stephen?

1f22a21a-aff5-4635-b04b-a5bed631e288

Page 321

1    Q.    Ms. Morris testified about the
2 Excel spread sheets, too. And she then backed
3 off on it and said they use them mostly for
4 non-qualified calculations.
5         So is it your understanding that
6 they use those more broadly?
7         MR. BLUMENFELD: Objection.
8 BY MR. BRUCE:
9    Q.    Did they check every calculation
10 through Excel?
11        MR. BLUMENFELD: Objection.
12        THE WITNESS: I can't speak to
13    specifically how they use whatever spread
14    sheets they may have at their disposal.
15 BY MR. BRUCE:
16    Q.    And you don't have any
17 responsibility to look into that?
18        MR. BLUMENFELD: Objection.
19        Is this one of the topics in the
20    30(b)(6), Stephen?
21        MR. BRUCE: Yes.
22        MR. BLUMENFELD: Which one?
23        MR. BRUCE: The minimum benefits
24    data.

Page 322

1        MR. BLUMENFELD: You are not asking
2    him about minimum benefits data.
3        MR. BRUCE: I am asking what he did
4    to find out about that data.
5        MR. BLUMENFELD: No, you are not.
6        MR. BRUCE: Yes, I am.
7        MR. BLUMENFELD: Ask him that
8    question then.
9 BY MR. BRUCE:
10    Q.    Did you talk to Lorraine Morris
11 about this?
12    A.    About what?
13        MR. BLUMENFELD: Objection.
14 BY MR. BRUCE:
15    Q.    About the minimum benefits data
16 being missing in the DBRK system?
17    A.    Very briefly, yes, I spoke to her
18 about that.
19    Q.    What did she say?
20    A.    She said that they would be
21 providing some more information to you to be
22 responsive to the requests that you had made.
23    Q.    On the minimum benefits?
24    A.    On the information that you had

Page 323

1 made a request for and they were providing to
2 you.
3    Q.    She testified that her
4 investigation of that was over, that she does
5 not have an explanation for the minimum benefits
6 being missing.
7         So is it your understanding that
8 she is still working on that?
9         MR. BLUMENFELD: Objection. Again,
10    you are characterizing the deposition
11    testimony for somebody that wasn't here.
12        If I have a question for the
13    witness --
14 BY MR. BRUCE:
15    Q.    Did she give you some assurance
16 that she was still working on that?
17        MR. BLUMENFELD: Objection; asked
18    and answered.
19        THE WITNESS: Whether she gave -- I
20    don't know that it was assurance, but I
21    was under the impression that she would
22    still continue to be responsive to
23    whatever requests that you were making of
24    them, yes.

Page 324

1 BY MR. BRUCE:
2    Q.    And your understanding is that she
3 is going to try and restore that data or what?
4         MR. BLUMENFELD: Objection to the
5    form of the question.
6         THE WITNESS: Which data is this?
7 BY MR. BRUCE:
8    Q.    The minimum benefits data, is
9 Prudential going to try to restore that
10 information to the system?
11    A.    Prudential has, as we have talked
12 about before, identified places where they could
13 do a more efficient and easier job of
14 calculating benefits for our participants.
15        To the extent we have already
16 talked about that, I told you that my
17 understanding is that yes, they have certain
18 projects out there. Whether they are low
19 priority now or not matters not at the end
20 because each individual participant can be
21 assured that their calculation will be accurate
22 because of all of the information that is
23 available to Lorraine and her team and all of
24 Prudential.

John Arko



Page 325

1    Q.    But you don't know what all of that
2  information is, right, that's available to them?
3  You just trust that it's available; is that
4  correct?
5    A.    I know that there is information
6  that is required to do a calculation of the
7  CIGNA Pension Plan benefits and we make sure in
8  cooperating with Prudential that they either
9  have that information or have access to that
10  information.
11    Q.    And how is the minimum benefits
12  information available to them if it's not in the
13  DBRK system?
14    A.    Through -- I am not sure exactly
15  how they go about utilizing all of the
16  information at their finger tips.  To the extent
17  that they require, though, any additional
18  information or need any additional calculations
19  done, they have access to, whether it be CIGNA
20  or other folks at Prudential, including the
21  actuarial team.
22    Q.    So the actuarial team has a data
23  base of minimum benefits?
24      MR. BLUMENFELD:  Objection;

Page 327

1          C E R T I F I C A T I O N
2
3
4  I, Lynn McCloskey, a Shorthand Reporter and
5  Notary Public, do hereby certify the foregoing
6  to be a true and accurate transcript of my
7  original stenographic notes taken at the time
8  and place hereinbefore set forth.
9
10
11
    _____
    Lynn McCloskey
12  Shorthand Reporter
    Notary Public
13
14  DATED:_____
15
16
17
18      (The foregoing certification of this
19  transcript does not apply to any reproduction of
20  the same by any means, unless under the direct
21  control and/or supervision of the certifying
22  shorthand reporter.)
23
24

Page 326

1    mischaracterizes his testimony.
2        THE WITNESS:  No, I do not believe
3    that they do.
4  BY MR. BRUCE:
5    Q.    Okay.  If you have nine thousand
6  individuals with that data missing, do you think
7  that can be recreated individually by Denise
8  Bellenger on an Excel spread sheet?
9        MR. BLUMENFELD:  Objection;
10    argumentative.
11        THE WITNESS:  If we were --
12        MR. BLUMENFELD:  And to the form.
13        THE WITNESS:  If we require an
14    individual to have a calculation done,
15    yes, I have every faith 58 that whether it
16    be Denise or whoever at Prudential, that
17    they have all of the tools and mechanisms
18    available to them to produce an accurate
19    calculation.
20        MR. BRUCE:  I'm done with this
21    witness for now.
22        (Whereupon, the deposition
23    concluded at 6:00 p.m.)
24

Page 328

1          LAWYER'S NOTES
2
3  LINE   PAGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24