**Amara v. CIGNA**, Case No. 01-2361 (MRK)

# EXHIBIT 241

**Amara v. CIGNA, C.A. 01-2361 (MRK)**

**DEPOSITION DESIGNATIONS AND COUNTER DESIGNATIONS**

**Deposition of Andrew Hodges dated June 29, 2003**

**(1) Plaintiffs' Deposition Designations (marked in blue)**

      p.   7, line 2 - p. 8, line 11
      p. 15, lines 14 - 21
      p. 29, line 14 - p. 38, line 8 (See attached Depo. Ex. 29)
      p. 91, line   6 - p. 93, line 24
      p. 93, line 25 - p. 100, line 19
      p. 102, line   6 - p. 105, line 21
      p. 171, line 24 - p. 175, line 21
      p. 198, line   4 - p. 202, line 11

**(2) Defendants' Deposition Designations (marked in red)**

      p. 100, line 20 - p. 101, line 18
      p. 202, lines 12 - 16

6/29/2003                                                    Andrew B. Hodges

Page 1

```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT
 2

 3

 4

 5     -------------------------------)
       JANICE C. AMARA, individually  )
 6     and on behalf of others        )
       similarly situated             )
 7              Plaintiff             ) Civil Action No.
       VS                             ) 3:01-CV-2361 (DJS)
 8                                    )
       CIGNA CORP. AND CIGNA          )
 9     PENSION PLAN                   )
                Defendants            )
10     -------------------------------)
11
12
13
14
               DEPOSITION OF:  ANDREW B. HODGES
15             DATE:  JUNE 29, 2003
               HELD AT:  MOUKAWSHER & WALSH, LLC
16             21 OAK STREET, SUITE 209
               HARTFORD, CONNECTICUT
17
18
19
20
21
22
               Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221
23                BRANDON SMITH REPORTING SERVICE
                      44 Capitol Avenue
24                    Hartford, CT 06106
                      Tel (860) 549-1850
25
```

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

6/29/2003                                                      Andrew B. Hodges

**Page 2**

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFF:
3  STEPHEN R. BRUCE, ESQ.
   805 15TH STREET, NW,
4  SUITE 210
   WASHINGTON, DC 20005
5  Tel: 202-371-8013
6
   REPRESENTING THE DEFENDANT:
7
   JEREMY P. BLUMENFELD, ESQ.
8  MORGAN LEWIS
   1701 MARKET STREET
9  PHILADELPHIA, PA 19103-2921
   Tel: 215-963-5258
10 Fax: 215-963-5299
11
   ALSO IN ATTENDANCE:
12
   JANICE AMARA
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1       I N D E X
2  WITNESS:                    PAGE:
3  Andrew Hodges
       Direct Examination by Mr. Bruce      4
4
5  EXHIBITS:                   PAGE:
6  Exhibit 28, complaint tracking form............ 24
   Exhibit 29, Philadelphia team members listing...... 29
7  Exhibit 30, various e-mails................... 46
   Exhibit 31, comparison between
8  cash balance and defined benefits............ 51
   Exhibit 32, comparison between
9  cash balance and traditional benefits........ 57
   Exhibit 33, comparison between
10 cash balance and defined benefits............ 60
   Exhibit 34, interoffice memo from
11 David Durham to Mike Bell.................. 70
   Exhibit 35, interoffice memo dated 6/10/97...... 83
12 Exhibit 36, amendment number 1
   to the CIGNA pension plan Part B.............. 109
13 Exhibit 37, cash balance pension plan proposal..... 114
   Exhibit 38, sample participant estimated benefit.... 118
14 Exhibit 39, spreadsheet on 133 1/3 accrual test.... 125
   Exhibit 40, e-mail from Lisa Carskadden
15 to Andy Hodges dated 11/27/02............... 127
   Exhibit 41, e-mail from Andy Hodges to
16 Janet VanDeusen............................ 141
   Exhibit 42, retirement plan training material...... 161
17 Exhibit 43, e-mails from Lisa Carskadden to
   Andy Hodges................................ 163
18 Exhibit 44, non-qualified settlement rates,
   early retirement factor analysis.............. 167
19 Exhibit 45, memo from GTM to DML dated 1/1/99...... 171
   Exhibit 46, memo from Arthur Assantes
20 to Andy Hodges dated 6/26/97............... 175
   Exhibit 47, e-mail from Steve Comkowycz
21 to John Arco................................ 184
   Exhibit 48, list of pension plan participants..... 204
22 Exhibit 49, packet of papers relating
   to Robert Upton............................ 205
23 Exhibit 50, packet of documents dated 4/28/03..... 211
   Exhibit 51, memo from GTM to DML............. 290
24
   (Exhibits retained by Attorney Bruce)
25

**Page 4**

1          (Deposition commenced at 9:47 a.m.)
2
3       ANDREW HODGES, Deponent, having first
4  been duly sworn, deposes and states as follows:
5
6       DIRECT EXAMINATION BY MR. BRUCE:
7
8       Q   State your name and tell us where you live.
9       A   Andrew B. Hodges, 61 Kathryn Lane,
10 Plantsville, Connecticut, 06479.
11      Q   And Mr. Hodges, have you ever had your
12 deposition taken before?
13      A   I have not.
14      Q   Have you ever testified in court?
15      A   I have not.
16      Q   Have you ever been a juror?
17      A   I have not.
18      Q   Have you had any association with the judicial
19 system, any contact with the judicial system?
20      A   I've been called for jury duty, but never
21 served as a juror.
22      Q   And you've never been sued for anything?
23      A   I have not.
24      Q   Never sued anyone?
25      A   I have not.

**Page 5**

1       Q   And can you tell me what did you do to prepare
2  for your deposition today?
3       A   Preparation was essentially a couple phone
4  calls with Jeremy just exposing me to the mechanics of
5  how the process would work.
6           MR. BRUCE:  What was that?
7           MR. BLUMENFELD:  No, I just didn't want
8  him to disclose any confidential communications.
9           MR. BRUCE:  Well, don't signal to the
10 witness.
11          MR. BLUMENFELD:  Okay.  I apologize.
12 BY MR. BRUCE:
13      Q   Go ahead.
14      A   That's all my complete thought on the matter.
15 He just discussed, because I was somewhat
16 apprehensive --
17          MR. BLUMENFELD:  Objection to the form of
18 the question, and also I'm going to object and instruct
19 you to the extent that what he's asking you, whatever
20 question that was, calls for the disclosure of
21 communications between you as the client and me as the
22 attorney, you're instructed not to answer that question.
23 BY MR. BRUCE:
24      Q   Is it your understanding that you are Mr.
25 Blumenfeld's client?

2 (Pages 2 to 5)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

6/29/2003                                                              Andrew B. Hodges

Page 6

1    A   Yes.
2    Q   And but you are an ex-CIGNA employee, right?
3    A   Yes.
4    Q   And did Mr. Blumenfeld inform you that you did
5  not have to be represented by him?
6    A   Yes.
7    Q   What did he tell you about that?
8        MR. BLUMENFELD:  Excuse me, I'm going to
9  object and I'm going to instruct you not to answer the
10  question to the extent that it calls for the
11  communication of conversations between you and myself
12  because those are attorney/client privilege
13  communications.
14       THE WITNESS:  Okay.
15  BY MR. BRUCE:
16    Q   Were you aware that you could appear here
17  without an attorney?
18    A   Yes.
19    Q   And were you aware that you could appear here
20  with an attorney other than Mr. Blumenfeld?
21    A   Yes.
22    Q   And why did you choose not to do so?
23       MR. BLUMENFELD:  Objection to the form of
24  the question.
25       THE WITNESS:  I'm sorry?

Page 7

1  BY MR. BRUCE:
2    Q   Why did you choose not to appear here by
3  yourself or with another attorney?
4    A   Just confidence in Mr. Blumenfeld.
5    Q   Well, you realize Mr. Blumenfeld actually
6  represents CIGNA Corporation, don't you?
7    A   Correct.
8    Q   And you realize that that may not necessarily
9  be consistent with your interests?
10       MR. BLUMENFELD:  Objection to that
11  characterization.
12  BY MR. BRUCE:
13    Q   Well, do you realize there's a possibility
14  that he may have a conflict of interest in representing
15  you?
16    A   I would be surprised if that were the case.
17    Q   Do you realize that his primary allegiance is
18  to CIGNA Corporation?
19       MR. BLUMENFELD:  Objection to the form of
20  the question and that characterization.
21  BY MR. BRUCE:
22    Q   Do you realize that his primary allegiance is
23  to CIGNA Corporation?
24       MR. BLUMENFELD:  Same objection.
25       MR. BRUCE:  Let him answer the question.

