<u>Amara v. CIGNA</u>, Case No. 01-2361 (MRK)

# EXHIBIT 244

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANICE C. AMARA, GISELA R. BRODERICK, ANNETTE S. GLANZ individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>vs.<br><br>CIGNA Corp. and CIGNA Pension Plan,<br><br>           Defendants. | Civil. No. 3:01-CV-2361 (MRK)<br><br>April 19, 2006 |

**PLAINTIFF STEPHEN D. CURLEE'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO HIM**

**General Objections**

Plaintiff objects to Defendant CIGNA's Interrogatories on the following grounds:

1. Absent leave of Court, FRCP 33 limits interrogatories to 25 questions, "including all discrete subparts." Through compound questions with "discrete subparts," CIGNA has posed in excess of the permissible number of interrogatories.

2. CIGNA's Interrogatories ask for legal contentions, even though absent class members do not "contend" anything directly. They are members of the class on whose behalf the named Plaintiffs make legal contentions.

3. CIGNA's Interrogatories repeatedly refer to the attached Exhibits A, B, and C as containing the November 1997 Newsletter, 1998 Summary Plan Description and 1999 Summary Plan Description. The exhibits contain only one page of text from a 19-page 1998 SPD and two pages from the 1999 SPD, and only every other page from the November 1997 Newsletter.

4. CIGNA's Interrogatories repeatedly refer to the term "misleading" without explaining the legal meaning of this term when there is a duty to disclose.

5. CIGNA's Requests for Admission repeatedly refer to the terms "harm or prejudice" without explaining the legal meaning of these terms and without explaining the "likely prejudice" standard that applies in the Second Circuit.

Each response below is made subject to the foregoing General Objections, regardless of whether a specific objection is stated in the particular response.

If Plaintiff learns of or uncovers additional information, he reserves the right to supplement or change these responses.

1. For each Request for Admission directed to you by CIGNA that you did not admit without qualification, please explain in detail the basis for your response.

**ANSWER:** The multi-part Interrogatories set out below which cover each Request for Admission repeat this Interrogatory. Accordingly, my answers are provided below in response to the more specific Interrogatories.

2. For each Request for Admission directed to you by CIGNA that you did not admit without qualification, please identify any and all documents that support or relate or refer to your response.

**ANSWER:** The multi-part Interrogatories set out below which cover each Request for Admission repeat this Interrogatory. Accordingly, my answers are provided below in response to the more specific Interrogatories.

3. If you did not admit without qualification Request for Admission No. 1, 2, or 3, please describe in detail:

a. The language in the newsletter that you believe was misleading or inaccurate;
b. Each and every way in which you were harmed or prejudiced, including the damages, and calculations of damages, you suffered as a result of such harm;
c. When you suffered such harm or prejudice;
d. Whether such harm or prejudice is ongoing;
e. Any and all documents related to such harm or prejudice;
f.. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:** The November 1997 Newsletter did not inform me that the new cash balance plan would reduce my retirement benefits. The statements in the "Message from CEO Bill Taylor" that CIGNA will "significantly enhance" the retirement program and that the "enhancements will make our retirement program highly competitive" are inaccurate, incomplete, and misleading. The statement on page 1 that the new plan "is similar to the current pension plan" is misleading. The statement on page 2 that "The new Retirement Plan provides the same benefit security as current Pension Plan" is also misleading and inaccurate. When people see that type of language about the new plan, they are led to believe that everything is okay. The Newsletter goes back and forth between discussing the Retirement Plan and the SIP and the combination of the two, which is confusing because the old plan was always a separate benefit from our 401(k) plan. The Newsletter did not tell me about a significant reduction in my rate of benefit accrual under the new plan. Page 4 of the Newsletter also says that "One advantage the company *will not* get from the retirement program changes is cost savings," which is also misleading and inaccurate. If our

3

benefits are reduced compared to the prior plan, CIGNA is clearly saving money. Page 4 also states that employees in focus groups found the old plan difficult to understand, which is contradictory to what I believed and what I heard from other employees.

