## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANICE C. AMARA, | : | |
| GISELA R. BRODERICK, | : | |
| ANNETTE S. GLANZ, | : | |
| individually and on behalf | : | |
| of all others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | Civil No. 3:01-CV-2361 (MRK) |
| | : | |
| CIGNA Corp. and | : | |
| CIGNA Pension Plan, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' POST-TRIAL BRIEF

Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Named Plaintiffs and
Plaintiff Class

# **Table of Contents**

I.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  In a Defined Benefit Plan, the "Accrued Benefit" Is an Annual Benefit
    Commencing at Retirement Age  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  Cash Balance Plans Are Required to Comply With the Rules for
        Defined Benefit Plans  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    B.  CIGNA's Cash Balance Plan Is a Defined Benefit Plan  . . . . . . . . . . 7

III.  CIGNA's Cash Balance Transition Method Produced Years of Service
    with No Additional Benefits in Violation of ERISA's Anti-Backloading
    and Vesting Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    A.  CIGNA Set Up the "Wear-Away" Effect by Converting
        Participants' Accrued Benefits to Opening Account Balances with
        Less Protected and Lower Values and Then Building Future
        Accruals Only on This New Floor  . . . . . . . . . . . . . . . . . . . . . . . . 10
    B.  A Period of Years Where Participants "Accrue No Additional
        Benefits" Violates ERISA's 133⅓% Accrual Rule . . . . . . . . . . . . 15
    C.  Conditioning Future Accruals on Giving Up Statutory Rights to
        Previously-Earned Annuities Violates ERISA's Vesting
        Requirements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.  The Rate of an Employee's Benefit Accrual under CIGNA's Cash
    Balance Formula Decreases With Age. . . . . . . . . . . . . . . . . . . . . . . . . . 28
    A.  CIGNA Recognized Its "Vulnerability" to the Age Discrimination
        Claim Because Its Actuaries Found the "Accrual Rates
        Decline with Increases in Age and Service"  . . . . . . . . . . . . . . . . 30
    B.  Congress Always Uses the Term "Benefit Accrual" to Refer
        to the Increase in the Accrued Benefit.  . . . . . . . . . . . . . . . . . . . . 33
    C.  An Employee's "Benefit Accrual" Under a Defined Benefit Plan
        Does Not Have a Primary and a Secondary Meaning  . . . . . . . . . . 36
    D.  Cash Balance Plans with Graded Pay Credits Can Only Comply
        with the 133⅓% Accrual Rule Based on the Increase in the
        "Accrued Benefit" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    E.  Age Discrimination and the "Time Value of Money" Are Not
        Mutually Exclusive; In a Defined Benefit Plan, Age Discrimination
        Occurs When an Employer Offers Older Employees Lower

Retirement Benefits for a Year of Service than Younger
Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

F.   The Periods of "Wear-Away" Where Neither Accrued Benefits
Nor Imputed Inputs Are Actually Paid to Older Employees Violate
the Age Discrimination Rule.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

V.   CIGNA Violated Its Duty to Disclose Significant Benefit Reductions.  . . 48

A.   CIGNA's Cash Balance Conversion Substantially Reduced
Future Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

B.   Cash Balance Conversions "Mask" Benefit Reductions . . . . . . . . . 55

C.   CIGNA's Communications and the Uncontested Expert Testimony
Show that CIGNA Did Not Disclose Reductions But Instead
Assured Employees that the "New Plan" Offered "Comparable" or
Larger" Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

1.   The Purported Section 204(h) Notice Tells Participants that
the Changes Are "Enhancements" and Does Not Mention
Reductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2.   CIGNA's Summary of Material Modification and SPD
Tell Participants that the Benefits Are "Comparable" or
"Larger" and Do Not Mention Reductions  . . . . . . . . . . . . . 60

D.   CIGNA Deliberately Withheld Accurate Information About the
Effects of the Amendments to Avoid "Any Significant Negative
Reaction from Employees." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

E.   ERISA Section 204(h) Requires Advance Notice of a "Significant
Reduction" in Future Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

F.   No Matter How Narrowly CIGNA Construes Section 204(h), It
Cannot Be Satisfied by Telling Employees that Benefits Are
"Enhanced" When They Are Actually Reduced . . . . . . . . . . . . . . 72

G.   Benefit Reductions Must Also Be "Fully Explained" in
Summaries of Material Modification or Updated Summary Plan
Descriptions    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

H.   Even If There Was No Affirmative Duty to Disclose at the Outset,
CIGNA Had a Fiduciary Duty to "Speak Truthfully" When It
Discussed the Effects of the Cash Balance Changes. .  . . . . . . . . . 77

I.   CIGNA's Disclosures Resulted in "Likely Prejudice" to the
Participants' Ability to Make "Well-Informed Employment and
Retirement Decisions." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

VI.    CIGNA Did Not Disclose the Amendment of Its "Rehire Rule" to Former Employees and Does Not Contest that This Likely Prejudiced Them   . . . 88

VII.   In Violation of Treasury Regulations, Participants and Spouses Were Not Notified When Annuity Options Have Greater "Relative Values" than the Cash Balance Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

       A.    CIGNA Did Not Tell Participants or Spouses When the Cash Balance Accounts Were Worth Less than the Annuity . . . . . . . . . . 95

       B.    As Late as the Month Before Trial, CIGNA Was Withholding Information About the Greater Relative Value of the Part A/Tier 1 Annuities from Participants in the <u>Depenbrock</u> Group . . . . . . . . . 101

VIII.  Complete Relief Including Past Benefits Can Be Provided to the Members of the Class under ERISA §§502(a)(3) and (a)(1)(B) Consistent With <u>Great-West</u> and the Second Circuit's Decisions in <u>Frommert</u> and <u>Swede</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amato v. Western Union International, Inc.*, 773 F.2d 1402 (2d Cir. 1985)   1

*Arizona Committee for Deferred Compensation Plans v. Norris*, 463 U.S. 1073 (1983) .......................................... 43

*Arnett v. CalPERS*, 179 F.3d 690 (9th Cir. 1999), *vacated and remanded on other grounds*, 528 U.S. 1111 (2000) ................................................ 44

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) ................................. 39

*Becker v. Kodak*, 120 F.3d 5 (2d Cir. 1997) ................................ 51

*Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755 (7th Cir. 2003) ..................................................................... *passim*

*Bixler v. Central Pa. Teamsters Health & Wel. Fund*, 12 F.3d 1292 (3d Cir. 1993) ........................................................ 94

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................ 104

*Bryerton v. Verizon Communications, Inc.*, 2007 WL 1120290 (S.D.N.Y. 2007) .............................................. 30, 37

*Burke v. Kodak Retirement Income Plan*, 336 F.3d 103 (2d Cir. 2003), *cert.denied*, 540 U.S. 1105 (2004) ...................................... 76, 79, 86, 94

*Burstein v. Allegheny Health Educ. & Research Fdn. Retirement Acct. Plan*, 2004 WL 2612162 (E.D. Pa. 2004), *on remand from* 334 F.3d 365 (3d Cir. 2003) ................................................. 76

*Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004) ....  1, 24, 106

*Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032 (2d Cir. 1985) ................................................................ 52, 75

iv

*Charles v. Pepco Holdings*, 437 F. Supp. 2d 248 (D.Del. 2006) ............ 9, 14

*In re Citigroup Pension Plan ERISA Litigation*, 470 F. Supp. 2d 323
   (S.D.N.Y. 2006) ............................................................... *passim*

*In re Citigroup Pension Plan ERISA Litigation*, 241 F.R.D. 172
   (S.D.N.Y. 2006) ....................................................... 83, 87, 106

*In re Citigroup Pension Plan ERISA Litigation*, 238 F.R.D. 345
   (S.D.N.Y. 2006) .............................................................. 71, 87

*Connecticut v. Teal*, 457 U.S. 440 (1982) ................................... 47

*Cooper v.  IBM Personal Pension Plan*, 457 F.3d 636
   (7th Cir. 2006) .................................................... 29, 38, 42, 44

*Copeland v. Geddes Federal Sav.*, 62 F.S.2d 673, 678 (N.D.N.Y.1999) .... 69

*Costantino v. TRW*, 13 F.3d 969 (6th Cir. 1994) ........................... 95

*Crosby v. Bowater*, 212 F.R.D. 350 (W.D. Mich. 2002), *vacated and
   remanded on other grounds*, 382 F.3d 587 (6th Cir. 2004) .................. 11

*Davis v. Adelphia*, 475 F. Supp. 2d 600 (W.D.Va. 2007) ......................... 94

*Depenbrock v. CIGNA Corp.*, 389 F.3d 78 (3d Cir. 2004) .............. 1, 13, 89

*District Council 37, AFSME v. NY City Department of Parks*, 113 F.3d
   347 (2d Cir. 1997) ................................................................ 47

*Drutis v. Quebecor*, 459 F. Supp. 2d 580 (E.D.Ky. 2006) ......................... 30

*EEOC v. Jefferson Co. Sheriffs' Department*, 467 F.3d 571 (6th Cir.
   2006) ............................................................................ 43

*Eaton v. Onan Corp.*, 117 F. Supp. 2d 812 (S.D.Ind. 2000) ............. 8, 30, 37

*Eddy v. Colonial Life Insurance Co.*, 919 F.2d 747 (D.C. Cir. 1990) ........ 48

v

*Engers v. AT&T*, 2007 WL 14585 (D.N.J. 2007) .......................................... 9

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000) ....................... *passim*

*Finley v. Dun and Bradstreet Corp.*, 471 F. Supp. 2d 485 (D.N.J. 2007) ...................................................................................... 30, 37

*Flanigan v. GE*, 242 F.3d 78 (2d Cir. 2001) ............................................... 79

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006) ........................ *passim*

*Gediman v. Anheuser-Busch*, 299 F.2d 537 (2d Cir. 1962) ....................... 95

*Geissal v. Moore Medical Corp.*, 524 U.S. 74 (1998) ............................... 67

*General Dynamics Land System v. Cline*, 540 U.S. 581 (2004) ................. 36

*Gray v. Great American Recreation Association, Inc.*, 970 F.2d 1081 (2d Cir. 1992) ...................................................................................... 3

*Great-West v. Knudson*, 534 U.S. 204 (2002) ....................................... 105-6

*Greenblatt v. Delta Plumbing & Heating*, 68 F.3d 561 (2d Cir. 1995) ...... 39

*Hamilton v. Air Jamaica*, 945 F.2d 74 (3d Cir. 1991) .............................. 49

*Harper v. Virginia Department of Taxation*, 509 U.S. 86 (1993) ............. 106

*Harte v. Bethelehem Steel,* 214 F.3d (3d Cir.), *cert. denied,* 531 U.S. 1037 (2003) ............................................................................ 49

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) ................................... 45

*Heidgerd v. Olin Corp.*, 906 F.2d 903 (2d Cir. 1990) ............................... 74

*Hirt v. Equitable*, 441 F. Supp. 2d 516 (S.D.N.Y. 2006) ...... 1, 30, 37, 66, 70

*Hirt v. Equitable*, 2006 WL 2627564 (S.D.N.Y. 2006) ........................ 70-71

*Hudson v. General Dynamics Corp.*, 118  F. Supp. 2d 226 (D.Conn. 2000) ................................................. 78

*Hullett v. Towers, Perrin, Forster, and Crosby*, 38 F.3d 107 (3d Cir. 1994) ................................................. 10

*In re J.P. Morgan Chase Cash Balance Litigation*, 460 F. Supp. 2d 479 (S.D.N.Y. 2006) ...................... 29, 72

*Jordan v. Federal Express*, 116 F.3d 1005 (3d Cir. 1997) ......................... 94

*Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) ............................ 44

*Klay v.  Humana*, 382 F.3d 1241 (11th Cir. 2004) .................................... 87

*Langman v. Loeb*, 328 F.3d 68 (2d Cir. 2003) .......................................... 21

*Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863 (11th Cir. 1997) ........................................ 94

*Laurent v. PriceWaterhouse*, 448 F. Supp. 2d 537 (S.D.N.Y. 2006) .......... 30

*Layaou v. Xerox Corp.*, 238 F.3d 205 (2d Cir. 2001)  ...................... 52, 74-75

*Layaou v. Xerox Corp.*, 330 F. Supp. 2d 297 (W.D.N.Y. 2004) ..... 76, 80, 86

*Lyons v. Georgia-Pacific Corp.*, 221 F.3d 1235 (11th Cir. 2000), *cert. denied*, 532 U.S. 967 (2001) ................................................... 1

*McCarthy v. Dun & Bradstreet*, 482 F.3d 184 (2d Cir. 2007) ................... 76

*Meinhardt v. Unisys*, 74 F.3d 420 (3d Cir. 1996) ...................................... 78

*Mertens v. Hewitt Associates*, 508 U.S. 248 (1993) .................................. 41

*Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58 (1987) ................ 39

*Mullins v. Pfizer, Inc.*, 23 F.3d 663 (2d Cir. 1994) ........................ 51, 78, 99

*Parsons v. AT&T*, 2006 WL 3826694 (D.Conn. 2006) .............................. 29

*Ream v. Frey*, 107 F.3d 147 (3d Cir. 1997) ................................................. 83

*Register v. PNC Financial*, 477 F.3d 56 (3d Cir. 2007) ..................... *passim*

*Register v. PNC Financial*, 2005 WL 3120268 (E.D. Pa. 2005) ............... 37

*Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749 (1995) .......................... 106

*Richards v. FleetBoston Fin. Corp.*, 427 F. Supp. 2d 150 (D. Conn. 2006) ............................................................................................... *passim*

*Richards v. FleetBoston Fin. Corp.*, 2006 WL 860674 (D.Conn. 2006) ..... 82

*Richards v. FleetBoston Fin. Corp.*, 2006 WL 2092086 (D. Conn. 2006) .. 76

*Richards v. FleetBoston Fin. Corp.*, 2006 WL 2979373 (D.Conn. 2006) ... 82

*Romero v. Allstate*, 404 F.3d 212 (3d Cir. 2005) .................................. 67, 69

*Sereboff v. Mid Atlantic Medical Services, --U.S.--*, 126 S. Ct. 1869 (2006) .............................................................................................. 104

*Smith v. City of Jackson*, 544 U.S. 228 (2005) .................................... 39, 47

*Soares v. State of Conn.*, 8 F.3d 917 (2d Cir. 1993) ................................ 100

*Stahl v. Tony's Building Materials*, 875 F.3d 1404 (9th Cir. 1989) ............ 52

*Sunder v. U.S. Bank. Pension Plan*, 2007 WL 541595 (E.D. Mo. 2007) ............................................................................................ 30, 37

*Swede v. Rochester Carpenters Pension Fund*, 467 F.3d 216 (2d Cir. 2006) ................................................................................................ 106

*Syverson v. IBM*, 472 F.3d 1072 (9th Cir. 2007) ........................................ 50

*Thomforde v. IBM*, 406 F.3d 500 (8th Cir. 2005) ...................................... 50

*Tocker v. Philip Morris*, 470 F.3d 481 (2d Cir. 2006) ............................... 80

*Tomlinson v. El Paso*, 2007 WL 891378 (D. Colo. 2007) .............. 30, 46, 48

*Tootle v. ARINC Inc.*, 222 F.R.D. 88 (D.Md. 2004) ................................... 30

*Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238 (2000) ........... 39

*United States v. Caccia*, 122 F.3d 136 (2d Cir. 1997) ................................. 3

*Wasley Products, Inc. v. Bulkalites*, 2006 WL. 3834240 (D.Conn. 2006) .. 51

*West v. AK Steel*, 484 F.3d 395(6th Cir. 2007) ................................... 11, 105

*Wheeler v. Pension Value Plan for Employees of the Boeing Co.*, 2007
    WL 781908 (S.D.Ill. Mar. 13, 2007) ...................................... 30

*Wilkins v. Mason Tenders District Council Pension Fund*, 445 F.3d 572
    (2d Cir. 2006) ........................................................................ 52

## STATE CASES

*Ries v. Kane*, 478 A.2d 1195 (N.J. Super. 1983) ....................................... 10

# FEDERAL STATUTES, REGULATIONS, AND LEGISLATIVE HISTORY

ADEA §4(i), 29 U.S.C. §623(i) .................................................................... 28

ADEA §7(f)(1)(A), 29 U.S.C. §626(f)(1)(A) ............................................. 50

ERISA §2(a), 29 U.S.C. §1001(a) ............................................................... 1

ERISA §3(16), 29 U.S.C. §1002(16) .......................................................... 51

ERISA §3(34), 29 U.S.C. §1002(34) ........................................................... 4

ERISA §102(a), 29 U.S.C. §1022(a) ................................................ 48, 87

ERISA §203(a), 29 U.S.C. §1053(a) ................................................ 5, 15, 23

ERISA §203(e), 29 U.S.C. §1053(e) ................................................ 93, 95

ERISA §204(b)(1)(A), 29 U.S.C. §1054(b)(1)(A) ........................................ 8

ERISA §204(b)(1)(B), 29 U.S.C. §1054(b)(1)(B) .............................. *passim*

ERISA §204(b)(1)(C), 29 U.S.C. §1054(b)(1)(C) ........................................ 8

ERISA §204(b)(1)(H), 29 U.S.C. §1054(b)(1)(B) ................ 6, 28, 35-38, 41

ERISA §204(b)(2), 29 U.S.C. §1054(b)(2) ............................................ 6, 28

ERISA §204(h), 29 U.S.C. §1054(h) .................................... *passim*

ERISA §204(g), 29 U.S.C. §1054(g) ................................................ 105-6

ERISA §205(g), 29 U.S.C. §1055(g) ................................................ 93, 95

IRC §411(b)(1)(H), 26 U.S.C. §411(b)(1)(H) ............................................ 28

IRC §411(b)(2), 26 U.S.C. §411(b)(2) ................................................ 28

IRC §417(e), 26 U.S.C. §417(e) .................................................... 7

29 C.F.R. 1625.22(b)(3) .................................................. 50

29 C.F.R. 2520.102-2(a) ................................................ 49, 51

29 C.F.R. 2520.102-2(b) ........................................ 49, 75-76, 81

29 C.F.R. 2520.102-3(l) ........................................ 50, 76

29 C.F.R. 2520.104b-3(a) ........................................ 49, 51, 68, 76

29 C.F.R. 2520.104b-4(c) ............................................................. 90

29 C.F.R. 2590.606-1(a) ............................................................. 50

Treas. Reg. 1.401(a)(4) ............................................................. 35

Treas. Reg. 1.401(a)-20 ............................................................. 95-96

Treas. Reg. 1.411(a)-11(c)(2)(i) ............................................... 94-95

Treas. Reg. 1.411(b)-1(a) ......................................................... 18, 34

Treas. Reg. 1.411(b)-1(b)(2)(ii)(A) .......................................... 17

Treas. Reg. 1.411(b)-1(b)(3)(iii) ............................................. 17

Treas. Reg. 1.411(b)-2(i) ........................................................... 9

Treas. Reg. 1.411(d)-4 ............................................................. 98

Treas. Reg. 1.411(d)-6 ............................................... 49, 51, 68, 73, 90-92

Treas. Reg. 1.417(e)-1(b)(2)(i) ...................................... 94-95, 103

Treas. Reg. 54.4980F-1 ............................................................. 69

52 Fed. Reg. 45360 (Nov. 27, 1987) ........................................ 44

53 Fed. Reg. 11876 (April 11, 1988) .................................... 29, 44

53 Fed. Reg. 31837 (Aug. 22, 1988) ........................................ 95

60 Fed. Reg. 64320 (Dec. 15, 1995) ........................... 19, 68, 73, 90

63 Fed. Reg. 68678 (Dec. 14, 1998) ........................... 19, 35, 68, 73

64 Fed. Reg. 56578 (Oct. 13, 1999) .......................................... 12

65 Fed. Reg. 70227 (Nov. 21, 2000) ......................................................... 77

3 ERISA Leg. Hist. 4750 ........................................................................... 48

67 Fed. Reg. 76123 (Dec. 11, 2002) ............................................... 29, 31, 44

68 Fed. Reg. 17277 (April 9, 2003) ........................................................... 69

H.R. Conf. Rep. 93-1280, 1974 U.S.C.C.A.N. 5038 ............................. 21, 34

H.R. Conf. Rep. 99-453, *reprinted in* 131 Cong. Rec. 38124 ..................... 68

H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868 .................................. 36

IRS Notice 96-8, 1996-1 C.B. 359 ....................................................... 24, 26

Rev. Proc. 2005-23 .................................................................................. 106

## MISCELLANEOUS

*Res. of Contracts 2d* ................................................................................. 27

*Restatement (2d) of Trusts* ............................................................... 103-104

Langbein, *Questioning the Trust Law Duty of Loyalty,* 114 Yale L.J.
  929 (2005) ....................................................................................... 52, 94

Shea, Francese and Newman, *Age Discrimination in Cash Balance
  Plans: Another View,* 19 Va. Tax. Rev. 763 (2000) .............................. 37

Zelinsky, *The Cash Balance Controversy,* 19 Va. Tax. Rev. 683 (2000) ..... 4

**Introduction**

"ERISA was enacted for the purpose of assuring employees that they would not be deprived of their reasonably-anticipated pension benefits." Amato v. Western Union Int'l, 773 F.2d 1402, 1409 (2d Cir. 1985) (citing ERISA §2(a), 29 U.S.C. §1001(a)). "There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them." Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 743 (2004). Congress recognized that "ERISA's vesting provisions could be thwarted if employers were permitted too much latitude in defining accrued benefits." Amato, 773 F.2d at 1409.

