# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANICE C. AMARA, GISELA R. BRODERICK, ANNETTE S. GLANZ, individually and on behalf of all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | |
| vs. | : : | Civil No. 3:01-CV-2361 (MRK) |
| CIGNA Corp. and CIGNA Pension Plan, | : : : | |
| Defendants. | : | |

## PLAINTIFFS' PROPOSED POST-TRIAL FINDINGS OF FACT

Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

Thomas Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Named Plaintiffs
and Plaintiff Class

## Table of Contents

I.     Characteristics of Defined Benefit, Defined Contribution and Cash
       Balance Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    CIGNA's Conversion to a Cash Balance Formula Mimicked Some Features
       of a Savings Plan, But Left Employees with No Actual Accounts, Annual
       Contributions, or Investment Earnings  . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.   CIGNA's Use of a "Greater of" Transition Formula in Combination With
       Reductions in Future Benefits Produces "Wear-Aways", i.e., Years with
       No Further Benefit Accruals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
       A.     The Experts Agree on What Caused the Wear-Aways and that the
              Wear-Aways Were Predictable . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
       B.     The Periods of Wear-Away Are Not an Inherent or Natural Part
              of a Cash Balance Conversion; an "A+B" Formula Would Have
              Avoided Wear-Aways  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
       C.     CIGNA Admits that There Are Years in Which "Employees
              Accrue No Additional Benefits" and that It Anticipated That
              Result. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
       D.     CIGNA's Actuarial Expert Maintains that the Wear-Aways Are
              "Beneficial" to Employees and a "Good Thing".. . . . . . . . . . . . . 34
       E.     The Plan Years With No Additional Benefits Are Followed by
              Plan Years in Which the Accrual Rate Is More Than 133⅓%
              Higher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
       F.     CIGNA Has Conditioned Future Cash Balance Accruals on
              Participants Giving Up Statutory Rights to Previously-Earned
              Annuities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV.    The Rate at Which Employees Earn Retirement Benefits Under CIGNA's
       Cash Balance Formula Decreases with Age  . . . . . . . . . . . . . . . . . . . . . . 44
       A.     Internally CIGNA Recognized that "Older" Employees Lose
              Benefits with Cash Balance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
       B.     CIGNA's Board Was Told of CIGNA's "Vulnerability" to the
              Age Discrimination Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

V.     Cash Balance Conversions "Mask" Benefit Reductions Because
       Participants Cannot Compare Cash Balance Formulas with the Prior

Benefit Formulas Without Converting Credits to Annuity Form . . . . . . . 55

A.  CIGNA's Cash Balance Conversion Substantially Reduced
Future Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.  Internally CIGNA Was Aware that the Cash Balance Conversion
Reduced Future Benefits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

C.  CIGNA's SPD, SMM and Purported Section 204(h) Notice Do
Not Disclose the Reductions in Future Benefits. . . . . . . . . . . . . . . 69

    1.  Professor Stratman found no disclosures of reductions or
    other disadvantages in CIGNA's communications with its
    employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    2.  CIGNA offered no expert report or evidence to rebut
    Professor Stratman's analysis.. . . . . . . . . . . . . . . . . . . . . . 89

D.  CIGNA's 30(b)(6) Witness Agreed that the SPD, SMM and
Purported Section 204(h) Notice Do Not Disclose Benefit
Reductions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

E.  Although It Has Disclosed Potential Reductions in Other
Instances, CIGNA Did Not Disclose these Reductions. . . . . . . . . 93

F.  CIGNA's Inadequate Disclosures Affected the Ability of Its
Employees to Make Well-Informed Employment and Retirement
Decisions    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

    1.  CIGNA repeatedly recognized that employees have to plan
    for retirement with the information that CIGNA provides.. . 98

    2.  Employees requested additional information in managers
    meetings, focus groups and individual communications. . . 100

    3.  CIGNA had a policy of "NOT" providing benefit
    comparisons or information about "negative impacts"
    from the cash balance changes. . . . . . . . . . . . . . . . . . . . . . 103

    4.  CIGNA's objective was to "quickly dispel any perceptions
    of take-aways" and avoid "significant negative reaction
    from employees" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

    5.  The individual testimony offers additional circumstantial
    evidence that employees were "likely to have been harmed
    as a result" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

        (a)  Janice Amara . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
        (b)  Gisela Broderick . . . . . . . . . . . . . . . . . . . . . . . . . . 115
        (c)  Patricia Flannery . . . . . . . . . . . . . . . . . . . . . . . . . 118
        (d)  Annette Glanz . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
        (e)  Bruce Charette . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

        (f)     Robert Upton ............................... 124

        (g)    Barbara Hogan .............................. 126

VI.   CIGNA Did Not Disclose the Amendment of Its "Rehire Rule" to
      Former Employees in a Section 204(h) Notice or a Summary of Material
      Modification .............................................. 129

VII.  Participants and Spouses Have Not Been Notified When Annuity
      Options Have Greater "Relative Value" than the Cash Balance
      Accounts. .............................................. 135

     A.    CIGNA Has Not Notified Participants When "Old Plan Benefits"
           Are Greater as the SPD Promises. ........................ 135

     B.    CIGNA Has Not Notified Participants or Spouses When the
           Annuity Form of Benefit Has a Higher "Relative Value" ....... 138

     C.    CIGNA's Actuarial Expert Admits that CIGNA's Notices
           Do Not Explain the "Relative Value" of Benefit Options. ...... 144

     D.    CIGNA Continues to Withhold Information About the
           "Relative Value" of Benefit Options from Class Members in the
           *Depenbrock v. CIGNA* Group. ........................... 147

Appendix I (Comparison of CIGNA's 1998/1999 and 2006 Summary Plan
Descriptions) .................................................. A-1

Appendix II (Identification List of Key Employees and Witnesses) ......... A-4

I.    **Characteristics of Defined Benefit, Defined Contribution and Cash Balance Plans.**

1.    Defined benefit plans typically offer to pay employees an annuity based on a percentage of the employee's highest salary multiplied by years of service. Edward Zelinsky, *The Cash Balance Controversy*, 19 VA. TAX REV. 683, 687 (2000). As an employee draws closer to retirement age and enjoys a higher salary, the plan's benefits increase. Id. at 688.

2.    Defined contribution plans do not offer fixed assurances about the benefits that employees will receive at retirement. Employees bear the risk of what happens to the money after the funds are contributed. Id. at 691-2. But employees have an unconditional right to the money allocated to their separate individual accounts, plus the upside risk of favorable investment returns.

3.    The employer's contributions to a defined contribution plan are typically level (e.g., 10% of each year's salary). Zelinsky, supra, at 692.

4.    Cash balance plans "imitate some features" of savings plans by referring to individual accounts and allocations, Esden v. Bank of Boston, 229 F.3d 154, 158 (2d Cir. 2000), but the accounts and allocations are "hypothetical" rather than actual: "the employee has no actual account, the employer makes no contributions to an employee account, and ... there is no account to which interest might be added." Berger v. Xerox, 338 F.3d 755, 758 (7th Cir. 2003).

1

5.    In a cash balance conversion, a hypothetical opening account is established. Many companies have established the opening accounts by calculating the present value of the participant's normal retirement benefit, without including any subsidized early retirement benefits to which the participant may be eligible. A variety of other methods have been used, including assigning a value to all of the employee's previously-earned benefits or setting the opening account at zero with the previous benefits treated as a dual benefit. Ex. 12 at P 2094; Ex. 13 at MER 01798; Ex. 14 at 20.

6.    The employee's hypothetical account typically receives a benefit credit (also called a pay credit) equal to a percentage of an employee's salary. Hypothetical interest credits are also assigned to the account at a specified rate, e.g., 4.5%, or a variable rate under a specified standard, e.g., the interest crediting rate tracks rates for short- or mid-term Treasury bills. Zelinsky, supra, at 693-4. The hypothetical interest credits are not related to the employer's return on investments, as required for defined contribution plans.

7.    In what was dubbed the "first generation," cash balance formulas offered all participants a flat percentage pay credit, such as 5%, along with interest credits, which resulted in "accrual patterns that strongly favored short-service employees." Ex. 15 at 3.

8.     The "second generation" of cash balance designs offered graded pay credits based on age or a combination of age and service. Ex. 16. According to a 2004 survey by Mellon, 74% of cash balance formulas have graded pay credits. Ex. 17 at 12; see also Ex. 18 (U.S. Bureau of Labor Statistics Compensation Survey).

9.     The employee's cash balance "account" is the total of any opening account balance and the hypothetical pay and interest credits. The account may or may not be fully-funded. See, e.g., Burstein v. Allegheny Fdn. Ret. Account Plan, 334 F.3d 365 (3d Cir. 2003) (cash balance plan terminated without funds to pay the amounts credited to the accounts).

10.     In July 1996, the William Mercer Company ("Mercer"), which advised CIGNA about its cash balance conversion, prepared a discussion of legal issues for cash balance plans for its clients. Mercer's discussion recognized that ERISA's vesting, accrual and benefit option rules "all key off" the deferred annuity at normal retirement age. Mercer observes, however, that cash balance designs do not "inherently" offer a deferred annuity commencing at normal retirement age:

> "The plan design operates quite well merely defining the account balance and the method for determining an immediate annuity at any point in time." "Many employers continue to simply treat the plan like a lump-sum account plan without regard to making a deferred annuity

3

calculation. It's not clear whether the IRS will approve this."

Ex. 19 at EPTO 4166-67.

11.    In November 2005, the GAO issued a report finding that older

workers have borne the brunt of reductions in benefits from cash balance

conversions. The report found that the median benefit decrease for an older worker

was $238 per month compared with $59 per month for a younger worker (a

difference of 300%). *Private Pensions: Information on Cash Balance Pension*

*Plans* (GAO-06-42), available at http://www.gao.gov/new.items/d0642.pdf.

12.    In a March 2006 "Issue Brief," the Employee Benefit Research

Institute ("EBRI") analyzed the 401k contributions that would need to be made to

make-up for lost benefit accruals if final-average pay plans or cash balance plans

were frozen. EBRI found that the median contribution rate for a final-average pay

plan is from 8% to 13.5% of pay, compared with about 3% to 4.6% of pay for a

cash balance plan. Ex. 20 at 9.

13.    CIGNA's actuarial expert, Mr. Sher, testified that cost reduction has

not been a "primary motivation" for employers converting to cash balance

formulas, but then admitted that "Is costs a consideration? It always is. Is cost

reduction one of the things that companies study when deciding what to do?  Yes,

certainly it is."  Tr.  1178, line 11 -  1179, line 13.

14.    A 2004 Mellon survey on which Mr. Sher was the "lead researcher" (Tr. 983, line 10 - 984, line 5) found that the long-term costs of plans converted to cash balance formulas were expected to decrease for 64% of plans. Ex. 232 at 30. See also Tr. 1185, line 6 - 1188, line 12. Long-term costs were expected to increase for only 8% of such plans. Ex. 232 at 30; Tr. 1188, lines 1 - 12.

15.    A June 1985 Newsletter by Kwasha Lipton entitled "Exciting New Retirement Concept: The Cash Balance Pension Plan," states that "likely candidates" for cash balance plans include "Companies seeking to reduce or modify their pension plan obligations." Ex. 236, at fifth page. The Newsletter further states that "For all of these companies, a major stumbling block has been the potential for negative employee reaction, resulting in large part from the lack of an acceptable replacement for their present pension plan. A Cash Balance plan may be just the popular alternative they have been seeking." Id.

## II.    CIGNA's Conversion to a Cash Balance Formula Mimicked Some Features of a Savings Plan, But Left Employees With No Actual Accounts, Annual Contributions, or Investment Earnings.

16.    Before 1998, CIGNA plan participants enjoyed a traditional defined benefit formula consisting of an annuity calculated at 1.67% or 2% of an average of highest pay times years of credited service. The two-tiered benefit structure (1.67% or 2%) depended on the employee's date of hire: Individuals hired after

December 31, 1988 were called "New Formula Participants" and placed under the lower 1.67% formula. Ex. 2 at 11 and 34.

17.    According to a CIGNA newsletter, CIGNA's traditional defined benefit plan "provide[d] a fixed monthly pension benefit for the employee's lifetime based on ... years of service with a participating CIGNA company and earnings closest to the date an employee leaves CIGNA."  Ex. 23. "[S]ince current wages generally reflect the retiree's current standard of living, retirement income levels ... more closely reflect current economic needs." Id.

18.    The Tier 1 (2%) formula offered "subsidized" early retirement benefits under which benefits for employees eligible for early retirement were only reduced to 76 or 79% for retirement at age 55. The early retirement benefits included a valuable Social Security supplement payable between ages 55 and 65. Ex. 2 at 36-37. A "Free 30%" survivor's benefit, also called a Preserved Spouse's Benefit, was also provided. Id. at 56-57, 67-73.

19.    CIGNA's Tier 2 (1.67%) formula offered early retirement benefits with longer service requirements and larger reductions for early retirement, with a Social Security supplement payable between ages 55 and 62. Ex. 2 at 36-39. It did not offer a Free 30% survivor's benefit.

20.    In 1998, CIGNA converted its traditional defined benefit pension

6

plan (sometimes called "Part A") to a cash balance pension plan (sometimes called "Part B"). See, e.g., Ex. 8, Tab 2 at AMARA-00441.

21.     Participants under the Tier 1 (2%) formula who were active employees on January 1, 1998 with 45 or more age and service points were grand-fathered and therefore remained under CIGNA's traditional defined benefit formula. Other active participants were moved to the cash balance formula. Ex. 1 at 6 and Ex. 24 at 6-8.

22.     Section 1.55 of the Plan document specifically provides that the cash balance account of a participant "is a bookkeeping account ...; it is not an actual account, and no Plan assets are allocated to it." Ex. 1 at 14. The Plan also provides that CIGNA does not guarantee "that the assets of this Plan will be sufficient to provide any or all of the benefits payable under this Plan." Id. at 74.

23.     CIGNA's Annual Report for 2005 shows that its Pension Plan is less than 75% funded. Ex. 25 at 65.

24.     In August 1997, the Mercer company advised CIGNA that "There are no legal requirements whatsoever in terms of how you determine an employee's opening account balance":

> "As you know, the typical method is to set it equal to the present value of the accrued benefit. However, in theory, a company could take other plausible approaches such as a retroactive application of the cash balance formula or a special contribution applied to past

7

service or really anything else. It could even be zero if you wanted."

Ex. 13 at MER 01798.

25.    CIGNA decided to establish opening accounts, which it called "initial

retirement accounts," by calculating the participant's current annual benefits at

normal retirement age, computing an actuarial value for that benefit based on a

6.05% interest rate and using the "GATT" mortality table. See Ex. 1 at 9-10; Ex.

26 at DO3925. A lower 5.05% interest rate was applied to the accrued benefit at

age 62 for participants under the Tier 2 (1.67%) formula who were active

employees on January 1, 1998 and whose age and service were 55 points or

greater. Id.

26.    The value of early retirement benefits and other favorable features

under the prior plan were not included in the opening balances. Ex. 3 (Poulin Rpt)

¶25; Tr.  211, line 16 -  213, line 6 (Poulin testimony explaining that early

retirement benefits, surviving spouse benefit, and Social Security supplement were

"various benefits that were not included in the opening account balance"); see also

Ex. 239, at 95, line 3 - 96, line 5 (Arko deposition confirming that "there wasn't a

concept of early retirement subsidies in the new plan"); Ex. 241, at 171, line 24 -

174, line 13 (Hodges deposition that opening balances did not include early

retirement benefits).

27.     The GATT mortality table was applied in a manner that took a discount for "pre-retirement mortality," i.e., the likelihood that a participant would die between his or her current age and age 65. Ex. 3 (Poulin Rpt) ¶32 and Ex. 4 (Poulin Suppl Rpt) ¶15; see also Ex. 10 (Sher Rpt) at 8 (mortality was "assumed at all ages"); Ex. 27 (Answer to Int. No. 4 in the First Set of Interrogatories); Tr. 211, lines 6-22 (Poulin testimony explaining that this discount would be approximately ten percent for a 40-year-old employee). CIGNA's Rule 30(b)(6) witness, John Arko, testified that CIGNA applied the pre-retirement mortality discount "per the terms of the plan." Ex. 239, at 90, line 20 - 92, line 14.

28.     CIGNA's hypothetical pay credits followed a "second generation" design by using a graded schedule based on age and service. Specifically, CIGNA's cash balance formula used the following schedule to calculate benefit credits (also called "pay credits"):

| AGE + SERVICE POINTS | BENEFIT CREDITS: | |
| --- | --- | --- |
| | On Earnings Below Integration Level | On Earnings Above Integration Level |
| Under 35 | 3% | 4.5% |
| 35 to 44 | 4% | 5.5% |
| 45 to 54 | 5% | 6.5% |
| 55 to 64 | 6% | 7.5% |
| 65 or more | 7% | 8.5% |

Ex. 1 at 22. The "Integration Level" is defined as one-half of the Social Security taxable wage limit in each year. Ex. 1 at 10-11.

9

29.     Interest credits were added to the hypothetical accounts by using the yield on 5-year Treasury bills plus 25 basis points as an index, with a Floor Interest Rate of 4.5%. Ex. 1 at 24.

30.     CIGNA expected to earn more on the plan's actual investments than the interest crediting rates: "A cash balance approach allows us to ... reduce overall cost by earning more on our investments than we pay in the declared rate." Ex. 28 at D12287 (1/6/1997).

31.     Through its cash balance formula, CIGNA offers to pay the accumulated benefit credits and interest credits, but it does not project a definite level of benefits at retirement. Section 1.1 of CIGNA's Plan document defines the "accrued benefit" as the balance of a participant's Retirement Account on the date of determination (with an exception for (1) distributions during years when the floor interest rate applies, and (2) distributions where the "minimum benefit" rule applies). Ex. 1 at 1. The indefinite level of future benefits makes the plan's promise of future benefits comparable to that of a variable annuity. The risk of lower future interest rates is placed on the participant. Ex. 3 (Poulin Rpt) at ¶35; Tr.  445, line 2 - 446, line 24 (Poulin testimony explaining how cash balance plans are "analogous" to a variable annuity).

32.     In response to a question from the Court, Mr. Sher agreed that it is

10

"true" that "in terms of annuities" employees take the "risk of interest rate fluctuations." Tr.  1001, line 13 -  1003, line 4.

33.    Mr. Sher also testified that falling interest rates can have a "dramatic impact"on benefits.  Tr.  1014, lines 6-17; p. 1032, line 13 -  1033, line 9; p. 1119, line 18 - 1120, line 2.

34.    When a participant separates from service before age 55, CIGNA only offers the participant a lump sum distribution or an "immediate" annuity based on the participant's current age, even if the participant is young, e.g., age 30. Ex. 29 (Answer to Int. No. 4 in Second Set). CIGNA assumes that 100% of participants select the lump sum. ¶420 below. As a result, "the benefit is effectively a lump sum delivered at termination." Ex. 30.

35.    By converting to the cash balance formula, CIGNA expected to reduce both the ultimate benefits paid and its pension liability. Gerald Meyn, CIGNA's Vice President for Employee Benefits, observed in January 1997 that "A cash balance approach allows us to provide the competitive benefit level of a defined contribution plan but reduce overall cost by earning more on our investments than we pay in the declared rate." Ex. 28 at D12287. In June of that same year, David Durham, CIGNA's Assistant Vice President of Global Benefits, estimated "pension expense reductions of 12 to 15% over the next 20 years," even

11

though most of the Tier 1 (2%) formula employees were being grand-fathered under the prior plan. Ex. 77. In 2002, Mr. Meyn again observed "A conversion to a cash balance plan clearly reduces the ultimate benefits paid, and, of course, lowers the net pension liability." Ex. 31 at 29113.

36.     In discovery, the Plaintiff class requested additional documents related to CIGNA's cost savings from its conversion to a cash balance plan. Ex. 34 (Request Nos. 21, 22, 27, and 29).  CIGNA resisted producing documents responsive to these requests.  On September 15, 2006, the Court ordered CIGNA to produce documents "that bear on this cost savings issue from '97 to '98." Tr. 928, line 15 - 930, line 5. CIGNA produced the documents that have been introduced as Defendants Ex. 739 in October 2006. Those documents only cover 1997; Defendants' counsel contend that they understood the Court's Order to be limited to that time period.

37.     A June 1997 document entitled "FAS expense projections" compares future expenses for the current program and four alternatives.  Ex. 739 at SUPPD 25709.  Alternative "6A", which was closest to the cash balance plan that CIGNA ultimately adopted, shows an approximately 13% reduction in expenses for the "whole plan."  Mr. Poulin testified that because benefits for grandfathered participants were not being reduced at all, this translated to a 25% reduction in

benefits for employees who were moved to the cash balance plan. Tr.  1503, line
12 -  1506, line 6.  Mr. Poulin concluded that this was "generally consistent with
the fact that there were expected cost savings."  Tr.  1506, line 7 - 21.

### III.   CIGNA's Use of a "Greater of" Transition Formula in Combination With Reductions in Future Benefits Produces "Wear-Aways", i.e., Years with No Further Benefit Accruals.

38.     In certifying the class, Judge Squatrito found that the Plaintiff
contends "that the conversion of the pension plan necessarily conditioned receipt
of further benefits under the provisions of Part B upon [Ms. Amara's] acceptance
of CIGNA's valuation of her accrued benefit under the prior plan .... [Under this
methodology] plaintiff's annuity benefit would remain constant for a certain
period of time even though she is technically accruing additional benefits under
Part B." Slip Op. filed Dec. 20, 2002, at 2-3.

39.     Judge Squatrito detailed the related processes:

"Upon conversion, plaintiff's annuity benefit was no longer based
upon the formula set forth in Part A, but rather was transformed into a
hypothetical individual account, with a particular "balance." This
"initial retirement account" was based upon the present actuarial
value of the annuity benefit due plaintiff at her normal retirement age,
which is sixty-five years of age, under Part A. Part B provides that
when plaintiff elects to receive her benefit, she would receive the
greater of the account balance, or the "minimum benefit" as that term
is defined under Part B.

"[A]s a result of these calculations plaintiff experienced a period
where benefits "constructively" accrued in her cash balance account.

This is so because the minimum benefit payable to plaintiff was greater than her hypothetical account balance, which means that plaintiff would not begin to realize the accrual of benefits under Plan B until her hypothetical account balance exceeded the amount of the minimum benefit." Slip Op. at 3 - 4.

40.    The Class' actuarial expert, Claude Poulin, prepared a report in April 2003 showing how CIGNA's opening accounts were established below actual value, beginning with CIGNA's exclusion of valuable rights to subsidized early retirement benefits in establishing the opening balances. Ex. 3 (Poulin Rpt) ¶¶ 24-29; see also Tr. at 206, line 20 - 208, line 23 (testifying on what he was asked to opine and adopting his reports/declarations as testimony).

41.    At trial, Mr. Poulin testified that for "an employee who is entitled to a subsidized retirement benefit at age 55, the present value of that benefit in some cases might be nearly close to twice the present value of the benefit at age 65.  So there is a wearaway in the fact that this early retirement subsidy is not included in the opening account balance."  Tr.  211, line 23 - 212, line 13.

42.    Mr. Poulin also found that CIGNA had taken a "pre-retirement mortality" discount when it converted their Part A benefits to cash balance, which caused participants to lose another part of the value of their previous benefits. Ex. 3 (Poulin Rpt) ¶32 and Ex. 4 (Poulin Suppl  Rpt) ¶15; see also Tr.  211, lines 6 - 22.

14

43.    A discount for pre-retirement mortality is as much as 10% at age 30. Ex. 4 (Poulin Suppl Rpt) ¶15. CIGNA offered no mechanism under which participants could recoup this mortality discount as they grew older and the risk of pre-retirement mortality shrank. Ex. 3 (Poulin Rpt) ¶32 and Ex. 4 (Poulin SupplRpt) ¶15. Mr. Poulin testified, "this discount is lost forever ... it is never recredited back." Tr. 217, lines 8-16.

44.    Mr. Poulin's report explains how participants lost still another part of their previous benefit accruals when interest rates fell below the 6.05% interest rate generally used to establish the opening account balance, and remained below that level for all but one of the years from 1999 to date. Under these conditions, the opening balances that CIGNA established are unable to "re-purchase" the annuity entitlements that participants already possessed. Ex. 3 (Poulin Rpt) ¶34 and Ex. 4 (Poulin Suppl Rpt) ¶12-14; Tr. 210, line 16- 211, line 5 ("If the interest rate that is used later or if the prevailing interest rates decrease after the conversion, then it will be difficult for the opening account balance to recreate the benefit that was converted").

45.    To illustrate, if an employee age 40 earned a $1,000 per month annuity before 1998 and the annuity was converted to an opening account balance of approximately $27,900 with a 6% interest rate, the opening account balance

converts back to an annuity of only $640 per month based on current interest rates of around 4.5%. Ex. 3 (Poulin Rpt) ¶¶33-34; Ex. 4 (Poulin Suppl Rpt) ¶¶12-14; Tr. 278, line 5 - 279, line 6.

46.     In Ms. Amara's case, CIGNA's exclusion of the value of her early retirement benefits, its pre-retirement mortality discount and its use of a 6+% interest rate to establish the opening account balances created a "wear-away" period that made her participation in the cash balance plan's accruals illusory for more than 7 years. Ex. 32 at 28174 and 28629; Ex. 3 (Poulin Rpt) ¶¶25-27.

