# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-----------------------------------------------------X
                                 :

JANICE C. AMARA, GISELA        :      3:01 CV 2361 (MRK)
R. BRODERICK, ANNETTE S. GLANZ  :
individually, and on behalf of others    :      Trial Dates:
similarly situated,                 :      September 11-15, 2006
                                 :      January 24-25, 2007
                    Plaintiffs,  :
           v.                    :
                                 :
CIGNA CORP. AND CIGNA       :
PENSION PLAN,                :
                               :
                 Defendants.  :
                               :
-----------------------------------------------------X

## **DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT**

Dated:  June 25, 2007           **MORGAN, LEWIS & BOCKIUS LLP**
                                   By:  /s/ Joseph J. Costello
                                   Joseph J. Costello
                                   Jeremy P. Blumenfeld
                                   Jamie M. Kohen
                                   *Admitted pro hac vice*
                                   1701 Market Street
                                   Philadelphia, Pennsylvania  19103-2921
                                   (215) 963-5295/5258/5472
                                   (215) 963-5001 (fax)

                                 **ROBINSON & COLE**
                                   James A. Wade (CT # 00086)
                                   280 Trumbull Street
                                   Hartford, Connecticut  06103
                                   (860) 275-8270
                                   (860) 275-8299 (fax)

                                   *Attorneys for Defendants*
                                   *CIGNA Corporation and CIGNA Pension Plan*

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND ON CASH BALANCE PLANS AND TRADITIONAL PLANS ........ 1

    A.    Traditional Defined Benefit Plans ........................................................................ 1

    B.    Cash Balance Plans ............................................................................................... 2

II.     THE CIGNA PENSION PLAN ............................................................................... 6

    A.    CIGNA's Part A Traditional Pension Plan And The Creation Of The
             Part B Cash Balance Plan ..................................................................................... 6

          1.    All Plan Participants Earned Benefits Under Part A Through
                 December 31, 1997 ...................................................................................... 6

          2.    On November 4, 1997, CIGNA Amended The Plan To Freeze
                 Accruals In Part A For Certain Plan Participants As Of
                 December 31, 1997 ...................................................................................... 8

          3.    On December 21, 1998, The Amendment Creating Part B Was
                 Signed, Retroactive To January 1, 1998 .................................................. 10

    B.    The Terms Of Part B ........................................................................................... 12

          1.    Benefit And Interest Credits ..................................................................... 12

          2.    Opening Account Balances, Protected Minimum Benefits,
                 And Retirement ........................................................................................ 15

          3.    CIGNA Part B Plan Administration ......................................................... 19

                (a)    Filing A Claim For Benefits ........................................... 21

                (b)    Denial Of Claim .............................................................. 21

                (c)    Appeals Procedure .......................................................... 22

III.     PART B TREATS OLDER EMPLOYEES AT LEAST AS WELL AS IT
        TREATS YOUNGER EMPLOYEES (COUNT 3) .............................................. 23

    A.    Defendants' Expert's Analysis Of Age Discrimination Is Grounded In
             Sound Actuarial Science ..................................................................................... 23

          1.    Mr. Sher's Credentials .............................................................................. 23

          2.    Mr. Sher's Methodology And Conclusions ............................................. 24

    B.    Plaintiffs' Expert's Analysis Of Age Discrimination Is Fatally Flawed ............ 30

IV.     PART B DID NOT RESULT IN FORFEITURES OR BACKLOADING
        (COUNT 1) ........................................................................................................... 48

V.     PLAINTIFFS AND THE TESTIFYING CLASS MEMBERS HAVE BEEN
        PROVIDED ABUNDANT INFORMATION REGARDING THEIR
        RETIREMENT BENEFITS AND HAVE SUFFERED NO LIKELY, OR
        ACTUAL HARM RESULTING FROM ANY OMISSIONS FROM THE SPD
        OR SECTION 204(H) NOTICE (COUNTS 2 AND 4) ...................................... 53

# TABLE OF CONTENTS

Page

A. The Plan Administrator Provided Participants Several Written Communications Regarding The Freezing Of Accruals Under The Old Plan, The Creation Of Part B, And The Precise Amounts In Participants' Part B Accounts ................................................................................................ 54

    1. A Memorandum Was Sent To Managers, A Letter Was Sent To Grandfathered Participants Notifying Them Of Their Status, And A Memorandum Was Sent To Human Resources Representatives And Key Benefits Contacts .............. 54

    2. The Signature Benefits Newsletter Sent To Employees In Early November Provided Notice That Part A Accruals Would Be Frozen As Of December 31, 1997, Introduced The Cash Balance Plan, And Notified Participants That Information Regarding Their Opening Account Balances Was Forthcoming ........................................................................ 55

    3. In December 1997, All Participants Received A Signature Benefits Retirement Kit, Which Reinforced To Participants That CIGNA Would Freeze Accruals Under Part A For All Non-Grandfathered Participants As Of December 31, 1997, And Further Explained The Cash Balance Plan And That Account Balance Information Was Forthcoming ........................ 59

    4. The Plan Administrator Provided Participants Precise Information Regarding Their OAB And Their Part B Pension Accounts Through Total Compensation Reports, Annual Account Statements, SPDs, A Retirement Planner, A Benefits Hotline, And Websites .............................................. 67

VI. THE PART B SPD MET ERISA'S DISCLOSURE REQUIREMENTS ....................... 78

A. The Part B SPD Was Not Required To Disclose The Potential Wear-Away Effect, Which Was Not The Result Of A Plan Provision .............. 78

B. The Wear-away Effect Was Caused By Falling Interest Rates After The Conversion, Which The Plan Administrator Could Not Anticipate ............ 79

C. The Wear-away Effect Attributable To The Early Retirement Subsidy Could Only Possibly Affect A Small Subset Of Participants .............................. 84

    1. The Wear-away Effect Attributable To The Early Retirement Subsidy Only Could Result For Eligible Employees During The Early Retirement Window .................... 84

    2. The Wear-away Effect Attributable To The Early Retirement Subsidy Only Resulted As to Participants' Annuity Options, And Defendants Anticipated Most Participants Would Elect A Lump Sum ....................................... 86

## TABLE OF CONTENTS

**Page**

D.     Plaintiffs' Communications Expert James Stratman's Analysis Was
       Highly Flawed................................................................................... 87

E.     None Of The Plaintiffs Or Testifying Class Members Suffered Likely Or
       Actual Harm Resulting From Any Omission In The SPD Or Section
       204(h) Notice ................................................................................... 88

VII.   DEFENDANTS' FAILURE TO PROVIDE PRESENT-VALUE DISCLOSURES
       PRIOR TO OCTOBER 2004 DID NOT VIOLATE ERISA (COUNT 5). ................... 103

VIII.  PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED
       RELEASES WHICH BAR THEIR CLAIMS (ALL COUNTS)................................. 107

Defendants CIGNA Corporation ("CIGNA") and CIGNA Pension Plan (collectively, "Defendants") hereby propose the following findings of fact set forth below.[1]

## I.    BACKGROUND ON CASH BALANCE PLANS AND TRADITIONAL PLANS

### A.    Traditional Defined Benefit Plans

1.    The formula for earning benefits in a traditional defined benefit pension plan typically is an annual benefit payable for the life of the employee ("annuity"), where the annual benefit is a percentage of the employee's "salary" multiplied by the employee's years of service.  Salary may be defined as final salary, the average of salary in the last five years, or some other similar definition.  For example, an employee might accrue a pension benefit commencing at age 65 of 1.5% of salary for every year of service. After 30 years of service he would have an annual pension benefit of 45% of salary.  Trial Testimony of Lawrence Sher (hereinafter "Sher Tr.") 959-60; Ex. 10, Sher Report at 2.

2.    The annuity has an actuarially equivalent present value based on interest rates and the participant's age and life expectancy.  In other words, using certain actuarial assumptions, the value of the annuity can be expressed as a lump sum value today.  Sher Tr. 959-60.

3.    By design, participants under traditional pension plans earn most of their benefits in their last years of service.  Traditional plans provide most of their benefits only after an employee stays with the same employer for many years.  Sher Tr. 956, 960-63.

---

[1]    Defendants aimed herein to limit the Proposed Post-Trial Findings of Fact to those findings most critical to the Court's determination of the issues in this matter.  Defendants note that additional facts supportive of Defendants' arguments may be found in exhibits not cited herein.  On the first day of trial, the Court held that all exhibits were admitted as full exhibits and could be used by either party for any purpose.  Tr. 10; see dkt. #233 (Defendants' List of Trial Exhibits); dkt. #238 (Plaintiffs' List of Trial Exhibits).  However, the Court sustained Defendants' objections to the wholesale admission of Exhibits 181 - 193 and 196 - 199.  Tr. 10.

4.     Traditional plans also frequently provide subsidized early retirement benefits that encourage employees to stay with the employer until such benefits become available and then to leave.  An unsubsidized early retirement benefit is a benefit payable before normal retirement age (typically age 65) that has the same value (discounting to present value and with actuarial adjustments) as the age-65 benefit.  A subsidized early retirement benefit is a benefit payable before normal retirement age that has an overall value <u>greater than</u> the value of the normal retirement benefit.  If the employee does not retire early, the value of the subsidized benefit is worn away and lost.  Sher Tr. 963-65; Trial Testimony of Claude Poulin (hereinafter "Poulin Tr.") 212.

### B.     Cash Balance Plans

5.     "Cash balance" retirement plans were designed to reflect changes in the workforce of employees and to allow employees to earn their retirement benefits more evenly over their careers.  Sher Tr. 956; Ex. 10, Sher Report at 1.

6.     Since the mid-1980s, hundreds of U.S. employers have adopted "cash balance" retirement plans.  Most of these plans resulted from the "conversion" of their traditional defined benefit plans to cash balance plans.  Sher Tr. 949, 984-85, 987; Ex. 10, Sher Report at 1.

7.     Recent estimates indicate that between one-quarter and one-third of large U.S. employers sponsor a cash balance plan.  According to the Pension Benefit Guaranty Corporation, over 1,500 cash balance plans and other similar "hybrid" plans were in existence as of 2003, providing pension benefits to over 8 million participants, one quarter of the total population covered by defined benefit plans.  Ex. 531, Pension Benefit Guaranty Corp., Pension Insurance Data Book 2004, at 59 (2005), at http://www.pbgc.gov/docs/2004databook.pdf (last visited June 22, 2006).

8.      Usually, the amount of the cash balance benefit earned in any period is equal to a percentage of the participant's pay during that period and, therefore, is often referred to as a "pay credit."  Pay credits can be defined in a number of ways.  For example, they may be a fixed percentage of pay (e.g., 5%), they may be integrated with social security (e.g., 3% of pay up to the social security wage base and 5% over the wage base), or they may vary by the employee's age or service (e.g., 4% of pay each year up to age 40 and 5% each year thereafter).  Pay credits are periodically credited to a participant's account (e.g., each pay period).  Sher Tr. 972-74; Ex. 10, Sher Report at 2-3.

9.      In order to reflect economic changes associated with the passage of time, i.e., the time value of money, cash balance plans also provide for "interest credits," determined by applying a plan-specified interest rate to the participant's account balance.  In most cases, the interest credit rate is a "floating" rate that changes annually (or more frequently) and is tied to a market rate such as the yield on a selected U.S. Treasury security.  Sometimes, a floating interest credit rate is subject to a minimum fixed rate (e.g., 4%), to a maximum fixed rate (e.g., 8%), or both.  Sher Tr. 972, 976-77; Ex. 10, Sher Report at 3.

10.      Because of its different plan design, the benefit formula under a cash balance plan is expressed in a different way than under a traditional defined benefit plan.  In a traditional plan, the benefit formula is typically expressed as a life annuity beginning at the normal retirement age defined by the plan (often age 65).  Conversely, the benefit in a cash balance plan is expressed as a current lump sum value that is equal to the employee's "cash balance account."  Sher Tr. 959.

11.      The fundamental formula in a cash balance plan – benefit credits and interest credits – is easy to understand, and employees can appreciate exactly how those amounts will

increase over time.  Poulin Tr. 1559-60; Sher Tr. 955; Ex. 10, Sher Report at 1.

12.     Cash balance plans allow employees to earn benefits more evenly throughout their career, whereas traditional defined benefit plans are heavily economically backloaded. Sher Tr. 1397, 1443-1445.

13.     Since most employees do not stay with the same employer for most of their careers, employees will often receive more generous benefits under cash balance plans than under traditional defined benefit plans with similar costs.  Cash balance plans are not inherently more or less costly than traditional defined benefit plans.  Sher Tr. 1006-07; 1179-80.

14.     Traditional defined benefit plans generally are viewed as, and are, less valuable to employees in an increasingly mobile workforce, because benefits generally are frozen based on the employees' salary at termination of employment.  Thus, inflation tends to eat away at the value of benefits earned in a traditional plan for employees who do not spend their entire career with one company.  Sher Tr. 1442.  Cash balance plans, by contrast, use interest credits to index benefits earned against inflation.  Sher Tr. 1153-55; Ex. 10, Sher Report at 20.

15.     Many cash balance plans are the result of "conversions" from traditional defined benefit plans that are accomplished through plan amendments.  There are two major approaches used in practice:  the "sum-of" approach and the "opening balance" approach. Sher Tr. 988; Ex. 10, Sher Report at 3.

16.     Under the "sum-of" approach, benefit accruals as of the conversion date under the prior traditional benefit formula are frozen.  At the same time, participants begin to receive benefit credits (and interest credits) going forward.  The prior plan accrued benefits typically would continue to be paid under the forms previously allowed (which often do not include a

lump sum option), and the cash balance portion usually is payable in a lump sum equal to the participant's account balance, or as an annuity. Essentially, the participant in these cases has two separate pension benefits, with different rules, formulas, and procedures governing each form. Ex. 10, Sher Report at 3-4.

17.     Under the "opening balance" approach, participants are granted initial cash balance accounts as of the conversion date to reflect their years of service under the prior benefit formula. Often, opening balances are determined based on the lump sum value of the accrued normal retirement benefit under the prior formula as of the conversion date, by discounting the benefit to present value using certain interest rates and actuarial factors prevalent at the time. Ex. 10, Sher Report at 4.

18.     Sometimes, opening balances are increased to an extent to reflect subsidies inherent in early retirement benefits under the prior formula. Many employers have been reluctant, however, to build early retirement subsidies into opening balances because that could result in a much more favorable treatment as compared to the prior benefit formula. That is because in a traditional plan, the value of early retirement subsidies dissipates, i.e., wears away and is lost, as the employee continues to work. Once the subsidized value of the early retirement benefit is factored into the opening balance, however, it does not wear away. Ex. 10, Sher Report at 4.

19.     There is no provision of law that sets forth minimum requirements for determining opening balances. In fact, the United States General Accounting Office has specifically stated that "current federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, provided that a plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate

from the employer." Ex. 533, United States General Accounting Office, Report to
Congressional Requesters, Private Pensions, Implications of Conversions to Cash Balance
Plans, September, 2000 at 30 (P02283); Ex. 10, Sher Report at 4.

20.     However, in order to assure that participants always receive at least as much as
they were entitled to under the prior formula, cash balance plan conversions with opening
balances generally provide that in no event will the employee's total benefit be less than the
benefit earned on the conversion date under the pre-conversion benefit formula. Sher Tr. 988-
89; Ex. 10, Sher Report at 4.

21.     The opening balance approach has been the more popular approach primarily
because employers perceived that employees would prefer to have all of the plan benefits
expressed under the new paradigm – that is, in terms of a current lump sum value. From the
employee's perspective, neither approach is inherently superior. It depends on the design
details and on future events that are unknown at the time of the conversion (e.g., changes in
interest rates, pay increase rates, etc.). Sher Tr. 987, 1343; Ex. 10, Sher Report at 4.

## II.    THE CIGNA PENSION PLAN

### A.    CIGNA's Part A Traditional Pension Plan And The Creation Of The Part B Cash Balance Plan

#### 1.    All Plan Participants Earned Benefits Under Part A Through December 31, 1997.

22.     Prior to January 1, 1998, CIGNA had a traditional pension plan for its
employees. Ex. 2, Prior CIGNA Pension Plan in effect before January 1, 1998 ("Part A").
When CIGNA created a cash balance plan for certain participants in the CIGNA Pension Plan
(sometimes referred to as the "Plan"), known as "Part B," the original traditional defined
benefit plan formula that continued for certain grandfathered participants was labeled "Part

A." Ex. 2, Part A. For ease of reference, CIGNA's traditional defined benefit will be hereafter referred to as "Part A."

23. Depending on an employee's employment history, the employee would either be entitled to benefits under the Tier 1 or Tier 2 formula under Part A. The "Tier 1" formula provides an age-65 annuity benefit equal to 2% of final three-year average pay for each year of service up to 30 years, less a "social security offset." The participant can retire early at age 55 with 10 or more years of service and receive an immediate annuity benefit equal to the accrued age 65 benefit (not reflecting the social security offset), reduced for early commencement by factors in the Plan. Upon reaching age 65, the benefit is reduced by the participant's social security offset. Ex. 2, Part A at 4.2, 4.3 (D00040-46).

24. The Tier 2 formula provides an age-65 annuity benefit equal to 1⅔% of final five year average pay for each year of service up to 35 years, less the social security offset. A Tier 2 participant could retire early after age 55 with 15 more years of service and receive an immediate annuity benefit equal to the accrued age-65 benefit (not reflecting the social security offset), reduced by 5% per year if benefits begin before age 65 (e.g., 50% for commencement at age 55). Upon reaching age 62, the benefit payable is reduced by the social security offset (adjusted to age 62). Ex. 2, Part A at 4.3(b) (D00046).

25. The early retirement benefits, i.e. pre-age 65 benefits, available under Tier 1 and Tier 2 were subsidized benefits, although the Tier 2 subsidy was not substantial. Ex. 2, Part A at 4.3 (D00043).

26. The Plan also included a provision that benefited certain married participants – the so-called "Preserved Spouse's Benefit" – whereby a portion of the participant's pension (generally 30%) would be payable after his or her death for the remaining lifetime of the

surviving spouse.  When this kind of protection is provided to retired participants, many pension plans reduce the participant's lifetime pension in order to compensate for the added value of the survivor payments.  However, participants eligible for the Preserved Spouse's Benefit received it free of charge.  A participant eligible for this coverage who elects to have a larger portion (e.g., greater than 30%) of the pension to continue to his or her spouse after the participant's death, would get credit for the free preserved spouse's benefit – i.e., only the difference between the amount elected and the amount of preserved spouse's benefit would serve to reduce the participant's lifetime pension.  For example, a participant who elects a 50% spouse's benefit would only have his or her lifetime pension reduced to pay for the cost of providing the additional 20% spouse's benefit.  Ex. 2, Part A at Section 6.4 (D00063).

27.     The Tier 1 and Tier 2 formulas did not have a lump sum option.  That is, participants could elect their benefits in one of several different annuity options, but could not elect to receive their benefits as a lump sum.  Ex. 2, Part A at Article VI (D00260 - 71); Sher Tr. 1026.

28.     Under Part A, once employees were separated from employment with CIGNA, their plan benefit was static and did not continue to grow or keep up with inflation, because it was based on earnings with CIGNA.  Ex. 2, Part A at 4.2 (D00040 - 43).

### 2.     On November 4, 1997, CIGNA Amended The Plan To Freeze Accruals In Part A For Certain Plan Participants As Of December 31, 1997.

29.     In November 1997, CIGNA's Chief Executive Officer ("CEO"), Wilson Taylor, signed an amendment to the CIGNA Pension Plan freezing benefit accruals for all Tier 2 participants (also known as "new formula participants") and all Tier 1 participants with a combined age and years of credited service less than 45.  Depenbrock v. CIGNA Corp., 278 F. Supp. 2d 461, 469 (E.D. Pa. 2003), reversed on other grounds, 389 F.3d 78 (3d Cir. 2004)

("Taylor's execution of Amendment Number 4 . . . froze the pension benefit accruals of the participants that would be converted to cash balance plan effective December 31, 1997").

30.     The amendment provided in part:

> Notwithstanding any other provision of the Plan, no Employee who, as of December 31, 1997, is a New Formula Participant or has a combined total Years of Credited Service and age less than forty-five (45) shall accrue any additional benefits under the Plan after December 31, 1997.

> The foregoing cessation and/or suspension in benefit accruals and exclusion from eligibility to participate in the Plan after December 31, 1997, shall remain in effect until the adoption of a subsequent amendment to the Plan, and such subsequent amendment may provide for benefit accruals under terms and conditions different from the Plan provision in effect before 1998. No such subsequent amendment shall result in the accrued benefits of any Participant being less than such Participant's accrued benefit under the plan as of December 31, 1997.

Ex. 2, Amendment No. 4 (D00132 - 133).

31.     Thus, according to the express words of Amendment No. 4, until a "subsequent amendment" was adopted, the affected participants had their benefits frozen (i.e, accruals reduced to zero), and they would accrue no new pension benefits after December 31, 1997. Ex. 2, Amendment No. 4 (D00132).

32.     The only Plan amendment causing a reduction in benefits was this freezing of benefit accruals under Part A for certain participants, effective December 31, 1997.  Ex. 2, Amendment No. 4 (D00132).

33.     Those older, longer service employees whose age plus service totaled at least 45 and who were not "new formula participants" were grandfathered, and continued to accrue benefits under Part A.  Ex. 2, Amendment No. 4 (D00132).

34.     Indeed, Plaintiff's expert Mr. Poulin admitted that if there is a plan amendment which freezes all future benefit accruals, the rate of benefit accrual for affected participants

would be zero, and that the subsequent adoption of a new plan would be an increase from the prior rate of benefit accrual.  Poulin Tr. 387-88.

35.     Mr. Poulin further admitted that if "CIGNA had ceased all future benefit accruals effective December 31, 1997, and then in 2005 had adopted its cash balance plan retroactive to January 1st of 1998, that [adoption of the cash balance plan] would have been an increase in benefit accruals."  Poulin Tr. 388.

### 3.     On December 21, 1998, The Amendment Creating Part B Was Signed, Retroactive To January 1, 1998.

36.     On December 21, 1998, the CEO signed the Plan document for the cash balance plan, Part B, as well as an updated Part A Plan document, Ex. 2, Part A at D10336 - 443); Ex. 1, Part B at D10444 - 10530; Depenbrock, 389 F.3d 78 (holding that "December 21, 1998, is the effective date of the amendment" implementing the cash balance plan).

37.     Although the Plan document was not signed until December 1998, it was retroactive to January 1, 1998.  Depenbrock, 389 F.3d at 83.  Thus, Part B participants received pension and interest credits in 1998 for the entire year.  See, e.g., Ex. 519, Pension Plan Statement for the Period Ending June 30, 1998 (reflecting benefit and interest credits earned from January 1, 1998 to June 30, 1998).

