UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------X
                                                     :
JANICE C. AMARA, GISELA                              :     3:01 CV 2361 (MRK)
R. BRODERICK, ANNETTE S. GLANZ                       :
individually, and on behalf of others                :     Trial Dates:
similarly situated,                                  :     September 11-15, 2006
                                                     :     January 24-25, 2007
                          Plaintiffs,                :
           v.                                        :
                                                     :
CIGNA CORP. AND CIGNA                                :
PENSION PLAN,                                        :
                                                     :
                          Defendants.                :
                                                     :
-----------------------------------------------------X

### DEFENDANTS' POST-TRIAL PROPOSED CONCLUSIONS OF LAW

Dated:  June 25, 2007          **MORGAN, LEWIS & BOCKIUS LLP**
                               Joseph J. Costello
                               Jeremy P. Blumenfeld
                               Jamie M. Kohen
                               *Admitted pro hac vice*
                               1701 Market Street
                               Philadelphia, Pennsylvania  19103-2921
                               (215) 963-5295/5258/5472
                               (215) 963-5001 (fax)

                               **ROBINSON & COLE**
                               James A. Wade (CT # 00086)
                               280 Trumbull Street
                               Hartford, Connecticut  06103
                               (860) 275-8270
                               (860) 275-8299 (fax)

                               *Attorneys for Defendants*
                               *CIGNA Corporation and CIGNA Pension Plan*

# TABLE OF CONTENTS

**Page**

I.     PART B IS NOT AGE DISCRIMINATORY ................................................. 1

    A.     The Current State Of The Law Regarding Cash Balance Plans ........................... 1

    B.     Part B Treats Older Employees At Least As Well As It Treats Younger
        Employees ................................................................................................................... 3

    C.     The Decisions Finding That Cash Balance Plans Are Age Discriminatory
        Are Flawed ................................................................................................................. 5

        1.     The Phrase "Rate Of An Employee's Benefit Accrual" Does Not
                Refer To The "Accrued Benefit." ................................................................ 5

        2.     The Term "Benefit Accrual" Cannot Refer To The "Accrued
                Benefit" Because That Interpretation Cannot Be Applied
                Consistently At All Ages. ............................................................................ 11

        3.     The Second Circuit's Decision In <u>Esden v. Bank of Boston</u> Does
                Not Address Age Discrimination Or The Meaning Of The Term
                "Benefit Accrual." ....................................................................................... 13

        4.     The Economic Effects That Plaintiffs Challenge Here Are Lawful
                In Other Contexts, Including With Traditional Defined Benefit
                Plans ............................................................................................................ 15

        5.     The Treasury Department Has Consistently Endorsed Cash
                Balance Plans As Not Being Age Discriminatory ................................... 16

    D.     Plaintiffs' Argument That Wear-Away Is Age Discriminatory Is A
        Distortion Of The Facts and Governing Law ...................................................... 19

    E.     Plaintiffs' Age Discrimination Claim Is Time-Barred ........................................ 21

II.    PART B DOES NOT VIOLATE ERISA'S NONFORFEITABILITY RULE OR
    ERISA'S 133⅓% ANTI-BACKLOADING RULE ...................................... 24

    A.     The Plan Does Not Violate ERISA's 133⅓% Rule ........................................... 25

    B.     The Plan Does Not Cause Any Impermissible Forfeitures ................................. 29

    C.     Count 1 Also Is Time-Barred ................................................................................ 34

III.   PLAINTIFFS WERE NOT LIKELY OR ACTUALLY HARMED, AND THE
    WRITTEN DISCLOSURES SATISFIED ERISA'S DISCLOSURE
    REQUIREMENTS ....................................................................................... 35

    A.     The Opening Account Balance Information, Total Compensation Reports
        And Annual Account Statements Distributed To Plan Participants
        Foreclose Any Liability On Plaintiffs' Disclosure Claims ............................... 35

i

**TABLE OF CONTENTS**
(continued)

Page

    1.    The Plan Administrator Provided Part B Participants With Complete And Timely Information Regarding The Exact Amount Of Their Cash Balance Accounts .............................................. 35

    2.    Courts In The Second Circuit Have Consistently Rejected ERISA SPD/Section 204(h) Disclosure Claims When Plan Participants Have Been Provided Sufficient Information About Their Benefits Through Other Means, As In This Case ................................... 37

    3.    The Trial Testimony Of Plaintiffs And The Testifying Class Members Demonstrates That Any Deficiencies In The 1998 And 1999 SPDs And The 1997 Section 204(h) Notice Constituted Harmless Error ...................................................................... 42

B.    The Part B SPD Met ERISA's Disclosure Requirements .................................. 42

    1.    The Part B SPD Met The Requirements Of ERISA Section 102 ........... 43

    2.    The Part B SPD Was Not Required To Disclose A Reduction In The Rate Of Benefit Accrual With Age ................................................ 44

    3.    The Part B SPD Was Not Required To Provide A Comparison To Benefits That Participants Would Have Earned Under The Old Plan ................................................................................................ 45

    4.    The Part B SPD Was Not Required To Disclose The Potential Wear-Away Effect .......................................................................... 46

        a.    The Wear-Away Effect Did Not Cause Any Reduction In Plan Benefits, And Was Not The Result Of A Plan Provision ...................................................................... 49

        b.    The Wear-Away Effect Was Caused By Falling Interest Rates After The Conversion, Which The Plan Administrator Could Not Anticipate ................................ 50

        c.    The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Only Possibly Affect A Small Subset Of Participants .................................................... 51

            (1)    The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Result Only For Eligible Employees During The Early Retirement Window ......... 52

            (2)    The Wear-Away Effect Attributable To The Early Retirement Subsidy Would Only Result If A Plan Participant Elected An Annuity Option, But Most Cash Balance Participants Elect A Lump Sum ................ 52

    5.    The Part B SPD Was Not Required To Disclose All Of The Factors In The OAB Calculation. ...................................................... 52

**TABLE OF CONTENTS**
(continued)

                                                                              Page

6.    Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be
      Governed Exclusively By The Terms Of The CIGNA Pension
      Plan, Not The SPD ................................................................... 56

C.    The Plan Administrator Provided Adequate Notice Under ERISA Section
      204(h). ...................................................................................... 58

      1.    Only The Amendment Freezing Accruals Under Part A Required
            A Section 204(h) Notice, Which The Plan Administrator Provided ....... 59

      2.    Even If A 204(h) Notice Was Required For The Cash Balance
            Adoption, The Plan Administrator Fulfilled That Requirement ............. 60

            a.    Section 204(h) As It Existed At The Time Part B Was
                  Created Provides The Applicable Requirements For The
                  Allegedly Required Notice ......................................... 61

            b.    The Plan Administrator Provided A Proper Section 204(h)
                  Notice To Active Employees ...................................... 63

      3.    The Plan Administrator Was Not Required Under ERISA Section
            204(h) To Notify Vested Separated Old Plan Participants About
            The Amended Rehire Rule ............................................... 67

D.    Plaintiffs Do Not Have A Pending Claim For An Inadequate Summary Of
      Material Modification Regarding The Cash Balance Conversion ................. 69

E.    Plaintiffs' Disclosure Claims Are Time-Barred ................................... 71

      1.    Plaintiffs' SPD Claim Is Time-Barred ................................. 71

      2.    Plaintiffs' Section 204(h) Claim Is Time-Barred ..................... 73

F.    Any Disclosure Claims Would Lie Against The Plan Administrator, Who
      Is Not A Party ............................................................. 74

IV.   DEFENDANTS' FAILURE TO PROVIDE PRESENT-VALUE DISCLOSURES
      OF THEIR DIFFERENT BENEFIT OPTIONS PRIOR TO OCTOBER 2004 DID
      NOT VIOLATE ERISA ............................................................. 77

A.    Part B Does Not Violate ERISA's Anti-Cutback Rule In Section 204(g).......... 77

B.    Plaintiffs Amara, Broderick And Glanz Do Not Have Standing To Pursue
      A Present-Value Disclosure Claim ........................................... 79

C.    Pre-October 2004 Treasury Regulations Did Not Require Disclosure Of
      The Present Value Of Benefit Options ...................................... 80

D.    Any Present-Value Disclosure Claims Would Lie Against The Plan
      Administrator, Who Is Not A Party .......................................... 84

E.    Plaintiffs' Present-Value Disclosure Claim Is Time-Barred ................ 85

iii

# TABLE OF CONTENTS
(continued)

Page

V.    PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED
RELEASES THAT BAR THEIR CLAIMS .................................................................... 85

VI.   EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEIR REMEDIES
ARE LIMITED ........................................................................................................ 87

    A.    Monetary Damages Generally Are Unavailable Under ERISA
Section 502(a)(3) ................................................................................. 87

    B.    Plaintiffs Are Not Entitled To Retroactive Relief ................................ 91

    C.    Any Relief Must Be Limited By The Pension Protection Act Of 2006 .............. 94

Defendants CIGNA Corporation ("CIGNA") and the CIGNA Pension Plan (the "Plan") (together "Defendants") propose the following conclusions of law:

## I.     PART B IS NOT AGE DISCRIMINATORY.

Since the inception of this litigation, the parties' primary dispute has been whether Part B violates ERISA's prohibition against age discrimination in Section 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H).  See Rule 23 Order at 5 - Count 3(A)(1).  This Court hereby joins the majority of courts that have addressed this issue and concludes that Part B, like other cash balance plans, is not age discriminatory.

### A.     The Current State Of The Law Regarding Cash Balance Plans

1.     There is a split of legal authority on the question of whether cash balance plans are inherently age discriminatory.  The two courts of appeals that have addressed this question – the Seventh Circuit in Cooper v. IBM Pers. Pension Plan, 457 F.3d 636 (7th Cir. 2006), and the Third Circuit in Register v. PNC Fin. Servs. Group, 477 F.3d 56 (3d Cir. 2007) – have held that cash balance plans are not age discriminatory and therefore do not violate ERISA Section 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H).

2.     To date, nine district courts are in accord.  See Bryerton v. Verizon Commc'n, Inc., No. 06-6672, 2007 WL 1120290 (S.D.N.Y. Apr. 17, 2007) (Chin, J.) (rejecting claim that cash balance plan design is age discriminatory); Sunder v. U.S. Bank Pension Plan, No. 05-01153, 2007 WL 541595 (E.D. Mo. Feb. 16, 2007) (Webber, J.) (same); Finley v. Dun & Bradstreet Corp., 471 F. Supp. 2d 485 (D.N.J. 2007) (Chesler, J.) (same); Laurent v. PriceWaterhouseCoopers LLP, 448 F. Supp. 2d 537 (S.D.N.Y. 2006) (Daniels, J.) (same); Drutis v. Quebecor World (USA), 459 F. Supp. 2d 580 (E.D. Ky. 2006) (Forester, J.) (same); Hirt, et al. v. The Equitable Ret. Plan for Employees, Managers and Agents, 441 F. Supp. 2d 516 (S.D.N.Y.

- 1 -

2006) (Hellerstein, J.) (same); Tootle v. ARINC, Inc., 222 F.R.D. 88 (D. Md. 2004) (Blake, J.)

(same); Engers v. AT&T Corp., No. 98-3660, 2001 U.S. Dist. LEXIS 25889 (D.N.J. June 6,

2001) (Chelser, J.) (same); Eaton v. Onan Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000)

(Hamilton, J.) (same).

     3.     Hirt v. Equitable is on appeal to the Second Circuit, Case No. 06-4757.  As of the

filing of this brief, appellate briefing in Hirt has been completed, but no argument date has been

set.

     4.     In reaching their conclusion that cash balance plans do not discriminate against

older participants, these courts have relied on the statutory text, the legislative history, the

Treasury Department's considered and repeated view that cash balance plans are legal, the nature

of how benefits are earned in cash balance plans, and fundamental economic principles.

     5.     Three district court judges have held that cash balance plans are age

discriminatory.  See Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150 (D. Conn. 2006)

("FleetBoston I") (Hall, J.); Parsons v. AT&T Pension Benefit Plan, 3:06CV552 (JCH), 2006

WL 3826694 (Hall, J.); In re J.P. Morgan Chase Cash Balance Litig., 460 F. Supp. 2d 479

(S.D.N.Y. 2006) (Baer, J.) ("J.P. Morgan I"); In re Citigroup Pension Plan ERISA Litig., 470 F.

Supp. 2d 323 (S.D.N.Y. 2006) (Scheindlin, J.) ("Citigroup I").

     6.     In August 2006, the Pension Protection Act ("PPA") was enacted.  Among other

things, the PPA confirmed that cash balance plans are not age discriminatory with respect to

benefits earned on or after June 29, 2005.  See Pension Protection Act of 2006, Pub. L. No. 109-

280, 120 Stat. 780.

     7.     The courts that have held that cash balance plans are age discriminatory based

their conclusions on a misinterpretation of the statute and without considering the legislative or

regulatory history behind ERISA Section 204(b)(1)(H) or the economic and other implications of their holdings, both as to cash balance plans and traditional defined benefit plans. <u>See</u> <u>FleetBoston I</u>, 427 F. Supp. 2d 150; <u>Parsons</u>, 2006 WL 3826694; <u>J.P. Morgan I</u>, 460 F. Supp. 2d 479; <u>Citigroup I</u>, 470 F. Supp. 2d 323.

**B.    Part B Treats Older Employees At Least As Well As It Treats Younger Employees.**

8.      The trial evidence in this case leaves no doubt that benefits under Part B, and the accrual of those benefits, <u>increase</u> with age. First, the benefit credit rate is the same or higher for older employees than for similarly-situated younger employees, as set forth in Article VI of Part B. Second, the interest credit rate under Part B is the same for all participants, regardless of age. Although that rate can fluctuate from year to year (based on the yield on five year Treasury securities plus .25%), all participants in any given year will earn interest at the same rate.

9.      Notably, Plaintiff's expert, Claude Poulin, has admitted that this rate approximates "the kind of investment return retiring plan participants would experience in the marketplace if they chose to invest in 'relatively risk-free investments.'" <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (quoting Claude Poulin).

10.     Third, the calculations used to set opening account balances favored older employees. An older employee's opening account balance will always be higher than the account balance of a similarly-situated younger employee (with the same years of service and earnings history before 1998), even in the absence of the age-favored open account balance provision in Part B. In other words, in any given year, the older employee's cash balance benefit will equal or exceed the benefit payable to a similarly-situated younger employee. This result, of course, cannot be described as age discrimination.

11.     Defendants' expert Lawrence Sher described several ways that one could measure

whether Part B is age discriminatory, and using each methodology, Part B is not age discriminatory.

12.     Plaintiffs' expert Claude Poulin's age discrimination analysis was not actuarially or economically consistent.  For example, Mr. Poulin compares an employee's benefit payable at some point in the future (age 65) in dollars payable in the future, with the employee's salary earned today in today's dollars, without adjusting for the time value of money.  Further compounding the problem, Mr. Poulin then compares the results for two different employees without accounting for the fact that the future benefits he is comparing are payable at two different times, e.g., when each employee turns age 65.  This type of analysis violates fundamental principles of the time value of money.

13.     The differences that Plaintiffs try to attribute to age discrimination merely reflect the time value of money, a well-settled economic principle routinely recognized and applied by courts.  See, e.g., Metz v. United Techs. Corp., 754 F.2d 63, 66 (2d Cir. 1985) ("[I]n computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.") (citations omitted); Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 536-37 (1983) ("In all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.") (internal quotations omitted).

**C.    The Decisions Finding That Cash Balance Plans Are Age Discriminatory Are Flawed.**

    **1.    The Phrase "Rate Of An Employee's Benefit Accrual" Does Not Refer To The "Accrued Benefit."**

14.    The statute that Plaintiffs maintain Part B violates is ERISA Section

204(b)(1)(H)(i), which provides in relevant part that:

> a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i).

15.    In contrast, the three district court judges that have found that cash balance plans

are age discriminatory have based their decisions exclusively on a determination that the term

"benefit accrual" in Section 204(b)(1)(H) <u>unambiguously</u> means the same thing as the "accrued

benefit" – a defined term in ERISA (<u>see</u> 29 U.S.C. §§ 1002(23), 1054(c)(3)) – and that any age

discrimination analysis therefore must compare the normal retirement annuity benefits payable to

participants at different periods of time.  <u>FleetBoston I</u>, 427 F. Supp. 2d at 164-65; <u>Parsons</u>, 2006

WL 3826694, at *1; <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 485-88; <u>Citigroup I</u>, 470 F. Supp. 2d at

341-44.

16.    None of these courts has even considered the purpose of the statutory section at

issue or the reasonableness of their conclusions, except to note that they are bound to apply the

unambiguous words regardless of the consequences.  <u>FleetBoston I</u>, 427 F. Supp. 2d at 164-65;

<u>Parsons</u>, 2006 WL 3826694, at *1; <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 489; <u>Citigroup I</u>, 470 F.

Supp. 2d at 45.

17.    For a statute to meet the high threshold of being "unambiguous," it must be

susceptible to only one <u>reasonable</u> interpretation.  <u>Rabin v. Wilson-Coker</u>, 362 F.3d 190, 196

(2d. Cir. 2004) ("A statute is ambiguous if its terms are susceptible to two or more reasonable meanings.").

18.     Here, there is no basis for concluding that the phrase "rate of an employee's benefit accrual" unambiguously refers to the specifically defined term "accrued benefit." Indeed, the only two courts of appeals to have addressed this question have ruled to the contrary. That these six reasonable and well-respected appellate judges (along with numerous district court judges) have concluded that "rate of an employee's benefit accrual" does not refer to the "accrued benefit" demonstrates at a minimum that the phrase cannot <u>unambiguously</u> mean what Plaintiffs contend.

19.     Moreover, the courts that have held that "rate of an employee's benefit accrual" unambiguously means the "accrued benefit" have rooted their interpretation in the principle of statutory construction that words used in one part of statute must be interpreted to have the same meaning in other parts of the same statute. <u>FleetBoston I</u>, 427 F. Supp. 2d at 164-65; <u>Parsons</u>, 2006 WL 3826694, at *1; <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 485-86; <u>Citigroup I</u>, 470 F. Supp. 2d at 342. This reliance was misplaced.

20.     First, this principle only applies <u>where the same word or phrase is used in both parts of the statute</u>. See <u>United States v. Maria</u>, 186 F.3d 65, 71 (2d Cir. 1999) ("As a general matter, the use of different words within the same statutory context strongly suggests that different meanings were intended.").

21.     As the Ninth Circuit explained:

> Congress's explicit decision to use one word over another in drafting a statute is material. It is a decision that is imbued with legal significance and should not be presumed to be random or devoid of meaning. Even words with remarkably similar definitions can still convey a unique or distinct meaning or flavor from words that are similar or even synonymous in nature because

of their differing tone or usage within a sentence.

S.E.C. v. McCarthy, 322 F.3d 650, 656 (9th Cir. 2003) (internal citations omitted).  Yet Section

204(b)(1)(H) does not use the term "accrued benefit."

      22.     There is no reason to conclude that <u>different words</u> in different parts of a statute

must be interpreted to mean the same thing.  To the contrary, that Congress chose not to refer to

the "accrued benefit" in ERISA Section 204(b)(1)(H), but instead used different words, reflects

that Congress intended a different meaning.

      23.     Ample evidence exists that Congress understood specifically how to require

testing based on age-65 annuity benefits.  ERISA's 133⅓% anti-backloading rule explicitly

refers to the "accrued benefit <u>payable at the normal retirement age.</u>"  29 U.S.C. § 1054(b)(1)(B)

(emphasis added).

      24.     Congress added Section 204(b)(1)(H) in 1986, twelve years after the anti-

backloading rules were enacted.  If Congress intended for age discrimination to be tested the

same way ERISA's 133⅓% anti-backloading rule was tested, it easily could have used the same

language.  That different language was used – "rate of benefit accrual" and without any reference

to normal retirement age – confirms that a different meaning was intended.  <u>See also</u> <u>Mohegan</u>

<u>Tribe v. State of Connecticut</u>, 483 F. Supp. 597, 600 (D. Conn. 1980) ("It is a canon of statutory

construction that where as here the words of a later statute differ from those of a previous one on

the same or a related subject, the legislature must have intended them to have a different

meaning.").

      25.     Even where the same word appears multiple times in a statute, the word can have

different meanings depending on context.  In 2004, the Supreme Court recognized this canon in a

case particularly germane to Plaintiffs' age discrimination claims here.  In <u>Gen. Dynamics Land</u>

Sys., Inc. v. Cline, 540 U.S. 581 (2004), the Supreme Court held that the word "age" had

different meanings in different parts of the Age Discrimination in Employment Act ("ADEA").

Id. at 595-96.

26.      In rejecting the plaintiff's argument that the word "age" must mean the same

thing throughout the ADEA, the Court held:

> The argument rests on two mistakes.  First, it assumes that the
> word "age" has the same meaning wherever the ADEA uses it.
> But this is not so, and [plaintiff] simply misemploys the
> presumption that identical words used in different parts of the same
> act are intended to have the same meaning.  [Plaintiff] forgets that
> the presumption is not rigid and readily yields whenever there is
> such variation in the connection in which the words are used as
> reasonably to warrant the conclusion that they were employed in
> different parts of the act with different intent.
>
> *  *  *
>
> So it is easy to understand that Congress chose different meanings
> [of the word "age"] at different places in the ADEA, as the
> different settings readily show.  Hence the second flaw in
> [plaintiff's] argument for uniform usage:  it ignores the cardinal
> rule that statutory language must be read in context since a phrase
> gathers meaning from the words around it.  The point here is that
> we are not asking an abstract question about the meaning of "age";
> we are seeking the meaning of the whole phrase "discriminate . . .
> because of such individual's age."

