# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JANICE C. AMARA,                          :
GISELA R. BRODERICK,                      :
ANNETTE S. GLANZ,                         :
individually and on behalf                :
of all others similarly situated,         :
                                          :
                        Plaintiffs,       :
                                          :
            vs.                           :    Civil No. 3:01-CV-2361 (MRK)
                                          :
CIGNA Corp. and                           :
CIGNA Pension Plan,                       :
                                          :
                        Defendants. :


## PLAINTIFFS' POST-TRIAL REPLY BRIEF


Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Named Plaintiffs and
Plaintiff Class

# **Table of Contents**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     "WEAR-AWAY" CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.     The Periods of "Wear-Away" With No Additional Benefits Violate ERISA's 133⅓% Benefit Accrual Rule. . . . . . . . . . . . . . . . . . . . . . . 3

     B.     Section 7.3 of the Plan Violates ERISA Because It Requires Participants to "Elect" Between Forfeiting the Previously-Earned Annuity (Including Early Retirement Features) or Forfeiting Any Cash Balance Accruals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    "AGE DISCRIMINATION" CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     A.     CIGNA's Argument that the Term "Benefit Accrual" in ERISA §204(b)(1)(H) Does Not Refer to the Change in the "Accrued Benefit" Ignores the Statutory Context and Usage and Ultimately Substitutes a Neologism of "Imputed" "Inputs" for the Statute's Established Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     B.     Even if Age Discrimination Could Be Measured by Costs Incurred, the Periods of "Wear-Away" With No Additional Benefits Violate the Age Discrimination Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.   "204(h) NOTICE" CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     A.     ERISA §204(h) Required CIGNA to Tell Its Employees that Their Future Benefits Were Being Significantly Reduced. . . . . . . . . . . 29

     B.     Plaintiffs Have Shown "Likely Prejudice" from the §204(h) Violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C.      ERISA Also Required Advance Notice of the Change in the
        "Rehire Rule" So Former CIGNA Employees Would Know that
        They Were Returning to Work For No Pension Benefits ........ 42

IV.    "SUMMARY PLAN DESCRIPTION (SPD)" CLAIMS ............. 47

A.      CIGNA's Summary Plan Description and Summary of Material
        Modifications Omits Any Disclosure of Reductions, Losses or
        Forfeitures and Falsely Assures Participants that the Cash Balance
        Benefits Are "Larger" or "Comparable." ..................... 47

B.      CIGNA's Efforts to Minimize the Need to Disclose Wear-aways
        Are Misguided ........................................ 53

        1.      Wear-aways Should Have Been Disclosed Even if They
                Would Not Have Affected as Many People or Lasted as
                Long With Higher Interest Rates. ..................... 54

        2.      Wear-Aways Should Have Been Disclosed Even If the
                Duration of the Wear-away Is Affected by How 'Well Off'
                People Were Before the Conversion ................... 58

C.      CIGNA's Disclosures Resulted in "Likely Prejudice" to the
        Participants' Ability to Make Well-Informed Employment and
        Retirement Decisions. ................................... 58

D.      CIGNA Has Not Come Close to Meeting Its Burden of Showing
        that Its Inadequate and Misleading Disclosures Were "Harmless
        Error". ............................................... 61

E.      CIGNA Had "Fair Notice" under Rule 8 of the SMM Claim. ..... 64

V.     "RELATIVE VALUE" CLAIMS ............................... 66

A.      CIGNA Did Not Disclose the Relative Value of Optional Forms
        of Benefit as Required by Treasury Regulations In Effect Since
        1988. ............................................... 66

ii

B.    The Named Plaintiffs Have Standing to Bring the Relative Value
Claim; Exhaustion Is Not Required for Statutory Claims;
Moreover, Plaintiffs Amara and Broderick Exhausted CIGNA's
Claim Procedures.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

VI.    CIGNA Is the "Plan Administrator" For Disclosure Purposes Because
CIGNA Controlled the Disclosures and No Other Person Is Designated
in the Plan Document. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

VII.    The Class' Claims Are Not Barred by Statutes of Limitations  . . . . . . . . 81

VIII.    Frommert and Swede Show that the Supreme Court's Great-West
Decision Does Not Preclude Relief for ERISA Violations.  . . . . . . . . . . 86

IX.    The Releases that CIGNA Solicited from Over 2,000 Class Members
Contain an Express Exception for "Any Claims for Benefits Under Any
Retirement Programs"; CIGNA Never Communicated Any Intention that
Those Words Would Mean Less than What They Say. . . . . . . . . . . . . . . 89

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

# TABLE OF AUTHORITIES

## FEDERAL CASES

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) ................................. 19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 127 S. Ct. 1955 (2007) ....... 65

*Bonovich v. Knights of Columbus*, 146 F.3d 57 (2d Cir. 1998), *aff'g*, 963 F.Supp. 143 (D.Conn. 1997) ............................................................. 12-13

*Brody v. Enhance Reinsurance Co. Pension Plan*, 2003 WL 1213084 (S.D.N.Y. 2003) ...................................................................... 36

*Broga v. Northeast Utilities*, 315 F. Supp. 2d 212 (D.Conn. 2004) ........... 39

*Bryerton v. Verizon Communs. Inc.*, 2007 WL 1120290 (S.D.N.Y. 2007) . 36

*Burke v. Kodak Retirement Income Plan*, 336 F.3d 103 (2d Cir. 2003), *cert. denied*, 540 U.S. 1105 (2004) ........................................... 39, 61, 64

*Campanella v. Mason Tenders' Dist. Council*, 132 Fed.Appx. 855 (2d Cir. 2005) ........................................................................ 82

*Campbell v. BankBoston*, 327 F.3d 1 (1st Cir. 2003) ................................ 13

*Caputo v. Pfizer*, 267 F.3d 181 (2d Cir. 2001) ........................................... 85

*Carey v. IBEW Local 363 Pension Plan*, 201 F.3d 44 (2d Cir. 1999) ........ 82

*Carlson v. Principal Financial Group*, 320 F.3d 301 (2d Cir. 2003) ......... 80

*Carrabba v. Randalls Food Markets*, 145 F. Supp. 2d 763 (N.D. Tex. 2000), *aff'd*, 252 F.3d 721 (5th Cir. 2001), *cert. denied*, 534 U.S. 995 (2001) ................................................................................ 92

*Carter v. AT&T*, 870 F. Supp. 1438 (S.D. Ohio 1994) ............................... 92

iv

*Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032 (2d Cir. 1985) ................................................................ 47

*Charles v. PEPCO*, 437 F. Supp. 2d 248 (D.Del. 2006) ............................. 5

*Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ................................................................... 8

*Christensen v. Chesebrough Pond's, Inc.*, 1993 U.S. Dist. LEXIS 21278 (D. Conn. 1993) ........................................................ 83

*In re Citigroup Pension Plan ERISA Litigation*, 470 F. Supp. 2d 323 (S.D.N.Y. 2006) ..................................................... 8, 29, 82

*In re Citigroup Pension Plan ERISA Litigation*, 241 F.R.D. 172 (S.D.N.Y. 2006) ........................................................ 59

*Cole v. Travelers Insurance Co.*, 208 F. Supp. 2d 248 (D.Conn. 2002) ..... 82

*Cooper v. IBM Personal Pension Plan*, 457 F.3d 636 (7th Cir. 2006) ........ 19

*Cooper v. IBM Personal Pension Plan*, 2004 WL 322918 (S.D. Ill. 2004) 88

*Costantino v. TRW*, 13 F.3d 969 (6th Cir. 1994) ....................... 66

*Crocco v. Xerox*, 137 F.3d 105 (2d Cir. 1998) ........................... 79

*Crowley v. Corning, Inc.*, 234 F. Supp. 2d 222 (W.D.N.Y. 2002) ............ 79

*In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005) ...................................................... 93

*Curtiss-Wright v. Schoonejongen*, 514 U.S. 73 (1993) ............................. 87

*Deal v. United States*, 508 U.S. 129 (1993) ................................. 15

*Devlin v Empire Blue Cross and Blue Shield*, 274 F.3d 76 (2d Cir. 2001) . 67

*EEOC v. Jefferson Co. Sheriffs' Department*, 467 F.3d 5761 (6th Cir. 2006) ................................................................................. 22

*EM Ltd. v. Republic of Argentina*, 382 F.3d 291 (2d Cir. 2004) ................... 7

*Engers v. AT&T*, 428 F. Supp. 2d 213 (D.N.J. 2006) ................................ 67

*Engers v. AT&T*, 2006 WL 3359722 (D.N.J. 2006) .................................... 67

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000) ......... 2, 12, 16, 19, 23

*Fallick v. Nationwide Mutual Insurance Co.*, 162 F.3d 410 (6th Cir. 1998) ................................................................................... 74

*Fernandez-Vargas v. Gonzales*, 126 S. Ct. 2422 (2006) ........................... 88

*Frommert v. Conkright,* 433 F.3d 254 (2d Cir. 2006) ......................... *passim*

*Gilley v. Monsanto*, __ F.3d __, 2007 WL 1837114 (11th Cir. 2007) ........ 87

*Gomes v. Avco Corp.*, 964 F.2d 1330 (2d Cir. 1992) .................................. 84

*Gray v. Great American Recreation Association*, 970 F.2d 1081 (2d Cir. 1992) .................................................... 27, 33, 45, 89

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000) ................................................................................... 80

*Harrow v. Prudential Insurance Co.*, 279 F.3d 244 (3d Cir. 2002) ............ 74

*Hirt v. Equitable,* 450 F. Supp. 2d 331 (S.D.N.Y. 2006) ........................... 82

*Hirt v. Equitable*, 2006 WL 2627564 (S.D.N.Y. 2006) .............................. 29

*Hooven v. Exxon Mobil Corp.*, 465 F.3d 566 (3d Cir. 2006) ............... 38, 57

*Hudson v. General Dynamics*, 118 F. Supp. 2d 226 (D.Conn. 2000) ......... 39

*In re J.P. Morgan Chase Cash Balance Litigation,* 460 F. Supp. 2d 479
   (S.D. N.Y. 2006) ............................................................... 86

*Jensen v. Times Mirror Co.*, 634 F. Supp. 304 (D.Conn. 1986) ................ 83

*Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132 (D. Mass. 2004) .. 79

*Langman v. Loeb*, 328 F.3d 68 (2d Cir. 2003) ............................................. 6

*Laurent v. PriceWaterhouseCoopers*, 448 F. Supp. 2d 537 (S.D.N.Y.
   2006) ................................................................................ 47

*Layaou v. Xerox Corp.*, 238 F.3d 205 (2d Cir. 2001) ................................. 47

*Lee v. Burkhart*, 991 F.2d 1004 (2d Cir. 1993) ................................... 78-79

*Manginaro v. Welfare Fund of Local 21*, 21 F. Supp. 2d 284
   (S.D.N.Y. 1998) ............................................................ 64, 82

*Martens v. Thomann*, 273 F.3d 159 (2d Cir. 2001) ................................... 73

*McAuley v. IBM*, 165 F.3d 1038 (6th Cir. 1999) ........................................ 39

*McCarthy v. Associated Clearing Bureau*, 1999 WL 1995185 (D.Conn.
   1999) ................................................................................ 84

*McCarthy v. Dun & Bradstreet*, 482 F.3d 184 (2007) ............................... 48

*Mertens v. Hewitt Associates*, 508 U.S. 248 (1993) .................................. 16

*Miles v. New York State Teamsters Conference Pension Fund*, 698
   F.2d 593 (2d Cir. 1983) ........................................... 81-82, 85

*Mullins v. Pfizer*, 23 F.3d 663 (2d Cir. 1994) ....................................... 32, 38

*Nechis v. Oxford Health Plans*, 421 F.3d 96 (2d Cir. 2005) ................. 74, 77

vii

*Paese v. Hartford Life & Accident Insurance Co.*, 449 F.3d 435 (2d Cir. 2006) ................................................. 74

*Parry v. SBC Corp.*, 363 F. Supp. 2d 275 (D.Conn. 2005) ........................ 75

*Parsons v. AT&T*, 2006 WL 3826694 (D.Conn. 2006) .............................. 86

*RIJ Pharm. Corp. v. Ivax Pharms, Inc.*, 322 F. Supp. 2d 406 (S.D.N.Y. 2004) ................................................. 27

*Register v. PNC Financial*, 477 F.3d 56 (3d Cir. 2007) .......................... 8, 34

*Richards v. FleetBoston Fin. Corp*, 427 F. Supp. 2d 150 (D.Conn. 2006) ................................................. 12, 21, 80

*Richards v. FleetBoston Fin. Corp*, 238 F.R.D. 345 (D.Conn. 2006) ........ 59

*Richards v. FleetBoston Fin. Corp*, 2006 WL 2092086 (D.Conn. 2006) ................................................. 47, 51

*Romero v. Allstate*, 404 F.3d 212 (3d Cir. 2005) ........................... 34, 85-86

*Royal Indemnity Co. v. Wyckoff Heights Hospital*, 953 F. Supp. 460 (E.D.N.Y. 1996) ................................................. 7

*Shane v. Connecticut*, 821 F. Supp. 829 (D.Conn. 1993) ......................... 83

*Shaver v. Siemens*, 2007 WL 1006681 (W.D. Pa. 2007) ............................ 89

*Siegel v. Converters  Transport Inc.*, 714 F.2d 213 (2d Cir. 1983) ............ 83

*Soares v. Connecticut*, 8 F.3d 917 (2d Cir. 1993) ...................... 70

*Sosna v. Iowa*, 419 U.S. 393 (1975) ........................... 73

*Swede v. Rochester Carpenters Pension Fund*, 467 F.3d 216 (2d Cir. 2006) ................................................. 87

viii

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ............................................ 65

*Thomforde v. IBM*, 406 F.3d 500 (8th Cir. 2005) ...................................... 92

*Tootle v. ARINC*, 222 F.R.D. 88 (D. Md. 2004) ......................................... 1

*Travelers Ins. Co. v. 633 Third Associates*, 14 F.3d 114 (2d Cir. 1994) .... 83

*United States Parole Commission v. Geraghty*, 445 U.S. 388 (1980) ........ 73

*Venturini v. Metropolitan Life Insurance Co.*, 55 F. Supp. 2d 119
  (D.Conn. 1999) ..................................................................................... 82

*Wasley Products, Inc. v. Bulkalites*, 2006 WL 3834240 (D. Conn.
  2006) ...................................................................................................... 78

*Weinreb v. Hospital for Joint Diseases Orthopaedic Institute*, 404 F.3d
  167 (2d Cir.2005) ................................................................................. 61

*Weiss v. Regal Collections*, 385 F.3d 337 (3d Cir. 2004) .......................... 73

*Wells v. Harris*, 185 F.R.D. 128 (D.Conn. 1999) ...................................... 83

*White v. Secretary of Health and Human Services*, 654 F. Supp. 888
  (E.D.N.Y. 1987) ..................................................................................... 7

*White v. Sundstrand*, 256 F.3d 580 (7th Cir. 2001) ................................... 13

*White v. White Rose Rood*, 128 F.3d 110 (2d Cir. 1997) ........................... 83

*Williams v. Caterpillar*, 994 F.2d 658 (9th Cir. 1991) ............................... 13

*Wolf v. National Shopmen Pension Fund*, 728 F.2d 182 (3d Cir. 1984) .... 75

## FEDERAL STATUTES, RULES,  REGULATIONS AND
## LEGISLATIVE HISTORY

ERISA §3(7), 29 U.S.C. §1002(7) .............................................................. 42

ix

ERISA §3(16)(A), 29 U.S.C. §1002(16) ................................................. 76

ERISA §102, 29 U.S.C. §1022 ................................................. 32

ERISA §204(b)(1)(B), 29 U.S.C. §1054(b)(1)(B) ..................... 6, 13, 15-17

ERISA §204(b)(1)(H), 29 U.S.C. §1054(b)(1)(H) .............................. *passim*

ERISA §204(b)(2), 29 U.S.C. §1054(b)(2) ........................................... 15-16

ERISA §204(c)(3), 29 U.S.C. §1054(c)(3) ................................................. 19

ERISA §204(g), 29 U.S.C. §1054(g) ........................................................ 13

ERISA §204(h), 29 U.S.C. §1054(h) ................................................. *passim*

ERISA §205(g), 29 U.S.C. §1055(g) ........................................................ 20

IRC §417(e), 26 U.S.C. §417(e) ................................................................ 20

29 C.F.R. 2520.102-2 ................................................. 32, 49-50, 53

29 C.F.R. 2520.104b-4(c) ................................................................ 45

Treas. Reg. 1.401(a)-20 ................................................................ 68

Treas. Reg. 1.401(a)(4)-3 ................................................................ 17

Treas. Reg. 1.401(a)(4)-4(e)(1) ................................................................ 71

Treas. Reg. 1.411(a)-4 ................................................................ 12

Treas. Reg. 1.411(b)-1(b)(3)(iii) ................................................................ 5

Treas. Reg. 1.411(d)-3(g)(6)(ii)(A) ................................................................ 71

Treas. Reg. 1.411(d)-4 ................................................................ 70

Treas. Reg. 1.411(d)-6 ........................................................................ 32

Treas. Reg.  1.417(a)(3)-1(c)(2)(i) ............................................... 72

53 Fed. Reg. 31837 (Aug. 22, 1988) ........................................... 66

H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868 .................... 14

Fed. R. Civ. P. 15(c) .............................................................. 83-84

Fed. R. Civ. P. 19 ..................................................................... 80

## STATE STATUTES

Conn. Gen. Stat. Ann. §52-576 (2006) ................................... 82

Conn. Gen. Stat. Ann. §46a-82(e) ............................................ 83

## MISCELLANEOUS

Albert Feuer, *When Are Releases of Claims for ERISA Plan Benefits Effective?*, 38 J. MARSHALL L. REV. 773, 865-66 (Spring 2005). ......... 94

*Manual for Complex Litig.* (Fourth) ........................................... 93

2000 *Tax Notes Today* (TNT) 62-44 ........................................... 68

James A. Wooten, *The Employee Retirement Income Security Act of 1974* (U.Cal. Press 2004) ............................................................. 20

**Introduction**

There is no dispute that if CIGNA wanted to reduce its employees' future retirement benefits, it could have done so while avoiding "wear-aways" by using an "A + B" formula or similar structural protection. There is also no controversy that CIGNA as a major provider of employee benefits was more than capable of explaining benefit reductions in plain English. While CIGNA will not admit it, it could have also designed a formula that avoided age discrimination. Claude Poulin's testimony and cases like Tootle v. ARINC, 222 F.R.D. 88, 90 n.1 (D. Md. 2004), show this can be done.

