# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------------X
                        :

JANICE C. AMARA, GISELA         :       3:01 CV 2361 (MRK)
R. BRODERICK, AND ANNETTE S.  :
GLANZ individually, and on behalf  :       Trial Dates:
of others similarly situated,     :       September 11-15, 2006
                        :       January 24-25, 2007
               Plaintiffs,  :
         v.            :
                        :
CIGNA CORP. AND CIGNA      :
PENSION PLAN,            :
                        :
             Defendants.  :
                        :
-------------------------------------------------------X

## <u>DEFENDANTS' POST-TRIAL BRIEF</u>

Dated:  August 8, 2007         **MORGAN, LEWIS & BOCKIUS LLP**
                                 Joseph J. Costello
                                 Jeremy P. Blumenfeld
                                 Jamie M. Kohen
                                 *Admitted pro hac vice*
                                 1701 Market Street
                                 Philadelphia, Pennsylvania  19103-2921
                                 (215) 963-5295/5258/5472
                                 (215) 963-5001 (fax)

                               **ROBINSON & COLE**
                                 James A. Wade (CT # 00086)
                                 280 Trumbull Street
                                 Hartford, Connecticut  06103
                                 (860) 275-8270
                                 (860) 275-8299 (fax)

                                 *Attorneys for Defendants*
                                 *CIGNA Corporation and CIGNA Pension Plan*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................v

I.    INTRODUCTION .....................................................................................1

II.   JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON
      COUNT 3 BECAUSE PART B IS NOT AGE DISCRIMINATORY .............................4

      A.    The Current State Of The Law Regarding Cash Balance Plans ............................5

      B.    Part B Treats Older Employees At Least As Well As It Treats Younger
            Employees ...........................................................................................6

      C.    The Decisions Finding That Cash Balance Plans Are Age Discriminatory Are
            Flawed .............................................................................................11

            1.   The Phrase "Rate Of An Employee's Benefit Accrual" Does Not Refer
                 To The "Accrued Benefit." ..............................................................12

            2.   The Term "Benefit Accrual" Cannot Refer To The "Accrued Benefit"
                 Because That Interpretation Cannot Be Applied Consistently At All
                 Ages ........................................................................................17

            3.   The Second Circuit's Decision In Esden v .............................................20

            4.   The Economic Effects That Plaintiffs Challenge Here Are Lawful
                 In Other Contexts, Including With Traditional Defined Benefit Plans ....22

            5.   The Treasury Department Has Consistently Endorsed Cash Balance
                 Plans As Not Being Age Discriminatory ..............................................24

      D.    Plaintiffs' Argument That Wear-Away Is Age Discriminatory Is A
            Distortion Of The Facts and Governing Law ...............................................27

      E.    Plaintiffs' Age Discrimination Claim Is Time-Barred ...................................30

III.  JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON
      COUNT 1 BECAUSE PART B DOES NOT VIOLATE ERISA'S 133⅓% ANTI-
      BACKLOADING OR NON-FORFEITABILITY RULES ...........................................33

      A.    The Plan Does Not Violate ERISA's 133⅓% Rule .......................................34

      B.    The Plan Does Not Cause Any Impermissible Forfeitures ...............................40

      C.    Plaintiffs' Backloading/Forfeiture Claims Are Time-Barred ............................44

IV.   JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS  ON
      COUNTS 2 AND 4 BECAUSE PLAINTIFFS WERE NOT LIKELY OR
      ACTUALLY HARMED, AND THE WRITTEN DISCLOSURES SATISFIED
      ERISA'S DISCLOSURE REQUIREMENTS ........................................................45

i

## TABLE OF CONTENTS

**PAGE**

A.  The Opening Account Balance Information, Total Compensation Reports And Annual Account Statements Distributed To Plan Participants Foreclose Any Liability On Plaintiffs' Disclosure Claims ...................................................46

    1.  The Plan Administrator Provided Part B Participants With Complete And Timely Information Regarding The Exact Amount Of Their Cash Balance Accounts ...................................................................................46

    2.  Courts In The Second Circuit Have Consistently Rejected ERISA SPD/Section 204(h) Disclosure Claims When Plan Participants Have Been Provided Sufficient Information About Their Benefits Through Other Means, As In This Case................................................................54

    3.  The Trial Testimony Of Plaintiffs And The Testifying Class Members Demonstrates That Any Deficiencies In The 1998 And 1999 SPDs And The 1997 Section 204(h) Notice Constituted Harmless Error..........59

B.  The Part B SPD Met ERISA's Disclosure Requirements ...................................61

    1.  The Part B SPD Met The Requirements Of ERISA Section 102............62

    2.  The Part B SPD Was Not Required To Disclose A Reduction In The Rate Of Benefit Accrual With Age .........................................................65

    3.  The Part B SPD Was Not Required To Provide A Comparison To Benefits That Participants Would Have Earned Under The Old Plan......65

    4.  The Part B SPD Was Not Required To Disclose The Potential Wear-Away Effect .........................................................................................66

        a.  The Wear-Away Effect Did Not Cause Any Reduction In Plan Benefits, And Was Not The Result Of A Plan Provision.............70

        b.  The Wear-Away Effect Was Caused By Falling Interest Rates After The Conversion, Which The Plan Administrator Could Not Anticipate ...................................................................71

        c.  The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Only Possibly Affect A Small Subset Of Participants ...............................................................................76

            (1)  The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Result Only For Eligible Employees During The Early Retirement Window..........77

            (2)  The Wear-Away Effect Attributable To The Early Retirement Subsidy Would Only Result If A Plan Participant Elected An Annuity Option, But Most Cash Balance Participants Elect A Lump Sum ........................78

    5.  The Part B SPD Was Not Required To Disclose All Of The Factors In The OAB Calculation ..............................................................................79

**TABLE OF CONTENTS**

PAGE

6.     Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be Governed Exclusively By The Terms Of The CIGNA Pension Plan, Not The SPD ................................................................................ 83

C.     The Plan Administrator Provided Adequate Notice Under ERISA Section 204(h) ........................................................................... 85

    1.     Only The Amendment Freezing Accruals Under Part A Required A Section 204(h) Notice, Which The Plan Administrator Provided ........ 86

    2.     Even If A 204(h) Notice Was Required For The Cash Balance Adoption, The Plan Administrator Fulfilled That Requirement ............. 88

        a.     Section 204(h) As It Existed At The Time Part B Was Created Provides The Applicable Requirements For The Allegedly Required Notice ........................................................... 89

        b.     The Plan Administrator Provided A Proper Section 204(h) Notice To Active Employees ...................................................... 91

    3.     The Plan Administrator Was Not Required Under ERISA Section 204(h) To Notify Vested Separated Old Plan Participants About The Amended Rehire Rule ............................................................. 96

D.     Plaintiffs Do Not Have A Pending Claim For An Inadequate Summary Of Material Modification Regarding The Cash Balance Conversion ...................... 99

E.     Plaintiffs' Disclosure Claims Are Time-Barred ................................................. 102

    1.     Plaintiffs' SPD Claim Is Time-Barred ................................................. 102

    2.     Plaintiffs' Section 204(h) Claim Is Time-Barred ................................. 103

F.     Any Disclosure Claims Would Lie Against The Plan Administrator, Who Is Not A Party ............................................................................. 104

V.     JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 5 BECAUSE DEFENDANTS' FAILURE TO PROVIDE PRESENT-VALUE DISCLOSURES OF THEIR DIFFERENT BENEFIT OPTIONS PRIOR TO OCTOBER 2004 DID NOT VIOLATE ERISA ................................................ 109

A.     Part B Does Not Violate ERISA's Anti-Cutback Rule In Section 204(g) ......... 109

B.     Plaintiffs Amara, Broderick And Glanz Do Not Have Standing To Pursue A Present-Value Disclosure Claim ........................................................... 112

C.     Pre–October 2004 Treasury Regulations Did Not Require Disclosure Of The Present Value Of Benefit Options ......................................................... 114

D.     Any Present-Value Disclosure Claims Would Lie Against The Plan Administrator, Who Is Not A Party ....................................................... 118

E.     Plaintiffs' Present-Value Disclosure Claim Is Time-Barred .............................. 119

iii

# TABLE OF CONTENTS

**PAGE**

VI.  PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED
     RELEASES THAT BAR THEIR CLAIMS....................................................120

VII. EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEIR REMEDIES
     ARE LIMITED............................................................................................122

     A.   Monetary Damages Generally Are Unavailable Under ERISA
          Section 502(a)(3)..............................................................................124

     B.   Plaintiffs Are Not Entitled To Retroactive Relief................................127

     C.   Any Relief Must Be Limited By The Pension Protection Act Of 2006 .............130

VIII. CONCLUSION .........................................................................................130

## TABLE OF AUTHORITIES

**PAGE**

### CASES

Alessi v. Raybestos-Manhattan, Inc.,
451 U.S. 504 (1981) ................................................................................40

Allen v. WestPoint-Pepperell, Inc.,
11 F. Supp. 2d 277 (S.D.N.Y. 1997) ................................................................80

Ariz. Governing Comm. for Tax Deferred
Annuity & Deferred Comp. Plans v. Norris,
463 U.S. 1073 (U.S. 1983) ........................................................128, 129

Auer v. Robbins,
519 U.S. 452 (1997) ................................................................................24

Averhart v. US WEST Mgmt. Pension Plan,
46 F.3d 1480 (10th Cir. 1994) ................................................................108

Barnes v. Lacy,
927 F.2d 539 (11th Cir. 1991) ................................................................68

Estate of Becker v. Eastman Kodak Co.,
120 F.3d 5 (2d Cir. 1997) ........................................................................68

Beecher v. Able,
575 F.2d 1010 (2d Cir. 1978) ................................................................126

Berger v. Xerox Corp. Ret. Income Guarantee Plan,
338 F.3d 755 (7th Cir. 2003) ................................................................21, 22

Bogosian v. Woloohojian Realty Corp.,
323 F.3d 55 (1st Cir. 2003) ....................................................................67

Bonovich v. Knights of Columbus,
963 F. Supp. 143 (D. Conn. 1997), aff'd, 146 F.3d 57 (2d Cir. 1998) ..................43, 44

Bryerton v. Verizon Commc'n, Inc.,
No. 06-6672, 2007 WL 1120290 (S.D.N.Y. Apr. 17, 2007) ................................5

Burke v. Kodak Ret. Income Plan,
336 F.3d 103 (2d Cir. 2003) ........................................................46, 55, 84

Campanella v. Mason Tenders Dist. Council Pension Plan,
299 F. Supp. 2d 274 (S.D.N.Y. 2004) ................................................121

## TABLE OF AUTHORITIES

**PAGE**

Campbell v. BankBoston,
327 F.3d 1 (1st Cir. 2003) ............................................................. 2, 42

Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension,
201 F.3d 44 (2d Cir. 1999) ............................................................. 101

Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo,
148 F.3d 194 (2d Cir. 1998) ............................................................. 58

Cent. Laborers' Pension Fund v. Heinz,
541 U.S. 739 (2004) ............................................................. 15, 110

Chaplin v. Nationscredit Corp.,
307 F.3d 368 (5th Cir. 2002) ............................................................. 120

Chapman v. Choice Care Long Island Term Disability Plan,
288 F.3d 506 (2d Cir. 2002) ............................................................. 114

Charles v. Pepco Holdings, Inc.,
437 F. Supp. 2d 248 (D. Del. 2006) ............................................................. 90

Chen v. U.S. Dep't of Justice,
434 F.3d 144 (2d Cir. 2006) ............................................................. 19

Chevron Oil Co. v. Huson,
404 U.S. 97 (1971) ............................................................. 128, 129

In re Citigroup Pension Plan ERISA Litig., ("Citigroup I")
470 F. Supp. 2d 323 (S.D.N.Y. 2006) ............................................................. passim

In re Citigroup Pension Plan ERISA Litig.,
Civ. A. No. 05-05296, 2007 WL 1074912 (S.D.N.Y. Apr. 4, 2007) ............................... 93

City of Los Angeles, Dep't of Water & Power v. Manhart,
435 U.S. 702 (1978) ............................................................. 127, 128

Coan v. Kaufman,
457 F.3d 250 (2d Cir. 2006) ............................................................. 124

Cooper v. IBM Pers. Pension Plan,
457 F.3d 636 (7th Cir. 2006) ............................................................. 2, 5, 22, 23, 29

Cooper v. IBM Pers. Pension Plan,
274 F. Supp. 2d 1010 (S.D. Ill. 2003) ............................................................. 6

## TABLE OF AUTHORITIES

**PAGE**

Crowley v. Corning, Inc.,
234 F. Supp. 2d 222 (W.D.N.Y. 2002).................................................................. 107

Curtiss-Wright Corp. v. Schoonejongen,
514 U.S. 73 (1995) ................................................................................. 61, 84

Daill v. Sheet Metal Workers' Local 73 Pension Fund,
100 F.3d 62 (7th Cir. 1996) ........................................................................... 31

De Pace v. Matsushita Elec. Corp. of Am.,
257 F. Supp. 2d 543 (E.D.N.Y. 2003) ............................................................. 121

Depenbrock v. CIGNA Corp.,
278 F. Supp. 2d 461 (E.D. Pa. 2003)............................................................ 86, 88

Depenbrock v. CIGNA Corp.,
389 F.3d 78 (3d Cir. 2004) .................................................................... 59, 85, 88

Dickerson v. Feldman,
426 F. Supp. 2d 130 (S.D.N.Y. 2006) ............................................................. 113

Drutis v. Quebecor World (USA),
459 F. Supp. 2d 580 (E.D. Ky. 2006) ................................................................. 5

Eaton v. Onan Corp.,
117 F. Supp. 2d 812 (S.D. Ind. 2000)............................................... 5, 15, 19, 26

Eichorn v. AT&T Corp.,
484 F.3d 644 (3d Cir. 2007) ......................................................................... 125

Engers v. AT&T Corp.,
428 F. Supp. 2d 213 (D.N.J. 2006)................................................................ 116

Engers v. AT&T Corp.,
No. 98-3660, 2001 U.S. Dist. LEXIS 25889 (D.N.J. June 6, 2001) ................... 5

Esden v. Bank of Boston,
229 F.3d 154 (2d Cir. 2000) ...................................................................... passim

Exarhakis v. Visiting Nurse Serv. of N.Y.,
No. 02-CV-5562 (ILG), 2006 WL 335420 (E.D.N.Y. Feb. 13, 2006)............... 56

Fair v. Int'l Flavors & Fragrances, Inc.,
905 F.2d 1114 (7th Cir. 1990) ...................................................................... 120

## TABLE OF AUTHORITIES

**PAGE**

Finley v. Dun & Bradstreet Corp.,
471 F. Supp. 2d 485 (D.N.J. 2007) .................................................................... 5

Fischer v. Phila. Elec. Co.,
994 F.2d 130 (3d Cir. 1993) ............................................................................. 68

Fisher v. Penn Traffic Co.,
No. 06 Civ. 5848(HB), 2007 WL 496657 (S.D.N.Y. Feb. 16, 2007) ............ 124

Florida v. Long,
487 U.S. 223 (1988) ............................................................................... 128, 129

Francia v. Wonderoast, Inc. Profit Sharing Plan,
No. 92-CV-790S, 1995 WL 625705 (W.D.N.Y. Oct. 19, 1995) ..................... 41

Frommert v. Conkright,
433 F.3d 254 (2d Cir. 2006) ...................................................................... 44, 47

Gen. Dynamics Land Sys., Inc. v. Cline,
540 U.S. 581 (2004) ........................................................................................ 14

Gerosa v. Savasta & Co.,
329 F.3d 317 (2d Cir. 2003) .......................................................................... 124

Gomes v. Avco Corp.,
964 F.2d 1330 (2d Cir. 1992) .......................................................................... 32

Graham County Soil & Water Conservation Dist. v. United States,
545 U.S. 409 (2005) ........................................................................................ 31

Graham v. N.Y. Dep't of Civil Serv.,
907 F.2d 324 (2d Cir. 1990) .......................................................................... 128

Gray v. Briggs,
No. 97-6252, 1998 WL 386177 (S.D.N.Y. July 7, 1998) ............................. 122

Gray v. Great Am. Recreation Ass'n, Inc.,
970 F.2d 1081 (2d Cir. 1992) .......................................................................... 67

Great-West Life & Annuity Ins. Co. v. Knudson,
534 U.S. 204 (2002) ............................................................................... 124, 125

H. Prang Trucking Co. v. Local Union No. 469,
613 F.2d 1235 (3d Cir. 1980) ........................................................................ 126

## TABLE OF AUTHORITIES

**PAGE**

Hirt v. Equitable Ret. Plan for Employees, Managers and Agents,
441 F. Supp. 2d 516 (S.D.N.Y. 2006) ................................................................. 5, 90, 105

Hirt v. Equitable Ret. Plan for Employees, Managers and Agents,
No. 01CIV7920 (AKH), 2006 WL 2627564, at *2 (S.D.N.Y. Aug. 24, 2006) ............. 104

Hudson v. Gen. Dynamics Corp.,
118 F. Supp. 2d 226 (D. Conn. 2000) ......................................................................... 68

Hughes Aircraft Co. v. Jacobson,
525 U.S. 432 (1999) ..................................................................................................... 84

In re J.P. Morgan Chase Cash Balance Litig., ("J.P. Morgan I")
460 F. Supp. 2d 479 (S.D.N.Y. 2006) ................................................................... passim

In re J.P. Morgan Chase Cash Balance Litig.,
No. 06-732, 2007 WL 1549121 (S.D.N.Y. May 30, 2007) ......................................... 125

Johnson v. Railway Express Agency, Inc.,
421 U.S. 454 (1975) ..................................................................................................... 30

Jones & Laughlin Steel Corp. v. Pfeifer,
462 U.S. 523 (1983) ..................................................................................................... 11

Jones v. Federated Fin. Reserve Corp.,
144 F.3d 961 (6th Cir. 1998) ...................................................................................... 108

Kagen v. Flushing Hosp.,
No. 96-CV-5795, 2000 WL 1678015 (E.D.N.Y. Nov. 3, 2000) .................................... 91

King v. Pension Trust Fund of the Pension, Hospitalization
and Benefit Plan of the Elec. Indus.,
No. 01-CV-2604, 2003 WL 22071612 (E.D.N.Y. Sept. 5, 2003) ............................ 3, 110

Koenig v. Intercont'l Life Corp.,
880 F. Supp. 372 (E.D. Pa. 1995) ................................................................................ 91

Langman v. Laub,
328 F.3d 68 (2d Cir. 2003) ..................................................................................... 34, 35

Langman v. Laub,
No. 97 Civ. 6063(MGC), 2002 WL 472033 (S.D.N.Y. Mar. 28, 2002) ...................... 110

## TABLE OF AUTHORITIES

**PAGE**

Laurent v. PriceWaterhouseCoopers LLP,
448 F. Supp. 2d 537 (S.D.N.Y. 2006) ........................................................ 5, 58

Layaou v. Xerox Corp.,
330 F. Supp. 2d 297 (W.D.N.Y. 2004) ............................................................ 82

Layaou v. Xerox Corp.,
238 F.3d 205 (2d Cir. 2006) ............................................................................ 82

Ledbetter v. Goodyear Tire & Rubber Co., Inc.,
127 S. Ct. 2162 (2007) ............................................................................... 30, 31

Lee v. Burkhart,
991 F.2d 1004 (2d Cir. 1993) .................................................................. 107, 109

Lehman v. Univ. of Hartford Defined Contribution Ret. Plan,
No. CIV.A. 399CV2272CFD, 2002 WL 31076080 (D. Conn. Jul. 17, 2002) ............... 119

Linder v. Byk-Chemie USA, Inc.,
No. 3:02CV1956(JGM), 2006 WL 648206 (D. Conn. March 10, 2006) ....................... 122

Lorenzen v. Employees Ret. Plan of the Sperry & Hutchinson Co.,
896 F.2d 228 (7th Cir. 1990) ..................................................................... 68, 69

Lugo v. Employees Ret. Fund of Illumination Prods. Indus.,
529 F.2d 251 (2d Cir. 1976) .......................................................................... 116

McKeown v. Pac. Bell Directory,
No. C-97-0427MHP, 1999 WL 111886 (N.D. Cal. Feb. 26, 1999) ................................. 69

Malia v. Gen. Elec. Co.,
23 F.3d 828 (3d Cir. 1994) ........................................................................... 107

Marcella v. Capital Dist. Physicians' Health Plan, Inc.,
293 F.3d 42 (2d Cir. 2002) ............................................................................. 25

McCarthy v. Dun & Bradstreet Corp.,
No. Civ.A.3:03CV431(SRU), 2004 WL 2743569 (D. Conn. Nov. 13, 2004) ............ 80, 84

McCarthy v. Dun & Bradstreet Corp.,
482 F.3d 184 (2d Cir. 2007) ..................................................................... passim

McKinsey v. Sentry Ins.,
986 F.2d 401 (10th Cir. 1993) .................................................................. 107, 108

## TABLE OF AUTHORITIES

**PAGE**

Mers v. Marriott Int'l Group Accidental Death, Dismemberment Plan,
137 F.3d 510 (7th Cir. 1998) ............................................................................ 63

Mertens v. Hewitt Assocs.,
508 U.S. 248 (1993) ............................................................................... 61, 124

Metz v. United Techs. Corp.,
754 F.2d 63 (2d Cir. 1985) ................................................................................ 11

Miller v. Xerox Corp. Ret. Income Guarantee Plan,
447 F.3d 728 (9th Cir. 2006) ............................................................................ 22

Moffett, Hodgkins & Clarke Co. v. City of Rochester,
178 U.S. 373 (1900) ....................................................................................... 127

Mohasco Corp. v. Silver,
447 U.S. 807 (1980) ......................................................................................... 30

Mohegan Tribe v. State of Connecticut,
483 F. Supp. 597 (D. Conn. 1980) .................................................................... 14

Moore v. Philip Morris Cos., Inc.,
8 F.3d 335 (6th Cir. 1993) .............................................................................. 119

Mullins v. Pfizer, Inc.,
23 F.3d 663 (2d Cir. 1994) .............................................................................. 67

Nechis v. Oxford Health Plans, Inc.,
421 F.3d 96 (S.D.N.Y. 2005) ................................................................... 105, 126

Normann v. Amphenol Corp.,
956 F. Supp. 158 (N.D.N.Y. 1997) .............................................................. 90, 91

Park v. Trustees of the 1199 SEIU Health Care Employees Pension Fund,
418 F. Supp. 2d 343 (S.D.N.Y. 2003) ............................................................... 55

Parsons v. AT&T Pension Benefit Plan,
No. 3:06cv552(JCH), 2006 WL 3826694 (D. Conn. Dec. 26, 2006) .......... 3, 12, 13, 17, 31

Pastore v. Witco Corp.,
388 F. Supp. 2d 212 (S.D.N.Y. 2005) .......................................................... 47, 55

Pelosi v. Schwab Capital Markets, L.P.,
462 F. Supp. 2d 503 (S.D.N.Y. 2006) ............................................................. 126

xi

## TABLE OF AUTHORITIES

**PAGE**

Priest v. Fireman's Fund Ins. Co.,
No. 05-CV-0157E(Sr), 2007 WL 475325 (W.D.N.Y. Feb. 9, 2007) .............................. 126

Probe v. State Teachers' Ret. System,
780 F.2d 776 (9th Cir. 1986) ...................................................................................... 129

Rabin v. Wilson-Coker,
362 F.3d 190 (2d. Cir. 2004) ....................................................................................... 12

Register v. PNC Fin. Servs. Group, Inc.,
No. 04-CV-6097, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005) ................................ 26, 65

Register v. PNC Fin. Servs., Group, Inc.
477 F.3d 56 (3d Cir. 2007) ....................................................................................... passim

Richards v. FleetBoston Fin. Corp., ("FleetBoston I")
427 F. Supp. 2d 150 (D. Conn. 2006) ...................................................................... passim

Richards v. FleetBoston Fin. Corp., ("FleetBoston II")
235 F.R.D. 165 (D. Conn. Mar. 31, 2006) .................................................................. 27

Richards v. FleetBoston Fin. Corp., ("FleetBoston III")
No. 04-1638, 2006 WL 2092086 (D. Conn. July 24, 2006) ...................................... 37, 65

Robinson v. Shell Oil Co.,
519 U.S. 337 (1997) ..................................................................................................... 16

Rothwell v. Chenango County N.Y.S.A.R.C. Pension Plan,
No. 3:03-CV- 00637 (GLS), 2005 WL 2276023 (N.D.N.Y. Sept. 19, 2005) ................. 57

S.E.C. v. McCarthy,
322 F.3d 650 (9th Cir. 2003) ....................................................................................... 13

Sandberg v. KPMG Peat Marwick, LLP,
111 F.3d 331 (2d Cir. 1997) ........................................................................................ 30

Scott v. Admin. Comm. of the Allstate Agents Pension Plan,
113 F.3d 1193, 1200 (11th Cir 1997)) ......................................................................... 90

Seales v. Amoco Corp.,
82 F. Supp. 2d 1312 (M.D. Ala. 2000) ....................................................................... 119

Shaver v. Siemens Corp.,
No. 2:02cv1424, 2007 WL 1006681 (W.D. Pa. Mar. 30, 2007) .................................. 120

TABLE OF AUTHORITIES

**PAGE**

Sheehan v. Metro. Life Ins. Co.,
368 F. Supp. 2d 228 (S.D.N.Y. 2005) ........................................................ 56, 57

Shields v. Reader's Digest Ass'n, Inc.,
331 F.3d 536 (6th Cir. 2003) .............................................................................. 119

Sikora v. Am. Can Co.,
622 F.2d 1116 (3d Cir. 1980) ............................................................................. 129

Smart v. Gillette Co. Long-Term Disability Plan,
887 F. Supp. 383 (D. Mass. 1995) ..................................................................... 120

Stahl v. Tony's Bldg. Materials, Inc.,
875 F.2d 1404 (9th Cir. 1989) .............................................................................. 68

Strohmeyer v. Metro. Life Ins. Co.,
No. 3:04cv1808(WWE), 2005 WL 3963770 (D. Conn. Nov. 15, 2005) ....... 126

Sunder v. U.S. Bank Pension Plan,
No. 05-01153, 2007 WL 541595 (E.D. Mo. Feb. 16, 2007) .............................. 5

Swanson v. U.A. Local 13 Pension Plan,
779 F. Supp. 690 (W.D.N.Y. 1991) ...................................................................... 69

Swinney v. Gen. Motors Corp.,
46 F.3d 512 (6th Cir. 1995) .................................................................................. 68

Syed v. Hercules Inc.,
214 F.3d 155 (3d Cir. 2000) ........................................................................... 31, 32

Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund,
295 F. Supp. 2d 844 (N.D. Ill. 2003) .................................................................. 69

Thomas v. City of New York,
143 F.3d 31 (2d Cir. 1998) ................................................................................. 114

Tocker v. Philip Morris Cos.,
470 F.3d 481 (2d Cir. 2006) ................................................................................ 57

Tootle v. ARINC, Inc.,
222 F.R.D. 88 (D. Md. 2004) .......................................................................... 5, 19

Tyndall v. New England Teamsters & Trucking Indus. Pension Fund,
No. 3:03 CV 194(CFD), 2006 WL 3815140 (D. Conn. Dec. 27, 2006) ......... 127

xiii

## TABLE OF AUTHORITIES

**PAGE**

United States v. Maria,
186 F.3d 65 (2d Cir. 1999) ............................................................................................... 13

In re Unisys Sav. Plan Litig.,
74 F.3d 420 (3d Cir. 1996) ......................................................................................... 67, 68

United States v. Am. Trucking Ass'ns,
310 U.S. 534 (1940) ....................................................................................................... 20

United States v. Caccia,
122 F.3d 136 (2d Cir. 1997) ............................................................................................ 67

Wallace v. Kato,
127 S. Ct. 1091 (2007) .................................................................................................... 31

Wasley Prods., Inc. v. Bulkalites,
No. 3:03-383(MRK)/3:03cv1790(MRK),
2006 WL 3834240 (D. Conn. May 31, 2006) ............................................................... 109

Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.,
404 F.3d 167 (2d Cir. 2005) ........................................................................... 3, 47, 54, 55

White v. Sundstrand Corp.,
256 F.3d 580 (7th Cir. 2001) ........................................................................................... 41

Wilkins v. Mason Tenders Dist. Council Pension Fund,
445 F.3d 572 (2d Cir. 2006) ............................................................................................ 56

Williams v. Caterpillar, Inc.,
944 F.2d 658 (9th Cir. 1991) ..................................................................................... 42, 43

Williams v. Comm'n on Human Rights and Opportunities,
786 A.2d 1283 (Conn. App. Ct. 2001) ............................................................................ 31

Wilson v. Garcia,
471 U.S. 261 (1985) ....................................................................................................... 30

## STATUTES AND REGULATIONS

29 U.S.C. § 1001nt ......................................................................................................... 25

29 U.S.C. § 1002 .................................................................................. 12, 16, 17, 105, 106

29 U.S.C. §§ 1021-25 ................................................................................................... 108

# TABLE OF AUTHORITIES

**PAGE**

29 U.S.C. § 1022 ................................................................................................. 63

29 U.S.C. § 1024(b)(1) ................................................................................. 102, 105

29 U.S.C. § 1053(a) ............................................................................................. 41

29 U.S.C. § 1054(b)(1) ................................................................................. passim

29 U.S.C. § 1054(b)(2) ....................................................................................... 16

29 U.S.C. § 1054(c)(3) .................................................................................. 12, 17

29 U.S.C. § 1054(g) ........................................................................................... 112

29 U.S.C. § 1054(h) ..................................................................... 86, 91, 95, 105

29 U.S.C. §1104(a)(1) ...................................................................................... 108

26 C.F.R. § 1.401(a)(4)-(13) ......................................................................... 27, 28

26 C.F.R. § 1.410(b)-3 ....................................................................................... 27

26 C.F.R. § 1.411(d)-3 ................................................................................ 110, 117

26 C.F.R. § 1.411(d)-6T, Q 9 ................................................................. 97, 98, 100

26 C.F.R.. § 1.411(d)-6, Q&A 10 ....................................................................... 91

26 C.F.R. § 1.417(a)(3) .............................................................................. 116, 117

26 C.F.R. § 54.4980F-1 ..................................................................................... 28

29 C.F.R. § 1.411(b)-1 ....................................................................................... 35

29 C.F.R. §§ 2520.102-1 – 102-5 ...................................................................... 62

29 C.F.R. § 2520.102-3 .................................................................. 62, 65, 70, 71

29 C.F.R. § 2520.102-4 ................................................................................ 66, 101

29 C.F.R. § 2520.104b-4 ................................................................................... 101

45 Fed. Reg. 14, 029, 14,030 (1980) ................................................................ 101

# TABLE OF AUTHORITIES

PAGE

56 Fed. Reg. 47,524 (Sept. 19, 1991) .................................................................25

63 Fed. Reg. 68,678, 68,682 (Dec. 14, 1998) ...........................................89, 91

67 Fed. Reg. 76,123-01 (Dec. 11, 2002) ...........................................................26

68 Fed. Reg. 17,277 (Q&A 11) (Apr. 9, 2003) ...........................................73, 96

## RULES

Fed. R. Civ. P. 15(c)(2) ...................................................................................104

Fed. R. Civ. P. 23(c)(1)(B) ..............................................................................112

## STATE STATUTES

Conn. Gen. Stat. Ann. § 31-53 .........................................................................32

Conn. Gen. Stat. Ann. §§ 31-58 .......................................................................32

Conn. Gen. Stat. Ann. § 31-72 ................................................32, 45, 103, 119

Conn. Gen. Stat. Ann. § 46a-82 .......................................................................31

Conn. Gen. Stat. Ann. § 52-576, ....................................................................125

Conn. Gen. Stat. Ann. § 52-596 ..............................................32, 45, 104, 121

## MISCELLANEOUS

Carol Quick,
Overview of Cash Balance Plans, EBRI Notes 1 (July 1999)...........................52

Department of Treasury,
General Explanation of the Administration's
Fiscal Year 2005 Revenue Proposals 104 (2004)............................................26

Department of Treasury,
General Explanation of the Administration's
Fiscal Year 2006 Revenue Proposals 82 (2005)..............................................26

Department of Treasury,
General Explanation of the Administration's
Fiscal Year 2007 Revenue Proposals 66 (2006)..............................................26

xvi

## TABLE OF AUTHORITIES

**PAGE**

Dobbs, Law Of Remedies, § 4.3(7) (2d ed. 1993) .......................................................... 126

H.R. Doc. No. 107-84,
Legislative History of Public Law 107-16 ....................................................... 95

H.R. Rep. No. 93-807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639 ............................ 36

H.R. Rep. No. 99-1012 (1986), reprinted in 1986 U.S.C.C.A.N. 3868 ........................... 19

I.R.S. Notice 96-8 – Cash Balance Plans .......................................................... 44

House Report 107-84, , ..................................................................................... 95

Pub. L. No. 109-280, 120 Stat. 780 (2006) .............................................................. 5, 130

Pub. L. No. 107-16 § 659(b), 115 Stat. 38 (2001)...................................................... 89, 95

"Post-PPA Cash Balance Plan Determination Letter Process: IRS Closely-Scrutinizing 'Greater-Of' Benefit Formulas for Compliance with Anti-Backloading Standards," May 18, 2007 .......................................................... 39

Regina T. Jefferson,
Striking a Balance in the Cash Balance Plan Debate, 49 Buffalo L. Rev. 513 (2001) ..... 52

W. Page Keeton,
Prosser And Keeton On The Law Of Torts § 69 (5 ed. 1988)........................................ 108

## I.    INTRODUCTION

Plaintiffs Janice C. Amara, Gisela R. Broderick, and Annette S. Glanz ("Plaintiffs") have brought this action against Defendants CIGNA Corporation ("CIGNA") and the CIGNA Pension Plan (the "Plan") (together "Defendants") alleging violations of the Employee Retirement Income Security Act ("ERISA").  Plaintiffs' Third Amended Complaint (the "Complaint") challenges certain aspects of, and communications about, CIGNA's cash balance pension plan, known as "Part B," which was effective January 1, 1998.  The Complaint contains five claims:[1]

- Count 1 alleges that the conversion to a cash balance plan and the protection of previously–earned benefits through the Plan's minimum benefit provisions violated the non-forfeitability and anti-backloading rules of ERISA Sections 203(a) and 204(b)(1)(B), 29 U.S.C. §§ 1053(a) and 1054(b)(1)(B).

