UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANICE C. AMARA, GISELA R. BRODERICK, ANNETTE S. GLANZ, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>CIGNA CORP. and CIGNA PENSION PLAN,<br><br>    Defendants. | Civil No. 3:01-CV-2361 (MRK) |

**DEFENDANTS' RESPONSES TO
THE COURT'S JANUARY 25, 2008 INQUIRIES**

**INTRODUCTION**

On January 25, 2008, the Court asked the parties to address five questions relating to Plaintiffs' backloading, cash balance conversion, disclosure and age discrimination claims under the Employee Retirement Income Security Act ("ERISA"). The responses of Defendants CIGNA Corporation and CIGNA Pension Plan to those questions are set forth below.

**DEFENDANTS' RESPONSES**

**1.**   **133 ⅓%Testing: Structural v. Operational**

The Court's first question was whether testing for compliance with the 133 ⅓% anti-backloading rule is required to be done "structurally" or "operationally." In other words, must the plan be tested for compliance by examining actual historical benefit amounts earned over time (an "operational test"), or must compliance be tested prospectively based on the plan's current design (a "structural" test). The Court asked

1

this question in the context of analyzing whether a plan that uses a variable interest crediting rate could satisfy the 133 ⅓% anti-backloading rule even though interest rates might fluctuate over time.[1]

The answer to the Court's question can be derived from the language of the statute itself. Specifically, ERISA Section 204(b)(1)(B) describes the 133 ⅓% rule as a forward-looking structural test, *i.e.*, it compares the current year's benefit to the benefit "for any *later* plan year." 29 U.S.C. § 1054(b)(1)(B) (emphasis added). Thus, compliance with the rule is tested by measuring, year-by-year, whether benefits that could be earned in the future ("any later plan year") would cause a violation of the rule in the current plan year. Historical benefit amounts earned -- based on actual interest rate fluctuations and salary increases -- are irrelevant because the statute and regulations require that all factors used to calculate benefits be kept constant for testing purposes: "social security benefits and all other relevant factors used to compute benefits *shall be treated as remaining constant as of the current plan year for all years after the current year.*" 29 U.S.C. §1054(b)(1)(B)(iv) (emphasis added). The regulations further explain that:

> For purposes of this paragraph, for any plan year, social security benefits and all relevant factors used to compute benefits, *e.g., consumer price index*, are treated as remaining constant as of the beginning of the current plan year for all subsequent plan years.

---

[1] This claim was not raised in any of the multiple versions of Plaintiffs' Complaint, nor did Plaintiffs' expert conduct any analysis in his reports or offer any testimony on this issue. To the contrary, Plaintiffs alleged only that the existence of wearaway violated the 133 ⅓% rule, and never challenged Part B's ongoing pay and interest credit structure. Plaintiffs also failed to raise this claim in any of their pretrial submissions, or in their description of class claims, issues, and defenses, which the Court requested the parties to file under Fed. R. Civ. P. 23(c)(1)(B).

26 C.F.R. § 1.411(b)-1(b)(2)(D).

Based on the statutory language and regulations, the district court in *Wheeler v. Pension Value Plan for Employees of Boeing Co.*, No. 06-cv-500, 2007 WL 781908 (S.D.Ill. Mar. 13, 2007), rejected the very same variable interest credit backloading theory advanced by Plaintiffs here:[2]

> Plaintiffs do not dispute that, assuming a constant rate of interest, the Plan is not backloaded, but argue that the "real-world" effect of the Plan's use of a variable interest rate (the annual rate on 30-year Treasury securities) to compute "Interest Credits" creates a situation in which variations in the 30-year Treasury rate are likely to cause backloading. This argument is simply wrong. The Plan clearly is a "frontloaded"-- not backloaded -- cash balance plan within the meaning of applicable Treasury regulations. *As noted, 26 C.F.R. § 1.411(b)-1 states plainly that factors used to compute benefits will be assumed to be constant even when a plan uses a variable outside index like the Consumer Price Index ("CPI") to compute such benefits.* See 26 C.F.R. § 1.411(b)-1 (b)(2)(ii)(D).
>
> * * *
>
> As Notice 96-8 makes clear, there is nothing improper about the Plan's use of the 30-year Treasury rate to compute "Interest Credits" allocated to a Plan participant's CBA. . . . Even if it is the case that variations in the 30-year Treasury rate can result in "Interest Credits" causing a Plan participant's CBA to grow by more than one-third in a given Plan year -- and this seems mathematically implausible -- this is not actionable as backloading under Notice 96-8. The Service's position is sensible and acknowledges the peculiar nature of cash balance plans. Because, as discussed, an employee's benefits under a cash balance plan are expressed in the form of periodic hypothetical credits to a hypothetical cash balance account, it would be very easy for any cash balance plan that employs a variable outside index to compute interest credits to be accused of

