# EXHIBIT B

Westlaw.

Slip Copy                                                                                             Page 1
Slip Copy, 2008 WL 222558 (D.Conn.)
**(Cite as: Slip Copy)**

**Custer** v. Southern New England Telephone
Company
D.Conn.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Barbara J. **CUSTER**, et al., Plaintiffs,
v.
SOUTHERN NEW ENGLAND TELEPHONE
COMPANY, et al., Defendants.
**Civil Action No. 3:05cv1444 (SRU).**

Jan. 25, 2008.

Edward W. Ciolko, Joseph H. Meltzer, Joseph A.
Weeden, Schiffrin Barroway Topaz & Kessler LLP,
Radnor, PA, Patrick A. Klingman, James E. Miller,
Sheperd Finkelman Miller & Shah, Chester, CT,
Thomas G. Moukawsher, Moukawsher & Walsh,
Hartford, CT, for Plaintiffs.
Christine Button, Jenny L. Stewart, Patrick W. Shea,
Paul, Hastings, Janofsky & Walker, Stamford, CT,
for Defendants.

### MEMORANDUM OF DECISION

STEFAN R. UNDERHILL, District Judge.
   **\*1** This dispute arises from Southern New
England Telephone Company ("SNET's") [FN1]
conversion of its pension plan from a traditional
defined benefit plan, under which retiring plan
participants earn a percentage of their ending salary
for the remainder of their lives, to a **cash balance**
account plan, under which retiring plan participants
accrue service and interest credits throughout their
careers to be paid out as a lifetime annuity when they
retire. Plaintiffs in this case, Barbara Custer and other
SNET plan participants (collectively "plaintiffs"),
filed a six-count complaint in which they allege that
SNET's **cash balance** plan fails to comport with
several ERISA requirements.

> FN1. In their complaint, plaintiffs name
> SNET Pension Plan, Southern New England
> Telephone Company, Southern New
> England Telecommunications, Inc., and AT
> & T, Inc. as defendants. Throughout the
> decision I refer to the defendants
> collectively as "SNET."

   SNET filed a motion to dismiss, or, in the
alternative, for summary judgment on all counts.
SNET raises multiple procedural and substantive
arguments for dismissal. For reasons that follow,
defendants motion is denied with respect to the
procedural arguments, and granted with respect to the
substantive arguments.

### I. Standard of Review

   SNET has moved to dismiss, or in the
alternative, for partial summary judgment. A motion
to dismiss for failure to state a claim should be
granted only if "it is clear that no relief could be
granted under any set of facts that could be proved
consistent with the allegations."*Hishon v. Spalding,
467 U.S. 69, 73 (1984)*. The function of a motion to
dismiss is "merely to assess the legal feasibility of a
complaint, not to assay the weight of evidence which
might be offered in support thereof."*Ryder Energy
Distribution Corp. v. Merrill Lynch Commodities,
Inc., 748 F.2d 774, 779 (2d Cir.1984)* (quoting
*Geisler v. Petrocelli, 616 F.2d 636, 639 (2d
Cir.1980)*).

   In determining the sufficiency of plaintiffs' claim
for Rule 12(b)(6) purposes, courts consideration is
limited to: "the factual allegations in plaintiffs'
amended complaint, which are accepted as true;""to
documents attached to the complaint as an exhibit" or
incorporated therein by reference; "to matters of
which judicial notice maybe taken;" or, finally, "to
documents either in plaintiffs' possession or of which
plaintiffs had knowledge and relied on in bringing
suit."*Brass v. American Film Technologies, Inc., 987
F.2d 142, 150 (2d Cir.1993)*. Therefore, for purposes
of the instant motion, I assume the truth of all factual
allegations, and I will also consider the summary plan
description ("SPD"), the notice, and other documents
to which the complaint refers.

   SNET also moves, in the alternative, for
summary judgment. Summary judgment is
appropriate when the evidence demonstrates that
"there is no genuine issue as to any material fact and
that the moving party is entitled to a judgment as a
matter of law."*Fed.R.Civ.P. 56(c); see also Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)*
(plaintiff must present affirmative evidence in order

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to defeat a properly supported motion for summary judgment). When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson, 477 U.S. at 255;Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59(1970).*

## II. Background

**\*2** All facts are taken from the complaint and from other documents to which the complaint refers. Plaintiffs' factual allegations are assumed to be true for purposes of this motion. Unless otherwise noted, the facts are undisputed.

### A. *Cash Balance* Plans

ERISA's statutory structure contemplates two types of retirement plans; defined contribution plans and defined benefit plans. *29 U.S .C. § 1002(34)-(35).* A defined contribution plan is "a pension plan which provide[s] for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."*29 U.S.C. § 1002(34).* By contrast, "a defined benefit plan is any retirement plan that is not a defined contribution plan."*Id.* (citing *29 U.S.C. § 1002(35)).* A typical defined benefit plan grants retirees a percentage of their final salary for the remainder of their lives.

**Cash balance** plans generally share certain attributes with both defined contribution plans and defined benefit plans. Like a traditional defined contribution plan, participants in a **cash balance** plan accrue benefits in an "account." Unlike a traditional defined contribution plan, however, a participant's account in a **cash balance** plan is not "real;" it is a mathematical construct to determine the size of a plan participant's lifetime annuity that the employer will pay out when the participant retires. The account is not capitalized in the sense that neither the participant, nor the employer, is actually setting aside money. Instead, the employer is simply accruing an obligation to pay out benefits at a future date.

