# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JANICE C. AMARA,                    :
GISELA R. BRODERICK,                :
ANNETTE S. GLANZ,                   :
individually and on behalf          :
of all others similarly situated,   :
                                    :
                Plaintiffs,   :
                                    :
    vs.                           :    Civil No. 3:01-CV-2361 (MRK)
                                    :
CIGNA Corp. and                     :
CIGNA Pension Plan,                 :
                                    :
        Defendants.  :

## PLAINTIFFS' SUPPLEMENTAL POST-TRIAL BRIEF

Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Named Plaintiffs and
Plaintiff Class

# **Table of Contents**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Does CIGNA's Use of Variable Interest Rates to Compute Accrued
      Benefits Violate ERISA's 133⅓% Rule In Years When Decreases in
      Applicable Interest Rates Cause the Participant's Accrued Benefit to
      Grow Slowly or Not at All? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   What Evidence Have Plaintiffs Offered to Show that CIGNA's
      Wear-Aways Discriminate on the Basis of Age and Should an Inference
      Be Drawn Based on CIGNA's Failure to Produce the Data for "Large
      Group" Proof? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  What Are All the Reasons Why a Participant's Part A Annuity
      May Be Worth More Than a Lump Sum Distribution Under Part B?  . . . 14

IV.   Does Crocco v. Xerox Require Plaintiffs to Sue Both the Plan and Any
      Plan Administrator in an ERISA §502(a)(1)(B) Action? . . . . . . . . . . . . . 18

V.    Does the Record Indicate Whether or Not Mr. Beltz Drafted
      Benefit Election Forms? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AMA v. United Healthcare*, 2007 WL 1771498 (S.D.N.Y. 2007) .............. 19

*Barnett v. IBM*, 885 F. Supp. 581 (S.D.N.Y. 1995) .................................... 18

*Blickenstaff v. R.R. Donnelley & Sons*, 378 F.3d 669 (7th Cir. 2004) ........ 18

*Burstein v. Allegheny Health, Ed. & Resources Fdn.*, 263 F. Supp. 2d
  949 (E.D.Pa. 2002) ................................................................................ 19

*Chapman v. Choicecare Long Island Term Disability Plan*, 288 F.3d 506
  (2d Cir. 2002) ........................................................................................ 19

*Charles v. PEPCO*, 513 F. Supp. 2d 47 (D. Del. 2007) ............................ 3-4

*Colin v. Marconi Commerce System Retirement Plan*, 335 F. Supp. 2d
  590 (M.D.N.C. 2004) ............................................................................. 19

*Communications Workers of America v. Nynex Corp.*, 1997 WL 122869
  (S.D.N.Y. 1997) .................................................................................... 18

*Crocco v. Xerox*, 137 F.3d 105 (2d. Cir. 1998) .................................... 18-19

*Custer v. SBC*, 2008 WL 222558 (D.Conn. Jan. 28, 2008) .......................... 9

*Gray v. Great American Recreation Association*, 970 F.2d 1081 (2d Cir.
  1992) ..................................................................................................... 14

*Hall v. LHACO, Inc.*, 140 F.3d 1190 (8th Cir. 1998) ................................ 19

*Long Island Care at Home v. Coke*, 127 S. Ct. 2339 (2007) ................... 2, 7

*RIJ Pharm. Corp. v. Ivax Pharms, Inc.*, 322 F. Supp. 2d 406 (S.D.N.Y.
  2004) ..................................................................................................... 14

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002) ........................................................... 14

*Robinson v. Sheet Metal Workers' National Pension Fund, Part A*, __ F.3d __, 2008 WL 302610 (2d Cir. Feb. 5, 2008) ......................................... 15

## FEDERAL STATUTES AND REGULATIONS

ERISA §3(16)(A), 29 U.S.C. §1002(16)(A) ................................................. 20

ERISA §204(b)(1)(B), 29 U.S.C. §1054(b)(1)(B) ..................................... 1, 3

ERISA §204(b)(1)(H), 29 U.S.C. §1054(b)(1)(H) ..................................... 10

ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B) ................................. 18-19

ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) ................................................. 19

IRC §7805(b), 26 U.S.C. §7805(b) ............................................................. 8

Treas. Reg. 1.411(a)-11(c)(2)(i) ................................................................... 21

Treas. Reg. 1.411(b)-1(a)(1) ....................................................................... 7

