UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANICE C. AMARA, individually and on behalf of others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:01CV2361(MRK) |
| | : | |
| CIGNA CORPORATION and CIGNA PENSION PLAN, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

Since the mid-1980s, hundreds of U.S. employers have converted their traditional defined benefit pension plans into what are known as "cash balance" retirement plans. In fact, according to the Pension Benefit Guaranty Corporation, over 1,500 cash balance plans and other similar hybrid plans were in existence as of 2003, providing pension benefits to over 8 million participants, approximately one-quarter of the total employee population covered by defined benefit plans. *See* Pension Benefit Guaranty Corp., Pension Insurance Data Book 2004, at 59-60 (2005), *available at* http://www.pbgc.gov/docs/2004databook.pdf. Like many other corporations, CIGNA Corporation converted its traditional defined benefit plan to a cash balance plan, in 1998.

Despite their popularity among employers, cash balance plans have spawned considerable litigation. This case is yet another in a long list of cases challenging an employer's conversion to a cash balance retirement plan under the Employee Retirement Income Security Act ("ERISA").[1]

---

[1] *See, e.g.*, *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56 (3d Cir. 2007); *Campbell v. BankBoston, N.A.*, 327 F.3d 1 (1st Cir. 2003); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003); *Esden v. Bank of Boston*; 229 F.3d 154 (2d Cir. 2000); *Custer v. S. New Eng. Tel. Co.*, No. 3:05cv1444 (SRU), 2008 WL 222558 (D. Conn. Jan. 25, 2008); *Finley v. Dun & Bradstreet Corp.*, 471 F. Supp. 2d 485 (D.N.J. 2007); *Richards v. FleetBoston Fin. Corp.*, 427 F. Supp. 2d 150 (D. Conn. 2006); *Hirt v. Equitable Ret. Plan*, 441 F. Supp. 2d 516 (S.D.N.Y.

Plaintiffs consist of a class of current and former CIGNA employees who participated in CIGNA's traditional defined benefit plan before January 1, 1998 and have participated in CIGNA's cash balance plan since that time. *See* Memorandum of Decision [doc. # 61]. Plaintiffs and Defendants raise numerous class, sub-class, and individual claims and defenses. *See* Order Under Federal Rule 23(c)(1)(B) [doc. # 241] (listing the class, sub-class, and individual claims and defenses). At the risk of over-simplification, however, the central issues in this case may generally be described as follows: whether CIGNA's cash balance plan is age discriminatory or otherwise violates certain non-forfeiture and anti-backloading rules under ERISA; whether CIGNA gave the notices and other disclosures required by ERISA; and whether the information CIGNA provided its employees about the conversion and the cash balance plan in summary plan descriptions and other materials satisfied ERISA's requirements.

The questions raised in this case are vitally important to both employers and employees (and their families). Given how profoundly significant retirement plans and planning are to the great majority of Americans – employees and employers alike – this is one area where the answers should be clear, explicit, and definite. Regrettably, however, the answers to the issues raised by these parties are not entirely clear, in large measure due to the fact that ERISA, and the regulations under it, are often lamentably obscure – to describe them as a tangled web does not do them justice. On top of that, there are conflicting decisions around the country on identical issues, making planning for nationwide enterprises impossible. Difficult, time-consuming, and expensive litigation with

---

2006); *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323 (S.D.N.Y. 2006); *In re J.P. Morgan Chase Cash Balance Litig.*, 460 F. Supp. 2d 479 (S.D.N.Y. 2006); *Eaton v. Onan Corp.*, 117 F. Supp. 2d 812 (S.D. Ind. 2000). This is not the first case involving CIGNA's conversion. *See Depenbrock v. CIGNA Corp.*, 389 F.3d 78 (3d Cir. 2004).

uncertain results – such as this case represents – is assuredly not a sensible way to manage the Nation's retirement system for either employers or employees. Sadly, at least for now, litigation appears to be the only option available to them.

In this case, the Court conducted a bench trial over seven days, hearing testimony (live and via deposition) from more than a dozen witnesses and receiving into evidence over 800 exhibits. The parties submitted detailed stipulations, proposed findings of fact and conclusions of law, and pre-trial briefs, and following trial, they submitted post-trial briefs and proposed findings of fact and conclusions of law. The Court also held a lengthy oral argument following completion of post-trial briefing. Counsel for each side distinguished themselves throughout this case by their skillful advocacy, professionalism, and civility. The Court is grateful to each of them.

In accordance with Rule 52 of the *Federal Rules of Civil Procedure*, the Court makes the following findings of fact and conclusions of law. As a preface to those findings and conclusions, the Court would note that these are close questions of law, involving complex and technical regulations, and the facts underlying this case are also complicated and extensive. Risking over-simplification, the Court can summarize as follows its general findings and conclusions to the key issues noted above: CIGNA's Plan is not age discriminatory and does not violate the non-forfeiture and anti-backloading rules under ERISA; in effectuating the conversion to the cash balance plan, CIGNA did not give a key notice to employees that is required by ERISA; and CIGNA's summary plan descriptions and other materials were inadequate under ERISA and in some instances, downright misleading. ERISA gives employers substantial leeway in designing a pension plan, and the Court believes that CIGNA's Plan complies with the relevant statutory provisions. However, ERISA also emphasizes the importance of disclosure by employers to employees regarding the

details of the company's pension plan, to enable employees to plan for their retirement and to make decisions of profound importance for their lives. This is where CIGNA failed to fulfill its obligations; the company did not provide its employees with the information they needed to understand the conversion from a traditional defined benefit plan to a cash balance plan and its effect on their retirement benefits. As noted below, the Court will require further briefing on the issue of what remedies are required or appropriate in view of the Court's rulings on liability.

## I.    Factual Background

The summary that follows, which is based upon the facts adduced at trial, is intended to provide general background information needed to understand the parties' dispute. Further facts bearing directly on certain contested issues are discussed in later sections.

**Background Regarding Retirement Plans.**    A traditional defined benefit plan provides an eligible employee with an annuity (an annual benefit payable for the life of the employee) that is calculated as a percentage of the employee's salary multiplied by the employee's years of service. "Salary" may be defined as the highest salary the employee achieved, an average of the employee's salary over the last several years of service, or some other similar definition. For example, an employee might accrue a pension benefit beginning at age 65 of 1.5% of salary for every year of service; an employee who worked for the company for 30 years would then have an annual retirement benefit of 45% of salary. If a retirement plan defines "salary" as the employee's highest salary, then the employee's plan benefits would increase as the employee moves closer to retirement and enjoys the higher salary that typically comes with longer service. By design, participants in traditional defined benefit plans often earn most of their benefits in the last several years of service.

4

Also by design, the employer bears the risk of fluctuations in interest rates or the market over the life of the retired employee.

Traditional defined benefit plans often offer subsidized early retirement benefits, which encourage employees to remain with the company until the benefits are available and then to leave. A subsidized early retirement benefit is a benefit payable before normal retirement age (often as of age 55) that has an overall value that is greater than the present value of the benefit payable at normal retirement age (usually age 65). If the employee does not retire at the earliest opportunity to obtain the subsidized early retirement benefit – say, 55 – the value of that benefit diminishes with each passing year until it is completely lost as of the date of normal retirement – for example, by age 65.

By contrast to traditional defined benefit plans, defined contribution plans do not offer fixed assurances of annual benefits for life upon retirement. Instead, the employer contributes a certain amount (for example, 10% of each year's salary) to the plan each year. Each employee is entitled to the money allocated to a separate individual retirement account, plus the upside risk of favorable investment returns. However, the employee bears the risk of fluctuations in interest rates or the market once the employer contributes the funds to the employee's retirement account.

Cash balance plans "imitate some features" of defined contribution plans by referring to individual accounts and allocations, *Esden v. Bank of Boston*, 229 F.3d 154, 158 (2d Cir. 2000), but the accounts and allocations are only "hypothetical," not real. The "employee has no actual account, the employer makes no contributions to the employee account, and so there is no account balance to which interest might be added." *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 758 (7th Cir. 2003). Though they may imitate some of the features of defined contribution

plans, cash balance plans are governed by the rules for defined benefit plans. *See Esden*, 229 F.3d at 158.

Cash balance plans were introduced in the mid-1980s, and hundreds of employers have adopted them since then. Recent estimates are that between one-quarter and one-third of large U.S. employers sponsor a cash balance plan. *See* Pension Benefit Guaranty Corp., Pension Insurance Data Book 2004, at 59-60. Though Plaintiffs in this case contend that cash balance plans discriminate against older workers (an issue the Court addresses below), depending on how the plan is configured, cash balance plans may provide advantages for both employees and employers. Because employees covered by cash balance plans earn benefits more evenly throughout their careers, those plans may provide increasingly more mobile employees more benefits than they could expect to receive under a traditional defined benefit plan, where benefits accrue primarily at the end of an employee's career. The accounts are also familiar to employees who are increasingly comfortable with 401(k)-type programs. Often, cash balance plans (unlike many traditional defined benefit plans) provide for payment of a lump sum benefit, giving employees the ability to manage their funds during their retirement. For an employer, while cash balance plans are not inherently more or less costly than traditional defined benefit plans, converting to a cash balance plan can provide significant cost savings. For example, a 2004 Mellon Bank survey found that the long-term costs of plans converted to cash balance formulas were expected to decrease for 64% of plans. *See* Ex. 232, at 30; *see also* Ex. 28 (Interoffice Memo), at D12287 ("A cash balance approach allows us to provide the competitive benefit level of a defined contribution plan but reduce overall cost by earning more on our investments than we pay in the declared rate."); Ex. 31 (email from Gerry Meyn), at D029113 ("A conversion to a cash balance plan clearly reduces the ultimate benefits paid, and, of course,

lowers the net pension liability . . . ."). Cash balance plans also allow employers to shed some or all of the risk of interest rate and market fluctuations during the employee's life. *See* Trial Tr. 1001:13 to 1002:4 (Mr. Sher, Defendants' expert, testifying that employees assume the risk of interest rate fluctuations with respect to annuities under cash balance plans).

In a cash balance plan, each eligible employee has a hypothetical account that receives benefit credits. One credit is referred to as a "pay credit," and it is equal to a percentage of the employee's salary. Pay credits can be defined in a number of different ways: they may be set as a fixed percentage of pay (5% of salary); they may be integrated with Social Security (3% of pay up to the Social Security wage base and 5% over the base); or they may vary with the employee's age or service (4% each year to age 40 and 5% each year thereafter), referred to as "graded pay credits." Cash balance plans also typically provide "interest credits," determined by applying a specified interest rate to the employee's hypothetical account balance. Some plans provide that the interest credit is a floating rate that changes annually or more frequently and is tied to a market rate, such as the yield on selected U.S. Treasury securities. Others allow the interest credit rate to float subject to a maximum (say, 8%) or a minimum (say, 4%), or both. Unlike with many traditional defined benefit plans, which pay benefits as an annuity and do not include a lump sum option, benefits under a cash balance plan often are payable as either a lump sum that equals the hypothetical account balance or an annuity based upon the value of the account balance.

Many cash balance plans are the result of conversions from traditional defined benefit plans, and there are a variety of ways in which employers may provide for the conversion and transition to the new plan. One approach is to freeze the benefits payable under the prior plan and at the same time provide for the employees to receive benefit credits (both pay and interest credits) under the

cash balance plan going forward.  The prior plan benefits continue to be paid under the terms of the prior plan and the cash balance benefits are paid under the new plan.  Under this approach, the employee has essentially two separate pension benefits, with different rules, formulas, and procedures governing them.  This is the so-called "A plus B" approach discussed at trial.

Other employers instead provide the employee with an opening account balance.  There are a variety of ways of establishing the opening account balance, though no legal requirements governing the creation of opening balances.  *See* Ex. 13, at MER01798 (a consultant to CIGNA advised the company that opening balances "could even be zero if you wanted"); Ex. 533 (General Accounting Office Report), at 30 ("[C]urrent federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans . . . .").[2]  One method of creating opening balances is to calculate the present value of the employee's normal retirement benefit (an annuity commencing at normal retirement age, usually age 65) under the prior plan as of the conversion date.  Such a plan typically would also provide that each employee would in any event never receive less than the benefit earned under the prior plan as of the date of conversion under the pre-conversion benefit formula.  Depending on how the employee's opening account balance and minimum benefit are calculated, the minimum benefit may be greater than the employee's account balance.  This is the so-called "greater of A or B" approach referred to in the testimony.

**CIGNA's Traditional Defined Benefit Plan.**          Before January 1, 1998, CIGNA had a traditional defined benefit plan for its employees, which will be referred to in this Opinion as "Part A."  Part A provided two benefit formulas depending upon the individual's date of hire.  Individuals

_____

[2] The Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006) ("PPA"), subjects plan conversions occurring after June 29, 2005 to certain requirements, which can be found at 29 U.S.C. § 1054(b)(5)(B)(ii).

Case 3:01-cv-02361-MRK    Document 269    Filed 02/15/2008    Page 9 of 122

hired before December 31, 1988 were known as "Tier 1 employees"; individuals hired after that date were "Tier 2 employees."

Tier 1 employees received 2% of final three-year average pay for each year of service up to 30 years, less a Social Security offset. Tier 1 employees with 10 or more years of service also received a subsidized early retirement benefit; they could retire at age 55 and receive an immediate annuity benefit equal to the accrued age-65 benefit (not reflecting the Social Security offset, known as the "Social Security supplement"), reduced for early commencement by certain factors set forth in the Plan. Upon reaching age 65, the benefit would be reduced by the participant's Social Security offset.

Tier 2 employees received an age-65 annuity benefit equal to 1.67% of final five-year average pay for each year of service up to 35 years, less a Social Security offset. Tier 2 employees also received subsidized early retirement benefits; a Tier 2 employee with 15 years or more of service could retire at age 55 and receive an immediate annuity benefit equal to the accrued age-65 benefit (not reflecting the Social Security offset), reduced by 5% per year if benefits began before age 65 (thus 50% for commencement at age 55). Upon reaching age 62, the benefit payable would be reduced by the Social Security offset (adjusted to age 62).

Tier 1, but not Tier 2, employees also were eligible for a "Free 30%" survivor's benefit (the "Preserved Spouse's benefit"). Under this benefit, a portion of a participant's pension (generally 30%) would be payable after the participant's death for the remaining lifetime of the surviving spouse. Many plans effectively require participants to pay for the added value of the survivor's benefit, but under CIGNA's Part A, eligible Tier 1 employees received the benefit without charge.

A participant who wanted a larger portion to go to a surviving spouse (say, 50%) would pay a charge based only on the difference between the Free 30% and the percent requested (here, 20%).

CIGNA's Part A did not offer a lump sum option. Participants could elect to receive their benefits in one of several different annuity options, but they could not receive their benefits in a lump sum. Under Part A, when an employee separated from CIGNA, their plan benefit remained frozen and did not grow, because it was based on the employee's earnings at CIGNA.

**CIGNA's Conversion to Cash Balance Plan.** During 1996 and 1997, CIGNA, along with outside consultants such as the William Mercer Co. ("Mercer"), engaged in planning for a conversion of its defined benefit pension plan to a cash balance plan. In accordance with its conversion plan, in November 1997, CIGNA's Chief Executive Officer ("CEO") signed an amendment to CIGNA's defined benefit pension plan freezing benefit accruals for all Tier 2 employees and for all Tier 1 employees with a combined age and years of service less than 45. The plan was that Tier 1 employees who had age and service credits of 45 or more would be grandfathered under the old Plan and thus continue to accrue benefits under Part A. All other employees would be moved to the new cash balance plan.

The November 1997 amendment provided in pertinent part as follows:

> Notwithstanding any other provision of the Plan, no Employee who, as of December 31, 1997, is a New Formula Participant or has a combined total of Years of Credited Service and age less than forty-five (45) shall accrue any additional benefits under the Plan after December 31, 1997. . . . *The foregoing cessation* and/or suspension in benefit accruals and exclusion from eligibility to participate in the Plan after December 31, 1997, *shall remain in effect until the adoption of a subsequent amendment to the Plan*, and such subsequent amendment may provide for benefit accruals under terms and conditions different from the Plan provisions in effect before 1998. No such subsequent amendment shall result in the accrued benefit of any Participant being less than such Participant's accrued benefit under the plan as of December 31, 1997.

Ex. 2 (Part A), at D00132 (Amendment No. 4) (emphasis added).

On December 21, 1998, CIGNA's CEO signed the plan document for the cash balance plan, Part B, as well as an updated Part A plan document. *See* Ex. 501 (Part A), at D10440; Ex. 1 (Part B), at D00349. Even though the cash balance plan document was not signed until the end of 1998, the cash balance plan was made retroactive to January 1, 1998 so that Part B participants received retirement pay and interest credits for the entire year of 1998. *See* Ex. 519.

Non-grandfathered employees who were employed as of December 31, 1997 became participants in Part B. Additionally, any employees hired for the first time after January 1, 1998 automatically became participants in Part B upon their hire. These individuals are not part of the Class in this case; the Class includes only those Part B participants who previously were participants in Part A.

Part B provides that grandfathered participants in Part A who left CIGNA before December 31, 1997 and were rehired after adoption of Part B would become participants in Part B upon their rehire. As a result, those former employees who rejoined CIGNA between January 1, 1998 and December 21, 1998 (when Part B was signed) were placed into Part B. However, in a lawsuit filed by one such rehire, John Depenbrock, the United States Court of Appeals for the Third Circuit held that certain rehires should have remained in Part A, because the amendment creating Part B and establishing its rule applicable to rehires was not valid until signed by CIGNA's CEO on December 21, 1998. *See Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 82-83 (3d Cir. 2004). As a result of the *Depenbrock* decision, other grandfathered Part A participants who were rehired between January 1, 1998 and December 21, 1998 were notified in February 2005 that their benefits would be recalculated under Part A. *See* Ex. 539 (Letters from plan administrator regarding *Depenbrock* dated

February 4, 2005).  There are approximately 194 employees who fall into this group.  *See* Ex. 173, at SuppD15466.[3]

**Opening Balances.**    Non-grandfathered employees who were employed by CIGNA as of December 31, 1997 received a hypothetical opening account balance that was calculated by reference to their Part A accrued benefits.  In particular, the opening account balance was calculated by taking the participant's current annual benefit at normal retirement age (age 65) and computing the actuarial value of that benefit based on a 6.05% interest rate and by using the 1983 (unisex) Group Annuity Mortality Table (GATT).  A lower 5.05% interest rate was applied to the accrued benefit at age 62 for Tier 2 participants who were active employees on December 31, 1997 and whose age and service totaled 55 or greater.[4]  Thus, older or longer-serving employees received a more favorable opening balance calculation than similarly-situated younger or shorter-service employees.  By design, therefore, for employees with identical service and compensation histories before 1998, the older employee would always receive a greater opening account balance than the similarly-situated younger employee.

---

[3] Former CIGNA employees who were rehired between December 21, 1998 and December 31, 2000 became participants in Part B and had their Part A benefits converted into an opening account balance.  Employees rehired after December 31, 2000 became entitled to two different benefits based on two different formulas: one based on the benefits earned under Part A before they left CIGNA and a separate benefit based on their service in Part B once they were rehired.  *See* Ex. 504 (Amendment No. 2 to Part B), at SuppD0481-SuppD0482.

[4] Because the age-62 benefit included some of the Part A early retirement benefits, a portion of those benefits was included in these participants' opening account balances.  However, the full value of those benefits was not protected, and as discussed later, CIGNA acknowledged that early retirement benefits as a rule were not included either in participants' opening account balances or, correspondingly, in the lump sums available under Part B.

12

The opening balance did not, however, include the full value of the subsidized early retirement benefit, the Social Security supplement, or the Preserved Spouse's benefit. Also, the GATT mortality tables were used to discount the retirement benefit for pre-retirement mortality – that is, the likelihood that the participant would die between his or her current age and the normal retirement age of 65. Plaintiff's expert Claude Poulin explained that this pre-retirement mortality discount would be approximately 10% for a 30- or 40-year-old employee. *See* Trial Tr. 211:14-22. The discount was applied for purposes of determining employee opening balances, and therefore, as an employee grew older and the risk of pre-retirement mortality diminished, the employee would not recoup the amount of the discount taken in calculating the employee's opening balance.

**Benefit Credits.** Part B participants also earn benefit credits that have both a pay and an interest component. These benefit credits are age- and service-favored – that is, Part B provides a higher credit rate to older or longer-service employees than similarly-situated younger or shorter-service employees. The benefit credits are also integrated with Social Security, meaning that Part B provides a higher credit on pay over the Social Security integration level, which is defined as one-half of the Social Security taxable wage limit each year (for example, $34,200 in 1998). Ex. 1 (Part B), at D00291; Ex. 10 (Sher Report), at 6.

The following table shows Part B's pay credit rates:

13

| Age and Service Points | Rate Applied to Pay Up to Integration Level | Rate Applied to Pay Over Integration Level |
|:---:|:---:|:---:|
| Under 35 | 3 % | 4.5 % |
| 35-44 | 4 % | 5.5 % |
| 45-54 | 5 % | 6.5 % |
| 55-64 | 6 % | 7.5 % |
| 65 or More | 7 % | 8.5 % |

Therefore, an employee whose age is 40 with 10 years of service would have age and service points of 50.  Assuming a Social Security integration level of $43,500 and further assuming that the employee earned $60,000 in a particular year, the employee would receive a pay credit of $3,247.50 (5% of $43,500 plus 6.5% of $16,500).  If that same employee was 60 (thus having 70 age and service points), she would receive a pay credit in that same year of $4,447.50 (7% of $43,500 plus 8.5% of $16,500).  As a consequence of the Part B design, for any two participants who have the same service and compensation history, the older one will receive a pay credit for any given year that is the same or higher than the younger employee.

Participants in Part B also receive interest credits quarterly on their hypothetical account balances at a floating rate that is subject to change at the beginning of each calendar year.  The annualized interest rate is the yield on five-year U.S. Treasury securities in the preceding November plus 0.25%, subject to a minimum rate of 4.5% and a maximum of 9.0%.  *See* Ex. 1 (Part B), at D00293 (§ 4.2(b)).  Thus, Plan participants bear the risk of interest rate fluctuations, within the rate corridor provided by the Plan.  Interest rate credits continue until the participant's account is paid out as a lump sum or annuity payments begin.  In any given year, all participants earn interest at the same rate; the interest rate credit is thus the same for all participants, regardless of age or length of service.

14

Under Part B, at retirement, or upon termination of employment, a participant could elect to receive benefits in the form of a lump sum. Alternatively, a participant could elect to receive benefits in one of several other forms available, including a single life annuity (stream of monthly payments payable for life) or a joint and survivor annuity (stream of monthly payments for life, with additional payments payable to a spouse for the life of the spouse). *See* Ex. 1 (Part B), at D00307-D00309 (§ 7.2).

**Minimum Benefits and Wear Away.**     Under the terms of Part B, employees receive the greater of a retirement benefit based on their hypothetical account balances or their minimum benefit, as defined in the Plan. The Plan defined "minimum benefit" as, "in the case of a Participant who has a Part A Accrued Benefit which is converted into an Initial Retirement Account, the Participant's Part A Accrued Benefit, expressed in the form of a single life annuity commencing at the Participant's Normal Retirement Date," "increased by the Equivalent Actuarial Value of the applicable Preserved Spouse's Benefit." Ex. 1 (Part B), at D00280 (§ 1.32). Part B also provided that these employees' Part B accrued benefit, "expressed in the form of an immediate lump sum distribution, shall in no event be less than the present Equivalent Actuarial Value (determined using the Applicable Interest Rate and the Applicable Mortality Table) of the Participant's Minimum Benefit." Ex. 1 (Part B), at D00720 (§ 1.1(c)). In effect, the minimum benefit was the participant's age-65 annuity benefit under Part A, enhanced by the Free 30% spouse's benefit if applicable. Section 7.3 of the Plan also protected the employee's right to subsidized early retirement benefits to which they were entitled under Part A, provided those benefits were taken in the form of an annuity.

As a consequence of the manner in which opening balances were calculated under Part B, a participant's opening account balance was not always equivalent to the value of the participant's

15

Part A accrued benefit. This is because the opening account balances were discounted to account for the risk of pre-retirement mortality and did not include the value of certain benefits, such as the Social Security supplement. As a result, an employee's opening account balance could be much less than the employee's Part A accrued benefit. Take Ms. Amara, for example. Under Part A, before Part B became effective, she had earned vested retirement benefits of $1,833.65 a month starting at age 55. Therefore, that was her Part A accrued benefit. However, her opening account balance under Part B was $91,124.88, which converts to an approximate age-55 annuity benefit of only $900, less than half her Part A accrued benefit. *See* Ex. 3 (Poulin Declaration), ¶¶ 25-26.

Interest rate fluctuations also affect the relationship between an employee's minimum benefit and her account balance. Recall that within a rate corridor bounded by a minimum and a maximum, the employee bore the risk of interest rate fluctuations. Since the opening account balances were calculated by converting each participant's annuity benefit into a lump sum using a particular interest rate (6.05% or 5.05%), if interest rates dropped, the employee's minimum benefit could exceed the employee's account balance. That is just what happened at CIGNA. With one exception, interest rates dropped each year after CIGNA converted to a cash balance plan, and that exacerbated the gap between employees' opening account balances and their minimum benefits. The actual historical interest credit rates under Part B are as follows:

| Year | Interest Credit Rates |
|------|----------------------|
| 1998 | 6.05% |
| 1999 | 4.79% |
| 2000 | 6.22% |
| 2001 | 5.95% |
| 2002 | 4.50% |
| 2003 | 4.50% |
| 2004 | 4.50% |
| 2005 | 4.50% |
| 2006 | 4.70% |

Ex. 10; Ex. 587; Ex. 588.  To illustrate this point, assume that an employee aged 40 had earned a

$1,000 per month annuity before 1998.  That annuity would be converted to an opening account

balance of approximately $27,900 using a 6% interest rate, but when interest rates dropped to 4.5%,

an account balance of $45,150 would be required to purchase that same $1,000 per month annuity.

*See* Ex. 3 (Poulin Decl.), ¶¶ 33-34; Ex. 4 (Supplemental Poulin Declaration), ¶¶ 12-14.

　　　Thus, the design of Part B, plus the drop in interest rates, led to a phenomenon that is known

as "wear away" for many, though by no means all, employees.  Wear away means that there are

periods of time in which the employee's account balance is less than the employee's minimum

benefit.  What wear away means in practice is that even though an employee is continuing each year

to receive pay and interest credits under Part B, and the employee's account balance may even be

growing, it nonetheless remains less than the minimum benefit earned as of December 31, 1997; in

effect, where there is wear away, even though the employee continues to work for CIGNA and

continues to receive benefit credits, the employee's expected retirement benefits have not grown

17

beyond what the employee was entitled to under Part A as of December 31, 1997. *See, e.g.*, Ex. 40 (2002 memorandum from CIGNA's Vice President for Employee Benefits), at D028635 ("Using the present value of normal retirement age benefits results in a significant 'wear away' period during which time employees accrue no additional benefits with future service.").

