**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JANICE C. AMARA, GISELA R. BRODERICK, ANNETTE S. GLANZ, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>   vs.<br><br>CIGNA CORP. and CIGNA PENSION PLAN,<br><br>                Defendants. | Civil No. 3:01-CV-2361 (MRK) |

**DEFENDANTS' RESPONSES TO**
**THE COURT'S APRIL 30, 2008 INQUIRIES**

**INTRODUCTION**

On February 15, 2008, the Court issued its Memorandum of Decision ("MOD") in which it ruled in favor of Defendants on certain claims and in favor of Plaintiffs with respect to certain disclosure claims under the Employee Retirement Income Security Act ("ERISA"). On April 30, 2008, the Court asked the parties to address five questions related to the disclosure claims decided by the Court in the MOD and the parties' subsequent submissions on remedies and individualized issues. The responses of Defendants CIGNA Corporation and CIGNA Pension Plan to those questions are set forth below.[1]

---

[1] Defendants will not repeat herein all of the arguments made in their April 16, 2008 Memorandum on Individual Issues and Class Relief, but incorporate by reference that document in its entirety.

**DEFENDANTS' RESPONSES**

**1.    Attorneys' Fees**

The Court asked whether any appeal of the Court's rulings on the underlying merits and remedies must be deferred until the Court rules on Plaintiffs' request for attorney's fees.

It is Defendants' position that once issues of liability and remedies (excluding attorneys' fees) have been determined and incorporated into a judgment, a court of appeals has jurisdiction to review the merits of those decisions even if a district court has not resolved a party's request for attorneys' fees and costs.[2]  Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202 (1988) (adopting "a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final"); Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 83 (2d Cir. 1998) (same).  See also Correspondent Servs. Corp. v. First Equities Corp. of Florida, 338 F.3d 119, 123 n. 4 (2d Cir. 2003) ("The pending motion for attorney's fees in the district court is collateral to the merits of the underlying action and does not affect the finality of the district court's judgment or, therefore, our jurisdiction."); Farkas v. Rumore, 101 F.3d 20, 22 (2d Cir. 1996) (per curiam) ("[W]here an order disposes of a party's substantive claims, but does not dispose of claims relating to attorney's fees, the time for appeal of the substantive claims starts to run from the date of the first order unless the district court explicitly grants a delay." (citations omitted)).  Accordingly, Defendants respectfully submit that the Court can defer ruling on Plaintiffs' request for attorneys' fees and costs without affecting the Second Circuit's ability to review the Court's underlying decisions and judgment on merits and remedies issues.

---

[2]    There is an exception where the attorneys' fees and costs are sought as part of a contractual damages remedy where, for example, a contract at issue entitles the prevailing party to an award of attorney's fees.  Defendants do not believe that this exception applies in this case.

**2.**     **Benefit Election Forms**

The Court asked the parties to estimate the number of class members potentially affected by the Court's ruling that certain benefit election forms were deficient and to address whether any proposed remedy could avoid requiring class members to repay the lump sum they received to the Plan in order to elect an annuity benefit that was available to them as a benefit option under the terms of the Plan.

As Defendants understand it, the only individuals who "prevailed" on Plaintiffs' relative value claim (and who therefore could possibly be entitled to any remedy) are those who elected a lump sum benefit between January 1, 1998 and September 30, 2004 despite being eligible for an immediate frozen subsidized early retirement annuity benefit that was more valuable than the lump sum they elected.[3]  (MOD at 114-15).  Current regulations, however, only require a disclosure that benefit options are not relatively equal where they vary by more than five percent.[4]  Consistent with these regulations, Defendants submit that class members whose subsidized early retirement annuity benefit had a value within five percent of the lump sum benefit the class member elected should not be entitled to any new disclosures and should not be awarded any additional benefits, or the right to change their original lump sum benefit election.

