## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANICE C. AMARA, individually and on behalf of others similarly situated, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Case No.  3:01CV2361(MRK) |
| | : |
| CIGNA CORPORATION and CIGNA PENSION PLAN, | : |
| | : |
| Defendants. | : |

## MEMORANDUM OF DECISION

The Court previously issued an opinion in this case regarding liability.  *See* Memorandum of Decision ("Liability Decision") [doc. # 269].  The Court will assume that the reader is familiar with its Liability Decision and will not repeat at length the numerous findings of fact and conclusions of law determined in that opinion.  Here, the Court decides what relief is appropriate in light of the statutory violations determined in its Liability Decision.  Those violations related primarily to certain notices and disclosures CIGNA Corporation and the CIGNA Plan (collectively, "CIGNA") were required to provide to CIGNA employees in connection with the transition from a defined benefit pension plan to a cash balance plan.  Additional issues, including the specific mechanisms for implementing the relief provided, will be addressed in a later decision.

The remedy issues addressed in this decision are complex, difficult, and enormously important to employers and employees alike.  Unfortunately, the relevant statutory provisions and existing case law do not provide clear guidance.  Moreover, the remedy choices available to the Court are not ideal, for either CIGNA or Plaintiffs.  Therefore, the Court candidly acknowledges at the outset considerable uncertainty regarding the proper resolution of many of the issues addressed

below.  For that reason, the Court has decided *sua sponte* to stay its judgment so that the parties can proceed to the Second Circuit for further guidance before the Court and the parties seek to implement the Court's judgment.  The stakes are far too high – for both CIGNA and its employees – to implement the Court's judgment in the face of such substantial uncertainty.

## I.

Before turning to the substance of the appropriate relief, the Court will address two preliminary procedural questions: (1) which issues are appropriate for class treatment and which should be considered individual issues; and (2) what remedies are available in an ERISA class action certified under Rule 23(b)(2) of the *Federal Rules of Civil Procedure*.

## A.

Plaintiffs argue that there are no remaining individual issues in light of the Court's Liability Decision.  CIGNA, on the other hand, claims that several important individual issues remain.  CIGNA identifies four issues it considers appropriate for individual treatment following the Court's Liability Decision: whether any individual employee suffered likely prejudice and/or whether the violations constituted harmless error for that employee; whether and when an employee gained actual knowledge of the true facts regarding the transition to Part B; whether an employee individually faced a significant reduction in the rate of future benefit accrual such that a § 204(h) notice was required for that particular employee; and whether certain waivers signed by retiring employees beginning in 2004 make those employees ineligible for any relief.  As a result, CIGNA asks the Court to decertify the Class or to commence individual discovery and hold Teamsters hearings (named for *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360-61 (1977)) on the remaining individual issues.  Indeed, CIGNA asks for permission to begin depositions of each

of the approximately 25,000 members of the Class.  *See* Defendants' Memorandum on Individual Issues and Class Relief [doc. # 276] at 9 n.10.  The Court agrees with Plaintiffs.

With respect to CIGNA's claim that individual issues remain regarding likely prejudice/harmless error, CIGNA relies primarily on two documents – the parties' March 10, 2006 Stipulation and Joint Motion on Conduct of Discovery and Trial on "Likely Prejudice" and "Harmless Error" Issues Connected with Second and Fourth Claims for Relief ("Stipulation") [doc. # 167] and the Court's March 12, 2007 Order Under Federal Rule 23(c)(1)(B) ("Rule 23(c)(1)(B) Order") [doc. # 241].  In the Stipulation, the parties agreed to engage in limited discovery, involving eight class members chosen by Plaintiffs and eight chosen by CIGNA, regarding the likely prejudice/harmless error issue in order to determine whether a basis existed for expanding similar discovery to the entire Class.  In the Rule 23(c)(1)(B) Order, the Court described the claims as articulated by Plaintiffs and the defenses as articulated by CIGNA.  At the time, CIGNA opposed several of the claims described by Plaintiffs on the ground that the issues involved were individual, rather than class-wide.

CIGNA's arguments regarding likely prejudice/harmless error fail for several reasons.  First, CIGNA's interpretation of the Stipulation and the Rule 23(c)(1)(B) Order is belied by the text of those two documents.  The Stipulation expressly states, "The parties expect that the trial will result in a final judgment on the issues of likely prejudice and harmless error for all class members who testify.  *The Court will decide whether the trial results in a final judgment on these issues for all other class members.*"  Stipulation [doc. # 167] at 4-5 (emphasis added).  The Stipulation also notes that the parties would confer with the Court after the trial to determine "[t]he *need for*, and

3

procedures for, any individualized hearings on likely prejudice or harmless error, and any related

discovery." *Id.* at 5 (emphasis added). The Court's Rule 23(c)(1)(B) Order uses similar language:

> In designating the class issues, the Court relies upon the Third Amended Complaint
> [doc. # 165], for which leave to amend was granted on February 15, 2006 [doc.
> # 164]. In contesting the class claims, Defendants have identified class, sub-class,
> and individual defenses. The recitation below generally sets forth the claims of the
> parties as they have chosen to describe them, with such specificity as is required to
> understand the claim. *The Court expresses no opinion on the merits of the claims or
> defenses of the parties, and therefore the parties should attach no significance to the
> particular phraseology chosen to describe any claim or defense* . . . .

Order Under Federal Rule 23(c)(1)(B) [doc. # 241] at 2-3 (emphasis added).

Thus, both the parties' Stipulation and the Court's Rule 23(c)(1)(B) Order contemplated the

possibility that once the trial was complete, the Court would determine that no individual issues

regarding likely prejudice/harmless error remained. And in fact that is exactly what the Court did

when it held that "[a]pplying the *Burke* [*v. Kodak Retirement Income Plan*, 336 F.3d 103 (2d Cir.

2003),] and *Frommert* [*v. Conkright*, 433 F.3d 254 (2d Cir. 2006),] standard to the facts of this case,

. . . Plaintiffs have met their burden of showing likely harm and prejudice." Liability Decision [doc.

# 269] at 104. The Court did not distinguish the named Plaintiffs from the rest of the Class, nor did

the Court require an individualized showing such as that requested by CIGNA, even from the named

Plaintiffs themselves. Such an approach both mirrors the case law (*Frommert*, for example, which

was not even certified as a class action, did not require individualized showings by each plaintiff)

and reflects the group nature of the harm inflicted. For CIGNA issued the same misleading notices

and disclosures to the Class as a whole, and thus all class members were affected equally and in a

similar manner by those publications. As a consequence, the Court believes that its holding

unambiguously applies to the entire Class, and that no individual issues remain with respect to likely prejudice/harmless error.

Even assuming that the Court's holding could be interpreted as leaving open the possibility that individual issues remained on this subject, the Court would nevertheless reject CIGNA's arguments. CIGNA "acknowledge[s] that this Court has held that certain uniform written communications were insufficient to defeat a claim of likely prejudice, or demonstrate harmless error, on a classwide basis, and . . . do[es] not seek to relitigate those issues here." Defs.' Mem. [doc. # 276] at 3. Yet CIGNA then goes on to argue that

> before an absent class member is entitled to a remedy, the Court must rule on whether that class member had "actual knowledge" of the information the Court held was not sufficiently disclosed, and whether that class member's particular claims otherwise succeed or fail under the likely prejudice/harmless error analysis.

*Id.* at 3-4.[1] In making this claim, CIGNA does not explain on what basis it expects to find that certain employees, despite having received the same disclosures CIGNA admits "were insufficient to defeat a claim of likely prejudice, or demonstrate harmless error," *id.* at 3, would have "actual knowledge" of the undisclosed information. The Court notes in this regard that Plaintiffs assert, *see* Plaintiffs' Reply Memorandum on Relief [doc. # 277] at 13, and CIGNA has not denied, that CIGNA failed to avail itself of the full scope of discovery permitted under the parties' Stipulation. Rather, CIGNA limited its discovery to requesting documents from and deposing the eight class members chosen by Plaintiffs, and decided not to call any class members at all as witnesses at trial. Thus,

---

[1] The Court notes that CIGNA purports to stay within Second Circuit precedent in making its argument. However, CIGNA then goes on explicitly to assert that "[a]t a minimum, a plan participant should be required to prove detrimental reliance before being entitled to benefits based on a flawed SPD," Defs.' Mem. [doc. # 276] at 2 n.1, a position contrary to Second Circuit precedent, *see Frommert*, 433 F.3d at 267 (rejecting requirement of actual prejudice) (citing *Burke*, 336 F.3d at 112).

CIGNA has not provided the Court with any evidence that even a single employee had actual knowledge from CIGNA of the undisclosed information regarding the transition to Part B.

The qualifier "from CIGNA" is important, for only official corporate statements, whether from written documents or from CIGNA employees responsible for providing that information, should be permitted to supplement the official disclosures the Court found lacking in its Liability Decision. Although CIGNA suggests that the office rumor mill, or statements made at a co-worker's going-away party, could suffice to render harmless the materially misleading notices and disclosures officially provided by CIGNA, there is no case support for what the Court considers an outlandish proposition. For in each of the cases CIGNA cites, the employer provided information regarding the missing provisions by means of an additional, official notice or through authorized conversations between an employee and a representative of the company. *See, e.g.*, *Weinreb v. Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 171-72 (2d Cir. 2005); *Park v. Trustees of the 1199 SEIU Health Care Employees Pension Fund*, 418 F. Supp. 2d 343 (S.D.N.Y. 2005); *Pastore v. Witco Corp. Severance Plan*, 388 F. Supp. 2d 212, 221 (S.D.N.Y. 2005).[2] Given that CIGNA bears the burden of demonstrating harmless error, *see Burke*, 336 F.3d at 113, and has instead offered only unsupported speculation about what thousands of depositions might reveal, the Court would in any event decline to order the wide-ranging, time-consuming, and almost certainly fruitless additional discovery CIGNA requests.

For the same reasons, the Court rejects CIGNA's argument that whether and when an employee gained "actual knowledge" of the facts regarding Part B should be treated as an individual

---

[2] Moreover, the harmless error cases that CIGNA relies on all involved requirements to qualify for benefits under the plan, rather than material misrepresentations in official company notices and disclosures about the plan, making those cases of questionable relevance here.

issue. At oral argument, CIGNA suggested that employees who received but did not read the misleading notices and disclosures should be considered not to have demonstrated likely harm. And in a supplemental filing with the Court, CIGNA points to *Cement & Concrete Workers District Council Welfare Fund v. Lollo*, 148 F.3d 194 (2d Cir. 1998), for the proposition that "a plaintiff cannot recover for a misrepresentation under ERISA without proof that he personally knew of the misrepresentations." Defendants' Responses to the Court's April 30, 2008 Inquiries [doc. # 280] at 10.

