UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------------X
:
JANICE C. AMARA, GISELA            :   3:01 CV 2361 (MRK)
R. BRODERICK, AND ANNETTE S.       :
GLANZ individually, and on behalf  :   Trial Dates:
of others similarly situated,      :   September 11-15, 2006
                                   :   January 24-25, 2007
               Plaintiffs,         :
                                   :
        v.                         :
                                   :
CIGNA CORP. AND CIGNA              :
PENSION PLAN,                      :
                                   :
               Defendants.         :
                                   :
-----------------------------------------------------------X

## DECLARATION OF MATTHEW J. HENDERSON

I, Matthew J. Henderson, do depose and state of my own personal knowledge as follows:

1. I am a Vice President and Senior Consulting Actuary with Prudential Retirement. I have been employed by Prudential since 2001. I also am an actuary for the CIGNA Pension Plan ("the Plan"). I have served as an actuary for the Plan since approximately 2003.

2. I am a Fellow in the Society of Actuaries and a Member of the American Academy of Actuaries.

3. I have the reviewed the Court's June 13, 2008 Memorandum of Decision in this case, including the Court's decision ordering an "A+B" remedy and the Court's remedy on the "relative value" issue. It should be noted, however, that value of the A+B remedy includes and subsumes within it any relative value issue. That is because the relative value of the options available to class members will be equal once the A+B remedy is implemented.

4. I have estimated, in present day dollars, the additional benefits ordered by the

Court. The methodology used to estimate the value of those benefits is described below.

5. The preliminary list of participants potentially impacted by the A+B remedy was derived from the pension administration system currently maintained by Prudential for the Plan. Prior to 2004, this system was maintained by CIGNA. CIGNA also provided data updates for Prudential to incorporate into this system. Specifically, I (and my team) looked at all current or former Plan participants who participated in the cash balance plan and who had an original hire date before January 1, 1998. We identified 27,415 participants that fell into this category.

6. Approximately 6,480 of these 27,415 participants terminated their employment prior to becoming vested in their Plan benefits and roughly 98% of them have experienced a break-in-service such that they could receive no benefit from the Plan attributable to their prior service period. These individuals are not entitled to a benefit under Part B and would not be entitled to any benefit under A+B design either.

7. Approximately 2,040 of the 27,415 participants accrued no credited service in the Plan before January 1, 1998, i.e., they were not entitled to any benefit before January 1, 1998, regardless of the cash balance conversion. This would include participants who were hired before January 1, 1998, but who worked for a business that did not participate in the Plan, or who did not work sufficient hours in any Plan year to earn a year of credited service. These participants were not entitled to any benefit under Part A before January 1, 1998, and consequently would not be entitled to any additional benefit under the A+B remedy.

8. Approximately 110 participants initially participated in the cash balance plan but were subsequently retroactively returned into Part A pursuant to the *Depenbrock* decision. Because these individuals will receive their entire benefit under Part A, they will not be affected by the A+B remedy.

9. Former Tier 1 participants, i.e., 2% formula participants, who were rehired after December 31, 2000 were already entitled to an A+B remedy under the terms of the Plan. We have identified approximately 320 participants who fall into this category.

10. There are approximately 400 of the 27,415 individuals whose data we have yet to analyze to determine the effect, if any, of an A+B remedy on their benefit. These individuals are not part of the analysis described below. However, approximately 150 of these individuals are pre-retirement deaths for whom we would expect the current cash balance plan to provide a more valuable benefit. The remaining 250 individuals are primarily Part A New Formula participants with limited early retirement subsidy and generally smaller opening account balances..

11. To determine the impact of the A+B remedy, benefits under the Plan before and after the A+B remedy were valued as of a "measurement date." For participants that have been paid their Part B benefit, the measurement date is the date their Part B benefit commenced. For other participants who have yet to receive payment, the measurement date was April 1, 2008. Benefits from the Plan with and without the A+B remedy were valued separately. The value of the Plan benefits under an A+B approach *minus* the value of the existing Plan benefit was determined to be the value of the remedy for that participant.[1]

12. All values determined as of measurement dates that were earlier than April 1, 2008 were projected forward to April 1, 2008 at a rate of interest equal to the "Applicable Interest Rate" defined by the Plan.

13. To determine the value as of June 13, 2008 (the date of the Judgment), the amounts determined as of April 1, 2008 were then increased with interest at a rate of interest

---

[1] There is one exception. Specifically, for some participants who had already received a benefit under Part B, the A+B remedy provided a *lower* benefit than the benefit the participant already received. For those individuals, the value of the A+B remedy was assumed to be zero (and not a negative number)

3

equal to the "Applicable Interest Rate" defined by the Plan.

