UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANICE C. AMARA,  individually and on behalf of others similarly situated, | Civil No. 3:01cv2361 (JBA) |
| *Plaintiff*, | |
| *v.* | |
| CIGNA CORPORATION and CIGNA PENSION PLAN, | December 20, 2012 |
| *Defendants*. | |

**MEMORANDUM OF DECISION ON REMEDIES AND CLASS CERTIFICATION**

The facts of this case have been discussed in numerous opinions and need not be repeated here in full detail.[1] Suffice it to say that Plaintiff Janice C. Amara and other similarly situated individuals brought suit against Defendants CIGNA Corporation and the CIGNA Pension Plan (collectively, "CIGNA") challenging the validity of the adoption of a new employee pension plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1022(a), 1024(b), 1054(h). After an extensive bench trial, Judge Mark R. Kravitz found in Plaintiffs' favor, issuing separate opinions determining CIGNA's liability and setting the appropriate remedy. *See Amara v. CIGNA Corp. (Amara I)*, 534 F. Supp. 2d 288 (D. Conn. 2008) (liability decision); *Amara v. CIGNA Corp. (Amara II)*, 559 F. Supp. 2d 192 (D. Conn. 2008) (remedy decision). In determining relief, he ordered that the terms of the CIGNA Plan be reformed, finding legal authority under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). After the Second Circuit

---

[1] A richer factual account is contained in Judge Kravitz's earlier decisions, *Amara v. CIGNA Corp.*, 534 F. Supp. 2d 288 (D. Conn. 2008), and *Amara v. CIGNA Corp.*, 559 F. Supp. 2d 192 (D. Conn. 2008), as well as the Supreme Court's discussion of the case, *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011).

affirmed, the Supreme Court vacated the judgment, holding that ERISA § 502(a)(1)(B) did not provide the Court with the power to reform the terms of the CIGNA Plan. *See CIGNA Corp. v. Amara (Amara III)*, 131 S. Ct. 1866, 1878, 1882 (2011). Although the Supreme Court determined that § 502(a)(1)(B) did not empower the Court to reform the terms of the CIGNA Plan, it also found that "nearby" § 502(a)(3) authorizes equitable forms of relief similar to the remedy Judge Kravitz had entered. *See id.* at 1878–80. However, given that the district court's exclusive reliance on § 502(a)(1)(B) as the basis for relief, *see Amara II*, 559 F. Supp. 2d at 206, the Supreme Court remanded the matter to determine in the first instance the appropriate remedy under § 502(a)(3). *Amara III*, 131 S. Ct. at 1882. The case was subsequently transferred to the undersigned following Judge Kravitz's death.

After remand, the parties briefed the question of what relief was appropriate under ERISA § 502(a)(3). In addition, CIGNA filed a Motion to Decertify the Class [Doc. # 323], requesting that the Court decertify the class if it finds that an equitable remedy is available under ERISA § 502(a)(3). As discussed below, this Court finds that both reformation and surcharge are appropriate equitable remedies that allow it to provide Plaintiffs with the same form of relief that was ordered previously. The Court further finds that it is unnecessary to decertify the class and thus DENIES the pending Motion to Decertify the Class.

As noted in an earlier opinion, the remedy issues presented here are as complex as they are important to the American workplace. While the Court is grateful for the Supreme Court's thoughtful opinion in this case, and heavily relies on it, there remains lingering uncertainty about the proper resolution of many of these issues. Previously, the

district court's judgment was stayed *sua sponte* to allow the parties to pursue an appeal to the Second Circuit, in light of this uncertainty and the high stakes for CIGNA and its employees. *See Amara II*, 559 F. Supp. 2d at 195. The Court will again *sua sponte* stay this judgment, based on the same reasoning, to allow the parties to seek guidance from the Second Circuit.

## I.

At the outset, the Court will review the essential facts, its prior opinions, and the Supreme Court's decision in order to frame the legal issues that are relevant on remand.

This suit arises from revisions made to CIGNA's pension plan in 1998. Prior to that year, CIGNA offered its employees a defined-benefit plan—an annuity in an amount determined by the employee's salary and duration of employment. In keeping with past nomenclature, the Court refers to CIGNA's pre-1998 defined-benefit plan as "Part A." In November 1997, CIGNA notified its employees via newsletter that Part A would last through year's end, to be replaced in the new year by an "account balance plan," which the Court refers to as "Part B." Under Part B, retiring employees receive a lump-sum payment based on annual contributions from CIGNA that earn interest. As part of the transition from Part A to Part B, CIGNA promised that an employee's accrued benefits under Part A would be converted into an equivalent contribution to the employee's individual cash-benefit account. CIGNA guaranteed that each employee upon retirement would receive the "greater of A or B"—*i.e.*, the higher of an employee's guaranteed annuity or the benefits accrued under the cash balance plan.

Ms. Amara, on behalf of approximately 25,000 beneficiaries, sued, alleging, *inter alia*, that CIGNA's 1998 plan revisions violated ERISA §§ 1022(a), 1024(b), and 1054(h).

Judge Kravitz conducted a seven-day bench trial and found CIGNA liable for inadequate disclosures relating to the conversion from Part A to Part B. *See Amara I*, 534 F. Supp. 2d at 329–54. Specifically, he found that CIGNA's November 1997 Newsletter materially misled employees in violation of ERISA § 204(h), *see id.* at 344, and that CIGNA included other materially misleading statements in its Summary of Material Modifications ("SMMs") and Summary Plan Descriptions ("SPDs"), *see id.* at 351. Having found CIGNA's disclosures and notices statutorily defective, the Court applied the Second Circuit's "likely harm" standard, a "presumption of prejudice in favor of the plan participant after an initial showing that he was likely to have been harmed." *See id.* at 352 (quoting *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 113–14 (2d Cir. 2003)). As the evidence at trial raised the *Burke* presumption of actual prejudice, and because CIGNA had failed to rebut this presumption as to individual Plaintiffs, Judge Kravitz concluded that a classwide finding of liability was appropriate.  *See id.* at 352–54; *see also Amara II*, 559 F. Supp. 2d at 197 ("[T]he Court believes that its [*Amara I*] holding unambiguously applies to the entire Class, and that no individual issues remain with respect to likely prejudice/harmless error.").

    In a second decision setting remedies, Judge Kravitz ordered "A + B" relief, whereby the CIGNA Plan would provide class members with "all accrued Part A benefits in the form those benefits were available under Part A, plus all accrued Part B benefits in the form those benefits are available under Part B." *Amara II*, 559 F. Supp. 2d at 214.  He set A + B relief based on the following determinations. First, he found that no individual issues remained and that classwide relief was appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure. *See id.* at 200, 203. Second, he concluded that ERISA

§ 502(a)(1)(B) authorized A + B relief, expressly declining to decide whether he could order the same or similar relief under ERISA § 502(a)(3). *See id.* at 206 ("[T]he Court need not, and does not, decide whether Plaintiffs could obtain relief under § 502(a)(3)."). Third, Judge Kravitz determined, in his equitable discretion, that reforming the CIGNA Plan to provide A + B benefits was an appropriate remedy for the misrepresentations in CIGNA's notices. *See id.* at 214.

After this judgment was affirmed by the Second Circuit, the Supreme Court granted certiorari on the question of "whether a showing of 'likely harm' is sufficient to entitle plan participants to recover benefits based on faulty disclosures." *Amara III*, 131 S. Ct. at 1876. In resolving this question, the Supreme Court announced three principles of law. First, the Supreme Court held that it was error to have relied on ERISA § 502(a)(1)(B) to reform the CIGNA Plan. *See id.* at 1876–78. Second, "given the likelihood that, on remand, [the District Court would] turn to and rely upon" ERISA § 502(a)(3), the Supreme Court considered whether a remedy similar to that entered was authorized as "appropriate equitable relief" pursuant to ERISA § 502(a)(3), concluding that substantially similar relief could be obtained under § 502(a)(3). *Id.* at 1878, 1880. Third, turning to the legal standard for prejudice, the question on which certiorari was granted, the Supreme Court declared that "the standard of prejudice must be borrowed from equitable principles, as modified by the obligations and injuries identified by ERISA itself," leaving it to the District Court "to conduct that analysis in the first instance . . . ." *Id.* at 1871, 1882.

