UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANICE C. AMARA, *individually, and on behalf of others similarly situated*,<br>    *Plaintiffs*, | )<br>)<br>)<br>) | 3:01-CV-02361 (SVN) |
| v.<br>CIGNA CORPORATION and CIGNA PENSION PLAN,<br>    *Defendants*. | )<br>)<br>)<br>)<br>) | <br><br><br><br>May 6, 2024 |

## RULING ON PLAINTIFFS' MOTION FOR ACCOUNTING OR POST-JUDGMENT DISCOVERY AND MOTION TO STRIKE

Sarala V. Nagala, United States District Judge.

In this long-pending class action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), two motions are currently before the Court. First, Plaintiffs have moved for an accounting or post-judgment discovery, based on their contention that Defendants (collectively, "Cigna") have improperly calculated award payments due to class members, in violation of previous Court orders. Second, in response to Defendants' sur-reply opposing Plaintiffs' motion for accounting, Plaintiffs moved to strike various portions of Defendants' sur-reply brief and its supporting declaration.

For the reasons that follow, Plaintiffs' motions are DENIED.

I.      BACKGROUND

This case has a lengthy and complex history, which has been set forth in numerous prior rulings in this case and with which the parties' familiarity is presumed. The Court thus provides only the background necessary to explain its decision on the present motions.

In 2001, Plaintiffs and others similarly situated brought this action, claiming that Cigna had violated ERISA in its switch from a defined benefit pension plan ("Part A") to a cash balance plan ("Part B"). After a bench trial, Judge Mark R. Kravitz found in favor of Plaintiffs and held

that, though the switch to Part B was ultimately proper, it was not accompanied by appropriate disclosures regarding the impact of the change to Part B. *Amara v. Cigna Corp.*, 534 F. Supp. 2d 288 (D. Conn. 2008). To address these violations, Judge Kravitz crafted a remedy which reformed the Cigna plan to provide class members "all accrued Part A benefits in the form those benefits were available under Part A, plus all accrued Part B benefits in the form those benefits were available under Part B" ("A+B relief" or "*Amara* benefit"). *Amara v. CIGNA Corp.*, 559 F. Supp. 2d 192, 214 (D. Conn. 2008). Following a Supreme Court decision regarding which ERISA provision could properly authorize such an award, *see CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), Judge Janet B. Arterton found that the reformation of the Plan to afford A+B relief previously awarded by Judge Kravitz was authorized under the ERISA provision identified by the Supreme Court, and was the appropriate remedy for Cigna's violations of ERISA. *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 265 (D. Conn. 2012), *aff'd*, 775 F.3d 510 (2d Cir. 2014).

After A+B relief was affirmed by the Second Circuit, the project of implementing this relief began. This project was, to say the least, not a simple one, and itself spawned several more years of litigation. In short, a methodology had to be adopted that would allow Cigna to measure the Part A piece of the A+B relief that class members were owed. This was complex in part because the benefits class members accrued under Part A prior to the Plan transition in 1998 had been rolled over as a lump sum to form the opening cash balance (the "Initial Retirement Account") of the Part B accounts. *See* Defs.' Opp. Br., ECF No. 618 at 8. After years of accumulating interest and benefit credits in the Part B account, the piece of the Part B account that appropriately represented the Part A benefit was difficult to ascertain. *See* ECF No. 486 at 5 (noting that Cigna "has not maintained records of the amounts each class member accrued under Part A"). And, while the Part A plan had to be taken in the form of an annuity (and thus, the *Amara* benefit would

be in the form of an annuity), the Part B plan provided for payment in the form of either a lump sum or an annuity. Furthermore, Cigna was entitled to credit itself for the Part A benefits it provided to class members under Part B through the Initial Retirement Accounts (the "offset"). Thus, in order to calculate A+B relief, a complex methodology was adopted, across a series of rulings by Judge Arterton, to determine the value of the Part A annuity—essentially by working backward from the Part B benefits. *See, e.g.*, ECF Nos. 459, 485, 486.