Page 8

1        THE WITNESS:  Not a concern.
2  BY MR. BRUCE:
3    Q   That's not a concern?
4    A   Of mine.
5    Q   Did you ever talk to John Arko about your
6  deposition?
7    A   Yes.
8    Q   When was that?
9    A   That had to have been, the best of my
10  recollection, probably last fall-ish, when this process
11  was underway.
12    Q   And what was your conversation with Mr. Arko?
13    A   Nothing more than have you been called, yes,
14  have you been called, yes, it'll be a very interesting
15  process. Nothing specific.
16    Q   Did you talk with him about what the
17  litigation was about?
18    A   I don't recall, because I believe we were
19  under instruction not to.
20    Q   Who gave you an instruction not to discuss
21  what the litigation was about?
22       MR. BLUMENFELD:  I'm going to object
23  belatedly to the previous question, and to the extent
24  that that disclosure calls for the disclosure of
25  attorney/client communications, you are instructed not

Page 9

1  to answer that question.  To the extent it does not call
2  for communications between you and counsel, you may
3  answer that question.
4        MR. BRUCE:  Mr. Blumenfeld, you can't
5  coach him at every question.  Let him answer the
6  question, and if you want to instruct him not to answer,
7  but you're coaching him.
8        MR. BLUMENFELD:  I am not coaching him.
9  I gave exactly the instruction that you suggested I
10  should give, and I wanted to make clear that to the
11  extent he could answer the question because it didn't
12  call for the disclosure of attorney/client
13  communications, that he could answer the question.
14  BY MR. BRUCE:
15    Q   Who told you not to talk about the litigation?
16       MR. BLUMENFELD:  Same instruction, same
17  objection.
18       THE WITNESS:  I will not answer that
19  question.
20  BY MR. BRUCE:
21    Q   You're refusing to answer the question?
22    A   Well, under advice from counsel.
23    Q   And does that include if the instruction was
24  from Paul Gontarek (phonetic)?
25    A   I feel it's appropriate to not answer this

3 (Pages 6 to 9)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

6/29/2003                                                                          Andrew B. Hodges

---

**Page 14**

1       THE WITNESS: Relevant to this?
2 BY MR. BRUCE:
3   Q   Yes.
4   A   Absolutely not.
5   Q   Do you have any computer files at home
6 relevant to this CIGNA pension plan?
7   A   Absolutely not.
8   Q   So you never did any work from home?
9       MR. BLUMENFELD: Objection to the form of
10 the question.
11      THE WITNESS: Work was done at home on a
12 computer issued laptop, and that laptop was turned in
13 upon my termination from CIGNA Corporation.
14      MR. BLUMENFELD: Just answer the
15 questions.
16      MR. BRUCE: Mr. Blumenfeld, don't coach
17 him.
18      MR. BLUMENFELD: I'm telling him to
19 answer your questions.
20      MR. BRUCE: He's answering the question.
21 No, you're trying to advise him not to answer anything
22 more, and that's improper.
23      MR. BLUMENFELD: I was telling him to
24 answer the question.
25      MR. BRUCE: No, it's improper. It's

---

**Page 15**

1 improper for you to be representing him in the first
2 place because you have a conflict, you're representing
3 CIGNA Corporation, you're not representing Mr. Hodges.
4 You don't have Mr. Hodges's interests at heart. You're
5 representing CIGNA Corporation, and it's a farce for you
6 to pretend that you're representing Mr. Hodges.
7       MR. BLUMENFELD: You know what, Steven, I
8 don't appreciate your characterization. If you want to
9 make accusations about my ethical standards or my firm's
10 ethical standards, you can certainly do so, but I would
11 appreciate it if you get on with this deposition,
12 please.
13 BY MR. BRUCE:
14   Q   Are you paying Mr. Blumenfeld to represent
15 you?
16   A   I am not.
17   Q   Are you aware of what his hourly rates are?
18   A   I am not.
19   Q   Who do you think is paying Mr. Blumenfeld to
20 represent you?
21   A   I don't know that anyone is.
22   Q   You don't suspect that CIGNA Corporation is
23 paying you?
24      MR. BLUMENFELD: Objection to the form of
25 the question.

---

**Page 16**

1       THE WITNESS: Hadn't given it much
2 thought.
3 BY MR. BRUCE:
4   Q   Had you given it thought if you hired another
5 attorney that it would cost money?
6   A   Didn't cross my mind.
7   Q   What kind of files did you keep on the CIGNA
8 pension plan, Mr. Hodges?
9       MR. BLUMENFELD: Objection to the form of
10 the question.
11      THE WITNESS: Plan documents, summary
12 plan descriptions, and files for individual participants
13 and their benefit measurements.
14 BY MR. BRUCE:
15   Q   Any other files?
16   A   Copies of documents relating to minimum
17 funding standards, maximum tax deductible standards for,
18 I would speculate, the previous ten years, documents
19 containing management reports providing accounting
20 information under SFAS 87, 88, and 132.
21   Q   Did you keep project files?
22   A   For a time being, and then purged them.
23   Q   And how did you purge them?
24   A   Through our documents, I don't know what the
25 right term is, but through our document destroying

---

**Page 17**

1 system, if you will. We've hired an organization to
2 come and empty secured bins to ensure the proper
3 disposal of documents.
4   Q   Did you have a project file on the cash
5 balance plan?
6   A   Yes.
7   Q   And did you purge that file?
8   A   Yes.
9   Q   When did you purge that file?
10   A   I would guess it would be sometime in 2000. I
11 don't know precisely.
12   Q   And why did you purge that file?
13   A   Based on the appraisal that information was no
14 longer needed.
15   Q   Wasn't there a new rehire rule connected with
16 the cash balance plan that was under consideration at
17 that time?
18   A   Yes, I suppose. I don't believe that the
19 documents disposed of contained any documents relative
20 to the point you just made.
21   Q   So you saved some of your documents?
22   A   I believe that the -- my involvement with the,
23 quote unquote, rehire change, if you will, was being
24 advised that the change was going to occur.
25   Q   So you don't believe that you had any

---

5 (Pages 14 to 17)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Page 26

1    Q   So his SERP was designed to make up the
2  difference between the benefits that he would receive
3  under the cash balance plan and the standard
4  supplemental plan and the benefits that he would have
5  received under the Part A plan?
6    A   That certainly appears to be the case.
7    Q   And was there a difference between those
8  benefits?
9    A   I'm sure there was a difference.
10   Q   And who has to approve a freestanding SERP?
11   A   I believe it's the protocol that that goes to,
12  up through the, at least as high as the head of HR for
13  CIGNA Corporation, if not to the CEO.
14   Q   So Mr. Gregor, or someone acting on his
15  behalf, had figured out that he was not going to receive
16  the level of benefits under the cash balance plan that
17  he would have received had he continued under Part A,
18  and so he asked for a supplemental benefit to make up
19  the difference, is that right?
20         MR. BLUMENFELD: Objection, foundation,
21  form of the question.
22         THE WITNESS: I have no idea what
23  preceded this matter.
24  BY MR. BRUCE:
25   Q   Well, how do you recall that it came up?

Page 27

1    A   Presumably, received a copy of the SERP
2  documenting the promise and was advised to advise or
3  counsel the participant on quantitative matters relative
4  to that.
5    Q   Well, was he concerned that the cash balance
6  plan was going to be a reduction for him?
7    A   I have no idea. Again, I was not privy to
8  those conversations.
9    Q   How many other people have freestanding SERPs,
10  Mr. Hodges?
11   A   I guess I would ask you to clarify the
12  question as to in what employment status are they
13  currently in, because there's probably many, if you
14  factor in those that retired 20 years ago. If,
15  assuming, and I will make this assumption, that you are
16  looking, or interested in SERPs that were created in the
17  relative recent past, I would suggest there's probably
18  something on the order of a dozen.
19   Q   And who keeps the records of those?
20   A   Office of the Plan Administrator, as well as
21  Lorraine Morris's team.
22   Q   And when you refer to the Office of the Plan
23  Administrator, what individuals are you referring to?
24   A   John Arko, and his subordinates.
25   Q   Who are his subordinates?

Page 28

1    A   I don't know. There's been somewhat of a
2  turnover in that population, but I think, I believe
3  copies of the SERPs reside in John's office.
4    Q   So how did you determine that Mr. Gregor's
5  SERP would make up the difference between the benefits
6  that he would have received under Part A and the
7  benefits that he was going to receive under a cash
8  balance?
9         MR. BLUMENFELD: Objection to the form of
10  the question, foundation.
11         THE WITNESS: Please ask the question
12  again, Mr. Bruce.
13         MR. BRUCE: Could you read the question
14  back?
15         (Question read by Court Reporter)
16         THE WITNESS: That would be documented in
17  the SERP itself. I didn't make that determination.
18  That determination would be made by the plan
19  administrator.
20  BY MR. BRUCE:
21   Q   So did you ever see the SERP?
22   A   I'm sure I did.
23   Q   So the SERP didn't actually have a formula as
24  much as it just promised him to make up whatever
25  difference there is between --

Page 29

1    A   I don't recall the form. Interpretation
2  matters would be handled in Philadelphia.
3    Q   Did you ever review any other freestanding
4  SERPs that were designed to make up the difference
5  between the cash balance plan and the prior plan?
6    A   None that I can recall.
7    Q   Are you familiar with an individual named
8  Robert Otton (phonetic)?
9    A   I am not.
10   Q   A lawyer for CIGNA?
11   A   I am not.
12         MR. BLUMENFELD: Objection to the form of
13  the question.
14         MR. BRUCE: Let's mark this as 29.
15         (Exhibit 29, Philadelphia team members
16  listing, marked for identification)
17  BY MR. BRUCE:
18   Q   And can you identify Exhibit 29, or any part
19  of this?
20         MR. BLUMENFELD: Steven, let me just
21  interrupt. I have two blank pages in here on mine, P
22  29, that you gave me.
23         MR. BRUCE: Let's see. Does yours have
24  blanks?
25         THE WITNESS: I don't believe so.