  Page 2 of the Newsletter says that employees with more than 45 age and service points will stay in the old plan because switching them to the new plan could jeopardize their retirement plans. I was switched to the cash balance plan even though I had well over 45 age and service points at the time of the conversion. I was originally an Equicor (formerly Equitable) employee until CIGNA purchased Equicor in March 1990 and I was placed into CIGNA's "Tier 2" formula. By the end of 1997, I had accumulated eighteen years of vesting service because I had been working for Equicor since December 1979. But, despite crediting my vesting service since 1979, CIGNA said that my hire date, and the hire date for all other Equicor employees, was only January 1, 1989. Employees like me were switched to the cash balance plan even though we had over 45 age and service points, simply because CIGNA made an artificial decision about our hire dates. It wasn't fair to put me in the new plan, since other Equicor employees who retired before the cash balance formula was implemented are able to enjoy their pension benefits under the prior plan.

  After the conversion, there were conversations among former Equicor associates about the unfair pension changes. A few of the employees suspected that their benefits were being reduced. However, the Newsletter and other documents from CIGNA made it sound like everything was okay. When CIGNA told me what my opening account balance was, it seemed low on its face, but it was difficult to do an apples to apples comparison with my prior benefits. I could not confirm that my benefits were being reduced or how significant these reductions were

until I heard about this lawsuit sometime in 2003. I still do not really know the extent of the reductions.

CIGNA's communications simply did not give me the facts to assess the financial impact of the conversion to cash balance on my retirement benefits. If the employees, including myself, had been told beforehand how much our benefits were going to be reduced under the cash balance plan, we could have complained about it to our managers. I would have established a dialogue with my manager as far as what I could have done to make up for the difference in benefits. I could have made adjustments to my financial plans, like increase my 401(k) contributions to the maximum amount, especially since I had decreased my contributions at various times during my employment. I could have also saved more money and contributed more of my income to an IRA. Up to the time of the conversion, I had worked for CIGNA for seven years under the assumption that I was in the traditional pension plan, which was very significant to me. If CIGNA had disclosed the reductions, I could have moved to a different company with better compensation and benefits.

The method for computing the damages and/or equitable relief sought has been set out in the March 8, 2004 Answers to the Second Set of Interrogatories from CIGNA (see the Answers to Interrogatory Nos. 1-9) and in Mr. Poulin's Supplemental Declaration dated January 3, 2006. In terms of Mr. Curlee's individual benefits, Mr. Poulin estimates that a return to the Part A Tier 2 formula, sought as relief for the violations in Counts II and IV, would increase his annuity benefits, as of the end of 2004, from approximately $2,510 per month at age 65 under cash balance to $3,687 per month (based on final average earnings of $226,910 over the 36 months from 1998-2000, 13 years of credited service, and a net accrual rate under the Tier 2 formula of

1.5%). In addition, Mr. Curlee would have been eligible for early retirement benefits, including a Social Security supplement to age 62, under the Part A Tier 2 provisions.

A rate of benefit accrual that is not reduced because of age would offer him an annuity of $3,132 per month at age 65, applying the 1.79% accrual rate that Actuary Poulin found for younger employees to Mr. Curlee's cumulative 1998-2004 salary of $1,237,776 and adding that to the $1,286 annuity that he had at the start of 1998.

The documents related to Mr. Curlee's pension benefits are identified in response to Document Request No. 1.

4. If you did not admit without qualification Request for Admission No. 4, 5, or 6, please describe in detail:

   a. The language in the newsletter that you believe should have been included;

   b. Each and every way in which you were harmed or prejudiced, including the damages, and calculations of damages, you suffered as a result of such harm or prejudice;

   c. When you suffered such harm or prejudice;

   d. Whether such harm or prejudice is ongoing;

   e. Any and all documents related to such harm or prejudice;

   f. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:** See my answer to Interrogatory No. 3. The Newsletter failed to identify any of the disadvantages of cash balance, including any periods of time where no additional retirement benefits would be earned, reductions in future accruals, and the elimination of the valuable early retirement benefits. CIGNA did not disclose how the opening account balances were calculated,

6

including that a pre-retirement mortality discount had been applied or that early retirement benefits were not included in the values. I could not do an apples to apples comparison between my cash balance benefits and my benefits under CIGNA's old plan.