The first "cash balance" pension formula is generally credited to the Bank of America in 1985. See Lyons v. Georgia-Pacific Corp., 221 F.3d 1235, 1238 n.2 (11th Cir. 2000), cert. denied, 532 U.S. 967 (2001). Although it was not obvious to employees or the public at the outset, it is now established that cash balance formulas are a part of "corporate America's recent effort to curb costs by, inter alia, scaling back the benefits provided under pension plans." Depenbrock v. CIGNA, 389 F.3d 78, 79 (3d Cir. 2004); see also Hirt v. Equitable, 441 F.Supp.2d 516, 536-37 (S.D.N.Y. 2006); U.S. Gov't Accounting Office, Private Pensions:

1

Information on Cash Balance Pension Plans (2005); and ¶¶12-15.[1]

Cash balance pension formulas "mimic the simplicity of a defined contribution plan" such as a 401(k) plan by referring to employee accounts and hypothetical credits. Esden v. Bank of Boston, 229 F.3d 154, 158 (2d Cir. 2000). In Berger v. Xerox, 338 F.3d 755, 758 (7th Cir. 2003), Judge Posner determined that cash balance formulas cannot be subject to a "hybrid" legal status, but must be regulated as defined benefit plans because "the employee has no actual account, the employer makes no contributions to an employees account, and so there is no account balance to which interest might be added." In Esden, supra, 229 F.3d at 159 n.6 and 171, the Second Circuit held that cash balance plans are subject to regulation as defined benefit plans, and that the statutory rules cannot be supplanted by ones "more accommodating to the design objectives" of cash balance sponsors.

The violations that this class action addresses all relate to the protections that Congress has enacted over a period of more than 30 years for "accrued benefits" under defined benefit plans. As demonstrated below, CIGNA failed to comply with ERISA's anti-backloading, vesting, age discrimination and disclosure rules. CIGNA's violations are not inherent to a cash balance design. CIGNA could

---

[1] "¶" refers to the Plaintiffs' Proposed Post-Trial Findings.

have designed a cash balance formula that complies with the anti-backloading, vesting and age discrimination rules. And it could have drafted its communications about the changes to warn employees about benefit reductions and other unfavorable aspects of its new plan design. But, as shown below, CIGNA consistently failed to tell its employees that the changes were reducing benefits. And, in the most stunning default at trial, CIGNA opted to call none of the witnesses that it promised would explain how the company sought to comply with the law and honestly communicate the changes to employees. Tr. 909, line 4 - 910, line 15 and 1060, lines 4-14.[2]

## I.    In a Defined Benefit Plan, the "Accrued Benefit" Is an Annual Benefit Commencing at Retirement Age.

Federal law defines two types of pension plans: (1) defined benefit plans and (2) defined contribution plans. ERISA's standards for defined benefit plans focus on protecting justified expectations of monthly or annual income in retirement. Defined contribution plans, such as 401k plans, are plans with separate individual accounts. For those plans, ERISA's standards focus on making sure that employers actually make promised contributions and protecting the investment

---

[2] To the extent any of CIGNA's defenses depend on facts which are especially within CIGNA's sphere of knowledge, Plaintiffs respectfully submit that the Court should draw the "missing witness" inference. See United States v. Caccia, 122 F.3d 136, 138-39 (2d Cir. 1997); Gray v. Great American Recreation Ass'n, Inc., 970 F.2d 1081, 1082 (2d Cir. 1992).

3

returns on the accounts. <u>Berger v. Xerox</u>, supra, 338 F.3d at 757; Zelinsky, "The Cash Balance Controversy," 19 <u>Va.Tax Rev.</u> 683, 687-93 (2000).

The distinctions between defined benefit and defined contribution plans are found in ERISA's definitions of the two types of plans and the definition of the "accrued benefit." Under ERISA, an "individual account plan" or "defined contribution" plan is:

> a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains, and losses and any forfeitures of accounts of other participants which may be allocated to such participant's account.

ERISA §3(34), 29 U.S.C. §1002(34).[3] A defined benefit plan is defined more simply as: "a pension plan other than an individual account plan." ERISA §3(35). Critical to the distinction between these two types of plans is ERISA's split definition of the "accrued benefit":

> The term "accrued benefit" means–

> (A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and except as provided in §204(c)(3), expressed in the form of an annual benefit commencing at normal retirement age.

> (B) in the case of a plan which is an individual account plan, the

---

[3] This brief generally follows the convention of citing ERISA sections without the parallel U.S.C. citations. Where the text does not include the parallel citation, it can be found in the Table of Authorities.

balance of the individual's account.

ERISA §3(23); Esden, supra, 229 F.3d at 163. A defined benefit plan is permitted to provide its benefits at earlier ages or in different forms, but ERISA §§3(23)(A) and 204(c)(3) require that in those instances plans must provide at least the actuarial equivalent of the benefit expressed in the form of an annuity at retirement.

To protect the interests of employees and their spouses in a secure retirement, Congress has enacted a series of minimum standards which build on the "accrued benefit" as defined for each of these two types of plans. Some of these rules cover both kinds of plans, but the application of the rule depends on the definition of the "accrued benefit." For example, ERISA establishes minimum vesting requirements for "accrued benefits." ERISA §§3(19) and 203. But the "accrued benefit" that must be vested is different in each type of plan.

Critical to the discussion below, ERISA contains three important provisions specifically directed at problems with defined benefit plans: First, to keep plan sponsors from avoiding the vesting rules through the mathematical formulas under which employees earn "accrued benefits," ERISA establishes "anti-backloading" rules. The anti-backloading rules regulate the rates at which benefits must accrue under a defined benefit plan. ERISA §§204(a)(1) and 204(b)(1). There are no

parallel rules for defined contribution plans. <u>Second</u>, since 1986, ERISA has prohibited age discrimination in the rate of an employee's benefit accrual under a defined benefit plan. ERISA §204(b)(1)(H). A different test based on the rate at which contributions are made to the employee's account applies to defined contribution plans. ERISA §204(b)(2). <u>Third</u>, ERISA §204(h) requires employers to notify employees in advance when a plan is amended to reduce the rate of future benefit accrual. Only a subset of defined contribution plans called "money purchase pension plans" are subject to this requirement.[4]

### A.    Cash Balance Plans Are Required to Comply with the Rules for Defined Benefit Plans.

In <u>Esden</u>, the Second Circuit held that, as much as plan sponsors or benefit consultants may want to create a "hybrid" legal status, cash balance plans are "defined benefit" plans, with "wide-reaching" "regulatory consequences":

> notwithstanding that cash balance plans are designed to imitate some features of defined contribution plans, they are nonetheless defined benefit plans under ERISA. n 6. The regulatory consequences of this classification are wide-reaching. First, ERISA § 3(23) provides different definitions of "accrued benefit" for defined benefit and defined contribution plans. Only for a defined contribution plan is "accrued benefit" defined as simply "the balance of the individual's account."... Second, defined benefit plans are subject to a series of parallel statutory constraints ... from which defined contribution plans are exempted. Those relevant to this case include:

---

[4] Money purchase pension plans are relatively uncommon today. The more common "401k" plans are qualified as profit sharing or stock bonus plans and are not subject to this rule.

6

limitations on "backloading" of accruals ...; the valuation rules of I.R.C. §417(e) ... and the definitely determinable benefits requirement of I.R.C. §401(a)(25).

229 F.3d at 158 (internal citations omitted). The Second Circuit concluded that "however 'hybrid' in design a cash balance plan may be, it remains subject to a regulatory framework that is in many regards rigidly binary." Id.

In Richards v. FleetBoston, 427 F.Supp.2d 150 (D. Conn. 2006), a cash balance pension case with similar claims to this one, Judge Hall followed Esden in holding that "defined benefit plans face significantly different requirements from those applicable to defined contribution plans." Id. at 163-65. In Berger v. Xerox, supra, 338 F.3d at 763, Judge Posner observed that when a "hybrid" cash balance plan does not comply with the rules for defined benefit plans, the meaning of "hybrid" is clear: "for 'hybrid' read 'unlawful.'"

### B.    CIGNA's Cash Balance Plan Is a Defined Benefit Plan.

In certifying the lawsuit as a class action, Judge Squatrito recognized that CIGNA's conversion of its traditional defined benefit pension plan to a "cash balance" formula "changed the method of calculating and accounting for annuity benefits by basing the amount of the annuity upon a hypothetical individual account balance. This hypothetical balance is derived from "credits" reflecting a predetermined percentage of the employee's salary ("benefit credit") and interest

7

at a predetermined rate ("interest credit"). Thus, the cash balance plan resembles a

defined contribution plan, but remains a defined benefit plan." Slip Op. filed Dec.

20, 2002, at 2. CIGNA's Application for Determination to Internal Revenue

Service also affirms, under oath, that CIGNA's Plan continues to be a defined

benefit plan. Ex. 37 at DO1954.

### III.    CIGNA's Cash Balance Transition Method Produced Years of Service with No Additional Benefits in Violation of ERISA's Anti-Backloading and Vesting Rules.

The "only" benefit accrual test that a cash balance pension plan like

CIGNA's "might satisfy is the so-called 133⅓ percent test under ERISA section

204(b)(l)(B)." Esden, supra, 229 F.3d at 167. This is because the 133⅓% test is

the only accrual rule that a formula which bases benefits on each year's pay can

satisfy. Id. at 167 n.18; Register v. PNC Finan., 477 F.3d 56, 70 (3d Cir. 2007); In

re Citigroup Pension Plan ERISA Litig., 470 F.Supp.2d 323, 337 (S.D.N.Y. 2006);

Eaton v. Onan Corp., 117 F.Supp.2d 812, 843 (S.D.Ind. 2000). The two other

accrual rules in ERISA are designed for defined benefit formulas that use averages

of final or highest pay. See ERISA §§204(b)(1)(A) and (C). Due to the cost-

cutting impetus for their adoption, cash balance formulas invariably eschew

benefit calculations based on final or highest average pay and base benefits on

each year's pay.[5]

ERISA's 133⅓% benefit accrual rule requires that "the value of the benefit accrued in any year ... not exceed the value of a benefit accrued in any previous year by more than 33%." Esden, supra, 229 F.3d at 169; ERISA §204(b)(1)(B); Treas. Reg. 1.411(b)-2(i)(B). Viewed from the other direction, the 133⅓% accrual rule requires that the participant earn an "annual rate" of benefit accrual in each "particular plan year" which is not less than 75% of the accrual rate in any later plan year. Esden, 229 F.3d at 167.

The accrued benefit earned in each particular plan year cannot simply be a bookkeeping notation; it must represent a "payable" addition to the participant's retirement income. Cf. In re Citigroup, supra, 470 F.Supp.2d at 337 (accrual rules must be satisfied "in any given year"); Charles v. Pepco Holdings, 437 F.Supp.2d 248, 251 (D.Del. 2006) (plaintiffs must have the opportunity to prove "whether the use of a variable interest rate actually caused plaintiffs' accrued benefits to decrease 'on account' of additional service"); Engers v. AT&T, 2007 WL 14585 *4 (D.N.J. Jan. 3, 2007) (ERISA §204(b)(1)(B) "states two conditions that must both be met. Both ... refer to the benefit 'payable at [the] normal retirement age.'

---

[5] There are some hybrid plans called "pension equity" plans which base benefits on final or highest average pay. See Dan McGill, Fundamentals of Private Pensions (8th ed.) at 314-16 (defining a "pension equity" plan).

Whether or how this covers Plaintiffs' complaints that their benefits have not been paid depends on interpretation of the word 'payable'").[6]

### A.   CIGNA Set Up the "Wear-Away" Effect by Converting Participants' Accrued Benefits to Opening Account Balances With Less Protected and Lower Values and Then Building Future Accruals Only on This New Floor.

In its cash balance conversion, CIGNA converted the retirement benefits that its employees had already earned to opening account balances. As shown by the report of Claude Poulin, the class' actuarial expert, the opening balances did not reflect the full value of participants' previous benefits. Mr. Poulin explained how a shortfall between the value of participants' retirement benefits and the opening accounts necessarily developed from: (1) CIGNA's exclusion of rights to "subsidized" early retirement benefits, including a valuable "Social Security supplement," and (2) CIGNA's application of a "pre-retirement mortality" discount. Tr. 211, line 6 - 212, line 13; Ex. 3 (Poulin Rpt) ¶¶ 25 and 32. When benefits are not completely lost in the event of death before retirement, pre-retirement mortality discounts have been found to violate ERISA's anti-forfeiture

---

[6] Accord Hullett v. Towers, Perrin, Forster, and Crosby, 38 F.3d 107, 113 (3d Cir. 1994) ("payable means the point at which money may be paid on demand, not the point at which payment actually commences"); Ries v. Kane, 478 A.2d 1195, 1199, 1201 (N.J. Super. 1983) (employer's position on meaning of "payable" "would result in the employer not being responsible to pay any benefit"; court should interpret statute in a way that "avoid[s] the anomalous result of a bill which is intended to increase benefits, yet does not do so").

requirements. See <u>West v. AK Steel</u>, 484 F.3d 395, 2007 WL 1159951, *14-15 (6th

Cir. 2007) ("Even if the participant were to die before the age of 65, his or her

beneficiary is still entitled to the entire accrued benefit").[7]

In addition, because of falling interest rates after 1997, the new opening

balances had a lower and less stable value in terms of retirement income than the

participants' previous benefits (which were expressed in annuity form). As Mr.

Poulin explained, converting annuity benefits to opening accounts transforms the

benefits into something like a variable annuity. Tr.  445, line 2 - 446, line 24; Ex. 3

(Poulin Rpt) ¶33-35. If interest rates move above the rate used at the conversion,

retirement benefits increase. But if interest rates go down, as they have since 1997,

the retirement benefits that can be restored with the hypothetical account decrease.

<u>Id</u>.

After establishing these opening accounts, CIGNA provided that future

benefit accruals could only be built on top of the new hypothetical floor. Because

the opening accounts did not reflect the full value of the previously-earned

benefits and because interest rates fell after 1997, the benefits of many members of

the Plaintiff class failed to increase at all for a number of years.

---

[7] Accord <u>Berger v. Xerox Corp.</u>, supra, 338 F.3d at 764 (describing use of
pre-retirement mortality discount as "unfathomable"); <u>Crosby v. Bowater</u>, 212
F.R.D. 350, 361-62 (W.D. Mich. 2002), vacated and remanded on other grounds,
382 F.3d 587 (6th Cir. 2004).

In certifying the class, Judge Squatrito described this claim:

> In layman's terms, as a result of these calculations plaintiff experienced a period where benefits "constructively" accrued in her cash balance account. This is so because the minimum benefit payable to plaintiff was greater than her hypothetical account balance, which means that plaintiff would not begin to realize the accrual of benefits under Plan B until her hypothetical account balance exceeded the amount of the minimum benefit.

12/20/02 Slip Op. at 3 - 4. The period of what Judge Squatrito described as constructive accruals is more commonly known as a "wear-away." In Richards, Judge Hall found that a wear-away causes employees "to work for many years following [a cash balance conversion] without actually accruing any new benefits, despite the existence of a hypothetical cash balance account that show[s] benefits being added each quarter." 427 F.Supp.2d at 155.[8]

In the case of the named Plaintiff Janice Amara, CIGNA's "wear-away" made her participation in the CIGNA cash balance accruals illusory for more than seven years. See Ex. 32 at 28174 and 28629. Under the old plan formula, Ms. Amara had earned early retirement benefits of $1,833.65 a month starting at age 55. Ex. 3 (Poulin Rpt) ¶¶ 24-26. But CIGNA's opening account for Amara was $91,124.88, which converts to an age 55 annuity of only $900 per month. Id. But

---

[8] Accord 64 Fed. Reg. 56578, 56579 (Oct. 13, 1999) (as a result of "wear-away" designs, "employees who had already earned benefits may not earn additional retirement benefits for varying periods of time after the conversion"; the wear-away effect "continues until an employee's benefit under the on-going cash balance formula 'catches up' with the employee's protected benefit").

for the Third Circuit's 2004 decision in <u>Depenbrock v. CIGNA</u>, 389 F.3d 78, which restored her to the old formula, Ms. Amara would have spent the rest of her career with CIGNA 'catching up' with the level of benefits she had already earned. Dramatically illustrating the difference between the two formulas, Ms. Amara's benefits nearly doubled when she was put back under the old formula. ¶164.

The same type of wear-aways applied to Plaintiffs Gisela Broderick and Patricia Flannery who were unaffected by the <u>Depenbrock</u> decision. After Ms. Broderick was rehired in 2000, she worked for three and one-half years. But her pension benefits when she retired were exactly the same as when she was rehired. Her benefit was $2,010 per month at age 65 when she left CIGNA in 1997 and the same amount when she retired in 2004.[9] The same happened to Ms. Flannery who is still at work with CIGNA: Her retirement benefits have not increased at all based on her employment between 2000 and 2006. ¶¶58-59.

Because named Plaintiff Annette Glanz was younger than Broderick and Flannery and did not have a right to early retirement benefits, her benefits caught up with her previous level of benefits after three years, but the accruals in those

---

[9] Tr. 1299, line 12 - 1300, line 4 (Sher testimony that Broderick's cash balance benefit in the last year was still $200 less than the $2,010 that she had five years earlier) and Ex. 235, first page.  Mr. Poulin calculated Ms. Broderick's age 60 benefit and found that the cash balance amount lagged still farther behind: $1,400 compared with $2,191. ¶55.

'catch up' years were never regained. ¶¶60-61. Mr. Poulin prepared a spreadsheet

to show Annette Glanz's benefit accruals on a year-by-year basis. It shows that her

annuity benefit at the end of 2000 was $566.88, only $2.88 more than the $564

benefit she had at the beginning of 1998. Ex. 6 and ¶¶60-61, 104-105. In response

to Mr. Poulin's spreadsheet, Defendants' expert, Mr. Sher, prepared a spreadsheet

on Ms. Glanz's accruals showing practically the same effects. The only difference

was that Mr. Sher calculated Ms. Glanz's benefits with a method that made the

years with no additional accruals Years 1, 2 and 5, rather than Years 1 through 3

under Mr. Poulin's method. ¶106 and Exs. 234 and 235.[10]

CIGNA was aware of the "wear-away" effects. For example, an internal

CIGNA memorandum acknowledges: "Using the present value of normal

retirement age benefits results in a significant "wear-away" period during which

time employees accrue no additional benefits with future service." Ex. 40 at

28635; see also ¶¶81-92. Actuary Andy Hodges testified at his June 2003

deposition that he was aware of wear-aways at the time of the conversion and that

---

[10]  Mr. Sher disclaimed that his spreadsheet had anything to do with
compliance with the 133⅓% rule and stated, several times, that he was not
opining on whether CIGNA's Plan satisfies this rule. ¶118. Without testimony
from Mr. Sher or any other witness, it is difficult to understand what CIGNA relies
on as its defense. In <u>Charles v. Pepco Holdings</u>, supra, 437 F.Supp.2d at 251, the
district court denied judgment when it was "unclear exactly what calculation
defendants are proposing as the proper method to test compliance."

a "myriad of factors" caused wear-away periods, including early retirement subsidies, pre-retirement mortality discounts, and falling interest rates. He also recognized that wear-away periods could last up to six years. ¶¶82-85.

A wear-away design is not an inherent or necessary part of a cash balance conversion. Cash balance conversions can be designed without wear-aways. ¶¶74-78. In fact, the Pension Protection Act of 2006 requires all cash balance conversions after June 29, 2005 to be designed with no wear-aways. P.L. 109-280, §701(a)(1), adding ERISA §204(b)(5)(B)(ii).

CIGNA's "wear-away" design has two critical legal ramifications. First, the periods with no additional benefits followed by benefits in later plan years violate the prohibition in ERISA's 133⅓% accrual rule against "backloading" benefit accruals. ERISA §204(b)(1)(B). Second, CIGNA's design makes payment of the benefits derived from the cash balance credits conditional on whether the employee elects to forego payment of his or her previously-accrued benefits in annuity form. This causes a loss or forfeiture of the cash balance accruals (or conversely the previously-accrued benefits, depending on the election) in violation of the nonforfeitability requirements in ERISA §203(a).