47.     Under the "Part A"/Tier 1 formula, Ms. Amara earned benefits of $1,833.65 a month starting at age 55 before the 1998 cash balance conversion. Ex. 3 (Poulin Rpt) ¶¶ 24-26.

48.     However, Ms. Amara's opening account balance under the "Part B" cash balance provisions was just $91,124.88, which converts to an age 55 annuity of only $900 per month. This is less than 50% of her Part A benefit of $1,833 per month. Id.

49.     Under CIGNA's formula, Ms. Amara accrued no actual cash balance benefits until the $900 Part B annuity combined with years of benefit credits and interest progresses to the point where it exceeds the $1,833.65 age 55 benefit to which she was entitled before Part B was established. Id. at ¶ 30.

16

50.    At the approximately $7,000-8,500 per year rate at which she was earning pay credits under the cash balance formula, the difference of $93,000 would not be made up for over ten years. Ex. 4 (Poulin Suppl Rpt) ¶¶21-22.

51.    Ms. Amara testified that she only learned about the "wear-away" when she attended a going-away party for two of her colleagues in September 2000. CIGNA's chief actuary, Mark Lynch, told her at that event that "you would be really sick if you knew the wearaway factors they were using with your benefit." Tr. 34, lines 6-17.

52.    Ms. Amara also experienced a wear-away of her normal retirement benefits.  In his testimony, Mr. Poulin determined that Ms. Amara's accrued benefit at normal retirement was worth approximately $261,600 in 2003, while her cash balance account at the end of 2003 was $165,213, which included approximately $40,000 in benefit and interest credits since she returned to CIGNA in 1998.  Tr. 431, line 5 - 436, line 1. He determined that this wear-away period, without consideration of her early retirement benefits, was approximately five years.  Once that period is over, "[t]he $40,000 that was not credited will never be credited back.  She will only get future benefit credits."  Tr. 436, line 2 - 437, line 7.

53.    When Ms. Broderick separated from service in 2004 after 3½ years

of participation under the cash balance formula, her retirement benefits, like Ms.

Amara's, were still based on the benefits that she had earned before 1998. The

cash balance formula had added nothing to those benefits. Ex. 4 (Poulin Suppl

Rpt) ¶23.  Mr. Poulin explained, "at that time when she terminated in December

of 2004, not only did she lose in terms of the age 60 benefit, lose in the sense

that she did not gain any additional benefit in these four years, but she also did

not accrue any benefit, any normal retirement benefit.  So that these four years,

she did not accrue any pension at all."  Tr.  229, line 19 -  234, line 18.

54.     CIGNA's system printouts show the wear-away for Gisela

Broderick. They show $218,944 as the value of her minimum benefit from her

service under the old plan prior to 1998 compared with $208,764 in her cash

balance account when her benefits commenced. Ex. 33 at SuppD1936 and

SuppD1940.  Mr. Poulin testified that "[t]he pay credits and the interest credits

that were shown in these benefit statements ... will never be credited and in fact,

will be lost forever."  Tr.  237, line 6 -  237, line 13.

55.     Ms. Broderick's 1998 benefit statement stated that her age 65

benefit was $2,010 per month, which did not include the free 30% survivor's

benefit.  Ex. 4, Tab 8 at P1217.  Her 2004 benefit statement showed an age 60

benefit of $2,026.  Id. at P1270.  Mr. Poulin calculated that her age 60 benefit

before the conversion, including the free 30% benefit, was $2,191.  Ex. 4, ¶23.

Mr. Poulin determined that Ms. Broderick, like Ms. Amara, experienced "a

wearaway both in the early retirement benefit and the normal retirement benefit."

Tr.  229, line 5 - 232, line 24.  He testified, "[W]hen I convert the $218,000,

which we now know was the value of the age 65 benefit, when we convert this

amount to an age 60 benefit, then we arrive at an amount of approximately

$1400 [per month].  And that $1400 was less than what she was entitled to under

the prior plan at age 60."  Tr.  231, lines 6-14.

56.    Mr. Sher testified that if early retirement benefits were ignored and

interest rates were counter-factually assumed to have remained constant, Ms.

Broderick's wear-away would have ended "by the end of 2001."  The Court

clarified that "she would have worked with no additional retirement benefit" for

"about a year-and-a-half" and Mr. Sher responded "certainly by the end of 2001,

based on my calculations, [the wearaway] would have disappeared."  Tr.  1015,

line 21 -  1016, line 21.

57.    Like Ms. Amara, Ms. Broderick "did not find out what wearaway

was," or that "I had not earned anything from the time that I went back to

CIGNA to the time that I retired," until after she became a Plaintiff in this

litigation. Tr.  113, lines 8-21.

58.    The same applied to Patricia Flannery. After nearly six years of service under the cash balance formula from October 2000 to the present, Patricia Flannery has zero additional accruals because of CIGNA's wear-away. Her cash balance account at the end of 2005 only converts to an annuity benefit of $756 per month, Ex. 7 (Poulin IndivCalcs), compared with the annuity of $813 per month ($9,762 annually) that she had earned with her service before 1998. Ex. 156 at P 1588.

59.    During Ms. Flannery's testimony, the Court inquired about the print-outs in Ex. 230 indicating that Ms. Flannery "had worked from 2000 to 2006, and during that period received no increase" from her minimum benefit. CIGNA's counsel promised to "put somebody on who could explain that."  Tr. 921, line 20 - 922, line 25. CIGNA did not present any testimony to address Ms. Flannery's circumstances.

60.    Even if a participant's cash balance account ultimately exceeds the value of the previously-earned benefits by the time the participant separates from service, the value of the cash balance accruals in the first few years after the conversion may still be zero. Mr. Poulin prepared a spreadsheet showing how Annette Glanz's benefits did not increase for 3 years after the cash balance conversion. Ex. 4 (Poulin Suppl Rpt) ¶25 and Ex. 6. Her cash balance accruals in

the first three years after January 1, 1998 of over $254 per month went to "catch up" with the value of the benefits that she had already had earned for her service before 1998. Id. The lost accruals in those years are never recouped.  Tr.  226, line 16 -  228, line 15.

61.    Mr. Poulin testified that Ms. Glanz's wear-away period was attributable to the "mortality discount" and the "interest rate differential."  Ms. Glanz was not eligible for an early retirement benefit.  Tr.  227, line 9 -  229, line 4.

62.    Mr. Sher testified that, even if interest rates remained the same, Ms. Glanz would still experience a year of wear-away attributable to "this preretirement mortality issue."  Tr.  1033, line 14 -  1034, line 22. He called this a "minor" effect. Tr. 1022, line 13 - 1023, line 3.

63.    Ms. Glanz testified that "until I heard about this lawsuit" she "wasn't aware" that her cash balance benefits were not growing for any period. Tr.  169, line 24 -  170, line 12.

64.    For any employee whose "old plan benefit" or "minimum benefit," i.e., the benefit they had earned before 1998, is greater than their cash balance account at separation, the additional accruals from the cash balance formula were zero. Ex. 4 (Poulin Suppl Rpt) ¶31.

65.     Mr. Poulin testified that "the overwhelming majority" of CIGNA's employees "experienced wearaway."  "[T]he exception would be for a very short service employee who would have had a very small accrued benefit so that the initial pay credit would nullify this impact immediately." Tr. at 218, line 15 - 219, line 9.

66.     The Plaintiff class requested electronic data in discovery that would show how many participants continued to have protected benefits in excess of the cash balance accounts in each year. Ex. 34 (Request No. 4). CIGNA has not produced the requested data, despite the Plaintiffs' Motion to Compel and two Rule 30(b)(6) depositions.

67.     The only group of class members who did not experience significant wear-aways were those under the Tier 2 (1.67%) formula like Barbara Hogan and Stephen Curlee who had more than 55 age and service points. CIGNA used a lower 5.05% interest rate to convert their benefits to account balances which generally meant that their benefits were not subject to a significant wear-away. Tr. at 219, line 11 -  220, line 19. Mr. Poulin prepared a table which shows that while Ms. Hogan did not experience a wear-away, her future benefits were still substantially reduced compared with the benefits she would have under the Tier 2 (1.67%) formula. Ex. 4 (Poulin Suppl Rpt) ¶28 and Ex. 7 (Poulin Indiv Calcs);

22

Tr. 220, line 23 - 221, line 19.

**A.    The Experts Agree on What Caused the Wear-Aways and that the Wear-Aways Were Predictable.**

68.    In general, Mr. Sher agreed with Mr. Poulin that the reasons for the wear-aways after CIGNA's cash balance conversion were: (a) the application of a "greater of" transition design to a participant's prior benefits rather than an "A+B" design, (b) the exclusion of early retirement subsidies from the opening balances, (c) the application of a pre-retirement mortality discount in determining opening balances, (d) the effect of falling interest rates after 1997 on the annuities to which the accounts can be converted, and (e) the rate at which the new cash balance benefits are growing compared with the plan's previous rate of accruals. Tr. 1344, line 2 - 1346, line 6.

69.    Mr. Sher agrees with Mr. Poulin that a "new employee" would not experience any wear-away because a sine qua non for a wear-away is a "prior benefit." Tr. 1300, lines 8-24 and Tr. 1345, lines 20-22.

70.    Because younger, shorter-service employees do not have substantial early retirement benefits from their service before the cash balance conversion, they experience shorter wear-away periods than employees who have such benefits. See Ex. 3 (Poulin Rpt) ¶27.

71.    Mr. Poulin testified that, in 1997, it would have been possible to

23

predict that there would be periods of wear-away for "substantial" portion of the

CIGNA employees.  "The mere fact ... that the benefits were converted in the

opening account balance that were the normal retirement benefits payable at age

65 with the early retirement subsidy, the fact that the free 30 percent, the fact that

the Social Security supplement, that these benefits were not part of the opening

account balance created ipso facto a wearaway." Tr.  1517, line 24 - 1518, line 25.

72.     In response to the Court's questions, Mr. Sher admitted that the wear-

aways could be predicted:

> "THE COURT: Would it be typical to expect, for a decent-sized
> portion of an employee population, that they might go as long as five
> or six years before they would actually cross and get into the positive
> on the conversion?"  Tr.  1008, lines 15-22.

> MR. SHER: I think you have to, first we have to, look at each
> individual situation ... what are the causes of this phenomenon?..I
> would characterize the early retirement as sort of a byproduct,... that
> what we talked about is a natural thing for the early retirement to
> have that impact."

Tr.  1008, line 23 -  1009, line 22.

> "THE COURT: But going into a plan like this, would you expect
> there to be ... [a] reasonably significant portion of your employee
> population who could expect to not add to their minimum benefit for
> periods of between three and five years?

> MR. SHER: I think it depends.  I mean, the early retirement is one
> factor ... One approach is to do this grandfathering which is
> suggesting that CIGNA did it for a large group of people, not for
> everyone.  So there are some people who are getting that early

24

retirement, who could have that early retirement wearaway and that could last several years, the early retirement wearaway."

Tr. 1009, line 23 - 1010, line 19.

THE COURT: In 1998, was it predictable and known to CIGNA, because of the various things we talked about–probably not with respect to interest rates so much but the early retirement subsidy sort of bringing that out and the preretirement mortality, in fact people's opening balances ... would be lower than their minimum protected benefit?

MR SHER: I think certainly benefit projections, you know, could have been done to get at your question ... The problem is it's hard to disregard [interest rate changes] but yes, absent that, yes.

THE COURT: Listen, we all have to predict things. Taking normal old regular old interest rate assumptions as you are standing in 1998, you still would have known that the opening balances for some sizeable group of employees, not obviously all, would be less than their protected benefit under the old plan? You would know that because you know mathematically that you are eliminating the early retirement subsidy.

MR. SHER: Yes."

Tr. 1029, line 20 - 1030, line 22.

THE COURT: [O]ne could ... have some prediction of whether there was going to be no wearaway; that the wearaway was minimal, you know, two months for most employees; or on average, depending on where you fell in the spectrum, it could be two to three years. That would be some quantity that might prove to be wrong but would have been at least knowable at the time, right?

MR SHER: Yes, I think at least my experience, that's often done ...

Tr. 1031, line 13 - 1033, line 10.

25

73.    The Court also asked, "[I]n designing these plans, would it be typical that you or the consultants in the company would try to make some estimates of wearaway for the employee population and then discuss potential mitigative solutions or not?"  Mr. Sher answered, "Yes."  Tr.  1019, lines 7-12; see also Tr. 1031, lines 8-18 ("people do various kinds of analyses including projections using various assumptions as to what might happen in the future ... That's how they design the transition provisions essentially, by looking at the potential impact").

**B.    Periods of Wear-Away Are Not an Inherent or Natural Part of a Cash Balance Conversion; an "A+B" Formula Would Have Avoided Wear-Aways .**

74.    CIGNA could have avoided wear-aways by using what is called a "sum of" or "A+B" approach, "where A is the protected benefit earned before the cash balance conversion and B is the benefit under the cash balance formula." Ex. 35 at 74 (Jt. Comm. on Taxation report). Many companies with cash balance formulas use this approach. Ex. 17 at 5 (2004 Mellon survey).

75.    Mr. Poulin testified that "[i]t is possible to design an A plus B situation."  He also testified that he has seen cash balance plans that include the value of early retirement benefits in the opening account as well as plans with fixed interest rates which prevent wear-aways based on declining interest.  Tr. 215, line 9 -  217, line 7.

26

76.    A July 2000 survey by PriceWaterhouseCoopers, which employed

Mr. Sher at the time, stated that "We may see more employers adopting the no-

opening-balance approach due to the negative media and Congressional attention

recently directed at the so called "wear-away" effect that can occur under the

opening balance approach–i.e., when employees' pensions do not grow for a

period of time after the conversion."  Ex. 12 at P 2095.

77.    CIGNA adopted an A+B formula for Tier 1 (2%) formula participants

who were rehired after 2000 so that they "keep their already-earned old plan

benefits." Ex. 132 at D05532 and 5534.

78.    Section 701(a) of the Pension Protection Act effectively requires an

A+B formula for all cash balance conversions after June 29, 2005. P.L. 109-280.

79.    Mr. Sher prepared spreadsheets illustrating an "A+B Age 65

Benefit" and the wear-away effect for the named Plaintiffs, the testifying class

members (except Patricia Flannery) and Stephen Curlee a former employee who

was deposed by CIGNA.  Ex. 235.  His spreadsheets purported to show that an

"A+B Age 65 Benefit" would be less beneficial for Barbara Hogan and Mr.

Curlee than the Plan's greater of approach. Tr. 1123, line 7 - 1125, line 22

(concluding that "the plan approach is superior"); Tr. 1328, line 19 - 1329, line

21; Tr. 1333 lines 17 - 25 (Mr. Sher: "Even if there's a cut in the formula, it

doesn't follow that the A plus B is always going to be better." The Court: "We saw that with Curly and with Hogan, right? They were protected with a higher rate." Mr. Sher: "Right.").

80.     CIGNA did not produce the electronic spreadsheet for these calculations on the grounds that it included "proprietary" information. Tr. 1099, line 2 - 1100, line 3. However, cross-examination showed that Mr. Sher miscalculated the "A+B" benefits for Mr. Curlee and Mrs. Hogan. Mr. Sher used Mr. Curlee's and Mrs. Hogan's age 62 benefits in the calculations, rather than their higher age 65 benefit amounts.  Tr.  1349, line 6 -  1355, line 8.  The class list also shows that Mr. Curlee's accrued benefit at the conversion was $1,285.72, not the $1,076.07 that Mr. Sher used in his calculations.  Ex. 238. The class list further shows that Ms. Hogan's accrued benefit at the conversion was $229.44, compared with the $216.98 that Mr. Sher used. Id. If the correct numbers were used, the "A+B" annuity amounts for Mr. Curlee and Ms. Hogan in Mr. Sher's spreadsheet would have been better than their age 65 annuities under the Plan's greater of approach. Tr. 1355, line 9 -  p. 1357, line 7 (agreeing that the "A plus B number is greater than the plan number").

28

### C.    CIGNA Admits that There Are Years in Which "Employees Accrue No Additional Benefits" and that It Anticipated That Result.

81.    CIGNA's Answer to Interrogatory No. 8 admits that there were wear-away periods after CIGNA's cash balance conversion:

> "certain participants can have a 'wear-away period' .... During the wear-away period, a participant continues to accrue additional benefits under the cash balance formula, but because the benefits under the cash balance formula are less than the participant's 'Minimum Benefit' (a defined term under Part B), the participant is entitled to the (greater) Minimum Benefit. Whether a participant has a wear-away period, and the length of that period, depends on a number of factors, including work history and interest rates, both at the time of retirement and the time an Initial Retirement Account is established."

Ex. 17. See also id. (Answer to Interrogatory No. 10) ("the length of a participant's 'wear-away period' ... depends on a participant's individual facts and circumstances and cannot be computed in advance, because it can depend on future changes in interest rates and changes in an employee's salary").

82.    Andrew Hodges, CIGNA's chief actuary for projects, was deposed in June 2003. Mr. Hodges testified that he became aware that CIGNA's cash balance conversion led to wear-aways upon his "inspection" of "what was being proposed." He found a "myriad of factors" causing wear-aways, including "[e]arly retirement utilization, compensation patterns subsequent to the conversion event, and continued employment at CIGNA Corporation." The rate of interest used in

annuitization was also "clearly ... a factor ... The purchasing power of a cash balance account goes down as interest rate go down ... It could give rise to a wearaway period." Ex. 241, at 93, line 25 - 97, line 8.  Mr. Hodges also agreed that the pre-retirement mortality discount creates a wear-away effect.  Id. at 97, line 9 - 100, line 19; and p. 102, lines 6-8.

83.    Mr. Hodges was aware that wear-away periods could last up to six years.  Ex. 241, at 105, lines 8-21.

84.    Mr. Hodges understood that wear-away could be avoided by using an A + B formula. He "did not know why Benefits Management did not go A plus B, if you will, from the initial creation of the cash balance plan."  Ex. 241, at 103, lines 6-16.

85.    Mr. Hodges heard informal complaints about wear-away from rehires who he characterized as "[s]urprised out of their own ignorance."  He said that the rehires "often kicked themselves, if you will, for not reading SPDs, not asking the right questions in the re-interview process, et cetera, but certainly people caught my attention and said is this right, and I would say mechanically under the terms of the plan that's what the plan appears to call for."  Ex. 241, at 103, line 18 - 105, line 21.

86.    A January 2002 memorandum by CIGNA's Vice-President for

Employee Benefits acknowledges: "Using the present value of normal retirement age benefits results in a significant "wear-away" period during which time employees accrue no additional benefits with future service." Ex. 40 at 28635.

87.    Another memo by CIGNA's Assistant Vice President of Global Benefits in November 2001 explains how under "the concept of "wear-away" ... long service employees earn little or no benefit in the first years after a pension change while early retirement benefits are "worn-away" by the passage of time." Ex. 41 at 28655.

88.    CIGNA recorded notes of conversations in December 2000 with Michele Bergman, another rehired participant like Ms. Amara. The notes show that CIGNA advised Ms. Bergman that the "wearaway" ends "at age 62"–ten years after she was rehired–and that "if you fly by age 55-56, you'll actually wind up with more." CIGNA concluded, "hope you didn't come back just for pension." Ex. 42 at 20518-21.

89.    An October 2002 letter from CIGNA to another participant states: "Mr. Lamb's pension has not decreased each year from 1998 to 2002; however, it has not increased" over those five years. Ex. 43 at 4.

90.    Papers related to Peter Andruszkiewicz refer to a "wearaway until ? [sic]" Ex. 44 at 20527.

91.    In January 2002, about a month after Janice Amara filed this

31

lawsuit, John Arko, CIGNA's Director of Retirement Benefits, prepared an example of "wear-away" for CIGNA officials, using Ms. Amara's age, service, benefit amounts, and initial termination and rehire dates. Compare Ex. 32 with Ex. 45 and Ex. 46.

92.    The spreadsheet shows that Ms. Amara earns no additional benefits for more than 7 years after 1998. At age 55, the annuity value of her account balance is only projected to reach $1,340 per month, compared with the $1,830 per month that she already had before the cash balance conversion. Ex. 32 at 28174 and 28629. Thus, Ms. Amara "accrue[s] no additional benefits" for her service from 1998 to retirement. Ex. 40 at 28635.

93.    However, in a January 1, 1999 memo to CIGNA's head of Human Resources responding to criticisms in the *Wall Street Journal* that some employers were "deliberately establishing opening balances below the real value of each employee's pension," Gerry Meyn denied that this occurred in CIGNA's conversion: "we didn't do that and would have disclosed it if we had. So there's no exposure for us on that point." Ex. 48 at D10837.

94.    In a September 1999 communication with CIGNA's Board of Directors, Mr. Meyn also recognized that wear-aways occur after some cash balance conversions, but denied that any took place after CIGNA's conversion: Some companies' "opening cash balances are established below actual value,

resulting in multiple years without additions to an individual's pension accrual ...
No [CIGNA] employee will experience any period without standard additions to
his pension account." Ex. 47, third page. In an earlier July 15, 1997 memo to the
People Resources Committee of CIGNA's Board, the Committee was also
assured that there would be "no reduction in benefit value" for Tier 1 employees
who were transferred. Ex. 49 at D00606.

95.    John Arko, who was designated under Rule 30(b)(6) to offer the
corporation's testimony about compliance with the rules in ERISA section
204(b)(1)(B), see Ex. 21, testified that he was unaware of any analysis about
whether the plan's wear-away complies with the 133⅓% accrual rule – other
than some material in a "binder" that Mercer prepared. Ex. 239, at 17, line 12 -
19, line 20; see also id. at 190, line 4 - 191, line 23.

96.    In response to a subpoena duces tecum, Mercer produced the
"binder" material. The binder and a November 1997 memorandum discuss the
benefit accrual tests, but do not analyze any compliance issues related to wear-
aways. See Ex. 50 at MER 90-94 and Ex. 51.

97.    An April 27, 1997 Mercer memo indicates that Mercer believed that
the actual rate at which benefits accrue did not matter and that CIGNA simply
had to ensure that the final benefit was "no less than" the frozen minimum:

"The important legal requirement is to ensure that when a final

33

benefit is determined for an employee, it is no less than the present value of the accrued benefit payable at normal retirement age that the participant had earned up through the effective date of the change to cash balance, in other words a preservation of the minimum benefit under Section 411(d)(6) of the Code."

Ex. 13 at MER 1798.

### D.    CIGNA's Actuarial Expert Maintains that the Wear-Aways Are "Beneficial" to Employees and a "Good Thing."

98.    Mr. Sher acknowledged that opening balances and "greater of" transitions promote "rapid wear-away." Tr. 1338, line 18 - 1339, line 6; see also Tr. 1332, lines 4-13 (greater of approach allows "quicker transition") and Tr. 1334, lines 2 -9 (it gets rid of the old formula "more quickly").

99.    Mr. Sher views the wear-aways as stemming from the statutory protection of the minimum benefit. He believes "it's a good thing" when wear-aways occur. He testified that the minimum benefit is protected "from the effect of the reduction in interest rates on the cash value, related to the cash balance account.  It's a good thing.  Anybody else that has an account balance that doesn't have that protection, new employee that has the same balance, would get [the cash balance amount]."  The participant "is getting the protected benefit. That's a good thing."  Tr.  1299, line 24 -  1303, line 4; see also p. 1117, line 19 - 1118, line 11 ("So reducing interest rates, while it might be portrayed as well, there's this wearaway effect ... I don't see how it's terrible.  I see it being

34

beneficial").

100.   Without prompting, Mr. Sher offered an extended discussion about how he could explain to Ms. Broderick that "it's a good thing" that she did not earn any additional retirement benefits after she was rehired by viewing falling interest rates as having increased the value of her protected annuity benefits. Tr. 1300, line 7 - 1303, line 4.

### E.   The Plan Years With No Additional Benefits Are Followed by Plan Years in Which the Accrual Rate Is More Than 133⅓% Higher.

101.   In an Application for Determination to the IRS, CIGNA maintains that the pay and interest credits that it assigns to participants' accounts provide benefit accruals in each plan year comply with ERISA's 133⅓% accrual rule. See Ex. 37 at DO1955.  CIGNA's Plan cannot satisfy that test on the basis of the pay credits because 7% is more than 133⅓% of 3%.  If it is to pass that test, the Plan must therefore satisfy it on the basis of the annuity commencing at normal retirement age. Tr. 467, lines 1-15; Ex. 19 (Mercer discussion of legal issues related to cash balance plans).

102.   However, as discussed above, the pay and interest credits added to CIGNA's accounts actually provide no additional retirement income for many participants for several years following the cash balance conversion. For example, CIGNA maintains that it credited Ms. Broderick with annual benefit

35

credits totaling over $29,500 for her employment from June 2000 to March 2004. Ex. 36, fourth page. But Ms. Broderick's retirement benefits did not actually increase as a result of the hypothetical credits. Her annuity benefits did not increase between 2000 and 2004. Even the $218,944 lump sum distribution that CIGNA offered Ms. Broderick in November 2004 was based entirely on the value of the benefits that she had earned before 1998. Ex. 33 at SuppD1940 and Ex. 38. The final amount of her cash balance account, which was to include accruals from 2000 to 2004, was only $208,764 – over $10,000 less. Ex. 33 at SuppD1931.

103.   The same kind of benefit plateau applies to Patricia Flannery. Her cash balance account after six years under the cash balance formula remains less than the value of the benefits she earned before 1998. See ¶58 above.