38.     The adoption of Part B resulted in an increase in benefit accruals for non-grandfathered participants who moved to the cash balance plan because the previously adopted Amendment No. 4 had frozen all of their benefit accruals.  That is, non-grandfathered participants went from having no benefit accruals (under Amendment No. 4) to accruing benefits under Part B.  Ex. 11 at 1-5

39.     The non-grandfathered participants who were employed as of December 31, 1997 became participants in Part B, and their Part A accrued benefits were converted to an

opening account balance in Part B at that time. Ex. 1, Part B at Section 1.28 (D00278-79).

40.    Additionally, any employees hired for the first time after January 1, 1998 automatically became participants in Part B upon their hire. Ex. 1, Part B at Section 2.1 (D00285). These individuals are not part of the class in this case, which only includes Part B participants who previously were participants in Part A.

41.    Plan participants who were no longer employed by CIGNA on December 31, 1997, did not become participants in Part B unless and until they were rehired. Accordingly, these individuals are not part of the class in this case because they never were participants in Part B. Ex. 1, Part B at 2.4(a) (D00285).

42.    Part B provides that grandfathered participants in Part A who left CIGNA and then were rehired by CIGNA after the adoption of the Part B would become participants in Part B upon their rehire. Ex. 1, Part B at Section 2.4 (00285).

43.    Originally, the Plan Administrator placed rehires who rejoined CIGNA between January 1, 1998 and December 21, 1998 (when Part B was signed) into Part B. Depenbrock, 389 F.3d at 80. However, in a lawsuit filed by a rehire, John Depenbrock, the United States Court of Appeals for the Third Circuit determined that those rehires should have remained in Part A because the amendment creating Part B and establishing its rule applicable to rehires was not valid until signed by the CEO on December 21, 1998. Depenbrock, 389 F.3d at 82-83.

44.    As a result of the Depenbrock decision, the Plan Administrator decided to notify other grandfathered Part A participants who were rehired between January 1, 1998 and December 21, 1998 that their benefits would be recalculated under Part A. Ex. 539, Letters from Plan Administrator Regarding Depenbrock dated February 4, 2005. There are

approximately 194 employees who fall into this group.  Ex. 176, <u>Depenbrock</u> Letters at SuppD0484.

## B.    The Terms Of Part B

### 1.    Benefit And Interest Credits

45.    Under the Plan, participants receive a "hypothetical" individual cash balance account that grows with the addition of benefit and interest credits.  Ex. 1, Part B at Article IV.

46.    Under Part B, participants earn benefit credits (referred to as "benefit credits") based on a percentage of their "Eligible Earnings" each year, plus interest on their account balance.  Ex. 1, Part B at Article VI (D00291 - 93).

47.    The benefit credit rate is age- and service-favored – i.e., Part B provides a higher credit rate to older or longer service employees than similarly situated younger or shorter service employees.[2]  The following table shows the Plan's benefit credit rates:

**Table A:  Benefit Credit Rates Under Part B of CIGNA Pension Plan**

| Age Plus Service | Rate Applied to Pay Up to Integration Level | Rate Applied to Pay Over Integration Level |
|---|---|---|
| Under 35 | 3% | 4.5% |
| 35 – 44 | 4% | 5.5% |
| 45 – 54 | 5% | 6.5% |
| 55 – 64 | 6% | 7.5% |
| 65 or over | 7% | 8.5% |

Ex. 1, Part B at 4.1(a); Sher Tr. 973; Ex. 10, Sher Report at 6.

48.    For example, an employee who is age 40 with 10 years of service in 2003 (i.e, age plus service is 50) and earns $60,000 receives a benefit credit in 2003 of $3,247.50 (5% of

---

[2]    The benefit credit rate also is integrated with Social Security to some extent – i.e., provides a higher credit rate on pay over the "Social Security integration level."  Part B provides that the integration level is one-half of the Social Security taxable wage limit in each year (e.g., $34,200 in 1998 and $43,500 in 2003).  Ex. 503**,** Amendment 1.2 to Part B (D00323).

$43,500 plus 6.5% of $16,500).  Had the same employee been age 60 rather than 40, the

benefit credit would be $1,200 higher, or $4,447.50 (7% of $43,500 plus 8.5% of $16,500).

For any two participants who have the same service and pay history, the older one will receive

a benefit credit in a given year that is either the same or higher than the younger employee.

Similarly, as an employee continues in service, his or her benefit credit rates will either remain

the same or increase from one year to the next.  Ex. 10, Sher Report at 6-7.

49.     Participants also receive interest credits quarterly on their account balances at a

floating rate that is subject to change at the beginning of each calendar year.  The annualized

Plan rate is the rate on five-year U.S. Treasury securities (constant maturity) in the preceding

November plus 0.25% (subject to a minimum of 4.5% and a maximum of 9.0%).  Ex. 1, Part B

at Section 4.2(b) (D00293).

50.     Interest credits continue to be added to a participant's account until the account

is paid out as a lump sum or until annuity payments start.  Ex. 1, Part B at Section 4.2

(D00292 - 293).

51.     The interest credit rate under Part B is the same for all participants, regardless

of age.  Although that rate can fluctuate from year to year (based on the yield on five year

Treasury securities plus .25%), all participants in any given year will earn interest at the same

rate. Ex. 1, Part B, Section 4.2; Sher Tr. 977; Ex. 10, Sher Report at 7, 9.

52.     Notably, Plaintiff's expert, Claude Poulin has admitted that this rate

approximates "the kind of investment return retiring plan participants would experience in the

marketplace if they chose to invest in 'relatively risk-free investments.'"  McCarthy v. Dun &

Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quoting Claude Poulin when testifying

about the 30-year Treasury rate, which usually is slightly higher than the 5-year Treasury rate).

Poulin Tr. 309.

      53.     The actual historical interest credit rates under Part B of the Plan are as follows:

**Table B:  Interest Credit Rates**

**Under Part B of CIGNA Pension Plan**

| Year | Plan Interest Credit Rates |
|------|:--------------------------:|
| 1998 | 6.05% |
| 1999 | 4.79% |
| 2000 | 6.22% |
| 2001 | 5.95% |
| 2002 | 4.50% |
| 2003 | 4.50% |
| 2004 | 4.50% |
| 2005 | 4.50% |
| 2006 | 4.70% |

Poulin Tr. 276, 349; Ex. 10, Sher Report at 7; Ex. 587, 2004 Annual Account Statement

(P 1273); Ex. 588, 2005 Annual Account Statement (P 2400).

      54.     In any given year, the older employee's benefit will equal or exceed the benefit

payable to a similarly situated (i.e., same salary history and years of service) younger

employee.  Poulin Tr. 309-10; Sher Tr 974-75.

      55.     Moreover, CIGNA's pay and interest credit rates were both well within the

mainstream rates provided by other cash balance plans.  Sher Tr. 983, 989, 1001; Ex. 17, 2004

Mellon Survey of Cash Balance Plans, at 12-14.

2.      **Opening Account Balances, Protected Minimum Benefits, And Retirement**

56.      Former Part A participants who began coverage under Part B under the terms of the Plan received opening balances based on the present value of their accrued benefits under the applicable Part A benefit formula as of December 31, 1997.  Ex. 1, Part B at Section 1.28 (D00278 - 279).

57.      New hires after December 31, 1997 were placed into Part B with an opening account balance of zero because they had no previously earned benefit.  Employees rehired between December 21, 1998 and December 31, 2000 became participants in Part B and had their Part A benefits converted into an opening account balance.  Employees rehired after December 31, 2000 became entitled to two different benefits based on two different formulas: one based on the benefits earned under Part A before they left CIGNA and a separate benefit based on their service in Part B once they were rehired.  Poulin Tr. 307-310; Ex. 504, Amendment No. 2 to Part B.

58.      For purposes of calculating the present value of each participant's accrued benefit under Part A, different present value factors (and the benefits to which they apply) were used depending upon individual circumstances.  Poulin Tr. 307-310; Ex. 1, Part B at Section 1.28 (D00278 - 79).

59.      The most favorable treatment was provided to participants who were eligible for Part B on January 1, 1998 and whose age plus service totaled 55 or more on such date.  For such a participant, the opening balance was equal to the present value of the participant's subsidized age 62 early retirement benefit, using an interest rate equal to the five-year Treasury rate in effect in November 1997, minus 0.75% — i.e., 5.05%.  Mortality was assumed at all ages based on the 1983 (unisex) Group Annuity Mortality Table ("1983 GAM

Table"). Ex. 1, Part B at 1.28 (D00278 - 79); Poulin Tr. 309-10; Sher Tr. 982-83; Ex. 10, Sher Report at 8.

60.    Because the normal retirement benefit under Part A generally was only payable if the participant lived until commencing benefits, the opening account balances were adjusted to reflect that the normal retirement benefit under Part B would be payable regardless of whether the participant lived until retirement.  In other words, participants' annuity benefits were subject to a mortality adjustment to account for the life-insurance value of the benefit included under Part B that did not exist under Part A.  Plaintiff's expert, Claude Poulin, admitted that this mortality adjustment was appropriate.  Poulin Tr. 482-84.

61.    For all other Part B participants, the opening balances were determined based on the accrued Part A normal retirement benefit (payable at age 65), using an interest rate equal to the five-year Treasury rate in effect in November 1997, plus 0.25% — i.e., 6.05%. For participants joining Part B after January 1, 1998, i.e., rehires, open account balances were based on the 30-year Treasury bond rate in effect at the time.  Again, mortality was assumed at all ages based on the 1983 GAM Table.  Ex. 1, Part B at 1.28 (D00278 - 79); Poulin Tr. 309; Sher Tr. 981-82, 992-993; Ex. 10, Sher Report at 8.

62.    Thus, for these older employees, the benefit was converted into an opening account balance using a lower (and hence more favorable) interest rate.  Poulin Tr. 309-10; Sher Tr. 982; Ex. 10, Sher Report at 8.  In other words, the calculations used to set opening account balances favored older employees.  Certain older employees, i.e., those with more than 55 age and service points (including testifying class members Hogan and Curley), had their opening account balances based on a more favorable age-62 subsidized benefit and using

a more favorable (lower) interest rate.  Poulin Tr. 220-21; 309-10; Sher Tr. 982-83; Pls. Ex. 10, Sher Report at 8.

63.     In addition, Mr. Poulin admitted that an older employee's opening account balance will always be higher than the account balance of a similarly-situated younger employee (with the same years of service and earnings history before 1998), even in the absence of the age-favored open account balance provision in Part B.  Poulin Tr. 309-10.

64.     The setting of these opening account balances was within the mainstream of practice in cash balance conversions.  In fact, the most common approach is not to include any early retirement subsidies in opening balances.  This is because an early retirement subsidized benefit is lost if not taken at early retirement.  If the early retirement subsidized benefit is included in the opening account balance, the employee who retires at normal retirement age will have an increased account balance based on a subsidized benefit that he or she did not actually elect to receive.  Sher Tr. 982-83, 991-993.

65.     Under Part B, any participant (including any of the Plaintiffs) is entitled at retirement to receive a benefit at least as valuable as his or her account balance, including all benefit and interest credits.  Ex. 1, Part B at Section 7.1 (D00305 - 07); Ex. 1, Part B at Section 1.1 (D00270).

66.     At retirement, or upon termination of employment, a participant can elect to receive benefits in the form of a lump sum.  Alternatively, a participant can elect to receive benefits in one of several other forms available, including a single life annuity (stream of monthly payments payable for life) or a joint and survivor annuity (stream of monthly payments for life, with additional payments payable to a spouse for the life of the spouse).  Ex. 1, Part B at Section 7.2 (D00307 - 09).

67.     If the amount of the account is less than a certain minimum benefit earned by the participant before January 1, 1998 set forth in Part B (the "Minimum Benefit"), the participant receives the equivalent of the account balance (including all benefit and interest credits) <u>plus</u> additional pension benefits sufficient to raise the participant's overall retirement benefit up to the minimum.  Ex. 1, Part B at Sections 1.1(c) (D00270), 1.32 (D00280), 7.3(b) (D00309).

68.     In other words, a participant is entitled to the <u>greater of</u> a retirement benefit based on his account balance or the Minimum Benefit set forth in Part B.  Ex. 1, Part B at Sections 1.1(c) (D00270), 1.32 (D00280), 7.3(b) (D00309).

69.     Specifically, Section 1.1(c) of the Plan provides that:

> <u>Minimum Benefit.</u>  In the case of a Participant who has a Part A Accrued Benefit which is converted into an Initial Retirement Account, such Participant's Accrued Benefit, expressed in the form of an immediate lump sum distribution, shall in no event be less than the present Equivalent Actuarial Value (determined using the Applicable Interest Rate and the Applicable Mortality Table) of the Participant's Minimum Benefit.

Ex. 1, Part B at Section 1.1(c) (D10451).

70.     The Minimum Benefit is defined as a participant's age-65 annuity benefit under Part A, enhanced by the value of the "Preserved Spouse's Benefit," if applicable.  Ex. 1, Part B at Section 1.32 (D00280).

71.     Normal retirement age under the Plan is defined generally as age 65.  Ex. 1, Part B at Section 1.34 (D00281).

72.     In addition, Section 7.3 of the Plan protects other benefits, in other benefit forms (e.g., early retirement subsidized benefits), to which an employee was entitled under the prior formula.  Ex. 1, Part B at Section 1.34 (D00281); Ex. 1, Part B at Section 7.3(c) (D00309).

73.     The most common reason that a participant might be entitled to more than the value of his or her account balance is if the participant was entitled to a subsidized early retirement benefit under the prior Plan, which would be preserved under Section 7.3 of Part B, but was not included (for most employees) as part of the employee's opening account balance. Under these circumstances, the participant is entitled to his or her protected higher subsidized early retirement benefit.  Sher Tr. 988-89, 992-95, 1010, 1028-29, 1087; Poulin Tr. 226-27.

74.     Because the initial account balance was calculated by converting each participant's annuity benefit into a lump sum using a particular interest rate, a subsequent decrease in interest rates also could cause an employee's Minimum Benefit to exceed the value of the employee's account balance.  Under these circumstances, the participant is entitled to his or her protected Minimum Benefit.  Poulin Tr. 214-15; Sher Tr. 1009-1016, 1024-25, 1026.

75.     For many participants, the minimum benefit is irrelevant because the participant's account balance exceeds the minimum benefit value at the time of benefit commencement.  Sher Tr. 988-89, 992-95, 1010, 1028-29, 1087.

### 3.     CIGNA Part B Plan Administration

76.     Both the Part A and Part B Plan documents provided that the Plan Administrator shall be "the person, entity, or committee responsible for the administration of the Plan as specified in Article XIII."  Ex. 1, Part B at Section 1.46 (D00282); Ex. 2, Part A at Section 15.1 (D00098).

77.     Both the Part A and Part B Plan documents provided that a Plan Administrator would be designated by "The Committee," which was defined as "the CIGNA Corporation Corporate Benefit Plan Committee, or a successor entity or group of persons, that is the

Named Fiduciary for the Plan as described in Article XII."  Ex. 1, Part B at Section 1.17

(D00272); Ex. 2, Part A at Section 1.18 (D00010).

78.    Both the Part A and Part B Plan documents provided that the "Committee shall

delegate to a Plan Administrator the duties, authority and functions set forth in this Article

XIII." Ex. 1, Part B at Section 13.1 (D00329); Ex. 2, Part A at Section 15.1 (D00098).

79.    Thus, the Plan document vested authority in the Benefits Committee to appoint

a Plan Administrator.  Ex. 1, Part B at 13.1 (D00329); Ex. 2, Part A at 15.1 (D00098).

80.    In accordance with these Plan provisions, the Committee formally designated

Stewart M. Beltz, Assistant Vice President Benefits, as the Plan Administrator for the

traditional defined benefit plan on March 29, 1996.  Ex. 507, Plan Administrator

Appointments at SuppD1098.

81.    The Committee designated Mr. Beltz's replacement as Plan Administrator,

Gerald T. Meyn, Vice President, on May 14, 2003.  Ex. 507, Plan Administrator

Appointments at SuppD1099.

82.    Effective August 20, 2004, the Committee replaced Mr. Meyn with John Arko

as Plan Administrator.   Ex. 507, Plan Administrator Appointments at SuppD1092.

83.    The 1998 Part B summary plan description ("SPD") and 1999 Part B SPD

explicitly list the Plan Sponsor and the Plan Administrator for Part B:

> Plan Sponsor          CIGNA Corporation
>                 . . .
> Plan Administrator    Stewart M. Beltz
>                       CIGNA Corporation
>                       1601 Market Street
>                       Philadelphia, PA 19192

Ex. 505, 1998 Part B SPD at 17 (D00842); Ex. 506, 1999 Part B SPD at J-10 (D00652).

84.     CIGNA is the Plan Sponsor for the CIGNA Pension Plan.  Ex. 1, Part B at Section 14.1 (D00333).

85.     CIGNA is not the Plan Administrator for the CIGNA Pension Plan.  Ex. 1, Part B at Section 13.1 (D00329 - D00330).

86.     John Arko is the current Plan Administrator for the CIGNA Pension Plan.   Ex. 1, Part B at Section 13.1 (D00329 - D00330).

87.     The Plan Administrator has the power to "interpret and construe the provisions of the Plan" and to "determine all questions relating to a Participant's participation and benefits under the Plan."  Ex. 1, Part B at Sections 13.2(a), 13.2(d) (D00329); Ex. 2, Part A at 15.2(a), 15.2(d) (D00098).

88.     The Plan contains a detailed claims and appeals procedure for employees who have questions or concerns about their benefits.  Ex. 1, Part B at Article XIII.  As detailed in the Plan, the Claims Procedure states:

13.5 Claims Procedure

(a)     Filing A Claim For Benefits.  A Participant or Beneficiary shall notify the Plan Administrator or its delegate of a claim for benefits under the Plan.  Such request may be in any form adequate to give reasonable notice to the Plan Administrator or its delegate and shall set forth the basis of such claim and shall authorize the Plan Administrator or its delegate to conduct such examinations as may be necessary to determine the validity of the claim and to take such steps as may be necessary to facilitate the payment of any benefits to which the Participant or Beneficiary may be entitled under the Plan.  The Plan Administrator shall make all determinations as to the right of any person to a benefit under the Plan.

(b)     Denial Of Claim.  If the Plan Administrator denies in whole or in part any claim for benefits under the Plan by any Participant or Beneficiary, the Plan Administrator shall furnish the claimant with written notice of the decision not later than ninety (90) days after receipt of the claim, unless special circumstances require an

extension of time for processing the claim.  If such an extension of time for processing is required, written notice of the extension shall be furnished to the claimant before the end of the initial ninety- (90-) day period.  In no event shall such extension exceed the period of ninety (90) days from the end of the initial period.  The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan Administrator expects to render the final decision.

The written notice of the denial of a claim shall set forth in a manner calculated to be understood by the claimant:

(1)     The specific reason or reasons for the denial;

(2)     Specific reference to the pertinent Plan provisions on which the denial is based;

(3)     A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4)     Appropriate information as to the steps to be taken if the claimant wishes to submit his claim for review.

(c)     Appeals Procedure.  A claimant or his authorized representative may request a review of the denied claim by the Plan Administrator.  Such request shall be made in writing and shall be presented to the Plan Administrator not more than sixty (60) days after receipt by the claimant of written notice of the denial of the claim.  The claimant shall have the right to review the pertinent documents and to submit issues and comments in writing.  The Plan Administrator shall make its decision on review not later than sixty (60) days after receipt of the claimant's request for review, unless special circumstances require an extension of time, in which case a decision shall be rendered as soon as possible, but not later than 120 days after receipt of the request for review.  The decision on review shall be in writing and shall include the specific reasons for the decision, written in a manner calculated to be understood by the claimant, and specific references to pertinent Plan provisions on which the decision is based.

The Plan claims procedure shall be administered in accordance with the applicable regulations of the Department of Labor.

Ex. 1, Part B at Section 13.5 (D00330 - 331)

89.     The Plan also accounts for the fact that occasionally errors may occur by specifically providing that the Plan Administrator will correct any mistakes:

> 13.6 Clerical Error
>
> > If any fact pertaining to eligibility for an amount of benefits payable under the Plan to a Participant or other payee has been misstated, or in the event of clerical error, the benefits will be adjusted by the Plan Administrator or its delegate on the basis of the correct facts in a manner precluding individual selection.

Ex. 1, Part B at Section 13.6 (D00331 - 332).

90.     Prudential Retirement ("Prudential") is the record keeper for the CIGNA Pension Plan, since the Stock Purchase and Asset Transfer of CRIS of CIGNA to Prudential in November 2003.  Morris Tr. 753-54, 836.

## III.     PART B TREATS OLDER EMPLOYEES AT LEAST AS WELL AS IT TREATS YOUNGER EMPLOYEES (COUNT 3)

### A.     Defendants' Expert's Analysis Of Age Discrimination Is Grounded In Sound Actuarial Science.

91.     Defendants' expert, Lawrence Sher, has proposed a methodology for determining the rate of an employee's benefit accruals with respect to cash balance benefits under Part B of the CIGNA Pension Plan.  The Court finds that Mr. Sher's methodology and conclusions are sound and grounded in well-accepted principles of actuarial science.

#### 1.     Mr. Sher's Credentials

92.     Lawrence Sher is a Principal and the Director of Retirement Policy at Buck Consultants, Inc., an actuarial and employee benefits consulting firm owned by Affiliated Computer Services.   He is a Fellow of the Society of Actuaries and has practiced as an

actuary since 1973.  He practices primarily in the area of pension benefits.  Sher Tr. 944-50;

Ex. 10, Sher Report at 1, Appendix A.

93.     Mr. Sher has extensive experience designing and consulting with respect to

defined benefit pension plans, including cash balance plans.  In the past sixteen years, he has

devoted a significant portion of his time to issues relating to cash balance plans, including

providing technical assistance and advice to his firm's consultants and clients and to

government officials, initiating and supervising research activities, speaking at professional

conferences, publishing articles, and responding to questions from the media.  Sher Tr. 948-

50; Ex. 10, Sher Report at 1- 2, Appendix A.

94.     Pursuant to Fed. R. Evid. 702, the Court finds that Mr. Sher is qualified as an

expert by his knowledge, skill, experience, training and education on the design of cash

balance and traditional defined benefit plans generally, and the operation of Parts A and B of

the CIGNA Pension Plan specifically.  The Court further finds that Mr. Sher's testimony is

based on sufficient facts and data drawn from the record, and is the product of reliable

actuarial principles and methods, and that Mr. Sher has applied these principles and methods

reliably to the facts of this case.