Id. (internal citations and punctuation omitted, emphasis added, ellipsis in original).

27.      Thus, the Supreme Court held in Cline that the word "age" in sub-paragraph (a) of

29 U.S.C. § 623 did not mean the same thing as the word "age" in subparagraph (f) of that same

section, because of the different contexts in which the word was used.  Id.

28.      In this case, the inquiry is to determine the meaning of the phrase "rate of an

employee's benefit accrual," which, unlike the term "accrued benefit," has no specific definition

under ERISA.

- 8 -

29.     In <u>Cent. Laborers' Pension Fund v. Heinz</u>, 541 U.S. 739 (2004), the Supreme

Court defined the phrase "benefit accrual" as "the rate at which an employee earns benefits to put

in his pension account."  <u>Id.</u> at 749.  This, not surprisingly, is the same definition used by the

Seventh Circuit in <u>Cooper</u> and the Third Circuit in <u>Register</u>.  Although the Supreme Court in

<u>Heinz</u> was not interpreting the phrase in the specific context of ERISA's age discrimination

provision, the Court's common-sense interpretation of the phrase is further evidence that

Plaintiffs' analysis is incorrect.

30.     There are many ways to calculate a rate of benefit accrual, depending on the

context and the purpose of the calculation.  The <u>Eaton</u> court held:

> The concept of the "benefit accrual rate" does not have a single,
> self-evident meaning, especially in the world of pension plan
> regulation.  The term is used and defined in different ways and for
> different purposes under ERISA and the Internal Revenue Code.
>
> \*   \*   \*
>
> The argument distinguishing between "accrued benefit" and "rate
> of benefit accrual" may seem like pretty fine hair splitting.
> Nevertheless, pension law is a highly technical field where hairs
> are split with ever finer razors.

117 F. Supp. 2d at 830 and n.8 (collecting examples, internal parenthetical omitted).

31.     The three district court judges that concluded that cash balance plans are age

discriminatory failed to consider the purpose or context of the analysis, <u>i.e.</u>, to determine whether

older employees are worse off than similarly-situated younger employees under a pension plan.

This was error.  <u>See</u> <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997) ("The plainness or

ambiguity of statutory language is determined by reference to the language itself, the specific

context in which that language is used, and the broader context of the statute as a whole.").

32.     In a similar vein, some courts have suggested that if defined benefit plans were

supposed to be tested for age discrimination based on the allocation to the employee's account –

the way defined contribution plans are tested – Congress would have used the same language for

prohibiting age discrimination in a defined benefit plan that it used to prohibit age discrimination

in a defined contribution plan. Compare 29 U.S.C. § 1054(b)(1)(H) with 29 U.S.C. § 1054(b)(2).

33.     This argument reflects an apparent misunderstanding of the definition of a defined

benefit plan. Specifically, a defined benefit plan is defined as any plan other than an individual

account plan, i.e., a defined contribution plan. Compare 29 U.S.C. § 1002(34) with 29 U.S.C. §

1002(35). There are many different types of defined benefit plans, which accrue benefits in

different ways. Congress could not test age discrimination for all defined benefit plans in terms

of an account balance (like it did for defined contribution plans) because most defined benefit

plans do not even have "accounts." By contrast, all defined contribution plans are individual

account plans. See 29 U.S.C. § 1002(34). Thus, it made sense for Congress to define the

accrued benefit in a defined contribution plan as the account balance. For a defined benefit plan

that mirrors an individual account plan (e.g., a cash balance plan), however, the rate of benefit

accrual should be measured in terms of the way benefits actually are accrued, i.e., earned, in the

plan – based on allocations to the employee's account.

34.     Age discrimination requires a meaningful analysis of whether older participants

are worse off than similarly-situated younger participants. As explained above, under Part B,

older participants are treated as well as, or better than, similarly-situated younger participants.

Thus, Part B is not age discriminatory.

35.     The phrase "rate of an employee's benefit accrual" does not refer to the "accrued

benefit" and does not require testing based on the statutorily defined term "accrued benefit."

Even if the Section 204(b)(1)(H) used the words "accrued benefit," however, nothing in ERISA

would require that such a benefit be expressed in the form of an age-65 annuity. ERISA Section 3(23) defines "accrued benefit" as "the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A) (emphasis added). 29 U.S.C. § 1054(c)(3), in turn, provides:

> For purposes of this Section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age. . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit.

29 U.S.C. § 1054(c)(3) (emphasis added). Thus, ERISA specifically permits an accrued benefit "to be determined as an amount other than an annual benefit commencing at" age 65. Id.

### 2. The Term "Benefit Accrual" Cannot Refer To The "Accrued Benefit" Because That Interpretation Cannot Be Applied Consistently At All Ages.

36.    According to Plaintiffs, as well as Judges Hall, Baer and Scheindlin, ERISA Section 204(b)(1)(H) requires that age discrimination always be tested exclusively with reference to employees' age-65 annuity benefits and does not allow for any variation. FleetBoston I, 427 F. Supp. 2d at 162-68; Parsons, 2006 WL 3826694, at *1; J.P. Morgan I, 460 F. Supp. 2d at 485-88; Citigroup I, 470 F. Supp. 2d at 62-68.

37.    Section 204(b)(1)(H) also provides, however, that an employee's rate of "benefit accrual" cannot be reduced "because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(emphasis added). Relying on this underlined language, many courts have held that Section 204(b)(1)(H) applies equally at all ages, both before and after age 65.

38.    Indeed, Congress's principal purpose in enacting Section 204(b)(1)(H) was to protect employees who continued to work after normal retirement age. See Eaton, 117 F. Supp.

2d at 826-29 ("[The legislative history] provides considerable support for defendants' argument that Congress did not intend for the pension age discrimination provisions to apply to the rate of benefit accrual for participants under the age of 65."); <u>Tootle v. ARINC, Inc.</u>, 222 F.R.D. 88, 93 (D. Md. 2004) ("[L]egislative history and statutory language provide strong evidence that [ERISA's age discrimination provisions are] not intended to protect workers until after they have attained normal retirement age.").

39.      Congress enacted ERISA Section 204(b)(1)(H) out of concern for the way employees over 65 were being treated, yet Plaintiffs' analysis affords <u>lesser</u> protection to that group.  Whatever the phrase "benefit accrual" means, that same definition must apply at all ages, both before and after 65.

40.      Plaintiffs offer no basis for interpreting the term "benefit accrual" to mean one thing for employees under age 65 and another thing for employees after age 65, particularly if the term unambiguously refers to the "accrued benefit" as Plaintiffs' claim.

41.      Plaintiffs' purportedly unambiguous definition of "benefit accrual" (<u>i.e.</u>, for employees under age 65) is inconsistent with the legislative history.  Specifically, when Congress enacted Section 204(b)(1)(H)(i), it provided an example in its Conference Report of how the statute should work to ensure that plans were not discriminating based on age.  <u>See</u> <u>Eaton</u>, 117 F. Supp. 2d at 830 (citing H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868, 4026). The Conference Report is "the most authoritative source [] on the meaning of legislation."  <u>Chen v. U.S. Dep't of Justice</u>, 434 F.3d 144, 153 (2d Cir. 2006).  Yet if Plaintiffs' unambiguous definition of "benefit accrual" (at least before age 65) were correct, the example in the Conference Report would itself be illegal because the accrual formula it describes – when measured in terms of an age-65 annuity – actually decreases with age.  <u>See also, e.g.,</u> <u>Eaton</u>, 117

F. Supp. 2d at 830.

42.       These same mathematical principles would cause the accrual pattern for many common and traditional defined benefit plans to be age discriminatory with respect to benefits earned by employees who work after normal retirement age.  Indeed, even traditional career pay plans and final average pay plans (the most common plan designs for non-union employees in the United States) would be age discriminatory under Plaintiffs' approach for accruals after age 65.

43.       Moreover, applying different tests for age discrimination before and after 65 is particularly illogical here, because Part B utilizes the same formula both before and after age 65.

44.       Because Plaintiffs' interpretation of the term "benefit accrual" does not work at all ages, it cannot be correct.  See United States v. Am.Trucking Ass'ns, 310 U.S. 534, 542-44 (1940) ("When [a literal interpretation of a statute] has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act.  Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has followed that purpose, rather than the literal words.").

            3.       The Second Circuit's Decision In Esden v. Bank of Boston Does Not
                     Address Age Discrimination Or The Meaning Of The Term "Benefit
                     Accrual."

45.       Plaintiffs' suggestion that the Second Circuit's decision in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000), compels a conclusion that cash balance plans are age discriminatory is wrong.

46.       Esden involved a very narrow issue not present in this case:  the process for calculating lump sum benefits in a cash balance plan known as "whipsaw."  Esden, 229 F.3d at

- 13 -

158-59.  The Second Circuit held that cash balance plans must engage in the whipsaw process

when calculating lump sum benefits under certain circumstances because of the specific statutory

definition of the phrase "accrued benefit" and IRS Notice 96-8, which describes whipsaw.  Id. at

163-168 (quoting definition of "accrued benefit" and citing Notice 968).

47.     The Second Circuit's decision in Esden relied on the statutory definition of the

term "accrued benefit" because that exact term was used by Congress in the statutory provision

at issue in that case.  Esden, 229 F.3d at 158.  By contrast, as explained above, the term "accrued

benefit" does not appear in ERISA's age discrimination provision and the phrase "rate of an

employee's benefit accrual" in Section 204(b)(1)(H) does not – and cannot – refer to the

"accrued benefit" for all the reasons described above.

48.     Thus, Esden does not support Plaintiffs' position that cash balance plans are age

discriminatory.

49.     Indeed, in Berger v. Xerox Corp. Ret. Income Guarantee Plan, 338 F.3d 755 (7th

Cir. 2003), the Seventh Circuit agreed with the Esden court's conclusions regarding whipsaw

based on the definition of the term "accrued benefit."  Berger, 338 F.3d at 759.  Yet the Seventh

Circuit in Cooper nevertheless held that cash balance plans are not age discriminatory.

50.     In Cooper, the Seventh Circuit specifically rejected the argument that its earlier

decision regarding whipsaw in Berger (and the Second Circuit's decision in Esden) compelled a

finding that cash balance plans are age discriminatory.  As the Seventh Circuit explained:

> To derive the "actuarial equivalent" of a pension at age 65, a plan
> must (a) add all interest that would accrue through age 65, then (b)
> discount the resulting sum to its present value.  Berger v. Xerox
> Corp. Retirement Income Guarantee Plan, 338 F.3d 755, 762-63
> (7th Cir. 2003).  Plaintiffs characterize step (a) as extra interest
> credits for the young, but they ignore step (b).  The discount rate
> may be close to (if it does not exceed) the rate at which interest is
> imputed, so the amount paid out in cash may be close to if not

- 14 -

below the nominal balance in the account.  <u>Berger</u> did not consider
§ 204(b)(1)(H)(i) and does not hold that the process of grossing up
the balance and then discounting is a form of age discrimination.
To the contrary: <u>Berger</u> described this process as the means to
avoid age discrimination.

As far as we can see, ours is the first appellate decision to address
the status of cash-balance plans under § 204(b)(1)(H)(i).  The class
directs our attention to two decisions from other circuits that it says
supply helpful analysis.  <u>Miller v. Xerox Corp. Retirement Income
Guarantee Plan</u>, 447 F.3d 728 (9th Cir. 2006); <u>Esden v. Bank of
Boston</u>, 229 F.3d 154 (2d Cir. 2000).  As the class reads them,
these opinions stand for two important propositions.  First, that an
"accrued benefit" in a cash-balance plan is an annuity at normal
retirement age.  Second, that there is a "fundamental" distinction
between defined-contribution and defined-benefit plans.  Both of
these propositions are correct, and both of them are irrelevant.

Start with the first proposition.  What the true meaning of "accrued
benefit" may be is not controlling; § 204(b)(1)(H)(i) does not use
that phrase, and we have explained why "benefit accrual" means
something other than "accrued benefit." Once we start to calculate
accrued benefits for people who quit or retire early, it is necessary
to impute extra interest and discount.  <u>Berger</u> describes how this is
done.  But "benefit accrual" refers to the annual addition to the pot,
not to the final payout.  The holding of <u>Esden</u>, <u>see</u> 229 F.3d at 168,
mirrors that of <u>Berger</u> and requires no further comment.

<u>Cooper</u>, 457 F.3d at 640-41.

51.      <u>Esden</u> (and <u>Berger</u>) also confirm that, contrary to Plaintiffs' position throughout

this litigation, the time value of money is a fundamental principle under ERISA.  <u>Esden</u>, 229

F.3d at 161; <u>Berger</u>, 338 F.3d at 63.  <u>Esden</u> specifically describes how to calculate an "accrued

benefit" expressed as a lump sum in present day dollars.  <u>Esden</u>, 229 F.3d at 161.

52.      In short, and as reflected in <u>Cooper</u>, the Second Circuit's decision in <u>Esden</u> does

not compel – or even support – the conclusion that cash balance plans are age discriminatory.

**4.      The Economic Effects That Plaintiffs Challenge Here Are Lawful In
Other Contexts, Including With Traditional Defined Benefit Plans.**

53.      The Seventh Circuit in <u>Cooper</u> and the Third Circuit in <u>Register</u> both recognized

that differences in the age-65 annuity benefits of older and younger participants that Plaintiffs

challenge are due exclusively to differences in the number of years to payout of the benefit and

the time value of money, not to age discrimination.  <u>Cooper</u>, 457 F.3d at 683-40; <u>Register</u>, 477

F.3d at 70.

54.     As an economics matter, the interest earned in cash balance plans over time is no

different than the effects of interest on defined contribution plans, or of cost of living increases

under the Social Security system, both of which are entirely lawful.  These same economic

effects – cited as evidence of age discrimination by Plaintiffs – are common and lawful in

traditional final average pay plans.

> **5.     The Treasury Department Has Consistently Endorsed Cash Balance
> Plans As Not Being Age Discriminatory.**

55.     Plaintiffs' interpretation of ERISA Section 204 (b)(1)(H)(i) also ignores the

Treasury Department's repeated formal pronouncements that cash balance plans are not

inherently age discriminatory.

56.     The Second Circuit in <u>Esden</u> explained that a "consistent and reasonable

interpretation by the responsible agency is entitled to deference, regardless of its form of

publication."  <u>Esden</u>, 229 F.3d at 169.  <u>See also</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997)

(agency's interpretation set forth in amicus brief was entitled to deference where "[t]here is

simply no reason to suspect that the interpretation does not reflect the agency's fair and

considered judgment on the matter in question").  <u>See also Marcella v. Capital Dist. Physicians'</u>

<u>Health Plan, Inc.</u>, 293 F.3d 42, 48 (2d Cir. 2002) ("Even though not formally promulgated as

regulations, these opinion letters, as the views of the agency charged with implementing ERISA,

are at least a body of experience and informed judgment to which courts and litigants may

properly resort for guidance, and we have often relied on them for guidance.") (internal

quotations and citations omitted).

57.     The Treasury Department is the agency responsible for interpreting and issuing regulations under ERISA.  See 29 U.S.C. § 1001nt (Section 101(a) of the Reorganization Plan No. 4 Of 1978 gives the Secretary of the Treasury authority to issue regulations under ERISA). Its endorsement of cash balance plans is clear.

58.     In 1991, the Treasury Department published safe harbor regulations for cash balance plans.  See Treas. Reg. § 1.401(a)(4)-8(c)(3)(iii)(B).  In the preamble to the regulations, the Treasury Department stated that "[t]he fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation [i.e., the pay credit] will not cause a cash balance plan to fail to satisfy the requirements of section 411(b)(1)(H), relating to age-based reductions in the rate at which benefits accrue under a plan."  56 Fed. Reg. 47,524 (Sept. 19, 1991) (codified at 26.C.F.R. pt. 1).

59.     This is an explicit rejection of Plaintiffs' theory that cash balance plans are inherently age discriminatory because of the increased time that younger participants have to earn interest.  The Second Circuit in Esden cited approvingly to these safe harbor regulations. Esden, 229 F.3d at 169-70.

60.     In 1996, the Treasury Department published IRS Notice 96-8, approving cash balance plan designs with interest credits that accrue up-front (like Part B) and describing how lump sum benefits in a cash balance plan should be determined.  See IRS Notice 96-8, Part III.A. It is implausible that the Treasury Department would have issued rules describing how to calculate lump sums in a cash balance plan if its interpretation of ERISA would render all cash balance plans inherently illegal.

61.     In 2002, the Treasury Department proposed regulations that squarely rejected the

- 17 -

notion that cash balance plans are inherently age discriminatory.  <u>See</u> 67 Fed. Reg. 76,123-01 (Dec. 11, 2002).

62.     In its revenue proposals for 2005, 2006, and 2007, the Treasury Department confirmed that "cash balance plans and cash balance plan conversions are not inherently age discriminatory." <u>See</u> Department of Treasury, General Explanation of the Administration's Fiscal Year 2005 Revenue Proposals 104 (2004); Department of Treasury, General Explanation of the Administration's Fiscal Year 2006 Revenue Proposals 82 (2005); Department of Treasury, General Explanation of the Administration's Fiscal Year 2007 Revenue Proposals 66 (2006).

63.     In short, as the <u>Register</u> court held, "[t]he Department of Treasury has consistently stated that cash balance plans are not age discriminatory."  <u>Register v. PNC Fin. Servs. Group, Inc.</u>, 04-CV-6097, 2005 WL 312268 268, *7 (E.D. Pa. Nov. 21, 2005).

64.     The Department's formal pronouncements, which are consistent with the legislative history and the economic reality of the cash balance plan design, are entitled to deference.

65.     Plaintiffs mistakenly rely on the Treasury Department's interpretation of ERISA Section 204(h) (regarding certain disclosure requirements) to support their interpretation of the age discrimination prohibition in ERISA Section 204(b)(1)(H).  This is incorrect because ERISA's age discrimination provision has a different purpose than ERISA's Section 204(h) notice provision, so it is reasonable for the Treasury Department to interpret these two provisions differently, consistent with their respective (and different) purposes.

66.     Thus, although the Treasury Department may have determined that it was appropriate to measure rates of benefit accrual one way for purposes of ERISA Section 204(h) notice requirements, the Treasury Department has determined that a different interpretation is

appropriate for purposes of ERISA's age discrimination provision.  As the <u>Eaton</u> court held:

> The concept of the "benefit accrual rate" does not have a single, self-evident meaning, especially in the world of pension plan regulation.  The term is used and defined in different ways and for different purposes under ERISA and the Internal Revenue Code.

<u>Eaton</u>, 117 F. Supp. 2d at 830 (also collecting examples).

### D.   Plaintiffs' Argument That Wear-Away Is Age Discriminatory Is A Distortion Of The Facts and Governing Law.

67.     "Wear-away" is a period of time during which a participant accrues new benefits under one benefit formula, but because those benefits are less than benefits earned under a different formula, the overall amount of benefits does not change for a period of time.  <u>See</u> <u>Richards v. FleetBoston</u>, 235 F.R.D. 165, 168 (D. Conn. 2006) ("<u>FleetBoston II</u>") ("The idea that an employee covered by these terms does not actually accrue any new benefits under the Amended Plan until the value of the hypothetical cash balance account exceeds that of the frozen Traditional Plan benefit is known as the 'wear-away' effect.")

68.     The Treasury Department has issued regulations that specifically acknowledge and endorse wear-away periods, including with respect to cash balance conversions.  For example, the regulations provide safe harbors from certain ERISA requirements for plans that have particular types of wear-away periods.  <u>See</u> 26 C.F.R. § 1.401(a)(4)-13 (describing safe harbor "formula with wear-away" and "formula with extended wear-away"); 26 C.F.R. § 1.410(b)-3(a)(2)(iii)(C) (permitting plans where "the plan is applying the wear-away formula . . . and the employee's frozen accrued benefit exceeds the benefit determined under the current formula").

69.     Current regulations under ERISA Section 204(h), 29 U.S.C. § 1054(h), further provide that a Section 204(h) notice is required for a plan amendment after September 2, 2003

"that results in a wear-away period" and describe in detail how notice should be provided when a wear-away results from the conversion of a traditional plan to a cash balance plan.  See 26 C.F.R. § 54.4980F-1 Q&A 11(a)(4)(ii).

70.     Thus, the existence of a wear-away period is not inherently unlawful.

71.     Plaintiffs' argument that Part B is age discriminatory not only based on its fundamental design, but also because the wear-away period can be longer for some older employees than for some younger employees, reflects a fundamental distortion of the facts and the legal principles governing age discrimination.

72.     Plaintiffs' claim that wear-away periods were longer (in hindsight) for some older employees than for some younger employees does not constitute age discrimination.  What Plaintiffs call age discrimination is merely the transition from a plan that was heavily age-favored (Part A) to a plan (Part B) that is still age-favored, but merely less so.  As the Seventh Circuit explained in Cooper, that is not age discrimination.  Cooper, 457 F.3d at 642 ("But removing a feature that gave extra benefits to the old differs from discriminating against them.  Replacing a plan that discriminates against the young with one that is age-neutral does not discriminate against the old.").

73.     Plaintiffs' reliance on the availability of subsidized early retirement benefits for older participants to prove age discrimination underscores the deficiencies in their wear-away analysis because ERISA's age discrimination provision provides that "the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals."  29 U.S.C. § 1054(b)(1)(H)(v) (emphasis added).