CIGNA chose a different path. It designed a formula with substantially-reduced future retirement benefits, which declined further with age, and periods of wear-away with no additional benefits–and it kept its employees in the dark about the deep cuts in their benefits and the insidious effects of a "greater-of" design. CIGNA even instructed its communications people "not to compare the old to the new plans." PFF 306. Worse still, CIGNA led its employees in the opposite direction, telling them that their previously-earned benefits were "fully protected," promising that the benefits under the cash balance benefits would be "comparable" or "larger," and vowing that "Each dollar's worth of [cash balance] credits is a dollar of retirement benefits payable to you."

1

Now, without presenting a single fact witness or document to this effect, CIGNA says that it did not expect for the cash balance formula to turn out this poorly, but even if CIGNA expected it, its only fiduciary duty was to tell employees the "exact amount" of their new cash balance accounts. As at trial, CIGNA brushes aside inconvenient facts and precedents in its rush to conclude that CIGNA bears no responsibility. Thus, CIGNA ignores the evidence that it knew it was cutting benefits while it was heralding the changes as "an overall improvement." In terms of the law, CIGNA repeatedly confines the precedents of this Circuit to "very narrow" facts,[1] or simply ignores them.[2]

Beyond this reply, Plaintiffs have not prepared additional documents in response to CIGNA's voluminous proposed findings, conclusions of law, and responses to Plaintiffs' proposed findings. This Court's Order did not invite or require the parties to file responses to the other party's proposed findings or to prepare new conclusions of law. See Dkt. #246. If it will assist the Court,

---

[1] Dfs. Br. at 20 (Esden); see also id. at 44 (the "only issue" in Esden is a whipsaw calculation of a lump sum; there is "no offset provision" here "as in Frommert"); at 57-58 ("Nor is this a situation where the employer ... misled [participants] into believing the benefits were larger than they were" as in Frommert).

[2] See, e.g., Dfs. Br. at 45-61 (ignoring Frommert's holding on likely prejudice) and id. at 127-30 (ignoring Swede's holdings on relief for ERISA violations).

2

Plaintiffs will, of course, prepare such documents. With respect to CIGNA's proposed findings, Plaintiffs observe that there is more characterization than quotation, e.g., DFF 265-67, 294-95, and that when quotations appear, they are often preceded by inaccurate descriptions, e.g., DFF 128: "Poulin admitted as much at trial ...." when he did not. CIGNA's proposed findings of fact also rely heavily on legal conclusions by the actuarial experts, e.g., DFF 168 and 171, an approach which the Court warned against.[3]

## I.     "WEAR-AWAY" CLAIMS.

### A.     The Periods of "Wear-Away" With No Additional Benefits Violate ERISA's 133⅓% Benefit Accrual Rule.

CIGNA does not dispute that there were periods of one or more years after its cash balance conversion when the members of the class did not earn any additional retirement benefits. Wear-away periods exist whether the benefits payable at early or normal retirement age are examined.[4] Gisela Broderick's and Patricia Flannery's retirement benefits did not increase at all after they were rehired by CIGNA in the year 2000. Ms. Flannery's benefits have not increased

_____

[3] Plaintiffs also observe that virtually all of the factual references in Defendants' brief are off by one, e.g., a cite to DFF 162 is really to DFF 163.

[4] With no supporting citation, Defendants incorrectly assert that "much of Plaintiffs' evidence regarding Count 1 relates to the wear-away of subsidized early retirement benefits." Dfs. Br. at 40 n.30.

after over six years of additional service. PFF 53-59 and 102-3. Plaintiffs have also shown that the normal retirement benefits of Annette Glanz, who was a younger participant, did not increase at all in annuity form in 1998, 1999 and a third year (2000 or 2002 depending on whether Mr. Poulin's or Sher's analysis is used). PFF 60-62 and 104-6.

CIGNA says it should be allowed to set up a Chinese wall within its benefit formulas and satisfy the accrual rules without regard to the "interaction" between the cash balance formula and the prior formula which creates periods with no new accruals. In the disclosure section of its brief, CIGNA admits that the periods of wear-away are the result of the "interaction of various Plan provisions." Dfs. Br. at 66 and 70. But in the backloading section, CIGNA contends that the same "interaction" should be ignored for purposes of compliance, while it continues to apply to limit actual accruals and payments.

Remarkably, CIGNA never explains what benefits Ms. Glanz earned in 1998, 1999 or 2002 under its theory. Nor does CIGNA explain what benefits Ms. Broderick and Ms. Flannery earned in 2000-2004 and 2000-2006, respectively. CIGNA dances around the numbers and fails to address the example in the 133⅓% regulations which shows that an intermediate period of years with little or

no accruals violates this anti-backloading rule. 1.411(b)-1(b)(3)(iii) (Example 3).[5]

Even CIGNA's expert demurred when it came to explaining how CIGNA's Plan satisfies the 133⅓% rule. While Mr. Sher was critical of Plaintiffs' position, he carefully pointed out that he was <u>not</u> showing how the Plan complies with 133⅓% rule. PFF 118. Again, this was not by chance. <u>Charles v. PEPCO</u>, 437 F.Supp.2d 248, 251 (D.Del. 2006), indicates that even if CIGNA's theory about treating each formula separately was accepted, CIGNA would have problems complying with the 133⅓% rule because of the dramatic impact of variable rates of interest in converting account balances to "accrued benefits" payable at retirement age. PFF 31-33 and 44-45.

While judgment should not be granted to CIGNA because it does not show how it satisfies the backloading rules even under its theory, Plaintiffs certainly wish to respond to CIGNA's chief argument against their position, namely, that the 133⅓% rule must be applied without consideration of the "interaction between various Plan provisions"–even if the current amendment provides for such an

---

[5] A recent onslaught of letters from ABC, ERIC, Mr. Sher, and other consultants to the Treasury Department about the IRS position on "greater-of" formulas asks that Treasury modify this regulation, which has been in effect for 30 years. See PFF 113-114 and infra pp. 9-10.

interaction. See Dfs. Br. at 35-37.[6] CIGNA's construction of Section

204(b)(1)(B)(i) raises an interpretive issue which has obviously troubled the Third

Circuit in <u>Register</u> and Judge Hall in <u>Richards</u>. If the "amendment to the plan

which is in effect for the current year" contains an adverse interaction with

previously-earned benefits, is that interaction considered or ignored when the

amendment is "treated as in effect for all other plan years"?

    The problem with CIGNA's approach is that it has the effect of reading out

a critical element of the amendment in effect for the current year, namely, the

interaction with the previously-earned benefits. If the plan says that all employees

accrue additional benefits at a rate of $10 per month, with no interaction with a

previous accrual rate of $5 per month, the "current amendment" clause clearly

allows the "across-the-board increase[] in benefit rates" and the 133⅓% rule is

satisfied even though $10 is more than 133⅓% of $5. See <u>Langman v. Loeb</u>, 328

F.3d 68, 71 (2d Cir. 2003). However, if a plan states that all employees accrue

additional benefits at a rate of $10 per month, except that employees with

---

[6] Defendants contend that Mr. Poulin "admitted" at trial that if the current plan is treated as in effect for all years, there are no wear-aways. *Id*. at 36. However, the passage which CIGNA quotes concerns whether employees hired after the cash balance conversion will have wear-aways. See DFF 165. Mr. Poulin simply affirmed that a pre-condition to wear-away is the existence of a previously-earned benefit, i.e., a "greater of" formulation "wears away" previously-earned benefits instead of offering additional accruals.

previously-accrued benefits at a $20 per month rate will not accrue any benefits in the current and subsequent years until the new formula catches up, CIGNA's approach leads to an absurd result. The negative interaction with previously accrued benefits would be applied in operation, but ignored for purposes of complying with the anti-backloading rules. The result would be fictional "compliance" benefits substituting for real benefit accruals for a number of years before real accruals pick up again. Because this is the very backloading that the rules are designed to prevent, Plaintiffs submit that CIGNA's approach is wrong. The primary constraint of the 133⅓% rule is that the participant must earn an "accrued benefit" in "each plan year" that is "payable at normal retirement age." In the Second Circuit, "payable" "means that payment is owed." EM Ltd. v. Republic of Argentina, 382 F.3d 291, 294 (2d Cir. 2004).[7] It does not mean a fictional payment.

---

[7] See also Royal Indem. Co. v. Wyckoff Heights Hosp., 953 F. Supp. 460, 466 (E.D.N.Y. 1996) ("payable" is defined as "Capable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable. A sum of money is said to be payable when a person is under an obligation to pay it. Payable may therefore signify an obligation to pay at a future time, but, when used without qualification, term normally means that the debt is payable at once, as opposed to "owing"); White v. Secretary of Health and Human Services, 654 F.Supp. 888 (E.D.N.Y. 1987) ("Accrued benefits are defined as benefits due and payable...benefits withheld pursuant to section 402(t)(1)) are never payable. Therefore, benefits withheld under section 402(t)(10) may not accrue").

Other than quoting the Third Circuit's decision in <u>Register v. PNC Finan.</u>, 477 F.3d 56 (3d Cir. 2007), CIGNA offers no reasoning to support that result. Dfs. Br. at 37. Plaintiffs do not hesitate to acknowledge that <u>Register</u> is inconsistent with their position. For compliance purposes, <u>Register</u> simply red pencils any interaction between two or more formulas so the anti-backloading tests can be satisfied with benefits that are not "payable." <u>Register</u> is wrong because it revises the statutory language, is inconsistent with Treasury Department regulations, and does not take the purpose of the accrual rules "seriously." See <u>In re Citigroup</u>, 470 F.Supp.2d 323, 338 (S.D.N.Y. 2006). <u>Register</u>'s revision of the Treasury Department's aggregation regulation as applying only to two or more "co-existing" formulas, 477 F.3d at 72, draws a distinction which is not in the regulation. The notion that a formula does not "co-exist" when it is in the current amendment but is not providing ongoing accruals would insert a new rule into the regulation that the Treasury Department never adopted. Under a "greater of" formula, two or more formulas in the current amendment are used to determine the benefits accrued in the current plan year. The Treasury Department's regulations require aggregation of such formulas. Under <u>Chevron U.S.A. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984), the Treasury Department's position cannot effectively be set aside on a novel ground.

8

CIGNA acts as though it has been unaware that the IRS requires a plan with two or more formulas to aggregate formulas for compliance with the anti-backloading rules. Dfs. Br. at 38. But this regulation has been in effect since 1977 and criticisms of it and a related example in the 133⅓% rule by the American Benefits Council ("ABC") and ERIC, of which CIGNA is a member, date back to 2000 and suggest that CIGNA is aware of this. As the 2003 Conference of Consulting Actuaries audiotape showed at trial, Mr. Sher specifically asked about this and the IRS told him that "You look at the net benefit and when you have ... a period of zero accruals and the other kicks in, it's an issue on a 133 and 1/3." Ex. 52 at 12. An "Action Alert" from ABC states that some of the companies who are members of ABC have already received letters from the IRS about backloading violations from "greater of" transition formulas.[8] Yet another letter by ABC and ERIC about "greater of" formulas was sent to the Treasury Department on July 18, 2007, indicating that there was a recent meeting on this issue.[9]

---

[8]  Available at http://www.americanbenefitscouncil.org/documents/aa01-01.cfm.

[9] Available at http://www.americanbenefitscouncil.org/documents/backloading_groupletter071807.pdf.

In a July 9, 2007 letter to the Treasury Department on behalf of his employer, Buck Consultants, CIGNA's expert, Mr. Sher, now admits that he has been aware of the "IRS Position" concerning "greater of" transition provisions for at least "seven years."[10] At trial, he testified that "as far as I know," the "wearaway situation" has "never been considered to be problematic or raised as problems by the government." PFF 109.[11] As at trial, Mr. Sher criticizes the IRS position (which he previously ascribed to Mr. Poulin) and requests that the issues be viewed in a different way. Contrary to CIGNA's argument founded on a memo from another law firm, see Dfs. Br. at 38-39, Mr. Sher's letter shows that he understands that the "IRS Position" concerns "greater of" formulas where one of the formulas provides a minimum or frozen benefit.[12]

---

[10] Available at http://www.buckconsultants.com/buckconsultants/Portals/0/Documents/PUBLICA TIONS/Buck_Research/Comment_Letters/Comment_to_IRS_CB_Plans_07_09_0 7.pdf

[11] Mr. Sher also stated that in "his experience," benefit formulas are tested separately for compliance in both his expert report and deposition testimony. Ex. 10 at 35 and Ex. 192 at 262.

[12] CIGNA relies on a May 18, 2007 memo from Ivins Phillips & Barker, a Washington law firm specializing in ERISA, which CIGNA attaches as "Exhibit A" and tries to elevate by describing it as an "article." Dfs. Br. at 39 n.29. CIGNA says that Plaintiffs invited this by submitting recent statements from the American Benefits Council (ABC) and the ERISA Industry Committee (ERIC). But Plaintiffs submitted ABC's and ERIC's statements because CIGNA is a member

10

Alternatively, CIGNA seeks to excuse the periods with no accruals by attributing the length of these periods, in large part, to the decline in interest rates after 1997. Dfs. Br. at 27 and 71-76. This is a non-sequitur because ERISA's anti-backloading rules do not contain any exception for years in which interest rates are low (or, e.g., years in which any economic indicator is low). Unless the statute or regulations allow for it, the failure to comply with the accrual rules is not excused by a "hybrid" feature that the plan sponsor designs and gains from by paying lower benefits.

**B.    Section 7.3 of the Plan Violates ERISA Because It Requires Participants to "Elect" Between Forfeiting the Previously-Earned Annuity (Including Any Early Retirement Features) or Forfeiting Any Cash Balance Accruals.**

Although both parties describe CIGNA's formula as a "greater of" formula, CIGNA does not even actually ensure that participants receive the greater of two benefits, but instead provides an "election" in which participants can elect the less valuable of the two. At trial, CIGNA's expert, Mr. Sher, agreed that this is how Section 7.3 operates. Pls. Br. at 25. Exhibit 158 shows, moreover, that Mercer specifically advised CIGNA that any participant electing the cash balance lump sum will "forfeit the value of the early retirement subsidy." PFF 412.

―――――――――――

of both organizations. Ivins Phillips is a law firm, not a membership organization.

11

Treasury regulations in effect since 1988 make clear that the payment of vested benefit accruals cannot be conditioned on the participant giving up other benefits. Treas. Reg. 1.411(a)-4. CIGNA's brief does not distinguish the Treasury regulations or the "election" provided in Section 7.3 of CIGNA's Plan document. Dfs. Br. at 44. CIGNA simply sidesteps the Second Circuit's reliance in Esden, on the same regulations. See 229 F.3d 154, 166-67 (2d Cir. 2000). In the age discrimination portion of its brief, CIGNA describes Esden as a decision which is limited to "accrued benefits." Dfs. Br. at 21. But the election in Section 7.3 applies to "accrued benefits" so the distinction that CIGNA draws will not work.

To counter Esden, CIGNA relies on Judge Hall's ruling in Richards. But whether or not Richards is correctly decided on this issue, it does not address an "election." Under Section 7.3 of CIGNA's Plan, Lillian Jones and Douglas Robinson "elected" cash balance lump sums and thereby gave up protected annuities that were worth nearly twice as much. PFF 403-4 and 417-18. In Richards, there were no such elections. Plaintiffs pointed this out in their opening brief, Pls. Br. at 27-28, and CIGNA does not respond.

Instead, CIGNA turns to Bonovich v. Knights of Columbus, 146 F.3d 57 (2d Cir. 1998), aff'g, 963 F.Supp. 143 (D.Conn. 1997), and three decisions in other circuits, none of which involve elections to forego protected accrued

12

benefits. <u>Bonovich</u>, a case in which Your Honor participated, did not deal with an election. Moreover, the decision specifically states that the renewal commissions whose offset was at issue in that case "cannot be construed as previously earned and deferred wages." 146 F.3d at 62. <u>Campbell v. BankBoston</u>, 327 F.3d 1 (1ˢᵗ Cir. 2003), also did not involve an election and, as CIGNA acknowledges, is limited to whether the anti-cutback protection in ERISA §204(g) was violated.[13]

## II.    "AGE DISCRIMINATION" CLAIMS.

### A.    CIGNA's Argument that the Term "Benefit Accrual" in ERISA §204(b)(1)(H) Does Not Refer to the Change in the "Accrued Benefit" Ignores the Statutory Context and Usage and Ultimately Substitutes a Neologism of "Imputed" "Inputs" for the Statute's Established Terms.