- Count 2 alleges that the summary plan description ("SPD") for Part B did not satisfy applicable statutory disclosure requirements under ERISA Section 102, 29 U.S.C. § 1022.

- Count 3 alleges that Part B (and by definition all cash balance plans) is age discriminatory and therefore violates ERISA Section 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i).

- Count 4 challenges whether Defendants satisfied disclosure obligations under ERISA Section 204(h), 29 U.S.C. § 1054(h), as that provision existed in 1997-1998.

- Count 5 alleges that Part B violated the anti-cutback rule under ERISA Section 204(g), 29 U.S.C. § 1054(g).

See Complaint, dkt. #165.

---

[1]    Judge Squatrito certified a class by Order of December 20, 2002.  See Memorandum of Decision, dkt. #61.  On March 12, 2007, this Court entered an Order Under Federal Rule 23(c)(1)(B) describing the class, appointing class counsel, and identifying the class claims, issues and defenses, and the individual claims, issues and defenses.  See Court's Order Under Federal Rule 23(c)(1)(B), dkt. #241 ("Rule 23 Order").

Counts 1 and 3 depend on the terms and operation of Part B and the interpretation of applicable law.  The two courts of appeals that have addressed the issue of whether cash balance plans are age discriminatory (Count 3) — the Third and Seventh Circuits — have concluded that they are not.  Register v. PNC Fin. Servs. Group, 477 F.3d 56, 67-70 (3d Cir. 2007); Cooper v. IBM Pers. Pension Plan, 457 F.3d 636, 637-41 (7th Cir. 2006).  Based on the legislative history, the Treasury Department's view that cash balance plans are legal, and fundamental economic principles, these courts, as well as nine district court judges, have rejected challenges to the design of cash balance plans.  Three district court judges have essentially held that all cash balance plans are per se age discriminatory and illegal.  For the reasons explained in detail herein, and consistent with Register and Cooper, Defendants respectfully submit that this Court should find that Part B is not age discriminatory and reject Plaintiffs' claim in Count 3.

As to Count 1, every court to have considered the issues has rejected Plaintiffs' argument that similar formulas for setting opening account balances for cash balance plans violate ERISA. Register, 477 F.3d at 70-72 (cash balance conversion formula for setting opening account balances and protection of prior formula benefits as a minimum benefit does not violate ERISA); Campbell v. BankBoston, 327 F.3d 1, 8-9 (1st Cir. 2003) (same); Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150, 168-70 (D. Conn. 2006) ("FleetBoston I") (same).  Thus, there is neither a factual nor a legal basis for Plaintiffs' claim in Count 1.

Counts 2 and 4 challenge the adequacy of particular communications about the Plan — specifically, the SPDs issued in 1998 and 1999, and the Section 204(h) notice distributed in 1997.  These communications, however, fully complied with ERISA, and neither likely nor actually harmed Plaintiffs or the class members who testified at trial.  As a result of CIGNA's distribution of detailed, individualized opening account balance information, annual account

statements and Total Compensation Reports, Plan participants knew the exact amount in their cash balance accounts and therefore had an informed basis for making employment and retirement decisions. Given these circumstances, the Court should reject Plaintiffs' claims in Counts 2 and 4. See Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst., 404 F.3d 167, 171-72 (2d Cir. 2005) (rejecting plaintiff's SPD disclosure claim where employer provided plaintiff with other communications "sufficient to inform him" of plan requirements).

The parties are in the process of settling most of the issues raised in Count 5. However, Plaintiffs' present-value disclosure claim remains for the Court's consideration. The parties have different positions regarding when the Treasury regulations began to require that a benefit election form provide to participants present-value disclosures of their different benefit options. Nonetheless, even if the earlier Treasury regulations required the same disclosures as the new regulations issued in 2004 (which would mean that the adoption of the new, expansive regulations was pointless), Count 5 would still fail because such a claim does not arise under Section 204(g) of ERISA, the statutory provision upon which Plaintiffs' Complaint relies. See, e.g., King v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus., No. 01-CV-2604, 2003 WL 22071612, at *10 (E.D.N.Y. Sept. 5, 2003) ("[T]he proper inquiry under ERISA § 204(g)(1) is whether plaintiff's monthly benefit was in fact reduced by a plan amendment.") (internal citations and quotations omitted). The present-value disclosure claim, never certified for classwide treatment by this Court, also fails because each of the three Plaintiffs was either only entitled to benefits of equal value or elected the most valuable benefit option available to her, and therefore has no standing to assert this claim.

Finally, there are serious questions about the remedies available to Plaintiffs in the unlikely event that they prevail on one or more of their claims. In light of Plaintiffs' failure to

address this issue with any specificity in their submissions to the Court, Defendants respectfully request that they be given the opportunity to brief this issue fully if and when it becomes necessary to do so.  However, Plaintiffs' vague description of their proposed remedies suggests that they are seeking monetary and retroactive relief, which is not available under ERISA Section 502(a)(3).  See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 215 (2002).  Furthermore, to the extent Plaintiffs seek benefits that exceed those available under the written terms of the Plan, their claims and those of thousands of other class members are barred by the releases they signed in exchange for severance pay at the time they left CIGNA.

For the reasons set forth below, and as further supported by Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law, there simply is no factual or legal basis for Plaintiffs' claims.  Judgment should therefore be entered in favor of Defendants on all counts of the Complaint.

## II.     JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 3 BECAUSE PART B IS NOT AGE DISCRIMINATORY.

Since the inception of this litigation, the parties' primary dispute has been whether Part B violates ERISA's prohibition against age discrimination in Section 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H).  See Rule 23 Order at 5 - Count 3(A)(1).  This Court should join the majority of courts that have addressed this issue and conclude that Part B, like other cash balance plans, is not age discriminatory.  Count 3 is also time-barred.

**A.    The Current State Of The Law Regarding Cash Balance Plans**

As this Court recognized during the trial of this matter, there is a split of legal authority

on the question of whether cash balance plans are inherently age discriminatory.[2]  The two courts

of appeals that have addressed this question — the Seventh Circuit in Cooper v. IBM Pers.

Pension Plan, 457 F.3d 636 (7th Cir. 2006), and the Third Circuit in Register v. PNC Fin. Servs.

Group, 477 F.3d 56 (3d Cir. 2007) — have held that cash balance plans are not age

discriminatory and therefore do not violate ERISA Section 204(b)(1)(H).  To date, nine district

courts are in accord.  See Bryerton v. Verizon Commc'n, Inc., No. 06-6672, 2007 WL 1120290

(S.D.N.Y. Apr. 17, 2007) (Chin, J.) (rejecting claim that cash balance plan design is age

discriminatory); Sunder v. U.S. Bank Pension Plan, No. 05-01153, 2007 WL 541595 (E.D. Mo.

Feb. 16, 2007) (Webber, J.) (same); Finley v. Dun & Bradstreet Corp., 471 F. Supp. 2d 485

(D.N.J. 2007) (Chesler, J.) (same); Laurent v. PriceWaterhouseCoopers LLP, 448 F. Supp. 2d

537 (S.D.N.Y. 2006) (Daniels, J.) (same); Drutis v. Quebecor World (USA), 459 F. Supp. 2d 580

(E.D. Ky. 2006) (Forester, J.) (same); Hirt v. The Equitable Ret. Plan for Employees, Managers

and Agents., 441 F. Supp. 2d 516 (S.D.N.Y. 2006) (Hellerstein, J.) (same);[3] Tootle v. ARINC,

Inc., 222 F.R.D. 88 (D. Md. 2004) (Blake, J.) (same); Engers v. AT&T Corp., No. 98-3660, 2001

U.S. Dist. LEXIS 25889 (D.N.J. June 6, 2001) (Chelser, J.) (same); Eaton v. Onan Corp., 117 F.

Supp. 2d 812 (S.D. Ind. 2000) (Hamilton, J.) (same).  In reaching their conclusion that cash

---

[2]    In August 2006, the Pension Protection Act was enacted.  Among other things, the statute
confirmed that cash balance plans are not age discriminatory with respect to benefits earned
on or after June 29, 2005.  See Pension Protection Act of 2006, Pub. L. No. 109-280, 120
Stat. 780 (2006).

[3]    Hirt is on appeal to the Second Circuit, Case No. 06-4757.  As of the filing of this Brief,
appellate Briefing in Hirt has been completed, and oral argument has not yet been set.

balance plans do not discriminate against older participants, these courts have relied on the statutory text, the legislative history, the Treasury Department's considered and repeated view that cash balance plans are legal, the nature of how benefits are earned in cash balance plans, and fundamental economic principles. By contrast, three district court judges have held that cash balance plans are age discriminatory. See FleetBoston I, 427 F. Supp. 2d 150 (D. Conn. 2006) (Hall, J.); Parsons v. AT&T Pension Benefit Plan, 3:06CV552 (JCH), 2006 WL 3826694 (D. Conn. Dec. 26, 2006) (Hall, J.); In re J.P. Morgan Chase Cash Balance Litig., 460 F. Supp. 2d 479 (S.D.N.Y. 2006) (Baer, J.) ("J.P. Morgan I"); In re Citigroup Pension Plan ERISA Litig., 470 F. Supp. 2d 323 (S.D.N.Y. 2006) (Scheindlin, J.) ("Citigroup I").[4]

Respectfully, the courts that have held that cash balance plans are age discriminatory based their conclusions on a misinterpretation of the statute and without considering the legislative or regulatory history behind ERISA Section 204(b)(1)(H) or the economic and other implications of their holdings, both as to cash balance plans and traditional defined benefit plans. This Court has now had the benefit of hearing evidence at trial about how benefits are earned in a cash balance plan and the economic effect of these plans on participants. Based on this evidence, it is clear that CIGNA's cash balance plan does not discriminate based on age. Judgment should therefore be entered in favor of Defendants on Plaintiffs' age discrimination claim in Count 3.

**B.    Part B Treats Older Employees At Least As Well As It Treats Younger Employees.**

The trial evidence in this case leaves no doubt that benefits under Part B, and the accrual of those benefits, increase with age:

---

[4]    The first case holding that cash balance plans were age discriminatory was Cooper v. IBM Pers. Pension Plan, 274 F. Supp. 2d 1010 (S.D. Ill. 2003). That decision was reversed on appeal by the Seventh Circuit.

- First, the benefit credit rate is the same or higher for older employees than for similarly situated younger employees, as set forth in Article VI of Part B.  Defendants' Proposed Post-Trial Findings of Fact ("DFF") ¶¶ 47, 48.

- Second, the interest credit rate under Part B is the same for all participants, regardless of age.  Although that rate can fluctuate from year to year (based on the yield on five year Treasury securities plus .25%), all participants in any given year will earn interest at the same rate.  DFF ¶ 51.  Notably, Plaintiffs' expert, Claude Poulin, has admitted that this rate approximates "the kind of investment return retiring plan participants would experience in the marketplace if they chose to invest in 'relatively risk-free investments.'"  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) ("<u>Dun & Bradstreet</u>") (quoting Claude Poulin).[5]

- Third, the calculations used to set opening account balances favored older employees.  Certain older employees, <u>i.e.</u>, those with more than 55 age and service points (including testifying class members Hogan and Curley), had their opening account balances based on a more favorable age-62 subsidized benefit and using a more favorable (lower) interest rate.  DFF ¶ 62.  In addition, Mr. Poulin and Defendants' expert, Larry Sher, agreed that an older employee's opening account balance will always be higher than the account balance of a similarly situated younger employee (with the same years of service and earnings history before 1998), even in the absence of the age-favored opening account balance provision in Part B.  DFF

---

[5]    Mr. Poulin was testifying about the 30-year Treasury rate, which usually is slightly higher than the five-year Treasury rate.  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (quoting Claude Poulin when testifying about the 30-year Treasury rate, which usually is slightly higher than the 5-year Treasury rate); DFF ¶ 52.

¶ 63.  In other words, in any given year, the older employee's cash balance benefit will equal or exceed the benefit payable to a similarly situated younger employee.  This result, of course, cannot be described as age discrimination.

An example helps to illustrate the point.  Consider two employees who started work at CIGNA at the beginning of 1998 when the cash balance conversion occurred — Employee Y, who was age 45 at the time, and Employee O, who was age 50.  Assume that both employees receive the same salary until the end of 2002 (assumed to be $30,000 in 1998 and growing 4.5% each year) and then leave for other jobs.  During the five-year period, both employees will receive the same benefit credits (based on 5% of pay since all of their pay will be under the Social Security integration level), the same interest credits (based on the actual rates in effect those years) and the same account balance.  The table below, which applies <u>equally to both employees</u>, shows the development of their benefit credits, interest credits and account balances as of the end of each year.[6]

| Year | Pay | Benefit Credits | Interest Credits | Account Balance at End of Year |
|------|-----|-----------------|------------------|--------------------------------|
| 1998 | 30,000 | 1,500 | 0 | 1,500 |
| 1999 | 31,350 | 1,568 | 72 | 3,140 |
| 2000 | 32,761 | 1,638 | 195 | 4,973 |
| 2001 | 34,235 | 1,712 | 296 | 6,981 |
| 2002 | 35,776 | 1,789 | 314 | 9,084 |
|      |     |     |     |     |
| 2012 | -- | -- | 5,023 | 14,107 |
| 2017 | -- | -- | 3,473 | 17,580 |

DFF ¶ 115.

---

[6]    For simplicity of illustration, the table adds interest credits at the end of the year and assumes a flat benefit credit rate.  In reality under Part B, the benefit credits of the older employee, and hence the account balance of the older employee, would be higher than that of the younger employee.  DFF ¶ 115 n.5.

At the end of 2002, both employees have the same account balance of $9,084, and Employee Y is then age 50 and Employee O is age 55.  Next, assume that the account balances, if left untouched, will grow at a 4.5% interest-credit rate (the minimum under Part B) as follows:

| Year | Account Balance (rounded) |
|---|---|
| 2002 (both depart) | $  9,100 |
| 2012 (Employee O turns 65) | $14,100 |
| 2017 (Employee Y turns 65) | $17,600 |

Both of these employees can elect to receive their benefits <u>at the same time</u> and, if they do so, the older employee will always receive the same, or more, money than the younger employee.  Similarly, Employee O could take his money out of the plan in 2012 and earn the same market rate of interest that Employee Y earns in the Plan.  DFF ¶ 115.  Regardless of the circumstances, it is undisputed that Employee O is at least as well off economically as Employee Y and has suffered no detriment because of his age.  Notably, Mr. Poulin never even tried to suggest otherwise, nor did he address this fundamental point in his report or at trial.

By contrast, Mr. Sher described several ways that one could measure whether Part B is age discriminatory.  Using each methodology, Mr. Sher concluded that Part B is not age discriminatory.  DFF ¶¶ 95-110.  Mr. Sher also explained several flaws in Mr. Poulin's age discrimination analysis, including Mr. Poulin's failure to be actuarially or economically consistent.  DFF ¶¶ 111-151.  For example, Mr. Poulin compared an employee's benefit payable at some point in the future (age 65) in dollars payable in the future, with the employee's salary earned today in today's dollars, without adjusting for the time value of money.  Further compounding the problem, Mr. Poulin then compared the results for two different employees without accounting for the fact that the future benefits he is comparing are payable at two

different times, u.g., when each employee turns age 65. This type of analysis violates

fundamental principles of the time value of money — principles that Mr. Poulin ultimately

acknowledged at trial:

> Q. Now, you agree, Mr. Poulin, that it's a fundamental principle in
> the theory of interest that the value of an amount of money at any
> given point in time depends upon the time elapsed since the money
> was paid in the past or upon which the time will elapse in the
> future before it is paid?
> A. I believe that this seems to be a standard definition.
>
> Q. Do you agree with it?
> A. Well, yes.
>
> *   *   *
>
> Q. The follow-up question was: And do you see that the next
> paragraph, the first sentence, "As a consequence of the above
> principle, it is obvious that two or more amounts of money payable
> at different points in time cannot be compared until all the amounts
> are accumulated or discounted to a common date?" Do you see
> that statement?
> And your answer to that question was?
> A. Yes.

DFF ¶ 118. As Mr. Sher explained, by correcting for those flaws, even Mr. Poulin's analysis

would confirm that Part B was not age discriminatory. DFF ¶ 125.

Importantly, Mr. Poulin did not dispute Mr. Sher's age discrimination analysis or

Mr. Sher's criticisms of Mr. Poulin's analysis. Nor did Mr. Poulin testify that older employees

were economically disadvantaged vis-à-vis similarly situated younger employees. Instead,

Mr. Poulin's only response to Mr. Sher was one of statutory interpretation – he argued that

ERISA requires one to test for age discrimination (at least before age 65) with respect to the

"accrued benefit" expressed in the form of an annuity commencing at age 65. DFF ¶ 112.

Effectively, Mr. Poulin believes that ERISA requires one to compare the $14,100 "age-65

benefit" that the older Employee O will have in 2012 with the $17,600 "age-65 benefit" that the

- 10 -

younger Employee Y will have in 2017, even if that analysis does not make economic or

actuarial sense.  Because $17,600 is nominally larger than $14,100 (although <u>not</u> more

economically valuable because of when the benefit is payable), Mr. Poulin bizarrely concluded

that discrimination results and that younger Employee Y had a higher rate of benefit accrual than

older Employee O <u>from 1998 through 2002</u>.  As explained at trial, the differences that Mr. Poulin

and Plaintiffs try to attribute to age discrimination merely reflect the time value of money, a

well-settled economic principle routinely recognized and applied by courts.[7]  Mr. Poulin's

analysis is nonsensical and not consistent with, let alone compelled by, the terms of the statute

upon which Plaintiffs rely.

     **C.**    **The Decisions Finding That Cash Balance Plans Are Age Discriminatory Are Flawed.**

Pursuant to the Court's instruction at trial, Defendants will not repeat the rationale of

each court, <u>see</u> <u>supra,</u> page 6, that has found that cash balance plans are not age discriminatory

and do not violate ERISA Section 204(b)(1)(H).  The decisions holding that cash balance plans

are age discriminatory, however, are flawed for several reasons, now described.

---

[7]    <u>See, e.g.,</u> <u>Metz v. United Techs. Corp.</u>, 754 F.2d 63, 66 (2d Cir. 1985) ("[I]n computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.") (citations omitted); <u>Jones & Laughlin Steel Corp. v. Pfeifer</u>, 462 U.S. 523, 536-37 (1983) ("In all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.") (internal quotations omitted).

1.    **The Phrase "Rate Of An Employee's Benefit Accrual" Does Not Refer To The "Accrued Benefit."**

The statute that Plaintiffs maintain Part B violates is ERISA Section 204(b)(1)(H)(i), which provides in relevant part that:

> a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i).  The three district court judges who have found that cash balance plans are age discriminatory have based their decisions exclusively on a determination that the term "benefit accrual" in Section 204(b)(1)(H) <u>unambiguously</u> means the same thing as the "accrued benefit" — a defined term in ERISA[8] — and that any age discrimination analysis therefore must compare the normal retirement annuity benefits payable to participants at different periods of time.  <u>FleetBoston I</u>, 427 F. Supp. 2d at 164-65; <u>Parsons</u>, 2006 WL 3826694, at *1; <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 485-88; <u>Citigroup I</u>, 470 F. Supp. 2d at 341-44.  None of these courts has even considered the purpose of the statutory section at issue or the reasonableness of their conclusions, except to note that they are bound to apply the unambiguous words regardless of the consequences.  <u>FleetBoston I</u>, 427 F. Supp. 2d at 164-65; <u>Parsons</u>, 2006 WL 3826694, at *1; <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 489; <u>Citigroup I</u>, 470 F. Supp. 2d at 344-45.  Respectfully, this interpretation is wrong.

As an initial matter, for a statute to meet the high threshold of being "unambiguous," it must be susceptible to only one reasonable interpretation.  <u>Rabin v. Wilson-Coker</u>, 362 F.3d 190, 196 (2d Cir. 2004) ("A statute is ambiguous if its terms are susceptible to two or more reasonable

---

[8]    <u>See</u> 29 U.S.C. §§ 1002(23), 1054(c)(3).

meanings."). Here, there is no basis for concluding that the phrase "rate of an employee's benefit accrual" unambiguously refers to the specifically defined term "accrued benefit." Indeed, the only two courts of appeals to have addressed this question have ruled to the contrary. That these six reasonable and well-respected appellate judges (along with numerous district court judges) have concluded that "rate of an employee's benefit accrual" does not refer to the "accrued benefit" demonstrates at a minimum that the phrase cannot <u>unambiguously</u> mean what Plaintiffs contend. <u>See also</u> Judge Kravitz, Trial Transcript at 1201 ("Congress must have left it unclear, otherwise all those really good people wouldn't have reached different views.").

Moreover, the courts that have held that "rate of an employee's benefit accrual" unambiguously means the "accrued benefit" have rooted their interpretation in the principle of statutory construction that words used in one part of a statute must be interpreted to have the same meaning in other parts of the same statute. <u>FleetBoston I</u>, 427 F. Supp. 2d at 164-65; <u>Parsons</u>, 2006 WL 3826694, at *1; <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 485-86; <u>Citigroup I</u>, 470 F. Supp. 2d at 342. This reliance was misplaced. First, this principle only applies <u>where the same word or phrase is used in both parts of the statute</u>. <u>See</u> <u>United States v. Maria</u>, 186 F.3d 65, 71 (2d Cir. 1999) ("As a general matter, the use of different words within the same statutory context strongly suggests that different meanings were intended."). As the Ninth Circuit explained:

> Congress's explicit decision to use one word over another in drafting a statute is material. It is a decision that is imbued with legal significance and should not be presumed to be random or devoid of meaning. Even words with remarkably similar definitions can still convey a unique or distinct meaning or flavor from words that are similar or even synonymous in nature because of their differing tone or usage within a sentence.

<u>S.E.C. v. McCarthy</u>, 322 F.3d 650, 656 (9th Cir. 2003) (internal citations omitted). Yet Section 204(b)(1)(H) does not use the term "accrued benefit." There is no reason to conclude that

different words in different parts of a statute must be interpreted to mean the same thing.  To the contrary, that Congress chose not to refer to the "accrued benefit" in ERISA Section 204(b)(1)(H), but instead used different words, reflects that Congress intended a different meaning.

Ample evidence exists that Congress understood specifically how to require testing based on age-65 annuity benefits.  ERISA's 133⅓% anti-backloading rule explicitly refers to the "accrued benefit payable at the normal retirement age."  29 U.S.C. § 1054(b)(1)(B) (emphasis added).  Congress added Section 204(b)(1)(H) in 1986, twelve years after the anti-backloading rules were enacted.  If Congress intended for age discrimination to be tested the same way ERISA's 133⅓% anti-backloading rule was tested, it easily could have used the same language.  That different language was used — "rate of benefit accrual" and without any reference to normal retirement age — confirms that a different meaning was intended.  See supra, page 13. See also Mohegan Tribe v. State of Connecticut, 483 F. Supp. 597, 600 (D. Conn. 1980) ("It is a canon of statutory construction that where as here the words of a later statute differ from those of a previous one on the same or a related subject, the legislature must have intended them to have a different meaning.").[9]

---

[9]    Even where the same word appears multiple times in a statute, the word can have different meanings depending on context.  In 2004, the Supreme Court recognized this canon in Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581 (2004), where it held that the word "age" had different meanings in different parts of the Age Discrimination in Employment Act ("ADEA").  Id. at 595-96.  In rejecting the plaintiff's argument that the word "age" must mean the same thing throughout the ADEA, the Court held:

> The argument rests on two mistakes.  First, it assumes that the word "age" has the same meaning wherever the ADEA uses it. But this is not so, and [plaintiff] simply misemploys the presumption that identical words used in different parts of the same

continued . . .

In this case, the inquiry is to determine the meaning of the phrase "rate of an employee's benefit accrual," which, unlike the term "accrued benefit," has no specific definition under ERISA.[10]  There are many ways to calculate a rate of benefit accrual, depending on the context and the purpose of the calculation.  DFF ¶ 98.[11]  Indeed, even Mr. Poulin calculated different

---

> act are intended to have the same meaning.  [Plaintiff] forgets that the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.
>
> * * *
>
> So it is easy to understand that Congress chose different meanings [of the word "age"] at different places in the ADEA, as the different settings readily show.  Hence the second flaw in [plaintiff's] argument for uniform usage:  it ignores the cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it.  The point here is that we are not asking an abstract question about the meaning of "age"; we are seeking the meaning of the whole phrase "discriminate . . . because of such individual's age."

Id. (internal citations and punctuation omitted, emphasis added, ellipsis in original).

[10]  In Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739 (2004), the Supreme Court defined the phrase "benefit accrual" as "the rate at which an employee earns benefits to put in his pension account."  Id. at 749.  This, not surprisingly, is the same definition used by the Seventh Circuit in Cooper and the Third Circuit in Register.  Although the Supreme Court in Heinz was not interpreting the phrase in the specific context of ERISA's age discrimination provision, the Court's common-sense interpretation of the phrase is further evidence that Plaintiffs' analysis is incorrect.

[11]  The Eaton court held:

> The concept of the "benefit accrual rate" does not have a single, self-evident meaning, especially in the world of pension plan regulation.  The term is used and defined in different ways and for different purposes under ERISA and the Internal Revenue Code.
>
> * * *
>
> The argument distinguishing between "accrued benefit" and "rate of benefit accrual" may seem like pretty fine hair splitting.

continued . . .

rates of benefit accrual <u>for the same plan</u> depending on the purpose of his calculations and what he was trying to analyze.[12]  DFF ¶ 99.

The three district court judges who concluded that cash balance plans are age discriminatory failed to consider the purpose or context of the analysis, <u>i.e.</u>, to determine whether older employees are worse off than similarly situated younger employees under a pension plan. Respectfully, this was in error.  <u>See</u> <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").[13]  Age discrimination requires a meaningful analysis of whether older participants are

_____

> Nevertheless, pension law is a highly technical field where hairs are split with ever finer razors.

117 F. Supp. 2d at 830 & n.8 (collecting examples, internal parenthetical omitted).

[12]    Specifically, Mr. Poulin calculated different rates of benefit accrual for the same career average plan when he compared the career average plan to a three-year final average pay formula and to a five-year final average pay formula.  DFF ¶ 99.

[13]    In a similar vein, some courts have suggested that if defined benefit plans were supposed to be tested for age discrimination based on the allocation to the employee's account — the way defined contribution plans are tested — Congress would have used the same language for prohibiting age discrimination in a defined benefit plan that it used to prohibit age discrimination in a defined contribution plan.  <u>Compare</u> 29 U.S.C. § 1054(b)(1)(H) <u>with</u> 29 U.S.C. § 1054(b)(2).  This argument reflects an apparent misunderstanding of the definition of a defined benefit plan.  Specifically, a defined benefit plan is defined as any plan other than an individual account plan, <u>i.e.</u>, a defined contribution plan.  <u>Compare</u> 29 U.S.C. § 1002(34) <u>with</u> 29 U.S.C. § 1002(35).  There are many different types of defined benefit plans, which accrue benefits in different ways.  Congress could not test age discrimination for all defined benefit plans in terms of an account balance (like it did for defined contribution plans) because most defined benefit plans do not even have "accounts."  By contrast, all defined contribution plans are individual account plans.  <u>See</u> 29 U.S.C. § 1002(34).  Thus, it made sense for Congress to define the accrued benefit in a defined contribution plan as the account balance.  For a defined benefit plan that mirrors an individual account plan (<u>e.g.</u>, a cash balance plan), however, the rate of benefit accrual should be measured in terms of the way benefits actually are earned in the plan — based on allocations to the employee's account.  DFF ¶ 105.

worse off than similarly situated younger participants.  As explained above, under Part B, older participants are treated as well as, or better than, similarly situated younger participants.  Thus, Part B is not age discriminatory.[14]

### 2. The Term "Benefit Accrual" Cannot Refer To The "Accrued Benefit" Because That Interpretation Cannot Be Applied Consistently At All Ages.

As explained above, in this case — as in all of the cases where courts have found cash balance plans were age discriminatory — Plaintiffs claim that "benefit accrual" <u>unambiguously</u> refers exclusively to the defined term "accrued benefit," i.e., an employee's age-65 annuity benefit.  <u>See</u> Pls.' Post-Trial Br. at  33-36.  That is, according to Plaintiffs, as well as Judges Hall, Baer and Scheindlin, ERISA Section 204(b)(1)(H) <u>requires</u> that age discrimination always be tested exclusively with reference to employees' age-65 annuity benefits and does not allow for any variation.  <u>See</u> <u>FleetBoston I</u>, 427 F. Supp. 2d at 162-68; <u>Parsons</u>, 2006 WL 3826694, at *1; <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 485-88; <u>Citigroup I</u>, 470 F. Supp. 2d at 341-42.  Thus, Plaintiffs' expert, Mr. Poulin, insisted at trial that there is only one mathematical formula that

---

[14]  As explained above, the phrase "rate of an employee's benefit accrual" does not refer to the "accrued benefit" and does not require testing based on the statutorily defined term "accrued benefit."  Even if Section 204(b)(1)(H) used the words "accrued benefit," however, nothing in ERISA would require that such a benefit be expressed in the form of an age-65 annuity. ERISA Section 3(23) defines "accrued benefit" as "the individual's accrued benefit determined under the plan and, <u>except as provided in section 1054(c)(3)</u> of this title, expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A) (emphasis added).  29 U.S.C. § 1054(c)(3), in turn, provides:

> For purposes of this Section, in the case of any defined benefit plan, if an employee's accrued benefit is <u>to be determined as an amount other than an annual benefit commencing at normal retirement age</u>. . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit.

29 U.S.C. § 1054(c)(3) (emphasis added).  Thus, ERISA specifically permits an accrued benefit "to be determined as an amount other than an annual benefit commencing at" age 65. <u>Id.</u>

- 17 -

can be used to calculate a participant's accrued benefit and to test for age discrimination under

ERISA Section 204(b)(1)(H).  He testified:

> Q.  Sir, am I correct that your formula [in paragraphs 13 and 14 of your report] is based on your opinion that the calculation of the rate of benefit accrual must be made with reference to the age 65 annuity?
> A.  Yes, it is.
>
> *   *   *
>
> Q.  Just so we are clear, your method doesn't address the rate of -- aside from what's in paragraphs 13 and 14, you don't address any other way of measuring the rate of benefit accrual in a cash balance plan, correct?
> A.  This is correct.

DFF ¶ 112.

Section 204(b)(1)(H) also provides, however, that an employee's rate of "benefit accrual"

cannot be reduced "because of the attainment of <u>any age</u>."  29 U.S.C. § 1054(b)(1)(H) (emphasis

added).  Relying on this underlined language, many courts have held that Section 204(b)(1)(H)

applies equally at all ages, both before and after age 65.  Indeed, Congress's principal purpose in

enacting Section 204(b)(1)(H) was to protect employees who continued to work <u>after</u> normal

retirement age.  Thus, <u>whatever the phrase "benefit accrual" means, that same definition must

apply at all ages, both before and after 65</u>.

Yet Mr. Poulin admitted that testing for age discrimination with reference to the "accrued

benefit, <u>i.e.</u>, age-65 annuity benefits, <u>does not work for benefit accruals after age 65</u>.  As he

conceded at trial:

> Q.  And in fact, Mr. Poulin, the formula that you articulate in paragraphs 13 and 14 doesn't actually work for benefit accruals after age 65, correct?
> A.  No, it's not intended to work because the benefit accrual requirements are to determine whether there is backloading prior to

> normal retirement age and all three of them, they refer to the age
> 65 benefit so that there is – the calculations stop at age 65.

DFF ¶ 134. [15]

Plaintiffs offer no basis for interpreting the term "benefit accrual" to mean one thing for

employees under age 65 and another thing for employees after age 65, particularly if the term

unambiguously refers to the "accrued benefit" as Plaintiffs' claim.[16]  Moreover, applying

different tests for age discrimination before and after age 65 is particularly illogical here, because

Part B <u>utilizes the same formula both before and after age 65</u>.  Mr. Poulin admitted that cash

---

[15]  Mr. Poulin's interpretation of the statute makes no sense from a public policy standpoint.
Congress enacted ERISA Section 204(b)(1)(H) out of concern for the way employees over
age 65 were being treated, yet his analysis affords <u>lesser</u> protection to that group.  <u>See</u> <u>Eaton</u>,
117 F. Supp. 2d at 826-29 ("[The legislative history] provides considerable support for
defendants' argument that Congress did not intend for the pension age discrimination
provisions to apply to the rate of benefit accrual for participants under the age of 65.");
<u>Tootle</u>, 222 F.R.D. at 93 ("[L]egislative history and statutory language provide strong
evidence that [ERISA's age discrimination provisions are] not intended to protect workers
until after they have attained normal retirement age.").  Indeed, according to Mr. Poulin,
Part B is not age discriminatory after normal retirement age.  DFF ¶ 133.

[16]  Mr. Poulin presumably modified his definition of "benefit accrual" for accruals after normal
retirement age because he knew that his regular (and purportedly unambiguous) definition of
"benefit accrual" (i.e., for employees under age 65) is inconsistent with the legislative
history.  Specifically, when Congress enacted Section 204(b)(1)(H)(i), it provided an
example in its Conference Report of how the statute should work to ensure that plans were
not discriminating based on age.  <u>See</u> <u>Eaton</u>, 117 F. Supp. 2d at 830 (<u>citing</u> H.R. Rep. No.
99-1012 (1986), 1986 U.S.C.C.A.N. 3868, 4026).  The Conference Report is "the most
authoritative source[] on the meaning of legislation."  <u>Chen v. U.S. Dep't of Justice</u>, 434
F.3d 144, 153 (2d Cir. 2006).  Yet if Plaintiffs' unambiguous definition of "benefit accrual"
(at least before age 65) were correct, the example in the Conference Report would itself be
illegal because the accrual formula it describes — when measured in terms of an age-65
annuity — actually decreases with age.  DFF ¶ 135.  <u>See also, e.g.</u>, <u>Eaton</u>, 117 F. Supp. 2d at
830.  These same mathematical principles would cause the accrual pattern for many
common and traditional defined benefit plans to be age discriminatory with respect to
benefits earned by employees who work after normal retirement age.  Indeed, even
traditional career pay plans and final average pay plans (the most common plan designs for
non-union employees in the United States) would be age discriminatory under Plaintiffs'
approach for accruals after age 65.  DFF ¶¶ 137, 139.

balance plans were "probably not" age discriminatory after normal retirement age.  DFF ¶ 133.