---

[2] If the factors that were used to calculate benefits were not treated as remaining constant, then even a traditional career or final average pay plan would violate the 133 ⅓% rule because salary increases of more than 33% (even over several years) would cause benefit increases of more than 33% over time. This is why traditional final average pay plans are economically backloaded. (Tr. 1212-13, 1216-17). As Plaintiffs' expert, Claude Poulin, testified, benefit accrual rates in the traditional plan described in Exhibit 2 to his Supplemental Report (Trial Ex. 4), including salary increases, would rise from 1.79% in earlier years to 3.97% in later years. (*See, e.g.*, Tr. 393-94). Of course, this is more than a 33% increase.

> backloading benefits due to inevitable swings in the applicable interest rate. In fact, Plaintiffs' position appears to render it largely impossible for a cash balance plan to use a variable interest rate. As Plaintiffs recognize, ERISA does not prohibit all backloading of benefits under a plan subject to the statute, only backloading that violates the statute and its implementing regulations.
>
> \* \* \*
>
> Finally, the Court notes the "gotcha!" quality of Plaintiffs' theory, which seeks to trip up the Plan on the basis of swings in the 30-year Treasury rate. The Court sees no compelling interest in playing such games, or in forcing Boeing to alter Plan provisions that obviously are intended to benefit Plan participants. As discussed, the Plan provides a minimum 5.25% floor for computing "Interest Credits," but the variable rate enables participants to do better than 5.25% in Plan years when the applicable 30-year Treasury rate exceeds the 5.25% floor. It would be easy for the Plan to adopt a fixed rate for computing "Interest Credits," but this would not necessarily be in the interest of Plan participants. . . . The Court concludes that the allegations of backloading set out in Count I of Plaintiffs' complaint fail to state a claim upon which relief can be granted.

*Wheeler*, 2007 WL 781908, 3-5 (emphasis added).

Likewise, the Internal Revenue Service recently issued Revenue Ruling 2008-7 in which it specifically held that a cash balance plan with a variable interest crediting rate was required to be tested for the 133 ⅓% rule by keeping the interest crediting rate constant for testing purposes:

> Furthermore, the value of all relevant factors used to determine benefits for the current plan year is kept constant in determining the annual rates of accrual for future years. *Thus, for example, for the plan year under consideration, which is 2002, the 3.87% interest crediting rate, the 5.48% applicable interest rate under § 417(e)(3), and the applicable mortality table under § 417(e)(3) are assumed to remain constant in determining the annual rate of accrual for each plan year after 2002.*
>
> \* \* \*
>
> For purposes of applying the 133 1/3% rule to the plan, *the interest crediting rate (the current year's value of the three-year Treasury Constant Maturity rate plus 25 basis points) and the conversion factor for future years (using the applicable interest rate and the applicable*

4

>   *mortality table under § 417(e)(3) for 2002) are assumed to be the same as for the current plan year.*

IRS Rev. Ruling 2008-7, at 9, 12 (attached as Exhibit A) (emphasis added).[3]

In sum, the statutory language, governing regulations, IRS Revenue Ruling 2008-7, and *Wheeler* each confirm that Plaintiffs' backloading claim must be tested "structurally" -- by keeping Part B's interest crediting rate, and all other factors that form part of the benefit formula, constant. Part B has a minimum interest rate of 4.5% and a maximum rate of 9%. (Trial Ex. 1, § 4.2(b)). Plaintiffs have not even alleged, let alone proven, that Part B fails the 133 ⅓% rule at any rate in this range, if that rate is assumed to be constant for all future years. Accordingly, Plaintiffs' backloading claim, to the extent based on the use of a variable interest crediting rate, fails as a matter of law.[4]