### B. *SNET's Plan*

Prior to July 1, 1995, SNET offered its employees a traditional defined benefit plan. The plan provided each qualified retiring employee with a percentage of his final salary for the rest of his life. Effective July 1, 1995, SNET converted its defined benefit plan to a **cash balance** plan.

Under SNET's **cash balance** plan, each participant's **cash balance** account is comprised of three parts: the opening account balance; accrued service credits; and accrued interest credits. The opening balance is generally based on the participants' benefits under the old plan as of July 1, 1995.[FN2]Participants then earn service credits at the end of each month based upon their level of pay and years of service.

FN2. The opening account balance is determined in four steps. First, SNET calculates the participant's core pension benefit under the old plan as of July 1, 1995, the effective date of the plan. Button Aff. ex. E at 15. Second, SNET multiplies the core pension benefit by the early retirement factor. *Id.* Third, SNET multiplies the result by the opening balance factor. *Id.* Finally, the participants who were eligible for, and did participate in, the **cash balance** plan before July 1995 received the credits they had previously earned under the **cash balance** plan. *Id.*

Finally, participants earn interest credits annually based upon fixed negotiated percentages. Each participant earns the same rate of interest, but the total amount of interest is directly proportional to the participant's years of service until retirement; the more years of service the participant has until retirement age, the longer his balance will accrue interest, and the more total interest the participant will accrue, provided the participant remains employed until normal retirement age (employees who take early retirement have their lifetime annuity reduced to its present value). If a younger participant remains employed through retirement age, he will thus accrue more total interest per service credit than similarly situated older workers.

**\*3** The conversion of, and interaction between,

Slip Copy                                                                                                    Page 3
Slip Copy, 2008 WL 222558 (D.Conn.)
(Cite as: Slip Copy)

the old plan and the new plan is central to the issues in this case. Perhaps as an incentive to take early retirement, as part of the switching to the new plan, SNET front-loaded some retirement benefits. Under the new **cash balance** plan, all retiring employees will receive the greater of: (1) the value of their benefits under the old defined benefit plan, frozen as of the conversion date in 1995, and increased by ten percent ("permanent enhanced benefit"); or (2) the value of their lifetime annuity under the new **cash balance** plan. (This operation of the new plan is referred to hereafter as the "greater-of option"). As a practical matter, participants thus receive 110 percent of their benefits under the old plan until the value of the cash account under the new plan catches up to and exceeds their permanent enhanced benefit. The parties, and other courts, refer to the catch-up period as the "wear-away" period because, plaintiffs argue, the benefits that participants can receive will not increase during that period. The period is more aptly named a "catch-up" period, however, because it is the period during which employees' benefits under the **cash balance** plan catch up to their front-loaded permanent enhanced benefit.

C. *Plaintiffs' Claims*

Plaintiffs raise six claims in their complaint. In Count I, plaintiffs allege that the plan's interest credit structure violates ERISA's age discrimination provision, ERISA § 204(b)(1)(H). In Count II, plaintiffs allege that the "wear-away effect" also violates ERISA's age discrimination provision, ERISA § 204(b)(1)(H). In Count III, plaintiffs allege that the **cash balance** plan violates ERISA's "anti-backloading" provision, ERISA § 204(b)(1)(A)-(C). In Count IV, plaintiffs allege that the plan's SPD did not comport with the requirements set forth in ERISA § 102. In Count V, plaintiffs allege that SNET's notice failed to comport with the requirements set forth in ERISA § 204(h). Finally, in Count VI, plaintiffs allege that SNET violated its fiduciary duties as set forth in ERISA § 404. Plaintiffs seek declaratory and injunctive relief.

D. *SNET's Arguments For Dismissal/Summary Judgment*

SNET now moves to dismiss, or in the alternative for entry of summary judgment on, all counts. Procedurally, SNET argues that plaintiffs' claims are time-barred, or are barred by the doctrine of laches. SNET also argues that Barbara Custer's

claims are barred by *res judicata.* Finally, SNET argues that the complaint fails to sufficiently allege a basis for standing because plaintiffs fail to allege that any of their permanent enhanced benefit levels actually exceeded their **cash balance** account, and thus, none of the plaintiffs would have experienced any "wear away." [FN3] Substantively, SNET argues that each of plaintiffs' claims lack merit.

> [FN3]. I do not address SNET's standing claim in detail, but it is not clear that all plaintiffs actually lack standing. By not presenting any affirmative evidence on plaintiffs' standing to bring suit, SNET has not met its burden on this motion with respect to its standing argument. Moreover, even if some plaintiffs lack standing, others may not.

**III. Procedural Arguments**

A. *Are Plaintiffs' Claims Time Barred?*

SNET's motion to dismiss plaintiffs' claims as time-barred raises two disputed issues: (1) Which statute of limitations applies to plaintiffs' claims?; and (2) When did plaintiffs' claims accrue? Because the latter question is dispositive of the statute of limitations issue, I need not answer the former. [FN4]

> [FN4]. SNET converted its plan to the **cash balance** plan in 1995. The longest potentially applicable statute of limitations period, however, is six-years. Even if that statute applied, any cause of action accruing in 1995 would be untimely.

**\*4** "[A] plaintiff's cause of action under ERISA accrues 'when there has been a repudiation by the fiduciary which is clear and made known to the beneficiary.' " *Carey v. IBEW Local 363 Pension Plan,* 201 F.3d 44, 47 (2d Cir.1999) (quoting *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 598 (2d Cir.1983)).