Treas. Reg. 1.411(b)-1(b)(2)(ii)(A) ........................................................... 7

Treas. Reg. 1.417(e)-1(b)(2)(i) ................................................................... 21

Rev. Rul. 2008-7 (Feb. 1, 2008) ...................................................... 1-4, 7-8

## Introduction

Plaintiffs submit this Supplemental Post-Trial Brief to respond to the five

questions presented by the Court in the January 25, 2008 telephonic conference:

**I.    Does CIGNA's Use of Variable Interest Rates to Compute Accrued Benefits Violate ERISA's 133⅓% Rule In Years When Decreases In Applicable Interest Rates Cause the Participant's Accrued Benefit to Grow Slowly Or Not at All?**

The 133⅓% accrual rule in ERISA §204(b)(1)(B), 29 U.S.C.

§1054(b)(1)(B), requires that a plan's benefit formula or formulas satisfy an

accrual test either structurally and operationally. The structural and operational

terminology is derived from the IRS's guidance on the application of the accrual

rules and documents prepared by benefit consultants such as CIGNA's consultant

Mercer. See, e.g., Ex. 39 (IRS Alert Guidelines) at 10; Rev. Rul. 2008-7 (attached

as Ex. A) at 18; and Ex. 51 (Mercer). When a plan is designed to "always" comply

with an accrual rule (which Plaintiffs call "structural" compliance), it necessarily

complies with the rule on an operational basis in each year. For example, a Plan

that offers a benefit accrual rate of 1% of each year's pay will always comply with

the 133⅓% rule. Absent a demonstration that a Plan's formula always complies,

compliance must be demonstrated in each "particular plan year" by looking at the

difference between the accrued benefit at the end of the previous plan year and the

accrued benefit at the end of the current plan year. Compliance in one year, e.g.,

2002, does not mean that the plan will comply in later years. See, e.g., Rev. Rul. 2008-7 at 18.

Revenue Ruling 2008-7, which was issued on February 1, 2008, confirms Plaintiffs' position that compliance with the 133⅓% rule must be demonstrated by examining the "increase in the accrued benefit" expressed in the form of an annuity in the plan year. *Id.* at 9. Even "if the plan does not define the accrued benefit as an annual benefit commencing at normal retirement age," the benefit that "is tested to determine whether the plan satisfies the accrued benefit requirements" is the "annual benefit commencing at normal retirement age." *Id*. The "annual rate of accrual for a plan year is generally determined as the increase in the accrued benefit." *Id*.

As discussed further below, Plaintiffs do not mean to suggest that this Court should accept everything in this new Revenue Ruling. Far from it, the Ruling contains some controversial, lobbyist-inspired conclusions which Plaintiffs believe the Court should disregard as plainly erroneous and inconsistent with the statute and regulations under Long Island Care at Home v. Coke, 127 S.Ct. 2339, 2349 (2007).[1] But Plaintiffs submit that other parts of the Ruling's analysis are uncontroversial and entitled to deference.

---

[1] See Wall Street Journal, "Treasury Validates Some Pension Rollbacks," Feb. 4, 2008, A3 (attached as Ex. C).

In calculating whether a Plan's annual rates of accrual satisfy the 133⅓% test, ERISA §204(b)(1)(B)(iv) provides that "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year." The Treasury Department's new Revenue Ruling makes clear that in the case of a cash balance formula, the "relevant factors used to compute benefits" include both the "applicable interest rate" used to convert account balances to annuity form and the "interest crediting rate." Rev. Rul. 2008-7 at 2 and 9.

Although the statute requires that relevant factors be held constant "for all years after the current year," "changes in relevant factors" between the previous year and the current one are not disregarded. Rev. Rul. 2008-7 at 18. This distinction is very important. For example, if the applicable interest rate in 1997 is 6.0%, the participant's accrued benefit at the end of 1997 is determined with a 6.0% rate. But if the applicable interest rate in 1998 drops to 5%, the accrued benefit at the end of that year is determined with the 5% rate, with that rate held constant for future years. In such instances, the annual rate of accrual for 1998 determined on the basis of the "increase in the accrued benefit" between the end of 1997 and the end of 1998 can be zero or even a negative amount.