And, as this case illustrates, it may take years for some employees' account balances to catch up to the minimum benefit to which the employees were entitled under Part A as of December 31, 1997. Take Ms. Amara again. In her case, even though she was earning pay and interest credits every year, Plaintiff's expert Claude Poulin estimated that "it would take over 10 years for her cash balance account to exceed the value of her previously earned benefits." Ex. 4 (Supp. Poulin Decl.), ¶ 22; *see also* Ex. 3 (Poulin Decl.), ¶¶ 25-27; Ex. 32, at D028174, D028629.

Ms. Broderick and Ms. Glanz also experienced several years of wear away, as Defendants' expert, Lawrence Sher, acknowledged. *See* Ex. 235. According to Plaintiffs' expert, Patricia Flannery experienced nearly six years of wear away, from October 2000 to the present. At the end of 2005, her account balance converted to an annuity benefit of $756 per month, compared to the annuity of $813 per month she had earned with her service before 1998. *See* Ex. 7; Ex. 156. Plaintiff sought data showing the precise number of employees who actually experienced wear away, but Defendants assert that they do not maintain data that would provide that information. According to Plaintiffs' expert, Mr. Poulin, "the overwhelming majority" of CIGNA's employees experience wear away, with the exception of short-service employees and Tier 2 employees, like Barbara Hogan and Stephen Curlee, who had more than 55 age and service points and therefore benefitted from the 5.05% interest rate used to calculate opening balances. *See* Trial Tr. 218:15 to 219:9; Trial Tr. 219:15 to 220:1; Ex. 4 (Supp. Poulin Decl.), ¶ 28.

18

Defendants disagree regarding the precise amount of the wear away and the precise number of years for the catch-up period for any given employee; they also characterize that period differently from Plaintiffs. However, there is no doubt, and Defendants' expert conceded this, that wear away is a real phenomenon, that is a consequence of the design of Part B, and that many CIGNA employees experienced it. *See, e.g.*, Ex. 27 (CIGNA's answers to interrogatories No. 8 and 10); Ex. 241 (Hodges Deposition), at 93-103. Thus, both experts essentially agreed that the reasons for wear away were a combination of the following factors: (a) CIGNA's selection of the "greater of A or B" approach rather than the "A plus B" approach; (b) the exclusion of early retirement subsidies from the opening balances; (c) the application of a pre-retirement mortality discount in determining opening balances; and (d) the effect of falling interest rates after 1997 on the annuities to which the accounts can be converted.

Moreover, as Defendants' own expert acknowledged, wear away is a phenomenon that was well known and understood at the time of CIGNA's adoption of a cash balance plan. Thus, in response to the Court's questions, Mr. Sher admitted that wear away can be anticipated depending upon the design of the cash balance plan and the assumptions a company makes about interest rates:

> The Court: Would it be typical to expect, for a decent sized portion of an employee population, that they might go as long as five or six years before they would actually cross and get into the positive on the conversion?
>
> Mr. Sher: I think you have to, first we have to, look at each individual situation. . . . What are the causes of this phenomenon? . . . I would characterize the early retirement as sort of a byproduct, . . . that what we talked about is a natural thing for the early retirement to have that impact.

Trial Tr. 1008:17-21, 1008:23 to 1009:10.

The Court: But going into a plan like this, would you expect there to be . . . [a] reasonably significant portion of your employee population who could expect to not add to their minimum benefit for periods of between three and five years?

Mr. Sher: I think it depends.  I mean, the early retirement is one factor . . . .  One approach is to do this grandfathering which is suggesting that CIGNA did it for a large group of people, not for everyone.  So there are some people who are getting that early retirement, who could have that early retirement wearaway and that could last several years, the early retirement wearaway.

Trial Tr. 1009:23 to 1010:13.

The Court: In 1998, was it predictable and known to CIGNA, because of the various things we talked about – probably not with respect to interest rates so much but the early retirement subsidy sort of bringing that out and the preretirement mortality, in fact people's opening balances . . . would be lower than their minimum protected benefit?

Mr. Sher: I think certainly benefit projections, you know, could have been done to get at your question . . . .  The problem is it's hard to disregard [interest rate changes] but yes, absent that, yes.

The Court: Listen, we all have to predict things.  Taking normal old regular old interest rate assumptions as you are standing in 1998, you still would have known that the opening balances for some sizeable group of employees, not obviously all, would be less than their protected benefit under the old plan?  You would know that because you know mathematically that you are eliminating the early retirement subsidy.

Mr. Sher: Yes.

Trial Tr. 1029:21 to 1030:22.

The Court: [O]ne could . . . have some prediction of whether there was going to be no wearaway; that the wearaway was minimal, you know, two months for most employees; or on average, depending upon where you fell in the spectrum, it could be two to three years.  That would be some quantity that might prove to be wrong but would have been at least knowable at the time, right?

Mr. Sher: Yes, I think at least my experience, that's often done . . . .

20

Trial Tr. 1032:19 to 1033:2; *see* Trial Tr. 1019:7-11 (The Court: "So in designing these plans, would it be typical that you or the consultants in the company would try to make some estimates of wearaway for the employee population and then discuss potential mitigative solutions or not?"  Mr. Sher: "Yes."); Trial Tr. 1031:11-15 (Mr. Sher: "[P]eople do various kinds of analyses including projections using various assumptions as to what might happen in the future. . . .  That's how they design the transition provisions essentially, by looking at the potential impact . . . .").

The Court finds that wear away should have been anticipated by CIGNA, though the precise amount of wear away or duration for any given employee could not be predicted with accuracy.  As discussed later, CIGNA was aware that its Plan could result in wear away, although there is no evidence in the record that CIGNA made any estimates of the precise amount of wear away for its employee population.  *See* Ex. 81 (Mercer materials, which do not include any calculations of wear away).

**CIGNA Announces and Describes Conversion to Employees.**    In early November 1997, about a year before CIGNA's CEO signed the plan documents for Part B, CIGNA sent a special edition "Signature Benefits Newsletter" (the "1997 Newsletter") to all employees.  Ex. 8, Tab 1; Ex 516.[5]  It was entitled "Introducing Your New Retirement Program," and it described not only the conversion to the cash balance plan, but also enhancements to CIGNA's Savings and Investment Plus ("SIP"), the 401(k) defined contribution plan.

The 1997 Newsletter informed employees that a new retirement program was going to be introduced effective January 1, 1998:

---

[5]  Ex. 8, Tab 1 and Ex. 516 are identical and therefore for convenience, the Court will cite to Ex. 516.

> On January 1, 1998, CIGNA will introduce a new retirement program. The program includes the new CIGNA Retirement Plan, which replaces the current CIGNA Pension Plan for most employees, plus an enhanced version of Savings and Investment Plus (SIP), our 401(k) plan. Most CIGNA employees will participate in the new CIGNA Retirement Plan, although some long-service employees will remain in the current Pension Plan. . . . If you are moving to the new Retirement Plan, you will continue to earn benefits under the Pension Plan through December 31, 1997, and then transfer to the CIGNA Retirement Plan beginning in 1998.

Ex. 516, at D00607 (emphasis omitted). The 1997 Newsletter stated that employees participating in the new plan would "stop earning benefits under the current Pension Plan on December 31, 1997." *Id.* at D00611. It also informed employees that additional information would be forthcoming in December 1997.

In an inset box on the 1997 Newsletter's cover, a "Message from CEO Bill Taylor" states: "I am pleased to announce that, on January 1, 1998, CIGNA will significantly enhance its retirement program. . . . These enhancements will make our retirement program highly competitive . . . ." *Id.* at D00607. The 1997 Newsletter tells employees that "the new plan is designed to work well for *both* longer- and shorter-service employees," it provides "steadier benefit growth throughout [the employee's] career," and it "build[s] benefits faster" than the old plan. *Id.* at D00610. On the same page, the 1997 Newsletter tells employees that "[o]ne advantage the company *will not* get from the retirement program changes is cost savings." *Id.* However, an internal expense projection prepared at the time showed that CIGNA anticipated a reduced cost of approximately $10 million by virtue of the conversion from a traditional defined benefit plan to a cash balance plan, though it also expected to incur an additional cost of approximately $10 million by virtue of upgrades to its SIP or 401(k) plan. *See* Ex. 739. The 1997 Newsletter did not discuss or even mention the phenomenon of wear away.

22

The 1997 Newsletter described how employees would receive an opening account balance

and benefit credits:

> The new CIGNA Retirement Plan is an account balance plan – a type of retirement
> plan that is becoming increasingly popular as a simpler alternative to traditional
> pension plans. Here's how the new plan will work:
>
> •    If you are transferring from the current Pension Plan to the new plan, an
>      account will be set up for you in January.
>
> •    If you earned a benefit under the current Pension Plan, the lump sum value
>      of that benefit as of December 31, 1997, will be transferred to your account
>      as your opening balance.
>
> •    Beginning in January, your Retirement Plan account will grow through two
>      types of credits:
>
> > - Benefit credits. CIGNA will make a benefit credit to your account
> > for each year in which you work at least 1,000 hours for the company.
> > These credits will range from 3% to 8.5% of your eligible annual
> > earnings, depending on your age, service and earnings.
> >
> > - Interest Credits. CIGNA will also credit your account with interest
> > each quarter until you receive your benefit from the plan. The annual
> > interest rate will vary from 4.5% to 9%, depending on recent yields
> > of 5-year Treasury Bonds. This interest rate is consistent with
> > guidelines set by the IRS for account balance retirement plans.

Ex. 516, at D00608 (emphasis omitted). The 1997 Newsletter informed employees that

information concerning their account balances was forthcoming:

> CIGNA will begin the process of calculating final pension benefits and Retirement
> Plan opening balances early in 1998, after all 1997 payroll data are finalized. Benefit
> calculations are expected to be completed in the spring. Once balances are
> calculated, they will be credited to Retirement Plan accounts retroactively to January
> 1, 1998, so you won't lose any interest credits for the first part of 1998. You will be
> informed of your final Pension Plan benefit and Retirement Plan opening balance in
> your Total Compensation Report, scheduled to be mailed in May 1998.

*Id.* at D00611 (emphasis omitted).

23

The 1997 Newsletter also told employees about their options upon leaving CIGNA:

> When you retire or leave CIGNA, you will have the option to receive your vested account balance in one of two ways. You may choose an annuity (monthly payments for life), or you may take your account balance as a single lump sum payment. The lump sum option is new and resembles the SIP payment option. If you prefer, you may roll over your lump sum payment into an individual retirement account (IRA) or your new employer's qualified retirement plan. This provision allows you to assume investment control over your benefit – and defer income taxes on it – until you are ready to use it. You will also have the option to leave your account balance in the Retirement Plan, where it will continue to earn interest credits until you elect to receive your benefit.

*Id.* at D00608.

In December 1997, CIGNA sent each participant a Retirement Program Information Kit ("Retirement Kit"). Ex. 508. There were four different versions of the Retirement Kit, depending upon whether the participant was being converted to Part B or grandfathered in Part A and whether he or she participated in CIGNA's supplemental pension plan. Again, the Retirement Kit, like the 1997 Newsletter, explains that the changes were being made to "improve the competitiveness of our benefits program and thus our ability to attract and retain top talent." Ex. 508, at D00724 (emphasis omitted). The Kit states that the changes are "enhancements to the plans," and that CIGNA is not saving any money with the changes, "nor has the new program been designed to save money." *Id.* at D00724- D00725.

The Retirement Kit explained that non-grandfathered employees would cease accruing benefits under Part A as of December 31, 1997, and would automatically become a participant in Part B "on January 1, 1998." *Id.* at D00726, D00718. The Retirement Kit provided greater detail than the Newsletter regarding pay and interest credits, which would be added to employees' hypothetical accounts on a quarterly basis, and payment options. It also told employees that they

24

would receive periodic account statements called "Total Compensation Reports" so they could "keep track of [their] account growth." *Id.* at D00745.

The Retirement Kit also contained detailed information about the calculation of opening balances. However, it did not state that a pre-mortality discount would be applied in calculating the opening balances. CIGNA informed employees as follows:

### Step 2: Converting Your Final Pension Benefit to an Opening Balance

Your normal pension benefit is an annual payment made to you for life, beginning when you turn age 65. To convert that annual pension benefit into an opening balance for the new plan, a calculation has to be made to determine how much that future stream of payments is worth today. This type of calculation is called a present value calculation.

The method used to calculate the present value of a pension benefit is established by law. Basically, the present value of your pension benefit equals the amount of money that someone would need to invest now to have enough money in the future to pay your annual pension benefit. This calculation is made assuming that the "invested" money would earn a moderate rate of interest (about 6.5% per year). Because of the relatively low interest rate, the amount available to you today is relatively large. In fact, to increase your opening balance, CIGNA has selected a much lower interest rate than the 7% or 8% rate adopted by most companies making similar pension plan changes.

Your current age affects the present value of your pension benefit, because the closer you are to retirement age, the less time there is for the lump sum balance to grow, and therefore the more money you need to invest now. Because of this, two people who have earned the same pension benefit at age 65 will have different opening account balances if their ages are different. The older person will have the larger opening balance because there is less time for that person's account balance to grow.

Table 1 shows the factors that will be used to convert final annual pension benefits to opening balances. . . .

### Special Conversion Formula for Older, Longer-service Employees

If your age and credited service with CIGNA total 55 or more on January 1, 1998, two special procedures will be used in calculating your opening account balance:

- First, your opening balance will be based on the present value of your age 62 early retirement benefit, rather than on the present value of your age 65 normal retirement benefit. The age 62 benefit has a higher present value than the age 65 benefit.

- Second, a lower interest rate will be used in making the present value calculation (one percentage point less than the standard rule – for instance, 5.5% if the standard rate is 6.5%). The lower interest rate increases the size of your opening balance.

These special procedures have been adopted because most employees in this age and service category will have fewer years to accumulate benefits under the new Retirement Plan. CIGNA wants to ensure that these older, longer-service employees receive fair and adequate benefits at retirement.

*Id.* at D00719-D00721 (footnote omitted).

Under a heading captioned "How Your Benefit Grows," the Retirement Kit states that "[e]ach dollar's worth of credits is a dollar of retirement benefits payable to you after you are vested." *Id.* at D00740. It also contains examples of how a hypothetical employee's account would grow. The Retirement Kit includes this question: "Will my benefit be better under the new Retirement Plan?" The answer was as follows:

The new Retirement Plan is different from the current Pension Plan, so exact comparisons of benefits that cover all possible outcomes are difficult. *Generally speaking, the new Retirement Plan, in comparison with the current Pension Plan, tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees*. . . . Of course, other features of the new plan add to your benefit value as well. The lump sum distribution option can be very valuable, since it will allow you to move your benefits into other tax-deferred investments after you retire or leave CIGNA. Also, because the Retirement Plan works like a savings plan, with contributions credited to an account, you should find it easier to understand. You now have two plans that are account-based, enabling you to track your retirement benefits by looking at your statements. *As a result, you will see the growth in your total retirement benefits from CIGNA every year and will be able to update your financial plans accordingly*.

26

*Id.* at D00729 (emphasis added); *see also id.* at D00724 ("[B]enefits will grow faster during the early part of your career."). Once again, there is no discussion of wear away. In response to the question, "Why wasn't I allowed to stay in the Pension Plan?," the Retirement Kit told participants who were being moved to the cash balance plan that "[o]ur analysis showed that, in comparison to people with a higher age and service combination, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan . . . ." *Id.* at D00725. CIGNA did not produce any such analysis in discovery or at trial.

The Retirement Kit also addressed the issue of rehired employees. It noted that they would be placed in Part B. *Id.* at D00739 ("If you are hired or rehired after January 1, 1998, you will become a participant in the Retirement Plan on your date of hire.").

In February 1998, participants received the February 1998 Signature Benefits Newsletter, and in May 1998, participants received an additional newsletter answering frequently asked questions about Part B. *See* Ex. 97; Ex. 180. The February 1998 Newsletter states that employees hired before 1989 with fewer than 45 age and service points "were moved [to Part B] because they have enough time to take advantage of the new Plan provisions. They do not face the problems that those nearer retirement would face if they were suddenly moved out of the pre-1989 Plan." Ex. 97, at SuppD1330.

A June 1998 Newsletter explained how to use the Total Compensation Reports. *See* Ex. 101. Each participant annually received a Total Compensation Report. One CIGNA employee's 1998 Report showed how the opening account balance was calculated:

| | | |
|---|---|---|
| Your Highest Eligible Average Earnings | | $143,478.96 |
| Your Benefit Service Factor | x | 01670 |
| Years of Credited Service | x | 7.00 |
| Your Age 62 Benefit Before Offset | = | $16,772.69 |
| Your Social Security Offset (see note) plus Early Retirement Reduction | - | $3,859.89 |
| Your Actual Age 62 Annual Benefit | = | $12,912.80 |
| Based on average life expectancy at your age and an interest rate of 5.05% the lump sum actuarial factor is | x | 6.0813 |
| Your lump sum benefit – Opening Account Balance | | $78,562.55 |

Ex. 85, at P1801. The Report also stated that "[t]his [initial] balance represents the full value of the benefit you earned for service before 1998 payable to you at age 65. . . . This means that the lump sum growing at this rate of interest to retirement is equivalent to the value of the lifetime annuity payments you have earned." Ex. 98, at P1527 (emphasis omitted).

The Report also notified employees of financial planning and retirement planning tools that CIGNA had made available to employees. All the named Plaintiffs received annual Total Compensation Reports. These annual statements list the opening balance at the beginning of each year, the new pay and interest credits earned, and the closing balance. *See, e.g.*, Ex. 519; Ex. 520.

In October 1998, CIGNA issued the Summary Plan Description ("SPD") for Part B, and a nearly identical version was re-issued in September 1999. Ex. 505 (1998 SPD); Ex. 506 (1999 SPD). The SPD contained information regarding the following topics: eligibility; how breaks in service affect eligibility; how the cash balance account grows, including how pay and interest credits accrue; when benefits are paid; how benefits are paid; how the benefit is affected by certain "life

28

events"; administrative details concerning the operation of the Plan; minimum benefits; change of control protections; spouse's rights; the appeal process; circumstances under which the Plan can be amended or terminated; and a statement of ERISA rights.  *See* Ex. 505 (1998 SPD); Ex. 506 (1999 SPD).  It also informed employees that they could obtain a copy of the Plan from the plan administrator, and the Plan was later made available on CIGNA's intranet site.  *See* Ex. 524.

As the Retirement Kit stated, the SPD also repeats the following: "Each dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested."  Ex. 505 (1998 SPD), at D00828; Ex. 506 (1999 SPD), at D00624 (same).  It explained that "[y]our account balance grows in two ways – annual benefit credits and quarterly interest credits. . . . For each year in which you earn a year of credited service, CIGNA will add benefit credits to your account equal to a percentage of your annual eligible earnings. . . . Your account also will grow through interest credits."  Ex. 505 (1998 SPD), at D00828-D00829 (emphasis omitted); Ex. 506 (1999 SPD), at D00624 (same).  The SPD did not mention or explain wear away, although it did state that participants would never receive less than the minimum benefit:

> If you participated in the Pension Plan before 1998, your old plan benefits were converted to an opening account balance in this Plan.  Your final Plan benefits cannot be less than your old plan benefits on December 31, 1997.  *If this minimum benefits rule applies to you, you'll be notified by the Retirement Service Center when you request a distribution.*

Ex. 505 (1998 SPD), at D00838 (original emphasis omitted and emphasis added).

The SPD provides the following information to employees who were rehired by CIGNA, and the SPD was provided in binders for new hires and rehired employees:

> If you were in the old Plan when you left, the pension benefits you earned will be converted to an opening account balance in the this [*sic*] plan when you return.  The conversion formula used [to obtain the opening account balance] is based on

guidelines established by the federal government for valuing pension benefits. If you have questions about the conversion formula, you may call the CIGNA Retirement Service Center at 1.800.224.4624.

Ex. 505 (1998 SPD), at D00833; *see also* Exs. 509-12.

**This Lawsuit.**    This lawsuit was filed in 2001 by Ms. Amara and others. Judge Dominic Squatrito, who previously presided over this case, certified it as a class action on December 20, 2002, *see* Mem. of Decision [doc. # 61], and additional named Plaintiffs were added on February 15, 2006. *See* Order [doc. # 164]. On March 12, 2007, this Court issued an order complying with the requirements of new Rule 23(c)(1)(B) [doc # 241], and that Order specifies the class, sub-class, and individual claims and defenses. The following discussion seeks to address the class and sub-class issues.

## II.    Threshold Procedural Issues

Before turning to the parties' substantive arguments, the Court will address two threshold procedural issues raised by CIGNA: The first is whether Plaintiffs' claims are time-barred; the second is whether the named Plaintiffs and thousands of other Class members waived the claims asserted in this case. Neither argument has merit.

**A.    Statute of Limitations.**    Plaintiffs brought this lawsuit under section 502 of ERISA, 29 U.S.C. § 1132, which does not contain a limitations period. Where Congress fails to provide a statute of limitations, federal courts apply the statute of limitations that governs the most closely analogous state cause of action. *See Sandberg v. KPMG Peat Marwick, LLP*, 111 F.3d 331, 333 (2d Cir. 1997); *Miles v. N.Y. State Teamsters Conference*, 698 F.2d 593, 598 (2d Cir. 1983); *Chisholm v. United of Omaha Life Ins. Co.*, 514 F. Supp. 2d 318, 324 (D. Conn. 2007). The question in this case is which state cause of action is most closely analogous to ERISA. Plaintiffs argue for

Connecticut's six-year statute of limitations for written contracts, Conn. Gen. Stat. § 52-576; CIGNA, on the other hand, contends that Connecticut's 180-day statute of limitations for age discrimination claims, Conn. Gen. Stat. § 46a-82, or its two-year statute of limitations for actions to collect wages or fringe benefits, Conn. Gen. Stat. § 52-596, is more appropriate.

Every decision of the Second Circuit that the Court has found holds that the most closely analogous state statute of limitations for employee benefit claims similar to Plaintiffs' is that for written contracts.[6] Courts have generally reasoned, and this Court now adopts that reasoning, that even when the claim is that a company's plan does not comply with ERISA's statutory requirements, the focus is on the adequacy and legality of the plan itself, which is a written contract between employers and their employees. In *Miles*, for example, the Second Circuit held that because employee benefit plans are contracts, New York's six-year statute of limitations for causes of action in contract applied to claims under ERISA to determine the employee's eligibility for pension benefits. *See* 698 F.2d at 598; *see also Campanella v. Mason Tenders' Dist. Council Pension Plan*, 299 F. Supp. 2d 274, 280 (S.D.N.Y. 2004), *aff'd* 132 Fed. Appx. 855 (2d Cir. 2005) (applying six-year statute of limitations for claims of statutory violations under ERISA); *Carey v. Int'l Bhd. of Elec. Workers*, 201 F.3d 44, 49 (2d Cir. 1999) ("[W]e affirm the judgment of the District Court that Carey's ERISA claim is barred by the six-year statute of limitation.").[7] District courts in the Second

---

[6] Plaintiffs seek relief on the ground that CIGNA has failed to comply with the statutory standards established by ERISA; they have made no claim of breach of fiduciary duty. CIGNA, for its part, has made no argument that Plaintiffs' claims are equivalent to general tort claims for statute of limitations purposes, and therefore the Court expresses no view on that issue.

[7] Notably, in *Sandberg*, one of the few cases to apply a different statutory period, the court distinguished Mr. Sandberg's claims as "claims that an employer *aborted the vesting or enjoyment of benefits*," 111 F.3d at 334 (emphasis added), not claims that the plan violated ERISA's statutory standards. In such a case, the court held "the most analogous state-law cause of action under section

31

Circuit have also uniformly held that New York's and Connecticut's statutes of limitations for written contracts govern actions under ERISA. *See, e.g.*, *Cole v. Travelers Ins. Co.*, 208 F. Supp. 2d 248, 252 (D. Conn. 2002) (applying Connecticut's six-year statute of limitations for contract actions); *Venturini v. Metro. Life Ins. Co.*, 55 F. Supp. 2d 119, 120 (D. Conn. 1999) (same); *Manginaro v. Welfare Fund of Local 771, I.A.T.S.E.*, 21 F. Supp. 2d 284, 293 (S.D.N.Y. 1998) (applying New York law).

Indeed, colleagues in this District have expressly rejected both Connecticut's 180-day statute of limitations for age discrimination claims and its two-year statute of limitations for actions to collect on unpaid wages in favor of the six-year limit for written contracts. *See Parsons v. AT&T Pension Benefit Plan*, No. 3:06cv552 (JCH), 2006 WL 3826694, at *2 (D. Conn. Dec. 26, 2006) ("Contrary to *Sandberg*, which involved no claims related to specific benefits, this case deals with determining specific benefits, and thus is about a contract. Hence, the court finds that the most analogous state statute of limitations is six years, for breach of contract claims[, not 180 days, for age discrimination claims]."). As the court explained in *Christensen v. Chesebrough-Pond's, Inc.*, No. 5-92-cv-727(AHN), 1993 U.S. Dist. LEXIS 21278 (D. Conn. Nov. 24, 1993)

> [T]his court remains unpersuaded that it should depart from the considerable weight of authority which holds that ERISA actions to recover unpaid employee welfare benefits should be governed by state statutes of limitations governing contract actions. In addition, this result is consonant with the remedial nature of ERISA, and the liberal construction traditionally given to the Act, a conclusion that other circuits apparently share.

*Id.* at *16 (citation and quotation marks omitted). This Court agrees.

---

510 is 'wrongful termination' or 'retaliatory discharge,' catch-all descriptions of state-law causes of action encompassing an employee's claim that he was discharged in violation of public policy." *Id.*

Finally, several district courts that have recently considered claims similar to Plaintiffs' regarding the conversion of a traditional defined benefit plan to a cash balance plan have held that the six-year statute of limitations period for written contracts applies to such claims. *See Hirt v. Equitable Ret. Plan*, 450 F. Supp. 2d 331, 333-34 (S.D.N.Y. 2006) (applying New York law); *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323, 336-37 & n.70 (S.D.N.Y. 2006) ("Defendants argue that the Court should apply a three-year statute of limitations. In arguing for a three-year time limit [rather than New York's six-year limit for written contracts], defendants ignore – without attempting to distinguish – many Second Circuit decisions.") (citation omitted); *In re J.P. Morgan Chase Cash Balance Litig.*, 460 F. Supp. 2d 479, 483 (S.D.N.Y. 2006) ("Employee benefit plans are contracts, accordingly, under New York law, the applicable statute of limitations is six years.").