On the issue of repayment, the Court has indicated that if it decides to void the original election of affected class members, it will not require those class members who then elect an annuity benefit to repay any lump sum amounts they have received.  The Court also stated that

---

[3]     Tier 1 (i.e., 2% formula) individuals rehired after December 31, 2000 were entitled to benefits under an "A+B" methodology, with their Part A benefit available exclusively as an annuity based on pre-1998 service, and a separate Part B benefit based on post-1997 service. Thus, these individuals were given any choice to elect benefit options of unequal value.

[4]     The 2003 Treasury regulations permit optional forms of benefits to be deemed relatively equal where they vary by five percent or less.  See 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iii).

any annuity elected by a class member must be offset against the lump sum that individual received plus interest/ expected investment gains. While Defendants agree that such an offset would be appropriate if the Court required no repayment, Defendants submit that neither ERISA Section 502(a)(1)(B) nor ERISA Section 502(a)(3) authorizes an award of additional benefits beyond those provided under the terms of the Plan. Thus, under ERISA Section 502(a)(1)(B),[5] any class member who received a lump sum that exceeds the present value of the stream of annuity payments that class member would have received to date (had he or she elected an annuity in lieu of the lump sum) should be required to pay back the "excess" lump sum as a condition to electing the annuity benefit. Any remedy that does not require repayment would constitute an award in excess of the benefits to which the class member was entitled under the terms of the Plan, a windfall that is simply not permissible under ERISA. See Layaou v. Xerox Corp., 330 F.Supp. 2d 297, 304-05 (W.D.N.Y. 2004) (ordering plan administrator to recalculate benefit and opining that it would "not be unreasonable" for administrator to "subtract out the amount of the prior distribution" since to do otherwise would provide plaintiff with a "windfall").

**3.    ERISA Section 204(h) Remedy Regarding The Failure To Disclose Wearaway**

The Court asked the parties about the breadth of any remedy for failure to disclose wearaway and whether any additional remedy (besides a remedy to compensate for wearaway) would be equitable or appropriate under the circumstances, and in light of the communications provided to Plan participants.

As an initial matter, Plaintiffs' expert Claude Poulin testified that the "overwhelming majority" of class members experienced wearaway:

---

[5]   ERISA Section 502(a)(3) does not allow any award of additional benefits for all the reasons explained by Defendants in their April 16, 2008 submission.

4

> I cannot say for sure that 100 percent of the employees had experienced wearaway but I would say that the overwhelming majority experienced wearaway.

(Tr. 219; see also Tr. 221-22). Thus, any remedy to correct for wearaway will benefit this same group, i.e., an "overwhelming majority" of class members.

Setting aside all of Defendants' objections to Plaintiffs' proposed remedies solely for purposes of this submission, there are two principal ways to "eliminate" wearaway: by changing the Plan into an "A+B" formula or by adjusting the method for creating opening account balances. In their April 16, 2008 submission, Defendants proposed a method for adjusting the formula for creating opening account balances.[6] This proposed formula is the same formula used under Part B for certain longer service employees that Mr. Poulin admitted was sufficient to eliminate wearaway. (Tr. 219). An alternative would be to add the value of any early retirement subsidy to a participant's account balance if the participant elects to retire with sufficient age and service to have been eligible for a subsidized early retirement under Part A.

Regardless of *how* wearaway is addressed, however, there is no reason to afford any additional remedy, even if such a remedy were otherwise possible under ERISA's enforcement provisions. If the Court orders a remedy to eliminate wearaway, the Part B SPD published in September 1998 (*before* the Part B Plan document was executed) would be accurate. Plaintiffs have not alleged any deficiencies in the manner in which the SPD disclosed how benefits were earned under Part B annually, on an ongoing basis, nor has the Court found any such deficiencies. Indeed, once wearaway is eliminated for (or for participants who never

---

[6] Changing to an A+B plan design would eliminate the ability of Plan participants to take a lump sum of their Part A benefit because a lump sum benefit option was not available under Part A. Moreover, such an approach would not be consistent with the terms of the Part B SPD or specific communications notifying Plan participants about how opening account balances were created, because under an A+B approach, opening account balances for all Plan participants would be zero.

experienced wearaway), the statement in the 1998 SPD that "Each dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested" would be completely accurate. (MOD at 29, quoting 1998 SPD). Likewise, the opening account balance would equal or exceed the value of all prior Plan benefits, including early retirement subsidies. (MOD at 98). Under these circumstances, there is no basis in Second Circuit precedent (or elsewhere in ERISA) to afford any additional remedy.