However, the Court does not consider this statement a good-faith representation of the Second Circuit's holding in *Lollo*, as even the most cursory review of the opinion makes clear. There, the Second Circuit faced a scenario in which the misrepresentations of an ERISA fiduciary to a *third party* allegedly resulted in harm to the plaintiffs (in the form of inadequate funding for the plan). As the court explicitly stated, "We hold that a plaintiff does not establish the reliance element of fraud for purposes of ERISA or New York law by showing only that a third party relied on a defendant's false statements." *Lollo*, 148 F.3d at 196. *Lollo* had nothing to do with statutory violations regarding the notices and disclosures mandated by ERISA, and the Second Circuit made the statement cherry-picked by CIGNA in the context of a claim for fraud, which unlike the statutory violations asserted in this case, requires a showing of detrimental reliance.[3]

---

[3] In that same supplemental filing, CIGNA also cites to *Moriarity v. United Technologies Corp. Represented Employees Retirement Plan*, 947 F. Supp. 43, 52-53 (D. Conn. 1996), for the proposition that a participant may not be considered harmed by a misleading notice if he has not in fact read that notice. However, CIGNA does not explain how *Moriarity*'s holding, which imposes a detrimental reliance standard, survives the Second Circuit's later decision in *Burke*. *See also Manginaro v. Welfare Fund of Local 771, I.A.T.S.E.*, 21 F. Supp. 2d 284, 296 (S.D.N.Y. 1998) (rejecting *Moriarity*'s detrimental reliance standard).

7

Perhaps unsurprisingly, CIGNA also fails to comment on the likelihood that any employee could even recall, much less prove, ten years after the fact, which publications (or sections of publications) she had read at the time of the transition. As with the likely prejudice/harmless error issue, the Court believes that CIGNA is seeking impermissibly to shift its burden of proof onto the Class. That CIGNA may not do. *See Burke*, 336 F.3d at 113.

The other two alleged individual issues raised by CIGNA, regarding § 204(h) notices and waivers, appear only in footnotes (perhaps signaling that even CIGNA is uneasy about raising them). With respect to the former, CIGNA claims that individual discovery is appropriate to determine whether a particular employee, at the time of the transition to Part B, was likely to experience a significant reduction in the rate of future benefit accrual, thus triggering a § 204(h) notice. *See* Defs.' Mem. [doc. # 276] at 3 n.2. For the reasons discussed above, CIGNA is incorrect to say that the Court's description of this issue as possibly individual in its Rule 23(c)(1)(B) Order constitutes a ruling that the Court itself either held that position then or does so now. The Court agrees with CIGNA that a § 204(h) notice is due only to those employees whose benefits are "reasonably expected" to be reduced, *see* Treas. Reg. 1.411(d)-6T (Q&A-8), and that "[w]hether a participant or alternate payee is described in paragraph (a) of this Q&A-9 [as a 'participant whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment'] is determined based on all relevant facts and circumstances at the time the amendment is adopted." Treas. Reg. 1.411(d)-6T (Q&A-9(b)). However, the language of the regulation suggests to the Court that CIGNA should have undertaken the assessment of the "relevant facts and circumstances" contemporaneously with the provision of the notice to other employees; in other words, CIGNA should have determined, as it planned the dissemination of its notices, whether there were any employees or classes of employees

8

who did not need to receive a § 204(h) notice.  Such an interpretation is not only true to the text of the regulation, but also recognizes the difficulty of performing such an analysis after the fact.  Here, for example, CIGNA would have to attempt to recreate, a decade later, what it would reasonably have known about the effect on each individual's retirement benefits as a result of the implementation of Part B.  Such a feat is difficult, if not impossible – and thus it is perhaps unsurprising that CIGNA has presented no evidence, either at trial or in its submissions on remedies, to suggest either that it is capable of performing such an after-the-fact analysis or that the analysis would indicate that certain classes of employees were not entitled to a § 204(h) notice.

Further and more importantly, the issue at this point is not who was entitled to a § 204(h) notice; the Court addressed that issue in its Liability Decision.  *See* Liability Decision [doc. # 269] at 76-78 (employees generally), 105-09 (rehires).  Rather, the relevant issue at this point is what to do about the material misrepresentations in the § 204(h) notices CIGNA in fact sent to all the members of the Class except rehires.  The Court does not believe that CIGNA should be permitted to escape responsibility for its misleading statements by attempting to determine ten years after the fact that certain employees were never entitled to receive the misleading notices CIGNA sent them.

Regarding waivers, CIGNA makes only the halfhearted claim that it "*may* . . . be able to rely on a release signed by certain absent class members as a complete defense to their claims."  Defs.' Mem. [doc. # 276] at 7 n.8 (emphasis added).  CIGNA is correct that the Court rejected its argument about waivers in its Liability Decision.  *See* Liability Decision [doc. # 269] at 39.  However, the Court did not limit its holding to the pre-2004 waivers; rather, it stated, "the Court concludes that CIGNA, which has the burden of proof on this issue, has failed to demonstrate under any standard, much less the 'closer scrutiny' applicable in the ERISA context,  that the waivers signed by CIGNA

9

employees intentionally relinquished or abandoned the claims Plaintiffs assert here." *Id.* (citation omitted). Thus, the Court concludes that CIGNA has failed to identify, in light of the evidence offered at trial and the Court's Liability Decision, any remaining individual issues.

### B.

The second preliminary issue was not raised by either party in their submissions on remedies, but the Court feels compelled to address it. The issue relates to the compatibility of certain kinds of relief under ERISA with the limitations imposed on Rule 23(b)(2) class actions. Specifically, Plaintiffs in this case invoke both ERISA § 502(a)(1)(B), which enables a claimant "to recover benefits due to him under the terms of [the] plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," and ERISA § 502(a)(3), which permits suits

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

However, Rule 23(b)(2) of the *Federal Rules of Civil Procedure* provides for class actions where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that *final injunctive relief or corresponding declaratory relief* is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2) (emphasis added).

As the Second Circuit has noted, when claims for monetary relief predominate over claims for injunctive or declaratory relief, certification under Rule 23(b)(2) may not be appropriate. The court set forth the standard for such certification decisions in *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147 (2d Cir. 2001), stating that

> before allowing (b)(2) certification a district court should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery.

*Id.* at 164. The "presumption of cohesion and unity between absent class members and the class representatives" that underlies Rule 23(b)(2) classes permits "incidental damages," however, "because entitlement to such damages does not vary based on the subjective considerations of each class member's claim, but flows directly from a finding of liability on the claims for class-wide injunctive and declaratory relief." *Id.* at 165 (quotation marks and alterations omitted).

The question, then, is whether the "benefits due under the terms of the plan" that Plaintiffs seek in this case constitute non-incidental damages such that the relief requested is not appropriate for a Rule 23(b)(2) class. Having considered the facts and circumstances of this case and governing precedent, the Court is satisfied that Plaintiffs' prayer for monetary relief is incidental to the injunctive and declaratory relief sought, and thus the certification of the class under Rule 23(b)(2) is no bar to that relief. As an initial matter, the Court notes that the presiding judge at the time the Class was certified did not have the benefit of the Second Circuit's guidance in *Robinson*. *See* Memorandum of Decision [doc. # 61]. Understandably, then, the findings now required by *Robinson* are absent from that opinion. Nevertheless, the Court finds that the Class would have merited certification under Rule 23(b)(2) under *Robinson*, because CIGNA acted on grounds generally applicable to the Class, and the primary relief sought by Plaintiffs is a declaration that Part B is invalid and an injunction requiring the plan administrator to reform his records to provide employees with benefits under Part A.

11

Here, CIGNA applied the terms of Part B to all class members equally, and CIGNA also sent out identical notices and disclosures to the members of the Class. As a result, any injunctive or declaratory relief ordered by the Court could be implemented as to all class members without regard to the members' individual circumstances, and any monetary relief awarded to Plaintiffs would be as a direct result of the equitable relief ordered. The calculation of benefits would be a mechanical process that would not depend in any way on "the subjective considerations of each class member['s] claims." *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 20 (2d Cir. 2003) (quotation marks omitted). Further, the Court believes that reasonable plaintiffs would seek this injunctive and declaratory relief even if no monetary recovery were possible – in light of the benefit to the Class even solely on a prospective basis – and that at least some form of the injunctive and declaratory relief requested by Plaintiffs is reasonably necessary and appropriate given their success on the merits of certain of their claims. *See Robinson*, 267 F.3d at 164.

The Court's conclusion is further supported by the fact that several other courts have made the same determination in similar factual circumstances. Although there is no Second Circuit decision directly on point, the Seventh Circuit, in an opinion by Judge Richard Posner, emphatically recognized the possibility of recovery under § 502(a)(1)(B) by a Rule 23(b)(2) class. In *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003), "Xerox contend[ed] that this suit does not seek injunctive or declaratory relief, but really just damages equal to the difference between the lump sums to which ERISA entitled the members of the class and the smaller lump sums that they actually received." *Id.* at 763. The Seventh Circuit rejected that argument, noting the importance of distinguishing the question of declaratory or injunctive versus monetary relief under Rule 23(b)(2) from the question of legal or equitable relief under ERISA (a question to

which the Court will soon return). Judge Posner held that the relief requested by the class in *Berger*

was "not equitable, but it is declaratory. What is sought is a declaration that Xerox's method of

computing the lump sums to which withdrawing employees are entitled is unlawful. That is a

ground common to all the members of the class." *Id.* Although

> the declaration sought and obtained was merely a prelude to a request for damages[,]
> . . . a declaratory judgment is *normally* a prelude to a request for other relief, whether
> injunctive or monetary . . . . As long as the concrete follow-on relief that is envisaged
> will if ordered . . . be the direct, anticipated consequence of the declaration, rather
> than something unrelated to it, the suit can be maintained under Rule 23(b)(2).

*Id.* at 763-64 (citations and emphasis omitted).

Here, too, Plaintiffs share a common complaint regarding the transition to Part B and the

notices and disclosures related to that transition, and any recalculated benefits the Court awards

would be "the direct, anticipated consequence" of its declaratory or injunctive relief. *Id.* at 764; *see*

*also Heffner v. Blue Cross & Blue Shield of Ala.*, 443 F.3d 1330, 1340 (11th Cir. 2006) (permitting

certification under Rule 23(b)(2) of plaintiffs' ERISA claims under § 502(a)(1)(B) and § 502(a)(3)

but for Eleventh Circuit's requirement of individual showing of detrimental reliance to recover for

misleading SPD); *cf. Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1257-59 (2d Cir.