14. For purposes of calculating the value of the benefit under the Plan before the A+B remedy (i.e., under the actual terms of Part B), the benefit was valued as a lump sum equal to the greater of (a) the accumulated account balance as of the measurement date and (b) the lump sum value, as of the measurement date, of the pension accrued under the under the Part A formula for service earned before conversion, i.e., the minimum benefit. For purposes of measuring (b), the accrued Part A formula pension was assumed to commence at the participant's Normal Retirement Age in the form of a single life annuity, and was valued using the Applicable Interest Rate and Applicable Mortality Table in the Plan.[2]

15. For purposes of calculating the value of the benefit under the Plan after the A+B remedy (i.e., under the Court's remedy order), the value was determined to be the sum of (a) the cash balance benefit credits earned after conversion and accumulated with interest at the cash balance interest crediting rate defined by the Plan and (b) the lump sum value of the pension accrued under the under the Part A formula for service earned before conversion.

16. For purposes of measuring the value of the Part A formula benefit accrued as of the cash balance conversion date, the accrued Part A formula pension was assumed to commence at the later of (a) age the participant would be first eligible to commence the annuity pension benefit under the terms of Plan Part A based on the participant's age and vesting service as of the

---

[2] Note: for some participants, the actual (b) benefit could include a subsidized early retirement benefit value. Nevertheless, for purposes of calculating the value of (b) in this analysis, only the Normal Retirement Age annuity was used. As a result, this analysis understates the value of the actual Part B benefit (before the Court ordered A+B remedy) for some participants and therefore increases the difference between the value of the benefit before and after the A+B remedy. The only exception to this rule would be that we included the early retirement subsidy in the minimum benefit for people that have already been paid their benefit in the form of an annuity after they became eligible for the subsidy.

4

measurement date and (b) the age of the participant as of the measurement date.[3] Thus, the benefit valued for a participant who could elect a subsidized early retirement was the subsidized early retirement benefit. The accrued Part A formula pension was assumed to be payable in the form of a single life annuity which included a life annuity equivalent of the social security supplement. For purposes of measuring the Part A formula benefit value, the Applicable Interest Rate and Applicable Mortality Table in the Plan were used to determine the lump sum value of those annuity payments as of the measurement date.

17. Under the assumptions and methods described above, the total value of the A+B remedy is estimated to be $68 million as of June 13, 2008. Of this total, $27 million is attributable to participants who have commenced benefits (either a lump sum or annuity), $24 million is attributable to non-paid participants who were still actively employed as of April 1, 2008, and $17 million is attributable to non-paid participants who are no longer employed as of April 1, 2008.

18. Only a limited portion of this remedy would be payable as of the date of the Judgment. Nothing would be due immediately to participants who have not commenced their benefits. Therefore, the maximum value of the amount immediately due from the plan because of the remedy is the $27 million estimated remedy cost for paid participants. The portion of this amount that could be due immediately will be related to the benefit form the remedy payment assumes.

19. Roughly $2 million of the $27 million estimated remedy cost for paid participants

---

[3] When determining the earliest age at which the participant could commence their Part A formula pension under the terms of Plan Part A, active employees were assumed to have terminated on the measurement date. It would be possible for additional service to produce a greater subsidy for a small number of participants receiving the old formula benefit under Part A. The additional value expected if we changed this assumption was determined to be minimal.

is attributable to early retirement subsidies on the Part A formula benefit that participants cannot commence right away because they have not met the eligibility requirements for that benefit.

20. Of the rest ($25 million), the amount due as of the date of the Judgment varies depending on whether the benefits already paid to these participants are attributed to those participants' Part B benefits, i.e., cash balance pay and interest credits, or to those participants' Part A benefits.

21. One possible interpretation of the Court's order would require treating the benefits previously paid to these participants as being attributable first to the Part A benefit to which these participants are entitled under the Court's A+B remedy, even though Part A did not have a lump sum option and even though many participants who have been paid a benefit under Part B would not be eligible to commence a Part A benefit based on their age and/or service. Under this approach, the full $25 million would be a cash balance benefit that is payable as of the date of the Judgment to these participants as a lump sum.

22. Alternatively, one could treat the benefits previously paid to these participants as being attributable first to the Part B cash balance benefit to which these participants are entitled. If so, any remedy payments due as of the date of the Judgment would be annuity payments under the Part A formula. Under this approach, approximately $7 million of the $27 million estimated remedy value for paid participants is attributable to participants who are <u>currently eligible</u> to commence a benefit under Part A. (That is because although participants could elect to receive their Part B benefit at any age upon termination of employment, Part A benefits are only payable at age 65, or as early as age 55 for certain participants). However, that $7 million represents the

current value of the full past and <u>future</u> stream of annuity payments due to those participants. Only approximately 33% of that $7 million value, or approximately $2.3 million, is attributable to annuity payments that would be due as of the date of the Judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  11  day of July, 2008.

Matthew J. Henderson