The Supreme Court did not, however, disturb the underlying findings of fact regarding CIGNA's notice violations. *See id.* at 1882 ("We are not asked to reassess the

evidence."). Nor did the Supreme Court suggest that the remedies chosen were improper in any respect aside from the fact that they were ordered pursuant to ERISA § 502(a)(1)(B). Thus, there seems to be little reason why this Court should depart from the relief previously ordered, in the event that it finds that the same relief may be granted pursuant to ERISA § 502(a)(3) and consistent with Rule 23 of the Federal Rules of Civil Procedure. Neither party has put forward compelling reasons why, as a matter of remedial discretion, this Court should alter the form of relief granted four years ago. *See Amara II*, 559 F. Supp. 2d at 206–19 (fashioning appropriate remedies for each of CIGNA's ERISA violations).

Accordingly, the primary questions on remand are: (1) whether ERISA § 502(a)(3) empowers this Court to order CIGNA to provide class members with A + B benefits; and (2) whether Plaintiffs have demonstrated on a classwide basis that they are entitled to the requested relief.

## II.

ERISA § 502(a)(3) creates a cause of action for a "beneficiary . . . to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter . . . ." As Plaintiffs are beneficiaries and because defects in CIGNA's notices have been found to have violated ERISA, the only disputed question regarding the applicability of ERISA § 502(a)(3) is whether ordering CIGNA to provide Plaintiffs with A + B benefits constitutes "other equitable relief" within the meaning of the statute. Whether a particular remedy qualifies as "equitable relief" under ERISA § 502(a)(3) is a two-part inquiry into (1) the general character of the relief and (2) the basis for the plaintiff's claim. *See Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 364 (2006)

("While [the plaintiff's] case for characterizing its relief as equitable thus does not falter because of the nature of the recovery it seeks, [the plaintiff] must still establish that the basis for its claim is equitable."); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) ("[W]hether [a remedy] is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought." (quotation marks omitted)). Thus, this Court must consider (A) whether surcharge, reformation, and estoppel are, as a general matter, remedies available under § 502(a)(3); and (B) whether, on the facts before the Court, Plaintiffs can establish an equitable basis for surcharge, reformation, or estoppel.

## A.

The remedies decision expressed doubt about whether Plaintiffs could obtain A + B relief pursuant to § 502(a)(3), noting that several Supreme Court opinions had "severely curtailed the kinds of relief that are available under § 502(a)(3)." *Amara II*, 559 F. Supp. 2d at 205 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993), *Knudson*, 534 U.S. 204, and *Sereboff*, 547 U.S. 356).[2] The Supreme Court, however, found this concern "misplaced," concluding that ERISA § 502(a)(3) "authorizes forms of relief similar to those that the court entered." *Amara III*, 131 S. Ct. 1871, 1878. According to the Supreme

---

[2] Judge Kravitz also expressed misgivings about ordering relief under § 502(a)(3) when it could otherwise provide relief under § 502(a)(1)(B), observing that "the Second Circuit has clearly held that relief is not available under § 502(a)(3) where the same relief is available § 502(a)(1)(B)." *Amara II*, 559 F. Supp. 2d at 192; *see also Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006) (noting that the Supreme Court "has consistently disfavored the expansion of the availability of equitable relief where remedies at law are sufficient" and citing *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)). This concern was obviated when the Supreme Court held that A + B relief could not be ordered under § 502(a)(1)(B). *See Amara III*, 131 S. Ct. at 1878.

Court, reformation, equitable estoppel, and surcharge are all "distinctively equitable" remedies available under § 502(a)(3), and each "closely resembles" the A + B relief ordered by Judge Kravitz. *Id.* at 1879.

Ordinarily such a pronouncement would settle the question. Here, however, further analysis is appropriate to address the argument raised by Justice Scalia in his concurrence, and reiterated by CIGNA (*see* Defs.' Mem. of Law [Doc. # 323-1] at 2 n.2), that the Supreme Court's pronouncement about the availability of surcharge, reformation, and estoppel under ERISA § 502(a)(3) is "blatant dictum." *See Amara III*, 131 S. Ct. at 1884 (Scalia, J., concurring). Indeed, Justice Scalia specifically urged caution: "The Court's discussion of the relief available under § 502(a)(3) and *Mertens* is purely dicta, binding upon neither us nor the District Court. The District Court need not read any of it—and, indeed, if it takes our suggestions to heart, we may very well reverse." *Id.* at 1876.

Courts citing *Amara III* have tended to agree that the Supreme Court's discussion of the availability of surcharge, reformation, and estoppel under § 502(a)(3) is dicta. *See, e.g., Sergent v. McKinstry*, 472 B.R. 387, 412 (E.D. Ky. 2012); *Biglands v. Raytheon Emp. Sav. & Inv. Plan*, 801 F. Supp. 2d 781, 786 (N.D. Ind. 2011); *N. Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare*, No. 4:09-CV-2556, 2011 WL 5325785, at *9 (S.D. Tex. Nov. 3, 2011). Without dwelling on the question of the formal scope of the Supreme Court's holding, this Court will follow clear statements of law issued recently by the Supreme Court, unless applying a rule announced in dicta to the facts before it would

lead to a plainly erroneous result.[3] As the Fourth Circuit described it, "[e]ven assuming for the sake of argument that [*Amara III*'s discussion of § 502(a)(3) is dicta], we cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court."  *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012); *see also Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 108 (2d Cir. 2010) (following Supreme Court dicta as persuasive authority).  This is particularly so where, as here, the legal pronouncement was made in the very case before the Court on remand.

In any event, this Court agrees that surcharge, reformation, and estoppel are remedies generally available under § 502(a)(3), even if the practical result of entering such relief is a monetary payment. *See Amara III*, 131 S. Ct. at 1880 ("[T]he fact that this relief takes the form of a money payment does not remove it from the category of traditionally equitable relief."). In *Mertens*, the Supreme Court defined as "equitable relief" under § 502(a)(3) "those categories of relief that were *typically* available in equity." 508 U.S. at 256 (emphasis in original).  The battery of treatises and pre-merger cases cited by the Supreme Court, *see Amara III*, 131 S. Ct. at 1879–80, make clear that surcharge, reformation, and estoppel were typically available in equity, thus satisfying the *Mertens* test.

---

[3] It can be noted that if the Supreme Court's discussion in Section II.B of ERISA § 502(a)(3) is dicta, so too is the Supreme Court's analysis of the required showing of prejudice in Section III. And this second legal issue—the requisite standard of harm—was the question on which the Supreme Court granted certiorari in the first place. *See Amara III*, 131 S. Ct. at 1876.  Put differently, the Supreme Court's legal conclusions made regarding § 502(a)(3) were logically necessary for it to answer the question on which it granted certiorari. This pronouncement was not an offhand rumination about a peripheral legal question, but the considered analysis of an issue of law.