Of particular relevance to the motions before this Court, one aspect of the methodology that was challenged and decided (in 2017) was the use of "floor rates" in the calculation of the A+B remedy. By way of background, Cigna's Part B Plan provides that an annuity paid under Part B shall be calculated using the "Applicable Interest Rate," which is defined as the annual rate of interest on 30-year Treasury securities, for November of the year before benefits are commenced, unless the annuity produced using that number is *lower* than the Applicable Interest Rate in effect as of July 1, 2009 (the "floor rate"). *See* Pls.' Mot. for Disc. Ex. 1, ECF No. 614-1 §§ 1.6, 7.1. Previously, in connection with deciding whether Cigna could use the Plan's "floor rates" to add interest to the offset amounts for participants who had elected to receive their Part B benefits in a lump sum, the Court held that "use of floor rates is inappropriate for the calculation of the offset," because those rates fixed interest rates at an "artificial floor" which was not actually representative of the value received by class members who had received their Part B benefits as a lump sum; in other words, Cigna could not receive credit for an amount that was greater than that actually provided. *See* ECF No. 485 at 6[1]; *see also* ECF No. 486 at 15.

Plaintiffs' central argument in the motions before the Court is that Cigna has disobeyed this Court's orders by using the floor rates to calculate the offset for participants who elected to

---

[1] This opinion is published at *Amara v. Cigna Corp.*, No. 3:01-CV-2361 (JBA), 2017 WL 88968 (D. Conn. Jan. 10, 2017), *on reconsideration on other grounds*, No. 3:01-CV-2361 (JBA), 2017 WL 10902877 (D. Conn. July 14, 2017).

3

receive their Part B benefits in annuity form, leading to a greater offset and decrease in the A+B relief available to class members than is allowed. They also argue that the notices provided to class members have violated Court orders in a variety of ways. For its part, Cigna stresses that it does not use floor rates in an inappropriate manner, and that it has been and continues to implement A+B relief in compliance with all of this Court's orders.

The Court addresses Plaintiffs' motions below.

## II.     MOTION FOR ACCOUNTING OR POST-JUDGMENT DISCOVERY

### A. Legal Standard

This Court has already held that it has the authority to order the relief sought by Plaintiffs as part of its jurisdiction to enforce its judgments and orders. *See* ECF No. 486 at 20 (in the context of denying Plaintiffs' request for a compliance plan, recognizing the Court possesses "inherent authority" to enforce its judgment) (citing *Riggs v. Johnson Cnty.*, 73 U.S. 166, 187 (1867)); ECF No. 606 at 8 (in the context of denying Plaintiffs' first motion for accounting, recognizing that "this Court indeed has the authority to order a post-judgment accounting").[2] Although Judge Arterton previously noted that there is "scant case law on the propriety of a post-judgment accounting in the absence of a contempt finding," *see* ECF No. 606 at 9, courts in this Circuit and elsewhere have generally recognized that a party seeking relief designed to allow for the enforcement of a Court order must make some showing that a Court order has been violated. *See id.* at 11; *Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 100–01 (D.D.C. 2015) (requiring evidence that a non-moving party has "not fully complied with the court's earlier orders"); *California Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008); *Massachusetts Union of Pub. Hous. Tenants, Inc. v. Pierce*, 1983 WL 150, at *4 (D.D.C. 1983) (recognizing the

---

[2] This opinion is published at *Amara v. Cigna Corp.*, No. 3:01-CV-2361 (JBA), 2020 WL 4548135 (D. Conn. Aug. 6, 2020), *aff'd*, 53 F.4th 241 (2d Cir. 2022).

4

"undisputed" power of a court to enforce its orders, and finding that "[b]efore being permitted to take extensive discovery on the issue of compliance with a court's order, the party seeking such discovery bears the burden of making a *prima facie* case that there has in fact been disobedience of the order"); *N. W. Controls, Inc. v. Outboard Marine Corp.*, 349 F. Supp. 1254, 1256 (D. Del. 1972) (substantially same); *Damus v. Nielsen*, 328 F.R.D. 1, 3 (D.D.C. 2018) (discovery should be granted if "significant questions regarding noncompliance with a court order have been raised") (citation omitted) (cleaned up); *Floyd v. City of New York*, No. 08 CIV. 1034 (AT), 2020 WL 3819566, at *4 (S.D.N.Y. July 8, 2020) (same, citing *Abdi v. McAleenan*, 2019 WL 1915306, at *2 (W.D.N.Y. Apr. 30, 2019)).

B. Discussion

The parties dispute neither this legal standard nor the Court's authority to order the requested relief, should it find the standard met. Thus, the question for the Court is whether, as applied here, Plaintiffs have raised "significant questions regarding noncompliance with a court order" sufficient to justify the remedy sought. *See Floyd*, 2020 WL 3819566, at *4 (citation omitted).[3] For the reasons discussed below, the Court finds they have not and thus, their motion is DENIED.