8 (Pages 26 to 29)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

Andrew B. Hodges

Page 30

1    MR. BLUMENFELD: Can you tell me how many
2  it is?
3    MR. BRUCE: I'll just recopy it. Two
4  blank pages. What Bates numbers are you missing?
5    MR. BLUMENFELD: I don't know that I'm
6  missing any. I have 13421 and then two blanks and then
7  13422, so how many pages is the exhibit supposed to be?
8    MR. BRUCE: Do you have this page?
9  BY MR. BRUCE:
10   Q  I was asking you to identify Exhibit 29.
11   A  I'm sure I've seen something similar to this.
12  This obviously dates back to presumably sometime in
13  early '97, if not late '96.
14   Q  How did you determine that?
15   A  This appears to be a document identifying the
16  individuals involved with the actual administration of
17  Part B of the CIGNA pension plan.
18   Q  Doesn't this appear to be an identification of
19  people who are involved in developing the cash balance
20  design?
21   A  I would suggest --
22     MR. BLUMENFELD: Objection.
23     THE WITNESS: No.
24  BY MR. BRUCE:
25   Q  No? Why is that?

Page 31

1    A  This was the administration team, not the
2  benefit design team.
3    Q  Okay. Who was on the benefit design team?
4    A  The precise roster I'm unable to provide, but
5  essentially it would be Benefits Management in
6  Philadelphia.
7    Q  And who were those individuals?
8    A  That would be Mr. Main, Mr. Durham, would be
9  the primary leaders of that initiative.
10   Q  Mr. Arko?
11   A  I don't know if he as a matter of setting
12  policy was on that team.
13   Q  Well, this list does include Mr. Durham, so
14  how are you distinguishing -- and it lists him as plan
15  design, so how are you distinguishing between the
16  administrative team and the design team?
17     MR. BLUMENFELD: Objection.
18     THE WITNESS: I would speculate that Mr.
19  Durham is involved in this team was simply to ensure
20  design decisions were carried out in administrative
21  matters.
22  BY MR. BRUCE:
23   Q  And how are you identifying these people as
24  being administrative, as this is being the
25  administrative team, what leads you to that?

Page 32

1    A  Essentially the list of people on the last
2  page of the 405 that you have together, those are all
3  Hartford based folks charged with administering the
4  CIGNA pension plan. D 13423.
5    Q  Well, let's go through that list a minute.
6  Can you identify anyone on that page who is not an
7  active CIGNA employee in addition to yourself?
8    A  Today?
9    Q  Yes?
10     MR. BLUMENFELD: We're talking D 13423,
11  correct?
12     MR. BRUCE: Yes.
13     THE WITNESS: Of the seven names here, to
14  the best of my knowledge, Ms. Lepp is not a CIGNA
15  employee, obviously I am not a CIGNA employee, nor is
16  Ms. Rodegher or is Mr. Dutton.
17  BY MR. BRUCE:
18   Q  And what happened to Ms. Lepp?
19     MR. BLUMENFELD: Objection.
20     THE WITNESS: I do not know.
21  BY MR. BRUCE:
22   Q  How about Ms. Rodegher?
23     MR. BLUMENFELD: Objection.
24     THE WITNESS: I do not know.
25  BY MR. BRUCE:

Page 33

1    Q  And Mr. Dutton?
2    A  I do not know.
3      MR. BLUMENFELD: Same objection.
4  BY MR. BRUCE:
5    Q  How about Steve Comkowycz? I'm not asking
6  you, I'm not sure his name is on this list, but he's no
7  longer a CIGNA employee, right?
8    A  To the best of my knowledge, that is true.
9    Q  What does that mean, to the best of your
10  knowledge?
11   A  I haven't been at CIGNA for three or four
12  weeks. He was not a CIGNA employee, to the best of my
13  knowledge, when I left. I do not know what has
14  transpired in the interim.
15   Q  Whether he might have been rehired?
16   A  Exactly.
17   Q  When did he leave?
18   A  Sometime in 2003. I've lost track.
19   Q  And did you think that there was a possibility
20  that he might have been rehired?
21   A  No.
22     MR. BLUMENFELD: Objection.
23     THE WITNESS: I was simply trying to be
24  as precise as possible with my response.
25  BY MR. BRUCE:

9 (Pages 30 to 33)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

6/29/2003                                                                Andrew B. Hodges

---

Page 34

1    Q    So in Exhibit 29 it lists several
2 responsibilities that you would have on this project.
3 Are any of the responsibilities that are listed there
4 ones that you did not wind up actually having?
5    A    Yes, of the five listed.
6         MR. BLUMENFELD: Objection.
7 BY MR. BRUCE:
8    Q    Yes. Which ones are those?
9    A    I did not perform item 1.
10   Q    Any others?
11   A    I would suggest that I did not take a lead
12 role in item 3. I would suggest that item 4, again I
13 was more told what to do than consult on what to do.
14 Similarly with item 5.
15   Q    So the only one of these that you think that
16 you actually carried out and the way that someone might
17 read this would be number 2, which is to convert the
18 accrued balances of Tier 2 participants to beginning
19 account balances?
20   A    Correct.
21        MR. BLUMENFELD: Objection.
22        MR. BRUCE: Would you not object while
23 he's answering?
24        MR. BLUMENFELD: Do me a favor, give me a
25 chance to object before you answer the question.

---

Page 35

1         THE WITNESS: Understood.
2 BY MR. BRUCE:
3    Q    And did William Mercer also work on that
4 project of converting the accrued balances to beginning
5 account balances?
6         MR. BLUMENFELD: Objection.
7         THE WITNESS: I do not know.
8 BY MR. BRUCE:
9    Q    You don't remember?
10   A    I think that's a fair characterization.
11   Q    And you said that you don't believe that you
12 actually developed the benefit calculation
13 specifications for Tier 2 employees, is that correct?
14   A    That is correct.
15   Q    Who do you believe did that?
16   A    Mr. Comkowycz.
17   Q    And number 3 was consult with lead systems
18 designer on Tier 2 system requirements. Who do you
19 believe actually carried out that function?
20   A    The majority of that function was Mr.
21 Comkowycz.
22   Q    And the same with item 5, test the Tier 2
23 benefit calculations?
24   A    Correct.
25   Q    And just to clarify for me the, when you're

---

Page 36

1 referring to this is referring to developing benefit
2 calculation specifications for Tier 2, but what we seem
3 to be talking about at this stage would have been
4 developing the cash balance plan, so this is really
5 referring to developing the cash balance plan
6 specifications for people who are coming out of the Tier
7 2 formula?
8         MR. BLUMENFELD: Objection.
9         THE WITNESS: Yes.
10 BY MR. BRUCE:
11   Q    And then someone else was developing
12 specifications for people who were being moved to cash
13 balance from the Tier 1 formula, and that, according to
14 this, would have been Joanne Fuller?
15        MR. BLUMENFELD: Objection.
16        THE WITNESS: Let me think of the best
17 way to characterize this. The work done by Steve
18 Comkowycz for item 1 under my name would encompass all
19 individuals moving from CIGNA Part A to CIGNA Part B.
20 BY MR. BRUCE:
21   Q    Whether they were in Tier 1 or Tier 2?
22   A    Correct.
23   Q    And on this sheet Brian Dutton is named as the
24 lead systems designer. So Mr. Comkowycz would have been
25 under Brian Dutton?

---

Page 37

1         MR. BLUMENFELD: Objection.
2         THE WITNESS: He would have been a peer
3 of Brian Dutton's.
4 BY MR. BRUCE:
5    Q    Mr. Comkowycz was considered a systems
6 designer?
7    A    No. He would be, when you say under, I
8 immediately thought of corporate hierarchy and reporting
9 relationships. They were working together on making
10 this project happen.
11   Q    But Mr. Comkowycz was a systems designer, he
12 was not an actuary?
13   A    He was not an actuary, I would suggest nor was
14 he a systems designer, he was simply a very
15 knowledgeable pension professional who could translate a
16 plan document into a specification for a lead systems
17 designer to establish whatever code is necessary for
18 setting up the system.
19   Q    So in your mind someone who's a systems
20 designer is really the person who takes the
21 specifications and puts them into code?
22   A    Yes.
23   Q    And so the developing the specifications would
24 have been the role of an actuary or a pension
25 professional?

---

10 (Pages 34 to 37)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

6/29/2003                                                                          Andrew B. Hodges

Page 38

1    A   Correct.
2    Q   And to your knowledge, was Joanne Fuller
3  involved in that process of developing the
4  specifications for the Part B plan?
5    A   She was not.
6    Q   And why was that?
7         MR. BLUMENFELD: Objection.
8         THE WITNESS: I have no idea.
9  BY MR. BRUCE:
10   Q   Well, what happened, if you recall?
11        MR. BLUMENFELD: Objection.
12        THE WITNESS: The time line escapes me,
13  but I believe she no longer worked on the CIGNA pension
14  plan when the 01 specifications dimension of the project
15  was conducted.
16  BY MR. BRUCE:
17   Q   And under Janet VanDeusen's responsibilities
18  there's one that refers to, the third one refers to
19  consult with the business analyst and lead systems
20  designer on compliance and related issues.  Do you
21  recall Ms. VanDeusen being responsible for compliance
22  related issues?
23   A   I do not recall.
24   Q   How do you recall that compliance related
25  issues were handled?