As described in the response to Interrogatory No. 3, if I had known about how much my benefits were being reduced, I could have taken steps to protect myself, including expressing my dissatisfaction about the changes and making better-informed savings and employment decisions.

5. If you did not admit without qualification Request for Admission No. 7, 8, or 9, please describe in detail:

   a. The language of the 1998 SPD for Part B that you believe was misleading or inaccurate;

   b. Each and every way in which you were harmed or prejudiced, including the damages, and calculations of damages, you suffered as a result of such harm or prejudice;

   c. When you suffered such harm or prejudice;

   d. Whether such harm or prejudice is ongoing;

   e. Any and all documents related to such harm or prejudice;

   f. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:** Neither the 1998 nor the 1999 SPD says that your benefit accruals would be reduced under the cash balance plan and neither describes any periods of time where a participant does not earn any additional benefits. The SPD simply articulates how the cash balance plan works, without comparing it to the old plan. I could not perform comparative calculations with the prior benefit formula to determine how much I had lost. The SPD represents that "each dollar's worth of credit is a dollar of retirement benefits payable to you" and that my benefit "will

grow steadily throughout [my] career as credits are added" to the account, which is also misleading.

As described above in response to Interrogatory No. 3, if I had been given adequate information about the benefit reductions and other disadvantages under cash balance, I could have taken steps to protect myself.

6. If you did not admit without qualification Request for Admission No. 10, 11, or 12, please describe in detail:

   a. The language in the 1998 SPD for Part B that you believe should have been included;

   b. Each and every way in which you were harmed or prejudiced, including the damages, and calculations of damages, you suffered as a result of such harm or prejudice;

   c. When you suffered such harm or prejudice;

   d. Whether such harm or prejudice is ongoing;

   e. Any and all documents related to such harm or prejudice;

   f. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:** See my answer to Interrogatory No. 5.

7. If you did not admit without qualification Request for Admission No. 13, 14, or 15, please describe in detail:

   a. The language of the 1999 SPD for Part B that you believe was misleading or inaccurate;

   b. Each and every way in which you were harmed or prejudiced, including the damages, and calculations of damages, you suffered as a result of such harm or prejudice;

   c. When you suffered such harm or prejudice;

   d. Whether such harm or prejudice is ongoing;

   e. Any and all documents related to such harm or prejudice;

   f. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:**   See my answer to Interrogatory No. 5. As far as I can tell, the language in the 1999 SPD seems the same as the 1998 SPD.

   8. If you did not admit without qualification Request for Admission No. 16, 17, or 18, please describe in detail:

   a. The language in the 1999 SPD for Part B that you believe should have been included;

   b. Each and every way in which you were harmed or prejudiced, including the damages, and calculations of damages, you suffered as a result of such harm or prejudice;

   c. When you suffered such harm or prejudice;

   d. Whether such harm or prejudice is ongoing;

   e. Any and all documents related to such harm or prejudice;

   f. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:**   See my answer to Interrogatory Nos. 3, 5 and 7.

   9. If you did not admit without qualification Request for Admission No. 19 or 20, please describe in detail:

   a. The written or oral disclosures (e.g., newsletters, SPDs, pamphlets, booklets, policies, etc.) from CIGNA regarding pension benefits that you contend were false, inaccurate or misleading.