## B.    A Period of Years Where Participants "Accrue No Additional Benefits" Violates ERISA's 133⅓% Accrual Rule.

Wear-away periods during which a participant's net benefit accruals cease

15

and then pick up again violate ERISA's 133⅓% accrual rule. Internally, CIGNA

has recognized that its cash balance conversion produced periods of "wear-away"

in which participants "accrue no additional benefits," earn little or no benefits"

and "see no benefit improvement." See ¶¶86-87, 381. ERISA's 133⅓% accrual

test requires that the "annual rate" of benefit accrual "payable at the normal

retirement age" can go up by no more than 133⅓% in any later plan year. ERISA

§204(b)(1)(B). If no additional benefits are earned for a period of several plan

years with accruals picking up again in later years, the plan does not comply with

the statutory rule against backloading. This is because the rate of benefit accrual

after the period of wear-away period ends is "infinitely" greater than the rate in the

years with no additional benefit accruals. Tr. 240, line 22 - 241, line 21, and Ex. 3

(Poulin Rpt) ¶ 30.

　　CIGNA's non-compliance with the ERISA's 133⅓% rule cannot be

repaired by drawing on the higher rates of accrual under the plan's previous

formulas as if they were a reservoir of credits. Treasury regulations issued in 1977

make clear that higher accruals from previous years cannot be averaged with lower

or non-existent rates in intermediate years to avoid a violation. Instead, the plan's

formula must pass the test based on the accruals in "each particular plan year."

The Treasury regulations offer an example in which a plan offers a 2% accrual rate

in the first 5 years of participation, followed by a 1% rate in years 6-10, and then

1.5% in all years thereafter. The regulations provide that the accrual rates in the

years 6-10 must comply with the statutory requirements without resorting to the

higher accrual rates in the earlier years. As a result, the lower accrual rate in years

6-10 violates the law, notwithstanding that an average accrual rate for years 1-10

would not fall below 1.5%. Treas. Reg. 1.411(b)-1(b)(3)(iii) (Example 3).

     In <u>Richards</u>, Judge Hall did not find a violation of the 133⅓% rule because

of a special rule in ERISA §204(b)(1)(B)(i). That subsection provides that in

satisfying the 133⅓% rule "any amendment which is in effect for the current year

shall be treated as in effect for all other plan years." ERISA §204(b)(1)(B)(i) and

Treas. Reg. 1.411(b)-1(b)(2)(ii)(A). Judge Hall held that if §204(b)(1)(B)(i)

applied, "employees such as Richards would never have accrued a benefit under

the Traditional Plan, and would have started accruing benefits under the cash

balance formula from the start of their employment. Assuming such a scenario,

such employees would suffer no backloading of benefits" because they "never

have accrued a benefit under the Traditional Plan, and would have started accruing

benefits under the cash balance formula from the start of their employment." 427

F.Supp.2d at 171. Likewise, <u>Register v. PNC Finan.</u>, 477 F.3d 56, 71-72 (3d Cir.

2007), holds that "once there is an amendment to the prior plan, only the new plan

formula is relevant when ascertaining if the plan satisfies the 133 1/3% test."

The construction of the clause in 204(b)(1)(B)(i) that was accepted in

Register and Richards is inconsistent with the example referenced above and with

the Treasury regulation in effect since 1977 which provides that when benefits are

"determined under more than one plan formula," the benefits "must be aggregated

in order to determine whether or not the accrued benefits under the plan for

participants satisfy one of the alternative methods." Treas. Reg. 1.411(b)-1(a). The

IRS has also issued "Alert Guidelines on Minimum Vesting Standards" which

confirm that the aggregation regulation applies when a plan has two formulas, one

of which offers a minimum benefit. In an example, a plan's regular benefit formula

offers a benefit of 0.5% of compensation for each year of service. In year X, the

plan becomes "top-heavy" which requires a "minimum" accrual of 2% per year.

The IRS concludes that if the plan provides that a participant shall receive "not

less than" the "greater of" his or her accrual under the regular formula or the top-

heavy minimum, it will violate the 133⅓% rule. The IRS shows how for a

participant with 6 years of service the net increase in the first two years of 0.5%

will be exceeded by the 2% accrual rate in future years by more than 133⅓%. Ex.

39 at 12. In regulations issued under ERISA §204(h), the Treasury Department

also recognizes that a "minimum benefit" provision can affect the "rate of future

18

benefit accrual." 60 F.R. 64320, 64322 (Dec. 15, 1995); 63 F.R. 68678, 68681

(Dec. 14, 1998). Neither CIGNA nor its expert contests that the frozen benefit

used under its "greater of" approach is a "minimum benefit."

At a November 2003 meeting of the Conference of Consulting Actuaries,

CIGNA's actuarial expert, Mr. Sher, was recorded on audiotape questioning a

panel of IRS officials about whether the aggregation regulation applies to a frozen

minimum benefit that has the effect of eliminating or reducing net accruals in

future plan years. The IRS officials are recorded telling him that "You look at the

net benefit and when you have ... a period of zero accruals and the other kicks in,

it's an issue on a 133 and 1/3." Ex. 52 at 12.[11]

Although the discussion at the CCA meeting is unofficial, recent April 16

and May 18, 2007 comments to the IRS from the American Benefits Council

(ABC) and the ERISA Industry Committee (ERIC), both of which include CIGNA

as members,[12] confirm the IRS's position. ABC states that: "there is a problem

with the way that the IRS has been interpreting the backloading rules; in general,

---

[11] In his expert report, Mr. Sher nevertheless asserted that in his "experience," the 133⅓% test is performed without taking into account the effect of the benefits under the protected but frozen formula. Ex. 10 (Sher Rpt) at 35; see also Tr. 1045, lines 19-22 (testifying that "as far as I know", the government has never raised any problems with respect to the "wearaway situation").

[12] ¶113. Mr. Sher's firm, Buck Consultants, is also a member of ABC. Id.

the IRS interpretation invalidates 'greater of' formulas." ERIC states that "the Service's current application of the 133⅓% test to hybrid plans is disallowing some of the most participant-favorable [sic] methods of conversion," namely, "a 'greater of' approach for current plan participants." [13]

Unaware of the IRS's position, the Register decision suggested that the aggregation regulation is inapplicable because "it applies in cases where there are two co-existing formulas under a single plan." 477 F.3d at 72. This is wrong because the aggregation regulation is mandatory and it contains no exception based on whether formulas which are indisputably in the current plan are characterized as "co-existing." If Register means that the aggregation regulation should not apply where one formula is frozen but still an operative part of the current plan, i.e., it does not offer "on-going" accruals, this is also a construction of the regulation that the IRS has never espoused or adopted.

That position, moreover, would make no sense from a legislative or regulatory perspective. If it was correct, a participant who accrues no additional benefits for a plan year would counter-factually be assumed to have an accrued

---

[13] ¶¶113-114. Also available online at http://www.americanbenefitscouncil.org/documents/irs_notice_2007-6_comments.pdf , at 20, and http://www.eric.org/forms/uploadFiles/b34900000012.filename.Notice_2007-6_ERIC_Comments_ver.3.pdf , at 3.

benefit that is "payable at the normal retirement age" for purposes of the 133⅓%

test. To illustrate, if a plan with a $20 per month benefit formula is amended after

10 years to offer a $10 per month benefit, an employer could adopt a "greater of"

formula under which participants with 10 years of service would earn no

additional benefits for the next 10 years. According to Register, this formula

would comply with the anti-backloading rules even though no additional accruals

are actually payable to longer-service employees for the next 10 plan years.

     ERISA §204(b)(1)(B)(i), the clause about the amendment "in effect for the

current year" on which Register and Richards rely, was intended to serve a

different purpose than this. The ERISA Conference Report explains this clause as

follows: "For example, if a plan provides a one percent rate of accrual for all

participants in 1976, and is amended to provide a 2 percent rate of accrual for all

participants in 1977, the plan will meet this test, even though 2 is more than 1-1/3

times 1." H.Conf. Rep. 93-1280, at 274, 1974 U.S.C.C.A.N. 5038, 5055. In

Langman v. Loeb, 328 F.3d 68, 71 (2d Cir. 2003), the Second Circuit explained

that this clause is intended to allow "across-the-board increases in benefit rates

made at some future time on behalf of all current employees regardless of past

service." The Treasury Department's aggregation regulation is no impediment to

these purposes. A plan that is amended to provide a 2% benefit accrual in all

future plan years will comply with the 133⅓% rule after application of the aggregation regulation.

Interpreting this clause in the manner of <u>Register</u> and <u>Richards</u> has the effect of allowing a "scenario" in which benefits that are not "payable" to be treated as payable when an employer uses a "greater of" transition in combination with a reduction in future rates of accrual. Simply put, a clause like this should not be construed to nullify the language and purpose of the general rule; the requirement that benefits accrue and be "payable" for each plan year cannot be replaced with one that accepts hypothetical notations. Most importantly, as the aggregation regulation shows, the Treasury Department and the IRS have never interpreted ERISA's accrual rules in a manner which permits this.

As <u>Esden</u> makes clear, neither CIGNA nor other companies are allowed "to have it both ways." 229 F.3d at 167 n.8. If an amendment "in effect for the current year" provides that the benefits under a prior formula are taken into account, the accrual rule must be satisfied when the benefits under the two formulas are aggregated. ERISA does not allow employers to satisfy the 133⅓% accrual rule when participants actually accrue "no additional benefits" in a plan year. Allowing accruals that exist only as notations to substitute for benefits that are actually paid in retirement defeats the statutory purpose of preventing backloading and thereby

22

ensuring a relatively even progression in the accrual of retirement benefits.

Here, as the Plaintiffs' actuarial expert found, there was a zero rate of accruals in plan years following CIGNA's cash balance conversion (the "wear-away" period). Tr. 240, line 22 - 241, line 21; Ex. 3 (Poulin Rpt) ¶ 30. If the zero rates of accrual are followed by non-zero rates in later plan years, the Plan violates the 133⅓% accrual rule. Id. Structurally, this violation, as well as the violation of the anti-forfeiture rule described next, can be remedied by requiring CIGNA to ensure that the cash balance accruals are always provided as an addition to the previously-earned benefits, i.e., the A + B formula discussed at trial.[14]

### C. Conditioning Future Accruals on Giving Up Statutory Rights to Previously-Earned Annuities Violates ERISA's Vesting Requirements.

To keep promises of accrued benefits from becoming illusory, ERISA §203(a) also provides that benefit accruals must be "nonforfeitable" once a participant has the number of years of service required to be vested (which is generally five years). ERISA §3(19) defines a non-forfeitable right as a right that is "unconditional." ERISA §203(a)(3) catalogs a number of exceptions under which losses of benefits will not be considered forfeitures. In every other instance,

---

[14] As mentioned, Section 701(a) of the 2006 Pension Protection Act requires this for any cash balance conversion after June 29, 2005, regardless of the accrual method or other factors. P.L. 109-280, §701(a)(1), adding ERISA §204(b)(5)(B)(ii).

however, a loss or reduction of accrued benefits is prohibited after a participant is vested. Under ERISA, direct and indirect reductions are equally unlawful. In Central Laborers' Pension Trust v. Heinz, supra, 541 U.S. at 744, the Supreme Court held that "placing materially greater restrictions on the receipt of the benefit 'reduces' the benefit just as surely as a decrease in the size of the monthly payment."

Treasury regulations have provided since 1988 that "A right which, at a particular time, is conditioned under the plan upon a subsequent event, subsequent performance, or subsequent forbearance which will cause loss of such right is a forfeitable right at that time." Treas. Reg. 1.411(a)-4. In IRS Notice 96-8, 1996-1 C.B. 359, the Treasury Department explains that:

> If benefits ... have accrued [but] those benefits are disregarded when benefits commence before normal retirement age, the plan has effectively conditioned entitlement to the benefits ... on the employee not taking a distribution prior to retirement age.

Section 7.3 of CIGNA's amended Plan document places just these kinds of restrictions on the receipt of participants' benefits. This Section requires participants in CIGNA's Plan to "elect" to keep their prior benefits "in annuity form." Ex. 1 at D00309. A participant who "elects" to keep the benefits he or she earned in plan years before January 1, 1998 as an annuity loses the right to payment of the cash balance accruals earned in the years after that date. ¶¶120-23.

24

The right to receipt of the cash balance accruals is thus conditioned on foregoing receipt of previously-earned benefits in annuity form, including, most notably, receipt of the previously-earned benefits at early retirement age. If a participant wants to receive the previously-earned benefits at early retirement, CIGNA makes the participant give up any cash balance accruals. As Mr. Sher testified, "if you elect a lump sum, you are not going to get a subsidy.  The subsidies are provided if you elect an annuity."  Tr. 1428, line 2 - 1433, line 3. Conversely, Ms. Broderick testified that she "assumed" the  pension and interest credits listed in her benefit statements "was money that was going to be paid to me when I retired." But when she elected an annuity, she never received any of those amounts.  Tr.  105, line 3 - 107, line 14.

Esden struck down a condition like this. In Esden, the Bank of Boston converted to a cash balance plan in 1989. The Bank protected the benefits that Ms. Esden earned with her 16 years of service before the change and offered her additional accruals for her service after the change on top of those benefits. But if Ms. Esden commenced her benefits before normal retirement age, the Bank would pay her only part of the cash balance benefits she earned after the change. According to Esden, the plan sponsor "trie[d] to have it both ways" by claiming compliance with ERISA's benefit accrual rules, but conditioning the right to

payment of the accruals earned in certain plan years on when the participant

commenced benefits. 229 F.3d at 167 n.8 and 168. The Second Circuit held that

the Bank of Boston could not "offer an employee the voluntary choice of a partial

forfeiture in exchange for a particular form of payment." Id. at 173. The Court

concluded that "part of [Ms. Esden's] pension benefit was made conditional on the

distribution option chosen, in violation of the anti-forfeiture provisions of ERISA

§203(a)." Id. at 158 and 168. In so holding, the Second Circuit relied on the

Treasury Department's nonforfeitability regulation and IRS Notice 96-8. 229 F.3d

at 167-78 and 173.

In Berger v. Xerox, the Seventh Circuit relied on Esden in holding that the

"law forbids" a plan to "condition[] the employee's right to future interest credits

on the form of the distribution that he elects to take (pension at age 65 rather than

lump sum now)." 338 F.3d at 763. When a "plan concedes that the employee has

an absolute, vested, indefeasible entitlement ... to a pension at age 65," it cannot

condition those benefits. 338 F.3d at 761.

The Second Circuit found another condition illegal in Frommert v.

Conkright, 433 F.3d 254, 260-61 (2d Cir. 2006). There, Xerox's retirement plan

offered the "greater of" benefits under two or more formulas. Xerox amended one

of the formulas to create a "hypothetical" or "phantom" offset. The Second Circuit

26

held that "although the application of the phantom account does not directly deplete an employee's pension account, by altering the comparative process, it imposes a <u>condition</u> on the payment of benefits that leads just as surely to a decrease." 433 F.3d at 268 (emph. added). The "ultimate effect" was to condition the payment of benefits. <u>Id</u>.

In this instance, the "ultimate effect" of Section 7.3 is to condition payment of the cash balance accruals on accepting the value of the opening account in lieu of the participant's previously-earned benefits in an annuity form.  This condition has little or no effect on new hires or younger, shorter-service participants who did not have significant benefits under the prior plan. ¶¶69-70. But it especially conditions the payment of benefits to older or longer-service employees whose opening balances were "established below actual value." Ex. 47, third page.

In <u>Richards</u>, Judge Hall did not find a forfeiture in similar circumstances because she saw no "choice" that the participant could make. 427 F.Supp.2d at 169-70. There are two problems with this conclusion. <u>First</u>, a "condition" is not synonymous with a choice. A condition is an event that "limits or qualifies" an obligation to distribute money or other property. <u>Res. of Contracts 2d</u>, §224 and Comment a. A condition may exist even if there is no viable option. <u>Second</u>, unlike in <u>Richards</u>, there is an express "election" here. Under Section 7.3, a

27

participant "elects" whether to (1) accept his or her benefits from before 1998 "in an annuity form," or (2) accept the cash balance accruals combined with the opening account balance. Ex. 1 at 40. <u>Esden</u> holds that such a "voluntary choice" cannot result in a "partial forfeiture" of benefits. 229 F.3d at 172. Here, election of the protected benefits in annuity form produces a forfeiture of the cash balance accruals earned in the years after 1997.

## IV.   The Rate of an Employee's Benefit Accrual under CIGNA's Cash Balance Formula Decreases Based on Age.

ERISA §204(b)(1)(H) prohibits age discrimination in the rate of an employee's benefit accrual under a defined benefit plan. ERISA §204(b)(2) separately prohibits age discrimination in the rate at which amounts are allocated to individual accounts under a defined contribution plan.[15] Plaintiffs contend that CIGNA's cash balance formula violates the age discrimination standard applicable to defined benefit plans. As described below, Plaintiffs further contend that even if CIGNA came under the standard applicable to defined contribution plans, it would violate it because the hypothetical credits to accounts under CIGNA's cash balance formula are only contingently payable to older employees.

ERISA §204(b)(1)(H) provides that a defined benefit plan:

----

[15] Congress enacted parallel rules in the Internal Revenue Code and the Age Discrimination in Employment Act. See IRC §411(b)(1)(H) and (b)(2), 26 U.S.C. §§411(b)(1)(H) and (b)(2), and ADEA §4(i), 29 U.S.C. §623(i).

> shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

In regulations proposed in 1988, the Treasury Department stated that "any differences in the rate of benefit accrual ... may not be based, directly or indirectly, on the attainment of any age." 53 Fed. Reg. 11876, 11880 (April 11, 1988).[16] Invoking the "hybrid" nature of its formula, CIGNA is asking this Court to apply an amalgam of the two tests, which imports aspects of the "input" perspective of the defined contribution test but which, strictly speaking, conforms with neither the defined benefit nor the defined contribution test.

Because this issue has been extensively litigated, this Court has asked the parties to confine the discussion in the post-trial briefing to points not already made in existing district court and appeals court decisions. Tr. at 1583-84.[17]

---

[16] Although the regulations were never finalized, taxpayers were authorized to "rely on these regulations for guidance." Id. at 11878. See also 67 Fed. Reg. 76123, 76129 (Dec. 11, 2002) ("the reliance provided on the 1988 proposed regulations continues to be available").

[17] The decisions for and against age discrimination violations in cash balance pension formulas are currently:

For: In re Citigroup Pension Plan ERISA Litig., 470 F.Supp.2d 323 (S.D.N.Y. 2006); In re J.P. Morgan Chase Cash Balance Litig., 460 F.Supp.2d 479 (S.D.N.Y. 2006); Richards v. FleetBoston, 427 F.Supp.2d 150 (D.Conn. 2006); Parsons v. AT&T, 2006 WL 3826694 (D.Conn. Dec. 26, 2006).

Against: Register v. PNC Finan., 477 F.3d 56 (3d Cir. 2007); Cooper v.

29

**A.    CIGNA Recognized Its "Vulnerability" to the Age Discrimination Claim Because Its Actuaries Found the "Accrual Rates Decline With Increases in Age and Service."**

Before 1998, CIGNA plan participants enjoyed a traditional defined benefit formula consisting of an annuity calculated at 2% or 1.67% of a final average of salary times years of service. The rates of benefit accrual did not decrease on account of age. Ex. 2 at 34-35 and Ex. 3 (Poulin Rpt) ¶13.

Effective January 1, 1998, CIGNA converted to its cash balance formula. Mr. Poulin's expert report shows how age, or the proxy of the number of years to retirement, is the key factor in computing benefit accruals under the new formula. Mr. Poulin's report shows that the "accrued benefit" that ERISA requires must now be computed by taking CIGNA's annual pay credit and compounding it using a factor equal to $(1 + i)^{65 - n}$ and then dividing the result by an annuity factor. In this formula, "n" equals the employee's age. Because "65 - n" represents potential

IBM, 457 F.3d 636 (7th Cir. 2006); Bryerton v. Verizon Communications, Inc., 2007 WL 1120290 (S.D.N.Y. Apr. 17, 2007); Tomlinson v. El Paso, 2007 WL 891378 (D. Colo. March 22, 2007); Wheeler v. Pension Value Plan for Employees of the Boeing Co., 2007 WL 781908 (S.D.Ill. Mar. 13, 2007); Sunder v. U.S. Bank. Pension Plan, 2007 WL 541595 (E.D. Mo. Feb. 16, 2007); Finley v. Dun and Bradstreet Corp., 471 F.Supp.2d 485 (D.N.J. 2007); Laurent v. PriceWaterhouse, 448 F.Supp.2d 537 (S.D.N.Y. 2006); Hirt v. Equitable, 441 F.Supp.2d 516 (S.D.N.Y. 2006), on appeal under C.A. 06-4757; Drutis v. Quebecor, 459 F.Supp.2d 580, (E.D.Ky. 2006), on appeal under C.A. 06-6380; Tootle v. ARINC, 222 F.R.D. 88 (D.Md. 2004); Eaton v. Onan, 117 F.Supp.2d 812 (S.D.Ind. 2000).

years to retirement, the accrual rate will be lower for older employees than for younger employees, all other factors being equal.  As Mr. Poulin testified, the decrease in accrual rates:

> is not a function of years with the employer.  It is not related to the credited service to the employee.  Nor is it even related to the compensation of the employee.  It's strictly a function of the age of the employee, which determines the number of years between the attained age and age 65.