104.   Similarly, Annette Glanz did not receive any increase to her retirement benefits for her employment from 1998 through 2000. Mr. Poulin prepared a spreadsheet showing that her cash balance account at the end of 2000 translated to an annuity benefit of $566.88 per month which was only $2.88 more than the $564 benefit that she had at the end of 1997. Ex. 6; Tr. at 226, line 9 - 228, line 15. The benefit "credits" of $11,586 that CIGNA assigned to Ms. Glanz's "account" for the period from 1998 to 2000 did not add to her retirement benefits and therefore were not unconditionally payable to her. Id.

36

105.   Mr. Poulin testified that Glanz's wearaway was shorter because she was "not" "eligible for early retirement benefits" under the prior plan. The "two principal factors" contributing to her wear-away were the "mortality discount" and "lower rate of interest." Tr. at 228, line 21 -  229, line 4.

106.   Mr. Sher admitted that Ms. Glanz experienced years without any benefit accruals.  In handwritten notes and a separate spreadsheet, he applied the interest rates in effect each year from 1998 to 2005 to determine how much Ms. Glanz's accruals were.  Ex. 234 and 235.  He calculated that her accrued benefit under the cash balance plan was less than her minimum benefit of $564.00 under the prior plan for the first two years.  He also found that her benefit dropped in 2002 from $879 to $677, so that there would have been no accrual in that year either. Tr.  1286, line 13 -  1288, line 24; see also Tr. 1304, lines 1 - 25 (confirming that the year-by-year numbers for Ms. Glanz in Ex. 235 correspond with the handwritten numbers in Ex. 234).

107.   The rate of benefit accrual after the years with wear-away is "infinitely" greater than the zero accrual rate in effect during the wear-away period. Ex. 3 (Poulin Rpt) ¶ 30. Mr. Poulin testified, "Mathematically, if a person has no benefit accrual followed by a period where or followed by a year where there is a benefit accrual, albeit small, any quantity divided by zero exceeds 133 percent so that mathematically, a person who experiences wear-away for a certain

37

period of time, then would, at the time that this person accrues a benefit following the period, they would have no benefit accrual during the wearaway period, then it is not in compliance with 133-1/3 percent." Tr. 240, line 22 - 241, line 21.

108.   CIGNA's expert witness, Mr. Sher, did not discuss the requirements of the 133⅓% rule, except in the last paragraph of his report. Ex. 10 (Sher Rpt) at 35. Mr. Sher asserted that the 133⅓% test could be performed without regard to any benefits earned under a prior formula. Id; Tr. 1290, line 5 - 1293, line 1.

109.   Mr. Sher also testified, "if that were the way the test were to be applied, there would be many, many situations in practice that would have a problem, that as far as I know have never been considered to be problematic or raised as problems by the government, at least with respect to this narrow situation we are looking at, which is the wearaway situation." Tr. 1045, lines 4-22.

110.   The Treasury Department's Alert Guidelines on the vesting and accrual rules offer an example where a participant has a "minimum" benefit under one formula and a benefit computed under a different formula. In these instances, the Treasury Department examines the additional accrual in each year after the two formulas are aggregated to determine whether the Plan complies with the accrual rules. Ex. 39 at 12.

111.   Three months after his first deposition in this action, and over three

years before the trial, Mr. Sher attended a November 2003 meeting of the

Conference of Consulting Actuaries which was recorded on tape. At the

Conference, Mr. Sher asked a panel of IRS officials whether the Treasury

regulation providing that benefit accruals under different formulas "must be

aggregated" (see Treas. Reg. 1.411(b)-1(a)) applies to a frozen minimum benefit

formula that has the effect of eliminating or reducing net accruals in future plan

years. He was told that the aggregation rule applies: "You look at the net benefit

and when you have ... a period of zero years and the other kicks in, it's an issue

on a 133 and 1/3." See Ex. 52 at 12; Tr. 1405, line 10 - 1406, line 23.

112.   In February 2004, only three months after the CCA meeting, Mr.

Sher was asked about the IRS's approach to plans with more than one benefit

formula in a deposition in the *Engers v. AT&T* litigation. Mr. Sher testified that

"The transition issue ... when you are going from one formula to another, I'm not

aware of that being questioned. I can recall having a discussion with an IRS

official who indicated to me that he doesn't think that that's a problem, that it

hadn't been and it isn't." See Tr. 1407, line 15 - 1408, line 22; Ex. 237 at 146-

47.

113.   On April 16, 2007, the American Benefits Council sent comments to

the IRS acknowledging that the IRS has been taking the position that "greater of"

transition formulas violate the accrual rules and criticizing that position: "there is a

39

problem with the way that the IRS has been interpreting the backloading rules; in
general, the IRS interpretation invalidates 'greater of' formulas." Available at
http://www.americanbenefitscouncil.org/documents/irs_notice_2007-6_comment
s.pdf, at 20. CIGNA is a member of the American Benefits Council. Mr. Sher's
employer, Buck Consulting, is also a member of the American Benefits Counsel.
See http://www.americanbenefitscouncil.org /about/memberlist.cfm.

114.    On May 18, 2007, the ERISA Industry Committee, of which
CIGNA is also a member, transmitted a similar comment letter to the IRS with
"objections to the Service's current interpretation." ERIC expressed concern that
"the Service's current application of the 133⅓ % test to hybrid plans is
disallowing some of the most participant-favorable methods of conversion,"
namely, the "'greater of' approach," Available at
http://www.eric.org/forms/uploadFiles/b34900000012.filename.Notice_2007-6_
ERIC_Comments_ver.3.pdf.

115.    On direct, Mr. Sher discussed an illustration that he used in Table G
of his expert report (Ex. 10 at 31) concerning a plan with an instant $5,000
minimum benefit where several subsequent years of employment do not produce
additional benefit accruals. He said that it reminds him of "no good deed goes
unpunished" because "if the rules were to be applied the way we've heard that
they ought to be applied from the plaintiffs ... you are going to be treated as if

you are backloaded. Just doesn't make any sense to me." Tr. 1046, line 24 -
1047, line 24.

116.   On cross-examination, Mr. Sher agreed that the use of a "greater of"
transition rule in combination with a reduction in a plan's rate of accruals from
$20 per month per year of service to $10 per month could result in no additional
benefits for 10 years for a participant with 10 years of service under the prior
formula. Tr. 1332, line 14 - 25.

117.   On cross-examination, Mr. Sher further admitted that the illustration
in Table G would have problems complying with the 133⅓% accrual rule
because of Example (3) in the 1977 Treasury regulations on that rule. Tr. 1424,
line 9 - 1426, line 2.

118.   Mr. Sher admitted that he has never demonstrated how CIGNA
complies with the 133⅓% rule consistent with his position that the test should be
applied without aggregating the benefits earned under the prior formula. Tr.
1290, line 23 - 1294, line 3 ("If you want to know how I would do the 133-1/3
percent test, it's neither the way Mr. Poulin has done it nor is it the way I've
suggested to make the changes, because I wasn't viewing this as 133-1/3 percent
test. If that's what it was intended to do, I wouldn't do it either way...I have not
done any kind of analysis as to how I would do the 133-1/3 percent test"). Mr.
Sher's spreadsheets for Annette Glanz showed that if her benefits under the cash

41

balance formula were considered separately, she still had two years (1999 and 2002) where her accrued benefits did not grow from one plan year to the next. Tr. 1293, lines 4 - 22 and Ex. 235, fourth page. Mr. Sher says that all of his calculations for Ms. Glanz "are estimates, they're all projections." Tr. 1288, lines 12-13; see also Tr. 1314, lines 1-10. He is still not sure that ERISA requires a company with a cash balance formula to make a definite determination of the accrued benefits for each plan year or even when the participant separates from service. Tr. 1314, line 1 - 1315, line 19 ("somebody leaves at age 40, you do not lock in the dollar amount of their annuity"; "[t]he person is vested in their normal retirement benefit" which "you don't know the dollar amount of"); see also Tr. 1419, line 24 - 1420, line 14 (describing Esden as involving a "back and forward type of calculation that results in paying an employee anything other than the explicit promise made to the employee, which was the account balance," which "just didn't make sense").

### F. CIGNA Has Conditioned Future Cash Balance Accruals on Participants Giving Up Statutory Rights to Previously-Earned Annuities.

119. CIGNA's 2005 Annual Report recognized that "The plaintiffs allege ... that the Plan violated ERISA by impermissibly conditioning certain post-1997 benefit accruals on the amount of pre-1998 benefit accruals." Ex. 25 at 84.

120. Under CIGNA's plan design, CIGNA employees whose Tier 1 or

42

Tier 2 retirement benefits were higher than the values established under the Part B cash balance formula can receive either their "old plan benefits," also known as "minimum benefits," or their cash balance accruals under Part B, but not both. Section 7.3 of the Plan provides that if a participant's old plan benefit has been converted to a cash balance account, the participant can receive the frozen benefit amount as an annuity, but without any cash balance pay or interest credits. Ex. 1 at 40, and Ex. 3 (Poulin Rpt) ¶¶25-28.

121.    The effect of this Section is to require participants to give up their protected Tier 1 or Tier 2 retirement benefits in annuity form as a condition of collecting any cash balance accruals. Ex. 3 (Poulin Rpt) ¶29.  Mr. Poulin testified, "If [participants] receive their benefit in an annuity form and this benefit has a greater value than the cash balance account, then they would in fact not receive all the benefits or all the pay credits and interest that were theoretically credited to their accounts in the interim, prior to their date of termination." Tr. at 239, line 24 -  240, line 21.

122.    Mr. Sher explained how Section 7.3 "accomplish[es]" wear-away, stating the section requires the "early retirement adjustments in Part A" and "Social Security supplement under Part A" to be "taken into account" "for purposes of the minimum benefit." Tr.  1023, lines 5-25.  But if a participant elects the cash balance benefit, rather than the annuity, she does not receive the

43

value of early retirement subsidy or Social Security supplement.  Mr. Sher

testified, "I don't see anything wrong with that...if you elect a lump sum, you are

not going to get a subsidy.  The subsidies are provided if you elect an annuity...If

you don't elect an annuity, you get a lump sum based on a normal retirement

benefit."  Tr. 1428, line 2 - 1433, line 3.  Mr. Sher refused to answer the

question "what effect" the election of an annuity has on a participant's "rights to

any other benefits that were earned under the cash balance formula."  Id.

123.   In his report and deposition, Mr. Sher recognized that CIGNA's

cash balance design places a condition on the payment of the cash balance

accruals. He contends, however, that this condition should not be considered a

"forfeiture," without offering supporting reasons. Ex. 10 (Sher Rpt) at 30-33 and

Ex. 192 (Sher Depo) at 231-36, 251-61.

**IV.    The Rate at Which Employees Earn Retirement Benefits under CIGNA's
Cash Balance Formula Decreases With Age.**

124.   Mr. Poulin found that "age was not a factor" in determining benefit

accruals under CIGNA's "prior plan." Ex. 3 (Poulin Rpt) ¶13. Under CIGNA's

prior 2% and 1.67% of final average pay formulas, retirement benefits were

computed based on years of credited service and salary. Tr.  245, lines 13-21.

The calculation of benefits did not depend on age.  Tr.  1495, line 12 -  1496, line

11.

44

125.   Mr. Poulin found, however, that "the age of the employee is an integral part of the rate of benefit accrual under Part B." Ex. 3 (Poulin Rpt) ¶13; Tr.  1497, line 21 -  1498, line 10. Mr. Poulin's report shows how age, or the proxy of how near the participant is to retirement, is a key element in computing benefit accrual under CIGNA's formula. Mr. Poulin shows that the benefit accrual under CIGNA's cash balance formula is computed by taking the annual pay credit and hypothetically compounding it using a factor equal to $(1 + i)^{65 - n}$ and dividing the result by an annuitization factor. In this formula, "n" equals the employee's current age. Other factors being equal, the benefit accrual rate will be lower for older employees than for younger employees because "65 - n" represents potential years to retirement.

126.   Mr. Poulin explains:

"[U]nder Part B, the rate of benefit accrual decreases as a direct result of increases in the employee's age. As the employee gets one year older, the interest credit, which is strictly a function of the number of years between the date of determination and age 65, is correspondingly reduced."

Id. at ¶15.

127.   Mr. Poulin testified:

"[L]et's assume that this pay credit is 5 percent and if all employees make $40,000, so that 5 percent of $40,000 is $2,000 which is credited to 30-year-olds as well as 60-year-olds.

In the case of the 60-year-old, the $2,000 is projected to normal

45

retirement age, let's assume at a rate of 5 percent, for five years, and
is then converted into an annuity payable for life at age 65.

The $2,000 accumulated for five years will provide a benefit of X.
Let's assume that this benefit is $250 per year at age 65; whereas the
$2,000 that is credited to the 30-year-old employee will also
accumulate at 5 percent but for 35 years instead of five years ... So
that over the 35-year period, the $2,000 will grow to perhaps eight or
nine thousand and then will provide a benefit commensurate with a
lump sum at age 65 ... the fact that it accumulates for 35 years, it is
strictly a function of the age of the employee."

Tr. 260, line 3 - 261, line 17.

128.   Mr. Poulin concludes that "this is tantamount to a pension plan that
would provide, for instance, a rate of 3 percent at age 30 and 1 percent at age 60,
so that the rate declines with age." Tr. 261, lines 18-23.

129.   Mr. Poulin testified that this decrease in accrual rates "is not a
function of years with the employer.  It is not related to the credited service to the
employee.  Nor is it even related to the compensation of the employee.  It's strictly
a function of the age of the employee, which determines the number of years
between the attained age and age 65." Tr. 269, lines 7-24.

130.   Professor Edward Zelinsky also explains:

"Consider, for example, a participant who, at ages thirty-five, forty-
five, and fifty-five receives in each year a theoretical contribution of
$1000 to her hypothetical cash balance account. As of age sixty-five,
the earliest contribution will, in annuity terms, represent an annual
income of $1094 per year; the $1000 contributed ten years later at age
forty-five will constitute at retirement an annuity of $507 per year;
and the last $1000 contributed at age fifty-five will, at retirement,

46

represent an annuity of $235 per year. Thus, even though the employee, in defined contribution terms, has been accruing contributions at a steady pace (i.e., $1000 per year), the employee has been earning benefits at a decreasing rate in defined benefit terms."

Zelinsky, supra at 721-23.

131.   For the named Plaintiff Janice Amara, Mr. Poulin calculated benefit accrual rates (without regard to the wear-away) that decrease from 1.59% at age 48, to 1.27% at age 53, and down to 0.75% at age 65. Id. at ¶18 and 'Ex. D' to Ex. 3; Tr.  259, lines 14-23.

132.   Mr. Poulin's analysis shows that CIGNA's age-graded benefit credit schedule counteracts the age bias in the underlying formula to a limited degree but, as in Ms. Amara's case, does not eliminate it. Ex. 3 (Poulin Rpt) ¶¶ 16-19.

133.   In Exhibits F-1 through F-3 to his report, Mr. Poulin computed the decreasing accrual rates for three employee "profiles" that correspond with the ones CIGNA used internally to benchmark the changes: a Tier 1 (2%) employee age 30 with 9 years of service and $40,000 in compensation, a Tier 2 (1.67%) employee age 40 with 5 years of service and $45,000 in compensation and a Tier 2 employee age 50 with 10 years of service and $60,000 in compensation. Ex. 53 at 12983. Mr. Poulin again found rates of accruals that decrease from 1.79% at early ages to 1.2% at age 50, and down to .66% at age 65. Ex. 3 (Poulin Rpt) ¶21 and Exs. F-1 to F-3.

134.    CIGNA's periods of wear-away are also a function of age because the wear-away is based on early retirement eligibility. Tr. 222, lines 6-18. Employees such as Janice Amara, Gisela Broderick and Patricia Flannery, who are eligible for early retirement benefits, have wear-aways based on the value of those benefits. See Ex. 3 (Poulin Rpt) ¶¶25-28. "[E]arly retirement eligibility is a function of age." Defs. 6/27/2006 Resp. to Pls. Prop. Findings (dkt. #179), ¶93; see also Ex. 2 at 36-37 and 40.

**A.    Internally CIGNA Recognized that "Older" Employees Lose Benefits with Cash Balance.**

135.    Internally, CIGNA recognized as early as January of 1997 that "older" employees, also described as those "nearer" or "closer to retirement," would lose benefits with cash balance:

- • A "disadvantage" of cash balance plans is that "Employees closer to retirement can't accumulate sufficient assets to replicate the DB benefit at the same age." Ex. 54 at D00467 (1/2/1997).

- • Cash balance plans offer "lower final pension values for older, longer service ee's." Ex. 55 at MER 1384 (1/6/1997).

- • "Older employees will not attain as large a retirement fund value under the cash balance plan." Ex. 28 at 12288 (1/6/1997).

- • "For older employees with longer service the benefit may be viewed as a takeaway." Ex. 56 at SuppD1870 (3/12/1997).

- • "The current Plan provides its highest growth in benefits nearer retirement age - a benefit they can't match under the new Plan." Ex. 57 at 14468.

48

• "Factually, we know that the benefit earned from age 60 to 65 is going to be lower." Ex. 58 at SuppD1579-80 (9/23/1997).

• "[T]he nearer employees get to retirement age, the less time they have to earn compounded interest on their benefit credits. The higher points help compensate for this." Ex. 59 at 27438.

136.    CIGNA also knew that the benefit "accrual rates" under its cash balance formula decline with increases in age and service. Arthur Assantes, a CIGNA actuary who is now President of the Hooker & Holcomb actuarial consulting firm in Hartford, see Ex. 60, wrote:

> "As [one] would expect in a plan designed to mimic a defined contribution plan, *accrual rates decline with increases in age and service* for employees in the cash balance plan."

Ex. 61 at 10044 (6/26/1997) (emphasis added).

137.    Another CIGNA actuary prepared a spreadsheet dated October 22, 1997 which also shows "accrual rates" declining from 1.73% at age 43 down to .66% by age 65. Ex. 62.[1]

138.    The electronic version of this Lotus spreadsheet shows that CIGNA computed the "accrual rates" in the same manner as Mr. Poulin, i.e., by projecting the account balance to retirement age, converting to an annuity, subtracting the annuity at the end of the previous year, and computing the "accrual rate" as a

---

[1] The date of this document is shown in the electronic file. Ex. 9 (Caalim Decl.) ¶8.

49

percentage of compensation. Ex. 9, ¶8.

139.   As a provider of retirement services to other companies, CIGNA

posted material on its corporate website recognizing that:

> Under cash balance plans, "employees who are age 50 or older" may
> "experience a material reduction in the future rate at which they
> accrue benefits, resulting in a measurably lower benefit at
> retirement."

Ex. 63, third page.

**B.    CIGNA's Board Was Told of CIGNA's "Vulnerability" to the
Age Discrimination Claim.**

140.   CIGNA's Board of Directors was aware of CIGNA's "vulnerability"

to the legal argument that its accrual rates discriminate as early as September

1999. In a memorandum to CIGNA's Board of Directors, the Vice-President for

Employee Benefits warned:

> "Cash Balance Plans are alleged to violate ADEA: This is a new
> challenge, related in part to opening balances established below
> actual value, but also is a challenge to a flatter schedule of accruals. .
> . . CIGNA's age-progressive accrual schedule reduces, but does not
> eliminate, vulnerability to this argument."

Ex. 47, third page.

141.   The same memorandum advises the Board about problems when

"Opening cash balances are established below actual value, resulting in multiple

years without additions to an individual's pension accrual," i.e., periods of wear-

away, but the Board was told that CIGNA had not done this and therefore "No

50

employee will experience any period without standard additions to his pension account." Ex. 47, third page.

142.    Although CIGNA and its Board were informed of the company's "vulnerability" to an age discrimination claim, CIGNA did not obtain a legal opinion on whether its cash balance formula is lawful. The class requested any legal advice related to this claim in two requests. Ex. 34 (Request No. 2) and Ex. 64 (Request No. 14). No legal opinion on age discrimination was produced in discovery or identified in a privilege log.

143.    John Arko, CIGNA's Rule 30(b)(6) witness, testified he believed that CIGNA obtained some assurance from Mercer about age discrimination, but could not specify a document. Ex. 239, at 29, line 13 - 30, line 21; p. 33, line 6 - 34, line 24; p. 36, lines 3-15. Neither CIGNA nor Mercer (which was served with a subpoena duces tecum) produced any document about compliance with the age discrimination rules.

144.    In its July 8, 1996 discussion of legal issues, Mercer recognized that "If the rate of accrual is interpreted as the rate of increase in accrued benefit, and the accrued benefit is defined as an annuity at normal retirement age, then there's an issue" about whether "cash balance plans violate the rule" on the rate of benefit accrual decreasing because of age. Ex. 19 at EPTO 4170. In this discussion, Mercer gave an example where the accrual drops from $459 per month at age 35

to $143 per month at age 55. Id.

145.  In November 1997, Mercer prepared a spreadsheet for CIGNA showing accrual rates at older ages decreasing to 35.5% of the rate in the earlier years. Ex. 51 at MER 769-70. The accompanying memo explains that "an employee's accrual rate declines as he ages through a particular contribution rate – that is, a 3% contribution this year produces a higher accrual rate than a 3% contribution next year ... if the formula wasn't graded accrual rates would decline steadily" as the participant ages. Ex. 51 at MER 767.

146.  Actuary Andy Hodges testified at his deposition that he was not aware that there was an age discrimination issue related to the cash balance formula and does not recall ever discussing age discrimination issues at CIGNA. Ex. 241, at 91, line 6 - 93, line 24.

147.  CIGNA presented actuary Lawrence Sher as an expert witness to defend against the age discrimination claim. Mr. Sher is a well-known defender of cash balance designs who served as the chief actuary for Kwasha Lipton and successor companies for 24 years. Ex. 10 (Sher Rpt) at A-1, B-1; Tr. 1173, line 20 - 1176, line 16.  Mr. Sher has testified for the defense in many cash balance cases, including Esden v. Bank of Boston, Cooper v. IBM, Berger v. Xerox, Lyons v. Georgia Pacific, and Engers v. AT&T.  Tr. 1172, lines 3-14.

148.  Kwasha Lipton is recognized as responsible for the original cash

balance conversions in the mid-1980's. See <u>Eaton v. Onan</u>, 117 F.Supp.2d 812, 819 (S.D. Ind. 2000); Tr.  1174, lines 5-12. Kwasha Lipton was acquired by PriceWaterhouse Coopers in 1997. A 2001 sales brochure prepared by Pricewaterhouse Coopers touts: "Hands down, we're the experts. No other company has more experience assisting companies in introducing Cash Balance plans." Ex. 65 at 29100.

149.   Mr. Sher admits that neither he nor his consulting firm is authorized to give legal advice. He also testified that neither he nor his firm ever warned clients of any concerns with the legality of cash balance formulas.  Ex. 192 (Sher Depo) at 148-51 and 173-77; see also Tr. at 1205, line 25 -  1206, line 11. A slide entitled "Age Discrimination" that he prepared for a 1999 Glasser LegalWorks seminar states that age discrimination is "Not an Issue in Practice." Ex. 66 at P 2344.

150.   Mr. Sher admits that CIGNA's Plan does not conform with ERISA's definition of the term "accrued benefit" as the "annual benefit commencing at normal retirement age." Ex. 192 (Sher Depo) at 78-79 and 269-72; see also Tr. 959, lines 13-23 (Mr. Sher testified at trial: "In a traditional plan ... the benefit under the plan is defined in terms of an annuity, life annuity beginning at normal retirement age, usually age 65... Just the opposite occurs in a cash balance plan. You define the benefit in terms of a current account, current value.  Hypothetical

53

account").

151.    Mr. Sher admits that Mr. Poulin is computing the plan's accrual rate

consistent with the methodology used under the 133⅓% accrual rule and related

Treasury regulations. Ex. 10 (Sher Rpt) at 27-28 and Ex. 192 (Sher Depo) at 159-

63.

152.    But Mr. Sher does not believe this is the only way to comply with the

age discrimination rule. Instead, he suggests that the rate of benefit accrual might

be measured by "the rate of growth in an employee's account balance." Ex. 10

(Sher Rpt) at 11 and 13; Tr.  1133, line 13 -  1134, line 15.

153.    Alternatively, Mr. Sher contends that the differences in annuity

benefits that younger and older workers receive as a result of the annual

hypothetical allocations under CIGNA's formula reflect the "time value of

money." Ex. 10 (Sher Rpt) at 15-18; Tr.  1154, line 20 -  1156, line 3.

154.    It is undisputed that CIGNA's annual pay and interest credits are

hypothetical credits and not monetary allocations. The end-products of CIGNA's

hypothetical pay and interest credits are indistinguishable from a schedule under

which the rate of accrual decreases progressively from 1.73% of pay down to .66%

of pay because of age. Tr. 267, lines 2-17.

155.    CIGNA recognized internally that the hypothetical pay and interest

credits would reduce the benefits of "older employees" more in relation to the

prior formula than younger employees. CIGNA also recognized that the Plan's traditional 1.67% and 2% of average pay formulas provided their "highest growth in benefits nearer retirement age." Ex. 57 at 14468 and ¶135 above.

156.   After the cash balance changes, CIGNA's Plan offers the lowest rate of growth in retirement benefits "nearer to retirement age." CIGNA's internal spreadsheets show that the Plan's "accrual rates" decrease from 1.95% at age 20 to 0.66% at age 65. Ex. 62.