## 2.     Mr. Sher's Methodology And Conclusions

95.     Mr. Sher described several ways that one could measure whether Part B is age

discriminatory.  Using each methodology, Mr. Sher concluded that Part B is not age

discriminatory.  Sher Tr. 1133-53; Pls. Ex. 10, Sher Report at 8-20.

96.     The Part B benefit credits for any older employee are at least as great as for any

younger employee with the same years of service and pay.  Ex. 1, Part B, at Section 4.1

(D00291); Pls. Ex. 10, Sher Report at 8-9.

97.     In addition, all Part B participants, regardless of age, receive interest credits at an interest rate equal to the rate on five-year Treasury securities for the year plus 0.25% (subject to the 4.5% minimum and 9% maximum rates).  Ex. 1, Part B, at Section 4.2 (D00292 - 293); Ex. 10, Sher Report at 7, 9.

98.     Section 204(b)(1)(H)(i) of ERISA uses the undefined phrase "the rate of an employee's benefit accrual."  This phrase is <u>not</u> a term of art that has a specific meaning in the actuarial profession.  Actuaries calculate benefit accrual rates in a variety of contexts.  Sometimes actuaries project benefits and then attribute those benefits to particular years of service or periods of time, in which case the actuary has calculated a benefit accrual "rate."  In this general sense, actuaries commonly calculate benefit accrual rates.  However, there is no universal method that actuaries invariably or ordinarily use for these purposes.  Benefit accrual rates can be determined in a variety of ways, and the method that should be used in any given instance depends on the purpose of the calculation and the guidance, if any, given in the applicable rules and regulations.  Sher Tr. 1129-53; Ex. 10, Sher Report at 9.

99.     Indeed, even Mr. Poulin calculated different rates of benefit accrual <u>for the same plan</u> depending on the purpose of his calculations and what he was trying to analyze.  Poulin Tr. 395-97.  Specifically, Mr. Poulin calculated different rates of benefit accrual for the same career average plan when he compared the career average plan to a three-year final average pay formula and to a five-year final average pay formula.  Poulin Tr. 395-97; Ex. 4, Poulin Supp. Report, at Exhibits 1, 2.

100.     In some instances, ERISA and the Internal Revenue Code spell out precisely how benefit accrual rates should be determined.  For example, ERISA and the Code provide significant details as to how benefit accrual rates must be determined in testing a defined

benefit plan under the anti-backloading rules in ERISA sections 204(b)(1)(A), (B) and (C) and the parallel provisions of the Code.  In this instance, IRS regulations provide even more details as to how to comply with those provisions.  Under these circumstances, actuaries follow the requirements of the statute and regulations.  Sher Tr. 1210-13, 1411; Ex. 10, Sher Report at 9-10.

101.    Other provisions in ERISA and the Code allow a choice among various methods of calculating benefit accrual rates.  For instance, section 1.401(a)(4)-3 of the nondiscrimination regulations introduces the term "accrual rate" and proceeds to define two types of rates, the "normal accrual rate" and the "most valuable accrual rate," and then provides three general approaches for calculating either of those rates.  These regulations permit additional variations in how the rates can be calculated, for example, by allowing social security benefits to be "imputed" into the rates and by allowing the rates to be stated as dollar amounts or as a percentage of pay, where pay may be determined in alternative ways.  Ex. 10, Sher Report at 10.

102.    Still other provisions, such as ERISA section 204(b)(1)(H)(i), provide no specificity at all about how the employee's benefit accrual rate is to be determined.  In these instances, an actuary called upon to calculate a rate of benefit accrual should choose a method that is consistent with sound actuarial and economic principles and with the purpose for which the determination is being made.  Of course, the actuary should reflect applicable regulations or other binding authority.  Sher Tr. 1133-44; Ex. 10, Sher Report at 10.

103.    A preliminary question is whether it is even necessary to engage in actuarial calculations of the rate of benefit accrual under the Part B cash balance formula.  Section 204(b)(1)(H)(i) asks whether the "rate of an employee's benefit accrual" is frozen or reduced

"because of the attainment of any age." If it is clear from the terms of a benefit formula that benefits continue to accrue in the same manner before and after the attainment of any given age or in a manner that becomes more favorable as age progresses, then there is no reason why mathematical calculations would be required. Sher Tr. 1133-34; Ex. 10, Sher Report at 10-11.

104.    Under the CIGNA Part B cash balance formula, as age progresses, benefit credit rates continue to apply at the same or at a higher level. And, interest is credited to all participants at a rate indexed to five-year Treasury securities (subject to the minimum and maximum fixed rates). Neither interest credits nor benefit credits are reduced or frozen because of the attainment of any age. Thus, actuarial calculations are not required in order to see that the cash balance formula does not reduce the rate of an employee's benefit accrual because of age. Sher Tr. 1139-44; Ex. 10, Sher Report at 11.

105.    To the extent that actuarial calculations are required, an appropriate means of determining the rate of benefit accrual under the Part B cash balance formula is to measure the rate of growth in an employee's account balance. Table C-1 illustrates this approach for an employee hired at age 30 with a starting salary of $60,000 per year and 4.5% annual pay increases. The interest-crediting rate is also assumed to be 4.5% in all years. Sher Tr. 1134-44; Ex. 10, Sher Report at 11.

**Table C-1:  Rate of Increase in Account Balance[3]**
(4.5% Annual Pay Increases; 4.5% Annual Interest Credit Rate)

| | | | | | | Rate of Employee's Benefit Accrual Based on Incr. in Acct. Balance | | | |
| | | | | | | Not Time Value Adj. Including Interest | | IRS Prop. Approach Excluding Interest | |
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| Age | Service | Pay | Benefit Credits | Interest Credits | End of Yr. Acct. Bal. | As Dollar Amount | As a % of Pay | As Dollar Amount | As a % of Pay |
|---|---|---|---|---|---|---|---|---|---|
| 31 | 1 | 60,000 | 2,048 | – | 2,048 | 2,048 | 3.41% | 2,048 | 3.41% |
| 32 | 2 | 62,700 | 2,140 | 92 | 4,280 | 2,232 | 3.56% | 2,140 | 3.41% |
| 33 | 3 | 65,522 | 2,891 | 193 | 7,364 | 3,084 | 4.71% | 2,891 | 4.41% |
| 34 | 4 | 68,470 | 3,021 | 331 | 10,716 | 3,352 | 4.90% | 3,021 | 4.41% |
| 35 | 5 | 71,551 | 3,157 | 482 | 14,355 | 3,639 | 5.09% | 3,157 | 4.41% |
| | | | | | | | | | |
| 40 | 10 | 89,166 | 4,826 | 1,525 | 40,236 | 6,351 | 7.12% | 4,826 | 5.41% |
| 45 | 15 | 111,117 | 7,125 | 3,291 | 83,545 | 10,416 | 9.37% | 7,125 | 6.41% |
| 50 | 20 | 138,471 | 10,264 | 6,132 | 152,663 | 16,396 | 11.84% | 10,264 | 7.41% |
| 55 | 25 | 172,561 | 12,791 | 10,396 | 254,201 | 23,187 | 13.44% | 12,791 | 7.41% |
| 60 | 30 | 215,042 | 15,940 | 16,387 | 396,482 | 32,327 | 15.03% | 15,940 | 7.41% |
| 65 | 35 | 267,981 | 19,864 | 24,698 | 593,409 | 44,562 | 16.63% | 19,864 | 7.41% |

Sher Tr. 1134-44; Ex. 10, Sher Report at 12.

106.    The resulting rates are determined in dollar amounts (columns 6 and 8) and as a

percentage of pay (columns 7 and 9).  Columns 6 and 7 take the total increase in account

balance during each year.  Looking at these results, it is not surprising that annual changes in

account balances increase more and more quickly over time as interest credits begin to

accumulate on growing account balances.  If one considers the time value of money, however,

the rates of increase would track the benefit credit amounts (Column 8) and the benefit credit

rates (Column 9) because the time value of money would offset the interest credits paid under

the formula.  In fact, the IRS proposed regulations mentioned earlier do precisely that.

Column 8 presents the time value adjusted rates determined in accordance with the IRS

---

3    For simplicity of illustration, Table C-1 adds interest credits at the end of the year.  Ex. 10
     at 12.

proposed regulations using dollar amounts and Column 9 does so as percentages of pay. Again, the rates either remain level or increase in each passing year.  Sher Tr. 1134-44; Ex. 10, Sher Report at 12-13.

107.    The following Table C-2 repeats the calculations in Table C-1 except that, rather than assuming 4.5% annual pay increases, no annual pay increases are assumed (i.e., the employee's pay is assumed to remain at $60,000 in all years).  Sher Tr. 1144-; Ps' Ex. 10, Sher Report at 13.

108.    **Table C-2:  Rate of Increase in Account Balance[4]**

(No Annual Pay Increases; 4.5% Annual Interest Credit Rate)

| | | | | | | Rate of Employee's Benefit Accrual Based on Incr. in Acct. Balance | | | |
| | | | | | | Not Time Value Adj. Including Interest | | IRS Prop. Approach Excluding Interest | |
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| Age | Service | Pay | Benefit Credits | Interest Credits | End of Yr. Acct. Bal. | As Dollar Amount | As a % of Pay | As Dollar Amount | As a % of Pay |
|---|---|---|---|---|---|---|---|---|---|
| 31 | 1 | 60,000 | 2,048 | – | 2,048 | 2,048 | 3.41% | 2,048 | 3.41% |
| 32 | 2 | 60,000 | 2,048 | 92 | 4,188 | 2,140 | 3.57% | 2,048 | 3.41% |
| 33 | 3 | 60,000 | 2,648 | 188 | 7,025 | 2,836 | 4.73% | 2,648 | 4.41% |
| 34 | 4 | 60,000 | 2,648 | 316 | 9,989 | 2,964 | 4.95% | 2,648 | 4.41% |
| 35 | 5 | 60,000 | 2,648 | 449 | 13,086 | 3,097 | 5.16% | 2,648 | 4.41% |
| | | | | | | | | | |
| 40 | 10 | 60,000 | 3,248 | 1,267 | 32,676 | 4,515 | 7.53% | 3,248 | 5.41% |
| 45 | 15 | 60,000 | 3,848 | 2,434 | 60,372 | 6,282 | 10.47% | 3,848 | 6.41% |
| 50 | 20 | 60,000 | 4,448 | 4,036 | 98,168 | 8,484 | 14.14% | 4,448 | 7.41% |
| 55 | 25 | 60,000 | 4,448 | 6,124 | 146,669 | 10,572 | 17.62% | 4,448 | 7.41% |
| 60 | 30 | 60,000 | 4,448 | 8,727 | 207,110 | 13,175 | 21.96% | 4,448 | 7.41% |
| 65 | 35 | 60,000 | 4,448 | 11,971 | 282,430 | 16,419 | 27.36% | 4,448 | 7.41% |

Sher Tr. 1144-45; Ex. 10, Sher Report, p.13.

---

4    For simplicity of illustration, Table C-2 adds interest credits at the end of the year.  Ex. 10 at 13.

109.    Using the growth in an employee's account balance to measure an employee's rate of benefit accrual (whether time value adjusted or not) is consistent with the fact that the basic promise in the cash balance formula is the employee's account balance.  Part B generally provides (Section 1.1) that on any date of determination the "Accrued Benefit, expressed in the form of an immediate lump sum distribution" is equal to the participant's cash balance account.  Ex. 1, Part B, at Section 1.19(a) (D00270); Ex. 10, Sher Report at 13-14.

110.    Consistent with Section 1.1, every form of benefit that an employee may elect to receive with respect to the cash balance benefit is derived from the employee's account balance.  Ex. 10, Sher Report at 14.

### B.    Plaintiffs' Expert's Analysis Of Age Discrimination Is Fatally Flawed.

111.    Plaintiffs' expert, Claude Poulin, has proposed a methodology for determining the rate of an employee's benefit accrual with respect to cash balance benefits under Part B of the CIGNA Pension Plan.  Mr. Poulin has admitted that he did not offer (and was not asked to offer) any opinions on the process for calculating lump sum benefits in a cash balance plan known as "whipsaw."  Poulin Tr. 356-57.  The Court finds that Mr. Poulin's methodology and conclusions are flawed and unreasonable as a matter of actuarial science.

112.    The Poulin methodology measures rates of benefit accrual by considering the size of the benefit that an employee would have if the employee (i) left the balance in his or her cash balance account to accumulate until age 65, and then (ii) converted the age 65 account balance into a life annuity.  Poulin Tr. 262; Sher Tr. 1146-51; Ex. 10, Sher Report at 15.  Thus, Plaintiffs' expert, Mr. Poulin, insisted at trial that there is only one mathematical formula that can be used to calculate a participant's accrued benefit and to test for age discrimination under ERISA Section 204(b)(1)(H).  He testified:

> Q.     Sir, am I correct that your formula [in paragraphs 13 and 14 of your report] is based on your opinion that the calculation of the rate of benefit accrual must be made with reference to the age 65 annuity?
> A.     Yes, it is.
>
> *   *   *
>
> Q.     Just so we are clear, your method doesn't address the rate of -- aside from what's in paragraphs 13 and 14, you don't address any other way of measuring the rate of benefit accrual in a cash balance plan, correct?
> A.     This is correct.

Poulin Tr. 347-48; Ex. 3 at 4-5.

113.     The second of these steps – conversion of the account balance into a life annuity – has no impact on the analysis.  Ex. 10, Sher Report at 15.

114.     On the other hand, the first step — measuring the size of the benefit that the employee would have <u>if he left his account balance untouched until age 65</u> – is critical.  By definition, a younger employee will have to wait longer than an older employee to turn age 65. The Poulin methodology, however, measures the rate of accrual of an employee's "age 65 benefit" without making any allowance for the fact that younger employees will have to wait longer than older employees before they will actually be able to receive the benefit being measured.  Thus, when Mr. Poulin compares rates of benefit accrual of employees of different ages, he inherently compares benefits payable at different times.  This approach ignores the time value of money and misstates the value of the benefit delivered by a plan over time. Poulin Tr. 260-66; Sher Tr. 1148-51; Ex. 10, Sher Report at 15.

115.     An example will illustrate the point.  Consider two employees who started work at CIGNA at the beginning of 1998, when the cash balance conversion occurred, at ages 45 (Employee Y) and 50 (Employee O).  Assume that both employees work at the same salary until the end of 2002 (assumed to be $30,000 in 1998 and growing 4.5% each year) and then

leave for other jobs.  During the 5-year period, both employees receive the same benefit

credits (based on 5% of pay since all of their pays will be under the social security integration

level), the same interest credits (based on the actual rates in effect those years) and the same

account balance.  Table D, which applies to both employees, shows the development of their

benefit credits, interest credits and account balances as of the end of each year.[5]

### Table D: Development of Cash Balance Accounts for Two Hypothetical Employees

| Year | Pay | Benefit credits | Interest Credits | Account at End of Yr. |
|------|-----|-----------------|------------------|------------------------|
| 1998 | 30,000 | 1,500 | 0 | 1,500 |
| 1999 | 31,350 | 1,568 | 72 | 3,140 |
| 2000 | 32,761 | 1,638 | 195 | 4,973 |
| 2001 | 34,235 | 1,712 | 296 | 6,981 |
| 2002 | 35,776 | 1,789 | 314 | 9,084 |
|      |        |       |     |       |
| 2012 | -- | -- | 5,023 | 14,107 |
| 2017 | -- | -- | 3,473 | 17,580 |

Both employees have the same account balance of $9,084 at the end of 2002; Employee Y is

then age 50 and Employee O is age 55.  Assume that the account balances, if left untouched,

will grow at a 4.5% interest-crediting rate as follows:

| Year | Account Balance (rounded) |
|------|---------------------------|
| 2002 (both depart) | $  9,100 |
| 2012 (Employee O turns 65) | $14,100 |
| 2017 (Employee Y turns 65) | $17,600 |

Both of these employees can elect to receive their benefits at the same time and, if they do so,

the older employee will always receive the same, or more, money than the younger employee.

---

[5]    For simplicity of illustration, Table D adds interest credits at the end of the year and
assumes flat pay credit rates.  In reality under Part B, the benefit credits of the older
employee, and hence the account balance of the older employee, would be higher than that
of the younger employee.   Sher Tr. 951-53.

Similarly, Employee O could take his money out of the plan in 2012 and earn the same market rate of interest that Employee Y earns in the Plan.  Sher Tr. 1148-49; Ex. 10, Sher Report at 15-16.

116.    The Poulin methodology would compare the $14,100 "age 65 benefit" that the older employee will have in 2012 with the $17,600 "age 65 benefit" that the younger employee will have in 2017.  Because $17,600 is larger than $14,100, the Poulin methodology implies that the younger employee had a higher rate of benefit accrual than the older employee from 1998 through 2002.  Poulin Tr. 260-66; Sher Tr. 1144-51; Ex. 10, Sher Report at 16.

117.    This approach compares economic apples and oranges.  The younger employee in the example will receive a larger age 65 benefit than the older employee, but will have to wait five years longer to receive it.  At any given point in time, the two employees will have the same account balances.  Only by waiting longer to receive his or her benefits can the younger employee receive more interest credits than the older employee, and hence, a superficially larger benefit.  Poulin Tr. 260-66; Sher Tr. 1144-51; Ex. 10, Sher Report at 17.

118.    The Poulin methodology distorts the value of the benefits delivered by a benefit formula unless it is adjusted to reflect the economic significance of <u>waiting</u> to receive payment of a benefit, i.e., unless it is corrected to reflect the time value of money.  The time value of money is an economic principle which holds that the longer one must wait to receive a payment, the less the payment is worth – a principle that Mr. Poulin ultimately acknowledged at trial:

> Q.    Now, you agree, Mr. Poulin, that it's a fundamental principle in the theory of interest that the value of an amount of money at any given point in time depends upon the time elapsed since the money was paid in the past or upon which the time will elapse in the future before it is paid?
> A.    I believe that this seems to be a standard definition.

Q.     Do you agree with it?
A.     Well, yes.

*   *   *

Q.     The follow-up question was:  And do you see that the next paragraph, the first sentence, "As a consequence of the above principle, it is obvious that two or more amounts of money payable at different points in time cannot be compared until all the amounts are accumulated or discounted to a common date?" Do you see that statement?
And your answer to that question was?
A.     Yes.

Poulin Tr. 352, 354; Ex. 10, Sher Report at 17.

119.     Actuaries routinely account for the time value of money by "discounting" a sum payable in the future to its "present value" using an appropriate "discount rate."  The interest-crediting rate paid by the CIGNA Part B cash balance formula is a reasonable measure of the rate of return that the market would pay for an investment similar to a CIGNA cash balance account, and is therefore an appropriate discount rate for purposes of discounting future benefits under the cash balance formula to present value.  Sher Tr. 1135-40, 1144-51; Ex. 10, Sher Report at 17.

120.     The interest-crediting rate and the time value of money offset each other during the period that employees wait to receive their benefits, leaving the plan benefit credit rates as the real rates of benefit accrual under the cash balance formula in economic terms.  The interest-crediting rate does not discriminate in favor of younger employees; it prevents the value of a benefit credit from being eroded by the passage of time.  Sher Tr. 1139-43; Ex. 10, Sher Report at 17-18.

121.     Mr. Poulin's approach also violates another actuarial principle — that assumptions regarding the future should be applied consistently throughout the same set of calculations.  In his Ex. D, Mr. Poulin assumes that there will be a positive interest-crediting

rate under the Plan in the future (4.5%), but that employees will not receive any future pay increases. Given historical relationships among general inflation, general wage and salary increases and market interest rates, assuming zero pay increases in this instance is actuarially unreasonable. Such an assumption also is inconsistent with Mr. Poulin's assumption of 4% salary increases elsewhere in his report (Exs. F-1, F-2 and F-3). Sher Tr. 1150-51; Ex. 10, Sher Report at 18.

122.     Even if one were to use the Poulin methodology, it should be employed in a manner that makes reasonable and actuarially consistent assumptions about the future. Such an approach would no longer appear to show a declining rate of benefit accrual with age under the cash balance formula. Table E modifies Poulin's Ex. D by assuming 4.5% annual pay increases. The projected accounts at age 65 attributable to each year's benefit credit with interest (Column 4) turn out to be the same for all ages (except for rounding). Columns 5 and 6 calculate rates of benefit accrual both in dollar amounts (Column 5) and as percentages of pay at age 65 (Column 6). The rates determined as dollar amounts are level by age as are the rates as a percentage of age 65 pay. Age 65 pay is used rather than the pay in each year because the annuity benefits all begin at age 65. It would be actuarially unsound to compare annuities beginning at age 65 with pay at any other point in time. Sher Tr. 1144-45; Ex. 10, Sher Report at 18.

**Table E:  Accrual Rates Under CIGNA Part B Applying Poulin Approach
Revised to Reflect 4.5% Pay Increase Assumption**

| | | | | Age 65 Annuity Benefit Accrual Rates | |
|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] |
| Age | Pay | Benefit credits | Value of Benefit credits at Age 65 | Dollar Amounts | % of Pay at Age 65 |
| 48 | 100,000 | 7,987 | 16,880 | 1,586 | 0.75% |
| 49 | 104,500 | 8,346 | 16,879 | 1,585 | 0.75% |
| 50 | 109,203 | 8,722 | 16,880 | 1,586 | 0.75% |
| 51 | 114,117 | 9,115 | 16,880 | 1,586 | 0.75% |
| 52 | 119,252 | 9,525 | 16,880 | 1,586 | 0.75% |
| 53 | 124,618 | 9,953 | 16,879 | 1,585 | 0.75% |
| 54 | 130,226 | 10,401 | 16,879 | 1,585 | 0.75% |
| 55 | 136,086 | 10,869 | 16,879 | 1,585 | 0.75% |
| 56 | 142,210 | 11,358 | 16,879 | 1,585 | 0.75% |
| 57 | 148,609 | 11,869 | 16,879 | 1,585 | 0.75% |
| 58 | 155,296 | 12,403 | 16,879 | 1,585 | 0.75% |
| 59 | 162,284 | 12,962 | 16,880 | 1,586 | 0.75% |
| 60 | 169,587 | 13,545 | 16,880 | 1,586 | 0.75% |
| 61 | 177,218 | 14,154 | 16,879 | 1,585 | 0.75% |
| 62 | 185,193 | 14,791 | 16,879 | 1,585 | 0.75% |
| 63 | 193,527 | 15,457 | 16,879 | 1,585 | 0.75% |
| 64 | 202,236 | 16,153 | 16,880 | 1,586 | 0.75% |
| 65 | 211,337 | 16,879 | 16,879 | 1,585 | 0.75% |

Sher Tr. 1151-53; Ex. 10, Sher Report at 19.