74.     In addition, because they are eligible for a subsidized early retirement, older participants are better off than similarly-situated younger participants who are not eligible for

early retirement and have a more valuable benefit.  Thus, even assuming that an older participant

may have a longer wear-away period vis-à-vis his or her subsidized early retirement benefit, this

is only because the subsidized minimum benefit to which the older participant is entitled is

<u>higher</u> than the unsubsidized minimum benefit available to the younger participant.  In all cases,

the older participant is better off than a similarly-situated younger participant.  That is not age

discrimination.

### E.  Plaintiffs' Age Discrimination Claim Is Time-Barred.

75.     Plaintiffs' claim that Part B was age discriminatory also fails because it is time-

barred.

76.     A statute of limitations "inevitably reflects a value judgment concerning the point

at which the interests in favor of protecting valid claims are outweighed by the interests in

prohibiting the prosecution of stale ones."  <u>Johnson v. Railway Express Agency, Inc.</u>, 421 U.S.

454, 463-64 (1975).

77.     Statutes of limitation serve several important policies, including rapid resolution

of disputes, repose for those against whom a claim could be brought, and avoidance of litigation

involving lost evidence or distorted testimony of witnesses.  <u>See, e.g.</u>, <u>Ledbetter v. Goodyear

Tire & Rubber Co., Inc.</u>, 127 S. Ct. 2162, 2177 (2007); <u>Wilson v. Garcia</u>, 471 U.S. 261, 271

(1985).  For these reasons, strict adherence to limitation periods "is the best guarantee of

evenhanded administration of the law."  <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980).

78.     Where an ERISA provision does not contain its own statute of limitations for a

particular claim, the most analogous state statute of limitations governs.  <u>See</u> <u>Sandberg v. KPMG

Peat Marwick, LLP</u>, 111 F.3d 331, 333 (2d Cir. 1997) ("When Congress fails to provide a statute

of limitations for claims arising under federal statutes, a court must apply the limitations period

- 21 -

of the state-law cause of action most analogous to the federal claim.").

79.     Here, Plaintiffs' ERISA Section 204(b)(1)(H)(i) claim alleging age discrimination is most analogous to Connecticut's statutory provisions prohibiting age discrimination and the corresponding 180-day statute of limitations that applies to such claims.  See Conn. Gen. Stat. Ann. § 46a-82 (stating age discrimination complaint "must be filed within 180 days after the alleged act of discrimination"); Williams v. Comm'n on Human Rights and Opportunities, 786 A.2d 1283 (Conn. App. Ct. 2001) (holding plaintiff's discrimination claim barred by 180-day statute of limitations).

80.     Judge Hall rejected the 180-day age discrimination statute of limitations in favor of the breach of contract statute of limitations in Parsons, 2006 WL 2826694, at *2.  However, this Court finds unpersuasive Parsons' reasoning that an ERISA age discrimination claim "deals with determining specific benefits, and thus is about a contract."   Id.  See also J.P. Morgan I, 460 F. Supp. 2d at 483 (applying statute of limitations for breach of contract claims to ERISA age discrimination claim simply because "[e]mployee benefit plans are contracts").

81.     Rather, because Connecticut's specific statute of limitations for age discrimination is more analogous, this Court does not rely on the breach of contract statute of limitations. See Syed v. Hercules Inc., 214 F.3d 155, 159 (3d Cir. 2000) (applying "more specific statute of limitations covering employment disputes [which provides] for recovery upon a claim of wages, salary, or overtime for work, labor or personal services performed, . . . or for any other benefits arising from such work, labor or personal services performed" as opposed to statute of limitations "for general actions on a promise") (internal emphasis omitted).

82.     The accrual of ERISA claims is governed by "federal common law."  Daill v. Sheet Metal Workers' Local 73 Pension Fund, 100 F.3d 62, 65 (7th Cir. 1996) ("[W]e look to

federal common law for purposes of determining the accrual date of a cause of action under a federal statute such as ERISA.").  Under federal common law, "[i]t is the standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief."  Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007) (internal quotations and citations omitted).  See also Graham County Soil & Water Conservation Dist. v. United States, 545 U.S. 409, 418 (2005) (recognizing the standard federal rule "that the limitations period commences when the plaintiff has a complete and present cause of action.") (internal quotations omitted); Ledbetter, 127 S. Ct. at 2171 (plaintiff's "cause of action was fully formed and present at the time that the discriminatory employment actions were taken against her, at which point she could have, and should have sued").

83.    While certainly at the time the Plan document was published, participants had a complete cause of action, Count 3 may have accrued even earlier, since active employees were notified about the forthcoming cash balance plan in November 1997, and Part B was effective on January 1, 1998 for non-rehired employees.  Plaintiffs' age discrimination claim accrued no later than December 21, 1998, when the Part B Plan amendment was signed.

84.    Yet Plaintiffs did not file their amended Complaint alleging their age discrimination claim until April 12, 2002.  The age discrimination claim does not relate back to Plaintiffs' original Complaint because the claim does not arise out of the same factual allegations.  See, e.g., Gomes v. Avco Corp., 964 F.2d 1330, 1334 (2d Cir. 1992) (finding that a Section 1981 claim based on discriminatory refusal to process a grievance did not relate back to the plaintiff's original claim, which only mentioned one of the grievances because the second grievance was considered a separate transaction not contained in the original complaint).

85.    Even if the age discrimination claim were to relate back, however, it would still

be untimely, as Plaintiffs' original Complaint was filed on December 18, 2001.  Accordingly,

Plaintiffs' age discrimination claim is untimely.

86.     Even if the Court had concluded that the 180-day statute of limitations did not

apply, the other most analogous statute of limitations in Connecticut would be the two-year

statute applicable to a "[c]ivil action to collect wage claim [or] fringe benefit claim."  Conn. Gen.

Stat. Ann. § 31-72; Conn. Gen. Stat. Ann. § 52-596.

87.     Section 72 of Title 31 applies to statutory wage and fringe benefit violations, such

as minimum wage violations (see Conn. Gen. Stat. Ann. §§ 31-58 to 31-62b), and violations of

the Connecticut Prevailing Wage Law (see Conn. Gen. Stat. Ann. § 31-53).  See Conn. Gen. Stat.

Ann. § 31-72.  See also Syed, 214 F.3d at 160-61 (holding that Delaware's one-year statute of

limitations for claims to recover wages and benefits applied to plaintiff's ERISA claims).

88.     Plaintiffs are plainly attempting to "collect" additional "fringe benefits" —

specifically, greater pension benefits — in Count 3.  That claim is not grounded in contract or in

an interpretation of Part B, and therefore is not subject to any contractual limitations period.

89.     Thus, regardless of whether the 180-day or two-year limitations period applies,

Plaintiffs' age-discrimination claim is time-barred.

## II.     PART B DOES NOT VIOLATE ERISA'S NONFORFEITABILITY RULE OR ERISA'S 133⅓% ANTI-BACKLOADING RULE.

90.     At a fundamental level, Plaintiffs' challenges to the formula for calculating

opening account balances fail because:

> [C]urrent federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, provided that a plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate from the employer.

Ex. 533, United States General Accounting Office, Report to Congressional Requesters, Private

Pensions, Implications of Conversions to Cash Balance Plans, September, 2000, at 30 (emphasis added).

91.     Here, Part B does exactly what is required by providing a minimum benefit which protects the benefits to which an employee was entitled under the prior formula.  There is no impermissible forfeiture and no violation of ERISA's backloading rules.

92.     Plaintiffs rely on ERISA Sections 203(a), 29 U.S.C. § 1053(a), and 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), to attack the calculation of opening account balances under Part B. Each court to have addressed these issues has squarely rejected claims identical to those asserted here, both in the cash balance context and otherwise.  See, e.g., Register, 477 F.3d at 70-72; FleetBoston I, 427 F.Supp.2d at 168-70.

**A.     The Plan Does Not Violate ERISA's 133⅓% Rule.**

93.     Plaintiffs' suggestion that the Plan violates ERISA's 133⅓% anti-backloading rule because of the "wear-away" effect that exists for some employees related to the minimum benefit "greater-of" protection in Part B is incorrect.

94.     ERISA's anti-backloading rules in Section 204(b)(1) limit a defined benefit plan's ability to "backload" certain retirement benefits to later years of service.  The Second Circuit explained in Langman v. Laub, 328 F.3d 68 (2d Cir. 2003), that Congress enacted the anti-backloading rules:

> to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue "backloading," i.e., by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement.

Id. at 71 (quoting H.R.Rep. No. 93-807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688); see

also <u>Register</u>, 477 F.3d at 71 (same).

        95.      In order to satisfy the anti-backloading rules, a defined benefit plan need only

meet one of three separate tests: (1) the "3% method;" (2) the "133⅓% rule;" or (3) the

"fractional rule."  <u>See</u> 29 U.S.C. § 1054(b)(1)(A)-(C); 29 C.F.R. § 1.411(b)-1(a); 29 C.F.R. §

1.411(b)-1(b)(1), (2) and (3) (describing each test).  The challenges to cash balance plans in this

case (as in other cases) involve application of the 133⅓% rule, which generally requires that:

> the annual rate at which any individual who is or could be a
> participant can accrue the retirement benefits payable at normal
> retirement age under the plan for any later plan year is not more
> than 133⅓ percent of the annual rate at which he can accrue
> benefits for any plan year beginning on or after such particular
> plan year and before such later plan year.

29 U.S.C. § 1054(b)(1)(B); <u>see also</u> 29 C.F.R. § 1.411(b)-1(b)(2) (providing examples).

        96.      Critically, ERISA requires that the 133⅓% rule be examined without

consideration of any prior benefit formulas or prior plans.  Section 204(b)(1)(B)(i) specifically

provides that when testing for compliance with the 133⅓% rule, "any amendment which is in

effect for the current year shall be treated as in effect for all other plan years."  29 U.S.C. §

1054(b)(1)(B)(i).  <u>See also</u> <u>Langman</u>, 328 F.3d at 71.  This means that the current operative plan

is assumed to have existed for all time; it is impermissible to compare benefits under the current

formula with benefits under a prior formula when testing for compliance under the rule.  <u>See</u>

<u>Register</u>, 477 F.3d at 71-72 (alleged violation of the 133⅓% rule cannot be based on comparison

of the minimum protected benefit earned under the prior formula to the current cash balance

formula).

        97.      Plaintiffs' argument that Part B violates the 133⅓% rule depends on exactly such

a prohibited comparison.  The minimum benefit protection under Part B is based exclusively on

the <u>prior plan's</u> benefit formula, which cannot be considered for purposes of anti-backloading

testing.  29 U.S.C. § 1054(b)(1)(B)(i).

98.     These are the same circumstances the Third Circuit faced in <u>Register</u>, wherein the

court held:

> [O]nce there is an amendment to the prior plan, only the new plan
> formula is relevant when ascertaining if the plan satisfies the 133
> ⅓% test.  A participant's election to retain his early retirement
> benefits from the old plan is not relevant to this calculation.  If we
> treat the amended plan as in effect for all other plan years, as
> Congress directs us to do, appellants never would have accrued a
> benefit under the old plan and would have started to accrue
> benefits under the cash balance formula from the beginning of their
> employment.  Accordingly, there is no violation of the anti-
> backloading provisions under appellants' aggregate-formula
> theory.  Moreover, the objective of the anti-backloading
> provisions, to prevent a plan from being unfairly weighted against
> shorter-term employees, simply is not implicated by the [cash
> balance] conversion.

<u>Register</u>, 477 F.3d at 72 (internal citation and quotations omitted).

99.     Likewise, Judge Hall in the <u>FleetBoston I</u> case reached the same conclusion,

holding:

> If the Amended Plan is treated as having been in effect for all plan
> years, employees such as Richards would never have accrued a
> benefit under the Traditional Plan, and would have started accruing
> benefits under the cash balance formula from the start of their
> employment.  Assuming such a scenario, such employees would
> suffer no backloading of benefits.

427 F. Supp. 2d at 170-71 (rejecting claim that cash balance conversion violated the 133⅓%

rule); <u>see also</u> <u>Richards v. FleetBoston</u>, No. 04-1638, 2006 WL 2092086, *3 (D. Conn. July 24,

2006) ("<u>FleetBoston III</u>") (affirming holding that cash balance plan wear-away does not violate

the 133⅓% rule).

100.     Plaintiffs also cannot premise any purported violation of the 133⅓% by relying on

the wear-away of early retirement benefits.  The 133⅓% rule explicitly precludes testing for

compliance by looking at early retirement benefits. <u>See</u> 29 U.S.C. § 1054(b)(1)(B)(iii) ("[T]he fact that benefits under the plan may be payable to certain employees before normal retirement age <u>shall be disregarded</u>."). Instead, the 133⅓% rule is tested only with respect to benefits payable at "normal retirement age." 29 U.S.C. § 1054(b)(1)(B).

101. Perhaps recognizing that there is no caselaw or regulation supporting their theory of liability on their anti-backloading claim, Plaintiffs' have attempted, post-trial, to introduce letters from the ERISA Industry Committee ("ERIC") and the American Benefits Council ("ABC") characterizing the IRS position regarding cash balance plan conversion, as admissible evidence of the IRS' formal position regarding such conversions. However, these letters were not written by the IRS and have not been adopted by the IRS.

102. More fundamentally, the letters do not relate to the circumstances presented in this case or anything analogous. Although Plaintiffs describe the letters as reflecting the IRS position regarding cash balance plan conversions where previously earned benefits are frozen, as occurred with the adoption of Part B in this case, this is a mischaracterization. The letters simply do not refer to cash balance plan conversions where the prior traditional formula was <u>frozen as a minimum benefit</u>. Rather, the letters refer to the current discussion within the IRS about certain conversions where participants are offered an ongoing benefit formula based on the greater of a cash balance benefit for all years of service <u>or a continuation of the previous traditional defined benefit formula on a going forward basis</u>. When two ongoing formulas are used to determine a participant's benefit, the rule that a plan amendment "shall be treated as in effect for all other plan years" is inapposite. 29 U.S.C. § 1054(b)(1)(B)(i). Thus, the ERIC and ABC letters do not address the "A + B" or greater of "A or B" conversion methods that were at issue in <u>Register</u>, <u>FleetBoston</u>, and this case.

103.    This distinction was explained succinctly in a recent article:

> The IRS evidently is concerned that where two or more formulas interact to determine a "winning benefit," there can be wear-away periods during which a participant's net benefit accruals may cease and then pick up again. . . .
>
> Our experience to date has been that the IRS will not press this position if there are only two competing formulas: The cash balance formula and a frozen traditional formula. In that instance, the IRS understands that a "greater of" formula is just a mechanism for complying with Code § 411(d)(6): i.e., the cash balance formula governs, but with a backstop guarantee that a participant's benefit will never be less than the value of the traditional benefit accrued as of the date of conversion.
>
> But the IRS is taking a harder line where a greatest-of formula involves one or more active formulas in addition to the cash balance formula.

"Post-PPA Cash Balance Plan Determination Letter Process:  IRS Closely-Scrutinizing 'Greater-Of' Benefit Formulas for Compliance with Anti-Backloading Standards," dated May 18, 2007 (emphasis added) (attached hereto as Exhibit A).

104.    In short, notwithstanding Plaintiffs' efforts to mischaracterize the IRS' position, and upon considering the actual statutes and governing regulations, there is no basis for Plaintiffs' position that Part B violated the 133⅓% rule.

**B.    The Plan Does Not Cause Any Impermissible Forfeitures.**

105.    Under ERISA Section 203(a), every pension plan must "provide that an employee's right to his <u>normal retirement benefit</u> is non-forfeitable upon the attainment of <u>normal retirement age</u> . . ." and satisfaction of the Plan's vesting rules.  29 U.S.C. § 1053(a) (emphasis added).

106.    ERISA's nonforfeitability rule only applies to the "normal retirement benefit" payable at "normal retirement age."  29 U.S.C. § 1053(a).

107.    Plaintiffs incorrectly claim that Part B somehow violates this provision.  Part B

protects employees' minimum benefits by providing employees with the greater of (1) their

protected frozen Minimum Benefit ("A"), or (2) their cash balance account balance ("B").

108.    In <u>Alessi v. Raybestos-Manhattan, Inc.</u>, 451 U.S. 504 (1981), the Supreme Court

held that:

> the statutory definition of "nonforfeitable" assures that an
> employee's claim to the protected benefit is legally enforceable,
> <u>but it does not guarantee a particular amount or a method for
> calculating the benefits.</u>

451 U.S. at 512 (emphasis added and citation omitted).

109.    Consistent with <u>Alessi</u>, courts repeatedly have held that ERISA's nonforfeitability

provision does not prohibit a plan from providing participants with the greater of two benefit

formulas.  Rather, ERISA's nonforfeitability provision simply requires that whatever benefits the

plan provides – and whatever formula or combination of formulas is used – those benefits are

actually paid to participants.  As one district court explained:

> Applying this rule in the present case, this Court finds that while
> ERISA protects an employee's right to his accrued pension
> benefits it exerts little control over the content/amount of the
> benefits themselves.   The parties to the pension plan are
> responsible for deciding the actual benefits available under the
> plan.

<u>Francia v. Wonderoast, Inc. Profit Sharing Plan</u>, No. 92-CV-790S, 1995 WL 625705, at *13

(W.D.N.Y. Oct. 19, 1995) (internal quotations and citations omitted).

110.    With respect to plans that provide the greater of two benefits (<u>i.e.</u>, "A or B" and

not "A + B"), the Seventh Circuit explained in <u>White v. Sundstrand Corp.</u>, 256 F.3d 580 (7th Cir.

2001), that:

> Any pension plan giving retirees the greater of two amounts, as
> opposed to the sum of these amounts, can be described as

> confiscating the difference. . . . But under ERISA that is neither
> here nor there.  The Employee Retirement Income Security Act
> does not require employers to establish plans that are particularly
> favorable to employees.

Id. at 582-83.

111.     Recognizing this totally acceptable, and lawful, form of pension plan design,

courts have rejected challenges virtually identical to those asserted by Plaintiffs here.  For

example, the First Circuit affirmed the dismissal of an identical claim in Campbell when

addressing the employer's conversion from a traditional plan to a cash balance plan:

> [Plaintiff] argues that this reduction amounts to a forfeiture of an
> accrued benefit in violation of 29 U.S.C. § 1054(g).  There was no
> forfeiture, because no accrued benefits were reduced; only
> expected benefits were reduced, which [defendant] could, under
> the law, modify or eliminate.
>
> The ERISA anti-cutback provision protects against the erosion of
> "accrued benefits". . . .  The reduction of pension benefits of which
> [plaintiff] complains was merely the elimination of future expected
> accruals of benefit.  The December 31, 1996 amendment to the
> plan protected all of the pension benefit based on [plaintiff's] work
> for the company up to that point; it merely ceased accruals under
> the old plan based on employment from that point forward.  This
> was an elimination of an expected, not accrued, benefit.  There was
> no ERISA violation.

327 F.3d at 8-9 (internal citations and quotations omitted).  Although the plaintiff in Campbell

brought his challenge under ERISA Section 204(g), the First Circuit specifically held that the

cash balance conversion did not cause a "forfeiture" of benefits, because the plaintiff's

previously earned benefits – like Plaintiffs' previously earned benefits in this case – were

protected.  Campbell, 327 F.3d at 8-9.  See also Register, 2005 WL 3120268, at *2-3 (same).

112.     Similarly, in Williams v. Caterpillar, Inc., 944 F.2d 658 (9th Cir. 1991),

Caterpillar maintained union and management pension plans that were part of an "integrated

system."  Id. at 662.  Under the integrated plan, employees who retired would receive the greater

of either their management pension or their union pension, but would not receive both.  Id. at

663.  A number of former employees who had been demoted from management into the union

one to five years before their retirements filed suit.  Like Plaintiffs in the instant case, they

alleged that the benefits they accrued under the union plan were forfeitable because they would

not receive those benefits if they received their management plan benefits.  Id. at 662.

113.    Specifically, these former employees claimed – as Plaintiffs contend here – that:

> Although receiving the higher of these two figures [the
> management or union pensions] would appear to be the result that
> appellants would want, appellants contend that even the
> Management Plan figure is impermissibly low.  Because that
> [management] plan did not give credit for any years of service
> after their demotions, it does not literally compensate appellants
> for those years.  Technically, appellants fell under the coverage of
> the Union Plan for their final years, but because that plan produced
> a lower figure [of retirement benefits] and was "offset" by the
> Management Plan amount, appellants actually received no
> additional incremental benefit allocable to those final years.  In
> short, under Caterpillar's calculations, appellants would have
> received the very same pensions that they are now receiving if they
> had been eligible to retire and had retired on the dates on which
> they received their demotions, rather than one to five years later.

Id. at 663 (emphasis in original).  Therefore, the plaintiffs argued, the plans "worked an

impermissible forfeiture of nonforfeitable vested benefits" and violated ERISA.  Id. at 662

(internal quotations omitted).

114.    The Ninth Circuit rejected the plaintiffs' claim, holding that:

> [T]he Caterpillar plans do take all of appellants' years of service
> into account.  It only appears otherwise because of the offset
> provision:  the Union Plan, which credits appellants for 100% of
> the time they have devoted to the company, would yield a lower
> pension benefit than the Management Plan, which does not, and so
> pursuant to the offset, Caterpillar has given appellants the greater
> Management Plan amount.

Id. at 663 (emphasis in original).