Mr. Poulin's mathematical analysis of CIGNA's cash balance formula is not controversial. In fact, CIGNA internally computed virtually identical "accrual rates." PFF 137. If ERISA §204(b)(1)(H) refers to the rate at which accrued benefits are earned, as §§204(b)(1)(B) and 204(h) do, plaintiffs should prevail. If the statute allows a plan sponsor to use the rate at which imputed "inputs" are credited to a hypothetical account, as <u>Cooper v. IBM</u> permitted, defendants should

---

[13] <u>White v. Sundstrand</u>, 256 F.3d 580 (7ᵗʰ Cir. 2001), and <u>Williams v. Caterpillar</u>, 994 F.2d 658 (9ᵗʰ Cir. 1991), are like <u>Campbell</u> not precedential in this Circuit. Those decisions, too, did not involve elections as in Section 7.3 or the Treasury regulations on which Plaintiffs rely.

prevail. CIGNA attempts to manufacture a controversy about Plaintiffs' or Mr. Poulin's theory not working after 65. Dfs. Br. at 18-20. But this is a diversion.[14]

The central interpretive issue is whether Section 204(b)(1)(H) is best construed by comparing it with the other rules on benefit accruals under defined benefit plans or analogizing it to the rules on allocations under defined contribution plans. An important preliminary point, however, is that CIGNA is not actually requesting that the Court adopt the defined contribution test, which requires actual contributions to an actual individual savings account. CIGNA indirectly acknowledges that it is not requesting this, but asks instead for an as-yet unspecified amalgamation of the defined benefit and defined contribution tests. Dfs. Br. at 9 (there are "several ways that one could measure whether Part B is age discriminatory"), 15 (there are "many ways to calculate a rate of benefit accrual"), 16 n.13, and 26-27 n.22 (benefit accrual "does not have a single self-evident meaning"). CIGNA contends that this is acceptable because the statute is

_____

[14] The 1986 Conference Report indicates that if the Plan's accrual rate is a retirement benefit of $10 per month per year of service, the same "additional benefit of $10 per month" can be offered to those who work past age 65, 1986 U.S.C.C.A.N. 3868, 4026, even though their remaining life expectancies are progressively shorter. Mr. Poulin and Plaintiffs agree with the Conference Report. Defendants' suggestion that Plaintiffs' theory necessitates an $11 per month benefit for a year of service by an employee who is age 66, $12 per month for an employee who is age 67, etc., see DFF 135, is unfounded.

"ambiguous." Dfs. Br. at 12-20.

The indefiniteness of CIGNA's position on how it complies is similar to its approach to the 133⅓% rule. CIGNA criticizes Plaintiffs' position while remaining non-committal on its own. CIGNA's approach to the statute is also wrong for four reasons. First, a statute is not ambiguous because a phrase or word in isolation can be read in different ways. Any dictionary shows that words have different meanings. A word or phrase is only "ambiguous" in a legal sense if the potentially different meanings cannot be resolved by context. See, e.g., Deal v. United States, 508 U.S. 129, 131-32 (1993). Judges Hall, Scheindlin and Baer ruled that the meaning of the term "benefit accrual" can be resolved by context. Section 204(b)(1) regulates benefit accruals under defined benefit plans and Section 204(b)(2) regulates the allocation of monetary contributions under defined contribution plans. For purposes of Section 204, benefit accruals means the change in the accrued benefit, as shown by §204(b)(1)(B) and by §204(h), which was enacted only six months before §204(b)(1)(H).[15] Giving the term "benefit accrual" a meaning that is more akin to the phrase "allocations to the employee's account"

---

[15] CIGNA attempts to distinguish Congress' use of the term "benefit accrual" in Section 204(h) by stating that "[o]bviously" the age discrimination rule "has a different purpose" "so it is reasonable" for the same term to be interpreted "differently." Dfs. Br. at 26 n.22.

in §204(b)(2) and less akin to the accrual rate in §§204(b)(1)(B) and 204(h)

ignores the differences in language and the contextual links.

Second, CIGNA espouses an approach at odds with general principles of

statutory construction and Esden when it encourages this Court not to assume a

consistent use of "rate of benefit accrual" and "accrued benefit" in a defined

benefit plan. Dfs. Br. at 16. Esden holds that the statute must be interpreted

consistently and that the sponsors of cash balance plans cannot "have it both

ways." 229 F.3d at 167 n.8; and see, e.g., Mertens v. Hewitt Assocs., 508 U.S.

248, 260 (1993) (language used in one portion of the statute "should be deemed to

have the same meaning" elsewhere). The sponsors of cash balance plans must

conform with the rules applicable to defined benefit plans which focus "rigidly"

on age-65 annuities. While this has "wide-reaching" regulatory consequences,

Esden, 229 F.3d at 158, ERISA's regulatory scheme was enacted first and in our

nation's legal framework it has priority over the design preferences of plan

sponsors or their consultants. A defined benefit plan cannot measure an accrued

benefit as an age-65 annuity, but measure the rate of benefit accrual as an imputed

contribution to a hypothetical account. This would make a defined benefit plan

fish and fowl. Regardless of any other circuit's views, the Second Circuit has

forbidden this in Esden.

16

CIGNA relatedly contends that it is unclear whether Congress intended for "benefit accrual" in §204(b)(1)(H) to refer to the benefit payable at normal retirement age as it did in §204(b)(1)(B). Dfs. Br. at 14. However, the statutory context and the direction in ERISA §204(b)(1)(H)(v) that "the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals" again provides clear guidance that the statutory rule is directed at normal retirement benefits. In its discussion of wear-aways only a few pages away, CIGNA acknowledges as much. Dfs. Br. at 38.

Third, if the statutory section remains ambiguous after examining its context, the legislative history and the regulatory agencies' use of the term "benefit accrual" can be examined. The 1974 ERISA Conference Report, the 1986 OBRA Conference Report and the Treasury regulations repeatedly show that "benefit accrual" refers to the change in the accrued benefit. Pls. Br. at 33-36.[16]

_____

[16] Even in the 2006 Pension Protection Act, which prospectively legalizes many cash balance formulas, Congress never uses the term "benefit accrual" in any other manner. Instead, it redefined the term "accrued benefit" (the very term which CIGNA maintains is unconnected to §204(b)(1)(H)). See P.L. 109-280, §701(a)(1).

CIGNA contends that the Treasury Department has used the term "benefit accrual" in other ways. But the one example that CIGNA offers in its Proposed Findings (DFF 101) is a red herring. Treas. Reg. 1.401(a)(4)-3 establishes a general test for non-discrimination in favor of highly-compensated employees based on the "normal accrual rate" and "the most valuable accrual rate." In both

As a counterbalance to Plaintiffs' citation of the Treasury Department regulations going back to 1977 on "benefit accrual," CIGNA cites a series of almost identically-worded, one-sentence statements from the Treasury Department, including in administration budget proposals, as an "endorsement of cash balance plans." Dfs. Br. at 24-26. There are three important points which CIGNA ignores. First, these statements never interpret the term "benefit accrual" but rather, in CIGNA's own words, "endorse" a conclusion. As long ago as 1996, CIGNA's consultant, Mercer, recognized that the Treasury's statement is "without explanation." Ex. 19 at EPTO4170. Second, these statements obviously offer a more limited endorsement than Defendants would like. They simply conclude that cash balance formulas are not "inherently" illegal, without reaching the question of whether formulas like CIGNA's violate the law. Third, Congress directed the three Federal agencies (Treasury, Labor and the EEOC) to coordinate interpretations of §204(b)(1)(H). P.L. 99-509, §9204(d). The only coordinated agency views concerning §204(b)(1)(H) were in the 2002 proposed regulations which tried to establish a "special" rule for cash balance formulas but were subsequently withdrawn.

---

instances, the "accrual rate" is the increase in the "accrued benefit ... during the measurement period." 1.401(a)(4)-3(d)(1).

Finally, even if the statute remains ambiguous (at least in a lay sense) after considering context, legislative history and regulatory usage, the courts have the responsibility to make considered, non-legislative decisions to resolve such ambiguities. No authority is provided for a court to say, "Okay, it's ambiguous, let's legislate a rule accommodating to one party or the other's interests." See, e.g., Esden, 229 F.3d at 171 (refusing to reformulate rules to be "more accommodating to the design objectives of cash balance plans"). There is also no judicial authority to amalgamate aspects of the statutory tests for defined benefit and defined contribution plans into a "hybrid" that comports with neither rule. Developing a rule that tests for age discrimination based on "imputed" "inputs" (as the Seventh Circuit did in Cooper v. IBM, 457 F.3d 636, 639-40 (2006)) substitutes "neologisms" for the "legal terminology" used under the statute. See BFP v. Resolution Trust Corp., 511 U.S. 531, 537 (1994). No interpretive principle that the reward for finding and sustaining an ambiguity in a statute is a test based on neologisms. *Id*.

CIGNA falls back on its analogy to the "time value of money." Dfs. Br. at 9-11 and 22-24. Practically all of us use the time value of money in some contexts and Congress uses it in the context of defined benefit retirement plans to determine the present value of accrued benefits as set forth in ERISA §§204(c)(3)

19

and 205(g).[17] However, the time value of money is not implicit in every transaction or statutory rule and an analogy to the time value of money built on hypothetical credits to hypothetical accounts cannot, in particular, create a safe haven for discrimination on the basis of age. As Mr. Poulin testified, benefits under CIGNA's cash balance formula cannot be calculated without reference to the number of years between the participant's current age and age 65. Clearly, defined benefit formulas do not have to function this way. For over a century pension plans such as one initiated by the Pennyslvania Railroad Company in 1900 have calculated the amount of benefits payable in retirement age based on years of service and a percentage of an average of salary. James A. Wooten, The Employee Retirement Income Security Act of 1974 (U.Cal. Press 2004), at 20.[18] CIGNA and its expert now say that it does not make, and presumably has never made, "economic or actuarial sense" to provide two employees with the same years of service and salary but different current ages with the same "age-65 benefit." Dfs. Br. at 8-11. As CIGNA should know based on the line of business in which it is engaged, this is the way defined benefit plans were designed both

---

[17] ERISA §205(g) is more commonly referred to as Code §417(e), which is the parallel provision in the Internal Revenue Code.

[18] Plans for hourly employees sometimes offer a benefit of $X per month for each year of service, rather than a percentage of salary.

20

before and after ERISA. Whatever else may be said, CIGNA was ill-advised to jettison the traditional, non-discriminatory design for one that directly challenges the statutory focus on normal retirement benefits without carefully considering the consequences.

Make no mistake, no one challenges CIGNA's right to control costs. ERISA allows future rates of accrual to be reduced or even frozen across-the-board (after a proper Section 204(h) notice), and it also permits limits which are not based on age. ERISA §204(b)(1)(H)(ii) allows benefits to be either capped at a certain amount or limited after a certain number of years of participation.[19]  The benefits earned in a plan year are not, however, permitted to be reduced based on age, even if an employer or its consultants believe that this is the only result that makes "economic or actuarial sense" and that paying the same age-65 benefit to two employees with equal service and salaries is "nonsensical" or "bizzare[]." Dfs. Br. at 11. Because the amount of retirement benefits earned in a year is "perfectly correlated" with age under CIGNA's cash balance formula, Richards, 427 F.Supp.2d 150, 168 (D.Conn. 2006), CIGNA's formula discriminates.

---

[19] "A plan shall not be treated as failing to meet the requirements of this subparagraph [204(b)(1)(H)(i)] solely because the plan imposes (without regard to age) a limitation on the amount of benefits that the plan provides or a limitation on the number of years of service or participation which are taken into account for purposes of determining benefit accrual under the plan."

One can argue, as CIGNA's expert does, that this discrimination in benefit amounts can be justified on the basis of the increasing actuarial costs to the plan sponsor of providing the same benefit to older employees. But unlike Section 4(a) of the ADEA, ERISA §204(b)(1)(H) and ADEA §4(i) do not offer an affirmative defense based on actual or imputed "costs incurred." Although cited in Plaintiffs' brief, CIGNA does not distinguish the *en banc* ruling in <u>EEOC v. Jefferson Co. Sheriffs' Dept.</u>, 467 F.3d 5761, 572 (6th Cir. 2006), that it is age discrimination for benefits to be calculated "in such a way that an older employee ... receives ... lower monthly payments" than a younger employee.[20]

Just as Congress' views on any number of economic, social and foreign policy issues can change, sometimes in inconsistent directions, Congress' views on ERISA and the ADEA can change. Whatever Congress' views are today, it is clear that the 1986 Congress placed a priority on ensuring that employees accrue retirement benefits for a year of service which are not reduced as they grow older. If a defined benefit plan's rate of benefit accrual is $10 per month per year of service when employees are in their 20's or 30's, that rate of benefit accrual cannot

---

[20] In May of 2007, the Solicitor General of the United States filed a brief in support of the EEOC and in opposition to the defendants' petition for certiorari of the ruling in <u>EEOC v. Jefferson Co</u>. See http://www.usdoj.gov/osg/briefs/2006/0responses/2006-1037.resp.pdf, at 8-9.

be gradually reduced to $9 per month, $8 per month, $7, etc., as an employee moves into his or her 40s, 50s or 60s. Even if an employer could justify such reductions on the basis of the imputed actuarial costs of providing benefits to older workers, ERISA and the ADEA do not recognize that justification. CIGNA is not allowed to do the same thing by calling it a "hybrid" formula and analogizing to the time value of money.

At bottom, CIGNA and its expert are rebelling against the statutory scheme. They argue that equal benefit accruals for older employees in terms of the age-65 benefit does not make "economic or actuarial sense." Dfs. Br. at 11. As <u>Esden</u> and Notice 96-8 show, however, whatever advantages cash balance formulas legitimately bring to the table, e.g., less volatile costs and the alleged simplicity of an hypothetical account, they must comply with the rules for defined benefit plans. For defined benefit plans, the statutory keystone is the normal-retirement-age annuity. As <u>Esden</u> says, this has "wide-reaching" "regulatory consequences," 229 F.3d at 158, which the consultants who designed and promoted "cash balance" formulas evidently did not appreciate. One of them is that when older workers' benefit accruals are compared with younger workers for age discrimination purposes it is the age-65 annuity, not imputed inputs, that matters. The wisdom of having a plan type that is based on age-65 annuities can be debated and changed,

as Congress has done with the PPA. But as a matter of statutory construction there is little room for debate about the proper interpretation of the law as it existed from 1986 to 2006.

This Court should ignore CIGNA's claim that the "economic implications" of the decision is a good reason to see the age discrimination rules its way. Dfs. Br. at 6 and 129-30. As this case has developed, it has become clear that continuing the old pension plan formula because of the absence of the Section 204(h) notice and eliminating the wear-aways have greater financial implications than the pure <u>Cooper v. IBM</u> issue of eliminating age discrimination in rates of accruals under the cash balance formula. As CIGNA advised its Board in 1999, CIGNA's graduated pay credit schedule lessened CIGNA's "vulnerability" to this claim, PFF 140, as does the fact that it employs very few workers who are in their late 50's or 60's. Ex. 201 (showing only 8% of Plan B participants over age 55 and only 3% over age 60). CIGNA introduces no evidence to suggest that the costs of complying with the law "would threaten the solvency of CIGNA's pension plan." Dfs. Br. at 130.

B.    **Even if Age Discrimination Could Be Measured by Costs Incurred, the Periods of "Wear-Away" With No Additional Benefits Violate the Age Discrimination Rule.**

Applying §204(b)(1)(H) to wear-aways is not a theory that Plaintiffs'

24

counsel coined. The IRS Chief Counsel's 1999 Senate testimony recognized that "we are considering the whole range of factors that might indicate a cash balance plan conversion has resulted in age discrimination. For example, we will consider the impact of the wearaway period as it affects employees of different ages." Ex. 532 at 5.

A period of wear-away means that the actual amount of retirement benefit payment that will be made for a year of service and the cost incurred are nil. During a period of wear-away, CIGNA cannot satisfy either the statutory test prescribed for defined benefit plans or the test for defined contribution plans. For Gisela Broderick's and Patricia Flannery's years of service from 2000 to 2004 and 2000 to 2006, there were no actual payments or additional costs incurred by CIGNA. By contrast, for new hires, employees with little or no benefits under the prior formulas, and employees who are not eligible for early retirement benefits under the prior formulas, in other words, younger employees, there were actual payments and costs. PFF 69-70 and 157. For CIGNA to satisfy the age discrimination test, hypothetical credits would have to substitute for actual payments or actual costs incurred.

In its responses to Plaintiffs' proposed findings, CIGNA admits that wear-away is "more likely" for participants who are eligible for early retirement

25

and that "early retirement eligibility is a function of age." See Dfs. Resp. to Pls.

Prop. Findings, ¶¶70 and 134. Yet now CIGNA contends that Plaintiffs have not

provided sufficient evidence of the discrimination for "large groups of older and

younger employees." Br. at 28. CIGNA obviously is not counting its own

responses or the fact that Ms. Amara, Ms. Broderick, Ms. Flannery, Ms. Jones, and

Mr. Robinson are all relatively older employees whose service and salary is not

atypical. CIGNA conveniently forgets that Plaintiffs requested the data to do a

"large group" comparison of periods of wear-away and CIGNA never produced

the key data element for that comparison, namely, the accumulated cash balance

amount. Plaintiffs' Proposed Findings state:

> The Plaintiff class requested electronic data in discovery that would show
> how many participants continued to have protected benefits in excess of
> their cash balance account in each year. Ex. 34 (Req. No. 4). CIGNA has
> not produced the requested data, despite the Plaintiffs' Motion to Compel
> and two Rule 30(b)(6) depositions.

PFF 66. Plaintiffs' pre-trial motion for adverse inferences further stated that

CIGNA was not producing the data needed to show "wear-aways" on a plan-wide

basis. Dkt. # 199 (8/31/2006) at 9. CIGNA cannot suggest after trial that Plaintiffs

should be required to offer proof based on "large groups" when CIGNA prevented

that from happening at trial by not producing the data and presented no

inconsistent evidence of its own (even though it has that data). In fact, when a

party has "especially full knowledge" but does not offer any evidence, an

inference can be drawn against that party. Gray v. Great American Recreation

Ass'n, 970 F.2d 1081, 1082 (2d Cir. 1992) ("The non-appearance of a litigant at

trial or his failure to testify as to facts material to his case as to which he has

especially full knowledge creates an inference that he refrained from appearing or

testifying because the truth, if made to appear, would not aid his contention"); RIJ

Pharm. Corp. v. Ivax Pharms, Inc., 322 F.Supp.2d 406, 419 (S.D.N.Y. 2004)

("where a party fails to provide relevant information within its control...the Court

may infer that the information, if disclosed, would be harmful to the party who

fails to provide it").