If Part B uses the same formula at all ages – and the plan is not age discriminatory after age 65 –

then it should not be discriminatory at any age.  Because Plaintiffs' (and Judges Baer, Hall and

Scheindlin's) interpretation of the term "benefit accrual" does not work at all ages, it cannot be

correct.  See United States v. Am. Trucking Ass'ns, 310 U.S. 534, 542-44 (1940) ("When [a

literal interpretation of a statute] has led to absurd or futile results, however, this Court has

looked beyond the words to the purpose of the act.  Frequently, however, even when the plain

meaning did not produce absurd results but merely an unreasonable one plainly at variance with

the policy of the legislation as a whole this Court has followed that purpose, rather than the

literal words.").

> **3.    The Second Circuit's Decision In Esden v. Bank of Boston Does Not Address Age Discrimination Or The Meaning Of The Term "Benefit Accrual."**

Plaintiffs and Judges Baer, Hall and Scheindlin suggest that the Second Circuit's decision

in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000), compels a conclusion that cash balance

plans are age discriminatory.  See Pls.' Post-Trial Br. at 39-40; FleetBoston I, 427 F. Supp. 2d at

163-64, 167; J.P. Morgan I, 460 F. Supp. 2d at 487-88; Citigroup I, 470 F. Supp. 2d at 342.

However, Esden involved a very narrow issue not present in this case:  the process for

calculating lump sum benefits in a cash balance plan known as "whipsaw."  Esden, 229 F.3d at

158-59.  The Second Circuit held that cash balance plans must engage in the whipsaw process

when calculating lump sum benefits under certain circumstances because of the specific statutory

definition of the phrase "accrued benefit" and IRS Notice 96-8, which describes whipsaw.  Id. at

163-68 (quoting definition of "accrued benefit" and citing Notice 96-8).

Notably, Plaintiffs do not allege a whipsaw claim, and Mr. Poulin has admitted that he did not offer (and was not asked to offer) any opinions on whipsaw.  DFF ¶ 111.  More importantly, the Second Circuit's decision in <u>Esden</u> relied on the statutory definition of the term "accrued benefit" <u>because that exact term was used by Congress in the statutory provision at issue in that case</u>.  <u>Esden</u>, 229 F.3d at 158.  By contrast, as explained above, the term "accrued benefit" does <u>not</u> appear in ERISA's age discrimination provision and the phrase "rate of an employee's benefit accrual" in Section 204(b)(1)(H) does not — and cannot — refer to the "accrued benefit" for all the reasons described above.  Thus, <u>Esden</u> does not support Plaintiffs' position that cash balance plans are age discriminatory.

Indeed, in <u>Berger v. Xerox Corp. Ret. Income Guarantee Plan</u>, 338 F.3d 755 (7th Cir. 2003), the Seventh Circuit agreed with the <u>Esden</u> court's conclusions regarding whipsaw based on the definition of the term "accrued benefit."  <u>Berger</u>, 338 F.3d at 759.  Yet the Seventh Circuit in <u>Cooper</u> nevertheless held that cash balance plans are <u>not</u> age discriminatory.  In <u>Cooper</u>, the Seventh Circuit specifically rejected the argument that its earlier decision regarding whipsaw in <u>Berger</u> (and the Second Circuit's decision in <u>Esden</u>) compelled a finding that cash balance plans are age discriminatory.  As the Seventh Circuit explained:

> To derive the "actuarial equivalent" of a pension at age 65, a plan must (a) add all interest that would accrue through age 65, then (b) discount the resulting sum to its present value.  <u>Berger v. Xerox Corp. Retirement Income Guarantee Plan</u>, 338 F.3d 755, 762-63 (7th Cir. 2003).  Plaintiffs characterize step (a) as extra interest credits for the young, but they ignore step (b).  The discount rate may be close to (if it does not exceed) the rate at which interest is imputed, so the amount paid out in cash may be close to if not below the nominal balance in the account.  <u>Berger</u> did not consider § 204(b)(1)(H)(i) and does not hold that the process of grossing up the balance and then discounting is a form of age discrimination.  To the contrary: <u>Berger</u> described this process as the means to avoid age discrimination.

> As far as we can see, ours is the first appellate decision to address the status of cash-balance plans under § 204(b)(1)(H)(i). The class directs our attention to two decisions from other circuits that it says supply helpful analysis. <u>Miller v. Xerox Corp. Retirement Income Guarantee Plan</u>, 447 F.3d 728 (9th Cir. 2006); <u>Esden v. Bank of Boston</u>, 229 F.3d 154 (2d Cir. 2000). As the class reads them, these opinions stand for two important propositions. First, that an "accrued benefit" in a cash-balance plan is an annuity at normal retirement age. Second, that there is a "fundamental" distinction between defined-contribution and defined-benefit plans. Both of these propositions are correct, and both of them are irrelevant.
>
> Start with the first proposition. What the true meaning of "accrued benefit" may be is not controlling; § 204(b)(1)(H)(i) does not use that phrase, and we have explained why "benefit accrual" means something other than "accrued benefit." Once we start to calculate accrued benefits for people who quit or retire early, it is necessary to impute extra interest and discount. <u>Berger</u> describes how this is done. But "benefit accrual" refers to the annual addition to the pot, not to the final payout. The holding of <u>Esden</u>, <u>see</u> 229 F.3d at 168, mirrors that of <u>Berger</u> and requires no further comment.

<u>Cooper</u>, 457 F.3d at 640-41.[17] In short, and as reflected in <u>Cooper</u>, the Second Circuit's decision in <u>Esden</u> does not compel — or even support — the conclusion that cash balance plans are age discriminatory. Plaintiffs' repeated reliance on <u>Esden</u> is therefore misplaced.

### 4. The Economic Effects That Plaintiffs Challenge Here Are Lawful In Other Contexts, Including With Traditional Defined Benefit Plans.

The Seventh Circuit in <u>Cooper</u> and the Third Circuit in <u>Register</u> both recognized that differences in the age-65 annuity benefits of older and younger participants that Plaintiffs

---

[17]  <u>Esden</u> (and <u>Berger</u>) also confirm that, contrary to Plaintiffs' position throughout this litigation, the time value of money is a fundamental principle under ERISA. <u>Esden</u>, 229 F.3d at 161; <u>Berger</u>, 338 F.3d at 63. <u>Esden</u> specifically describes how to calculate an "accrued benefit" expressed as a lump sum in present day dollars. <u>Esden</u>, 229 F.3d at 161. Thus, if one wanted to compare the "accrued benefit" payable to an older participant versus a younger participant adjusted for differences in the number of years to payout of the benefit and the time value of money, one could easily do so by comparing lump sums calculated pursuant to <u>Esden</u>. Notably, neither Plaintiffs nor their expert in this case has even tried to do so.

challenge are due exclusively to differences in the number of years to payout of the benefit and the time value of money, not to age discrimination. Cooper, 457 F.3d at 638-40; Register, 477 F.3d at 70. As an economics matter, the interest earned in cash balance plans over time is no different than the effects of interest on defined contribution plans, or of cost of living increases under the Social Security system, both of which are entirely lawful. These same economic effects — cited as evidence of age discrimination by Plaintiffs and Judges Baer, Hall and Scheindlin — are common and lawful in traditional final average pay plans. DFF ¶¶ 127, 137, 138; FleetBoston I, 427 F. Supp. 2d at 166-67; J.P. Morgan I, 460 F. Supp. 2d at 488; Citigroup I, 470 F. Supp. 2d at 343-44. Mr. Poulin admitted as much at trial when discussing an illustrative example:

> A. I think so. So we have a 40-year-old who just started and a 60-year-old who already has 20 years of service.
>
> Q. They're doing the same job and both make the same salary, okay? Over the course of time, they get salary increases and let's assume they get the same salary increases over the course of time because they're doing the same job, okay?
> A. Um hum.
>
> Q. Do you understand so far?
> A. I think so.
>
> Q. Okay? In five years, the 60-year-old will be normal retirement age and he can start receiving his normal retirement benefits, correct?
> A. Yes.
>
> Q. Can you tell me if it was, to make it simple, a 1 percent formula, he would be getting 1 percent times years of service, 25 years of service, times whatever his pay is at the time he is 65, correct?
> A. Correct.
>
> Q. The 40-year-old keeps working for another 20 years, keeps getting pay increases at the same rate they were getting them before. Do you understand that?

- 23 -

A.  Um hum.  Yes.

Q.  Okay.  When the 40-year-old turns 65, he's going to be entitled to a pension annuity based on 25 years of service as well, correct?
A.  Correct.

Q.  Based on his final average salary, and his final average salary is going to be substantially higher than the final average salary of the 60-year-old, correct?
A.  That's right.

Q.  His annuity benefit will be a lot higher in dollar amounts, correct?
A.  Yes.

Q.  Okay.  That's not age discrimination?
A.  No.

DFF ¶ 128.

In this example, although both employees have the same years of service, the younger employee earns a higher age-65 annuity benefit than the older employee.  According to Mr. Poulin, this is not age discrimination.  Yet this is the same interest effect as in cash balance plans, except that cash balance plans index benefits for time value (or inflation) based on an interest credit rate, instead of based on increases in the employee salaries over time.  Accordingly, there is no age discrimination.

### 5.    The Treasury Department Has Consistently Endorsed Cash Balance Plans As Not Being Age Discriminatory.

Plaintiffs' interpretation of ERISA Section 204 (b)(1)(H)(i) also ignores the Treasury Department's repeated formal pronouncements that cash balance plans are not inherently age discriminatory.  The Second Circuit in Esden explained that a "consistent and reasonable interpretation by the responsible agency is entitled to deference, regardless of its form of publication." Esden, 229 F.3d at 169.  See also Auer v. Robbins, 519 U.S. 452, 462 (1997) (agency's interpretation set forth in amicus Brief was entitled to deference where "[t]here is

simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question").[18]  The Treasury Department is the agency responsible for interpreting and issuing regulations under ERISA,[19] and its endorsement of cash balance plans is clear:

- In 1991, the Treasury Department published safe harbor regulations for cash balance plans.[20]  See 26 C.F.R. § 1.401(a)(4)-8(c)(3)(iii)(B).  In the preamble to the regulations, the Treasury Department stated that "[t]he fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation [i.e., the benefit credit] will not cause a cash balance plan to fail to satisfy the requirements of section 411(b)(1)(H), relating to age-based reductions in the rate at which benefits accrue under a plan."  56 Fed. Reg. 47,524 (Sept. 19, 1991) (codified at 26 C.F.R. § 1).  This is an explicit rejection of Plaintiffs' theory that cash balance plans are inherently age discriminatory because of the greater amount of time that younger participants have to earn interest.

- In 1996, the Treasury Department published IRS Notice 96-8, approving cash balance plan designs with interest credits that accrue up-front (like Part B) and describing how lump sum benefits in a cash balance plan should be determined.  See IRS Notice 96-8, Part III.A.

---

[18]  See also Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 48 (2d Cir. 2002) ("Even though not formally promulgated as regulations, these opinion letters, as the views of the agency charged with implementing ERISA, are at least a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and we have often relied on them for guidance.") (internal quotations and citations omitted).

[19]  See 29 U.S.C. § 1001nt (Section 101(a) of the Reorganization Plan No. 4 of 1978 gives the Secretary of the Treasury authority to issue regulations under ERISA).

[20]  The Second Circuit in Esden cited approvingly to these safe harbor regulations.  Esden, 229 F.3d at 169-70.

It is implausible that the Treasury Department would have issued rules describing how to calculate lump sums in a cash balance plan if its interpretation of ERISA would render all cash balance plans inherently illegal.

- In 2002, the Treasury Department proposed regulations that squarely rejected the notion that cash balance plans are inherently age discriminatory.  See 67 Fed. Reg. 76,123-01 (Dec. 11, 2002).

- In its revenue proposals for 2005, 2006, and 2007, the Treasury Department confirmed that "cash balance plans and cash balance plan conversions are not inherently age discriminatory."[21]

In short, as the Register court held, "[t]he Department of Treasury has consistently stated that cash balance plans are not age discriminatory."  Register v. PNC Fin. Servs. Group, Inc., No. 04-CV-6097, 2005 WL 3120268, at *7 (E.D. Pa. Nov. 21, 2005), aff'd 477 F.3d 56 (3d Cir. 2007).  The Department's formal pronouncements, which are consistent with the legislative history and the economic reality of the cash balance plan design, are entitled to deference.[22]

---

[21]  See Department of Treasury, General Explanation of the Administration's Fiscal Year 2005 Revenue Proposals 104 (2004); Department of Treasury, General Explanation of the Administration's Fiscal Year 2006 Revenue Proposals 82 (2005); Department of Treasury, General Explanation of the Administration's Fiscal Year 2007 Revenue Proposals 66 (2006).

[22]  Plaintiffs and Judge Hall mistakenly rely on the Treasury Department's interpretation of ERISA Section 204(h) (regarding certain disclosure requirements) to support their interpretation of the age discrimination prohibition in ERISA Section 204(b)(1)(H).  See Pls.' Post Trial Br. at 35; FleetBoston I, 427 F. Supp. 2d at 165 n.12.  As explained previously, however, there are numerous ways to determine a rate of benefit accrual, depending on the purpose for which the rate is being measured.  Obviously, ERISA's age discrimination provision has a different purpose than ERISA's Section 204(h) notice provision, so it is reasonable for the Treasury Department to interpret these two provisions differently, consistent with their respective (and different) purposes.  Thus, although the

continued . . .

**D.    Plaintiffs' Argument That Wear-Away Is Age Discriminatory Is A Distortion Of The Facts and Governing Law.**

"Wear-Away" is an effect, largely caused by a decline in interest rates, that results in a participant who is accruing new benefits under one benefit formula not to experience any growth in overall benefits.  See Richards v. FleetBoston, 235 F.R.D. 165, 168 (D. Conn. Mar. 31, 2006) ("FleetBoston II") ("The idea that an employee covered by these terms does not actually accrue any new benefits under the Amended Plan until the value of the hypothetical cash balance account exceeds that of the frozen Traditional Plan benefit is known as the "wear-away" effect.). The Treasury Department has issued regulations that specifically acknowledge and endorse wear-away periods, including with respect to cash balance conversions.  For example, the regulations provide safe harbors from certain ERISA requirements for plans that have particular types of wear-away periods.  See 26 C.F.R. § 1.401(a)(4)-13 (describing safe harbor "formula with wear-away" and "formula with extended wear-away"); 26 C.F.R. § 1.410(b)-3(a)(2)(iii)(C) (permitting plans where "the plan is applying the wear-away formula . . . and the employee's frozen accrued benefit exceeds the benefit determined under the current formula").  Current regulations under ERISA Section 204(h), 29 U.S.C. § 1054(h), further provide that a Section 204(h) notice is required for a plan amendment after September 2, 2003 "that results in a wear-

_____

Treasury Department may have determined that it was appropriate to measure rates of benefit accrual one way for purposes of ERISA Section 204(h) notice requirements, the Treasury Department has determined that a different interpretation is appropriate for purposes of ERISA's age discrimination provision.  As the Eaton court held:

> The concept of the "benefit accrual rate" does not have a single, self-evident meaning, especially in the world of pension plan regulation.  The term is used and defined in different ways and for different purposes under ERISA and the Internal Revenue Code.

Eaton, 117 F. Supp. 2d at 830 (also collecting examples).

away period" and describe in detail how notice should be provided when a wear-away results

from the conversion of a traditional plan to a cash balance plan. See 26 C.F.R. § 54.4980F-1

Q&A11(a)(4)(ii). Thus, the existence of a wear-away period is not inherently unlawful.

Nonetheless, Plaintiffs argue that Part B is age discriminatory not only based on its

fundamental design, but also because the wear-away period can be longer for some older

employees than for some younger employees. See Pls.' Post-Trial Br. at 45-48. This argument

reflects a fundamental distortion of the facts and the legal principles governing age

discrimination.

With regard to the facts, Plaintiffs' expert, Mr. Poulin, admitted that he never actually

analyzed the lengths of the wear-away periods for large groups of older and younger participants,

or examined average wear-away periods for older and younger participants. DFF ¶ 147. In fact,

Mr. Poulin never even analyzed the demographics of participants in the Plan. DFF ¶ 147. Thus,

he never actually examined whether wear-away periods were generally longer for older

employees than for similarly situated younger employees.

In fact, Mr. Poulin's specific testimony regarding wear-away actually contradicts his

conclusory and unsupported assertions that wear-away periods were longer for older employees

and therefore age discriminatory. Mr. Poulin admitted that Plan participants converted on

January 1, 1998 who had more than 55 age and service points, i.e., older participants, had no

wear-away periods because their conversion factors were more favorable than those used for

similarly situated younger participants. DFF ¶ 148. Thus, Plaintiffs' assertion that wear-away

periods were longer for older participants is simply untrue. In addition, Mr. Poulin also admitted

that the mortality discount (which Mr. Poulin testified is a cause of wear-away) always is greater

for a younger participant than for similarly situated older participants.  DFF ¶ 149.  In short, his

conclusory testimony is not supported by the facts or his own expert opinions.

      Furthermore, even if Plaintiffs had actual evidence to back up their argument, Plaintiffs'

claim that wear-away periods were longer (in hindsight) for some older employees than for some

younger employees does not constitute age discrimination.  It is undisputed that Part A was

economically age-favored, i.e., an older participant with the same service and salary history

received a more valuable benefit than a similarly situated younger employee.  DFF ¶ 150.

Likewise, both experts agreed that opening account balances were always higher for older

employees than for similarly situated younger employees.  See supra, page 7.  Thus, at any point

in time, an older participant converted to Part B will always have a protected Minimum Benefit

and an account balance that is higher than that of a similarly situated younger participant.  See id.

Stated differently, what Plaintiffs call age discrimination is merely the transition from a plan that

was heavily age-favored (Part A) to a plan (Part B) that is still age-favored, but merely less so.

As the Seventh Circuit explained in Cooper, that is not age discrimination.  Cooper, 457 F.3d at

642 ("But removing a feature that gave extra benefits to the old differs from discriminating

against them. Replacing a plan that discriminates against the young with one that is age-neutral

does not discriminate against the old.").

      Mr. Poulin's reliance on the availability of subsidized early retirement benefits for older

participants to prove age discrimination underscores the deficiencies in his wear-away analysis.

That approach simply cannot be squared with ERISA's age discrimination provision, which

provides that "the subsidized portion of any early retirement benefit is disregarded in

determining benefit accruals."  29 U.S.C. § 1054(b)(1)(H)(v) (emphasis added).  In addition,

because they are eligible for a subsidized early retirement, older participants are better off than

similarly situated younger participants who are not eligible for early retirement.  Thus, even assuming that an older participant may have a longer wear-away period vis-à-vis his or her subsidized early retirement benefit, this is only because the subsidized Minimum Benefit to which the older participant is entitled is <u>higher</u> than the unsubsidized Minimum Benefit available to the younger participant.  In all cases, the older participant is better off than a similarly situated younger participant.  That is not age discrimination.

## E.   Plaintiffs' Age Discrimination Claim Is Time-Barred.

Plaintiffs' claim that Part B was age discriminatory also fails because it is time-barred.  A statute of limitations "inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones."  <u>Johnson v. Railway Express Agency, Inc.</u>, 421 U.S. 454, 463-64 (1975).  Statutes of limitation serve several important policies, including rapid resolution of disputes, repose for those against whom a claim could be brought, and avoidance of litigation involving lost evidence or distorted testimony of witnesses.  <u>See, e.g.</u>, <u>Ledbetter v. Goodyear Tire & Rubber Co., Inc.</u>, 127 S. Ct. 2162, 2177 (2007); <u>Wilson v. Garcia</u>, 471 U.S. 261, 271 (1985).  For these reasons, strict adherence to limitation periods "is the best guarantee of evenhanded administration of the law."  <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980).

Where an ERISA provision does not contain its own statute of limitations for a particular claim, the most analogous state statute of limitations governs.  <u>See</u> <u>Sandberg v. KPMG Peat Marwick, LLP</u>, 111 F.3d 331, 333 (2d Cir. 1997) ("When Congress fails to provide a statute of limitations for claims arising under federal statutes, a court must apply the limitations period of the state-law cause of action most analogous to the federal claim.").  Here, Plaintiffs' ERISA Section 204(b)(1)(H)(i) claim alleging age discrimination is most analogous to Connecticut's

statutory provisions prohibiting age discrimination and the corresponding 180-day statute of

limitations that applies to such claims.  See Conn. Gen. Stat. Ann. § 46a-82 (stating age

discrimination complaint "must be filed within 180 days after the alleged act of discrimination");

Williams v. Comm'n on Human Rights and Opportunities, 786 A.2d 1283 (Conn. App. Ct. 2001)

(holding plaintiff's discrimination claim barred by 180-day statute of limitations).[23]  Plaintiffs'

age discrimination claim accrued no later than December 21, 1998, when the Part B Plan

amendment was signed.[24]  Yet Plaintiffs did not file their amended Complaint alleging their age

---

[23]  Judge Hall rejected the 180-day age discrimination statute of limitations in favor of the
breach of contract statute of limitations in Parsons, 2006 WL 2826694, at *2.  However, this
Court should reject Parsons' unpersuasive reasoning that an ERISA age discrimination claim
"deals with determining specific benefits, and thus is about a contract."  Id.  See also J.P.
Morgan I, 460 F. Supp. 2d at 483 (applying statute of limitations for breach of contract
claims to ERISA age discrimination claim simply because "[e]mployee benefit plans are
contracts").  Because Connecticut's specific statute of limitations for age discrimination is
more analogous, this court should not rely on the breach of contract statute of limitations.
See Syed v. Hercules Inc., 214 F.3d 155, 159 (3d Cir. 2000) (applying "more specific statute
of limitations covering employment disputes [which provides] for recovery upon a claim of
wages, salary, or overtime for work, labor or personal services performed, . . . or for any
other benefits arising from such work, labor or personal services performed" as opposed to
statute of limitations "for general actions on a promise") (internal emphasis omitted).

[24]  The accrual of ERISA claims is governed by "federal common law."  Daill v. Sheet Metal
Workers' Local 73 Pension Fund, 100 F.3d 62, 65 (7th Cir. 1996) ("[W]e look to federal
common law for purposes of determining the accrual date of a cause of action under a
federal statute such as ERISA.").  Under federal common law, "[i]t is the standard rule that
[accrual occurs] when the plaintiff has a complete and present cause of action, that is, when
the plaintiff can file suit and obtain relief."  Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007)
(internal quotations and citations omitted).  See also Graham County Soil & Water
Conservation Dist. v. United States, 545 U.S. 409, 418 (2005) (recognizing the standard
federal rule "that the limitations period commences when the plaintiff has a complete and
present cause of action.") (internal quotations omitted); Ledbetter, 127 S. Ct. at 2171
(plaintiff's "cause of action was fully formed and present at the time that the discriminatory
employment actions were taken against her, at which point she could have, and should have
sued").  While certainly at the time the Plan document was published, participants had a
complete cause of action, Count 3 may have accrued even earlier, since active employees
were notified about the forthcoming cash balance plan in November 1997, and Part B was

continued . . .

discrimination claim until April 12, 2002.[25]  See dkt. #s 25, 26, 33.  Accordingly, Plaintiffs' age

discrimination claim is untimely.

      If the Court were to conclude for some reason that the 180-day statute of limitations did

not apply, the other most analogous statute of limitations in Connecticut would be the two-year

statute applicable to a "[c]ivil action to collect wage claim [or] fringe benefit claim."  Conn. Gen.

Stat. Ann. § 31-72; Conn. Gen. Stat. Ann. § 52-596.[26]  Plaintiffs are plainly attempting to

"collect" additional "fringe benefits" — specifically, greater pension benefits — in Count 3.  See

Plaintiff Class' Additional Submission on Relief, dated September 12, 2006, dkt. #205

("Submission on Relief") at 3.  That claim is not grounded in contract or in an interpretation of

Part B, and therefore should not be subject to any contractual limitations period.

      Thus, regardless of whether the 180-day or two-year limitations period applies, Plaintiffs'

age-discrimination claim is time-barred.  Consequently, even if the Court were to conclude that

Part B and other cash balance plans are age discriminatory, judgment should be entered in favor

of Defendants on Count 3 of Plaintiffs' Complaint.

---

      effective on January 1, 1998 for non-rehired employees.  DFF ¶¶ 178, 179.

[25]    The age discrimination claim does not relate back to Plaintiffs' original Complaint because
the claim does not arise out of the same factual allegations.  See, e.g., Gomes v. Avco Corp.,
964 F.2d 1330, 1334 (2d Cir. 1992) (finding that a Section 1981 claim based on
discriminatory refusal to process a grievance did not relate back to the plaintiff's original
claim, which only mentioned one of the grievances because the second grievance was
considered a separate transaction not contained in the original complaint).  Even if the age
discrimination claim were to relate back, however, it would still be untimely, as Plaintiffs'
original Complaint was filed on December 18, 2001.

[26]    Section 72 of Title 31 applies to statutory wage and fringe benefit violations, such as
minimum wage violations (see Conn. Gen. Stat. Ann. §§ 31-58 to 31-62b), and violations of
the Connecticut Prevailing Wage Law (see Conn. Gen. Stat. Ann. § 31-53).  See Conn. Gen.
Stat. Ann. § 31-72.  See also Syed, 214 F.3d at 160-61 (holding that Delaware's one-year
statute of limitations for claims to recover wages and benefits applied to plaintiff's ERISA
claims).

**III.    JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 1 BECAUSE PART B DOES NOT VIOLATE ERISA'S 133⅓% ANTI-BACKLOADING OR NON-FORFEITABILITY RULES.**

Count 1 of the Complaint essentially challenges the Plan's formula for calculating an opening account balance as (1) violating ERISA's 133⅓% anti-backloading rule, and (2) causing an impermissible forfeiture of benefits.  See Rule 23 Order at 3 - Count 1(A), (B).  At a fundamental level, Plaintiffs' challenges to the formula for calculating opening account balances fail because:

> [C]urrent federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, <u>provided that a plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate from the employer.</u>

Ex. 533, United States General Accounting Office, Report to Congressional Requesters, Private Pensions, Implications of Conversions to Cash Balance Plans, September, 2000, at 30 (emphasis added).

Here, the terms of the Plan unambiguously do exactly what is required.  Specifically, Section 1.1(c) of Part B provides that:

> In the case of a Participant who has a Part A Accrued Benefit which is converted into an Initial Retirement Account, such Participant's Accrued Benefit, expressed in the form of an immediate lump sum distribution, shall in no event be less than the present Equivalent Actuarial Value (determined using the Applicable Interest Rate and the Applicable Mortality Table) of the Participant's Minimum Benefit.

DFF ¶ 69.  The Minimum Benefit is defined as a participant's age-65 annuity benefit under Part A, enhanced by the value of the "Preserved Spouse's Benefit," if applicable.  DFF ¶ 70.  In addition, Section 7.3 of the Plan protects other benefits, in other benefit forms (e.g., early retirement subsidized benefits), to which an employee was entitled under the prior formula.

Accordingly, for any participant — regardless of age — the participant's previously earned benefits are protected. DFF ¶ 72. ERISA requires nothing more. There is no impermissible forfeiture and no violation of ERISA's backloading rules.

Nevertheless, Plaintiffs rely on ERISA Sections 203(a), 29 U.S.C. § 1053(a), and 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), to attack the calculation of opening account balances under Part B. Unlike Count 3, however, there is no split of authority on the viability of Plaintiffs' anti-backloading and forfeiture claims. Rather, each court to have addressed these issues has squarely rejected claims identical to those asserted here, both in the cash balance context and otherwise. See, e.g., Register, 477 F.3d at 70-72; FleetBoston I, 427 F. Supp. 2d at 168-70. As set forth below, there is no statutory basis for Plaintiffs' claims in Count 1, so Defendants are entitled to judgment in their favor on this Count. Count 1 also is time-barred.

### A.    The Plan Does Not Violate ERISA's 133⅓% Rule.

Plaintiffs suggest that the Plan violates ERISA's 133⅓% anti-backloading rule because of the "wear-away" effect that exists for some employees related to the Minimum Benefit "greater-of" protection in Part B. See Pls.' Post-Trial Br. at 8-9, 15-23. This claim fails.

ERISA's anti-backloading rules in Section 204(b)(1) limit a defined benefit plan's ability to "backload" certain retirement benefits to later years of service. The Second Circuit explained in Langman v. Laub, 328 F.3d 68 (2d Cir. 2003), that Congress enacted the anti-backloading rules:

> to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue "backloading," i.e., by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement.

- 34 -

Id. at 71 (quoting H.R. Rep. No. 93-807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688); see also Register, 477 F.3d at 71 (same).

In order to satisfy the anti-backloading rules, a defined benefit plan need only meet one of three separate tests: (1) the "3% method;" (2) the "133⅓% rule;" or (3) the "fractional rule." See 29 U.S.C. § 1054(b)(1)(A)-(C); 29 C.F.R. § 1.411(b)-1(a); 29 C.F.R. § 1.411(b)-1(b)(1), (2) and (3) (describing each test). The challenges to cash balance plans in this case (as in other cases), involve application of the 133⅓% rule, which generally requires that:

> the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133⅓ percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

29 U.S.C. § 1054(b)(1)(B); see also 29 C.F.R. § 1.411(b)-1(b)(2) (providing examples).

Critically, ERISA requires that the 133⅓% rule be examined without consideration of any prior benefit formulas or prior plans. Section 204(b)(1)(B)(i) specifically provides that when testing for compliance with the 133⅓% rule, "any amendment which is in effect for the current year shall be treated as in effect for all other plan years." 29 U.S.C. § 1054(b)(1)(B)(i). See also Langman, 328 F.3d at 71. This means that the current operative plan is assumed to have existed for all time; it is impermissible to compare benefits under the current formula with benefits under a prior formula when testing for compliance under the rule. See Register, 477 F.3d at 71-72 (alleged violation of the 133⅓% rule cannot be based on comparison of the minimum protected benefit earned under the prior formula to the current cash balance formula).

Yet Plaintiffs' argument that Part B violates the 133⅓% rule depends on exactly such a prohibited comparison. Specifically, Plaintiffs argue that:

A.     Because of the minimum benefit protection – which is based on benefits earned under the prior plan formula – there is a period of time (the "wear-away" period) during which an employee's account balance might increase but would still be below the employee's minimum benefit, such that, according to Plaintiffs, there is no new net benefit accrual;

B.     When the account balance later surpasses the minimum benefit amount, benefit accruals resume according to Plaintiffs; and

C.     Because any benefit accrual ("B" above) would be more than 133⅓% percent of a "zero" benefit accrual ("A" above), Part B violates the 133⅓% rule, according to Plaintiffs.

DFF ¶ 164.

As explained previously, the minimum benefit protection under Part B is based exclusively on the <u>prior plan's</u> benefit formula, which cannot be considered for purposes of anti-backloading testing.  29 U.S.C. § 1054(b)(1)(B)(i).  Mr. Poulin admitted at trial that there would be no wear-away period, and hence no period of "zero" benefit accruals followed by a resumption of accruals, if the current plan is treated as if it were in effect for all prior years:

> Q.  Okay.  I would like you to assume now that the cash balance plan amendment was not effective January 1st of 1998 but instead was effective January 1st of 1997.  If you assume that to be the case, then people who were hired in 1997 or thereafter would have no wear-away, correct?
> A.  Yes.
>
> *   *   *
>
> Q.  If I asked you to assume that from the moment the original CIGNA pension plan had been adopted, assume that the cash balance plan had been adopted at that point in time.  Nobody in the cash balance plan would have any wear-away, correct?
> A.  Everybody was hired after that implementation date?  Yes.

DFF ¶¶ 165.[27]

---

[27]     Moreover, Mr. Sher testified that based on his experience and observation of other

continued . . .

These are the same circumstances the Third Circuit faced in <u>Register</u>, wherein the court held:

> [O]nce there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the 133 ⅓% test. A participant's election to retain his early retirement benefits from the old plan is not relevant to this calculation. If we treat the amended plan as in effect for all other plan years, as Congress directs us to do, appellants never would have accrued a benefit under the old plan and would have started to accrue benefits under the cash balance formula from the beginning of their employment. Accordingly, there is no violation of the anti-backloading provisions under appellants' aggregate-formula theory. Moreover, the objective of the anti-backloading provisions, to prevent a plan from being unfairly weighted against shorter-term employees, simply is not implicated by the [cash balance] conversion.

477 F.3d at 72 (internal citation and quotations omitted). Likewise, Judge Hall in the

<u>FleetBoston I</u> case reached the same conclusion, holding:

> If the Amended Plan is treated as having been in effect for all plan years, employees such as Richards would never have accrued a benefit under the Traditional Plan, and would have started accruing benefits under the cash balance formula from the start of their employment. Assuming such a scenario, such employees would suffer no backloading of benefits.

427 F. Supp. 2d at 170-71 (rejecting claim that cash balance conversion violated the 133⅓% rule); <u>see also</u> <u>Richards v. FleetBoston</u>, No. 04-1638, 2006 WL 2092086, at *3 (D. Conn. July 24, 2006) ("<u>FleetBoston III</u>") (affirming holding that cash balance plan wear-away does not violate the 133⅓% rule).[28]

---

practitioners in his field, application of the 133⅓% rule is "forward looking" only and any wear-away effect resulting from CIGNA's cash balance conversion would be irrelevant under the rule. DFF ¶ 166.

[28]    Mr. Poulin apparently understands that when a plan is amended, only the amended formula is supposed to be considered when testing for compliance with the 133⅓% rule. He

continued . . .

Plaintiffs' position on the application of the 133⅓% rule is further undermined by their focus on the wear-away of subsidized early retirement benefits experienced by some participants. See Pls.' Post-Trial Br. at 10; DFF ¶ 151.  However, the 133⅓% rule explicitly precludes testing for compliance by looking at early retirement benefits.  See 29 U.S.C. § 1054(b)(1)(B)(iii) ("[T]he fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded.") (emphasis added).  Instead, the 133⅓% rule is tested only with respect to benefits payable at "normal retirement age."  29 U.S.C. § 1054(b)(1)(B).  Thus, Plaintiffs cannot premise any purported violation of the 133⅓% rule by relying on the wear-away of early retirement benefits.   DFF ¶¶ 166, 167.