---

[3] If rates were not assumed to be constant for purposes of testing compliance with the 133 ⅓% rule, then all variable rate cash balance plans would fail because of the compounding effect of interest over time. In enacting the Pension Protection Act of 2006, however, Congress specifically authorized cash balance plans to credit interest at a "market rate of return . . . that is equal to the greater of a fixed or variable rate of return." 29 U.S.C. § 1054(b)(5)(B). Of course, Congress would not endorse cash balance plans with a variable rate of return (with or without a fixed minimum rate) if such plans violated the 133 ⅓% rule.

[4] In Revenue Ruling 2008-7, the IRS also rejected Plaintiffs' argument that any cash balance plan with a wearaway caused by a *frozen* minimum benefit violates the 133 ⅓% rule. The IRS explained:

> If, for a period of years, the lump sum-based benefit formula does not provide a greater benefit than the frozen accrued benefit under the pre-conversion formula as of December 31, 2001, then there is a period where the annual rate of accrual is zero. After that period, there will be a period of a positive annual rate of accrual as the lump sum-based benefit formula begins to provide a benefit that exceeds the frozen accrued benefit under the pre-conversion formula.
>
> Ordinarily, a period of a zero annual rate of accrual followed by a period of positive annual rates of accrual would result in a plan failing to satisfy the 133 1/3% rule. However, because there is no

2.     **<u>Lump Sum Benefit Amounts</u>**

The Court's second question sought clarification from the parties on which benefit components, if any, were available under Part A that would not be available if a participant elected a lump sum benefit under Part B.

The answer to that question depends on the participant and on a number of factors to be determined at the time the participant elects to receive his or her benefit. To begin with, there was no lump sum option available under Part A, so participants could never elect to receive a lump sum benefit under Part A. Under Part B, however, a participant could elect to receive a benefit in the form of a lump sum. The amount of that benefit is the *greater of* (1) the lump sum value of the participant's frozen benefit under Part A or (b) the participant's cash balance account. (Trial Ex. 1, § 1.1(a), § 1.1(c), 1.32).

For purposes of number (1) above, when a participant elects a lump sum benefit, the frozen Part A benefit is based on the value of the participant's normal retirement (age 65) annuity benefit, <u>plus</u> the value of the participant's Free-30 Preserved Spouse's Benefit, but without any Social Security supplement or subsidized early retirement

---

> ongoing accrual under the preconversion formula for these participants for service after the January 1, 2002 effective date of the conversion amendment, the lump sum-based benefit formula is the only formula under the plan (other than the § 411(d)(6) protected benefit), and, pursuant to the special rule of § 411(b)(1)(B)(i), that formula is treated as if it were in effect for all other plan years. Accordingly, the benefits under the lump sum-based benefit formula are the only benefits that need to be considered for purposes of applying the 133 1/3% rule (and the § 411(d)(6) protected benefit under the pre-conversion formula accrued through the date of conversion is disregarded in applying § 411(b)(1)(B)).

> IRS Rev. Ruling 2008-07, at 12. In so doing, the IRS specifically distinguished plans with a frozen minimum benefit (<u>e.g.</u>, the CIGNA Plan) from the circumstances cited by Plaintiffs involving plans with two ongoing benefit formulas. *Id.* at 12-13.

6

benefit. (Trial Ex. 1, § 1.32, 7.3(c)).[5] For purposes of number (2) above, the account balances were calculated in different ways for different groups of participants:

    (a)    The account balances for those participants who were converted on January 1, 1998 whose age and service add up to 55 or more "points" included – as part of the Initial Retirement Account (opening account balance) – the value of the participant's normal retirement (age 65) annuity benefit <u>plus</u> the value of previously earned subsidized early retirement benefits.[6] (Trial Ex. 1, § 1.28(a)(1)). Importantly, moreover, these annuity benefits were reduced to present value as of January 1, 1998 using a significantly lower (and hence more favorable) interest rate. (Trial Ex. 1, § 1.28(a)(2)). Thus, although this benefit amount would not explicitly include the Free-30 Preserved Spouse's Benefit or Social Security supplement components, the lump sum value of this benefit (reduced to present value at a favorable interest rate) could exceed the full value of the subsidized early retirement benefit, Free-30 Preserved Spouse's Benefit, and Social Security supplement previously available under Part A. (Both Mr. Poulin and Mr. Sher testified about the favorable treatment this group received. (Tr.