SNET argues that the statute of limitations began to run when it converted its plan to the **cash balance** plan in 1995. SNET's argument is based on the premise that plaintiffs are presumed to have knowledge of the repudiation because they received the SPD and the notice of benefit reduction.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

That premise is faulty. "While receipt of a SPD from the Plan may be sufficient notice, there are no assurances that this is so." *In re J.P. Morgan Chase Cash Balance Litig.,* 460 F.Supp.2d 479, 484 (S.D.N.Y.2006). In *J.P. Morgan Chase,* the court confronted the same statute-of-limitations question with respect to an identical ERISA challenge to a **cash balance** plan. As in this case, defendants argued that the repudiation occurred when it converted its pension plan from a traditional defined benefit plan to a **cash balance** plan. *Id.* at 483.Plaintiffs argued, however, and the court held, that even though the repudiation occurred when the plan was converted, the repudiation may not have "clear and made known to the beneficiaries" at that time. *Id.* The court based its denial of defendants' motion to dismiss on the fact that the plaintiffs had alleged the defendants "failed to provide adequate notice with respect to the decrease in their retirement benefit as a result of the conversion to a **cash balance** plan," and thus the plaintiffs were "unaware of the reduction in their retirement benefits that resulted from the ... conversion."*Id.*

Similarly, the complaint in this case is replete with allegations that the notices SNET gave were insufficient, and that plaintiffs had no knowledge of their claims until recently. *See* Compl. at ¶ 2 ("Plaintiffs and the class have not been given an adequate summary plan description explaining how benefits accrue under the Plan"); Compl. at ¶ 45 ("[P]rior to the effective date of the change, SNET failed to provide adequate notice to plan participants, explaining to them the existence and the extent of a significant reduction of their benefits"); Compl. at ¶ 46 ("Further, despite this impact, the summary plan description provided to Plan participants does not adequately explain the full import of the **cash balance** plan terms, including but, not limited to, an explanation of the wear-away effect and a disclosure that benefit accruals under the plan are reduced by advancing age"); Compl. at ¶ 47 ("SNET has misleadingly promised all participants that they would benefit from the conversion to a **cash balance** plan, concealing from participants through the present day that the **cash balance** formula significantly reduces future benefits, discriminates based on age and leaves many Plan participants with long periods of time under which they accrue no new benefits."); Compl. at ¶ 65 ("The summary plan description provided by the Defendants to Plaintiffs and the Class following the conversion and the one

supplied today fail to adequately describe, in a manner calculated to be understood by the average plan participant, that the **cash balance** formula discriminates based on age and leaves many plan participants with long periods of time under which they accrue no new benefits. The deficient summary plan descriptions led Plantiffs and the Class to believe that such features were not components of the Plan."); *See also* Compl. at ¶¶ 70, 72.

**\*5** Because I must accept as true the allegations concerning when plaintiffs gained knowledge of the repudiation, it would be improper to dismiss plaintiffs' claims as time-barred. *See also Parsons,* 2006 U.S. Dist. LEXIS 93135 at *6 ("the parties are in disagreement over whether the defendants' communications regarding the changes to **cash balance** plans did or did not 'clearly repudiate' anything. The court will not reach this argument until further discovery has been conducted, because factual issues appear determinative.").

B. *Are Plaintiffs' Claims Barred by Laches?*

SNET argues that plaintiffs' claims are barred by laches. "A party asserting a laches defense must show that the plaintiff has inexcusably slept on [his] rights so as to make a decree against the defendant unfair. Laches additionally requires a showing by the defendant that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action."*Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 132 (2d Cir.2003) (per curiam) (internal citation and quotations omitted). A defendant is prejudiced by a delay when the assertion of a claim available some time ago "would be inequitable in light of the delay in bringing that claim. Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed."*Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 192 (2d Cir.1996) (internal citation and quotations omitted).

SNET's laches claim fails for at least two reasons. First, for reasons stated in the preceding section, whether plaintiffs were on notice of their claim is a disputed fact, so it is not yet possible to determine if the plaintiffs intentionally slept on their rights. Second, SNET has failed to show it was prejudiced by the alleged delay.

C. *Are Custer's Claims Barred by Res Judicata?*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The doctrine of *res judicata* provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."*Allen v. McCurry,* 449 U.S. 90, 94 (1980); *see also St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir.2000); *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994)."To prove that a claim is barred by res judicata, the moving party must demonstrate that: (1) the previous action involved an adjudication on the merits; (2) the previous action involved the same parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the previous action."*Powers v. City of New York,* 2007 U.S. Dist. LEXIS 27704, *9 (E.D.N.Y.2007). In this case, the first two prongs are not at issue.

With respect to the third prong, "[t]he Second Circuit has adopted a transactional approach to determining whether a claim may be dismissed on the ground that it 'could have been' raised in a previous action."*Id.* at *16.Whether a party could have raised a claim in a prior action "depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first."*Id.* To determine whether claims arise from the same transaction, the court "must look to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.' " *Id.* (quoting *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir.1997). "The term 'transaction' must be given a flexible, common-sense construction that recognizes the reality of the situation." *Id.* at *17.

**\*6** SNET argues that Custer's claims are barred by the doctrine of *res judicata.*Specifically, they argue that Custer was a member of a previous class action, *Parry v. SBC Communs., Inc.,* 375 F.Supp.2d 31, 36 (D.Conn.2005), and that Custer could have, and should have, brought her claims in that action.