In <u>Charles v. PEPCO</u>, 513 F.Supp.2d 47 (D. Del. Sept. 19, 2007), a district

3

court glossed over the distinction between holding interest rates constant for future years and recognizing the effects of decreased rates between the previous and the current year. As a result, the district court appears to have concluded that decreases in interest rates under variable standards can never result in violations of the accrual rules. *Id*. at 51-53. The Treasury's new Ruling does not make the same mistake. It recognizes that holding interest rates constant in future years does not erase the effects on benefit accruals of "decreases" in rates between the previous year and the current one. Rev. Rul. 2008-7 at 18-19. In the event that changes in relevant factors affect the plan's accruals, the Ruling states that compliance must be tested each year and if those changes "result in a failure to satisfy the accrual rules, the plan's benefit formula would need to change." *Id.* at 18-19.[2]

Applying these principles, CIGNA's formula is not structured to always comply with the 133⅓% rule because the Plan's use of variable interest rates can potentially cause the rate of benefit accrual in annuity form to grow too slowly to satisfy the requirements of the 133⅓% rule. CIGNA also does not comply with the rule on an operational year-by-year basis because, as described below and at

---

[2]    The "example" in the Ruling addresses the effect of a decrease in interest credit rates. But the analysis and holding apply to any "changes in relevant factors." *Id*. at 18.

4

trial, the variable rates of interest that CIGNA uses have, in fact, caused

participants' rates of benefit accruals to be less in the years following the

conversion than the 133⅓% rule requires.

Mr. Poulin has shown that if a $1,000 per month annuity at the end of

1997 is converted to an opening account balance of approximately $27,900 with

a 6% applicable interest rate, the opening balance will convert back to an annuity

of only $640 per month if the applicable interest rate drops to 4.5%. Ex. 3

(Poulin Rpt.) ¶¶ 33-34; Ex. 4 (Poulin Suppl. Rpt.) ¶¶ 12-14; Tr. 445 line 14 -

446, line 24. As a result of decreases in the applicable interest rate, participants

may not accrue any additional retirement benefit in annuity form in the current

year. See also Tr. 210, line 16 - 211, line 5 ("If the interest rate that is used later

or if the prevailing interest rates decrease after the conversion, then it will be

difficult for the opening account balance to recreate the benefit that was

converted").

When Defendants' actuarial expert, Mr. Sher, testified about the effects of

decreases in interest rates, he agreed that falling interest rates have a "dramatic

impact" on benefits: "[W]hen you are converting the account to an annuity, the

lower the interest rate, the lower the annuity." Tr. at 1014, line 6 - 1015, line 8.

Mr. Sher also prepared spreadsheets which show how a participant's accrued

benefit expressed in annuity form decreases from plan year to plan year when interest rates decrease from the previous year and are held constant for all future years. In Ms. Glanz's case, Mr. Sher determined that her accrued benefit, expressed in annuity form at age 65, was $567 per month at the end of 1997, $512 at the end of 1998, $409 at the end of 1999, $795 in 2000, $879 in 2001, and that it dropped again to $677 in 2002. See Ex. 235, fourth page (under "Accd Age 65 Ben" and "Accd Age 65 Ben at conv old plan"); see also Tr. 1286, line 13 - 1288, line 24; Tr. 1304, lines 1-25.[3] Thus, even if accruals under the cash balance formula are considered by themselves on a year-by-year basis, Ms. Glanz has three plan years (1998, 1999 and 2002) when her accrued benefits did not increase from one year to the next as required by the 133⅓% rule.

As Mr. Poulin's and Mr. Sher's expert calculations demonstrate, when applicable interest rates fall from the rate applicable in the previous year and the reduced rate is held constant for all future years, the result can be a zero or even negative rate of accruals in the current plan year followed by positive rates in later years. This occurs even when the cash balance formula is tested alone. For this reason, Mr. Sher was careful not to express an opinion about CIGNA's compliance with the 133⅓% rule. Tr. 1290, line 5 - 1293, line 1. At trial,

---

[3] Similar decreases apply to Ms. Broderick over a period of six years. See Ex. 235, first page.

CIGNA presented no other defense witnesses or exhibits to support compliance or to counter the calculations performed by both the Plaintiffs' expert and CIGNA's own expert.