Not only does CIGNA fail to distinguish any of this case law, it also does not cite even a single case in which a court in this Circuit has applied the shorter statutes of limitations that CIGNA urges upon the Court. Simply asserting that the reasoning in *Parsons* is "unpersuasive," Defendants' Post-Trial Brief [doc. # 251], at 31 n.23, is insufficient. The only case CIGNA cites for support is *Syed v. Hercules Inc.*, 214 F.3d 155 (3d Cir. 2000), in which the Third Circuit considered which statute of limitations to apply to Mr. Syed's claim for benefits under § 502a(1)(B) of ERISA. At the outset of its analysis, the court noted, "Although this Circuit has not decided which state statute of limitations is applicable to ERISA § 502(a)(1)(B), *every other circuit* to address the issue has applied the statute of limitations for a state contract action." 214 F.3d at 159 (emphasis added) (collecting cases). The Third Circuit chose to apply a contract statute of limitations as well, but Delaware law had two such statutes of limitations. Thus, although the Third Circuit eventually settled on the

shorter statute of limitations under the more specific contract provision covering employment disputes, the court nevertheless accepted the premise that a contract statute of limitations is the most closely analogous state statute of limitations. The court also went on to add that it was "inclined to agree with the dissent that the one-year limitations period of § 8111 is not optimal." 214 F.3d at 161. Given the overwhelming weight of authority in the Second Circuit for applying Connecticut's six-year contract statute of limitations, the Court rejects CIGNA's argument for a shorter limit and concludes that Plaintiffs' claims are timely.[8]

    **B.    Waivers.**    Several of the named Plaintiffs and many Class members signed written waivers of claims in order to receive severance benefits.[9]  The signed waivers defined the released claims as follows:

> "Claims" are any and all claims, demands and causes of action of whatever kind, including any claim for attorney's fees, that you now have, or at any time had, against any Released Persons, but only to the extent they arise out of or relate in any way to your employment or termination of employment with the Company and its affiliates.

Ex. 525, ¶ 5(e).  Importantly, the waivers included an exception for "any claims for benefits under any retirement, savings, or other employee benefit programs." *Id.* ¶ 5(f).  CIGNA contends that the exception "only applies to claims for *benefits* under the Plan, not claims alleging statutory ERISA

---

    [8] CIGNA also argues that certain claims that Plaintiffs added to the case by way of amendments are untimely because they do not relate back to the filing of the original Complaint. *See* Defs.' Post-Trial Brief [doc. # 251], at 32 n.25.  However, the parties fully briefed this issue at the time Plaintiffs moved to amend, *see* docs. ## 112, 116, 117, 124, and CIGNA raised these very arguments in its papers.  The Court permitted the amendments to Plaintiffs' claims, *see* Ruling [doc. # 123], and declines to reconsider that decision here.

    [9] According to Plaintiffs, in discovery CIGNA produced approximately 2,000 individual releases; the Class totals more than 27,000 participants.  Plaintiffs' Post-Trial Reply Brief [doc. # 254], at 89.

violations," and that Plaintiffs' claims of statutory violations are barred by the release language of the waivers. Defs.' Post-Trial Brief [doc. # 251], at 121. The Court disagrees.

The Court acknowledges at the outset that employees can release claims of statutory ERISA violations in return for severance benefits. "In *Lockheed Corp. v. Spink*, 517 U.S. 882, 894 (1996), the Supreme Court sanctioned the use of early retirement incentives conditioned upon the release of claims and found that conditioning additional benefits on the voluntary waiver of claims against an employer was not prohibited by section 406(a)(1)(D) of ERISA." *De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 555 (E.D.N.Y. 2003) (citation and quotation marks omitted); *see also Smart v. Gillette Co. Long-Term Disability Plan*, 887 F. Supp. 383, 385 (D. Mass. 1995) ("Both parties agree that the conditioning of severance benefits on an agreement to waive an ERISA claim is not prohibited by the statute."). Nor need a release expressly mention ERISA in order for a court to conclude that ERISA claims were waived. *See, e.g.*, *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 373 (5th Cir. 2002) ("Finally, plaintiffs cite no section of ERISA or any caselaw to suggest, much less to require, that, to cover an ERISA claim, a release must specifically mention ERISA.").[10]

However, courts have also uniformly held that the party relying on the waiver bears the burden of proving that the waiver was "an intentional relinquishment or abandonment of a known right or privilege." *Smart*, 887 F. Supp. at 385 (quotation marks omitted); *see also Shaver v. Siemens Corp.*, No. 2:02cv1424, 2007 WL 1006681, at *14 (W.D. Pa. Mar. 29, 2007) ("As previously noted,

_____

[10] Similarly, in *Fair v. International Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1117 (7th Cir. 1990), the court of appeals noted that the plaintiff's claim could be characterized as arising either under the parties' settlement agreement or under ERISA, but held that even if the claim were considered to arise under ERISA, it was nevertheless barred by the covenant not to sue. *See also Linder v. Byk-Chemie USA, Inc.*, No. 3:02 CV 1956(JGM), 2006 WL 648206, at *9-*10 (D. Conn. Mar. 10, 2006) (comparing case to *Fair* and noting that the court there upheld a waiver of ERISA rights despite the fact that ERISA was not mentioned explicitly in the waiver).

it is generally recognized that the proponent of a release seeking to assert it as a defense to a cause of action bears the burden of proving the effectiveness of the release."). Further, "the validity of a waiver of pension benefits under ERISA is subject to closer scrutiny than a waiver of general contract claims." *De Pace*, 257 F. Supp. 2d at 555 (alteration and quotation marks omitted). The reason courts have taken this more protective approach in the ERISA context is "'because individuals waiving pension benefits claims are relinquishing rights that ERISA indicates a strong congressional purpose of preserving.'" *Linder v. Byk-Chemie USA, Inc.*, No. 3:02 CV 1956(JGM), 2006 WL 648206, at *6 (D. Conn. Mar. 10, 2006) (alteration omitted) (quoting *Finz v. Schlesinger*, 957 F.2d 78, 81 (2d Cir. 1992)).

When courts have found waivers to bar ERISA claims, the language of the waiver was all-inclusive and unambiguous. In *Linder*, for example, the release stated:

> The Executive hereby fully and forever releases the Company Group from any and all claims, causes of action and charges, of whatever kind or nature, whether known or unknown, which he now or hereafter may have against any member of the Company Group, including, but not limited to, claims arising under or in any way connected with his employment with the Company or the termination of such employment.

*Id.* The *Linder* court found the terms of the release to be clear, and also noted that the plaintiff was already aware at the time he signed the release of the issue for which he eventually sued his former employer. *Id.* at *8. Similarly, in *Smart*, "[t]he language of the agreement explicitly state[d] that Smart waived all claims 'known and unknown.'" 887 F. Supp. at 386. And in *Chaplin*, the court relied on a waiver to bar plaintiffs' ERISA claims because "[t]he terms of the releases unambiguously reveal an intent to cover every imaginable cause of action." 307 F.3d at 372. By contrast, in *Carter v. AT&T Co.*, 870 F. Supp. 1438 (S.D. Ohio 1994), the court sided with the plaintiff, who claimed

36

that the manner in which AT&T calculated her years of service under its pension plan violated the

Pregnancy Discrimination Act of 1978.  Ms. Carter had signed a general release of claims against

the company, but the release "specifically reserve[d] the employee's rights for benefit claims under

the pension plan."  870 F. Supp. at 1441.  The court held that AT&T's early retirement enhancement

system, which credited certain employees with additional years of service but denied full credit for

time spent on maternity leave, violated Title VII, and that this was "exactly the exception that was

provided for in the release."  *Id.* at 1442.

Consistent with the protective approach to ERISA waivers, courts have also looked askance

at defendants' attempts to use ambiguous waivers to bar claims employees reasonably thought were

preserved under a waiver.  For example, in *Thomforde v. IBM Corp.*, 406 F.3d 500, 502 (8th Cir.

2005), Mr. Thomforde signed a waiver that he (and his counsel) believed released all claims except

those under the Age Discrimination in Employment Act ("ADEA").  However, IBM argued that Mr.

Thomforde had confused the release of claims and the covenant not to sue, and that in fact Mr.

Thomforde's substantive claims under the ADEA were also barred.  The court refused to accept

IBM's position:

> We can easily see how a participant under this Agreement could construe the
> statement that 'this covenant not to sue does not apply to actions based solely under
> the ADEA' as an exception to the general release, not just an exception to the
> covenant not to sue.  Given the lack of clarity in the Agreement, and IBM's
> declination to tell Thomforde what it meant by the language, we hold that the
> Agreement is not written in a manner calculated to be understood by the intended
> participants as required by the [Older Workers Benefits Protection Act].

*Id.* at 504 (alterations omitted).  Similarly, in *Carrabba v. Randalls Food Markets, Inc.*, 145 F. Supp.

2d 763, 771 (N.D. Tex. 2000), plaintiffs sued for payments they claimed were owed under a previous

pension plan offered by the company, which had been terminated "long before the execution of any

37

of the releases" that defendant argued barred their claims.  The court refused to enforce the waivers with respect to those claims, noting that

> [t]he indication from the evidence is that neither party to the waiver/release documents gave any thought to the [prior pension plan] or any claims arising under [that plan] when the documents were drawn, signed, and delivered.  There is certainly no basis in the evidence for any finding that any signatory on such a release/waiver document intended by execution and delivery of the document to release defendant of any claim that is being asserted in this action.

*Id.* at 772.

Examining the language of CIGNA's waivers, the initial release language is broad, though not so all-encompassing as some of the releases in the cases noted above.  However, the CIGNA release contains an explicit exception for claims under CIGNA's retirement programs, and the Court finds no indication that either party, much less both, intended to draw the kind of fine distinctions CIGNA now argues the Court should read into the exception.  CIGNA points to no language, either in the waivers themselves or in the SPD for the Severance Pay Plan,[11] that suggests, let alone explicitly states, that the exception covers only claims for benefits under the terms of the Plan, and not claims under ERISA itself.  Although CIGNA cites to three decisions in the Second Circuit that have distinguished between claims for benefits and statutory ERISA violations, none of those cases considered the distinction in the context of a release of ERISA claims.  *See Campanella*, 299 F. Supp. 2d at 280, 281 (exhaustion context); *De Pace*, 257 F. Supp. 2d at 558 (same); *Gray v. Briggs*, No. 97 CIV. 6252(DLC), 1998 WL 386177, at *7 (S.D.N.Y. July 7, 1998) (same).

_____

[11] The SPD for the Severance Pay Plan states, "You will release CIGNA companies, and their officers, directors, employees and agents, from any liabilities arising out of, or related to, your employment and termination of employment (of course, your rights arising under other benefit plans on or after your termination of employment date will be preserved)."  Ex. 213, at P2307 (emphasis omitted).

CIGNA drafted the release language and certainly could have limited the exception to claims for benefits under the Plan only, and not under ERISA.[12]  CIGNA did not do so, and the Court will not rewrite the release for CIGNA at this stage.  Accordingly, the Court concludes that CIGNA, which has the burden of proof on this issue, has failed to demonstrate under any standard, much less the "closer scrutiny" applicable in the ERISA context, *see De Pace*, 257 F. Supp. 2d at 555, that the waivers signed by CIGNA employees intentionally relinquished or abandoned the claims Plaintiffs assert here.  *See Smart*, 887 F. Supp. at 385.[13]

## III.    Age Discrimination

One of Plaintiffs' principal contentions in this case is that CIGNA's cash balance plan discriminates against workers on the basis of age.  Section 204(b)(1)(H) of ERISA prohibits a defined benefit plan under which "an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."  29 U.S.C. § 1054(b)(1)(H)(i); *see also* 26 U.S.C. § 411(b)(1)(H)(i) (similar Internal Revenue Code provision).  The statutory provisions do not define "benefit accrual," "rate of . . . benefit accrual" or "because of

---

[12] As Plaintiffs note, CIGNA amended the exception clause in 2004 to cover "any claims for benefits payments to which the Plan Administrator determines you are entitled under the terms of any retirement, savings, or other employee benefit programs in which the Company participates (but your Release does cover any claims you may make for severance benefits beyond those described or referred to in this Agreement and any claims for benefits beyond those provided under the terms of the applicable plan)."  Ex. 214, at SuppD4287-SuppD4288 (¶ 5(f)(2)).  Although this change is not dispositive of the issue presented, it at least suggests that the original language was sufficiently ambiguous that employees might not have understood that CIGNA intended to preserve only claims for benefits under the terms of the Plan.  In any event, the change shows that CIGNA knew how to limit the exception clause if it wished to do so.

[13] In light of this determination, the Court need not consider, and does not decide, whether CIGNA's solicitation of releases after this action was filed would violate the rules against communication with absent Class members during the pendency of a lawsuit.

the attainment of any age." The Treasury Department proposed regulations to define those terms, but withdrew its proposals in the expectation of congressional amendments, which were not enacted at the time CIGNA adopted its cash balance plan.[14] That legislative and administrative vacuum has led to considerable litigation in the courts over the meaning of those phrases.

In brief, CIGNA – through its expert Lawrence Sher – contends that so long as the rate at which employees accrue interest and pay credits does not discriminate on the basis of age, the Plan does not violate the prohibitions on age discrimination. As Mr. Sher points out, under CIGNA's Plan, older and longer-serving employees accrue pay credits at the same or higher rates than younger or shorter-serving employees. This is because pay credits in the CIGNA Plan are age- and service-favored; interest rate credits are the same regardless of age or service. Furthermore, the calculation of opening balances favored older employees by using a more favorable conversion rate for participants whose age and service totaled 55 or greater.

Plaintiffs, on the other hand, contend that in determining the "rate of benefit accrual," courts must focus not on the annual accruals – or inputs – but rather on the benefits that are payable upon normal retirement – the outputs. Through their expert Claude Poulin, Plaintiffs assert that a younger worker who has the same service record and same compensation as a similarly-situated older worker will at normal retirement receive a greater annuity than the similarly-situated older worker. This is because the younger worker has more years to normal retirement and therefore more years to

_____

[14] In 2006, Congress passed section 701(a)(1) of the PPA, which significantly modified the application of the age discrimination provisions to cash balance plans and recognized that cash balance plans are not age discriminatory with respect to benefits earned on or after June 29, 2005. The PPA is not retroactive. Moreover, section 701(d) states that nothing in the amendments "shall be construed to create an inference" with respect to ERISA's age discrimination provision, § 1054(b)(1)(H), "as in effect before such amendments." *See Register*, 477 F.3d at 65 n.8.

accumulate benefit credits and reap the financial advantages of the phenomenon of compound interest.

Since this litigation was filed, numerous courts have addressed the precise issue presented in this case. Two divergent positions have emerged. At the risk of over-simplification, one school of thought – exemplified by a decision of the Court's colleague Judge Janet C. Hall – concludes, after an assessment of the statutory text and legislative history, that the phrase "rate of benefit accrual" in the age discrimination provision should be equated with the term "accrued benefit," which is defined in ERISA and means the annual benefit commencing at normal retirement age. *See Richards v. FleetBoston Fin. Corp.*, 427 F. Supp. 2d 150, 157-62 (D. Conn. 2006). According to this line of reasoning, since younger employees will receive an annual benefit payable at normal retirement age greater than the benefit that an older, similarly-situated worker would receive, cash balance plans (or at least plans like CIGNA's) violate the age discrimination prohibitions. Other courts have embraced Judge Hall's analysis. *See, e.g.*, *In re Citigroup*, 470 F. Supp. 2d 323; *In re J.P. Morgan Chase*, 460 F. Supp. 2d 479.

Judge Frank Easterbrook of the Seventh Circuit took a contrary view in *Cooper v. IBM Personal Pension Plan*, 457 F.3d 636 (7th Cir. 2006). *Cooper* held that when Congress used the phrases "rate of benefit accrual" and "accrued benefit" in ERISA, Congress meant different things; otherwise, according to ordinary canons of construction, Congress would not have used different phrases. According to *Cooper*, "rate of benefit accrual" refers to the rate of the employer's contributions to the plan (which in CIGNA's case is always greater for older employees than younger, similarly-situated employees), rather than to the increase due to compounding interest in a participant's accrued normal retirement benefit. As Judge Easterbrook put it, Plaintiffs' argument

41

"treats the time value of money as age discrimination . . . [and] [t]reating the time value of money as a form of discrimination is not sensible." *Id.* at 638-39. Furthermore, Judge Easterbrook explains, Plaintiffs' approach adds to the younger and older workers' accounts all of the interest earned until age 65, but then neglects to discount that resulting sum to present value for purposes of comparison. When an appropriate discount rate is used, the apparent excess earned by the younger worker (through the magic of compound interest) disappears.

The two circuit courts to address this issue since *Cooper* have agreed with Judge Easterbrook and found cash balance plans not to be age discriminatory. *See Drutis v. Rand McNally & Co.*, 499 F.3d 608 (6th Cir. 2007); *Register v. PNC Fin. Servs. Group., Inc.*, 477 F.3d 56 (3d Cir. 2007). Many other district courts have also embraced *Cooper*'s reasoning. *See, e.g., Custer v. S. New Eng. Tel. Co.*, No. 3:05cv1444 (SRU), 2008 WL 222558 (D. Conn. Jan. 25, 2008); *Tomlinson v. El Paso Corp.*, No. 04-cv-02686-WDM-MEH, 2007 WL 891378 (D. Colo. Mar. 22, 2007); *Sunder v. U.S. Bank Pension Plan*, No. 4:05CV01153 ERW, 2007 WL 541595 (E.D. Mo. Feb. 16, 2007); *Finley v. Dun & Bradstreet Corp.*, 471 F. Supp. 2d 485 (D.N.J. 2007); *Tootle v. ARINC, Inc.*, 222 F.R.D. 88 (D. Md. 2004); *Eaton v. Onan Corp.*, 117 F. Supp. 2d 812 (S.D. Ind. 2000).

The Second Circuit has not yet had the opportunity to consider this issue. However, that court currently has before it two cases that will afford the circuit an opportunity to decide the question presented by this case. In *Hirt*, 441 F. Supp. 2d 516, *appeal docketed*, No. 06-4757cv (2d Cir. Oct. 13, 2006), District Judge Alvin Hellerstein held that PNC's cash balance plan was not age discriminatory. Similarly, in *Bryerton v. Verizon Communications Inc.,* No. 06 Civ. 6672(DC), 2007 WL 1120290 (S.D.N.Y. Apr. 17, 2007), *appeal docketed*, No. 07-1680cv (2d Cir. Apr. 23, 2007), Judge Denny Chin followed *Hirt*. *Accord Custer*, 2008 WL 222558; *Laurent v.*

42

*PriceWaterhouseCoopers LLP*, 448 F. Supp. 2d 537 (S.D.N.Y. 2006). *Hirt* and *Bryerton* have been briefed but not yet argued before the Second Circuit.

Given the fact that *Hirt* and *Bryerton* are before the Second Circuit and that the courts that have considered this issue have already thoroughly discussed the arguments on each side of the question, the Court will not repeat those arguments at length in this decision. Counsel for both parties agreed that there were no material differences between CIGNA's Plan and the plans that were considered in the previously cited decisions. Suffice it to say that after careful consideration, this Court adopts the position of the Third, Sixth, and Seventh Circuits, as well as that of the district courts in *Hirt* and *Bryerton*.

In this Court's view, CIGNA's cash balance plan is not age discriminatory. To the contrary, the CIGNA Plan provides greater annual benefits to older workers who are similarly situated to younger workers. Thus, this Court agrees with Judge Chin, who recently summarized the reasons why a cash balance plan like CIGNA's is not age discriminatory:

> First, the terms of the Plan are not only age neutral, but actually provide pay credits at a rate that is more generous for older employees than for younger employees. Interest credits are calculated at an identical rate for all employees. Thus, the fact that a younger employee's pay credits are eventually worth more than those paid to an older employee (with a comparable salary and similar number of years of service) results not from discrimination, but from the fact that the younger employee has had more time to accumulate interest (as it will take more years for the younger employee to reach age 65). In other words, the discrepancy results from the time value of money.

> As the *Cooper* court explained, "[n]othing in the language or background of § 204(b)(1)(H)(i) suggests that Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings. Treating the time value of money as a form of discrimination is not sensible."

Second, plaintiffs' position is based on their repeated assertion that "benefit accrual" and "accrued benefit" are equivalent. There is, however, simply no indication that Congress meant for the two terms to be used interchangeably. Congress easily could have used the same terminology, but it did not. Indeed, I agree with Judge Easterbrook's interpretation that the phrase "benefit accrual" in § 204(b)(1)(H)(i) "reads most naturally as a reference to what the employer puts in . . . while the defined phrase 'accrued benefit' refers to outputs after compounding."

. . .

Third, a comparison of the parallel anti-discrimination provisions for defined benefit and defined contribution plans reinforces this reading of the text. According to § 204(b)(2)(A), "[a] defined contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." This provision is nearly identical with the anti-discrimination provision for defined benefit plans, with the exception that the provision for defined benefit plans states what is prohibited, while the provision for defined contribution plans states what works. . . . [I]t would make little sense for Congress to allow for the accumulation of interest for defined contribution plans, but prohibit it for defined benefit plans.

*Bryerton*, 2007 WL 1120290, at * 4-*5 (citations omitted).

Furthermore, as Judge Easterbrook pointed out in *Cooper* and as Plaintiffs' expert Mr. Poulin acknowledged, *see* Trial Tr. 266-67, when one discounts the younger worker's benefits to present value, any difference between the older worker and younger worker's annuity disappears. That is, one cannot compare what an older worker will receive as an annuity in 2015 to the annuity that a younger worker will receive in 2030. Not surprisingly, those figures will always be different and the younger worker's annuity will always look greater. That is what Mr. Poulin did in his report. But that differential is because of interest, not age discrimination. As Mr. Sher properly explains, *see* Ex. 10 (Sher Report), at 17; Trial Tr. 1147-49, to make any meaningful comparison, one needs to discount the younger worker's annuity to 2015 (or inflate the older worker's to 2030) and when that is done, the differential caused by compound interest disappears.

One final argument bears mention. In addition to what might be called the traditional age discrimination argument, Plaintiffs claim that CIGNA's Plan discriminates against older employees because, they say, wear away affects older employees more than younger employees – older participants have longer wear away periods under the CIGNA Plan according to Plaintiffs. If that were true, Plaintiffs might well have a good age discrimination claim. But the Court finds that there is simply no evidence to support Plaintiffs' assertion, and much of the evidence refutes it.

Plaintiffs rely heavily upon the fact that wear away is affected by the elimination of subsidized early retirement benefits in calculating the opening balance and that early retirement eligibility is a function of age. But as the experts testified, wear away results from a variety of factors, and in this case it was principally driven by the fall in interest rates, which affects all employees equally. *See Custer*, 2008 WL 222558, at \*10 ("The 'wear-away' period is not necessarily longer for older workers; it is longer for workers that have greater frozen benefits. Under the old plan, the size of a worker's frozen benefits is a function of a worker's salary and years of service, not his age."). Furthermore, Plaintiffs' expert acknowledged that the mortality discount used in calculating the minimum benefit always is greater for younger participants than for similarly-situated older participants. Indeed, Plaintiff's expert conceded that he had never actually analyzed the lengths of wear away periods for older and younger participants, or even the demographics of the participants in the Plan, though in his defense Plaintiffs complain that CIGNA failed to produce during discovery the data necessary to conduct such an analysis.[15] However, if CIGNA's Plan did

---

[15] CIGNA maintains that it did not calculate the length of wear away periods for any employees, and that there was, as a result, no such data to produce to Plaintiffs. *See* Defendants' Responses to the Court's January 25, 2008 Questions [doc. # 267], at 13. Further, CIGNA persuasively argues that no actual participant data would have been required in order to analyze whether the length of wear away periods was discriminatory on the basis of age. *Id.* at 14.

45

structurally disfavor older employees in terms of wear away, the Court does not understand why Mr. Poulin could not have shown it; he seemed to have little difficulty seeking to show other alleged adverse impacts from the structure of the CIGNA Plan.

Finally and importantly, the Court agrees with CIGNA that what Plaintiffs see as age discrimination is merely the transition from one plan that was heavily age-favored to another plan that is still age-favored but less so. In the Court's view, that transition is not age discrimination. *See Cooper*, 457 F.3d at 642 ("But removing a feature that gave extra benefits to the old differs from discriminating against them. Replacing a plan that discriminates against the young with one that is age-neutral does not discriminate against the old.").

## IV.   Anti-Backloading and Non-Forfeiture Rules

**A.   Anti-Backloading Rules.**     Section 204 of ERISA addresses "backloading," or the practice by which employers seek to postpone the crediting of the bulk of retirement benefits to their employees' pensions until late in the employees' careers. *See* 29 U.S.C. § 1054(a)-(b)(1). Backloading does not merely postpone the time at which employers must make contributions to the employees' accounts; it also benefits the employer because only employees who remain at the company until retirement reap relatively large retirement benefits. As the Second Circuit explained in *Langman v. Laub*, 328 F.3d 68 (2d Cir. 2003), "'The primary purpose of [minimum accrual rates] is to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue 'backloading,' i.e., by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the

---

Accordingly, the Court will not draw an adverse inference against CIGNA, as Plaintiffs request.

employee's later years of service when he is most likely to remain with the firm until retirement.'" *Id.* at 71 (alteration in original) (quoting H.R. Rep. No. 93-807 (1974)).

The anti-backloading provisions of ERISA require employers to satisfy one of three possible tests, all aimed at ensuring a steady accumulation of retirement benefits over the course of an employee's career. The parties agree that the applicable test in this case is the so-called 133-1/3% rule, rather than the 3% rule or the fractional accrual rule, because benefits under CIGNA's cash balance plan are calculated using a career pay history. *See* 29 U.S.C. § 1054(b)(1). The other two rules apply to plans that, unlike the CIGNA Plan, base their benefit calculations on final or highest average pay. *See* 29 U.S.C. § 1054(b)(1)(A), (C).

It is apparent from the statutory text that the 133-1/3% rule is prospective, in that an employer must demonstrate each year that the plan will comply with the rule in all future years; benefit accruals in previous years are not taken into consideration. *See* IRS Revenue Ruling 2008-7. A defined benefit plan satisfies the requirements of the 133-1/3% rule if under the plan

> the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

29 U.S.C. § 1054(b)(1)(B); *see also* 26 C.F.R. § 1.411(b)-1(b)(2). Thus, the rate of benefit accrual in any given year may not exceed the rate of benefit accrual in any prior year by more than 133-1/3%. The corollary of this requirement is that each year's accrual must be no less than 75% of any later year's accrual.

47

There are important limitations or restrictions in making the calculations required to demonstrate compliance with the rule.  For one, the 133-1/3% rule is to be examined without consideration of any prior formulas or prior plans.  Thus, the rule provides that  "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." 29 U.S.C. § 1054(b)(1)(B)(i).  Furthermore, "the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded."  29 U.S.C. § 1054(b)(1)(B)(iii).  In light of this provision, Plaintiffs conceded at oral argument that wear away due solely to the exclusion of early retirement benefits from the protected minimum benefit should not be considered in determining compliance with the 133-1/3% rule.  In addition to the exclusion of early retirement benefits from the calculations under the 133-1/3% rule, ERISA also provides that "social security benefits and *all other relevant factors* used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year."  29 U.S.C. § 1054(b)(1)(B)(iv) (emphasis added).  These factors include the applicable consumer price index, for example.  *See* 26 C.F.R. § 1.411(b)-1(b)(2)(D).