Moreover, there is a fundamental difference between a remedy that effectively eliminates wearaway and a remedy that increases the ongoing benefit amounts earned by participants each year from 1998 to the present, such as Plaintiffs' request that this Court create a new plan that combines Part A and Part B. Although wearaway may not have been sufficiently disclosed, every class member was told annually precisely what he or she earned in new benefits each year in an annual account statement. The account statement and the SPDs also explained exactly how that amount was calculated.

For example, Plaintiff Annette Glanz was explicitly told in her annual account statements that she earned a benefit of $3095.98 in 1998, $3495.14 in 1999, $4994.94 in 2000, and $5668.89 in 2001, and she was told how those benefits were calculated. (See Trial Ex. 520). Yet despite these disclosures, Plaintiffs request, as a remedy for the disclosure violation, benefit accruals in each of those years that (according to Plaintiffs) would far exceed the annual benefit accruals that Ms. Glanz was unambiguously told she was receiving.

There is no basis for awarding any class member more than that class member was specifically told he or she had earned in each year, nor is there any basis for awarding additional benefits based on a formula not described in the SPD or the Plan documents. Accordingly,

6

assuming the Court decides to order a monetary remedy over Defendants' objections, that remedy should be limited to eliminating wearaway.

**4.    Individualized Issues / Knowledge**

The Court asked a number of questions about authority supporting Defendants' contention that the likely prejudice / harmless error standard is an individualized inquiry, and whether there are any individualized or classwide dates at which any remedy for the class should end.[7]

As an initial matter, the Second Circuit in Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 113 (2d Cir. 2003), did not alter the substantive requirement that there must be actual prejudice flowing from a faulty disclosure before any remedy can obtain. Instead, the Second Circuit merely created a burden-shifting approach for evidentiary purposes because the Second Circuit felt it would be unfair to place the burden of proof exclusively on a plan participant. Id. at 113. Thus, in this burden-shifting paradigm, instead of a participant having to prove detrimental reliance or actual harm flowing from a faulty disclosure, a participant must only

---

[7]  During the April 30, 2008 argument, the Court also asked whether a participant must prove detrimental reliance to recover for misrepresentations on a breach of fiduciary duty claim. This Court, per Judge Arterton, answered that question in the affirmative:

> To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an employee benefit plan, a plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to their detriment.

Adams v. Tetley USA, Inc., 363 F. Supp. 2d 94, 108 (D. Conn. 2005) (internal quotations and citations omitted). See also McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 153 F.Supp.2d 268, 296 (S.D.N.Y. 2001) (same); King v. Pension Trust Fund of the Pension Hospitalization and Benefit Plan of the Elec. Indus., 131 F. A'ppx 740, 742 (2nd Cir. Feb. 22, 2005) (rejecting breach of fiduciary duty misrepresentation claim because plaintiff "did not rely on the statement, and therefore suffered no injury and is not entitled to relief").

prove that he or she was "likely to have been harmed" by such a disclosure. Burke, 336 F.3d at 113 ("[W]e require, for a showing of prejudice, that a plan participant or beneficiary was *likely* to have been harmed as a result of a deficient SPD.") (emphasis in original).[8] Next, upon a showing of likely harm, the defendant has the burden to demonstrate that the participant was not actually harmed by the disclosure deficiency, i.e., that the deficiency was "harmless error." By definition, the only material impact of this burden shifting – or any burden shifting – at trial is in a circumstance where the evidence on this point weighs equally in favor of both parties, i.e., neither party has a preponderance of the evidence in its favor or against it. Medina v. California, 505 U.S. 437, 449 (1992) ("[T]he allocation of the burden of proof to the defendant will affect [judicial] determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence [in favor of the plaintiff] is just as strong as the evidence [in favor of the defendant]."); Cigaran v. Heston, 159 F.3d 355, 357 (8th Cir. 1998) ("The shifting of an evidentiary burden of preponderance is of practical consequence only in the rare event of an evidentiary tie: If the evidence that the parties present balances out perfectly, the party bearing the burden loses.").