1996) (holding that remedies under ERISA are equitable for purposes of determining right to jury

trial under Seventh Amendment).

Two other district courts in the Second Circuit have also recently certified Rule 23(b)(2)

classes in the context of a transition from a traditional defined benefit plan to a cash balance plan.

*See Richards v. FleetBoston Fin. Corp.*, 235 F.R.D. 165 (D. Conn. 2006); *In re Citigroup Pension*

*Plan ERISA Litig.*, 241 F.R.D. 172 (S.D.N.Y. 2006). Both of these cases also involved claims under

ERISA § 502(a)(1)(B) and § 502(a)(3). In *Richards*, Judge Janet C. Hall noted that

> [t]he relief sought need not be solely equitable in nature: when both equitable and monetary relief are sought, the district court may still certify the class under subsection (b)(2) if it determines that certification is appropriate 'in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case.'

235 F.R.D. at 173-74 (quoting *Parker*, 331 F.3d at 20). Further, *Richards* recognized that "[f]or purposes of subsection (b)(2), an injunction requiring the payment of monies unlawfully withheld in the past may be considered injunctive relief." *Id.* at 174.

*In re Citigroup* also certified a class under Rule 23(b)(2) under circumstances almost identical to those here. The district court stated that the certification fell "squarely within the purview of Rule 23(b)(2)," because "even if [plaintiffs] were somehow precluded from monetary recovery, reasonable Plan participants would bring suit to enjoin the Plan's application of the fractional rule and to compel a reformation of the Plan to comply with ERISA's minimum rates of benefit accrual." *In re Citigroup*, 241 F.R.D. at 180-81. "In other words, given the import and necessity of plaintiffs' prayers for declaratory and injunctive relief, they 'predominate' over other prayers for relief under *Robinson*." *Id.* at 181.

Once again, the Court recognizes the distinction between injunctive relief for the purposes of Rule 23(b)(2), and equitable relief versus monetary damages under ERISA § 502(a)(3). The Court concerns itself here solely with the former. For the reasons previously stated, the Court finds that certification under Rule 23(b)(2) was appropriate and does not serve as a bar to relief, whether under ERISA § 502(a)(1)(B) or § 502(a)(3).

## II.

The Court must address one more preliminary issue before turning to the nature of the relief ordered, and that is the availability of relief under ERISA. Plaintiffs request a declaration that Part

B is void and an injunction ordering a return to Part A, or, failing that, an injunction remedying the misrepresentations identified by the Court in its Liability Decision (for example, by establishing A+B and "comparable" benefits). Therefore, the Court must determine at the outset whether the relief Plaintiffs request is available to them under ERISA § 502(a)(1)(B), and if not, whether that relief is instead available under the equitable catch-all provision of ERISA § 502(a)(3).

CIGNA rightly points out that the Court held in its Liability Decision that Part B itself is lawful. Therefore, the only violations for which CIGNA is liable are those regarding the notices and disclosures describing the transition to Part B. *See* Liability Decision [doc. # 269] at 121. CIGNA argues that the holding of *Frommert* regarding § 502(a)(1)(B)'s applicability to plan reformation, when combined with the Second Circuit's decision in *Crocco v. Xerox Corp.*, 137 F.3d 105 (2d Cir. 1998), bars any relief for Plaintiffs.

In *Frommert v. Conkright*, 433 F.3d 254, the Second Circuit held that when a court orders a plan administrator to reform the terms of a plan in light of misleading notices and disclosures, the court is in fact ordering the provision of benefits under the plan via ERISA § 502(a)(1)(B). *See* 433 F.3d at 270 ("The relief that the plaintiffs seek, recalculation of their benefits consistent with the terms of the Plan, falls comfortably within the scope of § 502(a)(1)(B) . . . .") (emphasis omitted). The court went on to note that "[b]ecause adequate relief is available under this provision, there is no need on the facts of this case to also allow equitable relief under § 502(a)(3)," and cited to other court of appeals and Supreme Court cases for the proposition that relief should only be ordered under § 502(a)(3) if it is unavailable under ERISA's other remedy provisions. *Id.* (emphasis omitted); *see Wilkins v. Mason Tenders District Council Pension Fund*, 445 F.3d 572, 578 (2d Cir. 2006)

("Section 502(a)(3) has been characterized as a 'catch-all' provision which normally is invoked only when relief is not available under § 502(a)(1)(B).").

Prior to *Crocco*, the Second Circuit had already restricted claims of inadequate disclosures to plan administrators only (claims for benefits under the plan, however, could proceed against the plan itself or the administrator or trustees of the plan in their official capacities). *See Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 104 (2d Cir. 2005). In *Crocco*, the court extended the logic of *Lee v. Burkhart* to hold that an employer may not be considered a *de facto* co-administrator of a plan if an administrator has been designated in accordance with the requirements of ERISA. *See Crocco*, 137 F.3d at 107. CIGNA thus argues that because the "benefits under the terms of the plan" sought by Plaintiffs are only possible due to the notice and disclosure violations found by the Court, only the plan administrator may be held liable for the resulting benefits under the plan via § 502(a)(1)(B). Consequently, CIGNA asserts, Plaintiffs' failure to name the plan administrator as a defendant is not only fatal to their claim under § 502(a)(1)(B) but also to their claim under § 502(a)(3), because remedies available under the former may not be awarded instead under the latter.

The Court disagrees with CIGNA for several reasons and holds that Plaintiffs may recover benefits from the CIGNA Plan (as opposed to CIGNA itself) under § 502(a)(1)(B).[4] First and most importantly, nowhere has the Second Circuit made the distinction CIGNA attempts to draw between

---

[4] This Court held in its Liability Decision that CIGNA had indeed validly named a plan administrator. *See* Liability Decision [doc. # 269] at 64-65. However, as the Court indicated in its Liability Decision, *see id.* at 68, but for *Crocco*'s seemingly categorical prohibition on *de facto* co-administrators, the Court would order relief under § 502(a)(1)(B) against CIGNA itself, given the fact that CIGNA was the entity that produced and distributed the notices and disclosures the Court found defective. If the Second Circuit reconsiders the language of *Crocco*, the Court urges that any appropriate relief be ordered against CIGNA itself, as well as the CIGNA Plan.

benefits under the terms of the plan as written and benefits under the terms of the plan as affected by inadequate or misleading disclosures.  Misleading notices and disclosures were not at issue in *Crocco*, and in *Frommert,* the court not only did not draw the distinction CIGNA seeks but it held that benefits under the plan as a result of a misleading SPD "f[ell] *comfortably within the scope*" of § 502(a)(1)(B).  *Frommert*, 433 F.3d at 270; *see also May Dep't Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 601 (7th Cir. 2002) ("The benefits sought were plan benefits; the question was how to compute them.  The answer was given by ERISA, but that is just to say that, like many other contracts, pension plans governed by ERISA contain certain provisions implied by law.").  True enough, the plaintiffs in *Frommert* (unlike here) sued the plan administrator.  But the Second Circuit did not emphasize that fact or otherwise indicate that the relief ordered under § 502(a)(1)(B) would not otherwise have been available.  In fact, in the predecessor case to *Frommert – Layaou v. Xerox Corp.*, 238 F.3d 205 (2d Cir. 2001) – the administrator was dismissed from the case before the remand to the district court for the determination of appropriate relief.  *See Layaou v. Xerox Corp.*, 330 F. Supp. 2d 297, 299 (W.D.N.Y. 2004) (identifying defendants as Xerox Corp. and the Xerox pension plan).

Reading "benefits under the terms of the plan" to mean exactly that, regardless of whether those benefits derive from the literal terms of the plan or from the misleading statements in CIGNA's required disclosures, the Court believes the CIGNA Plan itself is an appropriate defendant.  The Second Circuit has repeatedly stated that "'in a recovery of benefits claim, . . . *the plan* and the administrators and trustees of the plan in their capacity as such may be held liable.'"  *Crocco*, 137 F.3d at 107 (quoting *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989)) (alteration omitted and emphasis added); *see also Wilkins*, 445 F.3d at 583 ("[A]s decisions of this court have

17

made clear, if a summary plan is inadequate to inform an employee of his rights under the plan, ERISA empowers plan participants and beneficiaries to bring civil actions *against plan fiduciaries* for any damages that result from the failure to disclose under 29 U.S.C. § 1132(a)(1)(B).") (quotation marks omitted and emphasis added).  Thus, until the Second Circuit rules otherwise, the Court believes that any remedial benefits it orders as a result of the materially misleading statements in CIGNA's notices and disclosures constitute benefits under the terms of the plan, and the CIGNA Plan is liable for those benefits under § 502(a)(1)(B).[5]

In light of this holding, the Court need not consider whether any relief ordered under § 502(a)(1)(B) would also be available under § 502(a)(3).  That question is particularly complicated for a number of reasons.  For one, the Second Circuit has clearly held that relief is not available under § 502(a)(3) where the same relief is available under § 502(a)(1)(B).  *See, e.g.*, *Wilkins*, 445 F.3d at 578.  But the Second Circuit has not squarely confronted a situation in which relief that would otherwise be available under § 502(a)(1)(B) is not in fact available because, for example, the plan administrator is not a named defendant.  Therefore, it is unclear whether in such a case relief would indeed be barred by § 502(a)(1)(B) or whether a court might, through its equitable powers, instead provide relief under § 502(a)(3).

---

[5] Although CIGNA argues that such an approach would eviscerate the Second Circuit's directive in *Lee v. Burkhart*, 991 F.2d 1004, that only plan administrators be held liable for defective notices, the Court disagrees.  For example, ERISA provides that an administrator may be held personally liable at a court's discretion if he fails within thirty days to comply with a request for information he is required by ERISA to provide.  *See* 29 U.S.C. § 1132(c)(1).  Such damages are not at issue here, and the Court does not reach the question of whether its present reasoning would extend to such damages.  Nor does the Court address any other ways in which remedies for defective notices may or may not be extended beyond plan administrators.

For another, even if the latter course were theoretically possible, the Supreme Court has issued several opinions, beginning with *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993), that have severely curtailed the kinds of relief that are available under § 502(a)(3).  *See, e.g.*, *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356 (2006); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).  *Mertens* and subsequent cases have drawn a sharp line between "traditionally equitable" and "traditionally legal" relief, and have permitted only the former under § 502(a)(3).  *See, e.g.*, *Mertens*, 508 U.S. at 255-56; *Great-West*, 534 U.S. at 210 (noting that in *Mertens*, the Court "held that the term 'equitable relief' in § 502(a)(3) must refer to 'those categories of relief that were *typically* available in equity'").  The Supreme Court stated in *Great-West* that "[a]lmost invariably[,] suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty."  534 U.S. at 210 (quotation marks and alteration omitted).