**B.**

The Court now turns to whether surcharge, reformation, or estoppel is available in this case, such that CIGNA may be ordered to provide Plaintiffs with A + B benefits pursuant to § 502(a)(3). An affirmative answer to this question requires Plaintiffs to demonstrate an adequate basis to obtain the requested equitable relief, drawing on "case law from the days of the divided bench." *Sereboff*, 547 U.S. at 363–64. As discussed below, the Court finds that both surcharge and reformation are available on the facts of the case, because Plaintiffs can establish the material "conditions that equity attached to" both forms of relief. *Knudson*, 534 U.S. at 216. Having found both reformation and surcharge, it is unnecessary for the Court to address whether estoppel is also available.[4]

### 1. Reformation

In considering whether Plaintiffs can establish the equitable prerequisites for reformation, a threshold question is presented: reformation of *what*? Equity courts applied different standards when the writing to be reformed was a contract or a trust. As the Ninth Circuit observed, "[i]t is unclear whether [a court] should analyze reformation in the context of trust law or contract law because retirement plan documents are similar

---

[4] Even if the Court were to find estoppel, it is unlikely that Plaintiffs could obtain class recovery on that basis. As Justice Scalia observed, "CIGNA admits that respondents might be able to recover under § 502(a)(3) pursuant to an equitable estoppel theory, but it presumably makes this concession only because questions of reliance would be individualized and potentially inappropriate for class-action treatment." *Amara III*, 131 S. Ct. at 1885 (Scalia, J., concurring).

to both trusts and contracts." *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162,

1166 (2012).[5]

CIGNA argues that the Court should apply the standard for trust rather than

contract reformation, noting that the Supreme Court observed that ERISA generally

treats plans as trusts. (*See* Defs.' Mem. of Law at 25 (quoting *Amara III*, 131 S. Ct. at

1879).) This Court disagrees with CIGNA for several reasons. First, in discussing how the

A + B remedy might be regarded as reformation, the Supreme Court repeatedly referred

to *contract* reformation. *See Amara III*, 131 S. Ct. at 1879–81. Second, notwithstanding

the centrality of trust law within the scheme of ERISA, *see Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 110 (1989), the economic reality is that the CIGNA Pension Plan

arises out of employment contracts with Plaintiffs; the employees' retirement benefits are

one component of a broader compensation package. As such, the Court believes that

contract reformation is as or more appropriate than trust reformation. *See* Restatement

(Third) of Trusts § 12 cmt. a (2003) ("Where the owner of property receives

consideration for making a declaration of trust . . . the rules governing . . . reformation . . .

are the rules applicable to contracts . . . ."). Finally, CIGNA has not identified a

pre-merger case that demonstrates that a court of equity, presented with an analogous

trust-contract hybrid, would have applied the standards of trust reformation, rather than

contract reformation. Without a clear historical analog for guidance,[6] the Court

---

[5] The *Skinner* court addressed the uncertainty by applying both standards, finding that Plaintiff could not succeed under either framework. *Skinner*, 673 F.3d at 1166.

[6] Of course, the way compensation is structured in the American workplace has changed dramatically since the merger of law and equity. *See* Frank R. Dobbin, *The Origins of Private Social Insurance: Public Policy and Fringe Benefits in America, 1920–*

11

concludes that Plaintiffs may establish their entitlement to reformation under either theory. Since Plaintiffs and the Secretary of Labor as *amicus curiae* address most of their arguments to contract reformation, the Court will too. (*See* Pls.' Br. [Doc. # 317] at 36–40; Br. for Sec'y of Labor [Doc. # 329] at 15–19.)

Equity courts traditionally had the power to reform contracts that failed to express the agreement of the parties, owing either to mutual mistake or to the fraud of one party and the mistake of the other. *See Amara III*, 131 S. Ct. at 1881 ("Equity courts . . . would reform contracts to reflect the mutual understanding of the contracting parties where fraudulent suppressions, omissions, or insertions materially affected the substance of the contract, even if the complaining party was negligent in not realizing its mistake . . . ." (quotation marks, citations, and alterations omitted)); *see also Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2005) (recognizing "fraud, mutual mistake or terms violative of ERISA" as bases for reformation). A plaintiff must prove mistake and fraud by clear and convincing evidence. *See* 2 Dan Dobbs, *Law of Remedies* (2d ed. 1993) § 11.6(1) at 743. Here, Plaintiffs have established a basis for this Court to reform the CIGNA Pension Plan due to CIGNA's fraud paired with Plaintiffs' unilateral mistake.[7]

---

*1950*, 97 Am. J. Soc. 1416, 1417 (1992)  (noting employee welfare programs developed in the 1910s and 1920s, and employee health and pension programs were initiated mostly after the 1920s); Lawrence S. Root, *Employee Benefits and Social Welfare: Complement and Conflict*, 479 The Welfare State in America: Trends and Prospects 101, 102 (1985) ("The current structure of employee benefits in the United States arose in the late 1930s and 1940s.").

[7] Defendants' counsel calls attention to a recently issued opinion that takes a more restricted view of the equitable requirements of reformation. *See Osberg v. Foot Locker, Inc.*, No. 07 Civ. 1358 (KBF), 2012 WL 6062542 (S.D.N.Y. Dec. 6, 2012). In *Osberg*, the court interpreted *Amara III* as superimposing a monolithic requirement of "actual harm"

CIGNA engaged in fraud or similarly inequitable conduct. *See* 3 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 873 at 421 (5th ed. 1941) (stating that while "fraud" has no precise definition in equity, it generally consisted of "obtaining an undue advantage by means of some intentional act or omission that was unconscientious or a violation of good faith"); *see also Tokio Marine & Fire Ins. Co. v. Nat'l Union Fire Ins.*

on any equitable remedy sought under ERISA § 502(a)(3). *See id.* at *6–7 (analyzing reformation and surcharge together). A one-size-fits-all approach, however, does not square with *Amara III*, in which the Supreme Court made clear that the law of equity had no general principle of harm, and that, as such, "to the extent any such requirement [of harm] arises, it is because the specific remedy being contemplated imposes such a requirement." *See Amara III*, 131 S. Ct. at 1881. The requirements vary among estoppel, reformation, and surcharge, and the *Osberg* court applies the "actual harm" requirement too broadly. *Amara III* discusses the "actual harm" requirement only in the context of surcharge. *See id.* ("[J]ust as a court of equity would not *surcharge* a trustee for a nonexistent harm . . . , a fiduciary can be *surcharged* under § 502(a)(3) only upon a showing of actual harm . . . ." (citation omitted and emphasis added)); *id.* at 1881–82 ("[T]o obtain relief by *surcharge* for violations of §§ 102(a) and 104(b), a plan participant or beneficiary must show that the violation injured him or her. But to do so, he or she need only show harm and causation. Although it is not always necessary to meet the more rigorous standard implicit in the words 'detrimental reliance,' actual harm must be shown." (emphasis added)). It is true that the Supreme Court held that the "likely harm" presumption under *Burke* was insufficient to obtain any of the three sought-after remedies—reformation, surcharge, or estoppel—under ERISA § 502(a)(3). *See id.* at 1880–82 ("We need not decide which remedies are appropriate on the facts of this case in order to resolve the parties' dispute as to the appropriate legal standard [, i.e., whether a showing of "likely harm" was sufficient,] in determining whether members of the relevant employee class were injured."). However, this holding—that the *Burke* presumption is insufficient to entitle Plaintiffs to reformation, surcharge, or estoppel—does not imply that reformation and estoppel are subject to an identical "actual harm" requirement that applies to claims of surcharge. Rather, the analytical framework in *Amara III* is clear: a court should look to the rules in equity. And as the Supreme Court indicated, courts of equity "would reform contracts to reflect the mutual understanding of the contracting parties where fraudulent suppressions, omissions, or insertions . . . materially . . . affected the substance of the contract . . . ." *Id.* at 1881 (quotation marks, citations, and alterations omitted).

13

*Co.*, 91 F.2d 964, 966 (2d Cir. 1937) (reformation was appropriate based on one party's unilateral mistake combined with the fact that the court could infer that the other party knew of the mistake, knowledge which alone qualified as the "inequitable conduct" necessary to reform the contract). CIGNA's deficient notice led to its employees' misunderstanding of the content of the contract, and CIGNA did not take steps to correct their mistake. Instead, CIGNA affirmatively misled and prevented employees from obtaining information that would have aided them in evaluating the distinctions between the old and new plans. *See Amara I*, 534 F. Supp. 2d at 343 (finding that CIGNA informed its benefits department and consulting company *not* to provide benefits comparisons under the old and new plans). Furthermore, CIGNA sought and obtained an advantage from its inequitable actions. *See id.* (finding that CIGNA intentionally and successfully avoided adverse employee reactions, which had caused other employers to modify their intended cash balance plans).