1. *Floor Rates*

First, the Court concludes that Plaintiffs have not raised significant questions regarding Defendants' compliance with this Court's previous orders regarding the use of floor rates.

---

[3] Plaintiffs suggest that the standard for an accounting is distinct, in that a trust beneficiary need only show that its fiduciaries "have records about the implementation of a trust that they are sharing among themselves and with others," but not with trust beneficiaries, and that "such records include information related to compliance with fiduciary duties." *See* ECF No. 614 at 9. As Plaintiffs do not analyze Defendants' conduct by this standard, but instead repeatedly assert that Defendants failed to comply with Court orders, the Court finds it appropriate to utilize the standard expounded in the cases above, and by Judge Arterton in assessing Plaintiffs' previous motion for accounting.

Plaintiffs argue that Defendants have been using the floor rates to calculate offsets for class members who select an annuity under Part B, in violation of Judge Arterton's previous orders prohibiting such use. *See* ECF Nos. 485 at 5–6, 486 at 16. Defendants vehemently dispute this contention, arguing that, though they do use floor rates to calculate the annuities owed under Part B in cases where the floor rate provisions of the Plan apply, they do not use the floor rates to convert that number into the offset figure (*e.g.*, to convert the Part B annuity into a lump sum value, and then back into a single-life annuity). Thus, the floor rates are "incorporat[ed]" in the offsets, by virtue of being a part of the annuity payment itself, but are not used in the manner clearly prohibited by Judge Arterton, to convert Part B payments into offsets. *See* ECF No. 618 at 26. Cigna contends that offsetting the Part B annuity amounts actually paid to Plan participants— even insofar as those amounts incorporate use of the floor rates to calculate the annuity—is consistent with the Court's approved methodology, which was intended to give Cigna credit for amounts it actually paid to plan participants, as close to "mathematically equivalent as possible." *See Amara*, 559 F. Supp. 2d at 217 (Kravitz, J.) ("The Court intends through this [offset] procedure that the lump sum plus interest and the annuity payments otherwise due to date will be made as mathematically equivalent as possible, to minimize any overpayment on the CIGNA Plan's part."). Plaintiffs, in reply, again claim that this method violates the previously approved methodology, as they interpret Judge Arterton's orders as holding that floor rates were not supposed to be used *at all* in the calculation of offsets, including in the calculation of the Part B annuity itself. *See* Pls.' Reply Br., ECF No. 623 at 13. At oral argument, Plaintiffs clarified their position that the offset was intended to be calculated only from the amount of the Initial Retirement Account rolled over from Plan A to Plan B, and was not intended to provide Cigna the benefit of any additional amounts it paid if a participant elected to receive their Part B amount in annuity form.

6

The Court holds that the manner in which Defendants use the floor rates, to calculate the Part B annuity payment owed to class members in accordance with the Plan provisions at section 7.1, and then to take an offset of that amount, does not run afoul of Judge Arterton's prior rulings. First, these orders were clearly limited to the use of floor rates in "calculating the rate used to convert lump sums to annuities or to calculate the offset" for participants who had received their Part B benefits in a lump sum, *see, e.g.*, ECF No. 486 at 16—they did not prohibit the use of floor rates in the broad manner Plaintiffs now suggest. Judge Arterton's rationale supports this reading. The primary reason she precluded the use of floor rates in calculating the offset for participants who had already received a lump sum of their Part B benefits was because the lump sums themselves had not been calculated using floor rates but were "simply . . . the amounts indicated in the cash balance accounts." ECF No. 485 at 6. Thus, allowing Cigna to credit itself by using the floor rates, which were higher than market interest rates, for purposes of the offset for participants who had already received a lump sum payment would be inequitable because the floor rates were merely offered to those who elected an annuity payment under the plan, not actually paid to those who had already received a lump sum, and the "value of the lump sum from a beneficiary's point of view is better measured by rates available to the beneficiary." *Id.* at 5–6. In other words, Cigna could not benefit from the use of floor rates when crediting itself for lump sum payments already made (by using them to create a higher offset based on the amount paid under Part B), because those "internal [Plan] rates" were not "available to Plan beneficiaries who took their benefits as lump sums," and were, in any event, "artificial." *Id.* at 6. In that sense, Judge Arterton endorsed Cigna's present view that it should receive credit for value actually provided to participants.