Page 39

1    A   I don't understand what you mean by
2  compliance.
3    Q   Well, you don't understand what this document
4  refers to when it's referring to compliance?
5    A   Correct.
6    Q   You have no idea about what compliance means?
7        MR. BLUMENFELD: Objection.
8        THE WITNESS: I would suggest that Janet
9  is not -- the use of the word compliance here is limited
10  to compliance in terms of the plan document to ensure
11  that the system is faithful to the terms of the plan.
12  BY MR. BRUCE:
13   Q   So when this document is referring to
14  compliance, you think it's referring to making sure that
15  the document, the specifications comply with the plan
16  document?
17   A   Correct.
18   Q   And are you aware that the plan document for
19  the CIGNA pension plan was not actually executed until
20  December of 1998?
21        MR. BLUMENFELD: Objection.
22        THE WITNESS: The precise date that it
23  was signed, I really don't know.
24  BY MR. BRUCE:
25   Q   Well, when you're referring to work being done

Page 40

1  in 1997, that time period of making sure that
2  specifications conformed with the plan document, what
3  plan document are you referring to?
4         MR. BLUMENFELD: Objection.
5         THE WITNESS: It would have to be
6  whatever versions existed at that time.
7  BY MR. BRUCE:
8    Q   And did you see earlier versions of the plan
9  document, or did you see detailed descriptions of what
10  the rules would be?
11        MR. BLUMENFELD: Objection.
12        THE WITNESS: I recall seeing both.
13  BY MR. BRUCE:
14   Q   And if we referred to compliance with the
15  ERISA or code requirements for a defined benefit plan,
16  what is your understanding of how those, that type of
17  compliance related issue was handled in the development
18  of the cash balance plan?
19        MR. BLUMENFELD: Objection.
20        THE WITNESS: Please ask the question
21  again.
22        MR. BRUCE: Can you read it back?
23        (Question read by Court Reporter)
24        THE WITNESS: It's my understanding that
25  it was handled and it was not across my desk.

Page 41

1  BY MR. BRUCE:
2    Q   And who was it handled by?
3    A   I honestly don't know.  It was handled by
4  Benefits Management in Philadelphia.
5    Q   Are you familiar with the test for determining
6  whether a defined benefit plan is back-loaded?
7    A   Can you clarify what you mean by back-loaded?
8    Q   You've never heard the term back-loaded?
9    A   I've heard the term back-loaded, but I've
10  heard it in several different contexts.
11   Q   Tell me what context you've heard it.
12   A   I assume you're referring to, I believe it's a
13  term under Code Section 411 that defines accrual rules.
14  I assume that you're referring to Internal Revenue Code
15  410 and 411 that establishes accrual rules that a
16  pension plan must comply with, is that --
17   Q   Yes.  Did you ever take part in testing the
18  cash balance plan for compliance with those rules?
19   A   I did not.
20        MR. BLUMENFELD: Objection.
21  BY MR. BRUCE:
22   Q   Do you know who did?
23   A   Yes.
24   Q   Who is that?
25   A   Arthur Assantes.

11 (Pages 38 to 41)

Brandon Smith Reporting Service

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

6/29/2003                                                                 Andrew B. Hodges

Page 90

1      A   I have not seen either.
2          MR. BLUMENFELD:  You already asked him
3   that question.
4   BY MR. BRUCE:
5      Q   And you were not shown any documents by Mr.
6   Blumenfeld?
7      A   I was not.
8      Q   Did you ever meet with Mr. Blumenfeld in
9   person before today?
10     A   I have not.
11     Q   Have you met with anyone else from Morgan
12  Lewis?
13     A   I have not.
14     Q   And how long did you meet with Mr. Blumenfeld
15  today?
16     A   Ten minutes, 15 minutes, before proceedings
17  started, just hi, Jeremy, how are you, nice to meet you.
18  That was the extent of it.
19     Q   And how long did you talk with him before
20  today?
21     A   Probably a couple of hours.
22     Q   Did you ever talk with Bob Steele?
23         MR. BLUMENFELD:  Objection to the form of
24  the question.
25         THE WITNESS:  Certainly over the 20 years

Page 91

1   we've both been with CIGNA, but never relative to this.
2   BY MR. BRUCE:
3      Q   You've never talked to Bob Steele after his
4   deposition?
5      A   Absolutely not.
6      Q   Were you aware that there was an age
7   discrimination issue with cash balance plans?
8      A   On a global sense?
9      Q   Yes.
10     A   I was not aware.
11     Q   When you were looking at the cash balance
12  design back in 1996 and 1997, you were not aware that
13  there was an issue as to whether some cash balance
14  designs complied with the age discrimination rules?
15     A   I was totally ignorant on the relevance of
16  that issue to cash balance plans.
17     Q   When did you first learn that there was an age
18  discrimination issue with respect to rates of accruals
19  under cash balance plans?
20     A   Probably the precise date escapes me, but June
21  24th or June 25th the year 2003.
22     Q   What happened then?
23         MR. BLUMENFELD:  I'm going to object and
24  instruct you that to the extent that it calls for the
25  disclosure of attorney/client communications, you're

Page 92

1   instructed not to answer that question.
2          THE WITNESS:  In reference to Mr.
3   Blumenfeld's comments, I will not answer the question.
4   BY MR. BRUCE:
5      Q   You're telling me that you never heard that
6   cash balance plans have issues in regard to whether they
7   comply with the age discrimination?
8      A   Absolutely not, never ever had the two
9   connected.
10     Q   Were you aware that there's an age
11  discrimination rule in ERISA?
12     A   In all honesty, no.  Let me qualify that
13  statement.  I believe I understood, I understood,
14  perhaps issues that are tangential to that, things like
15  it's inappropriate to suspend accruals at age 65.  As I
16  think it through, that's probably one of the items under
17  the section of ERISA to which you refer.  And that's
18  walking around knowledge for anyone who's been in this
19  business.  I was not aware of a link between the accrual
20  of cash balance benefits and age discrimination, other
21  than the obvious, you cannot stop somebody from accruing
22  benefits at any age.
23     Q   You were not aware that it would be illegal to
24  have a plan that provided benefits of, say, 2 percent of
25  pay for everyone who's younger than age 45 and 1 percent

Page 93

1   of pay for everyone who's over age 45?
2      A   In those terms, I probably would have
3   recognized that benefit structure as inappropriate.
4      Q   And would you recognize a benefit structure as
5   inappropriate if it started off at 2 percent of pay and
6   went down with each year of increasing age by point 1
7   percent?
8          MR. BLUMENFELD:  Objection to the form of
9   the question.
10  BY MR. BRUCE:
11     Q   If it went from 2 percent to 1.9 percent to
12  1.8 percent?
13     A   Exclusively tied to the age of individual.
14     Q   Yes.
15     A   That would have caught somebody's attention.
16     Q   Whose attention would it have caught?
17     A   Well, I mean I speak figuratively, that a
18  trained eye should have caught that, when it's that
19  explicit.
20     Q   So in all of your conversations with your
21  fellow actuaries at CIGNA, you don't recall ever
22  discussing the age discrimination issues with cash
23  balance plans?
24     A   Absolutely not.
25     Q   You do recall discussing the wearaway issues,

24 (Pages 90 to 93)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Page 94

1  right?
2     A   Absolutely.
3     Q   And what do you recall about that?
4     A   That a wearaway is a term that's not unique
5  and new to the creation of cash balance plans, but
6  basically it's a world where you have two different
7  benefit structures and the plan ultimately delivers the
8  benefits of maximum value, if you will.
9     Q   And were you aware that the CIGNA cash balance
10 conversion was leading to wearaways?
11    A   Yes.
12    Q   And how did you become aware of that?
13    A   Inspection of the, you know, just an immediate
14 fallout of what was being proposed.
15    Q   And what did you learn?
16    A   That there could be a period, the duration of
17 that period highly contingent upon the facts associated
18 with that individual, where benefits under the cash
19 balance plan may be, quote unquote, catching up to the
20 benefits provided under Part A.
21    Q   And did you figure out what factors caused
22 that?
23    A   Again, as a myriad of factors.
24    Q   Well, start.
25        MR. BLUMENFELD:  Objection to the form of

Page 95

1  the question.
2  BY MR. BRUCE:
3     Q   Can you name any of those factors?
4     A   Early retirement utilization, compensation
5  patterns subsequent to the conversion event, and
6  continued employment at CIGNA Corporation.
7     Q   And how about the rate of interest used in
8  annuitization?
9     A   Yeah, that clearly is a factor.
10    Q   So if you converted someone's benefits at a
11 certain rate of interest and then interest rates dropped
12 thereafter, so that if their benefits were reconverted
13 to an annuity, there might be a period of wearaway as a
14 result of the decrease in the interest rates?
15    A   You're creating a theoretical world that
16 probably can't exist in reality, but I agree with you.
17    Q   And isn't that the world in which we're living
18 right now, that you didn't, CIGNA, convert people's
19 previous benefits based on a 6 plus percent rate of
20 interest generally?
21        MR. BLUMENFELD:  Objection.
22        THE WITNESS:  Help me focus on the type
23 of conversion that you want me to consider.
24 BY MR. BRUCE:
25    Q   The standard conversion.

Page 96

1         MR. BLUMENFELD:  Objection.
2  BY MR. BRUCE:
3     Q   Of people who were in Tier 2 was based on a
4  6 plus percent rate of interest, right?
5     A   I assume by standard conversion you mean those
6  converted as of January 1st, 1998, the interest rate
7  used for such an individual, i.e., points less than 55,
8  the interest rate used was 6.05 percent.
9     Q   Yes.  And the interest rate, if one of those
10 individuals now took their cash balance and reconverted
11 it to an annuity, would be a lower rate of interest,
12 right?
13    A   If that event occurred in 2003, for instance.
14    Q   Yes.
15    A   The precise rate escapes me, but I know that
16 it is lower than 6.05.
17    Q   And that fact could cause a wearaway effect,
18 right?
19        MR. BLUMENFELD:  Objection to the form of
20 the question.
21        THE WITNESS:  The purchasing power of a
22 cash balance account goes down as interest rates go
23 down.
24 BY MR. BRUCE:
25    Q   And that can cause a wearaway effect, right?