    b. Each and every way in which you were harmed or prejudiced by such disclosures, including the damages, and calculations of damages, you suffered as a result of such harm or prejudice;

    c. When you suffered such harm or prejudice;

    d. Whether such harm or prejudice is ongoing;

    e. Any and all documents related to such harm or prejudice;

    f. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:** See my answers above. In December 1997, I received a "Retirement Information Kit" which included documents entitled "Transition to the New Retirement Plan," "Q&A on the Retirement Program," and "Your CIGNA Retirement Program." The Information Kit tells you something about how the cash balance plan works but again does not compare the new plan with your benefits under the old plan. Page 5 of "Transition to the New Retirement Plan" discusses a "special conversion formula for older, longer-service employees"; if this formula had to be adopted to ensure that these employees "receive fair and adequate benefits at retirement," CIGNA should have kept us in the old plan. On page 2 of the "Q&A on the Retirement Program," a question asks "Why is CIGNA changing the retirement program," and the answer portrays the change as being positive even though the retirement benefits of employees, including myself, were being reduced. On Page 3, which asks "Why are some employees not affected by the pension changes," the answer says that "to be fair, we will maintain these employees in the current plan." Since I had more than 45 age and service points, it was fair to keep me in the current Plan, too.

    I also received "Total Compensation Reports" from CIGNA each year. I believe these reports were used to show the employees all of the benefits that were available to them. The

Total Compensation Reports that I received after the cash balance conversion seemed to be more forthright about the amounts and sources of income I had for retirement than my prior reports.

10. If you did not admit without qualification Request for Admission No. 21 or 22, please describe in detail:

   a. The written or oral disclosures that you contend CIGNA should have made, but did not.

   b. Each and every way in which you were harmed or prejudiced by CIGNA not making such disclosures, including the damages, and calculations of damages, you suffered as a result of such harm or prejudice;

   c. When you suffered such harm or prejudice;

   d. Whether such harm or prejudice is ongoing;

   e. Any and all documents related to such harm or prejudice;

   f. Any and all individuals with knowledge about such harm or prejudice.

**ANSWER:** As stated in my answers to Interrogatory Nos. 3 and 4, CIGNA should have disclosed all relevant information about the cash balance plan, including the disadvantages and the formulas for calculating opening account balances and future benefits, so a participant could figure out what the change in pension formulas and features meant to him or her. CIGNA should have told us if benefits were going to be reduced under the new plan so we could express dissatisfaction and make savings and employment decisions with full information.

11. If, in response to any of the previous interrogatories, you indicated that you were harmed or prejudiced in any way regarding your finances or retirement planning, please identify

11

on the chart below each asset and liability of you and your spouse, for the period of time **one (1) year before through one (1) year after the date of each and every** harm or prejudice you suffered and identify documents sufficient to confirm the information contained in your response. Treat the following kinds of assets and liabilities together (e.g., treat all bank accounts as one asset):

Assets
- Savings, checking, and other banking accounts
- Certificates of deposit
- Mutual funds, stocks, bonds, and other similar investments
- Home
- Real estate (other than your home)

Liabilities
- Mortgages
- Loans
- Credit card debt

Do not include in your assets any funds held in a spendthrift or irrevocable trust.

**ANSWER:** Objection: Relevance, overbreadth, undue burden, annoyance, and oppression.

| Type of Asset | Amount |
| --- | --- |
| Savings, checking, and other banking accounts | $20,000 |
| Certificates of deposit | None |
| Mutual funds, stocks, bonds, and other similar investments | $550,000 |
| Home | $500,000 |
| Real estate (other than your home) | None |
| Other assets (identify): | None |
|  |  |
| **Type of Liability** | **Amount** |
| Mortgages | $1,660/month |
| Loans | None |

| Credit card debt | None |
|---|---|
| Other liabilities (identify): | None |
|  |  |

(Attach additional sheets if necessary).

12. If, in response to any of the previous interrogatories, you indicated that you were harmed or prejudiced in any way regarding your finances or retirement planning, please identify in the chart below all sources of income (including but not limited to jobs, self-employment, investments, Social Security payments, gifts, inheritances, and pension benefits) to you and your spouse that provided you and your spouse with $1,000 or more for the period of time **one (1) year before through one (1) year after the date of each and every** harm or prejudice you suffered and identify documents sufficient to confirm the information contained in your response.