Tr. 269, lines 7-24.

Mr. Poulin's mathematical analysis is not subject to serious dispute. The Treasury Department recognizes that cash balance plans produce a "larger accrual for younger employees when measured as the increase in the benefit payable at normal retirement age." See also 67 Fed. Reg. 76123, 76126 (Dec. 11, 2002). The William Mercer Company ("Mercer") which CIGNA used as its advisor on the cash balance conversion also recognized this in a July 1996 discussion of legal issues with cash balance conversions:

> If the rate of accrual is interpreted as the rate of increase in accrued benefit, and the accrued benefit is defined as an annuity at normal retirement age, then there's an issue [about whether] cash balance plans violate the rule.

Ex. 19 at EPTO 4170.

For three "profiles" of employees that CIGNA itself used, Mr. Poulin computes annual accrual rates ranging from 1.79% of pay at age 30 down to 0.63% at age 65. Ex. 3 at Ex. F-1. In a 10/22/1997 internal analysis, CIGNA

31

essentially paralleled Mr. Poulin's calculations. CIGNA's actuaries calculated "accrual rates" under the cash balance formula which progressively decline from 1.73% of pay at age 43 down to .66% of pay at 65. Ex. 62 and ¶137.

The record shows, moreover, that a senior CIGNA actuary specifically told CIGNA that the benefit "accrual rates" under the cash balance formula decline with age:

> As [one] would expect in a plan designed to mimic a defined contribution plan, accrual rates decline with increases in age and service for employees in the cash balance plan.

Ex. 61 at 10044. In a September 1999 memorandum to its Board, CIGNA recognized its "vulnerability" to the argument that its cash balance accrual rates decrease with age. In the memorandum, the Board was warned:

> Cash Balance Plans are alleged to violate ADEA: This is a new challenge, related in part to opening balances established below actual value, but also is a challenge to a flatter schedule of accruals... . CIGNA's age-progressive accrual schedule reduces, but does not eliminate, vulnerability to this argument.

Ex. 47, third page.[18]

Thus, even before the cash balance formula went into effect, CIGNA recognized that it was vulnerable to a claim of age discrimination if the rate of

---

[18] Other internal documents further show CIGNA's awareness that "older employees," whom CIGNA also described as employees "closer to retirement" or "nearer to retirement age," would earn lower benefits under the cash balance formula. ¶135.

benefit accrual is measured by the change in the accrued benefit. Simply put, if the rate of benefit accrual is measured in that manner, Plaintiffs should prevail. See, e.g., Richards, supra, 427 F.Supp.2d at 163 ("employees experience an increasingly lower rate of benefit accrual as they age, if that rate is defined as the change in the value of their accrued benefit measured as an annual benefit commencing at normal retirement age"). If the Court agrees, there should be no fallback position for CIGNA based on a good faith belief in compliance. CIGNA clearly recognized its "vulnerability" on the age discrimination claim and took the risk that its position would not be sustained.

### B.    Congress Always Uses the Term "Benefit Accrual" to Refer to the Increase in the Accrued Benefit.

Richards holds that "rate of benefit accrual" "refers to [the] rate measured as a change in the annual benefit commencing at normal retirement age." 427 F.Supp.2d at 164-165. By contrast, Register states that the term "benefit accrual" is not related to the "accrued benefit." 477 F.3d at 69 ("We find no indication that Congress intended that courts and administrators use these phrases interchangeably").

Congress' and the Federal agencies' consistent use of the term "benefit accrual" to refer to the change in the participant's accrued benefit supports Richards' position and fails to support Register. Congress first used the terms

"benefit accrual" and "accrual rate" in ERISA and the 1974 Conference Report to describe the change in a participant's "accrued benefit." The Conference Report states that, "In general, the accrued benefit is to be defined in terms of the benefit payable at normal retirement age," and "Each plan [will be] required to satisfy one of three accrued benefit tests (which limit the extent of 'backloading' permitted under the plan)." H.R. Conf. Rep. 93-1280, 273, 1974 U.S.C.C.A.N. 5038, 5055. The Conference Report details how one of those rules, the "133⅓%" rule, measures the "rate of accrual" or "accrual rate" in different years based on the "accrued benefit." Conf. Rep. at 274, 1974 U.S.C.C.A.N. at 5055-56. All told, the Conference Report uses the terms "benefit accrual," "rate of accrual" and "accrual rate" in twenty places. See 1974 U.S.C.C.A.N. at 5046, 5050-52, 5055-59, 5113, 5180.[19]

The 1977 Treasury regulations on the accrual rules further specify that the "method provided by the plan for determining accrued benefits [must] satisf[y] at least one of the[se] alternative methods." Treas. Reg. 1.411(b)-1(a). The regulations describe, in particular, how the 133⅓% rule compares the "rate of benefit accrual" by looking at the "accrued benefits" earned in earlier and later

---

[19] Even in the 2006 Pension Protection Act, which legalized many cash balance formulas, Congress never used "benefit accrual" in any other manner. Instead, it redefined the term "accrued benefit" for certain purposes as "the balance of a hypothetical account." P.L. 109-280, §701(a)(1).

plan years. 1.411(b)-1(b)(2)(iii), Examples (2) and (3), and 1.411(b)-1(g).

Altogether, the Treasury Department has now used the terms "benefit accrual,"

"accrual rate," or "rate of accrual" in 34 sets of regulations related to defined

benefit plans. The usage advanced by the cash balance advocates has never

appeared. See, e.g., Treas. Reg. 1.401(a)(4)-3(d)(1); 1.410(a)-7(e); 1.411(d)-

2(b)(2); 1.411(d)-3(b)(3)(ii); 54.4980F-1, Q&A-6(b) and 8(b).

Perhaps most decisively, Congress' use of the term "benefit accrual" is also

manifest in ERISA §204(h), 29 U.S.C. §1054(h), which was enacted only six

months before ERISA §204. ERISA §204(h) requires plan administrators to

provide advance notice of a significant reduction in "the rate of future benefit

accrual." In issuing regulations on this rule, the Treasury Department concluded

that "[t]he statutory phrase "rate of future benefit accrual" implies, on its face, that

section 204(h) is limited to changes in the accrued benefits." 63 Fed. Reg. 68678,

68680 (December 14, 1998).

If the court needs to resort to the legislative history of OBRA (see Richards,

427 F.Supp.2d at 159), the 1986 Conference Report provides further support that

Congress intended for "benefit accrual" to refer to the change in the "accrued

benefit." The Conference Report states that "Present law specifies certain

requirements with respect to the rate at which benefits are accrued (i.e., earned)

35

under a pension plan" and it describes those requirements as the "benefit accrual

requirements." Conf. Rep. 99-1012, at 375, 1986 U.S.C.C.A.N. 3868, at 4020. The

Conference Report illustrates the application of ERISA §204(b)(1)(H) by

describing a defined benefit plan that "provides a benefit of $10 monthly per year

of service." It concludes that the new rule will require older employees to earn the

same "additional benefit of $10 per month." H.R. Conf. Rep. No. 99-1012, at 381,

1986 U.S.C.C.A.N. at 4026. The Conference Report also offers an example where

a defined benefit plan provides a retirement benefit under a "fractional rule"

formula based on highest average pay and years of participation. The Conference

Report states that the new rule will not be violated where 45-year-old and 55-year-

old employees "have different accrued benefits because of the different rate of

benefit accrual for each year of service" but the older employee enjoys a higher

rate of benefit accrual than the younger employee. Conf. Rep. at 379; 1986

U.S.C.C.A.N. at 4024.[20] Again, the "accrued benefits" are unmistakably based on

the "rate of benefit accrual."

### C.    An Employee's "Benefit Accrual" Under a Defined Benefit Plan Does Not Have a Primary and a Secondary Meaning.

The decisions holding that cash balance formulas comply with the

---

[20] This is consistent with the Supreme Court's later opinion in *General Dynamics Land Sys. v. Cline*, 540 U.S. 581 (2004), that the ADEA does not prohibit reverse age discrimination.

prohibition against age discrimination in benefit accruals have accepted the argument that the "rate of an employee's benefit accruals" does not have to be measured by the change in the "accrued benefit" because Congress did not specifically define the term "benefit accruals" in ERISA §204(b)(1)(H). See, e.g., Shea, Francese and Newman, "Age Discrimination in Cash Balance Plans: Another View", 19 Va. Tax Rev. 763 (2000). Accord Register, 477 F.3d at 68-69; Bryerton v. Verizon Communications, Inc., 2007 WL 1120290 at *4; Sunder v. U.S. Bank. Pension Plan, 2007 WL 541595 at *9; Finley v. Dun and Bradstreet Corp., 471 F.Supp.2d at 490; Hirt v. Equitable, 441 F.Supp.2d at 552.

The proponents of this position do not generally contest that the general or primary meaning of the term "benefit accrual" is the change in the "accrued benefit." The view that a plan sponsor can nevertheless select a second meaning of this key statutory term originates with Eaton v. Onan, supra, 117 F.Supp.2d 812. There, Judge Hamilton concluded that although the statutory phrase "rate of benefit accrual" generally means the change in the accrued benefit, it does not have a "single, self-evident meaning."  117 F.Supp.2d at 830 and 832-34. Eaton held that a second meaning can be attached to the term "benefit accrual" in the cash balance context based on how the plan sponsor has "defined" the benefit. Id.

Five years later, Judge Davis' opinion in Register v. PNC Financial, 2005

WL 3120268 *6-7 (E.D. Pa. 2005), followed <u>Eaton</u>. Judge Easterbrook's opinion

in <u>Cooper</u> also tracks <u>Eaton</u>'s analysis without citing it. <u>Cooper</u> concludes that the

phrase "rate of benefit accrual" can mean "the rate at which value is added (or

imputed) to an account." 457 F.3d at 638-39. "What the true meaning of 'accrued

benefit' may be is not controlling; 204(b)(1)(H)(i) does not use that phrase." <u>Id</u>. at

641. Six months later, the Third Circuit's <u>Register</u> decision followed both <u>Cooper</u>

and <u>Eaton</u> in holding that "the 'benefit' as used in the phrase 'benefit accrual'

refers to the stated account balance as that is how the benefit is defined by cash

balance plans." 477 F.3d at 68-70.

    The view that the term "benefit accrual" in ERISA §204(b)(1)(H) does not

have a "single, self-evident meaning," and therefore that the court can attach a

secondary meaning depending on how the plan sponsor defines the benefit,

ignores the standard principle that "if a term is susceptible to two meanings "all

but one ... is ordinarily eliminated by context." <u>Deal v. United States</u>, 508 U.S.

129, 131-32 (1993). If a statutory term is susceptible to different interpretations in

isolation, courts examine the "placement and purpose" of the term in the statutory

scheme, and other indicia of Congressional intent, including the use of the term in

other sections of the statute. <u>Holloway v. United States</u>, 526 U.S. 1, 6-7 (1999);

<u>Whitman v. Am. Trucking Ass'n.</u>, 531 U.S. 457, 465-68 (2001) (rejecting

"secondary meaning" that would insert economic cost factor into air quality

standard).

There is, moreover, a "presumption that similar language in two labor law

statutes has a similar meaning." Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58,

61 (1987). Smith v. City of Jackson, 544 U.S. 228, 233 (2005), emphasizes:

> when Congress uses the same language in two statutes having similar
> purposes, particularly when one is enacted shortly after the other, it is
> appropriate to presume that Congress intended the text to have the same
> meaning in both statutes. [21]

When the proposed secondary meaning "entails the replacement of standard

legal terminology with a neologism," these rules are "even stronger." BFP v.

Resolution Trust Corp., 511 U.S. 531, 537 (1994). Here, it is indisputable that

both Cooper and Register ultimately adopt a neologistic concept of "imputed"

"inputs" which is analogous to, but not the same as, the defined contribution plan

test for actual monetary allocations to an individual account.

In Esden, this Circuit recognized that "the rules governing distributions

from defined benefit plans are framed in terms of the normal retirement benefit –

typically a single life annuity payable at normal retirement age." 229 F.3d at 159.

---

[21] Harris Trust & Sav. Bank v. Salomon Smith Barney, 530 U.S. 238, 244-
46 (2000) (interpreting ERISA §502(a)(3) consistently with §502(a)(5));
Greenblatt v. Delta Plumbing & Heating, 68 F.3d 561, 576 (2d Cir. 1995)
(argument that company was an "employer" for purposes of one section of ERISA
but not another discarded because the "statute makes no such distinction").

The Court held that the Plan is not free to "contract around the statute":

> The Plan is correct that a pension benefit is defined according to the terms of the plan; but ERISA is quite explicit that those terms are circumscribed by statutory requirements and restrictions. The Plan cannot contract around the statute.

Esden, 229 F.3d at 173. The idea that benefit accruals can be measured by "imputed" "inputs" depending on whether the plan sponsor wants to "contract around" the statutory measure is simply inconsistent with Esden.

### D.    Cash Balance Plans with Graded Pay Credits Can Only Comply with the 133⅓% Accrual Rule Based on the Increase in the Accrued Benefit.

Close to 75% of the companies with cash balance formulas have graded pay credit schedules. ¶8. Graded pay credit schedules can only comply with ERISA §204(b)(1)'s backloading rules on the basis of the accrued benefit, i.e., the output. If the inputs, i.e., the hypothetical pay credits, are tested, the plan will not pass the anti-backloading tests. In Esden, pay credits ranged from 3.25 % to 11.0 %. 229 F.3d at 160. The Second Circuit observed that while the Bank of Boston's plan would fail the 133⅓% accrual test if the accrual rate was measured by the pay credits alone, the plan could still pass because of the value of the projected interest credits compounded to retirement: "while 11% is 338% of 3.25%, the Plan may still qualify under the 133 1/3 percent test because of the value of the interest credits compounded annually through normal retirement age ("NRA")." Id. at 167

n.18.

The same applies to CIGNA's formula. If the accrual rate is measured by pay credits, CIGNA fails because the differential between a 3% of pay credit in earlier plan years and a 7% pay credit in later plan years exceeds 133⅓%. As a result, a cash balance formula like CIGNA's can only comply with ERISA §204(b)(1)(B) on the basis of the annual benefit commencing at the normal retirement age, i.e., the accrued benefit. ¶101. Thus, even if the term "benefit accrual" in ERISA §204(b)(1)(H) could have a secondary meaning inconsistent with Congress' and the Federal agencies' unquestioned general use of the term, a cash balance plan with a graded pay credit schedule can only comply with the statute's benefit accrual rules based on the "accrued benefit." Equally obviously, the measure of benefit accrual certainly cannot shift from one subsection to the next, i.e., the "rate of benefit accrual" cannot mean "accrued benefits" for purposes of §204(b)(1)(B) and then hypothetical inputs in §204(b)(1)(H). See Mertens v. Hewitt Assocs., 508 U.S. 248, 260 (1993) ("language used in one portion of a statute (§ 502(a)(3)) should be deemed to have the same meaning as the same language used elsewhere in the statute (§ 502(a)(5))").

41

**E.    Age Discrimination and the "Time Value of Money" Are Not Mutually Exclusive; In a Defined Benefit Plan, Age Discrimination Occurs When an Employer Offers Older Employees Lower Retirement Benefits for a Year of Service than Younger Employees.**

No one suggests that cash balance formulas are based on actual accounts or contributions or that the accounts are credited with actual investment earnings. See Berger v. Xerox, supra, 338 F.3d at 758. Nevertheless, an analogy has been drawn between the way that interest credits are assigned to the accounts and the "time value of money." Register and Cooper both accept this analogy and suggest that the decreasing rates of accrual under cash balance formulas reflect the unremarkable consequences of the time value of money. Register, 477 F.3d at 69; Cooper, 457 F.3d at 639.

In re Citigroup and Richards, however, reject the argument that a "'mere correlation' exists between reduced rates of accrual and older age, because any reduction in rates of benefit accrual is really a function of the time value of money." 470 F.Supp.2d at 343. Richards finds that age is "perfectly correlated" with the reduced rates of accrual. 427 F.Supp.2d at 168. In Citigroup, Judge Scheindlin finds that while it "is a fair statement" that the reductions in the rate of benefit accruals are a "function of the time value of money," "it is inaccurate to the extent it assumes that the time value of money and age are mutually exclusive."

42

470 F.Supp.2d at 343. "Because the actuarial conversion [to the age 65 annuity] requires knowing an individual's age, cash balance plans are not age neutral....[A]s a matter of plain arithmetic, a greater value is added to a younger employee's account than to an older employee's account." Id. at 343-44.

A long line of authority supports Judge Hall's and Judge Scheindlin's conclusion that employers cannot avoid an anti-discrimination statute by explaining discriminatory effects in neutral economic terms that remain entirely dependent on age, race, or sex. In Arizona Comm. for Deferred Compensation Plans v. Norris, 463 U.S. 1073, 1081 (1983), the Supreme Court held that "one cannot say that an actuarial distinction based entirely on sex is based on any other factor than sex."

The same principle has been applied to age discrimination. As here, employers sometimes excuse reductions in benefits as not based on age, but rather on a factor that is perfectly-correlated with age, such as the number of years the employee has to retirement. In EEOC v. Jefferson Co. Sheriffs' Dept., 467 F.3d 571, 572 (6th Cir. 2006), the Sixth Circuit, sitting en banc, rejected the argument that the KRS plan "merely uses age as one of several factors to determine benefits" and held that the ADEA is violated when benefits were calculated "in such a way that an older employee who is eligible to receive disability benefits receives fewer

43

benefits–in the form of lower monthly payments–than a younger disabled employee." See also <u>Arnett v. CalPERS</u>, 179 F.3d 690, 695 (9th Cir. 1999), vacated and remanded on other grounds, 528 U.S. 1111 (2000) (the "practical application" of the formula "leaves no doubt that age at hire ... is the sole basis for lower benefits.").[22] The <u>EEOC Compliance Manual</u> provides that a formula that bases benefits on "potential years" to retirement is a proxy for age because it gives younger workers more "constructive years" than older workers.[23]

<u>Cooper</u> holds that the differences in the retirement benefits earned for a year of employment are simply because "younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn [imputed] interest on each year's retirement savings." 457 F.3d at 639. With due respect, this is the same

---

[22] Because <u>Kimel v. Florida Bd. of Regents</u>, 528 U.S. 62 (2000), held that public employees cannot sue State governments individually or collectively, <u>Arnett</u> was vacated. However, the EEOC refiled the suit under its authority and settled the case for the largest recovery in its history. See AARP Magazine, July-Aug 2003, online at: http://www.aarpmagazine.org/lifestyle/ Articles/a2003-05-21-mag-justice_age.htm .

[23] <u>Id</u>. at Section 3, Employee Benefits (issued October 27, 2000)). See also 67 Fed. Reg. 76123, 76124 and 76133 (2002 proposed Treasury regulations, now withdrawn prohibiting reductions that are "directly or indirectly" "because of the participant's attainment of any age"); 52 Fed. Reg. 45360, 45362, and 53 Fed. Reg. 11876, 11880 (1987 and 1988 proposed regulations by the EEOC and Treasury Department stating that age discrimination exists if age is a limiting factor).

as holding that it is not age discrimination for an employer to reduce retirement

benefits based on the number of years before retirement so long as the employer

excuses the reductions with an analogy to a neutral economic principle. A table

which progressively reduces the accrual rate based on age would be prohibited,

but the same table accompanied by an neutral explanation would not be.

Discrimination law has long rejected the idea that courts cannot go behind a

company's facially non-discriminatory explanation of obviously discriminatory

results. See, e.g., Hazen Paper Co. v. Biggins, 507 U.S. 604, 608-11 (1993).