157.   The actual cost that CIGNA incurs as a result of the hypothetical pay and interest credits for employees like Janice Amara, Gisela Broderick, Annette Glanz and Patricia Flannery who "accrue no additional benefits with future service," Ex. 40 at 28635, is less than for younger employees who have little or no previously-earned benefits to "wear-away."

**V.    Cash Balance Conversions "Mask" Benefit Reductions Because Participants Cannot Compare Cash Balance Formulas with the Prior Benefit Formulas Without Converting Credits to Annuity Form.**

158.   A "major stumbling block" to reductions is "negative employee reactions."  Ex. 236, fifth page.  The May 5, 1999 issue of the *Wall Street Journal* published a story on professional conferences in which consulting actuaries discussed how "[c]onverting to a cash-balance plan does have an advantage as it masks a lot of the changes....There is very little comparison that can be done between the two plans." Ex. 67. The article quoted actuaries, including from the

Mercer firm which prepared CIGNA's disclosures, discussing the confusion among employees in a recorded October 1998 meeting of the Society of Actuaries in New York:

> "Amy Viener, an actuary at William M. Mercer Inc., noted: 'You switch to a cash-balance plan where the people are probably getting smaller benefits, at least the older-longer-service people; but they are really happy, and they think you are great for doing it.'"

> "An actuary with Watson Wyatt Worldwide who spoke on a panel called 'Introduction to Cash Balance/Pension Equity Plans' alongside Ms. Viener, is heard saying on a tape: 'It is not until they are ready to retire that they understand how little they are actually getting.' 'Right, but they're happy while they're employed,' responded Ms. Viener of Mercer during the panel discussion."

159.    In a September/October 1999 article, CIGNA's actuarial expert, Mr. Sher, writes: "For the same reason that it's hard to compare apples with oranges, employees will find it difficult to compare benefits under a cash balance plan with those under the prior traditional plan–no matter what information is provided." Ex. 68, at 20. In a 2001 article, Mr. Sher reported on a survey conducted by his consulting firm which found that among the 59% of cash balance conversions with 20% or more "benefit reductions" "at certain ages," there was little or no disclosure of the reductions to employees. Ex. 14 at 22; Tr. 1190, line 8 - 1191, line 15.

160.    At trial, Mr. Sher testified, "if one wants to hypothesize, what would have happened if the prior plan continued versus how benefits are being paid, you

know, would accrue under the cash balance plan, yes, that is a difficult thing to communicate." "I would have said to a client, yes, it is difficult to, you know, for employees to make comparisons.  That would have been part of the discussion." Tr.  1380, lines 1 -  1381, line 6.

161.   In September 2000, the United States General Accounting Office concluded that "In many instances of conversions to cash balance plans, sponsors did not ensure that participants received sufficient information about plan changes that can reduce future benefit accruals." Ex. 69 at 35.

**A.    CIGNA's Cash Balance Conversion Substantially Reduced Future Benefits.**

162.   In March 13, 2000 internal memorandum about class member John Depenbrock's benefits, Gerald Meyn stated: "John's projected pension value (present value at age 55) if he had continued in Part A earning 2% per year would have been $1.8 million. The projected pension value at age 55 under present circumstances [in the case balance plan] is $1.0 million." Ex. 70. This was a 45% reduction.

163.   After the Third Circuit's 2004 <u>Depenbrock v. CIGNA </u>decision required CIGNA to place Mr. Depenbrock back under the Part A formula, his retirement benefits nearly doubled. Mr. Depenbrock's benefits increased from $2,769 per month at age 55 to $5,266 per month between the ages of 55 and 65

and $4,737 per month after age 65. Ex. 71 and Ex. 72.

164.   After the <u>Depenbrock</u> decision, CIGNA also moved named Plaintiff Janice Amara back into the Part A Plan. Ms. Amara's benefits increased from $1,831 per month to $4,096 per month between ages 55 and 65 and $3,386 per month after age 65. Ex. 46.

165.   Another class member, Jack Lamb, saw his benefits nearly double when he was placed back in the Part A formula in February 2006 as the result of the <u>Depenbrock</u> decision and he and his wife's repeated complaints that CIGNA was not implementing the Third Circuit's decision. Ex. 73 at SuppD14400 and Ex. 74.

166.   Other examples of the increases are included in Ex. 73 (e.g., Michael Ferris).

167.   Mr. Poulin's calculations for the other named Plaintiffs and witnesses who were under the Tier 1 (2%) formula show similar differences: Ms. Broderick's benefits were reduced by 46% compared to if she continued under the Tier 1 formula. Ms. Glanz's benefits were reduced by 48%. Mr. Law's were reduced by 49%, Ms. Flannery's by 48%, and Mr. Charette's by 40%. Ex. 7 (Poulin Indiv. Calcs). The reductions for the Tier 2 (1.67%) witnesses were only slightly less, ranging from 34% to 49%. <u>Id</u>. See also Tr.  243, line 19 -  245, line 12 (explaining that "the average reduction" for Tier 1 employees "is 46 percent

whereas for the tier 2 employees, the average reduction is 40 percent").

168.   At trial, CIGNA's counsel agreed that if CIGNA "never adopted the cash balance plan," and participants continued under the Part A plan, "they would have a larger benefit than they have under th[e] conversion."  Tr. 908, line 20 - 909, line 1.

169.   Mr. Poulin's Supplemental Report shows how a change from a final or highest average pay formula to a career average pay formula alone nearly always causes a substantial reduction in future benefits. Ex. 4, ¶¶8-10. Mr. Poulin explained that "the career average accrued benefit for this plan that provides 1.79 percent times compensation ... results in a percentage reduction of 42 percent." Tr.  256, line 8 -  256, line 13; see also p. 258, line 15 -  259, line 5 (agreeing with the Court that "typically employee salaries increase over time," so "by merely switching ... from a final average ... to career average ... you necessarily will affect negatively the accrual average"). As Mr. Poulin's Supplemental Report shows, cash balance conversions effect the same change. Id; see also Tr.  257, line 14 - 258, line 8.

170.   The report of CIGNA's expert, Mr. Sher, agreed with Mr. Poulin's conclusion that CIGNA's new formula substantially reduced the future rate of benefit accruals. In his report, Mr. Sher estimated that the prior Tier 1 plan's net accrual rate was approximately 1.5% of highest pay (net of a Social Security

offset) compared with an accrual rate of approximately 0.75% of highest pay under the cash balance formula, assuming 4.5% annual salary increases. Ex. 10 (Sher Rpt) at 19 and 20 n.12; Tr. 1219, line 13 - 1221, line 13; see also Tr. 1498, line 11 - 1499, line 14, and Ex. 192 (Sher Depo) at 186-91. Defendants' counsel instructed Mr. Sher not to prepare or include any benefit comparisons in his supplemental report. Ex. 193 (Sher 11/2005 Depo) at 31-33 and 166; see also Tr. 1214, line 3 - 1215, lines 23.

171.    Mr. Poulin's actuarial report identifies and summarizes three other features of CIGNA's cash balance conversion that have caused future benefits to be lower than under the prior formula and less than participants might reasonably expect. He describes how:

(1)    The value of the prior plan's subsidized early retirement benefits, including a Social Security supplement payable between age 55 and ages 62 or 65, and the Free 30% survivor's benefit, were excluded from the computation of opening account balances;

(2)    A pre-retirement mortality discount was applied in computing the opening accounts, further discounting their value; and

(3)    Because interest rates declined after 1997, the opening account balances established with a 6.05% interest rate do not, even with interest, allow participants to "re-purchase" their previous normal retirement age benefits.

Ex. 3 (Poulin Rpt) ¶¶25-35 and Ex. 4 (Poulin SupplRpt), ¶¶12-17 and 37-39; see also Tr. 210, line 16 - 213, line 6.

60

172.    Defendants' expert, Mr. Sher, agreed that early retirement benefits and free 30% survivor's benefits were excluded from the opening accounts, that mortality was "assumed at all ages," including before retirement, and that falling interest rates reduced the value of the opening accounts in terms of retirement benefits. He also agreed that the plan's method of comparing benefits under two formulas means that a participant's "actual benefit might be rising more slowly or not at all." Ex. 10 (Sher Rpt) at 8 and 29-35; Ex. 193 (Sher 11/2005 Depo) at 103-7; see also Tr. 1344, line 13 - 1346, line 10 (agreeing that elimination of early retirement subsidies, use of preretirement mortality discount, and falling interest rates are causes of wearaway);  Tr. 1033, line 14 - 1034, line 22 (one-year of Annette Glanz's wear-away was attributable to pre-retirement mortality); Tr. 1011, line 21-p. 1012, line 4 (the free 30% benefit can "actually length[en] the wearaway period").

173.    Mr. Sher's Supplemental Report states that the Plan's Social Security supplement is a "non-protected benefit under the law."  Ex. 11 at 7.  He testified Social Security supplements are not protected under the regulations on ERISA §204(g), but he then admitted that "qualified" Social Security supplements which are based on early retirement eligibility are protected.  Tr. 1364, line 13 - 1367, line 17.  But to be qualified, he contended that "there would have to be language in the plan indicating that the employer is treating ... it as a qualified supplement"

61

in order for the supplement to be protected.  Tr.  1369, line 2  -  1372, line 11.

**B.     Internally CIGNA Was Aware that the Cash Balance Conversion Reduced Future Benefits.**

174.    As far back as February 1994, the Towers Perrin consulting company warned CIGNA that "Mid-career hires" and Long-service retirees" will be "losers with cash balance." Ex. 76 at D10656.

175.    Originally, CIGNA was not going to transfer any Tier 1 (2%) formula participants to the cash balance formula because it recognized that the Tier 1 formula was "much higher." A January 6, 1997 memorandum from the Vice President for Employee Benefits to the head of Human Resources stated:

> "We do not suggest offering this program to Tier 1 (2%) pension plan participants whose plan provides much higher pension benefits."

Ex. 28 at 12288.

176.    Sometime before July 1997, the cash balance proposal was modified to move Tier 1 participants with less than 45 age and service points to the lower cash balance formula. Ex. 49 at D00603.

177.    CIGNA's Information Kit was never revised to cover the inclusion of Tier 1 (2%) formula participants. Instead, it only described the Tier 2 (1.67%) formula. Ex. 8, Tab 2 at AMARA-00441-442.

178.    CIGNA recognized that one of the "Negatives" of the cash balance change was that it is "Not [a] final pay based benefit." Ex. 54 at D00464. A

7/15/1997 Memo to the People Resources Committee of CIGNA's Board recognizes that the current formula is based on "highest" pay and states that the cash balance plan's "career average accrual of benefits" will "result in an expense reduction." Ex. 49 at D00599-600. An article by Ian Glew, CIGNA's Senior Vice President for Plan Sponsor Solutions, also states that "in many traditional defined benefit plans, benefits are based on final earnings.  This can be more costly to employers than cash balance plans, where benefits are based on career average earnings." Ex. 75 at 3.

179.   A November 2001 computation by CIGNA "compares the level of pension benefits we provide to employees" under the old Tier 1 plan and shows the old pension plan providing 53% of Final Pay at age 65 compared with 31% under CIGNA's Cash Balance Plan. The reductions were even more pronounced at early retirement ages, e.g., 35% of Final Pay under the old plan compared with 17% of Final Pay under Cash Balance. Ex. 41 at 28654 and 28660; see also Ex. 40 at 28634 and 28638 (1/7/2002 memo using same data).

180.   A November 2002 memo by actuary Andy Hodges states that if the grand-fathered Part A employees were moved to cash balance, their benefits would be reduced to 61% to 78% of their former levels after only 5 years under the cash balance plan. Ex. 79 at 29424.

181.   The reductions for the Tier 2 employees were slightly less than for

Tier 1 employees. In April 1997, CIGNA asked Mercer to prepare a "comparability analysis to gauge the amount of additional or reduced benefit value relative to the current benefit formulas." Ex. 80 at MER 1320. Mercer prepared spreadsheets for CIGNA showing that the new plan's benefits were often between 70 and 80% of the prior plan's Tier 2 (1.67%) formula. Ex. 81 at MER 792.

182.   Another memo indicates that the cash balance formula was designed to provide older Tier 2 employees with "benefits at age 60 of about 85% of what they would have received from their former plan." Ex. 41 at 28656.

183.   The Tier 2 employees who testified at trial or in depositions, Messrs. Haber, Upton, and Curlee and Ms. Hogan, incurred reductions of 49%, 40%, 36% and 34%, respectively, over periods of employment with CIGNA after the cash balance conversion ranging from 4 to 7 years. Ex. 7 (Poulin Indiv Calcs); see also Tr. at 245, line 4 - 8 (average reduction for Tier 2 employees is "40 percent").

184.   Bar graphs entitled "Proposed Program vs. Current Program" which were prepared in July 1997 show the impact of the changes on Tier 2 employees." Ex. 82 at SuppD1644. The bar graphs were also included in a packet of "Revised discussion points with division presidents." Ex. 83 at SuppD1617-1628.

185.   The bar graphs show that the "Proposed Program" was only comparable to the current program if CIGNA made additional contributions to the 401k Plan (aka "SIP") of 2% of pay every year and the 401k accounts always earn

a 9% rate of interest.  See Ex. 83 at SuppD1623-26 and Ex. 240 (Arko 4/2006

Depo) at 158, line 9 - 166, line 23.

186.   CIGNA's additional SIP contributions have averaged less than 1%

over the period from 1998-2005. Ex. 84. That level of additional SIP contributions

assumes the participant contributes the maximum of 6% of his or her own pay; if

the participant does not do this, the additional SIP contributions are

proportionately lower. See id.

187.   CIGNA's increase in the SIP contribution at the time of the cash

balance conversion was to benefit "savers," including grandfathered participants,

rather than to make up for any benefit reductions from the cash balance formula.

A July 1997 document entitled "Additional Retirement Plans Discussion" states

that the cash balance benefits will be "below competition (for mid-career hires)"

and discusses whether to increase the cash balance benefit or provide a higher,

discretionary 401(k) (the "SIP")  matching contribution.  Ex. 739 at SUPPD25809.

Rather than increase the cash balance plan's credits by one percent of pay, where

the "benefit goes to all employees (even non-savers)", CIGNA decided to add a

variable SIP match in company stock where the "match goes only to savers based

on their savings rate" because this "offers cost flexibility."  Id.  See also

SUPPD25857 (stating that "Employees get money based on how much they are

willing to save").

65

188.   Total Compensation Reports ("TCR"s) distributed to participants in 1998 and later years offered participants income replacement percentages based on the cash balance formula using a 6.8% interest crediting rate and a 7 or 8% annuity conversion interest assumption. Ex. 85 (1994-2002 TCRs) and Ex. 86 (2003-2005 TCRs). The 1998 Total Compensation Report states: "The estimates shown in this report represent our best efforts at this time to calculate figures based on what we consider to be realistic assumptions." Ex. 85 at P 1803.

189.   In a 3/19/1998 communication to Denise Hill with a "cc" to DML (Donald M. Levinson, the head of HR), Barry Wiksten wrote in regard to the 1998 Total Compensation package: "Did suggest some changes to reassure those with concerns about having "sufficient retirement income." The compound interest examples ought to do it …" Ex. 87 at SuppD1641.

190.   The compound interest assumptions used in the Total Compensation Reports were unrealistic. Tr.  275, line 22 -  280, line 18. CIGNA's interest crediting rates for 1998-2005 averaged less than 5% and the applicable 30-year Treasury interest rates used to convert cash balance accounts to annuities averaged less than 5.5%. Ex. 3 (Poulin Rpt) ¶34; Tr. at 271, lines 9-21; and Ex. 88 (IRS table of 30-year Treasury securities rates).[2]

191.   Mr. Poulin's Supplemental Report shows how a 1.5% differential in

_____

[2]  CIGNA uses the rate from November of the preceding year. Ex. 1 at 2.

the projected interest rate for an employee who is age 40 makes a 60% difference in the projected benefit. Ex. 4 at ¶12; see also Tr. 277, line 24 - 279, line 6.

192.  CIGNA "Production Outline" shows that Mercer was assigned to perform additional "old/new plan comparisons" in October 1997, with a target distribution date of Dec. 5, 1997. Ex. 89 at SuppD1724.

193.  An October 6, 1997 memo from Mercer to Denise Hill, CIGNA's Director of Human Resources Communications, attaches drafts of the Newsletter and Information Kit and talks about Mercer's actuaries "adjusting the assumptions" in a "comparison graph" "so that both plans provide equal benefits at 30 years of service. We'll fax this graph separately." Ex. 90 at SuppD 1850.

194.  The final versions of CIGNA's Newsletter and its Information Kit did not contain a comparison graph. See Ex. 8, Tabs 1 and 2. No faxed comparison graph was included in CIGNA's or Mercer's document production in discovery.

195.  In addition to recognizing that the cash balance formula offers a benefit based on "career average" salary instead of "highest" pay, CIGNA has recognized the three points in Mr. Poulin's analysis: First, CIGNA recognized that it was eliminating the old Plan's early retirement benefits for the future: "Employees in the old Tier 1 (2%) Plan lose the potential ultimate value of that Qualified and Supplemental plans' early retirement subsidy." Ex. 140 at 4649;

see also Ex. 49 at D00600 (7/15/1997 memo to People Resources Committee: The Tier 1 formula "offers significant early retirement and surviving spouse subsidies.... The pension change will result in an expense reduction due to the ... elimination of early retirement subsidies"); Ex. 91 at D030950 ("our early retirement provisions effectively doubled the value of the plan for those who took advantage of early retirement"); Ex. 75 at 3 (article by CIGNA Senior Vice President on cash balance "savings from the elimination of the large early retirement subsidies generally offered in traditional defined benefit plans").

196.   CIGNA has also recognized that its opening accounts excluded the value of early retirement benefits and Social Security supplements from the opening account balances. A chart prepared for a meeting at Eagle Lodge in Bucks County, Pennsylvania in May 1997 shows an employee with a beginning of the year account balance less than the lump sum value of minimum benefit because the early retirement subsidy is not included. Ex. 93 at 29935.

197.   An 8/29/1997 draft indicates that CIGNA considered adjusting the cash balance accounts when an employee reached age 55 to include early retirement subsidies, but this was not part of the final plan design. Ex. 94 at D11911. A 2001 memo again considers including early retirement subsidies in the accounts for a limited group of former Tier 1 employees because it "Offers some protection should regulatory review of cash balance conversions become

68

severe." Ex. 140 at 4650.

198.   Second, CIGNA's Answer to Interrogatory No. 4 in the First Set of Interrogatories admits that a discount for pre-retirement mortality was applied in establishing the opening accounts. Ex. 27.

199.   Third, the effects that "declining interest rates" would have on the value of benefits was observed as early as CIGNA's May 1997 meeting with Mercer at Eagle Lodge in Pennsylvania. Ex. 93 at 29937-38; see also Ex. 48 (1/1/1999 memo discussing "effect of falling interest rates"); and Ex. 27 (Answer to Interrogatory No. 8, recognizing that wear-aways are a function of "interest rates").

C.   **CIGNA's SPD, SMM and Purported Section 204(h) Notice Do Not Disclose the Reductions in Future Benefits.**

200.   CIGNA offered its employees an overview of how the cash balance plan operates in a series of communications.  In a 10/30/1997 letter to employees, CIGNA represented that "we expect the new plan ... to be a plus for most employees." Ex. 95 at SuppD1275.

201.   In November 1997 CIGNA distributed a "Special Edition" of its Benefits Newsletter entitled: "Introducing Your New Retirement Program." Ex. 8, Tab 1.

202.   CIGNA contends that this Newsletter is an ERISA Section 204(h)

69

Notice of a significant reduction in the rate of accruals, although it is not

identified as such. Ex. 239 (Arko Depo) at 41, line 17 - 46, line 24.

203.   In an inset box on the Newsletter's cover, a "Message from CEO

Bill Taylor" declares: "I am pleased to announce that on January 1, 1998,

CIGNA will significantly enhance its retirement program." "These

enhancements will make our retirement program highly competitive...." Ex. 8,

Tab 1.

204.   The Newsletter tells employees that "The new plan is designed to

work well for *both* longer- and shorter-service employees," it provides "steadier

benefit growth throughout [the employee's] career," and it "build[s] benefits

faster" than the old plan. Id. at 4 (emph. in orig.).

205.   The same page of the November 1997 Newsletter tells employees

that "One advantage the company will not get from the retirement program

changes is cost savings." Id.

206.   CIGNA contends that a December 1997 Information Kit is a

summary of material modification ("SMM") under ERISA, although it is not

identified as such.  Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

207.   The Information Kit states that the changes are being made to

"improve the competitiveness of our benefits program and thus our ability to

attract and retain top talent." The Kit represents that the changes are

"enhancements to the plans." Ex. 8, Tab 2 at AMARA 00447.The Information Kit

represents that CIGNA is not saving any money with these changes, "nor has the

new program been designed to save money." Id. at AMARA-00448.

208.   A brochure in the Information Kit entitled "Transition to the New

Retirement Plan" includes a discussion, with a numerical example, about how the

"benefits that you have earned under the Pension Plan through December 31, 1997

are fully protected, and their value will be reflected in your new plan balance."

The brochure includes an example showing how the opening balance can be

reconverted to the same benefits. Ex. 8, Tab 2 at AMARA-00441 to 443.

209.   Mr. Poulin's supplemental report examined this example and explains

how it is "mathematically impossible" for the opening balance used in this

example to repurchase the same benefit:

> "In the example, a hypothetical plan participant entitled to a normal
> retirement age benefit of $2,123 a year at age 40 has an opening
> account balance of $4,076 based on the conversion factor of 1.920 at
> that age.  This factor is the actuarial present value at age 40 of an
> annuity of $1.00 a year starting at age 65 and payable for life, based
> on an interest rate of 6.5% and the GATT Mortality Table.  This
> section of the Information Kit ends with the following statement:
> 'After 25 years of investment at 6.5% annual interest, $4,076 would
> grow to about $19,700, which is enough money to pay the employee
> the $2,123 annual benefit beginning at age 65, assuming the
> employee has an average life expectancy and the unpaid portion of
> the benefit continues to grow at a rate of 6.5% per year.'  The second
> portion of this statement is inaccurate and misleading.  While it is true
> that the accumulation of $4,076 at 6.5% for 25 years will yield
> $19,700, this amount can only purchase an annuity of $1,920 at age

65, ie., 90.4% of the amount on which the opening account balance was based.  It is in fact mathematically impossible to repurchase the normal retirement age annuity of $2,123 to which this participant was entitled on December 31, 1997 at a rate of 6.5% since the initial mortality discount is lost forever."

Ex. 4 (Poulin Suppl Rpt) ¶16; Tr.  237, line 15 -  239, line 23 ("It is mathematically impossible to arrive at this $2,123 on the interest alone of 6.5 percent ... this was, I believe, a major flaw in that presentation, that the recrediting of interest ... will never make the employee whole for the mortality discount that was used in the opening account balance").

210.   Under the heading "How Your Benefit Grows," the Information Kit represents that "Each dollar's worth of credits is dollar of retirement benefits payable to you." Ex. 8, Tab 2 at AMARA-00463. No indication was given of a potential for wear-away periods during which participants will not earn additional retirement benefits. See id.

211.   The Information Kit poses the question "Will my benefit be better under the new Retirement Plan?" In response, CIGNA told employees that while comparisons are "difficult,"  "Generally speaking, the new Retirement Plan, in comparison with the current Pension Plan, tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees." Ex. 8, Tab 2 at AMARA-00452. Employees were separately told that the "benefits will grow faster during the early part of your career." Id. at AMARA-00447.

72

212.   In response to the question "Why wasn't I allowed to stay in the Pension Plan?," the Information Kit told participants who were being moved to cash balance that "Our analysis showed that, in comparison to people with a higher age and service combination, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan." Ex. 8, Tab 2 at AMARA-00448. Neither CIGNA nor Mercer produced any such analysis in discovery.

213.   Similar representations that the cash balance benefits were comparable or larger appear in other written communications: A 1997 list of "Revised discussion points with division presidents" represents that there will be "NO negative impact on most employees with long service or near retirement." Ex. 83 at SuppD1618. The memo further states that the "Short term impact is very positive – higher average benefits for all" and the "Long term impact – potentially the same or more but dependent on profitability measures, personal savings/investment." Id.

214.   The same representation that the new Retirement Plan "tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees" appears in a set of questions and answers prepared for managers in December 1997.  Ex. 57 at D00596.

215.   An Interoffice Memo dated 11/3/1997 entitled "Introducing the New Retirement Plan" from Gerald Meyn to CIGNA Managers also represents that

73

CIGNA was "*not* changing the plan to cut costs." Ex. 96 at D00584 (emph. in orig.).

216.   A February 1998 Signature Benefits Newsletter states that employees hired before 1989 with age and service less than 45 points "were moved…because they have enough time to take advantage of the new plan provision. They do not face the problem that those nearer to retirement would face if they were suddenly moved out of the pre-1989 plan."  Ex. 97 at SuppD 1330.

217.   Subsequent communications did not correct or qualify any of these statements. A May 1998 Signature Benefits Newsletter responds to a sample of survey responses from the Retirement Plan Communications Survey but only addresses questions re: the "Social Security offset," "1,000 hours needed to accrue a year of service," and the five year vesting requirement. Ex. 180 at SuppD1292. Numerous survey responses and individual requests quoted below at ¶¶299-300 asked for information about how the old plan compares with the new, but those questions went unanswered.