123.    In paragraph 22 of his declaration, Mr. Poulin asserts that his Exs. F requires

the use of a pay increase assumption to fairly analyze Part A benefits (which are based on final

average pay).  He characterizes cash balance benefits as being "career average pay" benefits

because pay increases do not affect benefits already earned.  However, unlike a true career

average pay plan, cash balance plan benefits do respond to the same inflationary and related

economic forces as final average pay plans.  Final average pay benefits are "indexed" by each

individual's pay increase rates whereas cash balance benefits are indexed equally for all employees by interest credits. Sher Tr. 1153-68; Ex. 10, Sher Report at 20.

124.    The fact that indexing in the final average pay plan is individually determined and is only granted while the employee is working – as compared to a broad index that applies as long as the cash balance account remains in the plan – does not change the fundamental economics. Just because an employee does not have continued inflation protection in a final average pay plan if he leaves before retirement but does have such protection in a cash balance plan should not, in and of itself, cause the accrual rates to change in a way that makes them appear to be age discriminatory. Sher Tr. 972, 976-77, 1153-68; Ex. 10, Sher Report at 20.

125.    As Mr. Sher explained, by correcting for those flaws, even Mr. Poulin's analysis would confirm that Part B was not age discriminatory. Sher Tr. 1133-53; Ex. 10, Sher Report at 14-20.

126.    Mr. Poulin concluded that age is the cause of the decline in rates of benefit accrual observed under his proposed methodology. Even if that methodology is accepted as a correct means of measuring rates of benefit accrual, it does not establish that age is the cause of the observed decline. In fact, it is time and not age that explains the results produced by Mr. Poulin's methodology. Any apparent link between age and rate of benefit accrual would disappear if the methodology compared employees who waited equal lengths of time to take their benefits. Poulin Tr. 260-63; Sher Tr. 1144-51; Ex. 10, Sher Report at 21.

127.    The same correlation between age and rate of benefit accrual would appear to exist if the Poulin methodology were applied to a savings account or to social security benefits. Savings accounts earn interest over time, and social security benefits increase over time because they are indexed to the growth in national average wages. As a result, all other

things being equal, a younger person will have a larger savings account or a larger social

security benefit at age 65 than an older person.  These differences, however, are not caused by

age; they are caused by the passage of time.  Sher Tr. 1153-55; Ex. 10, Sher Report at 22-25.

128.    Mr. Poulin admitted as much at trial when discussing an illustrative example:

A.    I think so.  So we have a 40-year-old who just started and a 60-year-old
who already has 20 years of service.

Q.    They're doing the same job and both make the same salary, okay?  Over
the course of time, they get salary increases and let's assume they get the
same salary increases over the course of time because they're doing the
same job, okay?

A.    Um hum.

Q.    Do you understand so far?

A.    I think so.

Q.    Okay?  In five years, the 60-year-old will be normal retirement age and
he can start receiving his normal retirement benefits, correct?

A.    Yes.

Q.    Can you tell me if it was, to make it simple, a 1 percent formula, he
would be getting 1 percent times years of service, 25 years of service,
times whatever his pay is at the time he is 65, correct?

A.    Correct.

Q.    The 40-year-old keeps working for another 20 years, keeps getting pay
increases at the same rate they were getting them before.  Do you
understand that?

A.    Um hum.  Yes.

Q.    Okay.  When the 40-year-old turns 65, he's going to be entitled to a
pension annuity based on 25 years of service as well, correct?

A.    Correct.

Q.    Based on his final average salary, and his final average salary is going to
be substantially higher than the final average salary of the 60-year-old,
correct?

A.    That's right.

Q.    His annuity benefit will be a lot higher in dollar amounts, correct?

A.    Yes.

Q.    Okay.  That's not age discrimination?

A.     No.

Poulin Tr. 1539-40.

129.     In addition, the Part B cash balance formula would not appear to produce a declining rate of benefit accrual under the Poulin methodology if the formula did not guarantee interest credits to employees irrespective of whether they continue to work for CIGNA.  The Poulin methodology assumes that all of the interest credits that ultimately accrue on a given benefit credit accrue in the year that the underlying benefit credit was earned.  That assumption could not be made if the formula conditioned the receipt of interest credits on continued employment at CIGNA.  In that case, interest credits would have to be treated as accruing in the year that the credits are actually added to an employee's cash balance account, since the credits would not accrue at all if not for the year of service in which they were added to the account.  Under the Poulin methodology, the latter treatment of interest credits would result in rates of benefit accrual that appear to increase rather than decrease as the employee approaches age 65.  Sher Tr. 1148-51; Ex. 10, Sher Report at 21.

130.     The fact that the Part B cash balance formula guarantees interest credits whether or not an employee continues working for CIGNA is thus an essential cause of the declining rate of benefit accrual that appears to exist under the Poulin methodology.  It makes little sense, however, to say that guaranteeing interest credits "causes" a reduction in the rate of employee benefit accruals because of age.  The guarantee of interest credits has nothing to do with age.  It simply ensures that former as well as current CIGNA employees are protected from having their benefits eroded by the passage of time.  Sher Tr. 1048-49, 1050-51; Ex. 10, Sher Report at 22.

131.    If an actuarial approach to testing rates of benefit accrual implies that common and traditional defined benefit formulas that are age-neutral or age-favored on their face results in a rate of benefit accrual that decreases with age, that is a strong indication that the approach is unreasonable.  Mr. Poulin's approach implies that many well-accepted types of plan designs are age discriminatory.  Sher Tr. 1397, 1443-45; Ex. 10, Sher Report at 22-25.

132.    Consider a plan that gives employees an age-65 annuity equal to $10 dollars per month multiplied by the employee's number of years of service.  An employee who participates in the plan for 5 years will receive an age-65 annuity of $50 per month; one who participates for 10 years will receive an age-65 annuity of $100 per month; and so on.  If the employee continues to work beyond age 65, he or she continues to accrue an additional $10 per month for each additional year of service, but his or her annuity will not start until he or she retires.  The plan described above is cited in the Conference Report on ERISA section 204(b)(1)(H) as an example of a plan that complies with the age discrimination rules.  H.R. Conf. Rep. 1012, 99th Cong., 2d Sess. 381 (1986).  If the mathematical approach advocated by Mr. Poulin were applied to this plan, the plan would violate ERISA Section 204(b)(1)(H)(i) for all employees over age 65.  In the example, an employee who works through age 66 earns an extra $10 per month during the year he or she turns 66, but the extra annuity does not begin until age 66 when he or she retires.  Thus, in his or her 66th year, the employee earns an annuity of $10 per month beginning at age 66.  Ex. 10, Sher Report at 22-23.

133.    Mr. Poulin admitted that cash balance plans were "probably not" age discriminatory after normal retirement age.  Poulin Tr.  423.  If Part B uses the same formula at all ages – and the plan is not age discriminatory after age 65 – then it should not be discriminatory at any age.

134.    Mr. Poulin's report did not illustrate rates of accrual after age 65 for the Part B cash balance formula even though it seems that the primary, if not the only, focus in adopting ERISA section 204(b)(1)(H)(i) was on accruals after normal retirement age.  Exs. 3, 4, and 7; Poulin Tr. 348, 413.  Yet Mr. Poulin admits that testing for age discrimination with reference to the "accrued benefit, <u>i.e.</u>, age-65 annuity benefits, <u>does not work for benefit accruals after age 65</u>.  As he conceded at trial:

> Q.    And in fact, Mr. Poulin, the formula that you articulate in paragraphs 13 and 14 doesn't actually work for benefit accruals after age 65, correct?
>
> A.    No, it's not intended to work because the benefit accrual requirements are to determine whether there is backloading prior to normal retirement age and all three of them, they refer to the age 65 benefit so that there is – the calculations stop at age 65.

Poulin Tr. 418.

135.    Nevertheless, under Mr. Poulin's approach – and his mathematical formula – all benefits must be expressed in the form of an age-65 annuity for purposes of determining the rate of benefit accrual.  If $10 per month beginning at age 66 is expressed as an actuarially equivalent age-65 annuity, it will be <u>less</u> than $10 per month.  This is both because an age-66 annuity would begin one year later than an age-65 annuity and because a 66-year-old is not expected to live as long as a 65-year-old and is therefore expected to receive fewer annuity payments.  Applying Mr. Poulin's approach to the plan cited in the Conference Report will therefore make it appear that the plan's rate of benefit accrual steadily decreases with age after age 65.  The rate of benefit accrual under the plan declines from $10 per year of service at age 65 to about $9 per year of service at age 66, and continues to decrease with each additional year of service thereafter.  The age-65 annuities that are actuarially equivalent to $10 annuities

at ages 66 through 70 would be $9.09, $8.24, $7.45, $6.72 and $6.04, respectively.[6]  Poulin Tr. 262; Sher Tr. 1146-51, 1157-63; Ex. 10, Sher Report, 22-23.

136.    Many pension plans in the United States covering union employees follow the flat dollar per year of service model of the $10 per month example cited in the Conference Report.  If the plan in the Conference Report fails the age discrimination rules, then so would many union pension plans.  Sher Tr. 1157-63; Ex. 10, Sher Report at 23.

137.    For the same reasons, a pay plan or final average pay plan would fail under Mr. Poulin's approach for all employees who work past age 65.  Consider a career pay plan that provides an annuity at age 65 equal to the sum of 1% of each year's pay.  An employee who participates in the plan for 10 years will receive an annuity at age 65 equal to 1% of the sum of his or her pay during those 10 years (which is equivalent to 10% of his or her average pay over that period).  Typically, such a plan would provide that individuals who work past age 65 continue to accumulate 1% of pay as an annuity, and begin receiving their annuity upon retirement.  Ex. 10, Sher Report at 22-25.

138.    This is a traditional and widely used type of benefit formula.  Under Mr. Poulin's approach, however, such plans would violate ERISA section 204(b)(1)(H)(i) for all employees over age 65.  The mathematics of this formula is the same as for the $10 per month plan discussed above.  At all ages over 65, the rate of employee benefit accrual under such a plan, expressed in terms of an age-65 annuity (as required by Mr. Poulin's methodology), steadily declines with increasing age.  The same results would occur with a traditional final average pay plan as well.  Sher Tr. 1153-55; Ex. 10, Sher Report at 22-25.

---

[6]    For this purpose, a 6% interest rate and the 1983 GAM Table were used.

139.     This conclusion is disturbing because most of the traditional pension plans covering non-union employees in the United States are based on a career or final average pay formula and would fail Mr. Poulin's test for age discrimination.  Ex. 10, Sher Report at 24.

140.     Mr. Poulin's approach would also cause contributory defined benefit plans to fail the age discrimination rules.  In a typical contributory defined benefit plan, an employee earns a benefit equal to the greater of either (a) a benefit defined by the plan, or (b) the benefit derived from employee contributions to the plan, plus statutory interest credits on those contributions until normal retirement age.  Employee contributions to a contributory defined benefit plan and the statutory interest credits that accrue on those contributions are directly analogous to the pay and interest credits in a cash balance plan, and accrue in the same pattern as do benefits under a cash balance plan.  Ex. 10, Sher Report at 24.

141.     If the rate of benefit accrual under a contributory defined benefit plan is calculated under the Poulin approach and employee contributions plus interest are producing the larger benefit (as can often occur), such a plan will display a declining rate of benefit accrual at every age before normal retirement age in exactly the same pattern that Mr. Poulin attributes to cash balance plans.  In other words, under Mr. Poulin's approach, providing the interest credits that ERISA mandates for contributory defined benefit plans can cause those plans to fail the age discrimination rules.  Ex. 10, Sher Report at 24-25.

142.     Mr. Poulin's basic objection to cash balance plans is that younger employees will have more time than older employees to accumulate compound interest credits before turning age 65.  Under this logic, any means of remedying the alleged discrimination will be radical because the remedy will have to neutralize the effects of compound interest and the time value of money.  A plan would have to provide a 64-year-old with just as much of an

increase in his or her benefit from the effects of compound interest credits as a 21-year-old by the time both turn 65.  In other words, the 64-year-old would have to get the advantage of 44 years of compound interest even though he or she would only have to wait a single year to receive his or her benefit.  Alternatively, the 64-year-old would have to be given an offsetting benefit large enough to offset the advantage of compound interest to the 21-year old.  As Mr. Poulin observes, the CIGNA Part B cash balance benefit credits do increase with age (actually by a combination of age plus service), but not by enough to satisfy his requirements. Therefore, no matter how one tries to do this, it would be enormously expensive and disruptive, unless one cuts the benefits of younger employees almost to zero.  Poulin Tr. 260-66; Sher Tr. 1433-36; Ex. 10, Sher Report at 25.

143.    Mr. Poulin testified that, according to his methodology, the cost of providing the benefit to a 25-year old versus a 65-year old was about 5-7 to one, and accordingly, you would have to increase the pension of the 65-year old by 5-7 times in order to get the same actuarial present value.  Poulin Tr. 306-07.

144.    Table F to the Sher Report illustrates the benefit credits that would be necessary at each age – beginning with the lowest rates in the current plan formula at age 21 – to produce acceptable results under Mr. Poulin's methodology.  For this purpose, it is assumed that interest credits each year would be equal to the maximum plan rate of 9% because to assume any lower interest credit rate would not guarantee that benefit credit rates would never decrease by age. The required benefit credit rates are stated in terms of single rates at each age (i.e., not integrated with social security as in the current Part B) to simplify the analysis.  Sher Tr. 1433-36; Ex. 10, Sher Report at 25-26.

**Table F: Required Part B Benefit Credit Rates to Satisfy Poulin Theory**

| Age | Current Benefit Credit Rates (under / over integration level) | Required Composite Rates |
|---|---|---|
| 21 | 3.0% / 4.5% | 4.2% |
| 25 | 3.0% / 4.5% | 5.9% |
| 30 | 4.0% / 5.5% | 9.1% |
| 35 | 5.0% / 6.5% | 13.9% |
| 40 | 6.0% / 7.5% | 21.5% |
| 45 | 7.0% / 8.5% | 33.0% |
| 50 | 7.0% / 8.5% | 50.8% |
| 55 | 7.0% / 8.5% | 78.2% |
| 60 | 7.0% / 8.5% | 120.3% |
| 64 | 7.0% / 8.5% | 169.7% |

Sher Tr. 1433-36; Ex. 10, Sher Report at 26.

145.    As Table F demonstrates, in order to equalize the highly skewed "rates of benefit accrual" produced by Mr. Poulin's proposed methodology, an employee aged 64 would have to receive a benefit credit about 40 times the size of the benefit credit of a 21-year-old!  Thus, if the 21-year-old received an annual benefit credit equal to 4.2% of pay, the 64-year-old would have to receive an annual benefit credit of almost 170% of pay!  If the 21-year-old worked his or her entire career under such a plan, he or she would accrue a life annuity at age 65 that would pay him or her well in excess of his or her salary while working – as much as five to seven times his or her salary – depending upon actual pay increases and interest credits.  Sher Tr. 1433-36; Ex. 10, Sher Report at 26.

146.    These figures are absurd.  Pension plans are designed to replace a portion of an employee's pay while working.  The Court is not aware of any plan that was designed to pay a

retirement annuity greater than an employee's salary while working, much less five to seven times that salary, and Mr. Poulin failed to identify any such plan. Moreover, any actuarial approach that implies that older workers would have to receive benefit credits 40 times higher than younger employees in order to avoid age discrimination is in the Court's view unsound. Cash balance plans like Part B are economically age-neutral or age-biased in <u>favor</u> of older workers as they are. Requiring them to change in the way that Mr. Poulin's approach requires would make them radically <u>reverse</u> age discriminatory. Pls. Ex. 10, Sher Report at 26-27.

147. Mr. Poulin never analyzed the lengths of the wear-away periods for large groups of older and younger participants, or examined average wear-away periods for older and younger participants. In fact, Mr. Poulin never even analyzed the demographics of participants in the Plan. Thus, he never actually examined whether wear-away periods were <u>generally</u> longer for older employees than for similarly situated younger employees. Poulin Tr. 223, 233, 310-311. As the transcript reflects:

> Q     Mr. Poulin, you testified yesterday that the wear-away period, in your opinion, was longer for older employees than for younger employees, is that right?
> A   Yes.
>
> Q     Did you do any calculations in any of your reports to substantiate that testimony?
> A   Not in this instance.

Poulin Tr. 310.

148. In fact, Mr. Poulin's specific testimony regarding wear-away actually contradict his conclusory and unsupported assertions that wear-away periods were longer for older employees and therefore age discriminatory. Mr. Poulin admitted that Plan participants converted on January 1, 1998 who had more than 55 age and service points, <u>i.e.</u>, older participants, had <u>no</u> wear-away periods because their conversion factors were more favorable

- 46 -

than those used for similarly situated younger participants.  Poulin Tr. 220-221, 311, 313.

Thus, Plaintiffs' assertion that wear-away periods were longer for older participants is simply

untrue.

149.    In addition, Mr. Poulin also admitted that the mortality discount (which Mr.

Poulin testified is a cause of wear-away) always is greater for a younger participant than for

similarly situated older participants.  Poulin Tr. 316.  In short, his conclusory testimony is not

supported by the facts or his own expert opinions.

150.    More importantly, moreover, even if Plaintiffs had actual evidence to back up

their argument, Plaintiffs' claim that wear-away periods were longer (in hindsight) for some

older employees than for some younger employees is a nonsensical analysis for measuring age

discrimination.  It is undisputed that Part A was economically age favored, i.e., an older

participant with the same service and salary history received a more valuable benefit than a

similarly situated younger employee.  Poulin Tr. 315; Sher Tr. 961-62, 968-69.  Likewise,

both experts agreed that opening account balances were always higher for older employees

than for similarly situated younger employees. Poulin Tr. 315; Sher Tr. 981-983.  Thus, at any

point in time, an older participant converted to Part B will always have a protected minimum

benefit and an account balance that is higher than that of a similarly situated younger

participant.  Accordingly, older participants regardless of wear-away, are always entitled to a

greater benefit than similarly situated younger participants.

151.    Further revealing the flaw in Mr. Poulin's age discrimination wear-away

argument is his reliance on the fact that older participants were eligible for subsidized early

retirement benefits which subjected them to a longer wear-away period than similarly situated

younger participants who are not eligible for a subsidized early retirement benefit.  Poulin Tr.

222-24; 317.  This early retirement subsidy was a benefit to older employees.

## IV.   PART B DID NOT RESULT IN FORFEITURES OR BACKLOADING (COUNT 1).

152.    The written terms of Part B unequivocally provide that all benefits previously

accrued under the prior Plan formula are protected.  First, Section 1.1(c) provides that a

participant's Accrued Benefit under Part B "shall in no event be less than the . . . Participant's

Minimum Benefit," which in turn is defined as "the Participant's Part A Accrued Benefit."

Ex. 1, Part B, at Section 1.1 (D00270); Sher Tr. 963-66, 988-89, 992, 1020.

153.    Second, for employees who were entitled to a "Preserved Spouse's Benefit"

under Part A (also known as the "free 30%"), the employee's Minimum Benefit also includes

the value of that benefit.  Ex. 1, Part B, at Section 1.1(c), 1.32 (D000270, 280); Sher Tr. 963-

66, 988-89, 992, 1020, 1023, 1028-29.

154.    Third, Section 7.3(b) of the Plan protects employees' rights to any early

retirement annuity benefits that they earned under Part A.  Ex. 2, Part A, at Section 7.3;

Ex. 10, Sher Report at 29-30; Sher Tr. 963-66, 988-89, 992, 1020, 1023.

155.    Lastly, Amendment No. 4, which provided for the freezing of accruals under

Part A, expressly provided that "[n]o such subsequent amendment shall result in the accrued

benefits of any Participant being less than such Participant's accrued benefit under the plan as

of December 31, 1997."  Ex. 2; Amendment No. 4 (D00132).

156.    Where benefits were not calculated in accordance with the terms of the Plan,

those issues were brought to the attention of Prudential or the Plan Administrator (pursuant to

the Plan's claim and appeal procedures), the mistake was corrected, the terms of Part B were

followed, and the correct benefit was paid.  For example, although Prudential initially

miscalculated Plaintiff Broderick's benefit without the Free 30%, that mistake was corrected once the issue was brought to its attention and Ms. Broderick has since received all of the benefits she is due.  Ex. 172, March 31, 2006 letter from Prudential to Gisela Broderick (hereinafter "Gisela/Prudential letter") at (P2050).

157.    Because the Part A benefit formulas include "early retirement subsidies" (i.e., the favorable reduction factors for benefit commencement before age 65), such favorable treatment, including the value of a social security supplement, was preserved under section 7.3.  Ex. 1, Part B, Section 7.3 (D00309); Ex. 10, Sher Report at 29-30.

158.    The CIGNA Pension Plan did not have a lump sum option before the January 1, 1998 amendment (and still does not offer Part A benefits in a lump sum).  Moreover, basing lump sums on the present value of normal retirement benefits in traditional defined benefit plans that provide early retirement subsidies on annuity benefits is a common practice.  Sher Tr. 1026; Ex. 10, Sher Report at 30.

159.    Whenever employees in a defined benefit plan are entitled to the greater of the amounts under two benefit formulas, the employee might be accruing benefits under one formula, yet their actual benefit might be rising more slowly or not at all.  Sher Tr. 1048-51; Ex. 10, Sher Report at 30-31.

160.    This effect is relatively common both in ongoing plans and in conjunction with a plan amendment that changes the plan's basic benefit formula or the method for determining early retirement benefits.  In a plan amendment, the result, often called the "wear-away" effect, can mean that the employee will not receive additional benefits for a period of time after the amendment.  Sher Tr. 1009, 1017-19; Ex. 10, Sher Report at 32.

161.    For example, assume that the pre-amendment plan provided a flat benefit of $5,000 to all employees, regardless of pay or service.  That plan is amended after the employee in the example has five year of service to substitute the 2% benefit formula for all years of service, both past and future.  The employee will receive a past service benefit under the new formula equal to $3,000 ($600 times five years) and will be credited with $600 in each year thereafter.  The plan provides that all existing participants will receive no less than the $5,000 accrued benefit on the date of amendment under the prior formula.  That provides an immediate $2,000 boost in what otherwise would have been provided under the new formula (i.e., $5,000 less $3,000).  Sher Tr. 1048-51; Ex. 10, Sher Report at 32.

162.    This protection is a real benefit to the existing employee.  A new employee who earns $30,000 each year will have a benefit of only $3,000 after he or she renders 5 years of service.  Thus, although the employee in the example will not receive any additional benefits until he renders another four years of service, he or she will be better off vis-à-vis the new employee.  Sher Tr. 1011-12; Ex. 10, Sher Report at 32.