- 32 -

115.    Notably, Judge Hall rejected an identical claim in the <u>FleetBoston I</u> case, wherein the court held:

> The terms of the Amended Plan itself state that an employee in Richards' position, upon termination of employment, will receive the greater of the balance in her hypothetical cash balance account and the frozen benefit derived from the Traditional Plan.  Thus, the Amended Plan terms give Richards no claim to benefit accrual during the years in which her hypothetical account balance is below the value of her frozen Traditional Plan benefit.    Section 203(a) gives Richards a non-forfeitable claim to her accrued benefit, but the balance of the hypothetical cash account does not become part of her accrued benefit until it surpasses the value of the frozen Traditional Plan benefit.    Thus, the plan does not require a forfeiture of an accrued benefit, nor is the receipt of accrued benefits conditional.

427 F. Supp. 2d at 170.  <u>See also</u> <u>Bonovich v. Knights of Columbus</u>, 963 F. Supp. 143, 146-48 (D. Conn. 1997) (dismissing forfeiture claim because "plaintiffs overlook the fact that deduction of their benefit-like renewal commissions is itself part of the formula for determining the amount of their pension benefits, and because ERISA does not control the content and calculation method of plan benefits, [defendant] may integrate participants' pension plan benefits with their renewal commissions"), <u>aff'd</u>, 146 F.3d 57 (2d Cir. 1998).

116.    The holdings in <u>Esden</u>, <u>Berger</u> and <u>Frommert v. Conkright</u>, 433 F.3d 254 (2d Cir. 2006) cannot circumvent this overwhelming authority.

117.    The only issue in <u>Esden</u> and <u>Berger</u> was the calculation of lump sum benefits pursuant to IRS Notice 96-8 and a process known as "whipsaw."  Because of the lump sum calculations used in the plans in <u>Esden</u> and <u>Berger</u>, employees received <u>less</u> than the present value of their normal retirement benefit, which caused an impermissible forfeiture.  <u>Esden</u>, 229 F.3d at 167; <u>Berger</u>, 338 F. 3d at 763.  Similarly, in <u>Frommert</u>, a plan was amended to provide a <u>lower</u> benefit than that to which employees were previously entitled, due to a new method of

calculating benefit offsets. <u>Frommert</u>, 433 F.3d at 261.

118.    By contrast, Part B fully complies with the requirements of Notice 96-8, <u>Esden</u> and <u>Berger</u>, and has no offset provision resulting in a benefit reduction as in <u>Frommert</u>. To the contrary, pursuant to Section 1.1(c), Part B uses a "greater-of" formula – participants can never receive less than the value of their previously accrued benefit.

119.    Thus, because Part B unambiguously provides that no participant can receive less than his or her previously accrued benefit, there can be no unlawful forfeiture under ERISA Section 203(a).

### C.    Count 1 Also Is Time-Barred.

120.    Additionally, Plaintiffs' claims that Part B violated ERISA's 133⅓% anti-backloading and non-forfeitabilty rules in Count 1 fail because they are time-barred, for the same reasons as discussed above in connection with Count 3.

121.    Count 1, unlike Count 3, is not a claim for age discrimination that would warrant the application of Connecticut's 180-day statute of limitations for age discrimination claims. However, it is undisputed that Plaintiffs are attempting in Count 1 to "collect" additional benefits, specifically, greater pension "benefits." Consequently, the analogous statute of limitations in Connecticut is the two-year statute applicable to a "[c]ivil action to collect wage claim [or] fringe benefit claim." Conn. Gen. Stat. Ann. §§ 31-72, 52-596.

122.    Just as for Count 3, Count 1 accrued no later than December 21, 1998, the date that the Part B Plan amendment was signed, and possibly earlier. Because Plaintiffs did not file their first Complaint until December 18, 2001, Count 1 is time-barred.

III.    **PLAINTIFFS WERE NOT LIKELY OR ACTUALLY HARMED, AND THE WRITTEN DISCLOSURES SATISFIED ERISA'S DISCLOSURE REQUIREMENTS.**

123.    The Plan Administrator's SPDs issued in 1998 and 1999 complied with ERISA's specific statutory disclosure requirements, 29 U.S.C. § 1022.

124.    The Plan Administrator's Section 204(h) notice distributed to Plan participants in 1997, complied with ERISA's specific statutory disclosure requirements, 29 U.S.C. § 1054(h).

125.    CIGNA distributed detailed, individualized opening account balance information, annual account statements and Total Compensation Reports that provided Plan participants with an ample basis for making informed employment and retirement decisions, and which defeat any finding of likely prejudice and/or establish harmless error as to Plaintiffs' disclosure claims in Counts 2 and 4.

126.    Plaintiffs' disclosure claims in Counts 2 and 4 also fail because they are time-barred, and because they lie only against the CIGNA Plan Administrator, whom Plaintiffs did not name as a defendant in this case.

A.    **The Opening Account Balance Information, Total Compensation Reports And Annual Account Statements Distributed To Plan Participants Foreclose Any Liability On Plaintiffs' Disclosure Claims.**

1.    **The Plan Administrator Provided Part B Participants With Complete And Timely Information Regarding The Exact Amount Of Their Cash Balance Accounts.**

127.    The Court rejects the basic premise of Plaintiffs' disclosure claims in Counts 2 and 4, namely that Plan participants were not provided with sufficient information regarding their pension benefits to make "well-informed employment and retirement decisions."

128.    Plaintiffs have failed to establish any technical deficiencies in the 1998 and 1999 SPDs and the 1997 Section 204(h) notice, and cannot meet their individual burdens of proving

that they were likely harmed by these purported deficiencies or overcome Defendants' argument that any such deficiencies constituted harmless error.  See Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 113 (2d Cir. 2003) ("Cognizant of ERISA's distribution of benefits, we require, for a showing of prejudice, that a plan participant or beneficiary was likely to be have been harmed as a result of a deficient SPD.  Where a participant makes the initial showing of likely harm, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error."); Frommert, 433 F.3d at 267-68 (applying likely harm / harmless error analysis to Section 204(h) notice claim).

129.    In a sense, the likely harm and harmless error analyses are two sides of the same coin, and courts in the Second Circuit often seem to conflate the two.  Compare Weinreb, 404 F.3d at 172 (finding no likely harm where the plaintiff received the information missing from an SPD through other channels), with Pastore v. Witco Corp., 388 F. Supp. 2d 212, 221 (S.D.N.Y. 2005) (finding harmless error where the plaintiff received the information missing from the SPD through another channel).  Regardless of whether the Court analyzes the individualized account balance information given to Plaintiffs and the testifying class members under the rubric of likely prejudice or harmless error, Plaintiffs' disclosure claims fail either way.

130.    The Plan Administrator provided Part B participants complete and timely information regarding the exact amount of their cash balance accounts, how the cash balance plan would operate and how OABs would be calculated.  Given these extensive disclosures, class members understood the individualized cash balance information that the Plan Administrator provided to them and were able to incorporate that information into their personal financial decision-making.

131.    Cash balance plan benefits are considered easier to understand than those

provided under a traditional defined benefit plan, because the benefit value is expressed in terms of an account.  See United States General Accounting Office, Report to Congressional Requestors, Private Pensions, Implications of Conversions to Cash Balance Plan, September 2000, at 14-15; see also Citigroup I., 470 F. Supp. 2d at 327 (citing Regina T. Jefferson, Striking a Balance in the Cash Balance Plan Debate, 49 Buffalo L. Rev. 513 (2001)); Esden, 229 F.3d 154, 158 n.5 (citing Carol Quick, Overview of Cash Balance Plans, EBRI Notes 1 (July 1999)).

> **2.    Courts In The Second Circuit Have Consistently Rejected ERISA SPD/Section 204(h) Disclosure Claims When Plan Participants Have Been Provided Sufficient Information About Their Benefits Through Other Means, As In This Case.**

132.    In circumstances similar to those at issue here, courts in the Second Circuit have rejected disclosure claims.  For example, in Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst., 404 F.3d 167, 171-72 (2d Cir. 2005), the plaintiff sought to prevent enforcement of a plan requirement that a participant submit an enrollment form to be eligible for life insurance, because the participant was not notified of the requirement in an SPD — in fact there was no SPD at all. See id. at 170 (the hospital "did not create or provide an SPD").  The participant, however, had been notified of the enrollment form requirement through other informal communications and telephone calls.  See id. at 172.  Accordingly, the Second Circuit held that the plaintiff "failed to raise any material issue of fact demonstrating likely prejudice from the absence of an SPD," affirmed summary judgment against the plaintiff, and never reached the harmless error standard. Id. at 172 (emphasis added).

133.    Contrary to their assertion, Plaintiffs are not entitled to a presumption of harm upon a finding that a written disclosure itself was legally deficient.  While the Burke court rejected a detrimental reliance standard in favor of a "likely harm" standard, Plaintiffs' contention that likely harm may be presumed from a document itself would render obsolete the

Second Circuit's likely harm requirement articulated in <u>Burke</u>. Although <u>Burke</u> and <u>Weinreb</u> involved allegations of non-disclosure, the Second Circuit held in both cases that the plaintiff was required to <u>prove</u> that she was likely harmed by the non-disclosure. <u>See</u> <u>Burke</u>, 336 F.3d at 113 ("Where a participant makes this initial showing. . ."). Indeed, in <u>Weinreb</u>, the Second Circuit affirmed summary judgment specifically because the plaintiff failed to meet her burden of proving likely harm, despite that there was a "complete absence of an SPD" and accordingly it was indisputable that the SPD was "legally deficient." <u>Weinreb</u>, 404 F.3d at 172.

134.    In <u>Pastore</u>, the court granted summary judgment in favor of the plan administrator, despite finding that the severance plan's SPD unlawfully omitted the eligibility condition that a participant was only entitled to severance if he resigned because the company was requiring him to relocate. <u>Pastore</u>, 388 F. Supp. 2d at 221. Pastore had been offered the choice of moving to another office or working part-time at home, and accordingly was refused severance upon his resignation on the ground that he was not required to relocate, a condition to benefits about which he pled ignorance. <u>Id.</u> In finding harmless error, the court noted that "it is undisputed that Plaintiff learned of the 'required to relocate' requirement of the CIC Program when he was provided and admittedly read a copy of the 'Change in Control Severance Program Description' before he announced his resignation." <u>Id.</u> at 221.

135.    Likewise, in <u>Park v. Trustees of the 1199 SEIU Health Care Employees Pension Fund,</u> 418 F. Supp. 2d 343 (S.D.N.Y. 2003), the court noted that Mrs. Park was not "likely prejudiced" by the failure of the SPD to include information regarding the plan's lost spouse waiver, because Mrs. Park "was sufficiently aware of the lost spouse waiver to seek to invoke it." <u>Id.</u> at 354.

136.    This is not a situation where the Plan participants were left with unanswered

questions regarding the eligibility for benefits under Part B or the conditions that might exclude

participants from coverage.  In other words, Plaintiffs have not alleged that certain information

missing from the SPD and Section 204(h) notice, if included, would have permitted any class

member to reap a larger Part B benefit.  See, e.g., Wilkins v. Mason Tenders Dist. Council

Pension Fund, 445 F.3d 572, 585 (2d Cir. 2006) ("To show likely prejudice, he must proffer

sufficient evidence that, had the SPD given him adequate notice of his burden of proof" of

showing covered employment, he would have preserved records "adequate to prove his

entitlement to additional benefits.").

137.    Courts have rejected disclosure claims where the missing information would not

have made a difference in the benefits the participant would have obtained.  For example, in

Sheehan v. Metro. Life Ins. Co., 368 F. Supp. 2d 228 (S.D.N.Y. 2005), the plaintiff alleged likely

harm based on a restriction in the employer's disability benefits certificate that was absent from

the SPD, which provided that benefits will not be paid if the participant's disability "results

from, or is caused or contributed to by a mental or nervous disorder."  Id. at 235.  The court

found that the plaintiff could not prove likely harm because, based on the medical evidence

concerning the plaintiff, even if he had been apprised of the terms missing from the SPD, he

could not "have acted in a way as to avoid the effect of the restrictions" in the plan.  Id. at 262;

see also id. at 235-36, 263-65.

138.    Similarly, in Exarhakis v. Visiting Nurse Serv. of N.Y., No. 02-CV-5562 (ILG),

2006 WL 335420, at *13 (E.D.N.Y. Feb. 13, 2006), the court held that the plaintiff could not

demonstrate likely harm based on the failure to provide an SPD for the employer's long-term

disability benefits policy, because the plaintiff's testimony suggested that even if she had been

given an SPD she would have returned to work as soon as possible rather than taking leave under

the policy.  See also Tocker v. Philip Morris Cos., 470 F. 3d 481, 489 (2d Cir. 2006) (noting that

no likely prejudice would result to participant where SPD failed to explain the plan

administrator's discretionary authority to determine benefit eligibility, since that authority did

not affect the entitlement to benefits, but rather only affected the procedure once a denial of

benefits had occurred).

139.     By contrast, courts have held that a participant can establish likely harm and that

the employer cannot demonstrate harmless error where the employer has failed to provide

information crucial to the participant's ability to obtain a larger benefit.  See, e.g., Rothwell v.

Chenango County N.Y.S.A.R.C. Pension Plan, No. 3:03-CV- 00637 (GLS), 2005 WL 2276023,

at *7 (N.D.N.Y. Sept. 19, 2005) (finding likely harm and no harmless error because the plaintiff

did not receive information critical to her ability to minimize market losses on her benefits).

140.     Here, none of the Plaintiffs or testifying class members provided any evidence,

nor could they, that had the SPDs or Section 204(h) notice better reflected the terms of Part B,

they would have obtained any greater benefits.  In other words, this is not a situation where, as a

result of a disclosure's deficiency, the participant "was not aware of the need to take an action

within his control . . . which would have avoided the restriction on eligibility for benefits, and

consequently failed to take that action."  Sheehan, 368 F. Supp. 2d at 262.

141.     Nor is this a situation where the employer did not properly apprise participants of

the amount of their pension benefits and therefore mislead them into believing the benefits were

larger than they were.  Such was the case in Frommert, where the Second Circuit found a

disclosure violation based upon the fact that the plaintiffs had their benefits reduced by a

"phantom account," which was never disclosed to them and was not even properly part of the

plan until after many had already retired.  Id. at 265-67.  As the court stated:

> The prolonged absence of any mention of the phantom account from Plan documents, most notably SPDs, likely, and quite reasonably, led Plan participants to believe that it was not a component of the Plan. Rather, rehired employees likely believed that their past distributions would only be factored into their benefits calculations by taking into account the amounts they had actually received.

Frommert, 433 F. 3d at 266-67.

142.     Thus, Frommert is inapposite because there the plaintiffs thought that, based on the SPD, they were entitled to more money than they actually were, whereas CIGNA's Plan Administrator advised Part B participants of the precise amount in their cash balance accounts each year.  See also Laurent, 448 F. Supp. 2d at 546-47 (refusing to dismiss SPD claim because its deficiencies had the result participants making a "reasonable assumption" of "grossly overestimating the value of their pension benefits") (emphasis added).

143.     Because the exact amount of each Plan participant's cash balance account was explicitly described in the various written disclosures provided to participants, any deficiencies in the 1998 and 1999 SPDs and the 1997 Section 204(h) notice did not cause likely harm or constituted harmless error.

144.     Plaintiffs' allusions to general breach of fiduciary duty standards carry no weight here since Plaintiffs have never asserted a fiduciary breach claim in this matter.  Nevertheless, Plaintiffs could not show that they relied to their detriment on any alleged misleading communications.  See Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo, 148 F.3d 194, 196-97 (2d Cir. 1998) (rejecting ERISA misrepresentation claim where plaintiffs did not personally rely on alleged misrepresentations to their detriment).

### 3. The Trial Testimony Of Plaintiffs And The Testifying Class Members Demonstrates That Any Deficiencies In The 1998 And 1999 SPDs And The 1997 Section 204(h) Notice Constituted Harmless Error.

145.    Even if the Plan Administrator had not distributed individualized OAB information, annual account statements and Total Compensation Reports that advised Plan participants of the exact amount of their cash balance accounts, Plaintiffs and the class members who testified at trial made it clear that any deficiencies in the 1998 and 1999 SPDs and the 1997 Section 204(h) notice were plainly harmless error.

146.    Likewise here, the class members' testimony demonstrates variation in whether they were likely or actually harmed by the alleged deficiencies in the Part B SPD and Section 204(h) notice.

### B. The Part B SPD Met ERISA's Disclosure Requirements.

147.    The Supreme Court has admonished that the precise ERISA rules dictate the parameters of the disclosure requirements: "ERISA already has an elaborate scheme in place for enabling beneficiaries to learn their rights and obligations at any time," which "is quite thorough," and is not "intended it to be supplemented by a faraway provision in another part of the statute." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995).

148.    Here, Plaintiffs seek to impose upon Defendants additional disclosure obligations that go well beyond what is required by ERISA Section 102, 29 U.S.C. § 1022, the statutory provision that governs the contents of an SPD.

149.    Plaintiffs seem to suggest that to the extent there is any uncertainty in the law as to what must be disclosed, it should be resolved in favor of requiring disclosure to Plan participants. In taking this position, however, Plaintiffs overlook the Supreme Court's admonition that ERISA is "an enormously complex and detailed statute that resolved

innumerable disputes between powerful competing interests—<u>not all in favor of potential plaintiffs</u>." <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 262 (1993) (emphasis added).

150.     Apart from the fact that Plaintiffs and the testifying class members were neither likely nor actually harmed as a result of any deficiency in the Part B SPD, that document itself met ERISA's technical disclosure requirements.

### 1.     The Part B SPD Met The Requirements Of ERISA Section 102.

151.     Because the Plan document for Part B contains some 80 pages of single-spaced information that attempts to address every aspect of the Plan's design, the Plan Administrator provided participants with an SPD that summarized the plan.  As a summary, the SPD is, by definition, shorter and simpler than the plan.  As a result, and by necessity, the SPD cannot contain or describe in detail all of the plan's provisions.  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184 (2d Cir. 2007) ("<u>Dun & Bradstreet</u>") (holding that while the SPD "might have been more informative," it only has to "summarize, rather than describe in every detail, the benefits available"); <u>Mers v. Marriott Int'l Group Accidental Death, Dismemberment Plan</u>, 137 F.3d 510, 517 (7th Cir. 1998) (rejecting argument "that beneficiaries should be able to use only the SPD and never consider whether additional terms exist.  This position is counter to the purpose of an SPD.").

152.     Section 102 of ERISA and the applicable regulations set forth specific parameters concerning information that must be included in a SPD.  29 U.S.C. § 1022; 29 C.F.R. §§ 2520.102-1 through 102-5.  Thus, the SPD must contain a statement:

> clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of [the regulations].

29 C.F.R. § 2520.102-3(l) (in effect 1997 through Nov. 21, 2000).

153.     The Part B SPD met these disclosure requirements.  Specifically, the SPD contained information concerning the following topic areas:  eligibility; how breaks in service affected eligibility; when benefits are paid; how benefits are paid; how the benefit is affected by certain "life events;" administrative details concerning the operation of the plan; change of control protections; spouse's rights; the appeal process; circumstances under which the plan can be amended or terminated; and a statement of ERISA rights.  The Part B SPD also included the following provisions related to Plan participants' cash balance accounts, the accrual of benefit and interest credits, and the guaranteed Minimum Benefit.

154.     Nowhere does the Part B SPD represent that an employee will receive the Minimum Benefit plus his or her benefit and interest credits (the so-called "A + B" formula), to which Plaintiffs now claim they are entitled.  Indeed, the fact that the SPD told Plan participants that they might receive their protected Minimum Benefit if it was higher than their cash balance benefit was a clear indication that a participant's prior protected benefit might be greater than his or her account balance, and that there might be a period of time during which there would be no increase in his or her overall pension benefit.

### 2.     The Part B SPD Was Not Required To Disclose A Reduction In The Rate Of Benefit Accrual With Age.

155.     Even apart from the fact that Defendants have already established that participants did not experience declining rates of benefit accrual with age, nothing requires an SPD to disclose "whether or not a participant's rate of benefit accrual declines with age."  FleetBoston III, 2006 WL 2092086, at *9 (holding that the SPD adequately explained the cash balance plan's rate of benefit accrual, despite that it failed to describe the formula as declining with age); Register, 2005 WL 3120268, at *9, aff'd 477 F.3d 56 (3d Cir. 2007) ("ERISA § 102 does not

require that the SPD describe how the benefit accrual rates change as participants age.").

### 3. The Part B SPD Was Not Required To Provide A Comparison To Benefits That Participants Would Have Earned Under The Old Plan.

156.     Plaintiffs' argument that the Part B SPD was deficient because it failed to provide a comparison of each participant's benefits in the form of an age-65 annuity under Part B with what they would have been under the old pension plan relies on the flawed premise that an SPD is required to describe benefits under an old benefit formula that does not apply.  That is not required by ERISA because an SPD is a summary of <u>the existing, operative plan</u>.  <u>See</u> 29 C.F.R. § 2520.102-3 ("The summary plan description must accurately reflect the contents of the plans as of a date no earlier than 120 days prior to the date such summary plan description is disclosed.").