    CIGNA alternatively argues that the wear-aways cannot violate

§204(b)(1)(H) because the "subsidized portion of any early retirement benefit is

disregarded in determining benefit accruals." Dfs. Br. at 29-30. Here, CIGNA

relies on a linguistic slight of hand. Plaintiffs are not asking that this Court award

Ms. Broderick or Ms. Flannery "subsidized" early retirement benefits to redress

the ERISA §204(b)(1)(H) violation. Plaintiffs simply contend that older

employees must receive the cash balance benefits that they were promised (which

are by definition "unsubsidized") in addition to the benefits they previously

earned. Ms. Broderick's and Ms. Flannery's benefits did not improve for four and

27

six years, respectively, whether their benefits payable at early or normal retirement age are considered.

If a plan sponsor could take a participant's older age (or a proxy for age like early retirement eligibility) and turn it into a basis for not paying additional accruals, this would open a gaping hole in ERISA's protection. ERISA §204(b)(1)(H) proscribes reductions and cessations in benefit accruals because of age (which must include direct proxies for age). As with the treatment of the "current amendment" under the 133⅓% accrual rule, CIGNA's approach would take a statutory subsection and interpret it in a way that upends the general rule and purpose. The subsection about disregarding the subsidized portion of early retirement benefits should be interpreted to mean what it says, namely, that the accrual of the "subsidized" portion of early retirement benefits is outside of the general rule. Because CIGNA's cash balance formula does not offer subsidized early retirement benefits, this is a moot point here. To satisfy ERISA §204(b)(1)(H), Plaintiffs merely seek to ensure that the unsubsidized cash balance accruals earned after 1997 are actually paid to both older and younger workers alike.

28

III.    "204(h) NOTICE" CLAIMS.

A.      ERISA §204(h) Required CIGNA to Tell Its Employees that
        Their Future Benefits Were Being Significantly Reduced.

ERISA §204(h) was enacted to give employees advance notice of benefit

reductions. The statutory heading and language, Conference Report and case law

all show that "written notice of the reduction" is required. Although the legislative

history is sparse, this was clearly done so that employees may "take steps quickly

to protect themselves as best they can," Hirt, 2006 WL 2627564 *2, including

complaining or bargaining about the reductions, "seeking injunctive relief, altering

retirement investment strategies, or perhaps considering other employment."

Frommert v. Conkright, 433 F.3d F.3d 254, 266 (2d Cir. 2006). The statute

recognizes the importance of "timely action" by requiring the notice to be in

advance. In re Citigroup, 470 F.Supp.2d at 266. Notice at a later date is useful but

advance notice clearly offers possibilities for rollbacks and other modifications

due to negative employee reactions that are less likely to occur later.

Here, Mr. Poulin's calculations and CIGNA's own documents show that

CIGNA's conversion to a cash balance formula produced benefit reductions on the

order of 30-50%. PFF 162-70 and 174-85. Even CIGNA's expert admitted that his

calculations indicate a 0.75% to 0.8% rate of accrual under the cash balance plan

29

compared with around 1.5% under the Tier 1 formula. Tr. 1219, line 13 - 1221, line 13. Furthermore, everyone, including CIGNA, CIGNA's consultant Mercer and CIGNA's expert Mr. Sher, recognizes that without adequate explanations, conversions to cash balance formulas "mask" benefit reductions or make it "difficult to compare" benefits with those under the prior formula so employees understand how much less they will be receiving. Pls. Br. at 55-56. CIGNA admits that exact comparisons are difficult for employees to make on their own. *Id*.

But to this day, CIGNA has <u>never</u> told its employees about how much the cash balance conversion reduced their future retirement benefits. CIGNA's 30(b)(6) witness, Mr. Arko, admitted that the Newsletter gave no notice of reductions. CIGNA called no witnesses to identify disclosures of reductions and admitted in Court that participants would have a "larger benefit" if CIGNA never adopted the cash balance plan. Tr. 908, line 20 - 909, line 1.

Now CIGNA says that all that Section 204(h) required was for employees to receive a "summary" of the cash balance formula, distinguishing this from a "notice of reductions." Even accepting that distinction, Plaintiffs ask: Which communication or communications provides that "summary"? The Newsletter does not summarize the cash balance formula but promises that details will be forthcoming and assures employees that the cash balance changes are

30

"enhancements" and part of an "overall improvement in ... retirement benefits" which will "work well for both longer- and shorter-service employees" and will "build benefits faster" than the old plan. PFF 204 and 231.

The next communication, the Information Kit, might be considered a summary of the cash balance formula in the sense that it offers more details, except that it, too, inaccurately and misleadingly tells the employees that their prior benefits are "fully protected;" the cash balance benefits are generally speaking, "comparable" or "larger;" CIGNA "is not saving any money with the changes;" and they have "plenty of time to take full advantage of the many attractive features." PFF 207, 236-39. In terms of wear-away, the Information Kit reinforces the assurance in the Newsletter of "steadier benefit growth throughout your career" by stating that "Each dollar's worth of credits is a dollar of retirement benefits payable to you." PFF 233 and 241. In other words, CIGNA version of a "summary" of an amendment that unquestionably reduced benefits is one that tells participants, in a variety of ways, that their retirement benefits are <u>not</u> being reduced.

Using the dictionary, a summary is a brief account or abridgement that dispenses with "needless" details or formalities. <u>The Oxford English Reference Dictionary</u> (2d ed.). Under ERISA, a "summary" is also the key word in the

31

summary plan descriptions (SPDs) and summaries of material modification

(SMMs) which are prescribed by ERISA §102 and Labor Department regulations.

Paralleling the statutory and regulatory language for SPDs and SMMs, Treasury

regulations on ERISA §204(h) provide that a summary must be "written in a

manner calculated to be understood by the average plan participant." 1.411(d)-6,

Q&A-10. Labor Department regulations in effect since 1977 provide that a

summary "must not have the effect of misleading, misinforming or failing to

inform participants." 29 C.F.R. 2520.102-2; accord Mullins v. Pfizer, 23 F.3d 663,

668 (2d Cir. 1994) ("a plan administrator may not make affirmative material

misrepresentations to plan participants about changes to an employee pension

benefits plan"). A written communication that inaccurately leads the average plan

participant to believe that his or her benefits are not being reduced cannot qualify

as a "summary" under either the dictionary definition or the regulations.[21]

The only limit on the content of the summary under the 204(h) regulations is

that it "need not explain how the individual benefit of each participant ... will be

_____

[21] CIGNA has also not responded to Plaintiffs' point about how the Treasury
Department's section 204(h) regulations cover plan amendments that indirectly
affect the rate of accruals as well as direct reductions in the dollar amount or
percentage of compensation on which benefit accruals are calculated. Treas. Reg.
1.411(d)-6, Q&A-6. An understandable notice of an amendment that indirectly
reduces benefit accruals has to summarize how the change affects benefits if it is
"calculated to be understood by the average plan participant."

affected by the amendment." 1.411(d)-6, Q&A-10 (emph. added). Plaintiffs have never contended that Section 204(h) requires CIGNA to provide individual, participant-specific calculations. They only ask that this Court rule that CIGNA violated Section 204(h) when it failed to honestly summarize the benefit reductions and instead repeatedly represented that the changes were making benefits "comparable" or "larger."

The evidence, including the communications themselves, Professor Stratman's analysis of the communications, the lay witnesses' testimony, and a specific instruction from CIGNA to the drafter of the communications "not to compare the old to the new plans," shows that CIGNA's Newsletter and its Information Kit were not "calculated to be understood by the average plan participant." PFF 200-254, 302-309 and 338-375. At the trial, CIGNA offered no witnesses or documentary evidence to show that its disclosures were "calculated to be understood." Even if the missing witness inference does not cause an inference to be drawn against CIGNA, it counsels against drawing exculpatory inferences based on facts within CIGNA's "especially full knowledge" which CIGNA chose not to offer in court. See Gray v. Great American Recreation Ass'n, 970 F.2d 1081, 1082 (2d Cir. 1992).

CIGNA's brief is as dismissive of the case law on Section 204(h) as it is of

33

the statutory language, legislative history, and regulations. In its effort to

disconnect the "notice" or "summary" from "reductions," CIGNA never addresses

the statement in the 1986 Conference Report about giving "written notice of the

reduction." See Dfs. Br. at 88-96. In the Second Circuit, <u>Frommert</u> has held that

Section 204(h) was violated when Xerox did not "fully explain[]" how an

amendment reduced future benefits. 433 F.3d at 262. But CIGNA never cites or

distinguishes <u>Frommert</u> in this context. CIGNA also ignores the <u>Romero</u> decision

where the Third Circuit recognized that the 2001 amendments to Section 204(h)

continue the same "basic notice requirement" as before. 404 F.3d at 219 n.4.

CIGNA offers only weak distinctions of the holdings in <u>Hirt</u> and <u>In re Citigroup</u>

that Section 204(h), as originally enacted, requires a "fair warning" of benefit

reductions.[22]

As a fallback, CIGNA abandons the deposition testimony of its Rule

30(b)(6) witness, Mr. Arko (who is the current "Plan administrator"), that the

---

[22] CIGNA distinguishes <u>Hirt</u>'s "approach" as "inconsistent" with the Third Circuit's decision in <u>Register</u> and it distinguishes <u>Citigroup</u> as "inapposite" factually. Dfs. Br. at 90 n.70 and 92 n.72. <u>Register</u> found no Section 204(h) violation in a notice that specifically advised participants that their benefits were being "reduced." 477 F.3d at 72-3. It is difficult to understand how <u>Hirt</u>'s approach is inconsistent with that. It is equally difficult to see how Judge Scheindlin's ruling in <u>Citigroup</u> that Section 204(h) requires "fair warning" was limited to the facts of that case.

Newsletter provided the Section 204(h) notice. PFF 260-69. Now CIGNA suggests that the Newsletter in combination with the Information Kit "and/or" the 1998 SPD tells all–or told enough. Dfs. Br. at 87, 91 and 96. But even if CIGNA can disclaim 30(b)(6) testimony and sweep in later documents for the 204(h) notice, the package of documents still does not disclose reductions or honestly explain the effects of the changes. CIGNA is correct that the Newsletter promises that more information is forthcoming. But CIGNA never delivered any information about benefit reductions or periods of wear-away. In later communications, as in the Newsletter, CIGNA continued to act as if benefit reductions and wear-aways did not exist while affirmatively leading the employees to believe that the results of the cash balance formula are "comparable" or "larger" and that "[e]ach dollar's worth of credits" would be payable to them in retirement. As CIGNA's counsel admitted at trial, the subsequent documents do not tell anyone about their future benefits being cut by the amendment, or potentially eliminated by wear-aways. PFF 256.

Alternatively, CIGNA argues that even if Section 204(h) is interpreted to require disclosure of the effect of the change, CIGNA could be considered to have discharged that obligation by telling employees that their retirement benefits were "frozen" after December 31, 1997. Dfs. Br. at 86-88. However, this ignores two

35

important facts: <u>First</u>, CIGNA did not tell the employees that their retirement

benefits were "frozen" after December 31, 1997. As Professor Stratman explained,

CIGNA's Newsletter and other communications disclose that the old formulas

stop on December 31, 1997 and that a new formula replaces them on January 1,

1998. Tr. at 600, lines 13-17 and 623, line 15 - 624, line 19. <u>Second</u>, there was no

freeze for CIGNA to disclose, but rather a reduction in benefits. A freeze in

benefits is when "employees no longer accrue benefits under the Plan based on

employment on or after" a specific date. See, e.g., <u>Bryerton v. Verizon Communs.</u>

<u>Inc.</u>, 2007 WL 1120290 *2 (S.D.N.Y. 2007). Contending that the millisecond

between December 31, 1997 and January 1, 1998 constitutes a freeze is not a

serious argument. See <u>Brody v. Enhance Reinsurance Co. Pension Plan</u>, 2003 WL

1213084 *11 (S.D.N.Y. 2003) ("It is not so obvious to this Court than when there

is a freeze in benefits, along with the promise of retroactive benefit accruals once

the new Plan is adopted ... any additional benefit accruals at all constitute an

overall increase because the baseline is zero"). Here, January 1, 1998 was not the

date on which a "freeze" started in any meaningful sense of the word (except for

the undisclosed freezes of participants' benefits through the wear-away design).

Instead, January 1, 1998 was the date on which the plan transitioned from "Part A"

formulas that provided benefits at relatively generous levels to a cash balance

36

formula that provided much lower benefits.

With respect to wear-aways, CIGNA argues that Section 204(h), as originally enacted, did not require wear-aways in any way related to early retirement benefits to be disclosed because the Treasury regulations limited the notice to reductions in normal retirement benefits. However, as explained above, Plaintiffs contend that CIGNA failed to give notice that the cash balance accruals, which are by definition unsubsidized, are not actually paid when the wear-away design applies–either at early or normal retirement age.

CIGNA next asserts that it should not be expected to have anticipated significant wear-aways in normal retirement benefits in 1997 because of the unpredictability of future interest rates. If constant future interest rates are assumed (an idea which CIGNA finds in 2003 regulations whose applicability CIGNA otherwise disclaims), CIGNA suggests that the wear-away effect is negligible. Dfs. Br. at 71-76 and 95-96.

CIGNA's argument does not hold water. First, if CIGNA did not disclose benefit reductions, it violated ERISA §204(h) whether or not it also failed to disclose wear-aways. Second, CIGNA had to expect wear-aways from its selection of a "greater of" design with opening balances based on a pre-retirement mortality discount and the exclusion of early retirement benefits, and a lower rate of accrual

37

to catch up with the plan's prior benefits. CIGNA should, furthermore, have anticipated the effects on benefits if interest rates fell because it was adopting a variable interest crediting rate as a hedge against exactly that circumstance. Moreover, between the beginning and end of 1997, 5-year T-bills and 30-year Treasuries had already fallen from 6.33% to 5.77% and from 6.83% to 5.99%, respectively. Between 1997 and 1998, these rates dropped by over 100 basis points.[23]

CIGNA's brief suggests that it will argue that even if rates were already falling, it could not predict whether they might go back up and therefore could not offer participants any forward-looking statements about wear-aways. However, the fact is that CIGNA did make such statements. It promised that "Each dollar's worth of credits is a dollar of retirement benefits payable to you" and that "your benefit will grow steadily throughout your career." PFF 241. Fiduciaries cannot bury their heads in the sand and persist with misleading statements while participants lose benefits. See Mullins v. Pfizer, 23 F.3d 663, 668-69 (2d Cir. 1994); Hooven v. Exxon Mobil Corp., 465 F.3d 566, 578 (3d Cir. 2006) ("statute's SPD provisions implicitly *require* employers and plan administrators to correct

---

[23] See
http://federalreserve.gov/releases/h15/data/Monthly/H15_TCMNOM_Y5.txt and
http://federalreserve.gov/releases/h15/data/Monthly/H15_TCMNOM_Y30.txt.

misleading or incomplete SPDs"); McAuley v. IBM, 165 F.3d 1038, 1046 (6th Cir.

1999).[24]

### B. Plaintiffs Have Shown "Likely Prejudice" from the §204(h) Violation.

CIGNA simply ignores Frommert's ruling that participants can establish

likely prejudice by showing that they could "take timely action in response" to an

amendment reducing benefits, such as "seeking injunctive relief, altering

retirement investment strategies, or perhaps considering other employment." 433

F.3d at 266. In persistently seeking to require something else, CIGNA also ignores

the guiding principle in Burke v. Kodak that the "likely prejudice standard avoids

the use of harsh common law principles to defeat employees claims based on a

federal law designed for their protection." 336 F.3d 103, 113-14 (2d Cir. 2003).

In its brief, CIGNA maintains that there can be no likely prejudice from

"any deficiencies" in its 204(h) notice because it told the participants the "exact

amount" of their cash balance accounts. Dfs. Br. at 58. Essentially, CIGNA's

position is that the statutory policies about the need to disclose reductions are off-

base. According to CIGNA, participants don't need to know how much their

_____

[24] In this District, Broga v. Northeast Utils., 315 F.Supp.2d 212, 250 (D.Conn. 2004) (Squatrito), follows McAuley. Hudson v. General Dynamics, 118 F.Supp.2d 226, 260 (D.Conn. 2000) (Arterton), discusses it but ultimately did not reach the issue.

benefits have been "reduced." They simply need to know what they have left, even
if the amount remaining is expressed in a form that does not allow comparison to
the retirement benefits that they had before. Swindlers should have it so good: Slip
a note under the door with an exact amount on it, no matter that it represents only
a fraction of the monthly income that the person reasonably expected to receive.
According to CIGNA, that's all that a person who has lost nearly everything needs
to know: What he or she has left.

   CIGNA says that Frommert is "inapposite" factually because this is not a
situation where an employer reduced benefits and led participants to believe that
their benefits under the amended plan "were larger than they were." Dfs. Br. at 57-
58. CIGNA evidently forgets that here, too, it reduced benefits and affirmatively
led participants to believe that the cash balance benefits were "comparable" or
"larger." More importantly, there is no indication in Frommert that the principles
for demonstrating likely prejudice are limited to whether the plan has a "phantom
offset" that no one understands, as opposed to a "wear-away" or other reductive
interaction that no one understands.

   As indicated, CIGNA's position is flatly at odds with the statutory policies
on disclosing "reductions." CIGNA actually goes so far as to say that the "Court
need not address the question of whether these [ERISA] communications were

40

deficient" because "the most critical component" of CIGNA's "communications effort" was not the ERISA-required communications at all, but its Total Compensation Reports and individualized account statements. Dfs. Br. at 45-46.