Perhaps recognizing that there is no caselaw or regulation supporting their theory of liability on their anti-backloading claim, Plaintiffs have attempted, post-trial, to introduce letters from the ERISA Industry Committee ("ERIC") and the American Benefits Council ("ABC") characterizing the IRS position regarding cash balance plan conversions as admissible evidence of the IRS's formal position regarding such conversions.  However, these letters were not written by the IRS and have not been adopted by the IRS.  More fundamentally, the letters do not relate to the circumstances presented in this case or anything analogous.  Although Plaintiffs describe the letters as reflecting the IRS position regarding cash balance plan conversions where previously earned benefits are frozen, as occurred with the adoption of Part B in this case, this is a mischaracterization.  The letters simply do not refer to cash balance plan conversions where the

---

admitted during his testimony that it is common and lawful for a traditional career average plan to have periodic updates that would result in a benefit accrual increase of more than 133⅓%.  DFF ¶ 167.  That testimony simply cannot be reconciled with his position that Part B violates the 133⅓% rule.

prior traditional formula was <u>frozen as a minimum benefit</u>.  Rather, the letters refer to the current

discussion within the IRS about certain conversions where participants are offered an ongoing

benefit formula based on the greater of a cash balance benefit for all years of service <u>or a</u>

<u>continuation of the previous traditional defined benefit formula on a going forward basis</u>.[29]

When two ongoing formulas are used to determine a participant's benefit, the rule that a plan

amendment "shall be treated as in effect for all other plan years" is inapposite.  29 U.S.C. §

1054(b)(1)(B)(i).  Thus, the ERIC and ABC letters do not address the "A + B" or "greater of A

or B" conversion methods that were at issue in <u>Register</u>, <u>FleetBoston I</u> and this case.

　　　　In short, notwithstanding Plaintiffs' efforts to mischaracterize the IRS's position, and

upon considering the actual statutes and governing regulations, there is no basis for Plaintiffs'

---

[29]　This distinction was explained succinctly in a recent article:

> The IRS evidently is concerned that where two or more formulas interact
> to determine a "winning benefit," there can be wear-away periods during
> which a participant's net benefit accruals may cease and then pick up
> again. . . .
>
> <u>Our experience to date has been that the IRS will not press this position if
> there are only two competing formulas: The cash balance formula and a
> frozen traditional formula</u>.  In that instance, the IRS understands that a
> "greater of" formula is just a mechanism for complying with Code §
> 411(d)(6): i.e., the cash balance formula governs, but with a backstop
> guarantee that a participant's benefit will never be less than the value of
> the traditional benefit accrued as of the date of conversion.
>
> <u>But the IRS is taking a harder line where a greatest-of formula involves
> one or more active formulas in addition to the cash balance formula.</u>

"Post-PPA Cash Balance Plan Determination Letter Process:  IRS Closely-Scrutinizing
'Greater-Of' Benefit Formulas for Compliance with Anti-Backloading Standards," dated
May 18, 2007 (emphasis added) (attached hereto as Exhibit A).  While this article is no
more admissible for its truth than the informal materials upon which Plaintiffs rely, it
nevertheless may be helpful to understand the fallacy of Plaintiffs' contention.

position that Part B violated the 133⅓% rule.  Defendants are therefore entitled to judgment in

their favor on Plaintiffs' anti-backloading claim in Count 1.

### B.     The Plan Does Not Cause Any Impermissible Forfeitures.

Under ERISA Section 203(a), every pension plan must "provide that an employee's right

to his <u>normal retirement benefit</u> is non-forfeitable upon the attainment of <u>normal retirement age</u>"

and satisfaction of the Plan's vesting rules.  29 U.S.C. § 1053(a) (emphasis added).[30]  Plaintiffs

contend that Part B somehow violates this provision, even though Part B protects employees'

minimum benefits by providing employees with the greater of (1) their protected frozen

Minimum Benefit ("A"), or (2) their cash balance account balance ("B").  In fact, what Plaintiffs

seek is "A + B."  <u>See</u> Pls.' Proposed Findings of Fact ¶¶ 54-56.  There is no legal basis, however,

for such a claim.[31]

In <u>Alessi v. Raybestos-Manhattan, Inc.</u>, 451 U.S. 504 (1981), the Supreme Court held

that:

> the statutory definition of "nonforfeitable" assures that an
> employee's claim to the protected benefit is legally enforceable,
> <u>but it does not guarantee a particular amount or a method for
> calculating the benefits.</u>

451 U.S. at 512 (emphasis added and citation omitted).  Consistent with <u>Alessi</u>, courts repeatedly

have held that ERISA's nonforfeitability provision does not prohibit a plan from providing

participants with the greater of two benefit formulas.  Rather, ERISA's nonforfeitability

---

[30]   Again, much of Plaintiffs' evidence regarding Count 1 relates to the wear-away of
subsidized early retirement benefits, or wear-away effects generally.  However, ERISA's
nonforfeitability rule only applies to the "normal retirement benefit" payable at "normal
retirement age."  29 U.S.C. § 1053(a).

[31]   Mr. Poulin conceded that the use of a greater of "A or B" formula is not itself illegal under
ERISA.  DFF ¶ 168.

provision simply requires that whatever benefits the plan provides — and whatever formula or combination of formulas is used — those benefits are actually paid to participants. As one district court explained:

> Applying this rule in the present case, this Court finds that while ERISA protects an employee's right to his accrued pension benefits it exerts little control over the content/amount of the benefits themselves. The parties to the pension plan are responsible for deciding the actual benefits available under the plan.

Francia v. Wonderoast, Inc. Profit Sharing Plan, No. 92-CV-790S, 1995 WL 625705, at *13 (W.D.N.Y. Oct. 19, 1995) (internal quotations and citations omitted).

With respect to plans that provide the greater of two benefits (i.e., "A or B" and not "A + B"), the Seventh Circuit explained in White v. Sundstrand Corp., 256 F.3d 580 (7th Cir. 2001), that:

> Any pension plan giving retirees the greater of two amounts, as opposed to the sum of these amounts, can be described as confiscating the difference. . . . But under ERISA that is neither here nor there. The Employee Retirement Income Security Act does not require employers to establish plans that are particularly favorable to employees.

Id. at 582-83.

Recognizing this totally acceptable, and lawful, form of pension plan design, courts have rejected challenges virtually identical to those asserted by Plaintiffs here. For example, the First Circuit affirmed the dismissal of an identical claim in Campbell when addressing the employer's conversion from a traditional plan to a cash balance plan:

> [Plaintiff] argues that this reduction amounts to a forfeiture of an accrued benefit in violation of 29 U.S.C. § 1054(g). There was no forfeiture, because no accrued benefits were reduced; only expected benefits were reduced, which [defendant] could, under the law, modify or eliminate.

- 41 -

> The ERISA anti-cutback provision protects against the erosion of "accrued benefits". . . . The reduction of pension benefits of which [plaintiff] complains was merely the elimination of future expected accruals of benefit. The December 31, 1996 amendment to the plan protected all of the pension benefit based on [plaintiff's] work for the company up to that point; it merely ceased accruals under the old plan based on employment from that point forward. This was an elimination of an expected, not accrued, benefit. There was no ERISA violation.

327 F.3d at 8-9 (internal citations and quotations omitted).[32]  See also Register, 477 F.3d at 71-72 (same).

Similarly, in Williams v. Caterpillar, Inc., 944 F.2d 658 (9th Cir. 1991), Caterpillar maintained union and management pension plans that were part of an "integrated system." Id. at 662. Under the integrated plan, employees who retired would receive the greater of either their management pension or their union pension, but would not receive both. Id. at 663. A number of former employees who had been demoted from management into the union one to five years before their retirements filed suit. Like Plaintiffs in the instant case, they alleged that the benefits they accrued under the union plan were forfeitable because they would not receive those benefits if they received their management plan benefits. Id. at 662. Specifically, these former employees claimed — as Plaintiffs contend here — that:

> Although receiving the higher of these two figures [the management or union pension] would appear to be the result that appellants would want, appellants contend that even the Management Plan figure is impermissibly low. Because that [management] plan did not give credit for any years of service after their demotions, it does not literally compensate appellants for those years. Technically, appellants fell under the coverage of

---

[32]  Although the plaintiff in Campbell brought his challenge under ERISA Section 204(g), the First Circuit specifically held that the cash balance conversion did not cause a "forfeiture" of benefits, because the plaintiff's previously earned benefits — like Plaintiffs' previously earned benefits in this case — were protected. Campbell, 327 F.3d at 8-9.

- 42 -

> the Union Plan for their final years, but because that plan produced
> a lower figure [of retirement benefits] and was "offset" by the
> Management Plan amount, appellants actually received no
> additional incremental benefit allocable to those final years.    In
> short, under Caterpillar's calculations, appellants would have
> received the very same pensions that they are now receiving if they
> had been eligible to retire and had retired on the dates on which
> they received their demotions, rather than one to five years later.

Id. at 663 (emphasis in original).  Therefore, the plaintiffs argued, the plans "worked an

impermissible forfeiture of nonforfeitable vested benefits" and violated ERISA.  Id. at 662

(internal quotations omitted).  The Ninth Circuit rejected the plaintiffs' claim, holding that:

> [T]he Caterpillar plans do take all of appellants' years of service
> into account.    It only appears otherwise because of the offset
> provision:  the Union Plan, which credits appellants for 100% of
> the time they have devoted to the company, would yield a lower
> pension benefit than the Management Plan, which does not, and so
> pursuant to the offset, Caterpillar has given appellants the greater
> Management Plan amount.

Id. at 663 (emphasis in original).

Notably, Judge Hall rejected an identical claim in the FleetBoston I case, wherein the

court held:

> The terms of the Amended Plan itself state that an employee in
> Richards' position, upon termination of employment, will receive
> the greater of the balance in her hypothetical cash balance account
> and the frozen benefit derived from the Traditional Plan.  Thus, the
> Amended Plan terms give Richards no claim to benefit accrual
> during the years in which her hypothetical account balance is
> below the value of her frozen Traditional Plan benefit.    Section
> 203(a) gives Richards a non-forfeitable claim to her accrued
> benefit, but the balance of the hypothetical cash account does not
> become part of her accrued benefit until it surpasses the value of
> the frozen Traditional Plan benefit.    Thus, the plan does not
> require a forfeiture of an accrued benefit, nor is the receipt of
> accrued benefits conditional.

427 F. Supp. 2d at 170.  See also Bonovich v. Knights of Columbus, 963 F. Supp. 143, 146-48

(D. Conn. 1997) (dismissing forfeiture claim because "plaintiffs overlook the fact that deduction

- 43 -

of their benefit-like renewal commissions is itself part of the formula for determining the amount

of their pension benefits, and because ERISA does not control the content and calculation

method of plan benefits, [defendant] may integrate participants' pension plan benefits with their

renewal commissions"), aff'd, 146 F.3d 57 (2d Cir. 1998).

Plaintiffs attempt to circumvent this overwhelming authority by distorting the holdings in

Esden, Berger and Frommert v. Conkright, 433 F.3d 254 (2d Cir. 2006).  See Pls.' Post-Trial Br.

at 25-27.  As noted previously, however, the only issue in Esden and Berger was the calculation

of lump sum benefits pursuant to IRS Notice 96-8 and a process known as "whipsaw."  See

supra, at 20-21.  Because of the lump sum calculations used in the plans in Esden and Berger,

employees received less than the present value of their normal retirement benefit, which caused

an impermissible forfeiture.  Esden, 229 F.3d at 167; Berger, 338 F.3d at 763.  Similarly, in

Frommert, a plan was amended to provide a lower benefit than that to which employees were

previously entitled, due to a new method of calculating benefit offsets.  Frommert, 433 F.3d at

261.  By contrast, Part B fully complies with the requirements of Notice 96-8, Esden and Berger,

and has no offset provision resulting in a benefit reduction as in Frommert.  To the contrary,

pursuant to Section 1.1(c), Part B uses a "greater-of" formula — participants can never receive

less than the value of their previously accrued benefit.

Thus, because Part B unambiguously provides that no participant can receive less than his

or her previously accrued benefit, there can be no unlawful forfeiture under ERISA Section

203(a).  Judgment should therefore be entered in favor of Defendants on Count 1.

### C. Plaintiffs' Backloading/Forfeiture Claims Are Time-Barred.

Additionally, Plaintiffs' claims in Count 1 that Part B violated ERISA's 133⅓% anti-

backloading and non-forfeitabilty rules fail because they are time-barred, for the same reasons as

discussed above in connection with Count 3.  See supra, at 30-32.  Count 1, unlike Count 3, is not a claim for age discrimination that would warrant the application of Connecticut's 180-day statute of limitations for age discrimination claims.  However, it is undisputed that Plaintiffs are attempting in Count 1 to "collect" additional benefits, specifically, greater pension "benefits."  See Submission on Relief at 3.  Consequently, the analogous statute of limitations in Connecticut is the two-year statute applicable to a "[c]ivil action to collect wage claim [or] fringe benefit claim."  Conn. Gen. Stat. Ann. §§ 31-72, 52-596.[33]  Because Plaintiffs did not file their first Complaint until December 18, 2001, Count 1 is time-barred.  For this independent reason, the Court may enter judgment in favor of Defendants on Count 1.

## IV. JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNTS 2 AND 4 BECAUSE PLAINTIFFS WERE NOT LIKELY OR ACTUALLY HARMED, AND THE WRITTEN DISCLOSURES SATISFIED ERISA'S DISCLOSURE REQUIREMENTS.

Counts 2 and 4 challenge the adequacy of the SPDs issued by the Plan Administrator in 1998 and 1999, and the Section 204(h) notice distributed to Plan participants in 1997.  See Rule 23 Order at 4 - Count 2(A)(1); Rule 23 Order at 6 - Count 4(A)(1).  As discussed in further detail below, see 61-96, all of these communications, however, complied with ERISA's specific statutory disclosure requirements, 29 U.S.C. § 1022 (for SPDs), and 29 U.S.C. § 1054(h) (for Section 204(h) notices).  The Court need not address the question of whether these communications were deficient, however, since Plaintiffs and the testifying class members received detailed, individualized opening account balance information, annual account statements and Total Compensation Reports that provided Plan participants with an ample basis

---

[33]    Just as for Count 3, Count 1 accrued no later than December 21, 1998, the date that the Part B Plan amendment was signed, and possibly earlier.  See supra, at 31 n.24.

for making informed employment and retirement decisions.  These additional disclosures —

which foreclose any finding of likely or actual harm — are fatal to Plaintiffs' claims.  Plaintiffs'

claims also fail because they are time-barred, and because they lie only against the CIGNA Plan

Administrator, whom Plaintiffs did not name as a defendant in this case.

      **A.    The Opening Account Balance Information, Total Compensation Reports And Annual Account Statements Distributed To Plan Participants Foreclose Any Liability On Plaintiffs' Disclosure Claims.**

             **1.    The Plan Administrator Provided Part B Participants With Complete And Timely Information Regarding The Exact Amount Of Their Cash Balance Accounts.**

The basic premise of Plaintiffs' disclosure claims in Counts 2 and 4 is that Plan

participants were not provided with sufficient information regarding their pension benefits to

make "well-informed employment and retirement decisions."  See Pls.' Post-Trial Br. at 79.  In

making this assertion, however, Plaintiffs and their communications expert, Professor James F.

Stratman, completely ignore the most critical component of the CIGNA Plan Administrator's

communications effort regarding Part B:  the opening account balance ("OAB") information,

Total Compensation Reports and annual account statements that advised Plan participants of the

exact amount of their cash balance accounts.  These materials provided participants with an

informed basis for making financial and other life decisions.  Given these circumstances,

Plaintiffs not only have failed to establish any technical deficiencies in the 1998 and 1999 SPDs

and the 1997 Section 204(h) notice, see infra, discussion at 61-96, but they cannot meet their

individual burdens of proving that they were likely harmed by these purported deficiencies or

overcome Defendants' argument that any such deficiencies constituted harmless error.  See

Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 113 (2d Cir. 2003) ("Cognizant of ERISA's

distribution of benefits, we require, for a showing of prejudice, that a plan participant or

- 46 -

beneficiary was likely to be have been harmed as a result of a deficient SPD.  Where a

participant makes this initial showing, however, the employer may rebut it through evidence that

the deficient SPD was in effect a harmless error."); Frommert, 433 F.3d at 267-68 (applying

likely harm/harmless error analysis to Section 204(h) notice claim).[34]

The Plan Administrator provided Part B participants complete and timely information

regarding the exact amount of their cash balance accounts.  In November 1997, the CIGNA Plan

Administrator distributed a Signature Benefits Newsletter (the "Newsletter") that introduced Plan

participants to how the Part B cash balance plan would operate:

> The new CIGNA Retirement Plan is an account balance plan—a
> type of retirement plan that is becoming increasingly popular as a
> simpler alternative to traditional pension plans.  Here's how the
> new plan will work:
>
> If you are transferring from the current Pension Plan to the new
> plan, an account will be set up for you in January.
>
> If you earned a benefit from the current Pension Plan, the lump
> sum value of that benefit as of December 31, 1997, will be
> transferred to your account as your opening balance.

DFF ¶ 184.  Importantly, the Newsletter informed employees that more information concerning

their account balances would be forthcoming:

---

[34]  In a sense, the likely harm and harmless error analyses are two sides of the same coin, and
courts in the Second Circuit often seem to conflate the two.  Compare Weinreb, 404 F.3d at
172 (finding no likely harm where the plaintiff received the information missing from an
SPD through other channels), with Pastore v. Witco Corp., 388 F. Supp. 2d 212, 221
(S.D.N.Y. 2005) (finding harmless error where the plaintiff received the information missing
from the SPD through another channel).  Regardless of whether the Court analyzes the
individualized account balance information given to Plaintiffs and the testifying class
members under the rubric of likely prejudice or harmless error, Plaintiffs' disclosure claims
fail either way.

> CIGNA will begin the process of calculating final pension benefits and Retirement Plan opening balances early in 1998, after all 1997 payroll data are finalized. Benefit calculations are expected to be completed in the spring. Once balances are calculated, they will be credited to Retirement Plan accounts retroactively to January 1, 1998, so you won't lose any interest credits for the first part of 1998. You will be informed of your final Pension Plan benefits and Retirement Plan opening balance in your *Total Compensation Report*, scheduled to be mailed in May 1998.

DFF ¶ 185. The Newsletter also contained a calendar of important dates that referenced the May 1998 mailing of the Total Compensation Reports, and promised that additional information concerning Part B would be provided in December 1997, when Plan participants received a comprehensive Retirement Program Information Kit ("Retirement Kit"). DFF ¶ 189.

In December 1997, the Plan Administrator provided each participant this Retirement Kit, which further described how the cash balance plan would operate and how OABs would be calculated. DFF ¶¶ 190-210. Specifically, the Retirement Kits advised employees (1) that for most participants, their OABs would be based on the value of the participant's age-65 annuity (not their subsidized early retirement benefit) as of December 31, 1997, (2) that CIGNA would be using an interest rate of approximately 6.5% for calculating the present values, (3) that age was a factor in determining OABs, with an older employee receiving a higher OAB than a younger employee with the same earnings history, (4) of the factors used to calculate OABs, and (5) that for employees with a combination of age and service of 55 years or higher (i.e., certain older employees), their OABs would include part (or all) of the value of their subsidized early retirement benefit and would be converted using a lower, and hence more favorable, interest rate.

DFF ¶ 203.  The Retirement Kit repeated[35] to participants that additional individualized

information regarding their specific account balance would be provided:

> You recently received a Signature Benefits *Total Compensation Report*, which shows your Pension Plan benefit as of March 31, 1997.  You will receive a similar statement in the spring of 1998, showing your final benefit under the Pension Plan, plus your CIGNA Retirement Plan opening account balance.

DFF ¶ 208.  The Retirement Kit further informed participants that they would be able to monitor

the balance of their cash balance accounts through the account statements they would receive:

> To help you keep track of your account growth, you will receive periodic account statements.  Each statement will show CIGNA's benefits credits and interest credits to your account and the value of your account at the end of each period.  Benefits credits for the period covered by the statement will be based on the assumption that you will earn at least 1,000 hours of credited service for that year.  If you don't complete the required service for a period, your account will be adjusted accordingly.

DFF ¶ 202.[36]

As the Retirement Kit indicated, in May of 1998, each participant received a document

called the Total Compensation Report, which provided information regarding the OAB in Part B:

> The new CIGNA Pension Plan features the security of a traditional pension plan, but adds more flexibility since you can decide how much of your retirement funds you want to use and when.  You are not tied to a fixed schedule of benefit payments.  What's more, it is portable so you can take your vested benefit when you leave the company and invest it as you wish.

---

[35]  Plaintiffs' expert, Professor Stratman, testified that "repetition is one of the most powerful devices" for communication with plan participants, yet he inexplicably disregarded the Plan Administrator's repeated message to CIGNA Plan participants that the exact amount of their cash balance accounts would be set forth in their individualized annual account statements and Total Compensation Reports.  DFF ¶ 305.

[36]  In June 1998, participants received a Signature Benefits Newsletter that explained how to use the Total Compensation Reports provided to the participants.  DFF ¶ 213.

Your initial account balance on January 1, 1998 was $[number]

The balance represents the full value of the benefit you earned for service before 1989 and payments to you at age 62. It was calculated just as if you had left CIGNA on December 31, 1997 and deferred your pension to age 62. It was converted to a lump sum based on an assumed interest rate of 5.05%. This means that the lump sum growing at this rate of interest to retirement is equivalent or the value of the lifetime annuity payments you have earned.

DFF ¶ 214. The May 1998 Total Compensation Report showed each participant exactly how his or her particular OAB was calculated. For example, noting that the information was calculated as of December 31, 1997, it stated:

| Your Highest Eligible Average Earnings | $ | 143,478.96 |
|---|---|---|
| Your Benefit Service Factor | x | .01670 |
| Years of Credited Service | x | 7.00 |
| Your Age 62 Benefit Before Offset | = $ | 16,772.69 |
| Your Social Security Offset (see note) plus Early Retirement Reduction | $ | 3,859.89 |
| Your Actual Age 62 Annual Benefit | = $ | 12,912.80 |
| Based on average life expectancy at your age and an interest rate of 5.05% the lump sum actuarial factor is | x | 6.0813 |
| Your lump sum benefit – Opening Account Balance | = $ | 78,526.55 |

DFF ¶ 215. Thus, the May 1998 Total Compensation Report disclosed to participants their Minimum Benefit — their monthly pension benefit as of December 31, 1997 (at age 62 or 65, as appropriate). DFF ¶ 215.[37] Notably, the 1998 Total Compensation Report disclosed the specific

---

[37]   Likewise, all participants had received annual statements of the accrued monthly pension benefit at retirement age they had earned in the Total Compensation Reports they received

continued . . .

benefit upon which the account balance was based (age 62, in the above example — age 65, for

most younger employees), the interest rate that was used to calculate the present value OAB

(5.05% in this example, slightly higher (and less favorable) for most younger employees), and

the "average life expectancy" factor, which is a layman's way of referring to mortality tables.

DFF ¶ 216.[38]

Additionally, as indicated in the Retirement Kit, in June 1998, participants received their

first annual individualized account statement for Part B, which reminded participants of the OAB

calculation they previously received, and that the OAB was based on the prior plan benefit as of

their normal retirement age:

> Your opening balance was based on the lump sum equivalent value
> of the Age 65 benefit you earned under the prior Pension Plan as of
> December 31, 1997. The detailed calculation of your benefit was
> produced in your 1998 Total Compensation Report which you
> received in May.

DFF ¶ 227. (emphasis added).[39]  In October 1998, participants received the first Part B SPD,

which provided detailed information regarding the Plan's terms and operation, and again alerted

participants that they would be receiving periodic individualized account statements in the

future.  DFF ¶¶ 234, 243.

In subsequent years, the Plan Administrator has continued to provide every participant in

Part B with an annual cash balance account statement and Total Compensation Report.  The

---

under the old plan.  DFF ¶¶ 223, 224.

[38]  The Total Compensation Reports also provided information to employees regarding how
much they would need in assets to reach their target retirement income, and how inflation
might affect that analysis.  DFF ¶ 220.

[39]  This account statement was for a participant who was converted with an OAB using the age-
65 benefit, whereas the statement was different for participants with the more favorable age-
62 OAB calculation.

annual statements list the opening balance at the start of the subject year, the benefit and interest credits earned that year, and the closing balance as of June 30 of that year. DFF ¶ 229. The Total Compensation Reports provide similar account balance information and note the estimated annual benefit payable at age 62 or age 65. DFF ¶¶ 216, 219. Thus, since 1998, Part B participants have been provided comprehensive information concerning the calculation of their OABs and amount in their cash balance accounts each year. DFF ¶¶ 214, 215, 225.[40]

Given these extensive disclosures, it is not surprising that a number of class members who testified at trial acknowledged that they understood the individualized cash balance information that the Plan Administrator provided to them and that they were able to incorporate that information into their personal financial decision-making.[41] For example, class member Barbara Hogan testified as follows:

> • When she received the November 1997 Newsletter and the Retirement Kit describing the Part B cash balance plan, she understood that she would not be accruing any additional benefits under Part A. DFF ¶ 387.

---

[40] CIGNA also provided numerous opportunities for participants to obtain additional information. For example, CIGNA made available a 1-800 hotline called Signature Benefits Services and later AnswerLine®, which was designed for the express purpose of answering participants' questions, and had an Intranet site through which participants could request a benefits estimate. DFF ¶¶ 231, 251-52. Moreover, participants had their prior old plan estimates with which to compare the OAB calculation. DFF ¶¶ 316, 329, 358, 384, 391.

[41] Cash balance plan benefits are considered easier to understand than those provided under a traditional defined benefit plan, because the benefit value is expressed in terms of an account. DFF ¶ 302. See United States General Accounting Office, Report to Congressional Requestors, Private Pensions, Implications of Conversions to Cash Balance Plan, September 2000, at 14-15; see also Citigroup I., 470 F. Supp. 2d at 327 (citing Regina T. Jefferson, Striking a Balance in the Cash Balance Plan Debate, 49 Buffalo L. Rev. 513 (2001)); Esden, 229 F.3d 154, 158 n.5 (citing Carol Quick, Overview of Cash Balance Plans, EBRI Notes 1 (July 1999)).

- In her life decision-making, she utilized all of the various sources of information the Plan Administrator provided concerning her Part B benefit, including the Part B OAB explanation, the annual account balance statements, the Total Compensation Reports, and the benefit estimates provided to her. Ms. Hogan explained that she incorporated the data from these sources into her retirement and financial planning. DFF ¶ 390.

- Upon reviewing the amount of her OAB in 1998 (as reflected in the June 1998 Total Compensation Report), Ms. Hogan increased her contributions to her CIGNA 401(k) savings account. DFF ¶ 390.

- In June 1999, Ms. Hogan requested a set of Part B benefit estimates and then was able to compare them to an old pension plan estimate she had received in March 1997, and incorporate the new information into her financial planning. DFF ¶¶ 391, 392.

Other Plaintiffs and class members similarly testified to the ways in which they were able to incorporate the Plan Administrator's Part B disclosures into their personal financial decision-making. For example:

- Annette Glanz testified that her financial adviser incorporated the cash balance account data from her Part B annual account statements into her family financial plan. DFF ¶ 353.

- Robert Upton testified that his financial adviser incorporated into his financial plan the cash balance account data set forth in the Total Compensation Reports and Part B annual account statements. DFF ¶ 402. Mr. Upton then explained that while he could have altered his 401(k) savings based on the information he received concerning his cash balance benefit, he had already reached the maximum contribution limits for his 401(k) account. DFF ¶ 403.

- Gisela Broderick testified that based on her Part B annual account statement, she understood that she would not be entitled to the so-called "A + B" formula constituting her prior pension plan benefit plus her cash balance accruals. DFF ¶ 335. Ms. Broderick also acknowledged that CIGNA's various disclosures were devised to assist her financial

> planning, but in contrast to the other class members, Ms. Broderick testified that she did not rely on the information in those disclosures in her retirement planning because she and her husband never prepared a financial plan.  DFF ¶¶ 341, 342.

These Plan participants — presumably like thousands of others — recognized that the detailed OAB information, annual account statements and Total Compensation Reports were key to understanding their Plan benefits.  Their testimony underscores how unreasonable it is that Plaintiffs and their expert refused to even acknowledge the existence of these Plan Administrator communications in their submissions to the Court.  As set forth below, courts in the Second Circuit have refused to award plan participants a windfall when information they claim was missing from an SPD was provided through some other appropriate source.  This Court should do the same.

> **2.      Courts In The Second Circuit Have Consistently Rejected ERISA SPD/Section 204(h) Disclosure Claims When Plan Participants Have Been Provided Sufficient Information About Their Benefits Through Other Means, As In This Case.**

In circumstances similar to those just described, courts in the Second Circuit have rejected disclosure claims.  For example, in Weinreb v. Hosp. for Joint Diseases Orthopeadic Inst., 404 F.3d 167, 171-172 (2d Cir. 2005), the plaintiff sought to prevent enforcement of a plan requirement that a participant submit an enrollment form to be eligible for life insurance, because the participant was not notified of the requirement in an SPD – in fact, there was no SPD at all. See id. at 170 (the hospital "did not create or provide an SPD").  The participant, however, had been notified of the enrollment form requirement through other informal communications and telephone calls.  See id. at 172.  Accordingly, the Second Circuit held that the plaintiff "failed to raise any material issue of fact demonstrating likely prejudice from the absence of an SPD," affirmed summary judgment against the plaintiff, and never reached the harmless error issue.  Id.

(emphasis added).[42]

In Pastore, the court granted summary judgment in favor of the plan administrator, despite finding that the severance plan's SPD unlawfully omitted the eligibility condition that a participant was only entitled to severance if he resigned because the company was requiring him to relocate.  Pastore, 388 F. Supp. 2d at 221.  Pastore had been offered the choice of moving to another office or working part-time at home, and accordingly was refused severance upon his resignation on the ground that he was not required to relocate, a condition to benefits about which he pled ignorance.  Id.  In finding harmless error, the court noted that "it is undisputed that Plaintiff learned of the 'required to relocate' requirement of the CIC Program when he was provided and admittedly read a copy of the 'Change in Control Severance Program Description' before he announced his resignation."  Id.  Likewise, in Park v. Trustees of the 1199 SEIU Health Care Employees Pension Fund, 418 F. Supp. 2d 343 (S.D.N.Y. 2003), the court noted that Mrs. Park was not "likely prejudiced" by the failure of the SPD to include information regarding

---

[42]  Contrary to their assertion, Plaintiffs are not entitled to a presumption of harm upon a finding that a written disclosure itself was legally deficient.  See Pls.' Post-Trial Br. at 81-82.  While the Burke court rejected a detrimental reliance standard in favor of a "likely harm" standard, Plaintiffs' contention that likely harm may be presumed from a document itself would render obsolete the Second Circuit's likely harm requirement articulated in Burke.  Although Burke and Weinreb involved allegations of non-disclosure, the Second Circuit held in both cases that the plaintiff was required to prove that she was likely harmed by the non-disclosure.  See Burke, 336 F.3d at 113 ("Where a participant makes this initial showing . . . .").  Indeed, in Weinreb, the Second Circuit affirmed summary judgment specifically because the plaintiff failed to meet her burden of proving likely harm, despite that there was a "the complete absence of an SPD" and accordingly it was indisputable that the SPD was "legally deficient."  Weinreb, 404 F.3d at 172.

the plan's lost spouse waiver, because Mrs. Park "was sufficiently aware of the lost spouse waiver to seek to invoke it." Id. at 354.

This is not a situation where the Plan participants were left with unanswered questions regarding the eligibility for benefits under Part B or the conditions that might exclude participants from coverage.  In other words, Plaintiffs have not alleged that certain information missing from the SPD and Section 204(h) notice, if included, would have permitted any class member to reap a larger Part B benefit.  See, e.g., Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 585 (2d Cir. 2006) ("To show likely prejudice, he must proffer sufficient evidence that, had the SPD given him adequate notice of his burden of proof" of showing covered employment, he would have preserved records "adequate to prove his entitlement to additional benefits.").  Courts have rejected disclosure claims where the missing information would not have made a difference in the benefits the participant would have obtained.  For example, in Sheehan v. Metro. Life Ins. Co., 368 F. Supp. 2d 228 (S.D.N.Y. 2005), the plaintiff alleged likely harm based on a restriction in the employer's disability benefits certificate that was absent from the SPD, which provided that benefits will not be paid if the participant's disability "results from, or is caused or contributed to by a mental or nervous disorder." Id. at 235.  The court found that the plaintiff could not prove likely harm because, based on the medical evidence concerning the plaintiff, even if he had been apprised of the terms missing from the SPD, he could not "have acted in a way as to avoid the effect of the restrictions" in the plan.  Id. at 262; see also id. at 235-36, 263-65.[43]

---

[43]  Similarly, in Exarhakis v. Visiting Nurse Serv. of N.Y., No. 02-CV-5562 (ILG), 2006 WL 335420, at *13 (E.D.N.Y. Feb. 13, 2006), the court held that the plaintiff could not demonstrate likely harm based on the failure to provide an SPD for the employer's long-

continued . . .

By contrast, courts have held that a participant can establish likely harm and that the employer cannot demonstrate harmless error where the employer has failed to provide information crucial to the participant's ability to obtain a larger benefit.  See, e.g., Rothwell v. Chenango County N.Y.S.A.R.C. Pension Plan, No. 3:03-CV- 00637 (GLS), 2005 WL 2276023, at *7 (N.D.N.Y. Sept. 19, 2005) (finding likely harm and no harmless error because the plaintiff did not receive information critical to her ability to minimize market losses on her benefits).  Here, none of the Plaintiffs or testifying class members provided any evidence, nor could they, that had the SPDs or Section 204(h) notice better reflected the terms of Part B, they would have obtained any greater benefits.  In other words, this is not a situation where, as a result of a disclosure's deficiency, the participant "was not aware of the need to take an action within his control . . . which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action."  Sheehan, 368 F. Supp. 2d at 262.

Nor is this a situation where the employer did not properly apprise participants of the amount of their pension benefits and therefore mislead them into believing the benefits were larger than they were.  Such was the case in Frommert, where the Second Circuit found a disclosure violation based upon the fact that the plaintiffs had their benefits reduced by a "phantom account," which was never disclosed to them and was not even properly part of the

---

term disability benefits policy, because the plaintiff's testimony suggested that even if she had been given an SPD she would have returned to work as soon as possible rather than taking leave under the policy.  See also Tocker v. Philip Morris Cos., 470 F.3d 481, 489 (2d Cir. 2006) (noting that no likely prejudice would result to participant where SPD failed to explain the plan administrator's discretionary authority to determine benefit eligibility, since that authority did not affect the entitlement to benefits, but rather only affected the procedure once a denial of benefits had occurred).

plan until after many had already retired.  Id. at 265-67.[44]  Thus, Frommert is inapposite because

there the plaintiffs thought that, based on the SPD, they were entitled to more money than they

actually were, whereas CIGNA's Plan Administrator advised Part B participants of the precise

amount in their cash balance accounts each year.[45]

   In sum, because the exact amount of each Plan participant's cash balance account was

explicitly described in the various written disclosures provided to participants, any deficiencies

in the 1998 and 1999 SPDs and the 1997 Section 204(h) notice did not cause likely harm or

constituted harmless error.  Plaintiffs' disclosure claims therefore fail.[46]

---

[44]   As the court stated:

> The prolonged absence of any mention of the phantom account
> from Plan documents, most notably SPDs, likely, and quite
> reasonably, led Plan participants to believe that it was not a
> component of the Plan.  Rather, rehired employees likely believed
> that their past distributions would only be factored into their
> benefits calculations by taking into account the amounts they had
> actually received.