---

[5] IRS regulations specifically authorize plans to offer optional forms of benefit that do not include the value of subsidized early retirement benefits or social security supplements. *See* 26 CFR 1.411(d)-4, A-2 ("A plan may treat a participant as receiving his entire nonforfeitable accrued benefit under the plan if the participant receives his benefit in an optional form of benefit in an amount determined under the plan that is at least the actuarial equivalent of the employee's nonforfeitable accrued benefit payable at normal retirement age under the plan. This is true even though the participant could have elected to receive an optional form of benefit with a greater actuarial value than the value of the optional form received, such as an optional form including retirement-type subsidies, and without regard to whether such other, more valuable optional form could have commenced immediately or could have become available only upon the employee's future satisfaction of specified eligibility conditions.").

[6] Whether the account balance includes the full value of the participant's early retirement subsidy under Part A, or only a portion of that value, depends on the age of the participant as of January 1, 1998. (Trial Ex. 1, § 1.28(a)).

Tr. 220-21, 309-10, 982-83; Trial Ex. 10, Sher Report at 8)).  The process for calculating each participant's opening account balance, including the use of a subsidized (age 62) early retirement benefit and the specific interest rate used, was described in the Retirement Information Kit (Trial Ex. 508), Total Compensation Report for 1998 (Trial Ex. 85), and Opening Account Balance Statement (Trial Exs. 519, 597, 616, 667) provided to Plan participants.  (*See also* Defs' Proposed Findings of Fact 202-204, 213-217, 226-227).  The pay credit and interest credit formula used to add to the account balance was described in the Retirement Information Kit (Trial Ex. 508) and Summary Plan Description ("SPD") (Trial Exs. 505, 506).

      (b)      The account balance of other participants converted on January 1, 1998 (*i.e.*, those whose age and service did not add up to 55 or more "points") was based on the value of each participant's normal retirement (age 65) annuity benefit and would not include the value of any early retirement subsidy.  (Trial Ex. 1, § 1.28(b)(1)).  This benefit, however, also was reduced to present value at a discount rate more favorable than the statutory discount rate in effect at the time.[7]  (Trial Ex. 1, § 1.28(b)(2)(a)).  Many of these participants were younger and/or more recently hired, so they generally had not earned any substantial early retirement subsidized benefit and were not eligible for the Free-30 Preserved Spouse's Benefit under Part A even before the cash balance conversion.  The process for calculating each participant's opening account balance, including the use of a normal (age 65) retirement benefit rather than the subsidized (age

---

[7] The rate used for this group was more favorable than the statutory discount rate at the time, but not as favorable as the rate used for participants with 55 or more "points."

62) early retirement benefit and the specific interest rate used, was described in the same communications referenced above.

    (c)    The account balance of participants converted after January 1, 1998 because of a rehire was based on the value of each participant's normal retirement (age 65) annuity benefit and would not include the value of any early retirement subsidy. These participants had their benefits reduced to present value using the statutory discount rate in effect at the time.

Thus, whether any particular participant's lump sum benefit would include the value of that participant's subsidized early retirement benefit or Free-30 Preserved Spouse's Benefit depends on the relative values of "(1)" and "(2)", described above and in Sections 1.28 and 1.32 of Part B, *at the time the participant elects to receive the benefit*. If a participant's frozen Part A benefit as a lump sum ("(1)" above) exceeded the participant's cash balance account ("(2)" above), then the participant would receive a benefit that included the value of the Free-30 Preserved Spouse's Benefit, but not any subsidized early retirement benefit or Social Security supplement. If a participant's cash balance account exceeded the value of the participant's frozen Part A benefit as a lump sum, then the benefit could (depending on the number of age and service points of the participant) include the subsidized early retirement benefit, but not the Free-30 Preserved Spouse's Benefit or Social Security supplement.