The claims in *Parry,* however, are distinct from the claims Custer raises here. *Parry* addressed "the proper interpretation of the plan amendments in the pension plans of defendant SBC Communications Inc.'s ... subsidiary, SNET and defendant Cingular

Wireless LLC." *Id.* at 35-36.The plaintiffs in *Parry* claimed they were "entitled to certain **cash balance** pension benefits under the terms of their pension plans."*Id.* at 36.The plaintiffs in *Parry* were not challenging the plan as non-compliant with ERISA. In this case, however, Custer is not seeking to interpret and enforce the terms of the plan. To the contrary, Custer and other plaintiffs are requesting that I declare that the plan fails to comply with ERISA.

As such, the claims in *Parry* and those raised here would not form a convenient trial unit. In fact, not only are the two issues unrelated, but it would have been somewhat inconsistent for Custer to have brought both sets of claims in one action because she would be arguing that she was entitled to certain benefits under the SNET plan, while simultaneously arguing that the SNET plan is invalid because it does not comply with ERISA. Indeed, it does not even appear to be possible for Custer to receive, in one action, the relief she requested in both actions. The concept of *res judicata* does not require that when a plaintiff is a part of a class action to recover benefits under a pension plan, that plaintiff must bring every conceivable claim related to that plan for fear of claim preclusion, even if those claims are inconsistent with each other.

Finally, removing Custer from the litigation will make no practical difference in the prosecution of the claims. As long as one party is not barred from bringing the claim, the court can enter the declaratory and injunctive relief sought, and can award costs and fees. SNET's *res judicata* argument thus fails.

**IV. SNET's Substantive Arguments**

A. *Does the Interest Credit Portion of SNET's* **Cash Balance** *Plan Violate ERISA's Age Discrimination Provisions?*

At the outset, it bears mentioning why ERISA § 204(b)(1)(H)(i), the age discrimination provision for defined benefit plans, as opposed to ERISA § 204(b)(2)(A), the age discrimination provision for defined contribution plans, applies to **cash balance** plans. The applicability of section 204(b)(1)(H)(i) is not obvious because, as previously stated, **cash balance** plans combine the attributes of both defined contribution plans and defined benefit plans.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Second Circuit, in *Esden v. Bank of Boston, 229 F.3d 154 (2d Cir.2000),* decided the issue in a footnote:

Under ERISA the term[ ] "defined contribution plan" and "individual account plan" are synonymous and are both defined as "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses...." ERISA § 3(34) (emphasis added). A "defined benefit plan" is defined as any plan "other than an individual account plan."ERISA § 3(35). However "hybrid" in design a **cash balance** plan may be, it remains subject to a regulatory framework that is in many regards rigidly binary. Because the individual accounts, and the employer contributions and the interest credits to those accounts, are all hypothetical under a **cash balance** plan, it is classified as a defined benefit plan.

**\*7***Id.* at 159 n. 6. The *Esden* Court's classification of **cash balance** plans can be problematic for regulatory purposes because courts must treat **cash balance** plans, which share many attributes with defined contribution plans, as defined benefit plans. Applying the regulatory requirements for defined benefit plans to **cash balance** plans thus occasionally becomes an exercise in fitting a square peg into a hole that is more round than square.

Nevertheless, the clear import of *Esden's* holding is that the age discrimination provision for defined benefit plans, ERISA § 204(b)(1)(H)(i), applies to SNET's **cash balance** plan.[FN5]That provision provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."ERISA § 204(b)(1)(H)(i). ERISA does not define "the rate of an employee's benefit accrual," but defines "accrued benefit" as "an annual benefit commencing at normal retirement age ."*29 U.S.C. § 1002(23)(A).*

> FN5. If the age discrimination provision for defined contribution plans applied to SNET's plan, then it would not be age-discriminatory. That provision provides that "[a] defined contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which

amounts are allocated to the employee's account is not reduced, because of the attainment of any age."ERISA § 204(b)(2)(A). Under SNET's plan, the "allocations to the employee's account," do not decrease with the attainment of age.

The court in *In re Citigroup Pension Plan ERISA Litig., 470 F.Supp.2d 323 (S.D.N.Y.2006),* accurately framed the issue as one of statutory interpretation:

The crux of the age discrimination issue is the definition of the "rate of an employee's benefit accrual" as it is used in section 204(b)(1)(H)(i) of ERISA. If the phrase refers to an employee's retirement benefit (output), as plaintiffs contend, then **cash balance** plans are discriminatory because they afford younger employees higher rates of benefit accrual than their similarly situated older counterparts. However, if the phrase refers to the employer's annual contributions to the hypothetical accounts (inputs), then there is no discrimination. Plaintiffs argue that the relevant "benefit" is the overall benefit an employee receives upon retirement (i.e., the annuity at normal retirement age). Under this interpretation, in order to avoid age discrimination, the rate at which a participant accumulates her retirement benefit cannot decrease as she ages. Defendants, however, contend that "the presence or absence of age discrimination should be measured based on the change in participant's **cash balance** account from year to year, rather than the total value of the annual contributions to the account at retirement age."Under this view, using annual allocations of interest and pay credits as the relevant paradigm, as long as the employer makes ever-increasing contributions to accounts, there is no ERISA violation.

*Id.* at 341.

In considering the claim plaintiffs raise in Count I, I do not write on a clean slate. Although the Second Circuit has yet to decide the issue,[FN6] several other district courts and circuit courts of appeal have weighed in on whether **cash balance** plans are age-discriminatory, and more specifically, whether the interest credit structure of **cash balance** plans violates ERISA § 204(b)(1)(H)(i). The courts are split.