While recognizing that the Court can find a violation on the basis described above and that the standards for disregarding an agency interpretation of its own regulations are high, see <u>Coke</u>, supra, 127 S. Ct. at 2349, Plaintiffs submit that the Treasury's interpretation of the "special rule" on the "current amendment" in the same Ruling is "plainly erroneous and inconsistent with" the statute and the Department's regulations. In this regard, the Ruling first concedes that "a period of a zero annual rate of accrual followed by a period of positive annual rates" is "ordinarily" a violation. *Id*. at 12. But it then proceeds to disregard the interaction with benefits under the pre-conversion formula that produces the zero annual rate of accrual on the ground that "there is no ongoing accrual under the pre-conversion formula." *Id*. This is sophistry which is plainly erroneous and inconsistent under <u>Coke</u> because: (1) the "current amendment" provides for this interaction, (2) the Treasury regulation at 26 C.F.R. 1.411(b)-1(b)(2)(ii)(A), which repeats the statutory language, does not draw any such distinction, (3) the regulation on plans with two or more benefit formulas mandates, without qualification, that the formulas "must be aggregated" (Treas.

7

Reg. 1.411(b)-1(a)(1)), and (4) the same Revenue Ruling and accompanying press release recognize that the Treasury will now have to issue new proposed regulations and provide Internal Revenue Code "Section 7805(b) relief" in order to "allow separate testing of backloading with respect to the scenario under the revenue ruling" (*id.* at 20 and Feb. 1, 2008 release, attached as Ex. B). Indeed, in an earlier passage, the same Ruling recognized that "the total benefit provided by the interaction of the two formulas must accrue in a manner that satisfies" the accrual rule. *Id.* at 8.

The fundamental point here is that an interaction which is an integral and unmistakable part of the "current amendment" cannot be ignored without rewriting the amendment. To illustrate, suppose a "current amendment" provides that a participant will receive the greater-of his or her cash balance benefit or a previously-earned $100 per month benefit. If the participant's cash balance benefit is $99 or less, the effect of this amendment is to make nothing more payable to the participant.  The interaction with the protected benefit cannot be ignored without revising the Plan provision. Acting as though the interaction does not exist, e.g., pretending that a participant has accrued $99 when he or she has accrued nothing more, not only leads to a world of fantasy accruals, but it also disregards the statute's language and basic purpose, which is to ensure that

participants earn benefit accruals in each "particular plan year" which are "payable" at retirement and which fall within certain parameters. A "zero annual rate of accrual" means that nothing more is "payable" to the participant at retirement as a result of his or her participation in that particular plan year. That reality cannot be overcome with sophistry.[4]

If the Court believes that the Treasury's ruling on this point is not plainly erroneous or inconsistent with the statute and regulations, Plaintiffs respectfully submit that at least the same deference should be accorded to the parts of the Treasury's analysis discussed above which favor Plaintiffs' position when the progression of accrued benefits under the cash balance formula is considered without that interaction. For example, using Mr. Sher's calculations, Ms. Glanz's accrued benefits show a negative progression from $564 (or $567) per month at the end of 1997 to $512 per month in 1998, $409 in 1999, with another negative

---

[4] Plaintiffs relatedly call the Court's attention to Custer v. SBC, 2008 WL 222558 (D.Conn. Jan. 28, 2008), which reached the same conclusion as the Revenue Ruling. In Custer, Judge Underhill decided that if the current Plan provision interacts with benefits under a previous formula and the Plan provision is "treated as in effect for all other plan years," then "participants would have no benefits under the old plan." Id. at *12. As with the Ruling, Plaintiffs submit that Judge Underhill's approach rewrites an integral term of the current Plan and ignores the all-too-real impact of the amendment on participants. In doing this, Custer, like the Ruling, disregards the basic statutory requirement that participants like Ms. Glanz and Ms. Broderick must earn an additional accrued benefit in "each plan year" that is "payable" in their retirement.

year of accruals in 2002. Exs. 234, first page and 235, fourth page.[5]

## II.    What Evidence Have Plaintiffs Offered to Show that CIGNA's Wear-Aways Discriminate on the Basis of Age and Should an Inference Be Drawn Based on CIGNA's Failure to Produce Data for "Large Group" Proof?