Plaintiffs make two arguments under the 133-1/3% rule.  Their principal argument is that Part B violates the rule because there are no benefit accruals during wear away periods, as benefits under Part B will not be paid to an employee with a protected minimum benefit under Part A unless and until the employee's cash balance account exceeds the protected minimum benefit.  The second claim does not rely on the phenomenon of wear away; rather, Plaintiffs argue that Part B violates the 133-1/3% rule structurally because of the use of variable interest rates.  Neither of these arguments is persuasive.

48

Regarding wear away, the evidence showed that there were many CIGNA employees who experienced this phenomenon, including named Class representatives. During the wear away period, Plaintiffs argue, the rate of benefit accrual is zero. Thus, any later accrual, once the cash balance account exceeds the protected minimum benefit, must necessarily be more than 133-1/3% of the (non-existent) accrual during wear away. CIGNA points out that Plaintiffs' argument is dependent upon comparing the minimum vested benefit under CIGNA's prior plan with the accrued benefits under CIGNA's new plan, and argues that such a comparison between the two plans is not permissible under 29 U.S.C. § 1054(b)(1)(B)(i). In response, Plaintiffs invoke the so-called "aggregation rule," under which

> [a] defined benefit plan may provide that accrued benefits for participants are determined under more than one plan formula. In such a case, the accrued benefits under all such formulas must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfy one of the alternative methods [i.e., one of the three anti-backloading tests].

26 C.F.R. § 1.411(b)-1(a). Plaintiffs assert that the aggregation rule should apply to Part B because "more than one plan formula" is involved in calculating the benefit accruals of employees who have a protected minimum benefit under Part A. Plaintiffs' claim is that although benefit accruals under Part A were frozen before Part B was introduced, Part B is still sufficiently dependent on Part A that the two plans can both be said to determine participants' accrued benefits within the meaning of the aggregation rule.

The Court disagrees with Plaintiffs. It is true that a participant's right to be paid her vested benefits from a prior version of the Plan may indirectly affect the accrual calculation under the new version of the Plan during the wear away period. However, the Court does not consider the mere comparison of benefits under Part A and Part B to constitute sufficient use of the terms of Part A to

49

qualify for the application of the aggregation rule.  The potential overlap of the two versions of

CIGNA's Plan, referred to here as a wear away period, is essentially an artifact of the transition from

a defined benefit plan to a cash balance plan; it is not a backloading issue.[16]  Even Plaintiffs' expert,

Mr. Poulin, admitted that if CIGNA had originally implemented a cash balance plan, rather than a

defined benefit plan, there would have been no wear away for any employees, *see* Trial Tr. 409:15

to 410:16, and so no possibility of a backloading claim based on that wear away.  Assuming that Part

B is not itself violative of the 133-1/3% rule, then, Part B does not impermissibly backload CIGNA

employees' benefits.

The Court finds further support for its decision in the fact that all other courts to have

considered whether a transition from a defined benefit plan to a cash balance plan under a "greater

of A or B" approach like CIGNA's falls under the aggregation rule, have held that it does not.  As

the Third Circuit noted in *Register*, 477 F.3d 56, Plaintiffs' "argument fails . . . because it cannot

surmount the barrier that the [aggregation rule] they cite does not apply in cases of plan amendments.

Rather, it applies in cases where there are *two co-existing formulas under a single plan*." *Id.* at 71-72

(emphasis added).  Judge Hall also recently dismissed an almost identical argument under the

aggregation rule in *Richards*, 427 F. Supp. 2d at 171, on the ground that under 29 U.S.C.

§ 1054(b)(1)(B)(i),

---

[16] Plaintiffs point for support to Example 3 in 26 C.F.R. § 1.411(b)-1(b)(2)(B)(iii), which states that a plan that provides for accruals of 2% of salary for the first five years, 1% of salary for the second five years, and then 1.5% of salary for each year thereafter fails the 133-1/3% test, despite the fact that the average of the accumulations would not violate the test.  The Court does not find this example persuasive, because the change in accumulation rates that Plaintiffs rely on in the case of CIGNA's Plan is not the result of a specific plan provision, but rather is due to the shift from Part A to Part B.  As discussed above, under the amendment rule Part B is considered always to have been in effect.

the Amended Plan is treated as having been in effect for all plan years, [and so] employees such as Richards would never have accrued a benefit under the Traditional Plan, and would have started accruing benefits under the cash balance formula from the start of their employment. Assuming such a scenario, such employees would suffer no backloading of benefits.

*See also Custer*, 2008 WL 222558, at \*12-\*13 (applying amendment, rather than aggregation, rule in the case of a cash balance transition employing the "greater of A or B" model); *Finley*, 471 F. Supp. 2d at 494-95 (same); *Allen v. Honeywell Ret. Earnings Plan*, 382 F. Supp. 2d 1139, 1160 (D. Ariz. 2005) ("Thus, in determining whether a new benefit formula violates the 133 1/3 percent rule, one does not compare the new formula with the old formula; rather, the backloading question must be answered by considering the new formula on a stand-alone basis."). Although Plaintiffs attempt to distinguish this line of cases, they cite to no opinion in which the court applied the aggregation rule, rather than the amendment rule, to a similar conversion from a traditional defined benefit plan to a cash balance plan.

The Court's conclusion also sensibly conforms to the policy concerns motivating the anti-backloading rules. Those rules were intended to ensure the steady accumulation of retirement benefits and to protect employees' interests.[17] Assuming that the "greater of A or B" formula was intended to, and did in fact, guarantee that CIGNA employees who had accrued benefits under Part A received the larger of those benefits or the new benefits they accrued under Part B, the Plan furthered, rather than frustrated, the goals of the 133-1/3% rule. This fact reinforces the Court's conviction that the backstop provided by the protected minimum benefit is simply a form of

---

[17] Thus, the Court rejects Plaintiffs' narrow interpretation of the purpose of the aggregation rule, which they claim is limited to a scenario in which an employer seeks to provide an across-the-board increase in benefits to employees of a magnitude that would otherwise violate the 133-1/3% rule. *See* Pls.' Post-Trial Brief [doc. # 247], at 21.

grandfathering to assure an orderly and sensible transition between plans, and not impermissible back-loading.[18]  *See Register*, 477 F.3d at 72 ("Moreover, the objective of the anti-backloading provisions, to prevent a plan from being unfairly weighted against shorter-term employees, simply is not implicated by the PNC conversion [to a cash balance plan].") (quotation marks and citation omitted).

Plaintiffs also argue that apart from the issue of wear away, there is a structural flaw in CIGNA's Plan that violates the 133-1/3% rule.  Part B uses a fixed scale of pay credits that ranges from 3-7% of pay under the Social Security integration level.  As 7% is more than 133-1/3% of 3%, the only way that Part B can satisfy the 133-1/3% rule is if the interest credits added to the pay credits "smooth out" the overall accumulation of retirement benefits.  This smoothing occurs because the younger employees, having more time until retirement, receive more interest credits than similarly-situated older employees, helping to offset the greater pay credit percentages for the latter group.  Under Part B, interest credits, unlike pay credits, are not set in advance; rather, they are based on an interest rate that is variable within a certain range.  Plaintiffs argue that fluctuating interest rates may cause the accrual of the normal retirement benefit to vary in ways that would violate the 133-1/3% rule. This is because each year's interest rate is used to project the value of the cash balance account to normal retirement age and so to estimate an employee's age-65 annuity (the

---

[18] Although not binding, a recent IRS Revenue Ruling came to the same conclusion with respect to plans such as CIGNA's, which preserve benefits already accrued under the pre-conversion formula in the form of a guaranteed minimum benefit. *See* IRS Rev. Rul. 2008-7, at 12 ("Ordinarily, a period of zero annual rate of accrual followed by a period of positive annual rates of accrual would result in a plan failing to satisfy the 133 1/3% rule.  However, because there is no ongoing accrual under the pre-conversion formula for these participants for service after the January 1, 2002 effective date of the conversion amendment, the lum sum-based benefit formula is the only formula under the plan . . . and, pursuant to the special rule of § 411(b)(1)(B)(i), that formula is treated as if it were in effect for all other plan years.").

"normal retirement benefit" for defined benefit plans).  Even seemingly small changes in interest rates from year to year may result in large fluctuations in the accumulation of the normal retirement benefit as a result of the projection of those current benefits potentially decades into the future.

This argument, too, fails under the plain language of the relevant statutory section.  ERISA states that "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year."  29 U.S.C. § 1054(b)(1)(B)(iv); *see also* 26 C.F.R. § 1.411(b)-1(b)(2)(D).  Thus, CIGNA could permissibly hold constant, as it did, the interest rate used to calculate the accumulation of future benefits in determining compliance with the anti-backloading rules.  *See Wheeler v. Boeing Co.*, No. 06-cv-500-DRH, 2007 WL 781908, at *3 (S.D. Ill. Mar. 13, 2007) ("Plaintiffs . . . argue that the 'real-world' effect of the Plan's use of a variable interest rate (the annual rate on 30-year Treasury securities) to compute 'Interest Credits' creates a situation in which variations in the 30-year Treasury rate are likely to cause backloading.  This argument is simply wrong.  The Plan clearly is a 'frontloaded' – not backloaded – cash balance plan within the meaning of applicable Treasury regulations.  As noted, 26 C.F.R. § 1.411(b)-1 states plainly that factors used to compute benefits will be assumed to be constant even when a plan uses a variable outside index like the Consumer Price Index ("CPI") to compute such benefits.").  Further, assuming that future years' benefits do not accrue at a rate that exceeds 133-1/3% of the rate for the base year in question, the fact that the base year's rate of accrual may exceed that of a prior year by more than 133-1/3% due to real-world fluctuations in interest rates does not violate the rule.[19]  Plaintiffs have not claimed, or provided any evidence to suggest, that if

---

[19] Again, although not binding, Revenue Ruling 2008-7 supports this interpretation of the statute and regulations.  *See* IRS Rev. Rul. 2008-7, at 10-12 (holding interest rate and conversion factor for future years constant in application of 133-1/3% rule, and applying the rule only

one holds constant any interest rate in CIGNA's permissible window of 4.5-9% for all future Plan years, the rate of future benefit accrual would violate the 133-1/3% rule.

Furthermore, under Part B, employees could only benefit from the variability of interest rates – they will never earn less than 75% of any future year's accrual in a given year, assuming that the minimum interest rate applies, and they may earn more if they retire in a year in which the variable interest rate happens to be higher than the minimum guaranteed rate.[20]  The court in *Wheeler*, 2007 WL 781908, at *5, noted the "gotcha!" quality of Plaintiffs' argument,

> which seeks to trip up the Plan on the basis of swings in the 30-year Treasury rate. The Court sees no compelling interest in playing such games, or in forcing Boeing to alter Plan provisions that obviously are intended to benefit Plan participants.  As discussed, the Plan provides a minimum 5.25% floor for computing "Interest Credits," but the variable rate enables participants to do better than 5.25% in Plan years when the applicable 30-year Treasury rate exceeds the 5.25% floor.

*Id.* at *5.  Thus, the Court holds that the 133-1/3% rule is not violated by the use of a variable interest rate, provided that no interest rate in the 4.5-9% window, held constant, results in impermissible backloading.  Although the Court is sympathetic to Plaintiffs' concerns regarding wear away, and will discuss that issue in greater detail elsewhere in this opinion, the Court finds that Part B does not violate ERISA's prohibition on backloading.

---

prospectively), 18-19 (noting that if the applicable interest rate in a future year, held constant, results in an accrual pattern that violates the rule on a going-forward basis, the plan would need to be amended to bring it into compliance).

[20] Defendants also note that this uncertainty regarding the exact value of the age-65 annuity is inevitable when a variable interest rate is used, as it is impossible definitively to determine the value of the annuity without knowing the market-based interest rate that will apply in the year of the employee's retirement.  Prior to that point, only estimates are available, based on each year's rate. Defendants point to 29 U.S.C. § 1054(b)(1)(B)(iv) as an indication that Congress did not intend that all such variable interest rate plans be forbidden as failing to satisfy the 133-1/3% rule.

    **B.    Non-forfeitable Benefits.**    As part of its efforts to protect employees and their

retirement benefits, ERISA prohibits the forfeiture of accrued benefits except under limited

circumstances that do not apply to this case.  *See* 29 U.S.C. § 1053(a)(3).  Section 203(a) of ERISA

states emphatically, "Each pension plan shall provide that an employee's right to his normal

retirement benefit is nonforfeitable upon the attainment of normal retirement age . . . ."  29 U.S.C.

§ 1053(a).  A defined benefit plan "satisfies the requirements of this clause if an employee who has

completed at least 5 years of service has a nonforfeitable right to 100 percent of the employee's

accrued benefit derived from employer contributions."  *Id.* § 1053(a)(2)(A)(ii).  Elsewhere, ERISA

defines "nonforfeitable" as "a claim obtained by a participant or his beneficiary to that part of an

immediate or deferred benefit under a pension plan which arises from the participant's service, which

is unconditional, and which is legally enforceable against the plan."  29 U.S.C. § 1002(19).

    Plaintiffs argue that Part B works an impermissible forfeiture for two reasons.  First, Article

VII of Part B gives CIGNA employees the option of receiving their retirement benefits as either an

annuity or a lump sum.  *See* Ex. 1 (Part B), at D00305-D00307 (Art. VII).  However, as Section 7.3

makes clear, a prior Part A participant's vested early retirement benefits are available only if the

employee chooses an annuity.  *See id.* at D00309 (§ 7.3).  Thus, Plaintiffs claim that an employee

choosing a lump sum forfeits any early retirement benefits for which she otherwise qualified.

Second, even disregarding early retirement benefits, Plaintiffs argue that in establishing a "greater

of A or B" formula, CIGNA has required its employees to forfeit either the cash balance accruals,

if they choose an annuity, or the protected minimum benefit, if they choose a lump sum.  For the

reasons that follow, the Court rejects each argument.

Despite ERISA's requirement that benefits be non-forfeitable, employers have substantial leeway in deciding how to define the non-forfeitable benefit.  As the Supreme Court explained in *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981),

> the statutory definition of "non-forfeitable" assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit.  As we explained last Term, "it is the claim to the benefit, rather than the benefit itself, that must be 'unconditional' and 'legally enforceable against the plan.'"

*Id.* at 512 (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 466 U.S. 359, 371 (1980)).  In *Alessi*, an employer sought to offset the pension benefits of its employees by the value of any workers' compensation benefits for which those employees were eligible.  The Supreme Court held that such offsets did not work an impermissible forfeiture of benefits under ERISA.  According to the Supreme Court, "It is particularly pertinent for our purposes that Congress did not prohibit 'integration,' a calculation practice under which benefit levels are determined by combining pension funds with other income streams available to the retired employees."  *Id.* at 514; *see Bonovich v. Knights of Columbus*, 963 F. Supp. 143, 148 (D. Conn. 1997) (permitting integration of participants' renewal commissions with their pension plan benefits).[21]   The Court further noted that "in considering this integration option, the House Ways and Means Committee expressly acknowledged the tension between the primary goal of benefit[t]ing employees and the subsidiary goal of

---

[21] Similarly, in *Williams v. Caterpillar, Inc.*, 944 F.2d 658 (9th Cir. 1991), the Ninth Circuit upheld a pension plan with different sub-plans for managers and non-managerial union workers. Upon retirement, employees who had worked both as managers and in non-managerial positions received the greater of the benefits as calculated under each of the sub-plans. Plaintiffs complained that in receiving benefits under the managers' sub-plan, they were required to forfeit the benefits they had earned under the non-managerial union workers' sub-plan. Citing *Alessi*, the court held that Caterpillar had broad discretion to determine the content of its employees' pension benefits and that Caterpillar had not abused that discretion. *Id.* at 664-65.

containing pension costs." *Alessi*, 451 U.S. at 515. As a result, Congress chose the compromise position of protecting the overall level of benefits to which employees were entitled, while at the same time permitting employers to use funds freed up by the integration procedure to support the pensions of employees without access to such third-party sources of income.

Although CIGNA did not employ an integration procedure *per se* in defining benefit accrual under Part B, the company's use of a "greater of A or B" formula had a similar effect. Part B explicitly defines the "accrued benefit" of prior participants in Part A as "no . . . less than the present Equivalent Actuarial Value . . . of the Participant's Minimum Benefit" under Part A. Ex. 1 (Part B), at D00270 (§ 1.1(c)). The minimum benefit, in turn, is "the Participant's Part A Accrued Benefit, expressed in the form of a single life annuity commencing at the Participant's Normal Retirement Date," increased by the "Equivalent Actuarial Value of the . . . Preserved Spouse's Benefit" where applicable. *Id.* at D00280 (§ 1.32). CIGNA thus defined benefit accrual under Part B as occurring only when and if the cash balance account of prior Part A participants exceeds the minimum benefit under Part A. As *Alessi* made clear, this approach is permissible, and in fact CIGNA's Plan is more favorable to its employees than that approved by the Supreme Court. After all, CIGNA considers only benefits it already owes to participants under Part A, not additional sources of outside income such as workers' compensation. Unless a benefit has accrued under Part B, no impermissible forfeiture can take place, and so the Court must reject Plaintiffs' argument that in establishing a "greater of A or B" formula, CIGNA has required them to forfeit either the cash balance accruals, if they choose an annuity, or the early retirement benefits, if they choose a lump sum.

Two other courts have reached the same conclusion in similar circumstances, where employers used an "A or B" approach in shifting from a defined benefit to a cash balance retirement

plan.  In *Richards*, 427 F. Supp. 2d 150, FleetBoston established opening account balances for its employees in a manner similar to CIGNA's.  Those employees who had previously accrued benefits under the old pension plan, as under Part B, would receive the greater of the cash balance account at the time of retirement or the frozen benefits under the prior plan.  Early retirement benefits were not made a part of the opening account balances, and so FleetBoston employees argued that they were required impermissibly to forfeit those benefits in order to receive the benefits accrued under the new plan, or were forced to forfeit the cash balance accruals if they chose the frozen benefits.  FleetBoston, on the other hand, argued that no forfeiture existed, because employees always received the greater of the two amounts.  Again looking to *Alessi*, the court held that

> the Amended Plan terms give Richards no claim to benefit accrual during the years in which her hypothetical account balance is below the value of her frozen Traditional Plan benefit.  Section 203(a) gives Richards a non-forfeitable claim to her accrued benefit, but the balance of the hypothetical cash account does not become part of her accrued benefit until it surpasses the value of the frozen Traditional Plan benefit.  Thus, the plan does not require a forfeiture of an accrued benefit, nor is the receipt of accrued benefits conditional.

427 F. Supp. 2d at 170.  Thus, FleetBoston had authority to determine the content of the benefit that, once accrued, became non-forfeitable under ERISA, and the company chose to define the accrued benefit as the balance in the cash account *only if* it exceeded the frozen benefits.[22]

Similarly, in *Campbell v. BankBoston, N.A.*, 327 F.3d 1 (1st Cir. 2003), BankBoston shifted from a defined benefit to a cash balance plan, but put in place a "benefit safeguard" provision

---

[22] Plaintiffs attempt to distinguish *Richards* on the basis that Part B permits employees to choose between their frozen benefits (as an annuity) and their current benefits (as a lump sum), *see* Pls.' Post-Trial Reply Brief [doc. # 254], at 11-13, whereas FleetBoston's plan automatically provided participants with the greater of the two benefits.  The Court does not find the presence of an employee election to be material to its analysis in light of its determination that there was no accrued benefit to forfeit, whether automatically or by choice, until the cash balance account exceeded the protected minimum benefit under Part A.

intended to ensure that employees who had accumulated benefits under the defined benefit plan would not receive less than the value of those benefits upon retirement.  Given that Mr. Campbell's accruals under the old plan were significantly larger than the opening balance of his cash account, the implementation of the cash balance plan effectively ended his pension accrual.  In upholding BankBoston's plan under ERISA, the First Circuit noted that "[b]enefits already earned under an old plan may not be taken away, but benefits expected but not yet accrued are not similarly protected." *Id.* at 8 (citations omitted).  Thus, "[t]here was no forfeiture, because no accrued benefits were reduced; only expected benefits were reduced, which BankBoston could, under the law, modify or eliminate."  *Id.*

For similar reasons, the Court reaches the same result with respect to Plaintiffs' early retirement benefits. Part B states:

> A Participant's normal retirement benefit shall be his Accrued Benefit at his Normal Retirement Date.  Notwithstanding the foregoing, the amount of the Participant's normal retirement benefit, expressed in the form of a single life annuity, shall in no event be less than the greatest early retirement benefit he could have received if he had elected to retire and commence receiving his vested Accrued Benefit in the form of a single life annuity prior to his Normal Retirement Date.

Ex. 1 (Part B), at D00294-D00295 (§ 5.2(a)).  Although this language would appear to support Plaintiffs, the text continues, "This provision is intended to comply with Treas. Reg. § 1.411(a)-7(c), and shall have no application except as required by that regulation."  Treasury Regulation 1.411(a)-7(c) excludes Social Security offsets from the calculation of an employee's "early retirement benefit." 26 C.F.R. § 1.411(a)-7(c)(4)(i) ("For purposes of this paragraph [on calculating the normal retirement benefit], the early retirement benefit under a plan shall be determined without regard to any social security supplement.").  Further, actuarial subsidies such as Part A's subsidized early

retirement benefits are also ignored under the regulations for the purposes of calculating the normal retirement benefit. *See* 26 C.F.R. § 1.411(a)-7(c). Thus, Part B complies with the Treasury regulations by including only the value of the Preserved Spouse's benefit, where applicable, in the value of the minimum benefit under Part A, as the other benefits offered under Part A (the Social Security offset and the subsidized early retirement benefits) need not be included. A violation of the non-forfeitability statute, then, could only occur if a CIGNA employee chose a lump sum distribution worth less than the present actuarial value of his normal retirement benefit under Part A, plus the Preserved Spouse's benefit if applicable. Because Plaintiffs have not shown that any employee in fact made such a choice, they have failed to demonstrate any impermissible forfeiture.

Plaintiffs cite to *Esden*, 229 F.3d 154, and *Berger*, 338 F.3d 755, for support, but these cases are inapposite. Both deal with the phenomenon known as "whipsaw." Whipsaw may occur when an employee under a defined benefit plan requests a lump sum disbursal of his benefits before reaching age 65. Cash balance plans must be "frontloaded" in order to be tax-qualified, meaning that the employee vests in his future interest credits at the same time that he vests in the underlying pay credits. As a result, he is entitled to the interest on any already-earned pay credits until the normal retirement age of 65, even if he chooses to retire sooner. If the employee retires at the age of 55 and requests a lump sum, for example, the employer must use a projection rate to calculate the actuarial value of the annuity at age 65, and then apply a discount rate to determine the present lump sum value of that annuity at the time of disbursal. The federal government sets the discount rate that pension plans must use to determine the present value of future sums, but the plans themselves set the projection rate. Thus, if the projection rate is higher than the discount rate (which was the case in *Esden* and *Berger*), then the present value of the employee's normal retirement benefit will exceed

his current cash account balance.  This disparity is known as whipsaw.  In order to avoid paying employees a sum greater than the balance of their cash accounts, the employers in *Esden* and *Berger* adopted a special projection rate for these kinds of early retirement calculations, and set the projection rate equal to the government-mandated discount rate.  The result was that the projected actuarial value of the normal retirement benefit, when discounted to its present value, was equivalent to the balance in the cash accounts.

The courts in both *Berger* and *Esden* held that the employers' practice constituted an impermissible forfeiture of accrued benefits under 29 U.S.C. § 1053(a).  *See Berger*, 338 F.3d at 761-62; *Esden*, 229 F.3d at 173.  However, in both *Berger* and *Esden*, the benefits in question were future interest credits on underlying pay credits that the employees had already accrued.  These future interest credits are unquestionably part of the normal retirement benefit that ERISA protects.  Here, on the other hand, as already explained, Plaintiffs have not been required to forfeit any part of their normal retirement benefit.  The pay and interest credits under Part B do not accrue (and so become part of the normal retirement benefit) until the balance of the cash account exceeds the minimum benefit under Part A, and all the elements of the benefits provided under Part A that ERISA protects from forfeiture are made part of the minimum benefit under Part B.  As a result, *Esden* and *Berger* are simply irrelevant, and the Court finds as a fact that no violation of the non-forfeiture statute occurred here.

## V.    Plan Descriptions and Disclosures

Plaintiffs assert that CIGNA failed to provide certain required disclosures to its employees and that the plan descriptions that CIGNA did provide did not meet the statutory standards under

ERISA. Before turning to the parties' arguments, however, the Court must first address CIGNA's contention that Plaintiffs did not sue the right defendant on these claims.

A.      **Plan Administrator.** CIGNA argues that Plaintiffs' failure to name the plan administrator as a defendant, in addition to CIGNA and the CIGNA Pension Plan, is fatal to Plaintiffs' claims regarding plan descriptions and disclosures because only the plan administrator may be held liable for defects in the notices and disclosures required by ERISA.

The Court readily acknowledges that this particular area of ERISA is even more confused and confusing than other aspects of ERISA law. The confusion is apparent from the variety of approaches taken even within this District. For example, in *Custer*, 2008 WL 222558, the court never discussed the possibility that only the plan administrator could be held liable for failures in plan descriptions, despite the fact that the plaintiffs in that case had only named the plan and the employer as defendants. By contrast, in *Richards*, 427 F. Supp. 2d 150, the court focused on the nature of the relief requested – whether under ERISA § 502(a)(1)(B) or § 502(a)(3) – and dismissed claims against the employer brought under the former section but allowed claims under the latter.

Whether the plan administrator alone may be held liable for defects in statutorily-required notices and disclosures is more complicated than, and conceptually distinct from, the question of under which statutory section Plaintiffs seek relief. Under ERISA, the plan administrator is responsible for issuing certain required disclosures, such as periodic Summary Plan Descriptions ("SPDs") and Summaries of Material Modifications ("SMMs"), *see* 29 U.S.C. § 1024(b)(1), and notices of significant reductions in the rate of future benefit accrual under § 204(h). *See* 29 U.S.C. § 1054(h)(1). ERISA defines the plan administrator as "the person specifically so designated by the terms of the instrument under which the plan is operated [or] if an administrator is not so designated,

the plan sponsor."  29 U.S.C. § 1002(16)(A).  In this case, the plan sponsor is CIGNA.  *See* 29

U.S.C. § 1002(16)(B)(i).  The plan administrator at the time the § 204(h) notice and 1998 and 1999

SPDs were published was Mr. Stewart Beltz, a CIGNA employee, and the current holder of that

position is Mr. John Arko, another CIGNA employee.  *See* Ex. 507, at SuppD1098, SuppD1092.

Neither of these individuals was  named as a defendant in this suit; the only defendants are CIGNA

and the CIGNA Pension Plan.