---

8   See also Exarhakis v. Visiting Nurse Serv. of N.Y., No. 02-CV-5562, 2006 WL 335420, at *12 (E.D.N.Y. Feb. 13, 2006) ("The emphasis on the word 'likely' indicates the heightened showing required in order to survive a summary judgment motion on a deficient-SPD claim; rather than simply identifying a factual dispute that possibly prejudiced plaintiff, e.g., that plaintiff might have filed for and received benefits had the SPD not been deficient, plaintiff must provide sufficient evidence on which an inference could be based that she would have filed for the benefits but for the deficiency in the SPD."); First Unum Life Ins. Co. v. Wulah, Civ. No. 06-1749, 2007 U.S. Dist. LEXIS 82650, at *19-20 (S.D.N.Y. Nov. 8, 2007) ("Unlike Weinreb, Exarhakis, and most cases applying the likely prejudice standard, in which it was undisputed that a plan participant (or potential participant) lost out on benefits because of the plan administrator's failure to apprise him of certain features of the plan, [plaintiff] has not shown that he is materially worse off than he would have been had he received an SPD . . .").

Even under the Second Circuit's burden shifting approach, however, a participant is not entitled to a remedy upon a finding that a participant was not actually harmed by an inadequate disclosure.  See, e.g., Weinreb v. Hosp. For Joint Diseases Orthopaedic Inst., 404 F.3d 167, 172 (2d Cir. 2005) (participant failed to prove likely prejudice where he otherwise had knowledge of the information that was not disclosed in an SPD); Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 585 (2d Cir. 2006) (to demonstrate likely prejudice, participant must prove that he likely would have taken specific steps to obtain additional benefits).  In similar circumstances, courts have made clear that a participant cannot be harmed by a deficient disclosure if the participant did not read the disclosure or otherwise learn about the contents of the disclosure.  See, e.g., Moriarity v. United Techs. Corp. Represented Employees Ret. Plan, 947 F. Supp. 43, 52-53 (D. Conn. 1996) (rejecting claim based on defective SPD, holding "Plaintiff's own affidavit proves fatal to his claim - Plaintiff stated that he is not certain if he ever read the alleged faulty SPD.  *Without having read the SPD, Plaintiff could not have relied on it or been prejudiced or misled by its contents*") (emphasis added), aff'd on other grounds, 158 F.3d 157 (2nd Cir. 1998).  Indeed, none of the Second Circuit cases addressing this issue held that harm, or the absence of harm, could be proven on a classwide basis without learning from each class member what that class member knew and when, and whether that class member suffered actual harm as a result of a disclosure deficiency.  Any lesser standard conflates harm, or likely harm, (regardless of who bears the burden of proof) with a separate and objective standard of materiality.  See, e.g., Ehrler v. Kellwood Co., 521 F.2d 1347, 1350 (8th Cir. 1975) (recognizing in another context that "[t]his objective test for materiality is not to be confused with the subjective test for reliance, which is whether the particular plaintiffs would have acted

9

differently if the fact had been disclosed to them. This test substitutes the individual plaintiff for the reasonable person.").

Moreover, in Cement and Concrete Workers District Council Welfare Fund, Pension Fund, Legal Servs. and Annuity Fund v. Lollo, 148 F.3d 194 (2d Cir. 1998), the Second Circuit squarely faced the question of "whether the plaintiff must be the person to whom the misrepresentation was directed, *who knew of it*, and who relied upon it" to recover for a misrepresentation under ERISA. Id. at 196 (emphasis added). In rejecting the plaintiff's misrepresentation claim in that case, the court held that a plaintiff cannot recover for a misrepresentation under ERISA without proof that he personally knew of the misrepresentations. Id. at 196-97. The same should be true under Burke, regardless of who bears the burden of proof and regardless of whether the standard is detrimental reliance or some other measure of actual, or "likely," harm.