Plaintiffs seek to limit this language from *Great-West* to the factual scenario presented in that case, in which the plaintiff sought "to impose personal liability on respondents for a contractual obligation to pay money" *Id.*  But it is not clear that such an interpretation is viable in light of *Frommert*.  There, the Second Circuit made the following observation about the plaintiffs' claims, which were strikingly similar to those presented here: "While the plaintiffs seek to expand the nature of their claim by couching it in equitable terms to allow relief under § 502(a)(3), the gravamen of this action remains a claim for monetary compensation and that, above all else, dictates the relief available."  433 F.3d at 270 (citing *Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 321 (2d Cir. 2003)) (emphasis omitted).

19

Especially in view of these knotty issues and since the Court has already decided that Plaintiffs may obtain full relief under § 502(a)(1)(B), the Court need not, and does not, decide whether Plaintiffs could obtain relief under § 502(a)(3).

### III.

The most complicated of the many complex issues facing the Court relates to the November 1997 Signature Benefits Newsletter that CIGNA identifies as its ERISA § 204(h) notice. The Court previously determined in its Liability Decision that the transition to Part B worked a significant reduction in the rate of future benefit accrual, meaning that a § 204(h) notice was due to CIGNA's employees. *See* Liability Decision [doc. # 269] at 76. The Court also noted the difficulty in determining whether CIGNA had provided all the information required by then-governing Treasury regulations, or whether Plaintiffs were correct in their assertion that CIGNA had failed to offer a summary of the amendment that was written in a manner calculated to be understood by the average plan participant. *See id.* at 78. Given the material misrepresentations in the § 204(h) notice, however, the Court did not reach the question of precisely what information would have been required, instead resting its decision on CIGNA's affirmatively misleading statements. *See id.* at 78-79. As the Court found, "CIGNA offered statements that misled plan participants into believing that significant reductions in the rate of future benefit accrual were not a component or a possible result of Part B," whether due to the accrual provisions of Part B itself or to the transition from the old to the new plan (i.e., wear away). *Id.* at 80.

The question, then, is what remedy is appropriate in light of CIGNA's violation of ERISA's requirement for an accurate § 204(h) notice. Plaintiffs claim that the obvious and unavoidable remedy for a defective § 204(h) notice is invalidation of the underlying amendment to which the

§ 204(h) notice applied. In support of this proposition, they point to *Frommert*, 433 F.3d at 263, in which the Second Circuit held that Xerox's failure to provide a § 204(h) notice regarding a "phantom offset" meant that the provision in question "may not be applied" to employees rehired before the plan was permissibly amended. Plaintiffs argue further that invalidation is required by the language of the statute itself, which states that without a valid notice, a plan "*may not be amended so as to provide for a significant reduction in the rate of future benefit accrual.*" 29 U.S.C. § 1054(h) (emphasis added). Thus, Plaintiffs request that

> [t]o remedy the ERISA § 204(h) violation, all members of the class who[m] CIGNA employed after the January 1, 1998 cash balance conversion, including persons rehired after that date, whose benefits are less than the benefits they would have earned under the Part A formula should be restored to the Part A benefit formulas (Tier 1 or Tier 2) that applied on December 31, 1997. . . . Unless and until proper notice of reductions is given, participants must continue to accrue benefits under the more favorable benefit formulas in effect on December 31, 1997.

Plaintiffs' Memorandum on Relief [doc. # 275] at 32-33.

CIGNA disagrees with Plaintiffs' contention for several reasons (even apart from CIGNA's assertion, discussed and rejected above, that Plaintiffs may only recover under ERISA § 502(a)(3) and that the relief Plaintiffs request is barred under *Great-West*). First, CIGNA argues that the remedy proposed by Plaintiffs bears no relationship to the harm Plaintiffs suffered and would thus constitute a windfall, given that CIGNA sent out various notices informing its employees that they would earn benefits under Part B beginning in 1998. Second, and similarly, Amendment 4 unambiguously froze benefit accruals under Part A, and no one disputes that Amendment 4 was validly noticed under § 204(h) or that CIGNA employees understood that Part A was being frozen. Finally, CIGNA argues that the Court's holding that rehires were not owed § 204(h) notices

forecloses any remedy for that group of employees under § 204(h).  *See* Defs.' Mem. [doc. # 276] at 19.

Certain of CIGNA's arguments are easily addressed.  For example, the Court agrees with CIGNA that the Court's determination in its Liability Decision that no § 204(h) notice was due to rehires, *see* Liability Decision [doc. # 269] at 109, bars the extension of any relief for CIGNA's § 204(h) violation to rehired employees.  As the Court stated in its Liability Decision, however, rehires remain eligible for relief regarding the misrepresentations in the Summary of Material Modifications and Summary Plan Descriptions they received.  *See* Liability Decision [doc. # 269] at 109.

CIGNA's argument regarding the amendment of § 204(h), on the other hand, is less persuasive.  Specifically, the text of the statute was amended in 2001 to add subsection (6)(a), which reads:

> In the case of any egregious failure to meet any requirement of this subsection with respect to any plan amendment, the provisions of the applicable pension plan shall be applied as if such plan amendment entitled all applicable individuals to the greater of (i) the benefits to which they would have been entitled without regard to such amendment, or (ii) the benefits under the plan with regard to such amendment.

29 U.S.C. § 1054(h)(6)(a).  CIGNA claims that the absence of language prior to 2001 explicitly permitting the invalidation of amendments not preceded by a proper § 204(h) notice means that such a remedy is unavailable under the pre-2001 version of the statute.  This position, however, is directly contradicted by *Frommert*, which itself relied on the pre-2001 text of § 204(h) as supporting precisely such a remedy.  *See* 433 F.3d at 263.

However, the freeze imposed by Amendment 4 and the sweeping nature of Amendment 5, which established all of Part B, constitute unusual, if not unique, circumstances that render the

Court's decision particularly difficult. Benefit accruals under Part A were frozen as of December 31, 1997 by virtue of the validly adopted Amendment 4, and CIGNA provided a valid § 204(h) notice of that freeze in its November 1997 Signature Benefits Newsletter. However, in that same document, CIGNA also assured its employees that Part B was in the works. As soon as CIGNA could "formally adopt the new CIGNA Retirement Plan, with all legally required terms and provisions," Ex. 516 (Nov. 1997 Newsletter), at D00611, it would, and CIGNA promised that the new plan's benefits would be made retroactive to January 1, 1998. Thus, the freeze served essentially as a placeholder, and was intended to disappear once Part B became operative. The Court is aware of no other case, at least in this circuit and perhaps nationally, in which such a freeze was implemented in the process of transitioning to a cash balance plan.

Furthermore, the Court notes that Plaintiffs have never challenged the validity of either the § 204(h) notice preceding Amendment 4, which put in place the freeze, or Amendment 4 itself. Indeed, the Court can find no fault with CIGNA's § 204(h) notice. CIGNA informed plan participants that "[e]mployees participating in the new CIGNA Retirement Plan will stop earning benefits under the current Pension Plan on December 31, 1997," Ex. 516 (Nov. 1997 Newsletter) at D00611, and even Plaintiffs' communications expert, Prof. James Stratman, testified that he could not draft "clearer text that would explain [this fact] to participants." Defs.' Mem. [doc. # 276] at 23; *see* Ex. 516 (Nov. 1997 Newsletter) at D00611; Ex. 2 (Part A) at D00132 (Am. No. 4). Thus, the one thing that is absolutely clear from CIGNA's communications with its employees is that (with the exception of grandfathered employees) all CIGNA employees would stop receiving benefits under Part A as of December 31, 1997. Yet, what Plaintiffs desire as a remedy is for all CIGNA employees to continue to receive benefits under Part A after December 31, 1997.

23

Further, and even apart from the question of appropriate notice, Plaintiffs have not challenged the freeze on a substantive basis. They might have argued that the freeze constituted a sham attempt on CIGNA's part to avoid having to provide a § 204(h) notice for Part B, or to avoid a possible return to Part A if Part B were invalidated. They might also have argued that the § 204(h) notice for the freeze, even though technically accurate, should nevertheless be considered void because it was embedded within a document that the Court has found offered materially misleading statements about Part B, and CIGNA employees might never have accepted the freeze without the assurance that a comparable retirement plan would retroactively take its place. Plaintiffs have argued none of these things, however, and the Court will not make these arguments now on Plaintiffs' behalf.

Finally, CIGNA points to Treasury Regulation 1.411(d)-3, which in its 1997 and 1998 form stated that separate amendments are treated "as one plan amendment" only where the amendments have "the same adoption and effective dates." 26 C.F.R. § 1.411(d)-3(b). Amendments 4 and 5 had different adoption and effective dates, and as a result, CIGNA argues that the Court may not treat them as one amendment for the purpose of invalidation. The Court, however, notes that the regulation cited expands on § 204(g), ERISA's anti-cutback provision, and seeks to close a loophole employers might use in order to reduce employees' benefits in an otherwise-impermissible way. The Court sees a risk here not of an impermissible cutback, but rather of CIGNA exploiting a technicality (a freeze that was intended to "disappear" when no longer needed) to frustrate employees' entitlement to notice under § 204(h).

Somewhat similar concerns motivated the Court's decision in its Liability Decision to ignore the effect of the freeze in determining whether a significant reduction in the rate of future benefit accrual had occurred, triggering the requirement of a § 204(h) notice. Despite the troublesome

24

possibility of legalistic chicanery, however, the Court also recognizes that there is a difference between ignoring the effect of a freeze for the purpose of determining whether a § 204(h) notice is due and voiding the amendment underlying the freeze, as Plaintiffs now request though they have never challenged the amendment itself. For even if the defective § 204(h) notice regarding Amendment 5 (implementing Part B) means that Part B itself is inoperative, Plaintiffs offer no justification or support for the proposition that the defective § 204(h) notice regarding Amendment 5 should somehow also implicate properly noticed Amendment 4. Nor is the Court unaware of the incongruity of ignoring Amendment 4, an amendment that the parties agree all employees were well aware of, in providing a remedy for a failure of notice regarding Amendment 5.

As noted above, Amendment 5 is also unusual in its scope, in that it created what was essentially an entirely new defined benefit program. *Frommert*, in contrast, involved a much narrower amendment, namely the provision detailing the method of computing interest on the retirement benefits already received by employees who had previously worked for Xerox and later returned. *Frommert*, 433 F.3d at 257. Thus, invalidating that amendment had little effect on the overall functioning of Xerox's benefit plan. Here, however, while it is true that Part A was still operative with respect to at least some CIGNA employees through March 31, 2008, and so it should not be difficult to move class members from one computer spreadsheet to another, the effect on CIGNA's retirement program would be immense. Instead of having shifted almost all of its employee population into Part B, CIGNA would be required to extend Part A to as many as ten or twenty thousand additional employees, significantly complicating and delaying its attempt to move fully into the new plan. Given the noticeably higher benefit accrual rate under Part A, a widespread return to Part A would also be extremely costly. The Court is particularly reluctant to order such a

remedy given that the terms of Part B themselves are legally valid under ERISA and CIGNA provided substantial accurate information to its employees regarding, for example, the method by which they would accumulate pay and interest credits.