As a result of CIGNA's fraud, its employees were mistaken as to their retirement benefits. *See* 3 Pomeroy § 839, at 284–85 ("Mistake," to courts of equity, meant "an erroneous mental condition, conception, or conviction, induced by ignorance, misapprehension, or misunderstanding of the truth, but without negligence, and resulting in some act or omission done or suffered erroneously by one or both the parties to a transaction, but without its erroneous character being intended or known at the time."). In the context of ERISA plans, mistake is measured by comparing the actual terms of the plan to the baseline of the beneficiaries' objective, reasonable expectations about the scope of benefits provided. *See, e.g.*, *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 819 (7th Cir. 2010) ("ERISA § 502(a)(3) authorizes equitable reformation of a

plan that is shown, by clear and convincing evidence, to contain a scrivener's error that does not reflect participants' *reasonable expectations* of benefits." (emphasis added)); *Int'l Union v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 907 (3d Cir. 1992) (considering what participants "could have reasonably expected," and finding that "plaintiffs' reasonable reliance on the . . . Plan documents would *probably not* have led them to believe that there would be any excess funds remaining upon termination" (emphasis added)). Judge Kravitz previously found that Plaintiffs reasonably believed that Part B would protect the retirement benefits that they had theretofore accrued:

> These statements taken as a whole created a *reasonable expectation* on the part of plan participants that Part B would protect all Part A benefits, including early retirement benefits, in the opening account balance or the Part B protected minimum benefit, and that Part B benefits would begin accruing immediately.

*Amara II*, 559 F. Supp. 2d at 211 (emphasis added); *see also Amara III*, 131 S. Ct. at 1882 (leaving in place this Court's factual findings). Applying the "reasonable expectations" standard for determining whether ERISA plan participants were mistaken as to the terms of Part B, *see Young*, 615 F.3d at 819, the Court concludes that Plaintiffs have made the requisite showing.

In his concurrence, Justice Scalia suggests that ordering reformation on these facts would be inappropriate because it would

> alter the terms of a contract in response to a third party's misrepresentations—not those of a party to the contract. The SPD is not part of the ERISA plan, and it was not written by the plan's sponsor. Although in this case CIGNA wrote both the plan and the SPD, it did so in different capacities: as sponsor when writing the plan, and as administrator when preparing the SPD. ERISA carefully distinguishes these roles, and nothing the Court cites suggests that they blend together when performed by the same entity.

*Amara III*, 131 S. Ct. at 1884–85 (Scalia, J., concurring) (quotation marks and citations omitted). In other words, the Court should not impute the fraud or inequitable conduct committed by CIGNA *as plan administrator* to CIGNA *as employer-sponsor*, and absent this attribution of culpability, CIGNA *as employer-sponsor* lacked the necessary fault for the Court to order reformation of the contract. This Court respectfully disagrees with Justice Scalia that CIGNA's wrongdoing is to be construed as bounded by the statutorily prescribed duties that it was violating. Such a distinction between the roles is artificial where, as here, one party acts as both sponsor and administrator. *See Amara I*, 534 F. Supp. 2d at 331 (finding that CIGNA was a "*de facto* administrator or co-administrator of the Plan for purposes of the disclosures at issue in this case").

CIGNA raises two additional arguments against reformation. First, CIGNA argues that reformation is inappropriate because the CIGNA Pension Plan is a distinct and blameless legal entity and because the Court found violations only of obligations imposed on the plan administrator. (*See* Defs.' Mem. of Law at 24 ("There is no basis for Plaintiffs' request for reformation of the Plan here because the Plan has not done anything wrong.").) This line of argument is unconvincing. Courts do not require a showing that a contract or a trust is itself culpable or liable before ordering the writing reformed, and CIGNA has not articulated why the entity status of the plan makes a material difference.  Second, CIGNA contends that reformation fails because there was no clear agreement aside from that which was embodied in Part B. *See id.* at 27–29. However, the November 1997 Signature Benefits Newsletter, the December 1997 Retirement Program Information Kit, the October 1998 SPD for Part B, and the September 1999 SPD for Part B provide sufficient evidence of the parties' mutual intent

16

that Part B would ensure that plan participants would be guaranteed the full amount of their accrued Part A benefits, including early-retirement benefits, and that Part B benefits would begin accumulating immediately. *See Amara II*, 559 F. Supp. 2d at 211.

In sum, as there was "mistake on one side and fraud or inequitable conduct on the other," *Simmons Creek Coal Co. v. Doran*, 142 U.S. 417, 435 (1892), the Court will reform the CIGNA Pension Plan to accord with the parties' intent—reflected in the November 1997 Newsletter, December 1997 Information Kit, and the SPDs—that the plan participants receive the full value of their Part A benefits, undiminished by wear away and inclusive of their early retirement benefits.  The Court thus orders CIGNA to reform its Plan to provide Plaintiffs with A + B benefits.

## 2. Surcharge

Alternatively, under the doctrine of surcharge, "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *Amara III*, 131 S. Ct. at 1880. As the Ninth Circuit observed—and consistent with the Supreme Court's statement, above—ERISA beneficiaries can obtain surcharge under either of two distinct theories: (1) to prevent unjust enrichment, an ERISA fiduciary that obtained a benefit through a breach of duty can be ordered to return that benefit to the trust or beneficiaries; or (2) a fiduciary can be surcharged to compensate for damages caused by its breach of duty. *See Skinner*, 673 F.3d at 1167 (analyzing both standards of surcharge independently); *see also* Restatement (Third) of Trusts §100 (2012) (providing that a breaching trustee is chargeable with either the amount of unjust enrichment or of

compensatory losses to the trust).[8] If recovery can be had under both theories, a court should order the "alternative that is more beneficial to the trust and its beneficiaries . . . ." Restatement (Third) of Trusts §100 cmt. a (2012).

Addressing the appropriateness of applying surcharge as an equitable remedy in a comparable situation, the Second Circuit has made clear that surcharge can take the form of make-whole compensation or disgorgement of ill-gotten profits:

> At common law, an accounting surcharging a trustee for breach of his fiduciary duty was a readily available remedy. A trustee was subject to surcharge for loss, destruction, or diminution in value of the trust property if he failed to exercise the requisite skill and care . . . . If a trustee was acting in his own interest in connection with performing his duties as a trustee, he was held accountable for *any loss to the estate or any profit he made*, even if the transaction was fair and reasonable. Further, trustees have been surcharged where they have not personally profited from their breach, in situations where they have either negligently or knowingly permitted third parties to benefit from the trust property. For a trustee's account to be surcharged, he need not be guilty of fraud or intentional wrongdoing, but simply have failed to discharge a duty required by law.

*Morrissey v. Curran*, 650 F.2d 1267, 1282 (2d Cir. 1981) (emphasis added). The Second Circuit continued, "the same general rules of surcharge do apply to other fiduciaries. . . . [W]e see no reason not to permit a surcharge, when warranted by the facts, against one occupying any fiduciary status." *Id.* (citations omitted) (citing cases).

As discussed below, the Court finds that CIGNA may be surcharged on the basis of either a make-whole or unjust-enrichment theory.[9]

---

[8] Functionally, the difference between these two variations of surcharge is who gets returned to their *status quo ante* position. Proceeding based on unjust enrichment returns the fiduciary to its pre-breach baseline, while the compensatory version returns the trust estate or beneficiaries to their baseline.

### a. Make-Whole Relief

As equity courts had the authority to provide beneficiaries with make-whole relief by surcharging a fiduciary that breached its duties for any losses caused by its breach, *see Amara III*, 131 S. Ct. at 1880, the question is whether Plaintiffs can establish that they have a viable basis for make-whole surcharge. *See Sereboff*, 547 U.S. at 363–64.