7

Judge Arterton's ruling, however, very clearly cabined itself to the use of floor rates to calculate the offset *for participants already paid lump sums*.[4] It was silent about the use of floor rates to calculate a Part B annuity payment, although it implicitly seems to recognize a distinction between an annuity *offered* (but ultimately not accepted, by a class member who took a lump sum instead), and an annuity received. *See, e.g.*, *id.* at 5–6 (rejecting "Cigna's insistence that it receive credit for annuities it merely *offered* [as] misplaced since the benefits were taken as lump sums"). To be sure, Cigna should not (and indeed, does not) use the floor rates to re-annuitize Part B annuities received by class members. Cigna's present use of the floor rates in calculating the Part B annuity itself does not create the same issues previously identified, and resolved, by Judge Arterton.[5]

Nor can Plaintiffs demonstrate that Cigna's use of floor rates is inappropriate by demonstrating that certain class members ultimately received benefits that were lower than the potential benefit they were notified they might receive in January of 2019. *See, e.g.*, ECF No. 614 at 12–16. Contrary to Plaintiffs' assertions, it is clear that the notices sent out in January of 2019 provided only an estimate of the relief class members could expect to receive. Although Plaintiffs are correct that the notice did not advise class members that the form of election could impact the remedy, it did clearly advise, as Plaintiffs recognize, that the date of benefit commencement and age of benefit selection could impact the remedy payment due. *See* Pls.' Mot. for Disc. Ex. 6, ECF

---

[4] The Court notes that the parties have not identified any Court orders specifically addressed to annuitants, as opposed to class members who received lump sums under Part B. This may be because the vast majority of class members appear to have elected to take their Part B benefits in lump sum form. *See Amara*, 559 F. Supp. 2d at 215 n.8 (Kravitz, J.) ("The Court assumes that most retirees will elect to take their additional Part B benefits in the form of a lump sum, given that approximately 95% of retirees chose a lump sum originally.").

[5] While Plaintiffs argue that the use of floor rates decreases the *Amara* benefit, Cigna contends that the use of floor rates when calculating Part B annuity payments ultimately leads to higher total retirement benefit payments to class members, *see, e.g.*, Defs.' Sur-Reply Br., ECF No. 628 at 8, though also, as a result, to a higher ultimate offset to Cigna. The Court need not address this dispute, as the relevant question is not the amount of the A+B relief paid out, but whether it was calculated in accordance with previous Court orders.

No. 614-6 at 4.[6]  As Judge Arterton recognized in the context of authorizing Section 204(h) notice in this case, the notices provided "sufficient information for each applicable individual to determine the *approximate magnitude* of the expected reduction for that individual," and that, while further information could make them "more precise," it carried the "attendant risk of making them . . . more difficult to understand."  *See* ECF No. 507 at 16[7]; *see also* ECF No. 550 at 6 (recognizing, in the context of evaluating attorneys' fees, that the "remedy awards may be greater or lesser depending on how class members choose to exercise their rights under the reformed Plan").  Although Judge Arterton expressed that the methodology applied across the class should be consistent, and payments made as promptly as possible, there is no Court order requiring Cigna to pay beneficiaries the same amount it estimated they might be owed in January of 2019.  In fact, as clarified at oral argument, the January 2019 notices themselves were not even explicitly approved by the Court (though they were attached to a subsequent status report, *see* ECF No. 567-5).  The Court only ordered that the parties exchange "their individual results for each class member," for inclusion in the notices, and set deadlines for the mailing of the notices and for Cigna to pay *past due* benefits, *see* ECF No. 555 at 11; thus, the Court cannot find that Defendants, in paying out amounts other than those listed in the January 2019 notices or in modifying the notices over the years, is in violation of any Court order.

Perhaps recognizing that Defendants do not use the floor rates in the precise manner proscribed by Judge Arterton, Plaintiffs then slightly shift their argument to claim that Defendants' current approach to the use of floor rates represents a change in their methodology, apparently

---

[6] In addition, the notices recognize that the calculation of the remedy is disputed, and provide two calculations of the remedy, one from Cigna counsel and one from class counsel, *see id*.  It is thus difficult to see how Plaintiffs' contention that these numbers were set in stone could be accurate.