Page 97

1     A   It could give rise to a wearaway period.
2     Q   But you have never analyzed whether it does,
3  is that what you're saying?
4     A   That's not what I'm saying.  I'm sure there's
5  been instances where we've looked at the duration of the
6  wearaway period, and I would suggest that it's highly
7  contingent upon some of the variables we already talked
8  about.
9     Q   Are you familiar with the term pre-retirement
10 mortality discount?
11    A   Yes.
12    Q   And when CIGNA established opening account
13 balances under the cash balance plan, was a
14 pre-retirement mortality discount applied?
15    A   Yes, it was.
16    Q   If an individual continues to work for CIGNA,
17 will there ever be a mortality gain to make up for that
18 discount?
19        MR. BLUMENFELD:  Objection to the form of
20 the question.
21        THE WITNESS:  Yeah, I don't understand
22 what you mean by mortality gain.
23 BY MR. BRUCE:
24    Q   Well, if someone was age, let's say in their
25 early forties, when CIGNA converted to a cash balance

25 (Pages 94 to 97)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

6/29/2003                                                                Andrew B. Hodges

Page 98

1  plan, there might have been a pre-retirement mortality
2  discount on the order of 10 percent, right?
3      A    There would be a mortality discount, but I'd
4  have to look at the mortality table to accept your 10
5  percent characterization, but continue.
6      Q    Okay. So if their benefit at age 65 was worth
7  a thousand dollars, the mortality discount might reduce
8  that to $900, how did they ever make up that hundred
9  dollars?
10         MR. BLUMENFELD:    Objection to the form of
11  the question.
12         THE WITNESS:    Again, I'm wrestling with
13  your use of numbers. I appreciate in this context it's
14  for illustrative purposes, but I don't on the surface
15  accept that a thousand could turn into 900, but
16  nevertheless, to answer your question, I don't believe
17  the terms of the plan would call for the mortality, the
18  individual to be, the individual's benefit to be
19  increased for the value of survivorship. Does that
20  answer your question?
21  BY MR. BRUCE:
22      Q    Well, maybe you can explain to me what -- you
23  did take part in establishing these opening account
24  balances, right?
25      A    Correct.

Page 99

1      Q    And developing the specifications for it?
2      A    Correct.
3      Q    So what was your thinking about the
4  appropriateness of applying a pre-retirement mortality
5  discount when people were not actually getting a
6  distribution of those benefits?
7      A    I believe the thinking was simply to value an
8  annuity payable in the future, in this case either for
9  the standard converse, age 65, what is the value under
10  an accepted actual basis, i.e., interest and mortality,
11  of that accrued promise.
12      Q    And your understanding was that customarily a
13  pre-retirement mortality discount was applied when
14  people received the lump sum distributions at early
15  ages, right?
16      A    Virtually universally, not in practice.
17      Q    And why did you think it was appropriate to
18  apply pre-retirement mortality discount when people
19  would not actually be receiving the money at that age?
20         MR. BLUMENFELD:    Objection to the form of
21  the question.
22         THE WITNESS:    Simply that that was the
23  value of the annuity, at that point in time.
24  BY MR. BRUCE:
25      Q    And if they continued to live, do they ever

Page 100

1  make up for the mortality discount, do they ever get a
2  credit to --
3      A    You mean mathematically?
4      Q    Yes.
5      A    No.
6      Q    And doesn't that result in the never reaching
7  the level of benefits that they had before?
8         MR. BLUMENFELD:    Objection to the form of
9  the question.
10         THE WITNESS:    Certainly not necessarily
11  due to the dynamic nature of the interest rates, the
12  possibility of benefit credits and so forth.
13  BY MR. BRUCE:
14      Q    Well, if someone's benefits are converted at
15  age 45 with a mortality, pre-retirement mortality
16  discount of 10 percent, and they continue to work for
17  CIGNA until age 65, do they ever get a credit for having
18  lived to age 65?
19      A    No.
20      Q    So what are they paying for with that 10
21  percent discount, what did they get as a result of that
22  10 percent discount?
23      A    I'm fairly certain I don't understand the
24  question.
25      Q    Well, there was a 10 percent discount, and if

Page 101

1  they continued to live to age 65 and prove that they did
2  not die during that period, what do they get for having
3  had their benefits reduced?
4      A    The individual would receive --
5         MR. BLUMENFELD:    Objection.
6         THE WITNESS:    Would receive nothing, as
7  would be the case in a normal lump sum distribution.
8  You don't -- in general, the pension world does not
9  operate that you determine mortality in arrears.
10  BY MR. BRUCE:
11      Q    The person would actually have had the money
12  at age 45 in the case where --
13      A    Sure, but similarly the individual who drops
14  dead at 46 doesn't have their opening account balance
15  discounted for the fact that they were now dead at 46.
16      Q    So you're saying if they drop dead at 46, then
17  their survivors or someone will actually get that money?
18      A    Correct.
19      Q    And so CIGNA took a discount for having
20  provided people with an automatic death benefit, is that
21  what happened?
22         MR. BLUMENFELD:    Objection.
23         THE WITNESS:    I don't know if the cause
24  and effect is as you've characterized it, but there was
25  no intent to not deliver to the beneficiaries of the now

26 (Pages 98 to 101)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

6/29/2003                                                    Andrew B. Hodges

Page 102

1  deceased hypothetical 46 year-old we're discussing
2  anything other than the opening account balance as
3  measured as we've discussed, plus any applicable
4  benefit, credits or interest credits.
5  BY MR. BRUCE:
6      Q  Do you see that the pre-retirement mortality
7  discount also creates a wearaway effect?
8      A  Yes.
9      Q  And then another part of the wearaway effect,
10 if you take like Janis Amara's case, is not including
11 the value of the early retirement subsidies in the
12 opening account balance, right?
13         MR. BLUMENFELD:  Objection.
14         THE WITNESS:  In the context of assumed
15 receipt of the Part A annuity, during the early
16 retirement period.
17 BY MR. BRUCE:
18     Q  Okay.  And were you aware of the statement
19 that Mark Lynch made to Janis about you'd be sick if you
20 knew how long your wearaway was?
21         MR. BLUMENFELD:  Objection.
22         THE WITNESS:  Very unaware of that
23 comment.
24 BY MR. BRUCE:
25     Q  Did you ever talk with Mark Lynch about

Page 103

1  wearaway?
2      A  No.  Well, I shouldn't answer so
3  categorically.  I'm sure we did over time.  I mean I had
4  other clients that sponsored similar plans.  I'm sure
5  it's been discussed in staff meetings and so forth.
6      Q  Did you understand that wearaway could be
7  avoided by an A plus B formula?
8      A  Yes.
9      Q  And did you understand the reasons why CIGNA
10 did not avoid wearaway by using an A plus B formula?
11         MR. BLUMENFELD:  Objection to the form of
12 the question.
13         THE WITNESS:  I do not know why Benefits
14 Management did not go A plus B, if you will, from the
15 initial creation of the cash balance plan.  I don't know
16 their reasoning.
17 BY MR. BRUCE:
18     Q  And you never heard any discussion of that
19 issue?
20         MR. BLUMENFELD:  Objection to the form of
21 the question.
22         THE WITNESS:  I can honestly say no until
23 such time as they change the form, the treatment of
24 rehires, and I was advised to make it happen under the
25 system.

Page 104

1  BY MR. BRUCE:
2      Q  And do you know why management changed,
3  decided to change the treatment of rehires?
4      A  I have no direct knowledge of why they did it.
5  Indirectly I assume they felt that the rules under the
6  proposed change would better serve benefit delivery
7  under CIGNA.  I was not in a conference room discussing
8  why they did it.
9      Q  You never heard about the complaints of the
10 rehired employees?
11         MR. BLUMENFELD:  Objection.
12         THE WITNESS:  I'm sure formally, no.
13 Informally I'm sure people caught my attention in the
14 office.
15 BY MR. BRUCE:
16     Q  And what did they catch your attention with?
17     A  Just the whole wearaway concept.
18     Q  Well, did they catch your attention with the
19 rehires were surprised that this was going on?
20     A  Surprised out of their own ignorance.
21     Q  Out of their own ignorance, what does that
22 mean?
23     A  I do not recall an informal conversation in
24 which the rehired participant felt that they were
25 mis-advised on how their benefits would be managed, if

Page 105

1  you will, under the rehire event.  They were not happy
2  with the answer, but often kicked themselves, if you
3  will, for not reading SPDs, not asking the right
4  questions in the re-interview process, et cetera, but
5  certainly people caught my attention and said is this
6  right, and I would say mechanically under the terms of
7  the plan that's what the plan appears to call for.
8      Q  And you're aware that in some of these rehire
9  situations that the wearaway may be as long as ten
10 years?
11         MR. BLUMENFELD:  Objection.
12         THE WITNESS:  I would have to put pencil
13 to paper to verify that statistic.
14 BY MR. BRUCE:
15     Q  Did you ever put pen to paper to --
16     A  Yeah, and I don't recall anything of that
17 duration.
18     Q  What do you recall?
19     A  This is very, very speculative, because it's
20 been a long time since I've done this, maybe something
21 on the order of four, five, or six years.
22     Q  Are you aware that cash balance plans can only
23 comply with one of ERISA's three accrual rules?
24         MR. BLUMENFELD:  Objection to the form of
25 the question.