**ANSWER:** Objection: Relevance, overbreadth, undue burden, annoyance, and oppression. Subject to those objections, my response to Document Request No. 1 includes all the documents I have located about my retirement benefits from CIGNA. CIGNA already possesses my W-2's and other information related to my salary, bonuses, and 401k contributions and balance.

After my job at CIGNA was abolished in 2003, I began working for AIM Healthcare Services, Inc. from September 2003 to November 2004. Since then I have been drawing on my 401(k) account as income. I also took a lump sum distribution of my pension in July 2004 and rolled that amount into an IRA. Since November 2005, I have been self-employed but I continue to rely on my 401(k). As of April 6, 2006, I have been in a precontractual phase of employment with AXA Advisors LLC.

| Year | Source of Income | Amount |
|---|---|---|
| 2003 | Final salary at CIGNA | $ 181,944 |

|  | SS benefits at age 62 | $ 1,562/month |
|  | SS benefits at age 66 | $ 2,140/month |
|  | CIGNA 401(k) | $ 20,000 |
|  |  |  |

13. If, in response to any of the previous interrogatories, you indicated that you were harmed or prejudiced in any way regarding your finances or retirement planning, please identify your and your spouse's federal tax returns for the period of time **one (1) year before through one (1) year after the date of each and every** harm or prejudice you suffered.

**ANSWER:**   Objection: Relevance, overbreadth, undue burden, annoyance, and oppression.

14. If, in response to any of the previous interrogatories, you indicated that you were harmed or prejudiced in any way regarding your finances or retirement planning, please identify any financial planners or accountants with whom you consulted during the period of time **one (1) year before through one (1) year after the date of each and every** harm or prejudice you suffered and also:

    a.    Identify where was the financial planner located?

    b.    Identify any documents prepared or generated by you, your spouse, your financial planner or accountant related to your financial circumstances during the period of time **one (1) year before through one (1) year after the date of each and every** harm or prejudice you suffered.

**ANSWER:**   I began meeting with a financial advisor in Nashville approximately two years ago regarding my investments. We have not discussed anything related to my pension with CIGNA, other than his advice to take a lump sum distribution of my cash balance account and

14

roll over the amount into my IRA. I do not have any documents prepared by me or my financial planner related to my financial circumstances.

15. Did you sign a release or waiver of claims in connection with your employment with CIGNA, including but not limited to any claims for severance pay?

**ANSWER:** Yes.

Dated: April 19, 2006

*/s/ Stephen R. Bruce*
Stephen R. Bruce ct23534
Suite 210
805 15th St., NW
Washington, DC 20005
(202) 371-8013
stephen.bruce@prodigy.net

Thomas G. Moukawsher ct08940
Ian O. Smith ct24135
Moukawsher & Walsh, LLC
21 Oak Street
Hartford, CT 06106
(860) 278-7000
tmoukawsher@mwlawgroup.com

## VERIFICATION

I, Stephen D. Curlee, hereby state as follows:

1. I am a plaintiff class member in the *Amara v. CIGNA* litigation.

2. Pursuant to 28 U.S.C. §1746, I verify under penalty of perjury that the facts set forth in Plaintiff Stephen D. Curlee's Answers to Defendants' First Set of Interrogatories are true and correct to the best of my knowledge, information and belief.

Dated: April 18, 2006

*[signature]*
Stephen D. Curlee

## CERTIFICATION OF SERVICE

I certify that a copy of the Plaintiff Stephen D. Curlee's Answers to Defendants' First Set of Interrogatories to Him was mailed on this 19th day of April 2006, by first-class U.S. Mail, postage prepaid, to counsel for the Defendants at:

> Joseph J. Costello
> Jeremy P. Blumenfeld
> Jamie M. Kohen
> Morgan, Lewis & Bockius
> 1701 Market St.
> Philadelphia, PA 19103-2921
> (215) 963-5295
>
> James A. Wade
> Erin O'Brien Choquette
> Robinson & Cole, LLP
> 280 Trumbull Street
> Hartford, CT 06103-3597

Dated this 19th day of April, 2006.

*[signature]*
Stephen R. Bruce