**F.     The Periods of "Wear-Away" Where Neither Accrued Benefits Nor Imputed Inputs Are Actually Paid to Older Employees Violate the Age Discrimination Rule.**

As indicated above, CIGNA's cash balance formula does not satisfy the age

discrimination test for a defined contribution plan either. The test for defined

contribution plans requires that actual monetary contributions be allocated to a

participant's separate individual account. Actual investment returns must also be

allocated to the account, not artificial interest credits. No "wear-away" of those

allocations is allowed based on previously-earned benefits. As a result, even if this

Court had the latitude to substitute the defined contribution test, CIGNA's cash

balance formula would fail.

Mr. Poulin's analysis shows that CIGNA's cash balance conversion and

45

formula are based on age, even assuming <u>arguendo</u> that the measure of discrimination for a cash balance plan is costs. The wear-away periods result in zero benefits and zero costs for older employees like Amara, Broderick and Flannery, who "accrue no additional benefits" Tr. 222, lines 6-18, and Ex. 4, 21-30. The resulting costs are therefore non-existent or lower than for younger employees. See <u>Tomlinson v. El Paso</u>, supra, 2007 WL 891378 *2 ("it is far from clear that the hypothetical payments made to older employees' cash balance accounts ... should qualify as a 'cost incurred' under [29 U.S.C. §]623(f), especially if the company knows that the vast majority of older workers will never cash in these "payments" but will rather elect the (now-frozen) benefits they had earned under the old plan"). The discrimination against older employees like Ms. Broderick and Flannery cannot, moreover, be justified as an unavoidable effect of a non-age based decision. Many cash balance plans avoid any "wear-away" of previously-earned benefits based on age by providing "A+B" or similar transition formulas. ¶¶74-76 and 84.

CIGNA has recognized that "wear-aways" occur for a period of years, especially for those employees with "early retirement subsidies" from the previous plan. ¶¶86-87, 195-97. CIGNA's response to Plaintiffs' proposed pre-trial findings admitted that "early retirement eligibility is a function of age" and

46

that the Plan's periods of "wear-away" with no additional benefits are "more likely" for participants who are eligible for early retirement benefits under the prior plan. Dfs. 6/27/2006 Resp. to Pls. Prop. Findings, ¶¶81 and 93.

CIGNA nevertheless asserts that "the wear-away period for employees who are over age 65 will be less than the wear-away period for employees who are younger than age 65." Id. at ¶93. In addition to the fact that only 171 of 29,570 participants in the cash balance plan are over age 65, see Ex. 201, this defense is inconsistent with the law. If employees in a protected group are discriminated against, it is no excuse and "of little comfort" that "other members" are not. Connecticut v. Teal, 457 U.S. 440, 455 (1982) (Title VII); Dist. Council 37, AFSME v. NY City Dep't of Parks, 113 F.3d 347, 354 (2d Cir. 1997) (ADEA). Because the discrimination in actually paying the hypothetical cash balance inputs based on early retirement eligibility is undisputed, whether it is termed disparate impact or disparate treatment is inconsequential. The law prohibits both. Smith v. City of Jackson, supra, 544 U.S. at 235-38.

Although the IRS has not taken an official position, the testimony of the IRS's Chief Counsel before the Senate HELP Committee is instructive:

in active coordination with the Equal Employment Opportunity Commission (EEOC) and Department of Labor (DOL)... we are considering the whole range of factors that might indicate a cash balance plan conversion has resulted in age discrimination. For example, we will

47

> consider the impact of the wearaway period, as it affects employees of
> different ages.

Defs. Ex. 532 at 5 (emph. added); accord Tomlinson v. El Paso, supra.

## V.     CIGNA Violated Its Duty to Disclose Significant Benefit Reductions.

The "duty to disclose material information" is at "the core" of an ERISA

"fiduciary's responsibility." Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750

(D.C. Cir. 1990). In the floor debates on ERISA, the late Senator Jacob Javits,

the chief co-sponsor of ERISA, voiced his concern with "nicely phrased"

booklets that assured workers that they were "covered by a good pension plan"

when the "cold legal phrasing" in plan documents provided otherwise:

> Many workers are led to believe they are covered by a good pension plan
> because of nicely phrased booklets and other assurances handed them by
> their employers. When the time comes for the payoff, they learn that the
> cold legal phrasing in pension contracts says otherwise.

3 ERISA Leg. Hist. 4750. In response to these problems, Congress has required

understandable disclosures of benefit reductions in two forms of written

communication: (1) a summary of material modification ("SMM") or updated

summary plan description ("SPD"), required by ERISA §102(a), and (2) an

ERISA §204(h) notice of significant reduction in the future rate of benefit

accruals, which must be distributed at least 15 days in advance of the effective

dates of such changes.

Congress thereby intends to ensure that employees are told in understandable language about benefit reductions and other disadvantages from plan amendments. Armed with this information, "dissatisfied" employees can "bargain further" with the employer, Hamilton v. Air Jamaica, 945 F.2d 74, 78 (3d Cir. 1991), and if that is unsuccessful, at least make "well-informed employment and retirement decisions." Harte v. Bethelehem Steel, supra, 214 F.3d at 446, 451 (3d Cir.), cert. denied, 531 U.S. 1037 (2003).

To ensure that the Section 204(h) notices and the summaries of plan provisions are understandable, Congress and the Federal agencies have consistently used the same standard. The notices and summaries must be written "in a manner calculated to be understood by the average plan participant." See 29 C.F.R. 2520.102-2(a) (SPD), 2520.104b-3(a) (SMM) and Treas. Reg. 1.411(d)-6, Q&A 10 (Section 204(h) notice). To be written in this manner, a summary must satisfy several related rules:

> Any description of exception, limitations, reductions, and other restrictions on plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.... The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations.

29 C.F.R. 2520.102-2(b). The same understandability standard appears in other

statutes, including COBRA and the OWBPA provisions of the ADEA.[24] In each

case, the understandability requirement means that the notice must explain the

subject matter in a manner calculated to be understood by the average plan

participant. For example, an SPD must contain a statement:

> clearly identifying circumstances which may result in disqualification,
> ineligibility, or denial, loss, forfeiture, offset [or] reduction of any benefits
> that a participant or beneficiary might otherwise reasonably expect the
> plan to provide based on the description of benefits required by paragraphs
> (j) and (k) of this section [which provide that the plan's requirements
> "respecting eligibility for participation and for benefits" and for joint and
> survivor's benefits, including any election rules, must be described].

29 C.F.R. §2520.102-3(l). The SPD has to explain these "circumstances" in a

manner that the average plan participant can understand. Similarly, an ERISA

Section 204(h) notice must explain that an amendment which is about to take

effect is going to significantly reduce the future rate of benefit accrual. With this

information, employees can express their dissatisfaction and, if that is

unsuccessful, take actions to protect themselves.

_____

[24] Notices of rights to health insurance continuation coverage, which were mandated by COBRA along with the ERISA §204(h) notices, are required to be "written in a manner calculated to be understood by the average plan participant." 29 C.F.R. 2590.606-1(a). The same requirement is in the OWBPA provisions to the ADEA, which were enacted in 1990. See 29 U.S.C. §626(f)(1)(A); 29 C.F.R. 1625.22(b)(3) and (4); Thomforde v. IBM, 406 F.3d 500, 503-4 (8th Cir. 2005) (waiver of ADEA claim only valid if "it is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate"); Syverson v. IBM, 472 F.3d 1072, 1086 (9th Cir. 2007).

ERISA places the responsibility for these disclosures on the "plan administrator."[25] Here, the "plan administrator" is CIGNA because the Plan document does not designate anyone other than the corporation. ERISA §3(16)(A) and see Ex. 1 at 13 and 60.[26] Because fiduciary responsibilities attach to plan administration, see ERISA §3(21)(A), the assignment of the disclosures to the plan administrator reinforces the responsibility to "speak truthfully" in the communications. See Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994); Becker v. Kodak, 120 F.3d 5, 10 (2d Cir. 1997) (duty to disclose "complete and

---

[25] See 29 C.F.R. 2520.102-2(a) ("In fulfilling these requirements, the plan administrator shall exercise considered judgment and discretion by taking into account such factors as ... the complexity of the terms of the plan"); 29 C.F.R. 2520.104b-3(a) ("The administrator ... shall furnish a summary of any material modification to the plan"; "the administrator shall furnish this summary, written in a manner calculated to be understood by the average plan participant...."), and Treas. Reg. 1.411(d)-6, Q&A-1 ("The plan administrator must provide the notice ... not less than 15 days before the effective date of the plan amendment"). See also id. at Q&A 9, 11, 13-14.

[26] CIGNA assigned the title of Plan administrator internally to a particular employee (Stewart Beltz in the 1997-1998 time period and currently, John Arko), but the legal responsibility to fulfill the statutory functions remained CIGNA's. See ERISA §3(16)(A) and Wasley Products, Inc. v. Bulkalites, 2006 WL 3834240, *5-6 (D.Conn. 2006) ("employer/principal may be held vicariously liable under ERISA for the acts of its employee when the employee breaches fiduciary duties while acting within the scope of his employment"). In this instance, Mr. Beltz actually does not appear to have been involved with CIGNA's disclosures. ¶¶271-72. CIGNA's June 27, 2006, Proposed Findings of Fact state that Denise Hill, another former CIGNA employee, was "personally responsible for managing the communications process to employees."  Pls. ¶273.

51

accurate information"). Professor Langbein, who is recognized as one of the country's leading ERISA scholars, writes that "The court-created disclosure duties of ERISA fiduciaries respond to (and to some extent compensate for) the widespread use of conflicted fiduciaries in ERISA plan administration." "Questioning the Trust Law Duty of Loyalty," 114 Yale L.J. 929, 950-51 (2005).

In light of the statutory and regulatory language and purposes, the Second Circuit has required adverse changes to a plan to be "fully explained," including the full import of the interaction with any prior plan provisions. Layaou v. Xerox Corp., 238 F.3d 205, 210-11 (2d Cir. 2001); Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1040 (2d Cir. 1985). Accord Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 584 (2d Cir. 2006) ("SPD must be specific enough to enable the ordinary employee to sense when there is a danger that benefits could be lost or diminished," quoting Stahl v. Tony's Bldg. Materials, 875 F.3d 1404, 1408 (9th Cir. 1989)).

A.    **CIGNA's Cash Balance Conversion Substantially Reduced Future Benefits.**

Whatever legal arguments CIGNA wishes to advance about disclosures, there is no getting around that CIGNA's 1998 cash balance amendments substantially reduced benefits compared with the benefits offered under the prior 1.67% and 2% of highest average pay formulas. Mr. Poulin's Supplemental

Report shows how a change from a final average pay formula to a career average formula can cause an up to 42% reduction in future benefits by itself. Ex. 4 at ¶10, ¶169; and Tr. 256, line 8 - 256, line 13.

Based on three "profiles" of employees that CIGNA itself used in its analyses, Mr. Poulin found significant reductions for both Tier 1 and Tier 2 formula employees. Ex. 3 at ¶¶20-21. Using data supplied by CIGNA, Mr. Poulin further showed that the benefits of the named Plaintiffs, testifying witnesses and three other deponents were from 34 to 49% lower after periods of only four to eight years of additional employment compared with their benefits if the prior formulas had continued. ¶¶167 and 183.

CIGNA's consultant, Mercer, also computed significant benefit reductions, as did CIGNA's in-house actuaries. ¶¶179-82. CIGNA internally recognized that the Tier 1 (2%) formula "provides much higher pension benefits." Ex. 28 at 12288. Other memos show that the cash balance plan's benefits may be less than 50% of the benefits under the old plan's Tier 1 formula. ¶179. For Tier 2 (1.67%) formula participants, Mercer prepared comparisons generally showing 20% or more reductions. ¶¶181-82. The reductions for Tier 2 employees were actually considerably higher: Mr. Poulin's calculations, using CIGNA's data, show that the benefits of the four witnesses

from Tier 2 were reduced by an average of 40% after only four to seven years under the cash balance formula. Ex. 7 ¶6.

CIGNA's actuarial expert, Mr. Sher, did not contest these calculations. Instead, Mr. Sher was specifically instructed by Defendants' counsel not to do any comparative calculations.¶179. Mr. Sher's expert report indirectly showed that he agrees with Mr. Poulin's conclusion that the new formula substantially reduces the future rate of benefit accruals. Mr. Sher found that the new plan offers a level accrual rate of .75%, .8% or at most .9% of highest pay compared with the old plan's accrual rate of approximately 1.5% of highest pay. Ex. 10 at 19 and 20 n. 12. and Tr. 1219, line 13 - 1221, line 13.

At trial, CIGNA's counsel agreed that if CIGNA "never adopted the cash balance plan," and participants continued under the Part A plan, "they would have a larger benefit than they have under th[e] conversion." Tr. 908, line 20 - 909, line 1.

Mr. Poulin's actuarial report identified other features of CIGNA's cash balance conversion that CIGNA should have disclosed because they may cause losses of benefits that participants might expect, namely: (1) the exclusion of the value of early retirement benefits from the opening accounts; (2) CIGNA's application of a pre-retirement mortality discount to compute opening accounts,

(3) CIGNA's use of interest rates to establish opening accounts that may be higher than those available to "repurchase" annuities with the same accounts; and (4) the "greater of" approach which causes participants to lose several years of future accruals. Tr. 209, line 8 - 213, line 6; Ex. 3 (Poulin Rpt) ¶¶ 18-35.

Mr. Sher did not disagree with any part of Mr. Poulin's analysis. Mr. Sher agreed that early retirement benefits were excluded from the opening accounts, that mortality was "assumed at all ages," including before retirement, that falling interest rates have reduced the value of the opening accounts in terms of retirement benefits, and that the plan's methodology of comparing benefits under two formulas means that a participant's "actual benefit might be rising more slowly or not at all." Ex. 10 (Sher Rpt) at 8 and 29-35; Tr. 1344, line 13 - 1346, line 10. During the trial, Mr. Sher also agreed with the Court that at the time of the conversion, it would have been "predictable and known to CIGNA" that "opening balances for some sizeable group of employees" "would be less than their protected benefit under the old plan." ¶72.

### B.    Cash Balance Conversions "Mask" Benefit Reductions.

A "major stumbling block" to benefit reductions is "negative employee reactions." Ex. 236, fifth page. As early as 1999, the Wall Street Journal reported on professional conferences in which actuaries, including from the Mercer firm

which advised CIGNA, were joking about how cash balance conversions

"masked" benefit reductions until employees retired:

> Amy Viener, an actuary at William M. Mercer Inc., noted: "You switch to a cash-balance plan where the people are probably getting smaller benefits, at least the older-longer-service people; but they are really happy, and they think you are great for doing it."

> An actuary with Watson Wyatt Worldwide who spoke on a panel called "Introduction to Cash Balance/Pension Equity Plans" alongside Ms. Viener, is heard saying on a tape: "It is not until they are ready to retire that they understand how little they are actually getting." "Right, but they're happy while they're employed," responded Ms. Viener of Mercer.

Ex. 67. In 1996, Mercer prepared client presentation materials explicitly touting

how cash balance conversions can "mask" benefit reductions and identifying this

as a reason why cash balance conversions are "popular" with employers. Ex. 115.

Defendants' expert, Mr. Sher, concedes that "For the same reasons it's difficult to

compare apples with oranges, employees will find it difficult to compare benefits

under a cash balance plan with those under the prior traditional plan." Ex. 68.

CIGNA has also recognized that "exact comparisons of benefits" are "difficult"

for employees to make on their own. ¶309.

> ### C.    CIGNA's Communications and the Uncontested Expert Testimony Show that CIGNA Did Not Disclose Reductions But Instead Assured Employees that the "New Plan" Offered "Comparable" or "Larger" Benefits.

CIGNA's communications and the uncontested expert testimony show that

CIGNA offered its employees an overview of how the cash balance plan operates, and, when it said more, said the changes were a "plus" or an "enhancement" for employees and that their benefits would be "comparable" or "larger." The three documents that CIGNA now contends constituted its Section 204(h) Notice, Summary of Material Modifications, and Summary Plan Description are, respectively: (1) the November 1997 Newsletter, (2) the December 1997 Information Kit, and (3) the October 1998 and September 1999 SPDs.

Professor James F. Stratman, Associate Professor at the University of Colorado at Denver and Director of its Technical Communications Program, was retained by the Plaintiff class to examine the November 1997 Newsletter, the December 1997 Information Kit and the 1998/1999 SPD. Ex. 8 (Stratman Rpt) at 4. Professor Stratman is an expert in the understandability of written communications in the legal, business and technical fields. ¶228.

### 1. The Purported Section 204(h) Notice Tells Participants that the Changes Are "Enhancements" and Does Not Mention Reductions.

Professor Stratman analyzed the November 1997 Newsletter which CIGNA contends was its ERISA §204(h) notice. The Newsletter began with an inset from CIGNA's CEO telling employees that the cash balance changes will "significantly enhance" CIGNA's retirement program. Professor Stratman found that this

57

statement "set[s] certain expectations in readers about the nature of information

that will follow" and provides a "positive frame." Tr. 524, line 18 - 526, line 20;

Ex. 8 at 5. According to Stratman, the Newsletter not only leads participants to

anticipate an "enhance[ment]" and fails to disclose benefit reductions, but it also

contains three misleading representations:

> (1) Participants in the new plan "will see an overall improvement in
> their retirement benefits" (the inset box in the Newsletter, on p.2,
> col.b)

> (2) "[T]he new plan is designed to work well for *both* longer- and
> shorter-service employees'" (Newsletter p. 4, col. a);

> (3) The new plan provides "steadier benefit growth throughout [the
> employee's] career" (Newsletter p.4, col. a).

Professor Stratman testified at trial that these statements are "of concern

because there's no real qualification about some of the reductions that longer

service employees will encounter under the transition." Tr. 531, lines 5 - 14. He

also testified that "if the allegation of wearaway and that in particular is true, then

it's hard to see the consistency between what is going to happen to some of these

employees and the phrase or the clause 'provides steadier benefit growth'." Tr.

531, lines 7-24. He did not find "anything that explains the reductions in this

document or foreshadows them or hints of such occurring." Tr. 532, lines 7-23.

Professor Stratman also testified that the language in the Newsletter that

58

"one advantage the company will not get" "is cost savings" was "part of [the] consistent issuance of assurances to people that they're not going to be in trouble ... this may encourage people to believe that for other strategic reasons of importance to the company ... they're not doing this to get savings." Tr. 622, line 7 - 623, line 3.

In response to a Rule 30(b)(6) notice related to compliance with the disclosure rules, CIGNA produced John Arko, its Director of Retirement Benefits. According to Mr. Arko, the §204(h) Notice "of a reduction in the rate of accruals" was contained in a specific article within the November 1997 Newsletter. Ex. 239 (Arko Depo) at 41. Pressed on the subject, Arko specified the part of the newsletter that he believed gave the notice: "It was on Page 5 of this newsletter. It would be the story labeled, Opening Balances to be Calculated Next Spring." Id. at 47-8 (describing Tab 4 to Ex. 8). "I think that this story satisfies to the extent we were trying to put a 204(h) notice out, that this was – this notice and that story was intended to do that." Id. at 48. Asked where in the story the disclosure was made, Arko declared: "I think the entire story...." Confronted with each section of the story and asked "Does that ...tell participants that their benefits will be reduced under that new plan?" Mr. Arko testified for each section that "No," the language cited did not tell participants that their benefits will, in fact, be reduced under the

new plan. Id. 82-84. Having reviewed the article section by section, Arko finally

agreed:

> Q. Is there something in this article that tells employees that their benefits
> will be reduced under the plan?
>
> A. No.

Id. at 85. Mr. Arko attended the first part of the trial as CIGNA's corporate

representative, but despite foreshadowing about how he and others would defend

the company's disclosures, CIGNA never called Mr. Arko or anyone else to rebut

Professor Stratman and the other evidence about CIGNA's disclosures.

In response to the Court's questions at trial, CIGNA's counsel confirmed

that there are no statements in CIGNA's Newsletter, Information Kit, SPD or any

other written communication where CIGNA tells employees that "they were not

actually earning retirement benefits" as a result of the conversion. ¶256.

> ### 2.     *CIGNA's Summary of Material Modification and SPD Tell Participants that the Benefits Are "Comparable" or "Larger" Do Not Mention Reductions.*

CIGNA's Summary of Material Modification and Summary Plan

Description gave participants no more indication of the "reductions" or "wear-

aways" than CIGNA's purported ERISA §204(h) notice, but instead suggested

that the cash balance formula offered "comparable" or "larger" benefits to those

the employees previously enjoyed.

60

Professor Stratman analyzed the disclosures in the Information Kit (which CIGNA says is an SMM). He found that this summary assured participants that their previous benefits were "fully protected" with the opening accounts, as if this were a mere transfer of obligations. He found that in answer to the question "Why wasn't I allowed to stay in the [old] Pension Plan?" participants were assured that "in comparison to people with higher age and service combinations, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan." Ex. 8 at 8. Professor Stratman testified, "I don't think the average reader, against the consistency and the categorical nature of the earlier assurances, are going to see or feel anything of concern here and indeed, the language doesn't support that.  It says you've got plenty of time to reap the benefits of this new thing." Tr. 543, lines 12-23.