218.   Phone scripts were used to field calls to a 1-800 telephone number provided to participants. The phone scripts did not provide information about benefit reductions from the cash balance conversion or any other disadvantages of the changes. See Ex. 59.

219.   CIGNA's 1998 Total Compensation Report ("TCR") contains an

almost identical representation to the one in the Information Kit about how the

opening account balance will, with interest credits, result in the same lifetime

annuity benefits, with no mention of a pre-retirement mortality discount or the

effect on benefits if interest rates fall:

> "This [initial] balance represents the full value of the benefit you
> earned for service before 1998 payable to you at age 65. ... It was
> converted to a lump sum based on an assumed interest rate of 6.05%.
> **This means that the lump sum growing at this rate of interest to
> retirement is equivalent to the value of the lifetime annuity
> payments you have earned**."

Ex. 98 at P 1527 (emph. in original).

220.    The Total Compensation Reports (TCRs) also represented that

"CIGNA pays" specific dollar amounts for their pensions. CIGNA does not

actually make contributions to any accounts and the amounts given do not

correspond with what CIGNA actually pays. For example, Gisela Broderick is told

that "CIGNA pays" $7,617 and $16,757 for her pension in 2001 and 2002. Ex. 99.

There was no qualification that she was actually under a "wear-away" where she

was not earning any additional benefits. Id. Ms. Broderick testified that "I

assumed that that was money that was going to be paid to me when I retired," but

she "didn't" receive those amounts.   Tr.  105, line 3 -  107, line 14.  Ms. Amara

testified that she figured out that the amount listed as what "CIGNA pays" is "the

sum of the benefit credit and the interest credit" in the preceding year. Tr.  33,

lines 2-24. She did not receive what the TCR says that "CIGNA pays" either. Tr. 37, line 16 - 40, line 7.

221.   In October 1998, the company issued the ERISA-required summary plan description ("SPD") about the amendments. The SPD repeated the representation that "Each dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested." Ex. 8, Tab 3 at 3 and Tab 4 at J-2. The SPD did not contain any disclosure about the wear-away periods in which participants would earn no accruals for several years of participation. See id.

222.   The SPD contained no descriptions of reductions in future rates of accruals. It also does not describe any other disadvantages of the cash balance formula, such as the elimination of a formula based on highest pay closest the retirement, the exclusion of valuable early retirement benefits from the opening accounts, or the application of a pre-retirement mortality discount in computing the opening accounts. See Ex. 8, Tab 3.

223.   In November 1999, CIGNA reissued the same SPD, with no noticeable changes other than in the format. See Ex. 8, Tab 4. Again, CIGNA made no disclosures about the benefit reductions or other disadvantages of cash balance. Id.

224.   On July 28, 2006, CIGNA distributed a new SPD and Supplement to active participants and retirees about the cash balance plan. Ex. 218. The new SPD

76

provides information on:

> (1)  The "bookkeeping" nature of the cash balance accounts with "no actual money" in the account; and

> (2)  The "effect of interest rates on your annuity payments."

Ex. 218, SPD at 4 and 13. This information was not provided in the disclosures distributed with the cash balance conversion.

225.  CIGNA's new SPD and Supplement eliminate or qualify many of the assurances that were made contemporaneous with the cash balance conversion, including: (1) that "Each dollar's worth of credit is a dollar of retirement benefits payable to you," (2) that the opening account balances are "equal" to the lump sum value of the prior pension benefit and are "based on guidelines established by the federal government," and (3) that participants will be "notified" "if the minimum benefits rule applies to you." Plaintiffs' counsel have prepared a summary table to compare the statements in the new SPD and Supplement with the statements in the earlier SPDs. See Appendix I.

226.  The new SPD and Supplement were produced by Defendants on August 2, 2006. Defendants produced no documents related to the drafting of the new SPD or Supplement. A Pension Plan Initiatives log maintained by Prudential indicates that CIGNA began preparation of these documents in early 2006, with distribution scheduled for the end of April 2006. Ex. 220 at SuppD025509.

### 1.     Professor Stratman found no disclosures of reductions or other disadvantages in CIGNA's communications with its employees.

227.     The Plaintiff class engaged Professor James Stratman, Associate Professor at the University of Colorado at Denver and Director of its Technical Communications Program, to examine CIGNA's purported Section 204(h) Notice, its SMM and its SPD. Ex. 8 (Stratman Rpt) at 4; Tr.  499, line 11 -  500, line 25.

228.     Professor Stratman has written a law review article based on his research on ERISA SPD's which the Third and the Tenth Circuit Courts of Appeal have relied upon.[3] Tr.  501, line 17 -  502, line 5.  He is an expert in the understandability of written communications in the legal, business and technical fields.  Tr.  501, line 1 -  504, line 22.

229.     Professor Stratman analyzed the statement in the November 1997 Newsletter–which CIGNA contends is a Section 204(h) Notice, see Ex. 239 (Arko Depo) at 41, line 17 - 46, line 24–stating that the retirement program changes will "significantly enhance" CIGNA's program. Professor Stratman found: "This statement is important because it may set participants' expectations about all other information that follows in the subsequent stream of CIGNA communications

---

[3] James F. Stratman, "Contract Disclaimers in ERISA Summary Plans: A Deceptive Practice?" *Industrial Relations Law Journal*, Vol. 10, No. 3, 350 - 380 (1988). Cited in <u>Alexander v. Primerica Holdings</u>, 967 F.2d 90, 93 (3d Cir. 1992), and <u>Chiles v. Ceridian</u>, 95 F.3d 1505, 1518-19 (10th Cir. 1996).

78

concerning the change of plans." Ex. 8 (Stratman Rpt) at 5; Tr. 524, line 18 - 526, line 20 (language "set[s] certain expectations in readers about the nature of information that will follow" and provides a "positive frame").

230. Professor Stratman testified that because the Newsletter was the first document employees received, "to the extent that it sets expectations about or creates worry in the minds of the employees, it is very important. It is conceivable ... if [employees] were getting a stream of this and they're told at the end, well, more information will be coming, it could have the effect of having them not be concerned when they see the next item that comes along..." Tr. 532, line 24 - 533, line 11. "It might lower their scrutiny ... of things that come along later." Id. at 533, lines 12-13.

231. According to Professor Stratman, the Newsletter reinforced the initial statement that the changes "enhanced" benefits with three representations:

(a) "[N]ew plan participants 'will see an overall improvement in their retirement benefits' (p. 2, col. b, inset box)

(b) 'the new plan is designed to work well for *both* longer-and shorter service employees' (p. 4, col. a);

(c) the new plan provides 'steadier benefit growth throughout [the employee's] career" (p.4, col. a).

232. Professor Stratman testified that the first representation "implies that the other group of people, those people going forward into Plan B, will also see an

overall improvement in their retirement benefits." Tr. 530, line 5 - 531, line 2.

The language that the new plan "is designed to work well for both longer and

shorter service employees" is also "of concern because there's no real qualification

about some of the reductions that longer service employees will encounter under

the transition." Tr. 531, lines 5 - 14.

233.  Professor Stratman also testified that "if the allegation of wearaway

and that in particular is true, then it's hard to see the consistency between what is

going to happen to some of these employees and the phrase or the clause 'provides

steadier benefit growth'." Tr. 531, lines 7-24.  This language does not tell

participants that by switching from a final average pay plan, they would lose

benefit growth "at the end of your career, when you are earning your highest

salary." Tr. 581, line 1 - 582, line 1.

234.  Professor Stratman found no indication of benefit reductions in these

three statements.  He testified:  "[I]t's good news basically going forward, longer

and shorter service employees are going to see steadier growth, so nothing is really

being called out here, ... even to the level of equivocation which by definition is

not clear communication, nothing even rising to that level.  So I don't see anything

that explains the reductions in this document or foreshadows them or hints of such

occurring." Tr. 532, lines 7 - 23.

235.  Professor Stratman also testified that the language in the Newsletter

80

that "one advantage the company will not get" "is cost savings" is "part of consistent issuance of assurances to people that they're not going to be in trouble ... this may encourage people to believe that for other strategic reasons of importance to the company ... they're not doing this to get savings." Tr. 622, line 7 - 623, line 3.

236.   Professor Stratman also analyzed the disclosures in the December 1997 Information Kit (which CIGNA contends is a Summary of Material Modifications ("SMM")). Tr. 534, lines 6 - 11. Professor Stratman found the Kit assured participants that their benefits were "fully protected" after they were converted to a value "in the new plan balance." Ex. 8 (Stratman Rpt) at 7. Professor Stratman found that the Kit reinforces that assurance by telling participants that the conversion factors were "based on guidelines established by the government to ensure a fair transition for employees." Id. Professor Stratman found that CIGNA compares the conversion to a mere "transfer" of benefits from one place to another, assuring employees that:

> "all of your benefits earned under the current pension plan through December 31,1997 will remain yours. As of January 1, 1998, those benefits will be transferred to the new plan."

Id. at 8.

237.   Professor Stratman testified that "these are categorical statements and people are being reassured, hey, everything is protected here." Tr. 535, lines 14 -

81

23.  Professor Stratman also examined the statement "At the same time you will begin earning retirement benefits under the new plan."  "[S]aying 'at the same time,' it's sort of like saying one moment you are in Plan A, the next moment you are in Plan B, you will begin earning retirement benefits under the new plan."  Tr. 534, line 12 -  535, line 13. With respect to the language on federal guidelines, Professor Stratman testified that "fair transition ... is obviously meant to say ... you don't have to worry about this ... we are doing this according to some government rules... It's a reassurance to them that this will be done fairly." Tr.  544, line 6 - 546, line 3.

238.    Professor Stratman found that CIGNA's communications repeatedly "direct employees' attention away from potential reductions," for example, by representing that they were moved because "Our analysis showed, that in comparison to people with a higher age and service combination, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan." Ex. 8 at 8.  Professor Stratman testified, "Again, there's nothing being communicated here to participants about the nature and impact of the reductions and it isn't clear why exactly this comparison is being made between you in your group and these folks that stayed ... it might again reinforce people's feeling that, hey, well, they're looking out for the group that would be negatively impacted." Tr.  541, line 17 -  542, line 21.  He further stated, "I don't think the average

reader, against the consistency and the categorical nature of the earlier assurances, are going to see or feel anything of concern here and indeed, the language doesn't support that.  It says you've got plenty of time to reap the benefits of this new thing."  Id. at 543, lines 12-23.

239.    Professor Stratman found that the direction away from potential reductions was "reinforced" by the answer to the question, "Will my benefits be better under the new retirement plan?" where CIGNA tells its employees that "Generally speaking, the new retirement plan, in comparison with the current pension plan, tends to provide larger benefits for shorter-term employees and comparable benefits for longer service employees." Ex. 8 at 8.  Mr. Stratman testified that this question is "one of the uppermost questions in readers' minds...This might be the place ... that a reader might naturally believe that they would get a straight story here about any bad news." Tr.  551, line 19 -  552, line 6.  Based on the response, however, readers would not "be able to infer" a significant reduction in benefit accruals.  "[T]he word 'comparable' suggests fairly equal," so readers are "going to get some feeling that, well, for us folks in this group that didn't get moved or get to stay in Plan A, we are going to be doing about the same as we have been."  Tr.  552, line 10 -  553, line 14.

240.    Professor Stratman testified that the use of "Q&A's" are "common" in "corporate communications."  "It's suggesting that ... we are going to give you a

clear picture here of what's going to happen and we understand you have questions on your mind about this and so here they are." Tr. 553, line 15 - 554, line 25.

241. Professor Stratman observed how the Information Kit assures participants moved to the new plan that their "retirement benefit will continue to grow," Ex. 8 at 7, and in another part of the Kit reassured them of that growth by stating that:

> "Each dollar's worth of credits is a dollar of retirement benefits payable to you after you are vested. Under the plan, your benefit will grow steadily throughout your career as credits are added to your account."

Id. at 9. Professor Stratman testified, "[H]ere, with respect to the alleged wearaway, there is no warning whatsoever. In fact, there's a very opposite kind of statement, reinforcing the impression that ... you are continuously going to get your benefits." He also observed, "We have 'will grow steadily' and again, if you are under wearaway, then clearly you are not seeing steady benefit growth. You are seeing a hiatus in there." Tr. 559, line 16 - 560, line 20.

242. Professor Stratman concludes that the Information Kit nowhere suggests any "ways in which benefit reductions relative to the old plan are possible" and does not disclose that "benefits may not grow at all for several years and that the ultimate rate may be lower than the prior rate." Ex. 8 (Stratman Rpt) at 7 and 9.

84

243.    Professor Stratman testified that after participants received the
Information Kit, "given the consistency of the cues and the statements in all of
these documents leading up to this 1998 summary plan document, the impression
would be reinforced, that people were going to be in good shape and that they
needn't be particularly concerned about this transition." Tr. 562, lines 5-16.  He
testified that, by the time employees received the SPD, "[i]t's possible ... that
people who had gotten this far with this stream of documents might feel that they
already knew what the situation is with this cash balance conversion and therefore,
may not read this document at all or may read it very lightly and skim." Tr. 563,
lines 4 - 17.

244.    Professor Stratman examined the nearly-identical SPDs distributed in
1998 and 1999. Observing the SPD's repetition of the promise in the Information
Kit that "Each dollar's worth of credits is a dollar of retirement benefits payable to
you," and "Under the plan, your benefit will grow steadily throughout your career
as credits are added to your account," Professor Stratman found that the SPDs
reinforce "[t]he notion that the change to the new plan involves no loss of
benefits." Ex. 8 at 11. The SPDs fail to disclose that:

> - "employees might not immediately begin earning benefits after
> conversion but will instead have new benefits delayed for a number
> of years.
>
> - the early (age 55) retirement benefits disappear entirely.

85

- the employee's total pension value may not be comparable to what it was under the old plan and may even be significantly reduced.

- the cash balance payment option may be relatively less valuable than the annuity options under the old plan."

Id. at 12.

245.    Professor Stratman testified that "here again, [there is] no qualification with respect to individuals who might be going or if it's the case that there's wearaway, if they were going to experience wearaway.  There's no mention of a qualification here concerning the words 'steadily growing'."  Tr.  563, line 18 -  564, line 13.

246.    With respect to the statement that the opening balance "is going to be equal to the lump sum value of the pension benefit you earned through December 31, 1997," Professor Stratman found that "there's nothing to really warn readers here about the nature and impact of the alleged reductions." Tr.  565, line 12 - 566, line 6.

247.    Professor Stratman found that the "import" of the language that the "conversion formula used is based on guidelines established by the federal government" is to "raise [the] credibility of the writer, to get them to trust what is happening and to assure them, but nothing else is being said." "[T]his would make people feel that, well, good, they're doing this on the up and up, if I was going to

86

lose value, maybe the government guidelines have something to do with...making sure that isn't going to happen." Tr. 566, line 13 - 567, line 16.

248.    Professor Stratman points to only a "hint" of possible reductions in the SPD's statement that "your final Plan benefits cannot be less than your old plan benefits on December 31, 1997" with the promise that "if this minimum benefits rule applies to you, you'll be notified by the Retirement Benefit Center." Ex. 8 at 12. He concludes that it is doubtful an average reader would understand the import of this clause given all the other reassuring language in CIGNA's documents. Id. As described in ¶¶401-410 below, CIGNA did not, in fact, ever notify employees when this "minimum benefits rule" applied to them.

249.    Professor Stratman testified that "against all of the reassuring language up to this point, I again don't think this is going to surface any questions or concerns on the part of people.  It's telling me, yeah, I'm entitled to the Plan A benefits that I had and I will never have less than those."  Tr.  569, lines 8 - 21.

250.    Professor Stratman testified that the language in both the 1998 and 1999 SPDs were identical.  He also testified that there were no "additions" to the 1999 SPDS that "mitigated any concerns" he had about the 1998 version.  Tr. at 572, line 16 -  573, line 2.

251.    Professor Stratman concluded:

"Instead of disclosing the potential reductions, the SPDs and

87

> precursor documents offer assurance of steadier benefit growth with
> no disclosure that the rates decrease with age, that they drop in
> comparison with the old plan, or that they are conditional upon giving
> up part of the value of accrued benefits under the old plan."

Ex. 8 at 12-13.

252.    Professor Stratman testified that the problems with CIGNA's communications involves both omissions and misrepresentations.  He indicated that CIGNA was misrepresenting "[t]he nature and impact of the reductions that certain employees would experience upon the conversion of their Plan A benefits into Plan B benefits."  Tr.  619, lines 1-23.  The communications "encourag[ed] readers of these documents to believe that this is an improvement to their pension plan and with no particular qualifications issued."  Tr.  619, line 24 -  620, line 5.

253.    Professor Stratman also addressed the language in the Total Compensation Reports which indicates that "CIGNA pays" some amount "and includes it in a total amount of compensation."  He testified that, where a participant was experiencing wear-away, this would not be a good way to communicate what the person is actually earning under the plan.  Using an example, he explained, "if I get a stock report from my mutual company and they're telling me you earned X number of dollars and I didn't actually earn those dollars, would that be bad communication?  I can only suppose that would be the case."  Tr.  617, line 15 -  618, line 25.

88

254.   Two of the employee witnesses testified that they went back and specifically looked for disclosures of reductions and could not find them.  ¶¶369 (Upton), 374 (Hogan).

### 2.   *CIGNA offered no expert report or evidence to rebut Professor Stratman's analysis.*

255.   CIGNA produced no expert testimony to counter Professor Stratman's report on the Newsletter, Information Kit or SPDs.

256.   During the trial, the Court asked CIGNA's lead counsel, Mr. Costello, if Defendants claimed "that in any of these documents, there is a statement that any employees' benefits would be less under the new plan than they were under the old plan." Mr. Costello responded that "there are number of statements that we can point to."  Tr.  591, lines 11-19.  However, he later admitted that he was unable to point out any statements that told employees that "they were not actually earning retirement benefits."  Tr.  597, line 21 -  600, line 9.  The Court stated, "I just wanted to establish that.  There's nothing that would give anyone any direct certainly explicit statement that regarding the fact that they may be subject to the wearaway," to which Mr. Costello responded: "Correct."  Tr.  599, line 16 -  600, line 9.

257.   CIGNA's actuarial expert, Mr. Sher, has written that "employees will find it difficult to compare benefits under a cash balance plan with those under the

89

prior traditional plan," Ex. 68 at 20, and found in a survey on this topic that "[i]n most cases, employees do not receive details about significant potential benefit reductions." Ex. 14, at 24.

258.   Mr. Sher has also urged companies to be honest about reductions from cash balance conversions: "Explain to people who will see reductions what will happen and why you are doing it so they will understand." Ex. 100 (trade article quoting Lawrence Sher).

259.   Mr. Sher testified that he asked Defendants' counsel whether he should address the disclosure issues in Mr. Poulin's report and was told that counsel "didn't want me to address them." Ex. 192 (Sher Depo) at 106-7.

**D.     CIGNA's Rule 30(b)(6) Witness Agreed that the SPD, SMM and Purported Section 204(h) Notice Do Not Disclose Benefit Reductions.**

260.   In response to a Rule 30(b)(6) notice about compliance with the disclosure rules, Ex. 21, CIGNA produced John Arko, whose title was Director of Retirement Benefits at that time and is now Benefits Strategy Director and Plan Administrator. Ex. 239 (Arko Depo) at 6, lines 2-19 and Ex. 240 (Arko 4/2006 Depo) at 5, lines 15-21 and 10, lines 7-21.

261.   According to Mr. Arko, the November 1997 Newsletter contained a §204(h) notice that gave employees notice "of a reduction in the rate of accruals." Ex. 239, at 41, line 17 - 46, line 24.

262.   Mr. Arko specified the part of the Newsletter that he believes gave the §204(h) notice: "It was on Page 5 of this newsletter. It would be the story labeled, Opening Balances to be Calculated Next Spring." Id. at 47, line 16 - 48, line 4 (describing Pls. Dep Ex. 61, which is identical to the Newsletter attached as Tab 1 to Ex. 8). "I think that this story satisfies to the extent we were trying to put a 204(h) notice out, that this was – this notice and that story was intended to do that." Id. at 48, lines 5-23.

263.   Asked where in the story the disclosure was made, Arko declared: "I think the entire story." Id.

264.   Confronted with each section of the story and asked "Does that ...tell participants that their benefits will be reduced under that new plan?" Mr. Arko testified for each section that "No," the language did not tell participants that their benefits will be reduced under the new plan. Id. 81, line 5 - 85, line 8; see also id. at 49, line 1 - 59, line 18.

265.   Having reviewed the article paragraph-by-paragraph, Mr. Arko finally agreed:

> "Q. Is there something in this article that tells employees that their benefits will be reduced under the plan?
>
> A. No."

Id. at 85, line 5-8.

266.   Mr. Arko was also asked whether CIGNA's Information Kit contained notice of reductions in the rate of accruals. He stated "No, I don't believe so." Ex. 239, at 41, line 17 - 42, line 16. When asked about the statement in the Kit that "Generally speaking, the new retirement plan in comparison with the current pension plan tends to provide larger benefits for shorter service employees, and comparable benefits for longer service employees," Mr. Arko stated that this was an accurate statement "given this was created in 1997." Id. at 259, line 17 - 260, line 2. He would not describe what he considered "comparable benefits" to mean, id. at 265, line 6 - 270, line 16 or respond to the question of whether a shorter- service employee who was older would receive a "larger" benefit under the cash balance plan. Id. at 260, line 13 - 264, line 19.

267.   In the Rule 30(b)(6) deposition, Mr. Arko also agreed that CIGNA's SPDs do not identify the features described in ¶¶171-72 and 244 above. When asked whether the SPD discloses that the opening account balance is not based on the early retirement value, Mr. Arko responded "I don't see specific words that define that detail."  Ex. 239, at 140, lines 3-20.

268.   Mr. Arko was non-responsive to a series of questions about whether the SPD suggested that participants would not receive their old plan benefits plus the new plan benefits. See Ex. 239, at 141, line 6 - 153, line 3 and at 285, line 7 - 292, line 19.

92

269.   In response to whether the SPD discloses that accrual rates decrease with age, Mr. Arko stated "I don't believe it directly does." Ex. 239, at 321, lines 3-21.

270.   At the start of the bench trial, CIGNA's counsel introduced "two representatives of CIGNA and CIGNA plan, Paul Gontarek, in-house counsel for CIGNA, and John Arko who is the plan administrator for the CIGNA plan."  Tr. 2, lines 1-10; see also Tr.  13, lines 19-23 ("John Arko is the representative of the Defendants").  Mr. Arko was present during the first four days of the trial but was not called to testify and did not attend the second part.  Tr.  1060, lines 4-14 ("[A]fter Mr. Sher testifies, other than some deposition designations, we will rest.  We will not have any other witnesses, we don't have any need for any other witnesses").

### E.    Although It Has Disclosed Potential Reductions in Other Instances, CIGNA Did Not Disclose these Reductions.

271.   CIGNA is the "plan administrator" for disclosure purposes because it controlled the disclosures and ERISA §3(16)(A) provides that the "plan sponsor" is the plan administrator absent the specific designation of a different person in the instruments under which the plan is operated, namely, the Plan document.  Stewart Beltz was never specifically designated in the Plan document as the plan administrator. See Ex. 1. A March 29, 1996 internal memorandum

from Donald Levinson states that he had been authorized by CIGNA's Corporate Benefit Plan Committee to make a plan administrator appointment and that he appoints Mr. Beltz. Dfs. Ex. 507 at SuppD1098. No Committee records were produced reflecting either Mr. Levinson's authority or this appointment.

272. Mr. Beltz had no responsibilities for the preparation of the Section 204(h) notice, the SMM, or the SPD. CIGNA, not Mr. Beltz, entered into a contract with William Mercer to assist in preparing the 204(h) and SMM. See Ex. 118. The Newsletter, Information Kit, and SPDS were prepared and distributed by CIGNA. The Newsletter is designated as a product of "CIGNA Benefits Communications" department. Ex. 8, Tab 1 at 1. The SMM bears CIGNA's registered trademark. Ex. 8, Tab 2 at AMARA-00445, 457, and 477. The SPDs also bear the logo of CIGNA's Signature Benefits department. Ex. 8, Tabs 3 and 4.

273. CIGNA's June 27, 2006 Proposed Findings state that Denise Hill, CIGNA's former Vice President, Corporate Relations, Director of Human Resources, was "personally responsible for managing the communications process to employees." Ms. Hill was designated as a likely witness for CIGNA but did not testify at trial. Stewart Beltz was never listed as a witness. Dfs. 6/27/2006 Trial Memo. at 9.

274. As described above, CIGNA's summaries of the amendments do not

mention any periods of wear-away with no additional benefits or any other reductions in the rate of future benefit accrual.

275.    CIGNA's disclosures also did not provide sufficient information about the changes for participants to compute such reductions for themselves. Participants were not given formulas to help them calculate the retirement benefits that they would receive under the cash balance plan and compare them with the old plan's benefits. See Ex. 8, Tabs 1-4.

276.    In contrast to the absence of any disclosure of reductions in the Newsletter, CIGNA provided notice of "reductions" in a 2004 disclosure directed to the employees who were previously grand-fathered. There, CIGNA disclosed that certain early retirement and death benefits would be "frozen" and "eliminated" prospectively. See Ex. 103 at 5, 10 and 24.