163.    The fact that an employee who elects an annuity under Part B of the CIGNA Pension Plan might receive no more than the protected annuity as of December 31, 1997 (with the early retirement subsidies) is caused by a wear-away effect.  The accrued benefit under the Part A formula as of December 31, 1997 payable as an early retirement annuity has subsidized early commencement factors included in it.  The fact that the value of the social security supplement increased the protected benefit accentuates the wear-away effect, even though such add-on can only benefit, not harm, affected employees.  Sher Tr. 963-66, 988-89, 992, 1011-12, 1020, 1023; Ex. 10, Sher Report at 29-30, 32-33.

164.    However, Plaintiffs argue that:

A.   Because of the minimum benefit protection – which is based on benefits earned under the prior plan formula – there is a period of time (the "wear-away" period) during which an employee's account balance might increase but would still be below the employee's minimum benefit, such that, according to Plaintiffs, there is no new net benefit accrual;

B.   When the account balance later surpasses the minimum benefit amount, benefit accruals resume according to Plaintiffs; and

C.   Because any benefit accrual ("B" above) would be more than 133⅓% percent of a "zero" benefit accrual ("A" above), Part B violates the 133⅓% rule, according to Plaintiffs.

Poulin Tr. 232-38; 240-42.

165.   Mr. Poulin admitted at trial that there would be no wear-away period, and hence no period of "zero" benefit accruals followed by a resumption of accruals, if the current plan is treated as if it were in effect for all prior years:

Q.   Okay.  I would like you to assume now that the cash balance plan amendment was not effective January 1st of 1998 but instead was effective January 1st of 1997.  If you assume that to be the case, then people who were hired in 1997 or thereafter would have no wear-away, correct?

A.   Yes.

*   *   *

Q.   If I asked you to assume that from the moment the original CIGNA pension plan had been adopted, assume that the cash balance plan had been adopted at that point in time. Nobody in the cash balance plan would have any wear-away, correct?

A.   Everybody was hired after that implementation date? Yes.

Poulin Tr.  409-410; Sher Tr. 1041-46.

166.   Mr. Sher testified that as used based on his experience and observation of other practitioners in his field, application of the 133⅓% rule is "forward looking" only and any wear-away effect resulting from CIGNA's cash balance conversion would be irrelevant under the rule.  Sher Tr. 1042-45.

167.    Mr. Poulin apparently understands that when a plan is amended, only the amended formula is supposed to be considered when testing for compliance with the 133⅓% rule. He admitted during his testimony that it is common and lawful for a traditional career average plan to have periodic updates that would result in a benefit accrual increase of more than 133⅓%. Poulin Tr. 461-462. That testimony simply cannot be reconciled with his position that Part B violates the 133 1/3% rule.

168.    Mr. Poulin conceded that the use of a greater of "A or B" formula is not itself illegal under ERISA under all circumstances. Poulin Tr. 209-10, 465.

169.    Mr. Poulin also testified that Ms. Amara would be entitled to a monthly annuity of $900 beginning at age 55 attributable to her opening balance of $91,124.77 and that such annuity is less than 50% of the $1,833.65 annuity she was entitled to under Part A. Several points are worth noting regarding this claim:

> • No matter what the annuity attributable to the opening balance turns out to be, Ms. Amara's age 55 annuity cannot fall below $1,833.65.

> • The difference between the guaranteed age 55 annuity and the $900 estimated age 55 annuity is attributed to the fact that opening balances do not include early retirement subsidies inherent in the $1,565.48 amount. The 79% factor at age 55 under the Plan would drop to about 42% had true actuarial equivalent early retirement reductions been applied. As discussed earlier, it is perfectly acceptable and common practice not to include early retirement subsidies in opening balances or in lump sum distributions.

> • It is also common practice to include a discount for mortality both before and after age 65 both in determining opening balances and lump sum distributions.

> • At the time of the conversion, it was not possible to know what Ms. Amara's annuity benefit at any future date would actually be with respect to her opening balance since that depends on future interest rates.

- Mr. Poulin engages in "Monday morning quarterbacking" by implying that CIGNA intentionally understated opening balances. Mr. Poulin apparently believes that CIGNA should be punished for not having predicted the decline in interest rates subsequent to the January 1, 1998 conversion date.

- Given that the 30-year US Treasury bond rate was 6.11% in November 1997, the discount rates used to determine opening balances were generous for those with age plus service 55 or higher (5.05%) and quite reasonable for all others (6.05% or the 30 year Treasury rate for those who become participants in Part B after January 1, 1998).

- Mr. Poulin did not analyze what the impact would have been if interest rates had risen rather than fallen and what the effect would be if interest rates were to rise from this point forward.

Ex. 10, Sher Report at 33-34.

170.    Additionally, the Plan Administrator's disclosures complied with applicable requirements at the time regarding the requirement to provide notice of the relative value of benefit options for certain participants who subsequently elected to receive a lump sum benefit that had a lower actuarial present value than an early retirement annuity benefit to which the employee was entitled. Participants were notified about each benefit form available to them, the amount of the benefit, and when and how that benefit is payable. Sher Tr. 1237-38; Ex. 191.

171.    The Treasury regulations in effect at the time did not require that a plan automatically provide a participant with every benefit option that might be available to him at any point in time in the future. Rather, the regulations only require that when a participant elects his benefit, he be informed of the different options available to him at that time. Ex. 11, Supplemental Expert Report of Lawrence Sher at 9-10.

172.    The Plan Administrator presently is in the process of updating its disclosures to comply with new regulations. Morris Tr. 806-07, 814-18.

173.    Plaintiffs have identified only two participants who apparently believe they received inadequate disclosures, neither of whom is a named Plaintiff in this lawsuit.  These two class members elected to receive their benefits in a particular form, e.g., single lump sum payment versus monthly annuity.  They have not filed a claim with the Plan Administrator.  Ex. 536, Distribution Election Forms.

**V.    PLAINTIFFS AND THE TESTIFYING CLASS MEMBERS HAVE BEEN PROVIDED ABUNDANT INFORMATION REGARDING THEIR RETIREMENT BENEFITS AND HAVE SUFFERED NO LIKELY, OR ACTUAL HARM RESULTING FROM ANY OMISSIONS FROM THE SPD OR SECTION 204(H) NOTICE (COUNTS 2 AND 4).**

**A.    The Plan Administrator Provided Participants Several Written Communications Regarding The Freezing Of Accruals Under The Old Plan, The Creation Of Part B, And The Precise Amounts In Participants' Part B Accounts.**

174.    The decision to freeze accruals in the Plan for non-grandfathered participants and to create Part B triggered the distribution of a series of communications that provided notice of the changes that would begin January 1, 1998, as next described.

**1.    A Memorandum Was Sent To Managers, A Letter Was Sent To Grandfathered Participants Notifying Them Of Their Status, And A Memorandum Was Sent To Human Resources Representatives And Key Benefits Contacts.**

175.    On November 3, 1997, a memorandum was sent to all managers above grade 50, along with an advance copy of the Signature Benefits Newsletter described below.  This memorandum was individually addressed to each manager with a mailing label and the manager's office address.  Ex. 514, November 3, 1997 Memorandum attaching November 1997 Signature Page (D00583-591).

176.    In early October of 1997, a letter was sent to all grandfathered Part A participants at their home addresses notifying them that they would continue to accrue benefits under the old defined benefit formula, and also alerting them that more information on the

changes would be distributed in a Signature Benefits Newsletter and Retirement Program Information Kit.  Ex. 513, October, 1997 Letter (D00582).

177.    In late November of 1997, a memorandum entitled "New Benefit Processes or Rules Effective January 1, 1998" was sent to all human resources and benefits managers describing the key eligibility attributes of the new plan.  Ex. 518, November 28, 1997 Memorandum.

> **2.    The Signature Benefits Newsletter Sent To Employees In Early November Provided Notice That Part A Accruals Would Be Frozen As Of December 31, 1997, Introduced The Cash Balance Plan, And Notified Participants That Information Regarding Their Opening Account Balances Was Forthcoming.**

178.    In early November of 1997, a special edition "Signature Benefits Newsletter" (hereinafter the "Newsletter") was issued to all employees at their desktops, describing changes to the Plan.  The old plan (Part A) was referred to as the "Pension Plan," while the new cash balance plan (Part B) would be referred to as the "Retirement Plan."  Ex. 516, November, 1997 Signature Benefits Newsletter.

179.    The Newsletter informed employees that a new retirement program was going to be introduced effective January 1, 1998, which was more than four weeks away.  As it stated:

> On January 1, 1998, CIGNA will introduce a new retirement program.  The program includes the new CIGNA Retirement Plan, which replaces the current CIGNA Pension Plan for most employees, plus an enhanced version of Savings and Investment Plus (SIP), our 401(k) plan.  Most CIGNA employees will participate in the new CIGNA Retirement Plan, although some long-service employees will remain in the current Pension Plan. . .
>
> If you are moving to the new Retirement Plan, you will continue to earn benefits under the Pension Plan through December 31, 1997, and then transfer to the CIGNA Retirement Plan beginning in 1998.

Ex. 516, November, 1997 Signature Benefits Newsletter at 1 (D00607).

181.    Notably, the Newsletter described not only the change from Part A to Part B for the defined benefit pension plan, but also enhancements to CIGNA's Savings and Investment Plus ("SIP"), the 401(k) defined contribution plan.  Ex. 516, November, 1997 Signature Benefits Newsletter.

181.    CIGNA's "no anticipated cost savings" representation are supported by CIGNA's expense projections concerning the changes in the retirement package to be rolled out in 1998.  Poulin Tr. 1525-27; Exs. 49 (D606), 739.

182.    The expense projection showed that CIGNA anticipated a reduced cost of approximately $10M by virtue of the conversion from the traditional pension plan to a cash balance plan, and an additional cost of approximately $10M by virtue of upgrades to its "SIP" or 401(k) plan.  Ex. 739 (Supp D 025709).

183.    The Newsletter informed non-grandfathered employees that benefits accrued under Part A would be frozen on December 31, 1998:

> Employees participating in the new CIGNA Retirement Plan will stop earning benefits under the current Pension Plan on December 31, 1997.

Ex. 516, November, 1997 Signature Benefits Newsletter at 5 (D00611).  Thus, the Newsletter provided notice of the impending freeze more than 15 days before the effective date of December 31, 1997.

184.    The Newsletter introduced the new cash balance plan design and explained to employees how their account would grow by increasing benefit and interest credits:

> The new CIGNA Retirement Plan is an <u>account balance plan</u>—a type of retirement plan that is becoming increasingly popular as a simpler alternative to traditional pension plans.  Here's how the new plan will work:

If you are transferring from the current Pension Plan to the new plan, an account will be set up for you in January.

If you earned a benefit from the current Pension Plan, the lump sum value of that benefit as of December 31, 1997, will be transferred to your account as your opening balance.

Beginning in January, your Retirement Plan account will grow through two types of credits:

- **Benefit credits.**  CIGNA will make a benefit credit to your account for each year in which you work at least 1,000 hours for the company. These credits will range from 3% to 8.5% of your eligible annual earnings, depending on your age, service and earnings.

- **Interest Credits.**  CIGNA will also credit your account with interest each quarter until you receive your benefit from the plan. The annual interest rate will vary from 4.5% to 9%, depending on recent yields of 5-year Treasury Bonds.  This interest rate is consistent with guidelines set by the IRS for account balance retirement plans.

Ex. 516, November, 1997 Signature Benefits Newsletter at 2 (D00608) (emphasis in original).

185.    The Newsletter also informed employees that information concerning their

account balances was forthcoming:

CIGNA will begin the process of calculating final pension benefits and Retirement Plan opening balances early in 1998, after all 1997 payroll data are finalized.  Benefit calculations are expected to be completed in the spring.  Once balances are calculated, they will be credited to Retirement Plan accounts retroactively to January 1, 1998, so you won't lose any interest credits for the first part of 1998.  You will be informed of your final Pension Plan benefits and Retirement Plan opening balance in your <u>Total Compensation Report</u>, scheduled to be mailed in May 1998.

Ex. 516, November, 1997 Signature Benefits Newsletter at 5 (D00622) (emphasis in original).

186.    Although the employees who were to remain in Part A were notified by letter,

as noted above, the Newsletter reiterated which employees would remain in the old plan:

> Employees who were hired prior to 1989, who do not work for a healthplan company in the CIGNA HealthCare Division, and whose age and service total at least 45 years, will stay in the current Pension Plan rather than transfer to the new CIGNA Retirement Plan.

Ex. 516, November, 1997 Signature Benefits Newsletter at 2 (D00608).

187.    The Newsletter also explained to employees their options upon leaving

CIGNA, including that:

> When you retire or leave CIGNA, you will have the option to receive your vested account balance in one of two ways.  You may choose an annuity (monthly payments for life), or you may take your account balance as a single lump sum payment.  The lump sum option is new and resembles the SIP payment option.  If you prefer, you may roll over your lump sum payment into an individual retirement account (IRA) or your new employer's qualified retirement plan. This provision allows you to assume investment control over your benefit—and defer income taxes on it—until you are ready to use it.  You will also have the option to leaver your account balance in the Retirement Plan, where it will continue to earn interest credits until you elect to receive your benefit.

Ex. 516, November, 1997 Signature Benefits Newsletter at 2 (D00608).

188.    The Newsletter provided employees information concerning the opportunity to

seek additional information concerning their benefits:

> If you have questions, please e-mail your questions to Signature Benefits Services (e-mail address:  Signature Benefits, Svcs) or you may call Signature Benefits Services at Network 761.3539 or 1.800.551.3539.

Ex. 516, November, 1997 Signature Benefits Newsletter at 6 (D00612).

189.    The Newsletter informed employees that additional information concerning the

new pension plan would be forthcoming in December 1997, when they received a

comprehensive Retirement Program Information Kit (hereinafter the "Retirement Kit").  Ex.

516, November, 1997 Signature Benefits Newsletter at 1 (D00607).

**3.    In December 1997, All Participants Received A Signature Benefits Retirement Kit, Which Reinforced To Participants That CIGNA Would Freeze Accruals Under Part A For All Non-Grandfathered Participants As Of December 31, 1997, And Further Explained The Cash Balance Plan And That Account Balance Information Was Forthcoming.**

190.    In early December 1997, CIGNA sent each participant a Retirement Program Information Kit ("Retirement Kit"), comprising Signature Benefits brochures, utilizing an individual mailing label on a sealed envelope at the participant's office.  Exs. 227-28.

191.    There were four versions of the Retirement Kit, depending upon whether the participant was being converted to Part B or grandfathered into Part A, and whether the participant also participated in the supplemental pension plan, as seen in the records kept by Denise Hill, at the time the Assistant Vice President, Human Resources & Services Communications.  Accordingly, employees were separated into four different categories with a particular code on their mailing label:

| Color of Brochure | Conversion to Part B? | Subject to Supplemental Plan? | Mailing Label Code |
| --- | --- | --- | --- |
| Burgundy | N | N | 298 PEN |
| Burgundy | N | Y | 299 PENSUP |
| Blue | Y | N | 300 RET |
| Blue | Y | Y | 301 RETSUP |

Ex. 517, E-mail dated November 17, 1997 (D00578-00579).

192.    The employees overwhelmingly felt that the Signature Benefits Retirement Kits were easily understandable.  In a survey of recipients of the brochure, 92% of respondents said that they thoroughly read the brochure, and 89% said that the brochure was clearly written. These results demonstrate that employees paid attention to the Signature Benefits brochure. Ex. 107, March 3, 1998 Memorandum from D. Hill attaching Surveys (SuppD001587-1609).

193.     The Retirement Kit described not only the change from Part A to Part B for the defined benefit pension plan, but also enhancements to CIGNA's SIP, the 401(k) defined contribution plan.  Ex. 508, Retirement Kit.

194.     The Retirement Kit's question and answer section notified each participant that the benefits in his or her Part A pension plan would be frozen as of December 31, 1997:

> Q.  What will happen to the benefits I have earned under the Pension Plan?
>
> A.  Benefits that you have earned under the current Pension Plan will be converted to an opening account balance in the new CIGNA Retirement Plan.  Your opening balance will equal the lump sum value of your pension benefits as of December 31, 1997.  This amount will be calculated during the spring of 1998, once we have all the year-end payroll data for 1997.  It will then be added to your new plan account retroactive to January 1, 1998. **You will earn no further benefits under the Pension Plan after December 31, 1997**.  Starting in 1998, you will earn benefits under the new plan.

Ex. 508, Retirement Kit Q&A at 4 (D00726) (emphasis added).

195.     The Retirement Kit notified employees of the impending freeze of benefits more than 15 days before the effective date of December 31, 1997.  Ex. 508, Retirement Kit.

196.     Mr. Stratman admitted that he could not draft "clearer text that would explain to participants in the new plan that they would stop accruing benefits under the old plan as of December 31, 1997" than was included in the November 1997 Newsletter and Retirement Kit. Stratman Tr. 594.

197.     The Retirement Kits alerted participants to the upcoming plan amendment:  "If you are in the Pension Plan on December 31, 1997, you will automatically become a participant in the new CIGNA Retirement Plan on January 1, 1998."  Ex. 508, Retirement Kit at 2 (D00738).

198.    The Retirement Kit essentially repeated the information contained in the Newsletter regarding the cash balance plan's growth through benefit and interest credits, that CIGNA would credit previously earned benefits into an opening account balance equivalent to the pension earned through December 31, 1997, and that employees once vested could choose to receive benefits as either a lump sum or an annuity.  Ex. 508, Retirement Kit.

199.    The Retirement Kit, however, offered more detail concerning the way in which benefit and interest credits were earned:

**Benefit Credits**

For each year in which you earn a year of credited service, CIGNA will add a benefit credit to your account equal to a percentage of your annual eligible earnings. the percentage will depend on your benefit points, which are the sum of your age and credited service as of January 1 of the year.  Benefits credits are made according to the chart below.

The Retirement Plan is designed to work together with Social Security.  As the chart shows, the plan provides a higher benefit credit for the portion of your eligible earnings above the Social Security "integration level."  The integration level will be $34,000 in 1998 and 50% of the Social Security taxable wage base thereafter.

The additional credit for income above the integration level reflects the fact that there are no Social Security retirement benefits for income above the taxable wage base.  Neither you nor CIGNA pays Social Security retirement taxes on your income above the Social Security taxable wage base, so CIGNA shares some of these tax savings with you through this extra credit.

Once you terminate or take a distribution from the plan, benefit credits will no longer be made to your account.

**Interest Credits**

Your account balance will also grow through interest credits.  The annual interest rate will equal the yield on 5-year Treasury Bonds as of November of the previous year, plus 0.25 percentage points. In no case, however, will the annual interest rate be less than

4.5% or greater than 9%.  These interest rates are consistent with guidelines established by the IRS for account balance plans.

Interest credits will be made to your account until you take a distribution of your plan benefit.

**Quarterly Posting of Credits**

While you are working at CIGNA, benefit and interest credits will be added to your account quarterly.  Interest credits will be calculated using your account balance at the end of the quarter, but before benefit credits have been made.  The quarterly posting of benefit credits is merely a projection until you meet the 1,000 hour service requirement to earn benefit credits during the year.  You continue to earn quarterly interest credits until you receive your benefit from the plan, regardless of whether you are eligible for benefit credits.

Ex. 508, Retirement Kit at 4-5 (D00740-D00741) (emphasis in original).

200.    The Retirement Kit defined "eligible earnings" and "credited service" under the plan.  Ex. 508, Retirement Kit at 5-6 (D00741-D00742).  It also contained a chart with the benefit credit rates.  Id. at 4-5.

201.    The Retirement Kit also offered examples to help participants understand how their accounts would grow.  One such example explained:

In each example, we will assume that the plan's integration level for the year is $34,000 and the rate used in determining the interest credit is 6.5%.

Example 2:  Assume that Joan is 50 years old, earning $70,000 a year, and has 6 years of service with CIGNA.  Let's also assume that her starting account balance is $24,625.  Because Joan's age and service total 56 points, she qualifies for a benefit credit of 65 of eligible earnings up to the integration level and 7.5% above the integration level.

| | |
|---|---|
| Opening account balance | $24,625 |
| Interest credit (assuming 6.5%) | $1,750 |
| Benefit credit (6% x $34,000) + | |
| (7.5% x $36,000) | $4,740 |

| | |
|---|---|
| Joan's account balance at end of year | $31,115 |
| Joan's account balance at age 55 | $63,910 |
| Joan's account balance at age 65 | $228,876 |

Note:  The projections for benefits at age 55 and 65 assume no increase in eligible earnings and a consistent annual interest credit of 6.5%.

Ex. 508, Retirement Kit at 6 (D00742).

202.    The Retirement Kit made participants aware of the account statements they would receive to be able to monitor the balance of their cash balance accounts:

> To help you keep track of your account growth, you will receive periodic account statements.  Each statement will show CIGNA's benefits credits and interest credits to your account and the value of your account at the end of each period.  Benefits credits for the period covered by the statement will be based on the assumption that you will earn at least 1,000 hours of credited service for that year.  If you don't complete the required service for a period, your account will be adjusted accordingly.

Ex. 508, Retirement Kit at 9 (D00745).

203.    With respect to opening account balances, the Retirement Kits also specifically advised employees (1) that for most employees, opening account balances would be based on the value of the employee's age-65 annuity as of December 31, 1997; (2) that CIGNA would be using an interest rate of approximately 6.5% for calculating the present values; (3) that age was a factor in determining opening account balances; (4) of the factors used to calculate opening account balances; and (5) that for employees with a combination of age and service of 55 or higher (i.e., certain older employees), their opening account balances would include part (or all) of the value of their subsidized early retirement benefits and would be converted using a lower, and hence more favorable, interest rate.  Ex. 508, Retirement Kit at 9 (D00745).

204.    The Retirement Kits further provided:

**(Step 2) Converting Your Final Pension Benefit to an Opening Balance**

Your normal pension benefit is an annual payment made to you for life, beginning when you turn 65. To convert that annual pension benefit into an opening balance for the new plan, a calculation has to be made to determine how much that future stream of payments is worth today. This type of calculation is called a present value calculation.

The method used to calculate the present value of a pension benefit is established by law. Basically, the present value of your pension benefit equals the amount of money that someone would need to invest now to have enough money in the future to pay your annual pension benefit. This calculation is made assuming that the "invested" money would earn a moderate rate of interest (about 6.5% per year). Because of the relatively low interest rate, the amount available to you today is relatively large. In fact, to increase your opening balance, CIGNA has selected a much lower interest rate than the 7% or 8% rate adopted by most companies making similar pension plan changes.