157.     ERISA does not require that an SPD describe a plan that no longer applies or compare benefits under a current plan versus benefits under the plan it replaced.  Indeed, where, as here, a pension plan is amended as to only some participants (<u>i.e.</u>, those being moved into Part B), the regulations provide that the SPD for those participants need only include information applicable to them:

> [A] plan amendment altering benefits may apply to only those participants who are employees of an employer when the amendment is adopted and to employees who later become participants, but not to participants who no longer are employees <u>when the amendment is adopted</u>. . . .  In such cases the plan administrator may fulfill the requirement to furnish a summary plan description to participants covered under the plan and beneficiaries receiving benefits under the plan by furnishing to each member of each class of participants and beneficiaries a copy of a summary plan description appropriate to that class.  <u>The summary plan description may omit information which is not applicable to the class of participants or beneficiaries to which it is furnished.</u>

<u>See</u> 29 C.F.R. § 2520.102-4 (emphasis added).  In other words, the SPD for Part B need not

include information as to Part A going forward, as such information would be inapplicable to the converted participants starting January 1, 1998.

**4.    The Part B SPD Was Not Required To Disclose The Potential Wear-Away Effect.**

158.    The Part B SPD was not required to have explicitly warned Plan participants that they might suffer a wear-away effect.

159.    Given the lack of predictability of the wear-away, ERISA Section 102 did not require CIGNA's Plan Administrator to be clairvoyant regarding the potential wear-away effect and provide the type of disclosure that Plaintiffs they were due.

160.    No "missing witness" inference is called for regarding Defendants' failure to call witnesses to testify about the Plan Administrator's disclosures regarding the cash balance plan. None of the witnesses CIGNA opted not to call were legally "missing witness," since they were readily available for Plaintiffs to call, and indeed, Plaintiffs had reserved the right to call any witnesses listed in Defendants' pre-trial submission if Defendants did not call them.  See Pls' Trial Witness List, dkt. # 194.  See United States v. Caccia, 122 F.3d 136, 138-39 (2d Cir. 1997) (a missing witness charge is inappropriate for a witness who is merely an "uncalled witness"), contrast Gray v. Great Am. Recreation Ass'n, Inc., 970 F.2d 1081, 1082 (2d Cir. 1992) (witnesses absconded on the eve of trial).  Furthermore, a missing witness inference is only "marginally probative" where the witness's deposition testimony is admitted at trial, as was the deposition of John Arko, the Plan Administrator.  Bogosian v. Woloohojian Realty Corp., 323 F.3d 55, 68 n. 10 (1st Cir. 2003) (noting that any adverse inference becomes less compelling where testimony of witness is admitted at trial by way of deposition).

161.    The Second Circuit recognizes that ERISA plan administrators do not have "a duty of clairvoyance" regarding information that might affect participants' benefits in the future.

Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994) ("[W]e do not require an ERISA

fiduciary to be perfectly prescient as to all future changes in employee benefits.").

162.    Courts rely on this principle to reject liability for ERISA fiduciaries where the

information allegedly concealed from participants was based on unpredictable factors not

reasonably foreseeable.  For example, in In re Unisys Sav. Plan Litig., the Third Circuit noted

that when Unisys provided plan ERISA participants information about the risks accompanying

certain investments, it was not required "to opine on [one investment]'s financial condition or to

predict [another investment]'s eventual demise."  In re Unisys Sav. Plan Litig., 74 F.3d 420, 442-

43 (3d Cir. 1996) (citing Fischer v. Phila. Elec. Co., 994 F.2d 130, 153 (3d Cir. 1993)).

163.    See also Fischer, 994 F.2d at 153 ("ERISA does not impose a 'duty of

clairvoyance' on fiduciaries."); Swinney v. Gen. Motors Corp., 46 F.3d 512, 520 (6th Cir. 1995)

(holding ERISA imposes no "duty of clairvoyance" and reversing employer liability where the

defendant stated that laid-off employees were not eligible for a voluntary termination of

employment program, because at the time the defendant was not seriously considering altering

the policy that was subsequently changed); Barnes v. Lacy, 927 F.2d 539, 544 (11th Cir. 1991)

(reversing finding of ERISA liability where district court's finding that employer should have

disclosed that early retirement program was forthcoming when the employer had not yet

considered such a program "placed an unreasonable burden upon [the employer] to predict

future, unintended events"); Hudson v. Gen. Dynamics Corp., 118 F. Supp. 2d 226, 263 (D.

Conn. 2000) (finding no liability where the employer failed to disclose information about

contemplated retirement incentives, since "the employer had not yet undertaken serious

consideration of the incentives, and to find the employer liable for failing to provide it would

impose no less than the duty of clairvoyance specifically rejected in Mullins.").

164.     Likewise, the Second Circuit has made clear that a plan administrator is not obliged to "anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status." Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 9 (2d Cir. 1997) (quoting Lorenzen v. Employees Ret. Plan of the Sperry & Hutchinson Co., 896 F.2d 228, 236 (7th Cir. 1990)).

165.     "To require ERISA summary plan descriptions to include accurate and complete information about all of the different factual settings in which a given pension plan rule might apply would lead to the promulgation of 'summaries' many pages in length, perhaps even longer than the plan itself, that would be of no use to the ordinary employee." Stahl v. Tony's Bldg. Materials, Inc., 875 F.2d 1404, 1409 (9th Cir. 1989) (finding no breach of fiduciary duty for failure to warn participant that his pension benefits could be drastically reduced upon expiration of collective bargaining agreement between union and his employer). Thus, courts should not "require summary plan descriptions to discuss the application of general rules to a wide range of particular situations and thereby provide specific advice to employees on how to shape their conduct to fit the rules." Id. at 1408. If SPDs were required to anticipate every "idiosyncratic contingency" that might affect participants' benefits, they "would be choked with detail and hopelessly confusing." Lorenzen, 896 F.2d at 236.

166.     For example, in Lorenzen, the court found no ERISA liability where the SPD explained that spousal death benefits were lower if a participant died before his postponed retirement date, but did not advise participants of the consequences of finding themselves on life-support machinery shortly before their scheduled date of retirement. Lorenzen, 896 F.2d 228, 236.

167.     Additionally, in Swanson v. U.A. Local 13 Pension Plan, the court found that the

SPD adequately apprised the participant that once he retired, his benefit formula would be calculated according to the rate in effect as of the day of his retirement, even if he went back to work and thereafter re-retired, and did not need to advise the employee "to take enough time and consider other alternatives to be sure he wanted to retire." Swanson, 779 F. Supp. 690, 697, 699 (W.D.N.Y. 1991).  See also Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund, 295 F. Supp. 2d 844, 852-53 (N.D. Ill. 2003) (SPD was not required to explain the consequences of placing participant's permanent-disability benefits application on hold pending outcome of potentially healing surgery "[s]ince this situation was unique to Tegtmeier, as being placed on life support before retirement was unique to the participant in Lorenzen").

168.    Similarly, in McKeown v. Pac. Bell Directory, No. C-97-0427 MHP, 1999 WL 111886 (N.D. Cal. Feb. 26, 1999), the court considered whether the SPD was deficient for failing to include the plan's "no reduction" provision (which operated similarly to the Minimum Benefit under Part B), upon which the plaintiffs claimed they would have relied to make their decision of when to retire.  Id. at *9.  The court ruled that the SPD did not have to disclose the provision because "plaintiffs here have presented no evidence that defendants knew that the no reductions provision would apply to particular persons and intentionally omitted the information," and the "no reductions provision applies in very few instances."  Id.

169.    Because the CIGNA Plan Administrator could not have anticipated the wear-away periods that resulted, he therefore was not required to provide a disclosure regarding the potential wear-away effect in the SPD.

### a.    The Wear-Away Effect Did Not Cause Any Reduction In Plan Benefits, And Was Not The Result Of A Plan Provision.

170.    Plaintiffs' contention that the potential wear-away effect should have been disclosed in the SPD because it caused a "reduction" in benefits is factually inaccurate.  See 29

C.F.R. § 2520.102-3(l).

171.    The wear-away effect did <u>not reduce</u> the amount of a benefit that a participant might otherwise be entitled to under plan provisions.  <u>See</u> 29 C.F.R. § 2520.102-3(l).  Indeed, the wear-away effect can never result in participants getting less than their Part B account balance, so there was no reduction for the Plan Administrator to disclose.

172.    The Part B SPD, which is a summary of <u>the existing, operative plan</u>, did not need to separately disclose the potential wear-away effect.  <u>See</u> 29 C.F.R. § 2520.102-3.

173.    The fact that the Section 204(h) notice Treasury regulations were amended (in 2003) to require disclosure of a wear-away, whereas the SPD regulations have never – and do not currently – specifically require disclosure of a wear-away, further indicates that such a disclosure is <u>not</u> required in an SPD's description of the existing, operative plan.  <u>See</u> 68 Fed. Reg. 17277 (April 9, 2003) Q&A 11.

174.    Because the breadth and extent of the potential wear-away effect could not be anticipated, as next described, the SPD was not deficient for failing to disclose it.

> **b.    The Wear-Away Effect Was Caused By Falling Interest Rates After The Conversion, Which The Plan Administrator Could Not Anticipate.**

175.    The reasonableness of the interest rates CIGNA used to calculate OABs relates to disclosures made about the process for creating OABs.  Plaintiffs' expert Claude Poulin was recently quoted by the Second Circuit as stating that "the rates used for the calculation of lump sums [the 30 year Treasury rate] give an indication of what ERISA and the Internal Revenue Code prescribe as reasonable actuarial assumptions for the purposes of determining actuarial equivalence in general."  <u>Dun & Bradstreet</u>, 482 F.3d 184 (2d Cir. 2007) (quoting the declaration of Claude Poulin).

176.     Plaintiffs' suggestion that CIGNA should have known that interest rates would drop and a wear-away effect would occur is not legally supportable.  The only fair basis to predict the likely impact of future interest rates, given the unforseeability of their expected change, is to assume constant interest rates, as the Plan Administrator did in disclosures to participants.  Indeed, this was the approach the Treasury Department took when it amended its regulations (subsequent to the relevant time period in this case) to require disclosure of a wear-away in a Section 204(h) notice:

> [T]o determine whether a wear-away occurs as a result of a section 204(h) amendment that converts a defined benefit plan to a cash balance pension plan that will credit interest based on a variable interest factor specified in the plan, the future interest credits must be projected based on the interest rate applicable under the variable factor at the time section 204(h) notice is provided.

68 Fed. Reg. 17,277 (April 9, 2003) - Q&A-11.

177.     Because cash balance plans are expressed in the form of lump sums and most participants elect lump sums, the Plan Administrator did not violate ERISA by focusing his disclosures to Part B Plan participants on lump sums.

178.     Because the wear-away effect could come and go, and was so sensitive to interest rate fluctuations, CIGNA and the Plan Administrator were relieved from any obligation to predict that effect in the SPDs provided to Plan participants.

>    **c.     The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Only Possibly Affect A Small Subset Of Participants.**

179.     The Plan Administrator did not need to disclose to Part B Plan participants the potential for a wear-away effect for a subset of participants due to the protected minimum annuity benefit's inclusion of early retirement subsidies, which were not factored into the calculation of the OABs for most participants, since such potential wear-away effect was

dependent upon on a multitude of individualized factors.

> **(1)    The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Result Only For Eligible Employees During The Early Retirement Window.**

180.    Because the wear-away effect attributable to early retirement subsidies could only affect a  limited population of Part B participants who previously had attained ten years of service under the old plan, and only for the limited time period when they would have been eligible for an early retirement subsidy under the old plan, it did not have to be disclosed.

> **(2)    The Wear-Away Effect Attributable To The Early Retirement Subsidy Would Only Result If A Plan Participant Elected An Annuity Option, But Most Cash Balance Participants Elect A Lump Sum.**

181.    Because the potential wear-away effect attributable to early retirement subsidies could only occur where participants elect their benefits in the form of an annuity, and the vast majority of cash balance plan participants will elect a lump sum benefit when given the option, it did not have to be disclosed.

> **5.    The Part B SPD Was Not Required To Disclose All Of The Factors In The OAB Calculation.**

182.    Nothing in Section 102 of ERISA requires an SPD to include a description of the factors going into the calculation of an OAB, such as that early retirement subsidies were not included, that a "pre-retirement mortality discount" was applied, and that CIGNA applied certain interest rates in computing OABs.

183.    That is particularly true here, where the OAB calculations were a one-time event that the Plan Administrator nevertheless disclosed to participants in other written disclosures.

184.    Caselaw demonstrates that such details regarding benefit calculations do not need to be included in an SPD.  As the Second Circuit recently held, "neither ERISA nor the Labor

Department's regulations require a summary plan description to describe or illustrate every method by which a plan benefit may be limited under an early payment option or similar such limitation." Dun & Bradstreet, 482 F.3d at 194. "No case has ever held that a mere failure to include the specific methodology used to calculate a benefit is an ERISA violation." McCarthy v. Dun & Bradstreet Corp., No. Civ.A.3:03CV431(SRU), 2004 WL 2743569, at *5 (D. Conn. Nov. 13, 2004), aff'd, Dun & Bradstreet, 482 F.3d at 194.

185.    Moreover, the use of mortality factors in determining pension benefits is routine and uncontroversial. See, e.g., Esden, 229 F.3d at 161, 165 and n.14 (noting that mortality was assumed in cash balance calculation); Allen v. WestPoint-Pepperell, Inc., 11 F. Supp. 2d 277, 285 (S.D.N.Y. 1997) (noting use of mortality tables in retirement plan calculations).

186.    The Second Circuit's recent analysis in Dun & Bradstreet, upholding summary judgment on the claim that the SPD inadequately disclosed the method by which a benefit was actuarially reduced when paid to former employees, is instructive. Dun & Bradstreet, 482 F.3d at 189.

187.    Under the Dun & Bradstreet plan, employees who terminated before age 55 (like the plaintiffs), could choose to receive payments as early as age 55, rather than waiting for their deferred vested age-65 benefit. Id. at 189. Under this early payment option, the participant's deferred vested age-65 benefit would be actuarially reduced both to account for the time value of money (by reducing the benefit by a discount rate for each year prior to age 65), and by a pre-retirement "mortality factor to adjust actuarially for the possibility that a participant might not live to the age of 65." Id. The plan also included a different, more favorable early retirement benefit for employees, unlike plaintiffs, who were employed at age 55 and had ten years of service. Id. 189-190. Dun & Bradstreet's SPD included a "Vesting" section that explained the

deferred vested benefit available to former employees, and an "Early Retirement Benefit" section which discussed the more favorable early retirement benefit for active employees.  Id. at 190. However, "[t]here is no table or discussion in the Vesting section of the Summary Plan Description that sets forth the percentage by which the actuarial reduction will reduce the benefit of a pension-vested former employee who is terminated from employment with Dun & Bradstreet before reaching the age of 55 but elects to receive payments before the age of 65."  Id.

188.    The Second Circuit first held that the SPD's description of the deferred vested retirement benefit was sufficiently accurate and comprehensive to satisfy Section 102(a), because the regulations and statute "do not explicitly require disclosure of the method of actuarial reduction. . . ."  Id. at 192.  The court reasoned that while the SPD "might have been more informative in discussing the early payment option of the deferred vested retirement benefit," an SPD only has to "summarize, rather than describe in every detail, the benefits available" and was sufficient in disclosing to participants that their benefit would be reduced, without detailing the specific method of reduction.  Id. at 194.

189.    The court also held that in failing to disclose the method of actuarial reduction, the SPD did not violate the Section 102(a) requirement to disclose "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  Id. at 199.  The SPD sufficiently provided information such that participants would not be misled as to their benefits, despite that the plaintiffs had alleged that the SPD "minimize[d] the effect of benefit limitations" by disclosing the actuarial reduction formula for current but not former employees.  Id. at 195 (citation omitted).

190.    Thus, Dun & Bradstreet makes clear that an SPD does not need to detail all of the calculations involved in determining participants' benefits, and does not need to explain every

possible condition which affects participants' ultimate benefit amount.

191.     Likewise, <u>Dun & Bradstreet</u> supports Defendants' argument that the SPD's disclosure of the method of calculating benefits under Part B, and of the Minimum Benefit rule, was sufficient to satisfy Section 102(a).

192.     <u>Layaou v. Xerox Corp.</u>, 238 F. 3d 205 (2d Cir. 2006) does not support the proposition that an SPD must not only state that benefits may be reduced, but also describe how benefits are reduced.  In <u>Layaou</u>, the plan applied a "phantom account" offset to reduce participants' pension benefits based on the amount of any prior distributions they received under the plan.  <u>Id.</u> at 210.  The SPD omitted any reference to the phantom account system, however, and noted only that "[t]he amount you receive may also be reduced if you had previously left the Company and received a distribution at that time."  <u>Id.</u>  In reversing summary judgment in favor of the defendants on the question of whether the SPD was misleading, the <u>Layaou</u> court relied squarely on the fact that the SPD's omissions arguably misled the plaintiff into believing that he or she was going to receive more than he or she did in pension benefits.  <u>Id.</u> at 211.

193.     On remand, the district court found that the failure of the SPD to disclose "the 'phantom account' offset, <u>coupled with the annual benefit statements that had been provided to Layaou</u>, would clearly have misled him into believing that his monthly benefit would be considerably higher than it turned out to be."  <u>Layaou x. Xerox Corp.</u>, 330 F. Supp. 2d 297, 304 (W.D.N.Y. 2004) (emphasis added).

194.     Here, by contrast, the annual account statements and Total Compensation Reports provided by the CIGNA Plan Administrator informed Plan participants of the exact amount of their cash balance accounts, and accordingly, <u>Layaou</u> is inapposite.  Indeed, to the extent that participants did not understand that their protected Minimum Benefit under CIGNA's old plan

might be greater than their cash balance account, participants could only receive more – not less – than they believed.

195.    Moreover, the Second Circuit in Dun & Bradstreet distinguished Layaou, where participants were offered no information on the phantom offset, in contrast to Dun & Bradstreet's SPD which included the allegedly-omitted information albeit in summary form. Dun & Bradstreet, 482 F.3d at 197.  The Second Circuit also made clear that it "[did] not consider the dicta in the Layaou opinion to signify that ERISA imposes a blanket requirement under which a Summary Plan Description invariably must describe the method of calculating an actuarial reduction or must use a clarifying example to illustrate how a benefit is actuarially reduced . . ." Id.

196.    Applying this principle here, CIGNA's SPD was sufficient without explicitly disclosing the fact that OABs did not include early retirement subsidies for most participants, and the mortality factors and interest rates used to calculate the OABs.  Moreover, because all of this information was previously disclosed in the OAB materials and Total Compensation Reports provided to Plan participants in the Spring of 1998, the Plan Administrator had no objection to later disclosing this information in the Part B SPD.

   **6.    Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be Governed Exclusively By The Terms Of The CIGNA Pension Plan, Not The SPD.**

197.    Even assuming arguendo that Plaintiffs could otherwise show that they suffered likely or actual harm resulting from alleged deficiencies in the SPD, Plaintiffs still are not entitled to pension benefits based on any document other than the actual governing Part B Plan document.

198.    The Second Circuit has held that publishing an SPD can effectively modify the

terms of an underlying plan document in some circumstances.  See, e.g., Burke, 336 F. 3d at 110.

199.    However, in Burke, the court held that the SPD controlled where its terms

conflicted with the terms of the written plan document.  Burke, 336 F. 3d at 110-11.  Here, by

contrast, Plaintiffs do not allege that the SPD conflicted with provisions in the Plan document.

Accordingly, Burke lends no support to Plaintiffs' argument that the Plan should be enforced

without the pre-retirement mortality discount, since that discount was not applied pursuant to a

Plan provision.  See also McCarthy, 2004 WL 2743569 at *27 ("Burke is distinguishable

because it involved a conflict between the employer's summary plan description and the

retirement plan.").

200.    Moreover, the Second Circuit's suggestion that an SPD can effectively modify the

terms of an ERISA plan is inconsistent with the Supreme Court's decision in Curtiss-Wright

Corp., 514 U.S. 73 (1995).  In Curtiss-Wright, a company tried to amend its medical plan by

publishing a new SPD describing the new plan terms.  The Supreme Court held that publishing

the SPD could only modify the terms of the plan if the act of publishing the SPD satisfied the

formal amendment procedures in the plan.  See id. at 83-85.  The Court further explained that

where a plan reserves to one particular corporate body the right to modify a plan, "one must look

only to [that corporate body] and not to any other person" to determine whether an amendment is

valid. Id. at 79 (emphasis in original).

201.    In addition, publishing an SPD is the exclusive responsibility of a plan

administrator.  By contrast, the act of amending or modifying the terms of an ERISA plan is a

settlor function that does not implicate any of ERISA's fiduciary duties.  See, e.g., Hughes

Aircraft Co. v. Jacobson, 525 U.S. 432, 444-45 (1999) ("[A]n employer's decision to amend a

pension plan concerns the composition or design of the plan itself and does not implicate the

employer's fiduciary duties which consist of such actions as the administration of the plan's assets. . . .  A settlor's powers include the ability to add a new benefit structure to an existing plan.").

202.	Here, the Plan Administrator – the person with exclusive responsibility for publishing the SPD – did not have the power to modify the terms of Part B, and, moreover, the publication of the SPD did not satisfy the Plan's formal amendment procedures.  See Depenbrock v. CIGNA Corp., 389 F.3d 78, 83 (3d Cir. 2004) (holding that despite that disclosures were provided to participants earlier, CIGNA's plan amendment creating Part B and modifying the rehire rule was not valid until it was signed by the CEO on December 21, 1998).

203.	To permit the SPD to effectively modify the terms of Part B would run afoul of Curtiss-Wright.  Plaintiffs' benefits must be governed exclusively by the terms of the Part B Plan document.