CIGNA asserts that it told employees in these non-ERISA communications what was (at least hypothetically) the "exact amount of their cash balance accounts" and gave them a variety of other information in the Information Kit and SPD, not all of which was inaccurate. Dfs. Br. at 47-54. CIGNA's bottom-line is that "because the exact amount of each Plan participant's cash balance account was explicitly described in the various written disclosures provided to participants, any deficiencies in the ... 1997 Section 204(h) notice did not cause likely harm or constituted harmless error." Dfs. Br. at 58.

CIGNA's position would simply throw the protected class to the wolves. Not only would it be permissible for a company to fail to disclose reductions, it can affirmatively mislead employees to believe that there are no reductions so long as it reveals the "exact amount" of a hypothetical account balance.

Why would CIGNA, a company whose slogan is "a business of caring" and whose communications consistently recognized the importance of retirement planning (PFF 290-96) do this? It is undisputed that when employees retire, they learn that their new "accounts" convert to only a fraction of the retirement income

41

that they need, or if the accounts are not converted to an annuity, they learn that it does not last for many years. See PFF 158. CIGNA's focus, however, was not on what its former employees would eventually come to find out. The important thing for CIGNA was to "dispel any perception of a take-away" (even if true) and thereby "avoid any significant negative reaction from employees." PFF 322-337. CIGNA achieved that goal and the related cost savings that it sought. Now it is simply fighting to hold onto its gains even though likely prejudice from its non-disclosures and misleading disclosures is clearly established.

###### C.    ERISA Also Required Advance Notice of the Change in the "Rehire Rule" So Former CIGNA Employees Would Know that They Were Returning to Work For No Pension Benefits.

The term " participant" "means any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type ...." ERISA §3(7), 29 U.S.C. 1002(7). ERISA Section 204(h) provides that a notice of a significant reduction in future benefit accruals must be provided to "<u>each participant</u> in the plan." The Treasury regulations provide, however, that a section 204(h) notice need not be provided "to any participant whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment." 1.411(d)-6, Q&A-9(a).

Whether former employees satisfy this criteria requires a determination

based on "all relevant facts and circumstances at the time the amendment is

adopted." *Id.*, Q&A-9(b). Thus, if CIGNA wanted to withhold notice of a change

in its Rehire Rule to former employees who might subsequently be rehired, it

needed to make a contemporaneous determination, based on all the facts and

circumstances, that the future benefit accruals of former employees such as Ms.

Broderick, were reasonably expected "not to be" affected by the change in the

Rehire Rule.

CIGNA has never presented any evidence that it made any such

determination. CIGNA's expert, Mr. Sher, also did not offer any fact-based expert

opinion about this issue. Mr. Sher testified that he did not ask CIGNA for any

information concerning the facts and circumstances and CIGNA did not supply it.

PFF 392. Mr. Sher was unaware of elementary facts about how many employees

were rehired in 1998, 1999, etc. and he did not even know what the Rehire Rule

was. *Id*.

Nevertheless, CIGNA's post-trial brief suggests that the issue is "how many

former employees CIGNA anticipated in 1997 that it would be rehiring" and that

its "position is that the Part B [sic] Plan administrator did not anticipate that

CIGNA would hire as many rehires as it subsequently did." Dfs. Br. at 98-99.

CIGNA's formulation of the question differs from the regulatory question: First,

43

any determination not to provide notice had to be made based on the facts and circumstances "at the time the amendment is adopted," which was December 21, 1998–not 1997. Second, the issue is not whether anyone anticipated "CIGNA would hire as many rehires as it subsequently did," but whether it was reasonable to conclude at the end of December 1998 that the number of rehires was so small as to justify not notifying those potentially affected about the change in the Rehire Rule. Third, especially because Q&A-9(a) offers an exception to the statutory duty to provide notice based on a contemporaneous determination, CIGNA bears the burden of establishing that it actually made a contemporaneous determination.

It is undisputed that CIGNA rehired over 2,600 people in 1998 and 1999. PFF 390. In addition to the magnitude of the sheer numbers, it is undisputed that dramatic reductions in future retirement benefits awaited former employees if they accepted offers to return to CIGNA. CIGNA's December 1997 Information Kit shows that CIGNA was aware of the impact of moving older employees to the cash balance formula: There is "not enough time before retirement to recover from this disruption." PFF 393.

Most critically, CIGNA makes no effort to distinguish <u>Frommert</u>'s application of Section 204(h) to another amended "rehire rule."See Dfs. Br. at 96-99. As in <u>Frommert</u>, the change in CIGNA's rehire rule applied only to rehires and

44

it had a dramatic effect on their benefits by setting up an adverse interaction with a "hypothetical" account. CIGNA offers no reason why Section 204(h) would require notice to rehires of a hypothetical offset that could wipe out any additional benefits in <u>Frommert</u> but would require no notice here when the Rehire Rule had the same effect.

The missing witness inference adds to the reasons for finding in favor of the rehired employees on this issue. If CIGNA is now suggesting that it did not anticipate in December of 1998 that there would be enough rehires to justify notice, it should have presented that evidence through documents or a fact witness. Contrary to CIGNA's suggestion, Dfs. Br. at 67 n.49, the missing witness inference applies when facts are within the "especially full knowledge" of a party who fails to present testimony. See <u>Gray v. Great American Recreation Ass'n, Inc.</u>, 970 F.2d 1081, 1082 (2d Cir. 1992).

Lastly, CIGNA offers no defense to the Plaintiffs' point that even if CIGNA could navigate around the Section 204(h) notice requirement, a summary of material modification ("SMM") was required to be distributed to vested separated participants by "July 29, 1999" (see Dfs. Br. at 100 n.79) unless the change "in no way affects such ... vested separated participant's ... rights under the plan." 29 C.F.R. 2520.104b-4(c). CIGNA admits that it provided no such notice of the

45

change in the Rehire Rule. CIGNA circularly argues that the change in the Rehire Rule did not affect rehires "unless and until they were rehired." Dfs. Br. at 101. But again this modifies the regulatory question about whether the change "in no way affects such ... vested separated participant's ... rights under the plan." Obviously, the change in the Rehire Rule affected their rights. Before the change, vested separated participants had the right to be placed back under a reasonably generous retirement benefit formula. After the change, they did not and, in fact, after the change many would wind up earning no additional retirement benefits at all.

As a result of CIGNA's failure to provide either the 204(h) notice or the SMM, employees like Gisela Broderick and Patricia Flannery returned to CIGNA without being told that they were coming back to a retirement plan from which they would derive little or no additional benefits. Both testified that this was one of the reasons that they came back to CIGNA. PFF 349 and 357. If a disclosure obligation is found, CIGNA has stated that it is not challenging "likely prejudice" to the rehires.

IV.   **"SUMMARY PLAN DESCRIPTION (SPD)" CLAIMS.**

A.   **CIGNA's Summary Plan Description and Summary of Material Modifications Omits Any Disclosure of Reductions, Losses or Forfeitures and Falsely Assures Participants that the Cash Balance Benefits Are "Larger" or "Comparable."**

Except to assert that decisions are factually "inapposite," CIGNA's discussion of SPDs does not address the Second Circuit's decisions dating back to Chambless v. Masters, Mates & Pilots, 772 F.2d 1032, 1040 (2d Cir. 1985), requiring that SPDs "fully explain" changes to a plan. See also Layaou, 238 F.3d 205, 210-11 (2d Cir. 2001), Frommert, 433 F.3d at 262. In Richards, Judge Hall specifically ruled that FleetBoston's SPD "failed to explain the full import" of the wear-away provision. 2006 WL 2092086, *8 (D.Conn. 2006).[25]

CIGNA's brief drops its pre-trial effort to distinguish Frommert as involving indirect or hidden reductions. See Defs. 6/27/2006 Br. (dkt. #182) at 54 and 62. That argument will not pass muster because the reductions here are equally indirect and difficult to figure out. In place of that argument CIGNA substitutes silence. In an over 45-page discussion of the disclosure requirements

[25] Laurent v. PriceWaterhouseCoopers, 448 F.Supp.2d 537, 547 (S.D.N.Y. 2006), also recently concluded that an SPD was faulty and that there was likely prejudice when it did not disclose that the plan's normal retirement age was set at a very early date thereby denying participants' information that the plan's benefits were reduced.

for SPDs, SMMs, and 204(h) notices, CIGNA fails to mention <u>Frommert</u>. See Dfs. Br. at 61-108.

CIGNA points to the Second Circuit's decision in <u>McCarthy v. Dun & Bradstreet</u>, 482 F.3d 184 (2007), as though it signals a different era where reductions in benefits will not need to be fully explained. Dfs. Br. at 80. But the SPD in <u>McCarthy</u> said that early retirement benefits would be lower for terminated employees than for actives. The issue there was whether the SPD had to say how much lower by specifying the actuarial assumptions used. 482 F.3d at 194-95.

Because CIGNA's brief focuses so much on minimizing wear-aways, and appears to Plaintiffs' counsel to confuse even that issue, it is best to again frame the issues. Plaintiffs maintain that CIGNA's SPD does not fully explain three of the changes CIGNA's cash balance conversion brought about, namely, (1) the "reductions" in future benefits, (2) the elections offered to participants like Lillian Jones and Douglas Robinson in which the lump sum option was "less valuable than the annuity benefits" they had earned before the conversion, and (3) the wear-away conditions CIGNA placed on the receipt of cash balance benefits. Dkt. # 165 at 13-14, 17.

In its brief as at trial, CIGNA does not dispute that the Information Kit and the SPD, like the earlier Newsletter, did not disclose the 30-50% benefit

48

reductions. CIGNA also does not dispute that neither its SPDs nor any other communications disclosed that participants like Lillian Jones who were eligible for subsidized early retirement benefits could lose a large part of those benefits by electing lump sums. Finally, except for an effort in a footnote which is discussed below, CIGNA does not dispute that the SPD does not identify the wear-away effect or anything similar as a circumstance under which the cash balance pay and interest credits that a participant could reasonably expect to receive will not be paid.

At the most fundamental level, CIGNA maintains that ERISA's disclosure rules do not require any comparative assessments to reveal the impact of changes. Dfs. Br. at 65-66 and 93. This is clearly contrary to what the regulations and case law say: They repeatedly talk about disclosing "reductions," "losses," and "disadvantages." See, e.g., 29 C.F.R. 2520.102-2(b) and 2520.102-3(l). CIGNA's professed aversion to comparisons is, moreover, contrary to what CIGNA actually did. CIGNA repeatedly offered participants comparative assessments about the impact of the cash balance formula (old benefits are "fully protected" new benefits will be "comparable" or "larger" and will "grow steadily throughout your

49

career").[26] The problem was that its assurances were misleading and in violation of the regulations about not hiding the disadvantages of a plan. 29 C.F.R. 2520.102-2(b).

Although CIGNA earlier argues that section 204(h) does not cover wear-aways related to early retirement benefits, Dfs. Br. at 95, it makes no such argument about the SPD. The disclosure requirements for SPDs are clearly not limited to normal retirement benefits. Instead, they cover any benefits that a participant might reasonably expect to receive on the basis of the description of benefits.

Nevertheless CIGNA contends it would have to be "clairvoyant" to predict the "idiosyncratic contingency" of wear-aways. Dfs. Br. at 66-67. At trial, however, CIGNA's expert acknowledged that wear-aways were inevitable from adopting a greater of formula and then discounting the opening cash balance accounts for pre-retirement mortality and not including early retirement benefits in the opening balances. PFF 68, 72, and 98. Indeed, as Mr. Sher stated at a seminar in 1999, the purpose of a "greater of" formulation is to "get rid of the prior

---

[26] Plaintiffs have also shown instances when CIGNA disclosed potential reductions in other communications. PFF 276-77. When CIGNA was doing something that was actually "more favorable," it also had no difficulty disclosing it. See Dfs. Br. at 48; 51 n. 39; 70 n.52, 94 n.73.

formula the fastest." Ex. 66 at P2340. Mr. Sher acknowledged that this was going to affect a "sizeable" number of persons and that it is typical to assess such effects. PFF 72-73.

CIGNA's chief actuary for projects, Andy Hodges, also testified at his 2003 deposition that he was aware of wear-aways at the time of CIGNA's cash balance conversion. His testimony showed that he knew all of the factors discussed at trial; plus he knew that wear-away periods could last up to six years and that this could have been avoided with an A + B formula. PFF 82-84. CIGNA would have to be blind not to have seen these consequences, and the accounting gains accruing to it, from the plan design that it deliberately selected.

CIGNA quotes the "idiosyncratic contingency" language from some of the cases about the information that is required to be covered in an SPDs. Dfs. Br. at 68. But it never addresses Judge Hall's ruling in <u>Richards</u> that the wear-away effect "is not an idiosyncratic contingency." 2006 WL 2092086 *8 (D.Conn. 2006). Although CIGNA now seeks to minimize the time periods, even a one-year period of service with no benefit accruals can hardly be treated as an "idiosyncratic contingency." CIGNA simply offers no defense to the "mathematically impossible" example in the Information Kit which hid the wear-aways resulting from the pre-retirement mortality discounts. Pls. Br. at 62. It

51

also offers no defense to its failure to disclose the wear-away caused by excluding the value of early retirement benefits from opening account balances.

As indicated, CIGNA makes one effort in a footnote to say that it disclosed wear-aways. However, the quote from Professor Stratman's testimony, see Dfs. Br. at 68 n.49, is taken out of context. Professor Stratman testified "that there might be some circumstance in which maybe I don't earn any more" but he went on to say "my theory is that they wouldn't notice this given all of the reassurances up to this point, both in the SPD itself and in the prior communications that we've looked at." He concluded that "in the context of the categorical nature of the statements made about the conversion and the opening account balances ..., they're not going to see this as any type of warning." Tr. 570, lines 8-11 and 571, line 4-8; see also PFF 248-49. CIGNA's misreading of this testimony is shown by the fact that during the cross-examination of Professor Stratman, CIGNA's counsel admitted to the Court that he could not point to any statement in the communications that tells employees that "they were not actually earning retirement benefits." Tr. 597, line 21 - 600, line 9.

At bottom, CIGNA is challenging the statutory disclosure scheme. It maintains that despite the regulatory language and case law about fully explaining the impact of changes and clearly identifying reductions, losses and forfeitures and

52

not minimizing the disadvantages, participants do not actually need any that information. According to CIGNA, all participants need to know is the "exact amount" of their cash balance. Dfs. Br. at 58. Other than legal argumentation, CIGNA offers no expert testimony or other evidence to support that remarkable assertion.

### B.     CIGNA's Efforts to Minimize the Need to Disclose Wear-aways Are Misguided.

Sensing the Court's concern with CIGNA's failure to disclose wear-aways, CIGNA post-trial brief goes to great lengths to downplay the incidence of wear-aways. Although CIGNA did not offer a single defense witness other than Mr. Sher, CIGNA now says that periods of wear-away discussed at trial were not suffered by as many CIGNA participants as might be imagined, or would not have been so long except for the decline in interest rates from the mid-1990's to date. CIGNA's post-trial effort to downplay the incidence of wear-aways is ironic because the Department of Labor's SPD regulations specifically warn that "[a]ny description of exception, limitations, reductions and other restrictions on plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant." 29 C.F.R. 2520.102-2(b). But that is precisely what CIGNA is doing. For instance, CIGNA engages in an entirely unsupported reinterpretation of

the deposition testimony of Andy Hodges, CIGNA's chief actuary for projects. See

Dfs. Br. at 72-73 n.56 and DFF 268.

CIGNA also tries to minimize the incidence of wear-aways incurred by

persons who were eligible (or who grew into eligibility) for early retirement

benefits under the prior formula. Dfs. Br. at 77-78. If CIGNA wanted to offer

evidence about the number of employees eligible for early retirement, it was

certainly within CIGNA's capacity to run an electronic query to determine that

number. But that would risk having one of CIGNA's own witnesses show that

even if this was "only" several hundred people or less than one thousand, it was no

"idiosyncratic contingency." CIGNA's considered failure to present evidence

within its especially full knowledge again warrants the missing witness inference.

There is simply nothing in the ages, service or salaries of Ms. Broderick, Ms.

Flannery, and Ms. Jones which rendered them so atypical or idiosyncratic as to

warrant CIGNA's hiding that they were not earning any additional benefits under

the cash balance regime.

**1.    Wear-aways Should Have Been Disclosed Even if They Would
Not Have Affected as Many People or Lasted as Long with
Higher Interest Rates.**

CIGNA further acts as if it should have no responsibility to disclose wear-

aways because the period of time when participants earned no additional benefits

54

was extended by the decline in interest rates between the mid-1990's and currently. CIGNA's position is wrong for four reasons:

First, as mentioned, there were inevitable periods of wear-away because of CIGNA's selection of a greater-of formulation combined with applying pre-retirement mortality discounts and excluding early retirement benefits in establishing opening accounts. As Mr. Sher's exhibits show, Ms. Glanz had an undisclosed one-year wear-away even if interest rates were constant. PFF 62 and Exs. 234-35. Mr. Sher admitted that Ms. Broderick had an undisclosed one and one-half year wear-away even if interest was held constant and early retirement benefits were ignored. PFF 56. Thus, wear-aways would have happened with or without declines in interest rates; it just would have been less damaging (and less advantageous from an accounting perspective for CIGNA).

Second, there is no question that CIGNA's use of a greater of formula with a variable interest crediting rate to compute accrued benefits predictably produces wear-aways when the tracked indices fall. The plan design inevitably means that employees receive lower benefits and CIGNA realizes actuarial and accounting gains when interest rates fall. The "guaranteed" floor interest rate of 4.5% shows that CIGNA knew that benefit accruals would fall with declining interest rates and would have to be supported to avoid backloading violations. Ex. 50.