Frommert, 433 F.3d at 266-67.

[45]   See also, Laurent, 448 F. Supp. 2d at 546-47 (refusing to dismiss SPD claim because its
deficiencies had the result participants making a "reasonable assumption" of "grossly
overestimating the value of their pension benefits") (emphasis added).

[46]   Despite this wealth of information provided to participants, Plaintiffs suggest that CIGNA
somehow breached its fiduciary duty to participants by hiding the ball regarding
"reductions" that the new plan introduced.  See Pls.' Post-Trial Br. at 51, 77-79.  However,
Plaintiffs' allusions to general breach of fiduciary duty standards carry no weight here since
Plaintiffs have never asserted a fiduciary breach claim in this matter.  This is not surprising
since Plaintiffs could not show that they relied to their detriment on any alleged misleading
communications.  See Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo,
148 F.3d 194, 196-97 (2d Cir. 1998) (rejecting ERISA misrepresentation claim where
plaintiffs did not personally rely on alleged misrepresentations to their detriment).
Plaintiffs' resort to inapplicable general principles of fiduciary duty reflects only the
weakness in their position.

3.    **The Trial Testimony Of Plaintiffs And The Testifying Class Members Demonstrates That Any Deficiencies In The 1998 And 1999 SPDs And The 1997 Section 204(h) Notice Constituted Harmless Error.**

Even if the Plan Administrator had not distributed individualized OAB information, annual account statements and Total Compensation Reports that advised Plan participants of the exact amount of their cash balance accounts, Plaintiffs and the class members who testified at trial made it clear that any deficiencies in the 1998 and 1999 SPDs and the 1997 Section 204(h) notice were plainly harmless error.  Specifically:

- Plaintiff Amara acknowledged that she was reinstated into Part A and her pension benefits were increased in light of the decision in the case of Depenbrock v. CIGNA Corp., 389 F.3d 78, 83 (3d Cir. 2004).  DFF ¶ 326.

- In addition to the testimony summarized on page 53-54, Plaintiff Broderick testified that when she returned to CIGNA in 2000, she knew the SPD was available on CIGNA's Intranet website, but she did not even review it until two years later. DFF ¶ 336.

- In addition to the testimony summarized on page 53, Plaintiff Glanz, who was converted to Part B on January 1, 1998, admitted that she would have remained employed by CIGNA even if she believed her pension was being reduced.  DFF ¶ 354.  While Ms. Glanz suggested that she would have requested a pay increase had she believed her pension was being reduced, she conceded that raises typically were not negotiated at CIGNA.  DFF ¶ 354.  She also acknowledged that her later decision to leave CIGNA had nothing to do with her pension benefits.  DFF ¶ 350.

- Ms. Glanz also admitted that because she was only about 40-years-old at the time the Plan Administrator provided Plan participants the various disclosures, she did not pay close attention to any of the pension-related information provided to her. DFF ¶ 346.  Similarly, she never took the opportunity offered by CIGNA to obtain a pension estimate, because she understood that all of the "factors" affecting her pension benefits could change substantially in the future, and that interest rates could fluctuate. DFF ¶ 348.

- Bruce Charette was 29-years-old when he was converted to

- 59 -

Part B on January 1, 1998.  DFF ¶ 357.  He testified that he understood that there was something "wrong" about the new plan when he read a newspaper article about the <u>Depenbrock</u> suit.  DFF ¶ 364.  Yet Mr. Charette admitted that he did not alter his retirement goals or increase his 401(k) plan contributions, and that the information did not alter his decision to remain employed at CIGNA.  DFF ¶ 366.

• Patricia Flannery, a former Tier 1 rehire, claimed that she would not have returned to CIGNA had she known she "was going to jeopardize [her] pension."   DFF ¶ 374.   However, when Ms. Flannery heard about the employment opportunity at CIGNA in 2000, she had been working for years doing calligraphy and framing and not earning any pension at all, and Ms. Flannery did not turn down any other job offers to work for CIGNA.  DFF ¶ 374.  Ms. Flannery also claimed that had she known that rehired employees would be participants in Part B, she would have negotiated a higher salary upon her rehire.  DFF ¶ 371.  However, she conceded that she tried to negotiate a higher salary upon her rehire, but was unsuccessful.  DFF ¶ 371.

• Ms. Flannery also testified that upon her rehire in 2000 she was not given sufficient information regarding the cash balance plan, but then she admitted that even when she was told that the Part B SPD was available online, she did not review it.   DFF ¶ 375.  Moreover, despite claiming to have known since 2001 that her pension was less than she expected, Ms. Flannery has continued to work for CIGNA and still works there today.  DFF ¶ 383.

• In addition to the testimony summarized on page 52-53, Barbara Hogan testified that she was converted to Part B on January 1, 1998, had more than 55 age and service points, and accordingly received the more favorable OAB calculation and experienced no wear-away effect.  DFF ¶ 384-85.  Although Ms. Hogan claimed that she would have increased her savings had she better understood her Part B pension benefits, she admitted that she made no adjustments to her savings and even purchased a more expensive house after she learned that her Part B benefits were less than she had expected.   DFF ¶ 393.   Similarly, Ms. Hogan maintained that she would have asked for a raise had she better understood her Part B pension benefits, but acknowledged that she never did so after she learned that her retirement benefits were lower under the cash balance plan.  DFF ¶ 393.

• Robert Upton worked as an attorney for CIGNA and was converted to Part B on January 1, 1998.  DFF ¶ 396.  In addition to

the testimony summarized on page 53, he testified that he learned
in 1999 that his pension benefit was going to be 29 percent lower
under the new plan, yet despite this, Mr. Upton made no efforts to
search for a job outside of CIGNA until 2005.  DFF ¶¶ 406, 407.

In short, it is clear from this evidence that any deficiency in the 1998 and 1999 SPDs and

the 1997 Section 204(h) notice constituted harmless error.

## B.    The Part B SPD[47] Met ERISA's Disclosure Requirements.

The Supreme Court has admonished that the precise ERISA rules dictate the parameters

of the disclosure requirements:  "ERISA already has an elaborate scheme in place for enabling

beneficiaries to learn their rights and obligations at any time," which "is quite thorough," and is

not "intended it to be supplemented by a faraway provision in another part of the statute."

Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995).  Here, Plaintiffs seek to impose

upon Defendants additional disclosure obligations that go well beyond what is required by

ERISA Section 102, 29 U.S.C. § 1022, the statutory provision that governs the contents of an

SPD.  Plaintiffs seem to suggest that to the extent there is any uncertainty in the law as to what

must be disclosed, it should be resolved in favor of requiring disclosure to Plan participants.  In

taking this position, however, Plaintiffs overlook the Supreme Court's admonition that ERISA is

"an enormously complex and detailed statute that resolved innumerable disputes between

powerful competing interests—not all in favor of potential plaintiffs."  Mertens v. Hewitt

Assocs., 508 U.S. 248, 262 (1993) (emphasis added).  Apart from the fact that Plaintiffs and the

testifying class members were neither likely nor actually harmed as a result of any deficiency in

the Part B SPD, that document itself met ERISA's technical disclosure requirements, as next

---

[47]    The 1998 and 1999 SPDs are identical in substance.  DFF ¶ 234.  Accordingly, the two
SPDs will be referred to as one in this section of Defendants' Post-Trial Brief

described.

### 1.    The Part B SPD Met The Requirements Of ERISA Section 102.

Because the Plan document for Part B contains some 80 pages of single-spaced information that attempts to address every aspect of the Plan's design, the Plan Administrator provided participants with an SPD that summarized the Plan.  As a summary, an SPD is, by definition, shorter and simpler than the plan.  As a result, and by necessity, an SPD cannot contain or describe in detail all of the plan's provisions.  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184 (2d Cir. 2007) ("Dun & Bradstreet") (holding that while the SPD "might have been more informative," it only has to "summarize, rather than describe in every detail, the benefits available"); Mers v. Marriott Int'l Group Accidental Death, Dismemberment Plan, 137 F.3d 510, 517 (7th Cir. 1998) (rejecting argument "that beneficiaries should be able to use only the SPD and never consider whether additional terms exist.  This position is counter to the purpose of an SPD").

Section 102 of ERISA and the applicable regulations set forth specific parameters concerning information that must be included in a SPD.  29 U.S.C. § 1022; 29 C.F.R. §§ 2520.102-1 through 102-5.  Thus, the SPD must contain a statement:

> clearly    identifying    circumstances    which    may    result    in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of [the regulations].

29 C.F.R. § 2520.102-3(l) (in effect 1997 through Nov. 21, 2000).

The Part B SPD met these disclosure requirements.  Specifically, the SPD contained information concerning the following topic areas:  eligibility; how breaks in service affected eligibility; when benefits are paid; how benefits are paid; how the benefit is affected by certain

"life events;" administrative details concerning the operation of the plan; change of control

protections; spouse's rights; the appeal process; circumstances under which the plan can be

amended or terminated; and a statement of ERISA rights.  DFF ¶ 235.  The Part B SPD also

included the following provisions related to Plan participants' cash balance accounts, the accrual

of benefit and interest credits, and the guaranteed Minimum Benefit:

(1) Under the Plan, participants have an individual cash balance account that "contains

credits in the form of hypothetical dollars.  It does not contain actual dollars."  DFF ¶ 237.

(2) Plan participants earn benefit credits based on a percentage of their "Eligible

Earnings" each year, plus interest on their account balance:

> For each year in which you earn a year of credited service, CIGNA
> will add benefit credits to your account equal to a percentage of
> your eligible earnings.  The percentage will depend on your points,
> which are the sum of your age and credited service on January 1 of
> each year.  Benefit credits are made according to the chart below.

DFF ¶ 240.  The SPD included a chart showing how benefit credits were earned, and how the

Social Security integration level was factored into the benefit credits, along with examples of the

amount of credits that would be earned in different income brackets.  DFF ¶ 241.

(3) Under the Plan, interest is credited quarterly on account balances at a floating rate that

is subject to change at the beginning of each calendar year.  The annualized Plan rate is the rate

on five-year U.S. Treasury securities (constant maturity) in the preceding November plus 0.25%

(subject to a minimum of 4.5% and a maximum of 9.0%).  DFF ¶ 243.  Interest credits continue

to accrue until the account is paid out as a lump sum or until annuity payments start.  DFF ¶ 243.

(4) Rehired participants who participated in CIGNA's old pension plan were advised:

> If you were in the old Plan when you left, the pension benefit you
> earned will be converted to an opening account balance in this
> plan when you return.  The conversion formula used [to obtain the
> opening account balance] is based on guidelines established by the

federal government for valuing pension benefits.   If you have questions about the conversion formula, you may call CIGNA retirement Services Center at 1.800.224.4624.

DFF ¶ 239.

  (5) A Plan participant is entitled to the greater of the retirement benefit based on his cash balance account or the Minimum Benefit set forth in the Plan:

Your final plan benefits cannot be less than your old plan benefits on December 31, 1997.  If this minimum benefit rule applies to you, you will be notified by the plan service center when you request a distribution.

DFF ¶ 244.

Nowhere does the Part B SPD represent that an employee will receive the Minimum Benefit plus his or her benefit and interest credits (the so-called "A + B" formula), to which Plaintiffs now claim they are entitled.  DFF ¶ 246.  Indeed, the fact that the SPD told Plan participants that they might receive their protected Minimum Benefit if it was higher than their cash balance benefit was a clear indication that a participant's prior protected benefit might be greater than his or her account balance, and that there might be a period of time during which there would be no increase in his or her overall pension benefit.[48]

In sum, the Part B SPD accurately summarized the key provisions of the Plan and informed participants precisely as to how their cash balance benefits would be earned and paid. No more was required.

---

[48] The testimony of Plaintiffs' expert, Professor Stratman, was revealing on this point.  When questioned about the Minimum Benefit provision in the SPD, he acknowledged that "this is an effort to reassure folks that the company is aware that there might be some circumstance in which maybe I don't earn any more."  DFF ¶ 245 (emphasis added).

**2.      The Part B SPD Was Not Required To Disclose A Reduction In The Rate Of Benefit Accrual With Age.**

Plaintiffs allege that the Part B SPD was faulty because it failed to disclose that a Plan participant's rate of benefit accrual would decline with age. See Pls.' Post-Trial Br. at 63-64. Even apart from the fact that Defendants have already established that participants did not experience declining rates of benefit accrual with age, nothing requires an SPD to disclose "whether or not a participant's rate of benefit accrual declines with age." FleetBoston III, 2006 WL 2092086, at *9 (holding that the SPD adequately explained the cash balance plan's rate of benefit accrual, despite that it failed to describe the formula as declining with age); Register, 2005 WL 3120268, at *9, aff'd, 477 F.3d 56 (3d Cir. 2007) ("ERISA § 102 does not require that the SPD describe how the benefit accrual rates change as participants age."). Plaintiffs cite no authority supporting their position that the Part B SPD was deficient in this regard.

**3.      The Part B SPD Was Not Required To Provide A Comparison To Benefits That Participants Would Have Earned Under The Old Plan.**

Plaintiffs next argue that the Part B SPD was deficient because it failed to provide a comparison of each participant's benefits in the form of an age-65 annuity under Part B with what they would have been under the old pension plan. See Pls.' Post-Trial Br. at 63. This argument relies on the flawed premise that an SPD is required to describe benefits under an old benefit formula that does not apply. That is not required by ERISA because an SPD is a summary of the existing, operative plan. See 29 C.F.R. § 2520.102-3 ("The summary plan description must accurately reflect the contents of the plans as of a date no earlier than 120 days prior to the date such summary plan description is disclosed."). ERISA does not require that an SPD describe a plan that no longer applies or compare benefits under a current plan versus benefits under the plan it replaced. Indeed, where, as here, a pension plan is amended as to only

- 65 -

some participants (i.e., those being moved into Part B), the regulations provide that the SPD for

those participants need only include information applicable to them:

> [A] plan amendment altering benefits may apply to only those
> participants who are employees of an employer when the
> amendment is adopted and to employees who later become
> participants, but not to participants who no longer are employees
> <u>when the amendment is adopted</u>. . . .  In such cases the plan
> administrator may fulfill the requirement to furnish a summary
> plan description to participants covered under the plan and
> beneficiaries receiving benefits under the plan by furnishing to
> each member of each class of participants and beneficiaries a copy
> of a summary plan description appropriate to that class.  <u>The
> summary plan description may omit information which is not
> applicable to the class of participants or beneficiaries to which it is
> furnished.</u>

<u>See</u> 29 C.F.R. § 2520.102-4 (emphasis added).  In other words, the SPD for Part B need not

include information as to Part A going forward, as such information would be inapplicable to the

converted participants starting January 1, 1998.  Again, Plaintiffs have no authority for their

position, which the Court should reject.

### 4. The Part B SPD Was Not Required To Disclose The Potential Wear-Away Effect.

Plaintiffs next complain that the Part B SPD should have explicitly warned Plan

participants that they might suffer a wear-away effect.  <u>See</u> Pls.' Post-Trial Br. at 62-64.  As

noted above, <u>see</u> <u>supra</u>, at 27, the wear-away effect describes a period of time during which a

participant's minimum protected benefit remains larger than his or her account balance, despite

the fact that the account balance is growing with benefit and interest credits.  The potential wear-

away effect is not a Plan provision, but rather is caused from the interaction of various Plan

provisions that were explicitly described to participants (Minimum Benefit, OAB based on age

62 or 65 prior benefit, interest rate and mortality discount applied in the OAB calculation) and

unpredictable factors outside of CIGNA's control.  Given this lack of predictability, ERISA

Section 102 did not require CIGNA's Plan Administrator to be clairvoyant regarding the potential wear-away effect and provide the type of disclosure that Plaintiffs claim they were due.[49]

The Second Circuit recognizes that ERISA plan administrators do not have "a duty of clairvoyance" regarding information that might affect participants' benefits in the future. Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994) (holding that "we do not require an ERISA fiduciary to be perfectly prescient as to all future changes in employee benefits"). Courts rely on this principle to reject liability for ERISA fiduciaries where the information allegedly concealed from participants was based on unpredictable factors not reasonably foreseeable. For example, in In re Unisys Sav. Plan Litig., the Third Circuit noted that when Unisys provided plan ERISA participants information about the risks accompanying certain investments, it was not required "to opine on [one investment]'s financial condition or to predict [another investment]'s

---

[49] Plaintiffs criticize Defendants for not calling witnesses to testify about the Plan Administrator's disclosures regarding the cash balance plan, and suggest the Court should draw a "missing witness" inference. Pls.' Post-Trial Br. at 3, n.2. Here, none of the witnesses CIGNA opted not to call were legally "missing witness," since they were readily available for Plaintiffs to call, and indeed, Plaintiffs had reserved the right to call any witnesses listed in Defendants' pre-trial submission if Defendants did not call them. See Pls.' Trial Witness List, dkt. #194. See United States v. Caccia, 122 F.3d 136, 138-39 (2d Cir. 1997) (a missing witness charge is inappropriate for a witnesses who is merely an "uncalled witnesses"), contrast Gray v. Great American Recreation Ass'n, Inc., 970 F.2d 1081, 1082 (2d Cir. 1992) (witnesses absconded on the eve of trial). Furthermore, a missing witness inference is only "marginally probative" where the witness's deposition testimony is admitted at trial, as was the deposition of John Arko, the Plan Administrator. Bogosian v. Woloohojian Realty Corp., 323 F.3d 55, 68 n.10 (1st Cir. 2003) (noting that any adverse inference becomes less compelling where testimony of witness is admitted at trial by way of deposition).

eventual demise." In re Unisys Sav. Plan Litig., 74 F.3d 420, 442-43 (3d Cir. 1996) (citing

Fischer v. Phila. Elec. Co., 994 F.2d 130, 153 (3d Cir. 1993)).[50]

Likewise, the Second Circuit has made clear that a plan administrator is not obliged to

"anticipate every possible idiosyncratic contingency that might affect a particular participant's or

beneficiary's status." Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 9 (2d Cir. 1997)

(quoting Lorenzen v. Employees Ret. Plan of the Sperry & Hutchinson Co., 896 F.2d 228, 236

(7th Cir. 1990)). "To require ERISA summary plan descriptions to include accurate and

complete information about all of the different factual settings in which a given pension plan rule

might apply would lead to the promulgation of 'summaries' many pages in length, perhaps even

longer than the plan itself, that would be of no use to the ordinary employee." Stahl v. Tony's

Bldg. Materials, Inc., 875 F.2d 1404, 1409 (9th Cir. 1989) (finding no breach of fiduciary duty

for failure to warn participant that his pension benefits could be drastically reduced upon

expiration of collective bargaining agreement between union and his employer). Thus, courts

should not "require summary plan descriptions to discuss the application of general rules to a

---

[50] See also Fischer, 994 F.2d at 153 ("ERISA does not impose a 'duty of clairvoyance' on fiduciaries."); Swinney v. Gen. Motors Corp., 46 F.3d 512, 520 (6th Cir. 1995) (holding ERISA imposes no "duty of clairvoyance" and reversing employer liability where the defendant stated that laid-off employees were not eligible for a voluntary termination of employment program, because at the time the defendant was not seriously considering altering the policy that was subsequently changed); Barnes v. Lacy, 927 F.2d 539, 544 (11th Cir. 1991) (reversing finding of ERISA liability where district court's finding that employer should have disclosed that early retirement program was forthcoming when the employer had not yet considered such a program "placed an unreasonable burden upon [the employer] to predict future, unintended events"); Hudson v. Gen. Dynamics Corp., 118 F. Supp. 2d 226, 263 (D. Conn. 2000) (finding no liability where the employer failed to disclose information about contemplated retirement incentives, since "the employer had not yet undertaken serious consideration of the incentives, and to find the employer liable for failing to provide it would impose no less than the duty of clairvoyance specifically rejected in Mullins").

wide range of particular situations and thereby provide specific advice to employees on how to shape their conduct to fit the rules." Id. at 1408.   If SPDs were required to anticipate every "idiosyncratic contingency" that might affect participants' benefits, they "would be choked with detail and hopelessly confusing." Lorenzen, 896 F.2d at 236.

For example, in Lorenzen the court found no ERISA liability where the SPD explained that spousal death benefits were lower if a participant died before his postponed retirement date, but did not advise participants of the consequences of finding themselves on life-support machinery shortly before their scheduled date of retirement. Lorenzen, 896 F.2d at 236.[51] Similarly, in McKeown v. Pac. Bell Directory, No. C-97-0427 MHP, 1999 WL 111886, (N.D. Cal. Feb. 26, 1999), the court considered whether the SPD was deficient for failing to include the plan's "no reduction" provision (which operated similarly to the Minimum Benefit under Part B), upon which the plaintiffs claimed they would have relied to make their decision of when to retire. McKeown, 1999 WL 111886, at *9.  The court ruled that the SPD did not have to disclose the provision because "plaintiffs here have presented no evidence that defendants knew that the no reductions provision would apply to particular persons and intentionally omitted the information," and the "no reductions provision applies in very few instances." Id.  Because the

---

[51]    Additionally, in Swanson v. U.A. Local 13 Pension Plan, the court found that the SPD adequately apprised the participant that once he retired, his benefit formula would be calculated according to the rate in effect as of the day of his retirement, even if he went back to work and thereafter re-retired, and did not need to advise the employee "to take enough time and consider other alternatives to be sure he wanted to retire." Swanson, 779 F. Supp. 690, 697, 699 (W.D.N.Y. 1991).  See also Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund, 295 F. Supp. 2d 844, 852-53 (N.D. Ill. 2003) (SPD was not required to explain the consequences of placing participant's permanent-disability benefits application on hold pending outcome of potentially healing surgery "[s]ince this situation was unique to Tegtmeier, as being placed on life support before retirement was unique to the participant in Lorenzen").

CIGNA Plan Administrator could not have anticipated the wear-away periods that resulted, it therefore was not required to provide a disclosure regarding the potential wear-away effect in the SPD.

### a. The Wear-Away Effect Did Not Cause Any Reduction In Plan Benefits, And Was Not The Result Of A Plan Provision.

Most fundamentally, Plaintiffs' contention that the potential wear-away effect should have been disclosed in the SPD because it caused a "reduction" in benefits is factually inaccurate.  See 29 C.F.R. § 2520.102-3(l).  The wear-away effect did not reduce the amount of a benefit that a participant might otherwise be entitled to under plan provisions.  DFF ¶ 163.  Indeed, the wear-away effect can never result in participants getting less than their Part B account balance, so there was no reduction for the Plan Administrator to disclose.

Plaintiffs also incorrectly suggest that the failure of the Part B SPD to reference the potential wear-away effect constituted an omission of a crucial Plan term.  See Pls.' Post-Trial Br. at 11-15.  It is undisputed, however, that the wear-away effect was not a Plan provision, but rather a potential effect for certain participants resulting from the interaction of several Plan provisions that were described in the SPD and other communications to participants.  DFF ¶ 256.  The Part B SPD was a summary of the existing, operative plan and was created for distribution to all participants in the new cash balance plan, including Part B participants first hired on or after January 1, 1998 who received an OAB of zero and therefore could not experience any wear-away.  DFF ¶ 255.[52]  As such, the Part B SPD, which is a summary of the existing, operative

---

[52]  Other Part B participants likewise did not experience a wear-away effect.  For participants with very short service, no wear-away would be experienced because the initial benefit credit in Part B nullified their protected Minimum Benefit.  DFF ¶ 258.  Additionally, for a certain group of participants, CIGNA used a more favorable discount rate in calculating

continued . . .

plan, did not need to separately disclose the potential wear-away effect.  See 29 C.F.R.

§ 2520.102-3.  See supra, at 65.[53]

Thus, the potential wear-away effect was not a Plan term, but rather results from the interaction of different factors with various levels of unpredictability.  The wear-away effect could occur as a result of some or all of:  interest rate fluctuations, a participant's prior benefit under the old plan, the future salary that the participant earns, wheter they were in Tier 1 or Tier 2 under the old plan, when they elect to initiate a benefit, when they elect to retire, whether they are married at the time that they elect to initiate a benefit, as well as other unforeseeable factors. DFF ¶ 256.  Because the breadth and extent of the potential wear-away effect could not be anticipated, as next described, the SPD was not deficient for failing to disclose it.

### b. The Wear-Away Effect Was Caused By Falling Interest Rates After The Conversion, Which The Plan Administrator Could Not Anticipate.

Plaintiffs do not quibble with the initial interest rate CIGNA used to calculate the OABs,[54] but rather admit that regardless of what rate CIGNA had used at conversion, the wear-

---

their OABs (the five-year Treasury Rate minus 75 basis points rather than the five-year Treasury Rate plus 25 basis points), and used the age 62 rather than the age 65 benefit, which incorporated some of the early retirement subsidy.  This resulted in higher OABs, and some of these participants, for example, testifying class member Barbara Hogan, did not experience wear-away.  DFF ¶ 385.

[53] The fact that the Section 204(h) notice Treasury regulations were amended (in 2003) to require disclosure of a wear-away, see infra, at 96, whereas the SPD regulations have never — and do not currently — specifically require disclosure of a wear-away, further indicates that such a disclosure is not required in an SPD's description of the existing, operative plan.

[54] Both Plaintiffs' and Defendants' experts agreed that OABs could be set to be any number, including zero, as long as previously earned benefits were protected.  DFF ¶ 261. Nevertheless, the reasonableness of the interest rates used to calculate OABs relates to disclosures made about the process for creating OABs.  Mr. Poulin was recently quoted by the Second Circuit as stating that "the rates used for the calculation of lump sums [the 30-

continued . . .

away effect resulted because interest rates dropped thereafter.  DFF ¶ 260.  Importantly, falling interest rates caused a wear-away effect <u>not</u> because they lowered the value of participants' account balances, but rather because they raised the value of the protected minimum benefits.[55] Thus, although some participants may have experienced a wear-away effect, the value of their benefits still was <u>higher</u> than it was when the conversion occurred.  Moreover, Plaintiffs readily admit that "[i]f interest rates move above the rate used at conversion, retirement benefits increase."  Pls.' Post-Trial Br. at 11.  Plaintiffs' expert further conceded that had interest rates remained the same as they were at conversion, no wear-away effect would result in terms of the benefit payable at normal retirement.  DFF ¶ 265.  Nonetheless, Plaintiffs allege that the SPD should have disclosed that a wear-away effect could occur due to the interest rate used to calculate OABs.

     Plaintiffs' suggestion that CIGNA should have known that interest rates would drop and a wear-away effect would occur is foolish.  <u>See</u> Pls.' Post-Trial Br. at 11-15.[56]  CIGNA's Plan

---

year Treasury rate] give an indication of what ERISA and the Internal Revenue Code prescribe as reasonable actuarial assumptions for the purposes of determining actuarial equivalence in general."  <u>Dun & Bradstreet</u>, 482 F.3d 184 (quoting the declaration of Claude Poulin).  Mr. Poulin admitted that for those participants who were not eligible for early retirement subsidies under the old plan, their OAB was actually higher than the actuarial equivalent of their normal retirement benefit at age 65 under the old plan, because a slightly lower interest rate was used.  DFF ¶ 261.

[55]  The wear-away effect occurred because the prevailing interest credit rate after conversion wound up being lower than the interest rate that was used to determine the participants' OABs at the time of conversion.  DFF ¶ 263.  Accordingly, the value of some participants' Minimum Benefit was greater than the value of their OAB even with the growth from benefit and interest credits.  Indeed, the Minimum Benefit was designed to protect participants in the event that interest rates decline.  If interest rates decline, the annuity that one could purchase with the account balance decreases, but the participant still would have the protection of their minimum protected annuity.  DFF ¶ 264.

[56]  Plaintiffs contend that CIGNA was aware of the wear-away effect at the time of conversion,

continued . . .

Administrator could not predict in 1998 how future interest rates would fluctuate, and from an economic perspective, Plaintiffs' expert admitted that there is no "way to account perfectly for the changes in interest rates" that will occur in the future. DFF ¶ 266. Accordingly, the only fair basis to predict the likely impact of future interest rates, given the unforseeability of their expected change, is to assume constant interest rates, as the Plan Administrator did in the disclosures to participants. DFF ¶ 267. Indeed, this was the approach the Treasury Department took when it amended its regulations (subsequent to the relevant time period in this case) to require disclosure of a wear-away in a Section 204(h) notice:

> [T]o determine whether a wear-away occurs as a result of a section 204(h) amendment that converts a defined benefit plan to a cash balance pension plan that will credit interest based on a variable interest factor specified in the plan, the future interest credits must be projected based on the interest rate applicable under the variable factor at the time section 204(h) notice is provided.

68 Fed. Reg. 17,277 (Apr. 9, 2003) (Q&A 11).

At trial, Defendants' expert, Lawrence Sher, demonstrated the inability to predict the wear-away of normal retirement benefits without knowing future interest rates. He illustrated the manner in which interest rates affected the wear-away by examining how various testifying class members' wear-away period would have looked if interest rates had remained constant from the

---

but support this point by referencing CIGNA memos that were prepared in 2000-2002, and which cast no light on what CIGNA knew in 1997-98. See Pls.' Post-Trial Br. at 14. Plaintiffs also refer to the deposition testimony of Andrew Hodges, an actuary for the Plan at the time of the conversion. See id. at 14-15. However, Mr. Hodges' testimony merely establishes that he understood that certain factors, which were "highly contingent upon the facts associated with that individual," could potentially contribute to a wear-away effect — not that a wear-away effect necessarily would result upon the conversion. DFF ¶ 268 (stating that there "could be a period" of wear-away).

year of conversion until the participant's normal retirement age.  DFF ¶ 269.[57]  Mr. Sher's

analysis also examined the wear-away effect if interest rates had gone in the opposite direction

— in other words, if interest rates had increased by exactly the same amounts that they had

actually declined during the period from when the participant converted to Part B until January

of 2002.  DFF ¶ 272.

For example, Ms. Broderick's account balance as of July 2000 (upon rehire) was

$141,620, and had interest rates remained constant, the lump sum value of her frozen benefit

would have increased about $15,000 by January 2002, whereas her cash balance account would

have increased about $25,000.  DFF ¶ 273.  Had interest rates remained constant, Ms. Broderick

would have experienced <u>no</u> wear-away effect with respect to her lump sum benefit, <u>i.e.</u>, she was

always earning additional lump sum benefits and her annuity wear-away would have lasted less

than 18 months.  DFF ¶ 273.  Critically, cash balance plans are expressed in the form of lump

sums and most participants elect to take lump sums.  DFF ¶ 300.  Thus, it made sense for the

Plan Administrator to to focus disclosures on lump sums.

Additionally, had interest rates risen (instead of fallen as they did) from January 1, 2001

to January 1, 2002, Ms. Broderick's lump sum, based on her account balance, would have

increased from $141,620 to $166,822 (over a $25,000 jump), but the value of her frozen age-65

annuity would have decreased from $141,621 to $134,732 (about a $7,000 decrease), rendering

---

[57]    Mr. Sher's analysis took into account the preretirement mortality discounts that the Plan
Administrator applied for Part B.  DFF ¶ 270.  However, because the analysis examined the
effect of interest rates on the normal retirement benefit, it excluded the effect of any early
retirement subsidies, which nevertheless did not have any wear-away effect with respect to
lump sum benefits.  DFF ¶ 270.  Additionally, the Free 30 was not considered for purposes
of the analysis, because Free 30 eligibility can only be determined at retirement, not before.
DFF ¶ 271.

her cash balance benefit more valuable and the Minimum Benefit inapplicable.  DFF ¶ 274.[58]

Mr. Sher's analysis reflected that when interest rates fall, it is more likely that the protected Minimum Benefit is going to be the "greater of" in the "A or B" formula, and more valuable than the cash balance benefit for lump sum and annuity options.  DFF ¶ 276. Furthermore, his analysis shows that the wear-away effect actually resulted in Ms. Broderick's lump sum Minimum Benefit, had she collected a benefit on January 1, 2002, increasing in value by $40,000 compared to the value of that benefit as of July 2000 when she was rehired. DFF ¶ 277.

For Plaintiff Glanz, had interest rates remained constant since her 1998 conversion to Part B, she would have experienced no lump sum wear-away effect at all, and her cash balance annuity value would have exceeded her Minimum Benefit before she finished her first year in Part B.  DFF ¶ 278.  Indeed, assuming that interest rates remained at the same level as at conversion, the lump sum benefit (as opposed to their annuity benefit) for all of the participants Mr. Sher examined showed no wear-away effect with respect to their normal retirement benefits. DFF ¶ 279.  Again, this is particularly significant in light of the fact that most cash balance plan participants elect a lump sum.  See infra at 79.[59]

In summary, Mr. Sher's analysis demonstrated that the wear-away effect could come and go.  If, in the future, interest rates increased, the wear-away effect at any point in time could

---

[58]   In reality, because interest rates fell, her cash balance account increased from $141,620 to $165,995 (about a $24,000 increase), and the lump sum value of her frozen age 65 annuity increased, just by more, from $146,254 to $181,719 (about a $35,000 increase).  DFF ¶ 276.

[59]   Mr. Sher's analysis also demonstrated that in an environment of rising interest rates, the Part B plan approach (greater of "A or B") is better for participants than the "A + B" approach. DFF ¶ 280.

disappear entirely, even retroactively.  DFF ¶ 283.[60]  In other words, depending upon how interest rates change, "somebody could fall into a wear-away period and then, because of fluctuations in interest rates, have that wear-away period go away and then fall back into the wear-away period, depending on if interest rates fall again."  DFF ¶ 284.  During this time period, however, cash balance benefit values would be increasing with the addition of benefit and interest credits.  Thus, the fact that the wear-away effect was so sensitive to the interest rate fluctuations relieved CIGNA and the Plan Administrator from any obligation to predict that effect in the SPDs provided to Plan participants.  In other words, clairvoyance was not required. See supra, at 67-68.