**3.**    <u>**Plaintiffs' Failure to Name the Plan Administrator as a Defendant**</u>

The Court's third question related to Plaintiffs' failure to name the Plan Administrator as a defendant. Specifically, the Court asked whether the following reference in the Second Court's decision in *Crocco v. Xerox Corp.*, 137 F.3d 105, 107 (2d Cir. 1998), meant that Plaintiffs only had to name the Plan as a defendant on its claims

9

regarding the purported inadequacy of the SPDs, Section 204(h) notice, and present-value disclosures:

> In *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195 (2d Cir. 1989), we held that, "[i]n a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Id.* at 1199.

The answer to the Court's question is "no." In the case quoted by the *Crocco* court, the Second Circuit in *Leonelli* affirmed the decision of the district court to refuse to permit a plaintiff to amend his complaint to add a claim for long-term disability benefits under the applicable plan. In doing so, the Second Circuit agreed with the district court that such an amendment would be futile given "plaintiff's failure to name the Pension Administrative Committee as a defendant." *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989). Thus, it was the failure to sue the plan administrator -- not the plan -- that the court found to be fatal to the plaintiff's claim.

To be sure, there have been a number of cases in which courts have permitted plan participants to pursue claims for benefits under the terms of a plan against the plan alone, without suing the plan administrator. For example, in *Chapman v. Choicecare Long Island Term Disability Plan*, 288 F.3d 506, 509-10 (2d Cir. 2002), the Second Circuit relied on its holdings in *Leonelli* and *Crocco* in concluding that a benefit plan was a proper defendant in a case in which a plan participant claimed she was entitled to long-term disability benefits under the plan. The court permitted the plaintiff to proceed against the plan even though the plaintiff failed to name the plan administrator as a defendant (although that issue was not specifically addressed by the court).

In all of these cases, however, the claim asserted was one *for benefits under the existing terms of a plan*. ERISA plainly contemplates that a plan participant can sue a plan to recover benefits to which he or she is entitled. *See* 29 U.S.C. §1132(a)(1)(B) ("A

civil action may be brought (1) by a participant or beneficiary. . . to recover benefits due him under the terms of his plan . . . ."); 29 U.S.C. §1132(d) ("An employee benefit plan may sue or be sued under this subchapter as an entity."). But Plaintiffs' disclosure claims in Counts 2, 4 and 5 of their Third Amended Complaint are not claims for benefits under the existing terms of the CIGNA Pension Plan. As Plaintiffs themselves have acknowledged, these claims are directed to the adequacy of disclosures that are "the responsibility" of "the 'plan administrator.'" (Pls.' Post-Trial Br. at 51). *See also* 29 U.S.C. §1024(b)(1) ("The administrator shall furnish . . . a copy of the summary plan description. . . ."); 29 U.S.C. §1054(h) (". . .the plan administrator provides a written notice, setting forth the plan amendment and its effective date. . . .").

Defendants are aware of no case -- and Plaintiffs have failed to identify any -- in which a court has held that a benefit plan can be sued regarding the adequacy of disclosures that were, by statute, the responsibility of the plan administrator. To the contrary, courts that have addressed this issue have held that *only* the plan administrator can be sued for such violations. *See, e.g., Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994) ("The case law also confirms that any cause of action for violation of these disclosure requirements is proper *only* against the plan administrator, the party responsible under the statute.") (emphasis added); *Thorpe v. Retirement Plan of the Pillsbury Co.*, 80 F.3d 439, 444 (10th Cir. 1996) ("Such causes of action may be brought *only* against designated plan administrators, rather than the plan itself or the employer.") (emphasis added); *cf. Ranke v. Sanofi-Sythelabo, Inc.*, No. 04-1618, 2004 WL 2473282, at *2 (E.D. Pa. 2004), *aff'd on other grounds*, 436 F.3d 197 (3d Cir. 2006)

(holding that a benefit plan is not a proper defendant in a case challenging the adequacy of fiduciary disclosures).