> FN6. Guidance may be forthcoming. The Second Circuit will soon hear an appeal in *Hirt v. Equitable Retirement Plan for*

Case 3:01-cv-02361-MRK     Document 267-3     Filed 02/08/2008     Page 8 of 13

Slip Copy                                                                                                      Page 7
Slip Copy, 2008 WL 222558 (D.Conn.)
(Cite as: Slip Copy)

*Employees, Managers & Agents,* 441 F.Supp.2d 516 (S.D.N.Y.2006), a decision upholding a **cash balance** plan as not age-discriminatory.

**\*8** Several courts have interpreted the "rate of an employee's benefit accrual" to mean the rate of change in the total the overall benefit a participant receives upon retirement. *Parsons,* 2006 U.S. Dist. LEXIS 93135; *In re Citigroup Pension Plan ERISA Litig.,* 470 F.Supp.2d 323; *In re J.P. Morgan Chase* **Cash Balance** *Litig.,* 460 F.Supp.2d 479; *Richards v. FleetBoston Financial Corp.,* 427 F.Supp.2d 150 (D.Conn.2006). Those courts held that the terms "benefit accrual" and "accrued benefit" are linguistically similar, and thus, synonymous. They then applied ERISA's definition of "accrued benefit," as defined earlier in the statute, to the term "benefit accrual" as used in the age discrimination provision (i.e. "annual benefit commencing at normal retirement age"). Following that approach, SNET's plan would be clearly age-discriminatory because the plan will, for example, pay a worker who joined the company at age twenty-five forty years worth of interest payments upon retirement, and will pay a worker who joined the company at age sixty only five years worth of interest payments upon retirement.

A majority of courts, and the only circuit courts of appeal that have considered the issue, however, have held that "the rate of an employee's benefit accrual" refers to the change in the participant's **cash balance** account from year to year, rather than the annual benefit commencing at normal retirement age. *Register v. PNC Financial Services Group, Inc.,* 477 F.3d 56 (3d Cir.2007); *Cooper v. IBM Personal Pension Plan,* 457 F.3d 636 (7th Cir.2006); *Drutis v. Rand McNally & Co.,* 499 F.3d 608 (6th Cir.2007); *Drutis v. Quebecor World (USA), Inc.,* 459 F.Supp.2d 580 (E.D.Ky.2006); *Hirt,* 441 F.Supp.2d 516; *Laurent v. PriceWaterhouseCoopers LLP,* 448 F.Supp.2d 537 (S.D.N.Y.2006); *Tootle v. ARINC, Inc.,* 222 F.R.D. 88 (D.Md.2004); *Eaton v. Onan Corp.,* 117 F.Supp.2d 812 (S.D.Ind.2000); *Bryerton v. Verizon Communs. Inc.,* 2007 U.S. Dist. LEXIS 29488 (S.D.N.Y.2007); *Walker v. Monsanto Co. Pension Plan,* 2007 U.S. Dist. LEXIS 67704 (D.Ill.2007); *Wheeler v. Pension Value Plan,* 2007 U.S. Dist. LEXIS 17608 (D.Ill.2007); *Buus v. WaMu Pension Plan,* 2007 U.S. Dist. LEXIS 95729 (D.Wash.2007); *Tomlinson v. El Paso Corp.,* 2007 U.S. Dist. LEXIS 20766 (D.Colo.2007); *see also Charles v. Pepco Holdings, Inc.,* 513 F.Supp.2d 47 (D.Del.2007).

Those courts employed several interpretive theories to reach the conclusion that "accrued benefit" and "benefit accrual" have different meanings.

Several canons of statutory interpretation are instructive. First, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended," *Jama v. Immigration & Customs Enforcement,* 543 U.S. 335, 357 (2005). Because Congress used (and defined) the term "accrued benefit" in one section of the statute, and used the term "benefit accrual" (without definition) in another part of the statute, the two terms represent different concepts.

**\*9** Second, two other somewhat related canons apply here: (1) statutes should be interpreted "in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608 (1979); and (2) statutes should "be interpreted in a way that avoids absurd results." *United States v. Venturella,* 391 F.3d 120, 126 (2d Cir.2004). Plaintiffs' argument in Count I is largely based on a "technicality;" **cash balance** plans are not actually age-discriminatory; [FN7] they merely account for the time value of money. Indeed, allowing interest to grow and compound throughout the course of an employee's career is a "means to *avoid* age discrimination." *Cooper,* 457 F.3d at 641 (emphasis in original).

> FN7. The *Cooper* Court articulated, in some detail, how and why **cash balance** plans are not actually age-discriminatory. 457 F.3d at 640.

Moreover, holding that **cash balance** plans are age-discriminatory would be an absurd result, because **cash balance** plans are functionally equivalent to defined contribution plans, at least with respect to accruing benefits. As the Seventh Circuit noted in *Cooper,* the difference between **cash balance** plans and defined contribution plans is semantics with respect to whether the plans discriminate based on age:

Interest in a defined-contribution plan is real, while interest credits in a defined-benefit plan are bookkeeping entries (effectively debt obligations of the employer to the extent that the pension trust fund does not cover them). But so what? [Defendant] does not contend that its plan is governed by § 204(b)(2)(A), just that § 204(b)(1)(H)(i) does not

whimsically require a court to find age discrimination for a defined-benefit plan when materially identical statutory language allows functionally identical defined-contribution plans to operate without any taint of discrimination. To say that defined-benefit and defined-contribution plans are governed by different subsections of ERISA is not to say that what is lawful for one must be forbidden to the other. We conclude that § 204(b)(1)(H)(i) and § 204(b)(2)(A) indeed provide similar treatment with respect to claims of age discrimination.