The periods of wear-away under CIGNA's Part B plan violate the age

discrimination rule in ERISA §204(b)(1)(H) because the duration of the wear-

away depends on factors that are correlated with age. Mr. Poulin's analysis

showed that the Plan's wear-away design results in longer cessations of benefit

accruals for older employees like Ms. Amara, Ms. Broderick, and Ms. Flannery

because the differences between the value of older employees' previously-earned

annuity and their account balances are larger than for younger employees, which

leads to longer "wear-aways." Tr. 222, line 6 - 224, line 16; Tr. 229, line 5 - 233,

line 17; Ex. 4 (Poulin Suppl. Rpt.) ¶¶21-30. Mr. Poulin testified that "[t]he

longest duration of wearaway will be for older long service employees as

opposed to younger short service employees" and that "[i]n general, the greatest

impact is for those people who are in their 50s." Tr. 222, line 6 - 223, line 22; Tr.

310, line 9 - 311, line 14 ("older employees had wearaway, that continued until

---

[5] If the "total benefit provided by the interaction of the two formulas" is considered instead, Mr. Poulin has shown that Ms. Glanz's accrual rate is zero for the first three plan years, rather than negative in 1998, 1999 and 2002 . Ex. 6 and Tr. 226, line 8 - 229, line 4. From either perspective, the 133⅓% rule is violated.

several–more than several years, six or seven years after December 31, 1997; whereas for younger employees [like Ms. Glanz and Mr. Charette], it was two or three years"). Mr. Poulin explained that this is because the difference between the value of their Part A benefit and their cash accounts is "larger" and the pre-retirement mortality discount has the "greatest impact" at older ages. Tr. 222, line 6 - 224, line 16; Tr. 270, line 15 - 271, line 21 ("the wearaway is most pronounced especially, for those employees who reach early retirement age of 55").

Using the persons who testified at trial, Plaintiffs offered examples which show how the benefits of relatively older employees with fairly typical service and salaries failed to grow for a number of years after the conversion. Ex. 4 ¶¶21-26. In Ms. Flannery's case, CIGNA's own printouts showed that her benefits failed to grow in lump sum form for over six years of employment. Pls. Prop. Findings ¶59 and Ex. 230 at P-1626 and 1627 (comparing cash balance of $86,862.19 with "minimum" lump sum of $89,079.49). Plaintiffs' expert also showed that Ms. Flannery's monthly annuity based on her service before 1998 was $813, while her cash balance account at the end of 2005 only converted to an annuity benefit of $756 per month.  Compare Ex. 156 at P1588 with Ex. 7. Defendants' expert, Mr. Sher, prepared a series of spreadsheets which further

illustrate how the wear-away periods are longer for older employees like Ms.
Broderick. Ex. 235; Tr. 1299, line 12 - 1300, line 4.

In internal documents which have been admitted into evidence, CIGNA
executives recognize that "employees earn little or no benefit in the first years
after a pension change while early retirement benefits are 'worn-away' by the
passage of time." Pls. Prop. Findings ¶¶86-87 and Exs. 40-41; see also ¶¶134-35;
Ex. 54 ("disadvantage" of cash balance is that "Employees closer to retirement
can't accumulate sufficient assets to replicate the DB benefit at the same age"). As
Mr. Poulin testified, younger, shorter-service employees, by contrast, experience
little or no wear-away periods.  Ex. 3 (Poulin Rpt.) ¶27; Pls. Prop. Findings ¶¶69-
70 and 157.

In response to Plaintiffs' Proposed Findings on this subject, CIGNA
admitted that wear-aways are "more likely" for participants who are eligible for
early retirement and that "early retirement eligibility is a function of age." Defs.
Resp. to Pls. Prop. Findings ¶¶70 and 134. In effect, Defendants conceded that
participants over age 45 and especially over age 55 are "more likely" to experience
substantial periods of wear-away.

Without offering any evidence itself, CIGNA faults Plaintiffs for not doing
"large group" comparisons. Defs. Br. at 28. But in discovery, Plaintiffs asked for

classwide data to do such comparisons to further prove that older participants
"have protected benefits in excess of their cash balance account" for longer
periods than younger employees. Pls. Prop. Findings ¶66; see Exs. 34 (Req. No. 4)
and 179 (Req. No.19). In particular, Plaintiffs requested minimum benefit amounts
and opening account balances, ledgers of cash balance pay and interest credits
since that time, including accumulated account balances, data about early
retirement eligibility, and data about the forms of benefit offered and the benefit
amount elected.  CIGNA did not produce the requested data despite Plaintiffs'
Motion to Compel and two Rule 30(b)(6) depositions (the minimum benefit and
opening account balances were missing for approximately 9,400 individuals in the
class list, as was much of the pay and interest credit data, the accumulated cash
balances, and the early retirement information). Plaintiffs' pre-trial motion for
adverse inferences clearly stated that CIGNA did not produce the data needed to
show "wear-aways" on a plan-wide basis.  Dkt. # 199 (8/31/2006) at 9. In addition
to examining the wear-away periods for employees like Ms. Glanz who moved out
of the wear-aways before their employment ended, Plaintiffs' expert could have
used the data to further prove that older employees are more likely than younger
employees to have minimum benefits at termination of employment that exceed
the value of the cash balance account.