        In arguing that the plan administrator is the only party who can be sued on Plaintiffs'

disclosure claims, CIGNA relies primarily on the statutory language in the sections of ERISA

regarding the provision of notices and disclosures.  Both § 204(h) and § 104(a), which discusses

SMMs and SPDs, explicitly require the plan administrator to provide the documents at issue.  *See*

29 U.S.C. § 1054(h) (an amendment is invalid unless "the *plan administrator* provides a written

notice" meeting the requirements of the statute) (emphasis added); 29 U.S.C. § 1024(b)(1) (stating

that "*[t]he administrator* shall furnish to each participant" the required SPDs and SMMs) (emphasis

added).  Indeed, Plaintiffs admit that "ERISA places the responsibility for these disclosures on the

'plan administrator.'"  Pls.' Post-Trial Brief [doc. # 247], at 51.  The Second Circuit has also noted

this assignment of duties by permitting suits to recover benefits under a plan to proceed against the

plan itself and/or the administrator of the plan, while restricting claims of inadequate disclosures to

plan administrators only.  *See Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993) ("ERISA

undoubtedly requires that participants be told who has the financial obligation to fund the plans.  But

that obligation is placed on the person designated under ERISA as the 'administrator' of the plan, not

on every fiduciary."); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 104 (2d Cir. 2005) (limiting

liability for defective notices to administrators as defined by ERISA); *see also Klosterman v. W. Gen.*

*Mgmt.*, 32 F.3d 1119, 1122 (7th Cir. 1994) ("Western General, the only defendant, cannot be held liable for any inaccuracies in the SPD.  Congress has explicitly provided that the responsibility for complying with these statutory requirements falls on the plan administrator.  The case law also confirms that any cause of action for violations of these disclosure requirements is proper only against the plan administrator, the party responsible under the statute.").

Plaintiffs have two responses to CIGNA's argument: first, that the designation of Mr. Beltz, and presumably also Mr. Arko, as plan administrator was procedurally defective (making CIGNA, as the plan sponsor, the default administrator); and second, that even if Mr. Beltz was the validly-appointed plan administrator, CIGNA effectively retained control over the content and provision of the documents at issue in this case and therefore CIGNA should be held liable for any defects in those documents.[23]

Plaintiffs claim that CIGNA should be considered the plan administrator under 29 U.S.C. § 1002(16)(A) because Part B does not designate an individual by name as administrator.  However, Treasury regulations explain that the plan instrument may "specifically designate" an administrator in a variety of ways:

---

[23] The Court requested after trial that counsel brief the possibility of adding the plan administrator (whether Mr. Beltz or Mr. Arko) as a defendant at this time.  Plaintiffs were amenable to the idea but continued to assert that the addition was not necessary, *see* Plaintiffs' Brief on Whether an Individual Employee/Plan Administrator Can Be Added as a Defendant [doc. # 265]; CIGNA objected to the addition and also argued that the claims against the administrator would not relate back to the original Complaint and so would be untimely.  *See* Defendants' Memorandum of Law in Response to the Court's September 24, 2007 Order Regarding the Addition of a New Defendant and Notice of Supplemental Authority [doc. # 264].  In light of the contentiousness of the issue and the Court's resolution of the question on other grounds, the Court did not pursue the matter further.  However, the Court notes that had Plaintiffs' counsel, even simply in an excess of caution, elected to name the plan administrator in addition to the company and the Plan itself, substantial confusion and effort would have been avoided.

> (1) By name, (2) By reference to the person or group of persons holding a named position or positions, (3) By reference to a procedure established under the terms of the instrument pursuant to which a plan administrator is designated, or (4) by reference to the person or group of persons charged with specific responsibilities of plan administrator. . . .

26 C.F.R. § 1.414(g)-1(a). The Court finds that CIGNA's Plan uses the third method to designate an administrator. Article XIII, "Plan Administration," states that "[t]he [Corporate Benefit Plan] Committee shall delegate to a Plan Administrator the duties, authority and functions set forth in this Article XIII," and that "[t]he Plan Administrator shall perform all such duties as are necessary to operate, administer and manage the Plan in accordance with [] its terms . . . ." Ex. 1 (Part B), at D00329 (§§ 13.1, 13.2). Thus, the Court agrees with CIGNA that detailing the procedure by which Mr. Beltz was eventually chosen was sufficient to satisfy the "specific designation" requirement under ERISA and Treasury Regulation 1.414(g)-1(a). The Court, therefore, rejects Plaintiffs' first response to CIGNA's argument that Plaintiffs have sued the wrong defendant.

However, the Court agrees with Plaintiffs regarding CIGNA's role in the actual administration of Part B. Despite its finding regarding the validity of Mr. Beltz's appointment as plan administrator, the Court believes that CIGNA should be treated as a *de facto* administrator or co-administrator of the Plan for purposes of the disclosures at issue in this case.[24] For the Court finds, on the basis of numerous facts, that CIGNA, and not the plan administrator, had exclusive responsibility for the preparation and publication of these notices and disclosures. In fact, Mr. Beltz, the plan administrator named in the 1998 and 1999 SPDs, was so peripheral to those issues that he was not even on CIGNA's list of likely witnesses at trial. *See* Defendants' Trial Memorandum [doc.

---

[24] As a result, the Court need not address Plaintiffs' arguments under *respondeat superior*. *See, e.g.*, Pls.' Post-Trial Reply Brief [doc. # 254], at 75-81.

# 180], at 9.  Instead, Ms. Denise Hill, a former Vice President, Corporate Relations, Director of Human Resources, was designated as the person to testify regarding "[c]ommunications about the conversion to Part B and the operation of Part B."  *Id.*  Indeed, Mr. Arko, the current administrator of the Plan and CIGNA's Rule 30(b)(6) witness, who was scheduled to testify at trial but was not called, testified at his deposition that he had not contacted Mr. Beltz in preparation for his deposition to determine if Mr. Beltz had any documentation relevant to the preparation of CIGNA's notices and disclosures.  *See* Ex. 194 (Arko Dep.), at 51:11-18.

Further, the Signature Benefits Newsletter published in November 1997, entitled "Introducing Your New Retirement Program," was published by CIGNA Benefits Communications.  *See* Ex. 516, at D00607.  Mr. Beltz's name is mentioned nowhere in this newsletter, and indeed the newsletter informs readers, "If you have questions, please e-mail your questions to Signature Benefits Services . . . or you may call Signature Benefits Services . . . ."  *Id.* at D00612.  The December 1997 Retirement Kit, one section of which is entitled "Transition to the New CIGNA Retirement Plan," was also published under the Signature Benefits rubric and includes the same contact information for questions regarding Part B.  *See* Ex. 508, at D00718, D00733.

Although the October 1998 and September 1999 SPDs both list Mr. Beltz as the plan administrator, *see* Ex. 505 (1998 SPD), at D00842; Ex. 506 (1999 SPD), at D00632, both also carried the "Signature Benefits" logo, and there is no indication that Mr. Beltz was in any way involved in the preparation or dissemination of the SPDs.  These documents were also the first to indicate that CIGNA employees should contact Mr. Beltz, rather than Signature Benefits Services, regarding questions about the Plan.  *See* Ex. 505 (1998 SPD), at D00841; Ex. 506 (1999 SPD), at D00631.  Yet even then, the direction to contact the plan administrator was only in the section

66

entitled "Statement of ERISA Rights."  Ex. 505 (1998 SPD), at D00840-D00841; Ex. 506 (1999

SPD), at D00631.  The "Administrative Details" section, on the other hand, which listed common

issues regarding the Plan in question-and-answer format, told participants they should contact the

Retirement Service Center if they had a "general question about [their] pension plan."  Ex. 505 (1998

SPD), at D00835; Ex. 506 (1999 SPD), at D00628.  In a similar vein, it appears that CIGNA as an

entity, and more specifically Ms. Hill rather than Mr. Beltz, took an active role in seeking out

William Mercer, a consulting firm, for assistance in providing information regarding the transition

to Part B and in preparing the ERISA notices required as a result of that transition.  *See* Ex. 117

(prospectus provided by Mercer to CIGNA, not Mr. Beltz, regarding a contract to prepare § 204(h)

notices, SMMs, and SPDs); Ex. 118 (request for approval of consulting services, from Denise Hill

and David Durham to Ted Detrick).  Mr. Beltz was not a listed recipient of Ms. Hill's request for the

approval of Mercer's consulting services, nor was he listed even as a "cc" on that document.

However, CIGNA argues that even were it to be considered a *de facto* co-administrator of

the Plan, the Second Circuit has foreclosed any possibility that CIGNA could be held liable as such

for any defects in the disclosures under § 502(a)(1)(B).[25]  In *Crocco*, the Second Circuit held that

lawsuits to recover benefits under § 502(a)(1)(B) lie only against "the plan and the administrators

and trustees of the plan in their capacity as such," and that an employer may not be considered a *de*

*facto* co-administrator if an administrator has been designated in accordance with the requirements

of ERISA.  *See Crocco*, 137 F.3d at 107; *Nechis*, 421 F.3d at 104.

---

[25] Section 502(a)(1)(B) authorizes a civil action "by a participant or beneficiary" "to recover
benefits due to him under the terms of [the] plan, to enforce his rights under the terms of the plan,
or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

While the language of *Crocco* is clear, it is less apparent to the Court that *Crocco* had in mind the factual circumstances of a case like this. *Crocco* involved an individual employee's claim for benefits under the plan, which the administrator herself denied; the company had no involvement other than in its role as employer of the administrator. Indeed, the relief ordered was a remand to the administrator for the statutorily required "full and fair review" of the denial of Ms. Crocco's claim. *See Crocco*, 137 F.3d at 109. Here, on the other hand, CIGNA retained full control over the processes alleged to have violated ERISA, such as the issuance of notices and disclosures, and the allegations go far beyond the administrator's denial of a single employee's claim to benefits. Mr. Beltz had no apparent involvement in, or control over, these processes or disclosures, in direct contrast to the administrator in *Crocco*, suggesting that *Crocco* might not be a bar to holding CIGNA liable for the disclosures as a *de facto* co-administrator of the Plan. Despite these observations, unless and until the Second Circuit clarifies its holding in *Crocco*, this Court is bound by it, and as CIGNA points out, the plain language of *Crocco*'s holding prevents the Court from finding CIGNA liable for inadequate disclosures under § 502(a)(1)(B), even if – as the Court finds – CIGNA should be considered a *de facto* co-administrator for the purpose of those disclosures.

Even under *Crocco*, however, Plaintiffs are not deprived of all relief. The Second Circuit in *Crocco* was careful to distinguish between lawsuits to recover benefits under § 502(a)(1)(B), which can be brought only against a plan[26] or its administrator, and claims against an employer on

---

[26] To the extent Plaintiffs seek to recover benefits under the Plan under § 502(a)(1)(B), they may pursue such claims against the Plan itself, which is a named defendant. *See* 29 U.S.C. § 1132(d)(1) ("An employee benefit plan may sue or be sued under this subchapter as an entity."); *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 509 (2d Cir. 2002) ("Several times in prior opinions we have indicated that a plan is a proper defendant in an action to recover benefits under § 1132(a)(1)(B)."); *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1998) ("In a recovery of benefits claim, only the plan and the administrators and trustees of the plan

behalf of the plan for a breach of fiduciary duty under § 502(a)(2) or claims for injunctive or other equitable relief under § 502(a)(3). *See Crocco*, 137 F.3d at 107 n.2. The court in *Crocco* expressly limited its holding only to § 502(a)(1)(B) claims. *See id.* at 107. Judge Hall recognized this distinction recently in *Richards*, where she noted that "*Crocco* left open the possibilit[y] that a plan participant might sue a corporate employer who was not a named plan administrator as a fiduciary, where the participant is bringing a breach of fiduciary duty claim, and that a participant might be able to sue the corporate employer for equitable relief under section 502(a)(3)." 427 F. Supp. 2d at 181; *see Crocco*, 137 F.3d at 107.

Thus, the Court holds that Plaintiffs may pursue their disclosure claims against CIGNA, but only to the extent Plaintiffs seek injunctive or equitable relief under § 502(a)(3). Pragmatically, the Court notes that CIGNA is in the best position to respond to any injunctive and equitable relief requested, as the Plaintiffs' claims focus not so much on the denial of any individual employee's request for benefits – over which the individual plan administrator would have ultimate authority – but rather on the decision to implement Part B in the manner the company did and the entire information program regarding the transition from Part A to Part B. These decisions, and the related notices and disclosures prepared by CIGNA, were directed from the highest levels of the company, and Mr. Beltz appears to have had no control over, or even input into, the process.[27] Indeed, one of

in their capacity as such may be held liable."); *Am. Med. Ass'n v. United HealthCare Corp.*, No. 00 Civ. 2800 (LMM), 2007 WL 1771498, at *22 (S.D.N.Y. June 18, 2007) ("It is well-settled – both within this Circuit and within the instant litigation – that claims for monetary benefits under ERISA § 502(a)(1)(B) may be asserted only against the plan, or the administrators or trustees of the plan.") (quotation marks omitted).

[27] In this respect, the current case is distinguishable from *Lee*, 991 F.2d 1004, in which the Second Circuit held that a third party could not be considered a *de facto* co-administrator with respect to allegedly defective disclosures. *See id.* at 1010. There, the plaintiffs did not allege that

the primary disclosures that Plaintiffs argue was misleading (as discussed below) was a letter to plan

participants from CIGNA's CEO, Bill Taylor, which was featured on the first page of the CIGNA

newsletter introducing Part B.  Furthermore, the fact that Mr. Beltz is currently retired and in no

position to provide any equitable relief this Court may deem appropriate also weighs in favor of

allowing Plaintiffs to pursue their inadequate disclosure claims against CIGNA under § 502(a)(3).

*See Richards*, 427 F. Supp. 2d at 181 (permitting claims under § 502(a)(3) to go forward against a

corporate employer not named an administrator under the company plan); *Hall v. LHACO, Inc.*, 140

F.3d 1190, 1196 (8th Cir. 1998) ("Only the Plan and the current plan administrator can pay out

benefits to Hall. . . .  LHACO, even if it once was the plan administrator for Hall's Plan, is no longer

in that capacity, and thus cannot be enjoined to make payments of benefits from the Plan."); *Colin*

*v. Marconi Commerce Sys. Employ. Ret. Plan*, 335 F. Supp. 2d 590, 597 (M.D.N.C. 2004) ("More

on point are the numerous decisions stating that a party which does not have any control or discretion

over a plan is not a proper party to an action for ERISA benefits.") (collecting cases).  CIGNA

appears to have acknowledged as much in a previous filing with this Court, representing to Judge

Squatrito (who earlier presided over this case) that "[i]f the Court orders that a provision of the Plan

must be changed or removed, the Plan, acting through its trustees and fiduciaries, must then

implement that relief as to all of the Plan's participants."  Defendants' Opposition Brief [doc. # 30],

at 8.  Therefore, the Court concludes that Plaintiffs are permitted to pursue their claims of allegedly

defective notices and disclosures against CIGNA under § 502(a)(3), but *not* § 502(a)(1)(B).

---

their employer had designated the third party as an administrator for the purpose of disclosures, nor
did they allege that their employer had delegated its disclosure duties to the third party.  Here, in
contrast, Plaintiffs argue, and the Court finds, that CIGNA should be considered the administrator
of the Plan for purposes of the statutorily required notices and that CIGNA affirmatively took on
itself responsibility for providing the notices and disclosures in question.

**B.     Statutorily Required Notices and Disclosures.**     As part of its efforts to protect employees' retirement benefits and employees' reasonable expectations regarding those benefits, ERISA requires plan administrators to provide plan participants with certain notices and disclosures. These include § 204(h) notices of significant reductions in the rate of future benefit accrual, Summaries of Material Modifications ("SMMs") to the plan, and Summary Plan Descriptions ("SPDs").  Plaintiffs here claim that CIGNA, acting as plan administrator, failed to comply with ERISA's statutory and regulatory notice requirements.[28]  They allege both procedural and substantive defects, and argue that at least some aspects of Part B may be invalid as a result.  Finally, they claim that CIGNA sought by means of these inadequate notices and disclosures to avoid the negative employee reaction that otherwise might have accompanied the transition to Part B.  CIGNA, for its part, asserts that it provided all the notice required and that its notices and disclosures were not materially misleading.

The publications in question are: the November 1997 Signature Benefits Newsletter, which CIGNA has identified as a § 204(h) notice; the December 1997 Retirement Program Information Kit, which CIGNA has identified as an SMM; the October 1998 SPD for Part B; and the September 1999 SPD for Part B.  Plaintiffs claim that the § 204(h) notice was deficient because it failed to inform

---

[28] As part of their case regarding CIGNA's notices, Plaintiffs submitted an expert report by a communications professor, James Stratman.  *See* Ex. 8.  In that report, Prof. Stratman presented his analysis of CIGNA's notices and suggested respects in which those notices might be considered deficient for their failure to communicate in a readily understandable manner certain features of the transition to Part B and the terms of Part B itself.  CIGNA sought to exclude this testimony under *Federal Rule of Evidence* 702, on the ground that the proffered report encompassed legal conclusions that experts are not permitted to make.  *See* Motion *in Limine* [doc. # 178].  The Court denied CIGNA's motion to exclude and admitted the evidence subject to CIGNA's continuing objection. *See* Order [doc. # 214].  The Court need not address CIGNA's continuing objection here, as the Court has not relied on Prof. Stratman's report in its analysis of the disclosures at issue.

plan participants of a significant reduction in the rate of future benefit accrual under Part B, and that the SMM and SPDs were deficient because they failed to inform plan participants of the possibility of wear away and of the possibility that accrued benefits under Part A might not be fully protected. The Court will first address the § 204(h) notice and then turn to the SMM and SPDs.

*Section 204(h).*          Section 204(h) does not permit amendments to a plan "so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date" to all plan participants and certain other parties. 29 U.S.C. § 1054(h)(1).[29] Treasury regulations make clear that "[f]or purposes of section 204(h), an amendment to a defined benefit plan affects the rate of future benefit accrual only if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age." 63 Fed. Reg. 68678, at 68681 (Treas. Reg. 1.411(d)-6, Q&A-5).[30] Thus, reductions or eliminations of early retirement benefits, for example, do not require a § 204(h) notice. *See id.* ("[T]he rate of future benefit accrual is determined without regard to optional forms of benefit (other than the annual benefit described in paragraph (a) of this Q&A-5), early retirement benefits, or retirement-type subsidies, within the meaning of such terms as used in section 411(d)(6) of the Code (section 204(g) of ERISA).").  The regulations also provide that

---

[29] Section 204(h) was amended in 2001.  For the sake of convenience, the Court notes that all citations to that section refer to the 2000 version of the statute unless otherwise indicated.

[30] This Court adopts the *Depenbrock* court's determination that the amendment enacting Part B was formally executed on December 21, 1998.  *See Depenbrock*, 389 F.3d at 83.  As such, the 1998 Final Regulations, 63 Fed. Reg. 68678, which apply to amendments adopted on or after December 12, 1998, govern.  The 1995 Temporary Regulations, however, are in any case identical in all respects relevant to this case.  For the sake of convenience, all citations are to the 1998 Final Regulations unless otherwise noted.

72

whether a contemplated reduction is "significant" is "determined based on reasonable expectations taking into account the relevant facts and circumstances at the time the amendment is adopted." *Id.* (Q&A-7). Because a § 204(h) notice is aimed at providing participants with a "heads up" about changes to the plan, only those employees who are current participants in the plan, and whose benefits are "reasonably expected" to be reduced, must receive notice. *See id.* at 68681-82 (Q&A-8); *id.* at 68682 (Q&A-9(b)) ("Whether a participant or alternate payee is described in paragraph (a) of this Q&A-9 [as a "participant whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment"] is determined based on all relevant facts and circumstances at the time the amendment is adopted."). Put another way, if a § 204(h) notice is not due an employee at the time of amendment, the notice is never required to be provided to the employee, even if the employee's benefits end up being reduced as a result of the amendment at some future point in time.

As for the content of the notice itself, § 204(h) – as it existed prior to 2001 – required only the text of the amendment and its effective date. *See* 29 U.S.C. § 1054(h). The regulations also permitted the substitution of a summary of the amendment for the actual text, provided that it was "written in a manner calculated to be understood by the average plan participant and contain[ed] the effective date." 63 Fed. Reg. at 68682 (Treas. Reg. 1.411(d)-6, Q&A-10). However, "[t]he summary need not explain how the individual benefit of each participant or alternate payee will be affected by the amendment." *Id.* Generally, and except under limited circumstances not present here, an amendment that is not accompanied by a valid § 204(h) notice is void. *See id.* at 68682-83 (Q&A-13, -14).

Before turning to the substance of CIGNA's § 204(h) notice, however, the Court must determine whether the circumstances of Part B's implementation meant that such a notice was not

73

required.  The first argument against the necessity of a § 204(h) notice is that Part B did not actually

work a significant reduction in plan participants' benefit accrual.  CIGNA froze the accrual of

benefits under Part A as of December 31, 1997.  *See* Ex. 2 (Part A), at D00132 (Am. No. 4).  Part

B was not formally established until December 21, 1998.  *See Depenbrock.*, 389 F.3d at 83.  CIGNA

provided a § 204(h) notice regarding the original freeze in the November 1997 Newsletter, *see* Ex.

516, at D00611, and argues that no later such notice was necessary, because any accrual under Part

B was necessarily greater than the total lack of accrual under the freeze.

The Court does not find this argument persuasive.  While it is true that a resumption of

benefit accrual after a freeze would normally constitute an increase, rather than a decrease, in that

accrual, the freeze here was nominal at best.  CIGNA always intended to establish Part B, and simply

wished to cease its obligations under Part A while it worked out the final details of the new plan.

As CIGNA stated in its 1997 Newsletter, in the first sentence of the first paragraph, "On January 1,

1998, CIGNA will introduce a new retirement program."  Ex. 516, at D00607.  Later in the same

newsletter, CIGNA wrote,

> Employees participating in the new CIGNA Retirement Plan will stop earning
> benefits under the current Pension Plan on December 31, 1997.  Prior to April 1998,
> CIGNA will *formally adopt* the new CIGNA Retirement Plan, with all legally
> required terms and provisions.  The effective date of the new plan, which will
> technically be an amendment to the existing plan, *will be January 1, 1998*.

*Id.* at D00611 (emphasis added).  Thus, CIGNA made clear from the outset that its intent was to shift

directly from Part A to Part B, with the freeze only as an interim stopgap.  CIGNA reassured its

employees of this fact by telling them, "Once [opening] balances are calculated, they will be credited

to Retirement Plan accounts *retroactively to January 1, 1998*, so you won't lose any interest credits

for the first part of 1998."  *Id.* (emphasis added).  As another district court in this Circuit has noted,

74

"It is not so obvious to this Court that when there is a freeze in benefits, along with the promise of retroactive benefit accruals once the new Plan is adopted, any additional benefit accruals at all constitute an overall increase because the baseline is zero." *Brody v. Enhance Reinsurance Co. Pension Plan*, No. 00 Civ. 9660(LAP), 2003 WL 1213084, at *11 (S.D.N.Y. Mar. 17, 2003) (citation omitted). The Court finds further support for its position in the purpose underlying ERISA's notice requirements, namely to protect employees' interests and their reasonable expectations. Permitting employers to avoid these important obligations simply by exploiting the technicality of "freezing" old benefits before retroactively instituting new ones runs diametrically opposite to that purpose, and the Court refuses to adopt such a position.

The second reason CIGNA claims a § 204(h) notice was not required is that § 204(h) notices are intended to provide a warning to employees regarding prospective changes to their retirement plan, but Part B was implemented retroactively. The statute specifically requires publication of the notice "after adoption of the plan amendment and not less than 15 days before the *effective date* of the plan amendment." 29 U.S.C. § 1054(h)(1) (emphasis added); *see also Frommert v. Conkright*, 422 F.3d 254, 266 (2d Cir. 2006) (refusing to accept tardy notice in lieu of required advance notice under § 204(h)). Thus, literal compliance with the statute in the case of a retroactive amendment would appear to be difficult, if not impossible. However, the Court does not believe that this difficulty compels the conclusion either that a § 204(h) notice was not required or that Part B, at least with respect to its retroactivity, was by necessity invalid. A primary purpose of notice under § 204(h) is to provide employees the opportunity to learn about changes to their retirement plan and perhaps to complain or otherwise seek to modify those changes if they are unacceptable. If CIGNA had provided notice after the adoption of Part B in December 1998, but before the formal retroactive

75

implementation of Part B, plan participants would have had advance notice of the changes, as ERISA requires, but would also have retained the retroactive benefit accruals. The possibility of retroactive accruals is attractive both to employers, such as CIGNA, who may need time to implement a new program but wish to provide benefit accruals for the implementation period once the plan is complete, and to employees, who would obviously prefer to accrue (even reduced) benefits retroactively if the other option is no benefits at all while the employer perfects the new plan. Thus, the Court finds that the retroactive nature of Part B, standing alone, is insufficient to defeat an otherwise-existing requirement to issue notice under § 204(h).

Without the obstacles of a freeze or retroactivity, and comparing the benefit accruals under Part A with those under Part B, the Court finds that a significant reduction occurred. CIGNA itself admitted at trial that if CIGNA "never adopted the cash balance plan," "[plan participants] would have a larger benefit than they have under th[e] conversion." Trial Tr. 908:20 to 909:1. Plaintiffs' expert testified that switching from a final or highest average formula to a career average pay formula itself is almost guaranteed to cause a substantial reduction in future benefits, and in fact, such a result is commonsensical. *See, e.g.*, Trial Tr. 258:5-22 (Mr. Poulin agreeing with the Court that "typically employee salaries increase over time," so "by merely switching . . . from a final average . . . to [a] career average . . . you necessarily will affect negatively the accrual average"); Ex. 10 (Sher Report), at 19, 20 n.12 (Mr. Sher estimating that the prior Tier 1 accrual rate, net of a Social Security offset, was approximately 1.5% of highest pay, while the accrual rate under Part B, assuming 4.5% annual salary increases, was approximately .75% of highest pay).[31]  In addition, all

---

[31] The Court must infer Mr. Sher's agreement with the substance of this statement from calculations made in his expert report, as CIGNA directed him not to prepare or include any explicit benefit comparisons in his supplemental report. *See* Ex. 193 (Sher Deposition), at 31:11 to 32:25;

of the factors mentioned in the previous discussion of wear away that contributed to lower opening account balances for certain plan participants would also have reduced the rate of benefit accrual for those participants, because they would receive fewer interest credits as a result. For example, an internal CIGNA memorandum from Gerry Meyn regarding Class member John Depenbrock stated that "John's projected pension value (present at age 55) if he had continued in Part A earning 2% per year would have been $1.8 million. The projected pension value at age 55 under present circumstances [i.e., under the cash balance plan] is $1.0 million." Ex. 70, at D01146. This change constituted a 45% reduction in Mr. Depenbrock's benefits. *See also* Ex. 41 (2001 Interoffice Memo from David Durham to Gerry Meyn), at D028654 (chart showing old pension plan benefits for a hypothetical employee at age 65 as 53% of final pay, compared with 31% under the cash balance plan, and as 35% at age 55, compared with 17% under the cash balance plan). Similarly, Mr. Robert Upton, one of the few employees to receive a comparison of benefits under the new and old plans, discovered that his benefits under the cash balance plan, even using an interest rate that he considered unrealistically high, were 29% lower than those he would have received under Part A. *See* Trial Tr. 657:1-16. Using a 5.8% interest rate, the reduction climbed to 44%. *See* Trial Tr. 662:2-11.