The Court also acknowledged during the April 30, 2008 oral argument that the length of time that any remedy should be in effect might also turn on when a class member acquired actual knowledge of the relevant information, or otherwise when that class member ceased to suffer any harm. In that regard, several things bear note:

(1)     The class action Complaint was filed in this case in December, 2001, and Plaintiffs and the class must be charged with knowledge of the information therein. Accordingly, any ongoing remedy should cease as of January, 2002 at the latest. See Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 92 (1990) ("Under our system of representative litigation, each party is deemed bound by the acts of his lawyer-agent *and is considered to have*

*notice of all facts, notice of which can be charged upon the attorney.*") (emphasis added, internal citations and quotations omitted); New York v. Hill, 528 U.S. 110, 115 (2000) (same).[9]

(2) Plaintiffs and class members testified that they were surprised when they received their opening account balance statements because their opening balances were so low. (e.g., Glanz Tr. 165-67). These opening account balance statements were published in June 1998 and, accordingly, should cut-off any additional remedy as of that date.

(3) At least some class members received from CIGNA actual benefit comparisons between the benefits they would have received under Part A and the benefits to which they would be entitled under Part B. For example Robert Upton received information from CIGNA in 1999 that his benefits would be 29% lower under the cash balance plan. (Upton Tr. 656-57). There should be no ongoing remedy for Mr. Upton after 1999.

(4) During the April 30, 2008 oral argument, the Court asked Defendants to notify CIGNA that the executives responsible for the design of the cash balance plan might not be entitled to any remedy because of their purported knowledge of wearaway. The executives responsible are no longer employed by CIGNA, and Defendants believe that any class member -- executive or otherwise -- who had or obtained knowledge of the information that the Court found was not properly disclosed should be denied a remedy.

## 5. Disclosure Claims Against The Plan

The Court asked the parties for any additional authority regarding Plaintiffs' ability to pursue claims against the Plan itself (as opposed to the Plan administrator) seeking benefits based on disclosure violations that were solely the responsibility of the Plan administrator, and for which the Plan had no responsibility.

---

[9] Although these cases involved individual named plaintiffs, the same principle should apply to a members of a class.

Defendants believe they have presented the relevant authority to this Court in their April 16, 2008 submission and will not repeat those arguments herein.

Respectfully submitted,

Dated:  May 16, 2008    **MORGAN, LEWIS & BOCKIUS LLP**

By: /s/ Joseph J. Costello
Joseph J. Costello
Jeremy P. Blumenfeld
Jamie M. Kohen
*Admitted pro hac vice*
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
(215) 963-5295/5258/5472
(215) 963-5001 (fax)


**ROBINSON & COLE**
James A. Wade (CT # 00086)
280 Trumbull Street
Hartford, Connecticut  06103
(860) 275-8270
(860) 275-8299 (fax)

*Attorneys for Defendants*
*CIGNA Corporation and CIGNA Pension Plan*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing Defendants' Responses to the Court's April 30, 2008 Inquiries was filed electronically through the CM/ECF system on May 16, 2008.  Notice of this filing will be sent by e-mail to all parties listed below by operation of the Court's electronic filing system.  The parties may access this filing through the Court's CM/ECF system.  The aforementioned documents were also served on the parties listed below by first class United States mail, postage prepaid, this 16th day of May 2008.

>Thomas G. Moukawsher
>Moukawsher & Walsh, LLC
>328 Mitchell Street
>Groton, CT  06340
>
>Stephen R. Bruce
>805 15th Street, NW
>Suite 210
>Washington, DC  20005

By: /s/ Joseph J. Costello
    Joseph J. Costello