In light of all these difficulties, then, and with considerable uncertainty, the Court determines, in an exercise of its equitable powers, that a return to Part A is not an appropriate remedy for CIGNA's deficient § 204(h) notice under the peculiar factual circumstances presented here. The Court recognizes that the Second Circuit expressly held in *Frommert* that "[w]ithout . . . proper notice [under § 204(h)] to Plan participants, *the amendment was ineffective as to them*." 433 F.3d at 268; *see also Hirt v. Equitable Ret. Plan*, 441 F. Supp. 2d 516, 539 ("The statute makes a sufficient notice a precondition to the effectiveness of the plan amendment."). This categorical mandate is also supported by the language of the statute itself. However, the Court is faced here with a situation in which the apparently exclusive remedy of invalidation would harm, rather than benefit, Plaintiffs, for the result would be a return not to a viable benefit plan, but to a freeze. It is unclear whether CIGNA contemplates that plan participants would retain even those benefits accrued under Part B in the intervening years, but the Court is confident that ERISA § 204(g), which prohibits the cutback of previously accrued benefits, would protect all the benefits accrued under Part B prior to the date of judgment. Nevertheless, the ultimate effect would be a prospective freeze of Part B for the members of the Class. Such a remedy would be cold comfort to Plaintiffs, and the Court does not believe that ERISA, which focuses so emphatically on protecting workers and their reasonable expectations, or equity could require such a result. *See DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 64-65 (2d Cir. 1997) ("*Sullivan* made clear that cases involving ERISA benefits are inherently equitable in nature . . . ."); *Sullivan*, 82 F.3d at 1257-59. Moreover, the Court believes

26

that its remedy for the misrepresentations in CIGNA's Summary of Material Modifications and Summary Plan Descriptions, described below, will at least partly ameliorate the significant reduction in the rate of future benefit accrual worked by the implementation of Part B.

The Court does, however, wish to emphasize its concerns about CIGNA's use of a freeze here and its implications for § 204(h). For by upholding the validity of the freeze amendment, and consequently not ordering the invalidation of Part B, the Court has permitted CIGNA effectively to eviscerate the notice requirements of § 204(h). CIGNA's failure to provide a valid § 204(h) notice meant that CIGNA was able to introduce Part B without the potentially significant controversy that might have resulted had CIGNA been open with its employees about the cuts in benefits CIGNA proposed. Yet a return to the freeze, or the maintenance of Part B, shields CIGNA from the consequences for a defective § 204(h) notice intended by the statute and by the Second Circuit: a return to the more favorable plan provisions pre-dating the amendment. And because the plan participants would return to a frozen Part A, rather than Part A itself, CIGNA would be free to reimplement Part B, preceded by a proper § 204(h) notice, without having been required to return to the original, more favorable plan terms in the meantime. As a result, plan participants would gain nothing, and CIGNA would face a minor inconvenience, but little else. Without a realistic possibility of returning to Part A, furthermore, the employees would have no leverage by which to encourage CIGNA to reconsider Part B, leverage that § 204(h) notice is specifically intended to provide. *See Frommert*, 433 F.3d at 266-67. Such an outcome is particularly troublesome because, as the Court found in its Liability Opinion, CIGNA never intended the freeze to be permanent. *See* Liability Decision [doc. # 269] at 74-75.

27

That said, the Court does not believe that CIGNA intentionally implemented the freeze here in order to avoid its responsibilities under § 204(h) with respect to Part B or to attempt to shield itself from the possibility of a return to Part A – and certainly there was no evidence presented to support such an assertion. Further, as the Court noted in its Liability Decision, *see id.* at 76, the combination of a freeze and retroactive benefits may have been more favorable to CIGNA's employees than other alternatives, such as a freeze without retroactive benefits. The Court therefore does not believe that CIGNA was acting in bad faith with respect to the freeze (for had the Court concluded otherwise, the Court believes that it would have ample power to remedy such misconduct). Should other employers, based on the Court's reasoning here, seek to adopt a practice of using a freeze to evade the otherwise-applicable provisions of § 204(h), moreover, the Court is confident that the Treasury Department and the Internal Revenue Service may address the problem through regulation.

Although the Court has determined that a return to Part A is not an appropriate remedy for CIGNA's violation of § 204(h), the Court does believe that new § 204(h) notices are in order. All members of the Class, including rehires, should be provided a § 204(h) notice regarding the transition to Part B within a reasonable time after judgment has entered. That notice should comply with current Treasury Regulations, including the requirement of providing information sufficient to permit a plan participant to understand how her personal retirement benefits may be affected by the change. *See* Treas. Reg. 54.4980F-1 (Q&A 11). The Court understands that a § 204(h) notice is usually due at the time of the amendment or not at all. However, especially in light of the Court's determination that the invalidation of Part B is not warranted, the Court believes that plan participants at least deserve to know, albeit belatedly, the true effect on their retirement benefits of the transition to Part B.

# IV.

Despite the impossibility on these facts of returning to Part A as a remedy for CIGNA's defective § 204(h) notice, Plaintiff nevertheless qualify for alternative relief as a result of the materially misleading statements CIGNA included in its Summary of Material Modifications ("SMM") and Summary Plan Descriptions ("SPDs").  The SMM, embodied in the December 1997 Retirement Information Kit, and the October 1998 and September 1999 SPDs were the most important disclosures CIGNA was required to provide its employees.  As detailed in the Liability Decision, these documents, and particularly the SPDs, are intended by ERISA to serve as a primary source from which employees can learn about their pension benefits.  As such, ERISA and its accompanying regulations set out strict requirements that the documents must satisfy.  *See* Liability Decision [doc. # 269] at 87-90.  The Court found that CIGNA's SMM and SPDs were deficient in several respects as a result of CIGNA's material misrepresentations: first, the disclosures failed to indicate to employees the possibility of wear away and the effect wear away could have on benefit accruals, *see id.* at 90-97; second, the disclosures led plan participants to believe that all of their Part A accrued benefits, including their early retirement benefits, would be preserved in the opening account balance or as part of the Part B protected minimum benefit, *see id.* at 97-100; and third, the disclosures led plan participants to believe that "the accrual rates for both short- and long-term employees under Part B were at least roughly equivalent to those under Part A," *id.* at 104.

The Court believes that the remedy for the first two disclosure violations, regarding wear away and early retirement benefits, is straightforward.  Recall that as documented at length in the Liability Decision, CIGNA told its employees that "Each dollar's worth of credit is a dollar of retirement benefits payable to you after you are vested.  Under the plan, your benefit will grow

29

steadily throughout your career as credits are added to your account." Ex. 505 (1998 SPD) at D00828; *see also* Ex. 506 (1999 SPD) at D00624 (same). Similarly, in its 1998 SPD, CIGNA stated that plan participants' quarterly statements would show "the amount of accumulated credits in your account. You'll see that amount *continue to grow* every year you are with CIGNA." Ex. 505 (1998 SPD) at D00826 (original emphasis omitted and emphasis added); *see also* Ex. 506 (1999 SPD) at D00623 (same). CIGNA also wrote in its September 1999 SPD, "If you were an employee on December 31, 1997, or rehired after 1997, *any benefit* you earned under the Pension Plan through December 31, 1997 was converted to an opening account balance in this Pension Plan." Ex. 506 (1999 SPD) at D00624 (emphasis added); *see also* Ex. 505 (1998 SPD) at D00828 (same). These statements taken as a whole created a reasonable expectation on the part of plan participants that Part B would protect *all* Part A benefits, including early retirement benefits, in the opening account balance or the Part B protected minimum benefit, and that Part B benefits would begin accruing immediately.

As Plaintiffs have repeatedly noted, implementing an "A+B," rather than a "greater of A or B," approach would completely resolve both problems.[6] Under A+B, an employee would receive all of her Part A benefits in the form those benefits were previously offered under Part A, plus all the benefits she accrued under Part B, in whatever form those benefits are offered. Because there is no attempt to transition Part A benefits into the Part B accrual formula, there is no need for an opening account balance and thus no question of whether early retirement benefits are a part of that

---

[6] As Plaintiffs have also noted, the Pension Protection Act, P.L. 109-280, § 701(a)(1), which added § 204(b)(5)(B)(ii) to ERISA, requires an A+B approach for all cash-balance transitions after June 29, 2005. Thus, the Court's concern about the draconian results of a return to Part A are not present here; in a sense, CIGNA's materially misleading notices and disclosures have simply resulted in its missing the deadline for a non-A+B transition.

opening account balance or not.  Additionally, because any Part B accrued benefits would simply

be tacked on to the Part A benefits, there would be no possibility of wear away.  As the Court

indicated in its Liability Decision, CIGNA's notices regarding yearly accruals under Part B were

accurate in all respects other than their failure to inform employees that they might not actually be

accruing those benefits.  Given the materially misleading statements the Court found in the SMM

and the SPDs to the effect that wear away was not a likely result of the transition to Part B and that

early retirement benefits would be included in the opening account balances and/or the Part B

minimum benefit, the Court finds and holds that these representations have become terms of the Plan

under the reasoning of *Frommert*.[7]  *See Frommert*, 433 F.3d at 265.  As such, the Court's remedy

here constitutes benefits under the terms of the plan under ERISA § 502(a)(1)(B).

Both CIGNA and Plaintiffs have expressed objections to the Court's proposal.  CIGNA

maintains its objection to any form of relief for Plaintiffs.  Assuming nevertheless that the Court

found relief appropriate, CIGNA states in its Memorandum that it would prefer that the Court order

the recalculation of opening account balances using the same formula as that applied to participants

with 55 or more age and service points.  *See* Defs.' Mem. [doc. # 276] at 27.  The Court rejects this

approach, however.  For it would not remedy CIGNA's misrepresentations regarding the inclusion

of all early retirement benefits – that is, in the opening account balances, the age 62 benefit, rather

than the age 55 benefit, would be used.

---

[7] As the Second Circuit indicated in *Frommert*, any remedy for notice violations should end
when the proper disclosures are made.  *See Frommert*, 433 F.3d at 263, 268-69.  The Court
suggested in its Liability Decision, *see* Liability Decision [doc. # 269] at 99 n.40, that CIGNA had
disclosed the restrictions on the availability of early retirement benefits in the Supplement to its July
2006 SPD.  However, CIGNA has nowhere disclosed the possibility of wear away, and as such, the
Court finds that the A+B remedy is appropriate unless and until such disclosure is made.