To begin with, the Court must grapple with CIGNA's argument that surcharge is unavailable because the only type of actionable harm that surcharge may redress is harm to a trust itself, here the ERISA plan. (*See* Defs.' Mem. of Law at 16-18.) The disclosure

---

[9] As a threshold matter, the Court disagrees with CIGNA's contention that Plaintiffs waived their ability to request surcharge as an equitable remedy based on representations they made in a 2006 brief and on their failure to argue surcharge before this and other courts. The burden is on CIGNA to demonstrate waiver, *see Meacham v. Atomic Knolls Power Lab*, 627 F. Supp. 2d 72, 76 (N.D.N.Y. 2009), and the Court finds that CIGNA has not met this burden. Initially, CIGNA argued that Plaintiffs waived their ability to request these remedies in their 2006 briefing. CIGNA now argues that Plaintiffs have waived claims for surcharge largely because they failed to identify them in response to Judge Kravitz's request. However, while Plaintiffs fail to ask for surcharge by name, their requests on all three counts are requests for "make-whole" monetary relief owed them because of CIGNA's errors, which is essentially a request for surcharge. The fact that Plaintiffs did not request surcharge by name is of small import, especially given that case law at the time generally disfavored equitable remedies. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 143 (1967). Although Plaintiffs could have been more specific, there is nothing in their brief to the Court that demonstrates their "*intentional relinquishment* of a known right"—the standard for determining when a claim was waived. *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 295 (2d Cir. 2011) (emphasis in original).  Second, CIGNA argues that Plaintiffs have waived their right to raise such claims based on their failure to argue them before this and other courts. However, CIGNA offers no evidence that Plaintiffs ever intended to relinquish their right to plead surcharge. Given the Court's equitable power and the state of the case law at the time of Plaintiffs' actions, the Court interprets Plaintiffs' silence on the subject forgivingly and finds that CIGNA has not conclusively demonstrated that Plaintiffs knowingly waived their ability to claim surcharge.

violations, CIGNA insists, did not diminish the plan's assets, and therefore cannot serve as the substantive basis for surcharge. CIGNA is correct that the archetypal surcharge redressed damage to trust assets attributable to a trustee's mis- or non-feasance (*see* Defs.' Mem. of Law at 18 (citing seven such cases)). However, courts also surcharged trustees for deterrence purposes, even if their breaches caused no harm to their respective trusts. *See* George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 861, at 5 (2d ed. 1995) ("In some cases the object in assessing damages is to deter trustees from the commission of breaches of trust even though the trust itself has suffered no loss."); 2 Scott on Trusts § 170.25, at 1387 (3d ed. 1967); *cf. Lund v. Albrecht*, 936 F.2d 459, 464 (9th Cir. 1991) (requiring an accounting of profits for fiduciary breach, even though there was no loss). In the end, the Court cannot agree that a loss to trust assets is a prerequisite to surcharge, because such a reading cannot be squared with the clear language in *Amara III* that "[t]o obtain relief by surcharge for violations of §§ 102(a) and 104(b), a plan participant or beneficiary must show that the violation injured him or her." 131 S. Ct. at 1881–82.[10]  It is challenging to even imagine a scenario where a violation of ERISA

---

[10] The Court is also unpersuaded by CIGNA's argument that allowing surcharge for any harm caused by a fiduciary would render superfluous § 502(a)(2), which provides a cause of action against fiduciaries, incorporating the standard of liability in ERISA § 409, 29 U.S.C. § 1109. Even the most expansive interpretation of § 502(a)(3) would not render ERISA § 502(a)(2) wholly superfluous, as § 502(a)(2) authorizes suits by the Secretary, while § 502(a)(3) does not. Some degree of conceptual overlap does not render the Court's construction impermissible. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007); *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996). If anything, the surplusage argument cuts the other way: insofar as § 502(a)(2) addresses a fiduciary's liability to the plan itself, *see Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993) ("*Russell* . . . bars plaintiffs from suing under [§ 502(a)(2)] because plaintiffs are seeking damages on their own behalf, not on behalf of the Plan." (citing *Mass. Mut. Life Ins. Co. v. Russell*,

§§ 102(a) or 104(b) would by itself lead to the type of harm to trust assets that CIGNA asserts is a necessary prerequisite to surcharge. Thus, the Supreme Court clearly contemplates that surcharge is available under § 502(a)(3) even absent a loss to the ERISA plan itself.

The Supreme Court made clear that make-whole surcharge is available "only upon a showing of actual harm—proved . . . by a preponderance of the evidence." *Id.* at 1881. The Supreme Court further explained that "actual harm may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust-law antecedents." *Id.* As Judge Bates observed, the "actual harm" standard is not exactly a model of clarity. *See Clark v. Feder Semo & Bard, P.C.*, Civil Action No. 07-470 (JDB), 2012 WL 3340745, at *32 (D.D.C. Aug. 15, 2012) ("The distinctions between 'actual harm,' 'detrimental reliance,' and 'injury' are not obvious."). This Court reads the phrase "actual harm" to mean simply those losses (or harms or injuries) that a plaintiff-beneficiary can establish were caused by the fiduciary breach. *See Amara III*, 131 S. Ct. at 1881 (a beneficiary "need only show harm and causation"). Thus, the key questions are (1) what standard of causation is required to obtain make-whole surcharge, and (2) whether Plaintiffs have made the requisite showing.

Starting with the appropriate standard of causation, the Supreme Court clarified that detrimental reliance is sufficient but not necessary to demonstrate the requisite

---

473 U.S. 134, 139–44 (1985)), then a sensible interpretation would be to construe the catch-all language in § 502(a)(3) as reaching those categories of direct harm to beneficiaries for which § 502(a)(2) does not afford relief. *See Russell*, 473 U.S. at 150 (Brennan, J., concurring) (noting that because § 502(a)(2) provides remedies for the plan, "beneficiaries accordingly must look elsewhere in ERISA for personal relief," and suggesting § 502(a)(3)).

causal link. *See id.* (noting that "equity courts did not insist upon a showing of detrimental reliance" when ordering surcharge, but that "actual harm may sometimes consist of detrimental reliance"). In *Skinner*, the Ninth Circuit adopted a standard of "but for" causation. 673 F.3d at 1167 ("The beneficiary can pursue the remedy that will put the beneficiary in the position he or she would have attained but for the trustee's breach."). The Ninth Circuit found the necessary causation lacking, because the plaintiffs "did not rely on the inaccurate SPD." *Id.* This conclusion—that absent a showing of reliance, a beneficiary has not established factual causation—seems inconsistent with Supreme Court's statements about detrimental reliance. *See Clark*, 2012 WL 3340745, at *32 (noting that it "is difficult to reconcile [the Ninth Circuit's] conclusion with [*Amara III*'s] statement that employees may have been 'injured . . . even if they did not themselves act in reliance on summary documents'" (quoting 131 S. Ct. at 1881)).  The Ninth Circuit also rejected the argument that the issuance of an inaccurate SPD was itself a compensable harm, reasoning that this "interpretation would render the [plan administrator] strictly liable for every mistake in summary documents." *Skinner*, 673 F.3d at 1167; *accord Clark*, 2012 WL 3340745, at *32. In *Clark*, the district court applied what appeared to be a standard of but-for causation, but, in denying the plaintiff's claim, the court assiduously avoided basing its reasoning on the fact that the plaintiff admitted to not relying on the SPD. *See Clark*, 2012 WL 3340745, at *33 ("[The plaintiff] candidly admitted that she did not rely on [the SPD] for any information. That alone would not be enough to preclude recovery, but it certainly does not help her case."); *id.* at *34 ("[I]t is hard to believe that [the plaintiff] was in a position to do anything with that information that would have made a difference, and hence hard to conclude that she has even

articulated a viable theory of how she was harmed by the inadequate disclosure."). Finding the reasoning of *Clark* persuasive and observing that some notion of factual cause is inherent in the notion of make-whole relief, the Court will apply a standard of but-for (or factual) causation.[11]

Considering what this causation inquiry will involve in cases such as this, at a minimum, the inquiry will entail considering what would have happened had CIGNA's notices not been materially misleading.  In essence, the Court must imagine a counterfactual world in which CIGNA issued valid notices and disclosures, and then, taking account of the various factors (workplace dynamics, the materiality of the information, the stickiness of wages, etc.), to consider whether it was more likely than not in this conjured world that Plaintiffs would not have been harmed. The practical effect of the inherent difficulty of this causal inquiry is that the burden of proof matters a great deal.