[7] This opinion is published at *Amara v. CIGNA Corp.*, No. 3:01-CV-2361 (JBA), 2017 WL 10902877 (D. Conn. July 14, 2017).

taking issue with the fact that Defendants use the Part B amount actually paid out (which, in appropriate instances, incorporates the floor rate) as the starting point in their offset calculation, rather than the amount of the Initial Retirement Account itself. *See, e.g.*, ECF No. 623 at 6–7; Pls.' Reply App. A, ECF No. 623-1, Holland Supp. Decl. ¶ 21 (suggesting a "simple[r] approach" for calculating the offset, starting from the opening account balance with interest). This argument, too, is unavailing, as the Court credits Defendants' position that it has consistently used the amount actually paid under Part B as the starting point for offset analysis, which is well-supported by the numerous sample calculations on the docket and sent to Plaintiffs. *See, e.g.*, ECF No. 486 at 12 (showing a methodology for individuals already paid a lump sum that starts with the "lump sum paid," then converted into an annuity to start the offset calculation); Reiss Email to Plaintiffs' Counsel dated May 5, 2017, ECF No. 585-1 (showing net remedy benefit due calculations that subtract annual life annuity equivalent of Part B benefit paid in line VI(b)); Defs.' Opp. Br. Ex. 1, ECF No. 618-2 (sent in 2017 and 2018, according to Gay Decl. ¶ 10, and showing "annual annuity paid" at line V(a), to calculate the offset, matches IB(c) under Part B); ECF No. 618-38, Reiss Decl. ¶¶ 2–4 (describing transmission of spreadsheets to Plaintiffs' counsel); Pls.' Reply Br. Ex. 11, ECF No. 623-3 at 8 (showing "annual annuity paid" at line V(a)); *id.* at Ex. 12, ECF No. 623-4 at 4. Although Plaintiffs are correct that none of these sample calculations show on their face the use of floor rates to reach the starting "annuity paid," they all clearly demonstrate that the "annuity paid," in cases where a participant selected an annuity, was the starting point from which the offset was calculated. These examples illustrate the common methodology used by Defendants over many years as, with respect to annuitants and class members who select a lump sum, Cigna appears to have always begun offset calculations with the amount of the benefit received. *See* ECF No. 507 at 12 (noting Court's intention that the remedy "be calculated uniformly across the entire

class"). The Court does not find that this methodology raises significant questions with regard to Cigna's compliance with a previous Court order.

When questioned at oral argument about why Plaintiffs did not contest this aspect of Cigna's methodology when these sample calculations were received years ago, Plaintiffs' counsel stumbled over an answer, and then proffered that Judge Arterton had precluded such an argument. That is true, but she did so in July of 2018 and August of 2019 because Plaintiffs were, even then, belated in raising their methodology concerns. *See* ECF No. 618 at 14 (citing transcript of status conference at ECF No. 538); ECF No. 579 at 5[8] ("declin[ing] to entertain" methodological dispute that could have been brought up in methodology-related briefing); *see also Amara v. Cigna Corp.*, 53 F.4th 241, 256 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 2484, 216 L. Ed. 2d 448 (2023) (finding no abuse of discretion in Judge Arterton's conclusion that Plaintiffs had waived certain arguments by failing to raise them at an earlier time). Given the numerous ways Plaintiffs have challenged Cigna's calculations over time, and the fact that these issues could have been raised regardless of (and well before) any of Judge Arterton's admonitions, the Court finds that Plaintiffs' suggestion that a fundamental aspect of this methodology (using the Part B payment to calculate the offset) is somehow inappropriate is too little, too late.

2. *Small Benefit Cashouts*

Lastly, and for the first time in reply, Plaintiffs argue that the change in Defendants' methodology is illustrated by the fact that Defendants did not use floor rates to calculate payments for class members entitled to a "small benefit cashout." ECF No. 623 at 7. In their sur-reply, Defendants seized on this point and stated that small benefit cashout recipients (individuals whose *Amara* remedy is paid out as a lump sum if it falls below a $5,000 threshold) in fact did have their

---

[8] This decision is also available at *Amara v. Cigna Corp.*, No. 3:01-CV-2361 (JBA), 2019 WL 3854300 (D. Conn. Aug. 16, 2019), *aff'd*, 53 F.4th 241 (2d Cir. 2022.

11

Part B annuities calculated using floor rates, where applicable, and that, like all other class members, this Part B annuity then formed the starting point for an offset calculation. *See* ECF No. 628 at 6; Defs.' Sur-Reply Br. Ex. 1, Gay Supp. Decl. ¶ 3. This dispute over the proper method for calculating the small benefit cashouts spurred, in part, Plaintiffs' motion to strike, which in turn generated three more briefs on this issue. *See* Pls.' Mot. to Strike, ECF No. 629, Defs.' Opp. to Strike, ECF No. 630, Pls.' Reply in Support of Strike, ECF No. 631.