27 (Pages 102 to 105)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

6/29/2003                                                                Andrew B. Hodges

Page 170

1    Q   Which interest crediting rules are you talking
2  about, Notice 96-8?
3    A   I believe so.
4    Q   You think that even refers to early
5  retirement?
6    A   I have not studied 96-8, but that's my
7  speculative comment on why the mechanism can work as I
8  described it.
9    Q   And who has the responsibility of having
10 looked at those issues to determine whether, in fact,
11 that is permissible?  Did you have that responsibility?
12   A   I did not have that responsibility.
13   Q   Who does?
14   A   I would suggest that it was the, I would
15 speculate, stronger than suggesting, that it was input
16 from the drafter of the plan document.
17   Q   And who's the drafter of the plan document?
18   A   Drinker Biddle.
19   Q   So you think drinker buildings made the final
20 decisions on drafting the plan document?  I thought they
21 were the attorneys.  Attorneys usually say they don't
22 make the final decision, the client does, so --
23   A   Then perhaps, again, I was not privy to all
24 the communication.
25         MR. BLUMENFELD:  Objection.

Page 171

1         THE WITNESS:  But perhaps it was Benefits
2  Management in Philadelphia.  I do not remember providing
3  any concrete professional advice vis-a-vis 96-8.
4         (Exhibit 45, memo from DML to DML
5         dated 1/1/99, marked for identification)
6  BY MR. BRUCE:
7    Q   Exhibit 45 is a memo from GTM, which stands
8  for Gerry T. Main, to DML, which stands for Donald M.
9  Levinson, dated 1/1/99.
10   A   Um-hum.
11   Q   Have you ever seen this memo?
12   A   I do not recall seeing it.
13   Q   And down at the bottom it says cc GTM direct
14 reports.  Do you know what that refers to?
15   A   That would, I presume, in the parlance of
16 corporate hierarchy, it's people who reported directly
17 to Mr. Main.
18   Q   To direct reports directly above him?
19   A   I would suggest the perspective is downward,
20 not upward.
21   Q   Okay.  And it attaches a Wall Street Journal
22 article about cash balance pension plans.
23   A   Okay.
24   Q   Did you ever see any of the Wall Street
25 Journal articles about cash balance?

Page 172

1    A   I've seen some of them prepared by Ms.
2  Schultz.
3    Q   So you were familiar with the articles in the
4  Wall Street Journal?
5         MR. BLUMENFELD:  Objection.
6  BY MR. BRUCE:
7    Q   About cash balance plans?
8         MR. BLUMENFELD:  Objection.
9         THE WITNESS:  I recall seeing some of
10 them.  I don't particularly recall seeing this one.
11 BY MR. BRUCE:
12   Q   Do you recall seeing articles in the Wall
13 Street Journal about cash balance blanks and age
14 discrimination?
15   A   No, I don't see the connection.  Again, as we
16 discussed this morning, I was not sensitive to the age
17 discrimination issues until recently.
18   Q   What did you think the Wall Street Journal
19 articles were about, just wearaway?
20   A   Perhaps the ones that I --
21         MR. BLUMENFELD:  Objection.
22         THE WITNESS:  -- read.
23 BY MR. BRUCE:
24   Q   What do you recall them being about?
25   A   Wearaway.

Page 173

1    Q   The first bullet in Mr. Main's memo says that,
2  "Her most damaging assertion is that some employers are
3  deliberately establishing opening balances below the
4  real value of each employee's pension.  Of course we
5  didn't do that and have disclosed it if we had.
6  So there's no exposure for us on that point."  Did CIGNA
7  establish an opening account balances that were equal to or
8  greater than the real value of each employee's pension?
9    A   CIGNA created --
10         MR. BLUMENFELD:  Objection.
11         THE WITNESS:  CIGNA created opening
12 account balances that were a function of either the, in
13 a group that initially was converted, that were a
14 function of either the age 65 benefit or the age 62
15 benefit, and representations of real value and non-real
16 value are highly speculative.
17 BY MR. BRUCE:
18   Q   So real value included the early retirement
19 subsidies, the opening account balances didn't include
20 the real value, but if real value just included the age
21 62 or age 65 benefit, then you think a defensible case
22 could be made that the opening balances did include the
23 real value, is that right?
24         MR. BLUMENFELD:  Objection.
25         THE WITNESS:  I will leave that to other

44 (Pages 170 to 173)

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

6/29/2003                                                                      Andrew B. Hodges

Page 174

1  people. I'm simply reporting exactly how the opening
2  account balances were measured.
3  BY MR. BRUCE:
4      Q   Okay. Well, you didn't follow my question,
5  or --
6      A   Perhaps not. Ask it again.
7      Q   If real value includes the value of the early
8  retirement benefit, then CIGNA did not establish opening
9  balances equal to that real value, right?
10         MR. BLUMENFELD: Objection.
11         THE WITNESS: Under that supposition,
12 yes, early retirement were not in there for a section of
13 the people.
14 BY MR. BRUCE:
15     Q   And did CIGNA disclose to the employees that
16 opening balances did not include the early retirement
17 value?
18     A   I don't know.
19         MR. BLUMENFELD: Objection.
20         THE WITNESS: I don't know what was in
21 communications and what wasn't at this point.
22 BY MR. BRUCE:
23     Q   Did you take any part in reviewing the
24 communications?
25     A   More than likely, yes.

Page 175

1      Q   And what communications do you recall
2  reviewing?
3      A   It was a communications campaign that started
4  in, I believe, the fall of 1997, stepping people from,
5  you know, hey, we're going to make a change level
6  communication to, which is generic, all participants
7  receive the same communication, to I believe a
8  personalized communication identifying, again,
9  individual situations and opening account balances and
10 so forth.
11     Q   And did you also review the summary plan
12 descriptions?
13     A   Yes.
14     Q   And didn't you in fact help work up some of
15 the examples in the summary plan description?
16     A   Checked the math.
17     Q   You didn't develop the examples themselves?
18     A   I'm trying to remember if I did it. I don't
19 recall if I did it and discussed it with them or they
20 did it and I checked it, but there definitely was
21 involvement there.
22         MR. BRUCE: Let's mark this as 46.
23     (Exhibit 46, memo from Arthur Assantes
24         to Andy Hodges dated 6/26/97, marked
25         for identification)

Page 176

1  BY MR. BRUCE:
2      Q   Exhibit 46 is a memo from Arthur Assantes to
3  yourself, David Durham, John Arko, and Donna Parker
4  about non-discriminatory plan amendment testing dated
5  June 26, 1997.
6      A   Um-hum.
7      Q   Do you recall anything about this?
8      A   Just that my involvement was peripheral.
9  Participating in the matter from the perspective of what
10 data did we have in-house and what data had to come from
11 our colleagues in Philadelphia. That's what initially
12 hits me.
13     Q   Do you know whether the CIGNA tested for
14 non-discrimination on the basis of contributions or
15 benefits?
16     A   I believe it was on the basis of benefits.
17     Q   And that refers to accrual rates, right?
18     A   Yes.
19     Q   And the benefits are the annuity benefits that
20 people will get at retirement?
21         MR. BLUMENFELD: Objection.
22         THE WITNESS: I believe so. I believe
23 that's how Mr. Assantes conducted the test.
24 BY MR. BRUCE:
25     Q   And on the second page of his memo it says, in

Page 177

1  the middle of the last paragraph, it says, "As you would
2  expect in a plan designed to mimic a defined
3  contribution plan, accrual rates decline with increases
4  in age and service for employees in the cash balance
5  plan." Do you see that?
6      A   Um-hum.
7      Q   Do you have any reason to disagree with that
8  statement?
9      A   Not in the context of how to measure accrual
10 rates under the general test.
11     Q   And you didn't have any basis for thinking
12 that that presented a problem in terms of ERISA or the
13 code, because you weren't aware that there was a
14 requirement that accrual rates not decrease because of
15 age, right?
16         MR. BLUMENFELD: Objection.
17 BY MR. BRUCE:
18     Q   You were unaware of that?
19     A   Correct.
20     Q   If you look at Exhibit D, it computes accrual,
21 what he calls a normal accrual rate, and then the most
22 valuable accrual rate under the cash balance plan, and
23 those accrual rates decrease with age and service,
24 right?
25     A   No, I'm not seeing that, Mr. Bruce.

45 (Pages 174 to 177)

Brandon Smith Reporting Service

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Page 198

1    Q   Right?
2    A   In a general sense, I think I'm in agreement
3  with you.
4    Q   So if you have pay credits that were
5  designated for individuals for 1998 through 2002, and
6  those people have worked for CIGNA long enough to be
7  vested, how can it be that they wind up in exactly the
8  same place that they were at the end of 1998 if those
9  pay credits have not been added to their benefits?
10       MR. BLUMENFELD: Objection. Steven,
11  you're doing it again, and you're trying to trick the
12  witness into making a statement that you think is the
13  law.
14       MR. BRUCE: You're making a speech
15  objection.
16       MR. BLUMENFELD: Yes, I am.
17       MR. BRUCE: Let him answer the question.
18       MR. BLUMENFELD: Stop asking the witness
19  about what the law is or what you think the law is or
20  what he thinks the law is.
21       MR. BRUCE: Mr. Poulin answered
22  questions.
23       MR. BLUMENFELD: He was an expert
24  witness.
25       MR. BRUCE: He's an expert, too, and this

Page 199

1  is his job, this is what he did for CIGNA.
2       MR. BLUMENFELD: He is not an expert
3  witness.
4       MR. BRUCE: We can ask him the questions.
5       MR. BLUMENFELD: He's a factual witness.
6       MR. BRUCE: He's an expert in his line of
7  work, and we can ask him these questions. If you want
8  to --
9       MR. BLUMENFELD: He wasn't designated by
10  us as an expert.
11       MR. BRUCE: If you want to put in a
12  petition to have me pay for some of his time as an
13  expert, I'll be more than happy to pay for it.
14       MR. BLUMENFELD: He hasn't been
15  designated by you or us as an expert.
16       MR. BRUCE: He's allowed to testify
17  because his line of work is as an expert. He's a
18  pension actuary.
19       Can we read him back the question?
20       (Question read by Court Reporter)
21       THE WITNESS: It's --
22       MR. BLUMENFELD: He's not showing you
23  anything.
24       MR. BRUCE: I was just putting those
25  back, I'm sorry.