In response to the question, "Will my benefits be better under the new retirement plan?" CIGNA assured participants that "the new retirement plan, in comparison with the current pension plan, tends to provide larger benefits for shorter-term employees and comparable benefits for longer service employees." Ex. 8, at 8.  Professor Stratman testified that "the word 'comparable' suggests fairly equal," so readers are "going to get some feeling that, well, for us folks in this group that didn't get moved or get to stay in Plan A, we are going to be doing

61

about the same as we have been."  Tr. 552, line 10 - 553, line 14.

Mr. Poulin also examined a numerical example in the Information Kit that describes how the opening balances will, with interest, allow a participant to obtain the same annuity as before the change. Mr. Poulin found that the example is "mathematically impossible" because it fails to account for the "pre-retirement mortality" discount that CIGNA took. Tr.  237, lines 15- 239, line 23; Ex. 4 at ¶16.

Professor Stratman concluded that the Information Kit nowhere discloses that: (1) the opening balances did not "fully protect" the benefits that participants had already earned, (2) that "benefits may not grow at all for several years," and (3) even after such periods of wear-away, the future rates of benefit accrual were significantly reduced. Instead, the Kit offered contrary assurances and did not even "suggest ways in which benefit reductions relative to the old plan are possible." Ex. 8 (Stratman Rpt) at 7 and 9; see also Tr.  563, line 18 -  564, line 13 (there is "no qualification with respect to individuals who might be going ... to experience wearaway.  There's no mention of a qualification here concerning the words 'steadily growing'"). Professor Stratman testified that "given the consistency of the cues and the statements in all of these documents leading up to this 1998 summary plan document, the impression would be reinforced, that people were going to be in good shape and that they needn't be particularly concerned about

this transition." Tr. 562, lines 5-16.

Professor Stratman's analysis of the adequacy of the disclosures in the SPD is similar to his analysis of the Information Kit. Observing the SPD's promise that "Each dollar's worth of credit is a dollar of retirement," which was also in the Information Kit, Professor Stratman found that the SPD reinforces "[t]he notion that the change to the new plan involves no loss of benefits...." Ex. 8 at 10-11. At trial, he testified that "with respect to the alleged wearaway, there is no warning whatsoever. In fact, there's a very opposite kind of statement, reinforcing the impression that...you are continuously going to get your benefits." Tr. at 559, line 16 - 560, line 20. In sum, he concluded that the SPD fails to disclose three critical matters, namely, that:

> • Employees might not immediately begin earning benefits after conversion but will instead have new benefits delayed for a number of years.
>
> • The early (age 55) retirement benefits disappear entirely.
>
> • The employee's total pension value may not be comparable to what it was under the old plan and may even be substantially reduced.

Id. at 12. Professor Stratman found "nothing to really warn readers here about the nature and impact of the alleged reductions." Tr. 565, line 12 - 566, line 6.

Professor Stratman concluded that the SPDs were misleading:

> Instead of disclosing the potential reductions, the SPDs and precursor documents offer assurance of steadier benefit growth with no disclosure that

the rates decrease with age, that they drop in comparison with the old plan, or that they are conditional upon giving up part of the value of accrued benefits under the old plan.

Id. at 12-13.

Confirming Professor Stratman's findings, Mr. Arko's July 2003 deposition testimony as CIGNA's Rule 30(b)(6) witness conceded that CIGNA's SMM and SPD do not describe a single one of the reductions and other disadvantages that Mr. Poulin identified for Professor Stratman. Asked whether the SPD discloses that the opening accounts do not include early retirement benefits, he testified "I don't see specific words that define that detail." Asked whether the SPD discloses the potential for wear-aways, Mr. Arko was repeatedly non-responsive. Asked whether the SPD discloses that accrual rates decrease with age, he stated "I don't believe it directly does." Ex. 239 (Arko Depo) at 140-53, 285-92, and 321.

**D.     CIGNA Deliberately Withheld Accurate Information About the Effects of the Amendments to "Avoid Any Significant Negative Reaction from Employees."**

Discovery uncovered an explicit instruction from CIGNA to Mercer "not to compare the old to the new plans" in preparing the Newsletter (Section 204(h) notice) or the Retirement Information Kit (the SMM). ¶¶306-8. In addition to this instruction to Mercer, CIGNA produced documents showing that it instructed its own benefits personnel to keep employees in the dark about the reductions and not

provide any comparisons in response to requests for information:

> We continue to focus on NOT providing employees before and after
> samples of the Pension Plan changes.

¶¶310-21.

Despite these instructions, CIGNA was evidently still wary of negative

employee reactions. Therefore, as described above, CIGNA's disclosures

repeatedly assured the employees that their benefits were being "enhanced" or

improved. ¶¶203-14. The only reservation to the assurances that CIGNA expressed

was that they should stop short of "unequivocal statements about 'will not harm'

or 'big improvement.'" Ex. 58 at SuppD1581. Along this line, CIGNA told the

employees that the opening balances were computed by following "guidelines

established by the government," which CIGNA now admits do not exist. Compare

¶¶236-37 with Dfs. Prop. Findings ¶19. CIGNA represented that the employees'

prior benefits were "fully protected" in the opening balances, when they were not,

and CIGNA gave the employees an example to assure them of that protection,

which Mr. Poulin has determined was "mathematically impossible" because it

ignored the effect of the pre-retirement mortality discount that CIGNA had taken

in establishing those opening accounts. ¶¶208-9. CIGNA also assured its

employees that there were no "cost savings" from these changes, when the

evidence shows that CIGNA knew this was untrue. Compare ¶¶205, 207, 215 with

Tr. 1503, line 12 -  1506, line 21and ¶¶35-37.[27]

The record shows that the strategy behind CIGNA's communications was to "dispel any perception of a take-away" and "avoid[] any significant negative reaction from employees." ¶¶323 and 334-35. CIGNA was concerned with the possibility of newspaper articles about the reductions such as the Wall Street Journal's September 1997 article on Deloitte & Touche's cash balance conversion, which resulted in Deloitte & Touche having to roll back the changes. ¶¶324-29. Another Wall Street Journal article about how employees were losing benefits in cash balance conversions appeared on December 4, 1998. On the same day, CIGNA circulated a letter to its employees again assuring them that the "Plan is not designed to save money" and that CIGNA "wants to ensure that older, longer-service employees receive fair and adequate benefits at retirement." ¶332 and Ex. 217. The results of this disinformation campaign were, in CIGNA's words, "better than expected." ¶¶333-35. A March 13, 2000 e-mail from Gerald Meyn stated,"Our Jan 1998 introduction of the plan did not set off any significant rumblings at CIGNA and things remain quiet."  Ex. 124 at D14160.

---

[27] In Hirt v. Equitable, supra, 441 F.Supp.2d at 536, Judge Hellerstein found that "The savings that Equitable's management estimated to result from the change in pension plan is also indicative of the reduced rate of benefit accrual to participants."

E.    **ERISA Section 204(h) Requires Advance Notice of a "Significant Reduction" in Future Benefits.**

Since its enactment in April 1986, ERISA §204(h) has required that employees be told in advance when the pension benefits that they can earn in the future are being cut. As enacted, ERISA §204(h) provides that:

> a plan ...may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date to ...each participant in the plan.

P.L. 99-272, Sec. 11006.[28]

Section 204(h) was enacted in the same legislation that required employers to notify employees of their right to health insurance continuation coverage ("COBRA notices"). See Geissal v. Moore Med. Corp., 524 U.S. 74, 79-80 (1998). The Conference Report makes clear that giving employees "notice of the reduction" in advance of the effective date is what the rule is all about:

> an amendment to reduce significantly future benefit accruals under a plan is not effective unless, subsequent to the adoption of the amendment and at least 15 days prior to the effective date of the amendment, the plan administrator gives written notice of the reduction to each participant in the plan....

---

[28] Section 204(h) was amended in 2001 in respects generally not pertinent to this case. See Romero v. Allstate, 404 F.3d 212, 219 n.4 (3d Cir. 2005) (Congress "did not alter the basic notice requirement, but rather set forth requirements for the notice itself").

H.Conf. Rep. 99-453, at 569, reprinted in 131 Cong. Rec. 38124, 38287 (Dec. 19, 1985). Prior to Section 204(h)'s enactment, ERISA required that any material modification (positive, negative, or neutral) be disclosed in an understandable manner, but those disclosures could be distributed as late as 210 days after the plan year in which the modification became effective. 29 C.F.R. 2520.104b-3(a).

The Treasury Department first issued regulations on Section 204(h) in temporary form in 1995 under the title "Notice of Significant Reduction in the Rate of Future Benefit Accrual." These regulations allow a plan administrator to provide either the entire amendment or a summary of the amendment to each participant. 60 Fed. Reg. 64,320, 64,323 (Q&A 10) (Dec. 15, 1995). The regulations provide that a summary "need not explain how the individual benefit of each participant ... will be affected by the amendment," but it must be "written in a manner calculated to be understood by the average plan participant." Treas. Reg. 1.411(d)-6, Q&A 10[29]; see also 60 F.R. 64320, 64323 (Dec. 15, 1995) (temporary regulations).  The notice requirement would be a hollow shell if the summary is not required to give "notice of the reductions," especially when the

---

[29] This Treasury Regulation is no longer published in the Code of Federal Regulations because of the 2001 changes. The Federal Register citation is for the regulation is 63 F.R. 68678, 68682 (Dec. 14, 1998).

reductions are not otherwise understandable to an average plan participant.[30]

Parsing words, CIGNA suggests that a notice could summarize the amendment without disclosing its effect. Defs. 6/27/2006 Trial Br. at 70-71. This view has voiced by others, including CIGNA's actuarial expert, Ex. 11 (Sher Suppl Rpt) at 4, but it has never been accepted by the Treasury Department or any court. In one of the earliest Section 204(h) cases in this Circuit, Copeland v. Geddes Federal Sav., 62 F.S.2d 673, 678 (N.D.N.Y. 1999), a purported Section 204(h) notice was held inadequate because it was untimely and did not adequately "explain" what the early retirement features that were "eliminated" by the amendment.

In Frommert, supra, 433 F.3d at 263, the Second Circuit held that "under ERISA §204, plan sponsors are prohibited from amending a plan in a way that reduces future benefit accrual without proper notice to plan participants." In Frommert, an amendment created a "hypothetical" or "phantom" offset based on prior distributions. The Second Circuit held that "the application of the phantom account does not directly deplete an employee's pension account," but "it imposes a condition on the payment of benefits that leads just as surely to a decrease." 433

---

[30] In June 2001, Congress amended ERISA §204(h) to require still more specific information. P.L. 107-16, Sec. 659; Treas. Reg. 54.4980F-1, Q&A 11; 68 F.R. 17277, 17284 and 17287 (April 9, 2003). Romero v. Allstate, supra, 404 F.3d at 219 n.4.

F.3d at 268. The "ultimate effect" was that "once the phantom account was added, the value of an employee's accrued benefits were reduced significantly." Id. The Second Circuit held that Section 204(h) was violated because Xerox did not "fully explain[]" how the amendment reduced future benefits until several years after it was first implemented. Id. at 262.[31]

In Hirt v. Equitable Ret. Plan, supra, Judge Hellerstein observed that "Companies are free to change from traditional defined benefit plans to cash balance plans, notwithstanding that a significant reduction in future benefit accruals will result. But they must give adequate notice that their plans are being amended." 441 F.Supp.2d at 537. Equitable's "notice did not offer a comparison of benefits under the Cash Balance Plan to those under the former plan" and "did not give adequate notice ... about the reduction in retirement benefits produced by the amendment." Id. "A notice is intended to give fair warning, and fails to do so if it is cryptic, or requires research beyond the document itself." Id. at 538. In an August 24, 2006 opinion, the court expanded on that construction, holding that Equitable's notice "failed to give a clear and informative notice" as required by Section 204(h). Hirt (II), 2006 WL 2627564 *2. The court explained that the

---

[31] Furthermore, the Court held that Xerox's "belated disclosure" could not "stand in for the advance notice that is actually required under §204(h)." "[B]elated disclosure of so significant a change cannot be squared with ERISA's mandate." 433 F.3d at 262, 266.

advance notice requirement "is not a dry, technical item":

> laconic efforts to disclose an amendment without disclosing its purport and
> effect is not evidence of good faith. The requirement of actual notice to all
> participants is not a dry, technical item in a punch list of things-to-do; it is a
> means of communicating, to give a 'heads up' to those about to be deprived
> of an important economic expectancy that they might wish to take steps
> quickly to protect themselves as best they can, to compensate for, or avert,
> the anticipated deprivation.

Id., appeal pending under C.A. 06-4757.

In Richards, Judge Hall followed Frommert in holding that the "Complaint

could support a finding that the defects in notice 'likely, and quite reasonably led

participants to believe' that the wear-away effect and decreasing rate of benefit

accrual were not components of the plan." 427 F.Supp.2d at 173. Judge Hall later

certified a class on the employees' ERISA §204(h) claim under Rule 23(b)(2),

finding "no evidence that any of the putative class members had actual knowledge

of the full impact of the cash balance plan prior to the effective date of the

change." 238 F.R.D. 345, 350.

In In re Citigroup Pension Plan ERISA Litigation, 470 F.Supp.2d 323

(S.D.N.Y. 2006), Judge Scheindlin granted summary judgment to the plaintiff

employees because Citigroup's ERISA §204(h) notices were insufficient to notify

them of a reduction in benefits from a conversion to a cash balance pension

formula. 470 F.Supp.2d at 335 and 339-40. "Plaintiffs had every reason to expect

that under the new cash balance plan, their pensions would continue to accrue at a rate approved by Congress. It therefore is immaterial that the December 1999 §204(h) notice stated in bolded font that the 2000 [Cash Balance Amendment] could result in a reduction of their benefits." Id. at 339.[32] "Nor can it be said that the notices 'allowed applicable individuals to understand the effect of the plan amendment' because plaintiffs were without fair warning that the formula endangered their right to a minimum rate of benefit accrual." Id. (quoting 68 Fed. Reg. at 17283 (1998)). The court concluded that "[g]iven the material omissions, [the notice] remained 'insufficiently accurate and comprehensive to reasonably apprise Plan participants and beneficiaries of their rights'." Id. (quoting Frommert, 433 F.3d at 267).[33]

F.     **No Matter How Narrowly CIGNA Construes Section 204(h), It Cannot Be Satisfied by Telling Employees that Benefits Are "Enhanced" When They Are Actually Reduced.**

As indicated, CIGNA presently argues that Section 204(h), as it existed in 1997, did not require it to tell employees anything about reductions, but merely

---

[32] CIGNA's purported Section 204(h) notice did not contain any statement about a reduction of benefits, much less one "in bolded font."

[33] In In re J.P. Morgan Chase Cash Balance Litig., 460 F.Supp.2d 479, 491 (S.D.N.Y. Oct. 30, 2006), Judge Baer denied a motion to dismiss the ERISA §204(h) claim because plaintiffs alleged that defendants "failed to inform them that the switch to the cash balance plan would reduce their retirement benefit."

required it to announce that the plan was being amended. Dfs. 6/27/2006 Br. at 70-73. However, <u>Frommert</u> holds that §204(h) requires that notice of an amendment creating a significant reduction in the rate of future benefit accrual must explain that "benefits [will] be reduced" so employees can "make a meaningful decision regarding whether they [will] accept the terms." 433 F.3d at 262.

CIGNA distinguishes <u>Frommert</u> as holding that notice is required where benefit accruals are reduced "indirectly." Dfs. 6/27/2006 Br. at 72. But CIGNA's distinction actually reinforces the point because the reductions effected by a cash balance conversion are also indirect. Consistent with <u>Frommert</u>, the Treasury Department's regulations dating back to 1995 establish that advance notice to employees is required not only for direct reductions in percentages or dollar amounts, but also indirect changes that reduce future benefits, such as a change in the method of determining "average compensation" or the introduction of a "minimum benefit" provision that reduces future benefits. Treas. Reg. 1.411(d)-6, Q&A-6.[34] While a summary of a direct reduction in benefits from $20 per month to $10 per month may in one sense be self-explanatory without further disclosure that the reduction is 50%, it is next-to-impossible to provide an understandable notice of reductions from an amendment that <u>indirectly</u> reduces future benefits

---

[34] See 60 F.R. 64320, 64322 (Dec. 15, 1995), and 63 F.R. 68678, 68681 (Dec. 14, 1998).

without disclosing how the amendment effects benefits.

Here, moreover, far from relegating itself to a matter-of-fact announcement that the plan was being amended, CIGNA went out of its way in its Newsletter, Information Kit and SPD to offer employees the assurances that were necessary to avoid a negative reaction, telling them that there were no cost-savings, telling that the retirement program was being "enhanced" and that there would be an "overall improvement in their retirement benefits," "steadier benefit growth" and "comparable" or "larger" benefits. ¶¶229-253. Section 204(h)'s notice requirement cannot be satisfied by telling employees that their benefits are improved or enhanced when they are actually substantially reduced.

### G.    Benefit Reductions Must Also Be "Fully Explained" in Summaries of Material Modification or Updated Summary Plan Descriptions.

The Second Circuit has repeatedly emphasized the importance of disclosures and the summary plan description, in particular, to ERISA:

> ERISA "contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary."

Layaou v. Xerox Corp., 238 F.3d 205, 209-10 (2d Cir. 2001) (quoting

Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990)). The Court

has also stressed that the SPD regulations require an honest effort to

understandably communicate both the favorable and unfavorable parts of the plan without "misleading, misinforming or failing to inform":

> Regulations promulgated under ERISA prescribe the format of a SPD. The format of the summary plan description must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, [or] restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant ... [and] shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. 29 C.F.R. § 2520.102-2(b).

Layaou, supra, 238 F.3d at 209-10.

Since 1985, the Second Circuit has ruled that the "full import of the interaction" between existing plan provisions and an amendment altering the computation of benefits must be explained in an SPD, or else the disclosure does not comply with ERISA. Chambless v. Masters, Mates & Pilots Pension Plan, supra, 772 F.2d at 1040. In Layaou, 238 F.3d at 210-11, the Second Circuit determined that even general language that benefits "may also be reduced" is inadequate under this standard. Instead, Xerox had to fully disclose the interaction between "prior distributions" and current benefits. For the disclosure to be adequate, it had to explain how benefits are reduced and be definite, e.g., "will be reduced." Because "the explanations provided in the SPD ... did not provide the critical information needed by employees in [plaintiff's] circumstances ... the SPD

lacked the clarity and completeness required by § 1022."[35]

ERISA specifically requires that material modifications, including amendments that reduce benefits, be understandably disclosed to participants, using the same standards that apply to SPDs. See 29 C.F.R. 2520.102-2(b) and 2520.102-3(l) (the SPD regulation) and 29 C.F.R. 2520.104b-3 (the SMM regulation). ERISA thus prohibits an SPD (or an SMM) that "obscures" or tends to "minimize" benefit limitations. Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 110 (2d Cir. 2003), cert. denied, 540 U.S. 1105 (2004).

These rules are no different for cash balance conversions. In Richards, Judge Hall applied the disclosure requirements to "defects in notice" in a cash balance conversion, 427 F.Supp.2d at 173, and required disclosure of the "full import" of the conversion, particularly the wear-away effect which "is not an idiosyncratic contingency." 2006 WL 2092086 *8 (July 24, 2006). See also Burstein v. Allegheny Fdn. Ret. Acct. Plan, 2004 WL 2612162 *1 (E.D. Pa. 2004),

---

[35] On remand, the district court in Layaou found that a participant "would not know how or to what extent the benefit would be reduced" from the SPD, even though the amended plan provision "resulted in a significant reduction in plaintiff's benefits, compared to what he would have received without the offset." 330 F.Supp.2d 297, 303 (W.D.N.Y. 2004).

Compare McCarthy v. Dun & Bradstreet, 482 F.3d 184, 194-95 (2d Cir. 2007) (SPD adequately "disclose[d] the circumstances in which the actuarial reduction would occur"; "[t]here is simply no way that a former employee ... could be under the impression that he was to receive the same benefits").

on remand from 334 F.3d 365 (3d Cir. 2003) (after the Third Circuit ruled that an SPD's disclosures about cash balance conversion must be sufficiently comprehensive to apprise employees of changes affecting their benefits, the district court found that the term "earned" in the SPD in essence "created a contractual right to the hypothetical bookkeeping entries").