277.    CIGNA also talked about "potential reductions" in benefits in another context immediately prior to the cash balance conversion: The 1997 Total Compensation Report talks about "the potential reduction in retirement income" that "mobility creates" i.e., "[i]f you move among employers over the years." Ex. 85 at P 1774.

278.    At his deposition, David Durham testified that he believes there was a discussion that the 204(h) notice "language" should be included in the Information Kit because the benefits for former Tier 1 employees were less. Ex.

197, at 167-69. But no such language was included.

279.   Mr. Sher testified that he did not offer an opinion on whether Section 204(h) notice should have been provided to CIGNA's employees.  Tr. 1221, lines 14-17.  But in his Supplemental Report, he opined that there is "no requirement to disclose in an ERISA 204(h) notice the effect of a plan amendment, either in general or at the participant level." Ex. 11 (Sher Suppl Rpt) at 4.

280.   Paul Strella, one of the Mercer consultants who advised CIGNA, see Ex. 13, has been quoted in a May 5, 1999 *Wall Street Journal* article stating: "The [advance notice] law 'doesn't require you to say, We're significantly lowering your benefit.' All it says is, 'Describe the amendment.' So you describe the amendment." Ex. 67. As described in ¶308 below, both CIGNA's Newsletter and the Information Kit were prepared by Mercer.

281.   The Newsletter article which CIGNA's 30(b)(6) witness identified as the 204(h) notice does not describe the amendment. See Ex. 8, Tab 1 at 5.

282.   The Newsletter contains statements about how the cash balance changes "enhance" the retirement program, are "designed to work well for *both* longer-and shorter-service employees" and provide "steadier benefit growth throughout [the employee's] career." Ex. 8, Tab 1 at 1 and 4) (emph. in orig.).

283.   A description and graph about "How your benefit could grow" appears alongside the article with the purported "204h notice" in the Newsletter.

The graph indicates that the benefits under cash balance may grow to over $1 million at age 65. Id.

284.    CIGNA's Answers to Interrogatory Nos. 6-7 alternatively maintain that a 204(h) notice was given that benefits were "frozen." Ex. 27. But the Newsletter does not provide notice of a freeze. It tells employees their benefits under the old formula will stop "after" December 31, 1997 and on January 1, 1998 that their benefits will start under the cash balance formula. Ex. 8 (Stratman Rpt), Tab 1 at 1 and 5.

285.    Professor Stratman testified that "the statement that benefits will stop or CIGNA retirement plan will stop earning benefits under ... the current pension plan, is accurate." But he stated that there is "obviously" nothing in that statement suggesting that employees would not begin accruing benefits under the cash balance plan.  Tr.  623, line 15 -  624, line 19.

**F.    CIGNA's Inadequate Disclosures Affected the Ability of Its Employees to Make Well-Informed Employment and Retirement Decisions.**

286.    Neoclassical economics teaches that labor markets function efficiently when employees and employers both have reasonably "complete information." See, e.g., "Comparable Worth: A Brief Review of History Practices & Theory, 69 Minn. L. Rev. 1199, 1213 (May 1985).

287.    As described above, CIGNA's purported Section 204(h) notice and its

SMM and SPDs do not tell employees about reductions in future rates of accruals or any periods with no additional benefit accruals.

288.   The only employees who knew about the extent of the reductions would have been the executives and actuaries, such as Gerry Meyn, David Durham, John Arko and Andy Hodges, who knew about the reductions from the internal communications that they either received or wrote.

289.   CIGNA admits that the cash balance amendments were "material modifications" because, *inter alia*, it prepared a summary of material modifications in the form of the Information Kit about the changes. Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

### 1.   *CIGNA repeatedly recognized that employees have to plan for retirement with the information that CIGNA provides.*

290.   CIGNA recognized that "employees have based their financial and retirement planning on the assumption that they will continue to earn benefits under the CIGNA Pension Plan." Ex. 104 at D12398.

291.   In annual Total Compensation Reports ("TCRs"), CIGNA recognized that employees have to make "difficult decisions" based on the information that CIGNA provides. Ex. 86 at P 1956. The 1997 Total Compensation Report began by asking"Are you prepared for the future?" Ex. 85 at P 1766. The Report focuses on financial plans, the decisions that employees have to make about whether to

spend or save, and the need to replace 75% of pre-retirement income. Id. at P 1766 and 1776.

292.   The December 1997 Information Kit/SMM also recognizes that employees needed to update their financial plans for the cash balance changes. It states that under cash balance, "you will see the growth in your total retirement benefits from CIGNA every year and will be able to update your financial plans accordingly." Ex. 8, Tab 2 at AMARA-00452.

293.   The Information Kit stresses the importance of planning for the future: "It's never too early or too late to start planning ... the sooner you start planning and saving, the better off you'll be financially when you decide to retire." Ex. 8, Tab 2 at AMARA-00461.

294.   A June 1998 Signature Benefits Newsletter states that "The Total Compensation Report has extensive information to help everyone with retirement planning–particularly how much you should consider saving in SIP ... or if you need to increase your savings for retirement in other ways." Ex. 101 at SuppD1279.

295.   The June 1998 Newsletter states that the 1998 Total Compensation Report "devotes considerable space to retirement planning" and informs participants that the "average retirement period is longer with longer average lifetimes." Ex. 101 at SuppD1278.

296.    The 1998 Total Compensation Report states that "With this information, you can begin to measure whether you need to save more, or change your investment strategy to satisfy your personal income goals."  Ex. 85 at P 1788-89.

### 2. *Employees requested additional information in managers meetings, focus groups and individual communications.*

297.    Focus group sessions in April 1997 found that "Over 70% [of employees in the focus group sessions] saw a Pension Plan as an important company guarantee. A guaranteed benefit (disregarding the actual size of the benefit) was seen as an important benefit component." Ex. 105 at SuppD1854.

298.    In August 1997, CIGNA managers were asked to review the cash balance proposal. They urged CIGNA to "publish case studies (positive and negative)" and be ready "to support the employees who will be negatively impacted ASAP" and "avoid perception that we are not telling the entire story." They also urged CIGNA to "show illustrations that 'prove' small lump sums will yield equivalent benefits in the future."  Ex. 106 at 11936.

299.    A survey questionnaire attached to CIGNA's December 1997 Information Kit asked "What additional information would you like CIGNA to provide?" The survey elicited numerous questions from employees about whether and to what extent, if any, the cash balance conversion reduced their benefits:

"I don't understand why CIGNA is not providing the details instead of saying trust me." Ex. 107 at SuppD1601.

"More specific detail re: calculation of lump sum" and "project the retirement under the old and new plan." Ex. 107 at SuppD1604.

"Show me the math on the old vs. new. Did I win or lose?" "How much additional personal savings will be required to cover potential shortfalls." Ex. 107 at SuppD1605.

"Comparison to old pension plan ie. dollar amount ie. would lump sum distribution buy an annuity comparable to the old plan?" Ex. 107 at SuppD1606.

"Specifics on my benefit and how to plan for annuity amounts at early retirement." Ex. 107 at SuppD1606.

"I have read the information and studied the examples, however I am not sure how/what impact this will have on me. I trust CIGNA will be distributing individual specifics in the future." Ex. 107 at SuppD1606.

"would lump sum distribution buy an annuity comparable to old pension plan?" Ex. 107 at SuppD1606.

"A comparison for me personally of my benefit at retirement, given identical assumptions, under each plan." Ex. 107 at SuppD1607.

"How much I accrued under the old program that will be transferred to the new and the real reason CIGNA made this change." Ex. 107 at SuppD1607.

Provide "a comparison for me ... under each plan ... unless the interest rate under the new plan exceeds 7% consistently, my benefit will turn out to be less than what I would have received under the old plan." Ex. 107 at SuppD1607.

"I would like specific information regarding what I can look forward to as a retirement income. Am I better off before or after the changes

101

in 1998? I certainly could not tell by this information." Ex. 107 at
SuppD1609.

300.   In individual communications with CIGNA, employees also asked for

comparisons:

"I would like to understand how the new Plan results in my particular
case would compare to what I would have received in the future
under the current Plan, whether I spent 30, 20, 15, or less years at
CIGNA.... what I am interest in is what financial enhancement this
new plan provides for someone in my situation.... The SB Newsletter
does not provide this." Ex. 108 (11/6/1997 email from Janice
Weidenborner), at SuppD1668.

"In my case, it appears that CIGNA is planning to cut its annual
contribution to my pension plan by 39%. I hope I have misunderstood
or miscalculated. In any case, I would appreciate any clarification that
you can provide. One of the claimed advantages of the new plan is
that it is easier to understand. This ceases to be much of an advantage
if I understand that the new plan will dramatically reduce my
pension." Ex. 109 (11/6/1997 email from Steve Bailey) at
SuppD1673.

"what would the value of my retirement package be under the old
plan, and under the new plan? ... So I can get an apples to apples
comparison"; "my sense" is that "my lifetime benefit has been
reduced." Ex. 110  (11/5/1997 email from Mike Walsh) at
SuppD1671.

"I just received the information kit on the retirement plan conversion.
Inside, it details how to roughly calculate my "balance" that will be
deposited into the new account balance plan in the spring. If I go back
to my 1997, 1996, 1995 Signature Benefits Total Compensation
reports (page 2 of the report where it details what CIGNA pays on my
behalf for the CIGNA Pension Plan) and add these CIGNA
contributions for those years together, and also add estimated
amounts for the prior years before the total compensation report was
prepared, I can't seem to get the two numbers close. My question is

102

are these two supposed to be comparable?" Ex. 111 (12/11/1997 email from Mike Walsh) at D030811.

"trying to understand why I am ... in the new pension plan. I was hired prior to 89 and my age and service exceed 45. How will the highest growth in benefits, for me, be met under the new plan?" Ex. 112 (12/16/1997 email from Barry Pitek) at SuppD1686.

"What is the percent difference (plus or minus) between what I will receive at retirement under the new program compared to what I would have received under the old plan?" Ex. 113 (1/6/1998 email from John Schwoerer) at D030795.

"I would not expect CIGNA to have many employees that were hired prior to 1989 and have under 45 years of combined age and service. Being in the minority I am suspicious to how good the new plan is for me! I would suspect that the plan is optimized to the majority of employees with little consideration for the few that share my circumstances. Therefore, I would like to formally request a meeting so that somebody from human resources of benefits can explain to me why: ... The new plan is better for me in the long run." Ex. 114 (12/19/1997 email from Brian Mitchell) at D030797.

301.    As described below, the responses to these requests generally told the

employees that CIGNA was not doing "side-by-side comparisons." ¶¶314-320.

> ### 3.    *CIGNA had a policy of "NOT" providing benefit comparisons or information about "negative impacts" from the cash balance changes.*

302.    As indicated in the *Wall Street Journal* article, CIGNA's consultant

Mercer was aware that cash balance conversions can "mask" pension benefit

reductions. Ex. 67. In presentation materials for clients prepared in July 1996,

Mercer identified "Masking a cut in pension plan benefits" as a reason why "Cash

balance plans are popular with employers." Ex. 115 at P 2159.

303.   At the same time, a 3/17/1997 Mercer presentation to CIGNA on communication issues stated that the client should "Deal with 'bad news' up front" in its communications. Ex. 116 at 1521. The same presentation includes a point about offering a "Comparison of new to old." Id. at 1516.

304.   In May 1997, Mercer prepared a second presentation for a meeting with CIGNA at Eagle Lodge. Mercer identified "Major Problem Areas in Cash Balance Administration" including "New benefits compared to "expectation" from the current plan." Ex. 93 at 29930-31.

305.   In a third presentation in August 1997, Mercer stated: "What helps in this situation is to acknowledge the reality, to be forthright about any negative news." Ex. 117 at SuppD1549.

306.   However, in the same presentation, Mercer states that CIGNA had decided not to offer comparisons. The August 1997 presentation expressly states that "CIGNA has decided, for a number of reasons, not to compare the old to the new plans." Ex. 117 at SuppD1548.

307.   The Plaintiff class asked CIGNA to explain its reasons in Interrogatory No. 1 to the Second Set of Interrogatories. CIGNA answered that "employees could be confused if they were provided with a comparison of the old plan to the new plan, particularly because employees could not choose to select

benefits under the old plan.  In addition, a comparison would be highly dependent on individualized circumstances, costly and time-consuming to prepare." Ex. 29.

308.   In September 1997, CIGNA entered into an over $200,000 contract with Mercer to offer professional communications services to prepare CIGNA's disclosures, including the Newsletter and Information Kit. Ex. 118 at SuppD1775-76.

309.   The Newsletter and Information Kit that Mercer prepared for CIGNA did not compare the old and the new plans, except to tell participants that "exact comparisons of benefits ... are difficult" and then offer the assurances detailed above, such as that "Generally speaking" the new plan provides "comparable" or "larger" benefits. Ex. 8, Tab 2 at AMARA-00452.

310.   Although employees requested more comparative information in focus groups, in response to surveys, and in individual communications, CIGNA had a policy against providing comparisons, which was expressed in its instruction to Mercer and in other internal communications. A September 13, 1997 email from CIGNA's Assistant Vice President of Global Benefits on the subject of "Retirement Communications" states:

> "We continue to focus on NOT providing employees before and after
> samples of the Pension Plan changes. We will focus on their need to
> project retirement income needs (with our help), anticipate SS
> benefits (with our help) and ultimately in the Total Compensation
> Report we can offer advice on a reasonable level of savings they need

to consider in addition to the Pension benefits CIGNA will provide
(as shown in detail in the TCR)."

Ex. 119 at 11708. See also Ex. 120 at 20529 ("we don't do" comparisons); Ex. 121

at 21235 (don't do any "non-standard" pension calculations of "what if" employee

stayed in the old plan);

311.    At his deposition, Mr. Arko agreed that "as a general rule"

"employees would not be provided with comparisons between their benefits under

the old plan and the new plan." Ex. 239 (Arko Depo) at 238, line 9 - 239, line 4.

312.    Robert Upton, a lawyer in the group insurance law department who

was under the Tier 2 (1.67%) formula in the prior plan, is the only non-executive

level employee known to have obtained a comparison from CIGNA. The

comparison that he received showed a 29% reduction compared to the Tier 2

formula.  Ex. 122 at D020832.

313.    Even that comparison was adjusted from an originally higher estimate

of the reduction: David Durham initially computed Mr. Upton's reduction at 42%.

But a 12/7/1999 email from John Arko to Mr. Durham about that computation

states: "Using a 6 or 6.8% rate tells much better, accurate story. Using 6.8% the

annuity would be about 61K for a replacement ratio to the old plan of 75%

(instead of 58% using your numbers)." Ex. 122 at D020852.

314.    Mr. Upton testified that he met with Gerald Meyn and asked him

whether other employees could obtain comparisons. Mr. Meyn said that they could. Mr. Upton then told Naomi Biggs, a senior attorney in the Group Insurance Law department, that she could ask for a comparison. Tr. 663, line 24 - 665, line 10. When Ms. Biggs asked for a "comparison/projection of old/new benefits," she was told it "employees would NOT be provided such a comparison." Ex. 120 at 20529 and 20531.

315.    Discovery uncovered a number of examples of employees who sought comparisons and were denied them. Barry Pitek asked "How will the highest growth in benefits, for me, be met under the new plan?" He was told that "Moving to the new plan does not negatively impact you." Ex. 123 at D0292744 and Ex. 112 at SuppD1686.

316.    Mike Walsh asked "what would the value of my retirement package be under the old plan, and under the new plan?" He was told "We are not doing side-by-side comparisons of old versus new benefits since any comparison we make requires estimates" of various factors "which are different for each employee's situation."  He was also told that the "goal of the program is to provide comparable benefits for a long career with CIGNA." Ex. 123, next to last page, and Ex. 110 at 1671.

317.    Janice R. Weidenborner who was age 32 with 10 years of service at the conversion was told  "[w]e are not doing side-by-side comparisons of old

versus new benefits" but "you have plenty of time to take advantage of the many attractive features of the Retirement Plan." Ex. 123 at 29766.

318.    In another communication, Steve J. Bailey noted the CEO's statement about how cash balance would be an "enhancement" but by his "quick calculation" it was a 39% reduction for him. Ex. 109 at 1673. CIGNA told him that "We are not providing comparisons of benefits at this time." Id.

319.    Stewart Beltz wrote to named Plaintiff Gisela Broderick on July 31, 2001 in response to her request that CIGNA "identify the impact of the pension benefit conversion to your pension benefit at the time of your retirement."  He told her that "It is difficult to quantify the impact; however, I can assure you that in no event will your benefit be less than the benefit you had accrued through December 31, 1997."  Ex. 125 at P 1236.

320.    John Arko's notes of a discussion with class member John Nystrom state: "When pushed for rationale, I explained people employed 12/31/97 were examined to be sure projected benefits were fair." Ex. 126.

321.    A memo from Mr. Arko to Gerry Meyn concerning questions raised by class member Dave Carlson indicates that Mr. Arko was to tell him that "At your age (less than early retirement eligibility) accruals over the next few years look to be greater than they would have been under the old plan." Ex. 127 at D020652.

### 4.    CIGNA's objective was to "quickly dispel any perceptions of take-aways" and avoid "any significant negative reaction from employees."

322.    As described below, CIGNA's communications strategy was to "quickly dispel any perceptions of take-aways" and avoid "any significant negative reaction from employees."

323.    In three internal documents, CIGNA stated that it wanted to "Quickly dispel any perceptions of 'takeaways'" in communicating with the employees and "focus on the potential additional benefits." Ex. 128 at D14872 (7/25/1997 Discussion Points for Division Presidents); Ex. 117 at 1544 (8/1997 Meeting with Mercer); Ex. 129 at 1897 (9/12/1997 Project Planning Meeting with Mercer).

324.    In September 1997, newspaper articles began appearing on cash balance conversions covering instances involving Deloitte & Touche, IBM, Chase-Manhattan Bank, and Verizon, in which complaints from employees caused benefit reductions to be wholly or partially rolled back. Ex. 130. An article also appeared in July 1999 about changes that Prudential, one of CIGNA's main competitors, made in response to complaints from managerial-level employees about a 40% reduction in pension benefits. Ex. 131.

325.    The first article was the *Wall Street Journal*'s September 23, 1997 news article on Deloitte & Touche's cash balance conversion entitled "Pension War Breaks Out at Accounting Giant." Id.

326.    The same day, CIGNA's Gerry Meyn compared CIGNA's changes with Deloitte's changes in a "Commentary on Deloitte and Touche Article." Ex. 58 at 1578.

327.    Mr. Meyn attached his "commentary on the WSJ Article, explaining where D&T went wrong, and how we are and will be different" to a 9/23/1997 email for Donald Levinson, the head of Human Resources. Ex. 58 at SuppD1581.

328.    Mr. Meyn told Mr. Levinson that Deloitte had "stupidly promised 'no harm' and 'big improvement.'" Ex. 58 at SuppD1579. Mr. Meyn then listed what CIGNA's communications should "tout" or "stress" and what to not to say. The list states that "CIGNA's communications will not make unequivocal statements about 'will not harm' or 'big improvement.'" Id. at SuppD1581. At the same time, "CIGNA's communications will always be honest, and not promise more than they can deliver." Id.

329.    A handwritten note by Gerry Meyn to Mr. Levinson on another copy of the *Wall Street Journal* article states that: "Our goal is to take all necessary steps to stay out of the papers." Ex. 58 at SuppD1582.

330.    A survey included in the December 1997 Information Kit found that employees believed that CIGNA was committed to providing comprehensive information about their retirement benefits: 90% agreed with the statement that "[t]he company seems committed to giving me comprehensive information about

110

retirement benefits." Ex. 107 at SuppD1592.

331.   The survey also asked employees whether they agreed with the statement "I believe my retirement benefits will be the same or better after the changes." Ex. 107 at SuppD1588. Of those in the New Plan, 20% strongly agreed, 40% agreed, 31% neither agreed nor disagreed or did not know, and only 9% disagreed. Id. at SuppD1590; see also Tr.  574, line 13 -  575, line 1.

332.   A letter dated December 4, 1998 from CIGNA's Vice-President of Employee Benefits to employees was prepared in response to a *Wall Street Journal* article on the same date about employees "losing" benefits in cash balance conversions, while employers were winning "big." The letter stated that CIGNA "wants to ensure that older, longer-service employees receive fair and adequate benefits at retirement" assured employees that its "Plan is not designed to save money." Questions and Answers enclosed with the letter repeat the assurances contained in the Information Kit that "generally speaking" the cash balance benefits are "comparable" or "larger" than the prior plan's and that CIGNA is saving no money "with these changes."  Ex. 217.

333.   The strategy of not disclosing the reductions produced the desired result. In September 1999 Gerry Meyn reported to the Board that "CIGNA's Cash Balance plan has been very well received by CIGNA employees (employee survey ratings up 15 percentage points) and has not generated notable controversy." Ex.

111

47.

334.   CIGNA concluded "we've been able to avoid bad press," Ex. 48, and

"we have avoided any significant negative reaction from employees." Ex. 133 at

SuppD1566 (3/9/1998 memo).

335.   The statement that "we have avoided any significant negative

reaction from employees" has handwritten comments from the head of CIGNA's

Human Resources Department, Donald M. Levinson: "Neat!" and "Agree!" and

"Better than expected outcome." Ex. 133 at SuppD1566.

336.   A March 13, 2000 e-mail from Gerald Meyn states that "Our Jan 1998

introduction of the plan did not set off any significant rumblings at CIGNA and

things remain quiet." Nevertheless, he attached "materials which would be sent to

employees soon after any negative press for CIGNA on this topic." Ex. 124 at

D14160. The attached "Fact Sheet" reiterated the statements that "our new account

balance pension plan generally tends to provide larger benefits for shorter-service

employees and comparable benefits for longer-service employees," id. at D14162

and D14165, and the representation that "the Plan is not designed to save money,"

id. at D14161. No reductions or other disadvantages of cash balance were

identified in the materials. See id. at D14161-65.

337.   As late as January 2003, CIGNA continued to be concerned that it not

"raise awareness" of the cash balance changes. In considering a proposal to

transfer the grand-fathered employees who were still under the Tier 1 formula to

the cash balance plan, Kenneth Bottoms in CIGNA's Compensation department

wrote to Gerald Meyn, with a copy to Don Levinson, the head of HR:

> "the media will be all over it no matter how it is handled ... the 10%
> of employees who have this special benefit ... will complain to the
> 90% who are in the cash balance plan and renew this as an issue for
> employees in the 90% group who have been reading in the
> newspapers about the evils of cash balance plan. The point is that this
> is an issue that will raise awareness for many employees even beyond
> those in the Tier 1 plan."

Ex. 134. CIGNA ultimately decided to leave the grand-fathered employees under

the Tier 1 formula, but to make prospective reductions to their early retirement and

death benefits. See ¶276.

> **5.      The individual testimony offers additional circumstantial
> evidence that employees "were likely to have been harmed as
> a result."**

338.    The three named Plaintiffs and four other class members offered

testimony related to the likely prejudice from CIGNA's misleading and inadequate

disclosures.

> **(a)      Janice Amara.**

339.    Janice Amara is currently 57 years old. She is a former NASD

principal and client executive within CIGNA's Retirement and Investment

Services.  She was hired by CIGNA in 1972, which made her a "Tier 1" formula

participant. She left CIGNA in 1995 and was rehired in September 1998.  She

continued to work for CIGNA until October 2003.  Tr. 15, line 16 - 18, line 5.

340.   Ms. Amara testified that during her rehire interview, she inquired about her retirement benefits and confirmed that she would receive her "protected benefit" as well as "additional accruals" to her account.  Tr.  26, lines 17-22.  There was no discussion of any benefit reductions.   Tr.  26, line 23 -  27, line 7.  Ms. Amara testified that she looked through the 1999 SPD online and did not see any material stating that she would not earn any additional benefits or that the cash balance plan would provide less benefits.  Tr.  28, lines 6-22; Tr.  30, lines 15-22.  She did never received any written communications from CIGNA stating that she would not earn any additional benefits.  Tr.  30, line 23 -  31, line 1.

341.   Ms. Amara received a Total Compensation Report in 2001 that stated that "CIGNA pays $15,059," which she subsequently figured out to be "the sum of the benefit credit and the interest credit" in the year 2000. Tr.  33, lines 2-24.  Because she did not actually earn any additional benefits in that year, the amount that "CIGNA Pays" was obviously not accurate. Tr. 37, line 16 - 40, line 7 ("even though my account looked like it was steadily growing, in fact, my retirement benefits weren't growing at all").

342.   Ms. Amara further testified that:

"I first heard of the term wearaway as it relates to my benefit when I went to a going away party ... in September of the year 2000, and I was talking with Mark Lynch, who is a senior level actuary in the

retirement division... Mark said to me: Jan, you would be really sick
if you knew the wearaway factors they were using with your benefit.

Tr.  34, lines 6-17. After she learned about the wear-away, Mrs. Amara stated,

"I was very upset and I was very, very concerned ... I realized that I
had come back to CIGNA without a knowledge, even, that my
benefits weren't– my retirement benefits weren't going to be growing
and at that time, I was concerned about my retirement and frankly, my
husband has Parkinson's disease and I knew that we weren't going to
be able to work maybe as long as we thought we were going to be
able to, and so I was very upset."

Tr.  35, line 19 and Tr. 36, line 21 -  37, line 2.