Your current age affects the present value of your pension benefit, because the closer you are to retirement age, the less time there is for the lump sum balance to grow, and therefore the more money you need to invest now. Because of this, two people who have earned the same pension benefit at age 65 will have different opening account balances if their ages are different. The older person will have the larger opening balance because there is less time for that person's account balance to grow.

Table 1 shows the factors that will be used to convert final annual pension benefits to opening balances. If the employee in the example in the previous section were 40 years old, the opening balance would be calculated by multiplying his or her $2,123 annual pension benefit by the factor for a 40-year-old in the table. In this case, the opening balance would be:

$2,123   x   1.920 = $4,076

After 25 years of investment at 6.5% annual interest, $4,076 would grow to about $19,700 which is enough money to pay the employee the $2,123 annual benefit beginning at age 65, assuming the employee has an average life expectancy and the unpaid portion of the benefit continues to grow at a rate of 6.5% per year.

**Special Conversion Formula for Older, Longer-service Employees**

If your age and credited service with CIGNA total 55 or more on January 1, 1998, two special procedures will be used in calculating your opening account balance:

- First, your opening balance will be based on the present value of your age 62 early retirement benefit, rather than on the present value of your age 65 normal retirement benefit. The age 62 benefit has a higher present value than the age 65 benefit.

- Second, a lower interest rate will be used in making the present value calculation (one percentage point less than the standard rule – for instance, 5.5% if the standard rate is 6.5%). The lower interest rate increases the size of your opening balance.

  These special procedures have been adopted because most employees in this age and service category will have fewer years to accumulate benefits under the new Retirement Plan. CIGNA wants to ensure that these older, longer-service employees receive fair and adequate benefits at retirement.

Ex. 508, Retirement Kit at 3-5 (D00719-00721).

     205.    The Retirement Kit also provided detailed information regarding the payment options, including the lump sum option, single life annuity (with no cash refund), single life annuity (with cash refund), 50% joint and survivor annuity and 100% joint and survivor annuity. Ex. 508, Retirement Kit at 8 (D00744).

     206.    The Retirement Kit's also addressed the relative value of the participants' benefits under Part A and Part B:

Q. Will my benefit be better under the new Retirement Plan?

A. The new Retirement Plan is different from the current Pension Plan, so exact comparisons of benefits that cover all possible outcomes are difficult. Generally speaking, the new Retirement Plan, in comparison with the current Pension Plan, tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees. . . .

Of course, other features of the new plan add to your benefit value as well. The lump sum distribution option can be very

> valuable, since it will allow you to move your benefits into other tax-deferred investments after you retire or leave CIGNA. Also, because the Retirement Plan works like a savings plan, with contributions credited to an account, you should find it easier to understand. You now have two plans that are account-based, enabling you to track your retirement benefits by looking at your statements. As a result, you will see the growth in your total retirement benefits from CIGNA every year and will be able to update your financial plans accordingly.

Ex. 508, Retirement Kit Q&A at 7 (D00729) (omitting information re 401(k) plan).

207.    It would likely have been confusing for the Plan Administrator to provide to participants a comparison of their Part B annuity benefit estimate versus a Part A annuity benefit to which they would never be entitled because the Part A plan was frozen and inapplicable as to these converted participants. Ex. 11, Supplemental Expert Report of Lawrence Sher, dated October 28, 2005 at 5; Sher 1233-37.

208.    The employees also were told how to obtain information concerning their current pension benefits:

> Q.  I don't know what my current pension benefit is. How do I find out?
>
> A.  You recently received a Signature Benefits Total Compensation Report, which shows your Pension Plan benefit as of March 31, 1997. You will receive a similar statement in the spring of 1998, showing your final benefit under the Pension Plan, plus your CIGNA Retirement Plan opening account balance. Your opening account balance will be the lump sum value of your final Pension Plan benefit, which will be transferred to the new CIGNA Retirement Plan. Remember, final pension benefits and opening balances will not be calculated until the spring of 1998, after all 1997 payroll data have been finalized.

Ex. 508, Retirement Kit (D00733).

209.    The Retirement Kit addressed the fact that employees rehired after January 1, 1998, would be placed in Part B, as it stated:

> If you are hired or rehired after January 1, 1998, you will become
> a participant in the Retirement Plan on your date of hire.

Ex. 508, Retirement Kit (D00739).

210.    The Retirement Kit's question and answer section also provided information to

participants on how they could obtain additional information on their pension benefits:

> These pages provide answers to questions that you may have
> about the retirement program changes.  If you have additional
> questions about the Retirement Plan, you may e-mail your
> questions to Signature Benefits Services (e-mail address:
> Signature Benefits at network 761.3539 or 1.800.551.3539.

Ex. 508, Retirement Kit (D00733).

211.    The following February, participants received the February 1998 Signature

Benefits Newsletter, which provided answers to frequently asked questions regarding Part B,

including explaining why certain people were moved into the cash balance plan while others

were grandfathered into Part A.  Ex. 97, February 1998 Signature Benefits Newsletter.

**4.      The Plan Administrator Provided Participants Precise Information Regarding Their OAB And Their Part B Pension Accounts Through Total Compensation Reports, Annual Account Statements, SPDs, A Retirement Planner, A Benefits Hotline, And Websites.**

212.    In May 1998, all participants received a Signature Benefits Newsletter further

answering frequently asked questions regarding Part B.  Ex. 180, May 1998 Signature Benefits

Newsletter.

213.    Again in June 1998, participants received another Signature Benefits

Newsletter, which explained the Plan Administrator's forthcoming Total Compensation

Reports to the participants, and how to use them.  Ex. 101, June 1998 Signature Benefits

Newsletter.

214.    Each participant received yearly a document called the Total Compensation

Report.  The 1998 Total Compensation Report, provided to participants in May 1998, supplied

information regarding the opening account balance in Part B:

> The new CIGNA Pension Plan features the security of a traditional pension plan, but adds more flexibility since you can decide how much of your retirement funds you want to use and when.  You are not tied to a fixed schedule of benefit payments.  What's more, it is portable so you can take your vested benefit when you leave the company and invest it as you wish.
>
> Your initial account balance on January 1, 1998 was $[number]
>
> The balance represents the full value of the benefit you earned for service before 1989 and payments to you at age 62.  It was calculated just as if you had left CIGNA on December 31, 1997 and deferred your pension to age 62.  It was converted to a lump sum based on an assumed interest rate of 5.05%.  This means that the lump sum growing at this rate of interest to retirement is equivalent or the value of the lifetime annuity payments you have earned.

Ex. 85, 1998 Total Compensation Report at 2 (P1788) (emphasis omitted).

215.    The 1998 Total Compensation Report showed each participant exactly how his or her particular opening account balance was calculated:

| | | |
|---|---|---|
| Your Highest Eligible Average Earnings | | $  143,478.96 |
| Your Benefit Service Factor | x | 01670 |
| Years of Credited Service | x | 7.00 |
| Your Age 62 Benefit Before Offset | = | $   16,772.69 |
| Your Social Security Offset (see note) plus Early Retirement Reduction | - | $    3,859.89 |
| | | |
| Your Actual Age 62 Annual Benefit | = | $   12,912.80 |
| Based on average life expectancy at your age and an interest rate of 5.05% the lump sum actuarial factor is | x | 6.0813 |
| Your lump sum benefit – Opening Account Balance | | $   78,526.55 |

Ex. 85, 1998 Total Compensation Report at 15 (P1801).

216.    Thus, the 1998 Total Compensation Report disclosed the specific benefit upon which the account balance was based (age 62, in the above example – age 65, for most younger employees), the interest rate that was used to calculate the present value opening account balance (5.05% in this example, slightly higher (and therefore less favorable) for most younger employees), and that the calculations factor in the "average life expectancy," which is a layman's way of referring to mortality tables.  Ex. 85, 1998 Total Compensation Report at 15 (P1801).

217.    The 1998 Total Compensation Report provided information regarding the interest rate used to calculate the opening account balances and that life expectancy was a factor in those calculations and demonstrated exactly how the opening account balance was calculated.  Ex. 85 1998 Total Compensation Report at 15 (P1801).

218.    The 1998 Total Compensation Reports also disclosed participants' minimum benefits earned as of December 31, 1997 under Part A.  Ex. 85, 1998 Total Compensation Report at 15 (P1801).

219.    Since 1998, Total Compensation Reports have been provided to employees on an annual basis.  Although the reports after 1998 no longer explained how the opening account balance in Part B was established, they continue to provide information on participants' account balances and estimated annual benefit payable at age 62.  Ex. 85, 1999 Total Compensation Report (P1815).

220.    The Total Compensation Reports provide information to employees suggesting how much they would need in assets to reach their target retirement income, and how inflation might affect that analysis.  Ex. 85, 1998 Total Compensation Report (P1790).

221.    The Total Compensation Reports notify employees of the Retirement Planner available to them:

> CIGNA Retirement Planner is a Windows-based financial planning program that comes on a disk. Just pop it into your personal computer and explore how changes in your future savings and your investments results can affect your potential retirement income. CIGNA Retirement Planner allows you to include all your personal savings and company pension benefits as well as those of your spouse to get a more complete picture of your financial situation. Just call CIGNA's AnswerLine® at 1.800.253.2287 for your copy of CIGNA Retirement Planner.

Ex. 85, 1998 Total Compensation Report at 8 (P1794) (emphasis omitted).

222.    The Total Compensation Reports alert employees that more information is available:

> This personalized Total Compensation Report highlights your CIGNA cash compensation and benefit plans. More detailed information can be found in the official plan documents. This report is only a summary of your benefits and does not constitute a legal document or contract, nor is it an express or implied contract or guarantee of employment.

> The estimates shown in this report represent our best efforts at this time to calculate figures based on what we consider to be realistic assumptions. CIGNA reserves the right to correct any errors. In the event that any information set forth in this report is incorrect, the actual amount of your benefit as determined in accordance with the terms of the plan will govern the benefit to which you will be entitled under that plan.

> If you have any questions concerning your Total Compensation Report, contact Signature Benefits Services at 1.800.551.3539.

Ex. 85, 1998 Total Compensation Report at 17 (P1803).

223.    Class Member Stephen Curlee produced the Total Compensation Reports he received, which included the May 1998 Total Compensation Reports that included details regarding how his OAB was calculated. Ex. 85, 1998 Total Compensation Report (P1785-1804). His 1995 Total Compensation Report (P1750-64) disclosed his monthly pension

benefit payable at age 65 earned as of the end of 1995, and his 1997 Total Compensation

Report (P1765-84) disclosed his monthly pension benefit payable at age 62 earned as of the

end of 1997.  Ex. 85, 1995 Total Compensation Report at P1761; 1997 Total Compensation

Report at P1774.

224.    Plaintiffs Janie Amara and Gisela Broderick and class members Robert Upton,

Barbara Hogan, Bruce Charette, Steven Law, and Flannery produced the total compensation

reports they received.  <u>See</u> Exs. 560-563 (Amara); Exs. 99, 589-591 (Broderick); Exs. 98, 625-

627 (Upton); Exs. 653-654 (Hogan); Exs. 669-675 (Charette); Exs. 685-690 (Law); and Exs.

713-715 (Flannery).

225.    The Plan Administrator has provided every participant in Part B with an annual

cash balance account statement since June 1998.  Ex. 520, Pension Plan Statements.

226.    Plaintiffs Amara, Broderick, Glanz and class members Robert Upton, Barbara

Hogan, Steven Law, Stephen Curlee and Bruce Charette produced annual account statements

they received.  Exs. 556-559 (Amara); Exs. 581, 583, 585-588 (Broderick); Exs. 598 (Glanz);

Exs. 615, 617-624 (Upton); Ex. 647-651 (Hogan); Ex. 684 (Law); Ex. 695 (Curlee); Exs. 667-

668 (Charette); and Exs. 709-712 (Flannery).

227.    The first Pension Plan Statement provided, in June 1998, also included

information concerning the calculation of participants' opening account balances, including

that such balances were based on previously earned age 65 (or age 62) benefits.

> Your opening balance was based on the lump sum equivalent
> value of the Age 65 benefit you earned under the prior Pension
> Plan as of December 31, 1997.  The detailed calculation of your
> benefit was produced in your 1998 Total Compensation Report
> which you received in May.

Ex. 519, Pension Plan Statement, for Period Ending June 30, 1998.

228.    Plaintiff Annette Glanz and class members Robert Upton and Bruce Charette produced the June 1998 account statement they received, which included their OAB calculation.  Ex. 597(Glanz); Ex. 616 (Upton); Ex. 667 (Charette).

229.    The annual statements list the opening balance at the start of the subject year, the new benefit credits earned and interest credits earned, and the closing balance as of June 30 of that year.  Ex. 520, Pension Plan Statements.

230.    The account statement also reminded participants of the benefit credit rates and interest credit rates under Part B.  The annual statements note the annualized interest rate which was applied in determining the benefit and interest credits.  Ex. 519, Pension Plan Statement, for Period Ending June 30, 1998; Ex. 520, Pension Plan Statements.

231.    At the bottom of the statement, a toll-free 800 number was provided so that participants could raise any questions about their statements.  Ex. 520, Pension Plan Statements.

232.    The Part B Plan document contains some 80 pages of single-spaced information that attempts to address every aspect of the Plan's design, and every contingency that might occur with any participant or beneficiary:  current, former, deceased, disabled, rehire, part-time, full-time, temporary, permanent, single, married, separated, divorced, widowed.  Ex. 1, Part B.

233.    The Plan document by necessity reads much like a statute:  it contains 63 specifically defined terms and 16 different "Articles," each with numerous sections and subsections, as well as internal cross-references between provisions.  Ex. 1, Part B.

234.    In October of 1998, CIGNA issued the SPD for Part B, a virtually identical version of which was reissued in September of 1999.  Ex. 505, 1998 SPD for Part B; Ex. 506,

1999 SPD for Part B.[7]

235.    The SPD contained information concerning the following topic areas: eligibility; how breaks in service affected eligibility; how the cash balance account grows, including how benefit and interest credits accrued; when benefits are paid; how benefits are paid; how the benefit is affected by certain "life events;" administrative details concerning the operation of the plan; Minimum Benefits; change of control protections; spouse's rights; the appeal process;  circumstances under which the plan can be amended or terminated; and statement of ERISA rights.  Ex. 505, 1998 Part B SPD at Table of Contents (D00825); Ex. 506, 1999 Part B SPD at Table of Contents (D00622).

236.    The SPD introduced participants to this basic cash balance plan design:

> The CIGNA Pension Plan is an "account balance" plan.  With this type of plan, a specific amount is created to a pension account for you periodically — similar to a savings plan. . . .
>
> You'll receive a quarterly statement of your Pension Plan account balance.  What's shown will be the amount of accumulated credits in your account.  You'll see that amount continue to grow every year you are with CIGNA.

Ex. 505, 1998 SPD at 1 (D00826).

237.    The SPD also explained that the "account contains credits in the form of hypothetical dollars.  It does not contain actual dollars."  Ex. 505, 1998 SPD at 14 (D00839).

238.    The Part B SPD informed participants that their old pension plan benefits would be converted into an OAB:

> If you participated in the Pension Plan before 1998, your old plan benefits were converted into an opening account balance in this Plan.

---

[7]    Because the 1998 and 1999 SPDs are virtually identical, they will be referenced together as "the SPD."

Ex. 505, 1998 Part B SPD at 13 (D00838) (emphasis omitted); Ex. 506, 1999 Part B SPD at J-7 (D00629).

239.    The Part B SPD also offered OAB information to employees who were rehired by CIGNA:

> If you were in the old Plan when you left, the pension benefit you earned will be converted to an opening account balance in the this [sic] plan when you return.  The conversion formula used [to obtain the opening account balance] is based on guidelines established by the federal government for valuing pension benefits.  If you have questions about the conversion formula, you may call CIGNA retirement Services Center at 1.800.224.4624.

Ex. 505, 1998 Part B SPD at 8 (D00833) (emphasis omitted).

240.    The Part B SPD explained to participants how their cash balance account would grow:

> Your account balance grows in two ways – annual benefit credits and quarterly interest credits. . . .   For each year in which you earn a year of credited service, CIGNA will add benefit credits to your account equal to a percentage of your eligible earnings. . . . Your account also will grow through interest credits.

Ex. 505, 1998 SPD at 3-4 (D00828-00829); Ex. 506, 1999 Part B SPD at J-2 (D00624).

241.    The Part B SPD next included a chart showing how benefit credits were earned, and how the social security integration level was factored into the benefit credits, along with examples of the amount of credits that would be earned in different income brackets.  Ex. 505, 1998 SPD at 3-4 (D00828-00829).

242.    The Part B SPD explained how the account balance would grow with interest credits:

> Your account also will grow through interest credits.
>
> The annual interest rate will equal the yield on 5-year Treasury Bonds as of November of the previous calendar year, plus 0.25 percentage points.  The annual interest rate will not be less than

> 4.5% or greater than 9%. . . .
>
> CIGNA will add interest credits to your account each quarter until the month before your benefit commencement date.

Ex. 505, 1998 SPD at 4 (D00829).

243.    The SPD alerted participants that they would be receiving periodic account statements in the future:

> Each statement will show benefit credits and interest credits added to your account and the value of your account at the end of each period.

Ex. 505, 1998 SPD at 4 (D00829).

244.    The Part B SPD disclosed the minimum benefit rule, stating that the participants would never receive less than the accrued benefit they earned under the old plan as of December 31, 1997:

> Minimum Benefits
>
> If you participated in the Pension Plan before 1998, your **old plan** benefits were converted to an opening account balance in this Plan.  Your final Plan benefits cannot be less than your **old plan** benefits on December 31, 1997.  If this minimum benefit rule applies to you, you'll be notified by the Retirement Services Center when you request a distribution.

Ex. 505, 1998 SPD at 13 (D00838) (emphasis in original); Ex. 506, 1999 Part B SPD at J-7 (D00629).

245.    The testimony of Plaintiffs' expert, Professor Stratman, was revealing on this point.  When questioned about the Minimum Benefit provision in the SPD, he acknowledged that "this is an effort to reassure folks that the company is aware that there might be some circumstance in which maybe I don't earn any more."  Stratman Tr. 570.

246.    Nowhere does the SPD represent that an employee will receive the Minimum Benefit plus his or her benefit and interest credits ("A +B"), as Plaintiffs now seek.  To the

contrary, the SPD explains that benefit and interest credits are added to an employee's account and that if a participant's account balance (including those benefit and interest credits) is less than the Minimum Benefit (the "old plan benefits on December 31, 1997"), the employee will receive the Minimum Benefit.  Ex. 505, 1998 SPD at 13 (D00838).

247.    The SPD made clear that while it sought to concisely and accurately reflect the key Plan provisions, it served only as a summary and that additional terms and conditions dictated the methodology of the Plan:

> This summary plan includes certain key features of the CIGNA Pension Plan.  It does not, however, cover every detail included in the plan document, trust agreement or other contracts that govern the plan. Every attempt has been made to ensure the accuracy of the information within.  If there is any discrepancy between the contents of this material and the official plan documents and contracts, the plan documents and contracts will govern.

Ex. 505, 1998 SPD at 19 (D00844).

248.    The SPD informs participants that they may obtain a copy of the Plan:

> ERISA provides that all plan participants are entitled to:

> Obtain copies of the plan documents and trust agreements and other plan information upon written request to the plan administrator.

Ex. 505, 1998 SPD at 15(D00840).

249.    The SPD was thereafter included (and is still included) in the new hire benefits binder provided to new employees, and rehired employees, upon the inception of their employment.  Exs. 509-512, Signature Benefits Binders for 1998-2001.  It also later was added to the CIGNA Intranet cite.  Ex. 524, CIGNA Laptop with Intranet Electronic File; Ex. 523, "CIGNA & You" & "Your CIGNA Life" Intranet Printouts.

250.    CIGNA did not anticipate that it would hire as many rehires as it subsequently did.  The November 2000 memorandum in which the Plan Administrator Mr. Beltz

acknowledges that "[r]ecent patterns in rehires have shown that on average we are now rehiring more employees who are closer to early retirement age than ever before" refers only to the number of rehires close to early retirement age and does not speak to the number of rehires as a whole.  The memorandum also speaks nothing to the "facts and circumstances" at the time of the amendment and CIGNA's awareness of the frequency of rehires.  Ex. 138.

251.    As noted in the Signature Benefits documentation provided to participants, and as listed on participants' annual account statements, CIGNA operated a telephone hotline, called AdviceLine®, for participants who wanted more information about the new plan or their benefits thereunder.  The "Signature Benefits Services" operating out of CIGNA's Philadelphia office fielded questions about the new plan through the end of 1997 and into 1998.  Ex. 85, 1998 Total Compensation Report at 8 (P1794).

252.    Additionally, CIGNA's Intranet site also permitted employees to request a benefits estimate or ask questions of a benefits specialist.  This site was called "Cigna and You" until 2005, when the name was changed to "Your Cigna Life."  The Intranet also posted the SPDs for Plan A and Plan B.  Ex. 524, CIGNA Laptop with Intranet Electronic file; Ex. 523, "CIGNA & You" & "Your CIGNA Life" Intranet Printouts.

253.    Finally, CIGNA's Internet website permitted participants to log on to obtain account information, including calculations of their benefits at a given retirement age.  Ex. 521, CIGNA Internet Website Printout.

254.    Today, Prudential maintains a similar website that is called the Prudential Website.  Ex. 522, Prudential Internet Website Printout.

## VI.    THE PART B SPD MET ERISA'S DISCLOSURE REQUIREMENTS.

### A.    The Part B SPD Was Not Required To Disclose The Potential Wear-away Effect, Which Was Not The Result Of A Plan Provision.

255.    The Part B SPD was a summary of the existing, operative plan and was created for distribution to all participants in the new cash balance plan, including Part B participants first hired on or after January 1, 1998 who received an OAB of zero and therefore could not experience any wear-away effect.  Poulin Tr. 357.

256.    The wear-away effect was caused by the interaction of several plan provisions that were disclosed in the SPD, and only could affect participants who were converted to Part B from CIGNA's old pension plan.  Sher Tr. 1020-21, 23.

257.    Specifically, the wear-away effect could occur as a result of some or all of: future interest rate fluctuations, a participant's prior benefit under the old plan, the future salary the participant earns, whether they were in Tier 1 or Tier 2 under the old plan, when they elect to initiated a benefit, when they elect to retire, whether they are married at the time that they elect to initiate a benefit, as well as other unforeseeable factors.  Sher Tr. 1026-29.

258.    Not all participants who had been in the old plan experienced a wear-away effect.  For participants with very short service, no wear-away effect would be experienced because the initial benefit credit in Part B nullified their protected benefit.  Poulin Tr. 219.