> **C.	The Plan Administrator Provided Adequate Notice Under ERISA Section 204(h).**

204.	Plaintiffs contend in Count 4 that CIGNA violated ERISA Section 204(h), 29 U.S.C. § 1054(h), by reducing their plan benefits without proper advance notice to participants.  This argument is without merit because (1) the Plan Administrator provided timely notice of the Plan amendment freezing the Part A benefits, which was the only reduction of benefit accruals class members experienced, (2) even if the Part B amendment required a Section 204(h) notice, the Plan Administrator's written communications to all covered participants fulfilled that requirement, and (3) the Plan Administrator was not required to provide notice of the rehire amendment to employees who were not employed by CIGNA at the time.

1.    **Only The Amendment Freezing Accruals Under Part A Required A Section 204(h) Notice, Which The Plan Administrator Provided.**

205.    ERISA Section 204(h) requires a plan administrator to notify participants of a plan amendment that is likely to cause a "significant reduction" in the rate of future benefit accrual at least 15 days in advance of the implementation of the amendment.  See 29 U.S.C. § 1054(h).

206.    Section 204(h), as it was stated at the time of the alleged violation, stated:

> (h) Notice of significant reduction in benefit accruals
>
> (1) A [pension] plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to-
>
> (A) each participant in the plan.

29 U.S.C. § 1054(h) (emphasis added).

207.    Here, the only plan amendment causing a reduction in "future benefit accruals," and which therefore could possibly require a Section 204(h) notice, was the freezing of benefit accruals under Part A for certain participants, effective December 31, 1997.  See Depenbrock v. CIGNA Corp., 278 F. Supp. 2d 461, 469 (E.D. Pa. 2003), rev'd on other grounds, 389 F.3d 78 (3d Cir. 2004) ("Taylor's execution of Amendment Number 4 . . . froze the pension benefit accruals of the participants that would be converted to the cash balance plan effective December 31, 1997.").

208.    For this amendment, the Plan Administrator adequately and timely provided a Section 204(h) notice to each participant through the November 1997 Newsletter and/or the Retirement Kit distributed in early December 1997.  Either of these documents suffices to fulfill

the Plan Administrator's obligations under Section 204(h) regarding the freeze amendment.

209.     The Plan Administrator did not violate ERISA Section 204(h) by failing to provide an adequate Section 204(h) notice for the creation of Part B because while the freeze amendment caused a "reduction" in future benefits (because it reduced future benefits to zero), the subsequent adoption of Part B did not effect any "reduction."  Rather, the Part B amendment, which was signed on December 21, 1998, retroactive to January 1, 1998, resulted in a benefit increase for participants whose accruals, at that point, were frozen.

210.     Plaintiffs' suggestion that the amendments implementing the freeze and Part B were a single event is belied by the Third Circuit's decision in Depenbrock that while the freeze amendment was signed in October 1997 and became effective December 31, 1997, the cash balance amendment was signed on December 21, 1998 and became effective only on that date. See Depenbrock, 278 F. Supp. 2d at 466, 469 (noting that Amendment No. 4, "which froze the pension benefit accruals of the participants that would be converted to the cash balance plan effective December 31, 1997," was executed on October 31, 1997); Depenbrock, 389 F.3d at 83 (holding that "December 21, 1998, is the effective date of the amendment" implementing the cash balance plan).

### 2.     Even If A 204(h) Notice Was Required For The Cash Balance Adoption, The Plan Administrator Fulfilled That Requirement.

211.     Even if a Section 204(h) notice regarding the implementation of Part B was required, the Plan Administrator fulfilled that requirement with the various disclosures provided to Plan participants describing the Plan amendment, which supplied all of the information required by Section 204(h) and its regulations at the time.

> **a.     Section 204(h) As It Existed At The Time Part B Was Created Provides The Applicable Requirements For The Allegedly Required Notice.**

212.     Plaintiffs' contention that under Section 204(h) as it was amended in 2001 the Plan Administrator was obligated to describe or illustrate the "effect" of the Part B Plan amendment is incorrect since Section 204(h), as it existed at the relevant time in 1997-98, required only a "summary" of a plan amendment.

213.     Proposed regulations were pending since 1995, 60 Fed. Reg. 64,320, 64,323 (Q&A 10) (Dec. 15, 1995), and the final 204(h) regulations case were issued December 14, 1998, and applied to plan amendments on or after December 12, 1998.  See Treas. Reg. s 1.411(d)-6, 63 Fed. Reg. 68,678 (1998).  Both required that only "the entire amendment or a summary of the amendment" be provided in the notice.

214.     Section 204(h) was again amended in 2001, and attendant regulations were issued in 2003.  See Pub.L. 107-16 s 659(b), 115 Stat. 38 (2001).

215.     Section 204(h) was amended in 2001 (and its attendant regulations in 2003) to require administrators to explain an amendment's resultant reductions.  However, the 2001 statutory amendment explicitly stated that "[t]he amendments made by this section shall apply to plan amendments taking effect on or after the date of the enactment of this Act," which was June 7, 2001.  See Economic Growth and Tax Relief Reconciliation Act of 2001, Pub.L. 107-16 s 659(b), 115 Stat. 38 (2001).

216.     Moreover, the amendment's legislative history further makes plain that Congress amended Section 204(h) to require not only a "summary" of the amendment, but also "sufficient information (as defined in Treasury regulations) to allow participants to understand the effect of the amendment."  See Legislative History of Public Law 107-16, House Report 107-84,

Conference Agreement - (4)(c) at 264-66 (emphasis added).

217.    Caselaw confirms that the 2001 amendment to Section 204(h) did not apply retroactively.

218.    For example, in Register, 477 F.3d 56, the Third Circuit recognized that for a 1999 plan amendment, the pre-2001 amendment Section 204(h) regulations required only a summary of the plan amendment and "need not explain how the individual benefit of each participant . . .will be affected by the amendment." Id. at 72 (quoting Scott v. Admin. Comm. of the Allstate Agents Pension Plan, 113 F.3d 1193, 1200 (11th Cir. 1997)). See also Normann v. Amphenol Corp., 956 F. Supp. 158, 165 n.4 (N.D.N.Y. 1997); Charles v. Pepco Holdings, Inc., 437 F. Supp. 2d 248, 252 (D. Del. 2006) (noting that for a 1998 Section 204(h) notice, "the law only requires the notice to include an understandable summary of the amendment and not a description of its potentially adverse effects.").

219.    Likewise, the district court from the Southern District of New York properly applied the pre-2001 Section 204(h) regulations in Citigroup I, 470 F. Supp. 2d at 335-36 n..60-61.

220.    Despite this authority, the district court's opinion in Hirt, 2006 WL 2627564 (Aug. 24, 2006), stated that "[t]he 2001 statutory amendment made explicit that which was implicit in the requirement of a notice." Hirt v. Equitable Ret. Plan for Employees, Managers and Agents, 441 F. Supp. 2d 516, 528 (S.D.N.Y. 2006).

221.    This Court rejects Hirt's reliance on a subsequent statutory amendment for several reasons. First, despite referencing the amended requirement, the Hirt court held that Equitable's Section 204(h) notice in 1990 did not satisfy the statutory requirements as they existed in 1990. Hirt, 441 F. Supp. 2d at 539 (noting "[t]he insufficiency of Equitable's 1990 Notice – under the

terms of the statute in effect at the time it was given . . . .") (emphasis added).  Thus, the

discussion of the amended statute was mere dicta.

222.    Next, Hirt's interpretation of the subsequent amendment as merely clarifying that

which was implicit in an earlier statute is contrary to the statutory and regulatory effective dates

and the legislative history.  As noted above, Hirt's approach also is inconsistent with that of the

Third Circuit and every other court which has evaluated a Section 204(h) claim after a

subsequent change in the legal standard.

223.    In sum, the legality of the Section 204(h) notice issued by CIGNA's Plan

Administrator in 1997 must be governed solely by the statutory and regulatory scheme in place

as of that date, which required only that plan administrators make a "good faith effort to" ensure

that Section 204(h) notices provided a "summary of the amendment . . . written in a manner

calculated to be understood by the average plan participant."  Notice of Significant Reduction in

the Rate of Future Benefit Accrual, 63 Fed. Reg. 68,678, 68,682 (Dec. 14, 1998).

### b.    The Plan Administrator Provided A Proper Section 204(h) Notice To Active Employees.

224.    Under the Section 204(h) requirements at the time, the Plan Administrator

fulfilled any requirement to provide a Section 204(h) notice for the Part B amendment by

providing all converted participants the November 1997 Newsletter, the Retirement Kits and/or

the 1998 SPD, each of which "[set] forth the plan amendment and its effective date."  29 U.S.C.

§ 1054(h); 29 U.S.C.§ 1054(h) and Treas. Reg. 1.411(d)-6, Q&A 10 (as in effect in 1997).

225.    Courts in this Circuit have held that an SPD can satisfy Section 204(h) notice

requirements.  See Normann v. Amphenol Corp., 956 F. Supp. 158 (N.D.N.Y. 1997); Kagen v.

Flushing Hosp., No. 96-CV-5795, 2000 WL 1678015 (E.D.N.Y. Nov. 3, 2000); Koenig v.

Intercont'l Life Corp., 880 F. Supp. 372, 375 (E.D. Pa. 1995).

226.    The Third Circuit's recent decision in <u>Register</u>, 477 F.3d 56, is instructive here. In <u>Register</u>, PNC converted from a traditional defined-benefit pension plan to a "greater-of" cash balance plan, like CIGNA.  <u>Id.</u> at 60.  When announcing the plan change, PNC provided participants "a 20-page brochure which summarized the changes to the plan, described the cash balance pension plan design, offered additional resources for more information, defined important words and terms, and instructed participants on how to read their personalized statements."  <u>Id.</u> at 72.  The court found that PNC satisfied Section 204(h)'s notice requirements, despite that the brochure <u>did not</u> alert participants that "in some instances [the amendment] may reduce the rate of future Pension Plan benefit accruals," because it set forth the plan amendment and the effective date and "<u>[t]hat explanation was all that was required</u>."  <u>Id.</u> at 73 (emphasis added).

227.    The Southern District's opinion in <u>Citigroup I</u>, holding that the Section 204(h) notices failed to inform participants of a reduction in benefits from a conversion to a cash balance formula, is inapposite.  Citigroup's plan did not comply with one of ERISA's three prescribed minimum accrual rules, but rather was "unlawfully structured to allow for impermissible backloading" in a "bold and exploitive contortion of the [fractional] rule." <u>Citigroup I</u>, 470 F. Supp. 2d at 337-38.  The court found that Citigroup's notice violated Section 204(h) since "plaintiffs were without fair warning that the formula endangered their right to a minimum rate of benefit accrual."  <u>Id.</u> at 329.  The court's reasoning is inapplicable here given that Part B does not violate ERISA's minimum accrual or backloading rules.

228.    Moreover, unlike the alleged 204(h) flaws here, in <u>Citigroup</u>, the 204(h) notice failed to summarize a key plan term:

> It has been suggested that the Court's ruling stands for the proposition that any post-amendment discovery of a cash balance

> formula's technical defect will render the § 204(h) notices of that
> amendment per se defective.  This reading is overly broad.  Insofar
> as the Court's ruling suggests that the § 204(h) notices were
> required to describe how the amendments were going to reduce
> rates of benefit accrual, their lack of detail was of secondary
> importance to their material omission of an unorthodox yet vital
> component of the Plan's formula.

In re Citigroup Pension Plan ERISA Litig., Civ. A. No. 05-05296, 2007 WL 1074912, at *12

(S.D.N.Y. April 4, 2007) ("Citigroup III") (footnotes omitted).  Thus, the Citigroup Section

204(h) notice was held to be deficient because it omitted a crucial plan term, whereas the key

terms of Part B were explained to participants.

229.    Plaintiffs' contention that the Section 204(h) notice should have compared

participants' benefits under Part A and Part B is not legally supportable.  Nothing in Section

204(h) required the notice to compare what a participant's benefits would be if the participant

had remained in a prior plan.

230.    Plaintiffs' contention that CIGNA's 204(h) notice violated ERISA and was

misleading in that it stated that CIGNA was "enhancing" its retirement program, despite that

some participants would earn lesser benefits than they would have if they remained in the old

plan, is not legally supportable.  The Newsletter and Retirement Kit were describing not only the

change from the old plan to Part B for the defined benefit pension plan, but also enhancements to

CIGNA's SIP, the 401(k) defined contribution plan.  Moreover, the cash balance plan offered

some distinct advantages over the prior defined benefit plan.

231.    Plaintiffs' contention that CIGNA's 204(h) notice violated ERISA because

CIGNA improperly notified participants that it did not anticipate costs savings as a result of the

retirement plan changes is not legally supportable.  This criticism fails because the trial evidence

supported the "no anticipated cost savings" representation made by CIGNA, as reflected in

CIGNA's expense projections concerning the changes in the retirement package to be rolled out in 1998.

232.    Plaintiffs' contention that the Section 204(h) notice should have disclosed the potential wear-away effect is not legally supportable, for the same reasons as described above with regard to the SPD, since the inability to accurately foresee and predict the wear-away effect obviated the need for such a potential future effect to be disclosed.

233.    Plaintiffs' contention that the Section 204(h) notice should have disclosed the potential wear-away effect caused by the early retirement subsidies in the old plan is contrary to the law in effect at the time.  Prior to the 2001 statutory amendment, a Section 204(h) notice did not take into account early retirement subsidies in determining whether participants suffered a reduction in future benefit accruals.  See Legislative History of Public Law 107-16, House Report 107-84, Conference Agreement - (4)(c) at 265 (in describing the "present law," before the 2001 proposed amendments, noting that "the regulations provide that the rate of future benefit accrual is determined without regard to optional forms of benefit, early retirement benefits . . .").

234.    The 2001 amendments to Section 204(h) were revised to take into account early retirement subsidies.  See Pub.L. 107-16 s 659(b), 115 Stat. 38 (2001) (describing that the revised statute adds a section "(3) EARLY RETIREMENT.--A plan amendment which eliminates or significantly reduces any early retirement benefit or retirement-type subsidy (within the meaning of section 411(d)(6)(B)(i)) shall be treated as having the effect of significantly reducing the rate of future benefit accrual.); 29 U.S.C. 1054(h)(9) (2007) ("For purposes of this subsection, a plan amendment which eliminates or reduces any early retirement benefit or retirement-type subsidy (within the meaning of subsection (g)(2)(A)) shall be treated as having the effect of reducing the rate of future benefit accrual.")).

235.    Furthermore, the 2003 amended regulations added provisions specifically requiring that a wear-away be disclosed in a Section 204(h) notice, further indicating that prior to such regulations, explicit disclosure of a wear-away was not mandated.  See 68 Fed. Reg. 17277 (April 9, 2003) Q&A 11 ("Illustrative examples are in any event required to be provided for any change from a traditional defined benefit formula to a cash balance formula or a change that results in a period of time during which there are no accruals (or minimal accruals) with regard to normal retirement benefits or an early retirement subsidy (a wear-away period).").

236.    Because the 1997 Newsletter, Retirement Kits and/or SPD fulfilled the Plan Administrator's duty to disclose the Part B plan amendment to participants as it existed in 1997-98, Plaintiffs' Section 204(h) claim fails.

### 3.    The Plan Administrator Was Not Required Under ERISA Section 204(h) To Notify Vested Separated Old Plan Participants About The Amended Rehire Rule.

237.    CIGNA did not violate ERISA §204(h), 29 U.S.C. §1054(h) by implementing the amended "rehire rule" without notice to terminated vested participants of significant reductions in their future rate of accruals.

238.    No Section 204(h) notice was required for participants of the old plan not employed at that time of the Part B conversion because (1) the amendment did not cause a reduction in their future benefit accruals since they were not accruing any benefits at the time of the amendment, and (2) these employees were not likely to be affected by the amendment.

239.    Importantly, if a plan administrator is not required to provide a Section 204(h) notice to a particular participant at the time of the amendment, there is no obligation to provide that participant a Section 204(h) notice at any later date.  Section 204(h) notice obligations are triggered only based on the facts and circumstances "at the time the amendment is adopted."  26

C.F.R. § 1.411(d)-6T (Q-9).

240.     Section 204(h) requires that written notice be provided <u>only</u> to those participants

who are likely to experience a significant reduction in benefits.  The regulations in effect during

the relevant time state that a participant who, at the time of the amendment, is not expected to

have a significant reduction is not required to be provided the notice:

> Q-9:   If section 204(h) notice is required with respect to an
> amendment, must such notice be provided to participants or
> alternate payees whose rate of future benefit accrual is not reduced
> by the amendment?
>
> A-9:  (a) In general.  A plan administrator need not provide section
> 204(h) notice to any participant whose rate of future benefit
> accrual is <u>reasonably expected not to be reduced by the
> amendment</u>. . .

26 C.F.R. § 1.411(d)-6T (emphasis added).  The regulations also make clear that whether a

particular participant is "reasonably expected" to have a significant reduction in future benefits is

"determined based on all relevant facts and circumstances at the time the amendment is

adopted."  <u>Id.</u>

241.     The regulations further address the circumstances of former employees and

provide that no Section 204(h) notice is required:

> (c) Examples.   The following examples illustrate the rules in this
> Q&A-9:
>
> Example 1.  Plan A is amended to reduce significantly the rate of
> future benefit accrual of all current employees who are participants
> in the plan.   <u>It is reasonable to expect based on the facts and
> circumstances that the amendment will not reduce the rate of future
> benefit accrual of former employees who are currently receiving
> benefits or that of former employees who are entitled to vested
> benefits.   Accordingly, the plan administrator is not required to
> provide section 204(h) notice to such former employees.</u>

26 C.F.R. § 1.411(d)-6T (emphasis added).

242.    Thus, at the time of the adoption of the plan amendment that modified the "rehire rule" on December 21, 1998, the benefits of class members like Plaintiffs Broderick and Flannery, who no longer worked for CIGNA, were not likely to be affected by the amendment at all.  See 26 C.F.R. § 1.411(d)-6T.  Unless and until these employees were rehired, the Plan amendment would have zero affect on them.

243.    Moreover, Plaintiffs have not provided evidence concerning how many former employees CIGNA anticipated in 1997 that it would be rehiring, or reflecting any other "facts and circumstances" that would demonstrate a "reasonable" expectation in 1997 or 1998 that droves of former employees would return to CIGNA.

244.    The Plan Administrator was not required to issue a Section 204(h) notice to former employees.

       **D.**     **Plaintiffs Do Not Have A Pending Claim For An Inadequate Summary Of Material Modification Regarding The Cash Balance Conversion.**

245.    Plaintiffs' claim that CIGNA failed to fulfill its requirement to provide a summary of material modification ("SMM") regarding the cash balance conversion is not properly part of this suit, because despite numerous opportunities, Plaintiffs never added an SMM claim to their Complaint in this matter.

246.    Even if Plaintiffs' SMM claim was properly before this Court, the claim would be time-barred.  Pursuant to 29 C.F.R. § 2520.104b-3, the Plan Administrator was required to, and did, furnish the affected participants with an SMM no later than "210 days after the close of the plan year in which the modification or change was adopted."  Id.  Since the Plan was adopted on December 21, 1998, the effective deadline for distribution of the SMM was July 29, 1999.  Id.

247.    Given that the most analogous statute of limitations for statutory ERISA violations is two years, and that Plaintiffs knew, or "should have known" of their alleged SMM

claim by July 29, 1999, see Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension, 201 F.3d 44, 47-48 (2d Cir. 1999), Plaintiffs' SMM claim, first articulated on June 6, 2006, is patently untimely.

248.    Even if Plaintiffs' SMM claim was properly before the Court, Plaintiffs' claim as to its deficiencies in not disclosing alleged reductions fails for the same reasons as those set forth above relating to their SPD claim in Count 2, since it is undisputed that CIGNA distributed an SMM to active employees in the form of a Retirement Kit, in December 1997, and an SPD in October 1998 (which satisfied any SMM disclosure requirements).

249.    Plaintiffs' SMM claim would also be barred because it was not asserted against the Plan Administrator, who is not party to this litigation.

250.    Plaintiffs' claim that vested separated participants should have been provided an SMM notifying them of the amended rehire rule likewise fails.  The Plan Administrator was not required to distribute to vested separated participants an SMM relating to the conversion because the cash balance conversion did not affect them and would not affect them unless and until they were rehired.  See 29 C.F.R. § 2520.104b-4 (specifically providing alternative methods of SMM compliance for "a retired participant, a vested separated participant [and] a beneficiary receiving benefits under the plan," as opposed to currently employed participants).

251.    The Department of Labor has described that an SMM "is merely a summary of changes in information previously described in the summary plan description."  Rules and Regulations for Reporting and Disclosure; Summary Plan Description Requirements, 45 Fed. Reg. 14, 029, 14,030 (1980) (codified at 29 C.F.R. Part 2520).  Thus, where certain participants were not required to receive an SPD in the first instance, these participants would not then be entitled to an SMM.

252.    Where a pension plan is amended as to only some participants, the SPD for those participants need only include information applicable to them.  See 29 C.F.R. § 2520.102-4 (stating that the summary plan description "may omit information which is not applicable to the class of participants or beneficiaries to which it is furnished.").  Here, the part B SPD need not have included information related to the old plan going forward (which applied to the vested separated participants), as such information would be inapplicable to the converted participants starting January 1, 1998.  Thus, if the Plan Administrator had no obligation to provide vested separated participants an SPD that included cash balance information, it makes little sense to suggest that the Plan Administrator was required to provide that same class of participants with an SMM describing aspects of the cash balance conversion.