55

But even if the interest rate environment was so unpredictable that CIGNA was unable to anticipate, CIGNA certainly had no business telling its employees that "Each dollar's worth of credits is a dollar of retirement benefits payable to you after you are vested" and that their benefits will "grow steadily throughout your career," without qualifying those statements for the entirely predictable consequences of the plan's design.[27]

Third, even if interest was not an appreciable factor in extending the periods of wear-away at the time of the November 1997 Newsletter, it was by the time CIGNA distributed the SPDs. Between November 1997 and CIGNA's October 1998 SPD, 5-year T-bill and 30-year Treasury rates fell from 5.80 % and 6.11 %, respectively, to 4.54 % and 5.25%.[28] Thus, by the time CIGNA prepared and distributed the SPDs interest rates had already fallen by over 100 basis points. Mr. Poulin's and Mr. Sher's testimony both recognize the "dramatic impact" that interest rates can have on the benefits produced by cash balance accounts. PFF 31-33 and 44-45. At a minimum, CIGNA should have corrected its promises about

---

[27] CIGNA's new 2006 SPD discloses the effect that lower interest rates can have on retirement benefits. PFF 224.

[28] See http://federalreserve.gov/releases/h15/data/Monthly/H15_TCMNOM_Y5.txt and http://federalreserve.gov/releases/h15/data/Monthly/H15_TCMNOM_Y30.txt.

"Each dollar's worth of credits" and explained that the formula was now causing thousands of employees not to earn any additional benefits for not just one year, but two or more years. <u>Hooven v. Exxon Mobil Corp.</u>, 465 F.3d 566, 578 (3d Cir. 2006), holds that "the statute's SPD provisions implicitly *require* employers and plan administrators to correct misleading or incomplete SPDs." Emph. in orig.

<u>Fourth</u>, CIGNA has never presented any evidence about what it did, or did not expect in terms of interest rates. Mr. Sher testified that he had no knowledge about what CIGNA expected. Tr. 1030, line 23 - 1031, line 18. CIGNA had the opportunity to present witnesses on whether it expected or did not expect interest rates to decline in 1997, 1998 or 1999 and decided not to do so.

The unrealistically high 6.8 to 8% interest rates that CIGNA continued to use to project benefits in its Total Compensation Reports shows that CIGNA was quite attuned to the effect of interest rates on benefits under the cash balance plan. PFF 188-91. But CIGNA's persistence in using those rates to project benefit from 1998 to 2005–long after rates had dropped to much lower levels–shows that CIGNA had a different agenda than disclosure. PFF 188-91. CIGNA's agenda was not to correct misleading or incomplete statements but to continue the ruse that the cash balance plan was comparable to the old plan.

2. **Wear-aways Should Have Been Disclosed Even if the Duration of the Wear-Away Is Affected by How 'Well Off' People Were Before the Conversion.**

CIGNA suggests that from one perspective wear-aways reflect how "well off" people were before the change. Dfs. Br. at 70 and 74-75. This sounds like the impromptu argument that Mr. Sher made at trial about how he would like to try to persuade Ms. Broderick that she hasn't lost anything. PFF 100. But wear-aways clearly reduce the benefits that participants reasonably expect. Participants reasonably expect to receive their cash balance benefits in addition to their old pension benefits (A + B). They do not expect an interaction in which the promised new pension benefits will net them nothing more. Saying that Ms. Broderick earned additional benefits because the present value of her frozen benefits increased, Dfs. Br. at 74-75, is pure sophistry. When interest rates fell, the increased present value of her previously-earned annuity merely kept her in the same place.

C. **CIGNA's Disclosures Resulted in "Likely Prejudice" to the Participants' Ability to Make Well-Informed Employment and Retirement Decisions.**

CIGNA acts as though Plaintiffs contend that "likely prejudice" must be presumed from any disclosure violation. Dfs. Br. at 55 n.42. Plaintiffs actually laid out four reasons why the Court should find likely prejudice: (1) the defects in the

58

notices themselves, including the misleading statements that the old benefits were fully protected and that the changes were improvements, (2) CIGNA's instructions to Mercer and its own staff "not to compare the old and new plans" and to withhold comparative information in response to individual requests, (3) CIGNA's internal memos going up to the head of HR about dispelling the perception of a take-away to avoid negative employee reactions, and (4) the expert testimony from Professor Stratman and lay testimony from the current and former CIGNA employees about likely prejudice at trial. Pls. Br. at 83-84.

In a footnote, CIGNA suggests that even if it "hid the ball" by combining non-disclosures with misleading statements, this should have no effect on "likely prejudice" but should only be actionable through a separate breach of fiduciary duty action. Dfs. Br. at 58 n.46. It is obvious, however, that the misleading statements are an additional reason to find likely prejudice. If a disclosure omits notice of benefit reductions, it is one thing. But affirmatively telling employees that their benefits will be "comparable" or "larger" causes likely prejudice to be established by the "defects" in the disclosures "themselves." Citigroup, 241 F.R.D. 172, 179 (S.D.N.Y. 2006) (citing Richards, 238 F.R.D. 345, 349 (D.Conn. 2006)).

As with likely prejudice from the 204(h) notices, CIGNA's bottom-line is that there should be no "likely prejudice" from the deficiencies in the SPD/SMMs

59

because all employees need to know is the "exact amount" of their cash balance accounts. Dfs. Br. at 58-59. Again, CIGNA's position would eradicate virtually all of ERISA's disclosure requirements. CIGNA's position is simply at odds with the legislative priorities and with the Second Circuit's holding in <u>Frommert</u>. If all the <u>Frommert</u> plaintiffs needed to know was the exact amount of their benefits after the phantom offset, the Second Circuit should have ruled for Xerox. CIGNA also has no answer to the rulings in <u>Frommert</u> and <u>Richards</u> that likely prejudice results from leading participants to believe that reductions are "not components" of the changes when they actually are.

CIGNA argues that putting aside some of the kinds of actions described in <u>Frommert</u>, there is nothing any of the individuals affected by the inadequate disclosures could have done differently. Dfs. Br. at 56-57. CIGNA does not address the points that <u>Layaou</u> made in response to Xerox's virtually identical argument. Pls. Br. at 85-86. CIGNA also ignores the plain fact that the employees could have taken different actions even of the type that CIGNA describes. For instance, Patricia Flannery could have taken a job with another company and begun drawing her early retirement benefits from CIGNA immediately if she had known that she was returning to a "no pension" situation with CIGNA. PFF 357. Barbara Hogan testified that she had two job offers at the time of the cash balance

conversion, but did not leave CIGNA because she "trusted" the pension changes were going to be satisfactory. PFF 375. And Lillian Jones clearly could have elected an annuity if CIGNA had told her that she was giving up $80,000 in value by electing a lump sum. PFF 418.

CIGNA tries to say that proof of likely prejudice should require proof by the plaintiffs of actual harm, see Dfs. Br. at 47 n.34 (likely harm and harmless error are "two sides of the same coin"). But this would turn the likely prejudice standard into the harsh requirement that <u>Burke</u> expressly rejected, 336 F.3d at 112, and would shift the burden of establishing harmless error from the defendant to the plaintiff. Here, Plaintiffs have shown likely prejudice by showing that the disclosures likely caused average plan participants to misunderstand the plan in material ways and that there are many actions that could have been taken had honest disclosures been made, such as complaining about the changes and altering their employment and retirement decisions. PFF 344-375.

### D.    CIGNA Has Not Come Close to Meeting Its Burden of Showing that Its Inadequate and Misleading Disclosures Were "Harmless Error"

The Second Circuit defines "harmless error" as actual knowledge of the information that was unlawfully withheld. See *Frommert*, 433 F.3d at 272; *Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 171-72 (2d

Cir.2005). CIGNA suggests that its omissions and misleading statements were

harmless because its annual statements and Total Compensation Reports ("TCRs")

made up for any deficiencies in the ERISA-required disclosures, for example, by

providing participants with the account balance and an individualized statement

about how their opening account balances were calculated. Dfs. Br. at 50. But

there were simply no disclosures in those statements about benefit reductions or

wear-aways. Instead, the annual statements and TCRs falsely heralded benefit

credits and amounts that "CIGNA pays" which were not actually paid during the

wear-away periods. Ms. Broderick offered vivid testimony about the benefit

credits shown in the annual statements and about the amounts shown in the TCRs

that "CIGNA Pays": "Q: Did you assume you were actually going to get the

money that was on those pages? A: I was assuming that my account was growing

by that amount." "Q: Did you get any of that money? A: No I didn't get any of that

money." Tr. 104, line 5 - 107, line 9.

   As stated above, the TCRs that CIGNA now offers as establishing harmless

error are the same documents that continued to project future benefits using

unrealistic 6.8 to 8% interest assumptions up until 2005 so as to hide the

reductions long after interest rates had fallen to around 5%. PFF 188-90. The

evidence again indicates that this was not happenstance: There were internal

discussions about "adjusting the assumptions" in graphs, "reassur[ing] those with concerns about having 'sufficient retirement income'," and additional instructions not to disclose any comparative information in response to individual requests. PFF 189-194, 306 and 310-11.

CIGNA also makes the outlandish claim that the "Plaintiffs and the class members who testified at trial made it clear that any deficiencies in the 1998 and 1999 SPDs and the 1997 Section 204(h) notice were plainly harmless error." Dfs. Br. at 59 and 61 (emph. added). As support for this assertion, CIGNA offers a series of bulleted points with inaccurate and incomplete statements. Even accepting those points, the material never comes remotely close to showing "harmless error. Dfs. Br. at 59-61 and 52-54.

To illustrate, CIGNA suggests that Gigi Broderick "never prepared a financial plan." Dfs. Br. at 54. But Ms. Broderick's testimony showed that she suffered likely prejudice by accepting an offer to return to CIGNA not knowing that there would be no pension, not asking for more compensation when she had the opportunity, and not saving more because she did not understand the losses until this litigation. Ms. Broderick's deposition showed, moreover, that while she and her husband, like most people, do not have a written financial plan they have engaged in planning for their retirements for years. Ex. 565 at 23, lines 4-16; see

also Tr. 138, line 17 - 139, line 7. There is nothing in her testimony that even remotely shows "harmless error."

CIGNA's bullet points also criticize Ms. Glanz and Ms. Broderick for not reviewing the SPD more carefully or sooner than they did, Dfs. Br. at 59. But the fact is that no matter how quickly or how often anyone read the SPD it would not tell them about benefit reductions or wear-aways because the information was simply not there. In addition to Professor Stratman's testimony, Ms. Hogan testified about how she and co-workers went through the SPD and "looked for any kind of information in there saying it was going to be reduced" but could find nothing except statements that the plan was "enhanced." PFF 374.[29]

### E.    CIGNA Had "Fair Notice" under Rule 8 of the SMM Claim.

CIGNA questions whether the original or the amended Complaints provide CIGNA with fair notice of the allegation that CIGNA has not complied with the rules for summaries of material modification (SMM's). Dfs. Br. at 99-102. However, the regulations cited in Claim 2 of the original and all the amended Complaints apply to both SPDs and SMMs, and the misleading language which is

---

[29] In Burke, 336 F.3d at 113, the Second Circuit cited Manginaro v. Welfare Fund of Local 21, 21 F.Supp.2d 284 (S.D.N.Y. 1998), as a "useful illustration" of how "likely prejudice" is established and quoted the district court's conclusion that Manginaro could have learned about the limitation, if it had been disclosed, for his co-workers or union "even if he never read the SPD himself."

specifically quoted in that Claim about "Each dollar's worth of credits ..." is

located not only in CIGNA's SPD but also in the Retirement Information Kit

which CIGNA contends was an SMM.

Furthermore, a Rule 30(b)(6) deposition was taken in July 2003 specifically

on CIGNA's compliance with ERISA's disclosure requirements, including the

requirements for SMMs. Exs. 21 and 194. In addition, CIGNA is presently relying

on the aforementioned Retirement Information Kit to serve not only as an SMM,

but also as its 204(h) notice. Dfs. Br. at 87, 91, and 96. Given that position, it is

difficult to understand how the compliance of the Information Kit could not be at

issue in this case. Finally and most decisively, this Court's March 12, 2007 Order

on the class claims, issues and defenses specifically recognizes that compliance

with the rules for SPDs and SMMs is a claim or issue in this case. Dkt. #241 at 4.

Against this background, it is outlandish for CIGNA to maintain that it

lacked fair notice that the compliance of the Retirement Information Kit with

ERISA's disclosure requirements was at issue in this case. See Swierkiewicz v.

Sorema, 534 U.S. 506, 513-14 (2002) (Rule 8(a)'s "simplified notice pleading

standard relies on liberal discovery rules and summary judgment motions to define

disputed facts and issues"; exceptions requiring "greater particularity" are not to

be extended); Bell Atl. Corp. v. Twombly, 550 U.S. __, 127 S.Ct. 1955, 1974

(2007).

## V.    "RELATIVE VALUE" CLAIMS.

### A.    CIGNA Did Not Disclose the Relative Value of Optional Forms of Benefit as Required by Treasury Regulations In Effect Since 1988.

The Treasury Department's 1988 regulations on disclosing the relative

value of benefit options were clear, as was the rule in Section 7.1(b) of CIGNA's

Plan document: Participants must receive an explanation of the relative value of

benefit options, including the extent to which any benefit option is "subsidized."

The purpose of the regulations was to keep participants from unknowingly losing

"retirement subsidies" consistent with Congress' strategy in the 1984 Retirement

Equity Act. <u>Costantino v. TRW</u>, 13 F.3d 969, 979-80 (6th Cir. 1994). The remedy

for a violation is also clear: "No consent is valid" without the explanation.

Contrary to Defendants' suggestion (Dfs. Br. at 2 and 116-17)[30], Plaintiffs'

relative value claim does not depend on the 2003 relative value regulations. The

1988 regulations made clear that companies had to explain the relative value of

options. 1.401(a)-20, Q&A 36 (53 Fed. Reg. 31849). The new regulations require

a quantitative, "participant-specific" comparison that was not required by the old

---

[30] CIGNA's brief inexplicably changes the term "relative value" to "present value" and continues that usage throughout its brief.

regulations. 1.417(a)(3)-1(c)(2).

Engers v. AT&T, 428 F.Supp.2d 213 (D.N.J. 2006), a case which one of

Amara's counsel handles, is not to the contrary. See Dfs. Br. at 116. In response to

the plaintiffs' motion for reconsideration, Judge Linares acknowledged that he did

not "specifically analyze" the "relative values" claim that the Plaintiffs had made

based on the 1988 regulations because he "had already determined that Plaintiffs

were unable to bring such a claim." 2006 WL 3359722, *4 (D.N.J. 2006).[31]

A January 28, 2000 letter to the Secretary of the Treasury from Senator Tom

Harkin provides further disproof of CIGNA's position. Senator Harkin is credited

with having awakened the agencies to the lack of compliance with the 1988

relative value regulations. In his letter, Senator Harkin states that "In recognition

of the necessity for full and complete disclosures, Treasury has issued regulations

under the corresponding provisions of the Internal Revenue Code" and "[t]o

emphasize the importance of this requirement, Treasury repeated the

requirement–employees must receive 'an explanation of the relative values' of the

optional forms–in two additional regulations." However, as here:

The information uncovered by my staff suggests that many employers not

------

[31] The Second Circuit rejected the analysis on which Judge Linares based
that separate determination in Devlin v Empire Blue Cross and Blue Shield, 274
F.3d 76, 89-90 (2d Cir. 2001).

only fail to 'explain' the 'relative values' of the optional forms of benefit, but some employers may in fact present the options in a manner intended to hide the fact that the annuity form of benefit has a 'value' substantially greater than the lump sum.

Senator Harkin continued that it has:

apparently become the norm for a large number of companies to simply list the dollar amount of the available lump-sum payment along with the dollar amount of numerous annuity payment options. Almost uniformly, employers provide employees with pieces of paper which make little or no effort to explain the relative values of the different forms of payment. In the final analysis, they 'disclose' nothing.

Far from writing off the existing regulations, Senator Harkin concluded that:

Failure to give employees clear, understandable information that a lump-sum payment has far less value than an annuity is reprehensible, and, I believe, illegal. A fair interpretation of the IRS regulations, enforceable under ERISA by DOL, requires that employees receive full disclosure.

2000 TNT 62-44 (available in Lexis).

No reasonable argument can be made that CIGNA complies with the 1988 relative value regulation, or with Section 7.1(b) of its own Plan which requires "sufficient additional information to explain the relative values" of the options "available under the Plan". Ex. 1. Disclosure of benefit amounts is not the same as explaining their relative value, including "the extent to which optional forms are subsidized relative to the normal form of benefit." Treas. Reg. 1.401(a)-20, Q&A 36.

68

Is there <u>anything</u> in CIGNA's benefit election form or related material that can plausibly pass for an explanation of relative value? CIGNA's expert, Mr. Sher, reviewed the form and the related materials and admitted that there was nothing. PFF 428. Now CIGNA asserts that only disclosing "the amounts of the different benefits without any comparison of present values" is "typical" and that it should be sufficient. Dfs. Br. at 116. But CIGNA never explains how this complies with the regulatory or Section 7.1(b) requirement for an explanation and never grapples with how employees would know whether one option was "subsidized" from the "amounts" it provided. Even Lorraine Morris, the head of Prudential's Retirement & Investment Services division, could not figure out which of Lillian Jones' benefit options was more valuable. PFF 425. Mr. Poulin had to apply his actuarial skills to determine that the annuity form was worth $80,000. *Id*. at 418.

CIGNA's position that it did not comply with the 1988 regulations because it was waiting for more specific guidance is also undermined by the fact that when the more specific quantitative guidance was provided, CIGNA did not comply with it. CIGNA concedes that it did not comply with the requirements for quantitative comparisons of relative values from October 2004 until May 2006 when Rule 30(b)(6) depositions were taken on this issue. Dfs. Br. at 118.