> c.    **The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Only Possibly Affect A Small Subset Of Participants.**

Another factor with the potential to create a wear-away effect for a subset of participants was the protected minimum annuity benefit's inclusion of early retirement subsidies, which were not factored into the calculation of the OABs for most participants.[61]  Specifically, Plaintiffs complain that the SPD should have explicitly disclosed that because participants' OABs were in

---

[60]    As Mr. Sher explained that "you could start off with not thinking you are going to have very much wear-away, interest rates go down all of a sudden looks like you will have four or five years of wear-away, and then next year interest rates go up and it disappears and could come back again.  This notion that there's a "period" [of wear-away] is really a misnomer.  It's an effect . . . ."  DFF ¶ 285.

[61]    Plaintiffs' expert conceded that he did not analyze how much of the actual wear-away effect that participants experienced was caused by the early retirement subsidies as opposed to other causes that he identified.  DFF ¶ 290.  Plaintiffs also complain that the SPD did not disclose that the Social Security supplement might be subject to a wear-away because it was not included in the OABs but was part of the minimum protected annuity.  The Social Security supplement, however, was simply part of the protected early retirement benefit.  DFF ¶ 163.

most cases based on their age-65 benefit and their minimum protected benefit could include their early retirement subsidized benefit, participants might experience a wear-away effect. See Pls.' Post-Trial Br. at 63. To the contrary, this potential early retirement wear-away effect – limited only to a small subset of participants — did not have to be disclosed as it was dependent upon a multitude of individualized factors, as next explained.

### (1)     The Wear-Away Effect Attributable To The Early Retirement Subsidy Could Result Only For Eligible Employees During The Early Retirement Window.

The wear-away effect attributable to the early retirement subsidy could only occur for a limited population of participants during the time period when they would have been eligible for an early retirement subsidy under the old plan. DFF ¶ 286. The OAB for most participants was based on their age-65 benefit, as repeatedly disclosed to participants, whereas some participants' minimum protected annuity could be based on a subsidized early retirement benefit if they retired between ages 55 and 64. DFF ¶ 286. For that reason, there are several years in which the minimum protected early retirement benefit is greater than the cash balance account. DFF ¶ 285.

Additionally, only Part B participants who previously had attained ten years of service under the old plan were eligible for early retirement and therefore could possibly have been subject to such a wear-away effect. DFF ¶ 287. Plaintiffs do not have any evidence concerning what percentage of the population was eligible for early retirement at the time of the conversion to the cash balance plan population, or what percentage of the population was likely to grow into early retirement eligibility. DFF ¶ 288. In fact, most participants who might otherwise have been affected by the early retirement wear-away effect were grandfathered and never became participants in Part B. DFF ¶ 289.

Even as to those participants eligible for a subsidized early retirement benefit, the wear-

away effect could be outgrown, the same result as for employees working without a cash balance subsidy as long as they continue working.  The early retirement subsidy applied between ages 55-64, but if a participant retired upon age 55 and elected to defer benefits, or continued to work until normal retirement age, the additional benefit of the early retirement "would have been foregone as a result of those benefits not commencing."  DFF ¶ 291.  In other words, if a participant did not take the early retirement subsidized benefit, he would lose the value of the early retirement subsidized benefit gradually from age 55 to 65.  DFF ¶ 292.  Moreover, if someone was eligible for early retirement but was already ages 57, 58 or 59 at the time of the conversion, the impact of the early retirement wear-away would be lessened.  DFF ¶ 293.  Similarly, for younger persons who at the time of the conversion would not be eligible for early retirement for many years (like Plaintiff Glaz), any wear-away effect was likely to be eliminated because if they worked long enough to qualify for early retirement, they necessarily would earn enough in their cash balance account to be unaffected, as Plaintiffs' expert admitted.  DFF ¶¶ 294-95.  Thus, because the early retirement wear-away effect would only affect a small subset of participants who met a variety of requirements, and only for a limited time period, it did not have to be disclosed.  See supra, at 68-70.

> **(2)     The Wear-Away Effect Attributable To The Early Retirement Subsidy Would Only Result If A Plan Participant Elected An Annuity Option, But Most Cash Balance Participants Elect A Lump Sum.**

Importantly, the subsidized early retirement benefit only is available where participants elect their benefits in the form of an annuity.  DFF ¶ 297.[62]  Thus, there is no early-retirement

---

[62]    Because the prior plan did not offer a lump sum option, the lump sum minimum protected benefit in Part B is based on the normal retirement benefit and does not include the value of

continued . . .

wear-away effect when a participant elects to receive a lump sum distribution of his or her cash balance account. Part B was specifically designed to offer this new lump sum option, and there was no reason for CIGNA or the Plan Administrator to expect that any significant number of participants would elect an annuity and possibly experience a wear-away effect. DFF ¶ 299. Indeed, as Mr. Sher testified, the vast majority of cash balance plan participants will elect a lump sum benefit when given the option. DFF ¶ 301. Accordingly, it was appropriate for CIGNA's SPD to focus on the plan provisions that would affect lump sum payments, and not to describe the many permutations that might affect various annuity payments. In sum, for this reason as well as those just discussed, the Part B SPD did not have to disclose the potential wear-away effect.

**5.     The Part B SPD Was Not Required To Disclose All Of The Factors In The OAB Calculation.**

Additionally, Plaintiffs complain that the SPD did not include sufficient information regarding the calculation of the OABs for participants who had converted from the old plan. Specifically, Plaintiffs suggest that the SPD should have explicitly stated that early retirement subsidies were not included, that a "pre-retirement mortality discount" was applied, and that CIGNA applied certain interest rates in computing OABs, all of which are issues that may contribute to the wear-away effect. See Pls.' Post-Trial Br. at 62-64. However, nothing in Section 102 of ERISA requires an SPD to include a description of these OAB factors. That is particularly true here, where the OAB calculations were a one-time event that the Plan Administrator nevertheless disclosed to participants in other written disclosures.

_____

a subsidized early retirement benefit. DFF ¶ 398. Accordingly, the wear-away effect only occurs when a participant elects an annuity. DFF ¶ 298.

Caselaw demonstrates that such details regarding benefit calculations do not need to be included in an SPD. As the Second Circuit recently held, "neither ERISA nor the Labor Department's regulations require a summary plan description to describe or illustrate every method by which a plan benefit may be limited under an early payment option or similar such limitation." Dun & Bradstreet, 482 F.3d at 194. "No case has ever held that a mere failure to include the specific methodology used to calculate a benefit is an ERISA violation." McCarthy v. Dun & Bradstreet Corp., No. Civ.A.3:03CV431(SRU), 2004 WL 2743569, at *5 (D. Conn. Nov. 13, 2004), aff'd, Dun & Bradstreet, 482 F.3d at 194. Moreover, the use of mortality factors in determining pension benefits is routine and uncontroversial. See, e.g., Esden, 229 F.3d at 161, 165 & n.14 (noting that mortality was assumed in cash balance calculation); Allen v. WestPoint-Pepperell, Inc., 11 F. Supp. 2d 277, 285 (S.D.N.Y. 1997) (noting use of mortality tables in retirement plan calculations).

The Second Circuit's recent analysis in Dun & Bradstreet, upholding summary judgment on the claim that the SPD inadequately disclosed the method by which a benefit was actuarially reduced when paid to former employees, is instructive. Dun & Bradstreet, 482 F.3d 184. Under the Dun & Bradstreet plan, employees who terminated before age 55 (like the plaintiffs), could choose to receive payments as early as age 55, rather than waiting for their deferred vested age-65 benefit. Id. at 189. Under this early payment option, the participant's deferred vested age-65 benefit would be actuarially reduced both to account for the time value of money (by reducing the benefit by a discount rate for each year prior to age 65), and by a pre-retirement "mortality factor to adjust actuarially for the possibility that a participant might not live to the age of 65." Id. The plan also included a different, more favorable early retirement benefit for employees, unlike plaintiffs, who were employed at age 55 and had ten years of service. Id. at 189-190.

Dun & Bradstreet's SPD included a "Vesting" section that explained the deferred vested benefit available to former employees, and an "Early Retirement Benefit" section which discussed the more favorable early retirement benefit for active employees. Id. at 190. However, "[t]here is no table or discussion in the Vesting section of the Summary Plan Description that sets forth the percentage by which the actuarial reduction will reduce the benefit of a pension-vested former employee who is terminated from employment with Dun & Bradstreet before reaching the age of 55 but elects to receive payments before the age of 65." Id.

The Second Circuit first held that the SPD's description of the deferred vested retirement benefit was sufficiently accurate and comprehensive to satisfy Section 102(a), because the regulations and statute "do not explicitly require disclosure of the method of actuarial reduction." Id. at 192. The court reasoned that while the SPD "might have been more informative in discussing the early payment option of the deferred vested retirement benefit," an SPD only has to "summarize, rather than describe in every detail, the benefits available" and was sufficient in disclosing to participants that their benefit would be reduced, without detailing the specific method of reduction." Id. at 194. The court also held that in failing to disclose the method of actuarial reduction, the SPD did not violate the Section 102(a) requirement to disclose "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." Id. at 199. The SPD sufficiently provided information such that participants would not be misled as to their benefits, despite the fact that the plaintiffs had alleged that the SPD "minimize[d] the effect of benefit limitations" by disclosing the actuarial reduction formula for current but not former employees. Id. at 195.

Thus, Dun & Bradstreet makes clear that an SPD does not need to detail all of the calculations involved in determining participants' benefits, and does not need to explain every

possible condition which affects participants' ultimate benefit amount.  Likewise, <u>Dun &</u>

<u>Bradstreet</u> supports Defendants' argument that the SPD's disclosure of the method of calculating

benefits under Part B, and of the Minimum Benefit rule, was sufficient to satisfy Section 102(a).

 Plaintiffs cite <u>Layaou v. Xerox Corp.</u>, 238 F.3d 205 (2d Cir. 2006), for the proposition

that an SPD must not only state that benefits may be reduced, but also describe how benefits are

reduced.  <u>See</u> Pls.' Post-Trial Br. at 74-75.  In <u>Layaou</u>, the plan applied a "phantom account"

offset to reduce participants' pension benefits based on the amount of any prior distributions they

received under the plan.  <u>Layaou</u>, 238 F.3d at 210.  The SPD omitted any reference to the

phantom account system, however, and noted only that "[t]he amount you receive may also be

reduced if you had previously left the Company and received a distribution at that time."  <u>Id.</u>  In

reversing summary judgment in favor of the defendants on the question of whether the SPD was

misleading, the <u>Layaou</u> court relied squarely on the fact that the SPD's omissions arguably

misled the plaintiff into believing that he or she was going to receive <u>more</u> than he or she did in

pension benefits.  <u>Id.</u> at 211.[63]

 <u>Layaou</u> is inapposite.  Here, the SPD told Plaintiffs the critical information regarding

how benefits accrued under Part B.  There was no hidden offset or other circumstances that led

Plaintiffs to mistakenly believe they would obtain higher benefits than the plan provided.  DFF

---

[63] On remand, the district court found that the failure of the SPD to disclose "the 'phantom account' offset, <u>coupled with the annual benefit statements that had been provided to Layaou</u>, would clearly have misled him into believing that his monthly benefit would be considerably higher than it turned out to be."  <u>Layaou x. Xerox Corp.</u>, 330 F. Supp. 2d 297, 304 (W.D.N.Y. 2004) (emphasis added).  Here, by contrast, the annual account statements and Total Compensation Reports provided by the CIGNA Plan Administrator informed Plan participants of the exact amount of their cash balance accounts.  <u>See</u> <u>supra</u>, discussion at 47-52.

¶¶ 233-47.  Indeed, to the extent that participants did not understand that their protected

Minimum Benefit under CIGNA's old plan might be greater than their cash balance account,

participants could only receive <u>more</u> — not less — than they believed.

Moreover, the Second Circuit in <u>Dun & Bradstreet</u> distinguished <u>Layaou</u>, where

participants were offered no information on the phantom offset, in contrast to Dun &

Bradstreet's SPD which included the allegedly omitted information, albeit in summary form.

<u>Dun & Bradstreet</u>, 482 F.3d at 197.  The Second Circuit also made clear that it "[did] not

consider the <u>dicta</u> in the <u>Layaou</u> opinion to signify that ERISA imposes a blanket requirement

under which a Summary Plan Description invariably must describe the method of calculating an

actuarial reduction or must use a clarifying example to illustrate how a benefit is actuarially

reduced . . . ."  <u>Id</u>.  Applying this principle here, CIGNA's SPD was sufficient without explicitly

disclosing the fact that the OABs did not include early retirement subsidies for most participants,

or the mortality factors and interest rates used to calculate the OABs.  More fundamentally, as

noted above in Section IV.A.1, <u>all</u> of this information was previously disclosed in the OAB

materials and Total Compensation Reports provided to Plan participants in the Spring of 1998.

DFF ¶¶ 214-224, 227-231.  Given these circumstances, the Plan Administrator had no obligation

to later disclose this information in the Part B SPD.

### 6.    Even If The SPD Were Deficient, Plaintiffs' Benefits Must Be Governed Exclusively By The Terms Of The CIGNA Pension Plan, Not The SPD.

As explained previously, the Part B SPD satisfied ERISA's disclosure requirements and

Plaintiffs have suffered no likely or actual harm resulting from alleged deficiencies in that

document.  Nevertheless, even assuming <u>arguendo</u> that Plaintiffs could otherwise satisfy the

elements of their SPD claim, they still are not entitled to pension benefits based on any document

- 83 -

other than the actual governing Part B Plan document. See Rule 23 Order at 4 - Count 2(A)(2) (noting the issue of "[w]hether ERISA permits a plan participant to recover benefits based on the terms of an SPD instead of the actual terms of the plan").

Defendants recognize that the Second Circuit has held that publishing an SPD can effectively modify the terms of an underlying plan document in some circumstances, see, e.g., Burke, 336 F.3d at 110, and that this Court is bound by the Second Circuit's decisions in those cases. However, in Burke, the court held that the SPD controlled where its terms conflicted with the terms of the written plan document. Burke, 336 F.3d at 110-11. Here, by contrast, Plaintiffs do not allege that the SPD conflicted with provisions in the Plan document. Accordingly, Burke lends no support to Plaintiffs' argument that the Plan should be enforced without the pre-retirement mortality discount, since that discount was not applied pursuant to a Plan provision. See Pls.' Post-Trial Br. at 103; see also McCarthy, 2004 WL 2743569, at *27 ("Burke is distinguishable because it involved a conflict between the employer's summary plan description and the retirement plan.").

Moreover, Defendants respectfully submit (and raise this issue to preserve it for appeal) that the Second Circuit's suggestion that an SPD can effectively modify the terms of an ERISA plan is inconsistent with the Supreme Court's decision in Curtiss-Wright Corp., 514 U.S. 73 (1995). In Curtiss-Wright, a company tried to amend its medical plan by publishing a new SPD describing the new plan terms. The Supreme Court held that publishing the SPD could only modify the terms of the plan if the act of publishing the SPD satisfied the formal amendment procedures in the plan. See id. at 83-85. The Court further explained that where a plan reserves to one particular corporate body the right to modify a plan, "one must look only to [that corporate body] and not to any other person" to determine whether an amendment is valid. Id. at

79 (emphasis in original).[64]  Here, the Plan Administrator — the person with exclusive

responsibility for publishing the SPD — did not have the power to modify the terms of Part B,

and, moreover, the publication of the SPD did not satisfy the Plan's formal amendment

procedures.  DFF ¶¶ 36, 87, 234.  See Depenbrock, 389 F.3d at 83 (holding that despite that

disclosures were provided to participants earlier, CIGNA's plan amendment creating Part B and

modifying the rehire rule was not valid until it was signed by the CEO on December 21, 1998).

Accordingly, to permit the SPD to effectively modify the terms of Part B would run afoul of

Curtiss-Wright.  Plaintiffs' benefits must be governed exclusively by the terms of the Part B Plan

document.

> **C.     The Plan Administrator Provided Adequate Notice Under ERISA Section 204(h).**

In Count 4, Plaintiffs contend that CIGNA violated ERISA Section 204(h),

29 U.S.C. § 1054(h), by reducing their Plan benefits without proper advance notice to

participants.  See Rule 23 Order at 6 - Count 4(A)(1).  This argument is without merit because

(1) the Plan Administrator provided timely notice of the Plan amendment freezing the Part A

benefits, which was the only reduction of benefit accruals class members experienced, (2) even if

the Part B amendment required a Section 204(h) notice, the Plan Administrator's written

communications to all covered participants fulfilled that requirement, and (3) the Plan

---

[64]    In addition, and as discussed below, publishing an SPD is the exclusive responsibility of a
plan administrator.  By contrast, the act of amending or modifying the terms of an ERISA
plan is a settlor function that does not implicate any of ERISA's fiduciary duties.  See, e.g.,
Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444-45 (1999) ("[A]n employer's decision
to amend a pension plan concerns the composition or design of the plan itself and does not
implicate the employer's fiduciary duties which consist of such actions as the administration
of the plan's assets. . . .  A settlor's powers include the ability to add a new benefit structure
to an existing plan.").

Administrator was not required to provide notice of the rehire amendment to employees who were not employed by CIGNA at the time. For these reasons, judgment should be entered in favor of Defendants on Count 4.

> **1.     Only The Amendment Freezing Accruals Under Part A Required A Section 204(h) Notice, Which The Plan Administrator Provided.**

ERISA Section 204(h) requires a plan administrator to notify participants of a plan amendment that is likely to cause a "significant reduction" in the rate of future benefit accrual at least 15 days in advance of the implementation of the amendment. See 29 U.S.C. § 1054(h).[65] Here, the only plan amendment causing a reduction in "future benefit accruals," and which therefore could possibly require a Section 204(h) notice, was the freezing of benefit accruals under Part A for certain participants, effective December 31, 1997. DFF ¶¶ 30-32 (Amendment No. 4). See Depenbrock v. CIGNA Corp., 278 F. Supp. 2d 461, 469 (E.D. Pa. 2003), reversed on other grounds, 389 F.3d 78 (3d Cir. 2004) ("Taylor's execution of Amendment Number 4 . . . froze the pension benefit accruals of the participants that would be converted to the cash balance plan effective December 31, 1997").

---

[65]     Section 204(h), as it was stated at the time of the alleged violation, stated:

> (h) Notice of significant reduction in benefit accruals
>
> (1) A [pension] plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to-
>
> (A) each participant in the plan.

29 U.S.C. § 1054(h) (emphasis added).

For this amendment, the Plan Administrator adequately and timely provided a Section 204(h) notice to each participant through the November 1997 Newsletter and/or the Retirement Kit distributed in early December 1997:[66]

> "Employees participating in the new CIGNA Retirement Plan will stop earning benefits under the current Pension Plan on December 31, 1997."

DFF ¶ 183 (Newsletter) (emphasis added).

> "Q.  What will happen to the benefits I have earned under the Pension Plan? . . . You will earn no further benefits under the Pension Plan after December 31, 1997."

DFF ¶ 194 (Retirement Kit) (emphasis added).

Regarding these disclosures, Plaintiffs' communications expert Professor Stratman admitted that he could not draft "clearer text that would explain to participants in the new plan that they would stop accruing benefits under the old plan as of December 31, 1997."  DFF ¶ 196. Moreover, class members similarly testified that they understood from the documents that they would not be earning any more pension benefits under the old plan.  E.g., DFF ¶ 387 (Hogan). Thus, the Newsletter and/or the Retirement Kit timely notified each participant of the freeze and constituted a lawful Section 204(h) notice.

Plaintiffs suggest that the Plan Administrator violated ERISA Section 204(h) by failing to provide an adequate Section 204(h) notice for the creation of Part B.  This theory likewise fails. While the freeze amendment caused a "reduction" in future benefits (because it reduced future benefits to zero), the subsequent adoption of Part B did not effect any "reduction."  Rather, the

---

[66]   Either of these documents suffices to fulfill the Plan Administrator's obligations under Section 204(h) regarding the freeze amendment, although the Plan Administrator intended the Newsletter to satisfy its notice obligation.

Part B amendment, which was signed on December 21, 1998, retroactive to January 1, 1998, resulted in a benefit <u>increase</u> for participants whose accruals, at that point, were frozen. In other words, there were two amendments: (1) Amendment No. 4, which froze accruals under Part A and therefore triggered the notice requirement of Section 204(h), and (2) the December 21, 1998 amendment that created Part B and caused participants to start earning benefits again.[67]

Indeed, Plaintiff's expert, Mr. Poulin, admitted that if there is a plan amendment which freezes all future benefit accruals, the rate of benefit accrual for affected participants would be zero, and that the subsequent adoption of a new plan would be an increase from the prior rate of benefit accrual. DFF ¶ 34. Mr. Poulin further admitted that if "CIGNA had ceased all future benefit accruals effective December 31, 1997, and then in 2005 had adopted its cash balance plan retroactive to January 1st of 1998, that would have been an increase in benefit accruals." DFF ¶ 35. In sum, because the converted participants' benefit accruals were increased rather than reduced by the implementation of Part B, no additional Section 204(h) notice was required.

### 2. Even If A 204(h) Notice Was Required For The Cash Balance Adoption, The Plan Administrator Fulfilled That Requirement.

Even if a Section 204(h) notice regarding the implementation of Part B was required, the Plan Administrator fulfilled that requirement with the various disclosures provided to Plan

---

[67]  Plaintiffs' suggestion that the amendments implementing the freeze and Part B were a single event is belied by the Third Circuit's decision in <u>Depenbrock</u> that while the freeze amendment was signed in October 1997 and became effective December 31, 1997, the cash balance amendment was signed on December 21, 1998 and became effective only on that date. <u>See Depenbrock</u>, 278 F. Supp. 2d at 466, 469 (noting that Amendment No. 4, "which froze the pension benefit accruals of the participants that would be converted to the cash balance plan effective December 31, 1997," was executed on October 31, 1997); <u>Depenbrock</u>, 389 F.3d at 83 (holding that "December 21, 1998, is the effective date of the amendment" implementing the cash balance plan). Thus, Plaintiffs' suggestion that the freeze and the cash balance plan implementation were a single plan amendment is both faulty and disingenuous.

participants describing the Plan amendment, which supplied all of the information required by

Section 204(h) and its regulations at the time.

a.    **Section 204(h) As It Existed At The Time Part B Was Created Provides The Applicable Requirements For The Allegedly Required Notice.**

Despite Plaintiffs' admission that "in June 2001, Congress amended ERISA § 204(h) to

require still more specific information," Pls.' Post-Trial Br. at 69 n.30, Plaintiffs point to Section

204(h) as it was amended in 2001 and argue that the Plan Administrator was obligated to

describe or illustrate the "effect" of the Part B Plan amendment.  See Pls.' Post-Trial Br. at 70-

71.  This is incorrect.  Section 204(h), as it existed at the relevant time in 1997-98, required only

a "summary" of a plan amendment.  See supra, n.65.[68]

Defendants do not dispute that Section 204(h) was amended in 2001 (and its attendant

regulations in 2003) to require administrators to explain an amendment's resultant reductions.

However, the 2001 statutory amendment explicitly stated that "[t]he amendments made by this

section shall apply to plan amendments taking effect on or after the date of the enactment of this

Act," which was June 7, 2001.  See Economic Growth and Tax Relief Reconciliation Act of

2001, Pub. L. 107-16 § 659(b), 115 Stat. 38 (2001).  Moreover, the amendment's legislative

history further makes plain that Congress amended Section 204(h) to require not only a

"summary" of the amendment, but also "sufficient information (as defined in Treasury

---

[68]    Proposed regulations were pending since 1995, 60 Fed. Reg. 64,320, 64,323 (Q&A 10) (Dec. 15, 1995), and the final 204(h) regulations were issued December 14, 1998, and applied to plan amendments on or after December 12, 1998.  See 26 C.F.R. § 1.411(d)-6, 63 Fed. Reg. 68,678 (1998).  Both required that only "the entire amendment or a summary of the amendment" be provided in the notice.  See Pls.' Post-Trial Br. at 68.  Section 204(h) was again amended in 2001, and attendant regulations were issued in 2003.  See Pub. L. 107-16 § 659(b), 115 Stat. 38 (2001).

regulations) to allow participants to understand the effect of the amendment." See Legislative History of Public Law 107-16, House Report 107-84, Conference Agreement - (4)(c) at 264-66 (emphasis added).

Caselaw confirms that the 2001 amendment to Section 204(h) did not apply retroactively. For example, in Register, 477 F.3d 56, the Third Circuit recognized that for a 1999 plan amendment, the pre-2001-amendment Section 204(h) regulations required only a summary of the plan amendment and "need not explain how the individual benefit of each participant . . . will be affected by the amendment." Id. at 72 (quoting Scott v. Admin. Comm. of the Allstate Agents Pension Plan, 113 F.3d 1193, 1200 (11th Cir. 1997)).[69] Likewise, the district court from the Southern District of New York properly applied the pre-2001 section 204(h) regulation in Citigroup I, 470 F. Supp. 2d at 335-36, nn.60-61.[70]

---

[69]  See also Normann v. Amphenol Corp., 956 F. Supp. 158, 165 n.4 (N.D.N.Y. 1997); Charles v. Pepco Holdings, Inc., 437 F. Supp. 2d 248, 252 (D. Del. 2006) (noting that for a 1998 Section 204(h) notice, "the law only requires the notice to include an understandable summary of the amendment and not a description of its potentially adverse effects.").

[70]  Despite this authority, Plaintiffs point to the district court opinion in Hirt, 2006 WL 2627564 (Aug. 24, 2006), which stated that "[t]he 2001 statutory amendment made explicit that which was implicit in the requirement of a notice." Hirt v. Equitable Ret. Plan for Employees, Managers and Agents, 441 F. Supp. 2d 516, 538 (S.D.N.Y. 2006); see Pls.' Post-Trial Br. at 70-71. This Court should reject Hirt's reliance on a subsequent statutory amendment for several reasons. First, despite referencing the amended requirement, the Hirt court held that Equitable's Section 204(h) notice in 1990 did not satisfy the statutory requirements as they existed in 1990. Hirt, 441 F. Supp. 2d at 539 (noting "[t]he insufficiency of Equitable's 1990 Notice – under the terms of the statute in effect at the time it was given") (emphasis added). Thus, the discussion of the amended statute was mere dicta. Next, Hirt's interpretation of the subsequent amendment as merely clarifying that which was implicit in an earlier statute is contrary to the statutory and regulatory effective dates and the legislative history. As noted above, Hirt's approach also is inconsistent with that of the Third Circuit and every other court which has evaluated a Section 204(h) claim after a subsequent change in the legal standard.

In sum, the legality of the Section 204(h) notice issued by CIGNA's Plan Administrator in 1997 must be governed solely by the statutory and regulatory scheme in place as of that date, which required only that plan administrators make a "good faith effort to" ensure that Section 204(h) notices provided a "summary of the amendment . . . written in a manner calculated to be understood by the average plan participant."  Notice of Significant Reduction in the Rate of Future Benefit Accrual, 63 Fed. Reg. 68,678, 68,682 (Dec. 14, 1998).  This is the appropriate standard by which the Court must evaluate the Section 204(h) notice at issue.

> **b.      The Plan Administrator Provided A Proper Section 204(h) Notice To Active Employees.**

Under the Section 204(h) requirements at the time, the Plan Administrator fulfilled any requirement to provide a Section 204(h) notice for the Part B amendment by providing all converted participants with the November 1997 Newsletter, the Retirement Kits and/or the 1998 SPD, each of which "[set] forth the plan amendment and its effective date."  29 U.S.C. § 1054(h); 26 C.F.R. Reg. § 1.411(d)-6, Q&A 10 (as in effect in 1997); DFF ¶¶ 177, 178, 189, 194, 234.[71]

As detailed in Defendants' Proposed Findings of Fact, the 1997 Newsletter provided Plan participants an introduction to the concept of a cash balance plan, an explanation of how their account would grow by increasing benefit and interest credits, and of their forms of benefit options upon leaving CIGNA.  DFF ¶ 183, 186.  See also supra, at 47-48.  The Retirement Kit likewise alerted participants to the upcoming plan amendment:  "If you are in the Pension Plan

---

[71]   Courts in this Circuit have held that an SPD can satisfy Section 204(h) notice requirements.  See Normann v. Amphenol Corp., 956 F. Supp. 158 (N.D.N.Y. 1997); Kagen v. Flushing Hosp., No. 96-CV-5795, 2000 WL 1678015 (E.D.N.Y. Nov. 3, 2000); see also Koenig v. Intercont'l Life Corp., 880 F. Supp. 372, 375 (E.D. Pa. 1995).

on December 31, 1997, you will automatically become a participant in the new CIGNA

Retirement Plan on January 1, 1998." DFF ¶ 197. It also contained even more detailed

information regarding the operation of the cash balance plan, and the way in which benefit and

interest credits were earned. DFF ¶ 199, 201. See also supra, at 48-49. Moreover, as described

in detail above, the SPD provided to participants in September 1998 described in detail the cash

balance plan's operation. See supra, at 62-64.

      Any of these documents sufficed to fulfill any Section 204(h) notice requirement for the

Part B Plan amendment, which, as described in full above, required only a summary of the

amendment and not any illustration of its effect. See supra, at 89-91. The Third Circuit's recent

decision in Register, 477 F.3d 56, is instructive here. In Register, PNC converted from a

traditional defined benefit pension plan to a "greater of" cash balance plan, like CIGNA.

Register, 477 F.3d at 60. When announcing the plan change, PNC provided participants with "a

20-page brochure which summarized the changes to the plan, described the cash balance pension

plan design, offered additional resources for more information, defined important words and

terms, and instructed participants on how to read their personalized statements." Id. at 72. The

court found that PNC satisfied Section 204(h)'s notice requirements, despite the fact that the

brochure did not alert participants that "in some instances [the amendment] may reduce the rate

of future Pension Plan benefit accruals," because it set forth the plan amendment and the

effective date and "[t]hat explanation was all that was required." Id. at 73 (emphasis added).[72]

_____

[72] The Southern District's opinion in Citigroup I, holding that the Section 204(h) notices failed
to inform participants of a reduction in benefits from a conversion to a cash balance formula,
is inapposite. See Pls.' Post-Trial Br. at 71-71. Citigroup's plan did not comply with one of
ERISA's three prescribed minimum accrual rules, but rather was "unlawfully structured to
allow for impermissible backloading" in a "bold and exploitive contortion of the [fractional]

continued . . .

- 92 -

Plaintiffs put forth several other arguments concerning alleged deficiencies in CIGNA's

Section 204(h) notices, all of which likewise fail:

> (1) Plaintiffs contend the Section 204(h) notice should have compared participants' benefits under Part A and Part B. See Pls.' Post-Trial Br. at 56, 63.

Nothing in Section 204(h), however, required the notice to compare what a participant's

benefits would be if the participant had remained in a prior plan, and indeed, Plaintiffs cite no

authority to justify their strained reading of Section 204(h)'s requirements.

> (2) Plaintiffs argue that CIGNA's 204(h) notice was misleading in that it stated that CIGNA was "enhancing" its retirement program, despite that some participants would earn lesser benefits than they would have if they remained in the old plan. See Pls.' Post-Trial Br. at 57-60.

---

rule." Citigroup I, 470 F. Supp. 2d at 337-38. The court found that Citigroup's notice violated Section 204(h) since "plaintiffs were without fair warning that the formula endangered their right to a minimum rate of benefit accrual." Id. at 329. The court's reasoning is inapplicable here given that Part B does not violate ERISA's minimum accrual or backloading rules, as explained more fully above. See supra, at 33-44. Moreover, unlike the alleged 204(h) flaws here, in Citigroup, the 204(h) notice failed to summarize a key plan term:

> It has been suggested that the Court's ruling stands for the proposition that any post-amendment discovery of a cash balance formula's technical defect will render the § 204(h) notices of that amendment per se defective. This reading is overly broad. Insofar as the Court's ruling suggests that the § 204(h) notices were required to describe how the amendments were going to reduce rates of benefit accrual, their lack of detail was of secondary importance to their material omission of an unorthodox yet vital component of the Plan's formula.

In re Citigroup Pension Plan ERISA Litig., Civ. A. No. 05-05296, 2007 WL 1074912, at *12 (S.D.N.Y. Apr. 4, 2007) ("Citigroup III") (footnotes omitted). Thus, the Citigroup Section 204(h) notice was held to be deficient because it omitted a crucial plan term, whereas here Plaintiffs concede that "an overview" of the key terms of Part B were explained to participants. Pls.' Post-Trial Br. at 57.

- 93 -

Plaintiffs' criticism misses the mark, as Plaintiffs blatantly ignore that the Newsletter and Retirement Kit were describing not only the change from the old plan to Part B for the defined benefit pension plan, but also enhancements to CIGNA's SIP, the 401(k) defined contribution plan. DFF ¶ 193. Indeed, despite all of Professor Stratman's bluster about how misleading the disclosures were in presenting an "enhanced retirement program," he admitted that he did not even know that the retirement program included a 401(k) plan. DFF ¶ 306. He then conceded, moreover, that "any plan participant who read the Signature Benefit Newsletter or the retirement kit would understand that when CIGNA said it was enhancing its retirement program, it was talking about both the cash balance plan and the 401k plan together." DFF ¶ 307. Thus, Plaintiffs' criticism is hollow.[73]

> (3)   Plaintiffs also complain that CIGNA improperly notified participants that it did not anticipate costs savings as a result of the retirement plan changes. See Pls.' Post-Trial Br. at 58-59.

---

[73] Plaintiffs also cannot deny, and indeed they do not, that the cash balance plan offered some distinct advantages over the prior defined benefit plan. For example, it was understandable and easy to use, and made a lump sum payment option available. DFF ¶¶ 10, 11, 16, 21. Indeed, while Professor Stratman allegedly opined on the misleading nature of the SPD obscuring the negative features of the old plan, he was not asked to consider any differences between the old and new plan that might be considered to be improvements or enhancements. DFF ¶ 308. Professor Stratman also did not consider the fact that under the new plan, participants now had the option to take a lump sum distribution of their entire account balance, an option that was not available under the old plan. DFF ¶ 309. He also did not consider (1) the increased portability the new plan afforded participants; (2) the fact that participants could take their benefit and roll it into an individual retirement account, (3) that under the new plan, participants earned their benefits more evenly over their careers, or (4) that the new plan made it easier for participants to understand the benefit amounts they were entitled to at any point in time. DFF ¶ 310. Professor Stratman also did not consider the fact that thousands of participants in the cash balance plan worked in the retirement industry, and had a particularly sophisticated knowledge about how the plans work. DFF ¶ 311.