These decisions are fully consistent with the Second Circuit's pronouncement in *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993), that the disclosure obligations associated with an SPD are "placed on the person designated under ERISA as the 'administrator' of the plan, not on every fiduciary." As Defendants argued in its Post-Trial Brief, that person was Stewart Beltz, not the CIGNA Pension Plan. *See* Defs'. Post-Trial Brief at 104-08. The fact that Plaintiffs named the Plan as a defendant does not excuse their failure to name Mr. Beltz as a defendant on claims that lie only against him as the Plan Administrator.[8]

### 4.     The Drafting of Benefit Election Forms

The Court's fourth question was whether there is any evidence in the record regarding who was responsible for drafting the benefit election forms upon which Plaintiffs' present-value disclosure claims in Count 5 are based. The record reflects that since Prudential became the recordkeeper for the CIGNA Pension Plan in the spring of 2004, Prudential has been responsible for preparing the benefit election forms and, at the direction of the current Plan Administrator, John Arko, revising those forms to comply with the 2003 Treasury regulations (effective October 1, 2004) that regulate such disclosures. (Tr. 803-824; Trial Ex. 166, 740).

---

[8] The Second Court's decision in *Crocco* also is fatal to Plaintiffs' assertion that Defendant CIGNA Corporation, the Plan sponsor, can somehow be liable for the purportedly inadequate disclosures of the Plan Administrator in light of the undisputed evidence that Mr. Beltz was designated as the Plan Administrator. 137 F.3d at 107-08.

5. **<u>Wearaway/Age Discrimination</u>**

The Court's final question is whether Plaintiffs were unable to present evidence to support their claim that older participants have a longer wearaway period than younger, similarly situated participants because Defendants purportedly failed to produce information they were required to produce in discovery and, if so, the implications of such a conclusion.

Defendants submit that (a) they satisfied their discovery obligations, (b) Plaintiffs' failure to offer any reports or testimony to even try to demonstrate that older employees have longer wearaway periods than similarly situated younger employees was their own fault, and was not caused by Defendants, and (c) in any event, longer wearaway periods for older employees would not violate ERISA's specific statutory prohibition against age discrimination.

First, Plaintiffs have failed to establish that Defendants did not produce information in their possession, custody or control responsive to this issue. Wearaway periods – with respect to lump sum or annuity benefits – were never used to calculate participants' benefits, and there is no evidence that Defendants or Prudential ever calculated the length of such periods. Not surprisingly, therefore, there are no records of the length of participants' wearaway periods that should have been produced. Nor were Defendants obligated to perform such calculations in response to Plaintiffs' discovery requests.[9]

---

[9] In fact, as Mr. Sher testified, even for the same participant, the length of any wearaway period would change over time, depending on interest rate fluctuations. (Tr. Tr. 1101-1128; Trial Exs. 737-38). Thus, the "length" of a participant's wearaway period as a historical matter is irrelevant; the only relevant consideration is whether the participant's frozen minimum benefit exceeds the

13

Defendants and Prudential did, however, arrange for an on site inspection so that Plaintiffs' counsel could have access to Prudential's DBRK database system and other document management systems and obtain data from those systems. Defendants also produced to Plaintiffs the Pension Express database, and Prudential produced classwide data from its DBRK database that included account balances and minimum benefit information *for thousands of participants*.[10] Plaintiffs' expert, Mr. Poulin, could have analyzed this data to try to prove that wearaway was age discriminatory, but he did not do so.

More importantly, Plaintiffs did not need *any* actual participant data to analyze whether the length of wearaway periods was age discriminatory. To the contrary, the best and only way to determine the impact of age on the length of participants' wearaway periods is to examine similarly situated participants of different ages, *i.e.*, employees with the same service, hire dates, marital status, and salary history, but who were of different ages. Critically, however, Plaintiffs did not need to examine *actual* participants that were identical in all respects except for their ages. (It is unlikely that such similarly situated participants actually exist). Instead, similar to the other analyses of hypothetical

---

        value of the participant's cash balance account upon benefit commencement, based on interest rates in effect at that time.