*Id.* at 641.In so holding, the *Cooper* court interpreted ERISA § 204(b)(1)(H)(i), at least with respect to **cash balance** plans, to be the functional equivalent of ERISA § 204(b)(2)(A).

I similarly hold that the interest credit formula of SNET's **cash balance** plan is not actually age-discriminatory, and that it merely accounts for the time value of money. As set forth in greater detail below, an employee's benefits are not calculated based upon whether that employee is older or younger, but are instead calculated based upon whether he is a newer or more senior employee. The critical determinant of an employee's benefits are his years to retirement, not his age. The fact that age may often have a loose correlation with an employee's years to retirement does not necessarily make a plan age-discriminatory. In fact, a **cash balance** plan would more likely violate ERISA § 204(b)(1)(H)(i) if it did not account for the time value of money.

**\*10** I also hold that it would make little sense to conclude that SNET's **cash balance** plan runs afoul of ERISA § 204(b)(1)(H)(i) when a functionally identical plan would not run afoul of ERISA § 204(b)(2)(A). I acknowledge that, in so holding, I am effectively applying ERISA § 204(b)(2)(A) to a **cash balance** plan, which creates some tension with the Second Circuit's footnote in *Esden*, noting that ERISA's framework is "rigidly binary." But to hold otherwise would be to apply blindly the age-discrimination framework for traditional defined benefit plans to **cash balance** plans when (a) SNET's plan is not actually age-discriminatory, and (b) a functionally equivalent plan would not violate ERISA's requirements. Plaintiffs' claim in Count I is thus dismissed.

**B. Does the "Wear-Away Effect" Created By SNET's Conversion of its Plan From a Traditional Defined Benefit Plan to a *Cash Balance* Plan Violate the Age**

*Discrimination Prohibition of ERISA § 204(b)(1)(H)(i)?*

As previously stated, ERISA's age discrimination provision for defined benefit plans provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."ERISA § 204(b)(1)(H)(i).

Plaintiffs allege that "[t]he 'wear-away' effect primarily affects older workers, who generally have greater frozen benefits under the [old plan] than younger workers. Older workers generally suffer longer wear-away periods on account of age."Second Amended Compl. at ¶ 55. Plaintiffs continue that "an older worker has to wait more years after the conversion to the **cash balance** formula to actually begin earning new retirement benefits.... This is because the Plan has caused the older worker's benefit accrual to cease until his **cash balance** account exceeds his frozen benefit under the Prior Formula."*Id.*

Plaintiffs' allegation that "an older worker has to wait more years after the conversion to the **cash balance** formula to actually begin earning new retirement benefits," however, is not accurate. The "wear-away" period is not necessarily longer for older workers; it is longer for workers that have greater frozen benefits.[FN8] Under the old plan, the size of a worker's frozen benefits is a function of a worker's salary and years of service, not his age. *See* Second Amended Compl. at ¶¶ 22-23. Because a workers' frozen benefits are not a function of the worker's age, the size of the "wear-away effect" is not a function of the worker's age. For example, the size of the "wear-away" period for an older worker with a given salary and years of service will not be greater than the length as a younger worker's "wear-away" period with the same salary and years of service to the company. Indeed, a participant's age, as opposed to his salary and years of service, has no impact on the length of the "wear-away" period.[FN9]

FN8. The size of a worker's frozen benefit may be loosely correlated with age because older workers tend to have more years of service, but a worker's age is not the "trigger" that decreases benefits. "Congress expressly permitted the rate of benefit accrual (however it is measured), to decline

over time as long as the decline is tied to the participant's years of service rather than the participant's age (and despite the one-to-one correlation of age and years of service)." *Eaton, 117 F.Supp.2d at 831-32.*

FN9. Plaintiffs have not alleged an actual "wearing away" of benefits, as opposed to a front-loading of benefits. As previously described, a participant's permanent enhanced benefit is determined by the participant's former benefit as calculated under the old plan, plus an additional ten percent.

**\*11** Moreover, employees are not actually "losing" benefits during the "wear-away" period. SNET chose to calculate the permanent enhanced benefit by starting with an employee's account balance under the old defined benefit plan, and increasing the balance immediately by ten percent. If SNET had chosen to evenly distribute the ten percent increase over the period of time during which the value of an employee's **cash balance** account caught up to the permanent enhanced benefit, then an employee's benefits would not remain stagnant, but would constantly increase (even if at a lower rate than the employee was previously receiving under the old plan).[FN10] SNET should not be penalized for front-loading the ten percent increase in benefits, as opposed to spreading that ten percent increase out over a period of years. Accordingly, plaintiffs' age discrimination claim in Count II is dismissed.

FN10. It is important to note that it is not necessarily illegal for a company to cut retirement benefits. It is only illegal to cut retirement benefits in a manner that violates ERISA.

**C. *Does the "Wear-Away Effect" Violate ERISA's Anti-Backloading Provisions Contained in ERISA § 204(b)(1)(B)?***

ERISA's backloading provision provides that:

A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age

under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

ERISA § 204(b)(1)(B). The Second Circuit has held that this section "requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any previous year by more than 33%." *Esden, 229 F.3d at 167 n. 18.* ERISA's anti-backloading provision is primarily designed to "prevent attempts to defeat the objectives of the minimum vesting provisions" by "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." *Langman v. Laub, 328 F.3d 68, 71 (2d Cir.2003)* (quoting H.R.Rep. No. 93-807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688)."In other words, the test applies to how a given plan operates at a given time and prevents it from being unfairly weighted against shorter-term employees." *Id.* Significantly, however, the statute also provides that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." ERISA § 204(b)(1)(B)(i).