13

Because the requested data was not produced and CIGNA did not offer any inconsistent evidence and effectively conceded what the data would show, it is appropriate for this Court to draw an adverse evidentiary inference against Defendants. Where the "breach of a discovery obligation is the non-production of evidence," a district court has the discretion "to proceed with the trial and give an adverse inference instruction." Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002). In Gray v. Great American Recreation Ass'n, 970 F.2d 1081, 1092 (2d Cir. 1992), the Second Circuit held that the "non-appearance of a litigant at trial or his failure to testify as to facts material to his case as to which he has especially full knowledge creates an inference that he refrained from appearing or testifying because the truth, if made to appear, would not aid his contention." See also RIJ Pharm. Corp. v. Ivax Pharms, Inc., 322 F.Supp.2d 406, 419 (S.D.N.Y. 2004) ("where a party fails to provide relevant information within its control...the Court may infer that the information, if disclosed, would be harmful to the party who fails to provide it").

## III.    What Are All the Reasons Why a Participant's Part A Annuity May Be Worth More Than a Lump Sum Distribution Under Part B?

If a participant elects a lump sum distribution under Part B, he or she may not receive the full value of the prior plan's annuity benefit for five reasons:

First, if the participant is eligible for early retirement, he or she will not

14

receive any of the value of the Plan's "subsidized" early retirement benefit. Ex. 3 (Poulin Rpt) ¶¶ 24-29; Tr. 211, line 23 - 212, line 13. Even though participants are not familiar with the term, actuaries characterize the reductions in an annuity benefit for early retirement as "subsidized" if they offer more than the actuarial equivalent of the age 65 benefit. For example, the 21 to 25% reductions that applied under the Tier 1 and Tier 2 Part A formulas for employees eligible for early retirement are much less than an actuarially-equivalent reduction, which would reduce the benefit by closer to 50%. Tr. 224, line 23 - 225, line 13. It is undisputed that the value of this early retirement benefit is not included in the Part B Plan except as part of the "protected" annuity benefit. Defs. Resp. to Pls. Prop. Findings ¶26. If a participant elects a lump sum distribution under Part B, that value is never paid.

Second, a participant who elects a lump sum under Part B will not receive any of the value of the Social Security supplements which were payable under the Tier 1 and Tier 2 formulas between age 55 and ages 62 or 65 to individuals who were early retirement eligible. Ex. 4 (Poulin SupplRpt), ¶37-38; Tr. 212, line 14 - 213, line 2.[6]

---

[6] As the Court recognized at trial, CIGNA's Plan protects the value of the Social Security supplement, thereby waiving any argument that the supplement could have been eliminated at the conversion. Compare Robinson v. Sheet Metal Workers' Nat. Pension Fund, Part A, __ F.3d __, 2008 WL 302610 (2d Cir. Feb. 5,

Third, a participant who elects a lump sum under Part B will not receive the value of the "Free 30%" benefit that was available under Tier 1 formula. See Ex. 3 (Poulin Rpt) ¶¶28 and 37 and Ex. 4 (Poulin SupplRpt) ¶34; see also Tr. 212, line 14 - 20. At trial and in their post-trial brief, Defendants' counsel confusingly assert that the Plan's provisions can be interpreted to include the value of the Free 30% survivor's benefit in the lump sum.   Defs. Br. at 111-12; Tr. 1540, line 19 - 1543, line 24. But CIGNA never did this. Doing it would have required CIGNA to import both the data for the Free 30% calculations and Free 30% calculation routines into the pension administration system for Part B. Mr. Arko testified that CIGNA did not carry the Free 30% benefit over into Part B. Ex. 195 (Arko 4/2006 Depo) at 109-112. Indeed, Ms. Broderick was the first Part B participant who CIGNA had ever paid the Free 30% benefit and she received it in annuity form. Ex. 172. Aside from counsel's assertion (which is not evidence), CIGNA offered no evidence that it ever considered much less adopted such an interpretation.