--------

Trial Tr. 1214:3 to 1215:23. The Court recognizes that Mr. Sher testified that switching from a final pay average to a career pay average need not *necessarily* result in a reduction in benefits, depending on the terms of the plans involved, *see* Trial Tr. 1346:20 to 1347:1, but takes the calculations in his expert report as an indication that he would not disagree with this statement in the context of CIGNA's transition. In further support of this conclusion, the Court notes that in an article Mr. Sher previously published, he acknowledged that "[t]he change to a more even accrual pattern [by means of a transition from a traditional pension plan to a cash balance plan] and the move away from early retirement subsidies tends to result in a slower growth of future benefit accruals (or even no growth for a while) for some mid-career employees." Ex. 68, at P2248. Thus, Mr. Sher appears at least to agree that the transition to a cash balance plan often results in a reduction of the *rate* of benefit accrual, the metric on which § 204(h) is focused.

Given that a § 204(h) notice was in fact due to plan participants, the Court now turns to the appropriate content for that notice. The discussion is somewhat complicated by the fact that the relevant Treasury regulations have been amended since 1998 to require additional information, such as the disclosure of wear away. CIGNA argues that at the time Part B was established, CIGNA was required at most to provide a summary of the amendment and its effective date; no explanation of the nature or extent of the reductions themselves, or even an indication that the notice was intended to comply with § 204(h), was necessary. Plaintiffs, on the other hand, assert that not only was a statement needed to the effect that "your benefits may be reduced," but in order to comply with the requirement that the summary be "written in a manner calculated to be understood by the average plan participant," 63 Fed. Reg. at 68682 (Treas. Reg. 1.411(d)-6, Q&A-10), some explanation of wear away and the other means by which benefits would be reduced was required. After all, a "direct" reduction of benefits from $20 to $10 a month may be self-explanatory, but the complicated provisions of Part B, and the interactions among them that had the potential to produce the wear away effect and other "indirect" reductions, were not. Plaintiffs argue that it was unrealistic of CIGNA to believe that a summary of Part B, without explicitly acknowledging the potential for reductions and how they might occur, could be comprehensible to the average plan participant. As Mr. Sher has written elsewhere, "For the same reason that it's hard to compare apples with oranges, employees will find it difficult to compare benefits under a cash balance plan with those under the prior traditional plan – no matter what information is provided." Ex. 68, at P2248.

Happily, the Court need not resolve this issue today, for even if § 204(h) did not require the additional information regarding reductions that Plaintiffs request, the statute certainly does not permit CIGNA to avoid providing such information and to offer material misrepresentations

78

suggesting benefit increases instead. CIGNA, through Mr. Arko, the company's Rule 30(b)(6) witness, identified the 1997 Newsletter as its § 204(h) notice. *See* Ex. 239 (Arko Dep.) at 41:17 to 44:21. Mr. Arko pointed to the article on page 5, entitled "Opening Balances To Be Calculated Next Spring," as providing the information required by § 204(h). *See id.* at 47:16 to 48:4; *id.* at 48:19-23 ("I think that this story satisfies to the extent we were trying to put a 204(h) notice out, that this was – this notice and that story was intended to do that."). However, when Plaintiffs' counsel at deposition asked Mr. Arko specifically about each section of the article and whether that section indicated to the reader that benefit accruals would be reduced under Part B, Mr. Arko admitted it did not. *See id.* at 81:5 to 85:8. Finally, when asked, "Is there something in this article that tells employees that their benefits will be reduced under the new plan?," Mr. Arko responded, "No." *Id.* at 85:5-8. There is no such statement in any of the other, later notices provided by CIGNA either. *See* Trial Tr. 600:5-9 (The Court: "I just wanted to establish that. There's nothing that would give anyone any direct certainly explicit statement [] regarding the fact that they may be subject to the wear away." Mr. Moukawsher: "Correct."). Notably, CIGNA did not call Mr. Arko as a witness at trial, even though he was listed as such and even though CIGNA had previously assured the Court that it would "put somebody on who could explain" the wear away that Ms. Flannery testified she had experienced. Trial Tr. 922:12-17 (Mr. Blumenfeld: "Your Honor, I'm not exactly sure but what may be going on there relates to whether there's an early retirement subsidy in the minimum benefit that wouldn't be part of the normal retirement benefit, but I would expect we would put somebody on who could explain that better than we."); *see also* Trial Tr. 909:4 to 910:9 (The Court: "I want to know more about the error [regarding the failure to include the Preserved Spouse's benefit on Ms. Flannery's benefit election form] because I'm very concerned. . . . [S]omebody ought to explain it

and tell me . . . that this is a one off, these things happen; or this is something more systemic . . . .
[A]ll I'm saying is, I want to hear from you and I want to hear testimony from you." Mr. Costello:
"Sure, and you will."). Nor did CIGNA follow through on its assertion in its Pre-Trial Brief that
"Defendants anticipate that a number of Plaintiffs and Class members will testify that they did not
find the SPD misleading [and] were not wanting for any additional pension information."
Defendants' Trial Brief [doc. # 182], at 64.

Instead, CIGNA offered statements that misled plan participants into believing that
significant reductions in the rate of future benefit accrual were not a component or a possible result
of Part B. For example, the inset panel on the first page of the 1997 Newsletter, featuring "A
Message from CEO Bill Taylor," states that he is "pleased to announce that, on January 1, 1998,
CIGNA will *significantly enhance* its retirement program." Ex. 516, at D00607 (emphasis added).
The newsletter also notes that, in contrast to Part A, which benefitted primarily those employees who
stayed with CIGNA "for their whole career," "the new plan is designed to work well for *both* longer-
and shorter-service employees. The new plan provides steadier benefit growth throughout your
career." *Id.* at D00610 (quotation marks omitted). Further, CIGNA stated explicitly that "[o]ne
advantage the company *will not* get from the retirement program changes is cost savings." *Id.* Thus,
nothing in the Newsletter indicated to plan participants that their rate of benefit accrual might
decrease, much less by a significant margin. And yet that is exactly what happened.

Even looking outside the purported § 204(h) notice to the other publications provided by
CIGNA, information regarding possible reductions in the rate of future benefit accrual is equally
non-existent. In the question-and-answer section of the Retirement Kit, for example, CIGNA
reiterated that it "is *not* reducing the overall amount it contributes for retirement benefits, nor has the

new program been designed to save money." Ex. 508, at D00725.[32]  While CIGNA admitted that

certain long-term employees would remain in Part A because "[t]hese employees couldn't match this

benefit growth under the new plan," it went on to assure readers that "[o]ther employees and all new

hires will be able to earn *comparable benefits* as career employees under the CIGNA Retirement

Plan." *Id.* (emphasis added).  With respect to those employees hired before 1989 but moved into Part

B due to insufficient age and service points for grandfathering, CIGNA emphasized, "Our analysis

showed that, in comparison to people with a higher age and service combination, you have plenty

of time to take full advantage of the many attractive features of the Retirement Plan, plus you will

have access to the new lump sum payment option." *Id.*  Later in the Retirement Kit, CIGNA

reiterated, "The new Retirement Plan is different from the current Pension Plan, so exact

comparisons of benefits that cover all possible outcomes are difficult.  Generally speaking, the new

Retirement Plan, in comparison with the current Pension Plan, tends to provide larger benefits for

shorter-service employees and comparable benefits for longer-service employees." *Id.* at D00729.

Further, CIGNA noted that "[t]he lump sum distribution option can be very valuable." *Id.*  In the

section entitled "Growth over time . . .," CIGNA reassured plan participants that "[e]ach dollar's

worth of credits is a dollar of retirement benefits payable to you after you are vested.  Under the plan,

your benefit will grow steadily throughout your career as credits are added to your account." *Id.* at

---

[32] CIGNA argues that additional contributions to SIP counterbalanced any savings from the implementation of Part B.  *See* Defs.' Post-Trial Brief [doc. # 251], at 94.  At trial, however, Plaintiffs noted that a portion of CIGNA's additional contributions to SIP were entirely discretionary on CIGNA's part, *see* Trial Tr. 1564:6 to 1565:4, and their expert, Mr. Poulin, agreed that changes to the defined benefit plan could not be offset, for purposes of ERISA notices, by changes to another benefit program.  *See* Trial Tr. 1563:22 to 1564:5.  Further, charts prepared by Mercer suggest that CIGNA would have had to provide the maximum discretionary contribution each year and SIP would have had to earn a 9% rate of interest each year in order for the additional benefits under SIP to approximate the reductions under the cash balance plan.  *See* Ex. 83, at SuppD1623-SuppD1626.

D00740.  The SPDs made similar statements.  *See* Ex. 505 (1998 SPD), at D00828; Ex. 506 (1999

SPD), at D00624.  Last but not least, CIGNA assured its employees that "[t]he conversion factors

we are using to determine your opening account balance are based on guidelines established by the

government to ensure a fair transition for employees," Ex. 508 (Retirement Kit), at D00726; *see also*

Ex. 505 (1998 SPD), at D00833 ("The conversion formula used is based on guidelines established

by the federal government for valuing pension benefits."); Ex. 506 (1999 SPD), at D00627 (same),

guidelines that CIGNA now admits do not exist.  *See* Defendants' Post-Trial Proposed Findings of

Fact [doc. # 250], ¶ 19 ("There is no provision of law that sets forth minimum requirements for

determining opening balances.") (citing GAO Report on conversions to cash balance plans, Ex. 533).

CIGNA claims that the information it provided to plan participants regarding the opening

account balances and how they were created, as well as the annual account statements and Total

Compensation Reports, constituted sufficient disclosure of all the material aspects of the Plan, thus

negating any deficiencies in the notices themselves.  The Court disagrees.  Although the Court

recognizes that the opening account balance materials included a substantial amount of useful

information regarding Part B, the Court does not accept CIGNA's contention that the information

it provided regarding the establishment of the opening account balances negates the defects in the

previously provided notices and disclosures.  For the problem lies not with the volume of

information CIGNA chose to provide, but rather with some of the statements made in CIGNA's

disclosures, which the Court finds were not written in a manner calculated to be understood by the

average plan participant and which failed to include important details regarding the transition to Part

B that reasonable employees would have wanted to know.

82

CIGNA was aware of this potential for confusion. CIGNA stated clearly in the Retirement Kit that "exact comparisons of benefits . . . are difficult," Ex. 508, at D00729, and Mr. Sher, CIGNA's expert, has compared the expression of benefits under traditional defined benefit plans and cash balance plans as "apples" and "oranges." Ex. 68, at P2248. Simply providing information about the setup and content of the opening account balances could not counteract the more favorable impression made by CIGNA's other statements about the positive features of the new plan and how employees' benefits would grow under Part B. Finally, given the substantial amount of misinformation on the subject contained in the notices and disclosures CIGNA provided, the Court refuses to accept that the information regarding the opening account balances, while admittedly accurate, cured the defects in the previous disclosures. *See, e.g.*, *In re Citigroup*, 470 F. Supp. 2d at 339 ("Plaintiffs had every reason to expect that under the new cash balance plan, their pensions would continue to accrue at a rate approved by Congress. It therefore is immaterial that the December 1999 § 204(h) notice stated in bolded font that the 2000 CBA could result in a reduction of their benefits. Given the material omissions, it remained insufficiently accurate and comprehensive to reasonably apprise plan participants and beneficiaries of their rights. Nor can it be said that the notices allowed applicable individuals to understand the effect of the plan amendment because plaintiffs were without fair warning that the formula endangered their right to a minimum rate of benefit accrual.") (quotation marks and alteration omitted); *Hirt*, 441 F. Supp. 2d at 538 ("A notice is intended to give fair warning, and fails to do so if it is cryptic, or requires research beyond the document itself.").

CIGNA employees suffered from the lack of accurate information in CIGNA's disclosures, and CIGNA was aware of this fact. For example, in August 1997, CIGNA asked a group of

managers to review the cash balance plan.  They recommended that CIGNA "[p]ublish case studies (positive and negative) and expect to be able to support employees who will be negatively impacted ASAP."  Ex. 106, at D11936.  The focus group also urged CIGNA to "[s]how illustrations that 'prove' small lump sums will yield equivalent benefits in the future (a lot of disbelief among managers about the way we handle data)."  *Id.*  Along the same lines, they noted, "General reaction to HR support is bad – too many examples of how poor the communications from HR have been in the past; low degree of reliance on information from the division."  *Id.*  CIGNA did not adopt either suggestion.  The managers' concerns were borne out by the disclosures produced by CIGNA, as made clear by the responses to a questionnaire attached to the December 1997 Retirement Kit that asked, "What additional information would you like CIGNA to provide?"  Employee responses included:

- "I don't understand why CIGNA is not providing the details instead of saying trust me.  Disclose details."  Ex. 107, at SuppD1601.

- "More specific detail re: calculation of lump sum."  *Id.* at SuppD1604.

- "CIGNA should plug in the individual employee's actual percentage, salary and points making the same general assumptions and project the retirement under the old and new plan."  *Id.*

- "Show me the math on the old vs. new.  Did I win or lose?  Since I have not been told I must assume I have lost.  Please prove if otherwise."  *Id.* at SuppD1605.

- "An actual projection for retirement based on my exact income and time with CIGNA projected to age 65."  *Id.*

- "If this was a benefit enhancement, actual individual comparisons would have been projected for each plan to show improvement.  Our pension plan has been *reduced* but claims to be improved – integrity?"  *Id.* at SuppD1606.

- "Comparison to old pension plan i[.]e. dollar amount i[.]e. would lump sum distribution buy an annuity comparable to old pension plan?"  *Id.*

- "I have read the information and studied the examples; however, I am not sure how/what impact this will have on me. I trust CIGNA will be distributing individual specific[s] in the future." *Id.*

- "A comparison for me personally of my benefit at retirement, given identical assumptions, under each plan[;] as I see it, unless the interest rate under the new plan exceeds 7% consistently, my benefit will turn out to be less than what I would have received under the old plan." *Id.* at SuppD1607.

- "How much I accrued under the old program that will be transferred to the new and the real reason CIGNA made this change." *Id.*

- "This was useless information. I would like specific information regarding what I can look forward to as a retirement income. Am I better off before or after the changes in 1998? I certainly could not tell by this information." *Id.* at SuppD1609.

Despite these requests for further information, and the wealth of evidence indicating that CIGNA was well aware of the true effects on the rate of benefit accrual likely to result from the shift to Part B, CIGNA chose not to inform its employees about those effects in order to ease the transition to a less favorable retirement program. In fact, CIGNA explicitly instructed Mercer, the consulting company that helped CIGNA produce the 1997 Newsletter and 1998 Retirement Kit, "not to compare the old to the new plans" in those documents. Ex. 117, at SuppD1548; *see also* Ex. 29, at 2. In an internal email, David Durham, CIGNA's Assistant Vice-President of Global Benefits, wrote, "We continue to focus on NOT providing employees before and after samples of the Pension Plan changes." Ex. 119, at D11708; *see also* Ex. 120, at D020529 (internal request by CIGNA employee for "comparison/projection of old/new benefits," which the benefits counselor told her "we don't do"); Ex. 121 (email from Mr. Beltz to CIGNA actuaries), at D021235 ("Please do not perform any 'hypothetical' or 'what if' calculations for any pension benefit accruals for which the employee is not currently or could not in the future be an eligible plan participant. If a participant has a frozen pension benefit, please do not conduct any pension calculation that projects future growth in any

85

frozen benefit.").  Mr. Arko confirmed at his deposition that "as a general rule the policy was that employees would not be provided with comparisons between their benefits under the old plan and the new plan."  Ex. 239 (Arko Dep.), at 238:10-13.

The reason for this reticence becomes clear in light of several internal CIGNA documents, which highlight CIGNA's desire to "[q]uickly dispel perceptions of 'take aways'" and "focus on the potential additional benefits."  Ex. 128 (discussion points for meeting of division presidents), at D14872; *see also* Ex. 117 (materials prepared for August 1997 meeting with Mercer), at SuppD1544 (same); Ex. 129 (materials prepared for September 12, 1997 project planning meeting with Mercer), at SuppD1897 (same).  The risk of an adverse employee reaction should the true magnitude of the reductions in the rate of future benefit accrual some plan participants would experience was real; in September 1997, several articles began to appear on cash balance conversions at other companies, and in some cases, complaints by employees resulted in partial or complete rollbacks of the proposed changes.  *See* Ex. 130 (*Wall Street Journal* articles, with titles including "Pension War Is Breaking Out As Deloitte Workers Study Plan," "Pension-Plan Controversy Escalates As IBM Gives In to Employee Anger," and "'Cash Balance' Saves Millions, Hides Pitfalls From Workers"); Ex. 131. CIGNA's strategy proved successful at avoiding a similar revolt within the company, and in 1999, Mr. Meyn reported to the Board of Directors that "CIGNA's Cash Balance plan has been very well received by CIGNA employees (employee survey ratings up 15 percentage points) and has not generated notable controversy."  Ex. 47, first page of attachment.  A 1998 Interoffice Memo reported, "Unlike some employers instituting these plans, we have avoided any significant negative reaction from employees."  Ex. 133, at SuppD1566.  And in an email dated March 13, 2000, Mr. Meyn wrote, "Our Jan 1998 introduction of the plan did not set off any significant rumblings at CIGNA, and

things remain quiet. . . .  Here are the materials which would be sent to employees soon after any

negative press for CIGNA on this topic."  Ex. 124.

Taking all of this information into consideration, the Court concludes that CIGNA was aware

of the significant reduction in the rate of future benefit accrual that would affect at least a substantial

proportion of its employees as a result of the transition to Part B, that CIGNA wished to avoid the

employee backlash likely to result from a thorough discussion of these aspects of Part B, and that

CIGNA sought to negate the risk of backlash by producing affirmatively and materially misleading

notices regarding Part B.  As a result, its § 204(h) notice failed to meet ERISA's stringent standards.

*Summary of Material Modifications and Summary Plan Descriptions.*     The principal

disclosures ERISA requires plan administrators to provide are Summaries of Material Modifications

and Summary Plan Descriptions.[33]  ERISA § 102 describes the requirements for SPDs and SMMs:

> The summary plan description shall include the information described in subsection
> (b) of this section, shall be written in a manner calculated to be understood by the
> average plan participant, and shall be sufficiently accurate and comprehensive to
> reasonably apprise such participants and beneficiaries of their rights and obligations
> under the plan.  A summary of any material modification in the terms of the plan and
> any change in the information required under subsection (b) of this section shall be
> written in a manner calculated to be understood by the average plan participant and
> shall be furnished in accordance with section 1024(b)(1) of this title.

---

[33] CIGNA argues that Plaintiffs' claim regarding the allegedly defective SMM is not properly before the Court.  *See* Defs.' Post-Trial Brief [doc. # 251], at 99.  Although Plaintiffs' Third Amended Complaint [doc. # 165] refers only to SPDs, the Court's Order Under Federal Rule 23(c)(1)(B) includes language referring to both SPDs and SMMs.  *See* Order [doc. # 241], at 4. Additionally, as Plaintiffs point out, the regulations regarding the content of SMMs and SPDs is virtually identical, *see* Pls.' Post-Trial Reply Brief [doc. # 254], at 64; the only material difference between the two relates to timing, and Plaintiffs have not claimed that CIGNA's SMM was defective due to tardiness.  Further, the Retirement Kit, which CIGNA identifies as an SMM, contains allegedly inaccurate statements found almost verbatim in the SPD.  Finally, and perhaps most importantly, CIGNA relies partly on the Retirement Kit as having provided notice of the provisions of Part B to plan participants.  In light of all these facts, the Court holds that Plaintiffs' SMM claim is properly a part of this case.

29 U.S.C. § 1022(a). Subsection (b), which lists the administrative and substantive information to be included in SPDs (and changes to which must be noticed in SMMs), includes requirements ranging from "the name and address of the person designated as agent for the service of legal process" to "the plan's requirements respecting eligibility for participation and benefits," "a description of the provisions providing for nonforfeitable pension benefits," and "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). The administrator must provide an updated copy of the plan's SPD to participants every five years if there have been intervening amendments to the plan, and otherwise every ten years. *See* 29 U.S.C. § 1024(b)(1). An SMM detailing any amendments must be distributed no later than 210 days after the end of the plan year in which the amendment was adopted. *See id.*[34] In assessing the adequacy of an SPD or SMM, a court should "consider the document as a whole." *See Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir. 1997).

As the extent and detail of the regulations governing SMMs and SPDs make clear, these documents are considered essential in informing employees of their rights under employers' pension plans. For example, the regulation on the style and format of SPDs states in no uncertain terms:

> The format of the summary plan description must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries. Any description of

---

[34] "The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, every fifth year after the plan becomes subject to this part an updated summary plan description described in section 1022 of this title which integrates all plan amendments made within such five-year period, except that in a case where no amendments have been made to a plan during such five-year period this sentence shall not apply. . . . If there is a modification or change described in section 1022(a) of this title (other than a material reduction in covered services or benefits provided in the case of a group health plan . . .), a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan." 29 U.S.C. § 1024(b)(1).

exception[s], limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations.

29 C.F.R. § 2520.102-2(b). Further, "[c]onsideration of these factors will usually require the limitation or elimination of technical jargon and of long, complex sentences, the use of clarifying examples and illustrations, the use of clear cross references and a table of contents." 29 C.F.R. § 2520.102-2(a). As with § 204(h) notices, SMMs and SPDs need only be provided to those participants and beneficiaries actually affected by the changes made, *see* 29 C.F.R. § 2520.104b-4(c), and different SPDs may be prepared for different groups of participants, including only the information relevant to that group. *See* 29 C.F.R. § 2520.102-4. Finally, an SMM need not be provided if the material modifications are described in an SPD that is published within the 210-day window otherwise applicable to SMMs. *See* 29 C.F.R. § 2520.104b-3(b).

Importantly, the Second Circuit has held that in addition to describing the individual provisions of the retirement plan and their import, an employer must also describe the interaction among those provisions if the result is likely to be material to plan participants. *See, e.g.*, *Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032, 1040 (2d Cir. 1985) (holding would-be SMM/SPD inadequate because it did not explain "the full import of the interaction of the wage-related provision and the Amendment for someone in Chambless' position"); *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 584 (2d Cir. 2006) ("Here, the Fund's SPD does not even mention the Policy, let alone explain its full import . . . . Obviously, it falls short of the high standards of clarity and completeness to which SPDs are held."); *Frommert*, 433 F.3d at 260

89

(requiring an SPD to "set out in full" the mechanics of a purported amendment to the plan).

Turning now to Plaintiffs' claims, the first point of concern regarding the SMM and SPDs relates to the disclosure of the possibility of wear away. The Court finds that CIGNA's disclosures were deficient in this respect. First of all, CIGNA admits that it nowhere informed its employees that they might not be accruing benefits under Part B, despite Mr. Sher's testimony that it would have been "predictable and known to CIGNA" that "opening balances for some sizeable group of employees" "would be less than their protected benefit under the old plan." Trial Tr. 1029:21 to 1030:22. Nevertheless, CIGNA argues that a disclosure of the potential for wear away was unnecessary for a variety of reasons: first, that wear away was an unpredictable, "idiosyncratic contingency"; second, that wear away was not the result of any one plan provision but rather the potential result of interactions between several plan provisions and unforeseeable circumstances such as future interest rates; and third, that wear away could only have affected a small number of plan participants. *See* Defs.' Post-Trial Br. [doc. # 251], at 67, 70, 72, 77.

CIGNA is correct that the Second Circuit "do[es] not require an ERISA fiduciary to be perfectly prescient as to all future changes in employee benefits." *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 (2d Cir. 1994). Further, "an SPD need not anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status." *Becker*, 120 F.3d at 9 (quotation marks omitted). However, the Second Circuit has taken a relatively narrow view of what constitutes an "idiosyncratic contingency." In *Becker*, for example, the court denied that "the possibility of death in the period between the election of retirement and the effective date of retirement is such a remote or 'idiosyncratic' contingency" that Kodak could omit from its SPD information regarding the effect of such a circumstance on a plan participant's benefits. *Id.*

90

Similarly, in *Mullins*, the court ruled against Pfizer, holding that the company could not deny the upcoming implementation of improved severance benefits when asked by employees considering early retirement.  As the court stated, "[W]e [do not] require a fiduciary to disclose its internal deliberations or to interfere with the substantive aspects of the collective bargaining process," but "[w]e do, however, hold that when a plan administrator speaks, it must speak truthfully."  *Mullins*, 23 F.3d at 669 (quotation marks, citation, and alteration omitted).

The circumstances in which courts have applied the so-called "duty of clairvoyance" exception, on the other hand, tend to be extreme.  In *Hudson v. General Dynamics Corp.*, 118 F. Supp. 2d 226 (D. Conn. 2000), for example, the court held that the company was not required to have provided information to one of the plaintiffs regarding later-implemented changes to the retirement plan.  As the court wrote,

> Information that would have provided the factual underpinning for such a belief, [namely, the introduction of the changes to the plan,] however, *was not available* at the time of his inquiry, and to find the employer liable for failing to provide it would impose no less than the duty of clairvoyance specifically rejected in *Mullins*, 23 F.3d at 669.

*Hudson*, 118 F. Supp. 2d at 263 (emphasis added).  But the same could not be said regarding the later inquiries of other plaintiffs:

> [The pension adviser's] noncommittal and non-factual responses to beneficiary questions were therefore not accurate, because she did know more than nothing, consideration of a golden handshake was certainly more than a rumor, and she had also heard the [company's] attorney admonish the [Joint Planning Process Committee] regarding the legal precautions the company felt necessary related to the timing and content of any disclosures.

*Id.* at 247-48.  Another example of an "idiosyncratic contingency," to which the Second Circuit has cited, is found in *Lorenzen v. Employees Retirement Plan of the Sperry & Hutchinson Co.*, 896 F.2d

228 (7th Cir. 1990). There, Mr. Lorenzen was taken off of life support and died mere days before

his retirement, and as a result, his widow's benefits were significantly reduced. The Seventh Circuit

indicated that it would not have required Sperry & Hutchinson to have provided information

regarding such an occurrence in its SPD, because otherwise, "the summaries would be choked with

detail and hopelessly confusing." *Id.* at 236. As these cases indicate, however, companies may avoid

liability for failing to provide information only when the beneficiary's circumstances are truly

idiosyncratic.