Further, Plaintiffs contest CIGNA's representation, in reliance on the testimony of Claude Poulin, the Plaintiffs' expert, that this recalculation formula would eliminate wear away.  Mr. Poulin's Supplemental Report, perhaps unsurprisingly, favors Plaintiffs' position and weighs against using CIGNA's approach.  *See* Ex. 4, ¶ 28 ("[P]articipants like Ms. Hogan who had more than 55 points on December 31, 1997 experienced a more favorable conversion rate in the calculation of their opening account balance, and hence non-existent *or shorter* wear-away periods.") (emphasis added). CIGNA also objects to an A+B approach because it "would not be consistent with the terms of the Part B SPD or specific communications notifying Plan participants about how opening account balances were created, because under an A+B approach, opening account balances for all Plan participants would be zero." Defs.' Responses [doc. # 280] at 5 n.6.  The Court rejects this argument as well and refuses to order a less-than-complete remedy on this basis.  Moreover, as CIGNA itself has repeatedly noted, all disclosures post-dating those regarding the transition were accurate, so only a limited number of documents could possibly be implicated by CIGNA's concerns.  All of the notices indicating participants' yearly accruals, for example, would now be accurate.

Plaintiffs, for their part, claim that A+B is an inadequate remedy for two reasons.  First, not all class members experienced wear away; some were affected only by Part B's lower benefit accrual rate, which A+B does not change.  Second, even those employees who did suffer from wear away may have experienced additional reductions in their overall benefits compared to those they would have earned had Part A continued, again as a result of Part B's lower benefit accrual rate.  Plaintiffs claim, then, that "overall the periods of wear-away account for only about 20 to 25% of the benefit losses from the cash balance changes." Plaintiffs' Supplemental Post-Argument Brief on Relief [doc. # 279] at 7.  However, Plaintiffs also admit that "[f]or . . . 21,000+ members of the class like Ms.

Glanz and Ms. Broderick, the periods of wear-away account for *substantial losses*," *id.* at 9 (emphasis added), and at trial, Mr. Poulin testified, "I cannot say for sure that 100 percent of the employees had experienced wearaway but I would say that the *overwhelming majority* experienced wearaway." Trial Tr. 219 (emphasis added). Also, Plaintiffs happily took advantage of the trial testimony of Lawrence Sher, CIGNA's expert, as well, that it would have been "predictable and known to CIGNA" that "opening balances for *some sizeable group of employees*" "would be less than their protected benefit under the old plan." Trial Tr. 1029:21 to 1030:22 (emphasis added).

The Court recognizes that a return to Part A would result in a larger recovery for Plaintiffs. That fact alone, however, is insufficient to render A+B inadequate, especially in light of Mr. Poulin's testimony regarding the substantial effect on class members' benefits as a result of wear away and the lack of any evidence in the trial record to support Plaintiffs' current complaints. For all of these reasons, then, the Court rejects both parties' objections to the A+B remedy, which the Court believes is a meaningful, substantial, and appropriate remedy.

The third misrepresentation, regarding so-called comparable benefits, is more complex. The relevant misleading statements appear in the SMM and the § 204(h) notice (discussed above), but not in the SPDs, which is unusual. In fact, the Court is not aware of any Second Circuit case in which the misrepresentations at issue were found only in an SMM. Although SMMs are important disclosures under ERISA, they are required only under certain circumstances, and may be rendered unnecessary by a timely SPD. *See* Liability Decision [doc. # 269] at 87-89. In recognition of these facts, the Court is reluctant to treat a misleading SMM as a misleading SPD – that is, to reform the terms of the plan in conformity with the SMM.

Even if the Court were to treat the SMM as equivalent to an SPD, however, significant problems would nevertheless remain. The only offending statements in the SMM that are not also found in the SPD (and cured by A+B) are the following: "CIGNA is *not* reducing the overall amount it contributes for retirement benefits, nor has the new program been designed to save money," Ex. 508 (Retirement Kit) at D00725; "Other employees and all new hires will be able to earn comparable benefits as career employees under the CIGNA Retirement Plan [i.e., Part B]," *id.*; "Our analysis showed that, in comparison to people with a higher age and service combination, you have plenty of time to take full advantage of the many attractive features of the Retirement Plan . . . ," *id.*; and "Generally speaking, the new Retirement Plan, in comparison with the current Pension Plan [i.e., Part A], tends to provide larger benefits for shorter-service employees and comparable benefits for longer-service employees," *id.* at D00729.

Although the Court found that Plaintiffs were correct in arguing that these statements created an impression that Part B's benefits were at least roughly comparable to benefits under Part A, these assurances differ significantly from CIGNA's assertions regarding wear away or early retirement benefits in that there are no concrete means of remedying the former as A+B serves to remedy the latter. Instead, the Court views these statements as more relevant to the § 204(h) notices and CIGNA's attempts to lull its employees into thinking that Part B would not result in a significant reduction in the rate of future benefit accrual. In order to make these statements "true," as Plaintiffs request, the Court would be required entirely to rewrite the Plan's provisions, with no clear guidance from the Plan itself or the relevant notices and disclosures. Plaintiffs concede that the Court does not have such authority. *See* Pls.' Supplemental Brief [doc. # 279] at 13-14. The Court wholeheartedly agrees.

34

Therefore, for the misrepresentations in CIGNA's notices, the Court orders that the CIGNA Plan provide class members with "A+B," that is, all accrued Part A benefits in the form those benefits were available under Part A, plus all accrued Part B benefits in the form those benefits are available under Part B.

**V.**

The Court now turns to CIGNA's benefit election notices. As discussed in the Liability Decision, *see* Liability Decision [doc. # 269] at 109-20, the Court found two defects in these notices. First, CIGNA failed to notify employees that early retirement benefits were only available through the Part A annuity, *see id.* at 114, and second, CIGNA failed to inform employees when their Part A benefits exceeded their Part B benefits (the so-called Minimum Benefits Rule), *see id.* at 118. A reformation of the benefit election notices to take account of the Court's A+B remedy would also address these two defects, as all Part A benefits (including early retirement benefits) would be protected and automatically provided in annuity form, and all Part B benefits would be available as a lump sum or an annuity, making the Minimum Benefits Rule irrelevant. Further, the introduction of A+B would affect the benefits of all retirees, and so all retirees would be eligible for amended notices. The Court will therefore first detail the content of the benefit election notices under the A+B approach. In an abundance of caution, however, the Court will then also address the steps necessary to remedy the misrepresentations identified in the benefit election notices by the Liability Decision, even if no other remedy were provided under § 204(h) or the SMM and SPDs.

The vast majority of retirees elected a lump sum upon retirement, and that lump sum was intended to be the actuarial equivalent of (at least some of) the retirees' Part A benefits, plus (at least some of) their Part B benefits. Due to the provisions of Part A, however, A+B requires that Part A

35

benefits be paid only in annuity form. The result is that the Court is faced with the question of how to convert a previously-paid lump sum into an annuity, in order to calculate the additional annuity to which a retiree may be entitled. This issue essentially boils down to whether retirees who elected a lump sum should be required to pay back a portion of that lump sum before being eligible to receive additional benefits in annuity form.[8]

CIGNA argues that any retiree whose lump sum payment exceeds the amount he would have received in annuity payments from the date of his retirement until his reelection should be required to pay back the difference to the CIGNA Plan before he can commence annuity payments. CIGNA argues that this approach is necessary to "put[] the participant in the same position vis-a-vis the Plan that the participant would have been in" had A+B been in place at the time the participant retired. Defs.' Mem. [doc. # 276] at 28. Increasing the already-paid lump sum benefit by the difference in value compared to the full-value Part A annuity "would be a windfall to participants by providing them additional monies to which they are not entitled under the terms of the Plan and that were never promised to participants, and that no participant could have elected had he/she been provided with the relevant information." *Id.* at 28-29. The Plan, CIGNA argues, was funded under the assumption that most employees would choose a lump sum (as in fact has been the case), and the large-scale shift in these actuarial assumptions[9] that would result from the implementation of A+B, and the

---

[8] The Court assumes that most retirees will elect to take their additional Part B benefits in the form of a lump sum, given that approximately 95% of retirees chose a lump sum originally. In such a case, concerns regarding a payback would be irrelevant, for the additional Part B benefits could simply be tacked on to the prior lump sum elected, with appropriate interest. A payback is an issue only where a retiree seeks essentially to convert a previously-received lump sum payment into an annuity.

[9] The Court notes, however, that the CIGNA Plan also uses actuarial assumptions in calculating participants' lump sum payments, which are the actuarial equivalent of plan participants'

compounding of that shift by not requiring a payback, could substantially interfere with the proper funding of the Plan.

Plaintiffs, for their part, reject the idea of a payback. Instead, they would institute an equitable setoff whereby the CIGNA Plan would be credited the amount of the lump sum payment (and reasonable interest), but would be responsible for pro rata annuity payments of the difference between the full-value Part A annuity payments and the monthly payments that would have resulted from an annuitization of the lump sum. This approach would allow retirees to receive the difference in value between the full-value Part A annuity (to which they are entitled under A+B) and the lump sum (which the retirees actually received), without any requirement of a payback. Plaintiffs argue that CIGNA's proposal would severely limit the scope of relief because it is almost inconceivable that any significant portion of affected employees would take advantage of the additional annuity if they were required first to pay the CIGNA Plan any amount of money.[10]

---

annuities. *See* Ex. 2 (Part B) at D00277 (§ 1.21) (defining "Equivalent Actuarial Value" as "an alternative form of benefit which has the equivalent value to the defined benefit of Part B . . . based on the following: (a) Mortality according to the Applicable Mortality Table, and (b) Interest at a rate of 7% per annum").

[10] In making their argument, Plaintiffs rely in part on Treasury Regulation 1.411(a)-11(c)(2)(i), which states that "consent is not valid if a significant detriment is imposed under the plan on any participant who does not consent to a [lump sum] distribution." 26 C.F.R. § 1.411(a)-11(c)(2)(i). Plaintiffs argue that any form of payback to CIGNA would constitute just such a "significant detriment" to Plaintiffs' receipt of their full-value Part A annuities. *See* Pls.' Mem. [doc. # 275] at 38-39. However, it is not clear to the Court that imposing a payback in the process of remedying a prior notice violation is equivalent to imposing a significant detriment on the choice between an annuity and a lump sum in the first instance. Further, the regulation goes on to state that "[w]hether or not a significant detriment is imposed shall be determined by the Commissioner by examining the particular facts and circumstances." 26 C.F.R. § 1.411(a)-11(c)(2)(i). In light of these ambiguities, the Court declines to rely on this regulation in making its determination of the appropriate remedy.