A plaintiff-beneficiary seeking surcharge bears the burden of proving that the defendant-trustee breached its fiduciary duty. *See Estate of Stetson*, 345 A.2d 679, 690 (Pa. 1975). However, once a plaintiff establishes that the fiduciary breached its duty and that the plaintiff suffered a "related loss," the burden to disprove causation shifts to the trustee. *See id.* ("When a beneficiary has succeeded in proving that the trustee has committed a breach of duty and that a related loss has occurred, we believe that the

---

[11] Plaintiffs argue that but-for cause is not the appropriate standard, raising a host of alternatives, none of which persuade the Court. Plaintiffs contend that this Court should either import the standards developed in cases on securities disclosures (*see* Pls.' Br. at 52) or use proximate cause but not factual cause (*see id.* at 57). The Court agrees only with the proposition that the materiality of the misstatements is an important factor in analyzing factual causation.

burden of persuasion ought to shift to the trustee to prove, as a matter of defense, that the loss would have occurred in the absence of a breach of duty."); *Branch v. White*, 239 A.2d 665, 674 (N.J. Super. Ct. App. Div. 1968) ("[T]he burden of proof should be on the defaulting trustee clearly to disestablish causal connection between default and loss to the beneficiary, rather than the contrary."); Restatement (Third) of Trusts § 100 cmt. e (2012) ("[W]hen a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach.").  Although courts do not unanimously embrace this rule, *see Whitfield v. Lindemann*, 853 F.2d 1298, 1304–05 (5th Cir. 1988) (noting that "authorities are not in accord" and citing cases), this Court adopts it, finding it consistent both with ERISA's statutory scheme, *see Amato v. W. Union Int'l, Inc.*, 773 F.2d 1402, 1409 (2d Cir. 1985), and with the Second Circuit's inclination to adhere to the way equity courts allocated burdens of proof. *Cf. Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty."); *Mitchell v. Robert De Mario Jewelry*, 361 U.S. 288, 292 (1960) ("[T]here is inherent in the Courts of Equity a jurisdiction . . . to give effect to the policy of the legislature.").

Based on the foregoing, the Court concludes that to evaluate a make-whole surcharge claim under § 502(a)(3), it should first consider whether Plaintiffs have met their burden of establishing (1) that CIGNA breached its fiduciary duty, and (2) that Plaintiffs suffered a "related loss," *see Estate of Stetson*, 345 A.2d at 690. If the Court determines that Plaintiffs have met their initial burden, it must decide if CIGNA can demonstrate that "the loss would have occurred in the absence of a breach of duty." *Id.*

Judge Kravitz previously found that CIGNA was the fiduciary responsible for the defective disclosures at issue. *See Amara I*, 534 F. Supp. 2d at 331; *see also Amara III*, 131 S. Ct. at 1884. Plaintiffs have also demonstrated that a "related loss" occurred, because, *inter alia*, Plaintiffs' retirement benefits were diminished by wear away, and he found that "CIGNA's SMM and SPDs were deficient . . . [because] the disclosures failed to indicate to employees the possibility of wear away and the effect wear away could have on benefit accruals." *Amara II*, 559 F. Supp. 2d at 211.

As Plaintiffs have met their burden, CIGNA must demonstrate that its fiduciary breach was not a factual cause of Plaintiffs' diminished retirement benefits. However, CIGNA has not convinced the Court that, had its disclosures been proper, Plaintiffs would have still suffered the same losses.  First, CIGNA has not demonstrated that a critical mass of Plaintiffs already knew about the potential for wear away, that all of their accrued Part A benefits might not preserved in the opening balance in Part B, or that the accrual rates under Part A and Part B were not "roughly equivalent." *See Amara I*, 534 F. Supp. 2d at 342–44 ("CIGNA employees suffered from the lack of accurate information in CIGNA's disclosures, and CIGNA was aware of this fact."). *Cf. Clark*, 2012 WL 3340745, at *33 (finding no causation where the plaintiff-beneficiary already knew the information that should have been disclosed). Second, Plaintiffs have shown that some employees read the disclosures looking for harmful changes and that others expected that they would hear through the office grapevine if the notices disclosed detrimental changes to benefits. *See Amara III*, 131 S. Ct. at 1881 ("[Employees who did not read the SPDs] may have thought fellow employees, or informal workplace discussion, would have let them know if, say, plan changes would likely prove harmful."); Ex. 250 to Pls.' Br.

[Doc. # 317-1] (Trial Tr. at 167, 650, 658, 713, 854–55, 881–83). Third, CIGNA has not carried its burden of demonstrating that, had CIGNA issued disclosures that did not materially mislead, CIGNA would have nevertheless implemented the same plan (without, say, offsetting salary concessions). Judge Kravitz previously found that

> CIGNA was aware of the significant reduction in the rate of future benefit accrual . . . , that CIGNA wished to avoid the employee backlash *likely to result* from a thorough discussion of these aspects of Part B, and that CIGNA sought to negate the risk of backlash by producing affirmatively and materially misleading notices regarding Part B.

*Amara I*, 534 F. Supp. 2d at 344 (emphasis added). This Court is inclined to give more weight to CIGNA's *ex ante* assessment of the risk of employee backlash than its *ex post* characterizations made during litigation. CIGNA considered the threat of employee backlash and rollbacks real enough to decide to mislead its employees. *Cf. Clark*, 2012 WL 3340745, at *34 (observing that because the plaintiff had already left her job, she was no longer in a "strong position to negotiate for greater benefits or consider leaving the firm, which are the paradigmatic examples of how an employee might gainfully react to a fully disclosed inadequacy in a retirement plan"). CIGNA thus has not carried its burden of "disestablish[ing the] causal connection" between the violative notices and the Plaintiffs' diminished retirement benefits. *See Branch*, 239 A.2d at 674.

### b. Unjust Enrichment

The Supreme Court observed that equity courts surcharged breaching trustees not only for make-whole relief, but also "to prevent the trustee's unjust enrichment." *Amara III*, 131 S. Ct. at 1880. Despite this observation in Part II.B of its opinion, the Supreme Court's subsequent discussion of surcharge in Part III appears to discuss the standards of

26

*make-whole* surcharge, rather than the criteria for obtaining surcharge premised on unjust enrichment. *See id.* at 1881–82. Without specific guidance about what a plaintiff-beneficiary must demonstrate under § 502(a)(3) to obtain a surcharge based on an unjust enrichment theory, this Court identifies the relevant "equitable principles, as modified by the obligations and injuries identified by ERISA itself." *See id.* at 1882.

Courts of equity exercised a "general superintending power" over trustees, regulating fiduciary conduct with a  broad range of tools.  *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 676 (1819). A chief tool was imposing personal liability for breaches of fiduciary duty. *See, e.g., Mosser v. Darrow*, 341 U.S. 267, 272 (1951) ("The most effective sanction for good administration [of a trust] is personal liability for the consequences of forbidden acts . . . ."). To achieve proper deterrence, courts deprived breaching trustees of ill-gotten profits, even when their actions did not cause a loss to the trust.  *See* George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 861, at 5 (2d ed. 1995); 2 Scott on Trusts § 170.25, at 1387 (3d ed. 1967).