As an initial matter, the Court notes that arguments raised for the first time in a reply brief are generally deemed waived. *See Tardif v. City of New York*, 991 F.3d 394, 404 n.7 (2d Cir. 2021). Plaintiffs' actual argument—that Defendants' improper calculation of the small benefit cashouts justifies the original remedy sought, an accounting and post-judgment discovery—is made in its motion to strike. The motion to strike is "enigmatically" styled as such, *see* ECF No. 459 at 1 n.1 (noting that Plaintiffs had "enigmatically" filed motions for extension of time which really sought a Court order regarding methodology disputes), since Plaintiffs argue alternatively that Cigna's statements regarding small benefit cashouts are false and misleading (because this was not how benefits were calculated), and that, *accepted as true*, these statements demonstrate the need for post-judgment discovery. *See, e.g.*, ECF No. 629 at 8 (claiming there is a "need for an accounting/post-judgment discovery to uncover what is going on"). Indeed, Cigna's argument that Plaintiffs' motion to strike is really an improper sur-sur-reply filed without leave is well-taken, and to the extent Plaintiffs invite the Court to construe it as such, it is declined.

Properly construed as a motion to strike, the Court does not find that Plaintiffs have demonstrated any statements were false and misleading—especially where Plaintiffs do not specify which statements they contend require striking. In any event, the Court notes that the parties' representations regarding the payment of small benefit cashouts do not affect its holding

above regarding floor rates. The Court accepts Defendants' argument that it used the floor rates permissibly to calculate Part B annuities for small benefit cashout class members who commenced such an annuity after 2009, consistent with how it used them for Dr. Kleinigger, Ms. Sabatella, and others who elected a Part B annuity after 2009 but were not considered small benefit cashout class members. At oral argument, Cigna explained that the 7,300 small benefit cashout class members were entitled to *Amara* remedy annuity payments less than $5,000 after deducting attorneys' fees, but may also have had large Part B cash balance benefits owed them. Cigna appropriately distinguishes between using the value of those Part B cash balance benefits when calculating the *eligibility* of a class member for a small benefit cashout from whether it is entitled to take an offset from any such Part B benefits ultimately paid to the class member.[9] Any other reading of Judge Arterton's small benefit cashout order, ECF No. 560, would result in a windfall to certain members of the class, who would have no offset taken for Part B benefits regardless of the value of those benefits, simply because the value of their *Amara* remedy annuity was less than $5,000.[10]

In sum, to the extent Plaintiffs' motions rely on Defendants' allegedly improper use of floor rates in benefit calculations, they are DENIED.

---

[9] Plaintiffs objected at argument to Defendants' Exhibit 1, which purported to demonstrate the method for calculating small benefit cashouts. The Court allowed Cigna to use the exhibit to explain its position during the hearing, but it does not rely on the exhibit in this Ruling.

[10] The Court notes that, to the extent there is ambiguity in Judge Arterton's small benefit cashouts order, it is likely the result of Cigna's unclear drafting of the proposed order, which Judge Arterton adopted without change. *See* ECF No. 560 at 1 (ordering that Cigna shall pay lump sums to class members "where the value of the future remedial annuity to which the class member is entitled is equal to or less than $5,000 (after deducting attorneys' fees) *regardless* of any back benefits or Part B cash balance benefits as to which the class member also is entitled (or has received)" (emphasis added). But Plaintiffs have provided no creditable response to Cigna's assertion that prohibiting it from receiving an offset for the portion of Part B cash balance benefits paid to the class member—which could be in the range of hundreds of thousands of dollars, even if the *Amara* remedy annuity is $5,000 or less—would result in an undue windfall. In addition, as noted at oral argument, it is likely that Plaintiff's view would essentially eliminate the group of small benefit cashouts entirely, a result which Plaintiffs, and this Court's prior orders, do not appear to intend—particularly since all of these class members have already been paid. The Court therefore reads Judge Arterton's ruling in a commonsense manner, and concludes that Cigna's method for offsetting small benefit cashout class members' Part B cash balance benefits comports with the Court's prior orders.

### 3. Notices to Class Members

Plaintiffs also make several arguments that the notices Cigna provided to class members violated Court orders and, in turn, "enable[d] the non-compliant recalculations and offsets to the relief." *See* ECF No. 614 at 16.