Page 200

1       THE WITNESS: It's the wearaway concept.
2  There's two different benefit structures, and one is
3  different than the other, no different than changing an
4  accrual freight 2 percent times years to 1 percent times
5  years.
6  BY MR. BRUCE:
7    Q   Okay. And your understanding is that the
8  wearaway concept is legal in all situations, is that
9  fair to say?
10       MR. BLUMENFELD: Objection.
11  BY MR. BRUCE:
12    Q   Well, is it your understanding that the
13  wearaway, that wearaway is legal in certain situations?
14    A   I would suggest yes, but I'm not an attorney,
15  and you've wrapped it in the blanket of what's legal and
16  what's not.
17    Q   Well, you said that this was all part of the
18  wearaway concept, as if that answered the question. So
19  I'm asking you why does that answer the question for you
20  of whether these benefits are conditional or
21  unconditional?
22       MR. BLUMENFELD: Objection.
23       THE WITNESS: Because prior to this
24  discussion I would have thought that it was totally in
25  the purview of a plan sponsor to modify their plan as

Page 201

1  they saw fit and create a wearaway environment.
2       MR. BLUMENFELD: Mr. Bruce, who is an
3  attorney, is not suggesting otherwise, he's just asking
4  you questions.
5       MR. BRUCE: Mr. Blumenfeld --
6       MR. BLUMENFELD: Yes.
7       MR. BRUCE: Why don't you coach him at a
8  break or something, rather than -- I mean that's just so
9  obvious for the record that it's going to look awful for
10  you, but go ahead.
11       MR. BLUMENFELD: I'm sorry you think so.
12  If you're going to keep asking the witness what's legal
13  and what's not legal, I'm going to note my objections,
14  and if you're going to keep implying that by asking
15  questions you're stating what the law is, and the
16  witness is supposed to rely on that, then I'm going to
17  make my objections clear on the record with regard to
18  that.
19  BY MR. BRUCE:
20    Q   So it was your understanding that there were
21  no situations in which the wearaway concept might be
22  illegal, is that right?
23       MR. BLUMENFELD: Objection.
24       THE WITNESS: I can't think of any off
25  the top of my head.

51 (Pages 198 to 201)

a2650c7a-bd5a-45b5-9dc7-f216aadb7ac

6/29/2003                                                          Andrew B. Hodges

Page 202

1    Q   Well, are there any situations in which A plus
2  B is required?
3    A   Not that I'm aware of.
4        MR. BLUMENFELD: Objection.
5  BY MR. BRUCE:
6    Q   So if someone has a benefit of a thousand
7  dollars a month, already at the end of 1997, you think
8  that, and the company says that we have an accrual
9  formula which is adding, you know, 1 percent of pay to
10 your benefits, you think there's no situations when the
11 company may be required to actually add benefits?
12       MR. BLUMENFELD: Objection.  When you say
13 required, Steven, are you talking about required by law?
14       MR. BRUCE: He can answer.
15       THE WITNESS: I'm simply not aware of any
16 off the top of my head.
17 BY MR. BRUCE:
18   Q   And in a defined contribution, you are aware
19 of defined contribution plan rules, right?
20   A   Peripherally.
21   Q   And if you have an account for someone that
22 has $10,000 in it at the end of 1997, and you tell them
23 that you're contributing 1 percent of their pay to that
24 defined contribution account, can you think of any
25 situations where when the company can get out of that

Page 203

1  promise?
2    A   I would suspect prospectively with some
3  advanced notice requirement being satisfied.
4    Q   Well, they can't just wear it away based on
5  the amount that the person already has?
6    A   I'm not, I don't understand the question.
7        MR. BLUMENFELD: Objection.
8  BY MR. BRUCE:
9    Q   Well, if someone under a defined contribution
10 plan, if someone has a defined amount in their account,
11 if they have $10,000, and in 1998 the company is
12 supposed to contribute another thousand dollars, are
13 there any wearaway rules allowed there?
14   A   Certainly not an expert on these rules.
15       MR. BLUMENFELD: Objection.
16       THE WITNESS: And I would highly
17 speculate no, that it's a promise that you must honor.
18 BY MR. BRUCE:
19   Q   And if you have, if somebody has accrued an
20 annuity benefit of $10,000 per year at the end of 1997,
21 and the company says that it's going to contribute
22 another thousand dollars per year for 1998, where do you
23 understand that there's ability to wear that thousand
24 dollars away?
25       MR. BLUMENFELD: Objection.

Page 204

1  BY MR. BRUCE:
2    Q   Where does that come from?
3    A   Sounds like you're dealing with a designed A
4  plus B scenario, and therefore, you know, if the
5  benefits accrue, the benefits accrue.
6    Q   In addition to A?
7    A   Right.
8    Q   And it's your understanding was that under
9  ERISA, that that is never required?
10       MR. BLUMENFELD: Objection.
11 BY MR. BRUCE:
12   Q   I'm not asking you whether it's always
13 illegal, I'm saying your understanding is that it's
14 never illegal?
15   A   In response to that question --
16       MR. BLUMENFELD: Objection, asked and
17 answered.
18 BY MR. BRUCE:
19   Q   Go ahead.
20   A   Just off the top of my head, I cannot think of
21 a scenario for which that's the case, but that's with
22 ten seconds of reflection.
23       (Exhibit 48, list of pension plan
24       participants, marked for identification)
25   Q   Let me show you Exhibit 48, and I'll tell you

Page 205

1  that this is the first two pages of a printout that
2  CIGNA produced, or CIGNA's attorneys produced for us,
3  which was over 2,000 pages long, and there was no cover
4  attached to it or anything, and I don't know whether
5  this was part of the CD that you burned or whether it
6  came from someone else, so I wanted to know whether you
7  could identify this printout?
8    A   I have no idea.
9    Q   Well, it appears to be social security
10 numbers, dates of birth, date of hire, age at hire.  Is
11 this a population list of everyone who's passed through
12 this pension plan?
13   A   I don't recall seeing this document.  I have
14 no idea what this is.
15   Q   Did you produce any really voluminous
16 databases as a part of your production?
17   A   No.  I wish I could help you, but I don't know
18 where this came from.
19       MR. BRUCE: Number 49.
20       (Exhibit 49, packet of papers relating
21       to Robert Upton, marked for identification)
22 BY MR. BRUCE:
23   Q   Exhibit 49 is a packet of papers related to
24 Robert Upton, who I asked you about earlier, who I
25 believe is a lawyer for CIGNA, and the packet of papers

52 (Pages 202 to 205)

Brandon Smith Reporting Service

a2650c7a-bd5a-45b5-9dc7-f216aadb7aca

Amara vs Cigna

6/29/2003                                                      Andrew B. Hodges

Page 294

```
1              JURAT
2
3
4       I, ANDREW HODGES, do hereby certify that
5   the foregoing testimony given by me on June 29, 2003, is
6   true and accurate, including any corrections noted on
7   the corrections page, to the best of my knowledge and
8   belief.
9
10
11
12                    _____
13              ANDREW HODGES
14
15
16
17      At          in said County of
18   , this      day of         , 2003,
19   personally appeared ANDREW HODGES, and he/she made oath
20   to the truth of the foregoing corrections by him/her
21   subscribed.
22
23   Before me,              , Notary Public
24
25          My Commission Expires:
```

Page 296

```
1   STATE OF CONNECTICUT
2      I, WENDY J. ALLEN, a Registered Professional
       Reporter/Commissioner within and for the State of
3      Connecticut, do hereby certify that I took the
       deposition of Andrew Hodges, on June 29, 2003, at the
4      offices of Moukawsher & Walsh, LLC, 21 Oak Street, Suite
       209, Hartford, Connecticut, Connecticut.
5
       I further certify that the above named deponent was
6   by me first duly sworn to testify to the truth, the
    whole truth and nothing but the truth concerning his/her
7   knowledge in the matter of the case of Janis Amara
    versus CIGNA Corporation, now pending in the United
8   States District Court, District of Connecticut.
9      I further certify that the within testimony was
    taken by me stenographically and reduced to typewritten
10  form under my direction by means of COMPUTER ASSISTED
    TRANSCRIPTION; and I further certify that said
11  deposition is a true record of the testimony given by
    said witness.
12
       I further certify that I am neither counsel for,
13  related to, nor employed by any of the parties to the
    action in which this deposition was taken; and further,
14  that I am not a relative or employee of any attorney or
    counsel employed by the parties hereto, nor financially
15  or otherwise interested in the outcome of the action.
16     WITNESS my hand and seal this 25th day of
    July, 2003.
17
18
19           _____
             Wendy J. Allen, RPR
20             Commissioner
21  My commission expires
    July 27, 2005
22
23
24
25
```

Page 295

```
1      TRANSCRIPT CORRECTIONS
2
       REPORTER: WENDY ALLEN
3
    CASE STYLE: JANIS AMARA
4             VS
         CIGNA CORPORATION
5
6   PAGE   LINE      CORRECTION
7
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24        NAME:_____
25        DATE:_____
```