The Department of Labor has also recognized that the SPD/SMM regulations "require a reasonably comprehensive and clear description of the provisions of a cash balance plan and how a prior conversion may have affected benefits that classes of participants may have reasonably expected the plan to provide." 65 Fed. Reg. 70227 (Nov. 21, 2000).

**H.    Even If There Was No Affirmative Duty to Disclose at the Outset, CIGNA Had a Fiduciary Duty to "Speak Truthfully" When It Discussed the Effects of the Cash Balance Changes.**

As Professor Stratman testified, like CIGNA's Newsletter (the purported ERISA §204(h) notice), the Information Kit and the SPDs did not simply omit any explanation of the reductions. Instead, CIGNA affirmatively represented to the employees that the changes would result in an "enhanced" retirement program that "works well for both longer- and shorter-service employees, and offers "steadier benefit growth" with "comparable" or "larger" benefits than before and no cost savings for CIGNA ¶¶229-53.

77

Even if there was no affirmative duty to disclose the reductions at the start, CIGNA had a fiduciary duty to "speak truthfully" when it chose to address the impact of the changes. Meinhardt v. Unisys, 74 F.3d 420, 442-43 (3d Cir. 1996) ("when a fiduciary speaks, it must speak truthfully ... and when it communicates with plan participants and beneficiaries it must convey complete and accurate information that is material to their circumstance"). Instead of fulfilling this duty, CIGNA offered its employees a series of assurances that were neither accurate nor complete, such as that "Each dollar's worth of credits is a dollar of retirement benefits payable to you." ¶¶200-25.

In Mullins v. Pfizer, supra, 23 F.3d at 668, the Second Circuit recognized the fiduciary duty "not to affirmatively mislead participants." Pfizer maintained a policy of denying any rumors about a new plan, going so far as to announce "that it was not considering offering an increased lump sum severance plan in the foreseeable future." The Second Circuit held that "[w]e adopt the view that a plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan." Id. Although a fiduciary is not required "to be perfectly prescient as to all future changes in employee benefits," "when a plan administrator speaks, it must speak truthfully." Id. at 669. Similarly, in Hudson v. General Dynamics Corp., 118 F.Supp.2d 226,

78

249 (D.Conn. 2000), Judge Arteron held that "A fiduciary cannot leave its front-line benefits counselors in the dark, or instruct them to give noncommittal and nonfactual responses to inquiries regarding potential benefit changes, if the information that is withheld is material to beneficiaries."[36]

### I.    CIGNA's Disclosures Resulted in "Likely Prejudice" to the Participants' Ability to Make "Well-Informed Employment and Retirement Decisions."

Settling a longstanding question about the elements of a claim for relief from an inadequate SMM or SPD, Burke v. Kodak, supra, ruled that plan participants can prevail in cases challenging flawed SPDs without proving individual detrimental reliance. 336 F.3d at 112-14. Instead the Second Circuit requires a showing of "likely prejudice," meaning that the participant "was likely to have been harmed as a result of the deficient SPD:"

> This "likely prejudice" standard avoids the use of harsh common law principles to defeat employees' claims based on a federal law designed for their protection. The result is a presumption of prejudice in favor of the plan participant after an initial showing that he was likely to have been harmed.

336 F.3d at 113-14.

In Frommert, supra, the Second Circuit held that the "likely prejudice"

---

[36] Compare Flanigan v. GE, 242 F.3d 78, 84-85 (2d Cir. 2001) ("[c]ommunicating information about future plan benefits is indeed a fiduciary obligation" but finding no breach where there was no evidence that GE "withheld material information" or "purposefully misled the plaintiffs in any way").

standard was satisfied where "[t]he prolonged absence of any mention of the

phantom account from Plan documents, most notably SPDs, likely, and quite

reasonably, led plan participants to believe that it was not a component of the

Plan. Rather, rehired employees likely believed that their past distributions would

only be factored into their benefit calculations by taking into account the amounts

that they had actually received." 433 F.3d at 267. As a result, "they were deprived

of the opportunity to take timely action in response to the purported 'amendment'"

such as by "seeking injunctive relief, altering retirement investment strategies, or

perhaps considering other employment." Id. at 266.

After the remand in Layaou, the district court found that the "conspicuous

absence" of any "explanation" led Layaou to believe that "his monthly benefit

would be considerably higher then it turned out to be. That mistaken belief would

likely have affected plaintiff's financial planning for his upcoming retirement."330

F.Supp.2d 297, 304 (W.D.N.Y. 2004).

In Tocker v. Philip Morris, 470 F.3d 481, 488 (2d Cir. 2006), the Second

Circuit explained that a "two step approach" applies "[w]here the SPD is silent."

First, the court "look[s] to see whether ERISA requires the term to be stated in the

SPD." Second, the court "consider[s] whether plaintiff was likely prejudiced by

the SPD's silence on the term or information at issue." In Tocker, the Second

80

Circuit concluded that "the applicable statutes and regulations do not require" that the "level of discretion reserved to a plan administrator" be contained in the SPD and there was no "conflicting language" concerning that discretion in the SPD. Id.

Here, the "information at issue" concerns the circumstances in which benefits that a participant might reasonably expect to receive may be reduced or lost entirely (as in a wear-away). ERISA specifically requires such circumstances to be disclosed in a Summary of Material Modification or updated SPD. 29 C.F.R. 2520.102-2(b), .102-3(l) and .104b-3(a). CIGNA's violation of these requirements was not through mere "silence." CIGNA's purported Section 204(h) notice, SMM, and SPD led the employees in the opposite direction of believing that "[e]ach dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested" and that the cash balance benefits were "comparable" or "larger." CIGNA's representations and assurances are in marked contrast to the adverse impact of the changes and to the internal documents in which CIGNA recognized that the benefits under the prior formula are "much higher" and that wear-away periods can occur during which participants "accrue no additional benefits." See ¶¶81-92, 174-99, 381.

In Richards, Judge Hall relied on Frommert in holding that likely prejudice may be established when the disclosures lead participant to believe that reductions

such as decreased rates of benefit accrual and wear-away periods with no additional benefits "were not components" of the changes. 427 F.Supp.2d at 173 (following Frommert, 433 F.3d at 267); see also 2006 WL 860674, *4 (the "defects in disclosure themselves are significant enough to establish a presumption of likely prejudice, common to all members of the class").[37]

In re Citigroup, Judge Scheindlin rejected the defendant's position that the plaintiffs could not establish the "likely prejudice" element because the plaintiffs remained employed after learning about the amendment and, according to the defendant, the "only consequence" of the deficient Section 204(h) notice was that plaintiffs did not bring a lawsuit sooner. The court held that Frommert "explicitly *rejected* the notion that beneficiaries must demonstrate the type of prejudice urged by defendants." 470 F.Supp.2d at 340 (emph. in orig.). Because the notices were insufficient, the plaintiffs "were deprived of the opportunity to take timely action in response to the purported amendment." Id. (citing Frommert, 433 F.3d at 266).

In a later class certification decision, Judge Scheindlin reaffirmed the grant

---

[37] In certifying the class on the Section 204(h) and SPD claims in Richards, 2006 WL 2979373 *3 (D.Conn. Oct. 16, 2006), Judge Hall stated that "the court remains unpersuaded by the defendants' argument that these Counts require individualized assessments into each potential class member's proof and defenses, as the 'likely prejudice' showing may be satisfied by the terms of the plan itself."

of summary judgment, finding that the court "need not make 'individualized assessments into each potential class member's proof and defenses, as the likely prejudice showing is satisfied by the terms of the plan itself. The defects in the Plan's accrual formula and in the section 204(h) notices were themselves significant enough to establish a presumption of likely prejudice, common to all potential class members, and this presumption has not been rebutted." 241 F.R.D. 172, 179 (S.D.N.Y. 2006).[38]

Here, "likely prejudice" can be presumed from (1) "the defects in the disclosures themselves" as in Richards and Citigroup, (2) CIGNA's express instructions to Mercer and its own administrative staff to withhold comparative information, (3) CIGNA's internal memos about avoiding negative employee reactions, and (4) the expert and lay testimony at trial. The likely prejudice is unmistakable because CIGNA's disclosures repeatedly assure employees that the changes are enhancements and improvements. ¶¶229-254. As in Frommert, this led participants to believe that wear-aways and benefit reductions were "not a component of the plan" and permitted CIGNA to avoid the direct and indirect

---

[38] See also Ream v. Frey, 107 F.3d 147, 156 (3d Cir. 1997) (while "it is impossible to know exactly what steps the beneficiaries could or would have taken on the basis of that information, at a minimum they would have been able to negotiate with Frey for installation of a procedure to secure the funds. Failing that, we believe they could have sought injunctive relief under ERISA §502(a)(3)(B) on behalf of the plan to the same end").

costs to itself of negative employee reactions.

As a result of CIGNA's concentration on its bottom-line, employees were forced to make "employment and retirement decisions" without realizing that the annual cash balance benefit credits were not actually payable and that CIGNA was substantially reducing their future benefits. The "likely prejudice" was that employees lost the opportunity to register their dissatisfaction on a timely basis and bargain with CIGNA, formally and informally, to roll back the changes or else to take other actions to protect themselves, including suing earlier than they did or seeking to increase compensation to make up for the reductions. As the Court stated at trial, "it seems counterintuitive to me that people would gladly say, no problem, I don't have to earn any retirement benefit, just keep paying me." Tr. 631, lines 14-16.

The employees' testimony vividly shows how full disclosures would have likely led to demands for changes in the cash balance formula or additional compensation, adjusted 401k contributions and different retirement plans, and the pursuit of other employment opportunities. ¶¶339-75. For example, Patricia Flannery testified that she could have bargained for a higher salary at her rehire interview since she "took a cut to come back" to CIGNA, or she could have taken a job with another company and begun drawing early retirement benefits from

CIGNA.  Tr. at 877 lines 9-16; 904, lines 8 - 24. Barbara Hogan testified that she had two job offers at the time of the conversion, but she did not leave CIGNA "because I trusted [CIGNA] and I trusted that my pension plan was going to be continued."  Had she known about the extent of the reductions, she could have "upped [her] 401K to the limit" or asked for a raise as she had successfully done in the past.  Tr. 716, line 23 -  717, line 8.  CIGNA has not challenged the testimony of the named Plaintiffs and other witnesses about how they could have complained, asked for more benefits or compensation, and changed their employment, savings and retirement plans if they had known the extent of the benefit reductions.

CIGNA has instead deterministically contended, with no factual support, that if the benefit reductions had been disclosed to employees, it would not have "made a difference in the benefits they received." Dfs. 6/27/2006 Br. at 4; id. at 60 ("Because Plaintiffs and the testifying class members cannot show that they would have received any greater benefit had the alleged SPD deficiencies not existed, their claim fails"); and id. at 63 n. 40 ("here, there is no information Plaintiffs have alleged was missing from the SPD which, if included, would have permitted any class member to reap a larger Part B benefit").

Xerox made the same argument in Layaou, saying that:

> Layaou cannot show any prejudice because, even if the SPD had adequately explained the 'phantom account' offset, there is nothing that he could have done differently that would have resulted in his receiving a higher retirement benefit. Since the Plan itself provided for the application of the offset, according to defendants, plaintiff got exactly the benefit to which he was entitled.

330 F.Supp.2d at 302. The district court rejected this, seeing it as the back door to detrimental reliance:

> To adopt defendants' analysis, though, would effectively be to require plaintiff to show 'detrimental reliance' on the faulty SPD, a standard that the Burke court rejected.... To hold that plaintiff cannot recover because the *Plan* provides for the offset would run counter to the Burke court's admonition that 'the consequences of an inaccurate SPD must be placed on the employer' ... and instead would effectively penalize plaintiff for Xerox's issuance of a faulty SPD.

Id. (emph. in orig.) As Layaou and Frommert both show, likely prejudice from inadequate or misleading disclosures does not just involve the inability of participants "to reap a larger ... benefit" under a Plan's terms, but involves the "depriv[ation] of the opportunity to take timely action" with respect to retirement, employment, and even litigation decisions. Frommert, 433 F.3d at 266; Layaou, supra, 330 F.Supp.2d at 304.

Under Burke, there "is a presumption of prejudice in favor of the plan participant after an initial showing that he was likely to have been harmed." 336 F.3d at 113-14. Here, Plaintiffs have plainly made the initial showing of likely harm by demonstrating the materiality of the undisclosed information to

86

bargaining and employment, savings and retirement decisions, including CIGNA's recognition in internal documents and disclosures that information is critical to those very important decisions. ¶¶290-296. Again, CIGNA was not an innocent beneficiary of the employees' lack of information. CIGNA deliberately planned to cut their benefits while avoiding negative employee reactions by withholding information and offering the "opposite kind" of assurances. ¶¶322-37 and 241.

CIGNA's view of the "likely prejudice" standard has been as opportunistic as its approach to disclosures. Several times CIGNA has threatened to "grind" these proceedings "to a halt" by taking "25,000 depositions" and requiring each member of the class to individually prove "likely prejudice." See 6/10/02 Opp. Br. at 12. The statutory standard is, however, what the "average plan participant" would understand and could have done, not what each individual class member speculates years later that he or she "would have" done with adequate disclosures. ERISA §102(a). In Frommert, the Second Circuit assessed what "over 100 Xerox employees" could "likely" have done without examining individual-by-individual testimony. 433 F.3d at 267. As this Court has noted, Citigroup granted summary judgment to the employees with no trial and Richards has indicated that the defects in the disclosures themselves are sufficient to establish "likely prejudice." 470 F.Supp.2d at 340, 241 F.R.D. at 179 and 238 F.R.D. at 349. In Klay v.

Humana, 382 F.3d 1241, 1260 (11th Cir. 2004), the plaintiff class in a RICO action

was comprised of over 600,000 doctors. The doctors alleged that "explanation of

benefit" forms concealed that they were being underpaid by HMO's and induced

them to accept reduced payments. The Eleventh Circuit ruled that circumstantial

evidence can be used to prove reliance on the explanations common to the class

because "it is ridiculous to expect 600,000 doctors across the nation to repeatedly

prove these complicated and overwhelming facts."

Here, CIGNA has had ample opportunity to rebut the presumption of likely

prejudice contemplated by Burke. CIGNA has failed to do this, instead choosing

to rest without calling a single fact or expert witnesses on that issue. Any

opportunity that CIGNA thought it had to "grind" these proceedings to a halt with

individual proofs was thereby foreclosed and with good reason, given the

overwhelming evidence that CIGNA deliberately and callously misled its

employees about the effects of these changes.

## VI.    CIGNA Did Not Disclose the Amendment of Its "Rehire Rule" to Former Employees and Does Not Contest that This Likely Prejudiced Them.

Until December 21, 1998, CIGNA's Plan document contained a favorable

"Rehire Rule" which placed rehired employees back under the benefit formula that

they previously enjoyed when they last worked for CIGNA. Even if new hires

were subject to a less favorable formula, rehires were returned to the same benefit formula that previously applied to them.

A December 21, 1998 amendment changed the rule from one that provided for a "resumption of participation upon re-employment" to one that provided for "no resumption of participation." ¶¶378-79.[39] The effect of the amendment was to provide that all rehired employees would be placed under the cash balance plan where they could expect to "see no benefit improvement for several years." ¶381 and Ex. 140 at 4649. They were placed in the cash balance plan even though CIGNA knew that employees "close to retirement eligibility" could be left "without enough time before retirement to recover from this disruption." Ex. 8, Tab 2 at AMARA-00448.

The Third Circuit's <u>Depenbrock</u> decision on the adoption date of CIGNA's amendment to the "Rehire Rule" required CIGNA to place Janice Amara back under the old formula, but it did not affect employees like Gisela Broderick and Patricia Flannery who were rehired by CIGNA after December 21, 1998. These employees accepted offers to return to CIGNA unaware that they were being moved to a cash balance formula or that this meant not only lower pension benefits but "no benefit improvement for a period of years." ¶¶349, 357, and 381.

---

[39] In <u>Depenbrock</u>, supra, 389 F.3d at 83, the Third Circuit held that CIGNA did not adopt the amendment to its "Rehire Rule" until December 21, 1998.

CIGNA concedes that neither the November 1997 newsletter nor the December 1997 Information Kit were distributed to terminated vested employees. ¶385. Moreover, if notice to terminated vested employees was required, CIGNA has announced that it will not contest that there was "likely prejudice" to the former employees who were rehired. See Dfs. 6/27/06 Br. at 72-75.

CIGNA nevertheless maintains that it had the right to repeal this favorable rule without giving any notice to former employees because it was not "likely" that "droves" of former employees would return to CIGNA and be adversely affected by the change. See Dfs. 6/27/2006 Br. at 74, Dfs. Prop. Pre-Trial Conclusions at ¶121 and Pls. ¶¶386 and 392.

The Treasury regulations on ERISA §204(h) provide that whether notice is required "is determined based on all relevant facts and circumstances at the time the amendment is adopted." Treas. Reg. 1.411(d)-6, Q&A-9; 60 F.R. 64320, 64323 (1995). The regulations on summaries of material modification are even more specific: They provide that SMMs need not be distributed if the amendment "in no way affects ... vested separated participant's rights under the plan." "[A] modification in benefits under the plan to which such  ... vested separated participant ... had not at any time been entitled (and would not in the future be entitled) would not affect his or her rights and hence need not be furnished." 29

C.F.R. 2520.104b-4(c).

With respect to the SMM, it is impossible to conclude that repeal of the Rehire Rule "in no way affects" the rights of terminated vested employees. Thus, a summary of material modification was required to be distributed. With respect to the 204(h) notice, CIGNA relies on an example in the Treasury regulations where benefits for employees in Division M are reduced, but notice is not required for employees in Division N because "it is reasonable to expect that only a small percentage of employees in Division N will be transferred" to Division M. Treas. Reg. 1.411(d)-6, Q&A-9 (Example (4)) and Dfs. 6/27/2006 Br. at 74-75.

It is important to recognize that the amendment in the Treasury's example is not directed at the employees who will be transferred from Division N to Division M. If the amendment was directed at those employees, notice to them would certainly be required under the facts and circumstances test because it would be impossible for the amendment to affect anyone else.

In Frommert, the Second Circuit applied the Section 204(h) notice requirement to another "rehire" rule. Without notice, Xerox adopted a "phantom offset" which was applicable only to rehired employees. 433 F.3d at 257 and 262-63. The Court held that the amendment "imposes a condition on the payment of benefits that leads just as surely to a decrease" and required advance notice of the

change. Id. at 266-68 (citing Central Laborers, 541 U.S. at 744-45).

Here, the evidence establishes that (1) CIGNA made no determination under the facts and circumstances test "at that time" as the regulations require (see Treas. Reg. 1.411(d)-6, Q&A-9)(1)), (2) the amendment to the "Rehire Rule" was specifically directed at rehired employees as in Frommert, and (3) it was reasonably expected that a significant number of former employees would return and be affected by the change. In fact, "CIGNA rehired 2,600 former employees in 1998-1999" alone, close to 500 of whom would have been grand-fathered under the Part A Plan if the rehire rule had not been amended. ¶390.

Here, as in Frommert, the amendment had disastrous consequences on the future pension benefits of rehired employees. In Frommert, the Second Circuit found likely prejudice from Xerox's change because the rehired employees were deprived of the opportunity to seek injunctive relief, alter retirement investment strategies, or consider other employment. 433 F.3d at 266. Here, too, placing the rehired CIGNA employees under the cash balance plan with no prior notice had disastrous consequences for their benefits. The effect of the amendment was to cause employees like Gisela Broderick and Patricia Flannery to "see no benefit improvement" for the rest of their careers. ¶381 ("Rehires see no benefit improvement for several years").

The "likely prejudice" to rehired CIGNA employees from the failure to disclose this change in advance was confirmed when Gisela Broderick and Patricia Flannery testified that they might not have returned to CIGNA, or could have at least asked for additional compensation, if they had known their retirement benefits were not going to increase. ¶¶349 and 357. The likely prejudice from the non-disclosure is also demonstrated by CIGNA's admission that when rehires began to learn that they would be moved to the cash balance formula there were "Problems with rehiring those who would lose substantial amounts." ¶¶396-97.

The evidence of likely prejudice is so strong that CIGNA has now stated that, if notice is required, it will <u>not</u> contest that there was "likely prejudice" to the former employees who were rehired. Dfs. 6/27/2006 Br. at 72-75. At trial, CIGNA in fact presented no witnesses or other evidence to contest likely prejudice.

## VII. In Violation of Treasury Regulations, Participants and Spouses Were Not Notified When Annuity Options Have Greater "Relative Values" than the Cash Balance Accounts.