343.    Ms. Amara testified that if she had been told during her rehire

interview in 1998 that she would not be earning additional benefits during a wear-

away period, she could have "negotiated for a higher salary," "looked and talked

to other employers," or "stayed at Hooker and Holcombe."  Tr.  45, lines 16-24

and Tr. 64, lines 7-14.  In fact, she turned down an invitation to apply at

Massachusetts Mutual because she wanted to apply at CIGNA. Tr.  45, line 25 -

46, line 11.  She testified that her base compensation upon returning to CIGNA

was $5,000 less than her salary at Hooker and Holcombe.  Tr.  46, lines 12-14.

### (b)    Gisela Broderick.

344.    Gigi Broderick is currently 63 years old. She was hired by CIGNA in

1980, which made her a "Tier 1" formula participant. At the end of 1997, CIGNA

sold the division in which she worked to Lincoln National.  Ms. Broderick was

rehired by CIGNA in June 2000 and worked until March 2004 as a Project

Manager in the Information Technologies Department of CIGNA systems. Tr. 69,

lines 13-14; 72, lines 12-25.

345. Ms. Broderick testified that she was never informed about the change

in the rehire rule which required rehired employees to be converted to the cash

balance plan. Tr. 85, lines 5-10. She believed she was going to be reinstated into

the Part A plan upon her rehire. Tr. 84, line 19- 85, line 4; Tr. 122, line 23 - 123,

line 5; Tr. 150, line 21-151, line 25. She did not learn that she was in the cash

balance plan until sometime after she was rehired. Tr. 87, lines 3-22. When she

found out she had been placed in the new plan, she wrote three letters to Stewart

Beltz in 2001 asking how her benefit had converted and "what impact this would

have ultimately on my monthly benefit at retirement." She testified that she did

not get "any answers to the questions that I had posed." Tr. 90, line 6 - 100, line

3. At that point, she still did not know that her benefits were being reduced. Tr.

100, lines 4-17.

346. Ms. Broderick also testified that another employee had asked if she

was going to be converted to the cash balance plan and was told that she would

have a "split pension" under the new rehire rule because "it wouldn't be

appropriate" for that employee "to be converted." Ms. Broderick testified, "if it

wasn't appropriate for her, why would it be appropriate for me?...When they said

116

it's not appropriate, I would imagine that they had figured out that this was not a good thing to do to employees; that they had changed their mind because by this time, the new hire rule had changed." Tr. 96, line 5 - 97, line 15.

347.   Ms. Broderick testified that CIGNA's Newsletter described the cash balance plan as "better and improved and enhanced" compared to the old plan and "that it was going to be a good thing for employees.  That's the way the whole newsletter was presented, that you would be earning under the new plan." Tr. 75, line 18 - 77, line 2.  Neither the Newsletter nor any other communication from CIGNA informed her that she would earn no additional benefits for the rest of her career after she returned to CIGNA.  Tr. 77, lines 3-6; Tr. 91, line 25 - 92, line 7; p. 94, lines 4-24; Tr. 100, lines 4-17; Tr. 103, line 22 - 104, line 25; Tr. 109, lines 6-12.

348.   Although Ms. Broderick has a master's degree in mathematics from Notre Dame, she could not determine the impact of the conversion on her benefit based on the information she was provided. Tr. 70, lines 2-4; Tr. 95, lines 9-18.

349.   Ms. Broderick testified that, before her rehire in 2000, her pension "was one of the motivators for ... coming back to CIGNA" and she believed she "had more to gain by going back to CIGNA and being reinstated in [her] pension." Tr. 82, line 19-24; Tr. 84, lines 2-3. Her salary upon returning to CIGNA was $14,000 less than her salary at her preceding job at Aetna, but she testified "I

117

thought that I would be regaining my service years and be under the pension plan, and I knew that that was a good thing for me." Tr. 85, lines 14-22. Had she known about the reductions in her pension benefit, she could have remained at her higher-paying job at Aetna, bargained for additional compensation from CIGNA upon her rehire, or looked for opportunities elsewhere. " Tr. 116, line 10 - 117, line 12. She testified "There was no point being at CIGNA if I was not adding to my pension. Tr. 117, lines 11-12.

### (c)    Patricia Flannery.

350.    Patricia Flannery is currently 61 years old. She was hired by CIGNA in 1978, which made her a Tier 1 formula employee. She had several periods of employment with CIGNA in different positions from 1978 until she left in 1997. She was rehired by CIGNA in October 2000 and is currently a Business Analyst in Integrated Care Systems. Tr. 873, line 2 - 875, line 13.

351.    Ms. Flannery testified that upon her return to CIGNA in 2000, she was never told that she would be converted to the cash balance plan, nor was she informed that the new plan would reduce her pension. Tr. 877, line 2 - 878, line 17; Tr. 903, lines 15-21. She asked if she was going to "continue with my pension" at the rehire interview and was told that "I would get my pension and I would be bridged with my time." At a later orientation, they told her to direct any questions to the pension department. Tr. 877, line 2 - 878, line 2. In 2001, she

118

called CIGNA's benefits department and was told for the first time that she was in the cash balance plan, with an account balance of only $16,000.  Tr.  878, lines 10-25.  She wrote an e-mail to Stewart Beltz in July 2001 complaining that she had never been told that she would be placed in the new plan and received a response from Denise Belanger stating that if Ms. Flannery had been hired in January 2001, she would have stayed in the old pension plan. Tr.  879, line 15 -  881, line 5; Tr.  882, line 19 -  883, line 6 ("if I had known that, I would not have taken the job").

352.   Ms. Flannery later spoke to two lawyers, one of whom she retained to send letters to John Arko in February and May of 2005 requesting copies of all of CIGNA's SPDs.  Ms. Flannery and her attorney never received a response.  Tr.  883, line 19 -  886, line 10.

353.   Ms. Flannery contacted Prudential to request a benefits statement and received one in October 2005, which stated her account balance was still $16,101 and her accrued annual benefit was only $3,501.  Tr.  895, line 18 -  896, line 9 and Ex. 155.  This amount was "a lot less" than the benefits she was told she had in 1992, which was $586 per month. Tr.  896, line 10-18; see also Tr. 875, line 22 -  876, line 15.

354.   In 2006, Prudential informed Ms. Flannery that her "opening balance should have been $51,505.45," with an accrued benefit of $9,762.  Ex. 156.  She did not receive an explanation of why a mistake had been made. Tr.  896, line 19 -

897, line 25.

355.   The Court inquired whether a witness from CIGNA would "be able to shed some light" on "how this jumped so dramatically." Tr.  898, lines 15-20. The Court told CIGNA's counsel "I want to know more about the error because I'm very concerned...somebody ought to explain it and tell me...that this is a one off, these things happen; or this is something more systemic....I want to hear from you and I want to hear testimony from you," to which CIGNA's counsel responded, "Sure, and you will."  Tr. 909, line 4 - 910, line 15.

356.   CIGNA did not present any evidence in response to the Court's inquiry. In discovery, John Arko, CIGNA's Rule 30(b)(6) representative, stated he was aware of the understatement of Ms. Flannery's minimum benefit but it is up to Prudential to decide whether "further steps" need to be taken beyond the "specific series of events that lead to this person's misstatement." Ex. 240 (Arko 4/2006 Depo) at 203, line 1 - 204, line 23.

357.   Ms. Flannery stated that she would not have come back to work for CIGNA had she known "I was going to jeopardize my pension."   Tr.  896, lines 2-18; see also Tr. 904, lines 1-14.  Had she known her benefits were going to be reduced, Ms. Flannery could have gone to work for another employer instead of CIGNA.  Tr. at 921, lines 8-13.   With another employer, she could also have begun drawing her early retirement benefits on top of her salary. Tr.  877 lines 9-

16; Tr. 904 lines 19-24. Alternatively, she would have bargained for a higher salary to make up the difference in benefits since she "took a cut to come back" to CIGNA in order "to bring my pension benefits up." Tr. 904, lines 8-18. After she discovered that her pension had decreased, she increased her 401k contributions. Tr. 905, lines 14-21. Ms. Flannery also testified that she will have to work longer before she can retire. Tr. 904, line 25 - 905, line 2.

### (d)    Annette Glanz.

358.    Annette Glanz is currently 42 years old. She was hired by CIGNA in 1988, which made her a Tier 1 formula employee. She was continuously employed from 1988 until June 2004 in different accounting-related capacities. Her last position was as a project controller in the Health Care division. Tr. 157, line 21 - 159, line 13.

359.    Ms. Glanz testified that she was told at a staff meeting "that the balance that we would start with" under the cash balance plan "would be similar to the value of the future payments that we would get under the old pension plan." Tr. 163, line 25 - 164, line 4. She stated that CIGNA's written communications "led me to believe that my opening balance was the present value of the benefit I had already accumulated under the old plan." Tr. 169, lines 10-16. She testified that she "would have specifically looked" for information about benefit reductions and "I never saw any reason for concern in any of the documents I read." Tr. 169,

121

lines 17-23.

360.   Ms. Glanz could not verify her opening account balance because she did not receive "any information ... of how to do the calculation" from CIGNA and she could not calculate the balance "on [her] own."  Tr.  167, line 24 -  169, line 9. She received benefit statements that told her the amount of her cash balance account and benefit interest credits, but they did not indicate what her "monthly" or annual retirement benefits would be.  Tr.  165, line 1 -  167, line 3.  Had she been told that her pension benefits were being reduced under the cash balance plan, she could have complained to her managers and negotiated a higher raise to make up the difference, and she could have also contributed more to her 401k account.  Tr.  170, lines 13-24.

361.   Ms. Glanz testified that she believes the employees' reaction to the cash balance conversion would be different if CIGNA had told employees company-wide that their benefits were being reduced substantially, as opposed to "if I had figured it out individually and taken it to ... my vice-president or my boss."  Tr.  179, line 22 -  180, line 8.  She explained, based on her own experience, that "a single person crusade in an environment like CIGNA isn't going to go anywhere."  Tr.  178, line 21 -  179, line 6.

### (e)    *Bruce Charette.*

362.   Bruce Charette is currently 40 years old. He was hired by CIGNA in

January 1987, which made him a Tier 1 formula employee. He has been continuously employed by CIGNA from 1987 to date and is currently a Project Consultant in the Health Care division. Tr. 847, line 16 - 848, line 25.

363.   Mr. Charette testified that he began working for CIGNA at age 19 because he heard about CIGNA's benefits and wanted a "job that would have really good retirement benefits, so this way I would be better off in the future." Tr.  848, line 18 -  850, line 6.  He testified that based on CIGNA's communications about the cash balance plan, his understanding was that "our benefits were going to be enhanced" and the new plan "was going to be exactly what or similar to what I had previously but maybe better."  Tr.  851, line 23 - 854, line 4.

364.   When he inquired about his opening account balance, a Benefit Services representative told him he was "doing extremely well" based on his "age and the length of service."  Tr.  857, line 5 -  858, line 3.  Mr. Charette testified that based on that information, "[t]here was no need" to change his retirement strategies "because I felt that everything was as good or better than the original plan."  Tr.  858, lines 4-7.

365.   If he had known earlier how much his benefits were reduced, Mr. Charette testified he would have "complained to senior management" and "asked my boss for more of a raise," since he had successfully negotiated for raises in the

past.  Tr.  862, line 21 -  864, line 16.  He also testified that he has chosen to

remain employed with CIGNA and to participate in this lawsuit, hoping that the

lawsuit will "be resolved" favorably and he will "get what I [had] earned."  Tr.

864, line 17 -  865, line 7; see also Tr. 870, lines 9-18 (the Court: "He's hoping it's

going to be fixed").

### (f)      Robert Upton.

366.   Robert Upton is currently 55 years old.  He was employed by CIGNA

in 1990, which made him a Tier 2 formula employee. He was continuously

employed from 1990 to April 2005 as an attorney in the Group Insurance Law

Department where his responsibilities included the review of advertisements for

"accuracy." Tr. 636, line 18 - 639, line 7.

367.   Mr. Upton  testified that based on the written materials he received

and a meeting that attended, he understood that the cash balance benefit" was

going to be a comparable benefit to what [he] would have obtained under the old

plan."  Tr.  642, lines 16-20; see also Tr. 643, line 24 -  644, line 2; Tr. 696, lines 5

- 13.  Mr. Upton received Total Compensation Reports each year.  Tr.  677, line 21

-  681, line 23. He testified that he would not be able to check the accuracy of or

calculate "the cash balance plan numbers" in those reports on his own.  Tr.  695,

line 24 -  697, line 21. In response to a question on cross about a statement in the

Total Compensation Report about the difference between an age 65 benefit and an

early retirement benefit, Mr. Upton testified that he was not aware that CIGNA provided "certain early retirement subsidies to early retirees." Tr. 677, lines 7-17.

368.   After Mr. Upton read articles about cash balance lawsuits in 1999, he testified that he asked for comparisons of "what I would receive under the new plan compared to what I would receive under the old plan."  Tr. 650, line 2 - 651, line 13.  After several communications with Gerry Meyn, David Durham, and John Arko discussing benefit comparisons, Mr. Upton learned in 2001 that his future benefits had been reduced by 29 percent.  Tr. 651, line 6 - 658, line 4; id. at 696, lines 14 - 25. That comparison used a 6.8 percent interest crediting rate, which was the rate that was also used in the Total Compensation Reports.  Mr. Upton was aware that "five-year treasury rates were much lower than that at the time" and requested another comparison using a lower, more "realistic" interest rate.  The new comparison showed a 44% reduction in his benefits.  Tr. 660, line 5 - 662, line 11.

369.   After discovering the reductions, Mr. Upton testified that he went back to CIGNA's written materials "to confirm my understanding that there would not be an adverse impact to me" and found no indication in those materials that there would be an adverse impact.  Tr. 697, line 22 - 698, line 25. He further testified that if he had known earlier how much his benefits were being reduced under the new plan, he would have "protested."  Tr. 667, lines 4 -

11.  He stated: "When I realized that the entire investment risk of all of these, including the cash balance plan, was shifted to me, I realized I better save more, be more aggressive in my savings... I conferred with a financial advisor consistently to try to save as much as I could." Tr.  667, line 19 - 668, line 13.

370.   Once he learned in late 2001 that he had a 44% reduction, Mr. Upton asked Gerald Meyn who he could complain to about the scale of the reductions. Mr. Meyn told him that he could take it up with Donald Levinson, the head of Human Resources.  Tr.  662, line 12 -  663, line 23. But after their meeting, Mr. Meyn called Mr. Upton's supervisor and told him to advise Mr. Upton not to go to Mr. Levinson.  Tr.  665, line 22 -  666, line 11.  Mr. Upton testified that "I took that as a warning ...[t]hat it could adversely impact my work experience at CIGNA, my career at CIGNA, if I pursued this any further."  Tr. 666, lines 12 - 16.

### (g)    Barbara Hogan.

371.   Barbara Hogan is currently 61 years old.  She was employed by CIGNA from 1990 to May 2001, which made her a Tier 2 formula employee. She is a former Customer Service Benefit Analyst for CIGNA International.  At the time of the cash balance conversion, Mrs. Hogan had more than 55 age and service points. Tr. 701, line 11 - 702, line 9.

372.   Mrs. Hogan testified that she left a prior job to go to work for

126

CIGNA in 1990 because she "wanted [the] pension and 401K plans that CIGNA offered" and she and her husband "were starting to look forward to [their] retirement ages at that time." Tr. 702, lines 10 - 21.

373.   When asked whether CIGNA's written communications in 1997-98 told her that benefits were being reduced, she responded, "There was nothing there saying that they were being reduced... I thought they were going to better for us, is what it was looking like in all the papers ... it was going to be a good thing for us, this new plan." Tr. 705, line 7 - 706, line 11; see also Tr. 713, lines 10 - 15. When she expressed concern about the new plan to her manager, George Sahorchek, he told her "you just don't understand it, it's going to be great for you...You are really going to make out really good in this. CIGNA is looking out for you." Tr. 706, line 21 - 707, line 2.

374.   In 1999, Mrs. Hogan requested benefit estimates for retirement at ages 58, 60, and 62. When she and her husband compared the estimates with one she received in 1997, she discovered that the benefits in the 1999 statements were "much lower" than her projected benefits in 1997. Tr. 704, lines 12-17; Tr. 710, line 22 - 712, line 16. She and her co-workers "went to the SPD" and "looked for any kind of information in there saying it was going to be reduced but everything said that it was an enhanced pension, plan, that we were going to make out better, they were taking care of us." Tr. 713, lines 5-15. When she

127

inquired about the difference, she was told that she and her husband "just don't understand it."  Tr.  713, lines 15-19; Tr. 716, lines 4 - 6.

375.   Based on what she knew, Mrs. Hogan increased her 401K contributions "a bit more at that time but not to the fullest extent I could have if I'd have known how much that I was ... losing here."  Tr.  716, lines 7 - 16; see also Tr. 730, lines 14 - 24. Had she known about the extent of the reductions, Mrs. Hogan testified that she could have maximized her contributions to her 401(k), asked for a raise as she had successfully done in the past, and looked for another job.  Tr. 716, line 23 -  717, line 8.  In fact, she refrained from applying for two specific job openings with other insurance companies in 1997 "because I trusted [CIGNA] and I trusted that my pension plan was going to be continued." Tr. 717, lines 1 - 4; see also Tr. 722, lines 6-19.

376.   CIGNA's Trial Brief stated that "Defendants anticipate that a number of Plaintiffs and class members will testify that they did not find the SPD misleading" and "were not wanting for any additional pension information."  See Defs. 6/27/2006 Br. at 64 (dkt. #182).  None of the named Plaintiffs or witnesses testified to this. Defendants did not present any other witnesses to testify to this either.

377.   The parties' March 10, 2006 Stipulation gave CIGNA gave the right to take discovery from 8 absent class members, to be selected by CIGNA, about

"likely prejudice" for CIGNA's disclosures. Ex. 135 at 1-2 (see also dkt. #167).

CIGNA did not exercise this right. The Stipulation also gave CIGNA permission

to ask 26 "key employees," including Gerald Meyn and John Arko, for any

documents that would tend to show an absence of likely prejudice. Id. at 3.

CIGNA did not exercise this right either.

## VI.    CIGNA Did Not Disclose the Amendment of Its "Rehire Rule" to Former Employees in a Section 204(h) Notice or a Summary of Material Modification.

378.    Section 2.4 of CIGNA's prior Pension Plan contained a rule entitled

"Resumption of Participation Upon Re-Employment" under which rehired

participants were returned to the benefit formula that previously applied to them.

Ex. 2 at 18-19.

379.    In 1998, CIGNA amended the prior Pension Plan, which was now

called Part A, to change the heading of this Section to "No Resumption of

Participation Upon Re-employment" and to provide that a participant who had

the age and service to be remain under the old formula would instead be moved

to the cash balance formula upon any rehire. Ex. 24 at 16-17; see also Ex. 1 at

16-17.

380.    The Third Circuit's Depenbrock v. CIGNA decision determined that

CIGNA did not adopt this amendment until December 21, 1998. 389 F.3d 78, 86

(2004).

129

381.   The modification to the rehire rule affected vested separated participants because it changed their retirement benefits if they were re-employed by CIGNA in comparison with the rule in effect when they left. CIGNA recognized that under the amended rule the "Rehires see no benefit improvement for several years." Ex. 140 at 4649.

382.   CIGNA did not give any notice of this amendment to the participants who would be subject to it: CIGNA's purported Section 204(h) Notice (the November 1997 Newsletter) does not mention any amendment to the rehire rule. Ex. 8, Tab 1.

383.   In <u>Depenbrock</u>, CIGNA maintained that the Information Kit was a summary of material modification of the change. Ex. 136 (CIGNA's Appellate Br. at 47-49, CIGNA SJ Brief at 36-37); see also 278 F.Supp.2d 461, 470 (E.D. Pa. 2003). CIGNA contended that the version of the Information Kit distributed to Tier 1 participants who were grand-fathered under the Part A Plan, including John Depenbrock, disclosed the modification. CIGNA pointed to a sentence in this version of the Information Kit which states: "If you leave CIGNA companies and are reemployed after December 31, 1997, you will not participate in the Pension Plan when you return.  Instead, you will be eligible to participate in the new CIGNA Retirement Plan." <u>Id</u>. and see Ex. 137 at D00642.

384.   The version of the Retirement Kit distributed to employees moved

to the cash balance plan states, "If you are hired or rehired after January 1, 1998, you will become a participant in the Retirement Plan on your date of hire." See Ex. 8, Tab 2 at AMARA-00462. No explanation of the impact of this rule on future benefits is given.

385.   No version of the Information Kit or other summary of material modification about the amended rehire rule was prepared or distributed to former employees who might be returning to work. CIGNA admits that neither version of the Information Kit nor any other notice was distributed to separated vested participants like Janice Amara or Patricia Flannery. Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

386.   CIGNA maintains that "Vested separated participants were not affected by the amendment to the CIGNA Pension Plan, and were therefore not provided with a revised summary plan description, until and unless they were rehired by CIGNA." Ex. 29 (Answer to Interrogatory No. 2 in Second Set).

387.   CIGNA further admits that the Information Kit was not distributed to some current CIGNA employees, including Gisela Broderick, who were transferred by CIGNA to Lincoln National after 12/31/1997. Ex. 27 (Answer to Interrogatory No. 14).

388.   The October 1998 SPD stated that "If you were an employee on December 31, 1997, or rehired after 1997, any benefit you earned under the

Pension Plan through December 31, 1997 was converted to an opening account balance in this Pension Plan." Ex. 8, Tab 3.

389.    But the October 1998 SPD was not given to rehired employees until after they were rehired. Ex. 29 (Answer to Interrogatory No. 2) (notice was not given "until and unless they were rehired by CIGNA").

390.    A change to the rehire rule would not affect vested separated participants if they had no reasonable expectation of being rehired. But "CIGNA rehired 2,600 former employees in 1998 and 1999." "480 employees (17%) were formerly from Tier 1." Ex. 140  at 4649; see also Ex. 138 at DO4355 ("Recent patterns in rehires have shown that on average we are now rehiring more employees who are closer to early retirement age than ever before").

391.    Mr. Sher agreed with the Court that former employees were "still part of the CIGNA pension plan, which has two parts to it at this point, and they're part of Part A."  Tr.  979, lines 4-7.  Mr. Sher also agreed  that "when the employee is rehired" and switched the cash balance plan, "their pension benefits may be being affected in some way because they're moving from A to B."  Tr. 979, lines 12-25.

392.    Mr. Sher testified that his "understanding was that [CIGNA was] sort of in the normal situation where there were rehires, as many companies have" and that "under normal circumstances, they're not anticipating that the

vast majority of people are going to be rehired." As a result, "there would be no point in providing any type of notice" to vested former employees.  Tr. 1223, lines 3 - 8. Mr. Sher's understanding was that there were only a "relatively small number" of employees, or "less than maybe two or three thousand" who would have been affected by the change in the rehire rule.  Tr.  1221, line 14 -  1223, line 13 - 21. Cross-examination revealed that Mr. Sher had no information or only the vaguest information about the numbers of people who CIGNA rehired. He was not even sure that he ever saw the Rehire Rule that CIGNA amended. Tr. 1222, line 12 -1223, line 21; Tr. 1224, line 7- 1226, line 4 and Tr. 1227, lines 9 - 23.

393.    CIGNA knew that employees "close to retirement eligibility" could be left "without enough time before retirement to recover from this disruption." Ex. 8, Tab 2 at AMARA-00448. When rehired employees found that they were being converted to the cash balance formula after being rehired, they were upset. See, e.g., Ex. 139 (Gisela Broderick's complaint letters); Ex. 44 at 20525 ("another rehire" [Peter Andruszkiewicz]; "Guess what? He's upset.").

394.    CIGNA's policy was to refuse to provide benefit comparisons to such employees. A 3/20/2001 email from Stewart Beltz, the Plan administrator, titled "Non-standard Pension Calculation Requests" states:

"In the event of ... the re-hire of a former employee with a vested or

133

unvested benefit, only conduct a pension calculation for the specific plan they would be eligible for. Please do not perform any "hypothetical" or "what if" calculations for any pension benefit accruals for which the employee is not currently or could not in the future be an eligible plan participant. If a participant has a frozen pension benefit, please do not conduct any pension calculation that projects future growth in any frozen benefit."

"Any attempt to request a "hypothetical", "what if" or any other non-standard pension calculation must be directed to John Arko or myself for prior approval, consistent with the process currently in place for all executive requests."

Ex. 121.

395.   When Ms. Broderick asked for a comparison, Stewart Beltz, who at that time had the title of Plan administrator, told her that it is "difficult to quantify the impact" of the cash balance changes. Ex. 125 at P 1236.

396.   When news of the effect of the change leaked out there were "Problems with rehiring those who would lose substantial amounts of early retirement subsidy." Ex. 70.

397.   In the year 2000, CIGNA decided to modify the rehire rule, effective for individuals rehired on or after January 1, 2001, to an "A+B" formula under which rehires would "keep their already-earned old plan benefits," including early retirement subsidies, as a separate benefit and earn cash balance accruals with no wear-away. Ex. 132 at D05532 and 5534 and Ex. 140 at DO4646 and 4649-50. CIGNA described this "as a recruiting incentive." Id. at 4650; see also Ex. 141 at

SuppD0186 (amendment "Facilitates re-hire of late career staff by grandfathering their favorable early retirement factors from the tier 1 plan").

398.    CIGNA remained concerned with the effect that disclosing this change would have on the individuals who had already been rehired. "I strongly suggest that any discussion [of changes to the benefits of rehired employees] be oral and not written for perpetuity (and xerox machines) since we have another 300+ employees rehired over the last two years who may not like their exclusion from the new rule." Ex. 142.