259.    Additionally, for a certain group of participants, CIGNA used a more favorable discount rate in calculating their OABs (the five-year Treasury Rate minus 75 basis points rather than the five-year Treasury Rate plus 25 basis points), and used the age 62 rather than the age 65 benefit, which incorporated some of the early retirement subsidy.  This resulted in higher OABs, and some of these participants, for example, testifying class member Barbara Hogan, did not experience any wear-away effect.  Poulin Tr. Tr. 219-21; Ex. 4.

260.     Plaintiffs do not challenge the reasonableness of the initial interest rate CIGNA used to calculate the OABs, but rather admit that regardless of what rate CIGNA had used, the wear-away effect was a result of the fact that interest rates dropped thereafter.  Poulin Tr. 317-18.

261.     Plaintiffs' expert further admitted that for those participants who were not eligible for early retirement subsidies under the old plan, their OAB was actually higher than the actuarial equivalent of their normal retirement benefit at age 65 under the old plan at conversion, because a slightly lower interest rate was used.  Poulin Tr. 328-29.

262.     Plaintiffs' and Defendants' experts agreed that opening account balances could be set to be any number, including zero, as long as previously earned benefits were protected. Sher Tr. 988-89; Ex. 10, Sher Report at 4; Poulin 447-48.

## B.     The Wear-away Effect Was Caused By Falling Interest Rates After The Conversion, Which The Plan Administrator Could Not Anticipate

263.     Much of the wear-away effect about which Plaintiffs complain occurred because prevailing interest rates went down in the years after the conversion.  Accordingly, the value of some participants' frozen minimum benefit increased substantially, such that it was greater than the value of their OAB even with the growth from pay and interest credits.  Poulin Tr. 271.

264.     Indeed, the minimum benefit was designed to protect participants in the event that interest rates declined.  If interest rates decrease, the annuity that one could purchase with the account balance decreases, but the participant still would have the protection of their minimum protected annuity.  Poulin Tr. 479.

265.     Plaintiffs' expert further conceded that had interest rates remained the same as they were at conversion, no wear-away effect would result in terms of the benefit payable at

normal retirement.  Poulin Tr. 318.

266.    CIGNA could not predict in 1998 how future interest rates would flux, and from an economic perspective, Plaintiffs' expert admitted that there is no "way to account perfectly for the changes in interest rates" that will occur in the future.  Poulin Tr. 214, 216; see also Sher Tr. 1103, 1010.

267.    The only fair basis to predict the likely impact of future interest rates, given the unforseeability of their expected change, is to assume constant interest rates, as CIGNA did in its disclosures to participants.  Sher Tr. 1104, 1119.

268.    Mr. Hodges' deposition testimony, merely establishes that Mr. Hodges understood that certain factors, which were "highly contingent upon the facts associated with that individual," could potentially contribute to a wear-away—not that a wear-away necessarily would result upon the conversion, let alone how many employees it would affect or to what degree.  Ex. 241, Hodges Dep. at 94 (stating that there "could be a period" of wear-away).

269.    Mr. Sher demonstrated the inability to predict wear-away effect of normal retirement benefits without knowing future interest rates, both in terms of lump sum and annuity benefits.  He illustrated the way that interest rates affected the wear-away by examining how various testifying class members' wear-away period would have looked if interest rates had remained constant from the year of conversion year remained the interest rate until the participant's normal retirement age.  Sher Tr. 1101-120, 1462-63; Exs. 737, 738.

270.    Mr. Sher's analysis took into account the preretirement mortality discounts that the Plan Administrator applied for Part B.  Sher Tr. 1109.  However, because the analysis examined the effect of interest rates on the normal retirement benefit, it excluded the effect of

any early retirement subsidies, which nevertheless did not have any wear-away effect with respect to lump sum benefits.  Sher Tr. 1103, 1108.

271.    The Free 30 was not considered for purposes of the analysis, because Free 30 eligibility can only be determined at retirement, not before.  Sher Tr. 1109.

272.    Mr. Sher's analysis also examined the wear-away effect if interest rates had gone in the opposite direction, in other words, if interest rates had increased by exactly the same amounts they had actually declined from when the participants converted to Part B until January of 2002.  Sher Tr. 1110-12.

273.    For example, Ms. Broderick's account balance as of July 2000 (upon rehire) was $141,620, and had interest rates remained constant, the lump sum value of her frozen benefit would have increased about $15,000 by January 2002, whereas her cash balance account would have increased about $25,000.  Sher Tr. 1113-14; Ex. 737.  Had interest rates remained constant, Ms. Broderick would have experienced no wear-away effect with respect to her lump sum benefit, i.e., she was always earning additional lump sum benefits and her annuity wear-away effect would have lasted less than 18 months.  Sher Tr. 1016, 1105-06.

274.    Had interest rates risen (instead of fallen as they did) from January 1, 2001 to January 1, 2002, Ms. Broderick's lump sum based on her account balance would have increased from $141,620 to $166,822 (about a $16,000 jump), but the value of her frozen age 65 annuity would have decreased from $141,621 to $134,732 (about a $7,000 decrease), rendering her cash balance more valuable and the minimum inapplicable.  Sher Tr. 1116-17; Ex. 738.

275.    In reality, because interest rates fell, Ms. Broderick's cash balance account increased from $141,620 to $165,995 to (about a $24,000 increase), and the lump sum value

of her frozen age 65 annuity <u>increased</u>, just by more, from $146,254 to $181,719 (about a $35,000 increase).  Sher Tr. 1113.

276.     Mr. Sher's analysis reflected that when interest rates fall, it is more likely that the protected minimum benefit is going to be the "greater of" in the A or B formula, and more valuable than the cash balance, for lump sum and annuity options.  Sher Tr. 1104, 1107.

277.     Furthermore, Mr. Sher's analysis shows that the wear-away effect actually resulted in Ms. Broderick, had she collected a benefit on January 1, 2002, receiving the value of a forty-thousand dollar increase in her lump sum benefit compared to the value of that benefit as of July 2000 when she was rehired.  Sher Tr. 1117-18.

278.     For Plaintiff Glanz, had interest rates remained the same from the 1998 conversion, she would have experienced no lump sum wear-away effect, and her cash balance annuity value would have exceeded her minimum before she finished her first year in Part B.  Sher Tr. 1033-36; Ex. 6.

279.     Indeed, assuming that interest rates remained at the same level as at conversion, the lump sum benefit (as opposed to their annuity benefit) for <u>all</u> of the participants Mr. Sher examined showed zero wear-away effect with respect to their normal retirement benefits.  Sher Tr. 1105-10; Ex. 738.

280.     Mr. Sher's analysis also examined how interest rates would affect a plan which offered an "A + B" approach, which Plaintiffs complain they should have been offered.  Sher Tr. 1121-28, 1325-28.  If interest rates rise, the Part B plan approach ("greater of A or B") produces a greater lump sum value than under the "A + B" approach.  Sher Tr. 1122.

281.     Thus, for some participants, like Mr. Curley and Ms. Hogan, if the mirror image interest rates had occurred, the plan approach would have offered a greater value than

the "A + B" approach would have.  Sher Tr. 1123-24, 26-27.  This resulted in part because these participants received a more favorable opening account balance under Part B given their age and service at the time of conversion, which partially captured the early retirement subsidy under the old plan.  Sher Tr. 1124-25.

282.    Likewise, under the mirror image assumption, Mr. Law's plan benefit using the greater of A or B approach would have been larger than his benefit under the A + B approach.  Sher Tr. 1126-27.

283.    Disclosing to participants that they might suffer a wear-away effect would have been inappropriate because the wear-away effect is an effect that could come and go.  For example, if in the future interest rates increased, the wear-away effect at any point in time could disappear entirely, even retroactively.  Sher Tr. 1011.

284.    In other words, depending upon how interest rates change, "somebody could fall into a wear-away period and then, because of fluctuations in interest rate, have that wear-away period go away and then fall back into the wear-away period, depending on if interest rates fall again."  Sher Tr. 1024-25.

285.    Mr. Sher explained: "you could start off with not thinking you are going to have very much wear-away, interest rates go down all of a sudden looks like you will have four or five years of wear-away, and then next year interest rates go up and it disappears and could come back again.  This notion that there's a "period" [of wear-away] is really a misnomer.  It's an effect . . ."  Sher Tr. 1012.

C.     **The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Only Possibly Affect A Small Subset Of Participants**

1.     **The Wear-Away Effect Attributable To The Early Retirement Subsidy Only Could Result For Eligible Employees During The Early Retirement Window**

286.     The wear-away effect attributable to early retirement subsidies could only occur for a limited population of participants during the time period when they would have been eligible for an early retirement subsidy under the old plan.  Sher Tr. 1026-27.  Because the OAB for most participants was based on their age-65 benefit, whereas some participants' minimum protected annuity could be based on a subsidized early retirement benefit if they retired between ages 55 and 64, the minimum protected early retirement benefit can be greater than the cash balance account for same period of time.  Sher Tr. 1083-84, 1089.

287.     Only Part B participants who previously attained ten years of service were eligible for early retirement and therefore would possibly have been subject to such a wear-away effect.  Sher Tr. 1027.

288.     Plaintiffs do not have any evidence concerning what percentage of the population was eligible for early retirement at the time of the conversion to the cash balance plan population, or what percentage of the population was likely to grow into early retirement eligibility.  Poulin Tr. 1562-63.

289.     In fact, most people who might have otherwise been affected by the early retirement wear-away effect were grandfathered and never became participants in Part B.  Sher Tr. 1009-10.

290.     Plaintiffs' expert did not analyze how much of the actual wear-away that participants experienced was caused by the early retirement subsidies as opposed to other causes that he identified.  Poulin Tr. 316.

291.    Even as to those participants eligible for a subsidized early retirement benefit, the wear-away effect could be outgrown, the same result as for employees working without a cash balance subsidy long as they continue working.  The early retirement subsidy applied between ages 55-64, but if a participant retired upon age 55 and elected to defer benefits, or continued to work until normal retirement age, the additional benefit of the early retirement "would have been foregone as a result of those benefits not commencing."  Sher Tr. 1085.

292.    In other words, if a participant did not take the early retirement subsidized benefit, he would lose the value of the early retirement subsidized benefit gradually from age 55 to 65.  Sher Tr. 964.

293.    Moreover, if someone was eligible for early retirement but was already ages 57, 58 or 59 at the time of the conversion, the impact of the early retirement wear-away effect would be lessened.  Sher Tr. 1028.

294.    Similarly, for younger persons who at the time of the conversion would not be eligible for early retirement for many years, any wear-away effect is likely to be eliminated because if they worked long enough to qualify for early retirement, they necessarily would earn enough in their cash balance account to be unaffected.  Sher Tr. 1028.

295.    For example, Plaintiffs' expert admitted that this would be the likely result for Plaintiff Glanz.  Poulin Tr. 424-25.

296.    The early retirement wear-away effect would only affect a small subset of participants who met a variety of requirements, and only for a limited time period.

    **2.**      **The Wear-Away Effect Attributable To The Early Retirement Subsidy Only Resulted As to Participants' Annuity Options, and Defendants Anticipated Most Participants Would Elect A Lump Sum.**

297.    Importantly, the subsidized early retirement benefit only is available where participants elect their benefits in the form of an annuity.  Sher Tr. 1090.

298.    Because the prior plan did not offer a lump sum option, the lump sum minimum protected benefit in Part B is based on the normal retirement benefit and does not include the value of a subsidized early retirement benefit.  Sher Tr. 1090; Ex. 2 (Part A); Ex. 1, Part B at Section 1.34 (D00281), Section 7.3(c) (D00309).  Accordingly, the wear-away effect only occurs when a participant elects an annuity.  Sher Tr. 1090.

299.    The cash balance plan was specifically designed to offer a new lump sum option, and indeed, CIGNA anticipated that most participants would elect their cash balance benefits in the form of a lump sum.  Sher Tr. 957.

300.    Cash balance plans are expressed in the form of lump sums and most participants elect lump sums.  Sher Tr. 1120-21.

301.    Rarely has Mr. Sher "seen anything under 80 percent and often the number is closer to 90 percent" of participants taking lump sums when such option is available.  Sher Tr. 1091.

302.    Cash balance plan benefits are considered easier to understand than those provided under a traditional defined benefit plan, because the benefit value is expressed in terms of an account.  Sher Tr. 955, Ex. 10, Sher Report at 1.

303.    Participants favor lump sums because "[t]hey can control the money, it's flexible, they can withdraw the money when they need it, they can leave money, you know, if money's left over it can go to their heirs."  Sher Tr. 957.

> **D.     Plaintiffs' Communications Expert James Stratman's Analysis Was Highly Flawed.**

304.     Plaintiffs' communications expert James F. Stratman did not address the 1998 Total Compensation Report and opening account statement in his report.  Ex. 8 at 4.

305.     Plaintiffs' expert, Professor Stratman, testified that "repetition is one of the most powerful devices" for communication with plan participants, yet he inexplicably disregarded the Plan Administrator's repeated message to Plan participants that the exact amount of their cash balance accounts would be set forth in their individualized annual account statements and Total Compensation Reports.  Stratman Tr. 562-563.

306.     Mr. Stratman admitted that he did not even know that the "enhanced retirement program" included a 401(k) plan.  Stratman Tr. 584.

307.     Mr. Stratman conceded that "any plan participant who read the Signature Benefit Newsletter or the retirement kit would understand that when CIGNA said it was enhancing its retirement program, it was talking about both the cash balance plan and the 401k plan together."  Stratman Tr. 585.

308.     While Mr. Stratman allegedly opined on the misleading nature of the SPD obscuring the negative features of the old plan, he was not asked to consider any differences between the old and new plan that might be considered to be improvements or enhancements.  Stratman Tr. 579.

309.     Mr. Stratman also did not consider the fact that under the new plan, participants now had the option to take a lump sum distribution of their entire account balance, an option that was not available under the old plan.  Stratman Tr. 579.

310.     Mr. Stratman also did not consider: (1) the increased portability the new plan afforded participants; (2) the fact that participants could take their benefit and roll it into an

individual retirement account, (3) that under the new plan, participants earned benefits more evenly over their careers, or (4) that the new plan made it easier for participants to understand the benefit amounts they were entitled to at any point in time.  Stratman Tr. 580, 583.

311.    Mr. Stratman also did not consider the fact that thousands of participants in the cash balance plan worked in the retirement industry, and had a particularly sophisticated knowledge about how the plans work.  Stratman Tr. 591.

**E.**      **None Of The Plaintiffs Or Testifying Class Members Suffered Likely Or Actual Harm Resulting From Any Omission In The SPD Or Section 204(h) Notice.**

312.    None of the Plaintiffs or testifying class members suffered any likely or actual harm as a result of any alleged disclosure violations in connection with Counts 2 or 4.

313.    Plaintiff Janice Amara was born on April 3, 1950, making her 47 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.  Trial Testimony of Janice Amara ("Amara Tr.") 15.

314.    Ms. Amara graduated law school in 1986.  Amara Tr. 15.  She was an employee benefits specialist.  Amara Tr. 15.

315.    Ms. Amara worked for CIGNA from 1972 until 1995, and was rehired in 1998.  Amara Tr. 15-16.

316.    At the time Ms. Amara left CIGNA in 1995, the Plan Administrator provided her with an estimate of the pension benefits she had earned under Part A.  Amara Tr. 19.

317.    Ms. Amara took a pay cut to return to CIGNA in 1998.  Amara Tr. 46.  She knew before being rehired by CIGNA that she would be placed in Part B when she returned.  Amara Tr. 22, 26.  Her expected pension benefits at CIGNA had nothing to do with her decision to return to the company, and she did not read the Part B SPD before she returned.

Amara Tr. 54.

318.    Ms. Amara first reviewed the Part B SPD on CIGNA's Intranet in 1999.

Amara Tr. 54-55.  She did not read the SPD carefully, but simply skimmed through it.  Amara

Tr. 55.

319.    Ms. Amara was advised by a co-worker, Mark Lynch, in September 2000 that

her opening account balance in Part B was affected by a "wear-away."  Amara Tr. 34.  She

understood what a "wear-away" was at the time Mr. Lynch spoke with her.  Amara Tr. 34.

320.    Ms. Amara spoke to the U.S. Department of Labor ("DOL") about the "wear-

away," and the DOL confirmed that it was legal.  Amara Tr. 47.

321.    Beginning in 1999, Ms. Amara received annual account statements and Total

Compensation Reports that described the exact amount of her Part B benefits.  Amara Tr. 33,

49.

322.    Ms. Amara made no effort to seek other employment outside of CIGNA at any

point before she left the company in 2003.  Tr. 17, 45.

323.    When she left CIGNA, Ms. Amara received $100,400 in severance pay in

exchange for signing a release.  Amara Tr. 45, 59, 64; Ex. 525.

324.    Ms. Amara had an opportunity to and did consult with an attorney before

signing the release.  No CIGNA attorneys spoke with her regarding the release.  Amara Tr. 57-

59.

325.    Ms. Amara has not tendered back the consideration she received upon

execution of the release.  Amara Tr. 59.

326.    Ms. Amara currently receives a pension benefit under Part A.  The Plan

Administrator switched her from Part B to Part A following the Third Court's decision in the

Depenbrock case.  Amara Tr. 44.

327.    Ms. Amara's estimates or benefit distribution forms related to Part B therefore had no bearing on the benefits to which she is entitled, as she is receiving benefits as if she were in Part A.  Amara Tr. 44.

328.    Plaintiff Gisela Broderick was born on March 12, 1944, making her 53 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.  Trial Testimony of Gisela Broderick ("Broderick Tr.") 69.  She has college and masters level degrees in mathematics. Broderick Tr. 70.

329.    She began working for CIGNA in 1980, but left the company as of December 31, 1997 when her business unit was sold to Lincoln National.  Broderick Tr. 72.  Prior to leaving CIGNA, she received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan.  Broderick Tr. 76-77, 144.  At the time she left CIGNA, the Plan Administrator provided her with an estimate of the pension benefits she would receive under Part A at retirement.  Broderick Tr. 78.

330.    Although she was entitled to a defined benefit pension while at Lincoln National, she never asked to see the SPD or plan document that described those benefits. Broderick Tr. 79.

331.    Later in 1998, she left Lincoln National to work for Hartford Life.  Prior to accepting employment with Hartford Life, she did not request any information about Hartford's pension plan.  Although she was entitled to a defined benefit pension while at Hartford, she never read the pension plan SPD in detail.  Broderick Tr. 79.

332.     In 1999, she left Hartford Life to work for Aetna.  Prior to accepting employment with Aetna, she did not request or review the SPD describing her pension benefits.  Broderick Tr. 81.  She received an SPD for the Aetna pension plan and the 401(k) plan after she started her employment, but did not read it cover-to-cover.  She focused on what she considered to be the salient points — the company matching contribution under the 401(k) plan and the vesting schedules.  Broderick Tr. 81.

333.     Although Ms. Broderick testified that she was interested in returning to CIGNA so she could be eligible for retiree medical benefits and earn additional pension benefits, she never initiated contact with CIGNA to explore re-employment.  However, representatives of CIGNA did initiate contact with her to ask her to consider returning in 2000.  Broderick Tr. 81-82.

334.     Prior to returning to CIGNA, Ms. Broderick did not ask to see the SPDs or Plan documents for Part A or Part B of the CIGNA Pension Plan.  She did, however, contact the CIGNA Benefits Hotline and was advised that she would recover her service years and be reinstated in the Plan.  The Benefits Hotline representative did not indicate whether she would be placed in Part A or Part B.  Broderick Tr. 84-85, 140-41.

335.     Ms. Broderick returned to CIGNA in June 2000 and was placed in Part B. Broderick Tr. 87.  Upon returning to CIGNA, she received annual account statements and Total Compensation Reports that described the exact amount of her Part B benefits.  She read these statements carefully and never raised any questions about them.  Broderick Tr. 105, 127, 137. Gisela Broderick testified that based on her Part B annual account statement, she understood that she would not be entitled to the so-called "A + B" formula constituting her prior pension plan benefit plus her cash balance accruals.  Tr. 133.

336.    Plaintiff Broderick testified that when she returned to CIGNA in 2000, she knew the SPD was available on CIGNA's Intranet website, but did not review it until 2002. Broderick Tr. 141-42.

337.    Ms. Broderick left CIGNA in 2004 because she was unhappy with her work assignments.  Her pension benefits had nothing to do with her decision to leave.  Broderick Tr. 146-47.

338.    She received $81,528.45 in severance pay in exchange for signing a release. Broderick Tr. 147; Ex. 526.

339.    Ms. Broderick had an opportunity to and did consult with an attorney before signing the release.  No CIGNA attorneys spoke with her regarding the release.  Broderick Tr. 149.

340.    Ms. Broderick has not tendered back the consideration she received upon execution of the release.  Broderick Tr. 150.

341.    Ms. Broderick and her husband have never engaged in financial or retirement planning because her husband is not inclined to discuss financial issues and plans.  Broderick Tr. 138-39.

342.    Ms. Broderick acknowledged that the annual account statements and Total Compensation Reports provided to her by CIGNA were provided to help her in financial planning, but admitted that she and her husband never prepared a financial plan.  Broderick Tr. 138-39.

343.    Ms. Broderick was erroneously not offered the Free 30% when she initiated benefit payments in 2003.  Upon notification by Ms. Broderick that there was a problem with her benefits, CIGNA treated her complaint as a claim to the plan administrator, who upon

discovery that an error had been made, recalculated her benefits to provide the Free 30%. Broderick Tr. 143. Ms. Broderick is now receiving all benefits to which she is due. Broderick Tr. 143.

344.    Plaintiff Annette Glanz was born on October 6, 1964, making her 33 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A. Trial Testimony of Annette Glanz ("Glanz Tr.") 156. She has a college degree in accounting. Glanz Tr. 156. She began working for CIGNA in 1988. Glanz Tr. 157.

345.    In 1997, Ms. Glanz received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan. Glanz Tr. 161-63. In 1998, she received the Part B SPD, but did not read that document carefully. Glanz Tr. 182, 184. In 1999, she received the revised Part B SPD, but did not read that document carefully. Glanz Tr. 184.

346.    Beginning in 1998, Ms. Glanz received annual account statements and Total Compensation Reports that described the exact amount of her Part B benefits. She acknowledged that because she was only about 40 years old at the time, she did not pay close attention to any pension-related information provided to her by CIGNA. Glanz Tr. 184.

347.    Ms. Glanz read the first annual account statement carefully, understood what her benefits under Part B were, and thereafter did not read these statements carefully because she already understood what they portrayed. Glanz Tr. 184.