253.    Additionally, the Plan Administrator had until July 29, 1999 to issue an SMM regarding the cash balance plan conversion.  See 29 U.S.C. § 1024(b)(1) (plan administrators must furnish participants and beneficiaries receiving benefits with summaries of new amendments no later than 210 days after the end of the plan year in which the amendment is adopted).  Accordingly, even if vested separated participants should have received a SMM, only those class members who were rehired after July 29, 1999 would be covered by such a claim.

### E.    Plaintiffs' Disclosure Claims Are Time-Barred.

#### 1.    Plaintiffs' SPD Claim Is Time-Barred.

254.    Plaintiffs' claim that CIGNA's SPD was inadequate also fails because such claim was not filed within the controlling statute of limitations.

255.    Where an ERISA provision does not contain its own statute of limitations for a particular claim, the most analogous state statute of limitations governs.  See Sandberg v. KPMG Peat Marwick, LLP, 111 F.3d 331, 333 (2d Cir. 1997) ("When Congress fails to provide a statute

- 71 -

of limitations for claims arising under federal statutes, a court must apply the limitations period of the state-law cause of action most analogous to the federal claim.").

256.     Count 2 alleges that Part B's SPD failed to satisfy the applicable statutory disclosure requirements under Section 102 by excluding information regarding conditions that may cause participants' benefits to be "lost" or forfeited.  In other words, Plaintiffs do not ask the Court to enforce language found in the SPD in a contract-like claim, but rather ask the Court to compare the contents of the SPD to what the statute requires and award them benefits <u>in excess</u> of what the Plan provides.  As such, the most analogous state statute of limitations is not the one applicable to contract claims, but rather Connecticut's two-year statute applicable applicable to a "[c]ivil action to collect wage claim [or] fringe benefit claim."  Conn. Gen. Stat. Ann. § 31-72; Conn. Gen. Stat. Ann. § 52-596.

257.     While Judge Baer applied the contract statute of limitations to an SPD claim in <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 483, simply because "[e]mployee benefit plans are contracts," this Court respectfully disagrees with his reasoning and hold that Connecticut's statute of limitations applicable to statutory benefit claims is more analogous than the contract statute, since Plaintiffs do not seek to enforce the terms of the SPD.

258.     Under this two-year statute of limitations, Count 2 was time-barred by the time it was included in Plaintiffs' original complaint in December 2001.  Plaintiffs' SPD claim accrued no later than December 21, 1998, following issuance of the October 1998 SPD and the formal adoption of Part B at which point the Plan document became available.  For this reason alone, Plaintiffs SPD claim is time-barred.

## 2.    Plaintiffs' Section 204(h) Claim Is Time-Barred.

259.    Plaintiffs' claim that the Plan Administrator failed to provide an adequate Section

204(h) notice also fails because it was not filed within the controlling statute of limitations.

260.    Where an ERISA provision does not contain its own statute of limitations for a

particular claim, the most analogous state statute of limitations governs.  See Sandberg v. KPMG

Peat Marwick, LLP, 111 F.3d 331, 333 (2d Cir. 1997) ("When Congress fails to provide a statute

of limitations for claims arising under federal statutes, a court must apply the limitations period

of the state-law cause of action most analogous to the federal claim.").  Plaintiffs' Section 204(h)

claim is most analogous to a "[c]ivil action to collect wage claim [or] fringe benefit claim" under

Connecticut law.  Conn. Gen. Stat. Ann. § 31-72; Conn. Gen. Stat. Ann. § 52-596.

261.    While Judge Hellerstein applied the contract statute of limitations to a Section

204(h) notice claim in Hirt, 450 F. Supp. 2d at 333, in that case the parties had agreed to the

application of that statute of limitations and were only contesting when the claim accrued.  See

Hirt v. Equitable Ret. Plan for Employees, Managers and Agents, No. 01 Civ. 7920 (AKH), 2006

WL 2627564, at *2 (S.D.N.Y. Aug. 24, 2006).  Because here Plaintiffs' Section 204(h) notice

claim seeks additional "benefits" Plaintiffs would have received had Part B not been effective,

and alleges a statutory violation and seeks a remedy that assumes no notice was provided, rather

than seeking to enforce the terms of the Section 204(h) notice, the benefit claim statute of

limitations rather than the contract statute of limitations is more analogous.

262.    Plaintiffs' original Complaint had alleged that Part B's SPD was insufficient, but

there was no suggestion of any other disclosure violations until the Section 204(h) notice claim

was added.  Accordingly, Count 4 cannot relate back to the filing of the earlier Complaints

because it does not arise out of the same conduct upon which the claims in those Complaints

were based.  See Fed. R. Civ. P. 15(c)(2).

263.    Plaintiffs maintain that participants should have received a Section 204(h) notice for the cash balance conversion effective January 1, 1998, which notice was due at least 15 days prior to the effective date of the amendment.  Yet Plaintiffs filed their Second Amended Complaint, which added a claim concerning a Section 204(h) notice, more than 7 years later — on May 6, 2005.  See dkt. # 109.  Plaintiffs' claim in Count 4 is time-barred.

**F.    Any Disclosure Claims Would Lie Against The Plan Administrator, Who Is Not A Party.**

264.    Plaintiffs' disclosure claims in Counts 2 and 4 also fail for the independent reason that Plaintiffs failed to name the only proper defendant, the Plan CIGNA Administrator.  29 U.S.C. § 1024(b)(1) ("The administrator shall furnish . . . a copy of the summary plan description . . ."); 29 U.S.C. 1054(h) ("the plan administrator provides a written notice, setting forth the plan amendment").  See also Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 104 (S.D.N.Y. 2005) (disclosure obligations are imposed only on the "plan administrator").

265.    ERISA Section 3(16)(A) states explicitly that the term "administrator" refers to "the person specifically so designated by the terms of the instrument under which the plan is operated."  29 U.S.C. § 1002(16).  Here, a plan administrator was designated in accordance with the precise terms of the written Plan document.

266.    Where as here, a plan administrator has been designated by the sponsor, that plan administrator alone – and not the sponsor – is responsible for any disclosure violations. ERISA § 3(16)(A), which defines the term "administrator," makes clear that a plan's sponsor is responsible for the legal responsibilities of a plan's administrator only where no such administrator is designated.  29 U.S.C. § 1002(16)(A)(ii).  Thus CIGNA's designation of an individual to be the "administrator" eliminates any responsibility it otherwise would have as the

sponsor.

267.    Moreover, the Second Circuit has explained in this vein that ERISA's disclosure "obligation is placed on the person designated under ERISA as the 'administrator' of the plan, not on every fiduciary," let alone the plan sponsor.  Lee v. Burkhart, 991 F.2d 1004 (2d Cir. 1993) (emphasis added); see also Malia v. Gen. Elec. Co., 23 F. 3d 828, 833 (3d Cir. 1994) (rejecting disclosure claims against employer under 29 U.S.C. §§ 1021-25 because "[o]nly plan administrators are required to disclose benefits information to beneficiaries").

268.    Plaintiffs' suggestion that CIGNA as the Plan sponsor should be held vicariously liable for any disclosure violations is incorrect.  In Lee, the Second Circuit expressly rejected the idea that an employer can be a de facto co-administrator jointly liable with the named administrator in a suit to recover benefits under ERISA.  991 F.2d  at 1010 (rejecting claim that an insurance company under contract to provide assistance in the management of an employer's self-funded employee benefits plan was an unnamed plan administrator).

269.    See McKinsey v. Sentry Ins., 986 F.2d 401, 404 (10th Cir. 1993) (criticizing the view that an employer could be a de facto administrator, and holding that "[29 U.S.C. §] 1002(16)(A) provides that if a plan specifically designates a plan administrator, then that individual or entity is the plan administrator for purposes of ERISA"); Crowley v. Corning, Inc., 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002) (rejecting outright plaintiff's respondeat superior argument against plan sponsor).

270.    Plaintiffs' reliance on Wasley Prods., Inc. v. Bulkalites, No. 3:03-383(MRK)/3:03cv1790(MRK), 2006 WL 3834240 (D. Conn. May 31, 2006), is misplaced. There, the court applied the doctrine of respondeat superior to the employer of third-party fiduciaries where the fiduciary duties at issue did not involve statutory obligations specifically

placed on plan administrators.  Id. at *6.  In other words, Wasley did not involve an attempt to

hold a plan sponsor vicariously liable as an "administrator," which would directly contravene the

Second Circuit's holding in Lee.  See Lee, 991 F.2d at 1010.

271.    Plaintiffs also could not show the agency relationship required for application of

the doctrine of respondeat superior to a plan sponsor, since the Plan Administrator was not acting

for the benefit of CIGNA in exercising his disclosure duties.  See, e.g., W. Page Keeton et al.,

Prosser and Keeton on The Law of Torts § 69 (5th ed. 1988); Jones v. Federated Fin. Reserve

Corp., 144 F.3d 961, 965 (6th Cir. 1998) ("Under the respondeat superior rule, a principal is only

held vicariously liable for torts committed by an agent when the agent acts for the benefit of his

principal within the scope of his employment.").  When a plan administrator is performing his

duties as plan administrator, he is acting solely in the interests of the plan participants and

beneficiaries and not the corporate employer, particularly where no breach of fiduciary duty has

been alleged.  See 29 U.S.C. §1104(a)(1) (stating that "a fiduciary [which includes a plan

administrator pursuant to 29 U.S.C. §1002(14)(A) and 21(A)] shall discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries").

272.    Moreover, to the extent Plaintiffs seek to impose respondent superior liability on

CIGNA for the actions of employees other than the Plan Administrator, Plaintiffs have failed to

establish that such employees were acting "in the interest" of CIGNA, as opposed to the plan or

its beneficiaries.  See also Averhart v. US WEST Mgmt. Pension Plan, 46 F.3d 1480, 1489-90

(10th Cir. 1994) (holding that the "designation of the . . . administrator is conclusive for purposes

of applying 1132(c) and cannot be expanded or modified . . . even where 'company personnel

other than the plan administrator routinely assume responsibility for answering requests from

plan participants and beneficiaries . . . .The statutory liability for failing to provide requested

information remains with the designated plan administrator . . . <u>not with the employer</u> or its other employees.'") (<u>quoting</u> <u>McKinsey</u>, <u>supra</u>, 986 F.2d at 404-05) (emphasis added).

273.    Plaintiffs' vicarious liability argument makes a mockery of the statutory distinction drawn between plans with an administrator and plans that fail to designate an administrator, and cannot succeed.

## IV.    DEFENDANTS' FAILURE TO PROVIDE PRESENT-VALUE DISCLOSURES OF THEIR DIFFERENT BENEFIT OPTIONS PRIOR TO OCTOBER 2004 DID NOT VIOLATE ERISA.

274.    Plaintiffs' claim in Count 5 that CIGNA should have made an explicit disclosure to participants where the relative present values of different benefit options were not equal fails because:  1) Part B does not violate ERISA's anti-cutback rule in Section 204(g), the statutory provision upon which they rely in their Complaint, 2) none of the three Plaintiffs has standing to pursue this relative value claim, 3) prior to October 2004, a presentation-value disclosure of different benefit options was required by neither ERISA nor the Plan, 4) the Plan Administrator has the exclusive legal responsibility for any such disclosures, and is not a party to this suit, and 5) the claim is barred by the statute of limitations for all participants who commenced benefits before May 2003.

### A.    Part B Does Not Violate ERISA's Anti-Cutback Rule In Section 204(g).

275.    Plaintiffs' claim in Count 5 alleging a violation of the anti-cutback rule under ERISA Section 204(g), which prohibits a plan amendment that reduces a participant's previously-accrued benefit, fails because the written terms of Part B unequivocally provide that all benefits previously accrued under the prior plan formula ("Part A") are protected, which protection is all that ERISA's anti-cutback rule requires.

276.    Section 204(g) provides in relevant part that "[t]he accrued benefit of a participant

- 77 -

under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title." 29 U.S.C. § 1054(g).

277.    Critically, this provision does not prohibit, or even limit, an employer's ability to reduce <u>future</u> pension accruals or even to cease them altogether.  <u>See, e.g.</u>, <u>Cent. Laborers'</u> <u>Pension Fund v. Heinz</u>, 541 U.S. 739, 747 (2004) ("[E]mployers are perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, future employment."); 26 C.F.R. § 1.411(d)-3(b)(3)(ii) ("Section 411(d)(6) only protects benefits that accrue before the applicable amendment date.").

278.    This is the parallel provision to 29 U.S.C. § 1054(g)(1) in the Internal Revenue Code.  Regulations issued pursuant to Section 411(d)(6) of the Internal Revenue Code are equally applicable to Section 204(g) of ERISA, 29 U.S.C. § 1054(g).  <u>See</u> <u>Heinz</u>, 541 U.S. at 747 ("Although the pertinent regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to ERISA § 204(g).").

279.    "[T]he proper inquiry under ERISA §  204(g)(1) is whether plaintiff's monthly benefit was in fact reduced by a plan amendment."  <u>King v. Pension Trust Fund of the Pension,</u> <u>Hospitalization and Benefit Plan of the Elec. Indus.</u>, No. 01-CV-2604, 2003 WL 22071612, at *10 (E.D.N.Y. Sept. 5, 2003) (internal citations and quotations omitted); <u>Langman v. Laub</u>, No. 97 Civ. 6063(MGC), 2002 WL 472033, at *2 (S.D.N.Y. Mar. 28, 2002) (same).

280.    Treasury regulations further explain that an amendment or series of amendments "will only violate section 411(d)(6) if, for any participant, the <u>net effect</u> is to decrease participants' accrued benefit <u>as of that applicable amendment date</u>."  26 C.F.R. § 1.411(d)-3(a)(2)(ii) (emphasis added).

281.    In this case, Part B does exactly what the Treasury regulation requires, as its

written terms unequivocally provide that all benefits previously accrued under the prior plan

formula are protected.

282.     Because nothing in ERISA Section 204(g) addresses, let alone mandates,

<u>disclosures</u> about employee benefit matters, Plaintiffs' present-value disclosure claim in Count 5

fails.

283.     Plaintiffs' claim under ERISA Section 205(g), 29 U.S.C. § 1055(g), which

addresses consent for benefit distributions that exclude a joint and survivor annuity, was never

included any of their Complaints and is not properly before the Court.

> **B.     Plaintiffs Amara, Broderick And Glanz Do Not Have Standing To Pursue A Present-Value Disclosure Claim.**

284.     Even if participants' benefit election forms should have included a present-value

disclosure starting in 1998, as Plaintiffs' allege, Plaintiffs Amara, Broderick and Glanz were not

harmed in any way by this non-disclosure and therefore have no standing to pursue a claim under

Count 5 on their own behalf or on behalf of any class of Plan participants.  Accordingly, no class

may be certified on this claim.

285.     Ms. Amara, like all other participants whose benefits have been recalculated as a

result of the <u>Depenbrock</u> decision, accordingly lacks standing to pursue a present-value

disclosure claim.  <u>See, e.g.</u>, <u>Dickerson v. Feldman</u>, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006)

("Where a plaintiff's stake in the controversy disappears before there has been an effort to certify

the class action, the action must be dismissed as moot") (citation omitted).

286.     Plaintiffs Broderick and Ms. Glanz, like Ms. Amara, have suffered no harm as a

result of not receiving a present-value disclosure and they therefore have no standing to pursue

that claim on their own behalf or on behalf of any Plan participant.

287.     Lillian Jones, the only class member who testified that she chose a less valuable

benefit option from an election form that did not disclose the present-value of the options, cannot serve as a class representative because (1) she received the form prior to October 2004, when the new regulations requiring more expansive disclosures went into effect, and (2) she never exhausted the remedies available to her under the Plan.  See Chapman v. Choice Care Long Term Disability Plan, 288 F.3d 506, 511 (2d Cir. 2002) ("[C]laimants must pursue all administrative remedies provided by their plan pursuant to statute.").

288.    Moreover, class members who have not yet initiated benefits (as noted above, a group which is undefined and undefinable at the present time cannot serve as class representatives.  First, because Prudential has brought all benefit election forms into compliance with the current regulations requiring present-value disclosures, there can be no violation with regard to this group of future participants.  Moreover, the claims of such participants are not ripe and therefore the court lacks jurisdiction to review their claims.  Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998); see also Lugo v. Employees Ret. Fund of Illumination Prods. Indus., 529 F.2d 251, 258 (2d Cir. 1976) (holding as unripe 53-year-old plaintiff's claim for retirement benefits, under plan which required that participants reach age 60 and work at least 90 months in prior ten years, because the claim is "at best a claim that when, seven years from now, plaintiff is old enough to be entitled to apply for such benefits, the trustees will deny his application on the basis of the 90/10 rule, which he claims is illegal.").

### C.    Pre-October 2004 Treasury Regulations Did Not Require Disclosure Of The Present Value Of Benefit Options.

289.    A classwide issue is whether there was a violation of ERISA § 205(g), 29 U.S.C. § 1055(g), Treas. Reg. 1.401(a)-20, Q&A 36 and/or Treas. Reg. 1.417(a)(3)-1 (as in effect thereafter), and the terms of the Plan itself.  A key classwide issue is whether such requirements arose as of October 1, 2004 or January 1, 1998.

290.    As both sides agree, the Treasury regulations enacted in 2003 (and effective

October 1, 2004), require that a benefit election form include present-value disclosure.  See 26

C.F.R. § 1.417(a)(3)-1.  Section 1.417(a)(3)-1 of the Income Tax Regulations was revised to

require that a benefit election form offer:

> The description of the relative value of an optional form of benefit
> . . . must be expressed to the participant in a manner that provides a
> meaningful comparison of the relative economic values of the two
> forms of benefit without the participant having to make
> calculations using interest or mortality assumptions.  Thus, in
> performing the calculations necessary to make this comparison, the
> benefits under one or both optional forms of benefit must be
> converted, taking into account the time value of money and life
> expectancies, so that the values of both optional forms of benefit
> are expressed in the same form.

26 C.F.R. § 1.417(a)(3)-1(c)(2)(i).  (emphasis added).

291.    The 2003 regulation included specific provisions as to the effective date of these

new, more expansive disclosure requirements: as of October 2004, these regulations required that

any benefit election form that offers benefit options not of relatively equal value provide such a

present-value comparison.  See 26 C.F.R. § 1.417(a)(3)-1(f)(ii).  As Section 1.417(f)(ii) states:

"This section also applies to a QJSA explanation with respect to any distribution with an annuity

starting date that is on or after October 1, 2004, and before February 1, 2006, if the actuarial

present value of any optional form of benefit that is subject to the requirements of section

417(e)(3) is less than the actuarial present value (as determined under § 1.417(e)-1(d)) of the

QJSA)."

292.    Moreover, the regulations required that as of February 1, 2006, all benefit election

forms contain a present-value disclosure.  See 26 C.F.R. § 1.417(a)(3)-1(f) ("Except as otherwise

provided in this paragraph (f), this section applies to a QJSA explanation with respect to any

distribution with an annuity starting date that is on or after February 1, 2006.").

293.     As both sides agree, the forms now must either state that all benefit options are relatively equal or else provide some quantitative comparison of the present values of the options.  CIGNA is fulfilling this legal requirement because CIGNA's recordkeeper Prudential has modified the benefit election forms to comply with the new disclosures requirements effective October 2004, and has offered re-election to any participants who previously elected their benefits from a form that did not include the present values of their benefit options.

294.     Such disclosures were not, however, required under the earlier version of the Treasury Regulations, which have never been interpreted to require present-value disclosures.  In Engers v. AT&T Corp., 428 F. Supp. 2d 213 (D.N.J. 2006), the court rejected the plaintiffs' argument (under the prior regulations) that an SPD was deficient because it failed to explain differences in the present-values of benefit options.  As the court stated:  "Plaintiffs again, do not point to legal authority that supports their claim that AT & T was required to disclose the cash balance conversion factors or differences in the relative values of participants' benefits."  Id. at 242.

295.     Prior to the issuance of the 2003 Treasury regulations, plan administrators did "not, as a general matter" provide the present values of different benefit options, but rather typically would do what CIGNA's Plan Administrator did, which was to include the amounts of the different benefits without any comparison of present values.  CIGNA's Plan Administrator notified participants about each benefit form available to them, the amount of the benefit, and when and how that benefit would be payable.  Although not specifically designated on the form as a Minimum Benefit under Section 1.1(c) or 7.3 of Part B, the Minimum Benefits were included among those benefit options.  These disclosures fully complied with the regulations in place prior to October 2004.

296.     Plaintiffs' contention that CIGNA violated an express provision in Section 7.1(b)(1) of the Plan document that participants will be provided "sufficient additional information to explain the relative values of the optional forms of benefits available under the Plan" and a promise in its SPDs that participants will be "notified" if the cash balance account is less than their "old plan benefits" is wrong.  The Plan Administrator notified participants by providing on their benefit election forms the amount of each benefit option, including the minimum benefits where applicable.  Under the Plan, as under the prior regulations that were in effect at the time the Plan document and SPD were drafted, that were in effect at the time the Plan document and SPD were drafted, nothing more was required to apprise participants of the values of their various benefit options.

297.     Contrary to Plaintiffs' suggestion, neither the prior version of the Treasury regulations nor the current regulations require that a plan automatically provide a participant with every benefit option that might be available to him at any point in time in the future. Plaintiffs' contention "that the optional forms of benefit that must be explained to participants include options with later commencement dates" is plainly wrong.  The regulations define "optional forms of benefit" as benefits that differ "in terms relating to the payment schedule, timing, commencement, medium of distribution (e.g., in cash or in kind), election rights, differences in eligibility requirements, or the portion of the benefit to which the distribution alternative applies."  26 C.F.R. § 1.411(d)-3(g)(6)(ii)(A).  Nothing in these regulations, or in any case interpreting the regulations, requires a plan administrator to provide participants with an explanation of options to which they are not entitled as of the benefit election form date.