In failing to tell participants like Lillian Jones that they were forfeiting

69

valuable benefits by electing lump sums, CIGNA violated (1) the duty to clearly identify circumstances in the SPD in which benefits can be lost or forfeited, (2) the requirement in Section 7.1(b) of CIGNA's Plan to give an explanation of the relative values, and (3) the 1988 relative value regulations. Again, CIGNA was not merely silent. Instead, it told participants that the "lump sum distribution option can be very valuable" and it told them participants that the opening cash balance accounts "fully protected" their old benefits. It never revealed Mercer's warning that subsidized early retirement benefits would be "forfeit[ed]" when participants (like Lillian Jones) elect lump sum distributions. PFF 412.

CIGNA's brief does not distinguish the Second Circuit's decision in Soares v. Connecticut, 8 F.3d 917, 921 (2d Cir. 1993), that the non-compliance of other persons or companies with a rule is not a defense. Moreover, there was no testimony that the non-compliance of others was the reason for CIGNA's non-compliance.

The Treasury Regulations show that CIGNA was also required to disclose the relative value of benefit options to participants like Douglas Robinson (and Janice Amara) who separated from service before age 55. The Treasury regulations provide that the optional forms of benefits that must be explained include any option with a later commencement date. Treas. Reg. 1.411(d)-4,

70

Q&A-1(b)(1); see also 1.411(d)-3(g)(6)(ii)(A) and 1.401(a)(4)-4(e)(1).[32] In line

with this, the benefit election form that CIGNA automatically sent to employees

like Robinson tells them that there is a deferred option. However, CIGNA's form

misleadingly tells employees that they will only earn interest by electing that

option when they could actually receive a benefit that is worth over twice as much

in Mr. Robinson's case. CIGNA's brief compounds this error by misleading the

Court about what was on its form, incorrectly stating that it "accurately reflected

the benefit options available to him." Dfs. Br. at 118 n.100.

CIGNA also maintains that disclosures were not required to be given to the

group of class members affected by the Depenbrock v. CIGNA decision, Dfs. Br.

at 118 n.101, even though those elections went out after October 2004, when the

new quantitative regulations took effect. Those regulations require that a

"description of the relative value of an optional form of benefit" "must be

expressed to the participant in a manner that provides a meaningful comparison of

the relative economic values of the two forms of benefit without the participant

having to make calculations using interest or mortality assumptions." Treas. Reg.

---

[32] CIGNA quotes the regulatory language that optional forms of benefit
include benefits that "differ in terms relating to the ... commencement" of the
benefit, but it never comes to grips with the meaning of those words. Dfs. Br. at
117-18.

1.417(a)(3)-1(c)(2)(i). There is no exception for elections like those that CIGNA

devised after the <u>Depenbrock</u> case.

> **B.    The Named Plaintiffs Have Standing to Bring the Relative Value Claim; Exhaustion Is Not Required for Statutory Claims; Moreover, Plaintiffs Amara and Broderick Exhausted CIGNA's Claims Procedures.**

To avoid an adverse ruling on the relative value claim, CIGNA's brief seeks

to reopen the issue of class certification. CIGNA says that the relative value

disclosure claim was "never certified for classwide treatment by this Court." Dfs.

Br. at 3 and 112 n.94. But CIGNA ignores the fact that this Court issued a March

12, 2007 Order defining the class claims and issues. That Order specifically covers

the relative value disclosure claim. Dkt. # 241 at page 7.

Moreover, before the Complaint was amended in June 2005 to add the

Section 204(h) and relative value claim claims, CIGNA raised "standing" issues

and asked for an additional class representative on the 204(h) claim. CIGNA did

not ask for an additional representative on the relative value claim as a condition

to that amendment, even though the Court made clear that it did not want the case

to be sidetracked on standing issues and would allow additional representatives to

be added. Now CIGNA asks for the relative value claim to be dismissed for lack of

standing, Dfs. Br. at 112-14, even though it failed to do so earlier.

72

CIGNA anticipates that if standing remains an issue, the Court could invite the addition of another class representative such as Lillian Jones. But CIGNA has an answer for this, too: It contends that Ms. Jones cannot be added as a named Plaintiff because she did not exhaust. Dfs. Br. at 114 n.96.

CIGNA's positions on standing and exhaustion are misguided for four reasons: (1) standing is not nullified when a plaintiff's individual claim becomes moot after certification of the class, (2) exhaustion is not required for statutory claims, (3) exhaustion would be futile as shown by CIGNA's position that ERISA did not require disclosures of relative value until the new regulations took effect in October 2004, and (4) Ms. Amara and Ms. Broderick already exhausted CIGNA's claims procedure.

First, it is well-established that standing is not nullified when a plaintiff's individual claim becomes moot after certification of the class. See Martens v. Thomann, 273 F.3d 159, 173 (2d Cir. 2001) ("Although, upon certification of a class, the class representative must have individual standing," "class representatives may continue to represent a class even if their individual claims become moot," following United States Parole Comm'n v. Geraghty, 445 U.S. 388, 404 (1980) and Sosna v. Iowa, 419 U.S. 393, 402 (1975)); Weiss v. Regal Collections, 385 F.3d 337, 342 (3d Cir. 2004) ("once a class has been certified,

mooting a class representative's claim does not moot the entire action because the class acquires a legal status separate from the interest asserted by the named plaintiff"). Claims frequently become moot on an individual basis after a case is certified. Even if Ms. Amara obtained complete relief in March 2005 as a result of the <u>Depenbrock</u> decision and Ms. Broderick avoided the harm from CIGNA's failure to disclose the relative value of benefit options in November 2004, Ex. 38 and 46, they had standing to raise that claim at the time the case was certified.

Second, exhaustion is not required for claims arising from violations of statutory standards. See, e.g., <u>Nechis v. Oxford Health Plans</u>, 421 F.3d 96, 102 (2d Cir. 2005) ("This circuit has not addressed the specific question whether exhaustion is required for statutory claims," but "[d]istrict courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation"); accord <u>Harrow v. Prudential Ins. Co.</u>, 279 F.3d 244, 252 (3d Cir. 2002).

Third, any requirement of exhaustion is subject to futility and similar equitable considerations. <u>Paese v. Hartford Life & Accident Ins. Co.</u>, 449 F.3d 435, 444 (2d Cir. 2006). When a company has a firm, plan-wide position against providing relief for a statutory issue, exhaustion is not required for an action to assert the rights "granted by ERISA itself." <u>Fallick v. Nationwide Mut. Ins. Co.</u>,

74

162 F.3d 410, 418 (6th Cir. 1998). In this instance, futility is shown by CIGNA's

firm, across-the-board position that ERISA does not require disclosures of the

relative value of benefit options.

Finally, ERISA only requires claims exhaustion; it does not require

plaintiffs "to raise every legal theory on which they base their claim for benefits in

order to exhaust." Parry v. SBC Corp., 363 F.Supp.2d 275, 304 (D.Conn. 2005);

accord Wolf v. Nat'l Shopmen Pension Fund, 728 F.2d 182, 186 (3d Cir. 1984)

(defendant said plaintiff did not exhaust particular issue, which was effectiveness

of waiver of 50% survivor's benefit). Here, both Ms. Amara and Ms. Broderick

exhausted CIGNA's claim procedure without success. Ms. Amara's claim included

CIGNA's failure to notify her about protected benefits. In response, CIGNA stated

that the errors were "inadvertent[]" and denied that it was systemically doing

anything wrong. Ex. 552 at 2. As stated in the motion for leave to amend, the

Complaint put CIGNA on notice that the claims included CIGNA's failure to

protect and notify participants about their protected benefits. See Mot. at 3-4 (dkt.

#112).

## VI.    CIGNA Is the "Plan Administrator" For Disclosure Purposes Because CIGNA Controlled the Disclosures and No Other Person Is Designated in the Plan Document.

The original and amended Complaints name CIGNA as a defendant in its

capacity as the plan sponsor and the plan administrator, and through a Corporate

Benefit Plan Committee, as a named fiduciary. Dkt. #165 ¶10. The Plan document

states that the Corporate Benefit Plan Committee "shall delegate to a Plan

Administrator certain duties, authority and functions," but the Plan document does

not designate any person as the Plan Administrator. Ex. 1 at Section 13.1. In

discovery in September 2006, CIGNA produced an internal memo in which the

head of HR appointed an individual CIGNA employee who is now retired, Stewart

Beltz, as the plan administrator for all of CIGNA's benefit plans. Ex. 204. Now

CIGNA maintains that the class's disclosure claims must be denied because

Plaintiffs did not name Mr. Beltz as an additional defendant. Dfs. Br. at 104-108

and 118-19.

ERISA §3(16)(A), 29 U.S.C. 1002(16)(A), defines the "plan administrator"

as "the person specifically so designated by the terms of the instrument under

which the plan is operated" and "if an administrator is not so designated, the plan

sponsor."[33]   In <u>Nechis v. Oxford Health Plans</u>, 421 F.3d 96, 104 (2d Cir. 2005),

---

[33] Treasury Regulation 1.414(g)-1 likewise shows that the test is whether "the instrument under which the plan is operated specifically designates a person as plan administrator of the plan." "If no person is specifically designated ... by the instrument under which the plan is established or operated," "[i]n the case of a plan maintained by a single employer, the employer is the plan administrator." If the plan administrator cannot be determined by application of these rules, "the plan administrator is the person or persons actually responsible ... for the control,

the employer was the default plan administrator when Oxford Health, the third-party administrator and operator, was not designated as such in the plan document.

There is no question that Mr. Beltz was not named in the "instrument under which the plan is operated," i.e, the Plan document or any plan amendment, as the plan administrator. Ex. 1. He was simply a CIGNA employee who was appointed by the head of HR to have certain responsibilities as part of his job. Mr. Beltz never had any responsibilities outside of his employment relationship with CIGNA.

Moreover, Mr. Beltz had no responsibilities for disclosures. All of the disclosures in question were prepared and distributed by CIGNA and were designated as CIGNA communications. PFF 271-72. Another CIGNA employee named Denise Hill was "personally responsible for managing the communications process to employees." PFF 273. And CIGNA, not Mr. Beltz, was responsible for instructing the drafter of the communications "not to compare the old to the new plans." PFF 306.[34]

_____

disposition, or management of the cash or property" of the plan, which again would be the employer in the case of a single-employer plan.

[34] When Plaintiffs took a Rule 30(b)(6) deposition on CIGNA's disclosures in 2003, the witness was asked whether he contacted Mr. Beltz for any information about the 204(h) notice or tried to determine whether he had any documents related to the notice. The witness responded that he did not. Ex. 194 at 51.

Wasley Prods., Inc. v. Bulkalites, 2006 WL 3834240 *5-6 (D. Conn. 2006), establishes that the "employer/principal may be held vicariously liable under ERISA for the acts of its employee when the employee breaches fiduciary duties while acting within the scope of his employment." CIGNA unconvincingly tries to distinguish Wasley on the ground that "the fiduciary duties at issue did not involve statutory obligations specifically placed on plan administrators." Dfs. Br. 107. CIGNA also makes a disingenuous argument that the agency relationship required for respondeat superior cannot exist because a Plan administrator is a fiduciary who must act for the benefit of the participants. Dfs. Br. at 108 n.90.

Plaintiffs believe the flaws in CIGNA's reasoning can be further seen in the following example: Suppose CIGNA went into the plan administrator business and detailed an employee like Mr. Beltz to serve as the plan administrator for another company's pension plan. Obviously, extensive and very specific provisions would have to be drafted in a contract before Mr. Beltz rather than CIGNA would be held liable for any mistakes. The situation is no different if CIGNA details Mr. Beltz to its own Plan. CIGNA, not Mr. Beltz, is responsible for any mistakes.

Lee v. Burkhart, 991 F.2d 1004 (2d Cir. 1993), does not limit the doctrine of respondeat superior in the ERISA context. As CIGNA says, Lee rejected the claim that an insurance company under contract to provide management services in the

78

administration of an employer's health insurance plan was an unnamed plan

administrator. 991 F.2d at 1010. Lee v. Burkhart specifically states that "unless the

plan sponsor, in this case P&W, designates another party to provide the disclosure

mandated by ERISA, the duty to make such disclosure is on the plan sponsor." *Id*.

Nor does any other case within the Second Circuit case reject the principle

of respondeat superior. CIGNA says that Crowley v. Corning, Inc., 234 F.Supp.2d

222, 228 (W.D.N.Y. 2002), rejected the principle of respondeat superior

"outright." Dfs. Br. at 107. But Crowley actually rejects the doctrine because there

were "no factual allegations which support a claim that Corning had de facto

control over the Committee members." Here, Plaintiffs allege, and have shown,

that CIGNA had de facto control over the disclosures and the Mr. Beltz did not, in

fact, have responsibility. See also Kling v. Fidelity Mgmt. Trust Co., 323

F.Supp.2d 132, 146 (D. Mass. 2004) ("Defendants have failed to cite a single

authority that evinces an intent within ERISA to eliminate the vicarious liability of

a corporation for the acts of its employees or agents").

The case law is also clear that an employer may not evade equitable

responsibility for a plan even if it properly designates a third-party as the plan

administrator in the instrument under which the plan is operated. In Crocco v.

Xerox, 137 F.3d 105, 107 n.2 (2d Cir. 1998), the Second Circuit reversed a district

79

court's holding that an employer with only indirect control over plan administration was legally the plan administrator, but noted that a participant may sue an employer if her claim "request[s] injunctive or other equitable relief under ERISA §502(a)(3)." Accord <u>Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.</u>, 530 U.S. 238, 246 (2000) (ERISA "§502(a)(3) admits of no limit (aside from the 'appropriate equitable relief' caveat) ... on the universe of possible defendants ... the focus, instead, is on redressing 'the act or practice which violates any provision of [ERISA Title I]"); <u>Carlson v. Principal Financial Group</u>, 320 F.3d 301, 307-8 (2d Cir. 2003) ("a non-fiduciary may be a proper defendant under Section 502(a)(3) if it would be a proper defendant under the common law of trusts"); <u>Richards</u>, supra, 427 F.Supp.2d at 181 (employer who is not named a plan administrator may be sued as a fiduciary "for equitable relief under section 502(a)(3)").

Accordingly, even assuming arguendo both that Mr. Beltz was the plan administrator and that the doctrine of respondeat superior did not apply, FRCP 19 would only require his joinder if in his "absence complete relief cannot be accorded among those already parties." Here, CIGNA represented to Judge Squatrito in 2002 that "If the Court orders that a provision of the Plan must be changed or removed, the Plan acting through its trustees and fiduciaries, must then

80

implement that relief as to all of the Plan's participants." Dfs. Opp. Br. filed June

7, 2002, at 8 (dkt. #30). Because Mr. Beltz is a former employee who lacks any

power to provide equitable relief and because ERISA does not provide for

fiduciaries to be personally liable, it does not appear that without his joinder

"complete relief cannot be accorded."

CIGNA's effort to pawn off its responsibilities for remedying disclosure

violations on an unwitting retired former employee must fail. Mr. Beltz was

simply an employee who had no other role other than to act as an agent for his

principal.

## VII.  The Class' Claims Are Not Barred by Statutes of Limitations.

There are many reasons to deny the CIGNA's statute of limitations defense,

the most important are that (1) the Second Circuit has uniformly applied the New

York and Connecticut six-year limitation periods for written contracts to ERISA

claims, (2) the amendments to the Complaint "relate back" applying standard

relation back principles, and (3) disclosure violations and structural ERISA

violations like these do not "accrue" in the manner which CIGNA suggests.

In Miles v. New York State Teamsters Conference Pension Fund, 698 F.2d

593, 598 (2d Cir. 1983) the Second Circuit held that because employee benefit

plans are contracts, under New York law the applicable statute of limitations is six

years. Connecticut's period for written contracts is also six years. Conn. Gen. Stat. Ann. 52-576 (2006). Vermont's limitations period is the same.

The six-year period for written contracts has been consistently applied by the Second Circuit and district courts within it to both statutory and non-statutory claims under ERISA. See, e.g., Miles, supra, Campanella v. Mason Tenders' Dist. Council, 132 Fed.Appx. 855, 856 (2d Cir. 2005); Carey v. IBEW Local 363 Pension Plan, 201 F.3d 44, 49 (2d Cir. 1999); Cole v. Travelers Ins. Co., 208 F.Supp.2d 248, 252 (D.Conn. 2002); Venturini v. Metropolitan Life Ins. Co., 55 F.Supp.2d 119, 121 (D.Conn. 1999); Manginaro, supra, 21 F.Supp.2d at 294.

Two district courts in this Circuit have recently held that six-year contract periods apply to statutory claims raised in cash balance cases like this one. In Hirt v. Equitable, supra, 450 F.Supp.2d 331, which is presently on appeal, Judge Hellerstein held that the participants' Section 204(h) claim was time-barred. But he did this by applying the six-year limitation for written contracts. Id. at 333-34. No argument is raised on appeal that any shorter limitations period should apply. See also In re Citigroup, supra, 470 F.Supp. 2d at 336-37 (where higher benefits are sought the statute is six years).