This criticism fails because the trial evidence supported the "no anticipated cost savings" representation made by CIGNA, as reflected in CIGNA's expense projections concerning the changes in the retirement package to be rolled out in 1998.  DFF ¶ 181.  The expense projection showed that CIGNA anticipated a reduced cost of approximately $10M by virtue of the conversion from the traditional pension plan to a cash balance plan, but an additional cost of approximately $10M by virtue of upgrades to its "SIP" or 401(k) plan.  DFF ¶ 182.

> (4) Plaintiffs contend that the Section 204(h) notice should have disclosed the potential wear-away effect.  See Pls.' Post-Trial Br. at 62.

For the same reasons as described above, the inability to accurately foresee and predict the wear-away effect obviated the need for such a potential future effect to be disclosed.  See supra, at 66-79.  Moreover, any suggestion that the Section 204(h) notice should have disclosed the potential wear-away effect caused by the early retirement subsidies in the old plan is contrary to the law in effect at the time.  Prior to the 2001 statutory amendment, a Section 204(h) notice did not take into account early retirement subsidies in determining whether participants suffered a reduction in future benefit accruals.  See Legislative History of Public Law 107-16, H.R. Doc. No. 107-84, Conference Agreement - (4)(c) at 265 (in describing the "present law," before the 2001 proposed amendments, noting that "the regulations provide that the rate of future benefit accrual is determined without regard to optional forms of benefit, early retirement benefits").[74]

---

[74]  The 2001 amendments to Section 204(h) were revised to take into account early retirement subsidies.  See Pub. L. 107-16 § 659(b), 115 Stat. 38 (2001) (describing that the revised statute adds a section "(3) EARLY RETIREMENT.--A plan amendment which eliminates or significantly reduces any early retirement benefit or retirement-type subsidy (within the meaning of section 411(d)(6)(B)(i)) shall be treated as having the effect of significantly reducing the rate of future benefit accrual); 29 U.S.C. § 1054(h)(9) (2007) ("For purposes of this subsection, a plan amendment which eliminates or reduces any early retirement benefit

continued . . .

Furthermore, the 2003 amended regulations added provisions specifically requiring that a wear-away be disclosed in a Section 204(h) notice, further indicating that prior to such regulations, explicit disclosure of a wear-away was not mandated.  See 68 Fed. Reg. 17,277 (Apr. 9, 2003) (Q&A 11) ("Illustrative examples are in any event required to be provided for any change from a traditional defined benefit formula to a cash balance formula or a change that results in a period of time during which there are no accruals (or minimal accruals) with regard to normal retirement benefits or an early retirement subsidy (a wear-away period).").

In sum, because the 1997 Newsletter, Retirement Kits and/or SPD fulfilled the Plan Administrator's duty to disclose the Part B plan amendment to participants as it existed in 1997-98, Plaintiffs' Section 204(h) claim fails.  Judgment should therefore be entered in favor of Defendants on Count 4.

> **3.      The Plan Administrator Was Not Required Under ERISA Section 204(h) To Notify Vested Separated Old Plan Participants About The Amended Rehire Rule.**

Plaintiffs also allege that by implementing the amended "rehire rule" without notice to terminated vested participants of significant reductions in their future rate of accruals, CIGNA violated ERISA § 204(h), 29 U.S.C. § 1054(h).  See Rule 23 Order at 6 - Count 4(A)(1)(b); Pls.' Post-Trial Br. at 89.[75]  In other words, Plaintiffs maintain that CIGNA should have provided a Section 204(h) notice of the modified "rehire rule" to participants of the old plan not employed at that time of the Part B conversion, such as Plaintiff Broderick and Patricia Flannery.  No Section

---

or retirement-type subsidy (within the meaning of subsection (g)(2)(A)) shall be treated as having the effect of reducing the rate of future benefit accrual.").

[75]    As noted earlier, this Court has not examined the propriety of class certification for Plaintiffs' disclosure claims, including this claim regarding the Section 204(h) notification to rehires.

204(h) notice was required for these former employees because (1) the amendment did not cause a reduction in their future benefit accruals since they were not accruing any benefits at the time of the amendment, and (2) these employees were not likely to be affected by the amendment.

First, at the time that Plaintiffs allege a Section 204(h) notice should have been issued to these former employees, they were not earning any benefits at all. Rather, once these employees were separated from employment with CIGNA, their prior plan benefit was frozen, and their accrual was "zero," no matter how it is measured. DFF ¶ 38. Accordingly, the Plan Administrator was not required to provide a Section 204(h) notice to these former employees because they were not accruing benefits, and accordingly, no logical argument can be made that the rehire amendment reduced their "benefit accruals."[76]

Second, Section 204(h) requires that written notice be provided <u>only</u> to those participants who are likely to experience a significant reduction in benefits. The regulations in effect during the relevant time state that a participant who, at the time of the amendment, is not expected to have a significant reduction is not required to be provided the notice:

> Q-9:  If section 204(h) notice is required with respect to an amendment, must such notice be provided to participants or alternate payees whose rate of future benefit accrual is not reduced by the amendment?

> A-9:  (a) In general.  A plan administrator need not provide section 204(h) notice to any participant whose rate of future benefit accrual is <u>reasonably expected not to be reduced by the amendment</u>.

---

[76]  Importantly, if a plan administrator is not required to provide a Section 204(h) notice to a particular participant at the time of the amendment, there is no obligation to provide that participant a Section 204(h) notice at any later date.  Section 204(h) notice obligations are triggered only based on the facts and circumstances "at the time the amendment is adopted." 26 C.F.R. § 1.411(d)-6T, Q-9.

26 C.F.R. § 1.411(d)-6T (emphasis added).  The regulations also make clear that whether a particular participant is "reasonably expected" to have a significant reduction in future benefits is "determined based on all relevant facts and circumstances at the time the amendment is adopted."  Id.  The regulations further address the circumstances of former employees and provide that no Section 204(h) notice is required:

> (c) Examples.  The following examples illustrate the rules in this Q&A 9:
>
> Example 1.  Plan A is amended to reduce significantly the rate of future benefit accrual of all current employees who are participants in the plan.  It is reasonable to expect based on the facts and circumstances that the amendment will not reduce the rate of future benefit accrual of former employees who are currently receiving benefits or that of former employees who are entitled to vested benefits.  Accordingly, the plan administrator is not required to provide section 204(h) notice to such former employees.

26 C.F.R. § 1.411(d)-6T (emphasis added).

Thus, at the time of the adoption of the plan amendment that modified the "rehire rule" on December 21, 1998, the benefits of class members like Plaintiff Broderick and Ms. Flannery, who no longer worked for CIGNA, were not likely to be affected by the amendment at all.  See 26 C.F.R. § 1.411(d)-6T.  Unless and until these employees were rehired, the Plan amendment would have zero effect on them.  Moreover, Plaintiffs have not provided evidence concerning how many former employees CIGNA anticipated in 1997 that it would be rehiring, or reflecting any other "facts and circumstances" that would demonstrate a "reasonable" expectation in 1997 or 1998 that droves of former employees would return to CIGNA.  The fact that 500 former Tier 1 employees were rehired between 1998 and 1999, see Pls.' Post-Trial Br. at 92, speaks only to who was rehired — not what CIGNA anticipated.  Moreover, CIGNA's later decision to modify the rehire rule in light of the high number of employees it rehired supports Defendants' position

that the Part B Plan Administrator did <u>not</u> anticipate that CIGNA would hire as many rehires as it subsequently did.[77]

In sum, the Plan Administrator was not required to issue a Section 204(h) notice to former employees.[78]  Plaintiffs' claim in Count 4 based on the rehired participants is therefore without merit.

> **D.     Plaintiffs Do Not Have A Pending Claim For An Inadequate Summary Of Material Modification Regarding The Cash Balance Conversion.**

Despite the fact that Plaintiffs' Post-Trial Brief argues that CIGNA failed to fulfill its requirement to provide a summary of material modification ("SMM") regarding the cash balance conversion, such a claim is not properly part of this suit.  <u>See</u> Rule 23 Order at 4 - Count 2(A)(1)(a), Count 2(A)(5).

The Court should not entertain Plaintiffs' SMM claim because despite numerous opportunities, Plaintiffs never added an SMM claim to their Complaint in this matter.  Although this case had been pending since 2001, this Court's Order dated March 22, 2005 permitted the parties until May 2, 2005 to amend the pleadings.  <u>See</u> dkt. #101.  On May 2, 2005, Plaintiffs filed a motion to extend the deadline for filing amended pleadings until May 6, 2005, which the

---

[77]  Plaintiffs point to a November 2000 memorandum in which the Plan Administrator, Mr. Beltz, acknowledges that "[r]ecent patterns in rehires have shown that on average we are now rehiring more employees who are closer to early retirement age than ever before." Ex. 138; <u>see</u> Pls.' Post-Trial Br. at 92.  This admission is irrelevant for two reasons.  First, it refers only to the number of rehires close to early retirement age and does not speak to the number of rehires as a whole.  More importantly, this admission speaks nothing to the "facts and circumstances" <u>at the time of the amendment</u> and CIGNA's awareness of the frequency of rehires.

[78]  Plaintiffs also assert that terminated vested employees should have been provided an SMM notifying them of the amended rehire rule, a claim which likewise fails for the same and other reasons.  <u>See</u> infra, at 101-02.

Court granted. See dkt. #s109 and 110. Plaintiffs filed a motion for leave to file their Second

Amended Complaint on May 6, 2005, see dkt. #112, which the Court granted, in part, on June

21, 2005. See dkt. #123. On January 9, 2006, Plaintiffs filed yet another motion for leave to

amend the pleadings (this time to add a named Plaintiff), see dkt. #155, which the Court granted

on February 15, 2006, see dkt. #164, permitting the filing of Plaintiffs' Third Amended

Complaint. See dkt. #165. Yet despite filing four different complaints and twice requesting

leave of this Court to amend their complaint, Plaintiffs never asserted that the Plan Administrator

provided participants with an inadequate SMM regarding the cash balance conversion.

Nevertheless, Plaintiffs included this argument in their Pre-Trial Memorandum on June 6, 2006.

See dkt. #174. The Court should decline to entertain this belated claim.[79]

In any event, it is undisputed that CIGNA distributed an SMM to active employees in the

form of a Retirement Kit in December 1997, and an SPD in October 1998 (which satisfied any

SMM disclosure requirements). DFF ¶ 190, 234. Consequently, even if Plaintiffs' SMM claim

was properly before the Court, Plaintiffs' claim as to its deficiencies in not disclosing alleged

---

[79] Even if Plaintiffs' SMM claim was properly before this Court, the claim would be time-barred. Pursuant to 29 C.F.R. § 2520.104b-3, the Plan Administrator was required to, and did, furnish the affected participants with an SMM no later than "210 days after the close of the plan year in which the modification or change was adopted." Id. Since the Plan was adopted on December 21, 1998, the effective deadline for distribution of the SMM was July 29, 1999. Id. Given that the most analogous statute of limitations for statutory ERISA violations is two years, see infra, Section E, and that Plaintiffs knew, or "should have known," of their alleged SMM claim by July 29, 1999, see Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension, 201 F.3d 44, 47-48 (2d Cir. 1999), Plaintiffs' SMM claim, first articulated on June 6, 2006, is patently untimely.

reductions fails for the same reasons as those set forth above relating to their SPD claim in Count 2.[80]

Plaintiffs also assert that vested separated participants should have been provided with an SMM notifying them of the amended rehire rule, a claim which likewise fails. See Pls.' Post-Trial Br. at 90-91. Contrary to Plaintiffs' contention, the Plan Administrator was not required to distribute to vested separated participants an SMM relating to the conversion because the cash balance conversion did not affect them and would not affect them unless and until they were rehired. See 29 C.F.R. § 2520.104b-4 (specifically providing alternative methods of SMM compliance for "a retired participant, a vested separated participant [and] a beneficiary receiving benefits under the plan," as opposed to currently employed participants). The Department of Labor has described that an SMM "is merely a summary of changes in information previously described in the summary plan description." Rules and Regulations for Reporting and Disclosure; Summary Plan Description Requirements, 45 Fed. Reg. 14,029, 14,030 (1980) (codified at 29 C.F.R. § 2520). Thus, where certain participants were not required to receive an SPD in the first instance, these participants would not then be entitled to an SMM.

As stated at length above, where a pension plan is amended as to only some participants, the SPD for those participants need only include information applicable to them. See 29 C.F.R. § 2520.102-4 (stating that the summary plan description "may omit information which is not applicable to the class of participants or beneficiaries to which it is furnished"). Here, the Part B SPD need not have included information related to the old plan going forward (which applied to

---

[80]   Likewise, an SMM claim would also be barred because it was not asserted against the Plan Administrator, who is not party to this litigation. See infra, Section F.

the vested separated participants), as such information would be inapplicable to the converted

participants starting January 1, 1998.  Thus, if the Plan Administrator had no obligation to

provide vested separated participants with an SPD that included cash balance information, it

makes little sense to suggest that the Plan Administrator was required to provide that same class

of participants with an SMM describing aspects of the cash balance conversion.  Therefore, even

if Plaintiffs' SMM claim was properly before this Court, their SMM claim fails.[81]

     **E.**    **Plaintiffs' Disclosure Claims Are Time-Barred.**

         **1.**    **Plaintiffs' SPD Claim Is Time-Barred.**

Plaintiffs' claim that CIGNA's SPD was inadequate also fails because such claim was not

filed within the controlling statute of limitations.  See Rule 23 Order at 5 - Count 2(B)(3) (noting

an individualized or sub-class issue of "[w]hether any individual class member's claim in

Count II is barred by the applicable statute of limitations.").

As noted above, where an ERISA provision does not contain its own statute of limitations

for a particular claim, the most analogous state statute of limitations governs.  See supra, at 30.

Count 2 alleges that Part B's SPD failed to satisfy the applicable statutory disclosure

requirements under Section 102 by excluding information regarding conditions that may cause

participants' benefits to be "lost" or forfeited.  In other words, Plaintiffs do not ask the Court to

enforce language found in the SPD in a contract-like claim, but rather ask the Court to compare

---

[81]   Additionally, the Plan Administrator had until July 29, 1999 to issue an SMM regarding the
cash balance plan conversion, as explained above in footnote 79.  See 29 U.S.C. §
1024(b)(1) (plan administrators must furnish participants and beneficiaries receiving
benefits with summaries of new amendments no later than 210 days after the end of the plan
year in which the amendment is adopted).  Accordingly, even if the Court were to find that
vested separated participants should have received an SMM, only those class members who
were rehired after July 29, 1999 would be covered by such a claim.

the contents of the SPD to what the statute requires and award them benefits <u>in excess</u> of what the Plan provides.  As such, the most analogous state statute of limitations is not the one applicable to contract claims, but rather Connecticut's two-year statute applicable to a "[c]ivil action to collect wage claim [or] fringe benefit claim."  Conn. Gen. Stat. Ann. § 31-72; Conn. Gen. Stat. Ann. § 52-596; <u>see</u> <u>supra</u>, at 30-31.[82]  Under this two-year statute of limitations, Count 2 was time-barred by the time it was included in Plaintiffs' original complaint in December 2001.[83]  For this reason alone, Plaintiffs' SPD claim may be rejected.

### 2.    Plaintiffs' Section 204(h) Claim Is Time-Barred.

Plaintiffs' claim that the Plan Administrator failed to provide an adequate Section 204(h) notice also fails because it was not filed within the controlling statute of limitations.  <u>See</u> Rule 23 Order at 7 - Count 4(B)(4) (noting an individualized or sub-class issue of "[w]hether any individual class member's claim in Count IV is barred by the applicable statute of limitations.").

As noted above, where an ERISA provision does not contain its own statute of limitations for a particular claim, the most analogous state statute of limitations governs.  <u>See</u> <u>supra</u>, at 30. In Count 4, Plaintiffs seek additional "benefits" they would have received had Part B not been effective because the Section 204(h) notice requirements were not fulfilled, <u>see</u> Submission on Relief at 4, and accordingly the claim is most analogous to a "fringe benefit claim" under

---

[82]    While Judge Baer applied the contract statute of limitations to an SPD claim in <u>J.P. Morgan I</u>, 460 F. Supp. 2d at 483, simply because "[e]mployee benefit plans are contracts," Defendants respectfully disagree with his reasoning and maintain that Connecticut's statute of limitations applicable to statutory benefit claims is more analogous than the contract statute, since Plaintiffs do not seek to enforce the terms of the SPD.  <u>See</u> <u>supra</u>, at 32.

[83]    Plaintiffs' SPD claim accrued no later than December 21, 1998, following issuance of the October 1998 SPD and the formal adoption of Part B, at which point the Plan document became available.  <u>See</u> <u>supra</u>, at 31 n.24.

Connecticut law.  Conn. Gen. Stat. Ann. § 31-72; Conn. Gen. Stat. Ann. § 52-596; see supra, at

32.[84]

Plaintiffs maintain that participants should have received a Section 204(h) notice for the

cash balance conversion effective January 1, 1998, which notice was due at least 15 days prior to

the effective date of the amendment.  Yet Plaintiffs filed their Second Amended Complaint,

which added a claim concerning a Section 204(h) notice, more than 7 years later — on May 6,

2005.  See dkt. #109.[85]  Accordingly, Plaintiffs' claim in Count 4 is time-barred.

**F.    Any Disclosure Claims Would Lie Against The Plan Administrator, Who Is Not A Party.**

Plaintiffs' disclosure claims in Counts 2 and 4 also fail for the independent reason that

Plaintiffs failed to name the only proper defendant, the Plan CIGNA Administrator.  See Rule 23

Order at 4 - Count 2(A)(4); id. at 5 - Count 4(A)(4) (noting that an issue under Counts 2 and 4 is

"[w]hether the Plan Administrator had the responsibility for distributing [the disclosure required

by] ERISA, such that Plaintiffs' failure to name the Plan Administrator as a defendant precludes

Plaintiffs' claims").

---

[84]    While Judge Hellerstein applied the contract statute of limitations to a Section 204(h) notice claim in Hirt, 450 F. Supp. 2d at 333, in that case the parties had agreed to the application of that statute of limitations and were only contesting when the claim accrued.  Hirt v. Equitable Ret. Plan for Employees, Managers and Agents, No. 01CIV7920 (AKH), 2006 WL 2627564, at *2 (S.D.N.Y. Aug. 24, 2006).  Because here Plaintiffs' Section 204(h) notice claim alleges a statutory violation and seeks a remedy that assumes no notice was provided, rather than seeking to enforce the terms of the Section 204(h) notice, the benefit claim statute of limitations rather than the contract statute of limitations is more analogous.

[85]    Plaintiffs' original Complaint had alleged that Part B's SPD was insufficient, but there was no suggestion of any other disclosure violations until the Section 204(h) notice claim was added.  Accordingly, Count 4 cannot relate back to the filing of the earlier Complaints because it does not arise out of the same conduct upon which the claims in those Complaints were based.  See Fed. R. Civ. P. 15(c)(2); see supra, at 32, n.25.

Plaintiffs readily admit that their disclosure claims lie against the Plan Administrator for the CIGNA Pension Plan:  "ERISA places the responsibility for these disclosures on the 'plan administrator.'"  Pls.' Post-Trial Br. at 51; 29 U.S.C. § 1024(b)(1) ("The administrator shall furnish . . . a copy of the summary plan description . . . ."); 29 U.S.C. § 1054(h) (stating "the plan administrator provides a written notice, setting forth the plan amendment").  See also Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 104 (S.D.N.Y. 2005) (disclosure obligations are imposed only on the "plan administrator").  Despite this, and despite filing numerous amended complaints, Plaintiffs chose not to sue CIGNA's Plan Administrator for Part B, who is not and has never been a party to this lawsuit.  Accordingly, the Court should enter judgment in Defendants' favor on Plaintiffs' disclosure claims against CIGNA and the Plan itself.

Plaintiffs argue that the Court should deem CIGNA the Plan Administrator because the Part B Plan document "does not designate anyone other than the corporation."  Pls.' Post-Trial Br. at 51.[86]  This is factually incorrect.  Both the Part A and Part B Plan documents provide that the Plan Administrator will be designated by "The Committee," which is defined as "the CIGNA Corporation Corporate Benefit Plan Committee, or a successor entity or group of persons, that is the Named Fiduciary for the Plan as described in Article XII."  DFF ¶ 77; see also DFF ¶ 76 (the Plan Administrator shall be "the person, entity, or committee responsible for the administration of the Plan as specified in Article XIII"); DFF ¶ 76 (Part A) (same); DFF ¶ 78 (Part B) ("The Committee shall delegate to a Plan Administrator the duties, authority and functions set forth in

---

[86]   ERISA Section 3(16)(A), to which Plaintiffs cite, see Pls.' Post-Trial Br. at 50, states explicitly that the term "administrator" refers to "the person specifically so designated by the terms of the instrument under which the plan is operated."  29 U.S.C. § 1002(16).  Here, a plan administrator was designated in accordance with the precise terms of the written Plan document.

this Article XIII."); DFF ¶ 78 (Part A) (same).  Thus, the Plan document vests authority in the

Benefits Committee to appoint a Plan Administrator for Part B.

In accordance with these Plan provisions, the Committee formally designated Stewart M.

Beltz, Assistant Vice President Benefits, as the Plan Administrator for the traditional defined

benefit plan on March 29, 1996.  DFF ¶ 80.[87]  Moreover, the 1998 Part B SPD and 1999 Part B

SPD explicitly list the Plan Sponsor and the Plan Administrator for Part B:

| | |
|---|---|
| Plan Sponsor | CIGNA Corporation |
| . . . | |
| Plan Administrator | Stewart M. Beltz |
| | CIGNA Corporation |
| | 1601 Market Street |
| | Philadelphia, PA 19192 |

DFF ¶ 83.[88]

Where as here, a plan administrator has been designated by the sponsor, that plan

administrator alone — and not the sponsor — is responsible for any disclosure violations.

ERISA § 3(16)(A), which defines the term "administrator," makes clear that a plan's sponsor is

responsible for the legal responsibilities of a plan's administrator only where no such

administrator is designated.  29 U.S.C. § 1002(16)(A)(ii).  Thus CIGNA's designation of an

individual to be the "administrator" eliminates any responsibility it otherwise would have as the

---

[87]    The Committee designated Mr. Beltz's replacement as Plan Administrator, Gerald T. Meyn, Vice President, on May 14, 2003.  DFF ¶ 81.  Effective August 20, 2004, the Committee replaced Mr. Meyn with John Arko as Plan Administrator.   DFF ¶ 82.

[88]    Moreover, Plaintiffs' own class member witnesses testified that they understood that the Plan Administrator was an individual.  For example, Ms. Flannery testified that in July 2001, she contacted Stewart Beltz, whom she understood to be the Plan Administrator for the CIGNA pension plan, to inquire as to why she had been converted to Part B, and in early 2005 she wrote to John Arko regarding her pension benefits because she understood that he was the Plan Administrator at that time.  DFF ¶ 377, 380.

sponsor.  Moreover, the Second Circuit has explained in this vein that ERISA's disclosure "obligation is placed on the person designated under ERISA as the 'administrator' of the plan, not on every fiduciary," let alone the plan sponsor.  Lee v. Burkhart, 991 F.2d 1004 (2d Cir. 1993) (emphasis added); see also Malia v. Gen. Elec. Co., 23 F.3d 828, 833 (3d Cir. 1994) (rejecting disclosure claims against employer under 29 U.S.C. §§ 1021-25 because "[o]nly plan administrators are required to disclose benefits information to beneficiaries").

Plaintiffs' suggestion that CIGNA as the Plan sponsor should be held vicariously liable for any disclosure violations is incorrect.  See Pls.' Post-Trial Br. at 51 n. 26.  In Lee, the Second Circuit expressly rejected the idea that an employer can be a de facto co-administrator jointly liable with the named administrator in a suit to recover benefits under ERISA.  991 F.2d at 1010 (rejecting claim that an insurance company under contract to provide assistance in the management of an employer's self-funded employee benefits plan was an unnamed plan administrator).[89]  Plaintiffs' reliance on Wasley Prods., Inc. v. Bulkalites, No. 3:03-383(MRK)/3:03cv1790(MRK), 2006 WL 3834240 (D. Conn. May 31, 2006), is misplaced.  There, the court applied the doctrine of respondeat superior to the employer of third-party fiduciaries where the fiduciary duties at issue did not involve statutory obligations specifically placed on plan administrators.  Wasley Prods., Inc., 2006 WL 3834240, at *6.  In other words, Wasley did not involve an attempt to hold a plan sponsor vicariously liable as an "administrator,"

---

[89]  See McKinsey v. Sentry Ins., 986 F.2d 401, 404 (10th Cir. 1993) (criticizing the view that an employer could be a de facto administrator, and holding that "[29 U.S.C. §] 1002(16)(A) provides that if a plan specifically designates a plan administrator, then that individual or entity is the plan administrator for purposes of ERISA"); Crowley v. Corning, Inc., 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002) (rejecting outright plaintiff's respondeat superior argument against plan sponsor).

which would directly contravene the Second Circuit's holding in Lee.  See Lee, 991 F.2d at

1010.  In short, Plaintiffs' vicarious liability argument makes a mockery of the statutory

distinction drawn between plans with an administrator and plans that fail to designate an

administrator, and cannot succeed.[90]

Because the Committee in fact designated a Plan Administrator, Plaintiffs' suggestion

that CIGNA be held to be the Plan Administrator should be rejected.  Rather, the existence of

this designation leads to the inescapable conclusion that only the Plan Administrator — and not

CIGNA or the Plan itself — may be liable for a disclosure violation.  That reason alone provides

a sufficient basis for this Court to reject Plaintiffs' claims against Defendants in Counts 2 and 4.

---

[90]   Furthermore, Plaintiffs could not show the agency relationship required for application of
the doctrine of respondeat superior to a plan sponsor, since the Plan Administrator was not
acting for the benefit of CIGNA in exercising his disclosure duties.  See, e.g., W. Page
Keeton et al., Prosser and Keeton on the Law of Torts § 69 (5th ed. 1988); Jones v.
Federated Fin. Reserve Corp., 144 F.3d 961, 965 (6th Cir. 1998) ("Under the respondeat
superior rule, a principal is only held vicariously liable for torts committed by an agent when
the agent acts for the benefit of his principal within the scope of his employment.").  When a
plan administrator is performing his duties as plan administrator, he is acting solely in the
interests of the plan participants and beneficiaries and not the corporate employer,
particularly where no breach of fiduciary duty has been alleged.  See 29 U.S.C. §1104(a)(1)
(stating "a fiduciary [which includes a plan administrator pursuant to 29 U.S.C.
§1002(14)(A) and 21(A)] shall discharge his duties with respect to a plan solely in the
interest of the participants and beneficiaries").  Moreover, to the extent Plaintiffs seek to
impose respondeat superior liability on CIGNA for the actions of employees other than the
Plan Administrator, Plaintiffs have failed to establish that such employees were acting "in
the interest" of CIGNA, as opposed to the Plan or its beneficiaries.  See also Averhart v. US
WEST Mgmt. Pension Plan, 46 F.3d 1480, 1489-90 (10th Cir. 1994) (holding: "[The]
designation of the . . . administrator is conclusive for purposes of applying 1132(c) and
cannot be expanded or modified . . . even where 'company personnel other than the plan
administrator routinely assume responsibility for answering requests from plan participants
and beneficiaries. . . . The statutory liability for failing to provide requested information
remains with the designated plan administrator . . . not with the employer or its other
employees.'") (quoting McKinsey, 986 F.2d at 404-05) (emphasis added)).

**V.     JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON COUNT 5 BECAUSE DEFENDANTS' FAILURE TO PROVIDE PRESENT-VALUE DISCLOSURES OF THEIR DIFFERENT BENEFIT OPTIONS PRIOR TO OCTOBER 2004 DID NOT VIOLATE ERISA.**

In the only part of Count 5 currently at issue,[91] Plaintiffs claim that CIGNA should have made an explicit disclosure to participants where the relative present values of different benefit options were not equal.  See Rule 23 Order at 7 - Count 5(A)(1).  This claim fails for a variety of reasons:  (1) Part B does not violate ERISA's anti-cutback rule in Section 204(g), the statutory provision upon which they rely in their Complaint, (2) none of the three Plaintiffs has standing to pursue this relative value claim, (3) prior to October 2004, a present-value disclosure of different benefit options was required by neither ERISA nor the Plan, (4) the Plan Administrator has the exclusive legal responsibility for any such disclosures, and is not a party to this suit, and (5) the claim is barred by the statute of limitations for all participants who commenced benefits before May 2003.  For each and all of these reasons, judgment should be entered in Defendants' favor on Count 5.

**A.     Part B Does Not Violate ERISA's Anti-Cutback Rule In Section 204(g).**

Plaintiffs' claim in Count 5 alleges a violation of the anti-cutback rule under ERISA Section 204(g), which prohibits a plan amendment that reduces a participant's previously-accrued benefit.  See Complaint, dkt. #165 at ¶¶ 61-62.  At a fundamental level, this claim fails because the written terms of Part B unequivocally provide that all benefits previously accrued under the prior plan formula ("Part A") are protected, which protection is all that ERISA's anti-cutback rule requires.

---

[91]    The remaining issues arising out of Count 5 are the subject of ongoing settlement discussions between the parties, and are not before the Court for adjudication.

Section 204(g) provides in relevant part that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title." 29 U.S.C. § 1054(g). Critically, this provision does not prohibit, or even limit, an employer's ability to reduce <u>future</u> pension accruals or even to cease them altogether. <u>See, e.g.</u>, <u>Cent. Laborers' Pension Fund v. Heinz</u>, 541 U.S. 739, 747 (2004) ("[E]mployers are perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, future employment."); 26 C.F.R. § 1.411(d)-3(b)(3)(ii) ("Section 411(d)(6) [92] only protects benefits that accrue before the applicable amendment date.").

Rather, "the proper inquiry under ERISA §  204(g)(1) is whether plaintiff's monthly benefit was in fact reduced by a plan amendment." <u>King v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus.</u>, No. 01-CV-2604, 2003 WL 22071612, at *10 (E.D.N.Y. Sept. 5, 2003) (internal citations and quotations omitted); <u>Langman v. Laub</u>, No. 97 Civ. 6063(MGC), 2002 WL 472033, at *2 (S.D.N.Y. Mar. 28, 2002) (same).  Treasury regulations further explain that an amendment or series of amendments "will only violate section 411(d)(6) if, for any participant, the <u>net effect</u> is to decrease participants' accrued benefit <u>as of that applicable amendment date</u>."  26 C.F.R. § 1.411(d)-3(a)(2)(ii) (emphasis added).

In this case, Part B does exactly what the Treasury regulation requires, as its written terms unequivocally provide that all benefits previously accrued under the prior plan formula are

---

[92]   This is the parallel provision to 29 U.S.C. § 1054(g)(1) in the Internal Revenue Code. Regulations issued pursuant to Section 411(d)(6) of the Internal Revenue Code are equally applicable to Section 204(g) of ERISA, 29 U.S.C. § 1054(g).  <u>See Heinz</u>, 541 U.S. at 747 ("Although the pertinent regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to ERISA § 204(g).").

protected.  First, Section 1.1(c) provides that a participant's Accrued Benefit under Part B "shall in no event be less than the . . . Participant's Minimum Benefit," which in turn is defined as "the Participant's Part A Accrued Benefit."  DFF ¶¶ 69, 152.  Second, for employees who were entitled to a "Preserved Spouse's Benefit" under Part A (also known as the "Free 30%"), the employee's Minimum Benefit also includes the value of that benefit.  DFF ¶ 153.  Third, Section 7.3(b) protects employees' rights to any early retirement annuity benefits that they earned under Part A.[93]  DFF ¶ 154.  Lastly, Amendment No. 4, which provided for the freezing of accruals under Part A, expressly provided that "[n]o such subsequent amendment shall result in the accrued benefits of any Participant being less than such Participant's accrued benefit under the plan as of December 31, 1997."  DFF ¶ 155.  Thus, Part B ensures that all previously accrued benefits are protected.  ERISA Section 204(g) requires nothing more.

Because nothing in ERISA Section 204(g) addresses, let alone mandates, <u>disclosures</u> about employee benefit matters, Plaintiffs' present-value disclosure claim in Count 5 fails.  Apparently recognizing this failure, Plaintiffs now belatedly try to articulate their claim as a violation of ERISA Section 205(g), 29 U.S.C. § 1055(g), which addresses consent for benefit distributions that exclude a joint and survivor annuity.  <u>See</u> Rule 23 Order at 7 - Count 5(A)(1)(a).  This claim, however, was never included in any of their Complaints.  Nonetheless, even if the Court entertains Count 5 under Section 205(g), Plaintiffs' present-value disclosure claim still fails for the following reasons.

---

[93]  Part A did not offer employees a lump sum benefit option.  DFF ¶ 27.  Thus, all of the early retirement benefits were available under Part A only in annuity form, and they are protected by Part B in that same form.

B.    **Plaintiffs Amara, Broderick And Glanz Do Not Have Standing To Pursue A Present-Value Disclosure Claim.**

Even if participants' benefit election forms should have included a present-value disclosure starting in 1998, as Plaintiffs allege, Plaintiffs Amara, Broderick and Glanz were not harmed in any way by this non-disclosure and therefore have no standing to pursue a claim under Count 5 on their own behalf or on behalf of any class of Plan participants.[94]

It is axiomatic that the "present-value" issue affects only participants for whom the various benefit options were of unequal present value and who chose the less valuable alternative. Under Part B, the benefit options only were unequal for participants eligible for a subsidized early retirement frozen annuity benefit that was more valuable than the lump sum benefit they elected. DFF ¶ 409. This differential occurred because the old plan's early retirement subsidy was protected only as part of the minimum annuity — not in the protected minimum lump sum. DFF ¶ 409.[95]

It cannot seriously be disputed that none of the three Plaintiffs established harm — likely or actual — with regard to the lack of present-value disclosures on their benefit election forms. Specifically, as to Plaintiff Amara, while Plaintiffs allege she was not told about her Minimum

---

[94]    No class has been certified on Count 5 because Plaintiffs filed their Third Amended Complaint adding Count 5 more than two years after the class was certified. See Fed. R. Civ. P. 23(c)(1)(B) ("An order certifying a class action must define and the class and the class claims, issues, or defenses").

[95]    As noted, Part A only offered an annuity option, and provided for a subsidized early retirement benefit, which was protected under Part B only as part of the minimum protected annuity. DFF ¶ 410. Moreover, although Plaintiffs' expert's testimony was hazy on the point, the Plan's so-called Free 30 benefit, the Part A survivor's benefit that was part of the Minimum Benefit protected under Part B, did not create a present-value disclosure issue. This is because the Free 30 was protected both as part of the minimum lump sum and the minimum protected annuity. DFF ¶ 411.