[10] Defendants addressed many of these issues in their Opposition to Plaintiffs' Motion for Adverse Inferences and Sanctions Based on Defendants' Responses to Discovery, which they incorporate here by reference. Although the information produced to Plaintiffs did not contain minimum benefit field information for all plan participants, that is because the DBRK database used by Prudential did not contain that information. Thus, Prudential produced the database records that it had in the form in which that information was maintained. Putting aside whether Part B participants received the benefits to which they were entitled (Plaintiffs' Count 5), it is undisputed that Defendants and Prudential produced minimum benefit information for thousands of Part B participants, which is a sufficiently large group to have been analyzed by Plaintiffs' expert.

participants performed by Mr. Poulin in his Report (*e.g.*, Trial Ex. 3, at Exs. D-G), Mr. Poulin could have, and should have, analyzed the length of the wearaway period for hypothetical participants of a particular age with various salary and service histories, marital statuses, and hire dates, and then adjusted the age of the hypothetical participants to see if the wearaway period (for lump sum and annuity benefits) was lengthened or shortened as a result of the change in age, with all other factors remaining constant. The only pieces of "data" Plaintiffs would have needed for this analysis are the terms of the Plan (Parts A and B) and the interest crediting and discount rates under Part B – the same data used by Mr. Poulin throughout his Report when he analyzed the impact of other Plan provisions on hypothetical Plan participants. Yet Plaintiffs chose not to conduct this analysis, or chose not to include it in Mr. Poulin's reports. This is a failure of proof by Plaintiffs, and Plaintiffs should be held accountable.

Lastly, Plaintiffs' claim that older participants have a longer wearaway period than similarly situated younger participants fails as a matter of law. Plaintiffs did not allege a violation of the Age Discrimination in Employment Act ("ADEA") in their Third Amended Complaint, nor did they file a charge of discrimination with the Equal Employment Opportunity Commission, a procedural prerequisite for pursuing such a claim. Thus, to the extent Plaintiffs are belatedly trying to assert an age discrimination claim generally this claim fails as a matter of law. Unlike the ADEA, moreover, ERISA's age discrimination provision does not prohibit all forms of age discrimination generally. Instead, 29 U.S.C. § 1054(b)(1)(H) only prohibits "the rate of an employee's benefit accrual" from being reduced because of age. Although courts have disagreed about the meaning of that phrase, no court has ever interpreted that phrase to refer to the

length of a wearaway time-period. For all of these reasons, and those set forth in Defendants' Post-Trial Brief,[11] Defendants are entitled to judgment in their favor on Plaintiffs' wearaway/age discrimination claim.

## SUPPLEMENTAL AUTHORITY

Defendants also wish to bring to the Court's attention recent supplemental authority bearing on Plaintiffs' claims in this case. Specifically, in *Custer v. Southern New England Tel. Co.*, No. 3:05-1444, 2008 WL 222558 (D. Conn. Jan. 25, 2008) (attached as Exhibit B), Judge Underhill held that cash balance plans are not age discriminatory and rejected many of the arguments made by Plaintiffs in this case, including Plaintiffs' backloading claim and their claim that CIGNA's wearaway periods were age discriminatory.

Respectfully submitted,

Dated: February 8, 2008

**MORGAN, LEWIS & BOCKIUS LLP**
By: /s/ Joseph J. Costello

Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
*Admitted pro hac vice*
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5295/5258/5472
(215) 963-5001 (fax)

---

[11]  Defendants explained in their Post-Trial Brief that Plaintiffs' claim that wearaway was age discriminatory is contrary to the facts, when considering all of the factors that impact the wearaway period and that subsidized early retirement benefits are "disregarded" when testing for age discrimination under ERISA. 29 U.S.C. § 1054(b)(1)(H)(v). (*See* Defs.' Post-Trial Brief at 27-30).

16

                              **ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)

*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing Defendants' Responses to the Court's January 25, 2008 Inquiries was filed electronically through the CM/ECF system on February 8, 2008. Notice of this filing will be sent by e-mail to all parties listed below by operation of the Court's electronic filing system. The parties may access this filing through the Court's CM/ECF system.

The aforementioned documents were also served on the parties listed below by first class United States mail, postage prepaid, this 8th day of February 2008.

Thomas G. Moukawsher
Moukawsher & Walsh, LLC
328 Mitchell Street
Groton, CT  06340

Stephen R. Bruce
805 15th Street, NW
Suite 210
Washington, DC  20005

By: /s/ Joseph J. Costello
Joseph J. Costello