In Count III, plaintiffs assert that the **cash balance** plan violates the 133 1/3 percent rule because participants effectively fail to accrue any benefits during the "wear-away" period, and thus any additional accrual after the "wear-away" period is an increase in their rate of benefit accrual exceeding thirty-three percent.

**\*12** Plaintiffs' claim, however, does not account for ERISA § 204(b)(1)(B)(i), which requires courts, for backloading purposes, to treat any plan amendment as "in effect for all other plan years." *Id.* When SNET's plan amendment is considered to be in effect for all other plan years, participants would have no benefits under the old plan, and would thus have no permanent enhanced benefit. Without a permanent enhanced benefit, participants would experience no "wear-away" period. *See Richards, 427 F.Supp.2d at 171* ("If the Amended Plan is treated as having been in effect for all plan years, employees such as Richards would never have accrued a benefit under the Traditional Plan, and

would have started accruing benefits under the **cash balance** formula from the start of their employment. Assuming such a scenario, such employees would suffer no backloading of benefits."). SNET's **cash balance** formula, when considered without regard to the plan it replaced, it is not backloaded-to the contrary, benefits, in the form of service and interest credits, accrue steadily and constantly throughout a participant's career. Indeed, if anything, the new **cash balance** plan is significantly less backloaded than the prior traditional defined benefit plan.[FN11]Because SNET's new plan, if in effect for all other plan years, is not backloaded, plaintiffs' claim in Count III is dismissed.

> **FN11.** The former plan was substantially weighted towards older employees because it awarded benefits based on an employee's salary and years of service, which are typically greatest during the employee's final years of employment.

**D.** *Did SNET's SPD Comply With ERISA's Disclosure Requirements?*

ERISA provides that a summary plan description:

shall include the information described in subsection (b), shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 104(b)(1) [29 USCS § 1024(b)(1) ].

29 U.S.C. § 1022(a). An SPD, however, need not "anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status."*Estate of Becker v. Eastman Kodak Co.,* 120 F.3d 5, 9 (2d Cir.1997); *see also Stahl v. Tony's Bldg. Materials, Inc.,* 875 F.2d 1404, 1408 (9th Cir.1989) (holding that an SPD "need not discuss every imaginable situation in which such events or actions might occur, but it must be specific enough to enable the ordinary employee to sense when there is a danger that benefits could be lost or diminished").

In this case, SNET's SPD explains with clarity and in detail how the plan works. Specifically, the SPD explains how the plan is funded, how eligibility is determined, how each participant's opening **cash account balance** is calculated, how participants earn service credits and interest credits, how the annuity is paid out, the effect on the spouse after a participant's death, and various tax consequences of the plan. Button Aff. ex. E. Perhaps most significantly, the plan explains, in detail, the "greater of" option. The SPD states that **"[i]f you are eligible for the [permanent enhanced] benefit, you will be entitled to the greater of your CBPA benefit or your [permanent enhanced] benefit when you terminate employment."***Id.* at 30 (emphasis in original). There is no question that the SPD reasonably apprises the participants and beneficiaries of their rights and obligations under the plan.

**\*13** Plaintiffs assert, in their complaint, that the SPD failed to "adequately describe, in a manner calculated to be understood by the average plan participant, that the **cash balance** formula discriminates based on age and leaves many plan participants with long periods of time under which they accrue no new benefits."Second Amended Compl. at ¶ 65. I have already held, however, that the interest credit provision of the plan is not age-discriminatory, that the "wear-away effect" is not age-discriminatory, and that, for backloading purposes, participants continue to accrue benefits during the "wear-away" period. It would thus be inconsistent to hold that SNET was required to inform its participants that the opposite was true. *See Register,* 477 F.3d at 73 (holding that an SPD did not improperly fail to notify participants that their **cash balance** plan was age-discriminatory when the plan was not, in fact, age-discriminatory).

Even if SNET's plan were age-discriminatory, plaintiffs' argument would still fail. The thrust of plaintiffs' argument is not that the SPD failed to "apprise the participants and beneficiaries of their rights and obligations under the plan," but instead, that the plan failed to comment on how the operation of the plan would affect certain participants as compared to other participants, and, essentially, that the SPD did not inform participants of potential legal challenges to the plan. ERISA, however, does not require a plan's SPD to make such disclosures. It only requires that the plan "be sufficiently accurate and comprehensive to reasonably apprise such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 11
Slip Copy, 2008 WL 222558 (D.Conn.)
**(Cite as: Slip Copy)**

participants and beneficiaries of their rights and obligations under the plan."29 U.S.C. § 1022(a). In this case, because the SPD reasonably apprises the SNET plan's participants and beneficiaries of their rights and obligations under the plan, plaintiffs have failed to state a claim in Count IV.

E. *Did SNET's Notice of Benefit Reduction Comport With ERISA?*

At the time of the plan amendment, ERISA provided that:
   A single-employer plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to-(1) each participant of the plan....

Consolidated Omnibus Budget Reconciliation Act of 1985, Title XI, § 11006, 100 Stat. 82 (1986). The Treasury regulations that existed at the time SNET amended its plan provided that the notice "need not explain how the individual benefit of each participant ... will be affected by the amendment."*Scott v. Admin. Comm. Of the Allstate Agents Pension Plan,* 113 F.3d 1193, 1200 (11th Cir.1997) (quoting 26 C.F.R. § 1.411(d)-6T (1996)).