Fourth, a participant who elects a lump sum under Part B will receive an amount that has been reduced by a pre-retirement mortality discount that does not apply to the annuity form. CIGNA does not dispute that it reduced the value of the Part B account balances compared with the Part A annuities by applying pre-

_____

2008).

16

retirement mortality discounts to compute the opening cash balance accounts. Ex. 3 ¶32; Ex. 4 ¶15. When participants elect lump sum distributions, the pre-retirement mortality discounts are never re-credited or otherwise restored. If a participant chooses the Part A annuity at retirement, no pre-retirement mortality discount is applied. As Mr. Poulin testified, the difference can be as much as 10% of the value. Tr. 211 lines 6-22.

Fifth, CIGNA's use of account balances, variable interest crediting rates and variable conversion interest rates effectively converts the Part A annuity from a stable source of retirement income to an unstable and less predictable source. As Mr. Upton testified, the investment risk which the annuity form places on the employer is effectively transferred to the participant. Tr.  667, line 19 - 668, line 13. When the interest crediting rate and the applicable interest rates fall, lump sums no longer translate into the same annuity. Ex. 3 (Poulin Rpt) ¶¶33-34 and Ex. 4 (Poulin SupplRpt), ¶¶12-14; see also Tr. 210, line 16 - 211, line 5. By electing a lump sum under Part B, the participant also loses the protection against future interest fluctuations that the annuity form provides. If interest rates fall, as they generally have since 1997, the lump sum distributions will not generate the same monthly income in retirement as the annuity.

**IV.    Does <u>Crocco v. Xerox</u> Require Plaintiffs to Sue Both the Plan and Any Plan Administrator in an ERISA §502(a)(1)(B) Action?**

In <u>Crocco v. Xerox</u>, 137 F.3d 105, 107 (1998), the Second Circuit stated, "In <u>Leonelli v. Pennwalt Corp.</u>, 887 F.2d 1195 (2d Cir. 1989), we held that, 'in a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable.'" Plaintiffs submit that this ruling indicates that Plaintiffs can sue either the Plan or the Plan administrator or the trustees. In most benefit cases, Plaintiffs only sue the Plan and complete relief is provided if they prevail. Indeed, before <u>Crocco</u>, there were decisions holding that the only possible defendant in a Section 502(a)(1)(B) action is the Plan.  See, e.g., <u>Communications Workers of Am. v. Nynex Corp.</u>, 1997 WL 122869, *4 (S.D.N.Y. 1997) (Section 502(a)(1)(B) "entitles the plaintiffs to bring an action to recover benefits only against a plan as an entity"); <u>Barnett v. IBM</u>, 885 F.Supp. 581, 591 (S.D.N.Y. 1995) ("ERISA only authorizes suits for benefits against the plan itself").[7]

In <u>Crocco</u>, the Second Circuit held that plan administrators could also be defendants in a Section 502(a)(1)(B) claim. The Plan itself was not sued in <u>Crocco</u> so the Second Circuit could not possibly have meant that both the Plan and the

---

[7] The Seventh Circuit still follows this rule. See <u>Blickenstaff v. R.R. Donnelley & Sons</u>, 378 F.3d 669, 674 (7th Cir. 2004) (§502(a)(1)(B) "generally is limited to a suit against the Plan").

Plan administrator had to be sued. Other decisions have since found it sufficient to sue either party. See, e.g., Chapman v. Choicecare Long Island Term Disability Plan, 288 F.3d 506, 509-10 (2d Cir. 2002) (following Leonelli and Crocco in holding that the Plan by itself is a proper defendant); AMA v. United Healthcare, 2007 WL 1771498 *22 (S.D.N.Y. June 18, 2007) (a §502(a)(1)(B) action can be brought "only against the plan or the administrators or trustees"). Indeed, Hall v. LHACO, Inc., 140 F.3d 1190, 1196 (8th Cir. 1998), holds that a Section 502(a)(1)(B) action cannot be brought against an administrator such as Mr. Beltz who "is no longer associated with the Plan."[8]

Thus, contrary to Defendants' argument, former administrators like Mr. Beltz cannot be indispensable defendants in a Section 502(a)(1)(B) action. Because either the Plan or a Plan administrator or a trustee can be sued in an ERISA §502(a)(1)(B) claim, the CIGNA Pension Plan is a proper defendant which can be held liable for Plaintiffs' disclosure claims under §502(a)(1)(B).[9]

---

[8] Accord, Colin v. Marconi Commerce Sys. Ret. Plan, 335 F.Supp. 2d 590, 598 (M.D.N.C. 2004); Burstein v. Allegheny Health, Ed. & Res. Fdn., 263 F.Supp. 2d 949, 963-64 (E.D.Pa. 2002).