In this case, however, wear away was both a structural phenomenon and one that CIGNA

could, and did, predict, despite the fact that it resulted from the interaction of several plan provisions

and falling interest rates.[35] As a matter of fact, various choices made by CIGNA in structuring the

opening account balances under Part B practically ensured that wear away would occur if interest

rates fell. A necessary precondition to wear away was CIGNA's use of a "greater of A or B" system,

because if CIGNA had chosen an "A plus B" approach instead, there would be no catch-up period

or wear away effect at all. Additionally, CIGNA chose to exclude all early retirement benefits but

the Preserved Spouse's benefit from the opening account balances. *See* Ex. 1 (Part B), at D00278-

D00279 (§ 1.28); Ex. 508 (Retirement Kit), at D00721. While this decision was legally permissible,

the unavoidable effect was that employees who had accrued such benefits under Part A would have

an opening account balance significantly smaller than their protected minimum benefit (if taken as

an annuity). CIGNA also applied a pre-retirement mortality discount to the Part A benefits when

---

[35] CIGNA demonstrated its ability to discuss the effect of changes in interest rates on participants' benefits, even if the rate changes themselves were difficult to predict, in its 2006 Part B SPD, which included a section entitled, "Effect of interest rates on your annuity payments." *See* Ex. 218, at 13.

establishing the opening account balances. *See* Ex. 508 (Retirement Kit), at D00720. This decision, too, was legally permissible, but it too had the inevitable result of shrinking the opening account balance in comparison to the annuity previously available under Part A.[36] Finally, CIGNA used an interest rate of approximately 6.5% to calculate the present value of the opening account balances (approximately 5.5% in the case of certain more senior employees). *See id.* at D00719-D00721. When interest rates later fell, the account balances were unable to grow quickly enough to "repurchase" the value of the plan participants' Part A annuities.[37] Although CIGNA appears to claim that the decline in interest rates that followed the implementation of Part B was entirely unexpected and unpredictable, interest rates had already fallen by over 100 basis points between 1997 and 1998, when CIGNA published the first Part B SPD. *See* Pls.' Post-Trial Reply Br. [doc. # 254], at 38.

Thus, the Court finds that CIGNA had a duty to inform plan participants of the possibility of wear away in its notices and disclosures regarding Part B. The fact that wear away might not have been intentional or the result of a single plan provision is irrelevant; CIGNA created a pension plan that was structurally susceptible to the wear away effect, and should have known, given the current state of interest rates, that further declines were of sufficient likelihood that wear away needed to be disclosed. The possibility of wear away was certainly a material fact regarding Part B, as some

---

[36] Indeed, in addition to being legally permissible, even Plaintiffs' expert, Mr. Poulin, agreed that in this case the use of such a mortality discount was appropriate. This was so because under Part A, benefits were only payable if the employee survived until commencing benefits, whereas under Part B, the benefits were payable regardless. Thus, the pre-retirement mortality discount applied in establishing the opening account balances reflected the life-insurance value included under Part B that did not exist under Part A. *See* Trial Tr. 481:1 to 484:7.

[37] The benefit accrual rate under Part B also played a role in the wear away effect, for had the rate been high enough, it might have offset even the falling interest rate.

CIGNA employees' pension benefits did not grow for several years as a result of the phenomenon. Treasury regulations require that "[a]ny description of exception[s], limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant." 29 C.F.R. § 2520.102-2(b).  By ignoring the risk of wear away, CIGNA did exactly that.

        Further supporting the Court's conclusion is evidence indicating that CIGNA was in fact aware of the possibility of wear away.  As noted above, CIGNA's expert testified that it would have been "predictable and known to CIGNA" that "opening balances for some sizeable group of employees" "would be less than their protected benefit under the old plan."  Trial Tr. 1029:21 to 1030:22.  Mr. Sher also agreed with the Court that "it [would] be typical that [he] or the consultants in the company would try to make some estimates of wearaway for the employee population and then discuss potential mitigative solutions."  Trial Tr. 1019:7-11.  In addition, Andrew Hodges, CIGNA's Chief Actuary for Projects, testified at his deposition that he became aware of the possibility of wear away upon his examination of the proposal for Part B.  He agreed that the interest rate used to calculate the opening account balances, as well as the pre-retirement mortality discount, could contribute to a wear away effect.  *See* Ex. 241 (Hodges Dep.), at 93:25 to 95:9.  Ms. Amara testified that at a going-away party for other CIGNA employees, Mark Lynch, CIGNA's Chief Actuary, told her, "Jan, you would be really sick if you knew the wearaway factors they were using with your benefit."  Trial Tr. 34:15-17.  Finally, an internal memorandum from CIGNA's Vice-President for Employee Benefits in January 2002 admitted that "[u]sing the present value of normal retirement age benefits results in a significant 'wear away' period during which time employees accrue no additional benefits with future service."  Ex. 40 at 28635.

With respect to CIGNA's claim that it was not required to provide notice of the possibility of wear away because only a small number of employees were affected, the Court holds that such a claim could bar liability only if CIGNA were able to show that the number of employees affected were *de minimis*.[38]  *Cf.* 29 C.F.R. § 2520.104b-4(c) ("A summary description of a material modification . . . need not be furnished . . . if the material modification or change *in no way affects* such retired participant's, vested separated participant's, or beneficiary's rights under the plan.") (emphasis added).  This is a showing CIGNA has not made, and which the Court does not believe it could make, especially in light of, for example, Mr. Sher's testimony that the opening account balances of "some *sizeable group* of employees" would be less than their Part A benefit.  Trial Tr. 1029:21 to 1030:22 (emphasis added).  In this respect, the Court notes that CIGNA failed to produce at trial any evidence regarding the exact number of employees likely to have been affected by wear away.  Further, the Court believes that the dramatic effect that wear away had on the pension benefits of certain named Plaintiffs, in some cases causing them to accrue no additional benefits at all from the time of Part B's implementation to their retirement, weighs against determining that the effects of wear away were sufficiently unimportant not to require attention in CIGNA's notices.

Even assuming, however, that CIGNA did not have an affirmative duty to inform plan participants regarding wear away, it nevertheless could not provide, instead of no information,

---

[38] CIGNA also appears to claim that because early retirement benefits were only available as part of an annuity, the wear away of those benefits would only affect those employees who chose an annuity.  Because most participants in the Plan chose a lump sum, CIGNA argues that it was not required to provide information regarding wear away.  *See* Defs.' Post-Trial Brief [doc. # 251], at 78-79.  However, CIGNA had, but chose not to provide, information regarding the number of plan participants who chose an annuity versus a lump sum.  For that reason, the Court finds that CIGNA failed to prove that only a *de minimis* number of employees potentially affected by the wear away of early retirement benefits chose an annuity rather than a lump sum.

materially misleading statements.  Yet that is just what CIGNA did.  For example, the 1997 Newsletter touts the fact that "[t]he new plan provides steadier benefit growth throughout your career." Ex. 516, at D00610.  The Retirement Kit states, "As of [January 1, 1998], the benefits you have earned under the Pension Plan will be converted to an opening account balance in the new plan. At the same time, you *will begin earning* retirement benefits under the new plan."  Ex. 508, at D00718; *see also id.* at D00726 ("You will earn no further benefits under the Pension Plan after December 31, 1997.  Starting in 1998, you will earn benefits under the new plan.").  Similarly, in its 1998 SPD, CIGNA states that plan participants' quarterly statements will show "the amount of accumulated credits in your account.  You'll see that amount *continue to grow* every year you are with CIGNA." Ex. 505, at D00826 (original emphasis omitted and emphasis added); *see also* Ex. 506 (1999 SPD), at D00623 (same).  Later in that same document, CIGNA claims that Part B features an "account in your name that grows each year with benefit and interest credits," and the "ability to earn retirement benefits *throughout your career*." Ex. 505 (1998 SPD), at D00826 (emphasis added); *see also* Ex. 506 (1999 SPD), at D00623 (same).  Directly under the heading "How Your Account Grows," CIGNA states, "Each dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested.  Under the plan, your benefit will grow steadily throughout your career as credits are added to your account." Ex. 505 (1998 SPD), at D00828; *see also* Ex. 506 (1999 SPD), at D00624 (same); Ex. 508 (Retirement Kit), at D00740 (same).

CIGNA argues that

the fact that the SPD told Plan participants that they might receive their protected Minimum Benefit if it was higher than their cash balance benefit was a clear indication that a participant's prior protected benefit might be greater than his or her account balance, and that there might be a period of time during which there would be no increase in his or her overall pension benefit.

Defs'. Post-Trial Br. [doc. # 251], at 64.  Thus, CIGNA contends that plan participants received all the notice of wear away that was required.  The Court disagrees.  Nowhere in any of the notices is the phenomenon of wear away, or any substantive equivalent, discussed or described.[39]  Further, in light of all of the above-mentioned statements that unequivocally state that all plan participants will begin accruing benefits under Part B beginning on January 1, 1998, the Court finds that plan participants would reasonably believe that wear away was not a component of, or a likely result of, Part B.  As CIGNA's counsel admitted to the Court, he could point to no statement in the notices that told employees "they were actually not earning retirement benefits."  Trial Tr. 597:21 to 598:25.  The indirect reference to the protected minimum benefit to which CIGNA now points is simply inadequate.

The Court now turns to the disclosure of which benefits accrued under Part A would be preserved in the opening account balance or as part of the protected minimum benefit established under Part B.  More specifically, Plaintiffs argue that CIGNA's disclosures were faulty because they led plan participants to believe that all of their Part A accrued benefits, including their early retirement benefits, would be protected.  Part B explicitly specifies that if an employee eligible for early retirement benefits under Part A chooses an annuity, rather than the lump sum distribution, that employee will receive *all* the early retirement benefits available, including "any Social Security supplement which would have been payable under Part A with respect to the Participant's Minimum

---

[39] Recently, a colleague of the Court's decided a § 204(h) notice was satisfactory in the face of a claim that wear away was not adequately disclosed, but the situation there was very different. *See Custer*, 2008 WL 222558.  In *Custer*, for example, SNET provided a § 204(h) notice that explained that a participant's guaranteed minimum benefit would be greater than the cash balance account for three to four years, and that retiring participants would receive their minimum benefits during that period.  In addition, there was no evidence that the company went one step further and made positive claims about benefits under the new plan, as did CIGNA here.

Benefit." Ex. 1 (Part B), at D00309 (§ 7.3(b)).  These additional early retirement benefits were, as noted previously, excluded from the lump sum distribution.  *See id.* (§ 7.3(c)) ("This section 7.3 *shall not apply* to any Participant who elects to receive his Accrued Benefit in the form of a lump sum distribution . . . .") (emphasis added).

Examining the statements CIGNA made about accrued benefits under Part A, however, the Court concludes that Plaintiffs reasonably could have believed that their early retirement benefits were fully protected as part of their minimum benefit and/or their opening account balance under Part B.  For example, in its November 1997 Newsletter, CIGNA stated simply, "If you earned *a benefit* under the current Pension Plan, the lump sum value of that benefit as of December 31, 1997, will be transferred to your account as your opening balance." Ex. 516, at D00608 (emphasis added). In the December 1997 Retirement Kit, CIGNA reiterated, "*Any benefits* that you have earned under the Pension Plan through December 31, 1997, are fully protected, and their value will be reflected in your new plan balance." Ex. 508, at D00718 (emphasis added); *see also id.* at D00726 ("If you are eligible for the new CIGNA Retirement Plan, all of your benefits earned under the current Pension Plan through December 31, 1997, will remain yours."); *id.* at D00740 (same).  In its September 1999 SPD, CIGNA wrote, "If you were an employee on December 31, 1997, or rehired after 1997, *any benefit* you earned under the Pension Plan through December 31, 1997 was converted to an opening account balance in this Pension Plan." Ex. 506, at D00624 (emphasis added); *see also* Ex. 505 (1998 SPD), at D00828 (same).  Later in the 1998 SPD, CIGNA assured its employees that "[i]f you participated in the Pension Plan before 1998, your old plan benefits were converted to an opening account balance in this Plan.  Your final Plan benefits cannot be less than your old plan benefits on December 31, 1997." Ex. 505, at D00838 (emphasis omitted).  In light of these

documents and their unqualified references to "old plan benefits," it was reasonable for CIGNA employees to conclude that all of their early retirement benefits were included in the protected minimum benefit, and that the employees would receive the full value of those benefits, regardless of whether they chose an annuity or a lump sum.[40]  Thus, the notices were not written in a manner calculated to be understood by the average plan participant.

The effect of these misleading statements was compounded by CIGNA's failure to inform its employees when the annuity option had a greater present value than the lump sum option, despite its representations that it would do so.  *See, e.g.*, Ex. 505 (1998 SPD), at D00838 ("Your final Plan benefits cannot be less than your old plan benefits on December 31, 1997.  *If this minimum benefits rule applies to you, you'll be notified by the Retirement Service Center when you request a distribution.*") (original emphasis omitted and emphasis added).  It is true that the 1997 Retirement Kit stated that "[y]our normal pension benefit is an annual payment made to you for life, beginning when you turn age 65," Ex. 508, at D00719, and that some Part A opening balances "will be based on the present value of [the participant's] age 62 early retirement benefit, rather than on the present value of [the] age 65 normal retirement benefit." *Id.* at D00721.  However, the Court finds that in light of apparently contradictory statements within the Retirement Kit itself, to the effect that *any* benefits previously accrued would be protected, *see id.* at D00718, and the lack of any indication in the later, authoritative SPDs that early retirement benefits would not be included in the opening account balances, these statements are not enough to prevent the disclosures as a whole from being

---

[40] It was not until CIGNA issued its revised Summary Plan Description for Part B in July 2006 that CIGNA informed its employees in a comprehensible manner of the restrictions on the availability of early retirement benefits if an employee chose a lump sum distribution.  *See* Ex. 731, at SuppD025662-SuppD025664.

statutorily inadequate.  For all of these reasons, then, the Court finds that CIGNA's SMM and its

SPDs, as well as its § 204(h) notice, were deficient and in violation of ERISA's requirements.

C.    **Likely Harm.**            Perhaps tellingly, CIGNA's primary argument in response to

the disclosure claims is that, even assuming that the notices and disclosures were statutorily

defective, Plaintiffs are nevertheless not entitled to relief because they have failed to demonstrate

injury.  The Second Circuit identified likely harm as the appropriate standard of injury in *Burke v.*

*Kodak Retirement Income Plan*, 336 F.3d 103 (2d Cir. 2003), holding that

> a prejudice standard is more consistent with ERISA's objective to protect the
> employee against inadequate SPDs.  A rule requiring detrimental reliance imposes
> an insurmountable hardship on many plaintiffs, . . . and such a rule hardly advances
> the Congressional purpose of protecting the beneficiaries of ERISA plans by insuring
> that employees are fully and accurately apprised of their rights under the plan.

*Id.* at 112 (quotation marks and alterations omitted); *see also Tocker v. Philip Morris Cos., Inc.*, 470

F.3d 481, 488 (2d Cir. 2006).  Thus,

> [c]ognizant of ERISA's distribution of benefits, [the Second Circuit] require[s], for
> a showing of prejudice, that a plan participant or beneficiary was *likely* to have been
> harmed as a result of a deficient SPD.  Where a participant makes this initial
> showing, however, the employer may rebut it through evidence that the deficient SPD
> was in effect a harmless error.

*Burke*, 336 F.3d at 113.  The court chose to employ a "likely harm" standard in order to avoid the

imposition of "harsh common law principles to defeat employees' claims based on a federal law

designed for their protection."  *Id.*  In sum, "[t]he result is a presumption of prejudice in favor of the

plan participant after an initial showing that he was likely to have been harmed."  *Id.* at 113-14.

In line with this protective approach, the Second Circuit has emphasized the broad nature of

"likely harm."  As the court explained in *Frommert*, "[a]s a result [of the inadequate notices], [the

plaintiffs] were deprived of the opportunity to take timely action in response to the purported

100

'amendment.' Such action might have included seeking injunctive relief, altering their retirement investment strategies, or perhaps considering other employment." 433 F.3d at 266; *see also Laurent*, 448 F. Supp. 2d at 547 (applying *Frommert*). Even the inability to bring a timely lawsuit itself can constitute likely harm if it results from misinformation provided in notices about the plan. In *In re Citigroup*, 470 F. Supp. 2d 323, for example, the court rejected the defendants' argument "that the only consequence [of the allegedly deficient § 204(h) notices] here was plaintiffs' failure to commence this litigation sooner, which hardly constitutes prejudice." *Id.* at 339 (quotation marks omitted); *see also Richards*, 427 F. Supp. 2d at 172-73; *Manginaro*, 21 F. Supp. 2d at 296-97 (plaintiffs prejudiced by SPD's failure to inform them of the plan's two-year statute of limitations on certain claims).

In light of the expansive view the Second Circuit has taken of likely prejudice, the Court must reject CIGNA's claim of harmless error. More specifically, CIGNA asserts lack of prejudice for three reasons: (1) none of the named Plaintiffs left CIGNA as a result of perceived deficiencies in Part B or the related notices and disclosures; (2) Plaintiffs received enough information about their benefits under Part B from other sources, including the opening account statements and the Total Compensation Reports, that any defects in the ERISA-required notices and disclosures were cured; and (3) even if Plaintiffs had received all of the information they claim should have been included in the notices and disclosures, no Class member's benefits under Part B would have changed. The second of these three rationales was discussed in the prior section regarding § 204(h) notices, and the Court will not repeat itself here. Suffice to say, the Court does not consider the additional

materials provided by CIGNA adequate either to cure the defects in the notices or to transform any possible prejudice into harmless error.[41]

The Second Circuit has explicitly rejected the claim that an employee who remains at his job necessarily has failed to show that defects in disclosures regarding plan provisions resulted in likely harm.  In *Frommert*, for example, the court examined Xerox's use of a "phantom offset"[42] in calculating the retirement benefits of rehired employees, which resulted in substantially lower benefits.  The district court had held that the plaintiffs failed to prove any injury, because all the employees had remained with Xerox despite later discovering the existence of the phantom offset and its dramatic effect on their retirement benefits.  The Second Circuit emphatically rejected this line of reasoning, stating that "[i]mposing a requirement that plan participants must show actual prejudice from a challenged plan amendment by terminating their employment imposes an unduly harsh burden on dissatisfied plan participants."  433 F.3d at 267.  Instead, the court noted that the absence of any mention of the phantom offset from the plan-related documents provided to the employees "likely, and quite reasonably, led plan participants to believe that it was not a component of the Plan."  *Id.*  This erroneous belief, fostered by inaccurate notices regarding the terms of Xerox's retirement plan, constituted likely harm.

------

[41] However, this determination of likely harm does not mean that the Court has determined what remedy, if any, is appropriate for the violations the Court has found, and further briefing will be required on that subject.  It may be that CIGNA's evidence regarding the lack of impact the faulty disclosures had on employees will go to remedy, even though that evidence was insufficient to rebut Plaintiffs' showing of likely harm.

[42] The "phantom offset" was so called because Xerox not only deducted the lump sum these employees had taken when they first left the company in calculating their retirement benefits upon rehire, but also deducted hypothetical interest that the lump sum would have accrued had it remained in Xerox's pension plan for the years in which the rehired employees worked for another company. *Frommert*, 433 F.3d at 260.

Courts have also rejected the idea that a plaintiff has failed to show likely harm if he cannot prove that he would have received a larger benefit were the notices accurate.[43]  For example, the district court in *Layaou v. Xerox Corp.*, 330 F. Supp. 2d 297 (W.D.N.Y. 2004), on remand from the Second Circuit, explicitly rejected Xerox's argument that Layaou was unable to show likely harm because "there is nothing that he could have done differently that would have resulted in his receiving a higher retirement benefit."  330 F. Supp. 2d at 302.  Relying on *Burke*, the district court explained that such a test would essentially re-impose the detrimental reliance standard eschewed by the Second Circuit.[44]  *Id.*

Similarly, the cases in which courts have found a rebuttal of the presumption of likely harm serve only to emphasize the expansive approach to likely harm adopted in this Circuit.  For in each of them, the court found actual knowledge on the plaintiff's part of the requirement omitted from the SPD.  In *Park v. Trustees of the 1199 SEIU Health Care Employees Pension Fund*, 418 F. Supp. 2d 343 (S.D.N.Y. 2005), for example, Mrs. Park had failed to fill out and submit a lost spouse waiver, which was required in order to name someone other than her spouse as the beneficiary under her pension plan.  As the court noted, "the lost spouse waiver was set forth in the Fund's Plan Document

---

[43] The court in *Sheehan v. Metropolitan Life Insurance Co.*, 368 F. Supp. 2d 228, 262 (S.D.N.Y. 2005), however, interpreted *Layaou v. Xerox Corp.*, 330 F. Supp. 2d 297 (W.D.N.Y. 2004), to construe *Burke* as holding that "in an ERISA action, likely prejudice to a plaintiff will be presumed if, as the result of an SPD deficiency, he was not aware of the need to take an action within his control (submitting an affidavit, filing a law suit) which would have avoided the restriction on eligibility for benefits, and consequently failed to take that action."  The court ruled against the plaintiff in that case, finding that he would have been ineligible for benefits even under the SPD provided to him by his employer, and regardless of any alleged deficiencies.  *Id.* at 262-63.

[44] The Second Circuit also examined the likely harm standard in *Wilkins*, 445 F.3d 572. Certain language in that opinion could be read as reintroducing a detrimental reliance requirement. However, the court did not explicitly restrict *Burke* or *Frommert*, and the Court will not presume *Wilkins* intended to do so implicitly.

which was attached to and distributed with the Fund's SPD, which the plaintiffs conceded Mrs. Park possessed."  *Id.* at 354.  Notably, plaintiffs were "unable to show that Mrs. Park was 'likely prejudiced' because plaintiffs admit that Mrs. Park was sufficiently aware of the lost spouse waiver to seek to invoke it."  *Id.*; *see also Weinreb v. Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 171-72 (2d Cir. 2005) ("Where a plan administrator fails to fulfill its statutory duty of furnishing an SPD, but where the evidence shows that the claimant had actual knowledge of the requirement at issue, any error is necessarily harmless."); *Pastore v. Witco Corp. Severance Plan*, 388 F. Supp. 2d 212, 221 (S.D.N.Y. 2005) (same).

Applying the *Burke* and *Frommert* standard to the facts of this case, the Court holds that Plaintiffs have met their burden of showing likely harm and prejudice.  As in *Frommert*, the notices provided by CIGNA "likely, and quite reasonably, led plan participants to believe" that wear away was not a likely result of the transition to Part B, that the full value of the accrued benefits under Part A, including early retirement benefits, would be included in the opening account balances, and that the accrual rates for both short- and long-term employees under Part B were at least roughly equivalent to those under Part A.  433 F.3d at 267; *see also Richards*, 427 F. Supp. 2d at 173.  Also as in *Frommert*, CIGNA's successful efforts to conceal the full effects of the transition to Part B "deprived [plaintiffs] of the opportunity to take timely action in response to the purported 'amendment,'" 433 F.3d at 266, whether that action was protesting at the time Part B was implemented, leaving CIGNA for another employer with a more favorable pension plan, or filing a lawsuit like this one.  As Ms. Amara testified, had she been told during her rehire interview that she would not be earning additional retirement benefits during a wear away period, she could have

"negotiated for a higher salary," "looked and talked to other employers," or stayed at her previous position. Trial Tr. 45:16-24.

## VI.    Rehire Rule

Some employees who had previously worked for CIGNA and had left the company's employ before Part B became effective, later returned to CIGNA. These employees were referred to as "rehires" during the litigation. As it developed, there were a considerable number of rehires at CIGNA. Originally, CIGNA intended to return the employees who had left to Part A when they came back. However, CIGNA decided to amend this "rehire rule" to provide that all employees hired by CIGNA after a certain date would be placed in Part B, regardless of whether they had previously accrued benefits under Part A. The result of this change meant that certain employees who were close to retirement age when they returned to CIGNA faced the possibility that, as a result of wear away and the method by which opening account balances were established, they would accrue no further pension benefits during their remaining time with CIGNA.

In *Depenbrock*, 389 F.3d 78, a group of CIGNA employees who had left the company and subsequently been rehired claimed that the amendment to the rehire rule had not yet been formally adopted at the time of their rehire, and so they should have been placed back into Part A, rather than entering Part B. CIGNA argued that the effective date of the amendment to the rehire rule was January 1, 1998, but the Third Circuit disagreed. The court held that CIGNA's Plan permitted only written amendments, and found that CIGNA's CEO had not signed the amendment to the rehire rule until December 21, 1998. *See* 389 F.3d at 83. The court also rejected CIGNA's argument that under the doctrine of ratification, the CEO's manifested intent that the amendment be retroactively valid from January 1, 1998 should control, because such an approach would effect a retroactive reduction

105

of the benefits that Mr. Depenbrock and others had accrued under Part A from the time of their rehire

to the date of the formal amendment to Part B.  *See id.* at 84.  Thus, Mr. Depenbrock and other

CIGNA employees, including Janice Amara, who were rehired before the formal amendment, were

ordered returned to Part A.  Had Ms. Amara not been returned to Part A as a result of the Third

Circuit's decision, she would have faced a wear away period of many years, indeed the entire

duration of her re-employment with CIGNA.  *See* Ex. 4 (Supp. Poulin Decl.), ¶¶ 21-22; Ex. 32, at

D028143, D028629.  Although *Depenbrock* provided relief only for CIGNA employees rehired

before December 21, 1998, Plaintiffs argue here that the same result should obtain for employees

rehired after that date because, they claim, CIGNA was required to send all separated, vested

employees a § 204(h) notice of significant reduction in the rate of future benefit accrual and an

SMM.  Only then could rehired employees make an informed choice as to whether to return to

CIGNA or not.

The requirements regarding § 204(h) notices, SPDs, and SMMs have been discussed above

and will not be repeated here.  The primary point of contention between the parties is whether

separated, vested employees who were no longer accruing benefits under Part A could be considered

"reasonably expected" to be affected by the amendment of the rehire rule for notice purposes, simply

by virtue of the fact that they had previously had the right to be placed back into Part A upon re-

employment.  *See* Ex. 2 (Part A), at D00025 (§ 2.4); 63 Fed. Reg. 68678, at 68682 (Treas. Reg.