The Court recognizes that both parties' positions have merit – particularly CIGNA's concern about maintaining the financial viability of the Plan for all its employees, and Plaintiffs' concern that encumbrances on the remedy offered may well transform an otherwise satisfactory proposal into an empty promise. As a consequence, and in the exercise of its equitable authority, the Court has sought to balance these competing interests in the remedy it now orders.

The Court takes as its starting point the premise that a payback should not be required. CIGNA claimed at oral argument that those retirees with the greatest disparity in value between the full-value Part A annuity and the lump sum taken should be least inconvenienced by the payback, as they would either have accumulated a large credit of otherwise-due annuity payments or they would still have tucked away a substantial portion of their lump sum payment. The Court disagrees. There is no requirement that retirees preserve their lump sum in an easily accessible form or even that they preserve that funding for future living expenses. To force retirees to come up with a possibly substantial amount of cash (especially in the current economic climate) in order to receive additional retirement benefits for which they are otherwise qualified is both unrealistic and contrary to the protective purposes embodied in ERISA. *Cf.* Liability Decision [doc. # 269] at 34-39 (discussing congressional intent to preserve benefits in the context of waivers).

The second fundamental premise of the Court's remedy is that the CIGNA Plan should receive full credit both for the lump sums already paid and for a reasonable amount of interest on those sums since the date of payment. Once the retiree's lump sum plus interest has been annuitized, the CIGNA Plan should subtract the resulting monthly payment from the monthly payment under the annuity originally available under Part A as of the date of the employee's retirement. The retiree

should then receive a lump sum of all past-due benefits as of the date of judgment[11] and a prospective stream of monthly payments of the difference going forward. Because the default payment option for retirement benefits under ERISA, as Plaintiffs note, is a qualified joint and survivor's annuity, the CIGNA Plan should offer these monthly payments for the duration of the employee's life and the applicable proportion of those payments for the life of the surviving spouse.[12]

The Court intends through this procedure that the lump sum plus interest and the annuity payments otherwise-due to date will be made as mathematically equivalent as possible, to minimize any overpayment on the CIGNA Plan's part. However, to the extent there remains some risk of overpayment, the Court finds that it is equitable that CIGNA, having provided statutorily inadequate benefit elections forms, bear that risk. Finally, although it is true that retirees who elected a lump sum would have received a form of benefit that was not available under Part A, the Court does not believe that retirees should be penalized and effectively prevented from enjoying the potentially substantial additional benefits for which they now qualify simply because they elected to take their retirement benefits in a form available to them at the time.

The second issue to be resolved is how, given that a payback is not required, the new elections should function. Because under A+B the receipt of Part A benefits in annuity form is

---

[11] The Court addresses the issue of prejudgment interest on past-due payments in a later section of this opinion.

[12] CIGNA argues that no posthumous benefits are appropriate because "for participants who have died, the lump sum option has already proven to be the more valuable option for that participant. Any failure to disclose the relative value of benefit options to these participants therefore is harmless error and no remedy should be awarded." Defendants' Reply to Plaintiffs' Supplemental Post-Argument Brief on Relief [doc. # 283], at 3. However, as the language of CIGNA's argument makes clear, CIGNA is attempting to reinsert a detrimental reliance standard. The Court rejects such a standard for the reasons given in the section of this opinion on likely harm.

mandatory, requiring retirees affirmatively to elect such a form of benefit is unnecessary. Therefore, any employee eligible for additional benefits only under Part A should receive a notice from the CIGNA Plan simply informing her of any additional money for which she is eligible (detailing the amount of past-due benefits and interest to be paid in a lump sum as well as the amount of the monthly annuity payments going forward), as well as the reason for these added benefits. Retirees eligible for additional benefits under Part B, however, would still have the option of receiving their Part B benefits as an annuity or a lump sum. Plaintiffs, understandably, are concerned that any affirmative action required by the new notices on the retirees' part will serve only to limit the number of class members who actually receive relief under the Court's order. The Court agrees. Therefore, the new notices for retirees eligible for additional benefits under Part B should offer the option of deciding between an annuity and a lump sum. If, however, the retiree fails to respond with a new election within some reasonable time, for example 90 days, the CIGNA Plan should provide those benefits in lump sum form (in light of the fact that over 95% of retirees currently choose to receive their benefits as a lump sum). Retirees eligible for additional benefits under both Part A and Part B should receive a hybrid notice, informing them of automatic additional lump sum and annuity payments under Part A and providing an election with respect to the additional benefits under Part B (with an automatic lump sum payment if the election form is not returned).

The Court also recognizes that providing additional annuities for employees whose annuity and lump sum are almost equivalent in present value may offer little real benefit to the retiree while contributing substantially to the CIGNA Plan's administrative expenses. For that reason, the Court adopts as a reference point the relative equivalency standard of 5% established in the 2003 Treasury Regulations, *see* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iii), and the CIGNA Plan may choose to provide

the relevant additional benefit to any employee who received a lump sum worth at least 95% of the present value of her annuity in the form of a supplemental lump sum should the CIGNA Plan find such an approach more convenient.

If A+B were to be rejected on appeal, the Court nevertheless believes that a remedy for the material misrepresentations in CIGNA's benefit election notices would still be appropriate. However, because CIGNA's statements concerned only the exclusion of early retirement benefits from the Part B lump sum and the comparative value of the Part A annuity and the Part B lump sum, the number of affected class members is likely to be relatively small. Plaintiffs have estimated that only approximately 350 to 400 participants would be eligible for relief, given that only those who had accrued early retirement benefits, retired before those benefits phased out at age 65, *and* chose a lump sum rather than an annuity could qualify. *See* Pls.' Supplemental Brief [doc. # 279] at 2. Thus, as an initial matter, the parties should determine which retirees require new notices. In this regard, the Court agrees with CIGNA that a cutoff date of September 30, 2004 is appropriate with respect to the failure to disclose the availability of early retirement benefits only in annuity form, as new Treasury regulations regarding the description of early retirement benefits became effective on October 1, 2004. *See* Liability Decision [doc. # 269] at 116 n.52.[13] However, the same cannot be said regarding the second disclosure violation. CIGNA promised its employees in the Part B SPDs that it would notify them if their Part A benefits exceeded their Part B benefits, and thus took on an

---

[13] Plaintiffs assert in their Reply that CIGNA "did not offer any relative value disclosures before May 2006," Pls.' Reply [doc. # 277] at 27 n.8, and so argue that the cutoff date of September 30, 2004 should be extended. However, the Court previously determined in its Liability Decision that CIGNA had rectified any non-compliance with the new regulations prior to the Court's decision, and for the reasons stated there, *see* Liability Decision [doc. # 269] at 116 n.52, the Court believes that the September 30, 2004 cutoff date is appropriate.

obligation above and beyond any imposed by statute or regulation. *See* Liability Decision [doc. # 269] at 118. As a result, the new regulatory regime that came into force on October 1, 2004 in no way affected CIGNA's obligation to comply with the Minimum Benefits Rule, and any CIGNA retiree who was affected by CIGNA's violation of that rule should also receive a corrected notice.

Turning to the content of the notices, the Court reiterates its concerns, raised above, regarding paybacks and affirmative opt-ins. At oral argument, CIGNA argued that offering an additional annuity without the requirement of a payback would induce essentially all eligible retirees to accept the annuity, despite the fact that, even having been provided accurate benefit election notices, those retirees might well still have preferred the lump sum. Such may indeed be the case. However, the Court can find no way to determine after the fact whether any employee would have made such a choice (and CIGNA similarly offers no suggestions). Plaintiffs instead request that the Court automatically shift retirees whose annuities had a greater present value than their lump sum payment into an annuity payment plan. Plaintiffs base their position on Treasury regulations stating that no consent to a lump sum payment is valid unless the employee and his or her spouse receive an explanation of the relative values of the optional forms of benefit. *See* 26 C.F.R. § 1.411(a)-11(c)(2)(i). According to Plaintiffs, the defective notices provided by CIGNA mean that any consent given was invalid, and the retirees should revert to the default form of benefit under ERISA, a qualified joint and survivor's annuity. *See* 29 U.S.C. § 1055(a)(1), (c).

The Court agrees that Plaintiffs have the better approach, for retirees who received materially misleading benefit election notices from CIGNA should not now be penalized, and prevented from receiving benefits for which they are otherwise qualified, simply because CIGNA failed to provide them with accurate information at the time the retirees made their original choice among benefit

42

options.  Thus, for substantially the same reasons given in the Court's discussion on A+B, the Court does not believe that an affirmative opt-in is appropriate for the new benefit election notices.

Because any employee who qualifies for additional benefits is to receive those benefits without an affirmative opt-in, the notice should not require the retiree to make any form of election. Rather, the notice should indicate the amount of the lump sum and annuity that the retiree will receive and the reason why these additional monies are being provided.  Finally, the Court believes that it is appropriate for the new notices to comply with all current Treasury Regulations to the extent applicable; just as CIGNA has lost the opportunity to implement a non-A+B cash-balance transition, permissible under the old regime, as a result of its materially misleading notices and disclosures, so has it lost the opportunity to provide notices and disclosures that satisfy only the prior, less rigorous regulations.

## VI.

Plaintiffs also seek to reassert their claim under ERISA's anti-cutback provision, § 204(g). To the extent Plaintiffs claim that any provision of Part B resulted in an impermissible cutback of their accrued benefits, the Court rejected their claim in its Liability Decision.  *See* Liability Decision [doc. # 269] at 121.  However, to the extent Plaintiffs argue under § 204(g) that a cutback occurred due to mismanagement of data on CIGNA's part,[14] the Court did not address that issue.  Nor had the parties briefed this issue previously.  Instead, the parties represented to the Court that this aspect of Plaintiffs' claims was the subject of settlement negotiations and did not need to be resolved as part

---

[14] Plaintiffs offer several examples of this alleged mismanagement, such as CIGNA's failure to include data on the Free 30% Survivor's Benefit in the new Part B database and its individual failures to maintain accurate information with respect to Patricia Flannery and Janice Amara.  *See* Pls.' Reply [doc. # 277] at 28-29.

of the Court's comprehensive Liability Decision. As such, the Court was surprised, and particularly

dismayed, to see this claim revived in Plaintiffs' Memorandum on Relief, submitted after the trial

was completed and indeed after the Liability Decision was issued. *See* Pls.' Mem. [doc. # 275] at

40-41. Because the Court was not squarely presented with this issue previously, the Court has not

had the opportunity to hear arguments from both parties or to make findings of fact and conclusions

of law. Further, the Court does not intend to reopen the trial record at this point or to conduct an

additional trial on this issue. Plaintiffs are free to pursue this claim in another action, however, as

it was removed from the case before trial. In this respect, the Court finds that the statute of

limitations on any such claim would be tolled during the pendency of this action.