An ERISA fiduciary that breaches its statutory duties may be surcharged for the amount of the benefit to the trustee personally as a result of the breach. *See Skinner*, 673 F.3d at 1167; Restatement (Third) of Trusts § 100(b) (2012) ("A trustee (or a fiduciary) who gains a benefit by breaching his or her duty must return that benefit to the beneficiary."); *see also* Restatement (First) of Restitution § 138 cmt. a (1937) ("[T]he beneficiary is entitled to obtain the benefits derived by the fiduciary through the breach of duty."). Here, CIGNA was the *de facto* plan administrator and breached its fiduciary duty by materially misleading its employees.

As with make-whole surcharge, the key question is about causation. Although the causation standard is substantially the same, it is not identical. In considering make-whole surcharge, the question is whether, but for CIGNA's deficient notices, each Plaintiff would not have received diminished retirement benefits. In weighing unjust-enrichment surcharge, the question is whether, but for CIGNA's deficient notices, CIGNA would not have obtained the cost savings that it did. While these inquiries initially appear to be two sides of the same causal coin, they differ in a critical respect. There may be circumstances, unlike here, where the causal connection between the breach and the beneficiaries' loss is not susceptible to proof through common questions of fact, but where the causal connection between the breach and the fiduciary's gain *can* be proved through common issues of fact. For example, if this Court was incorrect in drawing the classwide factual inference that all employees are entitled to make-whole surcharge because CIGNA failed to carry its burden of disestablishing causation, the result would not be that surcharge was unavailable to all Plaintiffs, but rather that the availability of surcharge would turn on individualized issues, such as whether a particular employee would have demanded a higher salary to offset the diminished retirement benefits. But in this scenario—hopefully merely a hypothetical one—in which the Court's classwide causal inference for make-whole surcharge was legal error, unjust-enrichment surcharge might still be available on a classwide basis. For example, the Court could draw the inference, informed by basic economics, that if CIGNA had disclosed that its pension benefits were less valuable, some proportion of employees would have demanded and received higher salaries. *See* 1 Handbook of Labor Economics 641–42 (1986) (recognizing basic wage-pension tradeoff); *Inland Steel Co. v. NLRB*, 170 F.2d 247, 251–53 (7th Cir.

1948). Of course, it cannot be known with certainty which employees would have received an offsetting raise. But the aggregate offset is susceptible through common proof that draws on comparable firms, considering, for example, whether firms that decreased pension benefits with proper notice also increased salaries.

However, as the Court has already found that it can order A + B relief on the basis of make-whole surcharge, this unjust-enrichment surcharge issue will not be expanded upon, but because the parties will likely seek the guidance of the Second Circuit, it is in the interests of judicial efficiency to make clear that if the Second Circuit disagrees with its application of reformation and make-whole surcharge, this Court is likely to allow a further hearing to determine whether the Court can order surcharge on an unjust-enrichment theory unless foreclosed by the Second Circuit.

### III.

Having determined that reformation and surcharge are available under § 502(a)(3), the Court turns to CIGNA's contention that neither remedy can be ordered on a classwide basis and that the Court must decertify the class. CIGNA argues that the Court must revisit class certification because the commonality and typicality prerequisites in Rule 23(a) are no longer satisfied in the wake of *Amara III*'s rejection of the "likely harm" standard.   CIGNA also argues that surcharge is not available to a (b)(2) class, because the remedy entails non-incidental monetary damages.

### A.

In the initial certification decision, Judge Dominic J. Squatrito found that the class met the commonality and typicality requirements of Rule 23(a) because common questions existed as to whether CIGNA's pension plan violated ERISA and whether

CIGNA's notices and disclosures were misleading. *See Amara v. Cigna Corp.*, No. 3:01cv2361 (DJS), 2002 WL 31993224, at *3 (D. Conn. Dec. 20, 2002). CIGNA contends that, after *Amara III*, no common questions remain and that, as a result, the class must be decertified.

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court offered guidance on the Rule 23(a)(2) commonality requirement, and by extension the typicality requirement.[12] 131 S. Ct. 2541 (2011). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* at 2551 (quotation marks and citation omitted). To meet the strictures of Rule 23(a)(2), the plaintiffs "claims must depend upon a common contention," and that "common contention . . . must be of such a nature that it is capable of classwide resolution." *Id.* CIGNA contends that "no class-wide common proof is available as to all of the elements necessary to impose . . . surcharge or reformation." (Defs.' Mem. of Law at 28.) However, the Court has already concluded that both reformation and surcharge can be resolved classwide. First, the Court determined that reformation is appropriate because in the context of ERISA plans, mistake is measured by the plan participants' reasonable expectations of the plan—an objective standard susceptible to proof through common questions of fact. *See supra* Part II.B.1; *Young*, 615 F.3d at 819. Similarly, the Court found surcharge appropriate based on the

---

[12] As the Supreme Court has repeatedly noted, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 131 S. Ct. at 2551 n.5 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 & n.13 (1982)).

following classwide determinations: (1) that Plaintiffs met their initial burden of establishing that CIGNA breached its fiduciary duty and that Plaintiffs suffered a "related loss"; and (2) that CIGNA had not satisfied its subsequent burden to disestablish the causal connection between its breach and Plaintiffs' related loss. *See supra* Part II.B.2; *Estate of Stetson*, 345 A.2d at 690. Having resolved the issues based on common proof, the Court has little difficulty finding them "capable of classwide resolution." *Dukes*,  131 S. Ct. at 2251.

## B.

Judge Kravitz previously held that certification of Plaintiffs' claim pursuant to § 502(a)(3) was appropriate under Rule 23(b)(2).  *See Amara II*, 559 F. Supp. 2d at 200–01 (considering the appropriateness of (b)(2) certification of both the § 502(a)(1)(B) and § 502(a)(3) claims under the standards set forth in *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147 (2d Cir. 2001), and reasoning that "CIGNA applied the terms of Part B to all class members equally, and CIGNA also sent out identical notices and disclosures to the members of the Class. As a result, any injunctive or declaratory relief ordered by the Court could be implemented as to all class members without regard to the members' individual circumstances, and any monetary relief awarded to Plaintiffs would be as a direct result of the equitable relief ordered."). However, as the Second Circuit recently noted, the Supreme Court's decision in "*Dukes* abrogated *Robinson* as a test for (b)(2) by replacing the predominance standard with the non-incidental standard . . . ." *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 223 (2d Cir. 2012).  Because *Amara II* relied on *Robinson*, the Court must consider the issue afresh in light of *Dukes*. *See Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012) (vacating the

certification of a (b)(2) class even though the district court "properly relied on . . . *Robinson*").

Rule 23(b)(2) provides that a class may be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Although the Supreme Court expressed doubt whether a class seeking monetary damages can ever be certified under (b)(2), its holding was narrower:

> Our opinion in *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 . . . (1994) (per curiam) expressed serious doubt about whether claims for monetary relief may be certified under [Rule 23(b)(2)]. We now hold that they may not, *at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief.*

*Dukes*, 131 S. Ct. at 2557 (emphasis added).  As the Second Circuit observed, *Dukes* instructs that "unless merely 'incidental' to the requested declaratory or injunctive relief, claims for individualized monetary damages preclude class certification under Rule 23(b)(2)." *Haddock*, 460 F. App'x at 29 (citing *Dukes*, 131 S. Ct. at 2557–60); *see also Hecht*, 691 F.3d at 222 ("After . . . *Dukes*, the right to notice and an opportunity to opt out under Rule 23 now applies not only when a class action is predominantly for money damages, but also when a claim for money damages is more than incidental.").  A useful starting point for understanding the non-incidental standard is *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), the decision from which the *Dukes* Court adopted the standard, *see Dukes*, 131 S. Ct. at 2560–61. Incidental damages, according to the Fifth Circuit, are "damages that flow directly from liability to the class *as a whole* on the claims

forming the basis of the injunctive or declaratory relief." *See id.* at 2560 (quoting *Allison*, 151 F.3d at 415) (emphasis in original).  Recovery of such damages

> should typically be concomitant with, not merely consequential to, class-wide injunctive or declaratory relief. Moreover, such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances. Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Allison*, 151 F.3d at 415.