First, Plaintiffs take issue with the fact that class members were not notified until September 2020 that the form of their Part B benefit could impact their A+B relief. See ECF No. 614 at 12; ECF No. 614-5 at 4. Although Defendants have demonstrated that certain employees received letters in August of 2019 that informed them that there could be an impact on their *Amara* benefit depending on the "form of payment you elect for [the] Part B benefit," *see* Defs.' Opp. Br. Ex. 17, ECF No. 618-20 at 2, Plaintiffs' point appears to be that the fact that this fact was not disclosed in earlier communications (including the January 2019 notice) demonstrates the change in Defendants' methodology to disfavor participants who selected an annuity under Part B. As discussed at length above, the Court does not find that Defendants have changed their methodology for calculating A+B relief. And, without that, the Court does not find that the September 2020 (or August 2019) notices in themselves demonstrate any violation of Court orders. That new information may have been included in the notices over time, or that more specific notices were provided to specific employees at the time they were benefit-eligible (even if those notices were not explicitly approved by the Court) does not reflexively mean those notices violated a Court order. This is especially true because, as discussed above, the original January 2019 notice was not explicitly approved by the Court and, as counsel explained at argument, was merely modeled on the class notices previously sent out. *See* ECF No. 507 at 16 (recognizing in the context of Section 204(h) notice that notices could provide further information which would make them "more precise," but not requiring such information).

14

Moreover, Plaintiffs' counsel has known for years that the form of benefit election under Part B impacts the ultimate benefit. As discussed above, Defendants repeatedly provided Plaintiffs with sample calculations in 2017 and 2018 showing that there are different steps in the offset equation for a lump sum versus an annuity, resulting in a different *Amara* remedy calculation. *Compare, e.g.*, ECF No. 623-3 at 7 (lump sum) *to* 623-3 at 8 (annuity). Thus, it should be no surprise to Plaintiffs (nor is it a surprise to the Court) that the form of benefits elected impacts the ultimate A+B benefit. The Court does not find that any of Cigna's notices, or its alleged failure to disclose the impact of the type of benefit selected earlier, have violated a previous Court order or raised a "significant question" regarding such a violation.

Plaintiffs next argue that Cigna switched to an improper two-step benefit election process, wherein Part A forms were sent only after the election of Part B benefits, rather than sending all forms at the same time, which deprived class members of potential benefits. Defendants admit that, between 2019 and 2021, Part B election paperwork was provided to recently terminated employees 55 or older, and that this paperwork stated that the Part A election paperwork would be sent separately within 90 days, but that today all paperwork (Part A and B) is mailed at the same time. *See* ECF No. 618 at 34 n.17.

It is not quite clear what Court order Plaintiffs contend this process violated. In their opening brief, Plaintiffs first stated that this two-step process went against the "August 3, 2018 Proposed order" presented to the Court, *see* ECF No. 614 at 7 (citing Pls.' Mot. for Disc. Ex. 4, ECF No. 614-4); however, Plaintiffs do not address Defendants' contention that this proposal was one of many versions submitted to the Court, which was ultimately never adopted, *see* ECF No. 618 at 24 n.9. As such, the Court does not find that the failure to provide benefit election forms in

the manner and at the time provided for by an unadopted proposed order raises significant questions regarding Defendants' compliance with the judgment.[11]

To the extent Plaintiffs' challenge is targeted at Defendants' general position that the Part A relief is "condition[ed] . . . on commencement of Part B," *see* ECF No. 623 at 11; ECF No. 614 at 18, Plaintiffs have likewise not shown how this violates a previous Court order. Although Plaintiffs point out that Judge Arterton ordered Defendants to "begin implementing the remedy as quickly as possible," *see* ECF No. 555 at 11, this is insufficient to demonstrate that Defendants had been ordered to provide Part A relief for all class members regardless of their Part B status, especially where Plaintiffs' first motion for accounting (which raised a similar argument) was rejected, *see* ECF No. 606 at 8, 12, and the question of whether or not this issue had been decided was clearly disputed by the parties even after a number of Judge Arterton's methodology rulings, *compare* ECF No. 558 at 5 (stating Plaintiffs' position that the Court has decided the issue) *to* ECF No. 559 at 3–4 (stating Cigna's position that the Court decided remedy payments would be calculated after Part B commencement). As the issue of conditioning Part A relief on commencement of Part B benefits has been raised essentially in passing in the briefs before the Court, and not been squarely presented, and the Court declines the invitation to take it up further.