Page 297

```
1
2
3
    July 25, 2003
4
    Jeremy P. Blumenfeld, Esq.
5   Morgan Lewis
    1701 Market Street
6   Philadelphia, PA 19103-2921
7
8   Dear Attorney Blumenfeld:
9   Enclosed please find your copy of the deposition of
    Andrew Hodges, taken on June 29, 2003.
10
    The original jurat and errata sheets are also enclosed.
11  Please note that the witness is allowed 30 days to read
    and sign the deposition as the rules provide.
12
    Please return only the original notarized jurat and
13  errata sheets to Attorney Bruce for filing. Thank you
    for your prompt attention to this matter.
14
    If you have any questions please call me.
15
    Sincerely yours,
16
17
    Wendy J. Allen, RMR, CRR, 00221
18  Court Reporter
19
20
21
22
23
24
25
```

75 (Pages 294 to 297)

Brandon Smith Reporting Service

EXHIBIT
29

# Philadelphia Team Members

Routing: TL42F
Fax: 5.5524

HR&S Manager: Suzanne Ash                Systems Manager: Ed Young

| Name | Role/Responsibilities |
|---|---|
| Betty Barker<br><br>Phone: 5.6977 | **Project Manager**<br>1. Bring project to completion in the time agreed upon and within the budget allowed<br>2. Remove obstacles that slow down progress<br>3. Provide guidance and encouragement to team members<br>4. Coordinate effort with DBS Project Manager<br>5. Manage expectations. |
| Diane Lastinec<br><br>Phone: 5.8772 | **Project Lead / Benefits Consultant**<br>1. Assist project manager with maintaining the various project activities.<br>2. Consult with Data Management, Systems and Retirement Services staff to develop and submit system specifications and business requirements.<br>3. Lead test efforts on all Wyatt system and CBMS changes ensuring accuracy of data. |
| Sandy Daukaus<br><br>Phone: 5.6753 | **System Consultant**<br>1. Consult on business requirements for conversion of data elements from Pension Express system to DBS system.<br>2. Develop method to transfer data between from Wyatt Systems to DBS system.<br>3. Lead Total Comp Report efforts to include assisting in the development of the document, data to be included, running test files with all data required to produce TCR, running the actual accrued pension benefit calculationed, verifying enhancements to Wyatt system to capture data to be produced on the TCR, sending accrued pension benefit to Andy Hodges to prepare Lump Sum values for participants moving to the Cash Balance Plan.<br>4. Test Tier I and Tier II benefit calculation systems |
| Terry Kane<br><br>Phone: 5.2216 | **Data Management Support**<br>1. Assist in the development of enhancements to the Wyatt System.<br>2. Assist in the Data Preparation work efforts to ensure data in ready to run through the accrued benefit calculation.<br>3. Consult with Plan Design to confirm data requirements.<br>4. Assist in the test efforts to confirm system calculation of pension benefits<br>5. Audit all data to be converted to DBS. |
| David Durham<br><br>Phone: 5.2556 | **Plan Design**<br>1. Develop Cash Balance Plan Design and detailed specifications.<br>2. Provide guidance on establishing new Cash Balance Pension Plan for CIGNA participants that qualify.<br>3. Ensure the new Cash Balance Pension Plan being developed is in compliance with IRS rulings, calculation methodology is accurate and pension calculation formula's are accurate.<br>4. Oversee that employee communications are generated timely and the information provided is accurate.<br>5. Lead re-write work effort on TCR report and secure vendor.<br>6. Oversee all aspects of changes to DB Pension Plan.<br>7. Approve all processes, procedures, communications and system output in place for Pension Program. |
| John Arko<br><br>Phone: 5.2562 | **Plan Design**<br>1. Ensure all Pension Program changes are in agreement and approved by Plan Administrator.<br>2. Attend all Project Team Meeting's and all sub-group meetings to address any IRS and compliance issues that surface.<br>3. Provide feedback on revisions required to SPD. |
| Regina Forrence<br><br>Phone: 2.2302 | **Lead CBMS Systems Designer**<br>1. Lead the design of all CBMS changes required to support enhancement to the current CIGNA's DB Pension Plan and new Cash Balance Plan.<br>2. Attend all Project Team Meetings and all sub-group meetings as required.<br>3. Assist in the design of the conversion program moving Wynen data to DBS.<br>4. Deliver agreed upon data file feeds on determined frequency to DBS |

# Philadelphia Team Members

Routing: TL42F
Fax: 5.5524

| HR&S Manager: Suzanne Ash | Systems Manager: Ed Young |
|---|---|

| Name | Role/Responsibilities |
|---|---|
| Ania Czaklosz<br><br>Phone: 5.2199 | **Manager – Retirement Services**<br>1. Review and provide input on administrative processes and procedures being outsourced to DBS.<br>2. Attend all Project Team Meetings and all sub-group meetings as required.<br>3. Provide guidance to staff on Data Preparation Project to prepare records for the 12/31/97 accrued benefit calculations and the data file conversion activity by 7/15/98.<br>4. Support test efforts on Wyatt system/ CBMS and CBN as needed.<br>5. Develop/document procedures for the remaining Retirement Services processes. |
| Jackie Mazzoni<br><br>Phone: 5.2212 | **Director – Benefit Specialties**<br>1. Provide direction on Retirement Services activities transferring to DBS and remaining in Philadelphia.<br>2. Attend Project Team Meetings to provide direction on various project activities, workflows and business requirements.<br>3. Approve all changes-impacting Retirement Services processing activities, communications to be generated/received and call flows. |
| David Wildfeuer<br><br>Phone: 5.4658 | **Director – Benefit Services**<br>1. Provide direction on participant call flow in and out of Signature Benefits Services.<br>2. Provide direction on all CBN activities that will/may be impacted.<br>3. Attend Project Team Meetings to provide direction on various project activities, workflows and business requirements.<br>4. Approve all changes impacting Signature Benefits Services processing activities, communications to be generated/received and call flows. |
| Denise Hil<br><br>Phone: 5.6813 | **Director – Benefits Communications**<br>1. Develop employee communications regarding upcoming benefit changes to include new Cash Balance Pension Plan.<br>2. Ensure that employee communications information is accurate, reviewed and generated on establish target date.<br>3. Oversee the development of the required changes to the SPD, review and distribution to employees. |
| Denise Lang<br><br>Phone: 5.2162 | **Benefits Analyst – HR Communications and Special Projects**<br>1. Lead the development of new communication letters and forms to be used (in fulfillment packages or other) for the remaining DB Pension Plan and the new Cash Balance Plan.<br>2. Work with DBS to revise letters and forms used in the current DBS fulfillment package via vendor SalesLink.<br>3. Attend all Project Team Meetings to provide support on various project activities surrounding communications to participants. |

D13421



D13422

# DBS Team Members

Routing: H17A
Fax: 2.3297

DBS Manager: Pat Flaherty    Systems Manager: Carl Berquist

| Name | Role/Responsibilities |
|---|---|
| Kathy Lepp<br><br>Phone: 2.4671 | **Project Manager**<br>1. Bring project to completion in the time agreed upon and within the budget allowed<br>2. Remove obstacles that slow down progress<br>3. Provide guidance and encouragement to team members<br>4. Coordinate effort with Philadelphia Project Manager<br>5. Manage expectations. |
| Janet Van Deusen<br><br>Phone: 2.2434 | **Assistant Project Manager**<br>1. Coordinate delivery of documentation (Business Requirements, WHW, fulfillment, etc)<br>2. Consult with Outsourcing Administration Manager on internal outsourcing processess<br>3. Consult with Business Analyst and Lead Systems Designer on compliance and related issues |
| Doug Battaglini<br><br>Phone: 2.2759 | **Business Analyst**<br>1. Coordinate systems workflow between Philadelphia and Hartford<br>2. Consult on business requirements for DBRK<br>3. Develop methods of data transfer between CBMS and benefit calculation system<br>4. Test Tier I and Tier II benefit calculation systems |
| Joanne Fuller<br><br>Phone: 2.2490 | **Lead Valuation Analyst**<br>1. Develop benefit calculation specifications for Tier I<br>2. Consult with Lead Systems Designer on Tier I system requirements<br>3. Prepare information for Total Comp Report<br>4. Test Tier I benefit calculation system |
| Andy Hodges<br><br>Phone: 2.2712 | **Consulting Actuary**<br>1. Develop benefit calculation specifications for Tier II<br>2. Convert accrued balances of Tier II participants to beginning account balance<br>3. Consult with Lead Systems Designer on Tier II system requirements<br>4. Consult with Philadelphia on plan design<br>5. Test Tier II Benefit Calculation System |
| Barbara Rodegher<br><br>Phone: 2.2741 | **Outsourcing Administration Manager**<br>1. Develop administrative processes and workflow for Plan Specialists and Retirement Service Center.<br>2. Provide training for Plan Specialists on CIGNA plan provisions, benefit calculations, and payment procedures.<br>3. Oversee fulfillment processing<br>4. Contribute to development of transition communications |
| Brian Dutton<br><br>Phone: 2.3136 | **Lead Systems Designer**<br>1. Design Tier I and Tier II Benefit Calculation Systems<br>2. Deliver agreed upon ancillary capabilities including data feed to SalesLink for fulfillment packages and quarterly cash balance statements.<br>3. Design conversion program for Wypen data transfer<br>4. Deliver agreed upon incoming data transfer and fulfillment capabilities |

D13423