ERISA §§203(e) and 205(g) and the related Treasury regulations provide that any distribution of benefits other than in annuity form must be with the "consent" of participants and their spouses. For the consent to be valid, the participant and spouse must be provided an understandable explanation of the options, including an explanation of any difference in the value of the annuity

93

option. Treas. Reg. 1.411(a)-11(c)(2)(i) and 1.417(e)-1(b)(2)(i). Professor

Langbein explains the related trust law: "Beneficiary consent is ineffective, if,

when consenting, the beneficiary 'did not know of his rights and of the material

facts which the trustee knew or should have known and which the trustee did not

reasonably believe that the beneficiary knew.'" "Questioning the Trust Law Duty

of Loyalty," 114 Yale L.J. 929, 964 (quoting Res. (2d) of Trusts §216(2)(b)).

The application of trust law in this context is not a remote issue. Cases

related to inadequate disclosures about benefit options are, in fact, relatively

common. See, e.g., Burke v. Kodak Ret. Income Plan, supra, 336 F.3d at 114

(spouse was likely prejudiced from SPD's failure to disclose requirement that

spouse sign domestic partner affidavit for benefit eligibility); Jordan v. Federal

Express, 116 F.3d 1005, 1014-17 (3d Cir. 1997) (breach of fiduciary duty to

inform participant that election was irrevocable); Bixler v. Central Pa. Teamsters

Health & Wel. Fund, 12 F.3d 1292, 1300-3 (3d Cir. 1993) (breach of duty to tell

surviving spouse about best options); Lasche v. George W. Lasche Basic Profit

Sharing Plan, 111 F.3d 863, 867 (11th Cir. 1997) (waivers of retirement benefits

"must strictly comply with the consent requirements set forth in ERISA"); Davis v.

Adelphia, 475 F.Supp.2d 600, 605-606 (W.D.Va. 2007) (spousal consent invalid

because widow unaware when she signed consent form that husband was naming

his children as beneficiaries).[40]

### A.    CIGNA Did Not Tell Participants or Spouses When the Cash Balance Accounts Were Worth Less than the Annuity.

To better implement ERISA §§203(e) and 205(g), Treasury regulations were promulgated in 1988 which provide that participants and spouses who are making benefit elections must be provided an explanation about the "relative value" of the optional forms of benefit, including "the extent to which optional forms are subsidized relative to the normal form of benefit." Treas. Reg. 1.401(a)-20, Q&A 36.[41] As stated, "no consent is valid" unless this explanation is provided. Treas. Reg. 1.411(a)-11(c)(2)(i) and 1.417(e)-1(b)(2)(i). These regulations were issued as an "integral part" of Congress' strategy, as expressed in the 1984 Retirement Equity Act, of protecting "retirement subsidies" and the rights of surviving spouses. Costantino v. TRW, 13 F.3d 969, 979-80 (6th Cir. 1994). When participants and their spouses elect an option with a lower value, they essentially

---

[40] The Second Circuit's concern with inadequate disclosures of benefit options predates ERISA. See Gediman v. Anheuser-Busch, 299 F.2d 537, 545 (2d Cir. 1962) (Friendly) (finding breach of duty where explanation that a benefit "'Would not be as much as' [was] not an apt description of the relationship of $ 32,780.44 to $ 79,690"; it did "not convey to the ordinary unlearned pensioner that on this account it would be only 42% as much").

[41] This regulation is no longer in the Code of Federal Regulations because it was replaced by a newer set of regulations. The cited regulation can still be found at 53 Fed. Reg. 31837, 31849 (Aug. 22, 1988) and are also included as Ex. 206.

are "being invited to sell their pension entitlement back to the company cheap."

Berger v. Xerox, supra, 338 F.3d at 762.

The Treasury regulations provide that participants must be "furnished ... sufficient additional information to explain the relative value of the optional forms of benefit available under the plan (e.g., the extent to which optional forms are subsidized relative to the normal form of benefit)." Treas. Reg. 1.401(a)-20, Q&A 36. CIGNA was certainly aware of this regulation because it adopted nearly identical language in its Plan document. Section 7.1(b) specifically requires "sufficient additional information to explain the relative values of the optional forms of benefit available under the Plan." Ex. 1 at D00305.

CIGNA was also aware that the relative values of the optional forms of benefit available under the Plan were not always equal, particularly when a participant was eligible for an early retirement benefit. In a September 1997 memorandum, Mercer specifically warned CIGNA that "any Tier 1 employee electing a lump sum would forfeit the value of the early retirement subsidy." ¶412.

However, CIGNA never communicated the forfeitures that Mercer warned about to its employees. Instead, its Retirement Information Kit told employees that the "lump sum distribution option can be very valuable." Ex. 8 at Tab 4, page AMARA-00452. It said nothing to suggest that participants who chose a lump sum

96

could be forfeiting part of the value of their benefits. Benefit option materials were automatically distributed to participants within 60 days after separations from service, ¶405, but those materials never mentioned forfeitures. As its Rule 30(b)(6) witness, John Arko, admitted in April 2006, CIGNA never gave participants or spouses any information on the relative values of options. ¶¶423-24.

Lillian Jones, a CIGNA retiree who started work at age 18 and worked for CIGNA for 35 years through two layoffs, was a victim of CIGNA's failure to disclose. ¶417. With no disclosure about the relative value of her benefit options, Ms. Jones elected a lump sum distribution and lost an early retirement subsidy that Mr. Poulin testified was worth approximately $80,000 more than the lump sum that she received. Tr. 288, line 13 - 289, line 14 and Ex. 7 (Poulin Indiv Calcs) ¶7.[42] At trial, Ms. Jones testified that she did not know that the annuity option was more valuable by $80,000. She testified that if CIGNA had told her that the annuity option was worth $80,000 more than the lump sum, she would "definitely have chosen the life annuity." ¶418. Summoned as an adverse witness, Lorraine Morris, the head of Prudential's Retirement & Investment Services division, testified that she could not tell which of Ms. Jones' options was more valuable

---

[42] CIGNA's disclosures to class representative Gisela Broderick were also deficient. Ms. Broderick was not told that her annuity option was worth more than the lump sum option.  Ex. 38.

from CIGNA's benefit election materials either. ¶425.

The Treasury regulations also require disclosure of relative values when a benefit with a higher value is available if a participant defers the commencement of benefits. Without those disclosures, class member Douglas Robinson elected a lump sum distribution at age 54 and 3 months when an annuity benefit worth twice as much was not disclosed to him. ¶403-4.[43] The Treasury regulations provide that the optional forms of benefit that must be explained to participants include options with later commencement dates. Treas. Reg. 1.411(d)-4, Q&A-1(b)(1); see also 1.411(d)-3(g)(6)(ii)(A), and 1.401(a)(4)-4(e)(1). Moreover, CIGNA's SPD contained an express promise that participants would be "notified" if their "old plan benefits" were more than the cash balance account. Ex. 8 (Stratman Rpt) Tab 3 at 13 and Tab 4 at J-7.

Rather than disclose that Mr. Robinson would receive nearly $900 more per month in a lifetime annuity by deferring his election for nine months, CIGNA described a "deferred option" under which he only would "receive interest" by waiting. ¶¶403-4. CIGNA's communications are inconsistent with the Treasury regulations on disclosing relative value, the promise in the SPD about notifying

---

[43] CIGNA's disclosures to class representative Janice Amara, who left at age 53 and 8 months, were similarly deficient. Ex. 146. But Ms. Amara was subsequently returned to the Part A formula pursuant to the Depenbrock ruling. ¶164.

participants of the "old plan benefits," and the fiduciary obligation to "speak truthfully." See Mullins v. Pfizer, Inc., supra, 23 F.3d at 669.

Over 9,900 out of 10,337 class members who have separated from service to date have elected lump sum distributions. Ex. 9 (Caalim Decl.) ¶6. CIGNA's response has been to act as if Lillian Jones and Douglas Robinson are the "only" examples that Class counsel can locate. Dfs. 6/27/06 Br. at 47. But of the 17 records of separated class members that were reviewed in an on-site inspection of pension records on January 17, 2006, 6 of the 17 were participants who selected lump sum distributions instead of more valuable annuity options, including Ms. Jones, Mr. Robinson, Dolores Feeney-Gallagher, Peter Andruszkiewicz, Robert Scanlan, and Michael McCormack. See Exs. 144, 191 and 207.

CIGNA has not provided a single example where the information about relative values was disclosed. ¶416. The class' April 2006 30(b)(6) depositions established that despite Mercer's warning about forfeitures, CIGNA and Prudential were somehow operating under the idea that all of its benefit options had equal actuarial value. ¶¶422-23.

CIGNA has offered no defense to its failure to tell participants about the "relative value" of their benefit options. Mr. Sher's only effort was to maintain that (1) CIGNA is not the only company to ignore the Treasury Department's 1988

99

"relative value" regulation, and (2) he personally believes that disclosures of relative value can be "misleading" to participants who have terminal health conditions like cancer that make a lump sum more attractive to them. ¶¶429-32.

Mr. Sher's testimony did not establish widespread non-compliance. ¶¶429-30. Defined benefit plans do not generally offer options with unequal actuarial value. At trial, Mr. Sher named two companies that he knew where such options were offered. Even if a herd mentality was at work, the non-compliance of others is not an excuse, Soares v. State of Conn., 8 F.3d 917, 921 (2d Cir. 1993) (reporting requirements for commercial fishing), and Mr. Sher acknowledged that he knows nothing about the actual reasons for CIGNA's actions. He was not aware that CIGNA's Plan specifically provides for these disclosures in conformity with the regulations. Tr. 1249, lines 11-15.

With respect to Mr. Sher's belief that actuarial values can sometimes be misleading, the simple answer is that the regulatory policy judgment is for the Treasury Department. If an employer is worried that an individual with a serious health condition might opt for an annuity when the lump sum is more valuable, it can add an appropriate disclaimer. But the Treasury regulations do not allow a company or a consultant to bootstrap an exceptional situation into a nullification of the general disclosure obligation. Moreover, Mr. Sher's speculation that

CIGNA might be averse to making statements about the "value" of a participant's benefits is belied by the provision in CIGNA's Plan which commits to making these disclosures and by the repeated assurances in CIGNA's communications that the "value" of participants' benefits was "fully protected" under the cash balance amendments and that "the lump sum distribution option can be very valuable." ¶¶208, 411, and 414.

### B. As Late as the Month Before Trial, CIGNA Was Withholding Information About the Greater Relative Value of the Part A/Tier 1 Annuities from Participants in the Depenbrock Group.

The retirement benefits of many of the class members whose benefits have been recalculated under the Depenbrock decision nearly doubled when they were placed back into the "much higher" traditional defined benefit formula. ¶¶163-66. But over 2½ years later, CIGNA has still not implemented the Depenbrock decision for all of the 194 members of this group whom that decision affects.[44]

Even in the instances where CIGNA has performed the recalculations, class members have been told that they must make "irrevocable" elections between the "Part A" benefits and cash balance. To assist with those elections (which CIGNA

---

[44] CIGNA has excluded 24 members of this group on grounds that are not stated in the Third Circuit's decision, e.g., only a short period of work after the rehire. Calculations related to 24 additional members of this group have never been produced. ¶440.

developed despite the fact that the <u>Depenbrock</u> decision contemplates an automatic return to Part A), CIGNA offered these class members no information about the "relative value" of Part A versus cash balance in conformity with the rules described above. Instead, CIGNA asked participants to make an irrevocable election about the "option" to stay under the cash balance formula, without disclosing the "relative value" of the options. ¶441. Again, this violates the regulations on disclosing the relative value of benefit elections and makes any consents to the less valuable cash balance option that CIGNA has secured invalid.

**VIII.  Complete Relief Including Past Benefits Can Be Provided to the Members of the Class under ERISA §§502(a)(3) and (a)(1)(B) Consistent With <u>Great-West</u> and the Second Circuit's Decisions in <u>Frommert</u> and <u>Swede</u>.**

On September 12, 2006, the Plaintiffs filed an Additional Submission on Relief at the Court's request, which describes the remedies sought for each violation. Dkt. #205. The requested relief for some of the violations is virtually built into the statute and regulations whereas the relief for other violations is established by precedent and reason. To illustrate, ERISA §204(h) provides that "unless" the statutory notice of significant reduction is provided, the plan "may not be amended so as to provide for a significant reduction in the rate of future benefit accrual." See <u>Frommert</u>, 433 F.3d at 268 ("without such proper notice to Plan participants, the amendment was ineffective as to them"); <u>Citigroup</u>, 470

F.Supp.2d at 340 ("the amendments never took legal effect"). Similarly, the

Treasury regulations on relative value disclosures provide that "No consent is

valid" unless the participant has received an explanation of the relative values of

the optional forms of benefit. Treas. Reg. 1.417(e)-1(b)(2)(i). Thus, the statute and

regulations establish at least the core element of the relief. By comparison, the

relief for violations of the anti-backloading and nonforfeiture rules or the SPD

requirements, although established under the case law (e.g., by <u>Burke</u> for a

violation of the SPD requirements) or by reason (e.g., voiding the provision that

violates the nonforfeitability requirements), is not directly prescribed by the statute

or regulations. See <u>Frommert</u>, 433 F.3d at 272 (district court's determination of

appropriate equitable relief "must be based on ERISA policy and the 'special

nature and purpose of employee benefit plans'").

       While some plan sponsors, including CIGNA in its pre-trial brief, are

actively contesting the availability of remedial relief in the form of retirement

benefits for ERISA violations, requiring that such benefits be provided is a

painfully obvious and necessary enforcement mechanism for a statute which is

entitled the "Employee Retirement Income Security Act." Requiring a trustee to

provide benefits in conformity with applicable law is also a longstanding form of

equitable relief. <u>Res. (2d) of Trusts</u>, §199 ("Equitable Remedies of Beneficiary":

"The beneficiary of a trust can maintain a suit (a) to compel the trustee to perform

his duties as a trustee; (b) to enjoin the trustee from committing a breach of trust;

(c) to compel the trustee to redress a breach of trust..."); id. § 197 ("Nature of

Remedies of Beneficiary": "Except as stated as Section 198, the remedies of the

beneficiary against the trustee are exclusively equitable").[45]

    Consistent with trust law, ERISA §502(a)(3) authorizes the courts "to

enjoin any act or practice which violates any provision of this title or the terms of

the plan or to obtain other appropriate equitable relief to redress such violations

or to enforce any provisions of this title or the terms of the plan." As the Supreme

Court held in Sereboff v. Mid Atlantic Medical Services, --U.S.--, 126 S.Ct. 1869,

1874 (2006): "ERISA provides for equitable remedies to enforce plan terms, so

the fact that the action involves a breach of contract can hardly be enough to

prove relief is not equitable; that would make Section 502(a)(3)(B)(ii) an empty

promise." The Supreme Court has also held that "[t]he fact that a judicial remedy

may require one party to pay money to another is not a sufficient reason to

characterize the relief as 'money damages.'" Bowen v. Massachusetts, 487 U.S.

879, 893 and 895 (1988) (that the benefits are monetary "cannot transform the

---

[45] Section 198 provides: "If the trustee is under a duty to pay money
immediately and unconditionally to the beneficiary, the beneficiary can maintain
an action at law against the trustee to enforce payment."

nature of the relief sought–specific relief, not relief in the form of damages"). In Great-West v. Knudson, 534 U.S. 204, 212 (2002), the Supreme Court affirmed Bowen, describing it as a suit that "was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward."

ERISA §502(a)(1)(B) separately provides authority for a participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." In Frommert, 433 F.3d at 270, which involved violations of ERISA §§204(h) and 204(g), the Second Circuit adopted the approach that when benefits have been calculated by applying an unlawful plan term, e.g., a term that is invalid because of the absence of 204(h) notice, but there is no ongoing violation because the violation has been eliminated going forward, the participant may recover benefits under the lawful plan terms under ERISA §502(a)(1)(B).[46]

When, as here, there are past due benefits and ongoing violations, Bowen and Great West indicate that the past benefits can be awarded under ERISA

---

[46] See also West v. AK Steel, 484 F.3d 395, 2007 WL 1159951, *8 (6th Cir. 2007) (Section 502(a)(1)(B) provides appropriate remedy for plan's failure to use "whipsaw calculation" to determine lump sum distributions; although "§502(a)(1)(B) offers redress only for the recovery of benefits, enforcement of rights, or clarification of rights to future benefits under the terms of the Plan, those terms must nevertheless comply with ERISA"); Berger v. Xerox, supra, 338 F.3d at 763-64.

§502(a)(3) if they are an "integral part of an equitable remedy" going forward. 534 U.S. at 218. Alternatively, past benefits can be awarded under §502(a)(1)(B) pursuant to Frommert and ongoing violations can be enjoined under §502(a)(3).

In Swede v. Rochester Carpenters Pension Fund, 467 F.3d 216, 219 and 221-22 (2d Cir. 2006), the Second Circuit affirmed these principles, holding that a former employee is entitled to "full retroactive benefits" for an ERISA violation. Although the Carpenters Pension Fund restored Mr. Swede's benefits as of November 2004 in light of the Supreme Court decision on ERISA §204(g) in Central Laborers' Pension Fund v. Heinz, 541 U.S. 739 (2004), it refused to pay him his full retirement benefits for the full period during which they were suspended. The Fund contended that IRS Revenue Procedure 2005-23 limited the retroactive effect of Heinz. The Second Circuit disagreed, concluding that Rev. Proc. 2005-23 did not "affect the substantive rights of parties under ERISA." 467 F.3d at 221. In so holding, the Second Circuit also rejected the Fund's argument that retroactive relief should not be allowed, citing the Supreme Court's decisions in Harper v. Virginia Dept. of Taxation, 509 U.S. 86 (1993) and Reynoldsville Casket Co. v. Hyde, 514 U.S. 749 (1995).

In In re Citigroup, supra, 241 F.R.D. at 181, Citigroup challenged whether restoring retirement benefits for the violations of ERISA §204 might fall outside

106

the ambit of "restitutionary relief." Judge Scheindlin held that "[w]hile it is true

that Plan participants are suing to recover benefits, the primary relief being

sought is declaratory" which "is neither restitutionary nor equitable." "What is

sought is a declaration that [Citigroup's] method of computing [accrued benefits]

is unlawful. [A] declaratory judgment is <u>normally</u> a prelude to a request for other

relief, whether injunctive or monetary." <u>Id</u>. (quoting <u>Berger</u>, 338 F.3d at 764).

**Conclusion**

This Court should not afford CIGNA "latitude in defining accrued

benefits" or "benefit accruals" for purposes of ERISA's statutory tests that would

essentially allow CIGNA to circumvent or nullify ERISA's anti-backloading and

nonforfeitability rules, as well as its protection against age discrimination in

benefit accrual rates. These rules were enacted to serve vitally important

protective purposes and should be enforced in the same manner. If CIGNA is

allowed to invent "hybrid" definitions of key statutory terms, the rules become

shams that fail to protect employees' retirement incomes.

Similarly, if CIGNA is allowed to intentionally mislead its employees

through written communications into believing that their cash balance benefits

were going to be "comparable" or "larger" and avoid honest disclosures of benefit

reductions, as well as the relative value of benefit options, participants will never

possess the information that Congress intended for them to have in order to make "well-informed employment and retirement decisions" and, in the case of Section 204(h), to be able to register their dissatisfaction on a timely basis in advance of the effectiveness of benefit reductions.

For these reasons, the named Plaintiffs and the Plaintiff class respectfully request that the Court find in its favor and grant the remedies that have been separately described. Without enforcement and complete relief, ERISA protections of employees' anticipated retirement income will be diminished to the kind of hollow promises that ERISA was enacted to stop more than 30 years ago.

Dated: May 25, 2007

Respectfully submitted,

 s/ Stephen R.Bruce
Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

 s/ Thomas G. Moukawsher
Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Named Plaintiffs and
the Plaintiff Class

108

## <u>CERTIFICATE OF SERVICE</u>

I certify that copies of the foregoing Plaintiff Class' Post-Trial Brief,

Proposed Post-Trial Findings of Fact with Appendices I and II, and this

Certificate of Service, were filed electronically through the CM/ECF system on

May 25, 2007.  Notice of this filing will be sent by e-mail to all parties listed

below by operation of the Court's electronic filing system:

> Joseph J. Costello
> Jeremy P. Blumenfeld
> Jamie M. Kohen
> Morgan, Lewis & Bockius
> 1701 Market St.
> Philadelphia, PA 19103-2921

> Christopher A. Parlo
> Morgan Lewis & Bockius
> 101 Park Avenue
> New York, NY 10178-0600

> James A. Wade
> Erin O'Brien Choquette
> Robinson & Cole, LLP
> 280 Trumbull Street
> Hartford, CT 06103-3597

/s/ Thomas G. Moukawsher
Thomas G. Moukawsher  ct08940
21 Oak Street
Hartford, CT 06106
(860) 278-7000
(860) 446-8161 (fax)
tmoukawsher@mwlawgroup.com

Attorney for Plaintiffs