399.    Gisela Broderick and Patricia Flannery testified that they might not have accepted CIGNA's job offer or could have bargained for increased compensation had they known what they were losing. See ¶¶349 and 357 above.

## VII.    Participants and Spouses Have Not Been Notified When Annuity Options Have Greater "Relative Value" than the Cash Balance Accounts.

### A.    CIGNA Has Not Notified Participants When "Old Plan Benefits" Are Greater as the SPD Promises.

400.    Under the heading "Minimum Benefits," the 1998 and 1999 SPD promised that participants would be notified of minimum benefits: "Your final Plan benefits cannot be less than your **old plan** benefits on December 31, 1997. If this minimum benefits rule applies to you, you'll be notified by the Retirement Services Center when you request a distribution." Ex. 8, Tab 3 at 13 and Tab 4 at

J-7 (emph. in orig.).

401.   CIGNA was asked in discovery to produce any documents that notified participants of their "old plan benefits" when they requested a distribution. CIGNA responded that it would produce "exemplars of responsive documents sent to particular participants." Ex. 34 (Request No. 13). But CIGNA did not do this.

402.   Asked again, CIGNA's counsel transmitted an email identifying two documents by Bates numbers as "exemplars" of such notices. Ex. 143. Inspection of those documents shows that they contain no notice related to "old plan benefits." Id.

403.   Discovery showed that there were no disclosures of "old plan benefits" when participants separate from service before age 55.  In addition to Ms. Amara (who left at age 53 and 8 months), Douglas Robinson left CIGNA at age 54 and 3 months. Within 60 days of his separation, CIGNA automatically sent him a benefit notice telling him he had the options of: (1) a lump sum of $131,940.65, (2) an immediate annuity of $741.87 per month, or $725.99 per month with a lump sum refund feature, or (3) a "Deferred Benefit" under which he would "keep his Retirement Account with the Plan" and "receive interest" credits. Ex. 144 at SuppD2406.

404.   In fact, if Mr. Robinson deferred his benefits for just 9 months, he

was entitled to an early retirement benefit from the old plan of $1,625 per month ($19,506 annually), which is more than twice the $741 immediate annuity option and much more valuable than several months of "interest." Ex. 144 at SuppD2405.

405.   As occurred with Ms. Amara and Mr. Robinson, CIGNA sends a benefit notice "automatically" to participants within 60 days after they separate from employment with a lump sum amount and "immediate" annuity options. Ex. 29 (Answer to Interrogatory No. 4 in the Second Set).

406.   The notice contains a box about the participant's option to defer benefits. But the description of that option indicates that the only thing to be gained by deferral is interest at the Plan's interest crediting rate: "I elect to keep my Retirement Account with the Plan until I notify you otherwise, but, not later than my age 65. I will receive interest in accordance with the Plan's provisions." 'Ex. H' to Ex. 3 (Poulin Rpt), and 'Ex. 10' to Ex. 4 (Poulin Suppl Rpt). There is no notice that a higher early retirement benefit may be available if the participant defers benefits to age 55.

407.   The Class' actuarial expert, Mr. Poulin, examined the written material that CIGNA distributes when participants and their spouses choose among benefit options and found no notice of old plan benefits. Ex. 3 (Poulin Rpt) ¶38 and Ex. 4 (Poulin Suppl Rpt) ¶¶39-40.

137

408.   In his Rule 30(b)(6) deposition, Mr. Arko stated there was no disclosure that "I'm aware of" telling participants they are receiving the old plan benefit; "but we make available to them the 800 number if they want to call to ask specific questions." Ex. 239, at 294, line 21 - 295, line 18. See also id. at 106, line 9 - 128, line 18 (admitting that the benefit notices do not show an annuity benefit available at age 55).

409.   CIGNA failed to tell named Plaintiff Janice Amara about her "old plan benefits" on two occasions: in February 2001 when she asked for a benefit estimate, and in December 2003 when she was automatically mailed a notice of her benefits after she separated from service. Ex. 145 at P 1011 and Ex. 146 at P 1147.

410.   CIGNA attributed the first omission to a "flaw" in "populating" the records in the system. Ex. 147. The second omission was because the system was not designed to notify participants of the old plan benefits if a participant separates from service before age 55 and requests a distribution or is automatically sent one.

**B.    CIGNA Has Not Notified Participants or Spouses When the Annuity Form of Benefit Has a Higher "Relative Value."**

411.   Section 7.1(b) of the Plan document specifically requires "sufficient additional information to explain the relative values of the optional forms of benefit available under the Plan." Ex. 1 at DOO305.  In addition to not notifying

138

participants about "old plan benefits" as the SPD promises, CIGNA has not provided participants, or their spouses, with information about the "relative values" of annuity options.

412.   In September 1997, Mercer advised CIGNA that "any Tier 1 employee electing a lump sum would forfeit the value of the early retirement subsidy."  Ex. 158 at MER 00660.

413.   In his first Rule 30(b)(6) deposition, John Arko testified that there were "no specific words" in the SPD disclosing that some benefit options may have a higher relative value than others. Ex. 239, at 154, line 13 - 156, line 7.

414.   Professor Stratman also found that the SPD fails to disclose that the cash payment options can be less valuable than the annuity options.  Ex. 8 (Stratman Rpt) at 12. The Retirement Information Kit told employees that the "lump sum distribution option can be very valuable." Ex. 8 at Tab 4, page AMARA-00452.

415.   After examining the benefit commencement package, Mr. Poulin observed that CIGNA does not explain that benefit options based on the protected minimum benefit can have a higher relative value than the account balance under Part B. Ex. 3 (Poulin Rpt) ¶38; Tr.  287, line 8 -  289, line 22.

416.   In discovery, CIGNA was asked to produce any benefit notices that disclosed the "relative values" of benefit options.  Ex. 34 (Request No. 18) and Ex.

27 (Interrogatory No. 12). CIGNA did not produce any such notices. Asked again, CIGNA's counsel transmitted an email identifying two documents by Bates numbers as "exemplars" of such notices. Ex. 143. Inspection of those documents reveals that they contain no disclosures related to the relative values of benefit options. Id.

417.    CIGNA's failure to disclose relative value of optional forms of benefit caused participants to elect lump sum distributions when annuity options are much more valuable. For example, Lillian Jones, who is now age 62, worked for CIGNA continuously, except for two short layoffs, for approximately 35 years since 1962 before her job was abolished in 2001. Tr. 737, line 4 - 738, line 14. She was sent a benefit election form that listed a $1,251 per month Life Annuity beginning at age 59 or a $122,965 lump sum. See Ex. 191.

418.    Ms. Jones elected the lump sum not knowing that her annuity benefit was worth approximately $200,600, or $80,000 more. Tr. 288, line 13 - 289, line 14 and Ex. 7 ¶7. CIGNA's election form and related materials contain no disclosures concerning the "relative value" of her benefit options. There was also no notice to her, as the SPD promised, that her "old plan" benefits were greater than the cash balance option. When Ms. Jones called CIGNA about the options on the election form, she was told that the annuity options "would not grow"; instead, "[a]s the cost-of-living would go up, it would still remain the same." Tr. 740, line

23 - 741, line 16.   Ms. Jones testified that if CIGNA had told her that the annuity

option was worth $80,000 more than the lump sum, she would "definitely have

chosen the life annuity."  Tr.  748, line 7 -  749, line 15; see also Tr. 743, lines 10 -

16.

419.   Mr. Poulin testified that because participants' cash balance accounts

did not include early retirement subsidies, Ms. Jones "was not an isolated case."

Tr.  1488, line 19 -  1489, line 24.  Gisela Broderick was also given an election

between an annuity that included an early retirement subsidy and a cash balance

account, which did not.  Ex. 38 and Tr.  229, line 5 - 232, line 24.

420.   Without disclosures that immediate or future annuity options can

have a higher value, participants nearly always select the lump sum distributions:

The class list shows nearly 10,000 participants commenced benefits since the cash

balance conversion, 96% of whom elected lump sum options. Ex. 9, ¶6. Since

April of 1997, CIGNA's actuaries have "assume[d] 100% utilization of the cash

option, i.e., all CFP/Tier II participants elect cash at termination." Ex. 159 at

D12949. Other documents refer to the "rare instances we have had to date with

Cash Balance participants electing an annuity." Ex. 160 at D12683.

421.   A Pension Activity log shows that CIGNA and Prudential had taken

the position that all the "forms of annuity" under the cash balance plan were of

equal value" and therefore the only disclosure needed was to "advise participants

that the forms of annuity are all of equal value." Ex. 165 at SuppD 15444 and 15446.

422.    Lorraine Morris of the Retirement & Investment Services division of Prudential (which was formerly part of CIGNA until a sale at the end of March 2004), confirmed that Prudential had been operating under the "advice" that "all of the options being offered under the cash balance plan were actuarial [sic] equal." Tr.  822, line 24 -  823, line 2.

423.    At two Rule 30(b)(6) depositions in April 2006, Ms. Morris and Mr. Arko admitted on behalf of Prudential and CIGNA that benefit options under the cash balance plan sometimes have "unequal" values and that disclosures should have been provided. Ex. 198 (Morris) at 135-37 ("It was our understanding that all benefits were equal [or] relatively equal" but Prudential is now aware of situations "of not being relatively equal") and Ex. 240 (Arko) at 117, line 9 - 125, line 4 ("there are certain times and certain circumstances when, in fact, they are not equal auctorial [sic] equivalent value and need to provide different documentation to people") and id. at 303, line 18 -  304, line 9.  See also Tr.  804, line 18 -  805, line 4, and Tr. 818, lines 2 - 21 (Prudential was "made aware" in May 2006 that "there were circumstances where certain groups of individuals' benefits would not be relatively equal").

424.    A May 6, 2006 "draft" analysis from one of Prudential's actuaries to

John Arko also acknowledges that there have been situations where the cash balance plan offered benefit options with "unequal" values. Ex. 166.

425.   When Ms. Morris was shown Lillian Jones' benefit election form at trial, she testified that she could not determine by looking at the form whether Mrs. Jones' life annuity options were more valuable with the lump sum amount. Tr.  803, line 14 -  805, line 17.  She admitted that other employees "presumably" would not be able to make that determination either.  Tr.  808, line 21 -  809, line 5.

426.   Ms. Morris testified that she understood that disclosures of unequal benefit options were only required to be provided since November 2005.  Tr.  806, line 2 -  807, line 15.  In response to the Court's inquiry, Ms. Morris agreed that there are participants "who made elections of benefits prior to November, 2005, who actually weren't told that their annuity benefits, in the case of subsidized annuity benefits, were not equal to the lump sum."  Tr.  808, lines 7-17.  She also agreed that while those participants were provided "a benefit package that reflected their benefits," "they just weren't told one way or the other" whether the options were equal.  Id. at lines 13-20.

427.   Ms. Morris testified that Prudential had reviewed the relative value information provided to participants since February 2006 and determined that only one individual had unequal benefit options and requires a new election form.  Tr.

813, line 19 - 815, line 6; Tr. 816, line 1 - 16.  She also stated that Prudential was

"in the process" of reviewing the relative value disclosures distributed since

November 2005, which she erroneously understood to be the effective date of new

regulations on disclosures of relative values. Tr.  816, line 13 -  817, line 18; Tr.

822, lines 9-20.

> **C.     CIGNA's Actuarial Expert Admits that CIGNA's Notices Do Not Explain the "Relative Value" of Benefit Options.**

428.   Going through CIGNA's benefit notices and comparing them with the

regulations, Mr. Sher could find no explanation of relative values of benefit

options, no disclosure of the extent to which optional forms are subsidized, and no

explanation of the interest rates used to calculate optional forms. Ex. 193 (Sher

11/2005 Depo) at 76-81; see also Tr.  1231, line 23 -  1233, line 1.   He

specifically looked at the election form for Lillian Jones and could find nothing to

indicate that her annuity options included an early retirement subsidy.  Tr. 1232,

line 22 - 1233, line 1.

429.   Mr. Sher would not opine directly about whether CIGNA was

required to give any disclosures of relative values. He stated that his opinion was

not whether "CIGNA did anything right or wrong," but "that what they did was in

line with others that I'm familiar with."  Tr.  1249, line 22 - 1250, line 9. See also

Tr. 1232, lines 5 - 12; Tr. 1246, lines 1 - 4.  Mr. Sher was not aware that

CIGNA's Plan specifically provided for these disclosures in conformity with the regulations.  Tr. 1249, lines 12-15.

430.   On cross-examination, Mr. Sher identified two other companies with options that were unequal actuarially analogous to CIGNA's who he believes did not provide the disclosures. Tr. 1237, line 24 - 1239, line 2.

431.   Mr. Sher also believes that providing information about the relative values of benefit options can be "misleading" or "possibly misleading." Tr. 1233, line 5 - 1234, line 10; Tr. 1246, lines 5- 8; Ex. 11 (Sher Suppl Rpt) at 9-10; Ex. 193 (Sher 11/2005 Depo) at 62-63, 67, 85. Mr. Sher contends that telling a participant that the actuarial present value of an annuity is greater than the lump sum option can discourage him from choosing the lump sum when there are special circumstances, such as "poor health" or a "family history," that make the actuarially less valuable lump sum option more appropriate for them. Ex. 11, at 9-10; Tr. 1233, lines 7 - 25.

432.   At trial, Mr. Sher testified, "I think that providing information on an individual basis of that sort can be misleading without providing a lot more information ... when you get down to the individual level really to tell somebody that this benefit has an actuarial value or has a value which is $80,000 more, taking your example, leaves I think a very strong indication, without caveating it and adding a whole bunch additional information which further may confuse an

individual." Tr.  1234, line 1 - 1236, line 17.

433.    Mr. Sher admitted that "the facts about what the benefits are and what form they're being paid" is not "an easy thing for employees to figure out." Tr.  1234 lines 5-15.  Mr. Sher suggests that participants should hire a financial planner at retirement to help them make decisions about which option to choose. Tr.  1236, line 18 - 1237, line 15.

434.    Mr. Poulin responded to Mr. Sher's testimony concerning financial planners:

> there are a lot of people who simply don't have the money to see an investment advisor so for them, everything else being equal, it is much simpler, easier, comfortable to have the financial security of having a fixed payment arriving every month as opposed to investing a sum of money when they have no, [in] some cases, no investment experience.

Tr.  1550, lines 15-24.

435.    Mr. Sher also opines that he does not believe that participants with more valuable deferred annuity options like Douglas Robinson are required to be told about their benefits "as of some future date, other than the distribution date" on the election form.  Tr.  1253, line 16 - 1259, line 4. However, CIGNA's election form already contains disclosure of the "deferred option," stating that Mr. Robinson "will receive interest in accordance with the Plan's provisions" if he defers.  Ex. 144.  Mr. Sher acknowledged that this section tells him that "he has

the ability to elect benefits at some future date rather than just currently." Tr. 1253, line 5 - 1254, line 14. Mr. Sher also admitted that he assumed that Mr. Robinson had "initiated" this with a request to start his benefits as of age 54 and 3 months and was not aware that CIGNA sent the election forms out automatically after separations from service. Tr. 1254, line 15 - 1255, line 7.

436.   CIGNA produced no other expert testimony or evidence to defend its compliance with the Treasury regulations on relative value disclosures.

**D.   CIGNA Continues to Withhold Information About the "Relative Value" of Benefit Options from Class Members in the *Depenbrock v. CIGNA* Group.**

437.   CIGNA rehired 194 members of the <u>Amara</u> class before December 21, 1998, who were previously under the Tier 1 (2%) formula and had 45 or more age and service points. Ex. 173 at SuppD15466 and Ex. 174 (listing Depenbrock rehires). Under the <u>Depenbrock v. CIGNA</u> decision, "the effective date of the amendment of Section 2.4 (the Rehire rule) of the CIGNA Pension Plan [was] DECLARED to be December 21, 1998." Ex. 175 (Order of Hon. Robert F. Kelly, Jr.).

438.   As a result, these 194 members of the <u>Amara</u> class were to be restored to the Tier 1 formula because the amendment to the rehire rule that placed them into the cash balance plan was not adopted until after they were rehired.

439.   CIGNA mailed a letter on February 4, 2005, stating that "As a result

of a recent federal court decision, the pension benefits of certain CIGNA Pension

Plan participants rehired by CIGNA between January 1, 1998 and December 21,

1998 will be recalculated under Part A of the CIGNA Pension Plan." Ex. 176.

440.   As described in ¶¶163-166, the benefits of many of the class members

who have received recalculations have nearly doubled. But CIGNA has still not

produced recalculations for 24 members of this group and has excluded an

additional 24 members of this group for reasons which are not described in the

Depenbrock decision, e.g., only a short period of work after the rehire.  Exs. 717

and 721.

441.   In instances where it has performed the recalculations, CIGNA has

offered participants irrevocable "elections" of remaining in the cash balance

formula or going to the Part A formula, without disclosing the "relative value" of

those options. See, e.g., Ex. 73 at SuppD21495.

442.   Ms. Morris testified that she did not know whether participants are

required to receive relative value disclosures regarding their Part A and Part B

benefits.  Tr.  820, lines 6-20.

* * * * *

443.   For the Court's convenience, Plaintiffs' counsel are attaching a list

identifying the key employees, witnesses, and experts for both parties as Appendix

II to these Findings.

148

Dated: May 25, 2007

                                                Respectfully submitted,

                                                s/ Stephen R. Bruce
                                                Stephen R. Bruce Ct23534
                                                Allison C. Caalim
                                                805 15th St., NW, Suite 210
                                                Washington, DC 20005
                                                (202) 371-8013

                                                s/ Thomas G. Moukawsher
                                                Thomas G. Moukawsher Ct08940
                                                Moukawsher & Walsh, LLC
                                                21 Oak St.
                                                Hartford, CT 06106
                                                (860) 278-7000

                                                Attorneys for Named Plaintiffs and
                                                Plaintiff Class

**APPENDIX I**

| Comparison of CIGNA's 1998/1999 and 2006 Summary Plan Descriptions | |
| --- | --- |
| **Summary Plan Description Sept. 1998 (and Oct. 1999)** | **Summary Plan Description & Supplement July 2006** |
| "The CIGNA Pension Plan is an 'account balance' plan. With this type of plan, a specific amount is credited to a pension account for you periodically–similar to a savings plan. The best part is that CIGNA does the saving for you. You make no contributions of your own to the Plan." (p. 1) | "Your Plan account is merely a bookkeeping account that represents the value of your Part B benefit. There is no actual money in it, and no Plan assets are allocated to it." (SPD p. 4) "When you start participating in Part B, an account is set up in your name...This account is a bookkeeping account that represents the value of your Plan benefit–there is no actual money in it.  The money in the Plan's trust fund is not allocated to any participant's individual account."  (SPD p. 5) |
| "Each dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested. Under the plan, your benefit will grow steadily throughout your career as credits are added to your account."(p. 3) | "Your account balance, and your resulting Part B benefit, grows throughout your CIGNA career as you earn benefit credits and your account receives interest credits." (SPD p. 5) |
| "The opening balance was equal to the lump sum value of the pension benefit you earned through December 31, 1997." (p. 3). The conversion formula used is based on the guidelines established by the federal government for valuing pension benefits." (p. 8) | "Generally, the amount of your Initial Retirement Account under Part B of the Plan equals the actuarial equivalent value of your accrued benefit under Part A expressed in the form of a single life annuity." (Suppl. p. 2) |

A-1

| | |
|---|---|
| "Your final plan benefits cannot be less than your old plan benefits on Dec. 31st, 1997. If this minimum benefits rule applies to you, you'll be notified by the Retirement Service Center when you request a distribution." | "If you are a former Part A participant whose Part A benefit was converted into an Initial Retirement Account under Part B when you first became an eligible employee and you elect to receive your vested Plan benefit in the form of an annuity upon your termination of employment with CIGNA for any reason other than death, your payments under Part B will be no less than the actuarial equivalent value of your minimum benefit expressed in the form of a single life annuity beginning on your benefit commencement date." (Suppl. p. 3) |
| A chart shows benefit amounts under the normal and optional payment methods for employee retiring at age 62 with account balance of $200,000 producing a $1,561 per month single life annuity, using a 6.83% interest rate assumption (p. 6). | A chart shows benefit amounts under the normal and optional forms of payment for an employee retiring at age 62 with account balance of $200,000 producing a $1,379 per month single life annuity, using a 5.5% interest rate assumption. (SPD p. 12) This is $182 per month less than the example in the 1998/1999 SPD. |

| | |
|---|---|
| No explanation or examples are given of the effect of interest rates on annuity payments. | "Effect of interest rates on your annuity payments:  "If you elect to receive payment of your vested Plan benefit in the form of an annuity, your vested account balance will be converted to monthly installment payments for life based on certain actuarial factors. These factors include:<br>  • An applicable interest rate;<br>  • Your life expectancy based on your age at benefit commencement date based on a mortality table required by the IRS; and<br>  • The form of payment you choose." (SPD p. 13)<br><br>Examples are given showing a $252,000 account balance converting to approximately $150 per month less in monthly annuity payments with each 1% drop in the applicable interest rate. (SPD p. 13)<br><br>"In determining the year in which you wish to begin receiving payment of your annuity, you should consider the impact of the applicable interest rate. This is especially true late in the year when the interest rate that will be used for the following year has already been announced. You may have the opportunity to have your annuity determined using the current year's applicable interest rate or, by postponing your benefit commencement date for a month or two, using the following year's rate. The higher the interest rate, the higher the monthly annuity payment when your vested account balance is converted into an annuity."(SPD p. 13) |

APPENDIX II

## IDENTIFICATION LIST OF KEY EMPLOYEES

**John Arko** - Benefits Strategy Director and Plan Administrator; formerly Director of Retirement Benefits.

**Arthur Assantes** - former Senior Actuary with CIGNA, currently President, Hooker and Holcomb consulting firm.

**Denise Belanger** - Senior Benefit Consultant, Retirement & Investment Services division of Prudential (formerly a division of CIGNA - until April 2004).

**Mike Bell** - Executive Vice President and CFO.

**Stewart Beltz** - former Plan Administrator (terminated mid-2003).

**Stephen Comkowycz** - former Senior Pension Consultant (terminated Feb. 2003).

**David Cordani** - President, CIGNA Healthcare.

**David Durham** - former Assistant Vice President of Global Benefits (terminated Oct. 2003).

**Robert Flanders** - Assistant Director, Benefits.

**Paul Gontarek** - In-house ERISA Counsel.

**Edward Hanway** - CEO of CIGNA.

**Denise Hill** - former Vice President, Corporate Relations, Director of Human Resources Communications at time of cash balance conversion (terminated January 2004).

**Andy Hodges** - former Chief Actuary for Projects (terminated in mid-2003; rehired by Prudential in 2006).

**Frank Lamay** - Vice President, Operational Planning.

**Donald Levinson** - former Executive Vice President, Human Resources and Services (terminated end of 2003).

**Gregg Loboda** - Vice President, Information Systems of Prudential.

**Mark Lynch** - Senior Vice President Actuarial Advisory Services.

**Gerald Meyn** - former Vice President, Employee Benefits and Health Management; former Plan Administrator (terminated mid-2004).

**Lorraine Morris** - Manager for Client Services, Retirement & Investment Services division of Prudential (formerly division of CIGNA until April 2004).

**Jean Renshaw** - Outside Counsel with Drinker, Biddle, and Reath in Philadelphia.

**Robert Steele** - former Assistant Vice President, Relationship Manager (terminated in 2006).

**Jim Stewart** - former Executive Vice-President and CFO.

**Paul Strella** - William Mercer consultant.

**Wilson Taylor** - former CEO of CIGNA.

**Barry Wiksten -** Senior Vice President, Public Affairs.

## Plaintiffs' Witnesses

**Janice Amara** - named Plaintiff, former NASD principal within CIGNA's Retirement and Investment Services division and client executive in charge of accounts (rehired in Sept. 1998 and terminated Oct. 2003); Tier 1 (2%) benefit formula under prior Plan.

**Gisela Broderick** - named Plaintiff, former Project Manager in the Information Technologies Department of CIGNA Systems (rehired in June 2000 and terminated March 2004); Tier 1 benefit formula.

**Bruce Charette** - class member, currently Project Consultant in Health Care division; Tier 1 benefit formula.

**Patricia Flannery** - class member, currently Business Analyst in Integrated Care Systems (rehired in Oct. 2000); Tier 1 benefit formula.

**Annette Glanz** - named Plaintiff, former project controller in Health Care division (terminated June 2004); Tier 1 benefit formula.

**Barbara Hogan** - class member, former Customer Service Benefit Analyst for CIGNA

International (terminated Aug. 2003); Tier 2 benefit formula.

**Lillian Jones** - class member, former Customer Service Analyst in CIGNA Health Care (terminated Dec. 2000); Tier 1 benefit formula.

**Robert Upton** - class member, former attorney in the Group Insurance Law Department (terminated April 2005); Tier 2 benefit formula.

### Plaintiffs' Experts

**Claude Poulin** - Plaintiffs' actuarial expert, President of Poulin Associates, Inc.

**James Stratman** - Plaintiffs' communications expert, Associate Professor of Communication at University of Colorado at Denver.

### Defendants' Expert

**Lawrence Sher** - Defendants' actuarial expert, Principal and Director of Retirement Policy at Buck Consultants, Inc.

A-6