348.    As a result of information communicated on the annual account statements, Ms. Glanz was aware that there was a toll-free number she could call to raise questions about her Part B opening account balance and benefits, but she never did so. Ms. Glanz opted not to

request a pension estimate, because she understood that all of the "factors" affecting her pension amount could change substantially in the future, and that interest rates could fluctuate. Glanz Tr. 184-85, 200.

349.    Ms. Glanz volunteered for layoff from CIGNA in 2004 because she wanted to move closer to her parents, who had relocated to Charlotte, North Carolina.  Glanz Tr. 171. As she requested, she was laid off from CIGNA in June 2004, and relocated to Charlotte, in the same town as her parents.  Glanz Tr. 171, 194.

350.    Ms. Glanz's decision to volunteer for layoff had nothing to do with the pension benefits she was receiving from CIGNA.  Glanz Tr. 175, 194.

351.    Upon relocating to Charlotte, Ms. Glanz began working temporary assignments in February 2005 and found permanent employment in 2005.  She accepted a job with a company that has no defined benefit pension plan.  Glanz Tr. 190.  She is entitled to participate in a 401(k) plan.  Glanz Tr. 190.  She did not ask to review the SPD for the 401(k) plan before accepting employment because retirement benefits were not a factor in her decision to accept the job.  Glanz Tr. 190.

352.    Prior to leaving CIGNA, Ms. Glanz and her husband did not have a written or formal financial plan into which expected retirement information would have been factored. Glanz Tr. 190-91.

353.    After arriving in Charlotte, Ms. Glanz and her husband retained a financial adviser.  The financial adviser was able to incorporate the retirement data from her annual account statements into a plan that projected her retirement plans.  Glanz Tr. 194.

354.    Ms. Glanz admitted that she would have stayed with CIGNA, even if she knew her pension was being reduced.  While she alleges that she would have requested a pay

increase, she conceded that raises typically were not negotiated at CIGNA.  Glanz Tr. 170,

177-78.

355.    At the time she left CIGNA, Ms. Glanz signed a release in exchange for

$46,009.62 in severance pay.  Glanz Tr. 174, 195; Exs. 527, 600, 601.

356.    Ms. Glanz read the release, did not consult an attorney or ask any questions of

anyone at CIGNA before signing it, did not speak with any CIGNA attorneys about the

release, and has not offered to tender back the consideration she received upon execution of

the release.  Glanz Tr. 196-97.

357.    Class member Bruce Charette was born on December 13, 1967, making him 29

years old at the time of the November 1997 Newsletter announcing the Part B cash balance

plan and the freezing of accruals for some participants under Part A.  Trial Testimony of

Bruce Charette ("Charette Tr.") 847.  He began working for CIGNA in 1987.  Charette Tr.

847.

358.    In 1995, the Plan Administrator provided Mr. Charette with an estimate of the

pension benefits he would receive under Part A at retirement.  Charette Tr. 870.

359.    In 1997, Mr. Charette received the November 1997 Newsletter and the

Retirement Kit describing the Part B cash balance plan, but did not read the entire document.

Charette Tr. 852.

360.    In 1998, Mr. Charette received the Part B SPD, but did not read it carefully.  He

found nothing misleading in the SPD.  Charette Tr. 858-59, 866.  In 1999, he received the

revised Part B SPD, but did not read it carefully.  There is nothing he found misleading in the

SPD.  Charette Tr. 866.

361.    Beginning in 1998, Mr. Charette received annual account statements and Total Compensation Reports that described the exact amount of his Part B benefits.    Charette Tr. 856.  Upon receiving the first annual report, which described his Part B opening account balance, he contacted the CIGNA benefit counselors because he thought his opening balance was too low.  The benefit counselors explained why he had been placed into Part B and how his opening account balance had been determined.  Charette Tr. 856-57.

362.    Mr. Charette did not alter his retirement plans based on the information he received regarding the amount of his Part B opening account balance.  Charette Tr. 858.

363.    In 2000, the Plan Administrator provided Mr. Charette with a benefit summary sheet describing his Part B benefits.  Charette Tr. 862.

364.    Mr. Charette testified that he believed that there was something "wrong" about the new plan when he read a newspaper article about the Depenbrock suit.  Charette Tr. 859.  He admitted, however, that he did not alter his retirement goals or increase his 401(k) plan contributions, and that the information did not alter his decision to remain employed at CIGNA.  Charette Tr. 869-70.

365.    In 2005, Mr. Charette asked for and received from Prudential, the Plan's new recordkeeper, a written explanation of how his Part B opening account balance was determined.  Charette  Ex. 663.

366.    None of the information Mr. Charette received from CIGNA or Prudential regarding his Part B account has had any impact on Mr. Charette's expectations regarding when he would retire, the amount he contributes to his 401(k) account, or his decision to remain employed with CIGNA, where he still works today.  Charette Tr. 869-70.

367.    Class member Patricia Flannery was born on March 20, 1946, making her 51

years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.  Trial Testimony of Patricia Flannery ("Flannery Tr.") 873.

368.    Ms. Flannery completed one year of college at night while working in the 1970s.   Flannery Tr. 873.  She began work for CIGNA in 1978 and left for another job opportunity in 1979.  Flannery Tr. 873.

369.    In 1981, Ms. Flannery returned to CIGNA until 1991, when she was laid off. Flannery Tr. 902, 912.  In 1993, Ms. Flannery returned to CIGNA on a short-term job until 1994.  Flannery Tr. 902.  In September, 1994, Ms. Flannery returned to CIGNA as an independent contractor doing clerical work until 1997, until her project ended.  Flannery Tr. 914.  After March 1997, Ms. Flannery worked as an independent contractor for CIGNA doing computer testing, for two years.  Flannery Tr. 873-74, 913.

370.    In October 2000, Ms. Flannery returned to CIGNA as a business analyst. Flannery Tr. 874.  She got the job through a colleague at CIGNA who also served as a business analyst, and was motivated to return by her desire to have healthcare and a pension, and she was not making as much money in calligraphy.  Flannery Tr. 876, 914

371.    She also claimed that had she known that rehired employees would be participants in Part B, she would have negotiated a higher salary upon her rehire.  On cross examination, however, she conceded that, in fact, she tried to negotiate a higher salary upon her rehire, but was unsuccessful.  Flannery Tr. 914-15.

372.    During the interview process, Ms. Flannery asked the Human Resources representative about her pension, and was told that her previous service would be bridged, that

she would get her pension, and that more information would be provided in orientation when she began her job.  Flannery Tr. 877, 904.

373.     The materials provided on the first day of Orientation instructed Ms. Flannery to contact the pension department for more information on her pension.  Flannery Tr. 878. Two months later, at the beginning of 2001, Ms. Flannery spoke with Gene Bruler of HR regarding her pension.  Flannery Tr. 879.

374.     Ms. Flannery claimed that she would not have returned to CIGNA had she known she "was going to jeopardize my pension."  Flannery Tr. 896.  However, when Ms. Flannery heard about the employment opportunity at CIGNA in 2000, she had been working for years doing calligraphy and framing and not earning any pension, and that she did not turn down any other job offers to work for CIGNA.  Flannery Tr. 913-15.

375.     Ms. Flannery also complained that upon her rehire in 2000 she was not given sufficient information regarding Part B, but admitted that even when she was told that the Part B SPD was available online, she did not review it.  Flannery Tr. 919-20.

376.     In March 2001, Ms. Flannery received an estimate of her benefits in Part B, and she immediately thought that an error had been made because the figure of her opening account balance was too low.  Flannery Tr. 878.

377.     In July 2001, Ms. Flannery contacted Stewart Beltz, who she understood to be the Plan Administrator for the CIGNA pension plan, to inquire as to why she had been converted to Part B.  Flannery Tr. 879.

378.     In 2003, Ms. Flannery received her Total Compensation Report and in 2004 and 2005, her Total Rewards Report.  Flannery Tr. 917, Ex. 713 -715.

379.    In July 2004, Ms. Flannery called Prudential Retirement to inquire regarding her service credits for her prior CIGNA employment.  Flannery Tr. 895-96.

380.    In 2005, Ms. Flannery contacted John Arko, who she understood at that time to be the Plan Administrator for the CIGNA pension plan, and asked him to review her opening account balance because she believed there was an error.  Flannery Tr. 884.

381.    Prudential reviewed her prior CIGNA employment service history and determined that an error had been made in the calculation of Ms. Flannery's opening account balance.  Prudential then recalculated her opening account balance and sent her a statement indicated how such balance was derived.  Flannery Tr. 897-98, 920.

382.    After her account balance was corrected, Ms. Flannery received a pension statement, and was also able to access Prudential's website to check her account balance. Flannery Tr. 917-18.

383.    Despite that claims to have known since 2001 that her pension was less than she expected, Ms. Flannery has continued to work for CIGNA and still works there today. Flannery Tr. 916.

384.    Class member Barbara Hogan was born on November 5, 1945, making her 52 years old at the time of the November 1997 Newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.  Trial Testimony of Barbara Hogan ("Hogan Tr.") 701.  She began working for CIGNA in 1990.  Hogan Tr. 702.

385.    Because she had more than 55 age and service points at conversion, she received the more favorable OAB calculation and experienced no wear-away effect.  Poulin Tr. Tr. 219-21.

386.    In March 1997, the Plan Administrator provided Ms. Hogan with an estimate of the pension benefits she would receive under Part A at age 62.  Hogan Tr. 704; Ex. 643.

387.    Later in 1997, Ms. Hogan received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan.  Hogan Tr. 704-05.  Upon reading these materials, she understood that she would not be accruing any additional benefits under Part A.  Hogan Tr. 726-28.

388.    Because Ms. Hogan had more than 55 age and service points at the conversion, she received the more favorable opening account balance calculation such that there was no wear-away effect.  Poulin Tr. 220-221, 311, 313.

389.    Ms. Hogan received the 1998 Part B SPD, but did not read it carefully.  Hogan Tr. 726.

390.    Beginning in 1998, Ms. Hogan received annual account statements and Total Compensation Reports that described the exact amount of her Part B benefits.  Upon seeing the amount in her opening account balance in 1998, she increased her contributions to her 401(k) account.  Hogan Tr. 714-16, 730.  She thereafter incorporated the information regarding her pension benefits set forth in those reports in her retirement and financial planning.  Hogan Tr. 716.

391.    In mid-1999, Ms. Hogan requested a set of estimates for her retirement benefits under Part B and then compared them to her old pension plan estimate she had received in March 1997.  Hogan Tr. 710-12; Ex. 645.

392.    Ms. Hogan also received a summary of her Part B benefits in June 1999, which she incorporated into her financial planning.  Hogan Tr. 711-12, 716.

393.    Although Ms. Hogan claimed that she would have increased her savings had

she better understood her pension benefits, Hogan Tr. 716, she admitted that she made no adjustments to her savings and even purchased a more expensive house after she learned that her benefits were less than she suspected.  Hogan Tr. 724.

394.     Similarly, she claimed that she would have asked for a raise, Hogan Tr. 717, but acknowledged she never did so after she learned that her retirement benefits were lower under the cash balance plan.  Hogan Tr. 733-35.

395.     Ms. Hogan retired from CIGNA in 2001 and received a lump sum distribution of her Part B account balance.  Hogan Tr. 720-21.  She has made no effort to obtain employment since retiring from CIGNA.  Hogan Tr. 717.

396.     Class member Robert Upton was born on March 28, 1952, making him 45 years old at the time of the November 1997 newsletter announcing the Part B cash balance plan and the freezing of accruals for some participants under Part A.  Trial Testimony of Robert Upton ("Upton Tr.") 636.  He worked for CIGNA from 1990 until April 2005 as an attorney.  Upton Tr. 637-38.

397.     Among the positions Mr. Upton held prior to joining CIGNA was a five-year stint with the Social Security Administration, where he received extensive training on, among other things, calculating benefits.  Upton Tr. 637, 670.  He is a 1994 graduate of Dickinson Law.  Upton Tr. 637.

398.     In 1997, Mr. Upton received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan.  Upton Tr. 639-40.

399.     Beginning in 1998, Mr. Upton received annual account statements and Total Compensation Reports that described the exact amount of his Part B benefits.  Upton Tr. 644-45.  He received the first account statement, which set forth his Part B opening account

balance, in the summer of 1998. Upton Tr. 645. He thought the amount in his opening

balance was "shockingly" below what he had expected to receive, and raised this issue with

the Plan Administrator. Upton Tr. 645, 649.

400. Mr. Upton later advised the Plan Administrator that his expected Social

Security benefit had been overestimated in setting his Part B opening account balance. The

Plan Administrator recalculated his opening account balance to evaluate any effect of this

error. Upton Tr. 684-86.

401. Mr. Upton continued to receive annual account statements and Total

Compensation Reports describing the exact amount of his Part B benefit until he left CIGNA

in 2005. Upton Tr. 681.

402. Mr. Upton's financial adviser was able to incorporate the pension information

set forth in the Total Compensation Report and individual account statement CIGNA provided

him regarding his cash balance into a financial plan. Upton Tr. 688-91.

403. However, this information had no impact on the amount he was contributing to

his 401(k) account, as he had already reached the maximum contribution limits. Upton Tr.

656.

404. Beginning in November 1998, the Plan Administrator provided Mr. Upton with

a series of benefit summary sheets describing his Part B benefits. Upton Tr. 646.

405. Mr. Upton also raised a number of questions about his Part B benefits with the

Plan Administrator in 1999 and 2000, to which the Plan Administrator truthfully responded.

Upton Tr. 656-662.

406. Mr. Upton testified that he learned in 1999 that his pension benefit was going

to be 29 percent lower under the new plan. Upton Tr. 657-58.

407.    Despite this, Mr. Upton made no effort to actively search for a job outside of CIGNA until he interviewed with AAA Mid-Atlantic in 2005.  Upton Tr. 671.   He left CIGNA voluntarily in April 2005 to work for AAA Mid-Atlantic.  Upton Tr. 670.  AAA Mid-Atlantic also has a cash balance plan.  Mr. Upton did not ask any questions about the AAA Mid-Atlantic cash balance plan or review the AAA Mid-Atlantic cash balance plan SPD before accepting employment with AAA Mid-Atlantic.  Upton Tr. 672-73.

408.    Mr. Upton is a beneficiary under his partner's pension plan, but has never reviewed the SPD for that plan.  Upton Tr. 673-74.

## VII.    DEFENDANTS' FAILURE TO PROVIDE PRESENT-VALUE DISCLOSURES PRIOR TO OCTOBER 2004 DID NOT VIOLATE ERISA (COUNT 5).

409.    Under Part B, the benefit options only were unequal for participants eligible for a subsidized early retirement frozen annuity benefit that was more valuable than the lump sum benefit they elected.  This differential occurred because the old plan's early retirement subsidy was protected only as part of the minimum annuity — not in the protected minimum lump sum.  Poulin 1578.

410.    Part A only offered an annuity option, and provided for a subsidized early retirement benefit, which was protected under Part B only as part of the minimum protected annuity.  Sher Tr. 1084, 1229.

411.    The Plan's so-called Free 30 benefit, the Part A survivor's benefit that was part of the minimum benefit protected under Part B, did not create a relative value issue.  This is because the Free 30 was protected both as part of the minimum lump sum and the minimum protected annuity.  Ex. 1, Part B at Section 1.32 (D00280).

412.    None of the named plaintiffs established likely prejudice with regard to the lack of relative value disclosures on their benefit election forms.

413.    Ms. Amara is receiving benefits as if she was in Part A.  When she elected her

benefits under Part A, all of the benefit options had the same value, and any estimates or

distribution forms related to Part B had no bearing on the benefits to which she is entitled.

Amara Tr. 44; Ex. 540 (notification regarding <u>Depenbrock</u> recalculation).

414.    Plaintiffs acknowledged that they are not seeking any relief on behalf of

Ms. Amara.  <u>See</u> Tr. 432 ("Court: [s]he . . . has gotten everything you would have hoped for

her, right?  MR. BRUCE:  I believe that's correct, your Honor.").

415.    Plaintiff Broderick, a Tier 1 rehire who was eligible for the Free 30%, was

erroneously not offered the Free 30% when she initiated benefit payments in 2003.  CIGNA

recalculated Ms. Broderick's benefits to provide the Free 30%, and she chose the annuity

option, which was the most valuable of her benefit options.  Broderick Tr. 110; Ex. 38

(Broderick Benefit Election Form).

416.    Ms. Glanz has not initiated benefits, and Mr. Poulin admitted that she was not

eligible for a subsidized early retirement benefit.  Poulin Tr. 228.

417.    Now that benefit election forms must either state that all benefit options are

relatively equal or else provide some meaningful comparison of the options, CIGNA, with the

assistance of its recordkeeper Prudential, has taken steps to comply with the new requirements

on disclosures.  Morris Tr. 804-07.

418.    Defendants' expert Mr. Sher's testimony confirmed that prior to the 2003

Treasury regulations amendment, companies did "not, as a general matter" provide the relative

values of different benefit options.  Sher Tr. 1231-32.

419.    Companies did not know how to provide such information to participants, and

were concerned about misleading participants, because participants would then be making "a

decision based on incomplete or potentially misleading information."  Sher Tr. 1233, 1237, 1239, 1245-46.

420.    Rather, companies typically would do what CIGNA's Plan Administrator did, which was to include the amounts of the different benefits without any comparison of present values.  Sher Tr. 1240.

421.    Prior to the 2003 amendment, CIGNA's Plan Administrator notified participants about each benefit form available to them, the amount of the benefit, and when and how that benefit is payable.  Although not specifically designated on the form as a minimum benefit under Section 1.1(c) or 7.3 of Part B, the minimum benefits were included among those benefit options.  Sher Tr. 1258; see, e.g., Ex. 696.

422.    Douglas Robinson's benefit election form accurately reflected the benefit options available to him at the time that he requested a benefit.  Poulin Tr. 425-28; Ex. 144.

423.    The participants affected by the Depenbrock decision did not receive a benefit election form with different forms of benefit options.  Rather, these participants were offered a re-election into Part A or Part B, and Plaintiffs cite no authority whatsoever for the proposition that the relative value regulations should be extended to such a re-election.  Exs. 539-41.

424.    Lillian Jones is the only class member for Plaintiffs adduced evidence that she chose a less valuable benefit option from an election form which did not disclose the relative values of the options.  Jones Tr. 740; Ex. 191 (Jones election form).

425.    While her testimony was quite hazy, Ms. Jones sketchily suggested that she might be willing to re-pay her lump sum and elect the annuity option.  Jones Tr. 747-49.

426.    Ms. Jones' testimony suggested that any deficiency in Ms. Jones' benefit election form was harmless error because, as she testified, she chose the lump sum since she

could roll it over into an IRA and then it would grow.  Jones Tr. 742.

427.    While Plaintiffs complain that participants should not have been required to
retain personal financial planners in order to discern the difference between the lump sum and
annuity options, calculator are available online that translate the value of a lump sum today in
the form of a future annuity.  Sher Tr. 1455.

428.    While one benefit option may have a greater actuarial value, it often will be
less valuable to the individual participant because, for example if she was in poor health, had a
family history of dying young, or had some greater investment available or business to invest
in.  Sher Tr. 1233.

429.    In order to determine the relative value of a lump sum and annuity option for a
given participant, one would have to consider the life expectancy, including gender, which
would require CIGNA to engage in gender discrimination not permitted under ERISA.  Sher
Tr. 1224-25.

430.    Prudential has corrected any mistakes since October 2004 in which the benefit
options were not relatively equal and participants were so informed on their benefit election
form.  Such affected participants already were given an opportunity to re-elect their benefit in
light of the more fulsome relative value disclosures.  Morris Tr. 804-07; Ex. 740 (example
letters to participants reflecting revised relative value disclosures).

431.    Prudential has brought all benefit election forms into compliance with the
current regulations requiring present-value relative value disclosures.  Ex. 740 (example letters
to participants reflecting revised relative value disclosures).

432.    The group of participants who have benefit options of unequal present value in
the future is undefined and indefinable at the present time.  Sher Tr. 1026-27, 1085.

433.    CIGNA's Plan Administrator alone is responsible for providing participants proper benefit election forms and is tasked with the responsibility for interpreting the Plan and providing benefits to participants.  Ex. 1, Part B at Sections 13.2(a), (d).

434.    CIGNA's Plan Administrator has never been named as a defendant in this action.

435.    Plaintiffs' anti-cutback claim does not relate back to the filing of the earlier Complaints because it does not arise out of the same conduct upon which the claims in the original Complaint were based.  See Complaint filed December 18, 2001.

## VIII.  PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES WHICH BAR THEIR CLAIMS (ALL COUNTS).

436.    On September 22, 2003, almost two years after first filing her original complaint, Plaintiff Amara volunteered to be laid of by CIGNA and signed an Agreement and Release ("Release") in which she agreed "that [she] will not file (or ask or let anyone file for [her]) any charge, complaint, claim or lawsuit of any kind in connection with any claim released by this Agreement. . . ."  Ex. 525, Amara Release at ¶ 5(a).

437.    Ms. Amara further agreed to "release and discharge" any "Claims," defined in the Release as "any and all claims, demands and causes of action of whatever kind, including any claims for attorney's fees, that you now have, or at any time had, against any Released Persons, but only to the extent they arise out of or relate in any way to your employment or termination of employment with the Company and its affiliates."  Ex. 525, Amara Release at ¶ 5(e).

438.    The Release Ms. Amara signed waived all claims relating to her employment, but provided a narrow exception for claims for benefits under a pension plan.  Specifically, the

Release contains an exception for, among other things, "claims for benefits under any retirement, savings or other employee benefit programs."  Ex. 525, Amara Release at ¶ 5(f).

439.    As explained herein, Ms. Amara and the other Plaintiffs' claims in this lawsuit are not "claims for benefits <u>under</u>" the Plan.  Rather, Plaintiffs assert that the Plan is unlawful and that they are entitled to monies <u>in addition to</u> the benefits provided under the Plan.

440.    Class Representatives Amara, Broderick and Glanz each signed releases.  Ex. 525 (Amara Agreement and Release), 526 (Broderick Agreement and Release), 527 (Glanz Agreement and Release).

441.    Thousand of other class members signed a release virtually identical to the one signed by Ms. Amara, and received severance pay in exchange for doing so.  Ex. 559, Agreements and Releases of Class Members.  None of the Plaintiffs or class members who signed a release has tendered back the consideration they received in exchange for doing so.

Dated:  June 25, 2007                    Respectfully submitted,


**MORGAN, LEWIS & BOCKIUS LLP**

By:  /s/ Joseph J. Costello
Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
*Admitted pro hac vice*
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
(215) 963-5295/5258/5472
(215) 963-5001 (fax)

**ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)
*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*