298.     Plaintiffs' assertion that all benefit election forms provided by the Plan Administrator to Part B participants prior to October 2004 were invalid is meritless.

- 83 -

299.    The participants affected by the <u>Depenbrock</u> decision did not receive a benefit election form with different forms of benefit options, and accordingly the regulations at issue in Count 5 are inapplicable.  Rather, these participants were offered a re-election into Part A or Part B, and the relative value regulations do not apply to such a re-election.

300.    Moreover, there is no class representative in this litigation for the <u>Depenbrock</u>-affected participants.  Plaintiff Amara, who was part of the <u>Depenbrock</u> group, elected the most valuable benefit option upon her re-election and therefore would not have standing to pursue a present-value disclosure claim on her own behalf or on behalf of class members.

**D.    Any Present-Value Disclosure Claims Would Lie Against The Plan Administrator, Who Is Not A Party.**

301.    There can be no doubt that it is the plan administrator alone who is responsible for providing participants proper benefit election forms.  <u>See, e.g.</u>, <u>Lehman v. Univ. of Hartford Defined Contribution Ret. Plan</u>, No. CIV.A. 399CV2272CFD, 2002 WL 31076080, at *1 n.1, 4 (D. Conn. Jul. 17, 2002) (claim against plan administrator regarding proper spousal consent for change of beneficiary).  <u>See also, e.g.</u>, <u>Shields v. Reader's Digest Ass'n, Inc.</u>, 331 F.3d 536, 547 (6th Cir. 2003) (claim against plan administrator regarding acceptance of participant's benefits election form); <u>Moore v. Philip Morris Cos., Inc.</u>, 8 F.3d 335, 340 (6th Cir. 1993) (claim against plan administrator regarding spousal consent to designation); <u>Seales v. Amoco Corp.</u>, 82 F. Supp. 2d 1312, 1323 (M.D. Ala. 2000) (claim against plan administrator regarding failure to disclose to participants that the present value of their pension benefits had been incorrectly computed).

302.    As with their disclosure claims in Counts 2 and 4, Plaintiffs' failure to name the Part B Plan Administrator as a defendant is fatal to their present-value disclosure claim in Count 5.

E.     **Plaintiffs' Present-Value Disclosure Claim Is Time-Barred.**

303.     In Count 5, Plaintiffs make yet another statutory claim alleging that Part B's

design violates Sections 204(g) and 205(g) of ERISA and Treasury regulations, and seek a new

election to recover additional benefits.  Accordingly, the state statute most analogous would be

Connecticut's two-year statute for employees to bring a "[c]ivil action to collect wage claim [or]

fringe benefit claim."  Conn. Gen. Stat. Ann. § 31-72; Conn. Gen. Stat. Ann. § 52-596.

304.     To the extent that Plaintiffs are claiming in Count 5 that Defendants violated the

terms of the Plan document, such a claim would be subject to Connecticut's breach of contract

statute of limitations, Conn. Gen. Stat. Ann. § 52-576, and each participant's claim, again, would

accrue whenever he or she received their benefit election form.

305.     This is an individualized issue, since whether the statute of limitations bars a

given participant's claim depends upon when the participant received a benefit election form.

Count 5 was asserted for the first time when Plaintiffs filed their Second Amended Complaint on

May 6, 2005.  Thus, at least for all participants who elected a benefit more than two years earlier

– in other words, prior to May 6, 2003 – Count 5 is untimely.

V.     **PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES
        THAT BAR THEIR CLAIMS.**

306.     Nothing in ERISA requires a release to specifically state that the individual is

waiving ERISA rights.  Chaplin v. Nationscredit Corp., 307 F.3d 368, 373 (5th Cir. 2002).

Accordingly, a release like the one signed by Plaintiffs, which broadly covers any and all claims

arising out of a participant's employment, operates to waive ERISA claims.  Id.

307.     For example, in Linder v. Byk-Chemie USA, Inc., No. 3:02CV1956(JGM), 2006

WL 648206, at *9-10 (D. Conn. March 10, 2006), the court found that a release that did not

expressly mention ERISA claims still applied to such claims based on the breadth of the

language used:  "claims arising under or in any way connected with his employment with the Company or the termination of such employment."

308.    See also Fair v. Int'l Flavors & Fragrances, Inc., 905 F.2d 1114, 1117 (7th Cir. 1990) (release which "precludes Fair from bringing suit against IFF on any claim arising from her employment relationship with IFF" barred ERISA claim for pension benefit); Shaver v. Siemens Corp., No. 2:02cv1424, 2007 WL 1006681, at *31-32 (W.D. Pa. Mar. 30, 2007) (ERISA claim precluded by releases which did "not expressly waive ERISA claims" but "contain[ed] language which releases all claims arising out of employment or termination of that employment"); Smart v. Gillette Co. Long-Term Disability Plan, 887 F. Supp. 383, 386 (D. Mass. 1995) (release barring "any and all claims, charges, complaints, or causes of action" barred ERISA claims).

309.    The Release that each Plaintiff signed broadly covers all claims arising out of their employment with CIGNA:

> "Claims" are any and all claims, demands and causes of action of whatever kind, including any claim for attorney's fees, that you now have, or at any time had, against any Released Persons, but only to the extent they arise out of or relate in any way to your employment or terminated of employment with the Company and its affiliates.

(Release ¶5(e)).  Plaintiffs Amara, Broderick and Glanz upon their separation from CIGNA were each offered severance in exchange for signing a release, they each consulted with counsel before knowingly and voluntarily signing the release, the severance was paid, and they have not tendered back the severance to CIGNA.

310.    The Release Plaintiffs signed does not apply to their claims in this case because it excluded "any claims for benefits under any retirement, savings, or other employee benefit programs."  (Release ¶5(f)).  By its terms, however, this exclusion only applies to claims for

benefits under the Plan, not claims alleging statutory ERISA violations.  However, to the extent

Plaintiffs are seeking in Count 5 benefits to which they claim they are entitled under the terms of

the Plan, such benefit claims are barred by the Releases.

311.    In this litigation, Plaintiffs allege that various terms of the Plan violate ERISA and

that CIGNA failed to meet its statutory and regulatory disclosure obligations.  These are

statutory claims that courts in the Second Circuit consistently distinguish from claims for

benefits under the terms of a plan.

312.    For example, in Campanella v. Mason Tenders Dist. Council Pension Plan, 299 F.

Supp. 2d 274 (S.D.N.Y. 2004), the plaintiffs, like Plaintiffs here, alleged "that the Plan itself

violates ERISA['s]" accrual rules, and the court held that these were statutory claims, not claims

for benefits under the plan.  Campanella, 299 F. Supp. 2d at 280, 281; see also De Pace v.

Matsushita Elec. Corp. of Am., 257 F. Supp. 2d 543, 558 (E.D.N.Y. 2003) (distinguishing

statutory claims from benefit claims); Gray v. Briggs, No. 97-6252, 1998 WL 386177, at *7

(S.D.N.Y. July 7, 1998) (same).

313.    Plaintiffs and the thousands of other class members who signed releases received

the benefit of their bargain — valuable severance pay in exchange for a broad release.  Given the

nature of Plaintiffs' claims in the first four counts of their Complaint – none of which constitutes

a claim for benefits under CIGNA's existing benefit plans – these claims are plainly barred by

the Release.

## VI.    EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEIR REMEDIES ARE LIMITED.

### A.    Monetary Damages Generally Are Unavailable Under ERISA Section 502(a)(3).

314.    The Supreme Court has made clear that only equitable – not legal – relief is

available under ERISA Section 502(a)(3), and "money damages are, of course, the classic form of legal relief." <u>Mertens</u>, 508 U.S. at 255. As the Supreme Court explained, Section 502(a)(3) authorizes only "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 215 (2002).

315.    Nor can Plaintiffs circumvent this limitation by trying to characterize the relief they seek as "equitable."

316.    For example, in <u>Coan v. Kaufman</u>, 457 F.3d 250 (2d Cir. 2006), the Second Circuit upheld this court's denial of a plaintiff's request for an "injunction reinstating the terminated plans, requiring the trustees to pay into them additional benefits lost through a breach of fiduciary duty, and directing them to pay the additional benefits to Coan as required by the terms of the plans." <u>Id.</u> at 254. The Second Circuit held:

> We agree with the district court, moreover, that the alternative relief Coan seeks under section 502(a)(3), an injunction requiring the defendants to restore funds to the defunct 401(k) plan to be distributed to former participants, "<u>does not transform what is effectively a money damages request into equitable relief</u>." <u>Coan</u> I, 333 F. Supp. 2d at 26.

<u>Coan</u>, 457 F.3d at 264 (emphasis added). <u>See also</u> <u>Gerosa v. Savasta & Co.</u>, 329 F. 3d 317, 321 (2d Cir. 2003) ("In determining the propriety of a remedy [under ERISA], we must look to the real nature of the relief sought, not its label."); <u>Fisher v. Penn Traffic Co.</u>, No. 06 Civ. 5848(HB), 2007 WL 496657, at *5 (S.D.N.Y. Feb. 16, 2007) (finding that the plaintiff "cannot cloak a legal claim for damages in equitable clothing" by requesting a declaration for monetary damages).

317.    The Third Circuit's recent decision in <u>Eichorn v. AT&T Corp.</u>, 484 F.3d 644 (3d Cir. May 2, 2007), is instructive. In <u>Eichorn</u>, the plaintiffs sought "a decree requiring [defendant] to adjust its pension records retroactively to create an obligation to pay the plaintiffs

more money, both in the past and going forward." Id. at 645.  The Third Circuit held that this

relief was not available under ERISA Section 502(a)(3) because:

> The District Court rightly saw this as being, in essence, a request
> for compensatory damages merely framed as an "equitable"
> injunction.  The Court thus rightly concluded that the requested
> relief is not available under § 502(a)(3).

Id. at 655-57. (emphasis added; internal citations and quotations omitted).  See also In Re J.P.

Morgan Chase Cash Balance Litig., No. 06-732, 2007 WL 1549121, at *4 (S.D.N.Y. May 30,

2007) (participants who previously received lump sum distributions cannot seek additional

pension benefits because "any relief [they] may be entitled to in the event Plaintiffs were to

prevail would be a damage award, not benefit").

      318.     Similarly, Plaintiffs cannot characterize any of the relief they seek as restitution.

"[F]or restitution to lie in equity [and therefore be available under ERISA Section 502(a)(3)], the

action generally must seek not to impose personal liability on the defendant, but to restore to the

plaintiff particular funds or property in the defendant's possession."  Great-West, 534 U.S. at

205.  See also Great-West, 534 U.S. at 213 (Where a plaintiff "could not assert title or right to

possession of particular property, but in which nevertheless he might be able to show grounds for

recovering money to pay for some benefit the defendant had received from him, the plaintiff had

a right to restitution [only] at law.") (emphasis added).

      319.     See also Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 104 (2d Cir. 2005)

(restitution is not equitable relief available under § 502(a)(3) where "the monies upon which

Nechis seeks to impose a trust are premiums paid for health care coverage, which Oxford is

under no obligation to segregate and which Nechis does not allege to be segregated in a separate

account"); Priest v . Fireman's Fund Ins. Co., No. 05-CV-0157E(Sr), 2007 WL 475325, at *3 n.2

(W.D.N.Y. Feb. 9, 2007) (cautioning the plaintiff that "that requests for relief which include the

payments of benefits are classified as legal relief, even when the benefits would otherwise have been payable had the employer not interfered with the claimant's rights."); Pelosi v. Schwab Capital Mkts., L.P., 462 F. Supp. 2d 503, 513 (S.D.N.Y. 2006) (finding that "Pelosi's claim is clearly one seeking money damages for the benefits he believes were improperly withheld in violation of Defendants' legal duties to him"); Strohmeyer v. Metro. Life Ins. Co., No. 3:04cv1808(WWE), 2005 WL 3963770, at *3 (D. Conn. Nov. 15, 2005) (claim for "value of the life insurance benefits and interest constitutes a claim for monetary or legal compensation" was not equitable relief because "Plaintiff is not asking that defendants restore her property or money traceable to a fund in defendants' possession.").

320.     Plaintiffs' request that the Court order CIGNA to reform the written terms of Part B likewise seeks relief unavailable under ERISA Section 502(a)(3).  Reformation is only available as an equitable remedy where parties reach agreement on the terms of a contract, but incorrectly memorialize those terms in a written document.  Dobbs, Law of Remedies, § 4.3(7), vol. 1, p. 617  (2d ed. 1993) (Reformation is an appropriate remedy "[w]hen parties come to an agreement, but by fraud or mistake write it down in some fashion that does not truly reflect their contract.") (emphasis added).

321.     Consistent with Dobbs, the Second Circuit has held that "[i] is well established that reformation is appropriate only to conform an agreement to accurately reflect the intentions of the parties at the time of the agreement."  Beecher v. Able, 575 F.2d 1010, 1015 (2d Cir. 1978) (emphasis added).  See also H. Prang Trucking Co. v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir. 1980) ("Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement.")

- 90 -

322.    By contrast, where there is no actual agreement, i.e., no meeting of the minds, a writing cannot be reformed to reflect one party's understanding even if that understanding was caused by fraud or inequitable conduct.  See Moffett, Hodgkins & Clarke Co. v. City of Rochester, 178 U.S. 373, 385 (1900) ("A mistake on one side may be a ground for rescinding, but not for reforming, a contract.  Where the minds of the parties have not met there is no contract and hence none to be rectified.").

323.    Notwithstanding Plaintiffs' lack of any specific requested remedies, it is clear that the remedies they seek are not "equitable relief" available under ERISA Section 502(a)(3).

324.    Similarly, Plaintiffs' request for "interest" is not equitable relief available under Section 502(a)(3).  See Tyndall v. New England Teamsters & Trucking Indus. Pension Fund, No. 3:03 CV 194(CFD), 2006 WL 3815140, (D. Conn. Dec. 27, 2006) (Droney, J.) ("Knudson casts serious doubt on whether interest on retroactive awards of benefits is a permissible form of equitable relief.") (collecting cases).

**B.    Plaintiffs Are Not Entitled To Retroactive Relief.**

325.    The Supreme Court has admonished against providing retroactive relief in the context of pension plans:

> [Given] the potential impact which changes in rules affecting insurance and pension plans have on the economy. . . . the rules that apply to pension funds should not be applied retroactively unless the legislature has plainly commanded that result.

City of Los Angeles, Dep't of Water & Power v. Manhart, 435 U.S. 702, 721 (1978).

326.    The Supreme Court's jurisprudence teaches that when a pension plan is found to be unlawfully discriminatory, retroactive relief may not be awarded if:  (1) employers reasonably could have assumed that the plan was lawful, (2) retroactive relief is unnecessary to ensure future compliance with the law, and (3) retroactive relief would have a potentially disruptive impact on

plan operations nationwide.  <u>Manhart</u>, 435 U.S. at 718-23; <u>Ariz. Governing Comm. for Tax</u>

<u>Deferred Annuity & Deferred Comp. Plans v. Norris</u>, 463 U.S. 1073, 1106-07 (U.S. 1983); <u>Fla.</u>

<u>v. Long</u>, 487 U.S. 223, 229-40 (1988).  <u>See also</u> <u>Chevron Oil Co. v. Huson</u>, 404 U.S. 97, 106-07

(1971) (articulating general test for applying law retroactively).

327.     The first part of the test asks whether earlier precedent had "resolved in a

definitive way" the obligations of the employers, <u>Long</u>, 487 U.S. at 226, or instead "left some

doubt regarding its command."  <u>Id.</u> at 231.  Where, as here, the court confronts an uncertain area

of the law, the question is whether the earlier precedent had "clearly foreshadowed" the court's

resolution of the issue, <u>Chevron</u>, 404 U.S. at 106, or whether the issue was left as "debatable."

<u>Norris</u>, 463 U.S. at 1093.

328.     The Second Circuit defines "clearly foreshadowed" as where the employer was

given "fair notice of the illegality of its practice," and contrasts this with situations where an

employer "could have concluded in good faith" that its practice was legal.  <u>Graham v. N.Y.</u>

<u>Dep't of Civil Serv.</u>, 907 F.2d 324, 328 (2d Cir. 1990) (holding that using gender-based actuarial

tables to discriminatorily determine plan <u>benefits</u> was not foreshadowed by <u>Manhart</u> which

proscribed use of such tables to determine plan <u>contributions</u>).

329.     This is an objective test that examines the state of the uncertainty in the law, not

defendants' beliefs or state of mind.  <u>See</u> <u>Long</u>, 487 U.S. at 237 ("The meaning and scope of a

decision do not rest on the subjective interpretations of discrete, affected persons and their legal

advisors.").

330.     Here, as evidenced by the decisions of the Third Circuit in <u>Register</u>, the Seventh

Circuit in <u>Cooper</u>, and numerous district courts, a reasonable person "could have concluded in

good faith that" that CIGNA's cash balance conversion "was legal," and that its disclosures

satisfied ERISA's disclosure requirements. <u>Graham</u>, 907 F.2d at 328. <u>See also</u> <u>Manhart</u>, 435 U.S. 702, <u>Norris</u>, 463 U.S. 1073, <u>supra</u>.

331.     The second prong of the test also precludes retroactivity.  Under the second prong, a court may not presume that any change in the application of the law would be furthered by retroactive application of it, but rather must determine whether retroactivity is necessary in order "to deter deliberate violations or grudging compliance," <u>Long</u>, 487 U.S. at 230, or otherwise to advance federal policies.  <u>See id.</u> at 236-37; <u>Chevron Oil</u>, 404 U.S. at 107-08.

332.     In <u>Norris</u>, the Supreme Court recognized that plan administrators who once believed plans to be non-discriminatory (and therefore lawful) will quickly "conform their plans to insure that individual employees are allowed equal . . . benefits" even without the threat of retroactive relief.  463 U.S. at 1110.

333.     The same is true here.  Retroactive relief is not necessary to assure compliance with the law, so no retroactive relief is warranted.

334.     A court should not impose retroactive relief where such relief would have a potentially disruptive impact on CIGNA's entire cash balance pension plan and the pension plan system generally.  <u>See</u> <u>Norris</u>, 463 U.S. at 1106.  The Supreme Court held:

> Many working men and women have based their retirement decisions on expectations of certain stream of income during retirement.  These decisions depend on the existence of adequate reserves to fund these pensions.  A retroactive holding by this Court that employers must disburse greater annuity benefits than the collected contributions can support would jeopardize the entire pension fund.  If a fund cannot meet its obligations, the harm would fall in large part on innocent third parties.  This real danger of bankrupting pension funds requires that our decision be made prospective.

463 U.S. at 1110-11.

335.     <u>See also</u> <u>Long</u>, 487 U.S. at 238 (same); <u>Probe v. State Teachers' Ret. Sys.</u> 780

F.2d 776, 784 (9th Cir. 1986) (finding that the "danger of bankrupting pension funds would preclude giving retroactive effect to a decision that the plan at issue violates the Equal Pay Act"); Sikora v. Am. Can Co., 622 F.2d 1116, 1123 (3d Cir. 1980) (in denying retroactive relief, noting that to prevent "manifest injustice," rulings "that may conceivably upset the solvency of pension plans" must be given special consideration).

336.    Because CIGNA's cash balance plan calculated contributions based on expected payouts to participants, an unexpected liability would threaten the solvency of CIGNA's pension plan and adversely affect all plan participants in both Part B and Part A.  Accordingly, no retroactive relief is appropriate.

### C.    Any Relief Must Be Limited By The Pension Protection Act Of 2006.

337.    Any relief provided in connection with Count 3 (age discrimination) must be limited to the time period prior to June 29, 2005.  See Pub. L. No. 109-280, 120 Stat. 780 (2006).

338.    Under the Pension Protection Act of 2006 ("PPA"), which applies prospectively from June 29, 2005, cash balance plans like Part B are not age discriminatory.  See Pub. L. No. 109-280, 120 Stat. 780 (2006); see also Register, 477 F.3d at 65 n.8 (noting that the PPA settles the age discrimination dispute prospectively from June 29, 2005).

339.    Moreover, because the PPA provides that cash balance plans such as Part B are legal going forward, the PPA bars the Court from issuing any prospective injunctive relief.  <u>See</u> Pub. L. No. 109-280, 120 Stat. 780 (2006).


Dated:  June 25, 2007                        **MORGAN, LEWIS & BOCKIUS LLP**

                                By:  <u>/s/ Joseph J. Costello_____</u>
                                Joseph J. Costello
                                Jeremy P. Blumenfeld
                                Jamie M. Kohen
                                *Admitted pro hac vice*
                                1701 Market Street
                                Philadelphia, Pennsylvania  19103-2921
                                (215) 963-5295/5258/5472
                                (215) 963-5001 (fax)
                                jcostello@morganlewis.com
                                jkohen@morganlewis.com

                                **ROBINSON & COLE**
                                James A. Wade (CT # 00086)
                                280 Trumbull Street
                                Hartford, Connecticut  06103
                                (860) 275-8270
                                (860) 275-8299 (fax)
                                jwade@rc.com

                                *Attorneys for Defendants,*
                                *CIGNA Corporation and CIGNA Pension Plan*