Although CIGNA repeatedly proposes to substitute Connecticut's two-year period to collect wages or fringe benefits, Dfs. Br. at 32, 45, 103, 104, 119, no

Second Circuit or district court decision has ever adopted Connecticut's two-year

period in lieu of the written contract period. In this district, the shorter Connecticut

period was specifically rejected in <u>Christensen v. Chesebrough Pond's, Inc.</u>, 1993

U.S. Dist. LEXIS 21278 (D. Conn. 1993). Plaintiffs have found no decision where

it has been accepted as the most appropriate analog for an ERISA claim.[35]

In a series of footnotes, CIGNA misstates the legal standard on the relation

back of the amendments to the Complaint which added the age discrimination

claim on April 12, 2002, see Dfs. Br. at 32 n.25, and the Section 204(h) and

relative value claims on May 6, 2005, *id*. at 104 n.85 and 120. The Rule 15(c)

standard for relation back was satisfied by those amendments because the "revised

pleading contains alternative theories based on the same core facts as presented in

[the] prior pleading." <u>Wells v. Harris</u>, 185 F.R.D. 128, 131 (D.Conn. 1999)

(following <u>White v. White Rose Rood</u>, 128 F.3d 110, 116 (2d Cir. 1997),

<u>Travelers Ins. Co. v. 633 Third Assocs.</u>, 14 F.3d 114, 125 (2d Cir. 1994)); accord

<u>Shane v. Connecticut</u>, 821 F.Supp. 829, 834 (D.Conn. 1993); <u>Jensen v. Times</u>

<u>Mirror Co.</u>, 634 F.Supp. 304, 315 (D.Conn. 1986). See also <u>Siegel v. Converters</u>

---

[35] For the age discrimination claim, CIGNA proposes an even shorter 180-day period drawing on Connecticut's "Discriminatory Practice Complaint Procedure." Dfs. Br. at 30-31, citing Conn. Gen. Stat. Ann. §46a-82(e). Again, there is no authority for using a charge filing period like this.

Transp. Inc., 714 F.2d 213, 216 (2d Cir. 1983) (Rule 15(c) is liberally applied to ensure that claims are decided "on the merits rather than on procedural technicalities").

In this instance, the original Complaint alleges that after the cash balance conversion "pension benefits accrue at a lower rate," Cplt. ¶22 (dkt. #1), and that the SPD failed to describe "any conditions on receipt of the new cash balance accruals." Cplt. ¶40. The subsequent amendments relate back because they contain alternate legal theories based on the same core of facts set out in the original pleading. In the one case against relation back that CIGNA cites, Gomes v. Avco Corp., 964 F.2d 1330, 1334 (2d Cir. 1992), the plaintiff added a second grievance that was considered a separate transaction because it related to events in 1987, whereas the Complaint related to actions in 1985. Accord McCarthy v. Associated Clearing Bureau, 1999 WL 1995185 *5 (D.Conn. 1999) (claim did not relate back when it was "dependent upon entirely different facts and evidence").

With the standard six-year period and relation back, CIGNA's limitations arguments all fail. If necessary, Plaintiffs can also show that CIGNA's theory that a cause of action accrues on a one-time basis on the date an amendment was

adopted is wrong.[36] Close to 25 years ago, <u>Miles v. New York State Teamsters</u>

<u>Pension Fund</u>, supra, 698 F.2d at 598, established that ERISA causes of action

only accrue "when there has been a repudiation by the fiduciary which is *clear* and

made known to the beneficiaries." Emph. in orig. In <u>Frommert</u>, the Second Circuit

reversed the district court's finding that the plaintiffs' breach of fiduciary duty

claims for insufficient SPDs and 204(h) notice accrued when employees received a

Benefits Update that disclosed the nature of the phantom offset. Following <u>Caputo</u>

<u>v. Pfizer</u>, 267 F.3d 181, 193 (2d Cir. 2001), <u>Frommert</u> held that:

> while the Benefits Update may have heightened the plaintiffs' concerns
> regarding their expected benefits, it is not enough that plaintiffs had notice
> that something was awry; plaintiffs must have had specific knowledge of
> the actual breach of duty upon which they sued.

433 F.3d at 272. CIGNA does not distinguish <u>Frommert</u>'s ruling on this point.

CIGNA also does not distinguish the Third Circuit's decision in <u>Romero v.</u>

---

[36] See Dfs. Br. at 31 n.24 (age discrimination claim "accrued no later than
December 21, 1998," the date of adoption of the cash balance formula), *id*. at 45
n.33 (backloading and forfeiture claims "accrued no later than December 21,
1998"), *id*. at 102 (SPD claim accrued no later than December 21, 1998); *id*. at 104
(204(h) claim accrued 15 days before January 1, 1998).

For the SMM claim, CIGNA proposes the date when the SMM was due to
be distributed. Dfs. Br. at 100 n.79 (SMM claim accrued July 29, 1999). For the
relative value claim, CIGNA proposes the date when participants elected a benefit
without the required explanation. *Id*. at 119 (using two-year period from
Connecticut and date Complaint was amended, cut off date would be May 6,
2003).

Allstate, 404 F.3d 212, 223-24 (3d Cir. 2005), which held that "an unfair duty of

clairvoyance" would otherwise be imposed" and "participants likely unfamiliar

with the intricacies of pension plan formulas and the technical requirements of

ERISA" would be required "to become watchdogs over potential plan errors and

abuses." Addressing the ERISA §204(h) claim, Romero rejected a "rule that

unwaveringly ties the date of accrual to the date of the amendment" and held that

the "discovery rule" is applicable:

> It would make no sense, and indeed do a remarkable disservice to the
> underlying purposes of ERISA and its disclosure requirements, to deem a
> notice claim to have accrued before a plaintiff knows or should have known
> that an amendment has the effect which triggers the notice requirement.

404 F.3d at 225. See also In re J.P. Morgan Chase, 460 F.Supp.2d at 479, 483-84

(S.D.N.Y. 2006) (claim repudiation must be clear and known); Parsons v. AT&T,

2006 WL 3826694, *2 (D.Conn. 2006) (defendants must affirmatively show a

clear repudiation);

## VIII.   Frommert and Swede Show that the Supreme Court's Great-West Decision Does Not Preclude Relief for ERISA Violations.

If the positions stated in CIGNA's brief were to be accepted, Congress

enacted a large number of pension reforms over a nearly 35-year period to protect

participants and their families, but paradoxically or perversely enacted no

remedies when those rules are violated. Fortunately for participants and their

families, the Supreme Court decisions and the Second Circuit precedents are not

so bleak. The section of CIGNA's brief on relief (Dfs. Br. at 124-30) does not

distinguish the Supreme Court's decisons in <u>Sereboff</u> or <u>Bowen</u> (which <u>Great-</u>

<u>West</u> distinguished approvingly) or the Second Circuit's decisions in <u>Frommert</u>

and <u>Swede</u>, all of which were discussed in Plaintiffs' opening brief (*id*. at 102-7).

CIGNA overlooks <u>Frommert</u> and <u>Swede</u> even though they are in the heading to

that section of Plaintiffs' brief. A more recent Eleventh Circuit decision likewise

holds that a judgment requiring pension benefits to be paid in the future is

"injunctive relief." <u>Gilley v. Monsanto</u>, __ F.3d __, 2007 WL 1837114, *4 (11th

Cir. 2007) ("the judgment here does include injunctive relief, because it requires

Monsanto to continue to pay pension benefits as they accrue in the future").[37]

The Second Circuit's decision in <u>Swede v. Rochester Carpenters Pension</u>

<u>Fund</u>, 467 F.3d 216 (2d Cir. 2006), also addresses CIGNA's argument against

retroactive relief. Compare 467 F.3d at 221 with Dfs. Br. at 127-30. Plaintiffs cited

---

[37] CIGNA separately argues that the Supreme Court's decision in <u>Curtiss-Wright v. Schoonejongen</u>, 514 U.S. 73 (1993), is at odds with the Second Circuit's 2003 decision to provide relief for SPD violations in <u>Burke</u>. In its post-trial brief, CIGNA admits that this Court is bound to follow <u>Burke</u> but seeks to "preserve [this] for appeal." Dfs. Br. at 84. As a result, Plaintiffs will not detail how CIGNA misreads <u>Schoonejongen</u>, except to say that <u>Schoonejongen</u> involves the procedures for amending a plan while <u>Burke</u> involves appropriate equitable relief for a misleading SPD.

Swede for this point in their opening brief, Pls. Br. at 106, but CIGNA overlooks

it. Although not stated directly, CIGNA's argument against retroactive relief

presumably is limited to the ERISA §204(b)(1)(H) age discrimination claim. But

as stated in the discussion of that claim, CIGNA has never presented any evidence

that its liabilities for that claim would be either "unexpected" or sufficient to

"threaten the solvency of CIGNA's pension plan." Indeed, the 1999 background

memo to the CIGNA's Board concerning the "vulnerability" to this claim indicates

the opposite. PFF 140.[38]

Plaintiffs concede that Section 701(d)(1) of the PPA limits relief for the

ERISA §204(b)(1)(H) violation after the August 17, 2006 date on which the Act

was signed into law. Plaintiffs do not concede that the PPA constitutionally

changes the law between June 29, 2005 and the date of enactment. Especially

when a lawsuit is pending, retroactivity interferes with the judicial authority to

decide the lawsuit up to the date when a law is changed. See Fernandez-Vargas v.

Gonzales, 126 S.Ct. 2422, 2427-28 (2006).

---

[38] Cooper v. IBM, 2004 WL 322918, *1 (S.D. Ill. 2004), rev'd on other
grounds, 457 F.3d 636 (7th Cir. 2006), specifically discusses the issues of
retroactive relief for violations of ERISA §204(b)(1)(H).

IX.    **The Releases that CIGNA Solicited from Over 2,000 Class Members Contain an Express Exception for "Any Claims for Benefits Under Any Retirement Programs"; CIGNA Never Communicated Any Intention that Those Words Would Mean Less than What They Say.**

Releases are affirmative defenses which require close scrutiny.[39] Here, CIGNA cannot credibly contend that thousands of class members have released their claims for benefits in exchange for severance pay when the release contains an exception for "any claims for benefits under any retirement programs." CIGNA's lawyers have developed an argument that the exception does not include statutory claims, but there is no evidence that this was CIGNA's intent and no evidence of understandable communication of any such intent to employees. CIGNA's position on its releases is especially untenable because it presented no witnesses or evidence on the intent of the release or the exception, which again gives rise to the missing witness inference. See Gray v. Great American Recreation Ass'n, supra, 970 F.2d at 1082.

Although no discovery request was made for releases, CIGNA has produced copies of approximately 2,000 individual releases (from a class of over 27,000 participants). Review of the releases shows that CIGNA solicited the vast majority after the December 19, 2001 and December 20, 2002 dates on which this case was

---

[39] See, e.g., Shaver v. Siemens, 2007 WL 1006681, *13 (W.D. Pa. 2007) (releases/waivers are affirmative defenses which require "heightened scrutiny").

89

filed and then certified as a class action. The releases contain an express exception

for:

> any claims for benefits under any retirement, savings, or other employee
> benefit programs (but your Release does cover any claims you may make for
> severance benefits beyond those described or referred to in this Agreement).

Exs. 525-27 at ¶5(e). The releases do not contain any notice of the existence of

this lawsuit.

CIGNA nevertheless contends that the exception "only applies to claims for

benefits under the Plan, not claims alleging statutory ERISA violations" and that

the releases should bar relief in this lawsuit. Dfs. Br. at 121 (emph. in orig.).

CIGNA's affirmative defense based on the releases is wrong for so many

different reasons that it deserves sanctions. The most remarkable point is that

CIGNA continues to press this defense despite the fact that its release contains the

express exception for "any claims for benefits under any retirement ... programs."

CIGNA argues that this exception for "any claims" should only cover non-

statutory claims and "not claims alleging statutory ERISA violations." Dfs. Br. at

121.[40] But CIGNA has produced no evidence indicating that this was CIGNA's

intention, much less that any such intention was ever communicated to employees.

---

[40] In its Proposed Findings, CIGNA excises the word "any" from the
exception and describes it as "narrow." DFF 438.

The SPD for the Severance Pay Plan describes the release. It states that:

> You will release *CIGNA companies*, and their officers, directors, employees and agents, from any liabilities arising out of, or related to, your employment and termination of employment (<u>of course, your rights arising under other benefit plans on or after your *termination of employment date* will be preserved</u>).

Ex. 213 at P-2307 (emph. added; italics in orig.). The SPD does not disclose any qualification or restriction on the preservation of rights, as ERISA's SPD rules clearly require if one existed. The standard cover letter that accompanied the Severance Agreement stated, moreover, that "By signing the Agreement and Release, you are waiving your rights to pursue any issues or claims <u>related to your employment or termination of employment</u> ....." Ex. 212 (emph. added). Again, there is nothing to indicate that the exception to the release is limited to one type of claim for benefits, rather than "any claims for benefits" as the Agreement states.[41]

    This Court should rule that the exception for "any claims for benefits" must

---

[41] CIGNA's litigation position is also undercut by a revision of the exception that occurred in the middle of 2004. The revised exception covers "any claims for benefit payments to which the Plan administrator determines you are entitled under the terms of any retirement, savings, or other employee benefit programs in which the Company participates." Ex. 214. CIGNA produced no documents concerning the intent of this revision. Review of the releases indicates that the new language was added in the middle of 2004. This was after Plaintiffs filed their opposition to Defendants' motion to decertify, emphasizing the exception to the release.

be given its ordinary and common meaning. In <u>Carter v. AT&T</u>, 870 F.Supp. 1438,

1442 (S.D. Ohio 1994), AT&T claimed that a plaintiff released her rights to bring

a lawsuit for a violation of the Pregnancy Discrimination Act when she signed a

general release that reserved her rights for benefit claims under the pension plan.

The court held "this is exactly the exception that was provided for in the release."

   Even if CIGNA's outside counsel are capable of drawing fine legal

distinctions between claims for benefits under the Plan and claims for ERISA

statutory violations, this does not mean that either CIGNA, the named Plaintiffs,

or any other members of the class had that understanding. In addressing the

validity of a waiver under the ADEA, the Eighth Circuit in <u>Thomforde v. IBM</u>,

406 F.3d 500, 505 n.1 (8th Cir. 2005), stated, "It seems axiomatic that if an

agreement needs clarification" from a "corporate attorney," "it is not written in a

manner calculated to be understood." In <u>Carrabba v. Randalls Food Markets</u>, 145

F.Supp.2d 763, 771-72 (N.D. Tex. 2000), aff'd, 252 F.3d 721 (5th Cir. 2001), cert.

denied, 534 U.S. 995 (2001), the district court held that "there is no evidence that

any of the plaintiffs understood that they were releasing claims relating to the

MSP [Management Security Plan]"; "The indication from the evidence is that

neither party to the waiver/release documents gave any thought to the MSP or any

claims arising under the MSP when the documents were drawn, signed, and

delivered. There is certainly no basis in the evidence for any finding that any

signatory on such a release/waiver document intended by execution and delivery

of the document to release defendant of any claim that is being asserted in this

action."

In addition to the exception for "any claims for benefits," CIGNA's position

fails to account for the fact that an employee agrees in the Release that he or she

"will not file" a lawsuit. The only participant who filed a lawsuit was Janice

Amara and, as the Court knows, CIGNA nearly doubled her retirement benefits in

March 2005 as a result of the <u>Depenbrock</u> decision. CIGNA did not invoke the

release in her Severance Agreement as a bar to increasing her benefits even though

she was the only employee covered by CIGNA's Release to have filed a lawsuit.

Furthermore, even if CIGNA's releases were interpreted to cover the claims

in this lawsuit, CIGNA's solicitation of releases after the action was filed and

certified as a class action would violate the rules against communicating with

absent class members during the pendency of a lawsuit. See <u>Manual for Complex</u>

<u>Litig</u>. (Fourth) §21.33 ("Once a class has been certified, the rules governing

communications apply as though each class member is a client of the class

counsel." Defendants' attorneys "may only communicate through class counsel

with members on matters regarding the litigation."); <u>In re Currency Conversion</u>

93

Fee Antitrust Litig., 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (district court's

authority over communications with class members "is not limited to

communications that actually mislead or otherwise threaten to create confusion,

but extends to communications that interfere with the proper administration of a

class action or those that abuse the rights of members of the class").

In the Engers v. AT&T cash balance action (D.N.J., CV-98-3660), AT&T

was found to be soliciting releases from class members as part of Force

Management Programs during the pendency of the lawsuit. The district court

issued a preliminary injunction against that practice (and AT&T agreed to nullify

any releases signed after the date the lawsuit was filed) on the grounds that AT&T

needed to inform members of the class that they were giving up rights in a

proposed class action and could not communicate with them about their rights

except through counsel. Ex. 215 (minute entry and May 9, 2000 transcript).[42]

**Conclusion**

For the foregoing reasons, the Plaintiff Class requests that this Court enter

judgment in its favor.

_____

[42] Finally, even if CIGNA's releases were entirely in order, there are very substantial questions about whether rights to nonforfeitable pension benefits can be released in exchange for severance pay due to ERISA's anti-alienation rule. See Albert Feuer, "When Are Releases of Claims for ERISA Plan Benefits Effective?" 38 J. Marshall L. Rev. 773, 865-66 (Spring 2005).

Dated: July 26, 2007

Respectfully submitted,

 /s/ Stephen R.Bruce
Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013


 /s/ Thomas G. Moukawsher
Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Named Plaintiffs and
the Plaintiff Class

95

## <u>CERTIFICATE OF SERVICE</u>

I certify that copies of the foregoing Plaintiff Class' Post-Trial Reply Brief, and this Certificate of Service, were filed electronically through the CM/ECF system on July 26, 2007. Notice of this filing will be sent by e-mail to all parties listed below by operation of the Court's electronic filing system:

        Joseph J. Costello
        Jeremy P. Blumenfeld
        Jamie M. Kohen
        Morgan, Lewis & Bockius
        1701 Market St.
        Philadelphia, PA 19103-2921

        Christopher A. Parlo
        Morgan Lewis & Bockius
        101 Park Avenue
        New York, NY 10178-0600

        James A. Wade
        Erin O'Brien Choquette
        Robinson & Cole, LLP
        280 Trumbull Street
        Hartford, CT 06103-3597

                        <u>/s/ Stephen R. Bruce</u>
                        Stephen R. Bruce ct23534

                        Attorney for Plaintiffs