Benefit on two occasions, because Ms. Amara was rehired before December 21, 1998, CIGNA

voluntarily recalculated her benefits to her satisfaction in accordance with the Depenbrock

decision.  See Pls.' Post-Trial Br. at 98 n.43.  Ms. Amara is receiving benefits as if she was in

Part A, and indeed, Plaintiffs acknowledged that they are not seeking any relief on behalf of

Ms. Amara.  See DFF ¶414 ("Court: [s]he . . . has gotten everything you would have hoped for

her, right?  MR. BRUCE:  I believe that's correct, your Honor.").  When she elected her benefits

under Part A, all of the benefit options had the same value, and any estimates or distribution

forms related to Part B had no bearing on the benefits to which she is entitled.  Ms. Amara, like

all other participants whose benefits have been recalculated as a result of the Depenbrock

decision, accordingly lacks standing to pursue a present-value disclosure claim.  See, e.g.,

Dickerson v. Feldman, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006) ("Where a plaintiff's stake in

the controversy disappears before there has been an effort to certify the class action, the action

must be dismissed as moot.") (citation omitted).

    Plaintiff Broderick, a Tier 1 rehire who was eligible for the Free 30, was erroneously not

offered the Free 30 when she initiated benefit payments in 2003.  CIGNA recalculated

Ms. Broderick's benefits to provide the Free 30, and she chose the annuity option, which was the

most valuable of her benefit options.  DFF ¶ 415.  Similarly, Plaintiffs have never asserted that

Plaintiff Glanz, a Tier 1 employee who was continuously employed from 1988 until June 2004,

suffered any harm as a result of any lack of a relative value disclosure.  Ms. Glanz has not yet

applied for her CIGNA pension and has therefore not been required to make an election that

would have triggered any present-value disclosure obligation.  DFF ¶ 415.  Moreover,

Mr. Poulin admitted that Ms. Glanz was not eligible for a subsidized early retirement benefit.

DFF ¶ 415.  Thus, Ms. Broderick and Ms. Glanz, like Ms. Amara, have suffered no harm as a

result of not receiving a present-value disclosure and they therefore have no standing to pursue

that claim on their own behalf or on behalf of any Plan participant.[96]

     **C.**    **Pre–October 2004 Treasury Regulations Did Not Require Disclosure Of The Present Value Of Benefit Options.**

     Plaintiffs allege that neither CIGNA's SPD nor its benefit election materials disclose that

a lump sum payment of a participant's cash balance account may be less valuable than the

annuity benefits that the participant earned prior to 1998, in violation of ERISA § 205(g), 29

U.S.C. § 1055(g), 26 C.F.R. § 1.401(a)-20, Q&A 36 and/or 26 C.F.R. § 1.417(a)(3)-1 (as in

effect thereafter), and the terms of the Plan itself).  See Rule 23 Order at 7 - Count 5(A)(1)(a).

As noted in the Court's Rule 23 Order (and ignored in Plaintiffs' Post-Trial Brief), a key

classwide issue is whether such requirements arose as of October 1, 2004 or January 1, 1998.

See id. at 8 - Count 5(A)(3).

---

[96]   Lillian Jones, the only class member who testified that she chose a less valuable benefit option from an election form that did not disclose the present value of the options, cannot serve as a class representative because (1) she received the form prior to October 2004, when the new regulations requiring more expansive disclosures went into effect, see supra, discussion at 114-18, and (2) she never exhausted the remedies available to her under the Plan.  DFF ¶¶ 173, 424.  See Chapman v. Choice Care Long Island Term Disability Plan, 288 F.3d 506, 511 (2d Cir. 2002) ("[C]laimants must pursue all administrative remedies provided by their plan pursuant to statute.").  Moreover, class members who have not yet initiated benefits (as noted above, a group which is undefined and undefinable at the present time, see supra, at 112), cannot serve as class representatives.  First, because Prudential has brought all benefit election forms into compliance with the current regulations requiring present-value disclosures, there can be no violation with regard to this group of future participants.  DFF ¶ 430-31.  Moreover, the claims of such participants are not ripe and therefore the court lacks jurisdiction to review their claims.  Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998); see also Lugo v. Employees Ret. Fund of Illumination Prods. Indus., 529 F.2d 251, 258 (2d Cir. 1976) (holding as unripe 53-year-old plaintiff's claim for retirement benefits, under plan which required that participants reach age 60 and work at least 90 months in prior ten years, because the claim is "at best a claim that when, seven years from now, if old enough to be entitled to apply for such benefits, the trustees will deny his application on the basis of the 90/10 rule, which he claims is illegal").

As an initial matter, Defendants acknowledge that the Treasury regulations enacted in 2003 (and effective October 1, 2004) require that a benefit election form include present-value disclosure. See 26 C.F.R. § 1.417(a)(3)-1.[97]  The 2003 regulations included specific provisions as to the effective date of these new, more expansive disclosure requirements:  as of October 2004, these regulations required that any benefit election form that offers benefit options not of relatively equal value provide such a present-value comparison. See 26 C.F.R. § 1.417(a)(3)-1(f)(ii).[98]  Moreover, the regulations required that, as of February 1, 2006, all benefit election forms contain a present-value disclosure. See 26 C.F.R. § 1.417(a)(3)-1(f) ("Except as otherwise provided in this paragraph (f), this section applies to a QJSA explanation with respect to any distribution with an annuity starting date that is on or after February 1, 2006.").  In other words, Defendants concede that now the forms must either state that all benefit options are relatively equal or provide some quantitative comparison of the present values of the options.  To this end,

---

[97]  Section 1.417(a)(3)-1 of the Income Tax Regulations was revised to require that a benefit election form offer the following:

> The description of the relative value of an optional form of benefit . . . must be expressed to the participant in a manner that provides a meaningful comparison of the relative economic values of the two forms of benefit without the participant having to make calculations using interest or mortality assumptions.  Thus, in performing the calculations necessary to make this comparison, the benefits under one or both optional forms of benefit must be converted, taking into account the time value of money and life expectancies, so that the values of both optional forms of benefit are expressed in the same form.

26 C.F.R. § 1.417(a)(3)-1(c)(2)(i) (emphasis added).

[98]  As Section 1.417(f)(ii) states:  "This section also applies to a QJSA explanation with respect to any distribution with an annuity starting date that is on or after October 1, 2004, and before February 1, 2006, if the actuarial present value of any optional form of benefit that is subject to the requirements of section 417(e)(3) is less than the actuarial present value (as determined under § 1.417(e)-1(d)) of the QJSA)."

CIGNA's recordkeeper Prudential has modified the benefit election forms to comply with the new disclosure requirements effective October 2004, and has offered re-election to any participants who previously elected their benefits from a form that did not include the present-values of their benefit options.  DFF ¶¶ 173, 418, 431-32.

Defendants dispute, however, Plaintiffs' position that such disclosures were required under the earlier version of the Treasury Regulations, which have <u>never</u> been interpreted to require present-value disclosures.  Notably, Plaintiffs did not cite to any caselaw supporting their view that present-value disclosures were required under the prior regulations.  Indeed, in <u>Engers v. AT&T Corp.</u>, 428 F. Supp. 2d 213 (D.N.J. 2006), the court rejected the plaintiffs' argument (under the prior regulations) that an SPD was deficient because it failed to explain differences in the present values of benefit options.  As the court stated:  "Plaintiffs again, do not point to legal authority that supports their claim that AT&T was required to disclose the cash balance conversion factors or differences in the relative values of participants' benefits."  <u>Id.</u> at 242.

The <u>Engers</u> court's decision is consistent with the testimony of Defendants' expert, Larry Sher, that prior to the issuance of the 2003 Treasury regulations, plan administrators did "not, as a general matter," provide the present-values of different benefit options.  DFF ¶ 419.  Rather, plan administrators typically would do what CIGNA's Plan Administrator did, which was to include the amounts of the different benefits without any comparison of present values. DFF ¶ 420.  CIGNA's Plan Administrator notified participants about each benefit form available to them, the amount of the benefit, and when and how that benefit would be payable.  Although not specifically designated on the form as a Minimum Benefit under Section 1.1(c) or 7.3 of Part B, the Minimum Benefits were included among those benefit options.  DFF ¶¶ 421-22.  These

disclosures fully complied with the regulations in place prior to October 2004.  DFF ¶ 171-72.[99]

Furthermore, contrary to Plaintiffs' suggestion, neither the prior version of the Treasury regulations nor the current regulations require that a plan automatically provide a participant with every benefit option that might be available to him at any point in time in the future.  See Pls.' Post-Trial Br. at 98-99.  Plaintiffs contend "that the optional forms of benefit that must be explained to participants include options with later commencement dates."  Id. at 98.  This is plainly wrong.  The regulations define "optional forms of benefit" as benefits that differ "in terms relating to the payment schedule, timing, commencement, medium of distribution (e.g., in cash or in kind), election rights, differences in eligibility requirements, or the portion of the benefit to which the distribution alternative applies."  26 C.F.R. § 1.411(d)-3(g)(6)(ii)(A).  Nothing in the regulations, or in any case interpreting the regulations, requires a plan

---

[99]    Plaintiffs also allege that CIGNA violated an express provision in Section 7.1(b)(1) of the Plan document that participants will be provided "sufficient additional information to explain the relative values of the optional forms of benefits available under the Plan" and a promise in its SPDs that participants will be "notified" if the cash balance account is less than their "old plan benefits."  See Rule 23 Order at 7 - Count 5(A)(1)(b); Pls.' Post-Trial Br. at 96.  In this vein, the Part B SPD notified participants that:

> Your final plan benefits cannot be less than your old plan benefits on December 31, 1997.  If this minimum benefit rule applies to you, you will be notified by the plan service center when you request a distribution.

DFF ¶ 424.  To comply with this provision, the Plan Administrator notified participants by providing on their benefit election forms the amount of each benefit option, including the minimum benefits where applicable.  DFF ¶ 421.  Under the Plan, as under the prior regulations that were in effect at the time the Plan document and SPD were drafted, nothing more was required to apprise participants of the values of their various benefit options.

administrator to provide participants with an explanation of options to which they are <u>not</u> entitled as of the benefit election form date.[100]

In sum, Defendants concede that the present-value disclosure regulations have required more expansive disclosures since October 2004 and that such disclosures were not provided to Part B participants when they were presented with elections until May 2006. However, Plaintiffs' assertion that all benefit election forms provided by the Plan Administrator to Part B participants prior to October 2004 were invalid is meritless.[101]

> **D.    Any Present-Value Disclosure Claims Would Lie Against The Plan Administrator, Who Is Not A Party.**

There can be no doubt that it is the plan administrator alone who is responsible for providing participants proper benefit election forms. Indeed, in every case Plaintiffs cite in

---

[100]  For example, Plaintiffs complain that participant Douglas Robinson, who was age 54 at the time of his benefit election, should have been informed that if he waited until he was age 55, his Minimum Benefit would be greater because it would include the value of a subsidized early retirement benefit. <u>See</u> Pls.' Post-Trial Br. at 98. However, the regulations do not require such a disclosure because a benefit election form properly applies to a single distribution date. Had Mr. Robinson requested a benefit estimate or election form for some date in the future on which he would have been eligible for early retirement, the benefit options included would have reflected his eligibility <u>at that time</u>. However, Mr. Robinson's benefit election form accurately reflected the benefit options available to him at the time that he requested a benefit. DFF ¶ 422.

[101]  Plaintiffs also complain that the participants in the <u>Depenbrock</u> group were not provided "information about the 'relative value' of Part A versus cash balance in conformity with the rules described above." Pls.' Post-Trial Br. at 101-02. Plaintiffs mix apples with oranges. The participants affected by the <u>Depenbrock</u> decision did not receive a benefit election form with different forms of benefit options, and accordingly the regulations at issue in Count 5 are inapplicable. Rather, these participants were offered a re-election into Part A or Part B, and Plaintiffs cite no authority whatsoever for the proposition that the relative value regulations should be extended to such a re-election. DFF ¶ 423. Moreover, there is no class representative in this litigation for the <u>Depenbrock</u> affected participants. Plaintiff Amara, who was part of the <u>Depenbrock</u> group, elected the most valuable benefit option upon her re-election and therefore would not have standing to pursue a present-value disclosure claim on her own behalf or on behalf of class members.

support of applying trust law to their present-value disclosure claims, see Pls.' Post-Trial Br. at 94, the plan administrator was named as a defendant.  See e.g., Lehman v. Univ. of Hartford Defined Contribution Ret. Plan, No. CIV.A. 399CV2272CFD, 2002 WL 31076080, at *1 nn.1, 4 (D. Conn. July 17, 2002) (claim against plan administrator regarding proper spousal consent for change of beneficiary).[102]  As with their disclosure claims in Counts 2 and 4, Plaintiffs' failure to name the Part B Plan Administrator as a defendant is fatal to their present-value disclosure claim in Count 5.

       **E.**    **Plaintiffs' Present-Value Disclosure Claim Is Time-Barred.**

As noted above, where an ERISA provision does not contain its own statute of limitations for a particular claim, the most analogous state statute of limitations governs.  See supra, at 30. In Count 5, Plaintiffs make yet another statutory claim alleging that Part B's design violates Sections 204(g) and 205(g) of ERISA and Treasury regulations, and seek a new election to recover additional benefits, see Submission on Relief at 5, and again the most analogous statute would be Connecticut's two-year statute.  Conn. Gen. Stat. Ann. § 31-72; see supra, at 32. [103]

As the Court acknowledged, this is an individualized issue, since whether the statute of limitations bars a given participant's claim depends upon when the participant received a benefit

---

[102]  See also, e.g., Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 547 (6th Cir. 2003) (claim against plan administrator regarding acceptance of participant's benefits election form); Moore v. Philip Morris Cos. Inc., 8 F.3d 335, 340 (6th Cir. 1993) (claim against plan administrator regarding spousal consent to designation); Seales v. Amoco Corp., 82 F. Supp. 2d 1312, 1323 (M.D. Ala. 2000) (claim against plan administrator regarding failure to disclose to participants that the present value of their pension benefits had been incorrectly computed).

[103]  To the extent that Plaintiffs are claiming in Count 5 that Defendants violated the terms of the Plan document, such a claim would be subject to Connecticut's breach of contract statute of limitations, Conn. Gen. Stat. Ann. § 52-576, and each participant's claim would accrue whenever he or she received their benefit election form.

election form.  Count 5 was asserted for the first time when Plaintiffs filed their Second

Amended Complaint on May 6, 2005.  Thus, at least for all participants who elected a benefit

more than two years earlier — in other words, prior to May 6, 2003, Count 5 is untimely.

## VI.    PLAINTIFFS AND THOUSANDS OF CLASS MEMBERS SIGNED RELEASES THAT BAR THEIR CLAIMS.

As an initial matter, nothing in ERISA requires a release to specifically state that the

individual is waiving ERISA rights.  Chaplin v. Nationscredit Corp., 307 F.3d 368, 373 (5th Cir.

2002).  Accordingly, a release like the one signed by Plaintiffs, which broadly covers any and all

claims arising out of a participant's employment, operates to waive ERISA claims.  Id.  For

example, in Linder v. Byk-Chemie USA, Inc., No. 3:02CV1956(JGM), 2006 WL 648206, at *9-

10 (D. Conn. Mar. 10, 2006), the court found that a release that did not expressly mention

ERISA claims still applied to such claims based on the breadth of the language used:  "claims

arising under or in any way connected with his employment with the Company or the

termination of such employment."  See also Fair v. Int'l Flavors & Fragrances, Inc., 905 F.2d

1114, 1117 (7th Cir. 1990) (release which "precludes Fair from bringing suit against IFF on any

claim arising from her employment relationship with IFF" barred ERISA claim for pension

benefit); Shaver v. Siemens Corp., No. 2:02cv1424, 2007 WL 1006681, at *31-32 (W.D. Pa.

Mar. 30, 2007) (ERISA claim precluded by releases which did "not expressly waive ERISA

claims" but "contain[ed] language which releases all claims arising out of employment or

termination of that employment"); Smart v. Gillette Co. Long-Term Disability Plan, 887 F. Supp.

383, 386 (D. Mass. 1995) (release barring "any and all claims, charges, complaints, or causes of

action" barred ERISA claims).

Plaintiffs Amara, Broderick and Glanz each testified that upon their separation from

CIGNA, they were offered severance in exchange for signing a release, they consulted with

counsel before signing the release (the "Release"), the severance was paid, and they did not

tender back the severance to CIGNA. DFF ¶¶ 323-35, 338-40, 355-56, 440. Here, the Release

that each Plaintiff signed broadly covers all claims arising out of their employment with CIGNA:

> "Claims" are any and all claims, demands and causes of action of
> whatever kind, including any claim for attorney's fees, that you
> now have, or at any time had, against any Released Persons, but
> only to the extent they arise out of or relate in any way to your
> employment or termination of employment with the Company and
> its affiliates.

DFF ¶ 437 (Release ¶5(e)).

Throughout this litigation, Plaintiffs have suggested that the Release they signed does not

apply to their claims in this case because it excluded "any claims for benefits under any

retirement, savings, or other employee benefit programs." DFF ¶ 438 (Release ¶5(f)). By its

terms, however, this exclusion only applies to claims for <u>benefits</u> under the Plan, not claims

alleging statutory ERISA violations.[104] In this litigation, Plaintiffs allege that various terms of

the Plan violate ERISA and that CIGNA failed to meet its statutory and regulatory disclosure

obligations. These are statutory claims that courts in the Second Circuit consistently distinguish

from claims for benefits under the terms of a plan. For example, in <u>Campanella v. Mason</u>

<u>Tenders Dist. Council Pension Plan</u>, 299 F. Supp. 2d 274 (S.D.N.Y. 2004), the plaintiffs, like

Plaintiffs here, alleged "that the Plan itself violates ERISA['s]" accrual rules, and the court held

that these were statutory claims, <u>not</u> claims for benefits under the plan. <u>Campanella,</u> 299 F.

Supp. 2d at 280, 281; <u>see also</u> <u>De Pace v. Matsushita Elec. Corp. of Am.</u>, 257 F. Supp. 2d 543,

---

[104] Thus, to the extent Plaintiffs are seeking in Count 5 benefits to which they claim they are
entitled under the terms of the Plan, Defendants do not contend that such benefit claims are
barred by the Releases.

558 (E.D.N.Y. 2003) (distinguishing statutory claims from benefit claims); Gray v. Briggs, No.

97-6252, 1998 WL 386177, at *7 (S.D.N.Y. July 7, 1998) (same).

Plaintiffs and the thousands of other class members who signed releases received the

benefit of their bargain — valuable severance pay in exchange for a broad release.  Given the

nature of Plaintiffs' claims in their Complaint — none of which constitutes a claim for benefits

under CIGNA's existing benefit plans — these claims are plainly barred by the Release.

## VII.    EVEN IF PLAINTIFFS PROVE ERISA VIOLATIONS, THEIR REMEDIES ARE LIMITED.

Although Plaintiffs' Post-Trial Brief purports to describe the relief Plaintiffs seek in the

event that the Court rules in their favor on any of the claims, Plaintiffs' description of the

remedies they are requesting continues to be vague and wanting.  See Pls.' Post-Trial Br. at

102-07.  Plaintiffs also incorporate their prior Submission on Relief, but that document too fails

to specify the exact remedies Plaintiffs seek as well.[105]  Plaintiffs' disjointed remedies discussion

jumps from claim to claim and raises more questions than it answers, including, but not limited

to, the following:

> For Counts 1 and 3, Plaintiffs request that "the Class members
> whose retirement benefits have been reduced because of wear-
> away periods must have their benefits recalculated without them."
> Submission on Relief at 2-3.  Are Plaintiffs requesting that CIGNA
> be ordered to provide the equivalent of "A plus B" (as opposed to
> the greater of "A or B" as is currently paid)?  Are Plaintiffs
> requesting such relief with regard to the lump sum wear-away or
> the annuity wear-away?  Are Plaintiffs requesting such relief with
> regard to normal retirement benefits or early retirement benefits?

> For Count 3, Plaintiffs request that "[t]he additional retirement

---

[105]    Plaintiffs explained at trial that this Submission on Relief was a "summary of remedies . . .
not a brief and not in the form of an order."  Tr. 368.  Months later, there is no more
specificity to Plaintiffs' requested remedies.

benefits earned by older employees for years of service after January 1, 1998 must be conformed with the rates at which additional retirement benefits are earned by younger employees with [the] same years of service and salary." Submission on Relief at 3. Are Plaintiffs requesting that CIGNA ratchet up the benefits of older employees so that their accrued benefit at age 65 will increase at the same rate as the employee with the highest "benefit accrual"?

For Count 4, Plaintiffs state that "All members of the class who CIGNA employed on January 1, 1998 or who were rehired thereafter must be restored to the benefit formulas (Tier 1 or Tier 2) that applied on December 31, 1997." Submission on Relief at 3-4. Are Plaintiffs requesting that these class members be restored to the old pension plan that was frozen on 12-31-97 by Plan Amendment No. 4, in accordance with Plaintiffs' admission that the remedy for a Section 204(h) notice violation is to void the amendment?

For Count 5, Plaintiffs request that participants who already elected benefits should be offered a re-election. See Submission on Relief at 6. Are Plaintiffs requesting that any participants who elected lump sum benefits off of an election form that did not list the present values of different benefit options pay back the lump sum and be offered the opportunity to re-elect their benefit? Would this include those participants who already elected the most valuable benefit option? Would this include those participants for whom all benefit options were relatively equal?

While Defendants are confident that this Court will enter judgment in their favor on all of

Plaintiffs' claims, should the Court for some reason find for Plaintiffs, a host of legal principles

may preclude any remedy to Plaintiffs. If Plaintiffs further describe the remedies they seek in

this suit, or in the unlikely event that liability is found, Defendants respectfully request the right

to provide the Court with a more thorough analysis concerning which of those remedies, if any,

might be appropriate or available under ERISA. Nevertheless, Defendants herein Briefly

describe some of the legal principles which would limit any relief sought by Plaintiffs.

### A.      Monetary Damages Generally Are Unavailable Under ERISA Section 502(a)(3).

Plaintiffs' Post-Trial Brief maintains that monetary "relief in the form of retirement benefits . . . is a painfully obvious and necessary enforcement mechanism" and suggests that the Court can impose monetary damages as a secondary effect of a declaratory judgment or other equitable remedy.  Pls.' Post-Trial Br. at 103.  However, the Supreme Court has made "obvious" that only equitable — not legal — relief is available under ERISA Section 502(a)(3), and "money damages are, of course, the classic form of legal relief."  Mertens, 508 U.S. at 255.  As the Supreme Court explained, Section 502(a)(3) authorizes only "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)."  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. at 215.

Nor can Plaintiffs circumvent this limitation by trying to characterize the relief they seek as "equitable."  For example, in Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006), the Second Circuit upheld this court's denial of a plaintiff's request for an "injunction reinstating the terminated plans, requiring the trustees to pay into them additional benefits lost through a breach of fiduciary duty, and directing them to pay the additional benefits to Coan as required by the terms of the plans."  Coan, 457 F.3d at 254.  The Second Circuit held:

> We agree with the district court, moreover, that the alternative relief Coan seeks under section 502(a)(3), an injunction requiring the defendants to restore funds to the defunct 401(k) plan to be distributed to former participants, "does not transform what is effectively a money damages request into equitable relief."  Coan I, 333 F. Supp. 2d at 26.

Id. at 264 (emphasis added).  See also Gerosa v. Savasta & Co., 329 F.3d 317, 321 (2d Cir. 2003) ("In determining the propriety of a remedy [under ERISA], we must look to the real nature of the relief sought, not its label."); Fisher v. Penn Traffic Co., No. 06 Civ. 5848(HB), 2007 WL

496657, at *5 (S.D.N.Y. Feb. 16, 2007) (finding that the plaintiff "cannot cloak a legal claim for damages in equitable clothing" by requesting a declaration for monetary damages).

The Third Circuit's recent decision in Eichorn v. AT&T Corp., 484 F.3d 644 (3d Cir. 2007), is instructive.  In Eichorn, the plaintiffs sought "a decree requiring [defendant] to adjust its pension records retroactively to create an obligation to pay the plaintiffs more money, both in the past and going forward." Eichorn, 484 F.3d at 645.  The Third Circuit held that this relief was not available under ERISA Section 502(a)(3) because:

> The District Court rightly saw this as being, in essence, a request for compensatory damages merely framed as an "equitable" injunction.  The Court thus rightly concluded that the requested relief is not available under § 502(a)(3).

Id. at 655-57. (emphasis added; internal citations and quotations omitted).  See also In re J.P. Morgan Chase Cash Balance Litig., No. 06-732, 2007 WL 1549121, at *4 (S.D.N.Y. May 30, 2007) (participants who previously received lump sum distributions cannot seek additional pension benefits because "any relief [they] may be entitled to in the event Plaintiffs were to prevail would be a damage award, not benefit").

Similarly, Plaintiffs cannot characterize any of the relief they seek as restitution.  "[F]or restitution to lie in equity [and therefore be available under ERISA Section 502(a)(3)], the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." Great-West, 534 U.S. at 205, 213 (where a plaintiff "could not assert title or right to possession of particular property, but in which nevertheless he might be able to show grounds for recovering money to pay for some

benefit the defendant had received from him, the plaintiff had a right to restitution [only] at law")

(emphasis added).[106]

Plaintiffs' request that the Court order CIGNA to reform the written terms of Part B

likewise seeks relief unavailable under ERISA Section 502(a)(3). Reformation is only available

as an equitable remedy where parties reach agreement on the terms of a contract but incorrectly

memorialize those terms in a written document. Dobbs, Law of Remedies, § 4.3(7), vol. 1, at

617 (2d ed. 1993) (reformation is an appropriate remedy "[w]hen parties come to an agreement,

but by fraud or mistake write it down in some fashion that does not truly reflect their contract")

(emphasis added). Consistent with Dobbs, the Second Circuit has held that "[it] is well

established that reformation is appropriate only to conform an agreement to accurately reflect the

intentions of the parties at the time of the agreement." Beecher v. Able, 575 F.2d 1010, 1015 (2d

Cir. 1978) (emphasis added).[107] By contrast, where there is no actual agreement, i.e., no meeting

---

[106] See also Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 104 (2d Cir. 2005) (restitution is not equitable relief available under § 502(a)(3) where "the monies upon which Nechis seeks to impose a trust are premiums paid for health care coverage, which Oxford is under no obligation to segregate and which Nechis does not allege to be segregated in a separate account"); Priest v. Fireman's Fund Ins. Co., No. 05-CV-0157E(Sr), 2007 WL 475325, at *3 n.2 (W.D.N.Y. Feb. 9, 2007) (cautioning the plaintiff "that requests for relief which include the payments of benefits are classified as legal relief, even when the benefits would otherwise have been payable had the employer not interfered with the claimant's rights"); Pelosi v. Schwab Capital Mkts., L.P., 462 F. Supp. 2d 503, 513 (S.D.N.Y. 2006) (finding that "Pelosi's claim is clearly one seeking money damages for the benefits he believes were improperly withheld in violation of Defendants' legal duties to him"); Strohmeyer v. Metro. Life Ins. Co., No. 3:04cv1808(WWE), 2005 WL 3963770, at *3 (D. Conn. Nov. 15, 2005) (claim for "value of the life insurance benefits and interest constitutes a claim for monetary or legal compensation" was not equitable relief because "Plaintiff is not asking that defendants restore her property or money traceable to a fund in defendants' possession").

[107] See also H. Prang Trucking Co. v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir. 1980) ("Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the

continued . . .

of the minds, a writing cannot be reformed to reflect one party's understanding even if that

understanding was caused by fraud or inequitable conduct.  See Moffett, Hodgkins & Clarke Co.

v. City of Rochester, 178 U.S. 373, 385 (1900) ("A mistake on one side may be a ground for

rescinding, but not for reforming, a contract.  Where the minds of the parties have not met there

is no contract and hence none to be rectified.").

    In sum, and notwithstanding Plaintiffs' lack of any specific requested remedies, it is clear

that the remedies they seek are not "equitable relief" available under ERISA Section

502(a)(3).[108]

### B.     Plaintiffs Are Not Entitled To Retroactive Relief.

    Additionally, the Supreme Court has admonished against providing retroactive relief in

the context of pension plans:

> [Given] the potential impact which changes in rules affecting
> insurance and pension plans have on the economy. . . . the rules
> that apply to pension funds should not be applied retroactively
> unless the legislature has plainly commanded that result.

City of Los Angeles, Dep't of Water & Power v. Manhart, 435 U.S. 702, 721 (1978).

    The Supreme Court's jurisprudence teaches that when a pension plan is found to be

unlawfully discriminatory, retroactive relief may not be awarded if (1) employers reasonably

could have assumed that the plan was lawful, (2) retroactive relief is unnecessary to ensure future

compliance with the law, and (3) retroactive relief would have a potentially disruptive impact on

---

agreement.").

[108] Similarly, Plaintiffs' request for "interest" is not equitable relief available under Section
502(a)(3).  See Tyndall v. New England Teamsters & Trucking Indus. Pension Fund, No.
3:03 CV 194(CFD), 2006 WL 3815140 (D. Conn. Dec. 27, 2006) (Droney, J.) ("Knudson
casts serious doubt on whether interest on retroactive awards of benefits is a permissible
form of equitable relief.") (collecting cases).

plan operations nationwide.  Id. at 718-23; Ariz. Governing Comm. for Tax Deferred Annuity &

Deferred Comp. Plans v. Norris, 463 U.S. 1073, 1106-07 (U.S. 1983); Florida v. Long, 487 U.S.

223, 229-40 (1988).  See also Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07 (1971)

(articulating general test for applying law retroactively).

The first part of the test asks whether earlier precedent had "resolved in a definitive way"

the obligations of the employers, Long, 487 U.S. at 226, or instead "left some doubt regarding its

command," id. at 231.  Where, as here, the court confronts an uncertain area of the law, the

question is whether the earlier precedent had "clearly foreshadowed" the court's resolution of the

issue, Chevron, 404 U.S. at 106, or whether the issue was left as "debatable," Norris, 463 U.S. at

1093.  The Second Circuit defines "clearly foreshadowed" as where the employer was given

"fair notice of the illegality of its practice," and contrasts this with situations where an employer

"could have concluded in good faith" that its practice was legal.  Graham v. N.Y. Dep't of Civil

Serv., 907 F.2d 324, 328 (2d Cir. 1990) (holding that using gender-based actuarial tables to

discriminatorily determine plan benefits was not foreshadowed by Manhart, which proscribed

use of such tables to determine plan contributions).  This is an objective test that examines the

state of uncertainty of the law, not defendant's beliefs or state of mind.  See Long, 487 U.S. at

237 ("The meaning and scope of a decision do not rest on the subjective interpretations of

discrete, affected person and their legal advisers.").  Here, as evidenced by the decisions of the

Third Circuit in Register, the Seventh Circuit in Cooper, and numerous district courts, a

reasonable person "could have concluded in good faith" CIGNA's cash balance conversion "was

legal," and that its disclosures satisfied ERISA's disclosure requirements.  Graham, 907 F.2d at

328.  See also Manhart, 435 U.S. 702; Norris, 463 U.S. 1073.

The second prong of the test also precludes retroactivity. Under the second prong, a court may not presume that any change in the application of the law would be furthered by retroactive application of it, but rather must determine whether retroactivity is necessary in order "to deter deliberate violations or grudging compliance," Long, 487 U.S. at 230, or otherwise to advance federal policies. See id. at 236-37; Chevron Oil, 404 U.S. at 107-08. In Norris, the Supreme Court recognized that plan administrators who once believed plans to be non-discriminatory (and therefore lawful) will quickly "conform their plans to insure that individual employees are allowed equal . . . benefits" even without the threat of retroactive relief. Norris, 463 U.S. at 1110. The same is true here. Retroactive relief is not necessary to assure compliance with the law, so no retroactive relief is warranted.

Finally, as noted above, the court should not impose retroactive relief where, as here, such relief would have a potentially disruptive impact on CIGNA's entire cash balance pension plan and the pension plan system generally. See id. at 1106. The Supreme Court held:

> Many working men and women have based their retirement decisions on expectations of certain stream of income during retirement. These decisions depend on the existence of adequate reserves to fund these pensions. A retroactive holding by this Court that employers must disburse greater annuity benefits than the collected contributions can support would jeopardize the entire pension fund. If a fund cannot meet its obligations, the harm would fall in large part on innocent third parties. This real danger of bankrupting pension funds requires that our decision be made prospective.

Id. at 1110-11. See also Long, 487 U.S. at 238 (same); Probe v. State Teachers' Ret. Sys. 780 F.2d 776, 784 (9th Cir. 1986) (finding that the "danger of bankrupting pension funds would preclude giving retroactive effect to a decision that the plan at issue violates the Equal Pay Act"); Sikora v. Am. Can Co., 622 F.2d 1116, 1123 (3d Cir. 1980) (in denying retroactive relief, noting that to prevent "manifest injustice," rulings "that may conceivably upset the solvency of pension

plans" must be given special consideration).  Here, because CIGNA's cash balance plan

calculated contributions based on expected payouts to participants, an unexpected liability would

threaten the solvency of CIGNA's pension plan and adversely affect all plan participants in both

Part B and Part A.  Accordingly, no retroactive relief is appropriate.

**C.     Any Relief Must Be Limited By The Pension Protection Act Of 2006.**

Any relief provided in connection with Count 3 (age discrimination) must be limited to

the time period prior to June 29, 2005.  Under the Pension Protection Act of 2006 ("PPA"),

which applies prospectively from June 29, 2005, cash balance plans like Part B are not age

discriminatory.  See Pub. L. No. 109-280, 120 Stat. 780 (2006); see also Register, 477 F.3d at 65

n.8 (noting that the PPA settles the age discrimination dispute prospectively from June 29, 2005).

Moreover, because the PPA provides that cash balance plans such as Part B are legal going

forward, the PPA bars the Court from issuing any prospective injunctive relief.

**VIII.   CONCLUSION**

For the foregoing reasons, this Court should enter judgment in Defendants' favor on all

of Plaintiffs' claims.

Dated:  August 8, 2007                        Respectfully submitted,

                                             By: /s/ Joseph J. Costello

                                             **MORGAN, LEWIS & BOCKIUS LLP**
                                             Joseph J. Costello
                                             Jeremy P. Blumenfeld
                                             Jamie M. Kohen
                                             *Admitted pro hac vice*
                                             1701 Market Street
                                             Philadelphia, Pennsylvania  19103-2921
                                             (215) 963-5295/5258/5472
                                             (215) 963-5001 (fax)

- 130 -

**ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)

*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*