SNET sent out a letter to its plan participants dated June 1995.FN12Button Aff. Ex. B at 1. SNET attached a document to the letter entitled, "Benefit Connections: A New Pension Plan for Employees Who Stay With SNET."*Id.* at 3. Like the SPD, that document sets forth the effective date of the plan amendment and explains, in detail, how the plan amendment works. *Id.* at 1-6.The notice explains how a participant's opening account balance is calculated, how interest and service credits accrue, how the permanent enhanced benefit is calculated, how the annuity is paid out, and how the "greater-of" option works. *Id.* The notice is replete with examples and charts. *Id.* In fact, with respect to the "wear-away effect," the notice even explained that a participant's permanent enhanced benefit would be greater than the **cash balance** account for three to four years, and that a retiring participant would receive his permanent enhanced benefit during that period. *Id.* at 5.

FN12. ERISA requires that section 204(h) notice be given to employees at least fifteen days before the effective date of the plan. In this case, SNET dated its notice "June, 1995," but did not include a specific date in June. The new SNET plan became effective July 1, 1995. It is thus unclear whether SNET's notice complied with the fifteen-day provision. Plaintiffs, however, do not allege that the notice was untimely, only that it was substantively insufficient.

**\*14** Plaintiffs nevertheless assert that SNET violated ERISA's notice provision by "touting the positive effects of the **cash balance** formula while concealing that it significantly decreases benefits when compared with the prior formula."Second Amended Compl. at ¶ 70. In other words, although the notice explained to participants how much they would earn under the new plan, the notice failed to explicitly mention that their benefits were actually decreasing, and that the new plan was bad for some of the participants. At least at the time of the plan amendment, however, ERISA § 204(h), did not require such a statement, but only "notice setting forth the plan amendment and its effective date...."*Id.*FN13In this case, the notice clearly met that standard. *See* Register, 477 F.3d at 73 (rejecting plaintiffs claim that the ERISA § 204(h) notice was flawed because it failed to explain to the participants that the conversion would "significantly reduce[ ] the rate of future pension plan benefit accruals for each plan participant.") The *Register* Court held that the "brochure set forth the plan amendment and the effective date. That explanation was all that was required. Contrary to appellants' argument, the Treasury Regulations at the time of the amendment were clear that PNC was not required to discuss 'how the individual benefit of each participant or alternate payee will be affected by the amendment.' "

FN13. In 2002, Congress Amended ERISA to require that a plan amendment "be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information ... to allow applicable individuals to understand the effect of the plan amendment."ERISA § 204(h)(2).*See also* Hirt, 441 F.Supp.2d at 531.

Because SNET's notice complied with ERISA § 204(h), plaintiffs' claim in Count V is dismissed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 12
Slip Copy, 2008 WL 222558 (D.Conn.)
**(Cite as: Slip Copy)**

F. *Did SNET Breach its Fiduciary Duties to the Plan Participants?*

ERISA § 404 provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries...."*29 U.S.C. § 1104.* The Second Circuit has held that "[a] plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan."*Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir.1994).* The Second Circuit has expanded the duty not to misinform to include material omissions, as well as affirmative statements. *Mullins v. Pfizer, Inc., 147 F.Supp.2d 95, 108 (D.Conn.2001)* (citing *Pocchia v. NYNEX, 81 F.3d 275 (2d Cir.1996)*)."For example, in *Becker v. Eastman Kodak, 120 F.3d 5 (2d Cir.1997),* the Second Circuit found a breach of fiduciary duty based partially on the fact that the benefits counselor failed to provide 'complete and accurate information' about the mechanics and timing of the election to retire."*Id.*

Plaintiffs allege, in Count VI, that SNET has misled plan participants "by downplaying or failing to mention the disadvantages and benefit reductions caused by the adoption of the **cash balance** formula, thereby causing the plan participants likely harm and/or causing them to rely on the misrepresentations or omissions to their detriment."Second Amended Compl. at ¶ 72. Plaintiffs allege that SNET provided only positive information about the new **cash balance** plan, listing advantages but no disadvantages of the plan.

**\*15** Plaintiffs do not assert a new factual predicate in Count VI. They only reassert the factual predicates for their claims in counts four and five: "By making these misrepresentations and/or omissions and by failing to comply with ERISA §§ 102 and 204(h) SNET and AT & T, Inc. have breached the fiduciary duties they owe to Plan participants under ERISA § 404."*Id.*

Courts have held, however, that "where ERISA itself specifies a notice requirement, courts must be especially cautious in creating additional ones."*Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 112 (1st Cir.2002); Bernstein v. Metro. Life Ins.*

*Co., 453 F.Supp.2d 554, 559 (D.Conn.2006).* Moreover, for reasons set forth in the two preceding sections, SNET's communications to its plan participants accurately described the operation of the plan. The communications did not affirmatively mislead the plan participants, nor did they give incomplete information about the operation of the plan. Plaintiffs' breach of fiduciary duty claim in Count VI thus fails.

**V. Conclusion**

For the foregoing reasons, none of the counts in plaintiffs' complaint states a claim upon which relief can be granted. SNET's motion to dismiss or, in the alternative, motion for summary judgment **(doc. # 47)** is GRANTED. The case is dismissed, and the clerk shall close the file.

It is so ordered.

D.Conn.,2008.
Custer v. Southern New England Telephone Company
Slip Copy, 2008 WL 222558 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.