[9] In Crocco, the Second Circuit further noted that the employer is a proper defendant, even if the employer is not the Plan administrator, if the claim "request[s] injunctive or other equitable relief under ERISA §502(a)(3)." 137 F.3d at 107 n.2. It is undisputed that CIGNA is a defendant in this action in its capacity as the employer and Plan administrator and that Plaintiffs are requesting injunctive or equitable relief under §502(a)(3), in addition to relief under §502(a)(1)(B).

**V.     Does the Record Indicate Whether or Not Mr. Beltz Drafted Benefit Election Forms?**

Although Plaintiffs did not make a specific point of this, the record indicates that the benefit election forms and explanatory materials were <u>not</u> prepared by Mr. Beltz, who CIGNA asserts must be considered the "Plan administrator" under ERISA §3(16)(A). As with the November 1997 Newsletter, the Retirement Information Kit and the Summary Plan Descriptions, the record shows that the benefit election forms were prepared, distributed and processed by CIGNA and its agents. In this case, the election forms were the responsibility of plan specialists operating out of Hartford who worked for CIGNA and since Prudential's acquisition of CIGNA's retirement division now work for Prudential under an administrative services contract to continue to assist CIGNA with administration of the Plan. See Poulin Ex. H; Stratman Tab 8; Exs. 38, 46, 162 (draft distribution package with CIGNA Retirement and Investment Services heading), and 164 (March 13, 2006 draft notice of "relative values" with "Prudential Financial" heading).

The plan specialists in Hartford report to Lorraine Morris, the 30(b)(6) representative for Prudential who testified at trial pursuant to a subpoena. Ms. Morris testified that Prudential was responsible for preparing benefit election forms that disclose unequal options. Tr. at 805, line 5 - 818, line 25 ("we

20

[Prudential] would ensure that they would get whichever relative value disclosure is appropriate"). A Pension Activity Log dated August 2005 states that Ms. Morris is the "lead" person on the "Relative Value" project, which involves "chang[ing] the disclosure to advise the participants that the forms of annuity all are of equal value." See Ex. 166 at SUPPD15446.

In addition, regardless of who is sued for the relative value disclosure claim (the Plan, CIGNA, Mr. Beltz, Ms. Morris, or all of the above), the consequence of a violation of the Treasury regulations is the same: "No consent is valid" unless the participant receives an explanation of the relative values of the optional forms of benefit. Treas. Reg. 1.411(a)-11(c)(2)(i) and 1.417(e)-1(b)(2)(i). Thus, an election form that fails to make the required disclosures about the unequal value of benefit options is invalid, regardless of who was internally responsible for preparing it.

## Conclusion

For the foregoing reasons, Plaintiffs request that the Court enter judgment in their favor on these claims.

Dated: February 8, 2007

Respectfully submitted,

 s/ Stephen R.Bruce
Stephen R. Bruce Ct23534
Allison C. Caalim
805 15th St., NW, Suite 210
Washington, DC 20005
(202) 371-8013

 s/ Thomas G. Moukawsher
Thomas G. Moukawsher Ct08940
Moukawsher & Walsh, LLC
21 Oak St.
Hartford, CT 06106
(860) 278-7000

Attorneys for Named Plaintiffs and
Plaintiff Class

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing Plaintiff Class' Supplemental Post-

Trial Brief and this Certificate of Service were filed electronically through the

CM/ECF system on February 8, 2008. Notice of this filing will be sent by e-mail

to all parties listed below by operation of that system:

Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
Morgan, Lewis & Bockius
1701 Market St.
Philadelphia, PA 19103-2921

Christopher A. Parlo
Morgan Lewis & Bockius
101 Park Avenue
New York, NY 10178-0600

James A. Wade
Erin O'Brien Choquette
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103-3597

 s/ Stephen R.Bruce 
Stephen R. Bruce

Attorney for Plaintiffs