1.411(d)-6, Q&A-9) ("A plan administrator need not provide section 204(h) notice to any participant

whose rate of future benefit accrual is reasonably expected not to be reduced by the

amendment . . . ."); 29 C.F.R. § 2520.104b-4(c) ("A summary description of a material modification

to the plan or a change in the information required to be included in the summary plan description

need not be furnished to a retired participant, a vested separated participant or a beneficiary receiving benefits under the plan . . . if the material modification or change in no way affects such retired participant's, vested separated participant's, or beneficiary's rights under the plan."). CIGNA argues that these employees, once separated from the company, were no longer accruing benefits from CIGNA, and so any future accruals upon re-employment (whether under the original rehire rule or the less favorable amended version) could only be considered an increase, obviating any need for § 204(h) notices. Defs.' Post-Trial Brief [doc. # 251], at 97. Further, CIGNA argues that no notice was owed to separated, vested employees regarding the amendment to the rehire rule because these employees were not yet participants in Part B before their re-employment with CIGNA. *See id.* at 101-02. Under § 204(h), if notice is not due to an individual at the time of the amendment, the plan administrator need never provide a § 204(h) notice to that individual. *See* 63 Fed. Reg. 68678, at 68681-82 (Treas. Reg. 1.411(d)-6, Q&A-8); 29 C.F.R. § 2520.102-4 (no requirement to provide to a particular class of participants, such as former employees, an SPD detailing an amendment that does not affect that class). Plaintiffs counter that a determination whether the rights of a certain class of employees are likely to be affected by an amendment must be made through a contemporaneous assessment of "the relevant facts and circumstances at the time the amendment is adopted," 63 Fed. Reg. 68678, at 68681 (Treas. Reg. 1.411(d)-6, Q&A-7), and that CIGNA failed to provide any evidence that it had undertaken such an analysis. *See* Pls.' Post-Trial Brief [doc. # 247], at 92; Pls.' Post-Trial Reply Brief [doc. # 254], at 43-44.

Although Plaintiffs rely on *Frommert*, 422 F.3d 254, for the proposition that an employer must provide notice to separated, vested employees regarding a change in the methods of calculating benefits upon rehire, even after formal amendment of the plan, the Court disagrees. In *Frommert*,

as described previously, Xerox began using a so-called "phantom offset" in calculating the pension benefits of rehired employees who had taken a lump sum payout of previously-accrued benefits at the time they first left the company.  The Second Circuit determined that the Xerox pension plan had not been effectively amended until the 1998 SPD was published, which "set out in full" the nature of the phantom offset and how it was actually applied in the calculation of benefits for rehired employees.  *See id.* at 260.  The phantom offset rule was deemed inapplicable to all those who had been rehired before the issuance of that SPD, because "[w]ithout the benefit of such information, former employees contemplating returning to Xerox were denied the opportunity to make a meaningful decision regarding whether they would accept the terms of Xerox's pension plan."  *Id.* at 262; *see also id.* at 263 ("We also hold that the defendants failed to meet their obligations to provide advance notice of the amendment as required by § 204(h), meaning that the phantom account may not be applied to employees rehired prior to the issuance of the 1998 SPD.") (emphasis omitted).

However, the court then continued, "[F]or employees rehired *subsequent to the amendment of the Plan* through the 1998 SPD, the phantom account is a component of the Plan that they joined and thus may permissibly be applied to them. . . .  With full notice of the phantom account's existence, these rehired employees, unlike their predecessors who lacked such information, had the opportunity to make an informed decision about taking or leaving the terms of the deal offered to them under the Plan."  *Id.* at 263, 269 (emphasis added).  Thus, the Second Circuit held that a valid amendment to the plan document constituted all the notice required for former employees rehired after the amendment, even regarding rules specifically addressing that group of plan participants.  As the court stated, "Unlike employees rehired before the 1998 SPD was issued, those hired after

108

it was provided were not 'participants in the plan' at the time of the change required to be notified under § 204(h)." *Id.* at 269 n.12 (emphasis and alteration omitted). If the employees rehired after the amendment date are not "plan participants" for the purposes of § 204(h) notices, it stands to reason that neither are they plan participants for the purposes of SMMs or SPDs.

As a consequence, the Court concludes that CIGNA had no duty to provide notice of the amended rehire rule to all separated, vested employees, and was not required to provide any special notice to those rehired after December 21, 1998 – the valid amendment of Part B was itself sufficient to inform those employees of their rights under the Plan. Of course, the Court's determination that there was no violation of ERISA in CIGNA's failure to provide notice of the rehire rule specifically does not affect its determination that the notices provided to all CIGNA employees, whether rehires or not, were deficient due to their material misrepresentations regarding the mechanics of Part B.

## VII.  Choices Upon Retirement

ERISA requires that employers provide their employees with certain information regarding the relative values[45] of different benefit forms available at retirement, and Plaintiffs claim that CIGNA failed to comply with these regulations. Specifically, Plaintiffs assert that CIGNA was obligated to inform plan participants: (1) that the lump sum option did not include the early retirement benefits available as part of the annuity; (2) whether the annuity option for a given employee was more valuable than the lump sum option; (3) whether an employee's Part A benefits were greater than her Part B benefits; and (4) whether waiting until some future date to begin

---

[45] CIGNA refers to relative value as "present value," and indeed, to make a comparison between a lump sum and an annuity, one must almost invariably calculate the present value of the income stream provided by the annuity. However, for ease of reference and because the crux of Plaintiffs' claims is that CIGNA should have provided comparative information, the Court will use the term "relative value" here.

receiving benefits would result in higher benefit levels.  As a result of CIGNA's alleged failure to provide this information, Plaintiffs argue that some CIGNA employees chose a lump sum distribution when an annuity would have been more valuable.

Before turning to the substantive requirements for CIGNA's election form, there are two preliminary issues the Court must address.  The first and more important is Defendants' contention that the named Plaintiffs lack standing to raise these claims on behalf of the Class.[46]  Defendants argue that Ms. Amara's relative value claim is moot now that she has been returned to Part A (and so does not face the election under Part B of a lump sum versus an annuity); that Ms. Broderick suffered no harm because she chose the annuity option, which was the most valuable option available to her; and that Ms. Glanz, in addition to not yet having made the choice between an annuity and a lump sum, is not eligible for any subsidized early retirement benefits that would only be included in an annuity.  *See* Defs.' Post-Trial Brief [doc. # 251], at 112-14.[47]  The class here was certified on December 20, 2002.  *See* Order [doc. # 61].  At that time, Ms. Amara had not yet been returned to

---

[46] In a similar vein, CIGNA argues that only the plan administrator, Mr. Beltz, is an appropriate defendant on this claim, as it regards defects in notices provided to plan participants. The Court has addressed this argument in the Plan Administrator section of its Opinion, and need not repeat its analysis here.  For the reasons stated there, and given the lack of any indication in the record that Mr. Beltz was involved in the design of CIGNA's benefit election forms, CIGNA is an appropriate defendant on the relative value claim, at least with regards to ERISA § 502(a)(3).

[47] Ms. Jones testified that she chose a lump sum that was worth $80,000 less than her annuity option, but Defendants argue that she cannot serve as a class representative on this claim because she failed to exhaust her administrative remedies within CIGNA.  *See* Defs.' Post-Trial Brief [doc. # 251], at 114 n.96.  Regarding exhaustion, although the Second Circuit itself has not decided the issue, it has stated that "[d]istrict courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation." *Nechis*, 421 F.3d at 102 (quotation marks omitted).  Finally, the Court notes that Defendants have had ample opportunity to raise any concerns about standing earlier in the course of these proceedings, and in fact requested additional class representatives for other claims.  The Court thus does not consider Defendants' arguments a bar to its consideration of the merits of this claim.

110

Part A under the *Depenbrock* decision, and Ms. Broderick did not choose the annuity option under Part B until November 2004, when CIGNA recalculated her benefits to include the Preserved Spouse's benefit that had previously been erroneously excluded. Thus, both Ms. Amara and Ms. Broderick had viable relative value claims at the time the Class was certified, and standing at the time of class certification is all that matters. It is well-settled that so long as a class representative has standing at the time of certification, later mootness of that plaintiff's claim does not destroy standing on behalf of the class. *See, e.g.*, *Robinson v. Sheet Metal Workers' Nat'l Pension Fund*, – F.3d –, 2008 WL 302610, at *3 n.4 (2d Cir. 2008) ("The Supreme Court has held that the mootness of the claims of even the *only* lead plaintiff does not moot a class action. It follows *a fortiori* that the mootness of the claims of one of two lead plaintiffs does not moot the class action, so long as 'there are questions of law or fact common to the class' and 'the representative parties will fairly and adequately protect the interests of the class.'") (citations omitted) (quoting Fed. R. Civ. P. 23(a)(2), (4)); *Martens v. Thomann*, 273 F.3d 159, 173 n.10 (2d Cir. 2001) ("Generally, the moving plaintiffs are correct in stating that special standing rules exist for class representatives. Although, upon certification of a class, the class representative must have individual standing, class representatives may continue to represent a class even if their individual claims become moot.") (citation omitted) (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980), and *Sosna v. Iowa*, 419 U.S. 393, 402 (1975)).

Second, Plaintiffs urge the Court also to examine the relative value disclosures provided by CIGNA to employees covered by the *Depenbrock* decision. *See* Pls.' Post-Trial Brief [doc. # 247], at 101-02. However, this aspect of the relative value claim was not included in the Court's Order

Under Federal Rule 23(c)(1)(B) [doc. # 241], and the Court believes that the *Depenbrock* court is the appropriate forum for the enforcement of that court's judgment.

   **A.     Early Retirement Benefits.**   The Court now turns to the substance of Plaintiffs' first claim, namely that CIGNA was required to inform plan participants that the lump sum did not include any early retirement benefits (other than the Preserved Spouse's benefit).   Under the terms of Part B, an employee with an accrued benefit under Part A may choose at retirement to receive either the Part B accrued benefit as a lump sum or the Part A accrued benefit as an annuity.   The lump sum can be no less than the equivalent actuarial value of the employee's protected minimum benefit, but as discussed in the Anti-Backloading and Non-Forfeiture section, that minimum benefit includes no early retirement benefits other than the Preserved Spouse's benefit (where applicable). The annuity, on the other hand, includes all early retirement benefits for which the employee would have been eligible under Part A.[48]   *See* Ex. 1 (Part B), at D00309 (§ 7.3); Ex. 158, at MER00660 ("[CIGNA] could consider the use of a lump sum in Tier 1 but only for accrued benefits payable at normal retirement age.   In other words, any Tier 1 employee electing a lump sum would forfeit the value of the early retirement subsidy.").   Thus, at retirement, CIGNA employees with Part A accrued benefits must choose between a lump sum payment of the protected minimum benefit and an annuity that includes any subsidized early retirement benefits for which the employees would have qualified. In making their claim that CIGNA should have provided clearer notices regarding the availability of early retirement benefits, Plaintiffs rely on ERISA §§ 203(e) and 205(g).  Both of these provisions

---

   [48] Part B accrued benefits are also available in annuity form.  *See* Ex. 1 (Part B), at D00305 (§ 7.1(a)).   However, given that Class members' annuities automatically included early retirement benefits available under Part A, the Part B annuity for these employees was essentially converted into an annuity of their Part A accrued benefit.

require the written consent of a plan participant before a retirement benefit exceeding $5,000 may

be distributed as a lump sum, and various Treasury regulations explain and expand on the consent

requirement.[49]  For example, Treasury Regulation 1.401(a)-20, Q&A-36 states that

> for plan years beginning after December 31, 1988, participants must be furnished a
> general description of the eligibility conditions and other material features of the
> optional forms of benefit and sufficient additional information to explain the relative
> values of the optional forms of benefit available under the plan (*e.g.*, the extent to
> which optional forms are subsidized relative to the normal form of benefit or the
> interest rates used to calculate the optional forms).

26 C.F.R. § 1.401(a)-20, Q&A-36; *see also* 26 C.F.R. § 1.417(e)-1(b)(2)(i) (stating that no consent

to a lump sum distribution is valid unless the plan participant receives a disclosure form that satisfies

the requirements of Q&A-36).  Other Treasury regulations state that

> different optional forms of benefit exist if a distribution alternative is not payable on
> substantially the same terms as another distribution alternative. . . .  Thus, for
> example, different optional forms of benefit may result from differences in terms
> relating to the payment schedule, timing, commencement, medium of distribution
> (*e.g.*, in cash or in kind), election rights, differences in eligibility requirements, or the
> portion of the benefit to which the distribution alternative applies.

---

[49] Plaintiffs also raised previously a claim that CIGNA had failed to protect benefits earned under Part A, in violation of ERISA § 204(g), 29 U.S.C. § 1054(g), which prohibits amendments that decrease benefits already accrued under a pension plan.  As discussed in the Anti-Backloading and Non-Forfeiture section, the normal retirement benefit accrued under Part A, as well as the Preserved Spouse's benefit where applicable, became part of the protected minimum benefit under Part B. CIGNA argues that the subsidized early retirement benefits previously offered under Part A, while not part of the protected minimum benefit, were nevertheless preserved as required by ERISA § 204(g) because employees who would have qualified for those benefits under Part A could receive them as part of their annuity under Part B.  *See* Defs.' Post-Trial Brief [doc. # 251], at 111 n.93 ("Part A did not offer employees a lump sum benefit option.  Thus, all of the early retirement benefits were available under Part A only in annuity form, and they are protected by Part B in that same form.") (citation omitted).  The Court construes Plaintiffs' failure to pursue their § 204(g) claim in their post-trial briefing as an indication that they have abandoned this claim, and thus the Court does not decide this issue.

26 C.F.R. § 1.401(a)(4)-4(e)(1)(i); *see also* 26 C.F.R. § 1.411(d)-4, Q&A-1(b)(1) (same).  This

language is echoed in the Part B plan document, which states that

> [t]he Plan Administrator shall provide to each Participant . . . a written explanation
> of . . . [t]he terms and conditions of a Qualified Annuity, including a general
> description of the eligibility conditions and other material features of the optional
> forms of benefit and sufficient additional information to explain the relative values
> of the optional forms of benefit available under the Plan.

Ex. 1 (Part B), at D00305 (§ 7.1(b)(1)).

Looking at the terms of the Treasury regulations, the Court agrees with Plaintiffs that CIGNA

was required to notify its employees that the subsidized early retirement benefits were available only

through the annuity option.[50]  Treasury Regulation 1.401(a)-20, Q&A-36, for example, obligates

employers to explain "the extent to which optional forms are subsidized relative to the normal form

of benefit."  Thus, under the plain language of the regulation, merely including the early retirement

benefits in the value of the annuity, without making clear that those early retirement benefits were

available as part of the annuity and only as part of the annuity, was insufficient.  Yet a cursory

examination of the benefit election forms reveals no such disclosure, *see, e.g.*, Ex. 144, at

SuppD2406-SuppD2408, and even CIGNA's own expert agreed that CIGNA failed to provide this

information in its election forms.  *See* Ex. 193 (Sher Dep.), at 78:9 to 79:18 ("Q. And do you see any

language in there that – that explains the extent to which optional forms are subsidized relative to

the normal form of benefit? . . . A. There is nothing that I see. . . .  I don't see anything that compares

one benefit to another other than the numbers themselves and the explanations."); Ex. 239 (Arko

Dep.), at 154:24 to 156:2 ("Q. Does that description indicate to participants that some of those

---

[50] The Court finds that CIGNA did, however, comply with its obligation to notify participants
that they could choose to defer the receipt of their benefits.  *See* 26 C.F.R. § 1.411(a)-11(c)(2)(i).

benefit payment options may contain subsidized values, whereas other ones may not contain subsidized values? . . . A. I see no specific words that mirror those that you just asked about . . . ."). Instead, CIGNA and its actuaries had been operating under the assumption that the two forms of benefit – the annuity and the lump sum – were substantially equal, even though they were not; that is, subsidized early retirement benefits were only included in the former, not the latter. *See* Ex. 198 (Morris Deposition), at 135:5-7 ("It was our understanding that all benefits were equal, relatively equal."); Ex. 240 (Arko Dep.), at 119:22 to 120:17. Thus, the Court finds that CIGNA violated ERISA and the relevant Treasury regulations by not including an explicit statement in its benefit election forms to the effect that early retirement benefits accrued under Part A were only available under the annuity, and not as part of the lump sum payment.

**B.    Lump Sum Versus Annuity.**    However, contrary to Plaintiffs' claims, CIGNA was not required to inform plan participants whether, in the case of a particular employee, the annuity option was more valuable than the lump sum option. It is true that Treasury regulations required "sufficient additional information to explain the relative values of the optional forms of benefit available under the plan," 26 C.F.R. § 1.401(a)-20, Q&A-36, but it is unclear what "relative value" was intended to mean, or how employers could comply with that requirement. Plaintiffs argue that in order to provide an understandable explanation of the value of an annuity versus that of a lump sum, CIGNA needed to calculate the present value of the annuity, essentially putting the two benefits into a similar economic form. Such a presentation would also, at least implicitly, suggest which of the two was more valuable.[51] The Court disagrees.

---

[51] Plaintiffs argue that CIGNA's statement in its Retirement Kit to the effect that "[t]he lump sum distribution option can be very valuable," Ex. 508, at D00729, is itself comparative, and misleading when no information is provided regarding the value of the annuity option. In light of

More recent Treasury regulations, which became effective as of October 2004, offer helpful insight. The notice of proposed rule-making for the revised regulations defined the problem to be addressed as follows:

> In particular, participants who are eligible for both subsidized annuity distributions and unsubsidized single-sum distributions may be receiving notices that do not adequately explain the value of the subsidy that is foregone if the single-sum distribution is elected. In such a case, merely disclosing the amount of the single-sum distribution and the amount of annuity payments may not adequately enable those participants to make an informed comparison of the relative values of those distribution forms, even if the interest rate used to derive the single sum is disclosed. Furthermore, questions have been raised as to how the relative values of optional forms of benefit are required to be expressed under current regulations. *Accordingly, these proposed regulations are being issued to propose disclosure requirements that would enable participants to compare the relative values of the available distribution forms using more readily understandable information.*

67 Fed. Reg. 62417, at 62419 (emphasis added).[52] The notice went on to explain that under the proposed regulations, and so presumably not under the version previously in effect,

> the description of the relative value of an optional form of benefit compared to the value of the [qualified joint spousal annuity] must be expressed in a manner that provides a meaningful comparison of the relative economic values of the two forms of benefit *without the participant having to make calculations using interest or mortality assumptions*.

*Id.* (emphasis added).

---

the details provided in the benefit election form as to the lump sum and the monthly annuity payments, however, and the absence of a similar statement in that document, the Court does not agree with Plaintiffs' interpretation of the effect of the Retirement Kit's language.

[52] CIGNA has represented that it has brought its disclosures into compliance with the new regulations and has offered any employee who chose a less valuable benefit option after the effective date of the new regulations an opportunity to reconsider that choice. *See* Trial Tr. 805:22 to 806:24; Ex. 740 (example letters to participants reflecting revised relative value disclosures). Plaintiffs do not appear to contest this representation (except with regard to the *Depenbrock* class, which the Court has stated it will not consider), and so the Court will address only the period of January 1, 1998, when Part B became effective, until September 30, 2004.

116

This language suggests to the Court that although employers certainly could have chosen previously to provide the present value of both the annuity and lump sum options, such an approach was not required before the new regulations went into effect in 2004. Instead, employers could choose, like CIGNA, to provide the monthly payment available under the annuity and the value of the lump sum disbursal, and leave employees (and presumably their financial advisers) to make the necessary calculations to determine the present value of the annuity.[53] As CIGNA's expert, Mr. Sher, testified, one reason CIGNA might have chosen to do so is that providing the present value of an annuity and a lump sum, without further information, may in fact be misleading. *See* Trial Tr. 1233:7-25. Although the present value of the annuity may exceed the lump sum, the employee has the opportunity to invest the lump sum as she chooses, and those returns may result in a larger overall sum than the present value of the annuity. There are also personal reasons why certain employees might prefer a lump sum, such as the desire to have control over one's investments. Indeed, Ms. Jones, the only plaintiff to testify that she had chosen a lump sum worth less than the annuity, testified that she had met with a financial adviser regarding her retirement options. *See* Trial Tr. 745:13-14. Finally, the Court notes that CIGNA was not an outlier in choosing not to offer the present value of the annuity option to its employees; CIGNA's expert, Mr. Sher, testified that in doing so, CIGNA was following the general practice in the industry prior to the new regulations. *See* Trial Tr. 1231:23 to 1232:12. For all of these reasons, then, the Court finds that CIGNA did not violate ERISA by failing to indicate on employees' benefit election forms whether the annuity option or the lump sum option was more "valuable."

---

[53] Importantly, even under the 2004 regulations, providing present values of the annuity and the lump sum is not the only way to comply with the "relative value" requirement. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2).

C.    **Greater Benefits.**    Plaintiffs' final two claims, that CIGNA should have informed its employees if the benefits under Part A were greater than those under Part B and if waiting to retire would result in greater benefits, are related.  For waiting to retire could result in greater benefits (excepting the interest that would accrue while CIGNA held the underlying funds) only if the employee became eligible for early retirement benefits in the meantime.  Although there is no support in the regulations for an obligation on CIGNA affirmatively to point out the greater of the available options, the Court finds that CIGNA assumed that obligation as a result of statements it made in materials describing the transition to Part B.  In both the October 1998 and September 1999 SPDs, for example, CIGNA wrote, "Your final Plan benefits cannot be less than your old plan benefits on December 31, 1997.  *If this minimum benefits rule applies to you, you'll be notified by the Retirement Service Center when you request a distribution.*"  Ex. 505 (1998 SPD), at D00838 (original emphasis omitted and emphasis added); Ex. 506 (1999 SPD), at D00629 (same).  As the Second Circuit has noted,

> ERISA contemplates that the summary plan description will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary.  Further, the SPD is of such importance that where the terms of a plan and the SPD conflict, the SPD controls.

*Frommert*, 433 F.3d at 265 (quotation marks and citations omitted).  Thus, CIGNA was required, as a result of its promises in the SPDs, affirmatively to notify its employees if the present value of their retirement benefits under Part A exceeded those available under Part B.  As CIGNA's current plan administrator, Mr. Arko, testified at his deposition, there is no specific "disclosure that tells [plan participants] what they are being offered is the minimum benefit." Ex. 239 (Arko Dep.), at 295:13-14.  Instead, Mr. Arko noted that "we make available to them the 800 number if they want

118

to call to ask specific questions about the calculation of benefits." *Id.* at 295:15-18. Although CIGNA similarly suggests in its Post-Trial Brief that simply including the value of the Part A annuity among an employee's retirement options on the benefit election form satisfied this requirement, the Court disagrees. *See* Defs.' Post-Trial Brief [doc. # 251], at 117 n.99 ("To comply with this provision, the Plan Administrator notified participants by providing on their benefit election forms the amount of each benefit option, including the minimum benefits where applicable. Under the Plan, as under the prior regulations that were in effect at the time the Plan document and SPD were drafted, nothing more was required to apprise participants of the values of their various benefit options."). Especially in light of the difficulty employees (and even experts) had in evaluating the comparative value of the different retirement options, CIGNA could only comply with its obligation by pointing out explicitly that the Part A annuity had the greater present value.

However, the Court finds that CIGNA was not required to inform its employees that they would qualify for early retirement benefits under Part A if they postponed their retirement. Class member Douglas Robinson, for example, elected a lump sum distribution at age 54 and 3 months. Had he waited until age 55 to retire, he would have been eligible for early retirement benefits that would have resulted in an annuity with twice the present value of the lump sum he received. *See* Ex. 144, at SuppD2405-SuppD2406. Plaintiffs argue that CIGNA should have informed Mr. Robinson of this fact. For support, they point to CIGNA's promises to inform employees if their Part A benefits were greater than those under Part B, and Treasury Regulation 1.401(a)-20, Q&A-36, which requires a "general description of the eligibility conditions and other material features of the optional forms of benefit" on benefit election forms. Under Treasury Regulation 1.401(a)(4)-4(e)(1)(i), "optional forms of benefit" include those resulting from "differences in terms relating to the payment

119

schedule, timing [or] commencement."  CIGNA, on the other hand, claims that it was not required to provide information regarding age-55 early retirement benefits on Mr. Robinson's benefit election form because he did not yet qualify for them at the age of 54 and 3 months.  *See* Defs.' Post-Trial Brief [doc. # 251], at 118 n.100.

The Court agrees with CIGNA.  Although the regulations require a benefit election form to notify the employee of optional forms of benefit that differ with respect to timing or commencement, they nowhere require that employers inform employees of benefits for which those employees do not qualify.  Nor is the Court willing to read such a requirement into the regulations, given the administrative burden on employers that would result and the difficulty of finding a principled stopping point.  For example, if Mr. Robinson had been 53, or 50, or 45 at the time he retired, would CIGNA have been required to notify him of the possibility that he would qualify for early retirement benefits if he only postponed his retirement until age 55?  Similarly, one could argue that if CIGNA expected interest rates to rise in future, resulting in a larger annuity benefit, CIGNA should be required to inform employees of this possibility as well.  Yet such a requirement is clearly impracticable.  Given this impracticability and the fact that there is no allegation here that Mr. Robinson, independent of the benefit election form, was misled regarding the Plan's early retirement benefits, the Court finds that CIGNA's benefit election forms were not deficient in this respect.  In sum, the Court finds that CIGNA violated ERISA in not informing plan participants if the benefits for which they qualified at the time of retirement under Part A were greater than those available under Part B, but did not violate ERISA in not notifying employees if their benefits would be greater if they postponed retirement (as a result of qualifying for early retirement benefits under Part A).

## VIII.     Conclusion

To summarize, the Court concludes that CIGNA's cash balance plan did not violate the anti-backloading and non-forfeiture rules in ERISA §§ 203(a) and 204(b)(1)(B) (Count One), nor did it violate the age discrimination provision in ERISA § 204(b)(1)(H) (Count Three).  Further, CIGNA was not required to provide notice to rehired employees of the modification to the rehire rule under ERISA § 204(h) (Count Four).  To the extent Plaintiffs maintain an anti-cutback claim under ERISA § 205(g) as part of Count Five, the Court also finds that no cutback of accrued benefits occurred under Part B.  However, the Court finds that CIGNA failed to provide notice of a significant reduction in the rate of future benefit accrual under Part B in violation of ERISA § 204(h) (Count Four).  CIGNA also failed adequately to disclose material modifications to its pension plan and features that may result in reductions, losses, or forfeitures of benefits that a participant might otherwise reasonably expect to receive, in violation of ERISA § 102 (Count Two).  Finally, CIGNA failed to disclose the extent to which optional forms of benefit were subsidized, as required by Treasury Regulation 1.401(a)-20, Q&A 36, and whether plan participants' Part A minimum benefit exceeded their Part B account balance, as CIGNA had promised to do in its disclosures regarding Part B (Count Five).  Thus, the Court grants judgment to CIGNA on Counts One, Three, Four (to the extent Count Four addresses the rehire rule), and Five (to the extent Count Five addresses the cutback of accrued benefits); and grants judgment on liability only to Plaintiffs on Counts Two, Four (to the extent Count Four addresses CIGNA's § 204(h) notices), and Five (to the extent Count Five addresses failures of disclosure).

Determining what remedies are available and appropriate in light of the Court's liability findings is a complex issue on which the Court desires further briefing.  Therefore, the Court hereby

ORDERS the parties to file simultaneous briefs regarding class relief **no later than March 17, 2008**.

At the same time, the parties should file briefs regarding the issue of how to address any remaining

claims, including individual claims.  The parties should file simultaneous responses to each other's

briefs **no later than March 31, 2008**.


IT IS SO ORDERED.


/s/         Mark R. Kravitz
United States District Judge


**Dated at New Haven, Connecticut: February 15, 2008.**