## VII.

Finally, the Court addresses the issue of prejudgment interest on any past-due benefits owed

to class members who have already retired. The determination of whether to award prejudgment

interest rests with the discretion of the district court. *See Jones v. UNUM Life Ins. Co. of Am.*, 223

F.3d 130, 139 (2d Cir. 2000). In exercising this discretion, the Second Circuit has directed courts

to consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii)

considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the

statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.*

(quotation marks omitted). The same considerations should inform the Court's decision regarding

the appropriate rate of prejudgment interest, *see id.*, as there is no federal statute setting a standard

interest rate for prejudgment interest.

As the Court has already indicated, this analysis applies only to those plan participants who

have *already retired* and commenced benefits; employees who will prospectively receive A+B as

44

a result of this opinion are not entitled to prejudgment interest.  In the Court's view, under general principles of equity and the remedial principles of ERISA, the CIGNA Plan is not entitled to retain the time-value of the money it has improperly (albeit in good faith) withheld from the retired members of the Class.  For as the Second Circuit has noted, "[i]f benefits are not paid until after they are due, beneficiaries receive less monetary value than they are contractually entitled to. Furthermore, they would presumably need to borrow to meet their accumulating obligations, thereby incurring interest expenses [that] they might never recover." *Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 395 (2d Cir. 2004); *see also Jones*, 223 F.3d at 139-40.  As the D.C. Circuit also observed in *Moore v. CapitalCare, Inc.*, 461 F.3d 1, 13 (D.C. Cir. 2006), prejudgment interest to a plan participant is "presumptively" appropriate because "to permit the fiduciary to retain the interest earned on wrongfully withheld benefits would amount to unjust enrichment – a fiduciary would benefit from failing to pay ERISA benefits. . . . [P]rejudgment interest [also] ensures that a beneficiary is fully compensated, including for the loss of the use of money that is his."  Prejudgment interest is especially appropriate here in light of the fact that the CIGNA Plan will be credited with a reasonable rate of return on its lump sum payments to retirees in the calculation of the equitable setoffs.

With respect to the rate of prejudgment interest, although some courts have used the federal interest rate for *post*-judgment interest, *see* 28 U.S.C. § 1961(a), the Second Circuit has cautioned that

> [t]he suitability of that postjudgment rate for an award of prejudgment interest will depend on the circumstances of the individual case, and the court need not limit the award of prejudgment interest to the rate at which the injured party would have lent money to the government.  The court may, for example, consider whether the plaintiff would have invested the money at some higher rate, or it may take into

45

> account the rate of interest the defendant would have had to pay to borrow the money
> it withheld from the plaintiff.

*Jones*, 223 F.3d at 139 (citations omitted).  The Court does not consider the federal post-judgment interest rate, which is measured by interest on short-term, risk-free obligations, to be appropriate in this case.  Rather, in the interest of fairness, the Court believes that the rate should be the same as that used with respect to the CIGNA Plan's lump sum payments, namely, a reasonable rate of return.  Both the CIGNA Plan and the plan participants invested on a moderate- to long-range time horizon, given the former's interest in funding the Plan and the latter's interest in saving enough money to last throughout retirement.  Thus, in light of these considerations, the Court believes that a reasonable and appropriate rate of interest for payments past due would be the rate used in the same time period by the CIGNA Plan to calculate the lump-sum present value of retiring participants' annuities (i.e., the equivalent actuarial value).  These interest rates should apply to all benefits actually due between the implementation of Part B on January 1, 1998 and the date of judgment.

In ordering the payment of prejudgment interest, the Court acts under ERISA § 502(a)(1)(B).  Although the Second Circuit had previously indicated that such an award might also be possible under ERISA § 502(a)(3), *see Dunnigan v. Met. Life Ins. Co.*, 277 F.3d 223, 229 (2d Cir. 2002) ("Where interest is sought to make the plaintiff whole by eliminating the effect of a defendant's breach of a fiduciary duty, we see no reason why such interest should not be deemed 'appropriate equitable relief' within the scope of § 502(a)(3)(B)."), the Court is unsure whether prejudgment interest remains available under § 503(a)(3) after *Great-West*.  The Court's doubts are further reinforced by other, more recent Second Circuit case law suggesting the availability of prejudgment

interest under § 502(a)(1)(B), discussed below, and the general directive that relief available under § 502(a)(1)(B) should not instead be awarded under § 502(a)(3), *see Wilkins*, 445 F.3d at 578.

The theory behind an award of prejudgment interest under § 502(a)(1)(B) is that a pension plan, like CIGNA's, that requires payment of benefits at certain intervals also includes an implicit provision that benefits unreasonably delayed or withheld will be supplemented by interest when finally paid. *See* Ex. 2 (Part A) at D00039 (§ 4.1(b)); Ex. 1 (Part B) at D00296-D00297 (§ 5.7); *Dobson*, 389 F.3d at 395. As another court in this district has explained,

> The mandatory language of the provision for the monthly payment of benefits makes clear that the payment of such benefits *at the time provided* is the "benefit" accorded a beneficiary under the Plan. Thus, such a beneficiary is entitled to the value of his or her benefits *at the time they are due* and thus, in recognition of the time value of money, if those benefits are not paid when they are due, but are instead unreasonably delayed and paid later, the value of those benefits must include accrued interest to replace their otherwise diminished value to the plaintiff.

*Dobson v. Hartford Life & Accident Ins. Co.*, 518 F. Supp. 2d 365, 374 (D. Conn. 2007). Such "[i]mplied agreements to pay interest on delayed disbursements of owed money fit squarely within [the] tradition of common law contract interpretation." *Dobson*, 389 F.3d at 399 (quoting *Spalding v. Mason*, 161 U.S. 375, 396 (1896)). Reading CIGNA's Plan to incorporate an implied provision regarding interest on past-due benefits – as the Court finds in this case – also furthers the purposes of ERISA. For without such an incentive for an employer to pay benefits in a timely manner, the employer "could accumulate the cash, conserve its resources, earn interest off the improperly retained funds, and deprive . . . beneficiaries of desperately needed benefits without contractual consequences." *Id.* at 395.

The Court does not suggest that the CIGNA Plan had an improper motive in offering the benefits it did, and indeed the Court found the provisions of Part B themselves lawful. However,

47

the Court does believe that equity, the reasonable expectations of the parties, the intent of ERISA, and the language of Part A and Part B all weigh strongly in favor of an implied contractual provision for interest on withheld benefits and the corresponding recovery of that interest under § 502(a)(1)(B).

## VIII.

To summarize, then, the Court hereby declares that the manner in which CIGNA implemented the transition to Part B was unlawful as a result of CIGNA's materially misleading notices and disclosures, and that the terms of Part B have been correspondingly modified by CIGNA's October 1998 and September 1999 Summary Plan Descriptions. Accordingly, in light of CIGNA's statements in those publications that all early retirement benefits would be protected and CIGNA's failure to warn of wear away, the Court orders and enjoins the CIGNA Plan to reform its records to reflect that all class members must now receive "A+B" benefits; that is, all class members must receive their accrued benefits under Part A, in the form in which those benefits were available under Part A, and in addition their accrued benefits under Part B, in whatever form those benefits are available under Part B. CIGNA is also ordered to supply accurate § 204(h) notices to all members of the Class, including rehires, and must also issue an updated and corrected Summary Plan Description for Part B. As a result of CIGNA's failure to comply with ERISA's requirements for benefit election notices, the Court further orders the CIGNA Plan to provide new, accurate benefit election notices that reflect the Court's determinations above regarding the appropriate procedure for providing additional remedial benefits. All of these notices must satisfy current regulations to the extent relevant, and must be provided within a reasonable period. The remedial benefits, disbursed in the manner described above, constitute "benefits under the terms of the plan" under ERISA § 502(a)(1)(B). Any class member who has already retired and commenced receiving benefits is

48

further entitled to prejudgment interest, at the rate used in the same time period by the CIGNA Plan to calculate the lump sum present value of retiring participants' annuities, on any benefits due between January 1, 1998 and the date of judgment.

The Court also recognizes that the benefits awarded by this opinion are substantial, and that the law on which they are based is anything but settled. In light of the complexity of the issues and the weighty interests at stake, as well as the possibility that some or all of this opinion and the Liability Decision may be reversed on appeal, the Court believes that a stay is appropriate. *See* Fed. R. Civ. P. 62(c) ("While an appeal is pending from . . . [a] final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."). In making its determination, the Court has considered the factors laid down by the Second Circuit in *Hirschfeld v. Board of Elections*, 984 F.2d 35 (2d Cir. 1992): "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that might be affected." *Id.* at 39 (quotation marks omitted); *see also In re Turner*, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997); *Cohen v. Met. Life Ins. Co.*, No. 00 Civ. 6112 (LTS)(FM), 2008 WL 1826484, at *1 (S.D.N.Y. Apr. 22, 2008). The Second Circuit has also clarified that the requisite degree of likelihood of success on the merits varies according to the court's assessment of the other factors: "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (quotation marks and alteration omitted).

Although CIGNA has not argued, nor could it credibly claim, that it would suffer an irreparable injury if the stay is denied, neither will Plaintiffs suffer a substantial injury if the stay is granted. The Court does not discern a public interest in granting or denying a temporary stay of the remedies in this opinion until they are reviewed by the Second Circuit; indeed, the only public interest the Court sees here, and it is a strong one, is for clarity in this muddled yet extremely important area of the law. Finally, and as repeatedly noted above and in the Liability Decision, the lack of clear guidance in the law and the unusual factual circumstances present in this case have convinced the Court that the outcome of any appeal is far from certain, and the Court believes a stay is therefore both appropriate and necessary.

Thus, the Court hereby ORDERS that all of the remedies laid out in this opinion are to be stayed pending their review by the Court of Appeals for the Second Circuit. However, in recognition of the Plaintiffs' interest in guaranteeing that any award affirmed is indeed paid, the Court further ORDERS that CIGNA post a bond in an appropriate amount **no later than July 11, 2008**. The parties should confer on an appropriate amount, and if they are unable to agree, they can present the issue to the Court for decision. Finally, the Court ORDERS Plaintiffs to file a brief on the issue of attorneys' fees **no later than July 11, 2008**. The parties should then respond in accordance with the Local Rules. **The Clerk is directed to enter final judgment.**

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: June 13, 2008.**