Resolution of the question of whether the form of relief to be ordered entails non-incidental monetary damages may depend on which remedy is ordered—reformation or surcharge.

Reformation will lead to a monetary recovery that is wholly incidental to the relief. In a case very similar to this one and decided after *Dukes*, a district court held a (b)(2) class could seek reformation based on violations of ERISA §§ 104(h) and 102. See *Mezyk v. U.S. Bank Pension Plan*, Nos. 3:09–cv–384(JPG)(DGW), 3:10–cv–696(JPG)(DGW), 2011 WL 6729570 (S.D. Ill. Dec. 21, 2011).  As the district court explained:

> [*Dukes*] does not render certification under Rule 23(b)(2) improper. . . . [T]he relief sought . . . is for declaratory or injunctive relief that would apply to the class as a whole—a declaration that certain Plan provisions violate ERISA, an injunction requiring the Plan to cease implementing those Plan provisions and *reformation* of the Plan, plus an injunction requiring recalculation and payment of benefits under the proper calculations. Any monetary relief that might flow from such a decision is incidental, which [*Dukes*] does not foreclose. . . .

33

*Mezyk*, 2011 WL 6729570, at *2 (citation omitted and emphasis added).

More recently, in another ERISA class action including claims of "wear away," the Seventh Circuit directly addressed whether the certification of various subclasses under (b)(2) was appropriate in light of *Dukes*. *See Johnson v. Meriter Health Servs. Emp. Ret. Plan*, No. 12-2216, 2012 WL 6013457 (7th Cir. Dec. 4, 2012). The court concluded that reformation could be ordered consistent with Rule 23(b)(2):

> [A]ll that the subclasses are seeking, at least initially, is a reformation of the Meriter pension plan—a declaration of the rights that the plan confers and an injunction ordering Meriter to conform the text of the plan to the declaration. If once that is done the award of monetary relief will just be a matter of laying each class member's pension-related employment records alongside the text of the reformed plan and computing the employee's entitlement by subtracting the benefit already credited it to him from the benefit to which the reformed plan document entitles him, the monetary relief will truly be merely "incidental" to the declaratory and (if necessary) injunctive relief (necessary only if Meriter ignores the declaration).

*Johnson*, 2012 WL 6013457, at *6. Addressing the different possibilities available to the district court, the Seventh Circuit observed:

> Should it appear that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program, so that there is no need for notice and the concerns expressed in the *Wal–Mart* opinion are thus not engaged, the district court can award that relief without terminating the class action and leaving the class members to their own devices and also without converting this (b)(2) class action to a (b)(3) class action.

*Id.* at 7 (citing *Allison*, 151 F.3d at 415).

Agreeing with the reasoning in *Mezyk* and *Johnson*, the Court concludes that it may order reformation without disturbing the (b)(2) certification of the class. The Court can reform the CIGNA Plan consistent with Rule 23(b)(2), because the relief applies to

the class as a whole, and any monetary damages that will result flow directly and automatically from the reformation. Calculating damages under the reformed A + B plan would be a "mechanical process," *Amara II*, 559 F. Supp. 2d at 201, merely "a matter of laying each class member's pension-related employment records alongside the text of the reformed plan," *Johnson*, 2012 WL 6013457, at *6, rather than a complex process that would "require additional hearings to resolve the disparate merits of each individual's case" or "entail complex individualized determinations," *see Allison*, 151 F.3d at 415.

Surcharge, on the other hand, presents thornier issues under (b)(2). If the Court ordered surcharge on an unjust-enrichment theory, it would almost certainly have to certify a (b)(3) class. *See Haddock*, 460 F. App'x at 29 ("[I]f plaintiffs are ultimately successful in establishing [defendant's] liability on the disgorgement issue, the district court would then need to determine the separate monetary recoveries to which individual plaintiffs are entitled from the funds disgorged."). The Court need not resolve the issue, however, as it will exercise its remedial discretion to order reformation rather than surcharge. The Court therefore DENIES CIGNA's Motion to Decertify the Class [Doc. # 323].

## IV.

Judge Kravitz's prior remedies opinion, although finding its authority in § 502(a)(1)(B) rather than § 502(a)(3), was the result of careful calibration of the interests at stake. *See Amara II*, 559 F. Supp. 2d at 206–23. Insofar as Plaintiffs have renewed their request for relief broader than that which was previously ordered, the Court exercises its remedial discretion to limit the relief as follows.

1. With regard to CIGNA's failure to provide adequate notice, the Court ORDERS CIGNA to provide all members of the class, including rehires, with a § 204(h) notice regarding the transition to Part B within 60 days after judgment is entered. The new § 204(h) notice shall comply with current Treasury regulations.

2. With regard to CIGNA's misleading representations of additional benefits with no "wear-away" effect in the SMM and SPDs, the Court REFORMS the CIGNA Plan to reflect the fact that all class members must now receive A + B benefits, where "A" is the Part A benefit and "B" is the total of the cash balance pay and interest credits assigned after January 1, 1998. In other words, class members will receive (1) the full value of "their accrued benefits under Part A," including early retirement benefits, in annuity form; and (2) "their accrued benefits under Part B," in annuity or lump sum form. *Id.* at 222. Retirees and former employees shall receive past-due benefits "to be paid in a lump sum as well as the amount of the monthly annuity payments going forward." *Id.* at 217. The Court ORDERS and ENJOINS CIGNA Corp. to enforce the plan as reformed. *See Amara III*, 131 S. Ct. at 1876.

3. With regard to CIGNA's misrepresentations that all benefits would be protected, the Court concludes that the previous remedy—A + B relief—adequately addresses this violation as well. These representations provide an independent basis for the Court to REFORM the CIGNA Plan to reflect the fact that all class members must now receive A + B  benefits, and to ORDER and ENJOIN CIGNA Corp. to enforce the plan as reformed.

4.  With respect to class members who have already retired, the Court ORDERS that retirees and former employees will be entitled to receive the difference in value between the full-value of the Part A annuity (to which they are entitled under the "A+B" approach) and the lump sum; ORDERS that CIGNA Plan must provide new, accurate benefit election notices that reflect the Court's determinations regarding the appropriate procedure for providing additional remedial benefits; and ORDERS that any class member who has retired is entitled to prejudgment interest, calculated according to the methodology outlined in *Amara II*, 559 F. Supp. 2d at 221.[13]

5.  The Court ORDERS that all of the remedies provided in this opinion are to be stayed to allow the parties to pursue an appeal, if they so choose.  The Court also ORDERS that CIGNA post an appeal bond of forty million dollars to ensure that Plaintiffs' award will be paid, as Judge Kravitz previously required. *See Amara II*, 559 F. Supp. 2d at 222–23 (staying judgment but requiring that Defendants post a bond); Ruling and Order [Doc. # 300] at 1, 3 (setting the appeal bond at $40 million).  If CIGNA appeals, it shall post its bond on or before **January 22, 2013**. During the pendency of the appeal, either party may move to adjust the bond amount, if it becomes clear that the amount is either too low or too high.

---

[13] Neither party in their post-remand briefing specifically challenged Judge Kravitz's award of prejudgment interest for class members who already retired, or the manner in which it was to be calculated. The Court is thus led to believe that the parties assume that prejudgment interest does not raise issues distinct from those related to the other relief ordered.

6.  The issue of attorneys' fees remains to be decided.   Plaintiffs are directed to file an application for attorneys' fees and supporting documentation by **February 19, 2013** or, if there is an appeal, **thirty days** following the issuance of the Mandate from the United States Courts of Appeals for the Second Circuit.

7.  Finally, Defendants' Motion to Decertify the Class [Doc. # 323] is **DENIED**.   The parties' Joint Motion for Status Conference [Doc. # 376] is **DENIED** as moot. **The Clerk is directed to enter final judgment.**


                        IT IS SO ORDERED.

                        _____/s/_____
                        Janet Bond Arterton, U.S.D.J.


            Dated at New Haven, Connecticut this 20th day of December, 2012.