Lastly, Plaintiffs argue, again for the first time in reply, that the notices provided by Cigna between 2019 and 2021 were deficient because they violated Treasury Regulation 1.417(a)(3)-1 by not providing information "showing the impact on the Part A benefits of the various forms of Part B payment." *See* ECF No. 623 at 12. They aver that this argument responds to "new

---

[11] The Court notes that, to the extent Plaintiffs take issue with the fact that class members may have to wait to receive Part A benefits until after they elect Part B, and that this later start could impact the amounts they receive, *see* ECF No. 614 at 18, this concern seems to be addressed by the fact that Defendants use "the same benefit commencement date for Parts A and B . . . and true[] up class members for any 'delay' between the official Part A benefit commencement and first Part A payment." *See* ECF No. 618 at 25.

16

information" in Mr. Gay's declaration. *See id.* Defendants, in their sur-reply, argue that they have always provided all relative value disclosures required by the relevant Treasury regulation, and that the information Plaintiffs now claim was necessary to provide is not required by the regulation. ECF No. 628 at 10–11. As with Plaintiffs' argument regarding small benefit cashouts, Plaintiffs seized on Defendants' sur-reply in their motion to strike, arguing further that Defendants failed to comply with Treasury regulations in their disclosures. ECF No. 629 at 8–11; ECF No. 631 at 7–8. Once again, the Court notes that Plaintiffs' "motion to strike" does not appear to seek to strike anything at all related to the Treasury regulation issue, and it is therefore denied on that basis alone.

Furthermore, even were the Court to consider this argument, it would not justify the ultimate relief sought by Plaintiffs. Although Defendants of course have a general obligation to comply with any relevant regulations, Plaintiffs have pointed to no Court order in this case stating that Cigna needed to provide the relative value disclosure Plaintiffs now argue are required. To the extent the parties disagree on the interpretation of the requirements of the Treasury regulation, *compare* ECF No. 630 at 12 *to* ECF No. 631 at 8, this Court declines to opine on the merits of the issue where it is not properly presented to the Court. The Court's scope here is narrow, and focused on the question of whether Plaintiffs have raised "significant questions" regarding Defendants' compliance with Court orders—Defendants' compliance or non-compliance with a Treasury regulation, especially where the Court is only presented with the parties' competing legal interpretations on an issue first raised on reply, does not speak to this question. In other words, the Court declines Plaintiffs' invitation to explore this novel legal issue (which essentially seeks to raise an entirely new claim) through the vehicle of a motion for accounting or post-judgment discovery and a motion to strike.

In sum, Plaintiffs' motion for accounting or post-judgment discovery is DENIED.

### III. REMAINING ARGUMENTS IN MOTION TO STRIKE

Although the Court has addressed the majority of Plaintiffs' motion to strike above, given its significant overlap with arguments raised in the motion for accounting or post-judgment discovery, the Court briefly notes that it also rejects Plaintiffs' remaining arguments made in the motion to strike; namely, that Mr. Gay's statements (again, it is not clear which ones) should be stricken because he "appears to lack personal knowledge or be misinformed," *see* ECF No. 629 at 3, that a special master is needed to perform an accounting, *see id.* at 11, and that Defendants falsely contend that Plaintiffs have not explained what discovery they require, *see id.*

Plaintiffs' claim that Mr. Gay lacks personal knowledge because he never actually communicated with Plaintiffs' counsel, ECF No. 629 at 6, does not justify striking any portion of Mr. Gay's supplemental declaration. First, Mr. Gay declares only that certain information "[was] shared" with Plaintiffs' counsel, not that he shared it directly. *See* Gay Supp. Decl., ECF No. 628-1, ¶ 4. In any event, it appears that the file referenced by Mr. Gay was shared with Plaintiffs, *see* ECF No. 629 at 7, although they dispute what information was contained therein. Thus, there is nothing false or misleading in Mr. Gay's declaration. As the Court has denied Plaintiffs' motion for accounting or post-judgment discovery, it accordingly denies as moot Plaintiffs' requests to appoint a special master and strike Defendants' statement that they did not explain adequately what discovery was needed.

### IV. CONCLUSION

For the reasons described herein, Plaintiffs' motion for accounting and/or post-judgment discovery and Plaintiffs' motion to strike are DENIED.

**SO ORDERED** at Hartford, Connecticut, this 6th day of May, 2024.

                                             /s/ *Sarala V. Nagala*
                                            SARALA V. NAGALA
                                            UNITED STATES DISTRICT JUDGE